| | |
|---|---|
| **BLEICHMAR FONTI & AULD LLP**<br>Lesley E. Weaver (Cal. Bar No.191305)<br>555 12th Street, Suite 1600<br>Oakland, CA 94607<br>Tel.: (415) 445-4003<br>Fax: (415) 445-4020<br>*lweaver@bfalaw.com* | **DICELLO LEVITT GUTZLER LLC**<br>David A. Straite (admitted *pro hac vice*)<br>One Grand Central Place<br>60 E. 42nd Street, Suite 2400<br>New York, NY 10165<br>Tel.: (646) 993-1000<br>*dstraite@dicellolevitt.com* |
| **SIMMONS HANLY CONROY LLC**<br>Jason 'Jay' Barnes (admitted *pro hac vice*)<br>112 Madison Avenue, 7th Floor<br>New York, NY 10016<br>Tel.: (212) 784-6400<br>Fax: (212) 213-5949<br>*jaybarnes@simmonsfirm.com* | **PRITZKER LEVINE LLP**<br>Elizabeth C. Pritzker (Cal. Bar. No. 146267)<br>1900 Powell Street, Suite 450<br>Emeryville, CA 94608<br>Tel.: (415) 692-0772<br>Fax: (415) 366-6110<br>*ecp@pritzkerlevine.com* |
| **COTCHETT, PITRE & McCARTHY, LLP**<br>Nanci E. Nishimura (SBN 152621)<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br>Tel.: (650) 697-6000<br>Fax: (650) 697-0577<br>*nnishimura@cpmlegal.com* | **BOTTINI & BOTTINI INC**<br>Francis A. Bottini, Jr. (SBN 175783)<br>7817 Ivanhoe Avenue, Suite 102<br>La Jolla, California 92037<br>Telephone: (858) 914-2001<br>Facsimile: (858) 914-2002<br>*fbottini@bottinilaw.com* |

*Counsel for Consolidated Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| BENJAMIN HEWITT and KIMBERLEY WOODRUFF, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br>Defendant. | Case No. 5:21-cv-02155-LHK-VKD<br><br>CLASS ACTION<br><br>**DECLARATION OF JASON 'JAY' BARNES IN SUPPORT OF MOTION FOR 23(g) APPOINTMENT** |
| MEAGHAN DELAHUNTY, MEGHAN CORNELIUS, and JOHN KEVRANIAN, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v. | Consolidated Case No. 5:21-cv-03360-LHK<br><br>CLASS ACTION |

| | |
|---|---|
| GOOGLE LLC,<br>              Defendant. | |
| SALVATORE TORONTO, *on behalf of himself and all others similarly situated*,<br>              Plaintiffs,<br>     v.<br>GOOGLE LLC,<br>              Defendant. | Consolidated Case No. 5:21-cv-03725-LHK<br><br><u>CLASS ACTION</u> |

**DECLARATION OF JASON "JAY" BARNES**

I, JASON "JAY" BARNES, hereby declare under penalty of perjury:

1. I am an attorney who has been admitted to practice before this Court *pro hac vice* in the above-captioned matter.

2. I am a shareholder at the law firm Simmons Hanly Conroy, LLC, who, along with the law firms Bleichmar Fonti & Auld LLP, Pritzker Levine LLP, and Dicello Levitt Gutzler, represent Plaintiffs in the above-captioned *Hewitt* matter.

3. I submit this Declaration in support of the proposed leadership structure set forth in the Consolidated Plaintiffs' Joint Motion for Appointment of Interim Lead Counsel and Memorandum in Support, which moves for the appointment of the following interim lead counsel:

- Elizabeth C. Pritzker of Pritzker Levine LLP – Chair Lead/Liaison;
- Lesley E. Weaver of Bleichmar Fonti & Auld LLP;
- Jason 'Jay' Barnes of Simmons Hanly Conroy LLC;
- David A. Straite of DiCello Levitt Gutzler LLC;
- Nanci Nishimura of Cotchett, Pitre, & McCarthy LLP; and
- Francis A. Bottini, Jr. of Bottini & Bottini Inc.

4. I am a member in good standing of the State bar of Missouri since 2005 and am admitted to practice in the United States Supreme Court and the United States Court of Appeals for the Second, Third, Seventh, and Ninth Circuits.

5. As a proposed interim lead counsel in this case, I have expended considerable time, energy, and resources to investigate and identify the potential claims in this action, and I am fully committed to pursuing the claims on behalf of Plaintiffs and the proposed class. As set forth below, I have significant experience managing complex class actions related to Internet privacy, and my law firm has the necessary resources to handle the logistics and needs of this case.

**Work Done to Identify and Investigate Potential Claims in This Action**

6. Along with Ms. Weaver, I was primarily responsible for identifying and investigating the underlying facts and potential claims in the *Hewitt* action. In determining what

claims to make and how to plead them, we utilized a decade of experience in these types of actions and our experience before this Court. The allegations are carefully crafted based on our intricate knowledge of the technology, the law, and what works for consumers in these actions.

7. The following statements are made for purposes of this motion only, without waiving any privileges or confidentiality.

## Investigating the Facts

8. Over the past decade, I have litigated more than a dozen Internet browser and application-based data privacy cases. Through this experience, I have become well-versed in the technology and business practices of browser companies, including Google. The core of the *Hewitt* Complaint is its description of the Google Real Time Bidding system and how it works. It is based on experience and a thorough review of Google's voluminous, obscure, and public developer pages that it publishes to help website developers and other ad companies integrate Google's advertising systems into their own businesses. These Google Developer pages form much of the technology portion of the factual predicate for all of the cases. The *Hewitt* Complaint includes references to these Google developer pages in ¶¶ 100-121, 135, 143. As shown in *Hewitt* ¶¶ 102 and 105, the Google Developer pages provide a list "of the Bid Request variables that Open RTB Integration shares with developers" and the precise order in which the data is shared. The Google developer pages reviewed include the specific examples in *Hewitt* ¶¶ 111 and 112 containing specific health verticals in RTB system bid requests. See Hewitt ¶ 111 ("Pregnancy and Maternity" vertical); ¶ 112 ("OBGYN" vertical). The evidence of Google's use of these health verticals was only captured because of my investigation and decision to take screenshots of them. As stated in the Complaint, Google removed these examplars sometime in February or March 2021. *Hewitt* ¶ 110, 113.

9. To determine the scope of Google RTB in the United States, Ms. Weaver and I also consulted with experts who were able to determine there are nearly 1.3 million publishers in the Google RTB system and at least 229 different advertisers to whom Google discloses users' personal information in the United States. Compl. ¶¶ 160-161. Identification of the recipients of the personal information is key to full prosecution of the case. Through this research, we have been able to

1  identify the most prominent recipients and have served third-party subpoenas on 50 of them prior
2  to the filing of this motion.

3       10.    We also investigated public statements by private or governmental actors about
4  Google RTB. The allegations relating to these public statements of investigators elsewhere can be
5  found in ¶¶ 175-181.

6       11.    Google makes an "unequivocal" promise that it "will never sell any personal
7  information to third parties." *Hewitt* ¶ 77. However, based on our extensive experience in this area
8  of law, we understand that every false privacy statement made by a company matters. Accordingly,
9  we systematically examined Google's various contracts, privacy policies, and other statements to
10 show in the Complaint just how correct Google CEO Sundar Pichai was in stating that this was an
11 "unequivocal" promise. The result of that investigation can be found in ¶¶ 47-78.

12      12.    The other factual allegations in the *Hewitt* Complaint relating to Serious and Highly
13 Offensive Invasions of Privacy, Unjust Enrichment, Property Law, the Market-Testing of Privacy
14 Promises, and Google's public financial information are the product of years of experience in the
15 area. Along with Ms. Weaver and Mr. Straite, I have been involved in the leading cases that made
16 these claims actionable. For example, until *In re Google Cookie Placement Consumer Privacy
17 Litigation*, 806 F.3d 125 (3d Cir. 2015), to my knowledge, the tort of intrusion upon seclusion had
18 never been successfully applied to a massive Internet company such as Google. Likewise, *In re
19 Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) was a "watershed moment" for
20 Internet privacy law.[1] Similarly, in *Calhoun v. Google*, this Court was the first to apply the holdings
21 of *Facebook Internet* relating to property and economic loss in cases such as these. And, in
22 *Facebook Consumer Privacy User Profile Litigation* (litigated by Ms. Weaver), the Court set
23 important precedents that apply directly to the non-technical allegations of the Complaint.

24                          **Investigating the Legal Claims**

25      13.    As this Court has previously recognized, this developing area of the law is not for
26 the uninitiated. In *Calhoun*, the Court noted that "[t]hese are really complicated and subtle and

---

[1] Quinn Emanuel, June 2020: Facebook, Cookies and Data Privacy: A Watershed Moment, available at: https://www.jdsupra.com/legalnews/june-2020-facebook-cookies-and-data-27641/.

nuanced issues" in an area where "the law is developing" and is "always a challenging field." *Calhoun*, Motion to Dismiss Hearing Tr. 70:6-10. The Court then thanked the parties for all their "very, very helpful answers, insights [and] guidance." Those "very, very helpful answers, insights, [and] guidance" were the product of a decade of experience in this area of law – including multiple victories and one defeat from which I have learned how to better represent consumers.

14.  Though not necessary, from experience, I have learned that it is better to plead a privacy case with summary judgment level factual support for technology- and privacy-based element of every claim. Thus, the legal claims and specific allegations are a studied application of facts to the "complicated and subtle and nuanced" areas of law that this Complaint covers.

**Experience in Class Actions, Complex Litigation, and the Types of Claims Asserted Here**

*Personal Experience*

15.  I have as much or more experience in the types of claims asserted in this action than any lawyer in the United States. Over the past decade, I have served in leadership roles in many ground-breaking cases in the field of consumer data privacy focused on Internet communications. These include, but are not limited to:

- *In re Google Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125 (3d Cir. 2015) – To my knowledge, this was the first decision establishing that an Internet company can be held liable for intrusion upon seclusion for misleading consumers about their privacy practices. I served on the Plaintiffs' Steering Committee; had responsibility for briefing the intrusion and wiretap claims; and successfully argued the appeal before the Third Circuit.

- *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262 (3d Cir. 2016) – This was the first post-*Spokeo* decision from any Circuit court to affirmatively hold that privacy injury is sufficient to confer Article III standing for common law torts and statutory claims. I served as co-lead counsel with two other firms; had responsibility for briefing the intrusion, Wiretap, and VPPA claims; and successfully argued the appeal before the Third Circuit.

- *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) – This is the leading decision from the Ninth Circuit on several of the key claims in this case, including the ECPA, intrusion upon seclusion, and whether economic standing is established from the surreptitious taking and use of Internet user personal information through web-browsers. I currently serve as chair of the Plaintiffs' Steering Committee and a member of a member of a three-person Executive Committee that also includes DLG partner David Straite, who is co-lead on the case with another attorney. I have had responsibility throughout the case for issues relating to the ECPA and, with Mr.

Straite, shared responsibility for intrusion and invasion of privacy claims. Mr. Straite has had primary responsibility for economic damages issues and successfully argued the case on appeal, where the Ninth Circuit recognized property rights in personal data. Afterwards, lawyers at Quinn Emanuel warned, "[C]ompanies that profit from the sale of user data should be on notice that the decision in *In re Facebook, Inc. Internet Tracking Litigation* may well be a watershed for data privacy lawsuits in this area."[2]

- *Doe v. Virginia Mason,* Case No. 19-2-26674-1 SE (Kings County, Washington) – In this case, I am lead counsel amongst three law firms for a putative class of patients with intrusion, consumer protection, identity theft, wiretap, breach of fiduciary duty, and other claims against a hospital in Washington state for the unauthorized disclosure of patient data and communications to Facebook and Google via web-browser. In ruling in the patients' favor on a motion to dismiss, the court held that patients have a property right in their personally identifiable medical data.

- *Doe v. Partners, et. al.*, Case No. 1984-CV- 01651 (Suffolk County, Massachusetts 2019) – In this case, I am lead counsel amongst three law firms for a putative class of patients with intrusion, wiretap, and breach of fiduciary duty claims against a hospital for similar disclosure of patient data and communications to Facebook, Google, and others via web-browser.

- *Doe v. Medstar, Inc.*, Case No. 24-C-20-000591 (Baltimore City, Maryland 2019) – In this case, I am lead counsel amongst three law firms for a putative class of patients with intrusion, wiretap, and disclosure of private facts claims against a hospital for similar disclosures of patients data and communications to Facebook, Google, and others via web-browser.[3]

- *Calhoun v. Google, LLC,* Case No. 5:20-cv-05146-LHK (N.D. Cal. 2020) – In this case, currently pending before this Court, I am co-lead counsel alongside Lesley Weaver of BFA and Mr. Straite.

- *Smith v. Facebook*, 745 Fed. App'x 8 (9th Cir. 2018) (unreported) – I represented the putative class in this action against Facebook in which the Ninth Circuit upheld dismissal of claims. While we were not ultimately successful in this case, the experience made me better counsel in later privacy cases, including this one.

16. In addition to consumer data privacy cases, I have extensive experience in more traditional unfair business practice actions. For example, I successfully represented state and national classes in mislabeling claims against the diet company Atkins that led to significant monetary and injunctive relief that included removing the claim at issue from the defendant's

---

[2] https://www.jdsupra.com/legalnews/june-2020-facebook-cookies-and-data-27641/

[3] These hospital patient Internet data privacy cases are particularly relevant to *Hewitt* because they are based on the unauthorized disclosure and use of health information, which are among the "verticals" that Google sells to other companies in the RTB auction.

products. See, among others, *Fernandez v. Atkins Nutritionals, Inc.*, Case No.: 3:2017-cv-01628 (S.D. Cal.). Another representative case is *Bailey v. Rite Aid*, Case No. 4:18-cv-06926 (N.D. Cal.).

### ***Simmons Hanly Conroy***

17. Simmons Hanly Conroy LLC ("SHC") is a national litigation firm with offices in Illinois, Missouri, New York, and California. Since its founding in 1999, SHC has recovered over $4 billion in verdicts and settlements for its clients, including a recent verdict of $1 billion.

18. SHC has considerable experience in mass tort and class action litigation. At present, name partner Jayne Conroy is co-lead counsel in *In re National Prescription Opiate Litigation*, MDL No. 2804, currently pending in the Eastern District of Ohio.

19. SHC is also a leader in national mass tort and class litigation. Other cases in which SHC lawyers currently or have served as lead, co-lead, or on the Plaintiffs' Executive and/or Steering Committees include:

- *Allergan Biocell Text. Br. Implant Prod. Liability Litig.,* MDL 2921 (D.N.J)
- *Volkswagen 'Clean Diesel' Litigation*, MDL 2672 (N.D. Cal.)
- *Testosterone Repl. Therapy Products Liability Litig.*, MDL 2545 (N.D. Ill.)
- *Syngenta AG MIR162 Corn Litigation*, MDL 2591 (D. Kan.)
- *Pelvic Repair System Prod. Liability Litig.*, MDL 2325, 2326 & 2327 (S.D. W. Va.)
- *Yaz Marketing, Sales Prac., and Prod. Liab. Litig.*, MDL 2100 (S. D. Ill.)
- *Chantix (Varenicline) Products Liability Litigation*, MDL 2092 (N.D. Ala.)
- *Depuy Ortho. Pinnacle Hip Impl.Prod. Liability Litig.* MDL 2244 (N.D. Tex.)
- *In Re: Actos (Pioglitazone) Products Liability Litigation*, MDL 2299 (W.D. La.)
- *Propecia (Finasteride) Products Liability Litigation*, MDL No. 2331 (S.D.N.Y)
- *Zoloft Products Liability Litigation*, MDL No. 2342, (E.D. Pa.)
- *Bausch & Lomb Contact Lens Solution Products Liab. Litig.*, MDL 1785 (D.S.C.)
- *Toyota Motor Unintended Acceleration ... Litigation*, MDL 2151 (C.D. Cal.)
- *Zyprexa Products Liability Litigation*, MDL 1596 (E.D.N.Y)
- *Bextra and Celebrex ... Litigation*, MDL 1699 (N.D. Cal.)
- *In re Ephedra Products Liability Litigation*, MDL 1598 (S.D.N.Y)
- *Medtronic Implantable Defibrillators Prod. Liab. Litigation*, MDL 1726 (D. Minn.).
- *Bailey v. Rite Aid*, Case No.: 4:18-cv-06926 YGR (N.D. Cal.)
- *Fernandez v. Atkins Nutr.*, Case No. 3:17-cv-01628 (S.D. Cal.)
- *Parko v. Shell Oil Company*, 3:12-cv-00336-NJR-RJD (S.D. Ill.)
- *Keltner v. SunCoke Energy, Inc.*, Case No.: 2014-L-1540 (Ill. Cir. Ct. Madison Co.)
- *Buck et. al v. Republic Services, Inc.*, 4:13-cv-801-TCM (E.D.Mo.)
- *Chambers v. Merrill Lynch & Co., Inc.*, et al., 10-cv-07109 (S.D.N.Y.)
- *Madanat v. First Data Corporation*, 11-cv-364 (E.D.N.Y)
- *Closson v. Bank of America*, 04- 436877 (Cal. Superior Ct., S.F. Co.)
- *Remson v. Verizon*, 07-cv-5296 (E.D.N.Y)
- *Jones v. Honeywell International, Inc.*, 04-009174 (Fla. Cir. Ct., Hillsborough Co.)
- *Thomas v. ConocoPhillips, Inc.*, 2008 CA 001381 (Fla. Cir. Ct., Escambia Co.).

20. SHC shareholders have also served on the Plaintiffs' Executive Committee in *In re*

*Terrorist Attacks on September 11, 2001*, MDL 1570 (S.D.N.Y), which includes class actions, individual personal injury, death and property damage claims.

21. SHC's consistent and repeated leadership appointments demonstrate that it has the resources and experiences necessary to manage this case. SHC has and will continue to commit resources to this action until final resolution.

22. Additional information regarding SHC can be found on the firm's website, www.simmonsfirm.com.

**Counsel's Knowledge of the Applicable Law and Technology**

23. With the exception of *Facebook Internet* and *Calhoun* (for which I shared responsibility with David Straite and Lesley Weaver, respectively), I have had primary responsibility for all dispositive motions the Internet data privacy cases listed above and more. Altogether, I have briefed at least 23 dispositive motions in Internet data privacy cases and presented for the Plaintiffs at oral argument on dispositive motions at least 20 separate times. In addition to briefing I have also had primary responsibility for consulting with experts and taking fact and expert depositions relating to the technology in most of these cases.

24. Mr. Straite and I have worked together on groundbreaking Internet technology cases for more than ten years. There was no roadmap for these cases when we started. Over the past decade, piece-by-piece, case-by-case, Mr. Straite and I have worked on the most important cases that moved the law forward, helping courts become more familiar with the technology and the harms that can be caused by them. Mr. Straite and I led the charge to help establish the legal principle that companies such as Google can be held accountable for their misconduct and that the simple idea that "theft is actionable" applies to consumer Internet data just as it does to other property and data.

25. While I have had more experience working with Mr. Straite, Ms. Weaver is also a leader in this area. I first met Ms. Weaver after she successfully defeated a motion to dismiss in the *In re Facebook Consumer User Profile Litigation*. As it stands, Ms. Weaver's *Facebook Consumer User Profile Litigation* has the underlying fact pattern that is most similar to the instant case. In

that case, just like Google here, Facebook is accused of breaking its promises not to share user personal information with other companies. Through our work together on *Calhoun*, I have seen first-hand Ms. Weaver's incredible skill as a litigator, as a teammate, and a leader.

26.   In the motion to dismiss hearing in *Calhoun*, this Court noted that cases like *Hewitt* involve "really complicated and subtle and nuanced issues." In addition, the Court observed "the law is developing, so it's always a challenging field. But I really apreciate all of your very, very helpful answers, insights, and guidance." Together, Ms. Weaver, Mr. Straite, and I have been at the forefront of developing the law in this area. Counsel greatly appreciates your Honor's compliments at the hearing. Our insights, guidance and "very, very helpful answers" were the product of a decade of concentrated work in the area – starting when very few people understood the technology or its implications for consumers and only coming to fruition now, with courts such as this one fully recognizing the importance of the issues and providing thoughtful opinions on these topics.

### The Resources Counsel Will Commit to Representing the Class

27.   I, and my firm Simmons Hanly Conroy, is committed to bringing all of the resources necessary to successfully represent the *Hewitt* class. Our demonstrated leadership in the *Opioids Litigation* (and dozens of others) proves that SHC is more than capable of handling this action.

28.   Combined, SHC has more than 80 lawyers throughout the nation. If appointed, SHC will ensure that the class has the best attorneys and outside assistance (experts) available.

29.   While SHC is committed to ensuring the class has adequate resources, we also understand the need to prosecute the case efficiently. To this end, we have demonstrated to the court that we will do so through the filing and entry of a Time & Expense order in *Calhoun*, and will soon present the court with a similar order for *Hewitt*.

### Counsel Has Been Actively Prosecuting the Case

30.   Since filing the case, we have been actively engaged with counsel for Google to move the case forward. This includes:

- Negotiating a date by which Google was to respond to the *Hewitt* Complaint;
- Completing a multi-stage 26(f) conference;

- Serving voluminous discovery upon Google;

- Negotiating permission with Google to use Civil Investigative Demand documents from the Texas Attorney General's office to streamline prioritized discovery;

- Participating in two discovery hearings before Magistrate Judge Susan van Keulen;

- Negotiating and stipulating to a Protected Order that has already been entered;

- Negotiating and stipulating to an expert stipulation that has already been entered;

- Coordinating with counsel for *Calhoun*, *Delahunty*, and *Toronto* to reach agreement amongst Plaintiffs' counsel that *Delahunty* and *Toronto* should be consolidated with *Hewitt* and related but not consolidated with *Calhoun* and *Brown*;

- Coordinating with counsel for Google in all of the cases to determine Google's position on consolidation and relation;

- Negotiating an ESI protocol and 502(d) stipulation, a process not yet completed but for which the parties are working toward agreement; and

- Serving third-party subpoenas on 50 different recipients of RTB data.

**Other Relevant Professional Experience**

31. From 2011 to 2018, I served as a state legislator in the Missouri House of Representatives. During that time, I established a reputation as a strong, honest, independent-minded voice for my constituents and fellow Missourians. My integrity, willingness to do what was right regardless of political consequence, and ability to bring together diverse interests was recognized by both sides of the aisle. [4,5]

32. As a freshman representative, I was appointed chair of a special committee charged with investigating an economic development deal gone bad in which the governor had widely-touted a purported $40 million investment in a manufacturing plant in a small Missouri community through a combination of state tax credits and local financing. As the committee was formed, there were great concerns about it becoming overly partisan and bitter. I was told that there was no way

---

[4] St. Louis Post-Dispatch. *Lawmaker leading Missouri House's Greitens probe described as 'principled' and 'stubborn.* Apr. 10, 2018: https://www.stltoday.com/news/local/govt-and-politics/lawmaker-leading-missouri-house-s-greitens-probe-described-as-principled/article_69acc961-7a91-502e-a0a9-e7988c588a95.html

[5] St. Louis Post-Dispatch. *Man who holds Greitens' fate in his hands is used to standing alone.* Feb. 27, 2018: https://www.stltoday.com/news/local/columns/tony-messenger/messenger-man-who-holds-greitens-fate-in-his-hands-is-used-to-standing-alone/article_aac06853-e2f8-5987-88a9-3e0b11227dc3.html.

1  the committee would ever be able to reach consensus given the politics. We proved them wrong,

2  issuing a *unanimous bi-partisan* report with detailed findings of fact and suggestions for reform.

3  The investigation and its factual findings eventually led to the prosecution and imprisonment of the

4  "businessman" who had conned the state and local governments out of tax credit money. A reporter

5  for Bloomberg reported that, "There is only one bright spot in th[e] whole sad tale. A freshman

6  legislator representative Jay Barnes … has made the best suggestions for oversight of municipal

7  revenue bonds that I have seen."[6]

8        33.  Over the next eight years, I remained chair of investigative committees, consistently

9  working with colleagues from both parties to rise above partisanship. Because this demonstrated

10 leadership, in my final year, I was appointed chair of the House Special Investigative Committee

11 on Oversight, charged with investigating serious allegations of sexual misconduct, invasion of

12 privacy, misappropriation of data from a charity, and, eventually, allegations of campaign finance

13 violations. The governor resigned after the Committee had issued three *unanimous, bipartisan*

14 reports on his conduct, but before it took any official steps towards impeachment.[7] Afterwards, the

15 Kansas City Star wrote, "Rep. Jay Barnes and other members of the committee he led deserved

16 special credit for handling this difficult task with complete professionalism. … Missourians owe a

17 debt to Barnes, and all the members of the Greitens committee, for their hard work, seriousness of

18 purpose, transparency and bipartisan approach."[8]

19 **Commitment to Diversity**

20       34.  I and SHC recognize the importance of diversity in representation, as well as the

21 promotion of young attorneys to leadership roles. We are committed to designating a young and

22 diverse group of attorneys to staff this case, which will promote a fresh perspective, as well as

---

[6] MoScout, *Bloomberg Hearts Barnes*, September 21, 2012, quoting Bloomberg article no longer available: https://moscout.squarespace.com/daily-updates-1?offset=1349751960164

[7] See, Memo to the Missouri House Special Investigative Committee on Oversight, June 26, 2018: https://cdn.missourinet.com/wp-content/uploads/2018/06/Barnes-memo.pdf

[8] Kansas City Star, Editorial Board: *After 'crimes, misconduct, and moral turpitude,' it's time to hold Greitens accountable*. June 25, 2018: https://www.kansascity.com/opinion/editorials/article213801279.html

provide an opportunity for junior attorneys to learn and develop skills in a unique field of law.

35. I have a demonstrated record of advocating for justice and diversity.

36. I have received awards from:

    a. the Missouri Chapter of the NAACP for standing up against legislation to weaken standards against discrimination in Missouri;

    b. the St. Louis Children's Hospital for Children's Advocate of the Year in recognition of work to increase access to health care for Missouri children;

    c. Legal Services of Eastern Missouri for work to increase access to the civil justice system and access to health care for the working poor;

    d. the Missouri State Bar Association for work to improve our state's justice system; and

    e. the Missouri Association of Trial Attorneys for work to defend the right to access to the courts in our state;

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16th day of July 2021 at Jefferson City, Missouri.

_____
Jason "Jay" Barnes