COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
(rhodesmg@cooley.com)
JEFFREY M. GUTKIN (SBN 216083)
(jgutkin@cooley.com)
KELSEY R. SPECTOR (SBN 321488)
(kspector@cooley.com)
COLIN S. SCOTT (SBN 318555)
(cscott@cooley.com)
3 Embarcadero Center, 20th floor
San Francisco, CA 94111-4004
Telephone:    +1 415 693 2000
Facsimile:    +1 415 693 2222

ROBBY L.R. SALDAÑA
(rsaldana@cooley.com)
(appearance *pro hac vice*)
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
Telephone:    +1 202 776 2109
Facsimile:    +1 202 842 7899

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation,<br><br><br>This Document Relates to:  *all actions*, | Master File No. 5:21-cv-02155-LHK<br><br>**DEFENDANT GOOGLE LLC'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND AND PLAINTIFFS' ALLEGATIONS.......................................... 3

    A.    Plaintiffs Make Virtually No Detailed or Individualized Allegations ................... 3

    B.    Google's Services and Terms of Service ("ToS") ................................................. 3

    C.    Google's Privacy Policy....................................................................................... 4

    D.    The "How Our Business Works" Informational Webpage ..................................... 5

    E.    The RTB Process ................................................................................................. 5

III.  LEGAL STANDARD .............................................................................................. 6

IV.   ARGUMENT ........................................................................................................... 6

    A.    Plaintiffs Lack Article III Standing....................................................................... 6

    B.    Plaintiffs Fail to State a Breach of Contract Claim (Count 1). ............................. 8

        1.    The Informational Webpage Is Not Part of the ToS. .................................. 9

        2.    Plaintiffs Do Not Allege Any Actual Breach of the Privacy Policy. ........ 10

            a.    Plaintiffs Do Not Allege that Google Shared *Their* Personal Information or That They Opted Out of Personalized Ads........... 11

            b.    Plaintiffs Do Not Allege that Google Shared "Personal Information," As the Privacy Policy Defines That Term............. 11

            c.    The CCPA's Definition of "Personal information" Is Not a Part of Google's Contract with Account Holders. ....................... 13

    C.    Plaintiffs' Breach of Implied Covenant Claim (Count 2) Fails. ........................... 13

    D.    Plaintiffs Fail to State a Claim for Invasion of Privacy Under the California Constitution (Count 4) or Claim for Intrusion Upon Seclusion (Count 5). .......... 14

        1.    Plaintiffs Have Not Alleged that Google Shared Their Own Information. .............................................................................................. 14

        2.    Plaintiffs Have Not Alleged a Reasonable Expectation of Privacy. ........ 14

            a.    Google's Disclosures Foreclose an Expectation of Privacy. ........ 14

            b.    Plaintiffs Do Not Have a Reasonable Expectation of Privacy in the Data Allegedly Shared. ....................................................... 16

        3.    Plaintiffs Have Not Alleged A Highly Offensive Invasion of Privacy...................................................................................................... 17

    E.    Plaintiffs Fail to State a Claim for Publication of Private Information (Count 6) ........................................................................................................... 19

    F.    Plaintiffs' Breach of Confidence Claim (Count 7) Fails...................................... 20

        1.    The Express Contract About the Same Subject Matter Bars This Claim. ...................................................................................................... 20

        2.    Plaintiffs Otherwise Fail to State a Breach of Confidence Claim............. 21

    G.    Plaintiffs Fail to State a Wire Tap Act Claim for Disclosure (Count 10). ............ 22

**TABLE OF CONTENTS**
(continued)

Page

1.      Plaintiffs Fail to Allege Google Intercepted the Contents of Their Communications. ...................................................................................... 22

2.      Any Alleged Disclosure Occurred with Publishers' Lawful Consent...................................................................................................... 23

H.      Plaintiffs Fail to State a CIPA Claim, California Residents or Not (Count 8). .............................................................................................................. 25

V.      CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AdTrader, Inc. v. Google LLC,*
2018 WL 3428525 (N.D. Cal. July 13, 2018) ........................................................... 14

*Amtower v. Photon Dynamics, Inc.,*
158 Cal. App. 4th 1582 (2008) ............................................................................. 9

*Banga v. Equifax Info. Servs., LLC,*
2015 WL 3799546 (N.D. Cal. June 18, 2015) ......................................................... 14

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................ 6

*Bell v. City of Kellogg,*
922 F.2d 1418 (9th Cir. 1991) ............................................................................. 6

*Berkla v. Corel Corp.,*
302 F.3d 909 (9th Cir. 2002) ......................................................................... 20, 21

*Birdsong v. Apple, Inc.,*
590 F.3d 955 (9th Cir. 2009) ............................................................................... 8

*Brodsky v. Apple Inc.,*
445 F. Supp. 3d 110 (N.D. Cal. 2020) ................................................................. 25

*Brown v. Google LLC,*
2021 WL 949372 (N.D. Cal. Mar. 12, 2021) ........................................................ 18

*Calhoun v. Google LLC,*
2021 WL 1056532 (N.D. Cal. Mar. 17, 2021) ................................................ *passim*

*Chevron Corp. v. Donziger,*
2013 WL 4536808 (N.D. Cal. Aug. 22, 2013) ....................................................... 16

*Daly v. Viacom, Inc.,*
238 F. Supp. 2d 1118 (N.D. Cal. 2002) ............................................................... 20

*Davidson v. Hewlett-Packard Co.,*
2021 WL 4222130 (N.D. Cal. Sept. 16, 2021) ................................................. 15, 19

*Donovan v. RRL Corp.,*
26 Cal. 4th 261 (2001) ..................................................................................... 13

*In re Facebook, Inc.,*
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........................................................ 15, 19, 20

Cooley LLP
Attorneys At Law
San Francisco

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020)..................................................................... 10, 14, 17

*Facebook, Inc. v. BrandTotal Ltd.*,
   2021 WL 3885981 (N.D. Cal. Aug. 31, 2021)........................................................ 16

*Forsher v. Bugliosi*,
   26 Cal. 3d 792 (1980) ............................................................................................ 20

*Founding Members of the Newport Beach Country Club v. Newport Beach
   Country Club, Inc.*,
   109 Cal. App. 4th 944 (2003)................................................................................... 9

*Friedman v. DirecTV*,
   262 F. Supp. 3d 1000 (C.D. Cal. 2015)................................................................. 21

*Gonzales v. Uber Techs., Inc.*,
   305 F. Supp. 3d 1078 (N.D. Cal. 2018) ........................................................... 15, 23

*In re Google Android Consumer Privacy Litig.*,
   2013 WL 1283236 (N.D. Cal. Mar. 26, 2013)....................................................... 18

*In re Google Assistant Privacy Litig.*,
   457 F. Supp. 3d 797 (N.D. Cal. 2020) ..................................................... 10, 11, 16

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
   806 F.3d 125 (3rd Cir. 2015) ................................................................................. 23

*In re Google, Inc. Privacy Policy Litig.*,
   2013 WL 6248499 (N.D. Cal. Dec. 3, 2013).......................................................... 15

*In re Google, Inc. Privacy Policy Litig.*,
   58 F. Supp. 3d 968 (N.D. Cal. 2014) ..................................................................... 18

*Gravquick A/S v. Trimble Nav. Int'l Ltd.*,
   323 F.3d 1219 (9th Cir. 2003)................................................................................ 25

*Hawkins v. Comparet-Cassani*,
   251 F.3d 1230 (9th Cir. 2001).................................................................................. 7

*Heeger v. Facebook, Inc.*,
   509 F. Supp. 3d 1182 (N.D. Cal. 2020) ........................................................... 16, 17

*Hill v. Nat'l Collegiate Athletic Ass'n*,
   7 Cal. 4th 1 (1994) ................................................................................................. 19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Huynh v. Quora, Inc.,*
  2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ..................................................... 21

*In re iPhone Application Litig.,*
  2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ........................................................ 8

*Leerar v. WOW Air EHF,*
  2017 WL 11493651 (N.D. Cal. Sept. 5, 2017) ........................................................ 9

*In re Livent, Inc. Noteholders Sec. Litig.,*
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) .................................................................... 23

*Lopez v. Apple, Inc.,*
  519 F. Supp. 3d 672 (N.D. Cal. 2021) ................................................................... 16

*Low v. LinkedIn Corp.,*
  900 F. Supp. 2d 1010 (N.D. Cal. 2012) ................................................. 8, 14, 17, 18

*McGhee v. N. Am. Bancard, LLC,*
  755 F. App'x 718 (9th Cir. 2019) .......................................................................... 10

*Moreno v. Hanford Sentinel, Inc.,*
  172 Cal. App. 4th 1125 (2009) ............................................................................... 19

*Mujica v. AirScan, Inc.,*
  771 F.3d 580 (9th Cir. 2014) .................................................................................. 17

*Navarro v. Block,*
  250 F.3d 729 (9th Cir. 2001) .................................................................................... 6

*In re Nickelodeon Consumer Privacy Litig.,*
  827 F.3d 262 (3d Cir. 2016) ............................................................................. 18, 24

*Nygard, Inc. v. Uusi-Kerttula,*
  159 Cal. App. 4th 1027 (2008) ............................................................................... 12

*Orlando v. Carolina Cas. Ins. Co.,*
  2007 WL 781598 (E.D. Cal. Mar. 13, 2007) ......................................................... 11

*Perez v. Nidek Co.,*
  711 F.3d 1109 (9th Cir. 2013) .................................................................................. 7

*Prouty v. Gores Tech. Grp.,*
  121 Cal. App. 4th 1225 (2004) ............................................................................... 13

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*Racine & Laramie, Ltd. v. Cal. Dep't of Parks & Recreation,*
    11 Cal. App. 4th 1026 (1992) ............................................................... 13

4

5

*Reed v. Nat'l Football League,*
    2015 WL 13333481 (C.D. Cal. Sept. 24, 2015) ................................. 21

6

*Rodriguez v. Google LLC,*
    2021 WL 2026726 (N.D. Cal. May 21, 2021) ................................... 24

7

8

*San Jose Options, Inc. v. Yeh,*
    2014 WL 1868738 (N.D. Cal. May 7, 2014) ..................................... 21

9

*Sawicky v. AMC Networks Inc.,*
    2018 WL 11292263 (C.D. Cal. July 11, 2018) ................................. 21

10

11

*Shulman v. Grp. W Prods., Inc.,*
    18 Cal. 4th 200 (1998) ....................................................................... 19

12

13

*Smith v. Facebook, Inc.,*
    745 F. App'x 8 (9th Cir. 2018) ......................................................... 15

14

15

*Snapkeys, Ltd. v. Google LLC,*
    442 F. Supp. 3d 1196 (N.D. Cal. 2020) ............................................ 14

16

*Southland Corp. v. Emerald Oil Co.,*
    789 F.2d 1441 (9th Cir. 1986) ............................................................. 9

17

18

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ..................................................................... 6, 7

19

20

*Sullivan v. Oracle Corp.,*
    51 Cal. 4th 1191 (2011) ..................................................................... 25

21

*Sutherland v. Francis,*
    2013 WL 2558169 (N.D. Cal. June 10, 2013) ................................... 8

22

23

*Tapia Carmona v. Cnty. of San Mateo,*
    2019 WL 4345973 (N.D. Cal. Sept. 12, 2019) ................................. 23

24

25

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ..................................................................... 6, 7

26

*Treichler v. Johnson,*
    1992 U.S. Dist. LEXIS 8575 (N.D. Cal. June 4, 1992) ................... 13

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*Troyk v. Farmers Grp., Inc.*,
4     171 Cal. App. 4th 1305 (2009)............................................................................ 9

5     *United States v. Forrester*,
      512 F.3d 500 (9th Cir. 2008)............................................................................ 16

6

7     *Virgil v. Time, Inc.*,
      527 F.2d 1122 (9th Cir. 1975)......................................................................... 19

8     *Warth v. Seldin*,
      422 U.S. 490 (1975)........................................................................................ 6

9

10    *White v. Lee*,
      227 F.3d 1214 (9th Cir. 2000)........................................................................... 6

11    *Woods v. Google Inc.*,
12    2011 WL 3501403 (N.D. Cal. Aug. 10, 2011)................................................. 10

13    *In re Yahoo Mail Litig.*,
      308 F.R.D. 577 (N.D. Cal. 2015)..................................................................... 25

14

15    *In re Yahoo Mail Litig*,
      7 F. Supp. 3d 1016 (N.D. Cal. 2014) ............................................................... 23

16

17    *Young v. Facebook, Inc.*,
      2010 WL 4269304 (N.D. Cal. Oct. 25, 2010).................................................... 8

18    *Yunker v. Pandora Media, Inc.*,
      2013 WL 1282980 (N.D. Cal. Mar. 26, 2013)................................................. 18

19

20    *In re Zoom Video Commc'ns, Inc. Privacy Litig.*,
      2021 WL 930623 (N.D. Cal. Mar. 11, 2021)............................................... 7, 14

21    *In re Zynga Priv. Litig.*,
22    750 F.3d 1098 (9th Cir. 2014)...................................................................... 22, 23

23    **Statutes**

24    18 U.S.C.
         § 2510........................................................................................................ 22
25       § 2511.................................................................................................. 22, 23

26    Cal. Civ. Code
         § 1798.140.................................................................................................. 13
27       § 1798.198(a) ............................................................................................ 13

28

Cooley LLP
Attorneys At Law
San Francisco

vii

**Motion to Dismiss CAC**
**Case No. 5:21-cv-02155-LHK**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Cal. Penal Code § 631(a) ........................................................................................................... 25

**Other Authorities**

Rule 12(b) ........................................................................................................................... 1, 6

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

viii

MOTION TO DISMISS CAC
CASE NO. 5:21-CV-02155-LHK

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**: PLEASE TAKE **NOTICE THAT**, on December 9, 2021, at 1:30 p.m., the undersigned will appear before the Honorable Lucy H. Koh of the United States District Court at the San Jose Courthouse, Courtroom 8, 4th Floor, 280 South 1st Street, San Jose, CA 95113, and will then and there present Defendant Google LLC's Motion to Dismiss the Consolidated Class Action Complaint ("Motion").  This Motion is based on this Notice of Motion and Motion and Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, the Declaration of Robby Saldaña and exhibits attached thereto, the pleadings and other papers on file in this action, any oral argument, and anything else that the Court may consider.

**RELIEF REQUESTED**

Google requests that the Court dismiss the Consolidated Class Action Complaint ("CAC"), (ECF No. 92) under Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs lack standing under Article III or, in the alternative, dismiss Counts 1, 2, 4, 5, 6, 7, 8, and 10 under Rule 12(b)(6) because Plaintiffs fail to state a claim for relief.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This suit reflects a willful misunderstanding of how the Internet works.  Plaintiffs claim that Google "sold and disseminated" their personal information to third parties participating in Google's real-time bidding ad auction service ("RTB").  Yet, what data is exchanged in RTB is publicly disclosed—indeed, Plaintiffs cite the protocol throughout the CAC—and it contradicts their contentions.  Ignoring reality, Plaintiffs bring this sweeping putative class action against Google on behalf of all U.S. residents with a Google account ("Account Holders") who have used the Internet at any time since RTB began.  Despite the length, breadth, and inflammatory rhetoric of the CAC, several fundamental flaws permeate the allegations and foreclose Plaintiffs' claims.

First and foremost, Plaintiffs lack standing.   The CAC contains ***no individualized allegations*** showing Plaintiffs themselves were subject to the challenged practice.  In an obvious cut-and-paste job, every Plaintiff effectively alleges nothing more than they "use the Internet,"

"frequently use" certain browsers, and, thus, allege "on information and belief," Google disclosed their information.  Article III demands more.  Plaintiffs admit half of all ad exchange ads do not come through RTB but provide no facts whatever about their own Internet use that might even link them to Google's alleged practice.  While the CAC spends dozens of pages on RTB (including specific websites and advertisers involved, highly sensitive information allegedly shared, and Google's allegedly nefarious agreement with Facebook), no Plaintiff says they visited particular publishers' websites, saw these advertisers' ads, used the Internet in any way related to sensitive information, or used Facebook.  Thus, the CAC creates no basis from which the Court could infer Plaintiffs themselves were affected by the challenged conduct and no basis for Article III standing.

Plaintiffs' claims fail for additional reasons.  Google repeatedly disclosed that it would use and share the information allegedly shared with RTB participants for targeted ads and gave Account Holders control over that process.  The contracts state that Google will use Account Holder information to "provid[e] . . . personalized . . . ads (which you can change or turn off in Ad Settings)" and "we collect information to provide better services to all of our users . . . like which ads you'll find most useful."  The information allegedly improperly shared with RTB participants matches the information Google openly states that it collects, including "unique identifiers, browser type and settings, device type and settings . . . IP address," and "information about your location," and Google states that it will share such "non-personally identifiable" information "with our partners—like . . . advertisers."  Even as to "personal information," which Google defines separately from the information it collects, Google told Account Holders they could use their "Ad Settings" to "choose whether *your personal information* is used to make ads more relevant to you."  These contractual disclosures and practices defeat not just Plaintiffs' breach of contract and implied covenant claims, but also disprove any expectation of privacy and preclude Plaintiffs' breach of confidence claim, which cannot, under settled authority, rest on contractual obligations.

Plaintiffs' other claims fare no better.  The claim for publication of private information fails because Plaintiffs do not (and cannot) plead the alleged disclosure was so widespread as to be "substantially certain to become one of public knowledge" or was offensive and objectionable.  Plaintiffs' Wire Tap Act claim fails because Google did not allegedly intercept the "content" of any

1   communication and any alleged interception undeniably occurred with the consent (and alleged

2   participation) of the website publishers.   That Google did not intercept the content of any

3   communication also sinks Plaintiffs' California Invasion of Privacy Claim, and the Non-California

4   Plaintiffs also lack the required allegations connecting them to this state or this statute.

5       Despite the CAC's girth and accusatory tone, Plaintiffs' factual allegations do not and

6   cannot support their claims.  The Court should dismiss the CAC.

7   **II.    BACKGROUND AND PLAINTIFFS' ALLEGATIONS**

8       **A.    Plaintiffs Make Virtually No Detailed or Individualized Allegations**

9       Plaintiffs are eight residents of California (CAC ¶¶ 37–51), and eight non-residents (the

10  "Non-California Plaintiffs") (*id.* ¶¶ 53–67).  Plaintiffs allege that they are Google Account Holders

11  who were "required to indicate" that they agreed to "uniform conditions" set by Google, but they

12  do not allege when they signed up for an account or what documents they viewed.  (*Id.* ¶¶ 37–68.)

13  Plaintiffs allege they "ha[ve] used the Internet" on the Chrome, Safari, or Microsoft Edge web

14  browsers.  (*Id.*)  But they do not allege: how often they used the Internet (*i.e.*, rarely, sometimes,

15  daily); the devices they used to access it; anything about the websites they visited; or whether they

16  used any of the applications that they assert are relevant.  (*Id.*)  Nor do they allege how they manage

17  their browsers and devices, their chosen privacy settings, or whether their operating system even

18  allows Internet cookies.  (*Id.*)  Nevertheless, they contend solely on information and belief that

19  Google has, through RTB, "sold and shared" their "personal information" "about the websites,

20  content, photos, videos, and communications [each Plaintiff] sends, receives, views, or otherwise

21  accesses" on their Internet browser without their "express written consent."  (*Id.*)

22      **B.    Google's Services and Terms of Service ("ToS")**

23      To obtain a Google Account, an individual must agree to the ToS.  (CAC ¶¶ 71–72.)

24  Although the CAC attaches three ToS versions, Plaintiffs do not allege when they each signed up

25  for a Google Account or which ToS applies.  Instead, they focus on the ToS effective March 31,

26  2020.  (*Id.* ¶¶ 73, 78–79, Ex. 4.)  In a section titled "Permission to use your content," this ToS states

27  that a user gives Google a license to use the user's content, including to "provid[e]

28  recommendations and personalized . . . ads (which you can change or turn off in <u>Ads Settings</u>)."

(*Id.* Ex. 4 at 7.)  The phrase "Ads Settings" contains a hyperlink to a page where a user can toggle "personalized ad settings" off or on.  (*See id.*)[1]  This ToS provides that California law, excluding its choice of law rules, governs disputes about the ToS or Google's services.[2]  (*Id.* at 13.)

## C.    Google's Privacy Policy

Plaintiffs do not allege when each signed up for a Google account nor which version of Google's privacy policy ("Privacy Policy" or "Policy") applies to their claims.[3]  Since March 31, 2020, the ToS has explicitly stated that the Policy is not a part of the ToS.  (CAC ¶ 85.)  The most recent Policy in effect prior to March 31, 2020 disclosed, *inter alia*, that (1) "[w]e use the information we collect to customize our services for you," (2) "we collect information to provide better services to all our users . . . like which ads you'll find most useful," and (3) "[d]epending on your settings, we may also show you personalized ads based on your interests."  (*Id.* Ex. 15 at 1, 5.)  In a section titled "[i]nformation *we collect* as you use our services," the Policy detailed what is collected from a users' activity, including "unique identifiers, browser type and settings, device type and settings, operating system . . . the interaction of your apps, browsers, and devices with our services, including IP address."  (*Id.* at 2 (emphasis added)*.*)  The Policy also stated "[w]e collect information about your location when you use our services."  (*Id.* at 3.)  Under the heading "ads you'll find most useful," the Policy says "[w]e also may use your IP address to determine your approximate location" when showing a personalized ad.  (*Id.* at 18.)

The Policy made clear that Google may share "non-personally identifiable information" (defined as "information that is recorded about users so that it no longer reflects or references an individually identifiable user") "publicly and with our partners—like . . . advertisers."  (*Id.* Ex. 15 at 12, 27.)  The Policy separately defined "personal information" as "*information that you provide to us which personally identifies you*, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account."  (*Id.* at 28 (emphasis added).)  But even for personal

---

[1] Clicking on the hyperlink opens a webpage where a user can turn personalized ads on or off, whether the user is signed into a Google Account or not.  (Robby Saldaña Declaration ("Saldaña Decl.") ¶¶ 3–4, Exs. B–E.)

[2] The earlier versions attached to the CAC have a similar provision.  (*Id.* Ex. 2 at 6, Ex. 3 at 6.)

[3] Plaintiffs attach multiple Privacy Policies to the CAC.  (CAC Exs. 1, 6–20.)

information, the Policy made clear that, subject to the users' Ad Settings, "your personal information is used to make ads more relevant to you." (*Id.* at 8.)  That Policy also showed users how to opt-out of targeted advertising and take control over the information shared with third parties.  (*Id.* at 5 (describing how users can "control what information we use to show you ads by visiting your ad settings").)  A link to modify the Ad Settings immediately followed.  (*Id.*)

While Google has modified the Policy over time, the versions attached to the CAC show that Google made similar disclosures in each.  (*Id.* Ex. 6 at 2–3 (describing information Google collects); *id.* at 4 (disclosing that Google uses information to provide tailored ads); *id.* at 5 (describing that a user can edit ads preferences and opt out of certain advertising services).)

### D.  The "How Our Business Works" Informational Webpage

The ToS effective March 31, 2020 contains a hyperlink to an informational "How Our Business Works" webpage.  (CAC Exs. 4 at 2, 5.)  The webpage states "[a]dvertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, <u>unless you ask us to</u>." (*Id*. Ex. 5 at 1–2.)  Under the heading "Your data, your choice," the webpage makes clear that "[y]ou can use <u>Ad Settings</u> to control the information about you that's used to show ads.  And if you don't want to see personalized ads at all, you can <u>turn them off</u> at any time." (*Id*. at 2.)  The underlined phrases link to Ad Settings, which has the button allowing an Account Holder to turn off personalized ads in one click.  (*See* Saldaña Decl. ¶ 4, Ex. B.)

### E.  The RTB Process

Google operates an online ad platform, the real-time bidding exchange or "RTB," through which website owners (often called "publishers") sell open space on their sites and third-party advertisers looking to place ads can bid on that space in real-time.  (CAC ¶¶ 113, 120.)  Although Google allegedly operates "the world's largest ad exchange," nearly half of all online ad placements are made through a non-Google platform.  (*Id.* ¶¶ 113, 129.)  Google offers several publisher-side programs—AdMob, AdSense, and Ad Manger—that facilitate the ad placement process for websites selling ad space.  (*Id.* ¶¶ 125–27, 281.)  AdMob performs this function for smartphone apps.  (*Id.* ¶¶ 125, 281.)  Plaintiffs allege that, to use these programs, "Publishers install Google's code on their websites, which make requests to Google tied to identifying cookies."  (*Id.* ¶ 127.)

When a user (*i.e.*, the potential viewer of the ad) loads a website that uses RTB, an ad may be populated as a result of a nearly instantaneous auction process.  (*Id.* ¶¶ 128, 131, 134.)  Google offers ad space for consideration by providing certain data (specified in publicly available RTB protocols) about the website and the user to all RTB bidders.  *(Id.)*  This information includes: (1) a truncated or partial version of a user's IP address, (2) an ID, (3) an approximate user location, and (4) information about the web browser and version, among other information.[4]  *(Id.* ¶¶ 137, 140.)  Google also shares information about the website or app where the ad would display.  (*Id.*)

## III.    LEGAL STANDARD

Under Rule 12(b)(1), a court must dismiss claims where a plaintiff has failed to establish standing under Article III of the United States Constitution.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A court must also dismiss claims under Rule 12(b)(6) when "there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Without supporting factual allegations, "labels and conclusions, and a formulaic recitation of the elements of a cause of action" are not sufficient to save a complaint from dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## IV.    ARGUMENT

### A.    Plaintiffs Lack Article III Standing.

For each claim and form of relief sought, Article III requires Plaintiffs to demonstrate that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).  Plaintiffs bear the burden of establishing these elements and, at the pleading stage, "must clearly allege facts demonstrating each element."  *Spokeo*, 136 S. Ct. at 1547 (citation and internal quotations omitted).  In a class action like this one, Plaintiffs must also allege facts showing that they each ***personally*** suffered an injury.  *Warth v. Seldin*, 422 U.S. 490, 502 (1975) (it is not sufficient to show "injury has been suffered by other, unidentified members of the

---

[4] Contrary to the CAC's new allegation, Google has explained that "[l]ocation and its accuracy will be fuzzified as necessary to protect user privacy."  (*See* Saldaña Decl. Ex. A at 2.)

1    class").  Absent standing, a court must dismiss the case.  *Bell v. City of Kellogg*, 922 F.2d 1418,

2    1422 (9th Cir. 1991); *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001).

3         The CAC must be dismissed in its entirety because Plaintiffs fail to plead any harm.  *See*

4    *TransUnion LLC*, 141 S. Ct. at 2200 ("No concrete harm, no standing.").  The named Plaintiffs

5    allege ***essentially nothing*** about the nature or extent of their own online activity, which is

6    indispensable to show injury here.  Instead, relying on copying-and-pasting, Plaintiffs say only that

7    they "used the Internet" and list the browser(s) (including third-party browsers) each "frequently

8    uses." (CAC ¶¶ 37–68.)  Indeed, Plaintiffs plead that Google's practices affected them personally

9    only "[o]n information and belief."  (*Id.*)  These generic allegations are not enough to show that the

10   challenged practice harmed Plaintiffs.  *See In re Zoom Video Commc'ns, Inc. Privacy Litig.*, 2021

11   WL 930623, at *13 (N.D. Cal. Mar. 11, 2021) (plaintiff must do more than make "bare allegations

12   that each Plaintiff interacted with their device repeatedly" to "plausibly show that Plaintiffs' private

13   data was disclosed" (cleaned up)); *Spokeo*, 578 U.S. at 1548 ("Particularization is necessary to

14   establish an injury in fact," meaning "an injury . . . must affect the plaintiff is a personal and

15   individual way.") (citation and internal quotations omitted); *Perez v. Nidek Co*., 711 F.3d 1109,

16   1113 (9th Cir. 2013) ("[C]onclusory and bare bones words and phrases without any factual content"

17   are "vacuous claims [] insufficient to establish standing or to survive a motion to dismiss.").

18        To be clear, Plaintiffs possess the facts that bear on whether they can plausibly claim to

19   have personally suffered an injury in fact, but they conspicuously chose to plead none.  Notably,

20   while the ToS, which Plaintiffs attach to the CAC, explains how an Account Holder can opt out of

21   personalized ads, (CAC Ex. 4 at 7), Plaintiffs also do not allege whether they opted out of ads

22   personalization, nor how that setting affects their claims.  (CAC ¶¶ 37–68.)  Incredibly, Plaintiffs

23   do not even allege that they saw any online ads, much less personalized ones.  (*Id.*)  Plaintiffs baldly

24   allege that they used "websites from which Google sold and shared account holder information,"

25   but they plead no facts about these sites.  (*Id.*)  That silence is noteworthy, as Plaintiffs allege

26   Google makes publicly available a list of almost 200,000 RTB publishers and claim to have

27   identified hundreds of RTB advertisers, including several they name in the CAC.  (*Id.* ¶¶ 195–96.)

28   Yet, not one Plaintiff alleges that they visited any of these publishers' websites or that an RTB

advertiser displayed an ad to them.  Plaintiffs also fail to answer other basic questions about any websites they allegedly visited, such as whether they use cookies, disclose that use, or offer users an ability to opt out of cookies.  Similarly, although Plaintiffs allege Google entered into a problematic agreement with Facebook, (*id.* ¶¶ 165–167), none allege that they use Facebook or saw an ad for Facebook.  Further, Plaintiffs devote paragraphs to Google's alleged use of "verticals," which they assert disclose various categories of sensitive information about Account Holders to RTB participants, (*id.* ¶¶ 141–50), but no Plaintiff alleges they visited a website concerning a sensitive topic or ever saw an ad on such a topic, (*id.* ¶¶ 37–68).  In other words, all these pages of allegations are utterly untethered to the factual allegations about Plaintiffs themselves.

The striking paucity of facts about the named Plaintiffs' online activity renders the CAC's allegations of injury (of any kind) wholly conclusory, non-particularized, and insufficient to support standing.  (*See id.* ¶¶ 279–317.)  Without factual allegations showing that ***they*** were subject to the challenged practices, Plaintiffs cannot show that they suffered a particularized or concrete injury and so lack standing to bring these claims.  *See, e.g.*, *Birdsong v. Apple, Inc.*, 590 F.3d 955, 960–61 & n.4 (9th Cir. 2009) (affirming dismissal for lack of standing where plaintiffs alleged "a potential risk of hearing loss not to themselves, but to other unidentified iPod users"); *In re iPhone Application Litig.*, 2011 WL 4403963, at *4 (N.D. Cal. Sept. 20, 2011) (plaintiffs lacked standing where they made only "general allegations about the Mobile Industry Defendants, . . . but [did] not identif[y] an actual injury to themselves").  The Court must dismiss the CAC for lack of standing.

## B.    Plaintiffs Fail to State a Breach of Contract Claim (Count 1).

"Under California law, to state a claim for breach of contract a plaintiff must plead 'the contract, plaintiffs' performance (or excuse for nonperformance), defendant's breach, and damage to plaintiff therefrom.'"  *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1028 (N.D. Cal. 2012) (citation omitted).  Here, Plaintiffs do not allege when they signed up for a Google Account, the documents to which they agreed at that time or at any later date, or when any breach of their purported agreement with Google occurred.  These omissions alone warrant dismissal.  *See Sutherland v. Francis*, 2013 WL 2558169, at *4 (N.D. Cal. June 10, 2013) (Koh, J.) (dismissing breach of contract claim for failure to allege essential terms of the agreement, including "a specific

1    contract date"); *Young v. Facebook, Inc*., 2010 WL 4269304, at *3 (N.D. Cal. Oct. 25, 2010)

2    (dismissing contract claim where plaintiff "ha[d] not identified with any particularity how

3    Facebook breached any obligation owed to her").

4        Even putting these flaws aside, Plaintiffs do not adequately plead breach. The ToS is the

5    relevant contract (CAC ¶¶ 71, 340), and its meaning is a legal question. *See Southland Corp. v.*

6    *Emerald Oil Co*., 789 F.2d 1441, 1443 (9th Cir. 1986). The ToS's objective meaning—not any

7    Account Holder's subjective view—controls. *See Founding Members of the Newport Beach*

8    *Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003) ("California

9    recognizes the objective theory of contracts under which it is the objective intent, as evidenced by

10   the words of the contract, rather than the subjective intent of one of the parties, that controls[.]"

11   (citation omitted)). Plaintiffs' claims fail because the ToS does not incorporate the informational

12   "How Our Business Works" webpage, nor do they plausibly allege a breach of the Privacy Policy.[5]

13                   **1.    The Informational Webpage Is Not Part of the ToS.**

14       Plaintiffs allege that the March 31, 2020 ToS incorporates the "How Our Business Works"

15   webpage because the statement "These Terms reflect the way Google's business works" includes

16   a hyperlink to that page.[6] (CAC ¶¶ 78–80, 85, 341, & Ex. 4.) The language Plaintiffs rely on for

17   Google's purported contractual promise not to "sell" users' personal information does not appear

18   anywhere but this page. (*Id.* ¶¶ 80–81, 260, 342.) But Plaintiffs do not carry their burden to prove

19   incorporation. *See Leerar v. WOW Air EHF*, 2017 WL 11493651, at *4 (N.D. Cal. Sept. 5, 2017).

20       Although "parties may incorporate by reference into their contract the terms of some other

21   document, . . .the reference must be clear and unequivocal, the reference must be called to the

22   attention of the other party and he must consent thereto." *Troyk v. Farmers Grp., Inc.*, 171 Cal.

23   App. 4th 1305, 1331 (2009) (citation omitted); *Amtower v. Photon Dynamics, Inc.*, 158 Cal. App.

24   4th 1582, 1608 (2008) (finding no incorporation without a "clear and unequivocal reference . . .

25   _____

26   [5] Plaintiffs make allegations about Google's other alleged "promises" outside of the ToS and the
     Privacy Policy, (CAC ¶¶ 97–111), but they do not (and cannot) premise their breach of contract

27   claim on such extracontractual statements, (*see id.* ¶¶ 112, 340–46).
     [6] Even if Plaintiffs were correct, Google plainly could not have committed any breach of statements

28   in this webpage until after the ToS effective March 31, 2020 linked to the webpage.

that the terms of the external document are incorporated").  The ToS does not state that the webpage is part of the ToS or that users agree to be bound by it.  (CAC Exs. 4, 5.)  That the ToS links to the webpage does not make the webpage's informational statements contractual.  *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 610–11 (9th Cir. 2020) (Data Use Policy that "merely provides information—not commitments—regarding Facebook's use of information and how users can control that information" and did not "require the user to make any commitment" not incorporated); *McGhee v. N. Am. Bancard, LLC*, 755 F. App'x 718, 719 (9th Cir. 2019) (user agreement not binding where link "did not indicate that the User Agreement was incorporated into the Terms and Conditions"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 832 (N.D. Cal. 2020) ("vague statement" that additional terms may sometimes apply and form part of agreement insufficient to incorporate statements from other, hyperlinked webpages).

Moreover, this webpage is qualitatively different from the terms this Court deemed incorporated in *Calhoun v. Google LLC*, 2021 WL 1056532 (N.D. Cal. Mar. 17, 2021).  There, the ToS directed users to "additional terms for particular services," which the Court concluded incorporated the additional terms governing the Chrome service.  *Id.* at *19; *cf. Woods v. Google Inc.*, 2011 WL 3501403, at *4 (N.D. Cal. Aug. 10, 2011) (finding that an agreement incorporated Google polices when the agreement not only contained hyperlinks to Google policy webpages but expressly stated that use was "subject to all applicable Google . . . policies").  No service-specific terms are alleged to be relevant here.  (*See* CAC Ex. 4 at 1.)  Because the page is not contractual, Plaintiffs' contract claim concerning the alleged sale of personal information fails.

### 2.   Plaintiffs Do Not Allege Any Actual Breach of the Privacy Policy.

Plaintiffs never allege that Google breached an obligation in the ToS itself.  (*See* CAC ¶¶ 340–46.)  Instead, cobbling together different versions of the Privacy Policy, Plaintiffs claim that Google breached promises all placed under the umbrella of a purported promise not to share "personal information."[7]  (CAC ¶¶ 91, 93–94, 96, 260, 343–44, Exs. 1, 5–20.)  Not so.

---

[7] These purported promises are: (1) "We don't share information that personally identifies you with advertisers," (2) "We don't show you personalized ads based on <u>sensitive categories</u>, such as race, religion, sexual orientation, or health," (3) "We do not share your personal information with companies, organizations, or individuals outside of Google except . . . with your consent," and (4) "We may share non-personally identifiable information publicly and with our partners."

### a.   Plaintiffs Do Not Allege that Google Shared *Their* Personal Information or That They Opted Out of Personalized Ads.

As an initial and dispositive matter, Plaintiffs do not plead any factual allegations showing that Google shared *their* "personal information" or "personally identifiable information," or that they viewed a personalized ad based on race, religion, sexual orientation, etc.  (CAC ¶¶ 37–68); *see supra* IV.A.  This deficiency renders any claimed breach of the Policy implausible.  *See In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 833 (N.D. Cal. 2020) (plaintiffs did "not adequately plead that [their] 'personal information' ha[d] been shared" and failed to show breach).

Plaintiffs' claims also fail because no Plaintiff alleges that they opted out of personalized ads.  The Privacy Policy has for many years explicitly provided that a user can use their "Ad Settings" to "choose whether **your personal information** is used to make ads more relevant to you." (*E.g.*, CAC Ex. 15 at 8 (emphasis added), Ex. 13 at 8.)  Not only are these settings hyperlinked in the same section, (*Id.* at 8), Google repeatedly disclosed to Account Holders that they could (and can) opt out of tailored or personalized ads.  (*See*, *e.g.*, *id*. at 5 ("Depending on your settings, we may also show you personalized ads based on your interests."); *id.* (describing how users can "control what information we use to show you ads by visiting your ad settings").)  Plaintiffs cannot plausibly claim that Google breached an alleged duty not to share personal information if they failed to opt out of personalized ads.  *See Orlando v. Carolina Cas. Ins. Co.*, 2007 WL 781598, at *5 (E.D. Cal. Mar. 13, 2007) (dismissing breach of contract claim when plaintiff "ha[d] not alleged that conditions precedent necessary for her to recover have been performed, waived, or excused").

### b.   Plaintiffs Do Not Allege that Google Shared "Personal Information," As the Privacy Policy Defines That Term.

Google's Privacy Policy defines "personal information" as "***information that you provide to us which personally identifies you***, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account."  (CAC ¶ 87, Ex. 15 at 28 (emphasis added).)  Under the definition's plain meaning, the general reference to "other data"—which includes "information we associate with your Google Account"—is also limited to "information that you provide to us which

1   personally identifies you."  Indeed, all the Policy's specific examples of such information (*e.g.*,

2   names, email addresses, or billing information) bear on the plausible interpretation of "other data."

3   *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1045 n.4 (2008) ("Where general words

4   follow the enumeration of particular kinds or classes of persons or things, the general words will,

5   unless a contrary intent is manifested, be construed as applicable only to persons or things of the

6   same general nature or class as those specifically enumerated.").  The Privacy Policy explains that

7   information "that you provide to us which personally identifies you," such as your "name" and

8   "email address," is information which Google says that it will not share, subject to an Account

9   Holder's Ad Settings.  (CAC Ex. 15 at 28.)  Plaintiffs do not allege Google shares names, email

10  addresses, billing information, or other equivalent information through RTB.  (CAC ¶¶ 137, 201.)

11     By contrast, the Privacy Policy **differentiates** the **information that Google collects** and may

12  in some instances share, such as "unique identifiers" (*i.e.*, web "cookies"), "browser type," "device

13  type," "IP address[es]," and "information about your location."  (*Id*. Ex. 15 at 2–4.)  As Google

14  discloses, it uses the information it collects to "provide better services," and to "[p]rovide

15  personalized services, including content and ads."  (*Id*. at 1, 5.)  No plausible reading of the Policy

16  permits Plaintiffs to conflate the "personal information" users provide to Google with the distinct

17  information the Policy expressly says Google collects as people use its services.  (*See, e.g., id.* at 5

18  ("We don't share information that personally identifies you with advertisers, such as your name or

19  email"), *id.* at 12 ("We may share non-personally identifiable information . . . with our partners –

20  like publishers [and] advertisers.").)  Yet, it is clear from the CAC's reference to public RTB

21  documents that Google shares **only the latter** information in RTB.  The RTB protocol detailing the

22  "information that we know about the user" sent to participants includes, for example, a partial "IP

23  address," a unique identifier (called "Google ID"), "the browser and type of device," and "the user's

24  approximate geographic location."  (CAC ¶ 140; *see also id*. ¶ 137 (listing similar information in

25  OpenRTB Integration); *id.* ¶ 173 (acknowledging Google ID is nothing more than a cookie); *see*

26  *also* Saldaña Decl. Ex. A at 1 ("The Google ID [is] for the user.  This field is the unpadded web-

27  safe base64 encoded version of a binary cookie id.").)  Plaintiffs' contract claims rest on the alleged

28  sharing of "personal information," as the Policy defines that term, yet ***none*** of what is actually

shared through RTB satisfies that definition.  This, too, dooms their breach of contract claims.

### c.     The CCPA's Definition of "Personal information" Is Not a Part of Google's Contract with Account Holders.

Unable to rely on the Privacy Policy's definition of "personal information," Plaintiffs turn to the California Consumer Privacy Act's ("CCPA") definition, Cal. Civ. Code § 1798.140, claiming that the ToS's general choice of law provision "expressly adopt[s]" by designating California law.  (CAC ¶¶ 17, 74–77, 347.)  This conclusory allegation does not survive scrutiny.  Because the CCPA did not become operative *until* January 1, 2020, Cal. Civ. Code § 1798.198(a), its definition could not have bound Google prior to that date.  More fundamentally, Plaintiffs ignore the bedrock contract principle of consent.  *See Donovan v. RRL Corp.*, 26 Cal. 4th 261, 270 (2001) ("An essential element of any contract is the consent of the parties.").  Plaintiffs cannot plausibly claim that Google consented to the CCPA's definition of "personal information" when the Privacy Policy *already defined* that term differently.  (CAC ¶ 87, Ex. 15 at 28.)

To the extent this Court concluded in *Calhoun* that the choice of law clause imported the CCPA's different definition of "personal information," 2021 WL 1056532, at *9, *18, Google respectfully disagrees.  A choice of law clause cannot nullify the Policy's specific definition of "personal information."  *See Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225, 1235 (2004) ("[W]hen a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision."); *Treichler v. Johnson*, 1992 U.S. Dist. LEXIS 8575, at *6 (N.D. Cal. June 4, 1992) (dismissing contract claims for violations of Washington statutory law because the plaintiff had not shown that "the parties intended the general choice of law provision to nullify the specific terms contained in . . . the agreement").  Thus, the CCPA's definition is irrelevant here.

### C.     Plaintiffs' Breach of Implied Covenant Claim (Count 2) Fails.

Under California law, the implied covenant "cannot be extended to create obligations not contemplated in the contract."  *Racine & Laramie, Ltd. v. Cal. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031–32 (1992) (citations omitted).  Plaintiffs' claim falters because it largely concerns concededly "extra-contractual terms" to which the parties *never agreed*.  (CAC ¶¶ 357,

359–65.)  Plaintiffs' further claim that Google allegedly failed to inform them of "its conduct in RTB" (*id.* ¶ 368) fails because they identify no contractual term imposing such a duty.  (*Id.* ¶¶ 78–96); *AdTrader, Inc. v. Google LLC*, 2018 WL 3428525, at *3 (N.D. Cal. July 13, 2018) (dismissing implied covenant claim because "the FAC's allegations attempt to add obligations that do not expressly appear in the agreements referenced in the FAC").  The remaining theory that Google frustrated the contract's purpose relies on the same promises as the breach of contract claim and is thus duplicative.  (*Compare* CAC ¶¶ 342(g), 343(b), 356, *with id.* ¶¶ 358, 360(a)); *see*, *e.g.*, *Snapkeys, Ltd. v. Google LLC*, 442 F. Supp. 3d 1196, 1211 (N.D. Cal. 2020) (dismissing implied covenant claim because the same allegations were "at the heart" of the breach of contract claim).

**D.**   **Plaintiffs Fail to State a Claim for Invasion of Privacy Under the California Constitution (Count 4) or Claim for Intrusion Upon Seclusion (Count 5).**

"The California Constitution and the common law set a high bar for an invasion of privacy claim." *Low*, 900 F. Supp. 2d at 1025.  When both a Constitutional privacy claim and intrusion upon seclusion claim are alleged, "courts consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Facebook Internet Tracking*, 956 F.3d at 601.

**1.**   **Plaintiffs Have Not Alleged that Google Shared Their Own Information.**

A plaintiff must show that ***their*** information was shared to state a claim for invasion of privacy or intrusion upon seclusion.  *See, e.g.*, *In re Zoom Video Commc'ns*, 2021 WL 930623, at *12-13 (dismissing invasion of privacy claim for "fail[ure] to allege that *Plaintiffs'* data was shared with a third party"); *Banga v. Equifax Info. Servs., LLC*, 2015 WL 3799546, at *9 (N.D. Cal. June 18, 2015) (similar).   Without allegations about whether the named Plaintiffs opted out of personalized ads, the websites they visited (or whether the sites concerned sensitive topics), or the ads they saw, Plaintiffs have not shown that Google improperly shared their information.  (CAC ¶¶ 37–68); *see supra* IV.A.  This alone requires dismissal of these common law claims.

**2.**   **Plaintiffs Have Not Alleged a Reasonable Expectation of Privacy.**

**a.**   **Google's Disclosures Foreclose an Expectation of Privacy.**

When individuals create a Google account, they agree to the Google's ToS, which provides

that Google may analyze user content in some circumstances, including "to customize [its] services . . . such as providing recommendations and personalized . . . ads" and that account holders "can change or turn off" personalized ads in Ad Settings.  (CAC Ex. 4 at 7.)[8]  Google's Privacy Policy also discloses that Google: (1) "may show [account holders] personalized ads based on [their] interests" and (2) "may share non-personally identifiable information publicly and with our partners—like . . . advertisers."  (*See*, *e.g.*, *id.* Ex. 15 at 5, 12; *id.* Ex. 20 at 6, 13.)  Similarly, Google's "How our business works" page discloses that Google "use[s] personal information to make [its] products more helpful," such as by showing "ads based on [a user's] interests," and explains how users can "control the information about [them] that's used to show ads" or turn off personalized ads altogether.  (*Id.* Ex. 5 at 1–2.)

These agreements with and disclosures to users demonstrate that Plaintiffs have not plausibly alleged a reasonable expectation of privacy in the data purportedly shared with RTB participants and defeat their claims.  Indeed, where, as here, policies disclose how data is used for online services, courts routinely conclude that no reasonable expectation of privacy exists and dismiss common law privacy claims for that reason.  *See, e.g.*, *In re Google, Inc. Privacy Policy Litig.*, 2013 WL 6248499, at *16 (N.D. Cal. Dec. 3, 2013) ("[T]he Court does not find any expectation [of privacy] to be plausible in light of Google's earlier disclosure that it would commingle PII across products to support its advertising model."); *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (holding reasonable person viewing Facebook's terms and policies would understand Facebook "collect[s] its users' data from third-party sites" and "us[es] the data for advertising purposes"); *Davidson v. Hewlett-Packard Co.*, 2021 WL 4222130, at *8 (N.D. Cal. Sept. 16, 2021) (plaintiffs had no reasonable expectation of privacy where medical information was shared as contemplated by agreement); *In re Facebook, Inc.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019) (dismissing privacy claims brought by "plaintiffs who consented to this conduct" when they accepted Facebook's terms); *Gonzales v. Uber Techs.*, *Inc.*, 305 F. Supp. 3d 1078, 1092 (N.D. Cal. 2018) (plaintiff lacked reasonable expectation of privacy in geolocation data where plaintiff

---

[8] The earlier versions of the ToS attached to the CAC similarly disclosed that Google used a user's content to offer personalized ads.  (CAC Ex. 2 at 3; *id.*, Ex. 3 at 3.)

1    consented to and could reasonably expect that such information would be shared with other users).

2    Like in these cases, Plaintiffs' agreement to the challenged practices and Google's disclosures

3    preclude a reasonable expectation of privacy.[9]

             **b.**     **Plaintiffs Do Not Have a Reasonable Expectation of Privacy in the Data Allegedly Shared.**

6    As pled, the nature of the data allegedly shared also shows Plaintiffs have no reasonable

7    expectation of privacy.  Plaintiffs' failure to allege that ***their own*** data was shared or explain how

8    they had an expectation of privacy defeats their claims.  *See supra* IV.A; *see also In re Google*

9    *Assistant Privacy Litig.*, 457 F. Supp. 3d at 830 (dismissing common law privacy claims because

10    plaintiffs "ha[d] not alleged sufficient information" about their own experience and thus did not

11    establish an expectation of privacy); *see also Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 690 (N.D.

12    Cal. 2021) (dismissing same claims because plaintiffs did "not allege[] specific circumstances to

13    show that . . . their confidential communications" were at issue).

14    Moreover, the user-specific information Plaintiffs allege Google shares with RTB

15    participants is routinely shared, such as cookie identifiers,[10] truncated IP addresses, and information

16    about their web browser and version.   These allegations cannot support a reasonable expectation

17    of privacy.  *See, e.g.*, *Chevron Corp. v. Donziger*, 2013 WL 4536808, at *10 (N.D. Cal. Aug. 22,

18    2013) (dismissing privacy claim because there was "no privacy interest in" information voluntarily

19    turned over to third parties, such as IP addresses and subscriber information); *Heeger v. Facebook,*

20    *Inc.*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) (same); *United States v. Forrester*, 512 F.3d

21    500, 510 (9th Cir. 2008) (in Fourth Amendment context, "Internet users have no expectation of

22    privacy in . . . the IP addresses of the websites they visit.").

---

[9] Plaintiffs' failed attempt to shoehorn in the CCPA definition changes nothing. *See supra* IV.B.2.c. Moreover, Plaintiffs would still need to show a reasonable expectation of privacy and that any invasion by Google was highly offensive.  *See Facebook, Inc. v. BrandTotal Ltd.*, 2021 WL 3885981, at *7 (N.D. Cal. Aug. 31, 2021) ("reject[ing] [] scattershot citations to the CCPA," including to the definition of "personal information," which "failed to tie that law's actual requirements to the conduct at issue in th[e] case").  They cannot do so.  *See infra* IV.D.

[10] While Plaintiffs allege that Google shares a "Google ID," Plaintiffs admit that the Google ID is essentially nothing more than a cookie.  (CAC ¶ 173.)

The CAC's more sensational allegations—unconnected to any Plaintiff's alleged experience—are implausibly pled because the CAC and incorporated documents contradict them. For example, although Plaintiffs claim that Google provides user home addresses to RTB bidders, (CAC ¶ 204), as the protocol cited throughout the CAC explains, any location data shared is intentionally generalized. *See supra* II.E; (*see also* Saldaña Decl. ¶ 2, Ex. A at 2 (explaining that "geo" field provides only "approximate geographic location" that is "fuzzied as necessary to protect user privacy")). This "fuzzied" data cannot support an invasion of privacy. *Heeger*, 509 F. Supp. 3d at 1189 (no reasonable expectation of privacy in generalized location data).

Plaintiffs also allege that Google shares sensitive information through "verticals." (CAC ¶¶ 141–150.) Elsewhere in the CAC, however, Plaintiffs concede that ***user*** verticals are "[c]urrently unused" and "not populated by default" in the RTB. (*Id.* ¶¶ 140, 148.) Plaintiffs' naked speculation that a different variable "may" have or "likely" could be used to capture that information is insufficient. (*Id.* ¶ 149); *see Mujica v. AirScan, Inc.*, 771 F.3d 580, 592 (9th Cir. 2014) ("mere conjecture" is insufficient for a claim). In fact, although Plaintiffs allege Google shares "Detected Verticals," they recognize that this is data about ***the website*** hosting the ad, not information about any Account Holder. (CAC ¶¶ 140, 150.) Plaintiffs also insinuate that a cookie matching service enables RTB participants to de-anonymize information. (*Id.* ¶ 173.) But their allegations show only that the service allows RTB participants to associate their own cookies with Google's to inform their bid, not that RTB participants are de-anonymizing data. (*Id.* ¶ 177.) This Court has previously rejected speculation like this. *Low*, 900 F. Supp. 2d at 1025 ("Although Plaintiffs postulate that these third parties could, through inferences, de-anonymize this data [shared by the defendant], it is not clear that anyone has actually done so.").

### 3.      Plaintiffs Have Not Alleged A Highly Offensive Invasion of Privacy

Plaintiffs must show the invasion of privacy was "'highly offensive' to a reasonable person, and 'sufficiently serious' and unwarranted so as to constitute an 'egregious breach of the social norms.'" *Facebook Internet Tracking*, 956 F.3d at 606 (citation omitted). Even if the CAC established that Google shared ***Plaintiffs'*** information (it does not), Plaintiffs fail to show Google's alleged conduct is highly offensive. (CAC ¶ 406.) When the insufficiently pled allegations

1    regarding use of precise geolocation, verticals, and cookie matching are peeled away, *see supra*

2    IV.D.2.b, Plaintiffs' claims rest on information routinely shared online, such as a partial IP address,

3    cookie identifiers, the URL of the webpage, user-agent information, device identifiers, and

4    generalized geolocation information.[11]  (*Id.* ¶ 14.)  As numerous courts recognize, the use and

5    sharing of such information does not constitute a highly offensive invasion of privacy because it is

6    how the Internet and other online ecosystems have worked for years.

7         For example, in *In re iPhone Application Litigation*, this Court held that it was not "an

8    egregious breach of social norms" to disclose "the unique device identifier number, personal data,

9    and geolocation information," even assuming no consent.  844 F. Supp. 2d 1040, 1063 (N.D. Cal.

10   2012) (Koh, J.).  Other courts have held similarly.  *See In re Nickelodeon Consumer Privacy Litig.*,

11   827 F.3d 262, 294–95 (3d Cir. 2016) (noting "courts have long understood that tracking cookies

12   can serve legitimate commercial purposes" and that Google's use of cookies on third-party website

13   was not "sufficiently offensive")*; In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 988

14   (N.D. Cal. 2014) (similar); *In re Google Android Consumer Privacy Litig.*, 2013 WL 1283236, at

15   *11 (N.D. Cal. Mar. 26, 2013) (allegations that Android system "allowed third party Affiliates, like

16   Defendants AdMob and AdWhirl, to obtain [plaintiffs'] PII" and Google "tracked and shared highly

17   detailed confidential PII over a substantial period of time without [the plaintiffs'] knowledge or

18   consent" did not establish "an egregious breach of social norms"); *Low*, 900 F. Supp. 2d at 1025

19   (sharing of "a numeric code associated with a user and the URL of the profile page viewed" did not

20   "amount[] to a serious invasion of the protected privacy interest"); *Yunker v. Pandora Media, Inc.*,

21   2013 WL 1282980, at *15 (N.D. Cal. Mar. 26, 2013) (allegation that the plaintiff "provided Pandora

22   with his PII, which it then disclosed to third parties" not "highly offensive").

23        *Brown* and *Calhoun* do not change that conclusion.  There, plaintiffs alleged they took

24   **affirmative steps** to prevent Google from receiving information, but it was allegedly collected

25   nonetheless.  *Brown v. Google LLC*, 2021 WL 949372, at *21 (N.D. Cal. Mar. 12, 2021) (plaintiffs

26

27

28

---

[11]  Moreover, while Plaintiffs suggest that Google discloses their "browsing history," their allegations do not support (and indeed contradict) that.  Plaintiffs actually allege only that Google tells advertisers the website on which their ad would be placed.  (CAC ¶¶ 137-40 (excerpting Google's RTB protocols that list information sent through RTB).)

1    alleged "they were using private browsing mode" and thus alleged highly offensive behavior);

2    *Calhoun*, 2021 WL 1056532, at *1, *17 (plaintiffs alleged they chose not to sync their Google

3    accounts with their Chrome browsers and thus alleged "surreptitious" behavior).  Here, in sharp

4    contrast, Plaintiffs make no allegations at all that they opted out of ad personalization but were still

5    shown personalized ads.  In fact, as discussed, Google discloses it personalizes ads and provides

6    individuals with the opportunity to opt out of such personalization.  (CAC Ex. 4 at 7.)

7          **E.**    **Plaintiffs Fail to State a Claim for Publication of Private Information (Count 6)**

8          To state a claim for public disclosure of private facts, a plaintiff must show: "(1) public

9    disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable

10    person and (4) which is not of legitimate public concern."  *Shulman v. Grp. W Prods., Inc.*, 18 Cal.

11    4th 200, 214 (1998) (citation omitted).  "The absence of any one of these elements is a complete

12    bar to liability."  *Moreno v. Hanford Sentinel, Inc.*, 172 Cal. App. 4th 1125, 1130 (2009).  Plaintiffs'

13    claim (CAC ¶¶ 410–16) fails at the first element because they do not allege an actionable "public

14    disclosure."  "[C]ommon law invasion of privacy by public disclosure of private facts requires that

15    the actionable disclosure be widely published and not confined to a few persons or limited

16    circumstances."  *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 27 (1994); *Virgil v. Time, Inc.*,

17    527 F.2d 1122, 1126 (9th Cir. 1975) (information must be "substantially certain to become [] public

18    knowledge").  Here, Plaintiffs allege only disclosure to RTB participants for the purpose of

19    providing personalized ads, as disclosed in Google's ToS, Privacy Policy, and other documents.

20    (*See, e.g.*, CAC ¶ 113, 128, 132, Exs. 2–21.)  Disclosure to this limited group for the limited purpose

21    of computer-driven analysis of online ad opportunities, as contemplated by Google's disclosures,

22    cannot show the requisite publicity.  *See, e.g.*, *Davidson*, 2021 WL 4222130, at *8 (finding

23    "disclosures were limited to [certain] individuals . . . as dictated by," in relevant part, the "Privacy

24    Notice" and thus, "[g]iven their confined nature," did not constitute a public disclosure).  As courts

25    in this district recognize, "there's a difference between publicizing your sensitive information for

26    actual human beings to scrutinize (like, in a newspaper) and allowing your information to be added

27    to the vast sea of 'big data' that computers rather than humans analyze for the purpose of sending

28    targeted advertising on behalf of companies."  *In re Facebook, Inc.*, 402 F. Supp. 3d at 796.

Plaintiffs have not plausibly alleged the remaining elements either.  First, much of the information that Google allegedly discloses in RTB is not private because it is already known by websites by virtue of Plaintiffs' Internet use.  *See supra* IV.D.2 (explaining how such information is routinely shared on the Internet); (*see also* CAC ¶¶ 14, 37–68, 411); *Forsher v. Bugliosi*, 26 Cal. 3d 792, 808 (1980) ("[T]he facts disclosed must be *private facts*, not public ones."); *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1124–25 (N.D. Cal. 2002) (publication of activity observable to third parties does not support publication of private information claim).  Second, the disclosure of such information would not be offensive and objectionable to the reasonable person in the circumstances here.  Plaintiffs (and all users) can choose whether to opt out of personalized ads.  (CAC Ex. 4 at 7); *see also In re Facebook, Inc.*, 402 F. Supp. 3d at 797 (dismissing public disclosure of private facts claims where Facebook disclosed and users consent to data sharing at issue).  Moreover, it is not "offensive and objectionable" for Internet companies to share anonymized information that is part and parcel to how the Internet functions.  *See supra* IV.D.3.  And while Plaintiffs claim that Google publishes "sensitive information," they offer no individualized supporting allegations concerning their own sensitive information.  (CAC ¶¶ 37–68, 411.)  For these reasons, the Court should dismiss this claim with prejudice.

**F.     Plaintiffs' Breach of Confidence Claim (Count 7) Fails**

**1.     The Express Contract About the Same Subject Matter Bars This Claim.**

A breach of confidence claim is "grounded on an implied-in-law or quasi-contractual theory." *Berkla v. Corel Corp.*, 302 F.3d 909, 918 (9th Cir. 2002).  For this reason, "[t]here cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time." *Id.* (citation omitted).  Plaintiffs' claim runs headlong into this limitation.  In their breach of contract claim, Plaintiffs allege Google breached the ToS (including the allegedly incorporated webpage) and the Privacy Policy by using and disclosing "personal information." (*E.g.*, CAC ¶¶ 79–81, 260, 339–52.)  Plaintiffs rely on the same alleged agreements, and alleged use and disclosure of the same information, to claim that Google has breached their confidence.  (*See id.* ¶ 423 (identifying ToS); ¶¶ 419–20, 424–25.)  Because both claims rely on the same alleged contracts with the same subject matter, the Court cannot imply a contract but

1    rather must dismiss Plaintiffs' breach of confidence claim.  *See Berkla*, 302 F.3d at 918 (dismissing

2    breach of confidence claim that was "coterminous" with contract claim); *Huynh v. Quora, Inc.*,

3    2019 WL 11502875, at *8 (N.D. Cal. Dec. 19, 2019) (dismissing breach of confidence claim

4    "predicated on Quora's Privacy Policy," which plaintiffs alleged "governed" their relationship with

5    Quora and informed their expectations about how Quora would treat their personal information);

6    *San Jose Options, Inc. v. Yeh*, 2014 WL 1868738, at *6 (N.D. Cal. May 7, 2014) (similar).

### 2.    Plaintiffs Otherwise Fail to State a Breach of Confidence Claim

8    A breach of confidence claim requires that: (1) the plaintiff conveyed confidential and novel

9    information to the defendant; (2) the defendant had knowledge that the information was being

10   disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that

11   the confidence be maintained; and (4) there was a disclosure or use in violation of the

12   understanding.  *Berkla*, 302 F.3d at 917.  Plaintiffs' novel application of this claim fails.

13   Plaintiffs do not plead any factual allegations that plausibly show that any confidential or

14   novel information is at issue.  Instead, Plaintiffs allege that Google shared information that is

15   routinely shared online, such as Plaintiffs' partial IP address and operating system, generalized

16   geolocation information, and the publisher's URL.  (*See, e.g.*, CAC ¶¶ 14, 137, 140, 209–59); *see*

17   *supra* IV.D.2.  Despite the prevalence and public nature of this information, Plaintiffs never explain

18   how this information is "novel" or "confidential."  Nor can they.  That this information is regularly

19   shared with websites (*e.g.*, IP addresses) or is publicly posted online (*e.g.*, publisher's URL) defeats

20   any claim of "novelty" or "confidentiality."  *See, e.g.*, *Friedman v. DirecTV*, 262 F. Supp. 3d 1000,

21   1007 (C.D. Cal. 2015) (dismissing breach of confidence claim and rejecting suggestion that novelty

22   could exist in "unique combination" of existing information); *Sawicky v. AMC Networks Inc.*, 2018

23   WL 11292263, at *4 (C.D. Cal. July 11, 2018) ("public" idea was not confidential and could not

24   be subject of breach of confidence); *Reed v. Nat'l Football League*, 2015 WL 13333481, at *4

25   (C.D. Cal. Sept. 24, 2015) (holding that information was not confidential when plaintiff alleged he

26   had already shared information at issue with other third parties).

27   Furthermore, Plaintiffs' allegations do not plausibly establish that Google understood that

28   Plaintiffs disclosed any information in confidence or that Google and Plaintiffs had a shared

understanding that confidence would be maintained.  As explained in the ToS and Privacy Policy, Google Account Holders can opt out of personalized advertising, (CAC Ex. 4 at 7; *id.*, Ex. 15 at 8), but no Plaintiff alleges doing so.  Absent such allegations, Plaintiffs cannot plausibly allege Google understood Plaintiffs had disclosed information in confidence or that the parties had a shared understanding that the information would be maintained in confidence.

### G.   Plaintiffs Fail to State a Wire Tap Act Claim for Disclosure (Count 10).

#### 1.   Plaintiffs Fail to Allege Google Intercepted the Contents of Their Communications.

To state a Wire Tap Act ("WTA") claim for unauthorized disclosure, a plaintiff must allege that the defendant disclosed ***the contents*** of their communications.  *See* 18 U.S.C. §§ 2511(1)(a), 2510(4) (WTA claim requires an "intercept[ion]," defined as the "acquisition of the contents of any . . . electronic communication").  Plaintiffs' WTA claim (CAC ¶¶ 440–64) fails at the outset under this requirement.  The "content" of a communication means "the intended message conveyed by the communication," *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014), or the "substance, purport, or meaning of that communication," 18 U.S.C. § 2510(8).  Not all information meets that test.  "[R]ecord information regarding the characteristics of the message," such as "the name, address and subscriber number or identity of a subscriber or customer," are *not* the "contents" of a communication.  *In re Zynga Priv. Litig.*, 750 F.3d at 1104, 1107 (citation and internal quotations omitted).  Critically, personally identifiable information is not equivalent to the contents of a communication, nor is disclosure of such information proscribed.  *See id.* ("There is no language in [these statutes] equating 'contents' with personally identifiable information.  Thus, an allegation that [defendants] disclosed personally identifiable information is not equivalent to an allegation that they disclosed the contents of a communication.").

Here, Google allegedly disclosed "[t]he precise text of GET and POST requests" generated when users click to view a webpage as well as information about the web page, like its URL and subject matter.  (*See* CAC ¶ 474; *see also id.* ¶¶ 446(a) & (c), 449.)  Yet, as the Ninth Circuit concluded in *Zynga* when it affirmed dismissal of WTA claims with prejudice, this information "does not meet the definition of 'contents,' because these pieces of information are not the

'substance, purport, or meaning' of a communication." *Id*. at 1107 (citation omitted); *see also Gonzales v. Uber Technologies, Inc.*, 305 F. Supp. 3d 1078, 1084 (N.D. Cal. 2018) (dismissing WTA claim because "an individual's Facebook ID and the URL of the webpage the individual was viewing are not the contents of a communication"). Thus, Plaintiffs' WTA and CIPA claims predicated on such information are subject to dismissal with prejudice.

Plaintiffs' general allegation that Google discloses the "precise text of Plaintiffs' and Class Members' search queries at non-Google websites," (CAC ¶¶ 446(b), 474), is equally insufficient. Nothing Google allegedly shares with RTB participants includes this, as the CAC concedes. (*Id*. ¶¶ 135–38.) Thus, Plaintiffs cannot predicate their WTA claim on the alleged disclosure of such information. *See Tapia Carmona v. Cnty. of San Mateo*, 2019 WL 4345973, at *9 (N.D. Cal. Sept. 12, 2019) (Koh, J.) ("[G]eneral, conclusory allegations need not be credited when they are belied by more specific allegations of the complaint.") (citation and internal quotations omitted); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) (collecting cases).

### 2.    Any Alleged Disclosure Occurred with Publishers' Lawful Consent.

Under the WTA, "[a] person or entity providing an electronic communication service ['ECS'] to the public may divulge the contents of [a] communication with the lawful consent of the originator or any addressee or intended recipient of such communication."   18 U.S.C § 2511(3)(b)(ii). The consent of any one of these will defeat a WTA claim. *In re Yahoo Mail Litig*, 7 F. Supp. 3d 1016, 1026 (N.D. Cal. 2014) (Koh, J.) ("[T]he consent of one party is a complete defense to a Wiretap Act claim."). Here, Plaintiffs cannot state a WTA unauthorized disclosure claim because there was lawful consent. As Google disclosed, all users could (and can) opt in or out of personalized ads. *See supra* IV.B.2.a. Opting to receiving such ads is lawful consent.

Additionally, irrespective of user consent, the website Publishers—a fundamental "layer" of the RTB process, (CAC ¶ 120(a))—provide lawful consent. Publishers such as the New York Times or ESPN participate in the RTB system to sell space on their websites, which Account Holders visit. (*Id*. ¶¶ 118–132.) Publishers qualify as an "intended recipient" of the alleged communications here because they receive and respond to the GET requests at issue. *See In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 143 (3rd Cir. 2015) ("As

1   the intended recipient of a communication is necessarily one of its parties, and the defendants were

2   the intended recipients of the GET requests they acquired here, the defendants were parties to the

3   transmissions at issue in this case.")   The CAC also demonstrates that Publishers consent to

4   disclosure of the alleged contents.  Publishers must "install Google's code on their websites," (CAC

5   ¶ 127), or utilize "software developments kits" ("SDKs") that Google provides "for publishers to

6   incorporate into their apps," (*id.* ¶ 125), to sell ad space through RTB.  This software allegedly

7   collects information from an Account Holder when the holder visits a website, which is the same

8   information that Google allegedly discloses to third-party advertisers bidding through RTB to place

9   an ad on a Publisher's website.  (*Id.* ¶¶ 125, 128, 134.)  As Plaintiffs recognize, all of this, including

10  the information that allegedly constitutes the contents of Plaintiffs' communications, is disclosed

11  to RTB participants and the public.  (*Id.* ¶¶ 135–44, 201.)

12       These allegations resemble those where courts concluded that party consent defeated a

13  WTA claim.  In *Rodriguez v. Google LLC*, the court dismissed a WTA claim concerning a Google

14  software development kit that developers could install in their apps to "automatically send various

15  interactions between the app and its users (including the users' URL requests, in-app browsing

16  history, and in-app search queries) to Google."  2021 WL 2026726, at *2 (N.D. Cal. May 21, 2021).

17  The court determined the app developers "knowingly agree[d]" to install Google's software in their

18  apps and thus "consented to Google's collection of plaintiffs' data."  *Id.* at *5.  Similarly, in *In re*

19  *Nickelodeon Consumer Privacy Litigation,* which involved Google cookies on Viacom's website,

20  the court dismissed the WTA claim with prejudice because of consent.  2014 WL 3012873, at *13

21  (D.N.J. July 2, 2014), *aff'd in part by* 827 F.3d 262 (3d Cir. 2016).   Because the alleged

22  interceptions involved the use of cookies that websites install or allow to be installed, the

23  interceptions occurred "with the express consent of websites like Viacom."  *Id.*

24       The Publishers here are distinguishable from the websites in *Calhoun*.  There, the plaintiffs

25  alleged that websites installed tracking cookies for un-synced Chrome users on their sites, but the

26  sites did not understand what information was allegedly collected because "neither Google's

27  Privacy Policy nor any other disclosure to which Google points states that Google engages in the

28  alleged data collection while users are using Chrome without sync."  *Calhoun*, 2021 WL 1056532,

at *11.  Unlike *Calhoun*, Plaintiffs do not allege Publishers were unaware of the information they provided to Google or that such information would be used for individualized ads.  In fact, Plaintiffs allege that data sharing worked ***exactly*** as Google publicly said it would.  (CAC ¶¶ 135–144.)

**H.      Plaintiffs Fail to State a CIPA Claim, California Residents or Not (Count 8).**

At the outset, because the meaning of "contents" of a communication under CIPA is the same as under the Wiretap Act, *see Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020), ***all Plaintiffs' CIPA claims*** concerning allegedly unlawful interceptions fail for the reasons already discussed.  *See supra* IV.G.1.

The Non-California Plaintiffs' claims also fail because they cannot raise a CIPA claim for alleged interceptions not sent from or received within California.  *See In re Yahoo Mail Litig.*, 308 F.R.D. 577, 604 (N.D. Cal. 2015).  The CIPA reaches only interceptions that occur while a communication is in transit or is being sent or received "within this state."  Cal. Penal Code § 631(a).  Although the ToS designates California law for disputes, this does not allow the Non-California Plaintiffs to circumvent the CIPA.  *See id.*; *Gravquick A/S v. Trimble Nav. Int'l Ltd.*, 323 F.3d 1219, 1223 (9th Cir. 2003) ("When a law contains geographical limitations on its application, . . . courts will not apply it to parties falling outside those limitations, even if the parties stipulate that the law should apply.").  Here, no Non-California Plaintiffs alleges that they were in California or communicated with third-party websites located in California.  (CAC ¶¶ 53–68.)  Although the CAC alleges that "Google is headquartered in California" and "designed, contrived, and effectuated its practice of disclosing account holder information during the RTB process in California," (*id.* ¶ 428), this is insufficient.  The CIPA does not proscribe business operations generally, but rather discrete instances of interception within California.  *See* Cal. Pen. Code § 631(a).  Without factual allegations showing unlawful conduct in California, the Court should dismiss the Non-California Plaintiffs' CIPA claims.  *See Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) (concluding that a decision made in California did not justify application of California law without facts showing that unlawful conduct occurred in California).

**V.      CONCLUSION**

For the foregoing reasons, the Court should dismiss the CAC in its entirety.

1

2    Dated: October 1, 2021                        COOLEY LLP
                                                   MICHAEL G. RHODES (SBN 116127)
3                                                  JEFFREY M. GUTKIN (SBN 216083)
                                                   ROBBY L.R. SALDAÑA (*pro hac vice*)
4                                                  KELSEY R. SPECTOR (SBN 321488)
                                                   COLIN S. SCOTT (SBN 318555)
5

6

7                                                  By: */s/ Jeffrey M. Gutkin*
                                                        Jeffrey M. Gutkin
8
                                                   Attorneys for Defendant
9                                                  GOOGLE LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28