# EXHIBIT 1

## [Redacted Version of Plaintiffs' Opposition to Motion to Dismiss]

**PRITZKER LEVINE LLP**
Elizabeth C. Pritzker (SBN 146267)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (SBN 191305)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*

**COTCHETT, PITRE & McCARTHY, LLP**
Nanci E. Nishimura (SBN 152621)
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel.: (650) 697-6000
Fax: (650) 697-0577
*nnishimura@cpmlegal.com*

**DICELLO LEVITT & GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA  92037
Tel.: (858) 914-2001
Fax:  (858) 914-2002
*fbottini@bottinilaw.com*

[Additional counsel listed on signature page]

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation,<br><br>This Document Relates to: *all actions*. | Master File No. 5:21-cv-02155-LHK-VKD<br><br>**PLAINTIFFS' *SECOND CORRECTED* MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO GOOGLE'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Judge:  Hon. Lucy H. Koh<br><br>Hearing Date:    December 9, 2021<br>Hearing Time:    1:30pm<br>Hearing Location:   Courtroom 8 – 4th Floor |

# TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT AND FACTS ........................................................1

II.     COUNTER-STATEMENT OF ISSUE TO BE DECIDED ..................................2

III.    ARGUMENT .......................................................................................................3

        A.      Plaintiffs Adequately Allege Concrete and Particularized Injury ...................3

        B.      Plaintiffs Adequately Allege Breach of Contract ............................................5

                1.      Google's Promise Not to Sell Account Holders' PI Is Part of the Contract .......6

                2.      Google Broke Its Promise to Not Sell or Share PI ...............................7

                        a.      Plaintiffs Need Not Opt Out of Personalized Ads to Enforce Google's Promise to Not Share or Sell PI ...............................7

                        b.      Google's Interpretation of PI Is Objectively Unreasonable ..................8

                        c.      The CCPA's Definition of PI Governs Google's Contract with Account Holders ...............................9

        C.      Plaintiffs Adequately Allege Breach of the Duty of Good Faith and Fair Dealing ......10

        D.      Plaintiffs Adequately Allege Invasion of Privacy and Intrusion Upon Seclusion ........11

                1.      Plaintiffs Had Reasonable Expectations of Privacy ...........................11

                2.      Google's Conduct Was "Highly Offensive" ......................................14

        E.      Plaintiffs Adequately Allege Publication of Private Information .................15

        F.      Plaintiffs Adequately Allege Breach of Confidence .....................................15

                1.      An Express Contract Does Not Bar This Claim ................................16

                2.      Plaintiffs Adequately Plead All Elements of Breach of Confidence................17

        G.      Plaintiffs Adequately Allege Unauthorized Disclosure of Communications Content by Google as an Electronic Communications Service Provider under the ECPA ............19

                1.      Plaintiffs Allege Disclosure of "Content" .......................................20

                2.      Google Has Not Established the "*Lawful* Consent" of Anyone .......................21

        H.      Plaintiffs Adequately Allege a CIPA Claim for All Putative Class Members .............24

IV.     CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

*Cases*

*ACLU v. Clapper,*
    785 F.3d 787 (2d Cir. 2015) ............................................................................................ 4

*Aliotti v. R. Dakin & Co.,*
    831 F.2d 898 (9th Cir. 1987) .......................................................................................... 16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................................................ 3

*Balboa Ins. Co. v. Trans Global Equities,*
    218 Cal. App. 3d 1327 (1990) ....................................................................................... 18

*Banga v. Equifax Info. Servs.* LLC,
    2015 WL 3799546 (N.D. Cal. June 18, 2015) .............................................................. 12

*Berkla v. Corel Corp.,*
    302 F.3d 909 (9th Cir. 2002) .......................................................................................... 15

*Birdsong v. Apple,*
    590 F.3d 955 (9th Cir. 2009) ............................................................................................ 5

*Brown v. Google LLC,*
    525 F.Supp.3d 1049 (N.D. Cal. 2021) ..................................................................... 12, 14

*Brown v. Waddell,*
    50 F.3d 285 (4th Cir. 1995) ............................................................................................ 21

*Cal. Spine & Neurology Inst. v. United Healthcare Ins. Co.,*
    2019 WL 4450842 (N.D. Cal. Sept. 17, 2019) ............................................................. 16

*Calhoun, et al. v. Google, LLC,*
    526 F. Supp. 3d 605  (N.D. Cal. 2021) .................................................................. *passim*

*Carpenter v. U.S.,*
    138 S. Ct. 2206 (2018) ................................................................................................... 13

*Chevron Corp. v. Donziger,*
    2013 WL 4536808 (N.D. Cal. Aug. 22, 2013) .............................................................. 14

*Davidson v. Hewlett-Packard Co.,*
    2021 WL 4222130 (N.D. Cal. Sep. 16, 2021) ......................................................... 13, 15

*Davies v. Krasna,*
    14 Cal. 3d 502 (1975) .................................................................................................... 17

*Ent. Rsch. Grp. v. Genesis Creative Grp.*,
  122 F.3d 1211 (9th Cir. 1997) .......................................................................... 17, 18

*Fink v. Goodson-Todman Enterprises, Ltd.*,
  9 Cal. App. 3d 996 (Cal. App. 1970) .................................................................... 19

*Flores-Mendez v. Zoosk, Inc.*,
  2021 WL 308543 (N.D. Cal. Jan. 30, 2021) .......................................................... 18

*Friedman v. DirecTV*,
  262 F. Supp. 3d 1000 (C.D. Cal. 2015) ................................................................. 19

*Gonzalez v. Uber Techs., Inc.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018) ................................................................. 13

*Green v. Schwarzenegger*,
  1995 WL 874191 (C.D. Cal. July 12, 1995) .......................................................... 18

*Heeger v. Facebook, Inc.*,
  509 F. Supp. 3d 1182 (N.D. Cal. 2020) ................................................................. 14

*Hernandez v Hillsides, Inc.*,
  47 Cal. 4th 272 (Cal. 2009) .................................................................................... 15

*Huynh v. Quora, Inc.*,
  2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ..................................................... 17

*In re Easysaver Rewards Litig.*,
  737 F. Supp. 2d 1159 (S.D. Cal. 2010) ................................................................. 10

*In re Facebook Consumer Privacy User Profile Litig.* ("*FB Consumer Profile*"),
  402 F. Supp. 3d 767 (N.D. Cal. 2019) ......................................................... 7, 8, 10, 15

*In re Facebook, Inc., Internet Tracking Litig.* ("*Facebook Tracking*"),
  956 F.3d 589 (9th Cir. 2020) ........................................................................ *passim*

*In re Google Assistant Privacy Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020) .................................................................... 6

*In re Google Cookie Placement Consumer Privacy Litig.* ("*Google Cookie*"),
  806 F.3d 125 (3d Cir. 2015) ......................................................................... *passim*

*In re Google Referrer Header Privacy Litig.*,
  465 F. Supp. 3d 999 (N.D. Cal. 2020) .................................................................... 6

*In re Google, Inc. Privacy Policy Litig.*,
  2013 WL 6248499 (N.D. Cal. Dec. 3, 2013 .......................................................... 13

*In re iPhone App. Litig.*,
  2011 WL 4403963 (N.D. Cal. Sept. 20, 2011)................................................................... 5

*In re iPhone App. Litig.*,
  844 F. Supp. 2d 1040 (N.D. Cal. 2012).......................................................................... 5

*In re Nickelodeon Consumer Privacy Litig.*,
  2014 WL 3012873 (D. N.J. Jul. 2, 2014), *partially rev'd by* 827 F.3d 262 (3d Cir. 2016) .......... 23

*In re Pharmatrak, Inc.*,
  329 F.3d 9 (1st Cir. 2001) ............................................................................................ 23

*In re Yahoo Mail Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015) ................................................................................. 24

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  2017 WL 3727318 (N.D. Cal. Aug. 30, 2017)............................................................... 10

*In re Zoom Video Communications Inc. Privacy Litig.*,
  525 F.Supp.3d 1017 (N.D. Cal. 2021)............................................................................ 5

*In re Zynga Privacy Litig.*,
  750 F.3d 1098 (9th Cir. 2014)..................................................................................... 21

*Jewel v. NSA*,
  673 F.3d 902 (9th Cir. 2011)......................................................................................... 4

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)....................................................................................... 24

*Levine v. Vilsack*,
  587 F.3d 986 (9th Cir. 2009)......................................................................................... 3

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................................... 3

*Manzarek v. St. Paul Fire & Mar. Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008)....................................................................................... 3

*Negro v. Super. Ct.*,
  230 Cal. App. 4th 879 (2014) ..................................................................................... 22

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ..................................................................................................... 22

*Obama v. Klayman*,
  800 F.3d 559 (D.C. Cir. 2015) ...................................................................................... 4

*Ojala v. Bohlin*,
  178 Cal. App. 2d 292 (1960) ....................................................................................... 19

*Reed v. Nat'l Football League*,
  2015 WL 13333481 (C.D. Cal. Sept. 24, 2015) ............................................................................ 19

*Robinson Helicopter Co. v. Dana Corp.*,
  34 Cal. 4th 979 (2004).................................................................................................................. 17

*Rodriguez v. Google LLC*,
  2021 WL 2026726 (N.D. Cal. May 21, 2021) .............................................................................. 23

*San Jose Options, Inc. v. Ho Chung Yeh*,
  2014 WL 1868738 (N.D. Cal. May 7, 2014) .......................................................................... 17, 19

*Sawicky v. AMC Networks Inc.*,
  2018 WL 11292263 (C.D. Cal. July 11, 2018) ............................................................................. 19

*Schuchardt v. President of the United States*,
  839 F.3d 336 (3d Cir. 2016) ........................................................................................................... 4

*Shaw v. Regents of Univ. of Cal.*,
  58 Cal. App. 4th 44 (1997).............................................................................................................. 7

*Shulman v. Grp. W Prods., Inc.*,
  18 Cal. 4th 200 (1998)............................................................................................................. 11, 15

*SMC Networks, Inc. v. Hitron Techs., Inc.*,
  2012 WL 12892690 (C.D. Cal. Oct. 30, 2012) ............................................................................ 18

*Smith v. Facebook*,
  745 F. App'x 8 (2018)................................................................................................................... 13

*SocialApps, LLC v. Zynga, Inc.*,
  2012 WL 381216 (N.D. Cal. Feb. 6, 2012).................................................................... 16, 17, 19

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................................................................ 3

*Stasi v. Inmediata Health Grp.*,
  501 F. Supp. 3d 898 (S.D. Cal. 2020) .......................................................................................... 18

*Tele-Count Eng'rs, Inc. v. Pac. Tel. & Tel. Co.*,
  168 Cal. App. 3d 455 (1985) ................................................................................................... 18, 19

*Thompson v. Cal. Brewing Co.*,
  150 Cal. App. 2d 469 (1957) ......................................................................................................... 19

*U.S. v. Forrester*,
  512 F.3d 500, 504 (9th Cir. 2008) .......................................................................................... 13, 20

*U.S. Telecom Assoc. v. FCC*,
  227 F.3d 450 (D.C. Cir. 2000) ...................................................................................................... 21

*Valentine v. NebuAd, Inc.*,
    804 F. Supp. 2d 1022 (N.D. Cal. 2011) ............................................................................. 24

**Statutes**

18 U.S.C. § 2510(11) ............................................................................................................. 20

18 U.S.C. § 2511(3)(a) .......................................................................................................... 20

18 U.S.C. § 2511(3)(b) .......................................................................................................... 21

18 U.S.C. § 2511(3)(b)(ii) ..................................................................................................... 22

18 U.S.C. § 2520 ................................................................................................................... 20

18 U.S.C. § 2702(b)(3) .......................................................................................................... 22

Cal. Pen. Code § 631 ............................................................................................................ 24

Cal. Civ. Code § 1798.140 .................................................................................................... 10

## I.    SUMMARY OF ARGUMENT AND FACTS

### *"We do not and would never sell consumer data."*

Google CEO Sundar Pichai made this promise in sworn testimony before Congress in December 2018. ¶ 109.[1] Google repeats this promise in its Terms of Service ("ToS"), Privacy Policy, and dozens of other places in its statements to consumers. *See, e.g.*, ¶¶ 70-112. In a 2019 *New York Times* op-ed, Pichai publicly proclaimed that this Google privacy promise was "unequivocal." ¶ 110. But, as explained below, and as the CCAC exhaustively details, Google breaks this promise as a routine business practice through the Google Real Time Bidding ("RTB") system.

Through RTB, Google sells consumer personal information ("PI") to hundreds of companies through millions of different apps and websites. ¶¶ 194-199. This PI includes (1) IP addresses, (2) a Google ID, (3) "match data" through which Google knowingly helps recipients identify consumers, (4) User-Agent, (5) hyperlocal GPS coordinates, (5) webpage URLs, which contain content of Internet communications, (6) consumer interest data, including interests in sensitive categories such as race, health, gender, and sexual orientation, (7) device and advertising IDs, and (8) more. ¶¶ 137, 140-148. All of these categories are protected PI, both as a matter of California law and as a matter of Google's contract, as Google previously has admitted. *See Calhoun, et al. v. Google*, *LLC*, 526 F. Supp. 3d 605, 622 (N.D. Cal. 2021) (PI includes, among other things, "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement"). Google defines PI in its Privacy Policy to include "data that can be *reasonably linked* to [a name or email address] by Google, such as *information we associate with your Google Account*." ¶ 87. Google associates IP addresses, User-Agents, device identifiers, and geo-location with users' Google Accounts. ¶¶ 216, 222, 229, 236. Even if it did not, the combination of data elements that Google discloses to RTB recipients is designed to allow recipients to identify users. ¶¶ 163-184. As the CCAC pleads, even without access to all identifiers, Plaintiffs could trace the geo-location data sold by Google in RTB to specific "residential street addresses via free, publicly available tools." ¶ 204.

Google's motion is grounded in alternative facts that the Court must ignore. These include non

---

[1]  Unless otherwise noted, all "¶ __" references are to the Consolidated Class Action Complaint ("CCAC"), Dkt. No. 92, and all "Ex. __" references are to the Exhibits attached to the CCAC. All internal citations and quotation marks are omitted, and all emphasis is added.

sequiturs regarding Google's disclosures that it *collects* certain information, and purported settings through which Google claims a consumer can turn off targeted advertising. But this case is not about either of those things. The gravamen of Plaintiffs' complaint is not Google's *collection* of their information, or Google's internal use of it for its *own* ad targeting practices. Rather, Plaintiffs challenge Google's practice of *selling* their PI to hundreds of other companies despite having made an "unequivocal" promise that Google would "never" do such a thing. Simply put, Google's motion defends practices that are not at issue and ignores the practices that are: the unauthorized sale and sharing of consumer information through RTB.

Google's misconduct—the unauthorized sale and disclosure of users' PI through RTB—is not in dispute.[2] The CCAC outlines 23 separately pleaded express Google promises that are false or misleading compared to Google's actual business practices. Google's broken promises include:

- "We don't sell your personal information to anyone."
- "[W]e will never share [your] information with advertisers, unless you ask us to."
- "Advertisers do not pay us for personal information[.]"
- "At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies."
- "We don't share information that personally identifies you with advertisers[.]"
- "We do not share your personal information with companies, organizations, or individuals outside of Google except [list of exceptions that do not apply]."
- "[R]emember, we never share any of this personal information with advertisers."
- "Google will never sell any personal information to third parties."

¶ 260. Google's motion ignores these express promises, but the Court cannot. As explained below, Plaintiffs adequately allege facts sufficient for each of the claims at issue.

## II.    COUNTER-STATEMENT OF ISSUE TO BE DECIDED

Whether Plaintiffs' allegations state plausible claims for relief based on Google's sale of personal information in the Real Time Bidding auction without consent and in breach of express

---

[2] Plaintiffs do not oppose Google's Request for Judicial Notice (RJN) of Exhibit A. Google uses this document to claim no PI is sold because IP addresses and GPS are said to be "fuzzed." But the remaining data elements – and the combination thereof – are still PI as a matter of law in California. Just as important, this document *does not prove* that IP address and geo-location are actually fuzzed – raising a factual dispute. ███████████████████████ *See* Declaration of Elizabeth C. Pritzker,  ("Pritzker Decl."), Ex. A. Further, contrary to Google's fuzzification arguments, in Jedi Blue ████████████████████████████████████████████████████████████████ All of these factual matters defeat Google's motion to dismiss under Fed. R. Civ. P. 12(b)(6).

1  contractual promises to the contrary.

2  **III.    ARGUMENT**

3        Plaintiffs need only "plead[] factual content that allows the court to draw the reasonable

4  inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

5  (2009). This plausibility standard is not a "probability requirement;" it only requires "more than a sheer

6  possibility that a defendant has acted unlawfully." *Id.* At this stage, courts "accept factual allegations in

7  the complaint as true and construe the pleadings in the light most favorable to [plaintiffs]." *Manzarek v.*

8  *St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

9        **A.    Plaintiffs Adequately Allege Concrete and Particularized Injury**

10        "Where standing is raised in connection with a motion to dismiss, the court is to accept as true

11  all material allegations of the complaint, and…construe the complaint in favor of the complaining

12  party." *Levine v. Vilsack*, 587 F.3d 986, 991 (9th Cir. 2009). As a result, this Court must take as true all

13  allegations made by Plaintiffs that tend to show they have suffered "an invasion of a legally protected

14  interest" that is "concrete and particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Google

15  does not contest that the unauthorized sale of personal information (or breach of contract forbidding

16  such sale) qualifies as concrete harm. Instead, Google argues that Plaintiffs' individual allegations lack

17  sufficient detail. Mot. at 7. Google mischaracterizes the allegations, misstates the law, and raises factual

18  defenses not appropriate at the pleading stage.

19        A particularized injury is one that affects the plaintiff in a "personal and individual way." *In re*

20  *Facebook, Inc., Internet Tracking Liti*g. ("*Facebook Tracking*"), 956 F.3d 589, 598 (9th Cir. 2020)

21  (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, n.1 (1992)). The CACC contains hundreds of

22  paragraphs alleging facts showing that Google operated, and continues to operate, a massive

23  surreptitious data recording and transmission operation. Plaintiffs plead detailed and individualized facts

24  regarding their interactions with the Internet, which browser was used, and other facts—given Google's

25  near-ubiquitous practices—that all but guarantee their PI was unlawfully sold by Google to third parties.

26        The detail provided in the CACC is more than sufficient to allege individualized injury at the

27  pleading stage. In *Facebook Tracking*, for example, the Ninth Circuit held that plaintiffs alleged standing

28  to challenge Facebook's unauthorized tracking of their communications on millions of different

websites, 956 F.3d at 597-98, even though plaintiffs did not plead the precise URLs intercepted or the webpages visited. Instead, as here, they pled a ubiquitous business practice and facts sufficient to support the inference that they were affected by the unlawful activity. Similarly, in *In re Google Cookie Placement Consumer Privacy Litig.* ("*Google Cookie*"), the Third Circuit held plaintiffs alleged standing based on "highly specific allegations that [Google], in the course of serving advertisements to their personal web browsers, implanted tracking cookies on their personal computers," 806 F.3d 125, 134 (3d Cir. 2015), based on detailed allegations of a ubiquitous business practice and facts from which to infer that plaintiffs were affected by it.

In *Jewel v. NSA*, the Ninth Circuit held that plaintiffs had standing to sue the National Security Agency on behalf of a putative class of "ordinary Americans who are current or former subscribers to AT&T's telephone and/or Internet services." 673 F.3d 902, 906 (9th Cir. 2011). Although *Jewel* did not allege specific communication or location, the Ninth Circuit held that it was enough that she "described these actions as a 'dragnet' and a 'network of surveillance,'" and pled "the technical means," the equipment used, and "that *her* communications were part of the dragnet." *Id.* at 910; *see also ACLU v. Clapper*, 785 F.3d 787, 796 (2d Cir. 2015); *Schuchardt v. President of the United States*, 839 F.3d 336, 346 (3d Cir. 2016); *Obama v. Klayman*, 800 F.3d 559, 563 (D.C. Cir. 2015). In *Klayman,* plaintiffs did not even allege that their specific information was caught in the dragnet; rather, its size, purpose, and ubiquity allowed the Court to draw the reasonable inference that plaintiffs' call metadata was likely caught in it. *Klayman*, 800 F.3d at 563-564.

Consistent with above precedent, Plaintiffs, who are Google Account Holders, allege that Google operates a sprawling data collection and dissemination network that impacts every single Google Account, ¶¶ 37, 68, 185-199, and through RTB, shares specific PI about all Google Account Holders, such as geolocation, IP address, and browsing history. ¶¶ 205-259. Plaintiffs provide specific examples of Google's sharing and sale of this PI. ¶¶ 200-204. And Plaintiffs allege that RTB works "through Google's ubiquitous presence on the Internet" and that, through RTB auctions, "52 different companies 'observe at least 91 percent of an average user's browsing history" and "636 companies 'observe at least 50 percent of an average user's impressions.'" ¶¶ 180-181. These violations of Account holder privacy occur on an estimated 13.5 million websites operated by 1.3 million different publishers. ¶¶ 195, 199.

As a result, it is a more than reasonable inference for this Court to draw that because Plaintiffs were Google Account Holders who used the Internet through given browsers, their data was intercepted and distributed through RTB.

Google also claims that each named Plaintiff has not alleged a particularized injury because Plaintiffs do not allege whether "they opted out of ads personalization" or "saw any online ads." Dkt. No. 93 ("Mot.") at 16. Google fails to acknowledge the thrust of the CCAC: that Google engaged in a years-long campaign of bulk data collection and sale without users' knowledge or consent for its own enrichment. ¶¶ 135-144.

Google's cases are inapposite. *In re Zoom Video Communications Inc. Privacy Litig.* is not a standing case, and the court explained that whether the conduct occurred depended on certain extraneous factors that plaintiffs had not pled. 525 F.Supp.3d 1017, 1036-38 (N.D. Cal. 2021). No such shortcoming exists here because there are no such factors. In *Birdsong v. Apple*, plaintiffs lacked standing because they merely alleged "potential risk of hearing loss … to *other* unidentified iPod users." 590 F.3d 955, 960-61 (9th Cir. 2009) (emphasis added). Finally, regarding *In re iPhone App. Litig.*, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011), Google fails to mention that the *iPhone* plaintiffs successfully amended their complaint to add facts already pled here, including the devices used and the "specific type[s] of personal information collected, such as [p]laintiffs' home and workplace locations, gender, age, zip code, terms searched" and more. *In re iPhone App. Litig.*, 844 F. Supp. 2d 1040, 1055 (N.D. Cal. 2012); *cf.* CCAC ¶¶ 137-143, 201-255 (IP address, User-Agent, device identifiers, geo-location, communications content, cookies, interests and verticals). Thus, *iPhone App* actually supports Plaintiffs, not Google.

In sum, Plaintiffs adequately allege that they personally were injured by Google's actions. They plead, in detail, a ubiquitous unlawful business practice, plead facts related to its operation, and plead how Google unjustly enriches itself at Plaintiffs' expense. Plaintiffs also plead individual facts regarding their Internet use that make it a near-certainty that they were personally affected by the practices. At the pleading stage in the Ninth Circuit, this is more than sufficient to allege particularized injury.

### B.    Plaintiffs Adequately Allege Breach of Contract

Google argues that Plaintiffs do not plead the contract applicable to each named Plaintiff. Not true. All named Plaintiffs plead that they agreed to Google's ToS when signing up for a Google Account.

*See* ¶¶ 37, 39, 41, 43, 45, 47, 49, 51, 53, 55, 57, 59, 61, 63, 65, 67. Before March 31, 2020, Google's contract with Account Holders consisted of the ToS and Privacy Policy. ¶¶ 83-96, Exs. 2-4, 6-15. After March 31, 2020, Google expressly excluded the Privacy Policy from its ToS but incorporated and hyperlinked Google's *How Our Business Works* page. Exs. 4, 5. At all relevant times, Google promised not to sell or share the Account Holder's PI. Google does not dispute that it promised users it would not sell or share their PI; but argues that its promise was not contractual. Google also argues that Plaintiffs do not allege a breach of contract. These arguments fail for the reasons set forth below.

### 1. Google's Promise Not to Sell Account Holders' PI Is Part of the Contract

Google asserts that Plaintiffs rely only on the *How Our Business Works* page for Google's contractual promise not to sell Account Holders' PI, and that the page is merely informational, not part of the contract. Mot. at 9. Not so. Before March 31, 2020, Google made this promise repeatedly and consistently, including in ToS that incorporated Google's Privacy Policy,[3] through which Google promised not to share users' PI without consent: "We do not share your personal information with companies, organizations, or individuals outside of Google except … [w]ith your consent …" and "We don't share information that personally identifies you with advertisers." ¶ 91. Google has violated this promise – and the promise contained within it – that Google also does not "sell" such information.

After March 31, 2020, Google made express and incorporated its promise not to sell Account Holders' PI into the ToS by prominently displaying the hyperlink to the *How Our Business Works* page. It appears in the **second sentence**, which states:

> We know it's tempting to skip these Terms of Service, but it's important to establish what you can expect from us as you use Google services, and what we expect from you. These Terms of Service reflect <u>the way Google's business works</u>, the laws that apply to our company, and <u>certain things we've always believed to be true</u>.

¶ 79; Ex. 4 (blue font in original as hyperlinks).

Under California law, a contract "need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document." *Shaw v. Regents of Univ. of Cal.*, 58 Cal.

---

[3] Google does not dispute that through March 31, 2020, its Privacy Policy was part of its contract with Account Holders, as Plaintiffs allege. ¶¶ 83-84; *see also In re Google Referrer Header Privacy Litig.*, 465 F. Supp. 3d 999, 1011 (N.D. Cal. 2020) (Google's Terms of Service "incorporate" its "Web History Privacy Policy" and "Privacy Policy"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 831 (N.D. Cal. 2020) ("Defendants do not dispute that the TOS and the Privacy Policy are binding agreements to which they are parties").

App. 4th 44, 54 (1997). Where, as here, a document is prominently identified, made accessible by hyperlink, and reflects commitments, courts have held it to be incorporated. *See, e.g.*, *Calhoun*, 526 F. Supp. 3d at 633 (finding hyperlinked documents to be incorporated); *In re Facebook Consumer Privacy User Profile Litig.* ("*FB Consumer Profile*"), 402 F. Supp. 3d 767, 791 (N.D. Cal. 2019) (finding a document hyperlinked in the second sentence of the ToS incorporated into the ToS). Thus, Google's promise that it does not sell or share PI is part of its contract with users, including after March 31, 2020, as expressly stated in the *How Our Business Works* page.

Ironically, Google's defense relies on four documents for which it seeks judicial notice because the first is hyperlinked on page seven of the Terms of Service and the other three are screenshots of tabs that a user can view on the hyperlinked page. Plaintiffs do not oppose Google's RJN of Exhibits B-E. Although Exhibit B is far less prominent, it is indeed hyperlinked and reflects a commitment from Google that users can access the Ads Settings page. However, it is not relevant. Plaintiffs here complain about Google's sale of their PI to hundreds of other companies in violation of express promises—not "ads personalization" which can be accomplished without selling Plaintiffs' PI to others. Google cannot have it both ways. If Exhibits B-E, hyperlinked on page 7, can be considered on the contract and other claims, so too must "the way Google's business works" be considered part of the contract since it is the first and most prominent hyperlink in the Terms of Service.

### 2. Google Broke Its Promise to Not Sell or Share PI

Because Google cannot deny that it sells and shares Account Holders' PI through RTB, Mot. at 12; ¶¶ 137, 140, it attempts to obfuscate by conflating Account Holders' consent to Google using PI for its own targeted advertising with consent for Google to sell an Account Holder's PI to hundreds of third-party companies and other entities through RTB. In doing so, Google advances an objectively unreasonable definition of PI that contradicts prior ruling of this Court and California law—which all parties agree governs Google's contract with users. Mot. at 11-13. Each argument is unavailing.

### a. Plaintiffs Need Not Opt Out of Personalized Ads to Enforce Google's Promise to Not Share or Sell PI

*First*, Plaintiffs adequately allege Google shared their PI and personally identifiable information through RTB without consent, and in violation of its contract with Account Holders. *See supra*, I.A. Google tries to deflect by arguing Plaintiffs must opt out of tailored or personalized advertising to

maintain a breach of contract claim. Mot. at 11. Google's internal use of information is not at issue here: whether a Plaintiff opted out of targeted advertising is irrelevant to Google's breach of its duty not to sell or share their personal information.

*Second*, for Google to obtain dismissal, the contract at issue must have only one plausible interpretation – that being in favor of the defendant. *See FB Consumer Profile*, 402 F. Supp. 3d at 789-90, 794 ("[I]f a reasonable ... user could plausibly have interpreted the contract language as not disclosing that [the defendant] would engage in particular conduct, then [the defendant] cannot obtain dismissal of a claim about that conduct (at least not based on the issue of consent).") Nowhere in Google's discussion of its "use" of Account Holders' information does Google disclose that it will distribute such information to hundreds of different companies through RTB. A reasonable Account Holder reading the disclosures that Google might "use" their information to show personalized ads alongside other provisions in Google's Privacy Policy would conclude that Google "uses" such information internally, and that any information shared outside of Google does *not* include any personal information as defined by California law. *See* ¶ 95; *FB Consumer Profile*, 402 F. Supp.3d at 782-83 (holding consent is not an "all or nothing proposition" and that an agreement to share some data does not waive all privacy protections). Here, Google's interpretation is not plausible, let alone the "only" plausible interpretation.

### b. Google's Interpretation of PI Is Objectively Unreasonable

Google has admitted that data disclosed through RTB, such as cookie identifiers and browsing history, falls within California law and Google's definition of PI. *See Calhoun*, 526 F. Supp. 3d at 622. Google now tries to avoid that admission by proffering an objectively unreasonable definition of "Personal Information." Google argues that the "plain meaning" of its definition is that the "other data that can be reasonably linked" to the "information we associate with your Google Account" is necessarily limited to "information that you provide to us which personally identifies you," like name, email address, or billing information. Mot. at 11-12. But Google's so-called "plain meaning" writes out the broader category of "other data" which can be "reasonably linked to *such information*" as name, email address or billing information. It is also contrary to Plaintiffs' specific allegations that Google connects those dots. *E.g.*, ¶ 213 (IP address); ¶ 222 (User-Agent); ¶ 230 (device ids); ¶ 236 (geo-

location). Ironically, Google's contract defense also relies on the definition in the Privacy Policy that Google simultaneously argues is not part of the contract at all.

Google relies on its tortured reading to argue that when it promises Account Holders it will not share PI, it really means it will not share Personally Identify-*ing* Information, *i.e.* information which would identify someone on its own to anyone to whom it was disclosed. Mot. at 12. This is nonsense. Google knows the difference between Personal Information and Personally Identify*ing* information—if that is what it meant, that is what it would have said—and in any event, Google promises it will not share or sell *either* category. *E.g.* ¶ 93 (setting forth Google's promise that it will only share "non-personally identifiable information" publicly and with its partners).

As discussed above, a reasonable Google Account Holder reading that definition would understand it to encompass "other data that can be reasonably linked" to information that personally identifies them. Here, Plaintiffs allege that the information Google sells is enough for the recipient "to specifically identify the account holder," including through a cookie matching process that permits the recipient "to match [their own identifiers] … with a corresponding bidder-specific Google User ID." ¶¶ 167, 171. In short, "Google provides participants a key, via cookie matching, to determine exactly who certain Account Holders are." ¶ 173. Google even has a different process for California, showing it understands that the data is PI under California law. ¶ 174.

Google also advances a circular argument that it does not share PI through RTB because it defines PI to exclude the types of information shared through RTB, including "Google ID," browser and type of device," "the users' approximate geolocation" and other datapoints reflected in the CCAC, such as "Location of the user's home," and gender, keywords, interests, or intent. Mot. at 12; ¶¶ 137, 140. Rather than defeating Plaintiffs' claim, Google's concession that it shares such information through RTB is an admission of the breach; these types of information are PI under both California law and the contract.

### c. The CCPA's Definition of PI Governs Google's Contract with Account Holders

As with its interpretation of "Personal Information," Google attempts to run from issues settled by this Court, arguing that the California Consumer Privacy Act's (CCPA), CAL. CIV. CODE § 1798.140,

1   definition of "personal information" does not apply to its contract with Account Holders, and, even if it

2   did, it would only apply after January 1, 2020. Google's arguments on this point are unpersuasive, both

3   because they are inconsistent with the ToS (which provides that California law governs Google's

4   agreement with users), and because of this Court's ruling in *Calhoun* applying the CCPA's definition of

5   Personal Information. *See* 526 F. Supp. 3d at 622.[4]

6           **C.      Plaintiffs Adequately Allege Breach of the Duty of Good Faith and Fair Dealing**

7           California law provides "[e]very contract imposes on each party a duty of good faith and fair

8   dealing... that neither party will do anything which will injure the right of the other to receive the benefits

9   of the agreement." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *48 (N.D.

10  Cal. Aug. 30, 2017). Google argues that Plaintiffs' implied covenant claim fails both because it concerns

11  "extracontractual terms" (including a duty to disclose its conduct in RTB), *and* because it is duplicative

12  of the contract claim. Mot. at 13-14. Google is wrong on both theories.

13          Google's duty under the contract is consistent with its duty of good faith and fair dealing—but

14  the good faith and fair dealing claim gives Account Holders added protection where, as here, additional

15  bad faith action evades the spirit of the bargain and frustrates the purpose of the contract. *See*, *e.g.*, *FB*

16  *Consumer Profile*, 402 F. Supp. 3d at 802 (breach of contract and breach of implied covenant may

17  coexist); *In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1174 (S.D. Cal. 2010) (denying motion

18  to dismiss implied covenant claim where defendant shared consumer information, which frustrated the

19  confidentiality central to the contract).

20          Plaintiffs' implied covenant claim goes beyond Google's breach of its contract with Account

21  Holders. Plaintiffs plead bad faith acts that frustrate the purpose of the contract. Specifically, Plaintiffs

22  plead that Google broke express promises—which were consistent with the terms of the contract—that

23  it would not sell or share Account Holders' PI. *E.g.* ¶¶ 97-112, 260. Google argues that it had no

24  obligation to inform Account Holders of "its conduct in RTB" because there is no contractual term

25  imposing such a duty. But Google consistently promised Account Holders it would not sell or share their

---

26  [4] Google's definition of PI tracks the CCPA's definition in relevant part—both Google and California
27  law define PI to include information that could be "reasonably linked" with an Account Holder. *See,*
    *e.g. Calhoun*, *supra*; Mot. at 12; *see also* Ex. 13 at 26; Ex. 14 at 26; Ex. 15 at 28. Plaintiffs allege
28  disclosure of both personally identifying information and personal information. ¶¶ 137, 140-148.

PI. *E.g.* ¶¶ 78-112; ¶ 91(a) ("We do not share your personal information with companies, organizations, or individuals outside of Google …"). Google's failure to inform Account Holders of the sale and sharing of their PI through RTB frustrates the contract provisions that promise Account Holders that Google will not sell or share PI and that Account Holders controlled Google's use of their PI.

### D. Plaintiffs Adequately Allege Invasion of Privacy and Intrusion Upon Seclusion

Courts consider claims for invasion of privacy and intrusion upon seclusion together, and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Facebook Tracking*, 956 F.3d at 601 (setting forth the elements of each claim, pleading standard, and single test). Plaintiffs have plausibly alleged both elements.

#### 1. Plaintiffs Had Reasonable Expectations of Privacy

As to the first element, Plaintiffs need only allege "an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source." *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 232 (1998). "[T]he relevant question here is whether a user would reasonably expect that [Google] would [use its] access to the user's individual data" to sell it to hundreds of different companies under the circumstances at issue. *Facebook Tracking*, 956 F.3d at 602.

In *Facebook Tracking*, the Ninth Circuit assessed the amount of data, its sensitivity, the nature of the misuse, and Facebook's representations to its users in determining whether the plaintiffs had a reasonable expectation of privacy. *See id.* at 602–04. There, the court observed that "the amount of data … was significant," as was the fact that it was used "without user knowledge" and that Facebook did not "disclose the extent of information[.]" *Id.* at 603. Similarly, here, Plaintiffs allege that the amount of data shared and sold through RTB is staggering, *e.g.*, ¶¶ 9–10, 13–16, 113–114, 128–130, 137, 140, 201–204, and that this information was shared and sold through RTB without user knowledge, *e.g.,* ¶¶ 10, 21, 26, 117, 158.

With regard to sensitivity and nature of the misuse, the Ninth Circuit in *Facebook Tracking* found it important that Facebook was alleged to have obtained "a comprehensive browsing history of an individual, no matter how sensitive the websites visited, and then correlated that history with the time of day and other user actions on the websites visited." 956 F.3d at 603. Here, the sensitivity of the data sold through RTB is even more intrusive. Plaintiffs allege that Google sells troves of sensitive PI,

including (1) IP addresses (¶¶ 209–219); (2) geo-location data (¶¶ 204, 234–244); (3) web-browsing information and search terms (¶¶ 203, 253–259); and (4) "verticals" such as race, identity (*e.g.*, LGBT), health (*e.g.*, AIDS and HIV, depression, drug or alcohol treatment), religion (*e.g.*, Christianity, Buddhism), finance (*e.g.*, debt collection), divorce and separation, and bankruptcy. *E.g.*, ¶¶ 12–15, 140–141, 143. Google's misuse in sharing these sensitive categories of information in a manner that allows RTB participants to identify the Account Holder is highly intrusive. *E.g.*, ¶¶ 163–184, 245–252. Further, RTB allows advertisers to target users with "non-contextual ads"— ads that have nothing to do with the website that the user is visiting such as an ad for a drug rehab on a newspaper website or an ad for mental health treatment on a shoe store website. *E.g.*, ¶¶ 157–158, 160. Such efforts to "correlate[]" the data are an "important" factor in assessing the nature of the intrusion. *Facebook Tracking*, 956 F.3d at 603. As are the representations made to users. *See id.* at 603. Here, Plaintiffs allege that they reasonably relied on Google's ubiquitous promise to "never share" or sell their data without their consent. *E.g.*, ¶¶ 11, 140, 393. In sum, tested under *Facebook Tracking*, Plaintiffs easily meet the first element.[5]

Faced with this, Google's Motion rehashes arguments that have been repeatedly rejected. For example, Google offers another attack on Plaintiffs' standing, *see* MTD at 14, which fails for the reasons set forth above. *See supra* Part III.A; *see also* ¶¶ 27–68.[6] To the extent Google is arguing Plaintiffs must identify specific information that Google improperly disclosed, the Ninth Circuit has rejected such argument. *See Facebook Tracking*, 956 F.3d at 603 (rejecting argument that plaintiffs must "identify specific, sensitive information" at issue).

Google next argues that its disclosures foreclose Account Holders' expectation of privacy. Mot. at 14–16. Not so. As discussed above, Google's disclosures do not address the conduct at issue here— Google's ubiquitous *sharing and sale* of their data without their consent or knowledge. Google's

---

[5] *See also Google Cookie*, 806 F.3d at 150–52 (users maintained a reasonable expectation of privacy in their browsing histories); *Brown v. Google LLC*, 525 F.Supp.3d 1049, 1074 (N.D. Cal. 2021); *Calhoun*, 526 F. Supp. 3d at 629-630.

[6] Google's cited cases are inapposite. *See supra* Part III.A (distinguishing *Zoom*). Similarly, in *Banga v. Equifax Info. Servs. LLC*, plaintiff failed to allege "what particular information was disclosed or why that information qualifies as offensive and objectionable." 2015 WL 3799546 at *9 (N.D. Cal. June 18, 2015). In contrast, Plaintiffs detail categories of PI disclosed through RTB and why such information qualifies as PI under both California law and Plaintiffs' contracts with Google. ¶¶ 17, 205–259.

argument that Plaintiffs could "change or turn off" personalized ads is similarly unavailing. The Ninth Circuit rejected this argument in *Facebook Tracking*, stating "[t]he fact that users could have taken additional measures to prevent [the challenged conduct]…is not relevant at the pleading stage." 956 F.3d at 605. In any event, Plaintiffs "have alleged that these protections would not have done any good, even if users had employed them." *Id.*; *see also* ¶ 176. Google's promise that it "may share *non-personally identifiable information* publicly and with our partners" (Mot. at 15) confirms Plaintiffs' reasonable expectation that Google will not share their *personally identifiable information. E.g.*, ¶¶ 11, 99, 260.[7]

There is also no merit to Google's argument that cookie identifiers, IP addresses, and browsing histories are "routinely shared," so there is no reasonable expectation of privacy. Mot. at 16. This argument conflicts with both *Facebook Tracking*, where the Ninth Circuit held that the plaintiffs have a reasonable expectation of privacy in their browsing history (*see* 956 F.3d at 603),[8] and *Riley v. California*, in which the Supreme Court held the Fourth Amendment protects information on a smartphone because, among other things, it could include "[a]n Internet search and browsing history" and "location information." 573 U.S. 373, 395-96 (2014); *see also Carpenter v. U.S.*, 138 S. Ct. 2206, 2217 (2018) (holding an "individual maintains a legitimate expectation of privacy in the record of his physical movements" captured through a smartphone). Indeed, in *Google Cookie*, the Third Circuit rejected a similar argument by Google (that courts purportedly "routinely" find "no actionable privacy

---

[7] Google's cases are distinguishable and, for the most part, decided before *Facebook Tracking*. *See* Mot. at 15–16. In *In re Google, Inc. Privacy Policy Litig.*, Google expressly disclosed that it will commingle the information in such manner, so the court found no reasonable expectation of privacy. 2013 WL 6248499, at *16 (N.D. Cal. Dec. 3, 2013). In *Gonzales v. Uber Techs., Inc.*, the court found no reasonable expectation of privacy in geo-location data where a driver had "consented to the sharing of his geolocation data with perfect strangers (Lyft riders)." 305 F. Supp. 3d 1078, 1092 (N.D. Cal. 2018). *Davidson v. Hewlett-Packard Co.*, is inapposite as it was decided on summary judgment. 2021 WL 4222130 (N.D. Cal. Sep. 16, 2021). *Smith v. Facebook, Inc.* (which is non-precedential) is inapposite because the court found that the information was not "sensitive" and the plaintiffs' consented. 745 F. App'x 8, 9 (2018). As discussed above, Google did not disclose its conduct, but rather represented to Plaintiffs that it would not share or sell their PI, including sensitive information, and Plaintiffs did not consent.

[8] In *Facebook Tracking*, the Ninth Circuit distinguished *U.S. v. Forrester*, 512 F.3d 500, 504 (9th Cir. 2008) (cited by Google), observing that "a URL, unlike an IP address, identifies the particular document within a website that a person views and thus reveals much more information about the person's Internet activity." *Facebook Tracking*, 956 F.3d at 604.

invasion in cases involving tracking, collation, and disclosure of internet usage information"), observing that such argument was "a smokescreen." 806 F.3d at 150.[9]

### 2. Google's Conduct Was "Highly Offensive"

"Determining whether a defendant's actions were highly offensive to a reasonable person requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Facebook Tracking*, 956 F.3d at 606 (quotations omitted). Based on allegations of "surreptitious data collection," the *Facebook Tracking* court held that whether the challenged conduct was highly offensive "cannot be resolved at the pleading stage." *Id.*

Here, Plaintiffs similarly allege surreptitious sharing and sale of their personal and sensitive information. ¶¶ 279–293. Plaintiffs allege that "[t]he Google RTB relies on the disclosure of sufficiently detailed personal information so that bidders can be confident their ads are purchased for the right Account Holders, and so that the ads are likely to be effective. Without personal information, Google RTB would not provide sufficient information for bidders to make an informed bid, and prices for the bids would be lower." ¶ 286. Accordingly, each relevant factor for a finding of "highly offensive" conduct exists in this case. *E.g. Brown*, 525 F.Supp.3d at 1079; *Calhoun*, 526 F. Supp. 3d at 629-631. In addition, in *Google Cookie*, the court found public outcry and the responses of public officials relevant to this inquiry. *See* 806 F.3d at 151. Here, privacy advocates have called RTB "the world's biggest data breach" and members of Congress condemned the conduct as an "outrageous privacy violation" that raises "serious national security risks." ¶¶ 27-30.

Google denies that its conduct is highly offensive, again arguing that the information at issue is "routinely shared." Mot. at 18. As discussed above, courts consistently dismiss such a cavalier approach to privacy. *E.g.*, *Google Cookie*, 806 F.3d at 150; *Calhoun*, 526 F. Supp. 3d at 631. No amount of sugarcoating can change that Google's disclosure and sale of sensitive information relating to race,

---

[9] Google's cited cases are again inapposite. In *Chevron Corp. v. Donziger*, the court held that there was no reasonable expectation of privacy where disclosure was voluntarily made pursuant to a specific exception in the privacy policies at issue. 2013 WL 4536808, at *10 (N.D. Cal. Aug. 22, 2013). In *Heeger v. Facebook, Inc.*, the dismissed claims included only rote allegations about general geolocation data. *See* 509 F. Supp. 3d 1182, 1189–90, 1193 (N.D. Cal. 2020). Here, in contrast, Plaintiffs allege disclosure of geo-location data that can be used to pinpoint the user's location. *E.g.*, ¶¶ 182–184.

religion, sexual orientation, and health is an egregious breach of social norms and, thus, highly offensive.

### E.    Plaintiffs Adequately Allege Publication of Private Information

The elements of the claim for public disclosure of private facts are: "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." *Shulman*, 18 Cal. 4th at 214.

Google attacks primarily the first element, suggesting that the disclosure of information through RTB to the RTB participants does not amount to a "public" disclosure. Mot. at 19. Google is wrong. Plaintiffs allege that Google operates the world's largest ad exchange and that, as part of the RTB process, data is disclosed and sold to potentially hundreds of thousands of participants, if not millions. *E.g.* ¶¶ 113, 129, 192–199. As the *FB Consumer Profile* court observed, dissemination of private information to thousands of RTB participants is "generally going to be equivalent to making that information 'public.'" 402 F. Supp. 3d at 796.[10] Indeed, Plaintiffs allege secondary markets for RTB bid stream data, through which "federal agencies have purchased personal data" and provide a specific example of how the data was used to "out" a high-ranking Catholic priest as gay. ¶¶ 27-28, 238-40.

The remaining elements are easily met for the same reasons as for invasion of privacy and intrusion upon seclusion. *See supra* Part III.D. There is no merit to Google's suggestion that the information it discloses is not "private." As courts have oft observed, disclosure of some information does not automatically remove all privacy protections. *E.g.*, *Hernandez v Hillsides, Inc.*, 47 Cal. 4th 272, 289 (Cal. 2009); *FB Consumer Profile*, 402 F. Supp. 3d at 782; *Riley*, 573 U.S. at 395-96. Even if some of the disclosed information is "already known" as Google contends (Mot. at 20), other information (such as "verticals") and the breadth of a person's web-browsing communications are not. Google's *en mass* disclosure and sale of this compiled information is sufficient, at the pleading stage, to state a claim.

### F.    Plaintiffs Adequately Allege Breach of Confidence

The duty of confidence arises from tort law and is "an independent obligation that is separate and distinct from any contractual duty and therefore permits the recovery of punitive damages." *Berkla v. Corel Corp.*, 302 F.3d 909, 918 (9th Cir. 2002). To allege breach of confidence, plaintiffs must plead

---

[10] Once again, *Davidson* is wholly inapposite because the disclosure there was made to a limited number of persons (*see* 2021 WL 4222130), which is a far cry from the alleged disclosure to hundreds of thousands of RTB participants in this case.

"(1) they conveyed confidential and novel information; (2) [defendant] had knowledge that the information was being disclosed in confidence; (3) there was an understanding between [the parties] that the confidence be maintained; and (4) there was disclosure or use in violation of the understanding." *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 903 (9th Cir. 1987) (citation omitted).

Here, Plaintiffs plead all elements, alleging they conveyed sensitive PI, including browsing history and information about their race, religion, sexual orientation, and health (¶¶ 14-17, 163-184, 200-259, 419); that Google knew Plaintiffs were conveying their PI in confidence, as illustrated by Google's various privacy policies and representations (¶¶260, 420-423), on which Plaintiffs reasonably relied in using Google's services (¶¶ 26, 83-96, 158); and that Google then routinely violated this understanding by selling Plaintiffs' PI through RTB. ¶¶113-161, 185-259, 425-426.

### 1.    An Express Contract Does Not Bar This Claim

Citing *Berkla*, Google contends that this claim cannot coexist with Plaintiffs' breach of contract claim. Mot. at 20. The argument misconstrues the law and mischaracterizes CCAC. *First*, Plaintiffs may plead claims in the alternative, even if they advance inconsistent theories. *Cal. Spine & Neurology Inst. v. United Healthcare Ins. Co.*, 2019 WL 4450842, at *4 (N.D. Cal. Sept. 17, 2019) (Koh, J.) (express and implied contract claims may be alternatively pled); *SocialApps, LLC v. Zynga, Inc.*, 2012 WL 381216, at *3 (N.D. Cal. Feb. 6, 2012) (breach of confidence, contract, and CUTSA claims "based on the same allegations" can be pled in the alternative). Indeed, the *SocialApps* court distinguished the Ninth Circuit's *Berkla* decision by its procedural posture—the ruling on appeal in *Berkla* was the striking of a punitive damages award *after a jury trial*, not a ruling at the pleading stage. *Id.*

*Second*, Google's arguments are internally inconsistent. Google asserts that Plaintiffs' confidence and contract claims are duplicative, but then contradicts itself by arguing that virtually all its promises about confidentiality are extracontractual. Mot. at 9-13 & nn.5-7. For example, Google wrongly asserts that the *How Our Business Works* page (Ex. 5) is extracontractual, and that Plaintiffs rely only on that page for Google's promise not to "sell" PI. Mot. at 9. Similarly, Google disavows its other public promises, including on its: (1) *Who are Google's Partners* page (Ex. 21 at 2) (*e.g.*, "We don't share information that personally identifies you with our advertising partners[.]"); (2) *Personalized Advertising* page, (Ex. 22 at 2) (*e.g.*, "Advertisers can't use sensitive interest categories to target ads to

1    users[.]"); (3) *We do not sell your personal information to anyone* page (Ex. 23 at 1) (*e.g.*, "We give

2    advertisers data … without revealing any of your personal information. At every point in the process of

3    showing you ads, we keep your personal information protected and private."); and (4) *Your privacy is*

4    *protected by responsible data practices* page (Ex. 24 at 3-4) (*e.g.*, "We use leading anonymization

5    techniques to protect your data[.]"). Mot. at 9 n.5.[11] Google's assertion that these promises are

6    extracontractual bolsters Plaintiffs' breach of confidence claim at the pleading stage and demonstrates

7    that the breach of contract and breach of confidence claims are not coterminous as a matter of law.[12]

8           Moreover, the mere existence of a contract claim that arises from the same "nucleus of fact,"

9    *Berkla*, 302 F.3d at 918 n.9, does not preclude a claim for breach of confidence. "Tort damages have

10   been permitted in contract cases where...the duty that gives rise to tort liability is [] completely

11   independent of the contract…." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 989-90 (2004).

12   The duty of confidence is "an obligation in law where in fact the parties made no promise. It is not based

13   upon apparent intentions of the involved parties; it is an obligation created by law for reasons of justice."

14   *Ent. Rsch. Grp. v. Genesis Creative Grp.*, 122 F.3d 1211, 1227 (9th Cir. 1997) (quotations omitted); *see*

15   *also Davies v. Krasna*, 14 Cal. 3d 502, 508 (1975) (duty of confidence "lies not in the contractual

16   language but is imposed by law"); *SocialApps*, 2012 WL 381216 at *3 (breach of confidence cause of

17   action "is not limited to... the existence of a contract").

18           **2.    Plaintiffs Adequately Plead All Elements of Breach of Confidence**

19           Google asserts that Plaintiffs failed to place confidential and novel information at issue; that the

20   parties did not share an understanding of confidentiality; and that Google did not know Plaintiffs

21   provided their personal information in confidence. Mot. at 21-22. Google's position is untenable in view

22   of Plaintiffs' detailed allegations and established law.

23           First, "the information disclosed must be confidential and novel to warrant protection." *Ent.*

24   [11] Google's motion also disclaims CEO Pichai's testimony before Congress and *New York Times* op-ed.
     Mot. at 9 n.5; ¶¶ 109, 111 (Congressional testimony); Ex. 25 (*New York Times* op-ed).

25   
26   [12] Google's other authorities are distinguishable. *See Huynh v. Quora, Inc.*, 2019 WL 11502875, at *8
     (N.D. Cal. Dec. 19, 2019) (plaintiffs acceded that an express contract wholly subsumed breach of

27   confidence claim); *San Jose Options, Inc. v. Ho Chung Yeh*, 2014 WL 1868738, at *6 (N.D. Cal. May
     7, 2014) (rejecting defendant's argument that contract necessarily precluded breach of confidence tort

28   and permitting plaintiff to amend the tort claim).

1  *Res. Grp.*, 122 F.3d at 1227 (cleaned up). "Novel" information cannot be "too vague and commonplace"

2  or "well established" in the context where it appears. *Green v. Schwarzenegger*, 1995 WL 874191, at

3  *12 (C.D. Cal. July 12, 1995). Information is "confidential" if plaintiffs have not publicly disclosed it.

4  *E.g.*, *Ent. Res. Grp.*, 122 F.3d at 1227 (information not confidential when plaintiff sold it without a

5  nondisclosure agreement); *Tele-Count Eng'rs, Inc. v. Pac. Tel. & Tel. Co.*, 168 Cal. App. 3d 455, 463

6  (1985) (finding "substantially secret information" was conveyed "in confidence" to defendant).

7        Here, Plaintiffs allege that the "*totality* of [their] personal information, including the content of

8  their Internet communications, is confidential and novel." ¶ 419 (emphasis added). Plaintiffs identify

9  numerous technical documents describing the data that RTB participants receive (¶¶ 135-150) and

10 explain how that data can be used to identify Account holders (¶¶ 163-184). Because this PI can only

11 correspond to one person, such information is, by definition, novel. And, the information is confidential

12 because, to the extent Plaintiffs even knew that Google was collecting such information about them,

13 Google disclosed it in violation of its express promises not to do so.

14       The sale and dissemination of Plaintiffs' PI to hundreds of RTB participants is a breach of

15 confidence. *E.g.*, *SMC Networks, Inc. v. Hitron Techs., Inc.*, 2012 WL 12892690, at *2 (C.D. Cal. Oct.

16 30, 2012) (confidential and novel information at issue in a breach of confidence claim included

17 "information concerning Plaintiff's personnel"). Indeed, courts repeatedly recognize that information

18 about health or sexual orientation, for example, is *per se* confidential. *E.g.*, *Flores-Mendez v. Zoosk,*

19 *Inc.*, 2021 WL 308543, at *4 (N.D. Cal. Jan. 30, 2021) ("[S]exual preference[]" is "sensitive... private

20 information"); *Stasi v. Inmediata Health Grp.*, 501 F. Supp. 3d 898, 915 (S.D. Cal. 2020)

21 (acknowledging confidentiality of medical information) The same is true of browsing history and geo-

22 location information. *E.g. Riley*, 573 U.S. at 395-96.

23       Courts also recognize that actionable disclosures can consist of parts that may not be novel or

24 confidential in isolation, but that are when viewed together. *Balboa Ins. Co. v. Trans Global Equities*,

25 218 Cal. App. 3d 1327, 1334, 1343-46 (1990). As such, the Court should reject Google's approach of

26 analyzing in a vacuum the types of PI it discloses to RTB participants (Mot. at 21), because it ignores

27 that the disclosures occur in combination. *E.g.* ¶ 419 ("the totality of Plaintiffs' and Class Members'

28 personal information, including the content of their Internet communications, is confidential and

novel"); *San Jose Options, Inc.*, 2014 WL 4380045 at *5-6 (information was confidential and novel when "taken as a whole, viewing the forest instead of a single individual email"); *Fink v. Goodson-Todman Enterprises, Ltd.*, 9 Cal. App. 3d 996, 1014-1015, n.24 (1970) ("variety in the use of standard patterns can make for novelty" and "various [] features taken separately might be commonplace, but taken in combination with each other... they are not.").[13]

Second, Plaintiffs' allegations establish the parties' shared understanding that Plaintiffs' PI would be kept in confidence. "The breach of confidence tort … can be established without proof of a promise." *Tele-Count Eng'rs, Inc.*, 168 Cal. App. 3d at 466.[14] As discussed in Part III.D, *supra*, Plaintiffs allege that Google made express representations upon which they reasonably relied in forming their belief that their PI would not be disclosed. *E.g.*, Ex. 5 at 1; ¶ 260.

Finally, Google can hardly deny that it understood the information was also *disclosed* to Google in confidence. *See Ojala v. Bohlin*, 178 Cal. App. 2d 292, 300 (1960) ("The fact that defendant accepted the confidence that was reposed in him was amply shown by the assurance that he gave plaintiff that he would not use the [information] for his own benefit."). The situation is akin to that in *Thompson v. Cal. Brewing Co.*, where the parties formed a confidential relationship when the defendant "voluntarily assumed a relation of personal confidence with the plaintiff." 150 Cal. App. 2d 469, 475 (1957) (internal quotation marks omitted).

### G. Plaintiffs Adequately Allege Unauthorized Disclosure of Communications Content by Google as an Electronic Communications Service Provider under the ECPA

The Electronic Communication Privacy Act (ECPA) provides that "a person or entity providing an electronic communication service ["ECS"] to the public shall not" "intentionally divulge the contents

---

[13] Google's authorities are not to the contrary. Mot. at 21. Google misstates *Friedman v. DirecTV*, which rejected the confidence claim because plaintiffs failed to demonstrate that their ideas were novel, "either singly or in combination." 262 F. Supp. 3d 1000, 1007 (C.D. Cal. 2015). And, unlike in other cases, Plaintiffs never made the totality of their PI public to RTB participants. *See Sawicky v. AMC Networks Inc.*, 2018 WL 11292263, at *3-4 (C.D. Cal. July 11, 2018) (denying claim because plaintiff publicly filed information at issue with Copyright Office); *Reed v. Nat'l Football League*, 2015 WL 13333481, at *4 (C.D. Cal. Sept. 24, 2015) (denying claim because plaintiff publicly touted information as for sale).

[14] Google claims that Plaintiffs must opt out of personalized advertising for Google to have understood that Plaintiffs wanted their PI kept in confidence. Mot. at 22. This is simply wrong and erroneously seeks to "add an element of contract law to the cause of action." *Tele-Count Eng'rs, Inc.*, 168 Cal. App. 3d at 466. The breach of confidence claim is not limited "to the existence of a contract." *SocialApps*, 2012 WL 381216, at *3.

of any communication … while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication….” 18 U.S.C. § 2511(3)(a). A violation is subject to civil suit under 18 U.S.C. § 2520.

### 1.  Plaintiffs Allege Disclosure of “Content”

The ECPA defines “content” broadly, as that which “includes *any information relating to* the substance, purport, or meaning” of the communication at issue. 18 U.S.C. § 2510(11) (emphasis added). Google again attempts to re-write a definition through omission—here by leaving out the text “*any information relating*.” But Google cannot rewrite a federal statute to suit its needs on a motion to dismiss.

Plaintiffs allege that Google discloses “content” in several ways that correspond to how Google itself describes “content” in its developer documentation. These include the (1) “IAB *content* categories” of the site, section, or app; (2) the URL of the page; (3) the referrer URL; (4) “details about the Content within the site or app”; (4) keywords; (5) ID “uniquely identifying the content”; (6) “content episode number”; (7) “content title”; (8) “content series”; (9) video title; and (10) “a list of keywords describing the video, extracted from the content management system of the video publisher.” ¶ 449. Google cannot now disown its own descriptions. Plaintiffs also allege a list of specific examples of URLs that Google disclosed to RTB recipients, including: https://www.yourdictionary.com/fairness; and https://truththeory.com/men-with-beards-carry-more-germs-than-dogs-according-to-this-study. *See* ¶ 203(l), (w). These categories and URLs meet the definition of content under the ECPA.

Google relies on *Forrester* and *In re Zynga Privacy Litig.* to argue that the information disclosed through RTB is not “content” under the ECPA, but the Ninth Circuit distinguished both in *Facebook Tracking*, explaining that “the collection of URLs … reveals much more information about the person’s Internet activity” than IP addresses alone. 956 F.3d at 604-05. It explained that *Zynga*’s holding did not apply to a “full-string detailed URL, which contains the name of a website, folder, and sub-folders on the web-server, and the name of the precise file requested” and may include search terms. *Id.* at 605. Relatedly, the Ninth Circuit’s “reasonable expectation of privacy” analysis in *Facebook Tracking* applies equally to the “content” element here because the content versus non-content distinction is baked into Fourth Amendment “reasonable expectation” analysis. *Smith v. Maryland*, 442 U.S. 735 (1979). Consistent with this, *Zynga* explained that its holding did not apply to “a search term or similar

communication made by the user." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108-09 (9th Cir. 2014).

Even putting aside that Plaintiffs have alleged more than URLs as content and that Google itself uses the term "content" to describe the disclosures, no court has ever ruled that communications as detailed as those alleged here are not "content." In *Google Cookie*, the Court explained that "post-domain portions of the URL are designed to communicate to the visited website which webpage content to send the user … between the information revealed by highly detailed URLs and their functional parallels to post-cut-through digits, we are persuaded that – at a minimum – some queried URLs qualify as content." 806 F.3d at 139. In support, the Third Circuit cited a declassified opinion of the Foreign Intelligence Surveillance Court and legislative history indicating that "the portion of a URL …. Specifying Web search terms or the name of a requested file or article" is protected "content" under the ECPA. *Id.* (citing H.R. Rep. No. 107-236 at 53, 294-96 (2001)); *see also In re U.S. Order Authorizing Use of Pen Register*, 396 F.Supp.2d 45, 50 (D. Mass. 2005) ("contents" include URL "subject line, application commands, search queries, requested file names, and file paths").

Here, Plaintiffs allege disclosure of URLs that include "search terms or similar communications" and the "name[s] of a requested file or article." For example, in the URL, https://www.yourdictionary.com/fairness (¶ 203(l)), the word "fairness" is likely to have been a search term, but even if it were not, illustrates that there is no functional difference whether the user manually types the word "fairness" into their browser to find the result or whether they clicked a linked with the word "fairness" to get there. Whether typed manually or entered by mouse click, it is still a communication with information relating to the substance, purport, and meaning of the communication: the user is seeking the definition of the word "fairness." The use of a technological shortcut does not remove a communication from the ECPA's protection. If the user communicated the same information by Morse code or by telephone button clicks, the result would be the same: it is content. *See Brown v. Waddell*, 50 F.3d 285 (4th Cir. 1995); *U.S. Telecom Assoc. v. FCC*, 227 F.3d 450 (D.C. Cir. 2000).

Google's content argument would remove most Internet communications from the protection of the ECPA. There is no legal or factual basis for Google's argument—the Court should reject it.

### 2.    Google Has Not Established the "*Lawful* Consent" of Anyone

Google argues that its disclosure of content occurred pursuant to the ECPA provision providing

that such disclosure may be done "with the *lawful* consent of the originator or any addressee or intended recipient of such communication." 18 U.S.C. § 2511(3)(b) (emphasis added). "As the party seeking the benefit of the exception, it is Google's burden to prove consent." *Calhoun,* 526 F. Supp. 3d at 620 (quotations and citations omitted). "The 'lawful consent' exception to the prohibitions of the [ECPA] is not satisfied by consent that is merely constructive, implied in law, or otherwise imputed to the user by a court." *Negro v. Super. Ct.*, 230 Cal. App. 4th 879, 889 (2014). "[L]awful consent is manifestly intended to invest users with the final say regarding disclosure of the contents of their … messages while limiting the burdens placed on service providers by the Act." *Id*. at 896.

Lack of consent on the part of users is evident here. Notably, both in this action and in *Calhoun*¸ Google has taken the position that each Named Plaintiff must sign written consent forms before it would provide them with the content of their communications. In *Calhoun*, Google told the Court that this was necessary "to comply with the SCA." *See Calhoun*, No. 5:20-cv-05146, Mar. 9, 2021 Hrg. Tr. at 46:20-47:6. Google insisted that it was not enough for Plaintiffs' counsel to provide the forms; plaintiffs must *themselves* email the forms to a specific address at Google from the specific email address associated with the email account at issue. Google prevailed on this point. In *Calhoun*, this Court ordered written consent forms "be emailed from the subject accounts to Defendant at google-legal-support@google.com" and that only "[o]nce the emails are sent, Plaintiffs will have provided the requisite consent." *Calhoun*, Dkt. 155, Order re Joint Discovery Dispute, Apr. 5, 2021. Google has insisted on similar procedures to establish consent in this action. *But nowhere does Google claim it obtained this level of consent from users in connection with RTB.*

"Lawful consent" is the same under both primary sections of the ECPA; the Wiretap Act, 18 U.S.C. § 2511(3)(b)(ii) (applicable here), and the SCA, 18 U.S.C. § 2702(b)(3) (at issue in *Calhoun*). Having already litigated and prevailed on the level of consent necessary for an ECS disclosure under the ECPA in a related case and then insisting upon the same here, Google cannot now change its position. *See New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (judicial estoppel applies where "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position").

Even if estoppel with respect to consent of users did not apply, Google cannot demonstrate

publisher consent in this case. First, the same *lawful consent* standard applies to publishers and Google has not produced any evidence of any publisher consent consistent with the *lawful consent* procedures it prevailed upon in *Calhoun* and has insisted upon here. Second, as alleged, "Google promises the website publishers that fill advertising space through Google RTB that Google's use of information will be 'in accordance with Google's privacy policy'—the same Privacy Policy through which Google promises not to sell or share Account Holder information." ¶ 460. Google makes this promise at the end of the publisher sign-up process. *Id*. "Likewise, the Google API Terms of Service promise Google will abide by its Privacy Policy ¶ 461. Thus, even under an inapplicable lesser standard of consent, Google ties the consent of RTB publishers to the same promises it makes to Account Holders.

Ignoring that it makes the same promises to publishers, Google insists that publishers consent to Google breaking its "unequivocal" promises to millions of Account Holders by the mere act of "install[ing] Google's code on their websites." Mot. at 24:4. [15] But "consent to interception can [not] be inferred from the mere purchase of a service, regardless of circumstances." *In re Pharmatrak, Inc*., 329 F.3d 9, 19 (1st Cir. 2001). The rule is clear: where a company promises that it will not engage in specific conduct, and then engages in the conduct anyway, there is no consent. *Id*. at 15; *see also Facebook Tracking*, 956 F.3d at 607-08; *Google Cookie*, 806 F.3d at 143-46. To hold otherwise "would undercut efforts by one party to a contract to require that the privacy interests to those who electronically communicate with it be protected by the other party to the contract." *Pharmatrak*, 329 F.3d at 20.

Further, the ECPA "provides no refuge for a defendant who procures [alleged] consent by exploiting a known mistake that relates to the essential nature" of his conduct and "deceptive" purported legal documents are "independent ground[s] for invalidating [alleged] consent." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1074 (9th Cir. 2004). Here, Google assured publishers that Google's conduct would comply with the terms of the Google Privacy Policy. That promise is contractually binding on Google,

---

[15] *Rodriguez v. Google LLC*, 2021 WL 2026726 (N.D. Cal. May 21, 2021) and *In re Nickelodeon Consumer Privacy Litig.*, 2014 WL 3012873 (D. N.J. Jul. 2, 2014), *partially rev'd by* 827 F.3d 262 (3d Cir. 2016) are inapposite. Neither involved unauthorized divulgences, for which a different consent standard applied. Moreover, *Rodriguez* plaintiffs "concede[d] developers knowingly agree" to the conduct at issue, and *Nickelodeon* plaintiffs sued Nickelodeon for knowingly providing information to Google. Here, Google promised developers that their relationship was governed by the Privacy Policy that prohibits Google from engaging in the misconduct alleged. Google broke that promise.

and it is too late for Google to disown it or attempt to amend it. To the contrary, acceptance of Google's position would require the Court to hold that *publishers* can consent on behalf of Google Account Holders to Google breaking its unequivocal and express promise to those Account Holders that it would "never sell consumer data."[16]

### H.   Plaintiffs Adequately Allege a CIPA Claim for All Putative Class Members

Google makes two arguments against Plaintiffs' CIPA claims. *First*, Google argues that Plaintiffs have not adequately alleged "contents." This argument fails for the reasons set forth above in Part III.G. *Second*, Google incorrectly argues that the CIPA claim must be limited to California residents.[17] CIPA in fact protects non-Californians suing a California defendant. *See Valentine v. NebuAd, Inc*., 804 F. Supp. 2d 1022, 1027 (N.D. Cal. 2011).

Google's argument focuses on Google alone. Plaintiffs' CIPA claim, however, is based on Google's actions to "aid[], agree[] with, employ[], or conspire with" hundreds of different RTB recipients to help those recipients to, in "any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state[.]" *See* Cal. Pen. Code § 631. Google's reliance on its assertion that no non-California plaintiff "allege[d] they were in California or communicated with third-party websites in California" is misplaced; it also contradicts Plaintiffs' well-pleaded allegations. *See Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1003 (9th Cir. 2018).

Plaintiffs allege that Google RTB works through millions of websites and apps to aid hundreds of different companies in acquiring the content of user communications without authorization. ¶¶ 192-199 ███████████████████████████████████████████████

---

[16] Plaintiffs doubt Google will be able to produce evidence that any publisher agreed to Google breaching its promises Account Holders (an issue for another day). But it would not help Google even if it did, because such consent would not be "lawful" anyway.  Thus, Google would not qualify for the ECS divulgences exception under 18 U.S.C. § 2511(3)(b)(ii).

[17] *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 604 (N.D. Cal. 2015) is procedurally and substantively inapposite. First, the decision was on a class certification motion after significant discovery. Second, the case only involved alleged interceptions on a single website by a single defendant, not allegations of unauthorized conduct by a defendant on millions of websites that re-directed the content of communications to hundreds of different companies.

1

2

3    ████████████████████████████████ The ubiquity of Google RTB and the massive

4    scope of its disclosures are sufficient for Plaintiffs' CIPA allegations to apply to all Google Account

5    Holders.

6    **IV.    CONCLUSION**

7         Based on the foregoing, Plaintiffs respectfully request that the Court deny the Motion.

8

9    Dated: October 29, 2021

10   **PRITZKER LEVINE LLP**

11   By:    */s/ Elizabeth C. Pritzker*
     Elizabeth C. Pritzker (Cal. Bar No. 146267)
12   Jonathan K. Levine (Cal Bar No. 220289)
     Bethany Caracuzzo (Cal. Bar No. 190687)
13   1900 Powell Street, Suite 450
     Emeryville, CA 94608
14   Tel.: (415) 692-0772
     Fax: (415) 366-6110
15   *ecp@pritzkerlevine.com*
     *jkl@pritzkerlevine.com*
16   *bc@pritzkerlevine.com*

17   ***Interim Class Counsel***

18

19   **BLEICHMAR FONTI & AULD LLP**

20   By:    */s/ Lesley Weaver*
     Lesley Weaver (Cal. Bar No. 191305)
21   Anne K. Davis (Cal. Bar No. 267909)
     Matthew S. Melamed (Cal. Bar No. 260272)
22   Angelica M. Ornelas (Cal. Bar No. 285929)
     Joshua D. Samra (Cal. Bar No. 313050)
23   555 12th Street, Suite 1600
     Oakland, CA 94607
24   Tel.: (415) 445-4003
     Fax: (415) 445-4020
25   *lweaver@bfalaw.com*
     *adavis@bfalaw.com*
26   *mmelamed@bfalaw.com*
     *aornelas@bfalaw.com*
27   *jsamra@bfalaw.com*

28

**SIMMONS HANLY CONROY LLC**

By: _____/s/ Jay Barnes_____
Jason 'Jay' Barnes (*pro hac vice*)
An Truong (*pro hac vice*)
Eric Johnson (*pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**DICELLO LEVITT GUTZLER LLC**

By: //s/ David A. Straite
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*;

Amy Keller (admitted *pro hac vice*)
Adam Levitt (admitted *pro hac vice*)
James Ulwick (admitted *pro hac vice*)
Ten North Dearborn St., Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*alevitt@dicellolevitt.com*
*julwick@dicellolevitt.com*

**BOTTINI & BOTTINI, INC.**

By: _____/s/ Francis A. Bottini, Jr._____
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne Beste (SBN 326881)
Yury A. Kolesnikov (SBN 271173)
Nicholaus Woltering (SBN 337193)
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA  92037
Tel.: (858) 914-2001
Fax: (858) 914-2002
*fbottini@bottinilaw.com*
*achang@bottinilaw.com*
*abeste@bottinilaw.com*
*ykolesnikov@bottinilaw.com*
*nwoltering@bottinilaw.com*

**COTCHETT, PITRE & McCARTHY LLP**

By: */s/ Nanci E. Nishimura*
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal. Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
Noorjahan Rahman (Cal. Bar No. 330572)
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel.: (650) 697-6000
Fax: (650) 697-0577
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*
*nrahman@cpmlegal.com*

***Counsel for Plaintiffs and the Proposed Class***

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Elizabeth C. Pritzker, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of October, 2021, at Emeryville, California.


/s/ *Elizabeth C. Pritzker*
Elizabeth C. Pritzker

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2021, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

*/s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker