Pages 1 - 89

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VIRGINIA K. DeMARCHI, MAGISTRATE JUDGE

In re GOOGLE RTB CONSUMER      )
PRIVACY LITIGATION.            )
                              )  No. 5:21-cv-02155-LHK
_____)      (and related cases)

                              San Jose, California
                              Tuesday, November 2, 2021


**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**
**OF PROCEEDINGS BY REMOTE VIDEOCONFERENCE**

9:59 a.m. - 12:09 p.m. =  130 minutes


**APPEARANCES**:

   (All participants appeared by Zoom remote videoconference.)


For Plaintiffs:          Pritzker Levine, LLP
                         1900 Powell Street, Suite 450
                         Emeryville, California  94608
                 BY:     **ELIZABETH PRITZKER, ESQ.**
                         Tel: 415-692-0772
                         Fax: 415-366-6110
                         Email: ecp@pritzkerlevine.com


            (Appearances continued on following page.)


Transcribed by:          Leo T. Mankiewicz, Transcriber
                         leomank@gmail.com
                         (415) 722-7045

APPEARANCES:   (cont.)


For Plaintiffs:          Cotchett, Pitre & McCarthy, LLP
                         6519 1st Avenue, NW
                         Seattle, Washington 98117
                 BY:     **KARIN BORNSTEIN SWOPE, ESQ.**
                         Tel: (206) 778-2123
                         Fax: (650) 697-0577
                         Email: kswope@cpmlegal.com


                         DiCello Levitt Gutzler LLC
                         One Grand Central Place
                         60 East 42nd Street, Suite 2400
                         New York, New York 10165
                 BY:     **DAVID A. STRAITE, ESQ.**
                         Tel: 646-933-1000
                         Fax: 312-253-1443
                         Email: dstraite@dicellolevitt.com


                         Bleichmar, Fonti, & Auld, LLP
                         555 12th Street, Suite 1600
                         Oakland, California 94607
                 BY:     **ANNE K. DAVIS, ESQ.**
                         Tel: 415-445-4016
                         Email: adavis@bfalaw.com


For Defendant Google, LLC:

                         Cooley LLP
                         Three Embarcadero Center, 20th floor
                         San Francisco, California  94111-4004
                 BY:     **JEFFREY GUTKIN, ESQ.**
                         **COLIN SCOTT, ESQ.**
                         Tel: 415-693-2000
                         Fax: 415-693-2222
                         Email: gutkinjm@cooley.com

1    <u>Tuesday, November 2, 2021</u>

2                                                          <u>9:59 a.m.</u>

3                         P R O C E E D I N G S

4         **THE CLERK:**  Good morning.  This is the United States

5    District Court for the Northern District of California.  Please

6    remember that any recording of a court proceeding held by video

7    or telephone conference, including screen shots or other visual

8    or audio copying of court proceedings is strictly prohibited.

9         If counsel appearing and speaking in this first matter --

10   actually, the only matter this morning -- could please identify

11   themselves by using the raised hand feature?

12        Thank you.

13             **THE COURT:**  Good morning.

14             **UNIDENTIFIED FEMALE SPEAKER:**  Good morning.

15             **UNIDENTIFIED MALE SPEAKER:**  Good morning.

16             **THE COURT:**  Good morning.

17             **THE CLERK:**  Thanks a lot.  We'll get started in a

18   few minutes.

19                     (Pause in proceedings.)

20             **THE COURT:**  Good morning.  Looks like we have

21   everyone here.  Just go ahead and call the case.

22             **THE CLERK:**  Yes, your Honor.  The United States

23   District Court is now in session, the Honorable Virginia K.

24   DeMarchi presiding.  Calling the matter of *In re: Google RTB*

25   *Consumer Privacy Litigation*, Case number 21-CV-2155.

1       **THE COURT:**  Thank you.  May I have appearances,

2    please, starting with counsel for the plaintiffs?

3       **MS. PRITZKER:**  Good morning, your Honor.  Elizabeth

4    Pritzker as interim class counsel for the plaintiffs.  I want

5    to introduce my colleagues who will be handling the matter

6    today, Karen Swope of the Pitre firm, and David Straite of

7    Dicello, Levitt & Gutzler.  They're very experienced in

8    handling ESI in tech cases, so I'm going to let them handle

9    this case.

10      **THE COURT:**  Okay, thank you very much.  Thank you

11   and good morning.

12     And who is appearing for the defendant?

13      **MR. GUTKIN:**  Good morning, your Honor.  It's Jeff

14   Gutkin from the Cooley firm, for defendant Google, LLC.  Also

15   in my office here is my colleague Colin Scott.

16      **THE COURT:**  All right, thank you very much.

17     And Ms. Davis, I'm not sure that you stated your

18   appearance.

19      **MS. DAVIS:**  Thank you, your Honor.  Anne Davis, and

20   I'm also here for plaintiffs.  I'm part of the ESI team.

21      **THE COURT:**  Okay, thank you very much.

22     All right.  So I have read the joint submission, and have

23   gone through the competing proposals for this ESI protocol, and

24   I'm prepared to go through all of those matters in detail with

25   you, but I first wanted to ask a higher-level question.

1          I am aware that there is this other set of matters that

2     has been proceeding before Judge Van Keulen for discovery

3     purposes, the *Calhoun* litigation.  I can't say that I'm

4     entirely up to speed on what's going on in that case, but

5     I have -- I have looked at the dockets, the related case

6     dockets in that matter, and both sides refer to that matter in

7     the joint submission.

8          The first question for you all is, how does discovery

9     that's proceeding in those related litigations, in *Calhoun*,

10    relate to the discovery that you all anticipate having in this

11    case?  And I'm interested in issues like overlap, at least from

12    the defendant's perspectives, if any, to what extent, and let

13    me just pause there, and I'll figure out if I have other

14    questions, depending on your answers.

15         So let me ask that question first of the plaintiffs, and

16    then I'll ask the defendant.

17         **MR. STRAITE:**  Thank you, your Honor.  David Straite

18    for the plaintiffs; my first time appearing before your Honor.

19    Thank you for doing this via Zoom.

20         The two cases -- it's actually three cases, would be the

21    *RTB* case before your Honor today; there's also the *Calhoun*

22    matter, which is brought on behalf of unsynched Chrome users,

23    and then there's the *Brown* matter, which is brought on behalf

24    of incognito Chrome users.

25         Those three cases relate a little bit, but they're

1    fundamentally different in one respect.

2         *Calhoun* and *Brown*, which Judge Koh has already related as

3    related actions, those relate to what the plaintiffs allege is

4    the unlawful collection of personal information from the Chrome

5    browser.

6         In the *Google RTB* case before your Honor today, plaintiffs

7    allege the unlawful sale of information, regardless of whether

8    it was unlawfully collected and regardless which browser it was

9    taken from.

10        So while there is a little bit of overlap, one case, this

11   case, is fundamentally about the alleged unlawful sale of

12   personal information.  The other two cases are about the

13   alleged unlawful collection.  Will there be overlap?  Of

14   course, there may be some custodians that overlap. there may be

15   some data logs that overlap, but they are fundamentally

16   different cases.

17              **THE COURT:**  All right.

18              **MS. SWOPE:**  Your Honor, may I add one more thing?

19   There's different lead counsel in the two cases --

20              **THE COURT:**  Yes, I understand.

21              **MS. SWOPE:**  Okay.

22              **THE COURT:**  No, I understand that *Calhoun* and *Brown*

23   have been related, and I was thinking of them as a group for

24   this purpose, under the label of *Calhoun*.  I'm not sure if

25   that's how you think about it.  Like, I appreciate that they

1    are -- that different lawyers involved and all of those things,

2    but I appreciate the explanation for what the plaintiffs

3    perceive as the substantive difference in the two sets of

4    cases.

5        Let me ask the defendant for its view.  I don't know

6    which -- Mr. Gutkin, are you going to be speaking to these

7    matters?

8            **MR. GUTKIN:**  Yes, your Honor.  Thank you.

9        So in Google's view, I agree with most of what Mr. Straite

10   just said.  I think the cases are probably even less related,

11   and I expect there to be very little, if any, overlap of

12   material overlap in the discovery.

13       As Mr. Straite said, the *Calhoun* and *Brown* matters relate

14   to claims that Google improperly collected information, whereas

15   this action is about the particular data shared with buyers in

16   one particular Google advertising product, the Real-Time

17   Bidding product.

18       So it's sort of at different ends of the process, where

19   the *Calhoun* and *Brown* matters sit, versus this matter.

20       However, we did discuss the *Calhoun* matter in our papers

21   for a couple of reasons.  One, because some of the problematic

22   elements of plaintiffs' proposed ESI protocol are also in the

23   ESI protocol in *Calhoun*, and have not played out well, from

24   Google's perspective.  They have diminished rather than

25   enhanced efficiency.

1    And we also discussed *Calhoun* because it is many of the

2    same counsel who are prominent in this action are the counsel

3    also driving the *Calhoun* action.  That includes Mr. Straite on

4    this call now, but also Lesley Weaver, who is the senior

5    person, I believe, at Anne Davis' law firm, and a gentleman

6    named Jay Barnes.  All three of those sets of counsel are very

7    much a part of the team driving this action, and they are the

8    team driving the *Calhoun* action as well.

9    So we think the way this ESI protocol has played out there

10    is unfortunately an important predicter of what we can expect

11    here.

12    **THE COURT:**  All right.  I did note that observation

13    in the papers that was made at one point about the *Calhoun* ESI

14    protocol, and I guess what I'd say to the parties about that

15    is, if you do think there is some relevant data point from your

16    experience in the other case that you'd like to bring to my

17    attention as we go through, I am happy to hear that.

18    On the one hand, I think there's a lot of benefit, if

19    there have been things that are worked out and are working

20    well, why reinvent the wheel?  At the same time, if things are

21    not working well, I am certainly interested in thoughts about

22    problems that need solving.

23    I am aware that you have a special master in the other

24    case, so at the end of this conversation, I will raise that

25    issue with you all.

1        But I would like to just, as I said at the outset, go

2    through each of the disputes.  Let's just do them in order.

3    I have some thoughts on about them based on your submission,

4    which I'll share with you, and for some I have some questions

5    that I will pose.

6        So let me just start with this question of redaction of

7    irrelevant material, which is teed up in the papers, at least

8    in plaintiffs' section of the joint submission, as the

9    competing text in section 4(a) of your draft protocol.

10        So the plaintiffs, as I understand it, say there should be

11    no redaction of material that a party believes is irrelevant if

12    a document otherwise contains responsive information.  Google

13    does not directly respond on this point, so far as I can

14    discern from the papers.

15        I will tell you my inclination.  This issue has come up

16    before.  I'm not inclined to permit redaction of irrelevant

17    material just because it's irrelevant, except in extraordinary

18    circumstances, and the extraordinary circumstances that come to

19    mind from a prior matter was a case against the government

20    where I permitted redaction of sensitive material that was

21    entirely irrelevant to the matter at issue because it raised

22    national security concerns that would have implicated all sorts

23    of other complicated procedures and prevented disclosure --

24    timely disclosure of the documents.

25        So that's the kind of extraordinary circumstance that

1    I have in mind where I would permit redaction of irrelevant

2    material, but I'm inclined to advise you all, and bake it into

3    your order as well, stipulated order, that the default is no

4    redaction for irrelevant material just because it's irrelevant,

5    but if there's good cause to redact something for some other

6    reason, I'm prepared to handle it on a case-by-case basis.

7        So that's my inclination.  What I'd like to do is hear

8    from Google if there's some particular objection that I didn't

9    glean from your papers that you have to that particular text

10   section 4(a).

11        **MR. GUTKIN:**  Thank you, your Honor.  We did not

12   focus on that particular provision just due to the space

13   constraints, but basically Google's position is that a blanket

14   rule of this kind is not appropriate at the outset of the case,

15   because, as your Honor said, there will be some -- and

16   I understand and acknowledge that this would be rare, but there

17   may be some cases where we're redacting irrelevant material

18   with good cause.  So this could include the personal

19   information of Google employees, their personal e-mail address,

20   home phone number, their Social Security number, if for some

21   reason there's a responsive document where such information

22   appears.

23        There also could be situations where there is

24   extraordinarily sensitive Google business information, say,

25   relating to unreleased products or related to potential

1    acquisitions of other entities, the kinds of things that are

2    kept in all cases under strict lock and key that could appear

3    within a document.

4        And we just wanted to make sure that there was at least

5    some sensible exits from a blanket prohibition against

6    redactions based on relevancy for such very sensitive

7    information.

8        And I'll note that not only does the case law that

9    plaintiffs cited, the *Evon* case and the *State Street Bank* case,

10   both acknowledge that there can be appropriate times for the

11   redaction of irrelevant material, but there are, in the *In re*

12   *Apple Device* ESI protocol, which plaintiffs rely on heavily for

13   other reasons, that ESI protocol has certain outs for the

14   redaction of irrelevant material.

15       So those are the kinds of things we would ask your Honor

16   to allow.

17           **THE COURT:** Well, here's my concern about that, is

18   it's really hard for me to allow it up front, without knowing

19   what the "it" is that you would be proposing to redact.  You've

20   given some examples now that were not in the papers.  That's

21   fine, those situations may be appropriate, but what I'm

22   interested in knowing is how Google would propose to raise

23   those matters with plaintiffs when it was acting to redact

24   things.

25       So in other words, what I don't want to have is a

1    situation where there are redactions, and the plaintiffs don't

2    know why Google's making redactions, and then we just have a

3    fight about it.

4        So do you have some idea in mind for how you would

5    communicate that you were redacting material that would

6    otherwise be within a responsive document because that material

7    was, number one, irrelevant to the case, and had some

8    particular sensitivity?

9            **MR. GUTKIN:**  Yes, your Honor.  So a typical practice

10   that I've had, and again in the pretty rare cases where we're

11   redacting for a reason other than privilege redactions, is that

12   there's a label that is affixed with the redaction block that

13   would say either "redaction privilege," or sometimes would say,

14   "redaction privacy" to refer to, again, things like the home

15   address of a Google employee or a Social Security number or

16   that sort of thing; and sometimes, I think, also, a tag that

17   can be used is "redaction CBI," or confidential business

18   information, which would apply to things like -- and I want to

19   say again, I expect this to be rare, and maybe this doesn't

20   come up at all in this case, but would apply to things like

21   potential planned acquisitions of other entities, unreleased

22   products, the kind of super-sensitive, top-secret information

23   that can appear in a responsive document --

24            **THE COURT:**  Why is it --

25            **MR. GUTKIN:**  -- and that would have nothing to do

1    with this case.

2                    THE COURT:  Why wouldn't your protective order be

3    sufficient for that latter category?

4                    MR. GUTKIN:  Well, the protective order, you can

5    expect it to control the flow of information to the best of its

6    ability, but courts recognize that top-secret business

7    information that has no relevance of any kind can still

8    appropriately be redacted, even when a protective order exists,

9    and I think that's recognized in the -- again, in the *Apple*

10   *Device* ESI protocol, which is one of the few areas of that

11   protocol that I think has merit, but it's recognized in there.

12                   THE COURT:  All right, let me ask --

13                   MR. GUTKIN:  Of course -- I'm sorry, your Honor.  Of

14   course, if something had such a label and plaintiffs have

15   questions about it, then we can meet and confer about it,

16   discuss it, and make sure that there's no dispute about the

17   relevance of the redacted material.

18                   THE COURT:  All right, let me just get the

19   plaintiffs' view to what I now understand is essentially the

20   defendant's proposal for how to deal with redactions for things

21   other than privilege.  I've heard two justifications for

22   redaction.  One is privacy of personally identifiable

23   information of employees and the other is for super-sensitive

24   confidential business information.

25        So what is the plaintiffs' view?

1          **MS. SWOPE:**  Your Honor, Karin Swope for the

2    plaintiffs.  Actually, we would be willing to agree with Jeff

3    Gutkin's proposal, and we negotiated the *Apple* ESI protocol,

4    and at paragraph 5 of the protocol -- and we can submit this to

5    you after the hearing if you like the language -- it does agree

6    to redactions for both highly, you know, personal identifying

7    information and unannounced products, and highly sensitive

8    situations that are not relevant to the case.

9          So we're willing to submit this language and agree to put

10   it into an ESI protocol.  I think it sounds like Mr. Gutkin was

11   willing to agree to it as well, so we might be able to take

12   this off the table and use this.

13         **THE COURT:**  Excellent.  Well, I always like it when

14   the parties decide that they can actually agree on something

15   rather than have me decide it.  So I'm going to order you to

16   confer further on this item, and then let me know.

17         I would expect that the parties could agree on reasonable

18   language to accommodate your competing interests on this point,

19   and also I've shared with you my sort of default view, so

20   hopefully that's also helpful in resolving that particular

21   item.

22         **MS. SWOPE:**  Thank you, your Honor.

23         **THE COURT:**  Okay, so let's move on to the next one,

24   which is the question that comes up in section 4(b).  The

25   plaintiffs' proposed language is -- raises the issue about the

1    parties recognizing that they are obligated to produce relevant

2    and responsive non-privileged documents of which they are

3    aware, regardless of whether such documents contain any of the

4    agreed-upon or additional search terms.

5        So I'm not sure exactly what the dispute is about this,

6    because the rule doesn't particularly specifically address this

7    language, but I do have a question for the plaintiffs, which

8    is:  What, in plaintiffs' view, does it mean for a party to be

9    aware of a responsive document?

10       **MS. SWOPE:**  Sure, your Honor.  And in our papers we

11   cited a case, the *Waymo v. Uber*, which describes the situation,

12   but I will explain it to you, and that is is that, you know,

13   there -- we are asking for both parties to not blindly produce

14   documents based on search terms.

15       If there is a document that they know about that is

16   facially relevant, in fact, caught -- and this was the case in

17   the *Waymo v. Uber* case, and it was in a client's desk drawer,

18   and they gave it to counsel, and then counsel didn't produce it

19   because it didn't hit on any of the search terms.  Then

20   essentially, if you're aware that that is knowledge of a

21   facially relevant document either by the client or counsel,

22   then that obligation, if it's responsive to a document request,

23   then they can't hide behind the search terms to not produce a

24   document.

25       **THE COURT:**  I understand what your goal is here.

1    I just wanted to know specifically what "aware" means.  So it

2    doesn't mean should have known.  It means known.

3                **MS. SWOPE:**  Exactly.

4                **THE COURT:**  Okay.  So let me ask counsel for Google,

5    what is the problem with this provision?

6                **MR. GUTKIN:**  Well, your Honor has really hit on the

7    problem, which is, what does it mean for Google to be aware.

8    So Google is a massive entity.  We're probably going to have

9    numerous document custodians.  There's in-house counsel,

10   there's myself, and I don't -- the provision is vague to the

11   point that I don't understand exactly what obligations it's

12   creating for Google.

13        Now, the *Waymo* case that plaintiff cited is truly an

14   extreme example.  It has to do with a letter that the Deputy

15   General Counsel received at the same time that there were

16   document requests, and outside counsel was aware of the letter,

17   as were federal prosecutors, but then there were two board of

18   directors committees convened to discuss the letter.  So that

19   there was no debate there about whether there was awareness of

20   the letter, but I mean, I see this as a real gray area.

21        You know, is this just limited to outside counsel being

22   aware of a non-cumulative responsive document?  That certainly

23   seems like fair game.  If I am aware of non-cumulative

24   responsive documents that don't happen to hit a search term,

25   then those should be included in the production, but an

1    employee who maybe works on the product that I haven't

2    interviewed, you know, if that person in a deposition is aware

3    of something that it turns out is not in the production, that's

4    obviously -- that's an impossible standard for Google to comply

5    with.

6            THE COURT:  Let me ask you, did you talk about this

7    before this hearing and before you submitted your joint

8    submission?

9            MR. GUTKIN:  We did, your Honor.

10           THE COURT:  Okay.

11           MR. GUTKIN:  I will say we had numerous

12   meet-and-confers.  We exchanged various drafts.  We were

13   focused to some extent on, you know, provisions 7 and 8, which

14   are the heavy hitters, but we went through, you know, all of

15   the same process here as best as we could.

16           MS. SWOPE:  That's correct, your Honor.  One thing

17   I'll suggest maybe is, instead of saying they are aware, maybe

18   we can add, like, the control group or something like that, to

19   alleviate Mr. Gutkin's concern of a lower-level employee.

20       But certainly, the executives who were handling the

21   litigation and the outside counsel should not not produce --

22   not feel that they don't have an obligation to produce facially

23   relevant documents because they do not come up by search terms.

24   That's what we're trying to get at.

25           THE COURT:  All right.  I mean, if we start talking

1    about who's in the control group and who's not, that's a whole

2    other debate I expect, but I think the proposition is pretty

3    not controversial that if you know of a relevant document, you

4    have to produce it; as a party, it's just, whose knowledge is

5    attributed to the party.  It's easy when it's an individual.

6    It's hard when it's a big company.

7        So, you know, nobody -- defendant Google does not want to

8    be in the situation in the *Waymo* case.  It would be -- I mean,

9    so I'm just telling you that if that happens, that will be bad

10    for the defendant.

11        So I'm not sure it needs to be baked into your ESI

12    protocol, but I'm telling you right now that that's my

13    expectation, is that people will not be saying, well, it didn't

14    hit a search term, therefore, we had an obligation to produce

15    it.  That's not the way it works.

16        **MR. GUTKIN:**  Understood, your Honor, and that's

17    certainly never been my practice, and as I said, the *Waymo* case

18    is a truly extreme example where there was broad awareness,

19    including outside counsel, of a highly relevant document.  That

20    won't happen here, but the provision as drafted, to me, seemed

21    dangerously vague.

22        **THE COURT:**  Do you believe that you could reach

23    agreement and eliminate the dangerous statements of it by

24    agreeing with plaintiffs' counsel about which client

25    representatives or counsel are charged with the relevant

1    knowledge?

2          **MR. GUTKIN:**  Well, perhaps if it were outside

3    counsel.  It's different -- I don't know what Ms. Swope means

4    by the control group of executives.  I don't exactly know how

5    I could implement that, but we could confer about it further.

6          **MS. SWOPE:**  Well, typically, an example would be,

7    like, the attorneys of inside counsel who have the privilege of

8    being part of the attorneys eyes only, in a protective order

9    sometimes there's (inaudible) a few people at Google, and quite

10    frankly, the concern generally is not outside counsel.  The

11    concern generally are, like I said, are defendants outside --

12    inside counsel and corporations.

13       But I do agree that we can try to work out some language

14    in that regard, some few key inside counsel people.

15          **THE COURT:**  It might be helpful for both parties if

16    you could give some further thought to this, but what I intend

17    to do is, when I issue an order on the actual dispute that

18    you've presented to me after this hearing, is I will make my

19    view clear about my expectations, and I just -- I think it's

20    important for all parties to understand that, in part, this is

21    an obligation of counsel to properly advise your client, when

22    you're doing document collection, about this kind of

23    obligation.

24       So it is an obligation on outside counsel in two respects:

25    advising your client about what discovery requires, and also,

1    if you know of a document, not withholding it simply because it

2    didn't hit a search term.

3         You all are free to come up with a different way to

4    accomplish compliance with that obligation.  If you think that

5    simplifies your life, I'll let you do that, but I see the

6    problem you're trying to avoid.  It is a little bit hard to

7    solve when you have a large corporation with many people

8    involved.

9         So I'm happy to let you work on it further, but my order

10   will state my view as further guidance.

11             **MS. SWOPE:**  I think we can work on it further.

12             **THE COURT:**  Okay.  So let's leave it there.

13        All right, the next item I have is the preservation date

14   issue that shows up in the draft at Section 6(a).  The

15   plaintiffs say that the preservation obligation should go back

16   to January 1st of 2014, and Google says it should be March 26th

17   of 2016.

18        Do the parties agree that it should be the same date for

19   all ESI?  Let me ask plaintiffs.

20             **MR. STRAITE:**  Thank you, your Honor.  Yes, we had

21   not discussed separate preservation obligations, but plaintiffs

22   of course are always open to proposals for certain

23   subcategories of information that may make more sense to

24   shorten or extend.

25        So you'll see in the draft there is no separation for

1    types of ESI, but plaintiffs are open to hearing from Google if

2    there are certain RFPs or certain categories or certain ESI

3    sources that make sense to shorten period.  We can always have

4    that conversation.

5            THE COURT:  All right, Mr. Gutkin, same date for all

6    ESI, do you think that's appropriate?

7            MR. GUTKIN:  I think the same date for all ESI is

8    appropriate.  I don't -- just off the top of my head, I can't

9    picture what would need to be preserved any longer than the

10   already one year prior to statute of limitations that Google is

11   proposing.

12           THE COURT:  All right, and I understand the

13   justification the plaintiffs give is that there is this Texas

14   AG antitrust litigation.  There's already a production under

15   way in that case, may be complete in that case.

16       What is the status of the production in the antitrust

17   litigation?

18           MR. STRAITE:  Your Honor, do you mean the production

19   of documents to plaintiffs in this case or do you mean Google's

20   production to the --

21           THE COURT:  So you tell me that it's the same date

22   as the date that's the preservation obligation in the Texas AG

23   antitrust litigation and so that Google's obligation is, you

24   know, would be aligned here with the obligation in that matter.

25       So what is the status of document production in that

1   matter, the Texas AG antitrust litigation?

2           **MR. STRAITE:**  I would have to defer to Mr. Gutkin

3   regarding his client's --

4           **THE COURT:**  Okay.

5           **MR. GUTKIN:**  I believe, your Honor, that it's under

6   way and not completed.

7           **THE COURT:**  Okay.

8           **MR. GUTKIN:**  That would be my sense of it.

9           **THE COURT:**  All right, and I understand that Judge

10  Koh has ordered Google to produce the documents that were

11  produced to the Texas AG parties in this case as well.  Has

12  that happened?

13          **MR. GUTKIN:**  Yes, your Honor, although we had a

14  dispute over what Judge Koh meant, which actually has not been

15  resolved, but we produced to the plaintiffs all of the

16  documents from the Texas AG action that Google had deemed were

17  relevant, and that we were going to see if we had further

18  disputes.

19          **THE COURT:**  All right.

20          **MR. STRAITE:**  Your Honor, we do have further

21  disputes.  The documents that have been produced by Google are

22  just a handful, just a couple of thousand documents.  So what

23  Google has deemed relevant is a very, very, very small

24  percentage.  Plaintiffs are not proposing the entire

25  production, but there is a fairly substantial dispute regarding

1    the scope of Judge Koh's order that we'll have to bring to her

2    for her clarification.

3              **THE COURT:**  Okay.  All right.

4              **MR. GUTKIN:**  Sorry, just a final thing, that we

5    already brought that motion to Judge Koh, the motion for

6    clarification.

7              **THE COURT:**  Okay, and that's pending before her, not

8    before me.

9              **MR. GUTKIN:**  Correct.

10             **THE COURT:**  Okay.  All right, so let me just share

11   some thoughts on this, and I'm happy to hear from plaintiffs

12   further on this point, but I'm not persuaded that just because

13   there's an earlier date for preservation in some other action,

14   that that should be adopted here.  That doesn't seem to me like

15   a good reason.

16        And, you know, the plaintiffs' focus on welts (phonetic)

17   shouldn't be burdensome for Google, but at the same time, that

18   action may be resolved well before this one, and why should

19   there be a preservation obligation that is key to this other

20   litigation that may at some point no longer exist?  I mean,

21   there are just many practical reasons why that doesn't make a

22   lot of sense to me.

23        Google says that the March 26, 2016 date is a year before

24   the earliest actionable claim based on statute of limitations.

25   That seems reasonable to me.  I don't see any substantive

1    justification for a January 1st, 2014 date apart from the fact

2    that it may be the same date in some other unrelated

3    litigation.

4        So I'm happy to hear from the plaintiffs further on that

5    point, but that was my reaction based on your submission.

6            **MR. STRAITE:**  No, your Honor, we respect your view

7    and are willing to accept it.  We just ask there's an

8    understanding that if we do identify a certain database or

9    sub-category of information where it may make sense to go

10    earlier, that we have the right to bring it to your attention

11    on a timely basis, we would appreciate that.  Otherwise, we

12    understand your preference and we can live with it.

13            **THE COURT:**  All right.  I mean, as a general matter,

14    you know, these orders, whether they're stipulated entirely by

15    the parties and presented to me for approval or whether it's

16    something based on a ruling that I've made, if there is a good

17    reason to request a change, the parties are within bounds of

18    your case management schedule and deadlines you have, you're

19    always able to make a motion requesting relief.

20        And so I don't think that needs to be stated expressly in

21    stipulation or in any order by me, but based on what I have

22    before me, I will adopt the March 26, 2016 date for

23    preservation in your Section 6(a).

24        All right.  Next one is 6(b), the data sources to be

25    preserved, and I'm not even sure if you have a dispute here.

1    I couldn't tell whether it's been resolved or whether there's

2    still something that is a disagreement.

3        So what is the plaintiffs' view?

4            **MR. STRAITE:**  Thank you, your Honor.  I think

5    Mr. Gutkin will agree with me there's nothing we dispute with

6    respect to the ESI protocol.  We agree that Section 6(b) of the

7    proposed protocol pre-identifies two categories of ESI that

8    need not be preserved even if there's relevant ESI there.  We

9    negotiated A and B -- sorry, 1 and 2 of subsection (b).

10       There is a third category of ESI that we are still

11   negotiating.  Both sides have agreed not to include it in the

12   ESI protocol and we hope to address it very soon.  I know

13   Mr. Gutkin has suggested that a protective order motion may be

14   forthcoming shortly if we can't get it resolved and we

15   understand that, you know, time is of the essence, but we both

16   agree should not be in the ESI protocol.  So there's nothing on

17   the agenda for today.

18           **THE COURT:**  Okay, Mr. Gutkin, do you agree with

19   that?

20           **MR. GUTKIN:**  Yes, your Honor.  Nothing on the agenda

21   for today.  We're still meeting and conferring about another

22   category of documents that may not be able to be preserved, and

23   hopefully we'll reach agreement and not be back before you on

24   that.

25           **THE COURT:**  Okay, very good, then.

1      So let's get to the matters that seem to be driving the

2   bulk of the disagreement here, and those are the sections of

3   the proposed protocol that are Section 7 and 8.

4      Section 7 is, as I understand it, proposed provisions from

5   the plaintiff about specific disclosures about ESI and

6   information that's available to custodians that it wishes the

7   parties to exchange, and Section 8 is about the search

8   methodology, and in particular, plaintiffs propose particular

9   steps regarding search terms identification and their

10   application, and Google objects to both.

11      So my understanding of Google's objections here are

12   essentially that Google acknowledges that the parties should

13   confer about these matters, they're part of the Court's

14   Guidelines and Checklist for the 26(f) conference, but these

15   things should not be baked into a ESI protocol, specifically a

16   court order, that has this level of specificity and rigidity to

17   it.  Have I accurately captured Google's sentiments there?

18          **MR. GUTKIN:**  You have, your Honor, and if I could

19   just add to that just a bit briefly.  In our view, Sections 7

20   and 8 are seeking to impose mandatory automatic and

21   extraordinarily burdensome obligations on Google, with no

22   showing of any deficiency in our discovery.  It's discovery on

23   discovery on discovery.  There are many elements of this that

24   are not in the ESI Checklist or the Guidelines.  There are

25   elements of it that appear nowhere in any of the proposed

1    orders or ESI protocols that plaintiffs have pointed to you.

2         This is, to use a phrase, a kind of a wolf in sheep's

3    clothing, from Google's perspective, because in a context where

4    there's going to be such vastly asymmetrical discovery, all of

5    these pre-baked-in rules that require disclosure after

6    disclosure, and all of this work on Google's side for any

7    disputed custodians in any disputed search terms, this would be

8    an extraordinarily unusual and wildly burdensome ESI protocol

9    to adopt for those reasons, and I assume your Honor will want

10   to talk about the individual provisions, but that's my take as

11   an overall matter.

12         **THE COURT:**  And let me just ask the question:  Has a

13   provision like this been adopted in the ESI order in *Calhoun* or

14   *Brown*?

15         **MR. GUTKIN:**  Well, some parts of this are part of

16   the *Calhoun* protocol, but again, from Google's perspective and

17   at least in certain ways from plaintiffs' perspective, that has

18   not worked out well in *Calhoun*, and that there have been lots

19   of fights where Google -- from Google's perspective, the ESI

20   protocol imposed impossible-to-comply-with burdens, and I'm

21   sure Mr. Straite will tell you from, plaintiffs' perspective,

22   that Google didn't -- his view is that Google didn't comply

23   properly with the ESI protocol, but my take-away is that unlike

24   the traditional system where we say we're going to meet and

25   confer, we can talk about custodians and search terms and we'll

1    be reasonable, and we'll be back before your Honor where we

2    can't agree that this level of one-sided process has caused

3    many, many more fights than it has avoided.

4              **MS. SWOPE:**  Your Honor --

5              **THE COURT:**  Sorry, before we proceed, I'm getting a

6    message that says the internet connection is unstable.  Did you

7    guys just experience an outage, or is that just on my end?

8              **MS. SWOPE:**  Just your end.

9              **MR. GUTKIN:**  I did not, your Honor.

10             **THE COURT:**  All right.

11             **MR. GUTKIN:**  As long as you could hear me....

12             **THE COURT:**  I think I heard most of what you said,

13   but there was, like, everyone froze for a second.  Okay, that

14   did not bode well, but we're going to continue in the hopes

15   that the internet gremlins don't undermine this hearing.

16        Ms. Swope, you wanted to comment on this point.

17             **MS. SWOPE:**  Well, first of all, I'd like to take it

18   section by section, because we have a whole Section 7 that

19   Google has provided no alternative to.  I'm prepared to talk

20   about that.  And then we also have a Section 8, which is

21   methodology, and my co-counsel David is prepared to talk about

22   that.  So if we could separate the two sections, I think it

23   might be helpful.

24             **THE COURT:**  I do think it would be helpful to

25   separate the two sections.  Let me just give you my high-level

1    thoughts about the matter, based on what I've read.

2         I was asking about the *Calhoun* and *Brown* cases because

3    I was interested, as I said at the outset, about the experience

4    that you all have had about what worked and what didn't work,

5    and so, you know, perhaps that can be part of our conversation.

6         But starting with Section 7, my initial reaction to this

7    is that the parties should absolutely confer about these

8    topics.  They are the topics in the Guidelines and Checklist,

9    but what I don't understand is why they need to be part of a

10   court order, which is essentially what you're asking me to do.

11   I don't understand why I need to enter a court order if it's

12   already part of what you all have undertaken, or will be

13   undertaking going forward and conferring about these important

14   topics.

15        It is important to confer about who the relevant

16   custodians are, what the nature of ESI is, you know, how it's

17   maintained, and you have obviously already done some of that to

18   get to the point that you are right now in presenting this

19   disputed protocol to me.  So that's the sort of starting point

20   for my thinking about this section.

21        So Ms. Swope, if you would like to address Section 7 on

22   behalf of the plaintiffs, I'll hear what you have to say.

23              **MS. SWOPE:**  Thank you.  So your Honor, you are

24   correct that in our letter brief we outlined that every single

25   subsection of Section 7 is part of the ESI Checklist of the

1    Northern District of California, and we lined them up in the

2    brief.

3         So, you know, disclosures of where relevant ESI is

4    located, identification of custodians, by job title,

5    identifying ESI that's not readily accessible, all that is

6    considered part of the Northern District Checklist.  So this

7    isn't controversial.

8         There are two points.  One is, the devil's in the details,

9    and we don't want to have to come back to you again.  For

10    example, in Section (b) of Section 7, we're asking for

11    identification of systems where relevant ESI is likely to be

12    stored, including custodial, noncustodial and third party

13    locations.

14         Now, I envision, when it's time to have that disclosure,

15    Google is going to say, "Well, we're just going to give you

16    custodians.  We don't have to tell you non-custodial or

17    third-party services."  And if it's in the ESI protocol, if we

18    have a clear road map that's negotiated, then we won't have to

19    come back to you.

20         So I think that the reason that the advantage of having

21    the language in the ESI protocol is to prevent disputes down

22    the line.  That's the first thing.

23         The second thing is, I'd like to respond in a way to

24    reframe what Mr. Gutkin said, and that is, he said that,

25    "absent a demonstrated deficiency" -- I'm quoting his brief --

1    "parties answer discovery based on their own judgment", then

2    I would say that that's not the correct state of the law.  You

3    don't have to -- you don't have to have an absent demonstrated

4    deficiency for a party to enter into the principles of ESI,

5    which is transparency, cooperation and collaboration.

6        So this -- right now, just starting off, we're having Mars

7    talking to Venus, because we think that we want to have

8    transparency, cooperation, collaboration, and Mr. Gutkin has

9    said that, "No, we're going to build our own house, and if

10   there's a problem with it, then you have to come and talk to us

11   about it, after we've built the house."  And we --

12          **THE COURT:**  Can I ask you a question?  Have the

13   plaintiffs served document requests yet?

14          **MS. SWOPE:**  Yes, your Honor.

15          **THE COURT:**  Okay.  And have you all conferred about

16   the topics that are set out in Section 7 of plaintiffs'

17   proposal?

18          **MS. SWOPE:**  Not -- I have not, your Honor.  But

19   I will say that I came to the case after the 26(f) conference

20   was had.  I do understand that Google stayed conversation of

21   this ESI protocol until the lead counsel was determined, and so

22   now that -- once lead counsel of this case was ordered by the

23   Court, or interim lead counsel, then we resumed the

24   conversation.  So no.

25          **THE COURT:**  So, okay, and then final question is,

1    has it worked out the way you hoped, having, you know, at least

2    some components of what you propose here in the other matters

3    that we talked about, *Calhoun* and *Brown*, as in avoiding

4    disputes and streamlining things?

5              **MR. STRAITE:**  And your Honor, this is David Straite

6    for plaintiffs, also counsel in the *Calhoun* matter, not in the

7    *Brown* matter.

8         I am a little confused that Mr. Gutkin said that Section 7

9    and 8 of the proposed ESI protocol before your Honor ran into

10   difficulty in *Calhoun*.  Actually, it's Section 7 here led to

11   clarity and avoided disputes.  Section 7 requires Google to

12   make very basic disclosures, so that we can confer about ESI.

13   All of the topics in these checklists are triggered here.

14        For example, a list of custodians likely to have relevant

15   information, that's in the *Calhoun* order, and it's worked

16   brilliantly.  So that when the Court says, okay, plaintiffs,

17   you may propose up to 10 more custodians -- there were caps put

18   on discovery.  For example, we have a cap of 42 custodians.  We

19   get to look at the list of X number of custodians that Google

20   already identified as potentially relevant.  We then make our

21   case from that list, or maybe we can think of other ESI

22   custodians, but it has made the process more efficient, it's

23   made it go more smoothly.

24        All of the difficulties that we had in that case come from

25   the negotiation over who the custodians will be.  They are over

1    what the search terms will be.  Those are the disputes, but

2    there have been no disputes over section 7.  The disclosure of

3    relevant sources of non-custodial ESI, that's actually proved

4    to help the process go more smoothly and reduce the number of

5    disputes we had to bring to Judge van Keulen.

6         This is the first I'm hearing that a simple duty to

7    disclose sources would be a problem.  It's actually reduced

8    conflict.

9              **THE COURT:**  All right.  So Mr. Gutkin, I'm happy to

10   hear from you in response to what the plaintiffs say, but I do

11   want to reflect on one point, which is, I do agree with the

12   plaintiffs that the point of this whole ESI communication,

13   whether it's in a protocol or whether it's something that the

14   parties do because it's now required by the Federal Rules to do

15   it and to have the conversation about it, is, it's not a remedy

16   for a discovery failure.  It's something that you have to do so

17   that you don't have a discovery failure.

18        And I want to just observe for you all, which I'm sure is

19   extremely top of mind, which is that you have a substantial

20   document production completion deadline of April 21st of 2022

21   and a fact discovery cutoff of December 15th of 2022, and

22   unless you have already gotten going substantially on your

23   document production, those deadlines will be upon you very

24   soon.

25        And so it is very important to sort out how you're going

1    to deal with ESI, and it is absolutely asymmetrical here, and

2    I appreciate Google's point on that.  The burden falls

3    substantially on Google to deal with this.  But it will be even

4    more burdensome if it ends up having a bunch of disputes that

5    require you possibly to have to redo things because I order you

6    to redo things.  You want to avoid that.

7        So while I am not a fan of ordering the parties to do

8    things that they are already required to do anyway, because

9    I -- just sort of strikes me as not a good thing to have to do,

10   I really want to have you all avoid the problem of having

11   disputes bog down the completion of discovery in this case.

12       So let me just pause there, get Mr. Gutkin's reaction to

13   the arguments that the plaintiffs have made on Section 7.

14           **MR. GUTKIN:**  Yes, thank you, your Honor.  So as

15   Ms. Swope said, the issue is that the devil is in the details.

16   This is not just an embodiment of the general obligation to

17   confer about custodians and confer about search terms.  There

18   is so much more added into their Section 7 that I would say you

19   will not find anywhere in the ESI Guidelines or Checklists, and

20   I'll just try to give you a couple of examples of way that,

21   from Google's perspective, plaintiffs have kind of larded up

22   these provisions to create burdens where it's not proper.

23       So we have to, for the disclosure of custodians, we have

24   to say the dates of employment and a description of all of

25   their individual devices and storage systems, automatically,

1    for every custodian.  That goes beyond what's called for in the

2    ESI Checklist.

3        I apologize, I want to back up, because I just wanted to

4    respond to something Ms. Swope said.

5        We did conduct the 26(f) conference, and we did discuss

6    these issues to -- we had two separate multi-hour meetings for

7    that 26(f) conference and covered all of this to the extent the

8    parties felt that we needed to cover it, and plaintiffs are

9    trying to basically reopen it and codify not just what's in the

10   Guidelines and the Checklist, but actually plaintiffs' edited

11   versions of that, which add on lots of layers.

12       So that that's an example of a provision that's really

13   complete overkill, that we have to go through all of these

14   extra hurdles for every custodian.

15       Then they have (c) through (f), which are all

16   preservation-related questions that they're trying to codify in

17   this court order, and force us to do automatically, with no

18   showing that there's any kind of preservation issue, and we did

19   meet and confer about preservation issues, and have been.

20       Google has actually already produced some document

21   retention policies that we've been able to locate at this early

22   stage -- but by the way, your Honor, just for your knowledge,

23   we've produced almost 50,000 pages of documents, and that the

24   debate over the ESI protocol is holding up the custodial piece,

25   but we have moved forward with discovery, we have been talking

1    about preservation, we resolved the preservation issue on the

2    plaintiffs' side.  We're in the process of trying to resolve a

3    log preservation issue on the Google side, and we've produced

4    retention policies, but they're trying to bake into this order

5    all of these extra obligations.

6         Let me point out a couple of other things.

7         7(c), the automatic disclosure of all retention policies

8    they say is covered by ESI Checklist I, that's not true.

9    That's not covered -- in my view, that's not a fair

10   characterization of Checklist I.

11        7(e), we're supposed to provide a description of lost or

12   destroyed ESI.  I think that's nowhere in the Checklist.  They

13   just cite Checklist I, and 2.01(e).  I don't see those

14   referring to Google needing to investigate and describe every

15   piece of potentially lost ESI.

16        And your Honor, with reference to these preservation

17   issues, and the way that plaintiffs want to force us to delve

18   into them with no showing of a problem, I direct you to the

19   *Uschold* case and the *Jensen* case cited in our papers.  Those

20   are both cases where there were preservation discovery demands

21   made, and the courts held in the *Uschold* case, I think it was

22   Judge Laporte, if I remember correctly, held, without a showing

23   of a deficiency, I'm not going to force the party to submit

24   automatically to discovery on these preservation issues.

25        As a final point in Section 7, but I have a lot to say

1    about Section 8 and the impossibility of complying with

2    Section 8, but as a final point about Section 7, I would direct

3    your Honor to *Calhoun* docket entry 228, and obviously, your

4    Honor won't have it in front of you, but you could just take

5    that number down.  It's one of the many discovery dispute --

6    joint discovery dispute letters submitted to Judge Van Keulen,

7    and there is a section in that document where the heading of

8    the plaintiffs' section is, "The ESI Protocol Is a Court Order,

9    Not an Optional Guide," and with respect to my colleagues on

10   the phone, who I like quite a bit, my view is that they're

11   going to use this as a hammer against which to drill Google and

12   to say Google is not complying, and it is not necessary,

13   because we had the 26(f) conference, we covered these things.

14        I understand what your Honor is saying.  We -- our

15   Section 8 also includes a meet-and-confer on custodians and ESI

16   and search terms, but not -- it should not be codified like

17   this, with all of these specific and onerous parameters ahead

18   of time.

19             **THE COURT:**  Thank you for that.  Just a moment.  Let

20   me just say, I see a distinction between some of these

21   provisions.

22        So for example, (c), (d) and (e), the ones that you've

23   cited, Mr. Gutkin, that relate to questions of preservation of

24   material that's no longer accessible and those kind of things,

25   that's one category of information.  It's something that

1    I expect that you all have already covered in coming up with

2    the part of this order that refers to things that don't need to

3    be preserved, and if there is a concern about something that's

4    missing, there should be further conversation about why it's

5    missing.

6         You now have document requests, which you probably didn't

7    have at your 26(f) conference -- maybe you did, I don't know

8    how quickly plaintiff serves document requests -- but this is

9    the time where you should be talking about custodians,

10   custodians who are identified potentially in your initial

11   disclosures, and custodians who might have documents that are

12   responsive based on actual requests for production of

13   documents, and you should be talking about those.

14        And I don't necessarily agree with the plaintiffs that

15   this ESI protocol is the place where that obligation arises in

16   the first instance or should be documented in this form, but

17   the fact is that you all need to be talking about it, and if

18   you're not talking about it, you're delaying talking about it

19   for some reason, you should not be.

20        The same goes for sources of ESI.  You should be talking

21   about custodial and non-custodial sources of ESI.  This is the

22   law.  It doesn't have to be in a court order for it to be your

23   obligation.

24        And so, for example, Section 7(a) and (b) are things that

25   you must be doing, maybe not in that precise form, but if there

becomes a question, for example, in your discussion of

custodians about whether someone is or is not duplicative of

some of other custodian, you may well have to get into a

question of, well, this person was an employee between X and Y

date, that person was an employee between some -- you know,

some other dates.  Are they really overlapping or are they not?

You may have to share that information, and I would expect you

to share that information, with each other.

So I'm a little bit concerned that we are starting off on

the wrong foot, in the sense of, one could see the plaintiffs'

efforts here as saying, we can't trust the defendant to do the

right thing that they're obligated to do anyway under the law.

I'm not saying that that's what your argument is.  I credit

your explanation that you are trying to avoid disputes down the

road, and I appreciate that, but I do also appreciate Google's

point that an order can create disputes when what's really

required is the parties to actually talk to each other, and not

just say, oh, there's been a violation, now we have to come to

the Court.  I want to avoid that too.

So I am always interested in problem-solving and figuring

out the best way to accomplish these things.  I can simply

order you all to meet and confer about relevant custodians,

including non-custodial resources, and give you a deadline to

do it and report back to the Court.  I can do that, but I am

not a huge fan, as I said at the outset, of baking this into an

1   ESI order in the way that the plaintiffs have presented it.

2   Ms. Swope, I think you wanted to, or Mr. Straite, you

3   wanted to respond to Mr. Gutkin's comments and possibly also to

4   what I've just said.

5   **MS. SWOPE:**  Yes, your Honor, I do, and then maybe

6   Mr. Straite has something to say as well.

7   But I will say, your Honor, that again, I appreciate what

8   you're saying, that you expect the parties to follow the law,

9   but the law is not always so crystal clear when you get down to

10   the details.

11   Like, for example, on custodians, do you have to put their

12   job title?  You have to put their dates of employment.  Yes,

13   you just put the name, which is like throwing unknown people at

14   us.  So what level information is Mr. Gutkin going to provide

15   to us?

16   Now, I appreciate what you're saying is, follow the law,

17   but I think it would be easier for us to follow an order in

18   this case.

19   If your Honor would like to adopt the Checklist and

20   explain to Google that they have to follow the Checklist, maybe

21   that's a compromise that we can live with, but I see Mr. Gutkin

22   shaking his head no, and my point about that is, you know, it's

23   one thing to be in front of the Court and say we're going to

24   follow the law, and it's another thing to be negotiating

25   information at a meet-and-confer when your Honor is not

1    present.  And we want to avoid coming back to you, and I think

2    you want us to avoid coming back to you.

3                **THE COURT:**  I do.

4                **MS. SWOPE:**  So if you can give us some up-front

5    guidance in a protocol, then we'll just follow the protocol.

6    If that's -- so I think our fall-back position, if you're

7    disinclined to accept the language in our proposal, is that you

8    tell the parties that they have to follow the Checklist, and we

9    will comply with that.  We will do it.

10               **THE COURT:**  I think I understand what everyone's

11   interest is and why you're proposing what you're proposing.

12        I'd like to move on to Section 8, and that one I view a

13   little bit differently, because this is where, in my

14   experience, we can really have things go awry, and discovery

15   can be really derailed if this doesn't -- this search

16   methodology or search effort doesn't get nailed down.

17        So let me just start with a high-level question, and this

18   is principally directed to Google, because Google will be the

19   one producing the vast, substantially large quantity of

20   documents.  I understand on whom the burden of doing this ESI

21   review will principally fall.

22        Has Google decided whether it's going to rely on search

23   terms, on search terms exclusively, whether it's going to use

24   TAR, or some combination?

25               **MR. GUTKIN:**  Yes, your Honor.  So I would say there

1    is no current intention to use TAR.  However, I say that before

2    we yet know the corpus of documents that we would have to

3    review.  So I want to reserve the right to say that that could

4    happen.

5        You'll note that in Google's proposal, the black text in

6    Section 8, we agreed that if we decide to employ TAR, that we

7    should confer with them, meaning not only that we will tell

8    them that we're going to use TAR, but we'll talk about the

9    standard metrics that one uses to make sure that a TAR

10   production is adequate.

11       And I would say that as to search terms, there will

12   certainly be some of plaintiffs' RFPs that Google's agreed to

13   respond to, and by the away, we've been continuing to meet and

14   confer after our first responses.  We've added additional

15   proposals about things we'll do in a recent letter, and

16   plaintiffs will be responding to that, but there will be some

17   elements of our response that we'll be able to do by what

18   I call targeted collection, where they're asking for particular

19   things that we can go to people and get them, and then there

20   will be others where I think we will need to go to a custodial

21   collection, where we look at people's files and run search

22   terms.

23       It's a little hard for me to say which is going to be more

24   prevalent at this point.  I'm hoping that targeted collection

25   can accomplish a lot to minimize the custodial review needed,

1    but that's the current state of play from my side, your Honor.

2              THE COURT:  And if search terms are going to be used

3    by Google for some purpose, will you be sharing those search

4    terms with the plaintiffs before you apply them?

5              MR. GUTKIN:  Well, so we are willing to share the

6    search terms that we choose to use with plaintiffs, and that's

7    kind of what I consider part of the standard meet-and-confer

8    and, you know, we share search terms and they can give

9    feedback.

10       It's the problem we had with Section 8 is the extreme

11   level of mandatory follow-on steps that I'd like to talk about

12   as we go through it, assuming we're going provision by

13   provision, but yes, we are willing to share search materials

14   and also to take plaintiffs' input on appropriate search terms

15   and to try to meet and confer and iron all of that out.

16             THE COURT:  Okay, and here's the final question on

17   the search term/TAR issue.  I have had a case recently where

18   the issue came up about whether having used search terms, that

19   it would be inappropriate to then use TAR, or in what way would

20   TAR be used.  I don't want to have that issue here.  You may

21   all know about that case law, and about some of the Sedona

22   Conference writing about the appropriateness or not of mixing

23   those two vehicles.

24       I just -- I want you to talk about that before it happens,

25   because if it just happens because Google decides to do one

1    thing or another and then you have a problem, you may end up in

2    a situation where you have to redo it.  I just -- I wanted to

3    avoid that situation.

4        And we're talking high-level right now.  I'm asking you

5    some of the questions that jumped out at me.  We're not going

6    provision by provision.

7        So let me ask about another category, the custodians.

8    I have no idea how many custodians are appropriate for this

9    case at this point, and I don't know if you do either, but the

10   numbers that are proposed here are, to my eye, entirely

11   arbitrary.  They could be way too high or they could be way too

12   low, or whatever.

13       Does anybody have any sense at this point about how many

14   custodians, individual custodians, are likely or require, you

15   know, a search of ESI?  Can you tell from initial disclosures

16   or other things you know about the documents that have already

17   been produced?

18           **MR. GUTKIN:**  I would say, your Honor, in this

19   response to something Ms. Swope said, that we already, at

20   plaintiffs' request, prioritized production of kind of an

21   org-chart style document reflecting the Google personnel that

22   work on RTB issues.  Google does not have org charts, but

23   I believe there were about 33 people on that list, incidentally

24   disclosed with titles and with their managers, names and

25   titles.  I don't think there's any reason that all of those

1    people would be custodians, but I assume that's -- you know,

2    some of those people would be custodians for the requests where

3    we need to perform custodial searches.

4            **THE COURT:**  And so Mr. Gutkin, how would you propose

5    who should or should not be a custodian in this kind of

6    situation?

7            **MR. GUTKIN:**  Well, my proposal would be that we will

8    go through plaintiffs' RFPs that -- the ones that -- where we

9    are in agreement about the scope of what we're going to be

10   returning.  Google will figure out, as we already have been

11   figuring out -- and we've already been producing documents, the

12   ones we've been able to find at this point -- which ones we can

13   gather by targeted collection and which ones will require

14   custodial review, and then once we know where custodial review

15   is required, then we can propose custodians and search terms,

16   assuming we need search terms, which I think we would, to

17   identify the relevant documents.

18           **THE COURT:**  All right.  And you plan to be

19   transparent about who the custodians are, which ones need

20   search terms, which ones are going to be targeted searches

21   only, with the plaintiffs?

22           **MR. GUTKIN:**  Yes.  I'm not sure if I could totally

23   follow what your Honor is asking, but yes, I mean, I think that

24   when we get -- when we're ready to do custodial searches, which

25   we might already be doing but for the fight over the ESI

1    protocol and their provision that says we can't use any search

2    terms until we've agreed, or until at least we've conferred,

3    I think we could have a conversation with them and we could be

4    transparent about, we think these custodians and these terms

5    make sense, and then we could --

6              **THE COURT:**  And why.  So you would be prepared to

7    say why.  Like, if the list of 30 people who are RTB-related --

8    have RTB-related positions that you've already identified, you

9    will be able to say, for example, these, you know, whatever,

10   X number of folks are the custodians that have relevant,

11   responsive and non-duplicative documents, and we propose to use

12   the following search terms to collect documents, and then

13   review for responsiveness, and then the plaintiffs will say,

14   why this person and not that person, and Google will be

15   prepared to respond for -- explaining its reasons why.

16             **MR. GUTKIN:**  Yes, your Honor, within reason.

17   I mean, reasonable requests, of course, but yeah, that's the

18   process that I normally do in every case where the ESI protocol

19   would just say the parties will cooperatively engage and meet

20   and confer to sort out the search terms and custodians.

21        So that's exactly the process I anticipate, and I, again,

22   don't want to jump in the next step in the argument, but it's

23   so different than this process, where we have to give them

24   descriptions of all the nonresponsive documents and a sample of

25   the responsive documents that hit on every one of their search

1    terms and custodians, and the burden is on Google, and we can't

2    even make objections for facial relevance.  We still have to go

3    through their whole process.

4        So yes, your Honor, what you're describing is in line with

5    my expectation and my normal practice.

6            **THE COURT:**  And if the parties have a dispute about

7    which search terms should be applied to ESI, how do you -- how

8    would Google intend to raise that issue with me or navigate it?

9            **MR. GUTKIN:**  Well, I would assume just through your

10    Honor's normal meet-and-confer process, which I've used before

11    in other matters, and which I find to be very good, where we

12    confer until we reach an impasse, and then we have a lead

13    counsel meet-and-confer, and then we bring it to your Honor in

14    a joint letter.

15            **THE COURT:**  All right.  Just kind of going down that

16    path a little bit, before those matters come to me, typically

17    what the parties will have done is applied whatever it is, the

18    disputed search term is, to the collection, and one party is

19    usually saying this would create a number -- too many

20    irrelevant hits and the other party is saying no, this is just

21    fine, something like that, and my normal expectation is that

22    the parties will engage in that kind of effort in advance of

23    bringing a dispute to me; which is, again, part of the detail

24    that's provided in plaintiff's section, is a method for

25    accomplishing that result.

1      Does Google have any objection to doing that kind of

2  effort, that kind of testing of search terms that are disputed?

3           **MR. GUTKIN:**  So yes, because of the way the

4  inflexible and onerous process that plaintiffs have laid out,

5  where they can propose any number of search terms and any

6  number of custodians, and then we have to report back with

7  de-duplicated and unique hits on a by-custodian basis, and we

8  have to describe the type and nature of irrelevant documents

9  that we're seeing for any search term or custodian we dispute,

10  and we have to provide a sample of the responsive documents for

11  any search term that we dispute.

12      So I'd like to go on about this, but I don't know what,

13  you know -- at what level of detail you want me to answer your

14  Honor's question, but we strongly object to the inflexibility

15  and the automated nature of -- and let me note again their

16  provision, it's either 9 or maybe it's 11 -- sorry, it's

17  enumerated 11, that facial irrelevance of a custodian or search

18  term is not even an escape hatch for Google, expressly in

19  their --

20           **THE COURT:**  What is facial irrelevance, anyway?

21           **MR. GUTKIN:**  Well, so if they said -- and I'm not

22  saying that they will do this intentionally, but if they said

23  you should add a custodian -- custodians A, B and C because we

24  saw their name on some email, and I said, well, those people

25  work on the Waze product, describing, you know, ads for Taco

1   Bell that come up as you drive past a Taco Bell on Waze, or

2   whatever the product does, that I'm still, under this ESI

3   protocol, obligated to do all of their steps.  I can't actually

4   say we should not have to go through your rigid process, even

5   for custodians and search terms that we claim are facially

6   irrelevant.

7        And I'd like to bring in, at this moment, one data point

8   from the *Calhoun* action, which was, in the *Calhoun* action there

9   was a dispute over custodians.  Mr. Straite might correct my

10  numbers here, but if I remember correctly, Google proposed

11  something like 18 custodians, and then plaintiffs responded

12  with 79, what's called in the orders -- I've seen from Judge

13  Van Keulen in the parties' papers -- "persons of interest," so

14  other people that they thought could be custodians.

15       And we have a portion of our order that was not in

16  *Calhoun*, but a portion of what they're proposing for your Honor

17  to enter as an order where, for every disputed custodian, we

18  have to go through all of these steps, we have to collect all

19  their documents, we have to report on their search hits, their

20  unique search hits, their de-duplicated search hits, we have to

21  describe their irrelevant documents and we have to sample their

22  responsive documents, whatever that means.  I don't even know,

23  how can you sample responsive documents without reviewing all

24  of someone's documents?

25       But we would have to go through that -- we would have had

1    to go through that for all 79, and what happened in *Calhoun* is

2    that Google agreed to four, and then Judge Van Keulen ordered

3    an additional three, out of that 79.

4        So seven out of the original 79 became -- the persons of

5    interest became custodians.  And if, you know, my colleagues

6    here want to propose 79 custodians, then we can have that

7    conversation, but I certainly should not be subject to an order

8    from your Honor dictating that I have to jump through ten hoops

9    of fire based on their request that I add 79 custodians.

10            **THE COURT:**  All right, thank you.  I appreciate that

11   point.  Let me get the plaintiffs' view on Mr. Gutkin's

12   arguments, and I'm particularly interested in why this level of

13   detail that the plaintiffs are proposing is, in your view,

14   necessary or helpful.

15            **MR. STRAITE:**  Thank you, your Honor.  Plaintiffs are

16   proposing a protocol to avoid the seriatim arguments that will

17   delay discovery and make it impossible to meet the Court's

18   deadline to end fact discovery, in particular, the substantial

19   compliance deadline, which precedes the end of fact discovery.

20       We're asking for three principles, and we're very flexible

21   in how they'd be applied.  If your Honor has a concern about

22   individual provisions, we can negotiate them here or later and

23   come back, but the principles we'd like to be incorporated into

24   the protocol, number one, is that the process be transparent.

25   When we negotiate with Google, we need to know why certain

custodians are being proposed, why some are being opposed.

Number two, we'd like the process to be collaborative. We'd like it to be a negotiation rather than a take-it-or-leave-it approach. We lack the information. It's very one-sided. We don't know who John Smith is or Jane Doe when they're proposed to us. We need information so that we can work collaboratively.

And number three, it should be done on an informed basis. It's very unhelpful for Google to say, this particular set of search terms you proposed are irrelevant, or they're burdensome. It is now best practice, Sedona and the courts have all agreed, that hit reports are a necessary piece of data that are needed to evaluate relevance and burdens, which are the two conversations we likely would have regarding proposed search terms.

I'm very happy to hear Mr. Gutkin saying that -- maybe he'll correct me if I'm wrong -- that he would go first, Google would go first, and propose some custodians that are likely to have relevant information, and then we would have the opportunity to add our proposals on there.

I won't go into why the 79 number in *Calhoun* was actually not a relevant data point here. What's important is the process, how would we evaluate our proposals versus Google's proposals, and what's in the proposed plaintiff language from the ESI protocol is a way to have these conversations in

parallel, so that we can accomplish this without having the

multi-month delay.

If you want to talk about the process in *Calhoun*, what's

interesting there is we did have an ESI protocol provision

requiring hit counts.  Google refused to provide the hit counts

until we first resolved the question of facial relevance as to

all the terms and all the custodians.  Four-month delay, and

finally Judge Van Keulen had to order Google to produce the hit

counts in advance of the next meet-and-confer, which would have

been two days after the hearing.

The fact that she had to order something that was already

in the ESI protocol is the reason why there was that delay.

Once the hit counts were provided, the disputes were resolved

quickly.  They were --

**THE COURT:**  Let me just ask, in the *Calhoun* matter

that you're referring to, that specific example, was the

objection that Google was making was it's too burdensome to

search the documents that hit on the search term, or was it

some other objection?

**MR. STRAITE:**  The objection was to -- from my

recollection, for the specific example Mr. Gutkin gave, it was

an objection to running the proposed search terms over

custodians who were not yet fixed, and Judge van Keulen also

addressed that, and she said no, it's impossible to figure out

who the final set of custodians were before you start this --

1    the search term hit counts.  She ordered them be done in

2    parallel.  She said it's always how it's done, and that's

3    actually what she ordered, to be done in parallel, so we could

4    actually meet our deadlines.

5             **THE COURT:**  All right.  I don't want to relive

6    whatever happened in the *Calhoun* case.  I'm just trying to

7    figure out what the experience has taught you all, if anything.

8          I didn't mean to cut you off in your argument,

9    Mr. Straite.  I understand the three principles, and my sense

10   is that those are all worthy principles, but your Section 8 and

11   your Section 7 go too far.

12         We were focusing on Section 8.  Section 8 goes too far.

13   It's too rigid, and it doesn't -- it's not actually consistent

14   with your three principles, because it's not collaborative.

15   And it just strikes me as really unworkable.  I mean, good

16   sentiment behind it, wanting to have a structure that both

17   parties can count on to govern their interactions, but I think

18   it's overkill.

19         Here's what I'm thinking about ordering you all to do, is

20   I feel like what might be more helpful here, but I would

21   appreciate your reaction, is to give you some deadlines for

22   accomplishing things that are necessary to accomplish to get

23   the documents undergoing -- under way; so in other words, a

24   deadline for having a discussion about custodians, based on the

25   pending RFPs, and if there's a dispute about how many

custodians or who, there will be a deadline for bringing that
to my attention; you know, a deadline for the proposal of
search terms to be supplied, that kind of thing, but not with
the kind of rigidity that -- and numerical criteria that the
plaintiffs are advocating.

I just think that you all will run out of time to get this
stuff done, and that I'm not convinced that this ESI protocol
is actually going to help you achieve your goals.

So that was my thought coming into this hearing, is that a
time line for your discussions would be the most helpful thing
I could do for you.

I am also not averse to having you come in in person and
sit in my jury conference room or some other ventilated space
and talk about it, as captives, until you work it out.  That
was one of my pre-pandemic techniques, and I am prepared in
appropriate cases to reinvigorate that.

So those are the things I was thinking about.  Let me get
the plaintiffs' reaction to the idea of a time line for
accomplishing these steps.

**MR. STRAITE:**  Thank you, your Honor.  A time line
would be welcome.  The plaintiffs would absolutely welcome it,
whatever we could work out with Google.  Having a fixed
deadline sometimes focuses the mind.

When you talk about you're coming into, you know, a
windowless room in San Jose, Ms. Swope and I are -- I think

1    we're fans of that.  We've both had to do that with a special

2    master, retired Judge Westerfield, which is now JAMS.  She was

3    hired on the Apple iPhone throttling case, reporting to --

4    directly to Judge Davila, and we did, after we had reached an

5    impasse on search terms, we spent a day at JAMS and we got

6    final resolution of the ESI search terms, but it was only

7    possible because we had the hit reports.

8         So if your Honor is inclined to sort of morph Section 8

9    into more of a just a deadline-driven process, we would just

10   ask that it include the hit counts, because that will be the

11   basis for all the arguments and all the discussions we have.

12   That's the most efficient thing to do, we would ask.

13              THE COURT:  All right, and let me just, on this hit

14   report thing, I'm not actually sure -- I don't want to create a

15   dispute where we don't have one, but to my mind, hit reports

16   are only meaningful if what one party is saying is it creates

17   too much for me to review, or the hit rate is just, you know,

18   so lopsided -- like, you could say, if I have a search term

19   that includes some word that actually has nothing to do with

20   this -- it has something to do with this case but also has

21   something to do with some other matter that's irrelevant to

22   this case, and there's a way to address that by modifying the

23   search stream to say, "and not this," that's a useful endeavor

24   to engage in, and figure that out, and I had that in another

25   matter, and I just told the parties to go fix that problem.

1   But it wasn't so much that you had to have the hit reports

2   to sort that out.  It's just, you had to look at what was being

3   hit and have a conversation about it, and then one side

4   proposed a modification that would solve the problem once they

5   figured out what it was.

6   But otherwise, you know, hit reports, to me, don't really

7   matter unless the person who is having to review what gets hit

8   says that's too much for me to review.

9   I have had the argument made to me that if the hit report

10  generates too few hits, that's a problem that shows lack of

11  relevance.  I don't buy that argument.  I mean, that, to me,

12  means the hits are working, the search terms are good, because,

13  you know, your hit rate -- like, what is the ratio of relevant

14  stuff to not relevant stuff?  That's what matters.

15  So I'm not really sure why there's such a huge focus on

16  hit reports *per se*, unless you are anticipating the problem

17  will be burden.

18              **MR. STRAITE:**  Agreed, your Honor.  We would be

19  willing to accept a provision that says hit counts are only

20  required for any search stream that Google contends is

21  burdensome.  That would actually make a lot of sense.

22              **THE COURT:**  Okay.  That's an interesting proposal.

23  Mr. Gutkin?

24              **MR. GUTKIN:**  Yes, thank you, your Honor.  So the

25  problem is, if it's automatic and hard-wired that we have to do

1    hit counts, and I'll just -- again, I have some examples from

2    the *Calhoun* matter, to just talk at least at a high level about

3    why.

4        I understand that in *Calhoun*, the original set of search

5    terms included words like priv*, and monitor*, and sync* -- and

6    by "asterisk" I mean root expander --

7            THE COURT:  Yes.

8            MR. GUTKIN:  -- and track*, so that if a document

9    just said, "This project is on track," it would hit on that.

10        And then the volume -- and by the way, your Honor, you can

11    see these things spelled out -- I believe that even the

12    specifics of the search terms are spelled out in that docket

13    entry 228 from the *Calhoun* matter that I referred to before.

14        The volume of documents that was returned was so great

15    that Google has to kind of move search term documents to a

16    system to get these de-duplicated hit counts, and the system

17    has a by-volume charge associated with it, and the volume was

18    so high that it was many tens of thousands of dollars per month

19    to get these documents all over to a system to provide these

20    de-duplicated hit counts that plaintiffs were insisting on.

21        And so it just shouldn't be hard-wired that we have to do

22    that in all circumstances.  We should be able to talk about it

23    and, you know, I think hit counts can be helpful, and there are

24    times when they are helpful, but it shouldn't be part of an ESI

25    protocol, where whatever terms they propose I have to respond

1    within 14 days with de-duplicated, unique, by-custodian hit

2    counts, and that's exactly what -- that's one of the least

3    problematic provisions in Section 8, but it's one that inflicts

4    a huge expense and automatically and without thought for the

5    context of what's going on.

6          **MR. STRAITE:**  And your Honor --

7          **MR. GUTKIN:**  That's the issue with hit counts.

8          **MR. STRAITE:**  Mr. Gutkin makes my point when he

9    complains that plaintiffs proposed a term that returned volumes

10   that were inappropriately large.  That was demonstrated to

11   plaintiffs with the hit reports, and plaintiffs relented.  It

12   worked.  The system worked.  Hit counts were the tool that

13   helped us confer on an informed basis, and that's my third

14   component of the three things we're asking for, the three

15   principles, that it be an informed discussion.

16        And so that term, "privacy," was actually modified because

17   of the hit counts.  And I will correct Mr. Gutkin, we did not

18   get the de-duplicated in *Calhoun*, but leaving that aside, the

19   hit counts were the most important tool to help us come to an

20   informed negotiation.

21        And again, if it's just a question of volume, if it's

22   burdens, what other tool would there be?  If it's a question of

23   facial relevance, we're absolutely -- we hear your Honor, we

24   can have those conversations.  As long as we have the deadline,

25   then that will focus our minds so it doesn't drag on past fact

1    discovery.

2         THE COURT:  Let me put it to you this way, though,

3    just taking Mr. Gutkin's example.  If I saw a search term that

4    was a stand-alone term that said "priv*," I would say you're

5    going to need to modify that, right?  So you shouldn't have to

6    do hit counts for some things in order to have a reasonable

7    conversation about why something is very likely to be overly

8    broad, and I think that's Mr. Gutkin's point, is that these hit

9    counts can be very helpful, I agree.  They may be necessary in

10   order to resolve or at least inform the parties about the

11   dispute.

12        But there are some things that are just going to be --

13   it's not going to pass the straight-face test in terms of a

14   reasonable proposal, and you all are maybe taking a risk and

15   thinking, well, is this going to pass the straight-face test in

16   front of me?  I may disagree with you and think, yeah, it's

17   perfectly fine, and you'll have to do something else to

18   convince me otherwise.

19        But all I'm saying is that I am sensitive and sympathetic

20   to the argument that a rigid process does not necessarily serve

21   both sides' interests here, but you have to do something to get

22   under way, and that's really what I'm focused on, and my

23   expectation is that in the course of doing something, if one

24   side says, "I need to understand why you're saying this will be

25   a problem," that's the kind of thing that Mr. Gutkin explained,

1    which is, it would require us to move this amount of documents

2    to this system, you know, at this great expense, and we simply

3    can't do that for all of the individual custodians, that that's

4    the conversation that you will have, or that Mr. Gutkin will

5    say, "You know what, that term with that asterisk is going to

6    hit on all of these kinds of things that we know we have in our

7    documents, and can we find a way to eliminate those irrelevant

8    hits by adding this modification?"

9         And I expect the parties to have that kind of conversation

10   with each other, and to not say, I don't have to tell you that,

11   or from the plaintiffs' perspective, you don't have to know

12   everything about every custodian in order to resolve these

13   disputes.

14        So, you know, it may sound like I'm just trying to split

15   the baby between you all, but I'm really hoping that if I give

16   you some deadlines for accomplishing these tasks, that you all

17   will find a way to exchange the information that you actually

18   need in order to resolve the disputes, or at least most of

19   them, and that's what I'm trying -- what I think I'm going to

20   do with this dispute, at least as to Section 8.

21        We have been going for quite a long time on this

22   particular -- these two sections, Section 7 and 8, and I'd like

23   to get through the remainder of your items, so I'm going to

24   move on to the privilege issue, which is Section 11(d).

25        The plaintiffs want a provision that says the parties will

1    provide additional information upon request on a privilege

2    claim, and Google objects to that, but it's not clear to me why

3    there's an objection.  I assume it's that there's a resistance

4    to some sort of automatic disclosure of some additional

5    information that's not required by 26(b)(5), but maybe I'll let

6    Mr. Gutkin tell me why he doesn't like Section 11(d).

7          **MR. GUTKIN:**  Yes, your Honor is correct.  The issue,

8    again, is that it's hard-wired into plaintiffs' proposal.  It's

9    not -- of course, without this language, which I never had --

10    I've never personally seen before, and I don't recall seeing in

11    any of the orders that the parties submitted, it's certainly

12    not in any of the four that -- the ESI orders that Google

13    pointed to, but I've never seen a proposal that's hard-wired in

14    that whatever our privilege log is, they can just request more

15    information about as many entries as they want, and we are then

16    obligated to provide additional information.

17      So that's my objection to this as it's written, because

18    they have the right to ask me for that automatically without it

19    being in here, and if I refuse unreasonably, I am assuming I'll

20    have to answer to your Honor.

21          **THE COURT:**  Well, that assumption would be correct,

22    and if the parties anticipate bringing privilege disputes to my

23    attention, they're going to need to confer in advance, as

24    required by my standing order, and I will not look kindly on

25    some argument that says we asked, you know, for more

information about X, and the party claiming privilege wouldn't

share it, if that X is something that's meaningful to

resolution of the dispute, like, what was this third party's

role?  You know, it looks like there was a disclosure to a

third party.  How can you maintain privilege?  What was that

third party's role?  I mean, I'm going to expect that kind of

exchange of information.

So while, you know, I tend to agree that -- and I am

reluctant to put things in an order that are already required

by my standing order, and frankly, by your obligation to

confer, and also by, I might add, the Federal Rules, which

require you to share the information that allows the other side

to assess whether something is or is not privileged without

revealing that privilege.  I mean, that's sort of a basic

requirement anyway, and sometimes that can be done simply by

identifying subject matter at a high level in custodians,

author, recipient, et cetera, that's a knife (phonetic) that

needs more, and I expect you all to exchange that information

if that's the case, but not arbitrarily and not automatically,

and not just because it's in an order, and that's -- I view

that there's some mischief that could be unintentionally

created by having it in an order.  So I am reluctant to do

that.

But given that we're on this subject, privilege disputes

tend to be a little more involved than some of the other

1    discovery disputes that come my way, and I have recently had

2    occasion to -- well, I had an issue where the standing orders

3    procedure is in the word limits and, you know, the

4    don't-attach-things rule, made it impossible for me to decide a

5    privilege issue.

6        So I wanted to just let the parties know that if there's a

7    dispute that comes up about privilege that you all feel can't

8    adequately be presented to me by using my expedited procedures

9    in my standing order, you should let me know.  Sometimes there

10   are legal issues that can just be resolved using that expedited

11   procedure, but if you agree that you need something more, some

12   additional process, you should just let me know.  Just file

13   something and let me know, and I will hear you out.

14       But I'm not inclined to put 11(d) in the order that

15   I enter on ESI, but that's not because I disagree that

16   information exchange is necessary as part of a meet-and-confer,

17   where there is really something meaningful to share to resolve

18   the dispute.  Okay?

19       So that will be how I resolve 11(d).  If someone wants to

20   argue that, I'll let you do it, but....

21           MS. SWOPE:  No, your Honor, I think we understand

22   your position, and we'll defer to you on that.

23           THE COURT:  Okay.  Appendix A.  All right, we're

24   getting to the end of this dispute, but I think there are four

25   items that are the areas of disagreement.  These are linked

1    items in an e-mail that -- wanting those to be disclosed, the

2    file path, the Google Drive fields, and native files.

3        So let's talk about the linked items.  I am told by Google

4    that there are lots of e-mails that include links, and that it

5    would be impractical to produce everything at a particular link

6    for all documents.

7        **MS. SWOPE:**  And your Honor, we -- FMA (inaudible).

8        Your Honor, in our brief, we did reach -- come up with a

9    proposal that Mr. Gutkin had a chance to see before we

10   submitted it to you, and rejected it, but what we suggested is

11   that we -- that they produce -- because of the -- what he

12   described as the impracticability of having an entire

13   production with hyperlinks for his client, we asked that -- I'm

14   just trying to find the exact words, but essentially, we asked

15   that they produce the hyperlinks upon our request.

16       So we want to be able to -- you know, if there are certain

17   very hot documents that we think are extremely relevant to the

18   case, and we want to see what the employee is referring to when

19   he says, "click here" or "reference here," because we

20   understand that that is how -- that's the nomenclature of

21   corporate culture at Google is to talk to each other in

22   hyperlinks, that they're able to find those hyperlinks.

23       So we're not now -- and again, Mr. Gutkin had the chance

24   to see this in our briefing.  We're not asking for every

25   hyperlink.  We're asking for ones that are relevant and that

1   they'll produce them.

2              THE COURT:  Okay.  So on hyperlinks, Mr. Gutkin,

3   what's your --

4              MS. SWOPE:  Here it is:  "We request that Google

5   provide hyperlink documents which plaintiffs reasonably

6   request."

7              THE COURT:  Yeah, I see that.  I see that proposal.

8        So Mr. Gutkin, what's your response?

9              MR. GUTKIN:  So the problem, your Honor, was that

10  they included in the metadata this line that we have to

11  identify, by Bates number, the linked items.  It may be that we

12  don't have a disagreement if that's deleted from the metadata

13  fields that we're agreeing, because if Ms. Swope comes to

14  Google with reasonable requests and says, we can't locate the

15  document that's described at this hyperlink in this highly

16  relevant document, Google is willing to entertain reasonable

17  requests for that, but the problem is, this started off with,

18  and the presence of that field in the metadata specifications

19  suggests it could be an across-the-board requirement, which is

20  not just impracticable, it's actually literally impossible for

21  Google to comply with.

22       And I -- your Honor, I won't go on too long on this, but

23  every case, every decision that's ever looked at this has ruled

24  that linked documents are not attachments.

25       In the *Calhoun* matter, there were 61 documents that the

1    parties identified for Judge Van Keulen and requested all the

2    hyperlinked documents from just those 61.  Out of a production

3    of -- whatever it was -- hundreds of thousands of documents,

4    I think, for just those 61, it turned into 900 hyperlinks, and

5    Judge Van Keulen said, no way, that's not proportional, and

6    said, plaintiffs, you can pick 40 hyperlinks out of the 900.

7        So that -- if there are reasonable requests for manageable

8    numbers of linked documents, a lot of times they will have

9    already been produced because they're -- you know, sometimes

10    they're going to a Google Drive location, sometimes they're

11    linked to a different part of the same document, but we can

12    field a reasonable number of requests, but absolutely cannot

13    have a requirement in the metadata spec that this be provided.

14        **THE COURT:**  So let me just ask two questions.  One

15    is a technical question.  Does -- okay, I see that it says in

16    the proposal for the field description, Bates number for

17    hyperlinked items, which would imply that those were separately

18    produced and labeled, and I get that that's a problem.  But is

19    there a way to identify, in a metadata field, the existence of

20    hyperlinked documents in a way that's automated, or is that

21    also a technologically impossible thing to do?

22        **MR. GUTKIN:**  My understanding is that that's

23    impossible.  The documents don't -- the documents don't work

24    that way.  It is not -- the documents will not be saved in the

25    same location.  A linked document can be a cnn.com article, it

1    can be something on a Google Drive, you know, in a different

2    business unit.  It can be a part of the same document, but

3    there's no automated way to do anything with it, which is why

4    the Court --

5              THE COURT:  Wait, wait, but what I'm asking is,

6    let's say I have ten e-mails, three of them have hyperlinks to

7    something, somewhere.  I want to know which of the ten e-mails

8    have hyperlinks in them.  Is there some automated way to say

9    these do, these don't?

10             MR. GUTKIN:  I'm not aware that there is.  I've

11   never heard of such a capacity, but also, they are visible on

12   the face of the document, at least in my experience --

13             THE COURT:  Right, you'd have to --

14             MR. GUTKIN:  -- and there are multiple matters --

15             THE COURT:  You'd have to scan through it, you'd

16   have to figure it out, see -- you know, put your cursor over

17   it, see that it's actually a hyperlink as opposed to just

18   something that's underlined or whatever.  That's what you'd

19   have to do.

20             MR. GUTKIN:  They typically -- in my experience,

21   it's typically clear whether it's a hyperlink as opposed to

22   something underlined for emphasis.

23             THE COURT:  Yeah.

24             MR. GUTKIN:  It won't -- you know, "great quarter,"

25   underlined, will look different than "review document here,"

1    and the word "here" is underlined, or "cnn.com" is underlined.

2         **THE COURT:**  But that was the other point I had,

3    which is that you said, you know, often you'll be able to

4    figure out what the document is, but if it just is --

5    somebody's created a hyperlink and labeled it "here," the word

6    "here" that's linked to something, you won't know what the

7    "here" means.  You won't be able to know that.  And so I could

8    see that there would be an occasion on which it would be

9    impossible for the plaintiffs to know what that document was.

10        So I like the suggestion that, on a case-by-case basis,

11   where it really is a suggestion Ms. Swope made, also the

12   suggestion that I think you made, Mr. Gutkin, which is that on

13   a case-by-case basis, these things can be requested, but it

14   can't be automatic and it can't be everything because it really

15   is going to be this huge volume.

16        So I just don't see any way around that.  And it just --

17   it's sort of a technological problem but also just, it's the

18   practical nature of these things.

19        So I don't think that linked items can be part of your

20   metadata, unless plaintiffs have some different idea of what

21   can be shown as a metadata field.  I mean, if it was easy to

22   say the existence or not of hyperlinks in this document is

23   something that can be easily extracted and put in a metadata

24   field, that would be one thing, and at least you could say,

25   well, this is the universe of things that have links, let's go

1    through it and figure it out if there is anything that we

2    absolutely need to request specially.  Apart from that, I would

3    not put it in the metadata fields.

4         **MS. SWOPE:**  Your Honor, one thing that maybe we can

5    go back and look at is, when I say that the Google employees

6    spoke to each other using hyperlinks, they weren't referring to

7    CNN.  They had a habit of referring to their own documents,

8    it's an internal reference system, and I would think that that

9    internal reference system, there's a way to write a script to

10   track that or to find it, and what I would ask is for

11   Mr. Gutkin to inquire as to whether it's available, not for

12   every hyperlink, not for external hyperlinks, but for work --

13   for internal hyperlinks that refer to other documents within

14   the company that are internal to the company, because that's

15   the issue, is that the integrity of the document is -- it is --

16   is destroyed if you don't have a hyperlink, and also Mr. -- you

17   know, the party is required to produce the documents as they're

18   stored in normal course of business, and when their -- in the

19   normal course of their business is to refer to other company

20   documents as hyperlinks, to say that we can't see them really

21   frustrates our ability to understand the conversations and the

22   information that's passed between Google employees.

23        **THE COURT:**  I think that's a very context-dependent,

24   case-specific argument.  I don't think it necessarily would in

25   all cases, but it might in other cases, and you might have

1 absolutely correct justification for asking for those

2 hyperlinked documents.

3      If it is really a matter of writing a script, great, then

4 that's something that Google can do, but it doesn't sound like

5 it is --

6           MR. GUTKIN:  It's not, your Honor.  I can answer

7 Ms. Swope's question.  It's not -- not, to my knowledge,

8 possible to do that, and it's something I've asked about, and

9 you can see this in the *Noom* decision, and you can see this in

10 Judge Van Keulen's decision -- and I apologize, your Honor, if

11 I spoke over you.  I didn't mean --

12           THE COURT:  No, it's good.

13           MR. GUTKIN:  You can see this in Judge Van Keulen's

14 decision, where they just moved to compel the hyperlinks in

15 only 61 documents, and Google said, this is a strictly manual,

16 laborious process, because it's 900 hyperlinks, and Judge Van

17 Keulen said, I accept that, and you can have 40.

18      So that's -- you know, hopefully we won't be back in front

19 of you arguing about how many hyperlinks is reasonable, but the

20 requesting has to be the process, because there isn't another

21 option.

22           MS. SWOPE:  Right, I've not --

23           THE COURT:  Go ahead, Ms. Swope.

24           MS. SWOPE:  Well, we are coming to the Court on day

25 one asking for Google to accept, upon reasonable request, and

1  his client read our brief and didn't change the position.

2     So I guess I have to put it back to the Court and to

3  defendants:  Is Google willing to accept our request for

4  hyperlinked documents?  Because we submitted this as an issue,

5  and unless the position has changed, it's not clear to me

6  whether it's an issue or not.  I'm not quite sure --

7           **THE COURT:**  Regardless of what Mr. Gutkin says in

8  response to that question, I am going to order that it not be

9  part of the metadata automatic list of something that needs to

10 be Bates-labeled, but I am going to require that Google

11 entertain reasonable requests for production of hyperlinked

12 materials, and it's going to be handled on a case-by-case

13 basis, and if one party is not reasonable about the request or

14 responds to the request, then I will tell you that, because

15 I imagine it will come before me, and I would rather not have

16 it come before me, so I expect you to be reasonable about it.

17    So I don't want to say any more about that right now.

18 I think we've belabored it enough, but that's how I think we

19 should handle that issue.

20    The file path question is another category that is

21 disputed, and for that one I'm not entirely sure if this isn't

22 technical difficulty or just something that Google feels is too

23 intrusive and shouldn't have to do.

24    Mr. Gutkin, why don't I ask you to articulate the basis

25 for your objection.

1          **MR. GUTKIN:**  Sure.  So it's -- the file path is

2     often not available.  So therefore, it didn't return meaningful

3     data.  And then additionally, I've had this experience where

4     producing the file path sometimes can reveal privileged

5     information in what would otherwise be producible documents

6     because of the way documents can -- sometimes they can get

7     organized for collection by Legal, sometimes they're organized

8     at the request of counsel with a folder name that reveals

9     privilege, but my understanding is that it's -- this field was

10    not in the -- I should say, your Honor, just backing up one

11    step, I believe in the black text in Appendix A is all a copy,

12    if I'm not mistaken, of the metadata specifics agreed to in

13    *Calhoun*, and these -- the blue items are all the additions

14    plaintiffs are asking for here.

15         So file path was not part of the *Calhoun* specifics, and

16    it's frequently not available, and also requires an extra and

17    burdensome layer of privilege review, and I'm sure Mr. Straite

18    can set me straight if I'm wrong.

19             **THE COURT:**  Sometimes metadata fields -- other

20    metadata fields that are almost always agreed can have that

21    same issue.  You can have privileged information show up in a

22    metadata field, and that's not usually a problem, meaning it

23    can be -- it's a problem, but it's a problem for all metadata,

24    and people deal with it under 502(b), 502(d) kinds of

25    arrangements.

1       So is the file path something, if it is available, it will

2   be automatically -- it could automatically populate?  In other

3   words, it doesn't require some kind of manual -- no manual

4   anything is going to be required.  So if it is available, is

5   there any objection to providing it, apart from the concern

6   about privilege?

7           **MR. GUTKIN:**  I guess, your Honor, as long as we

8   understand that I'm saying, my understanding is it's frequently

9   not available --

10          **THE COURT:**  Understand.

11          **MR. GUTKIN:**  -- but if it is available for automated

12  collection, I guess I could revisit if the privilege issue

13  becomes a real problem, you know, a real impediment to

14  production, because it is in extra layer of review every time,

15  but....

16          **THE COURT:**  I mean, it may be an issue for some

17  custodians and not others.

18          **MR. GUTKIN:**  Um-hum.

19          **THE COURT:**  There will be some custodians for whom

20  there would be no expectation there would be any privileged

21  anything in a file path.  So this may be a small problem.

22      Okay, Google Drive fields, Google says this is irrelevant

23  and can't be reasonably provided, but I don't really have a lot

24  of detail on what's the problem with the Google Drive fields.

25          **MS. SWOPE:**  Your Honor, may I speak to that issue

```
1   first?
2              THE COURT:  Sure, go ahead.
3              MS. SWOPE:  So I'm not sure if you're familiar with
4   Google Docs --
5              THE COURT:  Yes.
6              MS. SWOPE:  -- and Google products, and so in Google
7   Docs, for example, you have different authors who participate
8   in creating a document, and if you were to put the drive of the
9   author, then you can easily see who is contributing to a Google
10  Doc, based on the metadata.
11      So the request for the author, the viewer, the
12  collaborator, is a back-end way of understanding who's
13  authoring and editing a document, without having to review
14  every single page, and this is, you know, as I understand,
15  technically feasible.  It's not requiring a manual production
16  review.  It's just simply a way to handle and manage the
17  documents in a more efficient manner once you receive them, in
18  terms of sorting by who wrote your document, who edited the
19  document, who looked at a document, that are Google Office
20  products.
21             THE COURT:  So I understand the justification for
22  author, viewer and collaborator, but why do you need labels and
23  folders?
24             MS. SWOPE:  In the same way that the file path, your
25  Honor, provides an understanding of how documents are organized
```

1   within a custodian, the folders and labels will help us

2   understand just the organizational structure of....

3        It's the same way, essentially, when you go back to the --

4   if you're old enough, like me, to remember the hard copy

5   documents, you know, you had a file, a label of a folder, and

6   then you understood, you know, how the documents were

7   organized.  It's just an organizational marker.

8            **THE COURT:**  All right, so let me hear from Google.

9   Why is there an objection to including this information in the

10  metadata fields?

11           **MR. GUTKIN:**  Let me say, your Honor, I think that --

12  I was just looking for a document that I could reference to

13  make sure that I got this correct.

14       I think the author probably doesn't need to be disputed,

15  because my understanding is that the information in this live

16  author would be the same as the information in the -- if we

17  have a different -- yeah, just above it we have an author

18  field, and I'm told that in the case of a Drive document, those

19  would be the same.  So that one is fine.

20       In terms of the drive viewers and drive collaborators,

21  I think that that's not relevant, because a drive viewer and a

22  drive collaborator, if your Honor has used Google Docs, that's

23  just people who have access to see a doc.  It's not a

24  document -- it's not a record of who's seen it or anything like

25  that.  That can include, you know, a mailing list, a

1    department, theoretically the public.  For documents shared in

2    certain ways, I think anyone can access it who has a link to

3    it, and collaborators is just anyone who has been -- has a doc

4    shared with them that has edit rights.

5        So these things are not probative.  They're really like --

6    it's like saying, for every document that comes from a filing

7    cabinet on floor 22, please give me a list of everyone on floor

8    22 who can open that filing cabinet and look at that document,

9    that would be the equivalent of the drive viewer; or give me a

10   list of everyone whose job would allow them to make an

11   annotation on that document on floor 22, which sometimes might

12   be everyone on floor 22 because everyone who received a

13   document has shared it with edit rights.

14       So those things are just not -- they're not relevant or

15   germane to anything, because they're not indicative of any

16   probative information.

17            **THE COURT:**  Is there --

18        **MR. GUTKIN:**  And again, it would be big lists, you

19   know, large departmental lists and such.

20            **THE COURT:**  So is there a field that shows who

21   actually viewed and who actually edited?

22        **MR. GUTKIN:**  No, I don't believe there is.  There's

23   certainly not in those fields, but I don't believe there is

24   such a field.

25            **THE COURT:**  Ms. Swope, do you agree that drive

1    viewers and drive collaborators are only access rights and edit

2    rights, respectively, and not actual access -- actual viewing

3    or actual editing?

4            **MS. SWOPE:**  Well, I am told that there's a reader

5    field.  So it does show who read a document.

6            **THE COURT:**  (Inaudible.)

7            **MS. SWOPE:**  Well, I think that drive collaborators

8    was an intent to get at that field, but one thing I'll say,

9    just to disagree with Mr. Gutkin, is who had access to the file

10   cabinet on 22 is a very important question to ask at a

11   deposition:  Did you look at this document?  Did you have

12   access to it?  Did you have --

13           **THE COURT:**  I agree --

14           **MS. SWOPE:**  Did you have access to this document?

15           **THE COURT:**  I agree, I agree that viewing and

16   editing are important questions, and the nature of Google Docs,

17   as I understand it, is that you can't actually tell necessarily

18   who edited it or looked at it or authored it.  It may just not

19   have any of that information unless you have those fields.

20       So if someone told me that this particular field would

21   show who actually looked at a document, or who actually edited

22   it, and it was an automatic thing, they didn't have to be --

23   you know, could be automatically extracted, I would allow it,

24   but simply access rights or editing rights, not good enough.

25       So maybe you all need to talk to your e-discovery vendors

1    or technical people a little bit further, and let me know what

2    the answer is to that question.  If you disagree, or are

3    uncertain about what's what, let me know, I'll give you an

4    opportunity to do that, and that would be my inclination about

5    how to resolve it.

6            **MS. SWOPE:**  And your Honor, I might point out that

7    Google created this product.

8            **THE COURT:**  Yes, I know.  So I'm sure, as a bunch of

9    lawyers, I'm sure you're all very technically proficient, but

10   I would like to have an opportunity for people to consult with

11   their technical personnel and give me the right answer.

12       Mr. Gutkin, maybe you already think you know the right

13   answer, but I would like for you to double-check and make a

14   representation about it.  And the plaintiffs can do the same.

15   I mean, I'm sure lots of people use Google Docs and know lots

16   about it, and nobody has a monopoly on the information that I'm

17   asking for.

18       All right, let me get to native files really quick.  Let

19   me ask the plaintiffs, why do you need Microsoft PowerPoint and

20   Google Slides in native format?

21           **MS. SWOPE:**  Yes, your Honor, so PowerPoint slides --

22   for two reasons.  PowerPoint slides have all kind of notes

23   fields which has really important information in the

24   preparation of a PowerPoint slide for the speaker that when

25   it's produced in a PDF, in a picture field you can't see the

1    notes field.

2        And then the other problem that often happens from my

3    experience is that the PowerPoint slides are produced in a way

4    that you cannot zoom in, and you can't read it.  And so when

5    you have a native document, you're just able to read it, to

6    zoom in, and then also to show the other parts of, as I said

7    before, the other parts of the PowerPoint, such as the notes

8    field to a PowerPoint, which has important information that you

9    are not able to get if you are given a PDF of a PowerPoint

10   slide, that --

11            **THE COURT:**  I'm not sure I understand the "zoom in"

12   problem, but I understand if there are parts of the file that

13   don't actually get captured in PDF, I'm not sure if that's

14   the -- if that's a problem in can be solved in some other way.

15       Let me ask Mr. Gutkin, what's Google's objection?

16            **MS. SWOPE:**  One more point is, often PowerPoints can

17   have animation that isn't able to be captured in a PDF.

18            **THE COURT:**  Okay.  All right, good point.

19       Mr. Gutkin, what's Google's objection to producing these

20   as native files?

21            **MR. GUTKIN:**  So the objection is the burden and

22   expense, because you're talking about usually a PDF of a

23   25-page PowerPoint might have been 50 kilobytes, whereas a

24   native file may be 200 megabytes.  They can be vastly more

25   voluminous in terms of data storage, which is how Google has to

1    pay to deal with such files, and that the relevance is -- of a

2    native file, in my experience, is very spotty; that although

3    it's true that they can have animations and you can see one

4    block come in from the left and one block come in from the

5    right, there's very rarely any additional information that's

6    available by virtue of having a native file.

7         I have, on occasion, had the experience that Ms. Swope

8    has, where a flat PDF of a PowerPoint can be difficult to read,

9    in which case we're fine with -- and sometimes this comes up

10   with color too, rarely, but one out of every 40 produced or a

11   hundred produced PowerPoints may have a pie chart where it's

12   useful to see the colors.  So we -- in those cases, we respond

13   to requests for a native copy of the document.

14        And then finally, it is not consistent with my experience

15   that where a PowerPoint has notes, the notes would be omitted

16   from the PDF version, and I don't know if this varies based on

17   presentation software that's in use, but I've many times seen

18   documents that I've produced in Google litigation where there's

19   a page of PowerPoint and then a page of comments, and then a

20   page of PowerPoint and a page of comments, so that you're

21   getting the information.

22        So I'm not aware that that's any kind of significant

23   advantage that justifies the greatly enhanced expense of doing

24   all PowerPoints automatically native from the start.

25             **THE COURT:**  All right, so I understand it's

1    principally a burden issue, both expense and just need to go

2    identify them and produce them in native format.

3        It would be helpful if you could confirm that the notes

4    fields will be produced, if the documents are produced in --

5    what did you agree on, TIFF format?

6        **MR. GUTKIN:**  I believe we did, yeah.  I was saying

7    PDF, but it's TIFF, with extracted text.

8        **THE COURT:**  So if that can be confirmed, that's one

9    thing.  I haven't had this come up since I've been a judge, but

10   I did have this issue come up when I was in practice, and

11   ordinarily, I mean, my experience is that tech folks

12   communicate with each other by PowerPoint.  Like, you know,

13   that's what they do.

14       And so when it came up, it was handled on a case-by-case

15   basis, and people were very accommodating in terms of producing

16   the native format.  So, you know, that might work, depending on

17   the nature and volume of the material.

18       If it were the case that notes fields were routinely

19   omitted from the TIFF format, that would be a problem, because

20   I think there could be lots of -- if a PowerPoint is relevant,

21   then the notes field would likely be relevant as well.

22       The other things, like animations and color, those all

23   could be important, but usually can be dealt with on a

24   case-by-case basis.  They're not always important.

25       The zoom-in issue, I'm not entirely sure if there's

1    something that you couldn't see, but again, it would seem like

2    a case-by-case treatment would be more appropriate, and until

3    we know if it's the case that there is just, like, the vast

4    quantity of all PowerPoint or Google Slides have these issues

5    and the only way to reasonably address it would be to have them

6    all in native format, I'm not -- I don't think that I have that

7    information right now in order to be able to say, yes, they all

8    have these kinds of difficulties, and so the default has to be

9    native.

10        So that's how I'm inclined to decide this issue, is to

11   have them produced as TIFF files, and then, like with the

12   linked items, reasonable requests for production of native

13   should be responded to favorably.

14            **MR. GUTKIN:**  Yes, your Honor.

15            **MS. SWOPE:**  Thank you, your Honor.

16            **THE COURT:**  Okay.  So I've kept you here a really

17   long time.  I am going to just kind of close the loop on this

18   time line concept for the matters in Section 7 and 8.

19        Would you all like an opportunity to propose some sort of

20   schedule to me, like, by this date we will have conferred and

21   resolved custodian issues or bring them to the Court, and by

22   this date, we will have, you know, worked on search terms and

23   crystallized our dispute about that or, you know, sources of

24   ESI?  Do you want to talk to each other first and propose

25   something?  Otherwise, what I do will be possibly arbitrary.

1    **MR. GUTKIN:**  For Google's part, because if the

2    burden for us will be very considerable and for me to write

3    checks that I'm asking my client to cash without consulting

4    them is going to get me fired.  So, you know, I think we should

5    confer among the parties, and I'll confirm with my client

6    what's possible, understanding we want to kind of get at this

7    right away.

8            **THE COURT:**  And to comply with the deadline that

9    Judge Koh had set and is unlikely to change.

10           **MS. PRITZKER:**  Your Honor, this is Elizabeth

11   Pritzker.  If I can speak to that, I mean, I do think there is

12   some benefit to setting a fairly robust and early deadline on

13   this.  As you mentioned, we've got to get to substantial

14   completion by April, which is only six months away, and we've

15   got a lot to talk about.  We've got search terms, custodians'

16   accounts, hyperlink requests, a lot of technical information

17   that I think we really need to go through.

18       I mean, a lot of the arguments that have been presented

19   here today are sort of hypothetical disputes that we don't

20   really have clarity on because I don't think we've done the

21   hard work of really sitting down and hammering through those

22   things.

23       So I guess what I would propose is that, you know, we set

24   a pretty quick deadline on having completed these

25   meet-and-confers maybe by the first week of December or so --

1          **THE COURT:**  I would think you should do it sooner.

2          **MS. PRITZKER:**  I would love to do it sooner, but

3   I was trying to be reasonable -- with an end date, and then to

4   provide a status report to your Honor as to where we are, and

5   maybe have another hearing.  Happy to do it faster, but....

6          **THE COURT:**  Yeah, I mean, this is really to get to

7   the point to see if you all can come up with a time line for

8   resolving custodians or creating disputes.  So to get to the

9   time line, anticipating that there will probably be disputes

10  I have to resolve along the way, I think you need -- I was

11  thinking two weeks to confer about that, and --

12         **MS. PRITZKER:**  I was jumping ahead to just suggest

13  that you set a time line and we'll meet it, but I understand.

14         **MR. GUTKIN:**  I just -- your Honor, I just want to

15  make sure I have adequate time to do what needs to be done on

16  our side.  As I said, it's an iterative process where, you

17  know, we haven't -- we've been fighting about the ESI protocol,

18  so we haven't been able to dive into this in the full way that

19  we need to, and we have to determine what's going to require a

20  custodial search in order to know who the custodians are, and

21  I might also add that there are lots of requests that we have

22  responded to and have agreed to respond to, but then there are

23  also disputed requests.

24      So the process would have to be a little iterative, but

25  I understand your Honor's guidance.

1          **THE COURT:**  Yes, but let me just put it this way,

2    though:  You have the Request for Production, and you have the

3    documents.  So there should be no -- nothing holds you back

4    from figuring out what custodians you want or think are the

5    right custodians, the non-custodial sources.  I don't know how

6    long you've had the Request for Production, but there is

7    nothing that the plaintiffs are doing to stand in your way to

8    figure those things out from Google's perspective and what

9    Google thinks is the right course of action, and I encourage

10   you to go ahead and do that part.

11         You do have to talk to the plaintiffs about it, about

12   something.  I will write you an order and I will give you

13   guidance on how to get to your next steps, but I am hoping that

14   this initial further conference about these items that you

15   asked to confer about, specifically these smaller items, and

16   how to get to resolution on -- I'm going to call them the

17   Section 7 and Section 8 issues, but again, I'm not necessarily

18   trying to convey to you that I'm going to bake anything into

19   the ESI order on those matters.

20         I just -- the questions of custodian and ESI search

21   methodology and how you're going to get the production out is

22   critical, and that's what you all need a time line for, those

23   steps.  So that's what I'm going to be giving you guidance on,

24   and require you to confer further about.

25         Let me just ask -- let me tell you two things that might

1   be of use.  I know people like to try to figure out what might

2   be a good indication of how I view similar disputes, and I'm

3   going to point you to two cases that are recent on my docket

4   that you might want to take a look at, because similar issues

5   have come up, and really, I'm not suggesting that I'm going to

6   rule on any of your issues in exactly the same way.  I'm just

7   saying that if you're looking for something as a reference

8   point, I'm going to point you to these two other matters.

9       One is the *Klein v. Facebook* matter, that's case

10   number 20-3639 -- I'm sorry -- 20-8570, and I've had a number

11   of disputes about ESI protective orders, depositions, that have

12   come up and are now the subject of agreed stipulations from

13   parties that I've signed off on.  So you may just want to have

14   a look at that.

15       The other one is *In re: Telescopes Antitrust Litigation*,

16   that's 20-3639, that's a related case, and those cases might

17   give you some guidance about my thinking about some of these

18   subjects, and also what causes me to lose patience, which is

19   also useful.

20       I do like to be consistent in terms of my application of

21   the law, but every case has its unique factors and will be open

22   my understanding about your dispute, and I want to make sure

23   that you appreciate that.

24       My final question for you all is:  Do you need a special

25   master in this case?  And if you're not sure, how will you

1  decide whether you need one?

2      Let me ask the plaintiffs.

3          **MS. PRITZKER:**  Your Honor, can we make that part of

4  our meet-and-confer?  I mean --

5          **THE COURT:**  Is it me?

6          **MS. PRITZKER:**  I'm not sure that we do need a

7  special master in this case, but obviously, I'd like to confer

8  with my side and confer with Mr. Gutkin and his team.  I'm not

9  sure a special master would be helpful here.

10         **THE COURT:**  I think it will slow you down, honestly,

11 and I have to do my job as resolving your disputes, but there's

12 only so much time, and if it turns into the kind of thing

13 where, you know, I can't (inaudible) the rest of my docket

14 because of this case, then that will have to --

15         **MS. PRITZKER:**  And we don't want to be in front of

16 you every week on discovery issues.  We want to get the

17 discovery flowing.  So if we can meet and confer on that, my

18 inclination is the same as yours.  I don't think a special

19 master is appropriate here, and will slow things down, but if

20 we can confer on that and get back to you, that --

21         **THE COURT:**  I'm happy to have you confer about

22 whatever you'd like.

23     All right, is there anything further for today?  Let me

24 ask the plaintiffs.

25         **MS. SWOPE:**  Your Honor, just a little -- would like

1    some clarification, because right now I think we're holding up

2    the custodial and search term disclosures until the entry of

3    the protocol, and I'm not -- it sounds like we don't want to do

4    that, so should we wait for your order?  I just want to

5    understand the step -- the process, how you envision the

6    process.

7              THE COURT:  I'm not entirely sure how to answer that

8    question.  I've told Google that they have things they can do

9    without anybody's order or anything.  You all probably on the

10   plaintiffs' side have things that you can do, in terms of, if

11   you have a document production, you can start thinking about

12   what search terms you want to propose, and nothing that you're

13   waiting on for me should hold up that kind of an effort as

14   well.  Same with custodian.

15       But I will issue an order, and I will do it soon, giving

16   you guidance about next steps, and I think that will answer the

17   question.

18             MS. SWOPE:  Thank you, your Honor.

19             THE COURT:  Okay.  Anything further from the

20   defendant?

21             MR. GUTKIN:  No, your Honor.  Thank you very much

22   for all the time this morning.

23             THE COURT:  All right, you're very welcome, and I'll

24   get an order out, so you have some more information.  Thank you

25   very much.

1          **MS. SWOPE:**  Thank you.

2          **MR. GUTKIN:**  Thank you, Judge.

3          **MS. PRITZKER:**  Thank you.

4                                                    <u>12:09 p.m.</u>

5                        ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4

5      I, Leo Mankiewicz, certify that the foregoing is a true

6   and correct transcript, to the best of my ability, of the above

7   pages of the official electronic sound recording provided to me

8   by the U.S. District Court, Northern District of California, of

9   the proceedings taken on the date and time previously stated in

10  the above matter.

11      I further certify that I am neither counsel for, related

12  to, nor employed by any of the parties to the action in which

13  this hearing was taken; and, further, that I am not financially

14  nor otherwise interested in the outcome of the action.

15

16                                              11/08/2021

17           Signature of Transcriber        Date

18

19

20

21

22

23

24

25