# <u>EXHIBIT A</u>

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED



**CONFIDENTIAL**

# Network Bidding Agreement

This Network Bidding Agreement (this **"Agreement"**) is entered into by Google LLC and Google Ireland Limited (collectively, **"Google"**) and Facebook, Inc. and Facebook Ireland Limited (collectively, **"Facebook"**) as of the Effective Date (as defined below). This Agreement governs Facebook's participation in the Network Bidding Pilot program and any successor services (collectively, the **"Program"**). Any use of the term "including" in the Agreement will mean "including, but not limited to." For clarity, any and all references to AdX, DoubleClick for Publishers, AdMob, AdSense, DoubleClick Bid Manager, the Google Display Network, or the Audience Network Service in this Agreement includes all successor products to the foregoing (such as, for example, Google Ad Manager and Google Ad Manager 360, which is the successor product to AdX and DoubleClick for Publishers, and Display and Video 360, which is the successor product to DoubleClick Bid Manager). Any use of the term "including" in this Agreement means "including, but not limited to." In consideration of the foregoing, the Parties agree as follows:

**1    Certain Definitions.**

1.1    "**Ads**" or "**Creative**" means advertising content.

1.2    "**Ad Inventory**" means for a specific Ad request the Ad space on Publisher Properties that has been made available for the placement of Ads via the Program.

1.3    "**Advertiser**" means a third-party advertiser on whose behalf Facebook buys Ad Inventory via the Program.

1.4    "**Affiliate"** means, with respect to a Party, an entity that directly or indirectly controls, is controlled by or is under common control with such Party.

1.5    "**Aggregate**" means data that: (a) is not broken out by individual Ad impression; and (b) has been combined with other data in a manner that ensures that such data does not identify any individual user, computer, or device.

1.6    "**Annual Minimum Spend Commitment**" has the meaning set forth in Exhibit B.

1.7    "**Antitrust Action**" means any administrative or judicial complaint, statement of objections or similar charge (whether seeking fines, penalties, decisions, orders, injunctions, decrees, judgments or any other corrective measures) filed, issued, or initiated by any Governmental Authority and alleging a violation of any Antitrust Law relating to the Agreement, or any litigation or proceeding initiated pursuant to Antitrust Law and relating to the Agreement, including any appeal from a judgment enjoining or declaring the Agreement unlawful pursuant to Antitrust Laws.





1.8    **"Antitrust Law"** means the Sherman Antitrust Act, as amended, the Clayton Antitrust Act, as amended, the Hart-Scott-Rodino Act, the Federal Trade Commission Act, as amended, and any and all other applicable laws, rules, or regulations of any jurisdiction that are designed or intended to prohibit, restrict, or regulate actions having the purpose or effect of monopolization, lessening of competition or restraint of trade.

1.9    "**Applicable Publisher**" means either (a) the Publisher on whose Publisher Property the Ad Inventory for a Bid Request is located or (b) the Publisher that is managing a third party Publisher Property where the applicable Ad Inventory is located.

1.10    "**Audience Network Service**" means Facebook's service that facilitates the sale and placement of Ads from Facebook and Facebook's third-party advertisers on third-party publisher properties.

1.11    "**Audience Network-Related Information**" means non-public information that Facebook discloses to Google that is related to the Audience Network Service.  For clarity, Audience Network-Related Information excludes Google Data, Google Program-Related Information, Bid Response Data, Facebook Data, and information Google has collected or received independent of Facebook's participation in the Program.

1.12    "**Beta Features**" means Program features that are identified as "Beta", "Alpha", "Experimental", "Limited Release" or "Pre-Release" or that are otherwise identified by Google as unsupported.

1.13    "**Bid Request**" means a notification to Facebook through the Program of the availability of Ad Inventory on Publisher Properties.

1.14    **"Bid Response"** means a non-zero bid on Ad Inventory.

1.15    "**Bid Response Data**" means any data provided by Facebook in response to a Bid Request, including any bid amounts.  For clarity, Bid Response Data excludes Facebook Data, Google Data, and data that Google has collected or received independent of Facebook's participation in the Program.

1.16    **"Bid Response Rate"** has the meaning set forth in Exhibit A.

1.17    **"Brand Features"** mean each Party's trade names, trademarks, logos and other distinctive brand features.

1.18    "**Confidential Information**" means information that one Party (or an Affiliate) discloses to the other Party under the Agreement, and that is marked as confidential or would normally be considered confidential information under the circumstances.  It

2



does not include information that is independently developed by the recipient, is lawfully given to the recipient by a third party without confidentiality obligations, or becomes public through no fault of the recipient. For clarity, (x) Google Data and Google Program-Related Information are considered Google's Confidential Information and (y) Facebook Data, Bid Response Data and Audience Network - Related Information are considered Facebook's Confidential Information. In addition, for clarity, the terms and conditions of this Agreement are considered Confidential Information under the Agreement.

1.19    "**Covered Governmental Authorities**" means one or more of the following Governmental Authorities (with respect to (a) through (n) solely when acting pursuant to an Antitrust Law): (a) The European Commission; (b) The United States Department of Justice; (c) The United States Federal Trade Commission; (d) Competition Bureau of Canada, (e) Korea Fair Trade Commission, (f) Japan Fair Trade Commission, (g) Competition Commission of India, (h) Australian Competition and Consumer Commission, (i) United Kingdom Competition and Markets Authority, (j) Competition Authority of France, (k) Federal Cartel Office of Germany, (l) Administrative Council for Economic Defense (CADE) of Brazil, (m) Taiwan Fair Trade Commission, (n) state attorney generals in the United States, or (o) any competent national data protection authority solely when acting pursuant to applicable national data protection law.

1.20    "**Data Protection Action**" means any administrative or judicial complaint, statement of objections or similar charge (whether seeking fines, penalties, decisions, orders, injunctions, decrees, judgments or any other corrective measures) filed, issued, or initiated by any competent national data protection authority acting pursuant to, and alleging a violation of, national data protection law relating to the Agreement, or any litigation or proceeding initiated by any competent national data protection authority acting pursuant to national data protection law and relating to the Agreement, including any appeal from a judgment enjoining or declaring the Agreement unlawful pursuant to national data protection law.

1.21    "**Destinations**" mean Properties to which Creative directs viewers (e.g., landing pages) and the redirect (e.g., URLs).

1.22    "**Disclosing Party**" means the Party disclosing Confidential Information.

1.23    "**Discrepancy**" means any discrepancy between Facebook's billing metrics and Google's billing metrics used to measure Ad impressions and/or revenue.

1.24    "**End User Interaction Data**" means the following data that Facebook discloses to Google in connection with the Program:  data related to an End User's interaction with an Ad provided by Facebook.  For clarity, End User Interaction Data excludes the identity of the advertiser and the content of the Ad.

3





1.25  "**End Users**" means individual human end users.

1.26  "**Facebook Data**" means the following data that Facebook discloses to Google in connection with the Program: (a) data related to Facebook provided Ads, including the identity of the advertiser, the content of the Ad, and any Facebook provided targeting specifications or parameters, (b) End User Interaction Data, and (c) the identification of an End User as a Facebook End User.  For clarity, Facebook Data excludes Bid Response Data, Google Data, and data that Google has collected or received independent of Facebook's participation in the Program.

1.27  "**Fee**" has the meaning set forth in Exhibit B.

1.28  "**Final Clearinghouse Auction**" means the final auction conducted by Google for Ad Inventory between Facebook, network bidders, exchange bidders, and the winner of the AdX auction. For clarity, this does not refer to the AdX auction, which submits a bid to the final auction.

1.29  "**Google Data**" means the following data that Google discloses to Facebook in connection with the Program: (a) Google Proprietary Data, (b) Google User Data, and (c) Google Platform Data.  For clarity, Google Data excludes Bid Response Data, Facebook Data, and data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement. In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer, or browser in connection with serving such Ad would not be considered Google Data.

1.30  "**Google Platform Data**" means the data identified in Exhibit E as "Google Platform Data" that Google discloses to Facebook in connection with the Program.  For clarity, Google Platform Data excludes data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement. In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer, or browser in connection with serving such Ad would not be considered Google Platform Data.  After the Effective Date, if Google shares additional data with Facebook, then Google may update the definition of Google Platform Data upon written notice to Facebook (including via e-mail) in accordance with Section 6.10 of this Agreement.

4



1.31 "**Google Policies**" has the meaning set forth in Section 3.1(a).

1.32 "**Google Policy Change**" has the meaning set forth in Section 3.1(a).

1.33 "**Google Privacy Policy**" means https://www.google.com/policies/privacy/ (as may be updated from time to time).

1.34 "**Google Program-Related Information**" means non-public information that Google discloses to Facebook that is related to the Program. For clarity, Google Program-Related Information excludes Google Data, Bid Response Data, Facebook Data, Audience Network-Related Information, and information that Facebook has collected or received independent of Facebook's participation in the Program.

1.35 "**Google Proprietary Data**" means the data identified in Exhibit E as "Google Proprietary Data" that Google discloses to Facebook in connection with the Program. For clarity, Google Proprietary Data excludes data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement. In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer, or browser in connection with serving such Ad would not be considered Google Proprietary Data. After the Effective Date, if Google shares additional data with Facebook, then Google may update the definition of Google Proprietary Data upon written notice to Facebook (including via e-mail) in accordance with Section 6.10 of this Agreement.

1.36 "**Google User Data**" means (a) header data in an HTTP(S) request initiated by Google for the purpose of cookie matching and (b) the data identified in Exhibit E as "Google User Data" that Google discloses to Facebook in connection with the Program. For clarity, Google User Data excludes data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement. In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer, or browser in connection with serving such Ad would not be considered Google User Data. After the Effective Date, if Google shares additional data with Facebook, then Google may update the definition of Google User Data upon written notice to Facebook (including via e-mail) in accordance with Section 6.10 of this Agreement.

1.37 "**Governmental Authority**" means any (a) foreign, federal, state or local court, administrative agency, commission, official board, bureau, self-regulatory agency,

5



officer, official, tribunal, mediator, governmental department, governmental authority or instrumentality, in each case solely when acting pursuant to an Antitrust Law, or (b) competent national data protection authority solely when acting pursuant to national data protection law.

1.38 **"Governmental Communication"** means any written or oral communication relating to Antitrust Law or any national data protection law received from or given to any Governmental Authority.

1.39 **"Gross Spend"** has the meaning set forth in Exhibit B.

1.40 "**Impression Count**" means the measurement of the number of Ad impression(s) that are filled.

1.41 "**Indemnified Party**" has the meaning set forth in Section 15.

1.42 "**Indemnifying Party**" has the meaning set forth in Section 15.

1.43 "**Initial Term**" has the meaning set forth in Section 17.

1.44 "**Intellectual Property Rights**" means all copyrights, moral rights, patent rights, trademarks, and any other intellectual property or similar rights (registered or unregistered) throughout the world.

1.45 "**Match Rate**" has the meaning set forth in Exhibit A.

1.46 **"Material Adverse Regulatory Effect"** means any substantial adverse effect on either Party relating to any pending or on-going filing, inquiry, investigation, litigation, statement of objections or similar charges, fines, penalties, decisions, orders, injunctions, decrees, judgments or any other corrective measures initiated by Covered Governmental Authorities.

1.47 **"Material Document Request"** means any demand or request from a Governmental Authority relating to the Agreement requiring production of documents, data or other information that the receiving Party reasonably concludes, in good faith, would be unduly burdensome to comply with, or would require production of documents, data or other information that the receiving Party reasonably concludes, in good faith, would include highly confidential trade secrets that are substantially unrelated to the Agreement and the production of which would threaten to cause material economic harm to the receiving Party. If the receiving Party is able to reach agreement with the Governmental Authority to reduce the scope of the demand or request such that it, in the receiving Party's reasonable and good faith judgment, would not cause or threaten to cause the receiving Party undue

6



burden or material economic harm, then the request or demand would not qualify as a Material Document Request.

1.48 "**Minimum Fee**" has the meaning set forth in Exhibit B.

1.49 "**Parties**" mean Google and Facebook collectively and "**Party**" means either Facebook or Google.

1.50 "**Phase 1**" has the meaning set forth in Exhibit A.

1.51 "**Phase 2**" has the meaning set forth in Exhibit B.

1.52 "**Phase 3**" has the meaning set forth in Exhibit B.

1.53 "**Program**" has the meaning set forth in the first paragraph of this Agreement.

1.54 "**Property**" means site(s), app(s) or other propert(ies) made available through the Program.

1.55 "**Publisher**" means a third-party publisher that makes its Propertie(s) available via the Program.

1.56 "**Publisher-Specific Data**" means the data identified in Exhibit E as "Publisher-Specific Data" that Google discloses to Facebook in connection with the Program. For clarity, Publisher-Specific Data excludes data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement. In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer or browser in connection with serving such Ad would not be considered Publisher-Specific Data. After the Effective Date, if Google shares additional data with Facebook, then Google may update the definition of Publisher-Specific Data upon written notice to Facebook (including via e-mail) in accordance with Section 6.10 of this Agreement.

1.57 "**Quarter**" means each three-month period of the calendar year (i.e., January 1 through March 31, April 1 through June 30, July 1 through September 30, and October 1 through December 31).

1.58 "**Real-Time**" means the period of time between the time when a Bid Response is received by Google and the time when the Final Clearinghouse Auction in which this Bid Response participates is completed, and either a winner is determined or it is determined that there is no auction winner.

7



GOOG-HEWT-00048251



1.59    "**Receiving Party**" means the Party receiving Confidential Information.

1.60    "**Renewal Term**" has the meaning set forth in Section 17.

1.61    "**Structured Negotiation**" will be the following process:  if the Parties cannot resolve the issue specified in this Agreement within ten (10) business days after the Parties begin discussing the issue, the Parties will escalate to their first-level executives identified in the table below, who will negotiate in good faith to determine a mutually-acceptable resolution.  If the executives in the first escalation level are unable to come to agreement within ten (10) business days from when they first begin discussing the issue, they will each escalate to the second level of executives identified in the table below, who will negotiate in good faith to determine a mutually-acceptable resolution within ten (10) business days from when they first begin discussing the issue.  If the Parties are still unable to determine a mutually-acceptable resolution after such ten (10) business days have lapsed, then either Party may terminate this Agreement in accordance with the notice period set forth in this Agreement.  Either Party may update its respective list of executives listed below upon written notice (including via e-mail) to the other Party.

| Table 1– Structured Negotiation Contact Information | | |
|---|---|---|
| **Escalation Level** | **Executive for Facebook** | **Executive for Google** |
| **First Level** | ███████████ | ████████████ |
| **Second Level** | ████████ | ██████████ |

1.62    "**Subcontractors**" mean a subcontractor, consultant, third-party service provider or agent engaged by either Party in connection with its use or provision of the Program.

1.63    "**Targets**" mean Ad trafficking decisions and targeting decisions.

1.64    "**Term**" has the meaning set forth in Section 17.

1.65    "**Three-Month Minimum Spend Commitment**" has the meaning set forth in Exhibit B.

1.66    "**Win Rate**" has the meaning set forth in Exhibit A.

8



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



2   **Program**.

    **2.1**    **Program Operation.**



9



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-HEWT-00048253





(e)

10



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-HEWT-00048254





11



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





## 2.2    Mutual Responsibilities.

(a)

12



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





## 2.3    Google Responsibilities.



13



    GOOG-HEWT-00048257





(c)

**2.4    Facebook Responsibilities.**



(a)

(b)

(c)

(d)

(e)

14



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-HEWT-00048258





**3  Policies.**

    **3.1  Policy Mechanism.**



15





**4    Ad Cancellation**.  Unless a Google Policy or the Program user interface (the "**UI**") provides otherwise, either Party may cancel any Ad; provided that Google may only cancel an Ad for the purposes set forth in Section 2.1(g).  Cancelled Ads will generally cease serving within 8 business hours or as described in a Google Policy or UI, and Facebook remains obligated to pay all charges resulting from served Ads.

**5    Payment.**

    **5.1    Payments to Google.**

        (a) Google will invoice Facebook for the Fee (as set forth in Exhibit B) on a monthly basis.  Facebook will pay Google the Fee, in immediately available funds or as otherwise approved by Google, within thirty (30) days after the date of invoice (the "**Payment Due Date**").  All payments will be made in U.S. dollars.  Late payments that are not disputed in good faith bear interest at the rate of 1.5% per month (or the highest rate permitted by law, if less); provided that interest will not begin to accrue until 30 days following the Payment Due Date.  If Facebook does not pay Google the Fee (other than any charge(s) disputed in good faith) within 10 days following the Payment Due Date, Google may suspend Facebook's participation in the Program on 10 days' prior notice to Facebook, provided, however, that in the event of a suspension pursuant to this Section 5.1(a), without limiting any of Google rights and remedies under this Agreement, Google will reinstate the provision and use of the Program to Facebook promptly following payment.  Google is responsible for paying all taxes and government charges associated with the Fee paid to Google.

16



GOOG-HEWT-00048260



(b) Charges to Facebook are solely based on Google's measurements for the Program and its applicable billing metrics (e.g., impressions). If there is a greater ▮▮▮▮ Discrepancy in aggregate across all Publishers between Facebook and Google's billing metrics during a particular month of the Term (the "**Discrepancy Period**"), then the Parties will work in good faith to identify the reason for and resolve the Discrepancy. If the Parties are unable to resolve the Discrepancy within 30 days, then Google's billing metrics will apply for the Discrepancy Period.

(c) Facebook is required to spend the minimum amount of Gross Spend as set forth in Exhibit B.

(d) Any portion of a charge not disputed in good faith must be paid in full. Other than as set forth in the immediately following sentence, neither Party may offset any payment due under this Agreement against any other payment to be made under this Agreement. Subject to Section 6 of Exhibit A, Google may offset any charges invoiced in the immediately subsequent invoice, to account for adjustments in Google's measurement of revenue and impression figures. Facebook will be able to calculate such adjustment via the mechanism described in Section 5.2(d).

(e) If applicable, Facebook will not exceed its aggregate credit line as determined by Google in its reasonable discretion (and made available if requested) and Google will not be obligated to provide the Program to Facebook in excess of such credit line. For clarity, the credit line will be based on Fees, and not on Gross Spend (as such capitalized terms are defined in this Agreement). Google reserves the right to reduce such credit line in its reasonable discretion. If a reduction in such credit line will materially impede Facebook's ability to participate in the Program, then Google will provide Facebook with the rationale for such reduction prior to such reduction and Facebook will have a meaningful, good faith opportunity to discuss and dispute such reduction with Google.

**5.2    Payments to Publisher.**

(a) 



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





## 6. Privacy and Data.

6.1.  Facebook must maintain, and will require that all third parties that collect data through Ads maintain a publicly available online privacy policy that provides notice of data collection practices related to its Ad campaigns booked through the Program, including without limitation use of a cookie, web beacon, or other tracking mechanisms.

18





6.2.    Facebook will not alter, and will prohibit third parties from altering, any Ad tags to pass information to Google that Google could use or recognize as personally identifiable information.

6.3.    Google will take reasonable steps to ensure that an End User is provided with clear and comprehensive information about, and gives consent to, the storing and accessing of cookies and other information on the end user's device where such activity occurs in connection with the Program and where providing such information and obtaining such consent is required by law.

6.4.    [REDACTED]

19





6.5.   **Additional Restrictions on Google's use of Bid Response Data.** Google will
not use Bid Response Data to: (a) transfer or otherwise disclose in Real-Time such
Bid Response Data to any Google system other than the system conducting the
auction for the applicable Ad Inventory; (b) adjust or otherwise influence in Real-
Time the bid response of another bidder (including Google) in the auction for the
applicable Ad Inventory; (c) adjust or otherwise influence in Real-Time the
computation of any price floor, price reserve, or other pricing parameter for the
applicable Ad Inventory; (d) reverse engineer, or otherwise derive the underlying
algorithms, strategies, models, or approach of Facebook's bidding logic (e.g.,
Google will not use Bid Response Data to improve Google's own bidding strategy
as a bidder); or (e) associate any Bid Response Data (including any bid amounts)
with any data related to Ads or Creatives (other than for the purposes set forth in
second sentence of Section 6.4 or (d) of the first sentence of Section 2.1(e)).
Notwithstanding the foregoing, the immediately preceding sentence does not apply
to the following data, as long as such data is not preferentially shared with
DoubleClick Bid Manager or the Google Display Network as compared to all other
bidders or other demand sources in an auction: (a) the amount of the second-
highest bid (which may be disclosed to the winning bidder or other demand source)
or (b) the amount of the highest bid (which may be disclosed to all bidders or other
demand sources in the same auction). Google may retain event-level Bid
Response Data for no longer than 18 months, except for certain event-level Bid
Response Data (*e.g.*, buyer identity, bid price, trading location, time stamp, etc.)
which may be kept indefinitely as required by Google's reasonable and standard
business practice solely for archival and record-keeping purposes (e.g., financial
reporting, audit purposes, or dispute resolution).

6.6.   **Restrictions on Facebook's use of Google User Data.** Facebook will not use
Google User Data (including any derivatives of Google User Data, but excluding
derivatives of IP address and user_agent, as such terms are referred to in Exhibit
E, solely from Facebook Users, as such term is defined in Exhibit C (such
derivatives of IP address and user_agent solely from Facebook Users, the
"**Specified Derivative Data**")) to bid or inform bidding on any platform or channel
other than the Program. In addition, Facebook will not use Google User Data
(including any derivatives of Google User Data, but excluding Specified Derivative
Data) to: (a) build, create, or enhance Publisher End User profiles or advertising
segments, (b) retarget Publisher End Users via other platforms or channels, or (c)

20





categorize an End User as a Publisher End User. Facebook will not store or retain Google User Data (including any derivatives of Google User Data), provided that, for clarity, Facebook may store, retain and use (a) Specified Derivative Data (as long as Facebook does not store or retain the actual IP address and user-agent) for no longer than 18 months and solely if such data is otherwise used and disclosed in accordance with this Agreement and (b) any bidding models specifically for the Program trained or optimized with Google User Data in accordance with this Section 6.6.

6.7.

6.8.



21







22



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## 7. **Regulatory Cooperation.**

7.1. To the extent permitted by applicable law, and subject to Section 7.2 below, each of Google and Facebook agrees to use its reasonable best efforts to:

(a) cooperate and assist each other in responding to any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority, and in defending the Agreement against any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority;

(b) promptly and fully inform the other Party of any Governmental Communication relating to the Agreement (provided that, to the extent appropriate, any Party may designate such information as attorneys' or outside counsel only);

(c) allow the other Party a reasonable time to review and consider in good faith the views of the other with respect to any Governmental Communication (**provided that**, to the extent appropriate, any Party may designate such information as attorneys' or outside counsel only);

(d) not advance arguments in connection with any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority (other than litigation between the Parties) over the objection of the other Party that would reasonably be likely to have a substantial adverse effect on that other Party; and

(e) consult with the other Party in advance, to the extent practicable, and give the other Party and its counsel reasonable notice and, to the extent not prohibited by law or the relevant Governmental Authority, an opportunity to attend and participate in any meeting or discussion with any Governmental Authority relating to any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority.

7.2. The Parties will use reasonable best efforts to attempt to (a) reach an agreement with a Governmental Authority to reduce the scope of any Material Document Request such that the request or demand, in the receiving Party's reasonable and good faith judgment, would not cause or threaten to cause the receiving Party undue burden or material economic harm or (b) avoid or resolve an Antitrust Action or Data Protection Action that seeks to enjoin the Agreement or seeks related monetary damages, fines or penalties; **provided, however**, that reasonable best efforts in this Section 7.2 will not under any circumstances require either Party to propose, negotiate, agree to, commit to and/or effect, by consent decree, hold separate order or otherwise (i) the sale, license, divestiture, transfer, or other disposition of any assets or business; (ii) any modification to any agreement, policy or practice, or any limitation on its freedom of action with respect to any assets or business, except in

23





each case for a modification of the terms of the Agreement that does not materially alter the economics of the Agreement or result in a Material Adverse Regulatory Effect; or (iii) to make any monetary or in-kind payment, whether denominated as a fine, penalty, damages, compensation, costs, attorney's fees or otherwise.

7.3. The foregoing obligations in this Section 7 will remain in effect after termination of the Agreement, until all Antitrust Actions, Data Protection Actions, and all inquiries or investigations relating to the Agreement by any Governmental Authority are concluded or become nonappealable and any relevant periods of limitation for the commencement of such actions have expired.

7.4. Notwithstanding the foregoing, if only one Party is identified as a target, defendant or an addressee of an Antitrust Action, Data Protection Action, or inquiry or investigation by any Governmental Authority relating to the Agreement, the obligations in Sections 7.1(a) through 7.1(e) and 7.2 do not apply to the Party that is the target, defendant or an addressee, whereas the other Party will remain subject to those Sections.

8. **Intellectual Property.** Except to the extent expressly stated otherwise in the Agreement, neither Party will acquire any right, title or interest in any Intellectual Property Rights owned or licensed by the other Party.

9. **Brand Features.** Neither Party will use the other Party's Brand Features (including for marketing and promotional purposes) with respect to this Agreement without such Party's prior written approval.

10. **Publicity or PR.** Neither Party may make any public statement or issue any marketing or other materials regarding the Program or this Agreement without the other Party's prior written approval. In addition, neither Party will issue presentations or other communications made generally available to Publishers regarding the Program without the other Party's prior written approval, **provided that**, the foregoing will not restrict either Party from communicating on a 1-on-1 basis with Publishers as necessary to operate or use the Program without needing to obtain approval from the other Party. Each Party will only start communicating with Publishers regarding this Program on a mutually approved date, **provided that**, after either Party's first communication with any Publisher regarding this Program, the immediately preceding sentence will apply (i.e., no further approval will be necessary for 1-on-1 communications with Publishers as necessary to operate or use the Program). Also, Facebook will not disclose to any Publisher any Fee charged by Google to Facebook that is less than the highest listed Fee in this Agreement (*e.g.*, 10% as of the Effective Date) charged by Google. Facebook may disclose to a Publisher the highest listed Fee in this Agreement charged by Google to Facebook, as long as such Publisher is under a non-disclosure agreement that protects the confidentiality of such disclosure with terms at least as restrictive as the terms set forth in this Agreement to protect Confidential Information.

11. **Confidentiality.** Other than as set forth in this Agreement, the Receiving Party will not disclose the Confidential Information of the Disclosing Party, except to Affiliates, employees, Subcontractors, or professional advisors of the Receiving Party who need to know it and who have agreed in writing (or in the case of professional advisors are

24





otherwise bound) to keep it confidential. The Receiving Party will ensure that those people and entities use the Confidential Information of the Disclosing Party only to exercise rights and fulfill obligations under the Agreement, and that they keep it confidential. The Receiving Party may also disclose Confidential Information when required by law after giving reasonable notice to the Disclosing Party, if permitted by law.

12. **Beta Features.** Google may provide Beta Features to Facebook in connection with the Program, as long as (a) Google notifies Facebook in writing (including via e-mail) prior to making the Beta Feature available for Facebook's use under the Program and (b) such Beta Features are not required to use the Program as contemplated under this Agreement. Google will have no liability under the Agreement (including any indemnification obligations) (excluding for clarity, Google's breach of Sections 2.1(b), 6.4, 6.5, 11 and 13(c)) arising out of or related to any use of Beta Features by Facebook, its Affiliates, or Advertisers. Any use of Beta Features will be solely at Facebook's own risk and may be subject to additional requirements as specified by Google. Google is not obligated to provide support for Beta Features and Google may cease providing Beta Features as part of the Program. For clarity, Facebook is not required to use any Beta Features and such use is in Facebook's sole discretion.

13. **Representations and Warranties.** Each Party represents and warrants that it (a) has all necessary rights and authority to enter into this Agreement, and perform its obligations hereunder and thereunder; (b) has obtained and maintains all rights, approvals, and consents from third parties necessary to enter into this Agreement and perform its obligations hereunder; and (c) will comply with applicable laws, rules, and regulations in (i) its performance of its obligations under this Agreement, and (ii) with respect to Google, its provision of the Program, and with respect to Facebook, its use of the Program. For clarity, reference to Section 13(c) of this Agreement refers to the compliance with laws, rules, and regulations provision set forth in the preceding sentence.

14. **Disclaimers.** Except as expressly provided for in the Agreement and to the maximum extent permitted by applicable law, NEITHER PARTY MAKES ANY WARRANTY OF ANY KIND, WHETHER IMPLIED, STATUTORY, OR OTHERWISE, AND EACH PARTY DISCLAIMS, WITHOUT LIMITATION, ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE, AND NON-INFRINGEMENT. THE PROGRAM AND THE AUDIENCE NETWORK SERVICE IS PROVIDED "AS IS" AND EXCEPT AS EXPRESSLY PROVIDED HEREIN, GOOGLE AND FACEBOOK, AND THEIR RESPECTIVE AFFILIATES AND ITS PUBLISHERS DO NOT MAKE ANY GUARANTEES IN CONNECTION WITH THE PROGRAM OR PROGRAM RESULTS, OR THE AUDIENCE NETWORK SERVICES, RESPECTIVELY. IN ADDITION, NEITHER PARTY WILL HAVE ANY LIABILITY OR INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT ARISING OUT OF OR RELATED TO PUBLISHER(S) OR ANY PUBLISHER PROPER(TIES).

15. **Indemnification.**

    15.1.

25







facebook Legal

[redacted]

15.2. The Indemnified Party must (i) promptly notify the Indemnifying Party in writing of any third-party claims (except that failure of the Indemnified Party to promptly notify the Indemnifying Party will not relieve the Indemnifying Party of its indemnification obligations, except to the extent it has been damaged by the failure); (ii) reasonably cooperate with the Indemnifying Party in the defense of the matter and (iii) give the Indemnifying Party primary control of the defense of the matter and negotiations for its settlement. The Indemnified Party may at its expense join in the defense with counsel of its choice. The Indemnifying Party may enter into a settlement only if it (A) involves only the payment of money damages by the Indemnifying Party and (B) includes a complete release of the Indemnified Party; any other settlement will be subject to written consent of the Indemnified Party (not to be unreasonably withheld or delayed).

15.3. If the Program (or technology used to provide the Program) becomes, or in Google's reasonable opinion is likely to become, the subject of an intellectual property infringement claim, then Google will promptly notify Facebook and, at its sole option and expense, may suspend provision of the Program (or technology used to provide the Program) and either: (x) procure the right to continue providing the Program as contemplated by this Agreement; (y) modify the Program to render it non-infringing without adversely affecting use of the Program; or (z) replace the Program with a functionally equivalent, non-infringing service. If the above options are not commercially practicable, either Party may terminate this Agreement.

**16. Limitation of Liability.**

16.1. [redacted]

Legal Dept. G.C. Google

18. **Termination.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





18.4. **Termination due to Regulatory Inquiry.** After first discussing with the other Party in good faith its concerns and potential alternatives to such termination, and only if a Party has otherwise taken all actions in compliance with the Agreement, either Party may terminate the Agreement:

    (a)    Within ninety calendar days of such Party receiving a Material Document Request from a Covered Governmental Authority in an investigation or inquiry substantially relating to the Agreement, **provided that**, prior to such termination pursuant to this Section 18.4(a), the terminating party will have first exhausted its reasonable best efforts obligation in Section 7.2(a) above and provided further that the terminating party will be entitled to one 30-day extension of the period provided for in this paragraph upon written notice to the other party that, while it has not yet exhausted its obligation under Section 7.2(a), it is continuing good faith efforts to do so;

    (b)    Within thirty calendar days of a Covered Governmental Authority commencing a formal inquiry or investigation (of which such party is a subject, target or respondent) (i) pursuant to an Antitrust Law or, in the case of a Covered Governmental Authority that is a national data protection authority, any national data protection law, and (ii) substantially relating to the Agreement;

    (c)    Within thirty calendar days of a Covered Governmental Authority initiating an Antitrust Action or Data Protection Action against such Party, **provided that**, prior to such termination pursuant to this provision, the Party will have first exhausted its reasonable best efforts obligations in Section 7.2(b) above (and given the other Party a reasonable opportunity to do so), and provided further that the terminating party will be entitled to up to two 30-day extensions of the period provided for in this paragraph upon written notice to the other party that, while it has not yet exhausted its obligation under Section 7.2(b) it is continuing good faith efforts to do so; or

28



(d)    Immediately if either Party exhausted its right to appeal any court, tribunal or agency of competent jurisdiction enjoining or declaring the Agreement unlawful pursuant to the laws, rules, or regulations of that jurisdiction.

(e)    **Scope of Termination.** Notwithstanding the above, if either party exercises its right to terminate pursuant to Sections 18.4(a) to 18.4(d), such termination will be geographically limited as set forth in this subsection (to the greatest extent technically practicable) and the Agreement will remain in force as to all other geographic regions, provided that any applicable minimum spend commitments will be prorated accordingly based on Facebook's Gross Spend in that region for the previous 12 months as a percentage of Facebook's total Gross Spend for the previous 12 months (for example, if Facebook spent $10,000,000 in a particular region for the previous 12 months and Facebook's Gross Spend was $100,000,000 for the previous 12 months, then Facebook's spend commitments would be prorated 10% (**i.e.**, $10,000,000/$100,000,000)), unless the terminating party reasonably and in good faith concludes that continuing operation of the Agreement in other geographic regions would be contrary to law, would have a Material Adverse Regulatory Effect, or would materially and adversely affect profitability of the Agreement as a whole to the terminating party:

(1)    In the case of any termination pursuant to Sections 18.4(a) – (c), the termination will have effect solely within the geographic jurisdiction of the Covered Governmental Authority whose action(s) provided the basis for the termination or, if smaller, the geographic region to which the Material Document Request, formal inquiry, investigation, Antitrust Action or Data Protection Action providing the basis for the termination relates;

(2)    In the case of any termination pursuant to Section 18.4(d), the termination will, to the greatest extent possible, be coterminous with the geographic scope of the relevant injunction or declaration of unlawfulness that provided the basis for the termination.

18.5. 

18.6.

**19. Miscellaneous.**



29

    



19.1. **Assignment.** Neither Party may assign this Agreement (in whole or in part) without the written consent of the other Party.

19.2. **Entire Agreement.** This Agreement sets out all terms agreed between the Parties and supersedes all other agreements between the Parties relating to its subject matter. In entering into this Agreement neither Party has relied on, and neither Party will have any right or remedy based on, any statement, representation or warranty (whether made negligently or innocently), except those expressly set out in this Agreement.

19.3. **Governing Law**. CALIFORNIA LAW, EXCLUDING CALIFORNIA'S CHOICE OF LAW RULES, WILL GOVERN ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROGRAM. ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROGRAM WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS IN SANTA CLARA COUNTY, CALIFORNIA, USA, AND THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS.

19.4. **Equitable Relief.** Nothing in this Agreement will limit a Party's ability to seek equitable relief.

19.5. **Notices.** All notices of termination or breach must be in writing and addressed to the other Party's Legal Department as well as the other party's primary contact. The e-mail address for notices being sent to Google's Legal Department is legal-notices@google.com. The address for notices being sent to Facebook's Legal Department should be delivered to 1 Hacker Way, Menlo Park, CA 94025 with attention to Facebook Legal Department. All other notices must be in writing and addressed to the other party's primary contact. Notice will be treated as given on receipt, as verified by written or automated receipt or by electronic log (as applicable). These notice requirements do not apply to legal service of process, which is instead governed by applicable law.

19.6. **Amendments.** All amendments must be agreed to by both Parties and expressly state that they are amending this Agreement.

19.7. **No Waiver.** Neither Party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

19.8. **Severability.** If any term (or part of a term) of the Agreement is invalid, illegal or unenforceable, the rest of the Agreement will remain in effect.

19.9. **No Third-Party Beneficiaries Unless Expressly Stated**. Except as expressly stated in this Agreement, there are no third-party beneficiaries to this Agreement.

19.10. **No Agency**. This Agreement does not create any agency, partnership, or joint venture among the Parties. For clarity, this is not an exclusive agreement.

30



19.11. **Subcontractors.** Either Party may subcontract any of its obligations under the Agreement, without the written consent of the other Party. Each Party is liable for the acts and omissions of its Subcontractors.

19.12. **Approvals.** The Parties agree that whenever the Agreement calls for written request or written approval to be provided by either Party, unless otherwise expressly stated that e-mail is not acceptable, such request or approval may be provided via e-mail. In addition, unless otherwise stated in this Agreement, any such approval will not be unreasonably withheld, delayed, or denied. For all instances in this Agreement where e-mail approval or e-mail agreement is permitted, such e-mail approval or e-mail agreement must be provided by a representative of each Party with either a title of Director or a title more senior than a Director.

19.13. **Force Majeure.** Except for payment obligations, no Party or its Affiliates is liable for inadequate performance to the extent caused by a condition that was beyond its reasonable control.

19.14. **Counterparts.** The Parties may execute this Agreement in counterparts, including facsimile, PDF, or other electronic copies, which taken together will constitute one instrument.

19.15. **Currency**. All dollar amounts referred to in this Agreement are in U.S. dollars.

19.16. **Authority.** Each Party represents that the individual signing this Agreement has the requisite legal authority to bind the Party on whose behalf he/she is signing.

Agreed and accepted as of the latest of the signature dates below (the "**Effective Date**"):



facebook
Legal

## EXHIBIT A

### PROGRAM COMMITMENTS

1. **Certain Definitions.**

   a. 

   b.

   c.

2. **Phase 1 Initial Roll-Out.**

   a. 

   b. As Google makes batches of ten (10) Publishers available to bid against via the Program, Facebook will use commercially reasonable efforts to enable at least 80% of those Publishers (including entering into agreements with those Publishers) within three (3) months of Google making available the 10th publisher of that batch, until Facebook has enabled at least 50 of those Publishers, so that Facebook has the ability to bid against all such Publisher Ad Inventory via the Program.

   c. 

3. **Match Rate.** Google will use commercially reasonable efforts to ensure that the Match Rate is at least 80% for mobile app and at least 60% for web (excluding Safari). For

32





example, for one hundred (100) Bid Requests, Google would use commercially reasonable efforts to ensure that Facebook will be able to identify the user on at least sixty (60) Bid Requests.  If other browser(s) prohibit or impose restrictions that are similar to Safari's restrictions on the use of third party cookies, then the Parties will use commercially reasonable efforts to adjust the Match Rate target level set forth in the first sentence of this section to account for such browser(s) in a mutually agreeable manner.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## EXHIBIT B

### FEE PAYMENTS

1.  **Certain Definitions.**
    a.



    b.

    c.

    d.

2.  **Phase 1.**
    a.



3.  **Phase 2.**
    a.



    b.

34



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





35



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





4. **Phase 3.**



5. **Fee.**

**Phase 1 and Phase 2.**

The following Fee will be charged during Phase 1 and Phase 2:

| Gross Spend on Annual Basis | Fees (% of Gross Spend) |
|---|---|
| $0 - $500,000,000 | 10% |
| $500,000,001 + | 5% |

For clarity, the above rates are tiered (i.e., if Facebook spends $600,000,000, then Google will charge a 10% Fee against the first $500,000,000 of spend and a 5% Fee against the next $100,000,000 of spend).

**Phase 3.**

The following Fee will be charged during Phase 3.

36



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| Gross Spend on Annual Basis | Fee (% of Gross Spend) |
|---|---|
| $0 - $500,000,000 | 10% |
| $500,000,001 + | 5% |

For clarity, the above rates are tiered (i.e., if Facebook spends $600,000,000, then Google will charge a 10% Fee against the first $500,000,000 of spend and a 5% Fee against the next $100,000,000 of spend).

Notwithstanding the foregoing sentence and table, in Phase 3, if Facebook's Gross Spend is $375,000,000 in any Quarter, the next Quarter's Fee will be billed at a flat rate of 5% of Gross Spend; however, if Facebook fails to spend $375,000,000 in the following Quarter, the next Quarter's Fee will be billed at a flat rate of 10% of Gross Spend. This will continue for the duration of the Term (e.g., during Phase 3, each Quarter's Fee will be adjusted based on Facebook's previous Quarter's Gross Spend).

37





## EXHIBIT C - GOOGLE POLICIES



**Circumventing ad systems**

38



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-HEWT-00048282







HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





**PROGRAM GUIDELINES.**



2. **Cookie Matching**



40



GOOG-HEWT-00048284







HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY







HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    GOOG-HEWT-00048286





43

    GOOG-HEWT-00048287



## EXHIBIT D - COMMON ADVERTISER POLICIES

The following is a subset of the Facebook Advertising Policies in effect as of the Effective Date:

### 4. Prohibited Content

**4.3 Discriminatory Practices.** Ads must not discriminate or encourage discrimination against people based on personal attributes such as race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical or genetic condition.

**4.6 Unsafe Supplements.** Ads must not promote the sale or use of unsafe supplements, as determined by Facebook in its sole discretion.

**4.8 Adult Products or Services.** Ads must not promote the sale or use of adult products or services, except for ads for family planning and contraception. Ads for contraceptives must focus on the contraceptive features of the product, and not on sexual pleasure or sexual enhancement, and must be targeted to people 18 years or older.

**4.9 Adult Content.** Ads must not contain adult content. This includes nudity, depictions of people in explicit or suggestive positions, or activities that are overly suggestive or sexually provocative.

**4.12 Personal Attributes.** Ads must not contain content that asserts or implies personal attributes. This includes direct or indirect assertions or implications about a person's race, ethnic origin, religion, beliefs, age, sexual orientation or practices, gender identity, disability, medical condition (including physical or mental health), financial status, membership in a trade union, criminal record, or name.

### 5. Restricted Content

**5.3 Real Money Gambling.** Ads that promote or facilitate online real money gambling, real money games of skill or real money lotteries, including online real money casino, sports books, bingo, or poker, are only allowed with prior written permission. Authorized gambling, games of skill or lottery ads must target people 18 years or older who are in jurisdictions for which permission has been granted.

**5.11 Political Advertising.** Advertisers can run political, election related and issue ads, provided the advertiser complies with all applicable laws and the authorization process required by Facebook.

44





## 10. Lead Ads

**10.4 Government Issued Identifiers.** Ads must not request government-issued identifiers, including Social Security numbers, passport numbers or driver's license numbers without our prior permission.

**10.8 Race or Ethnicity.** Ads must not request information regarding race or ethnicity without our prior permission.

**10.12 Trade Union Membership.** Ads must not request information regarding trade Union membership status without our prior permission.

45



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





46



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





47



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





48



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Amendment No. 1 to Network Bidding Agreement





1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



3.



4.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-HEWT-00048297





5.

6.



3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**7.** 

Agreed and accepted as of the latest of the signature dates below (the "**Effective Date**"):



4



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Name:**
**Title:**
**Date:**

5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Amendment No. 2 to Network Bidding Agreement



2.    Section 3 (Match Rate) of Exhibit A is hereby amended and replaced with the following language:

"3.  **Match Rate**.  Google will use commercially reasonable efforts to ensure that the Match Rate is at least 80% for mobile app.  For example, for one hundred (100) Bid Requests, Google would use commercially reasonable





efforts to ensure that Facebook will be able to identify the user on at least eighty (80) Bid Requests."

3.    

IN WITNESS WHEREOF, the parties have executed this Amendment by persons duly authorized. Agreed and accepted as of the latest of the signature dates below (the "**Amendment No. 2 Effective Date**"):











HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Amendment No. 3 to Network Bidding Agreement

This Amendment No. 3 to Network Bidding Agreement (this **"Amendment"**) is entered into by Google LLC and Google Ireland Limited (collectively, **"Google"**) and Facebook, Inc. and Facebook Ireland Limited (collectively, "**Facebook**") as of the Amendment No. 3 Effective Date (as defined below) and amends the Network Bidding Agreement, effective as of September 28, 2018, between Google and Facebook. Any use of the term "including" in this Agreement means "including, but not limited to." Capitalized terms not defined in this Amendment have the meanings given to those terms in the Agreement. The Parties agree as follows:

1.   **Phase 1 Completion**. As of the Amendment No. 3 Effective Date, the Parties hereby acknowledge and agree that Phase 1 is complete, and Phase 2 will begin as of July 1, 2020.

2.   **Miscellaneous.** The parties may execute this Amendment in counterparts, including facsimile, PDF, or other electronic copies, which taken together will constitute one instrument. Except as expressly modified herein, the terms of the Agreement remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment by persons duly authorized. Agreed and accepted as of the latest of the signature dates below (the "**Amendment No. 3 Effective Date**"):









 GOOG-HEWT-00048302

**EXECUTION COPY**

## Amendment No. 4 to Network Bidding Agreement



1.

2.

1

GOOG-HEWT-00048303

**EXECUTION COPY**



3.

4.

IN WITNESS WHEREOF, the parties have executed this Amendment by persons duly authorized.  Agreed and accepted as of the latest of the signature dates below (the "**Amendment No. 4 Effective Date**"):

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                 GOOG-HEWT-00048304















HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-HEWT-00048305