1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5    In re                         )
                                   )
6    Google RTB Consumer           )    No. C 21-02155-YGR
     Privacy Litigation,           )
7                                  )
     _____)

8

9                                       San Jose, California
                                        Tuesday, February 8, 2022
10

11   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                RECORDING  10:20 - 1:30 = 190 MINUTES
12

13   APPEARANCES:

14   For Plaintiffs:
                                   Simmons Hanly Conroy
15                                 112 Madison Avenue
                                   7th Floor
16                                 New York, New York 10016
                             BY:   AN V. TRUONG, ESQ.
17
                                   Cotchett, Pitre & McCarthy LLP
18                                 840 Malcolm Road, Suite 200
                                   Burlingame, California 94010
19                           BY:   BRIAN DANITZ, ESQ.

20                                 DiCello Levitt Gutzler LLC
                                   One Grand Central Place
21                                 60 East 42nd St., Suite 2400
                                   New York, New York 10165
22                           BY:   DAVID A. STRAITE, ESQ.

23              (APPEARANCES CONTINUED ON NEXT PAGE)

24

25

2

```
 1  APPEARANCES:  (Cont'd.)

 2                              Pritzker Levine LLP
                                1900 Powell Street
 3                              Suite 450
                                Emeryville, California 94608
 4                         BY:  ELIZABETH C. PRITZKER, ESQ.

 5  For Defendants:

 6                              Cooley LLP
                                3 Embarcadero Center
                                20th Floor
 7                              San Francisco, California
                                  94111
 8                         BY:  JEFFREY GUTKIN, ESQ.
                           BY:  KELSEY SPECTOR, ESQ.
 9

10  Transcribed by:             Echo Reporting, Inc.
                                Contracted Court Reporter/
11                              Transcriber
                                echoreporting@yahoo.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  Tuesday, February 8, 2022                          10:20 a.m.

2                      P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4          THE CLERK:  Calling Case 21-cv-2155-YGR, In re

5  Google RTB consumer privacy litigation.

6      If I could have counsel state their appearances,

7  beginning with plaintiffs, please.

8          MS. PRITZKER (via Zoom):  Good morning, your

9  Honor.  Elizabeth Pritzker, Pritzker Levine, as interim

10 class counsel for the plaintiffs.

11         THE COURT:  Good morning.

12         MR. DANITZ (via Zoom):  Good morning, your Honor.

13 Brian Danitz of Cotchett, Pitre and McCarthy on behalf of

14 plaintiffs.

15         THE COURT:  Good morning.

16         MR. STRAITE (via Zoom):  Good morning, your Honor.

17 David Straite, with DiCello Levitt Gutzler, for plaintiffs.

18         THE COURT:  Good morning.

19         MS. TRUONG (via Zoom):  Good morning, your Honor.

20 An Truong,

21 Simmons Hanly Conroy, with plaintiffs.

22         THE COURT:  Good morning.

23         MR. GUTKIN (via Zoom):  Good morning, your Honor.

24 This is Jeff Gutkin, appearing for defendant Google, LLC.

25         THE COURT:  Good morning.

4

1          MS. SPECTOR (via Zoom):  Good morning.  Kelsey
2    Spector, also appearing on behalf of Google, LLC.
3          THE COURT:  Okay.  Good morning.  We have quite a
4    crowd this morning.
5       So we are here on three discovery disputes that the
6    parties have submitted.  I will just take them in order.
7    And I don't know how you've organized yourselves in terms of
8    argument, but you're welcome to split up the argument if you
9    wish.
10      So starting first with docket number 141.  This is the
11   dispute concerning plaintiffs' request for production to
12   Google.  I'm just going to go through these in order, and I
13   have questions about them.  I will let you all argue if you
14   feel that there's something I have overlooked that you'd
15   like to raise with me.
16      But principally my questions have to do with I think
17   I'm missing some context for your dispute.  The discussion
18   is rather abbreviated.  You tried to cram a lot into each
19   letter, and this is probably the first set of disputes where
20   I need to have a more substantive understanding of what the
21   claims and defenses are about.  So I'm going to be asking
22   some questions along those lines.
23      So the first disputed request is number one.  And as
24   plaintiff describes it in their portion of the letter,
25   they're seeking non-privileged documents regarding Google's

5

1  internal investigations into the allegations of the

2  complaint.

3      My understanding is that Google says that the request

4  is too broad.  What I'm not sure about is whether the

5  dispute is over the original request or over the as-narrowed

6  requests that plaintiffs have put in their discovery

7  statement.

8      So who is arguing on behalf of Google for this one?

9  Let me just ask --

10          MR. GUTKIN:  That's --

11          THE COURT:  Yes.  Okay.  Go ahead.

12          MR. GUTKIN:  On behalf of Google is myself, your

13  Honor, Jeff Gutkin.

14          THE COURT:  Okay.  So what -- from Google's

15  perspective, are you arguing about what I'm calling the

16  as-narrowed version of RFP one or about the original

17  version?

18          MR. GUTKIN:  So I would say, your Honor, it's

19  both.  As we addressed in our brief, plaintiffs' modus

20  operandi in this case has been to launch these incredibly

21  broad and overinclusive requests such as request one, which

22  is just basically all documents related to the claims in

23  this case.  And then we have to have meet and confer, and

24  they try to narrow them down but -- that's going to come up

25  again and again over the course of discussing the RFPs that

6

1  are disputed here.

2       But even focusing only on the narrowed request, as I

3  understand that, although I can't say it's entirely clear to

4  me what plaintiffs think of as this narrowed request, it

5  basically is a request for all documents and communications

6  related to our investigation into the claims in the case.

7       I suppose what they're saying is after the complaint

8  was brought, and I just don't understand how that is a

9  proper source for discovery because it's going to be

10 overwhelmingly if not entirely privileged information.  So

11 it's --

12          THE COURT:  Well, let me ask Ms. Pritzker, or

13 whomever is arguing this one on behalf of the plaintiffs,

14 what they intend.

15      And by the way, I should just say I really don't want

16 to have a discussion about -- the request has been narrowed.

17 Let's just focus on what's been narrowed.  I don't really

18 want to hear about how the original requests of any party

19 were overbroad because that's the point of having you all

20 confer.  I just want whatever's the crystallized dispute

21 before me.  Otherwise, it will take us forever to get

22 through these.

23      All right.  So, Ms. Pritzker, what do the plaintiffs

24 want in connection with request for production number one?

25          MS. PRITZKER:  So your Honor hit it on the head.

7

1  I mean we've been meeting and conferring about these

2  requests for more than seven months, and obviously we've

3  narrowed the focus of the dispute over the course of this

4  meet and confer.

5      So what we're looking for our internal investigations

6  regarding the factual allegations of the complaint as they

7  relate to the Google RTB system or I guess the plaintiffs'

8  specific allegations to the extent that there was any

9  investigation done on a plaintiff-by-plaintiff basis to

10 ascertain what information was collected from them, used in

11 RTB auctions, disseminated to third parties.

12     So it's really internal investigations that could

13 include technical investigations by technical staff,

14 information -- you know, whether engineers looked into or

15 tried to ascertain what private information was being

16 collected, how it was stored, where it was disseminated, how

17 it was disseminated.  It's those kinds of things.

18     It's the investigation of the facts that underlie our

19 complaint as it relates to the Google RTB system and I guess

20 to the extent it relates to the plaintiffs specifically.

21         THE COURT:  All right.  So I heard Mr. Gutkin

22 express concern that the investigations presumably would

23 have occurred after the complaint was filed.  That's kind of

24 inherent in the request.  Is there any other way to

25 understand the request?

8

1          MS. PRITZKER:  They may have been, but they may

2    not have been, right?

3          THE COURT:  Okay.  Well, it's not seeking

4    privileged information.

5          MS. PRITZKER:  No.

6          THE COURT:  So not interested in anything that

7    would have been under the auspices of an investigation

8    conducted by counsel in response to the complaint, right?

9          MS. PRITZKER:  I would agree with that, your

10   Honor.  Not seeking privileged counsel investigation

11   employee information.  But just as in the Shearer case that

12   we cited, you know, there are investigations conducted by

13   business personnel, technical personnel, you know, other

14   personnel into the facts that are alleged in litigation or

15   in regulatory proceedings.

16       A lot of what we allege is not unique to this

17   particular case.  There are other regulatory actions that

18   have looked at the same kind of behavior.  And I guess to

19   the extent that there are pre-filing investigations as well

20   as post-filing investigations not conducted by counsel in

21   response to litigation but into the facts of the

22   allegations, the extent to which what Google was doing

23   comported with consumer consent, all of that is relevant and

24   not privileged and we think should be produced in the case.

25          THE COURT:  And do the parties have an agreement

9

1  about logging privileged documents that postdate some date

2  like the filing of the complaint or something like that?  Do

3  you all have that arrangement?

4           MS. PRITZKER:  I believe we do.  I believe it's in

5  our protective order.  But I believe we do.

6           MR. GUTKIN:  We do, your Honor.  It's in the ESI

7  protocol.

8           THE COURT:  Okay.  So I'm trying to get to the nub

9  of the issue.  If part of what the concern is on Google's

10 behalf is that this would be most likely to encompass

11 privileged material and there's some burden associated with

12 that, my expectation is that you would not have to log every

13 single document that fell within the scope of a privileged

14 investigation, that fell within the scope of RFP one,

15 correct, Mr. Gutkin?

16          MR. GUTKIN:  Well, your Honor, what I would say is

17 that documents are -- so I heard two things from Ms.

18 Pritzker which I would have to address.

19      One is the post-filing investigation and then I felt I

20 heard Mr. Pritzker waffling into pre-filing as well.

21      But on the post-filing investigation, it's correct that

22 we would not have to log communications with outside counsel

23 or certain designated counsel that are defined by agreement

24 of the parties, but it wouldn't exclude all communications

25 that relate to counsel.

1      And moreover, whether or not we have to log the

2  materials, it would still require searching for and

3  reviewing all the materials.  And the way that they -- one

4  way they've proposed to go about this is to use basically

5  the case name, or case names because this has consolidated a

6  number of individual cases, as search terms.

7      So we're still going to have to review all of those

8  materials to determine if they're privileged, to determine

9  whether or not they need to be logged.  And the prospect of

10  finding discoverable material among those things is

11  extremely slight.

12      And we cited for your Honor of the CoStar Group

13  decision which relates to how it is sort of inherently

14  unduly burdensome to require a party to sift through tomes

15  of privilege material to potentially find something not

16  privileged.

17          THE COURT:  Well, let me just pause you all there.

18      So it seems to me that there is some inherent relevance

19  to investigations of the complaint at issue and information

20  that is developed or gathered by the defendant in

21  connection -- you know, relating to those allegations.

22      It's pretty specific.  It's the allegations in the

23  complaint, not allegations in some regulatory proceeding.

24  Whether there is overlap between regulatory proceedings and

25  this case is neither here nor there.  Request for production

11

1  number one has to do with the allegations in the complaint.

2      Mr. Gutkin, it's within your power to figure out

3  whether there were any such investigations done, not by

4  running search terms but by asking relevant witnesses

5  whether there were any investigations that were done that

6  were not under the auspices of counsel-directed efforts.  If

7  you find them, you can figure out who the relevant

8  custodians are and then you all can have your discussion

9  about search terms.

10      But this is not as big a problem as you all are making

11  it, is my initial reaction.  So it seems like there ought to

12  be a way for all of you to get together and figure out a

13  process to narrow the scope of what would be a burdensome

14  investigation if you had to simply just run search terms and

15  review the whole mess.

16      If something is likely to be privileged because there

17  was an investigation headed by counsel of the allegations in

18  complaint when they were filed, you can find that out.  You

19  have control of the people who would know.  So just make

20  some inquiries, figure it out.  And then you can discuss

21  further whether there are some people who actually engaged

22  in an investigation that was unlikely to be privileged.

23      I don't see why that would be a problem for Google, and

24  I don't know why that would be a problem for the plaintiffs.

25              MS. PRITZKER:  For us, your Honor, it's exactly

12

1   what we're asking for.  I mean I think that's an appropriate

2   process.

3          THE COURT:  Okay.  Mr. Gutkin, why would that be a

4   problem for Google, that approach?

5          MR. GUTKIN:  Well, if, your Honor, the process

6   would be for us to consult the persons who are principally

7   involved in the product at issue and the issues as we

8   understand them in the case and to determine if they

9   conducted any kind of independent investigation apart from

10  their discussions with counsel, apart from anything they

11  were asked to do on behalf of counsel and without counsel's

12  knowledge, as long as the scope of the people that we have

13  to -- to whom we have to make that inquiry is what we

14  understand it to be, the people who were involved in the

15  product, then we could feasibly discuss that with them and

16  confirm if there was any independent investigation done not

17  at the direction of counsel and without counsel's knowledge.

18         THE COURT:  Well, I'm not sure exactly what to

19  tell you in response to that because I don't know what

20  Google's practices might be when it sued.  So if you get a

21  complaint, the complaint goes somewhere and somebody figures

22  out what to do about it.

23     So when you first get wind of these allegations, your

24  client take some steps.  So I don't know if that means the

25  only people you need to consult are the people in charge of

13

1 the product or whether you need to start back someplace else

2 and figure out, I don't know, in the legal department what

3 happened.

4       But I'm not micromanage that because I don't know.  But

5 you know, and you can figure out what the appropriate

6 hierarchy of people to inquire of is to figure out where the

7 answer may lie.

8       And so if there was some investigation done by

9 technical or businesspeople sort of independent of the

10 lawsuit and without the direction of counsel and it was just

11 done because it was done, you can figure that out.  And then

12 you can configure out who the relevant people are who were

13 engaged in that.

14       If there was something that was done at counsel's

15 direction -- inside counsel, outside counsel -- and

16 everything was under those auspices, well, then you have

17 your answer about whether it's privileged or work product or

18 whatever.

19       So I'm not going to tell you who you need to talk to

20 because I don't know, but you know.  And I think that that's

21 the appropriate way to sort this one out.

22       I'm going to move on, unless somebody needs to be heard

23 about RFP number one.

24             MS. PRITZKER:  No, your Honor.

25             MR. GUTKIN:  No, your Honor.

14

1          THE COURT:  Okay.  Good.

2     Number two, this is about documents concerning external

3 criticism, including considerations to modify RTB.  And I

4 understand that the plaintiffs say that Google shouldn't get

5 to decide what is relevant, and Google says that really you

6 should only have to produce material -- search for material

7 that involves material changes to RTB and changes that were

8 actually implemented.

9          MS. PRITZKER:  I'm sorry, your Honor, I believe

10 my -- were you containing, because my Zoom froze.

11          THE COURT:  We're good.  I think we're good.

12     Does anybody have a problem with connectivity?

13          MR. GUTKIN:  No, your Honor.

14          MS. PRITZKER:  It was on my computer, so okay,

15 good.  Thank you.

16          THE COURT:  All right.  No problem.

17          MS. PRITZKER:  So far so good.

18          THE COURT:  So far so good, okay.

19     So what I'm trying to understand is if the dispute is

20 about material changes that were actually made, if that's

21 where the parties' disagreement is, do the parties agree

22 that if changes were merely considered but not implemented,

23 that those changes are not relevant?  Let me ask Ms.

24 Pritzker or whoever on behalf of --

25          MS. PRITZKER:  No, the plaintiffs don't agree, and

15

1  there are good reasons for that, your Honor.

2      Potential changes that were discussed but not limited

3  are equally relevant, and the reasons why they weren't

4  implemented are relevant.  Is it because they don't address

5  the concern at issue.  Is it because it would make RTB

6  inoperable.  Is it because it has an impact on Google's

7  revenue that they don't want to make that change because it

8  decreases their profitability.  You know, do advertisers

9  hate it.

10     You know, there are reasons why changes that were

11 discussed but not implemented would be relevant I think to

12 the inquiry here, so --

13             THE COURT:  Okay.

14             MS. PRITZKER:  So it's not just real changes or

15 material changes but any changes that were contemplated,

16 implemented or not.

17             THE COURT:  Okay.  So Mr. Gutkin, just focusing on

18 the question of implemented changes versus changes that were

19 merely considered but not implemented, how do you respond to

20 Ms. Pritzker's point that changes that were contemplated but

21 not implemented may well be relevant here.

22             MR. GUTKIN:  So, your Honor, we have a wide

23 variety of document requests that are getting at all of the

24 kinds of information that Ms. Pritzker is describing through

25 other RFPs.  So if there is a discussion of privacy concerns

16

1  related to the real-time bidding product within a discussion

2  about a potential change that's never implemented, that

3  document would be produced anyway.

4       So the kinds of things that Ms. Pritzker -- some of the

5  kinds of things that Ms. Pritzker was just describing would

6  not -- they would be covered anyway.  We don't need this

7  overinclusive request for every change that Google has

8  considered making to this very substantial product, causing

9  us to sweep in every potential change, including the ones

10 that were never made.

11      So as a starting point, changes that were never made

12 means they actually have no impact on the issue in this

13 case, which is what user information was allegedly shared

14 with third parties through these RTB bid auctions.

15      If a change was never made, then obviously whatever was

16 considered in that change didn't affect one way or the other

17 the information that was shared.

18      So it's to -- bring in every potential change on such a

19 significant product is going to sweep in all kinds of

20 documents.  And so Ms. Pritzker referenced, oh, well, what

21 if it's going to have a change on revenue.

22      Obviously, not every change that the company considers

23 making that might affect revenue has any relevance here.

24      If there's a change to -- shall we add a fifth display

25 ad size of this many pixels by this many pixels, no, we

17

1   don't need to do that, that's not -- that doesn't seem like

2   a document that has any bearing on this case at all, even if

3   there is a whole discussion about how, well, that might

4   decrease revenue, advertisers might expect to pay less for

5   that.

6        I'm making this up.  But my point is, your Honor, that

7   it should -- it's only things that actually affected the way

8   the product operates that should have to be produced here.

9   And to try to bring in and force us to sort through every

10  document about every considered change that actually doesn't

11  affect any relevant evidence in this case and anything to do

12  with what's shared is just overbroad.

13           THE COURT:  So I understand that point to go in

14  part to the question of changes that are material as opposed

15  to not material.  You're using the word "relevance."  I

16  don't know if "material" means something different in the

17  context of this dispute.

18       But I'm curious, how would Google decide whether a

19  change was material or relevant to the dispute and produce

20  only those documents and not others?

21           MR. GUTKIN:  Well, whether a change was relevant

22  to the dispute I think would go to whether it's a change

23  that has anything to do with the user data that plaintiffs

24  allege is being shared with the participants in these

25  auctions, that is, the information that is sent over the

18

1  wire to the participants in these auctions.  That would be

2  kind of the relevance line.

3        THE COURT:  Right.  And how would Google make that

4  assessment?  Like operationally in your collection and

5  review of documents responsive to this request, how --

6  because one of the dispute is the plaintiffs don't want to

7  let you make that call.  So how would you go about making

8  that determination?

9        MR. GUTKIN:  Well, I think it actually is a

10  relatively objective determination that attorneys reviewing

11  a document can make.

12     To use my example of a change to the size of an ad

13  format, that is not going to have anything to do with

14  information shared with third parties through RTB, so it's a

15  make-able determination when you're reading the document and

16  you're understanding this change being discussed.

17        THE COURT:  But when we're talking about something

18  like modifications to RTB, is there not some kind of process

19  or documentation within Google that would reflect changes

20  that are made, some form of log or some sort of internal

21  process that -- it can affect a lot of other things when you

22  make a change to something like this.  And my understanding

23  is that most companies are pretty careful about those kinds

24  of things and would document any time it happened.

25     So for things that were actually changed, is there not

1  some documentation or log or something like that that would

2  catalog these things?

3          MR. GUTKIN:  Well, I'm not certain that I know the

4  answer to that, your Honor, in terms of whether there's any

5  centralized source that would reflect every actual change

6  made.

7      I would say that surely there would not be a

8  centralized source that reflects every considered change

9  that, you know, one engineer says to another, what about

10 doing this with the product, what about doing that.  There

11 would be no centralized source for that.  That's going to be

12 extremely difficult to find and then to try and review every

13 document with every kind of pie-in-the-sky idea that was

14 never implemented.

15         THE COURT:  Right.  I'm focusing on the things

16 that were actually made.

17     So I think it's worth investigating on the question of

18 burden if there is some kind of documentation that reflects

19 changes that were made.  And that way there's a vehicle --

20 for those kinds of changes there's a vehicle for the parties

21 to confer about whether a change is or is not material to

22 the litigation.

23     So in the event there is any disagreement about whether

24 it actually affects anybody's claims or defenses in the

25 case, you can have a conversation about that.  So I think

1  it's worthwhile figuring out if such documentation exists in

2  the first place, and that addresses only changes that were

3  actually made.

4      I take your point that changes that were merely

5  contemplated and not made, those are harder to figure out,

6  unless there is some regular process by which whoever is

7  responsible for making changes from a technical or

8  engineering perspective there's some reporting about these

9  kinds of things.  I don't know if there is or not.  That

10  might bear investigation as well.

11     But I am concerned that production of any change no

12  matter how relevant to the case, contemplated but not

13  implemented is actually proportional to the needs of the

14  plaintiffs in this litigation.  So I think there is some

15  narrowing of this that needs to happen, but I may actually

16  need to send you all back for some further discussion in

17  order to figure out what the right approach is here.

18     But I do think I understand what you all are fighting

19  about and why.  So thank you for that.

20     Let me move on to requests three and four.

21     These requests and the dispute about these requests I

22  understand concerns the request for information and

23  responses by Google to those requests made by regulators or

24  government entities.  And the plaintiffs say that the

25  allegations in these matters are overlapping with the

1  allegations in this case, so that the requests and responses
2  are likely relevant.
3       And I understand Google to say, well, the overlap is
4  really not that extensive, so this process of "Give me all
5  the requests and all the responses to the requests" is going
6  to result in the production of a lot of irrelevant material.
7       Let me just share with you all that I think it's
8  appropriate here, and in the context of your third dispute,
9  to limit the scope of what Google should provide to
10 plaintiffs to material questions and responses relating to
11 RTB.
12      I am not convinced, but I'll let the plaintiffs argue
13 if you'd like to, that anything having to do with data
14 privacy -- its collection, its storage, its dissemination --
15 is relevant.  The claims in the case, as I understand it,
16 have to do specifically with RTB being the vehicle by which
17 information -- personal information of Google account
18 holders is sold or otherwise disseminated.  And that's what
19 I think should be the focus of your discovery.
20      And generic statements or generic discovery about any
21 kind of data privacy issue or violation of data privacy
22 promises seems to me to be too far beyond the scope.  And
23 that's an observation, again, that I think relates both to
24 these requests three and four as to these regulators that
25 are at issue in the first docket number 141 dispute but also

22

1  to your third dispute in docket 143.

2     So the key is relevance.  Here -- and I like the

3  approach that you all appear to have taken, although it

4  didn't result in complete agreement.  But the approach that

5  you all appear to have taken with respect to the Texas AG

6  proceeding where there was a disclosure of what the CID's

7  were and some conference about, you know, which CID's

8  actually bear on the dispute and then a discussion about,

9  well, what was the production in response to those CID's.

10     That seems to me like a useful process, but I'm

11  concerned about what I understood Google to say in the third

12  dispute which is "Well, we didn't sort of associate our

13  production with particular CID's.  We just sort of produced

14  stuff."  And if that's the case, then I'm not sure how

15  useful it is.

16     So let me just pause there and say with respect to this

17  dispute, docket 141 and the request -- what is it, the

18  Australian proceeding and -- just a moment.  You all can

19  remind me.

20          MR. GUTKIN:  Arizona, your Honor.

21          THE COURT:  Arizona.  Australia and Arizona.

22     Is it possible to use the CID's as a vehicle for

23  figuring out what responses by Google might bear on this

24  matter?

25     And let me pose the question to Mr. Gutkin first.

23

1          MR. GUTKIN:  So a few things, your Honor.

2      First of all, Google has already produced the documents

3  from the regulatory proceeding that's actually mostly

4  aligned, not entirely but in significant part aligned with

5  this case, which is a couple of investigations in the United

6  Kingdom related to RTB and information shared through RTB.

7          So they said "Give us every thing in the world."  We

8  said these are somewhat aligned with the matter, issues in

9  this case so we will share that with you when we produce

10 that.

11         Then there is the Texas AG, which I guess we are going

12 to defer to later.  But there are portions of the Texas AG

13 that's an antitrust case but it touches on the relevant

14 product.  So we said "Okay, we'll give you some things from

15 this" and we ended up -- there are 14 requests there where

16 we said either here are the documents that we gave to the

17 Texas AG in response to these or we committed if and when

18 Google responds to these, you'll get them.

19         Now, that debate over the Texas CID -- I know your

20 Honor said not to go back to --

21         THE COURT:  That's okay.

22         MR. GUTKIN:  That debate took us months and cost

23 my client a ton of money because originally it was all

24 documents shared with the Texas AG.  Then it was over 100

25 requests and then we -- you know, we said, "But this is just

24

1  so much that's not relevant."  And then they came down to

2  their prioritized list of 48.

3      And I guess it will be for our third argument that I

4  will go through those in whatever detail your Honor wants to

5  show how they're not relevant.  But that was a tremendously

6  expensive and burdensome experience.

7      And now they're asking us to repeat that in connection

8  with two investigations, Arizona and Australia, that have --

9  from my perspective, your Honor, they have nothing to do

10  with this case and they have nothing to do with the

11  information being shared with third parties through the

12  real-time bidding auctions.  So --

13          THE COURT:  I get that point.  I don't mean to cut

14  you off.

15          MR. GUTKIN:  Yes, your Honor.

16          THE COURT:  But let me just make sure I get an

17  answer my question before I lose my train of thought.

18      In these investigations -- and if you need to

19  distinguish between and among them, that's fine -- is Google

20  able to associate particular productions with particular

21  CID's?  Like in response to this CID we reproduced "X"

22  documents.

23          MR. GUTKIN:  Yes, so that I know the answer for

24  the Texas AG is in some instances yes and in other instances

25  no.  So the answer for the Texas -- and this comes up in one

25

1  of the cases that we cited in the section of our brief that

2  it's sometimes not possible to identify -- that the burden

3  is partially that you can't identify the particular CID's

4  and find the documents from a larger pool.

5      I think the answer is going to be the same for Arizona,

6  and I'm not entirely sure about what the production, if any,

7  has been in the Australian action.  The Australian action

8  actually just came up in the last two weeks.  We had not

9  discussed it before that.

10     So if I'm -- I was going to discuss, your Honor, the

11 nature of those other -- the Australian and Arizona

12 investigations, but I don't know if I've answered your

13 question.

14         THE COURT:  Well, I do appreciate your point that

15 from your perspective, they are not overlapping, they are

16 different.  Might it be helpful, nevertheless, to produce

17 the CID's that came from those regulatory agencies to make

18 your point?

19     In other words, if you could show, like you are

20 attempting to do with the Texas AG litigation, that there

21 are the CID's that relate to all kinds of things that aren't

22 RTB, that relate to competition, not really privacy, the

23 competitive issues, antitrust concerns, might you have a

24 stronger argument to persuade the plaintiffs that this is

25 not a fruitful area for inquiry?

26

1          MR. GUTKIN:  So my reaction, your Honor, is that
2   that would -- that's only an appropriate exercise where
3   there's some plausible connection between these other
4   investigations and the case that we're litigating and that
5   my client should not be put to the expense of the months of
6   wrangling over, well, this one might contain certain
7   information or this one might not and having to fight about
8   it, particularly with where they landed on Texas and what an
9   overbroad set of requests they are still insisting we
10  produce from Texas.

11          So the Arizona investigation is about one particular
12  set of settings that users can control related to their
13  location history.  And what it's about is a claim that if
14  you turn off one setting on location history, that there is
15  still some other location history being pulled, despite the
16  fact that you've turned that off.  And it's about different
17  kinds of location history settings, nothing about what's
18  shared with third parties.

19          And even to the extent that location history sharing
20  with third parties is at issue here, that's covered by
21  everything we're already doing.  We've already produced
22  documents and will continue to produce documents that show
23  in a very precise way what location history information is
24  shared with third parties here.

25          So that area is covered.  And an AG investigation about

27

1   how certain settings work is totally beside the point.

2       And then just briefly on Australia, your Honor, that's

3   an even more egregious case of I do not know where they got

4   the connection to that Australian investigation other than

5   pulling it out of a hat.

6       What that's about is the claim that Google is

7   associating certain information provided by account holders

8   with certain information that Google is receiving from

9   websites and apps in a new way starting after a change in

10  Google's privacy policy applicable in Australia in I believe

11  June of 2016.

12      So I mean if your Honor just reads paragraph 26 of

13  what's called the amended concise statement, which is I

14  guess the equivalent of a complaint in the Australian

15  system, you can just see it's all about Google is combining

16  two different pools of information to use in targeted

17  advertising where the previous privacy policy said it

18  wouldn't combine these pools.

19      There is nothing about sharing any information with

20  third parties.  It's clearly all internal Google use of this

21  data for targeted advertising and there's certainly no

22  mention of real-time bidding and sharing information through

23  real-time bidding.  So --

24          THE COURT:  I get your point that they're not --

25  your point is, it's too burdensome to have to talk to the

28

1 plaintiffs about these two matters.  I don't think it's

2 burdensome and you're not contending that it's burdensome to

3 provide them with the CID's.  That seems like that would be

4 easy.  You just don't want to have to engage in a discussion

5 about them like you did with the Texas AG.

6          MR. GUTKIN:  Right.  History tells us it won't go

7 well or be quick.  It will cost my client a lot of money and

8 time and we'll be back before you.

9          THE COURT:  You could share with me, right?  And

10 that wouldn't be burdensome at all.  I could have a look at

11 it, right?

12          MR. GUTKIN:  That is true I think.

13          THE COURT:  Okay.

14          MR. GUTKIN:  Not knowing where the Australian

15 requests reside, I assume we could -- it wouldn't be

16 burdensome to share it with you.

17          THE COURT:  Okay.  Well, let me hear from the

18 plaintiffs about why you believe -- in light of Mr. Gutkin's

19 more fulsome statement here, why these two matters might

20 yield information that you're not going to get from these

21 other avenues that you're pursuing with respect to the UK

22 matters for example, and given my observation that I don't

23 think that things that go beyond RTB are relevant.  You can

24 address both those points, but I'd like to hear from you.

25          MS. PRITZKER:  Thank you, your Honor.

29

1    So I want to touch a little bit on the issue of what

2  goes beyond RTB, and only in this particular respect.  And I

3  can use the Arizona proceeding as an example.

4    So that's a 50-page complaint that cites testimony from

5  hundreds of internal Google employees.  And that complaint

6  alleges that Google's disclosures regarding location history

7  off feature misleads consumers in the sense that geolocation

8  data and other personal data of those folks is in fact

9  collected whether that feature is turned off or not.

10    In the words of that complaint, Google tracks users

11  like it or not and then uses that information to disseminate

12  to third parties in advertising.  That's the nature of the

13  AG proceeding.  So, you know, it's used by Google to sell

14  and target ads, very similar to RTB.

15    So part of the case -- yes, the case is about

16  disclosure of personal formation to third parties, but part

17  of the mechanism of RTB is how is that information

18  collected, where is it stored, what information is it

19  combined with, how is it then packaged, you know, held by

20  Google, packaged and then ultimately disseminated to

21  participants in the RTB process.

22    So this is the kind of information that is disclosed in

23  the Arizona proceeding, sort of the front end of the RTB

24  process, and it's the same kind of information that's

25  disclosed in the Australian proceeding.

1    In the Australian proceeding in particular, yes, it was

2  a different advertising feature of Google, but I think the

3  critical allegation there was that Google was combining or

4  associating personal information with third-party websites

5  but failed to obtain consumer consent in doing so, pretty

6  similar to the allegations here.

7    So, again, we want to look for what was the testimony

8  that was presented by Google employees on those matters, you

9  know.  First of all, who were the witnesses.  They may be

10  relevant custodians in this case.  We don't know who the

11  witnesses were.

12    You know, what documents were presented to show the

13  manner and use of collected user data and where was it

14  stored.  We don't have that information.  It's unlikely to

15  differ just because one avenue of the use of this

16  information is RTB versus some other avenue.

17        THE COURT:  But that's the case.  If it's unlikely

18  to differ, then why wouldn't you expect that the materials

19  that you've already gotten, I understand from the UK

20  proceedings, be sufficient, if those are even more closely

21  aligned with the dispute in this case?

22        MS. PRITZKER:  Well, particularly Arizona, your

23  Honor, where you've got hundreds of employees coming forward

24  to provide testimony.  We don't have that from the UK

25  proceeding.  Why isn't that important?  To me that seems

31

1  critically important.  Those are critical pieces of

2  information about what Google was doing, how it was doing

3  it, who was doing it and what higher-ups at Google knew

4  about it.

5      I mean those are particularly compelling pieces of

6  information which may not be revealed in the UK proceeding

7  at all.  I mean I'd have to compare the CID's -- which I

8  can't do because I don't have the CID's or the investigative

9  demands from the various proceedings where I could maybe

10  make that analysis.  But I don't even have that.  I don't

11  have anything.

12          THE COURT:  Okay.  So then why would testimony

13  about collection and storage of personal information matter

14  in this case, which as I understand it is about sale and

15  dissemination?  So why -- so presuming that the information

16  exists, and then the focus of your case is about sale and

17  dissemination in violation of representations made.

18          MS. PRITZKER:  From our perspective, it's just the

19  front end of the RTB auction process.  So, you know, how

20  information is collected from a user, whether that user has

21  his or her privacy settings or location data, you know,

22  settings on or off, how that information is collected, how

23  it's stored and repackaged and combined with other

24  information so that it can then be bid on by the advertisers

25  at an auction, it's the front end of the auction process.

32

1  It's completely relevant.

2      I mean we -- and it's completely relevant to our

3  allegation that Google does it without obtaining proper

4  consent from users to do so.

5          THE COURT:  All right.  Let me just ask Mr. Gutkin

6  a question.  I'll come back to you, Ms. Pritzker.

7      Is Google defending this case, in part, by arguing that

8  it does not in fact collect or store the kind of information

9  that -- and I don't know how you all are defining it.

10     I'm looking at the joint case management statement that

11 you all provided to Judge Gonzalez Rogers.  Device

12 identifiers, geolocation, specific content of internet

13 communications and highly detailed profile about interests,

14 including race, religion, sexual orientation, health status.

15     So is Google saying "We don't actually collect and

16 store that information or some portion of it"?  Is that part

17 of the defense in the case?

18         MR. GUTKIN:  Well, so your Honor, Ms. Pritzker,

19 with all due respect, is blurring a couple of things.

20     Ms. Pritzker is talking about information that Google

21 collects that it uses to serve targeted ads on third-party

22 websites, and that is different than information Google

23 discloses to third parties --

24         THE COURT:  I got it.  I got that.

25         MR. GUTKIN:  -- through the RTB auction.

33

1          THE COURT:  I got your point about that.  But my

2    question is like a more basic one.  Is part of Google's

3    defense, "We don't collect and/or store this information in

4    the first place"?

5          MR. GUTKIN:  Not about collection and storage.

6    Our defense is based on what do we disclose to participants

7    in the third-party auctions.

8          THE COURT:  Okay.

9          MR. GUTKIN:  Google collects -- just to finish

10   this thought.  I don't mean to go on too long.

11         THE COURT:  Okay.

12         MR. GUTKIN:  Google collects different kinds of

13   information for use in different contexts, but Google is

14   extraordinarily conscientious about the information it

15   shares with third parties through the RTB auction.  That is

16   a different context than Google collecting information in

17   its own internal ad targeting with its own internal ad

18   products.  I'd like --

19         THE COURT:  Okay.  I got it.

20         MR. GUTKIN:  I'd like your Honor --

21         THE COURT:  I've got to let Ms. Pritzker finish

22   your argument though.  I just wanted an answer to the

23   question about whether that was, you know, a defense because

24   I didn't understand if it was a defense that the information

25   isn't collected or stored in the first place anywhere by

34

1  Google because that informs some of the other disputes that

2  you all have.

3      I'll come back to you in a second.  Let me finish with

4  Ms. Pritzker.

5          MS. PRITZKER:  As I understand the defense that

6  Google is asserting in this case, at least in its motion to

7  dismiss, is that whatever it's doing falls within some area

8  of informed consent by users, not that it's not doing it but

9  there's a consent defense that I guess we will have to

10 litigate in the case.

11         THE COURT:  So back to the question of, you know,

12 if there is not a dispute about the information being

13 collected and stored, why would all of this testimony that

14 you believe exists in these Australian and Arizona matters

15 matter for this case?

16         MS. PRITZKER:  I think there is a dispute what

17 information is being collected and stored and disseminated.

18 I think if you look at our complaint, we have a whole list

19 of verticals or personally private information that's coded

20 in ads -- in response to bid requests that reveals very

21 personal private information about --

22         THE COURT:  What does that mean?  Elaborate on

23 that a little bit more, what you were saying was --

24         MS. PRITZKER:  So there are categories of -- you

25 know, in order for Google to sell, you know, to get

35

advertisers to bid on users, it has a whole list of

categories of information that you can basically target

users on with your ad.  And a lot of those targets include

very personal information that Google contends it does not

share with others, which could include health issues,

pregnancy, sexual activity, sexual orientation.

And, you know, there are exhibits to our complaint

where those -- where it's very clear that they're using

those vertical -- those very personally private pieces of

information that it's collecting about users and it's

disseminating it to advertisers as part of the RTB process.

And advertisers are bidding on it because they want to

direct an ad, you know, to that specific user that's

targeted to that consumer's whatever -- identity, gender,

location, sexuality.

So, you know -- so the information that is being

collected and how it's stored and how it's being associated

with the user's interaction with the internet at any

particular time is very important to the case, and it's very

important and it's very relevant to the RTB process.

MR. GUTKIN:  May I respond?

THE COURT:  Well -- yes, just a moment.

Let me just say, it seems to me that the zone of

discovery that is pertinent to this case has to include the

information that the plaintiffs contend is associated with a

36

1 Google account user and made available to RTB bidders.  That

2 defines the zone.

3     Now, if consent is an issue, then how Google procures

4 consent or not is relevant, but it has to be with respect to

5 the data that the plaintiffs have put at issue, the personal

6 information, that the plaintiffs have put at issue in the

7 case and not some other information.

8     So it's hard for me to sort that out from what you all

9 are telling me and I don't know if there's a dispute.  And

10 what I'm hoping is that with this kind of guidance, the

11 dispute can be narrowed if not entirely resolved.  But I'm

12 not sure that that's possible.

13     So, Mr. Gutkin, you wanted to say something more on

14 this particular issue.

15         MR. GUTKIN:  Well, I just want to say one thing

16 about Ms. Pritzker's last comment and one other thing about

17 Arizona.

18     The difference is what is disclosed to participants in

19 the RTB auction, which is clearly at issue, versus

20 everything that's collected and stored, regardless of

21 whether it's disclosed in an RTB auction.  And the way that

22 Ms. Pritzker is broadening the topics is bringing in things

23 that there is no -- there's not even any claim that they're

24 disclosed in the RTB auction and there would need to be a

25 claim.

37

1     And so collection, what's collected -- you know, let's
2  say Google has collected various information if you use the
3  Waze app or Google collects information if you watch YouTube
4  or you have a Google home speaker.  None of that matters if
5  it's not disclosed in the RTB auction.
6     And this kind of brings me back to where we started
7  with this Arizona litigation.  I'm actually not sure what
8  Ms. Pritzker is referring to when she says that the Arizona
9  investigation is about disclosure to third parties.  I
10 didn't see anything in that complaint about disclosure to
11 third parties, much less disclosure to third parties through
12 RTB.
13    That case is about what is Google collecting based on
14 about location history, based on various settings.  And I
15 just tried to quickly -- I had already looked through the
16 complaint for the every instance of the word "share" and
17 didn't see anything relevant.
18    I just quickly tried to look through for the word --
19 use of the word "third" as in third party, didn't find
20 anything relevant.  I don't know to what Ms. Pritzker is
21 referring because to my knowledge, that Arizona
22 investigation is not about disclosure to third parties.
23    It's about the claim that if you put your settings in a
24 certain way, Google shouldn't be collecting your location
25 information, and the claim is that Google does that.

38

1          THE COURT:  Okay.  What about the question of

2   consent to uses of information that is collected?  Is that

3   at issue in the Arizona and Australian matters, and does

4   that have some bearing?  The nature of consent, how that

5   consent is procured, what the consent encompasses, that

6   seems to me to be a potential area of overlap.

7          MR. GUTKIN:  So I think the answer is that it

8   would be totally different kinds of consent at issue.

9      So take Australia, the claim there is Google did not

10  adequately obtain consent to combining information that's

11  provided when someone signs up for a Google account, like

12  your name and your chosen gmail address with information

13  that was collected from apps or websites.

14     And the claim in Australia is there was a change in the

15  privacy policy that didn't adequately obtain consent, as I

16  understand it, for combining those two pools of information.

17     That consent is not relevant here.  I don't see any way

18  that that consent is relevant here.  That's consent about

19  one specific thing that Australia is claiming Google did

20  that doesn't pertain here.

21     What we're talking about here is the consents that

22  relate to RTB and what information is disclosed to bidders

23  in the real-time bidding auction.

24          THE COURT:  All right.  Mr. Straite, you wanted to

25  add something here?

39

1          MR. STRAITE:  Thank you, your Honor.

2      If we're going to talk about more of a narrowing of our

3  view of Australia and Arizona and say let's just focus

4  narrowly where the overlap is, I think there are three areas

5  where we have -- everyone can agree there's overlap.

6      Number one, Australia is investigating Google's

7  promise, quote, "Google does not sell your personal

8  information to anyone."  That promise in Google's

9  disclosures was attached to the complaint in Australia, so

10  it is at issue.

11      I hear Mr. Gutkin -- he's talking about other aspects

12  of the Australian case that aren't here, and we would

13  concede there are additional aspects to that case.  But for

14  sure Australia is challenging that promise as false.  It's

15  identical to the promise in this case.

16          THE COURT:  But in what context?  In any context?

17          MR. STRAITE:  To share your personal information.

18  Yes, your Honor, which is in the RGB auction is what we

19  allege, and it's also in the Australia case, yes.

20          THE COURT:  My question is does the Australian

21  investigation encompass RTB?  Is it open-ended, like any

22  form of selling of personal information or is it limited to

23  some other vehicle besides RTB?

24          MR. STRAITE:  It's our understanding it includes

25  RTB.

1           THE COURT:  Okay.

2           MR. STRAITE:  And it's focused most importantly on

3  the disclosures itself with the exact same promise.

4           THE COURT:  All right.  And what's the second

5  area?

6           MR. STRAITE:  The second area is the issue of

7  consent and that's something that we're seeing in both

8  Australia and Arizona, the idea that can you consent to or

9  not consent to the collection of information and sharing

10  information.

11      And both Arizona and Australia are prosecuting Google,

12  saying there is actually no control, it doesn't matter

13  whether you consent or not.  The same information is

14  collected, the same information is disseminated.

15      So those aspects of their investigation and their

16  prosecution are relevant here for the lack of control that

17  you have over the data.

18      Number three, I know you asked us to narrow.  So the

19  first two are -- even in the narrowing of the scope are

20  relevant, but if you could -- there is a basis to broaden a

21  little bit.  Inferred interests are actually part of this

22  case.

23      So if Google is disclosing to advertisers inferred

24  interest categories for targeting, how those inferred

25  interests are created, how they learn that you, for example,

41

1    might be interested in puppy dogs or in teddy bears or as

2    Ms. Pritzker said, more likely something more private, how

3    that information is collected and put into the verticals,

4    put into the profiles, that's relevant to this case.

5        So we agree with you that mostly -- you know, broadly

6    speaking, data collection is not this case.  This case is

7    about data dissemination.  What's being disseminated, the

8    interests that they infer that they tell people about you is

9    relevant and how that's created would be relevant.

10       One thing I left out regarding the Arizona case,

11   location tracking is relevant here.  One of the main

12   categories of personal information that we allege is being

13   improperly disclosed to the advertisers is your location,

14   your IP address, et cetera.  Under the CCPA, other aspects

15   of California law, that's personal information.

16       And Google says that they won't collect the personal

17   information and certainly won't sell it without your

18   consent.  In fact, they said they will never sell it.

19       So while Arizona is focusing on this tension between

20   tracking settings and what that means for consent, the

21   reality is that Arizona is alleging that Google is

22   improperly collecting the very location information that we

23   allege is being improperly shared to its advertisers.

24       So there is overlapping with Arizona.

25               THE COURT:  Okay.  We could spend an infinite

42

1    amount of time on this one.

2        Mr. Gutkin, you're raising your hand, like officially
3    raising your hand.  That's nice.

4        What I'm going to propose to do here is to have the
5    CID's provided to the Court so I can take a look.  Do we
6    really need -- is there something essential, Mr. Gutkin,
7    that you need to say in response to what Mr. Straite just
8    said?

9            MR. GUTKIN:  I'm just not -- your Honor, I'm not
10   aware of what he's talking about in Arizona with that
11   particular challenge.  And if you read their brief, it just
12   says the policy that was alleged to be misrepresentation
13   was, quote, "through an interface containing the same
14   promise at issue here."

15       I think that it's just a different promise in a
16   document that happens to also include here that they're
17   saying was breached in Australia.

18       I have many other reactions to what Mr. Straite just
19   said, but that was the one I was eager to provide.

20           THE COURT:  Okay.  Well, here's what I'd like to
21   ask and tell me if there's any problem with it.  Before you
22   all engage in any further discussion on this one -- and I
23   don't know if I will order that to happen -- I would like to
24   have the CID's and the complaints.

25       Now, if these are enormous complaints, maybe I'll

43

1  regret asking this, but I would like to see them.  I don't

2  think they're in the record already, but you can tell me.

3  If they are already in the record, I will not ask you to

4  re-file them.

5      Are they in the record already, either one of them?

6          MR. GUTKIN:  No, Your Honor.

7          THE COURT:  Okay.  Then I would like to see those.

8  I'll do an order asking for this.  But I think I'd like to

9  see what those are, so I can at least have some better

10  context for what you all are saying about what's within the

11  scope of those investigations and what is not.

12          MR. GUTKIN:  Your Honor, may I request that we

13  lodge the CID's rather than publicly file them so we don't

14  need to undertake motions to seal?

15          THE COURT:  Is there a protective order that

16  governs?

17          MR. GUTKIN:  There would be, yeah.  I mean there

18  are public versions.  I believe the Australian complaint is

19  entirely public.

20      There's a public redacted version of the Arizona

21  complaint but the requests themselves, I don't believe

22  either investigation would be public.  And if we could just

23  lodge them, that would save some time.

24          THE COURT:  I don't have any problem with lodging

25  just as a convenience, but -- is there any problem that the

44

1  plaintiffs see with that approach?

2          MS. PRITZKER:  No, your Honor.  I assume that's

3  what you asked for so --

4          THE COURT:  Okay.  Yeah, as opposed to filing.

5  Okay.  I'll make that clear.

6      Okay.  Moving on to requests seven, eight, nine, 10 and

7  11, these, as I understand them, encompass the preparation

8  for interviews and testimony by Google representatives.  And

9  there's also this question of the New York Times op-ed and

10 the effort that went into preparing -- to provide that.  So

11 the parties dispute both relevance and scope, burden, that

12 kind of thing.

13     On these requests I'm wondering whether it's useful to

14 limit what is being requested by reference to RTB, or if the

15 plaintiffs are confident that if I did that, none of these

16 things would explicitly fall within that zone.

17     So let me address that question first to the

18 plaintiffs.  I don't know who is arguing that issue.

19     If I just said anything related to RTB, yes, but not

20 anything related generally to privacy.

21         MS. PRITZKER:  I think it works.  Somebody's going

22 to kick me if I'm wrong, but I think it works for most of

23 these requests, with the possible exception of the New York

24 Times op-ed, which really talks more about Google's sort of

25 false promise to consumers that Google does not sell their

45

private information to third parties and tries to describe
ways in which -- you know, that they are fully compliant
with privacy laws and don't do exactly what we're alleging
in RTB.  I mean it's generic.  There aren't any specific
assertions of RTB in that New York Times op-ed by Google's
CEO.

So, you know, with that in mind, I don't know that --
yeah.

THE COURT:  But is about sale and dissemination to
third parties --

MS. PRITZKER:  It is.  It is.

THE COURT:  -- as opposed to just collection and
storage of private information, right?

MS. PRITZKER:  I mean he says in his op-ed, "To
make privacy real, we give you clear and meaningful choices
around your data, all while trying to be true to our
unequivocal policies that Google will never sell any
personal information to third parties and that you get to
decide how your information is used."

So yes, it's very much about dissemination of personal
information and personal data.

THE COURT:  Okay.  So let me ask for Google's
view.

Are there appropriate limitations like the ones I
suggested that would help resolve this dispute?  Like it's

46

1  limited to RTB or sale or dissemination of personal

2  information to third parties and any non-privileged

3  information that went into preparing a person who is

4  interviewing or testifying or writing these statements.

5         MR. GUTKIN:  So, your Honor, what you've suggested

6  is actually not far from what we agreed to do already, which

7  is that we said that we would provide this discovery with

8  regard to these kinds of external communications with

9  regulators that relate to the dissemination of user

10 information to third parties through RTB.

11     Your Honor asked if it could be limited to just all

12 such communications about RTB.  I would submit that's

13 unquestionably going to be too broad.

14     And I mean just to give you a couple of obvious

15 examples that they've asked for:  interviews, depos,

16 testimony, formal or informal.  So that means if there were

17 an interview in South Korea related to the existence of ad

18 fraud on RTB, meaning the question of do RTB advertisers

19 sometimes pay for traffic that turns out to be fake --

20 again, I'm making this up.  I'm not saying such questions

21 have ever been asked by South Korean regulators, but that

22 would be within the scope if we had to turn over every

23 interview, formal and informal, related to RTB.

24         THE COURT:  Okay.  So how about RTB and -- I mean

25 it would have to have the additional qualification of

47

1  personal information being sold or disclosed through RTB or

2  to other -- just to third parties generally.  If the

3  interview is not specific as to the mechanism, I think

4  that's arguably within the zone of what the plaintiffs are

5  asking for, but not just anything about general privacy

6  practices or anything like that.

7      So I'm trying to find a way to limit this so that it's

8  interviews, deposition or other testimony, or if it's not

9  testimony under oath, it's statements made to a regulatory

10  body or public writings like this op-ed.  That's the kind of

11  limitation I have in mind.

12          MR. GUTKIN:  Yes, so as long as it's -- I don't

13  know how to deal with the formal or informal inclusion in

14  the RFP.  But if it was formal interviews, depos and

15  testimony related to the dissemination of user information

16  through RTB, that's acceptable to Google.

17      And then I'd like to separately address the op-ed

18  piece --

19          THE COURT:  Okay.  Go ahead.

20          MR. GUTKIN:  -- if I can move on to that.

21      So what we're talking about here is effectively apex

22  discovery of the chief executive officer because he wrote an

23  op-ed piece talking generally about privacy and Google's

24  commitment to privacy.  And it's not specific to RTB.  A lot

25  of it is not even specific to ad targeting.

48

1      We cited your Honor's decision of the <u>Alta Devices</u>
2 case, that you need to have a factual basis to say that
3 there's going to be relevant information in the possession
4 of a senior executive of this kind before you can get
5 discovery.
6      And basically the entire link to this case that
7 plaintiffs are hanging their whole argument on is that he
8 reiterated one element of Google's handling of data, which
9 is that he made this one kind of partial sentence clause
10 reference to "We don't sell your information to third
11 parties."
12      But to bring in anything related to the chief executive
13 officer in connection with an op-ed piece that was not about
14 real-time bidding, that was about privacy generally, based
15 on that one statement is not proportional and also just not
16 consistent with the apex -- the doctrine of apex discovery.
17          THE COURT:  So I take your point, but my
18 suggestion here or my thought here is that it would be
19 limited to those statements in the New York Times op-ed that
20 have to do with sale or dissemination, that particular
21 statement of information to third parties.
22      And nobody forced the CEO to write that op-ed, and if
23 there was a basis or preparation, some documentation, some
24 research that went into his making that statement, that is
25 what I think the plaintiffs are after.

49

1    So I think it could be appropriately limited and it's

2    not an apex situation where the person is actually saying

3    the thing that is relevant to -- or arguably relevant to the

4    dispute.

5        So I don't really see what the problem if the request

6    is appropriately narrowed.

7            MR. GUTKIN:  Well, I guess that I would disagree,

8    your Honor, respectfully, that it's not an apex situation

9    where the chief executive officer of Google is talking about

10   privacy generally and one part of this discussion relates to

11   one of the representations they're talking about here in a

12   sentence clause and then that's opening up discovery of this

13   kind.

14       I mean, I think that what the topic --

15           THE COURT:  That's not what I'm saying.  You

16   misunderstand me.  It would be discovery limited to that

17   statement, not all the other statements that have nothing to

18   do this case.  That's what I'm proposing to do here by way

19   of limitation.

20       So the fact that that the CEO is an apex party or an

21   apex person, yes, you got that.  But I don't think that

22   there's really the same difficulty that was presented in

23   Alta Devices, given the fairly narrow approach that I'm

24   contemplating with respect to this one.

25       And this is about documents, right?  We haven't gotten

50

1  to the question of depositions, which is where this really

2  comes up.

3      So let me actually ask Ms. Pritzker, or whomever is

4  going to respond, a question about this interview issue.

5  What's an informal interview?

6          MS. PRITZKER:  I guess it would be one not

7  necessarily taken by a regulator, right?

8          THE COURT:  Okay.  You mean like a press?

9          MS. PRITZKER:  Or maybe a -- a pre-litigation

10 interview.  It could be by the press, it could be by a

11 member of the public, it could be by -- it could be -- yeah.

12         THE COURT:  I mean I have to have -- I think it's

13 helpful to have some concreteness to this question of if

14 it's not a formal interview by a regulator or Congress or

15 something --

16         MS. PRITZKER:  Right.

17         THE COURT:  -- or the media, I mean Google needs

18 to be able to find these things.  So we need to put some

19 boundaries around it.

20         MS. PRITZKER:  Well, a media interview I guess is

21 informal in the sense that it doesn't involve formal

22 proceedings, so I guess --

23         THE COURT:  No formal, okay.  So your request

24 encompasses a media interview.  And the way they would

25 figure out if someone was interviewed is if they are quoted

51

1   or referred to, right?  That's how they would know?

2           MS. PRITZKER:  Correct.

3           THE COURT:  Okay.

4           MS. PRITZKER:  Or there may simply be a record

5   that a media interview was conducted, whether it was

6   published or not, I assume.  Look, I think there are

7   probably ways to find this information.

8       And I just want to -- I did want to ask one question,

9   your Honor.  Is the limitation that you're proposing limited

10  to RTB or dissemination or sale of private information.  I

11  wasn't clear what limitation you --

12          THE COURT:  What I'm contemplating is

13  dissemination or sale of private information, personal

14  information to third parties, whether it's through RTB or

15  otherwise, but not RTB generally and not personal

16  information collection and storage generally --

17          MS. PRITZKER:  Okay.

18          THE COURT:  -- or ad targeting.  It has to be

19  dissemination or sale to third parties for advertising

20  purposes, is the idea that I have around how to resolve this

21  dispute.

22          MS. PRITZKER:  Understood.

23          THE COURT:  Okay.

24          MR. GUTKIN:  Your Honor, I want to respond.  I

25  don't know if you like or dislike electronic raising of the

52

1  hand, but since I have your attention --

2          THE COURT:  Go ahead.

3          MR. GUTKIN:  The RFP's in question do not include

4  media interviews, so that can't be the answer for what's

5  formal and informal.

6          THE COURT:  Okay.  Let me look back at them.

7          MR. GUTKIN:  I mean if you want to look at --

8  number seven is the first in the string of seven through

9  nine.

10          THE COURT:  Well, how do I know -- oh, I see.  So

11  the clauses to any regulator or government -- okay.  So that

12  cause modifies the whole rest of it.

13          MR. GUTKIN:  Yeah, so --

14          THE COURT:  All the things that -- okay, I got it.

15  Never mind.  Then we don't have to belabor that.

16          MR. GUTKIN:  Well, yes, what I was saying is, it

17  would include an informal interview with a regulator

18  anywhere in the world, and I don't know what that really

19  means.  But it definitely doesn't include, even by its own

20  limitations, media.

21          THE COURT:  Okay.

22          MS. PRITZKER:  I think the media inclusion just is

23  in nine.

24          THE COURT:  So let me have a look at nine.

25          MS. PRITZKER:  It's not limited to formal

53

proceedings, but it's about the allegations in the

complaint.  So anyway I think nine is broader than seven and

eight.

THE COURT:  Okay.  Well, I will think about it and

see what would make sense here, but this one could use some

narrowing and then I think you can have what you need, if

not necessarily everything that you want.

MR. GUTKIN:  Your Honor, I have one other comment

about the limitation.

THE COURT:  Yes.

MR. GUTKIN:  You said disclosure of user

information in RTB and then said or otherwise in

advertising, which I believe that those are just coextensive

circles on a Venn diagram.  But I wanted to be sure

because -- that it wasn't being broadened because the

complaint, the allegations in the complaint are all about

RTB, and I don't want to have to have this debate with

plaintiffs.

THE COURT:  Here's the problem.  I will be very

clear in my order, I hope.  But to the extent there is

testimony that is encompassing RTB but doesn't specifically

mention it, that would be fair game.  And what I mean by

that is if there's a statement that says in absolute terms,

"We do not sell or disseminate your personal information to

third parties without your permission," that encompasses the

54

1  allegations with respect to RTB.  It may not mention RTB

2  specifically, but that may be just because the discussion

3  was at a sufficiently high level that it can get into those

4  weeds.

5      But what I'm trying to say is that I don't mean to

6  include anything about RTB, only this dissemination or sale

7  of personal information.  But I do mean to encompass sale or

8  dissemination to third parties, even if RTB is not

9  mentioned, but not personal information collection and

10  storage generally.

11      So that's what I'm trying to carve out.  So I will try

12  to be very clear and sensitive to parties' concerns about

13  clarity in my order on this one.

14      Moving on to request number 22, technical details of

15  RTB is the issue here.  I don't really understand the

16  parties' dispute about documents reflecting collection and

17  storage of bid requests or user information.  Unless -- this

18  has come up a couple of times, but it seems to -- there a

19  couple of things going on here.

20      As a technical matter, often the appropriate solution

21  to the problem is to say produce documents sufficient to

22  show, whatever the operations are that are at issue.  So

23  whatever the functionality is of RTB, you have to produce

24  not every piece of paper that refers to it but documents

25  sufficient to show the operation and functionality.

1        What I'm not understanding is the part of this dispute

2   that has to do with plaintiffs' need to identify class

3   members.  So I'm hoping somebody could explain that to me.

4        Let me ask the plaintiffs.  What information do you

5   need to identify class members?

6            MS. PRITZKER:  I have to say that frankly on this

7   one, I'm at a loss.

8            THE COURT:  Okay.  Unless I have misstated your

9   argument, which is possible, I thought this was something

10  that you needed to identify class members.

11       So the briefs -- or the dispute submission says with

12  respect to subsets I and J, information about Google's

13  collection and storage is relevant to identification of

14  class members and calculation of damages.

15       I didn't understand that part.

16           MS. PRITZKER:  Well, I mean, again, I think

17  it's -- I think it does demonstrate, I guess, the reach of

18  RTB and I guess indirectly -- I mean if you can identify

19  through geolocation data and other data exactly what

20  information is being stored and maintained, you can identify

21  our class for purposes of the information that is

22  transmitted through the RBT process.  That's probably a very

23  good way to identify class members.

24           THE COURT:  Okay.  The class members are limited

25  to Google account holders in the first place, right?

56

 1          MS. PRITZKER:  Correct.

 2          THE COURT:  So you have that and then you have the

 3 further limitation which would be folks whose information

 4 was sold or disseminated to third parties through RTB,

 5 right?  Those are the folks who are within your class?

 6          MS. PRITZKER:  Correct.

 7          THE COURT:  Okay.  So I still don't understand why

 8 collection and storage is relevant, because you're really

 9 only worried about the back end -- or the front end.  I'm

10 not sure which end but the end that involves sale and

11 dissemination of information.  So you need to know who among

12 the Google account holders had that happen to them through

13 RTB.

14          MS. PRITZKER:  Right.  And that information would

15 be identified I guess in your back-end log or your back-end

16 information.  But it's still stored and maintained in a

17 collective way at Google.

18          THE COURT:  What is stored and maintained?

19          MS. PRITZKER:  The personal -- the information

20 about the user, right?  I mean what information is being

21 gleaned when they're touching -- you know, what information

22 about the user is being used to target advertisers.

23          THE COURT:  Okay.

24          MS. PRITZKER:  And what information is being

25 shared with the advertisers so they can bid on sending an ad

57

1   to that particular user.  So that's what information is

2   being stored, maintained, associated with a user and

3   monetized through the RTB process.

4           THE COURT:  Okay.  Let me ask Mr. Gutkin a

5   question.

6       If I said that the response to RFP 22 is documents

7   sufficient to show all of this technical information as

8   opposed to every piece of paper, would that be sufficient

9   for Google's purposes or something that describes the

10  functionality of RTB, how it works, that could be provided

11  to the plaintiffs?

12          MR. GUTKIN:  So, your Honor, I think I actually

13  have to approach this from a different tack, which is that

14  the things that are in dispute from 22 may be much narrower

15  than your Honor realizes.

16      22 is this A through Q, romanette (iv), list of

17  requests and we've agreed to produce documents for almost

18  all of this.  So the first --

19          THE COURT:  So just I, J and Q?

20          MR. GUTKIN:  I, J and Q.  And I actually don't

21  even think we have a disagreement about some of Q.

22      So I and J is just the location and manner in which we

23  store bid requests or the information that's in bid

24  requests.  And there's no relevance to just the location and

25  manner where we're storing data.  Not only is this not a

58

1 data breach case where it would matter if we were storing

2 data in some secure fashion.

3      Even the one claim that they had that related at all to

4 the storage of data, which was their Stored Communications

5 Act claim, fell by the wayside when Judge Koh ordered the

6 parties to narrow their case to the eight claims we would

7 litigate.  That Stored Communications Act claim is not even

8 an issue.

9      So Ms. Pritzker, respectfully, keeps referring to

10 various topics that have to do with the information that's

11 disclosed and how there is relevance to what is disclosed,

12 but that's the rest of 22, as well as numerous other

13 responses to which -- RFPs to which Google has agreed to

14 provide the relevant documents.

15      I and J is just the location and manner in which Google

16 stores bid requests or stores the information used or may be

17 used in bid requests and that's just not important.  The

18 storage, the housing, the database that houses these things

19 is not important.

20      Then turning to Q, the only other dispute from Google's

21 perspective in all of 22 is Q(i), the factors and analyses

22 that goes into selecting the winning bid.

23      So just a quick background.  We're talking about an

24 auction process where Google is going to receive many

25 different bids for an ad opportunity and it's going to have

59

1   to have a process for determining which bid is going to

2   produce the most money for the website publisher that's

3   hosting the ad opportunity and select from them.  And that's

4   going to be a whole complicated area of technical and, you

5   know, sometimes the moving target technical information

6   that's just not relevant here.  Like how is the winning

7   bidder selected is not relevant.

8       So we said for Q (i), that's not relevant.  And then

9   actually the other two that plaintiffs think of as in

10  dispute, Q romanettes (ii) and (iii), we already said we

11  will conduct a search for and produce documents sufficient

12  to show if the winning bidder gets any additional user

13  information from Google if there is any such thing and we'll

14  agree to do a search for and produce documents showing if

15  Google receives from the winning bidder any additional user

16  information if there is any such thing.

17      So we --

18          THE COURT:  I got it, I got it.  Thank you very

19  much for clarifying.  I do understand the scope of this

20  dispute and what you all are concerned about, so I don't

21  think I need more argument on this one.  I think we have so

22  many other matters to cover.  Let's move on.

23      Okay.  28 is drafts of exhibits attached to the

24  complaint.  I understand the plaintiff wants all documents

25  regarding discussions of the drafts, and Google has agreed

60

1  to produce earlier versions and non-privileged drafts but

2  not all documents discussing the drafts.

3      I have to say I agree with Google on this point.  I

4  don't understand why discussions of all drafts is really

5  proportional to the needs of the case.

6      It seems to me that once you have what Google has

7  already offered to produce here, that if there is something

8  that really seems to be critical for which it would make

9  sense to have all discussions about the draft, you could

10 seek that by way of follow-up as opposed to all discussions

11 about all drafts and all revisions of everything.  That just

12 seems to me to be way beyond what would be proportional

13 here.

14      And it's harder to find discussions of drafts than the

15 actual drafts or revisions themselves, so I think on a

16 burden point, that also makes sense.

17      So that's how I'm inclined to resolve this one.  If

18 anybody really needs to be heard on it, I will hear from you

19 that.  But otherwise, I'll move on.

20          MS. PRITZKER:  No, your Honor.  I think that's

21 sensible.  I mean, obviously, comments on drafts are

22 relevant for different issues, including the availability of

23 other reasonable alternatives or I mean there may be reasons

24 that are discussed in discussions about drafts that aren't

25 revealed in the drafts itself.  But I'm happy to take that

61

1 kind of piecemeal and we can follow up with that in

2 follow-up discovery.

3          THE COURT:  Okay.  Number 30.  Request 30 is about

4 analysis and decision-making in drafting policies including

5 collection and storage.  I understand that Google thinks

6 that this is not relevant, and the plaintiffs say that this

7 should not be limited to the United States, should include

8 collection and storage.

9     I'm really having trouble understanding why collection

10 and storage is relevant anyway.  We've kind of covered this

11 territory.  But the policies themselves are whatever they

12 are and then analysis and decision-making in drafting the

13 policies, including collection and storage, seems rather far

14 afield from what's at issue in the case.

15     So it's really a question for plaintiffs of why should

16 the discovery scope be this broad.  Who wants to take that

17 one?

18          MS. PRITZKER:  On the non-U.S. issue, there are

19 RTB participants, there are bidders who are foreign

20 governments or foreign entities.  So to the extent that

21 we're looking at ex-U.S., that's the information that we're

22 looking for.  So that information obviously is relevant to

23 the extent that Google is sharing personal information with

24 foreign entities or foreign governments.

25          THE COURT:  Okay.

62

1          MS. PRITZKER:  That to us was a relevant inquiry

2    here.  I'm searching for my notes on the other piece.  Maybe

3    somebody else wants to --

4          THE COURT:  David?

5          MR. STRAITE:  Thank you, your Honor.

6      And for the storage issue, one thing we didn't really

7    discuss before.  The manner of storage of this information

8    is highly relevant, not just for the merits of the case but

9    also for class certification, which we touched on a little

10   bit.  But how Google can access the database is relevant for

11   us for ascertainability, for ease of determining the extent

12   to which any person was served an ad through the RTB

13   auction, to the extent that that's recorded.

14      The information that's stored not only prior to the

15   auction, the manner in which it's accessed, that will then

16   bear on the feasibility of identifying class members.

17      If we know, for example, that in a millisecond Google

18   is able to query the back-end logs and determine who is the

19   best person to receive this ad or why, that sort of

20   information, the querying of the database of what they do

21   before the auction, learning how that's done will bear very,

22   very importantly on ascertainability, feasibility for

23   identifying class members, and then after the auction, the

24   extent to which any bid information is then stored, the

25   storage of the actual bid information is even more important

63

1 because then there was a successful bid.  And the extent to
2 which that's stored is relevant for the --

3          THE COURT:  So why can't you just ask Google like
4 whose information was provided in connection with an RTB bid
5 request?  Why can't you ask that question and they can tell
6 you whether they have the information or not?  Why do we
7 need discovery of, you know, layers of this?

8          MR. STRAITE:  Because it's more than just who was
9 served ads because of the RTB auction.  That's pretty much
10 all account holders.  It's going to be a very large
11 percentage of them, so that's not a real mystery.

12     The question is the calculation of damages, right?
13 It's the extent to which Google keeps track of the
14 monetization, keeps track of the revenues per user for these
15 ad impressions.  It's relevant to explore how that
16 information is stored, how easy it is to query the
17 databases.

18     We know that Google does it every second of every day.
19 Learning how that's done will then help in fashioning an
20 efficient class certification plan for the Court.

21          THE COURT:  Okay.  But that still kind of begs the
22 question as to why do you need analysis and decision-making
23 in drafting policies about -- I mean that's just kind of
24 like many steps removed from what you're describing.

25          MR. STRAITE:  This is maybe one where documents

64

1  sufficient to show, as your Honor had mentioned before,

2  might be a good first start.  And then if it looks like

3  there are targeted areas where we really do need more

4  information, we can come back here.  We try to avoid the

5  piecemeal fashion --

6              THE COURT:  Yes.

7              MR. STRAITE:  -- but there are times where that's

8  actually more efficient.  Maybe this is one of those times.

9              THE COURT:  Okay.  Well, let me ask Mr. Gutkin a

10  question about the limitation on the United States versus

11  other countries.  What is Google's concern there about

12  scope?

13             MR. GUTKIN:  So, your Honor, are you -- I'm not

14  exactly aware of where the dispute is over the limitation on

15  the U.S.

16     So the class is defined as U.S. account holders.  And

17  we've said that we would produce the documents that relate

18  to decision-making and analyses on our policies regarding

19  the use and sharing of information related to U.S. account

20  holders so I'm not --

21             THE COURT:  Okay.  Not to non-U.S. bidders.  It's

22  all tied to U.S. account holders.  I got it, okay.

23             MR. GUTKIN:  Yes.  So I'm not aware of kind of the

24  U.S./non-U.S. divide.

25     And just to respond to what Mr. Straite said, almost

65

1  all of which I disagree with but I don't use the time to
2  explain why, but this -- what we're talking about here is
3  just policies related to the collection and storage of
4  information.  That's what 30 is about.
5            THE COURT:  Right.
6            MR. GUTKIN:  We're saying that's not relevant.
7  They said in their brief on the offensive discovery, this
8  case, quote, "has nothing to do with data collected from the
9  devices."  It's just getting -- it's too far afield.  And we
10 said okay for use and sale of information but not collection
11 and storage policies.  That's just not relevant to anything
12 meaningful.
13           THE COURT:  Okay.  On this debate, since you all
14 have different interests depending on whose requests are at
15 issue, my understanding is that at least as far as a user's
16 own devices and behavior is concerned, that the reason
17 that's relevant is the question of consent but also the
18 question of whether a user has been harmed.
19      So if a user has taken steps to protect their private
20 information -- and that reflects a level of sophistication
21 or not.  Maybe haven't taken steps -- that impacts to what
22 extent they may have been harmed by the disclosure of their
23 personal information.
24      So Google is interested in that information, and I
25 understand why.  And, you know, that may dovetail with some

1  of the requests that plaintiffs are making about collection

2  and storage.  It's the user's behavior that I understand is

3  at issue in the case and then what Google does in light of

4  the directives or settings or conduct that the user has

5  engaged in to protect their personal information or not.

6  That's at issue too.

7        So, you know, I'm not sure I -- maybe I misunderstood

8  what your interests are here, but I think those things are

9  at issue and they cut different ways depending on the nature

10 of the request.  But to just say collection and storage is

11 irrelevant in one context and not another, I mean I don't

12 view the dispute that way.

13            MR. GUTKIN:  Well, so this is almost more Ms.

14 Spector's issue than mine going to our affirmative request,

15 but I think your Honor really hit the nail on the head when

16 saying that the information that's particular to the named

17 plaintiffs' results bears on or is relevant to the questions

18 of what -- you know, how they have their devices set up,

19 what were they doing on their devices, do they have harm, do

20 they have standing.

21      That's really a completely different set of issues than

22 the kinds of issues about what is Google collecting and how

23 is Google storing information.  That is not what's shared

24 with RTB participants.  On the defensive side, what matters

25 is what is shared with RTB participants.  But when were

67

1  taking discovery, there is no way to get at that from the

2  plaintiffs.

3      So what we can get at is, you know, how their devices

4  are set up.  That's kind of a short answer, but I mean I

5  agree with the way your Honor's thinking about this.

6          THE COURT:  Okay.

7          MR. GUTKIN:  But I think for 30, the collection

8  and storage policies are beyond the scope, beyond the reach

9  of what we should be doing.

10         THE COURT:  Okay.  Let me just ask from the

11  plaintiffs' perspective, do policies about collection and

12  storage have any bearing on the question of -- well, I'm not

13  going to ask that question until I get to your request for

14  production.

15     So let's move on to number 33, which is reporting on

16  user engagement in RTB and studies on the impact of privacy

17  breaches on user engagement.  This is one where I need a

18  little bit more context, and I'm not entirely sure that the

19  parties have really engaged with each other on the scope of

20  the dispute.

21     This seems like another one where the plaintiffs have

22  said, well, we'll narrow it to this.  And I'm not sure there

23  is a dispute if the request is narrowed as the plaintiffs

24  have described in the portion of the letter.

25     So referring to the letter, the plaintiffs say that

68

1  they want reporting on user engagement in RTB, which I just

2  said, and studies on the impact of privacy breaches on

3  engagement as relevant to the misrepresentation -- alleged

4  misrepresentation that Google doesn't sell your personal

5  information to anyone and the impact that might have on

6  account holders and the question of damages.

7       So what is Google willing to produce with respect to

8  request 33?

9            MR. GUTKIN:  So request 33, again going to the

10  request itself, is documents sufficient to establish

11  engagement on a monthly basis on Google's services.

12      So I have to point out that this one again started

13  crazy broad, but now let's just say it's only RTB.  So we

14  don't have the kind of they were calling it in our meet and

15  confer MAU.  That isn't the way data is tracked.  We don't

16  have that.

17      We are producing, we will be producing or probably

18  already have produced some other kinds of things that talk

19  about scope of RTB operations.  But the one requested here

20  is not something that we can reasonably give.

21      And then to the second point, which is about what I

22  consider to be a very vague request for documents relating

23  to the impact that privacy breaches have on user engagement,

24  it's like a totally separate RFP on a different topic.  But

25  I don't understand what that means.

69

1      They have not, to my knowledge, made any compromises to

2  put boundaries around how we would deal with that.  So that

3  would include -- I don't know what a privacy breach means

4  terms of their request, but does mean effect on Nest home

5  thermostat users based on some article about privacy related

6  to Google in the Wall Street Journal?  Like I really don't

7  understand how I could even try to respond to that, it's

8  just so broad and nebulous.  It's not a clear request I can

9  understand.

10          THE COURT:  Okay.  Let's break this down.

11      What do plaintiffs really want with respect to data

12  that is going to be helpful you think to -- let's start with

13  damages.

14          MS. PRITZKER:  To the extent that there are

15  documents or communications that that are prepared in the

16  ordinary course of business on a periodic basis about user

17  engagement, particularly related to -- generally but also as

18  narrowed to the RTB process or its impact on user

19  engagement, then that's what we want.

20          THE COURT:  So what would that mean?  So if I'm a

21  Google account holder and I am being served ads by third

22  parties based on my personal information, what kind of

23  metrics or statistics do you think would be relevant?

24          MS. PRITZKER:  I am assuming that Google runs

25  analytics on user engagement every second of every day

70

1  related to this.

2       THE COURT:  Right.  Are you interested am I

3  interacting with the ads, am I like skipping -- what are you

4  trying to figure out?  What's the nature of user engagement

5  you're trying to probe?

6       MS. PRITZKER:  I think it's both, you know, how

7  often are users sort of getting into the RTB process, how

8  often are bidders bidding on their information.  I mean it's

9  all kinds information related to their engagement with

10  services related to the RTB.

11       THE COURT:  Okay.  I'm having trouble

12  understanding it so that's not good.  And it may be a

13  function of you just don't know what data Google collects,

14  and I don't either.  But I'm just imagining you're sitting

15  there with your damages expert and you're trying to figure

16  out what information do you need and want to make your case

17  and what kinds of things do you think might be out there

18  that would be useful.

19       MS. PRITZKER:  I think on the other side, you

20  know, we've looked at that data privacy breach issue as a

21  kind of data point on which to measure sort of RTB's impact

22  on user engagement.  To the extent that there are prior

23  studies or analyses of what happened to user engagement or

24  with Google services as a result of a disclosed data breach

25  or some other wrongdoing with respect to the protection or

1  dissemination of personal information, you know, that's

2  potentially relevant or study of user engagements that are

3  shared with third parties as ways to get people to

4  participate in the auction.  You know, that information

5  would also be relevant to damages or, you know, the value of

6  this information to advertisers or that kind of thing.

7       So I'm certain that there are documents that are -- or

8  some that are -- I'm sure there are analytics or PowerPoints

9  or spreadsheets or, you know, analyses that are run on this

10 information all the time.  And, you know, obviously I'm not

11 sure getting it a daily basis would be useful to us, but you

12 know, some periodic basis from which we could measure user

13 engagement over the class period would be --

14       THE COURT:  Okay.  Let me ask a slightly different

15 question which is what is the plaintiffs' theory of damages

16 so far as you've been able to formulate it?

17       MS. PRITZKER:  It's basically an unjust enrichment

18 theory, your Honor, basically.

19       THE COURT:  So Google has been unjustly enriched

20 by being able to use personal information to sell ads to

21 have people pay for access.

22       MS. PRITZKER:  Correct, right.  They've monetized

23 people's personal information without their consent, and

24 that information has value, has monetary value that can be

25 measured.

1          THE COURT:  And forgive me for being a Luddite

2     here, but what does "user engagement" mean exactly?

3          MS. PRITZKER:  User engagement is basically, you

4     know, a way of evaluating or weighing the extent to which

5     people are using various Google services.  I think I'm

6     describing that accurately.

7          THE COURT:  Okay.  So like if --

8          MS. PRITZKER:  If I'm off, let me know, David, but

9     I think that's basically it.

10         THE COURT:  If I'm a Google account holder and I

11    stand 30 minutes a day, I don't know, going --

12         MS. PRITZKER:  On the internet.

13         THE COURT:  -- from website to website, yes, is

14    that what you're talking about, as opposed to if I spent

15    three hours a day doing that?  That's the kind of data that

16    you're trying to -- see, I'm trying to figure out how there

17    would be a metric that would tie RTB to that kind of

18    behavior and how you could get information that would be

19    useful in proving or disproving damages.

20         MS. PRITZKER:  Again, maybe we need to take some

21    depositions, but I'm certain that their analytics run on

22    this all day long at Google as to, you know, who is using --

23    who is accessing the internet, who is bidding on their

24    information and how much money Google is making off of those

25    particular bids.

73

1    I'm sure that that's an analysis that's run every

2  second of every day.

3        THE COURT:  Okay.  Have you all talked about this

4  issue?  I mean have plaintiffs and Google talked about this

5  issue and what there is?

6        MS. PRITZKER:  We have and it may be worth talking

7  about it more.

8    David, you wanted to say something?

9        MR. STRAITE:  Yeah, the answer is yes, we've

10 spoken.  But we could definitely use more conferring.  I

11 think Ms. Pritzker spoke pretty eloquently about the

12 economic damages theories that we're pursuing, the idea of

13 the unjust enrichment that's earned by we allege the

14 improper dissemination of personal information, but there

15 are other theories of damage here.

16    The most important one is the contract theory.  So if

17 you have a contract claim, there was a very clear promise

18 "We will not share your personal information."

19    At a minimum, California law recognizes nominal damages

20 for the breach of that contract, and then of course unjust

21 enrichment is another remedy there, another theory of

22 damages for breach of contract.

23    And of course there are also privacy claims.  You know,

24 the idea of the exposure of the personal information is a

25 breach of privacy.

74

1    So I would put three buckets in front of us and we

2 probably should deal with each of them separately because

3 they present different issues.

4    There's the contract damages, nominal damages and

5 otherwise.  There's the privacy harm.  And then there's the

6 economic damages.  They obviously overlap a little bit, but

7 they're worth discussing separately.

8         THE COURT:  Okay.

9         MR. STRAITE:  The user engagement question is the

10 idea it's not just, "Okay, if I can trust Google not to sell

11 my personal information, I'll surf the web more."  It's that

12 I might be willing to stay logged into my gmail account

13 more.  I might be willing to sign into the Chrome browser.

14 I might engage with Google products more frequently if I

15 trust that those promises are being honored.

16    If instead it is disclosed that "Hey, there's nothing

17 you can do about it.  Your personal will be disclosed during

18 the ad auction," maybe at that point, someone or a group of

19 people will say "I'll engage less with Google products.

20 Maybe I won't have a gmail account.  Maybe I won't use

21 Chrome.  Maybe I won't keep logged into YouTube."

22    Those actions, remaining logged in or not, will have an

23 impact on what's happening.  So the user engagement issue,

24 admittedly we're still learning.  There's a lot to learn in

25 this case, the extent to which those disclosures and

1  practices impact how people use Google services.  We don't

2  know yet but it's certainly relevant.

3          THE COURT:  Okay.  Thank you.

4      Mr. Gutkin, let me just ask this question, which is, is

5  there any kind of analysis that Google does on user

6  engagement generally?  Is there anything like that?

7          MR. GUTKIN:  So, your Honor referred to yourself

8  as a Luddite, and that was an unfair criticism because your

9  question is actually acute -- astute and exactly what the

10 point is here.

11     The user engagement concept is like a total square peg

12 for what they're talking about.  User engagement applies to,

13 you know, how often does somebody come to Facebook, how

14 often does somebody use Twitter.  It could apply to

15 something like Waze, how often somebody uses Waze.  But it

16 doesn't have any application in the context of real-time

17 bidding.

18     In real-time bidding, you wouldn't analyze user

19 engagement or monthly active users.  As we told them in meet

20 and confer, we don't.

21     And there are other requests, including some in 22 to

22 which we've agreed to respond, that relate to the scope of

23 the operations of RTB and, you know, the volume of auctions.

24 And that gets at everything relevant here.

25     So this kind of user engagement concept is really not

1 applicable in any way that makes sense when we're talking

2 about people using the web versus when we're talking about

3 people choosing to use a product like a Facebook or another

4 social media product.

5     Additionally, you could hear from the way that Mr.

6 Straite articulated his rationale for how we need to measure

7 the effect of privacy breaches on user engagement what an

8 incredibly impossible undertaking that would be to try to

9 respond to this RFP.

10     I mean is Google literally supposed to try to identify

11 every instance where anyone in the public believes that

12 there's been a privacy incident that's related to Google,

13 then go to each of its services and see if it's somehow

14 depressed use of those services?

15        THE COURT:  No, I think that they're asking you

16 for information that you've already collected and tracked,

17 not to create new stuff.  So I think it's like have you

18 studied this, do you have a reporting feature that says to

19 your various departments, "This is what happened when 'X'

20 event happened.  This is what the services experience in

21 terms of a decline or an increase."

22     I think that's the kind of thing that they're asking

23 about.  I'm just having trouble figuring how it's relevant

24 to the allegations in the complaint.  There may be some

25 data, I just don't know.  I still can't figure out what it

1  is.  We've been talking about it now for a long time.

2           MR. GUTKIN:  Yes.  I think it's not relevant.

3           THE COURT:  Yeah, I know.

4           MR. GUTKIN:  People choosing not to use gmail or

5  the Nest thermostat, I mean it's just -- come on, it's not

6  part of what we should be doing here.

7           THE COURT:  Ms. Pritzker, you wanted to have one

8  other go at it.

9           MS. PRITZKER:  Look, I think user engagement is

10 relevant because that is a metric by which Google gets

11 advertisers to bid on submitting ads to users, right?  It

12 measures content engagement, allows a business to determine

13 the level of customers and how to target them.  So it is

14 relevant.  It is an important piece of information.

15      All that being said, I'd like to end where we started,

16 that this, you know, frankly, is probably an area where I

17 think the parties should continue talking to see if there's

18 something that we can get to that would serve our purposes

19 and give comfort to Mr. Gutkin that the sky is not falling

20 with this request.

21      So if you would -- let's take this one off the table

22 for today and --

23           THE COURT:  That's fine. I'm happy to let you do

24 that.  And one avenue for further discussion might be if

25 there is a metric that matters to the people bidding, that

78

1 might be an area to pursue.  But I think it only makes sense

2 for Google to be asked to provide information that is more

3 or less readily accessible, not create out of --

4          MS. PRITZKER:  We agree.

5          THE COURT:  -- data some report.  I mean it's only

6 if there's something that's regularly reported or tracked or

7 studied or whatever that might be connected to the theory of

8 damages that would be an avenue for further discussion.

9     So, okay, I'm happy to leave that one to the side for

10 now.

11     With respect to the last one for this dispute which is

12 Google's market share for all digital advertising, again,

13 here's the difficulty I have.  I understand that this

14 request is connected to plaintiffs' damages case, and it

15 seems to me that RTB is sort of a subset of digital

16 advertising.

17     So what are you hoping to -- what are plaintiffs hoping

18 to discover with this request?

19          MS. PRITZKER:  I guess two things.  I mean market

20 share and digital advertising is clearly an important metric

21 to our damages theory and definitely demonstrates the

22 ubiquity of this practice and how many folks are impacted by

23 it.

24     But I think it's kind of a three little bears problem.

25 I mean Google will say that that kind of request is too

79

1  broad, that it doesn't have information that would break out

2  market share, particularly on RTB.

3      So we have to make some inferences, right?  I mean we

4  need to get to that just right spot.  And the way we get to

5  that just right spot is to try and start from the top and

6  see what comes up from the bottom and see if there's a piece

7  of information that gets us to where we need to be or gets

8  our experts to where we need to be in order to help

9  calculate damages, plaintiffs' damages.

10      I mean that's how I view this problem.

11          THE COURT:  Okay.  All right.  So it does seem

12  that market share might be a relevant component of a damages

13  analysis, but, Mr. Gutkin, how would Google request that

14  this RFP be limited given what information is available?  Is

15  there some way to narrow it?

16          MR. GUTKIN:  Well, not that I've come up with and

17  not that the plaintiffs have offered.  So I Googled across

18  all digital advertising.  That is a vast landscape in the

19  Google world.

20      So Google has services that help website publishers who

21  want to put an ad on their webpage.  There is Google.com,

22  which is the search site where Google runs a lot of ads.

23  There's YouTube which shows ads.  Then there are many

24  services that Google offers to advertisers who want to buy

25  online ad space, of which RTB is only one.

1    And I said, well, when you say you want the market

2  shares of all digital advertising, I assume you're excluding

3  at least everything on the publisher side, right?  And they

4  said no.  And basically they've said, no, we can't limit

5  this in any way.

6    And I would say also, I want to note just to make sure

7  we all see it, that this RFP is not just limited to like

8  documents sufficient to show a particular market share.

9  It's also all documents discussing or addressing that,

10  including third-party estimates of Google's market share.

11    So it's just an incoherently vague request that I

12  need -- I mean I need -- I objected to it and said I can't

13  comply with it, and I need plaintiffs to come up with some

14  proposal that's not everything under the sun, much less

15  every document discussing everything under the sun.

16        THE COURT:  Well, let me ask the question this

17  way.  So if Google does have documents sufficient to show

18  its market share, it seems like it might be useful to at

19  least provide that information and parse it in whatever way

20  it's capable of being parsed.

21    So, for example, if it's tracked in a way that

22  distinguishes publisher side advertising from the rest of

23  it, you can do that.  Or if this category contains all of

24  these different kinds of advertising, including stuff on

25  YouTube, including you know, these different services, you

1 could provide that information.

2       It seems like it's in Google's interest to do that, to

3 make the pie smaller, and why wouldn't you.  So for me it's

4 a question of what do you track, what do you have, not

5 what -- and if it's too high level and it requires the

6 parties to do some estimating, then that's what your experts

7 are going to have to do.

8       But I'm not -- I don't think it's reasonable to say any

9 and all documents and communications, including third-party

10 estimates of all digital advertising.  But documents

11 sufficient to show the market share for some relevant

12 category as closely tailored as possible to RTB related

13 advertising is discoverable.

14       So it's a question of what's available.

15            MR. GUTKIN:  Yeah, well, your Honor, another

16 complexity is kind of what is the market.  And so the

17 publisher side services -- there's one called AdSense,

18 there's one called AdMob -- that is not a market in which

19 RTB participates.

20       So it's all -- there is no way to respond to it as to

21 the market share in digital advertising.  But if it was --

22 you know, maybe there's a way that the parties could try to

23 figure out if we can navigate something that's document --

24 if we have such documents that are documents sufficient to

25 show something related to RTB specifically in the area where

82

1  RTB operates the services to advertisers looking to place

2  ads.

3      But I don't know exactly what's tracked, and I know it

4  would exclude much of what plaintiffs have asked for here,

5  in any event.

6          THE COURT:  Yeah.  I mean the concept I have in

7  mind is the narrowest possible market share data.  So you

8  know, the smallest salable unit kind of concept, right?

9      So whatever the sweet spot is for RTB, that -- you may

10 not be able to get to that specifically but you can get to

11 whatever is the next smallest thing that encompasses RTB

12 advertising.

13     So if you're excluding publishers, you're excluding

14 other categories, fine.  Just get as close as you can and

15 see what you have.  That's where I think the relevant

16 production lies.

17         MR. GUTKIN:  Yes.

18         THE COURT:  And documents sufficient to show.

19 That seems reasonable.  Not every single communication about

20 it.

21     So if you confer further, can you get to that point?

22         MS. PRITZKER:  I'm happy to accept that point,

23 but -- no, I mean I do think that's exactly the problem.  We

24 are trying to get to that sweet spot and simply saying that,

25 you know, "This is too much" and "This is too little," "We

1  don't have it in that particular form," doesn't get us

2  there.

3      So, yeah, if Mr. Gutkin and the good folks at Cooley

4  will go back to their client to try and see if these

5  materials exist in the way that your Honor has formulated

6  them, I think that will bring us a long way to resolving

7  this particular item.

8          MR. GUTKIN:  Yeah, I'm also not sure we're on the

9  same page, plaintiffs' counsel and myself, about the

10  relevance of market share at all.  But we can try to try to

11  work through that in kind of the same conversation to figure

12  out if there's some compromise or at least if we have any

13  kind of competing proposals or not.

14          THE COURT:  Right.  Okay.  And I understand that

15  it may be disputed from a damages perspective that market

16  share is not really relevant to the plaintiffs' damages.  I

17  get that.  It's not an antitrust case.

18      But I still think that that's a determination I

19  couldn't really make in the discovery phase, at least not

20  without a much more sophisticated understanding of the

21  claims and defenses.

22      So where I come down is it seems like this would be

23  discoverable.  It's not too burdensome.  And not too

24  burdensome some means documents sufficient to show what is

25  actually available, as narrow as possible.

84

1      That's kind of where I landed.  So I'm happy to have
2  you confer further with that guidance in mind.

3      And I think that takes care of docket 141 for now.  I'm
4  going to move on to docket 142, unless somebody has
5  something really critical they need to say.

6          MS. PRITZKER:  No.  Just thank you, your Honor,
7  and I really appreciate the time that you took to get us
8  through this lengthy dispute.

9          THE COURT:  Yeah.  You're all going to have to
10 wait until we're done so everybody's missing lunch until
11 we're finished, sorry.

12         MR. GUTKIN:  Thank you, your Honor.

13         THE COURT:  Okay.  Docket 142 is Google's request
14 for production to the plaintiffs.  And the first set of
15 disputed requests are requests three, five, six, 13, 14 and
16 22.

17     And I understand that these encompass generally
18 disclosures and communications regarding online ads,
19 damages, efforts to browse the internet anonymously
20 undertaken by the plaintiff.

21     And my understanding is that the dispute concerns, at
22 least in part, about how the plaintiffs plan to review and
23 produce documents.  And, you know, I want to make sure that
24 I am accurately understanding the parties' dispute here.

25     And let me just start by saying my general thought

85

1  about search terms and how they're used is the following.

2      Search terms are used to narrow the collection of

3  documents to be reviewed.  That collection is then reviewed

4  for responsiveness, and then you produce.  You can agree, if

5  you want to, to just produce whatever the search terms hit

6  on, if you want to but -- that could be efficient.

7      But normally that's not the way it works.  And so if

8  you find that a particular search term generates way too

9  many hits on non-responsive documents, then that's a signal

10 or a clue that maybe your search terms are too broad and you

11 have to do some narrowing and you adjust.

12         I think where this dispute is, is that somebody

13 has found -- the plaintiffs have found that the search terms

14 are hitting on -- well, that the documents that the search

15 terms hit on may be responsive but now the plaintiffs think,

16 well, they're not relevant.

17     Now, I'm not sure if I'm understanding you all

18 correctly and if the problem is search terms or what.  But

19 what is the problem from the plaintiffs' perspective?

20         MR. DANITZ:  Thank you, your Honor.  This is Brian

21 Danitz.

22     We felt we had reached an agreement on this and our

23 reviewers are going through tens of thousands of documents

24 as we speak.  And what we're doing is producing everything

25 we can, everything, except if it seems completely unrelated

1  to this case in any way but still sensitive to that person's

2  life.

3      So we are being overinclusive.  We are being

4  overinclusive.  So, yes, our production will include lots of

5  spam ads, for example, that we don't know whether or not

6  they're responsive, but Google's going to get them, right?

7      We're producing everything, but if something is a

8  personal email between friends that says "Cookie," you know,

9  they're not going to get it because it --

10          THE COURT:  Well, how would that be responsive?

11          MR. DANITZ:  It's not.

12          THE COURT:  Okay.  Well, then what's the problem?

13          MR. DANITZ:  There is none.

14          THE COURT:  Okay.  Well, let me ask Mr. Gutkin.

15      What's the problem?

16          MS. SPECTOR:  It's actually me, your Honor.

17  Kelsey Spector --

18          THE COURT:  Oh, sorry.  Ms. Spector.

19          MS. SPECTOR:  -- on behalf of Google.

20      So we've never argued that plaintiffs cannot review for

21  responsiveness.  We're perfectly fine with them doing so.

22      The problem has come in at a second step where they

23  have refused to commit to not also culling responsive

24  documents based on some undisclosed relevance criteria.

25      We also thought that we had an agreement and that

87

1  plaintiffs were going to produce responsive documents, but

2  they then kept qualifying and saying they might withhold

3  irrelevant documents as well, but we have no visibility into

4  what their relevance criteria is.  And that's where the

5  dispute has crystalized.

6         THE COURT:  Okay.  So, Mr. Danitz, are plaintiffs

7  withholding documents based on relevance even if the

8  documents are responsive to a request?

9         MR. DANITZ:  To the request itself, no.  To the

10  search terms, yes.  So, in other words, simply that it hits

11  on a search term --

12         THE COURT:  Yes.

13         MR. DANITZ:  -- does not make it responsive.

14         THE COURT:  I got it.  Okay.  Sounds like there's

15  no dispute.  You can't say it's responsive to a request and

16  yet not relevant to the lawsuit without having a

17  conversation with Google about that.  So that's the rule.

18      If it's responsive to the request and you think, "Oh,

19  wait, this is technically responsive to the request but it

20  really is not relevant to the lawsuit.  I don't really want

21  to have to produce this category of information," then you

22  have to have a conversation with Google about that so that

23  you all can sort out your understanding of the requests.

24      And if the requests encompass stuff that's not relevant

25  and you didn't appreciate that before, have a conversation

88

1    about it but don't just unilaterally decide.

2        So if you're not doing that, there's no issue.  Search

3    terms do not define the universe of responsive documents.

4    That's why you review after you get the search term hits.

5        Okay.  So I hope there's not really -- is there

6    something I'm missing?  But it seems like there really is no

7    dispute here.

8            MR. DANITZ:  Understood, your Honor.  Thank you.

9            THE COURT:  Okay.  And that's a good way to

10   resolve that one.

11       Okay.  Requests one and 23 are kind of grouped

12   together.  They concern forensic imaging, device settings,

13   and principally browsing history I understand is not the

14   exclusive concern but one of the major concerns.

15       I understand Google to say that plaintiffs' device

16   settings and conduct are relevant to damages.  I kind of

17   referenced this earlier.

18       The plaintiffs say, you know, there's a lot of

19   information that is private, citing to Riley and you've also

20   all referred me to Judge Van Keulen's decisions in the Brown

21   and Calhoun matters.  I understand all that.

22       So here's what I think is the right way to frame this

23   issue.  It does seem that the plaintiffs have put at issue

24   and the specific defenses Google has formulated do concern

25   plaintiffs' own behavior, the conduct that they've engaged

1 in, the settings that they've implemented, how they conduct

2 themselves online in terms of whether they're trying to be

3 anonymous or not.  That all seems to be relevant.

4      But what I don't understand is with respect to browsing

5 history as an example, unless the plaintiffs contend that

6 Google is actually selling or disseminating or using

7 browsing history in the RTB process, I don't understand why

8 there needs to be some discovery of any individual

9 plaintiff's browsing history, just taking that as an

10 example.

11      So let me ask Google that question.

12      Why is discovery of individual plaintiffs' browsing

13 history relevant to anything?

14           MS. SPECTOR:  I'm happy to answer that.  So there

15 are a couple of reasons why.

16      The first is that are alleging that plaintiffs are

17 alleging that Google targets ads based on sensitive

18 information that they glean from a user's web browsing

19 history, and I would point you to paragraph 150.  This goes

20 back to the verticals issue.

21      They state that detected verticals are inferred data

22 about web browsing history that Google is selling and from

23 which Google RTB participants can compile and augment their

24 own detailed dossiers about account holders.

25      So they have put this at issue, but I would also note

90

1  as we argue in our MTD, the detected verticals actually

2  reflects information about the publishing website.  And they

3  have alleged that they're seeing allegedly harmful ads based

4  on their browsing history to these supposedly sensitive

5  sites.

6       We are therefore entitled as a matter of course to get

7  a hold of documentary evidence that shows their web browsing

8  history so we can assess issues like standing, damages,

9  adequacy of representation.

10      And if the plaintiffs have not supposedly visited any

11 sensitive websites -- you know, I know my grandpa uses the

12 internet to like access his email account.  He would not be

13 an adequate representative of this class.

14      And those are the kinds of issues that we need

15 plaintiffs' web browsing history to explore.

16      And then --

17           THE COURT:  Wait.  Before you go off the point, so

18 if the allegation is that plaintiffs' browsing history is

19 being used to identify them for particular target

20 advertising, then presumably that's information that Google

21 already has.  Like it's been put into whatever profile or

22 information set is shared with the potential advertisers,

23 the RTB bidders.  So why wouldn't Google already have that

24 information?  Why would you need to discover it from the

25 plaintiffs?

1          MS. SPECTOR:  I don't know that Google has that

2  information.  I mean we disagree on the nature of how RTB

3  works.  That does not excuse plaintiffs from meeting their

4  own burden.  Whatever information Google has does not excuse

5  plaintiffs from meeting their own discovery obligations.

6  And because they put this information squarely at issue --

7          THE COURT:  But it's not at issue in the sense of

8  like -- just to take an example.  I go and visit some site

9  that would be embarrassing if you knew about it, right?  So

10 that's the thing.  So let's call it a sensitive site.

11      So I'm a plaintiff and I go and visit a sensitive site.

12 And you want to know that, that that's happened or not.

13      If what the plaintiffs are saying is true, then the

14 documentation of my visiting that sensitive site should be

15 something that Google has.  And Google can either

16 demonstrate that it doesn't have it or demonstrate that it

17 does.

18      I mean that should be information in Google's

19 possession and you wouldn't need me to give you a list or

20 access to my whole browsing history to show that I did go to

21 that sensitive site or not, unless there's really a dispute

22 about like people are getting targeted with ads when they

23 didn't visit a sensitive site.

24      And I'm putting aside the class representative issue

25 for a moment.  But I just want to understand how the

1 plaintiffs having said you're collecting all of this

2 information about me including my browsing history puts at

3 issue discovery of their browsing history if the allegation

4 is Google has it in its database already, just go find it.

5          MS. SPECTOR:  Well, to address your point, I'm not

6 sure that we would know.  We have a difference of view on

7 plaintiffs' allegations, and I don't know that we can know

8 what websites they've visited.  And this gets into a later

9 request about plaintiffs' My Activity.

10      Plaintiffs control what Google has access to.  And

11 because plaintiffs have put these sensitive topics at issue,

12 I think we have to get access to their web browsing history

13 so that we can ask them whether they have seen ads based on

14 the websites that they visited.

15          THE COURT:  So are you saying it's possible that

16 if the plaintiffs had said -- have set some setting in their

17 My Activity function, that an advertiser might be able to

18 discern a user's browsing history but Google won't know

19 that?

20          MS. SPECTOR:  Sorry.  I confused topics.  Let's

21 put My Activity aside for a second.  I take your point as

22 is.

23      We -- just going back to the browsing history, we

24 contest plaintiffs' allegations --

25          THE COURT:  Right.

1    MS. SPECTOR:  -- and that we of course have

2  discovery.  But plaintiffs have said that Google is

3  inferring information based on their web browsing history

4  through these detected verticals.  We need to know to test

5  plaintiffs' standing or harm whether or not they have seen

6  ads based on these sensitive categories.

7    And it's not going to be sufficient to ask them in an

8  interrogatory or a deposition whether they've seen ads

9  targeted to sensitive information, because they may not

10  remember.  They may have a different understanding of what

11  is sensitive.  They may have an understanding of sensitivity

12  that does not align with the vertical information that

13  they've put at issue in this case.

14    And because plaintiffs have interjected their web

15  browsing history into the heart of the matters at issue, we

16  need to be able to see documents so that we can test their

17  standing, adequacy and alleged damages.

18    THE COURT:  So for what period of time is browsing

19  history relevant in terms of collection of it?  There's

20  discussion about a forensic image of settings and other

21  information as of the date of the complaint.  So is that

22  what you're after, is a snapshot of browsing history on a

23  particular day?

24    MS. SPECTOR:  Yes.  So plaintiffs have actually

25  conducted this forensic imaging already as a matter of

94

 1  preservation.  What we're asking is for them to then produce

 2  snippets of that forensic image to us so that we can

 3  evaluate their claims.

 4          THE COURT:  But your understanding is it's a

 5  single day or --

 6          MS. SPECTOR:  Yes.

 7          THE COURT:  -- is it over a period of time?

 8          MS. SPECTOR:  Single day.

 9          THE COURT:  Browsing history on a single day.

10          MS. SPECTOR:  Yes.

11          THE COURT:  Okay.  Taking that as an example.

12          MS. SPECTOR:  At least for the forensic image.

13  We've served some other discovery requests that are not

14  currently before you that have to go preservation.

15          THE COURT:  Okay. All right.  Thank you.  Let me

16  hear from the plaintiffs on this issue.

17     I mean I do understand that among the pieces of

18  personal information that the plaintiffs are concerned

19  about, it does include their browsing history, so why

20  wouldn't you be in a position of having to share that

21  information in order to prove your claims and also to prove

22  that your plaintiffs are in a position to represent those

23  members of the class who believe that their browsing

24  history, sensitive information was disclosed to RTB bidders?

25          MR. STRAITE:  Thank you, your Honor.  David

1  Straite for plaintiffs.  I'll take that one.

2          THE COURT:  Okay.

3          MR. STRAITE:  So first, to clear up some

4  confusion.  This case has nothing to do with the sensitivity

5  of any ads shown to the plaintiff.  So when we talked

6  earlier about the buckets of our claims, we have the

7  contract damages.  We have privacy damages.  That includes

8  statutory damages in that bucket.  And then we have the

9  economic harm.

10     None of that is about anybody feeling offended that

11  they saw an ad.  What ads were actually shown is not

12  relevant to the case.  It is not part of damages.  It is not

13  a part of the claim.  That was simply part of the factual

14  description in the complaint of how the process works, but

15  whether I was shown an advertisement with a Tyrannosaurus

16  rex or with a Toyota, that has nothing to do with anything.

17     So all that matters for the case, all -- part of the

18  claim is what personal information was leaked in the RTB

19  auction in the process of deciding what ad to serve to whom.

20  But the actual ad shown isn't relevant.

21          THE COURT:  Got it.  Okay.

22          MR. STRAITE:  As to the issue of the web browsing

23  history, Google has -- as you know with the browsing

24  history, they're likely to have more web browsing history

25  because most people don't keep a lifetime of web browsing

96

1  history, so Google will have a more complete set.  And more

2  importantly, Google keeps a record of who won the RTB

3  auction, what ads were served and how much revenue was

4  generated.

5      Google has the complete set of data key to the

6  plaintiffs.  Plaintiffs don't have any of that information

7  so to be asking for it is duplicative.  And to the extent

8  it's not duplicative, it's completely irrelevant.  Talking

9  about relevancy, we talked about the sensitivity websites.

10  It's completely not at issue.

11      Whether the same information is leaked to Toyota or

12  whether it's leaked to a porn website, it's the same

13  personal information.

14          THE COURT:  I understand that.  But I am looking

15  at your own case summary presented to Judge Gonzalez Rogers

16  which says that the plaintiffs allege that conduct by Google

17  and through which Google earned substantial revenue violates

18  California and federal law and that among the explicit

19  promises to Google account holders is that Google will not

20  use certain sensitive information like race, religion,

21  sexual orientation or health for advertising purposes.

22      My understanding from the briefing on the discovery

23  dispute is that one of the ways that you all believe Google

24  obtains that kind of sensitive information is by looking at

25  someone's browsing history.

1      So why not produce the snapshot, the one day that

2   encompasses browsing history.  And if the argument is Google

3   already has it, well, then why are we fighting about it?

4            MR. STRAITE:  Right.  And they have a more

5   complete set and --

6            THE COURT:  Okay.  Well, then --

7            MR. STRAITE:  Because there may be browsing that

8   was not then reported to Google.

9      Say, for example, that a plaintiff visited a sensitive

10  website or any website, and suppose that particular activity

11  did not go to Google, it's literally not in Google's

12  possession, well, then it's not a part of the RTB case.

13     And so Google is getting additional web browsing

14  history that they don't have.  It's unnecessary and it's

15  intrusive when they have everything that's relevant.

16           THE COURT:  But Google just told me that they

17  don't have everything.  So who is right?

18           MR. STRAITE:  I'm not sure that --

19           THE COURT:  And how do I know?

20           MR. STRAITE:  Right.  So the first -- the way we

21  could find out would be to produce everything that Google

22  has on the plaintiffs, their identifiers and their devices.

23     Once we see what they have -- right?  So that would be

24  an easy first step.  Just for the main plaintiffs, not for

25  the whole class, if Google produced all information and data

98

 1  they have associated with the main plaintiffs, with their

 2  identifiers and with their devices.  Very simple, including

 3  the actual inferred data, their verticals.

 4      Once we saw that, including the web browsing history,

 5  then we can say "Look, they have all this information

 6  already.  There's no reason to intrude their privacy more."

 7          THE COURT:  Okay.

 8          MR. STRAITE:  That would be a good step.  We can

 9  then come back and then match it.

10          THE COURT:  Okay.  Somebody tell me why Google

11  doesn't have the information that Mr. Straite is talking

12  about, about -- just focusing on browsing history.  Why

13  don't you have that?

14          MR. GUTKIN:  Your Honor, this is Jeff Gutkin from

15  Google.

16      We don't have anything like what Mr. Straite is

17  describing about complete web browsing history for an

18  individual.  Google doesn't and couldn't keep all of that

19  information for all time for all people on the internet.

20  And it would not in any event relieve plaintiffs of their

21  obligation to produce relevant discovery, that Google should

22  somehow have to go first, turn over everything that Google

23  has -- which Mr. Straite has overstated -- and then

24  plaintiffs can therefore go in and see, well, what doesn't

25  Google have and we'll see if there's anything additional we

99

1   have to turn over.

2        Additionally, I just want to --

3             THE COURT:  Okay.  That's not really what I

4   understand to be the problem.  The problem is, Mr. Straite

5   is saying the plaintiffs have information that Google has

6   never had, so the way that we should solve this problem is

7   the information that Google actually has and collected on

8   whatever the date is that is the date of preservation,

9   whatever that is, that's sufficient for everybody, both the

10  plaintiffs and the defendant, because then everything will

11  know what Google has and collected.

12       If there's some way that -- and I understood Ms.

13  Spector to say that a plaintiff can control what Google can

14  know about them about their browsing history, then I don't

15  understand how Google could have it and not know it has it.

16  And that's what I'm struggling with.  But I'd like to focus

17  the dispute on the information that Google is actually

18  allegedly using to entice people to serve ads.

19            MS. SPECTOR:  Can I clarify?

20            THE COURT:  Sure.

21            MS. SPECTOR:  And I'm sorry, I may have introduced

22  this confusion.  So we have requested information associated

23  with plaintiffs' accounts because they are alleging that

24  plaintiff (sic) packages and sells that information.  That's

25  RFP 17.

1      There is a separate issue that has to do with these

2  detected verticals.  Plaintiffs put two kinds of vertical

3  information at issue, user verticals and detected verticals.

4      As plaintiffs admit in their complaint, user verticals

5  are not used in RTB currently.  What is shown is detected

6  verticals and this reflects information about the website on

7  which the ad is going to be displayed.  That's the

8  information that we, to my knowledge -- and Jeff can correct

9  me if I'm wrong -- we don't have that in aggregate, and we

10 need to be able to test and ask plaintiffs if they've seen

11 ads based on sensitive categories to test these allegations

12 about detected verticals and their claims that we've -- that

13 Google has breached its promises to account holders.

14          THE COURT:  But we're only talking about a

15 snapshot in time, right?

16          MS. SPECTOR:  The plaintiffs' web browsing

17 history, for the forensic images, yes.  But that would allow

18 us -- even just that snapshot is more than we presently

19 have, and it would give us material that we could use to

20 evaluate their claims and also follow up with additional

21 written discovery and deposition.

22          THE COURT:  All right.  Yes, Mr. Straite, go

23 ahead.

24          MR. STRAITE:  It also bears repeating that there

25 are lots of instances where information is leaked in the RTB

101

1 auction that does not result in an ad being placed, right?
2 So there are lurkers, there are people out there, hedge
3 funds, foreign governments, some not so savory, who are
4 collecting information.  They're not serving ads, they're
5 just collecting the information.
6     Google has a record of all of the participants.  Google
7 knows with precision each time information is fed into the
8 RTB auction and then the extent to which ads are served.
9     What was actually seen by the plaintiffs is not
10 relevant. So you could have a plaintiff who never once
11 looked at an ad.  They always looked away every time the ad
12 was put --
13          THE COURT:  It's not about the ad.
14          MR. STRAITE:  Right.
15          THE COURT:  It's about the information that is
16 shared with a third party.  I get that.  So please let's
17 just focus on that part.  I am not really caring about what
18 the ad is.  I'm just caring about what the information is --
19 the personal information that is allegedly shared with third
20 parties.
21     And if there is a single day that includes the user's
22 device settings at that time, the user's browsing history,
23 the user's device identifiers and their geolocation,
24 whatever it is, it's one day.
25          MR. STRAITE:  Right.

102

1              THE COURT:  And I am just -- you have put that at

2    issue.  You have said this information is being used by

3    Google to serve -- to allow third parties to serve as --

4    whatever the ads are -- to serve ads to these people.  And I

5    just see how you haven't put it at issue.

6          And I think it's a distinction not only between this

7    case and Brown and Calhoun, but it's also a huge difference

8    between this case and Riley.

9          Riley is about a warrantless search by the government

10   of the entirety of somebody's cell phone in the context of,

11   you know, the traditional notion of a search incident to

12   arrest.

13         These are plaintiffs who have initiated an action and

14   are seeking damages in a civil case in a totally different

15   context.  I understand that all kinds of personal

16   information is stored on electronic devices and it can be

17   highly sensitive.  So that point from Riley is well taken.

18         But the interests of the parties here are entirely

19   different, and there's an ability to protect people from

20   inappropriate use in litigation of information that might be

21   disclosed of a highly sensitive nature that we can undertake

22   here.  I'm not sure what that -- you know, if your

23   protective order is sufficient or whether some other

24   protection is warranted here.

25         But I'm having a really hard time when I'm faced with

103

1  plaintiffs saying Google has it all already and Google

2  saying no, we don't.  And the fact that it's highly

3  sensitive personal information seems irrelevant if you're

4  saying they have it already.

5      Okay.  So Google has it already, so we've already

6  passed that hurdle.  So there's lots of briefing about <u>Riley</u>

7  and this and that.  It seems to be not the issue.

8      So why isn't it just -- I mean the device setting

9  arguments are well taken, and I'm going to allow that to

10 be -- I'm going to require that be produced.

11     It's absolutely relevant to know how the devices were

12 set up and what the individual plaintiffs were attempting to

13 control about access to their information.  That is totally

14 relevant.  I don't see any way around that.

15     But the browsing history is kind of confounding.  So

16 sorry for the lecture, but Mr. Straite, would you like to

17 respond to that?

18         MR. STRAITE:  Yes.  I appreciate the opportunity.

19 I'll take them separately.  I'll start with the device

20 settings.  We hadn't had a chance to speak about them.

21     The device settings, part of the concern is we're not

22 sure what Google means by "device settings."  If Google is

23 saying the settings on the browser, that's something we can

24 have a conversation about.  We absolutely look forward to

25 having another meet and confer if that is what they want to

104

1  limit device settings to.

2      If instead device settings include say all the apps,

3  which we view both not relevant and also highly intrusive --

4  say, for example, we have a client who has a dating app and

5  he goes out and he turns on location settings and his

6  privacy setting so that he can see what other potential

7  dates are nearby.  There are these location features where

8  you can see who is nearby and that's how these devices work.

9      None of that is relevant to RTB auction, but it's

10  incredibly sensitive, even knowing the name of the app.

11  Some of these dating apps are not -- called dating

12  euphemistically.  That's not appropriate for Google to see.

13  And the settings have nothing to do with whether Google

14  takes personal information that it has and gives it to

15  RTB --

16          THE COURT:  So you're saying that the plaintiffs

17  are not alleging that any of this information associated

18  with those apps made it into the RTB auction?  You're going

19  to stipulate to that?

20          MR. STRAITE:  We can for all of -- for those apps,

21  absolutely.  So if that's what we need to do, we can go down

22  and have a meet and confer with Google regarding the

23  relevance of the apps, but more importantly it's the

24  sensitivity of the apps.

25      And going back to the first principle.  If Google took

1  the information and put it into the profiles or as part of

2  the verticals or if it was given to third parties, they have

3  a record of it.  And that's the first place to look for the

4  information.

5      But these device settings, we're not quite sure what

6  that means.  It seems to involve a lot of irrelevant and

7  really sensitive personal things -- banking settings which

8  don't seem to be relevant, dating apps, health apps, which

9  we don't understand how that --

10         THE COURT:  So let me just say, again, reflecting

11  my Luddite-ness here, I think I have gone and said, okay,

12  private setting generally, and then you can see a bunch of

13  apps and you can app specific setting.

14     So do you have any problem with privacy settings

15  generally on a given device?

16         MR. STRAITE:  We can go through all the various

17  settings with Google, have a meet and confer quickly.  We

18  can expedite that, your Honor, and say okay, let's go

19  through the general device settings versus it's the app

20  specific settings that disclose what the apps are.  That's

21  really sensitive.

22     But I hear your point.  Maybe a device setting that is

23  more general, we can talk about that.  That's something that

24  would be less sensitive.

25         THE COURT:  I'm going to hear from Google on this,

106

1 but it seems to me that to the extent the plaintiffs are

2 contending that their activity with respect to any

3 applications or any website got sucked into this profile

4 information, whether inferred or explicit or whatever terms

5 you all are using, to the extent those allegations encompass

6 that activity, and you say that that was used in the RTB

7 bidding process, then you have put that at issue, the

8 plaintiffs have put that at issue in some way.

9        And if you're willing to -- I don't know if this would

10 work for the defendant.  But if you say no, no, no, we are

11 confident that that's not part of the RTB bidding process so

12 therefore, it shouldn't be discoverable, then that's another

13 thing.  But I'm not sure that the defendant agrees with you

14 about that.

15        MR. STRAITE:  That's a great conversation to have.

16     So if we have a client who has -- you know, he has his

17 dating app.  If Google can confirm that information from

18 that is not a part of the RTB process, then that app is no

19 longer relevant -- if Google confirms that they are

20 receiving personal information through the use of that

21 dating app, okay, now that's a different story.

22     So that might be a useful first place to start, is

23 which apps does Google receive information from specific to

24 RTB.

25        THE COURT:  Okay.  What is Google's thought about

1 how we cut through this?  Because on the one hand I can see

2 that there is certain information, which if it's really not

3 at issue, like nobody thinks that Google is using it for any

4 purpose, fine, we can leave it out of the discussion.

5      But if there is a dispute, I'm not sure how we navigate

6 that.

7           MS. SPECTOR:  I would start with the first part.

8 I have two points I want to address.  First, I want to

9 address this dispute about what information is being used.

10 And then second, I want to address plaintiffs' cookie

11 matching allegations, which are separate and apart from

12 information that Google may be -- is allegedly sharing.

13      To the first point, I'm hearing something problematic

14 and I'm hesitant to go back to meet and confers, because

15 plaintiffs have repeatedly taken the position that they

16 don't need to get us information until we hand over

17 information and then they can judge amongst themselves what

18 really is at issue in this case.

19      Whatever information Google has cannot excuse

20 plaintiffs from producing information relevant to

21 allegations that they have put squarely at issue in this

22 case.  And you hit the nail on the head when you said that

23 they're alleging that this is all -- Google's building these

24 comprehensive profiles.

25      But the second point is one that is very important and

1  that I didn't hear David address.  Plaintiffs are alleging

2  that Google provides some kind of cookie matching service

3  that allows advertisers to re-identify an individual ad

4  target once their callout is placed in the RTB.

5      And plaintiffs' cookie settings on apps, including like

6  Bumble who runs its own advertisements, is going to be

7  relevant because if plaintiffs have granted Bumble

8  permission to run ad cookies on their app, that is going to

9  affect plaintiffs' privacy interest in their -- the claims

10  that they've asserted in this case.

11          THE COURT:  Is the issue here, from the

12  plaintiffs' perspective, that you don't want Google's

13  lawyers seeing this information, or is it like -- one

14  possibility would be you have some neutral who receives

15  forensic images in an anonymized way, sorts through them,

16  figures out what's relevant, what's not relevant based on

17  some criteria that we establish, and then gives the

18  information to Google.

19      So if it's the case that there are websites or apps

20  that have nothing to do with RTB and everybody agrees on

21  that, then they can just be excluded from what's disclosed

22  to Google about a particular plaintiff.  But you have some

23  neutral person making that assessment in the first place.

24      Are you all just worried about Google's lawyers having

25  this information or -- what is the problem?

1    MR. STRAITE:  Right.  And I think -- talk about

2  hitting the nail on the head.  Is the privacy interest of

3  the plaintiffs, we're not concerned there's any information

4  here that hurts the case.

5    We're concerned about their privacy interest being

6  unnecessarily intruded upon.  You talk with a neutral --

7  this was actually an approach that we did -- I worked with

8  Mr. Danitz on another case, the Apple iPhone throttling

9  case.

10    We actually had a neutral looking at forensic images of

11  the phones with the purpose of the third party there so that

12  Apple's lawyers wouldn't see all of the content and all of

13  the app settings.  There we were looking at bench testing

14  the performance of the device.  We wanted to make sure that

15  the content and the privacy wasn't given over to the

16  lawyers.

17    Here, Google's lawyers actually do want to see the

18  settings.  They actually do want to see the web browsing

19  history.  They want to see the websites that are being

20  visited beyond what they already know about, and that's the

21  problem.

22    We can try, your Honor.  We can absolutely in good

23  faith see if there's a way that a neutral third party solves

24  the privacy problem.  But, again, because Google wants to

25  see the actual web browsing -- which is what was shielded in

110

1  Apple.

2      And Judge Davila approved what the special master did

3  there with the neutral.  It was very closely guarded.  It

4  was only actually 10 plaintiffs.  The only thing we did

5  there was a sample.  We had a small percentage of the

6  plaintiffs -- Brian will correct me if I'm wrong.  I think

7  it was 10 out of 200 -- just to see if that was something we

8  could work with.  That's another idea, is that maybe it

9  could be a sample here.

10      We have 16 plaintiffs.  Maybe it would be two or three

11  and see if it works.  Maybe we can come to terms.

12      I just -- the big hurdle is going to be that Google

13  actually wants the information that we shielded from

14  disclosure in Apple.

15      So we can meet and confer over it and see if that's a

16  way to get past the impasse.

17          THE COURT:  I'm trying to avoid further meet and

18  confers.  That might prolong the process here.  Let me ask

19  Google this question.

20      If you had app specific settings for each plaintiff,

21  what would you do with that information from a discovery

22  perspective?

23          MS. SPECTOR:  So we would want to ask whether they

24  had seen any targeted ads based on the owner of the app.  So

25  take, for example, Bumble.  Plaintiffs are alleging that

111

1    they have been targeted with sensitive ads.  We would want

2    to know whether they saw any ads related to Bumble that they

3    consider to be sensitive and, especially, it would change

4    depending on whether or not they had enabled ad cookies.

5        As plaintiffs have alleged that the context of ads

6    matters and so if you're like seeing an ad for Bumble on

7    Bumble, that's different than seeing an ad for Bumble on the

8    New York Times.

9        And because they have alleged that Google has shared

10   all of this information through the RTB I think we want to

11   follow up to see if they had seen ads related to those apps.

12           THE COURT:  So your theory is that perhaps the

13   Google -- the Google account holders are seeing ads related

14   to permissions they've given particular apps or particular

15   websites and not based on whatever permissions they've given

16   Google?

17           MS. SPECTOR:  Yes.  I mean the permissions that

18   they've given apps who serve -- who also participate as

19   advertisers is relevant and affects their privacy interest

20   especially vis-a-vis the cookie matching allegations.

21           MR. STRAITE:  And we disagree.

22           THE COURT:  Just a moment.  So if Google has

23   information about -- let's just assume that Google has a

24   repository of information about what plaintiff A did on a

25   particular date in question when a forensic image was

112

created of their device.  So you could say we have a record
of what websites you visited or whatever and also a record
of what ads you saw through the RTB process.

So let's say you had that information and you could
look at that and say this person wasn't actually served any
ads through RTB or wasn't served ads from this source
through RTB.  But then the plaintiff -- plaintiff A is
saying I saw this kind of ad and I saw that kind of ad and
it had to be based on my personal information.

Then are you suggesting that Google could then defend
itself by saying that -- compare and contrast.  Here is what
you could have seen via RTB and here is what you actually
saw, and those two things don't match, so there must be some
other reason besides Google's RTB process that caused you to
believe that your private information was shared with RTB
bidders.

MS. SPECTOR:  Well, I'm not sure that Google does
have that information but because plaintiffs have put this
information at issue -- and I want to emphasize we're not
trying to embarrass the plaintiffs or invade their privacy.
But because they have alleged that they're receiving ads
based on sensitive categories that Google is compiling
detailed dossiers about them and targeting ads, accordingly,
and we need to be able to investigate that.

For example -- I don't know if this is one of the

113

1    examples I used but they talk about a contextualized ad

2    about seeing a motorcycle on a shoe site and suggest that's

3    because Google is constructing profiles.  We just need to be

4    able to test whether the particular named plaintiffs here

5    have experienced those kinds of ads, have standing, are

6    adequate, are typical and have any damages in this case.

7              THE COURT:  Mr. Straite, you wanted to say one

8    more thing about this one?

9              MR. STRAITE:  Right.  And for this one, the ads

10   that are shown to the plaintiffs are not at issue.  And we

11   can stipulate, we won't be putting any evidence in regarding

12   which plaintiff saw which specific ad.

13       All that matters is the other side, which personal

14   information shared with the bidders.  Google has access to

15   that.  That information is not included in any of the ad

16   records or any web browsing history on any plaintiff device.

17   There is literally not a single shred of evidence on those

18   devices that will suggest whether this ad was placed through

19   the RTB auction or another --

20             THE COURT:  No, I understand that, but your

21   clients are alleging that -- they are like why did I see

22   that ad?  It must be because Google has "X" information

23   about me.

24       That's part of the allegations that you've made and I

25   find it hard to believe that you won't be presenting that

114

1  kind of information, given that you've pled it.

2          MR. STRAITE:  I think we pled that factual

3  background just as context to understand how the auction

4  works, but we're not -- and we'll make it very clear on the

5  record here, our damages have nothing to do with whether the

6  ad was actually served and what they saw.  All that matters

7  is the personal information that was disclosed in the

8  auction for the advertisers to decide whether to serve.

9  Whether they served the ad or not, whether anyone saw the ad

10 is not -- we can take that out of the dispute now here on

11 the record.

12          THE COURT:  Well, I don't know that you can take

13 it out of the dispute now because Google is moving.  So I

14 think I have to decide it, and they don't want to just take

15 it out of the dispute.  They want me to decide it.  So I

16 think I have to.

17          MR. GUTKIN:  Your Honor, this is Jeff Gutkin.

18 I'll just be very brief.

19      But Mr. Straite is throwing out all of these kind of

20 nebulous and unworkable limitations on what discovery they

21 will give when in fact in the complaint they've made all

22 these allegations, how they're seeing ads out of context

23 that must necessarily be based on the profile that was built

24 about them.  And they emphasized again and again in the

25 complaint all the highly sensitive information that they're

115

1  claiming Google disclosed.

2      And now here they are and they're -- he is saying we

3  should take this app and that app and that kind of app off

4  the table.  But the bell's already been rung.  It's too late

5  for them to back away from that and now refuse to produce

6  the discovery we need to test whether all the claims they

7  made could have anything at all to do with their experience.

8          THE COURT:  Yeah, so I understand the parties'

9  positions I believe.  And it seems to me that the

10  plaintiffs' principal concern is the highly personal,

11  potentially personal and sensitive nature of the information

12  being disclosed.

13      And it seems to me that there is a way to protect your

14  clients in that regard, especially if we're talking about a

15  one-day snapshot forensic image.

16      So I feel like the focus of this dispute needs to be to

17  addressing those concerns.  And I will go back and look at

18  your protective order about this.

19      But I just don't see how, in light of your complaint,

20  you can avoid having discovery of the possible alternative

21  explanation for the allegations that your clients have made

22  about what they experienced.

23      And it is an alternative explanation, as I understand

24  it, is that the source of that ad serving was from some

25  other disclosure, not information disclosed through the RTB

116

1   process.  It just seems like a hard nut to crack and it

2   distinguishes this case from the others that you've relied

3   on.

4        So I will think further about the protecting privacy

5   issue, but it does sound to me like this kind of discovery

6   is at issue.

7        I'm going to move on to the second RFP.  This is the

8   online ads that plaintiffs have seen.

9        Sounds kind of eerily similar to what we were just

10  talking about.  But here, I'm not really sure what a

11  production of documents would look like from the plaintiffs.

12  I mean online ads, plaintiffs have seen ever?  Like what are

13  the limits?

14       I don't even understand how the plaintiffs are possibly

15  able to deal with a request like this, unless there's been

16  some preservation that's narrowed in time or whatever, I

17  just -- so let me ask Ms. Spector, so what is it that Google

18  expects would be produced with respect to request number 2?

19            MS. SPECTOR:  Yes.  We recognize that plaintiffs

20  likely have not been preserving all the ads they've seen

21  prior to filing suit.  We're in no way suggesting that we

22  expect them to produce those kinds of documents.

23       Pre-suit I do -- I mean I know that I personally -- I

24  was looking for a Le Creuset set over the winter holidays.

25  I saw a targeted ad that it was on sale.  I screenshot it

117

1  and like texted it to a friend because they were also

2  looking for a Le Creuset set.  It's those kinds of text

3  messages, emails, screenshots.

4      We had discussions with the plaintiffs that these may

5  be few and far between, but to the extent they exist we

6  would want to see them.  And since the complaint was filed,

7  we do expect plaintiffs to be preserving documents that

8  would support their claims in this case.

9      And we have discussed with them that we have a

10 disagreement on relevance of particular ads that their

11 clients have seen.  As we explained to the plaintiffs, in

12 particular paragraph 160 of the consolidated amended

13 complaint argues that the context of ads matters to privacy

14 interest.  So we would want an opportunity to evaluate the

15 particular ads that plaintiffs have seen since filing suit.

16          THE COURT:  All right.  Well, if the request was

17 just limited to ads that plaintiffs happen to have

18 preserved -- it may be an unrepresentative subset of all of

19 the ads I'm sure they have seen over many years or months or

20 whatever -- would that -- is that something that the

21 plaintiffs can deal with if it were so limited?

22          MR. STRAITE:  Prior to filing?

23          THE COURT:  It is pre-filing so -- yes.  Okay.

24 Thank you.  So Mr. Straite is that -- or Mr. Danitz.  I

25 don't know who is going to address that.

118

1          MR. DANITZ:  Your Honor, this is Brian Danitz.

2      So the search terms we're running on the emails would

3  capture the example Ms. Spector raised.  We're producing

4  tons of emails referencing ads.  So if there was an ad that

5  they had seen and they were talking about it, I'm sure that

6  would be produced.  It's responsive and we wouldn't hold it

7  back.

8          THE COURT:  So why object to this request then?

9          MR. DANITZ:  We don't know exactly what they want

10  or how we can meet what they're asking for.  They seem to be

11  asking for a running movie of what appears on people's

12  screens which people --

13          THE COURT:  Let's stop there.  So I've already

14  kind of gotten you all to a point where there is at least

15  some narrowing.  It's pre-filing and it's whatever you

16  happen to have preserved.

17      So is that -- are you representing that that's going to

18  be necessarily encompassed by the other discovery responses

19  that you're providing with respect to other RFPs and so

20  there's no way that it would not be encompassed and so --

21          MR. DANITZ:  From our understanding, yes, the

22  emails that we're producing would capture that, unless

23  Google can articulate any other kind of specific information

24  that they're looking for.

25          THE COURT:  What about text messages?  Are the

119

1  parties producing text messages?

2          MR. DANITZ:  Yes, your Honor.

3          THE COURT:  Okay.  So it would be encompassed by

4  Ms. Spector's example of the Le Creuset text message?

5          MR. DANITZ:  Yes, your Honor.  That would be

6  produced.

7          THE COURT:  Okay.  Seems like this one is not a

8  problem then.

9          MS. SPECTOR:  Can I just clarify?  The kinds of

10 emails that they have been producing are not potential

11 contestants for having been served through RTB.  They're

12 like spam email that you get when you -- you have to click

13 out of sponsorships when you make an online purchase.

14         THE COURT:  Well, then you can say, look, all of

15 the things that they have produced have nothing to do with

16 RTB.  Therefore -- like this is good for you, right?

17         MS. SPECTOR:  Okay.

18         THE COURT:  It's kind of like if the plaintiffs

19 say it's going to get produced, it's going to come out in

20 the wash, whatever's responsive to this.  We can't possibly

21 produce documentation of every ad every plaintiff has seen

22 pre-filing.  Like that's impossible, everybody agrees.  But

23 whatever you happen to have preserved, and if it happens to

24 not be anything served by the RTB process, well, then good

25 for Google and bad for plaintiffs.  I mean that's just the

120

1  way it is.  But --

2           MS. SPECTOR:  Can I make --

3           THE COURT:  Yes, go ahead.

4           MS. SPECTOR:  -- a second point?  I just -- I do

5  want to emphasize that plaintiffs should have been

6  preserving any ads that they believe were served through RTB

7  post-filing of the complaint.

8           THE COURT:  I mean I don't know what to say about

9  that.  You've told me that this request is limited to

10 pre-filing, so that's what I'm dealing with.

11          MS. SPECTOR:  No, no, no, no.  So I was trying

12 to -- I'm sorry if I misspoke, but I was trying to say that

13 there are two different categories of documents responsive

14 to this request.

15     In the pre-filing bucket, we understand that plaintiffs

16 normally would not have been preserving online ads except in

17 the rare instance of a new sale when you see an ad on your

18 Google search and you send it to a friend.

19     We do expect them to have been preserving the online

20 ads that they have been presented with since filing suit so

21 that we can explore whether they have standing or damages or

22 are adequate representatives of the class.

23          THE COURT:  Like every ad every day they're

24 supposed to take a screenshot?

25          MS. SPECTOR:  Yes.

121

1          THE COURT:  I mean sometimes they don't even stay

2  up long enough.  I just -- I don't see how this is possible.

3      So what mechanisms, if any, of the plaintiffs employed

4  to preserve ads?  And was that an understanding that was a

5  mutual understanding that you all would do that?

6          MR. DANITZ:  Your Honor, Google specifically

7  stated they don't expect us to take a running record of

8  everything that passes across someone's screen.  It's just

9  not -- it's not reasonable.

10          THE COURT:  Okay.  Well, here's the problem that

11  plaintiffs have.  If you're going to try to prove your case

12  and you haven't preserved the evidence of it, that seems

13  problematic.  So that's not a discovery dispute.  That's an

14  evidentiary issue you'll take up with your presiding judge

15  at some point, I assume, right?

16      So if it's a going-forward -- if your clients have

17  preserved ads going forward, those would be within the

18  request number two.

19          MR. DANITZ:  Well, that's an if.  There was never

20  a discussion about a process by which that would happen,

21  your Honor.

22          THE COURT:  Okay.  Well --

23          MR. DANITZ:  We don't know how to do it, to be

24  honest with you.  It's just people browse the web.

25          THE COURT:  Okay.  Again, I don't think that's --

122

1 it's within the scope of request number two, if you have it.

2 And if you don't have it, then you will be addressing that

3 issue if it merits addressing with somebody else later, is

4 how I think this gets resolved.

5         MR. DANITZ:  So is your Honor stating that we have

6 a duty to preserve --

7         THE COURT:  I'm not.

8         MR. DANITZ:  -- every single screen that shows up

9 on an --

10         THE COURT:  Mr. Danitz, I'm explicitly not stating

11 that and I'm not going there.  I'm not requesting and I'm

12 not demanding or ordering that somebody preserve

13 information.

14     I was trying to ferret out whether you all had an

15 agreement or not and what the scope of it was and what's

16 within the scope of the request number two.  It sounds like

17 maybe you all want to talk to each other about this.

18         MR. DANITZ:  The only agreement I'm aware of is

19 Google specifically stated --

20         THE COURT:  Okay.

21         MR. DANITZ:  -- we do not have to continue to take

22 images of this --

23         MS. SPECTOR:  Your --

24         THE COURT:  Well, it's not before me -- no, no,

25 no.  We're not going to do that.  We're not going to get

123

1  into it here.  That is for another day.

2      Mr. Straite, is there something that you want to say

3  about request number two and its scope, or more about this

4  issue of preservation?

5          MR. STRAITE:  I think preservation was covered.

6  Mr. Danitz is correct that up until today we had no

7  conversation --

8          THE COURT:  Okay.  I don't want to hear any more

9  about preservation.

10          MR. STRAITE:  And then the other issue I think

11  didn't get focused on is that our understanding is that

12  Google does have a record of the RTB auction process

13  including the one in which ads were served to whom.  I'm not

14  sure how long that gets preserved.  Our assumption is that

15  is being preserved, at least from the day we filed the

16  complaint.

17      So that whole information, the whole corpus of

18  information should exist at Google.

19          THE COURT:  Okay.  You all should talk about this

20  preservation issue, but certainly if Google has a record of

21  who got served what ad, great, that's helpful.

22      And then the plaintiffs' problem will be if there are

23  other ads that they think were served to them that Google

24  does not have a record of, you won't have any way to prove

25  that or not.  I don't know.  Again, I'm not going to get

124

1  into that.  I'm trying to figure out what the scope of this

2  request is, and I think I get it enough to resolve this

3  dispute.

4      But you all should really confer about this issue where

5  you seem to have a disagreement about preservation, going

6  both ways.

7      Okay.  I actually have a 1:30 calendar, so we're going

8  to get through the rest of this quickly.

9      Request 17, this is the plaintiffs' Google accounts.

10 And what I'd like to understand is if the plaintiffs execute

11 the Stored Communications Act waivers, is there any dispute

12 about what Google needs in order to obtain the relevant

13 information about the plaintiffs' Google accounts?

14     Let me ask Ms. Spector.

15         MS. SPECTOR:  There is.  We, first of all, have

16 been waiting for these for months.  But regardless of what

17 Google has in its possession, which I'll take up in a

18 second, that does not relieve plaintiffs from producing the

19 documents relevant to the allegations that they've made this

20 case and they're alleging that Google packages and sells

21 their account information.

22     But I will also add Google doesn't necessarily have the

23 same information that is in the plaintiffs' possession and

24 control.  And I don't want to start a preservation fight,

25 but we definitely have asked them to preserve the online ads

125

1    and their account information.  And presumably they have

2    been preserving their account information.  And if they've

3    edited and deleted information that is currently accessible

4    to Google, they should have a record of it since filing

5    suit.

6              THE COURT:  So is the account -- just focusing on

7    account information.  Would this be captured by the forensic

8    image?

9              MS. SPECTOR:  No, unless they captured the page.

10             THE COURT:  Okay.  Did the plaintiffs capture the

11   account information page and the forensic image?

12             MR. GUTKIN:  Our understanding, your Honor, is

13   that the My Activity and Bookmarks and Analytics is a

14   dynamic webpage that is created by going to the Google

15   server and getting the information and is really put

16   together on the fly through the browser from Google's

17   server.  The information resides with Google.  That's our

18   understanding of how it works.

19             THE COURT:  Did the plaintiffs take a snapshot of

20   that or anything when you did your forensic image?

21             MR. GUTKIN:  To be honest, your Honor, I don't

22   have full information to provide that.  I believe that would

23   have to be actively browsing and requesting that of Google

24   at the time.

25             THE COURT:  All right.  So, Ms. Spector, what

126

1  information does Google not have that it needs from the

2  plaintiffs relating to account information?

3         MS. SPECTOR:  It would be any information that

4  they have since deleted.  So they can control My Activity

5  and edit My Activity.  So if they've edited their activity,

6  we wouldn't have the same information as they do.

7         THE COURT:  So you don't have historical

8  information?  You can't go back in time and say this is what

9  the My Activity page, for example, looked like on the date

10 for this plaintiff?

11        MS. SPECTOR:  I don't know.  I don't believe so.

12 They control what information is presented to Google.

13        THE COURT:  Okay.  But you can certainly do it

14 right now, right?

15        MS. SPECTOR:  Yes.  We have been preserving

16 information from them, from their accounts.

17        THE COURT:  Since what time?

18        MS. SPECTOR:  We've taken a one-time snapshot of

19 their accounts.  I can't remember the exact date.

20        THE COURT:  Okay.  So you have that, at least as

21 it existed at that point in time.

22        MS. SPECTOR:  Yes.

23        THE COURT:  Okay.  So apart from changes, you have

24 everything that you need.

25        MS. SPECTOR:  Yes, apart from changes.

127

1          THE COURT:  Okay.  The SCA waiver thing needs to
2    get solved right away if Google is saying that they need
3    that in order to use or look at or whatever, this Google
4    account snapshot information that they've taken.
5        So when will plaintiffs complete the SCA waiver?
6          MR. DANITZ:  Thank you, your Honor.
7        We've completed all but four and we're working on the
8    final four now.  In terms of a time certain, I defer to my
9    colleagues, but we're working on it actively.  All but four
10   have been received.
11         THE COURT:  If I give you a deadline for that,
12   will that be helpful?
13         MR. DANITZ:  Yes, your Honor.
14         THE COURT:  You can tell your clients that the
15   Court has ordered them to sign by "X" date.
16         MR. DANITZ:  Yes, your Honor.
17         THE COURT:  Helpful?  Okay.  I will give them a
18   deadline.
19       And so the question for the plaintiffs is, I guess --
20   Google has taken a snapshot.  If there are any changes, do
21   the plaintiffs have a record of those changes?
22         MR. STRAITE:  Thank you, your Honor.  To our
23   knowledge, none of our plaintiffs have gone into their My
24   Activity and deleted anything.  You asked if that
25   information would be captured on our forensic images.  No,

128

1  devices don't contain My Activity information.  That's only

2  on Google's server.

3      So the only way for me -- let's say I have an Android

4  device and say I have a Google account.  The only way for me

5  to access the My Activity content would be to go through a

6  Google server.

7          THE COURT:  Right.

8          MR. STRAITE:  It's not stored locally on a device.

9          THE COURT:  Got it.

10          MR. STRAITE:  Right.  So no -- so to answer your

11  question directly, we have no knowledge that any plaintiff

12  has actively deleted.

13      You asked if there are changes.  There are changes

14  every day, as Mr. Danitz pointed out.  The My Activity page

15  can be very dynamic.  If you have certain settings where

16  Google collects a lot of information, that will change every

17  day pursuant to whatever Google's rules are for updated the

18  My Activity page.

19          THE COURT:  But in terms of what the plaintiffs

20  have done to change anything that might appear on those --

21  not just the My Activity page but those other settings, have

22  they taken steps to snapshot every time they made a change?

23          MR. STRAITE:  To our knowledge, they have not made

24  changes.

25          THE COURT:  All right.  So if the plaintiffs have

129

1  not made any changes and Google has a snapshot, then we

2  should be good.  I would expect Google to explore that in

3  deposition of plaintiffs if they needed to, but it seems

4  like we should be all set, as long as we have the waivers.

5      Okay.  So I think that's the resolution to number 17,

6  at least as far as documents are concerned.

7      I'm going to move on to the last discovery dispute

8  letter which is docket 143, and that has to do with the

9  Texas AG antitrust litigation.

10     I sort of feel like we've maybe covered this one

11 already, but this one is a little bit more crystalized than

12 with respect to the other regulatory matters in that I see

13 that we have the CID's and we have a discussion, a dispute

14 about which ones bear on this litigation.

15     I have to say that my impression was that many of the

16 categories in the CID's that the plaintiffs highlighted seem

17 to be a little far afield from RTB, and you've probably

18 gotten that sense from how this hearing has gone.

19     They -- for example, you know, the ones that are

20 reproduced in Google's portion of the dispute letter, the

21 CID's that are reproduced at page five don't seem really

22 relevant to this litigation.  And so that was a persuasive

23 example for me of how the plaintiffs' request, even they're

24 substantially narrow -- a much smaller subset of the CID's

25 than the Texas AG asked for, they're still not very closely

130

1  tied to what's at issue here.

2     So I can give the plaintiffs an opportunity to defend

3  the scope by way of reference to these three examples -- or

4  four examples on page five, but I'm not sure what else you

5  would say in the context of this Texas AG litigation.

6          MS. TRUONG:  And, if I may, your Honor.  An Truong

7  for plaintiffs.

8     I think at first blush, it may seem broad, but what we

9  allege in this case and what Google is doing here is taking

10 a very narrow view of RTB and how it operates.

11    RTB does not operate in a vacuum.  As we've alleged in

12 our complaint, RTB exists in an ecosystem that includes RTB

13 proper, which is the auction run by Google which sits at the

14 intersection of, broadly speaking, a demand-side platform,

15 which Google also participates in and a supply-side

16 platform, which Google also participates in.

17    And so at each of these intersecting systems, Google

18 has a presence and an influence in the manner in which

19 information flows through, is sold and is shared and

20 disclosed.

21    And we also allege in our complaint that Google,

22 through its various influences in this ecosystem, engages in

23 side agreements, gives preferential treatment to certain

24 participants, including itself, and gives certain advantages

25 to participants, and in this manner it is controlling the

131

1  dynamic of how information is exchanged.

2      And if you look at RFP 22, which is the first example

3  Google lists, that's what --

4          THE COURT:  Wait.  We're talking about request

5  for -- are you talking about -- oh, number 22 in the CID's.

6  Okay.  I got it.

7          MS. TRUONG:  Yeah, if you look at the joint

8  brief --

9          THE COURT:  I got it.  I see what you're talking

10  about.  I thought you meant RFP like the plaintiffs' RFPs.

11          MS. TRUONG:  No.

12          THE COURT:  Okay.  Thank you.

13          MS. TRUONG:  So we're looking here.  AdX is

14  Google's presence in RTB itself.  That's how Google itself

15  engages in RTB.  And what we're talking here is complaints

16  made by participants on the demand side of the platform and

17  the manner in which Google is engaging itself in RTB.  And

18  this goes to the basis of our allegations about how Google

19  is running RTB itself, how RTB works.  And it also goes to

20  how information is being valued and monetized and the manner

21  in which Google is engaging in these various side

22  agreements.

23      If there's a complaint from a participant -- for

24  example, if we look to I believe the second example, the

25  second bullet point example there from Google, and the

132

1 manner of pricing that's given in RTB, then that also speaks

2 to how RTB is working, and we think that that's directly

3 relevant to our case.

4         THE COURT:  That's not the examples that they've

5 given.  I mean the first bullet point on page five is

6 "Produce documents that relate to any complaint made by any

7 DSP or ad network regarding competition with AdX."  How does

8 that -- there may be like things within that request that

9 also relate to RTB, but the request is way broader than what

10 you would need.  So not a good vehicle for sort of focusing

11 this kind of discovery process.

12     It's very efficient to say stuff you've already

13 produced, you should reproduce again.  Nobody has to go and

14 re-gather it from the files, but this -- it has to have a

15 closer connection.  And I'm just not persuaded that all of

16 these requests -- this a good example -- have that kind of

17 close connection.

18     It doesn't have to be identical, but it doesn't seem to

19 have -- I mean only by happenstance would it have something

20 that would bear on this dispute.

21         MS. TRUONG:  Your Honor, I recognize that

22 position, but you know, in this particular example, AdX is

23 Google participating in RTB.  And so, you know, it might not

24 be within the exact four corners, but I think it certainly

25 fits within the factual foundations of our allegation and

133

1  the investigations that we're doing here.

2          THE COURT:  All right.  Let me let me just ask one

3  question about one of these requests because you all

4  highlighted it.  And this has to do with a user's

5  interaction with an AMP website, so there's a request

6  directed to AMP.  And plaintiffs say just, you know, this

7  shouldn't be an important distinction for the Court.

8      So can someone explain to me how does a user's

9  interaction with an AMP website have any connections to the

10  allegations that the plaintiffs are making in this case

11  about disclosure of personal information through the RTB

12  process?

13          MS. TRUONG:  And, your Honor, just to clarify, are

14  we looking at the examples plaintiffs provided; is that

15  right?

16          THE COURT:  Yes.  So this was your favorite

17  example.

18          MS. TRUONG:  69 and 81?

19          THE COURT:  Yes.  I was focusing on the -- and

20  this is the footnote four and I was focusing on the text

21  connected to footnote four.  And I had cited to you the

22  examples at page five.  So now I'm giving you an opportunity

23  to focus on your favorite example.

24          MS. TRUONG:  Thank you.  So we look to RFP -- or

25  CID number 69.  The specific manner in which the Texas AG

134

1  actually defines behavioral data, it was defined as

2  collected regarding user preferences, status, behaviors,

3  including demographic information, device identifiers,

4  browser identification, location information and browsing

5  history, which we've all alleged in our complaint.

6      And this is all talking about how that information is

7  collected from an AMP page.  And I know the Court had

8  discussed at the beginning here about keeping this limited

9  to how RTB works, but I don't think you can really divorce

10 the conversation of how RTB works without looking to how

11 that information is gathered and then transferred into RTB.

12      THE COURT:  If the request was about how RTB uses

13 the information, I would be aligned with you, but this seems

14 to be sort of a step removed which is how is the information

15 collected in the first place, which I -- you know, again, it

16 seems like there's lots of ways that -- you could take

17 discovery infinitely about how personal information is

18 collected, but if the dispute is about how it's sold or

19 disseminated, that's where we need to focus our effort.

20      MS. TRUONG:  Your Honor, so that point, what I

21 would say is I know we've alleged in this case various

22 privacy claims and part of that element is going to be the

23 highly offensive nature of Google's conduct in this case.

24 And I anticipate that Google's very capable counsel will be

25 raising that as a defense.

1    And so part of that analysis would be the scope and

2  level and volume of information Google is collecting.  And

3  if Google is collecting it from various sources, including

4  AMP pages, then that would go towards that scale of highly

5  offensive information that it then turns around and sells on

6  RTB.

7          THE COURT:  Okay.  So I really do have to switch

8  to my case management calendar in a little bit.  But I will

9  give -- I didn't let Google speak on this one.  I will

10  invite Google to say anything they would like to say in

11  response that you haven't already said.

12          MR. GUTKIN:  Yeah, I'll try to keep it brief, your

13  Honor.

14    I mean I don't understand how plaintiffs and their

15  letter brief said the Texas AG is overseeing a, quote,

16  "multi-state prosecution of Google for deceptively using

17  individuals' personal information to engage in targeted

18  digital advertising."

19    Your Honor should just look at the Texas AG complaint.

20  It's an antitrust case.  It's about how they claim Google is

21  frustrating competition.  You can see this in paragraphs

22  two, eight, and 18.  I have the quotes here, but I won't

23  read them to you, just give you the numbers.

24    I mean it's crystal clear that this is not a privacy

25  case.  If you go to the actual claims in the Texas AG

136

action, they're almost all antitrust claims.  Then even when
you get to the section of that complaint about state
supplemental deceptive trade practices claims, you're not
going to find anything in there that relates to the issues
in this case.

I want to make sure that it's clear to your Honor that
Google has already agreed to produce documents in many of
these 48 requests.  We did so when the requests, even though
its foreign antitrust case happened to touch on the relevant
issues here, like the request for the contract with the open
bidder participants.

The antitrust case, they wanted that.  We said, well,
that's at least arguably relevant here.  That's part of the
RTB product and we produced those.  And we actually have
agreed to -- I think the number is 14 out of the 48, not all
of which have been responded to yet, but we committed if
they are responded to, that we would provide answers for
those 14.

And then maybe just to conclude, the AMP example is
really kind of a perfect illustration of why this 48
requests is so grossly overbroad and untargeted.  You can
kind of tell by looking at the sequence of requests in that
AMP section that apparently the author of this CID thinks --
so AMP is accelerated mobile pages.  It's a format that
helps web pages load more quickly.

137

        The author of these thinks there's something that
Google has done with the way that it set up those pages
that's giving it an advantage over its competitors in terms
of the information Google is getting from AMP pages.

        It's nothing -- nothing to do with Google collecting
information from AMP pages and disclosing it to third
parties through RTB.  It's just question after question
about how do AMP pages compare to non-AMP pages.  And it's
so specific and such sort of inside baseball to this
apparent theory about how it's affecting competition.  It's
truly far afield from this case.

        And we did not reject those of the 48 that we rejected
lightly.  We went through them one by one.  And there's no
showing by plaintiffs that any of this Texas AG discovery
makes any sense.  And we've been debating about it for a
long time, and it should just be put to bed.

                THE COURT:  All right.  Thank you all.  I --

                MS. TRUONG:  Your Honor?

                THE COURT:  Yes.

                MS. TRUONG:  I'm so sorry.  Can I just ask one
point of clarification?

                THE COURT:  Sure.

                MS. TRUONG:  Because I think there seems to be a
disconnect between our understanding of Google's proposal.

        Mr. Gutkin had said there's 14 requests that are agreed

138

1  to.  I know his briefing papers says 18.  I don't know if it
2  would be helpful, but if I could suggest that Google
3  identify those items that it's agreeing to today, and that
4  way the Court would not waste time in reviewing those.
5      And I also think that once Google identifies those
6  items, perhaps the vocabulary and vernacular can be
7  cross-referenced with those other requests that plaintiff
8  has made.
9          THE COURT:  Okay.  I'm not sure about the last
10 part of what you said, but it would be helpful to get
11 clarity on what is agreed from Google's perspective and what
12 is not.  Perhaps you could just do a short supplemental
13 submission saying "We'll agree to produce documents
14 associated with these CID's" by number.  That would be
15 helpful just for clarity.
16     And I was going to just say to you all that I do
17 realize that the parties dispute but have argued to me that
18 Judge Koh made an order connected with this issue already.
19 I have to say I've looked at your joint case management
20 submission.  I've looked at her order.  I'm not sure who is
21 right.  So sadly I think it is ambiguous.
22     Maybe Judge Gonzales Rogers will have a different view.
23 But I was -- I was going to proceed with resolution of this
24 discovery dispute just by making a call, subject to whatever
25 the district judge may decide otherwise, because I don't

139

1  know what it is.

2      So I'm not ignoring that part of your dispute.  I just

3  felt there wasn't really anything useful you all could say

4  to me on that point in this hearing.

5      But I will issue a written order with some additional

6  guidance about next steps, and then I will resolve all of

7  the disputes.  We have to leave it there.

8      Thank you all for your time.  I appreciate it.

9          MS. TRUONG:  Thank you, your Honor.

10         MS. SPECTOR:  Thank you, your Honor.

11         MR. DANITZ:  Thank you, your Honor.

12         MR. GUTKIN:  Thank you so much for your time, your

13  Honor.

14         THE COURT:  The matter is concluded.

15         MR. STRAITE:  Thank you, your Honor.

16         MS. PRITZKER:  Thank you very much.

17      (Proceedings adjourned at 1:30 p.m.)

18

19

20

21

22

23

24

25

140

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14  

15

16            Echo Reporting, Inc., Transcriber

17              Monday, February 14, 2022

18

19

20

21

22

23

24

25