1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5    In re                    )
                              )
6    GOOGLE RTB CONSUMER      )    No. C 21-02155-YGR
     PRIVACY LITIGATION,      )
7                             )
     _____)

8
                              San Jose, California
9                             Tuesday, March 8, 2022

10   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                  RECORDING 11:08 - 12:10 = 62 MINUTES
11

12   APPEARANCES:

13   For Plaintiffs:

14                            Pritzker Levine LLP
                              1900 Powell Street, Suite 450
                              Emeryville, California 94608
15                        BY:  ELIZABETH C. PRITZKER, ESQ.
                          BY:  BETHANY CARACUZZO, ESQ.
16
                              Bleichmar Fonti & Auld LLP
17                            555 12th Street, Suite 1600
                              Oakland, California 94607
18                        BY:  LESLEY ELIZABETH WEAVER, ESQ.

19                            Cotchett, Pitre & McCarthy LLP
                              999 N. Northlake Way
20                            Suite 215
                              Seattle, Washington 98103
21                        BY:  KARIN BORNSTEIN SWOPE, ESQ.

22

23

24            (APPEARANCES CONTINUED ON NEXT PAGE.)

25

2

1  APPEARANCES:  (Cont'd.)

2                              Cotchett, Pitre & McCarthy LLP
                               840 Malcolm Road
3                              Suite 200
                               Burlingame, California 94010
4                         BY:  NANCI EIKO NISHIMURA, ESQ.

5  For Defendants:

6                              Cooley LLP
                               3 Embarcadero Center
                               20th Floor
7                              San Francisco, California
                                 94111
8                         BY:  JEFFREY GUTKIN, ESQ.
                          BY:  AARTI G. REDDY, ESQ.
9

10 Transcribed by:               Echo Reporting, Inc.
                                 Contracted Court Reporter/
11                               Transcriber
                                 echoreporting@yahoo.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Tuesday, March 8, 2022</u>                                    <u>11:08 a.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4          THE CLERK:  Calling case 21-cv-02155, In re Google

5  RTB consumer privacy litigation on for a discovery hearing.

6      Counsel, please state your appearances for the record,

7  beginning with plaintiff, please.

8          MS. PRITZKER (via Zoom):  Thank you, Ms.

9  Kratzmann.

10     Good morning, your Honor.  Elizabeth Pritzker, Pritzker

11  Levine, for the class plaintiffs.

12          THE COURT:  Good morning.

13          MS. WEAVER (via Zoom):  Good morning, your Honor.

14  Lesley Weaver of Bleichmar Fonti and Auld, also for the

15  plaintiffs.

16          THE COURT:  Good morning.

17          MS. CARACUZZO (via Zoom):  Good morning, your

18  Honor.  Bethany Caracuzzo also of Pritzker Levine for the

19  plaintiffs.

20          THE COURT:  Good morning.

21          MS. SWOPE (via Zoom):  Good morning, your Honor.

22  Karen Swope from Cotchett, Pitre and McCarthy for the

23  plaintiffs.

24          THE COURT:  Good morning.

25          MS. NISHIMURA (via Zoom):  Good morning, your

4

1 Honor.  Nanci Nishimura, Cotchett, Pitre and McCarthy, for

2 the plaintiffs.

3           THE COURT:  Good morning.

4      Defendants?

5           MR. GUTKIN (via Zoom):  Good morning, your Honor.

6 Jeff Gutkin from the Cooley firm appearing for defendant

7 Google, LLC.

8           THE COURT:  Good morning.

9           MS. REDDY (via Zoom):  Good morning, your Honor.

10 Aarti Reddy from the Cooley firm, also appearing for

11 defendant Google, LLC.

12           THE COURT:  Good morning.

13      So before I begin, are you all arguing today?

14           MS. PRITZKER:  Your Honor, this is Elizabeth

15 Pritzker.  I will be ideally quite silent.  And if you need

16 me to, I can go off video.

17      All of the people who are on the screen participated in

18 the lengthy meet and confers and they're probably better

19 steeped in all of this than I am, but I'm here in my

20 capacity as lead counsel ready to answer any questions.

21           THE COURT:  Okay.  Very well.

22      Let me just ask a further question, which is I

23 understand that the parties asked that this proceeding be

24 conducted under seal.  And what I wanted to find out is

25 whether the concern about proceeding under seal has to do

5

1  with the specific search terms or whether there are other

2  reasons why you think the matter might need to proceed under

3  seal, because as you may understand, I am disinclined to

4  conduct any proceedings under seal unless it's necessary.

5      So I suppose I should ask the defendant first about the

6  under seal request since I believe it's the information from

7  Google that's at issue.

8          MR. GUTKIN:  Yes, your Honor.  Jeff Gutkin for

9  Google.

10      I think the two principal concerns are, one, the

11  various code names that are at issue in the disputed search

12  terms.  As your Honor saw, we filed I believe on Friday a

13  pretty narrow request to seal parts of the papers, but that

14  did include internal log and project names that Google uses

15  that are not in the public record and that, for reasons we

16  can explain more if you'd like, could be damaging to

17  Google's business if they become public.

18      The second concern I have, your Honor -- and it depends

19  very much on how your Honor intends to go through this

20  proceeding, but in the meet and confer, there has been some

21  discussion in reference to both short term disputes and

22  custodian disputes about documents that Google has produced

23  in discovery that are marked under our protective order.

24      And if your Honor intends for the parties to kind of

25  engage in a substantive discussion where the content of such

6

1  documents could be discussed and would need to be discussed,

2  then I don't even know the full scope of what could come up.

3       I do know that many of the documents or -- it's not a

4  very large set of documents that plaintiffs have flagged for

5  us so far, but some of those documents do contain

6  confidential and sensitive information about how Google's

7  runs its business.  And I'm concerned that we would be

8  unable to have a robust discussion without that information

9  coming to light.

10            THE COURT:  I see.  All right.

11       Let me just ask if anyone from the plaintiffs would

12  like to respond on the question of whether the proceeding

13  needs to be under seal, and if so, for what purpose.

14            MS. WEAVER:  Yes.  Good morning, your Honor.

15  Lesley Weaver on behalf of the plaintiffs.

16       In general the plaintiffs do not tend to agree to

17  sealing these proceedings.  This is a class-action of

18  national import.

19       At the same time we do not want to raise any concerns

20  that Google might have about the confidentiality of the

21  issues that we're discussing, so we could seal, have a

22  preemptive -- have a blanket sealing order here and then the

23  parties can go back and request selected sealing of the

24  transcript later.

25       We would not object to that, your Honor, if you think

1  that's the best way to proceed.

2      Plaintiffs do not want to be in a position of arguing

3  against sealing and then find that that we have said

4  something that Google would argue violates the

5  confidentiality order.

6          THE COURT:  All right.  So here is how I'd like to

7  proceed.

8      I have a number of questions to address to the parties

9  just about the process you're engaging in and how it's going

10 and some of the matters that are raised in the papers.  And

11 I'd like to leave for the end a discussion of specific

12 search terms and perhaps also specific custodian issues.

13     So I wonder if we might conduct the proceeding -- if

14 everybody agrees to abide by this, don't reveal something

15 that is covered by a protective order in the course of

16 discussing what I consider to be higher level issues, and

17 then we get to the end, we can conduct the remainder of the

18 proceeding under seal when we talk about specific search

19 terms and specific custodian issues.

20     Is that acceptable to the defendant?

21         MR. GUTKIN:  Yes, your Honor, as long as

22 plaintiffs will do their best to avoid going into

23 confidential matter, I and Ms. Reddy will as well.

24         THE COURT:  Is that acceptable to the plaintiffs

25 then?

8

1          MS. WEAVER:  Yes, your Honor.

2          THE COURT:  Okay.  So let's proceed in that

3    fashion, and then when we get to a point where we need to

4    talk about details, we can have the matter under seal.

5          THE COURT:  Okay.  So I've read the papers that

6    you all submitted.  And what I am wondering in the first

7    instance is if you could share with me, is Google using some

8    form of technology assisted review -- I know that came up

9    when we were discussing the ESI protocol, but is there a

10   process or -- something beyond simply applying search terms

11   that is being used to identify responsive documents?

12         MR. GUTKIN:  To the first question, your Honor,

13   no, we are not at this time using technology assisted

14   review.  There are processes for locating the documents of

15   course beyond just search terms and reviewing search term

16   positive documents but that's targeted collection, et

17   cetera.  So the answer is no, I believe.

18         THE COURT:  Okay.  All right.  Thank you.

19      And then to what extent had the parties' e-discovery

20   professionals been participating in your efforts to resolve

21   some of these disputes about search terms and custodians?

22      I'll start with Mr. Gutkin or whomever on your side.

23      Have you had any e-discovery professionals involved or

24   has it just been lawyers?

25         MR. GUTKIN:  Well, so on the meet and confer

9

1  calls, of which we've had many, it has been the lawyers on

2  the Google side.  I believe that in one of the first calls

3  the plaintiffs had an e-discovery professional attend.  I

4  don't know off the top of my head if that person has

5  continued to attend after the first call where she did raise

6  a couple of issues.

7       However, we are of course working with an extensive

8  e-discovery team on our side between the calls, figuring out

9  what we can do, what we can't, et cetera.

10          THE COURT:  Okay.  Thank you.

11      And then for the plaintiffs, do you have the assistance

12  of an e-discovery person or people who are assisting in the

13  negotiation of these discovery disputes?

14          MS. WEAVER:  We do, your Honor.  We appreciate the

15  question, and to the extent the Court finds it helpful, we

16  would be happy to make our e-professionals available to

17  discuss directly with other e-professionals.

18          THE COURT:  Ms. Pritzker, is there something you

19  wanted to add?

20          MS. PRITZKER:  No.  Ms. Weaver took it for me, so

21  thank you.

22          THE COURT:  Okay.  Great.

23      Okay.  So that all sounds helpful.  Let me just add

24  address it at a sort of high level this issue that about

25  search terms.

10

1          So the way I think about search terms is they're about
2     quality, not quantity.  So search terms are effective if
3     they are good at hitting responsive documents without also
4     hitting an excessive number of nonresponsive documents.
5          So when I see a dispute about there are too many search
6     terms or this search term hit on, you know, a million
7     documents, it's hard for me to know what to make of those
8     kinds of remarks because does that mean there are a million
9     documents that are super responsive because that search term
10    is excellent or does that mean that only one percent of the
11    documents in that one million are responsive and it's a
12    terrible search term.
13         And same thing for number of search strings.  You know,
14    I can't tell from your submission.  And I know that, in
15    part, the plaintiffs say, well, that's our point.  We should
16    have hits.
17         But that's also not a really helpful response because
18    it would be so difficult to try to do an assessment based on
19    something that generates a million documents.  That sounds
20    like a lot of documents.
21         So when -- I just kind of set the stage there by saying
22    it's not super helpful to have that kind of discussion in
23    the briefing.  And so what I am wondering is whether there
24    is some mechanism -- alternative mechanism that the parties
25    may have contemplated or discussed where you can do an

1    assessment of a given search term based on a much more

2    limited kind of application of that term.

3         So I'm going to throw out some examples, not really

4    knowing anything about what you may have already discussed

5    or considered.  But if there are custodians who are already

6    kind of in the mix for review, their documents have been

7    collected, can you do a test on one custodian and say does

8    this search term string which is disputed result in an

9    inordinate number of unresponsive documents.

10        And that doesn't mean you review every single document

11   that got hit for that custodian, but you take some random

12   sample and do an assessment.  It should be something that is

13   quick and easy that will give you a good picture of how good

14   or not that term is on identifying responsive documents.

15        And, again, I am just making this up as an example.

16   There may be much, much better ways to do this kind of

17   testing.  But my question for the parties is, have you tried

18   to do some kind of sampling that will allow both parties to

19   get some information about whether a search term is

20   effective or not?

21        And let me start with the defendant with that question

22   since it's the defendant's documents.

23            MR. GUTKIN:  Thank you, your Honor.

24        I will answer and then I will also invite Ms. Reddy to

25   chime in, but I'll answer briefly, because Ms. Reddy and I

12

1  had sort of divided up today to some extent that the

2  specific discussion of search terms would be hers and then I

3  would work on the custodians.

4      But the difficulty that we have -- I mean first of all,

5  many of the disputes just relate to the connector, that is

6  within 50 versus a within 25, and we cited authority to your

7  Honor that within 50 is not appropriate.

8      But the difficulty that we have been in checking these

9  search terms is that so many of them are kind of facially

10 overbroad.

11     And just a few examples and then maybe I'll ask Ms.

12 Reddy to amplify this as she chooses, but we have search

13 term 18 that is kind of all privacy and consent criticisms

14 that are not in any way tethered to real-time bidding,

15 search term 37 which is references to real-time bidding that

16 are within a certain connector of just other Google products

17 like google.com and YouTube.

18         THE COURT:  Okay.

19         MR. GUTKIN:  Search term 39, all references to

20 real-time bidding or any of the other names for that that

21 are also within 50 of ads with a route expander and revenue

22 or profit or financial type turns.

23     I mean this is a product that runs ads, so I mean

24 that's kind of my problem, your Honor, is that from Google's

25 perspective, we have these facially overbroad and improper

1  terms.  And many of them we have shared hit counts with

2  plaintiffs for about 15 terms and many of them are returning

3  a million hits or 300,000 hits.

4      So even sampling that -- to use the last example, even

5  for one custodian sampling real-time bidding or any of the

6  other names for that product with ads and with revenue,

7  that's -- the product is an ads product that generates

8  revenue.  So these terms are, in our view, not appropriate

9  and they should be narrowed before we would attempt any kind

10 of sampling or that alternative approach.

11         THE COURT:  So in order to understand your

12 remarks, I just want to make sure that -- could I use the --

13 and I know you all have a dispute about what exhibits are

14 appropriate and not, but forgive me, I'm going to use

15 Exhibit D just because it's here and it's Google's.

16     If I looked at the category that Google has described

17 as sort of the rejected -- rejected without any sort of

18 contrary proposal on competing proposal, are those the terms

19 that Google contends are facially overbroad?  It looks like

20 18 is not on that list, but that's because there is a

21 competing proposal for 18?

22         MR. GUTKIN:  Yes.

23         THE COURT:  But if I understand you correctly, you

24 would say everything that's -- at least everything that's on

25 the rejected list is facially overbroad, as you've described

14

1  it?

2       MR. GUTKIN:  Yeah.  So why don't I hand it off to

3  Ms. Reddy to just get into the details, but you're right

4  about 18.  We suggested that should be limited to real-time

5  bidding, as I recall, which is why it's not on the rejected

6  list.

7       THE COURT:  Okay.

8       MS. REDDY:  And broadly speaking, your Honor --

9  and thank you, your Honor.  This is Aarti Reddy for the

10 defendant.

11      Broadly speaking, your Honor, a lot of the terms on the

12 reject lists are facially overbroad because they don't have

13 any connection, that we can tell, to RTB and/or user data

14 shared through RTB.

15      At the parties' last conference on February 8th, the

16 Court instructed the parties that the focus of discovery

17 efforts should be on the real-time bidding product and user

18 information that may be shared with bidders through the

19 real-time bidding product.

20      So we have tried to target search terms that, broadly

21 speaking, get at those issue areas.

22      For the terms that we have rejected, many of them, as

23 Mr. Gutkin pointed out, are facially overbroad.  Term 66,

24 for example, proposes RTB as a standalone term.  That is

25 just way too broad.  Not every document or communication

15

1  concerning the product is going to be relevant or

2  proportional here.

3          THE COURT:  Okay.  Let me pause you there on that

4  issue.

5      Okay.  So I'm looking at the rejected list, and I see

6  that -- let's say the first -- one, two, three, four --

7  five.  So eight, 10, 37, 38, and 39 all have RTB with

8  something else.  So it's not RTB standalone, and it is RTB.

9  So it is not other categories.

10     So to the point that you made initially that I

11 suggested an order I have not yet issued that discovery

12 ought to be limited to RTB, those first five satisfy that

13 requirement just on their face.

14     And then if I look at 66, which is RTB sort of

15 standalone, there is a little note there that says it's for

16 targeted custodians, not across the board.  And I want to

17 explore more what that means.

18     But just so I have an understanding of what the

19 argument is, I see some of these on the rejected list are

20 truly like standalone things that are not having anything to

21 do with RTB on their face.  They just don't have that word

22 in there.

23     So for the ones that are on the rejected list, am I

24 correct in understanding that Google has not attempted to

25 run these in a subset or even one custodian or take a sample

1 and just said what is the responsiveness rate versus hit

2 rate of any of these?  I just want to understand what the

3 nature of the dispute is.

4            MS. REDDY:  For ones that are on the rejected

5 list, your Honor, we did provide hit reports for a subset --

6            THE COURT:  Okay.

7            MS. REDDY:  -- for the terms that are on the

8 reject list.  I will note it's not just that these terms are

9 overbroad.  Some of them, based on our investigation, are

10 just facially irrelevant and we would not except those terms

11 to come up in a relevant manner with respect to RTB.

12      For example, there are a number of terms related to web

13 and app setting --

14            THE COURT:  Yes, I see that.

15            MS. REDDY:  -- search terms 43, 45 through 47, 49,

16 61.  Those are all terms that we would not expect to appear

17 in a relevant manner with respect to RTB because web and app

18 setting is a particular user setting that operates on

19 google.com.

20      RTB does not operate on Google sites like google.com,

21 so a change to web and app setting would not impact RTB.  So

22 we don't believe that these terms are relevant here.  We

23 suspect that these terms were just adopted from a different

24 privacy class action, Rodriguez, that involved different

25 legal and factual predicates.

17

1          THE COURT:  Okay.

2          MS. REDDY:  So there could be complex reasons for

3   why we've rejected these, and I'm happy to walk through each

4   of these terms, but at a broad level, some of them are

5   overbroad and other terms are just not facially relevant to

6   RTB.

7          THE COURT:  Okay.  So we will perhaps get into a

8   term-by-term kind of discussion.

9       But at a much higher level, for the ones where there is

10  a hit report that's been run -- and I assume what you're

11  referring to is a hit report that allowed you say, okay,

12  there were a million documents hit by this term -- has there

13  been any assessment to look at, say, I don't know, 50

14  documents that got hit and say of those random sample of 50

15  documents, there were no responsive documents in there, or

16  there were 50 percent responsive documents?  Has there been

17  any kind of assessment like that?

18         MR. GUTKIN:  No, your Honor.

19         THE COURT:  Okay.  So this is really an

20  informational question.  I don't want anyone to read

21  anything into this

22      But why couldn't there be something -- for some of

23  these, it may be very easy for me to conclude that something

24  is way too broad and not relevant or both those things and

25  shouldn't be in the mix at all.

1    But there may be others where it's harder for me to

2  tell, just based on what you presented to me, whether

3  something really is or is not on its face a useful search

4  term.

5    For those where I think some additional information

6  might be helpful, would it be -- how burdensome would it be

7  for Google to, say, take a custodian, run the term.  Maybe

8  you get a million hits or some very large number.  What you

9  do is you take a random sample of that, a small random

10  sample of it and you actually look.  And then you say, we

11  looked at it and of that random sample we had no responsive

12  documents or we had, you know, a large percentage, whatever

13  it is.  You characterize the nature of responsive documents.

14    How burdensome would that be?

15        MR. GUTKIN:  Well, your Honor, I think there is

16  some complexity to this.

17    First of all, it would have to be kind of exported to

18  our review tool.  I am not exactly sure how we would choose

19  the custodian.  I think we could randomize the documents,

20  but I'm not exactly sure how informative it would be.

21    And our perspective is this kind of procedure could

22  make sense if we have a dispute where it's borderline, you

23  know, the parties are pretty close.  But we feel like we've

24  already tried to narrow the disputes through a lot of meet

25  and confer.

1     And from Google's perspective, we still have many, many

2   terms where it's just imposing an undue cost and burden on

3   Google and occasioning delay that I'm not sure we have time

4   to deal with anymore to try to go through that process with

5   the terms that plaintiffs still have left here.

6          THE COURT:  Okay.  So I will have to make some

7   calls about -- you can't do this necessarily for everything.

8   So I appreciate that I will have to make some calls on

9   these, but it does seem to me like it would be useful

10   information to have, especially since I can't tell from your

11   submission for some of these terms whether they're effective

12   terms or not.

13     I'm going to let the plaintiffs address this issue as

14   well, but it's not super persuasive to me, Mr. Gutkin, that

15   a very small sample -- I don't know what I mean by very

16   small sample -- some usefully small sample is that

17   burdensome to check.  Maybe even do it manually if it's

18   small enough.

19     You just run the terms, you see how many hits you got,

20   you pick randomly some subset of documents to look at and

21   you report back to the plaintiffs about responsiveness or

22   not.

23     I mean that to me doesn't seem very hard at all.  And

24   maybe if you had to do that for 50 terms, that would end up

25   being quite burdensome, but I just don't understand why this

20

1  might not be a useful effort for those that are maybe

2  closer -- closer calls where the parties have a dispute that

3  can't be resolved.

4       So I'll hear from the plaintiffs on what they think,

5  but -- maybe it should at least be discussed among your

6  e-discovery professionals about whether this is feasible.

7            MR. GUTKIN:  Yeah, and just as a final comment,

8  your Honor -- and I know your Honor doesn't have unlimited

9  time -- but we're prepared to talk about the search terms

10 today, as we've been talking about them with plaintiffs, to

11 try to explain why this sampling, from Google's perspective,

12 would not be a productive use of time, and time is short and

13 we kind of need to finalize these disputes.

14      But with that, I'll --

15           THE COURT:  Okay.  All right.

16      Let me just hear from plaintiffs on this issue about

17 whether sampling might be useful.

18           MS. WEAVER:  Thank you, your Honor.  Lesley Weaver

19 on behalf of the plaintiffs.

20      We think that's an excellent suggestion.  Our expert

21 has proposed it and we on the plaintiffs' side have done it

22 on the limited production set of 20,000 documents that we

23 have at present from Google.

24      And Ms. Caracuzzo and Ms. Swope address more concretely

25 what we've done if you would like more information about it,

21

1  but we really do think that would be helpful.

2      The second point, however, is more troubling for the

3  plaintiffs, and that is that we are challenged by an overly

4  restrictive view of what is relevant in this case.

5      And so even if Google engages in this process, we are

6  very concerned that Google will decide anything that doesn't

7  have the letters "RTB" in it is not a relevant document.

8  And that is -- well, just briefly, your Honor, I would like

9  to talk about the scope of the case.  I know that you

10 entertained some argument at the last hearing.

11     THE COURT:  Yes, and I do appreciate that you all

12 are waiting on my order, and that that in part is

13 complicating resolution of this dispute.  So I understand

14 that that's an unfortunate circumstance for you all.

15     Go ahead, Ms. Weaver.

16     MS. WEAVER:  Thank you.  Well, first of all, let

17 me say we all understand the pressure that the courts are

18 under these days.  So we appreciate your input and the time

19 that you're willing to put in to this discussion today.

20     At its core, this is a contract case, and it centers on

21 some basic misrepresentations.

22     Google says, "We do not sell your personal information

23 to anyone."  Google says, "Google will never sell any

24 personal information to third parties."  Google says, "You

25 get to decide how your information is used."

22

1    In paragraph 260 of the complaint, we have identified
2    numerous representations that Google makes in its contract,
3    and then we identify what Google does to violate it.

4    And part of the violating is the selling part of the
5    data or what happens at the back end, but we need to
6    understand what Google is selling and how it gets there,
7    meaning -- a key disputed part is what happens at the point
8    of sale, which is the real-time bidding auction.

9    But it's also about what Google collects about account
10   holders, how it tracks them across the Internet through a
11   complex web of identifiers and cookies.

12   So on the front end, it tracks all this data and we'll
13   discuss -- there's a term that may come up later, but if you
14   will, this is -- Google is baking a cake and they're selling
15   a slice of cake in the end, and some of the words in these
16   terms are about these processes.  How do they create the
17   profiles.

18   And for us to understand the data flow, we can't only
19   be restricted to -- as we understand it, Google's version of
20   the world here is that all that we get to discover is what
21   is in the bid request and maybe some terms there.

22          THE COURT:  All right.  Let me just pause you
23   there.

24   So here's the difficulty with a case like this.  Well,
25   there are many difficulties with a case like this.  But

23

1  among them are that what you just described, having an

2  understanding of what information is available to disclose

3  in the RTB process is something that I would hope and expect

4  does not require the use of search terms, meaning -- we had

5  this discussion, you know, at the beginning of February I

6  think when I had my last hearing, which is there should be

7  documentation that allows the parties to -- in this case the

8  plaintiffs to understand what information is available and

9  is actually shared in the RTB auction process when somebody

10 bids and an ad is proposed to be placed.

11     That doesn't require the search through email, I

12 wouldn't think.  That is something that should be in a

13 technical document somewhere.

14     So this is -- if we're talking about most of this

15 material is email, that's not the kind of thing that search

16 terms are good for.  So I have a real problem with trying to

17 use the search terms as the vehicle for getting out

18 responsive documents and relevant documents that should be

19 found through a different methodology.

20     And what I fear is that the parties may be taking the

21 approach that search terms are going to define the

22 collection of documents that anyone has to look at, that's

23 all we're going to look at, and if there is another -- and I

24 know you had this dispute about what Google is aware of or

25 not aware of.

24

1    But if the search terms are defining the universe of

2  documents that Google has to look in -- look through to

3  identify responsive documents and then Google says, "Well,

4  these search terms are too broad," plaintiffs are worried

5  that they're not going to get information that you just

6  described, assuming that's all relevant.

7    So I just think that a fundamental issue here is the

8  use of search terms to get at certain categories of

9  documents that are not really amenable to search term

10  collection.

11    I don't know if that makes any sense to you all, but

12  that's the problem here.  There should be some other way for

13  Google to get information about what data is available from

14  a Google account holder to be used in the RTB auction

15  without having to use search terms.

16          MS. WEAVER:  Your Honor, if I may just respond to

17  that briefly.  And this does pull the thread on a nagging

18  concern that we have.  I'm also counsel in the related

19  Calhoun matter, and I can't unknow what I know.  And I do

20  know that search terms have yielded email which do discuss

21  how profiles are created or things like that.

22    And so --

23          THE COURT:  Okay.  But --

24          MR. GUTKIN:  Your Honor --

25          THE COURT:  Hold on.

1      But if they do -- let me just -- hypothetically, if

2  they do, they can't be the only source for that.

3      See, that's what I'm trying to say, is that all kinds

4  of stuff ends up in email but it's not the only source of

5  the information.

6      So it just seems so impractical for the parties to be

7  saying, well, let's use search terms in email to get this

8  information, which has got to be available from some other

9  source.

10     So I'm sorry to interrupt you, Ms. Weaver.  I'll let

11  you finish your thought and then I'll go to Mr. Gutkin on

12  this point.  So I want to be fair to both sides here.

13          MS. WEAVER:  That's a good point, your Honor, and

14  we agree with you.

15     What I can say is that issues relating to changes in

16  what information is collected about users and statements

17  that the CEO, as alleged in our complaint, has made about

18  privacy relating to the auction or relating to the creation

19  of profiles, is in email.

20     I know that Ms. Caracuzzo has some input about what

21  kinds of documents.  But your point is well taken, this

22  should not be a crutch to limit the search and maybe a more

23  targeted search could be made through certain technical

24  protos or schemas or things like that, and we would welcome

25  that.

26

1          THE COURT:  Okay.  All right.  Thank you.

2      Let me just go to Mr. Gutkin on this issue.

3          MR. GUTKIN:  Well, I have a few reactions, and

4  I'll try to be brief.

5      First of all, Ms. Weaver's characterization of this

6  concept that all information that Google collects is going

7  to need to be at issue in this case is to my mind a radical

8  and completely indefensible expansion of what discovery here

9  needs to be.

10     This needs to be the information that is actually

11  shared through this one product.  What we have here is a

12  case about a claim that personal information is being shared

13  through bid requests to advertisers using this one product.

14     All information Google collects is, needless to say, an

15  incredibly broad topic.  It's going to involve all kinds of

16  products not at issue, all kinds of information that never

17  under any circumstances would touch upon the real-time

18  bidding auction.

19     So that's my first reaction.

20          THE COURT:  Okay.

21          MR. GUTKIN:  Secondly, I completely agree with

22  your Honor.  And we have agreed to produce documents and

23  have already been producing documents regarding the data

24  flow.  We've produced a lot of documents on that already,

25  and it is being done by targeted collection, as makes sense.

1      Third of all, there are actually search terms that

2  we've accepted that are going to touch on these same issues,

3  including -- I mean I'll just point your Honor to -- you

4  were looking at Exhibit D, which is Google's exhibit related

5  to search terms that has the accepted search terms, which

6  plaintiffs refuse to include in their exhibit --

7            THE COURT:  Okay.

8            MR. GUTKIN:  But L, for example, has profiles,

9  verticals, segments and then near, disclose, send, transmit,

10  receive, recipient, circulate.  So that's a good example of

11  terms that touch on that.

12      We also have search term B, which is one that Google

13  has agreed to that is not limited to RTB but it has:

14  disclose, share, trade, exchange, within a certain connector

15  of user information, personal information, PII.

16      So we've agreed to search terms on this.

17      And then if you take kind of a perfect example of the

18  things that plaintiffs are asking for that don't make sense,

19  I would direct your Honor to search term 65, which is data

20  flow or user within three of flow and RTB.

21      So we are doing a targeted collection to show the data

22  flow and what information is transmitted.  We've already

23  produced all these publicly available protocols that say

24  here are the different things that are transmitted or can be

25  transmitted.

1    They want us to look at every document that references

2  data flow anywhere in the same document as RTB.

3        So I think, your Honor, what we're doing is exactly

4  consistent with what you're picturing.  And what plaintiffs

5  are trying to force us to do is not appropriate and not

6  defensible.

7              THE COURT:  Let's just take your last example.  Is

8  Google only producing publicly available documents or is it

9  also producing whatever detailed internal documents document

10  the data flow?

11             MR. GUTKIN:  It is not publicly available

12  documents.  We actually have lots of different internal

13  documents that we're producing and many we have produced

14  about the data flow.

15             THE COURT:  Okay.  Is --

16             MR. GUTKIN:  Although the -- I apologize.

17             THE COURT:  That's okay.  Go ahead.

18             MR. GUTKIN:  The publicly available documents

19  actually do provide the exact detail on what's shared

20  because that's the ones that the recipients of the bid

21  requests have to use to set up their systems for what

22  they're going to get.

23        So it's it's pretty comprehensive already, those

24  documents, but we're producing internal documents as well,

25  your Honor.

29

1          THE COURT:  I would expect there to be more detail
2  in internal documents than there is in public facing
3  documents or even in documents that are shared with the RTB
4  participants, because I expect that there are confidential
5  internal procedures and operations that Google has that
6  might bear on this dispute that would not be shared with
7  anyone else.
8      And so I would be surprised if only public documents
9  were being produced.  I understand, based on your
10  clarification, that's not what you meant to communicate, so
11  I get that.
12      All right.  These are some of the nuances that I think
13  are helpful for me in helping you resolve this dispute, but
14  I do think fundamentally that search terms tend to get used
15  in the wrong way, especially when applied to email, to get
16  things that should be gotten through some other better
17  means.  And I would really like to have the parties reflect
18  on that issue.
19      There may be some things that are only available
20  through the application search terms and it wouldn't be easy
21  to find or there's no really good feasible way to do a
22  targeted search for them, and it really is appropriate to
23  search terms.  Hard for me to tell from your submissions
24  what those are until we get into the weeds.
25      But, you know, I expect that we will get there.

1          MS. WEAVER:  Your Honor, may I respond briefly?  I

2   think I can --

3          THE COURT:  Yes.  Go ahead.

4          MS. WEAVER:  I understand what you're saying, and

5   I'm going to give you an example that is perfectly aligned

6   with what you are proposing.

7      In paragraph 146 of our complaint, relying on some of

8   the very public documents Mr. Gutkin is referring to, which

9   we reviewed before filing our highly detailed complaint,

10  there is a series of code in a snapshot there.  I wish I

11  could share my screen with you.

12      And among them it talks about detected verticals, which

13  are real-time categories that users are put in based on the

14  data collection that Google is constantly doing and running

15  algorithms.

16      And, for example, it said ID 184, and because of

17  another document, not in an email, to your point, we know

18  that that vertical, at least at some point in time, was

19  celebrities and entertainment news.

20      Another one there, ID 401, corresponds with pregnancy

21  and maternity.

22      And so what we want to understand in this case is how

23  people are being put in those segments, and we want the

24  internal documentation that reflects today what's happening

25  and what was happening at the beginning of the class period.

31

1    So that's to your point.

2    Search terms are appropriate in some other categories

3  with regard to discussions on privacy in the auction.

4          THE COURT:  But can I ask a question before you

5  leave that example?

6          MS. WEAVER:  Yes.

7          THE COURT:  So I think Mr. Gutkin pointed me to an

8  already agreed search term "L" maybe that includes

9  references to vertical, which would encompass detected

10  vertical, I assume, or any of those other terms that you

11  were using.  It seems like you're in vehement agreement on

12  that.

13          MS. WEAVER:  Yes, agreed.

14          MR. GUTKIN:  Well --

15          MS. WEAVER:  But to make your point, your Honor,

16  that -- so a search term may be effective there and also a

17  targeted collection as well.

18          THE COURT:  Okay.  All right.  So you're agreeing

19  with Mr. Gutkin in both respects.  Targeted search might be

20  necessary.  Search term might also be necessary.

21          MR. GUTKIN:  I just have to say, your Honor -- and

22  I won't use the time at this hearing -- what Ms. Weaver just

23  said is factually inaccurate about what a detected vertical

24  is.

25          THE COURT:  Okay.

32

1            MR. GUTKIN:  I have to say that because we're in a

2   public and she's misstated a fact.  But with respect to Ms.

3   Weaver, who I like --

4            MS. WEAVER:  I like you too, Jeff.

5            MR. GUTKIN:  Thank you.  We have F as in Frank, K

6   as in kite, L as in Larry.

7            THE COURT:  Yes, I see those.

8            MR. GUTKIN:  They all have vertical F search terms

9   that we've referred to.

10            THE COURT:  I see that.  So that's some area of

11   agreement between the parties.

12      But I interrupted you, Ms. Weaver.  You were going to

13   give me some counterexample?

14            MS. WEAVER:  Yes.  Examples where we think search

15   terms have been rejected.

16      And I'll start with the one that I frankly find a

17   little bit baffling, which Ms. Reddy referred to.

18            THE COURT:  Okay.  But let's make sure we don't

19   share any confidential information in the public -- okay.

20            MS. WEAVER:  Yes.  I will work on that.  I believe

21   Ms. Reddy herself referred to WAA, which is a public facing

22   user setting called Web and Activity.  And publicly that has

23   been the basis for Google's pending motion for summary

24   judgment on consent in the Calhoun matter and also similar

25   arguments in Rodriguez, which is to say, Google has taken

33

1  the position in other cases that that setting and a message

2  that goes to users, account holders, created consent.

3      And so it's a little confusing to us in this case that

4  Google is rejecting that search term, when it presumably at

5  some point will make a similar consent argument before its

6  pending -- Judge Gonzalez Rogers' ruling on that issue.

7           THE COURT:  Okay.  That actually was one that I

8  think I actually got in terms of the parties' dispute.  And

9  I understand that the issue is not that there is some rule

10 in the case for this WAA discussion but whether it should be

11 a standalone search term, given the nature that -- given the

12 role that it plays in the case, which I understand to be,

13 Google says, the individual plaintiffs and perhaps others in

14 the class -- but at least at this point the individual

15 plaintiffs have invoked a setting or not invoked settings on

16 their devices that is relevant to the question of whether

17 they have consented to a particular use of their personal

18 information.

19     And Google's argument is that doesn't justify a

20 standalone use of that term as a search term across all

21 custodians, that that would just cough up a bunch of

22 information that is not relevant to that particular defense.

23     So that's the issue that I see as joined.  So I'm not

24 sure what -- the briefing that I have doesn't really address

25 that issue.  And maybe it's because of the order in which

34

1  you all prepared this joint submission.

2       But I'm looking at the chart at page two, and the

3  argument that's there -- and I don't really see how a search

4  term that is a standalone use of WAA, or these variations,

5  really answers Google's concern.

6       So you can tell me what your answer is.

7            MS. WEAVER:  Yes.  Let me address substance.  And

8  then Ms. Swope is our search term -- the person who will be

9  addressing search terms in the weeds, if you will, your

10 Honor.

11           THE COURT:  Okay.

12           MS. WEAVER:  Literally it is -- Google is taking

13 the position that WAA -- I understand that is how Google is

14 pronouncing it --

15           THE COURT:  Okay.

16           MS. WEAVER:  -- is not relevant.

17      And then there is also SWA, which is the Supplemental

18 and so -- and I can say that there is significant -- you

19 know, Google is discussing when it is implementing these

20 consent changes whether or not they are effective.

21      They do sampling of users and discuss outcome as one

22 might expect --

23           MR. GUTKIN:  Your Honor --

24      I apologize, Ms. Weaver, I'm concerned.  I don't know

25 what the source of what you're saying is and I'm concerned

35

1  that it is subject to the protective order, possibly here,

2  or possibly in the other matter in which you're working.

3          THE COURT:  How about this.  Why don't we reserve

4  discussion of this for when I put the matter under seal,

5  which I will do shortly.

6      So I don't want to cut off the argument, Ms. Weaver,

7  but I do want to respect the parties' agreement to proceed

8  in this way that I described at the outset.

9          MS. WEAVER:  Your Honor, as do I.

10      Why don't we let Ms. Swope get in the weeds on the

11  search term.

12          THE COURT:  No getting in the weeds right now.

13          MS. SWOPE:  No, I'm actually looking to move out

14  of the weeds.

15          THE COURT:  Okay.  Let's move out of the weeds.

16          MS. SWOPE:  I think it's much better time served

17  to discuss this at a higher level and discuss process as

18  opposed to results, because there's a couple things that I

19  want to respond to Mr. Gutkin about process.

20      I feel like we're building a house on quicksand.  And

21  the problem is, is that exactly -- you suggested why don't

22  you just take one custodian and run the search terms on that

23  one custodian and see how it works.  And Mr. Gutkin

24  responded and there's issues exporting documents to the

25  review pool.

36

1    And that's exactly the issue that we have a problem

2    with.  The problem is that the process for purposes of

3    having a negotiation in a candid and informal discussion,

4    which you ordered us to do to begin with, is that Mr. Gutkin

5    and his client are not taking even the smallest one

6    custodian, their documents and moving it to the review

7    platform so that we can take even a sample.

8        So the process that --

9            THE COURT:  I understand that argument.  I'm sorry

10   to cut you off.

11           MS. SWOPE:  Sure.

12           THE COURT:  But I think that the point that Google

13   is raising in response is that while that might be

14   something -- and I'm putting words in Mr. Gutkin's mouth,

15   but I'm thinking that might be an appropriate course of

16   action for some terms.  It's not for all 50 or all 49 or

17   however many.

18       It's just like too much to ask when there are some

19   things that shouldn't be, even on their face, a search term.

20   So I --

21           MS. SWOPE:  I'm just talking about one custodian,

22   not --

23           THE COURT:  I know one custodian, but all 50

24   terms.  Okay.  That's the issue.  Do this 50 random samples

25   for 50 terms.  I can see how that could be maybe problematic

37

1 and not a good process.

2  I am interested in the parties' thoughts on process,

3 but I need to move on to some other aspects of the dispute.

4    MS. SWOPE:  Okay.

5    THE COURT:  So let's reserve, and I have a thought

6 maybe about the term by term, which we will save that for

7 under seal.

8  But let me get through a couple of other questions that

9 I have about the terms, and I think it applies across a

10 number of terms.

11  Connectors was an issue that Mr. Gutkin raised in

12 response to one of my questions.  So using connectors, it

13 seems like an issue that is actually very amenable to

14 testing based on the existing production.

15  And this is what I have in mind.  There are some

16 documents that have already been produced everybody agrees

17 are responsive, I hope.

18  And one thing that the parties could do is take a

19 sample of those and say for any of these disputes where you

20 have a dispute about connectors, whether it should be 15, 25

21 or 35 or 50, would some responsive document get excluded if

22 you use something bigger than 25?  That would be the

23 question.

24    MS. SWOPE:  Well, we've done that, your Honor.

25    THE COURT:  Okay.  That's not in the papers.  I

38

1 don't have that in the papers.

2         MS. SWOPE:  Well, what I can represent -- and

3 Bethany can support me as needed, but what I can represent

4 is we ran these searches on the terms of the production,

5 which are only 20,000 documents that we've received so far.

6 We have a very small sample.

7     And we've been told by Google that they're 50 percent

8 completion, so I understand it's an estimate but 40,000

9 documents for this cases is not enough documents.

10     But in any event, we ran the search terms and they

11 didn't -- and Bethany can correct me, but there was no

12 document that resulted from the searches that we ran.

13         MS. CARACUZZO:  Your Honor, if I just might jump

14 in on this.  Up until --

15         THE COURT:  Wait, wait.  Please wait.  Sorry.  I

16 got a message that says that the Internet connection is

17 unstable, and my screen froze.  I don't know if other people

18 experienced that but I'm worried that I may have missed a

19 large chunk of what Ms. Swope said.

20     So --

21         MS. SWOPE:  I can repeat.

22         THE COURT:  Can you repeat your last remark, okay,

23 about the --

24         MS. SWOPE:  And I can even repeat it more briefly.

25         THE COURT:  Good.

39

 1          MS. SWOPE:  We ran the search terms on the

 2   documents that Google has produced, which are only 20,000,

 3   and all the search terms that we ran produced no documents.

 4          THE COURT:  Produced no documents.

 5          MS. SWOPE:  No hits.

 6          THE COURT:  I see.  I see what you're saying.  So

 7   you weren't able to test the connector issue?

 8          MS. SWOPE:  That's right.  Additionally, your

 9   Honor -- additionally, we're like this, 50 and 25.  And we

10   offered to Google to meet at 35.  We said we'll compromise

11   only at 35, and they said no.

12          THE COURT:  Okay.  Got it.

13          MS. CARACUZZO:  If I can just shed a little light

14   on why -- your Honor, excuse me, Bethany Caracuzzo for

15   plaintiffs -- on why we didn't include any sort of hit

16   counts in our briefing, was because up until the time the

17   briefing was submitted, we only had about 4400 or about

18   5,000 documents from Google, and we got a production while

19   we were briefing and filing.  And so now we only have 20,000

20   documents from Google.  So we did run those across just very

21   recently.

22       And so I just wanted to clarify, 20,000 documents in a

23   case of this size and scope just isn't going to capture

24   things.  And it's clear it's not.

25       And perhaps we need a representation in writing, and

40

1 which we've requested from Google, as to what they're going

2 to be doing targeted searches on, so that we can make sure

3 and ensure to ourselves that everything is being captured.

4      Throughout this process, Google has refused to agree to

5 anything that we propose or put it in writing, and so we're

6 trying to get to the end game and we don't want to waste

7 your time here, but we need to make sure that we get the

8 documents that are responsive in this case.

9      And when we're getting zero hits against the near

10 20,000 documents we have, it doesn't really give us a lot of

11 confidence.

12           MS. SWOPE:  And one more thing I'd like to just

13 add on top of Bethany.  We only have -- in terms of hit

14 counts, we have six.  Right now, for the disputed terms, 50,

15 60 search terms, that's given us six hit count.

16           THE COURT:  Six report of hit counts?

17           MS. SWOPE:  Not reports, no.  No, six search term

18 hits, counts.

19           MR. GUTKIN:  That is inaccurate.

20           THE COURT:  I'm sorry.  I'm not understanding what

21 you mean by that.

22           MS. SWOPE:  Okay.  Let me explain in more detail.

23 They have selectively given us hit counts for search terms

24 and those hit counts are not duplicated.  And they gave us

25 nine and we've agreed on three, and now we're at six search

41

1  terms for which we have hit counts.

2          THE COURT:  Okay.  For which ones?

3          MS. SWOPE:  I'll tell you.

4          THE COURT:  It would be helpful if this was in the

5  papers -- it probably is somewhere -- just so I understand

6  what you're talking about.

7          MS. SWOPE:  Sure.  They are for numbers eight, 10,

8  17, 18, 37, 38, 39, 56, and 62.

9          THE COURT:  Okay.  So those are ones for which you

10  understand Google has run which -- has run these search

11  terms across the entire agreed custodian pool, one

12  custodian?

13          MS. SWOPE:  Some of them are for nine or 10

14  custodians and some of them are -- they're all for nine, 10,

15  11 custodians.

16      I have the report.  I can submit it to the Court if

17  you'd like to see it.

18          THE COURT:  That's okay.  I'm trying to understand

19  what has been done.

20      Okay.  So those hit reports were done for some subset

21  of custodians.

22          MS. SWOPE:  Well, the ones that Google agreed to

23  run the search terms on, correct.

24          THE COURT:  The numbers --

25          MS. SWOPE:  They said we'll agree to run these

42

1  search terms -- no, they said when we run these search terms

2  on these custodians, these are the hits that we received.

3      But the point is, is that I only have this number here.

4  I only have nine hit counts for the search terms.  I gave

5  you the search term numbers.

6      So I don't have a report.  We don't a report.  We don't

7  have -- and these numbers are not the duplicated.

8              THE COURT:  Okay.  I just --

9              MR. GUTKIN:  Your Honor --

10             THE COURT:  Yeah, okay.  Go ahead, Mr. Gutkin.

11             MS. SWOPE:  Well, I'm not --

12             THE COURT:  I just -- I'm not sure why we're

13  belaboring this particular issue.  I will come up with a

14  recommendation for the parties I think to do some kind of

15  testing on some subset of these terms.  If it's helpful to

16  know what hits have already been run on which terms and

17  custodians, that may be helpful so nobody has to redo any

18  work.

19      But I think I have to move beyond this if we're going

20  to get to the end of this discussion.

21             MR. GUTKIN:  If I may have 30 seconds, your Honor.

22             THE COURT:  On the hit terms?

23             MR. GUTKIN:  To respond to what Ms. Caracuzzo and

24  Ms. Swope just said.

25             THE COURT:  Okay.

43

1        MR. GUTKIN:  The statements they're making about
2   the search terms that they've run over our production, we're
3   hearing for the first time today.
4        So the statement that Ms. Caracuzzo made about how they
5   want various information about what's being gathered in what
6   way is not before your Honor.  It's not a briefed issue.
7        And Ms. Swope is not correct about the number of hit
8   reports we provided.  We said in our papers it's 15.  I have
9   a feeling Ms. Swope is looking at the updated count of hit
10  reports that we provided after they offered to switch
11  certain connectors from 50 to 35.
12        THE COURT:  Okay.
13        MR. GUTKIN:  So I just want that on the record,
14  that some of these issues are not joined.  One we're hearing
15  about for the first time, and I believe Ms. Swope is
16  incorrect.  But with that, I'll defer.
17        THE COURT:  Okay.  Let me ask questions about
18  custodians now, and then we'll get to the under seal portion
19  of this.
20        Is the plan that you all have to run all search terms
21  that end up being approved or agreed across all custodians
22  or is there some sort of customization that some search
23  terms will be applied to these custodians, others to these
24  custodians?  Is there any kind of discussion about that?
25        Let me ask the defendant first that question, and then

44

1    I will get to the plaintiffs.

2        MR. GUTKIN:  Yeah, so I don't have all of the

3    details at my fingertips.  There are a small number of

4    search terms that were related to certain kinds of issues

5    where we were running them across only the most senior of

6    the 21 designated custodians.  I believe it's four or five

7    such terms that are limited in that way.

8        Ms. Reddy may know.

9        MS. REDDY:  I don't have that number offhand.

10   It's more than four or five though.  It's closer to eight or

11   10.

12       THE COURT:  Okay.

13       MR. GUTKIN:  Okay.  So there are -- I misspoke

14   then.  There are a number but the bulk of our search terms

15   that you see in our Exhibit D, which has A through CC or

16   whatever is the last letter, would be run across all of the

17   custodians.

18       THE COURT:  And you're representing this is an

19   agreement that has been reached between the parties about

20   which search terms get applied to which custodians

21   collections?  Or is that just what Google is proposing to

22   do?

23       MR. GUTKIN:  It's the latter.  That is not an

24   issue that we ended up teeing up in this brief.

25       THE COURT:  Got it.

45

1          MR. GUTKIN:  It's the latter, that's Google's

2  proposal.

3          THE COURT:  Okay.  Now, let me hear from the

4  plaintiffs on that question.

5          MS. CARACUZZO:  Yes.  Your Honor, it's Bethany

6  Caracuzzo.

7      We haven't gotten that far --

8          THE COURT:  Okay.

9          MS. CARACUZZO:  -- because we have not received

10  enough information from Google about these custodians.

11      As you can tell from our briefing and we can dive into

12  when we get there, Google has really refused to share any

13  information about its custodians with us, repeatedly on many

14  calls pushing it back on us to justify the custodians and

15  find and locate the custodians, find their job duties, tell

16  them what their job duties are, go back into the documents

17  that they have produced -- which at that time was only 4400

18  documents -- and give them the Bates numbers for the

19  documents that those people appear in.

20      And so we haven't even really gotten into really having

21  a really robust and fulsome discussion about the custodians

22  because Google has refused to do so.

23      As to who is the most senior, I mean we can determine

24  that I guess by looking at their LinkedIn, but this is not a

25  discussion that Google has had with us at any point in time

46

1  or really wanted to engage in.

2          THE COURT:  Okay.  All right.

3      So there is an issue here, as I understand it, about

4  custodians and figuring out whether you have the right set

5  of custodians and whether adding more would be adding

6  potentially unique sources of documents or whether they

7  would be merely duplicative.  That's what I understand is

8  the core issue.

9      And it sounds like maybe that's something that I can't

10  address in public if it would require discussion about

11  different people, their roles and different projects with

12  code names.

13      So maybe now is the time when I need to put the

14  remainder of this proceeding under seal.  So I'm going to do

15  that now.

16      So let me turn it over to Ms. Kratzmann to instruct our

17  audience about what's going to happen next.

18          THE CLERK:  Yes, your Honor.

19      So those attendees who should not be privy to this

20  hearing should exit the webinar because I need to lock the

21  webinar.  And if I need to confirm with counsel --

22          THE COURT:  Let me just say to our audience, my

23  law clerks can stay in the proceeding.  Anyone else who is a

24  client -- actually not a client.  Anyone else who is a

25  lawyer associated with a party in this proceeding can stay

47

1 in the proceeding.

2    Everyone else should exit the Zoom proceeding so that

3 we can put the remainder of the proceeding under seal.

4    I think I have that right.  Yes, Ms. Kratzmann?

5        THE CLERK:  Yes, your Honor.

6        THE COURT:  And so you don't need to be promoted

7 to a panelist to remain in the proceeding and to hear what's

8 going on in the under seal portion, but we do need to have

9 people exit.

10    So let me -- there's a number of names that I don't

11 recognize.  Let me ask counsel for plaintiffs which of your

12 colleagues are appropriate to remain in the proceeding.  Can

13 you tell me their names.

14        MS. WEAVER:  I am not entirely certain.  I believe

15 Mr. David Straite is listening.  I don't know who else may

16 be.  Is there a list -- I tried to pull the participant list

17 up on my screen and I can't seem to see it.

18        THE COURT:  So you can't see the list of

19 attendees?

20        MS. WEAVER:  It's maybe my own infirmities, but I

21 cannot.

22        MS. SWOPE:  I can, your Honor.

23        THE COURT:  Okay.  So, Ms. Swope, please tell me

24 who should remain from the plaintiffs' side.

25        MS. SWOPE:  For plaintiffs, Brian Danitz, David

48

1  Straite, James Ulwick, and Yury Kolesnikov.

2          THE COURT:  Okay.  Ms. Kratzmann, did you get

3  that?

4          THE CLERK:  Let me just get those.

5      Okay.  Mr. Danitz.

6          MS. SWOPE:  Yes.

7          THE CLERK:  Straite.  Mr. Straite.

8          MS. SWOPE:  Yes.  James Ulwick.

9          THE CLERK:  James Ulwick, I see there.  Okay.

10          MS. SWOPE:  And the last one, Yury Kolesnikov.

11          THE CLERK:  Okay.

12          THE COURT:  Now, the same question for

13  defendants -- or defendant, excuse me.  Which of the folks

14  participating should remain?

15          MR. GUTKIN:  So Mr. -- there are several attorneys

16  from my law firm on this line in the attendees box that I

17  can see, Mr. Dillon, Mr. Scott, Mr. Anderson and Mr.

18  Saldana.  And then there is an attorney from Google, Ms.

19  Pierre, was is also in attendance who is fine from our

20  perspective to stay.

21          THE COURT:  Okay.

22          MR. GUTKIN:  Did someone address Ms. Eng

23  (phonetic)?  Is she counsel for plaintiffs?

24          THE COURT:  She is my law clerk.

25          MR. GUTKIN:  Oh, I'm -- thank you.

49

1      THE COURT:  She is allowed to stay.

2    All right.  I think then we are set.  I don't think

3 anyone needs to be removed.

4    Ms. Kratzmann?

5      THE CLERK:  That is correct.  I'm going to go

6 ahead and lock this now, your Honor.

7      THE COURT:  Okay.  Thank you.

8      THE CLERK:  And the webinar is now locked.  No one

9 else can join.

10    (Sealed portion of proceedings omitted.)

11    (Proceedings adjourned at 1:13 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

50

1                    CERTIFICATE OF TRANSCRIBER

2

3      I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16           Echo Reporting, Inc., Transcriber

17             Tuesday, March 15, 2022

18

19

20

21

22

23

24

25