# EXHIBIT 2

17. Explain how the price is determined for the winning bid in an AdWords Auction.

18. Describe how a Second-Price-Auction works in AdWords.

19. Explain how AdSense conducts an Ad Auction and selects a winning bid, including the role of AdRank in the process.

20. Explain how the price is determined for the winning bid in an AdSense Auction.

21. Describe how a Second-Price-Auction works in AdSense.

22. Explain Your business rationale for using Smart Pricing in an AdSense Auction to automatically reduce bids for certain Ad Inventory.

DoubleClick for Publishers

23. Explain how a user's browser interacts with DFP.

24. Explain the process of how DFP identifies whether or not an ad that was sold directly by the Publisher is eligible to be served to a user.

25. Explain the process of how DFP triggers AdWords to invite Advertisers to submit bids for an Ad Impression.

26. Explain the process of how DFP interacts with Ad Exchanges to submit bids for an Ad Impression.

27. Explain the process of how DFP interacts with AdX to collect bids for an Ad Impression.

28. Explain Your business rationale for offering DFP Small Business to Publishers for free.

29. Explain Your business rationale for charging Publishers for access to DFP Premium based on the number of impressions their ads receive.

    a. State how much You charge each Publisher per Ad Impression on DFP Premium.

    b. Explain Your business rationale for not including impressions sold through AdSense in this pricing model.

    c. Explain Your business rationale for not including impressions sold though AdX Seller in this pricing model.

    d. Identify the revenue of DFP by fiscal quarter for the Extended Time Period.

30. Identify the costs of running DFP by fiscal quarter for the Extended Time Period. To the extent that DFP Small Business and DFP Premium differ on cost, please distinguish between the costs of each.

Google Ad Exchange

31. Explain how AdX conducts an Ad Auction and selects a winning bid.

32. Explain how DSPs and Ad Networks submit bids for Ad Inventory and Ad Impressions. As part of Your response:

    a. Explain how AdX processes bids from DSPs and Ad Networks.

13

not include impressions sold through AdX Seller in DFP Premium pricing. The time period applicable to this Request is the Extended Time Period.

Google Ad Exchange

21. Produce Documents that relate to any complaint made by any Ad Exchange or SSP regarding how they interact with AdX in order to submit a bid for an Ad Impression. The time period applicable to this Request is the Extended Time Period.

22. Produce Documents that relate to any complaint made by any DSP or Ad Network regarding competition within AdX. The time period applicable to this Request is the Extended Time Period.

23. Produce Documents that relate to any complaint made by any Ad Exchange or SSP, regarding how AdX is optimized by You, including the reliability of any experiments conducted by AdX in order to optimize a AdX Auction. The time period applicable to this Request is the Extended Time Period.

24. Produce Documents that relate to any complaint made by any Ad Exchange or SSP regarding Your closing of an AdX Auction at a price lower than the reserve price. The time period applicable to this Request is the Extended Time Period.

25. Produce planning documents, white papers, market analyses, competitive analyses, retrospectives, strategic plans, or other decision-making and analytical Documents that relate to Your decision to impose a mandatory minimum ad spend for AdX.

26. Produce planning documents, white papers, market analyses, competitive analyses, retrospectives, strategic plans, or other decision-making and analytical Documents that relate to Your decision to only consider ad spend that is purchased through DBM to satisfy the mandatory minimum requirements for AdX.

Data Management Platforms

27. Produce Documents that relate to any complaint received by You from any DMP that You permitted to connect to, interoperate with, or integrate with DBM regarding problems connecting to, interoperating with, or integrating with DBM or Google Au1ience Center.

28. Produce Documents that relate to any complaint received by You from any DMP that You denied a request to connect to, interoperate with, or integrate with DBM or Google Audience Center.

29. Produce Documents which relate to how Your policy of prohibiting standalone DMPs from using tracking pixels on GDN affects their business, including their ability to retarget users on Ad Networks not owned by Google and their ability to target users across channels.

Retargeting

30. Produce Documents that relate to any complaint by any T-50 Advertiser regarding the use of last-click attribution or last-impression attribution by Google Analytics as a means to measure the effectiveness of any ad campaign, ad channel, or advertising strategy.

Dynamic Allocation

31. Produce Documents that relate to any complaint received by You from any Ad Exchange or any T-50 Publisher regarding how Dynamic Allocation estimated the CPM price of an Ad Exchange.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY

GOOG-CALH-00038854

49. Produce all Documents relating to any study responsive to the preceding request.

Exchange Bidding

50. Produce Documents that relate to any complaint by any T-50 Publisher regarding the Exchange Bidding process.

51. Produce Documents that relate to any instance in which any T-50 Advertiser or any Ad Exchange complained that they wanted to or intended to bid on any Ad Impression, but was unable to do so based on how an Ad Exchange was ranked in DFP with Exchange Bidding enabled.

52. Produce Documents that relate to any complaint made by any Ad Exchange related to integrating with AdX through a server-to-server connection.

53. Produce Documents that relate to the impact of Exchange Bidding on other Ad Exchanges.

54. Produce Documents that relate to the impact that Exchange Bidding had on Publishers' ad revenue.

55. Produce Documents that relate to the impact that Exchange Bidding had on Advertisers' ad spend.

56. Produce Documents sufficient to demonstrate any fee structure for fees charged to third-paiiy exchanges for the opportunity to participate in Exchange Bidding.

Mobile Targeting

57. Produce Documents that identify Your scale, market share, or product diversity as source of Your ability to collect and monetize data across multiple devices and technologies, or that otherwise compare Your ability to collect and monetize data across multiple devices and technologies with that of any competitor.

58. Produce Documents that relate to any complaint by any T-50 Publisher regarding AdMob SOK filling Ad Inventory that was a directly sold by the Publisher.

59. Produce planning documents, white papers, market analyses, competitive analyses, retrospectives, strategic plans, or other decision-making and analytical Documents that relate to Your decision to use a login function to collect user behavioral data across devices.

Accelerated Mobile Pages

60. Produce Documents sufficient to show Your relation to, control or influence over, or participation in the AMP Project, including Documents sufficient to identify any individual currently or previously employed or retained by You who possesses or has possessed decision-making authority relating to the AMP Project, and the nature of their authority.

61. Produce Documents sufficient to illustrate each materially different iteration of the governance of or final decision-making authority within the AMP Project (for instance, by a steering committee versus by technical lead).

62. Produce Documents sufficient to show the criteria by which participants in the governance of the AMP Project are or have been selected.

63. Produce Documents sufficient to identify all persons who have expressed a desire to participate in the governance of the AMP Project.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                    GOOG-CALH-00038856

64. Produce Documents sufficient to show the amount and type of resources (for instance, money, employee time, equipment, or facilities) You have expended in relation to the AMP Project.

65. Produce Documents sufficient to show the pros and cons of any technology, solution, or project You considered as a potential alternative to the AMP Project.

66. Produce Documents that relate to Your reasons or motivations for Your pa1ticipation in the AMP Project, including Your plans to profit directly or indirectly from the AMP Project.

67. Produce Documents that relate to any reason You have or have had for requiring that (or acquiescing to a requirement that) AMP pages be served from a cache via google.com or ampproject.org.

68. Produce Documents that relate to any direct and indirect benefits or costs to You of implementing a requirement that AMP Pages be served from a cache via google.com or ampproject.org (as opposed to a third-party server, such as a Publisher's server).

69. Produce Documents sufficient to show the types of Behavioral Data which You have collected or can collect when a user views an AMP Page.

70. Produce Documents sufficient to show the types of Behavioral Data which third-party website owners have collected or can collect when a user views an AMP Page.

71. Produce Documents sufficient to show the types of Behavioral Data which You have collected or can collect when a user views a non-AMP Page.

72. Produce Documents sufficient to show the types of Behavioral Data which third-party website owners have collected or can collect when a user views a non-AMP Page.

73. Produce Documents sufficient to show how the introduction or use of AMP Pages impacts the Cookie-Matching process.

74. Produce Documents that relate to any benefit You perceive as able to accrue to You when a user views an AMP Page instead of its non-AMP Page counterpart.

75. Produce all Documents relating to Your consideration or analysis of whether (or the extent to which) non-AMP Pages should be included in Your Carousels.

76. Produce Documents that relate to how a webpage's status as an AMP Page versus a non-AMP Page can impact that webpage's placement in Your search engine results page.

77. Produce Documents relating to Your analysis or consideration of whether, or the extent to which, a webpage's status as an AMP Page versus a non-AMP Page should impact that webpage's placement in Your search engine results page.

78. Produce Documents that relate to the direct or indirect financial impact to You arising from the AMP Project.

79. Produce Documents that relate to any of Your predictions or analysis of future direct or indirect financial impact to You arising from the AMP Project.

80. Produce all Documents that relate to any criticisms that the AMP Project harms competition or Publishers, including but not limited to Documents that relate to the correspondence published at ampletter.org.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                       GOOG-CALH-00038857

81. Produce Documents sufficient to show the extent to which any third-party analytics vendor is permitted or given access to Behavioral Data with respect to AMP Pages.

82. Produce Documents sufficient to show the criteria by which it is determined whether a third-party analytics vendor such as Adobe Analytics or comScore is permitted or given access to Behavioral Data which You collect or maintain and which results from an AMP Page being served from a cache via google.com or ampproject.org (as opposed to from a third-party server such as a Publisher's server).

83. Produce Documents sufficient to show Your relation to, control or influence over, or association with Prebid and prebid.org.

84. Produce all latency studies done by You or in Your possession with respect to the AMP Project or AMP Pages.

85. Produce all Documents relating to any study responsive to the preceding request.

86. Produce all abandonment studies done by You or in Your possession with respect to the AMP Project or AMP Pages.

87. Produce all Documents relating to any study responsive to the preceding request.

88. Produce all effectiveness studies done by You or in Your possession with respect to the AMP Project or AMP Pages.

89. Produce all Documents relating to any study responsive to the preceding request.

90. Produce Documents that relate to how the AMP Project will affect or has affected internet traffic to Publishers who offer their own targeted advertising services to Advertisers.

Chrome

91. Produce planning documents, white papers, market analyses, competitive analyses, merger retrospectives, strategic plans, or other decision-making and analytical Documents concerning the ability of third-patties to implement cross-site tracking or Cookie-Matching on Chrome.

92. Produce Documents that relate to any complaints from Publishers or Data Management Platforms regarding the ability of third-parties to implement cross-site tracking or Cookie-Matching on Chrome.

Privacy Policy

93. Produce planning documents, white papers, market analyses, competitive analyses, merger retrospectives, market studies, forecasts and surveys, strategic plans, and other decision-making and analytical Documents regarding changes You made to Your DFP Ad Privacy policy in 2016.

94. Produce Documents that relate to any complaints from any T-50 Publisher, or from any Data Management Platform, Ad Exchange, SSP, or DSP, regarding changes You made to Your DFP Ad Privacy Policy in 2016.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                                                                          GOOG-CALH-00038858

YouTube

95. Produce Documents that relate to any complaints from any T-50 Advertiser or T-50 Publisher, of from any DSPs or Ad Exchanges, regarding Your decision to remove YouTube Ad Inventory from other Ad Exchanges.

Competition

96. Produce planning documents, white papers, market analyses, competitive analyses, merger retrospectives, market studies, forecasts and surveys, strategic plans, and other decision-making and analytical Documents related to the sales, market share, or competitive position of You or Your products or competitors and their products. For the purpose of this interrogatory, "competitor" shall mean any competitor identified in response to interrogatories 104-115. The time period applicable to this Request is the Extended Time Period.

Financial Documents

97. Produce Documents sufficient to show Your share of Programmatic Advertising revenue (i.e. the total amount paid by Advertisers in respect of ads using your services) in comparison to the portion of Programmatic Advertising revenue received by Publishers for the Extended Time Period.

98. Produce Documents sufficient to show the fee structure paid by Advertisers on each of Your products in the Ad Intermediation Market and the Ad Serving Market for Advertisers throughout the Extended Time Period.

99. Produce Documents sufficient to show the fee structure paid by Publishers on each of Your products in the Ad Intermediation Market and the Ad Serving Market for Advertisers throughout the Extended Time Period.

100. Produce Documents sufficient to show the fee structure paid by Advertisers on each of Your products in the Ad Intermediation Market and the Ad Serving Market for Publishers throughout the Extended Time Period.

101. Produce Documents sufficient to show the fee structure paid by Publishers on each of Your products in the Ad Intermediation Market and the Ad Serving Market for Publishers throughout the Extended Time Period.

102. Produce Documents that relate to the historical bid data and pricing data of competing Ad Exchanges that is retained by DFP throughout the Extended Time Period.

103. Produce Documents that relate to how You use historical bid data and pricing data to calculate how much You will bid for Ad Inventory during the Extended Time Period.

104. Produce any contracts that You have entered into with any T-50 Publisher or T-50 Advertiser during the Extended Time Period.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                                                                                  GOOG-CALH-00038859

## INTERROGATORIES

**AdTech Products and Information**

1.  Identify all Source Code Repositories relating to each of Your past, present, and proposed AdTech Products, including a detailed description of the purpose and function of each.

2.  List the name and provide a brief description of each of Your AdTech Products over the Extended Time Period; for each such product, list any pre-release or internal code names or code words by which it has been known, its status (e.g., in use, retired, or renamed), all prior changes in status (including the date of any change in status; e.g., launch date, rebranding date), and any successor or predecessor product bearing the same or similar functionality (in whole or in part).

3.  Identify all software tools (both internally developed and purchased or licensed from a third party) You use to manage the development of Your AdTech products.



5.  Identify and describe in detail any advantages to any of Your AdTech Products arising from Your access to, accumulation of, or use of Behavioral Data.

6.  Identify and describe any advantages to any of Your AdTech Products arising from Your maintaining information that relates to past bidding behavior of bidders into an Ad Auction You conduct, including, but not limited to, Exchange Bidding and Open Bidding.

7.  Explain how You (including but not limited to GAM, AdX, DFP, AdSense, Google Ads, or other Google products and services) use the data You collect about Publishers' websites and profiles of their users. For example, but without limitation, this request pertains to audience profiles for the Publisher's audience, reach, engagement, Publisher profiles, Ad Inventory assessments or evaluations or ratings, Publisher or inventory quality scores, ratings, user or audience

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                          GOOG-CALH-00039023

demographics, affinities, or other segmentation information or evaluations that You create or maintain about the website users.

**AdTech Auction Mechanics**

8. List the name and provide a brief description of each of Your AdTech Auction Mechanics over the Extended Time Period; for each such auction mechanic, list any pre-release or internal code names or code words by which it has been known, its status (e.g., in use, retired, or renamed), all prior changes in status (including the date of any change in status; e.g., launch date, rebranding date), and any successor or predecessor auction mechanic bearing the same or similar functionality (in whole or in part).

9. List and describe in detail each feature change to GAM, DFP, and AdX during the Extended Time Period, including but not limited to changes to reservations, line item types, line item priorities, any changes involving how line items compete with one another, and any changes involving how other factors beyond line item types and priorities affect ad selection.

10. Describe in detail how guaranteed line items and remnant line items affect the bidding price AdX submits to DFP or GAM or how they otherwise influence the auction process. As part of your response, describe how this has changed, if at all, throughout the Extended Time Period.

11. The time period applicable to this interrogatory is the Extended Time Period. List the specifications and descriptions of the data transferred or communicated between:

    a.   GAM, DFP, and AdX under Dynamic Allocation and Enhanced Dynamic Allocation; and

    b.   GAM or DFP and non-Google Ad Exchanges.

12. Describe in detail the extent, if any, to which You have developed or used any sort of software or algorithm to predict present or future real-time bids from any non-Google Ad Exchange or **DSP.**

█   ████████████████████████████████████████████████████████████

    a.   use to conduct an Ad Auction to determine the winning bid amongst the bids received to display an ad, including the source(s) of such information;

█   ████████████████████████████████████████████████████████████

    c.   provide to the Publisher of the web page corresponding to an Ad Request regarding the conduct, details, and results of an Ad Auction; and

    d.   use to dynamically alter the conditions or circumstances of an Ad Auction, including but not limited to, alterations of bid floors, bid weights, and bid time outs.

14. Explain how You convert a winning bid from a second-price AdX or GAM auction to compete in a first-price auction such as Open Bidding.

15. Identify any restrictions on a Publisher's use of non-Google Ad Exchanges or SSPs when using DFP or GAM to connect to advertising demand, and explain Your technical or business justifications for each. As part of Your explanation, describe any circumstances under which a Publisher is allowed to serve an ad using DFP or GAM without allowing one of Your Demand-Side Products to bid on that ad inventory.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                    GOOG-CALH-00039024

identify the number of monthly impressions won by You that would not have been won without **DRS,** expressed as a percentage of all impress won by You for each month since you began using DRS until the present day.

59. Explain the role that negative revenue share **DRS** and bid-oblivious have on Publishers' revenue, Advertisers' prices, or Your Revenue. As part of Your response, explain the conditions under which You have accepted (or under which You would accept) a negative revenue share in order to win a particular Ad Impression.

60. Describe any predictions or knowledge of any actual or anticipated effect(s) that Advertisers' awareness of **DRS** or **RPO** would have on the use of Your Demand-Side Products, the revenue that You receive from Your Demand-Side Products, or on Your Quality efforts *(see, e.g.,* GOOG-TEX-00082760).

**Demand Side**

61. Identify any commission(s) or fee(s) You charge to Advertisers who purchase Ad Inventory through Google Ads or AdWords.

62. Explain whether the AdWords or Google Ads auction that occurs prior to Unified Auction is a first-price or second-price auction. As part of Your answer, describe how the winning bid from the AdWords or Google Ads auction participates in Unified Auction.

63. Explain Your business justification(s), technical reason(s), or other rationale(s) for restricting AdWords or Google Ads Advertisers to purchasing display Ad Inventory exclusively from Google Display Network other than for remarketing purposes.

[64. ████████████████████████████████████████████]

65. Identify any default ad campaign settings in AdWords or Google Ads that allow You to direct part of an Advertiser's ad spend to display inventory available on the Google Display Network or the Google Search Network. As part of your answer, identify the date that any such default setting was implemented.

66. Identify and describe in detail any policies or procedures that You have or have had regarding the use of Publishers' configuration data to recommend or direct that Publishers change their configurations to enable or preference Your AdTech Products.

67. Describe in detail any analysis, studies, experiments, or testing (including A/B testing or other comparative analysis) relating to the default campaign type in AdWords and/or the potential effects of any change or potential change thereto, including any analysis, studies, or testing relating to (or otherwise underlying or informing) Your decision to set the default campaign type in AdWords to include both Google Search Network and Google Display Network, and any effects such setting has had or could have on You or Publishers, Advertisers, Ad Exchanges, DFPs, or SSPs.

68. Explain how DV360, or any of its predecessor or successor products, selects the winning bid that it will submit to AdX, Open Bidding, Unified Auction, or a third-party Ad Exchange.

69. Identify any efforts, polices, or strategies to prevent any of Your Demand-Side Products from buying Ad Inventory through Header Bidding auctions. As part of Your answer, explain Your business justifications for any such decision.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                                                                               GOOG-CALH-00039030

## REQUESTS FOR DOCUMENTS

**AdTech Products and Information**

1. Produce a Clone of each Source Code Repository related to each of Your past, present, and proposed AdTech Products and AdTech Auction Mechanics.

2. Produce all Documents relating to Your development, maintenance, deployment, use, and/or operation of any past or present AdTech System, including, but not limited to, manuals, presentations, architecture diagrams, product requirement documents, data flow diagrams, programming guides, API references, protocol descriptions, interfaces, declarations, design specifications, launch reports, progress reports, status reports, onboarding materials, and/or training materials.

3. Produce a Clone of each Source Code Repository relating to processing and responding to commands, methods, and requests associated with Google Publisher Tags as described at https://support.google.com/admanager/answer/181073 (last viewed June 22, 2020).

4. Produce a Clone of each Source Code Repository relating to Your receipt of Ad Requests, including the processing and/or storage of the contents of Ad Requests.

5. Produce a Clone of each Source Code Repository relating to or otherwise effectuating the transmission of messages, information, or data from any of Your past, present, or proposed AdTech Products to any Publisher Ad Server.

6. Produce a Clone of each Source Code Repository relating to the transmission of Bid Requests in response to the receipt of an Ad Request, including Source Code related to the creation, transmission, and storage of such Bid Requests.

7. Produce a Clone of each Source Code Repository relating to the receipt of Bid Responses in response to Bid Requests.

8. Produce a Clone of each Source Code Repository relating to conducting an Ad Auction, including Source Code related to the determination of the winner, storage of information concerning bids, storage of information concerning the winning bidder, and the transmission of information concerning the result of the Ad Auction to others (including Advertisers and Publishers).

9. Produce a Clone of each Source Code Repository relating to dynamic alterations to the conditions or circumstances of an Ad Auction, including but not limited to, Source Code relating to alterations of bid floors, bid weights, and bid time outs.

10. Produce the database configuration (including schemas, procedures, functions, and triggers) for all databases used to store data relating to Ad Requests and their corresponding bids to display ads on web pages.

11. [REDACTED]

12. Produce a Clone of all Source Code that implements or effectuates Dynamic Allocation, Enhanced Dynamic Allocation, Exchange Bidding, Open Bidding, Unified Auction, Optimized Competition, Floor Pricing, and/or First Look.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                                                              GOOG-CALH-00039039



### AdTech Auction Mechanics



17. Produce all Documents relating to Your process of modifying a winning AdX bid from a second-price auction to compete in a subsequent first-price auction (such as in Open Bidding).

18. Produce all Documents that relate to Your decision to apply Publisher price floors to all programmatic buyers for Publishers participating in Open Bidding as part of the transition to a Unified Auction format.



    a.    Dynamic Allocation;

    b.    restricting non-Google Ad Exchanges' ability to access Dynamic Allocation before Dynamic Allocation became available to non-Google Ad Exchanges;

    c.    Your decision to allow AdX to outbid non-Google Ad Exchanges after they submitted their bids, as well as Your decision to discontinue this conduct;

    d.    Enhanced Dynamic Allocation;

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY     GOOG-CALH-00039040

    e.    Your decision not to support the option for Publishers to use Header Bidding in GAM, DFP, and AdX;

    f.    █████████████████████████

    g.    Your decision to charge a fee to Ad Exchanges who participated in Open Bidding or Exchange Bidding; and

    h.    Unified Auction.

**Relationships between Products**

21. The time period applicable to this request is the Extended Time Period. Produce Documents, including but not limited to product roadmaps, API documentation, interface documentation, interface specification, code documentation, product architecture schematics, and presentations (i) that detail or address the specifications, API documentation, and descriptions of the data transferred or communicated between the following, and/or (ii) that detail or address the functionality and interactions between the following:

    a.    DFP and AdX;

    b.    the Ad Server functionality of GAM and the Ad Auction functionality of GAM;

    c.    non-Google Publisher Ad Servers and AdX;

    d.    non-Google SSPs and AdX;

    e.    non-Google Ad Exchanges and DFP or GAM;

    f.    AdSense and AdX or DFP or GAM;

    g.    non-Google Ad Exchanges or Publisher Ad Servers and AdSense;

    h.    Google Ads and AdX or DFP or GAM;

    i.    non-Google DSPs and AdX or DFP or GAM;

    j.    non-Google Ad Exchanges and Google Ads;

    k.    non-Google Publisher Ad Servers and Google Ads;

    l.    DV360 and AdX or DFP or GAM;

    m.    non-Google Ad Exchanges and DV360;

    n.    SA360 and DFP or GAM;

    o.    non-Google Publisher Ad Servers and SA360;

    p.    AdSense and Google Ads;

    q.    non-Google DSPs and AdSense;

    r.    Google Marketing Platform (formerly DoubleClick Digital Marketing and Google Analytics 360 Suite) and AdX or DFP or GAM;

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY    GOOG-CALH-00039041

    s.    non-Google Ad Exchanges and Google Marketing Platform (formerly DoubleClick Digital Marketing and Google Analytics 360 Suite);

    t.    non-Google advertising analytics tools and AdX or **DFP** or GAM;

    u.    Chrome and Google Ads or DV360;

    v.    non-Google DSPs and Chrome;

    w.    Chrome and AdX or **DFP** or GAM; and

    x.    non-Google Ad Exchanges or Publisher Ad Servers and Chrome.

22.    Produce any Documents from the Extended Time Period that discuss or otherwise relate to analysis of, measurement of, or decisions related to:

    a.    the availability of the Google Display Network on non-Google Ad Exchanges;

    b.    the availability of the Google Display Network on non-Google DSPs;

    c.    Google Ads' ability or inability to interface with non-Google Ad Exchanges;

    d.    YouTube's ability or inability to interface with non-Google Ad Exchanges; and

    e.    YouTube's ability or inability to interface with non-Google DSPs.

**Changes to Products and Policies**



31

**Ad Auction Results**

24. Produce data sufficient to show, separately for Google Ads and DV360, on a monthly basis for the period starting January 2016 and until September 2019, the number of Ad Impressions (as an absolute number and as a percentage of the overall impressions made available on AdX or GAM) that Google Ads or DV360 won slightly above the bid submitted from a Header Bidding demand partner, whereby such bid from the Header Bidding demand partner would have otherwise won the impression (the "winning header bidding bid"). For the purposes of this request, "slightly above" means that the difference between the price that Google Ads or DV360 paid and the winning Header Bidding bid does not exceed $0.10 **CPM.**

25. Produce data sufficient to show, separately for Google Ads and DV360, on a monthly basis for the period starting October 2019 and until the present on the number of impressions (as an absolute number and as a percentage of the total number of impressions available in the Unified Auction) that Google Ads or DV360 won slightly above the floor price. For the purposes of this request, "slightly above" means that the difference between the price Google Ads or DV360 paid and the floor price does not exceed $0.10 **CPM.**

**Google Ad Manager**

26. Produce all Documents, including any tests, experiments, or simulations, and including any Documents from Your Rasta database, relating to the steps You have taken, and any steps You plan to take, to integrate (or otherwise co-market) Your products formerly known as DFP and AdX together into Your product now known as Google Ad Manager, including all steps relating to any technical, organizational, and personnel changes.

27. Produce all Documents that relate to changing the fees or commissions charged by AdX for conducting an auction of Ad Inventory.

28. ██████████████████████████████████████████████

29. Produce all Documents, including any Documents from Your Rasta database, relating to any experiment, analysis, or simulation You have conducted which relate to any of the "number of adjustments to the auction process" (or other "optimizations" to AdX or GAM) which You have made or have considered making (several such adjustments are listed in Your response to the Original TX CID Interrogatory 33).

30. To the extent you answered Interrogatory 25 above in the affirmative, produce all Documents relating to any such considerations, offer(s), and negotiations, including all related internal and external communications.

**Header Bidding and Open Bidding**

31. Produce all Documents relating to any of Your internal operations groups, employee groups, investigative teams, or task forces which have studied or examined (or are studying or examining) the effects of Header Bidding on any aspect Your business.

32. Produce all Documents relating to the establishment of, operation of, and conclusions drawn by Your Header Bidding Observatory Team.

32

33. Produce all marketing materials, materials relating to publicity campaigns, and material You provide to any of Your sales teams regarding Header Bidding.

34. Produce all Documents relating to any attempts by any Publisher, SSP, or Publisher Ad network to circumvent GAM's uniform pricing rules.

35. Produce the results of, and any supporting documentation associated with, any simulation or experiment You have conducted or are aware of related to Open Bidding, including but not limited to the experiments referenced in GOOG-TEX-00452550 and including any Documents from Your Rasta database.

36. Produce all Documents relating to Publishers or SSPs using Header Bidding and Open Bidding in combination, the implications of such conduct to You, and any actions You have taken or considered in response.

37. Produce all Documents that compare or relate to comparison of the performance of Open Bidding relative to Header Bidding, including but not limited to, the results of, and any supporting documentation associated with, any simulation or performance experiment related to Open Bidding and Header Bidding, including any Documents from Your Rasta database.

38. Produce all Documents containing or relating to any analysis of the flow of queries running through Header Bidding as compared to Open Bidding, including any analysis conducted by Al Fabrizio.

39. Produce all Documents relating to any attempts by You to solicit any Ad Exchange to become an Open Bidding Partner, and all Documents relating to any independent action You have taken or considered to increase or accelerate the adoption of Open Bidding by other Ad Exchanges.

40. Produce all Documents relating to any attempts by You to solicit any Publisher to participate in Open Bidding, and all Documents relating to any independent action You have taken or considered to increase or accelerate the adoption of Open Bidding by Publishers.

41. Produce all Documents relating to Your evaluation of Open Bidding Partners.

42. Produce all Documents relating to Your decision to remove Last Look for Open Bidding.

43. Produce all Documents, including any Documents from Your Rasta database, relating to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Open Bidding on Header Bidding, including but not limited to, any impact on Publisher revenue from the adoption of Header Bidding, the win rate of Header Bidding winners in Open Bidding or against AdX, and the volume of inventory sold through Header Bidding solutions.

44. Produce all Documents relating to your policies concerning multiple Ad Requests for a single ad slot, including any drafts, proposals, or correspondence relating to any changes made to Your multi-call polices.

45. Produce all Documents relating to any advantage or benefit conferred by increased viewability into Advertiser creatives as a result of Open Bidding which was not available to You prior to the introduction of Open Bidding.

33

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                                                                          GOOG-CALH-00039044

██ ████████████████ ████████████████████████████████████████

██ ██████████████████████████████████████

49. Produce all Documents relating to any fees You charge to Publishers, SSPs, or Ad Exchanges using Header Bidding that are not charged to Publishers, SSPs, or Ad Exchanges who are not using Header Bidding, or who are Open Bidding Partners or Authorized Buyers.

50. Produce all Documents relating to how You calculate or determine ad serving fees, the circumstances in which You charge ad serving fees, the circumstances in which You do not charge ad serving fees, and the circumstances in which You allow an exception to ad serving fees You would otherwise charge.

51. Produce all Documents relating to how You calculate fees for overly complex data reports and the circumstances in which such fees are charged.

52. Produce any contract between You and any third-party Ad Exchange, **SSP,** or Publisher that contains any provision that grants You "fair access" or the opportunity to bid on Publisher Ad Inventory sold on their platform1.

53. Produce any contract between You and any third-party Ad Exchange, **SSP,** or Publisher that contains any provision that requires them to make Ad Inventory available through Open Bidding if they also sell that inventory through Header Bidding.

**Unified Auction & Unified Pricing Rules**

54. Produce all Documents that relate to Your decision to implement Unified Auction and adopt Unified Pricing Rules, including but not limited to, strategy documents, white papers, competitive impact studies, and market analyses preceding that decision as well as those evaluating the impact and performance of Your Ad Tech Products as a result of Your decision.

55. Produce all Documents, including any Documents from Your Rasta database, that relate to any internal tests, experiments, simulations, or studies concerning the performance of third-party DSPs, Ad Networks, indirect line items, Direct sales and Header Bidding as a result of Your decision to move to Unified Auction and adopt Unified Pricing Rules.

56. Produce Documents that relate to any complaints made or concerns expressed by any T-50 Publisher, any T-50 Advertiser, any **SSP,** any **DSP,** or Ad Exchange, regarding the Unified Auction process (and/or Your announcement or implementation of Unified Auction), including all such complaints or concerns, any of Your internal discussion relating thereto, and any of Your responses.

57. Produce Documents analyzing or discussing the impact of Unified Auction on non-Google Ad Exchanges, Publishers, and/or Advertisers.

58. With respect to Your decision that publishers "will not be able to join the Bid Data Transfer file with other Ad Manager Data Transfer files" *(see* https://www.blog.google/products/admanager/rolling-out-first-price-auctions-google-ad-manager-partners/ (last viewed June 22, 2020)), produce:

   a. all Documents relating to Your decision, including all correspondence and studies underlying or otherwise relating to Your decision, Your evaluation of any alternatives,

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                                                                              GOOG-CALH-00039045

69. Produce Document relating to any complaints from any **DSP** or Advertiser regarding Your use of **DRS** or **RPO,** including Your internal discussions of any such complaints and any responses You have made to such complaints.

**Demand Side**

70. Produce all Documents that relate to Your decision to restrict AdWords or Google Ads Advertisers to purchasing display inventory exclusively from the Google Display Network other than for remarketing purposes.

71. Produce all Documents, including any analysis, experiments, studies, or testing (including A/B testing or other comparative analysis) relating to the default campaign type in AdWords and/or the potential effects of any change or potential change thereto, including any analysis, studies, or testing relating to (or otherwise underlying or informing) Your decision to set the default campaign type in AdWords to include both Google Search Network and Google Display Network, and any effects such setting has had or could have on You or any Publisher, Advertiser, Ad Exchange, DFP, or SSP.

72. Produce all Documents that relate to any decision by You to disclose AdWords and Google Ads log-level bidding data.

73. Produce any Documents that demonstrate how DV360 selects a winning bid from multiple demand sources to before it participates in an AdX auction, Open Bidding auction, or Unified Auction.

74. Produce all Documents that relate to bid shading, bidding algorithms, artificial intelligence, computer programs and applications, or other bidding strategy used by Google Ads or DV360 when bidding into any Ad Exchange, Header Bidding solution, or other auction.

75. Produce Documents that relate to any efforts undertaken, policies implemented, or buying strategies implemented by You to avoid buying Ad Inventory through Header Bidding auctions.

**Data Analytics and Verification**

76. Produce all Documents relating to Your introduction of private APIs in any of Your AdTech Products or AdTech Auction Mechanics, or for otherwise limiting third-party data usage or portability.

77. Produce all Documents relating to Your efforts to address, track, or combat fraudulent digital ad 1mpress1ons.

78. Produce all business and planning documents relating to Your consideration of, analysis of, or choice to offer any type of Attribution Model, including any type of Last Touch Attribution.

**Revenue/Pricing/Profits**



**Accelerated Mobile Pages (AMP)**

80. Produce all Documents relating to any efforts by any third-party Ad Exchange or **SSP** to increase the number of demand sources able to bid on Ad Inventory on AMP Pages, including those relating to any efforts based on traditional mediation techniques, Header Bidding, or by any other means.

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                          GOOG-CALH-00039047



**Internal Communications Channels**

109.  Produce all communications sent to, from, or on behalf of each of the Google Groups identified in Appendix A, and each additional Google Group, slack channel, wiki, hangout, and other electronic group messaging system or platform You identified in response to Interrogatories 123-124 above.

110.  Produce all Documents owned by or accessible to each of the Google Groups identified in Appendix A, and each additional Google Group, slack channel, wiki, hangout, and other electronic group messaging system or platform You identified in response to Interrogatories 123-124 above.

**General**

111.  Produce all Documents relating to any analysis, including substitution analysis, you have undertaken to assess or evaluate the extent to which the products or services of any other company compete with any of Your AdTech Products.

112.  Produce all Documents relating to any analysis you have undertaken to assess or evaluate any indirect network effects between Your Advertiser-facing AdTech Products and Your Publisher-facing AdTech Products.

113.  Produce all Documents relating to any analysis you have undertaken to assess or evaluate any barriers to entry and/or barriers to expansion faced by any other company who offers or potentially may offer any product or service in competition with any of Your AdTech Products; for purpose

HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY                                                    GOOG-CALH-00039050

of this request, "barriers" includes, but is not limited to, switching costs, default biases, information or data asymmetries, and access to inputs or customers.

114. Produce all communications between Google and the Interactive Advertising Bureau (IAB) concerning AMP, Header Bidding, and/or Supply Path Optimization.

115. Produce all Documents You reviewed or consulted in preparing any of Your responses to the Interrogatories in this CID and in the Original TX CID.

116. Produce Documents sufficient to support Your responses to the Interrogatories in this CID and in the Original TX CID.

117. To the extent You have not already done so, Produce all Documents responsive to the Requests for Documents in the Original TX CID in native format as specified in Exhibit B and in Instruction 3.A.C.a.

118. Produce Documents responsive to the Requests for Documents in this CID and in the Original TX CID which were or are associated with or created, held, or maintained by any of the Google Groups listed in Appendix A and/or any of the custodians listed in Appendix B. For purposes of clarity, neither this request nor Appendices A and B are intended to limit in any way the Google Groups and custodians from whom You must produce in response to this or any other CID; Your production must include all responsive non-privileged Documents from all of those Google Groups and custodians, as well as from all other sources in Your possession, custody, or control.

119. Produce all Documents, including all correspondence, sent to or from Sundar Pichai, Sergey Brin, and/or Larry Page which contain the phrase "Header Bidding" (or any $s_{yn}$onymous term or phrase, e.g., "HB").



40