1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3 Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5 In re                 )
                         )
6 GOOGLE RTB CONSUMER      )  No. C 21-02155-YGR
  PRIVACY LITIGATION,     )
7                     )
  _____)  **SEALED PROCEEDINGS**
8
                     San Jose, California
9                     Tuesday, March 8, 2022

10  <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
          RECORDING 12:10 - 1:13 = 63 MINUTES</u>
11

12 <u>APPEARANCES</u>:

13 For Plaintiffs:

                     Pritzker Levine LLP
14                  1900 Powell Street, Suite 450
                     Emeryville, California 94608
15             BY:  ELIZABETH C. PRITZKER, ESQ.
                 BY:  BETHANY CARACUZZO, ESQ.
16
                     Bleichmar Fonti & Auld LLP
17                  555 12th Street, Suite 1600
                     Oakland, California 94607
18              BY:  LESLEY ELIZABETH WEAVER, ESQ.

19                     Cotchett, Pitre & McCarthy LLP
                     999 N. Northlake Way
20                  Suite 215
                     Seattle, Washington 98103
21             BY:  KARIN BORNSTEIN SWOPE, ESQ.

22

23

            (APPEARANCES CONTINUED ON NEXT PAGE.)
24

25

2

```
 1  APPEARANCES:  (Cont'd.)

 2                              Cotchett, Pitre & McCarthy LLP
                                840 Malcolm Road
 3                              Suite 200
                                Burlingame, California 94010
 4                         BY:  NANCI EIKO NISHIMURA, ESQ.

 5  For Defendants:

                                Cooley LLP
 6                              3 Embarcadero Center
                                20th Floor
 7                              San Francisco, California
                                 94111
 8                         BY:  JEFFREY GUTKIN, ESQ.
                           BY:  AARTI G. REDDY, ESQ.
 9

10  Transcribed by:             Echo Reporting, Inc.
                                Contracted Court Reporter/
11                              Transcriber
                                echoreporting@yahoo.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1   Tuesday, March 8, 2022                                    12:10 p.m.

2                       P-R-O-C-E-E-D-I-N-G-S

3                           --oOo--

4       (Portion of proceedings omitted.)

5          THE COURT:  All right.  So this portion of the

6   proceedings will be under seal because of confidential

7   information that will potentially be discussed.

8       All right.  Let me start with the question of

9   custodians, and we were kind of getting into that issue.

10      One of the things that Google says in its portion of

11  the papers is that the custodians that are proposed to be

12  added are duplicative of custodians that are already on the

13  list to have their materials searched.  And I see that

14  there's some discussion in the papers about why there is

15  duplication, but also the titles are provided and I did see

16  there was an errata filing recently as to some of them.

17      So let me hear from the plaintiffs as to why -- if you

18  believe that information is not sufficient to allow you to

19  assess whether a particular custodian is going to be

20  duplicative of another custodian that's already to be

21  searched, what information you would need in order to make

22  an assessment one way or the other.

23         MS. CARACUZZO:  Your Honor, thank you.  This is

24  Bethany Caracuzzo.

25      I think really what this goes back to, and I hate to

4

1  kind of be repetitive, but we really needed to have during

2  the meet and confer process a transparent and fulsome

3  discussion on these issues.  Some of the information

4  regarding the duplicative nature of these custodians is set

5  forth for the first time in the brief.  And it is very brief

6  and I appreciate that that's because of word limits.

7      I'm not criticizing anyone for that, but a lot of this

8  information has not been shared with us previously.  And

9  we've provided, as I stated earlier, a lot of very detailed

10 information as to why we think these people are relevant and

11 have relevant information.

12     There may be some overlap, as with any organization.

13 Google is a very large organization, but this product RTB is

14 one of its largest products and expands because of the way

15 RTB works.  You know, it's from aggregating the ad inventory

16 on the publisher side on both websites and apps and it's

17 aggregating on the other side the demand for those ads for

18 marketers who are buying the ads.

19     Google owns the whole RTB.  It runs the software on the

20 RTB, manages the auctions and also is a key player on all

21 sides of that.  And the auction is huge, right?  It's $11

22 billion online a day.

23     So it's not just a limited group of people of like

24 eight people that might have responsive information on this.

25 And we did work extremely hard to try to identify people

5

1  that didn't have a significant overlap but might have.  And

2  we've had the opportunity to go into Google's meager

3  production to date to try to verify that we're not getting

4  duplicative information.

5       THE COURT:  I hear the frustration that plaintiffs

6  have.  You feel like you didn't get enough information in

7  advance of the briefing and the production to date is very

8  small so you don't have a lot of documents to review to kind

9  of inform your discussion.  I get all that.

10     But it would be -- given that we have so little time,

11 it would be very helpful if we could just take the dispute

12 as it comes right now with the information that you do have

13 in the briefing and explain to me why Google's present

14 explanation for why these folks that you propose to add are

15 not going to have unique information from the folks that are

16 currently in the mix for custodial review, why there is

17 something wrong with that.

18     And the thing that guides my thinking typically in

19 these disputes is it's not enough to say lots of people were

20 involved in acts.

21     Who is going to have the most -- the sort of best

22 collection of documents.  Who his most involved or for

23 whatever reason is going to be the best source of responsive

24 information.  And who is going to be mostly duplicative of

25 that.

1          MS. CARACUZZO:  Sure

2          THE COURT:  So that's the kind of information I

3  need to decide your dispute.  And I'd rather just leave to

4  the side the things that are really driving your

5  frustration, which I acknowledge.

6          MS. CARACUZZO:  I appreciate that, your Honor.

7  And I apologize, but I'm just trying to set the table of how

8  we got to this point.

9      So looking at page eight of the brief, if that's kind

10 of what's informing you, so that we can be on the same page,

11 perhaps that's what you had in mind where --

12         THE COURT:  Yeah, the section that begins with

13 "Custodians" at page seven is where I understand Google's

14 argument begins.  And they say:  Look, here are the people

15 who have been identified as custodians already.  Here's

16 their roles.

17     And then goes on to describe why they believe that

18 someone is either -- a proposed someone is either

19 duplicative of those custodians or doesn't really do work

20 that's related to the dispute -- the lawsuit.

21         MS. CARACUZZO:  Sure.

22         THE COURT:  And then we have the separate dispute

23 about senior employees.

24         MS. CARACUZZO:  Sure.  So looking at the heading

25 of "Duplicative," your Honor, so -- if I can understand

1  Google's letter here, they say that Bigler, Jun (phonetic),

2  Selly, LaSala, and Bellack are all duplicative of other

3  people.

4       And these people also been very different roles.  So

5  for example, Jonathan Bellack.  He currently hits on 850

6  documents in Google's production of 20,000 documents and

7  he's like the metadata custodian.

8       I understand they haven't designated custodians, but

9  he's the metadata custodian of 569 of those documents,

10  including many where he's the sole custodian.  So he was the

11  project manager for publisher ad platforms from April of

12  2018 and was directly involved in -- we'll use the term

13  ██████.  I know we're under seal but is a public term in other

14  complaints, ████████████████████████████████████████

15  ██████

16       So I know we talked earlier about linking search terms

17  to the word "RTB," but really Google rarely refers to it as

18  "RTB" internally.  It uses a lot of different other names

19  for it, one of which is ██████.

20       And so Mr. Bellack was, in the emails that we have

21  seen, very involved in the decision-making on how ██████ would

22  look, what it was going to -- you know, what its framework

23  was, how pricing would work, how revenues would work, what

24  was going to be shared.

25       And he is someone who is -- granted, along with other

8

1 people, but he's putting in his own thoughts and opinions on

2 this.  He's just not cc'd on the email.  He's a major player

3 of this, and he's now the senior director of product

4 management.

5      So he's someone that appears a lot of times in these

6 records.  And so I don't think he's duplicative of anyone

7 else.

8      We don't see Mr. Dupelis (phonetic) appearing in the

9 records nearly so much.  I think far, far, far less than

10 him.

11      Along the same lines, I think we talked about Mr.

12 LaSala.  He looks to me to be a very, very important person

13 in this case, for some of the same reasons, but he's got a

14 different job role, right?

15      So he's -- hold on.  Let me turn my page, sorry.

16      He had a lot -- he has a lot of emails and discussions

17 about strategic cookie match-making, leveraging of user

18 data, leveraging of data privacy.  He was the managing

19 director -- I'm sorry -- is the managing director of

20 publisher platform strategy.

21      He also was on the ███ launch team, but he was also

22 involved in a project which appears to be called ██████

23 ██████  ████████████ encompasses, at least what I can

24 tell to this point, Google running focus groups, which it

25 calls Panels.  It calls it Fieldwork.  It calls it a bunch

1  of different things to determine how users understand

2  consents and giving consent via their terms of service and

3  their privacy policies.

4       And it is this very same consent process that Ms.

5  Weaver highlighted earlier that Google is going to offer as

6  a defense in this case, saying we sold your data because you

7  gave us consent.

8       And from what we can tell in our mere 20,000 documents,

9  Google spends a lot of time and a lot of personnel figuring

10  out this consent, the language of each consent, how

11  consumers feel about the language of consent, whether they

12  understand that their data is being sold, whether they like

13  it.

14       They have a variety of focus groups, including Pinecone

15  and ███████ and other things that go to this issue.

16       And Mr. LaSala was very involved in that.  He drafted a

17  paper called ██████████████████ or was one of the drafters.

18  He conferred extensively with Mr. Bellack and Mr. Grato

19  (phonetic) about how they could leverage Gaia data to

20  provide value and monetization.

21       So, again, I think Mr. LaSala shows up in 908

22  documents, and he's a custodian in the metadata for 522 of

23  them.  So --

24            THE COURT:  On these two folks, is their role

25  specific to RTB or what became RTB?  Or was it about privacy

10

1 policy consent use of data more generally?

2         MS. CARACUZZO:  It looks like both to me, your

3 Honor.  I'm not the person who would best know, but based

4 upon what I'm seeing, they're both involved in ███, which

5 is RTB, ████████████████████████████, because

6 ███████ also ended up being what they made ████████

7 ███████████████████████████████████████

8 ███████████████████████████████████

9    And so they were part of the decision-makers on what

10 that would look like and how that would roll out, what it

11 would mean and what it would be telling users.

12    That's what I can tell with what we've got to date, and

13 he's all over these records as someone with important

14 information.  And, again, this is a custodian search.  This

15 isn't about depositions.  This is about someone who has

16 information.  Let's go look for it there because they appear

17 to have it.

18         THE COURT:  So if I understand correctly, the

19 argument is, for these two people in particular, Google is

20 saying that there are others who were at least in an

21 overlapping role and that's not borne out by your review of

22 the documents?

23         MS. CARACUZZO:  Not so far, your Honor.  I mean I

24 think they probably overlap in parts, right?  I mean no one

25 person is making all the decisions at Google regarding

11

1  privacy and no one person is making all the decisions

2  regarding consents.

3      And you can look at their job titles and see that

4  they're slightly -- they're different, but when I'm looking

5  in the documents and we're running names, we're not seeing a

6  lot from Kudej.  I don't know if I'm pronouncing that

7  properly yet.  We're not seeing a lot from Dupelis.

8      What we're seeing is -- Berntson is in there quite a

9  bit involved in these issues as well, but LaSala and Bellack

10  seem to have these sort of overlapping roles where they're

11  looking at what is going on with the ███████████ and trying

12  to tie that back into Google -- into RTB or ██████ as they

13  call it.

14          THE COURT:  Okay.  So in those two, I think they

15  clearly aren't duplicative of people that we've identified.

16  Going down to -- and I think those are the really the only

17  ones.

18      So Bigler, Jun and Selly, they are in different roles

19  than Mr. LaSala.  And -- sorry, just lost my place.  They're

20  in different roles than Mr. LaSala and Mr. Bellack because

21  we understand them to be engineers, software engineers.

22      Mr. -- and, sorry, I don't know if it's a Mr. or Ms.

23  Jun, my apologies.  But Mr. Jun is a person who is really

24  making -- decision-making from a tech point of view.

25      He was the engineer, owner and project manager of a

12

1  project called NERA, which has to do with cookie tracking

2  and terms like ████████ and ████████ you've seen in our

3  documents.  And so when we look for Haiwen (phonetic) Jun,

4  that person hits on 659 documents and what's been produced

5  to date.

6       And that person is really having discussions reporting

7  up to Chetna Bindra about things that they can do to change

8  and track how users behave and what they can do with the

9  cookies.  So that person seems pretty unique to some of the

10 other documents that we're seeing.

11          THE COURT:  Okay.  Let me pause you there.  Who is

12 the person Chetna Bindra?  Is that a custodian --

13          MS. CARACUZZO:  That is an agreed-upon custodian,

14 your Honor.  She is.

15          THE COURT:  Okay.  And so when you said engineers,

16 that caught my attention because my earlier remarks, doing

17 email searches for engineers in a case that's not a patent

18 case or something like that strikes me as maybe not a good

19 use of search terms.

20      So I'm skeptical of the claim that we need to do

21 searches of engineers.  Bigler, Jun and Selly if you have

22 somebody to whom they report or who is already an agreed

23 custodian.  It just strikes me as maybe a harder sell.

24          MS. WEAVER:  Your Honor, this is Lesley Weaver.

25      The one thing that I will say is everybody at Google is

13

1  an engineer.  And --

2       THE COURT:  But not everybody has that title,

3  right, so I appreciate everybody has a Ph.D. or whatever.

4  However, these are the -- we're talking about the roles that

5  these people serve in the organization.

6       And somebody who is a project manager, product manager,

7  whatever, that strikes me as maybe those persons might be

8  more susceptible to having relevant documents in their

9  email.  Engineers who are doing the technical

10  implementation, maybe not.

11      If there is a better source of how is it technically

12  implemented.  If this action happens, the software, the

13  platform produces this result.  That is something that is

14  not an email thing usually.  So -- but that's just my

15  observation.

16      Is there some reason why you think that that is not --

17  that should not have bearing on my decision here?

18       MS. CARACUZZO:  Two things, your Honor.

19      We did propose -- and we did kind of acknowledge that.

20  If you see, we did offer a proposal in our letter brief

21  where there was kind of the second 18 of individuals on our

22  list where we just wanted more information from Google to

23  continue to discuss their roles.

24      And I believe -- and I'm flipping a lot of papers here,

25  but I believe a couple of those might be included in it.  I

14

1  think that might include Bigler, but perhaps not.

2      I do think Jun is an important person because as a

3  project manager and engineer owner of NERA, it appears that

4  he or she was working very directly with Chetna Bindra to

5  make decisions regarding cookies.

6      And that might not be the case for others.  This is

7  what we're able to determine at this time.  But I do

8  appreciate the point regarding engineers.

9          MS. WEAVER:  We might also be able to provide the

10 Court with some examples of communications that we think are

11 relevant.  There are emails and there were also, as I

12 understand it, some other platforms that they used to

13 communicate about the development of the products at issue.

14         THE COURT:  Okay.  But, again, keep in mind that

15 we're focusing on the question of duplicative custodians,

16 right?  So these people may be involved as a "cc" in

17 everything, but we don't need to search their email, because

18 you've already got the custodians who were the principal

19 communicators, for example, or drivers of the discussion or

20 they're going to be copied on them.

21     It's just -- it's a question of proportionality,

22 really, what this is all about.

23         MS. CARACUZZO:  We do appreciate that, your Honor,

24 and we really did work to not identify people that were just

25 cc'd.  We spent a lot of time on this and we're trying to

15

1   get to the end game too.  We don't want a lot of fluff

2   either.

3           THE COURT:  Okay.

4           MS. CARACUZZO:  So turning to the next argument of

5   no connection to RTB in the letter brief.

6       And, again, I know this ties back into earlier issues,

7   so I don't really want to reiterate too much.  But, again,

8   like connection to RTB is really limited.  They don't even

9   use the term "RTB," and for the reasons that Lesley Weaver

10  explained earlier, there's a big piece of this case

11  regarding consent and privacy.

12      And so while someone's job title might not say

13  "real-time bidding auction," they were participating

14  directly in decision-making regarding both the auction and

15  the privacy consent.

16      So a great example of that would be Mr. Bender, Brad

17  Bender.  Brad Bender currently hits on 475 documents, 230 of

18  which he's the custodian.

19      He was a key decision-maker for ██████████  He's done

20  PowerPoint presentations called "Gaia Brad" that he's led

21  and sort of led the charge at the company.  His job title

22  involves vice president display and video ads.  So this --

23  the use of these ads goes across the spectrum into other

24  products.

25          THE COURT:  Are you saying his responsibilities

16

1  encompass RTB but are not limited to RTB?

2          MS. CARACUZZO:  That's correct.  He gave at least

3  two fireside chats discussing specifically the use of --

4  Google's use of personal user data in relation to ads.  He's

5  in documents regarding Google's case studies of RTB.

6      He was one of the decision-makers regarding the ███████

7  ███  and what it means and how that's going to apply

8  broadly.  That's this PowerPoint right here.

9      And he's also involved in listening to the user

10  feedback that they're getting from these focus groups

11  regarding consent flows and ████████████.  He was

12  involved in ██████████ which is what that is, involved in the

13  launch of ██████.  And his documents produced to date range

14  the entire period because of his involvement.

15      So I think he is certainly a key person and he does

16  have connections to RTB.

17          THE COURT:  So do we plan to have this same

18  discussion for every single one of the people on this list?

19          MS. CARACUZZO:  Well, I'm trying to pick out the

20  key ones, your Honor.

21          THE COURT:  So if you had to pick the key ones --

22          MS. CARACUZZO:  I'm trying to do that, your Honor.

23          THE COURT:  Because let me just say, I am not

24  inclined to allow all of these custodians to go into the

25  mix.  It seems like sort of just too many, and not just

17

1  because I think the number is too many.

2      But given what I understand is the description of

3  people's goals, there is some duplication in here.

4      So, yes, tell me who the key ones are from your

5  perspective that would be most helpful rather than going one

6  by one.

7          MS. CARACUZZO:  Okay.  So I think Greg Fair is

8  also key.  One of his titles is product manager of Google

9  Takeout, which is a tool that helps people export their data

10 from Google's 70 products.  But he's also product manager in

11 Privacy and Data Protection Office, which I think they call

12 the PDPO or something like that.

13     And so he's someone who sort of headed up the focus

14 groups as far as we can tell and ████, which they called

15 Fieldwork, where they tested out their terms in Dallas and

16 San Francisco and other locations and also in Project

17 Pinecone, which did the same.

18     So he seems to be someone that kind of covers that

19 basis pretty well.

20     And turning to -- I'm trying to get people by different

21 roles, your Honor.

22     Dave Monsays (phonetic) -- and I don't know if I'm

23 pronouncing that correctly -- while he doesn't hit on a lot

24 of documents produced to date here, he holds a patent

25 relevant to the user profile data in RTB and is included in

18

1  some documents regarding RTB collection and storage and

2  testing of privacy.  So that's why we named him.  He seems

3  to be sort of a person that's unique and separate to the

4  other people, given his involvement in the patent.

5          THE COURT:  The patent would be directed to the

6  technical implementation of the RTB auction, right?

7          MS. CARACUZZO:  Correct.  And I think he was

8  also -- and I know we're not structuring this case based on

9  the other case.  But he was also a 30(b)6 deponent twice in

10 Calhoun on similar issues.

11     So that's why we've named him --

12         MS. WEAVER:  He's not a low level engineer.  He's

13 often a spokesperson for Google and has been involved in --

14 this is public -- in implementing a settlement and reaching

15 and identifying class members.

16     So his wealth of Google -- his knowledge is certainly

17 rich.

18         THE COURT:  Okay.  All right.  Is that it for the

19 no connection to RTB category, those are your key people?

20         MS. CARACUZZO:  Hold on one -- if you would just

21 one moment, your Honor, I'm sorry, and I will let you know.

22     I disagree that these other people do not have no

23 connection to RTB for the reasons I have stated, but I'm

24 trying to highlight the people as your Honor requested.

25         THE COURT:  I appreciate that.

1        MS. CARACUZZO:  Thank you.  And then as far as the

2  very senior employees, I think we can just touch on this

3  quickly, your Honor, if you wish.

4        THE COURT:  Okay.

5        MS. CARACUZZO:  I think we had a discussion at the

6  last hearing regarding CEO Pichai and his public statements

7  regarding that Google does not sell your user data.

8     And, you know, again, we're not saying deposition at

9  this time.  We're just saying custodian.  And when he was

10 making those public statements, whom did he talk to at

11 Google.  What did they talk about, about whether those

12 statements are accurate and whether they actually reflected

13 Google's policies and procedures.

14     I think that information is all relevant.  Certainly,

15 Mr. Pichai did not spend the entire time of his job duties

16 doing related to RTB, so we're not seeking every

17 communication that he's had.  But we are seeking

18 communications that are related to this case and to the

19 privacy representations that Google has made that is

20 relevant to this case.

21        THE COURT:  So can I just ask generally with

22 respect to this category of very senior employee and I don't

23 know if there is a disagreement about whether these people

24 are very senior or only some of them are.  But do plaintiffs

25 have a proposal as to subsets of search terms that would be

20

1   run against these folks' custodial files or not?

2            MS. CARACUZZO:  We have not gotten that far, your

3   Honor, with our communications with Google.  But that's

4   something we're certainly willing and able to do for sure.

5            THE COURT:  Because it sounds like what you're

6   saying, at least for Mr. Pichai is that you're not expecting

7   the entire collection of search terms, whatever they are, to

8   be applied to his custodial files.

9            MS. CARACUZZO:  That's right.

10           THE COURT:  Okay.  And is the same true for the

11   others that are in this category?

12           MS. CARACUZZO:  Yes.  I mean we're seeking -- I

13   can't speak, your Honor, because we really haven't had much

14   discussions with Google as to the other job roles of these

15   other people and how far it expands beyond RTB.

16       Certainly CPO, the chief privacy officer Enright would

17   have involvement in other things, but we do see documents

18   that he is involved in RTB decision-making, as one would

19   think as a chief privacy officer.

20       The chief economist Varian, from what we understand, he

21   originated the concept of the value of user data and how to

22   monetize it in a second price auction, so he is certainly

23   going to have information.  We don't need all of his

24   documents that he's ever written.  We need ones that are

25   relevant to this case.

21

1      And same thing for Ms. Twohill, who is the chief

2  marketing officer.

3            THE COURT:  Okay.

4            MS. CARACUZZO:  As to whether Mr. Graham is high

5  level and Eisinger and Grato are high level, I can't speak

6  to that, your Honor, and we don't have that information.

7      I do have many documents from Mr. Grato where he was

8  directly involved in decision-making with Mr. Bellack.  And

9  in fact, he seemed to have some internal questions about the

10 propriety of how they were charging for user data and had

11 some opinions and back-and-forth internally questioning

12 Google's policy.  So that's why he came on to our radar.

13           THE COURT:  Okay.  All right.  Let me -- is that

14 it for -- I know there's there's probably more you could say

15 at length about all of these people, but I think I need to

16 hear from Google in response.

17     So I'm going to turn to Mr. Gutkin or whomever.

18     Mr. Gutkin, go ahead.

19           MR. GUTKIN:  Yes, your Honor.  It's me.  Thank

20 you.

21     So I want to back up one step and talk about the

22 custodians that we've agreed to.

23     So we've got 21 custodians already.  The current and

24 former lead decision-makers on the RTB product, the current

25 and former lead engineers, two current lead product

22

1  managers, and the former lead product manager.

2      Then we have three different employees that are on the

3  kind of marketing and sales side.  I could give you the

4  names.  You can sort of see it from the charts, but that's

5  Kudej, Childs, and Piermont.

6      We also have multiple kind of engineers and product

7  managers who are below that top tier that cover specific

8  areas that plaintiffs have alleged are relevant here.  We

9  proposed -- except for Ms. Piermont who I just mentioned, we

10  proposed all of these people in our original list of 13

11  custodians.

12      Plaintiffs came back with a list of 51, which included

13  four C-suite executives, literally every person who was on

14  the document that we produced that just showed who works on

15  the product, every person on that, and a variety of other

16  names.

17      We went through the meet and confer process.  And the

18  first time that we got explanation from plaintiffs as to --

19  I'm sorry, let me back up one step.

20      We went through that list individually with our team

21  and investigated every one of them, which led us to agree to

22  eight out of their 51.

23      Then we had a meet and confer with the plaintiffs and

24  said:  Can you give us a basis that I can take back to my

25  client to explain the rest of these people?

23

1    And I know Ms. Caracuzzo and I will disagree about

2  this, but plaintiffs said:  We are not going to give you a

3  basis.  It's public documents and it's the fact that they're

4  on -- they're just one of the people that works in the

5  department.

6    So the first time we got some additional information

7  was February 11th, two months after the original timing for

8  getting the list of custodians.

9    And then as a final point just on process, in the

10  letter brief, the draft of the letter brief, for the first

11  time we saw plaintiffs are actually saying they want 23

12  added and 18 they just want more information.  That I had

13  literally not seen until we saw their letter brief.

14        THE COURT:  Okay.

15        MR. GUTKIN:  But with that --

16        THE COURT:  But now we're here.  I'm going to give

17  you the same instruction that I gave Ms. Caracuzzo.  Help me

18  solve the dispute that I have before me.

19        MR. GUTKIN:  I understand.  And, your Honor, I

20  only felt obligated to address that because Ms. Caracuzzo

21  said Google was not participating.  And we absolutely were.

22    So we have these custodians that both for the current

23  time and the prior time cover the waterfront, the engineers

24  the lead engineers, the sub-engineers that work on relevant

25  pieces, the lead product managers, the former product

24

1  managers, the salespeople.

2      This is 21 custodians in a case that is about one

3  product and one challenge to what one product does.  And I

4  think it more than adequately covers.

5      With that, I guess I should turn to the specific people

6  that were discussed.

7          THE COURT:  Well, could I just ask a question of

8  both parties right now.  Is there a swap that maybe the

9  plaintiffs would ask for?

10     So in other words, do the plaintiffs prefer to have

11 Bellack and LaSala instead of some other two people?  Or do

12 the plaintiffs prefer to have Jun, or Bigler, Jun and Sellie

13 instead of somebody else who is on the list?

14     I mean if the custodial searches have not yet been run

15 because of this dispute and you want to horse trade because

16 the plaintiffs have developed information that they think

17 causes them to prefer one custodian over another in a

18 similar role, have you all discussed that possibility or --

19         MR. GUTKIN:  Your Honor --

20         MS. CARACUZZO:  Your Honor, we are open to that

21 and have always been open to such a negotiation, but we just

22 have never been provided with the type of information we're

23 being provided with today.

24         THE COURT:  Okay.  So Mr. Gutkin, would a trade be

25 appropriate from your perspective?

25

1          MR. GUTKIN:  No, your Honor.  Due to the looming

2   substantial completion deadline, we are forging with all 21

3   of these custodians because we understood them to be

4   accepted.  So we're already reviewing their documents.

5          THE COURT:  I see.  Just so I understand the

6   process, you've already collected their documents in your

7   review environment.  I thought everything was being held up

8   because you hadn't resolved custodians and search terms, but

9   that's not the case?

10         MS. CARACUZZO:  They are not reviewing for the

11  disputed custodians, your Honor.  I think he means about the

12  agreed custodians.

13         MR. GUTKIN:  No, for the agreed.

14         THE COURT:  Yes, that's what I meant.  You said

15  the custodians that have already been agreed, you're already

16  engaging in your collection, review and production process?

17         MR. GUTKIN:  Absolutely, your Honor.

18         THE COURT:  Okay.

19         MR. GUTKIN:  So we're not amenable to a swap and a

20  swap is not sensible.

21         THE COURT:  All right.  I just wanted to

22  understand that.  I understand what you're saying.  Okay.

23  Go ahead.

24         MR. GUTKIN:  So I guess what I'll try to do -- I'm

25  prepared to speak about every custodian on this list, but

26

1  I'll try to briefly address the individuals that Ms.

2  Caracuzzo called out.

3          THE COURT:  Okay.

4          MR. GUTKIN:  So Jonathan Bellack, he's one of the

5  few people who did have a role in RTB that's on their list,

6  but the role is very old.  It's not since December of --

7  September of 2016 that he was working on that.

8      He was a project manager at that time and we have eight

9  different project managers already on our custodian list.

10  So if you go back in time, you can find some documents

11  referencing RTB, but they're going to be covered by people

12  like Mr. Berntson, who was the head of the product until

13  recently, and lots of our other product managers.

14      Moreover, it's important that several of the people

15  that they are talking about are people with roles that are

16  publisher facing.

17      So Mr. Bellack -- Ms. Caracuzzo said he's a senior

18  director of product management.  Well, that's true but it's

19  on a totally different unrelated product, counter abuse

20  technology.

21      But before that, he is a publisher facing -- has a

22  publisher facing role.  So this case, if you picture the ad

23  exchange sitting in the middle, publishers are the websites

24  that will display ads.

25          THE COURT:  Right.

1          MR. GUTKIN:  Advertisers are the people who are

2    allegedly receiving the challenged personal information.

3    And he worked on the publisher side, meaning how do we make

4    the ad exchange work for publishers not the advertiser side,

5    which would be where the alleged misconduct occurred and the

6    transmission of user data that they claim is improper

7    occurred.

8          So that's what I'll say about Mr. Bellack.  A long time

9    ago we had eight project managers on the list already and

10   his work is on the publisher side so not particularly

11   relevant.

12         I'm glad that Ms. Caracuzzo called up Mr. LaSala

13   because he -- among the documents the plaintiffs identified

14   for us is a document related to the launch of ██, which is

15   a part of RTB, and what you would see in that document, that

16   they pointed to us as proof that he is a key custodian, is

17   that he says "Congratulations to the team on the launch of

18   ██," and he's responding to an email from custodian George

19   Levitt saying, "Hey everyone, we just launched ██ and

20   here's a description of the launch and all that we've

21   achieved."

22         And there's other parts of that same document that

23   lists like kind of the team leads and such and then lists a

24   category called supporters.

25         Mr. LaSala is among the supporters in that document,

28

1  Mr. Berntson, Glenn Berntson, who is one of our very first

2  13 custodians, is I believe one of the team leads.

3      So he is not -- he's not a good example.

4          THE COURT:  Could I take the opportunity to ask

5  the question that kind of cuts across both the search terms

6  and custodians, which is ███████ and ███████ what's the

7  difference, if any?

8          MR. GUTKIN:  I think -- go ahead, Ms. Reddy.

9          MS. REDDY:  I'm happy to address that.

10     So we disagree with Ms. Caracuzzo's definition of

11  ███████ Our understanding is that ███████ and ███████ are

12  two very different concepts.

13     ███████ is not relevant to this case at all.  Our

14  understanding is that it refers to ███████████████████████

15  ██████████████████████████████████.  So it

16  didn't involve RGB at all.

17     ████████████████████████████████

18  ███████████████████.  And we don't have reason

19  to believe that it is specifically relevant to RTB, but we

20  agreed to this search term within 15 of RTB out an abundance

21  of caution, because we couldn't rule out in the same way

22  that we could rule out with respect to ███████, that ███████

23  ███was not relevant to RTB.  So we couldn't make that

24  conclusive determination with respect to ███████  We could

25  make that determination with respect to ███████.

1    Again, ▓▓▓▓ relates to GDPR compliance.  We're

2 talking about a USA-based putative class.  GDPR does not

3 effect this US-based putative class.  We have no reason to

4 believe that ▓▓▓▓ is relevant.

5    THE COURT:  Okay.  But what the plaintiffs say is

6 that in practice, the people who are using the term to

7 mean -- when they're talking about ▓▓▓▓ just say ▓▓▓▓.

8    MS. REDDY:  That has not been our experience in

9 reviewing the documents, your Honor.  And plaintiffs have

10 pointed us to one document in meet and confer correspondence

11 and it does not support that position.  It does not

12 appear -- that document uses both the terms ▓▓▓▓ and

13 ▓▓▓▓ and it does not appear to use those terms

14 interchangeably.

15    THE COURT:  Okay.  I'm sorry to digress on that.

16 I just did want to have an explanation for what that was

17 about.  So I understand plaintiffs may disagree on that.

18 I'll get back to you on it.

19    Let me let Mr. Gutkin finish his narrative about

20 custodians.

21    MR. GUTKIN:  Thank you, your Honor.

22    So I think that the next was Mr. Bigler.  He is another

23 product manager.  I don't actually understand clearly what

24 plaintiffs' basis is for thinking that he has a relevant

25 role here.  The last time he had a role that related to --

1   what I can understand to be concerning RTB is outside the

2   statute of limitations when he was working -- his title says

3   double-click digital marketing from February of 2017.

4       Again, in addition to the eight product managers that

5   we already have as custodians, we have also three different

6   marketing custodians:  Ms. Piermont, Ms. Kutej, and Ms.

7   Childs.

8       So even if he was working on marketing that related to

9   RTB up through February of 2017, which is outside the

10  statute of limitations, that's going to be covered by the

11  three custodians we have.  They've identified in meet and

12  confer one document for us related to Mr. Bigler.  That's a

13  document that applies to a different product, the

14  double-click bid manager, which is also called display and

15  video 360.  It's a different product than RTB and so --

16          THE COURT:  I'm sorry.  I understood Ms. Caracuzzo

17  to say that Bigler, Jun and Selly were all engineers related

18  to -- working on NERA and I don't know what NERA is.

19          MR. GUTKIN:  Well, so NERA is a different project

20  that I have my notes on it on a different page.  But I think

21  that Ms. Caracuzzo misspoke because I don't believe Mr.

22  Bigler is an engineer.  I think he is a product manager.

23          THE COURT:  Or maybe I misrepresented what she

24  said, my apologies.  Okay.

25          MR. GUTKIN:  So in terms of Haiwen Jun, so Hiwen

31

1  Jun reports to Mr. Berntson so is a direct report to a

2  custodian.  And we have -- our investigation shows that

3  Hiwan Jun's work -- already you could hear in Ms.

4  Caracuzzo's narrative that Haiwen Jun is on documents with

5  Mr. Beloff (phonetic) who is a custodian, Mr. Berntson who

6  is a custodian and works with Chetna Bindra who is a

7  custodian and Tim Shea (phonetic) who is a custodian.

8      And I will put it this way without going into

9  attorney-client communications, our investigation is that

10 there is nothing relevant that Haiwen Jun is going to have

11 in her files that is not going to be duplicative of the

12 people that we already have.  I --

13          THE COURT:  Okay.  May I ask --

14          MR. GUTKIN:  Now, now Ms. Selly -- I'm sorry, did

15 you want to say something, your Honor?

16          THE COURT:  No.

17          MR. GUTKIN:  Ms. Selly I believe is the next one

18 that Ms. Caracuzzo called out as being one of their best

19 examples of people we should include.  Ms. Selly reports --

20 it is another salesperson and reports to custodian Marlene

21 Kudej.  Her role is somewhat equivalent to custodian Susan

22 Childs, but she only joined the group in October of 2021.

23      So during the great bulk of the class period, she is

24 working on something different that is not at all RTB

25 related.  And, again, we have already the three salespeople

32

1  in the list that we agreed to.

2      I think we're moving next in the list to Mr. Bender.

3      So, again, Mr. Bender is a vice president of not

4  related products.  Since 2019 news and search ecosystems and

5  vice president before that of display and video ads, which

6  is not a reference to RTB.

7          THE COURT:  But does it include RTB?  I was told

8  it did.

9          MR. GUTKIN:  Not to my understanding, no.  I

10 understand that Mr. Bender's work does not really relate to

11 RTB.  It would touch on RTB perhaps at times, but he is not

12 among the team that is actually working on RTB.  I think

13 that actually their basis for including him, from what

14 they've shared with us at times, is more just that he is

15 another person who has some general involvement in privacy

16 matters.

17     And we have -- as we said in our brief, there's this

18 very long list that they've asked us to -- of people who are

19 just involved in privacy matters generally at Google who

20 won't know and don't work on what are those privacy matters

21 specific to RTB.

22     RTB shares its own unique set of information with third

23 parties.  So there are all manner of privacy matters at

24 Google that would not be in any way relevant to RTB because

25 it's not -- they don't bear on the kinds of data that are

33

1   shared through RTB.

2       So as far as I know, Mr. Bender is just in possession

3   of a privacy study related to ███████.  It's in his files.

4   But he is very -- he's a vice president.  He's a very senior

5   product manager type person.

6       And, again, we have all of the RTB product managers,

7   including the vice president that Mr. Berntson reports to,

8   who is -- Apu Parma (phonetic), if I'm remembering her name

9   correctly.

10          THE COURT:  Okay.  Let me pause you here and just

11  ask a question.

12      I understand the point about general privacy and that's

13  too broad, and plaintiffs disagree.  But one of the things

14  we talked about last month in the prior dispute was this

15  question of there's a damages analysis that will be

16  undertaken.  The parties don't agree about how that analysis

17  should be conducted or what its relevant inputs might be.

18      But among the things that the plaintiffs wanted was any

19  understanding, study, analysis that Google has undertaken

20  about the valuation of the data or -- I think the concept

21  that was talked about a lot was customer engagement and how

22  different privacy regimes might impact that and all those

23  kinds of things that might affect Google's monetization of

24  data or the benefit that Google gets from various consumer

25  behavior, Google account holder behavior, let's say that.

1    So where I'm going with this is, even if some of these

2  folks are not appropriate custodians generally for ESI, if

3  it's the kind of thing where you just remarked, Mr. Gutkin,

4  that somebody has a study.  I don't know if the study is

5  relevant, but some people are known to have done focus group

6  research on matters that the plaintiffs think might bear on

7  the damages analysis, it seems like targeted searches could

8  be done for that kind of thing.

9    Have the parties discussed possibly for some of these

10  folks using that as a resolution?

11         MS. WEAVER:  Your Honor, if I may.  Lesley Weaver.

12    I think what we are learning here today is that the

13  parties have not discussed enough.  Plaintiffs are hearing

14  most of this information about these custodians for the

15  first time.  We would like to absorb and engage on this.

16    I can give you some factual information myself.  I

17  Haiwen Jun two weeks ago and I --

18         THE COURT:  Okay.

19         MR. GUTKIN:  Ms. Weaver, I hope you're not -- I

20  mean you're under a protective order in another matter, and

21  I feel like you're about to start talking about --

22         MS. WEAVER:  No, I'm not.

23         MR. GUTKIN:  -- and using material from another

24  matter.

25         THE COURT:  All right.  Let's just stop right

35

1 here.

2     Okay.  I'm sorry.  I know you have a lot more that you

3 could share with me.  Both sides have a lot more that you

4 could share with me.

5     We're getting again to a very late hour.  And, Mr.

6 Gutkin, I realize you have not had an opportunity to fully

7 respond to the arguments that were made in favor of some of

8 these custodians.

9     I want -- and we haven't even gotten to the search

10 terms.

11         MS. WEAVER:  May I propose that we confer further

12 and consider swapping?

13         THE COURT:  No.  No, the swapping -- I'm sorry, I

14 think the swapping just can't happen, given what Mr. Gutkin

15 said about what they've already done for the agreed

16 custodians.  I think that given the stage that you are at in

17 discovery, that's not really feasible if they really have

18 undertaken to proceed with these custodians that are agreed.

19     I wanted to say to the parties that on the question of

20 custodians and search terms -- and I hesitate to say this to

21 you all because you all have already done so much work.

22 What might be helpful for me, now that I've heard you talk

23 about these things at length both last month and today, is

24 if there were some very abbreviated discussion or remark

25 that you could make about what the issue is -- I have some

1  information on a term-by-term basis or a custodian-by-

2  custodian basis now in the brief about why something is too

3  broad or not appropriate or whatever, but I don't have that

4  for all of these things.

5      I am just wondering whether instead of setting another

6  proceeding and have you argue about specific search terms

7  and specific custodians more than you have done, is there

8  some information that you can provide in like a chart form

9  about particular search terms or particular custodians?

10     I'm not trying to get you all to do more meeting and

11 conferring, although that may be useful to you on the

12 custodians.  But on the search terms it might short-circuit

13 our process and I wouldn't need to have another proceeding.

14 I could go based on the discussion we have had and the

15 additional information that you provide me.

16     Is that something that you think you might be able to

17 do pretty -- I don't know, like in a week or so --

18         MS. WEAVER:  Yes.

19         THE COURT:  -- provide like an updated chart?  And

20 Ms. Weaver says yes for plaintiffs.

21     Mr. Gutkin, Ms. Reddy?

22         MS. REDDY:  Yes, that seems feasible for

23 defendant.

24         THE COURT:  Okay.  I think that --

25         MR. GUTKIN:  I will just note that I continue to

37

1  be concerned about the timing.  And, you know, you can see

2  both sides don't see eye to eye on this process and the

3  delay in the process, but we have this substantial

4  completion deadline coming up, and I continue to be

5  concerned.  Plaintiffs, from our perspective, cut off our

6  last conversation about custodians.  So I'm concerned about

7  that, your Honor.

8         THE COURT:  Yes.  I understand.  And I understand

9  I am part of the problem now too because I haven't gotten

10 you your answer to your first question.  I know that impacts

11 some of the search terms but not all of them.

12      So I am trying to take myself out of the equation as a

13 problem.  But in order to get through the search terms, I

14 think I might need in chart form just a little bit more

15 context for each of the terms.

16      You've already talked about some of them so you can do

17 this in abbreviated form, but let me just see what might be

18 the best vehicle.  And I know you all feel constrained by my

19 standing order about what you can and cannot submit to me.

20      But, for example, I'm just looking at -- let's see.

21 The terms that are rejected by Google.  I mean I understand

22 now "reject" means this is facially overbroad and we don't

23 even want to propose a counter proposal.  That's what I

24 reject to mean.

25      And I also understand that the last -- one, two, three,

38

1   four, five, six -- seven you say are untimely.  I get that.

2   So I don't need a lot more information than that.  At least,

3   that's your argument.  I don't necessary have the

4   plaintiffs' side of that on a term-by-term basis.

5        But if I look at the thing that encompasses the

6   disputed terms -- and, again, I'm looking at Exhibit D.  So

7   this has the list of disputed terms.

8        And I have the competing proposals.  Some like

9   explanation -- and it's in Google's part of the brief but

10  there's not really like the corresponding remark from the

11  plaintiffs' side so that I can kind of see them side by

12  side.

13       I think that would be helpful for me to have both

14  Google's argument and then the plaintiffs' response on a

15  term-by-term basis.  Not that you have to go write a bunch

16  more, but if you could maybe put it in this chart form for

17  the disputed terms and the rejected terms, I think that

18  would help me.

19            MS. WEAVER:  We can do that.  That's

20  understandable and we can do that.

21            THE COURT:  Okay.  Ms. Reddy?  Mr. Gutkin?

22            MS. REDDY:  Yes, we can do that, your Honor.  I

23  will say for all the terms we have agreed to accept,

24  Google's applied search terms in Exhibit D, we are already

25  running those search terms and we're in the midst of our

39

custodial review right now.

So, again, just to iterate Mr. Gutkin's concern, we've got our custodial review well underway, with the substantial completion deadline in mind and we're doing everything possible to complete --

THE COURT:  I understand but if the answer is you've made the wrong call about your search term and I so find, then you're going to have to run it.  And that's just what it is.

And I don't know what to tell you about how to manage that process.  But if -- you will of course de-dup things, so if you have a custodian whose collection is reviewed and is ready to be produced, and I say no, you need to do this other search string, you will add that in.  You will find out whether it's already hit on a document you're already producing or not.  And if there's some additional document, you will need to produce it.

I think that's how this is going to have to go.

But I'm not suggesting that you should hold up your production.  Is that a problem?  Like if I say go for it, whatever is agreed on the agreed custodians, agreed search terms, you proceed, you produce documents.  You shouldn't be waiting.

Is that how you're proceeding?

MS. REDDY:  That is how we're proceeding, your

40

1  Honor.

2         THE COURT:  Okay.

3         MR. GUTKIN:  And, your Honor --

4         THE COURT:  If the Court comes and says "On

5  custodian A, you have to run these additional search

6  strings," then you will be able to do that.  See if it hits

7  on anything extra and produce those, right?

8         MS. REDDY:  Yes.

9         MR. GUTKIN:  Yes, your Honor.  Sorry, Ms. Reddy,

10 please.

11        THE COURT:  Okay.  Whoever wants to answer.  Ms.

12 Reddy?

13        MS. REDDY:  Yes, that is our plan.  So if we get

14 an order to apply supplemental search strings, then we would

15 apply those.  What we wouldn't be able to do as quickly is

16 export for new custodians.  There's just an export process

17 that takes time.  It's very time-consuming and expensive.

18     So if there are new custodians designated, we'll first

19 need to export their data and then apply the search terms to

20 get --

21        THE COURT:  Right, because those aren't in your

22 system yet.  I totally get that.  So that's the part that's

23 most time consuming is saying:  Oh, if we have to get this

24 new custodian, collecting all this stuff and then apply the

25 search term.

41

1      I got that.  All right.  But I'm not introducing -- or

2  rather, it's not unduly burdensome to say, okay, we've

3  already made a production, now we have to produce more.

4  Because you're going to be able to judge if you've already

5  produced -- you've already exported for production a certain

6  set of documents, you will be able to tell whether anything

7  new is duplicative or not, right?

8           MS. REDDY:  We should be able to de-duplicate

9  that.

10          THE COURT:  That's what -- I'm sorry.  I'm not

11 asking it correctly, but that is what I was trying to say.

12          MS. REDDY:  I will note that de-duplication is not

13 a perfect process, so we will be able to de-duplicate to the

14 extent practicable, but sometimes it's -- we'll get

15 duplicates at times.

16          THE COURT:  Okay.  Ms. Caracuzzo, yes.

17          MS. CARACUZZO:  Just a quick question on the

18 format of the chart, your Honor.

19          THE COURT:  Yes.

20          MS. CARACUZZO:  Is the chart going to also require

21 de-duplicated hit counts for the terms that are disputed or

22 the rejected terms?

23          THE COURT:  So hit counts is a totally separate

24 issue.  And I will figure out what to order about that.  I'm

25 not sure what I will do, if some sampling is in order or

42

1  not.  I really would benefit from having the explanation for

2  the disagreement on a term-by-term basis.

3      And for Google it may be as simple as copying and

4  pasting on a term-by-term basis the arguments that you've

5  kind of lumped together in your part of the joint

6  submission.  And for plaintiffs it may be taking some of the

7  arguments that you shared with me here and just sort of

8  putting that discussion on a term-by-term basis.

9      Because what I didn't have in the papers is sort of a

10 joinder of the issues by the parties.

11     And, again, I imagine that's probably just kind of the

12 process by which these letters get put together.  I

13 understand it's a challenge.  It's the best thing I've come

14 up with so far.  It's not well suited to all disputes.  But

15 that's what we're doing right now.  So --

16         MR. GUTKIN:  Your --

17         THE COURT:  Yes.

18         MR. GUTKIN:  One other question, your Honor.  I'm

19 picturing just a couple of sentences --

20         THE COURT:  Yes, please.

21         MR. GUTKIN:  -- is not correct?

22         THE COURT:  Yes.  I don't want like paragraphs and

23 paragraphs.  Really, I need you to flag the issue for me.

24 Like the reason we want this is because.  And this proposal

25 from Google is too narrow because it is going to exclude

43

1 these kinds of things.

2     Like a sentence or two at the most really.  Don't use

3 it to write paragraphs please.  That will not be helpful.

4 Because I think between last month's argument and this

5 month's, I do have an understanding of what your

6 disagreements are and what the issues are in the case.

7     So thank you for your very helpful arguments on those

8 points.  So I think I just need something more abbreviated

9 in the chart.

10     So I'm going to suggest that you take D, the disputed

11 and rejected terms, and just add another column or two

12 columns with the explanations.

13     How long would you need to get that to me?

14          MS. WEAVER:  We can be very efficient, your Honor.

15 We can do it within a week.

16          THE COURT:  Okay.  I'll do a short order asking

17 that you submit that and I'll need you to file it.  You can

18 file it under seal, of course, because it will have things

19 in it.  I will just order that it can be filed under seal,

20 so you don't need to do your admin motions.  Okay?

21          MR. GUTKIN:  Thank you, your Honor.

22          THE COURT:  We'll file it under seal.

23          MS. WEAVER:  Your Honor, I don't know -- I know

24 that we're winding up here.  You asked some factual

25 questions that I could address here.

44

1          THE COURT:  Yes, what --

2          MS. WEAVER:  Great.  Project NERA was -- if you

3    would like to hear this.

4          THE COURT:  Can that go in the chart?

5          MS. WEAVER:  Yes, as long as we're not limited.  I

6    mean I understand.  We're going to be concise and I know how

7    to be concise, but I do need room to explain.

8          THE COURT:  But that relates to custodians, right?

9    That relates to the custodian question.

10         MS. WEAVER:  Yes.

11         THE COURT:  This is about search terms.

12     So about custodians, here's what I'd like to do on

13    custodians.

14     You've both told me that this was the first time you

15    were hearing X, Y, and Z explanation from the other side.

16    That's not good.  I just -- I don't know what to tell you.

17    It makes it almost impossible for me to really resolve the

18    dispute when the parties haven't had the discussion they

19    need to have before it comes to me.

20     It just -- I don't know any of these people, right?  I

21    don't have access to the documents and all those things.

22      So this may be where the explanation for NERA comes in.

23    But let's look at Exhibit E or whatever the equivalent

24    exhibit on the plaintiffs' side is.  But this is the one

25    that has the custodians.

45

1        If you all did --

2              MS. CARACUZZO:  B, your Honor.

3              THE COURT:  Yeah, so E and B are kind of parallel,

4    I guess, right?

5              MR. GUTKIN:  Yeah, they're the same except --

6    well, they're mostly the same, except B excludes the agreed

7    custodians.

8              THE COURT:  Okay.  All right.

9        So here is what would be helpful, is to have an

10   explanation of -- so Google has shared some context,

11   plaintiffs have shared some context about why they think a

12   particular custodian should or should not be among the folks

13   whose electronic data is searched.

14       I hope that the plaintiffs might be able to reduce

15   their list a little bit based on Ms. Caracuzzo's

16   representations about these are the people who really matter

17   us.  Because I will tell you that there are just too many,

18   it seems to me, given what I understand the scope of the

19   dispute and the people's roles.

20       So I think what would be helpful for me is to have in

21   chart format, again, an abbreviated explanation, which could

22   include what NERA is and why it matters for whomever it was

23   that the engineers or engineer for whom that was a relevant

24   explanation in support of why that person should be a

25   custodian.  If you could include that discussion there.

46

1       And, Mr. Gutkin, for Google, you could do the same
2   thing.  You could say this person was only involved in the
3   relevant project from October '21 forward and this person
4   wasn't involved after September of 2016, whatever the
5   relevant fact is.  But it just -- please keep it short.
6       But if I have that in chart form, I think that would be
7   helpful for me.
8       Now, is that also something you can do in a week?
9            MS. WEAVER:  Yes.
10            MS. CARACUZZO:  Yes, your Honor.
11            MR. GUTKIN:  So I'm a little less sure, your
12   Honor.  I mean I don't know how much -- I don't know which
13   they're going -- how much they're going to narrow their 23.
14   Obviously it would be great if we don't have to try to work
15   on this for all 23.
16            THE COURT:  I understand.
17            MR. GUTKIN:  And I don't know how much time it's
18   going to take me to kind of put all of that together.  I was
19   unprepared to talk about it today, but --
20            THE COURT:  Yes, I appreciate that.
21       I have to conclude this hearing soon.  But let me say
22   this, how quickly could the plaintiffs get a shortened list
23   of additional custodians to the defendant?
24            MS. WEAVER:  I think we could -- well, I'm going
25   to look at Ms. Caracuzzo's face as I say this.  Maybe by

47

1  Friday?

2          MS. CARACUZZO:  Yes, I would say by Friday.

3          MS. WEAVER:  Good.

4          THE COURT:  Okay.  So if you get that shortened

5  list by Friday.

6      Then I guess, Mr. Gutkin, it matters how much shorter

7  it is, but let's see -- do you think the parties could file

8  something -- and I can resolve this in pieces potentially.

9      I'm just looking at my calendar.  So if the search term

10 chart is shared with me in a week, that would be the 15th,

11 and then if the plaintiffs provide their shortened list of

12 new custodians that they are requesting by the 11th, and

13 then the parties take a week to provide their chart with

14 their explanations pro and con for a given custodian by the

15 18th, is that acceptable?

16         MS. WEAVER:  Yes.

17         THE COURT:  Mr. Gutkin?

18         MR. GUTKIN:  I can certainly try to do that.  I'll

19 just voice again that I'm concerned about the timing of

20 adding new custodians to anything that we would have to do

21 by the 21st.

22         THE COURT:  I understand that issue, and that is a

23 date that I was sent by Judge Koh.  I assume that Judge

24 Gonzales Rogers has retained that date, correct?

25         MR. GUTKIN:  All dates to my knowledge.

*Echo Reporting, Inc.*

48

1          THE COURT:  Yes, right.  So that is your date for

2  substantial completion of document production, right?

3          MR. GUTKIN:  Yes, your Honor.

4          THE COURT:  Okay.  So I will be clear from the

5  docket, but I think it goes without saying that if I'm

6  ordering something to be done and it can't possibly be done

7  by April 21st, then -- I mean nobody's -- I would hope the

8  plaintiffs are not going to say, "Oh, you missed the

9  deadline," because otherwise, the answer is you don't get

10  the information, right?

11      So I think there's a practical solution to this

12  problem.  I have not consulted with Judge Gonzales Rogers

13  about it, but I don't think it's the kind of concern, Mr.

14  Gutkin, that dictates the outcome of what I do.  Because

15  this dispute was submitted when it was submitted.  So I'm --

16          MR. GUTKIN:  Yes, your Honor.

17          MS. WEAVER:  Your Honor --

18          MR. GUTKIN:  I have --

19          THE COURT:  I decide it on the merits, in other

20  words, not the --

21          MR. GUTKIN:  I'm hopeful -- if I can just respond

22  about the 18th.  If the list is narrowed, then I'm hopeful

23  we could file something on the 18th.  I guess -- you said we

24  could do it piecemeal.  If there are pieces that are not

25  ready, then maybe there could be a subsequent --

49

1      THE COURT:  No, I meant between the search terms

2 and the custodians, separate pieces.

3      MR. GUTKIN:  Oh, I see.

4      THE COURT:  Mr. Gutkin, in all honesty, the

5 explanation that you're sharing with me here in the hearing

6 is exactly the kind of thing that on a per custodian basis

7 would be helpful for me to have and also the plaintiffs.

8      Same thing for the plaintiffs, the kind of discussion

9 that you're sharing with me in this hearing is the kind of

10 thing that would be helpful for you to share with Mr. Gutkin

11 about why a particular person is on your radar.

12      So that's really the level of information that I'm

13 hoping gets in this chart and that I can then use that as a

14 basis for making my decision about custodians.  Okay?

15      MR. GUTKIN:  Yes, your Honor.

16      THE COURT:  And I don't know what to tell you

17 about senior custodians, but my gut is that these people, if

18 they have relevant information, it will be for some subset

19 of these issues and that there needs to be some attention to

20 how you perceive.

21      Mr. Pichai is one example.  The op-ed we discussed a

22 month ago about why that might be or might not be

23 information that's relevant.

24      But there should be some way to find that information

25 either by date or by tailored search terms or subset of

50

1  search terms for that issue or just looking in targeted

2  searching that should generate the production that's

3  necessary and not just all the senior employees if they get

4  in the custodian mix have all search terms applied to their

5  email for the whole period.

6      That's my sense.  And so you're welcome to give some

7  attention to that in your further discussion.  But

8  ultimately I'll have to make a call on that.

9      Okay.  I think we need to conclude it here because I've

10 got another calendar coming in 15 minutes.

11     So thank you all.  I appreciate your time and

12 attention, and I will try to get both -- all of these orders

13 out, but the short order directing you what to do next will

14 come today.

15         MS. WEAVER:  Thank you, your Honor

16         MR. GUTKIN:  Thank you very much, your Honor.

17         MS. REDDY:  Thank you, your Honor.

18         MS. PRITZKER:  Thank you, your Honor.

19         THE CLERK:  I just want to confirm on the record,

20 your Honor, that this portion of the transcript is ordered

21 sealed --

22         THE COURT:  Yes, it is.

23         THE CLERK:  -- without order to access it.

24         THE COURT:  Right.  Right.  Without court order,

25 you can't access it.  The parties, of course, if they need

51

1   to access it, you can do your transcript request and I will

2   give permission for the parties to have access to the

3   transcript of the under seal portion but the under seal

4   portion won't be publicly available on the docket.

5          THE CLERK:  Thank you, your Honor.

6          MS. CARACUZZO:  Thank you, your Honor.

7          MR. GUTKIN:  Thank you very much, your Honor.

8       (Proceedings adjourned at 1:13 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

52

1                    CERTIFICATE OF TRANSCRIBER

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16            Echo Reporting, Inc., Transcriber

17               Tuesday, March 15, 2022

18

19

20

21

22

23

24

25