1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5    In re:                     )
                                )
6    GOOGLE RTB CONSUMER         )   No. C 21-02155-VKD
     PRIVACY LITIGATION,         )
7                                )
                                )
8
                                    San Jose, California
9                                   Tuesday, June 7, 2022

10   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 10:00 - 12:30 = 2 HOURS & 30 MINUTES

11

12   APPEARANCES:

13   For Plaintiffs:
                                    Bleichmar Fonti & Auld LLP
14                                  555 12th Street
                                    Suite 1600
15                                  Oakland, California 94607
                          BY:   ANNE K. DAVIS, ESQ.
16                        BY:   LESLEY ELIZABETH WEAVER, ESQ.

17                                  Pritzker Levine LLP
                                    1900 Powell Street
18                                  Suite 450
                                    Emeryville, California 94608
19                        BY:   JONATHAN K. LEVINE, ESQ.

20   For Defendant Google:
                                    Cooley LLP
21                                  3 Embarcadero Center
                                    20th Floor
22                                  San Francisco, California
                                      94111
23                        BY:   JEFFREY M. GUTKIN, ESQ.

24

25

*Echo Reporting, Inc.*

2

1    Transcribed by:              Echo Reporting, Inc.
                                  Contracted Court Reporter/
2                                 Transcriber
                                  echoreporting@yahoo.com
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Tuesday, June 7, 2022</u>                                    <u>10:00 a.m.</u>

2                     P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4       (Call to order of the Court.)

5            THE CLERK:  Calling case 21-cv-02155, In re Google

6  RTB Consumer Privacy Litigation, on for a discovery hearing.

7       Counsel, please make your appearances, beginning with

8  plaintiffs.

9            MS. DAVIS:  Anne Davis of Bleichmar, Fonti and

10  Auld for plaintiffs.

11            THE COURT:  Good morning.

12            MS. WEAVER:  Good morning, your Honor.  Lesley

13  Weaver of Bleichmar, Fonti and Auld for plaintiffs.

14            THE COURT:  Good morning.

15            MR. LEVINE:  Good morning, your Honor.  Jonathan

16  Levine, Pritzker Levine, for plaintiffs.

17            THE COURT:  Good morning.

18            MR. GUTKIN:  Good morning, your Honor.  Jeff

19  Gutkin from the Cooley firm for the defendant Google LLC.

20            THE COURT:  Good morning.  Thank you.

21       So we are here on a discovery dispute about the

22  plaintiffs' Rule 30(b)(6) deposition notice to Google.

23       You all can sit down.  Thanks.

24       So this discovery dispute does seem to raise a number

25  of issues that I've previously considered and resolved in

4

1  connection with the parties' dispute about plaintiffs'

2  document request to Google.

3       And I'll just start by saying I am always interested in

4  correcting any mistakes that I've made, but generally I'm

5  not inclined to revisit the same arguments again unless

6  there's a reason why discovery in deposition form should be

7  different or have different considerations than discovery in

8  the form of document production.  So I just wanted to say

9  that at the outset, and I am happy to hear from the parties

10 on that point.

11      The other thing that was a little bit difficult about

12 this dispute is that the plaintiffs' discussion in support

13 of these topics is pretty abbreviated.  And I realize that I

14 give you a word limit, but I have to say I -- I can

15 understand why the defense is resisting the discovery, but

16 many of my questions will be directed to the plaintiffs

17 because I don't understand in some cases why you are asking

18 for what you are asking.

19      In preparation for this hearing, I reread the entire

20 complaint and I also reread the motion to dismiss so that I

21 would have clear in my mind the claims and defenses, or at

22 least some of the defenses that are being asserted here.

23      But what I plan to do is go through the topics in

24 order.  Every single topic is disputed, except for topic 12,

25 so far as I can tell.

5

1     I don't know how you all have divided up the argument,
2 if you if you have divided up the argument.  But if it's
3 more convenient for you and you would like to just stay
4 seated at counsel table as we go through the topics --
5 because I do intend to go back and forth -- that's fine with
6 me.  You don't need to come up to the podium, but you may
7 also just come up to the podium and stay there if you would
8 prefer.  I will leave it up to you.
9     For the plaintiffs, is one person arguing or have you
10 broken up the matter in terms of topics?
11        MS. DAVIS:  Yes, your Honor.  This is Anne Davis
12 for plaintiffs.  I will be arguing, but --
13        THE COURT:  Okay.
14        MS. DAVIS:  -- probably Ms. Weaver and Mr. Levine
15 will also provide some support for some of the more detailed
16 topics.
17        THE COURT:  Okay.  That's fine.
18     Well, let's start with topic 1.  And let me say this is
19 the one that concerns the identity of Google employees and
20 various organizations of Google employees and the
21 organizational structure of teams responsible for details of
22 various products related to RTB.
23     So what I don't understand about this topic in the
24 first instance is what is the purpose for the discovery that
25 plaintiffs seek here?  And it occurred to me that maybe

6

1 you're trying to decipher an org chart or something like

2 that.  But this is an extraordinarily broad and detailed

3 topic for a deposition.

4      So can you help me with that, please, Ms. Davis?

5          MS. DAVIS:  Absolutely.  So I think in part we

6 recognize that the presentation is somewhat abbreviated by

7 the page limits.

8      But for this topic, you know, we seek to understand for

9 the class period not solely for those with current

10 responsibility how those, you know, with decision-making at

11 a high level interact with the different aspects of the

12 operations of the RTB system as well as other departments at

13 Google that impact the information that flows through the

14 RTB system.

15      So here our dispute is really with respect to whether

16 Google will provide testimony for the entirety of the class

17 period as opposed to only for those witnesses that have

18 current responsibility for strategic decision-making with

19 respect to RTB.

20      So there is an extent to which the papers don't

21 represent the outcome of our meet and confer process.  It is

22 presented as if we are seeking all employees, all aspects of

23 employee operations, every single department at Google.  And

24 that's not the case.

25      This topic is cabined respect to the operations of RTB,

7

1  and you know, I think we seek the picture throughout the

2  class period of those individuals and the structure at

3  Google as it pertains to the operation of RTB.  It's I think

4  a more cabined topic than presented in the papers.

5          THE COURT:  Well, the topic isn't limited to just

6  RTB, and it's limited to not just employees with

7  decision-making authority either, so far as I can tell.

8      So maybe you all have narrowed it and it's not

9  reflected in the papers and the dispute is only past versus

10  present.  And if that's the case, I can do my best to

11  resolve that issue.

12      But part of the difficulty with this topic is, number

13  one, it doesn't seem well suited to a deposition.  It seems

14  like the kind of thing that would either be produce

15  documents reflecting the people who have roles, however

16  defined, with respect to RTB or an interrogatory response.

17      I don't understand how you would expect a witness to

18  come to the deposition and recite from memory who all the

19  past and present employees, with all of these various roles

20  and their hierarchical organizational structure, would be.

21      So is there some document that you -- or documents that

22  you would like someone to explain to you and that that's the

23  basis for this topic?

24          MS. DAVIS:  No, I understand that, your Honor.

25  Google does not have org charts and has represented to us

8

1  that it does not have org charts.

2      And while the topic does encompass products that flowed

3  through RTB, it is in connection with the operation of RTB

4  that we seek information about some of these other products

5  that are listed.

6      The topic itself, you know, is those with the function

7  and the operations within Google on matters related to

8  Real-time Bidding.  And even to the extent that there are

9  other products mentioned, it is in the context of the flow

10 of data and their interaction with the RTB system.

11     So in -- you know, throughout our meet and confers with

12 Google and in a world where this is an entity that does not

13 have org charts or something where we are able to

14 specifically look at the structure of operations and from

15 documents glean this information, Google has agreed to

16 provide this information with respect to those with

17 decision-making authority into RTB.

18     We seek to be able to ask Google also about these other

19 products as they relate to RTB and how those with a core

20 function with respect to RTB interact with these other

21 products, because it is a large organization and they do

22 work together.  But to our knowledge, there is no single

23 document that Google could provide or reference that would

24 give us access to this information.

25     And, again, in the context of RTB and these other

9

1  products, my understanding of the dispute -- and Mr. Gutkin

2  can speak to this -- is with respect to the class period as

3  opposed to only those with current responsibility.

4          THE COURT:  So the topic is about the identity of

5  employees.  So is it your assertion that the parties don't

6  dispute the scope of the topic as to which employees are to

7  be identified, that the dispute is only about whether its

8  current employees or current and past employees?

9          MS. DAVIS:  So there is a dispute as to, as you

10  say, current and past employees, the entirety of the class

11  period versus only those employees with current

12  responsibility.

13      And then in terms of employees with functions that may

14  not be specifically classified as RTB, our interest is in

15  how those other products interact with and flow through RTB.

16  So, you know, the -- what we have initially sought is to be

17  able to take testimony on the topic as Google has agreed to

18  present it, though you know, as we've said, our preference

19  is to seek testimony for the entirety of the class period.

20      And to the extent that through that testimony, we are

21  able to obtain the information that we need, we would be

22  able to either move forward efficiently with respect to the

23  other aspects of the other advertising products that flow

24  through RTB or perhaps there would be another means of

25  discovery that would be efficient.

1    Where we are at right now is Google has refused to
2 provide a witness even for the areas for which they have
3 agreed to provide testimony.
4         THE COURT:  Okay.  So I think maybe I'm not asking
5 my question very clearly, but I read topic 1 as being about
6 the identity of employees, not an explanation of how data
7 flows through RTB through some other products, but just who
8 are the employees whom the plaintiffs may want to depose
9 someday in their individual capacity.
10    If that's what you're after, then my question is do you
11 and Google agree on the scope of the relevant employee roles
12 for this topic, or is there a dispute -- not just about past
13 and current, but about who, which -- people in which roles
14 who are to be identified by this 30(b)(6) witness?
15         MS. DAVIS:  So it is correct that one of the
16 outputs of this testimony would be who we might be able to
17 depose, which fact witnesses to identify.
18    There is a dispute as to the scope of employees that
19 may be specifically within an organization dealing with RTB
20 versus those that work with the ad products as they relate
21 to RTB.  And it's our position that we should be able to
22 obtain testimony about how those working on the core RTB
23 functions interact with these other ad products and who
24 handling these other little Google products interfaced with
25 those working directly on RTB.

11

1           THE COURT:  Why does that matter to the lawsuit?

2           MS. DAVIS:  Because these other advertising

3  products are participants in and are the source of some of

4  the data that flows through RTB and is ultimately disclosed.

5           THE COURT:  But these are Google products.  These

6  are not third parties -- third party platforms or anything

7  like that.  These are Google products from which Google may

8  place ads or sell ads or something like that, but they're

9  not external to Google.

10          MS. DAVIS:  But they are products through which

11  Google account holder data is collected, processed, compiled

12  and ultimately disclosed through RTB, to our knowledge.

13  And --

14          THE COURT:  So it's the source of information?

15  You contend it's among the sources of information that is

16  disclosed or shared or sold through RTB?

17          MS. DAVIS:  And also part of the sources of the

18  promises to Google's account holders that are at issue here.

19          THE COURT:  Okay.  But topic 1 is about the

20  identity of employees.

21      So let me hear from Google about what you think the

22  scope of this dispute is as to topic 1.  And you can stay

23  seated if you want or you can come up here, whatever you

24  prefer.

25          MR. GUTKIN:  Thank you, your Honor.  Jeff Gutkin

12

1  for Google.

2      I'm a little bit old-fashioned maybe --

3          THE COURT:  That's fine.

4          MR. GUTKIN:  -- I think I think better when

5  standing.

6      So I respectfully disagree with what Ms. Davis is

7  saying about the scope of the dispute on topic 1.  It's both

8  the enormous level of detail that plaintiffs are asking

9  Google to give.  Employees, teams, team leads,

10 organizational structure, titles, methods of communication

11 and coordination.  This is for every individual.  Chain of

12 command, reporting structure basically.

13     To ask a witness to come in and recite that level of

14 detail about not just RTB but all of these different

15 enormous organizations within Google is way beyond the

16 scope.  And I'm not sure why Ms. Davis is focused on this

17 one issue of current -- people with current decision-making

18 responsibility when that's just one small issue in a much

19 broader dispute.

20     And we had this whole meet and confer about this, and

21 plaintiffs would not relent on any of this.  They would not

22 narrow the scope of what was sought.  They would not change

23 the range of products at issue.

24     And your Honor is -- so that's the first issue is the

25 detail.

13

1    The second is the range of products.  Your Honor is
2 right, that this case is about disclosure through RTB to
3 third parties.  But yet they have included all -- first of
4 all, they've included organizations that I don't even
5 understand exactly how they're different.  But they've
6 included all of the publishing side services at Google where
7 ads can be displayed where people can sign up to have an ad
8 display on their website.  And then they've included two
9 internal first party advertising side services in Google ads
10 and Google Display and Video 360.
11    The fact that those internal advertising side services
12 might also purchase ads through RTB of course is not
13 relevant here because this case is about information given
14 to third parties through the RTB process and those third
15 parties purchasing ads, which is how we --
16        THE COURT:  I'm sorry, let me just make sure I
17 don't miss this observation.
18    So Ms. Davis says that among the reasons why the
19 plaintiffs want the identity of certain people associated
20 with these other Google products is because those products
21 are the source of some information that is ultimately
22 shared, and in the context of the operation of those
23 products, there are representations or consents given or
24 inferred based on how account holders interact with those
25 other products.

1    So I may not be doing justice to her argument, but
2    that's what I understood her to say.

3         MR. GUTKIN:  Yeah, so for the publisher side
4    products, those are the places where people who, say, run a
5    website or run an ad agency that helps people place ads on
6    their websites, those are the products that they sign up
7    for, and then RTB can be one of the sources of ads that goes
8    to those websites.

9    Now Ms. Davis has referred to information flows, which
10   I think is a completely different set of requests, and there
11   are other issues with some of that.

12   But what we're talking about here is large
13   organizations that their relationship to RTB is that RTB is
14   one of the many sources of ads that may come to their
15   customers and then to have to recite, you know, all of the
16   employees, the team -- I admit it.  I admit that after the
17   meet and confer, when Ms. Davis and her team added the words
18   "at a high level," comma, to the beginning of this
19   request -- which we said was much, much too detailed and an
20   impossible normalization test for any witness.  But it
21   doesn't matter if you ad "at a high level" when you have to
22   be responsible for testifying about the identity of
23   employees, team leads, org structures, chains of command and
24   methods of communication.

25        I mean to say to someone, "Do you use email?  Do you

1  use Google Chat?  Do you talk on the phone?" I mean, it is

2  impossible for a witness to deal with this topic as it's

3  framed.

4       And if what they want is information about data flows,

5  that's a separate topic that, as your Honor keeps saying,

6  this one is about the identity of people who work in these

7  giant organizations, so that -- the explanation that it's

8  about data flows or even the explanation that it's about

9  consents, your Honor has already held like we're not going

10 to do discovery on just data privacy generally --

11           THE COURT:  Okay.

12           MR. GUTKIN:  -- which sounds like what Ms. Davis

13 is alluding to.  But all of that would be not -- you don't

14 need the identity of everyone who works in the giant

15 organizations, much less the detail about all the people

16 they report to, how they communicate, et cetera, to get at

17 any of that information.

18           THE COURT:  All right.  Thank you, Mr. Gutkin.

19      All right.  On this one, I'm pretty persuaded that this

20 is the wrong discovery vehicle for what the plaintiffs wish

21 to accomplish here.

22      There may be some justification, given the state of

23 nonexistence of org charts, for there to be some witness who

24 will explain how the organization is structured and who does

25 what.

16

1      But this request, this topic is ridiculously overbroad.

2  And I just -- maybe if you had come to me and said, "We

3  served an interrogatory.  We have this list of, you know, 20

4  names.  We're trying to figure out who does what and how

5  they relate to each other.  We need a witness who can

6  explain that to us," fine.

7      But a topic that is this broad, this detailed and is

8  not limited to the relevant functional roles of any

9  particular employee, you're going to have to try again.

10 There's probably some kernel of something in here that would

11 be relevant and proportional to the needs of this case, but

12 topic 1 is not it.

13     And it doesn't sound like the parties have actually

14 narrowed it to something more sensible that I could then

15 resolve a more concrete, more limited dispute between you

16 all.

17     So I would like to move on to topic 2, unless --

18          MS. WEAVER:  If I --

19          THE COURT:  -- Ms. Weaver, you really need to say

20 something about topic 1.

21          MS. WEAVER:  I really do.

22          THE COURT:  All right.

23          MS. WEAVER:  We saw production of organizational

24 charts in this case.  We tried through document production.

25 And Google's counsel informed us that Google does not have

17

 1  them or anything like them.

 2          THE COURT:  Did you serve an interrogatory?

 3          MS. WEAVER:  I don't know if we've served an

 4  interrogatory.  We can do that.  But let me stick with this

 5  point.  I believe that if the motion pending before Judge

 6  Gonzalez Rogers is resolved, we will be able to return to

 7  the issue of whether or not Google has organizational charts

 8  or documents like them.

 9          THE COURT:  Great.

10          MS. WEAVER:  If we'd been given documents that lay

11  out who is in what department, then maybe we wouldn't have

12  needed this.  We're simply trying to move discovery forward

13  as it's --

14          THE COURT:  Yes.

15          MS. WEAVER:  And I need to address one other

16  issue, your Honor --

17          THE COURT:  But, Ms. Weaver, this is in your

18  control.  You can write a topic that is not so broad.  This

19  is the same issue I had with some document requests.

20      It is possible, within the parties' control, to ask for

21  what they really need and not take this kitchen sink

22  approach.

23          MS. WEAVER:  Okay.  Let me just be really clear.

24      I just want to say I was extremely disappointed to hear

25  Mr. Gutkin's remarks, because when we met and conferred, I

18

1  said to him repeatedly:  It's not all, it's not every.  We

2  just need to understand what is the department that's really

3  running Real-time Bidding, who are the people here, do they

4  use chats, texts and emails.

5      I take these depositions regularly in other cases, and

6  they can last maybe two hours.  So to act as though we came

7  in and said we need every -- I just -- I'm very disappointed

8  by that because that's not what happened.

9          THE COURT:  All right.  And, you know, I

10  appreciate that the whole point of my process here is to

11  have the parties confer and have serious discussions to

12  narrow the scope of what any dispute is, and I don't want to

13  be in a position of trying to resolve a dispute that doesn't

14  exist because you all have successfully narrowed it.

15      So I don't know what to tell you both.  I wasn't in the

16  room when you did it.  I have had parties who just can't

17  manage to agree on what they discussed, and they pay for a

18  court reporter to record their conversation.

19      I don't want you all to have to do this, but we can't

20  spend time on disputes like this, right?

21          MS. WEAVER:  Understood, your Honor.

22          THE COURT:  It just needs to be -- maybe your

23  starting point could be a little narrower and maybe the

24  parties could spend -- could be able to present the dispute

25  to me in writing that memorializes what you've actually

19

1   agreed.

2       If there is a dispute that really does require more

3   words, you can let me know in advance.  I'm not trying to

4   make this difficult for you all or for me.  I'm just trying

5   to, number one, encourage the parties to actually confer

6   seriously about their disputes and try to resolve what you

7   can and not turn this into, you know, a regular noticed

8   motion.  Trying to give you an expedited path to resolution.

9       So that's the purpose for all of the judges'

10  abbreviated discovery procedures.

11      But it has to be in writing for me to appreciate where

12  you are.  Otherwise, we have discussions like this.

13          MS. WEAVER:  Okay.  Then we will have to probably

14  seek relief from the limits.  We're trying to be brief

15  because we know you're overburdened.

16          THE COURT:  Yes, I know.  But if you really can't

17  do it, let me know, okay --

18          MS. WEAVER:  Okay.

19          THE COURT:  -- if you really can't do it -- I'd

20  like to move on to topic 2.

21          MR. GUTKIN:  Your Honor, I feel a little obligated

22  to --

23          THE COURT:  Please don't.

24          MR. GUTKIN:  -- respond to the -- okay.

25          THE COURT:  You know what, I know -- let me just

20

1 say -- let me just put a pin in it.  I'm sure you disagree

2 with whatever Ms. Weaver said, so let's just leave it at

3 that and move on to topic 2.

4     Okay.  Topic 2 is all about the location and sources of

5 data, and there's various types of data that's asked for.

6     I found this topic to be a little strange because I'm

7 not entirely sure what the plaintiffs are asking.  I'm

8 wondering if the plaintiffs are trying to use the deposition

9 to identify sources of discoverable information.

10     And if that's the case, let me just say I expect the

11 parties to confer about this and to not have to have

12 deposition testimony taken up -- you know, taking time to

13 figure -- I will allow it if there's really some problem

14 with communication and discovery.  But there wasn't really

15 an explanation in the papers about why the plaintiffs need

16 this information.

17     Again, it seems to me ridiculously overbroad and

18 unnecessary, but please help me understand what the point is

19 of topic 2.

20     MS. DAVIS:  Thank you, your Honor.

21     And I think again with respect to this topic, the small

22 aspect of this topic that Google has agreed to provide

23 testimony on, just that data shared with third party RTB bid

24 request recipients, is not the only relevant and important

25 aspect of the evidence that we need to take to be able to

21

1 prove our case.

2    The location and sources of the data streams topic, the

3 data concerning Google/RTB participants, bids, advertisers,

4 and ads, topic 2A, the targets of Google RTB advertising,

5 2B, you know, the location and sources of data relating to

6 compliance, all of this information is relevant to our

7 claims, particularly with respect to California privacy

8 claims that deal specifically with the location of

9 information and its transmission within California with our

10 CIPA claim with respect to the location of the information

11 and the transit of the information and discovery into these

12 topics, testimony into these topics from Google is necessary

13 for us to support our claims.

14    We need to know the location of the servers that are

15 transmitting this information, and we've been unable to

16 obtain this discovery through other sources.  We can't --

17        THE COURT:  Can I pause you there?  I think maybe

18 I misinterpreted your initial answer to my question.

19    I was wondering whether this topic is intended to find

20 sources of discoverable information in the sense of

21 custodial sources, non-custodial sources, where do we

22 require Google to search for relevant documents.

23    But it sounds like you're saying something different.

24 When you're saying to me we need to know the location of the

25 server where the information that is shared with third

22

1  parties is located, that's a different function than what I

2  thought topic 2 was -- so let me just ask again, are you

3  trying to police or monitor Google's compliance with

4  discovery requests, or is this something different?

5        MS. DAVIS:  So -- something different with respect

6  to the subtopics that go to the location and sources of data

7  that flows in through the RTB system.  That includes the

8  location and sources of information regarding account

9  holders that is compiled and ultimately results in the

10 information transmitted through the RTB system.  That is one

11 aspect.

12       THE COURT:  So this is what I've already ruled on.

13 This is the issue I've already ruled on in the document

14 production context where I said I don't think that's

15 relevant.  I think disclosure is relevant, but I don't think

16 figuring out where everything is stored and how it gets

17 there, how it's collected in the first place is relevant.

18    Is that this issue again?

19       MS. DAVIS:  Well, respectfully, your Honor, it is

20 this issue again.

21       THE COURT:  Okay.

22       MS. WEAVER:  It's document production and I think

23 we have heard your concern about the appropriate means of

24 obtaining relevant discovery in this matter that perhaps

25 document production or document production of an engineer's

23

1 documents or search terms might not be the appropriate

2 method to obtain that discovery.

3     But given the relevancy of the data flows of the

4 information that is compiled about users and ultimately

5 disclosed through RTB, the relevancy of the server location

6 and the structure of the RTB system to a number of our

7 claims, in our view, taking testimony from a knowledgeable

8 person -- Google's testimony as to this aspect of the case

9 is appropriate.

10         THE COURT:  Okay.  So now that I understand what

11 you're focusing on, it's not like you're trying to take

12 discovery on discovery.

13     If we look at topic 2A, where you ask for location and

14 sources of data concerning Google RTB participants, bids,

15 advertisers, and ads, how do I understand that?

16         MS. WEAVER:  So, your Honor --

17         MS. DAVIS:  Ms. Weaver will speak too.

18         MS. WEAVER:  My apologies.

19         THE COURT:  Okay.  What is that about?

20         MS. WEAVER:  So there are both front-end logs and

21 back-end logs.  And how the data is processed and flows

22 through those logs and whether fields can be separated so

23 that we could do more targeted requests or isolated requests

24 goes a long way toward streamlining discovery in this case.

25         THE COURT:  What is data concerning Google RTB

24

 1 participants?  Like what --

 2          MS. WEAVER:  Right.  So --

 3          THE COURT:  What are the boundaries of that

 4 category?

 5          MS. WEAVER:  It actually overlaps with what we

 6 discussed last week, your Honor, Google relating to -- oh,

 7 my sorry, the RTB participants as opposed to the --

 8          THE COURT:  Yeah, like is that?

 9          MS. WEAVER:  Right.  So participants in the

10 auctions may create their own identifiers, which they then

11 attach to individuals, and then Google will match

12 information about that.

13      I have to say we need discovery of this for me to be

14 able to be more specific, but it is, what is it that the

15 participants to the auction are bringing to the process and

16 what is Google bringing and how is it brought together and

17 then used in the auction?  Are they pooling data?  Are they

18 not pooling data?  Is it happening in front-end servers or

19 in back-end servers?

20      And I would say, your Honor, the location of the

21 servers is an element of our CIPA claim.  Just last

22 Thursday, the Ninth Circuit ruled in an unpublished opinion

23 upholding a CIPA claim with Justices Bumatay, Fletcher and

24 Silver sitting by designation in a case just like this.

25      This is a viable live important claim in the Ninth

25

1  Circuit, and we need to discover as an element of some of

2  these claims where the data sits and how it flows.  It's

3  literally an element of a statutory claim.

4           THE COURT:  So explain that to me.  So what does

5  it matter?  Okay.  So how would it matter?  Play that out

6  for me.  If the server is here as opposed to here --

7           MS. WEAVER:  Google will say it's not covered by

8  CIPA, the California wiretap act.

9           THE COURT:  So it has to be in California --

10          MS. WEAVER:  Yes.

11          THE COURT:  -- for your claim to --

12          MS. WEAVER:  Well, I don't want to concede

13 anything, but that is what they will contend.

14          THE COURT:  What is the point of the discovery in

15 terms of location, whether it's in or outside of --

16          MS. WEAVER:  It is to sustain our CIPA claim, yes.

17          THE COURT:  Whether it's in California or not in

18 California, that's the issue?

19          MS. WEAVER:  Yes, yes.  It is one issue.

20          THE COURT:  Okay.

21          MS. WEAVER:  Another issue will be where is the

22 data coming from and how does it flow, because that will be

23 an element of which -- is CCPA applying or not.  We will

24 argue that it is.  We argue that California law is.

25          THE COURT:  So how -- let's just kind go with this

26

1  example.

2      You have topic 2.

3          MS. WEAVER:  Okay.

4          THE COURT:  And then later on, you have topics 5,

5  6, 7, 8, and 15, all which seem to get at this notion of, is

6  there information being inferred based on participants using

7  the information they have and matching it or connecting it

8  somehow with information that Google has or provides.

9      So there's a cluster of other topics that are more

10  specific to not maybe the location of the server but how RTB

11  is interacting with these other activities involving bid

12  participants.

13      So when you keep describing things like "We want to

14  know about data concerning participants, bids, advertisers,

15  and ads," I can understand we need to know where the

16  location of the server is, but this is way broader than

17  that.

18      So I think that's part of the challenge here, is these

19  topics are so broad that I fear that you are not getting

20  maybe some things that you need because the topic is so much

21  broader than what you need.

22      Is there a way to narrow these?

23          MS. WEAVER:  Your Honor --

24      If I may.

25          MS. DAVIS:  Sure.

27

1          MS. WEAVER:  -- this is an immense case.  Chrome

2  is about one Google product.  Over a million documents were

3  produced.  We got a lot of information about the logs and

4  the back-end logs and the front-end logs.  That is one

5  subset of this case.

6          This case is all of Google products collecting data and

7  then it being amalgamated and sold in the auction or shared

8  in the auction.

9          So this is Calhoun and this is Real-time Bidding.

10          And so this case, when we talk about proportionality

11  and there are 50,000 documents that have been produced in

12  this case, and we got a million two in Chrome, and -- so I'm

13  just -- I need --

14          THE COURT:  I really --

15          MS. WEAVER:  I need to state a record on the

16  that, your Honor.

17          THE COURT:  Okay.  That's fine but I --

18          MS. WEAVER:  So the next piece is --

19          THE COURT:  That really wasn't what I was asking.

20          So I am not persuaded that the collection and

21  storage -- now maybe I'll be persuaded.  It's not in your

22  papers, as far as I can tell unless I missed it, about the

23  location of the server is what really matters for one of

24  your claims.

25          But I am not persuaded presently that how Google

28

1  collects and stores information is part of your case.

2      What is part of your case is what Google discloses,

3  whether it's disclosure through monetization or disclosure

4  through some other means.  And I take your point that it can

5  be Google discloses this bit of information and facilitates

6  the matching of that bit of information with somebody else's

7  information, allowing the third party to identify the user.

8      I understand that concept and I think that's within the

9  scope of your case.  But your case is about disclosure that

10 is unauthorized, not consented to, of personal information.

11          MS. WEAVER:  But of what --

12          THE COURT:  That's what I view this case as about.

13          MS. WEAVER:  So I agree with your Honor, but you

14 are cutting -- it is prejudicing our ability to be able to

15 talk to a jury if we cannot tell the jury what --

16          THE COURT:  Ms. Weaver, excuse me.

17          MS. WEAVER:  -- is being sold in the auction.

18          THE COURT:  You can.  You can.  I fully expect, as

19 I said last week, for Mr. Gutkin's client to disclose

20 everything that is disclosed in this RTB auction.  That's

21 the heart of the case, is the disclosure of that

22 information.

23      How it gets there in the first place, that's where I'm

24 not sure.

25          MS. WEAVER:  And let me --

29

1      THE COURT:  That seems like it's opening up a huge

2 can of worms that are not part of this case.

3      MS. WEAVER:  May I use an example that I can -- so

4 I can explain?

5    Let's talk about the named plaintiffs' data.  We spent

6 over a million dollars with the special master in Calhoun

7 trying to identify the named plaintiffs' data because that's

8 a proxy.

9    We were saying for six people, show us -- give us all

10 the data you have for these six people.  To engage in that

11 process, we had to talk about where Google keeps all of the

12 data, in what logs.

13    It's a little bit what we discussed about last time.

14 There are logs with fields that have -- if there are logs

15 with fields that say revenue can be associated with these

16 users, we need to be able to get into to understand how to

17 isolate that and where it lives and how it's used.

18    It's not so simple to say -- I can't think of a great

19 analogy for your Honor, but if you can't say "Oh, they're

20 selling the cake and we're only get the cost of sugar" --

21 what is sold in the auction is a slice of cake, and it is

22 baked and mixed throughout this process.  Literally, there's

23 something called a ███████████ that is what creates and

24 amalgamates all of the data.  That's why we need to

25 understand where the data comes in, what happens to the log,

30

1  what they do, how they build the inference.

2      It's immensely -- and let me just say this, your Honor.

3  There is such information asymmetry here, you know, for the

4  Court, for the plaintiffs, for the class, and that is part

5  of the case, actually.

6      So we -- you know, Mr. Gutkin can make representations

7  about things that are or not relevant, but we're entitled to

8  discovery of it to understand and test his -- he doesn't get

9  to decide "Oh, Google ad obs is not relevant, but Google ad

10 manager is."

11     We need to understand how the data flows through these

12 Google products when they're collecting information about

13 people and what they do with it.

14     So I can understand why you might look at this in a

15 regular case and say -- if this were like a securities case

16 where all the, you know, revenue -- you know, documents

17 were -- like that's not relevant.

18     The problem is that this is a product that is -- it's

19 the result of surveillance.  And so if you cut off from the

20 case how people are being surveilled and all of the data

21 for -- everything that Google is doing through all of these

22 other products in collecting information, that is part of

23 the offensiveness of the conduct.

24          THE COURT:  All right.  So, Ms. Weaver, let me

25 just say one thing.

31

1    I've already said that the case is about disclosure.

2  That's very clear and I do expect Google to tell you

3  everything that's disclosed about the people who are within

4  the class and the named plaintiffs.

5    But I'm still not persuaded that you must have

6  discovery of how it's collected in the first place, unless

7  the issues in the case are that Google says, you know, there

8  was consent to get that bit of information and disclose it.

9    If that's the issue, then there will be discovery of

10 that.  But so far, the problem is, is that you have not

11 demonstrated to me that that's what this case is about.  The

12 plaintiffs refer in their complaint to all kinds of things.

13 All of that has to do with disclosure.

14    I understand that you are upset that the information is

15 collected in the first place.  But those aren't your claims.

16          MS. WEAVER:  But, your Honor, they are.  There

17 are --

18          THE COURT:  There are allegations in the

19 complaint --

20          MS. WEAVER:  May I brief it?

21          THE COURT:  No.  There are allegations in the

22 complaint about these people's every move is tracked and

23 everything like that.  But the issue is what is disclosed.

24    The issue is not that they were tracked in the first

25 place, and I'm using "tracked" in a very loose way.  Please

32

1 understand me.  But that the information was disclosed

2 without their authorization.

3      You all are -- you know, there may be a hearing at

4 which Judge Gonzales Rogers solves this problem for you all.

5 But right now, I am the one that's deciding.  And I'm not

6 going to revisit this same argument again based on the very

7 poor showing that's been made in the discovery papers so

8 far.

9      So just citing to allegations in the 179-page complaint

10 is not going to be sufficient.  Okay?

11      The discovery has to be about what the claims are

12 about.

13      Now, this is the first time that I've heard, or at

14 least appreciated, that what you need is to know the

15 location of the server on which the data that is disclosed

16 to third parties is stored.  If that's true, that that's an

17 element of your claim, I agree that would be discoverable.

18      But that doesn't mean that the whole breadth of topic 2

19 and the sort of detail that you've described on many

20 occasions that you need -- I'm just not seeing it.  I've

21 just got to -- and I don't want to belabor this over and

22 over again, because I'm just not persuaded that that is

23 within the scope of your case.

24      So I have to say it is somewhat frustrating, I

25 appreciate, for all the parties.  But the arguments that are

33

1  being made to me in support of this discovery are undermined

2  somewhat by the extreme breadth of the discovery.  It's

3  just -- it's way overbroad.

4      If there are things that you need, tell me that you

5  need them.  But this sort -- like give me every and all

6  source -- data about every location and source of

7  information is just not in any case proportional to the

8  needs of the case.

9      So -- and I don't want to hear about Brown and Calhoun.

10  I mean it just doesn't matter to me, right?  That is not the

11  case I'm focusing on.  I'm focusing on this case.  You're

12  going to need to make the showing in this case.

13      All right.  Mr. Gutkin, do you need to be heard on

14  topic 2?

15          MR. GUTKIN:  No, only to say that counsel has kind

16  of pivoted away from what the topic is about.  The topic is

17  about what you already resolved.  They in fact appealed that

18  decision already, and that appeal is now deemed denied under

19  Rule 72-2(d) because there's been no action on it.

20          THE COURT:  Yes, I appreciate that history but --

21          MR. GUTKIN:  Okay.

22          THE COURT:  But there are some things that, again,

23  I think that the parties could confer about and the overlap

24  with topic 3 and some of these other topics, but -- for

25  example, I'm just looking at 2E, "Location and sources of

34

1  data concerning reports and studies concerning Google RTB."

2      Okay.  There may be studies about Google RTB that are

3  relevant to some issue in this case.  We had this come up in

4  document production, and maybe it's important to have a

5  witness explain those studies.

6      But topic 2E goes well beyond what that might be, what

7  that relevant information might be.  And this is the thing

8  that frustrates me so greatly, is there does seem to be some

9  core categories of information that the plaintiff

10 legitimately should be able to take deposition discovery

11 about, and the parties can't seem to get there.  And I don't

12 know why.  Maybe you do get there and it's just not showing

13 up in the papers.  And so I'm seeing these sort of disputes

14 at their worst, and you all have really made more progress

15 than I appreciate.

16     But I would encourage you to see if you can focus on

17 the things that the plaintiffs really do need, because they

18 do describe either how RTB operates or what the value of the

19 information shared is or whatever it may be.  I just -- I

20 can't tell from the dispute as it's presented.

21         MR. GUTKIN:  And, your Honor, we tried to talk

22 through these issues, and I feel like your Honor is saying

23 the things that I said in meet and confer.  And Ms. Weaver,

24 as she was alluding to before, didn't say "We're not seeking

25 every single piece of information under on the sun," but

35

1 then they served a revised request and the request is still

2 seeking every piece of information under the sun.

3      So if I do not object and do not narrow, then I'm not

4 going to be complying with my obligations.

5           THE COURT:  Yeah, okay.

6           MR. GUTKIN:  So I couldn't -- we've tried to get

7 them to narrow these things, and we have felt that we

8 couldn't.

9           MS. DAVIS:  And, your Honor, if I may.

10          THE COURT:  Yes.

11          MS. DAVIS:  I will say that one aspect of our

12 effort in meeting and conferring with Google has been to

13 come to a common understanding of topics, you know, for

14 which Google will offer testimony and we sought a date from

15 Google --

16          THE COURT:  Okay.  I'll get to the date in a

17 moment.

18          MS. DAVIS:  -- to go forward with that testimony.

19          THE COURT:  I will get a date in a moment.  I'll

20 get to that date issue.  I appreciate that.

21      You know, one possibility, which is what I alluded to

22 last time we were here, is that you all could just sit and

23 talk about it in my courtroom without me here and figure it

24 out.

25      If we were closer on some of these issues, I'd really

36

1  require you to do that, because this is just not good --

2  it's not a good use of my time, your time or the clients'

3  time to sort of debate these things from the sort of

4  beginning, which I feel like that's kind of where we are.

5  That's what it seems like to me.

6       There still seems to be, at least not represented to

7  the Court, you know, any kind of narrowing of what's in

8  dispute before you get here.

9       Maybe it's happened.  It just feels pretty raw.

10      But topic 3 is different, so let's go to topic 3,

11 because I do feel like there has been some effort here.

12      On topic 3, the focus of it is how RTB operates,

13 including but not limited to, and then there are various

14 subsets.

15      Let me just say at the outset, I feel it's reasonable

16 to obtain deposition testimony about how RTB operates,

17 certainly as permitted in my prior order, which resolved

18 only a very narrow dispute between the parties in terms of

19 document requests.  This is docket 184 regarding request for

20 production 22.

21      Specifically, it seems like what's within the

22 reasonable scope of discovery, consistent with that prior

23 order and the parties' prior agreement, is what the Google

24 account holder information flows through RTB are and how

25 it's shared and distributed and sold through RTB.

37

1     So this is the how does it get from RTB to a third

2 party.  That seems within the scope of what's been

3 previously ordered.

4     In addition -- I guess it would be topic 3E -- which is

5 how Google and participants associate, map or link

6 information shared in RTB with information already compiled

7 about RTB targets -- this is the matter I was alluding to

8 before -- including whether Google and participants

9 coordinate such association, mapping or linking, as alleged

10 in the complaint.  I think that's fair game within the

11 topic.

12     So essentially what's disclosed and how is it

13 disclosed.  And by "disclosed," I mean also to include topic

14 3E, which is if there is a disclosure that happens because

15 of a combination of information Google is sharing with

16 information that the RTB participant already has, I do think

17 that's fair game.  So I think that's clearly within the

18 scope of discoverable information.

19     Separately -- this is not part of request for

20 production 22.  But I do feel it's reasonable for plaintiffs

21 to obtain information about how third parties who

22 participate in RTB and Google itself may benefit from the

23 disclosure of information.  So that's subtopics 3B and 3C.

24     And I understand that Google doesn't disagree about

25 that, at least that's how I read the submission.  But the

38

1 problem is still the request -- part of the request or the

2 topic that concerns discovery of how information is

3 collected and stored, how the winning bid is determined, how

4 and where Google stores information about the bids received,

5 and about the winning bid and the identification of Google

6 owned properties that participate in RTB.

7       Now, we had a discussion a moment ago about some of

8 these issues, but there's nothing in the discovery dispute

9 submission that supports the topic as to those matters.

10 It's just not in there.

11      So, Ms. Davis, I guess I will give you the opportunity

12 to address that problem.

13         MS. DAVIS:  Thank you, your Honor.

14      It is helpful to have the clarification with respect to

15 the operations of RTB, the data flow through RTB.  I hope

16 that some of the information we provided about our claims

17 and the importance of the location of servers and how they

18 transmit that information has helped to describe with

19 greater particularity than we were able to do in the limited

20 space allowed by the papers, you know, and give information

21 about these issues.

22      The disputed subtopics, for example 3D, how Google

23 determines who wins a bid in RTB including the preferential

24 or different treatment from other participants that may be

25 related to the data that is provided by that participant or

39

1  data that that participant may receive as a result of an

2  agreement, that is an aspect of the topic that we think is

3  both relevant and proportional and covered by 3D.

4         THE COURT:  What does it relate to?  Is it a

5  damages subtopic?

6         MS. DAVIS:  Well, it is a damages subtopic with

7  respect to the agreements and any of the revenue that flows

8  through those agreements but also with respect to any

9  differential information that might be disclosed about

10  account holders in connection with an agreement, a winning

11  bid, or whether there is preferential treatment given

12  because additional information is disclosed.

13         THE COURT:  Okay.  That's a little different than

14  how I read "D" because "D" is about how Google determines

15  who wins a bid.  That doesn't seem to have anything to do

16  with anything relevant to your claims, unless I'm missing

17  something on damages.

18         MS. DAVIS:  Well, 2D --

19         THE COURT:  And then the second part of "D," the

20  including part, is providing preferential and different

21  treatment from other participants.

22     What I hear you saying now is the preferential or

23  different treatment that you have in mind is something

24  having to do with providing more data or obtaining more

25  information from the third party bid recipient who is the

40

1   winner.  Is that how I should understand this?

2          MS. DAVIS:  Yes.  That's one aspect of the

3   testimony that we see, where there are participants in RTB

4   and there are agreements between Google and those

5   participants, where there is additional information that

6   might be transmitted in a bid request or received from the

7   bidder in connection with those agreements.  That is an

8   aspect of 3D that we would seek testimony on.

9          THE COURT:  So why wouldn't you just ask that?

10  Why wouldn't you just formulate the topic to ask that

11  information?

12         MS. DAVIS:  Well, again, your Honor, I think,

13  through the course of our meet and confers with Google --

14  and, as I believe I mentioned at the outset, one difficult

15  aspect of the briefing on this dispute is that Google's

16  presentation is as if these meet and confers did not happen.

17  They only --

18         THE COURT:  Show me in your papers where you tell

19  me -- you tell me the information I need to know about this

20  topic in order to resolve the dispute in your favor.

21         MS. DAVIS:  Well --

22         THE COURT:  I'm looking at it right now.

23         MS. DAVIS:  No, I understand, your Honor.  And,

24  you know, again, I think, in part because of our space

25  constraints, our presentation of the information we seek is

41

1  focused on the areas that Google has told us it will not

2  provide testimony on.

3      We did provide a reference to docket 196, which did

4  provide greater detail as to the information we seek and the

5  relevance of some aspects of these topics.  But,

6  unfortunately, in light of the space constraints in the

7  papers -- and we hear your Honor about the need to perhaps

8  seek relief from the space constraints to provide a more

9  full description of what's at issue.  But in this instance,

10  our papers were focused on the areas where we understood

11  Google to be refusing to provide that testimony.

12          THE COURT:  Let me just say -- this is just an

13  example.  So I'm looking at the discussion in topic 3 which

14  appears at the bottom of page two and the top of page three.

15  You give me a long list of all the things that you say

16  Google won't provide, is not agreeing to, with emphasis on

17  the word "how."  Then you say that it's relevant and

18  proportional.  You cite docket 196 and you cite the

19  complaint.

20      There is no explanation here, even a very abbreviated

21  one like the one you just provided me, which is:  The reason

22  we want to know about whether the winner got preferential

23  treatment is because we think that it has to do with the

24  sharing of data, either from Google to the bidder or from

25  the bidder to Google in a way that implicates our claims in

42

1 the following manner.

2     There is just -- I just -- I need something like that

3 in order to decide these things.  And just sort of a litany

4 of "This is what we disagree on," full stop, "and see, we

5 have an allegation in our complaint," is just not enough.

6     So I mean you can help yourself and help me by using

7 the -- you know, I acknowledge -- limited space in these

8 discovery submissions to really just tell me why it's

9 relevant and proportional.

10     That's what I need to know.

11         MS. DAVIS:  And we hear you on that, your Honor.

12 And I think given the number of disputes and the aspects of

13 disputes where rather than coming to you on only those

14 topics where there is disagreement, we are also faced with

15 this blanket refusal to provide a witness for the topics for

16 which Google has agreed to provide testimony, which had we

17 been able to proceed in that manner, would have been

18 informative as to the remainder of the topics and perhaps

19 given us the ability to present to the Court a narrowed

20 dispute.

21     And I think we also very much hear you on coming to you

22 if we find that because of the space constraints, a more

23 fulsome presentation of the topics is difficult.  There are

24 many, many disputes before you and we want to provide you

25 the information that you need so that we can get the

43

1  discovery that we need.

2          THE COURT:  Okay.  I appreciate that.  And let me

3  just say that, again, it may be that Judge Gonzalez takes

4  care of your problem.

5      However, on topic 3, I will hear from Mr. Gutkin on the

6  ones that I understand Google disputes.  And if I'm mistaken

7  about the scope of the dispute, you can let me know.

8      But to the extent it's raising the same issues I've

9  already resolved, I'm not inclined to revisit that except

10 for perhaps this location issue.

11     Mr. Gutkin, I didn't give you an opportunity to address

12 that.

13     I would like to know from the plaintiffs, what is the

14 name or citation of the case that you referred me to?  Ms.

15 Weaver referred me to a Ninth Circuit case that was just

16 issued.

17         MS. WEAVER:  Your Honor, it is not directly on

18 point with regard to where servers are located.  But it's a

19 CIPA case, and give me just a moment --

20         THE COURT:  Okay.

21         MS. WEAVER:  -- and I will return.

22         THE COURT:  All right.  Thank you.

23     But let me turn to Mr. Gutkin in the meantime to

24 address those matters.

25         MR. GUTKIN:  Well, so your Honor, topic D, "How

44

1  Google determines who wins a bid," was already the subject

2  of motion practice that you resolved in Google's favor

3  through RFP 22Q, I believe.

4          THE COURT:  Right.

5          MR. GUTKIN:  Then Ms. Davis has said "Oh well,

6  part of that, how you determine who wins has to do with

7  whether different information is disclosed," but we've

8  already said in topic 3 that the witness will testify about

9  the information that's disclosed through RTB.

10      So -- but what we've agreed to do covers the part of

11  topic 3D that Ms. Davis made topic 3D discoverable.  In

12  fact, what topic 3D is about is solely this issue of how

13  Google determines who wins, which has been resolved against

14  plaintiffs.

15      As you said, topic F is an exact repeat of an issue

16  that you already resolved against plaintiffs.

17      Topic A, to the extent it's about how information is

18  collected and stored, is a repeat of an issue that you

19  resolved against plaintiffs and have reiterated today as not

20  going to change.

21      And then topic G, which I'm not sure if we discussed,

22  again, relates to that kind of first party transaction where

23  information is not being shared with third parties.

24      So Google's response to what we will provide

25  encompasses what's relevant.

1          THE COURT:  So right now, your objections --

2    Google's objections are to topics 3D, F and G.

3          MR. GUTKIN:  So we agreed in part to topic B.

4    Topic B, romanettes ii and iii, "How agreements are

5    typically structured and paid for and memorialized," we've

6    already produced the agreements.

7       And then topic B, romanette iii, "A general description

8    of agreements between Google and any RTB participant that do

9    not follow typical structure," we produced those agreements

10   as well.  And I don't -- that again sounds to me like a

11   memory test because of the use of the words "any RTB

12   participant."

13      So I'm not -- a witness would be -- I guess if this

14   topic were left as is and were accepted with the way they

15   wrote it, which is really the problem we've had that causes

16   so many -- the fact that we have so many disputes is because

17   of the way these are written and --

18          THE COURT:  But if you've already produced the

19   agreements, you can put up a witness who will answer

20   questions about the agreements, because you know what the

21   universe of agreements are because you produced them, right?

22          MR. GUTKIN:  Yes, but there are a lot of

23   agreements.  And so would the witness have to go through and

24   read and kind of memorize all of the differences in all of

25   the agreements that --

1            THE COURT:  Of course not.

2            MR. GUTKIN:  -- they already have --

3            THE COURT:  But the witness should be

4    knowledgeable enough to be able to answer questions about,

5    okay, this one was done differently, then this one -- why is

6    the language different?

7        If the witness can't answer -- I would be hard-pressed

8    to find if they really are voluminous and the questions are

9    very detailed, that a witness wasn't adequately prepared

10   unless the plaintiffs tell you in advance "We need the

11   witness to and to be able to answer questions on X, Y, Z, P,

12   D and Q."  Right?

13           MR. GUTKIN:  Yes.

14           THE COURT:  So if you have advance notice about

15   what they need, great, that's always helpful.  If not, I

16   mean if it's really detailed and no human could be expected

17   to know the answers to those questions, then there won't be

18   a problem, right?

19           MR. GUTKIN:  I mean that --

20           THE COURT:  So let's not get into the weeds on

21   that.  I think that if you have produced agreements and a

22   witness is generally knowledgeable about the agreements and

23   can be prepared to answer questions about them in some

24   reasonable fashion that would be consistent with what

25   30(b)(6) envisions, that's what's required.  And you all are

47

1  experienced counsel.  You know what that is.

2          MR. GUTKIN:  I should probably also address topic

3  3E.

4          THE COURT:  Before we get to 3E, what's wrong with

5  3B(i), the application and vetting process?

6      I wasn't really sure I knew what that meant, but I

7  assume that you did because I didn't see it as being

8  objected to.

9      But if it is objected to, can I understand what that

10  objection is about?

11         MR. GUTKIN:  Yes, I think it's not objected to.

12  We said we'd produce a witness on Google's policies

13  regarding who can participate in RTB.

14         THE COURT:  Okay.  All right.  So then 3E?

15         MR. GUTKIN:  Yes, so 3E, it's just broad, and it

16  also relates to how participants associate, map or link

17  information with information that they've already compiled.

18  So it's asking Google to speak to what the participants in

19  the program are doing in a way that to me is not proper.

20      So what we agreed to provide in connection with 3E is

21  testimony about Google's cookie matching program, which is

22  the way that Google facilitates people --

23         THE COURT:  Okay.

24         MR. GUTKIN:  -- using the data that they receive.

25         THE COURT:  Let me put it this way.  As I read 3E,

48

1  if Google has knowledge about what participants in its RTB

2  system are doing to map, link or associate information that

3  is shared with them in RTB, then you can provide a witness

4  who can testify to that.

5      If Google doesn't know, then you don't know.

6      So I think that's the way these things normally work.

7  You don't have to go and ask your participants what they are

8  doing.  It's just knowledge within Google's possession,

9  custody or control.

10      So I would think 3E is reasonably well drafted so that

11  you can identify someone to answer that.

12          MS. DAVIS:  Your Honor, your Honor, if I may.

13          THE COURT:  Ms. Davis, did you have something to

14  clarify on 3E?

15          MS. DAVIS:  Just one thing to clarify in terms of

16  Mr. Gutkin's limitation with respect to cookie matching.

17      You know, our concern is that by limiting it only to

18  cookie matching, that we will not have a witness prepared to

19  testify about ephemeral identifiers, about other forms of

20  the association, mapping and linking of information.

21      So our objection -- or our concern in this instance is

22  the limitation to cookie matching in particular.

23          THE COURT:  All right.  Well, I've said what I

24  think ought to -- let me put it again this way.

25      If you have something in mind and you haven't shared

49

1  that with Mr. Gutkin, it would be very difficult if he

2  doesn't know what you're really after, for him to prepare a

3  witness about that.  So if it's something beyond cookie

4  matching, like some of the other things that you've

5  described in your complaint or whatever this ephemeral

6  identifier is, you should share that in advance if you

7  really expect a witness to be identified to talk about that

8  stuff.

9      Also, none of that is in the discovery dispute

10  submission, that there is a dispute about cookie matching

11  versus ephemeral identifiers versus some other form of

12  associating, mapping or linking.

13      So do you all need to sit in my courtroom or Judge

14  Koh's old courtroom and talk about this some more, or can we

15  have a witness prepared on 3E without that further effort?

16          MR. GUTKIN:  I think with your Honor's guidance,

17  it's clear, as long as were talking about linking and

18  matching in the context of RTB and not anything thing like

19  what does Google as a company do in any other context to

20  link and match and what's Google's capacity to do that.  It

21  needs to be RTB related.

22      But I think with that, then your Honor has probably

23  made it clear.

24          THE COURT:  How I understand the allegations in

25  the complaint, it's that there is information shared in the

50

1  RTB process that, when coupled with information that the RTB

2  participants already have about a particular account holder,

3  allows them to identify specifically who that individual is.

4  Or maybe not completely specifically but, you know, more

5  specifically than just a generic person.

6       And so it is in the context of RTB that this -- I

7  understand this topic to be formulated, but it doesn't just

8  mean that the identification is made by the RTB participant

9  solely in the context of RTB.

10      So, again, I am not sure if I'm helping or hurting the

11 process of clarity here.  But I do appreciate that what

12 you're asking is that you don't have to have somebody

13 prepared on what Google might do with respect to any of its

14 other products or other services identifying people for

15 purposes of something else not RTB.  Yes?

16          MR. GUTKIN:  Exactly right.

17          THE COURT:  That's how I understand the topic.

18          MR. GUTKIN:  That's exactly the clarification I

19 needed, your Honor.

20          THE COURT:  All right.  And that seems pretty

21 consistent with what the plaintiffs are asking.  Yes?

22          MS. DAVIS:  And as I had mentioned, what I had

23 mentioned is also consistent with our meet and confer

24 discussions --

25          THE COURT:  Okay.

51

1          MS. DAVIS:  -- and the information we've provided
2   Mr. Gutkin.
3          THE COURT:  Okay.  So I think topic 3, I should be
4   able to describe in my order what the scope is of that.
5       Topic 4 is "Changes to the operation of RTB and why
6   those changes were or were not implemented, including
7   changes contemplated as a result of" five different things.
8       I understand the dispute to be pretty much the same as
9   the one that I resolved with respect to request for
10  production number two in docket number 184, my prior order.
11      Principally, Google objects to having to produce a
12  witness about changes that were not made and changes
13  unrelated to the sale or disclosure of account holder
14  information.
15      I continue to not be persuaded that discovery that's
16  broader than that is relevant and proportional to the needs
17  of the case.  There aren't any new arguments presented in
18  the discovery dispute submission.  So my inclination on this
19  one is to say same result as docket 184, request for
20  production number two.
21      So I'm not really sure, Ms. Davis, if there's anything
22  you would like to say on this point.  But are there any new
23  or different arguments that you have?
24          MS. DAVIS:  I do not have a new argument to
25  present here other than that set forth in the papers.

1          THE COURT:  Okay.  So topics 5, 6 and 7 --

2          MS. DAVIS:  Oh, Ms. Weaver --

3          MS. WEAVER:  I'd like to be heard on that very

4    quickly, your Honor.

5          THE COURT:  Uh-huh.

6          MS. WEAVER:  And I just -- I apologize if you've

7    already considered this.

8       But the concept is this.  Let's say Google did an

9    internal study because there was a public outcry about the

10   Real-time Bidding auction revealing private data and they

11   learned that in fact it was revealing private data but then

12   they decided not to do anything about it.  That would be an

13   element of a privacy claim or a punitive damages claim built

14   off a tort.  So that would be the kind of thing where we

15   would think it would be relevant.

16         THE COURT:  And I believe that you served a

17   document request that was described in that fashion that

18   seemed fine.

19      If you served a depo topic that asked for that

20   information, that might be fine too.  But topic 4 goes well

21   beyond that.

22      So ask for what you need and all may be well.  You may

23   find that Google is completely satisfied with producing a

24   witness who will testify about a report that says "Oh, this

25   is a real problem we found and we need to fix it" or "We're

53

1  not going to because it's too beneficial for us."

2      If there is such a report, then ask him to put up a

3  witness for it.  But don't -- like this is a repeat of the

4  same discussion we had with respect to request for

5  production two.  It's too broad, goes well beyond what you

6  actually need.

7      Okay.  Can we move on to -- oh, I'm sorry.  I needed

8  the case name.  I think that Ms. Weaver had provided that.

9          MS. WEAVER:  Yes.  But, again, with apologies, I

10  can provide a better cite when I have a moment to look, for

11  exactly the issue of where the server is located.

12      This cite is Javier v. Assur., 2022 U.S.App. LEXIS

13  14951, Ninth Circuit, May 31st.  And I'll repeat it.  2022

14  U.S.App. LEXIS 14951.

15          THE COURT:  Okay.

16          MS. WEAVER:  And, again, your Honor, it's

17  unpublished.

18          THE COURT:  I understand.  And I don't see

19  anything else here in the -- I was looking to see if you

20  cited me something and I just missed it.  But I don't see

21  anything in the discovery dispute submission.

22      Okay.  I would like to move on to topic 5.  I view 5, 6

23  and 7 as being somewhat related.  And the reason that I view

24  them as related is because I had one question that I think

25  is the same for each of them.

54

1        Is there a dispute in the case about whether the

2    profiles or verticals or inferred information is assembled

3    from public information or whether it reflects personal

4    information?  Is that is that a dispute between the parties

5    in the case?

6        And I came to that question after reading Google's

7    motion to dismiss, where one of the arguments that's made is

8    that this is not personal information.  This is public

9    information.  This is just how the Internet works.  And

10    people are out there on the Internet non-anonymized doing

11    whatever they're doing.

12        I'm simplifying, but that's one of the things -- I know

13    that there has been a dispute -- there is a dispute.  Google

14    does not concede that the information that the plaintiffs

15    claims is personal information, as defined in California

16    law, is what's disclosed.

17        But where I'm going with this is I wondered if topics

18    5, 6, and 7 are aimed at discovery of that -- relevant to

19    resolving that question if there really is a dispute on that

20    point.

21        So I don't know who to start with.  Let me ask the

22    plaintiffs, and starting in the context of topic 5 maybe

23    would be helpful.  This is "The creation and maintenance and

24    use of user profiles and verticals, user lists or methods of

25    categorizing Google account holders disclosed through RTB or

1  used to target users through RTB."

2     So maybe you could start by saying -- by telling me

3  what it is you're after specifically in this topic.

4        MS. DAVIS:  Sure.  So I think going to your

5  question about whether there is a dispute about what is

6  personal information, yes.  And it is that compilation of

7  information that is disclosed through RTB that, you know,

8  permits the identification of the individual that makes it

9  personal information.

10    Google's effort to parse into individual pieces of data

11  and separate each individual aspect of the information

12  disclosed through RTB is contrary to California law and is

13  contrary to the ability to link this information together,

14  back to the user, and as you mentioned in connection with

15  the prior topic, for participants in the auction to also

16  identify the user.

17    So here, where we looked to the user profiles, or as

18  Google transitioned to -- from cookie matching to FLoC,

19  which I believe was discussed last week with you, it is that

20  information ultimately shared through RTB that we seek

21  testimony on through this topic.

22        THE COURT:  So Google says that it will testify

23  about account holder profiles and verticals shared with

24  third party RTB participants.  And what I understand it to

25  say is the references to user lists or methods of

56

1  categorizing account holders disclosed through RTB or used

2  to target users through RTB is not sufficiently specific

3  and -- at least, that's part of the argument.

4      So when you say "user lists," what do you mean?

5          MS. DAVIS:  So -- and Ms. Weaver may be able to

6  add additional detail on this topic.

7      But throughout the class period, the information

8  disclosed through RTB has been the verticals that individual

9  users were placed in along with other personal identifying

10 information.  And Google explored and, you know, was

11 transitioning to, rather than specific verticals, other

12 methods of categorizing account holders based again on the

13 account holder information collected through the

14 surveillance apparatus and ultimately disclosed through RTB.

15         THE COURT:  What's the user list?

16         MS. DAVIS:  So the user list is a method of

17 categorization that would place account holders in lists

18 that are akin to the sort of very detailed verticals or

19 categories that were the predecessor to the list.

20     And, Ms. Weaver, if there is additional detail to add

21 on that point --

22         THE COURT:  So it's a method of categorization by

23 Google?

24         MS. WEAVER:  Yes.  And we actually frankly need

25 more discovery of this, your Honor.  But the general

57

1   concept, what is publicly available, is that when Apple
2   deprecated the use of third party cookies, it meant that
3   Google could not track people using third party cookies --
4   all of those third party cookies.  And so it has tried
5   different accommodations and different -- so what we want to
6   do is say it's not just limited to verticals here.
7       It's any way that it's saying -- when an advertiser
8   wants to target somebody who's feeling insecure, right, or
9   has this financial condition or something, if they put them
10  in a category --
11            THE COURT:  Wait, who's the "they"?  Is it the
12  advertiser that you're saying is creating --
13            MS. WEAVER:  The advertiser -- if Google --
14            THE COURT:  -- a user list or is it Google who is
15  creating a user list?
16            MS. WEAVER:  Both, your Honor, I believe.  But
17  what we want to understand is how Google categorizes people
18  in general.  That's the cleanest way to put it.
19            THE COURT:  Okay.
20            MS. WEAVER:  Whether it is verticals, whether it
21  is some other categorical description of people -- of Google
22  account holders.
23            THE COURT:  Okay.  But you only -- if Google were
24  simply doing this and didn't share any of the information,
25  it wouldn't matter, right?

58

1          MS. WEAVER:  It is doing it for the purpose of

2    making people the target.

3          THE COURT:  Right.  But it's because it shares the

4    information with somebody who's then going to target that

5    person with ads, right?

6          MS. WEAVER:  It is because people will be targeted

7    based on those categories.

8          THE COURT:  The topic says, as does topic -- well,

9    topic 5 says, "The creation and maintenance and use of."

10       So is creation and maintenance the same issue we've

11   been talking about?  And use is the disclosure?

12         MS. WEAVER:  Yeah, the targeting.

13         THE COURT:  Okay.

14         MS. WEAVER:  It's disclosure and targeting, right?

15   So it will be a litigated issue in the case.

16       What does it mean when Google says "We will not sell

17   your information"?

18         THE COURT:  So what you're worried about is Google

19   assembles information, says "Here's the person you want to

20   serve an ad to."  Okay.  I got it.

21         MS. WEAVER:  Thank you.

22         THE COURT:  So that's a form of user disclosure

23   that is within the scope of your claim.

24         MS. WEAVER:  Exactly.

25         THE COURT:  Okay.  So, fine, I understand that

59

1  point.

2      Let me just ask Mr. Gutkin.

3      If user list is understood as simply a subset of some

4  other method of categorization of an account holder based on

5  some criteria associated with that account holder, whether

6  we call it personal or not, like what's done in profiles,

7  like what's done in verticals, in other words, you

8  understand it is as a generic term to describe that concept,

9  is there a problem with producing a witness who will testify

10 to the use of that information for purposes of targeting

11 users through RTB or disclosing to participants in RTB so

12 that they can target users?

13      MR. GUTKIN:  Well, so, your Honor, first of all,

14 let me back up and correct something that Ms. Davis said or

15 at least identify that there's a factual dispute.

16      Ms. Davis claimed that user lists, like this person is

17 interested in motorcycles or this person is interested in

18 beaches, beach vacations, is disclosed through RTB based on

19 the user.  And that is not correct.

20      What is disclosed in the vertical, it's the difference

21 between something called the user vertical, which as the

22 complaint acknowledges, is not a used field, and the

23 detected vertical which relates to a classification of a

24 website, this is a website about motorcycles where this ad

25 opportunity appears.

60

1      So I want to make that clear on the record before it

2  goes unrebutted that Google is informing users through the

3  auction, this is a person who is interested in motorcycles

4  as opposed to this is an ad opportunity that is on

5  Kawasaki.com.  That's a website about transport.

6          THE COURT:  But the only reason -- if I understand

7  the complaint correctly, the only reason that an RTB

8  participant would care about that is because that person is

9  on that website about motorcycles, and Google knows that and

10 that's a feature of what is shared in the RTB auction

11 process.

12     That's what I understand them to say.

13         MR. GUTKIN:  Yes.

14         THE COURT:  And then maybe that allows the RTB

15 participant, but possibly also Google, to then record that

16 data point and say "This is a person who visited this

17 motorcycle webpage" and they're on a list now or categorized

18 as someone who has an interest in motorcycles.

19         MR. GUTKIN:  Well, your Honor, this is going to

20 kind of go into some of the factual merits, but there are

21 other reasons why advertisers want to know where their ads

22 will be shown that are not about the interests of the

23 person.

24         THE COURT:  Sure.

25         MR. GUTKIN:  Somebody -- you know, Prada does not

61

1  want necessarily it's ad for $5,000 bags to be shown on --

2  not to be disparaging of any brand but the Kia website or

3  the Yugo website, let's say --

4        THE COURT:  Sure.

5        MR. GUTKIN:  -- for cars that are highly

6  affordable.

7      There are various other reasons --

8        THE COURT:  Sure.

9        MR. GUTKIN:  -- that this information is relevant

10 that's not just what your Honor --

11       THE COURT:  So you wouldn't say it's personal to

12 the user.  There are some other considerations and --

13       MR. GUTKIN:  Yes.

14       THE COURT:  -- that might be a dispute that you

15 all have.  But for discovery purposes, I'm still not sure

16 that creation and maintenance is the important thing.

17       MR. GUTKIN:  Right.

18       THE COURT:  But use seems to be well within the

19 scope of the claims.

20       MR. GUTKIN:  Yes, so I think that, your Honor, if

21 you look at what we said we would provide, it's the same as

22 what your Honor is imagining.

23       THE COURT:  Okay.  Good.

24       MR. GUTKIN:  For topic 5 and topic 7, we said we

25 will provide the information that's actually shared through

62

1  the RTB bid requests.

2      Every time counsel discusses these things, they take it

3  to a higher level of generality and they talk about Google's

4  use of these things.  But what actually matters is what's

5  shared through the bid requests.

6      And I think that, your Honor, we have agreed to provide

7  the part of this that your Honor is feeling would be

8  relevant to provide.  And the --

9          THE COURT:  Is there --

10         MR. GUTKIN:  Just a final thing.

11         THE COURT:  Yes, okay.

12         MR. GUTKIN:  I absolutely agree that the creation

13 and maintenance is just a rejiggering of the topic that

14 plaintiffs refuse to let go of that your Honor has already

15 said is not relevant here, which is where does this all come

16 from.  Maintenance sounds again like storage, where is this

17 information stored.

18     I see my colleague bouncing up to respond, but --

19         THE COURT:  Okay.  Let me ask a question before --

20         MR. GUTKIN:  -- I think that's been clear.

21         THE COURT:  Okay.  Let me ask a question before it

22 leaves my brain, which is, is there a dispute from Google's

23 perspective about whether any of the information that is

24 made available through the RTB process to third parties,

25 whether that information is public or generic or just say

1  not personal?

2        MR. GUTKIN:  Yes, it's not personal.  It's

3  routine.  It's the kind of information that's always shared

4  when a person uses the web.

5     I mean certain information has to be shared even to

6  make a -- you know, the display of an ad possible, to make

7  it the correct format.  These are things that are always

8  going to be shared in all cases.

9        THE COURT:  But are you presently, for purposes of

10  this dispute, resisting discovery on that basis?

11        MR. GUTKIN:  We're not resisting discovery into

12  what's shared, which is why --

13        THE COURT:  Okay.  So whether -- so there's no

14  issue here between we think this is normal non-personal

15  information --

16        MR. GUTKIN:  Oh.  No.

17        THE COURT:  -- versus personal information.

18  You're not trying to divide a line -- or draw a line between

19  those things and say "You can get this information but not

20  that"?

21        MR. GUTKIN:  That's correct as --

22        THE COURT:  Okay.

23        MR. GUTKIN:  -- within the scope of our responses.

24        THE COURT:  What we're talking about, okay.

25        MR. GUTKIN:  Yeah.  What we said we would provide,

64

1   which is profiles and verticals and the location information

2   that's shared.

3           THE COURT:  Okay.  I think I understand the scope

4   of this dispute.

5       I would like to ask about 6.

6           MS. WEAVER:  Your Honor, may I make a point about

7   creation?

8           THE COURT:  Is it the same point that you've made

9   before?

10          MS. WEAVER:  Well, I think that counsel just put

11  it -- made it clearer, at least something clicked for me.

12      When Google disputes whether it's personal information,

13  whether it can be connected to me or whether it's public,

14  the source of the information becomes important.

15      So an example in the complaint is that there's a

16  vertical about visits to a gynecologist.  If that's

17  collected from somebody on a website, you know, going to

18  their doctor, is Google going to say that that was on the

19  Internet and that was public so they could collect it?  Yes.

20      And that's what that's partly why how the data comes in

21  and where it comes in is squarely within the case, because

22  did the user expect that she would be targeted and have, you

23  know, a thousand people looking at an auction bid saying

24  that right now, she just went to her doctor?  You know,

25  maybe not.  And that's what were in a fight about the jury.

65

1      So that's the point.

2          THE COURT:  All right.  That's an interesting

3  observation.  That is not anywhere briefed in anything that

4  I've seen.  Okay?  It's not any argument that has been made

5  before today.

6          THE COURT:  So right now, the way things stand

7  from what I understand Google to be saying, is that they are

8  producing everything to you in terms of what's disclosed,

9  shared, could be inferred by a third party and they are not

10 distinguishing between whether the information is public or

11 not personal and information that's personal.  They're not

12 making any distinction.

13     But what I hear you saying is that you can't make the

14 case that information truly is personal unless you know

15 where it came from, as opposed to looking at what the

16 information is.

17     All right.  So that's a new argument.

18     Mr. Gutkin, is that something that you can address

19 right now?

20         MR. GUTKIN:  Well --

21         THE COURT:  That that is the reason -- that for at

22 least some of the requests for production or topics of

23 deposition, that's a reason the plaintiffs need to know the

24 source or how it's created of these particular items of

25 information.

66

1          MR. GUTKIN:  So it is a new argument.  And also
2    Ms. Weaver takes an example like this, which is already
3    going to be in the information that's covered, and then
4    says:  Because of this, we need discovery of all sources of
5    all information under the sun.
6          But the URL -- a version of the URL of the website that
7    a person is on is part of what's shared with the advertiser
8    to say "This is a website opportunity on Kawasaki.com,"
9    which is what has to be done in all cases.
10         I don't believe there's an online advertising service
11   in the world that would say "We're going to show your ad,
12   but we won't tell you anything about where the ad might
13   appear."
14         So that example, again, is something that's already
15   covered when we say we will testify about the information
16   that's shared.
17          THE COURT:  Okay.  I understand the argument to be
18   a little bit different.
19         And I actually find it a little bit hard to get my head
20   around the idea that for a given item of information, it
21   would not be apparent from the face of the information
22   whether it is personal to an account holder or not.  That is
23   not necessarily self-evident to me, but I am the least
24   informed of the -- of the people in this room about that,
25   that situation and what situations might give rise to that

67

1 kind of a dilemma.

2      I would be interested to know whether there are any

3 categories of requests for production or any topics of

4 deposition for which that is an important question.

5      I'm not prepared to say, "Oh, let's now open up

6 discovery into how every item of information is created or

7 sourced or obtained by Google in the first instance."  I'm

8 not doing that.

9      But I am interested in exploring the argument that Ms.

10 Weaver has just raised --

11           MR. GUTKIN:  Well --

12           THE COURT:  -- because it seems pertinent to the

13 scope of discovery.

14           MR. GUTKIN:  I think, your Honor, that this is

15 actually -- with the meet and confer that we need to have

16 this week related to -- just to go back to the last hearing.

17           THE COURT:  Yeah, that's about the value --

18           MR. GUTKIN:  There's the information transmitted

19 in the bid request and a dispute about what Google will go

20 search for valuation documents related to.

21           THE COURT:  Right.  That's a -- okay.

22           MR. GUTKIN:  So here's an example of where this

23 particular dispute matters.  They said the bid request ID is

24 one of the pieces of personal information of -- a user's

25 sensitive or personal information.

68

1    The bid request ID is saying:  Hey, everyone who might

2  want to bid on this bid request, this is bid request ID

3  123456A, just so you can keep track of this singular

4  momentary ad opportunity.

5    And they're saying "Well, that's a piece of the user's

6  personal or sensitive information."  Just the identification

7  of the bid request ID.  That is on their list.

8    And we haven't yet met and conferred a second time

9  since the last hearing, but that's an example of where --

10 can't we at least agree that that number that just

11 identifies the bid request opportunity is not the sensitive

12 and personal information of the person who is on the web?

13         THE COURT:  Okay.

14         MR. GUTKIN:  So that's an example.

15         THE COURT:  I see.  So I am not prepared to

16 resolve this today, that particular issue that has just been

17 raised, either with respect to the valuation of information

18 or in the sort of broader context about is there a need for

19 the plaintiffs to obtain discovery of creation or sources of

20 items of information that are alleged to be disclosed.

21    Disclosure is always a touchstone.  We're not talking

22 about information that's not disclosed.

23    But within the information that is disclosed or used to

24 target a particular person with an ad, is there some reason

25 to obtain discovery about how that information got there in

69

1  the first place.

2      I'm happy to hear from the plaintiffs and the defendant

3  on this point, but it's the plaintiffs' burden to persuade

4  me that that is relevant discovery and that the scope of

5  what you're asking for in terms of creation or source is not

6  only relevant but proportional to the needs of the case.

7      So that showing hasn't been made as of today.  And I'll

8  just put that out there.  But that's not to foreclose the

9  parties from conferring about it further.

10     And I'm not going to get into or prejudge what you're

11 going to be doing with respect to valuation.  But conferring

12 about it further and then finding some way to tee that up

13 for me.

14     And you may decide you want to do that at some -- let

15 me just put it this way.  I don't want anyone to get hung up

16 on the timing of my standing order in terms of when you need

17 to do this.

18     So my standing order says, you know, you confer and

19 then somebody can say, you know, within five days we're

20 going to do this and then within five days of that, we're

21 going to submit the brief to the Court.

22     Just have a discussion about it.  And if there really

23 is something that you disagree on that's pretty fundamental

24 to the case and you think it's a discovery issue, you can

25 raise it with me.  But I don't -- I'm not -- I don't have

70

1   enough from the plaintiffs at this point in order to make

2   that determination.

3           MS. DAVIS:  And we do hear you on that, your

4   Honor, and think it would be helpful to meet and confer with

5   Google and present more information on the importance of

6   that aspect of the discovery, particularly with respect to

7   how it relates to the promises Google has made to its

8   account holders that are at issue here.

9           THE COURT:  Right.  Well, there are some topics

10  that have to do with promises and we'll get to that.  It may

11  be that those things are also connected.  I don't know.

12      But as to just 6 and 7, I'll tell you what my thoughts

13  are.  They're along the lines of what we talked about in 5,

14  but there are some different nuances.

15      For 6, you know, this dispute about whether information

16  can be mapped, associated or linked, that's easily resolved.

17  The question is, is it.  Okay?  So this request, topic 6

18  should be limited to identifiers and cookies that are

19  mapped -- the verb is "are" -- are mapped, associated or

20  linked.  And, you know, should leave off, at least for now,

21  the "how they're created or maintained."

22      That's how I think 6 should be narrowed.

23      7, it sounds like -- well, I'm not actually sure 7 has

24  to do with the same issues as topic 2, but the way I

25  interpreted 7 is what plaintiffs are after is disclosure of

71

1 location information related to Google account holders that

2 is disclosed through any RTB process.

3     So it's the disclosure of location information through

4 the RTB process.  That's what you want a witness to talk

5 about.  That seems fine too.  Again, leaving off the "how

6 it's collected or maintained" for the moment.

7     So am I misinterpreting what the plaintiffs are after

8 in topics 6 and 7?  I know you want more than what I am

9 prepared to allow, but that's that's how I understand the

10 dispute and what I think is the right result.

11          MS. DAVIS:  So I don't think you misinterpret what

12 we're after with respect -- we do want testimony.  We do

13 need evidence from Google as to what is disclosed.  And I

14 think our discussion on the importance of the source and

15 that connection also pertains to location, the source of

16 location information.

17          THE COURT:  Right.

18          MS. DAVIS:  And understanding our discussion on

19 that topic and we need to do some further work with Google

20 on that, I think that what you have said about where Google

21 has agreed to testify is something plaintiffs would like to

22 move forward with and quickly.

23          THE COURT:  Have I misunderstood Google's position

24 on --

25          MR. GUTKIN:  No.

72

1        THE COURT:  -- what it objects to or consents on 6

2   and 7?

3        MR. GUTKIN:  No, your Honor.  Just that 6 -- as

4   long as we're talking about identifiers that are mapped and

5   disclosed in RTB.

6        THE COURT:  Right.

7        MR. GUTKIN:  Again, not in other products.  That's

8   my only point.

9        THE COURT:  Right.  It is limited to RTB.

10       MR. GUTKIN:  Yes.

11       THE COURT:  All right.  I'd like to move on to 8

12  then.  The principal objection for topic 8 by Google is that

13  the word -- or the phrase "linked to" is vague.

14      I tend to agree.  I'm not really sure what the

15  plaintiffs want with topic 8.  It's not really explained in

16  the papers.

17      I inferred that this topic goes to the effort to

18  identify some measure of value or quantify monetization, all

19  going towards the damages claim that has been made.  But I'm

20  not sure I understand what "linked to" means in this context

21  or what "conversion tracking" is or "attribution pipelines."

22      And maybe those are all terms of art that are not in

23  dispute.  And you can tell me that that's the case.

24      But maybe I could use a little help here, Ms. Davis, on

25  what you're after.

1          MS. DAVIS:  Well, and, you know, the "linked to"

2  limit or is, is meant to cabin this topic to RTB and to

3  provide the parties with a basis to -- rather than, as Mr.

4  Gutkin frequently says, seeking all information about all of

5  Google's revenue pricing and advertising, that you know, we

6  are seeking testimony about the information linked to the

7  account holder -- about the revenue pricing and advertising

8  information that is linked to that account holder

9  information disclosed through RTB.

10          So, we are currently discussing these requests in terms

11  of document production and discussing the types of

12  information that are disclosed through RTB.  And I think

13  part of that process informs Google's understanding and our

14  understanding of the types of information that, you know, we

15  would be able to seek testimony on.

16          But the "linked to," the phrase is meant to provide

17  through the meet and confer process, through the narrowing

18  process, the assurance that what we are seeking is that

19  which is connected to the RTB system and connected to that

20  account holder information.

21          THE COURT:  Maybe this is just a well drafted

22  topic because the "linked to" is in the wrong place if

23  that's what you're trying to convey.  It's "Google account

24  information disclosed through RTB that is linked to revenue

25  or pricing information and advertising information."

74

1     That's a much broader and more ambiguous topic than

2 what you've just described.

3     So maybe this one can be deferred until you've had your

4 conversation about what kinds of information Google has that

5 can be used to support a damages case.  I don't know, but

6 you invited that possible interpretation by your reference

7 to the ongoing discussions.

8     I'm not entirely sure I understand what Google's view

9 is on this one, except that "linked to" is vague.  But is

10 there some core of information that a witness could be

11 prepared to testify about, having to do with the revenue or

12 pricing information linked to account holder information

13 that is disclosed through RTB?

14         MR. GUTKIN:  I mean I don't understand this topic

15 very well.  Ms. Davis's further elaboration just now doesn't

16 really help me understand what I would need to do to prepare

17 a witness.  The phrase "advertising information" is so

18 nebulous and it's advertising information, for example, and

19 a couple of things that are more like terms of art.

20     But to say "Google account holder information disclosed

21 through RTB that is linked to advertising information," like

22 linked in what context and what does "advertising

23 information" is everything in all of Google's data

24 advertising information because it's an advertising product.

25     So I just -- I have trouble understanding what this

1 topic is really getting at, apart from -- and if it's

2 supposed to be getting at, you know, values that Google

3 estimates or assigns to account holder information, that's

4 certainly not what's written.  That is the subject of the

5 RFP dispute that we're in the midst of.

6      But I just kind of can't make heads or tails of this,

7 particularly with a term like "linked to advertising

8 information."

9      And we're already saying this is what's disclosed, so I

10 can't tell what more it seeks.

11          THE COURT:  Might a possibility be here, complete

12 your discussion on the document request that sort of

13 parallels -- or document requests that parallel this topic.

14 Then reformulate this topic in a way that Google is -- or,

15 sorry, that plaintiffs are asking Google for the information

16 that they need from -- if I'm correct, that it's a damages

17 related topic.  Formulate your request in a way -- once

18 you've had a more complete understanding of what kind of

19 information Google has.

20      Is that one path to resolution here?

21          MS. DAVIS:  I think that is part of it.  But if I

22 may, with respect to advertising information, we've

23 previously discussed whether Google is able to provide for,

24 say, our named plaintiffs the revenue derived through the

25 advertising.  And the conversion tracking, you know, is one

1 aspect of that.  So I think it is --

2          THE COURT:  What is conversion tracking?

3          MS. DAVIS:  So the tracking of an ad conversion

4 where a user would interact with an ad.

5          THE COURT:  So a user clicks on the ad.  That's

6 what you're interested in?

7          MS. DAVIS:  That's one aspect of it.  So, you

8 know, this does go to damages.  This does go to what

9 information we can discover about the revenue Google

10 derived, and then specifically with respect to account

11 holders, as we've discussed, the revenue that is

12 attributable to even just our named plaintiffs is an aspect

13 of this.

14          MR. GUTKIN:  Your Honor, it sounds like Ms. Davis

15 is bringing up a separate topic, as came up two weeks ago

16 about different discovery.  Obviously, that's not what topic

17 8 is about.  It's just we're going into a new territory.

18          THE COURT:  Okay.  So the real problem with topic

19 8 is it's not drafted well enough.  It's just not, to

20 capture what you want.

21      So this will be one where you're going to need to try

22 again.  It's just -- I could sit here and spend a lot more

23 time trying to explore what might be a relevant and sensible

24 and actionable topic for a deposition, but I'm not going to

25 do that because I don't think that's a good use of my time

77

1  or your time.

2       I think you'll need to try again on this one.

3       Topic 9, "Google's policies and disclosures related to

4  the use of Google account holder information in RTB or for

5  advertising purposes, including but not limited to Google's

6  terms of service, Google's privacy policy, and the following

7  specific statements."

8       Google says this is overbroad.

9       And my thought in reading this is it sounded like a

10 contention deposition topic, which I may be misunderstanding

11 what you're after here.  That might be totally fine.  It

12 didn't sound to me though that the plaintiffs were trying to

13 discover facts but rather Google's position on various

14 things.

15      So, again, it may be misunderstanding of your topic.

16 But I'd really like to know what do the plaintiffs want to

17 know from a witness about these particular statements or the

18 listed policies.  Is it a litigation position or are there

19 facts about the statements that you want to know about?

20 What is it that a Google witness should be prepared to tell

21 you in deposition about these things?

22           MS. DAVIS:  And, you know, these topics -- these

23 topics, which are the policies and disclosures that are

24 related to the promises Google makes to its account holders

25 and the manner in which their information is used and

78

1  ultimately used and disclosed through RTB, you know, is the

2  focus of the testimony, and it is with respect to the

3  operation of those policies as to the users.

4          THE COURT:  The operation, what do you mean by

5  that?

6          MS. DAVIS:  The operation of the policies, the

7  impact of the policies and the disclosures, the promises

8  that were made to the users and how they operate with

9  respect to the use of account holder data through RTB.

10     And, here we have Google's limitation of its response

11  pertaining to these disclosures.  As, you know, with respect

12  to the account holder information transmitted through RTB,

13  the policies that govern the use of account holder

14  information, are those same policies that ultimately govern

15  the information that is the account holder information that

16  is disclosed through RTB.

17     So I'm --

18          THE COURT:  So --

19          MS. DAVIS:  -- I'm not sure we have a significant

20  disagreement on this topic, except with respect to whether

21  the parties have a shared understanding of, you know, at

22  what point the policies interact with the information

23  disclosed through RTB.

24     It's our view that Google has made these promises to

25  its users that the policies govern the use of account holder

79

1  data.  And ultimately those promises were broken with the

2  disclosure of the account holder information through RTB.

3          THE COURT:  So you want to ask a witness what does

4  the statement mean and does it apply to "X" category of

5  information shared through RTB.  Is that the kind of thing

6  that you want as far as the witness?

7          MS. DAVIS:  The account holder information that is

8  shared through RTB, that ultimately is shared through RTB,

9  yes.

10         THE COURT:  All right.  Let me understand from

11  Google, what is the dispute here?

12         MR. GUTKIN:  Well, the dispute is sounding

13  different based on what Ms. Davis just explained.

14     So topics 9 and 13 appear to be -- there's 10, which I

15  will get into, but 10 is seeking extraordinarily detailed

16  information on every topic.

17     But maybe we'll talk about that next or maybe we can

18  skip that one.

19     But 9 and 13, we objected to 13 as calling for legal

20  conclusions.  And 9, I wasn't really sure what the topic was

21  because it just says "Google's policies and disclosures."

22     We objected to the "related to the use of account

23  holder information in RTB or for advertising purposes,"

24  which obviously takes it way outside the scope of this case.

25  So we object to that.

1    But also with what Ms. Davis just said, it almost

2  sounded like that even 9 is going to be just calling for

3  legal contentions.  You know, how does Google interpret this

4  policy and, you know, is it consistent with this policy,

5  this conduct.

6    That just sounds like a question that only a lawyer

7  would be able to answer.  Obviously, a witness could say

8  this is the policy.  And other topics would cover how does

9  the product operate.

10    But based on the way Ms. Davis just explained this, now

11  I think maybe 9 is also just calling for legal contentions

12  in the same manner as 13.

13        THE COURT:  Well, let me just ask a question.  In

14  the case, is Google taking the position that if it made a

15  policy statement such as the ones enumerated here or some

16  kind of other disclosure in its terms of service about how

17  it uses or discloses account holder information but did not

18  specifically reference RTB in making such a policy statement

19  or disclosure, that the statement or disclosure does not

20  apply to RTB?

21    So I'm focusing on your last remark about -- or one of

22  your last remarks about limiting the response to RTB

23  disclosures versus for advertising purposes generally.  And

24  I'm just wondering, is that a distinction that you're making

25  in the case on behalf of Google?

81

1          MR. GUTKIN:  There would be some representations

2  that would apply to RTB, and then there would be some that

3  would not.

4          THE COURT:  Okay.  So is that one of the things

5  plaintiffs are trying to discover, is what representations

6  apply to RTB from Google's perspective and which do not?

7          MS. DAVIS:  Well, to the extent that there are

8  representations here that apply to Google's use of account

9  holder data for advertising purposes but somehow do not

10  apply to RTB, which is an advertising product, yes,

11  plaintiffs would like to understand the distinctions that

12  Google is drawing there.

13          THE COURT:  But is that -- again, I'm trying to

14  not create disputes but trying to understand what you need

15  from this topic.

16      And so what do you expect a witness to -- what kinds of

17  questions do you expect a witness to answer when faced with

18  topic 9?

19          MS. DAVIS:  Well, ultimately topic 9 -- and topic

20  9 -- you know, Mr. Gutkin has mentioned as it relates to the

21  policies, also relates to the consent of the users --

22          THE COURT:  Okay.

23          MS. DAVIS:  -- of account holders --

24          THE COURT:  Yes.

25          MS. DAVIS:  -- to have their information used and

82

1 how Google uses that information.

2          THE COURT:  Right, but what would you be asking

3 such a witness about those issues?  Like what would a

4 witness tell you, that your interpretation of the statement

5 is or is not correct?  Like are you trying to get someone to

6 agree or --

7          MS. DAVIS:  I mean this is Google's interpretation

8 of these policies.

9          THE COURT:  Yes, but it that what you're

10 interested in?

11          MS. WEAVER:  Your Honor, there's something called

12 "consent flow," which is Google creates its website.  The

13 person hops onto a Google service, YouTube, something pops

14 up.  There may be an ephemeral message that appears.

15      Google has taken the position in other cases that

16 there's something called the NAC which pops up and that that

17 obtained consent for Google to collect certain kinds of data

18 in certain ways.

19      So the factual basis we need to understand here is in

20 2016 what was the consent flow?  And in 2019 did that

21 change?  And we thought it would be more efficient to ask

22 questions about that.

23      We can identify documents, assuming Google produces

24 them, that would explain what is Google going to -- you

25 know, what is Google saying about the facts about what

83

 1 people saw.

 2          THE COURT:  So that might be topic 13.

 3          MS. WEAVER:  Yeah.  I mean --

 4          THE COURT:  What's topic 9 about?

 5          MS. WEAVER:  I'm sorry, so topic 9 -- give me just

 6 a second, your Honor --

 7          MR. GUTKIN:  I just --

 8          THE COURT:  Just wait.

 9          MS. WEAVER:  The question is, "For these policies

10 and disclosures where do they appear?"

11          THE COURT:  That's the question?

12          MS. WEAVER:  Yeah.  I mean, right, so what is --

13 how in the consent flow is this presented to users over

14 time.

15          THE COURT:  Wait.  So you have enumerated

16 statements --

17          MS. WEAVER:  Right.

18          THE COURT:  -- which are ones that are actually

19 mentioned in your complaint that are cited to particular

20 documents that are attached to the complaint.

21     So why do you need to ask a witness where the

22 statements appear?

23          MS. WEAVER:  Because it's critical to understand

24 for any of these arguments whether this is a hyperlinked

25 document, whether it's a click-through, whether it's a

84

1  browse wrap and if that changed over time.

2      And so we do have hard copy documents, but when I try

3  the case to a jury, I'm going to do an actual consent flow.

4  I'm going to act like, okay, here we are.  You went to the

5  website.  This is what you saw.

6      And so we do have these statements that we know, but we

7  we need the underlying facts of when these statements

8  appeared, how big the font -- you know, what it looked -- so

9  some of this we can get through production --

10          THE COURT:  When it appeared, how they're

11  displayed.

12          MS. WEAVER:  Right.

13          THE COURT:  What else?

14          MS. WEAVER:  And it's the same thing.  So if we

15  can move -- so what we tried to do was lay them out in 9 and

16  then in 10, 11 -- so in 10, they test the weight.  They they

17  create these consent flows and then they'll have -- they'll

18  send it kind of like to a mock jury, your Honor.

19      They will say, okay, let's test this.  Does this chill

20  people signing up or does it -- so like 10A is --

21          THE COURT:  Okay.  Did you guys talk about this?

22          MS. WEAVER:  Sorry?

23          THE COURT:  Did you all talk about this when you

24  conferred about these topics?

25          MS. WEAVER:  Yes, we conferred.  Certainly, the

1 studies, analyses, panels, research.

2         THE COURT:  No, about -- like did you, Ms. Weaver,

3 or someone on your team, tell Mr. Gutkin this is what we

4 need to know about topics 9, 10 --

5         MS. WEAVER:  Yes.

6         THE COURT:  -- and 13?

7         MS. WEAVER:  We did have discussions about we

8 wanted to understand why Google wrote these words this way,

9 how they studied them, what they -- so those are the

10 underlying facts that we want.  And it's all about consent

11 flow and what the users see.

12         MR. GUTKIN:  So that's moving off of topic 9.  I

13 mean Ms. Weaver has a better memory than I do, I'm quite

14 sure based on our work together so far.

15     But if I had gone into this deposition on topic 9 and

16 started getting these questions about "Please describe the

17 historical consent flow," I never would have been able to

18 guess that that's what topic 9 was about and in fact none of

19 these topics -- 10, 11, 13, none of them are about consent

20 flow.

21     There's a general -- so one of the kind of bedrock

22 principles of 30(b)(6) depositions is that in order to make

23 them feasible for the deponent, you have to describe with

24 specificity the subject matter of the questioning.

25     And here this articulation about why Ms. Weaver needs

86

1 consent flow information, which also seems like something

2 that could be covered by documents, but to hear that now

3 with the text of topic 9, it's kind of news to me.

4         THE COURT:  Well, honestly, this whole debate is

5 news to me, because I didn't get any of this from the

6 parties' papers.  It's not self-evident from the description

7 of the topics, and it's not described to me in the papers as

8 the basis for the dispute.

9     I just -- I don't know what to tell you all, but you

10 are totally wasting everybody's time with this.

11     I'm going to send you back to the drawing room on

12 topics 9 -- I mean there's some things that you agree

13 with -- agree to, but not on 9 and 10.

14     There's some subsets -- well, yeah, I mean there's like

15 zero justification given for topic 10, except that it's

16 related to topic 9.  And the explanation for why you need

17 the information is totally missing.

18         MS. DAVIS:  Your Honor, if I may.  Part of the

19 difficulty here is, again, where Google had agreed to

20 provide testimony as to topic 9 -- and topic 10 flows to

21 that -- typically we would be able to discuss who the

22 witness would be, to engage in that testimony, to expect

23 that a witness would be prepared to testify as to these

24 related topics and engage in that discussion.

25     In this instance, we had no ability to proceed forward

87

1 with witnesses for the topics for which Google was agreeing

2 to provide testimony.

3            THE COURT:  That is a separate issue.

4            MR. GUTKIN:  Yeah, I --

5            THE COURT:  The scope of what is totally within

6 plaintiffs' control, is defining in the first instance what

7 you want and why you want it.  You don't need Google for

8 that.

9      I mean, yes, you all do need to confer but in the first

10 instance explaining, articulating what you need and why you

11 need it is not dependent on anything Google does.

12      If you come to them and you say "We need this

13 information because" and Google says "Ah, but I can't give

14 you that because of this particular feature of how our

15 operations work" or "I don't have any employees who map to

16 that, but I do have employees who know this kind of

17 information," then you have that discussion.

18      But you all are coming to me purportedly with a dispute

19 that has been discussed on multiple occasions, and I can't

20 tell from the topics themselves or from the papers why you

21 want the information and what the nature of the dispute is.

22      You know, I got you on calendar right away after you

23 filed this dispute, because I am sensitive to the fact that

24 you've gotten an extension of your discovery deadline, in

25 part because discovery has been delayed because of so many

88

1  disputes and how long it's taken me to resolve the first

2  chunk of them.  And I'm trying to move it along.  But you

3  are not helping yourselves.

4      I just -- I'm not going to just continue to have these

5  discussions in the hearing for the first time, so you're

6  going to have to try again.

7          MS. WEAVER:  Your Honor, we apologize and we can

8  do better.  I will say that 13 does mention consent and our

9  brief at page seven actually does talk about the studies and

10  the user experience kinds of things we were talking about,

11  but --

12          THE COURT:  Okay.  But 13 is different.

13          MS. WEAVER:  -- that's fine.  You need something

14  more and we will get it to you.

15          THE COURT:  I'm going to write what I can write

16  based on what's been presented to me and then I'm going to

17  deny the rest of it.  The motion to -- to the extent I view

18  it as a motion to compel and a motion for protective order,

19  I will deny the motion to compel and grant the motion for a

20  protective order until you figure this out better and are

21  able to articulate what the topics are and why you need

22  them.

23      But let me just say for 13, this is how I'm

24  understanding 13.  To the extent Google is relying on

25  consent, it seems fair for Google to put up a witness who

89

1  talks about that contention, in the sense that the reason we

2  think this was not an unauthorized disclosure of information

3  is because we obtained the following consent or we notified

4  people of disclosure.  They didn't change their settings,

5  their ad settings.  This is why this is all fine for us to

6  do.

7      It's a contention deposition.  We're going to talk

8  about the timing of such a deposition at the end of this

9  hearing.  But 13 is not the hugest problem.

10     Topic 9 is a problem.

11     Topic 10 is a problem.

12     And topic 11, there's parts of it that I don't

13 understand and is not explained.

14     So I just -- I don't want to belabor it anymore.

15         MR. GUTKIN:  Can I be heard on topic 13, your

16 Honor, just very briefly?

17         THE COURT:  Okay.  Topic 13, very briefly.

18         MR. GUTKIN:  Just very briefly, I'll refer you to

19 the cases we cited.

20     In the Kanbar case, they sought deposition testimony

21 about why there was a claim that these post-it notes that

22 were like 3M post-it notes were identical, why they were

23 confusingly similar and why they were blurring, dilution and

24 tarnishment of 3M's marks.

25     And the court said this is all seeking the legal

90

1 conclusions of a party and it's out of bounds.  It's not

2 appropriate for a 30(b)(6).

3    In the <u>Lenz</u> case which we cite, they asked plaintiff to

4 provide the factual bases for their belief that this song

5 infringed the copyright of the song "Let's Go Crazy," which

6 I think is a Prince song.  And the court said the facts that

7 form those beliefs are legal conclusions and an improper

8 topic for a Rule 30(b)(6) deposition.

9    So that's all I wanted to say, is that I don't see how

10 this is not just asking us basically an ultimate contention

11 interrogatory.

12         THE COURT:  It may be.  It may be a contention

13 deposition and that may be improper.  But there are probably

14 factual statements because, frankly, you put them in your

15 motion to dismiss as well.  You've relied on the text of

16 some of the statements that are quoted in topic 9 as support

17 for your defense that there was any expectation of privacy.

18 So maybe a witness could be asked about that.  I'm not sure.

19    It's certainly not self-evident to me that topic 13

20 encompasses the kind of consent flow detail that Ms. Weaver

21 just expressed a moment ago.

22         MR. GUTKIN:  Nor was it to me.

23         THE COURT:  Yeah.  So, again, it may be that I

24 throw up my hands and I say go back and talk about --

25 reformulate and talk about topics 9, 10, 11 and 13.

1    I think 12 is undisputed, so hooray, that one is easy

2  and I'm not going to talk about it anymore.

3         MS. DAVIS:  Your Honor, if I may on topic 13.  As

4  Mr. Gutkin pointed to the cases -- and they cited our case.

5  <u>Majestic Building Maintenance</u> also does point to the proper

6  inquiry into the factual basis underpinning those defenses.

7         THE COURT:  Yes, but --

8         MS. DAVIS:  And that is topic 13.

9    For topics 9 through 11, you know, they are intended to

10  engage with the issue of consent.  They are intended to

11  explore the policies as we get through, you know, topic 11

12  that goes to the consent flow, to the testing of the consent

13  flow and to the manner in which users -- or Google obtained

14  consent.

15    You know, as Ms. Weaver said, we can do better, but our

16  effort is to divide the topics in a way that does clearly

17  explain them.  And in our discussions with Google, again,

18  what is not reflected in the papers, we hear your message

19  that you need more information.

20         THE COURT:  Okay.  Great.  Thank you for that.  I

21  appreciate that representation.

22    And I do think some further efforts are in order on

23  this if you all want deposition discovery.

24         MS. WEAVER:  Your Honor, if I may, a proposal

25  would be that to save and spare you the work of writing an

92

1 order and then we go back, I think we have a pretty good

2 idea of what you're looking for and how we might be able to

3 fix some problems.  Can we put the burden on us to change

4 and rewrite these and then we can come back to you if the

5 parties can't resolve it?

6          THE COURT:  Well, you'll need to do that anyway.

7 But I do feel like I should give you some written guidance.

8          MS. WEAVER:  Okay.

9          THE COURT:  And I will.  You can preempt that by

10 just being quicker than I am.  I'm not going to tell you

11 when you can re-serve or renegotiate or do whatever you're

12 going to do on these topics, but I will give you the benefit

13 in writing of my final views on this dispute.

14     Topic 14, I view this as the deposition version of the

15 document discovery dispute that is the subject of ongoing

16 discussions between the parties.  This goes back to docket

17 number 189, my prior order.

18     I didn't see any reason to truncate that effort that

19 you all are still engaged in, in the context of deposition

20 discovery of the same material.  I don't view the issue as

21 presented to me in the papers as being any different than

22 what the parties are already talking about.

23     Am I mistaken about that, Ms. Davis?

24          MS. DAVIS:  No, your Honor.

25          THE COURT:  Mr. Gutkin, do you agree?

1          MR. GUTKIN:  Yeah, I agree.  We've agreed to

2  provide someone who would give this information as it's kept

3  in the ordinary course of business.

4          THE COURT:  But the scope of what you provide

5  might depend on what documents, if any, you additionally

6  agree might reflect on things like the value of information,

7  the benefits associated or impact on revenue of various

8  disclosures of information in RTB.

9      All I'm saying is that it seems to me like those -- the

10  discussions that you're having on the documents are related

11  to the potential useful scope of topic 14.

12          MR. GUTKIN:  I agree with that.

13          THE COURT:  Okay.  So I'm not going to preempt

14  that by deciding separately topic 14.  I'll wait until that

15  process that you all are engaged in is completed or resolved

16  in some other way.

17      Topic 15, I've alluded to before.  I view it as being

18  related to or overlapping with topics 5 through 7, possibly

19  also topic 3.  There's no real explanation given for what

20  additionally -- and maybe this is just intended as a

21  catchall for anything that might have been missed in those

22  prior topics.  It's not very easy to figure out for me what

23  is -- if there's some additional information or different

24  information that's being encompassed here.

25      It does seem to me that this topic must be limited to

94

1  use for targeting in RTB as opposed to other contexts.  And

2  if flow of data through RTB, which is the phrase that's used

3  in the briefing, means something that encompasses creation,

4  collection, storage as well as use and disclosure, I feel

5  like that's the same issue that we have been belaboring in

6  many other topics in context.

7      So let me pose that question after those observations

8  to Ms. Davis.

9      What are you seeking specifically with topic 15?

10         MS. DAVIS:  And give me a moment to find my notes

11 on that topic --

12         THE COURT:  Okay.  Sure.

13         MS. DAVIS:  -- since we've moved around a little

14 bit.

15     Okay.  So, again with respect to topic 15, Google

16 states that we are seeking testimony on any Google use of

17 account holder information used to target account holders

18 for advertising.  This ultimately is tied to RTB and the

19 flow of account holder information that is disclosed through

20 RTB.

21     So I think that, as we earlier discussed in connection

22 with some of the related topics -- the profiles, verticals,

23 demographics that ultimately our disclosed through RTB --

24 are the subject of topic 15.

25     We are not seeking testimony on any use of account

95

holder information targeting for advertising that does not

ultimately flow through RTB, And our objection to -- or our

concern with Google's relevance objection is, again, this

sort of overstatement of the testimony that we seek.

So this is tied ultimately to the information that is

disclosed and the information about account holders in

connection with the advertising that is part of the auction.

THE COURT:  How is it different from topics 5

through 7?

MS. DAVIS:  It is related to topics 5 to 7, and

ultimately this may be an area where Google would prepare

the same witness to present information on these topics.

And that's something that as we take testimony, you know, we

are not seeking to take duplicative testimony.  We are not

seeking to repeatedly engage with these topics.

But because these are complicated topics, the

information flow that goes through RTB and the use of

account holder information, our effort is to explain

completely and in detail.

By separating the topics in this way, it sounds like --

and particularly given the truncated nature of our

presentation to the Court, that may have introduced some

confusion.

THE COURT:  Is it meant to be a catchall for

anything that might not have been captured by topics 5

1  through 7?  And then it's got tacked onto the end of it,

2  this data flow of all the data from its source through its

3  disclosure and additionally the teams and team leaders

4  responsible for creation and -- I don't even know what

5  calibration is.  But it's got sort of an identify employees

6  bit attached to it.

7       It seems a little bit of a Frankenstein topic that is

8  intended to be a catchall for things that might have gotten

9  this by other topics.  That's the impression that's created.

10          MS. DAVIS:  We are trying to be complete in our

11  notice to ensure that we are capturing the information that

12  is relevant to that which is disclosed through RTB, Google's

13  use of that information from Google account holders to

14  target for advertising that is connected to our earlier

15  discussions on topics 5 and 7.

16       You know, and it is those verticals, profiles, the

17  categorization of the users that we are trying to ensure we

18  capture completely with topic 15.  Specifically the data

19  flow for these aspects of categorization is called out in

20  topic 15, and you know, I think that in connection with

21  these other topics that deal with the use of account holder

22  information is key to topic 15.

23       We do need people's testimony as to how the account

24  holder information is disclosed through RTB.

25          THE COURT:  Okay.  Mr. Gutkin, anything on topic

97

1  15 you would like to argue?

2       MR. GUTKIN:  Just very briefly, your Honor.

3       In our view, the notice, as you've said, in places is

4  ridiculously overbroad and it's also very vague.  So I have

5  to respond to a topic like this, which I can't tell how it's

6  getting at something new by saying I don't understand it and

7  I can't prepare a witness.  And I think it's covered -- the

8  discoverable part is covered by 5.  It gets into the team

9  and team leads, which is addressed in 1.

10      It is framed as just Google's use of information,

11  rather than anything to do with specifically using and

12  sharing with third parties through RTB.

13      So, you know, we struggled to -- we felt we had to

14  respond by not just saying okay to topics that were too

15  broad or that we couldn't understand, which is how we ended

16  up here.

17      And 15 is an example of both of those problems.  But I

18  agree, it's effectively a catchall for things that your

19  Honor is going to resolve in the earlier topics.

20      MS. DAVIS:  Well, if I may, your Honor.  I think

21  it is -- the data flow for all of this information, the

22  people at Google involved in that data flow and who can

23  testify to that data flow is key evidence in terms of what

24  is actually disclosed through RTB.

25      MR. GUTKIN:  But we've already agreed to provide

98

1 the decision-makers for the information that's shared

2 through RTB in topic 1.

3           THE COURT:  Yeah, okay.  I think I have the

4 parties' views on topic 15.

5      I would like to talk about the last issue that's

6 raised, which is the timing of the deposition, at least

7 that's how I interpret it.

8      So, you know, this is kind of a case specific issue, I

9 feel.  It's not like there are absolute rules about when you

10 can and cannot take a particular deposition.  But from a

11 case management perspective, why do the plaintiffs need a

12 deposition now, as opposed to, for example, after

13 substantial completion of document production, which I don't

14 know what your new date is but --

15           MR. GUTKIN:  July 11.

16           THE COURT:  Okay.  So why -- you run the risk if

17 you take a deposition sooner without substantial completion

18 of the documents -- you get the document later you would

19 like to have examined the witness about.  You don't get a

20 do-over, right?

21      So what is the thinking behind insisting that the

22 deposition be done by June 15th or at least a designee,

23 designees be disclosed by June 15th?

24           MS. DAVIS:  Well, as distinct I think from a fact

25 witness at deposition, we're seeking Google's testimony as

99

1  to --

2          THE COURT:  But it's as to facts.  I mean Google

3  as the corporate entity is providing fact testimony.

4          MS. DAVIS:  And it is our view that taking this

5  fact testimony at this stage in the case in light of the

6  deadlines relating to class certification to provide us with

7  the time to, should need to, seek additional discovery or,

8  you know, provide the foundation for that in advance of our

9  class certification deadline, that Google --

10          THE COURT:  What's your class certification?

11          MR. GUTKIN:  September 26.

12          THE COURT:  I'm sorry, that's the motion?

13          MR. GUTKIN:  Correct.

14          MS. DAVIS:  Yes, September 26.

15      That, you know, getting Google's testimony on these

16  topics that are core to developing the evidence in our case

17  is necessary.  We have been stymied by a paltry document

18  production, only 50,000 documents.

19      We are seeking to resolve some of the information

20  asymmetry that we face in this case.  But given Google's

21  refusal to put forth a witness, even for those topics that

22  it agrees, we understand that in seeking testimony at this

23  time that it would be our burden to seek additional

24  testimony or information.

25      But it is, you know, in our view, very important to

100

1  take this testimony now rather than to run into discovery

2  deadlines at the end of the case and be faced with the

3  inability to develop the evidence that we need.

4      We need to take evidence to support our claims.

5          THE COURT:  Of course you need deposition

6  testimony.  I understand that, but what about having the

7  parties agree on some date by which you will do 30(b)(6)

8  depositions of Google after July 11 and sufficiently in

9  advance of September 26 so that you have an opportunity use

10  that information to prepare for the class cert motion?

11  Might not that make the most sense?

12          MS. DAVIS:  I mean I think a date for completion

13  of 30(b)(6) deposition testimony may make sense.  And to the

14  extent that that date extends beyond the substantial

15  completion deadline, we're certainly open to that

16  discussion.

17      But the complexity of briefing class certification in

18  this case and our need to obtain evidence well in advance so

19  that we can work with our experts, so that we can again seek

20  the deposition testimony from fact witnesses that we might

21  need, time is very short and --

22          THE COURT:  Isn't the July 11th deadline the

23  deadline for substantial completion of document

24  production --

25          MR. GUTKIN:  Correct.

1          THE COURT:  -- not substantial completion of other

2    discovery?

3          MS. DAVIS:  Well, it is the deadline for

4    substantial completion of document production.  That is

5    correct --

6          MR. GUTKIN:  Fact discovery --

7          THE COURT:  Wait just a minute, Mr. Gutkin.  Don't

8    interrupt.

9          MR. GUTKIN:  Yes, your Honor.

10         MS. DAVIS:  September is fast approaching.  So

11   from the just eight-week to 10-week period between July 11th

12   and September, we fear does not give us sufficient time to

13   take care of everything that we need to do.  So to start

14   earlier and take the testimony we need and begin developing

15   this evidence is we think critical to being able to

16   effectively move for class certification and to develop the

17   evidence we need to support our claims.

18         THE COURT:  All right.  Let me hear from Google on

19   the timing issue.

20         MR. GUTKIN:  First, I'll just respond very briefly

21   to the discussion of the document production because

22   plaintiffs have served overbroad document requests.  We've

23   had a lot of motion practice that's been overwhelmingly

24   resolved in favor of Google.

25         And so the issues with the document production I just

1  respond to in that way.

2      In terms of the timing, first of all, July 11th is

3  soon.

4      Second of all, your Honor has stated that in large --

5  what it sounds like, in large part this protective order may

6  be granted or you may send us back and say there needs to be

7  further specificity on these requests.

8      So to go forward with depositions now, at any time

9  before we have the information from your Honor and we know

10 what the parameters are going to be and we finish what may

11 be further meet and confer, it's just going to create the

12 certainty that we are going to have witnesses get prepared

13 on the basis of the state of play now, and then we're going

14 to be in a position of having to put the same witness up for

15 some -- you know, some small modification or some slightly

16 different direction, again like the consent flow.

17     I can't imagine if we had gone forward with topic 9,

18 then there was questioning about describe the consent flow

19 covering the entire class period and tell me all the details

20 of that.  They would have said "I have no idea" and then we

21 would have been back here again.

22          THE COURT:  Okay.  So let's assume that we have a

23 good set of deposition topics, whatever that means.  Let's

24 just -- let's put all these other issues about needing to

25 confer further or reformulate certain topics or whatever

1 aside.

2      What in Google's view is the most effective in terms of

3 timing for its depositions with respect to other things that

4 are going on the case?

5      So just assume you had a good notice that I said was

6 good to go.  What is the -- what are the relevant

7 considerations for timing?

8           MR. GUTKIN:  Yeah, I think probably the answer is

9 the later part of July or the first part of August so we're

10 still two months away from their motion for class

11 certification, which builds in additional time, but means

12 we're completed with the document production and we have

13 clarity on the topics.

14      And of course there could be multiple witnesses, so I

15 have to make sure I have the right people in the office at

16 the right time during the summer, but that timing seems like

17 it makes sense, unlike trying to dive in anytime before July

18 11.

19           THE COURT:  Okay.  And from Google's perspective,

20 do you have any idea about how many designees you would

21 have, ballpark?

22           MR. GUTKIN:  It's hard to say.  I mean if our

23 objections were sustained entirely and no further changes

24 were made, then it's probably three, potentially four, but I

25 don't --

104

1        THE COURT:  Okay.

2        MR. GUTKIN:  I don't know for certain.  I'd really

3   have to kind of study the topics --

4        THE COURT:  Okay.

5        MR. GUTKIN:  -- and think about my discussions.

6        THE COURT:  Okay.  All right.  Anything further

7   that the plaintiffs would like to say on the question of

8   timing?

9        MS. WEAVER:  Just one request, your Honor.

10     On the issue that we discussed with regard to the

11  creation, would your Honor accept briefing on that?  Because

12  we would be happy to do it and I apologize that we didn't do

13  it before.

14       THE COURT:  You mean briefing like normal

15  briefing?

16       MS. WEAVER:  Whatever you want.

17       THE COURT:  Like not abbreviated discovery type

18  briefing?

19       MS. WEAVER:  Yes, something -- yes.

20       THE COURT:  You know, I would entertain a proposal

21  from the parties about -- I think you understand why I'm

22  interested in this question.  And I would -- I don't want 25

23  pages from each of you on the subject.  That's not

24  necessary.  That's overkill.

25     If the normal format, the abbreviated format that I

1 have for discovery disputes doesn't suit this question,

2 which it may not, I would like you to confer and agree to

3 page limit, word limit, a way to do it, whether you make a

4 joint submission to me or whether you do it one goes first,

5 one goes second, that kind of thing.

6      If you could -- I mean I'll dictate it if you can't

7 agree.  But if you all could talk about how best to present

8 this to me, I would appreciate it.

9           MS. WEAVER:  I would hope that we could agree.

10           THE COURT:  Mr. Gutkin, you seem like you have

11 some thoughts about that.

12           MR. GUTKIN:  Well, so I feel like we're going back

13 over things that I've already charged my client a lot of

14 money to brief and resolve, so I would say it should be

15 short.  Maybe it could be three pages or five pages per side

16 and no reply or something, so we can just kind of get this

17 out there --

18           THE COURT:  Yes.

19           MR. GUTKIN:  -- that is, if we have to revisit

20 this issue.

21           THE COURT:  Yes.  I know you think of it as

22 revisiting, but I think we will all agree that this is the

23 first time, at least that I had heard or appreciated what

24 the basis is for what the plaintiffs -- why the plaintiffs

25 are asking for this information.

106

1    So it's being revisited in some sense, but not this

2 argument.  And I feel like I owe it to you all to hear what

3 you have to say on this point.

4    I do think it should be short.

5        MS. WEAVER:  That's fine, your Honor.

6        THE COURT:  The plaintiffs have had many

7 opportunities to share this with me also, and I am a little

8 bit dismayed that we've gotten so far without that

9 happening.  But it may be my fault.  It may be that I didn't

10 appreciate an argument that you made to me before.  That

11 could be.

12    But I would like to get it right, and I would like to

13 hear what you have to say.  And I don't think it's a

14 one-size-fits-all kind of a -- like every item of

15 information is subject to the same argument.  That doesn't

16 seem plausible to me.  But maybe you'll tell me that's not

17 right.

18    So I would like to understand what information has this

19 feature and what doesn't, meaning that the source matters on

20 the question of whether the information is public or not

21 personal versus personal and what it has to do with consent,

22 if anything.

23    That's what I'd like to understand.

24    And I -- again, it may get completely overwhelmed by

25 whatever Judge Gonzalez Rogers does on your other motion,

1 but I don't think so and I would like to have the benefit of

2 your views.

3     So please confer.  Let me know.  I'm going to give you

4 a deadline to let me know what you're going to do about it.

5 Can you let me know by Friday how you want to proceed on

6 this issue?

7          MS. WEAVER:  Yes, your Honor.

8          THE COURT:  Mr. Gutkin?

9          MR. GUTKIN:  I think so.  We have the other meet

10 and confer deadline also Friday that we --

11          THE COURT:  It could be longer, that's fine.

12          MR. GUTKIN:  -- had scheduled.

13          THE COURT:  You can have until, I don't know,

14 Monday.  Is that better?  You have an extra day, Monday,

15 Tuesday.

16          MR. GUTKIN:  Yeah, Tuesday I guess.

17          THE COURT:  If you let me know by Tuesday.  If you

18 disagree, just put your disagreement in writing and I'll

19 decide.  So I don't want to have a dispute about a dispute

20 about a dispute.  It's not efficient for anyone.

21     I appreciate that, yes, these are expensive matters and

22 that's independent of -- this whole process is independent

23 of the order I will write on the present dispute that we've

24 just argued, because I will do a written order on that.  And

25 I hope to have that to you this week, so you know exactly

1  what it is that I think about it.  So you can go from there

2  and do whatever you're going to do on the deposition topics.

3        MS. WEAVER:  Thank you, your Honor for the

4  opportunity to brief it.

5        MR. GUTKIN:  And just to make sure we're also not

6  fighting about -- what we're fighting about, it's about

7  whether the source of particular information shared through

8  RTB is discoverable.

9        THE COURT:  Creation and --

10        MR. GUTKIN:  That's what I understand it to be.

11        THE COURT:  Yeah, so creation or some other

12  source, right.

13     So I understand that there's a concept of Google

14  creates this or it's gotten from some other source.  So

15  it's -- yeah, I don't know what the right noun is, but

16  creation or source.

17        MS. WEAVER:  Understood, your Honor.

18        THE COURT:  And why is that discoverable, because

19  I don't think it is.  And I've already made that clear, and

20  I'd like to understand why you think it's discoverable and

21  also if it depends on the kind of information, I'd like to

22  understand that too.

23     So I think I've already articulated my assumption that

24  the information -- it should be apparent on its face whether

25  the information is personal to an account holder or not as

109

1  an identifying of an account holder, but I'm -- possibly I'm

2  wrong about that.

3      So that's -- I'd like to understand that.

4          MS. WEAVER:  We'd like the opportunity to try to

5  explain it, your Honor.  Thank you.

6          THE COURT:  Okay.

7          MR. GUTKIN:  Just the last timing thing.  So we'll

8  figure out if we have a dispute by Tuesday.  We have the

9  brief due to Judge Gonzalez Rogers on Wednesday so I'd

10  like -- if we're going to have to submit a dispute on paper

11  saying what are our different views about how to solve

12  this --

13          THE COURT:  I don't want briefing on this.  Just

14  lay it out:  Plaintiff's proposal is this, defendant's

15  proposal is that.

16          MR. GUTKIN:  Okay.

17          THE COURT:  I will just tell you what I want.

18  Okay?  So --

19          MR. GUTKIN:  That might be submitted later in the

20  week if we finish on Tuesday, but that's all I was

21  clarifying.

22          THE COURT:  All right.  I don't want to

23  micromanage this further.

24          MR. GUTKIN:  Okay.  Thank you.

25          THE COURT:  I'm giving you all an opportunity to

110

1  do it, and I think it would be helpful.  I'm telling you I

2  think it would be helpful.

3      So I will look forward to hearing something from you

4  all on Tuesday, and I'll put that in my order.

5          MR. LEVINE:  Your Honor, I know we've been going a

6  long time.

7          THE COURT:  Yes.

8          MR. LEVINE:  Just, again, to avoid a dispute about

9  the dispute, in terms of how we're supposed to proceed on

10  the meet and confer on the 30(b)(6) topics, understanding

11  that your Honor is going to be issuing an order --

12          THE COURT:  Yes.

13          MR. LEVINE:  -- I heard originally I think,

14  sitting there, that the order was going to give your

15  thoughts but then I heard that it was going to be your final

16  views.

17          THE COURT:  Okay.

18          MR. LEVINE:  But we're supposed to be meeting and

19  conferring and hopefully, so --

20          THE COURT:  I will tell you my final views on this

21  dispute.  This is what I think about the dispute that's been

22  presented to me.  I suspect that I will say for some of

23  these topics, the plaintiffs have not articulated why they

24  need the scope of what they need, and this is without

25  prejudice to you all conferring further -- coming up with a

1  different formulation of the topic and conferring further.

2  And you have control on the timing of that, you know, and

3  you'll just engage in the ordinary course.

4      So I don't mean to say you put forward a topic, it's

5  overbroad or it's not supported or I can't make heads or

6  tails of it for whatever reason, or it seems that the

7  parties have been conferred enough about it and you don't

8  get to have that topic ever again.  That's not what I'm

9  saying.

10          MR. LEVINE:  Okay.

11          THE COURT:  So when I say it's my final view, it's

12  the dispute as it's been presented to me, I'm going to tell

13  you what I think:  This is relevant and proportional.  This

14  is not.  This I can't understand.

15      And then you will go forth from there --

16          MR. LEVINE:  Okay.

17          THE COURT:  -- and do whatever you're going to do.

18  Okay?

19          MR. LEVINE:  That's helpful, because I think

20  otherwise you would doom the meet and confer and we'd just

21  simply say, but your Honor already ruled.

22          THE COURT:  Yeah, I know and then you're going to

23  order the transcript and I would have said two inconsistent

24  things or confusing things --

25          MR. LEVINE:  Right.

1        THE COURT:  And so it's fine to clarify, but I

2   will try to make myself clear in the written order that I

3   issue what I just said to you, but that's my intention, is

4   to have you all take what I -- take in writing what I think

5   of your current dispute and go from there.  Okay?

6        MR. LEVINE:  And just since we're all here --

7        THE COURT:  Yes.

8        MR. LEVINE:  -- quickly, there's been a lot of

9   discussion about the inability to present the issues, given

10  your Honor's procedural rules for briefing these issues.

11       THE COURT:  Yeah.

12       MR. LEVINE:  And what I was going to propose,

13  looking back at the letter brief, is if we could agree that

14  to the extent we have to bring topics back to your Honor, if

15  each side, you know, letter format so single-spaced -- if we

16  agree, it's a half a page per topic.

17       THE COURT:  You know --

18       MR. LEVINE:  I think that's enough for us to

19  provide enough substance to your Honor, so we don't have the

20  issues we have now where we can't -- I mean there's 15

21  topics.

22       THE COURT:  Yes, I know.  And let me just digress

23  here.

24       So I do sometimes have cases where everybody disagrees

25  about everything and I get five letter briefs where the

1 topics have been grouped per my order by subject matter.

2 And I'm not suggesting that you all do that.

3    But the fact that you've served a 15-topic depo notice

4 and you dispute all but one of the topics is -- and trying

5 to squeeze all that in a letter is one thing.  I mean

6 that -- that's because you can't agree on anything.

7    So, you know, the other disputes that you all have

8 submitted to me have been organized a little differently.

9 And they've allowed you more room to argue your points

10 because they have been about document requests that relate

11 to valuation or something like that.  So you sort of group

12 them together.

13    So that's one way to handle it.

14    But I'm reluctant to start expanding for you all across

15 the board, you know, the amount of pages or words that you

16 get, because that just destroys the whole efficiency.

17    You should be able, in a short amount of space, to tell

18 me why something is relevant and proportional.  You really

19 should.

20    So I'm not sure exactly what you're asking.  You're

21 asking me to change my standing order for purposes of

22 disputes that are repeat disputes.

23         MR. LEVINE:  Well --

24         THE COURT:  What I would rather have is something

25 from the parties that say:  This is what we need to ask you

1  about.  We're finding that the 1500 words that you give us

2  for arguing this is not sufficient, and here's why.

3      Just tell me that in a few words, and if I agree, I

4  will say yes, please go ahead and -- I'm interested in this

5  topic and you can have more words for that.  I've done that

6  before.

7      But I just don't want to have a blanket order that

8  changes my standing order for all purposes for this case.

9          MR. LEVINE:  Okay.

10         THE COURT:  Sorry.

11         MR. LEVINE:  No, I was not -- to be clear, I

12  wasn't asking for a blanket order.  I was asking for if we

13  come back specifically on just the 30(b)(6) issue.  This

14  wasn't meant to be a blanket request, your Honor.

15         THE COURT:  You should have a much smaller dispute

16  if you come back, right?  Fewer topics.  You've agreed,

17  you've conferred.

18         MR. GUTKIN:  We're going to have the guidance of

19  the order --

20         THE COURT:  I hope so.

21         MR. GUTKIN:  -- and the further conference.

22         THE COURT:  I hope so.  I hope you'll have

23  narrower disputes, and you can use your 1500 words to

24  explain the last remaining issues.

25         MR. LEVINE:  Thank you, your Honor.

115

1          THE COURT:  All right.

2          MR. GUTKIN:  Thank you very much, your Honor.

3          THE COURT:  All right.  This matter is concluded.

4 Thank you.

5      (Proceedings adjourned at 12:30 p.m.)

116

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16            Echo Reporting, Inc., Transcriber

17               Thursday, June 9, 2022

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*