# EXHIBIT 1

# (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (SBN 191305)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4004
Fax: (415) 445-4020
*lweaver@bfalaw.com*

*Counsel for Plaintiffs in Calhoun and RTB*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation*,<br><br>This document applies to: *all actions*. | Case No. 4:21-cv-02155-YGR-VKD<br><br>**DECLARATION OF LESLEY E. WEAVER PURSUANT TO DKT. 242 REGARDING DKT. 291 RE: DISPUTE AS TO ECONOMIC DAMAGES DISCOVERY**<br><br>Magistrate Judge Virginia K. DeMarchi<br><br>Hearing Date: None set. |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Case No. 4:21-cv-02155-YGR-VKD
DECL. OF LESLEY E. WEAVER RE: DKT. 291

I, Lesley E. Weaver, hereby declare as follows:

1. I am an attorney licensed in the State of California and admitted to the United States District Court for the Northern District of California. I am also the Partner-in-Charge of the California office of Bleichmar Fonti & Auld LLP, and chair of its consumer and antitrust litigation practice. I am co-counsel for Plaintiffs in *In re Google RTB Consumer Privacy Litigation*, No. 4:21-cv-02155-YGR-VKD, and in the related case *Calhoun, et al. v. Google LLC*, No. 4:20-cv-05146-YGR-SVK ("*Calhoun*"). I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

2. This declaration is made pursuant to Dkt. 242 regarding Dkt. 291 re: Dispute as to Economic Damages Discovery. I submit this declaration and reference and attach discovery produced by Google in the *Calhoun* action to address assertions made by Google regarding production of economic damages information.

3. Google has not produced data relating to its own internal calculations of:

    a. Revenues received by Google through its unauthorized sale of Named Plaintiffs' Personal Information through RTB auctions; and

    b. Evidence of royalty value of Personal Information sold through RTB auctions, which includes Google's internal evaluations of the market value of the data at issue, *e.g.*, Screenwise.

4. Google's counsel in this action categorically denies that Google maintains such evidence and refuses to discuss the above categories of information during meet and confers.

5. This declaration relies upon *Calhoun* discovery to show that, notwithstanding Google's statements to the contrary, and its refusal to meet and confer:

    a. Google possesses discovery related to the revenue it receives through its unauthorized sale of Named Plaintiffs' Personal Information through RTB auctions;

    b. Google has a program, Screenwise, through which Google has determined the fair market value of the data at issue;

      c.      Google shares and sells Named Plaintiffs' (and all absent class members') Personal Information outside of just RTB; and

      d.      Additional categories of relevant material have already been or can be collected and produced using processes identified through the Special Master Process in *Calhoun*.

6. In addition, *Calhoun* discovery reveals that Google's representations in this action regarding what is or is not "Personal Information" is contrary to Google's internal recognitions of what data must be redacted from bids to make it anonymous. As set forth further below, Google's position as to what is or is not Personal Information contradicts well-established science on identifiability of certain data points, which Google internally recognizes as valid.

**I.    Revenue Received By Google Through Its Unauthorized Sale of Named Plaintiffs' Personal Information Through RTB Auctions**

7. On May 31, 2022, Google told the Court that it that it did not maintain RTB revenue information tied to specific users. May 31, 2022 Hr'g Tr. at 40:8–18.

8. Documents produced in *Calhoun* indicate that Google's statement is incorrect. Google in fact maintains records that can be used to identify specific value that Google received from selling Account Holder Personal Information through RTB, *i.e.*, how much revenue Google received.

9. As detailed in Dkts. 251 and 271-3, ■■■■■■■■■■■■■■ is a Named Plaintiff data log produced in *Calhoun* that contains detailed records of ■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■ *See also Calhoun* Dkt. 271-7, Ex. 4 to the Declaration of Lesley E. Regarding Dkt. 269 (Joint Letter Brief) (GOOG-CALH-01202490). (There is a corresponding log with information ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. This corresponding log is named ■■■■■■■■■■■■ To Plaintiffs' knowledge, it contains the same information as the ■■■■■■■■■■■■ log, with the distinction that it is keyed by a Biscotti (device) rather than Gaia (Google Account) identifier. The ■■■■■■■■■■■■■■ log also indicates that ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

██████████████████████████.[1]

10. Contrary to Google's position taken in this case, discovery in *Calhoun* also demonstrates that this information is logged for billing purposes – just as Plaintiffs suggested in this case. *See* GOOG-CABR-05949047, a document discussing ██ (which is RTB), ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[2]

## II. Evidence of Royalty Value of Personal Information Sold Through RTB Auctions

11. On May 31, 2022, Google told the Court that Google Screenwise was a program where "[…] Google enlisted people to provide some different information that wouldn't be the same information shared through RTB and asked many different document requests to get everything that Google has related to this program about the different data so they could use it as a proxy to value totally different data in a totally different context that Google might use on unrelated products and said: We want all of that so we can value the account holder information shared through RTB." May 31, 2022 Hr'g Tr. at 40:22–41:9.

12. Discovery from *Calhoun* demonstrates that Google's characterization of Screenwise was false and misleading.

13. In a document titled "Conversion Panel Overview," Google admits that Screenwise sets the "market rate" for "panelists" at $20 per month. *See Calhoun* Dkt. 485-22, Ex. J to Plaintiffs' Opp. to Google's Motion to Strike Mangum (GOOG-CABR-04704597, at -636).

14. Attached as **Exhibit 1** is an excerpt of a document titled "Google Panels 101," in which Google defines a "panel" as "a recruited group of people ('panelists') who are sampled to be

---

[1] As the Court previously held, this evidence is relevant: "If Google has a record of who got served what ad, great, that's helpful. And then the plaintiffs' problem will be if there are other ads that they think were served to them that Google does not have a record of, you won't have any way to prove that or not. I don't know." Feb. 8, 2022 Hr'g Tr. at 123:20–25.

[2] Other revenue related discovery in *Calhoun* reveals that Google misled the Court about something as fundamental as whether Hyewon Jun is a relevant custodian. *See* GOOG-CABR-05949196, an email titled ████████████████████ with the comment, ████████████████████████████████████████████████████

representative of a population and have consented to a special privacy policy." GOOG-CABR-04077296, at -297. "Panelists install hardware and/or software meters that passively capture their activity across devices [and] are also paid fair market value for their participation." *Id*. at -298. Google's Panels, *e.g.*, Screenwise, include payment for installation of "Apps for Android and iOS mobile devices that shares device usages" via "cookies plus app usage activity, including in-app behavior on Android plus network activity on iOS." *Id*. at -301. There is also a "browser app extension[] available for Chrome, Safari, Firefox, Internet Explorer, and Edge browsers that share devices usage." *Id*. The "[b]rowser meters give URLs page resources and client-side interactions and cookies[.]" *Id*.

15. Attached as **Exhibit 2** is a document titled "Identifiers used by Google Panels." In this document, Google specifies that "Google Panels refers to panels from which Google extracts digital signals and behavior." GOOG-CABR-04312372. Screenwise is not the only Google panel. "For all of these panels, Panelists sign consent agreements" and Google "capture[s] the following identifiers for use in determining ad views, conversions, and other behavior … Gaia, YT Visitor, Zwieback, Biscotti, IDFA, RDID, FLoC, GFP, … IP address, [and] Panelist ID[.]" *Id*. The "digital signals and behavior" that Google associates with the "[i]dentifiers used by Google Panels" include same signals, behavior, and identifiers shared and sold by Google through RTB. *Id.*

16. Attached as **Exhibit 3** is an excerpt of a document titled "2020 Insights Panel, Product Requirements Document," in which Google states that each "[p]anelist is rewarded for their participation in the program" with "rewards … calculated biweekly ($10/2wks)." GOOG-CABR-04766037, at -056. A "qualified & compliant user gets an install bonus $10 after 1 week of install AND not inactive" and "bi-weekly rewards [thereafter] ($10/2wks, ~$20/4-weeks)." *Id.*

17. Attached as **Exhibit 4** is an excerpt of a document titled "Panels Explore Dashboard Design Doc." In this document, Google describes a "panel" as "a consumer research organization comprised of panelists who sign up for behavioral metering in exchange for compensation." GOOG-CABR-04120134, at -135.

18. In a document titled "Conversion Panel Proposal," is a April 22, 2021 proposal to expand Google's panels programs to pay consumers for their browsing history. *See Calhoun* Dkt.

485-20, Ex. I to Plaintiffs' Opp. to Google's Motion to Strike Mangum (GOOG-CABR-04704939.R).

19. In a Google spreadsheet, GOOG-CALH-00721187, titled "Google Cookie Usage Across Display," Cell A95 of the "ALL" tab in the spreadsheet describes "online panels" as using "Google and Doubleclick cookies." It further describes that program as "a group … of users that allow us to track their online behavior … in exchange for $. … We collect specific opt-in consent from panelists to collect and use their DoubleClick cookie with PII. These cookies are used to associate panelists' online behavior with other Google data." *Id*. It further explains that it pays for "URLs through" a browser "extension meter. The tab "AdX" in the spreadsheet specifies that Google ███████████████████████████████████████████████████████████████████ (Row 11Q). For the "Match Table" feature in RTB, Google specifies that the system ███████████████████████████████████████████ *Id*. at Row 11B. The buyer's cookie that Google matches for the buyer is the buyer's equivalent of a Gaia ID.

20. Attached as **Exhibit 5** is an excerpt of a document titled "Panels 101 for PWG-analytics." This document states that Google Panels have an approximately ███████ annual budget. It explains that panels are used to "recruit & consent users to install device meters / routers that collect data which Google cannot otherwise gather[.]" GOOG-CALH-00700433, at -439. There are nine total custom meters, including "2 mobile" and "5 browser." *Id*. at -440. The programs "[c]apture panelist activity on browsers [and] mobile apps," "produce logs with metered panelist activity," and "provide panel data to internal + external clients." *Id*. at -441. The document further explains that panels data is a collection of "logs of internet activities and various cookies." *Id*. at -445. For the browser installations, the "commonly-used information" includes "URL [and] Biscotti." *Id*. at -447. For "mobile" installations, the "commonly-used information" includes "App Usage, URL, [and] Biscotti." *Id*.

21. Consistent with the Court's reasonable request at the May 31 hearing, these are the very "same categories of information" at issue in RTB.

22. Attached as **Exhibit 6** are excerpts of the Screenwise Google 30(b)(6) Deposition of Troy Walker taken by *Calhoun* Plaintiffs. Among other things, Google admits:

   a. Google pays each Screenwise panelist "$5 for installation [of a browser

extension] for a max of $15 per person;" and $3 per month for each browser extension installed across devices and browsers. Ex. 6 at 13:20–15:20.

    b.    The data Google pays for includes "what URLs are visited, certain Google cookies related to ad activity[,] … the contents other web page visited [and] other information like location data." *Id*. at 23:23–24:6. When asked to clarify what "Google cookies," Walker stated that "the Doubleclick.net cookie is one example." *Id*. at 24:9–10. This is the Biscotti cookie at issue in RTB.

    c.    To qualify for these monthly payments, a panelist need only have a single activity in the last 28 days. *Id*. at 31:14–32:9. Walker also agreed that "as long as" the panelists' browser activity is "not zero" and there's not fraud, the panelists get paid for the browsing activity. *Id*. at 32:10–34:2.

23. Likewise, in the related *Brown* case, the Court specifically recognized that "Google Screenwise" is an example of why these cases involve economic injury. *Brown v. Google LLC*, No. 20-cv-03664-LHK, 2021 WL 6064009, at *15–16 (N.D. Cal. Dec. 22, 2021).

### III. Google's Internal Admissions About What Is Personal Information

24. *Calhoun* discovery demonstrates that Google shares and sells Account Holders' *Personal Information* in violation of the express promises at issue in this case. Below are just a handful of hundreds of relevant documents produced in *Calhoun* that Plaintiffs have been prohibited from sharing with the Court here.

25. A document titled "Chrome + Privacy Market strategy," includes the admission, "making money via targeting ads based on data is effectively selling your data." *Calhoun* Dkt. 461-92, Ex. 57 to Plaintiffs' Opp. to Google's MSJ (GOOG-CABR-00111820, at -821 (comment 4)). It also admits that the promise "Never sell your data to anyone" is on "Red" status at present because Google "allows 3Ps to collect your data very activity through Chrome through cookies, and extensions, and we make lots of money through ads – that sounds like selling data to many people. It is hard to reconcile this with a commitment not to share user-data, independent of how strong our story is on security." *Id*. at -822.

26. In a document regarding a Google program named "DataTransfer," through which

1  Google admits that it sells ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮ to publishers. See GOOG-CABR-05945407.

3      27.    In a slide deck titled "ADH, Data Transfer Key Value Review," dated January 2020,
4  it is stated that Google's privacy teams "want to redact" personally identifiable information from the
5  DataTransfer program because "[a]dvertisers can join conversion files … with impression files … to
6  infer a user's browsing history without user consent." See GOOG-CABR-05945057.

7      28.    A document produced in *Calhoun* at GOOG-CABR-05945100 identifies privacy
8  "risks associated with running the AM Data Transfer product," including fields that "can be used as
9  a fingerprint key[.]"

10     29.    *Calhoun* discovery also demonstrates that Google's position on "Personal
11 Information," as previously expressed to the Court, is contrary to Google's internal views and widely
12 accepted scientific principles that Google itself accepts as valid.

13     30.    Produced in *Calhoun* at GOOG-CABR-03827493 is a document with an admission
14 that Google's announcement that Chrome would end third-party cookies would not be sufficient to
15 stop "tracking in general." Michael Kleber, Google's employee in charge of ▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮ explains, "[i]t's really a stretch to do something about 3p cookies and then claim it's
18 something about tracking in general. *There are roughly zero non-Google companies whose tracking*
19 *depends only on 3p cookies*. If we go out claiming we're telling users who is tracking them but
20 actually we launch a UI that is blind to the vast majority of tracking techniques, we will look either
21 naïve or deliberately misleading" (emphasis added).

22     31.    A design document for Google's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" contains a comment
23 admitting that, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." See *Calhoun* Dkt. 225-8, Ex. D to Plaintiffs'
25 Motion to Compel Production of Plaintiffs' Information (GOOG-CALH-00030031).

26     32.    A document titled "Ads Fingerprinting in 2021+," which was last modified in
27 February 2021, explains that "device/app/browser/fingerprinting … is the use of unique or
28 probabilistically unique combinations of one or more device, network, or app/browser attributes to

1  identify a device, app, browser, or use across distinct transactions where no persistent unique
2  identifier is explicitly provided by a user's device, app, or browser." *See* GOOG-CALH-00423965,
3  at -990. "Types of fingerprints" include "[u]ser behavior patterns and configuration preferences
4  online," "[p]latform (software and hardware) characteristics," and "[n]etwork characteristics, such as
5  IP addresses." For IP addresses, Google clarifies that "they provide a unique identifier for a client
6  and stay stable over a period of time, thus can be used to identify users across websites. IP address is
7  the biggest fingerprinting surface that's almost as powerful as 3p cookies." *Id*. at -968. The document
8  states that "Google fundamentally believes fingerprinting does not respect user privacy." *Id*. at -977.
9  However, the same document admits that, as of 2021, Google has "pretend blindness to IP-based
10 identity graph and 3P operations," *i.e.*, fingerprinting, in RTB. *Id*. at -992. By 2023, the document
11 states that Google hopes to "drop IP signals in ads serving," and, by 2025, to "remove clients upon
12 IP fingerprinting detection." *Id*. Google's anti-fingerprinting timeline for RTB is outlined at -994.

13      33.     In his report filed in support of Plaintiffs' Motion for Class Certification in the
14 *Calhoun* action, Prof. Zubair Shafiq explains the concept of "entropy." *Calhoun* Dkt. 339-20 at 4–6,
15 ¶¶ 18–30.

16      34.     A document titled "Privacy Sandbox Vision" describes that the Privacy Sandbox
17 "mission is to 'Create a thriving web ecosystem that is respectful of users and private by default."
18 *See* GOOG-CABR-00057257. The document states that Google "will place more and more
19 restrictions on the use of third party cookies" and, in parallel, "aggressively combat the current
20 techniques for non-cookie based cross-site tracking, such as fingerprinting, cache inspection, link
21 decoration, network tracking and Personally Identifying Information (PII) joins." *Id*. This document
22 describes "fingerprinting" as "the generation of a unique identifier from intrinsic differences between
23 one user's device and another's that are detectable." *Id*. at -261. To combat fingerprinting, Google
24 developed a "███████ proposal," which would ████████████████████████
25 ████████████████████████████████████████████ *Id* ████████████████
26 ████████████████████████████████████████████ *Id*. Examples of seemingly
27 innocuous information that create sufficient entropy for a fingerprint include "client-hints," "user-
28 agent," "accept-language headers," "device orientation," "battery level APIs," and IP address. *Id*. at

-261–262.

35. In a slide deck presentation titled "IP Address Privacy," dated August 6, 2020, it specifies that a ▮▮▮▮▮▮▮▮▮▮▮▮" and that IP address alone takes up ▮▮▮▮▮▮▮▮▮▮▮. *See* GOOG-CABR-05460917 at -918.

36. In an internal Google design document titled "Measuring Identifiability of Web Platform Features." *See* GOOG-CABR-00059774. Google admits:

    a. "The IP address is an ephemeral but highly identifying surface." *Id*. at -779.

    b. "Properties of the TCP/IP stack and configuration could be used to detect the operating system, network configuration and hardware characteristics." *Id*. at -780.

    c. "Battery status API" is a fingerprint surface." *Id*.

    d. "[A]ny ephemeral identifier can lead to cross site identity joining." *Id*. at -782.

    e. "Another example would be sites A and B both observing a sequences of device orientation changes. [at different times]. Correlated device orientation changes along with timestamps is a highly identifiable feature that the sites can use to deduce that they are both observing the same user. This is true despite the fact that device orientations observed here can only take one of two values." *Id*.

    f. "Any set of observations that share temporal correlation can be used to identify a user with a high degree of confidence." *Id*.

37. Plaintiffs request that the Court refrain from issuing an order taking Google's position on "Personal Information" disclosed through RTB until it has (1) scheduled and taken evidence at a science day, including from Plaintiffs' experts; and (2) permitted Plaintiffs to use *Calhoun* discovery to demonstrate to the Court that Google internally agrees with Plaintiffs' experts.

### IV. Google Faces Little to No Burden In Producing These Materials Because Google Has a Process In Place to Extract Relevant Information

38. <u>Named Plaintiff Revenue Information</u> – Through the Special Master process, Google created a data pipeline using Account Holder identifiers to automatically extract Account Holder

1  communications from specific logs, including logs with revenue information specific to individual
2  Google Account Holders. Plaintiffs understand that this process can also be used to extract relevant
3  information from specific logs in this action.

4  39.  <u>Screenwise and Panels Discovery</u> – In *Calhoun*, Google produced a total of 94
5  documents that hit upon the term "Screenwise" and 240 documents containing "user panel" or "user
6  panels." There is no burden to Google producing these documents to Plaintiffs because Plaintiffs'
7  counsel already has them in their possession. In addition, Plaintiffs also have the 30(b)(6) deposition
8  transcript from *Calhoun*.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15th day of August, 2022 in Traverse City, Michigan.

                                              */s/ Lesley E. Weaver*
                                              Lesley E. Weaver