# EXHIBIT A

## (REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5    In re:                        )
                                   )
6    GOOGLE RTB CONSUMER           )
     PRIVACY LITIGATION,           )   No. C 21-02155-YGR
7                                  )
                                   )
8                                  )
     PATRICK CALHOUN, et al.,      )
9                                  )
             Plaintiffs,           )   No. C 20-05146-YGR
10                                 )
         vs.                       )
11                                 )
     GOOGLE, LLC,                  )
12                                 )
             Defendant.            )
13                                 )   **SEALED PROCEEDINGS**

14                                 San Jose, California
                                   Tuesday, December 6, 2022
15
     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
16            RECORDING 10:02 - 12:05 = 123 MINUTES

17   APPEARANCES:

18   For Plaintiffs:
                                   Bleichmar Fonti & Auld LLP
19                                 555 12th Street, Suite 1600
                                   Oakland, California 94607
20                        BY:   LESLEY ELIZABETH WEAVER, ESQ.
                          BY:   LESLEY WEAVER, ESQ.
21
                                   Simmons, Hanly, Conroy, LLP
22                                 112 Madison Avenue, 7th Floor
                                   New York, New York 10016
23                                 (212) 257-8482

24

25              (APPEARANCES CONTINUED ON NEXT PAGE)

2

1 | APPEARANCES:  (Cont'd.)

2 | For Plaintiff Google RTB:

3 |                                Pritzker Levine LLP
                                   1900 Powell Street, Suite 450
                                   Emeryville, California 94608
4 |                           BY:  CAROLINE CORBITT, ESQ.

5 |

6 | For Defendant Google RTB:
                                   Cooley LLP
                                   3 Embarcadero Center
7 |                                Floor 20
                                   San Francisco, California
8 |                                 94111
                              BY:  JEFFREY MICHAEL GUTKIN, ESQ.
9 |                           BY:  KELSEY SPECTOR, ESQ.

10 |

11 | Transcribed by:               Echo Reporting, Inc.
                                   Contracted Court Reporter/
                                   Transcriber
12 |                               echoreporting@yahoo.com

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

3

1  <u>Tuesday, December 6, 2022</u>                    <u>10:02 a.m.</u>

2                        P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4          THE CLERK:  Calling case 21-CV02155, In Re Google

5  RTB Consumer Privacy Litigation, on for discovery hearing.

6      If the parties would state their appearances, beginning

7  with Plaintiff, please.

8          MS. TRUONG:  An Truong, Simmons, Hanley, for

9  Plaintiffs.  Good morning, your Honor.

10         THE COURT:  Good morning.

11         MS. DAVIS:  Anne Davis, Bleichmar, Fonti Auld, for

12 Plaintiffs.

13         THE COURT:  Good morning.

14         MS. WEAVER:  Lesley Weaver, Bleichmar, Fonti, and

15 Auld, for Plaintiffs.  Good morning, your Honor.

16         THE COURT:  Good morning.

17         MS. CORBITT:  Caroline Corbitt, Pritzker, Levine,

18 LLP, for Plaintiffs.  Good morning, your Honor.

19         THE COURT:  Good morning.

20         MR. GUTKIN:  Good morning, your Honor.  Jeff

21 Gutkin from the Cooley Firm, appearing for Google, LLC.

22         MS. SPECTOR:  And Kelsey Spector from Cooley,

23 appearing on behalf of Google.

24         THE COURT:  Okay.  Good morning.  I see we have

25 three microphones between six lawyers.  So, if you all are

4

going to be addressing the Court, you're going to need to be
sure you have the microphone in front of you or it won't
pick you up.  Okay.  So, please, be mindful of that.  And I
think my courtroom deputy has already reminded you to try to
identify yourselves when you're talking so that we can make
sure the transcript, as there likely will be one, is clear
about who said what.

All right.  So, this matter is on regarding a dispute
about production of the named Plaintiffs' data, and I
understand that -- well, much of the material was filed
under seal, and I understand that Google has raised a
concern about conducting this matter in open court.

MR. GUTKIN:  Yes, your Honor.  We request that the
courtroom be sealed because we're going to be discussing
Google's confidential records, presumably details of its log
data that's stored.

THE COURT:  Um-hmm.

MR. GUTKIN:  There's an additional concern in
addition to just sealing the courtroom from the one member
of the public that I see here, which is that Ms. Corbitt,
who is from the Pritzker, Levine Firm, is in attendance
today, and I presume we're going to be discussing material
that is subject to the protective order in the Calhoun v.
Google action.

THE COURT:  Um-hmm.

5

1          MR. GUTKIN:  Since your Honor's last order, we

2    have not contented to the revelation of Calhoun protected

3    discovery material to lawyers who are not, you know, part of

4    that protective order.  And, I mean, with apologies to Ms.

5    Corbitt, whom I just met, I don't see how she can remain if

6    we're going to be discussing confidential material from the

7    Calhoun protective order that she is not entitled to access.

8          THE COURT:  Let me ask you a question about that.

9    So, I have the letter brief related to the discovery dispute

10   and then a separate letter related to the Calhoun material.

11   If we were just on the Calhoun material, limiting the

12   discussion to the contents of the letter and we didn't have

13   to get into the details of the exhibits, so the letter

14   characterizes some of the materials for sure but doesn't

15   necessarily quote from them, does Google still have a

16   concern about Ms. Corbitt being in the hearing?

17         MR. GUTKIN:  It does, your Honor, because I think

18   a big part of my discussion with you today relates to the

19   nature of the fields cited by Plaintiffs in their letter,

20   the fact that those fields are not relevant to the case here

21   and are not responsive to your order regarding the

22   production of named Plaintiff data, but I'll have to be

23   describing the fields and what they relate to, and this is

24   all information that counsel has access to solely because of

25   their involvement in the Calhoun matter and all strictly

6

1  under the auspices of the Calhoun protective order.

2          THE COURT:  Google doesn't have any concern about

3  Ms. Weaver, Ms. Truong or Ms. Davis?

4          MR. GUTKIN:  I believe that's correct.  I believe,

5  because they're all -- their law firms are all in the

6  Calhoun case, and I believe they're all part of the Calhoun

7  protective order.  And, if so, we do not.

8          THE COURT:  All right.  Thank you.  Let me hear

9  from the Plaintiffs first on the question of whether Ms. --

10  you know, I should just make the observation I have four

11  lawyers on behalf of the Plaintiff, and I'm not sure why I

12  need all four, but it seems that we could maybe make do with

13  fewer since I've seen many of you before.  You're all very

14  well informed.  And, with my apologies to Ms. Corbitt, is it

15  really necessary that she be in this particular hearing?

16          MS. CORBITT:  Your Honor, I am Caroline Corbitt,

17  and we object to this courtroom being closed to a member of

18  the firm that serves as interim lead counsel in this action.

19  This is a hearing in RTB concerning logs that are at issue

20  in this case and are Plaintiffs' data, RTB Plaintiffs, and

21  our lack of access to this hearing would present an

22  information asymmetry and impact our ability to effectively

23  prosecute this case.

24          THE COURT:  That really didn't answer my question.

25  So, why do we need all four of you when on behalf of the

7

1  Plaintiffs we have three lawyers who are very familiar with

2  the matters in the case?

3          UNIDENTIFIED SPEAKER:  I think the point that Ms.

4  Corbitt was making is that their firm is appointed lead

5  counsel in the case.  We are members of the Executive

6  Committee, and so that the law firm that is appointed lead

7  counsel is not privy to many discovery decisions that are

8  being made in the case, can't even see some of the

9  Plaintiff's own data, and that is the ongoing objection to

10 this procedure.

11         THE COURT:  So, this matter has already been

12 addressed before, both by Judge Gonzalez Rogers and by me in

13 a prior proceeding.  I'm not persuaded that for purposes of

14 this discovery dispute Ms. Corbitt's presence is necessary

15 given that I do have three other Plaintiff's lawyers who are

16 well informed and able to talk about the details, not only

17 of the underlying information but of the particular logs

18 that are under the protective order in the Calhoun matter,

19 which is really the intersection that we're at today.  So,

20 this dispute raises the question of whether information from

21 the other case can be used in this case.

22     So, I'm going to respectfully excuse Ms. Corbitt from

23 this proceeding and ask her to leave the room, and I'm also

24 going to excuse the gentleman in the back with apologies for

25 your coming here only to be excused.  I cannot sensibly

8

1  discuss this discovery dispute without getting into the

2  weeds of the information that Google has identified as

3  confidential, the details of the logs and other data sources

4  that are identified a confidential.  This is a discovery

5  matter.  The good cause standard applies, and I do find good

6  cause to conduct this hearing under seal.

7       So, at this time I'm going to pause and ask those I've

8  excused to please leave the courtroom.

9            MS. CORBITT:  Yes, your Honor.  Thank you.

10            THE COURT:  Thank you very much, Ms. Corbitt.

11       (Pause.)

12            MS. WEAVER:  And, your Honor, this is Lesley

13  Weaver.  Just to address why we have three lawyers, we are

14  giving opportunities to our younger lawyers in our firms to

15  make oral argument, and Ms. Truong will be presenting the

16  bulk of the argument with Ms. Davis' help today.

17            THE COURT:  Okay.  And I thank you for that, and I

18  really appreciate that, and I welcome that.  So, I'm not

19  complaining about the sheer number.  It's just that having

20  seen many of you before and knowing that you're familiar

21  with the matter, I feel that you -- Plaintiff's side is well

22  served by the representation you have here.

23       All right.  Let me just wait for Ms. Croutman

24  (phonetic) to close the door.

25            MS. CROUTMAN:  I'm just going to let the

9

1   (indiscernible).

2          THE COURT:  Oh, okay.  Thank you.

3      All right.  So, the rest of this proceeding will be

4   conducted under seal.  And, as before, if there is a

5   transcript ordered, we'll go through the usual procedure of

6   having a transcript prepared, and then I will require Google

7   or whomever to make a showing of what needs to be

8   confidential or not from the transcript, and the rest will

9   be public.

10     All right.  Let me start with some questions for the

11  Plaintiffs.  The discover dispute materials don't refer to

12  any specific request for production, and Google objects that

13  the Plaintiffs are asking for information that goes beyond

14  the order I issued in August at Docket Number 314.

15     And, so, I just wanted to be clear in terms of framing

16  what we're talking about.  Do the Plaintiffs agree that the

17  prior order I issued, the one at Docket Number 314, is the

18  correct point of reference for the underlying discovery

19  dispute of what needs to be produced?

20         MS. TRUONG:  Your Honor, An Truong for -- for

21  Plaintiffs.  Just for the Court's point of reference, the --

22  the named Plaintiff data dispute stems from an RFP, RFP 42,

23  which we propounded on Google back in May of 2021.  What

24  stemmed from that was -- my understanding is an agreement

25  from Google that anything that was transmitted with respect

1  to named Plaintiff through RTB would be produced, and then

2  in July of 2022, Google alerted the Court that there was

3  only one relevant log that would contain that information.

4  That's the ███████████████

5          THE COURT:  Um-hmm.

6          MS. TRUONG:  Around that same time, we brought the

7  cross-use motion based on things that we had learned in the

8  related case that suggested to us that there existed

9  additional information in other logs, and that was the

10  impetus, I believe, for what was the Court's Docket Number

11  314 where we then argued there's additional evidence of main

12  Plaintiff data that Google has not identified for us, and

13  that exists outside of the ██████████  log.  And the

14  dispute we have today with respect to the ████████  logs is a

15  subset of that information that we know exists.

16          THE COURT:  Okay.  So, I'm looking back at my

17  order, 314, which did encompass RFP Number 42, and I made

18  some rulings about what Google had to produce in various

19  categories.  So, it seems to me like it is appropriate to

20  use the order that I said governs Google's obligation about

21  what needs to be produced as our reference point, and then

22  the question becomes have they produced it or is there --

23  are there other sources of information that they have not

24  produced from that they should produce from.

25      So, is that consistent with how Plaintiffs are thinking

1  of the issue?

2          MS. TRUONG:  Yes, that's correct, your Honor.

3          THE COURT:  Okay.  All right.  Now, let me turn to

4  asking about the status of Google's production from the

5  Plaintiff's perspective because the papers said, Oh, Google

6  has been producing things, and we're about to produce some

7  additional things in the beginning of December.  So, I'm not

8  sure if that additional production has occurred.  I will be

9  asking Google about that.  But, from Plaintiff's

10 perspective, what is the status of Google's production of

11 the named Plaintiff data?

12         MS. TRUONG:  Your Honor, the last production we

13 had with respect to named Plaintiff data occurred on

14 November 14th, and it was not a complete production.  It was

15 not reflective of the outputs that we saw in Calhoun.  It

16 was, in fact, just excerpted information put in a different

17 document.  So, it lacked context and structure that our

18 experts would need to really evaluate the information that's

19 being reported about RTB transactions.  And it's -- I'm

20 sorry.

21         THE COURT:  Go ahead.

22         MS. TRUONG:  And it's also a subset of fields that

23 Google has unilaterally decided to produce to us.  So,

24 there's really no transparency in what's being produced, and

25 it's also been manipulated in a way that it's very difficult

12

1  for our experts to really evaluate and assess this

2  information.

3          THE COURT:  Could I ask you to -- to respond to

4  the -- and your response was fine, but it would be helpful

5  for me if you could respond to my question by reference to

6  what I ordered in -- in Docket 314.

7      So, in other words, if there is something missing, what

8  categories of information or even specific items of

9  information are missing from what Google has already

10  produced and that I ordered them to produce?

11          MS. TRUONG:  So, if I can start, your Honor, with

12  the reference in Docket 314 where the Court said that Google

13  was to present documents sufficient to show for each named

14  Plaintiff what information specific to that Plaintiff was

15  shared with RTB participants and the details of that

16  sharing.

17          THE COURT:  Okay.  And where are you reading from,

18  just so I see?

19          MS. TRUONG:  Oh, I'm sorry.  Docket 314 --

20          THE COURT:  Yeah, I got it.

21          MS. TRUONG:  -- page four, lines 23 and 25.

22          THE COURT:  Okay.  So, this is in the section

23  about linking account information?

24          MS. TRUONG:  Yes, your Honor.  And it's our

25  understanding that the subset of information Google has

13

1  produced -- and I believe it's primarily from the ███████

2  ████ log is missing a number of information that these

3  other logs we've identified would include. ████████████

4  ████████████████████████████████████████████

5  ████████████████████████████████  ██████████

6  ████████████████████████████████████████████

7  ████████████████████████████████████████████

8  ██████  It doesn't include any of the evidence of the

9  sensitive information being disclosed.  Some of the fields

10 we see there would be -- has ████████████████████

11 ██████████████████████████████

12 ███████████████████████████████

13 ████████████████

14   ██████████████████████████████████████████

15 ███████████████  ██████████████████████████

16 ████████████████████████████████████████████

17 ███████████████████████████████████

18 █████████████████████████████████

19 ████████████████████████████████████████████

20 ███████████  Our complaint includes allegations of sale of

21 personal information and general personal information for

22 our account holders who are signed in and signed out.  So,

23 that signed out component would be encompassed by the

24 ████████ queries.

25          THE COURT:  So, let me just pause you there

14

1  because that was a lot of -- that was a long list.

2      One of the things that Google says is that the

3  materials that the Plaintiffs are referencing as disclosing

4  information shared via RTB don't actually show information

5  shared via RTB.  They show information that Google is

6  tracking only internally.  And let me just take as an

7  example, because this is the one I understand, this dispute

8  about browsing history.

9  ████████████████████████████████

10 ████████████████████████████████

11 ████████████████████  ████████████████

12 ██████████████████  ██████████████████

13 ████████████  ████████████████████  ████████

14 ████████████████████████  ████████████████

15 ██████████████████████████████████████████

16 ██████████████████████████████████████████

17 ██████████████████████████████████

18 ██████████████

19 ██████████████████████████████████████

20 ██████████████████████████████████████

21 ██████████████████████████████████

22 ████████████████

23     So, that may not -- that framing may not work for all

24 of these other items that you've lived, but why is it not

25 absolutely compliant with my order for Google to say, We

15

1  have produced the ██████████ that was shared with the RTB

2  participant, and we have satisfied our obligation?

3        MS. TRUONG:  I think, first, your Honor, we

4  dispute the nature of that sharing right.  We dispute

5  Google's characterization of that.  And, two, the logs that

6  we're looking to not only tracks with actually shared, but

7  it's notations by Google about that sharing, about that

8  transaction, about that auction transaction itself.  So, you

9  know, I know --

10        THE COURT:  Wait, wait.  Stop there.  Notations by

11  Google about the sharing.  What -- what does that mean?

12        MS. TRUONG:  So, by way of example, one thing

13  Google argues -- and I believe this was specifically raised

14  with respect to the first log we identified, ████████████

15  ██████████████████, Google says this is just internal

16  information that -- that Google's talking about when it --

17  it's looking at its ads or its own internal analysis.  This

18  is what happened in this transaction, and Google's making

19  notations about this particular transaction, but it's still

20  notations about an auction transaction relating to one of

21  our named Plaintiffs.  And -- and that's not relevant for --

22        THE COURT:  But what -- what are the -- but what

23  are the -- what is the nature of the notations?  And, by the

24  way, I have -- here's what I did.  There was such a huge

25  volume of material, I didn't bring it all into this room,

16

1  but what I did is I printed out -- I hope I have it here.  I

2  printed out an excerpt from the ██████████████ that

3  you -- and I highlighted all of the entries that you all had

4  included in your discussion of that in the Calhoun letter

5  brief.  So, line nine -- I'm sorry -- row 9, rows 182, 183

6  -- so that I could see exactly what you were talking about

7  as your examples.

8      And, so, can you by using -- so, I only have those

9  excerpts, those pages that have those bits on them in front

10 of me right now, but is it possible for you to illustrate

11 for me what is a notation about the sharing of named

12 Plaintiff data that you think is meaningful to the dispute

13 that is in this ████████████████████ -- the

14 excerpt is at Docket 366-4 -- that you believe needs to be

15 produced and why?

16      MS. TRUONG:  And, I'm sorry, your Honor.  You --

17 you had indicated specific rows that the Court had for it or

18 is it the whole exhibit?

19      THE COURT:  So, I printed out the pages that

20 contain the rows that you all identified in your letter to

21 me.  So, let's look at your letter about the Calhoun

22 materials.  So, 366-3 is the under seal version, and I

23 looked at the paragraph discussing Exhibit 1, ████████

24 ████████████████, and there were rows identified in there,

25 specific rows and what they mean.  And, so, I went and

17

1  looked at that log, and I highlighted the rows so I could
2  have them in front of me, and I'm trying to understand what
3  you mean by saying -- what I -- this is what I infer you to
4  be arguing.  It's not enough for Google to produce literally
5  what was shared with an RTB participant.  In addition,
6  Plaintiffs want notations that Google has made internally
7  about what was shared with the RTB participant.
8      And, so, what I'm asking is can you point me to some
9  example of a notation about the sharing that you think is
10 important for this dispute, relevant, and within the scope
11 of what Google is required to produce?
12         MS. TRUONG:  Yes, your Honor.  One example I would
13 give is line 907.
14         THE COURT:  907, okay.
15         MS. TRUONG:  With respect to the winning bid, the
16 notation on the winning bid.  Another example I would give
17 to --
18         THE COURT:  What is -- what is that?  So, this is
19 -- this is what I understand, ██████████████████████████
20 ████████████████████████████
21         MS. TRUONG:  Correct.
22         THE COURT:  -- for this ad to be placed, and is
23 that a number, this --
24         MS. TRUONG:  That's our understanding, your Honor,
25 yes.

18

```
 1          THE COURT:  So, what is that?
 2          MS. TRUONG:  By ████████, which I believe
 3 is --
 4          UNIDENTIFIED SPEAKER:  ██████████
 5          MS. TRUONG:  ████████████
 6          THE COURT:  So, what is that?  How do I interpret
 7 that number?  Anybody know?
 8          UNIDENTIFIED SPEAKER:  So, that -- I mean, that
 9 number is directly relevant to Google's revenue.
10          THE COURT:  What is --
11          UNIDENTIFIED SPEAKER:  I apologize --
12          THE COURT:  Does anybody know what it is?
13          MS. TRUONG:  I believe it's the -- it's the ████
14 ████████████████████████████████████████,
15 which --
16          THE COURT:  Is that ██████████?  No.  Okay.  That
17 can't be.  So, what is that number?  Does anybody know?
18          MR. GUTKIN:  So, it's in ████████.
19          THE COURT:  Okay.  What's a ██████?
20          MR. GUTKIN:  I think that it might mean it's ████
21 ██████  It's either --
22          THE COURT:  Okay.
23          MR. GUTKIN:  -- going to be ████ cents or ████,
24 but I think it might be --
25          THE COURT:  Okay.  So, we're talking about ████████
```

19

1  So, some number, the corresponding ██. Okay. So, right
2  now, this row 907 ████████████████████████
3  ███████████        Okay. So, that's -- is that a -- is
4  that like adding additional information to what you are
5  otherwise getting from Google when it says we have or maybe
6  it will produce information showing what the winning -- so,
7  I'm trying to figure out what is the additional information
8  that you're seeking that is like the commentary or notation?
9          MS. TRUONG:  To that I would go, your Honor, to
10  lines 543 to 547.
11          THE COURT:  Okay.
12          MS. TRUONG:  Which is ███████████.
13          THE COURT:  Okay.
14          MS. TRUONG:  And in Google's papers, Google has
15  shared we don't share ████████████, and so this field
16  shouldn't be turned over.  But this is Google's
17  categorization of the browsing history where the ad query is
18  being served.  If Google categorizes that ad query in a
19  sensitive category, then it is a notation by Google, an
20  admission by Google, that this ad query is targeting a
21  sensitive category.  It says it appeals sensitive
22  information.
23          THE COURT:  Okay.  So, the numbers correspond to a
24  category?
25          MS. TRUONG:  Yes.  The -- our understanding is

20

1  there's a decoding document where, you know, for example,
2  1197 could be breast cancer.  1112 could be medical, like
3  165 would be gynecological visits or something.  They all
4  correspond to categories that can be assigned to an
5  individual based on their browsing history.
6          THE COURT:  So, this is -- even though this
7  particular information -- so, let's just take row 543, which
8  says ████████████, that is not shared with an RTB
9  participant, that particular reference.  But, internally, it
10 corresponds to something that you say is effectively an
11 admission by Google that, what, the Web page being visited
12 is a sensitive -- reflects some kind of sensitive category
13 of information?
14         MS. TRUONG:  We can say, your Honor.  And, also, I
15 would note Google is itself a participant in RTB.  So, in
16 some ways, this is itself a notation of how participants can
17 utilize this information to create ████████████, which is
18 something I believe we also alleged in our complaint, right,
19 the -- the ability to not only benefit from targeting
20 individuals but then use all of the information shared into
21 RTB to then create profiles, verticals, inferences on
22 individuals.
23         THE COURT:  Okay.  We had this discussion before,
24 and I -- I'd rather keep it simple because what I understood
25 is based on prior orders that I've issued, I have rejected

21

1   the notion that Google is a third party.  The claim is -- is
2   the -- the named Plaintiffs data are being shared with third
3   parties, not Google.  So, if -- if we can, for purposes of
4   just this discussion, and maybe, you know, your presiding
5   judge will disagree with me about that issue, but -- but I
6   interpret your complaint as information being shared with
7   third parties not Google.
8       So, if we can just leave aside the idea that Google
9   participates in RTB itself and just talk about third party
10  RTB participants for a moment, are Plaintiffs contending
11  that this indicator, ███████████, is shared with a
12  third party RTB participant?
13          MS. TRUONG:  We don't know, your Honor.  And we --
14  we would want the opportunity to try to explore that through
15  further discovery and have our expert and depositions and
16  witnesses delve into this, but our understanding is that the
17  logs we have identified is -- is a subset of logs from the
18  ████████████████████████████████████████████████
19  ████████████████████████████████████████  And,
20  so, that's what we're looking for here is all of the
21  notations Google has about an auction transaction, and
22  specifically with respect to each of our named Plaintiffs.
23          THE COURT:  So, here's -- this is -- this is kind
24  of why I'm pressing on this issue, because it sounds like
25  there may be two different things going on here.  One is my

22

order which says Google has to produce documents sufficient
to show what was shared with an RTB participant, and they
say, We don't share this row or the information in this row
with an RTB participant.  And you say, We don't know if they
do.  But -- so, it would be one thing if you could tell me,
We know from the Calhoun matter that they do.  That would be
one thing.  But I hear you saying a slightly different
additional thing, which is, okay, we don't know, but even if
what Google says is true -- and I'm putting words in your
mouth right now -- this information is important for the
Plaintiffs because it reflects what's -- let's just call it
an admission by Google about something that is shared in the
RTB auction.

So, that's the part I'm really -- and hopefully I've
not mischaracterized your position on that aspect of it, but
that's the part I'm trying to understand.  So, could you
elaborate on that aspect of what you're asking about?

MS. TRUONG:  On the latter point, yes, your Honor.
I -- I think -- I mean, you know, the way we view this is
it's as if we have a medical record of -- of what happened
in a medical malpractice case, and Google steps out of the
surgery room and makes additional notations about what
happened in that surgery, and we would think those
additional notations, although it didn't occur in the
surgery itself, would still be relevant to discovery for us.

23

1      And, so, one of those notations would be, for example,

2  the user verticals.  Good says we don't share that in the

3  RTB transaction.  We believe even if it isn't shared, then

4  an admission about the ways in which what is shared in RTB

5  can be utilized to become sensitive information.  It can be

6  utilized to create profiles and targeting of specific users.

7           THE COURT:  That's what I want to understand more

8  about.  So, how is it an admission about what is shared in

9  RTB?  And I missed the last part of what you said, being

10  sensitive and used to target people.  So, I just don't --

11  I'm not understanding that connection, and I perceive that

12  it's really important to your case.  So, can you please like

13  use -- I'm not sure the surgery thing helps because -- here,

14  let me take your surgery analysis.  Somebody's undergoing a

15  medical procedure, and Google makes an annotation that it

16  doesn't share with anybody about that medical procedure.  I

17  just don't see how that's relevant to your case.

18           MS. TRUONG:  I'm sorry, your Honor.

19           THE COURT:  That's okay.  If you would like to

20  confer, go ahead.  If you need to confer, take the time to

21  do it.  I want to get this right.

22      (Pause.)

23           MS. DAVIS:  And, your Honor, if I may, Anne Davis

24  for Plaintiffs.  While they are discussing, it is our

25  understanding that the verticals were during the class

24

1 period shared with third parties and --

2         THE COURT:  What's the basis for your understand?

3         MS. DAVIS:  And I believe Mr. Gutkin can, you

4 know, confirm as well that during the class period,

5 verticals were made available to third parties.  They may

6 not be today.  We, you know, are taking testimony actually

7 this week and will continue to, you know, evaluate these

8 representations.  But the, you know, information revealed

9 about users by the verticals and their sharing during at

10 least some portion of the class period is, you know, also a

11 basis for us seeking disclosure of this information.

12        THE COURT:  I did have a question about that that

13 I was going to pose, and I don't want to lose track of my

14 question to Ms. Truong.  So, let me just put a pin in that.

15 I will come back to it because I do want to know about the

16 timing issue because that -- that was mysterious to me, the

17 -- the pre-complaint versus the relevant time period.

18     Okay.  But back to you, Ms. Truong, tell me how this is

19 an admission.

20        MS. TRUONG:  Your Honor, I mean, the codes that

21 Google's putting in is effectively coded to specific

22 categories, and if we can present that to a jury and say

23 this category, 1197, which has been associated with this ad

24 query on Mayo Clinic relates to a very specific and

25 sensitive category, we believe that would be an admission on

25

Google's part that, yes, we are selling sensitive and personal information.  We've categorized it in a sensitive category.

THE COURT:  And what's the "it" that's being categorized, the fact that someone is visiting a website that falls into a category that then Google says is -- is in its view sensitive?

MS. TRUONG:  Your Honor, we're not sure about the full categorization of how Google does it, but we believe at least some component of it is based on the actuary itself, is based on the -- what's transmitted in the auction itself and what's given to those participants.

THE COURT:  You mean what the RTB participant actually displays by way of an ad?

MS. TRUONG:  We believe it's a combination of the bid request, the landing page, and what's displayed.

THE COURT:  So, it's the -- the website that the person is on and what they're shown that results in this categorization?

MS. WEAVER:  Lesley Weaver, your Honor.  What is at -- one of the things that's at issue with verticals is intra spaced advertising.  So, we don't know.  We need discovery of how verticals are created, but we have seen for our Plaintiffs in Calhoun that some were put in very specific pornography sites, very graphic, for example.

26

1          THE COURT:  Okay.  But when you say --

2          MS. WEAVER:  And, so --

3          THE COURT:  -- some, some -- some what?  Some

4  people?

5          MS. WEAVER:  An individual named --

6          THE COURT:  Yeah.

7          MS. WEAVER:  -- Plaintiff.

8          THE COURT:  Yeah.

9          MS. WEAVER:  So, if you look at Exhibit 2 here,

10  these are for our named Plaintiffs.

11          THE COURT:  Um-hmm.

12          MS. WEAVER:  When that vertical number appears,

13  that's really just a code for a category that Google has put

14  users in.  So --

15          THE COURT:  So, categorizing users or websites or

16  ads?

17          MS. WEAVER:  This -- the person.

18          THE COURT:  Okay.  Because I understood Ms. Truong

19  to say that the number -- the categorization number is a

20  combination of the ad being displayed and the website where

21  the user is.  So, it's not a categorization of the account

22  holder -- and perhaps I misunderstood -- but a

23  categorization of the particular event.

24          MS. WEAVER:  It is saying this person is in this

25  category and this vertical.  So, you can target them with

27

1 these kinds of ads.

2          THE COURT:  Okay.

3          MS. WEAVER:  And, so, these notations provide

4 information to at least Google internally, and it might be

5 -- we don't know.  We need discovery -- at some point in

6 time the actual vertical number was given to third parties.

7 Maybe later they decided to code it or rename it a different

8 way, but they are still communicating this vertical, and

9 we're looking at the exhibit you pulled out at line 1048.

10 That number will correlate to a decoding chart that they

11 have provided us in Calhoun, and it will say -- when we look

12 at the decoding chart, it will say this number correlates

13 with this kind of interest, this kind of pornography.  And

14 then that information is how users are targeted in the ad.

15      Now, whether or not Google actually today still gives

16 the third parties the actual vertical number we would like

17 discovery of.  They assert they don't anymore.  We would

18 like discovery of that.  It's contested because we know at

19 one point they did because of our --

20          THE COURT:  Okay.

21          MS. WEAVER:  And that's what we alleged, and that

22 was what's sustained.  So, that's the first piece.  And then

23 I think the second piece is even -- so, we think they did

24 give the vertical numbers.  But let's say now they don't.

25 Then the question you were asking is right on, which is is

28

1  this still being used somehow to target people.  So, all of

2  these list of verticals, so that when Google creates --

3  sends a  bid request out, █████████████████████████

4  ████████████████████████████████████████████████████████

5      THE COURT:  ███████████████████████████████████

6  ██████████

7      MS. WEAVER:  That's why we need to get the logs,

8  to see what they're sending out.

9      THE COURT:  Okay.  But let me -- forgive me, but I

10  thought the premise of the Calhoun part of this dispute was

11  that there is information from the Calhoun matter that you

12  believe contradicts information Google is telling the Court

13  here and telling you here in this case about what it shares

14  with RTB purchases.  So, putting aside the used to do it,

15  don't do it now dispute, just putting that aside for the

16  moment, let's just assume they are not sharing these

17  particular rows, the numbers that correspond to

18  categorizations, how would the fact that Google is

19  internally categorizing these people for its own purposes

20  have anything to do with what RTB participants know about

21  the named Plaintiffs?

22      MS. WEAVER:  So, we did not and we were expressly

23  precluded repeatedly from engaging in discovery in Calhoun

24  about realtime bidding.  What we can see are these logs and

25  the vertical categories in them.  Now we have filed this

29

1  lawsuit to try to discovery how these verticals are used,

2  and Google is just telling the court, We don't give them

3  these numbers.  So, they're not entitled to this discovery.

4      Obviously, we need to understand how they are used and

5  how they are categorized.  We could not get that discovery

6  in Calhoun.  What we know from Calhoun is that these

7  verticals are in the logs.  We got some of the decoding

8  sheets.  For example, the example I gave you is I know that

9  one of those Plaintiffs was put in a very graphic, shocking

10 pornography category.

11          THE COURT:  Um-hmm.

12          MS. WEAVER:  We don't know how she got put in it

13 or why, and the question is why would Google be putting

14 people in these categories and creating the verticals if it

15 wasn't to target them or create ads.  That's the very

16 purpose of doing it.

17          THE COURT:  Okay.

18          MS. WEAVER:  And, so, we want discovery of the

19 logs so that we can then have our experts look at how they

20 are used and how they are sorted.  If we don't have the

21 logs, we can't even begin that process.

22          THE COURT:  Right.  Well, so, one might say that

23 you don't file the lawsuit to get discovery.  You file the

24 lawsuit because you have a theory about how it's working.

25 So, that's the part I would like to hear about.  You have a

30

theory about how this information is being used to -- let me

put it this way.  Maybe this is not the right way of

thinking about it, but are you suggesting that by virtue of

Google categorizing people, they are then available to have

ads shown to them, whereas some other group of people who

are not so categorized would not have -- would not be sort

of offered as available to have ads shown to them?  Is that

how it works?

         MS. WEAVER:  That's exactly what the complaint

alleges.  And we actually cite a developer page that says

this is how -- so, developer pages are posted publically --

that includes an actual vertical.  I forget what paragraph

number it is in the complaint, but we've talked about it

many times.  So, that's exactly what we allege, is that

people are being targeted by those vertical categories.

         THE COURT:  So --

         MS. WEAVER:  And that is the understanding of our

experts.

         THE COURT:  Okay.  So, my understanding of how

this whole bid request thing works is somebody is on a page,

and then the RTB participants are jockeying to see who gets

to post an ad.  And, until they win, you don't know whose ad

is going to be posted.  So, let's say someone is in the

pornography category, whatever, and they are visiting a Mayo

Clinic website or something having nothing to do with body

1  parts.  Let's just say a florist website.  I'm trying to

2  understand how -- how your theory would work because they

3  are available to be shown an ad while on a florist website

4  because of the categorization in some completely unrelated

5  place.

6          MS. WEAVER:  So, it's not just about receiving an

7  ad.  It is the compilation of information putting you in a

8  category you're not even aware of and then disclosing that

9  information to every auction participant.  So, yes, it's

10 relevant how much money they made, but we have allegations

11 about people lurking in the auction.  And, so, they now know

12 that this ███████████████████████, which they can

13 piece together, has put this person in these categories

14 based -- and that is what we are trying to get discovery of.

15         THE COURT:  Okay.  But here's -- here's the

16 problem I was having, coming full circle to where I was with

17 Ms. Truong, which is Ms. Truong says you don't know that the

18 category numbers or information are being shared with

19 someone.  So, that's where I'm stuck.

20         MS. WEAVER:  Well, we allege it in the complaint,

21 and we have a developer manual.  We've talked about this on

22 a number of occasions, your Honor.

23         THE COURT:  Um-hmm.

24         MS. WEAVER:  Let me find the exact -- can we

25 please find the --

32

1          THE COURT:  No, that's okay.  I'm just -- there

2  seem to be two strands, and there -- the strings are

3  merging.  And, so, I'm trying to keep them separate so I can

4  understand the distinct arguments.

5          MS. WEAVER:  Um-hmm.

6          THE COURT:  Because it does sound like there is an

7  argument that the information is shared, and then there's an

8  argument that even if it's not shared, there is some kind of

9  exposure of the categorization, which I am still not clear

10 on how that would work.

11         MS. WEAVER:  Right.  So, let's be very precise.

12         THE COURT:  Yeah.

13         MS. WEAVER:  There's information, and there is the

14 verticals.  So, if the vertical itself is a number, the

15 narrow dispute that Google has focused on is the number

16 itself, the vertical, is not disclosed in the auction.

17     Now, we have a developer manual and an allegation that

18 says otherwise.  That's the first dispute.  The second is

19 how, if they stop at some point, giving the actual number

20 that correlates with the vertical in the bid request itself,

21 how are they now using the verticals?  They are creating

22 them for some purpose, your Honor.

23         THE COURT:  Let's just say --

24         MS. WEAVER:  Completely --

25         THE COURT:  Let's just say devil's advocate --

33

1          MS. WEAVER:  Uh-huh.

2          THE COURT:  Let's just say devil's advocate that

3    Google says, Of course, we create verticals.  They are

4    solely for our own internal purposes --

5          MS. WEAVER:  What purpose would that be?

6          THE COURT:  -- nothing to do with RTB.  Google may

7    have all kinds of internal purposes that have nothing to do

8    with an RTB participant, getting information, whether

9    successful or unsuccessful.  So, what is your -- because

10   often I see these letters, and they say, Oh, therefore, see

11   Google H-E-W-T, some document number that I don't have in

12   front of me.

13      The complaint is very detailed.  I have the complaint

14   in front of me.  What is the allegation that you think bears

15   most directly on this issue of --

16          MS. WEAVER:  For example --

17          THE COURT:  -- disclosure?

18          MS. WEAVER:  -- I'm looking at Exhibit 27 to the

19   complaint, which specifically identifies segment ID184

20   corresponds with celebrities and entertainment news.  That's

21   not actually what I was looking for, but --

22          THE COURT:  Okay.

23          MS. WEAVER:  -- it's an example of an actual

24   vertical being disclosed through the open RTB Protobuf.

25          THE COURT:  Okay.  And can you tell me the

34

1  paragraph number that you're -- that that's hooked to?  That

2  would be helpful if you -- I'm sorry to ask you for this

3  level of detail that wasn't in the brief, but this would be

4  helpful for me to track your argument.

5          MS. WEAVER:  Yes, your Honor.  Can you give us a

6  moment on that?

7          THE COURT:  Yeah.

8          MS. WEAVER:  And then we'll come back with those

9  citations.

10          THE COURT:  Okay.  Just that would be helpful for

11  my sorting out of this stuff.

12      Okay.  So, I understand that Google has taken the

13  position that the ███████████ log is --

14          MS. WEAVER:  Your Honor, I have the citation if

15  you would like.

16          THE COURT:  Okay.

17          MS. WEAVER:  So, for example, these categories

18  that are used that we call verticals are at paragraph 143.

19  It lists them there, health verticals categories, weight

20  loss, genetic disorders, sleep disorders.  There are many of

21  these there.  And, so, we believe that these internal

22  documents, that they are grouping account holders into

23  targeted advertising segments.  That's paragraph 156.  They

24  -- they prepare these profiles, and then they use those

25  profiles in furtherance of the Google RTB.

35

1          Paragraph one thirty --

2              THE COURT:  Just a minute.

3              MS. WEAVER:  Okay.

4          (Pause.)

5              THE COURT:  Okay.  This is the ambiguous part.

6  Using those profiles in furtherance of the Google RTB, so,

7  what does that mean?

8              MS. WEAVER:  So, look at paragraph 137, your

9  Honor, of the complaint.  It's a chart of bid request

10  variables that open RTB shares with developers.  And what we

11  don't know is in some of these keywords or user or custom

12  data, how -- how the verticals are used.  But if you look at

13  line 14 on page 39, it says:

14                  "Data.  Values for this field are

15              now redacted.  Segment ID references the

16              exchange ██████████ of the page.

17              Segment value corresponds to the weight

18              of that detected vertical, a higher

19              weight suggesting the page is more

20              relevant for the ██████████."

21          These are the kinds of -- this is the kind of data in

22  these logs that we need to understand what's happening.

23              THE COURT:  Um-hmm.  Okay.

24              MS. WEAVER:  If you look at paragraph 138 and

25  going on through that entire section, your Honor, through

36

1  145, it explains the use of verticals and profiles.

2      Paragraph 133 gives other examples.  Paragraph 145 says

3  the unique user profile store explains:

4                  "The store is updated frequently

5              based on the unique user's interaction

6              with ads, sites they visit, or actions

7              they take."

8              THE COURT:  I'm sorry.  That's not 145.  Where is

9  that?

10             MS. WEAVER:  One fifty-five.  I'm sorry, your

11 Honor.

12             THE COURT:  Oh.

13             MS. WEAVER:  "The more information, the

14             better the targeting.  You might also

15             want to use third party data management

16             platforms to enrich your first party

17             data."

18     So, we believe these vertical categories are used by --

19 because that is what Google tells developers, that we're

20 going to improve targeting, and that these verticals are --

21 are an integral part of doing it.

22             THE COURT:  So, I guess the question is how do you

23 -- what is going on to improve targeting.  That's the

24 question you're trying to answer.

25             MS. WEAVER:  How are they using the verticals in

1  general.  Yeah, I mean, if you look at paragraph 157, there

2  has been independent research outside of Google on these

3  topics about how they're using it, but they're not

4  specifically talking about the verticals, but we understand

5  that to be the way that they categorize users.

6          THE COURT:  Okay.  But --

7          MS. WEAVER:  Okay.

8          THE COURT:  -- just to answer my question about

9  the Calhoun material, you don't actually have information,

10 because you weren't allowed to get it, about -- from the

11 Calhoun matter that confirms that this information is being

12 shared directly with RTB participants.  There's some more

13 nuanced kind of interaction that you think is going on?

14         MS. WEAVER:  Yes.  I think there's two pieces.  I

15 mean, obviously we don't have them for our named Plaintiffs

16 in this case.

17         THE COURT:  Okay.

18         MS. WEAVER:  They're different Plaintiffs.  And,

19 so, what were trying to get for these named Plaintiffs is

20 what is contained in the logs and the verticals about these

21 Plaintiffs, in the logs that's collected.

22         THE COURT:  Okay.  So -- so, let me -- let me just

23 ask a question that I was going to start off asking before

24 you gave me those citations.  Thank you.

25    The ████████ log is the log that Google represents

38

 1  is the most direct and relevant source of data about what is

 2  shared in an RTB auction about the named Plaintiffs, and

 3  then there's this category of logs that you all refer to as

 4  ██████. I don't know why it's called ██████. It's not

 5  explained. But in terms of their sources, what is your

 6  understanding and belief about the sources of information

 7  for ██████ data and the ██████████ logs?

 8          MS. TRUONG: To be candid, your Honor, we're not

 9  sure because Google has not been very forthcoming about what

10  is in the ██████████ logs. The only reason we're aware

11  of the ██████ data is because of the two plus year process

12  that happened in Calhoun where we were able to learn here

13  are the fields in ██████, and I just want a -- a point of

14  clarification too.

15          ██████ is a database. We are not asking for that

16  whole database. We're only asking for a slice of

17  information with respect to named Plaintiff which we now

18  based on prior discovery is only in the back end, only

19  related to action, and only related to our clients.

20      And, so, from what we see in ██████, we can get the

21  compliment of RTB transaction information and related

22  information. And I'm -- I'm not sure at this point that

23  there is a dispute on Google's side that -- that there's

24  relevant information there. And I think, in fact, for

25  ██████████, your Honor, that's the one log we

39

1  identified where we didn't have an exemplar for it from

2  Calhoun, and that's because that's a log that Google ended

3  up saying, Okay, we've looked back in ████, and this is a

4  log that also contains relevant information.

5          THE COURT:  Right.  I mean, so, there are

6  different logs.  I understand that, and let's focus on the

7  different logs if ████ is -- is a not useful category.

8  Google does say very explicitly that with respect to the

9  ██████████████ log, that it contains only

10 internally used information.

11     The -- the extra step is only internal information and

12 that the ████████ logs provide you with the information

13 that you need, with the possible exception -- and this was

14 where I was going to ask for more information -- is the

15 Plaintiffs say they want to -- they wanted me to order

16 Google to promptly search and produce from the personal

17 ██████████ log the named Plaintiff data that

18 predates the May 2021 establishment of the data.  And I

19 understand that's a reference to the preservation in the

20 Calhoun case.  That's at Docket 365, page three.

21          MS. TRUONG:  May I --

22          THE COURT:  But I have no idea what that means.

23          MS. TRUONG:  May I clarify that, your Honor?

24          THE COURT:  Um-hmm.

25          MS. TRUONG:  Our understanding is in RTB in ████

40

1  ██████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████████████████████

4  ████████████████████████████████

5  ███████████████████████████. So -- so, the

6  substantive information that was being preserved was from

7  ████████ forward I believe, and I actually don't know if

8  that preservation is still continuing.

9      So, for the ████████████████ log, because the

10 preservation only started ███████, but the log retention

11 period goes back to ██████████████, that log is the

12 only log that we are aware of which would contain plea

13 complaint information about RTB transactions.

14         THE COURT:  Meaning the ████████████ log doesn't

15 include that?

16         MS. TRUONG:  Our understanding is does not, but,

17 again, we -- we don't have transparency into that.

18         THE COURT:  Well, you -- okay.  You all have

19 conferred before bringing this dispute to me, have you not?

20         MS. TRUONG:  We did, your Honor.

21         THE COURT:  Okay.  I'm going to be very unhappy if

22 someone refused to answer a question that was posed on that

23 -- based on that point.  And if someone didn't answer the

24 question, I'm going to be also unhappy because the whole

25 point of coming to me with a dispute is that you all have

41

1 talked to each other first.  So, okay.  So, what you want is

2 -- well, he's a question that, again, I -- since this is the

3 first occasion where I'm actually considering this Calhoun

4 related submission, are the Plaintiffs asking Google to

5 generate data from these four or five logs for the named

6 Plaintiffs in this case or are the Plaintiffs asking for

7 permission to use in this case data that you all already

8 have in the Calhoun matter, without any change or any

9 further expenditure of time release searches by Google?

10           MS. TRUONG:  Your Honor, we're asking for Google

11 to produce the named Plaintiff data which it has already

12 preserved in its pipeline for the RTB Plaintiffs in this

13 case.  That's the ██████████ information that Google already

14 has.  We're asking that it be produced as it's maintained in

15 the normal course of business, so Google doesn't get to

16 scrub that information or do a time slice of information

17 that it's already pulled.

18           THE COURT:  So, how would that happen?  So, for

19 example, I'm looking at Exhibit 1, which has thousands of

20 rows in it.  Is this a one day in the life of an account

21 holder?  What does this Exhibit 1 to docket -- well, I guess

22 it's Docket 366.  So, it's -- on -- on ECF, it's Docket 366-

23 4.  That's the document.  What does this -- what does this

24 reflect?  One day of one -- for one user or a period of

25 time?

42

1          MS. DAVIS:  Your Honor, Anne Davis for Plaintiffs.
2   So, we provided the Court -- and I -- a fairly lengthy
3   excerpt, you know, a portion of the data produced.  Our
4   understanding of the process is that the -- you know, the
5   database is queried using the ███ or ████████████
6   for named Plaintiff, and the return of the query is the data
7   that is produced.
8          What we are seeking is simply the output of the query
9   for the information for these logs already preserved in the
10  pipeline -- through the pipeline for our named Plaintiffs,
11  that it not be scrubbed or redacted or, you know, that
12  Google not be the sole determiner of relevant fields, simply
13  that the output of the query of the information associated
14  with our named Plaintiffs' identifiers be produced.
15         For a single log for which their attention period
16  predates the establishment of the pipeline, we're also, you
17  know, asking for that log to be queried and for the output
18  of information, only the information associated with our
19  named Plaintiffs' identifiers be produced, as --
20         THE COURT:  Okay.
21         MS. DAVIS:  -- it was in Calhoun.
22         THE COURT:  Okay.  What does Exhibit 1 show?
23  Could someone answer the question?  Is that a snapshot, one
24  day in the life?
25         MR. GUTKIN:  I believe it's one ad event, isn't

43

it?  That is an excerpt of that log for a single ad event

like a single ad impression, is that correct?

MS. DAVIS:  That's correct, your Honor.  So, this

is simply, you know, one excerpt of the total output of that

data log for a Calhoun named Plaintiff.  But Calhoun named

Plaintiffs, you know, provide us with the information to

demonstrate what is present in these other logs, but they

are not Plaintiffs in this action.

THE COURT:  I got it.

MS. DAVIS:  We have --

THE COURT:  I just -- I don't need more

information than what I'm asking for.  I'm really just

trying to understand what I have.  So -- so, essentially,

what you would need from the information -- let's just talk

about the information that's preserved, as you say, in this

pipeline.  You would have to run -- have Google run a query

on how they do it by -- is there some particular identifier

for an account holder that is consistent?

MS. DAVIS:  Well, your Honor, this information has

already been queried and has fallen through the pipeline to

the preservation platform.

THE COURT:  What would they query out of the

pipeline for the named Plaintiff data?

MS. DAVIS:  We are asking for the output from

these logs for the named Plaintiffs.  It is not the creation

44

1  of a new query except for the single log with the, you know,

2  lengthier retention period.

3         THE COURT:  How is the named Plaintiff identified,

4  the user ID?

5         MS. DAVIS:  The ████ --

6         THE COURT:  The user ID, is that user ID?

7         MS. DAVIS:  -- the user ID.

8         THE COURT:  Okay.

9         MS. DAVIS:  The ██████████ is an identifier that

10 associates information with an account holder.

11        THE COURT:  And for how many years?

12        MS. DAVIS:  The retention period for the -- and,

13 I'm sorry, the display ad queries --

14        MS. TRUONG:  It would, your Honor, be just for the

15 preservation term that Google initiated.

16        THE COURT:  So, since ██████?

17        MS. TRUONG:  Correct.

18        MS. DAVIS:  Except for the single log.

19        THE COURT:  Okay.  So -- and I'm going to get to

20 Google in a moment.  So, just sit tight, Mr. Gutkin.

21        MR. GUTKIN:  I'm restraining myself, your Honor.

22        THE COURT:  So, Google has said that the personal

23 -- just take the ████████████████ log -- reflects

24 fields that are not shared in RTB.  Okay.  You say, well, at

25 least some of these are.  But, yet, there's, as I've heard,

45

1 thousands of rows, and it -- you know, it seems odd that

2 Plaintiffs could reasonably say they're entitled to

3 everything in these logs given the scope of my order in

4 Docket 314, which was limited to documents sufficient to

5 show what was shared, not documents sufficient to show

6 admissions or documents sufficient to show other stuff that

7 Google does internally or whatever Google does with it but

8 documents sufficient to show what was shared.

9     So, you know, how -- how do you think the Court should

10 address, in a principled way, this observation, which I

11 think you must concede that this log contains all kinds of

12 information, just the ████████████ log that has

13 nothing to do with what I've ordered?

14       MS. TRUONG:  Yes, your Honor.  Our first point

15 would be these logs all relate to those option transactions,

16 and we would like an opportunity to explore all of those

17 fields.  And, while reasonable minds might disagree about

18 what is or isn't relevant at this stage, it would be

19 prejudicial to give Google the benefit of every doubt every

20 time they say they want to extract a field or remove

21 something.  We want the opportunity to explore all of that.

22     And, not only that, but the way that the information

23 comes out in these examples is structured and contextualized

24 data.  It comes out in events.  It's numbered one, two,

25 three, four, five six.

46

1          THE COURT:  What do you mean it comes out in
2  events and is numbered?
3          MS. TRUONG:  It comes out -- for example, we're
4  able to reference field number -- field line one, field line
5  17.  If you see -- if you go down, custom criteria has
6  subfields in it.  We're able to see what the subfields are
7  and see where we might want to dig in and get more discovery
8  on these issues.
9      What Google wants to do is just take line 10 and put it
10  in a new document.  Line 13 goes in a new document.  Line
11  256 goes in a new document.
12          THE COURT:  Um-hmm.
13          MS. TRUONG:  And we -- we don't have then, the way
14  the record is maintained in the ordinary course of business,
15  we're losing that context and structure for our experts to
16  review this.  And, frankly, it's adding work and
17  inefficiency to create these extra steps to create a new
18  document when we know that the pipelines exist.  We know
19  that the information has been pulled and it's available, and
20  we can litigate the merits of the -- the substance of
21  arguments of whether something is or isn't transmitted, but
22  we'd like the opportunity to try to explore that.
23          THE COURT:  Yeah.  So, here -- here's the problem,
24  and this has happened more than once in this case where I'm
25  asked to resolve a discovery dispute and we get to the

47

1  hearing or even just in the papers, and I say what's the RFP

2  at issue or what's the order at issue, and I then learn that

3  the discovery that's being requested goes beyond what ever

4  the it is.

5      So, you know, here, if we're talking about my order,

6  which is why I started the hearing that way, I didn't order

7  Google to produce any thing that you all might think might

8  be relevant for some use.  I ordered Google to produce

9  documents sufficient to show these particular categories of

10  things that were shared.

11      So -- so, that's -- that's why this -- it troubles me

12  when we come to a dispute and I find myself hearing

13  arguments which may be relevant arguments, but they're --

14  they're not with reference to any particular request that

15  you've discussed with Google or briefed to me.

16      So, I mean, I'm sensitive to the idea that having

17  documents as they exist in the ordinary course of business

18  is important for discovery, and there could conceivably be

19  ways to manage concerns about confidentiality.  I think

20  redaction is an appropriate way to handle that.  But if

21  we're talking about this is just one ad and it's 8500 rows

22  long, I mean, that starts to become really problematic.  And

23  when you tell me in the Calhoun portion of the dispute that

24  -- and I -- like I said, I was able to print it out from

25  that exhibit.  It's just a few pages if I look at rows 9 and

48

1   rows 182 to 187, and these are very discrete things that
2   you've highlighted for me, not the whole -- the whole log.
3       So, even if I were to say maybe there is a dispute
4   about whether this indicates information shared as opposed
5   to information just kept track of within Google and not
6   shared -- and I think there is a dispute about that -- it
7   still seems like it goes way beyond what I ordered in Docket
8   314.
9       So, that's the dilemma I think this dispute presents.
10          MS. WEAVER:  Your Honor, Lesley Weaver.
11          THE COURT:  Um-hmm.
12          MS. WEAVER:  You did order in the first sentence
13  there on page four, lines 23 to 25, what information was
14  shared, but the next sentence reads:
15              "If Google discloses information
16              that allows an RTB participant to
17              identify an account holder based on
18              information the participant may have
19              about that account holder, Google must
20              produce records showing the disclosure
21              of that information as well."
22      And the key is in the information.  So, maybe they're
23  not using the vertical number anymore, but we need to
24  understand what they are requesting and what then is going
25  in the bid request.

49

1          THE COURT:  I agree.

2          MS. WEAVER:  That's the first point.

3          THE COURT:  I agree that -- you know, we have this

4  whole dispute about cookies and if there's -- there's an

5  ability for the RTB participant to say, Oh, I see this

6  cookie and, therefore, I know that this person that's

7  showing up on this web page to see my ad is the same person

8  I have in my database about which I've collected lots of

9  other information and I can use what Google is providing me

10 to hook those data sets together, that's fair game.  But

11 this is not that, right?

12         MS. WEAVER:  So, that's the first step.  That's

13 how you connect it to the individual.  The second step is

14 what information is being shared.  And if it's not

15 necessarily -- if they are now correlating verticals in a

16 way to -- to another code that's coming out in the bid

17 request, we'd like to know that.

18     And I'd also note this relates to your ruling on

19 sensitive information.  So, you said -- your Honor said that

20 we did not explain previously -- this is page seven -- how

21 the documents they seek are relevant to their claims.  And,

22 so, you told us to go back and meet and confer, and what

23 we're doing is telling you how we can see in these logs

24 Google puts users into these sensitive categories, and now

25 we are trying to understand how Google uses those to create

1 the ad.

2    Maybe you're right and they're using sensitive

3 categories for internal purposes.  I don't know what those

4 would be.  I mean, they really are doing it -- they're in

5 the business of selling ads, and the reason that advertisers

6 like sensitive information is because it provokes a

7 response, and we know that, and that's in the complaint.

8 So, who are they using these in the realtime bidding

9 auction?  How are --

10          THE COURT:  So, what --

11          MS. WEAVER:  -- they using these interest-based

12 segments, not necessarily the numbers?

13          THE COURT:  What discovery have you taken on this

14 point that causes you to think that they are using these?

15          MS. WEAVER:  It's in the complaint.  It's in their

16 developer manuals.

17          THE COURT:  That's not discovery.

18          MS. WEAVER:  Right.  This -- this is the

19 discovery.  Like, we're taking depositions --

20          THE COURT:  Okay.

21          MS. WEAVER:  -- this week, and so what we would

22 say -- and maybe Ms. Truong wants to respond to this about

23 specifically we -- we have taken and we have seen, but the

24 -- the point of how Google uses the sensitive information is

25 at the heart of the case, and let me just say this.  So, you

51

made two points about what is the scope of your order.  A

lot of your order told us to meet and confer and that we

could come back, which is what we're doing.

The second thing I would say as to burden, it is --

this is the world of big data.  So we can, for purposes of

our own -- because I'm a lawyer, not an engineering expert

-- print out a hard copy for the Court.  Google is the

largest data aggregator in the world.  Our experts are

experts in this.  They know how to parse through, and we

went through the process in Calhoun to answer the very

astute questions you're asking, which is how do you search

for this and how do you produce it.

What we are asking for for the realtime bidding

Plaintiffs at large is that we not recreate that process

here, that we employ what we know, and that they run

searches for the realtime bidding Plaintiffs, just as they

did in Calhoun, because they can do it, and they can do it

quickly.  And I'm sure Ms. Truong has the statistics on how

quickly it can be done.

THE COURT:  Well, there's a dispute about that.

So, I've already seen that.  I don't -- I don't need anybody

to reiterate that.

MS. WEAVER:  Okay.

THE COURT:  It's not trivial, whatever it is.

Maybe it takes two weeks.  Maybe it takes a month.  I don't

52

1  know, but it's not just push a button and there it is it

2  seems.  At least there's a dispute about that.  Some

3  extraordinary effort was undertaken in fear of sanctions in

4  the other case it seems like.

5       So, let me turn to Google now.  So, I guess I'd like to

6  start with the point that I started with with the

7  Plaintiffs, which is I understood the dispute to be keyed

8  off of my order, Docket Number 314, and documents that are

9  responsive to that.

10       Is that Google's understanding as well?  That's the

11  approach that you took?

12            MR. GUTKIN:  Yes, your Honor.

13            THE COURT:  Okay.  What is the status of Google's

14  production?  There's an explanation in the opening portion

15  -- Google's opening portion of Docket 365 that advertised

16  there was more forthcoming.  So, where are we?

17            MR. GUTKIN:  The additional -- so, on the order of

18  800,000 records from the ███████████ have already

19  been produced as well as -- I don't know the number off the

20  top of my head but hundreds or low thousands of records from

21  the ██████ logs that we agreed to include in response to

22  the Court's order, and then there are -- we have not yet

23  done the second production but expect to do that probably at

24  the end of this week or early next.

25       We're in the process right now that I described as --

53

1  we described as part of the burden, where we had to give

2  notice to customers that we would be disclosing information

3  that's treated as confidential in their contracts with

4  Google, and we're fielding questions from customers and

5  explaining what's going on and allaying their concerns and

6  explaining what's happening, and then -- and that production

7  would happen.

8      That additional production will be, as we said in the

9  papers, on the order of four million records from the

10  █████████ logs, and I think it's about 6,000 thousand

11 records from the ████████logs.

12         THE COURT:  So, the Plaintiffs seem to have some

13 concern that the manner in which you're producing this

14 information removes context that would be relevant for their

15 understanding.  And, so, can you just -- I don't have a

16 copy, I don't think, of the ███████████ log production or

17 exemplar of it.  Maybe I do, and if I do, you can tell me

18 where it is.  But when you produce the information, is it in

19 the ordinary case in which it's kept in these logs or how is

20 it produced?

21         MR. GUTKIN:  Yes, your Honor.  I don't believe you

22 have a copy.  So, it's produced -- we've produced every

23 field in the ███████████ logs that reflect something

24 that's shared with the RTB participants, and it has the name

25 of the field and then the value of what's shared, if there

1  is a value in the field.  And it's exactly as it was kept in

2  the ordinary course.  It's just pulled straight from the

3  data and put into a -- you know, something that's like an

4  Excel file, but it's too much data for an Excel file, but

5  it's the equivalent of that.

6           THE COURT:  So, in other words, when you do the

7  query of this -- this ███████ log, you specify the

8  fields that appear?

9           MR. GUTKIN:  Yes, the fields that reflect what's

10  shared with the third party RTB participants --

11           THE COURT:  Okay.

12           MR. GUTKIN:  -- per the Court's order.

13           THE COURT:  So, since I don't have one in front of

14  me, I'm just going to, you know, look at the exemplar I have

15  of the ███████████ log.  I don't know if

16  they're at all structured the same, but Ms. Truong was

17  saying, well, you know, you can see here that there's an

18  actual -- you know, you can see the event that's identified

19  for this particular ad placement.  So, you can see when it

20  happened and all of these things.

21    Do the ███████ logs contain that same contextual

22  information, even if the internal event identifier that

23  Google uses is not literally shared with an RTB participant?

24           MR. GUTKIN:  So, yes.  We have the event

25  identifier, which I -- and the kind of exact time of the

55

1  event down to microseconds, which is the event identifier as

2  I understand it.  We have the URL where the ad would occur.

3  ███████████████████████████████████████████████████

4  ██████████████████████████  ███████████

5  ███████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████

8  ███████████████████████

9     ███████████████████████████████████████

10 ████████████████████████████████████████████████████

11 █████████████████  something that -- well, I'd like to take a

12 step back and kind of start responding to their

13 presentation.  Maybe I should finish this list, but it's not

14 something --

15         THE COURT:  No, that's okay.  I don't need the

16 complete list.

17         MR. GUTKIN:  Okay.

18         THE COURT:  I was just -- I wanted to test the

19 concern that the Plaintiffs had, which is they don't have

20 enough context to interpret the data in the form that Google

21 has produced it because it's missing all of these things

22 that are available in the ████████████████  log,

23 for example.

24         MR. GUTKIN:  Yeah.  So, well, let me first take a

25 step back and talk about the fact that in the -- today,

56

1  they're talking about a very small number of fields.  In the

2  papers, they have a discrete number of fields.  But what

3  they're asking for is all of the content across ███

4  ████████████████████████████████████████████████████████

5  ████    And they're not even -- don't even seem to be focused

6  on the ████████████████████████████████████████████████

7  ████████████████████████.  I think they're not focused on that

8  because they probably recognized that the burden of pulling

9  records from that log is very substantial.  It's not

10 pipeline data as they characterize it.

11      So, if we're having to produce everything under the

12 sun, it's a large amount of effort.  It's a large amount of

13 computing time, et cetera.  I think that's why they're not

14 focusing on the actual log that mostly reflects what's

15 shared, but --

16          THE COURT:  Can you tell me about that part of it,

17 because that was a question?  So, why are you choosing the

18 █████████████████████  ████████████████████████████████████

19 ████████████████████████████████████████████████  What

20 is its purpose?  Apart from this lawsuit, what is the

21 purpose of the ████████████████ log?

22          MR. GUTKIN:  Well, ████████████████████████████████

23 ███████████████████████  I think for -- to be honest, I'm not

24 sure of all of the purposes for which it used.  I know that

25 one of the purposes is like troubleshooting to make sure

57

1  that the auction is working right, that, you know, they know

2  what the people are receiving, bid requests and that sort of

3  thing.  It's a log that we've been preserving here that

4  wouldn't normally be kept for this length of time.

5      THE COURT:  Um-hmm.

6      MR. GUTKIN:  But it's -- it's not -- the reason

7  that we have focused on that log is because the case is

8  about what information is shared with third parties, third

9  party RTB recipients, and it is the log that -- logs by far

10 the bulk of that information as compared to anything else

11 Google would have.

12     THE COURT:  And what is the purpose of the

13 ████████████████████████████████████████

14     MR. GUTKIN:  So, the rest of the ██████ logs are

15 just recording all kinds of information related to Google's

16 entire ad business that relate to an ad event.  So, they're

17 not anything to do with RTB.  They're just logs that are

18 recorded in connection with ad events.

19     So, like the ██████████████ log is recording ad

20 queries that occur on Google's display network which ranges

21 across a number of different products, both publisher side

22 products where ads were shown and advertiser side products

23 where -- from which ads are purchased.

24     THE COURT:  Is -- do the -- do the ████████████

25 ██████████████████████████████████, do they draw

58

1  from -- I'm not sure I'm going to phrase this correctly but

2  from the same source?  Is one a subset -- is the ███████

3  ███████████████████  I mean, how --

4         MR. GUTKIN:  Yeah.

5         THE COURT:  Do they relate in any way?

6         MR. GUTKIN:  I don't -- I don't believe that they

7  draw from the same source, but I'm not certain, your Honor.

8  They aren't subsets. ████████████████████████████████

9  ██████████████████████        The other logs are just for

10 all -- the ones that we've been talking about are for all

11 display ad events, realtime bidding, other Google products.

12        THE COURT:  So, like, let's just say there was a

13 particular ad that was shared with the named Plaintiff in

14 the RTB auction or that was displayed to the named Plaintiff

15 in the RTB auction.  There would be something in ██████████

16 █████████████████████████████████████████  that would

17 reflect that event, and there would be the same data about

18 that event -- or not the same data.  There would be data

19 about that event in the ████████████████  but about the same

20 event, and could -- I'm assuming if the answer is yes, that

21 you could correlate them, yes?

22        MR. GUTKIN:  Yes.  And, so, for example, if you

23 take a single ad event -- and -- and, by the way, just to

24 answer one of your Honor's questions, if -- if you look at

25 this binder, like this is -- I -- I don't even know if it's

59

1 the whole thing or just an excerpt, but this is the printout

2 of the ██████████████████ for one event.

3         THE COURT:  Um-hmm.

4         MR. GUTKIN:  And then this is a printout of

5 another log for that one event.

6         THE COURT:  Yeah.  Obviously you wouldn't be

7 printing this stuff.  That was for my benefit?

8         MR. GUTKIN:  Right.

9         THE COURT:  If you produce it, you're going to be

10 giving it --

11         MR. GUTKIN:  That's right.

12         THE COURT:  -- electronically?

13         MR. GUTKIN:  But I'm just -- when we talk about

14 the volume --

15         THE COURT:  Yeah.  I understand.

16         MR. GUTKIN:  -- I mean, we're talking about

17 something extreme.  So, if you take a single ad event, the

18 ████████████████████████████████████████████

19 ██████████████████████████████████████████████████

20 █████████████████████████████████████        ██████

21 ██████████████████████████████████████████████████

22 ██████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ██████████████████████████        I could look on my computer, but

25 they have a field that would show that the two of them are

60

1  aligned.  And then if there was a payable ad event --

2  because, I mean, of course, if you show an ad and it's being

3  charged on a pay per click basis and no one clicks, it's not

4  paid.  If you show an ad and it turns out that there's a bot

5  that clicks it, it's not paid.  But if there's a payable ad

6  event, then it would appear also in the third -- the third

7  one that we've agreed to produce because of your Honor's

8  final order with an amount that was paid.

9           THE COURT:  Okay.

10          MR. GUTKIN:  And, so, you would see the people

11  that were sent the allegedly improper information.  You

12  would see the information about the ad that was served, and

13  you would see the amount paid.

14          THE COURT:  Okay.

15          MR. GUTKIN:  If I could just --

16          THE COURT:  Yeah.  Go ahead.  I interrupted your

17  trajectory.  Go ahead.

18          MR. GUTKIN:  I mean, I just wanted to talk a

19  little bit about Plaintiffs' presentation, because, to me,

20  what they're doing is they're revisiting old orders, trying

21  to undo your Honor's prior rulings.  They're asking for info

22  that we're already giving them because they don't understand

23  and haven't done the discovery or taken the time to

24  understand the data, and they have just flat out

25  misunderstandings of -- of the logs and what they represent.

61

1    So, with revisiting all the orders, a lot of Ms.

2  Truong's presentation, respectfully, focused on exactly what

3  your Honor has already ruled they're not entitled to,

4  Google's internal classification of ads as sensitive, and

5  they're not claiming that Google shares this is a sensitive

6  ad with third parties.  And if they are claiming that, it

7  wouldn't be correct.  But just saying, Oh, because google

8  classifies it as sensitive, we're entitled to get that

9  because it's relevant here, that is literally precisely what

10 your Honor denied in its August -- in her August 26th order.

11    They're also trying to revisit the order in a sense

12 that you said documents sufficient to show, and there was

13 another quote from your Honor where you said:

14              "Plaintiffs have not shown they're

15          entitled to discovery" --

16    This is -- I'm reading from the August 26th order:

17          -- "have not shown they're entitled to

18          discovery of all information Google

19          maintains about an account solely

20          because -- solely based on Google's

21          internal link of information with an

22          account."

23    That's -- that's basically the entire thing of what

24 they're trying to do with these ██████ logs.  They're

25 saying because the information is in some log related to an

62

1  ad event, they're entitled to all of the thousands of fields

2  of lots, not what your Honor ordered, which was sufficient

3  to show what was shared and the details of such sharing,

4  which is what we've actually produced, but, rather,

5  everything that's internally across many logs associated

6  with the ad event.

7      Also, in Ms. Truong's presentation, she's talking again

8  about -- and we have this in our papers, your Honor.  We

9  tried to lay it out using the line numbers so it would be as

10  clear to you as possible, as easy to follow, but --

11          THE COURT:  Are you in the Calhoun letter?

12          MR. GUTKIN:  Yes, in our section of the joint

13  Calhoun letter.

14          THE COURT:  Um-hmm.

15          MR. GUTKIN:  She's talking about items that they

16  already have.  So, what they call browsing history and is,

17  in fact, just the URL of where the ad opportunity occurred,

18  that's already being produced.  So, that's no basis,

19  obviously, to bring in the ██████████████████      The

20  ████████████████████████████████████████████████████

21  ██████████████████████.  And, in fact, in the ██████████

22  █████████████, you don't know if that was an amount paid

23  because that log ████████████████████████████████████

24  ████████████████████████████████████████████ --

25          THE COURT:  There was --

63

1          MR. GUTKIN:  -- which is why we use --

2          THE COURT:  -- something called winner that we --

3    we were talking about that --

4          MR. GUTKIN:  Yeah, but that's the -- the winning

5    bid amount or something like that?

6          THE COURT:  Yeah.

7          MR. GUTKIN:  That -- the winning bid might be

8    eight cents, but then no one clicked on the ad and --

9          THE COURT:  Oh, I see.

10         MR. GUTKIN:  -- nothing was paid.

11         THE COURT:  So it -- so, your -- your production

12   is distinguishing between the amount associated with the

13   winning bid and the amount actually paid?

14         MR. GUTKIN:  Because of your Honor's order,

15   because the order was to produce the amount.  This was

16   actually not the --

17         THE COURT:  Right.

18         MR. GUTKIN:  -- August 26th order.

19         THE COURT:  It was an order --

20         MR. GUTKIN:  It was the damages order but the

21   amount that Google was paid.

22         THE COURT:  Okay.

23         MR. GUTKIN:  So, we went to the work of doing

24   that.  That involving joining that log to a spam table to

25   try and get rid of ad events that were designated as spam.

64

 1      But, so, there's a bunch of info that they're asking

 2   for that they actually already have, as we've pointed out in

 3   our letter.  But then let's go to the -- the

 4   misunderstandings, because they're rampant, and they're

 5   stark.  And, I mean, I -- I focused from talking to you

 6   today on the ██████████████     log because it's easier

 7   to see there with the examples they pull, that they --

 8   they're saying we should produce the entirety of the

 9   ██████████████████     log, which is the one over here

10   that's, whatever it is, two inches thick for a single ad

11   event.  And they said, Here's our best examples of what's in

12   the ██████████████     log that's really crucial to this

13   case.  And it was -- it's just a list of things that are --

14   that are irrelevant and have nothing to do with RTB or

15   things that we've already produced.

16      So, they -- what they call user lists, which is, I

17   don't even know if I should read the numbers, but you can

18   see them in the papers.

19           THE COURT:  I'm following along in the papers.

20           MR. GUTKIN:  Yeah, what they called user lists,

21   specific ads, and ad bidders score, those are all things

22   that have no relation to RTB.  They relate only to other

23   Google ad products.  They also talk about ██████keywords.

24   ██████is the internal name at Google for the DV360 product,

25   which is one of Google's first-party products.  They refer

65

1  to the detected title as one of the pieces of data they

2  need.  That's not something that's ever shared or used by

3  RTB.

4       Then they also -- there's -- is a set where we already

5  gave them the data.  They say they'll need the transaction

6  dat a by communication from the ██████████.

7  That's already -- that's the URL, which is in the ██████.

8  They say they need the bids, which is a reference to a field

9  that's a count of the number of RTB callouts.  That's

10 actually -- we are producing that from the ██████████

11 ██████ log already.  And then they say the winners, which

12 we're already producing, with the name of the winner.

13      And then, lastly, I'll just point out -- we don't -- I

14 don't have to march through every single one, but there is a

15 field that they call bidders, and in a prior version

16 because, you know, we exchanged a draft of this, they had

17 actually called it participants who placed bids, and the

18 data that they identified was two potential RTB participants

19 who did not even receive a callout because the system

20 determined they shouldn't be sent a callout, and then one

21 who received a callout and didn't place a bid.  And the one

22 who received a callout would be reflected in the ██████

23 ██████ log where we list all of the recipients of the

24 callouts for the ad events.

25      So, what we're -- Plaintiffs have asked for, this just

1  giant batch of data, and now they're talking about just a

2  few narrow fields, and in their papers they're talking about

3  just a few narrow fields, and even their bases for getting

4  the few narrow fields that they chose as their, you know,

5  best examples to show to your Honor for why they need these

6  logs, they just prove Google's case.

7       So --

8            THE COURT:  So, I --

9            MR. GUTKIN:  -- to me, this --

10           THE COURT:  Yeah.

11           MR. GUTKIN:  -- this whole exercise is -- it's way

12  overbroad, and we've complied with the order, and Plaintiffs

13  just want to change the old orders, get again Google's

14  internal information that's nothing to do with RTB that

15  relates to other ad products about Google's internal

16  classifications of things that's sensitive, et cetera.

17           THE COURT:  Okay.  I got that point, and I think

18  it -- it is concerning to me that the order and the

19  discovery was about documents sufficient to show not

20  literally every information.  So, I got that point.  But let

21  me ask you about the verticals.

22      So, there seems to be a couple of dimensions of dispute

23  here, some of which Google acknowledges I think.  So, this

24  discussion about verticals -- and I don't know whether we

25  need to talk about the one called ███████████  or the later

67

1   one at row -- I'm looking at the ██████████████

2   ████████████████ document, the targeting verticals.  I

3   don't know if they're -- they are different things, but I

4   don't know if they're meaningfully different things.

5       But I understand Google to say something about

6   verticals used to be shared but isn't any longer.  If

7   something about verticals used to be shared and it's within

8   the relevant time period, Google has to produce it.  So,

9   what is the response on that?

10              MR. GUTKIN:  So, the ██████████████ are not -- not

11  related to RTB, as I understand it, never used.  There is

12  information from the targeting verticals that used to be

13  shared that was deprecated years ago but not outside of the

14  class period.

15              THE COURT:  Not outside.  So, within the class

16  period, Google was sharing some information about targeting

17  vertical?

18              MR. GUTKIN:  Yes.  It -- it wouldn't be in the

19  particular -- these particular logs because it's going back

20  further in time.  It wouldn't be in the ██████████████

21  ██████log, for example, because it goes back too far in

22  time.  But that's right.

23              THE COURT:  When was it deprecated?

24              MR. GUTKIN:  I believe it's -- so, let me -- let

25  me say one other thing about verticals.  I mean, Ms. Weaver

68

1 has been talking about what is characterized in the

2 complaint as a user vertical, which is a this person is

3 interested in motorcycles, and the user vertical field was

4 never used.  That was never shared with third parties.  But

5 then there's a separate thing called a ███████████████

6 which is this website is about motorcycles, and I believe

7 that was deprecated in February of 2020 or thereabouts.

8          THE COURT:  So, is ██████████████  the same

9 thing as the field called targeting vertical?

10          MR. GUTKIN:  ██████████████████████████████

11 ████████████████████████████████████████████

12 ███████████████

13          THE COURT:  ██████████████████████████████

14 ██████████████████

15          MR. GUTKIN:  ████████  It was a field in the bid

16 request like user agent and video side and that sort of

17 thing.

18          THE COURT:  Okay.  And is there any record of that

19 use of the ██████████████ field for the named Plaintiffs

20 during the -- the relevant period?

21          MR. GUTKIN:  I -- I don't know the answer to that,

22 your Honor.  I don't know for certain if there are any

23 records from -- for the named Plaintiffs from the time when

24 that was still in use.

25          THE COURT:  Don't you need to find that out in

69

1 order to comply with my order?

2          MR. GUTKIN:  We -- we can look for that, your

3 Honor.

4          THE COURT:  I think you need to.  I mean, at a

5 minimum, if there's a concession that there was -- the

6 ██████████████ field was shared, whatever its contents

7 were -- maybe they're totally innocuous, done with consent

8 or whatever, but if that was shared with an RTB participant

9 and Google has those -- that data, you need to produce it,

10 at least for the named Plaintiff data.  I mean, we're not

11 talking about everybody right now.  We're just talking about

12 named Plaintiffs.  So, am I missing something?

13          MR. GUTKIN:  Well, your Honor, I mean, we've --

14 obviously, we're producing a lot of data.  We are producing

15 -- the documents that we've produced in the case describe

16 exactly what was shared, but it's -- it's true, I would say,

17 that the individual information about the named Plaintiffs,

18 the kind of exact information about them, it wouldn't be

19 available in the ██████████████ log because it's too long ago

20 that it's deprecated that I --

21          THE COURT:  I see.

22          MR. GUTKIN:  It's possible that we could find it

23 in a different log for the named Plaintiffs.  It's possible,

24 but I don't know.

25          THE COURT:  Okay.  Well, I think that the

70

1  Plaintiffs would say it's in this -- they do say in their

2  brief that what they're after, at least if it's the same

3  thing as the targeting vertical, is in the ███████████

4  ███████████████████

5      So, how long ago -- how far back do those logs go?  Do

6  they go back to 2019?

7              MR. GUTKIN:  I think that's correct.  I think it's

8  1100 days.

9              THE COURT:  So, if there was a way to query that

10 data for the time period between whenever it starts, however

11 far back it goes during -- in the class period.  I forget

12 what your starting point for the class period is, but -- and

13 up and to the date it was deprecated, that seems to me to be

14 the information that you need to find out about, and I don't

15 see any discussion about burden.  If you haven't looked, I

16 guess you wouldn't know if it was burdensome or not, but I

17 don't know what to tell you.  I mean, it seems like it's --

18 it's relevant to their case, and it's within the scope of my

19 order.

20             MR. GUTKIN:  Yes, your Honor.  So, in my view,

21 given the -- all of the volume of what we've produced,

22 including all of the information about what was in the

23 ████████████████ field, it doesn't -- they don't also need

24 to get the individual information, but I -- I certainly

25 understand the point your Honor is making.

*Echo Reporting, Inc.*

1           THE COURT:  But that's not an interpretation of my

2    order.  That's just your view, right?  My order would

3    encompass that information, right?  Unless I'm -- am I

4    missing -- tell me if I'm missing something, Mr. Gutkin?

5           MR. GUTKIN:  So, I guess that the -- I don't know

6    exactly how the targeting verticals information corresponds

7    to what was actually shared through RTB, and we won't have

8    -- because of the ████████████ log not going back in time

9    all the way to ██████, we won't have what was shared through

10   RTB for the -- for the ████████████████████ but the -- I

11   understand that the targeting verticals field is related to

12   that, unlike the ████████████████████████ field that they

13   also identified.

14          THE COURT:  Here's what I think you need to do.

15   You need to ask a human about what was shared before it was

16   deprecated, and you need to ask that same human or some

17   other knowledgeable human about whether there's a record of

18   what was shared for the named Plaintiffs for that period of

19   time before it was deprecated, and if you don't have the

20   information, you don't have the information.  If you have

21   only a subset of the information, that's within the scope of

22   my order.  Now, if it's we have to restore, you know, a

23   gazillion backup logs and it's going to take us a year,

24   okay, we can have a conversation about burden but not before

25   you talk to each other about that.

1    But if the Plaintiffs are saying really the same

2 information is in this field called targeting verticals that

3 is already available in this other source that is not hard

4 to get and maybe it is hard to get because I understand the

5 preservation for the ██████████████ log was only as of

6 ████████    So, there's a question there.  But if it's in a

7 known place, then you should have a conversation about at

8 least getting that information.

9    I haven't made a decision that they don't get to have

10 what they're asking for, but your argument is persuasive up

11 until the point where the ██████████████ log doesn't really

12 satisfy my order, and I'm a little concerned that there

13 hasn't been an investigation of what would for this chunk of

14 material.

15         MR. GUTKIN:  Your Honor, it's -- I'm sure

16 Plaintiffs would not have a favorable about the way the meet

17 and confers have gone, as Google does not either.  But part

18 of the difficulty is we tried to discuss exactly what are

19 the individual fields in the Calhoun logs that they were

20 claiming we needed to bring into our process, because we

21 identified here's what we're going to do to get you

22 information about the ad that was shown and the amount that

23 was paid.

24         THE COURT:  Um-hmm.

25         MR. GUTKIN:  And Plaintiffs' response was we're

73

1  not -- you need to produce the entire log, and we're not
2  going to negotiate over individual fields. And the fields
3  that appear in the papers that led to this hearing, many or
4  maybe all of those we had to see for the first time in the
5  papers the individual fields and then run and figure out
6  what the story was with those individual fields. But I
7  understand your Honor's perspective on the targeting
8  verticals field.
9          THE COURT: Yeah. I mean, I'm going to -- I have
10 a few observations for you all when we're done here in a
11 moment about going forward yet again, having to address this
12 -- this kind of meet and confer process. But -- but I think
13 it's fair to say that Plaintiffs have made their interest in
14 verticals and ███████████████ really clear from the
15 beginning.
16     And, so, it -- it would surprise me if Google, in
17 investigating what was shared with RTB participants during
18 the class period would not know that the fact that these
19 ███████████████ were shared and aren't any longer is
20 something that's going to be important for discovery in the
21 case, because, for at least that period of time, the
22 Plaintiffs are going to make that a feature of the
23 litigation. I mean, they've sort of made that super clear.
24     So, again, I -- I'm not -- it's a difficult situation
25 for everyone to be in. I understand. You're very

74

1 vigorously litigating your respective positions, but let me

2 just say I think you shouldn't wait for my order.  You

3 should start investigating this issue.

4      I did want to ask about sampling because I was a little

5 bit puzzled about the sampling argument, and I'm sorry I

6 didn't raise that with Plaintiffs.  I'll let you comment on

7 it.  But what is the nature of the sampling?  So, I

8 understand that you're doing whatever you're doing as an

9 interpretation of documents sufficient to show, but I don't

10 really understand what is happening in the sampling.

11           MR. GUTKIN:  Well, we've picked out six weeks

12 dispersed over the period for which we have the █████████

13 ██████logs available, and -- and just all of the ad events

14 in those six weeks, and there -- so, it's like I -- I don't

15 have the exact dates, but it's October, July, May, and back

16 -- backward in time from October 2022 to July 2021.

17           THE COURT:  So, why can't you just do the whole

18 period for the eight named Plaintiffs?

19           MR. GUTKIN:  Because doing the whole period is

20 going to take, as we said in our papers, basically the next

21 two months, you know, significant time from a few different

22 engineers for a couple of months, and it's going to impose

23 the -- the attorney expense associated with the notice, the

24 required notice, to Google customers is very substantial

25 because of the --

1      THE COURT:  Because it's on an ad event, per ad

2  event, you have to --

3      MR. GUTKIN:  It's not that it's per ad event, but

4  it is that it's per customer.  So, per ad manager customer,

5  for example.  And there are -- you know, there were -- in

6  the sample, there was already 300, and there -- so, there

7  will be -- I would expect if we would have to do the entire

8  period, then it would be thousands, and many -- a meaningful

9  percentage contact us and say, What's going on?  What data

10 is being shared?  And there's a -- a lot of -- there's a lot

11 of expense for Google associated with all of that.

12     And, so, it's both the very significant resource-

13 intensive work on behalf of the Google engineers to get the

14 information together, the principal information being in the

15 ██████████  log, which is where we have the best records

16 of what was shared and that is not in any kind of pipeline,

17 and then coupled with all of that attorney expense.

18     THE COURT:  Okay.  So, is that not an argument for

19 requiring you to produce information from stuff that is

20 already in these pipeline, namely, these other logs?

21     MR. GUTKIN:  Well, the -- the other logs have --

22 they have vast amounts of information with nothing at all to

23 do with RTB.

24     THE COURT:  Okay.  You've already given notice to

25 customers for the information in those logs or only for some

76

1  subset of those logs?

2        MR. GUTKIN:  We've only -- we've -- I guess I'm

3  not quite sure what you're asking.

4        THE COURT:  In either case.  I didn't mean you.

5  When I mean you, I mean Google in the Calhoun matter had to

6  give notice for production of what Ms. Weaver and her

7  colleagues already have in the Calhoun matter, right?

8        MR. GUTKIN:  Yes.  It wouldn't be the same group

9  of customers receiving notice.  It wouldn't be -- and if you

10 change it from a sample to a larger sample or anything else,

11 then it becomes additional customers that haven't yet

12 received any kind of notice.

13       THE COURT:  What is -- what is it that -- if it's

14 information about the RTB or the named Plaintiffs that is

15 being shared with RTB participants, what is it exactly that

16 customers need notice about?

17       MR. GUTKIN:  So, it's a variety of things, but

18 even like the simplest example of the URL where the ad event

19 occurred is considered the customer's data under the

20 contracts with the customers.

21       THE COURT:  I see.

22       MR. GUTKIN:  So, you have to let them know under

23 the contract that their Data with a capital D is being

24 produced in the lawsuit per the contract.

25       THE COURT:  Um-hmm.  But it's a notice, not a

77

1  consent, obligation?

2          MR. GUTKIN:  It's a notice obligation, but, of

3  course, people contact us, want further information.  No one

4  has yet -- you know, through the -- the first -- the

5  completion of the first round of data that we did in July

6  and the round we're finishing now, no one has yet brought a

7  motion to prevent the production.  But, of course, that's a

8  possibility, but they -- it's a notice followed by answering

9  questions.

10          THE COURT:  So, is -- is Google prepared to make

11  any representations about the samples being representative

12  of the entire period?  And I'm not sure what the

13  representations would meaningfully entail, but, you know, if

14  you're doing like discrete months and somebody wanted to --

15  Plaintiffs wanted to extrapolate across the entire period

16  and say, you know, the volume and type of information being

17  shared for our named Plaintiffs was this over the entire

18  period, is that something that Google would have no problem

19  with?

20          MR. GUTKIN:  It's not -- it's not an issue that

21  we've discussed with Plaintiffs.  But, obviously, there are

22  methods of extrapolation, and we've provided this sample of

23  millions of records, and we've just picked it based on weeks

24  where it occurred.  So, we -- you know, we've tried to just

25  kind of give -- and this is something that was done in

78

1  Calhoun too with some records.  I guess they called them

2  time slices there.

3          THE COURT:  Okay.  But the sampling was intended

4  to be representative.  You weren't picking particular time

5  periods for some other reason.  It was in --

6          MR. GUTKIN:  Right.

7          THE COURT:  Okay.  All right.  Let me -- let me

8  circle -- I'm sorry.  I'll let you argue anything else you'd

9  to argue, Mr. Gutkin, because I've interrupted you a couple

10  of times.

11          MR. GUTKIN:  Let me just -- I'll try to be brief,

12  but the -- there were -- again, there were a number of

13  specific things that Ms. Truong mentioned that are things

14  that were already produced, including the ad format.  There

15  was a lot of discussion of context and structure, and I

16  think if you are able to, you know, read carefully through

17  our dense submission in the Cal -- separate Calhoun brief, a

18  lot of what we're talking about is not context and

19  structure.  It's irrelevancy.  You know, it's information

20  that is not used in any way in connection with the RTB

21  process.

22      Plaintiffs said in their papers and said again today

23  that there's no transparency, which I think that -- that

24  argument doesn't make any sense because they have -- like

25  they say in the papers, Google was not transparent about the

1  fields that it's omitting, but they have full copies of the

2  logs.  And by the time that we filed this brief, they also

3  had a copy of what fields from the logs we included.

4          THE COURT:  But do they have all available fields?

5  So, the --

6          MR. GUTKIN:  They had full copies of the logs from

7  Calhoun which reflected all the fields.  That's from --

8          THE COURT:  Of -- of the ███████████ logs, they

9  have full copies of logs from Calhoun?

10         MR. GUTKIN:  Not the ███████████ log, but the

11  logs that they're moving for in these papers, the --

12         THE COURT:  Right.  But --

13         MR. GUTKIN:  -- ████████ logs.

14         THE COURT:  -- here's -- here's what I think part

15  of their issue is with the ███████████ logs is they say

16  Google is selecting fields from those logs to produce to us,

17  and we have to take on faith their representation that those

18  are the correct fields.  So, is there any problem with just

19  sharing with the Plaintiffs the list of fields available in

20  the ███████████ log, not the entire log but there's a list

21  of fields?

22         MR. GUTKIN:  Well --

23         THE COURT:  So that they know what you're

24  producing and what you're not.

25         MR. GUTKIN:  Respectfully, your Honor, I actually

80

1  don't think they make that argument.  I think that their

2  argument is about the ██████ logs.

3          THE COURT:  No, I know -- I know that.  I'm asking

4  you this question.

5          MR. GUTKIN:  Yes.  So, I think that the ██████

6  ██████ logs also have a lot of Google internal information

7  that is not related to what -- it is not responsive to the

8  Court's order.  That's the simplest way to put it.

9          THE COURT:  Um-hmm.

10          MR. GUTKIN:  And if the Plaintiffs wanted to meet

11  and confer about the individual fields in the ██████

12  logs, we could do that, but --

13          THE COURT:  Okay.  All right.  Anything else?

14          MR. GUTKIN:  I guess my last point, your Honor, is

15  just the Plaintiffs said based on the information in

16  Calhoun, that what they're asking for is only a slice of the

17  ██████ logs that's related to the RTB auction, and that's

18  clearly not true.

19          THE COURT:  Okay.

20          MR. GUTKIN:  Maybe that's a point I've already

21  made, but --

22          THE COURT:  Okay.  All right.  Thank you.  Let me

23  just come back to you, Ms. Truong, or whomever at your table

24  about this question of sampling.  So, I understand Google to

25  say it's a -- a question of being able to actually produce

1  the information in some kind of timely way.  They couldn't

2  literally produce the information for the entire period of

3  time.  It would take months and months and months.  So,

4  they're getting you a sample.

5     For your purposes, let's just start with class

6  certification.  Isn't having a sample that shows what

7  information was produced for these named Plaintiffs, even if

8  it's not on every day for every ad event but it's

9  representative, assuming that it is, isn't that sufficient

10  for purposes of class certification which is your most

11  urgent deadline?

12        MS. TRUONG:  An Truong, your Honor, for the

13  record.  For our purposes, we would object to that because

14  we would want the full scope and volume of the information.

15  That's going to be a common evidence of some of our key

16  claims in this case, including whether there was reasonable

17  expectation of privacy and to the scope of the information

18  that was being shared, whether it was highly offensive,

19  whether the conduct included sensitive information, user

20  lists, verticals, that type of information.

21     And I want to note one thing.  Mr. Gutkin during his

22  presentation indicated that user lists were not shared in

23  the RTB transactions.  We disagree.  Our understanding is

24  that user lists are shared.  It's --

25        THE COURT:  What's a user list?

82

1          MS. TRUONG:  A user list is lists that

2  participants can create and Google can create that basically

3  says this is a category, sports enthusiasts.  And under that

4  list, we have all of these individuals that we have placed

5  into this user list, and RTB participants can pre-target

6  user lists.  So, they can say I'm Nike.  Google, I only want

7  you to show me RTB ads for people under the user list of

8  sports enthusiasts.  That's the only ads we want to see.

9  That's the only ones we're going to bid on.

10          THE COURT:  Okay.  But can I go back to the

11  sampling question, please?

12      So, if there were some way to obtain, you know, a

13  stipulation that  the sample is representative, would you

14  not be able to say -- you extrapolate these six weeks worth

15  of data across the entire class period.  We have hundreds,

16  thousands of such events for each person and then in the

17  class multiple that by how many account holders are in the

18  class.  You know, you could -- you could make the argument

19  that you need to make in terms of numerosity and typicality

20  and all of those things and why class treatment is the -- is

21  the only, you know, appropriate way to handle that.

22      So, well, you know, maybe it would be better to have it

23  like literally there, but if you can make this same argument

24  based on the representative sample, why is that not

25  sufficient?

1          MS. TRUONG:  Your Honor, I think that's an issue

2  we would want to take back to the team and discuss.

3          THE COURT:  Okay.

4          MS. TRUONG:  But I think our immediate concern

5  right now is the sampling Google is producing we don't think

6  is sufficient, which we've argued repeatedly at this

7  hearing.  There's the no transparency in the fields that are

8  being produced and what's being omitted, and I think that's

9  a key issue for us, to say that this is the sampling that's

10  actually going to be representative when it's actually just

11  Google's decision about producing only what it thinks is

12  relevant.

13          THE COURT:  So, you're talking about a different

14  sampling?  You're talking about the sampling of which

15  fields, not the sampling of time slices?

16          MS. TRUONG:  For the sampling of time slices --

17  and I think that -- with respect to Google's argument,

18  that's only with respect to the ████████ log, because I

19  don't think that there's a dispute here that for the ████

20  logs that we've identified, that information has been

21  preserved from a definitive time period from ████████.

22  And, so, our concern with sampling a limited time in the

23  ████████ log is we simply don't know what is being left

24  out from that time frame.

25          THE COURT:  From the time frame or from the

84

 1  fields?  That's what I'm trying to understand, or both?

 2          MS. TRUONG:  Both.

 3          THE COURT:  Both.  Okay.  But you have the

 4  production that's been made so far of the sampled ████

 5  ████ log.  So, you know what fields Google is producing.

 6          MS. TRUONG:  We only know what fields are being

 7  produced --

 8          THE COURT:  Right.

 9          MS. TRUONG:  -- not what's being omitted.  That's

10  correct.

11          THE COURT:  Okay.  Which goes back to my question

12  at the beginning, which is what information is missing,

13  right, from what I ordered?

14          MS. TRUONG:  Your Honor, based on our review of

15  what's been produced, we think that a lot of information is

16  missing with respect to identifiers for each of the named

17  Plaintiffs that are included in these transactions.  I think

18  there's a lot of information missing about the URL and the

19  browsing history.  Google says only a limited portion of the

20  Web page where the ad query is being placed shown, but we

21  think that it's much more detailed, and we're seeing that

22  information in the other logs.

23          THE COURT:  Okay.  So, this just a dispute where

24  -- I mean, not just, but this is -- the basis for your

25  dispute about that is you don't believe what Google's

85

1  telling you about what's shared?  You think they're wrong in

2  their representations to the Court?

3          MS. WEAVER:  Your Honor, I would -- I think you

4  were on the right path when you were suggesting that Google

5  might identify fields, because the disputed issue -- I'm

6  sorry.  This is Lesley Weaver.  I think it's a disputed

7  issue in this case what sharing is as we're talking about

8  making an actual number or is information somehow

9  encapsulated somewhere.

10     So, providing us the proto for the ███████ log,

11 which a proto is, as I understand it, a shorthand for a

12 description of the fields and what's contained in it.  It's

13 what developers use to help create the fields.  And, so, we

14 want it for both ██████ and for the ████████████, and

15 then we can have this discussion, and we've been asking for

16 these encounter and in here, so that we can understand what

17 is being upheld, and that is Ms. Truong, I think, unease

18 with the concept of accepting the sampling without knowing

19 what's in -- what  the fields are yet.

20          THE COURT:  Okay.

21          MS. WEAVER:  And then the second thing is --

22          THE COURT:  On the time part?

23          MS. WEAVER:  As to time --

24          THE COURT:  Yeah.

25          MS. WEAVER:  -- I -- we do need to consult.  I

86

1  think once we saw -- we could agree on what the sample is

2  and could review some of these, then we could talk about,

3  you know what, we do think this is sufficient.  I mean, we

4  want to be reasonable too.

5          THE COURT:  Okay.  All right.

6          MS. WEAVER:  And we might be able to find a

7  compromise, but it's really hard to say ahead of time that

8  that's the case.

9          THE COURT:  Okay.  I am thinking that one -- one

10  thing I may require ips for Google to share what the fields

11  are in the ████████████ log, and I realize you didn't put

12  that in your papers.  So, if there are arguments that need

13  to be made about that, I -- I guess I can give you an

14  opportunity to do that.  But if it's shared under the

15  protective order that -- and this thing that -- does this

16  proto exist, Mr. Gutkin, where it says here's the fields and

17  here's what it's about?

18          MR. GUTKIN:  So, I don't know the answer to that,

19  your Honor.  The ████████████ log I think is also, you

20  know, one of these giant logs with thousands of fields.

21  What we did is identified the fields in the ████████████

22  log that reflect what's shared with third parties through

23  bid requests.

24          THE COURT:  All right.  I know that's what you

25  did, and I -- but I don't have any way to resolve the

*Echo Reporting, Inc.*

87

1  dispute that you all have, where they say one thing and you

2  say another thing.  I could just say take a deposition and

3  we'll figure it out later, but I'm still hoping that you all

4  can talk to each other and come to some agreement.  Maybe

5  that's wishful thinking.  I will consider this.  I haven't

6  ordered it.  I will consider whether to ask you to share

7  that and have a further discussion about it.  Otherwise, I

8  think you ought to take your depositions -- I'm addressing

9  the Plaintiffs here.  Take your depositions.  Ask the person

10 knowledgeable, Hey, is this the only stuff that's shared?

11 What does sharing mean to you?  What if I define sharing in

12 this way and -- you know, and probe this issue, and if it

13 turns out that Google has been withholding information, then

14 you're well suited to come back --

15          MS. TRUONG:  Your Honor, may I --

16          THE COURT:  -- for relief.  Yeah.

17          MS. TRUONG:  Just on that latter point, I think

18 one of the problems we have is Google's refusing to let us

19 use the Calhoun information outside of --

20          THE COURT:  Yes, I know.

21          MS. TRUONG:  -- this limited instance.  Sol --

22          THE COURT:  Not just Google.  Judge Gonzalez

23 Rogers has -- has ordered that, except for this limited no

24 purpose.  And this particular dispute, I am quite concerned

25 that it has morphed into something beyond documents

88

1 sufficient to show.  So, that's one thing.

2      And I -- I'm -- I'm resisting allowing that to be

3 expanded.  That causes me some concern.  But I am also

4 concerned that documents sufficient to show have not been

5 produced for the things that are concededly shared and just

6 happen to not be in the retained ███████ log.  That's

7 a problem.  So, I think that needs to be remedied, and I

8 will consider what's the best way to remedy that.

9            MS. TRUONG:  I --

10           MR. GUTKIN:  Another point, your Honor.

11           THE COURT:  Yes.

12           MR. GUTKIN:  I apologize for interrupting.

13           THE COURT:  Okay.

14           MR. GUTKIN:  The proto -- there may be source code

15 that it may -- I don't know if this document exists, but it

16 may be only in source code, and we don't even have a

17 protective order that covers source code.  So, I'd just flag

18 that additional issue.

19           THE COURT:  This is not a problem.  If this were

20 really the issue -- so, nobody needs to produce source code

21 as in things that are -- only a computer can read.  I'm

22 talking about text, descriptive text.  If there's a document

23 that has descriptive texts and can be extracted from what

24 would otherwise be called source code but would reveal this

25 information, even if it's never been printed, it seems like

1 something that you could usefully discuss and you could

2 agree amongst yourselves on special treatment for that

3 document.  It will only be viewed in this context, if it --

4 if it needs that special treatment.  The fact that a

5 protective order governing source code doesn't presently

6 exist in this case should not be a barrier to talking about

7 these things.  If we're trying to get to the bottom of what

8 are the fields that are sufficient to show what was shared

9 in the RTB auction, that's what we need to accomplish, and

10 that should be your first order of business for this

11 dispute.  So, again, I'm going to consider what the best way

12 is to have that happen.

13     Let me say a few words about going forward.  I see in

14 the papers, and you've alluded to it in this hearing, that

15 the parties have some concern about how to proceed in view

16 of my order about how to deal with Calhoun stuff.  I didn't

17 think my order was ambiguous, but I don't -- I don't like to

18 hear that we didn't know this was at issue until we saw the

19 letter.  That should never happen because, you know what?

20 If that happens for one side or the other, it's just going

21 to take longer because then there's something that you

22 haven't talked about.  Plaintiffs are really motivated to

23 move fast here.  You -- you should have a lot of motivation

24 to tell Google all the reasons why they're wrong and explain

25 it and not just say it in conclusory fashion but to explain

1  it.  Here's why you're wrong, and here's what we know, and

2  here's why.

3       On the other side, you know, part of me thinks like if

4  Google is so confident in its position, you know, why not --

5  why not let -- well, this is -- this is on the merits, but I

6  had a thought that I won't -- I don't think is useful right

7  now, but I had a thought that if you're so confident that

8  the Plaintiffs are wrong about the Calhoun logs, why not let

9  them take one log, point it -- share it with Judge Gonzalez

10 Rogers, and then you can point out how wrong they are, and

11 they will look foolish.  But why is that not something

12 Google is willing to do?

13            MR. GUTKIN:  Well, your Honor, let me -- they took

14 the Calhoun log here and said, here -- again, look at the

15 section in our papers about the ███████████████, and

16 said, Here is exactly why we need this log, and identified

17 fields that they already have that are not related to RTB,

18 that don't mean what they think they mean, and they've just

19 overall misrepresented, and I -- I assume unintentionally,

20 that this log is really -- what is in here reflects what's

21 shared through the RTB auction when, in fact, what's shared

22 through the RTB auction is this much narrower thing that

23 they --

24            THE COURT:  Okay.

25            MR. GUTKIN:  -- know all about.

91

1          THE COURT:  Well, that was an idea I had last
2   night, but I'm not going to belabor that.
3      Let's go back to the procedure.  Do the parties need
4   some modification to my order at Docket 313, so that we
5   don't have disputes about how the conference is supposed to
6   happen when somebody wants to use Calhoun material.  Do --
7   do you need me to write something differently so that we
8   don't have a fight about what you're supposed to do?
9          MR. GUTKIN:  I don't think so, your Honor.  I
10  mean, I understood your order to say that if in the course
11  of a discovery dispute, the lawyers who were on the Calhoun
12  protective order want to present that to us, they can, and
13  the only thing that was -- I would say was tricky in this
14  process was the late disclosure of exactly what in the
15  Calhoun logs was going to be referenced in the papers
16  because that put at least Google in a very tough spot with
17  getting the -- for example, like I mentioned, the individual
18  fields in the ██████████████ log that they were
19  going to claim proof that that log was relevant here.
20          THE COURT:  Um-hmm.
21          MR. GUTKIN:  Getting those something like on
22  Wednesday for the filing on Monday and needing to get a team
23  of engineers to dig into that and tell me what every one of
24  those fields meant.
25          THE COURT:  Um-hmm.

92

1          MR. GUTKIN:  That -- that part was hard, and --

2          THE COURT:  Okay.

3          MR. GUTKIN:  -- again, not to cast aspersions

4    toward counsel, but we requested that at the final meet and

5    confer, they identify all the Calhoun documents that would

6    be a part of the process for briefing this named Plaintiff

7    data dispute, and Plaintiffs said, No, we don't intend to

8    include any at this time, and we'll need to see what you're

9    arguing to --

10          THE COURT:  Okay.

11          MR. GUTKIN:  -- decide which ones to do, and that

12   was --

13          THE COURT:  All right.  Well --

14          MR. GUTKIN:  -- problematic for us.

15          THE COURT:  -- but it may be fair.  So --

16          MR. GUTKIN:  Well --

17          THE COURT:  Okay.  Yeah.  So, I mean, do the

18   Plaintiffs think any modification to my Docket 313 order

19   needs to happen, apart from the one about who gets to see

20   what?

21          MS. DAVIS:  Your Honor, Anne Davis.  I think, you

22   know, it may not shock the Court to hear that we disagree

23   with Mr. Gutkin's recital and, you know, the length of time

24   that we had sent discussing these logs, you know, goes back

25   to ███████████  So, the --

93

1          THE COURT:  So, do you need a modification to the

2   order?

3          MS. DAVIS:  -- there is a surprise -- there's a

4   surprise to us.  In terms of the order, you know, I think

5   that the idea that there must be a -- we -- we do have

6   disputes as to, you know, Calhoun discovery.  That is the

7   focus of the discovery dispute.  So, the idea that there has

8   to be some separate, you know, existing dispute and

9   otherwise to address the relevance or need for discovery

10  produced in Calhoun in this action, consistent with Judge

11  Gonzalez Rogers' order, you know, that Google is now trying

12  to further limit our ability to present this information to

13  Google to discuss with Google the appropriateness of that

14  production is a concern to us.  So, to make clear --

15         THE COURT:  So, but they're saying they want to

16  know sooner rather than later what parts of the Calhoun

17  production you think are important for resolving an

18  underlying discovery dispute.

19      So, the way this all happens here is you've asked for

20  discovery.  They've said whatever they're going to say about

21  their production.  You're unhappy with the production or the

22  representation about what would be produced.  And you say

23  it's not sufficient, and we know it's not sufficient Because

24  we have this information from this other case that causes us

25  to think there are additional materials that you haven't

94

1  produced, and we want to be able to tell me if -- what that

2  is.

3      And, so, the point of Docket 313 was that you all

4  should tell Google that first and persuade them that they

5  are missing something, and I fully expect Google to be, you

6  know, consulting with whoever's representing Google in the

7  other case and the relevant engineers who are knowledgeable

8  to get to the bottom of it, I mean, not be siloed in the

9  sense that it's Google's information.

10     So, that's the process I envisioned.  But it's not as

11 if there is a stand-alone process to periodically try to

12 persuade me that this discovery in Calhoun in a vacuum

13 should be part of this case.  What's not what Judge Gonzalez

14 Rogers ordered or what I envisioned when I set up this

15 process for you all.

16     So, I'm just -- I'm trying to make -- you -- you need a

17 guidance.  I get it.  I tried to provide guidance like to

18 streamline how it would work.  And, so, my only question is

19 do you need more help in terms of streamlining it to make it

20 not cumbersome?

21         MS. WEAVER:  Thank you, your Honor.  If I may, you

22 know, I think that our view is that we have, consistent with

23 the order, identified these logs of information to Goggle

24 well in advance and have, with other pending disputes as

25 well as pertains to RTB discovery and the sufficiency of

95

1  Google's production --

2          THE COURT:  Okay.

3          MS. WEAVER:  -- consistent with our requests in

4  RTB.  So, at this time, I would say no.

5          THE COURT:  Okay.

6          MS. WEAVER:  But we will keep the Court informed.

7          THE COURT:  So, I won't do any modifications.  I

8  won't say it's working.  It may be broken, but --

9          MR. GUTKIN:  Your Honor --

10         THE COURT:  -- there's nothing I can do to fix it

11 at this point.

12         MR. GUTKIN:  -- I don't think we need a

13 modification of the order because I think the order is

14 clear, but I will disagree with Ms. Davis that the -- it's

15 not just about this named Plaintiff data dispute.  There are

16 other ways that the process is not -- in our view,

17 Plaintiffs aren't following the order with just bringing in

18 vast -- asking us to consider vast troves of Calhoun

19 discovery, separate and apart from an individual discovery

20 dispute.  So, that may be an issue we end up with before you

21 with again in the future.

22         THE COURT:  Well, I won't micromanage what's not

23 before me, but thank you for at least hearing me out, trying

24 to solve a problem.  I won't -- I won't mess with it right

25 now.

1       All right.  I think I have what I need to resolve your

2  dispute.

3            MS. DAVIS:  Your Honor, if I may, just to -- to

4  respond to a question that you had earlier.  We were talking

5  about the paragraphs in the complaint.

6            THE COURT:  Yes.

7            MS. DAVIS:  And I would direct your attention

8  specifically -- I mentioned some of these -- but paragraphs

9  146 actually has examples of ███████████ and then in

10 paragraph 148, it says Google removed these exemplars of

11 line codes specifying ███████████ for account

12 holders.  We alleged it made a distinction without a

13 difference because they included those.

14      And then paragraph 149 explains the concept that we

15 were discussing or is that now that Google is saying user

16 verticals are unused, it may reflect the fact that the

17 inferred information contained in those verticals has been

18 transferred to the new flock value, which is a new way they

19 have of describing.  That's what we've been trying to get

20 discovery of, and I do want to let the Court know that --

21            THE COURT:  Flock value?

22            MS. DAVIS:  Yeah, that's a new way of -- it's --

23 it's in the complaint as well.  It's -- I think they've even

24 moved on from this.  It was called the Federated List of

25 Cohorts, and it was a way of generating something akin to

97

1  these user lists.

2           THE COURT:  Okay.

3           MS. DAVIS:  Like how to group people by interests

4  group.

5           THE COURT:  But none of this is in the discovery

6  letter.  So, I'm hearing it all for the first time, and is

7  this FLOC field a thing in dispute?  I mean --

8           MS. DAVIS:  No, it is not.  I'm simply trying to

9  communicate to you that the -- our allegation that the

10 ███████████████  have been shared is in the complaint, and

11 if you're ruling on that issue, take a look at paragraphs

12 146 to 148.

13          THE COURT:  All right.  I'll note the paragraphs

14 that --

15          MS. DAVIS:  And the -- the second thing I was

16 going to say, your Honor, is we did not learn until this

17 hearing that there is a log that might have ██████████

18 ████████  in it and that ████████████████  are not in the

19 ████████████  logs, and that is -- that's incredibly

20 concerning to the Plaintiffs.

21          THE COURT:  But I think that if -- I mean, I got

22 that from the papers.  So, that surprises me, not that there

23 are possibly other sources for information that has been

24 deprecated, but it's absolutely clear from the papers that

25 the information was shared and then was deprecated.  You say

98

```
1  that.
2          MS. DAVIS:  Right.
3          THE COURT:  So, I don't understand why you're
4  all --
5          MR. GUTKIN:  Not --
6          MS. DAVIS:  What I'm saying is we have been told
7  repeatedly that ████████████████████████████
8  ████████████████████████████████████████████████
9  ████████████████████████████████████████████
10 ████████████████████████████████████████████████
11 ████████████████████████████████████████████
12 ██████████
13         THE COURT:  Mr. Gutkin can tell me if I'm wrong,
14 but that's not what I heard him say, that --
15         MR. GUTKIN:  Yes, your Honor.
16         THE COURT:  -- he still needed to actually
17 investigate that issue, which still needs to be
18 investigated.  Okay.
19         MR. GUTKIN:  I think your Honor understands.
20         THE COURT:  Okay.  All right.  I think this matter
21 is concluded.  Thank you all very much.
22         ALL:  Thank you, your Honor.
23    (Proceedings concluded at 12:05 p.m.)
24
25
```

99

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16            Echo Reporting, Inc., Transcriber

17              Thursday, December 22, 2022

18

19

20

21

22

23

24

25