```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3   Before The Honorable Virginia K. DeMarchi, Magistrate Judge

 4

 5   In re:                      )
                                 )
 6   GOOGLE RTB CONSUMER         )   No. C 21-02155-YGR
     PRIVACY LITIGATION,         )
 7                               )
     _____)
 8
                                     San Jose, California
 9                                   Thursday, April 11, 2023

10   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
         RECORDING 11:40 - 12:54 = 1 HOUR and 14 MINUTES
11

12   APPEARANCES:

13   For Plaintiffs:
                                 Bleichmar Fonti & Auld LLP
14                               555 12th Street
                                 Suite 1600
15                               Oakland, California 94607
                           BY:   ANNE K. DAVIS, ESQ.
16                         BY:   LESLEY ELIZABETH WEAVER, ESQ.

17                               Pritzker Levine LLP
                                 1900 Powell Street
18                               Suite 450
                                 Emeryville, California 94608
19                         BY:   JONATHAN K. LEVINE, ESQ.
                           BY:   ELIZABETH PRITZKER, ESQ.
20
     For Defendant Google:
21                               Cooley LLP
                                 3 Embarcadero Center
22                               20th Floor
                                 San Francisco, California
23                                94111
                           BY:   WHITTY SOMVICHIAN, ESQ.
24                         BY:   KELSEY SPECTOR, ESQ.

25
```

2

Transcribed by:                    Echo Reporting, Inc.
                                   Contracted Court Reporter/
                                   Transcriber
                                   echoreporting@yahoo.com

3

1  <u>Thursday, April 11, 2023</u>                            <u>11:40 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4      (Call to order of the Court.)

5          THE CLERK:  Calling case 21-CV-02155-YGR, In Re

6  Google RTB Consumer Privacy Litigation, on for Plaintiffs'

7  motion for contempt and sanctions hearing.

8      If the parties could state their appearances, please,

9  for the record, beginning with Plaintiffs' counsel.

10          MR. LEVINE:  Good morning, your Honor.  Jonathan

11  Levine for the Plaintiffs.

12          MS. DAVIS:  Anne Davis, Bleichmar Fonti and Auld,

13  also for the Plaintiffs.

14          THE COURT:  Okay.  Good morning.

15          MS. PRITZKER:  Good morning, your Honor.

16  Elizabeth Pritzker, Pritzker Levine, for the Plaintiffs.

17          THE COURT:  Okay.  Good morning.

18          MR. SOMVICHIAN:  Good morning, your Honor.  Whitty

19  Somvichian with Cooley, representing Google.  With me today

20  is Kelsey Spector.

21          THE COURT:  Okay.  Good morning to you both.

22      Everybody can be seated, and you can argue from the --

23  from counsel table.  Please do make sure you have the

24  microphone in front of you, and I'm sorry the Plaintiffs'

25  side has to share.  We only have two on the table.

4

1    We are here on the Plaintiffs' motion for a finding

2 that Google is in contempt of my orders dated August 26,

3 2022 and December 16, 2022 and Google's related motion for

4 sanctions related to that.

5    This is going to be -- this hearing is conducted in

6 public.  You saw my order I hope about that and the rules

7 that apply.  So, please, do respect -- respect the

8 protective orders in both the Calhoun matter and this one,

9 and if you feel it necessary, alert me before you say

10 something.

11    Any questions about how we're going to proceed?

12         MR. LEVINE:  No, your Honor.

13         THE COURT:  Okay.  Excellent.

14    So, I do have questions for the Plaintiffs.  It's the

15 Plaintiffs' motion.  As I understand it, the Plaintiffs are

16 focusing on two passages, one from my August 26, 2022 order

17 and the other from the December 16th, 2022 order.  Those

18 passages appear at pages two and three of the motion.  Those

19 are the -- the portions of the order that the Plaintiffs

20 believe have been violated by Google.

21    Is -- is that fair to -- to say that that -- those are

22 the -- that's the operative text?

23         MR. LEVINE:  In part, your Honor, yes.  I think it

24 also, as to the issue of what time period is the appropriate

25 period for the production, I think it also implicates part

5

1  of the December order that discusses the time sampling.

2          THE COURT:  Okay.  All right.  So, that's -- I get

3  it, the sampling piece which you address a little bit later

4  in the argument.

5          MR. LEVINE:  But in terms of the substantive

6  provisions of --

7          THE COURT:  Okay.

8          MR. LEVINE:  -- of the orders that required

9  certain information to be produced, I think you have to --

10          THE COURT:  That's the --

11          MR. LEVINE:  -- to identify the two --

12          THE COURT:  Okay.

13          MR. LEVINE:  -- the two paragraphs in question.

14          THE COURT:  All right.  So, then, when I read the

15  Plaintiffs' motion, the Plaintiff uses the formulation

16  "vertical information relating to the named Plaintiffs."

17  And, so, I'm -- I'm trying to understand very precisely what

18  the Plaintiffs are referring to when you use that

19  formulation in the brief.  So, vertical information relating

20  to the named Plaintiffs," do you mean that as a short of

21  shorthand for the two part -- the two passages from my

22  respective orders that are at page two and three?  Is that

23  -- is that how I should understand that or do you mean

24  something different, broader?

25          MR. LEVINE:  No.  I think it was trying to --

1  there were two orders and -- and your Honor in the orders
2  also sort of tried to, I think, summarize what we were
3  alleging in the complaints is vertical.  So, I think we were
4  trying to come up with a shorthand for the whole brief to
5  encompass that.  We weren't trying to go beyond what we
6  think you have ordered.

7          THE COURT:  Right.  Well, it's always a challenge
8  to figure out what I ordered, I guess, when we're faced with
9  a -- so, a sanctions motion or at least a motion contempt
10  it's extremely important to be very precise about what you
11  think the violation was, which requires that we be very
12  precise about what was ordered in the first place.  And, as
13  you all know, there was a motion for clarification.  I had
14  you all in, could not figure out hide nor hair what was
15  ambiguous about it, that -- and you disagreed on the
16  Plaintiffs' side that there was anything ambiguous about it,
17  and now I'm faced with this motion for contempt where I'm
18  trying to figure out was there a violation.

19      And, so -- so, here's -- here's what I am proposing to
20  you as what I understand you to be arguing.  So, when I
21  wrote the phrase, which is in my December order and is
22  quoted at page three, "verticals linked to account holders,"
23  I understand -- I understood at the time based on the
24  briefing and argument of the parties that verticals was some
25  kind of interest-based category or categories, and link I

7

1  didn't mean in any technical sense.  I meant it was

2  associated directly or indirectly with an account holder.

3      What my order says, though, is that Google must produce

4  documents sufficient to show for each named Plaintiff the

5  information, if any, that it provided RTB participants that

6  would permit those participants to infer information about

7  the account holder based on verticals linked with the

8  account holder.  In other words, I didn't broadly order

9  Google to produce any and all vertical information relation

10 to the named Plaintiffs.  I ordered this particular thing.

11     So, the Plaintiffs are absolutely right that my order

12 is broad enough to encompass information that goes from

13 Google to an RTB participant that allows that RTB

14 participant based on information it already has or has

15 access to to infer things about the account holder that

16 maybe Google didn't expressly disclose.  That is totally

17 within the scope of my order.

18     But what I'm a little bit worried about is that

19 Plaintiffs are arguing that Google was compelled by my order

20 to do something more than that, and that is the part that

21 I'm having some difficulty with.

22     So -- so, I would -- I would like for you all to

23 explain to me again in your own words what you think I

24 ordered and how -- and what you think they failed to do that

25 is within the scope of my order.

8

1          MR. LEVINE:  Okay.

2          THE COURT:  Okay.

3          MR. LEVINE:  So, I think the first -- so, the

4    first piece of it is pertaining or linked to the named

5    Plaintiffs.  So, it has to be that was shared and the

6    sharing occurs during a bid, in a bid, in a bid request.

7          THE COURT:  Bid request.

8          MR. LEVINE:  Okay.  So, it's named -- bid requests

9    so that are linked to one of the named Plaintiffs.  So --

10   so, that's sort of the first -- the first piece of how we

11   frame it.

12         THE COURT:  Um-hmm.

13         MR. LEVINE:  And then during the class period, if

14   it's -- if, as we understand your order, you seem to suggest

15   in the December 16th order that if Google didn't have to go

16   out and get advertiser permission, that, you know, you --

17         THE COURT:  Oh, I'm sorry.

18         MR. LEVINE:  Yeah.

19         THE COURT:  Let me just stop you there for a

20   minute.

21         MR. LEVINE:  Yep.

22         THE COURT:  And I want to -- I'm not ignoring, but

23   I want to put to the side the timing issues.

24         MR. LEVINE:  Okay.  That's fine.

25         THE COURT:  So, can we just focus on the it, the

9

1  information, the kind of information that was --

2      MR. LEVINE:  Fair enough.

3      THE COURT:  -- supposed to be disclosed.

4      MR. LEVINE:  It's the information pertaining to

5  the categories that would allow a participant in the bidding

6  to categorize in some way or infer information about the

7  named Plaintiffs that's transmitted as part of the bid

8  request.

9      THE COURT:  Exactly.  Okay.

10     MR. LEVINE:  That's what we understand --

11     THE COURT:  That's what I ordered.

12     MR. LEVINE:  Right.  And -- and, you know, we took

13 -- and we -- I will -- you know, I -- I've been practicing

14 -- Elizabeth and I have been practicing for 35 years each

15 together -- not together but for 35 years each.  I can count

16 on one hand the number of sanctions motions the two of us

17 have filed.

18     THE COURT:  Okay.  That's interesting.

19     MR. LEVINE:  But we take -- but -- but it goes to

20 the issue we were very careful -- it's a contempt motion,

21 and we were very careful to -- you know, we're very focused

22 in this motion as to what we think should have been produced

23 but wasn't, and there's only three data fields and then

24 identifier fields and then time period.

25     THE COURT:  Okay.  But the -- so, here's -- here's

1  one challenge for --

2          MR. LEVINE:  Yeah.

3          THE COURT:  -- for the contempt part of it.  You

4  are clear that you want the -- and I can say these fields

5  out loud I think, yes?

6          MR. LEVINE:  The opening brief was not filed under

7  seal.

8          THE COURT:  The brief, yeah.

9          MR. LEVINE:  So, anything in the opening brief --

10          THE COURT:  Right.  So, the user list --

11          MR. LEVINE:  Yep.

12          THE COURT:  -- contact labels and app categories,

13  those are the three fields that you say.  Those aren't

14  anywhere in my order.  So, those specific fields we all

15  agree they're not specifically called out in my order.  So,

16  it depends on under -- my understanding.  So, if I need to

17  grant your motion, I need to understand how those fields

18  correspond to what I have ordered.  So, that's -- that's one

19  issue, and that's -- so, that's pretty important.

20      But just getting back to like what did my order

21  communicate to Google that it had to do, so, I'm going to

22  ask you a hypothetical just so I -- from my understanding.

23  So, let's say we have an account holder who visits website

24  A.  We're going to call it website A.  And a bidder wants to

25  show an ad to whoever is visiting website A.  All the bidder

11

1  cares about is the fact that someone is looking at website

2  A.  The bidder doesn't know, doesn't care who the account

3  holder is, and Google doesn't share information.  This is a

4  hypothetical.  Google doesn't tell the RTB participant it's

5  account holder with this ID or something.  It doesn't --

6  doesn't share anything unique about that account holder

7  visiting the website A.

8      So, if Google issues a bid request for an ad to be

9  served to the account holder solely because that account

10 holder is on that website A, looking at that page, do the

11 Plaintiffs contend that that bid request is a disclosure by

12 Google that is within the scope of the order?  In other

13 words, does -- does your order say -- or does your motion

14 hypothesize that anything related to that bid request falls

15 within the scope of my order, even if the account holder is

16 like otherwise anonymous or does there have to be something

17 else?  Like, do -- does there have to be something else that

18 allows the RTB participant to identify the particular

19 account holder who's going to receive -- potentially receive

20 the ad?

21         MR. LEVINE:  That is not RTB.  That's a contextual

22 ad that's anonymous in which the named Plaintiffs --

23         THE COURT:  Okay.

24         MR. LEVINE:  -- weren't identified.  So, that's

25 not part of this case.

12

1          THE COURT:  Right.  So, that's not going to be --
2  that's not part of what you're trying to persuade me needs
3  to be disclosed.  Okay.

4          MR. LEVINE:  No.

5          THE COURT:  All right.

6          MR. LEVINE:  The -- the -- I think to -- to put a
7  little twist on your hypothetical --

8          THE COURT:  Yeah.

9          MR. LEVINE:  -- if I may, I think what would be in
10 our case is if a participant says, I want, you know,
11 everyone who has looked at Nike shoes, you know, I want
12 everyone who's looked at these Nike shoes --

13         THE COURT:  So, it's like the curated presentation
14 of --

15         MR. LEVINE:  It's -- right.

16         THE COURT:  Okay.

17         MR. LEVINE:  Now, if -- if -- and I want to show
18 ads to everyone who's -- who's looked at Nike shoes.

19         THE COURT:  Um-hmm.

20         MR. LEVINE:  If -- if it was anonymous, that's not
21 RTB.  I mean, what it -- but RTB is -- it's real-time
22 bidding.  I mean, you have to remember what real -- it's
23 real-time bidding.

24         THE COURT:  Yes, nanoseconds, right.

25         MR. LEVINE:  Right.  So, it's not everyone.  It's

13

1  -- it's -- you know, Susie Smith is right now looking at
2  Nike shoes, and we want to shoe her an ad, and what Google
3  is transiting is not just that -- is not just, oh, this
4  person is looking at.
5          THE COURT:  There's a person.
6          MR. LEVINE:  It's Susie Smith --
7          THE COURT:  Okay.  So, then --
8          MR. LEVINE:  -- is looking at an ap.
9          THE COURT:  Then let's talk about -- let's talk
10  about the -- the distinct field that you're asking about.
11  Okay.  So, I have to say in the motion, the description of
12  the fields was a little thin.  And let me -- let me just
13  share what my -- my problem is with the field.
14      So, as I already noted, I didn't -- I didn't actually
15  order Google to disclose these particular fields in my order
16  itself, but the user list is described as something that
17  includes signals that will show when a named Plaintiff sent
18  a previous communication on a specific topic or action user
19  lists are included as part of the user profiles that are
20  shared through RTB requests and also are available to RTB
21  participants for pre-targeting and other deals.
22          MR. SOMVICHIAN:  Your Honor?
23          THE COURT:  Yes?
24          MR. SOMVICHIAN:  Excuse me.
25          THE COURT:  Yes.

14

 1          MR. SOMVICHIAN:  I think if we're getting into the
 2  details --
 3          THE COURT:  That's -- I'm reading it like
 4  literally out of -- I don't think that's a redacted part of
 5  your motion.  That's in the opening motion, which is not
 6  redacted.  This is the characterization that the Plaintiffs
 7  have given.  I'm just literally reading from their
 8  unredacted brief.  So --
 9          MR. SOMVICHIAN:  Understood, your Honor.  I just
10  want to caution for counsel as well that if we're now
11  getting into specific internal functions and data sources --
12          THE COURT:  It's public.  What I just said is
13  public.  So, thank you.  If we go deeper than that, maybe
14  you -- you'll have an issue, but there's -- here's my -- my
15  point to Mr. Levine.  So, there's no citation in the record
16  for that discussion as a user list.  So, I'm -- I'm looking
17  at your -- your opening motion, and there's -- there's just
18  no -- it's -- it's on page five.  I mean, there's nothing
19  that refers me to anything.
20      So, what I'm -- what I'm wondering is -- and I can't
21  really understand this description honestly.  I'm not
22  entirely sure what you mean.  Signals that will show when a
23  named Plaintiff set a previous communication on a specific
24  topic or action?  I just --
25          MR. LEVINE:  I think in --

1          THE COURT:  It's a little vague, you know.

2          MR. LEVINE:  I think it's the example we may have

3    just been talking about, the Nike example, for example.

4    That would be an example of a user list, where there's a --

5    either Google at the request of -- of publishers is creating

6    a list of people who visit specific websites and that is the

7    user list.

8          THE COURT:  So --

9          MR. LEVINE:  So, if somebody wants to target

10   everyone who's looked at -- you know, maybe it's a

11   particular sneaker of Nike.  That's just one example.  It

12   could be anything.

13         THE COURT:  So, Google creates a list at the

14   request of the bidder or RTB participant of people to whom

15   the RTB participant would like in the future to send -- to

16   serve ads?  That's the contention?

17         MR. LEVINE:  Yeah.

18         THE COURT:  Okay.  And that's called a user list,

19   and Google stores that in a field is -- is the Plaintiffs'

20   contention.  And then when a bid request is sent, there's

21   some indicator or is it that only -- the only bid requests

22   that are sent are for such users as to a particular RTB

23   participant?  Is that the pre -- could you -- the parties

24   refer to pre-targeting, pre-filtering.

25         MR. LEVINE:  Right.

16

1      THE COURT:  Yeah.  Is that what you're targeting

2  about?

3      MR. LEVINE:  Our view is pre-targeting and -- pre-

4  targeting and pre-filtering are simply ways in which bid

5  participants can -- can narrow the -- what they -- what bids

6  they want to receive so they're not receiving every bid.

7  So, a bid participant could tell Google, Hey, we only want

8  to see -- we only want to see ads for people who are looking

9  for Nike sneakers right now or this or that.  So, it would

10 be pre-filtered so -- so the user list can be used or pre-

11 targeting and pre-filtering, and the can pre-target or pre-

12 filter by lots of different categories (audio glitch) are

13 used to narrow so that bid participants aren't flooded with

14 every single bid request.  They basically tell Google, Look,

15 we only want to bid on these kinds of things.

16      THE COURT:  Okay.  Okay.  So, if you were -- if

17 you were to get the discovery on the user list, you would

18 end up with a -- a set of -- I'm going to call them

19 transactions -- for the named Plaintiffs where they were

20 presented a -- a -- how should I put it?  They were

21 presented to RTB participants as -- to bid on, and there

22 would be a field in that R -- in that bid request that would

23 indicate this person is on user list whatever, A for Nike

24 shoes or user list B for something else, right?  That --

25 that's what the field would show?

17

1          MR. LEVINE:  It would -- it would provide the

2   reason why that person was receiving that ad.

3          THE COURT:  Okay.  But that would go --

4          MR. LEVINE:  I mean, that's --

5          THE COURT:  Your contention is that goes in the

6   bid request as opposed to it's stored in some database after

7   the fact but it doesn't actually go to the RTB participant

8   or is it just that it's kind of -- it's an inference that

9   someone would make?  Because I understand Google to say

10  someone may be on multiple lists for a particular RTB

11  participant and doesn't necessarily know why or as to --

12  with respect to what list someone is being, you know,

13  potentially targeted with an ad.

14         MR. LEVINE:  I think if it's used for pre-

15  targeting, it's within Google.  It may not be conveyed, but

16  if you remember the flow of information, the big participant

17  has already said, We only want to receive --

18         THE COURT:  Right.

19         MR. LEVINE:  -- these kinds of -- you know, we

20  only want to receive bids in this bucket.

21         THE COURT:  Okay.

22         MR. LEVINE:  So, Google has filled the bucket

23  already.  So, it's Google -- that may be a piece of internal

24  Google, but it's still associated with the named Plaintiffs,

25  so putting the named Plaintiffs in those buckets and then

1  putting out the bid requests so when the -- when that bid

2  participant gets that bid, it may not say pre-targeting, but

3  everyone knows it has to be --

4           THE COURT:  Okay.

5           MR. LEVINE:  -- pre-targeted because --

6           THE COURT:  That's how you got in the bucket?

7           MR. LEVINE:  That's how they got in the bucket and

8  the named Plaintiff still identified.

9           THE COURT:  But is there a scenario where the

10  particular -- what am I -- what's the word -- the particular

11  substantive data field that corresponds to a particular

12  categorization is actually sent to the RTB participant?  In

13  other words, is the user list data field populated in a bid

14  request so that the RTB participant can say, Oh, that's a

15  person who's on the list for Nike shoes or athletic

16  equipment or whatever the categorization is?

17           MR. LEVINE:  I don't know if it's outside of pre-

18  targeting.  I -- I personally don't know that.

19           THE COURT:  You just don't know?

20           MR. LEVINE:  I know for pre-targeting that it

21  presupposes that they're in the bucket already.  I don't

22  know whether there's a separate field generally for -- for

23  user lists or not.  It is still in Google's public

24  disclosures in terms of how they operate and -- and they do

25  talk about it in their public disclosures with respect to

19

1  pre-targeting and pre-filtering.

2          THE COURT:  Okay.  So, then let's move on to the

3  content labels one.

4          MR. LEVINE:  Um-hmm.

5          THE COURT:  And, again, I'm reading from the

6  public description about it.

7          MR. LEVINE:  Yep.

8          THE COURT:  Categories -- content labels are

9  described by the Plaintiffs as categories assigned by Google

10 based on the content of the publisher's page being visited

11 by the named Plaintiff, and it says that Plaintiffs contend

12 that Google still uses content labels for both pre-targeting

13 and bidding in RTB auctions.

14    So, how do the content labels differ from the user

15 list?

16         MR. LEVINE:  Well, I think content labels are a

17 categorization by Google -- I mean, a user list is a

18 specific thing.  It's a list -- a curated list of people who

19 have visited a specific web page or website or -- and it's

20 maintained either by the publisher or by Google at the

21 publisher's request.

22    Content labels are something within.  They're assigned

23 by Google, and they're -- it's based upon, again, what page

24 the -- you know, what kind of page or what  the URL is that

25 the --

1          THE COURT:  But they're labels assigned to
2    websites.
3          MR. LEVINE:  Yes.
4          THE COURT:  They're not groupings of people.
5          MR. LEVINE:  No.  That's right.
6          THE COURT:  So, how does the content label -- how
7    does disclosure of the content label field fit within the
8    scope of what I ordered?
9          MR. LEVINE:  I'm sorry.  Can you -- I'm sorry. Can
10   you --
11         THE COURT:  Yeah.  How does the content label
12   field fit within the scope of what I order if it's a label
13   placed on websites, not on -- doesn't group people?
14         MR. LEVINE:  Well, it's the website being visited
15   by the named Plaintiff.  I mean, so, if the named Plaintiff
16   is visiting Web MD to look at, you know, a health issue, it
17   would be categorized in some way as the health or something
18   like that.  That content label for that -- but that's -- and
19   that's what the named Plaintiff is -- that's the website the
20   named Plaintiff is on --
21         THE COURT:  Right.
22         MR. LEVINE:  -- in realtime.
23         THE COURT:  So, here -- here's what I understand
24   from my past orders.  I've already said that whatever the
25   bid request shares of the webpage on which the ad will be

21

1  placed goes -- goes to the RTB participant, and that has to

2  be produced, that field.  Okay.

3      So, the content label is a characterization of the

4  nature of the website.  So, if the website is May Clinic,

5  the content label will be something like healthcare site?

6              MR. LEVINE:  Right.

7              THE COURT:  So, that -- so, you want both things?

8              MR. LEVINE:  Right.

9              THE COURT:  Does the content label go to the RB

10 participant in the bid request or is it maintained only

11 internally by Google and never shared?

12             MR. LEVINE:  We think it may be used for pre-

13 targeting, again, but -- and, so, it would be a way of pre-

14 filtering.  You know, participants could pre-filter, say we

15 only want people in this bucket, the bucket being a -- kinds

16 of contents.

17             THE COURT:  So, Google says it doesn't use it for

18 either of those things, and I know you all have had some

19 opportunity to do deposition.  Do you have deposition

20 testimony that suggests that it is used for either pre-

21 targeting or that it's a field that goes to the RTB

22 participant so that they can then use it to identify what

23 they want to bid on or not?

24             MR. LEVINE:  Without disclosing the substance of

25 any --

22

1          THE COURT:  Yeah.

2          MR. LEVINE:  -- deposition, we haven't had that

3   many depositions, and the -- the specific substance of

4   fields other than a few fields, none of which are at issue

5   here because we don't have discovery of them yet, has not

6   been discussed so far.

7          THE COURT:  So, right now you don't have a basis

8   to know one way or the other whether the content label -- I

9   mean, whether Google is -- is incorrect in its

10  representations about how the content label field is used?

11         MR. LEVINE:  That is correct.

12         THE COURT:  Okay.

13         MR. LEVINE:  I mean, our view is -- our view is

14  these are all -- the three things we've focused on as the

15  fields that haven't been produced --

16         THE COURT:  Um-hmm.

17         MR. LEVINE:  -- are fields that are used by Google

18  to characterize the Web activity of the named Plaintiffs

19  that are used in the bid either for pre-targeting, which is

20  basically just bucketing in advance --

21         THE COURT:  Yeah.

22         MR. LEVINE:  -- or -- or for bids.

23         THE COURT:  So --

24         MR. LEVINE:  Content labels were used for most of

25  the class period.  I mean, I think --

23

 1          THE COURT:  They -- I'm sorry.  They were or were

 2   not?

 3          MR. LEVINE:  They were.  They were deprecated in

 4   2020.

 5          THE COURT:  Okay.

 6          MR. LEVINE:  So, they --

 7          THE COURT:  Yeah, no, I have all that.

 8          MR. LEVINE:  -- are used for four years of the

 9   class period.

10          THE COURT:  But the question is how are they used,

11   because I think, you know, the ground that's already been

12   covered in prior orders is that if something is used

13   internally by Google for its own purposes and not shared and

14   can't be inferred from the way in which it's used by Google

15   in the RTB process, then it's beyond the scope of what I

16   ordered.

17          MR. LEVINE:  It was shared in bid requests --

18          THE COURT:  So, the content --

19          MR. LEVINE:  -- until 2020.

20          THE COURT:  The content label field was shared in

21   the bid request?

22          MR. LEVINE:  Yeah.

23          THE COURT:  Okay.  So, that field went to an RTB

24   participant as part of the bid request?

25          MR. LEVINE:  And our -- and our understanding is

24

1  that it's still used now for pre-targeting purposes

2  internally within Google.

3          THE COURT:  Okay.

4          MR. LEVINE:  So, for four years of the class

5  period, it was shared with participants directly.

6          THE COURT:  Either shared or presently used to

7  sort of preselect who the RTB participant will present an ad

8  to?

9          MR. LEVINE:  Correct.

10          THE COURT:  Okay.  Now, let's move on to the app

11  categories.  In the papers, the Plaintiffs describe this as

12  the app equivalent of verticals for URL's included in RTB

13  request and that they're defined in a certain field.

14      So, same question.  This has to do with whether a

15  particular user who's been presenting an ad or is, you know,

16  prospectively going to be presented an ad, uses a particular

17  application, is that correct?  That's -- that's the theory

18  behind why you believe this discovery is within the scope of

19  my order?

20          MR. LEVINE:  Yes.

21          THE COURT:  Okay.  And, so, the app categories, is

22  that a data field that is part of the bid request or was

23  part of the bid request that goes to an RTB participant or

24  something that's used for preselection?

25          MR. LEVINE:  It was part of a bid request

25

1   obviously for certain kinds of bids, but it was part of a

2   bid request until 2020, and then it was deprecated, and our

3   understanding is it is still used for pre-targeting purposes

4   now.

5          THE COURT:  Okay.  Okay.  And is this only for --

6   so, the way this would happen is somebody's not on -- not

7   using -- or not in the particular application.  They're just

8   on the Web somewhere, but the fact that they are a user of a

9   particular application is what is getting used or

10  communicated.  Is that what the Plaintiffs contend?

11         MR. LEVINE:  Yes.

12         THE COURT:  Okay.  All right.

13         MR. LEVINE:  It's a way of -- again, a way of

14  categorizing them.  Say, if they'd been on -- if they have

15  an app for Web MD or some, you know, app that is -- sort of

16  characterizes them in some way --

17         THE COURT:  And --

18         MR. LEVINE:  -- or a dating app or, you know, any

19  -- any --

20         THE COURT:  So, is -- is the Plaintiffs' content

21  that with, you know, one or more of these three fields that

22  you're arguing about, that if an RTB participant gets the

23  information, either the preselection or the actual data

24  field, that the RTB participant then uses that information

25  for some other purpose or is it just enough that they know

1  it or it's shared with them in the fashion you've described?

2          MR. LEVINE:  We don't know what the --

3          THE COURT:  Okay.  No, but I'm --

4          MR. LEVINE:  -- participants do about --

5          THE COURT:  I'm talking about your theory of the

6  case.

7          MR. LEVINE:  We don't know what participants do,

8  but obviously it's behavioral, and it's -- you know, it's --

9          THE COURT:  Okay.

10          MR. LEVINE:  It's advertising directed to them.

11  So, the more the information the advertisers have --

12          THE COURT:  Yeah.

13          MR. LEVINE:  -- the more they're able to tailor

14  and decide, you know, whether this bid -- this person is

15  someone they want to bid on or not and how much to bid.  So,

16  you know, I think from the bid participant's perspective,

17  the more information they have and the more detailed

18  information, the more valuable it is and the better it is.

19          THE COURT:  Um-hmm.

20          MR. LEVINE:  So, if they are looking for

21  particular categories of information or particular -- you

22  know, it allows them to build a richer profile or see a

23  richer profile of the named Plaintiffs in each bid.

24          THE COURT:  Okay.  Let me ask one other question

25  about the -- the particular fields, and then I'll let you --

27

1  kind of what you want to tell me about sampling.

2          MR. LEVINE:  Sure.

3          THE COURT:  But, with respect to the particular

4  fields, you know, you noted just a moment ago that Google

5  says, well, this field was deprecated.  Maybe all of them

6  have been deprecated for at least one purpose now, and maybe

7  they're doing these for a different purpose.  But you raise

8  the question of preservation.

9      You know, this motion doesn't have any of the things

10 that one would typically expect if I were getting a

11 spoliation motion or anything like that.  And, you know,

12 there is a dispute between the parties about the timing --

13 maybe then that's not a dispute.  I mean, Google says once

14 we got the notice of suit, we took steps to preserve, and

15 those dates kind of align with what seems to be available.

16 So, unless there's going to be a dispute down the line

17 about, oh, no, you should have preserved much earlier than

18 the notice of the lawsuit, that's -- that's not really

19 before me.

20     So, you know, I can order what I order, but if it

21 doesn't exist, it doesn't exist.

22          MR. LEVINE:  Well --

23          THE COURT:  And, you know, I -- so, I -- but I'm

24 not sure that this motion for contempt is really the right

25 vehicle for addressing those concerns which are really more

28

1  of a spoliation issue.

2      So, could you respond to that observation?

3          MR. LEVINE:  Yes, I -- I can.  And there's --

4  there's several different answers.  So, as your Honor is

5  aware, we've been seeking this information for a long time.

6  Google has, you know, fought hard and long to prevent -- to

7  not produce it, and it wasn't until the day of the court-

8  ordered production date, January 31, that Google finally

9  fessed up and said, "We don't have some of this stuff."  And

10 that is contrary to what they assured us and the assured the

11 District Court and I think they assured you in terms of what

12 their -- what they were maintaining relative to this suit.

13     We don't have enough information right now, and Google

14 is refusing to talk to us about these issues and provide any

15 information to us about where they searched, when they

16 searched, what they searched, where information exists,

17 whether it exists other than the places they liked to

18 search --

19         THE COURT:  Okay.  But kind of --

20         MR. LEVINE:  -- or when it was spoliated.  So,

21 we're not ready.

22         THE COURT:  Yeah.  You're --

23         MR. LEVINE:  We think of spoliation --

24         THE COURT:  -- ready.  I think that's the -- so,

25 that's the right answer.  Okay.

1          MR. LEVINE:  So, the short answer is there is a

2    spoliation motion that's coming your way.

3          THE COURT:  Oh, great.

4          MR. LEVINE:  It's just not ripe yet.

5          THE COURT:  Okay.

6          MR. LEVINE:  But this motion does raise  -- the --

7    the response to this motion and dragging this motion out of

8    Google does raise very serious, in our mind, spoliation

9    issues.

10         THE COURT:  Okay.  Well, I'm -- I'm not going to

11   deal with spoliation.

12         MR. LEVINE:  We understand.  We're not asking for

13   that.

14         THE COURT:  I'm just going to make it really clear

15   so that we don't belabor that for this hearing.

16       Okay.  Back to the sampling issue.  So, you know,

17   here's my take on what I ordered.  So, in December of 2022,

18   I directed the parties to confer about sampling as to the

19   named Plaintiff's data, and I made a distinction in that

20   order between data that required notice to customers by

21   Google, recognizing there was some burden associated with

22   that, and data that didn't require notice to anybody, that

23   could just be produced without limitation with respect to

24   the named Plaintiff's data.

25       I have a -- I have not forgotten I have a whole

30

1 separate discovery dispute about sampling, and I viewed this

2 little sampling discussion as -- as kind of sucking that

3 dispute into this proceeding, and I -- it just didn't make

4 sense that you all were approaching it that way.  So, you

5 know, I have already ordered that if Google has data for

6 these detected verticals for named Plaintiffs during the

7 class period, it should produce that.

8     My recollection is Google told me a couple of hearings

9 ago that it did not.  I said look for it in other places.

10 So, maybe it's done that, maybe it hasn't.  But as far as

11 the -- the sampling, that was really triggered of whether

12 there's a burden for this -- based on this notice

13 requirement.  And if there was some other scheme for

14 sampling, I had ordered you all to talk about it.  So -- so,

15 my point is is that the December 16th, 2022 order was not

16 overwriting that direction to the parties about the need to

17 confer about sampling and representative sampling and all of

18 those things.

19     So, I'm -- you know, I'm not sure if you're taking a

20 line in my order and just kind of running with it, but that

21 remark about detected verticals had to do with the

22 acknowledgment to my mind in the hearing that preceded that

23 order where Google said, Yeah, we used to have this detected

24 verticals field that we did disclose with bid requests, but

25 we deprecated it well before the suit was filed.  And I

31

1  said, Well, go look for it and see if it's -- you know, you

2  can produce it because the -- the class -- in recognition

3  that the class period went back in time.

4      So -- so, that's what that was about, and I just -- I'm

5  a little bit worried that you're kind of running with that

6  and saying that applies to everything, user lists, content

7  labels, everything.

8          MR. LEVINE:  Well, it's the vertical.  It's the --

9  you ordered Google to produce a certain set of information

10 on -- by no later than January 31.

11         THE COURT:  Um-hmm.

12         MR. LEVINE:  So, the question then is, so, they

13 had to do that, even though there's a time dispute debate

14 going on, and so the question then is what did they produce,

15 and did it violate -- did it violate an order.

16     Now, our position is that you can read the -- you can

17 read your -- your discussion of time sampling, which

18 provided guidance since you haven't resolved the time

19 sampling issue yet.  It provided guidance.  And our position

20 is Google violated it either way.  One is they've made no

21 showing whatsoever that it's burdensome to produce for the

22 entire class period for the named Plaintiffs all of the

23 information required to be produced on January 31.  That's

24 number one because they haven't said, Oh, we have to go out

25 and get publisher permission for any of this stuff.  So,

32

1  they should have produced it for the -- to the extent it

2  exists for the entire class period.  And then, if they don't

3  have it for a period of the class period, we can have a

4  discussion as to whether it was -- doesn't exist because it

5  was destroyed in the ordinary course of business properly or

6  whether it was spoliated.

7             THE COURT:  Um-hmm.

8             MR. LEVINE:  That's -- that's option one, path

9  one.  Path two is what your Honor said is if you do

10 sampling, Google, you have to justify your sampling, and it

11 has to be representative of -- the sample is representative

12 of such that Plaintiffs can rely on it in making the

13 arguments they wish to make for class certification.

14            THE COURT:  I told you to talk about that, but I

15 didn't actually in my December 16th order say you shall do

16 this or you shall do that with respect to sampling.  I

17 ordered you to go talk about it.

18            MR. LEVINE:  But -- but they have a -- they have a

19 date to comply.  If they wanted to have that discussion with

20 us --

21            THE COURT:  Yeah.

22            MR. LEVINE:  -- there's something called the

23 telephone.  They could have --

24            THE COURT:  Yeah.  Okay.

25            MR. LEVINE:  -- picked up the phone and moved for

33

1 clarification.

2          THE COURT:  This is not helpful.

3          MR. LEVINE:  But, no, but --

4          THE COURT:  Not helpful.

5          MR. LEVINE:  -- that is the way it works.

6          THE COURT:  It's not -- it's not helpful.

7          MR. LEVINE:  Okay.

8          THE COURT:  So, I'm -- I'm being asked to hold

9 Google in contempt.

10          MR. LEVINE:  Yeah.

11          THE COURT:  You have to make a clear and

12 convincing showing to me that there's a violation of the

13 court order, a specific court order giving them notice.  So,

14 let's focus on that.

15          MR. LEVINE:  Okay.

16          THE COURT:  All right.

17          MR. LEVINE:  Let us say -- okay.  So, then they

18 say, Well, we were allowed to do sampling until then, but

19 it's not a representative sample --

20          THE COURT:  Okay.

21          MR. LEVINE:  -- because it doesn't include when

22 they were actually sharing the verticals.  How can -- that

23 can't be representative --

24          THE COURT:  Yeah.

25          MR. LEVINE:  -- if -- and that's an -- so, we

34

1  asked them, you know, Are you going to concede that for

2  class certification, and they say no.

3          THE COURT:  Okay.  All right.  I think those are

4  the questions that I had for the Plaintiffs.  If there's

5  anything else you'd like to share with me in support of your

6  motion, please do that now.

7          MR. LEVINE:  Yes.

8          THE COURT:  Otherwise, I'm going to turn to

9  Google.

10         MR. LEVINE:  Yes.  So, the other issue is the

11 identifiers.

12         THE COURT:  Okay.

13         MR. LEVINE:  Which is the third piece of this,

14 which is that they have removed the identifiers for each --

15 for each bid request that was produced, we have a query ID,

16 but we don't have any identifiers that link them to the

17 named Plaintiffs, and Google's answer to that is, Well, you

18 can go do that.  You can go put that piece back together.  I

19 mean, they literally say this.  You can go take it and take

20 this information that we've given you and, using the query

21 ID, relink it up to information you've previously produced

22 from other sources and put it all back together, and then

23 you'll get to the named Plaintiffs.  And there's -- there's

24 a bunch of problems with that.  One is it's not ordinary

25 course of business.  Two is they had to have that

35

information to pull these specific queries.  They had to

know the came from the named Plaintiffs.  How did they know

that these are the named Plaintiffs' bid requests if they

didn't have their identifiers?  So, those existed in the

logs from which they pulled this information, and they

removed those fields.

Number two is to the extent that it requires us to go

piece back together information that has been disaggregated

by Google, it creates prejudicial admissibility and

authenticity issues for us at trial because it forces us,

the lawyers, to create new evidence because we're putting

back together what Google has disaggregated.

So, if we try and put that evidence in front of a

witness or get it admitted at trial, it's not going to be

authentic or admissible because it's a lawyer-created, you

know, concoction from multiple different sources.

THE COURT:  Do you have these ID indicators that

you refer to in the papers in the prior data set that you

got?  So, if I understand, Google is saying you can just

match up the query ID's and you can take this additional

information that we've produced, and it can become part of

your data set.

So, my question, does that earlier data set include the

identifiers that you're referring to?

MR. LEVINE:  It can be done, but I'm not sure.  I

36

think there's still some of these data fields that we've

moved on separately that are part of one of the other

pending named Plaintiff disputes.

THE COURT:  Okay.  Well, in other words -- okay.

So, there may be some dispute about that, but all right.  I

-- I mean, it sounds -- it sounds to me like what Google is

saying is we just -- we produced the specific things.  I'm

not even sure what it is because there's not really a

description of what this other stuff is that actually got

produced, but we produced this other stuff and keyed it with

the query ID so that you could get together.  But they're

producing subsets of things as you -- as I resolve disputes

between the parties.  They produce a little bit more here, a

little bit more there.

So, you know, I don't think I addressed this level of

detail in my orders, though, is where I'm going with this is

I appreciate that there may be some difficulty in matching

up subsequent productions with earlier productions and

linking it, and we can address that.  But is that really a

motion for contempt?

MR. LEVINE:  yeah, because you ordered them to

produce this information for the named Plaintiffs, and the

logs they pulled this information from has to have the ID,

the Gaia ID or the Biscotti ID or the (indiscernible) for

the named Plaintiffs, and they didn't produce that.  So, I

1  don't know how they can comply with your order and say with

2  a straight face that each of the ones that they produced is

3  for the named Plaintiffs when they've pulled that -- they

4  have that and they pulled it out to make it harder for us

5  and to make it harder to show a jury in one spot, just like

6  the information is maintained at Google.  That is a -- that

7  is a violation of the Federal Rules, and it is -- it is --

8  it is not complying with your order.  Your order said

9  produce it for the named Plaintiffs.  There's nothing in

10 what they've produced that says this is for the named

11 Plaintiffs, and they have that information, and they

12 withheld it, and that is contemptuous.

13           THE COURT:  Okay.  Anything else on the motion?

14           MR. LEVINE:  No, your Honor.

15           THE COURT:  Okay.  Let me turn to Google.  I'm

16 sure there are a number of things you'd like to respond to,

17 but I do have some questions first.

18      The -- the category of information that I think is

19 highlighted by these three data fields is -- well, I -- I'm

20 going to just describe it the way I -- I've been thinking

21 about.  You tell me if this makes sense.

22      There's -- there's something that could be described as

23 categorizing users.  There's something that I think Google

24 describes as categorizing websites, but then there's really

25 this third category which is categorizing users by names of

1 the websites they visit and with respect to the third data

2 field that the Plaintiffs want, the applications they use.

3    So, it's sort of this inferential categorization that

4 the Plaintiffs contend is communicated to RTB participants

5 indirectly. So, there's not a label that says this person is

6 someone who visits Nike shoe websites but that by virtue of

7 this user list or content labels, this sort of preselection,

8 pre-targeting behavior in terms of who is presented to an

9 RTB participant based on that customer's preferences, there

10 is this inferential indirect information communicated.

11    So, you know, the -- that's what I -- that's what I

12 sort of gleaned is the -- is the crux of Plaintiffs'

13 argument for why this information's within the scope of my

14 order, and I would really like you to respond to that.

15        MR. SOMVICHIAN:  Your Honor, as we understood your

16 order from December -- and I've probably read it 50 times by

17 now -- and the thing that jumps out at me each time is the

18 -- the repeated limitation to data that's linked to a user.

19 And we do draw a distinction between that on the one hand

20 and something that's tied to a website.

21        THE COURT:  Um-hmm.

22        MR. SOMVICHIAN:  And, to be clear, even the data

23 that we produced we felt to be beyond the scope of the

24 order.  Why?  Because it's not shared with RTB bid

25 participants.  It's used only internally, and there are

39

1  categorizations of websites and not users.  We produced

2  that.

3          THE COURT:  Yes, but -- and I'll get to -- I want

4  to understand what you did produce, but -- but the part of

5  my order that I think is -- I'll read it.  It's the same

6  part that I -- I read to the Plaintiffs, which is that --

7  so, the first part was very explicit, that Google has to

8  produce for each named Plaintiffs the verticals data sales

9  that are shared with RTB participants.  We're not talking

10  about that right now.  We're talking about the second part,

11  which is Google must produce documents sufficient to show

12  for each named Plaintiff the information, if any, that it

13  provided to RTB participants that would permit those

14  participants to infer information about the account holder

15  based on verticals linked with the account holder.

16      So, the -- the nature of the linking may -- there -- I

17  think there -- I think maybe what you were trying to get me

18  to clary way back when, when you thought about whether I

19  should clarify anything, is the nature of the linking.

20  Okay.  So -- so, now that I get it or maybe get it, the --

21  the linking is -- is not meant to be a technical linking in

22  any way, shape or form.  It's -- it's more of an

23  association.

24      So, if what -- if what Google is doing is what the

25  Plaintiffs describe, which is grouping people in terms of

1  some behavior that they've engaged in on those websites --

2  so, these are people who like to go to athletic shoe

3  websites, that kind of thing, and then is using that to pre-

4  filter.  Even if that information is never expressly

5  disclosed to an RTB participant, I can see why they want it.

6  I can see why they want it.  It's not entirely clear to me

7  that it's literally within the scope of my order, but I can

8  see why they want it, and it makes sense to me that they

9  would want that.

10      So, anyway, that's -- that's what I'm trying to focus

11  on is I -- I think that you -- you all are reading like

12  little pieces of my order in isolation, and that's not what

13  I meant, and I apologize if I was not sufficiently clear,

14  but I -- for the life of me, I went back and read our

15  transcript of our hearing when you tried to tell me what you

16  needed clarification on and it was just a rant on the

17  Plaintiffs' side, and I couldn't figure out from Google what

18  you actually were trying to get me to distinguish between.

19      So, maybe it's my fault, but now I think I understand

20  why you care.  So, I apologize for interrupting, but that's

21  what I think is the focus of what Plaintiffs are asking

22  about.

23          MR. SOMVICHIAN:  Thank you for the clarification,

24  your Honor.  And, so, I think we need to go piece by piece

25  in terms of the specific data fields because what you just

41

1 explained in terms of what's in and what's out of the order

2 maps differently to each of the -- the three categories.

3            THE COURT:  Okay.

4            MR. SOMVICHIAN:  So, if -- if you take the content

5 -- I'm sorry -- the detected content labels.

6            THE COURT:  Content labels.  Okay.

7            MR. SOMVICHIAN:  Yes.

8            THE COURT:  And is it called detected content

9 labels?

10            MR. SOMVICHIAN:  And I'm sorry.  It's -- I'm

11 mixing up terms.  It's just content.

12            THE COURT:  Content labels.  Okay.

13            MR. SOMVICHIAN:  That is used for filtering,

14 but --

15            THE COURT:  And what do you mean by filtering?

16            MR. SOMVICHIAN:  It's to filter out things that

17 you don't want.  So, when an ad -- what an RTB participant

18 can do is as part of their ad campaign select, I don't want

19 bid requests for ad opportunities on particular categories

20 of -- of websites because of the -- of the subject matter.

21            THE COURT:  And are they doing that based on some

22 checklist of available categories?

23            MR. SOMVICHIAN:  Yes.

24            THE COURT:  Okay.  So, they just check -- check

25 no, and then the ones that are left are the ones that they

42

1  do want?

2          MR. SOMVICHIAN:  Yes.

3          THE COURT:  Okay.  So, it's not just negative.

4  It's negative and affirmative.  They're making a selection?

5          MR. SOMVICHIAN:  No.  For -- for content labels,

6  it's only to filter out what you don't want to get.

7          THE COURT:  Leaving what you do want to get?

8          MR. SOMVICHIAN:  And everything else is -- is

9  potentially eligible to be received as a -- as a bid

10 request.

11         THE COURT:  Okay.

12         MR. SOMVICHIAN:  But because of that, there is no

13 association, whether it's direct or indirect, to an

14 individual user.  So, if when they get a bid request, it's

15 for a particular user by a pseudonymous identifier, they

16 don't know how that maps to the content labels that they did

17 not want to receive ad opportunities for.  There's no

18 connection indirectly or indirectly (sic) in -- in that

19 circumstance.

20         THE COURT:  But they could say it's one of the 50,

21 100, 1,000 that we didn't deselect or that we didn't say no

22 to, right?  That's what they -- that's the information they

23 have?  It's one of the 1,055 that we didn't check off?

24         MR. SOMVICHIAN:  In theory, yes, you could -- you

25 could infer that from the -- the process.

1          THE COURT:  Okay.  Yeah, okay.

2          MR. SOMVICHIAN:  But, as we understood your order,

3   your Honor, that wouldn't have been a vertical shared with

4   RTB participants that is linked to the account holder.

5   Maybe you'll tell us it's wrong because of a broader

6   interpretation of indirectly.

7          THE COURT:  Um-hmm.

8          MR. SOMVICHIAN:  But that's how we interpreted it.

9   That's why we viewed this to be even further afield than the

10  information that we produced because of the fact that it's

11  only used to filter out things that an advertiser does not

12  want to receive, and so it, therefore, doesn't tell you, in

13  our view, anything indirectly or directly about the -- the

14  user.  That's number one.

15         THE COURT:  Okay.

16         MR. SOMVICHIAN:  With respect to user lists --

17         THE COURT:  Um-hmm.

18         MR. SOMVICHIAN:  I think the -- the key

19  distinction here is that these are not interest-based

20  categories that Google creates and assigns people to.  These

21  originate with the RTB bidder.  So, they can determine here

22  is a list of cookie ID's.  These are people -- and -- and

23  they can generate that however they've generated it based on

24  whatever criteria they've developed, and they can upload

25  that and say, We want bid requests for these cookie ID's

44

1   when you -- when they're detected elsewhere.

2           THE COURT:  Um-hmm.

3           MR. SOMVICHIAN:  That's information that they

4   originate.  That's not information that Google shares.

5   That's not information that --

6           THE COURT:  But why does that matter?

7           MR. SOMVICHIAN:  Because the -- the order related

8   to verticals and in the Plaintiffs' definition of verticals,

9   these were interest-based categories determined by Google

10  and assigned to individual users.

11          THE COURT:  Does my order say it has to be

12  determined by Google?  Let me just look.

13          MR. SOMVICHIAN:  I would look at page four of your

14  December order, your Honor, lines 12 to 15.

15          THE COURT:  Well, it just says that it groups them

16  into interest-based categories called verticals.  It doesn't

17  say who inspires the grouping.

18          MR. SOMVICHIAN:  So, in -- I'm looking at line 13.

19  In the operative complaint --

20          THE COURT:  Yeah.

21          MR. SOMVICHIAN:  -- Plaintiffs allege that Google

22  collects personal and sensitive information about account

23  holders, groups them into interest-based categories called

24  verticals and then shares the vertical or information about

25  the verticals with RTB participants

45

1          THE COURT:  Well, so, is --

2          MR. SOMVICHIAN:  So --

3          THE COURT:  But I think what the Plaintiffs would

4  say is if Google is taking the input from the RTB

5  participants and creating a list at their behest of folks,

6  of cookies or whatever it is that they want to have the

7  opportunity to bid -- you know, bid on, it doesn't matter

8  who generates the cookie list in the first place.  It's --

9  Google's implement that.  That's -- I think that's their

10 thesis.

11         MR. SOMVICHIAN:  Understood.  And, your Honor, you

12 might -- you might tell me that you intended that to be

13 included as the -- as part of your order.  The way we

14 interpret it was that these are interest categories that

15 Google assigns individual users to.

16         THE COURT:  Yes.

17         MR. SOMVICHIAN:  Not things that originate with

18 the RTB participants that they already know of.

19         THE COURT:  Okay.  Okay.  But once you have that

20 list, then is it used in the way that Mr. Levine described,

21 to sort of preselect?  I mean, that's the -- the whole

22 point, right?

23         MR. SOMVICHIAN:  Yes.

24         THE COURT:  Okay.

25         MR. SOMVICHIAN:  To that extent, yes.  I think the

46

1   -- the part I got maybe a bit confused was whether that

2   information is included in the bid request.

3              THE COURT:  Right.

4              MR. SOMVICHIAN:  It is not as far as we understand

5   it.  So the particular data field --

6              THE COURT:  And never was?

7              MR. SOMVICHIAN:  So, the -- the Stan Belloff

8   (phonetic) declaration addresses this.

9              THE COURT:  Yeah.

10             MR. SOMVICHIAN:  And there's a particular data.  I

11  don't want to get into the --

12             THE COURT:  You want to --

13             MR. SOMVICHIAN:  -- details on -- on the record.

14             THE COURT:  -- tell me the paragraph number --

15             MR. SOMVICHIAN:  Yeah.

16             THE COURT:  -- of his declaration or the -- the

17  paragraph?

18             MR. SOMVICHIAN:  Yes.

19             THE COURT:  Yeah.

20             MR. SOMVICHIAN:  That's paragraph three, your

21  Honor.

22             THE COURT:  Okay.  Right.  Okay.  So, that's the

23  timing of its use, okay.

24             MR. SOMVICHIAN:  And the last -- the last

25  category, the app categories, to -- to be clear, the --

47

1  these are -- these are not simply app categories that Google
2  shares to tell RTB participants that, hey, this is a -- this
3  is a user who has used this application.  That -- that's not
4  what it is.  As I understand it, it's the -- it has to do
5  with the ad opportunity and where the ad would be shown in
6  connection with the bid request.
7      So, it's not simply information about a user.  It's a
8  categorization of where the advertisement would be shown
9  and --
10          THE COURT:  That doesn't make any sense.  So, I'm
11  sorry.  How -- how is something called an app category about
12  where an ad might be shown on a website?
13          MR. SOMVICHIAN:  We're talking ads that could be
14  shown in a mobile app.
15          THE COURT:  On, in -- okay.  That was a question I
16  asked Mr. Levine.
17          MR. SOMVICHIAN:  Yeah.  So, it's not --
18          THE COURT:  But I --
19          MR. SOMVICHIAN:  It's not --
20          THE COURT:  So, it's only for ads shown in a
21  mobile application?
22          MR. SOMVICHIAN:  That's my understanding.  It's
23  not --
24          THE COURT:  Like an in-app ad?
25          MR. SOMVICHIAN:  Yes.

48

```
 1            THE COURT:  That's what that is?
 2            MR. LEVINE:  And I apologize if I got that wrong,
 3  your Honor.
 4            THE COURT:  No, I'm just --
 5            MR. SOMVICHIAN:  Yeah.
 6            THE COURT:  That seems like a kind of different
 7  animal than what -- most of what we're talking about.  So,
 8  is -- do RTB -- let me just ask a fundamental question.  Do
 9  RTB participants have an opportunity to bid on in-app ads?
10            MR. SOMVICHIAN:  The ads could be shown in mobile
11  apps in certain circumstances.
12            THE COURT:  Okay.  So -- so, it is kind of within
13  the relevant universe of ad showing for this litigation?
14            MR. SOMVICHIAN:  Yes.
15            THE COURT:  Okay.
16            MR. SOMVICHIAN:  And, again, the distinction we
17  drew, your Honor, is that these are categorizations of apps,
18  not users.  Google didn't assign individuals to certain
19  interest categories and allow people to -- or allow RTB
20  participants to target as to them.
21       This is information context for RTB participants to
22  know where their ad could potentially be shown.
23            THE COURT:  Is it like --
24            MR. SOMVICHIAN:  That's why we --
25            THE COURT:  Is it like the content labels field
```

49

1 that we were talking about for websites?

2          MR. SOMVICHIAN:  Different in that the content

3 labels, remember, are ways to pre-filter what you don't want

4 to get.

5          THE COURT:  Right.  So, this is a positive filter?

6          MR. SOMVICHIAN:  Correct.

7          THE COURT:  But it's -- it's used in the same way.

8 So, it's like we want our ads to be shown in these apps.

9 You can kind of select which ones.  Is that the -- the way

10 it works?

11          MR. SOMVICHIAN:  Yes, your Honor, but -- and the

12 additional context run app categories, though, is that these

13 -- these aren't even specific to RTB or -- or targeted

14 advertising.  These are public categories.  Apple has a

15 categorization of apps in its App Store.  Google Play has

16 it's own --

17          THE COURT:  Yeah.

18          MR. SOMVICHIAN:  -- categorization.  But these are

19 generally to -- to group apps together in -- in various app

20 stores.  They're not specific to RTB.  They're not specific

21 to advertising.

22          THE COURT:  But isn't that the same -- the -- true

23 for some of these other fields?  They're not specific to

24 RTB, but they are used in RTB?

25          MR. SOMVICHIAN:  That could be the case, your

50

1 Honor.  But with respect to these, the -- the additional

2 fact is that they're -- while -- while you can choose to

3 pre-filter based on them, again, the distinction that we

4 drew is that these are not user specific interest categories

5 that Google has created for purposes of advertising

6 targeting.

7         THE COURT:  Okay.  Okay.  I -- I understand.

8     What information did Google actually produce that it

9 didn't feel was within the scope of the order but produced

10 to avoid a dispute?

11        MR. SOMVICHIAN:  Unsuccessfully, your Honor,

12 but --

13        THE COURT:  Yeah.

14        MR. SOMVICHIAN:  -- what we did ultimately decide

15 to produce was internal data, and I -- I don't want to get

16 into --

17        THE COURT:  But --

18        MR. SOMVICHIAN:  -- particular names --

19        THE COURT:  But is it --

20        MR. SOMVICHIAN:  -- of fields, but --

21        THE COURT:  You describe it as the internal

22 website verticals data.  Are those -- is that something that

23 we have discussed before or not?

24        MR. SOMVICHIAN:  Yes.

25        THE COURT:  Okay.

51

1          MR. SOMVICHIAN:  So, they're data fields that are

2    used internally to implement this pre-filtering --

3          THE COURT:  Okay.

4          MR. SOMVICHIAN:  -- process.

5          THE COURT:  But they don't include the three

6    fields that we're talking about now?

7          MR. SOMVICHIAN:  No.

8          THE COURT:  Okay.  And what distinguishes them

9    from the three fields we're talking about now?  Like, where

10   does -- without, you know, telling me the -- what is the

11   nature of these things that you produced?

12         MR. SOMVICHIAN:  Yeah.  So, they're -- these are

13   the categories that RTB participants can choose to pre-

14   filter so that they receive bid requests from these 10

15   categories.

16         THE COURT:  So, it's the content labels?

17         MR. SOMVICHIAN:  They're -- they're similar to

18   content labels.

19         THE COURT:  Okay.

20         MR. SOMVICHIAN:  But they're no -- they're no

21   longer included in bid requests.

22         THE COURT:  Okay.

23         MR. SOMVICHIAN:  So, an RTB bid -- an RTB bidder

24   can still opt to pre-filter their bid request.  We only want

25   a bid request associated with these 10, 20, whatever number

52

1  of categories.  If they win that ad opportunity, they don't

2  get information on the -- they will know where the ad will

3  be shown, what website.  They will not get the

4  categorization that's associated with that website.  So, in

5  that sense, it's used only internally at Google to implement

6  the pre-filtering, but it's not shared in the bid request.

7            THE COURT:  So, the advertiser would just know it

8  would be one -- it's going to be one of the 10 that I

9  selected?

10            MR. SOMVICHIAN:  Exactly.

11            THE COURT:  But that's it.  Okay.

12            MR. SOMVICHIAN:  And, again, your Honor, because

13  that is not shared with RTB participants, it's not

14  associated with individual users in terms of grouping those

15  individuals into interest groups but, rather, as a

16  categorization of websites.

17            THE COURT:  Um-hmm.

18            MR. SOMVICHIAN:  We didn't feel that that was

19  covered by your -- by your order, but we produced it,

20  nonetheless, in --

21            THE COURT:  Okay.

22            MR. SOMVICHIAN:  -- the ultimately failed attempt

23  to -- to try to avoid a dispute.

24            THE COURT:  All right.  I -- I understand.  Okay.

25  And I -- I think I should just be candid with you all that I

1  thought that our prior discussions were about something that

2  everybody agreed on was called verticals and that you all

3  understood what that meant, even if I didn't have the

4  complete understanding of what it meant.

5       So, it's expanded beyond verticals to other things that

6  might be informative, but that was my original

7  understanding.

8       Okay.  Let me ask a question about this, for lack of a

9  better word, things that have been deprecated and are no

10 longer used the way they might have been used earlier in the

11 class period.

12      So, there are a couple of dimensions here.  There is

13 does the data still exist and then, for data that exists,

14 should it be sampled.  And my recollection and what's baked

15 into my order is that sampling was meant to address, as I

16 explained to the Plaintiffs, the idea that you would have to

17 give notice to anyone who thought it was their data, so,

18 notice to customers.  You have a contractual notice

19 obligation, not a consent obligation but a notice obligation

20 before producing, and that was potentially burdensome

21 because of the sheer number of people involved.

22      So, does any of the -- do any of the three data fields

23 that we're talking about, user lists, content labels, app

24 categories, have a notice requirement associated with them?

25           MR. SOMVICHIAN:  If -- if they were produced in

54

1  isolation, just those data fields, without the context

2  around the additional bid request information associated

3  with -- with the data, there may not be a notice

4  requirement.  It could also overlap, your Honor, with --

5  with publishers to whom Google has already provided notice.

6           THE COURT:  I see.

7           MR. SOMVICHIAN:  So, it --

8           THE COURT:  So, it depends?

9           MR. SOMVICHIAN:  It depends ultimately on the

10 scope of the -- of the production and the particular

11 publishers that we're talking about.

12          THE COURT:  And did Google have to go through the

13 notice -- well, when you did the internal website, what you

14 call the internal website verticals data production, was

15 that a sampled production, meaning did it conform to the

16 prior -- the prior sampling with the six -- the six discrete

17 weeks?

18          MR. SOMVICHIAN:  Yes.  We -- we tied that to the

19 same six one-week --

20          THE COURT:  Okay.

21          MR. SOMVICHIAN:  -- sample periods.

22          THE COURT:  Okay.  So, for things that are old,

23 you know, one of the concerns I have is that those -- those

24 six weeks may not do it if there are other data sources that

25 would reveal behavior, you know, sharing of information that

1  -- that no longer is happening.  And, so, I'm just going to

2  ask again with respect to things like the old detected

3  verticals field that goes back to later, I mean, I was told

4  in a prior hearing that that didn't exist and sent your

5  colleague off to go explore whether there was some other

6  data source that would reflect what was shared, even if the

7  logs where that would normally be reported didn't exist.

8      So, are you -- are you telling me now that that

9  information just no longer exists anywhere?

10             MR. SOMVICHIAN:  Correct, your Honor.

11             THE COURT:  Okay.  And you've investigated that?

12             MR. SOMVICHIAN:  Based on our investigation --

13  additional investigation, that is the case.

14             THE COURT:  Okay.

15             MR. SOMVICHIAN:  Yes.  And that --

16             THE COURT:  Yeah.

17             MR. SOMVICHIAN:  And that is also confirmed with

18  respect to the -- the form of the data fields that we're

19  talking about as they existed in bid requests.

20             THE COURT:  Um-hmm.

21             MR. SOMVICHIAN:  That is also addressed in the

22  Belloff declaration.

23             THE COURT:  Yeah.  No, I -- I saw that there were

24  -- there were date cutoffs for some of those as well.

25             MR. SOMVICHIAN:  Yes.

56

1          THE COURT:  All right.  Finally, I would like to

2  ask you respond to the Plaintiffs' argument which they make

3  at page nine of their reply brief regarding Google's -- and

4  they made it again here -- about Google's production not

5  including the Google account ID, Google User ID and joining

6  keys that link the two and how that has inhibited their

7  ability to make use out of the subsequent productions that

8  you've made.

9          You know, whether you intentionally stripped something

10  out or you just didn't include those fields when you made

11  the production, is -- is there any problem with just

12  including those things in the production that you make when

13  you -- you know, when you made this additional production

14  that corresponded to the six-week sampling periods?  Like,

15  any problem with producing those fields?

16          MR. SOMVICHIAN:  Your Honor, we -- that's the

17  reason we produced the -- the query ID field.  We -- we took

18  -- so, those are unique identifiers for a bid request.

19          THE COURT:  Right.

20          MR. SOMVICHIAN:  For the six one-week samples, we

21  took the query ID's associated with those and then searched

22  the database for the additional verticals fields that we

23  produced.  So, because the query ID was the way we tied

24  those together --

25          THE COURT:  Um-hmm.

1          MR. SOMVICHIAN:  -- we produced the vertical data

2   along with the query ID precisely so that they could do the

3   same thing.

4          THE COURT:  Right.  But could you not -- and this

5   is my question is just a mechanical question.  It's not a

6   why did you do it this way but just like a straight up

7   factual mechanical question.  If you -- even if you're using

8   the query ID as your sort of key to locating this additional

9   verticals information, when you make that production, could

10  you not have included in the fields that you were producing

11  as internal website verticals data the Google account ID and

12  Google user ID and any joining keys?

13         MR. SOMVICHIAN:  We could have -- we could have

14  included additional fields.

15         THE COURT:  Okay.

16         MR. SOMVICHIAN:  But joinability keys raises

17  separate issues.  I don't want to get into that.

18         THE COURT:  Okay.

19         MR. SOMVICHIAN:  But, yes, we could --

20         THE COURT:  Okay.

21         MR. SOMVICHIAN:  -- we could have included other

22  ways to join.  The query ID's is how we --

23         THE COURT:  Yes.

24         MR. SOMVICHIAN:  -- joined them, and that's why we

25  produced that.

58

1          THE COURT:  So, if I said just be accommodating
2  and do it, would that be burdensome?
3          MR. SOMVICHIAN:  I'm not sure that -- the full
4  time period needed to -- to pull that off, your Honor.  But
5  if we're talking about adding some data fields that are
6  available in the data for the same --
7          THE COURT:  That would help them match?
8          MR. SOMVICHIAN:  -- for the same time period --
9          THE COURT:  Yes.
10         MR. SOMVICHIAN:  -- we can look into that for
11 sure.
12         THE COURT:  That's what I'm just -- I just wanted
13 to -- just -- just a pure factual question.  Okay.
14    Those were the questions that I had.  I'm going to let
15 you respond to anything else you'd like to respond to.
16         MR. SOMVICHIAN:  So, your Honor, I think -- I
17 think you -- you hit the nail on the head at the beginning
18 of this.  This is their motion for contempt and sanctions,
19 and I think this whole discussion that we've had highlights
20 why they haven't come close to meeting the -- the burden
21 here.
22    You -- you may tell us your orders actually covered
23 these additional fields even though they're -- they're not
24 called verticals, there are some functional differences.
25 They're not tied to users but, rather, to -- to websites.

1   User lists are something different, that that -- you will

2   tell us what the scope ultimately is.  But I think the

3   requirement here and the standard for them to be entitled to

4   any form of sanction requires clear and convincing evidence

5   that Google intentionally disregarded your order, and if you

6   take a look at their -- their citation, page eight of their

7   brief, <u>Dual Deck</u> -- excuse me -- <u>Dual Deck VCR Anti-Trust</u>

8   <u>Litigation</u> -- it's 10 F.3d 693 -- they cite that and quote

9   it for the proposition that sanctions can be imposed even if

10  a violation is not willful.

11      The sentence right after their quoted sentence reads:

12              "But a person should not be held in

13          contempt if his action appears to be

14          based on a good faith and reasonable

15          interpretation of the Court's order."

16      THE COURT:  Um-hmm.

17      MR. SOMVICHIAN:  Your Honor, we -- we may have

18  gotten it wrong.  You'll tell us, but if we did, that's on

19  me.  But based on everything in your order, the -- the --

20  the terms repeated in the order regarding linking to -- to

21  users, what we discussed at the motion for clarification,

22  our effort to try to -- to understand the -- the scope

23  better, I don't think there's any question that we applied

24  at least a reasonable and good faith interpretation in

25  trying to understand and apply the Court's order in a

60

 1  sensible way.  And if -- if you tell us, well, app

 2  categories should also be produced, we'll, of course, abide

 3  by your order and we'll comply.  But in -- in the context of

 4  what brings us here, a contempt and sanctions motion, I

 5  don't think the Plaintiffs have come close to showing their

 6  burden, your Honor.

 7          THE COURT:  All right.  Thank you.

 8      Any reply?

 9          MR. LEVINE:  Yes, briefly, your Honor.  Just to be

10  clear that I think your Honor was asking earlier just --

11  this is just a clarification before I reply -- about the

12  time period sampling issue for just these three issues, the

13  fields that are here.  But, to be clear, our view is that

14  the entire production that occurred in February is

15  inadequate for the same reason in that it's only the six --

16  they -- they haven't produce anything for earlier.  So, that

17  -- that problem of six weeks not being representative is not

18  just for  these three because they haven't produced anything

19  for these three.  It's --

20          THE COURT:  So, that would apply to the entirety

21  of the production that they've made of all these?  We had,

22  you know, disputes going back to, you know, the spring.

23          MR. LEVINE:  Well, no.  I mean, and that's why

24  carved this -- that's why we carved this period out, because

25  for the time period issue, because verticals fields -- a lot

1 of these other fields still exist.  They're still used, but

2 because verticals in particular -- and I'm using that term

3 "verticals" as an interest-based -- things that somehow

4 categorize our named Plaintiffs by the interests and the

5 things they're doing --

6              THE COURT:  Um-hmm.

7              MR. LEVINE:  -- and that's how we were using the

8 term and we understood your Honor was using the term, I -- I

9 think Google improperly -- and they should have learned this

10 lesson because they were sanctioned for it in other cases --

11 took the word "verticals" literally and, you know, it said,

12 ah, we don't call it a vertical.  We don't think of it as a

13 vertical.  It's not a vertical.  So, you're not getting it.

14 And that's not the way that discovery works, and that was

15 really your Honor's order to improperly and willfully narrow

16 it.

17     But on the time period issue, because verticals in

18 particular, as you've heard and seen, stopped being used ex

19 -- in bid requests -- and every one of these fields was

20 included in a bid request that's for a good hunk of class

21 period -- the time period is more important.  So,

22 representative sampling from, say, 2021 may be okay for

23 certain fields to the extent that those fields always have

24 been included.

25              THE COURT:  Um-hmm.

1          MR. LEVINE:  But, to the extent you have fields, a

2   broad category of fields that stopped being used at some

3   point, time is important.  The -- the time that a sample is

4   of critical importance.

5          THE COURT:  Because it's after the fact?  It like

6   excludes what -- the time period that you were --

7          MR. LEVINE:  Right.

8          THE COURT:  -- using.  Yes, no, I get that point.

9   But -- but which is -- here's -- here's like a -- an

10  observation just about this dispute.  There are many things

11  that you're saying that are persuasive and resonate with me

12  about why you need something and even the scope of what you

13  need, but I didn't write it in my order, and part of that is

14  because these three fields were not the topic of any of our

15  discussions.  So, I couldn't be specific about it in this

16  order.  The time period issue that you're raising right now

17  about things that are deprecated wasn't raised before I

18  issued my order.  So, I -- it's really hard to say that I

19  ordered it and they didn't do it.  So -- and -- and I do

20  have in mind you have these other pending disputes, and I'm

21  going to share some thoughts with you about that at the end

22  of this proceeding, but -- but I -- I hear what you're

23  saying, and it -- and it makes a lot of sense.  It's just --

24          MR. LEVINE:  Well --

25          THE COURT:  -- I -- that's clear and convincing

63

1  evidence of contempt of court?

2           MR. LEVINE:  Well, we didn't know what else to do.

3  We already had two orders.  We couldn't file another

4  discovery motion.

5           THE COURT:  Yeah, well --

6           MR. LEVINE:  -- the right one --

7           THE COURT:  -- well, you could have because you

8  needed to wait for me to -- to issue my order.  So, okay, I

9  get it.

10           MR. LEVINE:  But if the outcome of this, if your

11  Honor -- if the outcome of this is simply your Honor says

12  the record ips sufficiently confused as to not warrant

13  contempt or sanctions but I order Google to produce these

14  three fields and for the entire production to link whatever

15  they produce, to include the ID's, the missing ID's, and to

16  produce for a representative sample throughout the class

17  period, that's fine.  And if Google then has to come back to

18  us and say, Hey, we can't produce for this part of the class

19  period, then we can have a discussion.  Then that triggers a

20  discussion as to why not and what happens to it and for some

21  of this stuff, maybe they have a legitimate explanation for

22  some of it.  Maybe they don't.  But until they're under an

23  obligation to produce discovery for the earlier time period,

24  we can't deal with spoliation and whether it should or

25  should exist.

64

1          THE COURT:  I understand.  I understand.  My -- my
2 point is just that calling it a contempt motion to encompass
3 those issues is totally premature.
4          MR. LEVINE:  Well, we --
5          THE COURT:  So, okay.
6          MR. LEVINE:  Fair enough.
7          THE COURT:  So -- so, I understand the point.
8      All right.  I think I have everything I need on this
9 motion.  I will issue an order.
10     So, the note about your many pending disputes --
11          MR. LEVINE:  Which Ms. Pritzker is going to --
12          THE COURT:  Well, I'm not -- we're not going to
13 argue it.
14          MR. LEVINE:  Okay.
15          THE COURT:  I just wanted to give you an update.
16 I -- I know you are waiting on me.  Unfortunately, you're
17 not the only people who have filed motions, in particular,
18 discovery motions before me, but those three that were filed
19 at the end -- last day of February, I will be issuing orders
20 on all three of them and this one by the end of the week.
21 So, just purely for timing so that you have that in mind.  I
22 know I have three more, and I hope to get to those by next
23 week.  So, just so you have in mind my timing, my schedule,
24 that's my plan.  Okay.  But the three on the 28th of
25 February, those will be decided by the -- by this week.

65

1  Okay.

2      All right.  Thank you all very much.

3          MS. PRITZKER:  Very helpful.  Thank you, your

4  Honor.

5          ALL:  Thank you, your Honor.

6          THE COURT:  The matter is concluded.

7      (Proceedings adjourned at 12:54 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

66

<u>CERTIFICATE OF TRANSCRIBER</u>

   I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

   I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.



Echo Reporting, Inc., Transcriber

Monday, April 17, 2023