# **Exhibit 5**

# **[Redacted Version]**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

|  |  |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

# EXPERT CLASS CERTIFICATION REPORT OF PROFESSOR NEIL RICHARDS

**July 14, 2023**

**REDACTED VERSION**

## TABLE OF CONTENTS

**Expert Class Certification Report of Professor Neil Richards**

I.    Executive Summary of Opinions ...................................................4

II.    Assignment ...................................................................................5

III.   Qualifications ...............................................................................5

IV.   Privacy Topics .............................................................................6

    A.    The Concept of Privacy ......................................................6

    B.    Privacy Is a Societal Norm and Fundamental Right With Deep Roots in U.S. Social, Legal and Cultural History ..........................................9

        i.    Constitutional Law ................................................10

            a.  Federal Constitution ...................................10

            b.  California Constitution ................................14

        ii.   Tort Law ................................................................15

        iii.  Statutory Law and The FIPs ...................................17

            a.  Federal Statutes ............................................17

            b.  The Fair Information Practices Principles ("FIPs") ...............18

            c.  California Statutes ........................................20

    C.    Privacy Is Recognized As a Fundamental Right by Consumers and Companies in the United States ...................................................24

        i.    Consumers Consider Privacy to Be a Fundamental Right ..........................24

        ii.   Technology Companies Recognize Privacy as a Fundamental Right and Core Societal Value ......................................27

V.    Google's Terms of Service and Privacy Policies Reflect Historical Societal Privacy Norms and Confirm People's Reasonable Expectations That Google Adheres to Those Norms ...................................................33

VI.   There Is Common Evidence From Which a Jury Could Conclude That Google RTB Contravenes Societal Privacy Norms ...................................................38

VII.  Protection of Fundamental Privacy Rights and Historical Societal Privacy Norms Requires Disclosure and Effective Controls About What Information is Collected About or Associated With U.S. Google Account Holders and Offered For Sale By Google to Google RTB Auction Participants ...................................................50

---

EXPERT CLASS CERTIFICATION REPORT OF NEIL RICHARDS

VIII.    Google's Terms of Service and Privacy Policies Could Give Rise to a Common
         (False) Expectation That Google Does Not Offer For Sale or Sell Information Linked
         to or Reasonably Associated With U.S. Account Holders...........................................56

IX.      Considering Google's Failure to Disclose the Details of Google RTB to U.S. Google
         Account Holders, There is Common Proof that Account Holders Lack any
         Mechanism to Consent to Google's Sharing or Selling their Personal Information
         Outside of Google via Google RTB..........................................................................56

Appendix A.............................................................................................................................59

Appendix B .............................................................................................................................91

---

EXPERT CLASS CERTIFICATION REPORT OF NEIL RICHARDS

I.      **Executive Summary of Opinions**

1.          This section includes an executive summary of each opinion proffered in this report:

2.          As described in Section IV, it is my opinion that privacy – including freedom from unwanted surveillance – is a fundamental right and important societal norm with deep roots in the social, cultural, and legal history of the United States.

3.          As described in Section V, it is my opinion that the Google Terms of Service and Privacy Policies that govern Google's relationship with its individual U.S. Google account holders reflect a societal understanding that privacy is a fundamental right and an important societal norm in the U.S.

4.          As described in Section VI, it is my opinion that Google's Real Time Bidding advertising auction practices ("Google RTB"), and the scope and quantity of information about and/or associated with individual U.S. Google account holders that Google shares with or sells to Google RTB auction participants (that is, entities outside Google) are at extreme odds with fundamental privacy rights and societal privacy norms in the U.S.

5.          As described in Section VII, it is my opinion that protection of fundamental privacy rights and societal privacy norms requires, at a minimum, informative disclosures about what information is collected about or associated with U.S. Google account holders and offered for sale to Google RTB auction participants.

6.          As described in Section VIII, it is my opinion that there is common evidence that Google's Terms of Service, Privacy Policies, and disclosures throughout the Class Period give rise to a common (false) expectation that Google does not offer for sale or sell information about or associated with U.S. account holders to Google RTB participants.

7.          As described in Section IX, it is my opinion that there is common evidence that Google fails to disclose its Google RTB auction to U.S. Google account holders or offer any

mechanism to consent to Google's sharing or selling information about or associated with them to entities outside Google via Google RTB.

## II.   Assignment

8.        Counsel for plaintiffs in this action ("Counsel") retained me to review documents and testimony[1] and render opinions concerning issues of privacy, and the conduct at issue, as described in the Executive Summary above and sections below. My analysis included issues related to Google's Terms of Service, Privacy Policies, disclosures and practices; my understanding of the nature and volume of information about or associated with U.S. Google account holders that Google offers for sale or sells to third-party organizations in the Google RTB advertising auction; and the historical and cultural foundations that underlie societal privacy norms in the United States.

9.        I am compensated at the rate of $750/hour. My compensation does not depend upon the outcome of the case. In the event of any recovery in this case, I understand that I will be excluded from the definition of any proposed or certified class and consent to such exclusion.

10.       This report has been prepared for purposes of this case only. It may not be used for any other purpose.

## III.   Qualifications

11.       My name is Neil Richards. I am currently the Koch Distinguished Professor in Law at Washington University School of Law in St. Louis, Missouri, where I have taught courses on privacy for twenty years, and where I co-direct the Cordell Institute for Policy in Medicine and Law which focuses on problems involving the collection and use of personal information. I am an affiliate scholar with the Stanford Center for Internet and Society, the Yale Information Society Project, and the Berkman-Klein Center at Harvard Law School, a Fellow with the Center for Democracy and Technology, and a member of the American Law Institute. Additionally, I have

---

[1] All case materials considered when forming my opinions are listed in <u>Appendix B</u>.

taught courses on U.S. and transatlantic privacy, security, and consumer data protection at other institutions, including Georgetown University, the University of Amsterdam in the Netherlands, and the University of Bocconi in Italy.

12.     In 1994, I earned a B.A. Degree in History with Special Honors, from The George Washington University. In 1997, I earned both an M.A. Degree in Legal History from the University of Virginia and a J.D., from the University of Virginia School of Law. Following my graduation from law school and graduate school, I clerked for Judge Paul V. Niemeyer on the United States Court of Appeals for the Fourth Circuit, and then for Chief Justice William H. Rehnquist on the United States Supreme Court.

13.     As one of the leading figures in the field of information privacy and a trained legal historian, my scholarship and teaching has focused the historical importance of privacy (in the U.S. and internationally), the continued importance of societal privacy norms, privacy rights, and privacy protections in our digital, networked society, and related issues. I have authored two books, written or contributed to chapters of several books, and published over a hundred academic or public articles devoted to these issues. I regularly speak at privacy conferences around the world.

14.     My detailed CV is included as Appendix A to this report, and includes further details about my academic research, instruction, and publications.

## IV.     Privacy Topics

### A.     The Concept of Privacy

15.     In the most general sense, privacy is the freedom from interference or intrusion, the right "to be let alone," a foundational and long-standing formulation most famously cited by Samuel Warren and Louis Brandeis in their groundbreaking 1890 paper on privacy.[2] This concept recognizes that each person has a sphere of existence and activity that belongs *to that individual alone*, where he or she is free of constraint, coercion, and uninvited observation or surveillance. In

---

[2] Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890).

the historical literature and the law, discussed below, this protected privacy sphere includes one's personal opinions, one's personal communications, how one behaves behind closed doors, and behavior within one's family and other intimate relationships.

16.     Privacy also includes "information privacy," a privacy concept that involves learning, knowing, and using what I refer to in my book, *Why Privacy Matters*, as "human information."[3] Information privacy is often defined in terms of "personal information" or "personal data"[4] – in very basic terms, this is information that is linked to or that can be reasonably associated with a human being.[5] Information privacy is essential because information is power, and human information confers the power to influence, nudge, and manipulate the humans to whom it relates – even when those people might not be known by name.

17.     Another central element of privacy – and one that has particular importance in the world of the informational-processing capabilities of a computers and Internet-based communication – is our ability to decide what information about ourselves is shared and with whom. A confidence or secret retains its quality even if I tell it to my doctor, my therapist, my lawyer, or if it is disclosed under seal in litigation. It is still "private" too. To understand whether such sharing is consistent with societal privacy norms, the important considerations include: (1) the "obscurity" of information (how hard it is for others to discover), (2) one's ability to confidently share information with only those persons of one's choosing, as well as (3) social context.[6] In other words, it is a mistake to talk about privacy separate and apart from the ways and contexts in which human information is collected, and processed, and how it is shared and used. Instead, it is important to focus on the ways in which human information is used to identify

---

[3] Neil Richards, *Why Privacy Matters* 21-26 (2022)

[4] *Id*., at 24-25.

[5] *See, e.g*., Cal. Civ. Code § 1798.80(e) (defining "personal information" as "any information that identifies, relates to, describes, or is capable of being associated with, a particular individual….").

[6] For obscurity, *see* Woodrow Hartzog, *Privacy's Blueprint: The Battle to Control the Design of New Technologies* 15, 95-96 (2018); for context, *see* Helen Nissenbaum, *Privacy in Context: Technology, Policy, and the Integrity of Social Life* (2009).

humans, observe their behavior (whether physically or online), and influence the decisions they make. And, particularly in an online setting, a critical consideration is whether all such processes are both transparent and comprehensible when individuals are making decisions about what to share, how, when, and with whom.

18.     Thus, one consistent tenet of privacy involves the ability to control, participate or exercise *meaningful* agency over one's own personal information and its dissemination, a concept I see reflected in the case law. *See, for example*, *Eichenberger v. ESPN, Inc.*, 876 F.3 979, 983 (9th Cir. 2017), quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989), holding "[a] right to privacy "encompass[es] the individual's control of information concerning his or her person."

19.     The U.S. Department of Commerce's National Institute of Standards and Technology ("NIST") includes this tenet in its definition of "privacy," which NIST defines as "assurance that the confidentiality of, and access to, certain information about an entity is protected; the right of a party to maintain control over and confidentiality of information about itself; freedom from intrusion into the private life or affairs of an individual when that intrusion results from undue or illegal gathering and use of data about that individual."[7]

20.     Similarly, in 2013, the UN General Assembly approved a resolution entitled "The right of privacy in the digital age,"[8] affirming that a fundamental right of privacy – expressed as "*the presumption that individuals have an area of autonomous development, interaction and liberty*, a 'private sphere' with or without interaction and free from State intervention and from excessive unsolicited intervention by other uninvited individuals – applies online as well as offline,

---

[7] National Institute of Standards and Technology, Computer Security Resource Center, "Glossary," https://csrc.nist.gov/glossary/term/privacy.
[8] UN General Assembly, Resolution 68/167, "The right to privacy in the digital age," A/RES/68/167 (Dec. 18, 2013), https://undocs.org/en/A/RES/68/167.

and declaring that the "mere existence of secret surveillance," whether undertaken by governments or by private actors, amounts to "an interference with this right."[9]

### B. Privacy is a Societal Norm and Fundamental Right with Deep Roots in U.S. Social, Legal and Cultural History

21.      The central tenets of privacy described above have long been protected as a fundamental and important societal value in the U.S. While many believe that these privacy concepts stem from Warren and Brandeis' famous 1890 article,[10] an examination of American legal history shows that rules to protect these values are even older and have ancient roots in the common law.

22.      Warren and Brandeis certainly gave this set of rules a name and some organizing principles in their famous article, but they were mining deep resources that in many respects were at the bedrock of American law.[11] As stated by privacy scholar Amy Gajda, "the right to privacy as a legal concept has always existed in some sense in U.S. law, ever since the very first long-form newspaper reported titillating scandal in 1690 and was immediately shut down."[12] While central to our societal and cultural fabric for centuries, these historical privacy tenets have continued to the present day. Professor Gajda acknowledges this persistent normative thread in her work: ".... Our right to privacy – the right to decide our public face and who we are in our most intimate moments even when we've shared those moments with others – is not a right born of today's new

---

[9] *See* UN General Assembly, Report of the Office of the High Commission for Human Rights, "The right to privacy in the digital age," 2-4, 12-15 (Aug. 3, 2018), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G18/239/58/PDF/G1823958.pdf?OpenElement.
[10] *See* Note 2, above.
[11] Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 GEO. L.J. 123 (2007).
[12] Amy Gajda, *Seek and Hide: The Tangled History of the Right to Privacy,* xi-xii (2022).

---

and invasive technologies but has long persisted as a counterbalance to truth and press and speech freedoms and the right to know."[13]

23.      In this section of my report, I will show how privacy has long been a foundational societal value recognized and protected in American law, and that it is best understood via three constructs – (1) constitutional law rules, (2) tort law rules, and (3) statutory law including data protection rules[14] – all of which recognize the central privacy tenets I discuss above, and further underscore the long-held U.S. societal interest in delineating privacy as an important value and fundamental right deserving legal protection.

### i.      Constitutional Law

### a.      Federal Constitution

24.      Privacy as a fundamental, constitutional right dates back at least to the origins of the American Republic, and with antecedents in the English common law that are even older. The United States Constitution of 1787 and the Bill of Rights of 1789 do not use the word "privacy" expressly, but protections for informational privacy run throughout the document. As the Supreme Court recognized in *Griswold v. Connecticut,* 381 U.S. 479, 484 (1965), "specific guarantees in the Bill of rights," read together, can be seen as creating a relatively coherent protection for privacy against the state. Indeed, in the subsequent case of *Whalen v. Roe*, 429 U.S. 589, 599 (1977), the Court read *Griswold* as expressly recognizing a privacy right including "the individual interest in avoiding disclosure of private matters."[15]

25.      Beyond the "constitutional privacy" cases, other bodies of constitutional doctrine reflect the societal interest in privacy and its protection. The First Amendment, for example, has

---

[13] *Id.*

[14] This division of the sources of American privacy law into four categories is drawn from and reflected in William McGeveran, *Privacy and Data Protection Law* (2016), a leading case book in U.S. privacy law.

[15] Neil M. Richards, *The Information Privacy Law Project*, 94 GEO. L. J. 1087, 1105 (2006).

---

long been read to value and protect anonymous speech and association.[16] And the Third Amendment's prohibition of the quartering of soldiers in private homes during peacetime is also the essence of a privacy right.[17] If privacy means anything, it means the right to keep others – whether soldiers, marketers, spies, door-to-door salesmen, or anyone else – out of your home, your affairs, and your information.

26.     Perhaps the most famous and influential body of constitutional privacy doctrine is that of the Fourth Amendment, which has expressly recognized the societal value of communications privacy since the U.S. Supreme Court's ruling in *Ex Parte Jackson* (1878) that the Fourth Amendment required the government to obtain a warrant before it read the contents of letters in the mails, even though such letters were in the possession of the government from the moment a letter was sent until the moment it was received.[18] *Jackson* itself represents the codification into constitutional law of postal confidentiality norms and rules dating back to the colonial period – a recognition that communications are no one's business but the sender and the recipient.[19]

27.     Modern interpretations of the Fourth Amendment since the 1960s have been built on the foundation of *Katz v. United States*.[20] *Katz* is best known for its recognition that privacy as a fundamental right protects reasonable, objective expectations of privacy that people have about their information (*Katz* itself recognized the importance of communications privacy in the context

---

[16] *E.g.*, *NAACP v. Alabama*, 357 U.S. 449 (1958) (anonymous association); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) (anonymous expression).
[17] U.S. CONST. AMEND. III; see also *Griswold,* 381 U.S. at 484 (making precisely this point).
[18] *Ex parte Jackson*, 96 U.S. 727, 733 (1877).
[19] Neil Richards, *The Third-Party Doctrine and the Future of the Cloud*, 94 WASH. U. L. REV. 1441, 1452-56 (2017); *see also* Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 GEO. L.J. 123, 140-44 (2007).
[20] 389 U.S. 347 (1967).

of the telephone booth). But from a historical perspective, three dimensions of *Katz* and its legacy are worth highlighting.

28. First, *Katz* recognized the fundamental right to Fourth Amendment privacy articulated by Justice Louis Brandeis in his famous dissent in *Olmstead v. United States*.[21] In that wiretapping case, Brandeis had argued that the fundamental societal tenets of privacy meant that it is essential for the law to keep up with changing technologies and social practices. Concerned that "[d]iscovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet,"[22] Brandeis argued for a broad interpretation of the Fourth Amendment that preserved its underlying substantive privacy protections notwithstanding changed circumstances. In the opinion, which ultimately became the foundation for the modern understanding of the Fourth Amendment, he discusses the need for the Fourth Amendment to be interpreted flexibly in the face of changing technologies, so that courts could continue to protect core societal privacy values, including "the significance of man's spiritual nature, of his feelings and of his intellect."[23]

29. Second, the concept of a "reasonable expectation of privacy" identified in Justice Harlan's concurrence in *Katz* has been highly influential in the ways that scholars, legislators, and ordinary people think about privacy protections far beyond Fourth Amendment doctrine, one that has been influential in American law, throughout American society, and around the world.[24] That

---

[21] 277 U.S. 438 (1928).

[22] *Id.,* at 473.

[23] *Id.,* at 478. *See also* Neil Richards, *The Third-Party Doctrine and the Future of the Cloud*, 94 WASH. U. L. REV. 1441, 1458-60 (2017).

[24] For example, the British privacy statute, the UK General Data Protection Regulation, allows personal data to be processed where a company has a "legitimate interest." UK GDPR, ART. 6(1)(f). As the British privacy regulator has advised companies in an official interpretive document, this means that "[t]he UK GDPR is clear that the interests of the individual could in particular override your legitimate interests if you intend to process personal data in ways the individual does not reasonably expect." Information Commissioner's Office, "What is the 'legitimate interests' basis?", March 22, 2018, https://ico.org.uk/for-organisations/guide-to-data-protection/guide-to-the-general-data-protection-regulation-gdpr/legitimate-interests/what-is-the-legitimate-interests-basis/.

---

is, in both law and consumer expectations, the test for whether privacy rights exist or have been invaded often rests on threshold questions about whether a reasonable person would have expected something to be private and under her control to determine whether or not it was shared. This is a historical concept rooted in deep societal norms.

30.      Third, recognizing these historically-rooted norms as well as Brandeis' concern about the law failing to evolve to protect historical values, recent Supreme Court cases applying *Katz* have interpreted it to apply naturally to digital technologies. In this line of cases, the Court has recognized the value of privacy in the context of new and potentially invasive technologies, ranging from the use of thermal scanners to scan private homes,[25] to GPS transponders revealing the location of cars,[26] to smart phones revealing large quantities of personal data,[27] to the location data held by cell phone companies from customers making phone calls.[28]

31.      These decisions are notable for their recognition, in new technological contexts, of the well-established historical societal privacy norms in one's private home, family relations, or household, in one's location and travels (which itself may reflect private information about a person), and in one's private thoughts, communications, and behaviors as the rights of citizens in a democratic society. In my opinion, based upon my experience and research over the past twenty-five years into the American law and history of privacy, these cases identify the societal risks of invasive digital monitoring like the surveillance of communications or data (like location or

---

[25] *Kyllo v. United States*, 533 U.S. 27 (2001).
[26] *United States v. Jones*, 565 U.S. 400 (2012).
[27] *Riley v. California*, 573 U.S. 373 (2014).
[28] *Carpenter v. United States*, 138 S.Ct. 2206 (2018).

---

browsing activity) that might be revealing of communications. These risks are present regardless of whether it is private or public actors engaging in such monitoring.[29]

### b.  California Constitution

32.      California's state Constitution expressly recognizes privacy as a fundamental societal and cultural norm – and, indeed, establishes and protects privacy as an inalienable human right. Added in 1974, Article 1, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy.*" (Italics added).[30] Thus, for over 50 years, the right to privacy has expressly sat at the core of those rights enshrined in California law.

33.      This "inalienable right [of] pursuing and obtaining … privacy" was intended to be an express expansion of the existing right to privacy of all Californians, and to extend to the sharing of private information. As a California court explained in interpreting the provision to apply to the non-public sharing of college grades shortly after its enactment, "[t]he right to privacy is much more than 'unnecessary wordage.' It is fundamental to any free society. Privacy is not now guaranteed by our State Constitution. This simple amendment will extend various court decisions on privacy to insure protection of our basic rights."[31] Similarly, shortly after its enactment, in a case involving the monitoring of college classrooms, the California Supreme Court explained that the provision was directed against four principal "mischiefs": "(1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the

---

[29] *See, e.g.*, Neil M. Richards, *The Dangers of Surveillance*, 126 HARV. L. REV. 1934, 1935, 1945-1952, 1958-59 (2013); Neil M. Richards, *The Perils of Social Reading*, 101 GEO. L.J. 689 (2013).
[30] CAL. CONST., ART I, §1 (1974).
[31] *Porten v. Univ. of San Francisco*, 64 Cal. App. 3d 825, 829 (1976) (quoting Cal. Ballot Pamp. at 28 (1972)).

disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing record.'"[32]

34.　　　Two decades later, in *Hill v. NCAA* (1994), the California Supreme Court again traced this Constitutional provision back to the voter initiative that gave rise to it, which had emphasized: "The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution'"[33] The Court further underscored the provision's reference to the historical societal interest in privacy as "a fundamental and compelling interest" that includes, within its protected sphere, "our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose."[34]

35.　　　Additionally, as pertinent here, the ballot arguments in favor of the Article 1, Section 1 directly acknowledge the present and increasing "capacity of both governmental and nongovernmental agencies to gather, keep, and disseminate sensitive personal information without checking its accuracy or restricting its use to mutually agreed or otherwise legitimate purposes."[35] It was against that backdrop that the California Supreme Court held that "the overbroad collection and retention of unnecessary personal information by government and business interests" was one of the principal "'mischiefs'" this provision was designed to guard against and protect.[36]

### ii.　　Tort Law

36.　　　Another important recognition of societal privacy norms over time in U.S. legal history has been tort law. Tort law, in fact, was the primary way in which privacy rights spread through American state law over the course of the twentieth century, spurred by the work of Warren and Brandeis and then by William Prosser, the Dean of University of California Berkeley

---

[32] *White v. Davis*, 13 Cal. 3d 757, 775 (1975).
[33] *Hill v. NCAA*, 7 Cal. 4th 9, 21 (1994) (citing Ballot Pamp., Proposed Stats. and Amends. to CAL. CONST. with arguments to voters, Gen. Elec. (Nov. 7, 1972), at 27).
[34] *Id.*, 7 Cal. 4th at 24.
[35] *Id.*, 7 Cal. 4th at 17.
[36] *Id.*, 7 Cal. 4th at 17-18.

Law School, whose work as a scholar, casebook author, treatise-writer, and reporter of the Restatement of Torts gave his work tremendous influence.

37.     Of course, privacy rights long-predate Warren, Brandeis, and Prosser in the Anglo-American common law. One of the reasons that privacy was able to flourish as an idea in the twentieth century is that it was a new word for a concept with deep common-law roots.[37]

38.     As a result of Prosser's careful work on privacy from the 1940s to the 1970s, today virtually all states recognize one or more of the four societal privacy norms recognized by Prosser in his scholarship and in the Restatement (Second) of Torts (1977), for which he served as Reporter:

> 1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.
>
> 2. Public disclosure of embarrassing private facts about the plaintiff.
>
> 3. Publicity which places the plaintiff in a false light in the public eye.
>
> 4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.[38]

39.     California common law has generally followed Prosser's classification of privacy interests, recognizing the four privacy torts of intrusion, disclosure, false light, and appropriation of name or likeness.[39] And, while "[t]he [California forms of] privacy tort seeks to vindicate multiple and different interests that range from freedom to act without observation in a home, hospital room, or other private place to the ability to control the commercial exploitation of a name or picture," each privacy tort category "identifies a distinct interest association with an individual's control of the process or products of his or her personal life."[40] The common denominator among

---

[37] Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 GEO. L.J. 123, 140-44 (2007).

[38] Neil M. Richards & Daniel J. Solove, *Prosser's Privacy Law: A Mixed Legacy*, 98 CALIF. L. REV. 1889 (2011).

[39] *See* 5 Witkin, SUMMARY OF CAL. LAW (9th ed. 1988) Torts, §§ 580-594, 674-693.

[40] *Hill v. NCAA*, 7 Cal. 4th at 24.

---

them, the California Supreme Court observed in *Hill*, "appears to be improper interference (usually by means of observation or communication) with aspects of life consigned to the realm of the 'personal and confidential' by strong and widely shared social norms."[41]

40.      Importantly, the common law privacy torts *do not require* additional consequences to be actionable. In this way, the privacy torts reflect a U.S. societal norm that the privacy intrusion is, *itself,* a tortious harm and is compensable as such. *See, e.g*., Restatement (Second) of Torts § 652B cmt. b (recognizing the tort of intrusion upon seclusion, for which the "intrusion itself" makes the defendant liable).

41.      The historical notion that the privacy intrusion is, itself, the harm remains so even in today's digital era. As legal scholar Jacqueline D. Lipton, has observed, "the greatest harms in the present age often come from unauthorized uses of private information online" including the improper collection, aggregation, processing, and dissemination of information.[42]

### iii.      Statutory Law and The FIPs

42.      The historical U.S. privacy norms described above are also reflected in numerous state and federal statutes, including in statutes that address data protection. For example, a leading practitioner's treatise cataloguing these laws at the federal and state level runs to just shy of 4,000 pages over two volumes.[43]

### a.      Federal Statutes

43.      An important example of a statute developed with statutory privacy norms in mind is the Wiretap Act of 1968, enacted shortly after the Supreme Court's decision in *Katz*. The legislative history and statutory text of the Wiretap Act demonstrates that Congress intended to protect the historical privacy rights discussed above when it passed the Act, adding a criminal

---

[41] *Id.*, 7 Cal.4th at 24-25.
[42] Jacqueline D. Lipton, *Mapping Online Privacy*, 104 NW. U. L. REV. 477, 498-99 (2010)
[43] *See* Andrew B. Serwin, *Information Security and Privacy: A Guide to Federal and State Law and Compliance* (2016).

prohibition and private right of action for those who have been wronged by private as well as government wiretapping.[44]

44.      With the prospect of widespread electronic communications on the horizon, Congress updated the Wiretap Act in 1986 by passing the Electronic Communications Privacy Act and Stored Communications Act, collectively referred to as "ECPA."[45] ECPA protects against warrantless and unconsented wiretapping and email interception by both state and private parties.[46] Once again, the statute's legislative history and text evidence a Congressional intent to protect existing U.S. societal norms concerning privacy: "[The SCA] is modeled after the Right to Financial Privacy Act, 12. U.S.C. § 3401 *et seq.* to protect privacy interests in personal and proprietary information…."[47]

45.      These federal statutes laws illustrate and represent the codification of a long American struggle against the privacy invasions of wiretapping, and the continued emphasis on privacy in one's own thoughts, communications, and ideas, that has continued in a variety of forms since the adoption of the telegraph and the telephone in the nineteenth century through to Internet and electronic communications today.[48]

### b.      The Fair Information Practices Principles ("FIPs")

46.      While not formally statutory, the Fair Information Practices Principles, or "the FIPs," are a collection of widely accepted principles to evaluate information systems, processes, programs, and activities that affect individual privacy, and form the conceptual basis for (or are

---

[44] *See* S. REP. NO. 99-541, at 2 (1986) ("[The Wiretap Act] is the primary law protecting the security and privacy of business and personal communications in the United States today.")
[45] *See* McGeveran, *supra*, at 339-40.
[46] *See* 18 USC §§ 2510 et seq. *See also* Neil Richards, *The Third-Party Doctrine and the Future of the Cloud*, 94 WASH. U. L. REV. 1441, 1463 (2017) (recounting this history in greater detail).
[47] S. REP. NO. 99-541, at 3. The Ninth Circuit Court of Appeals appears to concur with this reading of the law's statutory purpose. *See In Re Facebook, Inc., Internet Tracking Litig*., 956 F.3d 589, 598 (9th Cir. 2020).
[48] *See generally* Brian Hochman, *The Listeners: A History of Wiretapping in the United States* (2022).

---

consistent with) many privacy laws in the U.S. and around the world.

47.     Like many privacy concepts, the FIPs have a long tradition, and though they have been highly influential around the world, they were invented in the United States. The FIPs were the product of an anxiety in the late 1960s and early 1970s regarding large databases of information about people being developed by government and business entities and relying on the new technology of computers. They represent an ethic of fair information processing in the service of values of the protection and empowerment of people whose data is being processed. And they represent (in one form or another) the basic structure of legislative protection for privacy (sometimes known as data protection).[49]

48.     The origin of the FIPs was a highly influential report researched and drafted by a special advisory committee to the Secretary of the U.S. Department of Health, Education, and Welfare (HEW) in 1973. This report, entitled "Records, Computers, and the Rights of Citizens," created the FIPs as a set of ethical guidelines for the processing of personal data. Among the fundamental principles tested by the facts of this case are the prohibition on secret processing, the importance of control over one's personal data, and protections against data collected for one legitimate purpose being used for unrelated purposes. As Professor Woodrow Hartzog and I have explained:

> As formulated by the HEW Report, the original Fair Information Practices protected a set of six substantive and procedural bedrock principles. First, they included a prohibition on secret databases ("There must be no personal data record-keeping systems whose very existence is secret."). Second, they provided for notice of recordkeeping ("There must be a way for an individual to find out what information about him is in a record and how it is used."). Third, they gave rights to prevent data used for one purpose being used for another without consent ("There must be a way for an individual to prevent information about him that was obtained for one purpose from being used or made available for other purposes without his consent."). Fourth, they contemplated rights of data access and correction ("There must be a way for an individual to correct or amend a record of identifiable information about him."). Finally, they provided for protections of data reliability

---

[49] *See generally* Robert Gellman, *Fair Information Practices: A Basic History* (2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2415020.

and against data misuse ("Any organization creating, maintaining, using, or disseminating records of identifiable personal data must assure the reliability of the data for their intended use and must take precautions to prevent misuse of the data.").[50]

49.     Thus, from the inception of what is now sometimes called data protection law, it has been incumbent on companies and others who process personal data (particularly in large quantities) to (1) not process in secret, (2) make it possible for people to find out how their data is being processed, (3) make sure that data collected for one purpose is not used for another purpose in unconsented ways, (4) allow access and correction of false data, and (5) make sure that the data is reliable and not misused in in any way.

50.     The FIPs also have served as the conceptual backbone for several federal privacy laws, including the federal Privacy Act of 1974, 5 U.S.C. § 552a, and the Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501–6506. Indeed, in passing the Privacy Act, whose purpose is to establish a code of Fair Information Practice that governs the collection, maintenance, use, and dissemination of personally identifiable about individuals maintained in systems of records by federal agencies, Congress placed the societal privacy norm that exists in the U.S. upfront, declaring in the statute's preamble that "the right to privacy is a personal and fundamental right protected by the Constitution of the United States."[51]

### c.     California Statutes

51.     California's statutory regime is particularly noteworthy as it is one of the strongest state communications privacy regimes in the country, both in the number of statutes and in the strength of protections. California's scheme includes four relevant statutes.

52.     First, there is the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, et seq., which is the California state-law analog to ECPA.[52]

---

[50] Woodrow Hartzog & Neil Richards, *Privacy's Constitutional Moment and the Limits of Data Protection*, 61 B.C. L.Rev. 1687, 1700-01 (2020).

[51] Pub. L. 93-579 § 2 (1974).

[52] Cal. Penal Code § 631(a).

---

53.      CIPA's legislative history and text from 1967 – before the express adoption of the express constitutional right to privacy – show that the California legislature intended to protect the historical societal privacy norms discussed above when it enacted the law and granted civil and criminal penalties to those aggrieved by its violations.[53] Indeed, the enacted statute began with the opening finding that "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques have created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state."[54]

54.      While virtually every state today has a wiretapping statute, California's is one of the very strongest; it is one of a handful of "two party-consent" states, in which all parties must consent to the recording a communication before it can be recorded lawfully.[55]

55.      Second, there is California's next-generation communications privacy statute, the California Electronic Communications Privacy Act ("CalECPA").[56] CalECPA went beyond the existing state law (which was already more protective than the federal standard) to require a warrant before any state law enforcement official can compel a business to turn over any digital communications or "metadata" relating to communications activities, among other forms of digital surveillance and compulsion.[57]

56.      Third, in 2011, the California legislature enacted the California Readers Privacy Act ("CRPA"). According to its sponsors, the law "mirrors the strong privacy and free speech

---

[53] CAL. PENAL CODE § 630 (noting that CIPA was passed "to protect the right of privacy of the people of this state").
[54] CAL STAT. CH. 1509 § 631 at 3584.
[55] CAL. PENAL CODE § 631.
[56] CAL. PENAL CODE § 1546 *et seq*.
[57] *See* CAL. PENAL CODE § 1546 *et seq*.

standards that are already in place and extends them to digital books and electronic reading records" – essentially, "updating [Californians'] privacy for the 21st Century."[58] The law arose out of a concern that digital books allow libraries and digital booksellers (including Amazon and Google) to collect and use detailed personal information about readers, invading First Amendment protections for and traditional societal norms of privacy in what individuals read, and allowing for surveillance of persons by government and private actors alike.[59] To protect these historical privacy interests, the law defines "personal information" broadly as "[a]ny information that identifies, relates to, describes, or is associated with a particular user," and includes digital data including "unique identifier[s] or Internet Protocol address[es]…used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form," or "[a]ny information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or book, in whole or in partial form."[60]

57.     A fourth California privacy statute is the California Consumer Privacy Act of 2018 ("CCPA"). Among other things, the CCPA gives consumers the right to know what information a business has collected about them, the right to delete their personal information, the right to stop businesses from selling their personal information, including using it to target them with ads that follow them as they browse the internet from one website to another, and to hold businesses accountable if they do not take reasonable steps to safeguard their personal information, the right to correct inaccurate data about them, and the right to limit the use and disclosure of sensitive

---

[58] EFF.org, Reader Privacy Act of 2011, https://www.eff.org/cases/sb-602-californias-reader-privacy-act-2011.

[59] *See* EFF, Press Release, *California's Reader Privacy Act Signed into Law*, EFF.org, October 3, 2011, https://www.eff.org/press/archives/2011/10/03.

[60] Cal. Civ. Code § 1798.90. The statute's definition of "personal information" also extends to and explicitly includes the definition of "personal information" contained in Cal. Civ. Code § 1798.80, a data records privacy law dating back to 2000. *See* Cal. Civ. Code § 1798.90(b)(5)(A).

personal information.[61] In November 2020, California voters approved Proposition 24, the California Privacy Rights Act ("CPRA"), which amended the CCPA – it did not create a separate, new law – adding additional data privacy protections.[62]

58.     The CCPA is notable in at least two respects.

59.     First, like many of its predecessor privacy laws, the CCPA defines "personal information" expansively to include any "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."[63] Acknowledging that digital technologies implicate societal privacy concerns, the CCPA additionally provides a non-exhaustive list of "personal information" which includes unique personal identifiers, online identifiers, Internet Protocol (IP) addresses, email addresses, account names, characteristics of protected classifications under California or federal law, Internet or other electronic network activity (including browsing activity, search activity, and information regarding a person's interactions with an Internet website), geolocation data, employment-related information, education information, and "inferences drawn … to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes."[64] This definition is consistent with my understanding, as a privacy scholar and legal historian, of modern data privacy norms and expectations, focusing not only on how information is used but how information could be used (e.g., "identifies," "relates to," "could reasonably be linked").

60.     Second, while directed to modern technological data concerns, the CCPA's foundational and fundamental purpose is to underscore and protect long-standing societal privacy norms, including the autonomy of individuals to control the use and sale of their personal

---

[61] *See* Cal. Department of Justice, Office of the Attorney General, *California Consumer Privacy Act (CCPA)*, updated May 10, 2023, https://www.oag.ca.gov/privacy/ccpa.
[62] *Id.*
[63] CAL. CIV. CODE 1798.140(v)(1).
[64] *Id.*, at (A)-(K).

information. As stated in the approved ballot initiative language declaring the purposes of CPRA's amendments to the CCPA:

> … In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. … The amendment established a legal and enforceable constitutional right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use, including the sale, of their personal information.[65]

### C.     Privacy is Recognized as a Fundamental Right by Consumers and Companies in the United States

61.     The fundamental importance of privacy is not merely reflected in its instantiation in legal rules; privacy is also a fundamental right that is deeply rooted in American cultural and business practices as well. This is illustrated by: (1) research showing that consumers in the past and to this day have considered privacy to be a fundamental right; and (2) statements and internal research by technology companies (including Google) that consumers highly value privacy as a fundamental right and regard privacy as an important societal norm.

### i.     Consumers Consider Privacy to Be a Fundamental Right

62.     Historically and through to the present day, American consumers have considered privacy to be of critical importance to their lives.

63.     It is undeniable that privacy, data security, and concerns about the use of personal information remain substantial matters of concern for consumers, particularly where information is shared or sold outside a relationship in which information was collected. The vast number of popular books and articles on privacy – along with the sustained attention given to the Snowden revelations, the Cambridge Analytica scandal, and the well-documented problem of data breaches – are just a few illustrations of Americans' interest in protecting fundamental societal privacy norms.

64.     A robust literature of empirical work and consumer surveys confirms that privacy

---

[65] *California Attorney General*, Proposition 24, "Initiative 19-0021," at 3, November 4, 2019.

rights remain a keen source of consumer concern,[66] and that the more informed consumers are about data practices, the more likely they were to support regulation of technology companies so that company practices preserve and protect historical societal privacy norms.[67]   This is best illustrated by three recent studies.

65.      As one example, a 2020 meta-analysis of a significant amount of empirical work across a range of social science disciplines including psychology, computer science, and economics concluded that consumers continue to care deeply about their privacy and take significant steps to protect it. The authors found that "contrary to depictions of online sharing behaviors as careless," there was significant evidence that consumers take a wide variety of actions to protect their privacy. As they put it well,

---

[66] *E.g.,* Joseph Turow et al., *Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand It, Say They're Helpless to Control It, and Believe They're Harmed When Firms Use Their Data – Making What Companies Do Illegitimate*, Annenberg Sch. Of Comm., Univ. Pa. (February 2023); Pew Research Center, *Americans' Views About Data Collection and Security*, May 20, 2015, https://www.pewresearch.org/internet/2015/05/20/americans-views-about-data-collection-and-security/; Pew Research Center, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Nov. 15, 2019, https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/; Pew Research Center, *Most Americans support right to have some personal info removed from online searches*, Jan. 27, 2020, https://www.pewresearch.org/fact-tank/2020/01/27/most-americans-support-right-to-have-some-personal-info-removed-from-online-searches/; Pew Research Center, *Roughly six-in-ten online daters in the U.S. are concerned about data collection*, May 29, 2020, https://www.pewresearch.org/fact-tank/2020/05/29/roughly-six-in-ten-online-daters-in-the-u-s-are-concerned-about-data-collection/; Pew Research Center, *Half of Americans have decided not to use a product or service because of privacy concerns*, April 14, 2020, https://www.pewresearch.org/fact-tank/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/; Pew Research Center, *56% of Americans Support More Regulation of Major Technology Companies*, July 20, 2021, https://www.pewresearch.org/fact-tank/2021/07/20/56-of-americans-support-more-regulation-of-major-technology-companies/.
[67] *E.g*., Pew Research Center*, 56% of Americans Support More Regulation of Major Technology Companies*, July 20, 2021, https://www.pewresearch.org/fact-tank/2021/07/20/56-of-americans-support-more-regulation-of-major-technology-companies/.

---

> "[s]tudies, field studies, and experiments – as well as common sense – show that consumers engage in privacy-regulating behaviors continually and in both online and offline scenarios, crossing the many diverse dimensions and definitions of privacy…The drive for privacy is under-appreciated in part because individual actions to protect privacy are so ubiquitous and second nature that they go unnoticed, or are not construed as privacy behaviors."[68]

This finding is notable since there was also evidence cited in the analysis of how, in practice, "prohibitively difficult it is to attain desired, or even desirable levels of privacy through individual action alone." These scholars concluded "highlighting how the resiliency – and apparent universality – of a human drive for privacy provides hope for a future that balances privacy with sharing and data utility."[69]

66.    Second, a 2023 study by the International Association of Privacy Professionals (IAPP) about consumer attitudes about privacy had a number of findings that are relevant here. First, the IAPP concluded that the more consumers learn about privacy practices, the more concerned they become.[70] Second, the IAPP found that "consumers take action when they feel their privacy is threatened," which is significant because while "consumers who are concerned about their privacy take real-world actions to protect it[, e]ven consumers who stated they are not concerned with privacy take such actions."[71] The IAPP study made resoundingly clear that a core consumer concern when it comes to privacy is the sharing of their personal information in ways that they had little knowledge or control over.[72] Moreover, the unconsented sharing of personal data with third parties was the data practice that made consumers the most uncomfortable – even more so than data breaches.[73]

---

[68] Alessandro Acquisti et al., *Secrets and Likes: The Drive for Privacy and the Difficulty of Achieving It in the Digital Age*, 30(4) J. CONSUMER PSYCH. 736 (2020), https://myscp.onlinelibrary.wiley.com/doi/10.1002/jcpy.1191.
[69] *Id.*
[70] Müze Fazlioglu, *Privacy and Consumer Trust*, International Association of Privacy Professionals 8 (2023).
[71] *Id.*, at 8-10.
[72] *Id.*, at 31.
[73] *Id.*, at 32.

67.        Another 2023 study by an interdisciplinary group of social scientists at the Annenberg School of Communications at the University of Pennsylvania reached similar conclusions. Its title is an accurate summary of those conclusions with respect to consumers' interest in their personal information and the importance of society's historical preference that individuals have meaningful control over who knows what about their personal thoughts, interests and data: "*Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand It, Say They're Helpless to Control It, and Believe They're Harmed When Firms Use Their Data – Making What Companies Do Illegitimate*." The report found that "[h]igh levels of frustration, concern, and fear compound Americans' confusion: 80% say they have little control over how marketers can learn about them online; 80% agree that what companies know about them from their online behaviors can harm them. These and related discoveries from our survey paint a picture of an unschooled and admittedly incapable society that rejects the internet industry's insistence that people will accept tradeoffs for benefits and despairs of its inability to predictably control its digital life in the face of powerful corporate forces."[74]

68.        In the present case, Google's own internal research indicates that ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████[75]

ii.        **Technology Companies Recognize Privacy as a Fundamental Right and Core Societal Value**

69.        Large technology companies are sophisticated entities that are aware that consumers highly value privacy. An essential underlying characteristic of privacy when it comes to technology and the digital economy is trust. Trust is essential in informational relationships –

---

[74] Turow, *supra*, at 2.
[75] GOOG-HEWT-00012303 at -311.

those common relationships in our digital society in which information is shared with the expectation that it will not be abused.[76]

70.     Recognizing that privacy is essential to consumer trust, major technology companies take pains to commit (or at least to appear to commit) themselves to the importance of maintaining and protecting their customers' privacy in order to retain the information relationships on which their business depends.

71.     For example, Microsoft declares at the outset of its privacy website that "*Microsoft believes privacy is a fundamental human right*. We are committed to providing you with products, information, and controls that allow you to choose how data is collected and used."[77] Apple's page is similarly clear, stating that "*Privacy is a fundamental human right*. It's also one of our core values. Which is why we design our products and services to protect it. That's the kind of innovation we believe in."[78] Even Facebook/Meta, after a series of privacy scandals (including Cambridge Analytica), announced that they were planning "to "[build] a privacy-focused messaging and social networking platform."[79]

---

[76] *See* Neil Richards & Woodrow Hartzog, *Taking Trust Seriously in Privacy Laws*, 19. Stan. L. & Tech. 431 (2016); Neil Richards & Woodrow Hartzog, *Trusting Big Data Research*, 65 DePaul L. Rev. 579 (2017); Neil Richards & Woodrow Hartzog, *A Duty of Loyalty for Privacy Law*, 99 Wash. U. L. Rev. 963 (2021). A community of scholars in law, business, and the social sciences have written about how historical societal privacy norms and rules protecting privacy acknowledge the concept of trust that our emerging digital society needs to survive. *See, e.g.,* Jack M. Balkin, *Information Fiduciaries and the First Amendment*, 49 U.C. Davis L. Rev. 1183 (2016); Kiel Brennan-Marquez, *Fourth Amendment Fiduciaries*, 84 Ford L. Rev. 611 (2015); Dennis D. Hirsh, *Privacy, Public Goods, and the Theory of Trust Commons: A Response to Professors Fairfield and Engel*, 65 Duke L. J. Online 67 (2016); Ari Ezra Waldman, *Privacy as Trust: Sharing Personal Information in a Networked World*, 69 U. Miami L. Rev. 559, 561 (2015); Kirsten Martin, *Transaction Costs, Privacy, and Trust: The Laudable Goals and Ultimate Failure of Notice and Choice to Respect Privacy Online*, 18 First Monday (Dec. 2013), http://firstmonday.org/ojs/index.php/fm/article/view/4838/3802.

[77] Microsoft, "Privacy at Microsoft," https://www.microsoft.com/en-us/trustcenter/privacy/%E2%80%AF.

[78] Apple, "Privacy," https://www.apple.com/privacy/.

[79] *See* Mike Isaac, *Facebook's Mark Zuckerberg Says He'll Shift Focus to Users' Privacy*, N.Y. Times, Mar. 6, 2019.

---

72.       Google has also recognized the foundational, fundamental importance of trust and privacy, for its customers and for society generally. In its corporate human rights statement, for example, Google promises that "We are committed to respecting the rights enshrined in the Universal Declaration of Human Rights and its implementing treaties, as well as upholding the standards established in the United Nations Guiding Principles on Business and Human Rights (UNGPs) and in the Global Network Initiative Principles (GNI Principles)."[80] Notably, each of the documents whose standards Google "commit[s]" itself to uphold includes the foundational recognition of privacy as a human right.[81] Most clearly, the Global Network Principle for privacy begins unequivocally: "Privacy is a human right and guarantor of human dignity. Privacy is important to maintaining personal security, protecting identity and promoting freedom of expression in the digital age."[82] In a 2020 policy update, Google also took the position that it was

---

[80] Google, "Human Rights," https://about.google/intl/ALL_us/human-rights/.

[81] *See* UNIV. DECL. HUM. RTS, ART. 12 ("No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour and reputation. Everyone has the right to the protection of the law against such interference or attacks."); UNITED NATIONS GUIDING PRINCIPLES ON BUSINESS AND HUMAN RIGHTS at 5 ("States should not assume that businesses invariably prefer, or benefit from, State inaction, and they should consider a smart mix of measures – national and international, mandatory and voluntary – to foster business respect for human rights. The failure to enforce existing laws that directly or indirectly regulate business respect for human rights is often a significant legal gap in State practice. Such laws might range from non-discrimination and labour laws to environmental, property, privacy and anti-bribery laws."); GLOBAL NETWORK INITIATIVE PRINCIPLES ("Privacy: Privacy is a human right and guarantor of human dignity. Privacy is important to maintaining personal security, protecting identity and promoting freedom of expression in the digital age. Everyone should be free from illegal or arbitrary interference with the right to privacy and should have the right to the protection of the law against such interference or attacks. The right to privacy should not be restricted by governments, except in narrowly defined circumstances based on internationally recognized laws and standards. These restrictions should be consistent with international human rights laws or standards, the rule of law and be necessary and proportionate for the relevant purpose. Participating companies will employ protections with respect to personal information in all countries where they operate in order to work to protect the privacy rights of users. Participating companies will respect and work to protect the privacy rights of users when confronted with government demands, laws or regulations that compromise privacy in a manner inconsistent with internationally recognized laws and standards.")

[82] https://globalnetworkinitiative.org/gni-principles/.

---

EXPERT CLASS CERTIFICATION REPORT OF NEIL RICHARDS

dishonest behavior for a company to use "products or services that are marketed or targeted with the express purpose of tracking or monitoring another person or their activities without their authorization" including the monitoring of "browsing history" or "GPS trackers specifically marketed to spy or track someone without their consent."[83] In a written response to an inquiry from the Data Protection Commissioner of Ireland, Google committed itself to the proposition that



[84] And in an internal document from Sept. 2021, Google represented that

[85]

73.     In a 2010 interview, Google's then-CEO Eric Schmidt announced that "Google policy is to get right up to the creepy line and not cross it."[86] "Creepiness" is a common nomenclature in privacy discourse: it refers to the common reaction people experience when they learn of a new privacy threat or invasive information practice, and comes up often in discussions about consumer tracking practices uses to serve surveillance-based ads. As Apple CEO Tim Cook once remarked: "To me, it's creepy when I look at something and all of a sudden it's chasing me all the way across the web. . . . I don't like that."[87]

74.     Evidence produced by Google in discovery also provides common, objective facts from which a jury or trier of fact may conclude that Google understands its account holders value privacy, and reasonably expect that the company's privacy and information practices will not be

---

[83] Google, Update to Enabling Dishonest Behavior Policy (August 2020), https://support.google.com/adspolicy/answer/9726908?hl=en&ref_topic=29265.
[84] GOOG-HEWT-00429693 at -696 (Google Ireland Limited Inquiry Reference – Google Submissions to DPC, Feb. 18, 2022).
[85] GOOG-HEWT-00480745 at -753 (Sept. 2021).
[86] Derek Thompson, *Google's CEO: 'The Laws Are Written by Lobbyists.'* THE ATLANTIC, October 1, 2010.
[87] Shara Tibken, *Apple's Cook Says Ads That Follow You Online Are "Creepy*," CNET, Apr. 6, 2018, https://www.cnet.com/news/apple-tim-cook-says-facebook-ads-that-follow-you-are-creepy-daca-dreamers-privacy-taxes/.



[REDACTED] in tension with well-established privacy norms.[88]  As examples:

a. A 2015 [REDACTED] [89]

b. A Google market research report from Spring 2016 found that [REDACTED] [90]

c. A Google document of [REDACTED] [91]

d. In a 2018 presentation on [REDACTED] the script points out that in the context of ad-based data sharing, [REDACTED] Another speaker on the same script later added [REDACTED] "[92]

e. In another presentation on the [REDACTED] project, the script discusses under a hearing entitled [REDACTED]

---

[88] GOOG-HEWT-00057910 at -938 (Dec. 4, 2019).
[89] GOOG-HEWT-00012303 at -324 (2015).
[90] GOOG-HEWT-00040123 at -128 (Spring 2016).
[91] GOOG-HEWT-00088603 at -604.
[92] GOOG-HEWT-00480493 at -499, 504 (Oct. 23, 2018).

---



[93] Later in the document, the script states

[94] Later in the same document, the script again states that

[95]

f. A 2019 document entitled

states that while Google hoped that it could

That next point then

states:

[96]

g. Later in the same document, in the context of discussion about

---

[93] GOOG-HEWT-00098506 at -509.

[94] *Id.*, at -511.

[95] *Id.*

[96] GOOG-HEWT-00481219 at -220 (emphasis in original).

EXPERT CLASS CERTIFICATION REPORT OF NEIL RICHARDS



To this point, one of the Google commentators pointed out that ████████████████████████████████████████████████████████████████████████████████████████████████ ██7

h. As one Google internal study participant put it, ████████████████████████████████████████████████████████████████████ ██98

i. As another Google internal study participant explained, ████████████████████████████████████████████████████████████████████ 99

## V. Google's Terms of Service and Privacy Policies Reflect Historical Societal Privacy Norms and Confirm People's Reasonable Expectations that Google Adheres to Those Norms

75.     The Terms of Service, Privacy Policies, and other information practice notifications that Google uses with its U.S. account holders contain language that reflects historical societal privacy norms.[100] They also represent that Google adheres to those norms.

76.     Consider Google's current Privacy Policy, which begins with the bolded headline

---

[97] *Id.* (emphasis in original).

[98] GOOG-HEWT-00057910 at -938 (Dec. 4, 2019).

[99] GOOG-HEWT-00012303.

[100] Until 2020, Google's U.S. Terms of told Google account holders that "By using our Services, you agree that Google can use such data in accordance with our privacy policies." See Google Terms of Service, April 14, 2014, archived at https://policies.google.com/terms/archive/20140414?hl=en-US, also available at Pltfs' CCAC, Exhibit 2; Google Terms of Service, October 25, 2017, archived at https://policies.google.com/terms/archive/20171025?hl=en-US, also available at Plaintiffs' Consolidated Class Action Complaint ("CCAC"), Exhibit 3. In March 2020, Google's U.S. Terms of Service changed to say "Besides these terms, we also publish a Privacy Policy. Although it's not part of these terms, we encourage you to read it to better understand how you can update, manage, export, and delete your information." *See* Google Terms of Service, March 31, 2020, archived at  https://policies.google.com/terms/archive/20200331?hl=en-US; also available at CCAC, Exhibit 4.

---

"**When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control,**" and continues to promise that "across our services, you can adjust your privacy settings to control what we collect and how your information is used."[101] This phrasing underscores and is consistent with the societal norms that informational privacy involves trust and that a core tenet of privacy, both historically and in the digital age, means control over one's personal information.

77.     Google's prior Privacy Policies contain similar representations and commitments to historical, societal privacy norms. For example, Google's Privacy & Terms – Technologies and Principles – Privacy Principles, published on Google's website and incorporated in Google's Privacy Policy since at least September 10, 2015, says: "We don't sell users' personal information."[102] Google's "Consent Bump," issued to Google account holders in the U.S. on June 28, 2016, reiterates this point:

> "What is still the same?
>
> •     Google does not sell your personal information to anyone."[103]

78.     Later U.S. Google Privacy Policies and Terms of Service continue in this vein. For example, Google's Privacy Policy, dated June 28, 2016, states: "We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies: With your consent …With domain administrators…For external processing…For legal reasons….."[104]

79.     In another example, Google's Privacy Policy dated May 25, 2018, makes the following commitment to U.S. Google account holders: "We don't show you personalized ads

---

[101] Google Privacy Policy (eff. July 1, 2023), https://policies.google.com/privacy?hl=en-US.
[102] GOOG-HEWT-00058417 -at 418.
[103] GOOG-HEWT-00456456; GOOG-HEWT-00456464.
[104] Google Privacy Policy, June 28, 2016, archived at https://policies.google.com/privacy/archive/20160628?hl=en-US; also available CCAC, Exhibit 6, at 6-7;  July 1, 2023 version is available here: https://policies.google.com/privacy?hl=en-US

based on sensitive categories like race, religion, sexual orientation, or health. We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to."[105]

80.     Likewise, in its Google Safety Center – Our Privacy & Security Principles, published on Google's website and incorporated into Google's U.S. Privacy Policy and U.S, Terms of Service since September 10, 2018, Google commits that it will "[n]ever sell our users' personal information to anyone… [i]t's important to clarify that our users' personal information is simply not for sale."[106]

81.     Additionally, Google's "How Our Business Works" page, incorporated by hyperlink into Google's U.S. Terms of Service since March 31, 2020, states:

- "We don't sell your personal information. . . ."[107]

- "[W]e never sell your personal information to anyone. . . ." [108]

- "Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to. We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation to personalize ads to you."[109]

- "But when you use our products you trust us with your personal information. That's why we never sell your personal information and why we give you powerful privacy controls. It's a responsibility that comes with creating products that are accessible to everyone, everywhere."[110]

---

[105] CCAC, Exhibit 6 at 2.
[106] GOOG-HEWT-00459543 at 544.
[107] Google, *How Our Business Works*, https://about.google/intl/en_US/how-our-business-works/; also available CCAC, Exhibit 5 at 1; and Exhibit Ex. 4 (Terms of Service).
[108] *Id.*
[109] *Id.*
[110] *Id.*

---

82.     Google's U.S. Privacy Policy, revised as of March 31, 2020, reiterates the representation that "Google does not sell your personal information."[111]

83.     Google's CEO Sundar Pichai also has publicly represented that Google's informational practices adhere to historical societal privacy norms. For example, in a 2019 *New York Times* article, CEO Pichai stated privacy is "one of the most important topics of our times" and that "Privacy must be equally available to everyone in the world." Pichai went on to say that "To make privacy real, we give you clear, meaningful choices around your data. All the while staying true to two unequivocal policies: that *Google will never sell any personal information to third parties*; and that you get to decide how your information is used."[112] Similarly, in sworn testimony before a House Committee in 2018, Pichai stated that "As a company, we do not sell data. That would be against our principles. . .. *We do not and would never sell user data*."[113]

84.     In my opinion, Google's repeated public commitments to continually honor the private nature of its account holders' personal information, and Google's repeated representations that the company "does not" "will not" and "never" shares or sells account holders' personal information to "anyone" including, specifically, "with advertisers," reflect the deeply-held societal understanding that privacy is a fundamental right and an important societal norm in the U.S.

85.     It is also my opinion that Google's use of the phrase "personal information" in its U.S. Privacy Policies and Terms of Service is consistent with commonly-held traditions of privacy norms in the United States and the definitions of personal information under California law as discussed above.

86.     As discussed, above, Google's June 28, 2016 Privacy Policy discusses the

---

[111] Google U.S. Privacy Policy, March 31, 2020, archived at https://policies.google.com/privacy/archive/20200331?hl=en-US; also available at Pltfs' CCAC, Exhibit 16, and produced by Google in discovery as GOOG-HEWT-00001203.
[112] Sundar Pichai, *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good*, N.Y. Times, May 7, 2019 (emphasis added).
[113] Testimony of Sundar Pichai at 1:33:27, House Judiciary Committee, Dec. 11, 2018 (emphasis added).

"personal information" that Google collects from its U.S. account holders and promises that "[w]e do not share personal information with companies, organizations and individuals outside of Google" except for a few limited exceptions including consent, sharing with domain administrators, for legal reasons, or for external processing with "our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures."[114] The Policy states that "[i]nformation we collect when you are signed in to Google, in addition to information we obtain about you from partners, may be associated with your Google Account. When information is associated with your Google Account, we treat it as personal information."[115]

87.     Google's May 25, 2018 Privacy Policy defines "personal information" to include "information that you provide to us which personally identifies you, such as your name, email address, or billing information, *or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account*."[116] The Policy describes information "Google associate[s] with…Google Account[s]" to include:

> ". . . [U]nique identifiers [hyperlink], browser type and settings, device type and settings, operating system, mobile network information, including carrier name and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time and referrer URL of your request."[117]

"Unique identifiers" is defined within the May 25, 2018 Privacy Policy, and the hyperlinked term also takes a user directly to a definition of unique identifier, as "a string of characters that *can be used* to uniquely identify a browser, app or device" which includes cookies, advertising IDs, and

---

[114] CCAC, Exhibit 6, at 6-7 and https://policies.google.com/privacy/archive/20160628?hl=en-US
[115] *Id.,* at 3.
[116] CCAC, Exhibit 12, and https://policies.google.com/privacy/archive/20180525?hl=en-US
[117] *Id*., at 2.

other unique device identifiers.[118]

88.     Google's May 25, 2018 Privacy Policy also defines "Non-personally identifiable information" as "information that is recorded about users so that it no longer reflects or references an individually-identifiable user."[119]

89.     In my opinion, Google's definition of "personal information" in its U.S. Privacy Policies conforms to societal privacy norms and expectations of what information is private and at risk for intrusion. As I discuss in Section VI, deeply-held societal privacy norms, including the historical societal interest in protecting persons from unwanted surveillance, recognize that "personal information" is involved where tracking of people's locations (e.g., address, geolocation, IP address, etc.), persons (e.g., unique identifiers) or intellectual pursuits, characteristics, interests, and reading habits (e.g., browser activity, app activity, URLs, etc.) occurs.

## VI.   There is Common Evidence From Which a Jury Could Conclude that Google RTB Contravenes Societal Privacy Norms

90.     Although I am not a computer scientist, based on my academic work and teachings in privacy, informational privacy and privacy law,[120] as well as my review of the plaintiffs' Consolidated Class Action Complaint and published articles on the subject, I am generally aware of what Google's Real-Time Bidding ("Google RTB") advertising is, and how it functions.

91.     In very general terms, I understand that Google owns and operates systems for

---

[118]   See May 25, 2017 Privacy Policy (CCAC, Exhibit 12, and https://policies.google.com/privacy/archive/20180525?hl=en-US   at 27), and the hyperlinked definition: https://policies.google.com/privacy/archive/20180525?hl=en-US#footnote-unique-id
[119]   Id., at 25.
[120]   For example, I discuss the privacy implications of targeted marketing and behavioral advertising in my book, *Why Privacy Matters*, *supra*, at 35-50. I have also written about targeting marketing numerous times in other articles. See, *e.g.*, Neil Richards & Woodrow Hartzog, *The Pathologies of Digital Consent*, 96 WASH. U. L. REV. 1461, 1471, 1486 (2019); Neil Richards & Woodrow Hartzog, *A Duty of Loyalty for Privacy Law*, WASH. U. L. REV. 961, 971 (2021); Woodrow Hartzog & Neil Richards, *The Surprising Virtues of Data Loyalty*, 71 EMORY L.J. 985, 1003 (2022).

---

serving targeted display advertising on web browsers and apps through which Google observes, collects, and analyzes real-time data about account holders when they are using the Internet.[121] As an account holder uses her browser or app, that use is tracked, accompanied by cookies[122] and other identifiers which are sent from the account holder's browser or app to Google.[123] Google matches the cookies to the account holder's personal information stored at Google, and then sends "a bid request" containing certain of her personal information – including her Google User ID, IP address, device identifiers, personal identifiers, geolocation data, the specific content that the user has requested and been shown when the user is on a web-browser or the app in use when using a smartphone or tablet app – to various companies that participate in the Google RTB auction.[124] These outside companies may respond with a bid for the right to offer a targeted ad placement based on the account holder's personal information, or they may simply "lurk" in the auction to acquire information about the account holder.[125] The winning bidder earns the right to place an ad on the account holder's browser or personal device; it can then place its own ad, assign that right to another, or resell and republish the account holder's personal information obtained in the bid to other entities or databases.[126] The entire process is fully automated, and takes less than a hundred milliseconds – less than a blink of an eye.[127] But, crucially, Google RTB is invisible; it is not

---

[121] *See* CCAC ¶¶ 113-133.

[122] Based on my background and experience, I understand that cookies are small text files stored on a device to collect personal data and were originally created in the early 1990s, to allow a web site to ensure that when a person using the site moved from one page to another (for example from a product page to their shopping cart to the credit card information page), the web site could enable that session to continue smoothly and securely, though increasingly they have been used for widespread tracking out of all proportion to their original, limited, technical purpose. *See generally* Matthew Crain, Profit Over Privacy: *How Surveillance Advertising Conquered the Internet*, 65-67 (2021).

[123] *See* CCAC ¶¶ 134, 163-180.

[124] *See id.,* ¶¶ 6-7, 134, 205-59.

[125] *See id.,* ¶¶ 183-190.

[126] *See id.,* ¶¶ 183-190, 287.

[127] *See id.,* ¶ 116.

---

disclosed to Google account holders, nor is it apparent that it is happening.[128]

92.     I also understand, based on my reading of the Plaintiffs' complaint and the expert report of Professor Zubair Shafiq, Ph.D. (a professor Computer Science at the University of California, Davis, whose research and academic work focus on online security and privacy), that Google regularly transmits dozens of items of information linked to or reasonably associated with Google account holders to companies that participate in the Google RTB auction.[129] The transmission of this informational data to potential advertisers is integral to Google RTB: this is how Google has built its targeted online advertising system to function.[130]

93.     Based upon my knowledge of historical and contemporary privacy norms and practices, as well as my review of the evidence in this matter, it is my opinion that there are common, objective facts from which a jury or trier-of-fact may find that Google's RTB auction practices contravene historical U.S. societal privacy norms.

94.     Simply put, the types of data that Google shares with Google RTB participants are unprecedented in human history before the advent of surveillance-based advertising. They include browsing activity, IP address and device information, reading habits and video-watching habits, records of intellectual activity, along with traditionally recognized categories of protected personal data including race, gender, health, sex, sexuality, financial, religion, and location data [131]

---

[128] *See id.,* ¶¶ 116-117. I discuss the privacy implications of this lack of disclosure in Section VII below.

[129] *See id.,* ¶¶ 205-59; Expert Report of Professor Zubair Shafiq in Support of Plaintiffs' Motion for Class Certification ("Shafiq") ¶¶ 26-43.

[130] *See* Crain, *supra,* at 142-43. Indeed, internal Google documents produced in discovery further support this idea. For example, in a 2019 document entitled ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ GOOG-HEWT-00481219 at -220.

[131] *See, e.g.,* Shafiq, *supra*, at ¶¶ 44-68; *and see* Hessie Jones, *Real-Time Bidding: The Ad Industry Has Crossed a Very Dangerous Line*, FORBES, Oct. 18, 2021, https://www.forbes.com/sites/hessiejones/2021/10/18/real-time-bidding-the-ad-industry-has-

---

95.     These categories of information affect everyone in society, and they create significant risks of harms when exposed to third parties, including: autonomy harms (including coercion, manipulation, failure to inform, thwarted expectations, a lack of control, and chilling effects – all of which are among the core harms that societal privacy norms historically associate with intrusion itself, as both the Restatement of Torts (2d) and California law recognize)[132]; physical harms; economic harms; reputational harms; psychological harms; discrimination harms; and relationship harms (such as the loss of confidentiality and damage to the trust).[133]

96.     <u>Intellectual Records</u>. For example, one category of information is intellectual records.  As I explained above in Section IV, records of reading, letters, communications, and other forms of what we could call "intellectual records" have a long been recognized as highly private, supported by strong expectations of privacy, and often protected by specific laws singling them out for special protection. Privacy for the records of reading, thinking, and communication has always been viewed as essential to democracy because of the close relationship of these records to the processes of free expression.[134]

97.     These protections are particularly important in our digital society, as our ability to read, think, learn, and communicate privately have become mediated by digital technologies (including the web, web browsers like Google's Chrome, Google's search engine and also its Gmail email service) that create records of our communications along with our reading habits and intellectual interests. It is precisely for this reason that the Fourth Amendment protects "papers,"

---

crossed-a-very-dangerous-line/?sh=43edcbd848ca; Senator Ron Wyden (Oregon), et al., Letter to Hon. Joseph J. Simmons, Chairman of the Federal Trade Commission (FTC) urging FTC investigation of RTB, July 31, 2020.  https://www.documentcloud.org/documents/7011637-073120-Wyden-Cassidy-Led-FTC-Investigation-Letter

[132] *See* Section IV of this Report.
[133] *See* Danielle Keats Citron & Daniel Solove, *Privacy Harms*, 102 B.U. L. REV. 793, 831-846 (2022).
[134] Neil Richards, *Intellectual Privacy: Rethinking Civil Liberties in the Digital Age* 95-108 (2015).

that postal confidentiality law and communications privacy law have protected our communications, and that library confidentiality and other reader and video privacy statutes have protected our ability to read – and to engage with new and potentially controversial ideas – freely, fearlessly, and with meaningful guarantees of intellectual privacy and confidentiality. Particularly where there is good (and growing) empirical evidence that people who are watched systematically read, think, and communicate less freely, intellectual privacy is essential to any free society.[135]

98.     With respect to people's browsing activities, which are at the core of Google RTB,[136] the data that people search out on the Web is some of the most revealing information imaginable. People use their browsers for health information, perhaps about diseases or symptoms they might have, to explore their religion or their sexuality, to read the news, to explore political interests, to discover new books or articles, to satisfy their curiosity, to practice law and do legal work (whether as an attorney representing clients, a judge or law clerk working on a case, or an academic working on an article or an expert report).[137]

99.     When Google shares with Google RTB auction participants people's browsing activities (e.g., the webpage, URL, user list) together with the timestamped sequence of their locations (e.g., longitude and latitude)[138] and related personal data, as it routinely does in Google RTB, these companies can obtain a highly detailed view of people's lives.[139] In discovery produced by Google in this matter, Google RTB tech lead, Stan Belov, ██████████████████

---

[135] Richards, *Intellectual Privacy*, *supra*; *see also* Neil M. Richards, *Intellectual Privacy*, 87 TEX. L. REV. 387 (2008); Neil M. Richards, *The Perils of Social Reading*, 101 GEO. L.J. 689, 691-692, 704-705 (2013); Jonathon W. Penney, *Understanding Chilling Effects*, 106 MINN. L. REV. 1451, 1486, 1497, 1508 (2022).

[136] *See* CCAC ¶¶ 17; 90; 149-50; 180; 256-58; Shafiq, *supra*, ¶¶ 26-68, 80.

[137] *See, e.g.*, Richards, *Intellectual Privacy*, *supra* n. 134, at 131.

[138] In *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the U.S. Supreme Court found that "the timestamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations." *Id.*, at 415 (opinion of SOTOMAYOR, J.), available at https://www.supremecourt.gov/opinions/17pdf/16-402_h315.pdf

[139] *See* Shafiq, *supra*, ¶ 80.

[140]

100.     Because there is common evidence that Google commonly shares with third parties via Google RTB intellectual records associated with or that can be linked Google account holders, such as browsing data and interests,[141] and because such intellectual records are essential to the development of our political and personal beliefs and to the preservation of democracy, it is my opinion that a jury or trier of fact may conclude these practices, which are undisclosed to Google account holders (and contrary information is provided) run against longstanding and important privacy norms.

101.     Other personal information categories. Databases of other kinds of data also threaten violations of historical privacy norms and increase the risk of large and small harms. At the most serious levels of harm, for example, there is a long and troubling history in the United States of data about race being used to discriminate, and in Europe in the 1940s, databases and information technology (including the Hollerith punch-card technology made by IBM) were used by Nazi Germany to identify European Jews for deportation to concentration camps.[142]

102.     In addition to such examples of the utmost gravity, disclosures of personal data can lead to a variety of harms of varied lesser – though still significant – kinds. Leading privacy scholars Danielle Citron and Daniel Solove have categorized the harms that privacy violations can cause, including autonomy harms (including coercion, manipulation, failure to inform, thwarted expectations, a lack of control, and chilling effects), discrimination harms, psychological harms (such as emotional distress and disturbance), physical harms, economic harms, reputational harms, and relationship harms (such as the loss of confidentiality and damage to the trust that is necessary

---

[140] GOOG-HEWT-00144286.
[141] *See* Shafiq, *supra*, ¶¶ 26-43.
[142] *See e.g.,* Richard Sobel, *The Degradation of Political Identity under a National Identification System*, 8 B.U. SCI. & TECH. L.J. 37, 51 (2002) (quoting Edwin Black, *IBM and the Holocaust: The Strategic Alliance Between Nazi Germany and America's Most Powerful Corporation* (2001)).

for many important personal, professional, and commercial relationships to flourish).[143]

103.     Location data provides another example. There are common, objective facts from which a jury or trier of fact may conclude that Google RTB allows third parties to obtain location data about individuals, including data that can be used to identify that household's addresses.[144] The exposure of a person's home address coupled with other information (like them being on vacation, or working 9-5) can unknowingly subject the user to real-world risks and facilitate a range of crimes like robbery and assault.

104.     Google's own published research has found that location data is not just highly private and sensitive, but is regarded as such by its customers. Unsurprisingly, in the current post-*Roe* environment,[145] Google has been quick to admit that location data is particularly dangerous and problematic for personal privacy to collect and share.[146] In fact, in response to the Supreme Court's decision in *Dobbs* last summer, Google promised that it would delete certain kinds of location history in Google accounts pertaining to medical visits. A Google spokesperson explained that "Protecting our users' privacy and securing their data is core to Google's work. That's why we design products to help people keep their personal information private, safe, and secure – with easy-to-use tools and built-in protections. Privacy matters to people – especially around topics

---

[143] Danielle Keats Citron & Daniel Solove, *Privacy Harms*, 102 B.U. L. REV. 793, 831, 841-848, 859-861 (2022).

[144] *See* Shafiq, *supra*, ¶¶ 42, 83.

[145] In the aftermath of the 2022 Supreme Court decision in *Dobbs v Jackson Women's Health Organization* 142 S. Ct. 2228 (2022), a number of organizations and commentators have articulated the dangers that flow to everyone (and to marginalized groups in particular) when the processing of location data by large companies occurs in an unconstrained way. *See, e.g.*, Cindy Cohn & Corynne McSherry, *EFF's Statement on Dobbs Abortion Ruling*, EFF.ORG, June 24 2022; Danielle Keats Citron, *The End of Roe Means We Need a New Civil Right to Privacy*, SLATE, June 27, 2022; Johana Bhuiyan, *Facebook Gave Police their Private Data. Now, this Duo Face Abortion Charges*, THE GUARDIAN, Aug. 10, 2022.

[146] *See e.g.,* Jennifer Gollan, *Websites Selling Abortion Pills Are Sharing Sensitive Data with Google*, PROPUBLICA, Jan. 18, 2023; Runa Sandvik, *How US police use digital data to prosecute abortions*, TECHCRUNCH, Jan. 27, 2023.

---

such as their health."[147]

105.     In my opinion, the stream of user location information and dozens of other data that is linked to, associated with, or that reasonably associated with Google account holders, and routinely transmitted by Google to third-party RTB participants represents a level of surveillance that violates historical privacy norms – norms that Google itself represents that it follows.

106.     Calling Google RTB "the biggest data breach," a report by the Irish Council for Civil Liberties (ICCL) in May 2022 explained that Google RTB "operates behind the scenes on websites and apps. It tracks what you are looking at, no matter how private or sensitive, and it records where you go. Every day it broadcasts this data about you to a host of companies continuously, enabling them to profile you."[148] The ICCL gave several examples of dangerous Google RTB data usage where it had been collected by third parties, explaining that "there is no way to restrict the use of RTB data after it is broadcast. Data brokers used it to profile Black Lives Matter protestors. The US Department of Homeland Security and other agencies used it for warrant-less phone tracking. It was implicated in the outing of a gay Catholic priest through his use of Grindr. ICCL uncovered the sale of RTB data revealing likely survivors of sexual abuse."[149] In response to the FTC's call for comments on the prevalence of "commercial surveillance" in the summer of 2022, the ICCL submitted a report that made what was in my opinion a highly credible case that RTB constituted both an unfair and a deceptive trade practice under Section Five of the

---

[147] Jen Fitzpatrick, *Protecting People's Privacy on Health Topics*, Google The Keyword Blog, July 1, 2022, https://blog.google/technology/safety-security/protecting-peoples-privacy-on-health-topics/.

[148] Irish Council on Civil Liberties, *The Biggest Data Breach: ICCL report on scale of Real-Time Bidding data broadcasts in the U.S. and Europe*, May 16, 2022, https://www.iccl.ie/digital-data/iccl-report-on-the-scale-of-real-time-bidding-data-broadcasts-in-the-u-s-and-europe/. I note that the ICCL report covered all RTB activity and was not explicitly restricted to Google.

[149] *Id.*, at 2.

FTC Act.[150]

107.    For these and other reasons, the categories and quantities (discussed more below) of data sold by Google and shared in Google RTB bid requests have attracted the attention of regulators and civil liberties advocates in the United States and around the world.

108.    In 2020, a group of U.S. Senators wrote a letter to the FTC asking it to investigate RTB, based on credible media reports that "companies are participating in RTB auctions solely to siphon off Bidstream data,"[151] and that this "outrageous" accessing of data was being used to infer race data to profile participants in Black Lives Matter civil rights protests and the building of religious profiles based upon location data of church attendance.[152]

109.    The following year a group of federal lawmakers inquired about RTB and noted their concern that bidstream participants were siphoning revealing personal data and using it to create dossiers on Americans. Noting "multiple reports" that several federal agencies were buying these dossiers,[153] the lawmakers explained "that the United States is not the only government with the means and interest in acquiring Americans' personal data. This information would be a goldmine for foreign intelligence services that could exploit it to inform and supercharge hacking, blackmail, and influence campaigns. As Congress debates potential federal privacy legislation, we must understand the serious national security risks posed by the unrestricted sale of Americans'

---

[150] Irish Council on Civil Liberties, *Unfair and Deceitful Commercial Surveillance: Submission to the U.S. Federal Trade Commission*, Nov. 21, 2022, https://www.iccl.ie/digital-data/ftc-must-act-against-commercial-surveillance/.

[151] As described by federal regulators, "bidstream data" refers to the information in RTB, which they describe as "sensitive information about the potential recipient of the ad – device identifiers and cookies, location data, IP addresses, and unique demographic and biometric information such as age and gender." Wyden 7/31/2020 FTC Letter, *supra*. (https://www.documentcloud.org/documents/7011637-073120-Wyden-Cassidy-Led-FTC-Investigation-Letter ). *See also* CCAC ¶ 5.

[152] *Id.*, Wyden 7/31/2020 FTC Letter.

[153] *See also* Byron Tau, *How Cellphone Data Collected for Advertising Landed at U.S. Government Agencies*, WALL ST. J., Nov. 18, 2021; Joseph Cox, *CBP Refuses to Tell Congress How It Is Tracking Americans Without a Warrant*, VICE, Oct. 23, 2020.

---

EXPERT CLASS CERTIFICATION REPORT OF NEIL RICHARDS

data to foreign companies and governments."[154]

110.     There also is common reported evidence to support the conclusion that foreign companies and governments can use RTB bidstream data and the Internet advertising ecosystem more generally to spy on Americans.   For example, a 2021 letter from Senator Ron Wyden to the Federal Chief Information Officer at the Office of Management and Budget explained how ad networks can not only be used to install malware on computers that compromised their security but that

> The companies that deliver online advertisements also collect vast amounts of sensitive information about users, their movements, web browsing and other online activities, which is then offered for sale to anyone with a credit card. Indeed, I recently led a bipartisan Senate investigation into this unregulated market, which discovered that major advertising companies are providing Americans' data to firms in China, Russia and other high-risk foreign countries. It would surprise nobody if foreign intelligence services were eager to acquire that data and put it to use in hacking, blackmail and influence campaigns.[155]

Based on these underlying risks, the National Security Agency and the federal Cybersecurity and Infrastructure Security Agency have issued public guidance on the threats that advertising networks pose for the cybersecurity and privacy of their users' computers, and recommended the use of ad blockers to prevent such incursions on privacy and security.[156]

111.     Additionally, just this year, journalists reported that an Israeli-based company is marketing a product that uses RTB data (among others) to track people through their phones, "which it sells to governments around the globe."[157]

112.     And, in a recently declassified report on "Commercially Available Information,"

---

[154] Letter from Sen. Wyden et al. to Google, dated April 1, 2021 (GOOG-HEWT-00318797).

[155] Letter from Sen. Wyden to Clare Martorana, Federal Chief Information Officer, Office of Management and Budget, Sept. 22, 2021, https://www.documentcloud.org/documents/21068028-wyden-letter-to-omb-on-ad-blocking.

[156] *Id.*; *see also* Tim Starks, *CISA Tells Agencies to Consider Ad Blockers to Fend Off 'Malvertising'*, CYBERSCOOP, Jan. 14, 2021; Joseph Cox, *The NSA and CIA Use Ad Blockers Because Online Advertising Is So Dangerous*, VICE, Sept. 23, 2021.

[157] Ryan Gallagher, *Your Ad Data Is Now Powering Government Surveillance*, Bloomberg, May 10, 2023.

(CAI) including RTB data, the federal Office of the Director of National Intelligence Senior Advisory Group noted that data from RTB and other advertising platforms "that track end users as they browse the Internet…have significantly contributed to the profound increase in CAI." The bulk of the report was devoted to explaining that (1) "there is today a large and growing amount of CAI that is available to the general public, including foreign governments (and their intelligence services) and private sector agencies, as well as [U.S. intelligence agencies]"; (2) "CAI clearly provides intelligence value…It also raises significant issues related to privacy and civil liberties" in part related to "profound changes in the scope and sensitivity of CAI[.]"[158]

113.     Because (1) Google RTB bid requests transmit vast amounts of account holders' personal information, i.e., information that is reasonably susceptible of being associated with an individual or household, and (2) this information includes information such as the specific web page being visited by the user and the user's geolocation and persistent identifiers,[159] with third parties, it is my opinion that there is a common body of evidence from which a jury or trier-of-fact could conclude that Google's practice of sharing of account holders' bidstream data through Google RTB runs contrary to longstanding and important privacy norms.

114.     A second way in which Google RTB runs contrary to historical privacy norms, beyond the types of personal data shared, is the vast quantity of personal information sent to third parties. The volume of user data shared is historically unprecedented and so vast in scope that it is difficult to comprehend. Google engineer Stan Belov estimates ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[160]

---

[158] Office of the Director of National Intelligence Senior Advisory Group Panel on Commercially Available Information, *Report to the Director of National Intelligence* 3-4, Jan. 27, 2022, https://www.documentcloud.org/documents/23844477-odni-declassified-report-on-cai-january2022.
[159] *See* CCAC ¶¶ 140, 511.
[160] Deposition of Stanislav Belov, *In re Google RTB Consumer Privacy Litigation*, Dec. 13, 2022, 26:4-14.

---

115.     Additionally, according to Professor Shafiq, who analyzed the limited auction data thus far produced by Google for the seven named plaintiffs (representing just eight, one-week periods sampled from Google's records), for just the eight one-week periods for which Google produced data, there were more than ████ individual ad opportunities (queries), resulting in ██████████ bid requests being made by Google to ████ of different Google RTB participants.[161] In short, the limited evidence produced by Google shows that Google shared the seven named plaintiffs' data with ████ of third party RTB participants ████ of times over the course of just six weeks – on average, ████████████ *times each day*.[162]

116.     Moreover, according to Professor Shafiq, *nearly* ██ *percent* of the Google RTB bid requests involving the seven named plaintiffs that Google thus far has produced involve sensitive categories of information, such as health status, race, political affiliation, etc.[163] This despite Google's very clear representation, in its Terms of Service, its Privacy Policies, and its public statements, that Google "never" uses Google account holders' sensitive information "to personalize ads" to them.

117.     High-volume data sharing threatens privacy as the Supreme Court has recognized. If you have enough tiny, even innocuous-seeming information about a person, it is possible to assemble a highly detailed picture of a person's life.[164] Indeed, modern systems of data science enable striking insights about people based upon large enough data sets of "innocuous" data.[165] This is particularly true with respect to a Google Account Holder's interests, which can be finely

---

[161] *See Shafiq*, *supra*, ¶¶ 35-36.

[162] *See id.*

[163] *See id.*, ¶¶ 40, 42, 63.

[164] *Cf. Riley v. California*, 573 U.S. 373, 394-96 (2014) (extending the Fourth Amendment warrant requirement to apply separately searches of a cell phone incident to an otherwise valid arrest on the grounds that the data points on a cell phone can create a detailed picture of a person's life). *See also* Paul Ohm, *The Many Revolutions of Carpenter*, 32 HARV. J.L. & TECH. 357, 372 (2019).

[165] *See, e.g.*, Richards, *Why Privacy Matters*, *supra*, at 35-37; Daniel J. Solove, *Data Is What Data Does: Regulating Use, Harm, and Risk Instead of Sensitive Data*, NW. L. REV. 33-35 (forthcoming 2024).

mapped through Google's repeated transmissions of the web sites that person visits through Google RTB. The same can be said of the person's geolocation. The repeated transmission of the users' interests and geolocation to hundreds of RTB participants results in a fine-grained motion picture of that person's interests and movements over time.

118.     Based on the foregoing, it is my opinion there are common, objective facts (including Google's violations of its promises, the continued and expansive nature of Google RTB, etc.) from which a jury or trier of fact may conclude that Google RTB violates societal privacy norms.

**VII**.     **Protection of Fundamental Privacy Rights and Historical Societal Privacy Norms Requires Disclosure and Effective Controls About What Information is Collected About or Associated With U.S. Google Account Holders and Offered For Sale By Google to Google RTB Auction Participants**

119.     Google does not inform U.S. Google account holders that it offers for sale and sells the types of personal information that is linked to or can reasonably be associated with them, as discussed *supra*, to third-party companies in the Google RTB auction. Google's Terms of Service, Privacy Policies, and incorporated disclosures (discussed above in Section V and attached as exhibits to Plaintiffs' CCAC) do not contain such disclosures[166]; nor, to my knowledge, has Google produced evidence in this case that U.S. account holders are provided with such disclosures.

120.     As a scholar trained in the disciplines of law and history who has thought, written about, researched, discussed, and taught about privacy in the U.S. for over twenty years, it is my opinion that this lack of disclosure on Google's part runs afoul of fundamental privacy rights (and data privacy rights in particular), and is counter to historical U.S. privacy norms.

121.     Justice Brandeis wrote in 1928: "Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application

---

[166] *See* Notes 100-119, *supra*.

than the mischief which gave it birth."[167] Today, in in the context of digital privacy, perhaps the primary affirmative obligation digital services have is to give notice of their practices and not be deceptive about them.

122.     California law and federally-recognized best practices require that a company offering an online service link to a privacy policy.[168] The basic mechanism behind the requirement is that consumers are able to read and compare privacy policies in order to decide what services to use and otherwise exercise choices with respect to their information.[169] The purpose or effect of these decisions are to try to police the digital marketplace, by allowing well-informed consumers to essentially reward good practices and penalize bad ones.[170]

123.     In my own work, I have been critical of website privacy notices as being an effective privacy solution in and of themselves. There is a large body of academic literature criticizing prevailing privacy notice practices as ineffective.[171]

124.     In my opinion, societal privacy norms require that a company's privacy notice, at a minimum, both affirmatively and truthfully inform consumers of what the company may do with

---

[167] *Olmstead v. United States*, 277 U.S. 438, 472-73 (Brandeis, dissenting) (quoting *Weems v. United States*, 271 U.S. 349 (1910)). Brandeis was quoting Weems, but the passage also evokes the famous introduction to "The Right to Privacy," the landmark article that represented a modern starting point for privacy law in the U.S. *See* Note 1, *supra*, 4. HARVARD L. REV. at 193 ("Political, social, and economic changes entail the recognition of new rights, and the common law, in its eternal youth, grows to meet the demands of society.")

[168] *See, e.g.,* CAL. BUS. & PROF. CODE §§ 22575-22577.

[169] Fred H. Cate, *The Failure of Fair Information Practices Principles*, Consumer Protection in the Age of Information Economy, 341, 346 (Jane K. Winn ed. 2006).

[170] *See* Matthew A. Edwards, *Empirical and Behavioral Critiques of Mandatory Disclosure: Socio-Economics and the Quest for Truth in Lending*, 14 CORNELL J.L. & PUB. POL'Y 199, 242 (2005) (discussing disclosure in another context).

[171] *See, e.g.*, Neil Richards & Woodrow Hartzog, *Taking Trust Seriously in Privacy Law*, 19 STAN. TECH. L. REV. 431, 444-47 (2016); Neil Richards & Woodrow Hartzog, *The Pathologies of Digital Consent*, 96 WASH. U. L. REV. 1461 (2019); Solon Barocas & Helen Nissenbaum, "*On Notice: The Trouble with Notice and Consent Order*" 1-6 (Oct. 2009), available at https://nissenbaum.tech.cornell.edu/papers/ED_SII_On_Notice.pdf (scrutinizing the use of "notice and consent" to address privacy concerns in online behavioral advertising).

---

their data.

125.     As I stated earlier in this this report,[172] the societal context of one's communications, as well as the ability to decide what information about oneself is shared and with whom, are central societal privacy norms in the U.S. dating back to the founding of this country.

126.     Evidence produced by Google in discovery also provides common, objective facts from which a jury or trier of fact may conclude that Google understands that its privacy notices do not comport with its U.S. account holders' expectations of privacy.  As examples:

a.  A 2014/2015  summary of 

,,[173]

b.  The same 2015 document went on to find formally as "Finding #8" that:

[175]

c.  In a 2018 presentation on Google's ███████ project, dealing with the implementation of ██████████████, high-level slide bullet points explained

---

[172] *See* Section IV.
[173] GOOG-HEWT-00012303 at -307.
[174] *Id.,* at -327.
[175] *Id.*, at -388.

that 

[176]

d.  The script from that same presentation points out that in the context of ad-based data

sharing, 

[178]

e.  Another 2018 presentation on the ⬛⬛⬛⬛ project similarly pointed out Google's

knowledge that  A later slide in the same

---

[176] GOOG-HEWT-00480493 at -496.
[177] *Id.*
[178] *Id.,* at -510.
[179] GOOG-HEWT-00098506 at -507 (Oct. 8, 2018).

document was accompanied by the narrative: 

f.   Narration from yet another 2018 [REDACTED] documented sounded similar themes:

g.   A document prepared for the [REDACTED] dated October 4, 2018 noted that

h.   As noted above, a 2019 document entitled "

---

[180] *Id.*, at -509.
[181] GOOG-HEWT-00099180 at -181.
[182] GOOG-HEWT-00089761 at 779-81.



127.        In addition to this evidence, there is other evidence that consumers are unaware of the scale and scope of Google RTB. In addition to the academic work cited above,[185] federal lawmakers have expressed that when it comes to RTB, "Few Americans realize that companies are siphoning off and storing that 'bidstream' data to compile exhaustive dossiers about them."[186]

128.        To protect fundamental privacy rights and societal privacy norms, it is my opinion that Google's privacy notices, *i.e*., its Terms of Services, Privacy Policies, and related disclosures, must, at a minimum, disclose and contain effective controls about what information is collected about or associated with U.S. account holders and offered for sale by Google to Google RTB auction participants.

129.        As previously discussed, based on my review of the evidence that has been produced to date, Google's privacy notices contain no such disclosures. There is thus a common core set of evidence – Google's Terms of Service, Privacy Policies, and related notices – from which a jury or trier of fact could conclude that Google's lack of disclosure regarding its Google RTB practices violates prevailing, historical societal privacy norms.

---

[183] GOOG-HEWT-00481219 at -219-20.
[184] *Id.,* at -221.
[185] *See supra* ¶¶ 62-67.
[186] July 30, 2021 Wyden FTC Letter, *supra,*
https://www.documentcloud.org/documents/7011637-073120-Wyden-Cassidy-Led-FTC-Investigation-Letter.

---

**VIII**.    **Google's Terms of Service and Privacy Policies Could Give Rise to a Common (False) Expectation That Google Does Not Offer For Sale or Sell Information Linked to or Reasonably Associated With U.S. Account Holders**

130.    To the extent Google's Terms of Service, Privacy Polices and related privacy disclosures contain affirmative representations, they are notable in what they say Google ***will not do*** with U.S. account holders' personal information: to not share or sell account holders' personal information to anyone outside of Google.

131.    As explained above in Section V, there is substantial evidence, both in the public record, and from evidence produced by Google in discovery that provides common, objective facts from which a jury or trier of fact may conclude not only that a reasonable Google account holder has a reasonable expectation of privacy, but that Google is all too well aware of this fact.

**IX.**    **Considering Google's Failure to Disclose the Details of Google RTB to U.S. Google Account Holders, There is Common Proof that Account Holders Lack any Mechanism to Consent to Google's Sharing or Selling their Personal Information Outside of Google via Google RTB**

132.    As explained above in Part IV, there is substantial evidence, both in the public record, and from evidence produced by Google in discovery that provides common, objective facts from which a jury or trier of fact may conclude that Google has made numerous promises to its account holders over the years and up to the present day that it puts them "in control" of how their personal information is used and disclosed.

133.    Further, as explained above in Section V, there is substantial evidence, both in the public record, and from evidence produced by Google in discovery that provides common, objective facts from which a jury or trier of fact may conclude not only that the typical internet consumer (and by extension a Google account holder) cares deeply about their privacy, but that Google is all too well aware of this fact.

134.    Additionally, as explained above in Section VI, there is substantial evidence, both in the public record, and from evidence produced by Google in discovery that provides common, objective facts from which a jury or trier of fact may conclude not only that the typical internet

---

consumer (and by extension a Google account holder) has an understanding of internet information sharing that is limited at best, but that Google is all too well aware of this fact.

135.     Based on my review of the available record evidence, including Google's Terms of Service, Privacy Policies and related statements and disclosures, I have seen no evidence from which a jury or trier of fact may conclude that Google has disclosed the RTB system of information sharing to its account holders, nor have I seen any evidence from which a jury or trier of fact may conclude that Google offers any kind of viable opt-out from this kind of information sharing.

136.     It is my opinion that there is substantial evidence, both in the public record, and from evidence produced by Google in discovery that provides common, objective facts from which a jury or trier of fact may conclude that Google's promises to put its users in control with respect to Google RTB data are false. This evidence includes:

a.  A 2018 slide deck from Google's ██████████ project also reflected Google's knowledge that ████████████████████████████████████████████████ ████████████████████████████████████[187]

b.  A separate 2018 ████████ project slide deck noted that Google account holders ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████[188]

c.  According to Google internal documents, only a small percentage of Google account holders ████████████████████ █ ████████████████████ ████████████████[189]

137.     I have seen no evidence that Google RTB data sharing (including its existence, its scope, its quantity, and the lack of controls for further uses of Google RTB data) is disclosed to

---

[187] GOOG-HEWT-00098506 at -509 (Oct. 8, 2018).
[188] GOOG-HEWT-00099180 at -181.
[189] *See* GOOG-HEWT-00455800.

Google account holders. Nor have I seen any evidence, for example, that despite Google's promises to put its account holders "in control" of their data, that there a box to check that says even though Google says it doesn't sell or share my data, I am affirmatively checking this box to say that notwithstanding that promise, I consent to Google doing so.

Executed on July 14, 2023, in St. Louis, Missouri.

Neil Richards

**Appendix A:** CV of Professor Neil Richards

*NEIL M. RICHARDS*

***Koch Distinguished Professor in Law***
***Washington University in St. Louis***
**One Brookings Drive**

**St. Louis, Missouri 63130**

**Office: (314) 935-4794**

**Mobile: (314) 749-6863**

**email nrichards@wustl.edu**

---

## EMPLOYMENT & PROFESSIONAL SERVICE:

**Koch Distinguished Professor in Law**, Washington University School of Law, St. Louis, Missouri.

- Koch Distinguished Professor in Law, January 2019-present.
- Founding Director, Cordell Institute for Policy in Medicine & Law, October 2016-present.
- Thomas & Karole Green Professor of Law, July 2016-December 2018.
- Professor of Law with tenure, July 2008-June 2016.
- Associate Professor of Law, July 2003-July 2008.
- Awards
  - Voted Professor of the Year by student body, 2003-04 Academic Year.
  - Israel Treiman Faculty Fellow, 2005-06, 2018-19 Academic Years.
- Courses
  - Law School: Information Privacy Law, Advanced Privacy Law, First Amendment Law, Constitutional Law, Fourteenth Amendment Law, Property Law, Digital Civil Liberties Seminar, First Amendment Theory Seminar, Law and Politics Colloquium.
  - Arts & Sciences: The Digital Society (undergraduate trans-disciplinary course).
  - School of Engineering: Privacy & Security Law and Ethics.
- Conferences Organized
  - Cordell5: Why Privacy Matters, December 2-3, 2021.
  - Cordell4: The Future of Consent for Privacy and Health, April 23, 2021.
  - Cordell3: Ethics of Human Gene Editing, October 2019.
  - Cross-Border Privacy & Speech Roundtable, Berkeley Law, May 2019.
  - Cordell Institute Launch Symposium, Sept. 2018.
  - "Privacy and Trust in a Digital Age," *Washington University Law Review* Symposium, Sept. 2018.

- o   Institute for Policy in Medicine and Law Planning Symposium, Sept. 2017.
  - o   Washington University-Cambridge University International Privacy Conference, Clare College, Cambridge, June 2012, July 2013.
  - o   Washington University First Amendment Roundtable, 2013-15.
- Institutional Service
  - o   Chair, Law School Sesquicentennial Committee, 2015-17.
  - o   Chair, Institutional Profile Committee, 2014-15; Committee member 2015-16.
  - o   Chair, Faculty Appointments, 2010-11; Committee 2004-05, 2008-09, 2018-20.
  - o   Chair, Clerkships Committee, 2016-18, 2020-22; Faculty Clerkships Advisor, 2003-04, 2005-06, 2009-2011.
  - o   Decanal Review Committee, Spring 2010.
  - o   Washington University Faculty Senate Council, Law School Elected Representative, 2008-2011.
  - o   Faculty Chair, Washington University Social Media Committee, 2013-14.
  - o   Institute for Informatics Internal Advisory Board, 2018-present.
  - o   Provost's Online Education Committee, 2014-2017.
  - o   University Data Policy Committee, 2017-present.
  - o   University IT Council, 2014-2019.
  - o   Scholarship Committee, 2015-16.
  - o   Faculty Promotions Committee, 2012-13.
  - o   Faculty Marketing Committee, 2013-14.
  - o   Faculty Advisor, *Washington University Law Review*, 2004-2010.
  - o   Curriculum Committee, 2006-07 and 2009-10.
  - o   Student Life Committee, 2011-12.
  - o   Law School Liaison to Arts & Sciences, 2011-15.

**Treasurer, Privacy Law Scholars Foundation**, June 2021-present
- Program Committee Member, Privacy Law Scholars Conference, 2015-present.

**Visiting Professor of Law**, University of Bocconi, Milan, Italy, November 2021, May 2023
- Taught 12-hour module on "Artificial Intelligence and Human Rights."

**Visiting Professor of Law**, Georgetown Law School, Spring 2021.
- Taught 3-credit course on Information Privacy Law.

**Faculty Associate,** Berkman-Klein Center for Internet and Society at Harvard University, August 2022-present.

**Advisory Board Member**, Electronic Privacy Information Center, June 2022-present.

**Affiliate Fellow,** Yale Information Society Project, Yale Law School, March 2015-present.

---

**Affiliate Scholar,** Stanford Center for Internet & Society, Stanford Law, Jan. 2015-present.

**Member**, American Law Institute, 2015-present.

**Advisory Board Member,** Future of Privacy Forum, 2010-present.

**Adviser,** American Law Institute Project on Privacy Law, Sept. 2012-2019.

**IViR (Institute for Information Law) Fellowship,** University of Amsterdam, The Netherlands, Summer 2014. **Faculty Member,** IViR Summer Course on Privacy Law and Policy, 2014-2018.

**Distinguished Visiting Scholar**, Notre Dame Law School, October 2017.

**Trustee,** Freedom to Read Foundation, July 2015-July 2017.

**Visiting Professor of Law**, Utrecht University, the Netherlands, January 2012.
- Taught one-credit short course on Comparative Free Speech Law.

**Visiting Professor of Law**, University of Illinois College of Law, October 2010.
- Taught one-credit short course on Privacy and the First Amendment.

**Associate**, Wilmer, Cutler & Pickering, Washington, D.C. 2000-2003.
- Practice included privacy, electronic commerce, and appellate litigation.

**Hugo Black Faculty Fellow**, University of Alabama School of Law, Tuscaloosa, Alabama. Academic Year 1999-2000; Spring Semester 2003.  Inaugural research and teaching fellow in a visiting faculty program for former Supreme Court clerks.  Courses: Property Law, Constitutional Law, First Amendment.  Chaired Clerkships Committee, 1999-2000.

**Temple Bar Scholar**, American Inns of Court.  London, England. October 2000.

**Law Clerk**, Hon. William H. Rehnquist, Chief Justice of the United States, United States Supreme Court, Washington, D.C.  July 1998-July 1999.  Served during the Supreme Court's 1998-99 Term and the 1999 Presidential Impeachment Trial.

**Law Clerk**, Hon. Paul V. Niemeyer, United States Court of Appeals for the Fourth Circuit, Baltimore, MD.  August 1997-July 1998.

**Summer Associate**, Powell, Goldstein, Washington, D.C. (now Bryan Cave) Summers 1996-97.

**Research Assistant**, Professor A.E. Dick Howard, University of Virginia School of Law, Charlottesville, VA. 1995-1997.

---

## EDUCATION:

**University of Virginia School of Law**, J.D. May 1997.
   **Activities:** Executive Editor, *Virginia Law Review*.  Teaching Assistant, First-Year Study Skills Workshop.  Legal Education Project.  Editorial Board, *Virginia Journal of International Law*.
   **Honors:**  Order of the Coif.  Slaughter Honor Prize.

**University of Virginia**, M.A. Legal History.  Secondary Field of Study in Early American History.  May 1997.
   **Master's Thesis:** *Clio and the Court: A Reappraisal after Three Decades*.

**George Washington University**, B.A. History with Special Honors, *summa cum laude*, Phi Beta Kappa, University Honors Program.  Minor in Economics, Secondary Field of Study in International Affairs. May 1994.
   **Honors Thesis:** *The Last Days of the Horse: The U.S. Cavalry and Technology in the 20th Century.*
   **Awards:** National Merit Scholar (1990). Hubbard Prize for best student of American history. Distinguished Academic Achievement Awards. Strasser Essay Prize. Presidential Honor Scholarship (full tuition).

## PUBLICATIONS:

### Books:

WHY PRIVACY MATTERS (Oxford University Press 2021).
- Translated into Simplified Chinese and published by Social Sciences Academic Press, 2022.
- Portuguese and Spanish language editions are forthcoming.
- Awarded the 2023 Roy C. Palmer Civil Liberties Prize, honoring "a work of scholarship exploring the tension between civil liberties and national security in contemporary American society."
- Selected as an Amazon "Editor's Choice" as one of the ten best works of nonfiction published in December 2021.

INTELLECTUAL PRIVACY: RETHINKING CIVIL LIBERTIES IN THE DIGITAL AGE (Oxford University Press, 2015) (paperback ed. 2017).

**Works in Progress:**

*Fourth Amendment Notice and the Cloud*, BOSTON UNIVERSITY LAW REVIEW (forthcoming 2022) (with Jesse Lieberfeld).

**Articles and Essays in Law Reviews:**

*Legislating Data Loyalty*, 97 NOTRE DAME L. REV. REFLECTION 356 (2022) (with Woodrow Hartzog).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4131523

*The GDPR As Privacy Pretext and the Problem of Co-Opting Privacy*, 73 HASTINGS L.J. 1511 (2022).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4166261

*The Surprising Virtues of Data Loyalty*, 71 EMORY L.J. 985 (2022) (with Woodrow Hartzog).
- Selected for the Future of Privacy Forum's "Privacy Papers for Policymakers" award 2022.
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3921799

*A Duty of Loyalty for Privacy Law*, 99 WASH U.L. REV. 961 (2022) (with Woodrow Hartzog).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3642217

*Review of Lawrence Cappello, None of Your Damn Business: Privacy in the United States from the Gilded Age to the Digital Age,* 126 AMERICAN HISTORICAL REVIEW 1280 (2021).

*A Relational Turn for Data Protection?* 6 EUROPEAN DATA PROTECTION LAW JOURNAL 4 (2020) (with Woodrow Hartzog).

*Privacy's Constitutional Moment and the Limits of Data Protection*, 61 B.C. L. REV. 1687 (2020) (with Woodrow Hartzog).
- Selected for the Future of Privacy Forum's "Privacy Papers for Policymakers" award 2020.
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3441502

*The Pathologies of Digital Consent*, 96 WASH. U. L. REV. (2019) (with Woodrow Hartzog).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3370433

*Four Preconditions for Digital Expression (You Won't Believe #3!)*, 95 WASH. U. L. REV. 1353 (2018) (with Danielle Citron).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3155384

*Privacy's Trust Gap*, 126 YALE L.J. 908 (2017) (with Woodrow Hartzog).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2899760

*The Third-Party Doctrine and the Future of the Cloud,* 94 WASH. U. L. REV. 1441 (2017).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3123199

*Secret Government Searches and Digital Civil Liberties*, in NATIONAL CONSTITUTION CENTER, A TWENTY-FIRST CENTURY FRAMEWORK FOR DIGITAL PRIVACY (2017).
- Available at: https://constitutioncenter.org/digital-privacy

*Free Speech and the Twitter Presidency*, 2017 U. ILL. L. REV. ONLINE: TRUMP 100 DAYS (April 29, 2017).
- Available at: https://illinoislawreview.org/symposium/first-100-days/free-speech-and-the-twitter-presidency/

*Trusting Big Data Research*, 66 DEPAUL LAW REVIEW 579 (2017) (invited Symposium Issue) (with Woodrow Hartzog).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2717868

*Taking Trust Seriously in Privacy Law*, 19 STAN. TECH. L. REV. 431 (2016) (with Woodrow Hartzog).
- Selected for The Future of Privacy Forum's "Privacy Papers for Policymakers 2015."
- Selected for regular and encore discussion at the 2015 Privacy Law Scholars Conference.
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2655719

*Why Data Privacy Law Is (Mostly) Constitutional,* 56 WILLIAM AND MARY LAW REVIEW 1501 (2015).
- Selected for The Future of Privacy Forum's "Privacy Papers for Policymakers 2013"
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2335196

*The Internet Grows Up?* B.U. L. REV. ANNEX (2015).
- Available at: http://www.bu.edu/bulawreview/richards-the-internet-grows-up/

*Big Data Ethics,* 49 WAKE FOREST LAW REVIEW 393 (2014) (with Jonathan H. King).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2384174

*The Dangers of Surveillance*, 126 HARVARD LAW REVIEW 1934 (2013).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2239412

*The Perils of Social Reading*, 101 GEORGETOWN LAW JOURNAL 689 (2013).

- Selected for encore and regular discussion at the 2012 Berkeley-GW Privacy Law Scholars Conference.
- Awarded the 2012 University of Houston IPIL Sponsored Scholarship Grant prize.
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2031307

*Three Paradoxes of Big Data*, 66 STANFORD LAW REVIEW ONLINE 41 (2013) (with Jonathan H. King).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2325537

*The Limits of Tort Privacy*, 9 J. TELECOM. & HIGH TECH. L. 357 (2011).
- Invited submission for Conference on "Privacy and the Press," Silicon Flatirons Center, University of Colorado School of Law, Dec. 3, 2010.
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1862264

*Prosser's Privacy Law: A Mixed Legacy*, 98 CALIFORNIA LAW REVIEW 1887 (2011) (with Daniel J. Solove).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1567693

*The Puzzle of Brandeis, Privacy, and Speech*, 63 VANDERBILT LAW REVIEW 1295 (2010).
- Selected for discussion at the 2010 Berkeley-GW Privacy Law Scholars Conference.
- https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1584831

*Rethinking Free Speech and Civil Liability* (with Daniel J. Solove), 109 COLUMBIA LAW REVIEW 1650 (2009).
- Selected for plenary discussion at the 2009 Berkeley-GW Privacy Law Scholars Conference.
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1355662

*Privacy and the Limits of History,* 21 YALE JOURNAL OF LAW AND THE HUMANITIES 165 (2009) (review essay discussing Lawrence Friedman, *Guarding Life's Dark Secrets: Legal and Social Controls over Reputation, Propriety, and Privacy* (2007)).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1396888

*Intellectual Privacy,* 87 TEXAS LAW REVIEW 387 (2008).
- Selected for discussion at the 2008 Berkeley-GW Privacy Law Scholars Conference.
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1108268

*Privacy's Other Path: Recovering the Law of Confidentiality,* 96 GEORGETOWN LAW JOURNAL 123 (2007) (with Daniel J. Solove).
- Selected for the 2007 Michigan-Illinois Comparative Law Works-in-Progress Workshop.

---

- Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=969495

*The Information Privacy Law Project,* 94 GEORGETOWN LAW JOURNAL 1087 (2006) (essay).
- Reprinted in Practicing Law Institute, EIGHTH ANNUAL INSTITUTE ON PRIVACY AND SECURITY LAW: PATHWAYS TO COMPLIANCE IN A GLOBAL REGULATORY MAZE, 902 PLI/Pat 11 (July 2007).
- Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=941181

*Reconciling Data Privacy and the First Amendment,* 52 U.C.L.A. LAW REVIEW 1145 (2005).
- Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).
- Excerpted in Rodney Smolla, ed., THE FIRST AMENDMENT LAW HANDBOOK (Thompson West: 2006).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=598370

"The Good War," the Jehovah's Witnesses, and the First Amendment, 87 VIRGINIA LAW REVIEW 781 (2001) (book review).

The Supreme Court Justice and "Boring" Cases, 4 THE GREEN BAG 2D 401 (2001).

Sallie Mae, The Gunderson Effect, and My Plumber, 3 THE GREEN BAG 2D 251 (2000) (with Christopher P. Bowers).

Clio and the Court: A Reassessment of the Supreme Court's Uses of History, 13 JOURNAL OF LAW & POLITICS 809 (1998).

U.S. Term Limits v. Thornton and Competing Notions of Federalism, 12 JOURNAL OF LAW & POLITICS 521 (1996) (student note).

**Book Chapters:**

*Understanding American Privacy*, in RESEARCH HANDBOOK ON PRIVACY AND DATA PROTECTION LAW: VALUES, NORMS AND GLOBAL POLITICS, (Edward Elgar: Gloria González Fuster, Rosamunde van Brakel and Paul De Hert eds., 2021) (with Andrew Serwin & Tyler Blake).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3256918

*Digital Civil Liberties and the Translation Problem,* in THE OXFORD HANDBOOK OF CRIMINAL PROCESS (Oxford: Darryl K. Brown, Jenia Iontcheva Turner, & Bettina Weisser eds., 2019) (with Michael Washington).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3678698

*Big Data and the Future for Privacy*, in RESEARCH HANDBOOK ON DIGITAL TRANSFORMATIONS (Edward Elgar: F. Xavier Olleros & Majlinda Zhegu eds., 2016) (with Jonathan H. King).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2512069

*How Should the Law Think About Robots?* in ROBOT LAW (Edward Elgar: Ryan Calo, Michael Froomkin & Ian Kerr eds., 2016) (with William Smart).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2263363

*Privacy and Free Speech: The Transatlantic Divide,* in COMPARATIVE DEFAMATION AND PRIVACY LAW (Cambridge Press: Andrew T. Kenyon ed., 2015) (with Kirsty Hughes).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2648307

*Four Privacy Myths,* in A WORLD WITHOUT PRIVACY? (Cambridge Press: Austin Sarat ed., 2015).
- Keynote address, Amherst College/University of Alabama Conference on "A World Without Privacy? What Can/Should Law Do?" Jan. 17, 2014.
- Selected for The Future of Privacy Forum's "Privacy Papers for Policymakers 2014"
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2427808

*Privacy and Intellectual Freedom*, in THE HANDBOOK OF INTELLECTUAL FREEDOM (Unwin: M. Alfino ed., 2014) (with Joanna F. Cornwell).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2501448

*Tort Privacy and Free Speech*, in THE RIGHT TO PRIVACY - PERSPECTIVES FROM THREE CONTINENTS (De Gruyter: Dieter Doerr & Udo Fink eds., 2012).

**Other Writings:**

Fixing the Stored Communications Act's Secret Search Problem, Lawfare, June 30, 2023 (with Jesse Lieberfeld).

Comments of the Cordell Institute on AI Accountability, NTIA call for comments, June 27, 2023 (with Woodrow Hartzog & Jordan Francis).

Digital Child Protection is not Censorship, IAPP Privacy Advisor, June 15, 2023 (with Oliver Khairallah).

Comments of the Cordell Institute on the Prevalence of Commercial Surveillance and Data Security Practices that Harm Consumers, FTC Rulemaking Nov. 21, 2022.

We're So Close to Getting Data Loyalty Right, IAPP PRIVACY PERSPECTIVES, June 14, 2022 (with Woodrow Hartzog).

Facebook can change its name to Meta Platforms or anything else, but its current leadership cannot be trusted, MARKETWATCH, Dec. 24, 2021.

Creepiness Is the Wrong Way to Think About Privacy, SLATE, Dec. 2, 2021.

The U.S. Urgently Needs a Comprehensive Privacy Law that Goes Beyond the Fair Information Practices, CIPLblog, Nov. 30, 2021.

South Korea's COVID Success Stems From an Earlier Infectious Disease Failure, SLATE, Jan. 29. 2021.

A Duty of Loyalty for Privacy Law, OXFORD BUSINESS LAW BLOG, University of Oxford (UK), Oct. 28, 2020.

What Kind of First Amendment Do We Want? Legal scholar Neil Richards on the uses and abuses of free speech in the digital age, SLATE, Oct. 27, 2020 (interviewed by Chloe Hadavas).

Getting the First Amendment Wrong, BOSTON GLOBE, Sept. 4, 2020 (with Woodrow Hartzog).

Welcome to Cordell Perspectives, Cordell Perspectives, Cordell Institute for Policy in Medicine & Law, May 1, 2020 (with Jonathan Heusel).

Why Europe's GDPR Magic Will Never Work in the US, THE WIRED WORLD IN 2020, WIRED (UK), Feb. 20, 2020 (with Woodrow Hartzog).

There's A Lot to Like About the Senate Privacy Bill, If It's Not Watered Down, THE HILL, Dec. 6, 2019 (with Woodrow Hartzog).

Who is Who, and What Do They Do? Executive Powers over Surveillance, part two, IAPP.ORG, March 26, 2019 (with Andrew Serwin).

Who is Who, and What Do They Do? Executive Powers over Surveillance, IAPP.ORG, Jan. 29, 2019 (with Andrew Serwin).

It's Time to Try Something Different on Internet Privacy, WASHINGTON POST, Dec. 20, 2018 (with Woodrow Hartzog).

Who is Who and What Do They Do? Deconflicting Cyber, IAPP.ORG, Oct. 30, 2018 (with Andrew Serwin).

The Intelligence Community: Who Is Who and What Do They Do?, IAPP.ORG, Sept. 25, 2018 (with Andrew Serwin).

Why the Logan Pauls of the world can push the boundaries of privacy and good taste, THE HILL, Jan. 16, 2018.

We will work out the commercial, clinical, ethical and legal issues around genome sequencing. THE WIRED WORLD IN 2018, WIRED (UK), 2017 (with Jonathan Heusel).

Should Supreme Court Justices Continue to Have Life Tenure?, (revised), JUNIOR SCHOLASTIC MAGAZINE, Feb. 2017.

Should Supreme Court Justices Continue to Have Life Tenure?, (revised), NEW YORK TIMES UPFRONT MAGAZINE, Sept. 2016.

The future of espionage: What techniques will spies be using in ten years' time?, WIRED (UK), July 16, 2016.

Privacy and Respect for Individuals, ALA CHOOSE PRIVACY WEEK, May 4, 2016.

The iPhone Case and the Future of Civil Liberties, MICROSOFT TECHNOLOGY/ACADEMICS/POLICY BLOG, March 7, 2016.

Apple's Code = Speech Mistake, MIT TECHNOLOGY REVIEW, March 1, 2016.

The iPhone Case and the Future of Civil Liberties, BOSTON REVIEW, Feb. 25, 2016.

Apple v. The FBI: Why the 1789 All Writs Act Is the Wrong Tool, THE GUARDIAN, Feb. 24, 2016.

Facebook's New Digital Assistant M Will Need to Earn Your Trust, THE GUARDIAN, Sept. 9, 2015.

Privacy Law: From a National Dish to a Global Stew, LINKEDIN PULSE BLOG, April 8, 2015 (with Daniel J. Solove).

The Electronic Panopticon, THE CHRONICLE OF HIGHER EDUCATION, March 16, 2015.

Digital Laws Evolve, GQ KOREA, Feb. 2015.

Google Has Captured Your Mind, SALON, Feb. 26, 2015.

The Fifty Shades of Grey Paradox, SLATE, Feb. 13, 2014.

Why Regulating Revenge Porn Isn't Censorship, AL-JAZEERA AMERICA, Feb. 11, 2015  (with Danielle Citron).

---

How Encryption Protects Our Intellectual Privacy (And Why You Should Care), WIRED (UK), Jan. 7, 2015.

Digital Laws Evolve, THE WIRED WORLD IN 2015, WIRED (UK).

Will We Have Any Privacy After the Big Data Revolution?, TIME, Sept. 25, 2014.

Big Data Isn't Magic, ZOCALO PUBLIC SQUARE, Sept. 24, 2014.

Can and Should Perez Hilton Be Held Liable for Reposting Celebrities' Private Nude Photos Without their Consent?, FORBES, Sept. 3, 2014 (with Danielle Citron).

Can Technology Prevent Another Ferguson?, CNN.COM, Sept. 2, 2014.

Privacy Is Not Dead—It's Inevitable, BOSTON REVIEW, May 28, 2014.

The Promises and Pitfalls of Big Data, AL-JAZEERA AMERICA, May 8, 2014.

What's Up With Big Data Ethics?, FORBES, March 28, 2014 (with Jonathan H. King).

What's Up With Big Data Ethics?, O'REILLY STRATA BLOG, March 21, 2014 (with Jonathan H. King).

Gigabytes Gone Wild, AL-JAZEERA AMERICA, March 2, 2014, (with Jonathan H. King).

Obama's Surveillance Reforms, BOSTON REVIEW, Jan. 22, 2014.

Watching the Watchers: The Rise of Sousveillance, THE WIRED WORLD IN 2014, WIRED (UK).

They Know Where You Are (But They Shouldn't), BOSTON REVIEW, Aug. 26, 2013.

Opinion: Don't Let U.S. Government Read Your E-mail, CNN.COM, Aug. 18, 2013.

Surveillance After the Boston Bombing, THE CHRONICLE OF HIGHER EDUCATION, Issue #35, May 10, 2013.

Opinion: Surveillance State No Answer to Terror," CNN.COM, April 23, 2013.

Keep Your Update to Yourself, THE WIRED WORLD IN 2013, WIRED (UK).

Choose Privacy Week 2012: The Perils of Social Reading, PRIVACYREVOLUTION.ORG, May 2, 2012.

Rethinking Privacy in the Digital Age, WASHINGTON UNIVERSITY LAW MAGAZINE, Spring 2012, at p. 47.

Guest Blogger, CONCURRINGOPINIONS.COM, 2007-2012.

Should Supreme Court Justices Continue to Have Life Tenure? (revised) NEW YORK TIMES UPFRONT MAGAZINE, Sept. 21, 2009.

William Hubbs Rehnquist, in ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (West: 2008).

*Missouri v. Holland,* in ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (West: 2008).

*Foreword: The Rehnquist Court and the First Amendment*, 21 WASH. U. J. L. & POL. 1 (2006).

*Griswold v. Connecticut*, in THE ENCYCLOPEDIA OF PRIVACY (William Staples *et al.* eds., 2006).

*Should Supreme Court Justices Continue to Have Life Tenure?* NEW YORK TIMES UPFRONT MAGAZINE, March 7, 2005.

*The Constitutionality of Federal and State Historic Preservation Grants to Religious Properties* SJ053 ALI-ABA 873 (2004).

*Ex Ante: Taxing Cases,* 5 THE GREEN BAG 2d 2 (2001).

*The Electronic Communications Privacy Act and Internet Privacy Litigation,* LIBEL DEFENSE RESOURCES COUNCIL CYBER SPACE PROJECT (2001).

## ACADEMIC & PUBLIC PRESENTATIONS:

- "Why Tech Matters for Policy Scholarship," Tufts University Fletcher School of Diplomacy, Boston, MA, June 19, 2023.
- "A Concrete Proposal for Data Loyalty," Privacy Law Scholars Conference, U.C. Boulder, Boulder, Colorado, June 1, 2023.
- "Commentator: Secret Policing by Rebecca Wexler," Privacy Law Scholars Conference, U.C. Boulder, Boulder, Colorado, June 1, 2023.
- "Why Privacy Matters," Université Paris 1 - Panthéon-Sorbonne, Paris, France, May 26, 2023.
- "Duties of Data Loyalty and the Future of Data Protection," CPDP Conference, Brussels, Belgium, May 24, 2023.
- "Cross-Border Data Flows and 'Commercial Surveillance,'" Stanford Law School, May 12, 2023.
- "Three AI Case Studies," University of Bocconi, Milan, Italy, April 27, 2023.
- "Regulatory Approaches to AI," University of Bocconi, Milan, Italy, April 27, 2023.
- "Critical Perspectives on AI," University of Bocconi, Milan, Italy, April 26, 2023.
- "Why Privacy Matters," University of Bocconi, Milan, Italy, April 26, 2023.
- "What is Artificial Intelligence and How Should We Think About It," University of Bocconi, Milan, Italy, Aril 24, 2023.
- "Loyal AI," NIH Voice AI Symposium, Bethesda MD, April 19, 2023.
- "Privacy @ WashU Law," Hire WashU Event, Washington University School of Law, April 18, 2023.
- "Loyal AI," Washington University School of Law Alumni Weekend Keynote, April 15, 2023.

- "Palmer Prize Award Lecture: Why Privacy Matters," Chicago-Kent Law School, Chicago, IL, April 12, 2023.
- "Academia Meets Private Practice: Building Better Privacy Laws," IAPP Global Privacy Summit, Washington, DC, April 5, 2023.
- "ChatGPT and Academic Dishonesty," Washington University School of Law, April 4, 2023.
- "A Concrete Proposal for Data Loyalty," Harvard Law School, March 31, 2023.
- Co-Host, WashU Law Musical Showcase, March 29, 2023.
- "The Future of AI Regulation," Washington University-Sorbonne Seminar, March 24, 2023.
- "Subjective Expectations and Privacy: Zeitouni on the Psychology of Privacy," NYU Law JSD Forum, New York, NY, March 2, 2023.
- "Why Loyalty Matters for Video Game Companies," Entertainment Software Ratings Board, January 30, 2023.
- "Loyal AI," Ohio State University Program on Data Governance, January 25, 2023.
- "Why Privacy Matters," Ohio State University Data Points Lecture, Columbus, Ohio, January 25, 2023.
- "Why Privacy Matters Chinese Edition Book Launch," Digital Silk Road Security Think Tank, Suzhou Information Security Institute, Xi'an Jiangtong University and Institute of Cybersecurity and Rule of Law, Xi'an Jiaotong Institute of Science and Education, Dec. 8, 2022. (10,000 attendees).
- "Why Privacy Matters," London School of Economics, London, England, December 6, 2022.
- "Discussion and Q&A with Professor Richards," Oxford Internet Institute, University of Oxford, England, December 1, 2022.
- "Why Privacy Matters," Corpus Christi College, University of Oxford, England, December 1, 2022.
- "A Duty of Loyalty for Privacy Law," Information Accountability Foundation Policy Call Webinar, Nov. 17, 2022.
- "Trust, Loyalty, and Customers," Information Accountability Foundation Annual Retreat, Washington, DC Nov. 8, 2022.
- "Why Privacy Matters," UCLA Law School, Nov. 4, 2022.
- "Privacy's Social Dimensions," Berkeley Law School, Oct. 21, 2022.
- "Why Privacy Matters," Yale Law School, Sept. 29, 2022.
- "The Future of US Privacy Law," Ditchley Foundation, Chipping Norton, England, Sept. 23, 2022.
- "A Duty of Loyalty for Privacy Law," Georgia Tech University, Atlanta, Georgia, Sept. 19, 2022.
- "Why Privacy Matters," Monash University Law and Business Seminar Series, Melbourne, Australia, August 31, 2022.

---

- Why Privacy Matters, Universidad de San Andrés, Buenos Aires, Argentina, August 18, 2022.
- A Duty of Loyalty for Privacy Law, Information Accountability Foundation, August 18, 2022.
- Panelist, DLA Piper Workshop on Data Sustainability, San Diego, CA, June 28, 2022.
- The Surprising Virtues of Data Loyalty, Harvard Berkman-Klein Center, June 23, 2022.
- Opening Keynote: Why Privacy Matters, Future of Privacy Forum Advisory Board Annual Meeting, Middleburg, Virginia, June 13, 2022.
- Panelist, Workshop on Location Data in the Context of Public Health, Research, and Law Enforcement, National Academies of Sciences, June 9, 2022.
- Fourth Amendment Notice in the Cloud, Privacy Law Scholars Conference, Northeastern University, June 3, 2022.
- Privacy's Social Dimensions, Privacy Law Scholars Conference, Northeastern University, June 2, 2022.
- Against Engagement, Privacy Law Scholars Conference, Northeastern University, June 2, 2022.
- Participant, New Remedies for Platform Harms Workshop, Boston University School of Law, June 1, 2022.
- "Why Privacy Matters and the Future of Data Protection Law," Computers, Privacy & Data Protection Conference, Brussels, Belgium, May 25, 2022.
- "Closing Keynote: Why Privacy Matters," MERIT Network Annual Conference, Detroit, Michigan, May 11, 2022.
- "Why Privacy Matters," University of Graz, Austria, May 5, 2022.
- "Why Privacy Matters," Cato Institute Free Thought Podcast, April 19, 2022.
- Moderator, "Keynote Panel: Privacy Journalism," IAPP Global Privacy Summit 2022, Washington, DC, April 13, 2022.
- "Academia Meets Private Practice: Developing the "Best" State Privacy Law," IAPP Summit 2022, Washington, DC April 13, 2022.
- "Why Privacy Matters," University of Virginia School of Law, April 11, 2022.
- "Intellectual Privacy," University of Virginia School of Law, April 11, 2022.
- "Why Privacy Matters," Washington University School of Law Alumni Weekend, April 9, 2022.
- First Amendment and Data Privacy Roundtable, University of Colorado Law School, April 8, 2022
- "Why Privacy Matters," University of Georgia School of Law, April 8, 2022.
- Participant, Silicon Flatirons First Amendment/Privacy Roundtable, University of Colorado Boulder, April 8, 2022.
- "The Surprising Virtues of Data Loyalty," Cordell Ideas Lunch, Washington University School of Law, April 7, 2022.
- "Privacy @ WashU Law," Hire WashU Event, Washington University School of Law, April 7, 2022.

- Co-Host, WashU Law Musical Showcase, March 31, 2022.
- "Why Privacy Matters," Saint Louis University Law School, March 29, 2022.
- "Comparative Perspectives on the Metaverse," Cordell-Institute Sorbonne Seminar, March 25, 2022.
- "Fourth Amendment Notice and the Cloud," Washington University Cordell Institute Ideas Lunch, March 24, 2022.
- "Why Privacy Matters," Radboud University/Tilburg University, The Netherlands, March 8, 2022.
- "Why Privacy Matters," University of Maine Law School, Feb. 28, 2022.
- "*Schrems* and the Future of Cross-Border Transfers," Stanford Law School, Feb. 22, 2022.
- "Why Privacy Matters," Scheer Intelligence, KCRW Radio Los Angeles, Feb. 15, 2022.
- "Why Privacy Matters," University of Virginia School of Law "Common Law" Podcast, Feb. 9. 2022.
- "The Surprising Virtues of Data Loyalty," Future of Privacy Forum "Privacy Papers for Policymakers" Award Program, Washington, DC, Feb. 4, 2022.
- "Why Privacy Matters," St. Louis on the Air, KWMU Radio, Feb. 3, 2022.
- "Why Privacy Matters: An Interview with Neil Richards," AirBnb, January 28, 2022..
- "Data Privacy Day: Why Privacy Matters," Duke Law School/Kenan Center for Ethics, Jan. 28, 2022.
- "Why Privacy Matters," Fordham Law School, Jan. 24, 2022.
- "Platform Governance: Trust and Transparency," Yale Information Society Project, Dec. 10, 2021.
- "Why Privacy Matters," Washington University College Republicans, Dec. 7, 2021.
- "Concluding Remarks: Why Privacy Matters," Cordell5: Why Privacy Matters, Cordell Institute at Washington University, Dec. 3, 2021.
- "Why Privacy Matters," Washington University School of Law, Dec. 2, 2021.
- "Why Privacy Matters," Osgood Hall School of Law, Toronto, Canada, Nov. 30. 2021.
- "AI, Discrimination, and Manipulation," University of Bocconi Law School, Milan, Italy, Nov. 19, 2021.
- "Regulatory Approaches to AI," University of Bocconi Law School, Milan, Italy, Nov. 19, 2021.
- Host, Washington University-Sorbonne Information Law Salon, Nov. 12, 2021.
- "Why Privacy Matters," Berkeley Law School, November 9, 2021.
- "Co-Opting Privacy," Pound Civil Justice Institute Annual Conference, Hastings Law School, San Francisco, California, November 6, 2021.
- "A Conversation with Ari Waldman about *Industry Unbound*," Cordell Institute @ Washington University/St. Louis IAPP, November 3, 2021.
- "What Is Artificial Intelligence and How Should We Think About It?" University of Bocconi Law School, Milan, Italy, Nov. 2, 2021.

- "Why Privacy Matters," Washington University Parents Council, Oct. 29, 2021.
- "Social Media and 'Publicly Available' Information," Facebook Oversight Board/Annenberg Public Policy Center, University of Pennsylvania, Sept. 20, 2021.
- "The Surprising Virtues of Data Loyalty," Yale ISP Ideas Lunch, Yale Law School, July 22, 2021.
- "The Surprising Virtues of Data Loyalty," Washington University School of Law, June 23, 2021.
- Host, Junior Scholars Mentoring Session, Privacy Law Scholars Conference, Georgetown Law School, June 3, 2021.
- Commentator, Hannah Bloch-Wehba, Democratic Algorithms, Privacy Law Scholars Conference, Georgetown Law School, June 3, 2021.
- "The Surprising Virtues of Data Loyalty," Privacy Law Scholars Conference, Georgetown Law School, June 3, 2021.
- "Intellectual Privacy and Surveillance," Stanford Technology Law Review Symposium on Privacy and Surveillance, Stanford Law School, May 15, 2021.
- Co-Host, Washington University Musical Showcase, April 15, 2021.
- "A Duty of Loyalty for Privacy Law," Princeton University, March 23, 2021.
- "The Cordell Institute for Policy in Medicine & Law," Washington University Eliot Society, Feb. 25, 2021.
- "A Conversation with Judge Michael Y. Scudder," Washington University School of Law, Feb. 23, 2021.
- "The Schrems Litigation and the Future of Transatlantic Privacy," Stanford Law School, Feb. 22, 2021.
- "A Conversation with Judge Julia Smith Gibbons," Washington University School of Law, Feb. 12, 2021.
- "Why Privacy Matters: What Privacy Isn't," University of Colorado School of Law, Feb. 8, 2021.
- "Why Privacy Matters: Consumer Protection," Florida State College of Law, Feb. 4, 2021.
- "Free Speech In 2021 Requires Oversight, But From Whom?" St. Louis on the Air, KWMU Public Radio, Jan. 28, 2021.
- Panelist, "Schrems 2: Looking Back, Looking Forward," CPDP, Brussels, Belgium, January 28, 2021.
- "Burns Night Special - Meet the author: Neil Richards," University of Edinburgh School of Law, January 25, 2021.
- "A U.S. GDPR?" American Association of Law Schools Annual Meeting, joint session of the Section on Privacy and Defamation Law and Section on European Law, Jan. 5, 2021.
- Participant, Privacy Redress Options Workshop, Tech Policy Lab, University of Washington, Dec. 10, 2020.

- The Invalidation of the EU-US Privacy Shield and the Future of Transatlantic Data Flows, testimony before United States Senate Committee on Commerce, Science, and Transportation, Washington, DC. Dec. 9, 2020, https://www.commerce.senate.gov/2020/12/the-invalidation-of-the-eu-us-privacy-shield-and-the-future-of-transatlantic-data-flows.
- "Why Privacy Matters," Osgoode Hall Law School, York University, Toronto, Canada, Nov. 18, 2020.
- "Why Privacy Matters," Berkeley Law School, Nov. 9, 2020.
- "Do We Need a First Amendment 2.0?" New America Foundation/Slate/American University webcast, Oct. 28, 2020.
- "A Duty of Loyalty for Privacy Law," Yale Law School, New Haven, CT, Oct. 22, 2020.
- "Privacy's Constitutional Moment and the Limits of Data Protection," Hinshaw & Culbertson, LLP, Chicago, IL, Oct. 8, 2020.
- "The 'Innovation' Myth," Saint Louis University School of Law Childress Lecture Conference, Oct. 1, 2020.
- "The Future of Federal Privacy Legislation," Future of Privacy Forum Annual Meeting, Sept. 24, 2020.
- "A Duty of Loyalty for Privacy Law," Washington University Faculty Workshop, July 8, 2020.
- "The Future First Amendment," Conference on "Free Speech in the 21st Century," Alma Mater Europaea, Maribor, Slovenia, July 3, 2020.
- "A Duty of Loyalty for Privacy Law," Privacy Law Scholars Conference, George Washington University Law School, Washington, DC, June 4, 2020.
- "A Duty of Loyalty for Privacy Law," Northeastern Law School, Boston MA, April 27, 2020.
- "Privacy's Constitutional Moment and the Limits of Data Protection," Georgetown Law School, Washington, DC, Feb. 24, 2020.
- "Privacy's Constitutional Moment and the Limits of Data Protection," Future of Privacy Forum Privacy Papers for Policymakers, United States Senate, Washington, DC, Feb. 6, 2020.
- Participant, Roundtable on Julie Cohen's *Between Truth and Power*, Notre Dame Law School, Jan. 31, 2020.
- Chair, "A US GDPR? Prospects of Legislation, Regulation, and Adequacy," Computers, Privacy, and Data Protection (CPDP) 2018, University of Brussels, Brussels, Jan. 24, 2020.
- Panelist, "Turning the Tables: Academics in the Hot Seat," Computers, Privacy, and Data Protection (CPDP) 2018, University of Brussels, Brussels, Jan. 23, 2020.
- "Lessons from the Clinton Impeachment," Washington University School of Law, Oct. 30, 2019.
- "Why Privacy Matters," Koch Distinguished Professor in Law Installation, Washington University, St. Louis, Missouri, Oct. 28, 2019.

---

- "Privacy's Constitutional Moment," PLSC-Europe, The University of Amsterdam, The Netherlands, Oct. 25, 2019.
- "Introduction: The Ethics of Human Genome Editing," Cordell3 Conference, St. Louis, Missouri, Oct. 11, 2019.
- Moderator, "The Science of Biohacking," St. Louis Young Presidents' Organization, Oct. 10, 2019.
- "The Pathologies of Digital Consent," Stanford University Program on Democracy and the Internet, Palo Alto, California, Oct. 4, 2019.
- "The Future of Human Data in Health Care & Beyond," MOMENTUM: The Inauguration of Chancellor Andrew D. Martin, Washington University, St. Louis, MO, Oct. 3, 2019.
- "Why Privacy Matters," Washington University Political Theory Workshop, Sept. 13, 2019.
- "Why Privacy Matters," Society of Law Scholars Annual Meeting, University of Central Lancashire, Preston, England, Sept. 4, 2019.
- "Law Students vs. Technology," Washington University School of Law Orientation, St. Louis, Missouri, Aug. 16, 2019.
- "Private-Sector Threats to Privacy," Dartmouth College Summer Lecture Series, Aug. 8, 2019.
- "Information Fiduciaries and Trust Models for Data," Multidisciplinary Workshop on the Future of Health Data, Yale University, June 13, 2019.
- "Privacy's Constitutional Moment," Privacy Law Scholars Conference, Berkeley Law, May 30, 2019.
- Convenor and Moderator, Cross-Border Speech and Privacy Roundtable, Berkeley Law, May 29, 2019.
- "Digital Searches and Privacy," Duke University Kenan Center for Ethics, April 19, 2019.
- "Why Privacy Matters," Duke University Kenan Center for Ethics, April 18, 2019.
- "Notice and Choice," FTC Hearings on Competition and Consumer Protection in the 21st Century, Washington DC, April 10, 2019.
- Commentator, "Timothy Bartley, Big Data, Small Governance? Self-Regulation of Predictive Analytics in the Private Sector," Washington University Political Theory Workshop, April 5, 2019.
- "Why Privacy Matters," Boston University, March 20, 2019.
- "Genomic Privacy and Ethics," St. Louis Academy of Science, St. Louis, Missouri, Feb. 28, 2019.
- "Author Communication and the Law Reviews," Washington University School of Law, Feb. 22, 2019.
- Panelist, "Inside the Marble Palace: A Conversation with Four Former Supreme Court Clerks," Washington University School of Law, Feb. 12, 2019.

- Chair & panelist, "Clashing Constitutional Norms, Cross-Border Data, and Free Expression," Computers, Privacy, and Data Protection (CPDP) 2018, University of Brussels, Belgium, Feb. 1, 2019.
- "Why Privacy Matters," University of Tel Aviv, Israel, Dec. 10, 2018.
- Moderator, "Panel Discussion: *Carpenter v. United States*," Washington University School of Law, Oct. 30, 2018.
- "Privacy Colonialism: The EU as US Privacy Regulator," Amsterdam Privacy Conference (APC), University of Amsterdam, The Netherlands, Oct. 2018.
- "Privacy and Free Expression in a Time of Fake News," Tulane Law School, Sept. 28, 2018.
- "Surveillance and Free Expression," Yale Law School, Sept. 26, 2018.
- "The Pathologies of Consent," Washington University Law Review Symposium, Sept. 14, 2018.
- "Privacy Colonialism: The EU as US Privacy Regulator," Society of Law Scholars Annual Conference, Queen Mary School of Law, London, England, Sept. 6, 2018.
- "The Supreme Court Speaks on the Fourth Amendment: *U.S. v. Carpenter*," Thomas Eagleton Federal Courthouse, St. Louis MO, Aug. 23, 2018.
- "Law Students vs. Technology," Washington University Law Orientation, Sept. 22, 2018.
- "Why Privacy Matters," University of Amsterdam, The Netherlands, July 5, 2018.
- Commentary, "Designing without Privacy?," Privacy Law Scholars' Conference, George Washington University, Washington DC, June 2018.
- "Four Preconditions for Digital Expression (You Won't Believe #4!)," Privacy Law Scholars' Conference, George Washington University, Washington DC, June 2018.
- "Privacy and Design," Notre Dame Law School, April 27, 2018.
- "Thoughts on *Privacy's Blueprint*," Notre Dame Law School, April 27, 2018.
- "Why Privacy Matters," UCLA Law School Faculty Colloquium, April 2, 2018.
- "Why Privacy Matters," Washington University Institute for Informatics Annual Symposium, St. Louis MO, March 31, 2018.
- "Why Privacy Matters," Washington University Dallas-Fort Worth Regional Cabinet Annual Dinner, Dallas, Texas, March 8, 2018.
- "Data Transfer-Where Have We Been and Where Are We Going?" International Privacy + Security Forum, George Washington University, Washington DC, Feb. 26, 2018.
- Commentator, "Ari Waldman, Designing Without Privacy," Privacy Law Scholars Conference (Europe), University of Brussels, Belgium, Jan. 28, 2018.
- Moderator, "Finding a Way Forward for Cross-Border Data Requests," Computers, Privacy, and Data Protection (CPDP), University of Brussels, Belgium, Jan. 25, 2018.
- "Four Preconditions for Digital Expression (You Won't Believe #4!)," Washington University School of Law, Jan. 20, 2018.
- "Privacy's Trust Gap," Institute for Informatics, Washington University Medical School, Dec. 18, 2017.

- "Six Preconditions for Digital Expression (You Won't Believe #5!)," Princeton University Department of Philosophy, Dec. 15, 2017.
- "Intellectual Privacy," International Association of Privacy Professionals (IAPP), St. Louis Chapter, Dec. 13, 2017.
- "Distinguished Commentary: SidleyAustin Lecture on 'Privacy and the Collection/Use Distinction,'" Center for Data & Governance, Ohio State University, Nov. 9, 2017.
- "Why Privacy Matters," Notre Dame Law School Faculty Workshop, South Bend, Indiana, Oct. 27, 2017.
- "Amicus Briefing Before the U.S. Supreme Court," Microsoft Corporation, Brussels, Belgium, Oct. 18, 2017.
- "Trust and Connected Toys," Privacy + Security Forum, George Washington University, Washington, DC, Oct. 6, 2017.
- Panelist, "The Interrelation Between Privacy and Free Expression," University of Michigan School of Law, Sept. 22, 2017.
- "Closing Remarks: Genomics, Privacy, and Trust," Institute for Policy in Medicine & Law Planning Symposium, Washington University, Sept. 18, 2017.
- "An Evening with Edward Snowden," St. Louis, MO, Sept. 16, 2017.
- "Law Students v. Technology," Washington University Law Orientation, Aug. 24, 2018.
- Panelist, "Fake News, Trolling, & Cyberbullying: Debating Social Media Companies' Rights & Responsibilities," AEJMC, Chicago, Illinois, Aug. 9, 2017.
- "Why Privacy Matters," University of Amsterdam, The Netherlands, July 6, 2017.
- "Why Privacy Matters," Privacy Law Scholars Conference, Berkeley, CA, June 2, 2017.
- Commentator, "Sarah Igo, Surveillance and Transparency Since the Sixties," Privacy Law Scholars Conference, Berkeley, CA, June 2, 2017.
- "Intellectual Privacy," Washington University Science on Tap, St. Louis, MO, April 26, 2017.
- Participant, "Algorithms and Us," National Endowment for the Humanities, SUNY Stony Brook, Stony Brook NY, April 4-5, 2017.
- "Free Speech and the Twitter Presidency," University of Illinois College of Law, April 11, 2017.
- "Keynote: Why Privacy Matters," American Medical Informatics Association Annual Meeting, San Francisco, CA, March 27, 2017.
- "Privacy and the Future of the Cloud," Washington University School of Law, Dec. 14, 2016.
- "Why Privacy Matters," WindowGroup, St. Louis, MO, Dec. 7, 2016.
- "Challenges to the Enforcement of Consumer Privacy in the Information Age," ICPEN Annual Meeting, Bad Wiessee, Germany, Sept. 29, 2016.
- "The Dangers of Surveillance," Fontbonne University, St. Louis, MO, Sept. 22, 2016.
- "Oliver Stone's *Snowden*," ACLU of Eastern Missouri Movie Premiere, St. Louis, MO, Sept. 13, 2016.

- "Why Privacy Matters," Fontbonne University Convocation Address, St. Louis, MO, Aug. 24, 2016.
- "A Conversation with Judge Coleman," Washington University School of Law, Aug. 22, 2016.
- "Why Privacy Matters," University of Amsterdam, The Netherlands, July 6, 2016.
- "Intellectual Privacy and Intermediary Liability," Senate of Argentina, Buenos Aires, Argentina, June 8, 2016.
- "Intellectual Privacy and Intermediary Liability," Seminar on International Internet Politics, Universidad de San Andrés, Buenos Aires, Argentina, June 6, 2016.
- "Privacy and the Future of the Cloud," Privacy Law Scholars Conference, Washington, DC, June 1-2, 2016.
- "Privacy and Genomic Science," Washington University Genomics Retreat, April 29, 2016.
- "Trusting Big Data Research," Washington University School of Law, April 22, 2016.
- "Code = Speech?" Washington University First Amendment Roundtable, April 15, 2016.
- "Design, Privacy, and Trust," UC Berkeley Law School, April 8, 2016.
- "Comments on *Privacy's Blueprint*," UC Berkeley Law School, April 7, 2016.
- "Big Data: How will regulation affect your use of data analytics in the years ahead?" Microsoft Envision Conference, New Orleans, LA, April 4, 2016.
- "The Future of Privacy Laws," Microsoft Envision Conference, New Orleans, LA, April 4, 2016
- "Drones and Privacy," Washington University Assembly Series, March 31, 2016.
- "Taking Trust Seriously in Privacy Law," Saint Louis University School of Law, Feb. 19, 2016.
- "Justice Scalia: The Legacy and the Vacancy," Washington University School of Law, Feb. 17, 2016.
- "Trusting Big Data Research," University of Toronto School of Law, Jan. 22, 2016.
- "Privacy and Trust," Dartmouth College Geisel School of Medicine, Jan. 15, 2016.
- "Taking Trust Seriously in Privacy Law," Future of Privacy Forum "Privacy Papers for Policymakers 2015," Washington, DC, Jan. 13, 2016.
- Adviser, "American Law Institute Restatement of Information Privacy Principles," Philadelphia, Pennsylvania, Dec. 17, 2015.
- "Intellectual Privacy," Sever Institute Analytics Roundtable, Washington University, Dec. 15, 2015.
- "Trusting Big Data Research," Washington and Lee Law Review/Future of Privacy Forum Conference on "Beyond IRBs?" Washington, DC, Dec. 10, 2015.
- "Privacy and Trust," Dartmouth College Geisel School of Medicine, Nov. 15, 2015.
- "The Right to Be Forgotten and Free Expression," ASIS&T Annual Meeting, St. Louis, Missouri, Nov. 10. 2015.

- "Guardians of Data: How to Be Trusted in an Untrustworthy World," Microsoft Corporation, Redmond, Washington, Nov. 7, 2015.
- "Intellectual Privacy," Microsoft Corporation, Redmond, Washington, Nov. 7, 2015.
- "Intellectual Privacy," Washington University Seattle Regional Council Annual Dinner, Seattle, Washington, Nov. 6, 2015.
- "Commentary: Internet Search and Mass Surveillance," Conference on Empirical Research and the Law 2015, St. Louis, MO, Oct. 30, 2015.
- "Privacy, Security, and Trust," Fontbonne University, St. Louis, MO, Oct. 29, 2015.
- "Taking Trust Seriously In Privacy Law," Privacy Law Scholars Conference Europe, Amsterdam, The Netherlands, Oct. 26, 2015.
- "Intellectual Privacy and Personalized Media," Amsterdam Privacy Conference, Amsterdam, The Netherlands, Oct. 27, 2015.
- "Algorithms and Policing," Washington University School of Law Public Law and Policy Speaker Series, Oct. 20, 2014.
- "Intellectual Privacy and Libraries," The Digital Shift Online Library Conference, Oct. 14, 2015.
- "Intellectual Privacy," Washington University Management Team, St. Louis MO, Oct. 12, 2015.
- "Four Privacy Myths," STL SecureWorld Expo, St. Louis, MO, Sept. 22, 2015.
- "Intellectual Privacy," Washington University Law Alumni Weekend, Sept. 19, 2015.
- "Security Roundtable: The Right to Be Forgotten," Washington University, Sept. 17, 2015.
- "Intellectual Privacy," Fordham Law School, Sept. 16, 2015.
- "Intellectual Privacy," Yale Law School, Sept. 15, 2015.
- "Intellectual Privacy and the Hague Declaration," University of Brescia, Italy, July 22, 2015.
- "Privacy and Civil Liberties," Michigan State University Spartan Debate Institute (videoconference), July 17, 2015.
- "Intellectual Privacy," Washington University Law Eliot Society, St. Louis, MO, July 16, 2015.
- "Intellectual Privacy," University of Amsterdam, The Netherlands, July 9, 2015.
- "Intellectual Privacy," University of Leuven, The Netherlands, July 8, 2015.
- "Intellectual Privacy," American Library Association Annual Meeting, San Francisco, California, June 29, 2015.
- "Intellectual Privacy," Washington University Law Eliot Society, Chicago, IL, June 24, 2015.
- "A Theory of Privacy and Trust," Privacy Law Scholars Conference, Berkeley, California, June 5, 2015.
- "Privacy and Free Speech: A Transatlantic Divide," Privacy Law Scholars Conference, Berkeley, California, June 5, 2015.

- "Choose Privacy Week: Intellectual Privacy," University of Wisconsin-Milwaukee, May 4, 2015.
- Moderator, "Plenary Session: The First Amendment and Image Capture," Yale Free Expression Scholars Conference, New Haven, Connecticut, May 3, 2015.
- "Intellectual Privacy," Berkman Center for Internet and Society, Harvard University, Cambridge, Massachusetts, April 28, 2015.
- "Intellectual Privacy," Washington University Boston Regional Council Annual Dinner, Boston, Massachusetts, April 28, 2015.
- "Privacy Myths," Microsoft Corporation, Redmond, Washington, April 24, 2015.
- "Intellectual Privacy," University of Washington Tech. Policy Lab, April 23, 2015.
- "Intellectual Privacy," Washington University San Francisco Regional Council Annual Dinner, April 22, 2015.
- "Intellectual Privacy," Berkeley Law School, Berkeley, California, April 22, 2015.
- "Intellectual Privacy," Stanford Law School, Palo Alto, California, April 21, 2015.
- "Intellectual Privacy," Saint Louis University Law School, April 13, 2015.
- "Intellectual Privacy," Washington University School of Law, March 30, 2015.
- "Intellectual Privacy," University of Maryland School of Law, Baltimore, Maryland, March 27, 2015.
- "Intellectual Privacy," Washington University Pre-Law Society, March 25, 2015.
- "Big Data Ethics," National Academies of Sciences, Irvine, California, March 13, 2015.
- "Intellectual Privacy," Chicago-Kent School of Law, Chicago, Illinois, Feb. 23, 2015.
- "Intellectual Privacy," Fordham Law School, New York, NY, Feb. 2, 2015.
- "Law Enforcement Use of Body-Worn Cameras," IAPP Webinar, Jan. 30, 2015.
- Invited Delegate, LIBER Declaration on Data Mining, The Hague, The Netherlands, Dec. 9, 2014.
- "Ferguson and Free Speech," Washington University School of Law, Dec. 2, 2014.
- "Four Privacy Myths," American Association of University Women, St. Louis Chapter, Chesterfield, Missouri, Nov. 13, 2014.
- "Intellectual Privacy," Sever Analytic Roundtable, Washington University School of Engineering, Nov. 11, 2014.
- Discussant, American Law Institute Restatement of Information Privacy Principles, San Francisco, California, Nov. 6, 2014.
- "Privacy and Technology," Eliot Society Seminar Series, Washington University, Oct. 28, 2014.
- "A Theory of Privacy and Trust," Notre Dame Law School, Oct. 24, 2014.
- "Big Data and the Future for Privacy," University of Quebec at Montreal, Oct. 17, 2014.
- "Big Data Ethics," Washington University Olin School of Business, Oct. 10, 2014.
- "Why Privacy Matters," Washington University Political Theory Workshop, Sept. 19, 2014.

---

- Panelist, "Our Enduring Constitution," Washington University Constitution Day Event, Sept. 17, 2014.
- Panelist, "If You Have Nothing to Hide…" Missouri Bar Association Annual Meeting Plenary Session, Kansas City, Missouri, Sept. 11, 2014.
- "Why Privacy Matters," Saint Louis University Faculty Workshop Series, Sept. 3, 2014.
- "Why Privacy Matters," University of Amsterdam IViR, Amsterdam, the Netherlands, July 24, 2014.
- "Intellectual Privacy," University of Amsterdam, IViR Summercourse on Privacy Law and Policy, Amsterdam, The Netherlands, July 10, 2014.
- "Big Data Ethics," The Guardian Newspaper HQ, London, England, June 12, 2014.
- "Four Privacy Myths," Privacy Law Scholars Conference, GW Law School, Washington, DC, June 5, 2014.
- "Big Data Ethics," StampedeCon Big Data Conference, St. Louis Missouri, May 30, 2014.
- "Why Data Privacy Law Is (Mostly) Constitutional," Yale Free Expression Scholars Conference, Yale Law School, New Haven, Connecticut, May 3, 2014.
- "Privacy and Free Speech: The Transatlantic Divide," University of Melbourne Conference on Privacy and Defamation, Melbourne, Australia, April 24, 2014. (via Skype)
- "Four Privacy Myths," Washington University Law National Council, April 25, 2014.
- "Four Privacy Myths," Washington University Cyber-Security Roundtable, April 18, 2014.
- "The Dangers of Surveillance (Robots)," 2014 WeRobot Conference, University of Miami School of Law, Miami, Florida, April 5, 2014.
- "Four Privacy Myths," Loyola Law School, Chicago, Illinois, March 31, 2014.
- Facilitator, White House Office of Science & Technology Policy/Data & Society Institute Conference on The Social, Cultural & Ethical Dimensions Of "Big Data," NYU School of Law, New York, NY, March 17, 2014.
- "Why Data Privacy Law Is (Mostly) Constitutional," Future of Privacy Forum Privacy Papers for Policymakers, United States Congress, Washington, DC, March 5, 2014.
- "Why Data Privacy Law Is (Mostly) Constitutional," William and Mary Law Review First Amendment Conference, Williamsburg, Virginia, Feb. 22, 2014.
- "Four Privacy Myths," Keynote Address, University of Alabama Conference on Privacy Law, Tuscaloosa, Alabama, Jan. 17, 2014.
- "Four Privacy Myths," Ethical Society of St. Louis, Jan. 14, 2014.
- "The Dangers of Surveillance," Weidenbaum Center Policy Breakfast, Washington University, St. Louis, Missouri, Dec. 16, 2013.
- "Four Privacy Myths," Washington University School of Law Faculty Workshop, Dec. 5, 2013.
- "Why Surveillance Is Dangerous," Yale Information Society Project Thompson-Reuters Lecture Series, Yale Law School, Dec. 3, 2013.

- "Privacy and Security: A Roundtable," Washington University Interdisciplinary Program in the Humanities, St. Louis Missouri, Nov. 20, 2013.
- "Big Data Ethics," University of Pennsylvania Invisible Harms Conference, Philadelphia, Pennsylvania, Nov. 15, 2013.
- "Cyber-Security, Social Media, and Big Data," Washington University School of Engineering, Oct. 29, 2013.
- "Big Data Ethics," Wake Forest Law Review Symposium on Privacy, Winston-Salem, North Carolina, Oct. 24, 2013.
- "Three Paradoxes of Big Data," Stanford Law Review/Future of Privacy Forum Conference on Privacy and Big Data, Washington, DC, Sept. 10, 2013.
- "The Dangers of Surveillance," 2013 Society of Law Scholars Annual Meeting, University of Edinburgh School of Law, Edinburgh, Scotland, Sept. 5, 2013.
- "Intellectual Privacy," Washington University-Cambridge University International Privacy Law Conference, Clare College, Cambridge, England, July 29-31, 2013.
- "Data Privacy and the Right to be Forgotten after *Sorrell*," George Mason Law School Conference on the Law & Economics of Search and Social Media, Arlington, Virginia, May 15, 2013.
- "Data Privacy and the Right to be Forgotten after *Sorrell*," Center for Democracy and Technology, Washington, D.C., May 14, 2013.
- "Associations and Social Networks," Yale Law School Free Expression Scholars Conference, New Haven, Connecticut, May 4, 2013.
- "The Dangers of Surveillance," Yale Law School Free Expression Scholars Conference, New Haven, Connecticut, May 4, 2013.
- "Data Privacy and the Right to be Forgotten after *Sorrell*," Berkeley-GW Privacy Law Scholars Conference, Berkeley Law School, Berkeley, California, June 6-7 2013.
- "The Dangers of Surveillance," University of Illinois Faculty Workshop, Champaign, Illinois, April 18, 2013.
- "Free Speech Issues in the Standard & Poor's Case," Washington University Law/Business Roundtable, Washington University Olin School of Business, April 3, 2013.
- Conference Organizer and participant, Washington University First Amendment Conference, Washington University School of Law, March 21-22, 2013.
- "Intellectual Privacy," Amherst College Department of Law, Jurisprudence, and Social Thought, Amherst, Massachusetts, Feb. 22, 2013.
- "Intellectual Privacy" Fordham Law School Center for Information Law and Policy Workshop, Jan. 19, 2013.
- Panelist, Federal Trade Commission Workshop on "The Big Picture – Comprehensive Consumer Data Collection," Federal Trade Commission, Washington, DC, Dec. 6, 2012.
- "The Dangers of Surveillance," *Harvard Law Review* Symposium on Information Privacy in the Twenty-First Century, Harvard Law School, Cambridge, Massachusetts, Nov. 9, 2012.

- Invited participant, American Law Institute Invitational Conference on Information Privacy Law, San Francisco, California, Sept. 28, 2012.
- "The Dangers of Surveillance," Washington University Political Theory Workshop, Sept. 7, 2012.
- Invited Commenter, Ronald Krotoszynsky Faculty Workshop, Saint Louis University Law School Faculty Workshop, Sept. 6, 2012.
- "Intellectual Privacy," Duke Law School Faculty Workshop, Aug. 31, 2012.
- "The Perils of Social Reading," Comparative Perspectives on Privacy Conference (conference co-organizer), Clare College, Cambridge University, Cambridge, England, June 27, 2012.
- "The Perils of Social Reading," Berkeley-GW Privacy Law Scholars Conference, Washington, DC, June 8 & June 9 (encore session), 2012.
- "The Perils of Social Reading," Washington University School of Law Faculty Workshop, May 2, 2012.
- "How Should the Law Think About Robots?" WeRobot Conference, University of Miami, Coral Gables, Florida, April 22, 2012.
- "The Perils of Social Reading," University of Maryland Law Faculty Workshop, March 23, 2012.
- "Freedom of Assembly and Intellectual Privacy," Engaging *Liberty's Refuge* Conference, Washington University School of Law, March 2, 2012.
- Discussant and Google Fellow, Privacy Law Salon, Miami, Florida, Feb. 2, 2012.
- "Tort Privacy and Intellectual Privacy," University of Durham Law Faculty Workshop, Durham, England, Sept. 12, 2011.
- "Tort Privacy and Intellectual Privacy," Society of Law Scholars, Downing College, University of Cambridge, England, Sept. 6, 2011.
- "Intellectual Privacy: Rethinking Civil Liberties in the Digital Age," Washington University Faculty Workshop, Aug. 3, 2011.
- "Free Speech and Tort Privacy," Privacy Discussion Forum, Mainz, Germany, June 23, 2011.
- "Tech Talk: Intellectual Privacy," Google Campus, Mountain View, California, June 6, 2011.
- Discussant, "Sandra Petronio, Privacy Perils: Deciding to Disclose or Protect Confidentialities," Berkeley-GW Privacy Law Scholars Conference, June 3, 2011.
- Discussant, "What's Wrong with Spying?" Washington University Political Theory Workshop, April 15, 2011.
- "The Limits of Tort Privacy," University of California Berkeley School of Law, March 31, 2011.
- "The Limits of Tort Privacy," Notre Dame Law School Faculty Workshop, March 4, 2011.
- Participant, "Workshop on Meeting the Challenge of Online Hate," Stanford Center for Internet and Society, Jan. 14, 2011.

- "The Limits of Tort Privacy," Conference on "Privacy and the Press," Silicon Flatirons Center, University of Colorado School of Law, Dec. 3, 2010.
- "The Puzzle of Brandeis, Privacy, and Speech," University of California, Davis Faculty Workshop, Nov. 9, 2010.
- "Why Privacy Matters," ACLU of Eastern Missouri, Sept. 21, 2010.
- "Snyder v. Phelps and the First Amendment," Washington University School of Law Supreme Court Preview, Sept. 20, 2010.
- "The First Amendment in the 21st Century," Gephardt Center for Public Service, Washington University, Sept. 17, 2010.
- "The Puzzle of Brandeis, Privacy, and Speech," 2009 Berkeley-GW Privacy Law Scholars Conference, George Washington University School of Law, Washington, DC, June 4, 2010.
- "The Puzzle of Brandeis, Privacy, and Speech," Washington University School of Law Faculty Research Seminar, Feb. 24, 2010.
- "Prosser's Privacy Law: A Mixed Legacy," *California Law Review* Symposium on the 50th Anniversary of William Prosser's "Privacy" Article, GW Law School, Washington, DC, Jan. 29, 2010.
- Panelist, "Constitutional Law, Pharmaceutical Regulation, and Commercial Speech," Section on Law, Medicine, and Health Care and Section on Constitutional Law, Association of American Law Schools Annual Meeting, New Orleans LA, Jan. 2010.
- "Librarians, Privacy, and the First Amendment," Missouri Library Association Annual Meeting, Columbia MO, Oct. 9, 2009.
- "The Shadow First Amendment," Washington University School of Law Faculty Incubator Workshop, July 1, 2009.
- "Rethinking Free Speech and Civil Liability," 2009 Berkeley-GW Privacy Law Scholars Conference, Berkeley School of Law, Berkeley CA, June 5, 2009.
- Principal Commentator, "Frank Lovett, Legal Realism," Washington University Political Theory Workshop, Spring 2009.
- "Rethinking Free Speech and Civil Liability," Washington University School of Law Faculty Research Seminar, April 2009.
- "Brandeis, Privacy, and Speech," Washington University Political Theory Workshop, Feb. 2009.
- "Rethinking Free Speech and Civil Liability," Fordham Law School Center on Law and Information Policy Workshop, Dec. 5, 2008.
- "Intellectual Privacy," 2008 Berkeley-GW Privacy Law Scholars Conference, George Washington University School of Law, Washington, DC, June 13, 2008.
- "Brandeis, Privacy and Speech," Oklahoma City College of Law Faculty Workshop, March 25, 2008.
- "The Supreme Court," StreetLaw St. Louis Seminar, Feb. 15, 2008.
- "Intellectual Privacy," Loyola Los Angeles School of Law Faculty Workshop, Jan. 31, 2008.

- "Intellectual Privacy," Washington University Political Theory Workshop, Jan. 25, 2008.
- Discussant, "Ian McMullen, Bong Hits 4 Citizens?," Washington University Political Theory Workshop, Nov. 16, 2007.
- "*Branzburg v. Hayes* and Intellectual Privacy," Conference on *Branzburg v. Hayes*, University of Oregon Schools of Law and Communications, Eugene, Oregon, Oct. 5, 2007.
- Panelist, Washington University Political Theory Conference, Aug. 27, 2007.
- "Intellectual Privacy," Washington University School of Law Faculty Research Seminar, August 15, 2006.
- "Foundations, Trends, and Directions: Privacy and Security Law in 2007," PLI Eighth Annual Institute on Privacy Law, New York, NY, June 25, 2007.
- "Intellectual Privacy," University of Illinois Law School Faculty Workshop Series, Champaign, IL, May 2, 2007.
- "Intellectual Privacy," University of Missouri-Columbia Faculty Workshop Series, April 9, 2007.
- "Intellectual Privacy," University of Nebraska Faculty Workshop Series, March 22, 2007.
- "Privacy's Other Path," St. John's University Law School Faculty Workshop Series, Feb. 12, 2007.
- "Privacy's Other Path," Invited Participant, Michigan-Illinois Works-in-Progress Workshop on Comparative Law, Champaign, IL, Feb. 8-10, 2007.
- Panelist, "Information, Technology, and Privacy: What's Next?" Section on Defamation and Privacy Law, AALS Annual Meeting, Washington, D.C., Jan. 3, 2007.
- Participant and Discussant, Workshop on Binding Corporate Rules, Fordham University School of Law, Nov. 13-14, 2006.
- "Privacy without Confidentiality," Washington University School of Law Faculty Research Seminar, Nov. 8, 2006.
- "Privacy after September 11," Missouri Bar Association Annual Meeting, Sept. 28, 2006.
- "*Griswold*, Privacy, and the First Amendment," presented at the American Association of Law Librarians Annual Meeting, St. Louis, MO, July 11, 2006.
- Conference Organizer, Welcoming Remarks, and Panel Moderator, Conference on the Rehnquist Court and the First Amendment, Washington University School of Law, Nov. 18, 2005.
- "The Historiographical Poverty of Information Privacy Law," Symposium on "Privacy Law in the New Millennium: A Tribute to Richard C. Turkington," Villanova Law School, Oct. 28, 2005.
- "The Information Privacy Law Project," Washington University School of Law Faculty Research Seminar, Oct. 26, 2005.
- "The Information Privacy Law Project," Works-In-Progress Intellectual Property Colloquium 2005, Washington University School of Law, Oct. 8, 2005.
- "The Nomination of John Roberts and the Future of the Supreme Court," Pomona College, Pomona, California, Sept. 16, 2005.

- "The Information Privacy Law Project," Whittier Law School, Sept. 15, 2005.
- "The Information Privacy Law Project and the Limits of Metaphor," 2005 Cardozo/Berkeley/ Stanford/DePaul IP Scholars Conference, Cardozo Law School, Aug. 11, 2005.
- Chair and Discussant, "*The Digital Person* and the Information Privacy Law Project," Law and Society Association Annual Meeting, Las Vegas, NV, June 2, 2005.
- "Information Privacy, Free Speech, and *Lochner*," Fordham Law Review Symposium on Law and the Information Society. Fordham Law School, April 7, 2005.
- "Brandeis, Privacy, and Speech," Washington University School of Law Faculty Research Seminar, March 31, 2005.
- "The Constitutionality of Don't Ask, Don't Tell," Washington University School of Law, Feb. 24, 2005.
- "The War on Terror Cases and Separation of Powers," Washington University School of Law Student-Faculty Supreme Court Workshop, Sept. 1, 2004.
- "Journalism and the First Amendment," Bar Association of Metropolitan St. Louis, July 24, 2004.
- "Reconciling Data Privacy and the First Amendment," Washington University School of Law Faculty Research Seminar, July 14, 2004.
- "Rehnquist Court" faculty conference, Northwestern University School of Law, April 23-24, 2004.
- "*Lawrence v. Texas* and Privacy Law," Washington University School of Law Student-Faculty Supreme Court Workshop, October 1, 2003.
- "Reconciling Data Privacy and the First Amendment," University of Alabama School of Law Faculty Workshop, April 14, 2003.
- "Reconciling Data Privacy and the First Amendment," University of Virginia School of Law, October 10, 2002.
- "The Lessons of Past Federal Privacy Regulation for the Contemporary Privacy Debate," University of Alabama Faculty Workshop, April 22, 2002.
- "Family Law and the Supreme Court," Annual Meeting, Alabama State Bar Family Law Section, July 20, 2000.
- "The Supreme Court Law Clerk: An Agent with Many Masters," The Federalist Society, Montgomery (Alabama) Lawyers Chapter, April 14, 2000.

## SELECTED MEDIA APPEARANCES:

| **Newspapers:** | *The Guardian (U.K.)* | *Washington Times* |
|---|---|---|
| *Washington Post* | *Christian Science Monitor* | *St. Louis Post-Dispatch* |
| *Wall Street Journal* | *Chicago Tribune* | *Baltimore Sun* |
| *The New York Times* | *Boston Globe* | |

EXPERT CLASS CERTIFICATION REPORT OF NEIL RICHARDS

*Atlanta Journal-
Constitution*
*San Francisco Chronicle*
*New York Post*
*Cleveland Plain Dealer*
*Honolulu Advertiser*
*Arizona Republic*
*Tallahassee Democrat*
*Palm Beach Post*

*Green Bay Press Gazette*
*New Jersey Star-Ledger*
*Kansas City Star*

**News Services:**
Associated Press
Inman News Services
Medill News Services

Newhouse News Services
CNN.com
NBC News

**Magazines:**
*U.S. News & World Report*
*Black Enterprise*
*New York Times Upfront*
*Wired*
*Wired UK*

**Television:**
*CNN*
*MSNBC*
*PBS*
*Fox News Channel*

*Bloomberg TV*
All national network
affiliates in St. Louis

**Radio**:
National Public Radio
NPR On Point
BBC World Service
BBC Radio
CBS Radio
WWOR Radio New York
Bloomberg Radio
Associated Press Radio
Metro Networks Radio
Pacifica Radio

## PROFESSIONAL AND HONOR SOCIETIES:

American Law Institute; Phi Beta Kappa, Order of the Coif, Phi Alpha Theta History Honor
Society, Golden Key Honor Society, Phi Eta Sigma Honor Society.

## SELECT CONSULTING/LITIGATION EXPERIENCE

•   Independent Testifying Expert retained by the Irish Government on U.S. privacy law,
    *Data Protection Commissioner v. Facebook*, Irish High Court, Spring 2017 (commonly
    known as "*Schrems II*").

•   Testifying Expert on history and theory of privacy law retained by the ACLU, *Neal v.
    Roessler,* (Va. Cir. Ct. 2018) (challenge to Fairfax Police use of automatic license plate
    readers under the Virginia Data Collection Act).

•   Advising expert to firm representing fantasy sports company in successful right of
    publicity litigation against Major League Baseball from federal district court to Supreme
    Court certiorari phase.  The litigation, *Major League Baseball Advanced Media v. CBC
    Distribution & Marketing*, 505 F.3d 818 (8th Cir. 2007), cert. denied, 128 S.Ct. 2872
    (2008), is widely considered to have saved the independent fantasy sports industry.

•   Co-drafted Amicus Brief of Information Law Professors in *Spokeo v. Robins* before U.S.
    Supreme Court (2015).

- Advised prevailing sporting goods company in high-profile Supreme Court litigation relating to the problem of "patent trolls" or "non-practicing entities," *Octane v. Icon Health & Fitness*, 572 U.S. __ (2014).

- Represented celebrities in high-profile privacy litigation.

- Expert witness in consumer credit class action settlement, giving opinion on whether a settlement under the Fair Credit Reporting Act was in the best interests of consumers.

- Consulted with various state attorneys general's offices in privacy litigation over physician detailing statutes, culminating in the Supreme Court case of I*MS v. Sorrell, Inc*., 131 S.Ct. 2653 (2011).

- Drafted First Amendment argument in Law Professors Brief as Amicus Curiae in Opposition to Motion to Dismiss at 16-22, *SEC v. Siebel Sys., Inc*., 384 F. Supp. 2d 694 (S.D.N.Y. 2005) (No. 04 CV 5130(GBD)).

- Consulted with counsel, represented clients, or appeared in a variety of other cases involving privacy, defamation, or constitutional issues before a variety of state, federal, and international tribunals, including the U.S. Supreme Court

**Appendix B**: List of Case Materials Considered

Consolidated Class Action Complaint and Exhibits [ECF Nos. 92, 92-1]

Transcript of Dec. 13, 2022 Deposition of Stanislav Belov

Expert Class Certification Report of Professor Zubair Shafiq

Oct. 25, 2022 Order [ECF No. 344]

Oct. 26, 2022 Order [ECF No. 345]

Google's Response and Supplemental Response to Interrogatory No. 12

GOOG-HEWT-00001203

GOOG-HEWT-000144029

GOOG-HEWT-000105248

GOOG-HEWT-00012303

GOOG-HEWT-000126384

GOOG-HEWT-000134605

GOOG-HEWT-00013868

GOOG-HEWT-00014233

GOOG-HEWT-00019783

GOOG-HEWT-00020067

GOOG-HEWT-00035713

GOOG-HEWT-00318797

GOOG-HEWT-00040123

GOOG-HEWT-00046946

GOOG-HEWT-00057910

GOOG-HEWT-00058086

GOOG-HEWT-00058417

GOOG-HEWT-00064910

GOOG-HEWT-00070527

GOOG-HEWT-00088603

GOOG-HEWT-00089761

GOOG-HEWT-00089901

GOOG-HEWT-00092293

GOOG-HEWT-00097143

GOOG-HEWT-00098506

GOOG-HEWT-00099180

GOOG-HEWT-00144286

GOOG-HEWT-00156504

GOOG-HEWT-00168985

GOOG-HEWT-00182248

GOOG-HEWT-00191932

GOOG-HEWT-00429693

GOOG-HEWT-00455800

GOOG-HEWT-00456456

GOOG-HEWT-00456464

GOOG-HEWT-00459449

GOOG-HEWT-00459494

GOOG-HEWT-00459508

GOOG-HEWT-00459513

GOOG-HEWT-00459543

GOOG-HEWT-00480493

GOOG-HEWT-00480745

GOOG-HEWT-00481219

GOOG-HEWT-00481225