# <u>Exhibit 8</u>

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4

5     In re Google RTB Consumer

      Privacy Litigation,

6                                   No. 21-cv-02155-YGR

7     This Document Relates to:

      all actions,

8     _____/

9

10                  *** CONFIDENTIAL ***

11        VIDEOTAPED DEPOSITION OF JOHN KEVRANIAN

12        appearing at San Francisco, California

13             Friday, December 9, 2022

14

15

16

17

18

19

20

21

22    Reported by:

23    Natalie Y. Botelho

24    CSR No. 989

25    Job No. CS5613874

CONFIDENTIAL

Page 2

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4

5    In re Google RTB Consumer
     Privacy Litigation,

6                                    No. 21-cv-02155-YGR

7    This Document Relates to:
     all actions,

8    _____/

9

10

11

12          Videotaped deposition of JOHN KEVRANIAN,

13   taken on behalf of Google, at 3 Embarcadero Center,

14   20th Floor, San Francisco, California, beginning at

15   9:08 a.m. and ending at 4:21 p.m. on Friday,

16   December 9, 2022, before NATALIE Y. BOTELHO,

17   Certified Shorthand Reporter No. 9897.

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 7

1   San Francisco, California, Friday, December 9, 2022

2                    9:08 a.m.

3

4                 PROCEEDINGS

5           (Karin Swope and Kelsey Spector were not

6           present at the commencement of the

7           deposition.)

8           THE VIDEOGRAPHER:  Good morning.  We are

9   going on the record at 9:08 a.m. on December 9th,

10  2022.  Please note that the microphones are

11  sensitive and may pick up whispering and private

12  conversations.  Please mute your phones at this

13  time.  Audio and video recording will continue to

14  take place unless all parties agree to go off the

15  record.

16          This is Media Unit 1 of the video-recorded

17  deposition of John Kevranian, taken by counsel for

18  Defendant in the matter of In Re: Google RTB

19  Consumer Privacy Litigation, filed in the United

20  States District Court, Northern District of

21  California, Oakland Division, Case

22  No. 21-cv-02155-YGR.

23          The location of the deposition is 3

24  Embarcadero Center, 20th floor, San Francisco,

25  California 94111.  My name is Shawna Hynes,

CONFIDENTIAL

Page 8

1   representing Veritext Legal Solutions, and I'm the

2   videographer.  The court reporter is Natalie

3   Botelho, from the firm Veritext Legal Solutions.  I

4   am not related to any party in this action, nor am I

5   financially interested in the outcome.

6           If there are any objections to proceeding,

7   please state them at the time of your appearance.

8   Counsel and all present, including remotely, will

9   now state their appearances and affiliations for the

10  record, beginning with the noticing attorney.

11          MR. SOMVICHIAN:  Whitty Somvichian, with

12  Cooley, representing Google.

13          MR. DANITZ:  Brian Danitz of Cotchett

14  Pitre & McCarthy, for the plaintiff.

15          MS. NISHIMURA:  Nanci Nishimura, Cotchett

16  Pitre & McCarthy, for plaintiff.

17          MR. STRAITE:  David Straite, Dicello

18  Levitt, for Plaintiff.

19          MS. PRITZKER:  This is Elizabeth Pritzker

20  of Pritzker Levine.  I represent the plaintiffs.

21          THE VIDEOGRAPHER:  Thank you.

22          Will the court reporter please swear in

23  the witness, and then counsel may proceed.

24                  JOHN KEVRANIAN,

25  having been administered an oath, was examined and

CONFIDENTIAL

Page 9

1                testified as follows:

2

3             EXAMINATION BY MR. SOMVICHIAN

4             MR. SOMVICHIAN:  Q.  Good morning,

5    Mr. Kevranian.  We just met this morning.  You

6    understand you're here to be deposed in the class

7    action matter in which you're one of the named

8    plaintiffs?

9    A.      Yes.

10   Q.      Let me -- let me just mark for the record

11   the deposition notice in this case, so we have it.

12           And this will be the second exhibit.  Just

13   put a couple things in front of you.

14           (Whereupon Exhibit 1 and Exhibit 2 were

15           marked for identification.)

16           MR. SOMVICHIAN:  Q.  Mr. Kevranian, let's

17   start with the first document.  We won't take much

18   time with that.  Have you seen that before?

19   A.      Yes.

20   Q.      You understand it's the notice by which we

21   requested your deposition here today?

22   A.      Yes.

23   Q.      Have you been deposed before?

24   A.      Yes.

25   Q.      How many times?

CONFIDENTIAL

Page 13

1    Candy.

2    Q.        Any other reason?

3    A.        No.

4    Q.        What do you do in the context of the

5    Broadway Burlingame Business Improvement District?

6    A.        Well, I represent 110 businesses, which

7    the majority, over 90%, are family-owned businesses.

8    And out of the 110 businesses, I would say 85% are

9    minority business owners who I advocate for because

10   I work with City Council, I work with County

11   supervisors, and I advocate for our businesses with

12   different government agencies, and I help them out

13   on a daily basis, whatever their needs are for their

14   business.

15   Q.        Could you give me an example of what

16   you've done recently in terms of advocacy on behalf

17   of one of these businesses?

18   A.        Sure.  I'll give you a great example.

19   Recently I approached the County of San Mateo.  A

20   lot of our businesses were receiving environmental

21   health department fees, from $600 to about $2,000,

22   and because of COVID a lot of businesses were still

23   struggling, so they said to me, "John, we have a

24   hard time paying these fees.  Can you help us,

25   please?"

CONFIDENTIAL

1          I said, "Sure."

2          So I sent an e-mail to the County

3    Supervisor, and I said, "Can you please waive the

4    fees?"

5          And they looked into it and studied for

6    several months, and about four or five months later,

7    they said, "John, please attend one of our

8    supervisors meeting, and we're going to be

9    discussing the fee waiver that you approached us

10   with."

11         So the County waived $5.8 million worth of

12   fees to 5500 businesses in San Mateo County from one

13   e-mail that I sent advocating for our businesses.

14         Those are things that I do to our

15   family-owned businesses, our members of the Broadway

16   Business Improvement District.  I'm an advocate, and

17   they trust me.  I work very closely with small

18   business owners, and I do this as a volunteer.  I'm

19   not a paid individual.

20   Q.        Okay.  Thank you for that explanation.  As

21   part of your assistance for small businesses, do you

22   ever advise them on marketing or advertising?

23   A.        Sometimes, depending on the business.

24   Q.        Does any of that advice involve online

25   forms of marketing and advertising?

CONFIDENTIAL

Page 17

1    Q.        What about John B. Kevranian & Associates?

2    A.        No.

3    Q.        Did you ever promote Nuts For Candy

4    through any kind of online advertising program

5    through Google?

6    A.        No.

7    Q.        What about John B. Kevranian & Associates?

8    Any online marketing through Google --

9    A.        No.

10   Q.        -- that you can recall?

11             Does Nuts For Candy have a website?

12   A.        Yes.

13   Q.        What's the URL for that?

14   A.        NutsForCandy.com.

15   Q.        Okay.  I'll take a look at that at the

16   break, but do you -- do you place advertisements on

17   that website?

18             MR. DANITZ:  Objection; vague and

19   ambiguous as to "place advertisements."

20             THE WITNESS:  No.

21             MR. SOMVICHIAN:  Q.  Is there now or has

22   there ever been a website for John B. Kevranian &

23   Associates?

24   A.        No.

25   Q.        Mr. Kevranian, switching gears here, and

CONFIDENTIAL

Page 18

1    now focused on this litigation, tell me how you

2    first got involved in this case as a plaintiff.

3    A.        Well, I started hearing about Google

4    selling private personal information on media and

5    through congressional hearings, and I was concerned

6    about it, and I approached my attorneys and

7    discussed the case, and --

8            MR. DANITZ:  At this point I'm going to

9    caution the witness not to reveal privileged

10   attorney-client communications.

11           THE WITNESS:  Yes.

12           MR. DANITZ:  But you can continue.

13           THE WITNESS:  And that's how it started.

14           MR. SOMVICHIAN:  Q.  Okay.  Let me -- let

15   me get a little bit more background on that.

16   A.        Sure.

17   Q.        Okay?  So you referred to some

18   congressional testimony or some other news accounts

19   that led to you reaching out.  Can you be more

20   specific about what you saw or heard?

21   A.        Well, I heard in the media that Google was

22   selling personal information of Google account

23   holders, and I was concerned about my privacy and

24   what was being sold.

25   Q.        Where did you hear this?

CONFIDENTIAL

1    ambiguous, asked and --

2            THE WITNESS:  I don't remember.

3            MR. DANITZ:  Asked and answered.  Right.

4            MR. SOMVICHIAN:  Q.  Okay.  And what was

5    the concern or other reaction that you had stemming

6    from these --

7    A.        My concern --

8    Q.        -- news accounts that you were exposed to?

9    A.        My concern was, is my personal information

10   being sold to a third party, is Google selling my

11   personal information, because Google's statements

12   are, "We do not sell your personal information or

13   share your personal information with a third party."

14   Q.        After you saw these news accounts and saw

15   the testimony and before you approached attorneys,

16   did you do anything to research the subject or

17   otherwise educate yourself about the things that you

18   were concerned about?

19   A.        I don't remember.

20   Q.        What was the -- strike that.

21            How much time passed between when you saw

22   these news accounts and the congressional testimony

23   and the time when you approached your attorneys?

24   Can you approximate -- give me an approximate amount

25   of time?

CONFIDENTIAL

Page 21

1    A.         I don't remember.

2    Q.         Was it months?

3    A.         I can't remember.

4    Q.         Was it in the same year?

5    A.         I would say so.

6    Q.         But other than that, you can't be more

7    specific as to --

8    A.         No.

9    Q.         -- the amount of time?

10   A.         I can't remember.

11   Q.         Okay.  Who did you reach out to?

12   A.         I reached out to my attorney, Brian

13   Danitz, and my attorney, Nanci Nishimura.

14   Q.         How did you know Mr. Danitz?

15   A.         They're my attorneys.

16   Q.         From what prior engagements?

17   A.         Through other business transactions.

18   Q.         Okay.  When is the first time that

19   Mr. Danitz did work for you?

20   A.         He did work for me for our company.

21   Q.         Nuts For Candy?

22   A.         Yes.

23   Q.         What was the nature of the work generally?

24   A.         It was a class action for Visa

25   interchange.

CONFIDENTIAL

Page 35

1              (Whereupon Exhibit 4 was marked for

2              identification.)

3              MR. SOMVICHIAN:  Q.  Okay.  Mr. Kevranian,

4    you have in front of you now the consolidated class

5    action complaint.  Is this a document you're

6    familiar with?

7    A.        Yes.

8    Q.        Before we look at the actual contents of

9    this document, can -- can you tell me what

10   involvement you had, if any, in the preparation or

11   approval of the complaint?

12             MR. DANITZ:  And before you respond, I'm

13   going to ask the witness to not reveal

14   communications between your attorneys and you

15   regarding the complaint, but you can respond to the

16   question.

17             THE WITNESS:  Thank you.

18             A week prior to the filing of August 27th,

19   I reviewed the draft, I met with my attorneys and

20   reviewed the draft, and we went over certain things

21   and went through the pages and the draft -- then

22   afterwards, it was filed on August 27th.

23             MR. SOMVICHIAN:  Q.  That was about a week

24   before?

25   A.        It was about a week before that I met with

CONFIDENTIAL

Page 36

1    the attorneys to review the draft.

2    Q.        Who did you meet with?

3    A.        With Mr. Brian Danitz.

4    Q.        Anybody else?

5    A.        No.

6    Q.        Without telling me the contents of any

7    discussions that you had, did you provide feedback

8    or ask questions about the draft?

9    A.        Yes.

10   Q.        You mentioned a document that you recall

11   being filed on August 27th, right?

12   A.        Yes.

13   Q.        If you look here at the document in front

14   of you, there's a line at the very top.  It says

15   "Filed 9/16/21"?

16   A.        Yes.

17   Q.        Are you aware of whether this is a

18   different document than what you had in mind in your

19   prior response?

20   A.        I believe they had made some minor changes

21   after.

22   Q.        So feel free to flip through this

23   particular document, and I want to understand

24   whether you also reviewed this document as well as

25   the one that you just described a second ago.

CONFIDENTIAL

1    the record.  In putting this exhibit in front of the

2    witness, against our notice.

3            MR. SOMVICHIAN:  Q.  Mr. Kevranian, your

4    counsel doesn't want you looking at that version.

5    We'll mark another version for you.  Okay?

6    A.      Okay.

7    Q.      But you can keep it and just look at the

8    caption page.  Okay?  We're going to ask some

9    questions about that.

10   A.      Okay.

11   Q.      You see the caption says "Benjamin Hewitt,

12   et al., on behalf of themselves and all others

13   similarly situated, Plaintiffs."  You see that, sir?

14   A.      Yes.

15   Q.      Did you understand that you were one of

16   these plaintiffs?

17   A.      Yes.

18   Q.      What does it mean to you, in general

19   terms, to be a plaintiff?

20   A.      To be a plaintiff, class plaintiff, is to

21   do due diligence, to represent the class honestly

22   and ethically, and to have all the information

23   available to discuss the case with my attorneys and

24   ask questions, to study the complaint and all

25   documents by the courts, and also to be where I need

CONFIDENTIAL

Page 39

1    to be, like today at the deposition as a class

2    representative, and to -- I gave all my computer, my

3    phone information to my attorneys and the experts,

4    and to do what's best for the class, to advocate for

5    the class.

6    Q.        Mr. Kevranian, in your answer just now,

7    you said your understanding of being a plaintiff

8    involves studying the complaint and all documents by

9    the courts, something along those lines?

10   A.        Mm-hmm.

11   Q.        What other documents in this case have you

12   reviewed other than the complaint?

13   A.        Motion to dismiss by Judge Gonzalez

14   Rogers, the documents from Judge DeMarchi, the

15   discovery, all the documents that I've received from

16   my attorneys.

17   Q.        When you refer to discovery, what are you

18   referring to?

19   A.        The information from my computer, the --

20   my phone.

21   Q.        So I'm not talking about those materials,

22   sir.  In terms of documents either exchanged with

23   Google or from the court, can you be more specific

24   about what you recall reviewing?

25   A.        The exhibits that I've seen, the 28

CONFIDENTIAL

Page 40

1    exhibits.  I believe it was about 500 pages.

2    Also --

3    Q.        Exhibits to what?

4    A.        The exhibits that had to do with the

5    privacy policies and the terms of Google.  And

6    also --

7    Q.        Are you referring to exhibits to the

8    complaint?

9    A.        To the complaint.

10   Q.        I see.  Okay.  Anything else that you can

11   recall reviewing?  You mentioned the motion to

12   dismiss?

13   A.        Yes.

14   Q.        Do you remember the briefs filing by the

15   other side or the order from the Court?  What are

16   you referring to?

17   A.        The Judge DeMarchi's documents, where

18   certain documents that the plaintiffs are asking for

19   and certain documents that Google will not -- Google

20   has made it private where I cannot see them.  I have

21   not seen any of those.  It's for the attorneys only.

22   I have not seen any of the documents.  There are a

23   lot of documents out there that are not privy to me.

24   Q.        Do you recall seeing orders from the Court

25   either from -- from any of the judges involved in

1    this case?

2    A.          Can you repeat the question?

3    Q.          Yeah.  Do you recall -- so do you know who

4    the judges are that are involved in this case?

5    A.          Judge Gonzales Rogers and also Judge

6    DeMarchi.

7    Q.          Do you recall seeing any orders that

8    either one of those judges issued in this case?

9    A.          The motion to dismiss order.

10   Q.          Anything else?

11   A.          And also, I'm not sure what the documents

12   are called, but Judge DeMarchi's -- the order -- the

13   orders that she gives to both sides.

14   Q.          How often -- again, without revealing

15   contents of discussions you had with your lawyers,

16   how often have you had contact with them about this

17   case?

18   A.          Approximately every couple of weeks.

19   Q.          What form of communication usually?

20   A.          Usually I go to their office.

21   Q.          So -- and just looking at the caption --

22   we'll swap out a different version --

23   A.          Sure.

24   Q.          -- when we look at the contents.  In the

25   text that I just pointed out to you that describes

CONFIDENTIAL

Page 43

1    your understanding of the group of people who you

2    are trying to represent in this case, sir?

3              MR. DANITZ:  Objection; asked and

4    answered.

5              THE WITNESS:  I and the Google account

6    holders are average people, and the average person,

7    the average Google account holder who is like me.

8              MR. SOMVICHIAN:  Q.  What do you mean by

9    "average"?

10   A.        I'm not an expert to define what "average"

11   means.

12   Q.        Well, I'm not asking for an expert --

13   A.        Okay.

14   Q.        -- understanding, but just what -- how you

15   meant it when you said it just now.

16   A.        Individuals like me who have Google

17   account holders (sic).

18             MR. DANITZ:  Asked and answered.

19             MR. SOMVICHIAN:  Q.  What is your

20   understanding of what it means to be bringing this

21   case on behalf of other people?

22   A.        That I will do my due diligence to

23   advocate for them and to attend deposition, to be at

24   the trial, to read documents to understand them, and

25   also ask questions to my attorneys and have them

CONFIDENTIAL

Page 49

```
 1              THE WITNESS:  I don't know.
 2              MR. SOMVICHIAN:  Q.  You don't recall
 3    taking any action to sign out of your Google
 4    account, correct?
 5    A.         I don't remember.
 6    Q.         Now, since -- since filing this lawsuit,
 7    have you done anything to research whether you can
 8    sign out of your Google account and still use Google
 9    services?
10    A.         No.
11    Q.         What Google services do you use?  Do you
12    use Google Search?
13    A.         Yes.
14    Q.         Generally speaking, what do you use it
15    for?
16    A.         Searching for news, subjects, and many
17    other things.
18    Q.         Do you know one way or the other whether
19    you have to be signed in to your Google account in
20    order to use Google Search?
21    A.         I don't know.
22    Q.         How often do you use Google Search?
23    A.         Every day.
24    Q.         Do you use any other search engines?
25    A.         No.
```

CONFIDENTIAL

Page 55

1    you visit most commonly?  Let's take like the
2    first -- like the most common five maybe that you
3    can think of.
4            MR. DANITZ:  Counsel, at this point -- and
5    perhaps I should have mentioned this earlier, but
6    we're going to designate this transcript
7    "Confidential," as it's bringing up confidential and
8    personal information.
9            MR. SOMVICHIAN:  That's fine.
10           MR. DANITZ:  Sorry to interrupt.
11           THE WITNESS:  Can you repeat the question,
12   please?
13           MR. SOMVICHIAN:  Q.  Yeah.  What -- what
14   would you estimate to be the websites you visit most
15   frequently?  And let's just take the top three to
16   five that come to mind.
17   A.        Facebook.
18   Q.        Okay.
19   A.        YouTube, Google.  I can't think of any
20   other right now.
21   Q.        Where do you normally get your news, for
22   example?
23   A.        Oh, Google News.
24   Q.        Any other news websites that you -- that
25   you look at?

CONFIDENTIAL

1    A.            Facebook News.

2    Q.            What about online shopping sites?

3    Anything there?

4    A.            Shop -- no.

5    Q.            Can you think of any other websites that

6    you visit with some regularity?

7    A.            Regularly, I can't think of any right now.

8    Q.            Do you ever recall looking at -- or strike

9    that.

10              Are you aware of websites having privacy

11   policies?

12   A.            Some.

13   Q.            Which ones are you aware of having their

14   own privacy policy?

15   A.            I can't think of any right now.

16   Q.            Have you ever -- have you ever bothered to

17   click through and look at the privacy policy of any

18   website that you might be visiting?

19   A.            I don't remember.

20   Q.            That's not a -- that's not like a regular

21   practice of yours, right, to look at the terms or

22   privacy policy of some website that you might be

23   looking at?

24   A.            No.

25   Q.            And as you sit here today, you don't

Page 60

1          We're good with using this one?

2          MR. DANITZ:  This appears to be the

3    publicly filed document.

4          MR. SOMVICHIAN:  Q.  Okay.  Mr. Kevranian,

5    you previously testified, I think, to a recollection

6    of a version of the complaint filed on August 27th.

7    And you'll see in the top here, on the very front,

8    it says, "Filed 8/27/21."  Do you see that, sir?

9    A.          Yes.

10   Q.          Okay.  So I'll just say, I'm impressed by

11   your recollection of dates, at least in connection

12   with this pleading.  And if you look at the

13   document, do you recall this being -- or I'll ask

14   it, does this appear to be the document that you

15   reviewed as you describe in your testimony earlier

16   prior to the filing?

17   A.          It appears to be.

18   Q.          Okay.  Okay.  Can you turn to Page 10,

19   please, sir.

20          MR. DANITZ:  Counsel, are you referring to

21   the ECF numbers or the page numbers at the bottom?

22          MR. SOMVICHIAN:  The page numbers at the

23   bottom.

24   Q.          So look at the bottom and not the top.

25   A.          Oh, okay.

CONFIDENTIAL

Page 62

1  Q.        You agree that someone that did authorize

2  that use of their personal information is not

3  included within this group?

4  A.        I don't know.

5  Q.        Why not?

6  A.        These are legal terminologies, so...

7  Q.        I'm not asking for a legal opinion of any

8  kind, Mr. Kevranian, but is it your understanding

9  that if somebody has authorized the conduct that

10 you're complaining about in this case, that they're

11 not within the scope of the people that you're

12 bringing this case on behalf of?

13             MR. DANITZ:  Objection; that calls for a

14 legal conclusion.

15             MR. SOMVICHIAN:  Q.  You can answer.

16 A.        Well, can you repeat the question, please?

17 Q.        Yeah.  If somebody has authorized the

18 conduct that you are complaining about in this case,

19 is that somebody that you're bringing this case on

20 behalf of?

21 A.        Well --

22             MR. DANITZ:  Same objection.

23             THE WITNESS:  We did not authorize Google

24 to sell our personal information to a third party.

25             MR. SOMVICHIAN:  Q.  I understand.  Your

CONFIDENTIAL

Page 63

1    view is you did not, correct?

2    A.        I did not authorize Google to sell my

3    personal information to anyone.

4    Q.        Correct.  And that's why this says that

5    the case is being brought on behalf of individuals,

6    quote, "whose personal information was sold or

7    otherwise disclosed by Google without their

8    authorization."  So those people would be similarly

9    situated to you, correct?

10   A.        Yes.

11   Q.        So my question is, if somebody had

12   authorized the conduct that you're challenging in

13   this case, are those people part of who you are

14   trying to represent?

15            MR. DANITZ:  Objection; calls for

16   speculation.  Objection; incomplete hypothetical,

17   and calls for a legal conclusion.

18            MR. SOMVICHIAN:  Q.  You can answer, sir.

19   A.        Google states that they do not sell

20   anyone's personal information to a third party on

21   their websites, I guess, and everywhere else, in the

22   media, at Congress hearings, and this statement here

23   is for all Google account holders.

24   Q.        Okay.  I just -- but it says "without

25   their authorization."  So my question is, are you

CONFIDENTIAL

Page 65

1    MR. DANITZ:  Objection; asked and answered

2    multiple times, calls for speculation, calls for a

3    legal conclusion.

4    MR. SOMVICHIAN:  Q.  Go ahead.

5    A.        I did not authorize Google to sell my

6    information and all the Google account holders that

7    I'm representing.

8    Q.        Can you look at Paragraph 45 on Page 13.

9    You see Paragraph 45 refers to you?

10   A.        Yes.

11   Q.        The second sentence reads, "Plaintiff

12   Kevranian is a Google account holder who has used

13   the Internet, including websites from which Google

14   sold and shared account holder information without

15   authorization, as alleged herein."  Do you see that,

16   sir?

17   A.        Yes.

18   Q.        Is that a correct statement?

19   A.        Yes.

20   Q.        Do you have in mind any specific websites

21   that fall within this description of, quote,

22   "websites from which Google sold and shared account

23   holder information without authorization"?

24   A.        I don't know.

25   Q.        You can't -- you can't identify a specific

CONFIDENTIAL

1    website that falls within that statement, correct?

2              MR. DANITZ:   Objection; calls for expert

3    testimony.

4              THE WITNESS:   I'm not a technical expert.

5    I don't know.

6              MR. SOMVICHIAN:   Q.   How do you know if

7    that allegation is accurate, then?

8    A.         Can you ask the question, please?

9    Q.         Yeah.   How do you know if that allegation

10   is accurate?

11   A.         Through experts.

12   Q.         Have you discussed this with experts?

13   A.         My attorneys --

14             MR. DANITZ:   At this point I am going to

15   instruct the witness not to reveal privileged

16   attorney-client communications.

17             MR. SOMVICHIAN:   Q.   Okay.   Not -- I'm not

18   asking for contents.   Have you spoken to any of the

19   experts in this case?

20   A.         My attorneys have.

21   Q.         But you have not?

22   A.         No.

23   Q.         You don't have an independent basis to

24   know that this is accurate, other than relying on

25   your attorneys; is that fair?

CONFIDENTIAL

1    A.        This is the reason why I've hired the best

2    of the best in the attorneys in this field for this

3    case.

4    Q.        Right.  And you --

5    A.        They are the experts, and they represent

6    me.

7    Q.        Okay.  And I'm just confirming, sir, you

8    don't yourself have an independent basis to know

9    that this is accurate, other than relying on the

10    fine attorneys that you've retained to represent

11    you, right?

12    A.        And also, the news media information.

13    Q.        The last sentence in this paragraph --

14    we're looking at 45 again -- "In order to become a

15    Google account holder, Plaintiff Kevranian was

16    required to indicate he agreed to uniform conditions

17    drafted and set forth exclusively by Google that

18    govern the relationship between him and Google."

19    See that, sir?

20    A.        So what is your question again?

21    Q.        Yeah.  Is that accurate?

22            MR. DANITZ:  That was not your question,

23    Counsel.

24            MR. SOMVICHIAN:  I referred him to that,

25    and now I'm asking him is that an accurate

CONFIDENTIAL

Page 70

1          THE WITNESS:  It's a highly technical

2    issue.

3          MR. SOMVICHIAN:  Q.  Can you identify any

4    specific type of information that is encompassed by

5    this allegation that your personal information has

6    been shared through Google RTB?

7          MR. DANITZ:  Same objection; calls for a

8    legal conclusion.  Also calls for expert testimony.

9          THE WITNESS:  Can you repeat the question,

10   please?

11         MR. SOMVICHIAN:  Q.  Yeah.  This statement

12   says, "Google has sold and shared Kevranian's

13   personal information through Google RTB."  My

14   question to you is, can you identify any specific

15   type of information that's covered by this

16   statement?

17         MR. DANITZ:  Same objection.  Calls for a

18   legal conclusion and for expert testimony.

19         THE WITNESS:  Google has promised not to

20   sell our personal information, and they've sold the

21   information to third -- third parties, selling our

22   browser history, search history, computer ID,

23   cookies, and many other technical fields that are in

24   our computer system through their real-time bidding

25   process.

CONFIDENTIAL

1    A.        Yes.

2    Q.        Okay.  Do you have an iPhone?

3    A.        An iPhone.

4    Q.        What's the model?

5    A.        8.

6    Q.        That's still the one you're using

7    currently?

8    A.        Yes.

9    Q.        How long have you had that?  It's a

10   collector's item now.

11   A.        It is.  So long time.

12   Q.        You have a MacBook?

13   A.        Yes.

14   Q.        You use that to browse the Internet?

15   A.        Yes.

16   Q.        How long have you had that MacBook?

17   A.        Over a year.

18   Q.        What -- what computer did you use before

19   that?  Did that replace something?

20   A.        It was another Mac -- Apple computer.

21   Q.        Okay.  And you don't have that anymore?

22   A.        No.

23   Q.        What did you do with it?

24   A.        Actually, I do have it, but it's -- it

25   doesn't operate.  It doesn't turn on.

CONFIDENTIAL

Page 104

1    Mr. Kevranian, is it your allegation that the

2    highlighted text with the statements reflected in

3    there -- strike that.

4              Is it your allegation that the statements

5    highlighted in this document on the first page are

6    false?

7              MR. DANITZ:  I'm sorry, Counsel.  Okay.

8    "False."  I didn't hear that last word.

9              THE WITNESS:  Can you repeat the question,

10   please?

11             MR. SOMVICHIAN:  Q.  Yeah.  You see the

12   highlighted text?  Let's be more specific.  You see

13   the text that says, "We don't sell your personal

14   information to anyone"?  You see that?  It's

15   highlighted.

16   A.        Yes.

17   Q.        Is it your allegation in this case that

18   that statement is false?

19   A.        Yes.

20   Q.        What's the basis for saying that it's

21   false?

22   A.        Google has promised and has stated to all

23   Google account holders that they don't sell their

24   personal information to anyone.

25   Q.        Yeah.  What's your basis for alleging in

CONFIDENTIAL

Page 105

1    this case that that is not true?

2    A.          From the news --

3              MR. DANITZ:  Objection.  You can answer if

4    you have an independent basis, but objection, it

5    calls for attorney -- to the extent it calls for our

6    communications regarding privileged issues in this

7    case, please don't reveal those.  Also calls for

8    expert testimony.  You can answer.

9              THE WITNESS:  It's the information I've

10   received through the media, the congressional

11   hearings, news reports, that Google sells private

12   information -- private personal information to third

13   parties.

14             MR. SOMVICHIAN:  Q.  Okay.  And that's the

15   same information and sources that you referred to me

16   earlier today, right?

17   A.          Yes.

18   Q.          You don't have in mind some other source

19   that you've now remembered that's part of why you

20   think this is untrue, is it?

21             MR. DANITZ:  Mischaracterizes the

22   testimony, calls for expert testimony.  And I

23   instruct the witness not to reveal privileged

24   communications.  You can respond.

25             THE WITNESS:  No.

CONFIDENTIAL

Page 111

1    time in which you might have seen any of the
2    materials.  I'm focused on the time when you did the
3    review.  So that was a couple -- maybe a year or two
4    ago, right?  Or maybe a year and a half ago?
5    A.       Yes.
6    Q.       So that's the time frame I'm asking about.
7    So when you did that review of the draft complaint
8    and the exhibits, did you see any exhibit that made
9    you think, oh, this looks familiar because I've seen
10   it before?
11           MR. DANITZ:  Objection; lacks foundation
12   and calls for speculation.
13           THE WITNESS:  No.
14           MR. SOMVICHIAN:  Q.  Earlier today,
15   Mr. Kevranian, you've explained to me your concern
16   you believe Google is selling your personal
17   information.  What is your understanding of who
18   Google is allegedly selling information to?
19           MR. DANITZ:  Objection; calls for expert
20   testimony.
21           THE WITNESS:  Google is selling to -- our
22   personal information to third parties, and it's --
23   there's hundreds of different companies they're
24   work -- dealing with.
25           MR. SOMVICHIAN:  Q.  So I'm not asking you

CONFIDENTIAL

1    to different third-party individuals, and I don't

2    know what they're doing with that information.

3    Q.        I didn't ask what they were doing with it.

4    I'm asking for your own interpretation of the

5    personal information at issue.  And I think earlier

6    today you explained to me that part of the personal

7    information that you're concerned about being shared

8    includes the things that you search for online,

9    right?

10   A.        Online, my browser history's being sold,

11   my IP address is being sold.  There are dozens of

12   technical terms that I don't know.  The information

13   is being sold to third parties from our account.

14   Q.        Do you have any understanding of whether

15   your search history is shared through the RTB

16   process?

17            MR. DANITZ:  Objection; calls for expert

18   testimony.

19            THE WITNESS:  That's an expert's question.

20   Ask an expert, please.  I don't know.

21            MR. SOMVICHIAN:  Q.  This case is about

22   RTB, though, right?  You understand that?

23   A.        Yes.

24   Q.        But you don't know whether search history

25   is part of RTB or not?

CONFIDENTIAL

1    A.          It's in the complaint.

2    Q.          And what does it say in the complaint?

3    A.          That there are many factors they're using

4    to sell.

5    Q.          Do you know whether your browsing history

6    is part of RTB?

7              MR. DANITZ:  Objection; vague and

8    ambiguous.  Part of RTB?

9              MR. SOMVICHIAN:  Q.  Mr. Kevranian, do you

10   know whether your browsing history is shared with

11   third parties as part of RTB?

12   A.          I believe so.

13   Q.          If it was not, would that make you feel

14   differently about this case and the allegations that

15   you've brought?

16             MR. DANITZ:  Objection; improper

17   hypothetical, argumentative, calls for speculation.

18             THE WITNESS:  That's just one item out of

19   many.

20             MR. SOMVICHIAN:  Q.  Okay.  And I just

21   want to confirm, Mr. Kevranian, before getting

22   involved in this case, you weren't aware of, from

23   any source or from any person, that ads could be

24   shown to you online potentially based on things that

25   you search for?  That was not anything that you knew

CONFIDENTIAL

1   Q.        Are you familiar with that?

2   A.        No.

3   Q.        Okay.  You've been using the term

4   "personal information" throughout the day today.

5   How would you define it?

6             MR. DANITZ:  Objection; calls for legal

7   conclusion.

8             THE WITNESS:  It's a legal term, and

9   governments have explained the term, and my personal

10  information is only for me.  It's private, and I

11  don't want anyone to share it or sell it without my

12  authorization.  And also, my personal information is

13  about my religion, my political background, my

14  gender, where I live.  All my private, personal

15  information only belongs to me and no one else,

16  unless I give authorization, and not to have anyone

17  sell it.

18            MR. SOMVICHIAN:  Q.  Okay.  So those

19  things that you listed, including your religion,

20  your --

21  A.        Many other things.

22  Q.        I understand you're not trying to give me

23  the exhaustive list, but the examples that you gave

24  me, including religion, political background, where

25  you live, you view those as being personal

CONFIDENTIAL

1    that that information is not shared, does that

2    impact the claims you're making in this case?

3                MR. DANITZ:  Objection; calls for

4    speculation, calls for expert testimony.

5                THE WITNESS:  That's a legal and technical

6    question.  I'm not an expert.

7                MR. SOMVICHIAN:  Q.  Did you assume, as

8    part of the process of finalizing the complaint,

9    that there were not options to clear out cookies or

10   to control cookies?

11               MR. DANITZ:  Objection; vague and

12   ambiguous as to did you assume there were not

13   options.

14               THE WITNESS:  Can you rephrase the

15   question?  Or ask the question again, please.

16               MR. SOMVICHIAN:  Q.  Yeah, as part of --

17   when you filed the complaint, did you assume that it

18   was impossible to clear out your cookies and to

19   prevent the type of sharing of information that

20   you're complaining about?

21   A.          Well, I'm not a technical expert, so I

22   don't know what's involved with a lot of technical

23   things on a computer device, so...

24   Q.          I'm not saying whether you knew or not,

25   but is that -- did you have a belief one way or the

CONFIDENTIAL

1    other -- whether it was accurate or technically

2    correct, did you believe, when you were making

3    allegations about cookies being shared, that it was

4    not possible for somebody to block them from being

5    shared, and that there were no options to delete

6    them?

7    A.          The allegation is not only about cookies.

8    It's about many other topics and issues.  So cookies

9    alone is not the allegation here.

10   Q.          But it is part of your allegations?

11   A.          It's part of it.

12   Q.          Okay.

13   A.          But if you combine all the other topics,

14   you put the puzzles together.

15   Q.          Okay.  Well, I'm asking about one part of

16   the puzzle.

17   A.          Okay.

18   Q.          And I just want to understand.  Maybe you

19   didn't have a view one way or the other, but my

20   question is, when you filed the complaint that does

21   include allegations about cookies, did you assume

22   that users had no options for clearing out their

23   cookies or preventing them from being shared?

24   A.          I don't know.  I would say no.

25   Q.          No, you didn't have an understanding one

CONFIDENTIAL

1                identification.)

2                THE VIDEOGRAPHER:  This marks the

3    beginning of Media No. 5 in the deposition of John

4    Kevranian.  We're back on the record.  The time is

5    3:07.

6                MR. SOMVICHIAN:  Q.  Mr. Kevranian, in

7    front of you is Exhibit 20.  And before I ask you a

8    question about it, just to give you some context,

9    before we were looking at another document that

10   referred to something called Google Takeout.  And I

11   asked you a question about it.  It didn't seem to

12   ring a bell, but this is a document that was

13   produced by your counsel that appears to be a Google

14   Takeout that was sent to your e-mail address.  Can

15   you just take a look at it and see whether that jogs

16   any recollection for you?

17   A.        Yes.

18   Q.        Okay.  Does this help you recall that you

19   have used this Google Takeout service before?

20   A.        Yes.

21   Q.        What do you remember about doing that?

22   A.        It's been a year or so, so it was

23   information that I provided, I believe, to my

24   counsel.

25   Q.        Okay.  What -- so you downloaded these

CONFIDENTIAL

Page 188

1    files as part of this litigation?

2    A.        Yes.

3    Q.        Without telling me about the contents of

4    any privileged communications you had with your

5    lawyers, what was the purpose of downloading these?

6    Or do you know?

7    A.        I don't remember exactly.  It was for the

8    case.

9    Q.        What do you recall generally about this

10   information that you downloaded from Google Takeout?

11   A.        It may have been for discovery.

12   Q.        Did you ever review any of the files that

13   were downloaded?

14   A.        I may have seen it, but I don't remember

15   the contents exactly.

16   Q.        Okay.  That was going to be my next

17   question.  You don't remember the contents of any

18   specific file that is depicted here, do you?

19   A.        That's right.

20   Q.        Do you remember, even in general terms,

21   what the type of information was that was downloaded

22   that you may have looked at?

23   A.        It's been almost 14 months.  I don't

24   remember offhand.

25   Q.        Okay.  Going to show you another exhibit.

CONFIDENTIAL

Page 202

1    what they said because you didn't review them.  Is

2    that accurate?

3    A.        I don't know --

4              MR. DANITZ:  Objection; calls for

5    speculation, improper hypothetical, lacks

6    foundation.

7              THE WITNESS:  I don't know if they had

8    terms or conditions.

9              MR. SOMVICHIAN:  Q.  You didn't have an

10   expectation when you created Facebook that Facebook

11   might have a policy that governs your use of the

12   service?

13   A.        Well, I opened the account many, many

14   years ago, and I don't remember if they had terms

15   and conditions and what it was.

16   Q.        Mr. Kevranian, do you believe you were

17   injured in some way by the allegations that you're

18   making in the complaint?

19   A.        Yes.

20   Q.        How so?

21   A.        Well, Google has sold our personal

22   information, and they state that they don't sell our

23   personal information, and also to the other Google

24   account holders.

25   Q.        Okay.  But how were you injured by that?

A. My privacy has been sold. My personal information has been sold.

Q. What specific aspects of your privacy do you believe have been sold as part of this case?

A. Many different aspects, as it's been noted in the complaint.

Q. Okay. And we've talked about some today, right? You believe your search history, that's something that you think was private to you that was sold that caused you injury? Is that part of what you're claiming to be an injury?

MR. DANITZ: Objection; mischaracterizes the testimony.

THE WITNESS: It's many different aspects. Not only search history or cookies. It's many, many different aspects of my personal information that has been sold without my permission.

MR. SOMVICHIAN: Q. Okay. And we've talked about this. I'm trying to ask you now from the perspective of how you believe you were injured by that. Okay. So I understand your allegation that you believe certain aspects of your information were sold. You've explained to me that you perceive that to be an injury because you believe some of it to be private. Is that a fair characterization?

CONFIDENTIAL

Page 207

1    millions of Google account holders.

2                MR. SOMVICHIAN:   Q.   Let me ask it this

3    way:   What -- what compensation do you feel you're

4    entitled to as part of this case?

5    A.          Well --

6                MR. DANITZ:   Objection as to the word

7    "you."   Do you mean all of the class members,

8    Counsel?

9                THE WITNESS:   I and the class members,

10   millions of Google account holders, want

11   compensation, and we want the Court also to put an

12   injunction to stop Google's practices of selling

13   people's personal information, and the prayer of

14   relief is all spelled out on Page 129 and 130, and

15   it details what we want.

16               MR. SOMVICHIAN:   Q.   Okay.   So to your

17   counsel's point, my question is about you, John

18   Kevranian.   What do you feel you are entitled to by

19   way of compensation in this case?

20   A.          This is not only about me.   It's about

21   every single Google account holder.

22   Q.          I'm not asking about every Google account

23   holder.   I know you're trying to represent other

24   people, and that's understood.   But for you, sir,

25   what do you think you are entitled to as

CONFIDENTIAL

Page 208

1    compensation in this case?  You're a plaintiff.

2    You're making a demand.  You're saying Google should

3    compensate you.  I'm asking what you're asking for.

4    A.        I am a class representative, and I'm

5    representing Google account holders, and I can't

6    speak to myself only.  I'm speaking on behalf of

7    millions of Google account holders.

8    Q.        Okay.  And how is the compensation, in

9    your view, going to be calculated for either you or

10   anybody else in that group?

11          MR. DANITZ:  Objection; calls for expert

12   testimony.

13          THE WITNESS:  Through experts.  That's how

14   it would be determined.  And the courts.

15          MR. SOMVICHIAN:  Q.  I'm not asking for a

16   specific dollar amount, just to be clear,

17   Mr. Kevranian.  I'm trying to get any understanding

18   that you have as to how that amount of compensation

19   should be calculated.

20          MR. DANITZ:  Objection; calls for an

21   expert testimony.

22          THE WITNESS:  I am not an expert.  That's

23   why I have hired the best lawyers that are working

24   with the best experts, technical experts, financial

25   experts, all of them.

CONFIDENTIAL

Page 210

```
 1   testimony.
 2             THE WITNESS:  That's up to the Court to
 3   decide.
 4             MR. SOMVICHIAN:  Q.  Well, in your view,
 5   wouldn't it depend on the personal information that
 6   was shared and whether it was private and all these
 7   other things that you've explained were injuries to
 8   you?
 9             MR. DANITZ:  Objection; calls for expert
10   testimony.
11             THE WITNESS:  That's for the experts, and
12   also for the courts.
13             MR. SOMVICHIAN:  Q.  Are you saying,
14   Mr. Kevranian, that everybody should get compensated
15   in the same amount in this case?  Is that what
16   you're seeking on behalf of the class that you want
17   to represent?
18             MR. DANITZ:  Objection; mischaracterizes
19   the testimony, calls for speculation, and it calls
20   for expert testimony.  It also calls for a legal
21   conclusion.
22             THE WITNESS:  What I'm saying is, our
23   personal information is being sold without our
24   permission, and Google's statements are "We do not
25   sell your personal information to anyone."  And we
```

CONFIDENTIAL

Page 211

1  will -- we have experts and we have the courts to
2  decide on that.
3              MR. SOMVICHIAN:  Q.  And in your view, the
4  personal information that you think was shared about
5  you has some value that some expert can place on it;
6  is that your testimony?
7  A.        That is up to the Court to decide.
8  Q.        I thought that's what you just said, that
9  your personal information has some value that you're
10 asking to be compensated for.  Isn't that what you
11 just said?
12 A.        That's what I said, and that -- and we
13 will let the courts decide that.
14 Q.        In going to the Court to ask them -- to
15 ask the Court for compensation for some value for
16 your personal information, what are the aspects of
17 that information that you think the Court should
18 consider for determining the value?  Does it have to
19 do with the private aspects that you mentioned to me
20 earlier?
21             MR. DANITZ:  Objection; calls for expert
22 testimony.
23             THE WITNESS:  As I stated before, expert
24 testimonies and other information, and the courts
25 will make that decision.

CONFIDENTIAL

Page 212

1    MR. SOMVICHIAN:  Q.  Mr. Kevranian, you

2    also, I believe, mentioned an injunction or other

3    aspects of what you're asking the Court to do in

4    this case.  Can you explain that to me?  Things

5    other than compensation.

6    A.      Well, we want the courts to have Google

7    stop their practice of selling personal information

8    of Google account holders and other things.

9    Q.      What are those other things?

10   A.      They're spelled out on Page 129 and

11   Page 130 of the complaint.

12   Q.      Do you think you're at risk of future

13   injury from Google if you continue using Google

14   services?

15   A.      I can't think of the future.  I don't know

16   what the future entails.

17   Q.      Well, you still use Google services,

18   right?

19   A.      Yes.

20   Q.      You still have your Google account, right?

21   A.      Yes.

22   Q.      You still stay signed into it, right?

23   A.      Yes.

24   Q.      You still stay signed into your account,

25   and you browse the web, right?

CONFIDENTIAL

Page 213

1    A.          I can't avoid Google because I have all my

2    e-mail information, all my e-mails, and all my

3    documents, my photos.    So we're dependent on Google

4    because of all these years we've had the account.

5    Q.          You could sign out of your account while

6    you're browsing the Internet, right?

7                MR. DANITZ:  Objection; calls --

8                MR. SOMVICHIAN:  Q.  Have you ever thought

9    to do that?

10               MR. DANITZ:  Objection; calls for

11   speculation, calls for expert testimony.

12               THE WITNESS:  Repeat the question, please.

13               MR. SOMVICHIAN:  Q.  Yeah.  Have you ever

14   considered any option like signing out of your

15   account or clearing cookies or doing anything that

16   might potentially prevent the types of data sharing

17   that you're complaining about?

18               MR. DANITZ:  Objection; calls for

19   speculation, based on Mr. Kevranian's knowledge as

20   testified to here.

21               THE WITNESS:  I'm not a technical expert,

22   so I don't know how the signing out/signing in

23   works.

24               MR. SOMVICHIAN:  Q.  As part of the relief

25   that you're mentioning about ordering Google to stop

CONFIDENTIAL

Page 226

```
 1   Q.         And you mentioned that that then became a
 2   federal -- there was a federal court version of that
 3   case that got filed?
 4   A.         Yes.
 5   Q.         Do you remember what specific court?
 6   A.         No.
 7   Q.         Was it in Northern California?  Any idea?
 8   A.         I believe it's in the East Coast.
 9   Q.         East Coast.  Do you remember what state?
10   A.         No.
11   Q.         And you believe that that matter's now up
12   on appeal in some manner?
13   A.         It's pending.
14   Q.         You mentioned discovery earlier in this
15   case.  What have you done, Mr. Kevranian, to gather
16   any materials for discovery purposes in this case?
17   A.         I have provided my computer e-mail
18   accounts and all the information necessary from my
19   computer and my cell phone to my attorneys for all
20   the information they need.  Also -- can you repeat
21   the question, please?
22   Q.         Yeah.  What types of materials have you
23   gathered -- or strike that.
24              What types of information or materials
25   have you gathered in connection with discovery in
```

CONFIDENTIAL

Page 227

1   this case, that you can recall?

2   A.          All my computer information, and also my

3   cell phone information, and also my attorneys have

4   hired experts.

5   Q.          Did you ever look for any terms or

6   policies or other web pages or disclosures from

7   Google that you may have reviewed at any point?

8   A.          Whatever I had I turned over to the

9   attorneys, whatever information.  I don't remember

10  offhand what I turned.

11  Q.          Did you recall identifying any terms or

12  policies or disclosures that you actually reviewed

13  from Google that you provided as part of the

14  discovery process?

15  A.          I don't remember.

16  Q.          Do you remember undertaking an effort to

17  try to find or identify any terms or policies or

18  disclosures from Google that you had reviewed in

19  connection with any discovery obligation in the

20  case?

21  A.          As far as documents or as far as computer

22  information?

23  Q.          Documents.

24  A.          Documents?  I didn't have any documents in

25  regards to Google information you're requesting.

CONFIDENTIAL

Page 232

1        (Whereupon the deposition concluded at

2        4:21 p.m.)

3

4                    ---oOo---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 234

1                    CERTIFICATE OF REPORTER

2

3          I, Natalie Y. Botelho, a Certified

4    Shorthand Reporter, hereby certify that the witness

5    in the foregoing deposition was by me duly sworn to

6    tell the truth, the whole truth, and nothing but the

7    truth in the within-entitled.

8          The said deposition was taken down in

9    shorthand by me, a disinterested person, at the time

10   and place therein stated, and that the testimony of

11   said witness was thereafter reduced to typewriting,

12   by computer, under my direction and supervision;

13         That before completion of the deposition,

14   review of the transcript [ ] was|[X] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18         I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

     any of the parties thereto.

22   DATED: December 21, 2022

23

24         _Natalie Y. Botelho_

25         Natalie Y. Botelho, CSR No. 9897