# **Exhibit 10**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4                  ---oOo---

5   BENJAMIN HEWITT, et al., on

    behalf of themselves and all

6   others similarly situated,

7            Plaintiffs,

8            vs.          No. 4:21-cv-02155-LHK-VKD

9   GOOGLE LLC,

10           Defendant.

    _____/

11

12

13

14   ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY***

15

16

17

18            VIDEOTAPED DEPOSITION OF

19            CHRISTOPHER VALENCIA

20   _____

21        WEDNESDAY, DECEMBER 14, 2022

22

23   REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

24   JOB NUMBER: 5620686

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1                         --o0o--
2          Videotaped deposition of CHRISTOPHER VALENCIA,
3     taken by the Defendant, at COOLEY LLP, Three
4     Embarcadero Center, 22nd Floor, San Francisco,
5     California 94111, commencing at 9:12 A.M., on
6     WEDNESDAY, DECEMBER 14, 2022, before me, HOLLY THUMAN,
7     CSR, RMR, CRR.
8                         --o0o--
9                       APPEARANCES
10    FOR THE PLAINTIFFS AND THE PROPOSED CLASS:
11         DICELLO LEVITT LLC
           One Grand Central Place
12         60 E. 42nd Street, Suite 2400
           New York, New York 10165
13         By:  DAVID A. STRAITE, Attorney at Law
                 DStraite@dicellolevitt.com
14
15         DICELLO LEVITT LLC
           10 North Dearborn Street, Sixth Floor
16         Chicago, Illinois 60602
           By:  JAMES ULWICK, Attorney at Law
17              JUlwick@dicellolevitt.com
18    FOR DEFENDANT:
19         COOLEY LLP
           Three Embarcadero Center, 22nd Floor
20         San Francisco, California 94111
           By:  WHITTY SOMVICHIAN, Attorney at Law
21              wsomvichian@cooley.com
22    ALSO PRESENT:
23         TED HOPPE, Videographer
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                        Page  3

 1                          I N D E X
 2                     INDEX OF EXAMINATIONS
 3    EXAMINATION BY:                                    PAGE
 4    MR. SOMVICHIAN                                        6
 5    MR. STRAITE                                         301
 6    MR. SOMVICHIAN                                      302
 7                        --o0o--
 8          EXHIBITS MARKED FOR IDENTIFICATION
 9    NO.                DESCRIPTION                      PAGE
10    Exhibit 28    Ads Help - Control the ads you see    197
                    (GOOG-HEWT-00001055 through -056)
11
      Exhibit 29    Google Privacy and Terms -            218
12                  Advertising (GOOG-HEWT-00000208
                    through -210)
13
      Exhibit 30    Google Ad Settings - Settings for     225
14                  personalized ads
                    (GOOG-0HEWT-00456236)
15
      Exhibit 31    Web document, Google Account -        230
16                  Activity controls
17    Exhibit 32    Web document, Google Account, Ad      236
                    personalization
18
      Exhibit 32A   Screenshot                            269
19
      Exhibit 32B   Screenshot, Google Account, Ad        285
20                  personalization
21    Exhibit 33    Document headed "Location"            242
22    Exhibit 34    Document headed "Cookies and other    248
                    site data"
23
      Exhibit 34A   Screenshot headed "Cookies and other  267
24                  site data"
25    (Cont'd)
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                  Page 4

 1    (Exhibits, cont'd)
 2    Exhibit 35    Document headed "General settings"    248
 3    Exhibit 36    Document headed "Christopher Valencia  259
                    - Syncing to ████████@gmail.com"
 4
      Exhibit 36A   Screenshot headed "Sync and Google     268
 5                  Services"
 6    Exhibit 37    Document headed "Privacy and           262
                    security"
 7
      Exhibit 38    Web printout, enterprise.com,          275
 8                  "Reserve a Vehicle"
 9    Exhibit 39    Web printout, enterprise.com, Privacy  279
                    Preference Center
10
11                        --o0o--
12        PREVIOUSLY MARKED EXHIBITS REFERENCED
13    NO.              DESCRIPTION                    PAGE
14    Exhibit 4     Previously marked                  118
      Exhibit 5     Previously marked                  143
15    Exhibit 6     Previously marked                  153
      Exhibit 7     Previously marked                  193
16    Exhibit 8     Previously marked                  195
      Exhibit 9     Previously marked                  163
17
18                        --o0o--
19    INSTRUCTIONS TO WITNESS/REQUESTS TO MARK TRANSCRIPT
20                              PAGE     LINE
21       Instruction not to answer   130       16
22                        --o0o--
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 5

```
 1            SAN FRANCISCO, CALIFORNIA
 2          WEDNESDAY, DECEMBER 14, 2022
 3                  9:12 A.M.
 4                  --o0o--
 5              PROCEEDINGS
 6          THE VIDEO OPERATOR:  Good morning.  We are
 7    going on the record.  The time now is 9:12 on
 8    December 134, 2022.
 9          This is Media Unit 1 in the video-recorded
10    deposition of Christopher Valencia in regards to
11    the Google RTB Consumer Privacy Litigation,
12    Case Number 4:21-CV-02155-YGR-VKD.  This video
13    deposition is taking place at Cooley LLP, Three
14    Embarcadero Center, 20th floor, San Francisco,
15    California 94111.
16          My name is Ted Hoppe.  I am the
17    videographer.  I represent Veritext.
18          Counsel, could you please voice identify
19    yourselves for the record.
20          MR. SOMVICHIAN:  Yeah.  Whitty Somvichian
21    with Cooley.  I'm representing Google today.
22          MR. STRAITE:  Good morning.  David Straite
23    from DiCello Levitt, representing the plaintiff.
24          MR. ULWICK:  Good morning.  James Ulwick,
25    also here on behalf of the plaintiff.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

1           THE VIDEO OPERATOR:  The court reporter
2    today is Holly Thuman.
3           Holly, could you please swear the witness
4    in.
5                     --oOo--
6           CHRISTOPHER VALENCIA,
7    _____
8    called as a witness, having been first duly
9    sworn, was examined and testified as follows:
10                    ---oOo---
11          THE VIDEO OPERATOR:  Please proceed.
12             EXAMINATION BY MR. SOMVICHIAN
13   BY MR. SOMVICHIAN:
14      Q.  Good morning, Mr. Valencia.  I just
15   introduced myself a few minutes ago.  I'm
16   representing Google today.
17          You were just given an oath.  You
18   understand that that's the same type of oath that
19   you would take in a court of law?
20      A.  Yes.
21      Q.  And you understand you are obligated to
22   provide truthful, accurate answers to the best of
23   your ability today?
24      A.  Yes.
25      Q.  Is there any reason you can't do that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.  I -- no.  I did become an armed security

2    guard, but I'm not necessarily sure that's a trade

3    or anything.

4       Q.  Are you currently employed, sir?

5       A.  Yes.

6       Q.  What's your job today?

7       A.  I work as an armed security guard for a

8    private company.

9       Q.  How long have you been doing that?

10      A.  Security I've done since 2010.  Armed

11   security I've done since 2018.

12      Q.  Okay.  Do you hold any kind of

13   certification or license that allows you to do

14   that?

15      A.  Yes.  I -- I do have an exposed carry

16   permit.

17      Q.  What did you do before 2010?

18          MR. STRAITE:  Objection.  Vague.

19   BY MR. SOMVICHIAN:

20      Q.  Jobwise.

21      A.  That was actually the year I got out of

22   the Marines.

23      Q.  Okay.  Mr. Valencia, how did you get

24   involved in this case initially?

25          Can you just walk me through how you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1    became a plaintiff in this case?

2            MR. STRAITE:  And I would also instruct

3    the witness, while you should answer this question,

4    please don't reveal conversations you had with

5    counsel.

6            THE WITNESS:  It started with an ad on

7    Facebook.

8    BY MR. SOMVICHIAN:

9        Q.   Describe the ad for me, please.

10       A.   I don't remember what the ad said.

11       Q.   I don't need exact terminology, but just

12   the gist of it that you can recall.

13       A.   The ad said something to the effect of --

14   that Google was selling personal information.

15       Q.   Okay.  Was -- it was an advertisement.

16   Right?

17       A.   Yes.

18       Q.   It was an advertisement from lawyers?

19       A.   Yes.

20       Q.   It says something about Google selling

21   personal information, as far as you can remember?

22       A.   Yes.

23       Q.   Did it include some sort of link or a way

24   to contact lawyers?

25       A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 11

1          Q.   Okay.  What did you do after seeing this

2      ad?

3          A.   I responded by clicking the ad.

4          Q.   Okay.  Where did that take you?

5          A.   It took me to a website where I input my

6      name and email.

7          Q.   Okay.  Did that website have any other

8      information about the nature of the Google issue?

9          A.   I don't remember.

10         Q.   Anything else you remember about the

11     website that you accessed and where you entered

12     your contact info?

13         A.   No.

14         Q.   What happened then, after providing your

15     info?

16              I assume somebody reached out to you?

17         A.   Yes.

18         Q.   How?

19         A.   Via a phone call.

20         Q.   Okay.  In that phone call at that point in

21     that first conversation, were you seeking legal

22     advice?

23         A.   No.

24              MR. STRAITE:  Objection.  Calls for legal

25     conclusion.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 12

1    BY MR. SOMVICHIAN:

2        Q.  Tell me what -- tell me what -- well,

3    strike that.

4            Who reached out to you?

5        A.  James.  James Ulwick.

6        Q.  I want to focus on that conversation in

7    which you've explained you were not at that point

8    in time yet seeking legal advice.

9            Tell me about --

10           MR. STRAITE:  Objection.  Misstates

11   earlier testimony.

12   BY MR. SOMVICHIAN:

13       Q.  What did Mr. Ulwick say to you on that

14   initial phone call?

15           MR. STRAITE:  And I caution you not to

16   reveal advice of counsel.

17           THE WITNESS:  He explained to me some

18   details about the case.

19   BY MR. SOMVICHIAN:

20       Q.  How long was that phone call?

21       A.  It wasn't long.  It couldn't have been any

22   more than 10 or 15 minutes.

23       Q.  When did all this happen, by the way?

24           What year?

25       A.  This year.  2022.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 13

1      Q.   2022?  Are you sure about that?

2      A.   Yes.

3      Q.   What else do you recall about that first

4  phone call?

5      A.   I remember asking James a few questions

6  about what the case was about.

7      Q.   And what did you come to understand based

8  on that information?

9      A.   I learned the full extent of what Google

10  was doing.

11      Q.   What was that, as you understood it at

12  that time, based on the conversation?

13      A.   That they were selling personal

14  information.

15      Q.   Okay.  We'll get into the details of that,

16  but I want to focus on what you understood based on

17  that specific call.

18           Do you remember any other details that you

19  took away from that call about Google's practices?

20           MR. STRAITE:  Again, I caution the witness

21  only to answer questions about that first phone

22  call.  Any understandings you have based on

23  conversations with counsel thereafter, you do not

24  need to reveal.

25           THE WITNESS:  I don't remember -- I don't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1    remember learning how bad the situation was with

2    Google.

3    BY MR. SOMVICHIAN:

4        Q.  What do you remember learning about in

5    that phone call?

6        A.  The -- what I remember is that Google was

7    saying that they would not sell our personal

8    information but then turned around and did so.

9        Q.  Anything else you recall from that initial

10   phone call?

11       A.  No.

12       Q.  How did you react to the information that

13   you learned?

14           MR. STRAITE:  Objection.  Vague.

15   BY MR. SOMVICHIAN:

16       Q.  You can answer.

17       A.  I was pretty surprised.

18       Q.  What specifically surprised you?

19       A.  At the time, it was just surprising that

20   they did something that they said they wouldn't do.

21       Q.  Did you ask any questions in that phone

22   call?

23       A.  Yes.

24       Q.  What did you ask?

25           MR. STRAITE:  Again, if you were seeking

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 15

1   advice of James Ulwick, you should not reveal what
2   you asked him.
3              THE WITNESS:  I don't remember.
4   BY MR. SOMVICHIAN:
5        Q.  Okay.  After this phone call, what did you
6   do as it relates to Google?
7              MR. STRAITE:  Objection.  Vague.
8              THE WITNESS:  I -- I don't remember.
9   BY MR. SOMVICHIAN:
10       Q.  Let me ask you a more specific question.
11           After the call, did you try to do any of
12  your own research or investigation into what you
13  had just been told to see whether it was accurate
14  or to get more context?
15       A.  I do believe I looked up the lawsuit using
16  Google.
17       Q.  Okay.  What did you find?
18       A.  I found an article that I don't remember
19  the title of at this point.
20       Q.  What was the gist of the article that you
21  found?
22       A.  That Google was selling personal
23  information that they continuously said in their
24  terms of service that they would not sell.
25       Q.  How did you find this article?  Using a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16

1    Google search?

2         A.   Yes.

3         Q.   Other than this article that you found,

4    did you do anything else after your conversation

5    with Mr. Ulwick relating to what you had learned?

6         A.   No.

7         Q.   At what point did you decide to become a

8    plaintiff in this case?

9         A.   I don't remember.

10        Q.   Did you have other conversations with

11   Mr. Ulwick or other lawyers about the Google issues

12   before you decided to become a plaintiff in the

13   case?

14        A.   No.

15        Q.   Okay.  What was the next communication

16   that you had with anybody, whether it was

17   Mr. Ulwick or other attorneys, about this matter,

18   after this initial phone call?

19        A.   The only thing I remember is just waiting

20   for another -- another call for email from

21   James Ulwick.

22        Q.   Okay.  And at some point, you got that

23   follow-up?

24        A.   Yes.

25        Q.   Was that a phone call or an email?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.  I don't remember.

2    Q.  What was the subject of the communication,

3  whether it was a phone call or an email?

4        MR. STRAITE:  Again, instruct the witness,

5  you don't need to reveal any legal advice from

6  counsel.

7        THE WITNESS:  Can I hear the question

8  again?

9  BY MR. SOMVICHIAN:

10    Q.  Yeah.  What was the general subject of the

11  second communication that you got?

12    A.  I believe it was just more details about

13  the case.  I really don't remember at that point

14  what else I needed to do.

15    Q.  At this point, had you decided to be a

16  plaintiff in the case?

17    A.  I -- I don't remember.

18    Q.  Okay.  At what point did you decide to

19  participate in this case as a plaintiff?

20        MR. STRAITE:  Objection.  Asked and

21  answered.

22  BY MR. SOMVICHIAN:

23    Q.  You can answer if you can estimate a time.

24    A.  It is possible that by then, I did decide

25  to become a plaintiff; but for sure, it couldn't

Veritext Legal Solutions

800-567-8658                                      973-410-4098

1    have been any past, like, the fourth or fifth call

2    or email.

3         Q.   Okay.  So there may have been four or five

4    communications that you had with counsel before you

5    decided to participate in the case as a plaintiff?

6         A.   At best, I believe so, but it may well

7    have been less.

8         Q.   Okay.  And in those communications,

9    without telling me the details, you were receiving

10   additional information about the -- the allegations

11   in the case.  Is that fair?

12        A.   From James Ulwick, yes.

13        Q.   Were you also doing your own independent

14   research or investigation or looking up information

15   about the case apart from whatever was being

16   conveyed to you by Mr. Ulwick?

17        A.   No.

18        Q.   And other than that one article that you

19   found that you described to me earlier.  Right?

20        A.   Yes.

21        Q.   Okay.  You didn't know Mr. Ulwick before

22   he reached out to you about this case.  Right?

23        A.   No.

24        Q.   Did you know any of your current lawyers

25   before they started representing you in this class

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 19

1    action?

2         A.   No.

3         Q.   For example, you never knew Mr. Straite

4    before this case.   Right?

5         A.   No.

6         Q.   Had you had any interaction with the law

7    firms that are currently representing you before

8    this case?

9         A.   No.

10        Q.   For example, do you know any of the law

11   firms?

12             Could you name them?

13        A.   No.

14        Q.   Okay.   Does the firm Pritzker Levine sound

15   familiar to you?

16        A.   I probably saw them on paperwork, but past

17   that, I don't know them.

18        Q.   Okay.   Have you ever interacted with

19   anybody that you understood to be from that firm?

20        A.   No.

21        Q.   What about the firm Simmons

22   Hanly & Conroy, in New York City?

23        A.   No.

24        Q.   You don't know that firm?

25        A.   No.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 21

1      Q.   Okay.   Other than Mr. Ulwick and before
2   whatever meetings or interactions you had for this
3   deposition, have you interacted with any other
4   lawyers relating to this case?
5      A.   No.
6      Q.   Okay.   So you described to me some number
7   of communications.
8           It may have been four or five; it may have
9   been less.   Right?
10     A.   Yes.
11     Q.   And those were all with Mr. Ulwick?
12     A.   During the initial conversations, yes.
13     Q.   Okay.   And at some point in that sequence
14   of communications, you decided to participate in
15   this case as a plaintiff.   Right?
16     A.   Yes.
17     Q.   Okay.   So I want to focus on the time
18   period from that point to when you started
19   preparing for your deposition.   Okay?
20           So in that span of time, is Mr. Ulwick the
21   only person that you interacted with in this case?
22     A.   No.
23     Q.   Who else did you interact with?
24     A.   I don't remember their name at this point,
25   but there was another person.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 22

1    Q.  And what was the general nature of that

2    interaction, without revealing to me the substance

3    of any actual discussions?

4    A.  There was a Zoom meeting.

5    Q.  It was about this case?

6    A.  Yes.

7    Q.  In general, how often have you interacted

8    with any lawyers about this case in between the

9    time you decided to become a plaintiff and when you

10   started preparing for this deposition?

11   A.  I kept in contact with James throughout

12   the case.

13   Q.  Right.  I'm asking, how frequently?

14   A.  I contacted him once about every

15   two weeks, I believe.

16   Q.  Okay.  So as far as you can recall, you've

17   been in contact with Mr. Ulwick roughly every

18   couple weeks.  Is that about right?

19          MR. STRAITE:  Objection.  Misstates the

20   earlier question and testimony.

21   BY MR. SOMVICHIAN:

22   Q.  Go ahead.

23   A.  I believe so, yes.

24   Q.  Did you sign an engagement agreement, some

25   form of agreement, relating to your role as a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

1    plaintiff in this case between you and your

2    attorneys?

3         A.   Yes.

4         Q.   Based on that agreement, do you have some

5    expectation of what compensation you might get in

6    this case?

7         A.   Yes.

8         Q.   And what is that?

9         A.   The only compensation that I know I'm

10   guaranteed is the same as any other person affected

11   by this lawsuit.

12        Q.   Okay.  So you have some understanding that

13   you're representing other people who have been

14   affected by the lawsuit.  Is that right?

15        A.   Yes.

16        Q.   And it's your understanding, based on

17   whatever engagement agreement you have with

18   counsel, that whatever you might receive would just

19   be the same as everybody else that's involved?

20        A.   Yes.

21        Q.   Have you ever been involved in any other

22   litigation, Mr. Valencia?

23        A.   No.

24        Q.   And just to be clear, either as a

25   plaintiff like you are here or as a defendant where

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 26

1        Or -- I'm sorry, I don't understand.

2        A.   They were sending emails to an email

3    address that I don't really check, and I never made

4    the correction.  By the time I realized that they

5    were still sending me emails, they had already

6    moved on.

7        Q.   I see.  So you wanted to participate in

8    that case, but there was just a miscommunication

9    where you weren't receiving updates or outreach

10   from those lawyers.

11       Is that accurate?

12       A.   Yes.

13       Q.   Were any of those lawyers -- strike that.

14       How did you get in contact with those

15   lawyers?

16       Did they also reach out to you through

17   some ad, similar to what happened here?

18       A.   Yes.

19       Q.   Okay.  Are any of those lawyers that you

20   interacted with in that other prior matter also

21   involved in this case?

22       A.   I do not believe they are.

23       Q.   What did you do to prepare for today's

24   deposition, Mr. Valencia?

25       A.   I went over some paperwork with my

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 27

1    attorneys.

2        Q.  Is that Mr. Straite and Mr. Ulwick, who

3    are here today?

4        A.  Yes.

5        Q.  When did you meet with them?

6            MR. STRAITE:  Objection.  Misstates prior

7    testimony.

8    BY MR. SOMVICHIAN:

9        Q.  When did you go over paperwork with them?

10       A.  There was a meeting we had yesterday.

11       Q.  Did you have any other prior meetings with

12   your lawyers related to this deposition before the

13   meeting yesterday?

14       A.  Yes.

15       Q.  When was that?

16       A.  I don't remember the exact date.  I do

17   believe it was sometime last week.

18       Q.  What was the nature of the paperwork that

19   you went over?

20       A.  I don't think I can name anything

21   specific.

22       Q.  Was it related to your computing devices,

23   the computer and so forth?

24       A.  Yes.

25       Q.  Where do you live, by the way,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 28

1    Mr. Valencia?

2              I don't need an address, but just the

3    city.

4         A.   Southgate, California.

5         Q.   Okay.  You have a Google account.  Right?

6         A.   That's right.

7         Q.   Do you recall -- well, strike that.

8              Is that the Google account associated with

9    the Gmail address ████████@gmail.com?

10        A.   Yes.

11        Q.   So you created that Gmail account

12   yourself?

13        A.   Yes.

14        Q.   And you also created your Google account

15   yourself?

16        A.   Yes.

17        Q.   Do you recall generally the time frame

18   when you did that?

19        A.   I believe it was in 2009.

20        Q.   Do you recall anything about the

21   circumstances of why you were creating a Google

22   account at the time or what you were planning to

23   use it for or anything around the account creation?

24             MR. STRAITE:  Objection.  Vague.

25   //

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 37

```
1    used Bing.
2         Q.  Would you say that you use Google Search
3    predominantly and Bing occasionally?
4              How would you describe the relative, you
5    know, proportion of how often you use Google Search
6    versus Bing?
7         A.  The vast majority of my time, I use
8    Google.
9         Q.  Okay.  Do you use Google Chrome?
10        A.  Yes.
11        Q.  How often do you use Google Chrome?
12             Is that the primary web browser that you
13   use?
14             MR. STRAITE:  Objection.  Compound.
15   Objection.  Calls for speculation.
16             THE WITNESS:  The vast majority of my time
17   on line is usually with Chrome.
18   BY MR. SOMVICHIAN:
19        Q.  I should probably ask about the computing
20   devices you use.
21             You mentioned you have an Android.
22             Is that a Samsung Galaxy?
23        A.  That's right.
24        Q.  That's what you currently have?
25        A.  Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 38

1      Q.   Is your current device the same one that
2   was provided to your counsel to create a forensic
3   image?
4      A.   Yes.
5      Q.   And on that Samsung, you use Chrome?
6      A.   Yes.
7      Q.   Chrome was preinstalled on that device, I
8   assume?
9      A.   Yes.
10      Q.   And what other computing devices do you
11   use?
12      A.   A Samsung tablet and a Windows computer.
13      Q.   Do you know the model of the tablet?
14      A.   It was called a "Samsung Galaxy Tab A."
15      Q.   What about the Windows computer?
16      A.   It was from a brand called CLX Gaming.
17      Q.   CLX?
18      A.   Yes.  For clarification, that's actually
19   the current name of the brand.
20           The brand that I used at the time was
21   still called "Cybertron PC."  The "C" in CLX stands
22   for Cybertron.
23      Q.   Are you talking about two different
24   computers or the same computer --
25      A.   The --

1          Q.   Hold on -- actually, go ahead.

2          A.   The computer I owned was Cybertron PC.   I

3     just wanted to clarify that the -- if you look for

4     the brand, it's currently called "CLX Gaming."

5               MR. STRAITE:   And just to remind the

6     witness -- I'm sure counsel will agree with me --

7     any time counsel is speaking, let him finish so we

8     don't talk over each other so Holly will be happy.

9               THE WITNESS:   Sorry.

10    BY MR. SOMVICHIAN:

11         Q.   No problem.

12              But we're talking about the same computer;

13    just the name of the company changed.

14         A.   That's right.

15         Q.   All right.   Is that one of them souped-up

16    gaming computers with a tricked-out video card,

17    graphics card?

18              MR. STRAITE:   Objection.   Vague and

19    colorful.

20              THE WITNESS:   It used to be that.

21    BY MR. SOMVICHIAN:

22         Q.   Okay.

23         A.   It's obsolete now.

24         Q.   Is Chrome installed on that Windows

25    computer?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 40

1      A.   Yes, it is.

2      Q.   And do you still actively use that

3   computer?

4      A.   Yes.

5      Q.   How long have you had it?

6      A.   Since about 2016, I believe.

7      Q.   Okay.  What do you use your tablet for?

8      A.   Primarily for reading and watching videos.

9      Q.   Chrome is installed on that tablet?

10     A.   Yes.

11     Q.   Okay.  And you typically stay signed in to

12   your Google account when you're using the tablet?

13     A.   Yes.

14     Q.   Same with the Windows computer, the

15   Cybertron PC?

16     A.   Yes.

17     Q.   Same with your Galaxy phone?

18     A.   Yes.

19     Q.   Were the tablet and the Windows computer

20   also provided to counsel for purposes of creating a

21   forensic image in this case?

22     A.   Yes.

23     Q.   And the devices that you provided for

24   purposes of creating a forensic image are still the

25   devices that you currently use?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Yes.

2    Q.   Your employer doesn't give you, like, a

3    phone or other computing device for work, do they?

4    A.   When I'm on site, there is a work phone,

5    but I don't take it home.

6    Q.   What do you use it for at work?

7         Or do you use it at work?

8    A.   It's primarily used for an app called

9    "Tracktic."

10   Q.   Have you ever used that device for

11   personal web browsing?

12   A.   No.

13   Q.   Okay.  I assume you use the internet every

14   day?

15   A.   Yes.

16   Q.   What -- just very generally speaking, what

17   are the things that you access the Internet for?

18   A.   Watching movies, reading emails.  I look

19   up a lot of different news articles and historical

20   documents.

21   Q.   Shopping?

22   A.   Yes.

23   Q.   Gaming?

24   A.   Yes.

25   Q.   Social media?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 68

1        A.   Yes.

2        Q.   So your short-lived use of the VPN didn't

3    have anything to do with this case.  Right?

4        A.   Yes.

5        Q.   Yes, it did not have anything to do with

6    this case.

7        A.   That's right.

8        Q.   Okay.

9             MR. STRAITE:  Could we not ask the

10   question as a negative, maybe?

11            MR. SOMVICHIAN:  Yeah.

12       Q.   You didn't use the VPN because of any

13   privacy-related concern.  Right?

14       A.   Not at the time.

15       Q.   Since that time where you used a VPN that

16   you just described, have you used a VPN since?

17       A.   A few times, yes.

18       Q.   Okay.  Describe those to me, please.

19       A.   After I first learned the extension of how

20   they were -- how Google -- or what Google was

21   doing, I thought I should give the VPN another use

22   to see how much it would help.

23            And, honestly, it didn't do much, but I

24   did use it a few times, and ultimately, I had to

25   stop because, again, it did slow my Internet down

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 69

1    by a lot.

2          Q.   When did you use this VPN?

3               MR. STRAITE:  Objection.  Vague.

4               THE WITNESS:  I used it maybe three or

5    four times, starting sometime this year.  I don't

6    remember.

7    BY MR. SOMVICHIAN:

8          Q.   What were you expecting it to do?

9          A.   All I know is that, simply put, it was

10   better than nothing.  The -- just somehow make

11   myself more private.

12         Q.   Okay.  But then when you started using it,

13   it wasn't doing what you wanted.  Right?

14         A.   Yes.

15         Q.   How did you -- how did you make that

16   determination?

17         A.   I continued to see targeted ads.

18         Q.   What -- describe any ads that you can

19   recall that made you think you were still receiving

20   targeted ads.

21              MR. STRAITE:  Objection.  Calls for

22   speculation.

23              THE WITNESS:  There were still ads that

24   were picking up on search terms that I had looked

25   for.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 70

1    BY MR. SOMVICHIAN:

2          Q.   Can you give me an example?

3                MR. STRAITE:   Objection.   Calls for

4    speculation.

5                THE WITNESS:   There were a few ads for

6    various Xbox-related products that I saw.

7    BY MR. SOMVICHIAN:

8          Q.   After you had searched for Xbox --

9          A.   Yes.

10         Q.   -- or Xbox terms or products?

11         A.   Yes.

12         Q.   Is it fair to say that part of what you

13   were hoping to achieve by using the VPN was to stop

14   seeing targeted ads?

15         A.   Yes.

16         Q.   And that was a concern of yours related to

17   this litigation?

18         A.   Yes.

19         Q.   Okay.   And the VPN also slowed down your

20   system.   Right?

21         A.   Yes.

22         Q.   And that was one of the reasons why you

23   stopped using it.   Right?

24         A.   Yes.

25         Q.   Have you used a VPN since?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 89

```
 1    Objection.  Vague.
 2              THE WITNESS:  Can I get the question
 3    again?
 4    BY MR. SOMVICHIAN:
 5         Q.  I'll just simplify it.
 6              What do you understand this case to be
 7    about and the specific things that you are alleging
 8    Google to be doing that you believe are wrongful?
 9              MR. STRAITE:  Objection.  Compound.
10              THE WITNESS:  That Google is selling
11    personal information that they said they would not
12    sell to third parties.
13    BY MR. SOMVICHIAN:
14         Q.  Can you tell me anything more specific
15    than that?
16         A.  I can't think of anything.
17         Q.  Okay.  So, for example, when you say
18    "selling information to third parties," can you say
19    anything more about who these third parties are in
20    your allegations?
21              MR. STRAITE:  Objection.  Calls for
22    speculation.
23              THE WITNESS:  I do recall one ad that I'm
24    still seeing right now for a -- a sweater called
25    "Baerskin."
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1          I saw an ad that was most likely targeted

2    to me at random, but because I Googled it, now it's

3    targeting me on a fairly regular basis to the point

4    where it's just gotten annoying.

5    BY MR. SOMVICHIAN:

6          Q.    Okay.   So, just to be clear, I'm not

7    asking you to identify specific third parties, like

8    some specific business, for example; but in

9    general, who do you understand the third parties to

10   be when you are alleging that Google is selling

11   information to third parties?

12          MR. STRAITE:   Objection.   Calls for

13   speculation.   Calls for expert testimony.

14          THE WITNESS:   That much, I don't know.

15   BY MR. SOMVICHIAN:

16          Q.   Do you have any understanding or are you

17   making any allegation from this case, Mr. Valencia,

18   about how these third parties are using the

19   information that they're allegedly receiving?

20          MR. STRAITE:   Objection.   Vague.

21   Objection.   Calls for speculation.

22          THE WITNESS:   My understanding is that my

23   attorneys have information on who my information

24   was being sold to.

25   //

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 91

1   BY MR. SOMVICHIAN:

2        Q.   Okay.   So, now, moving on from the who.

3   Okay?

4            Now I'm asking whether you have any

5   understanding as to how the information is being

6   used as it relates to your allegations in this

7   case.

8            MR. STRAITE:   Same objections.

9            THE WITNESS:   I believe my information is

10  being used in a -- in some type of auction and sold

11  to various organizations.

12  BY MR. SOMVICHIAN:

13       Q.   Okay.   Do you have any understanding as to

14  how those organizations are using this information

15  that you believe is being sold to them?

16           MR. STRAITE:   Same objections.

17           THE WITNESS:   I don't fully understand it.

18  BY MR. SOMVICHIAN:

19       Q.   And when you say "personal information,"

20  can you be more specific, Mr. Valencia, in terms of

21  what you mean by that?

22       A.   Things that I -- that if anything should

23  be private, it does encompass pretty much

24  everything that I've seen.

25           But more specifically, I know that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 92

1    there -- that they've been gathering information

2    with regards to ethnic background, health, and even

3    things like sexual orientation.

4         Q.  Okay.  I want to be really, really precise

5    here because I want to understand what you're

6    alleging against my client.

7              So the personal information that you

8    believe Google is selling, first of all, are things

9    that you believe should be private.  Is that right?

10        A.  Yes.

11             MR. STRAITE:  Objection.  Vague.

12   BY MR. SOMVICHIAN:

13        Q.  And that includes your ethnic background,

14   your health status, and sexual orientation as

15   examples.  Right?

16             MR. STRAITE:  Objection.  Misstates prior

17   testimony.

18             THE WITNESS:  Yes.

19   BY MR. SOMVICHIAN:

20        Q.  Okay.  Other than those three categories,

21   can you think of other categories of personal

22   information that you believe are part of what

23   Google is improperly selling to third parties?

24             MR. STRAITE:  Objection.  Calls for expert

25   testimony.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 93

1          THE WITNESS:  I do believe I've seen
2     things with regards to political organizations as
3     well.
4     BY MR. SOMVICHIAN:
5          Q.   Anything else?
6          A.   I can't think of anything.
7          Q.   Does the acronym "RTB" mean anything to
8     you?
9          A.   Yes.
10         Q.   What does "RTB" mean to you?
11         A.   Real-time bid.
12         Q.   What is your understanding of what a
13    real-time bid -- strike that.
14              Was your understanding of how RTB relates
15    to the allegations you're bringing in this case?
16              MR. STRAITE:  Objection.  Calls for expert
17    testimony.
18              THE WITNESS:  My understanding is that
19    Google conducts auctions to sell information in a
20    very short amount of time.
21    BY MR. SOMVICHIAN:
22         Q.   Okay.  And the information that you're
23    referring to there, is the information that you
24    just described to me in the last set of questions
25    including things like ethnic background and sexual

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 94

1    orientation?

2         A.   Yes.

3         Q.   Okay.   Is there anything else,

4    Mr. Valencia, that you understand about RTB and how

5    it relates to this case?

6              MR. STRAITE:   Objection.   Vague.

7    Objection.   Calls for expert testimony.

8              THE WITNESS:   Can I hear the question

9    again?

10   BY MR. SOMVICHIAN:

11        Q.   Yeah.   Other than what you've already

12   explained to me, is there anything that you

13   understand about what RTB is and how it relates to

14   this case?

15             MR. STRAITE:   Same objections.

16             THE WITNESS:   Nothing that I haven't

17   already said.

18   BY MR. SOMVICHIAN:

19        Q.   Do you have any understanding,

20   Mr. Valencia, of how your case relates to online

21   advertising?

22             MR. STRAITE:   Objection.   Vague.

23   Objection calls for expert testimony.

24             THE WITNESS:   I feel I do have some

25   understanding.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 95

1    BY MR. SOMVICHIAN:

2         Q.   Okay.  Please explain that to me.

3         A.   Google repeatedly says that they will not

4    sell my data or personal information to third

5    parties but has done so anyway.

6         Q.   Okay.  What does that have to do with

7    advertising?

8              MR. STRAITE:  Objection.  Same objections

9    as before.

10             THE WITNESS:  The information is being

11   sold to other organizations to in turn make

12   targeted ads.

13   BY MR. SOMVICHIAN:

14        Q.   Okay.  All right.  So maybe I wasn't

15   asking the question well earlier, Mr. Valencia, but

16   I had previously asked you whether you had an

17   understanding of how the information was being used

18   in your allegations, and you previously

19   explained -- or previously answered that you

20   weren't sure.

21             Now you're explaining that as you

22   understand this case, the information that Google

23   is selling, you believe, is then used for targeted

24   ads.

25             Is that right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 96

1          MR. STRAITE:  Objection.  Misstates prior

2     testimony.

3               THE WITNESS:  Yes.

4     BY MR. SOMVICHIAN:

5          Q.  Okay.  You described to me your

6     understanding of the type of personal information

7     that's at issue in the case.  I just want to make

8     sure we have a clear record on what you view that

9     to be.

10              We've talked earlier, Mr. Valencia, about

11    IP addresses.

12              Are IP addresses part of the personal

13    information that you're saying Google improperly

14    sold to third parties?

15          MR. STRAITE:  Objection.  Calls for expert

16    testimony.

17              THE WITNESS:  Can I hear the question

18    again?

19    BY MR. SOMVICHIAN:

20          Q.  Yeah.  Are you alleging in this case,

21    Mr. Valencia, that part of the personal information

22    that you believe Google is selling to third parties

23    includes IP addresses?

24          A.  Yes.

25          Q.  Okay.  So let me go back to my prior

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 97

1  question when I was trying to get from you the most

2  complete list that you can give me, Mr. Valencia,

3  of what you believe is part of the personal

4  information that's being allegedly sold in this

5  case.

6        You described various things to me like

7  ethnic background and sexual orientation, and now

8  you're adding IP address to the list.  Is that

9  right?

10       A.  Yes.

11       Q.  Okay.  So what else is part of personal

12  information?

13       MR. STRAITE:  Objection.  Calls for expert

14  testimony.

15       THE WITNESS:  I don't fully understand

16  the -- the technical terms, but I do know that

17  there are certain data like the IP address and

18  cookies present on my computer or other electronic

19  devices that are being collected and then sold.

20       MR. STRAITE:  And, Counsel, we've been

21  going more than an hour.  I know you have a line of

22  questions.  I'm not asking to stop at this moment,

23  but we would like a break at the most logical spot.

24  BY MR. SOMVICHIAN:

25       Q.  Okay.  So let me make sure I understand

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1    your position on IP addresses.   Okay, Mr. Valencia?

2              If an advertiser pays Google to advertise

3    on line to people in some approximate location like

4    a city, based on an IP address, but the advertiser

5    doesn't get any information to tie that IP address

6    to somebody's specific Google account, they just

7    get the IP address and the approximate location, is

8    that something you're complaining about in this

9    case?

10             MR. STRAITE:  Objection.  Calls for expert

11   testimony.  Objection.  Calls for answer to a

12   hypothetical from a nonexpert witness.  Objection.

13   Vague.

14             THE WITNESS:  Yes.

15   BY MR. SOMVICHIAN:

16        Q.  Yes, that is part of what you're

17   complaining about in this case?

18        A.  Yes.

19             MR. STRAITE:  Same objections.

20             And to the witness, please let me get my

21   objections in before you respond.

22             THE WITNESS:  Sorry.

23   BY MR. SOMVICHIAN:

24        Q.  And your answer is yes, even if the IP

25   address as it's provided to an advertiser isn't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 99

1    tied to your Google account or some --

2              MR. STRAITE:  Same --

3              MR. SOMVICHIAN:  Go ahead.

4              MR. STRAITE:  Same objections.

5              THE WITNESS:  Yes.

6    BY MR. SOMVICHIAN:

7        Q.  If the only thing that an advertiser knows

8    that -- is that it's placing an ad and showing it

9    to somebody in a particular city and they don't

10   know anything else about you or your information in

11   your Google account, how is that personal

12   information?

13             MR. STRAITE:  Objection.  Argumentative.

14   Objection.  Calls for expert testimony.  Objection.

15   Asks for hypotheticals.

16             THE WITNESS:  I very much feel that no

17   matter what, this information is still private, and

18   Google should not be selling it.

19   BY MR. SOMVICHIAN:

20       Q.  But it's shared and accessible by the

21   websites that you visit.  Right?

22             MR. STRAITE:  Objection.  Argumentative.

23   Objection.  Calls for speculation and expert

24   testimony.

25             THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 100

1    BY MR. SOMVICHIAN:

2        Q.   And since you understand that a website

3    that you visit can receive your IP address, do you

4    think it would also be wrongful for that website to

5    use the IP address or share it with an advertiser?

6            MR. STRAITE:   Same objections.

7            THE WITNESS:   Yes.

8    BY MR. SOMVICHIAN:

9        Q.   What if you agreed to a term with that

10   website or the website had terms explaining that it

11   can use IP address in that way?

12           Would that change your view?

13           MR. STRAITE:   Objection.   Vague.

14   Objection.   Incomplete hypothetical.   Calls for a

15   hypothetical from a nonexpert witness.

16           THE WITNESS:   Yes.

17   BY MR. SOMVICHIAN:

18       Q.   Why?

19           MR. STRAITE:   Same objections.

20           THE WITNESS:   The websites that I

21   previously mentioned, specifically the message

22   boards, never had targeted ads to the extent of

23   what's going on now, if at all.

24   BY MR. SOMVICHIAN:

25       Q.   Okay.   We also earlier talked about an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 101

1    example where an ad was shown to you related to the

2    subject matter of the website that you were

3    viewing.

4            Do you recall that example that you gave

5    me, sir?

6        A.    I'm not sure.

7        Q.    I think an example was seeing an ad for

8    USCCA, maybe on a firearms-related website.

9            Do you recall that example?

10    A.    Yes.

11    Q.    So if an advertiser is receiving

12    information about the type of website or the

13    subject matter of the website on which it can show

14    an ad but it doesn't otherwise get information

15    about somebody's Google account information, is

16    that still something that you're complaining about

17    in this case?

18            MR. STRAITE:   Objection.   Incomplete

19    hypothetical.   Objection.   Vague.

20            THE WITNESS:   Yes.

21    BY MR. SOMVICHIAN:

22    Q.    Okay.   I want to be clear about the

23    example I'm having -- I'm asking you to consider.

24    Okay?

25            So in the example that we talked about

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

1    earlier, the firearms website, and USCCA was the ad

2    that was shown to you, if the advertiser only knows

3    that we have an opportunity to show an ad to

4    somebody who was on a firearms-related website and

5    they don't otherwise have information about you or

6    from your Google account, is that still personal

7    information in any way?

8              MR. STRAITE:  Objection.  Calls for a

9    legal conclusion.  Objection.  Calls for expert

10   testimony and an incomplete hypothetical.

11             THE WITNESS:  Yes.

12   BY MR. SOMVICHIAN:

13        Q.  Explain to me why you think that is still

14   personal information.

15             MR. STRAITE:  Same objections, plus

16   argumentative.

17             THE WITNESS:  In my opinion, Google says

18   that they're not going to sell it; and, therefore,

19   these ads, if anything, need to stop.

20             Since they haven't stopped, I wanted to

21   know what they were even doing with my information.

22   BY MR. SOMVICHIAN:

23        Q.  Does information have to be private, in

24   your view, to be part of what you're considering as

25   personal information in this case?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 103

1              MR. STRAITE:  Objection.  Vague.

2    Objection.  Calls for a legal conclusion.

3              THE WITNESS:  In my opinion, my

4    information needs to be private or, if anything,

5    they need to start sharing the profit that they're

6    making off of my information.

7    BY MR. SOMVICHIAN:

8         Q.  I don't understand that.

9              Can you explain that to me?

10        A.  I know that they're making money often of

11   selling personal information, like such as the

12   information I've mentioned before, where they sell

13   to organizations in return for targeted ads, and I

14   feel that since I don't expect them to stop sharing

15   that information and then stopping the targeted

16   ads, then they need to share a portion of the

17   profits that they get from the realtime bids.

18        Q.  Okay.  Thank you for that answer.  It

19   wasn't quite what I was asking.

20              I'm trying to understand what your view is

21   of the relationship between personal information

22   and private information.

23              MR. STRAITE:  Is there a question there?

24   BY MR. SOMVICHIAN:

25        Q.  Yeah.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 104

1          MR. STRAITE:  What is the question?

2          MR. SOMVICHIAN:  What is the relationship

3    in his understanding of the concept of personal

4    information and the concept of private information.

5          MR. STRAITE:  Objection.  Calls for a

6    legal conclusion.  Objection.  Calls for expert

7    testimony.

8          THE WITNESS:  I don't draw out that much

9    of a distinction between the two.  If I am looking

10   for a certain type of clinic that I don't want

11   people to know about, in my opinion, there's really

12   not that much different from me looking into

13   something such as a concealed-carry permit.

14          Both of those scenarios have information

15   that I wouldn't want people to know about, and

16   therefore should not exist, even as ads.

17   BY MR. SOMVICHIAN:

18      Q.  Is it your understanding and allegation in

19   this case, Mr. Valencia, that Google was sharing

20   ethnic background as part of the RTB process?

21          MR. STRAITE:  Objection.  Compound.

22   Objection.  Calls for expert testimony.

23          THE WITNESS:  I feel that they are, yes.

24   BY MR. SOMVICHIAN:

25      Q.  Is it your allegation that Google is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 105

1    sharing sexual orientation information through RTB?

2            MR. STRAITE:  Same objections.

3            THE WITNESS:  As I understand it, yes.

4    BY MR. SOMVICHIAN:

5        Q.  Same thing with political organizations.

6            Are you alleging in this case that RTB

7    shares information about people's political

8    organizations?

9            MR. STRAITE:  Same objections.

10           THE WITNESS:  Yes.

11           MR. STRAITE:  And, Counsel, we asked you

12   for a break more than 10 minutes ago.  We gave you

13   the courtesy of finding a logical spot, but it's

14   been a while.

15           MR. SOMVICHIAN:  Okay.  We'll break soon.

16       Q.  What about health-related information,

17   Mr. Valencia?

18           Are you alleging that Google shares

19   people's private health information through

20   Google RTB?

21           MR. STRAITE:  Objection.  Vague.

22   Objection.  Calls for speculation.

23           THE WITNESS:  Yes.

24   BY MR. SOMVICHIAN:

25       Q.  Do you have any basis for your allegations

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 112

1          Are you alleging in this case, sir, that

2     you were ever shown an ad based on your sexual

3     orientation?

4          MR. STRAITE:  And I'm going to instruct

5     the witness you don't need to disclose your sexual

6     orientation in this hearing -- in this room.  I'm

7     sorry.

8          THE WITNESS:  Without saying my own sexual

9     orientation, I can say that I have looked up

10    different things in regards to rights that people

11    should have that we shouldn't even be discussing,

12    and I did see ads for organizations to help people

13    of certain sexual orientations.

14    BY MR. SOMVICHIAN:

15         Q.  When you searched for that information,

16    did you use Google Search?

17              Is that what you have in mind?

18         A.  Yes.

19         Q.  And where did you see these ads?  Strike

20    that.  Let me take it in steps.

21              And after performing that search, you saw

22    ads shown to you that you perceived to be for

23    organizations related to the things that you had

24    searched for?

25         A.  Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 113

1     Q.   And how soon after your search did you
2   start seeing these ads?
3     A.   I can't say.  I'm fairly certain, though,
4   it was -- it had to have been a reasonably short
5   amount of time.  Not even a month passed.
6     Q.   Where did you see these ads that you have
7   in mind?
8     A.   Same places as before:  Things like
9   YouTube, Facebook, Google.
10     Q.   Were any of the websites on which you saw
11   these ads websites where the subject matter was
12   related to the organization or the issues that you
13   had searched for?
14     A.   Not every time.
15     Q.   But sometimes?
16     A.   Sometimes.
17     Q.   Okay.  So, in some instances, you saw ads
18   for organizations based on these issues that you
19   searched for, and you saw them on completely
20   unrelated websites like YouTube, but sometimes you
21   saw them on websites where the subject matter of
22   the website was related to the organization in some
23   way.  Fair?
24     A.   Yes.
25     Q.   What about your political views?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1    Are you alleging in this case that Google
2  showed you ads based on your political views?
3    A.  Yes.
4    Q.  All right.  Tell me about why you believe
5  that happened.
6    A.  This one, I have something more specific
7  to state.
8    There have been some very click-baity ads
9  that I saw that were complete opposite of what my
10  political beliefs are, and why these ads were
11  targeted to me at all, I have no idea.
12    I can say that the administration at the
13  time was somebody I was very much opposed to, so
14  it's -- I can imagine that these ads were just
15  there to try to get the word out; but in my
16  opinion, they were -- they were worded in a way
17  that was purposely annoying.
18    Q.  Are you blaming Google for any of this?
19    MR. STRAITE:  Objection.  Calls for
20  speculation.
21    THE WITNESS:  I personally feel that
22  Google sold this in a very -- sold the ad space in
23  a very inappropriate way.
24  BY MR. SOMVICHIAN:
25    Q.  Okay.  Do you have any idea whether this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 116

1      Q.   How?

2      A.   There are certain political beliefs I hold

3   that make medical ads inappropriate just in their

4   own existence.

5           For me personally, though, what it came

6   down to was it was advertising a medication that I

7   was likely never to use because, as I said this

8   before, I do have the VA, so I don't need to rely

9   on any outside organizations to provide me with

10  medication.

11     Q.   Okay.  So maybe the ads were irrelevant to

12  you.  But were they offensive to you?  That's my

13  question.

14     A.   Yes.

15     Q.   Why?

16     A.   In a certain way.

17          MR. STRAITE:  Objection.  Asked and

18  answered.

19          THE WITNESS:  The ads were offensive in

20  that they seemed to assume a lot about a person's

21  health and didn't necessarily reflect what I feel

22  about -- about medication and what I needed.

23  BY MR. SOMVICHIAN:

24     Q.   What about the ads that you saw before

25  some organization having to do with some sexual

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

1    orientation issue?  Was it offensive to you to see

2    those ads?

3              MR. STRAITE:  Again, I'm instructing the

4    witness, you do not need to reveal your sexual

5    orientation in this room.

6              THE WITNESS:  I didn't feel that they were

7    necessarily offensive so much as why it needed to

8    exist in the first place.  The idea that a person's

9    rights should be taken away is fairly offensive to

10    me.

11    BY MR. SOMVICHIAN:

12        Q.  Okay.  This issue about some -- a person's

13    rights being taken away, that has to do with the

14    underlying political or other issues that you were

15    interested in.  That doesn't have anything to do

16    with Google.  Right?

17              MR. STRAITE:  Objection.  Argumentative.

18              THE WITNESS:  In my opinion, the ads were

19    capitalizing on a problem that shouldn't exist.

20    The ads themselves were only being put out for the

21    purposes of making money off of something that

22    really shouldn't have existed in the first place.

23    BY MR. SOMVICHIAN:

24        Q.  So other than these categories that we've

25    talked about, are there other categories of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 119

1    was shown to me previously.

2         Q.   Okay.  Do you have any understanding of

3    the purpose of that document in this case?

4         A.   Can I hear the question again?

5         Q.   Do you have any understanding of the

6    purpose of that document in this case?

7         A.   I know this has information as to what --

8    what was being done with personal information by

9    Google and how they were selling that information.

10        Q.   Anything else that you understand about

11   what this document is and what its purpose might be

12   in this litigation?

13        A.   Information on Google and their real-time

14   bids.

15        Q.   Do you know what a complaint is, by any

16   chance?

17        A.   No.

18        Q.   Do you know if this was something that was

19   filed with the court on your behalf?

20        A.   Yes.

21        Q.   What do you understand about that?

22        A.   The complaint detailed how Google will not

23   sell any personal information to anyone and

24   detailing what information was sold.

25        Q.   Did you review this document?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 120

1        A.   A little bit, yes.

2        Q.   What do you mean by "a little bit"?

3        A.   Specifically, I did read the part that I'm

4    included in.

5        Q.   Any other parts?

6        A.   There was one part that I can't find.  I

7    had looked through a bit.

8        Q.   Can you describe the subject matter of the

9    additional parts that you may have reviewed?

10       A.   Oh, besides the introduction.  I did read

11   the introduction a little bit.  And this is the

12   part that I -- that I was thinking of.

13       Q.   Okay.  And for the record, you're pointing

14   to a graphic that appears on page 5?

15       A.   Yes.

16       Q.   Okay.  So you recall reviewing the

17   introduction a little bit.  You recall reviewing

18   this graphic on page 5, and you recall some

19   allegations that were specific to you.  Correct?

20       A.   Yes.

21       Q.   Okay.  Anything else in this document?

22       A.   I can't think of anything.

23       Q.   Okay.  Can you turn to page 12, please?

24            And I'm using the pages at the bottom.

25            There's also page numbers at the top, but

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 121

1    you can ignore this.

2         A.   So I'm at the right place?

3         Q.   You're at the right place.   Okay.

4              So paragraph 39 -- let's start over.

5              You see the numbered paragraphs --

6         A.   Yes.

7         Q.   -- Mr. Valencia?

8              So paragraph 39, that refers to you.

9    Right?

10        A.   Yes.

11        Q.   It says you've used a Chrome browser.   I

12   think that's accurate.   I think you've confirmed

13   that for us.

14        A.   Yes.

15        Q.   The next sentence reads:

16             "In order to become a Google account

17        holder, Plaintiff Valencia was required to

18        indicate he agreed to uniform conditions

19        drafted and set forth exclusively by Google

20        that governed the relationship between him

21        and Google."

22             Do you see that?

23        A.   Yes.

24        Q.   That's accurate too?

25        A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 122

1      Q.   And you did have an understanding when you

2   created your Google account that you accepted some

3   terms and policies that govern your relationship

4   with Google.   Correct?

5              MR. STRAITE:   Objection.   Calls for a

6   legal conclusion.

7              THE WITNESS:   Yes.

8   BY MR. SOMVICHIAN:

9      Q.   Okay.   Can you read paragraph 40 to

10   yourself, Mr. Valencia, and let me know when you're

11   done?

12             And my question is just going to be, for

13   starters, whether the information in there is

14   accurate.

15      A.   (Reviewing document.)

16             Okay.

17      Q.   Okay.   Is the information in paragraph 40

18   accurate as far as you understand it?

19      A.   Yes.

20      Q.   In the first sentence, it refers to

21   "Valencia's personal information."

22             Do you see that?

23      A.   Yes.

24      Q.   Is that the types of information that

25   you've described for me today that you are alleging

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 123

1    to be your personal information?

2         A.   Yes.

3         Q.   Can you go to the very first page, please?

4    Just the cover.

5              MR. STRAITE:   Counsel, do you mean --

6    which page?   You mean the second page?

7              You're in the right page.

8    BY MR. SOMVICHIAN:

9         Q.   So for the record, we're at the second

10   page of the exhibit, but it's just the caption page

11   that lists counsel and some other information about

12   this matter.

13             Do you see a list there in bold text

14   naming some law firms?

15             Do you see that?

16        A.   Yes.

17        Q.   Who do you understand those firms to be?

18             MR. STRAITE:   Objection.   Compound.

19             THE WITNESS:   Other firms representing --

20   on behalf of people who use Google services.

21   BY MR. SOMVICHIAN:

22        Q.   Are they representing you?

23             MR. STRAITE:   Objection.   Calls for a

24   legal conclusion.

25             THE WITNESS:   One law firm is.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 124

1   BY MR. SOMVICHIAN:

2          Q.   What's that?

3          A.   DiCello Levitt Gutzler.

4          Q.   And you understand that firm to be

5   representing you.

6          A.   Yes.

7          Q.   Right under that block of text under

8   "DiCello Levitt," it says, in italicized text:

9               "Counsel for Plaintiffs in the proposed

10          class."

11              Do you see that, sir?

12          A.   Yes.

13          Q.   Do you have an understanding of what the

14   term "plaintiffs" means in this context?

15          A.   Yes.

16          Q.   Tell me what your understanding is.

17          A.   A plaintiff is the person who brought up

18   the lawsuit, and I'm one of them in this case.

19          Q.   Okay.  And then it refers to a, quote,

20   "proposed class."

21              Do you see that?

22          A.   Yes.

23          Q.   Do you have any understanding of what that

24   refers to?

25          A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 125

1        Q.   What is that?

2        A.   Essentially, anyone who uses Google

3    services.

4        Q.   Okay.  What Google services are included

5    in the scope of what you just explained to me?

6        A.   Things such as Gmail, YouTube, Google

7    devices, Google Chrome, Google Maps, any types of

8    services that people tend to use when using Google

9    products.

10        Q.   Okay.  If somebody uses Google Chrome

11    without having a Google account, are they part of

12    the proposed class, as you understand it, in how

13    you just described it to me?

14            MR. STRAITE:  Objection.  Calls for a

15    legal conclusion.

16            THE WITNESS:  I -- I believe so.

17    BY MR. SOMVICHIAN:

18        Q.   It says -- same question:  If somebody

19    uses Google Maps but they don't have a Google

20    account, they're still part of the proposed class

21    in the way that you understand it?

22            MR. STRAITE:  Objection.  Calls for a

23    legal conclusion.

24            THE WITNESS:  I believe yes.

25    //

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126

1    BY MR. SOMVICHIAN:

2        Q.   Okay.   In the middle of the page, you see

3    some text identifying the court, United States

4    District Court, and it goes on.

5            Do you see that?

6        A.   Yes.

7        Q.   Okay.   And below there, there is a

8    reference to "Benjamin Hewitt, et al., on behalf of

9    themselves and all others similarly situated."

10           Do you see that?

11       A.   Yes.

12       Q.   Do you have an understanding of who

13   Benjamin Hewitt is?

14       A.   I believe that's another plaintiff such as

15   myself.

16       Q.   Okay.   And when that phrase refers to "all

17   others similarly situated," what's your

18   understanding of what that means?

19           MR. STRAITE:   Objection.   Calls for a

20   legal conclusion.

21           THE WITNESS:   Can I hear the question

22   again?

23   BY MR. SOMVICHIAN:

24       Q.   Yeah.   You see the text that reads, quote,

25   "On behalf of" -- strike that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 127

1          You see there's a reference to

2     "plaintiffs"?  You see that?

3          A.  Yes.

4          Q.  And it's your understanding that you are a

5     plaintiff?

6          A.  Yes.

7          Q.  Okay.  And above that, it says, quote, "on

8     behalf of themselves and all others similarly

9     situated."

10              Do you see that?

11         A.  Yes.

12         Q.  Okay.  So my question to you is:  What's

13    your understanding of who is within the group of

14    people, quote, "all others similarly situated"?

15              MR. STRAITE:  Objection.  Calls for a

16    legal conclusion.

17              THE WITNESS:  I am -- myself and other

18    plaintiffs are acting on behalf of anyone else who

19    uses Google devices and services.

20    BY MR. SOMVICHIAN:

21         Q.  What does it mean to you to be acting on

22    behalf of those people?

23              MR. STRAITE:  Objection.  Calls for a

24    legal conclusion.

25              THE WITNESS:  We are acting so that not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 128

1  everyone has to come to something like this.

2  BY MR. SOMVICHIAN:

3      Q.   Do you have an understanding of any

4  obligations that you might have in your role as

5  somebody acting on behalf of others?

6          MR. STRAITE:   Objection.  Calls for a

7  legal conclusion.

8          THE WITNESS:  Yes.

9  BY MR. SOMVICHIAN:

10     Q.   What's that?

11     A.   The main one is just being here today.

12     Q.   Anything else?

13     A.   Providing information from things like my

14  phone, my computer, tablet, that sort of thing.

15     Q.   And you've done that?

16     A.   Yes, I have.

17     Q.   And anything else that you understand to

18  be part of your obligations in your role of acting

19  on behalf of others?

20         MR. STRAITE:   Objection.  Calls for a

21  legal conclusion.

22         THE WITNESS:  Can I hear the question

23  again?

24  BY MR. SOMVICHIAN:

25     Q.   Yeah.  Is there anything else that you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 129

1  understand to be part of the obligation that you

2  have now that you're acting on behalf of other

3  people?

4          MR. STRAITE:  Same objection.

5          THE WITNESS:  Other than speaking to my

6  attorneys, I can't think of anything.

7  BY MR. SOMVICHIAN:

8      Q.  Okay.  In terms of speaking to your

9  attorneys, that so far has consisted of

10 communicating mostly with Mr. Ulwick.  Is that

11 right?

12         MR. STRAITE:  Objection.  Misstates

13 earlier testimony.

14         THE WITNESS:  That's right.

15 BY MR. SOMVICHIAN:

16     Q.  And you ballparked that for me earlier as

17 maybe once every few weeks?

18     A.  That's right.

19     Q.  So when you saw this document before,

20 without telling me any details of any

21 communications, did you ask any questions about it?

22         MR. STRAITE:  I also caution the witness,

23 you can answer that as phrased, but any

24 conversations between you and counsel are

25 privileged.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

1          But the question as asked is appropriate.

2              THE WITNESS:  Can I hear the question

3     again?

4     BY MR. SOMVICHIAN:

5          Q.  Yeah.  Did you ask any questions to your

6     lawyers about this document that you have in front

7     of you?

8          A.  I did.  I did ask questions.

9          Q.  How many?

10             MR. STRAITE:  Okay.  And I'm instructing

11    the witness not to answer anything more regarding

12    the conversation with counsel.

13             MR. SOMVICHIAN:  I'm just asking about the

14    number --

15             MR. STRAITE:  I'm instructing the witness.

16    BY MR. SOMVICHIAN:

17         Q.  Did you provide any comments about the

18    document, without revealing to me what those

19    comments were?

20         A.  Nothing comes to mind.

21         Q.  Okay.  And the portions of the document

22    that you reviewed are what you described to me

23    earlier.  Correct?

24         A.  I believe, yes.

25         Q.  Did you approve this document to be filed

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 131

1    on your behalf?

2         A.   Yes.

3         Q.   Do you feel like you understand the legal

4    claims of and causes of action in the case, or is

5    that something you're relying on your lawyers for?

6              MR. STRAITE:  Objection.  Calls for a

7    legal conclusion.

8              THE WITNESS:  I mostly relied on my

9    lawyers for this.

10   BY MR. SOMVICHIAN:

11        Q.   Can you turn to paragraph 30, which is on

12   page 10?

13             Are you there?

14        A.   Yeah.

15        Q.   Okay.  First of all, this isn't part of

16   what you had previously reviewed; right?  This

17   paragraph wasn't part of what you described to me

18   earlier?

19        A.   It was not.

20        Q.   Okay.  So it reads:

21             "Plaintiffs bring this class action" --

22             Actually, let's just pause right there.

23             What's your understanding of what a class

24   action is, Mr. Valencia?

25             MR. STRAITE:  Objection.  Calls for a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 132

1    legal conclusion.

2         THE WITNESS:  A class action lawsuit, as I

3    understand it, is a lawsuit brought in by a number

4    of people affected in similar ways.

5    BY MR. SOMVICHIAN:

6         Q.   Okay.  And here, what are the similar ways

7    that impact the people that you're seeking to

8    represent?

9         MR. STRAITE:  Same objection.

10        THE WITNESS:  People who are affected had

11   Google accounts that had their personal information

12   sold.

13   BY MR. SOMVICHIAN:

14        Q.   You see that it goes on and says:

15        "Plaintiffs bring this class action on

16        behalf of themselves and all Google account

17        holders in the United States whose personal

18        information was sold or otherwise disclosed

19        by Google without their authorization."

20        And it goes on to describe the claims in

21   the case.

22        Do you see that?

23        A.   Yes.

24        Q.   Do you have an understanding of what the

25   phrase "without their authorization" means and why

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 133

1    it's in here?

2              MR. STRAITE:  Objection.  Calls for a

3    legal conclusion.

4              THE WITNESS:  The information was sold

5    without my permission.

6    BY MR. SOMVICHIAN:

7         Q.  You agree that somebody who did give

8    permission wouldn't be part of this group of people

9    in the way that it's defined here?

10             MR. STRAITE:  Objection.  Calls for a

11   legal conclusion.

12             THE WITNESS:  I do believe that's right.

13   BY MR. SOMVICHIAN:

14        Q.  Are you aware of any ways in which

15   somebody could give permission or authorize the use

16   of their information?

17        A.  Can I hear the question again?

18        Q.  Are you aware of any ways in which a

19   Google account holder browsing on the Internet

20   could give permission to or authorize the use of

21   their information?

22             MR. STRAITE:  Objection.  Vague.

23             THE WITNESS:  I would only guess this in

24   that if there was somehow to explicitly say that

25   Google had permission to do so from the user.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 134

1    BY MR. SOMVICHIAN:

2        Q.   Okay.  And from that situation that you

3    have in mind, where that has occurred, that person

4    wouldn't be part of the group in the way that it's

5    defined in paragraph 30.  Fair?

6              MR. STRAITE:  Objection.  Vague.

7    Objection.  Calls for a legal conclusion.

8              THE WITNESS:  I believe that that's right.

9    BY MR. SOMVICHIAN:

10       Q.   Can you give me any examples that you have

11   in mind of that kind of situation?

12             MR. STRAITE:  Objection.  Vague.

13   Objection.  Calls for a legal conclusion.

14             THE WITNESS:  My understanding is that

15   when a contract is binding, that makes it so that

16   the contract must be followed.

17             And, therefore, in this case, the contract

18   specifically states -- the terms of agreement state

19   that our information, personal information, was not

20   being sold but then did get sold.

21             If there was a way for a user to agree to

22   sell that information somehow, then they would not

23   be a part of this; but, as I understand it, there

24   is no way.

25   //

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 143

```
 1    reviewed and portions that you did not review.
 2           Do you recall also seeing attached
 3    documents that were exhibits to the complaint?
 4           Does that sound familiar at all to you?
 5      A.  I -- I believe yes.
 6      Q.  What do you recall about being aware of
 7    any complaints -- I mean, strike that.
 8           What do you recall about seeing any
 9    exhibits to the complaint?
10      A.  What I recall is that they looked similar
11    to this document.
12      Q.  Okay.  Let me just show you one.
13           So this was -- this was previously marked
14    as Exhibit 5 in a prior deposition.
15           (Previously marked Exhibit 5 was
16            presented to the witness.)
17    BY MR. SOMVICHIAN:
18      Q.  So I'll represent to you, Mr. Valencia,
19    that this document you have in front of you, if you
20    look on the very first page, it says "Exhibit 4."
21      A.  Yes.
22      Q.  So it's a little confusing.  I want to
23    make sure we don't get off-track here.
24           So it was Exhibit 5 in a prior deposition,
25    but it was Exhibit 4 as attached to the complaint
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 144

1    that was filed on your behalf.  Okay?

2         A.  Okay.

3         Q.  And you can see the blue text at the very

4    top there, kind of similar to what you see on the

5    complaint.

6              Do you see that?

7         A.  Yes.

8         Q.  Okay.  So if you flip into Exhibit 4, you

9    can see at the very top left, it says "Google Terms

10   of Service."

11             But before we talk about the terms of

12   service, in looking at Exhibit 4, does that jog

13   your memory at all as to any prior review of the

14   exhibits to your complaint that you may have done?

15        A.  Yes.

16        Q.  What do you recall now?

17        A.  Well, I can say that I've -- I saw

18   something similar before on Google.

19        Q.  So I'm -- strike that.

20             You explained to me that you saw some

21   version of your complaint before it was filed.

22   Right?

23        A.  Yes.

24        Q.  Okay.  In connection with that review of

25   the complaint, do you also recall reviewing the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 145

1    exhibits to the complaint?

2        A.   Yes.

3        Q.   Okay.  Did you actually read them?

4            MR. STRAITE:  Objection.  Vague.

5            THE WITNESS:  I don't believe I actively

6    sat and read them.

7    BY MR. SOMVICHIAN:

8        Q.   Okay.  So in looking at Exhibit 4, it's

9    the Google Terms of Service.

10           Based on what you just said, fair to say

11   you didn't read the entirety of the exhibit at the

12   time that you reviewed the complaint?

13       A.   That's right.

14       Q.   But it sounds like you have a memory of

15   maybe looking at the Google Terms of Service

16   before, maybe unrelated to the litigation.  Is that

17   right?

18       A.   That's right.

19       Q.   Okay.  What's your recollection of any

20   prior time that you reviewed the Google Terms of

21   Service?

22       A.   I remember reading something in regards to

23   specifically apps and sites.  I can say I remember

24   searching Maps and Google Play.

25       Q.   Okay.  So you've now flipped forward into

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 156

1        Q.   Okay.  The first part of that, the
2   promises that you believe Google made, were you
3   aware of any statements or terms that Google made
4   to that effect before you got involved in this
5   case?
6        A.   I'm not sure I understand the question.
7        Q.   So at the time that -- well, let's take
8   the point in time when you clicked on that Facebook
9   ad.  Okay?
10       A.   Okay.
11       Q.   At that point in time, you were already
12  aware of having seen some statement from Google
13  that you can recall said, "We won't sell your
14  personal information" or something to that effect,
15  or did you only learn that as part of getting
16  involved in this case?
17            MR. STRAITE:  Objection.  Compound.
18            THE WITNESS:  I'm fairly certain that I
19  have run into the statement showing here that says
20  "We don't sell your personal information to
21  anyone," and I'm pretty sure I've seen that prior
22  to being involved in this lawsuit.
23  BY MR. SOMVICHIAN:
24       Q.   Okay.  But you couldn't specify where you
25  saw that, could you?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 157

1      A.   No.

2      Q.   And you couldn't identify a specific web

3  page for me where you saw that.   Right?

4      A.   No.

5      Q.   And it doesn't seem like it would have

6  been this page that's in front of you where you saw

7  something like that.   Fair?

8      A.   That's right.

9      Q.   Okay.   In the middle -- so you're on the

10  right page under the same heading that we were

11  looking at, and in the second middle paragraph, the

12  last sentence of that paragraph reads, quote:

13          "And if you don't want to see

14      personalized ads at all, you can turn them

15      off at any time."

16          Do you see that, sir?

17      A.   Yes.

18      Q.   Does the concept of personized ads mean

19  anything to you in the context of Google?

20          MR. STRAITE:   Objection.   Vague.

21          THE WITNESS:   Yes.

22  BY MR. SOMVICHIAN:

23      Q.   What do you understand "personalized ads"

24  to be specifically in the context of Google ads?

25          MR. STRAITE:   Objection.   Calls for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 183

1   Objection.  Calls for speculation.  Objection.

2   Calls for a legal conclusion.

3           THE WITNESS:  Yes.

4   BY MR. SOMVICHIAN:

5       Q.  Are you seeking to represent those kinds

6   of people in this case?

7           MR. STRAITE:  Objection.  Calls for a

8   legal conclusion.  Objection.  Vague.

9           THE WITNESS:  Yes.

10  BY MR. SOMVICHIAN:

11      Q.  Do you think somebody who wants their IP

12  address information to be used so that they can

13  receive ads about their approximate location should

14  be compensated in some way?

15      A.  Yes.

16          MR. STRAITE:  Objection.  Vague.

17  Objection.  Calls for speculation.  Objection.

18  Calls for a legal conclusion.

19  BY MR. SOMVICHIAN:

20      Q.  Why is that, sir?

21      A.  I don't believe that they fully understand

22  how much of their information is being affected the

23  way it is.

24      Q.  Now, are you talking about types of

25  information other than IP address?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 184

1        A.   That's right.

2        Q.   Okay.  But focused just on IP address, if

3   somebody understands that their IP address can be

4   used to determine the approximate location and they

5   prefer to get ads based on their approximate

6   location, do you think that they should be

7   compensated some amount of money just because their

8   IP address is actually used in that way?

9              MR. STRAITE:  Objection; calls for

10  speculation.  Objection; calls for a legal

11  conclusion.  Objection; vague.

12             THE WITNESS:  Yes.

13  BY MR. SOMVICHIAN:

14       Q.   Okay.  Explain why you think that.

15             MR. STRAITE:  Same objections.

16             THE WITNESS:  I do feel it's only fair

17  that if they're being affected the way that they

18  are, they should still be compensated for it.

19  BY MR. SOMVICHIAN:

20       Q.   But how are they being affected if that's

21  something that they want to receive; meaning to

22  receive ads based on their approximate location as

23  determined from their IP address?

24             MR. STRAITE:  Objection.  Calls for a

25  legal conclusion.  Calls for expert opinion.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 185

1          THE WITNESS:  I don't believe that

2    everyone affected is fully aware of how much

3    they're affected by this.

4    BY MR. SOMVICHIAN:

5          Q.   Objection.  Calls for hypothetical.  Calls

6    for expert opinion.

7             THE WITNESS:  They may understand that if

8    they were to order food, their -- there will be

9    restaurants that can know their approximate

10   location, but there are other websites they would

11   probably prefer have them not know and aren't fully

12   aware that these websites do, in fact, know that --

13   their approximate location.

14   BY MR. SOMVICHIAN:

15        Q.   So you would want people to have the

16   ability to control which websites are able to use

17   location information and which cannot.  Right?

18             MR. STRAITE:  Objection; calls for expert

19   testimony.  Objection; vague.

20             THE WITNESS:  Yeah.

21             MR. STRAITE:  And calls for speculation.

22   BY MR. SOMVICHIAN:

23        Q.   Are you aware of whether there are

24   currently existing ways for Google account holders

25   to do that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 289

1  practices that you're complaining about in this

2  case?

3          MR. STRAITE:  Objection.  Vague.

4  Objection.  Calls for a legal conclusion and expert

5  testimony.

6          THE WITNESS:  Yes.

7  BY MR. SOMVICHIAN:

8      Q.  How were you injured, in your view?

9          MR. STRAITE:  Same objections.

10         THE WITNESS:  The terms of agreement as

11  set by Google were that they would not sell

12  personal information to third parties and then did

13  exactly that.

14  BY MR. SOMVICHIAN:

15     Q.  But how were you injured by that?

16         MR. STRAITE:  Same objections.

17         THE WITNESS:  In my opinion, they should

18  not be doing that.

19  BY MR. SOMVICHIAN:

20     Q.  Okay.  I understand your position that

21  Google shouldn't be doing that, but how were you

22  harmed by the alleged violation that you're

23  complaining about, Mr. Valencia?

24         MR. STRAITE:  Same objections.

25         THE WITNESS:  I don't know how to answer

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 290

1    this.  The only way that I can say it is that

2    they -- that Google should not have done something

3    explicitly said that they wouldn't do this and then

4    turned around and did exactly that.

5    BY MR. SOMVICHIAN:

6        Q.  But --

7        A.  My information is my own, and if they use

8    it, that's already an injury in my view.

9        Q.  What is?

10       A.  My personal information, them turning

11   around and saying -- them saying that they will

12   never sell my personal information and then turning

13   around and doing so.

14       Q.  Let me ask it this way:  You're asking the

15   court in this case to do something for you.  Right?

16       A.  That's right.

17       Q.  And what is that?

18           Are you asking the court to give you

19   money?

20       A.  Not necessarily.  I feel that if this

21   practice continues, then I should get something out

22   of it; but, if anything, this practice needs to

23   stop.

24       Q.  Okay.  We'll come back to the practices.

25           But in terms of any requests for financial

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 291

1   compensation that you're making, are you making a

2   request that the court give you financial

3   compensation of some kind?

4        A.  No.

5        Q.  Are you seeking financial compensation on

6   behalf of anybody else?

7        A.  No.

8        Q.  Are you asking the court in this case to

9   award money to the other people who are similarly

10  situated to you?

11       A.  I'm only looking to get what everyone who

12  was affected, including anyone not directly in this

13  lawsuit, is entitled to.

14       Q.  Right.  And I'm trying to find out what

15  you think everybody is entitled to.

16           Is it money?

17       A.  Yes.

18       Q.  Okay.  So I think we flip-flopped here,

19  but it was probably asking the questions in a

20  confusing way.

21           So you are asking for money.  Right?

22       A.  Yes.

23       Q.  For yourself, what are you asking for?

24       A.  Nothing else other than what the

25  lawsuit -- what the other -- the entire class is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 292

1    entitled to.

2        Q.  Okay.  And for -- I understand you're not

3    asking that you get more than other people.  Right?

4        A.  That's right.

5        Q.  Okay.  But what are you asking to get

6    individually?

7            MR. STRAITE:  Objection.

8    BY MR. SOMVICHIAN:

9        Q.  I understand it's not more than other

10   people.

11            What are you asking to get?

12            MR. STRAITE:  Objection.  Asks for expert

13   testimony.

14            THE WITNESS:  I don't feel that I'm asking

15   for really anything.

16   BY MR. SOMVICHIAN:

17       Q.  Okay.  I -- I'm sorry, Mr. Valencia.  I'm

18   confused.

19            You are asking for money, though.  Right?

20       A.  No more than anyone else is entitled to.

21       Q.  Okay.  So how are you asking the court to

22   calculate the amount of money to give to you?

23            MR. STRAITE:  Literally asking for expert

24   testimony.  Objection.

25            THE WITNESS:  That's not something I think

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 295

1    BY MR. SOMVICHIAN:

2         Q.   Is it your position that everybody that

3    you're trying to represent should get the exact

4    same amount, even if they might be in different

5    situations in terms of the amount of information or

6    the type of information that was shared about them?

7              MR. STRAITE:  Same objections.

8              THE WITNESS:  Yes.

9    BY MR. SOMVICHIAN:

10        Q.   In terms of the changes to Google

11   practices that you alluded to earlier, can you be

12   more specific about what you are asking the court

13   to do in this case?

14        A.   I'm asking the court to -- to either do

15   something to stop this practice or at least allow

16   people to get something out of it.

17        Q.   And "get something out of it," you're

18   referring back to the money?

19        A.   That's right.

20        Q.   Have you considered whether there are --

21   strike that.

22             Mr. Valencia, do you believe you're at

23   risk of future harm from Google's practices?

24             MR. STRAITE:  Objection.  Calls for

25   speculation and expert testimony.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 296

1          THE WITNESS:  Yes, I do.

2     BY MR. SOMVICHIAN:

3          Q.   And does that concern have to do with

4     ongoing use of your personal information?

5               That's what you're concerned about?

6          A.   Yes.

7          Q.   Have you ever considered whether there are

8     existing ways for you to prevent that?

9          A.   Can I hear the question again?

10         Q.   Have you ever considered whether there are

11     existing ways for you to prevent the alleged uses

12     of information that you're concerned about?

13         A.   I have.

14         Q.   Tell me about what you've considered.

15         A.   I have considered possibly turning off ad

16     personalization.

17         Q.   Okay.  You -- I think you testified

18     earlier that you had considered it but didn't think

19     it would do much.  Right?

20         A.   That's right.

21         Q.   Okay.  Is there more to it than what you

22     previously described?

23         A.   I've considered it, but I am not fully

24     convinced that it will really have a -- make any

25     kind of a difference in the ads.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 301

1          So unless your counsel has anything, I
2     think we can wrap up for the day.
3               EXAMINATION BY MR. STRAITE
4     BY MR. STRAITE:
5          Q.  Mr. Valencia, could you please find
6     Exhibit 4, which is the complaint?  This is the
7     very first exhibit that we saw at the beginning.
8               Put that -- you can put that document in
9     front of you and the rest to the side.  I'll put
10    them in order.
11         A.  Okay.
12         Q.  Mr. Valencia, do you recall questions
13    related to Exhibit 4, of the consolidated class
14    action complaint?
15         A.  Yes.
16         Q.  And at the top of the document, you see
17    the date that says "Filed 8/27/21"?
18         A.  Yes.
19         Q.  And you testified that you saw and
20    approved a draft of this before this document was
21    filed.
22         A.  I believe so.
23         Q.  And in that process of approving this
24    document, were the communications you had with
25    James Ulwick?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.    Yes.

2          Q.    Does this now refresh your recollection of

3    when you first spoke with Mr. Ulwick in this case?

4          A.    Yes.

5          Q.    So it was before August 2021.

6               MR. SOMVICHIAN:  Leading.

7               MR. STRAITE:  Overruled.

8               THE WITNESS:  Yes.

9               MR. STRAITE:  Thank you.  Nothing further.

10               EXAMINATION BY MR. SOMVICHIAN

11    BY MR. SOMVICHIAN:

12          Q.    Okay.  I think what you're trying to

13    correct is a prior answer you gave about 2022 being

14    the time when you first got involved.  Right?

15          A.    That's right.

16               MR. SOMVICHIAN:  Okay.  That's fine.

17               MR. STRAITE:  Before we go off the record,

18    I just want to thank the gracious hospitality of

19    the Cooley team, as always.  I want that on the

20    record.  We appreciate it.

21               MR. SOMVICHIAN:  You're welcome.  Thank

22    you.

23               THE VIDEO OPERATOR:  Going off the record.

24    The time now is 6:05.

25               (Time noted, 6:05 P.M.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 304

1                  CERTIFICATE OF REPORTER

2         I, HOLLY THUMAN, a Certified Shorthand Reporter,

3    hereby certify that the witness in the foregoing

4    deposition was by me duly sworn to tell the truth, the

5    whole truth, and nothing but the truth in the

6    within-entitled cause; that said deposition was taken

7    down in shorthand by me, a disinterested person, at the

8    time and place therein stated; and that the testimony

9    of said witness was thereafter reduced to typewriting,

10   by computer, under my direction and supervision;

11        That before completion of the deposition review of

12   the transcript [] was [X] was not requested/offered.

13   If requested, any changes made by the deponent (and

14   provided to the reporter) during the period allowed are

15   appended hereto.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties thereto.

21

22   DATED: 12/29/2022

23

24        *Holly Thuman*

25        HOLLY THUMAN, CSR

     304