# EXHIBIT E

# (REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 3

# FILED UNDER SEAL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

## EXPERT CLASS CERTIFICATION REPORT OF

## PROFESSOR ROBERT ZEITHAMMER

**July 14, 2023**

**UNREDACTED VERSION SUBMITTED CONDITIONALLY UNDER SEAL**

## TABLE OF CONTENTS

Page

I.     QUALIFICATIONS ................................................................................................ 1

II.    BACKGROUND: DISPUTE AND ASSIGNMENT ...................................................... 2

III.   SUMMARY OF OPINIONS ................................................................................... 3

IV.   REVENUE DUE TO USER DATA: EMPIRICAL FRAMEWORK ............................ 4

V.    REVENUE DUE TO USER DATA: EVIDENCE FROM EXPERIMENTS AT
GOOGLE ............................................................................................................. 9

VI.   REVENUE DUE TO USER DATA: EVIDENCE FROM OBSERVATIONAL
STUDIES WITH ECONOMETRIC CONTROLS ......................................................... 14

VII.  REVENUE DUE TO USER DATA: EVIDENCE FROM OBSERVATIONAL
STUDIES WITHOUT ECONOMETRIC CONTROLS ............................................. 20

VIII. REVENUE DUE TO USER DATA: EVIDENCE FROM HISTORICAL TRENDS IN
DIGITAL ADVERTISING SPENDING ..................................................................... 23

IX.   REVENUE DUE TO USER DATA: ADDITIONAL QUALITATIVE EVIDENCE
FROM INTERNAL COMMUNICATIONS AT GOOGLE, AND CONSIDERATION
OF OUTLIERS ................................................................................................... 24

X.    REVENUE DUE TO USER DATA: META-ANALYSIS OF EFFECT SIZE ........... 27

XI.   MARKET PRICING MODEL: ANNUAL COMPENSATION OF PANELISTS BY
DIFFERENT VENDORS ......................................................................................... 32

XII.  MARKET PRICING MODEL: MARKET PRICE OF USER DATA INVOLVED IN
PERSONALIZED TRACKING ................................................................................ 36

XIII. SUMMARY AND CONCLUSIONS .......................................................................... 38

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## I.    QUALIFICATIONS

1.    I am a Professor of Marketing in the Anderson School of Business at the University of California, Los Angeles (UCLA). Prior to UCLA, I was Assistant Professor of Marketing in the University of Chicago Graduate School of Business.

2.    I earned a Ph.D. in Management Science from the Massachusetts Institute of Technology and an M.A. in Mathematics and B.A. in Economics and Mathematics from the University of Pennsylvania.

3.    I have authored or coauthored more than 20 peer-reviewed scientific articles in management science and quantitative marketing journals, including *Management Science*, *Marketing Science*, *Journal of Marketing Research and Quantitative Marketing and Economics*. I am an associate editor of *Management Science* and *Quantitative Marketing and Economics* and a member of the editorial board of *Journal of Marketing Research*. I have participated and/or delivered presentations in numerous academic conferences on quantitative marketing, and I have been invited to present my research in dozens of university departments. In my research, I studied auctions generally[1] and real-time bidding (RTB) auctions for internet advertising specifically.[2]

4.    For the last 19 years, I have taught both general marketing and specific marketing science techniques such as conjoint analysis and choice modeling to hundreds of MBA students at University of Chicago, University of California, and Hong Kong University of Science and Technology.

5.    I have been retained by counsel for Plaintiffs as an expert in this matter and submit this report in support of Plaintiffs' Motion for Class Certification. A copy of my

---

[1] E.g. Robert Zeithammer, *Forward-Looking Bidding in Online Auctions*, JOURNAL OF MARKETING RESEARCH, Vol. 43(3), pp. 462–476 (2006); Robert Zeithammer, *Optimal Selling in Dynamic Auctions: Adaptation Versus Commitment*, MARKETING SCIENCE, Vol. 26(6), pp. 859–867 (2007); Robert Zeithammer, *Strategic Bid-Shading and Sequential Auctioning with Learning from Past Prices*, MANAGEMENT SCIENCE, Vol. 53(9), pp. 1510–1519 (2007); Robert Zeithammer, *Commitment in Sequential Auctioning: Advance Listings and Threshold Prices*, ECONOMIC THEORY, Vol. 38(1), pp. 187–216 (2009).

[2] E.g. Robert Zeithammer, *Soft Floors in Auctions*, MANAGEMENT SCIENCE, Vol. 65(9), pp. 2949–4450 (2019).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

Curriculum Vitae is attached as **Appendix 1**. A list of my testimony in the prior 4 years is attached as **Appendix 2**. A list of Information Relied Upon is attached as **Appendix 3**. I am being compensated at my standard rate of $900.00 an hour.

## II.     BACKGROUND: DISPUTE AND ASSIGNMENT

6.     My understanding of the relevant facts in this matter is as follows: Google sells advertising inventory of publishers through automated real-time bidding auctions ("Google RTB"). For every potential display advertising impression auctioned on Google RTB, Google provides all auction participants with a bid request that includes information about the user, hereafter called "User Data." The User Data sent in bid requests includes information about the user, the user's location, the user's browser, the user's device (for example the user's computer or smart phone), the website or app the user is viewing, and unique identifiers that are used for tracking the user. In addition, it is my understanding that Google offers RTB participants a "cookie matching" service that enables Google RTB participants to link together their information with Google's information regarding particular users and that this is used to create user lists based on the particular user's browsing history.

7.     The Plaintiffs allege that Google's sharing of User Data about its account holders violates Google's contracts with its U.S. account holders and U.S. privacy laws, and entitles them to compensation. The Complaint identifies several potential sources of damages.

8.     My first assignment is to apportion the proportion of Google RTB revenues from class members due to Google's sharing of User Data with third parties through Google RTB. This apportionment is a key input into calculations of damages under the unjust enrichment model. My understanding of this model in the present setting is that Google's sharing of User Data increased its profits from facilitating display advertising relative to what those profits would be if the information was not shared with the auction participants.

9.     My second assignment is to establish a market price of User Data. The market price is a key input into calculations of damages under the market price model. My understanding of this model in the present setting is that Google's users are entitled to the fair

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

market value of their own User Data, and the prevailing market price establishes this fair market value.

10.     I am not an attorney or a privacy expert, so I do not offer any opinions regarding the legality of Google's conduct under California or other law. I merely take the existence of Google's sharing of User Data as defined in paragraph 6 during requests for bids as a fact.

11.     I am not a computer science expert, so I do not offer any opinions regarding the technologies third-party companies utilize to analyze the User Data, or how they use the User Data in the course of their business operations. Such details are also not necessary for me to fulfill my assignments outlined above as long as I observe revenues and prices associated with User Data sharing. Given the fact that the User Data is commonly shared in RTB requests, I analyze the impact of this User Data sharing on Google RTB revenues under the unjust enrichment model, and I analyze the market value of this User Data under the market price model.

## III.     SUMMARY OF OPINIONS

12.     Relying on a meta-analysis of all eleven distinct and reliable sources available to me, including internal experiments at Google, industry studies, academic econometric analyses of observational data, and rigorous analyses of natural experiments, I conclude that User Data commonly shared in RTB requests has a highly statistically significant effect on auction revenues in Google RTB, with at least 51.1% of the revenue directly attributable to the sharing of User Data in bid requests.

13.     The 51.1% estimate is conservative because I did not exclude any low outliers present in the literature, and because all of the internal experiments at Google I am aware of would suggest a higher proportion if analyzed in isolation.

14.     The 51.1% estimate is statistically precise, with a 95% confidence interval of [39.5%,62.8%], which also contains eight out of the eleven sources analyzed.

15.     Several existing vendors pay consumers for sharing data analogous to the User Data at issue in this case. Based on publicly available data about compensation offered by four

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

prominent vendors (Screenwise, Datacy, Datacoup, and Killi), I find that the market price consumers generally charge for sharing their user data is $38 per year per user.

16.    The $38 annual fair market price estimate is conservative because I did not exclude any low outliers, and because I generally assumed a lower number whenever my market research produced a range of possible values.

17.    The $38 annual fair market price estimate is precise in the sense that the 95% confidence interval of the true underlying fair market value is [$21,$54], which also includes three of the four vendors analyzed.

## IV.    REVENUE DUE TO USER DATA: EMPIRICAL FRAMEWORK

18.    This section lays out my empirical strategy for determining the effect of User Data on Google RTB auction revenue.

19.    Following the operative complaint, let "User Data" be any data that is commonly shared in an RTB bid request, and which can, in isolation or when aggregated with other User Data, be reasonably associated with an individual or a household. Examples of ███████████████ ⟩ identified in Google's own documents that are included in bid requests, include  Google User ID, Device IDs, Hosted Match Data, IP address, User Agent, Device Info, Carrier id, Hyperlocal info, URL, and User lists.[3]  Two examples of User Data are the truncated IP address and User Agent which ██████████████████████████ ⟩ ███████████ ⟩ according to a Google document.[4]  When a particular piece of User Data, such as User Agent or IP Address, is not available to the RTB participants for some reason, the user is partially anonymous. Their anonymity is only partial because other pieces of User Data may remain available, and RTB participants can thus re-construct their ability to identify individuals by combining the remaining pieces (this approach is sometimes called "fingerprinting" in the industry, see operative complaint for details). Therefore, any empirical

---

[3] GOOG-HEWT-00191932.
[4] GOOG-HEWT-00456109.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

strategy that compares auction outcomes with and without a particular piece of User Data will be conservative as a prediction of what would happen if all User Data became unavailable.

20.     An ideal empirical framework for measuring the effect of User Data on Google RTB auction revenue experimentally manipulates the availability of the User Data to RTB participants, and then observes the impact of the manipulation on Google RTB revenue. My understanding from the published literature and the internal communications at Google I reviewed is that several such experiments "holding back" User Data from RTB participants were performed at Google. Such an experiment is the gold standard in measuring the impact of User Data on revenue because the variation in information availability it relies on is deliberately random, not confounded with other factors. However, a properly conducted analysis of non-experimental observational data can also provide useful measures of the underlying effect, as I describe next.

21.     In addition to deliberate experimentation, observational data contains several types of natural experiments that withheld at least some parts of the User Data for an identifiable set of impression. One such natural experiment occurred after California passed the California Consumer Privacy Act (CCPA) in 2018, allowing people in California to block personalized ads. Another natural experiment has occurred after 2018–2019 when both Safari and Firefox browsers blocked third-party cookies by default while other browsers, most prominently Chrome, did not. Starting in 2010, the AdChoices program has enabled consumers to opt out of behaviorally targeted advertising among publishers participating in the AdChoices program. And finally, some portion of impressions have always been missing User Data, either because the users making these impressions somehow blocked tracking on their browsers or due to software glitches.

22.     In all four possible natural experiments, one can compare the Google RTB revenue with the User Data to the Google RTB revenue without it. Since other leading ad exchanges also share User Data in RTB requests, natural experiments evaluated on data from other leading ad exchanges are also informative as to the magnitude of the effect my first

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

assignment needs to measure, namely the effect of User Data on Google RTB revenue specifically.

23.    Another approach to assessing the impact of User Data on Google RTB auction revenue is to consider the historical shifts in advertising spending on the Internet. Since the emergence of profitable display advertising coincided with the emergence of highly targeted real-time bidding that relies on bid requests containing User Data, and since Google was a leading player in that transformation, a large portion of Google RTB revenue is likely due to this information.

24.    The recent repeated reluctance of Chrome to follow Safari's and Firefox's lead and block third-party cookies by default is additional historical evidence that User Data shared via third-party cookies is very profitable to Google.

25.    I discuss the above three sources of evidence in the order of decreasing scientific validity and precision: first, I will summarize the true randomized experiments conducted at Google. Second, I will discuss the evidence available from the academic and industry literature, which mostly relies on natural experiments and econometric methods to measure the size of the key effect. And third, I will present evidence that the emergence of profitable display advertising indeed coincided with the emergence of RTB relying on User Data.

26.    To define the measure of interest, I will focus on the proportion of revenue that each source attributes to User Data. This proportion will be expressed as a percentage, and its precision will be captured by a standard error whenever possible. Whenever a standard error is not available, I will calculate one based on all available data.

27.    To combine evidence from diverse sources, I will conduct a random-effect meta-analysis of all the estimates following the standard approach outlined in Borenstein et. Al (2010) – a standard reference article.[5] I will also investigate whether the type of source

---

[5] Michael Borenstein *et al*, *A Basic Introduction to Fixed-Effect and Random Effects Models for Meta-Analysis*, RESEARCH SYNTHESIS METHODS, Vol. 2010 Apr;1(2), pp. 97–111 (2010).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

(experimental vs. observational data) has a meaningful impact on the overall combined estimate. I now turn to the description of the meta-analysis I will conduct:

28.    Meta-analysis "is a central method for knowledge accumulation in many scientific fields …., adds value in providing a quantitative assessment of the relationship between two target variables … is nowadays also an established method in management research and related fields."[6] As explained in a recent "how to" guide,[7] the method involves eight steps. I now outline how my approach addresses each of the following eight steps:

Step 1 (defining the research question): the question I ask is "What is the effect of User Data on Google RTB auction revenue in U.S. digital advertising markets?"

Step 2 (literature search): I searched three sources of information: 1) the academic literature on RTB revenues due to User Data, starting with the only peer-reviewed article on the topic and searching through all the citing articles; 2) the industry reports on RTB revenues due to User Data, searched through internet keyword searches and citations in academic articles; and 3) the internal Google records produced in the case and provided to me by counsel. As is standard in the meta-analysis methodology, the literature search needs to be as inclusive as possible of potential sources of information about the effect magnitude, so I included both peer-reviewed papers and working papers, and I included both evidence from Google specifically and evidence from similar leading ad exchanges that also share User Data in their RTB requests.  As is standard in the methodology, I then removed duplicates, as well as measurements from other markets not relevant to the research question's scope.

Step 3 (choice of effect size measure): The primary measure of the effect of User Data on RTB auction revenues I extract from each source is the proportion of RTB auction

---

[6] Christopher Hansen, Holger Steinmetz & Jörn Block, *How to Conduct a Meta-Analysis in Eight Steps: A Practical Guide*, MANAGEMENT REVIEW QUARTERLY, Vol. 71, pp. 1–19 (2022).
[7] Ibid.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

revenues obtained that can be attributed to the availability of the User Data to the auction participants. In scientific terminology, this is the "average treatment effect on the treated", expressed as a proportion in order to compare across different sources. Note that some studies I examine report on the auction revenue directly while other studies report on the publisher revenue – the amount of money left over after the auctioneer and other intermediaries take their cut. Since all the intermediaries, including Google, take their compensation on a percentage basis (i.e. the publisher revenue is an affine transform of the auction revenue), the percentage change in the publisher's revenue due to a regime change such as a deprecation of User Data is the same as the percentage change in the auctioneer's revenue due to the same regime change.

Step 4 (choice of analytical method used): Given the single scalar measure of interest, the analytical method is univariate.

Step 5 (choice of software): The standard random-effect meta-analysis procedure described in the standard reference article can be implemented in Excel.

Step 6 (coding of effect sizes): The random-effect method described in the previous step requires the effect estimate and its standard error. In addition, my coding sheet will distinguish the type of analysis from three options: a) randomized experiment, b) econometric analysis of secondary data, and c) observational study without econometric controls for selection into treatment.

Step 7 (analysis type): Given the diversity of contexts and sampling strategies the three types of sources are likely to produce, the appropriate analysis to use is the random-effect meta-analysis.

Step 8 (reporting results): Given the analysis type and univariate method selected above, the reporting consists of the full list of evidence discovered by the literature search, the operative list of evidence without duplicates and irrelevant contexts, the meta-analytic mean effect, and its standard error.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## V.     REVENUE DUE TO USER DATA: EVIDENCE FROM EXPERIMENTS AT GOOGLE

29.     Google has conducted ▮▮▮▮▮▮▮▮▮▮ experiments to estimate the main number of interest – the effect of User Data on Google RTB revenues. I understand that the impression-level data from these experiments was requested but was not made available by Google, so I will rely on published and/or internal documents to summarize the results of these experiments.

30.     The only published study about internal experiments at Google I am aware of is "Effect of Disabling Third-Party Cookies on Publisher Revenue" by Deepak Ravichandran (Principal Engineer, Google Display Ads) and Nitish Korula (Senior Staff Research Scientist, Google Ad Manager).[8] The two authors set out to "empirically quantify the effect that disabling access to third-party cookies would have on the programmatic ad revenue of web publishers." To achieve this goal, they "ran a randomized controlled experiment on publishers who use the programmatic arm of Google Ad Manager's serving system, in which a Google service places ads on non-Google sites across the web." The experiment "disabled access to cookies for a small fraction of randomly selected users (the treatment group)," and found that "for the top 500 global publishers, average revenue in the treatment group decreased by 52%, with a median per-publisher decline of 64%." In footnote 4, the authors report that the average effect is so precisely estimated that "the 95% confidence interval is under +/- 1%." Since a 95% confidence interval is about four standard errors wide, I conclude that the standard error on the 52% estimate is less than 0.5%, so I will conservatively take 0.5% to be the standard error of the estimate for the purposes of my meta-analysis.

31.     The U.K. Competition and Markets Authority ("CMA") has re-examined the data from the Ravichandran and Korula experiment, and identified several reasons why the estimates may be biased: "CMA has identified a number of selection issues that might bias the estimates of the effect of blocking cookies on publisher revenue: (1) The treatment blinds Google DSP selectively; (2) the treatment reduces number of impressions per query; (3) the

---

[8]     Available at https://services.google.com/fh/files/misc/disabling_third-party_cookies_publisher_revenue.pdf (last accessed on March 11,2023).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

treatment increases queries without impressions and (4) the treatment increases impressions served by non-Google SSPs."[9] To account for these issues, the CMA "implemented econometric solutions to better estimate the effect of blocking cookies access from the perspective of publishers."[10] The CMA report concludes that after re-examining the data, "The results of our analysis show that blocking third-party cookies decreases short-run publisher revenue by 70% of the average revenue per query in the control group, which approximates business as usual during the study period."[11] This result shows that the bias in the original estimates is most likely a downward bias, making the 52% estimate conservative. On the other hand, the CMA only investigated data on U.K. users, so their result does not necessarily translate to U.S. users of main interest to this report.

32.     The record includes undated Excel files showing the results of ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

since the time-stamped internal communications █████████████████████████, and

at least some of these discussions likely refer to ██████████ documented in the Excel files.

After reviewing the Excel files, it is my understanding that █████████████████████

███████████████

████████████████████████████████████████████████

██████████████████

███████████████████████████

████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

---

[9] U.K. Competition and Markets Authority, *Online Platforms and Digital Advertising* (2020), at Appx. F, footnote 37.
[10] Ibid.
[11] Ibid.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

████████████████████████████ [12] █████████████████████████

████████████████████████████████████████████████████████

████████████ [13] ████████████████████████████████████

██████████ [14] ██████████████████████████████████████

██████ [15] ████████████████████████████████, these data suggest that the ██████ information are super-additive in terms of their revenue-generating potential. In other words, providing all ████ types of information during a Google RTB bid request increases revenue more than the sum of increases from providing the individual parts. The super-additivity of information pieces in turn suggests that RTB participants rely on highly detailed rich information made possible by combining all the pieces together in a sophisticated model.

33.    The most relevant experiment for estimating the impact of User Data on revenue is one ████████████ types of information. Since no information is provided about the precision of the ████████████████, I assume that the experiment was as precise as the one Google ████████ experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

34.    A ████████████████████████████████████

████████ [16] ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[12] GOOG-HEWT-00456342.
[13] GOOG-HEWT-00456341.
[14] GOOG-HEWT-00456344.
[15] GOOG-HEWT-00456346.
[16] GOOG-HEWT-00018008.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

███ [17] Since no information is provided about the precision of the ███████████, I assume that the experiment was as precise as the one Google █████ experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

35.     In addition to the above ████████ documented up to the first decimal point in the record, the record also includes ██████ mentioned in internal communications at Google with less accuracy. The next several paragraphs describe these mentions.

36.     ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Since no information is provided about the precision of the ██████████, I assume that the experiment was as precise as the one Google █████ experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

37.     ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████ [19] Since no information is provided about the precision of the revenue reduction, I assume that the experiment was as precise as the one Google █████ experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

38.     ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[17] "ITP" stands for "Intelligent Tracking Prevention."
[18] GOOG-HEWT-00188498.
[19] GOOG-HEWT-00287442.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.



[20] Since no information is provided about the precision of the █████████ mentioned in this communication, I assume that the experiment was as precise as the one Google █████ experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

39. ████████████████████████████████

████████████████████████████████

████████████████████████████████

███████ ████ ███ ███ ███ ███ ███ ███ ████

████████████████████████████████

████████████████████████████████

█████████

████████████████████████████████

███████████████████████ Since no information is provided about the precision of the quoted █████████, I assume that the experiment was as precise as the one Google █████ experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

40. ████████████████████████████████

█████████████████████████[22]████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████ Since no information is provided about the precision of the quoted

---

[20] GOOG-HEWT-00259566.
[21] GOOG-HEWT-00312065.
[22] GOOG-HEWT-00278045.
[23]  The  reference  is  given  as: ████████████████████████████
████████████████

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

███████████, I assume that the experiment was as precise as the one Google ███████ experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

41.    It is possible that some of the internal communications quoted above refer to the same underlying data, i.e. to the same experiment. My conservative reading of the record is that there were at least three experiments: 1) the experiment with cookies only documented in Ravichandran and Korula (2019) and finding a 52% revenue drop, 2) the experiment with



███,[24] and 3) the experiment with ██████████████████████.[25] All the other numbers are ██████████████████████████████████████ It is thus important to explore the sensitivity of any final estimate of the overall effect to the inclusion / exclusion of the approximate numbers since these could be simply duplicating each other instead of providing additional independent evidence.

## VI.    REVENUE DUE TO USER DATA: EVIDENCE FROM OBSERVATIONAL STUDIES WITH ECONOMETRIC CONTROLS

42.    The academic literature contains several studies of the effect of ad personalization on advertising revenue. The most relevant study analyzes the two natural experiments mentioned in the Empirical Framework section: enactment of the California Consumer Privacy Act (CCPA) in 2018, and both Safari and Firefox blocking third-party cookies by default in between 2018 and 2019.

43.    The CCPA provides that users should be allowed to opt out of being tracked.[26] Comparing the revenues from users who opt out to those who do not is a measure of the effect of User Data on display advertising revenues. The incidence of opting out has been low so far,

---

[24] GOOG-HEWT-00456342.
[25] GOOG-HEWT-00018008.
[26] Note that even when users opt out of tracking, the advertisers are still informed about the context in which the user is watching the ad, e.g. the publisher and the geographical location of the user. This report does not opine on the effectiveness of opt-out technologies.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

likely because of the "unclear and inconspicuous" placement of the opt-out notice by many websites.[27]

44.     When a user browses a site on a Safari or Firefox browser, tracking by third-party cookies is blocked by default. In contrast, users browsing on the Chrome browser are tracked (unless they are in California, and actively opt out under the CCPA – something very few users choose to do). Therefore, comparing the revenues from Safari or Firefox users to revenues from Chrome users is a measure of the effect of User Data on display advertising revenues.

45.     The best existing analysis of the two natural experiments described above I am aware of is a recent paper by Alcobendas, Kobayashi and Shum (2021)[28] who analyze data from 110,460 auctions conducted on a single day in 2021 to show ads to California residents. The auctions all sold impressions of one of the most popular ad type on a single popular site. Alcobendas *et al.* conduct extensive econometric modeling to estimate what would be the impact on Chrome of following suit and also blocking third-party cookies. The conclude that "Auction revenues on our analyzed Yahoo site would decrease by about 45% on average" (p. 34). Based on the data in the paper, I calculate the standard error of this estimate to be about 0.25%.[29]

46.     Another academic research paper which addresses the effect of User Data on display advertising revenues, and the only peer-reviewed paper in the set so far, is Johnson, Shriver and Du (2020) who analyze the AdChoices program.[30] They explain that "In 2010, the ad tech industry moved to self-regulate by launching the AdChoices program, which provides

---

[27] Sean O'Connor *et al.*, *(Un)clear and (In)conspicuous: The Right to Opt-Out of Sale Under CCPA* in Proceedings of the 20th Workshop on Privacy in the Electronic Society, pp. 59–72 (Nov. 2021).

[28] Miguel Alconbendas, Shunto Kobayashi & Matthew Shum, *The Impact of Privacy Measures on Online Advertising Markets* (Feb. 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3782889.

[29] Using Table 5, I can compare the two means of the winning bid.

[30] Garrett A. Johnson, Scott K. Shriver & Shaoyin Du, *Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry?*, MARKETING SCIENCE, Vol. 39(a), pp. 33–51 (2020).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

both notice and choice to consumers. AdChoices provides notice by superimposing the AdChoices logo over the corner of online display ads. AdChoices enables consumer choice through a website that allows consumers to opt out of behaviorally targeted advertising. Consumers who opt out still see ads, just not ads that are targeted based on their previous browsing behavior." Johnson, Shriver and Du analyze over 62 million ad impression transactions in a single week on a single exchange in 2015.

47.    Johnson, Shriver and Du sample impressions from three types of users: cookieless, cookied who opted out, and cookied who did not opt out. They conduct two analyses to account for any potential self-selection of the users into the opt-out category: first, they use fingerprinting techniques to re-generate the purchase history for the opted-out users, and they use the imputed history to predict what prices advertisements to those users would have received in the counterfactual world with tracking by cookies. This allows the authors to estimate the percentage difference between the prices fetched by the opted-out impressions and prices of comparable impressions by tracked cookied users. The authors' "preferred marginal effect estimates implies that opt-out impressions fetch 52.0% lower prices than cookied impressions."[31] Based on the data reported in the paper, I calculate the standard error of this estimate to be about 2.7%.[32]

48.    The second analysis to control for self-selection focuses on users who switched their opt-out status Johnson, Shriver and Du conduct is a difference-in-difference analysis. This analysis implies that opt-out impressions fetch 52.7% lower prices than cookied impressions. The similarity between the two estimates leads the authors to conclude that "These results are robust to alternative modeling and identification assumptions," and they further find that "opt-

---

[31] Ibid, at page 44.
[32] The model is log-linear, so I assess the error of the percentage difference using the model's formula, and then simulate from the asymptotic distribution of the critical *Opt-out* parameter (Table 3, Column 5 gives the mean and standard deviation of this parameter).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

out impressions tend to be sold at rates comparable with cookied impressions but they fetch lower prices when successfully auctioned."[33]

49.     Other academic papers reach very similar conclusions to Alcobendas, Kobayashi and Shum (2021) and Johnson, Shriver and Du (2020). Beales and Eisenach (2014) analyze a large "impression-level database of advertising placements during a one-week period in August 2013, provided by two anonymous companies that operate advertising exchanges with automated bidding."[34] They perform an econometric analysis that allows them to "measure the premium paid by advertisers for ads served to customers with cookies, and ultimately to assess the added economic value generated by information sharing in the online content market."[35] They find that "the availability of cookies to capture user-specific information is found to increase the observed exchange transaction price by at least 60 percent relative to the average price (for users with "new" cookies)." For the purposes of this report, I consider average-aged cookies for the two companies, and combine the data in Tables 2 and 3 to compute the difference in CPM due to a cookie to be 70.2% (standard error 0.44%) of the average CPM with a cookie for the first anonymous company and 49.4% (standard error 1.42%) for the second anonymous company.[36]

50.     Laub, Miller and Skiera (2023) analyze a large sample of auctions from a European ad exchange collected in 2016.[37] They first report that "uncookied" impressions fetched 60% less revenue to the publishers than cookied impressions. Then, the authors also

---

[33] Garrett A. Johnson, Scott K. Shriver & Shaoyin Du, *Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry?*, MARKETING SCIENCE, Vol. 39(1), pp. 33–51 (2020).

[34] J. Howard Beales & Jeffrey A. Eisenach, *An Empirical Analysis of the Value of Information Sharing in the Market for Online Content*, NAVIGANT ECONOMICS, Technical Report (2014).

[35] Ibid.

[36] My calculation uses the "Basic model" coefficients in Table 3 to compute the difference in CPM due to an average-aged cookie as 0.35 (SE 0.0022) for the first company and 0.14 (SE 0.0042) for the second company. Then, I infer the average CPM with an average-aged cookie to be 0.509 and 0.296 for the two companies from the overall average CPM and reported percentage of cookied impressions in Table 2. All standard errors are calculated using standard methods.

[37] Rene Laub, Klaus M. Miller & Bernd Skiera, *The Economic Value of User Tracking for Publishers* (Mar. 20, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4251233.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

use a regression approach similar to Johnson, Shriver and Du (2020) to control for selection, and the model (specification 1.3 in Tables 3 and 4) implies that the estimated relative price difference due to cookies is 41.2%. To control for confounding selection of impressions into the "uncookied" state, the 1.3 model specification controls for a rich set of user characteristics (device, OS, browser, time, and location), as well as for ad characteristics (position, format, and publisher). Therefore, one can interpret the 18.8 percentage points reduction from the raw difference to model 1.3 (60-41.3=18.8) as arising from somewhat less valuable kinds of users and ads systematically not having a cookie. This is the right level of controls needed for our counter-factual goal.[38] Using the same procedure as in the case of Johnson, Shriver and Du (2020), I calculate the standard error of this estimate to be about 3.4%.

51.     As outlined above, most of the evidence about the magnitude of the key effect within the academic research literature is mutually consistent and converges to a large apportionment of at least half of the revenue to personal tracking information analogous with User Data at issue. Only one academic paper I am aware of reaches a qualitatively different conclusion: Marotta, Abhishek, and Acquisti (2019) gives a small estimate of the effect of User Data on revenue.[39] The magnitude of the effect is difficult to discern from the paper because the critical part of the "Results" section says: "The estimated potential outcome mean for transactions without cookies is $0.93, while the potential outcome mean for transactions with cookies is $1.02, a statistically significant difference. We run the model using a logarithmic transformation of the variable, and the results suggest that when a cookie is available, publisher's revenue increases by about 4%."[40] These two sentences are inconsistent with each other because comparing the two means yields (1.02-0.93)/0.93=9.7% for the increase due to a cookie. My best interpretation of the results is that (1.02-0.93)/1.02=8.8% is the revenue due

---

[38] Laub, Miller and Skiera (2023), *supra*, go further in specifications 1.4 and 1.5, which also control for the fact that some advertisers tend to bid less or not at all for uncookied impressions. For the purposes of the present report, such advertiser behavior is material to the measurement of the effect of interest, and so should not be controlled away.
[39] Marotta Veronica, Abhishek Vibhanshu & Alessandro Acquisti, *Online Tracking and Publishers' Revenues: An Empirical Analysis* (WEIS, Working Paper, 2019).
[40] Ibid.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

to personalized tracking. My interpretation of the results is shared by the Laub, Miller and Skiera (2022) report.[41] The standard error of this difference can be computed as the standard error of the difference between the two imputed revenues (with and without cookie) reported in Table 4, and the standard calculation suggests it is 0.46%.

52.     The Marotta, Abhishek, and Acquisti (2019) result is broadly discounted in the literature as non-representative and unreliable. Some of the critiques include the fact that Marotta *et al.* only consider data from a single publisher as opposed to most of the literature that considers samples from multiple publishers on entire exchanges. Different publishers may benefit from personal tracking differently, and it is thus likely that Marotta et al happened to work with an outlier publisher. Google's own Korula and Ravichandran also discount the Marotta *et al.* results when they say: "We believe that the difference in results may be partially attributed to the fact that their analysis was performed on a single publisher (in contrast to the larger scale of previous studies), and in part due to the inherent challenges associated with the nature of observational studies (such as the need to control for many variables, some of which may themselves be influenced by the presence of cookies)."[42] The U.K. CMA says "the paper is based on a non-randomized observational design and relies on a relatively narrow set of user characteristics to account for selection bias. We expect that evidence from randomized experiments would be better able to address bias deriving from the comparison of users navigating with and without cookies."[43] Laub, Miller and Skiera add additional detail regarding the likely idiosyncratic setting of Marrotta *et al.*: "A possible explanation for this relatively low decrease in prices could be that Marotta, Abhishek, and Acquisti (2019) examine data of a publishing network, such as Condé Nast, running websites with thematically focused content such as fashion websites or sports websites. This thematic focus could allow advertisers to

---

[41] Rene Laub, Klaus M. Miller & Bernd Skiera, *The Economic Value of User Tracking for Publishers* (Mar. 20, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4251233.

[42] Deepak Ravichandran & Nitish Korula, *Effect of Disabling Third-Party Cookies on Publisher Revenue* (Aug. 27, 2019), https://services.google.com/fh/files/misc/disabling_third-party_cookies_publisher_revenue.pdf.

[43] U.K. Competition and Markets Authority, *Online Platforms and Digital Advertising* (2020), at Appx. F, ¶ 114.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

reach the target group based on contextual targeting, making user tracking data less critical. It remains unclear whether the finding holds for other publishers, particularly publishers with broader content such as News websites."[44]

## VII.   REVENUE DUE TO USER DATA: EVIDENCE FROM OBSERVATIONAL STUDIES WITHOUT ECONOMETRIC CONTROLS

53.    In addition to conducting detailed econometric analysis summarized in the previous section of this report, Alcobendas, Kobayashi and Shum (2021)[45] also report on direct comparisons of revenues with and without identifying information. Regarding the measure derived from comparing users who opted out from tracking to users who did not opt out, Alcobendas *et al.* report that opting out of tracking reduces the revenue from the impression by 62.4 percent.[46] I can apply the Delta method to calculate the standard error of this estimate to be 1.3 percent.[47]

54.    How can the effect of User Data on ad auction revenue be so large in light of the clearly ambiguous prediction based on a theory of opposing forces?[48] It is instructive to decompose expected revenue into the bidders' propensity to enter an auction and the magnitude of their bids. The accompanying data in Alcobendas, Kobayashi and Shum (2021) on bid magnitudes and participation shows that both decline with the loss of User Data. While the decline in bid magnitude is in line with the theorized positive force of the impression being less valuable, the decline in bidder participation goes against the theorized force of thicker

---

[44] Rene Laub, Klaus M. Miller & Bernd Skiera, *The Economic Value of User Tracking for Publishers* (Mar. 20, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4251233.

[45] Miguel Alconbendas, Shunto Kobayashi & Matthew Shum, *The Impact of Privacy Measures on Online Advertising Markets* (Feb. 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3782889.

[46] 63%=1-1.00/2.66 (a comparison of the Winning Bid under the two conditions in the bottom panel of Table 3 in the paper).

[47] The Delta method is the standard approach for calculating variances of ratios of two estimates.

[48] Jonathan Levin & Paul Milgrom, *Online Advertising: Heterogeneity and Conflation in Market Design*, AMERICAN ECONOMIC REVIEW, Vol. 100(2), pp. 603–607 (2010).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

markets without targeting. With the theorized negative force not materializing in reality, the resulting effect can become as large as Alcobendas *et al.* report.

55.   Regarding the measure from comparing users on "blocked-cookie" browsers like Safari or Firefox to "allowed-cookie" browsers like Chrome, Alcobendas *et al.* report that a user using a Safari or Firefox browser instead of Chrome reduces the advertising revenue from the impression by 51.3 percent.[49] I can apply the Delta method to calculate the standard error of this estimate to be 1.0 percent.[50] The pattern of forces is the same as in the previous measure: lower bids and less participation. Interestingly, the drop in participation is not as steep as that in the comparison based on opting out. This pattern is consistent with some kind of tracking persisting even among Safari and Firefox users.

56.   The U.K. CMA[51] cites three U.K. publishers who document [50-60%], [50-60%], & [70-80%] lower revenue from Safari/Firefox users (relative to Chrome or rest) due to lack of 3rd-party cookies in 2019. For the purposes of my report, I simply average the mid-points of these ranges and obtain an estimate of a 61.6% of the revenue due to personal tracking. Since no information is provided about the precision of this revenue reduction, I assume that the comparison was as precise as the one for which the precision information is available (blocked vs. unblocked browsers in Alcobendas, Kobayashi and Shum 2021), and thus assume the standard error to be 1.0%.

57.   A large intermediary firm named Bidswitch reports that in 2019, "matched" (identifiable based on cookies) users have "2x higher eCPMs" than "unmatched" (non-identifiable users).[52] In terms of the portion of the revenue due to personal tracking, this number corresponds to 50%. Bidswitch also reports that Chrome users have "1.8x higher

---

[49]  52%=1-1.46/2.99 (a comparison of the Winning Bid under the two conditions in the rightmost panel of Table 3 in the paper).

[50]  The Delta method is the standard approach for calculating variances of ratios of two estimates.

[51]  U.K. Competition and Markets Authority, *Online Platforms and Digital Advertising* (2020), at Appx. F.

[52]  Bidswitch, *Programmatic Insights* (Apr. 2020), https://www.bidswitch.com/wp-content/uploads/2020/03/BidSwitch-Programmatic-Insights-2019.pdf (last accessed Mar. 13, 2023).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

eCPMs" than Safari users, which in turn corresponds to at least 44.4% (=(1.8-1)/1.8) due to personal tracking by cookies since Safari users cannot be tracked by cookies while most Chrome ones can. Since no information is provided about the precision of this revenue reduction, I assume that the comparison was as precise as the one for which the precision information is available (blocked vs. unblocked browsers in Alcobendas, Kobayashi and Shum 2021), and thus assume the standard error to be 1.0%.

58.    PubMatic, a company that develops and implements online advertising software and strategies, reported in 2021 that [53] "ad prices (eCPMs) are 2.4x higher when an IDFA is present." The IDFA is "Apple's ID for Advertisers," so in terms of the portion of the revenue due to personal tracking, the "2.4x higher" number corresponds to 58.3%. Since no information is provided about the precision of this revenue reduction, I assume that the comparison was as precise as the one for which the precision information is available (blocked vs. unblocked browsers in Alcobendas, Kobayashi and Shum 2021), and thus assume the standard error to be 1.0%.

59.    The Interactive Advertising Bureau (IAB), an association of more than 700 leading media companies, brands, agencies, and the technology firms responsible for selling, delivering, and optimizing digital ad marketing campaigns, reports in 2020 that "A proprietary study by the ad exchange OpenX found that, over a week in which cookies were stripped from 3 billion impression opportunities, prices realized by cookie-less impressions were 51% lower."[54] Since no information is provided about the precision of this revenue reduction, I assume that the comparison was as precise as the one for which the precision information is available (blocked vs. unblocked browsers in Alcobendas, Kobayashi and Shum 2021), and thus assume the standard error to be 1.0%.

---

[53] PubMatic, *Applei's IDFA Opt-In; Impact on the Advertising Ecosystem* (Infographic, 2021), https://pubmatic.com/wp-content/uploads/2021/08/IDFA-Opt-In-Impact-Infographics.pdf?%20utm_source=website_reports&utm_medium=research_2021&utm_campaign=envision_2021&utm_content=idfa_infographic (last accessed Mar. 13, 2023).
[54] Interactive Advertising Bureau, *The Socioeconomic Impact of Internet Tracking* (Feb. 10, 2020), https://www.iab.com/insights/the-socioeconomic-impact-of-internet-tracking/ (last accessed Mar. 14, 2023)

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## VIII.    REVENUE DUE TO USER DATA: EVIDENCE FROM HISTORICAL TRENDS IN DIGITAL ADVERTISING SPENDING

60.    The first digital advertisement was a display "banner" ad on HotWired.com in 1994.[55] The idea of display advertising is thus almost as old as webpages. Advertising dollars simply followed the shift of consumer attention to digital media. But the early banner ads were widely criticized for being ineffective, and overall spending on them was miniscule as a proportion of total U.S. ad spending. Articles with titles such as "Why Do People Avoid Advertising on the Internet?" and "Internet advertising: Is anybody watching?" appeared in top peer-reviewed Marketing journals around the turn of the century.[56]

61.    Despite starting with display banner ads, the lion's share of digital advertising dollars was initially spent on search ads because they offered an unparalleled level of targeting.[57] As early as 1998, search websites started auctioning off positions in "sponsored search" results. Charging the advertisers only when a user actually clicked on an ad promised to bring accountability and response measurement into advertising, and advertisers flocked to the idea. Search advertising accounted for almost half of all advertising spending on the Internet throughout the first decade of the 21st century, outperforming online display advertising.[58]

62.    The idea of RTB auctions for individual impressions can be traced at least to 2006, when US Patent US20080162329A1 titled "Auction For Each Individual Ad Impression" was filed. However, that patent does not explicitly describe the idea of sending

---

[55] Ryan Singel, *Oct. 27, 1994: Web Gives Birth to Banner Ads*, WIRED (Oct. 27, 2010), https://www.wired.com/2010/10/1027hotwired-banner-ads/.

[56] Chang-Hoan Cho & Hongsik John Cheon, *Why Do People Avoid Advertising on the Internet?*, JOURNAL OF ADVERTISING, Vol. 33(4), pp. 89–97 (2004); Xavier Drèze & Francois-Xavier Hussherr, *Internet Advertising: Is Anybody Watching?*, JOURNAL OF INTERACTIVE MARKETING, Vol. 17(4), pp. 8–23 (2003).

[57] Avi Goldfarb, *What Is Different About Online Advertising?*, REVIEW OF INDUSTRIAL ORGANIZATION, Vol. 44(2), pp. 115–129 (2014).

[58] The IAB showed in their 2010 internet advertising revenue report that internet advertising revenues have grown from $8.09 billion in 2000 to $26.04 billion in 2010 and 46% of this revenue is achieved through search advertising (IAB Internet Advertising Revenue Report, 2010 Full Year Results (Apr. 2011)).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

User Data about the user as part of the bid request. The watershed moment for the joining of the RTB auction idea with the idea of providing personal tracking information occurred in 2008 when Google bought DoubleClick. This acquisition expanded Google's advertising business from search ads that use keywords for targeting to display ads that use User Data for targeting. As explained above, search advertising accounted for the majority of digital advertising that year. The total U.S. display advertising spending was approximately $10B.

63.    While the first decade of the 21st century digital advertising was the decade of search advertising, the second decade witnessed the re-emergence of display ads. By 2016, spending on display ads surpassed spending on search ads. The idea of display advertising was not new (see above). It is an accepted consensus in both academia and industry that the resurgence of display banner ads was enabled by the improved targeting ability made possible by User Data transmitted on RTB exchanges. By 2021, programmatic (mostly display) advertising accounted for 52 percent of all digital advertising by expenditure, and exhibited stronger growth than search advertising.[59]

64.    Advertising dollars flow to where they are most effective. The historical patterns in digital advertising outlined in the previous few paragraphs make it clear that emergence of RTB with the sharing of User Data was instrumental in making the advertising dollars flow to display advertising. While the strong positive direction of the effect of User Data on display advertising revenues is clear from the historical record, the record does not offer a clear way off apportioning the exact percentage of revenues due to the information. This type of measurement is best accomplished with experiments and econometric methods outlined in the previous sections of this report.

IX.    **REVENUE DUE TO USER DATA: ADDITIONAL QUALITATIVE EVIDENCE FROM INTERNAL COMMUNICATIONS AT GOOGLE, AND CONSIDERATION OF OUTLIERS**

65.    In addition to hard data from ▮▮▮▮▮ experiments, Google executives also discuss ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[59] IAB report 2021.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

Multiple past strategic deliberations and actions at Google provide qualitative evidence that personal tracking enabled by third-party cookies and other parts of User Data at issue in this case is very valuable to Google. In this section, I summarize this evidence and relate it to the rest of the report's evidence.

66. 

67.     Starting in 2021, Google has been promising to block third-party cookies in its Chrome browser approximately a year later. But it has now at least twice delayed this action. Specifically, the timeline of announcements was as follows[61]

1) In early 2021, the deprecation was announced for Q2 2022.

2) In June of 2021, the deprecation was delayed until the end of 2023.

3) In July of 2022, the deprecation was delayed until the second half of 2024.

It is evident from this repeated delaying of third-party cookie deprecation that projects such as  and many others under development have not yet succeeded in recovering the huge amount of revenue that would be lost should the deprecation happen according to the original schedule or even today.

68.     

---

[60] GOOG-HEWT-00126877.

[61] These events were widely reported and discussed in the industry. One reference that contains the entire chain of events is: Allison Schiff, *Google Delays the End of Third-Party Cookies (Again), From 2023 to the End of 2024*, AD EXCHANGER (July 27, 2022), https://www.adexchanger.com/privacy/google-delays-the-end-of-third-party-cookies-again-from-2023-to-the-end-of-2024/.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████ [62] This indicates Google is aware of the reduced value of the users without tracking information, and it also explains the drop in the number of bidders for "blocked" users found by Alcobendas, Kobayashi and Shum (2021).

69.    An undated document ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ [63] █████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ Rather than providing an estimate of the effect of interest to this report, ████████████ ████████████ shows that Google has experimented extensively not only with user anonymization, but with ████████ individual components of the bid request, and the effects of these ████████ on bidder behavior can be large.

70.    In the internal communications at Google, ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ [64] █████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

---

[62] GOOG-HEWT-00261158.
[63] GOOG-HEWT-00035713.
[64] GOOG-HEWT-00317558.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

X.    REVENUE DUE TO USER DATA: META-ANALYSIS OF EFFECT SIZE

71.    This section collects all the numerical estimates of the key quantity of interest – the effect of User Data on advertising revenue – and conducts a meta-analysis to determine the most likely average effect size. The meta-analysis follows the eight steps outlined above in the Empirical Strategy section of this report.

72.    Step 2 (literature review) of the meta-analysis begins with an inclusive search for evidence. Table 1 lists all the different estimates discovered in my search, all expressed as the percentage reduction in RTB advertising revenue due to removing the ability to track users individually. The estimates are sorted in magnitude. **Bold** font indicates experiments at Google – the gold standard for evidence. For collating the information in Table 1, I used the following rules: Whenever a paper or report describes multiple different datasets analyzed separately or different analyses of the same dataset, the different resulting estimates are listed separately in Table 1. Whenever the underlying evidence indicates only a range of values, I use the midpoint of the range (e.g., "70–80%" is represented as 75% in the table). Whenever a standard error is not available, I extrapolate from the closest analogous study as explained above, and report it in italics in Table 1.

73.    Before conducting a formal meta-analysis, it is useful to examine the clear patterns in the data. Table 1 contains 22 numerical estimates with a median of 55.2% and average of 54.3%. Given the diversity of methods and sources represented, I find the tight clustering of the numbers around their central tendency remarkable: almost two thirds (64%, to be exact) of the estimates are between 50% and 70%. One way to summarize Table 1 is that no matter what type of underlying analysis used, what year the data is from, and who the analyst was, the evidence indicates a large effect centered on 54.3% with a supermajority of estimates from these diverse sources landing between 50% and 70%.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Table 1: Numerical estimates of the reduction in revenue due to removing the bidders' ability to track users individually, sorted in ascending order**

| Estimated percentage reduction | Standard error (*imputed*) | Data Year | Source | Evidence type |
|---|---|---|---|---|
| 8.8% | 0.5% | 2016 | Marotta, Abhishek, and Acquisti (2019) | Econometric model, revenue ~ cookie |
| ███ | ███ | ███ | **GOOG-HEWT-00278045** | ████████ |
| 41.2% | 3.4% | 2016 | Laub, Miller and Skiera (2023) | Econometric model, revenue ~ cookie |
| 44.4% | *1.0%* | 2019 | Bidswitch (2020) | Observational data, cookies available vs. not |
| 45.0% | 0.3% | 2021 | Alcobendas, Kobayashi and Shum (2021) | Econometric model, revenue ~ cookie |
| 49.4% | 1.4% | 2013 | Beales and Eisenach (2014) | Econometric model, revenue ~ cookie, Company 2 |
| ███ | ███ | ███ | **GOOG-HEWT-00259566** | ████████ |
| 51.0% | *1.0%* | 2019 | IAB (2020) | Observational data, IDFA vs. not |
| 51.3% | 1.0% | 2021 | Alcobendas, Kobayashi and Shum (2021) | Observational data, Blocked vs. Unblocked browsers |
| 52.0% | 2.7% | 2015 | Johnson, Shriver and Du (2020) | Econometric model, revenue ~ opt out |
| **52.0%** | **0.5%** | **2019** | **Ravichandran and Korula (2019)** | **Experiment, absence of cookies** |
| 58.3% | *1.0%* | 2021 | Pubmatic (2021) | Observational data, cookies available vs. not |
| 60.0% | *1.0%* | 2016 | Laub, Miller and Skiera (2022) | Observational data, cookies available vs. not |
| 61.6% | *1.0%* | 2019 | U.K. CMA (2020) | Observational data, cookies available vs. not |
| 62.4% | 1.3% | 2021 | Alcobendas, Kobayashi and Shum (2021) | Observational data, Opt out vs. not under CCPA |
| ███ | ███ | ███ | **GOOG-HEWT-00018008** | ████████ |
| ███ | ███ | ███ | **GOOG-HEWT-00312065** | ████████ |
| ███ | ███ | ███ | **GOOG-HEWT-00287442** | ████████ |
| ███ | ███ | ███ | **GOOG-HEWT-00456342** | ████████ |

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

| | | | | |
|---|---|---|---|---|
| ███ | ███ | ███ | **GOOG-HEWT-00278045** | ██████████ |
| ███ | ███ | ███ | **GOOG-HEWT-00259566** | ██████████ |
| 70.2% | 0.4% | 2013 | Beales and Eisenach (2014) | Econometric model, revenue ~ cookie, Company 1 ██████████ |
| ███ | ███ | ███ | **GOOG-HEWT-00312065** | ██████████ |

74.    Another pattern immediately apparent from Table 1 is that the internal experiments at Google tend to ████████████████████████████████ ████████████████ If we assume conservatively that the references to approximate numbers in internal communications at Google referred to only three distinct underlying experiments either published or revealed by estimates up to the first decimal point, then the average of the three underlying experiments is ████. Either way, these estimates based on the internal experiments at Google are ████ than the average of the remaining estimates, which is 49.2%. The median experimental effect of 65% also exceeds the median effect among the remaining methods of 51.3%.

75.    I do not claim that Table 1 is the exhaustive universe of all existing documents that contain a measure relevant to estimating the effect of User data on Google RTB auction revenue. Should additional sources be produced or otherwise emerge, the meta-analysis can easily be expanded to include them, and my opinion may change as a result.

76.    Table 1 includes both published and unpublished results in order to control for the well-known publication bias. Borenstein *et al.* (2010), page 4, explains that: "the effects of published studies in management are inflated on average by 30% compared to unpublished studies. This so-called publication bias or 'file drawer problem' (Rosenthal 1979) results from the preference of academia to publish more statistically significant and less statistically insignificant study results." Since the only peer-reviewed academic article in the set (Johnson, Shriver and Du (2020)) sits right in the middle of the pack of effects shown in Table 1, publication bias does not seem like a problem in the present setting.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

77.    Another reason for including unpublished academic studies in Table 1 is that the peer-review process is very lengthy (e.g. Johnson, Shriver and Du 2020 took almost three years from the initial submission to the eventual publication). As a result, much of recent rigorous high-quality academic work is still under review in the journals despite its rigor, quality, and relevance to the research question at hand.

78.    To conduct a meta-analysis of the underlying effect, I need to eliminate duplicate analyses of the same data from Table 1. In doing so, whenever a source reports multiple analyses of the same data, I always retain the scientifically more rigorous estimate. I also eliminate all ballpark estimates from internal communications at Google because they may be referring to the same underlying experiments.

79.    To conduct a meta-analysis of the underlying effect among U.S. users on whom the operative complaint focuses, I need to also eliminate estimates derived entirely from non-U.S. users. Therefore, I do not include the estimate from the U.K. CMA (2020) specifically focused on U.K. users, as well as the Laub, Miller and Skiera (2022) estimate based on a on a "large European ad exchange data set that reaches 84% of the internet users in the respective market."[65]

80.    After eliminating the additional analyses based on the same data and foreign studies from Table 1, I am left with 11 independent sources listed in Table 2:

**Table 2: Numerical estimates of the reduction in revenue due to removing the bidders' ability to track users individually, sorted in ascending order, only the data sources taken to meta-analysis**

| Estimated percentage reduction | Standard error (*imputed*) | Data Year | Source | Comments |
|---|---|---|---|---|
| 8.8% | 0.5% | 2016 | Marotta, Abhishek, and Acquisti (2019) | Econometric model, revenue ~ cookie |

---

[65] Laub, Rene and Miller, Klaus and Skiera, Bernd, The Economic Value of User Tracking for Publishers (March 2023). Available at SSRN: https://ssrn.com/abstract=4251233 or http://dx.doi.org/10.2139/ssrn.4251233page . Page 16.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

| | | | | |
|---|---|---|---|---|
| 44.4% | *1.0%* | 2019 | Bidswitch (2020) | Observational data, cookies available vs. not |
| 45.0% | 0.3% | 2021 | Alcobendas, Kobayashi and Shum (2021) | Econometric model, revenue ~ cookie |
| 49.4% | 1.4% | 2013 | Beales and Eisenach (2014) | Econometric model, revenue ~ cookie, Company 2 |
| 51.0% | *1.0%* | 2019 | IAB (2020) | Observational data, IDFA vs. not |
| 52.0% | 2.7% | 2015 | Johnson, Shriver and Du (2020) | Econometric model, revenue ~ opt out |
| **52.0%** | **0.5%** | **2019** | **Ravichandran and Korula (2019)** | **Experiment, absence of cookies** |
| 58.3% | *1.0%* | 2021 | Pubmatic (2021) | Observational data, cookies available vs. not |
| ███ | ███ | ███ | **GOOG-HEWT-00018008** | ████████████ |
| ███ | ███ | ███ | **GOOG-HEWT-00456342** | ████████████ |
| 70.2% | 0.4% | 2013 | Beales and Eisenach (2014) | Econometric model, revenue ~ cookie, Company 1 |

81.    Given the diversity of contexts and sampling strategies involved in my inclusive literature search, the appropriate analysis to use is the random-effect meta-analysis.[66] Following Borenstein *et al.* (2010),[67] the random-effect meta-analysis implies a mean effect of 51.1% with a standard error of 5.9%. Note that this estimate corresponds closely to the average effect in Table 2 because the studies do not vary much in precision. As Borenstein *et al.* explain, the meta-analytic standard error is conservative because of the way they compute the underlying variation across studies. Based on totality of the data, the best estimate of the effect of removing User Data from requests is thus 51.1%, with a standard error of at most 5.9% implying a 95% confidence interval of [39.5%,62.8%]. I conclude that User Data has a highly significant effect on auction revenues in RTB, with at least 51.1% of the revenue directly attributable to the User Data.

---

[66] Michael Borenstein *et al*, *A Basic Introduction to Fixed-Effect and Random Effects Models for Meta-Analysis*, RESEARCH SYNTHESIS METHODS, Vol. 2010 Apr;1(2), pp. 97–111 (2010), at page 13: "When studies are gathered from the published literature, the random-effects model is generally a more plausible match."
[67] Ibid.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

82.     The random-effects meta-analysis based on sources in Table 2 is conservative because it does not exclude the obvious outlier study of Marotta, Abhishek, and Acquisti (2019), a study that has also been widely criticized in the literature. Excluding that study from the meta-analysis would yield a random-effect meta-analytic mean of 55.4% with a standard error of at most 6.2%.

83.     The random-effects meta-analysis based on sources in Table 2 is also conservative to narrowing the context solely to auctions run at Google because compared to an analysis that would analyze only the three experiments from Google. The effects in those ███████████ have an average of █████ with a standard deviation of 8.2%. While directionally ████ than the main estimate of 51.1%, the analysis narrowed to Google sources does not result in statistically significantly █████ estimates because █████ is within the main estimate's 95% confidence interval.

## XI.    MARKET PRICING MODEL: ANNUAL COMPENSATION OF PANELISTS BY DIFFERENT VENDORS

84.     Since 2012, Google has worked with Ipsos (a market research company) to recruit consumers into the Ipsos Screenwise Panel (hereafter "Screenwise Panel"). Members of the Screenwise Panel agree to install various "meters" that track their online behavior. The different types of meters include software that collects information from internet browsers or mobile phones and hardware such as a special router that allows personal tracking across devices.

85.     The "Summary" of the panel's privacy policy states:
- *"Google collects data through its meters, including, for example:*
    - *The content and advertising shown on your devices, and your interactions with that content and advertising, including videos you watched, your emails and SMS, and web pages you've visited.*
    - *Information you input (e.g., text you type) into your devices.*
    - *Cookies and device information.*

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

- *Your participation in the Panel is voluntary. You may end your participation in the Panel at any time by following the instructions provided to you during the sign-up process. You can also temporarily pause or turn off metering at any time.*
- *Google may combine the data collected with other data collected by Google when you're using Google products and services as a Google user. For example, we may combine your panel data with information in your Google Account(s) (e.g., which ads you viewed), or with anonymous or pseudonymous identifiers (such as cookies or unique device identifiers) used by Google products and services.*
- *Google will use the data above in connection with existing Google products and services, to provide, maintain, and improve them, and to develop new ones. For example, we may use this data to conduct analytics and measurement to understand how our services are used, as well as conduct ads-related market research. As another example, we may use this data to improve Google products such as Search, Android, YouTube and Google Assistant..."[68]*

86.    Since the Screenwise Panel compensates its members for being tracked, and the members enter this transaction voluntarily and with full knowledge of the data they are "selling" to Screenwise and how it is to be used, the compensation constitutes a market price for the User Data at the heart of the present matter. The potential usages indicated in the summary prominently include similar types of personalized tracking of usages involved in Google RTB advertising and, to that extent, the Screenwise compensation suggests a market price for the type of data used in RTB.

87.    Screenwise also tracks types of user data that are not included in Google RTB (e.g. content of messages) and unlike Google RTB, which is largely focused on third-party participants that gain access to the User data, Screenwise is a program with primary utility to Google owned and operated products.  Therefore, both the value users place on the data they share with Screenwise and the recipient of the data places on that data may be different than the corresponding values in the context of User Data shared in RTB bid requests. The resulting market price of data sharing on Screenwise is thus only an approximation of the true market price of User Data shared in RTB bid requests, and it is important to corroborate the market price with other sources of evidence, e.g. other markets for sharing personal user data.

---

[68] https://screenwisepanel.com/google-panel-privacy-policy.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

88.    The exact compensation structure of Screenwise Panel participants depends on the number and type of meters the panelist installs. The meters relevant for measuring online behavior are the following three types of software meters: The payment available is $3 per month for installing a piece of tracking software in the Chrome browser. Additional $3 per month is available for installing a tracking app on a mobile phone, and yet additional $3 per month is available for installing a tracking app on a tablet. Based on online reviews of the Screenwise panel, it is also my understanding that the $3 per month per browser can turn into $6 per month if the user installs the browser "meter" on browsers on two different devices.[69]

89.    One key benefit of User Data to third party users is cross-device and cross-website tracking. The average person in the U.S. uses about 3 devices connected to IP networks,[70] so cross-device tracking is important for tracking the totality of a single user's behavior. It is therefore conservative to assume that members of the class each use just one device to browse the internet, so the compensation they would earn in the Screenwise panel is $3 per month, i.e. $36 per year. My single device assumption is also conservative because both the online reviews and the Screenwise website mention even higher possible rewards available from connecting more than two devices, possibly from multiple household members.[71]

90.    Screenwise is not the only vendor that pays internet users for tracking their online behavior. Another prominent firm that pays users for their personal data is Killi, which claims to have 100 million U.S. accounts, and used three pricing tiers at least until the end of 2020:[72] "Killi has three tiers of data-sharing consent, each more revealing than the last. At a

---

[69]  https://lushdollar.com/the-screenwise-meter-panel/ includes a reward tier table "taken directly from the app itself", which shows weekly "incentives" of $1.00 for "computer only", and $1.50 for "Computer and EITHER Smartphone or Tablet". With four weeks in a month, connecting two devices to Screenwise thus provides a monthly incentive of $6.00.

[70] *Cisco Annual Internet Report* (2020–2023).

[71]  The incentive table documented on https://lushdollar.com/the-screenwise-meter-panel/ shows $2.00 per week for connecting "Computer and Smartphone and Tablet", and Screenwise.com says "Earn up to $16/month Each household member age 13+ earns by joining with their own devices." (last accessed May 19, 2023).

[72]  David Lazarus, *Column: This Company Will Pay You to Share Your Data. Is It Worth It?*, LOS ANGELES TIMES (Dec. 1, 2020), https://www.latimes.com/business/story/2020-12-01/column-privacy-money-for-data-sharing.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

minimum, you'll be asked to provide your date of birth, email address, gender, location, phone number, postal code and country. Beyond that, you can earn more money by viewing client companies' online videos, sharing your browsing habits, taking surveys and sharing transaction data, such as where you shop and how much you spend. Tier 1, 'Intermediate,' pays a base rate of $1 a month. Tier 2, 'Pro,' pays a base $2 monthly. Tier 3, 'Elite,' pays a base $3. The more data you share, and the more you participate in advertisers' marketing efforts, the more you can potentially make."[73] Yahoo Finance reports that "Killi pays users to share location, shopping, browsing, and spending data. It sells that data, and splits the profits with users 50/50…Killi is calling this new monthly payment the Killi Paycheck. Depending on how much data they share, users can earn $1, $2, or $3 each month."[74] More recently, Killi has introduced a fourth "All-Star" tier that pays even more.[75] When Killi members share their profile information, device information, and browsing information, they end up in the "Elite" tier,[76] and effectively share the same type and amount of data as contained in the User Data a Google RTB request shares. I conclude that the $3 per month (i.e. $36 per year) compensation for the "elite" Killi tier is the most relevant estimate of the fair market price of the User Data at issue in this case.

91.    Yet another company that paid users for their personal data was Datacoup, which reportedly paid users "up to $8 a month" for "directly linking online activity and spending" by linking browsing history and credit-card transactions.[77] Such a linkage is certainly possible with personalized tracking, so Datacoup's business model effectively paid people for tracking them personally. However, the data was reportedly only resold without personally identifiable information: "When you start selling your data, we combine it with all

---

[73] Ibid.
[74]    https://www.finance.yahoo.com/lifestyle/killi-featured-business-insider-124500261.html (last accessed Mar. 15, 2023).
[75] https://killi.io/faqs/what-are-the-different-killi-paycheck-tiers/ (last accessed July 7, 2023).
[76] Ibid.
[77] Sam Hawrylack, *Apps that Pay You for Data Collection*, CREDITDONKEY (June 12, 2021), https://www.creditdonkey.com/best-apps-data-collection.html and https://slate.com/technology/2014/02/personal-data-is-worth-8-a-month-to-startup-datacoup.html (last accessed Mar. 15, 2023).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

the other Datacoup users' data, take out anything personally identifiable, and then analyze the large pool, looking for patterns across different demographics and other data characteristics."[78] In February 2014, the site paid an average of $1.56.[79] The annual compensation of Datacoup users thus amounted to about $19. So even if personal details were actually removed from the personal data shared by users, the users still received an average of about $19 per year for allowing Datacoup to track their online behavior.

92.     More recently, a firm called Datacy (founded in 2021) also started paying internet users for their data. Shubham Agarwal of Digital Trends explains that "Datacy puts your data up for sale, alongside other users, and depending on how much buyers bid on it, it deposits a monetary amount in your account. It usually ranges from $5 to $10."[80] An article in TechCrunch documents that "Datacy is a tool that allows individuals to collect their browsing data, manage it, have it anonymized and aggregated with others and then sold. The end-user gets 85% of the resulting revenue, while Datacy takes 15%."[81] So even if personal details are actually removed from the tracking information, users still receive an average of at least $60 per year, for allowing Datacy to track their online behavior.

## XII.    MARKET PRICING MODEL: MARKET PRICE OF USER DATA INVOLVED IN PERSONALIZED TRACKING

93.     The preceding section documented annual compensation several prominent vendors offer their customers as compensation for sharing personalized tracking data. Table 3 below summarizes the annual compensation amounts at the different vendors.

---

[78] Adam Tanner, *Others You're your Data for Free, This Site Pays* Cash, FORBES (Mar. 3, 2014), https://www.forbes.com/sites/adamtanner/2014/03/03/others-take-your-data-for-free-this-site-pays-cash/.

[79] Ibid.

[80] Shubham Agarwal, *Should Big Tech Pay Youyou're your Data? It's Possible, but Also Problematic*, DIGITALTRENDS (June 13, 2021), https://www.digitaltrends.com/mobile/big-tech-pay-users-for-data/ (last accessed Mar. 15, 2023).

[81] Alex Wilhelm, *Datacy Raises $2.4M to Help Consumers Monetize Their Own Damn Data*, TECHCRUNCH (May 26, 2021), https://techcrunch.com/2021/05/26/datacy-raises-2-4m-to-help-consumers-monetize-their-own-damn-data/.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Table 3: Annual compensation for sharing User Data**

| Vendor | Annual compensation |
|---|---|
| Screenwise | $36 |
| Datacy | $60 |
| Datacoup | $19 |
| Killi | $36 |
| Average | $38 |

94.    The four compensation amounts in Table 3 are of the same order of magnitude, with Datacoup as the low-end outlier. In the absence of additional data about the relative prominence or importance of the different vendors, the industry-wide average compensation is a good measure of the average market price of personal tracking information. I therefore conclude that the market price of User Data is $38 per year per user.

95.    As explained above, the $36 market price of data sharing on the Google partner vendor Screenwise is only an approximation of the true market price of User Data shared in RTB bid requests. The prices at the other three vendors effectively corroborate the Screenwise price level, with the average compensation almost exactly matching it. My interpretation of the clustering of the four prices in Table 3 around the Screenwise price level is that there is a common market for user data on the internet, the market includes the Google partner Screenwise as a competitor, and the market has converged to a common market price of user data which is highly relevant to the market price of the User Data shared in Google RTB bid requests.

96.    To evaluate the precision of my estimate, I interpret the four vendors in Table 3 as four independent observations of the underlying market price. This allows me to characterize the standard error of the estimate.[82] The resulting standard error estimate is $8.4. In other words, the 95% confidence interval of the market price estimate in the previous paragraph is [$21,$54].

---

[82] The standard error is the standard deviation of the observation divided by two (the square root of the number of observations).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

97. Another source of data about the compensation in a tracking panel comes from



## XIII. SUMMARY AND CONCLUSIONS

98. Internet users' User Data shared with bidders during the RTB process drives just over half of Google's RTB revenues. I conducted a meta-analysis of eleven diverse and distinct sources of evidence about the magnitude of the effect, including Google's own experiments, rigorous academic studies, and industry studies based on both observational and experimental data, and my best estimate is that 51.1% of Google's RTB revenue can be attributed to the User Data about users at issue in the present dispute. The 95% confidence interval of the underlying effect is [39.5%,62.8%].

99. My best estimate is conservative for the following reasons:

- much of the evidence only relies on withholding a few pieces of the multidimensional User Data, and Google's own experiments indicate that ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- the meta-analysis did not exclude any outliers, not even one widely criticized observational study with an estimate order of magnitude lower than the ten other estimates. A large majority of the individual estimates (7 out of 11) is tightly clustered within 10 percentage points of the estimate.

- if one were to focus only on the ▮▮ Google's own experiments available to me in the record, the estimate would be ▮▮ In fact, every single one of those

---

[83] GOOG-HEWT-00265743.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

experiments implies a █████ magnitude of the effect than my best estimate based on the totality of the data.

100.    A growing market for personal tracking information exists. In this market, users voluntarily agree to share their user data with intermediary vendor companies in exchange for a monthly payment, with very few strings attached regarding the subsequent usage of their data. The users are thus effectively selling their personal user data to the vendors. I conducted a broad analysis of this market, and found four independent vendors who compensate their users with $38 per year on average, and whose individual prices are relatively tightly clustered around this average. This average compensation amount of $38 per year is my best estimate of the fair market price of the User Data about users at issue in the present dispute. Based on the variation of the compensation amounts across the four vendors, my 95% confidence interval of the $38 market price estimate in the previous paragraph is [$21,$54].

101.    This report supports calculations under the unjust enrichment model of damages and the market price model of damages. Both damages models, as well as my approach to informing both damage models is based on a well-accepted methodology given the data limitations I face at this time. The modeling I perform and the results it generates are based on information produced to date, and it is my understanding that the plaintiffs have requested additional data. I reserve the right to refine my model and update the report accordingly based on additional evidence.

Executed on July 14, 2023 in Los Angeles, California.

Robert Zeithammer, Ph.D.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## APPENDIX 1: CURRICULUM VITAE

## EMPLOYMENT

2019-present :  Professor of Marketing,  **UCLA Anderson School of Management**

2013-present :  Associate Professor of Marketing (with tenure),  **UCLA Anderson School of Management**

2007-2013 :  Assistant Professor of Marketing,  **UCLA Anderson School of Management**

2003-2007 :  Assistant Professor of Marketing,  **University of Chicago Graduate School of Business**

2022: Visiting Research Scholar, **Judge Business School, Cambridge University**

2018: Visiting Associate Professor of Marketing, **Hong Kong University of Science and Technology**

## EDUCATION

PhD in Management Science, MIT Sloan School of Management, 2003

**MA** in Mathematics**, University of Pennsylvania,** 1998

**BA** in Economics & Mathematics (Phi Beta Kappa, summa cum laude**), University of Pennsylvania,** 1998

## APPLIED AND PROFESSIONAL PUBLICATIONS

1.  Product Labeling Class Actions—Identifying the 'Con' in Conjoint Surveys (with John Tomlin). *Bloomberg Law*. November 1, 2018.

2.  The pivotal role of fairness: Which consumers like annuities? (with Suzanne Shu and John Payne). *Financial Planning Review* 1(3-4): 1:e1019. 2018.

## REFEREED JOURNAL PUBLICATIONS

3.  The Impact of a Supreme Court Decision on the Preferences of Americans regarding Abortion Policy (with Raphael Thomadsen and Song Yao). *Management Science.* forthcoming. 2023.

4.  Soft Floors in Auctions. *Management Science* 65(9): 3949-4450. 2019.

5.  Beyond Posted Prices: The Past, Present, and Future of Participative Pricing Mechanisms (Choice Symposium paper with Spann, M., Zeithammer, R., Bertini, M., Haruvy, E., Jap, S.D., Koenigsber, O., Mak, V., Leszczyc, P.P., Skiera, B., and Thomas, M.), *Customer Needs and Solutions* 5(1–2),121–136. 2018.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

6. Bidding For Bidders? How the Format for Soliciting Supplier Participation in NYOP Auctions Impacts Channel Profit (with Scott Fay), *Management Science* 63(12):4324-4344. 2017.

7. The Modern Advertising Agency Selection Contest: A Case for Stipends to New Participants (with Dan Horsky and Sharon Horsky), *Journal of Marketing Research* 53(5), 773-789. 2016.

8. Consumer Preferences for Annuities: Beyond NPV (with Suzanne Shu and John Payne), *Journal of Marketing Research*. 53 (2), 240-262. 2016.
   - **Paul Green Award** for best paper in *JMR*, finalist. 2016.

9. Optimal selling strategies when buyers name their own prices, *Quantitative Marketing and Economics* 13(2): 135-171. 2015.

10. Pay What You Want as a Marketing Strategy in Monopolistic and Competitive Markets (with Klaus M. Schmidt and Martin Spann), *Management Science* 61(6): 1217-1236. 2015.
    - Best Paper Award by **German Academic Association for Business Research**. 2015.

11. The Hesitant Hai Gui: return-migration preferences of U.S.-educated Chinese scientists and engineers (with Ryan Kellogg), *Journal of Marketing Research* 50(5): 644-663. 2013.

12. Vertical Differentiation with Variety-Seeking Consumers (with Raphael Thomadsen), *Management Science* 59(2): 390-401. 2013.

13. A reflection on analytical work in marketing: three points of consensus (with others, a Choice Symposium paper, co-organizer of the session with Raphael Thomadsen), *Marketing Letters* 23(2): 381–89. 2012.

14. The sealed-bid abstraction in online auctions (with Christopher Adams), *Marketing Science* 29(6): 964-987. 2010.
    - **Lead article with invited comments.**
    - Rejoinder to invited comments: Causes and implications of some bidders not conforming to the sealed bid abstraction (with Christopher Adams), *Marketing Science* 29(6): 998-1000, 2010.

15. Optimal reverse-pricing mechanisms (with Martin Spann and Gerald Haübl), *Marketing Science* 29(6): 1058-1070. 2010.
    - Erratum to Optimal reverse-pricing mechanisms (with Martin Spann and Gerald Haübl), *Marketing Science* 34(2): 297-299. 2015.

16. Statistical benefits of choices from subsets (with Peter Lenk), *Journal of Marketing Research* 46(4), 816-831, 2009.
A.
17. Commitment in sequential auctioning: advance listings and threshold prices, *Economic Theory* 38(1), 187-216, 2009.

18. Strategic bid-shading and sequential auctioning with learning from past prices, *Management Science* 53 (9), 1510-1519, 2007.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

19. Optimal selling in sequential auctions: Commitment vs. Adaptation, *Marketing Science* 26 (6), 859-867, 2007.

20. Forward-looking bidding in online auctions, *Journal of Marketing Research* 43(3), 462-476, 2006.

21. Bayesian estimation of multivariate Normal models when dimensions are absent (with Peter Lenk), *Quantitative Marketing and Economics* 4(3), 241-265, 2006.

22. Economics, psychology, and social dynamics of consumer bidding in auctions , (with others, a Choice Symposium paper), *Marketing Letters* 16(3 - 4), 401-13, 2005.

23. Forecasting new product trial in a controlled test market environment, (with Bruce Hardie and Peter Fader), *Journal of Forecasting* 22, 391-410, 2003.


**PROFESSIONAL SERVICE**

Associate Editor
  *Management Science* (since 2021)
  *Operations Research* (since 2016)
  *Quantitative Marketing and Economics* (since 2014)
  *Customer Needs and Solutions* (since 2013)
Member of the Editorial Review Board:
  *Marketing Science* (2007-2022)
  *Journal of Marketing Research* (2010-2012, and 2021-)
  *International Journal of Research in Marketing* (since 2011)
*National Science Foundation*, panelist, 2012.

**ACADEMIC HONORS AND AWARDS**

Eric and "E" Juline Faculty Excellence in Research Award, Anderson School of Management, 2011
Marketing Science Institute's Young Scholar, 2009.
Management Science Meritorious Service Award, 2010.
AMA-Sheth Doctoral Consortium (Student Fellow), 2002.
Phi Beta Kappa, 1998

**TEACHING**

**Global Immersion: Doing Business in Central Europe** (UCLA MBA elective), Fall 2015, Fall 2018
**Customer Assessment and Analytics** (UCLA MBA elective)**:** Winter 2014 - present
**Marketing Management** (UCLA MBA core course): Winter 2012 - present
**Marketing Management II** (UCLA MBA core course, quantitative part): 2007 - 2011
**Marketing Strategy** (Chicago MBA core course): 2003-2007
**UCLA Medical Marketing Executive Program:** 2007 - present
**Analytical modeling in marketing (PhD course):** Fall 2014, Winter 2017, Spring 2019
**Business Fundamentals for Analytics – Marketing:** Winter 2019 - present

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## APPENDIX 2: TESTIMONY IN LAST 4 YEARS

*Capture Eleven Group v. Otter Products, et al.*
Retained by counsel for defendant.
United States District Court, District of Colorado. Case No. 20-cv-2551.
Expert report (December 2022). Deposition (January 2023).

*Will Kaupelis and Frank Ortega, et al. v. Harbor Freight Tools USA*, Inc.
Retained by counsel for defendant.
United States District Court, Central District of California. Case 8:19-cv-01203.
Expert report (June 2020). Deposition (August 2020).

*Annette Navarro, et al. v. Procter & Gamble, et al*.
Retained by counsel for defendant.
United States District Court, Southern District of Ohio. Case 17-cv-00406.
Expert report (February 2020). Deposition (June 2020).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**APPENDIX3: INFORMATION RELIED UPON**

**Production materials**

GOOG-HEWT-00018008

GOOG-HEWT-00035713

GOOG-HEWT-00126877

GOOG-HEWT-00188498

GOOG-HEWT-00191932

GOOG-HEWT-00259566

GOOG-HEWT-00261158

GOOG-HEWT-00278045

GOOG-HEWT-00287442

GOOG-HEWT-00312065

GOOG-HEWT-00317558

GOOG-HEWT-00456109

GOOG-HEWT-00456341

GOOG-HEWT-00456342

GOOG-HEWT-00456344

GOOG-HEWT-00456346

GOOG-HEWT-00265743

**Publicly available materials**

Consolidated Class Action Complaint, In re Google RTB Consumer Privacy Litigation,   Case No. 4:21-cv-02155-YGR (Docket No. 92)

Alcobendas, Miguel and Kobayashi, Shunto and Shum, Matthew, The Impact of Privacy Measures on Online Advertising Markets (February 10, 2021). Available at SSRN: https://ssrn.com/abstract=3782889 or http://dx.doi.org/10.2139/ssrn.3782889

Beales JH, Eisenach JA (2014) An empirical analysis of the value of information sharing in the market for online content. Navigant Economics working paper.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

Borenstein M, Hedges LV, Higgins JP, Rothstein HR. A basic introduction to fixed-effect and random-effects models for meta-analysis. Res Synth Methods. 2010 Apr;1(2):97-111.

Cho, C.-H., & Cheon, H. J. (2004). Why Do People Avoid Advertising on the Internet? Journal of Advertising, 33(4), 89–97.

Drèze, X., & Hussherr, F. X. (2003). Internet advertising: Is anybody watching?. Journal of interactive marketing, 17(4), 8-23.

Garrett A. Johnson, Scott K. Shriver, and Shaoyin Du (2020) Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry? Marketing Science 39:1, 33-51.

Goldfarb, Avi, (2014), What is Different About Online Advertising?, Review of Industrial Organization, 44, issue 2, p. 115-129

Hansen, C., Steinmetz, H. & Block, J. How to conduct a meta-analysis in eight steps: a practical guide. Management Review Quarterly 72, 1–19 (2022).

https://9to5mac.com/2019/12/09/apple-safari-privacy-feature-ads/

https://www.creditdonkey.com/best-apps-data-collection.html

https://slate.com/technology/2014/02/personal-data-is-worth-8-a-month-to-startup-datacoup.html (last accessed 3/15/2023)

https://lushdollar.com/the-screenwise-meter-panel/

https://pubmatic.com/wp-content/uploads/2021/08/IDFA-Opt-In-Impact Infographics.pdf?utm_source=website_reports&utm_medium=research_2021&utm_campaign= envision_2021&utm_content=idfa_infographic

https://screenwisepanel.com/google-panel-privacy-policy

https://services.google.com/fh/files/misc/disabling_third-party_cookies_publisher_revenue.pdf

https://techcrunch.com/2021/05/26/datacy-raises-2-4m-to-help-consumers-monetize-their-own-damn-data/

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

https://www.bidswitch.com/wp-content/uploads/2020/03/BidSwitch-Programmatic-Insights-2019.pdf.

https://www.digitaltrends.com/mobile/big-tech-pay-users-for-data/ (last accessed 3/15/2023)

https://www.iab.com/insights/the-socioeconomic-impact-of-internet-tracking/

https://www.latimes.com/business/story/2020-12-01/column-privacy-money-for-data-sharing

https://www.finance.yahoo.com/lifestyle/killi-featured-business-insider-124500261.html    (last accessed 3/15/2023)

https://www.forbes.com/sites/adamtanner/2014/03/03/others-take-your-data-for-free-this-site-pays-cash/ (last accessed 6/29/2023)

IAB Internet Advertising Revenue Report, 2010 Full year results. April 2011.

IAB Internet Advertising Revenue Report. 2021

Laub, Rene and Miller, Klaus and Skiera, Bernd, The Economic Value of User Tracking for Publishers (October 18, 2022March 20, 2023). Available at SSRN: https://ssrn.com/abstract=4251233 or http://dx.doi.org/10.2139/ssrn.4251233

Levin, J., & Milgrom, P. (2010). Online Advertising: Heterogeneity and Conflation in Market Design. The American Economic Review 100(2), 603–607.

Marotta, V., V. Abhishek, and A. Acquisti (2019): Online tracking and publishers' revenues: An empirical analysis," WEIS 2019 Discussion paper, Working paper.

O'Connor, Sean, Ryan Nurwono, Aden Siebel, and Eleanor Birrell. "(Un) clear and (In) conspicuous: The right to opt-out of sale under CCPA." In Proceedings of the 20th Workshop on Workshop on Privacy in the Electronic Society, pp. 59-72. 2021.

Ravichandran, Deepak and Nitish Korula (August 27, 2019) "Effect of disabling third-party cookies on publisher revenue"

Singel, Ryan (2010) Oct. 27, 1994: Web Gives Birth to Banner Ads. Wired.com.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

UK Competition and Markets Authority (2020) "Online platforms and digital advertising market study", https://www.gov.uk/cma-cases/online-platforms-and-digital-advertising-market-study

Cisco Annual Internet Report, 2020-2023. https://www.cisco.com/c/en/us/solutions/executive-perspectives/annual-internet-report/ (last accessed 6/29/2023)

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.