# EXHIBIT F

## (REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 4

# FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation*, | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

**EXPERT CLASS CERTIFICATION REPORT OF**

**GREG J. REGAN, CPA/CFF, CFE**

**July 14, 2023**

**UNREDACTED VERSION SUBMITTED CONDITIONALLY UNDER SEAL**

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ................................................................................................... 1

    A.    Summary of Plaintiffs' Allegations ....................................................... 1

    B.    Assignment ............................................................................................ 2

    C.    Qualifications ......................................................................................... 4

    D.    Summary of Opinions ............................................................................ 6

II.   BACKGROUND ................................................................................................... 6

    A.    Overview of Google's Business and Advertising Services ..................... 7

    B.    Google's RTB Platform Generates Advertising Revenue ..................... 12

III.  CALCULATION OF DEFENDANT'S PROFITS ............................................. 13

    A.    The Methodology to Calculate Defendant's Profits ............................ 13

        1.    Identification of Google's RTB Revenues................................. 13

        2.    Apportionment of Google's RTB Revenues to the Value of the Personal Information Google Alleged to be Improperly Sold in RTB Auctions .... 15

        3.    Potential Costs Incurred by Google for RTB........................... 19

        4.    Summary of Defendant's Profits ............................................. 21

    B.    Methodology to Allocate an Unjust Enrichment Award to Class Members ........ 22

    C.    Limitations of Google's Document Production Related to the Calculation of Defendant's Profits ............................................................................ 23

IV.   CALCULATION AND ALLOCATION OF DAMAGES.................................... 25

## I.    INTRODUCTION

### A.    Summary of Plaintiffs' Allegations

1.      Plaintiffs Christopher Valencia, John Kevranian, Terry Diggs, Kimberley Woodruff, Rethena Green, Salvatore Toronto, and Tara Williams ("Plaintiffs") bring this proposed class action against Defendant Google LLC on behalf of all Google account holders subject to a United States Google Terms of Service ("TOS") whose personal information was sold or shared by Google in its Real Time Bidding ("RTB") auctions after June 28, 2016.[1]

2.      The Plaintiffs allege that Google makes two core promises to users who sign up for a Google account: 1) Google will not sell their personal information to third parties, and 2) Google account holders make the decisions regarding how their information is used.[2]

3.      Plaintiffs assert that their relationship with Google is governed by contractual agreements, including, among others, Google's United States TOS and Privacy Policy.[3] Plaintiffs claim that these agreements precluded Google from sharing or selling their personal information with or to third parties - consistent with Google's promises.[4]

4.      Since before the start of the Class Period (June 28, 2016), Google has maintained and operated its RTB auction platform, through which it generates revenue by selling digital advertisements to third party companies.[5] Plaintiffs contend that Google violates its promises to

---

[1] Plaintiffs' Motion for Class Certification, p.ii.
[2] Consolidated Class Action Complaint ("CCAC") ¶ 1, citing to Ex. 25 ("Google's Sundar Pichai: Privacy Should Not Be a Luxury Good," The New York Times, May 7, 2019, "To make privacy real, we give you clear, meaningful choices around your data. All while staying true to two unequivocal policies: that Google will never sell any personal information to third parties; and that you get to decide how your information is used."). *See also* "Google Safety Center: Ads and data," https://safety.google/privacy/ads-and-data/ (accessed June 11, 2023).
[3] *E.g.*, CCAC ¶¶ 70-73.
[4] *E.g.*, "How Our Business Works," Google, https://about.google/intl/ALL_us/how-our-business-works/ (accessed June 11, 2023), "Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to. We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you. We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information."
[5] CCAC ¶ 7.

---

Google account holders by sharing and selling their personal information with or to hundreds of companies around the world that participate in Google RTB auctions and bid for advertisements.[6] Specifically, I understand that in the Google RTB auctions, Google provides "unique identifier" information such as cookies, location, device ID numbers, and other data that allows RTB participants to track users over time and across devices, even if those participants do not actually bid in the auctions. I further understand that some RTB participants use this information to also compete for ad space to send users advertisements at specific prices by bidding in Google RTB auctions.[7]

5.      The Plaintiffs allege that Google's use of Google account holders' personal information in this manner breaches Google's TOS, violates privacy laws, and entitles Plaintiffs and the Class to compensation.[8] Plaintiffs specifically and further allege that Google has been unjustly enriched by the undisclosed sharing and sale of their personal information through Google RTB.[9]

6.      I understand that the Plaintiffs are filing a motion for class certification, that the named Plaintiffs are Google account holders residing in the U.S., and that none of the named Plaintiffs consented to Google sharing or selling their personal information with or to third parties. I further understand that all Google U.S. account holders similarly situated to the named Plaintiffs are potential members of the Class.[10]

**B.      Assignment**

7.      My firm, Hemming Morse, LLP ("HM"), was retained by Plaintiffs' counsel in *In re: Google RTB Consumer Privacy Litigation*, Case No. 4:21-cv-02155-YGR-VKD.

---

[6] CCAC ¶ 4.
[7] CCAC ¶ 7.
[8] CCAC ¶¶ 30, 352.
[9] CCAC ¶ 350.
[10] As discovery in this matter continues, my understanding of the composition of the Class may be refined further.

8.      I have been retained to evaluate appropriate methodologies to measure the impact of Google's allegedly improper sale of personal information through Google RTB related to the proposed Class from June 28, 2016 to present ("Class Period"). Based on my experience and understanding, Google's unjust enrichment is an appropriate methodology in these circumstances.[11]

9.      I have also been asked to determine the feasibility of identifying and calculating Google's unjust enrichment. The methodology to calculate unjust enrichment involves identification of gross revenue then deducting relevant costs.[12] For this reason, this methodology is frequently referred to as an accounting of "Defendant's Profits."[13] Certified Public Accountants ("CPAs") are frequently called upon to calculate unjust enrichment.[14]

10.     I have also been asked to determine whether there is a methodology by which any unjust enrichment award or other award of damages can be allocated to the Class.

11.     Finally, I was asked to calculate the Plaintiffs' damages as a result of Google's sharing of their personal tracking information with third parties.[15]

---

[11] Restatement of the Law, Restitution and Unjust Enrichment 3d, Part III Remedies, Chapter 7 – Remedies, Topic 1 - Restitution Via Money Judgment: The Measure of Unjust Enrichment, § 51 Enrichment by Misconduct; Disgorgement; Accounting (hereafter "Restatement 3d"), "(4) Unless the rule of subsection (2) imposes a greater liability, the unjust enrichment of a conscious wrongdoer, or of a defaulting fiduciary without regard to notice or fault, is the net profit attributable to the underlying wrong."

[12] Restatement 3d, Comment "h" Deductions and credits, "As a general rule, the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement."

[13] Restatement 3d, Comment "a", "Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.' Other cases refer to an 'accounting' or an 'accounting for profits.' Whether or not these terms are employed, the remedial issues in all cases of conscious wrongdoing are the same. They concern the identification and measurement of those gains to the defendant that should be regarded as unjust enrichment, in that they are properly attributable to the defendant's interference with the claimant's legally protected rights."

[14] *See, e.g.*, American Institute of CPAs ("AICPA") Forensic and Valuation Services Practice Aid, *Calculating Damages in Intellectual Property Disputes*, Fourth Edition, Ch. 5, Unjust Enrichment.

[15] *E.g.*, CCAC ¶ 300.

---

### C.    Qualifications

12.    I am a Partner in the Forensic Consulting Services Group of Hemming Morse, LLP.[16] I have been licensed as a CPA in California continuously since 1998. I am also licensed as a CPA in New York. I hold the Certified in Financial Forensics ("CFF") certification from the AICPA, which is the national professional organization for CPAs. I am also a Certified Fraud Examiner ("CFE"), which is a certification issued by the Association of Certified Fraud Examiners. I obtained my undergraduate degree from Georgetown University and Masters in Business Administration with an emphasis in Corporate Finance from the University of San Francisco.

13.    My work in the accounting profession includes experience as an auditor at Ernst & Young LLP, as the Controller of a publicly traded company, and as a consultant. Through these roles, I have gained substantial experience working with complex revenue and cost accounting systems. I have analyzed revenue recognition policies and practices in consulting and investigative capacities, as well as in dispute circumstances. I have also analyzed cost accounting systems and practices, including variable and fixed costs of products and services for profitability analysis and on many complex litigation matters. My work has involved extensive analysis of various forms of economic damages, including Defendant's Profits. I have calculated Defendant's Profits in matters involving companies such as Amazon, Avaya, ASML, Beyond Meat, Cisco, Fitbit, and PNC Bank. In these matters, I have implemented methodologies similar to those described herein, including detailed analysis of revenue and costs to determine net profits attributable to the alleged harm.

14.    The AICPA has 650,000 members. The AICPA delegates policy-setting in areas in which CPAs are active to nineteen different executive committees.[17] I have served as a member of the AICPA's Forensic & Valuation Services Executive Committee. This nine-member committee establishes professional standards and guidance for practitioners performing consulting services

---

[16] My expert qualifications, including the testimony I have given, are described in **Appendix A** hereto.

[17] *See* https://www.aicpa.org/about/governance/executivecommittees.html.

that require the application of forensic accounting or valuation-related methodologies. I was the Chair of the AICPA's Economic Damages Task Force from 2010-2013 and served as a member of this task force through 2020. I continue to regularly present at the AICPA's national forensic and valuation services conference. In 2012, I received the AICPA's Forensic Services Volunteer of the Year.

15.    I am also a member of the California Society of Certified Public Accountants and was the Chair of its statewide Forensic Services Section.

16.    The AICPA requires its members to comply with its standards. The AICPA has determined that the services I am performing in this matter are subject to its Statement on Standards for Forensic Services. These standards require me, among other things, to operate with integrity, and to be impartial, intellectually honest, and free of conflicts of interest.

17.    My hourly rate is $590 per hour. My compensation is not dependent on the calculations I have made, the opinions I express, or the outcome of this matter. A list of the sources I considered in preparing this report, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii) may be found in **Appendix B** to this report, as well as the footnotes herein. These sources include documents produced by Google, documents that are publicly available including documents published by Google, testimony, written discovery, and other expert reports.[18]

18.    I am providing this report in support of Plaintiffs' motion for class certification, in accordance with the Court's schedule, and anticipate I may perform further calculations and analysis in the future.[19] This report contains proprietary information designated as "CONFIDENTIAL" and "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" under a Stipulated Protective Order entered in the United States District Court for the Northern District of

---

[18] In addition, other evidence may be produced that could be relevant to my conclusions, including the testimony and reports of other witnesses. Accordingly, I reserve the right to amend my report and supplement my opinions after considering such evidence, if necessary.

[19] I understand the inquiry into the merits of the case will occur at a later date, at which time I may be called upon to offer further analysis or testimony.

California. Accordingly, no part of this report or its contents may be published without adherence to the applicable legal standards governing such publications.

### D.    Summary of Opinions

19.    The table below summarizes my present opinions:[20]

| No. | Opinion |
|---|---|
| 1 | Google maintains data related to RTB transactions in the ordinary course of its business (the "RTB Data"). *See* § III.A.1. |
| 2 | Google's maintenance of the RTB Data is consistent with its requirement to prepare financial statements that comply with generally accepted accounting principles ("GAAP") and its public disclosures that its internal control over financial reporting has been effective. *See* § II.A for further discussion. |
| 3 | The RTB Data maintained by Google is the type of data commonly used by experts performing calculations of unjust enrichment. |
| 4 | The RTB Data may be readily used to quantify RTB revenue related to personal information and related profits, which enables the relief sought by Plaintiffs to be readily quantified on a class-wide basis. *See* § III for further discussion.[21] |
| 5 | The Plaintiffs compensatory damages attributable to Google's sharing of their personal information are $3.17 per month. *See* § IV. |

## II.    BACKGROUND

20.    The section below provides background information regarding Google's sources of revenue, including Google RTB revenue, Google's internal controls, including as it relates to information systems, and other information related to my calculation of unjust enrichment in § III of this expert report.

---

[20] I am not an attorney, a technology expert, or an expert on privacy, and do not offer any opinions regarding the proper description of Google's alleged conduct. Accordingly, for purposes of my analysis, I assume that Plaintiffs will establish liability based on their allegations.

[21] My calculations address unjust enrichment during the Class Period as presently defined. To the extent that the trier of fact determines a different period applies, the calculations presented in this report can be modified using similar methodologies to those described in this report. In addition, this report should not be construed as expressing opinions on matters of law, which are outside of my expertise. To the extent I have interpreted regulations, contracts, agreements, relevant cases, or other evidence, these interpretations necessarily reflect my understanding thereof from a financial perspective.

**A.    Overview of Google's Business and Advertising Services**

21.    Alphabet Inc. ("Alphabet") is a collection of businesses—the largest of which is Google.[22] Google files its periodic financial statements with the Securities and Exchange Commission ("SEC"). The SEC requires Google to "make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect [its] transactions…."[23]

22.    The SEC also requires Google to devise and maintain a system of internal controls to permit preparation of financial statements in conformity with GAAP.[24] As a result, Google is required to track, manage, and maintain data to support the amounts reported as advertising revenue in its financial statements. Google evaluates the effectiveness of its internal control using the framework provided by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").[25] The COSO framework consists of 17 principles to evaluate internal control. Amongst these principles, Principle 13 focuses on an assessment of an entity's information systems. A point of focus of Principle 13 is "Information systems produce information that is timely, current, accurate, complete, accessible, protected, and verifiable and retained."[26] Google

---

[22] On October 2, 2015, Google was reorganized and Alphabet, Inc. became the parent company of Google and several Google subsidiaries and the successor issuer of Google Inc. Google remains the largest business of Alphabet, Inc. Alphabet Inc., Form 10-K for the fiscal year ended December 31, 2020, pp.5 and 26, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm (accessed July 11, 2023).

[23] SEC Recordkeeping and Internal Controls Provisions of the Securities Exchange Act of 1934, § 13(b)(2)(A).

[24] *Id.* at § 13(b)(2)(B)(ii). *See also* Rule 4-01 of SEC's Regulation S-X, "[F]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."

[25] *E.g.*, Alphabet Form 10-K for the fiscal year ended December 31, 2016, p.82, "Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016." https://www.sec.gov/Archives/edgar/data/1652044/000165204417000008/goog10-kq42016.htm (accessed July 11, 2023).

[26] COSO 2013 Framework. *See also* Alphabet Form 10-K for the fiscal year ended December 31, 2019, p.90, "We rely extensively on information systems to manage our business and summarize and report operating results." https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204420000008/goog10-k2019.htm (accessed July 11, 2023).

---

management has certified that it maintained effective systems of internal controls throughout the Class Period, including over its information systems.[27] My understanding of the records Google maintains related to revenues at issue in this litigation derive from these principles.

23.     GAAP require public companies to provide separate disclosure regarding the revenues and profits of each business segment.[28] GAAP states that the "management approach" should be applied to determine the information reported about the segment. That is, a registrant should report information about the segments used by management "for making operating decisions and assessing performance."[29] The objective is to provide information that helps users of the financial statements 1) better understand the entity's performance, 2) better assess its prospects for future net cash flows, and 3) make more informed judgments about the entity.[30]

24.     As relevant to this litigation, Google is comprised of two business segments: Google Services and Google Cloud.[31] Google Services' products include "ads, Android, Chrome, hardware, Gmail, Google Drive, Google Maps, Google Photos, Google Play, Search, and YouTube."[32] Google Cloud includes the Google Cloud platform that provides cybersecurity, data analytics, artificial intelligence, machine learning, and infrastructure.[33]

25.     Google Services generates revenue through placement of advertisements on both Google webpages and apps and third-party webpages and apps that make ad space available

---

[27] Google management expressed the same conclusion in each year during the Class Period as disclosed in its annual Form 10-K filed with the SEC (*e.g.*, Alphabet 2019 Form 10-K, p.90 and Form 10-K for the fiscal year ended December 31, 2018, p.83, https://www.sec.gov/Archives /edgar/data/1652044/000165204419000004 /goog10-kq42018.htm (accessed July 11, 2023)).

[28] Authoritative GAAP is promulgated by the Financial Accounting Standards Board ("FASB") and is contained within the FASB's accounting standards codification ("ASC" or the "Codification"). GAAP applicable to reporting of business segments is presented in ASC 280, *Segment Reporting*.

[29] ASC 280-10-05-3.

[30] ASC 280-10-10-1.

[31] Alphabet Form 10-K for the fiscal year ended December 31, 2022, p.5, https://www.sec.gov /ix?doc=/Archives/edgar/data/0001652044/000165204423000016/goog-20221231.htm (accessed July 11, 2023).

[32] *Id.*

[33] Alphabet 2022 Form 10-K, p.6.

---

through the Google network.[34] Google features Search ads that appear to consumers when they first arrive at Google (*e.g.*, Google Search or Google Maps).[35] Display ads are another type of advertising that Google provides so advertisers can target demographics such as age, gender, parental status or personal interests.[36] Display ads appear on the Google Display Network ("GDN"), which is a group of more than 2 million websites, videos, and apps accessed by Google Ads (formerly Google AdWords).[37]

26.    Google's financial statements filed with the SEC present the discrete results of the Google Services business as a segment. Within the Google Services segment, Google also separately presents Google's advertising revenue as seen in the example below:[38]

**Financial Results**

*Revenues*

The following table presents our revenues by type (in millions).

|  | Year Ended December 31, | |
|---|---|---|
|  | 2019 | 2020 |
| Google Search & other | $    98,115 | $    104,062 |
| YouTube ads | 15,149 | 19,772 |
| Google Network Members' properties | 21,547 | 23,090 |
| Google advertising | 134,811 | 146,924 |

27.    As seen in the example above, Google's financial reporting breaks down advertising revenue based on the location where an advertisement is presented to a consumer. The first and second categories include revenue generated from Google Search and other properties including YouTube ("Google Properties"). In these instances, Google generates revenue by selling advertising on its own webpages.

---

[34] *Id.*
[35] "The Google Network," https://support.google.com/google-ads/answer/1721923?sjid=7108829 557592027444-NA (accessed June 14, 2023).
[36]    "Reach a larger or new audience with Google Display Network targeting," https://ads.google.com/intl/en_id/home/resources/reach-larger-new-audiences/ (accessed June 8, 2023).
[37] *Id.*
[38] *See, e.g.*, Alphabet 2020 Form 10-K, p.33 (emphasis added).

28.     Google's financial reporting also identifies "Google Network Members' properties" as a third category.[39] In these instances, Google displays advertisements on third-party properties. Google pays the third parties a percentage of the related revenue recognized by Google.[40]

29.     The following table includes Google's publicly reported advertising revenues for "Google Properties"[41] and "Google Network Members' Properties" from 2017 through 2022:[42]

**Figure 1**

| Advertising Revenue ($s in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Google Properties | $77,961 | $96,451 | $113,264 | $123,834 | $177,796 | $191,693 |
| Google Network Members' Properties | $17,616 | $20,010 | $21,547 | $23,090 | $31,701 | $32,780 |
| Total Advertising Revenue | $95,577 | $116,461 | $134,811 | $146,924 | $209,497 | $224,473 |

30.     Google also tracks the geographic origin of its revenue. One way that Google determines the amount of revenue attributable to United States customers is the customer's billing address.[43] From 2017 through 2022, approximately 50% of Google's revenue has been generated from customers in the United States.[44] The table below illustrates Google's ability to identify revenue by geographic location:[45]

---

[39] *Id.*

[40] *E.g.*, "AdSense revenue share," "For displaying ads with AdSense for content, publishers receive 68% of the revenue recognized by Google in connection with the service. For AdSense for search, publishers receive 51% of the revenue recognized by Google." https://support.google.com/adsense/answer/180195?hl=en (accessed June 8, 2023).

[41] "Google Properties" advertising revenue include the revenue associated with "Google Search" and "YouTube Ads." Alphabet 2019 Form 10-K, p.60.

[42] Alphabet 2019 Form 10-K, pp.60-61 and Alphabet 2022 Form 10-K, p.59.

[43] *E.g.*, Alphabet Form 10-K for the fiscal year ended December 31, 2017, p.32, https://www.sec.gov/Archives/edgar/data/1652044/000165204418000007/goog10-kq42017.htm (accessed July 11, 2023).

[44] Alphabet 2019 Form 10-K, pp.60-61 and 2022 Form 10-K, p.59.

[45] Alphabet 2018 Form 10-K, p.30.

**Revenues by Geography**

The following table presents our revenues by geography as a percentage of revenues, determined based on the addresses of our customers:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| United States | 47% | 47% | 46% |
| EMEA | 34% | 33% | 33% |
| APAC | 14% | 15% | 15% |
| Other Americas | 5% | 5% | 6% |

For the amounts of revenues by geography, please refer to Note 2 of the Notes to Consolidated Financial Statements included in Part II, Item 8 of this Annual Report on Form 10-K.

31.    Further, Google tracks and reports monetization metrics it uses to measure the performance of its business in its SEC financial statement filings. For example, Google presents data regarding "Paid clicks" and "Impressions."[46]

32.    Google's financial reporting reflects its ability to access and analyze internal data to dissect specific reasons underlying changes in these metrics. For example, in 2020, Google attributed the increase in "Paid clicks" to "clicks relating to ads on Google Play."[47] Likewise, the growth in Impressions was attributed to Google Ad Manager activity.[48] Moreover, Google periodically reviews, refines, and updates its methodologies to report its monetization metrics.[49] When Google modifies its methodologies, it has been able to recast previously reported monetization metrics because it maintains the historical data to do so.[50] The ability to readily revise historical metrics using its available data is consistent with Google's assertions of effective internal control and recordkeeping.

---

[46] *E.g.*, Alphabet 2020 Form 10-K, p.35.
[47] *Id.*
[48] *Id.*
[49] *E.g.*, Alphabet 2020 Form 10-K, p.35.
[50] *E.g.*, Alphabet 2020 Form 10-K, p.34 (describing the method to modify the paid click reporting for current and prior periods after making a change to the treatment of YouTube engagement ads).

**B.    Google's RTB Platform Generates Advertising Revenue**

33.    As seen in the document excerpted below, Google documents describe the [REDACTED][51]



34.    According to Google, [REDACTED] [REDACTED][52] [REDACTED]es.[53] Google's [REDACTED]"[54] Accordingly, Google's RTB revenue is reported as a subset of "Advertising Revenue" from "Google Network Member Properties."[55]

---

[51] Levitte Tr. 136:6-11 and 137:1-139:8. *See also* GOOG-HEWT-00481225 at 225, "[REDACTED] [REDACTED]" I understand that discovery is ongoing and that other sources of revenue may be involved.

[52] Levitte Tr. 138:3-10. *See also* "Authorized Buyers Program Guidelines" available at https://www.google.com/intl/en/authorizedbuyers/guidelines/ (accessed June 28, 2023).

[53] Levitte Tr. 138:18-25 and 46:12-16 including "Q. Could you please describe to me what open bidding is so that I could understand how it's a subset of real-time bidding? A. Open bidding is an RTB product for third party SSPs. Q. What is an SSP? A. SSP stands for supply side platform." *See also* "Bring more bids to the auction with Open Bidding" available at https://admanager.google.com/home/resources/feature-brief-open-bidding/ (accessed June 28, 2023).

[54] *See, e.g.*, GOOG-HEWT-00248735 at 736, [REDACTED]; GOOG-HEWT-00179902 at 903, "[REDACTED]." *See also* Levitte Tr., 62:5-12 and 67:10-21, [REDACTED] [REDACTED]"

[55] Alphabet 2020 Form 10-K, p.34, "Google Network Members' properties consist of revenues generated on Google Network Members' properties participating in AdMob, AdSense, and Google Ad Manager."

---

### III.     CALCULATION OF DEFENDANT'S PROFITS

#### A.     The Methodology to Calculate Defendant's Profits

35.     Ultimately, the objective of a Defendants' Profits calculation is to isolate the portion of profits attributable to the alleged harmful act.[56] Accordingly, the first step in my analysis is to identify Google's RTB revenues during the Class Period (*see* § III.A.1).[57] My second step is to apportion Google's RTB revenues to the value generated by the alleged improper use of personal information (*see* § III.A.2).[58] Finally, it is appropriate to deduct identifiable marginal costs associated with those revenues to determine the profits from the relevant revenues (*see* § III.A.3).[59] These steps are further described in the following sub-sections.

#### 1.     Identification of Google's RTB Revenues

36.     Google does not publicly disclose Google RTB revenue. In response to discovery served by Plaintiffs, however, Google produced a spreadsheet itemizing Google's gross[60] RTB revenues from the beginning of 2017 through the end of June 2022. These ███████████

---

[56] Restatement 3d, (a) General principles and scope, "The principal focus of § 51 is on cases in which unjust enrichment is measured by the defendant's profits, where the object of restitution is to strip the defendant of a wrongful gain (§§ 3, 49(4))."

[57] Guidance available to damages experts regarding the calculation of unjust enrichment generally exists in the context of intellectual property damages. *E.g.*, AICPA Practice Aid, *Calculating Intellectual Property Damages* ("AICPA IP PA"), p.24, "Unjust enrichment is a damage measure that is frequently employed in intellectual property litigation." *Id.*, p.87, "[T]he burden to prove the affected revenue stream falls on the plaintiff."

[58] Restatement 3d, (g) Apportionment; AICPA IP PA, p.87.

[59] *See, e.g.*, Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, prepared by the Ninth Circuit Jury Instructions Committee, 2017 Edition updated March 2023 (hereafter "Ninth Circuit Model Jury Instructions"), § 15.29 Trademark Damages—Defendant's Profits, "The defendant has the burden of proving the expenses [and the portion of the profit attributable to factors other than use of the infringed trademark] by a preponderance of the evidence." *See also* AICPA IP PA, p.87.

[60] Google discloses that revenue is generally reported on a gross basis for Google Network properties and the amounts paid to the Google Network partners are recorded as a cost of revenues. (Alphabet 2022 Form 10-K, p.53). *See also* GOOG-HEWT-00046522, ███████████████████████ ; GOOG-HEWT-00359560, ███████████

---



███████████████████████████.[61] Google's RTB revenue for ███████ is summarized in the figure below:[62]

**Figure 2**



37.    As described above, the data provided by Google includes gross RTB revenues from January to June 2022. I annualized those results to estimate full year results for 2022 as presented in Figure 2. As Google's 2022 fiscal year is now complete, Google has the ability to provide actual RTB gross revenue numbers for all of 2022. Google also presumably has the ability to provide actual RTB gross revenue numbers for the second half of 2016 (July to December 2016) and whatever portion of 2023 is also within the proposed Class Period.

38.    The gross Google RTB revenue amounts set forth in Figure 2 above (and in the underlying spreadsheet produced by Google) appear ████████████████ with other documents produced by Google that I have reviewed that measure ████████████, including GOOG-HEWT-00456348, ████████████████████ GOOG-HEWT-

---

[61] Google LLC's Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 11-12), No. 11 indicating "'US User' means a user accessing the internet using a device with an IP address that Google associated with a location within the United States at the time the user was shown an ad that generated revenue." *See also id.* indicating "The row entitled 'US User Total' includes gross revenue from Authorized Buyers and Open Bidding Partners generated by advertisements displayed to US Users as defined above."
[62] Schedule 1.

00438960, Tab ███████████████████████████████████████; GOOG-HEWT-00481225 at 225 ██████████████████████████████. Having determined Google's gross RTB revenues for U.S. account holders for most of the Class Period, I turn to the remainder of the calculation of Defendants' Profits.

> 2.     Apportionment of Google's RTB Revenues to the Value of the Personal Information Google Alleged to be Improperly Sold in RTB Auctions

39.     As described above, the objective of a Defendant's Profits calculation is to isolate the profits attributable to the alleged harm. Accordingly, the second step in the calculation of Defendant's Profits is to apportion Google's RTB revenues to ascertain the value of the Google account holders' personal information alleged to have been improperly sold by Google to third parties. Put differently, apportionment removes the proportion of Google's RTB revenue that Google legitimately generated from the Defendant's Profits analysis.[63]

40.     I have been provided with and have reviewed the Expert Report of Professor Robert Zeithammer in Support of Plaintiffs' Motion for Class Certification dated July 14, 2023 (hereafter the "Zeithammer Report"). One of Prof. Zeithammer's assignments was to determine the proportion of Google's RTB revenues that is attributable to Google's sale of Google account holders' personal information to third parties through RTB auctions.[64]

41.     Based on his analysis, which included studying Google's internal data analyses,[65] Prof. Zeithammer determined that 51.1% of Google's RTB revenues are attributable to its sale of

---

[63] Restatement 3d, Comment and Illustrations, (g) "When the net profit in question has been realized in part as a result of the wrong to the claimant and in part from the defendant's legitimate activities--so that some part, at least, of the defendant's profit would have been realized in the absence of the wrong--what proportion of the net profit is attributable to the wrong to the claimant?" *See also* AICPA IP PA, p.87.

[64] Zeithammer Report ¶ 8.

[65] In my experience, this methodology is generally accepted. *See, e.g.*, Restatement 3d, Comment "e", "Observable facts concerning the defendant's activities may support a direct inference about the proportion of the defendant's overall business profits, or the increase over profits that would otherwise have been realized, attributable to the defendant's interference with the claimant's interests."

Google account holders' personal information.[66] Accordingly, the table below presents my calculation of the proportion of Google's U.S. RTB revenues (taken from Figure 2) attributable to Google's sale of Google U.S. account holders' personal information:[67]

**Figure 3**



42.    As seen in the table above, this methodology indicates that Google's gross RTB revenues from the sale of Google U.S. account holders' personal information from 2017 to 2022 totals approximately ██████████.[68] The 95% confidence interval for Prof. Zeithammer's apportionment calculation had a low end of 39.5% and a high end of 62.8%.[69] Using this range, Google's gross RTB revenues from the sale of Google U.S. account holders' personal information for the same period is in the range of ███████████████████.

---

[66] Zeithammer Report ¶ 81.
[67] Schedule 2. This calculation does not include any amounts for the second half of 2016 or whatever portion of 2023 is included in the Class Period. However, the calculation methodology would be the same once the revenue figures for these periods has been provided by Google.
[68] This number will increase when the 2016 and 2023 portions of the Class Period are included.
[69] A 95% confidence interval is the range from approximately two standard errors below to two standard errors above the estimate. This interval is used to cover the true value approximately 95% of the time. *See* Federal Judicial Center, Reference Manual on Scientific Evidence, Reference Guide on Statistics, Third Edition, p.285.

43.    My review of certain of Google's revenue testing documents produced in this litigation supports Prof. Zeithammer's analysis and conclusions. For example, Google uses A|B testing.[70] Google's █████████████████████████████.[71] Google uses A|B testing to measure ███████████████████.[72] For example, in ███████████████████ ████████████.[73] Google personnel observed that ████████████████████████████████.[74]



44.    As another example, in August 2019, Google ran an A|B test on the effect on publisher revenue of disabling third-party cookies.[75] Based on its randomized experiment, Google

---

[70] Google provides an example of A|B testing using a company that experienced a change in the number of ad conversions (*e.g.*, when a user performs an action in response to an ad—*see* https://developers.google.com/google-ads/api/docs/conversions/overview (accessed June 16, 2023). Google describes how the company may form a hypothesis regarding potential responses to the change such as changing the color of the button on the relevant webpage. This type of change may be tested using data. For example, the company may select a random sample of users who are presented the original button color, variable A. The conversions of users shown Variable A may then be compared against the conversions of another sample group of users that are displayed a modified button color, variable B (*i.e.*, A|B testing). *See also* Levitte Tr. 98:15-99:2; "Create an A/B test," https://support.google.com/optimize/answer/6211930?hl=en (accessed June 16, 2023); "A Refresher on A/B Testing," by Amy Gallo dated June 28, 2017 published in the Harvard Business Review, https://hbr.org/2017/06/a-refresher-on-ab-testing (accessed June 6, 2023)
[71] Levitte Tr. 98:15-23.
[72] *E.g.*, GOOG-HEWT-00132004 at Tabs ████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████.
[73] Ex. 82 (Levitte) at GOOG-HEWT-00140838 at 840, ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████.
[74] *Id.*
[75]   GOOG-HEWT-00480911, "Effect of disabling third-party cookies on publisher revenue" (indicating that Google's internal random experiments indicate revenue decreased 52% on-average when access to cookies was disabled).

---

concluded that the average publisher revenue decreased 52% when third-party cookies were disabled:[76]



45.    Consequently, the testing performed by Google, including A|B testing, provides useful data regarding methodologies used by Google itself to ██████████████████████ ██████████████████████████████████████████. I observed that when Google performed A|B testing, Google's methodology involved ████████████████████████ ██████████████████████████████. In this way, Google's internal methodology to ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████.

---

[76] *Id.* (emphasis added). The 95% confidence interval in Google's study was under +/-1% (*Id.* at GOOG-HEWT-00480912). *See also* GOOG-HEWT-00481229 at Tab "████████ ████████"; GOOG-HEWT-00480674, ██████████████████████ GOOG-HEWT-00480726 at 727, "███████████████████████████████████████████████" This ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████ *see also* Zeithammer Report ¶ 30.

3.    Potential Costs Incurred by Google for RTB

46.    The third step to compute Defendant's Profits is to identify and deduct relevant costs.[77] Relevant costs are the marginal costs incurred in producing the revenues that are subject to disgorgement.[78] Specifically, marginal costs include only those costs that vary when producing one more unit.[79] That is, marginal costs do not include expenses that would have been incurred absent the alleged harmful conduct.[80]

47.    I understand that Google has not, to date, produced marginal cost data tied specifically to the Google RTB gross revenue numbers reflected in Figure 2 above.[81] However, Google documents that I have reviewed indicate ███████████████████

---

[77] I understand that the defendant is frequently accountable regarding the determination of deductible costs, however, I am providing this analysis so that my methodology is completely described. *See* AICPA IP PA, p.88, "Similar to the issue of proving deductible costs, in an unjust enrichment claim, it is the defendant's responsibility to prove the deduction from sales to adjust for the apportionment of profits to the various assets that contribute to the sale of an infringing item. The plaintiff may rebut the testimony of the defendant on this issue."

[78] Restatement 3d, § 51, Comment and Illustrations, (h) "As a general rule, the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement."

[79] AICPA IP PA, p.37.

[80] Restatement 3d, § 51, Comment and Illustrations, (h) "By contrast, the defendant will not be allowed to deduct expenses (such as ordinary overhead) that would have been incurred in any event, if the result would be that defendant's wrongful activities--by defraying a portion of overall expenses--yield an increased profit from defendant's operations as a whole." *See also* Ninth Circuit Model Jury Instructions § 17.34, Copyright-Damages-Defendant's Profits, "For cases providing examples of the deductions from defendant's gross revenue, *see Frank Music Corp.*, 886 F.2d at 1548 (deducting direct costs of production from defendant's gross profit); *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984) (allowing deduction of overhead when infringer can demonstrate that it actually assisted production, distribution or sale of infringing product)...." These cases are consistent with the Restatement 3d's identification of marginal costs (*e.g.*, *Kamar Int'l* indicates deductible costs are the costs that "the infringer can demonstrate it was of actual assistance in the production, distribution or sale of the infringing product.").

[81] Google did produce one spreadsheet which purports to show ████████████████████ (GOOG-HEWT-00455801, "████████████ ████████████). This spreadsheet ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

 for Google's RTB platform based on traffic acquisition costs ("TAC") [82]

████ [83]

48.    Figure 4 illustrates my proposed methodology to deduct Google's marginal costs based on an assumption that the ████ TAC figure discussed in the paragraph above is reflective of Google's marginal costs:[84]

**Figure 4**



49.    These calculations may easily be adjusted if Google provides more detailed marginal cost data tied specifically to Google's U.S. RTB business for each of the years of the Class Period, including the second half of 2016 and the portion of 2023 included in the Class Period.

50.    As described further below, this RTB U.S. profit percentage may then be applied to Google's RTB revenues from United States customers and apportioned to account only for the

---

[82] TAC includes the amounts paid to Google Network Members for ads displayed on their properties. *See* Alphabet 2020 Form 10-K, p.38.

[83] *E.g.*, GOOG-HEWT-00359560 at 565, ████████████

████████████  *See also* GOOG-HEWT-00003103, ████████████

████████████

[84] Schedule 3.

improper sale of personal information by Google in RTB auctions using the methodology illustrated in Figure 3.

    4.   <u>Summary of Defendant's Profits</u>

    51.    Internally, Google ███████████████████████████████████████
███████████████████████████████████████████████████████.[85]

**FINANCIAL VALUE CREATION**

<u>Link to Paper</u>

**Key Takeaways**

- Ads businesses continue to grow, but gross revenue is not sufficient in thinking about our business. Profit and free cash flow are the ideal North Star metrics, but ████████████
████████████████ Our net revenue varies widely by product.

- Encourage you all to think about net revenue (gross revenue - traffic acquisition costs and content acquisition costs)
  ○ ████████████████████████

    52.    As seen above, Google's documents describe an ability to ████████████████████
██████" While this ███████████████████ contained ████████████████████████,[86] ██████
█████████ have not yet been produced. Accordingly, Figure 5 provides an illustration of the final step in my methodology to calculate Google's unjust enrichment based on the data presently available. This illustration reflects Google's RTB revenues from ███████████████ (Step 1, Figure 2), apportioned to account only for revenues from the sale of persopnal information (Step 2, Figure 3), multiplied by the estimated RTB profit margin for each year (Step 3, Figure 4):[87]

---

[85] GOOG-HEWT-00359560 at 565, ████████████████████ (emphasis added).
[86] *E.g.*, Levitte Tr. 61:2-10, 61:25-62:7.
[87] Schedule 4.

**Figure 5**



53.     Using this methodology, Defendant's Profits total approximately ▮▮▮▮ over the period from 2017 through 2022.[88] While the specific numbers may change if Google produced data, I expect the methodology to calculate Defendant's Profits will remain the same. The number also will increase if the second half of 2016 and the portion of 2023 included in the Class Period are included in the calculation.

**B.     Methodology to Allocate an Unjust Enrichment Award to Class Members**

54.     Finally, I have been asked to consider how to allocate an unjust enrichment award on a class-wide basis in the event that Plaintiffs prevail at trial and recover under this damage theory.

55.     I understand that Google has not produced Google RTB transaction data in discovery to date for all potential Class members for the entire Class Period. I also understand that Google contends it does not have RTB transaction data for all potential Class members for the full Class Period. If this is correct, then any allocation of a class-wide award to individual Class members will need to be calculated by some means other than a review of each Class member's individual RTB transaction records.

---

[88] Schedule 4. The lower bound is ▮▮▮▮ and the upper bound is ▮▮▮▮

56.     It is my understanding that Google does maintain, for each potential Class member, account information which identifies when the individual first signed up for a Google account in the U.S.[89] This account data can be used, on a per-Class member and pro-rata basis, to allocate any class-wide unjust enrichment award to all Class members based on months of usage of their Google accounts, which can be determined from records Google still maintains.

57.     The first step in such an allocation calculation would be to determine the total number of "member-months" for the Class, which would be the sum of the number of months all Class members maintained Google accounts during the Class Period. By way of example only, to illustrate how such an allocation can be calculated using a consistent methodology, if there are 100 Class members and 50 maintained a Google account for 60 months of the Class Period (3,000 total member-months) and 50 maintained a Google account for 20 months (1,000 total member-months), the total number of member-months would be 4,000. Any class-wide unjust enrichment award would then be divided by the 4,000 member-months figure to determine a per-month pro-rata number. Again, by way of example, if the class-wide award is $100,000, each member-month would worth $25. Each Class member would then be entitled to $25 times either the 60 months ($1,500) or the 20 months ($500) they maintained a Google account. These numbers are illustrative only and do not suggest or intend to convey the actual inputs to this calculation likely to be present here.

**C.    Limitations of Google's Document Production Related to the Calculation of Defendant's Profits**

58.     I understand that discovery in this matter is ongoing and that Google may produce additional financial data or provide more information about the financial data already produced. As described below, however, the data that Google has produced to date has limitations to its usefulness for calculating Defendant's Profits.

---

[89] *E.g.*, GOOG-HEWT-00455543, ███████████████████ for plaintiff John Kevranian.

59.    The single spreadsheet that Google has produced regarding its RTB revenues contains only a single annual amount broken down by United States users and all other users.[90] It does not include any data for large parts of the Class Period (the second half of 2016, the second half of 2022, and any part of 2023). The source of the data for the spreadsheet has not been identified.[91] It also appears that the spreadsheet was created specifically to respond to a discovery request rather than a Google document created and used in the ordinary course of business. Actual Google internal financial records providing more information and details about Google's U.S. RTB revenues for the entire Class Period certainly exist and would be useful in refining the precision of a calculation of the profitability of Google's RTB revenues.

60.    The same is true for the limited cost information Google has provided. This information is also presented in a single spreadsheet that identifies a single line-item annual amount.[92] The spreadsheet does not include cost information for large parts of the Class Period (the second half of 2016, the first half of 2017, the second half of 2022, and any part of 2023). This document also appears to have been created to respond to a discovery request rather than being a Google document created and used in the ordinary course of business. This data provides insufficient information to determine, for example, whether Google's profitability in the United States differs from its worldwide business, and whether Google has included costs that are not marginal in nature and that should be excluded for the purpose of calculating Defendant's Profits (*see* § III.A.3). It also does not provide any explanation for why profitability fluctuates from year-to-year.

61.    I reserve the right to supplement or amend this report when additional data, including the data identified above, becomes available to do so.

---

[90] GOOG-HEWT-00455648.
[91] *See* Google LLC's Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 11-12), No. 11.
[92] GOOG-HEWT-00455801.

---

## IV.    CALCULATION AND ALLOCATION OF DAMAGES

62.    As I discuss in ¶ 8, above, unjust enrichment is a disgorgement remedy designed to account for the unjust profits Google obtained from the improper sale of Class members' personal information to third parties during the Class Period. Compensatory damages from Google's sharing of Class members' personal information with third parties during the Class Period is calculated differently, but would be allocated in a manner similar to what I described in ¶ 57 above.

63.    Plaintiffs here allege that Google shares Google account holders' personal information with third parties without consent or compensation. A reasonable measure of compensation arising from this conduct is the market value of the Class member personal information shared with Google RTB participants in the auctions.[93]

64.    Prof. Zeithammer also was assigned to determine a market pricing damages model for discerning the market value of Google account holders' personal information.[94] Based on his analysis, which included a review and analysis of four vendors (including one used by Google) that pay consumers for their personal information, Prof. Zeithammer determined that the fair market value of Google account holders' personal information is $38 per year (or $3.17 per month) for each account holder.[95]

65.    A class-wide damages award compensating Google account holders for Google's improper sharing of their personal information with third parties during the Class Period can be allocated in the same "member-month" pro-rata manner that I described in ¶ 57 above. Alternatively, a jury could simply award each Class member $3.17 per month (or some other

---

[93] Restatement 3d, (2) "The value for restitution purposes of benefits obtained by the misconduct of the defendant, culpable or otherwise, is not less than their market value. Market value may be identified, where appropriate, with the reasonable cost of a license." *See also id.* at Comment "d. Liability not less than market value" indicating "So long as benefits wrongfully obtained have an ascertainable market value, that value is the minimum measure of the wrongdoing defendant's unjust enrichment, even if the transaction produces no ascertainable injury to the claimant and no ascertainable benefit to the defendant. Reasonable rental value or a reasonable royalty will often supply such a measure, as in Illustration 9; *see also* § 42, Illustrations 5-6."
[94] Zeithammer Report ¶¶ 9, 93-97.
[95] *Id.* ¶¶ 84-97.

---

amount) as compensatory damages, which would then be multiplied by the number of months each Class member maintained a Google account during the Class Period to determine the recovery for each individual Class member. Either allocation is possible here because, as noted above, Google maintains records for all Class members identifying when they first signed up for a Google account in the U.S.

\* \* \*

Dated: July 14, 2023

Greg J. Regan, CPA/CFF, CFE

**In re Google RTB Consumer Privacy Litigation**
**Schedule 1 - Google RTB Revenue (2017 to 2022)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**



Notes and sources:
[1] GOOG-HEWT-00455648.
[2]

**In re Google RTB Consumer Privacy Litigation**
**Schedule 2 - Google RTB Revenue (2017 to 2022) Apportioned to Personalized Tracking Information**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

Notes and sources:
[1] *See* Regan Report Section III.A.2 for data supporting the 51.1% estimate.

Schedule 2 to the Expert Class Certification Report of Greg J. Regan, CPA/CFF, CFE

**In re Google RTB Consumer Privacy Litigation**
**Schedule 3 - Marginal Costs (2017 to 2022)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**



Notes and sources:
[1] *See* Regan Report Section III.A.3 for

Schedule 3 to the Expert Class Certification Report of Greg J. Regan, CPA/CFF, CFE



In re Google RTB Consumer Privacy Litigation
Schedule 4 - Unjust Enrichment (2017 to 2022)
Expert Report of Greg J. Regan, CPA/CFF, CFE

Schedule 4 to the Expert Class Certification Report of Greg J. Regan, CPA/CFF, CFE

# APPENDIX A

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN FRANCISCO OFFICE**
201 Spear Street I Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road I Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Profile

Greg Regan is a Partner in the Forensic and Financial Consulting Services Group in the San Francisco office of Hemming Morse, LLP. In 2018, Greg became the Chair of California Society of CPAs Forensic Services Section. In 2013, Greg was appointed to the American Institute of CPA's ("AICPA") Forensic and Valuation Services Executive Committee. This 9-member committee establishes professional standards for practitioners performing consulting services that require the application of forensic or valuation-related methodologies. From 2010 to 2013, he served on the AICPA's Forensic and Litigation Services ("FLS") Committee. This 11-member committee provides professional guidance to CPA practitioners who perform accounting investigations, economic damage analyses such as lost profits calculations, and a variety of other services. Greg was the Chair of the AICPA's Damages Task Force from 2010 to 2013 and continues to be an active member. Greg received the AICPA's 2012 Award for the FLS Volunteer of the Year.

Greg has testified in federal and state courts as well as in arbitrations regarding these types of forensic analyses. Greg is a Certified Public Accountant (CPA), a Certified Financial Forensic (CFF), and a Certified Fraud Examiner (CFE). Greg serves as an Officer of the California Society of Certified Public Accountants (CalCPA) statewide Forensic Services Committee.

Greg received his B.S. degree in Accounting from Georgetown University, Washington, D.C., and his Masters in Business Administration with an Emphasis in Finance from the University of San Francisco. When he's not working, he enjoys spending time with his wife and coaching the sports teams of his two boys.

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## GREG REGAN, CPA/CFF, MBA                                    HEMMING.COM

### Employment & Education

■ Hemming Morse, LLP 2003 – Present
  -Partner
  -Director, 2007-2011
  -Manager, October 2003-2006

■ Golden Gate University 2009 – 2016
  -Adjunct Professor
  -Introduction to Financial Forensic Accounting, Spring
   2009-2016
  -An In-Depth Analysis of Economic Damages, Fall 2010

■ SupportSoft, Inc. (Nasdaq: SPRT) 1999 – 2003

■ Ernst & Young, LLP 1995 – 1999

■ University of San Francisco 2004 – 2007
  -Masters in Business Administration with emphasis in
   Finance
  -Beta Gamma Sigma Honor Society

■ Georgetown University, Washington, D.C. 1995
  -B.S. Accounting, Minor in Theology

### Professional & Service Affiliations

■ **Certified Public Accountant,** State of California, 1998
  State of New York, 2010

■ **Certified Fraud Examiner**

■ **Certified in Financial Forensics,** 2008

■ **American Institute of Certified Public Accountants**
  – Forensic & Valuation Services Executive Committee,
    2013-2016
  – Forensic & Litigation Services Committee,
    2010-2013
  – Chair, Damages Task Force
  – National Forensic & Valuation Conference
    – Co-Chair, 2014-2015
    – Planning Committee, 2011-2016

■ **California Society of Certified Public Accountants**
  – Co-chair, San Francisco Chapter Litigation
    Consulting Services Committee, 2006-2011
  – State Steering Committee, 2007-present
    Officer, 2012-2020

■ **CAMICO, Risk Management Committee,**
  2014-present

■ **California CPA Education Foundation**
  – Accounting & Auditing Curriculum Advisory
    Committee, 2007-2010

■ **Legal Aid of San Mateo County**
  – Board of Directors, Treasurer

■ **Board of Regents,** Junipero Serra High School

# HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**SAN FRANCISCO OFFICE**
201 Spear Street I Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road I Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## GREG REGAN, CPA/CFF, MBA

## Testimony

### Trial and Deposition

- **Knauf Ventures, LLC v. 154 Almonte Blvd, LLC (2023),** California Superior Court, Marin, Case No. CIV2003268

- **Virgin Hotels San Francisco, LLC v. 250 Fourth Development, L.P. et al. (2022),** Superior Court of California, San Francisco, Case No. CGC-20-584350

- **People of the State of California v Zovio, et al. (2021),** Superior Court of California, San Diego, Case No. 37-2018-00046134-CU-MC-CTL

- **Sumotext Corp. v. Zoove, Inc., et al. (2020)** U.S. District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF

- **PPFA, Inc. v. Center For Medical Progress, et al. (2019),** U.S. District Court, Northern District San Francisco, Case No. 3:16-Cv-00236-Who

- **ASML US, Inc, v. XTAL (2018),** Superior Court of California, Santa Clara, Case No. 16-CV-295051

- **State of Colorado v. Center for Excellence in Higher Education, Inc., et al. (2017),** District Court, Denver City and State of Colorado, Case No. 2014cv34530

### Arbitration and Deposition

- **T.I.M.E. Service Catalyst Handling, LLC v. Scott Rogers et al. (2022),** American Arbitration Association, Case No. No. 01-18-002-3360

- **Sutter Health and Sutter Health Plan v. Optum Insight, Inc. (2017),** American Arbitration Association Case No. 011500034226

- **Cloud Cruiser, Inc. v. Cisco Systems, Inc. (2017)** JAMS Reference No. 1100085560

### Deposition

- **Shannon McBurnie, et al. v. RAC Acceptance East LLC (2022),** U.S. District Court, Northern District of California, Case No. 3:21-cv-01429-JD

- **Steven Gomo v. NetApp, Inc. (2022),** Federal Court, ND CA, Case No. 5:17-cv-02990-BLF

- **Stahl and Reynolds v. Orthopedic Alliance (2022),** U.S. District Court, Central District of California, Case No. CV16-03966-MWF (SKx)

- **Barry Forman v. Timothy Covington (2022),** Superior Court of California, San Francisco, Case No. CGC-21-588962



SAN FRANCISCO OFFICE
201 Spear Street I Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

SAN MATEO OFFICE
177 Bovet Road I Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## GREG REGAN, CPA/CFF, MBA

### Testimony continued

### Deposition continued

- **Don Lee Farms v. Beyond Meat (2022),** Superior Court of California, Los Angeles, Case No. BC662838

- **New Prime Inc. v. Amazon Logistics, Inc. (2021),** U.S. District Court, Western District of Missouri, Case No. 6:19-cv-03236-MDH

- **Kiva Health Brands, LLC v. Kiva Brands Inc. (2021),** U.S. District Court, Northern District of California, Civil No. 3:19-cv-03459-CRB

- **Class B Investors v. 8minutenergy US Manager, LLC (2021),** JAMS Case Reference No. 1100110779

- **Synchrony Bank v. RevPar Collective, Inc. (2021),** Superior Court of California, San Francisco, Case No. CGC-18-566487

- **Bridge-Folsom, LP, v. Terra Firma Development Company, LTD (2021),** JAMS Arbritration, No. 1130008587

- **SRS Acquiom, Inc. v. PNC Financial Services Group, Inc. (2020),** U.S. District Court, District of Colorado, Civil Action No. 1:19-cv-02005-DDD-SKC

- **United States ex rel. Matthew Macdowell v. Synnex Corporation (2020),** U.S. District Court, Northern District of California, Case No. 19-cv-00173-WHA

- **Ahmad Hamdan v. Dorothy Reggi, et al. (2020),** Yuba County Superior Court, Case No. CVCV18-01936

- **Aqualegacy Development LLC v. 2012 Canrow Owner (2020),** Superior Court of California, Monterey, Case No. 16CV001078

- **Cisco Systems, Inc., And Cisco Technology, Inc. v. ADSI, et al. (2020),** U.S. District Court, Northern District of California, Oakland Division, Case No. 4:18-cv-07602 YGR

- **Administrator v. Marlette Funding, LLC et al. (2020),** District Court, Denver City and State of Colorado, Case No. 17CV30376

- **In Re: Restasis Antitrust Litigation (2020),** U.S. District Court, Eastern District of New York, Case No. MDL No. 2819 18-MD-2819 (NG) (LB)

- **Wetlands Preservation Foundation v. Department of Water Resources, The Nature Conservancy (2019)** Superior Court of California, San Joaquin, Case No. STK-CV-UWM-2018-8957

- **Healthnet v. American International Specialty Lines Insurance Company, et al. (2019),** Superior Court of California, Los Angeles, Case No. Bc357436

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
201 Spear Street I Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

SAN MATEO OFFICE
177 Bovet Road I Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Testimony continued

### Deposition continued

- **Fred Sahadi v. Liberty Mutual Insurance. et al (2019),** U.S. District Court Northern District of California, Case No. 5:18-CV-04061-LHIK

- **Justice Laub v. Drone Racing League, Inc. et al. (2019),** U.S. District Court, Central District of California, Western Division, Case No. 2:17-CV-06210-JAK (KSX)

- **United States Of America v. County Of Clark And Nevada Links, Inc. (2019),** U. S. District Court District Of Nevada, Case No. 2:17-Cv-02303

- **Fuse Chicken, LLC v. Amazon.com, Inc. (2019)** U.S. District Court Northern District of Ohio, Eastern Division, Case No. 5:17-cv-01538-SL

- **Golden Gateway Center v. San Francisco Waterfront Partners II, LLC (2018),** Superior Court of California, San Francisco, Case No. CGC 15-548437

- **The Barrel Cellar v. Quince Pacific Avenue (2018),** Superior Court of California, San Francisco, Case No. CGC-17-561363

- **Just Games Interactive Entertainment, LLC v. Scopely, Inc. (2018),** JAMS Arbitration

- **Mark de Bibo Company v. Ryan & Ryan Construction, Inc. (2017),** Superior Court of California, San Mateo, Case No. CIV534040

- **Amedee Geothermal Venture I v. Lassen Municipal Utility District (2017),** Superior Court of California, Lassen, Case No. 59485



**SAN FRANCISCO OFFICE**
201 Spear Street I Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road I Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Publications

- "Making Sense of Forensic Accounting", CalCPA Magazine, 2020

- "Trial Testimony by Financial Experts in California Court: A Reference Guide to Hearsay Evidence Objections", CalCPA FSS, 2019

- "Calculating Lost Profits", AICPA Practice Aid, 2019

- Unblurring the Line(s) Between Accounting and Legal Opinions", The Witness Chair, Winter 2017

- "Big Data's Day in Court", Plaintiff Magazine, January 2017

- "Attaining Reasonable Certainty in Economic Damages, Calculations", AICPA Practice Aid, 2015

- "How CPAs can benefi t from Colin Powell's Rule", AICPA "FVS Insider" Article, August 2013

- "Options for Consumers in Crisis - An Economic Analysis of the Debt Settlement Industry", December 31, 2012

- "Discount Rates, Risk, and Uncertainty in Economic Damage Calculations", AICPA Practice Aid, 2012

## Awards

- AICPA, Forensic & Litigation Services Volunteer of the Year, 2012

- Georgetown University, Dean's Citation, 1995

## AICPA CFF Education, Spring 2010-Present

- Fundamentals of the Legal System & Engagement Administration

- Reporting, Expert Reports, and the Provision of Testimony

- Financial Statement Investigations

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN FRANCISCO OFFICE**
201 Spear Street I Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road I Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## GREG REGAN, CPA/CFF, MBA                    HEMMING.COM

## Presentations

- "An Exploration of Reliance Damages", AICPA National Forensic & Valuation Services Conference (2022)

- "The 'State' of Sargon: 8 Years Later", CalCPA (2020)

- "Damages - When are they Foreseeable?", AICPA National Forensic & Valuation Services Conference, 2018

- "Linking Causation to Damages", AICPA National Forensic & Valuation Services Conference, 2017

- "Un-blurring the Lines Between Legal and Expert Opinions", AICPA National Forensic & Valuation Services Conference, 2017

- "Un-blurring the Lines Between Accounting and Legal Opinions", CalCPA Forensic Services Steering Committee, June 2016

- "Examining Cross-Examination", AICPA National Forensic & Valuation Conference, 2015

- "Experts on Offense, Experts on Defense", ABA National Securities Fraud Conference, 2014

- "Attaining Reasonable Certainty in a Damages Calculation", AICPA National Forensic & Valuation Conference, 2012 Texas Society of CPAs, 2013

# APPENDIX B

<u>APPENDIX B</u>

<u>CASE MATERIALS CONSIDERED</u>

Consolidated Amended Class Action Complaint with Exhibits (ECF Nos. 92, 92-1)

Order Granting in Part and Denying in Part Motion to Dismiss (ECF No. 233)

Order Re August 15, 2022 Discovery Dispute Re Damages-Related Discovery (ECF No. 326)

Order Revising Case Schedule (ECF No. 329)

Joint Discovery Letter Brief re: Account Identifiers (Unredacted) (ECF No. 502-3)

Transcript of December 8, 2022 deposition of Glenn Berntson

Transcript of December 13, 2022 deposition of Stanislav Belov

Transcript of April 13, 2023 deposition of George Levitte

Google LLC's Objections and Responses to Plaintiffs' First and Second Sets of Requests for Production of Documents, dated June 22, 2021

Google LLC's Objections and Responses to Plaintiffs' Third Set of Requests for Production of Documents, dated February 7, 2022

Google LLC's Objections and Supplemental Responses to Plaintiffs' Third Set of Requests for Production of Documents, dated May 27, 2022

Google LLC's Objections and Supplemental Responses to Plaintiffs' Third Set of Interrogatories, dated April 10, 2023

Google LLC's Objections and Supplemental Responses to Plaintiffs' Fourth Set of Interrogatories, dated June 8, 2023

Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Redacted), filed in *Brown, et al. v. Google LLC*, Case No. 4:20-cv-03664-YGR (N.D. Cal.) (ECF No. 609)

Expert Report of Michael J. Lasinski (Redacted), filed in *Brown, et al. v. Google LLC* (ECF No. 643-11)

Google LLC's Notice of Motion and Motion to Exclude Opinions of Plaintiffs' Damages Expert Michael J. Lasinski (Redacted), filed in *Brown, et al. v. Google LLC* (ECF No. 662)

Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Redacted), filed in *Brown, et al. v. Google LLC* (ECF No. 665)

Declaration of George Levitte Regarding Google Ad Manager Profits (Redacted), filed in *Brown, et al. v. Google LLC* (ECF No. 666-19)

Declaration of Bruce A. Strombom in Support of Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Redacted), filed in *Brown, et al. v. Google LLC*, Case No. 4:20-cv-03664-YGR (N.D. Cal.) (ECF No. 666-23)

Plaintiffs' Response to Google's Motion to Exclude Opinions of Plaintiffs' Damages Expert Michael J. Lasinski (Redacted), filed in *Brown, et al. v. Google LLC* (ECF No. 700)

Google LLC's Reply in Support of Motion to Exclude Opinions of Plaintiffs' Damages Expert Michael J. Lasinski (Redacted), filed in *Brown, et al. v. Google LLC* (ECF No. 715)

Order Granting in Part Motion for Class Certification; Granting in Part *Daubert* Motions; and Denying Motion to Strike Google's Non-Retained Experts, filed in *Brown, et al. v. Google LLC* (ECF No. 803)

Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification (Redacted), filed in *Calhoun, et al. v. Google LLC*, Case No. 4:20-cv-05146-YGR (N.D. Cal.) (ECF No. 340-18)

Expert Report of Bruce A. Strombom (Redacted), filed in *Calhoun, et al. v. Google LLC* (ECF No. 427-7)

Expert Rebuttal Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification (Redacted), filed in *Calhoun, et al. v. Google LLC* (ECF No. 484-4)

| | | |
|---|---|---|
| GOOG-HEWT-00001116 | GOOG-HEWT-00118950 | GOOG-HEWT-00248735 |
| GOOG-HEWT-00003103 | GOOG-HEWT-00126877 | GOOG-HEWT-00254825 |
| GOOG-HEWT-00011238 | GOOG-HEWT-00132004 | GOOG-HEWT-00265356 |
| GOOG-HEWT-00013256 | GOOG-HEWT-00136949 | GOOG-HEWT-00292026 |
| GOOG-HEWT-00013737 | GOOG-HEWT-00140838 | GOOG-HEWT-00296713 |
| GOOG-HEWT-00018008 | GOOG-HEWT-00141375 | GOOG-HEWT-00301133 |
| GOOG-HEWT-00018167 | GOOG-HEWT-00142957 | GOOG-HEWT-00302777 |
| GOOG-HEWT-00026521 | GOOG-HEWT-00153904 | GOOG-HEWT-00319231 |
| GOOG-HEWT-00029246 | GOOG-HEWT-00161770 | GOOG-HEWT-00321925 |
| GOOG-HEWT-00031686 | GOOG-HEWT-00164171 | GOOG-HEWT-00332409 |
| GOOG-HEWT-00040252 | GOOG-HEWT-00175666 | GOOG-HEWT-00332984 |
| GOOG-HEWT-00040916 | GOOG-HEWT-00176775 | GOOG-HEWT-00355064 |
| GOOG-HEWT-00046522 | GOOG-HEWT-00179902 | GOOG-HEWT-00359560 |
| GOOG-HEWT-00047130 | GOOG-HEWT-00185420 | GOOG-HEWT-00361634 |
| GOOG-HEWT-00047979 | GOOG-HEWT-00189672 | GOOG-HEWT-00361973 |
| GOOG-HEWT-00058735 | GOOG-HEWT-00191633 | GOOG-HEWT-00373255 |
| GOOG-HEWT-00061556 | GOOG-HEWT-00227373 | GOOG-HEWT-00388794 |
| GOOG-HEWT-00083529 | GOOG-HEWT-00247087 | GOOG-HEWT-00391597 |

GOOG-HEWT-00410222          GOOG-HEWT-00480911

GOOG-HEWT-00413578          GOOG-HEWT-00480943

GOOG-HEWT-00427905          GOOG-HEWT-00480951

GOOG-HEWT-00438815          GOOG-HEWT-00481162

GOOG-HEWT-00438817          GOOG-HEWT-00481219

GOOG-HEWT-00438960          GOOG-HEWT-00481225

GOOG-HEWT-00455543          GOOG-HEWT-00481229

GOOG-HEWT-00455648          GOOG-HEWT-00481271

GOOG-HEWT-00455701          GOOG-HEWT-00481289

GOOG-HEWT-00455768          GOOG-HEWT-00481290

GOOG-HEWT-00455784          GOOG-HEWT-00481291

GOOG-HEWT-00455801          GOOG-HEWT-00481292

GOOG-HEWT-00455802          GOOG-HEWT-00481293

GOOG-HEWT-00455804          GOOG-HEWT-00481294

GOOG-HEWT-00455805          GOOG-HEWT-00481295

GOOG-HEWT-00456348          GOOG-HEWT-00481296

GOOG-HEWT-00456428          GOOG-HEWT-00481297

GOOG-HEWT-00456450          GOOG-HEWT-00481298

GOOG-HEWT-00456451          GOOG-HEWT-00481299

GOOG-HEWT-00456452          IX_000039

GOOG-HEWT-00480490          NBCU_HEW_00041

GOOG-HEWT-00480491          RTB_GOOG-CABR-00180476

GOOG-HEWT-00480492          RTB_GOOG-CABR-04704939

GOOG-HEWT-00480608          RTB_GOOG-CABR-X-00000421

GOOG-HEWT-00480635

GOOG-HEWT-00480674

GOOG-HEWT-00480720

GOOG-HEWT-00480726