QUINN EMANUEL URQUHART & SULLIVAN, LLP

Diane M. Doolittle (CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (Bar No. 326971)
crystalnixhines@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

[*Additional counsel information in signature block below*]

*Attorneys for Defendant Google LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:20-cv-05146-YGR<br><br>**REPLY IN SUPPORT OF GOOGLE LLC'S MOTION TO STRIKE THE REPORTS OF PLAINTIFFS' CONSUMER EXPECTATIONS EXPERTS PROFESSORS JOSEPH TUROW AND LESLIE JOHN**<br><br>The Honorable Yvonne Gonzalez Rogers<br>Courtroom 1 – 4th Floor<br>Date: May 31, 2022<br>Time: 2:00 p.m.<br>Amended Complaint Filed: April 16, 2021<br>Trial Date: None Set |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................1

II. ARGUMENT .......................................................................................................................2

    A. Professor Turow's and John's rebuttal reports are untimely and should be disregarded ................................................................................................................2

    B. Even if the rebuttal reports are considered, they fail to demonstrate that Professor Turow and John applied reliable methodologies ......................................4

        1. Professors Turow's and John's opinions are unreliable because they rely exclusively on surveys and research in inapposite contexts and the Professors fail to explain how such surveys and research supports their opinions ..................................................................................4

        2. Professor Turow's and John's reports are unreliable because they failed to consider key elements of Plaintiffs'—and many Class Members'—contracts with Google .............................................................9

        3. Professors Turow and John's opinions are unreliable because they fail to define key terms embedded in their opinions ..................................10

    C. Professors Turow and John's opinions do not rely on specialized knowledge, and are therefore irrelevant ................................................................12

III. CONCLUSION .................................................................................................................13

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bailey v. Rite Aid Corp.*,
   338 F.R.D. 390 (N.D. Cal. 2021) ............................................................................................. 5

*Berman v. Freedom Fin. Network, LLC*,
   400 F. Supp. 3d 964 (N.D. Cal. 2019) ...................................................................................... 5

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ................................................................................................ 10

*Congdon v. Uber Techs., Inc.*,
   291 F. Supp. 3d 1012 (N.D. Cal. 2018) .................................................................................... 1

*Fontem Ventures, B.V. v. NJOY, Inc.*,
   2015 WL 12743861 (C.D. Cal. Oct. 22, 2015) ...................................................................... 10

*GPNE Corp. v. Apple, Inc.*,
   2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ......................................................................... 9

*Hadley v. Kellogg Sales Co.*,
   2019 WL 3804661 (N.D. Cal. Aug. 13, 2019) ......................................................................... 5

*In re PFA Ins. Mktg. Litig.*,
   2021 WL 5994908 (N.D. Cal. Nov. 3, 2021) ........................................................................... 8

*Krommenhock v. Post Foods, LLC*,
   334 F.R.D. 552 (N.D. Cal. 2020) ............................................................................................. 5

*Lust By & Through Lust v. Merrell Dow Pharms., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ...................................................................................................... 2

*Rodriguez v. Google*,
   2021 WL 6621070 (N.D. Cal. Aug. 18, 2021) ......................................................................... 9

*Rodriguez v. Google*,
   2022 WL 214552 (N.D. Cal. Jan. 25, 2022) ............................................................................. 9

*Salhotra v. Simpson Strong-Tie Company, Inc.*,
   2022 WL 625078 (N.D. Cal. Mar. 3, 2022) ......................................................................... 2, 8

## I. INTRODUCTION

Plaintiffs argue that "this is a simple contract case," Dkt. 482-3 (Class Cert Reply) at 1, and "[c]ontract interpretation is not the proper subject of a consumer survey," Opp. 1 (citing *Congdon v. Uber Techs., Inc.*, 291 F. Supp. 3d 1012 (N.D. Cal. 2018)). Nevertheless, they proffer *two consumer survey experts*—who did not conduct surveys here—to opine on "what a reasonable person would understand Chrome's disclosures and terms of service to convey to a person signing up for Chrome with regard to the Sync function." Opp. 2. Professor Turow's and John's opinions are pure *ipse dixit* and should be stricken.

Professors Turow and John admitted in deposition that they did not conduct any specific research for this case. In order for the Professors to "independently conclude that Chrome does not have users' consent to send their personal PI to Google," Class Cert Reply at 9—a central issue in the case—the Professors essentially just "read the materials very closely," gave their *own* interpretation of Google's disclosures, and then deemed their interpretation to be that of the "reasonable user." Acknowledging that "reading materials closely" is not "expertise," the Professors changed course in their untimely rebuttal reports (which Plaintiffs filed after Google deposed the Professors and filed the Motion to Strike). The Professors now contend that in interpreting Google's disclosures, they applied their decades of experience conducting and reviewing consumer surveys and secondary research *generally* related to internet privacy. But Plaintiffs have *rejected* the relevance of such general surveys and research because: "This case is not about Internet tracking generally—or even Google tracking generally. It is solely about the Chrome browser—and express promises Chrome made to users in a binding contract." Opp. 17.

Indeed, as Google's expert, Professor Tülin Erdem, explains, it is well established that consumer expectations with respect to privacy policies and disclosures are inherently context-dependent. Dkt. 431-1, Ex. 2 (Erdem Rep.) ¶¶ 26, 55-61. Assessing users' expectations or interpretations of Google's disclosures necessarily requires context-specific research. However, the *only* evidence Professors Turow and John cite to support their opinions consists of (mostly dated) surveys and secondary research from entirely inapposite contexts. When that inapplicable material is stripped away, as Plaintiffs tacitly concede it should be, all that remains is Professor John's and

Turow's *ipse dixit* on how "reasonable users" would interpret the specific statements and terms at issue in this case.

Each of Plaintiffs' two consumer expectations experts admitted that he/she routinely conducts surveys to assess consumer expectations (in Professor John's case, on a weekly basis). That neither conducted a survey here begs the question: Why not? The Opposition eschews the obvious answer: Plaintiffs and their experts knew that the studies would show that Chrome users do *not* uniformly expect that simply using Chrome in its default state (without enabling any privacy features) prevents Google from receiving the data that Google's Privacy Policy and the Account Holder Agreements specifically disclose Google *does* receive. That is what Google's expert, Professor Erdem, showed by surveying *actual* Chrome users.[1] To avoid this conclusion, Plaintiffs doubled up on their survey experts and asked each to offer a contrary conclusion based on nothing but their own say-so. That is not even "junk science"—it is not science at all.

For the reasons explained in Google's opening brief and below, Professor Turow's and John's reports should be stricken.

## II.   ARGUMENT

"As the party moving to admit [expert] testimony, Plaintiffs bear the burden of establishing its reliability." *Salhotra v. Simpson Strong-Tie Company, Inc.*, 2022 WL 625078, at *9 (N.D. Cal. Mar. 3, 2022) (citing *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).  Plaintiffs have failed to meet this burden.

### A.   Professor Turow's and John's rebuttal reports are untimely and should be disregarded

Tacitly conceding that the Professors' original reports provided no reliable methodology for their opinions, Plaintiffs submitted lengthy rebuttal reports from each Professor—*after* Google deposed them and filed the Motion to Strike—purporting to explain their methodologies in terms they did not mention in their original reports *or* when they were directly asked to describe their

---

[1] In contrast with Professors Turow and John, Professor Erdem does not opine on what "reasonable people" think or how they would interpret the disclosures at issue in this case.  Rather, she conducted surveys of *actual Chrome users* and let their answers speak for themselves.

methodologies in deposition.[2] *See, e.g.*, Dkt. 482-7 (John Rebuttal Rep.) ¶¶ 4-44; Dkt. 482-15 (Turow Rebuttal Rep.) ¶¶ 4-20. Plaintiffs' Opposition seeks to defend the Professors' opinions by extensively citing their untimely—and untested—rebuttal reports.

For example, in deposition Professor Turow testified that his methodology was to "read the materials very closely, and tr[y] to understand the plain meaning of the language." Dkt. 424-6 (Turow Tr.) 15:6-15.[3] When asked if this "methodology" is "accepted in your field of research," Professor Turow responded that "[t]his is not something I do as an everyday part of my work." *Id.* 19:10-20. In stark contrast with this testimony, Plaintiffs now assert—citing Professor Turow's rebuttal report—that "[h]is opinions are based on the methodologies and techniques applied in his field of study." Opp. 3 n.1. And Professor Turow now claims that his methodology involved application of "systematic discourse analysis" (Turow Rebuttal Rep. ¶¶ 12-13)—a methodology he did not mention in his opening report or when directly asked for his methodology in deposition.

Similarly, Professor John submitted a lengthy rebuttal report that, Plaintiffs claim, "further explains her methodology by making clear that scholars in her field conduct research in two basic steps: (1) secondary research—*i.e.*, reviewing and synthesizing prior scholarly work; and (2) primary research—collecting new empirical data." Opp. 5. This purported methodology was not mentioned in her original report or deposition testimony,[4] and she admitted that she did not apply step two. John Rebuttal Rep. ¶ 10.

The Professors' rebuttal reports are untimely, inconsistent with their testimony, and should

---

[2] Google has objected to Plaintiffs' submission of untimely rebuttal reports. *See* Objection to Reply Evidence, Dkt. 528.

[3] *See also id.* 107:14-23 (methodology for opinion one was to go to the "sync setup screen," "read the language very carefully," and "c[o]me up with [his] opinion."); *id.* 109:2-5 (same for opinion two); *id.* 109:20-110:1 (same for opinion three).

[4] In fact, Professor John's first opinion in her opening report was that "[a] common methodology can be applied to answering questions about consumer expectations and actions and would not require individual questioning of all consumers." Opp. 5. She acknowledged that "a common [methodology] [is] surveys," Dkt. 339-16 (John Rep.) at 2, but she did not conduct a survey here (even though she conducts surveys almost every day), Dkt. 424-8 (John Tr.) 54:1-6, 55:15-19. She identified no other methodology in her report, and even her rebuttal report fails to identify a methodology other than reading articles about surveys in different contexts.

thus be disregarded. *See* Google's Objection to Reply Evidence, Dkt. 528.

**B.   Even if the rebuttal reports are considered, they fail to demonstrate that Professor Turow and John applied reliable methodologies**

**1.   Professors Turow's and John's opinions are unreliable because they rely exclusively on surveys and research in inapposite contexts and the Professors fail to explain how such surveys and research supports their opinions**

Plaintiffs seek to defend Professor Turow's and John's methodologies by claiming their opinions are based "on their decades of experience and their and others' research in their relevant fields as well as Google's own documents." Opp. 1. Critically, however, the Professors admit they have not conducted any research that pertains to the issues in this case.[5] *All* of their experience pertains to inapposite contexts which Plaintiffs concede is irrelevant because: "This case is not about Internet tracking generally—or even Google tracking generally. It is solely about the Chrome browser—and express promises that Chrome made to users in a binding contract." Opp. 17.

The Professors also fail to explain how any of the cited surveys or research from inapposite contexts supports their opinions on how "reasonable users" would interpret the specific disclosures at issue here. To the contrary, Plaintiffs take the position (without any support from even their experts) that "there is no conceivable way to design an efficient survey" for this case, and that "the only proper survey in this case is a jury trial." Opp. 22-23. This position is frivolous,[6] but it forecloses Plaintiffs' arguments that *their* experts' opinions are supported by surveys designed for

---

[5] *See, e.g.* Turow Tr. 41:2-19, 42:12-21, 43:12-16, 44:6-24, 124:18-125:6 (Professor Turow has never conducted a survey on the topic of what people consider to be "personal information," does not know "if the population at large knows what personal information is within the internet industry," and never conducted any surveys on the topics of Google's disclosures, Chrome's sync feature, or any other Google product or service); John Tr. 122:22-125:4 (never conducted any surveys regarding Google disclosures, Chrome's sync feature, or any other Google product or service).

[6] Plaintiffs erroneously contend that a survey could not be designed for this case because of the alleged "complexities of [Google's] backend systems that create highly detailed profiles from not synced data." Opp. 22-23. Not only have Plaintiffs misleadingly presented documents relating to "user profiles," *see, e.g.*, *compare* Dkt. 461-4 (making claims about advertising profiles), *with* Dkt. 461-68 (Plaintiff "clickiness profile"), but, neither Plaintiffs nor their experts provide a legal or scientific basis to conclude that a complete understanding of how Google's "back-end" systems work is a prerequisite for conducting a survey regarding consumers' expectations of Google's disclosures.

entirely *different* contexts.

Plaintiffs next argue that a context-specific survey is not necessary based primarily on this Court's decision in *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390 (N.D. Cal. 2021). But there, the Court explained that a consumer survey on confusion or materiality issues is not necessary only if the expert's testimony on such issues "*is otherwise reliable.*" *Id.* at 401 (emphasis added); *see also Berman v. Freedom Fin. Networ*k, LLC, 400 F. Supp. 3d 964, 972 (N.D. Cal. 2019) (experts "may not testify as to whether a particular user or group of users was confused or misled absent a factual basis for so stating (e.g., survey data)"). Thus, in *Bailey*, the plaintiff's expert's opinion was reliable because he had conducted "hundreds if not thousands" of consumer interviews specifically about pharmaceutical ads promising "fast" results (a term at the heart of the dispute), and he had conducted "thousands" of consumer studies analyzing how consumers compare similar products that are differently priced (which again was at the crux of the dispute). *Bailey*, 338 F.R.D. at 401; *see also Bailey v. Rite Aid Corp.*, Case No. 4:18-cv-06926-YGR, Dkt. 92-6 (Expert Report of Bruce G. Silverman) ¶¶ 55, 62, 66.[7] Similarly, in *Hadley v. Kellogg Sales Co.*, 2019 WL 3804661 (N.D. Cal. Aug. 13, 2019), the court explained that "experience-based expert testimony is reliable if the expert explains how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at *24 (internal alterations and citations omitted).

The specific experience possessed by the experts in *Bailey* and *Krommenhock*, and the explanations provided in *Hadley*, are lacking here. Neither Professor Turow nor John cites any survey or study in which he/she asked users about disclosures or terms that are the same or similar to those at issue here. Nor do they explain how previously conducted surveys from different contexts

---

[7] The expert report in *Krommenhock*, another case cited by Plaintiffs (Opp. 11-13, 16), is distinguishable for the same reasons. *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 580 (N.D. Cal. 2020) ("Silverman's in-depth experience in this field, including attending numerous focus groups centered on marketing cereal and developing marketing plans for cereal products, qualify him to opine on the matters addressed in his Report."); *Krommenhock v. Post Foods, LLC*, Case No. 16-cv-04958-WHO, Dkt. 155-3 (Expert Report of Bruce G. Silverman) ¶ 113 ("I repeatedly heard consumers at focus groups where food products were being discussed use the word 'nutritious' as a synonym for healthy").

could be reliably applied here to support their opinions. In fact, Professor Turow disclaimed reliance on his prior surveys altogether. Turow Tr. 39:14-40:1, 40:23-41:1. Professor Turow further admitted that, in the entire course of his career, he never "took a … statement from a privacy policy and gave it to people and said, 'What does this mean?'" *Id.* 374:4-13.

Plaintiffs' Opposition brief tries to explain away these failings, but none of their after-the-fact justifications can save the Professors' opinions. *First*, Plaintiffs now claim that Professor Turow's "methodology" involved "compar[ing]" Google's "materials…to the privacy policies he studies." Opp. 3. But nothing in his report supports that claim. Nor does his report explain how his general experience in "learning how reasonable people understand" unidentified privacy policies and "hearing feedback about what people pay attention to or not for purposes of parsing information," *id.*, was applied in this case. For example, unlike the expert in *Bailey*, Professor Turow does not identify anything specific that "people pay attention to" in privacy policies and explain how that applies here. He simply makes conclusions that certain language gives the "clear impression" that Google will not receive the disputed data unless users have enabled Sync, without explaining how his prior experiences apply.[8]

*Second*, Plaintiffs contend vaguely that Professor John is "aware of significant research that looks at privacy policies and how people understand or misunderstand them." Opp. 14. But nowhere in her original report did she explain what the "significant research" is, what it says, and how (or whether) Professor John applied that research to this case. In her rebuttal report, Professor John, for the first time, highlighted a handful of articles summarizing surveys about privacy policies generally

---

[8] As another example, Professor Turow opines that Google's use of the word "personalize" in the Sync Setup screen "is a clear signal that Google will be using the individual's data if the person syncs." Dkt. 339-22 (Turow Rep.) ¶ 13; *see also id.* ¶ 14 (the statement "Google may use your browsing history to personalize Search, ads, and other Google services" "clearly create[s] the impression that it will use people's data for personalization *only* when they sync"). But he cites *nothing*—no prior studies, no prior interviews, no other articles—to support his interpretation or explain how he reached that conclusion. To the contrary, Professor Turow admitted that he has never conducted any research relating to how users interpret the term "personalization." Turow Tr. 114:1-17. Additionally, Professor Turow's first "sub-opinion" is that "upon download of Chrome and upon subsequently syncing, Google uses words that clearly create the impression that it will use people's data for personalization only when they sync with Chrome." Opp. 2-3. But this entire case is premised on people who did *not* enable Sync.

finding that *other companies'* privacy policies are difficult to understand. John Rebuttal Rep. ¶ 39. But, like Professor Turow, she fails to explain how those surveys support her opinion that "reasonable consumers" *would* understand *Google's* Privacy Policy or the Chrome Privacy Notice in the same manner that Plaintiffs suggest.[9] To the contrary, even in her rebuttal report, Professor John maintains that "if users were to read [Google's] disclosures, there would not be a single 'shared reality' as to what these disclosures mean."[10] *Id.* ¶ 41. She then makes an illogical leap and concludes that "Chrome's sharing of personal information with Google is inconsistent with reasonable expectations." *Id.*

Plaintiffs further contend that Professor John relies on "research that looks at what is an invasion of privacy and assessing people's expectations of privacy with respect to behaviorally targeted ads." Opp. 5. But the survey she cites did not ask the respondents to review any privacy policies (let alone Google's Privacy Policy), nor did it ask users how they interpreted privacy policies. Rather, the cited survey asked whether Facebook "should" show users advertisements targeted based on certain categories of information (*e.g.*, gender inferred from Facebook activity). That survey does not remotely support Professor John's opinions in this case regarding how "reasonable people" would interpret Google's disclosures.

*Third*, Plaintiffs contend that the Professors rely on "Google's own internal research." Opp. 1, 5. But Professor John's report cited only three Google documents, none which addresses the questions on which she opines. John Rep. at 2-3. Professor Turow cited only one Google document

---

[9] Professor John also fails to explain how those general studies apply to Google's disclosures, particularly given that she did not even consider or opine on the short and simple Account Holder Agreements (which she says, without any analysis "do not change [her] opinions," John Rebuttal Rep. ¶ 42). In fact, she acknowledges that "Chrome's disclosures" (presumably she means Google's disclosures) "are written at a lower reading level relative to many of the privacy policies tested in the work I cite." *Id.* ¶ 40.

[10] In her original report, Professor John similarly concluded "that if consumers did read the relevant privacy disclosures, they would not come to one singular interpretation of what these notices mean, and a common—and perhaps even the most common—understanding would be to conclude that not syncing means that Google would not collect their personal information." John Rep. at 5. Her opinion that Plaintiffs' interpretation would be "perhaps the most common" understanding is based solely on undisclosed research that privacy policies are "difficult…to understand… and that, indeed, most people do not understand them." *Id.*

in his report. Turow Rep. at 10 n.3. And he conceded that document was not prepared *by* Google, but *for* Google, by a consultant. Turow Tr. 300:1-2 ("This is just an external report by a consultancy"). He admitted that, in his report, he highlighted the parts of the document he believed supported his opinions, while ignoring the parts that undermined them. *See, e.g.*, *id.* 322:2-7 ("I used the points in the slide deck to…emphasize the difficulty of people understanding some of the language and particularly as I told you here, privacy policy. But there's nothing in my report that has anything to do with marketing or Nordstrom or data"). And he conceded that this document did not "mention any particular Google service" or "Chrome sync," and contended that he did not "believe that this study is necessarily worthwhile" and had "no sense that this is real stuff" because "focus groups can be just so bad." *Id.* 300:15-302:5; 309:8-19. Plaintiffs thus cannot credibly maintain that their expert's opinions are supported "by Google's own research."

This Court's decision in *In re PFA Ins. Mktg. Litig.*, 2021 WL 5994908 (N.D. Cal. Nov. 3, 2021) (Gonzalez Rogers, J.) is instructive. There the plaintiffs' expert opined that the "predominant[] motivation" of "recruits" of an alleged fraudulent multi-level marketing insurance business to purchase insurance policies themselves was "the recruit's desire to participate in PFA's financial opportunity sales plan." *Id.* *3. The Court found that opinion to be unreliable, "speculative and unsupported" because (1) "Plaintiffs have pointed to no portion of [the expert's] report or deposition testimony where he explains how his experience in the [relevant] industry could support his opinion as to the motivation for [class members] purchase of Living Life policies" and (2) the expert "conducted no surveys and does not claim to have studied consumer behavior in the context of IUL policies or the Living Life policies at issue here." *Id.* at *5; *see also Salhotra*, 2022 WL 625078, at *10 (striking expert's opinion as "classic ipse dixit" because he "proclaim[ed] the existence of an inherent defect but disclose[d] no methodology he applied or followed to arrive at that conclusion.")

The same is true of Professors Turow and John. They claim to have "decades of experience" conducting consumer surveys and research on various aspects of internet privacy *generally*, but they fail to explain how that experience supports their opinions on how users would interpret the specific

disclosures at issue.[11]

### 2. Professor Turow's and John's reports are unreliable because they failed to consider key elements of Plaintiffs'—and many Class Members'—contracts with Google

Professor John's and Turow's opinions are also unreliable because they purport to opine on how "reasonable users" would interpret select documents in Plaintiffs' contract with Google—documents Plaintiffs admit they never saw—while ignoring the starting point for the contracts—*i.e.*, the Account Holder Agreements that describe the data collection at issue and which Plaintiffs and many class members reviewed and to which they selected "I AGREE."

Plaintiffs assert that the Professors ignored the Account Holder Agreements because they "are not part of a binding contract with consumers and thus are not relevant to this case." Opp. 17. The only rationale Plaintiffs offer for this baseless argument is buried in footnote where they blatantly misquote Judge Seeborg as finding that "'WAA was not incorporated into the Terms of Service, and was not a standalone contract.'" *Id.* at 12 n.6 (misquoting *Rodriguez v. Google*, 2022 WL 214552, at *3-4 (N.D. Cal. Jan. 25, 2022)). In fact, Judge Seeborg concluded that "the Web and App Activity ('WAA') *Help Page* [*i.e.*, the help page that the *Rodriguez* plaintiffs claim Google breached] was not incorporated into the Terms of Service, and was not a standalone contract." The court's statement merely reconfirmed its earlier findings that the WAA Help Page (1) was not incorporated into "the Privacy Policy, via its 'learn more here' language," because the Privacy Policy "nowhere references the WAA Help Page," and (2) was not a standalone contract because Plaintiffs did not provide "valid consideration." *Rodriguez v. Google*, 2021 WL 6621070, at *4 (N.D. Cal. Aug. 18, 2021). In stark contrast, Plaintiffs' Account Holder Agreements *are* standalone contracts and Plaintiffs provided valid consideration, including the very data they now claim Google misappropriated.

---

[11] Plaintiffs' attempt to distinguish the cases relied upon by Google fails too. For example, Plaintiffs' description of *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014), underscores the inadequacy of Plaintiffs' experts' opinions. Opp. 16 & n.1. Plaintiffs acknowledge that the expert in that case "appeared to [have] plucked [the opinion] out of thin air without a methodology." *Id.* The same is true about Professors John and Turow.

Professors Turow's and John's failure to consider the critical components of Plaintiffs' contract with Google—the only documents that Plaintiffs and many class members actually reviewed, and which describe the very data collection at issue—further confirms that their opinions are unreliable.[12] *See Fontem Ventures, B.V. v. NJOY, Inc.*, 2015 WL 12743861, at *9 (C.D. Cal. Oct. 22, 2015) (excluding opinion of expert who "did not know various details about the accused…products" because report was "not based on a reliable and sufficient factual foundation"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (excluding expert's opinion because "[n]ot all relevant circumstances were incorporated into the expert's method of analysis").

### 3. Professors Turow and John's opinions are unreliable because they fail to define key terms embedded in their opinions

Professor Turow's and John's opinions also should be stricken because they fail to define key terms embedded in their opinions. For example, a key issue in this case is whether Chrome users reviewing the Chrome Privacy Notice would construe certain references to "personal information" to include the kind of technical data at issue (*e.g.*, IP address, GET requests).  But neither of the Professors defined "personal information" in their reports and they could not say whether the data at issue in this case constituted "personal information" much less explain how Chrome users would interpret that term in the context of the Chrome Privacy Notice.

Plaintiffs assert that "Professor Turow explained [in deposition] that he used 'personal information' in his report because Google uses that term, his definition of it is the same as Google's, and it involves identifying an individual within and potentially across devices." Opp. 23.  But Professor Turow never pointed to a specific Google definition, and when interpreting the Chrome Privacy Notice, Professor Turow offered inconsistent interpretations of the term.  He asserted that

---

[12]  Plaintiffs also spill much ink mischaracterizing documents that "discovery has revealed" but which Plaintiffs' experts did not consider or cite in their reports. Opp. 18-20. Because (1) these documents and arguments are not relevant to whether Prof. John and Turow's opinions are reliable, and (2) Google already addressed many of Plaintiffs' mischaracterizations (which also appear in their opposition to Google's motion for summary judgment) in its summary judgment reply brief, Dkt. 474-4 (Sealed Reply in Support of Motion for Summary Judgment), at 13-14, Google will not address those mischaracterizations again here.

users would interpret the term "personal information" in its "colloquial" sense when the Chrome Privacy Notice refers to "personal information and passwords, to help you fill out forms or sign in to sites you visit,"—*e.g.*, names, email addresses, phone numbers, passwords—but claimed that users would interpret the phrase "the personal information that Chrome stores" in the very next paragraph to cover a much broader set of data. *Compare* Turow Tr. 149:7-21, *with id.* 159:14-163:9 ("Only in that bullet should it be used in a colloquial sense. When it starts generalizing about the way in which Google approaches people's data, …it has a more general implication."). Professor Turow cited no authority or research to support this opinion. Nor did he point to any research explaining how reasonable users would interpret the term "personal information" in the context of the specific disclosures at issue, or even more generally.

Plaintiffs assert that Professor John defined "personal information" as "that pertaining to the self - it's so visceral what it means that it's hard to think of a synonym; sensitive personal information is that which makes a person feel vulnerable especially if revealed." Opp. 23.  This vague description only proves the point that Professor John failed to provide a meaningful definition for a key term. And like Professor Turow, she points to no research supporting her contention that "reasonable users" would interpret "personal information" in the context of the disclosures at issue to refer to the data at issue here.

In defense of Professor John's inability to define "privacy on the Internet"—a key term in her second opinion—Plaintiffs vaguely assert that "she explained that she means exactly what is written with those words."  Opp. 23.  But when asked to define the phrase in deposition, she was not able to do so.  John Tr. 162:24-163:24 ("privacy" is "abstract," "it's kind of like love.  Like how do you define love?"). Moreover, on its face, the phrase is exceedingly vague and, as Professor John acknowledged, "abstract."  "Privacy on the internet" is not an all or nothing proposition. There are different degrees of privacy—on the internet, and elsewhere—and the phrase obviously can mean different things to different people.

The secondary research Professor John cites to support this opinion proves the point: In "Why Am I Seeing This Ad?," the mean response to the survey question "Facebook *should* show me advertisements based on [certain targeting practices]," was 3.05 (out of 7) for practices

categorized as "us[ing] information obtained cross website" and 3.11 (out of 7) for practices categorized as "mak[ing] inferences about their attributes," with standard deviations of 1.8 and 1.7, respectively.[13] Similarly, although Professor John concludes that Plaintiffs' failure to read Google's Privacy Policy and the other disclosures is "similar to the majority of U.S. consumers," Opp. 9, the source cited in Professor John's report actually showed substantial variety: less than half (36% never read privacy policies), while 38% sometimes read them, 13% often read them, and 9% always did. John Rep. at 6.

### C. Professors Turow and John's opinions do not rely on specialized knowledge, and are therefore irrelevant

Professor Turow's and John's methodology is further undermined by the fact that they essentially admitted in deposition that their purported expertise is not necessary because "*anybody who approached this material … in a neutral way would come to the same conclusions*" that they did. Turow Tr. 24:15-17. This is so, they contend, because interpreting the disclosures at issue is "so straightforward" and "the answer to the question of how reasonable people would interpret the statements at issue in Google's disclosures is just *obvious*." *Id.* 23:23-25:12, 308:18-23; *see also id.* ("it would be very difficult not to...draw the meanings that I propose in my report"); John Tr. 129:15-23 ("it's hard for me to see how people would come to the conclusion that when they don't [sync] that all this information will be shared."). Professor Turow admitted that "the expertise [he is] offering" is simply "a person who reads the plain language in the document." Turow Tr. 116:23-117:15. And Plaintiffs argue that "the plain meaning of the text at issue [in Google's disclosures] *would not be in doubt to a reasonable person* who spent the time necessary to fully read and understand the policies." Opp. 14 (emphasis added).

But in the next breath, Plaintiffs seek to defend the utility of Professor Turow's and John's opinions, claiming their unique "interpretative abilit[ies]" are necessary because "reasonable people struggle understanding privacy policies," and Professors Turow and John are "better than the jury at interpreting [Google's] documents." *Id.* 20-21. Plaintiffs now contend that interpreting Google's

---

[13] Tami Kim *et al.*, *Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness*, 45 J. Consumer Res. 906, 911(2018).

"straightforward" disclosures requires the expertise of Professor Turow—who brought to bear "his strong background in understanding the nature of the technology" and "his 30-plus years of work in the areas of digital technologies, advertising, and society, along with reviewing and teaching about hundreds of privacy policies and learning how reasonable people understand them." *Id.* 13, 20. Apparently even Professor Turow's expertise is not enough because, according to Plaintiffs, interpreting Google's disclosures *also* requires the expertise of Professor John—who brought to bear her "expertise in privacy." *Id.* 20.

However, Professors Turow's and John's extraordinary experiences make them *unlike* the typical Chrome user, and thus their purportedly enhanced "interpretative abilities" would serve only to confuse the issue of what "reasonable people" think when reading Google's disclosures.

Plaintiffs cannot have it both ways. Their argument that the Professors' "vast experience interpreting and opining on privacy policies" is necessary to understand the "plain meaning of the text at issue" is foreclosed by the Professors' testimony that Plaintiffs' alleged interpretations would be "obvious" to "anybody who approached this material … in a neutral way."

Because Professors Turow and John do not offer any specialized expertise that will assist the trier of fact understand any issue, their opinions are irrelevant and should be stricken.

## III. CONCLUSION

The Motion to Strike should be granted.

DATED:  March 16, 2022                          Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ Andrew H. Schapiro*
Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (Bar No. 326971)
crystalnixhines@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Diane M. Doolittle (CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Josef Ansorge (admitted pro hac vice)
josefansorge@quinnemanuel.com
Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice)*
carlspilly@quinnemanuel.com
1300 I. Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: 202-538-8000
Facsimile: 202-538-8100

Jomaire A. Crawford (admitted pro hac vice)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*