# EXHIBIT 3
# to Declaration of
# W. Somvichian

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |
| --- | --- |
| **IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION** | **CASE NO. 4:21-CV-02155 YGR (VKD)** |

**EXPERT REPORT OF DOMINIQUE HANSSENS, PH.D.**
**SEPTEMBER 29, 2023**

# Table of Contents

I.      Qualifications .................................................................................................. 1

II.     Background and Summary of Allegations ...................................................... 2

III.    Assignment and Compensation ...................................................................... 5

IV.     Summary of Opinions ..................................................................................... 6

V.      Survey Design and Implementation ............................................................... 9

        A.      Survey Design ...................................................................................... 11

        B.      Screening Questions ............................................................................ 12

        C.      Main Questionnaires ............................................................................ 14

                1.      Main Questionnaire for the Business Disclosures Survey ......... 14

                2.      Main Questionnaire for the Privacy Disclosures Survey .......... 18

                3.      Main Questionnaire for the Existing Account
                        Hypothetical Disclosures Survey ............................................... 22

                4.      Main Questionnaire for the New Service
                        Hypothetical Disclosures Survey ............................................... 24

        D.      Survey Implementation ........................................................................ 25

VI.     The RTB Surveys Show That Many Consumers Expect Google to Share Information with
        Potential Advertisers, Often Accept Privacy Disclosures from Third-Party Publishers, and
        Are Likely to Accept a Privacy Policy Explicitly Stating That Google Shares Certain
        Types of At-Issue Information .......................................................................... 27

        A.      A Large Share of Consumers Expect Google to Share Information with Potential
                Advertisers When They Visit Publisher Websites ............................... 27

        B.      A Large Share of Consumers Have Seen and Accepted the Privacy Disclosures on
                Websites That Display Ads .................................................................. 30

        C.      A Large Share of Consumers Would Likely Accept a Hypothetical Google
                Privacy Policy That Explicitly Stated That Google Shares with Advertisers Certain Types
                of At-Issue Information ........................................................................ 32

VII.    Professor Richards' Opinions Are Flawed and Unreliable Because He Did Not Analyze
        Account Holder Expectations ........................................................................ 34

        A.      Prof. Richards' Opinions Are Unreliable Because He Did Not Analyze Account
                Holder Expectations and Instead Relied on Unsupported Assumptions ......................... 35

        B.      Prof. Richards Ignores Evidence Suggesting That Account Holders Could Learn
                from Multiple Sources About the Information That Google Shares with Advertisers ..... 45

## I.    Qualifications

1.      I am a Distinguished Research Professor of Marketing at the UCLA Anderson School of Management in Los Angeles, California, where I have served on the faculty since 1977.  I received my Licentiate from the University of Antwerp in Applied Economics and received my M.S. and Ph.D. degrees in Management from Purdue University.  At UCLA, I have taught a variety of marketing courses including Elements of Marketing, Marketing Strategy & Planning, and Customer Information Strategy.  I have received awards for distinguished teaching in the MBA and Executive MBA programs, including the UCLA Anderson School's Neidorf "Decade" teaching award.

2.      My research focuses on strategic marketing problems, to which I apply expertise in data-analytic methods, such as consumer surveys, econometrics, and time-series analysis.  I have frequently consulted on marketing and consumer behavior issues for companies in a variety of industries such as technology, information services, automobile, consumer products, and retail. These consulting assignments include the design and supervision of dozens of consumer surveys in a variety of sectors.  I am also a founding partner of MarketShare, a global marketing analytics firm headquartered in Los Angeles (now a division of TransUnion.).

3.      I have served as an area editor for *Marketing Science* and an associate editor for *Management Science* and the *Journal of Marketing Research*.  My papers have appeared in leading academic and professional journals in marketing, economics, and statistics.  Five of these articles have won Best Paper awards, in *Marketing Science* (1995, 2001), *Journal of Marketing Research* (1999, 2007), and *Journal of Marketing* (2010), and ten were award finalists.

4.      From 2005 to 2007, I served as the Executive Director of the Marketing Science Institute in Cambridge, Massachusetts.  The American Marketing Association awarded me the Churchill Award (2007) and the Mahajan Award (2013) for Career Contributions to Marketing Research and

Marketing Strategy, respectively.  The INFORMS Society for Marketing Science elected me as a Fellow (2010) and awarded me the Buck Weaver Award (2015) for lifetime contributions to the theory and practice of marketing.  A copy of my curriculum vitae setting forth my professional experience and qualifications is attached as **Appendix A**.

5.      I have served as an expert witness or offered consulting services in a number of cases that were related to the design and implementation of consumer surveys, assessing consumer purchase behavior and factors influencing purchase decisions, branding and marketing related issues, and damages.  I have testified in depositions and trials about the findings arising from the surveys I have conducted.  A list of my testimony in the past four years is attached as **Appendix B**.

## II.      Background and Summary of Allegations

6.      Google LLC ("Google") provides consumer and business technology products and services in both software and hardware segments, including Search, Chrome, Gmail, Google Maps, Google Pay, Pixel, and YouTube.[1]  Google's primary source of revenue is online advertising.[2]

7.      Advertisers use Google services to display ads on Google-owned websites as well as on independent partner websites that internet users visit to consume digital content.[3]  These partner websites are often referred to as "publishers," and include news sites, electronic magazines, blogs, etc.[4]  One of the technologies that Google uses to place and price ads on publisher websites is its Real Time Bidding ("RTB") system.[5]  In the RTB system, Google matches potential advertisers interested in displaying online ads with opportunities to show ads in publisher websites (known as

---

[1] "Products," *About Google*, https://about.google/products/.
[2] "How We Make Money with Advertising," *Google*, https://howwemakemoney.withgoogle.com/.
[3] "How We Make Money with Advertising," *Google*, https://howwemakemoney.withgoogle.com/.
[4] "Google for Publishers," *Google*, https://www.google.com/ads/publisher/.
[5] "Introduction to Real-Time Bidding (RTB)," *Authorized Buyers Help*, https://support.google.com/authorizedbuyers/answer/6136272?hl=en.

"ad impressions").[6]  I understand that as part of the process of running the RTB system, Google shares with potential advertisers a "bid request," providing "context about at least one ad opportunity so that the bidder can determine the optimal [advertisement] and bid amount (if any) for each impression."[7]

8.      Plaintiffs in this litigation allege that specific statements and disclosures made by Google in its Terms of Service, Privacy Policies, and Google account holder agreements (the "Challenged Statements") misrepresent to U.S. account holders that Google does not sell or share their personal information to participants in the RTB system.[8]  According to Plaintiffs, Google uses bid requests to sell to advertisers and other participants in the RTB system the personal information of Google account holders without their knowledge or consent.[9]  Specifically, Plaintiffs allege that when an account holder visits a publisher's website that partners with Google, the bid request that Google shares with potential advertisers contains information that can be associated with that Google account holder, including the following:

1)  Unique identifiers, such as the account holders' Google User ID,[10] or device IDs;[11]

2)  browser cookies, including Google-generated cookies that may allow advertisers to associate the account holders' browser with prior visits to other websites;[12]

---

[6]      "Introduction to Real-Time Bidding (RTB)," *Authorized Buyers Help*, https://support.google.com/authorizedbuyers/answer/6136272?hl=en.

[7]  "Real-Time Bidding," *Authorized Buyers*, September 15, 2023, https://developers.google.com/authorized-buyers/rtb/start.

[8]  Consolidated Class Action Complaint, *Benjamin Hewitt, et al. v. Google LLC*, United States District Court for the Northern District of California, San Jose Division, Case No. 5:21-cv-02155-LHK-VKD, September 16, 2021 ("Complaint") ¶¶1-3, 11, 83, 95.

[9]  Complaint, ¶ 12.

[10]  I understand that the Google User ID is not an identifier for someone's Google account but rather a cookie value derived from a cookie that Google associates with web browsers for advertising purposes.  *See* "Introduction to Real-Time Bidding (RTB)," *Authorized Buyers*, https://support.google.com/authorizedbuyers/answer/6136272?hl=en.

[11]  Complaint, ¶¶ 14, 90, 163, 226–233; Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; and Memorandum of Points and Authorities in Support Thereof, *In Re Google RTB Consumer Privacy Litigation*, United States District Court for the Northern District of California, Oakland Division, Case No. 4:21-cv-02155-YGR, July 14, 2023 ("Motion for Class Certification"), pp. 13–15.

[12]  Complaint, ¶¶ 14, 134, 152, 245–259; Motion for Class Certification, pp. 13, 15.

3) the truncated IP address of the account holder's device;[13]

4) the URL of the website being visited, or the name of the app being used;[14]

5) the content category and subcategory in which Google classifies the website being visited (also called a "vertical");[15]

6) technical details about the account holder's web browser or platform (e.g., the operating system version), also called the "user agent."[16]

9.     Plaintiffs seek to certify a class of "[a]ll individual Google account holders subject to a Google United States Terms of Service whose personal information was sold or shared by Google in its Real Time Bidding auctions after June 28, 2016" (the "Proposed Class").[17]

10.    In support of their motion for class certification, Plaintiffs submitted the expert report of Neil Richards, a professor at Washington University School of Law.[18]  In his report, Prof. Richards presents his review of "documents and testimony" and describes his opinions concerning issues of privacy in the RTB system.[19]  Specifically, Prof. Richards states that "privacy – including freedom from unwanted surveillance – is a fundamental right and important societal norm";[20] that "Google's Terms of Service and Privacy Policies … reflect a societal understanding" of those privacy rights and societal norms;[21] that "there are common, objective facts … from which a jury or trier of fact

---

[13] Complaint, ¶¶ 14, 209–219; Motion for Class Certification, pp. 13, 15.  Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address.  *See* "Privacy & Terms," *Google*, https://policies.google.com/privacy/key-terms?hl=en-US.  I understand that for purposes of RTB, Google only sources device locations from IP geolocation, never from GPS or other sources.  *See* "Geographical Targeting," *Google Developers*, https://developers.google.com/authorized-buyers/rtb/geotargeting.

[14] Complaint, ¶¶ 14, 201–202; Motion for Class Certification, pp. 6, 13.

[15] Complaint, ¶¶ 14–16, 144–150, 163, 201; Motion for Class Certification, p. 15.

[16] Complaint, ¶¶ 14, 140, 220–225; Motion for Class Certification, p. 13.  *See also* Complaint, ¶ 140 ("User-Agent. 'A string that identifies the browser and type of device that sent the request.'"); "User-Agent Targeting," *Authorized Buyers*, September 15, 2023, https://developers.google.com/authorized-buyers/rtb/useragent-targeting.

[17] Motion for Class Certification, p. 8.

[18] Expert Report of Professor Neil Richards, July 14, 2023 ("Richards Report").

[19] Richards Report, ¶ 8.

[20] Richards Report, ¶ 2.

[21] Richards Report, ¶ 3.

may conclude that Google RTB violates societal privacy norms,"[22] and that societal privacy norms require "informative disclosures about what information is collected about or associated with U.S. Google account holders."[23]  Prof. Richards further claims that "there is common evidence that Google's Terms of Service, Privacy Policies, and disclosures throughout the Class Period give rise to a common (false) expectation" that Google does not sell account holders' information in the RTB system.[24]  Finally, Prof. Richards claims that "there is common evidence that Google fails to disclose its RTB auction to U.S. Google account holders or offer any mechanism to consent to Google's sharing or selling information" through bid requests.[25]

## III.    Assignment and Compensation

11.    I was retained by counsel for Google and asked to address the following research questions:

- **Question 1:** Assess (1) whether members of the Proposed Class expect Google to share different types of information with advertisers when they visit websites or use apps that partner with Google to show advertising (like the websites and apps that participate in the RTB system) after they see the Challenged Statements and (2) the heterogeneity, if any, in Proposed Class members' exposure to, and actions related to, privacy-related banners and popups on websites that display advertising.

- **Question 2:** Assess whether members of the Proposed Class would accept Google's privacy policy if they were explicitly told that Google shares with advertisers certain types of information (like the types of information that Plaintiffs claim Google shares with advertisers in the RTB system).

- **Question 3:** Evaluate Prof. Richards' claims involving expectations of members of the Proposed Class about online privacy and the methodology he used to reach his conclusions.

---

[22] Richards Report, ¶¶ 4, 118.
[23] Richards Report, ¶ 5.
[24] Richards Report, ¶¶ 5–6.
[25] Richards Report, ¶ 7.

12.     In carrying out my assignment, I relied on my experience and expertise as a marketing professor, my experience conducting consumer surveys in a large number of consulting assignments and litigation matters, academic literature, materials produced in this litigation, the Richards Report, deposition testimony from Prof. Richards, deposition testimony from Plaintiffs, the declarations of Suneeti Vakharia and Hunter Hanzarik, and other materials.   A list of the materials I have relied upon to date in forming my opinions is attached as **Appendix C**.   All deposition transcripts and documents produced by Google cited in this report appear as exhibits to the concurrently-filed Declaration of Whitty Somvichian.

13.     I am being compensated at my standard billing rate of $1,100 per hour.  Staff at Cornerstone Research, a consulting firm, and GBK Collective ("GBK"), a survey management firm, worked under my direction and assisted me in this matter.   I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.   Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

14.     My work is ongoing, and I reserve the right to supplement my report and modify my opinions as I review additional data and information.

## IV.     Summary of Opinions

15.     I designed and conducted four online surveys of U.S. Google account holders (the "RTB Surveys") in accordance with standard survey procedures and best practices.   I find that, after reviewing excerpts from Google documents containing Challenged Statements, a large share of Google account holders think that it is somewhat or very likely that Google shares with potential advertisers information that Plaintiffs claim is personal information when Google account holders visit websites (or use apps) that display targeted ads.   For example, 74 percent of the respondents

who reviewed excerpts from Google's privacy policy containing Challenged Statements think that it is somewhat or very likely that Google shares with potential advertisers their browser cookies when they visit websites or use apps that display targeted ads (like the websites and apps that participate in the RTB system). A smaller share of Google account holders think that it is somewhat or very unlikely that Google shares with potential advertisers information that Plaintiffs claim is personal information. I also find that there is heterogeneity in the expectations of Google account holders depending on whether the information in question is their partial IP address, the URL of the website, the content categories in which Google classifies the website, their browser cookies, or the characteristics of their web browser and device.

16.    The RTB Surveys also show that in the past seven years, the vast majority of Google account holders have seen privacy popups or banners when they visited websites that display advertising. I find that there is substantial heterogeneity in how Google account holders interact with these privacy popups and banners, and in their implicit or explicit acceptance of privacy disclosures from websites that display ads.  For example, 58 percent of respondents clicked a button indicating they accepted the privacy policies of the website, 61 percent clicked on a button indicating they accepted all cookies, and 51 percent continued to navigate to the site after seeing the site's privacy popups and banners.  Moreover, the majority of respondents (65 percent) indicated that when they see these privacy banners or popups, the most frequent action they take is either to accept all cookies or policies or to ignore a popup or banner by either not interacting with it or by closing it.

17.    The RTB Surveys also show that a large share (more than 70 percent) of Google account holders would be somewhat or very likely to click the "I Accept" button after reading a hypothetical Google privacy policy excerpt that explicitly states that Google shares with

advertisers certain types of information that Plaintiffs allege Google shares with advertisers in the RTB system, in order to continue using their Google account and Google services. I find a similar result when respondents were asked to review and accept the same hypothetical Google privacy policy in order to sign up for a Google Service in which they are interested but do not currently use. This result avoids potential concerns respondents may have about losing access to their currently-used Google services if they choose not to accept the hypothetical privacy policy.

18.    My review of the report of Prof. Richards and his sources reveals that his opinions are unreliable for a number of reasons.

19.    To the extent Prof. Richards' opinions concern the expectations of members of the Proposed Class about the information that Google shares with advertisers in the RTB system (as opposed to the potential conclusions of a jury or trier of fact),[26] his opinions are flawed and unreliable. Prof. Richards has not done any empirical analysis of the expectations of members of the Proposed Class, including regarding to what extent, if at all, Google account holders were misled by the Challenged Statements. Prof. Richards ignores evidence from Plaintiffs' testimony and from academic research showing that expectations about privacy can be heterogeneous across consumers and reflect a variety of influences. Instead, he relies on a flawed, unscientific analysis of so-called "societal norms," while ignoring that different consumers can have different expectations about online privacy.

20.    Prof. Richards appears to derive his so-called societal norms from a flawed, unscientific process that is based on his personal experience and subjective appreciation, and is not amenable to scientific replication. Prof. Richards' analysis also includes a flawed and ad hoc review of documents that lacks a defined methodology and does not appear to be comprehensive, systematic,

---

[26] In this report I do not offer any opinion on the potential conclusions of a jury or trier of fact.

objective, or amenable to replication by another expert.  Moreover, none of the sources he cites as support for his claims about Google account holders' expectations address their expectations about the information that Google shares with advertisers in the RTB system; some of the sources he cites contradict his opinions.

21.    Prof. Richards ignores evidence that suggests that Google account holders could have learned about the information that Google shares with advertisers in the RTB system from multiple sources, and thus expectations may vary from person to person.  Prof. Richards ignores disclosures made by Google informing its account holders of the types of information collected and shared for advertising purposes.  He also ignores disclosures that Google account holders can encounter when they visit publisher websites, which can include extensive details about the information that publishers share with Google for the purposes of advertising.  Prof. Richards also appears to ignore that consumers are constantly exposed to targeted advertising, and by virtue of their experiences online, they could potentially infer that their information is being shared with advertisers whenever they visit a publisher website.

## V.    Survey Design and Implementation

22.    To address the questions posed to me by counsel for Google, I designed and conducted four surveys of U.S. Google account holders.  Two of the surveys address Question 1 of my assignment.  One is a survey of consumer expectations based on Google's "How Our Business Works" disclosures (the "Business Disclosures Survey"), and the other is a survey of consumer expectations based on Google's Privacy Policy disclosures (the "Privacy Disclosures Survey").  Question 2 of my assignment involves two additional surveys: a survey of consumer behavior based on a hypothetical privacy policy pertaining to an existing Google account (the "Existing Account Hypothetical Disclosures Survey") and a survey based on a hypothetical privacy policy

pertaining to a Google service not currently used by respondents (the "New Service Hypothetical Disclosures Survey"). The target population of the RTB Surveys, U.S. individuals who had a personal Google account in the past seven years, reflects Plaintiffs' definition of the Proposed Class.[27]

23. The RTB Surveys were conducted using an online survey panel. The use of online survey panels is considered a standard practice in survey research, and "the great weight of the expert community has come to accept this method of running surveys."[28] Online surveys offer advantages over other survey methods—including reduced interviewer bias and increased stimulus precision and realism.[29] An academic report that studied the use of online survey panels in litigation found that online panels were used in the vast majority of surveys analyzed, and that the researchers' "impression from the expert reports, court opinions, and [their] own experience is that internet surveys now are the default option."[30]

24. In designing and implementing the RTB Surveys, I addressed the key considerations in conducting rigorous consumer surveys and followed standard scientific methods to ensure the reliability of the results, including the following:[31]

- The design of the survey must be driven by the survey's stated objectives.[32]

- The design of the survey must ensure an accurate representation of the underlying

---

[27] Motion for Class Certification, p. 8.

[28] Kugler, M. B., and R. C. Henn Jr. (2022), "Internet Surveys in Trademark Cases: Benefits, Challenges, and Solutions," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S., and J. B. Swann, eds., 2nd ed., Diamond, S. S. and J. B. Swann, eds. Chicago, IL: ABA Publishing ("Kugler and Henn (2022)"), p. 471.

[29] Kugler and Henn (2022), pp. 472–477.

[30] Kugler and Henn (2022), p. 471.

[31] For a detailed discussion of scientific guidelines for surveys, *see, e.g.*, Diamond, S. S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Washington, D.C.: The National Academies Press, 359–423 ("Diamond (2011)").

[32] Diamond (2011), p. 373.

population of interest.[33]

- The sampling plan must be consistent with statistical principles and market research best practices.[34]

- Attempts should be made to minimize or eliminate bias—for example, bias stemming from respondent selection, question wording, ordering of questions or answer choices, or information in the survey that could reveal the sponsor or purpose of the survey.[35]

- The survey questions should be designed to ensure high-quality answers—for example, by avoiding confusion or guessing by respondents.[36]

- Attempts should be made to collect high quality data from respondents who are paying attention to the questions in the survey.[37]

- The investigator should verify that the survey responses are from valid respondents and should use standard statistical tools to analyze the data.[38]

### A.  Survey Design

25.  At the beginning of each of the RTB Surveys, I included a set of screening questions to identify members of the relevant target population and to determine whether respondents would qualify for inclusion in the corresponding survey.[39]  I describe the screening questions in more detail below.  Qualifying respondents were sent to a corresponding main questionnaire.  Each main questionnaire was designed to collect information necessary to answer the questions posed by counsel as part of my assignment.  **Appendix E** lists all the questions, answer choices, termination

---

[33] Diamond (2011), pp. 376–377, 380–383.
[34] Diamond (2011), pp. 377–380.
[35] Diamond (2011), pp. 383, 389, 395.
[36] Diamond (2011), pp. 387–391.
[37] Diamond (2011), pp. 386–387.
[38] Diamond (2011), pp. 364, 376.
[39] The screening questions were designed not to reveal information that could potentially influence responses to the main survey or otherwise inform or educate the respondents inappropriately.

criteria (for respondent screening), and question flow for the RTB Surveys.[40]

26.    Both the screening questions and main questionnaires contained multiple-choice questions. To avoid potential bias resulting from the order in which answer options to the questions appeared, I randomized the order of the answer options for each respondent, except for the "None of the above," "Don't know/Unsure," "Other," or "Prefer not to answer," options, where applicable.  In addition, for questions with answer options structured as a table, I randomized the order of rows across respondents where applicable and the direction of the response scale (from most to least likely or vice versa), excluding the "Don't know/Unsure" option.[41]

## B.    Screening Questions

27.    When designing a survey, it is standard practice to start with a group of questions that "screen potential respondents to determine if they are members of the target population of the survey."[42]  As noted in Diamond (2011), "screening questions must be drafted so that they do not … convey information that will influence the respondent's answers on the main survey."[43]

28.    The screening questions, answer choices, and termination criteria are the same across the RTB Surveys and further detailed in **Appendix E-1 – E-4**.[44]  The screening questions were designed to identify potential respondents in the target population (members of the Proposed Class), and to determine whether respondents qualify for inclusion in the survey.  For each of the RTB Surveys, I included screening questions to identify individuals who:

- In the past seven years have had a personal Google account;[45]

---

[40] In **Appendix F-1 – F-4**, I provide screenshots of the survey questions as they appeared to respondents.

[41] For questions that use a respondent's answers in one question as answer options in a subsequent question, I maintain the same order across all questions for a given respondent but randomize this order across respondents.  *See* **Appendix E-1 – E-4**.

[42] Diamond (2011), pp. 386–387.

[43] Diamond (2011), pp. 386–387.

[44] I used the same screener across the RTB Surveys.

[45] As explained in ¶ 9, Plaintiffs define the putative class period from June 28, 2016, to the present.

- were 13 years of age or older;[46]

- resided in one of the fifty U.S. states or in the District of Columbia.

In addition, I screened for individuals who used a desktop computer, a laptop/notebook computer, a smartphone, or a tablet computer to participate in the survey;[47] agreed to specify their gender;  do not currently work for a market research or marketing company or department of a company; do not currently work for a developer, seller, or marketer of software for online advertising;[48] and had not taken any surveys related to online privacy in the past six months.

29.     I also included an attention check question at the end of the screener (Question S10).[49]  If a respondent failed the attention check question at the end of the screener, they were terminated. These attention checks allow me to identify respondents who were not reading questions carefully.

30.     Respondents who answered any of the screening questions in a way that identified them as *not* being part of the target population (*not* U.S. individuals who had a personal Google account in the past seven years) were terminated from the survey immediately upon answering the relevant question.[50]  For example, if a respondent answered that she did not have a personal Google account in the past seven years, then that respondent was terminated.[51]

---

[46] I include respondents between 13 and 18 years old because I understand that minors are members of the Proposed Class. *See, e.g.,* Complaint, ¶¶ 67–68.

[47] To ensure that the survey was easy to read and respond to, and survey instructions and other content could be properly displayed, respondents were only allowed to participate in the survey through a desktop computer, a laptop/notebook computer, a smartphone, or a tablet computer (and not, for example, through an eBook reader, a device that is not optimized to properly display the survey).

[48] It is standard practice to use these types of exclusion criteria in order to collect unbiased responses.  Excluding respondents from surveys based on the industry they work in (*e.g.*, marketing, market research, and the industry of interest) is a common exclusion practice.  Exclusion based on industry is typically carried out to protect the confidentiality of the content of the survey (*e.g.*, from competitors) or to exclude respondents who might have specialized knowledge that may bias their responses.  *See, e.g.*, Barber, W. G., and G. E. Yaquinto (2022), "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S., and J. B. Swann, eds., Chicago, IL: ABA Publishing, p. 92; Brace, I. (2013), *Questionnaire Design: How to Plan, Structure and Write Survey Material for Effective Market Research*, 3rd ed., London, UK: Kogan Page Limited, pp. 29–31.

[49] *See* **Appendix E-1 – E-4.**

[50] *See* **Appendix G-1 – G-4** for details about the completion and incidence rates for each of the RTB Surveys.

[51] *See* **Appendix E-1 – E-3.**

31.     The inclusion of unrelated answer options in screening questions avoids drawing attention to the item(s) of specific interest to the investigator and avoids disclosing the sponsor and purpose of the survey in a way that could bias the answers to the main questions.[52]  I used such unrelated answer options in my screening questions when appropriate.  For example, instead of directly asking respondents a yes/no question if they have had a personal Google account in the past seven years, the survey asks which, if any, of several different online services the respondent has had an account with in the last seven years.

32.     To ensure that the sample of respondents to the RTB Surveys were representative of the target population, I relied on a well-accepted methodology called "click-balancing."[53]  For each of the RTB Surveys, I first invited a random sample of participants from a large consumer panel to answer the screening questions, ensuring that the demographic characteristics of this random sample matched the ages, gender groups, and geographic regions of the U.S. population of persons 13 years or older. Then, using the screening questions in my surveys I created a final sample of respondents that was valid and representative of the target population, and allowed me to reliably answer the questions posed to me by counsel.[54]  Only those respondents who passed the screener section were sent to the main questionnaire of the corresponding survey.

C.     Main Questionnaires

1.     Main Questionnaire for the Business Disclosures Survey

33.     The purpose of the Business Disclosures Survey was to assess whether members of the Proposed Class expect Google to share different types of information at issue in this matter with advertisers when they visit websites or use apps that partner with Google to show advertising (like

---

[52] Diamond (2011), pp. 386–387, 410.
[53] Kugler and Henn (2022), p. 489.
[54] Kugler and Henn (2022), p. 490.

the websites and apps that participate in the RTB system) after they see a statement from Google's "How Our Business Works" website. Plaintiffs cite multiple times to Google's "How Our Business Works" website and claim that it contains Challenged Statements, including the statement "[w]e don't sell your personal information."[55] Presenting survey respondents with disclosures from this website that focus on the Challenged Statements provides a valid method to assess the heterogeneity in the expectations of Google account holders after they view the Challenged Statements.[56]

34.    The questions, answer choices, and skip logic for the main questionnaire of the Business Disclosures Survey are detailed in **Appendix E-1**. The main questionnaire began by instructing respondents not to guess, but rather to choose the option "Don't know/Unsure" when they do not know or do not have an answer.[57]

35.    The survey then asked the respondents to review the following excerpt from Google's "How Our Business Works" page:

> We don't sell your personal information to anyone.
>
> We use your personal information to make our products more helpful to you. It's how we can autocomplete your searches, get you home faster with Maps, or show you more useful ads based on your interests. But we never sell your personal

---

[55] *See*, *e.g.*, Complaint, ¶¶ 11, 22, 80, 112. Prof. Richards also cites statements from Google's "How our Business Works" website and claims that it contains "language that reflects historical societal privacy norms." *See*, *e.g.,* Richards Report, ¶¶ 75, 81.

[56] Of the different documents cited by Plaintiffs as containing the Challenged Statements, Google's "How Our Business Works" page is the only document, other than Google's privacy policy, cited more than once in Plaintiffs' summary of the Challenged Statements related to personal information sharing. *See* Complaint, ¶ 260 (specifically, the first panel, labeled "Google shares Account Holders' personal information … without Account Holders' consent"). To make the stimulus salient for respondents, instead of presenting the entire content of the page, I selected a section of the document that has the largest amount of the text highlighted by Plaintiffs as supportive of their allegations (and included the title of the section, which was also highlighted by Plaintiffs). *See* Complaint, Exhibit 5.

[57] *See* **Appendix E-1**. To prevent respondents from guessing when they did not know the answer, I included "Don't know/Unsure" (or a version of it) as an answer choice for every question in the main questionnaires. This practice is recommended under the premise that "[b]y signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply." *See* Diamond (2011), p. 390.

information to anyone and you can use many of our products without signing in or saving any personal information at all.

When we show ads, advertisers pay us either for the placement of an ad – like a banner at the top of a web page – or for how an ad actually performs – like when someone clicks on it. Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to.  We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you. We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies.[58]

36.    After respondents had reviewed the excerpt from Google's "How Our Business Works" page,  the survey stated that advertisers work with Google to display targeted ads on many websites and apps across the internet, and then asked respondents to select, based on their understanding of the excerpt they reviewed, how likely or unlikely they think it is that Google shares with potential advertisers the following types of information, which Plaintiffs allege are personal information:

- The partial IP address of the respondent's device.
- The URL of the website or name of the app where the ad will be placed.
- Browser cookies, including Google-generated cookies that may allow advertisers to associate respondent's browser with prior visits to other websites.
- The content categories and subcategories in which Google classifies the website.
- The characteristics of the web browser and device the respondent uses to access the website.

In addition, the survey asked them to select, based on their understanding of the excerpt they reviewed, how likely or unlikely they think it is that Google shares with potential advertisers their home address, social security number, and the type and sizes of ads that could be displayed on a website.  These additional types of information were included as decoys to disguise the purpose

---

[58] Complaint, Exhibit 5. *See also* **Appendix E-1**.

of the survey.[59]

37.    Respondents could, if they wished, review again the excerpt from Google's "How Our Business Works" page by tapping or clicking on a link.  Respondents could receive further clarification on the meaning of technical terms by hovering over or tapping on those terms.  For example, if a respondent hovered over or tapped on "URL of the website," they would see a pop-up that states: "The web address of the webpage you would be visiting."[60]

38.    Respondents were asked to make their selection from a five-point Likert scale including the values "Very unlikely," "Somewhat unlikely," "Neither likely nor unlikely," "Somewhat likely," and "Very likely," as well as the option "Don't know/Unsure."  To avoid potential bias from the order in which the different types of information appeared, I randomly assigned the order for each respondent where applicable.  In addition, the direction of the Likert scale answer options (apart from "Don't know/Unsure" which was always shown as the last available option) was randomized to start with either "Very unlikely" or "Very likely."  This was done to control for any tendency of respondents to choose the first option.  This type of randomization of answer choice

---

[59] Diamond (2011), p. 411;  Simonson, I., and R. Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S. and J. Swann, eds., Chicago, IL: ABA Publishing, pp. 243–244 ("Demand effects (also referred to as demand artifacts) are produced when respondents use cues provided by the survey procedures and questions to figure out the purpose of the survey and to identify the 'correct' answers to the questions they are asked. The respondents may then provide what they perceive as the correct or expected answers, to make sure that the results 'come out right.'… [S]evere demand effects can be particularly problematic when the survey design and related questions (a) suggest the correct answer and/or (b) cause respondents to make comparisons or consider relations and other aspects.").

[60] *See* **Appendix E-1** and **Appendix F-1**.  Other technical terms defined in the survey are: **Browser Cookies:** Cookies are small pieces of text sent to your browser by a website you visit.  They help that website remember information about your visit. Cookies can be used to identify your web browser when you browse the internet.; **Characteristics of your web browser and device:**  Information that identifies the application or program (e.g., Chrome, Safari, Microsoft Edge), operating system (e.g., Android, iOS, Windows), and the version of the application and OS, being used to communicate over the Internet; and **Partial IP address:** Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address.  A complete IP address can be used to identify the geographic location from which a device is connecting to the Internet; a partial IP address can be used to identify a device's general geographic region.    *See*    "How    Google    Uses    Cookies,"    *Google*, https://policies.google.com/technologies/cookies?hl=en; "User-Agent Targeting," *Authorized Buyers*, September 15, 2023, https://developers.google.com/authorized-buyers/rtb/useragent-targeting; Complaint, Exhibit 12, pp. 4, 16, 26; "Authorized    Buyers    Real-time    Bidding    Proto:    Geo    Object,"    *Authorized    Buyers*, https://developers.google.com/authorized-buyers/rtb/realtime-bidding-guide#Geo%20Object.

order is standard practice in consumer surveys.[61]

## 2.    Main Questionnaire for the Privacy Disclosures Survey

39.    The purpose of the Privacy Disclosures Survey was to assess whether members of the Proposed Class expect Google to share different types of information at issue in this case with advertisers when they visit websites or use apps that partner with Google to show advertising (like the websites and apps that participate in the RTB system) after they see a statement from Google's privacy policy.  Plaintiffs cite multiple times to Google's privacy policy and claim that it contains Challenged Statements.[62]  Presenting survey respondents with disclosures from Google's privacy policy that focus on the Challenged Statements provides another valid method to assess the heterogeneity in the expectations of Google account holders after they view the Challenged Statements.[63]  A second purpose of the Privacy Disclosures Survey was to assess whether there is heterogeneity in Google account holders' exposure to privacy popups and banners from third-party websites that display advertising (like the websites and apps that participate in the RTB system), and in the actions that Google account holders take when they see privacy popups and banners on these websites.

40.    Similar to the main questionnaire of the Business Disclosures Survey, the main questionnaire of the Privacy Disclosures Survey began by instructing respondents not to guess. The questions, answer choices, and skip logic for the main questionnaire of the Privacy Disclosures

---

[61] Diamond (2011), pp. 395–396.

[62] *See, e.g.*, Complaint, ¶¶ 87, 91, 92, 93, 343.  Plaintiffs refer to Google's privacy policy as a "guide to how Google would 'process your information.'"  *See* Complaint, ¶ 84.  Of the different versions of the privacy policy cited by Plaintiffs, the versions from December 19, 2019 (Exhibit 15 to the Complaint) and February 4, 2021 (Exhibit 20 to the Complaint) are the only versions of Google's privacy policy cited twice in Plaintiffs' summary of the Challenged Statements related to personal information sharing.  *See* Complaint, ¶ 260 (specifically, the first panel, labeled "Google shares Account Holders' personal information … without Account Holders' consent").

[63] Similar to my approach in the Business Disclosures Survey, I focus respondents' attention on relevant excerpts containing some of the Challenged Statements.  These excerpts combine the paragraphs highlighted by Plaintiffs in Exhibit 15 (or Exhibit 20) of the Complaint that contain the word "share" and do not describe *exceptions* to the information sharing practices.  *See* Complaint, Exhibit 15 and Exhibit 20.

Survey are detailed in **Appendix E-2**. Instead of asking respondents to review disclosures from Google's "How Our Business Works" page, Question Q1 of the Privacy Disclosures Survey asked respondents to review the following excerpts from Google's privacy policy:

> We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.
>
> We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.[64]

41.     After respondents had reviewed the excerpt from Google's privacy policy, the survey stated that advertisers work with Google to display targeted ads on many websites and apps across the internet, and then asked respondents to select, based on their understanding of the excerpt they reviewed, how likely or unlikely they think it is that Google shares with potential advertisers the types of information described in ¶ 36 above.[65]

42.     The Privacy Disclosures Survey included a second section that asked respondents about their experience visiting internet websites that display advertising. In Question Q2, the survey showed respondents a series of images of banners and popups that Google account holders may

---

[64] Complaint, Exhibit 15, pp. 5, 12. *See also* **Appendix E-2**. The disclosure included highlighting for terms that respondents could click to read the definition that a user could see when reviewing the privacy policy online. I use definitions of these terms as they appear in the actual privacy policy provided by Google. **Non-personally identifiable information:** This is information that is recorded about users so that it no longer reflects or references an individually-identifiable user; **Show trends:** When lots of people start searching for something, it can provide useful information about particular trends at that time. Google Trends samples Google web searches to estimate the popularity of searches over a certain period of time and shares those results publicly in aggregated terms; **Specific partners:** For example, we allow YouTube creators and advertisers to work with measurement companies to learn about the audience of their YouTube videos or ads, using cookies or similar technologies. Another example is merchants on our shopping pages, who use cookies to understand how many different people see their product listings. *See* Exhibit 15.

[65] Respondents could view the meaning of the same technical terms as in Question Q1 of the Business Disclosures Survey. *See* **Appendix E-1**, **Appendix E-2**, **Appendix F-1**, **Appendix F-2**.

see when they visit certain websites that display advertising.[66]  After reviewing these banners and popups, respondents were asked to indicate whether they have seen banners or popups similar to the ones they had just reviewed when they visited websites that display advertising in the last seven years.  Respondents could review the example banners and popups again if they wanted to.  *See* **Exhibit 1**.

---

*EXHIBIT 1*
***Privacy Popups and Banners Shown to Respondents in the Privacy Disclosures Survey***



Source:  Privacy Disclosures Survey; "NBA," *NBA*, https://www.nba.com/; "AccuWeather," *AccuWeather*, https://www.accuweather.com/; "The Weather Channel," *The Weather Channel*, https://weather.com/; "New York Post," *New York Post*, https://nypost.com/

---

[66] *See* **Appendix F-2**.  These examples were taken from four websites classified amongst the top 50 most popular websites in the U.S., or the 50 most popular publisher websites in the U.S., according to the internet analytics website Semrush.  *See*  "Top 100: The Most Visited Websites in the US," *Semrush*,  https://www.semrush.com/blog/most-visited-websites/;  "Top  Websites  in  the  United  States  (Publishing  Industry),"  *Semrush*, https://www.semrush.com/trending-websites/us/publishing.  The  examples  were  selected  to  represent  common privacy popups and banners found across internet websites that display advertising.

43.    Respondents could select one of the three options: "Yes," "No," or "I don't know / unsure." The "I don't know / unsure" option remained last, while the other two options were randomized to control for any tendency of respondents to choose the first option.  If a respondent indicated that they had not seen similar banners or popups or were unsure/didn't know, the respondent was directed to the end of the survey.

44.    In Question Q3, the survey asked respondents who indicated in Question Q2 that they have seen similar banners or popups to select the actions that they have taken when they saw such banners or popups.  Respondents could select as many actions as applicable from the following list:

- Continued to navigate to the site without interacting with the banner or popup.
- Clicked on a link that provided additional information about the privacy policies of the website.
- Clicked on a "close" button or an "X" button that closed the banner or popup, and continued to the website.
- Clicked on a button indicating that you accepted the privacy policies of the website.
- Clicked on a button that opened a menu that allowed you to select the type of information you wanted to share with the website.
- Clicked on a button indicating that you accepted all cookies.
- Clicked on a button indicating that you rejected all cookies.
- Navigated out of the website or closed the website.

Respondents could also write in an action if the provided list did not include an action that they had taken.  Finally, respondents could select "None of the above" or "I don't know / unsure," which were both single-choice options.

45.    Respondents who selected more than one option from the options listed in Question Q3 were directed to Question Q4.  In Question Q4, the survey asked respondents who selected more than one action from the actions listed in Question Q3 to rank them in order of how frequently

they had taken them when they encountered banners or popups similar to those shown to them in Question Q2 over the past seven years.  The order in which these actions were shown to a given respondent was preserved from Question Q3.  If a respondent could not rank the actions, they could select the option "I don't have enough information to rank these actions" to proceed.

46.    Question Q5 asked respondents who indicated that they had "[c]licked on a link that provided additional information about the privacy policies of the website" in Question Q3 to select what actions they had taken after reading that additional information.  Respondents could select multiple answers from the options "Continued to use the website," "Navigated out of the website or closed the website," and "Other (please specify)" (asking respondents to specify in a text box), or they could select "None of the above" or "I don't know / unsure."  The first two options, "Continued to use the website" and "Navigated out of the website or closed the website," appeared in random order in the first two positions to control for any tendency of respondents to choose the first option, while the positions of "Other (please specify)," "None of the above," and "I don't know / unsure" options were fixed in positions three through five, respectively.

### 3.    Main Questionnaire for the Existing Account Hypothetical Disclosures Survey

47.    The purpose of the Existing Account Hypothetical Disclosures Survey was to assess whether, in order to continue using their Google Account and Google Services, members of the Proposed Class would be likely or unlikely to accept a hypothetical Google privacy policy if the policy explicitly stated that Google shares with advertisers certain types of information at issue in this matter.

48.    The questions, answer choices, and skip logic for the main questionnaire of the Existing Account Hypothetical Disclosures Survey are detailed in **Appendix E-3**.  The main questionnaire began by instructing respondents not to guess, but rather to choose the option "Don't

know/Unsure" when they do not know or do not have an answer.[67]

49.    The survey then asked respondents to assume that the following excerpt appears in a Google privacy policy, and asked them to review it carefully:

> Depending on your settings, we may show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

> We don't share your name or email with advertisers unless you ask us to, but we share other personal information.  For example, we share the partial IP address of your device; the URL for the webpage where the ad will be placed; your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with your prior visits to their websites; the content categories and subcategories in which Google classifies the website where the ad will be placed; and the characteristics of the web browser and device you use to access the website.  We also allow advertisers to associate their cookies with Google's cookies. Matching these cookies allows advertisers to connect the data we share with the data they may already associate with you.

Respondents could further receive clarification on the meaning of technical terms by hovering over or tapping on those terms.  For example, if a respondent hovered over or tapped on "URL of the website," they would see a pop-up that states: "The web address of a webpage you visit."[68]

50.    After respondents had reviewed the excerpt, the survey asked respondents to assume that in order to continue using their Google account and Google services, they are asked to review and accept a privacy policy that includes the excerpt they reviewed.  The survey then asked respondents

---

[67] *See* **Appendix E-3**.

[68] *See* **Appendix E-3**.  Other technical terms defined in the survey are "personalized ads," "personal information," "partial IP address," "URL," "browser cookies," and "characteristics of your web browser and device."  For "partial IP address," "URL," "browser cookies," and "characteristics of your web browser and device," I use the same definitions as in Question Q1 of the Business Disclosures Survey.  For "personalized ads," I use the definition as it appears in Google's privacy policy: **Personalized ads:** You may also see personalized ads based on information from the advertiser. If you shopped on an advertiser's website, for example, they can use that visit information to show you ads.  For "personal information," I made slight modifications to the definitions used in Google's privacy policy to avoid confusion among respondents: **Personal information:** This is information that you provide to us which personally identifies you, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.  *See* Complaint, Exhibit 16, pp. 20, 26.

to select, based on the excerpt they reviewed, how likely or unlikely they would be to click the "I Accept" button for this privacy policy.  Respondents could, if they wished, review again the excerpt from the hypothetical Google privacy policy.

51.    Respondents were asked to make their selection from a five-point Likert scale including the values "Very unlikely to click 'I accept'," "Somewhat unlikely to click 'I accept'," "Neither likely nor unlikely to click 'I accept'," "Somewhat likely to click 'I accept'," and "Very likely to click 'I accept'," as well as the option "Don't know/Unsure."  To avoid potential bias, the direction of the Likert scale answer options (apart from "Don't know/Unsure" which was always shown as the last available option) was randomized to start with either "Very unlikely to click 'I accept'" or "Very likely to click 'I accept'."

### 4.    Main Questionnaire for the New Service Hypothetical Disclosures Survey

52.    The purpose of the New Service Hypothetical Disclosures Survey was to assess whether members of the Proposed Class would be likely or unlikely to accept a hypothetical Google privacy policy in order to sign up for a Google service in which they are interested if the policy explicitly stated that Google shares with advertisers certain types of information at issue in this matter.  By asking survey respondents to assume that whether or not they accept the hypothetical privacy policy will not affect their ability to use Google services they currently use, the survey provides information on the heterogeneity in Google account holders' likelihood to accept the hypothetical privacy policy avoiding potential concerns respondents may have about losing access to their currently-used Google services if they choose not to accept the hypothetical privacy policy.

53.    The questions, answer choices, and skip logic for the main questionnaire of the New Service Hypothetical Disclosures Survey are detailed in **Appendix E-4**.  The main questionnaire of the survey began in a similar way as the Existing Account Hypothetical Disclosures Survey,

and asked the respondents to assume that the same hypothetical excerpt appears in a Google privacy policy.

54.     After respondents had reviewed the excerpt, the survey asked respondents to assume that they are interested in signing up for a Google service that they do not currently use, and in order to sign up they are asked to review and accept a privacy policy that includes the excerpt they reviewed.  As mentioned in ¶ 52, respondents were also asked to assume that whether or not they accept that privacy policy will not affect their ability to use other Google services they currently use.  Respondents were then asked to select, based on the excerpt they reviewed, how likely or unlikely they would be to click the "I Accept" button at the bottom of the privacy policy. Respondents could, if they wished, review again the excerpt from the hypothetical Google privacy policy.[69]

55.     Respondents were asked to make their selection from a five-point Likert scale including the values "Very unlikely to click 'I accept'," "Somewhat unlikely to click 'I accept'," "Neither likely nor unlikely to click 'I accept'," "Somewhat likely to click 'I accept'," and "Very likely to click 'I accept'," as well as the option "Don't know/Unsure."  To avoid potential bias, the direction of the Likert scale answer options (apart from "Don't know/Unsure" which was always shown as the last available option) was randomized to start with either "Very unlikely to click 'I accept'" or "Very likely to click 'I accept'."

### D.     Survey Implementation

56.     The Business Disclosures Survey was conducted from September 11, 2023, to September 14, 2023.  The Privacy Disclosures Survey was conducted from September 11, 2023, to September

---

[69] Highlighted technical terms and their definitions are the same as in Question Q1 of the Existing Account Hypothetical Disclosures Survey.  *See* **Appendix E-3**, **Appendix E-4**, **Appendix F-3**, **Appendix F-4**.

14, 2023. The Existing Account Hypothetical Disclosures Survey was conducted from September 14, 2023, to September 16, 2023. The New Service Hypothetical Disclosures Survey was conducted from September 14, 2023, to September 16, 2023. I worked with Cornerstone Research and GBK in designing, pretesting, and implementing the survey instruments for the RTB Surveys. I used Prodege, a reputable online consumer panel, to field the survey.[70]

57.     Survey respondents were recruited to the survey via a dashboard.[71] To confirm respondent identity and prevent duplicate responses, Prodege uses digital fingerprinting technology.[72] Prodege uses additional measures to help ensure integrity of the survey data.[73]

58.     The RTB Surveys were pretested to verify that they were well understood and did not cause any confusion among respondents.[74] Pretest interviews showed that respondents did not have difficulty understanding the questions or providing answers. No language changes or significant design changes were implemented as a result of the pretests. The pretest moderator questions are provided in **Appendix D**.

59.     The final number of respondents and the demographic characteristics of the samples of the RTB Surveys are shown in **Exhibit 2**. These sample sizes are sufficient to yield a margin of error for the key results from the RTB Surveys of at most 5.3 percentage points.[75]

---

[70] *See* **Appendix H** for information about Prodege and its quality assurance practices.

[71] People who enrolled in the panel ("panelists") are assigned to surveys based on the information the panel has on them. Panelists can start a survey by accessing it through their dashboard.

[72] *See* **Appendix H**.

[73] *See* **Appendix H**.

[74] Diamond (2011), p. 388.

[75] The margin of error "…serves to quantify the uncertainty associated with sampling in a poll or other survey." *See* Stoutenborough, J. W (2008), "Margin of Error (MOE)," in *Encyclopedia of Survey Research Methods*, Lavrakas, P. J. eds., Thousand Oaks, CA: SAGE Publications, Inc., pp. 450–451. This estimate is based on a standard confidence level of 95 percent. The margin of error is calculated based on a proportion of 0.5 and represents an upper bound on the actual margin of error. The actual margin of error for the results of the RTB Surveys can be calculated using the formula $1.96 \cdot \text{sqrt}(p \cdot (1-p)/n)$, where p is the proportion of respondents giving the response(s) of interest.

*EXHIBIT 2*
*Respondents' Demographic Characteristics in Each of the RTB Surveys*

| | Business Disclosures | | Privacy Disclosures | | Hypothetical Disclosures for an Existing Account | | Hypothetical Disclosures for a New Service | |
|---|---|---|---|---|---|---|---|---|
| | Count | Percentage | Count | Percentage | Count | Percentage | Count | Percentage |
| **Age** | | | | | | | | |
| 13-17 years old | 17 | 6% | 17 | 6% | 19 | 6% | 24 | 8% |
| 18-29 years old | 50 | 17% | 62 | 21% | 57 | 19% | 48 | 16% |
| 30-39 years old | 53 | 18% | 50 | 17% | 46 | 15% | 49 | 16% |
| 40-49 years old | 43 | 14% | 47 | 16% | 56 | 19% | 47 | 16% |
| 50-59 years old | 53 | 18% | 47 | 16% | 48 | 16% | 50 | 17% |
| 60 years or older | 84 | 28% | 77 | 26% | 76 | 25% | 83 | 28% |
| **Gender** | | | | | | | | |
| Male | 154 | 51% | 139 | 46% | 142 | 47% | 148 | 49% |
| Female | 146 | 49% | 161 | 54% | 159 | 53% | 153 | 51% |
| Other | 0 | 0% | 0 | 0% | 1 | <1% | 0 | 0% |
| **Region** | | | | | | | | |
| Northeast | 50 | 17% | 59 | 20% | 54 | 18% | 61 | 20% |
| Midwest Region | 63 | 21% | 66 | 22% | 71 | 24% | 64 | 21% |
| South Region | 115 | 38% | 116 | 39% | 117 | 39% | 109 | 36% |
| West Region | 72 | 24% | 59 | 20% | 60 | 20% | 67 | 22% |
| **Total** | **300** | **100%** | **300** | **100%** | **302** | **100%** | **301** | **100%** |

Source:  Business Disclosures Survey; Privacy Disclosures Survey; Existing Account Hypothetical Disclosures Survey; New Service Hypothetical Disclosures Survey

## VI. The RTB Surveys Show That Many Consumers Expect Google to Share Information with Potential Advertisers, Often Accept Privacy Disclosures from Third-Party Publishers, and Are Likely to Accept a Privacy Policy Explicitly Stating That Google Shares Certain Types of At-Issue Information

### A. A Large Share of Consumers Expect Google to Share Information with Potential Advertisers When They Visit Publisher Websites

60.     In Question Q1 of the Business Disclosures Survey and the Privacy Disclosures Survey, the survey stated that advertisers work with Google to display targeted ads on many websites and apps across the internet, and then respondents were asked to select, based on their understanding of the disclosures they reviewed (an excerpt from Google's "How our Business Works" page, or excerpts from Google's privacy policy), how likely or unlikely they thought it was that Google shared with potential advertisers different types of information.  **Exhibit 3** reports the proportion of respondents who selected in Question Q1 the answers "Very likely" or "Somewhat Likely" for each type of information at issue.[76]  **I find in both surveys that, after reviewing excerpts**

---

[76] This categorization is known as the "top two boxes," and is a standard method for analyzing data generated by a Likert scale.  *See e.g.*, "How to Use a Top 2 Box Score in Your Survey Analysis," *SurveyMonkey*, https://www.surveymonkey.com/mp/top-2-box-scores/.

containing the Challenged Statements, between 45 percent and 74 percent of respondents thought that it is somewhat or very likely that Google shares with potential advertisers the respondents' partial IP address, the URL and the content categories of the site they would be visiting, browser cookies, and the characteristics of their web browser and device when they visit websites or use apps that display targeted ads (like the websites and apps that participate in the RTB system).

---

*EXHIBIT 3*

*Respondents' Expectations that Google Shares Different Types of Information with Potential Advertisers (Top Two Boxes, N=300)*

*Q1: "Advertisers work with Google to display targeted ads on many websites and apps across the internet. Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?"*

| | Business Disclosures | | Privacy Disclosures | |
|---|---|---|---|---|
| | Count | Percentage | Count | Percentage |
| **Respondents who answered "Very likely" or "Somewhat likely"** | | | | |
| The partial IP address of your device | 136 | 45% | 157 | 52% |
| The URL of the website or name of the app | 221 | 74% | 218 | 73% |
| Your browser cookies | 200 | 67% | 221 | 74% |
| The content categories and subcategories in which Google classifies the website | 218 | 73% | 215 | 72% |
| The characteristics of the web browser and device | 189 | 63% | 197 | 66% |

Source: Business Disclosures Survey; Privacy Disclosures Survey
Note: This question also asked respondents about decoy types of information that are not challenged by Plaintiffs. The decoys were: Respondent's home address; Respondent's Social Security Number; The type of ads that could be displayed on a website (e.g., text ad, picture ad, video ad); The sizes of the ads that could be displayed on a website (e.g., 100 x 100 pixels). *See* **Appendix I-1** for the results including the decoy responses.

---

61.    **Exhibit 4** reports the responses to Question Q1 for all answer options in the Business Disclosures Survey and the Privacy Disclosures Survey. For each type of information, I find that a smaller share (between 7 percent and 28 percent) of Google account holders think that it is "very unlikely" or "somewhat unlikely" that Google shares that type of information with potential advertisers. Between 5 percent and 9 percent of respondents answered that they did not know or were unsure. These results indicate significant heterogeneity in the expectations of Google account holders depending on whether the information in question is their partial IP address, the

URL of the website, the content categories in which Google classifies the website, their browser cookies, or the characteristics of their web browser and device.

---

**EXHIBIT 4**

*Respondents' Expectations that Google Shares Different Types of Information with Potential Advertisers (N=300)*

*Q1: "Advertisers work with Google to display targeted ads on many websites and apps across the internet. Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?"*

| | Business Disclosures | | Privacy Disclosures | |
|---|---|---|---|---|
| | Count | Percentage | Count | Percentage |
| **The partial IP address of your device** | | | | |
| Very unlikely | 48 | 16% | 38 | 13% |
| Somewhat unlikely | 35 | 12% | 34 | 11% |
| Neither likely nor unlikely | 56 | 19% | 43 | 14% |
| Somewhat likely | 69 | 23% | 90 | 30% |
| Very likely | 67 | 22% | 67 | 22% |
| Don't know / Unsure | 25 | 8% | 28 | 9% |
| **The URL of the website or name of the app** | | | | |
| Very unlikely | 15 | 5% | 7 | 2% |
| Somewhat unlikely | 8 | 3% | 15 | 5% |
| Neither likely nor unlikely | 35 | 12% | 34 | 11% |
| Somewhat likely | 87 | 29% | 90 | 30% |
| Very likely | 134 | 45% | 128 | 43% |
| Don't know / Unsure | 21 | 7% | 26 | 9% |
| **Your browser cookies** | | | | |
| Very unlikely | 23 | 8% | 10 | 3% |
| Somewhat unlikely | 20 | 7% | 15 | 5% |
| Neither likely nor unlikely | 35 | 12% | 38 | 13% |
| Somewhat likely | 89 | 30% | 87 | 29% |
| Very likely | 111 | 37% | 134 | 45% |
| Don't know / Unsure | 22 | 7% | 16 | 5% |
| **The content categories and subcategories in which Google classifies the website** | | | | |
| Very unlikely | 10 | 3% | 15 | 5% |
| Somewhat unlikely | 12 | 4% | 11 | 4% |
| Neither likely nor unlikely | 41 | 14% | 39 | 13% |
| Somewhat likely | 93 | 31% | 87 | 29% |
| Very likely | 125 | 42% | 128 | 43% |
| Don't know / Unsure | 19 | 6% | 20 | 7% |
| **The characteristics of the web browser and device** | | | | |
| Very unlikely | 24 | 8% | 16 | 5% |
| Somewhat unlikely | 13 | 4% | 13 | 4% |
| Neither likely nor unlikely | 51 | 17% | 47 | 16% |
| Somewhat likely | 96 | 32% | 87 | 29% |
| Very likely | 93 | 31% | 110 | 37% |
| Don't know / Unsure | 23 | 8% | 27 | 9% |
| **Total** | **300** | **100%** | **300** | **100%** |

Source: Business Disclosures Survey; Privacy Disclosures Survey
Note: This question also asked respondents about decoy types of information that are not challenged by Plaintiffs. The decoys were: Respondent's home address; Respondent's Social Security Number; The type of ads that could be displayed on a website (e.g., text ad, picture ad, video ad); The sizes of the ads that could be displayed on a website (e.g., 100 x 100 pixels). *See* **Appendix I-2** for the results including the decoy responses.

### B.     A Large Share of Consumers Have Seen and Accepted the Privacy Disclosures on Websites That Display Ads

62.     **Exhibit 5** reports the responses to Question Q2 in the Privacy Disclosures Survey. Question Q2 asked respondents to indicate if in the past seven years they have seen popups or banners similar to the ones they were asked to review when they visited websites that display advertising.  The results indicate that the vast majority of respondents (89 percent) have seen such popups or banners.

---

*EXHIBIT 5*
*Respondents Have Seen Disclosures on Websites That Display Ads (N= 300)*

*Q2: "Have you seen banners or popups similar to these in the past seven years when you have visited websites that display advertising"*

|  | Count | Percentage |
|---|---|---|
| Yes | 268 | 89% |
| No | 19 | 6% |
| I don't know / unsure | 13 | 4% |
| *Total* | *300* | *100%* |

Source:  Privacy Disclosures Survey

---

63.     **Exhibit 6** summarizes frequencies of various actions that respondents who have seen banners or popups have taken when they saw them.  **Results from Q3 show that there is substantial heterogeneity in how Google account holders interact with privacy popups and banners from websites that display advertising.**  For example, 58  percent of respondents have clicked a button indicating they accepted the privacy policies of the website,  61 percent clicked on a button indicating they accepted all cookies, 51 percent continued to navigate to the site,  32 percent clicked on a button that opened a menu that allowed them to select the type of information they wanted to share with the website, 25 percent clicked a link that provided additional information about the privacy policies of the website, and 46 percent navigated out of the site.  The results show that **there is substantial variation in Google account holders' implicit or explicit acceptance of privacy disclosures from websites that display advertising**.

*EXHIBIT 6*

*Actions Taken by Respondents Who Indicated That They Have Seen Banners or Popups on Websites That Display Ads (N=300)*

*Q3: "Please select from the following list the actions you have taken in the past seven years when you visited a website that displays advertising and you saw banners or popups similar to the examples you reviewed in the previous question."[1]*

*Q5: "You indicated that, in the past seven years, at least some of the time you have clicked on a link that provided additional information about the privacy policies of the website. Which of the following actions have you taken after seeing this additional information?"[2]*

| | Count | Percentage |
|---|---|---|
| Clicked on a button indicating that you accepted the privacy policies of the website | 174 | 58% |
| Clicked on a button indicating that you accepted all cookies | 183 | 61% |
| Continued to navigate to the site without interacting with the banner or popup | 152 | 51% |
| Clicked on a "close" button or an "X" button that closed the banner or popup, and continued to the website | 209 | 70% |
| Clicked on a button that opened a menu that allowed you to select the type of information you wanted to share with the website | 97 | 32% |
| Clicked on a link that provided additional information about the privacy policies of the website | 76 | 25% |
|     Continued to navigate to the site[3] | 68 | 23% |
|     Navigated out of the site[3] | 56 | 19% |
| Clicked on a button indicating that you rejected all cookies | 146 | 49% |
| Navigated out of the website or closed the website | 139 | 46% |

Source: Privacy Disclosures Survey
Note:
[1] This question was asked only to respondents who answered "Yes" in Q2. Respondents could select multiple answers.
[2] Only respondents who selected "Clicked on a link that provided additional information about the privacy policies of the website" in Q3 were asked Q5.
[3] The breakdown is based on respondents' answers to Q5. Respondents could select multiple answers.

64.    **Exhibit 7** further details the actions taken by respondents who indicated that they have seen banners or popups on the websites that display ads by reporting the breakdown by the most frequently taken action. The two most frequent actions were accepting all cookies (20 percent of respondents indicated it as the most frequent action) and closing the banner or popup (20 percent of respondents indicated it as the most frequent action). Eleven percent indicated that their most frequent action was to accept the privacy policy of the website, while 15 percent answered that their most frequent action was to continue to the website without interacting with a banner or popup. Thus, approximately 65 percent of respondents answered that, when they see banners or popups similar to the ones they were shown, the most frequent action they take was either to accept all cookies or policies or to ignore a popup or banner by either not interacting with it or by closing

it.  In comparison, 13 percent of respondents indicated that their most frequent action was to close out of the website, or to reject all cookies.

---

**EXHIBIT 7**

*Most Frequent Actions Taken by Respondents Who Indicated That They Have Seen Banners or Popups on Websites That Display Ads (N=300)*

*Q4: "The following list includes the actions that you indicated you have taken in the past seven years when you visited a website that displays advertising and you saw a banner or popup similar to the ones you reviewed in the previous question. To the best of your ability, please rank these actions in order of how frequently you have taken them when you have encountered these banners or popups over the past seven years, with 1 being the action you have taken most frequently." [1], [2]*

|  | Count | Percentage |
|---|---|---|
| Most frequent action is Clicked on a button indicating that you accepted the privacy policies of the website | 32 | 11% |
| Most frequent action is Clicked on a button indicating that you accepted all cookies | 59 | 20% |
| Most frequent action is Continued to navigate to the site without interacting with the banner or popup | 44 | 15% |
| Most frequent action is Clicked on a "close" button or an "X" button that closed the banner or popup, and continued to the website | 59 | 20% |
| Most frequent action is Clicked on a button that opened a menu that allowed you to select the type of information you wanted to share with the website | 11 | 4% |
| Most frequent action is Clicked on a link that provided additional information about the privacy policies of the website[3] | 10 | 3% |
| Most frequent action is Navigated out of the website or closed the website | 10 | 3% |
| Most frequent action is Clicked on a button indicating that you rejected all cookies | 28 | 9% |
| Has seen banners or popups on websites that display ads, has taken some listed actions, but cannot rank them[4] | 8 | 3% |
| Has seen banners or popups on websites that display ads, but has not taken, is unsure if they have taken, or does not know if they have taken any listed action[5] | 7 | 2% |
| Has not seen, is unsure if they have seen, or does not know if they have seen banners or popups on websites that display ads[6] | 32 | 11% |
| *Total* | *300* | *100%* |

Source:  Privacy Disclosures Survey
Note:
[1] This question was asked only to respondents who answered "Yes" in Q2 and selected more than one action from the actions listed in Q3. Respondents were asked to rank actions they selected in Q3 in order of how frequently they had taken them.
[2] Respondents who selected a single action in Q3 were not asked Q4.  I count the action that they selected in Q3 as the most frequent action for the purposes of my analysis.
[3] Only respondents who selected "Clicked on a link that provided additional information about the privacy policies of the website" in Q3 were asked Q5.  Respondents could select multiple answers.  Among the 10 respondents who selected "Clicked on a link that provided additional information about the privacy policies of the website" as their most frequently taken action, 9 selected "Continued to navigate to the site" and 8 selected "Navigated out of the site."
[4] Includes respondents who selected (1) "Yes" in Q2, (2) more than one listed action in Q3, and (3) "I don't have enough information to rank these actions" in Q4.
[5] Includes respondents who selected (1) "Yes" in Q2 and (2) either "None of the above," "I don't know / unsure," or only selected "Other" in Q3.
[6] Includes respondents who selected "No" or "I don't know / unsure" in Q2.

---

## C.    A Large Share of Consumers Would Likely Accept a Hypothetical Google Privacy Policy That Explicitly Stated That Google Shares with Advertisers Certain Types of At-Issue Information

65.    In Question Q1 of the Existing Account Hypothetical Disclosures Survey and the New

Service Hypothetical Disclosures Survey, respondents were shown disclosures from a hypothetical Google privacy policy stating that Google may share with advertisers certain types of information that Plaintiffs allege is personal information.   In the Existing Account Hypothetical Disclosures Survey, respondents were asked to select, based on the disclosure they saw, how likely or unlikely they would be to click the "I Accept" button for the hypothetical Google privacy policy in order to continue using their Google account and Google services.   In the New Service Hypothetical Disclosures Survey, respondents were asked to select, based on the disclosure they saw, how likely or unlikely they would be to click the "I Accept" button for the hypothetical Google privacy policy in order to sign up for a Google service in which they are interested but do not currently use. **Exhibit 8** reports the proportion of respondents in each survey who selected different answer options indicating their likelihood of clicking the "I Accept" button for the hypothetical privacy policy.   I find in both surveys that more than 70 percent of respondents would be "somewhat likely" or "very likely" to click the "I Accept" button for the hypothetical Google privacy policy. These results indicate that **a large share of Google account holders would be somewhat likely or very likely to click the "I Accept" button after reading a hypothetical Google privacy policy that explicitly stated that Google shares with advertisers certain types of information that Plaintiffs allege Google shares with advertisers in the RTB system**.

*EXHIBIT 8*
*Respondents' Likelihood to Click the "I Accept" Button for the Privacy Policy with the Hypothetical Disclosures[1], [2]*

| | Hypothetical Disclosures for an Existing Account[3] | | Hypothetical Disclosures for a New Service[3] | |
|---|---|---|---|---|
| | Count | Percentage | Count | Percentage |
| Very unlikely | 14 | 5% | 18 | 6% |
| Somewhat unlikely | 25 | 8% | 22 | 7% |
| Neither likely nor unlikely | 33 | 11% | 37 | 12% |
| Somewhat likely | 98 | 32% | 108 | 36% |
| Very likely | 126 | 42% | 111 | 37% |
| Don't know / Unsure | 6 | 2% | 5 | 2% |
| *Total* | *302* | *100%* | *301* | *100%* |
| Very unlikely or Somewhat unlikely | 39 | 13% | 40 | 13% |
| Very likely or Somewhat likely | 224 | 74% | 219 | 73% |

Source: Existing Account Hypothetical Disclosures Survey; New Service Hypothetical Disclosures Survey
Note:
[1] For the New Service Hypothetical Disclosures Survey, Question Q1 was "Assume that you are interested in signing up for a Google service that you do not currently use and in order to sign up you are asked to review and accept a privacy policy that includes the excerpt you reviewed. Assume also that whether or not you accept this privacy policy will not affect your ability to use other Google services you currently use. Based on the excerpt you reviewed, how likely or unlikely would you be to click the 'I Accept' button for this privacy policy in order to use the Google service in which you are interested?"
[2] For the Existing Account Disclosures Survey, Question Q1 was "Assume that in order to continue using your Google account and Google services, you are asked to review and accept a privacy policy that includes the excerpt you reviewed. Based on the excerpt you reviewed, how likely or unlikely would you be to click the 'I Accept' button for this privacy policy?"
[3] Before answering Q1, respondents were shown the following hypothetical disclosure from a Google privacy policy: "Depending on your settings, we may show you personalized ads based on your interests. For example, if you search for 'mountain bikes,' you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings. We don't share your name or email with advertisers unless you ask us to, but we share other personal information. For example, we share the partial IP address of your device; the URL for the webpage where the ad will be placed; your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with your prior visits to their websites; the content categories and subcategories in which Google classifies the website where the ad will be placed; and the characteristics of the web browser and device you use to access the website. We also allow advertisers to associate their cookies with Google's cookies. Matching these cookies allows advertisers to connect the data we share with the data they may already associate with you."

## VII.    Professor Richards' Opinions Are Flawed and Unreliable Because He Did Not Analyze Account Holder Expectations

66.    The Richards Report presents several conclusions involving the expectations of Google account holders with regard to the information that Google shares with advertisers in the RTB system. Some of these opinions appear to refer to the expectations of members of the Proposed Class,[77] while others refer to the claimed existence of "common, objective facts from which a jury

---

[77] For example, Prof. Richards claims that "Google's Terms of Service, Privacy Policies, and disclosures throughout the Class Period give rise to a common (false) expectation that Google does not offer for sale or sell information about or associated with U.S. account holders to Google RTB participants." *See* Richards Report, ¶ 6.

could" make certain conclusions pertaining to the expectations of members of the Proposed Class.[78] To the extent Prof. Richards' opinions concern the expectations of members of the Proposed Class about the information that Google shares with advertisers in the RTB system, I show in this section that those opinions are flawed and unreliable. First, Prof. Richards has not done any empirical analysis of the expectations of members of the Proposed Class, including to what extent, if at all, Google account holders were misled by the Challenged Statements. Instead, he relies on a flawed, unscientific analysis of so-called "societal norms," while ignoring that multiple factors shape individual account holders' expectations, and that different consumers can have different expectations about online privacy. Second, Prof. Richards ignores evidence that suggests that account holders could have learned about the information that Google shares with advertisers in the RTB system from multiple sources, and thus expectations may vary from person to person.

### A.    Prof. Richards' Opinions Are Unreliable Because He Did Not Analyze Account Holder Expectations and Instead Relied on Unsupported Assumptions

67.    In his report, Prof. Richards claims that "Google's Terms of Service, Privacy Policies, and disclosures throughout the Class Period give rise to a common (false) expectation that Google does not offer for sale or sell information about or associated with U.S. account holders to Google RTB participants."[79]  In deposition, however, Prof. Richards clarified that his opinion was that "[t]here is substantial evidence, both in the public record, and from evidence produced by Google in

---

[78] *See*, *e.g.*, Richards Report, ¶ 131 ("[T]here is substantial evidence, both in the public record, and from evidence produced by Google in discovery that provides common, objective facts from which a jury or trier of fact may conclude not only that a reasonable Google account holder has a reasonable expectation of privacy, but that Google is all too well aware of this fact."). *See also* Richards Report, ¶ 74 ("Evidence produced by Google in discovery also provides common, objective facts from which a jury or trier of fact may conclude that Google understands its account holders value privacy, and reasonably expect that the company's privacy and information practices will not be 'creepy'…"), ¶ 126 ("Evidence produced by Google in discovery also provides common, objective facts from which a jury or trier of fact may conclude that Google understands that its privacy notices do not comport with its U.S. account holders' expectations of privacy.").

[79] Richards Report, ¶ 6.

discovery that provides common, objective facts from which a jury or trier of fact may conclude not only that a reasonable Google account holder has a reasonable expectation of privacy, but that Google is all too well aware of this fact,"[80] and that his opinions about Google account holders' expectations were given in the context of "what a trier of fact could find."[81]   To the extent Prof. Richards' opinions refer to the effect of the Challenged Statements on expectations of members of the Proposed Class (as opposed to the conclusions of a jury or trier of fact),[82] his opinions are unreliable because they are not based on any analysis of the relevant expectations of Google account holders, but instead are based on unreliable and unsupported assumptions and unscientific analysis.

68.    When consumer behavior experts analyze the expectations of a specific group of consumers, they rely on empirical methods to study that group of consumers.  These methods include consumer surveys, qualitative interviews, and the analysis of behavioral and economic data, among others.[83]   These empirical methods help researchers to identify and measure expectations, and in some cases, to test causal propositions about how a specific stimulus may affect the expectations or behavior of the group of interest.  This approach is consistent with the

---

[80] Deposition of Neil Richards, August 24, 2023 ("Richards Deposition"), pp. 169:16–170:4 ("Q. So you're not testifying that the terms of service and privacy policies creates a false expectation that Google does not offer for sale or sell information linked to or reasonably associated with U.S. account holders?  A. My opinion is that they could. And as I say in Paragraph 131, 'There is substantial evidence, both in the public record, and from evidence produced by Google in discovery that provides common, objective facts from which a jury or trier of fact may conclude not only that a reasonable Google account holder has a reasonable expectation of privacy, but that Google is all too well aware of this fact.'").

[81] Richards Deposition, p. 170:6–15 ("Q. When you say 'false expectation,' what do you mean?  A. I mean, in the -- in the context here of  what a trier of fact could find and there is common evidence to support such a finding, that when Google tells its account holders that they do not, will not, and never will share or sell their personal information with third parties, and that when Google, in fact, does that, that a trier of fact could find those things to be the case…").

[82] In this report I do not offer any opinion on the potential conclusions of a jury or trier of fact.

[83] Mizik, N. and D. M. Hanssens (2018), *Handbook of Marketing Analytics: Methods and Applications in Marketing Management, Public Policy, and Litigation support,* Cheltenham, UK: Edward Elgar Publishing Ltd, pp. 1–5 ("The academic discipline of marketing has developed and adopted a number of scientific techniques that enable the assessment of marketing impact. … Marketing analytics has been successful in adopting and refining techniques from several academic disciplines, including economics, econometrics, operations research, statistics, psychology, sociology and computer science. In particular, marketing analytics is equally motivated by research objectives of description, prediction, and causal inference.").

scientific method and is likely to result in verifiable conclusions that can be extrapolated to the group of interest (*i.e.*, the Proposed Class) with a known error rate.

69.     Contrary to this approach, Prof. Richards attempts to generate conclusions about the expectations of members of the Proposed Class by relying on unsupported assumptions and an unscientific analysis.  Specifically, Prof. Richards claims that because the Challenged Statements reflect so-called "societal norms" about privacy in the U.S., they give rise (or could give rise) to a common expectation among Google account holders that Google does not offer for sale or sell information linked with U.S. account holders.[84]  However, Prof. Richards merely assumes, but has not shown, that the expectations of members of the Proposed Class are the same as his so-called societal norms.[85]  Prof. Richards has not conducted any empirical analysis of the expectations of privacy from actual consumers.[86]

70.     Rather than analyzing the expectations of Google account holders, Prof. Richards claims that he analyzed the expectations of privacy of a hypothetical "reasonable Google account holder."[87]  Prof. Richards further claims that "in both law and consumer expectations, the test for whether privacy rights exist or have been invaded often rests on threshold questions about whether

---

[84] Richards Report, ¶¶ 75, 130–131.
[85] Richards Deposition, p. 96:9–16 ("[T]he standard for measuring whether a social norm is whether it one is that is - - that is generally accepted.  Q. And how do you know when something is generally accepted?  A. You study it, and you make that determination.  In this case, I have done so based upon my expertise.").
[86] Richards Deposition, p. 48:15–21 ("Q. Have you ever conducted a focus group on consumer expectations of privacy?  A. In a formal methodological setting, no.  Q. Have you ever conducted a survey that looked for statistical significant results in analyzing consumer expectations of privacy?  A. No."), p. 54:14–19 ("I have not conducted formal large and statistical surveys of consumer expectations of privacy.  Q. Have you conducted formal small statistical surveys of consumer expectations of privacy?  A. No."), p. 55:3–6 ("A. The -- the majority of my work is not statistical. I don't believe I have ever conducted a statistical study of consumer expectations of privacy."), p. 77:10–16 ("[D]id I conduct a focus group of Google accountholders in formulating my opinions on this Complaint, the answer is no, as I think I've already said.  Q. Did you talk with any of the named plaintiffs in this case?  A. No."), pp. 170:23–171:8 ("Q. So you did not conduct an [verbatim] quantitative analysis of the actual expectations of Google account holders; is that correct?  A. I believe we've already discussed that, and the answer's no.  Q. And you did not conduct a quantitative analysis of how, if in any way, Google's terms or privacy policies influenced account holders' expectations with respect to their Google accounts; correct?  A. I did not conduct a quantitative study.").
[87] Richards Deposition, p. 65:14–25 ("Q. So whose expectations are you opining about?  A. That of a reasonable Google account holder… a reasonable Google account holder having a reasonable expectation of privacy…").

a reasonable person would have expected something to be private."[88]  While the concepts of a "reasonable person" and a "reasonable expectation of privacy" are not terms of art in behavioral science, I understand that these concepts are used in the legal context to refer to, for example, expectations of privacy "relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens."[89]  To the extent Prof. Richards' analysis encompasses consumer expectations relative to the customs, occupations, or habits of Google account holders, his analysis is fundamentally flawed because he assumes without support that different Google account holders have homogeneous expectations about online privacy.

71.    Prof. Richards ignores evidence from academic research and from Plaintiffs' testimony showing that expectations about privacy can be heterogeneous across consumers and reflect a variety of influences.  For example, academic research has found that internet users have varying levels of privacy expectations, with some users being somewhat or very comfortable when sharing their personal information while others are somewhat or very uncomfortable doing so.[90]  Plaintiff Green testified that she prefers to share personal information if she sees value in doing so,[91] and Plaintiff Valencia is aware of methods to avoid sharing online his location information, but chooses not to use them.[92]  Survey research shows that consumers are statistically significantly more likely

---

[88] Richards Report, ¶ 29.

[89] *See, e.g.*, Order RE Motion to Dismiss First Amended Complaint, *Michael Gonzales v. Uber Technologies., Inc., et al.*, United States District Court for the Northern District of California, Case No.17–cv–02264–JSC, April 18, 2018, citing *TBG Ins. Servs. Corp.*, 96 Cal.App.4th at 450, 117 Cal.Rptr.2d 155.

[90] Brooke, A., et al., "Americans' Attitudes and Experiences with Privacy Policies and Laws," *Pew Research Center,* November 15, 2019, https://www.pewresearch.org/internet/2019/11/15/americans-attitudes-and-experiences-with-privacy-policies-and-laws/ ("Brooke et al. (2019)"); Rao, A. and J. Pfeffer (2020), "Types of Privacy Expectations," *Frontiers in Big Data*, 3, 7, 1–14, p. 8.

[91] Deposition of Rethena Green, April 20, 2023 ("Green Deposition"), p. 51:9–17 ("Q. When websites ask you for permission to access your location, do you generally say yes? … THE WITNESS: Yes. BY MS. SPECTOR: Q. Okay. And why? A. Because they ask -- they ask for my location, I -- maybe it enhances my time on the website.").

[92] Deposition of Christopher Valencia, December 14, 2022 ("Valencia Deposition"), pp. 66:24–68:1 ("A. … What's the VPN that you purchased? A. The VPN is called 'FastestVPN.' Q. And when did you start using that? A. I used it for a couple of hours right after I first purchased it, and then -- honestly, I don't remember when that was. Q. You only used it for a couple hours and then stopped using it? … THE WITNESS: Yes. BY MR. SOMVICHIAN: Q. Okay. Why did you stop using it? A. VPNs slow down your Internet by a considerable amount. … Q. And using a VPN allows you to appear as if you're accessing from some different location. Right? A. Yes.").

to expect that the free version of an app would share their data with advertisers compared to the paid version of the app.[93]  Socio-demographic factors, such as age, education level, household income, or political position can affect individuals' expectations about privacy and privacy regulations.[94]  For example, one study found that men were more likely than women to display their phone numbers and home addresses on social network websites.[95]  Internet users may also differ in how carefully, if at all, they read privacy policies or terms of service for internet services, how often they are exposed to such policies, and how well they understand them.[96]  Internet users may have different experiences with technology and level of knowledge of privacy-enhancing settings.[97]  Plaintiff Diggs, for example, testified that she did not set up her Gmail account on her own but rather asked her son to do it.[98]  In contrast, Plaintiff Kevranian testified that he does not ask his family members computer-related questions.[99]  Furthermore, Prof. Richards' own academic work shows that "social norms change over time and across societies."[100]

---

[93] Bamberger, K. A., et al. (2020), "Can You Pay for Privacy? Consumer Expectations and the Behavior of Free and Paid Apps," *Berkeley Technology Law Journal*, 35, 327–366, p. 353.

[94] Brooke et al. (2019); Frik, A., et al. (2022), "Users' Expectations About and Use of Smartphone Privacy and Security Settings," *CHI '22: Proceedings of the 2022 CHI Conference on Human Factors in Computing Systems*, Article No.: 407, 1–24, https://dl.acm.org/doi/10.1145/3491102.3517504 ("Frik et al. (2022)"), p. 3.

[95] Fogel, J. and E. Nehmad (2008), "Internet Social Network Communities: Risk Taking, Trust, and Privacy Concerns," *Computers in Human Behavior*, 25, 153–160, p. 153.

[96] Obar, J. A. and A. Oeldorf-Hirsch (2018), "The Biggest Lie on the Internet: Ignoring the Privacy Policies and Terms of Service Policies of Social Networking Services," *Information, Communication & Society*, *TPRC 44: The 44th Research Conference on Communication, Information and Internet Policy*, 1–37; Brooke et al. (2019).  Prof. Richards testified that he suspects that not every U.S. Google account holder has read the privacy policy or terms of services when they signed up for their Google account.  *See* Richards Deposition, pp. 132:3–133:4.

[97] Frik et al. (2022).

[98] Deposition of Terry Diggs, April 14, 2023 ("Diggs Deposition"), pp. 70:7–71:20 ("Q. Do you recall ever asking your son for help doing something with an electronic device? … THE WITNESS: Yes. BY MR. TREVOR: Q. Can you tell me what that scenario is you're thinking of? A. Well, he taught me how to make an e-mail. … Q. Were you watching him? A. No, he told me what to do. Q. And he helped you navigate through that process; is that right? A. Yes. Q. And as a result of working with your son then, did you feel more comfortable setting up an online account? ... THE WITNESS: I still don't know how to set up -- make an e-mail.").

[99] Deposition of John Kevranian, December 9, 2022 ("Kevranian Deposition"), pp. 92:14–25 ("Yeah. Do you have -- do you have family members that you view as being more tech-savvy that you might ask questions to, for example? A. No. Q. You don't have -- so if you have a computer-related question that you don't know yourself, you don't have a resource that you go to? A. No. Q.
You don't have any younger family members who are more familiar with Internet-related concepts? A. I have kids, but I don't bother them.").

[100] Richards, N. M. (2014), "Four Privacy Myths," Revised form, *A World Without Privacy?* (Cambridge Press, Austin Sarat, ed. 2015), *Washington University in St. Louis School of Law*, 1–37 ("Richards (2014)"), pp. 12-13.

72.    Because of the well-documented variation in consumer expectations,[101] a reliable analysis of Google account holders' privacy expectations cannot assume that reasonable Google account holders will have homogeneous privacy expectations, and cannot be based only on an analysis of so-called social norms derived from an ad hoc review of documents (some of which were written decades ago), as Prof. Richards has done.  For example, while Prof. Richards claims that the statements in Google's terms of service and privacy policies contain statements that "reflect[] historical societal privacy norms,"[102] he has not shown how many members of the Proposed Class were exposed to, let alone reviewed, those statements.[103]  Prof. Richards also opines that the use of the phrase "personal information" in Google's privacy policies and terms of service "is consistent with commonly-held traditions of privacy norms," but he has not conducted any analysis of how members of the Proposed Class understand the phrase "personal information."[104]  Different Plaintiffs have a different understanding of which information is personal,[105] and this

---

[101] *See, e.g.*, Kotler, P., and K. L. Keller (2006), *Marketing Management,* 12th ed., Upper Saddle River, NJ: Pearson Education, Inc., pp. 185–186 ("Perception is the process by which an individual selects, organizes, and interprets information inputs to create a meaningful picture of the world.  Perception depends not only on the physical stimuli, but on the stimuli's relation to the surrounding field and on conditions within the individual.  The key point is that perceptions can vary widely among individuals exposed to the same reality.  One person might perceive a fast-talking salesperson as aggressive and insincere; another, as intelligent and helpful.  Each will respond differently to the salesperson.").

[102] Richards Report, ¶ 75.

[103] Richards Deposition, pp. 171:9–172:6 ("Q. Did you analyze how many account holders saw any part of Google's terms of service? A. I did not conduct a quantitative study. … Q. Did you analyze how many Google account holders saw Google's privacy policies? A. I did not conduct a quantitative study, so no.").

[104] Richards Deposition, p. 141:13–17 ("This conclusion is about -- is situating Google's definition of personal information within the norms of privacy professionals. It does not speak to Google account holders one way or the other.").

[105] *See, e.g.*, Diggs Deposition, pp. 87:8–14 ("Q. And earlier this morning, I asked you what you meant by 'personal information.' Do you remember that?  A. Yes.   Q. Do you remember how you defined 'personal information' this morning?  A. Anything that's about me."), 88:7–20 ("Q. Do you believe that where you live is personal information?  A. Yes.  Q. Would that include your street address?  A. Yes.  Q. Would that include your ZIP code?  A. Yes."); Deposition of Tara L. Williams, August 17, 2023, p. 46:1–8 ("Q. … Can you think of any other things that you would consider to be personal information? THE WITNESS: Anything that I look at on the computer is personal because it's on my computer. No one else should know what I'm looking at but me."); Deposition of Salvatore Toronto, March 30, 2023 ("Toronto Deposition"), pp. 96:2–18, 97:22–98:11 ("Q. So is it your testimony that ZIP Code by itself is not personal or private information?  A. Well, in certain situations that could be private, personal. Q. What are those certain situations? … A. So I can see your point that by itself a ZIP Code is not important, not identified. It can't identify or disclose anything valuable. In some situations that is probably true...").

understanding has changed over time.[106]  Notably, documents produced in this case suggest that

Google account holders ███████████████████████████████████████████████████

███████████████████████████████████████ █████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████[108]  Similarly, Prof. Richards' own research states that "privacy can of

course mean many things,"[109] that "[p]rivacy is notoriously difficult to define,"[110] and that it is

"nearly impossible" for companies like Google to provide understandable yet detailed enough

privacy notices to internet users.[111]  Plaintiff Woodruff, for example, testified that she did not

realize that this case involved targeted advertising until asked about it during her deposition.[112]  In

sum, by assuming homogeneity within the Proposed Class, Prof. Richards ignores that different

consumers can have different expectations about online privacy.

73.    Prof. Richards' analysis is further flawed because he appears to derive his so-called societal

norms from a flawed, unscientific process.  At deposition, Prof. Richards stated that he determined

his so-called social norms "by experience, by reading, by thinking, by living in society… in a way

that is receptive to looking for social norms,"[113] and from "countless conversations" with

---

[106] Deposition of Kimberly Woodruff, May 4, 2023 ("Woodruff Deposition"), pp. 24:4–25:15 ("THE WITNESS: I would consider personal information -- at that time I considered it to be anything that was personally linked to me. … For example, my name, my e-mail address, the address that identifies my computer. … As pertains to that conversation at that time, that is what I had in my head. … Q. (By Mr. Wong) Has that definition changed since that time? A. It has expounded -- expanded.").
[107] ████████████████████████████ undated, GOOG-HEWT-00012303–414 at 344.
[108] ██████████████████████████████████████████████████████████████ GOOG-HEWT-00057910–8041 at 7940, 7973–7976, 8004.
[109] Richards (2015), p. 2.
[110] Richards (2015), p. 14.
[111] Richards, N. and W. Hartzog (2018), "The Pathologies of Digital Consent." *Washington University Law Review,* 96, 6, 1461–1503, p. 1484.
[112] Woodruff Deposition, p. 58:2–12 ("Q. Are you alleging that you personally received any ads based on the categories that we just looked at? A. I didn't realize we were -- this case was about advertising, I thought it was about Google selling my personal information in RTB. Q. So do you believe that you have received any ads based on the categories that we just reviewed? A. Again, I mean, this is talking about targeted advertising and I thought we were talking about real-time bidding.").
[113] Richards Deposition, pp. 95:24–96:2.

individuals from "all walks of life."[114]  He also stated that his analysis is based on a "qualitative appreciation,"[115] and that he relied on his personal expertise and judgment to determine that his so-called societal norms are generally accepted.[116]  In other words, Prof. Richards uses *ipse dixit* for his determination of what a societal norm is.  It is not clear how such an approach could be scientifically replicated by any expert that is not Prof. Richards.

74.     Prof. Richards' analysis also includes a flawed and ad hoc review of documents.  For example, Prof. Richards analyzed a selection of constitutional law rules, tort law rules, and statutory law including data protection rules.[117]  Prof. Richards also claims that privacy norms relevant to this case are reflected in an ad hoc collection of academic research, statements by Google and other technology companies, and in evidence produced by Google in discovery.[118]  Prof. Richards, however, does not provide the methodology he used to select the documents he analyzed, nor has he shown that his review was comprehensive, systematic, objective, and amenable to replication by another expert.[119]

75.     Moreover, none of the sources he cites as support for his claims about Google account holders' expectations address their expectations about the information that Google shares with advertisers in the RTB system.  First, the laws and legal documents analyzed by Prof. Richards to derive his so-called "societal norms" may reflect the expectations or intent of the authors; however,

---

[114] Richards Deposition, p. 44:21–23.  *See also* Richards Deposition, pp. 99:25–100:3 ("I drew upon my training and my work and my expertise and a countless number of things that I have read and conversations that I have had…").

[115] Richards Deposition, p. 97:9–12 ("A. … I'm not going to quantify it for you because my understanding in this -- in this context is that it is a qualitative appreciation."), pp. 107:23–108:2 ("I'm not going to put a quantitative number on general or common because it is a qualitative -- for me, in my methodology, I approached this as a -- in a qualitative sense, the quality of a thing rather than the quantity of a thing.").

[116] Richards Deposition, p. 96:9–16 ("[T]he standard for measuring whether a social norm is whether it one is that is -- that is generally accepted.  Q. And how do you know when something is generally accepted?  A. You study it, and you make that determination. In this case, I have done so based upon my expertise.").

[117] Richards Report, ¶ 23.

[118] Richards Report, ¶¶ 64–74.

[119] Richards Deposition, p. 66:9–17 ("Q. Did you review any articles or publications discussing Google RTB? … THE WITNESS: I've read articles and publications discussing Google RTB….  Q. And if those informed your opinions here, they are in the footnotes or in Appendix B; correct?  A. It is hard to say.").

as explained in ¶ 67, there is no reason to assume they are representative of the expectations of the population of Google account holders. In fact, Prof. Richards stated at deposition that the law may be at odds with consumers' beliefs.[120] The same is true about Prof. Richards' selection of quotes from technology companies like Microsoft, Apple, and Meta.[121] Such statements may represent how executives at these companies view privacy rather than what consumers expect, and the two can differ significantly for some consumers.[122]

76. Second, Prof. Richards cites ten research articles to claim that "privacy rights are a keen source of consumer concern."[123] However, the studies cited by Prof. Richards involve settings that are notably different from the issues in this litigation. For instance, none of the survey studies Prof. Richards cites focus on the population of Google account holders. These studies also analyze privacy questions in settings that are different from the RTB system, such as travel websites' pricing practices and the collection of medical information,[124] the ability to find personal information in internet searches,[125] or privacy concerns in online dating apps.[126] One of the studies

---

[120] Richards Deposition, p. 120:4–10 ("A. … Other times, it -- it looks to the underlying values of the law. BY MR WONG: Q. Which may be at odds with consumers' own beliefs? A. Potentially."). Prof. Richards also testified that "if someone conducted a survey … and found that … an appreciable percentage of people did not agree [with a societal norm]," then he "would have to consider such a survey and think about it[, and] would have to look at the … methodology of the survey and how if fits with the rest of the literature[.]" *See* Richards Deposition, p. 138:1–8.

[121] *See* Richards Report, ¶¶ 70–71.

[122] For example, a survey of American internet users from the same organization that conducted other surveys that Prof. Richards cites in in his report shows that most respondents believe their online activity to be tracked and have heard at least a little about how these data are used to serve targeted ads. *See* "Key Takeaways on Americans' Views About Privacy, Surveillance and Data-Sharing," *Pew Research Center*, November 15, 2019, https://www.pewresearch.org/short-reads/2019/11/15/key-takeaways-on-americans-views-about-privacy-surveillance-and-data-sharing/.

[123] Richards Report, ¶¶ 64–67.

[124] Turow, J., et al. (2023), "Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand it, Say They're Helpless to Control it, and Believe They're Harmed When Firms Use Their Data--Making What Companies Do Illegitimate," *Annenberg School for Communication, University of Pennsylvania*, 1–23 ("Turow (2023)"), p. 2.

[125] "Most Americans Support Right to Have Some Personal Info Removed from Online Searches," *Pew Research Center*, January 27, 2020, https://www.pewresearch.org/short-reads/2020/01/27/most-americans-support-right-to-have-some-personal-info-removed-from-online-searches/.

[126] "Roughly Six-in-Ten Online Daters in the U.S. Are Concerned about Data Collection," *Pew Research Center*, May 29, 2020, https://www.pewresearch.org/short-reads/2020/05/29/roughly-six-in-ten-online-daters-in-the-u-s-are-concerned-about-data-collection/.

citied is not specific to the U.S. population but rather considers consumers from across the world.[127] Another does not even address the privacy practices of technology companies, but instead it focuses on their economic power and influence.[128]

77.    Rather than supporting Prof. Richards' conclusions about the expectations of members of the Proposed Class, the cited studies confirm that there is significant heterogeneity in the privacy preferences of internet users.  For example, one of the studies finds that a large share of users expects websites to collect information about them.[129]    Another study cites "ample evidence of people not bothering to protect information."[130]

78.    Third, Prof. Richards cites to several internal Google documents to claim that Google account holders "reasonably expect that the company's privacy and information practices will not be 'creepy,' or otherwise in tension with well-established privacy norms."[131]    However, these documents are not necessarily representative of the population of Google account holders, or of their expectations about the information that Google shares with advertisers in the RTB system. For example, a presentation describing the findings of an ▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚ ▚▚▚▚▚▚▚▚▚▚▚▚ and advises against extrapolating the results to the U.S. population:

---

[127] "Privacy and Consumer Trust," *International Association of Privacy Professionals*, March 2023, https://iapp.org/resources/article/privacy-and-consumer-trust-summary/.

[128] "56% of Americans Support More Regulation of Major Technology Companies," *Pew Research Center*, July 20, 2021, https://www.pewresearch.org/short-reads/2021/07/20/56-of-americans-support-more-regulation-of-major-technology-companies/.  None of the questions in the survey used in this study discuss data or privacy practices. *See* "Methodology: The American Trends Panel Survey Methodology," *Pew Research Center*, https://www.pewresearch.org/wp-content/uploads/2021/07/Tech-Reg-Methodology-topline-2.0.pdf, p. 8.

[129] Turow (2023), pp. 9–10.

[130] Acquisti, A., et al. (2020), "Secrets and Likes: The Drive for Privacy and the Difficulty of Achieving it in the Digital Age," *Journal of Consumer Psychology*, 30, 4, 736–758, pp. 739–740.

[131] Richards Report, ¶ 74.



[REDACTED]

[REDACTED].[132]

Another presentation describing [REDACTED]

[REDACTED].[133]

Prof. Richards cites statements from other internal presentations and documents, but there is not enough information in these documents to establish if the statements cited by Prof. Richards are representative of the population of Google account holders. For example, [REDACTED]

[REDACTED]

[REDACTED].[135] Prof. Richards points to statements that involve users' "sensitive data," but the documents cited do not define what types of information are included in this category.[136] In at least one presentation, [REDACTED]

[REDACTED].[137]

### B. Prof. Richards Ignores Evidence Suggesting That Account Holders Could Learn from Multiple Sources About the Information That Google Shares with Advertisers

79.     In addition to relying on unsupported assumptions, Prof. Richards' analysis is flawed because he ignores evidence that suggests that account holders could learn from multiple sources



---

[132] [REDACTED], GOOG-HEWT-00057910–8041 at 7922.
[133] [REDACTED]," undated, GOOG-HEWT-00012303–414 at 304.
[134] *See* [REDACTED], GOOG-HEWT-00098506 at 511; Richards Report, ¶ 74.e.
[135] *See* [REDACTED], GOOG-HEWT-00481219 at 221 [REDACTED] Richards Report, ¶ 74.g.
[136] Richards Report, ¶¶ 74.d–74.e.
[137] [REDACTED]," undated, GOOG-HEWT-00480493 at 510 [REDACTED]

about the information that Google shares with advertisers in the RTB system. For instance, while Prof. Richards claims that Google "does not inform U.S. Google account holders that it offers for sale and sells" personal information in the RTB system,[138] he ignores numerous disclosures made by Google informing its account holders of the types of information collected and shared for advertising purposes, such as the following:

> [W]hen you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, **your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address**. We may also set cookies on your browser or read cookies that are already there. **Apps that use Google advertising services also share information with Google, such as the name of the app and a unique identifier for advertising**. Google uses the information shared by sites and apps to deliver our services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on our partners' sites and apps.[139]

> We may share non-personally identifiable information publicly and with our partners—like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. **We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.**[140]

> As part of your online ad experience, you likely see ads from businesses who use Google to advertise across certain websites and apps. To control these ads, visit Ad Settings to easily manage the **information that is used to show you ads. This includes information you've added to your Google Account, what we estimate about your interests based on your activity, and interactions with other advertisers that use our advertising platform to show ads.**[141]

80. Prof. Richards claims that disclosures like these are "irrelevant,"[142] and that he does not

---

[138] Richards Report, ¶ 119.

[139] "Technologies," *Google*, https://policies.google.com/technologies/partner-sites (emphasis added).

[140] "Google Privacy Policy," *Google*, https://policies.google.com/privacy (emphasis added).

[141] "Ads and Data," *Google*, https://safety.google/privacy/ads-and-data/ (emphasis added).

[142] Richards Deposition, p.177:4–8 ("Q. It is immaterial then whether or not any individual account holder knew of the alleged conduct by Google and -- and consented to the conduct? A. It's irrelevant.").

"think there is any way from Google's representations that any of its account holders could -- could knowingly consent to RTB."[143]  However, his analysis ignores that Google account holders who reviewed statements like these may have understood that Google would share their IP address, the URL of the website they visited, or other unique identifiers with advertisers.  I understand that various Google disclosures similar to these are collected and described in the declaration of Suneeti Vakharia.[144]

81.    Prof. Richards also ignores disclosures that Google account holders can encounter when they visit publisher websites.[145]  These disclosures can include extensive details about the information that publishers share with Google for the purposes of advertising.  Examples of these publisher disclosures include the following:

> [NYTimes.com Privacy Policy] We gather data and work with third parties to show you personalized ads on behalf of advertisers. This data comes from ad tracking technologies set by us or the third party (e.g., cookies), the information you provide (e.g., your e-mail address), your use of Times Services (e.g., your reading history), information from advertisers or advertising vendors (e.g., demographic data) and anything inferred from any of this information. We only use or share this information in a manner that does not reveal your identity. For example, we use Google to serve ads on Times Services. **Google uses cookies or unique device identifiers, in combination with their own data, to show you ads based on your visit to nytimes.com and other sites**. You can opt out of the use of the Google cookie by visiting the related Google privacy policy.[146]

> [Fandom.com Privacy Policy] Through our Services, **we may allow third-party advertising partners to set Technologies and other tracking tools to collect information regarding your activities and your device (e.g., your IP address, cookie identifiers, page(s) visited, location, time of day)**. These advertising

---

[143] Richards Deposition, p. 183:10–13.

[144] Declaration of Suneeti Vakharia in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *In Re Google RTB Consumer Privacy Litigation*, United States District Court for the Northern District of California, Oakland Division, Case No. 4:21-cv-02155-YGR, September 29, 2023.

[145] *See*, *e.g.*, Richards Deposition, p. 201:16–18 ("Q. And your evidence -- your evidence focuses on Google disclosing; correct, not a third party?  A. Certainly primarily, yes.").

[146] "The New York Times Company Privacy Policy," *The New York Times*, July 6, 2023, https://help.nytimes.com/hc/en-us/articles/10940941449492-The-New-York-Times-Company-Privacy-Policy- (emphasis added).  This website is amongst the top 100 most visited U.S. websites.  *See* "Top 100: The Most Visited Websites in the US," *Semrush*, https://www.semrush.com/blog/most-visited-websites/.

partners may use this information (and similar information collected from other websites) for purposes of delivering targeted advertisements to you when you visit third party services within their networks. We may receive revenue in connection with this activity. This practice is commonly referred to as "interest-based advertising" or "personalized advertising." For example, **we may use Technologies from Supply Side Platforms (also known as SSPs) such as Google's ADX, which uses cookies to collect information about your browsing history to target advertising.** We may also use Technologies from Audigent, Permutive, Google, Reddit or Liveramp to collect information for segmenting purposes based on its analysis of your interactions with the Services. We may also allow these third parties to place Technologies on our sites so they may better understand your behavior, and we may receive additional revenue in connection with that sharing.[147]

Plaintiff Diggs testified to seeing some form of notifications informing her of the websites' privacy practices.[148]  Also, I understand that additional cookies notices, privacy policies, and other disclosures are collected and described in the declaration of Hunter Hanzarik.[149]  Account holders who reviewed statements like these when they visited publisher websites may have understood that Google would share information about their visit with advertisers.  Moreover, as my Privacy Disclosures Survey results demonstrate, a large share of Google account holders has accepted (actively, or as a result of continuing to navigate the site) the cookie policies and privacy terms and conditions of publisher websites.[150]  Consistent with this finding, Plaintiff Valencia "normally hit[s] 'Accept'" for cookies when a cookie popup offers a user to accept or not accept,[151] even

---

[147] "Privacy Policy," *Fandom*, July 1, 2023, https://www.fandom.com/privacy-policy (emphasis added).  This website is amongst the top 100 most visited U.S. websites.  *See* "Top 100: The Most Visited Websites in the US," *Semrush*, https://www.semrush.com/blog/most-visited-websites/.

[148] Diggs Deposition, pp. 134:12–22 ("Q. Have you ever heard the term 'cookies' in connection with the Internet and websites? A. I have heard the term. Q. Where have you heard that term? … THE WITNESS: On sites. BY MR. TREVOR: Q. When you say, 'on sites,' what do you mean? A. Like if you're going to researching things, sometimes it will say, 'We use cookies.'"), p. 137:12–15 ("A. Like we use cookies, is it okay, you can opt in or opt out, I think. And if there isn't an opt in or opt out, then I usually leave it, because my understanding is that cookies aren't good.").

[149] Declaration of Hunter Hanzarik in Support of Google's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *In Re Google RTB Consumer Privacy Litigation*, United States District Court for the Northern District of California, Oakland Division, Case No. 4:21-cv-02155-YGR, September 29, 2023.

[150] *See* Section VI.B.

[151] Valencia Deposition, p. 75:19–24 ("Q. What's your personal practice, Mr. Valencia, when you see these cookie popups and there's an option to accept or not accept? What do you normally do? … THE WITNESS: I normally hit 'Accept.'").

though he testified that his high-level understanding is "that [cookies] has to do with some personal data collected from a person's Internet browser."[152]

82.    Prof. Richards' analysis also appears to ignore that consumers are constantly exposed to targeted advertising, and by virtue of their experiences online, they could potentially infer that their information is being shared with advertisers whenever they visit a publisher website.  For example, consider a user who had been shopping for a new pair of Nike sneakers online and then visits the New York Times website, where he is shown a Nike ad. From this interaction, the user can conceivably infer that his prior internet activity was used to target the ad he is seeing.  A similar inference may occur for users that saw ads that were targeted using the user's geographic location, browser characteristics (e.g., language), or the content category of the website they are visiting (e.g., a sports website).  For example, based on their online experiences Plaintiffs Valencia and Toronto have inferred that certain types of information are shared with advertisers.[153]  Empirical research shows that consumers are generally aware that app publishers rely on location data to create a more relevant advertising experience for people.[154]  Plaintiffs were aware of ads being targeted to them based on information that Plaintiffs claim is personal information, including

---

[152] Valencia Deposition, p. 73:4–12 ("Q. Mr. Valencia, what -- what's your general understanding of cookies as they're used on the Internet? I know that's a broad topic, but give me your just high-level understanding of how cookies are used on the Internet. A. All I know is that it has to do with some personal data collected from a person's Internet browser.").

[153] Valencia Deposition, pp. 79:23–80:12 ("Q. You mentioned that recently, you've started to notice ads that seem to be more targeted and relevant based on things like a search that you did or a website you looked at or some other actual interest of yours. Is that right? … THE WITNESS: That's right. BY MR. SOMVICHIAN: Q. Is it your understanding that cookies are used in some way to enable those types of ads to you? … THE WITNESS: Yes."); Toronto Deposition, pp. 88:16–89:2 ("Q. What personal information do you believe was sold and shared through Google RTB? … A. My search, all of my search habits, actions, et cetera, because if I search for a new tire, it seems like within hours there were ads for tires, from tire companies, for various tires. How could they have possibly learned that without Google disclosing my -- what my search was previously? That happened many, many times.").

[154] "The State of Location-Tracking Mobile Apps in 2019," *The Manifest*, May 22, 2019, https://themanifest.com/app-development/location-tracking-mobile-apps (In a survey of 727 app users, 96 percent of respondents have seen an ad that referenced their location).

health-related information,[155] previous shopping or viewing activity,[156] or location information,[157] but did not object to seeing targeted ads because they found targeted ads to be helpful.[158] Similarly, Google internal documents show that at least some Google account holders



.[159]    Prof. Richards also acknowledged that consumers could have learned about the RTB system through other public statements from "non-

---

[155] Diggs Deposition, pp. 199:12–201:2 ("Q. Do you believe that Google has ever shown you a personalized ad based on information about your health? … THE WITNESS: I don't know if they have or not, but I do know that ▮▮▮ there was a lot of ads, but I don't know if it was because of that. … Q. Do you feel that it was helpful to see those ads for the new treatments that you saw in advertisements? A. Yes."); Green Deposition, p. 40:10–23 ("Q. Okay. Have you ever seen any health-related advertisements? A. Yes. Q. Like what? A. For diabetes. Q. Okay. And did you find those advertisements helpful? A. Sometimes. Q. Okay. And why do you say that? A. Sometimes it pertain to me, sometime it didn't. Q. Okay. And so when the ad pertained to me, it was helpful? A. Yes.").

[156] Green Deposition, pp. 26:3–10, 74:3–7 ("A. … Have you ever seen other ads for a product or service that you've recently looked at? A. Yes. Q. Like what? A. Collagen."; "Q. And did you purchase the collagen there? A. Yes. Q. Okay. Would you say that ad was helpful to you? A. I can say yeah. Q. Okay. And why was it helpful? A. I had seen something that was interesting to me, and I clicked on it and purchased it."), 71:2–19 ("A. I looked for sparkly shoes for my grandmother's birthday. …Q. Did you see any ads related to sparkly shoes after you looked for some? A. Yes, I did. Q. Okay. Did you find those ads helpful? … THE WITNESS: Yeah, they were helpful. BY MS. SPECTOR: Q. Okay. Why? A. Because it was sparkly shoes. I was looking for them and then I seen ads for them."); Woodruff Deposition, pp 59:20–60:10 ("Q. Can you think of any other advertisements other than the [REDACTED] -- ones related to [REDACTED] that you -- that deal with the topics that we just looked at in this paragraph that you believe relate to your use of Google's -- of Google services that Google sold to third parties? … A. Honestly, in my head, almost every kind of advertising I get because my search engine is Google. Q. Can you give me an example of an ad that really sits on your mind that you believe -- A. If I look at [REDACTED], I get [REDACTED] ads. If I look at [REDACTED], I get ads pertaining to the kinds of [REDACTED] I look at, or [REDACTED], or anything."); Toronto Deposition, pp. 106:19–107:5 ("A. I previously was searching for tires to buy, replacement tires to buy for a sports training device, I was trying to build and then the next day, which was a few days ago, I, in searching for, not searching for, reading, being on the page that had my Gmail there were ads to the right. I'm pretty sure that was the precise time unless right after I searched my Gmail, I went to real news or I went to sports news and it was right there. I did all of that in less than ten minutes.").

[157] Green Deposition, pp. 66:3–67:1 ("Q. Okay. Do you know what an IP address is? A. I believe that an IP address is -- I'm not sure. This is just my recollection of what it is -- is the location address. … Q. Okay. Do you find it helpful to get online information related to your location? … THE WITNESS: If I am trying to say, as an example, like a restaurant, and I guess that that location would help me, the location -- I'm not sure how to say it. I guess the location app or whatever would help, yes."); Woodruff Deposition, pp. 63:21–24 ("Q. So you're not surprised when, say, you're on a website about travel and you see travel related ads, are you? A. Surprised? No."), 110:5–11 ("Q. (By Mr. Wong) Are you familiar with the term 'IP address'? A. Vaguely. Q. What is your understanding of what that means? A. An IP address is sort of like your home address except for it is your device's address."); Toronto Deposition, pp. 154:14–17 ("Q. … Do you understand that IP addresses can be used to approximate your location? A. I wouldn't doubt it.").

[158] Diggs Deposition, p. 102:12–24 ("Q. Do you object to Google showing you advertisements based on your location? … THE WITNESS: No. BY MR. TREVOR: Q. Do you object to Google showing you advertisements based on things you like to do? … THE WITNESS: No. BY MR. TREVOR: Q. Why not? … THE WITNESS: It's helpful."); Green Deposition, pp. 23:12–30:2 (Plaintiff Green testified that she saw ads targeted to her interests on popular websites, including news sources, Facebook, Instagram, and TikTok, and that she found targeted ads helpful.).

[159] ▮▮▮▮▮▮▮▮▮▮▮▮," undated, GOOG-HEWT-00012303–414 at 366.

Google entities."[160]  Plaintiff Kevranian, for example, testified that he learned "that Google sells … private personal information to third parties … through the media, the congressional hearing, news reports."[161]

83.    Finally, evidence from the RTB Surveys is consistent with the finding that Google account holders could learn from multiple sources about the information that Google shares with advertisers in the RTB system.  Indeed, as shown in Section VI.A, a large fraction of Google account holders think it is very likely or somewhat likely that Google shares information about their partial IP address, the URL and the content categories of the site they visit, their browser cookies, and the characteristics of their web browsers and devices with advertisers.  Notably, Prof. Richards stated that "[s]tatistical evidence can certainly inform determinations of -- of reasonableness."[162]

 

 

_____

Dominique Hanssens

          September 29, 2023

           Date

---

[160] Richards Deposition, p. 202:3–9 ("A. I cite to a series -- to -- to a -- to a number of publicly available statements by non-Google entities related to RTB.  Q. Wherein someone who read those statements could know about Google's conduct here; correct?  A. Someone could read these and learn about RTB, yes.").
[161] Kevranian Deposition, pp. 104:22–105:13.
[162] Richards Deposition, p. 120:3–10.

**Appendix A**

## DOMINIQUE M. HANSSENS

Distinguished Research Professor of Marketing
UCLA Anderson School of Management

### Office

UCLA Anderson School of Management
110 Westwood Plaza, Suite D412
Los Angeles, California 90095-1481, USA

Phone +1 310.825.4497 and +1 310.206.7422 (fax)

E-mail dominique.hanssens@anderson.ucla.edu

### Academic Positions

UCLA, Anderson School of Management
     Distinguished Research Professor, 2015-present
     Bud Knapp Professor of Marketing, 1999-2015

Marketing Science Institute, Cambridge, MA
     Executive Director, 2005-07

Catholic University of Leuven, Belgium
     Visiting Professor, Department of Applied Economics, 1984

Purdue University
     Graduate Instructor, School of Industrial Management, 1975-76

### Education

Ph.D., Purdue University, Management
     Thesis:   "An Empirical Study of Time-Series Analysis in Marketing Model Building."
      Chair:   Frank M. Bass

M.S., Purdue University, Management

Licenciate, University of Antwerp (UFSIA), Applied Economics

### Languages

Dutch, English, French, German, Spanish

**Appendix A**

# RESEARCH

**Books and Monographs**

S.Srinivasan and D.M.Hanssens. *Marketing and Firm Value*. Foundations and Trends in Marketing, 2022.

D. M. Hanssens. *Long Term Impact of Marketing: A Compendium*. World Scientific Publishing, 2018.

N. Mizik and D. M. Hanssens, Eds., *Handbook of Marketing Analytics: Methods and Applications in Marketing Management, Public Policy and Litigation Support*. Edward Elgar, 2018.

    Reviewed in *Applied Marketing Analytics* (Vol. 4, #2, 2018)

D.M. Hanssens, Ed., *Empirical Generalizations about Marketing Impact*. Cambridge, MA: Marketing Science Institute, Relevant Knowledge Series, 2009. Second Edition, 2015.

    Designated as a "*must read*" book by Quirk's Marketing Research, February 2013.

J. Villanueva and D.M. Hanssens. *Customer Equity: Measurement, Management and Research Opportunities.* Foundations and Trends in Marketing, 2007.

D.M. Hanssens, L.J. Parsons and R.L. Schultz.  *Market Response Models:  Econometric and Time Series Analysis*, 2nd Edition, Kluwer Academic Publishers, 2001.  Reprinted, 2003.

    Reviewed in *Journal of Marketing Research* (August 2002), *Interfaces* (July-August 2003), *International Journal of Forecasting* (April-June 2005).

    Chinese translation, Shanghai People's Publishing House, 2003.
    Japanese translation, Yuhikaku Publishing Company, 2017

D.M. Hanssens, L.J. Parsons and R.L. Schultz.  *Market Response Models:  Econometric and Time Series Analysis*, Kluwer Academic Publishers, 1990.

    Reviewed in *Journal of Marketing Research* (May 1991), *International Journal of Research in Marketing* (June 1991).

**Appendix A**

## Chapters in Books

Hanssens, D.M., L. Michelozzi & N. Mizik, "Brand Value, Marketing Spending, and Brand Royalty Rates," in *The Cambridge Handbook of Marketing and the Law,* J. Gersen and J. Steckel, Eds. Cambridge University Press, 2023.

Hanssens, D.M. and M.G.Dekimpe, "History of Marketing Science: Econometric Models" in *The History of Marketing Science, Second Edition,* R. Winer and S. Neslin, Eds., Now Publishers Inc., 2023.

Hanssens, D.M., "Reflections on the Marketing Science Discipline," in Dawn Iacobucci (Ed.), *Reflections of Eminent Marketing Scholars*, Foundations and Trends® in Marketing, 16, 2022.

Hanssens, D.M., "Return of Media Models," in *Handbook of Market Research*, C. Homburg, M. Klarmann and A. Vomber, Eds., Springer Verlag, 2022.

Hanssens, D.M., "Market Response Models for Social Marketing Causes", in Iacobucci, D. (Ed.) *Continuing to Broaden the Marketing Concept* (*Review of Marketing Research, Vol. 17*), Emerald Publishing Limited, pp. 87-96, 2020.

Hanssens, D.M. "Artificial Intelligence, Marketing Science and Sustained Profitability," in *The Future of Management in an AI World,* J. Canals and F.Heukamp, Eds., Palgrave Macmillan, 2019.

Hanssens, D.M. and Dekimpe, M.G., "Models for the Financial Performance Effects of Marketing," in *Handbook of Marketing Decision Models*, 2nd Edition, B. Wierenga and R. van der Lans (Ed.), Springer, 2017.

Hanssens, D.M., "What is Known about the Long-Term Impact of Advertising ?" in *Accountable Marketing: Linking Marketing Actions to Financial Performance*, D. Stewart and C. Gugel, Eds., Routledge, 2016.

Hanssens, D.M., J.Villanueva & S.Yoo, "Word-of-Mouth and Marketing Effects on Customer Equity," in *Handbook of Research on Customer Equity in Marketing*, V. Kumar and Denish Shah, Eds., Edward-Elgar Publishing, MA, 2015.

Hanssens, D.M., "History of Marketing Science: Econometric Models," in *The History of Marketing Science,* R. Winer and S. Neslin, Eds., Now Publishers Inc., 2014.

Luo, X., K. Pauwels & D.M. Hanssens, "Time-Series Models of Pricing the Impact of Marketing on Firm Value," in *Handbook of Marketing and Finance*, S. Ganesan, Ed., Edward-Elgar Publishing, MA, 2012.

Dekimpe, M.G. & D. M. Hanssens, "The Hidden Powers of Advertising Investments," in *Liber Amicorum in Honor of Peter S.H. Leeflang*, J. Wierenga, P. Verhoef and J. Hoekstra, Eds., Rijksuniversiteit Groningen, 2011.


**Appendix A**

Hanssens, D. M. and M. G. Dekimpe, "Short-term and Long-term Effects of Marketing Strategy," in *Handbook of Marketing Strategy*, V. Shankar and G. S. Carpenter, ed., Edward-Elgar Publishing, MA, 2012.

Lehmann, D.R. and Hanssens, D.M., "Marketing Metrics," in *Wiley International Encyclopedia of Marketing*, R. Peterson and R. Kerin, Eds., 2011.

Hanssens, D.M. and  Dekimpe, M.G., "Models for the Financial Performance Effects of Marketing," in *Handbook of Marketing Decision Models*, B. Wierenga (Ed.), Springer Science, 2008.

Dekimpe, M.G., Franses, P.H., Hanssens, D.M. and Naik, P., "Time Series Models in Marketing," in *Handbook of Marketing Decision Models*, B. Wierenga (Ed.), Springer Science, 2008.

Dekimpe, M.G. and Hanssens, D.M., "Advertising Response Modeling," in *Handbook of Advertising*, G. Tellis and T. Ambler (Eds.), Sage Publications, 2007.

Dekimpe, M.G. and Hanssens, D.M., "Persistence Modeling for Assessing Marketing Strategy Performance," in *Assessing Marketing Strategy Performance*, Lehmann, D. and Moorman, C. (Eds.), Marketing Science Institute, 2004.

Hanssens, D.M. "Allocating Marketing Communication Expenditures: A Long-Run View," in *Measuring and Allocating Marcom Budgets: Seven Expert Points of View*, Batra, R. and Reibstein, D. (Eds.), Marketing Science Institute, 2003.

Hanssens, D.M. and Parsons, L.J., "Econometric and Time-Series Market Response Models," in *Handbooks in OR & MS*, Vol 5,  Eliashberg, J. and Lilien, G.L. (Eds.), Elsevier Science Publishers, 1993. Translated in Japanese, 1998.


**Academic Articles**

B. Sezen and D.M. Hanssens, "Financial Returns to Corporate Brands: The Role of Extension Typicality," *Journal of Marketing Analytics*, March 2023.

R. Song, S. Jang, Y. Wang, D.M. Hanssens and J. Suh, "Reinforcement Learning and Risk Preference in Equity Linked Notes Markets," *Journal of Empirical Finance*, December 2021.

A. Edeling, S. Srinivasan and D.M. Hanssens, "The Marketing-Finance Interface: A New Integrative Review of Metrics, Methods, Findings and Future Directions," *International Journal of Research in Marketing*, 38 (4), December 2021.

   Finalist, Best Paper Award, *International Journal of Research in Marketing*

Y. Ding, W. DeSarbo, D.M. Hanssens, K. Jedidi, J. Lynch and D. Lehmann, "The Past, Present and Future of Measurement and Methods in Marketing Analysis," *Marketing Letters*, June 2020.

N. Bharadwaj, R. Rao and D.M. Hanssens, "Corporate Brand Value and Cash Holdings," *Journal of Brand Management*, July 2020.


**Appendix A**

D.M. Hanssens, "The Case for Research on the Marketing-Finance Interface," *Recherche et Applications en Marketing (English Edition)*, 34 (3), 2019.

   French translation available in "Arguments en faveur d'une recherche a l'interface Marketing - Finance," *Recherche et Applications en Marketing*, 34 (3), 2019.

D.M. Hanssens, "The Value of Empirical Generalizations in Marketing," *Journal of the Academy of Marketing Science*, January 2018.

H. Kim and D.M. Hanssens, "Advertising and Word-of-Mouth Effects on Pre-Launch Consumer Interest and Initial Sales of Experience Products," *Journal of Interactive Marketing*, 37, February 2017.

D. M. Hanssens, F. Wang and X-P. Zhang, "Performance Growth and Opportunistic Marketing Spending," *International Journal of Research in Marketing*, December 2016.

   Finalist, 2017 Best Paper Award, *International Journal of Research in Marketing*

D.M. Hanssens and K. Pauwels, "Demonstrating the Value of Marketing," *Journal of Marketing*, November 2016.

   Finalist, 2017 MSI/Paul Root Best Paper Award, *Journal of Marketing*
   Nominated for the 2021 Sheth Foundation/Journal of Marketing Award

P. Chintagunta, D.M. Hanssens and J. Hauser, "Marketing Science and Big Data," *Marketing Science*, May-June 2016.

H. S. Shin, D.M. Hanssens and K.I.Kim, "The Role of Online Buzz for Leader vs. Challenger Brands: The Case of the MP3 Player Market," *Electronic Commerce Research,* 2016. doi:10.1007/s10660-016-9218-7.

M. Fischer, H. Shin and D.M. Hanssens, "Brand Performance Volatility from Marketing Spending," *Management Science,* January 2016.

D.M. Hanssens, K. Pauwels, S. Srinivasan, M. Vanhuele and G.Yildirim, "Consumer Attitude Metrics for Guiding Marketing Mix Decisions," *Marketing Science*, July-August 2014.

   Finalist, Robert D. Buzzell Best Paper Award, *Marketing Science Institute*

S. Gupta, D. Hanssens, J. Hauser, D. Lehmann & B. Schmitt, "Introduction to Theory and Practice in Marketing Special Section of Marketing Science," *Marketing Science,* January-February 2014.

P. Chintagunta, D. Hanssens, J. Hauser, J. Raju, K. Srinivasan & R. Staelin, "Marketing Science: A Strategic Review," *Marketing Science*, January-February 2013.

D.M. Hanssens, "Response Models, Data Sources, and Dynamics: Commentary on 'Measuring the Impact of Negative Demand Shocks on Car Dealer Networks'," *Marketing Science*, January-February 2012.



**Appendix A**

M.G. Dekimpe & D.M. Hanssens, "Time Series Models in Marketing: Some Recent Developments," *Marketing - Journal of Research and Management*, *Special Issue in Honor of Lutz Hildebrandt*, 6 (1), 2010.

A.Joshi & D.M. Hanssens, "The Direct and Indirect Effects of Advertising Spending on Firm Value," *Journal of Marketing*, January 2010.

   MSI/Paul Root Best Paper Award, Journal of Marketing, 2011
   Robert D. Buzzell Best Paper Award, Marketing Science Institute, 2006

D.M. Hanssens, R. T. Rust & R. K. Srivastava, "Marketing Strategy and Wall Street: Nailing Down Marketing's Impact," *Journal of Marketing*, October 2009.

D.M. Hanssens, "Advertising Impact Generalizations in a Marketing Mix Context," *Journal of Advertising Research*, June 2009.

S. Srinivasan & D.M. Hanssens , "Marketing and Firm Value: Metrics, Methods, Findings and Future Directions," *Journal of Marketing Research*, June 2009.

   Lead article
   With commentaries and rejoinder
   Finalist for the 2009-2010 Paul Green Best Paper Award.
   Finalist for the 2014 William O'Dell Long Term Impact Award

   French translation available in "Marketing et valeur de l'entreprise : mesures, méthodes, résultats et voies futures de recherché," *Recherche et Applications en Marketing*, 24 (4), 2009.

A.Joshi & D.M. Hanssens, "Movie Advertising and the Stock Market Valuation of Studios," *Marketing Science*, March-April 2009.

P. Leeflang, T. Bijmolt, J. van Doorn, D. Hanssens, H. van Heerde, P. Verhoef & J. Wierenga, "Lift versus Base: Current Trends in Marketing Dynamics," *International Journal of Research in Marketing*, March 2009.

   Finalist, Best Paper Award, *International Journal of Research in Marketing*

S. Srinivasan, K. Pauwels, J. Silva-Risso and D.M. Hanssens , "Product Innovations, Advertising Spending and Stock Returns," *Journal of Marketing*, January 2009.

B.Bronnenberg, J.P.Dubé, C. Mela, P. Albuquerque, T. Erdem, B. Gordon, D. Hanssens, G. Hitsch, H. Hong & B. Sun, "Measuring long-run marketing effects and their implications for long-run marketing decisions," *Marketing Letters*, September 2008.

J. Villanueva, S. Yoo and D.M. Hanssens, "The Impact of Marketing-Induced vs. Word-of-Mouth Customer Acquisition on Customer Equity," *Journal of Marketing Research*, February 2008.

   Emerald Management Reviews Citations of Excellence Award, 2012

K.Pauwels & D.M. Hanssens, "Performance Regimes and Marketing Policy Shifts," *Marketing Science*, May-June 2007.

> Lead article
> Finalist, John D.C. Little Best Paper award
> Finalist, Frank M. Bass Best Dissertation-based Paper award

S. Gupta, D. Hanssens, B. Hardie, W. Kahn, V. Kumar, N. Lin, N. Ravishanker and S. Sriram (2006), "Modeling Customer Lifetime Value," *Journal of Service Research*, 9, 2 (November).

J-B. Steenkamp, V.R.Nijs, D.M. Hanssens and M.G. Dekimpe, "Competitive Reactions to Advertising and Promotion Attacks," *Marketing Science*, Winter 2005.

D.M. Hanssens, P. Leeflang and D.R. Wittink, "Market Response Models and Marketing Practice," *Applied Stochastic Models in Business and Industry*, July-October 2005.

> With commentaries and rejoinder

M.G. Dekimpe, D.M. Hanssens, V. Nijs and J-B. Steenkamp, "Measuring Short- and Long-Run Promotional Effectiveness on Scanner Data using Persistence Modeling," *Applied Stochastic Models in Business and Industry*, July-October 2005.

> With commentaries and rejoinder

K.Pauwels, I. Currim, M. Dekimpe, E. Ghysels, D. Hanssens, N. Mizik and P.Naik, "Modeling Marketing Dynamics by Time Series Econometrics," *Marketing Letters,* 15:4, 2004.

S. Srinivasan, K. Pauwels, D.M. Hanssens & M. Dekimpe, "Do Promotions Benefit Manufacturers, Retailers, or Both?," *Management Science*, May 2004.

> Best Paper Award, 2001 European Marketing Academy Meetings
> French translation available in "Les promotions beneficient-elles aux fabricants, aux distributeurs, ou aux deux?", *Recherche et Applications en Marketing*, 19 (3), 2004.

K. Pauwels, J. Silva-Risso, S. Srinivasan and D.M. Hanssens, "The Long-Term Impact of New-Product Introductions and Promotions On Financial Performance and Firm Value," *Journal of Marketing*, October 2004.

D.M.Hanssens & M. Ouyang, "Hysteresis in Marketing Response: When is Marketing Spending an Investment? *Review of Marketing Science*, 419, (2002).

K.Pauwels, D.M. Hanssens & S.Siddarth, "The Long-Term Effects of Price Promotions on Category Incidence, Brand Choice and Purchase Quantity," *Journal of Marketing Research*, November 2002, p. 421-439.

> Finalist for the 2002-2003 Paul Green Best Paper Award.
> Winner of the 2007 William O'Dell Award



**Appendix A**

V. Nijs, M. Dekimpe, J.-B. Steenkamp & D.M. Hanssens, "The Category Effects of Price Promotions, *Marketing Science*, Winter 2001.

    Lead article.
    Co-Winner of the 2001 John D.C. Little Best Paper Award.
    Winner of the 2002 Frank M. Bass Outstanding Dissertation Award.
    Finalist, 2011 Long-Term Impact Award, Society for Marketing Science

M.G. Dekimpe and D.M. Hanssens, "Time-Series Models in Marketing: Past, Present and Future," *International Journal of Research in Marketing*, September 2000.

G. Giuffrida, W. Chu and D.M. Hanssens, "Mining Classification Rules from Datasets with Large Number of Many-Valued Attributes," in *Lecture Notes in Computer Science*, 1777, Springer Verlag, 2000.

M.G. Dekimpe and D.M. Hanssens, "Sustained Spending and Persistent Response: A New Look at Long-Term Marketing Profitability," *Journal of Marketing Research,* November 1999, p. 1-31.

    Lead article.
    Winner of the 1999-2000 Paul Green Best Paper Award.
    Finalist for the 2004 William O'Dell Award.

M.G. Dekimpe, D.M. Hanssens & J.Silva-Risso, "Long-Run Effects of Price Promotions in Scanner Markets," *Journal of Econometrics,* March-April 1999,  p. 269-291.

M.G. Dekimpe, L. van de Gucht, D.M. Hanssens & K. Powers, "Long-Run Abstinence After Treatment for Narcotcs Abuse: What Are the Odds?", *Management Science,* November 1998.

D.M. Hanssens, "Order Forecasts, Retail Sales and the Marketing Mix for Consumer Durables, *Journal of Forecasting*, June-July 1998.

M.G. Dekimpe and D.M. Hanssens, "Empirical Generalizations about Market Evolution and Stationarity," *Marketing Science*, Summer 1995.

M.G. Dekimpe and D.M. Hanssens, "The Persistence of Marketing Effects on Sales," *Marketing Science,* Winter 1995.

    Lead article.
    Co-Winner of the 1995 John D.C. Little Best Paper Award.

G.S. Carpenter and D.M. Hanssens, "Market Expansion, Cannibalization and Optimal Airline Pricing," *International Journal of Forecasting,* Vol 10, 1994.

A. Roy, D.M. Hanssens and J.S. Raju, "Competitive Pricing by a Price Leader," *Management Science,* July 1994.

    Lead article.



**Appendix A**

K. Powers, D.M. Hanssens, Y.I. Hser and M.D. Anglin, "Policy Analysis with a Long-Term Time Series Model: Controlling Narcotics Use and Property Crime," *Mathematical and Computer Modeling, Vol. 17, 2,* 1993.

D.M. Hanssens and J.K. Johansson, "Synergy or Rivalry? The Japanese Automobile Companies' Export Expansion," *Journal of International Business Studies,* Fall 1991.

K. Powers, D.M. Hanssens, Y.I. Hser and M.D. Anglin, "Measuring the Long-Term Effects of Public Policy: The Case of Narcotics Use and Property Crime," *Management Science,* June 1991.

    Lead article.

G.S. Carpenter, L.G. Cooper, D.M. Hanssens and D.F. Midgley, "Modeling Asymmetric Competition," *Marketing Science,* Fall 1988.

D.M. Hanssens and P. Vanden Abeele, "A Time-Series Study of the Formation and Predictive Performance of EEC Production Survey Expectations," *Journal of Business & Economic Statistics,* October 1987.

S.I. Ornstein and D.M. Hanssens, "Resale Price Maintenance: Output Increasing or Restricting? The Case of Retail Liquor Stores," *Journal of Industrial Economics,* September 1987.

    Lead article. Reprinted in *Journal of Reprints of Antitrust Law and Economics,* W.Comanor (Guest Editor), 1990.

H. Gatignon and D.M. Hanssens, "Modeling Marketing Interactions with Application to Sales Force Effectiveness," *Journal of Marketing Research,* August 1987.

    Lead article.
    Finalist for the 1992 William O'Dell Award.

S.I. Ornstein and D.M. Hanssens, "Alcohol Control Laws and the Consumption of Distilled Spirits and Beer," *Journal of Consumer Research,* September 1985.

W.A.V. Clark, H.E. Freeman and D.M. Hanssens, "Opportunities for Revitalizing Stagnant Markets: An Analysis of Consumer Durables," *Journal of Product Innovation Management,* December 1984.

D.M. Hanssens and L.M. Liu, "Lag Specification in Rational Distributed Lag Structural Models," *Journal of Business & Economic Statistics,* October 1983.

D.M. Hanssens and H.A. Levien, "An Econometric Study of Recruitment Marketing in the U.S. Navy," *Management Science, October 1983.*

L.M. Liu and D.M. Hanssens, "Identification of Multiple-Input Transfer Function Models," *Communications in Statistics (Theory & Methods)*, 1982(3).

L.M. Liu and D.M. Hanssens, "A Bayesian Approach to Time-Varying Cross-Sectional Models," *Journal of Econometrics*, April 1981.


**Appendix A**

D.M. Hanssens, "Market Response, Competitive Behavior and Time-Series Analysis," *Journal of Marketing Research,* November 1980.

Finalist for the 1985 William O'Dell Award.

D.M. Hanssens, "Bivariate Time-Series Analysis of the Relationship between Advertising and Sales," *Applied Economics*, September 1980.

D.M. Hanssens and B.A. Weitz, "The Effectiveness of Industrial Print Advertisements across Product Categories,*" Journal of Marketing Research,* August 1980.

E.A. Pessemier, A.C. Bemmaor and D.M. Hanssens, "A Pilot Study of the Willingness to Donate Human Body Parts," *Journal of Consumer Research*, December 1977.

## Working Papers

R. Becerril-Arreola and D.M. Hanssens, "Measuring and Explaining Product Positionality," April 2020. Being revised for review.

H. S. Shin, D. M. Hanssens, K.I. Kim and J. A. Choe, "Positive vs. Negative e-Sentiment and the Market Performance of High-Tech Products," August 2013.

Grant recipient, *Marketing Science Institute*

S. Yoo, D.M. Hanssens & H. Kim, "Marketing and the Evolution of Customer Equity of  Frequently Purchased Brands," October 2012.

H. S. Shin, M. Sakakibara & D. M. Hanssens, "Marketing and R&D Investment of Leader vs. Follower," July 2010.

## Articles for Executives

N. Arora et al., "Charting the Future of Marketing Mix Modeling Best Practices," *MSI Blue Ribbon Panel Report*, July 2023.

D.M. Hanssens, "Return on Marketing Investments (ROMI)," *Impact at JMR*, forthcoming, 2023.

D.M. Hanssens, "Editorial: Marketing Science and Epidemiology," *Applied Marketing Analytics*, 6,1, 2020.

May, T., T. Chretien, C. Brandt Jones and D.M. Hanssens, "Beyond CSAT – Building Brands with Integrated Insights to Drive Results," *Journal of Brand Strategy*, 8, 4, Spring 2020.

D.M. Hanssens, "Creating Strong Brands for the Information Age," *The Journal of World Marketing Summit,* October 2019.


**Appendix A**

M. Fischer, H. Shin and D.M. Hanssens, "Marketing Spending and Brand Performance Volatility," *GfK Marketing Intelligence Review*, 10, 1, May 2018.

D.M. Hanssens, "Marketing Impact in the Digital Age," *The Journal of World Marketing Summit,* November 2017.

D. M. Hanssens, F. Wang and X-P. Zhang, "Vigilant Marketing: Catching Fleeting Opportunities for Growth Spurts," *Applied Marketing Analytics*, 3, 2, 2017.

P. Chintagunta, D.M. Hanssens and J.R. Hauser, "Why does Marketing Need to Strongly Embrace Data Science?," *GfK Marketing Intelligence Review*, 8, 2, 2016.

P. Farris, D. M. Hanssens, J. Lenskold and D. Reibstein, "Marketing Return on Investment: Seeking Clarity for Concept and Measurement," *Applied Marketing Analytics*, Summer 2015.

   *Marketing Science Institute* Top Download Award, 2015

C. Binder and D.M. Hanssens, "Why Strong Customer Relationships Trump Powerful Brands," *Harvard Business Review Online*, April 2015.

D.M. Hanssens, "The Long-Term Impact of Advertising," *GfK Marketing Intelligence Review*, 2015.

D. Kehrer (interview with D.M. Hanssens), "Why ROI is Often Wrong for Measuring Marketing Impact," *Forbes Insights*, July 2013.

D.M. Hanssens and M.G. Dekimpe, "The Flow Story," *Marketing Management,* Summer 2012.

D. M. Hanssens, "What is Known about the Long-Term Impact of Advertising," *Marketing Accountability Standards Board Practitioner Paper*, No. 2011-01, February 2011.

D.M. Hanssens, "Stability, Growth, Decline: Beating Recession Fatigue Requires Right Diagnosis," *IESE Insight*, 5, Second Quarter 2010 (in Spanish and English).

D.M. Hanssens, D. Thorpe & C. Finkbeiner, "Marketing When Customer Equity Matters," *Harvard Business Review*, May 2008.

D.M. Hanssens and E. Taylor, "The Village Voice: communities of customers and prospects are creating new challenges and opportunities," *Marketing Management*, March-April 2007.

D.M. Hanssens and B. Lewis, "Divvying up the Marketing Pie," *BAI Banking Strategies*, September/October 2005.

S. Srinivasan, K. Pauwels, D.M. Hanssens & M. Dekimpe, "Who Benefits from Price Promotions?", *Harvard Business Review*, September 2002.

D. M. Hanssens, "Information Driven Marketing Strategy," *International Journal of Medical Marketing*, Summer 2002.

**Appendix A**

D.M. Hanssens, "Comment on Hysteresis in Marketing," *Sloan Management Review*, Summer 1997

R. Birt and D.M. Hanssens, "Customer-Focused Database Marketing," *Case-in-Point Report*, 1996.

D.M. Hanssens, "Customer Information: The New Strategic Asset," *Chief Executive*, 1996.

D.M. Hanssens, "Managementopleiding voor de 21ste Eeuw," *Economisch & Sociaal Tijdschrift,* June 1994 (in Dutch).

D.M. Hanssens and P. Loewe, "Taking the Mystery out of Marketing," *Management Review*, August 1994.

**Appendix A**

# TEACHING

**Courses Taught at UCLA**

> Elements of Marketing (MBA)
> Mathematical Models in Marketing (MBA/PhD)
> International Marketing (MBA)
> Quantitative Research in Marketing (PhD)
> Time Series Analysis (PhD/MBA)
> Special Research Topics in Marketing (PhD)
> Management Field Studies Advisor (MBA)
> Directed Readings in Applied Econometrics and International Marketing (PhD/MBA)
> Workshop in Marketing (PhD)
> Data Analysis and Decisions under Uncertainty (Executive MBA)
> Research in Marketing Management (Ph.D.)
> Marketing Strategy and Policy (Executive MBA)
> Marketing Strategy and Planning (MBA)
> Action Research Project (Executive MBA)
> Customer Information Strategy (Executive MBA)
> Managerial Problem Solving (MBA)
> Marketing Management II (MBA)
> Marketing Strategy and Planning: Focus on Central & Eastern Europe (MBA)

**Doctoral Committees**

As chair or co-chair:

> Bonita J. Campbell, PhD Management, 1979. Professor, California State University, Northridge
> Yoshi Sugita, PhD Management, 1985. Professor of Economics, Gakushuin Univ. Tokyo
> Abhik Roy, PhD Management, 1989.  Professor, Quinnipiac University
> Keiko Powers, PhD Psychology, 1990.  Senior Marketing Scientist, MarketShare.
> Maria Cison, PhD Economics, 1990.  Economist, General Motors Corporation, Detroit
> Marnik Dekimpe, PhD Management, 1992.  Research Professor, Tilburg University
> Koen Pauwels, PhD Management, 2001. Professor, Northeastern University
> Julian Villanueva, PhD Management, 2003. Professor, IESE, Madrid
> Shijin Yoo, PhD Management, 2004. Professor, Korea University
> Amit Joshi, PhD Management, 2005. Professor, IMD, Lausanne
> Hyun Shin, PhD Management, 2008. Associate Professor, Hanyang Univ., Korea
> Rafael Becerril, PhD Management, 2013. Associate Professor, Univ. of South Carolina
> Ho Kim, PhD Management, 2013. Associate Professor, Univ. of Missouri, St. Louis

As member:

> Luiz Caleffe, PhD Education, 1980
> Hubert Gatignon, PhD Management, 1981
> Douglas Nigh, PhD Management, 1981
> Marjorie Chan, PhD Management, 1981
> Daniel Wunsch, PhD Education, 1981
> Mary Kreik, Dr. Public Health, 1982

**Appendix A**

Ngina Lythcott, Dr. Public Health, 1982
Harish Sujan, PhD Management, 1983
Sharon Garrett, PhD Public Health, 1983
Jan Ouren, PhD Public Health, 1983
Robert Curtis, PhD Management, 1985
Melvyn Menezes, PhD Management, 1985
Benoit Boyer, PhD Management, 1987
Kannan Srinivasan, PhD Management, 1986
Harold Stanislaw, PhD Psychology, 1987
Leon Crabbe, PhD Economics, 1988
Joao Assuncao, PhD Management, 1990
Parvish Nourjah, PhD Epidemiology, 1991
Ronald Rivas, PhD Management, 1997
Ronald Dietel, EdD Education, 1997
Reza Sadri, PhD Computer Science, 2001
Catarina Sismeiro, PhD Management, 2002
Yan-Nei Law, PhD Computer Science, 2005
Wayne Taylor, PhD Management, 2017
Kalyan Rallabandi, PhD Management, 2021

As external member:

Katrijn Gielens, Doctor in Applied Economics, Catholic University of Leuven, 1999
Vincent Nijs, Doctor in Applied Economics, Catholic University of Leuven, 2001
Marcel Kornelis, Doctor in Economics, University of Groningen, 2002
Isaac Dinner, PhD, Columbia University, 2011
Ofer Mintz, PhD, University of California, Irvine, 2011
Chloe Moon, PhD, University of California, Riverside, 2020
Mark Johnman, PhD, Bond University, Australia, 2021
Andre Martin, PhD, University of North Carolina, 2023

**Executive Seminars (since 2000)**

Wells Fargo Bank, 1995-2005
PriceWaterhouseCoopers, 2000
Columbia University Executive Program, 2001
Marketing Strategy in the Information Age, 2000-02
    Faculty Director, 2000-02
UCLA Strategic Leadership Institute, 2000-2003
Ambrosetti, Italy, 2002, 2004, 2005, 2006
Credit Suisse, 2002-03
University of California San Diego, Executive Program, 2003
Auchan, France, 2004
Gen-Probe, San Diego, 2004
Numico, Singapore, 2006
Greater Paris Investment Agency, 2007
SAS Forum, Madrid, 2007
Marketing Roundtable, Georgia State University, 2008



**Appendix A**

Amgen, 2008
Baptie CMO Community, 2008
Korea Productivity Center, 2009
Coca-Cola Latin America, 2010
Adobe, 2012
Teradata, 2013, 2015
American Bar Association, 2013
Hollywood IT Society, 2015, 2016
World Marketing Summit, Tokyo, 2016
Forbes CMO Summit, 2018
World Marketing Summit, Istanbul (2018), Tokyo (2019), Manila (2020),
    Lahore (2020), New Delhi (2020), Kuala Lumpur (2020)
MMA Global (2020)
Electronic World Marketing Summit, 2020-2023

**Appendix A**

## ADMINISTRATION

**Executive Director, Marketing Science Institute, Cambridge, Massachusetts, 2005-2007**

MSI is a not-for-profit institute founded in 1961 with the mission of bringing together the leading academics and practitioners in marketing to create knowledge that improves business performance. The Executive Director serves a two-year term, overseeing the research priorities, research grants, conference content, publications, collaborative research and other programs of the Institute. He or she also serves as key liaison between the MSI member companies and academic researchers.

**Executive Positions at UCLA, Anderson Graduate School of Management**

**Chairman, 1988-1990**

Chief academic officer for the 150 full-time and part-time faculty of the sole department in the school. Key responsibilities include hiring, promotion, salary negotiations, course assignments, summer research funding, departmental organization and budgeting. Position involves extensive contacts with the dean of the school and the university administration.

**Associate Dean, Academic Affairs & Strategic Planning, 1991-1993**

Responsible for all degree programs, interdisciplinary research centers, and information technology services of the school. Also charged with developing a strategic plan for the school. Position involves extensive contacts with the external constituencies. Acts as dean of the school in his absence.

**Vice-President, Management Education Associates, 1991-1993**

**Faculty Director, Global Executive MBA Program for the Americas, 2010-2013**

**Faculty Director, Morrison Center for Marketing and Data Analytics, 2015-2016**

**Other Administrative Functions**

**UCLA Anderson School of Management**

Marketing Area Chair, 1984-87, 1993-96, 1999-00, 2004-05, 2007-09, 2012-14.
Elected Member of Staffing Committee, 1982-83, 1984-86, 2000-02.
Chairman, Research Committee, 1986-88
Research Committee, 1990-1998, 2008-2013
Chairman, Executive Education Committee, 1993--95
Advisory Board member, Center for Corporate Renewal, 1995-1998
Elected Member of Faculty Executive Committee, 1997-2000, 2010-2013.
Board of Visitors Marketing Task Force, 1997-98, 2002-03
Teaching Improvement Committee, 1998-01
Advisory Board member, Center for Management in the Information Economy, 2000-02
Chairman, Faculty Advisory Board, Entertainment Research Center, 2002-2004

**Appendix A**

Faculty Director, Entertainment & Media Management Institute, 2004-05.
Compensation Task Force, 2011
Co-chair, UCLA Anderson Task Force on Branding, 2011-2012

**University of California**

Review Committee, UC Irvine Graduate School of Management, 1988
Chairman, UCLA Task Force on Economic Reconstruction and Development, 1992
Task Force on UCLA Faculty Workload, 1993--94
Task Force on Part-Time Masters Programs, 1993--94
Clinical Scholars Program Committee, UCLA School of Medicine, 1997-2002
Dean Search Committee, UCLA School of Education, 1999
Chairman, Dean Review Committee, UCLA School of Letters and Sciences, 2001-02
Dean Review Committee, UCLA Extension, 2011
Faculty Welfare Committee, UCLA Academic Senate, 2011-2014
Dean Search Committee, UCLA Extension, 2013
Vice Chancellor Search Committee, UCLA, 2015
External Review Committee, Samueli School of Engineering, UC Irvine, 2016

**Other**

Faculty Advisory Board, Gemini Consulting, San Francisco, 1988-1997
Marketing Advisory Board, KeraVision, San Jose, 1995-1999
Board of Directors, i-Mind Education Systems, 1998-2001
Academic Trustee, Marketing Science Institute, Boston, 2002-2005
Executive Committee, Marketing Science Institute, Boston, 2005-2011.
External Review Committee, Wharton School Marketing Department, 2003
Member, UCLA Committee on Research, 2003-2005.
Founding Director, Marketing Accountability Standards Board (MASB), 2006-2017
External Review Committee, New York University Marketing Department, 2008
Selection Committee, AMA Irwin Distinguished Marketing Educator Award, 2006-2009
     Chairman, 2008-2009
Board of Directors, MarketShare, Los Angeles, 2006-2015
International Advisory Board, HEC School of Management, Paris, 2009-2015
External Review Committee, Erasmus Research Institute of Management, Rotterdam, 2010
Academic Advisory Board, Unilever Marketing Science Unit, London, 2012-2015
Supervisory Board, Erasmus University Research Institute of Management, 2012-
Senior Advisor, Cornerstone Research, 2014-
Advisory Board, MarketShare, Los Angeles, 2016-17
President, INFORMS Society for Marketing Science, 2016-17
Selection Committee, Buck Weaver Award for Lifetime Contribution to Marketing
     Theory & Practice, ISMS, 2018-present
Advisory Board, LiftLab, San Francisco, 2019-
Chair, Research Evaluation Committee, Tilburg Institute for Economics and Management, 2020
Advisory Board, GBK Collective, 2021-

**Appendix A**

## PROFESSIONAL SERVICE

**Grants**

UCLA Alcohol Research Center, $39,000, for a study of regulation effect on alcohol consumption, 1979-80 (with S.I. Ornstein)
Director, Robert Anderson Research Endowment in Management, $250,000, 1988-93, 1997-99
Columbia Charitable Foundation, $230,000, Information Technology Planning Grant, 1991-1992
Director, William Leonhard Research Endowment in Management, $200,000, 1993-97
Various Marketing Science Institute research grants, 1996-present

**Editorial Boards**

Journal of Marketing Research, 1984-88 and 2003-05
Journal of Marketing Research, Associate Editor, 2007-10
Journal of Marketing Research, Editor's Advisory Board, 2010-16
Journal of Marketing, Associate Editor, 2014-16
Journal of Marketing, Special Issue Co-Editor, 2007-09
Marketing Science, 1983-94
Marketing Science, Area Editor, 1988-91
Marketing Science, Editor's Advisory Board, 2010-15
Marketing Science, Special Issue Co-Editor, 2013-16
Management Science, Associate Editor, 1978-88
Recherche et Applications en Marketing, 1987-
International Journal of Research in Marketing, 1993-2003
International Journal of Research in Marketing, Associate Editor, 2009-2016
Applied Marketing Analytics, Editorial Board, 2014-

**Ad Hoc Reviewing**

Marketing Science, 1981-82
Journal of Forecasting, 1981--
Management Science, 1981--
Journal of Marketing Research, 1981-83
Journal of Consumer Research, 1982--
Interfaces, 1992--
Decision Sciences, 1982--
International Journal of Research in Marketing, 1983-92
Computers & Industrial Engineering, 1983--
Journal of Business & Economic Statistics, 1984--
Journal of Product Innovation Management, 1984--
Psychometrika, 1985--
National Science Foundation, 1984--
Communications in Statistics, 1987--
Journal of Time Series Analysis, 1988--
Journal of Marketing, 1987--
International Journal of Forecasting, 1992--
Journal of Econometrics, 1996-
Marketing Letters, 1996-

**Appendix A**

Research Council of the United Kingdom, 1997
Research Foundation – Flanders, 2016


**Invited Research Seminars**

2022 Maastricht University*
    Emory University*
    Universidad de los Andes, Bogota, Colombia
2021 Imperial College London
    ESIC Madrid, European Marketing Academy Conference, Keynote Speaker*
2020 University of Texas, Austin
2019 Columbia University*
    Harvard Law School*
2018 IESE, Barcelona*
    BI Norwegian School of Management*
2017 University of Groningen*
    University of California, Riverside
2016 University of Tennessee
    University of Pennsylvania, Wharton School
    Indiana University, University of Notre Dame*,
    Chinese University of Hong Kong*
    University of Oxford
2015 University of Kansas, University of South Carolina,
    London Business School, New York University*,
    Bogazici University, Istanbul*, Tilburg University*
2014 University of Maryland, Northwestern University,
    Universität zu Köln, Tohoku University
2013 University of Michigan
2012 University of Texas, Austin, University of Central Florida,
    University of Florida, Fudan University Shanghai,
    University of Washington
2011 Boston University*, University of Utah
2010 University of California, Davis, University of North Carolina,
    Texas Christian University, Erasmus University, Rotterdam*
    BI Norwegian School of Management*
2009 Korea University*, Georgia State University*, University of Arizona
2008 UCLA Anderson Faculty Lecture Series, University of Minnesota,
    Tilburg University*, University of Missouri, Georgia State University
2007 Boston University, Columbia University, Arizona State University
2006 University of Groningen*, Harvard Business School,
    Emory University, Texas A&M University,
    University of Maryland, Massachusetts Institute of Technology,
    Dartmouth College
2005 Washington University, St. Louis, Ohio State University,
    Singapore Management University, University of Connecticut
    Yale University, MIT Data Center
2004 UCLA Marschak Interdisciplinary Colloquium, University of California, San Diego,
    UCLA Finance Seminar Series, Koc University, Istanbul


**Appendix A**

2003 Tulane University, Dartmouth College, McGill University,
       Tilburg University, Duke University
2002 University of Texas, Austin, Erasmus University, University of Groningen
2001 University of Texas at Dallas, Simon Fraser University,
       Tilburg University
2000 AMA Advanced Research Forum, Monterey, University of Western Ontario
1999 University of California, Riverside,  University of Southern California,
       Georgetown University, UCLA Anderson Faculty Lecture Series
1998 Humboldt University, Berlin, Northwestern University
1997 University of Cambridge, University of Washington Marketing Camp
1996 University of California, Berkeley, University of Budapest,
       Marketing Science Institute (1996-present)
1995 University of Texas, Austin, University of California, Irvine,
       Universitat Mainz
1994 Catholic University of Leuven, University of Iowa,
       Hong Kong University of Science & Technology
1991 INSEAD, Catholic University of Leuven Law School
1990 Catholic University of Leuven, Washington University, St. Louis,
       University of Florida, AMA Doctoral Consortium
1989 Georgetown University, Columbia University Marketing Camp
1987 Columbia University
1986 University of Houston
1985 Carnegie-Mellon University
1984 Washington State University, HEC Paris, Universidad de Zaragoza,
       Universiteit Antwerpen, Universite de Mons, Universiteit Gent,
       Universitat Bielefeld
1983 UCLA Economics Department
1982 University of Texas at Dallas, University of Washington
1981 Stanford University, Harvard University

* denote plenary lectures at conferences hosted by or at the university


**Consulting**

airlines: Air France
automotive: Ford, Mercedes, Lexus
consumer products: General Mills, Mars, Mattel Toys, Nestle, Coca-Cola
entertainment: Sony, Electronic Arts, Xbox, Disney, NBC, Vivendi
financial services: Home Savings, Wells Fargo, Wachovia, Schwab, CitiCorp, Fidelity
health care: Amgen, Johnson & Johnson, Safeguard Health, GlaxoSmithKline, KeraVision
information services: Catalina Marketing, TRW, TNS, MSN, Google
insurance: Progressive, Zurich
law firms: various expert-witness assignments
marketing analytics: MarketShare, LiftLab, LivePerson, GBK Collective
public sector: US Navy Recruiting Command
retailing: Ralphs, Wickes, Gelson's, Build-a-Bear, Albertsons
technology: Hewlett Packard, Hughes, Xerox, Dell, Microsoft, CDW, Motorola, Intel
telecommunications: British Columbia Telecom, British Telecom, General Telephone

**Appendix A**

**Honors and Awards**

2016 Wroe Alderson Award, Wharton School, University of Pennsylvania
2015 Buck Weaver Award for Lifetime Contribution to Marketing Theory & Practice, ISMS
2013 V. Mahajan Award for Career Contributions to Marketing Strategy Research, AMA
2010 Fellow, INFORMS Society for Marketing Science
2010 MSI/H. Paul Root Best Paper Award, *Journal of Marketing*
2007 Gilbert A. Churchill Lifetime Achievement Award, AMA
2007 William O'Dell Best Paper Award, *Journal of Marketing Research*
2006 Robert D. Buzzell Best Paper Award, *Marketing Science Institute*
2003 Neidorf "Decade" Teaching Award, UCLA Anderson School of Management
2003 Teaching Excellence Award, UCLA Executive MBA Program
2002 Frank M. Bass Outstanding Dissertation Award, *Marketing Science*
2001 John D.C. Little Best Paper Award, *Marketing Science*
2001 European Marketing Academy Best Paper Award
1999 Paul E. Green Best Paper Award, *Journal of Marketing Research*
1997 Teaching Excellence Award, UCLA Executive MBA Program
1995 John D.C. Little Best Paper Award, *Marketing Science*
1996 EMAC Doctoral Consortium Faculty Member
1990 AMA Doctoral Consortium Faculty member, 1990-present
1988 Teaching Excellence Award, UCLA Executive MBA Program
1983 Outstanding Reviewer Award, *Marketing Science*
1981 George Robbins Distinguished Teaching Award, UCLA School of Management
1981 Career Development Award, UCLA
1977 Member Beta Gamma Sigma (National Business Honor Society), 1977-present
1977 Purdue University representative, Albert Haring Annual Symposium
1976 Fellow, C.I.M., Brussels, Belgium (doctoral dissertation fellowship)
1975 Outstanding Teacher's Award, Purdue University

**Media**

Various interviews on management topics for Wall Street Journal, New York Times, Los Angeles Times, Fortune, Los Angeles Business Journal, ABC World News, NPR and other media.

Revised, August 2023



**Appendix B**

**Dominique M. Hanssens, Ph.D.**                                          August 2023
Distinguished Research Professor of Marketing
UCLA Anderson School of Management


# TESTIMONY HISTORY IN LAST FOUR YEARS


1. <u>Entertainment Studios Networks, Inc. v. McDonald's USA</u>, United States District Court, Central District of California. Deposition taken on April 4, 2023.

2. <u>City of Chicago v. JUUL Labs, Inc. et al</u>. Deposition taken on October 28, 2022.

3. <u>State of Minnesota v. JUUL Labs, Inc. et al., District Court, Fourth Judicial District.</u> Deposition taken on October 1, 2022.

4. <u>Nestle USA v. Ultra International Distributors</u>, United States District Court, Western District of Texas.  Depositions taken on September 27 and November 17, 2022.

5. <u>H. Rydman v. Champion Petfoods</u>, United States District Court, Western District of Washington.  Deposition taken on September 15, 2022.

6. <u>J. Hart v. The Weather Channel LLC</u>, United States District Court, Northern District of California. Deposition taken on April 14, 2022.

7. <u>adidas America Inc. v. Fashion Nova, Inc</u>., United States District Court, District of Oregon. Deposition taken on March 22, 2022.

8. <u>GM 8-Speed Transmission Litigation</u>, United States District Court, Eastern District of Michigan. Deposition taken on December 21, 2021.

9. <u>Takata Airbag Product Liability Litigation</u>, United States District Court, Southern District of Florida. Deposition taken on December 3, 2021.

10. <u>JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation</u>, United States District Court, Northern District of California. Depositions taken on October 1, 2021 and December 15, 2021.

11. <u>A.Helman et al. v. Marriott International, Inc. et al</u>., District Court of the Virgin Islands. Deposition taken on September 17, 2021.

12. <u>E. Stevens et al. v. Ford Motor Company,</u> United States District Court, Southern District of Texas. Deposition taken on June 16, 2021.

13. <u>R. Colangelo and K. Paradowski v. Champion Petfoods</u>, United States District Court, Northern District of New York.  Deposition taken on April 26, 2021.


**Appendix B**

14. <u>P.Guzman and J.Albright v. Polaris Industries</u>, United States District Court, Central District of California. Deposition taken on April 2, 2021.

15. <u>IntegrityMssageBoards.com, LLC, et.al. v. Facebook,Inc.</u> United States District Court, Northern District of California. Deposition taken on March 31, 2021.

16. <u>Epic Games Inc. v. Apple, Inc.</u>, United States District Court, Northern District of California. Deposition taken on March 25, 2021. Trial testimony given on May 20, 2021.

17. <u>J. Song and S. Wertkin v. Champion Petfoods</u>, United States District Court, District of Minnesota.  Deposition taken on December 16, 2020.

18. <u>J. Koenig v. Vizio, Inc.</u>, Superior Court of the State of California, County of Los Angeles. Deposition taken on June 23, 2020.

19. <u>Miller and Paulson v. Peter Thomas Roth</u>, United States District Court, Northern District of California. Deposition taken on April 15, 2020.

20. <u>MGA Entertainment, Inc. vs. Zuru, LLC</u>, Superior Court of the State of California, County of Los Angeles. Testimony at preliminary injunction hearing given on March 6, 2020.

21. <u>Sirius XM Radio Inc</u>, U.S. Copyright Royalty Board, Washington, D.C. Depositions taken on February 11 and July 2, 2020.  Trial testimony given on August 26, 2020.

22. <u>Blackberry v. Facebook et al.</u>, United States District Court, Central District of California. Deposition taken on December 21, 2019.

23. <u>G. Woolley et al. v. Ygrene Energy Fund</u>, United States District Court, Northern District of California. Deposition taken on September 26, 2019.

24. <u>S. Weaver v. Champion Petfoods</u>, United States District Court, Eastern District of Wisconsin. Deposition taken on September 18, 2019.

25. <u>D. Krommenhock and S. Hadley v. Post Foods LLC</u>, United States District Court, Northern District of California. Deposition taken on July 11, 2019.

26. <u>J. Beaty and J. Beaty v. Ford Motor Company</u>, United States District Court, Western District of Washington. Deposition taken on June 6, 2019.

27. <u>J. Reitman and C. Shoaff v. Champion Petfoods</u>, United States District Court, Central District of California, Western Division. Deposition taken on May 22, 2019.

28. <u>Obagi Cosmeceuticals v. ZO Skin Health</u>, Judicial Arbitration and Mediation Services. Deposition taken on April 25, 2019. Trial testimony given on May 17, 2019.

**Appendix C**

# Documents Considered List

## Academic Articles

Acquisti, A., et al. (2020), "Secrets and Likes: The Drive for Privacy and the Difficulty of Achieving it in the Digital Age," *Journal of Consumer Psychology*, 30, 4, 736–758

Bamberger, K. A., et al. (2020), "Can You Pay for Privacy? Consumer Expectations and the Behavior of Free and Paid Apps," *Berkeley Technology Law Journal*, 35, 327–365

Fogel, J. and E. Nehmad (2008), "Internet Social Network Communities: Risk Taking, Trust, and Privacy Concerns," *Computers in Human Behavior*, 25, 153–160

Obar, J. A., and A. Oeldorf-Hirsch (2018), "The Biggest Lie on the Internet: Ignoring the Privacy Policies and Terms of Service Policies of Social Networking Services," *Information, Communication & Society, TPRC 44: The 44th Research Conference on Communication, Information and Internet Policy*, 1–37

Rao, A., and J. Pfeffer, (2020), "Types of Privacy Expectations," *Frontiers in Big Data*, 3, 7, 1–14

Richards, N. M. (2014), "Four Privacy Myths," Revised form, *A World Without Privacy?* (Cambridge Press, Austin Sarat, ed. 2015), *Washington University in St. Louis School of Law*, 1–37, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2427808

Richards, N., and W. Hartzog (2018), "The Pathologies of Digital Consent," *Washington University Law Review*, 96, 6, 1461–1503

Turow, J., et al. (2023), "Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand it, Say They're Helpless to Control it, and Believe They're Harmed When Firms Use Their Data--Making What Companies Do Illegitimate," *Annenberg School for Communication, University of Pennsylvania*, 1–23, https://www.asc.upenn.edu/sites/default/files/2023-02/Americans_Can%27t_Consent.pdf

## Books and Book Chapters

Barber. W. G., and G. E. Yaquinto (2022), "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S. and J. B. Swann, eds., Chicago, IL: ABA Publishing

Brace, I. (2013), Questionnaire Design: How to Plan, Structure and Write Survey Material for Effective Market Research, 3rd ed., London, UK: Kogan Page Limited

Diamond, S. S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Washington, D.C.: The National Academies Press, 359–423

Frik, A. et al. (2022), "Users' Expectations About and Use of Smartphone Privacy and Security Settings," *CHI '22: Proceedings of the 2022 CHI Conference on Human Factors in Computing Systems*, Article No.: 407, 1–24, https://dl.acm.org/doi/10.1145/3491102.3517504

Kotler, P. and K. L. Keller (2006), *Marketing Management*, 12th ed., Upper Saddle River, NJ: Pearson Education, Inc.

Kugler, M. B. and R. C. Henn Jr. (2022), "Internet Surveys in Trademark Cases:  Benefits, Challenges, and Solutions," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 2nd ed., Diamond, S. S. and J. B. Swann, eds. Chicago, IL: ABA Publishing

Mizik, N. and D. M. Hanssens (2018), Handbook of Marketing Analytics: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, Cheltenham, UK: Edward Elgar Publishing Ltd

Simonson, I. and R. Kivetz (2022), "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S. and J. B. Swann, eds., Chicago, IL: ABA Publishing

Stoutenborough, J. W. (2008), "Margin of Error (MOE)," in *Encyclopedia of Survey Research Methods*, Lavrakas, P. J. eds., Thousand Oaks, CA: SAGE Publications, Inc., https://methods.sagepub.com/reference/encyclopedia-of-survey-research-methods

**Expert Reports and Depositions**

Deposition of Christopher Valencia, December 14, 2022

Deposition of John Kevranian, December 9, 2022

Deposition of Kimberley Woodruff, May 4. 2023

Deposition of Neil Richards, Ph.D., August 24, 2023

Deposition of Rethena Green, April 20, 2023

Deposition of Salvatore Toronto, March 30, 2023

Deposition of Tara L. Williams, August 17, 2023

Deposition of Terry Diggs, April 14, 2023

Expert Report of Professor Neil Richards, July 14, 2023

**Legal Documents**

Consolidated Class Action Complaint, *Benjamin Hewitt, et al. on behalf of themselves and all others similarly situated, v. Google LLC*, United States District Court for the Northern District of California, San Jose Division, Case No. 5:21-cv-02155-LHK-VKD, September 16, 2021, with Exhibits



**Appendix C**

Declaration of Hunter Hanzarik in Support of Google's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *In Re Google RTB Consumer Privacy Litigation*, United States District Court for the Northern District of California, Oakland Division, Case No. 4:21-cv-02155-YGR, September 29, 2023

Declaration of Suneeti Vakharia in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *In Re Google RTB Consumer Privacy Litigation*, United States District Court for the Northern District of California, Oakland Division, Case No. 4:21-cv-02155-YGR, September 29, 2023

Order RE Motion to Dismiss First Amended Complaint, *Michael Gonzales v. Uber Technologies., Inc., et al.*, United States District Court for the Northern District of California, Case No.17–cv–02264–JSC, April 18, 2018

Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; and Memorandum of Points and Authorities in Support Thereof, *In Re Google RTB Consumer Privacy Litigation*, United States District Court for the Northern District of California, Oakland Division, Case No. 4:21-cv-02155-YGR, July 14, 2023

**Websites and Public Press**

"56% of Americans Support More Regulation of Major Technology Companies," *Pew Research Center*, July 20, 2021, https://www.pewresearch.org/short-reads/2021/07/20/56-of-americans-support-more-regulation-of-major-technology-companies/

"AccuWeather," *AccuWeather,* https://www.accuweather.com/

"Ads and Data," *Google*, https://safety.google/privacy/ads-and-data/

"Americans' Attitudes and Experiences with Privacy Policies and Laws," *Pew Research Center*, November 15, 2019, https://www.pewresearch.org/internet/2019/11/15/americans-attitudes-and-experiences-with-privacy-policies-and-laws/

"Authorized Buyers Real-time Bidding Proto: Geo Object," *Authorized Buyers*, https://developers.google.com/authorized-buyers/rtb/realtime-bidding-guide#Geo%20Object

"Geographical Targeting," *Google Developers*, https://developers.google.com/authorized-buyers/rtb/geotargeting

"Google for Publishers," *Google*, https://www.google.com/ads/publisher/

"Google Privacy Policy," *Google*, https://policies.google.com/privacy

"How Google Uses Cookies," *Google*, https://policies.google.com/technologies/cookies?hl=en

"How to Use a Top 2 Box Score in Your Survey Analysis," *SurveyMonkey*, https://www.surveymonkey.com/mp/top-2-box-scores/

"How We Make Money with Advertising," *Google*, https://howwemakemoney.withgoogle.com/

**Appendix C**

"Introduction to Real-Time Bidding (RTB)," *Authorized Buyers Help*, https://support.google.com/authorizedbuyers/answer/6136272?hl=en

"Key Takeaways on Americans' Views About Privacy, Surveillance and Data-Sharing," *Pew Research Center*, November 15, 2019, https://www.pewresearch.org/short-reads/2019/11/15/key-takeaways-on-americans-views-about-privacy-surveillance-and-data-sharing/

"Methodology: The American Trends Panel Survey Methodology," *Pew Research Center*, https://www.pewresearch.org/wp-content/uploads/2021/07/Tech-Reg-Methodology-topline-2.0.pdf

"Most Americans Support Right to Have Some Personal Info Removed from Online Searches," *Pew Research Center*, January 27, 2020, https://www.pewresearch.org/short-reads/2020/01/27/most-americans-support-right-to-have-some-personal-info-removed-from-online-searches/

"NBA," *NBA*, https://www.nba.com/

"New York Post," *New York Post*, https://nypost.com/

"Privacy & Terms," *Google*, https://policies.google.com/privacy/key-terms?hl=en-US

"Privacy and Consumer Trust," *International Association of Privacy Professionals*, March 2023, https://iapp.org/resources/article/privacy-and-consumer-trust-summary/

"Privacy Policy," *Fandom*, July 1, 2023, https://www.fandom.com/privacy-policy

"Products," *About Google*, https://about.google/products/

"Real-Time Bidding," *Authorized Buyers*, September 15, 2023, https://developers.google.com/authorized-buyers/rtb/start

"Roughly Six-in-Ten Online Daters in the U.S. Are Concerned about Data Collection," *Pew Research Center*, May 29, 2020, https://www.pewresearch.org/short-reads/2020/05/29/roughly-six-in-ten-online-daters-in-the-u-s-are-concerned-about-data-collection/

"Technologies," *Google*, https://policies.google.com/technologies/partner-sites

"The New York Times Company Privacy Policy," *The New York Times*, July 6, 2023, https://help.nytimes.com/hc/en-us/articles/10940941449492-The-New-York-Times-Company-Privacy-Policy-

"The State of Location-Tracking Mobile Apps in 2019," *The Manifest*, May 22, 2019, https://themanifest.com/app-development/location-tracking-mobile-apps

"The Weather Channel," *The Weather Channel*, https://weather.com/

"Top 100: The Most Visited Websites in the US," *Semrush*, June 2023, https://www.semrush.com/blog/most-visited-websites/


**Appendix C**

"Top Websites in the United States (Publishing Industry)," *Semrush*, https://www.semrush.com/trending-websites/us/publishing

"User-Agent Targeting," *Authorized Buyers*, September 15, 2023, https://developers.google.com/authorized-buyers/rtb/useragent-targeting

**Bates Stamped Documents**

GOOG-HEWT-00012303–414

GOOG-HEWT-00057910–8041

GOOG-HEWT-00088603–24

GOOG-HEWT-00089761–817

GOOG-HEWT-00098506–36

GOOG-HEWT-00099180–7

GOOG-HEWT-00480493–519

GOOG-HEWT-00481219–24

**Appendix D**

# Google RTB Surveys
## Pretest Moderator Instructions

Please conduct all interviews over Zoom (or similar technology) using blind-to-the-purpose interviewers.

Provide an introduction to the respondent including the following elements:

1. Explain that the respondent will be asked to share their screen and take a survey followed by a few questions about their experience.
2. Send a unique link to the survey via the Zoom chat.
3. Ask the respondent to click on that link, which will open a survey in the respondent's browser. Instruct the respondent not to begin the survey yet.
4. Ask the respondent to come back to the Zoom window and share their screen.
5. Inform the respondent that the interviewer, as well as one or more observers, will be on the Zoom while the respondent is taking the survey.
6. Inform the respondent that they should take the survey as they would normally take a survey, whether that means taking it silently or reading/thinking aloud.
7. Ask the respondent if they have any questions, and then ask them to begin the survey.

Allow the respondent to complete the survey, then ask them the following questions. Follow-up questions can be asked for clarification of any responses.

Q1. Did you have any problems while taking the survey?
Q2. Did you think any questions were unclear? If so, which ones and why?
Q3. Did you think any answer options were unclear? If so, which ones and why?
Q4a. What do you think might be the purpose for conducting this survey?
Q4b. What makes you think so?
Q5. Is there anything else you would like to say about the survey?

Thank the respondent for participating.

**Appendix E-1**

# Business Disclosures Survey

**[NOTES TO PROGRAMMER IN BOLD CAPS AND BRACKETS]**

*Notes to respondents in italics*

## General Instructions

**[U.S. INBOUND SAMPLING MATCHED TO US CENSUS ON AGE GROUP, SEX, AND REGION.]**

**[PLACE DEVICE SNIFFER AT THE BEGINNING OF SURVEY; ASK RESPONDENTS TO RETURN IF NOT ON A QUALIFIED DEVICE. QUALIFIED DEVICES DEFINED IN S3.]**

**[TOTAL SAMPLE SIZE: N=300]**

**[TERMINATION TEXT:**

Thank you for your willingness to participate. Due to the specific guidelines we have been given for this study, we are unable to accept your offer to participate in our research. We value your time and opinions and look forward to your involvement in a future research study.

**]**

**[DO NOT ALLOW RESPONDENT TO GO BACK ON ANY QUESTION]**

## Introduction and Screening

Thank you for your willingness to participate in this study.  Your answers will be kept in confidence.  The results of this study will not be used to try to sell you anything.

If you normally wear glasses or contact lenses when viewing a screen, please wear them before continuing to the next page.

*When you are ready to start, please click or tap the "Continue" button.*

**[NEXT PAGE]**

S1.  Please take this survey when you have time to complete it uninterrupted and without distractions.

Please do not consult any other websites or other written materials while taking the survey.  Please answer all questions on your own without consulting any other person.

*Select one only.*

**[RANDOMIZE CHOICES. ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 2 ("I DO NOT UNDERSTAND OR DO NOT AGREE TO THESE INSTRUCTIONS"). OTHERWISE GO TO S2.]**

1.  I understand and agree to these instructions

2.  I do not understand or do not agree to these instructions

S2.  As an additional security measure, please enter the code exactly as it appears in the image above, and then click or tap "Continue" to continue.

Please enter it exactly as it appears, including upper and lower case letters.  Do not include any spaces. Type them all together.

**[PIPE IN ONE RANDOMLY SELECTED CODE.  CONFIRM THAT WHAT THE RESPONDENT TYPES IN MATCHES THE PIPED-IN CODE FOR SPELLING <u>AND</u> CASE.  USE ONLY UPPERCASE LETTERS.]**

**[IF THE CODE DOES NOT MATCH ON THE FIRST TRY, PIPE IN A DIFFERENT RANDOMLY SELECTED CODE AND ALLOW RESPONDENT TO TRY AGAIN.  TERMINATE IF THE CODE DOES NOT MATCH THE THIRD TIME RESPONDENT TRIES.  OTHERWISE GO TO S3.]**

TEXT BOX:  _____

**[NEXT PAGE]**

S3.  Which type of electronic device are you using to take this survey?

*Select one only.*

**[RANDOMIZE CHOICES EXCEPT 7 ("OTHER (PLEASE SPECIFY)"). ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 5 ("A TV-BASED BROWSER OR VIDEO GAME CONSOLE (FOR EXAMPLE, ANDROID TV, MICROSOFT XBOX, SONY PLAYSTATION, OR SIMILAR)"), 6 ("AN EBOOK READING DEVICE (FOR EXAMPLE, KINDLE, NOOK, SONY READER, OR SIMILAR)"), OR 7 ("OTHER (PLEASE SPECIFY)").  ALL OTHERS GO TO S4.]**

1.  A laptop/notebook computer
2.  A tablet computer (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)
3.  A desktop computer
4.  A smartphone (for example, Apple iPhone, Samsung Galaxy, or similar)
5.  A TV-based browser or video game console (for example, Android TV, Microsoft Xbox, Sony PlayStation, or similar)   **[TERMINATE]**
6.  An eBook reading device (for example, Kindle, Nook, Sony Reader, or similar)     **[TERMINATE]**
7.  Other (please specify) _____          **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S4. Do you, or does any member of your household, currently work for any of the following?

*Select all that apply.*

**[RANDOMIZE CHOICES EXCEPT 7 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("A MARKET RESEARCH OR MARKETING COMPANY OR DEPARTMENT OF A COMPANY") OR 2 ("A DEVELOPER, SELLER, OR MARKETER OF SOFTWARE FOR ONLINE ADVERTISING").  ALL OTHERS GO TO S5.]**

1. A market research or marketing company or department of a company   **[TERMINATE]**
2. A developer, seller, or marketer of software for online advertising        **[TERMINATE]**
3. A company that makes or sells automotive vehicles or parts
4. A company that provides accounting or tax preparation services
5. A bank or financial services company
6. A restaurant or food retail company
7. None of the above          **[ANCHOR] [SINGLE PUNCH]**

**[NEXT PAGE]**

S5.  Which of the following groups listed below includes your age?

*Select one only.*

**[DO NOT RANDOMIZE. ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("UNDER 13 YEARS OLD") OR 8 ("PREFER NOT TO ANSWER").**
**ALL OTHERS GO TO S6.]**

1. Under 13 years old         **[TERMINATE]**
2. 13-17 years old
3. 18-29 years old
4. 30-39 years old
5. 40-49 years old
6. 50-59 years old
7. 60 years or older
8. Prefer not to answer        **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S6.  What is your gender?

*Select one only.*

**[RANDOMIZE 1 ("MALE") AND 2 ("FEMALE").  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 4 ("PREFER NOT TO ANSWER").  ALL OTHERS GO TO S7.]**

1. Male
2. Female
3. Other (please specify) _____        **[ANCHOR]**
4. Prefer not to answer               **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S7.  In which state do you currently live?

*Select one only.*

**[ADD HIDDEN VARIABLE FOR COUNTRY REGION.]**

**[INCLUDE DROPDOWN LIST OF STATES INCLUDING WASHINGTON D.C. AND "NONE OF THE ABOVE". ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS "NONE OF THE ABOVE".  ALL OTHERS GO TO S8.]**

**[NEXT PAGE]**

S8.  In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or paid?

*Select all that apply.*

**[RANDOMIZE CHOICES EXCEPT 10 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]**

**[TERMINATE IF RESPONDENT DOES NOT SELECT 1 ("GOOGLE…"). ALL OTHERS GO TO S9.]**

1. Google (including Gmail, YouTube, Google Chrome, Google Drive, and other Google services)
2. Amazon (including Amazon Prime, Amazon Music, Prime Video, Kindle, and other Amazon services)
3. Microsoft (including Outlook.com, Office, OneDrive, Xbox Live, Windows, and other Microsoft services)
4. Facebook
5. Instagram
6. WhatsApp
7. Twitter
8. Snapchat
9. TikTok
10. None of the above          **[ANCHOR] [SINGLE PUNCH]**

**[NEXT PAGE]**

S9. Have you taken any surveys or participated in other kinds of research in the last 6 months on any of these topics?

*Select all that apply.*

**[RANDOMIZE CHOICES EXCEPT 5 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("ONLINE PRIVACY"). ALL OTHERS GO TO S10.]**

1. Online privacy          **[TERMINATE]**
2. Screen time habits
3. Food preferences
4. Mobile phone carriers
5. None of the above          **[ANCHOR] [SINGLE PUNCH]**

**[NEXT PAGE]**

S10.  Please select "South" from the following list in order to continue the survey.

*Select one only.*

**[RANDOMIZE CHOICES.  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT ANSWERS INCORRECTLY, OTHERWISE GO TO MAIN QUESTIONNAIRE]**

1.    North
2.    East
3.    South
4.    West

**[GO TO MAIN QUESTIONNAIRE]**

| Main Questionnaire |
| --- |

Thank you.  You qualify for this study.  For each of the following questions, if you don't know or if you don't have an answer, please don't guess.  Just indicate that you do not know by selecting the "Don't know/Unsure" option and click or tap "Continue" to proceed to the next question.

**[NEXT PAGE]**

Q1 Intro.

The following is an excerpt from Google's "How Our Business Works" page. Please review this excerpt carefully. Afterward, you will be asked to answer a few questions.

*Once you have reviewed the excerpt, click or tap "Continue" to proceed.*

**[RESPONDENT MUST VIEW TEXT FOR AT LEAST 30 SECONDS BEFORE BEING ABLE TO NAVIGATE TO THE NEXT PAGE.]**

## We don't sell your personal information to anyone

We use your personal information to make our products more helpful to you. It's how we can autocomplete your searches, get you home faster with Maps, or show you more useful ads based on your interests. But we never sell your personal information to anyone and you can use many of our products without signing in or saving any personal information at all.

When we show ads, advertisers pay us either for the placement of an ad -- like a banner at the top of a web page -- or for how an ad actually performs -- like when someone clicks on it. Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to.  We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you. We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies.

**[NEXT PAGE]**

# Appendix E-1

Q1. Advertisers work with Google to display targeted ads on many websites and apps across the internet.  Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?

*Please base your response on the excerpt you reviewed.*

*Hover over or tap the underlined terms if you wish to see a definition.*

*If you wish to see the excerpt of Google's website again, click or tap here.*  **[PROVIDE LINK TO POP-UP WINDOW WITH THE EXCERPT IN THE Q1 Intro. POP-UP SHOULD ALLOW RESPONDENTS TO VIEW IN-TEXT DEFINITIONS.]**

**[RANDOMIZE THE DIRECTION OF THE LIKELIHOOD SCALE ACROSS RESPONDENTS EXCEPT 'DON'T KNOW/UNSURE'.  RANDOMIZE ORDER OF ROWS.]**

**[IF RESPONDENT HOVERS OVER OR TAPS THE UNDERLINED TERMS, DISPLAY THE FOLLOWING TEXT FOR THE CORRESPONDING TERM:**

**Partial IP address:** Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address.  A complete IP address can be used to identify the geographic location from which a device is connecting to the Internet; a partial IP address can be used to identify a device's general geographic region.

**URL of the site:** The web address of the webpage you would be visiting.

**Browser Cookies:** Cookies are small pieces of text sent to your browser by a website you visit.  They help that website remember information about your visit.  Cookies can be used to identify your web browser when you browse the internet.

**Characteristics of your web browser and device:** Information that identifies the application or program (e.g., Chrome, Safari, Microsoft Edge), operating system (e.g., Android, iOS, Windows), and the version of the application and OS, being used to communicate over the Internet.

**]**

| | Very unlikely | Somewhat unlikely | Neither likely nor unlikely | Somewhat likely | Very likely | Don't know / Unsure [ANCHOR] |
|---|---|---|---|---|---|---|
| The partial IP address of your device | | | | | | |
| The URL of the website or name of the app where the ad will be placed (e.g., www.nba.com/lakers/schedule) | | | | | | |

# Appendix E-1

| Your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with prior visits to other websites | | | | | | |
|---|---|---|---|---|---|---|
| The content categories and subcategories in which Google classifies the website (e.g., "Weight Loss") | | | | | | |
| The characteristics of the web browser and device you use to access the website | | | | | | |
| Your home address | | | | | | |
| Your Social Security Number | | | | | | |
| The type of ads that could be displayed on a website (e.g., text ad, picture ad, video ad) | | | | | | |
| The sizes of the ads that could be displayed on a website (e.g., 100 x 100 pixels) | | | | | | |

**[DO NOT ALLOW RESPONDENT TO CONTINUE UNTIL THEY HAVE PROVIDED AN ANSWER FOR EACH OF THE ROWS]**

**[ALL GO TO END]**

END.  This completes the survey.  Thank you for your participation.

**[END OF SURVEY]**

**Appendix E-2**

# Privacy Disclosures Survey

**[NOTES TO PROGRAMMER IN BOLD CAPS AND BRACKETS]**

*Notes to respondents in italics*

## General Instructions

**[U.S. INBOUND SAMPLING MATCHED TO US CENSUS ON AGE GROUP, SEX, AND REGION.]**

**[PLACE DEVICE SNIFFER AT THE BEGINNING OF SURVEY; ASK RESPONDENTS TO RETURN IF NOT ON A QUALIFIED DEVICE. QUALIFIED DEVICES DEFINED IN S3.]**

**[TOTAL SAMPLE SIZE: N=300]**

**[TERMINATION TEXT:**

Thank you for your willingness to participate. Due to the specific guidelines we have been given for this study, we are unable to accept your offer to participate in our research. We value your time and opinions and look forward to your involvement in a future research study.

**]**

**[DO NOT ALLOW RESPONDENT TO GO BACK ON ANY QUESTION]**

## Introduction and Screening

Thank you for your willingness to participate in this study.  Your answers will be kept in confidence.  The results of this study will not be used to try to sell you anything.

If you normally wear glasses or contact lenses when viewing a screen, please wear them before continuing to the next page.

*When you are ready to start, please click or tap the "Continue" button.*

**[NEXT PAGE]**

S1.  Please take this survey when you have time to complete it uninterrupted and without distractions.

Please do not consult any other websites or other written materials while taking the survey.  Please answer all questions on your own without consulting any other person.

*Select one only.*

**[RANDOMIZE CHOICES.  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 2 ("I DO NOT UNDERSTAND OR DO NOT AGREE TO THESE INSTRUCTIONS").  OTHERWISE GO TO S2.]**

1.  I understand and agree to these instructions

2.  I do not understand or do not agree to these instructions


S2.  As an additional security measure, please enter the code exactly as it appears in the image above, and then click or tap "Continue" to continue.

Please enter it exactly as it appears, including upper and lower case letters.  Do not include any spaces.  Type them all together.

**[PIPE IN ONE RANDOMLY SELECTED CODE.  CONFIRM THAT WHAT THE RESPONDENT TYPES IN MATCHES THE PIPED-IN CODE FOR SPELLING <u>AND</u> CASE.  USE ONLY UPPERCASE LETTERS.]**

**[IF THE CODE DOES NOT MATCH ON THE FIRST TRY, PIPE IN A DIFFERENT RANDOMLY SELECTED CODE AND ALLOW RESPONDENT TO TRY AGAIN.  TERMINATE IF THE CODE DOES NOT MATCH THE THIRD TIME RESPONDENT TRIES.  OTHERWISE GO TO S3.]**

TEXT BOX:  _____

**[NEXT PAGE]**


S3.  Which type of electronic device are you using to take this survey?

*Select one only.*

**[RANDOMIZE CHOICES EXCEPT 7 ("OTHER (PLEASE SPECIFY)"). ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 5 ("A TV-BASED BROWSER OR VIDEO GAME CONSOLE (FOR EXAMPLE, ANDROID TV, MICROSOFT XBOX, SONY PLAYSTATION, OR SIMILAR)"), 6 ("AN EBOOK READING DEVICE (FOR EXAMPLE, KINDLE, NOOK, SONY READER, OR SIMILAR)"), OR 7 ("OTHER (PLEASE SPECIFY)").  ALL OTHERS GO TO S4.]**

1.  A laptop/notebook computer
2.  A tablet computer (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)
3.  A desktop computer
4.  A smartphone (for example, Apple iPhone, Samsung Galaxy, or similar)
5.  A TV-based browser or video game console (for example, Android TV, Microsoft Xbox, Sony PlayStation, or similar)   **[TERMINATE]**
6.  An eBook reading device (for example, Kindle, Nook, Sony Reader, or similar)     **[TERMINATE]**
7.  Other (please specify) _____     **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**


S4. Do you, or does any member of your household, currently work for any of the following?

*Select all that apply.*

**[RANDOMIZE CHOICES EXCEPT 7 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("A MARKET RESEARCH OR MARKETING COMPANY OR DEPARTMENT OF A COMPANY") OR 2 ("A DEVELOPER, SELLER, OR MARKETER OF SOFTWARE FOR ONLINE ADVERTISING").  ALL OTHERS GO TO S5.]**

1. A market research or marketing company or department of a company  **[TERMINATE]**
2. A developer, seller, or marketer of software for online advertising  **[TERMINATE]**
3. A company that makes or sells automotive vehicles or parts
4. A company that provides accounting or tax preparation services
5. A bank or financial services company
6. A restaurant or food retail company
7. None of the above          **[ANCHOR] [SINGLE PUNCH]**

**[NEXT PAGE]**

S5.  Which of the following groups listed below includes your age?

*Select one only.*

**[DO NOT RANDOMIZE. ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("UNDER 13 YEARS OLD") OR 8 ("PREFER NOT TO ANSWER").
ALL OTHERS GO TO S6.]**

1. Under 13 years old        **[TERMINATE]**
2. 13-17 years old
3. 18-29 years old
4. 30-39 years old
5. 40-49 years old
6. 50-59 years old
7. 60 years or older
8. Prefer not to answer       **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S6.  What is your gender?

*Select one only.*

**[RANDOMIZE 1 ("MALE") AND 2 ("FEMALE").  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 4 ("PREFER NOT TO ANSWER").  ALL OTHERS GO TO S7.]**

1. Male
2. Female
3. Other (please specify) _____       **[ANCHOR]**
4. Prefer not to answer            **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S7.  In which state do you currently live?

*Select one only.*

**[ADD HIDDEN VARIABLE FOR COUNTRY REGION.]**

**Appendix E-2**

**[INCLUDE DROPDOWN LIST OF STATES INCLUDING WASHINGTON D.C. AND "NONE OF THE ABOVE".
ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS "NONE OF THE ABOVE". ALL OTHERS GO TO S8.]**

**[NEXT PAGE]**

S8.  In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or paid?

*Select all that apply.*

**[RANDOMIZE CHOICES EXCEPT 10 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]**

**[TERMINATE IF RESPONDENT DOES NOT SELECT 1 ("GOOGLE…"). ALL OTHERS GO TO S9.]**

1. Google (including Gmail, YouTube, Google Chrome, Google Drive, and other Google services)
2. Amazon (including Amazon Prime, Amazon Music, Prime Video, Kindle, and other Amazon services)
3. Microsoft (including Outlook.com, Office, OneDrive, Xbox Live, Windows, and other Microsoft services)
4. Facebook
5. Instagram
6. WhatsApp
7. Twitter
8. Snapchat
9. TikTok
10. None of the above        **[ANCHOR] [SINGLE PUNCH]**

**[NEXT PAGE]**

S9. Have you taken any surveys or participated in other kinds of research in the last 6 months on any of these topics?

*Select all that apply.*

**[RANDOMIZE CHOICES EXCEPT 5 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("ONLINE PRIVACY"). ALL OTHERS GO TO S10.]**

1. Online privacy          **[TERMINATE]**
2. Screen time habits
3. Food preferences
4. Mobile phone carriers
5. None of the above          **[ANCHOR] [SINGLE PUNCH]**

**[NEXT PAGE]**

S10.  Please select "South" from the following list in order to continue the survey.

*Select one only.*

**[RANDOMIZE CHOICES.  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT ANSWERS INCORRECTLY, OTHERWISE GO TO MAIN QUESTIONNAIRE]**

1. North
2. East
3. South
4. West

**[GO TO MAIN QUESTIONNAIRE]**

| Main Questionnaire |
|---|

Thank you.  You qualify for this study.  For each of the following questions, if you don't know or if you don't have an answer, please don't guess.  Just indicate that you do not know by selecting the "Don't know/Unsure" option and click or tap "Continue" to proceed to the next question.

**[NEXT PAGE]**

Q1 Intro.

The following are excerpts from Google's privacy policy. Please review these excerpts carefully. Afterward, you will be asked to answer a few questions.

*Hover over or tap the highlighted terms if you wish to see additional information.*

*Once you have reviewed the excerpts, click or tap "Continue" to proceed.*

**[RESPONDENT MUST VIEW TEXT FOR AT LEAST 20 SECONDS BEFORE BEING ABLE TO NAVIGATE TO THE NEXT PAGE.]**

We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to.  For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

**[ADD AT LEAST TWO LINES TO SEPARATE THEM]**

We may share <u>non-personally identifiable information</u> publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to <u>show trends</u> about the general use of our services. We also allow <u>specific partners</u> to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

**[WHEN RESPONDENT HOVERS OVER OR TAPS THE WORDS IN BLUE UNDERLINED FONT, DISPLAY A POPUP WITH THE CORRESPONDING DEFINITIONS AS FOLLOWS:**

**Non-personally identifiable information**. This is information that is recorded about users so that it no longer reflects or references an individually-identifiable user.

**Show trends.**  When lots of people start searching for something, it can provide useful information about particular trends at that time. Google Trends samples Google web searches to estimate the popularity of searches over a certain period of time and shares those results publicly in aggregated terms.

**Specific partners.** For example, we allow YouTube creators and advertisers to work with measurement companies to learn about the audience of their YouTube videos or ads, using cookies or similar technologies. Another example is merchants on our shopping pages, who use cookies to understand how many different people see their product listings.

]

**[NEXT PAGE]**

Q1. Advertisers work with Google to display targeted ads on many websites and apps across the internet.  Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?

*Please base your response on the excerpt you reviewed.*

*Hover over or tap the underlined terms if you wish to see a definition.*

*If you wish to see the excerpts of Google's privacy policy again, click or tap here.*  **[PROVIDE LINK TO POP-UP WINDOW WITH THE EXCERPT IN THE Q1 Intro. POP-UP SHOULD ALLOW RESPONDENTS TO VIEW IN-TEXT DEFINITIONS.]**

**[RANDOMIZE THE DIRECTION OF THE LIKELIHOOD SCALE ACROSS RESPONDENTS EXCEPT 'DON'T KNOW/UNSURE'.  RANDOMIZE ORDER OF ROWS.]**

**[IF RESPONDENT HOVERS OVER OR TAPS THE UNDERLINED TERMS, DISPLAY THE FOLLOWING TEXT FOR THE CORRESPONDING TERM:**

**Partial IP address:** Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address.  A complete IP address can be used to identify the geographic location from which a device is connecting to the Internet; a partial IP address can be used to identify a device's general geographic region.

**URL of the site:** The web address of the webpage you would be visiting.

**Browser Cookies:** Cookies are small pieces of text sent to your browser by a website you visit. They help that website remember information about your visit.  Cookies can be used to identify your web browser when you browse the internet.

**Characteristics of your web browser and device:** Information that identifies the application or program (e.g., Chrome, Safari, Microsoft Edge), operating system (e.g., Android, iOS, Windows), and the version of the application and OS, being used to communicate over the Internet.

]

Appendix E-2

| | Very unlikely | Somewhat unlikely | Neither likely nor unlikely | Somewhat likely | Very likely | Don't know / Unsure [ANCHOR] |
|---|---|---|---|---|---|---|
| The partial IP address of your device | | | | | | |
| The URL of the website or the name of the app where the ad will be placed (e.g., www.nba.com/lakers/schedule) | | | | | | |
| Your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with prior visits to other websites | | | | | | |
| The content categories and subcategories in which Google classifies the website (e.g., "Weight Loss") | | | | | | |
| The characteristics of the web browser and device you use to access the website | | | | | | |
| Your home address | | | | | | |
| Your Social Security Number | | | | | | |
| The type of ads that could be displayed on a website (e.g., text ad, picture ad, video ad) | | | | | | |
| The sizes of the ads that could be displayed on a website(e.g., 100 x 100 pixels) | | | | | | |

**[DO NOT ALLOW RESPONDENT TO CONTINUE UNTIL THEY HAVE PROVIDED AN ANSWER FOR EACH OF THE ROWS]**

**[ALL GO TO Q2]**

Q2 Intro.  In this next section, we will ask you about your experience visiting internet websites that display advertising.

The following are examples of banners and popups that you may see when you visit certain websites that display advertising.

**[DISPLAY EXAMPLES.  ALLOW RESPONDENT TO SCROLL TO SEE ALL THE EXAMPLES]**







**[NEXT PAGE]**

**Appendix E-2**

Q2.  Have you seen banners or popups similar to these in the past seven years when you have visited websites that display advertising?

*Select one only.*

**[RANDOMIZE ORDER OF OPTIONS 1 AND 2]**

1.  Yes
2.  No
3.  I don't know / unsure **[ANCHOR]**

**[IF RESPONDENT SELECTS 1 (YES) GO TO Q3, ELSE GO TO END]**

**[NEXT PAGE]**


Q3.  Please select from the following list the actions you have taken in the past seven years when you visited a website that displays advertising and you saw banners or popups similar to the examples you reviewed in the previous question.

*If you wish to see examples again, click or tap here.*

*Select all that apply.*

**[PROVIDE LINK TO POP-UP WINDOW WITH THE EXAMPLES IN THE Q2 INTRO]**

**[RANDOMIZE ORDER OF OPTIONS 1 - 8]**

1.  Continued to navigate to the site without interacting with the banner or popup
2.  Clicked on a link that provided additional information about the privacy policies of the website
3.  Clicked on a "close" button or an "X" button that closed the banner or popup, and continued to the website
4.  Clicked on a button indicating that you accepted the privacy policies of the website
5.  Clicked on a button that opened a menu that allowed you to select the type of information you wanted to share with the website
6.  Clicked on a button indicating that you accepted all cookies
7.  Clicked on a button indicating that you rejected all cookies
8.  Navigated out of the website or closed the website
9.  Other (please specify) **[ANCHOR] [PROVIDE TEXT BOX FOR WRITTEN ANSWERS]**
10. None of the above **[ANCHOR] [SINGLE PUNCH]**
11. I don't know / unsure  **[ANCHOR] [SINGLE PUNCH]**

**[RESPONDENTS WHO SELECTED MORE THAN ONE OPTION FROM 1 TO 8, GO TO Q4, ELSE GO TO END]**


Q4.  The following list includes the actions that you indicated you have taken in the past seven years when you visited a website that displays advertising and you saw a banner or popup similar to the ones you reviewed in the previous question. To the best of your ability, <u>please rank these actions in order of how frequently you have taken them</u> when you have encountered these banners or popups over the past seven years, with 1 being the action you have taken most frequently.

*Please click and drag an item to rank it. If you are on a mobile phone, tap the items in the order you would like to rank them.*

| Action | Rank |
|---|---|
| **[PIPE-IN OPTIONS SELECTED FROM Q3 EXCEPT "OTHER," KEEP SAME ORDER AS IN Q3]** | **[ALLOW RESPONDENT TO RANK OPTIONS]** |

1. I don't have enough information to rank these actions **[CHECKBOX, SINGLE PUNCH]**

**[RESPONDENTS WHO SELECTED 2 ("CLICKED ON A LINK THAT PROVIDED ADDITIONAL INFORMATION ABOUT THE PRIVACY POLICIES OF THE WEBSITE") IN Q3 GO TO Q5, ELSE GO TO END.]**

Q5.  You indicated that, in the past seven years, at least some of the time you have clicked on a link that provided additional information about the privacy policies of the website.  Which of the following actions have you taken after seeing this additional information?

*Select all that apply.*

**[RANDOMIZE ORDER OF OPTIONS 1 AND 2]**

1. Continued to use the website
2. Navigated out of the website or closed the website
3. Other (please specify) **[ANCHOR] [PROVIDE TEXT BOX FOR WRITTEN ANSWERS]**
4. None of the above **[ANCHOR] [SINGLE PUNCH]**
5. I don't know / unsure  **[ANCHOR] [SINGLE PUNCH]**

**[ALL GO TO END]**

END.  This completes the survey.  Thank you for your participation.

**[END OF SURVEY]**

# Existing Account Hypothetical Disclosures Survey

**[NOTES TO PROGRAMMER IN BOLD CAPS AND BRACKETS]**

*Notes to respondents in italics*

## General Instructions

**[U.S. INBOUND SAMPLING MATCHED TO US CENSUS ON AGE GROUP, SEX, AND REGION.]**

**[PLACE DEVICE SNIFFER AT THE BEGINNING OF SURVEY; ASK RESPONDENTS TO RETURN IF NOT ON A QUALIFIED DEVICE. QUALIFIED DEVICES DEFINED IN S3.]**

**[TOTAL SAMPLE SIZE: N=300]**

**[TERMINATION TEXT:**

> Thank you for your willingness to participate. Due to the specific guidelines we have been given for this study, we are unable to accept your offer to participate in our research. We value your time and opinions and look forward to your involvement in a future research study.

**]**

**[DO NOT ALLOW RESPONDENT TO GO BACK ON ANY QUESTION]**

## Introduction and Screening

Thank you for your willingness to participate in this study.  Your answers will be kept in confidence.  The results of this study will not be used to try to sell you anything.

If you normally wear glasses or contact lenses when viewing a screen, please wear them before continuing to the next page.

*When you are ready to start, please click or tap the "Continue" button.*

**[NEXT PAGE]**

S1.  Please take this survey when you have time to complete it uninterrupted and without distractions.

Please do not consult any other websites or other written materials while taking the survey.  Please answer all questions on your own without consulting any other person.

*Select one only.*

**[RANDOMIZE CHOICES. ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 2 ("I DO NOT UNDERSTAND OR DO NOT AGREE TO THESE INSTRUCTIONS"). OTHERWISE GO TO S2.]**

1. I understand and agree to these instructions

2.  I do not understand or do not agree to these instructions


S2.  As an additional security measure, please enter the code exactly as it appears in the image above, and then click or tap "Continue" to continue.

Please enter it exactly as it appears, including upper and lower case letters.  Do not include any spaces. Type them all together.

**[PIPE IN ONE RANDOMLY SELECTED CODE. CONFIRM THAT WHAT THE RESPONDENT TYPES IN MATCHES THE PIPED-IN CODE FOR SPELLING <u>AND</u> CASE.  USE ONLY UPPERCASE LETTERS.]**

**[IF THE CODE DOES NOT MATCH ON THE FIRST TRY, PIPE IN A DIFFERENT RANDOMLY SELECTED CODE AND ALLOW RESPONDENT TO TRY AGAIN.  TERMINATE IF THE CODE DOES NOT MATCH THE THIRD TIME RESPONDENT TRIES. OTHERWISE GO TO S3.]**

TEXT BOX:  _____

**[NEXT PAGE]**


S3.  Which type of electronic device are you using to take this survey?

*Select one only.*

**[RANDOMIZE CHOICES EXCEPT 7 ("OTHER (PLEASE SPECIFY)"). ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 5 ("A TV-BASED BROWSER OR VIDEO GAME CONSOLE (FOR EXAMPLE, ANDROID TV, MICROSOFT XBOX, SONY PLAYSTATION, OR SIMILAR)"), 6 ("AN EBOOK READING DEVICE (FOR EXAMPLE, KINDLE, NOOK, SONY READER, OR SIMILAR)"), OR 7 ("OTHER (PLEASE SPECIFY)").  ALL OTHERS GO TO S4.]**

1.  A laptop/notebook computer
2.  A tablet computer (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)
3.  A desktop computer
4.  A smartphone (for example, Apple iPhone, Samsung Galaxy, or similar)
5.  A TV-based browser or video game console (for example, Android TV, Microsoft Xbox, Sony PlayStation, or similar)   **[TERMINATE]**
6.  An eBook reading device (for example, Kindle, Nook, Sony Reader, or similar)     **[TERMINATE]**
7.  Other (please specify) _____          **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**


S4. Do you, or does any member of your household, currently work for any of the following?

*Select all that apply.*

**[RANDOMIZE CHOICES EXCEPT 7 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("A MARKET RESEARCH OR MARKETING COMPANY OR DEPARTMENT OF A COMPANY") OR 2 ("A DEVELOPER, SELLER, OR MARKETER OF SOFTWARE FOR ONLINE ADVERTISING").  ALL OTHERS GO TO S5.]**

1.  A market research or marketing company or department of a company  **[TERMINATE]**
2.  A developer, seller, or marketer of software for online advertising  **[TERMINATE]**
3.  A company that makes or sells automotive vehicles or parts
4.  A company that provides accounting or tax preparation services
5.  A bank or financial services company
6.  A restaurant or food retail company
7.  None of the above  **[ANCHOR] [SINGLE PUNCH]**

**[NEXT PAGE]**

S5.  Which of the following groups listed below includes your age?

*Select one only.*

**[DO NOT RANDOMIZE. ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("UNDER 13 YEARS OLD") OR 8 ("PREFER NOT TO ANSWER").
ALL OTHERS GO TO S6.]**

1.  Under 13 years old  **[TERMINATE]**
2.  13-17 years old
3.  18-29 years old
4.  30-39 years old
5.  40-49 years old
6.  50-59 years old
7.  60 years or older
8.  Prefer not to answer  **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S6.  What is your gender?

*Select one only.*

**[RANDOMIZE 1 ("MALE") AND 2 ("FEMALE").  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 4 ("PREFER NOT TO ANSWER").  ALL OTHERS GO TO S7.]**

1.  Male
2.  Female
3.  Other (please specify) _____  **[ANCHOR]**
4.  Prefer not to answer  **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S7.  In which state do you currently live?

*Select one only.*

**[ADD HIDDEN VARIABLE FOR COUNTRY REGION.]**

Appendix E-3

[INCLUDE DROPDOWN LIST OF STATES INCLUDING WASHINGTON D.C. AND "NONE OF THE ABOVE". ALLOW ONLY ONE SELECTION.]

[TERMINATE IF RESPONDENT SELECTS "NONE OF THE ABOVE".  ALL OTHERS GO TO S8.]

[NEXT PAGE]


S8.  In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or paid?

*Select all that apply.*

[RANDOMIZE CHOICES EXCEPT 10 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]

[TERMINATE IF RESPONDENT DOES NOT SELECT 1 ("GOOGLE…"). ALL OTHERS GO TO S9.]

1. Google (including Gmail, YouTube, Google Chrome, Google Drive, and other Google services)
2. Amazon (including Amazon Prime, Amazon Music, Prime Video, Kindle, and other Amazon services)
3. Microsoft (including Outlook.com, Office, OneDrive, Xbox Live, Windows, and other Microsoft services)
4. Facebook
5. Instagram
6. WhatsApp
7. Twitter
8. Snapchat
9. TikTok
10. None of the above        [ANCHOR] [SINGLE PUNCH]

[NEXT PAGE]


S9. Have you taken any surveys or participated in other kinds of research in the last 6 months on any of these topics?

*Please select all that apply.*

[RANDOMIZE CHOICES EXCEPT 5 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]

[TERMINATE IF RESPONDENT SELECTS 1 ("ONLINE PRIVACY"). ALL OTHERS GO TO S10.]

1. Online privacy            [TERMINATE]
2. Screen time habits
3. Food preferences
4. Mobile phone carriers
5. None of the above            [ANCHOR] [SINGLE PUNCH]

[NEXT PAGE]


S10.  Please select "South" from the following list in order to continue the survey.

*Select one only.*

**[RANDOMIZE CHOICES.  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT ANSWERS INCORRECTLY, OTHERWISE GO TO MAIN QUESTIONNAIRE]**

1. North
2. East
3. South
4. West

**[GO TO MAIN QUESTIONNAIRE]**

| Main Questionnaire |
|---|

Thank you.  You qualify for this study.  For  this survey, if you don't know or if you don't have an answer, please don't guess.  Just indicate that you do not know by selecting the "Don't know/Unsure" option and click or tap "Continue" to proceed.

**[NEXT PAGE]**

Intro.  Assume that the following excerpt appears in a Google privacy policy.  Please review this excerpt carefully.  Afterward, you will be asked to answer a question.

*Hover over or tap the highlighted terms if you wish to see additional information.*

*Once you have reviewed the excerpt, click or tap "Continue" to proceed.*

**[RESPONDENT MUST VIEW TEXT FOR AT LEAST 25 SECONDS BEFORE BEING ABLE TO NAVIGATE TO THE NEXT PAGE.]**

Depending on your settings, we may show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

We don't share your name or email with advertisers unless you ask us to, but we share other personal information.  For example, we share the partial IP address of your device; the URL for the webpage where the ad will be placed; your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with your prior visits to their websites; the content categories and subcategories in which Google classifies the website where the ad will be placed; and the characteristics of the web browser and device you use to access the website.  We also allow advertisers to associate their cookies with Google's cookies. Matching these cookies allows advertisers to connect the data we share with the data they may already associate with you.

**[WHEN RESPONDENT HOVERS OVER OR TAPS THE WORDS IN BLUE FONT, DISPLAY A POPUP WITH THE FOLLOWING ADDITIONAL INFORMATION:]**

**Personalized ads.** You may also see personalized ads based on information from the advertiser. If you shopped on an advertiser's website, for example, they can use that visit information to show you ads.

**Appendix E-3**

**Personal information.** This is information that you provide to us which personally identifies you, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.

**Partial IP Address.** Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address.  A complete IP address can be used to identify the geographic location from which a device is connecting to the Internet; a partial IP address can be used to identify a device's general geographic region.

**URL.** The web address of a webpage you visit.

**Cookies.** Cookies are small pieces of text sent to your browser by a website you visit.  They help that website remember information about your visit.  Cookies can be used to identify your web browser when you browse the internet.

**Characteristics of your web browser and device**. Information that identifies the application or program (e.g., Chrome, Safari, Microsoft Edge), operating system (e.g., Android, iOS, Windows), and the version of the application and OS, being used to communicate over the Internet.

]

**[ALL GO TO NEXT QUESTION]**

**[NEXT PAGE]**


Q1.   Assume that in order to continue using your Google account and Google services, you are asked to review and accept a privacy policy that includes the excerpt you reviewed.  Based on the excerpt you reviewed, how likely or unlikely would you be to click the "I Accept" button for this privacy policy?

*If you wish to see the privacy policy excerpt again, click or tap here.*

**[PROVIDE LINK TO POP-UP WINDOW WITH THE EXCERPT FROM THE INTRO]**

*Select one only.*

**[RANDOMIZE DIRECT AND REVERSE ORDER FOR 1-5. ALLOW ONLY ONE SELECTION.]**

1.   Very unlikely to click "I accept"
2.   Somewhat unlikely to click "I accept"
3.   Neither likely nor unlikely to click "I accept"
4.   Somewhat likely to click "I accept"
5.   Very likely to click "I accept"
6.   Don't know / Unsure      **[ANCHOR]**

**[ALL GO TO END]**


END.  This completes the survey.  Thank you for your participation.

**[END OF SURVEY]**

# Appendix E-4

# New Service Hypothetical Disclosures Survey

**[NOTES TO PROGRAMMER IN BOLD CAPS AND BRACKETS]**

*Notes to respondents in italics*

## General Instructions

**[U.S. INBOUND SAMPLING MATCHED TO US CENSUS ON AGE GROUP, SEX, AND REGION.]**

**[PLACE DEVICE SNIFFER AT THE BEGINNING OF SURVEY; ASK RESPONDENTS TO RETURN IF NOT ON A QUALIFIED DEVICE. QUALIFIED DEVICES DEFINED IN S3.]**

**[TOTAL SAMPLE SIZE: N=300]**

**[TERMINATION TEXT:**

Thank you for your willingness to participate. Due to the specific guidelines we have been given for this study, we are unable to accept your offer to participate in our research. We value your time and opinions and look forward to your involvement in a future research study.

**]**

**[DO NOT ALLOW RESPONDENT TO GO BACK ON ANY QUESTION]**

## Introduction and Screening

Thank you for your willingness to participate in this study.  Your answers will be kept in confidence.  The results of this study will not be used to try to sell you anything.

If you normally wear glasses or contact lenses when viewing a screen, please wear them before continuing to the next page.

*When you are ready to start, please click or tap the "Continue" button.*

**[NEXT PAGE]**

S1.  Please take this survey when you have time to complete it uninterrupted and without distractions.

Please do not consult any other websites or other written materials while taking the survey.  Please answer all questions on your own without consulting any other person.

*Select one only.*

**[RANDOMIZE CHOICES. ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 2 ("I DO NOT UNDERSTAND OR DO NOT AGREE TO THESE INSTRUCTIONS"). OTHERWISE GO TO S2.]**

1.  I understand and agree to these instructions

2. I do not understand or do not agree to these instructions

S2. As an additional security measure, please enter the code exactly as it appears in the image above, and then click or tap "Continue" to continue.

Please enter it exactly as it appears, including upper and lower case letters. Do not include any spaces. Type them all together.

**[PIPE IN ONE RANDOMLY SELECTED CODE. CONFIRM THAT WHAT THE RESPONDENT TYPES IN MATCHES THE PIPED-IN CODE FOR SPELLING <u>AND</u> CASE. USE ONLY UPPERCASE LETTERS.]**

**[IF THE CODE DOES NOT MATCH ON THE FIRST TRY, PIPE IN A DIFFERENT RANDOMLY SELECTED CODE AND ALLOW RESPONDENT TO TRY AGAIN. TERMINATE IF THE CODE DOES NOT MATCH THE THIRD TIME RESPONDENT TRIES. OTHERWISE GO TO S3.]**

TEXT BOX: _____

**[NEXT PAGE]**

S3. Which type of electronic device are you using to take this survey?

*Select one only.*

**[RANDOMIZE CHOICES EXCEPT 7 ("OTHER (PLEASE SPECIFY)"). ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 5 ("A TV-BASED BROWSER OR VIDEO GAME CONSOLE (FOR EXAMPLE, ANDROID TV, MICROSOFT XBOX, SONY PLAYSTATION, OR SIMILAR)"), 6 ("AN EBOOK READING DEVICE (FOR EXAMPLE, KINDLE, NOOK, SONY READER, OR SIMILAR)"), OR 7 ("OTHER (PLEASE SPECIFY)"). ALL OTHERS GO TO S4.]**

1. A laptop/notebook computer
2. A tablet computer (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)
3. A desktop computer
4. A smartphone (for example, Apple iPhone, Samsung Galaxy, or similar)
5. A TV-based browser or video game console (for example, Android TV, Microsoft Xbox, Sony PlayStation, or similar)   **[TERMINATE]**
6. An eBook reading device (for example, Kindle, Nook, Sony Reader, or similar)     **[TERMINATE]**
7. Other (please specify) _____     **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S4. Do you, or does any member of your household, currently work for any of the following?

*Select all that apply.*

**[RANDOMIZE CHOICES EXCEPT 7 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("A MARKET RESEARCH OR MARKETING COMPANY OR DEPARTMENT OF A COMPANY") OR 2 ("A DEVELOPER, SELLER, OR MARKETER OF SOFTWARE FOR ONLINE ADVERTISING"). ALL OTHERS GO TO S5.]**

1. A market research or marketing company or department of a company  **[TERMINATE]**
2. A developer, seller, or marketer of software for online advertising        **[TERMINATE]**
3. A company that makes or sells automotive vehicles or parts
4. A company that provides accounting or tax preparation services
5. A bank or financial services company
6. A restaurant or food retail company
7. None of the above         **[ANCHOR] [SINGLE PUNCH]**

**[NEXT PAGE]**

S5. Which of the following groups listed below includes your age?

*Select one only.*

**[DO NOT RANDOMIZE. ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 1 ("UNDER 13 YEARS OLD") OR 8 ("PREFER NOT TO ANSWER").
ALL OTHERS GO TO S6.]**

1. Under 13 years old        **[TERMINATE]**
2. 13-17 years old
3. 18-29 years old
4. 30-39 years old
5. 40-49 years old
6. 50-59 years old
7. 60 years or older
8. Prefer not to answer        **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S6. What is your gender?

*Select one only.*

**[RANDOMIZE 1 ("MALE") AND 2 ("FEMALE").  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT SELECTS 4 ("PREFER NOT TO ANSWER").  ALL OTHERS GO TO S7.]**

1. Male
2. Female
3. Other (please specify) _____        **[ANCHOR]**
4. Prefer not to answer               **[ANCHOR] [TERMINATE]**

**[NEXT PAGE]**

S7. In which state do you currently live?

*Select one only.*

**[ADD HIDDEN VARIABLE FOR COUNTRY REGION.]**

[INCLUDE DROPDOWN LIST OF STATES INCLUDING WASHINGTON D.C. AND "NONE OF THE ABOVE". ALLOW ONLY ONE SELECTION.]

[TERMINATE IF RESPONDENT SELECTS "NONE OF THE ABOVE".  ALL OTHERS GO TO S8.]

[NEXT PAGE]


S8.  In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or paid?

*Select all that apply.*

[RANDOMIZE CHOICES EXCEPT 10 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]

[TERMINATE IF RESPONDENT DOES NOT SELECT 1 ("GOOGLE…"). ALL OTHERS GO TO S9.]

1. Google (including Gmail, YouTube, Google Chrome, Google Drive, and other Google services)
2. Amazon (including Amazon Prime, Amazon Music, Prime Video, Kindle, and other Amazon services)
3. Microsoft (including Outlook.com, Office, OneDrive, Xbox Live, Windows, and other Microsoft services)
4. Facebook
5. Instagram
6. WhatsApp
7. Twitter
8. Snapchat
9. TikTok
10. None of the above          [ANCHOR] [SINGLE PUNCH]

[NEXT PAGE]


S9. Have you taken any surveys or participated in other kinds of research in the last 6 months on any of these topics?

*Please select all that apply.*

[RANDOMIZE CHOICES EXCEPT 5 ("NONE OF THE ABOVE"). ALLOW MULTIPLE SELECTIONS.]

[TERMINATE IF RESPONDENT SELECTS 1 ("ONLINE PRIVACY"). ALL OTHERS GO TO S10.]

1. Online privacy          [TERMINATE]
2. Screen time habits
3. Food preferences
4. Mobile phone carriers
5. None of the above              [ANCHOR] [SINGLE PUNCH]

[NEXT PAGE]


S10.  Please select "South" from the following list in order to continue the survey.

*Select one only.*

**[RANDOMIZE CHOICES.  ALLOW ONLY ONE SELECTION.]**

**[TERMINATE IF RESPONDENT ANSWERS INCORRECTLY, OTHERWISE GO TO MAIN QUESTIONNAIRE]**

1. North
2. East
3. South
4. West

**[GO TO MAIN QUESTIONNAIRE]**

| Main Questionnaire |
|---|

Thank you.  You qualify for this study.  For this survey, if you don't know or if you don't have an answer, please don't guess.  Just indicate that you do not know by selecting the "Don't know/Unsure" option and click or tap "Continue" to proceed.

**[NEXT PAGE]**

Intro.  Assume that the following excerpt appears in a Google privacy policy.  Please review this excerpt carefully.  Afterward, you will be asked to answer a question.

*Hover over or tap the highlighted terms if you wish to see additional information.*

*Once you have reviewed the excerpt, click or tap "Continue" to proceed.*

**[RESPONDENT MUST VIEW TEXT FOR AT LEAST 25 SECONDS BEFORE BEING ABLE TO NAVIGATE TO THE NEXT PAGE.]**

Depending on your settings, we may show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

We don't share your name or email with advertisers unless you ask us to, but we share other personal information.  For example, we share the partial IP address of your device; the URL for the webpage where the ad will be placed; your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with your prior visits to their websites; the content categories and subcategories in which Google classifies the website where the ad will be placed; and the characteristics of the web browser and device you use to access the website.  We also allow advertisers to associate their cookies with Google's cookies. Matching these cookies allows advertisers to connect the data we share with the data they may already associate with you.

**[WHEN RESPONDENT HOVERS OVER OR TAPS THE WORDS IN BLUE FONT, DISPLAY A POPUP WITH THE FOLLOWING ADDITIONAL INFORMATION:]**

**Personalized ads.** You may also see personalized ads based on information from the advertiser. If you shopped on an advertiser's website, for example, they can use that visit information to show you ads.

Appendix E-4

**Personal information.** This is information that you provide to us which personally identifies you, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.

**Partial IP Address.** Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address.  A complete IP address can be used to identify the geographic location from which a device is connecting to the Internet; a partial IP address can be used to identify a device's general geographic region.

**URL.** The web address of a webpage you visit.

**Cookies.** Cookies are small pieces of text sent to your browser by a website you visit.  They help that website remember information about your visit.  Cookies can be used to identify your web browser when you browse the internet.

**Characteristics of your web browser and device**. Information that identifies the application or program (e.g., Chrome, Safari, Microsoft Edge), operating system (e.g., Android, iOS, Windows), and the version of the application and OS, being used to communicate over the Internet.

]

**[ALL GO TO NEXT QUESTION]**

**[NEXT PAGE]**


Q1. Assume that you are interested in signing up for a Google service that you do not currently use and in order to sign up you are asked to review and accept a privacy policy that includes the excerpt you reviewed.  Assume also that whether or not you accept this privacy policy will not affect your ability to use other Google services you currently use.  Based on the excerpt you reviewed, how likely or unlikely would you be to click the "I accept" button for this privacy policy in order to use the Google service in which you are interested?

*If you wish to see the privacy policy excerpt again, click or tap here.*

**[PROVIDE LINK TO POP-UP WINDOW WITH THE EXCERPT FROM THE INTRO]**

*Select one only.*

**[RANDOMIZE DIRECT AND REVERSE ORDER FOR 1-5 ALLOW ONLY ONE SELECTION.]**

1. Very unlikely to click "I accept"
2. Somewhat unlikely to click "I accept"
3. Neither likely nor unlikely to click "I accept"
4. Somewhat likely to click "I accept"
5. Very likely to click "I accept"
6. Don't know / Unsure     **[ANCHOR]**

**[ALL GO TO END]**

END.  This completes the survey.  Thank you for your participation.

**[END OF SURVEY]**

**Appendix F-1**

**Business Disclosures**

**Survey Screenshots**

**September 2023**

Thank you for your willingness to participate in this study. Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

If you normally wear glasses or contact lenses when viewing a screen, please wear them before continuing to the next page.

*When you are ready to start, please click or tap the "Continue" button.*



**Appendix F-1**

S1

Please take this survey when you have time to complete it uninterrupted and without distractions.

Please do not consult any other websites or other written materials while taking the survey. Please answer all questions on your own without consulting any other person.
*Select one only.*

○ I understand and agree to these instructions
○ I do not understand or do not agree to these instructions



S2



As an additional security measure, please enter the code exactly as it appears in the image above, and then click or tap "Continue" to continue.

Please enter it exactly as it appears, including upper and lower case letters. Do not include any spaces. Type them all together.



**Appendix F-1**

S3

Which type of electronic device are you using to take this survey?
*Select one only.*

○ A laptop/notebook computer
○ A desktop computer
○ An eBook reading device (for example, Kindle, Nook, Sony Reader, or similar)
○ A smartphone (for example, Apple iPhone, Samsung Galaxy, or similar)
○ A TV-based browser or video game console (for example, Android TV, Microsoft Xbox, Sony PlayStation, or similar)
○ A tablet computer (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)
○ Other (please specify) [＿＿＿＿＿＿＿＿＿]

Continue »

# Appendix F-1

S4

Do you, or does any member of your household, currently work for any of the following?
*Select all that apply.*

☐ A developer, seller, or marketer of software for online advertising

☐ A restaurant or food retail company

☐ A market research or marketing company or department of a company

☐ A bank or financial services company

☐ A company that provides accounting or tax preparation services

☐ A company that makes or sells automotive vehicles or parts

☐ None of the above

Continue ▶

**Appendix F-1**

S5

Which of the following groups listed below includes your age?
*Select one only.*

○ Under 13 years old

○ 13-17 years old

○ 18-29 years old

○ 30-39 years old

○ 40-49 years old

○ 50-59 years old

○ 60 years or older

○ Prefer not to answer

Continue »

**Appendix F-1**

S6

## What is your gender?
*Select one only.*

- ○ Female
- ○ Male
- ○ Other (please specify) [_____]
- ○ Prefer not to answer

Continue »

S7



In which state do you currently live?

Select one...

| Select one... |
|---|
| Alabama |
| Alaska |
| Arizona |
| Arkansas |
| California |
| Colorado |
| Connecticut |
| Delaware |
| Florida |
| Georgia |
| Hawaii |
| Idaho |
| Illinois |
| Indiana |
| Iowa |
| Kansas |
| Kentucky |
| Louisiana |

Continue ▸

**Appendix F-1**

S8

In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or paid?
*Select all that apply.*

- ☐ WhatsApp
- ☐ Microsoft (including Outlook.com, Office, OneDrive, Xbox Live, Windows, and other Microsoft services)
- ☐ Instagram
- ☐ Facebook
- ☐ Amazon (including Amazon Prime, Amazon Music, Prime Video, Kindle, and other Amazon services)
- ☐ Snapchat
- ☐ TikTok
- ☐ Google (including Gmail, YouTube, Google Chrome, Google Drive, and other Google services)
- ☐ Twitter
- ☐ None of the above

Continue ▸

**Appendix F-1**

S9

Have you taken any surveys or participated in other kinds of research in the last 6 months on any of these topics?
*Select all that apply.*

- ☐ Mobile phone carriers
- ☐ Screen time habits
- ☐ Online privacy
- ☐ Food preferences
- ☐ None of the above

Continue ▸

**Appendix F-1**

S10

Please select "South" from the following list in order to continue the survey.
*Select one only.*

○ South
○ North
○ East
○ West

Continue »

# Appendix F-1

Thank you. You qualify for this study. For each of the following questions, if you don't know or if you don't have an answer, please don't guess. Just indicate that you do not know by selecting the "Don't know/Unsure" option and click or tap "Continue" to proceed to the next question.



# Appendix F-1

Q1 Intro

The following is an excerpt from Google's "How Our Business Works" page. Please review this excerpt carefully. Afterward, you will be asked to answer a few questions.

*Once you have reviewed the excerpt, click or tap "Continue" to proceed.*

**We don't sell your personal information to anyone**

We use your personal information to make our products more helpful to you. It's how we can autocomplete your searches, get you home faster with Maps, or show you more useful ads based on your interests. But we never sell your personal information to anyone and you can use many of our products without signing in or saving any personal information at all.

When we show ads, advertisers pay us either for the placement of an ad – like a banner at the top of a web page – or for how an ad actually performs – like when someone clicks on it. Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to. We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you. We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies.

Continue▸

**Appendix F-1**

Q1

Advertisers work with Google to display targeted ads on many websites and apps across the internet. Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, <u>how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?</u>

*Please base your response on the excerpt you reviewed.*

*Hover over or tap the underlined terms if you wish to see a definition.*

*If you wish to see the excerpt of Google's website again,* **click or tap here.**

| | Very likely | Somewhat likely | Neither likely nor unlikely | Somewhat unlikely | Very unlikely | Don't know / Unsure |
|---|---|---|---|---|---|---|
| Your home address | ○ | ○ | ○ | ○ | ○ | ○ |
| The <u>URL of the website</u> or name of the app where the ad will be placed (e.g., www.nba.com/lakers/schedule) | ○ | ○ | ○ | ○ | ○ | ○ |
| The <u>characteristics of the web browser and device</u> you use to access the website | ○ | ○ | ○ | ○ | ○ | ○ |
| The type of ads that could be displayed on a website (e.g., text ad, picture ad, video ad) | ○ | ○ | ○ | ○ | ○ | ○ |
| Your <u>browser cookies</u>, including Google-generated cookies that may allow advertisers to associate your browser with prior visits to other websites | ○ | ○ | ○ | ○ | ○ | ○ |
| Your Social Security Number | ○ | ○ | ○ | ○ | ○ | ○ |
| The content categories and subcategories in which Google classifies the website (e.g., "Weight Loss") | ○ | ○ | ○ | ○ | ○ | ○ |
| The sizes of the ads that could be displayed on a website (e.g., 100 x 100 pixels) | ○ | ○ | ○ | ○ | ○ | ○ |
| The <u>partial IP address</u> of your device | ○ | ○ | ○ | ○ | ○ | ○ |


Continue »

END

This completes the survey. Thank you for your participation.



# Appendix F-2

**Privacy Disclosures**

**Survey Screenshots**

**September 2023**

Thank you for your willingness to participate in this study. Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

If you normally wear glasses or contact lenses when viewing a screen, please wear them before continuing to the next page.

*When you are ready to start, please click or tap the "Continue" button.*



**Appendix F-2**

S1

Please take this survey when you have time to complete it uninterrupted and without distractions.

Please do not consult any other websites or other written materials while taking the survey. Please answer all questions on your own without consulting any other person.
*Select one only.*

○ I understand and agree to these instructions
○ I do not understand or do not agree to these instructions



**Appendix F-2**

S2



As an additional security measure, please enter the code exactly as it appears in the image above, and then click or tap "Continue" to continue.

Please enter it exactly as it appears, including upper and lower case letters. Do not include any spaces. Type them all together.

Continue »

**Appendix F-2**

S3

Which type of electronic device are you using to take this survey?
*Select one only.*

○ A laptop/notebook computer

○ A desktop computer

○ A TV-based browser or video game console (for example, Android TV, Microsoft Xbox, Sony PlayStation, or similar)

○ An eBook reading device (for example, Kindle, Nook, Sony Reader, or similar)

○ A tablet computer (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)

○ A smartphone (for example, Apple iPhone, Samsung Galaxy, or similar)

○ Other (please specify) [_____]

Continue »

**Appendix F-2**

S4

Do you, or does any member of your household, currently work for any of the following?
*Select all that apply.*

☐ A company that provides accounting or tax preparation services

☐ A company that makes or sells automotive vehicles or parts

☐ A developer, seller, or marketer of software for online advertising

☐ A bank or financial services company

☐ A restaurant or food retail company

☐ A market research or marketing company or department of a company

☐ None of the above

Continue ›

**Appendix F-2**

S5

Which of the following groups listed below includes your age?
*Select one only.*

○ Under 13 years old
○ 13-17 years old
○ 18-29 years old
○ 30-39 years old
○ 40-49 years old
○ 50-59 years old
○ 60 years or older
○ Prefer not to answer

Continue »

**Appendix F-2**

S6

What is your gender?
*Select one only.*

○ Male
○ Female
○ Other (please specify) [_____]
○ Prefer not to answer

Continue »

S7



**Appendix F-2**

S8

In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or paid?
*Select all that apply.*

- ☐ Amazon (including Amazon Prime, Amazon Music, Prime Video, Kindle, and other Amazon services)
- ☐ TikTok
- ☐ Facebook
- ☐ Microsoft (including Outlook.com, Office, OneDrive, Xbox Live, Windows, and other Microsoft services)
- ☐ Google (including Gmail, YouTube, Google Chrome, Google Drive, and other Google services)
- ☐ WhatsApp
- ☐ Instagram
- ☐ Snapchat
- ☐ Twitter
- ☐ None of the above

Continue

**Appendix F-2**

S9

Have you taken any surveys or participated in other kinds of research in the last 6 months on any of these topics?
*Select all that apply.*

- ☐ Food preferences
- ☐ Screen time habits
- ☐ Online privacy
- ☐ Mobile phone carriers
- ☐ None of the above

Continue »

Confidential

**Appendix F-2**

S10

Please select "South" from the following list in order to continue the survey.
*Select one only.*

○ East
○ North
○ South
○ West

[ Continue » ]

**Appendix F-2**

Thank you. You qualify for this study. For each of the following questions, if you don't know or if you don't have an answer, please don't guess. Just indicate that you do not know by selecting the "Don't know/Unsure" option and click or tap "Continue" to proceed to the next question.

Continue »

# Appendix F-2

Q1 Intro

The following are excerpts from Google's privacy policy. Please review these excerpts carefully. Afterward, you will be asked to answer a few questions.

*Hover over or tap the highlighted terms if you wish to see additional information.*

*Once you have reviewed the excerpts, click or tap "Continue" to proceed.*

We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

Continue »

**Appendix F-2**

Q1

Advertisers work with Google to display targeted ads on many websites and apps across the internet. Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?

*Please base your response on the excerpt you reviewed.*

*Hover over or tap the underlined terms if you wish to see a definition.*

*If you wish to see the excerpts of Google's privacy policy again, **click or tap here.***

| | Very unlikely | Somewhat unlikely | Neither likely nor unlikely | Somewhat likely | Very likely | Don't know / Unsure |
|---|---|---|---|---|---|---|
| Your Social Security Number | O | O | O | O | O | O |
| Your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with prior visits to other websites | O | O | O | O | O | O |
| The characteristics of the web browser and device you use to access the website | O | O | O | O | O | O |
| The partial IP address of your device | O | O | O | O | O | O |
| The content categories and subcategories in which Google classifies the website (e.g., "Weight Loss") | O | O | O | O | O | O |
| The type of ads that could be displayed on a website (e.g., text ad, picture ad, video ad) | O | O | O | O | O | O |
| The sizes of the ads that could be displayed on a website (e.g., 100 x 100 pixels) | O | O | O | O | O | O |
| The URL of the website or name of the app where the ad will be placed (e.g., www.nba.com/lakers/schedule) | O | O | O | O | O | O |
| Your home address | O | O | O | O | O | O |



Confidential

**Appendix F-2**

Q2 Intro

In this next section, we will ask you about your experience visiting internet websites that display advertising.

The following are examples of banners and popups that you may see when you visit certain websites that display advertising.

 

**Appendix F-2**

Q2

Have you seen banners or popups similar to these in the past seven years when you have visited websites that display advertising?
*Select one only.*

○ Yes
○ No
○ I don't know / unsure

Continue »

**Appendix F-2**

Q3

Please select from the following list the actions you have taken in the past seven years when you visited a website that displays advertising and you saw banners or popups similar to the examples you reviewed in the previous question.

*Select all that apply.*

*If you wish to see examples again,* **click or tap here.**

☐ Clicked on a button indicating that you accepted all cookies

☐ Clicked on a button indicating that you accepted the privacy policies of the website

☐ Navigated out of the website or closed the website

☐ Continued to navigate to the site without interacting with the banner or popup

☐ Clicked on a button that opened a menu that allowed you to select the type of information you wanted to share with the website

☐ Clicked on a button indicating that you rejected all cookies

☐ Clicked on a "close" button or an "X" button that closed the banner or popup, and continued to the website

☐ Clicked on a link that provided additional information about the privacy policies of the website

☐ Other (please specify) [_____]

☐ None of the above

☐ I don't know / unsure

Continue ◂

**Appendix F-2**

Q4

The following list includes the actions that you indicated you have taken in the past seven years when you visited a website that displays advertising and you saw a banner or popup similar to the ones you reviewed in the previous question. To the best of your ability, <u>please rank these actions in order of how frequently you have taken them</u> when you have encountered these banners or popups over the past seven years, with 1 being the action you have taken most frequently.

*Please click and drag an item to rank it. If you are on a mobile phone, tap the items in the order you would like to rank them.*

| Clicked on a button indicating that you accepted all cookies | Clicked on a button indicating that you accepted the privacy policies of the website |
| Navigated out of the website or closed the website | |

| I don't have enough information to rank these actions |

1 | 1
2 | 2
3 | 3

Continue »

**Appendix F-2**

Q5

You indicated that, in the past seven years, at least some of the time you have clicked on a link that provided additional information about the privacy policies of the website. Which of the following actions have you taken after seeing this additional information?
*Select all that apply.*

☐ Continued to use the website
☐ Navigated out of the website or closed the website
☐ Other (please specify) _____
☐ None of the above
☐ I don't know / unsure

Continue »

**Appendix F-2**

END

This completes the survey. Thank you for your participation.

Finish

**Appendix F-3**

**Existing Account Hypothetical Disclosures**

**Survey Screenshots**

**September 2023**

Thank you for your willingness to participate in this study. Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

If you normally wear glasses or contact lenses when viewing a screen, please wear them before continuing to the next page.

*When you are ready to start, please click or tap the "Continue" button.*



# Appendix F-3

S1

Please take this survey when you have time to complete it uninterrupted and without distractions.

Please do not consult any other websites or other written materials while taking the survey. Please answer all questions on your own without consulting any other person.
*Select one only.*

◯ I do not understand or do not agree to these instructions

◯ I understand and agree to these instructions



**Appendix F-3**

S2



As an additional security measure, please enter the code exactly as it appears in the image above, and then click or tap "Continue" to continue.

Please enter it exactly as it appears, including upper and lower case letters. Do not include any spaces. Type them all together.

Continue→

**Appendix F-3**

S3

Which type of electronic device are you using to take this survey?
*Select one only.*

○ A desktop computer

○ A TV-based browser or video game console (for example, Android TV, Microsoft Xbox, Sony PlayStation, or similar)

○ A tablet computer (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)

○ A laptop/notebook computer

○ A smartphone (for example, Apple iPhone, Samsung Galaxy, or similar)

○ An eBook reading device (for example, Kindle, Nook, Sony Reader, or similar)

○ Other (please specify) [                    ]

Continue »

**Appendix F-3**

S4

Do you, or does any member of your household, currently work for any of the following?
*Select all that apply.*

☐ A company that makes or sells automotive vehicles or parts

☐ A company that provides accounting or tax preparation services

☐ A bank or financial services company

☐ A restaurant or food retail company

☐ A developer, seller, or marketer of software for online advertising

☐ A market research or marketing company or department of a company

☐ None of the above

Continue »

**Appendix F-3**

S5

Which of the following groups listed below includes your age?
*Select one only.*

- ○ Under 13 years old
- ○ 13-17 years old
- ○ 18-29 years old
- ○ 30-39 years old
- ○ 40-49 years old
- ○ 50-59 years old
- ○ 60 years or older
- ○ Prefer not to answer

Continue →

**Appendix F-3**

S6

## What is your gender?
*Select one only.*

○ Female

○ Male

○ Other (please specify) [                    ]

○ Prefer not to answer

Continue →

**Appendix F-3**

S7



**Appendix F-3**

S8

In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or paid?
*Select all that apply.*

☐ WhatsApp

☐ Amazon (including Amazon Prime, Amazon Music, Prime Video, Kindle, and other Amazon services)

☐ Snapchat

☐ Twitter

☐ Microsoft (including Outlook.com, Office, OneDrive, Xbox Live, Windows, and other Microsoft services)

☐ Google (including Gmail, YouTube, Google Chrome, Google Drive, and other Google services)

☐ Instagram

☐ Facebook

☐ TikTok

☐ None of the above

Continue ›

**Appendix F-3**

S9

Have you taken any surveys or participated in other kinds of research in the last 6 months on any of these topics?
*Select all that apply.*

- ☐ Screen time habits
- ☐ Mobile phone carriers
- ☐ Food preferences
- ☐ Online privacy
- ☐ None of the above

Continue ↗

**Appendix F-3**

S10

Please select "South" from the following list in order to continue the survey.
*Select one only.*

- ○ East
- ○ South
- ○ North
- ○ West

[Continue ›]

**Appendix F-3**

Thank you. You qualify for this study. For this survey, if you don't know or if you don't have an answer, please don't guess. Just indicate that you do not know by selecting the "Don't know/Unsure" option and click or tap "Continue" to proceed.

Continue »

**Appendix F-3**

Intro

Assume that the following excerpt appears in a Google privacy policy. Please review this excerpt carefully. Afterward, you will be asked to answer a question.

*Hover over or tap the highlighted terms if you wish to see additional information.*

*Once you have reviewed the excerpt, click or tap "Continue" to proceed.*

Depending on your settings, we may show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

We don't share your name or email with advertisers unless you ask us to, but we share other personal information. For example, we share the partial IP address of your device; the URL for the webpage where the ad will be placed; your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with your prior visits to their websites; the content categories and subcategories in which Google classifies the website where the ad will be placed; and the characteristics of the web browser and device you use to access the website. We also allow advertisers to associate their cookies with Google's cookies. Matching these cookies allows advertisers to connect the data we share with the data they may already associate with you.

**Appendix F-3**

Q1

Assume that in order to continue using your Google account and Google services, you are asked to review and accept a privacy policy that includes the excerpt you reviewed. Based on the excerpt you reviewed, how likely or unlikely would you be to click the "I Accept" button for this privacy policy?

*If you wish to see the privacy policy excerpt again, click or tap **here**.*
*Select one only.*

○ Very likely to click "I accept"

○ Somewhat likely to click "I accept"

○ Neither likely nor unlikely to click "I accept"

○ Somewhat unlikely to click "I accept"

○ Very unlikely to click "I accept"

○ Don't know / Unsure

Continue »

# Appendix F-3

END

This completes the survey. Thank you for your participation.



**Appendix F-4**

**New Service Hypothetical Disclosures**

**Survey Screenshots**

**September 2023**

Thank you for your willingness to participate in this study. Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

If you normally wear glasses or contact lenses when viewing a screen, please wear them before continuing to the next page.

*When you are ready to start, please click or tap the "Continue" button.*



**Appendix F-4**

S1

Please take this survey when you have time to complete it uninterrupted and without distractions.

Please do not consult any other websites or other written materials while taking the survey. Please answer all questions on your own without consulting any other person.

*Select one only.*

○ I understand and agree to these instructions

○ I do not understand or do not agree to these instructions



**Appendix F-4**

S2



As an additional security measure, please enter the code exactly as it appears in the image above, and then click or tap "Continue" to continue.

Please enter it exactly as it appears, including upper and lower case letters. Do not include any spaces. Type them all together.

Continue

**Appendix F-4**

S3

Which type of electronic device are you using to take this survey?
*Select one only.*

○ An eBook reading device (for example, Kindle, Nook, Sony Reader, or similar)

○ A laptop/notebook computer

○ A smartphone (for example, Apple iPhone, Samsung Galaxy, or similar)

○ A TV-based browser or video game console (for example, Android TV, Microsoft Xbox, Sony PlayStation, or similar)

○ A tablet computer (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)

○ A desktop computer

○ Other (please specify) [                    ]

Continue ▸

# Appendix F-4

S4

Do you, or does any member of your household, currently work for any of the following?
*Select all that apply.*

- ☐ A restaurant or food retail company
- ☐ A bank or financial services company
- ☐ A company that makes or sells automotive vehicles or parts
- ☐ A market research or marketing company or department of a company
- ☐ A company that provides accounting or tax preparation services
- ☐ A developer, seller, or marketer of software for online advertising
- ☐ None of the above

Continue »

**Appendix F-4**

S5

Which of the following groups listed below includes your age?
*Select one only.*

○ Under 13 years old
○ 13-17 years old
○ 18-29 years old
○ 30-39 years old
○ 40-49 years old
○ 50-59 years old
○ 60 years or older
○ Prefer not to answer

Continue →

**Appendix F-4**

S6

What is your gender?
*Select one only.*

○ Male
○ Female
○ Other (please specify) [_____]
○ Prefer not to answer

Continue ▸

**Appendix F-4**

S7



**Appendix F-4**

S8

In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or paid?

*Select all that apply.*

- [ ] Amazon (including Amazon Prime, Amazon Music, Prime Video, Kindle, and other Amazon services)
- [ ] Microsoft (including Outlook.com, Office, OneDrive, Xbox Live, Windows, and other Microsoft services)
- [ ] Snapchat
- [ ] WhatsApp
- [ ] TikTok
- [ ] Twitter
- [ ] Google (including Gmail, YouTube, Google Chrome, Google Drive, and other Google services)
- [ ] Facebook
- [ ] Instagram
- [ ] None of the above

Continue »

**Appendix F-4**

S9

Have you taken any surveys or participated in other kinds of research in the last 6 months on any of these topics?
*Select all that apply.*

- ☐ Online privacy
- ☐ Screen time habits
- ☐ Mobile phone carriers
- ☐ Food preferences
- ☐ None of the above

Continue »

**Appendix F-4**

S10

Please select "South" from the following list in order to continue the survey.
*Select one only.*

○ East
○ West
○ South
○ North

Continue ›

# Appendix F-4

Thank you. You qualify for this study. For this survey, if you don't know or if you don't have an answer, please don't guess. Just indicate that you do not know by selecting the "Don't know/Unsure" option and click or tap "Continue" to proceed.

Continue →

**Appendix F-4**

Intro

Assume that the following excerpt appears in a Google privacy policy. Please review this excerpt carefully. Afterward, you will be asked to answer a question.

*Hover over or tap the highlighted terms if you wish to see additional information.*

*Once you have reviewed the excerpt, click or tap "Continue" to proceed.*

Depending on your settings, we may show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

We don't share your name or email with advertisers unless you ask us to, but we share other personal information. For example, we share the partial IP address of your device; the URL for the webpage where the ad will be placed; your browser cookies, including Google-generated cookies that may allow advertisers to associate your browser with your prior visits to their websites; the content categories and subcategories in which Google classifies the website where the ad will be placed; and the characteristics of the web browser and device you use to access the website. We also allow advertisers to associate their cookies with Google's cookies. Matching these cookies allows advertisers to connect the data we share with the data they may already associate with you.



**Appendix F-4**

Q1

Assume that you are interested in signing up for a Google service that you do not currently use and in order to sign up you are asked to review and accept a privacy policy that includes the excerpt you reviewed. Assume also that whether or not you accept this privacy policy will not affect your ability to use other Google services you currently use. Based on the excerpt you reviewed, how likely or unlikely would you be to click the "I accept" button for this privacy policy in order to use the Google service in which you are interested?

*If you wish to see the privacy policy excerpt again, click or tap **here**.*
*Select one only.*

○ Very likely to click "I accept"
○ Somewhat likely to click "I accept"
○ Neither likely nor unlikely to click "I accept"
○ Somewhat unlikely to click "I accept"
○ Very unlikely to click "I accept"
○ Don't know / Unsure

[ Continue » ]

**Appendix F-4**

END

This completes the survey. Thank you for your participation.

Finish

# Case 4:21-cv-02155-YGR     Document 584-5     Filed 09/29/23     Page 179 of 216

# Appendix G-1

## Completion and Incidence Rates for Business Disclosures Survey

| | | Count | Percent of Total Receiving the Survey |
|---|---|---|---|
| [a] | Total Receiving the Survey | 522 | 100.0% |
| [b] | Incompletes | 45 | 8.6% |
| [c] | Total Terminates | 157 | 30.1% |
| | Automatic Termination[1] | 14 | 2.7% |
| | Did Not Understand or Agree to Instructions | 18 | 3.4% |
| | Failed CAPTCHA | 29 | 5.6% |
| | Did Not Meet Targeting Criteria | 93 | 17.8% |
| | Failed Attention Check | 3 | 0.6% |
| [d] | Quota Full | 20 | 3.8% |
| [e] = [a] - [b] - [c] - [d] | Qualified and Completed | 300 | 57.5% |
| [f] = ([a] - [b]) / [a] | Completion Rate | | 91.4% |
| [g] = [e] / [a] | Incidence Rate | | 57.5% |

Source: Business Disclosures Survey
Note:
[1] Respondents that were automatically terminated by panel's duplication check as part of the panel quality control.

# Appendix G-2

# Completion and Incidence Rates for Privacy Disclosures Survey

| | | Count | Percent of Total Receiving the Survey |
|---|---|---|---|
| [a] | Total Receiving the Survey | 516 | 100.0% |
| [b] | Incompletes | 43 | 8.3% |
| [c] | Total Terminates | 165 | 32.0% |
| | Automatic Termination[1] | 22 | 4.3% |
| | Did Not Understand or Agree to Instructions | 14 | 2.7% |
| | Failed CAPTCHA | 36 | 7.0% |
| | Did Not Meet Targeting Criteria | 92 | 17.8% |
| | Failed Attention Check | 1 | 0.2% |
| [d] | Quota Full | 8 | 1.6% |
| [e] = [a] - [b] - [c] - [d] | Qualified and Completed | 300 | 58.1% |
| [f] = ([a] - [b]) / [a] | Completion Rate | | 91.7% |
| [g] = [e] / [a] | Incidence Rate | | 58.1% |

Source: Privacy Disclosures Survey
Note:
[1] Respondents that were automatically terminated by panel's duplication check as part of the panel quality control.

# Appendix G-3

## Completion and Incidence Rates for
## Existing Account Hypothetical Disclosures Survey

|  |  | Count | Percent of Total Receiving the Survey |
|---|---|---|---|
| [a] | Total Receiving the Survey | 480 | 100.0% |
| [b] | Incompletes | 33 | 6.9% |
| [c] | Total Terminates | 113 | 23.5% |
|  | Automatic Termination[1] | 4 | 0.8% |
|  | Did Not Understand or Agree to Instructions | 8 | 1.7% |
|  | Failed CAPTCHA | 25 | 5.2% |
|  | Did Not Meet Targeting Criteria | 74 | 15.4% |
|  | Failed Attention Check | 2 | 0.4% |
| [d] | Quota Full | 32 | 6.7% |
| [e] = [a] - [b] - [c] - [d] | Qualified and Completed | 302 | 62.9% |
| [f] = ([a] - [b]) / [a] | Completion Rate |  | 93.1% |
| [g] = [e] / [a] | Incidence Rate |  | 62.9% |

Source: Existing Account Hypothetical Disclosures Survey
Note:
[1] Respondents that were automatically terminated by panel's duplication check as part of the panel quality control.

Confidential

# Appendix G-4

## Completion and Incidence Rates for
## New Service Hypothetical Disclosures Survey

| | | Count | Percent of Total Receiving the Survey |
|---|---|---|---|
| [a] | Total Receiving the Survey | 716 | 100.0% |
| [b] | Incompletes | 39 | 5.4% |
| [c] | Total Terminates | 169 | 23.6% |
| | Automatic Termination | 3 | 0.4% |
| | Did Not Understand or Agree to Instructions | 16 | 2.2% |
| | Failed CAPTCHA | 35 | 4.9% |
| | Did Not Meet Targeting Criteria | 111 | 15.5% |
| | Failed Attention Check | 4 | 0.6% |
| [d] | Quota Full | 207 | 28.9% |
| [e] = [a] - [b] - [c] - [d] | Qualified and Completed | 301 | 42.0% |
| [f] = ([a] - [b]) / [a] | Completion Rate | | 94.6% |
| [g] = [e] / [a] | Incidence Rate | | 42.0% |

Source: New Service Hypothetical Disclosures Survey

Note:

[1] Respondents that were automatically terminated by panel's duplication check as part of the panel quality control.

Confidential



**ESOMAR 2023**

37 Questions to
Help Buyers of
Online Samples

# Appendix H



Demo our skills in programming over 40 types of survey questions in real time!

Click Here →



From the content they create to a push towards responsible consumerism, Gen Z has a lot of influence

Win Over Gen Z →

Page 2/31

**Appendix H**

# Table Of Contents

**04**   Introduction

**07**   Sample Sources and Recruitment

**12**   Sampling and Project Management

**18**   Data Quality and Validation

**22**   Policies and Compliance

**27**   Metrics

**31**   About Us



# Introduction

**Appendix H**



The primary aim of these **37 Questions** is to increase transparency and raise awareness of the key issues for researchers to consider when deciding whether an online sampling approach is fit for their purpose. Put another way, the aim is to help researchers to ensure that what they receive meets their expectations. The questions are also designed to introduce consistent terminology for providers to state how they maintain quality, to enable buyers to compare the services of different sample suppliers.



# Company Profile



**1**

**What experience does your company have in providing online samples for market research? How long have you been providing this service? Do you also provide similar services for other uses such as direct marketing? If so, what proportion of your work is for market research?**

Prodege, with its proprietary panel audience through our leading consumer brands, has been delivering online sample to the market research industry for 15+ years. Through our panels, we deliver over 50 million annual survey completes to the world's leading market research firms, brands and agencies. In addition to online sample, Prodege offers Mobile Research Solutions, Access to Behavioral Data, Survey Programming, Coding, Translations, Data Processing and Data Visualization services as well as innovative and agile research solutions that make project creation & management easier from start to finish.

Prodege additionally provides omni-channel marketing solutions and access to verified purchasers to leading brands and agencies, allowing for targeting with our first party data, so they can **Market to Who Matters**.



# Appendix H

**2** Do you have staff with responsibility for developing and monitoring the performance of the sampling algorithms and related automated functions who also have knowledge and experience in this area? What sort of training in sampling techniques do you provide to your frontline staff?

Utilizing our proprietary Prodege, MyPoints, InboxDollars and ySense panel assets, we are able to offer a diversified and balanced sample blend to most accurately meet our clients' needs across hundreds of demographic and psychographic variables. We also implement technology to blend sample based on past participation frequency, recruitment source, and device platform to tailor the deliverable to fit the required target audience. These tools help ensure an accurate and consistent sample source over time. We discuss sample blending options with our clients during the bid stage, and with their approval or request we can utilize external panel partners with consistency. To avoid panelist duplication, we have a dedicated compliance team that continuously monitors our users to prevent fraud. These checks include a number of proprietary fraud prevention techniques as well as mobile verification.



Upon joining the Prodege team, we offer a detailed and engaging internal onboarding for staff to quickly get up to speed on our particular standards and practices, ensuring that they can quickly become familiar with our sampling techniques.

**3** What other services do you offer? Do you cover sample-only, or do you offer a broad range of data collection and analysis services?

In addition to online sample through our proprietary panel assets, Prodege offers:

- **Agile Research Solutions:** Making project creation & management easier from start to finish, our self-serve platforms enable you to DIY or partner with our team to offset your workload.

- **Mobile Research:** Gain a deeper understanding behind consumer actions the moment they happen

- **Research Solutions:** Best in class survey programming, coding, data processing and data visualization services

- **Shopper Data Solutions:** Insights and sample targeting from our panel members' online and offline purchase history



# Sample Sources and Recruitment

# Appendix H



## What this section is about

Answers to the questions in this section will help you understand the types of sample available from different sample providers in the market and the sources they rely on. This will help you evaluate the quality of the sample being offered, whether it is suitable for measuring change over time, and whether there are any specific constraints you need to consider when using it. It will also allow you to understand whether the sample provider is drawing the sample from its own sources or aggregating sources from other providers. We recommend that you first identify the sample types being offered and then ask the relevant questions for all sources.



Broadly speaking, there are two models of sample sources and recruitment:

### Panels

These are databases of potential participants who declare that they will cooperate for future data collection if selected, generally in exchange for a reward/incentive. This includes traditional access panels, co-branded panels, or opt-in databases of individuals who agreed to complete research projects and also undertake other non market research activities (watch ads, download an app, complete marketing offers, etc, also known as loyalty programmes, or rewards communities within GPT (Get paid to) sites.) Loyalty card and subscription databases are included here if there is a continuous relationship with members who understand the commitment asked of them.

### Intercepts

This includes intercepts from offer walls, affiliate networks, social media or other platforms to drive traffic to a survey. Intercept is an approach where potential participants are asked to take a survey for a reward while they are engaged in another activity such as playing an online game, reading news, or some other online activity. Intercepted participants may be previously unknown to the sample provider or may have been pre-identified and profiled through a prior survey experience.

**Appendix H**

**4** Using the broad classifications above, from what sources of online sample do you derive participants?

Through our wide range of recruitment channels and offerings, Prodege ensures a diverse composition of people that represent the population of the country in which we're conducting the research. We continue to grow our panel through recruiting new members via social media, online and offline advertising, member referrals, recommendations from influencers and acquisitions, as well as through long standing partnerships with firms such as United Airlines, Hilton Hotels and more. This diversification of recruitment sources enables Prodege to maintain a robust, proprietary panel to support client needs for consumer, B2B and other specialized audience segments.



**5** Which of these sources are proprietary or exclusive and what is the percent share of each in the total sample provided to a buyer? (Assume proprietary to mean that the sample provider owns the asset. Assume exclusive to mean that the sample provider has an exclusive agreement to manage/provide access to sample originally collected by another entity.)

Prodege is a leading sample provider for the market research industry. Prodege utilizes its proprietary actively-managed double opt-in research panels with millions of panelists. We maintain a database of thousands of demographic and behavioral attributes that are utilized to access sample for our clients' projects. Our experienced Project Management Team starts by understanding our clients' requirements (whether a nationally representative sample, or a specific targeted group) and the number of responses needed, ensuring the sample plan is optimized and executed accurately. Through diversified recruitment methods and a world-class engagement model, we deliver a more thoughtful approach to sampling. Our breakthrough model fosters member retention and ongoing participation. This brings many benefits to our clients including high performance on re-contact surveys, longitudinal studies, in-home use tests, and ongoing research programs. Over 95% of the survey completions Prodege provides to clients are sourced from our proprietary panels.

**Appendix H**



**6** What recruitment channels are you using for each of the sources you have described? Is the recruitment process 'open to all' or by invitation only? Are you using probabilistic methods? Are you using affiliate networks and referral programs and in what proportions? How does your use of these channels vary by geography?

Prodege offers a broad spectrum of diverse audiences to participate in surveys, including sometimes hard-to-reach people (teens, young adults, Hispanic Americans). We advertise on connected TV, radio, online, through mobile apps and continue to innovate new recruitment methods.

The recruitment process is 'open to all' through any of the marketing channels in which we're recruiting from and we encourage our members to refer people from their network to join.



**7** What form of validation do you use in recruitment to ensure that participants are real, unique, and are who they say they are? Describe this both in terms of the practical steps you take within your own organisation and the technologies you are using. Please try to be as specific and quantify as much as you can.

Prodege employs multiple means to ensure our panelists are who they say they are. These processes include email double opt-in verification, physical address verification, device fingerprinting, mobile verification and CAPTCHA. We partner with market research quality technology firms such as Imperium to further enhance our quality measures.

**Prodege's Leading Proprietary Panels**

   



**8** What brand (domain) and/or app are you using with proprietary sources? Summarise, by source, the proportion of sample accessing surveys by mobile app, email or other specified means.

Prodege owns and operates the leading proprietary panels of Prodege, MyPoints, InboxDollars and ySense. Surveys are accessible for all brands via email and mobile web. Prodege is the only panel that is accessible via mobile app.

**Appendix H**

**9**  Which model(s) do you offer to deliver sample? Managed service, self-serve, or API integration?

Prodege can deliver sample via our innovative DIY platform, through our Direct Managed Services team, or through approved API integrations.

**10**  If offering intercepts, or providing access to more than one source, what level of transparency do you offer over the composition of your sample (sample sources, sample providers included in the blend). Do you let buyers control which sources of sample to include in their projects, and if so how? Do you have any integration mechanisms with third-party sources offered?

Prodege offers a diversified and balanced sample blend through our proprietary panel to most accurately meet our clients' needs. Buyers that utilize our DIY platform select the sample sources for their project. Buyers that are leveraging our Direct Managed Service team are relying on our experienced Project Management team to fulfill their needs.  We discuss sample blending options with our clients during the bid stage, and with their approval or request we can utilize external panel partners with consistency.

**11**  Of the sample sources you have available, how would you describe the suitability of each for different research applications? For example, Is there sample suitable for product testing or other recruit/recall situations where the buyer may need to go back again to the same sample? Is the sample suitable for shorter or longer questionnaires? For mobile-only or desktop only questionnaires? Is it suitable to recruit for communities? For online focus groups?

Our diversified recruitment methods allow for us to have a proprietary panel that is suitable for different research applications whether quantitative, qualitative or a mixed-method approach.

**Appendix H**



# Sampling and Project Management

# Appendix H



## What this section is about

Answers to the questions in this section will help you understand the processes and procedures that are undertaken to provide you with a sample of participants for your survey. You should understand what biases may be inherent in, or as a result of, the approaches taken and the likely severity of those biases.

**12**  Briefly describe your overall process from invitation to survey completion. What steps do you take to achieve a sample that "looks like" the target population? What demographic quota controls, if any, do you recommend?

A Prodege Project Manager is responsible for managing and deploying survey invitations. Members of Prodege are invited to participate in surveys the following ways:

- An invitation is delivered via email

- A message is delivered to the member's inbox on the panel website (login/password required)

A survey invitation template is used for consistency so the panelist knows what to expect when they receive an invitation from Prodege. The invitations include the following information pertaining to the study:

- Amount of incentive offered for participation

- Approximate amount of time it will take to complete the survey

- Opportunity to decline survey via a "Decline Survey" button located at the bottom of the invitation

To prevent bias, we do not divulge the subject of the survey or the target audience. The amount of incentive offered to the member is based on the length and/or difficulty of the survey.

Every email invitation contains opt-out information in compliance with CAN-SPAM, access information about Prodege including contact information, FAQ, our privacy policy and how to prevent survey invitations from being blocked by SPAM filters.



**Appendix H**

**13** What profiling information do you hold on at least 80% of your panel members plus any intercepts known to you through prior contact? How does this differ by the sources you offer? How often is each of those data points updated? Can you supply these data points as appends to the data set? Do you collect this profiling information directly or is it supplied by a third party?

Prodege tracks and stores thousands of demographic and behavioral attributes through a number of channels, including completion of an introductory profiling survey upon joining the panel. All storage is compliant with international and national data laws. Behavioral data is collected through other member engagement activities. If a project requires targeting on criteria not currently captured in member profiles we can pre-screen on the fly and gather tens of thousands of responses within a matter of hours.

Member profiles are updated on an ongoing basis, with continuous refreshing to ensure data remains current. Utilizing our proprietary technology, member data is collected and stored real-time during the registration process, in follow-up surveys and on the member website. Members can proactively update their profile at any time, or we may send out notifications letting them know their profile is incomplete, or needs updating.

A more comprehensive list of attributes can be found in our panel book (provided upon request).

Appendix H



**14**  What information do you need about a project in order to provide an estimate of feasibility? What, if anything, do you do to give upper or lower boundaries around these estimates?

To provide a client with feasibility on a project, a Prodege Account Manager requires the following specifications to determine the sample size and field time for completion:

- Survey length and difficulty

- Number of completed interviews required

- Demographic criteria

- Non-demographic targeting, or behavioral criteria

- Survey quotas and sub-quotas

- Census balancing requirements

- Past participation/exclusion requirements

- Projected incidence on the population

- Fieldwork start and end dates



**Appendix H**

**15** **What do you do if the project proves impossible for you to complete in field? Do you inform the sample buyer as to who you would use to complete the project? In such circumstances, how do you maintain and certify third party sources/sub-contractors?**

If an additional panel source is required, and upon client approval, we access our global network of preferred partners who have gone through our vetting process for quality, consistency and representivity. We have Service Level Agreements in place with preferred partners which abide by the policies of global and local organizations such as ESOMAR and Insights Association.

**16** **Do you employ a survey router or any yield management techniques? If yes, please describe how you go about allocating participants to surveys. How are potential participants asked to participate in a study? Please specify how this is done for each of the sources you offer.**

Prodege does not employ an internal survey router. However, it is possible for a buyer of sample to employ a router for their project.

**17** **Do you set limits on the amount of time a participant can be in the router before they qualify for a survey?**

As answered in question 16 we do not have a router.

**18** **What information about a project is given to potential participants before they choose whether to take the survey or not? How does this differ by the sources you offer?**

We let participants know the approximate amount of time it will take to complete the survey, along with the incentive amount. We do not disclose any other detail about the survey (such as survey subject or target audience) so as to guard against bias.

**19** **Do you allow participants to choose a survey from a selection of available surveys? If so, what are they told about each survey that helps them to make that choice?**

As mentioned in our response to Question 18, our panel members see the survey length and incentive amount and decide based on that information whether or not to participate in the research at any given moment in time.

**Appendix H**

 **20**  What ability do you have to increase (or decrease) incentives being offered to potential participants (or sub-groups of participants) during the course of a survey? If so, can this be flagged at the participant level in the dataset?

Prodege is able to offer different incentives to different participant sub-groups and we're able to increase/decrease this over the course of a survey. We can provide participant-level incentive information when requested by our clients.

 **21**  Do you measure participant satisfaction at the individual project level? If so, can you provide normative data for similar projects (by length, by type, by subject, by target group)?

## Creating a positive member experience is core to everything we do at Prodege.

We actively measure panelist satisfaction both through quantitative and qualitative techniques. In addition to measuring satisfaction through metrics (activity/churn), we actively engage real-time with our members in online chats, blogs and social media to gauge satisfaction.

**Prodege continuously obtains feedback (both quantitative and qualitative) from our member base. We utilize this data internally to maximize member engagement and retention.**

 **22**  Do you provide a debrief report about a project after it has completed? If yes, can you provide an example?

Prodege Project Managers work closely with our clients to provide ongoing status updates to ensure accurate and timely delivery based on project specifications. When requested, we provide a sample debrief report, including gross sample sent, start rate, participation and incidence rates, screening and dropout rates, a description of the fieldwork process, and so on.

Clients monitor sample performance and create reports through the survey platform they use to run the survey. When Prodege conducts programming and hosting for our clients, we can provide clients with a summary report, cross-tabulation of data, online reporting metrics, or other deliverables based on project requirements.

Appendix H



# Data Quality and Validation

# Appendix H

## What this section is about

This section focuses on the quality of the in-survey data. In-survey data quality includes project level data validity and representativeness, survey-taking behaviours, sample blends, participant characteristics, and project level data health and audit practices.



**23** How often can the same individual participate in a survey? How does this vary across your sample sources? What is the mean and maximum amount of time a person may have already been taking surveys before they entered this survey? How do you manage this?

Prodege has the ability to manage how many surveys are sent to each member, and frequently implements business rules and exclusions on behalf of our clients in order to comply with their best practices.

**24** What data do you maintain on individual participants such as recent participation history, date(s) of entry, source/channel, etc? Are you able to supply buyers with a project analysis of such individual level data? Are you able to append such data points to your participant records?

Our proprietary panel and management system maintains individual respondent-level data within our panel database and allows us to automatically update the member records including: join date, emails opened, survey activity, profiling data, frequency and types of engagement with our panel sites, and incentives earned.

We are able to append select data points to participant records and share with clients when requested.

**25** Please describe your procedures for confirmation of participant identity at the project level. Please describe these procedures as they are implemented at the point of entry to a survey or router.

Prodege has a series of processes to handle member identity and detect fraud. To confirm panelist identities, Prodege works with third-party industry-standard data quality solutions to ensure a member is real and unique upon registration. Members are subject to a double opt-in process when initially joining our member communities.

Members cannot enroll more than once, meaning they cannot have more than one profile account in the panel database. In addition, our in-house compliance department continuously monitors fraud and eliminates threats. This may result in removing panel members or shutting out alien technologies caught attempting to cheat the system. As part of our reward verification procedure, Prodege's compliance team has also implemented IP address, mobile phone and physical address verification.

To avoid panelist duplication, we have a dedicated compliance team that continuously monitors our users to prevent fraud. These checks include a number of proprietary fraud prevention techniques as well as mobile verification. To avoid duplication when supplementing with external sources, we employ proprietary and 3rd party digital fingerprinting technologies.

  

**26** How do you manage source consistency and blend at the project level? With regard to trackers, how do you ensure that the nature and composition of sample sources remain the same over time? Do you have reports on blends and sources that can be provided to buyers? Can source be appended to the participant data records?

Utilizing our proprietary Prodege, MyPoints, InboxDollars and ySense panel assets, we are able to offer a diversified and balanced sample blend to most accurately meet our clients' needs across hundreds of demographic and sociographic variables.

We also implement technology to blend sample based on past participation frequency, recruitment source and device platform to tailor the deliverable to fit the required target audience. These tools help ensure an accurate and consistent sample source over time. We discuss sample blending options with our clients during the bid stage, and with their approval or request we can utilize external panel partners with consistency.

We can provide reports and append select information to participant records as requested by clients.

**Appendix H**

**27** Please describe your participant/member quality tracking, along with any health metrics you maintain on members/participants, and how those metrics are used to invite, track, quarantine, and block people from entering the platform, router, or a survey. What processes do you have in place to compare profiled and known data to in-survey responses?

Prodege tracks member quality on an ongoing basis through a variety of proprietary metrics with data collected through technology plus human-led audits. We gather behavioral data as well as responses to Quality Audit Surveys which our members complete regularly and then take action to quarantine or block members based on the outcomes of this analysis. Profiled data is compared to known data provided through 3rd party resources such as the USPS.

**28** For work where you program, host, and deliver the survey data, what processes do you have in place to reduce or eliminate undesired in-survey behaviours, such as

**(a)** random responding,
**(b)** Illogical or inconsistent responding,
**(c)** overuse of item non response (e.g., "Don't Know")
**(d)** inaccurate or inconsistent responding,
**(e)** incomplete responding, or
**(f)** too rapid survey completion?

At Prodege, we take data quality very seriously. We have our own in-house compliance department dedicated to monitoring and eliminating fraudulent panel members and undesired behaviors.

We use industry-standard data quality solutions provided by third-party partners, along with our own proprietary techniques, to ensure our panel exceeds industry standards. Because our panels originate from the success of our rewards programs, we are vigilant about detecting fraud. Observed offenders are removed from the panel and not allowed to re-register with the panel.

When we are providing survey programming for a project, we implement speeder and straightliner traps, honesty and engagement detection and review open-ended responses. Panelists who fail quality metrics are removed and/or replaced, so clients do not pay for poor quality survey completes. These members are then flagged, and monitored within our panel. Any repeat offenders are removed from our panel.

Appendix H



# Policies and Compliance

# Appendix H




## What this section is about

Sample providers, buyers, and their clients are subject to data protection and related information security requirements imposed by data protection laws and regulations. In addition, they may be subject to laws and regulations that may impact incentives paid o participants.

These laws and regulations vary by jurisdiction with different laws and regulations applying in different countries or states within countries, and are generally interpreted based on where the participant resides.

Applicable data protection laws and regulations include, but are not limited to: the Act on the Protection of Personal Information or APPI (Japan); the Australian Privacy Act (Australia); the California Consumer Protection Act or CCPA (state of California in the United States); the Children's Online Privacy Protection Act or COPPA (United States);  the Data Protection Act (United Kingdom); amendments regarding data localisation requirements to the Data Protection Act (Russian Federation); the General Data Protection Law (Brazil); the EU General Data Protection Regulation or EU-GDPR (EU/ EEA); the Health Insurance Portability and Accountability Act or HIPAA (United States);  the Graham-Leach Bliley Act or GLBA (United States); and PIPEDA (Canada). AB 2257 (the state of California in the United States) is an example of law and regulation related to employment which may impact incentives paid to participants.

Information security frameworks and standards include, but are not limited to COBIT, HITRUST, ISO 27001, the NIST Cybersecurity Framework and SOC 2.

**Appendix H**

**29** Please provide the link to your participant privacy notice (sometimes referred to as a privacy policy) as well as a summary of the key concepts it addresses. (Note: If your company uses different privacy notices for different products or services, please provide an example relevant to the products or services covered in your response to this question).

Privacy is an integral part of our well-established online business. Our Privacy Policy is provided to all panelists at sign-up and repeatedly thereafter.

Prodege's Privacy Policy (and a link to the video that describes it): **https://www.prodege.com/privacy/**

A few key concepts include: Cookies and Tracking Technologies, Sharing, Opt-In/Opt-Out, Children's Privacy, Security, Location of Processing and Applicable Law.

**30** How do you comply with key data protection laws and regulations that apply in the various jurisdictions in which you operate? How do you address requirements regarding consent or other legal bases for the processing of personal data? How do you address requirements for data breach response, cross-border transfer, and data retention? Have you appointed a data protection officer?

Data privacy and security is the top priority for Prodege, and we know that member data is one of our most valuable assets. Production systems are housed in secure data centers, with multiple layers of network and data protection. Access to these systems is provided on a least-privilege basis and includes the use of 2nd factor authentication. Access is logged and regularly audited. We have a range of security tools implemented to prevent, detect and mitigate unwanted behavior. Data is backed up and stored on machines with restricted access.

When appropriate, Prodege includes a data transfer rider that serves as an addendum to contracts with our survey partners.

Prodege continually enhances its Security Policies. These policies address data retention and incident response.

Further information about Prodege's data privacy and protection is available by emailing our designated Data Protection Officer at **dpo@prodege.com**.

**Appendix H**

**31** How can participants provide, manage and revise consent for the processing of their personal data? What support channels do you provide for participants? In your response, please address the sample sources you wholly own, as well as those owned by other parties to whom you provide access.

Consent for the collection and processing of personal data has long been required  by market research industry codes. It is also explicitly required by some data  protection laws and regulations. Some data protection laws and regulations, including EU-GDPR and CCPA as examples, also provide for access rights for participants to correct, update, or delete their data. Implementation of a participant support channel is also required by ISO 20252 (ISO 20252:2019: Market, Opinion and Social Research, Including Insights and Data Analytics - Vocabulary and Service Requirements).

Prodege complies with all legal requirements.

**32** How do you track and comply with other applicable laws and regulations, such as those that might impact the incentives paid to participants?

Prodege has designated resources, utilizing tools, technology, and trained legal staff to continuously monitor new regulations and changes to existing laws that impact every aspect of our business.

**33** What is your approach to collecting and processing the personal data of children and young people? Do you adhere to standards and guidelines provided by ESOMAR or GRBN member associations? How do you comply with applicable data protection laws and regulations?

In each market Prodege operates, we comply with applicable laws and ESOMAR association guidelines as relates to the protection of children's privacy. For example, in the US, Prodege complies with the United States Children's Online Privacy Protection Act (COPPA) which applies to young people under age 13.

Prodege only partners with trusted Market Research companies. Our research team works closely with clients to QA each survey, in advance of fielding, to ensure studies are appropriate for young respondents.

# Appendix H

 **34** Do you implement "data protection by design" (sometimes referred to as "privacy by design") in your systems and processes? If so, please describe how.

Yes. Our staff includes full time certified security and privacy professionals, who are engaged in all phases of our operations: design, development, deployment, monitoring, etc. We follow NIST Cybersecurity Framework Guidelines (e.g. least privilege, zerotrust), and use world-class tools for tracking and monitoring. Our data is hosted in hardened, secure data centers with a full set of compliance certs: Soc 1, 2 and 3, ISO 27001, etc.

 **35** What are the key elements of your information security compliance program? Please specify the framework(s) or auditing procedure(s) you comply with or certify to. Does your program include an asset-based risk assessment and internal audit process?

As mentioned above, our data is hosted in hardened, secure data centers with a full set of compliance certs: Soc 1, 2 and 3, ISO 27001, etc. We follow NIST Cybersecurity Framework guidelines, and have 24/7 smart network monitoring, with external oversight and escalation. All systems, tools and policies are under constant review and revision to optimize our efficiency, detection and response capabilities.

 **36** Do you certify to or comply with a quality framework such as ISO 20252?

We are not certified to ISO 20252. However we maintain high standards of security and privacy compliance throughout the organization.



Create an Insightful Survey in Seconds With Our Newest Tool,

**Pollfish AI!**

 Try it Now! →



Page 26/31



Appendix H

Metrics

# Appendix H

## What this section is about

This section lists common sample and data health metrics. Reviewing metrics periodically can serve as the basis for a conversation with sample providers about consistency and reliability, as well as whether the sample is appropriate for the population and business question being examined. Unexpected or unexplained  shifts in metrics may also indicate the potential for bias or error. While not all of these metrics are required and there are no benchmarks on the "right answers," providing transparency over time will create a meaningful dialogue about quality and utility.

**37** **Which of the following are you able to provide to buyers, in aggregate and by country and source? Please include a link or attach a file of a sample report for each of the metrics you use.**

01. Average qualifying or completion rate, trended by month

02. Percent of paid completes rejected per month/project, trended by month

03. Percent of members/accounts removed/quarantined, trended by month

04. Percent of paid completes from 0-3 months tenure, trended by month

05. Percent of paid completes from smartphones, trended by month

06. Percent of paid completes from owned/branded member relationships versus intercept participants, trended by month

07. Average number of dispositions (survey attempts, screenouts, and completes) per member, trended by month (potentially by cohort)

08. Average number of paid completes per member, trended by month (potentially by cohort)

09. Active unique participants in the last 30 days

10. Active unique 18-24 male participants in the last 30 days

11. Maximum feasibility in a specific country with nat rep quotas, seven days in field, 100% incidence, 10-minute interview

12. Percent of quotas that reached full quota at time of delivery, trended by month



**Prodege can provide this information to clients upon request.**

**Appendix H**

# Glossary

For the purpose of this document these terms have the following specific meanings:

**Affiliate partner (or Affiliate network)** means a network of communities with which a sample provider has a relationship to direct intercept traffic to their surveys.

**API (application programming interface)** means a set of definitions and protocols for building software applications capable of accessing and exchanging data.

**Blending** means the practice of combining multiple, heterogeneous sample sources with the aim of achieving a more consistent or more representative sample.

**Children** means individuals for whom permission to participate in research must be obtained from a parent, legal guardian, or responsible adult. Definitions of the age of a child vary substantially and are set by national laws and self-regulatory codes. In the absence of a national definition, a child is defined as being 12 and under and a "young  person" as aged 13 to 17.

**Completion rate** means the number of participants who fully complete the survey divided by the number of participants who start the survey.

**Consent** means freely given and informed indication of agreement by a person to the collection and processing of his/her personal data. Note that the specific requirements for consent will vary by jurisdiction.

**Exclusion** means excluding a potential participant from a research project based on their previous participation in a research project involving the same or similar product/ service category and/or methodology.

**Fraudulent participant** means a participant who deliberately misrepresents their identity, profiling information, or responses, including organisations that use bots to impersonate participants.

**Health metrics** means measures of quantitative assessment commonly used for comparing and tracking performance or production over time. In this context, health metrics refers to quantitative data used to track stability or changes in the sample a provider offers, and the metrics suggested are based on data that has been previously known to impact quality over time.

**Loyalty programme** means an arrangement in which customers of a company (or group of companies) are rewarded for purchases made with these companies. Rewards are normally given in a currency that can be spent at those companies (or their chosen partners).

**Paid completes** means interviews/surveys that are delivered and accepted by a client, are included in the final dataset, and for which the sample provider receives payment.

**Panel member (or simply member**) means an individual recruited from a documented source who has provided profile data and appropriate information for validation of identity, given explicit consent to participate in research according to the terms and conditions of panel membership, and has not opted out.

**Participant (sometimes call a participant or data subject)** means a person or organisation from whom or about whom data is collected for research.



# Appendix H

**Personal data (sometimes referred to as personally identifiable information or PII)** means any information relating to a natural living person that can be used to identify an individual, for example by reference to direct identifiers (such as a name, specific geographic location, telephone number, picture, sound, or video recording) or indirectly by reference to an individual's physical, physiological, mental, economic, cultural or social characteristics.

**Profiling information** means descriptive characteristics of a panel member.

**Quarantined members** means individuals who have broken some set of quality assessment protocols that result in them being either temporarily or permanently suspended from participating in future research activities with the company that quarantines them. Referral program means a process whereby a panel offers its existing panellists the opportunity to gain rewards by referring family, friends and colleagues (or visitors of their site) to join the panel.

**Representativeness** means the degree to which a sample reflects the target population being studied. A representative sample is one in which the distribution of important characteristics is approximately the same as in the target population.

**Rewards community (within Get Paid To (or GPT) sites)** means databases or panels of individuals who may undertake non-research activities (watch ads, download an app, complete marketing offers etc) usually in exchange for a reward, but who also agree to take part in research projects.

**Router** means an online software application that screens incoming research participants and then uses those results to assign participants to one of multiple available research projects. A router can also offer participants additional screeners and surveys after screener qualification failure or survey completion.

**Sample provider** means a service provider responsible for the provision and management of online samples from relevant sources including panels, intercepts, email lists, etc.

**Survey attempts** means the number of times the same individual clicked a link or entered into a survey environment in an attempt to complete a survey.

**Third Party Sources** means sources that the sample provider does not directly run or control.

**Yield management** means a variable allocation strategy through which outcomes are maximised by matching supply with demand.

# About Us

A cutting-edge marketing and consumer insights platform, Prodege has charted a course of innovation in the evolving technology landscape by helping leading brands, marketers, and agencies uncover the answers to their business questions, acquire new customers, increase revenue, and drive brand loyalty & product adoption. Bolstered by a major investment by Great Hill Partners in the fourth quarter of 2021 and strategic acquisitions of Pollfish, BitBurst & AdGate Media in 2022, Prodege looks forward to more growth and innovation to empower our partners to gather meaningful, rich insights and better market to their target audiences.



If you're looking to start a project with Prodege, email **TalkToUs@prodege.com** or reach out to your existing Account Manager.

# Appendix I-1

## Respondents' Expectations that Google Shares Different Types of Information with Potential Advertisers (Top Two Boxes, N=300)

Q1: *"Advertisers work with Google to display targeted ads on many websites and apps across the internet. Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?"*

| | Business Disclosures | | Privacy Disclosures | |
|---|---|---|---|---|
| | Count | Percentage | Count | Percentage |
| **Respondents who answered "Very likely" or "Somewhat likely"** | | | | |
| The partial IP address of your device | 136 | 45% | 157 | 52% |
| The URL of the website or name of the app | 221 | 74% | 218 | 73% |
| Your browser cookies | 200 | 67% | 221 | 74% |
| The content categories and subcategories in which Google classifies the website | 218 | 73% | 215 | 72% |
| The characteristics of the web browser and device | 189 | 63% | 197 | 66% |
| Your home address | 70 | 23% | 76 | 25% |
| Your Social Security Number | 31 | 10% | 29 | 10% |
| The type of ads that could be displayed on a website (e.g., text ad, picture ad, video ad) | 229 | 76% | 224 | 75% |
| The sizes of the ads that could be displayed on a website (e.g., 100 x 100 pixels) | 185 | 62% | 167 | 56% |

Source: Business Disclosures Survey; Privacy Disclosures Survey

Confidential

# Appendix I-2

## Respondents' Expectations that Google Shares Different Types of Information with Potential Advertisers (N=300)

*Q1: "Advertisers work with Google to display targeted ads on many websites and apps across the internet. Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?"*

| | Business Disclosures | | Privacy Disclosures | |
|---|---|---|---|---|
| | Count | Percentage | Count | Percentage |
| **The partial IP address of your device** | | | | |
| Very unlikely | 48 | 16% | 38 | 13% |
| Somewhat unlikely | 35 | 12% | 34 | 11% |
| Neither likely nor unlikely | 56 | 19% | 43 | 14% |
| Somewhat likely | 69 | 23% | 90 | 30% |
| Very likely | 67 | 22% | 67 | 22% |
| Don't know / Unsure | 25 | 8% | 28 | 9% |
| **The URL of the website or name of the app** | | | | |
| Very unlikely | 15 | 5% | 7 | 2% |
| Somewhat unlikely | 8 | 3% | 15 | 5% |
| Neither likely nor unlikely | 35 | 12% | 34 | 11% |
| Somewhat likely | 87 | 29% | 90 | 30% |
| Very likely | 134 | 45% | 128 | 43% |
| Don't know / Unsure | 21 | 7% | 26 | 9% |
| **Your browser cookies** | | | | |
| Very unlikely | 23 | 8% | 10 | 3% |
| Somewhat unlikely | 20 | 7% | 15 | 5% |
| Neither likely nor unlikely | 35 | 12% | 38 | 13% |
| Somewhat likely | 89 | 30% | 87 | 29% |
| Very likely | 111 | 37% | 134 | 45% |
| Don't know / Unsure | 22 | 7% | 16 | 5% |
| **The content categories and subcategories in which Google classifies the website** | | | | |
| Very unlikely | 10 | 3% | 15 | 5% |
| Somewhat unlikely | 12 | 4% | 11 | 4% |
| Neither likely nor unlikely | 41 | 14% | 39 | 13% |
| Somewhat likely | 93 | 31% | 87 | 29% |
| Very likely | 125 | 42% | 128 | 43% |
| Don't know / Unsure | 19 | 6% | 20 | 7% |
| **The characteristics of the web browser and device** | | | | |
| Very unlikely | 24 | 8% | 16 | 5% |
| Somewhat unlikely | 13 | 4% | 13 | 4% |
| Neither likely nor unlikely | 51 | 17% | 47 | 16% |
| Somewhat likely | 96 | 32% | 87 | 29% |
| Very likely | 93 | 31% | 110 | 37% |
| Don't know / Unsure | 23 | 8% | 27 | 9% |
| **Your home address** | | | | |
| Very unlikely | 131 | 44% | 111 | 37% |
| Somewhat unlikely | 47 | 16% | 55 | 18% |
| Neither likely nor unlikely | 38 | 13% | 39 | 13% |
| Somewhat likely | 44 | 15% | 41 | 14% |
| Very likely | 26 | 9% | 35 | 12% |
| Don't know / Unsure | 14 | 5% | 19 | 6% |
| **Your Social Security Number** | | | | |
| Very unlikely | 190 | 63% | 188 | 63% |
| Somewhat unlikely | 34 | 11% | 35 | 12% |
| Neither likely nor unlikely | 27 | 9% | 31 | 10% |
| Somewhat likely | 14 | 5% | 15 | 5% |
| Very likely | 17 | 6% | 14 | 5% |
| Don't know / Unsure | 18 | 6% | 17 | 6% |
| **The type of ads that could be displayed on a website (e.g., text ad, picture ad, video ad)** | | | | |
| Very unlikely | 8 | 3% | 6 | 2% |
| Somewhat unlikely | 8 | 3% | 7 | 2% |
| Neither likely nor unlikely | 36 | 12% | 39 | 13% |
| Somewhat likely | 85 | 28% | 99 | 33% |
| Very likely | 144 | 48% | 125 | 42% |
| Don't know / Unsure | 19 | 6% | 24 | 8% |
| **The sizes of the ads that could be displayed on a website (e.g., 100 x 100 pixels)** | | | | |
| Very unlikely | 13 | 4% | 12 | 4% |
| Somewhat unlikely | 13 | 4% | 21 | 7% |
| Neither likely nor unlikely | 57 | 19% | 58 | 19% |
| Somewhat likely | 80 | 27% | 84 | 28% |
| Very likely | 105 | 35% | 83 | 28% |
| Don't know / Unsure | 32 | 11% | 42 | 14% |
| **Total** | **300** | **100%** | **300** | **100%** |

Source: Business Disclosures Survey; Privacy Disclosures Survey

# Appendix I-3

# Ranking of Frequency of Actions Taken by Respondents Who Indicated That They Have Seen Banners or Popups on Websites That Display Ads (N=300)

*Q4: "The following list includes the actions that you indicated you have taken in the past seven years when you visited a website that displays advertising and you saw a banner or popup similar to the ones you reviewed in the previous question. To the best of your ability, please rank these actions in order of how frequently you have taken them when you have encountered these banners or popups over the past seven years, with 1 being the action you have taken most frequently." [1],[2],[3]*

| | Rank | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
| Clicked on a button indicating that you accepted the privacy policies of the website | 32 | 33 | 42 | 26 | 17 | 9 | 8 | 1 | 168 |
| Clicked on a button indicating that you accepted all cookies | 59 | 40 | 29 | 21 | 12 | 9 | 4 | 3 | 177 |
| Continued to navigate to the site without interacting with the banner or popup | 44 | 33 | 21 | 25 | 9 | 7 | 6 | 2 | 147 |
| Clicked on a "close" button or an "X" button that closed the banner or popup, and continued to the website | 59 | 57 | 37 | 26 | 14 | 7 | 2 | 0 | 202 |
| Clicked on a button that opened a menu that allowed you to select the type of information you wanted to share with the website | 11 | 13 | 19 | 12 | 17 | 12 | 6 | 3 | 93 |
| Clicked on a link that provided additional information about the privacy policies of the website[4] | 10 | 6 | 8 | 11 | 14 | 10 | 9 | 6 | 74 |
| Clicked on a button indicating that you rejected all cookies | 28 | 30 | 25 | 17 | 16 | 14 | 8 | 4 | 142 |
| Navigated out of the website or closed the website | 10 | 17 | 23 | 26 | 22 | 20 | 8 | 8 | 134 |

| | Rank | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
| Clicked on a button indicating that you accepted the privacy policies of the website | 11% | 11% | 14% | 9% | 6% | 3% | 3% | 0% | 56% |
| Clicked on a button indicating that you accepted all cookies | 20% | 13% | 10% | 7% | 4% | 3% | 1% | 1% | 59% |
| Continued to navigate to the site without interacting with the banner or popup | 15% | 11% | 7% | 8% | 3% | 2% | 2% | 1% | 49% |
| Clicked on a "close" button or an "X" button that closed the banner or popup, and continued to the website | 20% | 19% | 12% | 9% | 5% | 2% | 1% | 0% | 67% |
| Clicked on a button that opened a menu that allowed you to select the type of information you wanted to share with the website | 4% | 4% | 6% | 4% | 6% | 4% | 2% | 1% | 31% |
| Clicked on a link that provided additional information about the privacy policies of the website[4] | 3% | 2% | 3% | 4% | 5% | 3% | 3% | 2% | 25% |
| Clicked on a button indicating that you rejected all cookies | 9% | 10% | 8% | 6% | 5% | 5% | 3% | 1% | 47% |
| Navigated out of the website or closed the website | 3% | 6% | 8% | 9% | 7% | 7% | 3% | 3% | 45% |

Source: Privacy Disclosures Survey

Note:
[1] This question was asked only to respondents who answered "Yes" in Q2 and selected more than one action from the actions listed in Q3. Respondents were asked to rank actions they selected in Q3 in order of how frequently they had taken them.
[2] Higher rank indicates a more frequent action, meaning that rank 1 corresponds to the most frequent action.
[3] For respondents who indicated only one action in Q3, that was assigned rank 1 for the purposes of this analysis.
[4] For respondents who selected "Clicked on a link that provided additional information about the privacy policies of the website" in Q3 were asked Q5. Respondents could select multiple answers. Among the 10 respondents who selected "Clicked on a link that provided additional information about the privacy policies of the website" as their most frequently taken action, 9 selected "Continued to navigate to the site" and 8 selected "Navigated out of the site."

Confidential