# EXHIBIT 4
# to Declaration of
# W. Somvichian

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation,<br><br>This Document Relates to: *all actions* | Master File No. 4:21-cv-02155-YGR(VKD) |

**EXPERT REPORT OF BRUCE DEAL**
**SEPTEMBER 29, 2023**

**TABLE OF CONTENTS**

I.     ASSIGNMENT AND QUALIFICATIONS ........................................................1

    A.     Qualifications ...........................................................................................1

    B.     Assignment ..............................................................................................1

    C.     Facts and Data Relied Upon ...................................................................2

II.    SUMMARY OF OPINIONS ........................................................................3

III.   BACKGROUND ........................................................................................7

    A.     Summary of Plaintiffs' Allegations .........................................................7

    B.     Google RTB ..............................................................................................8

        1.   RTB Auctions and Alternatives to RTB ....................................... 8

        2.   Authorized Buyers and Open Bidding Partners........................... 11

        3.   Data Transferred to Bidders in RTB Auctions ......................... 12

IV.    MR. REGAN'S UNJUST ENRICHMENT METHODOLOGY IS
      UNRELIABLE AND DOES NOT ALLOW FOR CLASS-WIDE
      CALCULATION OF GOOGLE'S ALLEGED PROFITS FROM THE AT-
      ISSUE DATA ............................................................................................14

    A.     Mr. Regan's Unjust Enrichment Model is Unreliable Because It
        Includes RTB Revenue from Individuals Who are Not Proposed Class
        Members and Identifying Such Individuals Would Require
        Individualized Inquiry...............................................................................15

        1.   Problem 1a: Failure to Exclude Individuals Without Google
            Accounts, Who Are Not Proposed Class Members ................................. 15

        2.   Problem 1b: Failure to Exclude Individuals Not Subject to
            Google's U.S. TOS, Who Are Not Proposed Class
            Members ............................................................................. 18

    B.     Mr. Regan's Calculation of the Share of Revenue from the Disputed
        Conduct Is Also Flawed............................................................................19

    C.     Examples of Problems in Mr. Regan's Calculation of Google's RTB
        Revenue from Proposed Class Members ...................................................21

    D.     Additional Problems with Mr. Regan's Use of Prof. Zeithammer's
        51.1 Percent.............................................................................................22

        1.   Problem 1a: The Underlying Studies Do Not Measure the
            <u>Overall</u> Profit Effect on Google, Which Could Actually
            Increase In the But-For World ................................................. 23

        2.   Problem 1b: The Underlying Sources Are Not
            Representative of the At-Issue Data and Time Periods in
            the Case ................................................................................. 29

V.   MR. REGAN HAS FAILED TO PROPOSE A FEASIBLE AND
     RELIABLE METHOD OF CALCULATING COMPENSATORY
     DAMAGES ................................................................................................33

     A.   Plaintiffs' Experts' Proposed Model for Calculating Compensatory
          Damages Fails to Meet Valuation Standards and Does Not Calculate
          the Market Value of the At-Issue Data ....................................................34
          1.   Prof. Zeithammer Testified in Deposition that He Did Not
               Follow Established Valuation Standards for Calculating
               Market Value of the At-Issue Data ............................................ 35
          2.   Prof. Zeithammer's Market Price Estimate is Unreliable......................... 37
          3.   The Pricing Estimates Used by Prof. Zeithammer Are Not
               Reliable ......................................................................................... 42

     B.   The Variation in the Quantity and Type of Data Included in Individual
          Bid Requests Means That Individualized Inquiry Would Be Necessary
          to Determine Estimated Compensatory Damages ......................................44

VI.  THE PROPOSED CLASS CONTAINS UNHARMED PROPOSED
     CLASS MEMBERS WHO CANNOT BE IDENTIFIED WITHOUT
     INDIVIDUALIZED INQUIRY .................................................................46

     A.   Reason 1: Lack of Harm Due to Proposed Class Members'
          Understanding of Data Sharing...............................................................48

     B.   Reason 2: Lack of Harm Due to Proposed Class Members Taking
          Actions to Prevent Data Sharing..............................................................54

     C.   Reason 3: Lack of Harm Due to Benefits Received Exceeding Costs ....................56
          1.   Available data suggests a substantial share of Proposed
               Class Members having **low to no costs** of data sharing .......................... 57
          2.   Available data is consistent with a substantial share of
               Proposed Class Members who **derive benefit from** data
               sharing............................................................................................. 61
          3.   Even for those with some costs, the varying amounts of the
               type and quantity of data being shared would require
               individual inquiry to determine costs compared to benefits. .................. 65

VII. MR. REGAN HAS FAILED TO PROPOSE A RELIABLE CLASS-WIDE
     METHODOLOGY FOR ALLOCATING THE ALLEGED DAMAGES ..........................66

     A.   Mr. Regan's Allocation Method Would Allocate Damages to Proposed
          Class Members in Months When They Did Not Suffer Harm.....................67

     B.   Mr. Regan Has Failed to Propose a Method to Allocate Damages in
          Proportion to the Harm Suffered by Individual Proposed Class
          Members ................................................................................................68

## I.     ASSIGNMENT AND QUALIFICATIONS

### A.     Qualifications

1.      I am a Managing Principal of Analysis Group, Inc. ("Analysis Group"), an economic and financial consulting firm with offices located throughout the United States and internationally. I lead the economic consulting practice in Analysis Group's Menlo Park, California office. I have over 25 years of experience in economic, litigation, and management consulting. I have developed and managed hundreds of assignments requiring complex economic analysis of publicly available and internal client information. I have a Master's in Public Policy ("MPP") degree from Harvard University and have completed additional graduate coursework at Harvard. I have taught economics and analytic methods to graduate students at Harvard University and published articles on economics-related topics.

2.      I have provided expert testimony in dozens of matters over 25 years and have led the analysis on projects covering a wide range of topics. In much of my expert work, I deal with questions involving the use and analysis of large, complex datasets. I have prepared expert reports in many litigation matters involving complex class certification questions and many matters involving technology companies. Over my decades of experience, I have provided statistical analyses of hundreds of datasets across a wide range of industries and topics and developed damages calculations for hundreds of matters.

3.      I have testified many times in state and federal courts and in arbitrations, on behalf of both plaintiffs and defendants. Further information about my professional activities and prior testimony appears in **Appendix A**.

### B.     Assignment

4.      I have been retained by counsel for Google, LLC ("Google") to provide expert testimony in the matter of *In re Google RTB Consumer Privacy Litigation*, as captioned above.

5.      My assignment was to evaluate and respond to the opinions provided by Professor Robert Zeithammer[1] and Mr. Greg J. Regan[2] (collectively, "Plaintiffs' Experts") in their expert reports submitted on July 14, 2023. Specifically, my assignment was to assess whether Plaintiffs' Experts have offered reliable class-wide methodologies for calculating unjust enrichment and compensatory damages resulting from the alleged conduct at issue in this case. My assignment was also to evaluate Mr. Regan's assumption that all Proposed Class Members suffered harm and whether identification and evaluation of unharmed Proposed Class Members, if any, can be done on a class-wide basis. Finally, my assignment was to evaluate Mr. Regan's method for allocating damages to individual members of the class plaintiffs are seeking to represent ("Proposed Class Members").

6.      Analysis Group is compensated at the rate of $1,030 per hour for my time. Research and analysis for this report was also performed by Analysis Group personnel under my direction and guidance. Neither my compensation nor that of Analysis Group is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

**C.      Facts and Data Relied Upon**

7.      In forming my opinions, I have reviewed documents and other materials provided to me by counsel for Google or obtained from public sources. The sources on which I rely are identified in this report, the accompanying exhibits, and **Appendix B**. I understand that discovery is ongoing. Should additional  documents or information be made available to me, I may adjust or supplement my opinions as appropriate.

---

[1] Expert Class Certification Report of Professor Robert Zeithammer, in *In re Google RTB Consumer Privacy Litigation,* Case No. 4:21-cv-02155-YGR(VKD), July 14, 2023 ("Zeithammer Report").

[2] Expert Class Certification Report of Greg J. Regan, CPA/CFF, CFE, in *In re Google RTB Consumer Privacy Litigation,* Case No. 4:21-cv-02155-YGR(VKD), July 14, 2023 ("Regan Report").

## II.    SUMMARY OF OPINIONS

8.    Based on my review of the information identified herein, and using my experience, expertise, and analysis, I have reached the following opinions.

9.    **Opinion 1 – Unjust Enrichment:** Plaintiffs' Experts have neither proposed a reliable class-wide methodology for calculating unjust enrichment damages nor shown that unjust enrichment damages can be calculated on a class-wide basis.

10.    *First*, Mr. Regan's proposed unjust enrichment model seeks disgorgement of revenue and profits that are not tied to Plaintiffs' proposed class of Google account holders subject to a U.S. Terms of Service ("TOS"). Instead, Mr. Regan's model involves ***all*** revenue Google generates from ███████████████████████████ through Real Time Bidding auctions in the U.S., which would include revenue Google generates from Internet users without Google accounts, who are not Proposed Class Members. Additionally, Plaintiffs have not shown they can reliably exclude the amount of revenue Google generates from account holders who have not agreed to a U.S. TOS, and are therefore not Proposed Class Members, and it is my understanding that Google does not maintain this information. (See **Section IV.A**.)

11.    *Second*, Mr. Regan's proposed unjust enrichment model seeks disgorgement of revenue and profits that Google earned from data that I understand is not at issue in this case because Proposed Class Members voluntarily opted to share it. (See **Section IV.B**.)

12.    *Third*, Plaintiffs' Experts' economic framework for calculating Google's alleged unjust enrichment is fundamentally flawed and unreliable because they each fail to analyze how removing at-issue data from RTB bid requests sent to third parties ("Bid Requests") would impact Google's ***overall*** revenue. Specifically, Plaintiffs' Experts do not consider that, even if third-party Bid Request recipients ███████████████████████████ would have

submitted lower bids or chosen not to bid at all for ad inventory, ███████████████

███████████████████████████████████████

███████████████████. Plaintiffs' Experts acknowledge that these Google products,

███████████████████████ are not at issue in this lawsuit

because they do not involve sharing of data in Bid Requests with third parties.[3] The evidence in

this case suggests that if Google's revenue from ███████████████████████

decreased, Google's revenue from other products would have *increased*. Indeed, Google could

have even earned *higher* profit in this but-for world because, on average, Google earns higher

profit per dollar of overall ad revenue from products that are not at issue in this case than from

the at-issue products. (See **Section IV.D**.)

13.    ***Finally***, even if Plaintiffs' Experts were using the proper economic framework—

which they are not—Prof. Zeithammer's opinion that 51.1 Percent of Google RTB revenue is

attributable to the sharing of at issue data is flawed for two independent reasons. First, the studies

do not measure the ***overall*** effect on Google's revenue of omitting the at issue data from Bid

Requests sent to third parties. Second, the studies do not account for many industry changes that

limited the availability of the at-issue data during the Class Period and are therefore unreliable

for estimating the class-wide "effect of User Data on Google RTB auction revenue." Mr. Regan

does nothing to adjust the studies to make them more comparable when applying Prof.

Zeithammer's 51.1 Percent to calculate unjust enrichment. (See **Section IV.D**.)

---

[3] In addition, Prof. Zeithammer suggests in his report that if ████████████████████████ did not
win bids through the RTB process, then the advertisers who used these products would have likely shifted at least
some of their advertising budgets toward Google Search ads—thus also earning revenue for Google.

14.     Plaintiffs do not propose any method of addressing these flaws and remedying them would require individualized inquiry. (See **Section IV**.)

15.     **Opinion 2 – Compensatory Damages:** Plaintiffs' Experts likewise fail to present a reliable class-wide damages model for calculating compensatory damages based on the value of the alleged "personal information" at issue. Here too, the deficiencies in Plaintiffs' Experts' model cannot be cured without individualized inquiry.

16.     *First*, Prof. Zeithammer's method to estimate a $3.17 per month "market price" of the at-issue data fails to meet widely accepted standards for calculating the market value of an asset. Prof. Zeithammer testified in deposition that he did not follow any widely accepted valuation standards, which require that the market price be calculated using prices of identical or comparable assets. (See **Section V.A**.)

17.     *Second*, even if Prof. Zeithammer had applied an accepted valuation methodology, his market price analysis fails to adequately assess the market value of the at-issue data on a class-wide basis. The market price of all of the data of Proposed Class Members shared in Bid Requests is a function of: (1) the market value of the different types of at-issue data that *may* be included in Bid Requests (that is, price); and (2) the quantity of different types of data fields that *were actually* included in Bid Requests during the Class Period (that is, quantity).

18.     As to market value, the prices Prof. Zeithammer uses as benchmarks are not for *comparable* assets. Each of the four vendors he uses as a benchmark collects data that differs substantially from the data shared in Bid Requests. Further, the information he collected on three of the four vendors is sparse and unreliable—his "research" is based primarily on a handful of news articles that he admits are not comprehensive. And finally, each benchmark price includes

5

payment for user time and services provided by users that are not provided by Proposed Class Members. (See **Section V.A**.)

19.    As to quantity, Plaintiffs' Experts have also not shown that compensatory damages can be calculated on a class-wide basis. Evidence suggests that, for various reasons, Bid Requests frequently excluded at-issue data fields, like cookies and other pseudonymous identifiers, and I understand that it is not possible to reconstruct the quantity and type of data shared for all individual Proposed Class Members over the course of the Class Period. Certainly, Plaintiffs have not attempted to do so, or to show that this quantity can be calculated on a class-wide basis. (See **Section V.B**)

20.    ***Finally***, Mr. Regan did not consider the impact of benefits received by Proposed Class Members from Google's alleged sharing of the at-issue data in his calculation of compensatory damages. This includes, for example, coupons or discounts that Proposed Class Members may have redeemed through ads populated by Authorized Buyers and Open Bidding Partners on the basis of data in Bid Requests. Although these benefits should be subtracted from the value of the at-issue data from an economic perspective, they cannot be calculated without individualized inquiry. (See **Section VI.C**.)

21.    **Opinion 3 – Unharmed Proposed Class Members:** Mr. Regan proposed methods for calculating class-wide unjust enrichment and compensatory damages assuming all Proposed Class Members were harmed. There are many possible combinations of reasons why Proposed Class Members may be unharmed from an economic standpoint, including because they: (1) were aware of the at-issue data sharing and continued to use products and services in a way that did nothing to limit this sharing; (2) took actions that avoided the data sharing; and/or (3) received benefits from the at-issue data shared that exceeded the costs of the data sharing.

(See **Section VI**.) The evidence suggests that a substantial share of Proposed Class Members is unharmed, and Mr. Regan's class-wide unjust enrichment and compensatory damages models cannot be adjusted without individualized inquiry as to the unique circumstances of individual Proposed Class Members.

22.     **Opinion 4 – Allocation:** Mr. Regan has failed to propose a reliable methodology for allocating the alleged damages on a class-wide basis. Not all Proposed Class Members suffered economic harm in every month while they were account holders. The amount and type of data that Google included in Bid Requests varies substantially even across Proposed Class Members who were Google account holders for the same period of time. Likewise, the amount of monthly revenue, if any, Google earned from each Proposed Class Member also varies. For these reasons, Mr. Regan's proposal to allocate the same damages for each "member-month" would cause some Proposed Class Members to be substantially overcompensated and some to be undercompensated. (See **Section VII**)

III.     BACKGROUND

A.     **Summary of Plaintiffs' Allegations**

23.     Plaintiffs allege that Google, without informing account holders and in violation of the parties' alleged agreements,[4] "sells and shares" "personal information" about Google account holders with third parties in Google's real-time bidding ("RTB") auctions.[5] Plaintiffs further allege that Bid Requests sent to RTB participants contain information that is considered

---

[4] Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; and Memorandum of Points and Authorities in Support Thereof, in Re: Google RTB Consumer Privacy Litigation, Case No. 4:21-cv-02155-YGR(VKD), July 14, 2023 ("Motion for Class Certification"), ¶¶ 1–5.

[5] Consolidated Class Action Complaint, in *Benjamin Hewitt, et al., v. Google LLC,* Case No. 5:21-cv-02155-LHK(VKD), September 16, 2021 ("Complaint"), ¶¶ 3, 116.

"personal information" under California law and their agreements with Google,[6] including cookies and other pseudonymous identifiers, IP address, user agent, device information, geolocation, and browsing history.[7] On this basis, Plaintiffs bring various causes of action and seek to certify a class "consisting of all individual Google account holders subject to" Google's U.S. TOS "whose personal information was sold or shared by Google in its Real Time Bidding [] auctions after June 28, 2016" (the "Proposed Class").[8]

### B.     Google RTB

#### 1.     RTB Auctions and Alternatives to RTB

24.     RTB is a technology through which owners of websites and mobile applications ("publishers") can sell available space on their websites and apps to display advertisements, referred to as "digital advertising inventory," in real-time online auctions.[9] A website may have numerous blocks of digital ad inventory, which may be sold and populated in numerous ways, of which RTB auctions are only one way.[10]

25.     RTB auctions are facilitated by ad exchanges like the Google ad exchange and

---

[6] Complaint, ¶ 161.

[7] Complaint, ¶¶ 205–259. The user agent string helps identify the browser type and version that a user is using, as well as the operating system on which that browser is run. *See* "User-Agent Strings," Chrome for Developers, November 28, 2014, available at https://developer.chrome.com/docs/multidevice/user-agent/, accessed on September 27, 2023.

[8] Motion for Class Certification, p. vii. I refer to the period from June 28, 2016, to present as the "Class Period."

[9] Deposition Transcript of Stanislav Belov, December 13, 2022 ("Belov Deposition"), pp. 10:7–11:4 (all deposition transcripts and documents produced by Google cited in this report appear as exhibits to the concurrently-filed Declaration of Whitty Somvichian); "Introduction to real-time bidding (RTB)," Google, available at https://support.google.com/authorizedbuyers/answer/6136272?hl=en, accessed on August 24, 2023; "OpenRTB (Real-Time Bidding)," IAB Technology Laboratory, available at https://iabtechlab.com/standards/openrtb/, accessed on August 29, 2023.

[10] Marotta, et al., "Online Tracking and Publisher's Revenues: An Empirical Analysis," May 2019, pp. 1–35, at p. 11–12.

non-Google ad exchanges like Magnite (formerly the Rubicon Project) and OpenX.[11] RTB is not

specific to Google.[12] The OpenRTB open communication protocol maintained by the Interactive

Advertising Bureau (IAB) provides an open industry standard for communication and

interoperability between buyers and sellers of digital ad inventory.[13] This standard defines the

types of data that are exchanged between buyers and sellers to facilitate necessary

communication, and the way that bids are placed.[14]

26.     Publishers have different options to monetize their ad inventory, including non-

RTB options.[15] In general, when a publisher sends an ad request to Google, that request can

solicit different sources of demand ("demand channels") for ads from advertisers, including:[16]

- ***Authorized Buyers and Open Bidding Partners***. As explained below, these services are the focus of this case and allow various third-party (non-Google) companies to receive Bid Requests and bid on publishers' digital ad inventory through the RTB process.[17]

- ***Advertisers That Use Google Demand Products, including DV3 and Google Ads***

---

[11] "Rubicon Project," LinkedIn, available at https://www.linkedin.com/company/the-rubicon-project/, accessed on August 29, 2023; "In 2020, the company merged with Connected TV leader Telaria and became Magnite"; "Ad Exchange," 6sense, available at https://6sense.com/tech/ad-exchange, accessed on August 29, 2023. The OpenX Bidder product supports real-time (dynamic) bidding.

[12] Belov Deposition, p. 10:7–17.

[13] "OpenRTB (Real-Time Bidding)," IAB Technology Laboratory, available at https://iabtechlab.com/standards/openrtb/, accessed on August 29, 2023.

[14] "OpenRTB (Real-Time Bidding)," IAB Technology Laboratory, available at https://iabtechlab.com/standards/openrtb/, accessed on August 29, 2023; "Real-time Bidding," Google Authorized Buyers, available at https://developers.google.com/authorized-buyers/rtb/start, accessed on August 29, 2023.

[15] Marotta, et al., "Online Tracking and Publisher's Revenues: An Empirical Analysis," May 2019, pp. 1–35, at p. 11–12.

[16] Deposition Transcript of Dr. Glenn Berntson, December 8, 2022 ("Berntson Deposition"), pp. 14:12–23, 22:16–24.

[17] Authorized Buyers was formerly known as DoubleClick Ad Exchange. *See* "Authorized Buyers," Google for Developers, available at https://developers.google.com/authorized-buyers, accessed on August 29, 2023; "Introduction to Open Bidding," Google Ad Manager Help, available at https://support.google.com/admanager/answer/7128453, accessed on August 29, 2023.

*(formerly Google Display Network)*.[18] Google demand products, which I understand are *not* at issue, work directly with advertisers or their representatives (*e.g.,* ad agencies) to facilitate the display and targeting of ads.[19] ███████████████ ████ [20] but I understand that digital ad inventory sold through these products is not at issue because ████████████████████████████████████████████ █████████.[21]

- **Advertisers that Have Direct Contracts with Publishers**. Publishers can negotiate deals for ad campaigns with advertisers and self-manage the ads from these advertisers using Google's Ad Manager product.[22] This process is called direct reservations and does not involve Google RTB auctions.[23]

27.    Google's revenue from its various products is generally a percentage of the gross revenue generated for the publisher. For example, if a display ad is populated for 25 cents, Google may earn a percentage of those 25 cents as its revenue, with the publisher retaining the rest.[24] The percentage earned by Google varies across products and publishers. Given that

---

[18] Google Ads was formerly known as Google AdWords and Google Display Network. *See* "Reach a larger or new audience with Google Display Network targeting," Google Ads, available at https://ads.google.com/intl/en_in/home/resources/reach-larger-new-audiences/, accessed on August 29, 2023.

[19] *See* "Reach a larger or new audience with Google Display Network targeting," Google Ads, available at https://ads.google.com/intl/en_in/home/resources/reach-larger-new-audiences/, accessed on August 29, 2023; "Display & Video 360," Google Marketing Platform, available at https://marketingplatform.google.com/about/display-video-360/, accessed on August 29, 2023.

[20] GOOG-HEWT-00047191–225 at 213.

[21] GOOG-HEWT-00047130–152 at 150. ████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████

[22] An example of a direct relationship is where the New York Times (NYT) has a deal with Nike to serve a certain number of ads on specific NYT pages. In this direct relationship, Nike would give the NYT the ad it would like to display on the NYT site, the NYT loads up the ad into their Ad Manager account, and then the NYT sets up the parameters for the campaign and manages the ads from Nike that will show up on their site. Berntson Deposition, pp. 269:10–270:10.

[23] Berntson Deposition, pp. 269:10–270:10; GOOG-HEWT-00259486–88 at 86–87.

[24] ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████ *See, e.g.*, GOOG-HEWT-00456348; GOOG-HEWT-00455648. Google collects the total price that the advertisers pay for the ad, keeps the portion of that revenue that represents the agreed upon price for assisting with the sale of that ad (a.k.a. Google's revenue share), and sends the remainder of the revenue to the publisher. The

multiple demand channels compete for the same ad inventory, the ad inventory would almost always be sold, and Google would earn revenue, even if one demand channel is eliminated.[25]

### 2. *Authorized Buyers and Open Bidding Partners*

28.     As noted above, the two Google products at issue in this case are called Authorized Buyers ("ABs") and Open Bidding Partners ("OBPs"). Each participates in Google RTB auctions. Third-party entities that use these products to participate in Google RTB are also called ABs and OBPs.

29.     ABs such as third-party ad networks, agencies, and demand-side platforms have a technical server-to-server integration with Google to buy inventory from publishers.[26]

30.     OBPs are third-party ad exchanges that bid in Google RTB auctions.[27] Before sending Bid Requests to OBPs, publishers must establish contractual relationships with them.[28]

31.     As Plaintiffs' own expert identifies, a ███████ portion of Google's advertising revenue comes from ███████. From 2018 to 2021, Google generated ███████ in revenue globally from ███████.[29] *See* **Exhibit 1**. This ███████ revenue represents

---

portion of the bid price that Google sends out to the publishers is captured on Google's financial statements as Total Acquisition Costs ("TAC"). TACs are not the only incremental cost that Google may incur in relation to facilitating the selling of the ad, but it does represent the largest portion of Google's incremental costs associated with selling the revenue. *See, e.g.,* Alphabet Inc., SEC Form 10-K, for the period ended December 31, 2017, p. 34.

[25] Berntson Deposition, p. 15:21–16:14, 268:2–18; Interview with Stanislav Belov, August 16, 2023; Deposition Transcript of Robert Zeithammer, Ph.D., September 7, 2023 ("Zeithammer Deposition"), pp. 236:13–24; 237:13–238:2. Specifically, Prof. Zeithammer acknowledged in his deposition that, even if no third parties bid on an auction, Google can find an "internal bidder who can fill the space" and that Google can find a way to fill ad inventory "even if the actual auction [] results in no winner."

[26] *See* "Authorized Buyers overview," Google Authorized Buyers Help, available at https://support.google.com/authorizedbuyers/answer/6138000?hl=en, accessed on August 31, 2023; "Real-time Bidding," Google Authorized Buyers, available at https://developers.google.com/authorized-buyers/rtb/start, accessed on August 29, 2023.

[27] *See* "Bring more bids to the auction with Open Bidding," Google Ad Manager, available at https://admanager.google.com/home/resources/feature-brief-open-bidding/, accessed on August 29, 2023.

[28] "Introduction to Open Bidding," Google Ad Manager Help, available at https://support.google.com/admanager/answer/7128453, accessed on August 29, 2023.

[29] *See* GOOG-HEWT-00455648; *see also* Regan Report, "Schedule 1 – Google RTB Revenue (2017 to 2022)."

only ▮ percent of the $607.7 billion in total global advertising revenue over this same 4-year period, which includes revenue from serving ads on Google-owned properties like Google Search and YouTube. Google classifies the portion of the total global advertising revenue associated with ads served on publisher sites under the segment called "Google Network Properties."[30] In total, Google earned $96.3 billion in global advertising revenue from Google Network Properties from 2018 to 2021, and revenue from ▮▮▮▮▮ is only ▮ percent of Google's revenue from Google Network Properties.[31] *See* **Exhibit 2**.[32]

> 3. *Data Transferred to Bidders in RTB Auctions*

32. As detailed in the Expert Report of Dr. Aaron Striegel, Bid Requests contain various data fields with different types of possible data within these fields, including:

- **Publisher information**, such as the URL of web page or name of the mobile app containing the digital ad inventory where the ad will be displayed.

- **Technical parameters** about the ad inventory location, dimensions, and limitations (*e.g.,* whether a video ad is skippable).

- **Device data** about the browser or device accessing the publisher's web page or app to whom the ad will be shown (*e.g.,* IP address, user agent, model, platform, browser, etc.) *may* be included.

- **Pseudonymous identifiers and general location data** about the user to whom the ad will be shown *may* be included.[33] This could include information about the general user location, pseudonymous identifiers (*e.g*., cookies or mobile device identifiers),

---

[30] *See* Alphabet Inc., SEC Form 10-K for the fiscal year ended December 31, 2022, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204423000016/goog-20221231.htm, p. 6.

[31] The revenue from Google Network Properties is revenue from advertisers who own non-Google websites and apps, and use Google's network to sell their ad inventory, including by participating in AdMob, AdSense, and Ad Manager. *See* Alphabet Inc., SEC Form 10-K for the fiscal year ended December 31, 2021, December 31, 2021, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204422000019/goog-20211231.htm, p. 54.

[32] ▮ = ▮▮▮▮ / $607.7 billion. ▮ = ▮▮▮▮ / $96.3 billion. See **Exhibits 1** and **2**.

[33] Google has policies that mandate that the information that is passing through their systems be pseudonymous. Berntson Deposition, p. 324:20–25.

and hosted match data relating to the cookie matching process.[34] This data helps advertisers determine whether and in what amount to bid on ad inventory. Bid Requests do not include information like name, email, or postal address.[35]

33.     Contrary to Professor Zeithammer's assumption that the data fields in a Bid Request are "commonly shared,"[36] I understand that the type of fields populated and shared vary substantially across individual Bid Requests, and depend on numerous factors related to: (1) publisher choices (*e.g.,* whether to enable various options that can limit the extent of data shared in Bid Requests); (2) user hardware and software used (*e.g.,* default settings for browsers and user-selected settings that can block cookies); (3) user choices (*e.g.,* use of Virtual Private networks ("VPNs")); (4) user characteristics (*e.g.*, for minors, Google either does not send Bid Requests or sends Bid Requests with limited or no at-issue data); (5) Google's policies and practices, which have varied over time; and (6) legal compliance (*e.g.,* compliance with the Children's Online Privacy Protection Act ("COPPA")).[37] These factors are more fully addressed in the Declaration of Glenn Berntson and Dr. Striegel's report. **Exhibit 3** lists some factors that cause variation in the at-issue data included in Bid Requests.

---

[34] Expert Report of Aaron Striegel, in *In re Google RTB Consumer Privacy Litigation*, Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023 ("Striegel Report"), ¶¶ 43, 46, 57–71. Hosted match data refers to "Google-hosted match tables," which allow bidders to map their cookie for a given user to the user's Google User ID. See "Cookie Matching," Google Authorized Buyers, available at https://developers.google.com/authorized-buyers/rtb/cookie-guide#:~:text=Google%2Dhosted%20match%20tables,-For%20easier%20maintenance&text=Once%20a%20match%20has%20been,with%20their%20Google%20User%20ID., accessed on September 27, 2023.

[35] Complaint, ¶¶ 137, 140.

[36] Zeithammer Report, ¶ 11.

[37] Striegel Report ¶¶ 72–89.

IV.  **MR. REGAN'S UNJUST ENRICHMENT METHODOLOGY IS UNRELIABLE AND DOES NOT ALLOW FOR CLASS-WIDE CALCULATION OF GOOGLE'S ALLEGED PROFITS FROM THE AT-ISSUE DATA**

34.  Mr. Regan states that the "objective" of his unjust enrichment method is to "isolate the portion of profits attributable to the alleged harmful act."[38] He proposes a three-step methodology that: (1) identifies the gross ████████ revenue Google generated from ████ █████ during the Class Period; (2) assumes such gross revenue would have been 51.1 percent lower if Google did not share the at-issue data in Bid Requests; and (3) deducts some of Google's "marginal costs."[39] At step 2, Mr. Regan relies on Prof. Zeithammer, who uses a meta-analysis to "average" eleven estimates from ten sources to calculate the value of the at-issue data transmitted in Bid Requests as 51.1 percent of Google's revenue.[40] I refer to this percentage as "Prof. Zeithammer's 51.1 Percent."

35.  Mr. Regan's unjust enrichment method is flawed and unreliable because it includes revenue from individuals who are not part of the Proposed Class, fails to exclude revenue from Proposed Class Members who voluntarily shared their data for advertising purposes, and—most critically—improperly fails to consider the impact of sharing the at-issue data on Google's ***overall*** revenue.

---

[38] Regan Report, ¶ 35.

[39] Regan Report, ¶¶ 35, 46–48, 52. As Mr. Regan explains, marginal costs are additional costs that a company must incur to generate additional revenue. In his model, Mr. Regan deducts only TAC because "Google has not, to date, produced marginal cost data tied specifically to the Google RTB gross revenue numbers." While Google's marginal costs necessary to generate the Google RTB revenue would likely have included more than just TAC, I have not been asked to estimate these marginal costs at this stage. Notwithstanding, I note that Mr. Regan's TAC estimate is understated. As I show in **Exhibit 1**, Google paid out nearly 80 percent of the Google RTB booked revenue in the form of TAC to publishers—not 70 percent, as Mr. Regan has assumed.

[40] Regan Report, ¶¶ 40–42.

A.      **Mr. Regan's Unjust Enrichment Model is Unreliable Because It Includes RTB Revenue from Individuals Who are Not Proposed Class Members and Identifying Such Individuals Would Require Individualized Inquiry**

36.      Any calculation of unjust enrichment in this case must be tied to the marginal revenue generated from only Proposed Class Members, as Mr. Regan agreed in deposition.[41] However, the *only* method Mr. Regan uses to attempt to isolate Google's revenue to Proposed Class Members is to exclude ██████████████████ revenue from his calculation.[42]

37.      This simplistic approach is incomplete because it still includes revenue Google generated from individuals who are not Proposed Class Members, specifically: (1) users who are **not** Google account holders (*see* **Section IV.A.1**); and (2) users who are **not** subject to the U.S. TOS (*see* **Section IV.A.2**).

38.      Because Mr. Regan does not propose any method to exclude revenue from these non-Proposed Class Members, his methodology cannot reliably estimate Google's alleged unjust enrichment on a class-wide basis. Further, Mr. Regan cannot remedy these flaws with available data. To the contrary, the evidence I discuss below is consistent with individualized inquiry being necessary to calculate any unjust enrichment damages for the Proposed Class.

1.      *Problem 1a: Failure to Exclude Individuals Without Google Accounts, Who Are Not Proposed Class Members*

39.      Mr. Regan assumed that all ███████ revenue from ██████████ is associated with Google account holders.[43] That assumption is wrong and unsupported.

40.      Google earns RTB revenue from ███████████ that show ads to users who are *not* Google account holders. There is no requirement for a user to have a Google account to see ads

---

[41] Deposition Transcript of Greg Regan, September 5, 2023 ("Regan Deposition"), pp. 80:2–83:22.

[42] Regan Deposition, p. 94:21–25.

[43] Regan Deposition, p. 95:6–11.

populated by █████████.[44] The ads of █████████ populated using Google RTB appear on publisher sites accessed using a variety of browsers and apps, and can be shown to *any* user so long as the user does not block ads through use of certain browsers or other tools, and assuming other restrictions that limit the serving of ads do not apply (*e.g.*, COPPA).[45]

41.    I understand that Google does not have any means to identify what portion of the ads displayed through Google RTB auctions were shown to Google account holders as opposed to users without a Google account. For example, Mr. Berntson testified that, "[i]n the absence of the cookie that contains the [Google account] information, [Google has] no way of knowing that the traffic is associated with a Google user."[46] The cookie that contains the Google account information is called a GAIA cookie. With some exceptions, this cookie would not exist for three types of users who may see ads from █████████: (1) Google account holders signed out of their Google Account; (2) Google account holders signed in to their Google account but who have blocked third-party cookies; and (3) users with no Google account.[47] Because Google

---

[44] Interview with Stanislav Belov, August 16, 2023; Declaration of Dr. Glenn Berntson in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, in *In re Google RTB Consumer Privacy Litigation*, Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023.

[45] *See* **Section III.B**. *See also,* "Children's Online Privacy Protection Act (COPPA)," Google Publisher Policies Help, available at https://support.google.com/publisherpolicies/answer/10436800?hl=en, accessed on September 8, 2023; "Google Ads policies," Google Advertising Policies Help, available at https://support.google.com/adspolicy/answer/6008942?hl=en, accessed on September 8, 2023; "Ads & made for kids content," Google Advertising Policies Help, available at https://support.google.com/adspolicy/answer/9683742, accessed on September 8, 2023.

[46] Berntson Deposition, p. 165:3–24.

[47] Berntson Deposition, p. 165:3–24; Interview with Stanislav Belov, August 16, 2023. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Interview with Stanislav Belov, August 16, 2023. *See also,* "Clear, allow & manage cookies in Chrome," Google Chrome Help, available at https://support.google.com/chrome/answer/95647?hl=en&p=cpn_cookies#zippy=%2Callow-or-block-cookies, accessed on September 6, 2023. Moreover, when Google account holders for whom third-party cookies are available but who access sites without being signed in to their Google account, the ad is associated with pseudonymous Biscotti cookies that are not linked to their Google accounts. Berntson Deposition, pp. 165:3–25, 205:6–18.

generates RTB revenue from ████████████ users with and without Google accounts, it is impossible to reliably determine whether particular ad revenue is attributable to an ad shown to any of these groups of users.[48] As a result, it does not appear possible to reliably estimate, absent some type of individualized inquiry, the proportion of Google RTB revenue generated from Google account holders to exclude the revenue from ads shown to non-Google account holders.

42.    While Mr. Regan opines that Google has records which indicate when an individual signed up for a Google account in the U.S., he proposes no method for how to use this information to exclude revenue from non-Proposed Class Members, and there is no way to do so absent individual inquiry for the reasons discussed above. I anticipate that Mr. Regan may argue that it is possible to reliably estimate the proportion of account holders versus non-account holders in an overall population of users and then simply multiply the share of account holders by the amount of Google RTB revenue from ████████ However, this would not work. I have seen no evidence which suggests that Google earns, on average, the same amount of RTB revenue per user from users with Google accounts as it does from users without Google accounts. I understand that Google does not ███████████████████████████████ ████████████████████████.[49] Certain browsers block the sharing of certain data by default (*e.g.*, Apple Safari ("Safari"), which accounts for about 34 percent of the browser market during the Class Period).[50] If people who use Safari are also less likely to have a Google account, then it does not logically follow that Google would earn the same amount of RTB revenue from users with and without Google accounts. Therefore, even if Mr. Regan knew the percentage of

---

[48] Berntson Deposition, pp. 165:3–166:22.

[49] Interview with Stanislav Belov, August 16, 2023.

[50] *See*, **Exhibit 3**, **Exhibit 10**.

██████ with Google accounts in each year, he still could not reliably calculate the amount of RTB revenue attributable to the Proposed Class.

> ### 2. Problem 1b: Failure to Exclude Individuals Not Subject to Google's U.S. TOS, Who Are Not Proposed Class Members

43.     The Proposed Class is limited to Google account holders who are subject to a U.S. Google TOS.[51] Mr. Regan has stated that he assumed the RTB revenue reported under ████ ████ in the data Google produced in discovery meant that the revenue was from U.S. Google account holders.[52] His assumption is wrong. As a result, Mr. Regan's unjust enrichment includes revenue for users who were displayed an RTB ad but are not subject to a U.S. TOS.

44.     Google classified RTB revenue as being related to ██████ if the device the user was using when the ad was shown was associated with a U.S. Internet Protocol ("IP") address.[53] However, if users use VPNs, they may appear to be subject to Google's U.S. TOS even when they are not. This is because, when a user uses a VPN, the IP address that is transmitted is the IP address of the VPN server, and not the IP address of the user's network.[54]

45.     Non-U.S. users may use VPNs with a U.S. IP address because it makes them appear as if they are in the U.S., which in turn enables them to circumvent content restrictions. However, I understand this does not make them subject to U.S. TOS (*i.e.*, they are not a Proposed Class Member), and a proper class-wide damages model would necessarily exclude them.

---

[51] Motion for Class Certification, p. 4.

[52] Regan Deposition, p. 94:11–25, 95:6–11.

[53] Regan Report, fn. 61; Regan Deposition, p. 95:20–25, 96:1–10; Google's Revised Supp. Responses to Third Set of Interrogatories, Response No. 11.

[54] "What Is a VPN and Can it Hide My IP Address?" McAfee, available at https://www.mcafee.com/learn/what-is-a-vpn-and-can-it-hide-my-ip-address/, accessed on August 31, 2023. Mr. Regan is aware that VPN use can make someone outside of the U.S. appear to have an IP address in the U.S. *See*, Regan Deposition, p. 96:11–25, 97:1–25.

46.    This problem is likely to be substantial. The proportion of non-U.S. users who inaccurately appear via IP address to be in the U.S. (and therefore may be subject to a U.S. TOS) is large. For instance, studies indicate that about one third of the billions of internet users worldwide have used a VPN.[55] There is an indication that many of the VPNs used worldwide have a U.S. IP address because a substantial portion of users outside of the U.S. are using VPN, for example, to watch U.S. content on Netflix.[56]

47.    I understand that Google ████████████████████████████████████ ████████████████████████████████████████████████.[57] The problem is compounded by the fact that the non-U.S. users who may use a VPN (and appear to be in the U.S. through their IP address) may not have a Google account. I understand that Google would not be able to determine on a class-wide basis whether certain Google account holders are subject to the U.S. TOS. It would certainly be unable to do this for users without Google accounts or Google account holders for whom the GAIA cookie is missing while they browse.[58]

**B.    Mr. Regan's Calculation of the Share of Revenue from the Disputed Conduct Is Also Flawed**

48.    At the second step of his unjust enrichment method, Mr. Regan uses Prof. Zeithammer's 51.1 Percent to apportion Google's RTB revenue from ████████████ using what he considers to be the revenue contribution of "personal information" shared with third parties

---

[55] Vojinovic, I., "VPN Statistics for 2023 – Keeping Your Browsing Habits Private," DataProt, May 26, 2023, available at https://dataprot.net/statistics/vpn-statistics/, accessed on September 6, 2023.

[56] *See, e.g.*, Lovely, S., "Streaming Across Borders: 51% of Adults Worldwide Use a VPN to Watch Location Restricted Content on Netflix," CordCutting, available at https://cordcutting.com/vpn/streaming-across-borders-study/; "Need for Proxy/VPN Data in Today's Heightened Cybersecurity State," Digital Element, available at https://www.digitalelement.com/wp-content/uploads/2021/11/Proxy-VPN-Cybersecurity-Brief.pdf, accessed on September 22, 2023.

[57] Interview with Stanislav Belov, August 16, 2023.

[58] Interview with Stanislav Belov, August 16, 2023.

through Google RTB. Mr. Regan has failed to exclude revenue from Proposed Class Members who voluntarily shared data. From an economic perspective, if Proposed Class Members voluntarily shared their information, then they would not have suffered harm and should be excluded in Mr. Regan's model, but he proposes no way to do so. Proposed Class Members can "opt-in" to allow sharing of their data in numerous ways, and information suggests that a substantial portion of the Proposed Class likely did:

- ***CCPA Opt-Ins***. Users rarely reject (5 percent or less of the time) to sharing their data when they visit a website that shows them a banner with options to allow or reject the sharing of data with third parties.[59]

- ***Opt-ins Using Device Settings***. As a study cited by Plaintiffs' own expert explains, many Apple iPhone ("iPhone") users choose to change settings to actively opt *into* personalized advertising after the Apple's iOS ("iOS") 14.5 update, which stopped sharing the device identifier for advertising (IDFA) by default.[60] As of July 2021, over 40 percent of users of iOS version 14.5 and above opted into using the IDFA.

- ***Opt-ins Using Browser Settings***. Proposed Class Members who used browsers that default to restricting the sharing of third-party cookies—like Safari or Mozilla's Firefox ("Firefox")—can reverse these settings and voluntarily opt-in to the sharing of data.[61, 62]

- ***Implicit Opt-in by Foregoing Opt-Out Options***. Even Proposed Class Members who know of, but choose to forego, options to prevent the sharing of data with advertisers,

---

[59] "IAB CCPA Benchmark Survey Summary," Interactive Advertising Bureau, November 12, 2020, available at https://www.iab.com/insights/iab-ccpa-benchmark-survey/, accessed on August 25, 2023, p. 4 ("Few consumers are acting upon their CCPA rights, with many respondents seeing "sale" opt-out rates at 1-5% regardless of channel"); Hautala, Laura, "Pop-ups about cookies constantly interrupt you online. Here's how they could go away," CNET, December 28, 2020, available at https://www.cnet.com/news/privacy/why-youre-hounded-by-pop-ups-about-cookies-and-how-they-could-go-away/.

[60] *See* "Apple's IDFA Opt-In," PubMatic, 2021, available at https://pubmatic.com/wp-content/uploads/2021/08/IDFA-Opt-In-Impact-Infographics.pdf.

[61] Apple states that "Safari's key privacy features are enabled by default," including Intelligent Tracking Prevention. Users can opt out by unchecking "Prevent Cross-Site Tracking" in the settings. *See* "Safari Privacy Overview: Learn how the Safari web browser protects your privacy," Apple, November 2019, available at https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf.

[62] Mozilla states that "when you download Firefox, all protections included in Standard Enhanced Tracking Protection (ETP) are already enabled," but users can opt out by changing ETP settings. *See* "Enhanced Tracking Protection in Firefox for desktop," Mozilla Support, available at https://support.mozilla.org/en-US/kb/enhanced-tracking-protection-firefox-desktop, accessed on September 6, 2023.

can be considered to have voluntarily opted into the sharing of their data.[63]

49.    Mr. Regan does not propose a method to identify and exclude Proposed Class Members who allowed data sharing, or the corresponding proportion of Google's RTB revenue earned from such Proposed Class  Members.

### C.    Examples of Problems in Mr. Regan's Calculation of Google's RTB Revenue from Proposed Class Members

50.    Examples of four potential users whose characteristics are summarized in **Figure 1** below illustrate the flaws in Mr. Regan's approach for calculating the Google RTB revenue associated with Proposed Class Members. Assume the following about the four users:

- Users A, B, and D are Apple device and Apple Safari browser users. There are two differences between them: (1) They differ in when they opened their Google account; and (2) whether they opted into the sharing of their data.

- User C is a Chinese citizen and resident who has never been to the U.S. but appears to be in the U.S. due to their VPN usage. This user is not subject to Google's U.S. TOS.

**Figure 1**
**Examples of Individual Users Improperly Included in Unjust Enrichment Calculation**

| Hypo-<br>thetical<br>User | Type of<br>Devices<br>Used | Type of<br>Browser<br>Used | Relevant Software<br>Options / Tools Used | Effect of Software Options / Tools and<br>Browsers Used | Google<br>Account<br>Opened |
|---|---|---|---|---|---|
| User A | iOS | Safari | n.a. | n.a. | Never |
| User B | iOS | Safari | n.a. | n.a. | 2022 |
| User C | PC | Chrome | VPN used by Chinese citizen | User appears to be subject to Google U.S. ToS | 2015 |
| User D | iOS | Safari | Opted into IDFA & Cookies | Consent to sharing | 2015 |

51.    Mr. Regan's approach *wrongly* includes Google's RTB revenue from *all* four Users during the entire Class Period when his unjust enrichment method should *exclude* Google

---

[63] *See* Pegoraro, R., "Here's A Hint About How Few People Click Those "Do Not Sell My Personal Information" Links," Forbes, November 13, 2020, available at https://www.forbes.com/sites/robpegoraro/2020/11/13/heres-a-hint-about-how-few-people-click-those-do-not-sell-my-personal-information-links/?sh=22196f5d1fc9, accessed on September 6, 2023. See also discussion in **Section VI**.

RTB revenue from individuals like User A (who is not a Google account holder and thus not a Proposed Class Member) and User C (who is not subject to Google's U.S. TOS and also not a Proposed Class Member).[64] Further, his method should exclude the RTB revenue Google earned from User B before this user opened a Google account in 2022, but it does not.[65] Finally, Mr. Regan's method should exclude the contribution to Google's RTB revenue from the data that User D (and other Proposed Class Members) voluntarily opted into sharing.

**D.     Additional Problems with Mr. Regan's Use of Prof. Zeithammer's 51.1 Percent**

52.     Mr. Regan's attempt to estimate "unjust revenue" attributable to the sharing of "personal information" contains additional flaws and is unreliable. Specifically, Mr. Regan's model *does not* reliably measure Google's unjust revenue, for two main reasons:

- Prof. Zeithammer's 51.1 Percent does not reliably measure the effect on Google's revenue of removing the at-issue data from Bid Requests; and

- Even setting aside this flaw, Mr. Regan has also failed to propose a methodology that appropriately applies the 51.1 Percent to measure the overall effect on Google's RTB revenue.

53.     Prof. Zeithammer analyzed eleven estimates from ten sources to calculate the proportion of Google's RTB revenue attributable to the at-issue data. The sources he used are a mix of academic, industry, and Google studies and experiments that rely on different data,

---

[64] *See* **Section IV.A.**

[65] Mr. Regan implicitly recognizes that Proposed Class Members should receive damages only after opening a Google account. Mr. Regan proposes to allocate unjust enrichment damages "to all Proposed Class Members based on months of usage of their Google accounts, which can be determined from records Google still maintains." Mr. Regan claims that these records "identif[y] when the individual first signed up for a Google account in the U.S." (Regan Report, ¶ 56.) Moreover, Mr. Regan proposed that compensatory damages can be calculated by multiplying the alleged value of the at-issue data by "the number of months each Proposed Class Member maintained a Google account during the Class Period." (Regan Report, ¶ 65.) Finally, Mr. Regan finds relevant "Google … records … identifying when they first signed up for a Google account in the U.S." (Regan Report, ¶ 65.) Given all this, profits Google earned from Proposed Class Members *before* they opened a Google account should not be included in Mr. Regan's unjust enrichment calculations.

different periods, and measure different effects than the "effect of User Data on Google's RTB auction revenue."[66] He then uses a "meta-analysis" (a statistical combination of various studies) to develop an overall estimate and a confidence interval. While a meta-analysis may be appropriate in some situations, it is only as reliable as its sources. In this case, the sources Prof. Zeithammer used are *not* a proper measure of the revenue impact of sharing at-issue data in Google RTB, and thus his methodology is unreliable.

54.    There are two fundamental problems with Prof. Zeithammer's analysis. The first is that the underlying studies and experiments were not designed to—and do not—measure Mr. Regan's necessary input, *i.e*., the overall revenue effect on Google from blocking the at-issue data from some products, but not all products. The second problem is that most of the studies and experiments are not representative of the at-issue data transmitted in Google RTB during the Class Period. I discuss both issues in further detail below.

1.    *Problem 1a: The Underlying Studies Do Not Measure the <u>Overall</u> Profit Effect on Google, Which Could Actually Increase In the But-For World*

55.    The disputed conduct in this case is the sharing of alleged "personal information" in Bid Requests. In his report, Mr. Regan states that ██████████████████████████████ ████████████████████████████████[67] and identifies Google's gross revenue from ████████████████████████████████ as the focus for his model.[68]

56.    An unjust enrichment methodology, however, must account not just for revenue from ████████████ but for the *overall* impact on Google's revenue in a "but-for" world without

---

[66] Zeithammer Report, ¶ 18.

[67] Regan Report, ¶ 33.

[68] Regan Report, Schedule 1.

the alleged sharing of the at-issue data with third parties.[69] I understand that Plaintiffs

acknowledge that only the RTB revenue Google generates from data shared with third parties is

at issue in this case.[70] Thus, the proper analysis would evaluate the impact of omitting the at-

issue data from Bid Requests, including accounting for any resulting increased revenue from

other sources that are not at issue in this case, and estimate the resulting net change, if any, on

Google's overall revenue.

57.     As I explain in **Section III.B.2** above, Google's revenue from █████████

accounts for only approximately ██ percent of Google's revenue from ads served on Google

Network Properties. The bulk of Google's revenue is from products not at issue in this case, like

DV3 and Google Ads. Importantly, ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████[71] This means that revenue from these

advertisers is not at issue in this matter, as Plaintiffs' Experts agreed.[72] The fact that a ████████

portion of Google's advertising revenue comes from ████████████ highlights a critical flaw in



---

[69] As I explain above, this is because Google's disputed conduct is the sharing of data in Bid Requests shown to ███
████████, and ████████████ are not the only Google products that use at-issue data to personalize ads. In a
damages analysis, the "but-for" world differs from the actual world "only with respect to the harmful act." (Allen,
M.A., et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence,
Third Edition*, The National Academies Press, 2011, p. 432.) Thus, a claim of unjust enrichment should try to
measure the additional profit that the defendant earned as a result of the disputed conduct. The conceptual economic
framework is to isolate the disputed conduct, adjust the disputed conduct to conform to one that would not include
the disputed conduct, but keeps everything else the same (commonly described as the "but-for scenario" or "but-for
world"), and then compare the profit in the actual world to the profit in the but-for world.

[70] Plaintiffs state in their motion for class certification that "this is *not* a case about whether Proposed Class
Members were or were not shown personalized advertisements;" it is only a case about "Google shar[ing] or
[selling] class members' [alleged] personal information in the Google RTB auctions to third parties." Motion for
Class Certification, pp. 15–16. Emphasis in original.

[71] GOOG-HEWT-00047130–152 at 150 ███████████████████████████████████████████
███████████████████████████████

[72] Mr. Regan stated that it is "consistent with [his] understanding" that if ████████████ do not transmit the at-issue
data to third parties, then that revenue is not at issue in this matter. (*See* Regan Deposition, p. 72:15–19.) Prof.
Zeithammer stated that he did not analyze this situation but that "it is entirely possible" that Google earned revenue
from ████████████ without sharing data with third parties. (*See* Zeithammer Deposition, pp. 85:12–87:2.)

Mr. Regan's method. Even if revenue from ████████ would decrease by not sharing the at-issue data with them, other revenue (and profits) from other products not at issue would ***increase*** and provide an offset to any ██████ revenue reductions.

58.    To illustrate, imagine an auction where the highest (and winning) ██ bid for a banner ad was $1, the highest ██ bid was 98 cents, and the highest ██ bid was 96 cents. In Mr. Regan's model, he assumes the gross revenue would be ***51.1 cents lower*** if ██████ ██ were not able to use the alleged "personal data" in Bid Requests ($1 previously winning █ bid x 51.1 percent reduction).[73] However, as one can logically see, the actual reduction in Google's revenue from the sale of this digital ad impression would be much lower than 51.1 cents, as the ██ bid would be the new winner and Google's gross revenue would be ***only four cents lower*** (96 cents vs. $1).[74] This is a critical and substantial flaw in Regan's analysis.

59.    In fact, not only might any net decrease in gross revenue be quite small and far below 51.1 percent, as in the hypothetical example, but evidence suggests that Google could actually earn ***higher profits in the but-for world***. Google data show that it generates higher incremental profits per dollar of "booked" revenue from non-at-issue Google products like ███ ███████████████████████████████████████. For example, from 2018 to 2021, Google retained approximately ████████████████████████████.[75] During the same period, Google retained ████████████████████████████████

---

[73] Regan Deposition, p. 72:11–19.

[74] Mr. Regan agreed that if ██████████████████████████ that they could win the auction if ██ did not, and that ███████████████ revenues are not unjust enrichment to Google. *See,* Regan Deposition, pp. 65:5–18, 67:5–68:2, 72:11–19.

[75] *See* **Exhibit 1**.

█████████ from other Google Display Ads products such as ████████████████.[76] Thus, Google could easily earn more total profit even if the average price paid per display ad decreased as a result of ████████████ bids.

60.    Over the longer term, if advertisers reallocated spending away from display ads populated using the ████████████ products due to the at-issue data being omitted from Bid Requests, Google might also earn higher incremental profits per dollar of advertising spending as more ads are shown on its own properties, such as Google Search or YouTube. See **Exhibit 2**. Prof. Zeithammer states in his report that "[a]dvertising dollars flow to where they are most effective," and in part because of RTB, "[b]y 2016, spending on display ads surpassed spending on search ads."[77] This suggests that, in the absence of the at-issue data being shared in Bid Requests, the "advertising dollars" of ███ would shift from presumably less effective ads that omit at-issue data toward other options, such as to Google Search.

61.    As these facts and examples illustrate, the relevant approach here is *not* simply looking in isolation at the effect on Google's ████████ RTB revenue from not sharing the at-issue data in Bid Requests, but the effect on Google's *overall* revenue and profit, including increases in revenue and profit from other products. The underlying sources used by Prof. Zeithammer were not designed to—and do not—measure the net effect of decreases and increases across Google products. As a result, Mr. Regan's use of Prof. Zeithammer's 51.1 Percent is improper as that figure substantially overstates the effect of sharing at-issue data, potentially even incorrectly stating there is a decrease rather than increase in profits. Further,

---

[76] *See* **Exhibits 1** and **4**. From an economic perspective, Google can allow a product that is less profitable to win the right to serve an ad if that optimizes the price that publishers get, which would in turn incentivize publishers to remain customers of Google. In one internal document, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
*See* GOOG-HEWT-00018008–102 at 009.

[77] Zeithammer Report, ¶¶ 63–64.

neither Prof. Zeithammer nor Mr. Regan propose any method to address this fundamental flaw, nor am I aware of any.

62.    The following examples illustrate why the sources Prof. Zeithammer used do not measure the relevant "effect" of the *omission* of the at-issue data from Bid Requests while *continuing to allow* the use of existing data for products other than ████████.[78]

63.    **Example 1**: The Alcobendas et al. (2021) study Prof. Zeithammer cites states that the authors "focus[] on evaluating the likely effects of Google's announced plan, starting in 2023, to block third-party cookies by default on [Google's] Chrome [browser]...."[79] When the study finds that "ban[ning third-party cookies in Chrome] would reduce publisher revenue by 45%," the measured effect (45 percent) includes the revenue contribution of third-party cookies used to personalize ads for all advertisers competing for ad inventory. But such a study would only be relevant if it had blocked third-party cookies for the ███████ Bid Requests at issue and left third-party cookies available for other bids and/or personalization involving other participants who are not at issue, which it did not do. Thus, this 45 percent that Prof. Zeithammer used to calculate his 51.1 Percent is unreliable and clearly overstates the revenue impact attributable to the conduct at issue in this case.

64.    **Example 2**: Prof. Zeithammer's use of an internal Google experiment from 2019 is flawed for similar reasons. That study attempted to measure what would happen if *all* ads were not personalized—something Plaintiffs state they are not proposing. In summarizing the study, Google stated: "[W]e turned off the availability of personalized data.... The users in the treatment

---

[78] In **Exhibit 5**, I explain in further detail why none of the eleven statistics Prof. Zeithammer used measures the revenue contribution of the disputed conduct.

[79] Alcobendas, M., et al., "The Impact of Privacy Measures on Online Advertising Markets," Social Science Research Network, July 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3782889, pp. 1–40, at p. 1.

group saw only non-personalized programmatic ads."[80] Like the Alcobendas et al. (2021) study,

Google's experiment blocked the use of data wholesale, even in instances where such data was

not included in Bid Requests sent to third parties. For a study like this to be relevant, it would

have to measure the overall revenue decrease if data used to personalize ads is excluded from

Bid Requests but is otherwise available to serve ads using DV3 and other products not at issue in

this case.

65.   **Example 3:** Prof. Zeithammer also uses as an input a Google ████████



████████ where Google █████████████████████████████████████████████

████████████████████████████████.[81] Once again, ███████████████████████████

███████████████████████████████████████████████████████████████████████

██████. Thus, it does not measure the effect Mr. Regan attempts to apportion.

66.   According to Mr. Stan Belov, a Google staff software engineer who is technical

lead for Google RTB, █████████████████████████████████████████████████████

█████████████████████████████████████████████████████. Mr. Belov

explained this is because ████████████████████████████████████████████████

███████████████████████████████. Thus, like the other studies discussed above, this

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[82] And

even if Google could run an experiment to measure the overall effect of revenue and found some

overall decrease in "booked" revenue, Google's profits could still increase, as I discuss above.

---

[80] Ravichandran, D., and Nitish Korula, "Effect of disabling third-party cookies on publisher revenue," Google, August 27, 2019, available at https://services.google.com/fh/files/misc/disabling_third-party_cookies_publisher_revenue.pdf, p. 1.

[81] Zeithammer Report, ¶¶ 32–33; Interview with Stanislav Belov, August 16, 2023.

[82] Interview with Stanislav Belov, August 16, 2023.

67.     Considering these factors, it is clearly incorrect to determine unjust enrichment only by looking at the drop in revenue from ██████████ if the at-issue data was omitted from Bid Requests. Google could earn nearly the same amount of revenue and the same or even *higher* overall profits in a but-for world where *only* ██████████ do not receive the at-issue data. Google's unjust enrichment would be zero if the *overall* profit Google would have earned in the but-for world from *all* products used to serve ads on publisher sites—not just from ██████████ ██████—was higher than or equal to the Google's overall profits in the actual world. The methodology proposed by Mr. Regan and the inputs he uses from Prof. Zeithammer are neither accurate nor reliable to calculate unjust enrichment because they do not account for this.

2.     *Problem 1b: The Underlying Sources Are Not Representative of the At-Issue Data and Time Periods in the Case*

68.     Another problem is that the sources Prof. Zeithammer used to calculate his 51.1 percent are not tailored to the at-issue data and time period in this matter. Broadly speaking, various industry and product changes have restricted the data Google could have collected from Proposed Class Members during the Class Period. Thus, the revenue impact of omitting data from Bid Requests will necessarily decrease over time, as there is relatively less available data to omit, and the RTB revenue Google generated in the later periods already omitted data that could have been included in Bid Requests in earlier time periods.

69.     Nine of the eleven estimates in Prof. Zeithammer's meta-analysis rely on data that precede one or more of the many industry and product changes that restricted, over time, the data Google can collect from users. *See* **Figure 2**. These changes include privacy protections extended by various browsers, such as: (1) Safari's "Intelligent Tracking Prevention" ("ITP") designed to "disallow 3P [third-party] cookies" and "disallow data sharing without user

consent," which was launched in September 2017;[83] and (2) Firefox's "Enhanced Tracking Protection" ("ETP"), which launched in January 2019 and blocks third-party Cookies by default.[84] Other changes include the enactment of CCPA in January 2020 and the April 2021 launch of Apple's iOS version 14.5, which prevented the use and sharing of the IDFA identifier by default unless the user opts into it.[85] All of these changes occurred during the Class Period and, as Prof. Zeithammer acknowledged,[86] affect whether and which data was included in Bid Requests.  But Mr. Regan has proposed no variation in how he used Prof. Zeithammer's 51.1 Percent over the course of the Class Period in his calculation inputs.

70.    As **Figure 2** below shows, four of the eleven estimates are based on data before even the beginning of the Class Period, and four additional estimates are based on data from 2019, which is after Safari and Firefox changed their respective policies towards third-party cookies, but before other changes were in place. One additional estimate is based on data from March 2021, after CCPA went into effect but before the Apple iOS 14.5 update.

---

[83] Sweeney, M., and Paulina Zawislak, "A Timeline of Apple's Privacy Changes in Safari and iOS [infographic]," Clearcode, October 12, 2021, available at https://clearcode.cc/blog/timeline-apple-privacy-changes/, accessed on August 31, 2023; GOOG-HEWT-00018008–102 at 035.

[84] *See, e.g.,* Nguyen, N., "Today's Firefox Gives Users More Control over their Privacy," Mozilla, January 29, 2019, available at https://blog.mozilla.org/en/products/firefox/todays-firefox-gives-users-more-control-over-their-privacy/?_gl=1%2A1mau7dp%2A_ga%2AMTYyNzg0NjMzLjE2OTM1MDAxMzU.%2A_ga_MQ7767QQQW%2AMTY5MzUwMDkwNC4xLjEuMTY5MzUwMTI4NC4wLjAuMA.., accessed on August 31, 2023; "Today's Firefox Blocks Third-Party Tracking Cookies and Cryptomining by Default," Mozilla, September 3, 2019, available at https://blog.mozilla.org/press/2019/09/todays-firefox-blocks-third-party-tracking-cookies-and-cryptomining-by-default/, accessed on August 31, 2023.

[85] *See, e.g.,* GOOG-HEWT-00018008–102 at 035; "The Effective Date of the California Consumer Privacy Act of 2018 Has Come and Gone: What To Do Now," JD Supra, April 8, 2020, available at https://www.jdsupra.com/legalnews/the-effective-date-of-the-california-44990/, accessed on September 6, 2023; Haslam, K., "What's in iOS 14.5," Macworld, April 27, 2021, available at https://www.macworld.com/article/676189/whats-in-ios-14-5.html, accessed on September 6, 2023.

[86] Zeithammer Deposition, p. 54:20–22.

30

**Figure 2**

**Timeline of Data Used by the Ten Studies in Prof. Zeithammer's Analysis and Various Industry Changes that Affected the Availability of At-issue Data[87]**

*(Lines to the Timeline Indicate the Date of the Study, the Year in Parentheses Indicates the Year of Publication)*



71.     Studies conducted using data prior to changes that limited the availability of the at-issue data are not representative of the periods after the change or of the entire Class Period because they would, among other things, overestimate the "effect of User Data on Google RTB auction revenue" that Prof. Zeithammer is attempting to estimate. This is because they include the effect of restricting data that *was not even available* for substantial portions of the Class Period. For example, the Alcobendas et al. (2021) research studied the auction revenue impact on only one browser, Google Chrome ("Chrome"), if it blocked third-party cookies.[88] In addition to the previously-discussed flaw relating to measuring the total revenue impact, a finding that Chrome revenue would decrease by about 45 percent if it blocked third-party cookies by default does not translate or apply to the overall Google RTB revenue because a substantial portion of

---

[87] For sources and notes, *see* **Exhibit 6.**

[88] Alcobendas, M., et al., "The Impact of Privacy Measures on Online Advertising Markets," Social Science Research Network, July 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3782889, pp. 1–40, p. 4.

the overall RTB revenue comes from Firefox and Safari—which have already blocked third-party cookies by default for most of the Class Period.[89] Thus, the effect of removing third-party cookies from Bid Requests would be substantially smaller than 45 percent.[90]

72.     Prof. Zeithammer's meta-analysis also includes statistics that pertain to groups of users who are not representative of the Proposed Class. Four of the seven estimates that are based on data from some point in the Class Period are not representative because they either measure an effect for global users, for U.S. desktop users only, for U.S. users of a specific browser (*e.g.,* Chrome or Safari), or for users of apps viewed on iOS devices with iOS version 14.5 or above.[91]

73.     Prof. Zeithammer acknowledged that some Bid Requests are missing some of the at-issue data for reasons such as the browser settings described above.[92] He also acknowledged in his interpretation of Google's ███████████ that the presence or absence of different data in Bid Requests can have a different effect on Google's RTB revenue.[93] However, Prof. Zeithammer's methodology fails to account for differences in the at-issue data over time for the

---

[89] Zeithammer Report, ¶ 45.

[90] This can be illustrated with a hypothetical example. Assume for simplicity that, from 2019 to present, 50 percent of the ads on sites accessed using Chrome are populated using Google RTB Bid Requests with third-party cookies, and Google's RTB revenue from these ads were $600. Assume further that 50 percent of the ads on sites accessed through Safari and Firefox are populated using Bid Requests without third-party cookies (because the browsers blocked them by default), and Google earned $330 in RTB revenue from those ads (or 45 percent lower revenue than what is earned from ads shown on the Chrome browser because of the lack of third-party cookies in Safari/Firefox). Google's RTB revenue from all ads in this hypothetical total $930 (= $600 + $330). Removing cookies in this hypothetical example would decrease revenue from Chrome from $600 to $330 but would not affect revenue from Safari and Firefox because those Bid Requests had no cookies to begin with. The total revenue after cookies are removed is $660 (= $330 from Safari/Firefox + $330 from Chrome), and the total revenue decrease is only 29 percent (or $660 / $930 – 1), not 45 percent measured by the study.

[91] *See* **Exhibit 5.**

[92] Zeithammer Report, ¶ 21. ("[S]ome portion of impressions have always been missing User Data, either because the users making these impressions somehow blocked tracking on their browsers or due to software glitches.")

[93] Zeithammer Report, ¶ 32. Prof. Zeithammer discusses that ███████████████████████████████
███████████████████████

reasons described above. This issue renders his methodology unreliable for use by Mr. Regan to estimate the effect of the at-issue data on Google's RTB revenue.

## V.    MR. REGAN HAS FAILED TO PROPOSE A FEASIBLE AND RELIABLE METHOD OF CALCULATING COMPENSATORY DAMAGES

74.    Mr. Regan also proposes a methodology for a second measure of damages using a "market pricing" (aka "compensatory") approach.[94] Mr. Regan's compensatory damages model: (1) multiplies the number of months a Google account holder maintained a Google account during the Class Period;[95] by (2) the "market value" of the at-issue data in a Bid Request.[96] For the second item, Mr. Regan relies on Prof. Zeithammer, who calculates the "market value" as $3.17 per account holder per month based on a review of the amounts that, according to Prof. Zeithammer, four different vendors pay consumers for their information.[97] In Mr. Regan's

---

[94] Motion for Class Certification, p. 23; Regan Report, ¶¶ 62–64.

[95] To identify the number of months during which each Proposed Class Member was a Google account holder, Mr. Regan proposes to use Google records that identify when different individuals first signed up for a Google account in the U.S. However, he has not proposed how to deal with Proposed Class Members with multiple Google accounts. Approximately 37 percent of people in the U.S. have two email accounts and nearly half of the people have more than two accounts. Moreover, evidence suggests that a substantial proportion of the Proposed Class Members may have Google accounts under different names. Specifically, in 2020, the BBC reported that approximately two in every three women in the U.S. adopt their spouse's name when they get married. In 2023, the U.S. Census Bureau reported that approximately 67 percent of women marry at least once. These two statistics suggest that over 40 percent (67% x 67% = 45%) of women change their last names during their adult lives. Furthermore, McKinsey & Company reports that over 10 percent of people mask their identity by providing false personal information when opening accounts. These statistics indicate that individualized inquiry would be required to reconcile information for a substantial proportion of Proposed Class Members to ensure that they are not over-compensated. See Statista Research Department, "How many email addresses do you have?" Statista, available at https://www.statista.com/statistics/1291843/number-of-email-addresses-people-have-us/#:~:text=According%20to%20the%20results%20of,having%20over%20four%20email%20addresses; Savage, M., "Taking a husband's name emerged from patriarchal history. So why do so many young western couples still follow the tradition?" BBC, September 23, 2020, available at https://www.bbc.com/worklife/article/20200921-why-do-women-still-change-their-names; "Unmarried and Single Americans Week: September 17-23, 2023," U.S. Census Bureau, September 17, 2023, available at https://www.census.gov/newsroom/stories/unmarried-single-americans-week.html, accessed on September 26, 2023; Anant, V., et al., "The consumer-data opportunity and the privacy imperative," McKinsey & Company, April 27, 2020, Exhibit 4, available at https://www.mckinsey.com/capabilities/risk-and-resilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative#/, accessed on September 26, 2023.

[96] Regan Report, ¶¶ 57, 62–63.

[97] Regan Report, ¶¶ 56–57, 64–65; Zeithammer Report, ¶¶ 93–94.

model, the damages "recovery" to Proposed Class Members varies based only on a single dimension: the length of time they had a Google account.

75.    In theory, a compensatory damages model should provide a method for compensating individual Proposed Class Members for the market value of the *specific* at-issue data included in Bid Requests. This means that the model should *not* include market value estimates for different and non-comparable data that Google never collected and that it should consider differences in the quantity and mix of data shared for different Proposed Class Members.

76.    Plaintiffs' Experts' compensatory damages model is fundamentally flawed. *First,* Prof. Zeithammer's method to calculate the "market price" does not meet standards for calculating the market value of an asset (in this case, Bid Request data). He also does not use comparable data as a benchmark for the at-issue data, relying largely on third-party articles that contain speculation and sparse information about the programs at issue. His approach is therefore unsupported, unscientific, and analogous to saying that the market value of cars is equal to the market value of airplanes. While both are transportation vehicles, they are not comparable assets. *Second,* Plaintiffs' Experts' model assumes that the same "market price" uniformly applies to each "member-month" worth of data, no matter the *quantity* or the *type* of data shared in any Bid Request. Mr. Regan proposes no methodology to calculate the cumulative amount or mix of various types of Bid Request data or to account for variation among Proposed Class Members. Therefore, Mr. Regan's model cannot calculate compensatory damages feasibly or reliably on a class-wide basis, and it is not possible to do so without individualized inquiry.

**A.    Plaintiffs' Experts' Proposed Model for Calculating Compensatory Damages Fails to Meet Valuation Standards and Does Not Calculate the Market Value of the At-Issue Data**

77.    A standard valuation approach is to understand the type of asset being valued and

then apply accepted valuation techniques to ensure comparability with the asset being valued. Prof. Zeithammer valued the at-issue data in Bid Requests using market prices for assets that are not comparable. His analysis cannot reliably be adjusted to make them comparable, rendering his valuation inaccurate and unreliable.

> 1. *Prof. Zeithammer Testified in Deposition that He Did Not Follow Established Valuation Standards for Calculating Market Value of the At-Issue Data*

78.    It is well-accepted that there are three possible approaches to calculating the market value of an asset: (1) the income approach; (2) the market approach; and (3) the cost approach.[98] Which of these approaches is appropriate depends on the nature of the asset and available data. The *market approach* uses transaction or market price data of comparable assets.[99] Prof. Zeithammer attempts to apply the market approach based on an average of the supposed compensation that four vendors—Screenwise, Datacy, Datacoup, and Killi—pay to users for certain user data and other user activities that are of interest to those vendors.[100]

79.    Prof. Zeithammer's opinion is unreliable because, as he acknowledged,[101] he did not follow established valuation standards, which indicate that, when the market approach is used for valuing an asset, the transaction prices used as benchmarks must be for *identical* or *comparable* assets. This requirement is well established and used by valuation professionals. For example, the book *Financial Valuation* states that "the market approach uses prices of market

---

[98] Hitchner, J.R., "Financial Valuation, Applications and Models," Third Edition, Wiley Finance, 2011, pp. 965–966. *See also,* Shannon Pratt and Alina V. Niculita, "The Lawyer's Business Valuation Handbook," Second Edition, American Bar Association, 2010, pp. 24–25.

[99] Hitchner, J.R., "Financial Valuation, Applications and Models," Third Edition, Wiley Finance, 2011, p. 966.

[100] Zeithammer Report, ¶¶ 93–94, and more generally §§ VI and VII.

[101] Zeithammer Deposition, p. 106:17–25.

transactions involving identical or similar assets or liabilities."[102]

80.     Academics and industry participants have also explained that, to be comparable, data assets must contain the same or similar data and exclude dissimilar data.[103] This is because "user data" is a highly heterogeneous good and not a commodity with a standard market value like a barrel of oil, so different types of user data will have different market values due to the interaction of different supply and demand conditions.[104] Prof. Zeithammer notes this when he indicates in his report that "both the value users place on the data they share with Screenwise and the recipient of the data places on that data may be different than the corresponding values in the context of [at-issue data] shared in [Bid Requests]."[105] As a result, some types of data (*e.g.*, basic age, gender, and location information) sell for almost nothing, while other types of data (*e.g.*,

---

[102] Hitchner, J.R., "Financial Valuation, Applications and Models," Third Edition, Wiley Finance, 2011, pp. 965–968. The *International Financial Reporting Standards (IFRS)* state that "[v]aluation techniques within the market approach are based on the concept of comparables, assuming that the value of an asset… can be measured by comparing it to similar assets… for which a market price is available." "Illustrative examples to accompany IFRS 13 Fair Value Measurement: Unquoted equity instruments within the scope of IFRS 9 Financial Instruments," International Financial Reporting Standards, December 2012, pp. 1–70, at p. 15, available at https://www.ifrs.org/content/dam/ifrs/supporting-implementation/ifrs-13/education-ifrs-13-eng.pdf. The *Financial Accounting Standards Board (FASB)* and *Governmental Accounting Standards Board (GASB)*, which establishes a common set of accounting rules, requirements and practices that comprise the U.S. Generally Accepted Accounting Principles (GAAP), also indicate that the "market approach uses… market transactions involving identical or comparable… assets." *See* Financial Accounting Standards Board, Accounting Standards Codification 820-10-55-3A, available at https://asc.fasb.org/1943274/2147482078/820-10-55-3A; "About the GASB," Governmental Accounting Standards Board, available at https://www.gasb.org/aboutgasb.

[103] Xiong et al. (2022) explain that the market "approach is suitable for data assets *similar* to other items in the active market," and it may not be applicable for measuring the value of data assets if similar data assets are not available in the market. (Xiong et al., "Recognition and Evaluation of Data as Intangible Assets," SAGE Open, April-June 2022, pp. 1–13, at p. 9, available at https://journals.sagepub.com/doi/pdf/10.1177/21582440221094600.) *Infonomics* also notes that the valuation of data assets must consider the various differentiating characteristics of the data, including objective data quality metrics (validity, completeness, integrity, consistency, uniqueness, precision, timeliness, accessibility) and subjective data quality metrics (existence, scarcity, relevancy, usability, interpretability, believability, and objectivity). (Laney, D.B., "Infonomics: How to Monetize, Manage & Measure Information as an Asset for Competitive Advantage," Gartner, 2017, pp. 246–251.)

[104] For example, Skatova et al. (2019) found that users place much higher value on banking and medical records data than on browsing history data. (Skatova A., et al, "Unpacking Privacy: Willingness to pay to protect personal data," *PsyArXiv*, May 12, 2019, Working Paper, available at https://psyarxiv.com/ahwe4/, pp. 1–42, at p. 20.) Google's ██████████████████████████████████████████████████████████████████████████████ (*See* GOOG-HEWT-00456337–347.)

[105] Zeithammer Report, ¶ 87.

medical or financial records) sell for much more.[106] For this reason, different bundles of data will have different value depending on the market value and quantity of each specific data contained in each bundle and it is not appropriate to use the market value of data that is *not* included in Bid Requests to determine the market value of Bid Request data.

### 2. *Prof. Zeithammer's Market Price Estimate is Unreliable*

81.    Prof. Zeithammer's "market price" estimate suffers from numerous problems that render his opinions unreliable.

82.    **First**, the information Prof. Zeithammer collected on Killi, Datacoup and Datacy is sparse and unreliable, as he admitted.[107] Indeed, his "research" is based primarily on a handful of news articles that he agrees are not comprehensive.[108] Prof. Zeithammer states that **Killi** asks users to provide their "date of birth, email address, gender, location, phone number, postal code and country," and that users "can earn more money by viewing client companies' online videos, sharing [their] browsing habits, taking surveys and sharing transaction data, such as where you shop and how much you spend."[109] He claims that users could get between $1 and $3 dollars per month, depending on how much data they share and how much they "participate in advertisers' marketing efforts."[110] But he does not explain what this Killi transaction data includes, how extensive it is, or why it is comparable to the at-issue data in Bid Requests.

---

[106] *See* Steel, E., "Companies scramble for consumer data," June 12, 2013, available at https://www.ft.com/content/f0b6edc0-d342-11e2-b3ff-00144feab7de, accessed on September 13, 2023.

[107] Zeithammer Deposition, p. 97:8–23.

[108] Zeithammer Deposition, pp. 143:6–145:13.

[109] Zeithammer Report, ¶ 90.

[110] Zeithammer Report, ¶ 90.

83.     Prof. Zeithammer's understanding of what data is collected by **Datacoup** comes from three ambiguous third-party articles; he does not cite any Datacoup company materials.[111] The description in his report is limited to the statement that the data Datacoup purchased is for "'directly linking online activity and spending' by linking browsing history and credit-card transactions."[112] His description of **Datacy** also comes from two third-party articles and is even less precise. The article states that Datacy "allows individuals to collect their browsing data, manage it, have it anonymized and aggregated with others and then sold."[113]

84.     Screenwise is the only vendor for which Prof. Zeithammer has relatively more information, and he states in his report that the Screenwise and at-issue data are not comparable:

> Screenwise also tracks types of user data that are not included in Google RTB (e.g., content of messages) and unlike Google RTB, which is largely focused on third-party participants that gain access to the User data, Screenwise is a program with primary utility to Google owned and operated products. Therefore, both the value users place on the data they share with Screenwise and the recipient of the data places on that data may be different than the corresponding values in the context of User Data shared in RTB bid requests.[114]

Despite identifying these differences between Screenwise and the at-issue data in Bid Requests, Prof. Zeithammer makes no adjustment to the user compensation for Screenwise based on the different types of data collected. Further, while he claims that he looked at Killi, Datacoup, and Datacy to "corroborate" the Screenwise price, his "corroboration" is unreliable because he does not confirm whether the type of user data collected by other vendors is similar to or different from the at-issue data. He acknowledged these differences may exist and may affect the value of

---

[111] Zeithammer Report, ¶ 91.

[112] Zeithammer Report, ¶ 91.

[113] Zeithammer Report, ¶ 92.

[114] Zeithammer Report, ¶ 87.

the data.[115]

85.    ***Second***, the data at issue and the data collected by these different programs are not comparable. **Figure 3** below compares (1) the data that may be (but often is *not*) included in at-issue Bid Requests to (2) the data and other activities that are covered by the compensation of the four vendors that Prof. Zeithammer uses as benchmarks. Because Prof. Zeithammer does not provide any specifics on what data and required activities the annual compensation for Killi, Datacoup, and Datacy covers, I used the internet archive Wayback Machine to obtain this information. As shown in **Figure 3,** the types of data collected by Datacoup, Datacy, and Killi are not remotely comparable to the data at issue in this case. Users provide financial information related to their spending or credit card transactions to Datacoup and Killi. Financial information, which is not included in Bid Requests, is the among the type of information that people value the most, and the market value of this data is higher than the market value of other information like user location.[116] Datacoup and Datacy require users to provide access to data from the users' social media accounts. All three vendors require users to provide personally identifiable information (*e.g.*, email) and demographic information. For instance, Datacy's Privacy Policy shows that users must provide a name and email address to create their account and that Datacy collects not just browsing data but also "data from social networking sites," "data residing on any third-party platforms, such as Twitter," and demographic data.[117] And the data shared with Killi

---

[115] Zeithammer Deposition, pp. 89:16–90:3; 91:3–11; 92:22–93:3; Prof. Zeithammer states: "The resulting market price of data sharing on Screenwise is [] only an approximation of the true market price of User Data shared in RTB bid requests, and it is important to corroborate the market price with other sources of evidence, *e.g.*, other markets for sharing personal user data." Zeithammer Report, ¶ 87.

[116] Skatova A., et al, "Unpacking Privacy: Willingness to pay to protect personal data," *PsyArXiv*, May 12, 2019, Working Paper, available at https://psyarxiv.com/ahwe4/, pp. 1–42, at p. 20.

[117] "Privacy & Data Policy," Datacy, November 17, 2021, available at https://datacy.com/privacy-policy.

includes date of birth, email address, and phone number.[118]

**Figure 3**
**Comparison of Data in Bid Requests and Data in Prof. Zeithammer's Sources[119]**

| # | Category of Data or Tasks | At-Issue Data | Screenwise | Datacy | Datacoup | Killi |
|---|---|---|---|---|---|---|
| | | | Prof. Zeithammer's "Four Vendors" | | | |
| **Time and Services** | | | | | | |
| 1 | Sign up for an account and accept terms of service | | X | X | X | X |
| 2 | Fill out a profile | | X | X | X | X |
| 3 | Log in from time to time to confirm accuracy of data | | X | | | |
| 4 | Install an app or browser extension | | X | X | X | X |
| 5 | Link other apps or accounts (*e.g.,* social networks) | | | X | X | X |
| 6 | Respond to profile questions or surveys | | X | X | X | X |
| **Other Restrictions** | | | | | | |
| 7 | Do not opt out of interest-based advertising | | X | | | |
| 8 | Do not use "do not track" features or ad blockers | | X | | | |
| 9 | Do not turn off location reporting services | | X | | | X |
| 10 | Do not use a VPN to mask your location | | | | | X |
| **Location Information** | | | | | | |
| 11 | Coarse Location information | X | | | X[2] | |
| 12 | Precise Location information (*e.g.,* latitude and longitude coordinates, GPS signals) | | X | | | X |
| 13 | Home, mailing, and/or work address | | X | | | |
| **Identifiers and Identifying Information** | | | | | | |
| 14 | Anonymized pseudonymous cookie | Sometimes | X | | | |
| 15 | Pseudonymous cookies | | X | | | X |
| 16 | Other user IDs | | X | | | |
| 17 | Name | | X | X | X | |
| 18 | Nickname | | X | | | |
| 19 | Phone number | | X | | | X |
| 20 | Email address | | X | X | X | X |
| 21 | Information associated with Google account (*e.g.,* YouTube username) | | X | | | |
| **Demographic Information** | | | | | | |
| 22 | Date of birth | | X | | | X |
| 23 | Age | | X | X | X | X |
| 24 | Gender | | X | X | X | X |
| 25 | Languages spoken | | X | | | |
| 26 | Education and training | | X | X | X | |
| 27 | Marital status | | X | X | | |
| 28 | Profession | | X | | | |
| 29 | Income | | X | X | | |
| 30 | Monthly spending | | | | X | |
| 31 | Race and/or ethnicity | | X | X | | X |
| 32 | Number of members in the household | | X | | | |
| 33 | Demographic information about members of the household | | X | | | |
| 34 | Unspecified "demographic data" | | | | X | X |
| **Internet Browsing Activity** | | | | | | |
| 35 | Current URL visited | Sometimes | X | X | | X |
| 36 | Information about browsing history | | X | X | | X |
| 37 | Data from linking third-party platforms (*e.g.,* social networks) | | | X | X | |
| 38 | Data from online purchases (e.g., vendor name, date, purchase amount) | | | | X | X |
| **Device Information and Other Information** | | | | | | |
| 39 | Information about device model, platform, and/or browser | X | X | X | | X |
| 40 | Use of telephone, email, SMS, and instant messaging | | X | | | |
| 41 | Content of the user's screen at any time | | X | | | |
| 42 | Data associated to clicks and taps on a screen | | X | | | |
| 43 | Information input when visiting websites, including SSNs and credit card numbers | | X | | | |
| 44 | Information from motion, environmental, and position sensors on a device | | X | | | |
| 45 | System information, including crashes, use of airplane mode, battery, and storage | | X | | | |
| 46 | Information on Wi-Fi networks, data usage, and Bluetooth devices used | | X | | | |
| 47 | List of mobile applications installed | | | | | X |
| 48 | Information about permissions set in app | | | | | X |

---

[118] "Privacy Policy," Killi, June 23, 2021, https://killi.io/privacy-policy/.

[119] For notes and sources, *see* **Exhibit 7.**

86.    As **Figure 3** likewise shows (and Prof. Zeithammer partially acknowledges), the $3 payment compensates Screenwise participants for many types of data and activities never included in Bid Requests, including:

- Providing personally identifiable demographic information (*e.g.,* name, home, work and shipping address, phone numbers, email address(es) and date of birth);

- Providing demographic data about the panelist and other members of their household (*e.g.,* age, gender, languages spoken, education, marital status, profession, personal income, household income, and number of children);

- Providing financial information (*e.g.,* Social Security Number, or credit card number);

- Providing information about devices (e.g., phones and SMS) and activity (*e.g.,* duration of calls, phone numbers contacted, and timestamps of emails) when users are not browsing the internet;

- Providing system information (*e.g.,* crashes, "airplane mode" use, frequency of use, battery and charging status, use of local storage space).[120]

The Screenwise payment is also for continuous data collection that is not analogous to the occasional Bid Requests for Proposed Class Members. The payment also compensates users for logging into their Google accounts "from time to time" and confirming that their information is up to date and accurate, and restricts panelists from opting out of personalized advertising, using "do not track" features, using ad blockers, and turning off "location reporting" or similar services.[121]

---

[120] "Google Panel Privacy Policy," Ipsos Screenwise Panel, available at https://screenwisepanel.com/google-panel-privacy-policy, "Ipsos Screenwise Panel Privacy Policy," Ipsos Screenwise Panel, available at https://screenwisepanel.com/ipsos-Sow-privacy-policy.

[121] "Google Panel Terms & Conditions," Ipsos Screenwise Panel, available at https://screenwisepanel.com/google-panel-terms-condition.

87.     **Third**, Prof. Zeithammer's "market price" analysis is also unreliable because the nature of the different transactions within the different programs are not comparable. Unlike RTB, which involves occasional, passive transmission of data in Bid Requests, each of the programs relied on by Prof. Zeithammer as benchmarks require participants to complete various tasks. **Figure 3** shows that payments from all three vendors include consideration for **time spent** (*e.g.*, watching videos) and **services provided** (*e.g.*, taking surveys) by users (which are not required of Proposed Class Members). For example, Datacy required users to create accounts, link data sources, answer profile questions, install the Datacy browser extension,[122] and answer "targeted surveys" from advertisers.[123] Killi required users to provide "opinions on advertising related questions," and respond to surveys.[124] Datacoup required users to build an online profile where they linked certain social media accounts (*e.g.,* Facebook, Twitter, LinkedIn) and credit or debit cards one by one so their data could be collected.[125]

88.     The at-issue data consists of limited data fields shared without any expectation of time spent or services being provided by the Proposed Class Members. The time spent and services provided would require compensation and generate a market value different from the value of only the limited at-issue data, which is also different from the financial and other data shared in the proposed benchmarks.

3.     *The Pricing Estimates Used by Prof. Zeithammer Are Not Reliable*

89.     In addition to the problems identified above, there are other concerns with the actual pricing estimates Prof. Zeithammer uses that render them unreliable and inflated. First,

---

[122] "Privacy & Data Policy," Datacy, November 17, 2021, available at https://datacy.com/privacy-policy.

[123] "Consumer Insights Platform," Datacy, available at https://datacy.com/platform/uncover.

[124] "Privacy Policy," Killi, January 23, 2023, https://killi.io/privacy-policy/.

[125] "Datacoup FAQs," Datacoup, https://web.archive.org/web/20161220073524/https://datacoup.com/docs#faq.

three sources do not appear to have been stable, ongoing enterprises with large numbers of users during the Class Period. Valuation standards instruct that the valuation professional must analyze whether the market for the asset being valued is active. Transactions may be distorted and not indicative of fair value "if the market for the asset is not active."[126] Inactive market is defined as having "not sufficient frequency and volume to provide pricing information on ongoing basis," "price quotations [that] vary substantially either over time or among the market makers," "price quotations are not based on current information" or "little information [] released publicly."[127] Three vendors appear to have been inactive or have undergone substantial changes. For example:

- **Datacoup** shut down its operations in 2019 "because users were only making paltry sums of money."[128]

- Datacy appears to be inconsistent in its availability. A recent attempt on August 17, 2023 by my support team to sign up for **Datacy** resulted in being placed on a position number 20,417 on a "waitlist"—the company states that they are "working hard at getting Datacy ready for you to try" and offer a link to refer other users in exchange for "cut[ting] the queue" where the user appears to be placed in. Another attempt on September 26, 2023, did not receive a similar message. This variability is not consistent with an established and regular market for user data. See **Exhibit 8**.

- **Killi**, which is still in existence today (albeit under a rebranded name of Reklaim[129]), has changed the compensation structure away from cash compensation to include redeemable points, but there is no clear description of what it takes to earn points, how many points can be earned for providing different data and activities, or how the points should be valued.[130]

---

[126] Hitchner, James R., "Financial Valuation, Applications and Models," Third Edition, Wiley Finance, 2011, pp. 967–968.

[127] Hitchner, James R., "Financial Valuation, Applications and Models," Third Edition, Wiley Finance, 2011, pp. 967–968.

[128] Ramaswamy, A., "Caden launches with $3.4M to help consumers take control of their data," TechCrunch, January 20, 2022, available at https://techcrunch.com/2022/01/20/caden-launches-with-3-4-million-to-help-consumers-take-control-of-their-data, accessed on September 7, 2023.

[129] "Welcome to Reklaim," Reklaim, available at https://www.reklaimyours.com/learn/welcome-to-reklaim, accessed on September 26, 2023.

[130] "The More You Share, The More You Earn," Reklaim, available at https://www.reklaimyours.com/how-to-earn, accessed on September 26, 2023.

90.    Second, it appears that Prof. Zeithammer uses hypothetical compensation that Killi *might* pay users without explaining what is covered by that payment. He states that Killi has three payment tiers: users have the potential to get $1, $2 or $3 per month from Killi depending on their tier. Still, Prof. Zeithammer uses as a benchmark the payment of $3 per month for the highest, "Elite," tier.[131] He claims, without any discussion or analysis, that this tier is the most comparable to the at-issue data.[132] Yet, Prof. Zeithammer acknowledges that the amount users could get depends on how much they share and "participate in advertisers' marketing efforts," which means that, on average, participants get less than $3 per month.[133] Prof. Zeithammer's use of the highest payment is also inconsistent with his own methodology. In the case of Datacy, he used the average monthly payment and not the highest payment.

### B.    The Variation in the Quantity and Type of Data Included in Individual Bid Requests Means That Individualized Inquiry Would Be Necessary to Determine Estimated Compensatory Damages

91.    Another problem that Plaintiffs' Experts' have not addressed involves estimating the **quantity** and **mix** of information actually shared through RTB, and doing so would require individualized inquiry. As discussed in **Section III.B** above, Bid Requests *did not* share the same amount and type of data for all Proposed Class Members over the entire Class Period. For example, I understand that most of the at-issue data elements were removed from Bid Requests processed using restricted data processing, which applied in various situations during the Class

---

[131] Zeithammer Report, ¶ 90. Prof. Zeithammer notes that Killi added a tier called "All-Star" "more recently," and excludes the pricing for this tier from his analysis. Killi's website notes that, presently, users in the Elite tier earn 300 points per month, whereas users in the All-Star tier earn 100 points more than "Elite" users for providing additional types of data. (*See* "What are the different Killi Paycheck tiers?" Killi, available at https://killi.io/faqs/what-are-the-different-killi-paycheck-tiers/, accessed on August 30, 2023.)

[132] Zeithammer Report, ¶ 90.

[133] Zeithammer Report, ¶ 90.

Period.[134] Similarly, Bid Requests involving Proposed Class Members who used Safari or Firefox after the browsers blocked third-party cookies by default would not have a Google user ID value in the Bid Requests.[135]

92.    Even if Plaintiffs' Experts had developed a reliable estimate of the market value of sharing *all* possible components of the at-issue data (which they have not done), this would not suffice to estimate damages because it does not account for the fact that Google account holders did not always have all possible components of the at-issue data shared, and in fact have different types and quantity of data shared in Bid Requests. Individualized and time-consuming inquiry would be necessary to determine and value the actual data that was shared given the many factors that affect whether and which data was included in Bid Requests during the Class Period.[136] Various factors would cause data variation, including:

- Browsers that automatically blocked third-party cookies (*e.g.,* Safari or Firefox at different points in time);

- Third-party software that blocked third-party cookies or other at-issue data from being shared;

- Software or hardware settings by device and browser that blocked third-party cookies or other at-issue data from being shared;

- Google internal policies and data logic that prevented third-party cookies or other at-issue data from being shared (*e.g.,* no Bid Requests for Proposed Class Members detected to be younger than 13 years of age, and limited or no at-issue data shared in Bid Requests for Proposed Class Members who were between 13 and 18 years of age).

---

[134] Restricted data processing is a Google process through which Google omits certain data about a user from Bid Requests. Striegel Report ¶¶ 73–75. For example, from 2019 (when Google first introduced RDP) to 2021, Google did not send out Bid Requests when RDP processing was used, which means no data was shared for users. In 2021, Google enabled bid requests to be sent under RDP processing, but limited what data was shared, by completely redacting some data (*e.g.*, Google ID and other user IDs) and limiting or generalizing other information (e.g., geolocation data). Berntson Deposition, pp. 61:2–19, 67:5–69:25, 71:14–77:22, 81:3–20.

[135] Striegel Report ¶¶ 82–83.

[136] I understand that the data required to do a complete accounting of data fields that were shared in Bid Requests during the Class Period does not exist. Regan Report, ¶ 55.

93.    Individualized inquiry would be required to develop reliable estimates, by time period, for the *quantity* of data shared in Bid Requests for all Proposed Class Members during the Class Period.

## VI.    THE PROPOSED CLASS CONTAINS UNHARMED PROPOSED CLASS MEMBERS WHO CANNOT BE IDENTIFIED WITHOUT INDIVIDUALIZED INQUIRY

94.    An analysis of economic damages considers the difference between Proposed Class Members' economic position in the actual world and their economic position in the but-for world, thus isolating the economic effect, if any, of the disputed conduct.[137] While this economic analysis typically involves an assumption that the disputed conduct occurred, it does not require an assumption that *all* Proposed Class Members are economically disadvantaged, and any proposed damages model must account for this. Put differently, from an economic perspective, if some or all Proposed Class Members are not economically worse off in the but-for world, they are unharmed and should be excluded from damages calculations.

95.    However, Mr. Regan assumes that all Proposed Class Members have been harmed by the disputed conduct. Based on that assumption, he has not proposed a method to identify and exclude *any* unharmed Proposed Class Members from his damages models. Thus, if his assumption of harm to all Proposed Class Members is inaccurate, his class-wide damages models are unreliable as they would include damages for unharmed Proposed Class Members.

96.    Based on my review and analysis, I find Mr. Regan's assumption of harm to all Proposed Class Members to be unsupported. There are many possible combinations of understanding, knowledge, choices, and preferences among Proposed Class Members that would

---

[137] Allen, M.A., et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence, Third Edition*, The National Academies Press, 2011, p. 432.

cause a substantial portion of them to be unharmed. For example, if a Proposed Class Member understood Google's Privacy Policy to mean that Google would share the at-issue data with advertisers and still used Google's services, then that implies that the person must either: (1) not care about the data sharing at all; or (2) likes the personalization that is the by-product of the sharing. In both situations, the person's economic position in the actual world with data sharing is the same as or better than in the but-for world, and this person would be unharmed. So too for a Proposed Class Member who learned of the disputed data sharing through public sources and did nothing to prevent data sharing.

97.     Mr. Regan cannot calculate unjust enrichment from harmed Proposed Class Members without having a class-wide method to identify and exclude unjust enrichment from unharmed Proposed Class Members. Likewise, if the number of harmed Google account holders cannot be calculated on a class-wide basis, then compensatory damages (which are a direct function of the number of Proposed Class Members) cannot be calculated on a class-wide basis.

98.     Mr. Regan could not remedy this flaw in his damages model because substantial and time-consuming individualized inquiry would be necessary to identify unharmed Proposed Class Members. For instance, what each Proposed Class Member knew or how they understood the Privacy Policy is influenced by many things, including: individual experiences; knowledge gained through education, vocational training, and work experience; information learned from, among other things, talking to others, and/or read or heard from public sources; tendencies to research different topics; and sensitivity to privacy. The existence of multiple paths that would lead to unharmed Proposed Class Members and Mr. Regan's failure to propose a common methodology for calculating damages for *only* harmed Proposed Class Members render his proposed methodologies flawed and unreliable.

99.    Below, I discuss in more detail why Proposed Class Members may be unharmed, and why these reasons may affect large numbers of Proposed Class Members.

A.    **Reason 1: Lack of Harm Due to** <u>**Proposed Class Members' Understanding**</u> **of Data Sharing**

100.    A core question in the determination of the fact of harm is whether a Google account holder **understood** that their at-issue data would be shared with third parties in Google RTB. From an economic perspective, consumers' preferences can sometimes be, at least partially, inferred from their past choices. In economics, the "revealed preference" theory states that, if a consumer chooses option A instead of another attainable option B, then that choice means that the person believes they are better off with option A than with option B. Otherwise, they would have chosen option B in the first place.[138] In this case, a Proposed Class Member who is aware of Google's sharing of the at-issue data and decides to continue to use Google products instead of choosing other attainable options (*e.g.,* using browsers that prevent the sharing of the at-issue data) is consistent with Google's sharing of the at-issue data not causing the Proposed Class Member to be in an economically inferior position.

101.    In economic terms, lack of action to protect data privacy or investigate how to do so upon learning of data sharing in Bid Requests may reveal that Proposed Class Members either (1) do not care about the data that is being shared, or (2) even if they do care, the benefits they obtain from the sharing exceed the costs of sharing. This means that, from an economic perspective, Proposed Class Members would be unharmed if they were aware of this data sharing before they created a Google account. Proposed Class Members may also be unharmed if they did nothing to protect their data after becoming aware (even if they already had a Google

---

[138] Pindyck and Rubinfeld, "Microeconomics," 8th Edition, Pearson, 2013, pp. 92–95.

account).

102.     While determining what different Proposed Class Members knew about Google's data sharing would require individual inquiry, the results of Prof. Hanssens's survey analysis conducted in this case suggest that a large share of Google account holders think that it is somewhat or very likely that Google shares with potential advertisers information that Plaintiffs claim is personal information when Google account holders visit websites (or use apps) that display targeted ads.[139] Prof. Hanssens also finds that there is heterogeneity in the expectations of Google account holders depending on whether the information in question is their partial IP address, the URL of the website, the content categories in which Google classifies the website, their browser cookies, or the characteristics of their web browser and device.[140]

103.     Consistent with this finding, numerous public sources were available to inform Proposed Class Members about the sharing of the at-issue data. Thus, individualized inquiries would be necessary to ascertain what different Proposed Class Members read, encountered, or knew about Google's sharing of information in Bid Requests, and what actions they took and why upon gaining that knowledge. Below is a partial list of the many sources from which account holders could have learned about the data sharing.

104.     *Source 1: Website Pop-Ups about Cookies and Use of Data.* After the enactment of CCPA in January 2020, websites began displaying "pop-ups" that inform users about the use of cookies to personalize advertising. These pop-up banners often include descriptions of how cookies are being used for advertising and provide links to the publisher's disclosures like

---

[139] Expert Report of Dominique Hanssens, in In re Google RTB Consumer Privacy Litigation, Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023 ("Hanssens Report"), ¶¶ 8, 53–54.

[140] Hanssens Report ¶¶ 8, 53.

privacy policies. The banners also allow users to opt out of cookie use and sharing.[141] Although

CCPA is specific to California, I understand that the majority of websites made this opt-out

choice available regardless of jurisdiction.[142]

105.    Proposed Class Members who took time to review these CCPA disclosures may

have expected that, if they do not reject cookies for advertising purposes, those cookies would be

shared with advertisers. The information available through these banners is consistent with both

(1) widespread understanding that data is shared with third parties, and (2) that Proposed Class

Members are faced with making choices about whether to protect data when reminded of data

sharing. These are inconsistent with Mr. Regan's assumption of harm to all Proposed Class

Members.

106.    Studies show that a substantial portion of users accept the use of cookies after

seeing these pop-up banners either by selecting the accept or allow buttons, or by not taking

action to block the sharing of cookies.[143] Prof. Hanssens reached similar conclusions in his

surveys of Google account holders. Specifically, he found that most Google account holders

have seen privacy popups or banners when they visited websites that display advertising and

that, upon seeing these banners or popups, a majority of them either accept all cookies or policies

---

[141] Augustinos, T., "The Effective Date of the California Consumer Privacy Act of 2018 Has Come and Gone: What To Do Now?" JD Supra, April 8, 2020, available at https://www.jdsupra.com/legalnews/the-effective-date-of-the-california-44990/; Hautala, Laura, "Pop-ups about cookies constantly interrupt you online. Here's how they could go away," CNET, December 28, 2020, available at https://www.cnet.com/news/privacy/why-youre-hounded-by-pop-ups-about-cookies-and-how-they-could-go-away/.

[142] "IAB CCPA Benchmark Survey Summary," Interactive Advertising Bureau, November 12, 2020, available at https://www.iab.com/insights/iab-ccpa-benchmark-survey/, accessed on August 25, 2023. This survey finds that approximately 60 percent of businesses made this opt-out choice available to users "regardless of jurisdiction." *See also,* Hautala, Laura, "Pop-ups about cookies constantly interrupt you online. Here's how they could go away," CNET, December 28, 2020, available at https://www.cnet.com/news/privacy/why-youre-hounded-by-pop-ups-about-cookies-and-how-they-could-go-away/ ("Additionally, companies including Mozilla and Microsoft have already extended privacy rights guaranteed in the previous California privacy law to all US users. Businesses may do the same thing with the new law, proactively offering to honor the browser setting beyond California.")

[143] See discussion in ¶ 48 above, where I discuss that the vast majority of users are *not* opting out of the sharing and "sale" of data using these pop-ups.

or ignore the popup by not interacting with it or closing it.[144] Importantly, he found that there is substantial heterogeneity in how Google account holders interact with privacy popups and banners.[145]

107.    ***Source 2: Publicly Available Articles***. Numerous publicly available articles have disclosed that Google shares the at-issue information with advertisers. The following are some representative examples:

- In 2018, PR Newswire reported that Brave Software filed a complaint against Google in the EU accusing Google of exposing alleged personal information in RTB bid requests.[146]

- In 2019, the BBC published an article about Google's alleged sharing of data in Bid Requests and informed users of their option to find out "exactly how much information they are giving away" using a linked website to an Electronic Frontier Foundation research project, which "can reveal the extent to which your browsing is being tracked."[147]

- A March 2020 article by the Electronic Frontier Foundation informed readers that "[Google] shares data with advertisers directly and asks them to bid on individual ads" in Google's RTB auctions.[148]

- In 2021, Vice published an article informing readers that ad tech companies,

---

[144] Hanssens Report ¶¶ 9, 55–57.

[145] Hanssens Report ¶ 56.

[146] "Regulatory complaint concerning massive, web-wide data breach by Google and other 'ad tech' companies under Europe's GDPR; The complaints are being made by Dr Johnny Ryan of Brave, the private web browser, Jim Killock, Executive Director of the Open Rights Group, and Michael Veale of University College London," PRNewswire, September 12, 2018, available at https://www.prnewswire.com/news-releases/regulatory-complaint-concerning-massive-web-wide-data-breach-by-google-and-other-ad-tech-companies-under-europes-gdpr-the-complaints-are-being-made-by-dr-johnny-ryan-of-brave-the-private-web-browser-jim-killock-executive-d-300711726.html, accessed on August 24, 2023.

[147] Wakefield, J., "Google's 'secret web tracking pages' explained," BBC, September 5, 2019, available at https://www.bbc.com/news/technology-49593830, accessed on August 24, 2023.

[148] Cyphers, B., "Google Says It Doesn't 'Sell' Your Data. Here's How the Company Shares, Monetizes, and Exploits It.," Electronic Frontier Foundation, March 19, 2020, available at https://www.eff.org/deeplinks/2020/03/google-says-it-doesnt-sell-your-data-heres-how-company-shares-monetizes-and#:~:text=Real%2Dtime%20bidding%20is%20the,hundreds%20of%20different%20adtech%20companies, accessed on August 24, 2023.

including Google, share data with third-parties via RTB.[149]

I understand that the Declaration of Mr. Whitty Somvichian, submitted in this matter on September 29, 2023, lists additional articles that were published during the relevant period and informed readers of the data that was shared in Bid Requests/RTB auctions.[150]

108.    ***Source 3: Information from Companies That Provide Privacy Tools***. Companies that offer privacy enhancing products and compete with Google products have a strong economic incentive to publicize or inform users of Google's sharing of the at-issue data in order to encourage consumers to use their products. One example of such company is Brave Software, a U.S.-based company that offers a browser called Brave, which competes with Google Chrome, and an advertising network that competes with Google.[151] While Brave is nowhere near as large as Google, its efforts are again consistent with information being widely available. During the Class Period, Brave expanded from 1.2 million monthly worldwide active users in 2017 to over 57 million in 2023.[152]

109.    Brave has publicly disseminated information about the type of user information

---

[149] Cox, J., "The Hundreds of Little-Known Firms Getting Data on Americans," Vice, June 28, 2021, available at https://www.vice.com/en/article/n7bdkq/hundreds-companies-bidstream-data-location-browsing, accessed on September 7, 2023.

[150] Declaration of Whitty Somvichian in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, in *In re Google RTB Consumer Privacy Litigation*, Case No. 4:21-cv-02155-YGR (VKD), September 29, 2023, Exs. 45–54.

[151] Collins, B., "Google Chrome: Three Rival Browsers That Put It To Shame," Forbes, September 12, 2020, available at https://www.forbes.com/sites/barrycollins/2020/09/12/google-chrome-three-rival-browsers-that-put-it-to-shame/?sh=7558a676e1c8, accessed on August 24, 2023; "The best alternatives to Google Ads," Brave, July 18, 2023, available at https://brave.com/web3/google-ads-alternatives/, accessed on August 24, 2023.

[152] "Brave Passes 50 Million Monthly Active Users, Growing 2x for the Fifth Year in a Row," Brave, January 5, 2022, available at https://brave.com/2021-recap/, accessed on August 24, 2023; BraveBat, "Brave Browser Active Users," available at https://bravebat.info/brave_browser_active_users, accessed on September 7, 2023. Approximately 37.5% of Brave's traffic come from U.S. devices. *See* Balderson, K., "17 Brave Browser Market Share and Other Brave Statistics," VPN Central, available at https://vpncentral.com/brave-browser-market-share/, accessed on September 22, 2023.

that Bid Requests may contain, issuing numerous blogs on this subject in 2019.[153, 154] Brave also published a webpage called "RTB Evidence" with links to dozens of documents that, according to Brave, contain "[p]roof that… personal data were broadcast by Google" in Bid Requests.[155]

110.     ***Source 4: Google Information and Websites***. Google also publicly disclosed the type of information it included in Bid Requests. For example, a 2019 Google blog informed users that Google shares data, including truncating device IP addresses, user IDs, and contextual content categories (which were later deprecated), in Bid Requests.[156] Furthermore, Google's public webpage titled "Introduction to real-time bidding (RTB)" discloses that participants "receive pre-filtered ad call parameters" like URL, truncated IP address, encrypted user cookie, and some targeting information.[157] I understand that Google made additional disclosures about the information included in Bid Requests and that those disclosures are described in the

---

[153] GDPR is an E.U. data protection law that went in effect in May 2018. *See* Wolford, B., "What is GDPR, the EU's new data protection law?" GDPR.EU, available at https://gdpr.eu/what-is-gdpr/, accessed on September 22, 2023. GDPR affects not only European websites, but also US websites with European readership. *See* Marotta, et al., "Online Tracking and Publisher's Revenues: An Empirical Analysis," May 2019, pp. 1–35, at p. 28.

[154] *See, e.g.,* Ryan, J., "Regulatory complaint concerning massive, web-wide data breach by Google and other 'ad tech' companies under Europe's GDPR," Brave, September 12, 2018, available at https://brave.com/adtech-data-breach-complaint/, accessed on September 22, 2023; Ryan, J., "Brave uncovers Google's GDPR workaround," Brave, September 4, 2019, available at https://brave.com/google-gdpr-workaround/, accessed on September 22, 2023; Ryan, J., "Google and IAB's inadequate proposals to reform RTB," Brave, January 21, 2020, available at https://brave.com/google-iab-reform/, accessed on August 24, 2023; Ryan, J., "A summary of the ICO report on RTB – and what happens next," Brave, June 26, 2019, available at https://brave.com/ico-adtech-update-rtb/, , accessed on August 24, 2023; Ryan, J., "New evidence to regulators: IAB documents reveal that it knew that real-time bidding would be 'incompatible with consent under GDPR,'" Brave, February 20, 2019, available at https://brave.com/update-on-gdpr-complaint-rtb-ad-auctions/, accessed on September 22, 2023.

[155] For instance, the webpage contains links to information like a "[r]eport on personal data in Real Time Bidding" and an "explanatory document" on "RTB header bidder evidence." *See* "RTB evidence: Selected evidence submitted to data protection authorities to demonstrate RTB's GDPR problems," Brave, available at https://brave.com/rtb-evidence/, accessed on August 24, 2023; Ryan, J., "Report from Dr. Johnny Ryan – Behavioral advertising and personal data," Brave, available at https://brave.com/static-assets/files/Behavioural-advertising-and-personal-data.pdf, accessed on August 24, 2023; Ryan, J., "RTB Header Bidder Evidence – Explanatory Document," Brave, September 2, 2019, available at https://brave.com/static-assets/files/explanatory_note_google_RTB_and_push_pages.pdf, accessed on August 24, 2023.

[156] Bindra, C., "Additional steps to safeguard user privacy," Google Ad Manager, November 14, 2019, available at https://blog.google/products/admanager/additional-steps-safeguard-user-privacy/, accessed on August 25, 2023.

[157] "Introduction to real-time bidding (RTB)," Google Authorized Buyers Help, available at https://support.google.com/authorizedbuyers/answer/6136272?hl=en, accessed on August 24, 2023.

Declaration of Suneeti Vakharia.[158]

**B.     Reason 2: Lack of Harm Due to <u>Proposed Class Members Taking Actions to Prevent</u> Data Sharing**

111.     If Google did not share any at-issue data for a Proposed Class Member in Bid Requests, then that Proposed Class Member could not have suffered harm because their economic position is the same in the actual and but-for worlds.[159]

112.     During the Class Period, Google account holders were able to take actions to avoid data sharing, and thus avoid harm. I understand that several companies offer private browsers and software products known as "blockers" that block data collection and sharing and prevent Google from being able to share at-issue data with ABs and OBPs. Individualized inquiry would be required to determine whether Proposed Class Members used any of these tools. Mr. Regan proposes no method for identifying and excluding these account holders who did have privacy concerns and were able to avoid harm.

113.     As discussed above, the Brave Browser prevents sharing of data in Bid Requests and had over 57 million active users worldwide as of 2023.[160] The ads on Brave are populated using Brave's own advertising platform that works only if users opt in.[161] Thus, the ads Proposed Class Members see on sites accessed using Brave are not populated using Google's RTB process.

---

[158] Declaration of Suneeti Vakharia ¶ 4.

[159] Allen, M.A., et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, p. 432.

[160] "Brave Passes 50 Million Monthly Active Users, Growing 2x for the Fifth Year in a Row," Brave, January 5, 2022, available at https://brave.com/2021-recap/, accessed on August 24, 2023; "Brave Browser Active Users," BraveBat, available at https://bravebat.info/brave_browser_active_users, accessed on September 22, 2023.

[161] "Brave Ads FAQ," Brave, available at https://support.brave.com/hc/en-us/articles/360026361072-Brave-Ads-FAQ, accessed on August 24, 2023; "How do I opt-in to Brave Ads?," Brave, available at https://support.brave.com/hc/en-us/articles/360026648512-How-do-I-opt-in-to-Brave-Ads-, accessed on September 25, 2023.

114.    Another product that works even with the major browsers like Chrome and Safari is Ghostery's browser extension called "Tracker & Ad Blocker," which users can use when they access the internet using browsers like Chrome and Safari. I understand Ghostery prevents sharing of data in Bid Requests. The company describes its browser extension as a "privacy ad blocker" that "[b]locks ads, cookies, popups & other trackers"[162] "on websites you browse to control who collects your data," and "anonymizes [] data to further protect [user] privacy."[163] Specifically, Ghostery's "algorithm [] automatically detects and overwrites potential identifiers in the data submitted to trackers."[164] Therefore, for the millions of users who use an extension like Ghostery, it appears that the data that is transmitted is not the data of the user, but the data that Ghostery's algorithm includes.[165]

115.    Finally, there are widely used free ad blockers that Proposed Class Members could have used to block ads on browsers. Three examples are AdBlock (presently used by over 60 million people worldwide), AdBlock Plus (reportedly used by over 100 million users

---

[162] "Ghostery Tracker & Ad Blocker for Any Device," Ghostery, available at https://www.ghostery.com/ghostery-ad-blocker, accessed on August 24, 2023.

[163]"Ghostery – Privacy Ad Blocker Extension for Chrome," Chrome Stores, available at

https://chromestores.com/extension/ghostery-extension-chrome/#google_vignette, accessed on August 31, 2023.

[164] Schiff, A., "Ghostery Sheds Its Ad Tracker, Sells Off Its Plug-In To Focus On Compliance," AdExchanger, February 15, 2017, available at https://www.adexchanger.com/data-exchanges/ghostery-sheds-ad-tracker-sells-off-plug-focus-compliance/, accessed on August 24, 2023. Ghostery describes its anti-tracking feature as follows: "The Anti-Tracking feature is a heuristic approach to real-time, algorithmic tracking protection. Like Ghostery's Ad-blocking, it monitors all third-party requests. However, instead of simply blocking those requests, it analyzes them for personally identifiable information and then strips out that information before the request is sent. Anti-Tracking supplements Ghostery's block-list approach by catching anything that might have been missed. Therefore, even if trackers are allowed to execute, you can feel safe knowing that all personal information has been anonymized in the request." *See,* "Frequently Asked Questions," Ghostery, available at https://www.ghostery.com/faq, accessed on September 22, 2023.

[165] Konrad, T., "Cliqz buys Ghostery's consumer operations," Cliqz, February 15, 2017, available at https://cliqz.com/en/magazine/press-release-cliqz-acquires-ghostery, accessed on August 24, 2023. "Ghostery Privacy Browser," Aptoide, available at https://ghostery.en.aptoide.com/app, accessed on September 7, 2023; Barrett, B., "Ghostery's Making a Privacy Browser–and Ad-Free Search Engine," Wired, November 18, 2020, available at https://www.wired.com/story/ghostery-browser-search-ad-free/, accessed on September 7, 2023.

worldwide in 2016), and uBlock Origin, which provides "a free and open-source, cross-platform browser extension for content filtering" for 10 million global users on Chrome alone.[166] To the extent Bid Requests are not sent in instances when Proposed Class Members block ads by using ad blockers, those Proposed Class Members would not be harmed in this case.

116.    Obtaining information on which Google account holders used these or similar products during which time periods would require individualized inquiry.

## C.    Reason 3: Lack of Harm Due to Benefits Received Exceeding Costs

117.    From an economic perspective, when calculating how much to award Proposed Class Members for the value of the at-issue data shared in Bid Requests, damages should be offset by any benefits they received from the sharing of the at-issue data. To determine whether a Proposed Class Member was economically harmed by the disputed conduct, one must first identify the costs to the user from the at-issue data sharing, and then offset from those costs any benefits that the user might have derived *because* of the at-issue data sharing.[167]

118.    Neither the cost nor the benefit to a Proposed Class Member from the at-issue data

---

[166] "AdBlock – best ad blocker," Chrome Web Store, available at https://chrome.google.com/webstore/detail/adblock-%E2%80%94-best-adblocker/gighmmpiobklfepjocnamgkkbiglidom, accessed on August 31, 2023; Maheshwari, S., "Adblock Plus, Created to Protect Users From Ads, Instead Opens the Door," The New York Times, September 18, 2016, available at https://www.nytimes.com/2016/09/19/business/media/adblock-plus-created-to-protect-users-from-ads-opens-the-door.html, accessed on August 31, 2023; "Allowing Acceptable Ads in Adblock Plus," Adblock Plus, available at https://adblockplus.org/en/acceptable-ads#optout, accessed on September 25, 2023; "uBlock Origin – Free, open-source ad content blocker," uBlock Origin, available at https://ublockorigin.com/, accessed on September 1, 2023; "uBlock Origin," Chrome Web Store, available at https://chrome.google.com/webstore/detail/ublock-origin/cjpalhdlnbpafiamejdnhcphjbkeiagm, accessed on August 31, 2023. uBlock also has more than 9 million users on Microsoft Edge and more than 6 million users on Firefox. *See,* "uBlock Origin," Microsoft Edge Add-ons, available at https://microsoftedge.microsoft.com/addons/detail/ublock-origin/odfafepnkmbhccpbejgmiehpchacaeak, accessed on August 31, 2023; "uBlock Origin," Firefox Browser Add-Ons, available at https://addons.mozilla.org/en-US/firefox/addon/ublock-origin/, accessed on August 31, 2023.

[167] As one study put it, "individuals are consciously weighting costs (e.g. giving up privacy) and benefits… of their actions" when making decisions and "[w]hat choice users make depends on their preferences." Krasnova, H., et al, "Investigating the Value of Privacy in Online Social Networks: Conjoint Analysis," *Thirteenth International Conference on Information Systems*, 2009, Conference Paper, available at https://www.researchgate.net/publication/221599995_Investigating_the_Value_of_Privacy_in_Online_Social_Networks_Conjoint_Analysis, pp. 1–18, at p. 3.

sharing can be determined via common methods on a class-wide basis. Individualized inquiry is necessary because both the cost and the benefit to each person are a function of multiple factors that vary Class Member-to-Class Member, and which cannot be known on a class-wide basis. Specifically, the cost to each Proposed Class Member of the data sharing is a function of the person's sensitivity to and expectation of privacy, and the quantity and type of at-issue data shared in Bid Requests. And the amount of benefits the Proposed Class Member received also varies because of the data sharing is a function of the utility each Proposed Class Member received in the form or savings and other benefits.

119. The available evidence suggests that a substantial portion of Proposed Class Members derive benefits that exceed the costs of Google's at-issue data sharing.

*1. Available data suggests a substantial share of Proposed Class Members having* **low to no costs** *of data sharing*

120. The Named Plaintiffs allege that they have privacy expectations and desire to control the sharing of their data.[168] They reference public information regarding user preferences for privacy and controls over who sees their information.[169] While certainly some account holders may have such views, there is substantial evidence that many users do not place a meaningful value on the type of data at issue in this matter, consistent with low or zero cost of such data being shared.

121. A body of academic studies and industry surveys shows that people vary widely in their preferences for privacy, and a substantial share of people do not care about internet data privacy, are unwilling to pay anything to protect their data, and do not utilize readily available and free methods to protect their privacy. Research indicates that, when people do state they care about

[168] Complaint, § IV.J.

[169] *See, e.g.*, Complaint, ¶¶ 318, 320–322.

privacy, their privacy preferences depend on the type of information that is shared, who receives the information, and the reason for the sharing of the information. Below are examples of some of those studies. I list additional studies that reach similar conclusions in **Exhibit 9**.

- Lin (2022) found that, depending on the category of data being shared, between 29 and 50 percent of survey respondents were willing to share their data for no compensation.[170]

- The FTC concluded in an internal 2020 report on the economics of targeted advertising that "most studies report privacy valuations to be low" and that consumers place a "highly variable and difficult to establish—value on protecting their privacy."[171]

- A 2020 McKinsey survey found that about a quarter of the respondents stated that the privacy and protection of information about their location, websites browsed, searches performed, and apps and programs used was "not too important" to them.[172] The other options were "somewhat important" and "very important."

- A 2019 survey from the Center for Data Innovation found that "[o]nly one in four Americans want online services such as Facebook and Google to collect less of their data if it means they would have to start paying a monthly subscription fee."[173]

122.    Individual privacy preferences as revealed through actions are even lower than the privacy preferences expressed in response to general questions or a hypothetical situation. This phenomenon where people state that they value privacy, but rarely make an effort to protect their data is called the "Privacy Paradox."[174] The "Privacy Paradox" is a result of the "privacy

---

[170] Lin, T., "Valuing Intrinsic and Instrumental Preferences for Privacy," *Marketing Science,* May 2022, Vol. 41(4), available at https://doi.org/10.1287/mksc.2022.1368, pp. 663–681, Table 2.

[171] Lau, Y., "A Brief Primer on the Economics of Targeted Advertising," Bureau of Economics, Federal Trade Commission, January 2020, pp. 1–16, at p. 10, available at https://www.ftc.gov/system/files/documents/reports/brief-primer-economics-targeted-advertising/economic_issues_paper_-_economics_of_targeted_advertising.pdf accessed on August 24, 2023.

[172] Anant, V., et al., "The consumer-data opportunity and the privacy imperative," McKinsey & Company, April 27, 2020, available at https://www.mckinsey.com/capabilities/risk-and-resilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative, accessed on August 24, 2023.

[173] Castro, D., and Michael McLaughlin, "Survey: Few Americans Willing to Pay for Privacy," Center for Data Innovation, January 16, 2019, available at https://datainnovation.org/2019/01/survey-few-americans-willing-to-pay-for-privacy/, accessed on August 24, 2023.

[174] Gerber, N., et al., "Explaining the privacy paradox: A systematic review of literature investigating privacy attitude and behavior," *Computers & Security* 77 (2018) 226–261, at p. 227.

calculus"—an implicit cost-benefit analysis that each individual undergoes when making choices to "surrender a certain degree of privacy in exchange for outcomes that are perceived to be worth the risk of information disclosure."[175] Numerous studies illustrate the Privacy Paradox and privacy calculus:

- Skatova et al. (2019) found that "individuals are often willing to give up privacy for benefits defined in terms of money and/or convenience," and "consumers with the same underlying privacy preferences might make different decisions while sharing different types of data because the assessment of risks and benefits will be different in each data sharing environment."[176]

- Gerber et al. (2018) find that "[a]lthough survey results show that the privacy of their personal data is an important issue for online users worldwide, most users rarely make an effort to protect this data actively and often even give it away voluntarily."[177]

- Athey et al. (2017) found that "small navigation costs [e.g., time to research and make privacy-protecting choices] have a tangible effect on how privacy-protective consumers' choices are, often in sharp contrast with individual stated preferences about privacy."[178] [179]

123.    One of the most revealing sources of information about individual valuation of data privacy are user choices to forego protections (such as those offered by CCPA) that give users the

---

[175] Dinev, T. and Paul Hart, "An Extended Privacy Calculus Model for E-Commerce Transactions," *Information Systems Research*, March 2006, Vol. 17(1), available at https://www.jstor.org/stable/23015781, pp. 61–80, at pp. 61–62.

[176] Skatova A., et al, "Unpacking Privacy: Willingness to pay to protect personal data," *PsyArXiv*, May 12, 2019, available at https://psyarxiv.com/ahwe4/, pp. 1–42, at p. 8.

[177] Gerber, N., et al., "Explaining the privacy paradox: A systematic review of literature investigating privacy attitude and behavior," *Computers & Security* 77 (2018) 226–261, at p. 226.

[178] Athey, S., et al., "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *National Bureau of Economic Research*, June 2017, Working Paper, available at http://www.nber.org/papers/w23488, pp. 1–26, at Abstract.

[179] Another example is Acquisti et al. (2015), which describes a study that asked subjects for their privacy preferences and then looked at their social media behavior to see if their stated preferences for privacy differ from their revealed preferences for privacy. The study found that many of the people who express desire to protect certain information freely share that information on public forums. Acquisti, A., et al., "Privacy and human behavior in the age of information," *Science Magazine*, January 30, 2015, Vol. 347(6221), available at https://www.science.org/doi/10.1126/science.aaa1465, pp. 509–514, at p. 510.

option to opt out of sharing their information with third parties for advertising purposes.[180] A 2020 McKinsey study found that "[c]onsumers have greater control over their personal information as a result of the many privacy tools now available, including web browsers with built-in cookie blockers, ad-blocking software…, and incognito browsers…."[181] Yet a substantial portion of consumers do not take advantage of free options to protect their information, consistent with low to no value of being placed on information protection. The following studies and statistics indicate that at least a quarter of consumers do not care enough about the privacy of the data at issue in this case to spend the time to use free tools to protect that data:

- At most 5 percent of users exercise their rights under CCPA to opt-out of data sharing and very few, if any, consumers are using the rights granted by CCPA to ask businesses to delete stored data about them.[182] That means that despite being notified of rights and that data is being shared, over 90 percent of consumers are not using any privacy protections offered to them by the CCPA and are therefore consenting to the sharing of their data without any restrictions or direct compensation.

- A 2020 McKinsey study found that few consumers take advantage of tools to protect their data: over 35 percent of consumers never clear cookies or browsing history and nearly 60 percent do not disable or turn-off cookies.[183]

- A 2022 VPN market study found that 88 percent of users in the U.S. are familiar with VPNs, but less than half of them use VPN for work or personal purposes.[184]

---

[180] "California Consumer Privacy Act (CCPA)," State of California Department of Justice – Office of the Attorney General, May 10, 2023, available at https://oag.ca.gov/privacy/ccpa, accessed on August 25, 2023.

[181] Anant, V., et al., "The consumer-data opportunity and the privacy imperatives," McKinsey & Company, April 27, 2020, available at https://www.mckinsey.com/capabilities/risk-and-resilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative, accessed on August 24, 2023.

[182] "IAB CCPA Benchmark Survey Summary," Interactive Advertising Bureau, November 12, 2020, available at https://www.iab.com/insights/iab-ccpa-benchmark-survey/, accessed on August 25, 2023. The survey also finds that approximately 60 percent of businesses made this opt-out choice available to users "regardless of jurisdiction" so these results are, to some extent, also informative of choices from users outside of California.

[183] Anant, V., et al., "The consumer-data opportunity and the privacy imperatives," McKinsey & Company, April 27, 2020, available at https://www.mckinsey.com/capabilities/risk-and-resilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative, accessed on August 24, 2023.

[184] "3rd Annual VPN Market Report: 2022," Security.org, August 18, 2023, available at https://www.security.org/resources/vpn-consumer-report-annual/, accessed on August 25, 2023.

2. *Available data is consistent with a substantial share of Proposed Class Members who **derive benefit from** data sharing*

124.    The sharing of the at-issue data allows for ads to be personalized to individual interests or behavior. Research has repeatedly shown that a large share of consumers finds personalized ads to be helpful and/or beneficial. Moreover, consumers identify many benefits from personalized ads, including discounts, knowledge about new products, saving time when searching for products, finding more applicable products, and reduction in irrelevant ads.

125.    The potential economic benefits to Proposed Class Members from data sharing in Google RTB can be illustrated with a hypothetical example. Imagine a scenario where a Proposed Class Member goes on the Nike website, added a pair of $100 tennis shoes in the cart that the user planned to buy, and did not complete the purchase. Two days later, the Proposed Class Member goes to CNN.com and gets an ad from Nike for the same shoes, along with a coupon for a 10 percent discount. Nike's ad agency was an AB who won a Google RTB ad auction to display this ad. The Proposed Class Member clicks on the ad and purchases the shoes for $90. Without the Google RTB ad, the user may have paid $100 for the pair of shoes. If the Proposed Class Member saved $10 because the sharing of the user's data in a Bid Request allowed Nike to personalize the ad, then the saving is an economic benefit that the Proposed Class Member received.

126.    While determining the benefits from sharing the at-issue data would require individualized inquiry, studies conducted on this topic are consistent with substantial share of Proposed Class Member deriving benefits:

- In 2021, PRNewswire reported the results of a national survey by Visual Objects which found that more than half of consumers can name at least one benefit of targeted advertising. The benefits consumers identified include finding promotional sales and incentives (selected by 15 percent of respondents), finding new brands (selected by 14 percent of respondents), getting personalized product or service recommendations (13 percent of respondents), finding local businesses (12 percent),

and a more efficient online shopping experience (11 percent).[185]

- In a 2016 survey by Adlucent, consumers identified reduction in irrelevant ads (46 percent), a way to discover new products (25 percent); and making online searching and shopping faster and easier (19 percent) as some of the greatest benefits to personalized ads.[186, 187]

127.    The FTC has recognized that "[t]argeted ads reduce search costs and improve match quality, which in turn may increase price competition; this increases the total value consumers derive from acquiring the products they match with."[188] In addition, "[t]argeting could mean fewer ads overall; consumers benefit directly from not having to view ads, but also indirectly from cost-savings passed on by firms."[189]

---

[185] "Despite Negative Perceptions, 52% of Consumers Can Identify Benefits of Targeted Advertising," PRNewswire, March 25, 2021, available at https://www.prnewswire.com/news-releases/despite-negative-perceptions-52-of-consumers-can-identify-benefits-of-targeted-advertising-301255752.html, accessed on August 25, 2023. *See also*, Jordan, S., "Key Search Retargeting Benefits for Small Businesses," Visual Objects, March 28, 2022, available at https://visualobjects.com/digital-marketing/blog/search-retargeting, accessed on August 25, 2023.

[186] "71% of Consumers Prefer Personalized Ads." Adlucent, available at https://www.adluccent.com/resources/blog/71-of-consumers-prefer-personalized-ads/, accessed on August 25, 2023; Adluccent is a digital marketing performance agency. See, "Who We Are," Adluccent, available at https://www.adluccent.com/company/who-we-are/, accessed on September 26, 2023.

[187] There are other surveys which also found that a substantial share of users finds personalized ads to be beneficial. For example, a 2014 survey conducted by the market research company GfK found that about 50 percent of consumers view tailored ads as helpful, in part because they enable consumers to find the right products more quickly (which results in time savings). Moreover, over half of the 1,000 respondents in a 2013 survey commissioned by the Digital Advertising Alliance noted that ads help them find new products and services and help them save money and time. Finally, A 2013 Infosys survey of U.S. consumers and retailers shows that 58 percent of the surveyed customers discover new products through advertising. Among the potential benefits of personalization, the study mentions that the majority of consumers who have experienced personalization "are highly in favor of personalized coupons," personalized offers or promotions, and product recommendations based on previous purchases. *See* "The Value of Targeted Advertising to Consumers," Interactive Advertising Bureau, p. 5, available at https://www.iab.com/wp-content/uploads/2016/05/Value-of-Targeted-Ads-to-Consumers2.pdf, accessed on September 23, 2023; "The Value of Targeted Advertising to Consumers," Interactive Advertising Bureau, pp. 9-10, available at https://www.iab.com/wp-content/uploads/2016/05/Value-of-Targeted-Ads-to-Consumers2.pdf, accessed on September 23, 2023; "Rethinking Retail: Insights from consumers and retailers into an omni-channel shopping experience," Infosys, 2013, p. 3, available at https://www.infosys.com/newsroom/press-releases/documents/genome-research-report.pdf, accessed on August 25, 2023.

[188] Lau, Y., "A Brief Primer on the Economics of Targeted Advertising," Bureau of Economics, Federal Trade Commission, January 2020, pp. 1–16, at pp. 11–12, available at https://www.ftc.gov/system/files/documents/reports/brief-primer-economics-targeted-advertising/economic_issues_paper_-_economics_of_targeted_advertising.pdf, accessed on August 24, 2023.

[189] Lau, Y., "A Brief Primer on the Economics of Targeted Advertising," Bureau of Economics, Federal Trade Commission, January 2020, pp. 1-16, at p. 12, available at https://www.ftc.gov/system/files/documents/reports/brief-

128.    Similarly, some Named Plaintiffs also find personalized ads (some of which were made available because of sharing the at-issue data) to be helpful or beneficial. For example:

- Ms. Diggs testified in her deposition that she does not object to Google showing her advertisements based on her location or the things she likes because the ads are "helpful."[190]

- Mr. Valencia also finds online ads to be helpful, especially if they are relevant to his interests.[191] He has even received free products after following an ad to a website that was "giving away" products to new members.[192]

- Ms. Green finds ads to be helpful when they show her something in which she is interested, when they pertain to her, or when they show her options that are in her general location.[193]

129.    In addition to getting benefit from ads directly, consumers also benefit from the free services that are funded by ad revenue. Research from the Economics of Digital Services initiative led by the Center for Technology, Innovation and Competition and The Warren Center for Network & Data Service at the University of Pennsylvania found that digital ads provide benefits to consumers in the form of free media and price competition, and that "the change in consumer welfare due to the expansion of digital advertising… is large."[194] A similar finding

---

primer-economics-targeted-advertising/economic_issues_paper_-_economics_of_targeted_advertising.pdf, accessed on August 24, 2023. The benefits of personalized ads are not necessarily subjective. Proposed Class Members can benefit from discounts even if they do not like personalized ads. For example, Varian (2009) found that consumers may be better off when companies know about what types of products they prefer. Varian, H., "Economic Aspects of Personal Privacy," *Internet Policy and Economics Challenges and Perspectives, Second Edition,* 2009, at pp. 102-103.

[190] Deposition Transcript of Terry Diggs, April 14, 2023, ("Diggs Deposition"), pp. 102:12–24, 200:15–201:5.

[191] Deposition Transcript of Christopher Valencia, December 14, 2022, ("Valencia Deposition"), pp. 54:5–55:6, 57:4–59:8, 88:2–15.

[192] Valencia Deposition, pp. 71:2–72:9.

[193] Deposition Transcript of Rethena Green, April 20, 2023, ("Green Deposition"), pp. 25:18–26:10, 40:21–23, 54:6–10, 67:15–22, 71:6–17.

[194] Greenwood, J. et al., "A macroeconomic analysis reveals the benefits for consumers of digital advertising," University of Pennsylvania Carey Law School, October 11, 2021, available at https://www.law.upenn.edu/live/blogs/75-a-macroeconomic-analysis-reveals-the-benefits-for, accessed on August 25, 2023.

was summarized in the 2020 FTC economic report cited earlier, which stated:

> [I]t is important to remember that consumers highly value the free online goods and services provided by websites. In one study using large-scale discrete choice experiments, Brynjolfsson, Eggers and Gannamaneni (2018) estimate that the median consumer in 2017 values search engine services at $17,530 annually and email at $8,414 annually. … The advent of the targeted ad-supported business model essentially allows individual consumers to monetize their personal data in exchange for valuable digital goods and services, financed by revenues from targeted ads.[195]

Named Plaintiffs recognize that they receive benefit from the free services Google offers.[196]

130.    Research reveals that users are frequently willing to share their information in exchange for more relevant ads and digital experience. For instance, Turow et al. (2009) found that 32 percent of the study respondents *wanted* websites they visit to show them ads tailored to their interests, and 47 percent wanted to get discounts tailored to their interests. Between 24 and 34 percent of the respondents accepted targeting based on their activity on the website they were visiting and between 13 and 18 percent accepted tailoring based on the user's activity on other websites they had visited. Over 11 percent of respondents accepted targeting based on offline activity such as their in-store purchases. These preferences varied by age, with younger participants being much more open to targeting than older participants.[197]

131.    Similar studies have reached the conclusion that people are willing to share their information in exchange for more personalized ads, consistent with benefits exceeding costs:

---

[195] Lau, Y., "A Brief Primer on the Economics of Targeted Advertising," Bureau of Economics, Federal Trade Commission, January 2020, pp. 1-16, at p. 11, available at https://www.ftc.gov/system/files/documents/reports/brief-primer-economics-targeted-advertising/economic_issues_paper_-_economics_of_targeted_advertising.pdf, accessed on August 24, 2023.

[196] Deposition Transcript of John Kevranian, December 9, 2022, p. 53:1–12, ("Kevranian Deposition"); Green Deposition, pp. 88:16–90:3.

[197] Turow, J. et al., "Americans Reject Tailored Advertising and Three Activities that Enable It," Social Science Research Network, September 29, 2009, available at https://dx.doi.org/10.2139/ssrn.1478214, pp. 1–27, at pp. 15, 17–18.

- Approximately half of the consumers that the digital marketing performance agency Adlucent surveyed in 2016 were willing to give up some information (*e.g.,* name, address, what product categories they prefer, or information on life events like the birth of a child) to get personalized ads tailored to their interest and shopping habits.[198]

- In two surveys conducted in 2016 and 2018, Salesforce found that over 40 percent of the consumers are willing to share information about them if the information is used to deliver personalized offers, engagements, discounts, or product recommendations.[199]

- A 2016 Pew Research Center survey about attitudes on privacy found that a third of respondents would accept websites using their data to deliver targeted advertisements.[200]

132.    It is clear that a substantial portion of consumers benefit from personalized ads and that many are aware that personalization is done using data such as the at-issue data.

> 3.    *Even for those with some costs, the varying amounts of the type and quantity of data being shared would require individual inquiry to determine costs compared to benefits.*

133.    The assumption that all Proposed Class Members suffered harm that underlies the damages methods proposed by Mr. Regan is inconsistent with the data. For those who have no costs of sharing data, which is a substantial share, there can be no harm. Further, a substantial

---

[198] Pauzer, H., "71% of Consumers Prefer Personalized Ads," Adlucent, available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/, accessed on August 25, 2023.

[199] Salesforce is a software company that provides customer relationship management software and applications that focus on sales, customer service, marketing automation, and e-commerce, among other things. McGinnis, D., "Please Take My Data: Why Consumers Want More Personalized Marketing," Salesforce, December 2, 2016, available at https://www.salesforce.com/blog/consumers-want-more-personalized-marketing/, accessed on August 25, 2023 ; Salesforce Research, "Trends in Customer Trust: The future of personalization, data, and privacy in the Fourth Industrial Revolution," Salesforce, Research Brief, pp.1–16, at p. 7, available at https://c1.sfdcstatic.com/content/dam/web/en_us/www/documents/briefs/customer-trust-trends-salesforce-research.pdf; "What Is Salesforce?," Salesforce, available at https://www.salesforce.com/products/what-is-salesforce/, accessed on September 26, 2023. Interestingly, the preferences varied by age, with nearly two in three Millenials, over half of GenXs, and over 40 percent of Baby Boomers willing to share data with companies in exchange for personalized offers, discounts and product recommendations. *See* McGinnis, D., "Please Take My Data: Why Consumers Want More Personalized Marketing," Salesforce, December 2, 2016, available at https://www.salesforce.com/blog/consumers-want-more-personalized-marketing/, accessed on August 25, 2023.

[200] Edmonds, R., "People Don't Want to Trade Privacy for Targeted Ads," Poynter, January 14, 2016, available at https://www.poynter.org/business-work/2016/people-dont-want-to-trade-privacy-for-targeted-ads/, accessed on August 25, 2023.

share of people who might have *some* costs of sharing data also receive benefits from the sharing of the at-issue and similar data. Determining just how large a share of the Proposed Class Members had benefits that exceeded costs would require individual inquiry.

134. Another reason individualized inquiry is needed is that the amount and type of data included in Bid Requests varies.[201] For example, account holders who utilized VPNs masked some of their information, and account holders with privacy protection tools would have different data shared than others.[202] Less information would have been shared for Proposed Class Members who blocked sharing of their data (*e.g.*, through CCPA, cookie-blocking, or ad personalization settings) and masked their location than for users who did not block sharing.[203] Thus, there is variability in the costs to each Proposed Class Member from the at-issue data sharing.

135. The type and amount of data shared in Bid Requests for each Proposed Class Member directly affects the cost to the account holder from the data sharing. It is necessary to quantify the cost to each account holder to determine whether they were harmed given the benefits obtained from RTB ads that the account holder saw due to the shared data. As I discuss in **Section V.B**, individualized inquiry is necessary to determine how much data was shared for each Proposed Class Member and the cost to them from that data sharing.

## VII.  MR. REGAN HAS FAILED TO PROPOSE A RELIABLE CLASS-WIDE METHODOLOGY FOR ALLOCATING THE ALLEGED DAMAGES

136. Mr. Regan proposes to allocate damages to individual Proposed Class Members based on the number of months during which each Proposed Class Member was a Google

---

[201] For more information, *see, e.g.,* discussion in **Section VI.B**; *see also*, **Exhibit 3**.

[202] *See* discussion in **Section IV.A.2** and **Section VI.B**.

[203] For more information, see **Section IV.A.2** and **Section VI.B**.

account holder during the Class Period, with no adjustments of any kind.[204] Mr. Regan's approach implies that, if two Proposed Class Members were Google account holders for the same number of months, then: (1) Google was equally enriched from both of them; and (2) the market value of data shared in Bid Requests for each user was the same.[205] Mr. Regan's approach is flawed and unreliable, as it does not allocate damages in proportion to the harm suffered by individual Proposed Class Members and would allocate damages to Proposed Class Members in months when they did not suffer harm, even under Plaintiffs' theory.

### A.    Mr. Regan's Allocation Method Would Allocate Damages to Proposed Class Members in Months When They Did Not Suffer Harm

137.  In **Section VI** above, I discuss that a substantial proportion of Proposed Class Members may be unharmed for all or part of the Class Period, and that these unharmed members cannot be identified without individualized inquiry. Mr. Regan has proposed no method to identify these Proposed Class Members and remove them from the allocation of damages. Mr. Regan's proposed allocation method would therefore result in compensating unharmed Proposed Class Members at the expense of the harmed Proposed Class Members.

138.  This includes Proposed Class Members for whom Google did not send *any* Bid Requests containing information in a particular month. These Proposed Class Members should not be included in calculations of compensatory damages for that month, because no data was shared for those individuals in that month and their economic position in the but-for and actual world is the same. Similarly, those same Proposed Class Members should not be allocated any unjust enrichment for that month, because Google also would not have earned revenue from data

---

[204] Regan Report, ¶ 57. He proposes to calculate the damages per "member-month" as the ratio of total damages and total number of member-months.

[205] Regan Report, ¶¶ 57, 65.

shared for those individuals. Individualized inquiry would be necessary to determine whether Google shared data for or profited from data about each Proposed Class Member in each month.

**B.      Mr. Regan Has Failed to Propose a Method to Allocate Damages in Proportion to the Harm Suffered by Individual Proposed Class Members**

139.    Mr. Regan fails to account for the fact that the data shared during the Class Period varies substantially among Proposed Class Members. However, all else equal, the more data that was shared about a Proposed Class Member in each month, the more that Proposed Class Member would, theoretically, be harmed.

140.    ***First***, there is substantial variation in the number of Bid Requests for each Proposed Class Member. Data shows that the number of Bid Requests for each Named Plaintiff can vary ██████████.[206] *See* **Figure 4**. For example, over an approximately 18-month period, Google sent roughly ████████ Bid Requests for Mr. Valencia, and only ██████ Bid Requests for Ms. Diggs. All else equal, the more Bid Requests Google sends in each month in relation to a Proposed Class Member, the more data is shared for that Proposed Class Member.[207] Dr. Striegel's report details the myriad factors that affect how the data sent to third parties in Bid Requests varies for each Proposed Class Member.[208]

---

[206] Google LLC's Supplemental Objections and Responses To Plaintiffs' Fourth Set Of Interrogatories, Supplemental Response to Interrogatory No. 13, June 7, 2023.

[207] Yet, Mr. Regan's proposed allocation method would allocate the same damages for information shared in 2022 for all Named Plaintiffs, even though, for instance, ███████████████████████████████████████████ ██████████████████████████████████████████ *See* **Figure 4**.

[208] Striegel Report ¶¶ 15, 72–89.

**Figure 4**
**Summary of Number of Bid Requests for the Named Plaintiffs[209]**



141. **Second**, there is a variation in the total revenue Google earned from the data of each Proposed Class member. Google's RTB revenue from each Proposed Class Member is in part a function of (1) the number of winning bids associated with each Proposed Class Member and (2) the price the advertisers paid for those winning bids.[210] As **Figure 5** below shows, there was substantial variation in the number of winning bids associated with each Named Plaintiff. For instance, Mr. Valencia was shown ▮▮▮ Google RTB-winning ads per month whereas Mr. Kevranian was shown only ▮ Google RTB-winning ads per month.[211] This indicates that Google would likely have earned ▮▮▮▮▮▮ revenue from Google RTB ads shown to Mr. Valencia than to Mr. Kevranian. The price advertisers are willing to pay to show ads is also not uniform—it varies by Proposed Class Member and is driven in part by Proposed Class

---

[209] From Google LLC's Supplemental Objections and Responses To Plaintiffs' Fourth Set Of Interrogatories, Supplemental Response to Interrogatory No. 13, June 7, 2023.

[210] This is because Google earns RTB revenue when ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

[211] It is not surprising that the number of winning bids associated with Mr. Kevranian is the ▮▮▮▮ given that ▮ ▮▮▮▮▮▮▮▮▮▮▮ most likely means that Google or device IDs were not shared in Bid Requests for Mr. Kevranian from mid-2021 through 2022 (unless he voluntarily opted to share it). Kevranian Deposition, pp. 52:3–18; 82:12–83:17; Striegel Report ¶¶ 66, 82–83, 87.

Member characteristics.[212] Studies on which Prof. Zeithammer relied demonstrate that there is variability in the revenue generated from different Proposed Class Members.[213]

**Figure 5**
**Summary of Winning RTB Bid Requests for the Named Plaintiffs[214]**



142. ***Third***, even if one accepts the $3.17 as the appropriate average "market price" for the at-issue data (which it is not), Mr. Regan's proposed allocation still does not make economic sense because different amounts of information were shared in Bid Requests for different Proposed Class Members.[215] The same compensatory damages per month should not be awarded to a Proposed Class Member for whom Google sent few Bid Requests and for whom the at-issue data was omitted or was very limited as compared to Proposed Class Member for whom Google sent many Bid Requests with all of the Bid Request fields being regularly populated.

---

[212] For example, more advertisers may compete and be willing to pay a higher price to show an ad to a Proposed Class Member in Manhattan who frequently clicks on ads, has broad interests, and has a high income than a Proposed Class Member located in the rural region of upstate New York who does not typically click on ads, has a lower income, and has shown interest in only few categories of ads. *See* Evans, D.S., "The online advertising industry: Economics, evolution, and privacy," *Journal of economic perspectives*, Summer 2009, Vol. 23(3), pp. 37–60, at pp. 42–43, 50–51.

[213] For example, referencing the Alcobendas et al. (2021) study, Prof. Zeithammer states that "Alcobendas et al. report that a user using a Safari or Firefox browser instead of Chrome reduces the advertising revenue from the impression by 51.3 percent." (Zeithammer Report, ¶ 55.)

[214] From Google LLC's Supplemental Objections and Responses To Plaintiffs' Fourth Set Of Interrogatories, Supplemental Response to Interrogatory No. 14, June 7, 2023.

[215] *See* **Sections V.B, VI.**

143.   ***Finally***, Mr. Regan's proposed allocation method does not address shared Google accounts. His method implies that two Proposed Class Members who share an account should split the damages, while a member who does not share an account should get the full damages. If Google shared the exact same type and amount of information for all these three Proposed Class Members and Google was equally enriched from all three users, then it would not be economically reasonable for these three Proposed Class Members to be allocated different amounts of damages.[216]

<div style="text-align: right;">

_____

Bruce Deal

</div>

---

[216] For example, certain Proposed Class Members may have a family account that is shared by multiple family members. Mr. Regan's allocation method would improperly assign the same damages to a family account as it would to a single-user account.

**Exhibit 1**

█████████████████

**Revenue and Total Traffic Acquisition Costs**
*2017 – June 2022*

| $ in Millions | 2017 | 2018 | 2019 | 2020 | 2021 | Jan – June 2022 | 2018 – 2021 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**Notes:**
[1] Total Traffic Acquisition Costs (TAC) measure the amounts paid to Google Network partners for ads displayed on their properties. *See, e.g.,* Alphabet Inc., SEC Form 10-K, for the period ended December 31, 2017, p. 34. TAC are annualized for 2017 since data are available only from July to December 2017.
[2] While there may be other marginal costs to Google RTB, I only include TAC in this exhibit for the purposes of calculating Net Revenue as defined in the Regan Report, ¶¶ 51-52.

**Sources:**
[A] GOOG-HEWT-00455648.
[B] GOOG-HEWT-00455801.
[C] Alphabet Inc., SEC Form 10-K for the period ended December 31, 2017.
[D] Regan Report, ¶¶ 51–52.

**Exhibit 2**
**Alphabet Inc.**
**Consolidated Statements of Income**
*2016 – 2022*

| $ in Millions | 2016 Amount | 2016 % of Revenue | 2017 Amount | 2017 % of Revenue | 2018 Amount | 2018 % of Revenue | 2019 Amount | 2019 % of Revenue | 2020 Amount | 2020 % of Revenue | 2021 Amount | 2021 % of Revenue | 2022 Amount | 2022 % of Revenue | 2018 – 2021 Amount | 2018 – 2021 % of Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | | |
| Google Search & Other[1] | $63,785 | 70.7% | $69,811 | 63.0% | $85,296 | 62.3% | $98,115 | 60.6% | $104,062 | 57.0% | $148,951 | 57.8% | $162,450 | 57.4% | $436,424 | 59.1% |
| YouTube Ads[1] | N/A | N/A | 8,150 | 7.4% | 11,155 | 8.2% | 15,149 | 9.4% | 19,772 | 10.8% | 28,845 | 11.2% | 29,243 | 10.3% | 74,921 | 10.1% |
| Google Network Properties | 15,598 | 17.3% | 17,616 | 15.9% | 20,010 | 14.6% | 21,547 | 13.3% | 23,090 | 12.7% | 31,701 | 12.3% | 32,780 | 11.6% | 96,348 | 13.0% |
| **Google Advertising** | 79,383 | 87.9% | 95,577 | 86.2% | 116,461 | 85.1% | 134,811 | 83.3% | 146,924 | 80.5% | 209,497 | 81.3% | 224,473 | 79.4% | 607,693 | 82.2% |
| Google Other | 10,601 | 11.7% | 10,914 | 9.8% | 14,063 | 10.3% | 17,014 | 10.5% | 21,711 | 11.9% | 28,032 | 10.9% | 29,055 | 10.3% | 80,820 | 10.9% |
| **Google Services Total** | 89,984 | 99.7% | 106,491 | 96.1% | 130,524 | 95.4% | 151,825 | 93.8% | 168,635 | 92.4% | 237,529 | 92.2% | 253,528 | 89.6% | 688,513 | 93.2% |
| Google Cloud | N/A | N/A | 4,056 | 3.7% | 5,838 | 4.3% | 8,918 | 5.5% | 13,059 | 7.2% | 19,206 | 7.5% | 26,280 | 9.3% | 47,021 | 6.4% |
| Other Bets | 288 | 0.3% | 477 | 0.4% | 595 | 0.4% | 659 | 0.4% | 657 | 0.4% | 753 | 0.3% | 1,068 | 0.4% | 2,664 | 0.4% |
| Hedging Gains (Losses) | N/A | N/A | -169 | -0.2% | -138 | -0.1% | 455 | 0.3% | 176 | 0.1% | 149 | 0.1% | 1,960 | 0.7% | 642 | 0.1% |
| **Total Revenue** | 90,272 | 100.0% | 110,855 | 100.0% | 136,819 | 100.0% | 161,857 | 100.0% | 182,527 | 100.0% | 257,637 | 100.0% | 282,836 | 100.0% | 738,840 | 100.0% |
| | | | | | | | | | | | | | | | | |
| **Costs and Expenses:** | | | | | | | | | | | | | | | | |
| Cost of Revenue[2] | 35,138 | 38.9% | 45,583 | 41.1% | 59,549 | 43.5% | 71,896 | 44.4% | 84,732 | 46.4% | 110,939 | 43.1% | 126,203 | 44.6% | 327,116 | 44.3% |
| Research and Development | 13,948 | 15.5% | 16,625 | 15.0% | 21,419 | 15.7% | 26,018 | 16.1% | 27,573 | 15.1% | 31,562 | 12.3% | 39,500 | 14.0% | 106,572 | 14.4% |
| Sales and Marketing | 10,485 | 11.6% | 12,893 | 11.6% | 16,333 | 11.9% | 18,464 | 11.4% | 17,946 | 9.8% | 22,912 | 8.9% | 26,567 | 9.4% | 75,655 | 10.2% |
| General and Administrative | 6,985 | 7.7% | 6,840 | 6.2% | 6,923 | 5.1% | 9,551 | 5.9% | 11,052 | 6.1% | 13,510 | 5.2% | 15,724 | 5.6% | 41,036 | 5.6% |
| European Commission Fines[4] | 0 | 0.0% | 2,736 | 2.5% | 5,071 | 3.7% | 1,697 | 1.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 6,768 | 0.9% |
| **Total Costs and Expenses** | 66,556 | 73.7% | 84,677 | 76.4% | 109,295 | 79.9% | 127,626 | 78.9% | 141,303 | 77.4% | 178,923 | 69.4% | 207,994 | 73.5% | 557,147 | 75.4% |
| | | | | | | | | | | | | | | | | |
| **Income from Operations** | 23,716 | 26.3% | 26,178 | 23.6% | 27,524 | 20.1% | 34,231 | 21.1% | 41,224 | 22.6% | 78,714 | 30.6% | 74,842 | 26.5% | 181,693 | 24.6% |
| | | | | | | | | | | | | | | | | |
| **Other Income (Expenses), Net** | 434 | 0.5% | 1,015 | 0.9% | 7,389 | 5.4% | 5,394 | 3.3% | 6,858 | 3.8% | 12,020 | 4.7% | -3,514 | -1.2% | 31,661 | 4.3% |
| | | | | | | | | | | | | | | | | |
| **Income before Income Taxes** | 24,150 | 26.8% | 27,193 | 24.5% | 34,913 | 25.5% | 39,625 | 24.5% | 48,082 | 26.3% | 90,734 | 35.2% | 71,328 | 25.2% | 213,354 | 28.9% |
| | | | | | | | | | | | | | | | | |
| **Provision for Income Taxes** | 4,672 | 5.2% | 14,531 | 13.1% | 4,177 | 3.1% | 5,282 | 3.3% | 7,813 | 4.3% | 14,701 | 5.7% | 11,356 | 4.0% | 31,973 | 4.3% |
| | | | | | | | | | | | | | | | | |
| **Net Income** | $19,478 | 21.6% | $12,662 | 11.4% | $30,736 | 22.5% | $34,343 | 21.2% | $40,269 | 22.1% | $76,033 | 29.5% | $59,972 | 21.2% | $181,381 | 24.5% |

**Notes:**

[1] In 2016, Google Search & Other includes YouTube Ads. *See* Alphabet Inc., SEC Form 10-K for the period ended December 31, 2016, p. 25.

[2] Cost of revenue includes Traffic Acquisition Costs, as well as data center operating expenses, content acquisition costs, credit card and other transaction fees, stock-based compensation expense, hardware inventory costs, and amortization of intangible assets. *See,* e.g., Alphabet Inc., SEC Form 10-K, for the period ended December 31, 2016, p. 29. As of 2022, the cost of revenue included Traffic Acquisition Costs, data center and other operating expenses, content acquisition costs, and hardware inventory costs and other costs related to hardware. *See* , Alphabet Inc., SEC Form 10-K, for the period ended December 31, 2022, p. 29.

[3] All numbers are reported as of the most recent 10-K filing.

[4] The $5,071 million in European Commission Fines for 2018 were reduced by $217 million in 2022. *See* Alphabet Inc., SEC Form 10-K, for the period ended December 31, 2022, p. 38.

**Sources:** [A] Alphabet Inc., SEC Forms 10-K for the periods ended December 31, 2016 (pp. 25, 29), 2018 (pp. 27, 47), 2019 (pp. 29, 51), 2020 (pp. 33, 55), 2021 (pp. 33, 50), 2022 (pp. 29, 32, 38, 48).

**Exhibit 3**
**Examples Illustrating the Prevalence of Functionalities That Affect What Information Is Sent In Bid Requests**

| | Control | Effect | Available To... | Available When... | Examples of Prevalence |
|---|---|---|---|---|---|
| Publisher Choices | Restricted Data Processing (RDP) [A] | Restricts user data sharing in bid requests | All publishers | Selected by a publisher for a certain type/individual requests | All publishers presently use it to some extent |
| User Choices | Google Ad Personalization (GAP) [B] | Restricts user data sharing in bid requests | All users | Selected by a user in Google Ad Settings | |
| | Android Limit Ad Tracking (LAT) [C] | Blocks sharing of Android Advertising ID (ADID) | Users of Android devices | Selected by a user | |
| | Apple iOS Limit Ad Tracking (LAT) [C] | Blocks sharing of Apple ID for Advertisers (IDFA) | Users of devices with iOS version pre-14.5 | Selected by a user | In 2020, 31.5% of users of Apple devices with iOS version pre-14.5 used LAT |
| | Apple Permission to Track [D] | IDFA not shared by default | Users of devices with iOS version 14.5 and later | By default | All users of devices with iOS version 14.5 or later (unless they voluntarily allow tracking) |
| | Apple Safari Intelligent Tracking Protection (ITP) [E] | Blocks third-party cookies by default | Users of Safari browser since June 2018 | By default for Safari browser users | All Safari users since June 2018 (unless they voluntarily allow third-party cookies) |
| | Mozilla Firefox Enhanced Tracking Protection (ETP) [F] | Blocks third-party cookies by default | Users of Firefox browser since September 2019 | By default for Firefox browser users | All Firefox users since September 2019 (unless they voluntarily allow third-party cookies) |
| | Google Chrome Private Browsing Mode [G] | Blocks third-party cookies by default | Users of Chrome browser since May 2020 | By default for Chrome browser users in Incognito mode | Around 20% of browser users use Incognito mode for at least some of their browsing sessions |
| | Virtual Private Networks (VPNs) [H] | Protects user's geolocation by masking IP address | All users | A user installed a free or paid VPN | Around two thirds of Americans use VPNs |
| User Characteristics | Google Ad-Serving Protections for Teens [I] | Turns off GAP and processes bid requests under RDP for minors of 13 to 17 years of age | Users 13 years to 17 years of age | By default upon detection of user age | All detected Google account holders who are 13 to 17 years old |
| | Children's Online Privacy Protection Act (COPPA) [J] | No bid requests sent for minors under 13 years of age | Users under 13 years of age | By default upon detection of user age | All detected users who are under 13 years old |

**Exhibit 3**
**Examples Illustrating the Prevalence of Functionalities That Affect What Information Is Sent In Bid Requests**

**Sources:**

[A] Berntson Deposition, pp. 47:15–48:3, 48:19–49:10, 52:5–55:3, 69:19–70:2, 71:14–72:21, 138:3–143:19, 160:13–162:10, 178:2–9.

[B] "How personalized ads work," Google My Ad Center Help, available at https://support.google.com/My-Ad-Center-Help/answer/12155656?hl=en&co=GENIE.Platform%3DAndroid, accessed on August 31, 2023; "Settings for personalized ads," Google Ad Settings, available at https://adssettings.google.com/, accessed on September 1, 2023; Berntson Deposition, pp. 159:14–162:10, 183:11–24, 205:6–18.

[C] Newman, L. H., "A Simple Way to Make It Harder for Mobile Ads to Track You," Wired, September 21, 2019, available at https://www.wired.com/story/ad-id-ios-android-tracking/, accessed on September 28, 2023; O'Flaherty, K., "Apple's Stunning iOS 14 Privacy Move: A Game-Changer For All iPhone Users," Forbes, January 31, 2021, available at https://www.forbes.com/sites/kateoflahertyuk/2021/01/31/apples-stunning-ios-14-privacy-move-a-game-changer-for-all-iphone-users/?sh=367c234d7e8d, accessed on August 31, 2023; Sweeney, M., and Paulina Zawislak, "A Timeline of Apple's Privacy Changes in Safari and iOS [infographic]," Clearcode, October 12, 2021, available at https://clearcode.cc/blog/timeline-apple-privacy-changes/, accessed on August 31, 2023; "Limit Ad Tracking," Singular, available at https://www.singular.net/glossary/limit-ad-tracking/, accessed on September 1, 2023; Berntson Deposition, pp. 179:19–183:24.

[D] "If an app asks to track your activity," Apple, February 13, 2023, available at https://support.apple.com/en-us/HT212025, accessed on September 26, 2023.

[E] Hautala, L., "Here's how Apple's browsing privacy features will work in Safari," CNET, June 8, 2018, available at https://www.cnet.com/tech/tech-industry/heres-how-apples-browsing-privacy-features-will-work-safari/, accessed on September 26, 2023; Sweeney, M., and Paulina Zawislak, "A Timeline of Apple's Privacy Changes in Safari and iOS," Clearcode, October 12, 2021, available at https://clearcode.cc/blog/timeline-apple-privacy-changes/, accessed on August 30, 2023. Wilander, J., "Intelligent Tracking Prevention 2.0," WebKit, June 4, 2018, available at https://webkit.org/blog/8311/intelligent-tracking-prevention-2-0/, accessed on August 30, 2023.

[F] "Enhanced Tracking Protection in Firefox for desktop," Mozilla, available at https://mzl.la/3BX2oBb, accessed on September 6, 2023; "Today's Firefox Blocks Third-Party Tracking Cookies and Cryptomining by Default," Mozilla, September 3, 2019, available at https://blog.mozilla.org/press/2019/09/todays-firefox-blocks-third-party-tracking-cookies-and-cryptomining-by-default/, accessed on August 31, 2023.

[G] Protalinski, E., "Chrome 83 arrives with redesigned security settings, third-party cookies blocked in Incognito," VentureBeat, May 19, 2020, available at https://venturebeat.com/business/google-chrome-83/, accessed on August 31, 2023; "The Most Surprising Browser User Statistics And Trends in 2023," Gitnux, September 5, 2023, available at https://blog.gitnux.com/browser-user-statistics/, accessed on September 12, 2023.

[H] "What Is a VPN and Can it Hide My IP Address?," McAfee, available at https://www.mcafee.com/learn/what-is-a-vpn-and-can-it-hide-my-ip-address/, accessed on August 31, 2023; O'Driscoll, A., "VPN statistics: What the numbers tell us about VPNs," Comparitech, available at https://www.comparitech.com/vpn/vpn-statistics/, accessed on September 26, 2023.

[I] "Ad-serving protections for teens," Google Advertising Policies Help, available at https://support.google.com/adspolicy/answer/12205906?hl=en, accessed on September 11, 2023.

[J] Berntson Deposition, pp. 33:3–34:7, 64:17–65:1; "How Open Bidding works," Google Ad Manager Help, available at https://support.google.com/admanager/answer/7128958?hl=en&ref_topic=7512060&sjid=11192043347591034842-NA, accessed on August 31, 2023.

**Exhibit 4**
**Google Display Ads**
**Profit and Loss Statement**
*2018 – Q2 2023*

| $ in Millions | 2018 | 2019 | 2020 | 2021 | 2022 | Jan - June 2023 | 2018 – 2021 |
|---|---|---|---|---|---|---|---|

**Source:**
[A] GOOG-HEWT-00481705–710.

**Exhibit 5**
**Examples of Reasons Why Measurements Used by the Ten Studies in Prof. Zeithammer Meta-Analysis Are Not Representative of the At-Issue Data**

| Study Used in Prof. Zeithammer's Meta-Analysis | Measure of Interest | Why Measurement Does Not Apply to the Data at Issue in This Case | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Assumes data is unavailable for products that are not not-at issue[2] | Uses data from a different or anonymous ad exchange | Uses data from before the start of the Class Period and major industry changes | Measures the effects globally rather than on U.S. users | Measures the effects on users of only a subset of the browsers or apps through which users can see RTB-populated ads[3] | The study results appear to reflect the effect of other factors that might cause differences in prices for ad impressions beyond the use of user data[4] | The study does not measure the effect on Google's revenue overall (i.e., including offsetting effects from increases in revenue on other products) |
| Marotta, et al. (2019) | Measures the effect of "users' cookies" on "the ability of advertisers to perform behavioral targeting" and "publishers' revenues" using data from "a large media company." | X | X | X | X | | X | X |
| Bidswitch (2020) | Measures the differences in prices paid by advertisers for ads shown to users who use the Chrome browser (which does not block cookies by default) and Safari browser (which blocks cookies by default). | X | | | X | X | X | X |
| Alcobendas, et al. (2021) | Evaluates "the likely effects of Google's announced plan, starting in 2023, to block third-party cookies by default on Chrome" "using bid-level auction data from Yahoo." | X | X | | | X | X | X |
| Beales and Eisenach (2014)[1] | "Measure[s] the premium paid by advertisers for ads served to customers with cookies" using data from "two anonymous companies that operate advertising exchanges with automated bidding." | X | X | X | | | | X |
| IAB (2020) | Measures the difference in "prices realized by cookie-less impressions" compared to impressions with cookies on the OpenX ad exchange. | X | X | | | | X | X |
| Johnson, et al. (2020) | "Analyze[s] the economic impact of the AdChoices program" by "estimating the lost revenue from the inability to behaviorally target opt-out users" using "ad impression transactions" from "an [anonymous] ad exchange." | X | X | X | | X | | X |
| Ravichandran and Korula (2019) | Measures the effect of "disabling access to third-party cookies" on revenues of top 500 publishers "who use the programmatic arm of Google Ad Manager's serving system." | X | | | | | | X |
| Pubmatic (2021) | Measures the effects of IDFA presence on prices paid by advertisers for ads shown to iOS 14.5+ users. | X | | | | X | X | X |
| GOOG-HEWT-00018008-041 | | | | | | | | |
| GOOG-HEWT-00456342 | | | | | | | | |

**Exhibit 5**
**Examples of Reasons Why Measurements Used by the Ten Studies in Prof. Zeithammer Meta-Analysis Are Not Representative of the At-Issue Data**

**Notes:**

[1] Includes two separate results that Prof. Zeithammer uses in his meta-analysis. These two results only differ in that they are measured using data from two different ad exchanges.

[2] All studies, except internal Google experiments, assume that user data is not available for all advertising products, not just for ▮▮▮▮▮▮▮▮▮▮▮▮▮, thus overestimating the effects on revenues.

[3] For example, Bidswitch (2020) measures the effect of blocking cookies only for Safari users compared to Chrome users, Alcobendas et al. (2021) measure the effect of blocking cookies only for Chrome users, and Pubmatic (2021) measures the effects only for iOS 14.5+ users, thus excluding iOS users with versions prior to 14.5, Android users, and desktop users; measures the effects of IDFA, which is only available for in-app advertising, thus excluding in-browser advertising.

[4] For example, Bidswitch (2020) does not appear to control for differences in the characteristics of Chrome and Safari users, and Pubmatic (2021) does not appear to control for differences in the characteristics of iOS 14.5+ users who opt into IDFA and those who do not.

**Sources:**

[A] Beales, J.H., and Jeffrey A. Eisenach, "An Empirical Analysis of the Value of Information Sharing in the Market for Online Content," Navigant Economics, January 2014, available at

[B] "Programmatic Insights 2019," Bidswitch, April 2020, available at https://www.bidswitch.com/wp-content/uploads/2020/03/BidSwitch-Programmatic-Insights-2019.pdf, accessed on September 13, 2023.

[C] Alcobendas, M., et al., "The Impact of Privacy Measures on Online Advertising Markets," Social Science Research Network, July 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3782889, pp. 1–40.

[D] "The Socioeconomic Impact of Internet Tracking," IAB, February 10, 2020, available at https://www.iab.com/insights/the-socioeconomic-impact-of-internet-tracking/.

[E] Johnson, G., et al, "Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry?," Marketing Science, January 2020, Vol 39(1), available at https://pubsonline.informs.org/doi/10.1287/mksc.2019.1198, pp. 33–51.

[F] Ravichandran, D., and Nitish Korula, "Effect of disabling third-party cookies on publisher revenue," Google, August 27, 2019, available at https://services.google.com/fh/files/misc/disabling_third-

[G] "Apple's IDFA Opt-In," PubMatic, 2021, available at https://pubmatic.com/wp-content/uploads/2021/08/IDFA-Opt-In-Impact-Infographics.pdf, accessed on September 6, 2023.

[H] GOOG-HEWT-00018008–102.

[I] GOOG-HEWT-00456342.

**Exhibit 6**
**Timing of Data Used to Generate the Inputs in Prof. Zeithammer's Meta-Analysis**
**Compared to Industry Changes that Affected the Availability of At-Issue Data in Bid Requests**



**Notes:**
[1] Each study is placed on the timeline based on the month and year of the data used in the study. Because Bidswitch (2020) rely on data from 2019 data, I placed the study at the mid-year point. For IAB (2020), which does not report the month or year of the data used for the study, I assume that the data is from the middle of the year prior to the publication date. For GOOG-HEWT-00018008, I assumed that ████████████████████████████████████████████
[2] ████████████████████████████████████████████████████████████████████████████
(Zeithammer Report, ¶ 32).

**Exhibit 6**
**Timeline of Data Used by the Ten Studies from Dr. Zeithammer Analysis and Various Industry Changes that Affected the Availability of At-Issue Data**

**Sources:**

[A] Zeithammer Report, Table 2.

[B] Beales, J.H., and Jeffrey A. Eisenach, "An Empirical Analysis of the Value of Information Sharing in the Market for Online Content," Navigant Economics, January 2014, pp. 1–15, at p.9.

[C] Johnson, G., et al, "Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry?" Marketing Science, January 2020, Vol 39(1), pp. 33–51, at p. 37.

[D] Marotta, V., et al., "Online Tracking and Publisher's Revenues: An Empirical Analysis," May 2019, Working Paper, pp. 1–35, at p. 13.

[E] Motion for Class Certification, p. vii.

[F] Sweeney, M., and Paulina Zawislak, "A Timeline of Apple's Privacy Changes in Safari and iOS," Clearcode, October 12, 2021, available at https://clearcode.cc/blog/timeline-apple-privacy-changes/, accessed on August 30, 2023

[G] Wilander, J., "Intelligent Tracking Prevention 2.0," WebKit, June 4, 2018, available at https://webkit.org/blog/8311/intelligent-tracking-prevention-2-0/, accessed on August 30, 2023.

[H] Nguyen, N., "Today's Firefox Gives Users More Control over their Privacy," Mozilla, January 29, 2019, available at https://blog.mozilla.org/en/products/firefox/todays-firefox-gives-users-more-control-over-their-privacy/?_gl=1%2A1mau7dp%2A_ga%2AMTYyNzg0NjMzLjE2OTM1MDAxMzU.%2A_ga_MQ7767QQQW%2AMTY5MzUwMDkwNC4xLjEuMTY5MzUwMTI4NC4wLjAuMA.., accessed on August 31, 2023.

[I] GOOG-HEWT-00018008–102.

[J] Ravichandran, D., and Nitish Korula, "Effect of disabling third-party cookies on publisher revenue," Google, August 27, 2019, available at https://services.google.com/fh/files/misc/disabling_third_party_cookies_publisher_revenue.pdf, accessed on July 19, 2023.

[K] "The Socioeconomic Impact of Internet Tracking," IAB, February 10, 2020, available at https://www.iab.com/insights/the-socioeconomic-impact-of-internet-tracking, accessed on August 16, 2023.

[L] "Programmatic Insights 2019," Bidswitch, April 2020, available at https://www.bidswitch.com/wp-content/uploads/2020/03/BidSwitch-Programmatic-Insights-2019.pdf, accessed on September 13, 2023.

[M] Augustinos, T., "The Effective Date of the California Consumer Privacy Act of 2018 Has Come and Gone: What To Do Now?," JD Supra, April 8, 2020, available at https://www.jdsupra.com/legalnews/the-effective-date-of-the-california-44990/, accessed on September 25, 2023.

[N] Alcobendas, M., et al., "The Impact of Privacy Measures on Online Advertising Markets," Social Science Research Network, July 2021, pp. 1–40.

[O] "Apple's IDFA Opt-In," PubMatic, 2021, available at https://pubmatic.com/wp-content/uploads/2021/08/IDFA-Opt-In-Impact-Infographics.pdf, accessed on September 6, 2023.

[P] GOOG-HEWT-00456342

**Exhibit 7**
**Illustration of Differences between Data Included in RTB Bid Requests and Data, User Time, User Services and Other**
**Restrictions Included in Payments from Prof. Zeithammer's Benchmarks[1]**

| | Category of Data or Tasks | At-Issue Data | Prof. Zeithammer's "Four Vendors" | | | |
|---|---|:---:|:---:|:---:|:---:|:---:|
| | | | Screenwise | Datacy | Datacoup | Killi |
| | **Time and Services** | | | | | |
| 1 | Sign up for an account and accept terms of service | | X | X | X | X |
| 2 | Fill out a profile | | X | X | X | X |
| 3 | Log in from time to time to confirm accuracy of data | | X | | | |
| 4 | Install an app or browser extension | | X | X | X | X |
| 5 | Link other apps or accounts (*e.g.,* social networks) | | | X | X | |
| 6 | Respond to profile questions or surveys | | X | X | X | X |
| | **Other Restrictions** | | | | | |
| 7 | Do not opt out of interest-based advertising | | X | | | |
| 8 | Do not use "do not track" features or ad blockers | | X | | | |
| 9 | Do not turn off location reporting services | | X | | | X |
| 10 | Do not use a VPN to mask your location | | | | | X |
| | **Location Information** | | | | | |
| 11 | Coarse Location information | X | | | X[2] | |
| 12 | Precise Location information (*e.g.,* latitude and longitude coordinates, GPS signals) | | X | | | X |
| 13 | Home, mailing, and/or work address | | X | | | |

**Exhibit 7**
**Illustration of Differences between Data Included in RTB Bid Requests and Data, User Time, User Services and Other Restrictions Included in Payments from Prof. Zeithammer's Benchmarks[1]**

| | Category of Data or Tasks | At-Issue Data | Prof. Zeithammer's "Four Vendors" | | | |
|---|---|---|---|---|---|---|
| | | | Screenwise | Datacy | Datacoup | Killi |
| | **Identifiers and Identifying Information** | | | | | |
| 14 | Anonymized pseudonymous cookie | Sometimes | X | | | |
| 15 | Pseudonymous cookies | | X | | | X |
| 16 | Other user IDs | | X | | | |
| 17 | Name | | X | X | X | |
| 18 | Nickname | | X | | | |
| 19 | Phone number | | X | | | X |
| 20 | Email address | | X | X | X | X |
| 21 | Information associated with Google account (*e.g.,* YouTube username) | | X | | | |
| | **Demographic Information** | | | | | |
| 22 | Date of birth | | X | | | X |
| 23 | Age | | X | X | X | X |
| 24 | Gender | | X | X | X | X |
| 25 | Languages spoken | | X | | | |
| 26 | Education and training | | X | X | X | |
| 27 | Marital status | | X | X | | |
| 28 | Profession | | X | | | |
| 29 | Income | | X | X | | |
| 30 | Monthly spending | | | | X | |
| 31 | Race and/or ethnicity | | X | X | | X |
| 32 | Number of members in the household | | X | | | |
| 33 | Demographic information about members of the household | | X | | | |
| 34 | Unspecified "demographic data" | | | | X | X |

**Exhibit 7**
**Illustration of Differences between Data Included in RTB Bid Requests and Data, User Time, User Services and Other Restrictions Included in Payments from Prof. Zeithammer's Benchmarks[1]**

| | Category of Data or Tasks | At-Issue Data | Prof. Zeithammer's "Four Vendors" | | | |
|---|---|---|---|---|---|---|
| | | | Screenwise | Datacy | Datacoup | Killi |
| | **Internet Browsing Activity** | | | | | |
| 35 | Current URL visited | Sometimes | X | X | | X |
| 36 | Information about browsing history | | X | X | | X |
| 37 | Data from linking third-party platforms (*e.g.,* social networks) | | | X | X | |
| 38 | Data from online purchases (e.g., vendor name, date, purchase amount) | | | | X | X |
| | **Device Information and Other Information** | | | | | |
| 39 | Information about device model, platform, and/or browser | X | X | X | | X |
| 40 | Use of telephone, email, SMS, and instant messaging | | X | | | |
| 41 | Content of the user's screen at any time | | X | | | |
| 42 | Data associated to clicks and taps on a screen | | X | | | |
| 43 | Information input when visiting websites, including SSNs and credit card numbers | | X | | | |
| 44 | Information from motion, environmental, and position sensors on a device | | X | | | |
| 45 | System information, including crashes, use of airplane mode, battery, and storage | | X | | | |
| 46 | Information on Wi-Fi networks, data usage, and Bluetooth devices used | | X | | | |
| 47 | List of mobile applications installed | | | | | X |
| 48 | Information about permissions set in app | | | | | X |

**Exhibit 7**
**Illustration of Differences between Data Included in RTB Bid Requests and Data, User Time, User Services and Other Restrictions Included in Payments from Prof. Zeithammer's Benchmarks[1]**

| | At-Issue | Prof. Zeithammer's "Four Vendors" | | | |
|---|---|---|---|---|---|
| **Category of Data or Tasks** | **Data** | **Screenwise** | **Datacy** | **Datacoup** | **Killi** |

**Notes:**

[1] For Datacy, Datacoup, and Killi, the table was compiled using publicly available information. The table was prepared for illustration purposes and is not–nor it can be–complete. Blanks under the four vendors do not necessarily mean that the data was not collected. Blanks mean that I did not find a publicly-available source listing the data item as being among the information received.

[2] The sources cited below show that Datacy collected at least some location information, but it is unclear how precise the location information was. I conservatively assume that the location was coarse location data.

**Sources:**

[A] Complaint, ¶¶ 14–15.

[B] "Google Panel Terms & Conditions," Ipsos Screenwise Panel, June 1, 2021, available at https://screenwisepanel.com/google-panel-terms-condition, accessed on September 7, 2023.

[C] "Google Panel Privacy Policy," Ipsos Screenwise Panel, December 28, 2022, available at https://screenwisepanel.com/google-panel-privacy-policy, accessed on September 26, 2023.

[D] Datacy, available at https://personal.datacy.com/onboarding/1; https://personal.datacy.com/onboarding/2; https://personal.datacy.com/onboarding/3; https://personal.datacy.com/onboarding/4;  accessed on September 27, 2023.

[E] "Privacy & Data Policy," Datacy, November 17, 2021, available at https://datacy.com/privacy-policy, accessed on September 7, 2023.

[F] Tanner, A., "Others Take Your Data For Free, This Site Pays Cash," Forbes, March 3, 2014, available at https://www.forbes.com/sites/adamtanner/2014/03/03/others-take-your-data-for-free-this-site-pays-cash/?sh=556ca547a7946, accessed on September 7, 2023.

[G] Brewster, T., "Meet Datacoup - the company that wants to help you sell your data," The Guardian, September 5, 2014, available at https://www.theguardian.com/technology/2014/sep/05/datacoup-consumer-sell-data-control-privacy-advertising, accessed on August 30, 2023.

[H] Datacoup, "Diving into Data," Medium, May 17, 2016, available at https://medium.com/@datacoup/diving-into-data-f3a80f87e149, accessed on August 30, 2023.

[I] "FAQs," Datacoup, available at https://web.archive.org/web/20161220073524/https://datacoup.com/docs#faq.

[J] "How do I earn from data sharing," Killi, available at https://web.archive.org/web/20200408083908/https://killi.io/learn/#how-do-i-earn-from-data-sharing, accessed on August 30, 2023.

[K] "Terms & Conditions," Killi, March 19, 2021, available at https://killi.io/terms-conditions/, accessed on July 26, 2023.

[L] "Privacy Policy," Killi, June 23, 2021, available at https://killi.io/privacy-policy/, accessed on August 30, 2023.

[M] "Have Burning Questions?" Killi, December 02, 2020, available at https://web.archive.org/web/20201202115148/https://killi.io/faq/#how-do-i-withdraw-money.

**Exhibit 8**
**Datacy Signup Screen**



**Note:**
[1] This screenshot was redacted to remove information that may identify the member of my support team who attempted to access the information.

**Source:**
[A] Datacy, https://datacy.com/, accessed on August 17, 2023.

**Exhibit 9**
**Additional Evidence from Academic Studies Showing that**
**People Vary Widely in Their Preferences for Privacy**

| Source | Findings |
|---|---|
| Hann et al. (2007) [A] | Discussed the variability in user tastes for privacy and explained that some people are "convenience seekers" who care about time savings when visiting websites, have little regard for privacy policies, and are "much more accepting of cookies." |
| Krasnova et al. (2009) [B] | Identified variability in individual preferences for privacy, finding that over 20 percent of people are "Unconcerned Socializers" who do not account for long-term privacy risks and place higher value on the benefits from having their data collected. |
| Atienza et al. (2015) [C] | Examined user privacy preferences in the context of a mobile health (mHealth) app and found that "consumer attitudes regarding mHealth privacy/security are highly contextualized, with concerns depending on the type of information being communicated, where and when the information is being accessed, who is accessing or seeing the information, and for what reasons." ... "While most participants expressed a keen interest in protecting their privacy or security, many participants were also willing to exchange privacy and security if they viewed the use of mHealth technology to be more convenient or perceived certain benefits (to oneself or others)." |
| Skatova et al. (2019) [D] | Found that between 25 and 57 percent of respondents were unwilling to incur any out-of-pocket costs to protect their data on "browsing/search/click history." Moreover, between 5 and 20 percent of respondents were unwilling to pay even to protect information from their medical records, and a similar share did not care about paying to protect the precise location data from their mobile phone GPS system. |

**Notes & Sources:**

[A] Hann I.-H., et al., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," Journal of Management Information Systems, Fall 2007, Vol. 24(2), available at http://www.jstor.org/stable/40398677, pp. 13–42, at pp. 30–32, Table 4.

[B] Krasnova H., et al., "Investigating the Value of Privacy in Online Social Networks: Conjoint Analysis," International Conference on Information Systems, 2009, Conference Paper, available at https://www.researchgate.net/publication/221599995_Investigating_the_Value_of_Privacy_in_Online_Social_Networks_Conjoint_Analysis, pp. 1–18, at pp. 10–11.

[C] Atienza A.A., et al., "Consumer Attitudes and Perceptions on mHealth Privacy and Security: Findings From a Mixed-Methods Study," Journal of Health Communication: International Perspectives, April 2015, Vol. 20(6), available at https://www.tandfonline.com/doi/abs/10.1080/10810730.2015.1018560?journalCode=uhcm20, pp. 673–679, at pp.673, 676.

[D] Skatova A., et al., "Unpacking Privacy: Willingness to pay to protect personal data," PsyArXiv, May 12, 2019, Working Paper, available at https://psyarxiv.com/ahwe4/, pp. 1–42, at pp.15, 28–29. This study focused on respondents in the U.K., but evidence suggests that Europeans have higher privacy expectations and valuations. A Forbes article noted: "[u]nlike the typical mindset in Europe, many Americans choose to believe that their online behavior being tracked happens in their best interests or is a price to pay for getting free or discounted products. … Europeans are still more likely to take charge of their privacy." See, Beens, R., "The Privacy Mindset of the EU vs. the U.S.," Forbes, July 29, 2020, available at https://www.forbes.com/sites/forbestechcouncil/2020/07/29/the-privacy-mindset-of-the-eu-vs-the-us/?sh=367121cc7d01, accessed on August 24, 2023.

**Exhibit 10**
**Market Shares and Examples of Privacy Protection Measures for Top Browsers and Mobile App Platforms**

| Browser / Platform | Average Market Share[1] | Examples of Privacy Protection Measures | |
|---|---|---|---|
| | | Part of the Class Period for Which It Was Available[2] | Description |
| **Browsers[3]** | | | |
| Google Chrome | 48.0% | Entire Period | Users have option to change whether third-party cookies are blocked in browser settings.[C][D] |
| | | May 2020 | Third-party cookies blocked by default in private browsing mode.[E] |
| Apple Safari | 33.6% | Entire Period | Users have option to change whether third-party cookies are blocked in browser settings.[C] |
| | | June 2018 | Third-party cookies blocked by default in all browsing modes.[F][G] |
| Microsoft Edge / Internet Explorer[4] | 8.7% | Entire Period | Users have option to change whether third-party cookies are blocked in browser settings.[C] |
| | | January 2020 | "Harmful" third-party cookies blocked by default in all browsing modes.[K][L] |
| Mozilla Firefox | 4.6% | Entire Period | Users have option to change whether third-party cookies are blocked in browser settings.[C] |
| | | January 2019 | Third-party cookies blocked by default in private browsing mode.[M] |
| | | September 2019 | Third-party cookies blocked by default in all browsing modes.[N] |
| **Mobile App Platforms[5]** | | | |
| Apple iOS | 56.4% | September 2016 | Users can opt out of sharing device identifier (IDFA) in their device settings.[O] |
| | | April 2021 | Device identifier (IDFA) only shared with mobile apps if user selects to "allow tracking."[P][Q] |
| Android | 43.1% | Late 2021 | Users can opt out of sharing device identifier (ADID) in their device settings.[R] |

**Notes:**

[1] The average market share is calculated using the monthly market share for browsers or mobile operating systems during from June 2016 to August 2023.

[2] "Entire Period" means that the setting was introduced prior to June 2016 (the beginning of the Class Period) and is still available today.

[3] Includes the top five browsers by the average market share between June 2016 and August 2023 according to statcounter GlobalStats.[A]

[4] Microsoft Edge / Internet Explorer's market share includes "Edge," "Edge Legacy," and "Internet Explorer." Microsoft provides each of these browsers. Edge Legacy was released in July 2015, and Edge was released in January 2020.[H] Microsoft ended support for Edge Legacy as of March 2021, updating all installs to the new "Edge" browser as of April 2021.[I] Microsoft ended support for Internet Explorer as of June 2022.[J]

[5] Includes the top two mobile operating systems by average market share between June 2016 and August 2023, according to statcounter GlobalStats.[B]

**Exhibit 10**
**Market Shares and Examples of Privacy Protection Measures for Top Browsers and Mobile App Platforms**

**Sources:**

[A] "Browser Market Share United States of America June 2016 - Aug 2023," statcounter GlobalStats, available at https://gs.statcounter.com/browser-market-share/all/united-states-of-america/#monthly-201606-202308, accessed on September 19, 2023.

[B] "Mobile Operating System Market Share United States of America June 2016 - Aug 2023," statcounter GlobalStats, available at https://gs.statcounter.com/os-market-share/mobile/united-states-of-america/#monthly-201606-202308, accessed on September 19, 2023.

[C] Klein, M., "How to Block Third-Party Cookies in Every Web Browser," How-To Geek, February 4, 2016, available at https://www.howtogeek.com/241006/how-to-block-third-party-cookies-in-every-web-browser/, accessed on September 19, 2023.

[D] "Clear, allow & manage cookies in Chrome," Google, available at https://support.google.com/chrome/answer/95647?sjid=12071249112822275074-NA#zippy=%2Callow-or-block-cookies, accessed on August 31, 2023.

[E] Mardini, A., "More intuitive privacy and security controls in Chrome," Google, May 19, 2020, available at https://blog.google/products/chrome/more-intuitive-privacy-and-security-controls-chrome/, accessed on August 30, 2023.

[F] Sweeney, M., and Paulina Zawislak, "A Timeline of Apple's Privacy Changes in Safari and iOS," Clearcode, October 12, 2021, available at https://clearcode.cc/blog/timeline-apple-privacy-changes/, accessed on August 30, 2023.

[G] Wilander, J., "Intelligent Tracking Prevention 2.0," WebKit, June 4, 2018, available at https://webkit.org/blog/8311/intelligent-tracking-prevention-2-0/, accessed on August 30, 2023.

[H] "What's the difference between the new Microsoft Edge and Microsoft Edge Legacy?" Microsoft, available at https://support.microsoft.com/en-us/microsoft-edge/what-s-the-difference-between-the-new-microsoft-edge-and-microsoft-edge-legacy-a01258e5-8c05-7bbb-bed2-c65bec0eb126, accessed on August 31, 2023.

[I] "New Microsoft Edge to replace Microsoft Edge Legacy with April's Windows 10 Update Tuesday release," Microsoft, February 10, 2021, available at https://techcommunity.microsoft.com/t5/microsoft-365-blog/new-microsoft-edge-to-replace-microsoft-edge-legacy-with-april-s/ba-p/2114224, accessed on August 31, 2023.

[J] "Delete and manage cookies," Microsoft, available at https://support.microsoft.com/en-us/windows/delete-and-manage-cookies-168dab11-0753-043d-7c16-ede5947fc64d, accessed on August 31, 2023.

[K] Warren, T., "Microsoft's new Edge Chromium browser launches on Windows and macOS," The Verge, January 15, 2020, available at https://www.theverge.com/2020/1/15/21066767/microsoft-edge-chromium-new-browser-windows-mac-download-os, accessed on August 31, 2023.

[L] Chaudhry, A., and Barbara Krashnoff, "How to use Edge's tools to protect your privacy while browsing," The Verge, February 13, 2020, available at https://www.theverge.com/23057517/microsoft-edge-privacy-browser-security-browsing-how-to, accessed on August 31, 2023.

[M] Nguyen, N., "Today's Firefox Gives Users More Control over their Privacy," Mozilla, January 29, 2019, available at https://blog.mozilla.org/en/products/firefox/todays-firefox-gives-users-more-control-over-their-privacy/?_gl=1%2A1mau7dp%2A_ga%2AMTYyNzg0NjMzLjE2OTM1MDAxMzU.%2A_ga_MQ7767QQQW%2AMTY5MzUwMDkwNC4xLjEuMTY5MzUwMTI4NC4wLjAuMA.., accessed on August 31, 2023.

[N] "Today's Firefox Blocks Third-Party Tracking Cookies and Cryptomining by Default," Mozilla, September 3, 2019, available at https://blog.mozilla.org/press/2019/09/todays-firefox-blocks-third-party-tracking-cookies-and-cryptomining-by-default/, accessed on August 31, 2023.

[O] Gray, S., "iOS 10 to Feature Stronger "Limit Ad Tracking" Control," Future of Privacy Forum, August 2, 2016, available at https://fpf.org/blog/ios-10-feature-stronger-limit-ad-tracking/, accessed on September 19, 2023.

[P] "What happens with iOS 14.5 & LAT?" WeGrow, December 2021, available at https://www.wegrow.ai/blog/what-happens-with-ios-14-5-lat, accessed on September 19, 2023.

[Q] "iOS 14.5 delivers Unlock iPhone with Apple Watch, more diverse Siri voice options, and new privacy controls," Apple, April 26, 2021, available at https://www.apple.com/newsroom/2021/04/ios-14-5-offers-unlock-iphone-with-apple-watch-diverse-siri-voices-and-more/, accessed on September 19, 2023.

[R] Ion, F., "Google Will Let You Opt Out of Being Tracked by Apps in Android 12," Gizmodo, June 3, 2021, available at https://gizmodo.com/google-will-let-you-opt-out-of-being-tracked-by-apps-in-1847029681, accessed on September 19, 2023.

# Appendix A

**BRUCE F. DEAL**

**Managing Principal**

Phone: 650 853 7201                                                          1010 El Camino Real
Fax: 650 323 2796                                                                          Suite 310
bruce.deal@analysisgroup.com                                          Menlo Park, CA 94025

Mr. Deal leads the economic consulting practice in the Menlo Park, CA office of Analysis Group. He has over 25 years of experience in economic, litigation, and management consulting. He has led hundreds of projects requiring complex economic analysis of publicly available and internal client information.

He has served as an expert witness in dozens of litigation and regulatory matters, and has been retained as a neutral expert in a complex mediation. His work as an expert has covered a variety of practice areas, including antitrust, finance and securities litigation, damages, and business valuation. Mr. Deal's industry experience has included health care, insurance, technology, telecommunications, and many others.

Prior to joining Analysis Group, Mr. Deal spent several years as a senior consultant and manager with Arthur Andersen. In this position, he provided financial and management consulting services to hospitals, physicians, and other clients, in such areas as operational organization and efficiency, merger and consolidation strategies, current and projected financial performance, and overall strategic planning.

Mr. Deal has taught economics and analytic methods to graduate students at Harvard University and published articles on economics-related topics. He has also consulted on national economic policy issues to the government of Indonesia through the Harvard Institute for International Development.

He coauthored a major report, *The Economic Effects of Federal Participation in Terrorism Risk* with R. Glenn Hubbard, an Analysis Group affiliate and former chair of the President's Council of Economic Advisers. In addition, he also coauthored a study, *Economic Impact Analysis: Proposition 71 California Stem Cell Research and Cures Initiative* with Laurence Baker, an Analysis Group affiliate and Stanford University School of Medicine faculty member, with whom he published an updated interim economic report on California's stem cell initiative. Mr. Deal is also the coauthor of a chapter on the use of econometrics in antitrust litigation for a recent American Bar Association publication.

## EDUCATION

1994–97     Ph.D. coursework completed, Public Policy, Graduate School of Arts and Sciences, Harvard University, Cambridge, MA

1990     M.P.P., Public Policy, Kennedy School of Government, Harvard University, Cambridge, MA

1987     B.A., *Summa cum Laude*, Economics and Global Studies (double major), Pacific Lutheran University, Tacoma, WA

## TEACHING

| | |
|---|---|
| 1994–96 | Teaching Fellow, *Analytic Methods*, Kennedy School of Government, Harvard University |
| 1994–96 | Instructor, *Economics Summer Program for Mid-Career Graduate Students*, Kennedy School of Government, Harvard University |
| 1989–90 | Teaching Assistant, *Statistics*, Kennedy School of Government, Harvard University |

## PUBLICATIONS AND REPORTS

"COVID-19's Strain on Hospitals May Necessitate More Relief," with Mark Gustafson and Phil Hall-Partyka, *Law360* (May 26, 2020)

"Presentation of Econometric Analyses," with Samuel Weglein, in *Econometrics: Legal, Practical, and Technical Issues*, published by the American Bar Association (2014)

## EXPERT DEPOSITION AND TRIAL TESTIMONY

| | |
|---|---|
| September 2023 | Expert deposition in *Florida Emergency Physicians Kang & Associates, M.D., Inc., et al. v. United Healthcare of Florida, Inc., et al. (health insurance payor-provider matter)* |
| August 2023 | Expert deposition in *Richard E. Fischbein v. IQVIA, Inc.* (*TCPA matter*) |
| August 2023 | Expert deposition in *Confidential Arbitration (damages related to alleged financial fraud)* |
| July 2023 | Expert deposition in *Emergency Physician Services of New York., et al. v. UnitedHealth Group, Inc., et al. (health insurance payor-provider matter)* |
| July 2023 | Expert deposition in *Emergency Group of Arizona Professional Corp, et al. v. UnitedHealth Group, Inc., et al. (health insurance payor-provider matter)* |
| June 2023 | Trial testimony in *California Physicians' Service d/b/a Blue Shield of California v. Advanced Orthopedic Center, Inc. (health insurance payor-provider matter)* |
| April 2023 | Trial testimony in *People of the State of California v. Intuit, Inc. (FTC alleged deceptive advertising matter)* |
| April 2023 | Trial testimony in *CEP America – California v. Heritage Provider Network (health insurance payor-provider matter)* |
| February 2023 | Expert deposition in *People of the State of California v. Intuit, Inc. (FTC alleged deceptive advertising matter)* |
| February 2023 | Expert deposition in *Liberty Dialysis Hawaii LLC, et al. v. Health Management Network Inc., et al. (payor-provider contractual dispute)* |
| December 2022 | Expert deposition in *Harold Parsons v. The Commerce Insurance Company (proposed claims payment class action)* |

| November 2022 | Expert deposition in *CEP America – California v. Heritage Provider Network (health insurance payor-provider matter)* |
| October 2022 | Expert deposition in *Brian J. Lyngaas, D.D.S., P.L.L.C. v. IQVIA, Inc.* (TCPA matter) |
| October 2022 | Expert deposition in *Saint Alphonsus Health Alliance, Inc., et al. v. Corizon LLC, et al. (health insurance payor-provider matter)* |
| August 2022 | Expert deposition in *Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corporation, et al. (class certification opposition in a securities class action)* |
| July 2022 | Expert deposition in *Jeffrey Leonard, et al. v. John Hancock Life Insurance Company of New York, et al. (life insurance policy performance litigation)* |
| July 2022 | Trial testimony in *Dual Diagnosis Treatment Center, Inc., et al. v. Health Net, Inc., et al. (health insurance payor-provider matter)* |
| May 2022 | Expert deposition in *Dual Diagnosis Treatment Center, Inc., et al. v. Health Net, Inc., et al. (health insurance payor-provider matter)* |
| May 2022 | Deposition testimony in *Travel Nurse Across America, LLC v. Floyd Edwards Holdings, Inc., et al. (company valuation)* |
| March 2022 | Deposition testimony in *Hooman Melamed, M.D., Inc. v. Blue Shield of California Life and Health Insurance Company (health insurance payor-provider matter)* |
| December 2021 | Deposition testimony in *Los Robles Regional Medical Center, et al. v. Kaiser Foundation Health Plan, Inc., et al. (health insurance payor-provider matter)* |
| December 2021 | Deposition testimony in *Matthew N. Fulton v. Enclarity, Inc., et al.* (TCPA matter) |
| November 2021 | Deposition testimony in *Los Robles Regional Medical Center, et al. v. Kaiser Foundation Health Plan, Inc., et al. (health insurance payor-provider matter)* |
| November 2021 | Trial testimony in *Fremont Emergency Services (Mandavia), Ltd., et al. v. UnitedHealth Group Inc., et al. (health insurance payor-provider matter)* |
| November 2021 | Deposition testimony in *Confidential – OCC (securities valuation)* |
| September 2021 | Deposition testimony in *Fremont Emergency Services (Mandavia) Ltd., et al. v. UnitedHealth Group Inc., et al. (health insurance payor-provider matter)* |
| June 2021 | Deposition testimony in *Charles Tillage, et al. v. Comcast, et al. (class action alleging improper disclosure of fees)* |
| May 2021 | Deposition testimony in *Highfields Capital I LP, et al. v. SeaWorld Entertainment, Inc., et al. (securities fraud litigation)* |
| May 2021 | Deposition testimony in *Luke Davis, et al. v. Laboratory Corporation of America Holdings (class action alleging damages due to inadequate access to facilities)* |

| | |
|---|---|
| April 2021 | Deposition testimony in *California Physicians' Service v. HealthPlan Services (contract performance dispute)* |
| February 2021 | Deposition testimony in *Confidential – OCC (securities valuation)* |
| September 2020 | Deposition testimony in *California Physicians' Service v. HealthPlan Services (contract performance dispute)* |
| September 2020 | Deposition testimony in *In re: The Allstate Corporation Securities Litigation (class action alleging claim frequency misstatements)* |
| July 2020 | Deposition testimony in *Confidential Arbitration (health care pricing dispute)* |
| April 2020 | Deposition testimony in *In re: CenturyLink Sales Practices and Securities Litigation (class action alleging customer cramming and related allegation)* |
| February 2020 | Deposition testimony in *CEP America – California v. Heritage Provider Network (health insurance payor-provider matter)* |
| January 2020 | Expert deposition in *Confidential Arbitration (DMHC pricing matter)* |
| December 2019 | Expert deposition in *Confidential Arbitration (ownership dispute matter)* |

## PROFESSIONAL MEMBERSHIPS

American Economics Association

American Bar Association (non-lawyer member)

Association for Health Services Research

**Appendix B**
**List of Documents Relied Upon**

## Expert Reports

Expert Class Certification Report of Professor Robert Zeithammer, in *In re Google RTB Consumer Privacy Litigation,* Case No. 4:21-cv-02155-YGR(VKD), July 14, 2023

Expert Class Certification Report of Greg J. Regan, CPA/CFF, CFE, in *In re Google RTB Consumer Privacy Litigation* , Case No. 4:21-cv-02155-YGR(VKD), July 14, 2023

Expert Report of Aaron Striegel, in *In re Google RTB Consumer Privacy Litigation* , Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023

Expert Report of Dominique Hanssens, in *In re Google RTB Consumer Privacy Litigation* , Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023

## Legal Documents

Consolidated Class Action Complaint, in Benjamin Hewitt, et al., v. Google LLC, Case No. 5:21-cv-02155-LHK(VKD), September 16, 2021 ("Complaint").

Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; and Memorandum of Points and Authorities in Support Thereof, in *In re Google RTB Consumer Privacy Litigation* , Case No. 4:21-cv-02155-YGR(VKD), July 14, 2023

## Declarations

Declaration of Dr. Glenn Berntson in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, in *In re Google RTB Consumer Privacy Litigation* , Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023

Declaration of Suneeti Vakharia in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, in *In re Google RTB Consumer Privacy Litigation* , Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023

Declaration of Whitty Somvichian in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, in *In re Google RTB Consumer Privacy Litigation* , Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023

## Interrogatories

Google LLC's Revised Supplemental Objections and Responses To Plaintiffs' Third Set Of Interrogatories, August 30, 2023

Google LLC's Supplemental Objections and Responses To Plaintiffs' Fourth Set Of Interrogatories, June 8, 2023

## Depositions

Deposition Transcript of Christopher Valencia, December 14, 2022 (excluding Highly Confidential material)

Deposition Transcript of Dr. Glenn Berntson, December 8, 2022

Deposition Transcript of Greg Regan, September 5, 2023

Deposition Transcript of John Kevranian, December 9, 2022

Deposition Transcript of Rethena Green, April 20, 2023

Deposition Transcript of Robert Zeithammer, Ph.D., September 7, 2023

Deposition Transcript of Stanislav Belov, December 13, 2022

Deposition Transcript of Terry Diggs, April 14, 2023

## Produced Documents

GOOG-HEWT-00018008–102

GOOG-HEWT-00047130–152

GOOG-HEWT-00047191–225

GOOG-HEWT-00259486–88

GOOG-HEWT-00455648

GOOG-HEWT-00455801

GOOG-HEWT-00456337–347

GOOG-HEWT-00456348

GOOG-HEWT-00481705–710

## Books

Allen, M.A., et al., "Reference Guide on Estimation of Economic Damages," in Reference Manual on Scientific Evidence, Third Edition, The National Academies Press, 2011

Hitchner, J.R., "Financial Valuation, Applications and Models," Third Edition, Wiley Finance, 2011

Laney, D.B., "Infonomics: How to Monetize, Manage & Measure Information as an Asset for Competitive Advantage," Gartner, 2017

Pindyck, R., and Daniel L. Rubinfeld, "Microeconomics," Eighth Edition, Pearson, 2013

Pratt, S., and Alina V. Niculita, "The Lawyer's Business Valuation Handbook," Second Edition, American Bar Association, 2010

Varian, H., "Economic Aspects of Personal Privacy," in Internet Policy and Economics Challenges and Perspectives, Second Edition, 2009

## Academic Articles

Acquisti, A., et al., "Privacy and human behavior in the age of information," Science Magazine, January 30, 2015, Vol. 347(6221), available at https://www.science.org/doi/10.1126/science.aaa1465, pp. 509–514

Alcobendas, M., et al., "The Impact of Privacy Measures on Online Advertising Markets," Social Science Research Network, July 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3782889, pp. 1–40

Athey, S., et al., "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," National Bureau of Economic Research, June 2017, Working Paper, available at http://www.nber.org/papers/w23488, pp. 1–26

**Appendix B**
**List of Documents Relied Upon**

**Academic Articles (continued)**

Atienza A.A., et al., "Consumer Attitudes and Perceptions on mHealth Privacy and Security: Findings From a Mixed-Methods Study," Journal of Health Communication: International Perspectives, April 2015, Vol. 20(6), available at https://www.tandfonline.com/doi/abs/10.1080/10810730.2015.1018560?journalCode=uhcm20, pp. 673–679

Beales, J.H., and Jeffrey Eisenach, "An Empirical Analysis of the Value of Information Sharing in the Market for Online Content," Social Science Research Network, January 2014, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2421405, pp. 1–15

Dinev, T. and Paul Hart, "An Extended Privacy Calculus Model for E-Commerce Transactions," Information Systems Research, March 2006, Vol. 17(1), available at https://www.jstor.org/stable/23015781, pp. 61–80

Evans, D.S., "The online advertising industry: Economics, evolution, and privacy," Journal of economic perspectives, Summer 2009, Vol. 23(3), pp. 37–60

Gerber, N., et al., "Explaining the privacy paradox: A systematic review of literature investigating privacy attitude and behavior," Computers & Security 77 (2018) 226–261

Greenwood, J. et al., "A macroeconomic analysis reveals the benefits for consumers of digital advertising," University of Pennsylvania Carey Law School, October 11, 2021, available at https://www.law.upenn.edu/live/blogs/75-a-macroeconomic-analysis-reveals-the-benefits-for, accessed on August 25, 2023

Hann I.-H., et al., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," Journal of Management Information Systems, Fall 2007, Vol. 24(2), available at https://www.tandfonline.com/doi/abs/10.2753/MIS0742-1222240202/, pp. 13–42

Johnson, G., et al, "Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry?," Marketing Science, January 2020, Vol 39(1), available at https://pubsonline.informs.org/doi/10.1287/mksc.2019.1198, pp. 33–51

Krasnova, H., et al., "Investigating the Value of Privacy in Online Social Networks: Conjoint Analysis," Thirteenth International Conference on Information Systems, 2009, Conference Paper, available at https://www.researchgate.net/publication/221599995_Investigating_the_Value_of_Privacy_in_Online_Social_Networks_Conjoint_Analysis, pp. 1–18

Lin, T., "Valuing Intrinsic and Instrumental Preferences for Privacy," Marketing Science, May 2022, Vol. 41(4), available at https://doi.org/10.1287/mksc.2022.1368, pp. 663–681

Marotta, et al., "Online Tracking and Publisher's Revenues: An Empirical Analysis," May 2019, pp. 1–35

Ravichandran, D., and Nitish Korula, "Effect of disabling third-party cookies on publisher revenue," Google, August 27, 2019, available at https://services.google.com/fh/files/misc/disabling_third-party_cookies_publisher_revenue.pdf

Skatova A., et al., "Unpacking Privacy: Willingness to pay to protect personal data," PsyArXiv, May 12, 2019, available at https://psyarxiv.com/ahwe4/, pp. 1–42

Turow, J. et al., "Americans Reject Tailored Advertising and Three Activities that Enable It," Social Science Research Network, September 29, 2009, available at https://dx.doi.org/10.2139/ssrn.1478214, pp. 1–27

Xiong et al., "Recognition and Evaluation of Data as Intangible Assets," SAGE Open, April-June 2022, pp. 1–13, available at https://journals.sagepub.com/doi/pdf/10.1177/21582440221094600

**Publicly Available**

"3rd Annual VPN Market Report: 2022," Security.org, August 18, 2023, available at https://www.security.org/resources/vpn-consumer-report-annual/, accessed on August 25, 2023

"71% of Consumers Prefer Personalized Ads," Adlucent, available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/, accessed on August 25, 2023

"About the GASB," Governmental Accounting Standards Board, available at https://www.gasb.org/aboutgasb

"Ad Exchange," 6sense, available at https://6sense.com/tech/ad-exchange, accessed on August 29, 2023

"AdBlock – best ad blocker," Chrome Web Store, available at https://chrome.google.com/webstore/detail/adblock-%E2%80%94-best-adblocker/gighmmpiobklfepjocnamgkkbiglidom, accessed on August 31, 2023

"Ads & made for kids content," Google Advertising Policies Help, available at https://support.google.com/adspolicy/answer/9683742, accessed on September 8, 2023

"Ad-serving protections for teens," Google Advertising Policies Help, available at https://support.google.com/adspolicy/answer/12205906?hl=en, accessed on September 11, 2023

"Allowing Acceptable Ads in Adblock Plus," Adblock Plus, available at https://adblockplus.org/en/acceptable-ads#optout, accessed on September 25, 2023

"Apple's IDFA Opt-In," PubMatic, 2021, available at https://pubmatic.com/wp-content/uploads/2021/08/IDFA-Opt-In-Impact-Infographics.pdf

"Authorized Buyers overview," Google Authorized Buyers Help, available at https://support.google.com/authorizedbuyers/answer/6138000?hl=en, accessed on August 31, 2023

"Authorized Buyers," Google for Developers, available at https://developers.google.com/authorized-buyers, accessed on August 29, 2023

"Brave Ads FAQ," Brave, available at https://support.brave.com/hc/en-us/articles/360026361072-Brave-Ads-FAQ, accessed on August 24, 2023

"Brave Browser Active Users," BraveBat, available at https://bravebat.info/brave_browser_active_users, accessed on September 7, 2023

"Brave Passes 50 Million Monthly Active Users, Growing 2x for the Fifth Year in a Row," Brave, January 5, 2022, available at https://brave.com/2021-recap/, accessed on August 24, 2023

"Bring more bids to the auction with Open Bidding," Google Ad Manager, available at https://admanager.google.com/home/resources/feature-brief-open-bidding/, accessed on August 29, 2023

"Browser Market Share United States of America June 2016 - Aug 2023," statcounter GlobalStats, available at https://gs.statcounter.com/browser-market-share/all/united-states-of-america/#monthly-201606-202308, accessed on September 19, 2023

"California Consumer Privacy Act (CCPA)," State of California Department of Justice – Office of the Attorney General, May 10, 2023, available at https://oag.ca.gov/privacy/ccpa, accessed on August 25, 2023

"Children's Online Privacy Protection Act (COPPA)," Google Publisher Policies Help, available at https://support.google.com/publisherpolicies/answer/10436800?hl=en, accessed on September 8, 2023

"Clear, allow & manage cookies in Chrome," Google Chrome Help, available at https://support.google.com/chrome/answer/95647?hl=en&p=cpn_cookies#zippy=%2Callow-or-block-cookies, accessed on September 6, 2023

**Appendix B**
**List of Documents Relied Upon**

**Publicly Available (continued)**

"Consumer Insights Platform," Datacy, available at https://datacy.com/platform/uncover, accessed on September 7, 2023

"Datacoup FAQs," Datacoup, https://web.archive.org/web/20161220073524/https://datacoup.com/docs#faq, accessed on September 7, 2023

"Delete and manage cookies," Microsoft, available at https://support.microsoft.com/en-us/windows/delete-and-manage-cookies-168dab11-0753-043d-7c16-ede5947fc64d, accessed on August 31, 2023

"Despite Negative Perceptions, 52% of Consumers Can Identify Benefits of Targeted Advertising," PRNewswire, March 25, 2021, available at https://www.prnewswire.com/news-releases/despite-negative-perceptions-52-of-consumers-can-identify-benefits-of-targeted-advertising-301255752.html, accessed on August 25, 2023

"Display & Video 360," Google Marketing Platform, available at https://marketingplatform.google.com/about/display-video-360/, accessed on August 29, 2023

"Enhanced Tracking Protection in Firefox for desktop," Mozilla Support, available at https://support.mozilla.org/en-US/kb/enhanced-tracking-protection-firefox-desktop, accessed on September 6, 2023

"Frequently Asked Questions," Ghostery, available at https://www.ghostery.com/faq, accessed on September 22, 2023

"Ghostery – Privacy Ad Blocker Extension for Chrome," Chrome Stores, available at https://chromestores.com/extension/ghostery-extension-chrome/#google_vignette, accessed on August 31, 2023

"Ghostery Privacy Browser," Aptoide, available at https://ghostery.en.aptoide.com/app, accessed on September 7, 2023

"Ghostery Tracker & Ad Blocker for Any Device," Ghostery, available at https://www.ghostery.com/ghostery-ad-blocker, accessed on August 24, 2023

"Google Ads policies," Google Advertising Policies Help, available at https://support.google.com/adspolicy/answer/6008942?hl=en, accessed on September 8, 2023

"Google Panel Privacy Policy," Ipsos Screenwise Panel, available at https://screenwisepanel.com/google-panel-privacy-policy

"Google Panel Terms & Conditions," Ipsos Screenwise Panel, available at https://screenwisepanel.com/google-panel-terms-condition, accessed on September 7, 2023

"Have Burning Questions?" Killi, December 2, 2020, available at https://web.archive.org/web/20201202115148/https://killi.io/faq/#how-do-i-withdraw-money

"How do I earn from data sharing," Killi, available at https://web.archive.org/web/20200408083908/https://killi.io/learn/#how-do-i-earn-from-data-sharing, accessed on August 30, 2023

"How do I opt-in to Brave Ads?," Brave, available at https://support.brave.com/hc/en-us/articles/360026648512-How-do-I-opt-in-to-Brave-Ads-, accessed on September 25, 2023

"How Open Bidding works," Google Ad Manager Help, available at https://support.google.com/admanager/answer/7128958?hl=en&ref_topic=7512060&sjid=11192043347591034842-NA, accessed on August 31, 2023

"How personalized ads work," Google My Ad Center Help, available at https://support.google.com/My-Ad-Center-Help/answer/12155656?hl=en&co=GENIE.Platform%3DAndroid, accessed on August 31, 2023

"IAB CCPA Benchmark Survey Summary," Interactive Advertising Bureau, November 12, 2020, available at https://www.iab.com/insights/iab-ccpa-benchmark-survey/, accessed on August 25, 2023

"If an app asks to track your activity," Apple, February 13, 2023, available at https://support.apple.com/en-us/HT212025, accessed on September 1, 2023

"Illustrative examples to accompany IFRS 13 Fair Value Measurement: Unquoted equity instruments within the scope of IFRS 9 Financial Instruments," International Financial Reporting Standards, December 2012, pp. 1-70, available at https://www.ifrs.org/content/dam/ifrs/supporting-implementation/ifrs-13/education-ifrs-13-eng.pdf

"Introduction to Open Bidding," Google Ad Manager Help, available at https://support.google.com/admanager/answer/7128453, accessed on August 29, 2023

"Introduction to real-time bidding (RTB)," Google Authorized Buyers Help, available at https://support.google.com/authorizedbuyers/answer/6136272?hl=en, accessed on August 24, 2023

"iOS 14.5 delivers Unlock iPhone with Apple Watch, more diverse Siri voice options, and new privacy controls," Apple, April 26, 2021, available at https://www.apple.com/newsroom/2021/04/ios-14-5-offers-unlock-iphone-with-apple-watch-diverse-siri-voices-and-more/, accessed on September 19, 2023

"Ipsos Screenwise Panel Privacy Policy," Ipsos Screenwise Panel, available at https://screenwisepanel.com/ipsos-Sow-privacy-policy, accessed on September 7, 2023

"Mobile Operating System Market Share United States of America June 2016 - Aug 2023," statcounter GlobalStats, available at https://gs.statcounter.com/os-market-share/mobile/united-states-of-america/#monthly-201606-202308, accessed on September 19, 2023

"Need for Proxy/VPN Data in Today's Heightened Cybersecurity State," Digital Element, available at https://www.digitalelement.com/wp-content/uploads/2021/11/Proxy-VPN-Cybersecurity-Brief.pdf, accessed on September 22, 2023

"New Microsoft Edge to replace Microsoft Edge Legacy with April's Windows 10 Update Tuesday release," Microsoft, February 10, 2021, available at https://techcommunity.microsoft.com/t5/microsoft-365-blog/new-microsoft-edge-to-replace-microsoft-edge-legacy-with-april-s/ba-p/2114224, accessed on August 31, 2023

"OpenRTB (Real-Time Bidding)," IAB Technology Laboratory, available at https://iabtechlab.com/standards/openrtb/, accessed on August 29, 2023

"Privacy & Data Policy," Datacy, November 17, 2021, available at https://datacy.com/privacy-policy, accessed on September 7, 2023

**Appendix B**
**List of Documents Relied Upon**

**Publicly Available (continued)**

"Privacy checkup: Limit Ad Tracking up 216% on iOS, but down 85% on Android," Singular, available at https://www.singular.net/blog/limit-ad-tracking-privacy-checkup-in-2020/, accessed on September 1, 2023

"Privacy Policy," Killi, June 23, 2021, https://killi.io/privacy-policy/

"Programmatic Insights 2019," Bidswitch, April 2020, available at https://www.bidswitch.com/wp-content/uploads/2020/03/BidSwitch-Programmatic-Insights-2019.pdf

"Reach a larger or new audience with Google Display Network targeting," Google Ads, available at https://ads.google.com/intl/en_in/home/resources/reach-larger-new-audiences/, accessed on August 29, 2023

"Real-time Bidding," Google Authorized Buyers, available at https://developers.google.com/authorized-buyers/rtb/start, accessed on August 29, 2023

"Regulatory complaint concerning massive, web-wide data breach by Google and other 'ad tech' companies under Europe's GDPR; The complaints are being made by Dr Johnny Ryan of Brave, the private web browser, Jim Killock, Executive Director of the Open Rights Group, and Michael Veale of University College London," PRNewswire, September 12, 2018, available at https://www.prnewswire.com/news-releases/regulatory-complaint-concerning-massive-web-wide-data-breach-by-google-and-other-ad-tech-companies-under-europes-gdpr-the-complaints-are-being-made-by-dr-johnny-ryan-of-brave-the-private-web-browser-jim-killock-executive-d-300711726.html, accessed on August 24, 2023

"Rethinking Retail: Insights from consumers and retailers into an omni-channel shopping experience," Infosys, 2013, available at https://www.infosys.com/newsroom/press-releases/documents/genome-research-report.pdf, accessed on August 25, 2023

"RTB evidence: Selected evidence submitted to data protection authorities to demonstrate RTB's GDPR problems," Brave, available at https://brave.com/rtb-evidence/, accessed on August 24, 2023

"Rubicon Project," LinkedIn, available at https://www.linkedin.com/company/the-rubicon-project/, accessed on August 29, 2023

"Safari Privacy Overview: Learn how the Safari web browser protects your privacy," Apple, November 2019, available at https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf

"Settings for personalized ads," Google Ad Settings, available at https://adssettings.google.com/, accessed on September 1, 2023

"Terms & Conditions," Killi, March 19, 2021, available at https://killi.io/terms-conditions/, accessed on July 26, 2023

"The best alternatives to Google Ads," Brave, July 18, 2023, available at https://brave.com/web3/google-ads-alternatives/, accessed on August 24, 2023

"The Effective Date of the California Consumer Privacy Act of 2018 Has Come and Gone: What To Do Now," JD Supra, April 8, 2020, available at https://www.jdsupra.com/legalnews/the-effective-date-of-the-california-44990/, accessed on September 6, 2023

"The More You Share, The More You Earn," Reklaim, available at https://www.reklaimyours.com/how-to-earn, accessed on September 26, 2023

"The Most Surprising Browser User Statistics And Trends in 2023," Gitnux, September 5, 2023, available at https://blog.gitnux.com/browser-user-statistics/, accessed on September 12, 2023

"The Socioeconomic Impact of Internet Tracking," IAB, February 10, 2020, available at https://www.iab.com/insights/the-socioeconomic-impact-of-internet-tracking/

"The Value of Targeted Advertising to Consumers," Interactive Advertising Bureau, available at https://www.iab.com/wp-content/uploads/2016/05/Value-of-Targeted-Ads-to-Consumers2.pdf, accessed on September 23, 2023

"Today's Firefox Blocks Third-Party Tracking Cookies and Cryptomining by Default," Mozilla, September 3, 2019, available at https://blog.mozilla.org/press/2019/09/todays-firefox-blocks-third-party-tracking-cookies-and-cryptomining-by-default/, accessed on August 31, 2023

"uBlock Origin – Free, open-source ad content blocker," uBlock Origin, available at https://ublockorigin.com/, accessed on September 1, 2023

"uBlock Origin," Chrome Web Store, available at https://chrome.google.com/webstore/detail/ublock-origin/cjpalhdlnbpafiamejdnhcphjbkeiagm, accessed on August 31, 2023

"uBlock Origin," Firefox Browser Add-Ons, available at https://addons.mozilla.org/en-US/firefox/addon/ublock-origin/, accessed on August 31, 2023

"uBlock Origin," Microsoft Edge Add-ons, available at https://microsoftedge.microsoft.com/addons/detail/ublock-origin/odfafepnkmbhccpbejgmiehpchacaeak, accessed on August 31, 2023

"Unmarried and Single Americans Week: September 17-23, 2023," U.S. Census Bureau, September 17, 2023, available at https://www.census.gov/newsroom/stories/unmarried-single-americans-week.html, accessed on September 26, 2023

"User-Agent Strings," Chrome for Developers, November 28, 2014, available at https://developer.chrome.com/docs/multidevice/user-agent/, accessed on September 27, 2023

"Welcome to Reklaim," Reklaim, available at https://www.reklaimyours.com/learn/welcome-to-reklaim, accessed on September 26, 2023

"What are the different Killi Paycheck tiers?" Killi, available at https://killi.io/faqs/what-are-the-different-killi-paycheck-tiers/, accessed on August 30, 2023

"What happens with iOS 14.5 & LAT?" WeGrow, December 2021, available at https://www.wegrow.ai/blog/what-happens-with-ios-14-5-lat, accessed on September 19, 2023

"What Is a VPN and Can it Hide My IP Address?," McAfee, available at https://www.mcafee.com/learn/what-is-a-vpn-and-can-it-hide-my-ip-address/, accessed on August 31, 2023

"What Is Salesforce?," Salesforce, available at https://www.salesforce.com/products/what-is-salesforce/, accessed on September 26, 2023

"What's the difference between the new Microsoft Edge and Microsoft Edge Legacy?" Microsoft, available at https://support.microsoft.com/en-us/microsoft-edge/what-s-the-difference-between-the-new-microsoft-edge-and-microsoft-edge-legacy-a01258e5-8c05-7bbb-bed2-c65bec0eb126, accessed on August 31, 2023

"Who We Are," Adlucent, available at https://www.adlucent.com/company/who-we-are/, accessed on September 26, 2023

Alphabet Inc., SEC Form 10-K, for the fiscal year ended December 31, 2016, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204417000008/goog10-kq42016.htm

Alphabet Inc., SEC Form 10-K, for the fiscal year ended December 31, 2017, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204418000007/goog10-kq42017.htm

Alphabet Inc., SEC Form 10-K, for the fiscal year ended December 31, 2018, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204419000004/goog10-kq42018.htm

**Appendix B**
**List of Documents Relied Upon**

**Publicly Available (continued)**

Alphabet Inc., SEC Form 10-K, for the fiscal year ended December 31, 2019, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204420000008/goog10-k2019.htm.

Alphabet Inc., SEC Form 10-K, for the fiscal year ended December 31, 2020, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm

Alphabet Inc., SEC Form 10-K, for the fiscal year ended December 31, 2021, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204422000019/goog-20211231.htm

Alphabet Inc., SEC Form 10-K, for the fiscal year ended December 31, 2022, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204423000016/goog-20221231.htm

Anant, V., et al., "The consumer-data opportunity and the privacy imperative," McKinsey & Company, April 27, 2020, available at https://www.mckinsey.com/capabilities/risk-and-resilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative, accessed on August 24, 2023

Augustinos, T., "The Effective Date of the California Consumer Privacy Act of 2018 Has Come and Gone: What To Do Now?," JD Supra, April 8, 2020, available at https://www.jdsupra.com/legalnews/the-effective-date-of-the-california-44990/

Balderson, K., "17 Brave Browser Market Share and Other Brave Statistics," VPN Central, September 20, 2023, available at https://vpncentral.com/brave-browser-market-share/, accessed on September 22, 2023

Barrett, B., "Ghostery's Making a Privacy Browser–and Ad-Free Search Engine," Wired, November 18, 2020, available at https://www.wired.com/story/ghostery-browser-search-ad-free/, accessed on September 7, 2023

Beens, R., "The Privacy Mindset of the EU vs. the U.S.," Forbes, July 29, 2020, available at https://www.forbes.com/sites/forbestechcouncil/2020/07/29/the-privacy-mindset-of-the-eu-vs-the-us/?sh=367121cc7d01, accessed on August 24, 2023

Bindra, C., "Additional steps to safeguard user privacy," Google Ad Manager, November 14, 2019, available at https://blog.google/products/admanager/additional-steps-safeguard-user-privacy/, accessed on August 25, 2023

BraveBat, "Brave Browser Active Users," available at https://bravebat.info/brave_browser_active_users, accessed on September 7, 2023

Brewster, T., "Meet Datacoup - the company that wants to help you sell your data," The Guardian, September 5, 2014, available at https://www.theguardian.com/technology/2014/sep/05/datacoup-consumer-sell-data-control-privacy-advertising, accessed on August 30, 2023

Castro, D., and Michael McLaughlin, "Survey: Few Americans Willing to Pay for Privacy," Center for Data Innovation, January 16, 2019, available at https://datainnovation.org/2019/01/survey-few-americans-willing-to-pay-for-privacy/, accessed on August 24, 2023

Chaudhry, A., and Barbara Krashnoff, "How to use Edge's tools to protect your privacy while browsing," The Verge, February 13, 2020, available at https://www.theverge.com/23057517/microsoft-edge-privacy-browser-security-browsing-how-to, accessed on August 31, 2023

Collins, B., "Google Chrome: Three Rival Browsers That Put It To Shame," Forbes, September 12, 2020, available at https://www.forbes.com/sites/barrycollins/2020/09/12/google-chrome-three-rival-browsers-that-put-it-to-shame/?sh=7558a676e1c8, accessed on August 24, 2023

Cox, J., "The Hundreds of Little-Known Firms Getting Data on Americans," Vice, June 28, 2021, available at https://www.vice.com/en/article/n7bdkq/hundreds-companies-bidstream-data-location-browsing, accessed on September 7, 2023

Cyphers, B., "Google Says It Doesn't 'Sell' Your Data. Here's How the Company Shares, Monetizes, and Exploits It.," Electronic Frontier Foundation, March 19, 2020, available at https://www.eff.org/deeplinks/2020/03/google-says-it-doesnt-sell-your-data-heres-how-company-shares-monetizes-and#:~:text=Real%2Dtime%20bidding%20is%20the,hundreds%20of%20different%20adtech%20companies, accessed on August 24, 2023

Datacoup, "Diving into Data," Medium, May 17, 2016, available at https://medium.com/@datacoup/diving-into-data-f3a80f87e149, accessed on August 30, 2023

Datacy, https://datacy.com/, accessed on August 17, 2023.

Datacy, available at https://personal.datacy.com/onboarding/1, accessed on September 27, 2023.

Datacy, available at https://personal.datacy.com/onboarding/2, accessed on September 27, 2023.

Datacy, available at https://personal.datacy.com/onboarding/3, accessed on September 27, 2023.

Datacy, available at https://personal.datacy.com/onboarding/4, accessed on September 27, 2023.

Edmonds, R., "People Don't Want to Trade Privacy for Targeted Ads," Poynter, January 14, 2016, available at https://www.poynter.org/business-work/2016/people-dont-want-to-trade-privacy-for-targeted-ads/, accessed on August 25, 2023

Financial Accounting Standards Board, Accounting Standards Codification 820-10-55-3A, available at https://asc.fasb.org/1943274/2147482078/820-10-55-3A

Gray, S., "IOS 10 to Feature Stronger "Limit Ad Tracking" Control," Future of Privacy Forum, August 2, 2016, available at https://fpf.org/blog/ios-10-feature-stronger-limit-ad-tracking/, accessed on September 19, 2023

Haslam, K., "What's in iOS 14.5," Macworld, April 27, 2021, available at https://www.macworld.com/article/676189/whats-in-ios-14-5.html, accessed on September 6, 2023

Hautala, L., "Here's how Apple's browsing privacy features will work in Safari," CNET, June 8, 2018, available at https://www.cnet.com/tech/tech-industry/heres-how-apples-browsing-privacy-features-will-work-safari/, accessed on September 1, 2023

Hautala, L., "Pop-ups about cookies constantly interrupt you online. Here's how they could go away," CNET, December 28, 2020, available at https://www.cnet.com/news/privacy/why-youre-hounded-by-pop-ups-about-cookies-and-how-they-could-go-away/, accessed on September 22, 2023

**Appendix B**
**List of Documents Relied Upon**

**Publicly Available (continued)**

Ion, F., "Google Will Let You Opt Out of Being Tracked by Apps in Android 12," Gizmodo, June 3, 2021, available at https://gizmodo.com/google-will-let-you-opt-out-of-being-tracked-by-apps-in-1847029681, accessed on September 19, 2023

Jordan, S., "Key Search Retargeting Benefits for Small Businesses," Visual Objects, March 28, 2022, available at https://visualobjects.com/digital-marketing/blog/search-retargeting, accessed on August 25, 2023

Klein, M., "How to Block Third-Party Cookies in Every Web Browser," How-To Geek, February 4, 2016, available at https://www.howtogeek.com/241006/how-to-block-third-party-cookies-in-every-web-browser/, accessed on September 19, 2023

Konrad, T., "Cliqz buys Ghostery's consumer operations," Cliqz, February 15, 2017, available at https://cliqz.com/en/magazine/press-release-cliqz-acquires-ghostery, accessed on August 24, 2023

Lau, Y., "A Brief Primer on the Economics of Targeted Advertising," Bureau of Economics, Federal Trade Commission, January 2020, pp. 1–16, available at https://www.ftc.gov/system/files/documents/reports/brief-primer-economics-targeted-advertising/economic_issues_paper_-_economics_of_targeted_advertising.pdf, accessed on August 24, 2023

Lovely, S., "Streaming Across Borders: 51% of Adults Worldwide Use a VPN to Watch Location Restricted Content on Netflix," Cordcutting, December 15, 2021, available at https://cordcutting.com/vpn/streaming-across-borders-study/, accessed on September 6, 2023

Maheshwari, S., "Adblock Plus, Created to Protect Users From Ads, Instead Opens the Door," The New York Times, September 18, 2016, available at https://www.nytimes.com/2016/09/19/business/media/adblock-plus-created-to-protect-users-from-ads-opens-the-door.html, accessed on August 31, 2023

Mardini, A., "More intuitive privacy and security controls in Chrome," Google, May 19, 2020, available at https://blog.google/products/chrome/more-intuitive-privacy-and-security-controls-chrome/, accessed on August 31, 2023

McGinnis, D., "Please Take My Data: Why Consumers Want More Personalized Marketing," Salesforce, December 2, 2016, available at https://www.salesforce.com/blog/consumers-want-more-personalized-marketing/, accessed on August 25, 2023

Newman, L. H., "A Simple Way to Make It Harder for Mobile Ads to Track You," Wired, September 21, 2019, available at https://www.wired.com/story/ad-id-ios-android-tracking/, accessed on September 28, 2023

Nguyen, N., "Today's Firefox Gives Users More Control over their Privacy," Mozilla, January 29, 2019, available at https://blog.mozilla.org/en/products/firefox/todays-firefox-gives-users-more-control-over-their-privacy/?_gl=1%2A1mau7dp%2A_ga%2AMTYyNzg0NjMzLjE2OTM1MDAxMzU.%2A_ga_MQ7767QQQW%2AMTY5MzUwMDkwNC4xLjEuMTY5MzUwMTI4NC4wLjAuMA.., accessed on August 31, 2023

O'Driscoll, A., "VPN statistics: What the numbers tell us about VPNs," Comparitech, available at https://www.comparitech.com/vpn/vpn-statistics/, accessed on September 1, 2023

O'Flaherty, K., "Apple's Stunning iOS 14 Privacy Move: A Game-Changer For All iPhone Users," Forbes, January 31, 2021, available at https://www.forbes.com/sites/kateoflahertyuk/2021/01/31/apples-stunning-ios-14-privacy-move-a-game-changer-for-all-iphone-users/?sh=367c234d7e8d, accessed on August 31, 2023

Pauzer, H., "71% of Consumers Prefer Personalized Ads," Adlucent, available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/, accessed on August 25, 2023

Pegoraro, R., "Here's A Hint About How Few People Click Those "Do Not Sell My Personal Information" Links," Forbes, November 13, 2020, available at https://www.forbes.com/sites/robpegoraro/2020/11/13/heres-a-hint-about-how-few-people-click-those-do-not-sell-my-personal-information-links/?sh=22196f5d1fc9, accessed on September 6, 2023

Protalinski, E., "Chrome 83 arrives with redesigned security settings, third-party cookies blocked in Incognito," VentureBeat, May 19, 2020, available at https://venturebeat.com/business/google-chrome-83/, accessed on August 31, 2023

Ramaswamy, A., "Caden launches with $3.4M to help consumers take control of their data," TechCrunch, January 20, 2022, available at https://techcrunch.com/2022/01/20/caden-launches-with-3-4-million-to-help-consumers-take-control-of-their-data, accessed on September 7, 2023

Ravichandran, D., and Nitish Korula, "Effect of disabling third-party cookies on publisher revenue," Google, August 27, 2019, available at https://services.google.com/fh/files/misc/disabling_third-party_cookies_publisher_revenue.pdf

Ryan, J., "A summary of the ICO report on RTB – and what happens next," Brave, June 26, 2019, available at https://brave.com/ico-adtech-update-rtb/, accessed on August 24, 2023

Ryan, J., "Brave uncovers Google's GDPR workaround," Brave, September 4, 2019, available at https://brave.com/google-gdpr-workaround/, accessed on August 24, 2023

Ryan, J., "Google and IAB's inadequate proposals to reform RTB," Brave, January 21, 2020, available at https://brave.com/google-iab-reform/, accessed on August 24, 2023

Ryan, J., "New evidence to regulators: IAB documents reveal that it knew that real-time bidding would be 'incompatible with consent under GDPR,'" Brave, February 20, 2019, available at https://brave.com/update-on-gdpr-complaint-rtb-ad-auctions/, accessed on August 24, 2023

Ryan, J., "Regulatory complaint concerning massive, web-wide data breach by Google and other 'ad tech' companies under Europe's GDPR," Brave, September 12, 2018, available at https://brave.com/adtech-data-breach-complaint/, accessed on August 24, 2023

Ryan, J., "Report from Dr. Johnny Ryan – Behavioral advertising and personal data," Brave, available at https://brave.com/static-assets/files/Behavioural-advertising-and-personal-data.pdf, accessed August 24, 2023

Ryan, J., "RTB Header Bidder Evidence – Explanatory Document," Brave, September 2, 2019, available at https://brave.com/static-assets/files/explanatory_note_google_RTB_and_push_pages.pdf, accessed August 24, 2023

Salesforce Research, "Trends in Customer Trust: The future of personalization, data, and privacy in the Fourth Industrial Revolution," Salesforce, Research Brief, pp.1-16, available at https://c1.sfdcstatic.com/content/dam/web/en_us/www/documents/briefs/customer-trust-trends-salesforce-research.pdf

Savage, M., "Why do women still change their names?" BBC, September 23, 2020, available at https://www.bbc.com/worklife/article/20200921-why-do-women-still-change-their-names, accessed on September 24, 2023

Schiff, A., "Ghostery Sheds Its Ad Tracker, Sells Off Its Plug-In To Focus On Compliance," AdExchanger, February 15, 2017, available at https://www.adexchanger.com/data-exchanges/ghostery-sheds-ad-tracker-sells-off-plug-focus-compliance/, accessed on August 24, 2023

Statista Research Department, "How many email addresses do you have?" Statista, available at https://www.statista.com/statistics/1291843/number-of-email-addresses-people-have-us/#:~:text=According%20to%20the%20results%20of,having%20over%20four%20email%20addresses

**Appendix B**
**List of Documents Relied Upon**

**Publicly Available (continued)**

Steel, E., "Companies scramble for consumer data," June 12, 2013, available at https://www.ft.com/content/f0b6edc0-d342-11e2-b3ff-00144feab7de, accessed on September 13, 2023

Sweeney, M., and Paulina Zawislak, "A Timeline of Apple's Privacy Changes in Safari and iOS [infographic]," Clearcode, October 12, 2021, available at https://clearcode.cc/blog/timeline-apple-privacy-changes/, accessed on August 31, 2023

Tanner, A., "Others Take Your Data For Free, This Site Pays Cash," Forbes, March 3, 2014, available at https://www.forbes.com/sites/adamtanner/2014/03/03/others-take-your-data-for-free-this-site-pays-cash/?sh=556a547a7946, accessed on September 7, 2023

Vojinovic, I., "VPN Statistics for 2023 – Keeping Your Browsing Habits Private," DataProt, May 26, 2023, available at https://dataprot.net/statistics/vpn-statistics/, accessed on September 6, 2023

Wakefield, J., "Google's 'secret web tracking pages' explained," BBC, September 5, 2019, available at https://www.bbc.com/news/technology-49593830, accessed on August 24, 2023

Warren, T., "Microsoft's new Edge Chromium browser launches on Windows and macOS," The Verge, January 15, 2020, available at https://www.theverge.com/2020/1/15/21066767/microsoft-edge-chromium-new-browser-windows-mac-download-os, accessed on August 31, 2023

Wilander, J., "Intelligent Tracking Prevention 2.0," WebKit, June 4, 2018, available at https://webkit.org/blog/8311/intelligent-tracking-prevention-2-0/, accessed on August 30, 2023

Wolford, B., "What is GDPR, the EU's new data protection law?" GDPR.EU, available at https://gdpr.eu/what-is-gdpr/, accessed on September 22, 2023