# EXHIBIT 11
# to Declaration of
# W. Somvichian

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

5   In re Google RTB Consumer    )
    Privacy                      ) Case No.
6   Litigation,                  ) 4:21-cv-02155-YGR-VKD
                                 )
7                                )
    This document applies to:    )
8   All actions                  )
    _____ )

9

10

11

12     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13   VIDEO-RECORDED DEPOSITION OF PROFESSOR NEIL RICHARDS

14

15            Thursday, August 24, 2023

16            San Francisco, California

17

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 6056459

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 8

1          The court reporter is Hanna Kim, from the

2     firm Veritext Legal Solutions.

3          I am not related to any party in this

4     action, nor am I financially interested in the

5     outcome.

6          If there are any objections to proceeding,

7     please state them at the time of your appearance.

8          Counsel and all present, including

9     remotely, will now state their appearances and

10    affiliations for the record, beginning with the

11    noticing attorney.

12          MR. WONG:  Kyle Wong of Cooley LLP on

13    behalf of Google.

14          MR. DHILLON:  Anu Dhillon of Cooley LLP

15    also on behalf of Google.

16          MR. DANITZ:  Brian Danitz, Cotchett,

17    Pitre & McCarthy, for the Plaintiffs.

18          MS. PRITZKER:  Elizabeth Pritzker,

19    Pritzker Levine, on behalf of the Plaintiffs.

20          MS. SWOPE:  Karin Swope, Cotchett Pitre,

21    on behalf of the Plaintiffs.

22          THE VIDEOGRAPHER:  Thank you.

23          Will the court reporter please swear in

24    the witness, and then counsel may proceed.

25    ///

NEIL RICHARDS, PH.D.,
having been duly administered an oath
was examined and testified as follows:

EXAMINATION

BY MR. WONG:
Q. Good morning.
Could you state your name for the record.
A. Neil -- Professor Neil Michael Richards, R-I-C-H-A-R-D-S.
Q. Do you understand, Professor Richards, that today you are under oath to tell the truth?
A. I do.
Q. And this is the same oath that you would be under if you were in court.
So even if you're not in a formal court setting, you understand that the same oath applies?
A. Yes.
Q. And the court reporter's transcribing everything that we say. So she can't transcribe if we are talking at the same time. So I'm going to strive to wait until I think you've finished answering my question to ans- -- to ask another one.
And if you could wait to -- to hope that I am done ans- -- ask- -- asking my question before

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1  engaged in historical research first as an amateur

2  and then as a professional.

3        And I have published a variety of articles

4  dealing with -- with history.  In -- in particular,

5  the -- the intellectual and legal history of privacy

6  and privacy law.  And I have -- I -- I recently

7  published an -- a review in the leading history

8  journal of a -- of a book dealing with the history

9  of privacy.

10        I -- I serve -- I'm going to be serving on

11  an academic committee to assess the tenure of a --

12  of a his- -- of a historian who's coming up for

13  tenure at a different university.  That's literally

14  the thing I'll be doing next week when I go back to

15  St. Louis.

16     Q.   And outside of being a trained historian

17  and apparently a good cook, do you have any other

18  areas of expertise outside of the law?

19     A.   I'm -- I'm -- I'm sure I do.  I -- I think

20  as relevant to this case, my expertise is as a

21  historian and -- and scholar of privacy and data

22  protection.

23        THE COURT REPORTER:  Professor, can you

24  keep your hands down.

25        THE WITNESS:  I'm sorry.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

1        Q.   And what is your expertise in how

2     consumers understand privacy?

3             MS. PRITZKER:   Object to form.

4             THE WITNESS:   I have been one of the

5     leading privacy experts in the United States -- I'm

6     sorry.   I have been one of the leading privacy

7     experts in the world.   As -- as someone born in

8     England, it's difficult for me to talk about my

9     accomplishments with the con- -- arrogance often

10    expected of expert witnesses.

11             But I am -- I am one of the leading

12    privacy experts in the world.   I have -- I have

13    studied privacy in -- in, to my knowledge, all of

14    its forms full time at -- at Washington University,

15    as a full-time academic for over -- for over

16    20 years.   I have read a tremendous amount.   I have

17    attended a number -- more conferences than I can --

18    than I can count.   I have given hundreds and

19    hundreds of -- of presentations on -- on questions

20    of -- of privacy.

21             I have had countless conversations, as

22    I -- as I detail in my most recent book, "Why

23    Privacy Matters," with people all walks of life

24    across the Western world about concepts of privacy

25    over the past 20 years in -- in particular.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 45

1          I am regarded by my peers in disciplines

2    outside the law as an expert in -- in privacy.  My

3    work is frequently cited in academic and other

4    treatments of -- of consumer behavior.  I have

5    studied the -- the cultural, social, and legal

6    history of privacy, among others.  And that's --

7    that's a start.

8    BY MR. WONG:

9          Q.    All right.

10          But I asked about your specific expertise

11    in understanding how consumers think about privacy.

12    Not privacy in general, but consumers and their

13    understanding.

14          So what is your expertise in consumers,

15    consumer behavior, which you've just used in your

16    own answer, and privacy?

17          A.    I have written about consumer privacy

18    issues, studied, researched, discussed, presented,

19    and published on these questions for the past

20    20 years.

21          I have been asked to testify about

22    questions of privacy before Congress, before the

23    Federal Trade Commission.  I have read extensively

24    studies and monographs and articles about consumer

25    privacy expectations.  Then there's -- there's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     you mean?

2          A.    Empirical studies, broadly defined, are

3     ones that identify facts about the world to the

4     extent that a legal history describes facts against

5     the world.  That is in -- under the broad

6     definition, it is an empirical study.  Sometimes

7     when people use the term "empirical study," they

8     refer to qualitative research in the social

9     sciences, psychology, economics, sociology or

10    quantitative work in those disciplines as well.

11          So there's a -- there's a range of

12    meanings that -- that scholars and lawyers and the

13    lay public use or mean when they say empirical, and

14    I want to be precise in my answers today.

15          Q.    Have you ever conducted a focus group on

16    consumer expectations of privacy?

17          A.    In a formal methodological setting, no.

18          Q.    Have you ever conducted a survey that

19    looked for statistical significant results in

20    analyzing consumer expectations of privacy?

21          A.    No.

22          Q.    Do you have any formal training in

23    conducting a focus group on consumer expectations of

24    privacy in a formal methodological study?

25          A.    No.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 49

1    Q.   Do you have any formal training in

2    conducting a survey that looks for statistically

3    significant results in analyzing consumer --

4              THE COURT REPORTER:  Can you slow down

5    just a little bit, Counsel.

6    BY MR. WONG:

7    Q.   Do you have any formal -- sorry.  Strike

8    that.

9              Do you have any formal training in

10   conducting a survey that looks for statistically

11   significant results in analyzing consumer

12   expectations of privacy?

13   A.   I attended a workshop in empirical methods

14   some years ago, so I have received training in that.

15   Q.   Have you ever applied that training to

16   your own work on consumer privacy expectations?

17              MS. PRITZKER:  Object to form.

18              THE WITNESS:  I'm sure I must have.

19   BY MR. WONG:

20   Q.   Can you name an article in which you have?

21   A.   When you receive training in statistical

22   methods, you understand concepts like selection bias

23   and other sorts of methods by which you would

24   evaluate a study.  So I suppose I have used both my

25   formal training, as well as my informal training, of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    attending dozens, if not hundreds, of empirical

2    presentations at my home institution and other

3    institutions at conferences over my 20 plus years as

4    a full-time academic every time that I -- that I

5    read or evaluate a study.

6            And so, those -- those habits of mine,

7    those analytical skills are ones that -- that you

8    can't unlearn.  And so, for example, when -- when I

9    read consumer surveys or studies, I'm using that

10   training and that experience in assessing their --

11   their persuasiveness and their validity.

12       Q.   Do you believe you're an expert in

13   conducting surveys that look for statistically

14   significant results in analyzing consumer

15   expectations of privacy?

16       A.   In terms of actually running the survey

17   and conducting it, I would say that I am not trained

18   in quanti- -- I am not trained at an expert level in

19   the conduction of -- of large and quantitative

20   models and consumer surveys.

21           I do think that I would be welcomed on a

22   team, indeed a -- a leading team, as a subject

23   matter expert in privacy and consumers.

24           But with respect to the precise set of

25   skills of -- of actually crunching the numbers, that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    setting," correct, earlier in your testimony?

2        A.    I'd have to review the transcript.  We've

3    been -- we've been talking a lot about this.

4        Q.    You said it with respect to the focus

5    groups.

6            Do you recall that?

7        A.    I recall us talking about the focus

8    groups, yes.

9        Q.    So I'm asking whether or not you have

10   expertise in the actual results from focus groups in

11   a formal -- that -- that are conducted in a formal

12   methodological setting.

13       A.    Maybe I can simplify this.  I have ex- --

14   I have not conducted formal large and statistical

15   surveys of consumer expectations of privacy.

16       Q.    Have you conducted formal small

17   statistical surveys of consumer expectations of

18   privacy?

19       A.    No --

20       Q.    Have you ever --

21       A.    -- not to -- well, I -- I would have to

22   review my -- I would have to review my -- my

23   publications to answer that question with definitive

24   clarity.

25       Q.    You cannot recall as we sit here whether

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    or not you've ever conducted a statistical survey of

2    consumer expectations of privacy?

3        A.    The -- the majority of my work is not

4    statistical.   I don't believe I have ever conducted

5    a statistical study of consumer expectations of

6    privacy.

7        Q.    Have you conducted any -- so what other

8    kinds of surveys of consumer expectations of privacy

9    are you aware of?

10       A.    Well, you -- you asked me about

11   conducting.   I have read them.

12       Q.    Read statistical studies of consumer

13   expectations of privacy or other studies of consumer

14   expectations of privacy?

15             I am confused as to your answer.

16       A.    Both.

17       Q.    And I am asking whether or not you've ever

18   conducted a statistical or otherwise study of

19   consumer expectations of privacy.

20       A.    Again, I have not conducted a statistical

21   study of consumer expectations of privacy.

22       Q.    Have you conducted a nonstatistical study

23   of consumer expectations of privacy?

24       A.    Well, I think when you -- when you talk

25   about consumer expectations of privacy over time,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 65

1  they are notable in what they say Google will not do

2  with U.S. account holders' personal information:  to

3  not share or sell account holders' personal

4  information to anyone outside of Google."

5          In the next paragraph I say, "As explained

6  above in Section V, there is substantial evidence,

7  both in the public record, and from evidence

8  produced by Google in discovery that provides

9  common, objective facts from which a jury or trier

10  of fact may conclude not only that a reasonable

11  Google account holder has a reasonable expectation

12  of privacy, but that Google is all too well aware of

13  this fact."

14      Q.    So whose expectations are you opining

15  about?

16      A.    That of a reasonable Google account

17  holder.

18      Q.    So not of --

19      A.    And, also, for a full answer -- sorry,

20  I -- I paused, and -- and -- and --

21      Q.    I -- I -- I --

22      A.    -- you were -- you were justified in -- in

23  thinking I'd finished, but -- but -- but I hadn't.

24          So a reasonable Google account holder

25  having a reasonable expectation of privacy, but also

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 66

1    Google's awareness.

2         Q.   So not all Google U.S. account holders; is

3    that correct?

4              MS. PRITZKER:  Object as to form.

5              THE WITNESS:  This section of the report

6    has an opinion as to what a reasonable Google

7    account holder would expect.

8    BY MR. WONG:

9         Q.   Did you review any articles or

10   publications discussing Google RTB?

11             MS. PRITZKER:  Object as to form.

12             THE WITNESS:  I've read articles and

13   publications discussing Google RTB.

14   BY MR. WONG:

15        Q.   And if those informed your opinions here,

16   they are in the footnotes or in Appendix B; correct?

17        A.   It is hard to say.  I have been working in

18   the field of privacy for over 20 years.  I had -- I

19   had heard of RTB before working on this case.  I had

20   read articles about RTB before working on this case.

21   The -- the case materials that I considered in

22   formulating my opinions are disclosed in Appendix B.

23        Q.   And what are the -- do you recall where

24   these articles were published that you said you had

25   read before you worked on this case?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 77

1    in my day job while writing the report about RTB.  I
2    suspect that I -- I told my dean that I was working
3    on this case.  And I suspect that my dean -- though
4    he's quite old, he might not have a Google account,
5    but he -- I suspect he is a Google accountholder.
6              So -- so it -- it's inevitable that I --
7    that I would have.  If you're -- if you're asking
8    me, maybe I'll make -- I'm trying to make this easy
9    for you because I promise I'm not trying to be
10   difficult.  If you're asking me, did I conduct a
11   focus group of Google accountholders in formulating
12   my opinions on this Complaint, the answer is no, as
13   I think I've already said.
14        Q.   Did you talk with any of the named
15   plaintiffs in this case?
16        A.   No.
17        Q.   Do you have a Google account?
18        A.   I do.
19        Q.   And what Google accounts do you have?
20        A.   It's -- it's -- it's -- there's a lot of
21   different Google servers and products, but I'm happy
22   to -- to -- to go down the list with you, if you
23   want.
24        Q.   Sure.
25        A.   I -- I -- let me start.  I have a Gmail

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

1    work that I have authored, either individually or

2    jointly with -- with co-authors or other

3    collaborators.  In citing that opinion that may be

4    reflected in one of my scholarly works, that opinion

5    itself is a product of -- of documents of work, of

6    research, that is -- some of which is -- that is --

7    that is contained where appropriate in the text and

8    footnotes of that article.

9          So, for example, my -- my second book,

10   "Why Privacy Matters," I cite that a few times in

11   the report.  And by citing that, I'm -- no doubt was

12   thinking of -- of -- of -- of -- of that project,

13   which involved a lot of reading itself.  So -- so

14   all -- all of this is -- is built upon dec- --

15   decades of -- of study and -- and -- and learning

16   and -- and conversations with people from a wide

17   variety of walks of life about privacy.  And I would

18   say that there were -- where a key document should

19   have been cited, I cited it.

20         Q.   In Paragraph 3 -- I believe this is your

21   second opinion; is that correct?  Again, don't --

22   just read it silently, and when you're done, let me

23   know.

24         A.   (Witness reviews.)

25              Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    have rights that are not guaranteed through law.

2             For example, many people in the United

3    States, including, I believe, most people in the

4    city, believe that there is a fundamental right to

5    reproductive freedom, which is not currently not

6    guaranteed by the U.S. Constitution under the Dobbs

7    decision.

8             So you can have rights that are not

9    legally guaranteed, but a -- but a -- but in -- I

10   would say much of the time there is some linkage

11   between a right and a legal claim.

12            With respect to -- to norms, norms are --

13   I don't want to offer too technical of a -- a

14   definition, but a -- but a casual definition, let's

15   say, for the purpose of our discussion here, would

16   be a norm is something that is a shared expectation

17   of behavior.

18       Q.    Not necessarily shrouded in law?

19       A.    Correct, not necessarily.

20       Q.    And how do you determine what a societal

21   norm is?

22       A.    There are a number of ways to determine

23   what a societal norm is, but -- but I think the --

24   the most effective way is by experience, by -- by

25   reading, by thinking, by living in society, but

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 96

1   particularly in a -- in a way that is receptive to

2   looking for social norms.  Many social norms are --

3   are implicit.

4        Q.   So is there a [verbatim] academic -- is

5   there an academic standard by which to measure a

6   societal norm?

7        A.   There -- there is a -- there is a

8   literature on -- on social norms, but I would say

9   the -- the -- the standard for measuring whether a

10  social norm is whether it one is that is -- that is

11  generally accepted.

12       Q.   And how do you know when something is

13  generally accepted?

14       A.   You study it, and you make that

15  determination.  In this case, I have done so based

16  upon my expertise.

17       Q.   That sounds a little circular to me,

18  though.

19            So how do you make an objective

20  determination that something is generally accepted?

21       A.   You study it, and you assess it as a

22  scholar.

23       Q.   How does one do that, though, without some

24  quantitative assessment of something being generally

25  accepted?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 97

1      A.    Because, as I've already said, numbers are

2    not the only way to understand the world.

3      Q.    But if something -- generally accepted --

4    what does generally accepted mean then to you?

5    Because I'm confused by that.  To me, that sounds

6    like something that most people do, like 60 percent

7    of people or 70 percent of people.  Otherwise, it

8    wouldn't be generally accepted.

9      A.    Again, I -- I -- I -- I'm not going to

10    quantify it for you because my understanding in

11    this -- in this context is that it is a qualitative

12    appreciation.

13      Q.    And so what are the criteria for that

14    qualitative appreciation?

15      A.    Whether it is generally accepted.

16      Q.    And what is the criteria for when

17    something is generally accepted?

18      A.    Whether it is commonly understood to be

19    accepted.

20      Q.    So what it sounds like is that your

21    expertise is that you just say something is commonly

22    accepted, it is then generally accepted, and then it

23    is the qualitative social norm?

24          MS. PRITZKER:  Is there a question there?

25          Object as to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1    BY MR. WONG:

2        Q.   I don't understand what the criteria is if

3    you cannot explain to me what generally accepted

4    means.

5        A.   I have explained it as commonly accepted.

6        Q.   So generally accepted means commonly

7    accepted, but what -- what does that criteria --

8    how -- how is someone supposed to take that

9    methodology and apply it to -- to -- to an

10   everyday -- to everyday conduct?

11       A.   It requires an exercise of judgment

12   grounded in expertise.

13       Q.   So it's discretion?

14       A.   That's not what I said.

15       Q.   Well, I don't understand how -- how

16   does -- why -- why -- what -- what makes your

17   determination that something is generally accepted

18   different from someone who does not have your

19   historical training?

20       A.   Well, without -- again, going some odds to

21   my -- my own cultural conditioning as a -- as a

22   modest Englishman, I am one of the world's leading

23   experts in privacy and in the history of privacy

24   by -- by any measure.  That's the difference.

25            I have devoted 25 years of my life to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 99

1    thinking about these questions every day, to

2    studying them, to subjecting them to analysis, to --

3    to listening to --

4            I'm sorry, I should slow down for you.

5            -- to listening to countervailing

6    arguments and opposing perspectives and di- -- and

7    diverse perspectives, that this is an exercise in --

8    in judgment and expertise, and it is -- it is

9    qualitative rather than quantitative.  I'm not going

10   to put a number on common for you.

11   BY MR. WONG:

12       Q.   So it's your testimony that someone with

13   your expertise applies one criteria, which is

14   whether or not something is, in their determination,

15   generally accepted, and that is how you determine

16   whether or not something is historically a social

17   norm?

18       A.   You asked me what it meant -- as -- as I

19   understand it, you asked me what it meant for

20   something to be generally accepted.

21            With respect to the report that I authored

22   in this case, which was the product of many hours of

23   work and analysis specifically and rested, as I've

24   said, upon close to a quarter of a century of -- of

25   study, erudition, and expertise in these areas, I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    drew upon my training and my work and my expertise

2    and a countless number of things that I have read

3    and conversations that I have had and -- and

4    observations that I have made about privacy in --

5    specifically in the United States and in United

6    States history.

7            And I drew upon a significant amount of

8    historical and other research documenting the -- for

9    example, the instantiation of the fundamental social

10   norm of privacy in legal tests, in statutes, in

11   statements by technology companies, in empirical

12   research upon consumer expectations, and I think

13   other sorts of -- other forms of evidence that were

14   relevant to my determination.

15           But ultimately the determination of

16   whether privacy is a -- I want to refer to the --

17   the phrase that we're talking about to be precise,

18   "that privacy - including freedom from unwanted

19   surveillance - is a fundamental right and important

20   societal norm with deep roots in the social,

21   cultural, and legal history of the United States"

22   was a question of -- based upon all of that learning

23   and -- and observation and -- and research over

24   many, many years, was [verbatim] a conclusion that I

25   reached on the basis of my expert -- expertise.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 105

1           Here I -- I'm -- I'm weary that we're --

2      we're going to open a -- a very large can of

3      academic worms.  I don't know how we determine if

4      they're academic, if they're wearing little --

5      little mortar board hats or what, about the

6      relationship between norms and law.  But I'm happy

7      to -- if you want to go into this, I'm happy to talk

8      with you about it.

9           Q.   Well, you were saying that societal norms

10      are the criteria -- the only criteria you gave was

11      that it's generally accepted; right?

12                MS. PRITZKER:  Objection as to form.

13                THE WITNESS:  I don't think so.

14      BY MR. WONG:

15           Q.   So then what is your definition -- what is

16      the criteria for determining whether or not

17      something is a societal norm?

18           A.   I think the answer I gave before was

19      whether something is commonly accepted.  It is a --

20      it is a qualitative exercise in assessment.  And

21      this is -- this is where the -- the problems of

22      epistemology that I alluded to a moment ago come in,

23      how do we know what we know.  It is a -- it is a

24      complicated question.

25                But the answer I gave and the answer that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    other determination to figure out whether or not

2    spitting on someone violates a social norm?

3         A.   The good news is we don't have to talk

4    about hypotheticals here.  We can talk about this

5    case.  And in this case, Google made repeated

6    promises to its account holders that it would not,

7    does not, and never sell or share personal

8    information.

9         Q.   Right.

10             But I --

11        A.   And they shared personal information --

12             THE COURT REPORTER:  I'm sorry.  One

13    second.

14    BY MR. WONG:

15        Q.   You have to answer the question.

16             THE COURT REPORTER:  If we could slow down

17    a little and speak one at a time.

18    BY MR. WONG:

19        Q.   The question I asked was, if 99 percent of

20    people did something, is that not evidence of

21    general acceptance?

22        A.   I'm not going to speculate with you.  And,

23    again, I'm not going to put a quantitative number on

24    general or common because it is a qualitative -- for

25    me, in my methodology, I approached this as a -- in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    a qualitative sense, the quality of a thing rather

2    than the quantity of a thing.

3            And these are generally accepted and have

4    been for hundreds, if not thousands of years, in the

5    universities -- in -- in -- in leading universities,

6    let's say, of ways of understanding human behavior.

7    I understand -- I'll stop there.

8        Q.   So you are not going to answer whether or

9    not something that 99 percent of people do is a

10   social norm?

11       A.   I think I have answered the question,

12   which is that you don't need to put numbers on

13   things to understand them.

14           Let me -- let me -- let me try and answer

15   the question in a different way because I want to

16   answer your questions.

17           You are running into the same problem you

18   are accusing me of here because you want to put

19   numbers on things to establish them.  But without

20   some yardstick for how much is enough, which is

21   itself a qualitative inquiry, you can't establish it

22   either.

23       Q.   Yes, that may be a gray area, but

24   99 percent is not one of them.  And if someone did a

25   study of whether or not it's acceptable to spit in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    So in -- in Fourth Amendment law -- and,

2   of course, the Katz formulation, though it was only

3   in a concurrence, has come to be the -- the -- the

4   dominant doctrinal element.

5           But it's also -- and what I'm try- -- what

6   I'm saying in this -- in this section, it has been

7   so successful that it is -- it has slipped the

8   moorings of law and entered to be a concept that

9   people use outside of the legal concept -- the legal

10  system.

11          It is one -- in my experience it is one of

12  a -- of a handful of phrases from the law that

13  first-year law students come to law school already

14  having heard, not from being lawyers or being, you

15  know, aggressive prelaw overstudiers, but merely

16  from living in our society.

17      Q.    But a first-year law student is not a --

18  the -- the sort of average con- -- consumer; right?

19              MS. PRITZKER:  Object as to form.

20              THE WITNESS:  No, that -- that -- I

21  don't -- I don't think I was suggesting that.

22  BY MR. WONG:

23      Q.    Well, I'm saying, how -- how do you know

24  that -- that -- that this concept has permeated

25  consumers' expectations, like the -- the general

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    consumer?

2         A.    I have observed both in my work and in my

3    living in our society people talking about privacy

4    in these terms regularly.

5         Q.    And you think that's a -- a -- a

6    reasonable representation of the average U.S.

7    consumer?

8              MS. PRITZKER:  Objection.

9              THE WITNESS:  I don't think that's what

10   I'm saying.

11   BY MR. WONG:

12        Q.    So then how can you make the jump between

13   saying that the concept of a -- of a reasonable

14   expectation of privacy is something that the

15   ordinary consumer has -- has permeated down to the

16   level of the ordinary consumer?

17        A.    Because I have observed it.  I -- I

18   believe that it's discussed in the literature.

19        Q.    And you think that the average U.S.

20   consumer has knowledge of this concept?

21        A.    I -- it's -- it's hard to imagine what you

22   mean by an "average U.S. consumer," but I would

23   say -- what I say in the paragraph is that for many

24   people -- I'm paraphrasing here -- but then I do say

25   the -- "The test for whether privacy rights exist or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 120

1            THE WITNESS:  Yes.

2            Sometimes it involves statistical

3    evidence.  Statistical evidence can certainly inform

4    determinations of -- of reasonableness.  Other

5    times, it -- it looks to the underlying values of

6    the law.

7    BY MR WONG:

8        Q.    Which may be at odds with consumers' own

9    beliefs?

10       A.    Potentially.

11       Q.    In Paragraph 60 on Page 23, you talk about

12   the CCPA, which is a California approved voter

13   initiative law governing certain sorts of privacy

14   rights.  You -- you note that it's quote,

15   "consistent with your understanding, as a privacy

16   scholar and legal historian, of modern data privacy

17   norms and expectations."  [As read]

18            When you use the word "expectations" in

19   that sentence, whose expectations specifically are

20   you referring to?

21       A.    So first of all, the -- the CCPA was not a

22   ballot initiative law.  A ballot initiative was

23   introduced in California, and at the last minute a

24   statute was passed by the California legislature to

25   substitute for the ballot initiative, which was --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 123

1     A.   Well, it was -- as you noted earlier, it
2   was offered in a -- in a ballot initiative.  And
3   it -- and it was high -- both highly likely to pass.
4   And then the successor law was passed, I believe,
5   fully by a fairly significant vote by the voters of
6   California when they had a chance to -- to add to,
7   not to the CCPA protections in the California
8   Privacy Rights Act.
9          Second, in my -- in my study of privacy
10  over the last 20 years, I have seen numerous
11  references to, and I have seen -- have had
12  conversations with consumers that they expect their
13  information is protected, even if it is not linked
14  directly to their name, if it is related to them.
15          In addition, in context of this case, I
16  found that there is substantial evidence in the
17  record, as discuss- -- through the discovery
18  process, that that is not just what Google's
19  customers think, but also what Google knows Google's
20  customers think about the scope of privacy
21  protection.
22     Q.   So you're testifying that you understand
23  Google's intent; is that correct?
24          MS. PRITZKER:  Object as to form.
25          THE WITNESS:  I am testifying that I have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 124

1    seen evidence in the record that Google employees

2    express similar sentiments both as to -- with --

3    with respect to what consumers -- Google customers,

4    Google account holders --

5    BY MR. WONG:

6        Q.   So are you saying --

7        A.   -- expect.

8        Q.   Sorry.  Didn't mean to cut you off.

9        A.   No worries.

10       Q.   You -- you said, quote, "Google knows

11   Google's customers think" -- or I'm sorry.

12           It's not just what Google's customers

13   think, but also what Google knows Google's customers

14   think.  So --

15       A.   Correct.

16       Q.   So are you saying then that Google, the

17   entity, knows what its customers think in your

18   opinion?

19       A.   In my opinion, I have seen evidence in the

20   record to support two propositions as relevant to

21   this particular line of questioning.

22           The first proposition is, that I have seen

23   evidence that Google's customers believe that

24   privacy extends in these terms.  And second, I have

25   seen evidence that Google knows that Google's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    customers believe this.

2              Now, at -- at a certain level, those two

3    questions collapse into one because they -- it is

4    Google market research, but it's customers'

5    expectations.

6        Q.   So you keep saying "I have seen evidence

7    that."  So are you -- is it your opinion that

8    Google's customers believe that privacy exists, or

9    that you have seen evidence that Google's customers

10   believe that privacy exists?

11       A.   My opinion in this case is that -- in --

12   particularly in this section of the report, not just

13   Section 59 but Part IV, and I believe also extending

14   to Part V of my report, is that privacy, first, is a

15   fundamental right and deeply rooted societal norm.

16             And second -- and I'll want to refer to my

17   executive summaries here just for ease of reference

18   and to avoid saying too many words here for the

19   court reporter.

20             "As described in Section VIII, it is my

21   opinion that there is common evidence that Google's

22   Terms of Service, Privacy Policies, and disclosures

23   throughout the Class Period give rise to a common

24   (false) expectation that Google does not offer for

25   sale or sell information about or associated with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126

1    U.S. account holders to Google RTB participants."

2              In that section -- let me turn to that

3    section now.

4              Paragraph 126, I offer eight pieces of

5    evidence that I have seen for the proposition that

6    "evidence produced by Google in discovery provides

7    common, objective facts from which a jury or trier

8    of fact may conclude that Google understands that

9    its privacy notices do not comport with its U.S.

10   account holders' expectations of privacy."  [As

11   read]

12        Q.   So is it your testimony that there's

13   evidence of Google understanding its privacy notices

14   do not comport with U.S. account holders'

15   expectations of privacy, or is it your opinion that

16   Google understands that its privacy notices do not

17   comport with its U.S. account holders' expectations

18   of privacy?

19        A.   I don't understand my role in this matter

20   as an expert, as a privacy expert, to be to go

21   towards the ultimate questions in this case.  My

22   testimony is that there is common evidence from

23   which a jury may conclude that that is the case.

24        Q.   So you don't believe that Google

25   understands that its privacy notices do not comport

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 128

1    Google understands that its privacy notices do not

2    comport with its U.S. account holders' expectations

3    of privacy?

4        A.    As I understand my role in this case, it

5    is to determine whether there is common evidence

6    from which a jury may conclude that something is the

7    case.

8        Q.    So it's not your testimony that Google

9    understands that its privacy notices do not comport

10   with its U.S. account holders' expectations of

11   privacy?

12       A.    It's not my testimony, one way or the

13   other on that.  As I -- I see that as going beyond

14   the scope of what I -- the opinion that I was

15   retained to give.

16       Q.    So going to Section V on Page 33.

17       A.    Yes.

18       Q.    Okay.  You claim that quote, "Google's

19   Terms of Service and privacy policies" -- I'm sorry,

20   I'm quoting from -- I might be quoting from

21   Paragraph 3.  Sorry.  Hold on one second.  I just

22   want to make sure that I -- no.

23           Oh, I'm sorry, no.  This is Paragraph 75

24   on Page 33.  I apologize.

25           You write quote, "Google's Terms of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

1    norms is an ultimate question.

2             To the extent that it is not an ultimate

3    question, I am happy to -- I -- I -- I stand by the

4    report.  So if it -- if it were to be an ultimate

5    question, then it would be -- there's common

6    evidence to that fact.  But I believe that this --

7    this portion of the report -- because whether

8    Google's privacy policies reflect -- and terms of

9    service reflect historical societal privacy norms --

10            THE COURT REPORTER:  Professor, please

11   slow down, please.

12            THE WITNESS:  Sorry.

13            The -- the question of whether Google's

14   terms of service and privacy policies reflect

15   historical societal privacy norms is an ultimate --

16   because I don't think it is an ultimate question, I

17   offer the opinion that I give in V.  If it were to

18   be an ultimate question, I would, of course,

19   restrict my opinion to the fact that there is common

20   evidence.

21   BY MR. WONG:

22        Q.   And when you say "common evidence," what

23   do you mean?

24        A.   I mean, evidence of factual matters

25   that -- that runs throughout the class that I -- as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 131

1    I understand it, that a certain proposition may be

2    true or not.

3        Q.    And how do you know if a fact is common

4    in -- in -- in the analysis that you just told me

5    you are undertaking?

6        A.    I would say whether it is shared by a

7    significant portion.

8        Q.    And how -- and what criteria do you use to

9    determine when something is shared by a significant

10    portion of the class?

11    A.    I'm glad you asked that.  Because in this

12    case, the expectations that are -- the terms of

13    service and privacy policies apply to 100 percent of

14    the class, and so therefore, it would be common.

15    Q.    Do you have to read the terms of service

16    and privacy policies to have an expectation arise

17    from them?

18    A.    I think people have expectations about the

19    privacy practices of the companies with whom they

20    interact, whether or not they have read the privacy

21    policies or not.  But in this case, it is clear that

22    Google's privacy policies make clear that it says

23    repeatedly, more than once, in more than one

24    document, more than one period in time, that it

25    will -- will not, does not, and never shares the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    personal information of its account holders with

2    third parties.

3          Q.    Do you know that -- if every U.S. account

4    holder read the privacy policy that they agree to

5    when they signed up for their account?

6          A.    Do I know whether?

7          Q.    Mm-hmm.

8          A.    I would suspect not.

9          Q.    And do you know whether every U.S. account

10   holder read the terms of service that they agreed to

11   when they signed up for their account?

12         A.    Actually, let me -- let me revise my

13   answer.  I have not seen the -- the interface by

14   which -- I suppose I have seen it because I probably

15   did it myself, but I have forgotten what it looked

16   like because it was many years ago, and it was one

17   of a vast number of -- of such things that I -- that

18   I've engaged with in my career -- in -- in my life.

19   That's a technical question that I think is perhaps

20   best left to a technical expert.

21              I will say, as I have said in -- in my

22   writing, that by and large, consumers do not read

23   privacy policies.  And the reason for that is, it

24   is -- given the volume of privacy policies with

25   which consumers are potentially confronted on an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 133

1    annual basis, I believe there's a study that says it

2    would take them 78 working days just to read all of

3    them.  The study's a few years old, it might even be

4    more time now.

5            But -- but I do believe in this case,

6    Google has -- has repeatedly made the representation

7    that it does not, will not, and never shares the

8    personal information of its account holders to third

9    parties.

10           And these are some of the -- the instances

11   that I recount in Paragraph 5 -- in Section V.

12       Q.   But if someone doesn't read the terms of

13   service or the privacy policies or the other

14   information practice notifications that you talk

15   about in Paragraph 75, how do you know then that

16   this expectation of a specific -- of a specific

17   privacy behavior on Google's part runs through the

18   class?

19       A.   Well, I think whether I -- I say in

20   Paragraph 84 -- actually, I -- I say earlier, in

21   Paragraph 83, I talk about the -- the public

22   representations of Google's CEO that privacy is very

23   important and privacy must be equally available to

24   everybody in the world, and that Google stays true

25   to two unequivocal policies that "Google will never

1          Q.   So if someone conducted a survey and

2     said -- and found that, in fact, an -- an

3     appreciable percentage of people did not agree with

4     you, would that change your opinion?

5          A.   I would have to consider such a survey and

6     think about it.  And I would have to look at the

7     meth- -- underlying methodology of the survey and

8     how it fits with the rest of the literature, as is

9     the appropriate methodology of scholars.

10         Q.   You talk about other Google -- let's

11    see -- Paragraph 75, "other information practice

12    notifications that Google uses with its U.S. account

13    holders."  So I'm just trying to understand, what is

14    the universe of documents to which you are

15    referring?

16         A.   The reference in Paragraph 75 refers to

17    the documents that I cite in Part V of the report as

18    a whole.  And so, these include in Footnote 100,

19    Google's promise in its terms of service that, "By

20    using our Services, you -- you agree that Google can

21    use such data" --

22              THE COURT REPORTER:  I'm sorry --

23              THE WITNESS:  I'm sorry.  I'm --

24              THE COURT REPORTER:  -- please slow down.

25              THE WITNESS:  I'm trying not to waste

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 141

1       Q.   Oh, 85, I'm sorry.

2       A.   85.

3       Q.   85.

4       A.   In 8- -- I'm sorry, in 85 -- I thought we

5    were talking about 84 -- in 85, I say, "It's my" --

6    "It is also my opinion that Google's use of the

7    phrase 'personal information' in its U.S. Privacy

8    Policies and Terms of Service is consistent with

9    commonly-held traditions of privacy norms in the

10   United States and the definitions of personal

11   information under California law as a whole." [As

12   read]

13            This -- we are still in V here.  This

14   conclusion is about -- is situating Google's

15   definition of personal information within the norms

16   of privacy professionals.  It does not speak to

17   Google account holders one way or the other.

18       Q.   Earlier I -- I think you said -- so,

19   please correct me if I'm wrong -- that you believe

20   that Google's conduct here was a violation of its

21   terms of service and privacy policy; is that

22   correct?

23            MS. PRITZKER:  Objection as to form.

24            THE WITNESS:  I don't believe -- I don't

25   believe I said that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 143

1    here as a -- as a historian and an expert in

2    privacy.

3         Q.   So in Paragraph 91, your report -- your

4    report de- -- I'm sorry, hold on.  Let me rephrase.

5              In Paragraph 91 of your report, you

6    describe your understanding of the RTB process, and

7    you state, quote, "Google observes, collects, and

8    analyzes real-time data about account holders when

9    they're using the Internet," unquote.

10        A.   Where is this in -- in 90?

11        Q.   It is --

12        A.   It's on page 39?

13        Q.   It starts on 30- -- well, it start -- the

14   sentence starts on 38 and -- and ends on 39.  It's

15   just the -- the sort of last sentence --

16        A.   I see, yes.

17        Q.   -- on the page.

18             So do you know if Google observes user

19   data when they vi- -- when visitors visit any

20   website, or is it just some websites?

21        A.   That's a technical question, and I will

22   defer to the technical experts on that.

23        Q.   And do you know which websites it operates

24   on, if any, or is that also beyond your canon?

25             MS. PRITZKER:  Object as to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 144

1          THE WITNESS:  Could you repeat the
2     question?
3     BY MR. WONG:
4          Q.   Do you know which websites RTB operates
5     on, or is that beyond your canon?
6          A.   Off the top of my head, no.  But, again,
7     all questions relating to the technical operation of
8     RTB and particularly to the computer science and
9     data science of RTB are outside my expertise and
10    certainly outside the scope of my report.
11         Q.   So in this you just relied on Dr. Shafiq's
12    report and the Complaint, is that correct, for
13    Paragraph 91?
14          MS. PRITZKER:  Object as to form.
15          THE WITNESS:  As a -- as a matter of
16    methodology, Paragraph 91 sets a series of factual
17    assumptions about the nature and operation of RTB
18    upon which I rest my analysis.
19          It is a set of assumptions that I believe
20    to be credible and that I believe to be -- to be
21    grounded not just in the -- the Complaint, but --
22    but also Professor Shafiq's report, which I have
23    read and considered and find to be credible.
24          And also I cite the work of a -- of
25    another historian, Matthew Crain, in Footnotes 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 146

1      A.    Okay.

2            (Simultaneous speaking.)

3      Q.    -- what I was hoping for.  Thank you.  Or

4   what I wanted to know.

5      A.    I'm glad to gratify you.

6      Q.    If the facts, as you understand them, from

7   the Complaint and Dr. Shafiq's report turn out to be

8   incorrect, would that change your opinion?

9      A.    If --

10           MS. PRITZKER:  Object as to form.

11           THE WITNESS:  As a -- as a general matter,

12   if assumptions or facts upon which I rest my report

13   turn out to be substantially incorrect, I reserve

14   the right to reevaluate my opinions consistent

15   with -- with good practice.

16           MR. WONG:  How long have we been going?

17           THE VIDEOGRAPHER:  On this file,

18   52 minutes.

19           MR. WONG:  I think this is a good time to

20   take a few -- like a five-minute break.

21           Is that okay?

22           THE WITNESS:  Sure.

23           THE VIDEOGRAPHER:  This marks the end of

24   Media Number 3.  Going off the record.  The time is

25   1:43.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 163

1   policy.  That's certainly not my role in this

2   proceeding.

3        Q.   I never suggested it was.  You just said

4   that it would be simple to do.  So if it's so simple

5   to do, I was just -- thought maybe you could do it.

6   But maybe this is the simple thing, which is this

7   very detailed paragraph with eight footnotes.

8        A.   Is that a question?

9        Q.   No.

10        Do you know if the buyers of the --

11   alleged buyers of the information are actually able

12   to view it in the RTB transaction?

13        A.   That is a technical question, and I defer

14   to the technical experts --

15        Q.   Would it --

16        A.   -- in that respect.

17        Q.   -- matter if they were not able to view

18   it?

19        A.   It is my -- as I state in Paragraph 91,

20   "Google matches the cookies to the account holder's

21   personal information stored at Google, and then

22   sends 'a bid request' containing certain of her

23   personal information - including her Google User ID,

24   IP address, device identifiers, personal

25   identifiers, geolocation data, the specific content

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 164

1    that the user has requested and been shown when the

2    user is on a web-browser or the app in use when

3    using a smartphone or tablet ash" -- "dash to

4    various companies that participate in the Google RTB

5    auction."  [As read]

6         Q.   That does not answer whether or not they

7    are able to view it and whether or not that --

8         A.   I hadn't finished.

9         Q.   Okay.

10        A.   I also talk about in my report, evidence,

11   including that produced in discovery and that

12   contained in Professor Shafiq's report, potentially

13   among others, not only that I assume that recipients

14   of bid information transferred through RTB are able

15   to use it, but that they are able to assemble

16   detailed profiles of the Google account holders.

17   And that is an assumption upon which I rest my

18   report, that RTB enables this to happen.

19        Q.   But you don't know if that actually

20   occurs; correct?

21        A.   I am not a technical expert.

22        Q.   So you don't know that it actually occurs;

23   correct?

24        A.   I -- as a tech -- I am not going to answer

25   technical questions because they're beyond my

1    expertise.

2         Q.   So you have no answer to whether or not

3    you know if something occurs?

4         A.   My answer is, it is an assumption in my

5    report, based upon the sources that I've just

6    mentioned, that it does occur.

7         Q.   Okay.  It's -- it's a simple question to

8    answer, but if you can't answer it, I guess you

9    can't.

10        A.   Is that a question?

11        Q.   No.

12             In Paragraph 129 that you've been

13   referring to, you write, "Based on my review of the

14   evidence that has been produced to date, Google's

15   privacy notices contain no such disclosures."

16             Do you see that?

17        A.   Yes.

18        Q.   Are you aware of if -- if you have

19   reviewed every single Google policy and disclosure

20   that could be related to the conduct at issue?

21        A.   I reviewed a series of privacy policies,

22   terms of service and other documents that are

23   relevant to the conduct at issue.

24        Q.   So you can't say that you've reviewed

25   every policy that might be related to the conduct at

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 169

1    "Google's Terms of Service and Privacy Policies

2    Could Give Rise to a Common (False) Expectation That

3    Google Does Not Offer For Sale or Sell Information

4    Linked to or Reasonably Associated With U.S. Account

5    Holders."

6    BY MR. WONG:

7        Q.    Okay.  So you are not testifying that the

8    terms of service and privacy policies create a false

9    expectation that Google does not offer for sale or

10   sell information linked to or reasonably associated

11   with U.S. account holders?

12       A.    Could you repeat that question?  I want --

13   it seems to be an important one, and I want to be

14   sure that I -- I understand it completely before I

15   answer it.

16       Q.    So you're not testifying that the terms of

17   service and privacy policies creates a false

18   expectation that Google does not offer for sale or

19   sell information linked to or reasonably associated

20   with U.S. account holders?

21       A.    My opinion is that they could.  And as I

22   say in Paragraph 131, "There is substantial

23   evidence, both in the public record, and from

24   evidence produced by Google in discovery that

25   provides common, objective facts from which a jury

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    or trier of fact may conclude not only that a

2    reasonable Google account holder has a reasonable

3    expectation of privacy, but that Google is all too

4    well aware of this fact."

5              That is my opinion.

6         Q.    When you say "false expectation," what do

7    you mean?

8         A.    I mean, in the -- in the context here of

9    what a trier of fact could find and there is common

10   evidence to support such a finding, that when Google

11   tells its account holders that they do not, will

12   not, and never will share or sell their personal

13   information with third parties, and that when

14   Google, in fact, does that, that a trier of fact

15   could find those things to be the case, and that it

16   would create a false -- let me use the language I

17   use in my report.

18             In Paragraph 6, could "give rise to a

19   common (false) expectation that Google does not

20   offer for sale or sell information about or

21   associated with U.S. account holders to Google RTB

22   participants."  [As read]

23        Q.    So you did not conduct an [verbatim]

24   quantitative analysis of the actual expectations of

25   Google account holders; is that correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 171

1      A.   I believe we've already discussed that,

2   and the answer's no.   A quantitative account, no.

3      Q.   And you did not conduct a quantitative

4   analysis of how, if in any way, Google's terms or

5   privacy policies influenced account holders'

6   expectations with respect to their Google accounts;

7   correct?

8      A.   I did not conduct a quantitative study.

9      Q.   Did you analyze how many account holders

10  saw any part of Google's terms of service?

11     A.   I did not conduct a quantitative study.

12     Q.   And you did not then also analyze how many

13  account holders saw any part of Google's privacy

14  policies; is that correct?

15     A.   Could you repeat the question from the

16  beginning?

17     Q.   You did not analyze any account holders --

18  oh, sorry.

19          MR. WONG:   Could you repeat that question?

20          MS. PRITZKER:   I was going to say the

21  same --

22          THE WITNESS:   That was my problem.   Yeah.

23          MS. PRITZKER:   I was going to say same

24  thing.   You might want to just re-ask it.   Mm-hmm.

25          MR. WONG:   Oh, see -- oh --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 172

1          MS. PRITZKER:  Just re-ask it.

2    BY MR. WONG:

3          Q.   Did you analyze how many Google account

4    holders saw Google's privacy policies?

5          A.   I did not conduct a quantitative study, so

6    no.

7          Q.   Are you aware that some of the named

8    plaintiffs did not review the specific statements

9    that you discussed?

10          MS. PRITZKER:  Object as to form.

11          THE WITNESS:  I was not aware.

12   BY MR. WONG:

13          Q.   And how would those individuals then have

14   a false expectation of what Google is doing with

15   their information if they did not read the terms of

16   service or privacy policies?

17          A.   My opinion is that Google's privacy

18   policies, Google's statements, are consistent with a

19   deeply rooted societal norm of the fundamental right

20   of privacy.  And it is also my opinion that

21   consumers are entitled to rely upon that --

22   reasonable consumers are entitled to rely upon that

23   fundamental right, particularly where those

24   statements are confirmed by Google's -- sorry, where

25   those norms are confirmed by Google's public

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 176

1    that there is common evidence from which a jury

2    could conclude that all members of the class had

3    suffered a violation of their reasonable

4    expectations of privacy through Google's data

5    sharing that was not disclosed and through Google's

6    deception where it appeared to promise the opposite

7    of what it was actually doing.

8         Q.   What if someone knew this was happening

9    and didn't care?  Is that person -- if that person

10   doesn't have that expectation of privacy because

11   they knowingly have -- have found out about Google's

12   RTB auction practices and simply just continues to

13   go about their business and -- are -- are you -- are

14   you saying that that person's expectations of

15   privacy have been violated?

16        A.   It's my opinion that there is common

17   evidence that a jury could conclude that all members

18   of the class's privacy have been violated.

19        Q.   So it is immaterial if there are --

20        A.   I'm sorry.  Not their privacy.  I

21   apologize.  I want to be clear.  Their expectation

22   of -- their reasonable expectation of privacy --

23        Q.   So --

24        A.   -- surrounding their personal information

25   held by Google.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Sorry.  I didn't mean to interrupt.  So it

2    is --

3      A.    I paused.  My -- my fault.

4      Q.    It is immaterial then whether or not any

5    individual account holder knew of the alleged

6    conduct by Google and -- and consented to the

7    conduct?

8      A.    It's irrelevant.

9      Q.    So you said, "It is my opinion that under

10    a reasonable standard or not."  So can you clarify

11    what you mean by a -- "under a reasonable standard

12    or not"?

13      A.    Could you refer me to that paragraph?  I

14    have a pretty good grasp of my report, but that's --

15      Q.    No, no --

16      A.    -- that one's pushing it.

17      Q.    -- no, you testified just now, "It is my

18    opinion that under a reasonable consumer standard or

19    not, where Google promised every one of its account

20    holders that it does not, will not, and will never

21    share their personal information with third

22    parties."  [As read]

23            And then you go on to say that they

24    have -- "everyone in the class has suffered a

25    violation of their reasonable expectations of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178

1    privacy."

2              So I'm trying to get clarification as to

3    whether or not your opinion turns on --

4         A.   I see.

5         Q.   -- a reasonable consumer standard.

6         A.   It is unquestionably my opinion that the

7    reasonable consumer standard is violated here.  And

8    I think -- and I think there is -- there is

9    substantial evidence to provide common objective

10   facts from which the jury or trier of fact may

11   conclude that Google's violations of its promises

12   apply to every Google account holder, regardless of

13   whether they knew about it or not.

14        Q.   So is it your opinion then that consent in

15   this case is immaterial?

16        A.   It is my opinion in this case that where

17   Google says it is going to do one thing -- I'm

18   sorry, let me rephrase that.

19             It is my opinion in this case that where

20   Google makes promises about not sharing personal

21   information with third parties and then shares vast

22   amounts of personal information with third parties

23   in violation of that promise, there's no opportunity

24   for consumers to consent -- for Google account

25   holders, rather, to consent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 181

1    conclude that this is the case.

2         Q.   So your view is that consent can only be

3    given affirmatively through Google; is that your

4    testimony?

5         A.   That's not what I'm saying.

6         Q.   Well, you did say that.  You said "Google

7    does not offer any opportunity for account holders

8    to consent."  So are you saying that there are other

9    ways that account holders can consent other than if

10   Google offers an opportunity to do so?

11        A.   I'm saying that where a company -- I think

12   I've already answered this question.

13        Q.   I -- I don't think you have.

14             The first question that you have not

15   actually answered because you keep coming back to

16   the opportunity is, can a U.S. account holder have

17   found out about RTB through a third party, not

18   through Google, and consented to the conduct at

19   issue?

20             MS. PRITZKER:  Object as to form.

21             THE WITNESS:  If we are discussing consent

22   in a legal sense, then I am not offering a legal

23   conclusion in my report.  If we are offering a

24   conclusion on consent in terms of expectations of

25   consent and practical ability and norms surrounding

Page 182

1    consent, the pathologies of consent that I talk
2    about in the article you listed as Exhibit 2, means
3    that consent, in this situation, would be so far
4    from knowing involuntary gold standard consent as to
5    be meaningless.
6    BY MR. WONG:
7        Q.   So are you testifying then that it would
8    be meaningless as a legal matter?
9        A.   No, I'm not offering a legal opinion.
10       Q.   You just said that it would be
11   meaningless.
12       A.   As a matter of expectations.
13       Q.   You said consent in this situation would
14   be so far from knowing -- knowing involuntary gold
15   standard consent would be meaningless.  I don't -- I
16   don't understand how you're not saying that consent
17   would be, as a legal matter, void?
18           MS. PRITZKER:  Objection as to form.
19           THE WITNESS:  I'm not offering a legal
20   opinion.  What I am saying, and I have said this
21   before, that where a promise is made that Google
22   will not, does not, and never shares personal
23   information, and then that promise -- that
24   representation is false and Google, in fact, does,
25   and where Google offers no opportunity either

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 183

1    through disclosure or through a consent mechanism to

2    consent to it, that that is -- would not be consent.

3    BY MR. WONG:

4         Q.   So even if someone found out about what

5    Google was doing, because Google didn't disclose it

6    and didn't offer someone a button to click, that

7    consent would be meaningless; that is your

8    testimony?

9              MS. PRITZKER:  Object as to form.

10             THE WITNESS:  I don't think there is any

11   way from Google's representations that any of its

12   account holders could -- could knowingly consent to

13   RTB --

14   BY MR. WONG:

15        Q.   Why does it have to --

16        A.   -- because it was not disclosed.

17        Q.   Sorry.

18             Why does it have to be Google's

19   representations?  Why can't consent be from other

20   people?  For instance, you could see a New York

21   Times report or a news article that discloses a

22   certain company's data practices.  And then if

23   someone read those data practices, you could then --

24   wouldn't that person, if they continued to use that

25   company's products knowing from the New York Times

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 187

1    deper- [verbatim] -- or disable personalized ads?

2         A.    I have not conducted an empirical study of

3    such things, but it is my understanding that the

4    percentage of people -- that -- that -- well, let me

5    retract that.

6         Could you repeat the question?

7         Q.    Do you know what the percentage is for

8    other ad networks that allow people to opt out or

9    disable personalized ads?

10        A.    I do not.

11        MR. WONG:  Do you think we can take a

12   five-minute break?

13        MS. PRITZKER:  Sure.

14        THE VIDEOGRAPHER:  This marks the end of

15   Media Number 4.  Off the record.  The time is 3:05.

16        (Short recess taken.)

17        THE VIDEOGRAPHER:  This marks the

18   beginning of Media Number 5 in the deposition of

19   Professor Neil Richards.

20        We're back on the record.  The time is

21   3:28.

22        (Richards Deposition Exhibit 3 was marked

23        electronically.)

24   BY MR. WONG:

25        Q.    Exhibit 3 is the Plaintiffs' Motion in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 201

1    its account holders, nor have I seen any evidence

2    from which a jury or trier of fact may conclude that

3    Google offers any kind of viable opt-out."

4           And then, finally, in 137 I say, "I have

5    seen no evidence that Google RTB data sharing

6    (including its existence, its scope, its quantity,

7    and the lack of controls for further uses of Google

8    RTB data) is disclosed to Google account holders."

9           And then there's the -- the -- the passage

10   about the -- the failure to offer a consent that we

11   discussed before the last break.

12          And so based upon -- based upon that

13   and -- and my review of the materials, it is -- I

14   find that to be an accurate statement -- I believe

15   that to be an accurate statement.

16      Q.   And your evidence -- your evidence focuses

17   on Google disclosing; correct, not a third party?

18      A.   Certainly primarily, yes.

19      Q.   I believe in your report, for instance, in

20   Paragraph 108, you cite a letter from a group of

21   U.S. senators to the FTC asking to -- for the

22   investigation of RTB; correct?

23      A.   Yes.

24      Q.   And there's other documents and -- and

25   letters and disclosures in your report about Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 202

1    RTB that could disclose information to the public

2    about how RTB works; correct?

3        A.    I cite to a series -- to -- to a -- to a

4    number of publicly available statements by

5    non-Google entities related to RTB.

6        Q.    Wherein someone who read those statements

7    could know about Google's conduct here; correct?

8        A.    Someone could read these and learn about

9    RTB, yes.

10        Q.    And that means in your view, however, that

11    the statements that Google RTB is undisclosed is

12    still correct, even though there are other sources

13    that disclose some or all of Google's conduct?

14            MS. PRITZKER:  Objection as to form.

15            THE WITNESS:  It is -- I don't believe it

16    is my place to -- to try to infer what counsel meant

17    in their legal argument.  However, I think it is

18    a -- it is -- it remains -- considering the evidence

19    we have just discussed, it remains a -- to my mind,

20    correct that Google RTB is invisible, and that

21    Google RTB is undisclosed to account holders.  And I

22    think particularly -- let me stop there.

23    BY MR. WONG:

24        Q.    So even though there is disclosures that

25    are public about RTB, because it is not Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 203

1    disclosing it, you are of the opinion that Google

2    RTB is undisclosed to account holders; correct?

3         A.   It is my opinion that there is common

4    evidence from which a jury could conclude that

5    Google RTB is invisible and undisclosed to account

6    holders.

7         Q.   Are you aware personally that your

8    information can be shared with Google RTB

9    participants as you browse the web?

10             MS. PRITZKER:  Object as to form.

11             THE WITNESS:  Me, personally as a -- as an

12   internet user?

13   BY MR. WONG:

14        Q.   Yes.

15        A.   I -- I am aware of Google RTB and that

16   there is information sharing, yes.

17        Q.   And are you aware --

18        A.   That would seem to be a, sort of,

19   necessary predicate for my expert report in this

20   matter.

21        Q.   And are you aware of ways that you can

22   disable some or all of that sharing?

23             MS. PRITZKER:  Object as to form.

24             THE WITNESS:  That is a technical

25   question.  And I would defer to technical experts on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 204

1    that --

2    BY MR. WONG:

3        Q.    So you're --

4        A.    -- front --

5        Q.    Why do you --

6        A.    -- about -- about the efficacy -- the

7    availability and efficacy of such measures.

8        Q.    Well, are you aware of ways that are

9    available that you might be able to disable some or

10   all of that sharing?

11             MS. PRITZKER:  Objection as to form.

12             THE WITNESS:  I believe that Professor

13   Shafiq's report discusses some of those methods and

14   finds them to be not viable.

15   BY MR. WONG:

16       Q.    Have you undertaken any of those methods

17   yourself with relation to your Google account?

18       A.    Which methods are you referring to?

19       Q.    Have you disabled personalized ads via the

20   Google ad's personalization setting?

21       A.    That's a great question.  I believe that I

22   have.  Usually, when I have an opportunity -- as --

23   speaking as a -- as an individual, when I have an

24   opportunity to -- to opt out, I generally take it.

25   However, I am skeptical, both as an individual and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 214

1   BY MR. WONG:

2       Q.   And if there were to be any such

3   third-party privacy policies that disclosed the

4   sharing of information between a website and Google

5   and an advertiser, would that change any of the

6   opinions that you are providing here today?

7       A.   No.

8       Q.   And why is that?

9       A.   In this case, it remains my opinion that

10  Google promises that it will -- does not, will not,

11  never share or sell personal information with third

12  parties, and that it violates that promise millions

13  of times a day.  And it is my opinion that a jury

14  could conclude that that promise is broken by

15  Google, notwithstanding language in some privacy

16  policy somewhere on the web.

17      Q.   So are you saying then that Google, as a

18  legal matter, has made a contractual promise that it

19  has violated?

20      A.   I am not offering any legal conclusions in

21  my report.

22      Q.   You literally just said, "In this case, it

23  remains my opinion that Google promises that it

24  will -- does not, will not, never share or sell

25  personal information with third parties, and that it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 215

1    violates that promise millions of times a day."

2          So I'm trying to understand if that's --

3    that's not a legal opinion?

4          A.    No.

5          Q.    It's not a legal opinion that someone has

6    promised and violated that promise?

7          A.    That's correct.

8          Q.    And you are --

9          A.    If you --

10         Q.    -- not offering, then, a legal opinion on

11   that premise?

12         A.    I am not offering any legal conclusions

13   that go to the ultimate questions of law, or facts

14   for that matter, in my report.  My report talks

15   about the social, the fundamental right and deeply

16   rooted societal norm of privacy and the ways in

17   which Google's representations both seemingly adhere

18   to that societal norm and then violates it in

19   practice in ways that are not only disclosed, that

20   are -- but that contain affirmative representations

21   to the contrary.  And it is my opinion that there is

22   substantial evidence on that basis from which a jury

23   could conclude that that was a violation of the

24   norms and also unreasonable.

25         MR. WONG:  Thank you.  I think that is it.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 217

1                              JURAT

2

3            I, PROFESSOR NEIL RICHARDS, do hereby

4    certify under penalty of perjury that I have read

5    the foregoing transcript of my deposition taken

6    remotely via videoconference on Thursday, August 24,

7    2023; that I have made such corrections as appear

8    noted herein in ink, initialed by me; that my

9    testimony as contained herein, as corrected, is true

10   and correct.

11

12           Dated this _____ day of _____, 2023,

13   at _____.

14

15

16

17

18

19                      _____

                        PROFESSOR NEIL RICHARDS

20

21

22

23

24

25   Job No. CS6056459

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 218

CERTIFICATE OF REPORTER

1

2          I, Hanna Kim, a Certified Shorthand

3    Reporter, do hereby certify:

4          That prior to being examined, the witness

5    in the foregoing proceedings was by me duly sworn to

6    testify to the truth, the whole truth, and nothing

7    but the truth;

8          That said proceedings were taken before me

9    at the time and place therein set forth remotely via

10   videoconference and were taken down by me in

11   shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13          I further certify that I am neither

14   counsel for, nor related to, any party to said

15   proceedings, not in anywise interested in the

16   outcome thereof.

17          Further, that if the foregoing pertains to

18   the original transcript of a deposition in a federal

19   case, before completion of the proceedings, review

20   of the transcript [X] was [ ] was not requested.

21          In witness whereof, I have hereunto

     subscribed my name.

22   Dated:  29th day of August 2023

23

24

     Hanna Kim

25   CLR, CSR No. 13083