# EXHIBIT 14
# to Declaration of
# W. Somvichian

# (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4                 ---oOo---

5    BENJAMIN HEWITT, et al., on

     behalf of themselves and all

6    others similarly situated,

7              Plaintiffs,

8              vs.          No. 4:21-cv-02155-LHK-VKD

9    GOOGLE LLC,

10             Defendant.

     _____/

11

12

13

14    ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY***

15

16

17

18            VIDEOTAPED DEPOSITION OF

19            CHRISTOPHER VALENCIA

20    _____

21        WEDNESDAY, DECEMBER 14, 2022

22

23    REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

24    JOB NUMBER: 5620686

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

1            THE VIDEO OPERATOR:  The court reporter

2     today is Holly Thuman.

3            Holly, could you please swear the witness

4     in.

5                      --oOo--

6                CHRISTOPHER VALENCIA,

7     _____

8        called as a witness, having been first duly

9        sworn, was examined and testified as follows:

10                    ---oOo---

11           THE VIDEO OPERATOR:  Please proceed.

12              EXAMINATION BY MR. SOMVICHIAN

13    BY MR. SOMVICHIAN:

14       Q.  Good morning, Mr. Valencia.  I just

15    introduced myself a few minutes ago.  I'm

16    representing Google today.

17            You were just given an oath.  You

18    understand that that's the same type of oath that

19    you would take in a court of law?

20       A.  Yes.

21       Q.  And you understand you are obligated to

22    provide truthful, accurate answers to the best of

23    your ability today?

24       A.  Yes.

25       Q.  Is there any reason you can't do that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 54

1    into an article or something from another website

2    at least every day that I do click, and I can --

3    it's also very much likely that I have clicked on

4    certain things by accident.

5         Q.   For the things that you clicked on

6    intentionally -- you're talking about ads.  Right?

7         A.   Yes.

8         Q.   Fair to say you find online ads to be

9    helpful in at least some instances?

10        A.   Yes.

11             MR. STRAITE:   Objection.   Vague.

12   BY MR. SOMVICHIAN:

13        Q.   Fair to say you find online ads to be of

14   interest, at least initially, to click to see what

15   it might involve?

16             MR. STRAITE:   Objection.   Compound.

17   Objection.   Vague.

18             THE WITNESS:   Yes.

19   BY MR. SOMVICHIAN:

20        Q.   Have you ever -- have you ever seen an ad

21   that was related to something that -- strike that.

22   Let me try it again.

23             Have you ever accessed one website, maybe

24   looked at a product or something, and then later

25   navigated to some other website and then seen an ad

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 55

1    for that thing that you looked at before?

2        A.  Yes.

3        Q.  Okay.  Do you find that sometimes to be

4    helpful?

5            MR. STRAITE:  Objection.  Vague.

6            THE WITNESS:  Yes.

7    BY MR. SOMVICHIAN:

8        Q.  Give me an example.

9        A.  Most times, I don't end up buying

10   anything.  There's only one occasion where I saw

11   one very specific ad that was for a flight stick

12   that was being sold on a website that I had never

13   heard of before.  I remember that it was on

14   YouTube, and this is -- may well be the only time

15   where I actively saw a product in an ad where I not

16   only clicked it but ended up buying from that

17   website.

18       Q.  Okay.  So this was something that you had

19   seen on YouTube, and then you saw later an ad about

20   that product on some other website.  Is that right?

21       A.  No.  The ad itself was on YouTube, and I

22   clicked it.  It was a -- a banner ad located

23   somewhere, probably at the bottom of where the

24   video was, maybe just above the comments, where I

25   saw an ad for a flight stick that I clicked and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 56

1    ended up buying from that exact website.

2          Q.   What's a "flight stick"?

3          A.   Joystick, like the kind you use for flight

4    simulators.

5          Q.   Got you.   And had you looked into that

6    flight stick or flight sticks generally on some

7    other website before you saw the ad for it?

8          A.   That's right.

9          Q.   Do you remember where you had looked for

10   information about a flight stick before you saw the

11   ad?

12         A.   I don't remember.

13         Q.   Any other examples that you can think of,

14   Mr. Valencia, of a similar type of situation where

15   an ad was shown to you based on something that you

16   had looked at previously?

17         A.   There were lots of ads that I had seen and

18   had products I was interested in, but usually it

19   took the form of me looking into something like an

20   Xbox controller, seeing ads for the same

21   controllers on different websites, but I ended up

22   buying from places that I usually shop at like

23   Amazon or GameStop.

24         Q.   Do you find the ads on Facebook to be

25   helpful?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

1           MR. STRAITE:  Objection.  Vague.

2           THE WITNESS:  Occasionally.

3    BY MR. SOMVICHIAN:

4       Q.  Do you think ads are more helpful to you

5    if they're based on things that are relevant to

6    your interest as opposed to just showing random

7    things?

8           MR. STRAITE:  Objection.  Vague.

9    Objection.  Calls for speculation.

10          THE WITNESS:  Yes.

11   BY MR. SOMVICHIAN:

12      Q.  Can you give me an example?

13      A.  There have been some ads for products that

14   look interesting, but upon looking at the ad, I

15   ended up getting the feeling that it wasn't a

16   reputable website.

17      Q.  For example, do you find it helpful to get

18   ads about video games or video game equipment as

19   opposed to some random thing that you have no

20   interest in?

21          MR. STRAITE:  Objection.  Vague.

22          THE WITNESS:  Yes.

23   BY MR. SOMVICHIAN:

24      Q.  Have you ever seen an ad that was based on

25   your local area, whether it was, like, a local

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    event or a local business, as opposed to some other

2    unrelated location to you?

3              MR. STRAITE:  Objection.  Calls for

4    speculation.  Objection.  Vague.

5              THE WITNESS:  I don't recall any

6    particular ads.

7    BY MR. SOMVICHIAN:

8        Q.  For example, the ABC7 website in

9    Los Angeles that you access, does that show ads?

10       A.  I do believe, yes.

11       Q.  And have you noticed one way or the other

12   as to whether the ads shown on that website are for

13   things, you know, in the Los Angeles area as

14   opposed to some other state or city?

15       A.  Yes.

16       Q.  And is that more helpful to you to see an

17   ad that has something to do with Los Angeles when

18   you're accessing that ABC7 Los Angeles website as

19   opposed to some ad about an unrelated location?

20             MR. STRAITE:  Objection.  Vague.

21             THE WITNESS:  It is helpful on occasion.

22   BY MR. SOMVICHIAN:

23       Q.  Can you explain that to me?

24       A.  There have been some ads for things

25   like -- like video games that -- that were somewhat

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 59

1    helpful, but I hardly ever use them, so I

2    wouldn't -- ultimately, I wouldn't call them useful

3    enough for me to care.

4         Q.   But they were useful in some way.

5         A.   Yes.

6         Q.   And part of the usefulness was because it

7    was based on the local area?

8         A.   Yes.

9         Q.   Do you have in mind an ad for, like, a

10   local video game store or something like that?

11        A.   No.

12        Q.   And what's the example that you have in

13   mind?

14        A.   There was an ad on ABC7 for -- for

15   GameStop, and there are multiple GameStops in my

16   area.

17             Part of the reason I wouldn't necessarily

18   call it useful, though, is I don't have any way of

19   knowing if it had anything to do with the fact that

20   I live in the area that I live in.

21             On top of that, I didn't click it anyway.

22   If I was really interested in it, I would have gone

23   to the GameStop website myself.

24        Q.   Was that an ad for a specific product that

25   you were interested in?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 66

1   that have something that prevents you from

2   accessing the website altogether unless you turn

3   off your ad blocker.

4        Q.  Okay.  And so for those websites, you turn

5   it off generally, or do you just avoid those

6   websites?

7        A.  I turn it off.

8        Q.  Okay.  So you -- you turn it off, you

9   access the website, understanding that you can then

10  be shown ads, normally without the benefits of the

11  ad blocker.  Right?

12       A.  Yes.

13       Q.  Have your practices with respect to using

14  ad blockers changed at all after filing this

15  lawsuit?

16       A.  I did change one thing.

17       Q.  What's that?

18       A.  Some time ago, I purchased a VPN, and that

19  I do use a lot more often now, but I sometimes

20  had -- have to avoid it.

21       Q.  All right.  Let me break that down.

22            What's the VPN that you used, or -- let me

23  start over.

24            What's the VPN that you purchased?

25       A.  The VPN is called "FastestVPN."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 67

1      Q.  And when did you start using that?

2      A.  I used it for a couple of hours right

3   after I first purchased it, and then -- honestly, I

4   don't remember when that was.

5      Q.  You only used it for a couple hours and

6   then stopped using it?

7          MR. STRAITE:  Objection.  Mischaracterizes

8   prior testimony.

9          THE WITNESS:  Yes.

10  BY MR. SOMVICHIAN:

11     Q.  Okay.  Why did you stop using it?

12     A.  VPNs slow down your Internet by a

13  considerable amount.

14     Q.  Why were you interested in using the VPN

15  in the first place?

16     ███  ████████████████████████████████████

   ███ ███████████████████████████████████████

18     Q.  Okay.

19          MR. STRAITE:  And now I'd like to

20  designate the transcript attorneys' eyes only.

21  Thank you.

22  BY MR. SOMVICHIAN:

23     Q.  And using a VPN allows you to appear as if

24  you're accessing from some different location.

25  Right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 68

```
 1        A.  Yes.
 2        Q.  So your short-lived use of the VPN didn't
 3   have anything to do with this case.  Right?
 4        A.  Yes.
 5        Q.  Yes, it did not have anything to do with
 6   this case.
 7        A.  That's right.
 8        Q.  Okay.
 9            MR. STRAITE:  Could we not ask the
10   question as a negative, maybe?
11            MR. SOMVICHIAN:  Yeah.
12        Q.  You didn't use the VPN because of any
13   privacy-related concern.  Right?
14        A.  Not at the time.
15        Q.  Since that time where you used a VPN that
16   you just described, have you used a VPN since?
17        A.  A few times, yes.
18        Q.  Okay.  Describe those to me, please.
19        A.  After I first learned the extension of how
20   they were -- how Google -- or what Google was
21   doing, I thought I should give the VPN another use
22   to see how much it would help.
23            And, honestly, it didn't do much, but I
24   did use it a few times, and ultimately, I had to
25   stop because, again, it did slow my Internet down
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.  No.

2     Q.  Mr. Valencia, we've talked about a couple

3  different types of situations of ads being shown to

4  you.

5       One that you just mentioned was an ad

6  being shown based on something that you had

7  searched for.  Right?

8       That's a type of ad that you're familiar

9  with?

10    A.  Sorry.  Yes.

11    Q.  Are you also familiar with seeing ads that

12  are shown to you based on the topic or the subject

13  of the website that you're looking at?

14       MR. STRAITE:  Objection.  Calls for

15  speculation.  Objection.  Vague.

16       THE WITNESS:  Yes.

17  BY MR. SOMVICHIAN:

18    Q.  Can you give me an example of that from

19  your experience?

20       MR. STRAITE:  Objection.  Calls for

21  speculation.

22       THE WITNESS:  There was a time I saw an ad

23  for something called "U.S. Concealed Carry

24  Association," I believe.  Don't -- I don't know if

25  that's what it stands for.  I do know that it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 72

1    stands for -- the initials are USCCA.

2            I did some digging and found out that it

3    was a real thing, and the association was giving

4    away some -- some things with a new membership, and

5    I signed up just to get the -- the stuff.  I

6    canceled after.

7            Since then, I have continued to see ads

8    even though I don't subscribe to the service

9    anymore.

10   BY MR. SOMVICHIAN:

11        Q.  Where did you first see the ad?

12            Was it on some website that had some

13   relevance to security professionals?

14            MR. STRAITE:  Objection.  Compound.

15   Objection.  Calls for speculation.

16            THE WITNESS:  I believe I saw it on a

17   website that had to do with firearms.

18   BY MR. SOMVICHIAN:

19        Q.  Okay.  And in that instance, it was

20   helpful to you, the ad?

21            MR. STRAITE:  Objection.  Vague.

22            THE WITNESS:  Yes.

23   BY MR. SOMVICHIAN:

24        Q.  In fact, you clicked on it, and you

25   ultimately ended up signing up for whatever

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

1    benefits were available from that organization.

2    Right?

3        A.  Yes.

4        Q.  Mr. Valencia, what -- what's your general

5    understanding of cookies as they're used on the

6    Internet?

7            I know that's a broad topic, but give me

8    your just high-level understanding of how cookies

9    are used on the Internet.

10       A.  All I know is that it has to do with some

11   personal data collected from a person's Internet

12   browser.

13       Q.  What else do you understand about the

14   circumstances when that might happen?

15           MR. STRAITE:  Objection.  Vague.

16   Objection.  Calls for speculation.

17           THE WITNESS:  Can I hear the question

18   again?

19   BY MR. SOMVICHIAN:

20       Q.  Yeah, I'll just try it -- I'll just

21   rephrase.

22           You explained your understanding that

23   cookies have something to do with collection of

24   personal data.

25           What are the circumstances in which you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 75

1      Q.   Okay.   And those types of banners or

2   popups sometimes link to a cookie policy or a

3   privacy policy in your experience.   Is that fair?

4      A.   Yes.

5      Q.   And sometimes, they have a button or

6   something else that you can click to agree or not

7   agree?

8           Have you seen that in your experience?

9           MR. STRAITE:   Objection.   Vague.

10          THE WITNESS:   Yes.

11   BY MR. SOMVICHIAN:

12      Q.   Would you say these are pretty prevalent

13   in the websites that you access, either on your

14   mobile device or on your computer?

15          MR. STRAITE:   Objection.   Vague.

16   Objection.   Calls for speculation.

17          THE WITNESS:   Yes.

18   BY MR. SOMVICHIAN:

19      Q.   What's your personal practice,

20   Mr. Valencia, when you see these cookie popups and

21   there's an option to accept or not accept?

22          What do you normally do?

23          MR. STRAITE:   Objection.   Vague.

24          THE WITNESS:   I normally hit "Accept."

25   //

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 79

1    are used as part of the types of targeting that you

2    described earlier where, instead of just showing

3    random click-bait, the ads are instead shown based

4    on something you searched for or something related

5    to the subject of the website, for example?

6            MR. STRAITE:  Objection.  Vague.

7    Objection.  Calls for speculation.

8            THE WITNESS:  That, I only really started

9    to notice fairly recently.

10   BY MR. SOMVICHIAN:

11       Q.  Okay.  And is it your understanding that

12   cookies have something to do with the types of ads

13   that you have noticed more recently being targeted

14   based on those types of factors as opposed to being

15   random?

16            MR. STRAITE:  Same objections.

17            THE WITNESS:  Can I hear the question

18   again?

19   BY MR. SOMVICHIAN:

20       Q.  Yeah.  You -- let me take it in steps.

21   Okay?

22       A.  Okay.

23       Q.  You mentioned that recently, you've

24   started to notice ads that seem to be more targeted

25   and relevant based on things like a search that you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 80

1    did or a website you looked at or some other actual

2    interest of yours.  Is that right?

3                MR. STRAITE:  Objection.  Misstates prior

4    testimony.

5                THE WITNESS:  That's right.

6    BY MR. SOMVICHIAN:

7        Q.  Is it your understanding that cookies are

8    used in some way to enable those types of ads to

9    you?

10                MR. STRAITE:  Objection.  Calls for

11    speculation.  Objection.  Vague.

12                THE WITNESS:  Yes.

13    BY MR. SOMVICHIAN:

14        Q.  Is there anything more -- more specific

15    that you can say about your understanding of how

16    cookies are used in connection with selecting and

17    showing ads?

18                MR. STRAITE:  Objection.  Vague.

19    Objection.  Calls for speculation.

20                THE WITNESS:  All I know is that there are

21    certain ads now that's -- while they might have

22    been useful the first time, the fact that they've

23    gone -- gone for this long and as often as they do,

24    I feel it's just gone overboard.

25    //

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88

 1    for speculation.

 2             THE WITNESS:   There were -- there were ads

 3    for some stuff that was somewhat close to my house,

 4    but because of the fact that they weren't

 5    necessarily in my area, I wouldn't call them

 6    helpful enough for me to actively pursue anything

 7    with it.

 8    BY MR. SOMVICHIAN:

 9        Q.   Okay.   But in that example that you gave,

10    the ad was at least more relevant than something

11    that was -- that might be shown based on some

12    completely unrelated city or state.   Fair?

13             MR. STRAITE:   Objection.   Vague.

14    Objection.   Calls for speculation.

15             THE WITNESS:   Yes.

16    BY MR. SOMVICHIAN:

17        Q.   Mr. Valencia, you described to me earlier

18    an understanding that you came to have based on

19    discussions with your counsel about an alleged

20    selling of personal information.

21             Can you tell me more about what you

22    understand this case to be about and what you

23    believe Google to be doing?

24             MR. STRAITE:   Objection.   Misstates prior

25    testimony regarding discussions with counsel.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 303

1                          --o0o--

2          I declare under penalty of perjury that the

3    foregoing is true and correct.  Subscribed at

4    _____, California, this _____ day of

5    _____ 2022.

6

7                      _____

8                          CHRISTOPHER VALENCIA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Job No. CS5620686

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 304

CERTIFICATE OF REPORTER

1

2      I, HOLLY THUMAN, a Certified Shorthand Reporter,

3  hereby certify that the witness in the foregoing

4  deposition was by me duly sworn to tell the truth, the

5  whole truth, and nothing but the truth in the

6  within-entitled cause; that said deposition was taken

7  down in shorthand by me, a disinterested person, at the

8  time and place therein stated; and that the testimony

9  of said witness was thereafter reduced to typewriting,

10  by computer, under my direction and supervision;

11      That before completion of the deposition review of

12  the transcript [] was [X] was not requested/offered.

13  If requested, any changes made by the deponent (and

14  provided to the reporter) during the period allowed are

15  appended hereto.

16      I further certify that I am not of counsel or

17  attorney for either or any of the parties to the said

18  deposition, nor in any way interested in the event of

19  this cause, and that I am not related to any of the

20  parties thereto.

21

22  DATED: 12/29/2022

23

24  *Holly Thuman*

25      HOLLY THUMAN, CSR

   304