# EXHIBIT 16
## to Declaration of
## W. Somvichian

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4              Case No. 4:21-cv-02155-YGR-VKD

5

     * * * * * * * * * * * * * * * * * * * * * * * * * * *

6    IN RE:  GOOGLE RTB CONSUMER

7    PRIVACY LITIGATION,

8

9    THIS DOCUMENT APPLIES TO:

10   ALL ACTIONS

     * * * * * * * * * * * * * * * * * * * * * * * * * * *

11                    CONFIDENTIAL

12

13            VIDEOTAPED DEPOSITION OF:

14            CHRISTOPHER WILSON, PH.D.

15                    COOLEY LLP

16               500 Boylston Street

17              Boston, Massachusetts

18            August 31, 2023      9:01 a.m.

19

20   Reported by:

21   Darlene M. Coppola, RMR, CRR

22   JOB No. 6056467

23

24   PAGES 1 - 356

                                              Page 1

CONFIDENTIAL

```
 1                    P R O C E E D I N G

 2

 3              (Commencing at 9:01 a.m.)

 4

 5                    THE VIDEOGRAPHER:  We are on the

 6       record.  This is the videographer speaking,

 7       Shawn Budd, with Veritext Legal Solutions.

 8              Today's date is August 31, 2023, and

 9       the time is 9:03 a.m.  We are here in Boston,

10       Massachusetts, to take the video deposition of

11       Dr. Christopher Wilson in the matter of Google

12       Consumer Privacy Litigation.

13              Would counsel please introduce

14       themselves for the record.

15                    MS. PRITZKER:  Elizabeth

16       Pritzker, Pritzker Levine LLP for the

17       plaintiffs.

18                    MS. TRUONG:  An Truong, Simmons

19       Hanly Conroy for plaintiffs.

20                    MR. SOMVICHIAN:  Whitty

21       Somvichian, Cooley, representing Google

22       today.

23                    THE VIDEOGRAPHER:  Would the

24       court reporter please swear in the witness.
```

Page 5

CONFIDENTIAL

```
 1
 2                   CHRISTOPHER WILSON, PH.D.,
 3           a witness called for examination by
 4       counsel for the Defendant, having been
 5       satisfactorily identified by the production of
 6       his driver's license and being first duly
 7       sworn by the Notary Public, was examined and
 8       testified as follows:
 9
10                   THE STENOGRAPHER:   Thank you.
11       You may proceed.
12
13                   DIRECT EXAMINATION
14   BY MR. SOMVICHIAN:
15       Q.   Good morning, Dr. Wilson.  My name's
16   Whitty Somvichian.  I'm one of the attorneys
17   representing Google in this case, and you were
18   retained by plaintiffs' counsel in connection
19   with the litigation pending against Google,
20   correct?
21       A.   Correct.
22       Q.   You submitted an expert report in
23   connection with litigation?
24       A.   Correct.
```

Page 6

1    say, "It is my opinion that there is a uniform

2    set of information contained in all Google RTB

3    bid requests that is shared with and sold to

4    RTB participants."

5             Do you see that?

6         A.   I do.

7         Q.   Then the next sentence goes on to say,

8    "That is, based on Google's own documentation,

9    the Google RTB bid requests are intended to be

10   uniform in the types of information shared and

11   sold."

12             So I'm trying to understand what your

13   opinion exactly is.  Are you saying that the

14   data in RTB bid requests is intended to be

15   uniform across all bid requests but may

16   actually differ in individual bid requests, or

17   are you saying that the data contained in all

18   bid requests is literally uniform across all

19   bid requests sent to all RTB participants?

20        A.   So let's see.

21        Q.   Because the two sentences that I read

22   to you say -- seem to say to me both things,

23   which I -- I interpret as being inconsistent.

24        A.    (Witness reviews document.)

Page 27

1          Q.   So based on the exchange that we've

2     just had, it sounds like your opinion is that

3     you believe the structure and format of the

4     data included in bid requests is uniform, in

5     your view?

6          A.   (Witness nodding.)

7          Q.   But you've also seen that for certain

8     fields, they may contain different values, or

9     they may be missing entirely, and it was not

10    your assignment and you haven't rendered an

11    opinion on the extent to which that is true or

12    not true in any data set?

13                    MS. PRITZKER:   Objection as to

14    form.

15    BY MR. SOMVICHIAN:

16         Q.   Fair?

17         A.   Yes, I believe -- I believe I agree

18    with that.

19

20         (Exhibit No. 2 marked for identification.)

21

22    BY MR. SOMVICHIAN:

23         Q.   So, Dr. Wilson, you're not offering an

24    opinion, for example, that the Google user ID

                                             Page 31

CONFIDENTIAL

1    or any other identifier is actually included

2    uniformly in all individual bid requests

3    because that was not part of your assignment

4    to assess that, right?

5                    MS. PRITZKER:  Objection.

6    Objection as to form.

7        A.   I don't think I agree with that

8    characterization.  I am offering an opinion

9    about the structure -- as I've said, I am

10   offering an opinion about the structure and

11   the uniformity of the bid requests.  An

12   element like the user ID is certainly one of

13   the fields.  And the purpose of the exchange

14   is to make that kind of data available, to

15   share and sell it to facilitate targeted

16   advertising.

17                    So I -- I am of the opinion that that

18   data is being shared most of the time.

19   BY MR. SOMVICHIAN:

20       Q.   What's "most of the time"?

21       A.   The vast majority of the time.

22       Q.   Can you quantify that?  60 percent?

23   70 percent?  80 percent?  Did you evaluate

24   that?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          A.   So that was not part of my assignment

2     in this report.  I am not rendering an opinion

3     on the frequency -- or I'm not going to put a

4     precise number on the frequency of sharing.

5     However --

6          Q.   You're not --

7          A.   -- in my capacity as an expert,

8     someone who studied this for a long time, and

9     what we see in the literature, in general, and

10    my own work is that ads are typically targeted

11    based on this parameter.  It does seem like it

12    is shared the vast majority of the time.

13         Q.   Dr. Wilson, you're not offering an

14    opinion in this case that the Google user ID

15    is populated and there's a value in the field

16    for 100 percent of the bid requests that are

17    sent to RTB bid participants, are you?

18         A.   The report does not say that, so, no,

19    that is not an opinion I'm offering.

20         Q.   You're not offering an opinion that

21    it's 90 percent, right?

22         A.   That is correct.

23         Q.   Or 80 percent?

24         A.   That is not in the report, so, no.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1          Q.    Or any other percent because you

2     didn't calculate that, right?

3          A.    That is correct.   That is not in the

4     report.

5          Q.    And you didn't do that for any other

6     data field, correct?

7                    MS. PRITZKER:   Objection as to

8     form.

9     BY MR. SOMVICHIAN:

10         Q.    I'll ask a more complete.

11              You didn't -- you didn't perform an

12    analysis of the percentage of times in which

13    any field in the RTB bid requests is populated

14    or not populated, right?

15         A.    I want to be careful when I answer

16    this question.   I did not perform, in the

17    course of this analysis, an overall analysis

18    of the frequency of which any particular field

19    is populated.   That was not part of my

20    assignment.

21              However, there are particular places

22    in the report, specifically Section 9, where I

23    do look at whether particular elements are

24    being shared in a particular instance.

Page 34

CONFIDENTIAL

1    Q.    That's fair.

2          But you're not offering an opinion

3    that any specific field within the RTB bid

4    requests is, in fact, populated 100 percent of

5    the time across all bid requests to all

6    participants, right?

7    A.    That was not part my assignment, and,

8    no, I am not offering an opinion on that.

9    Q.    And I asked about 100 percent, but

10   you're also not offering an opinion that any

11   field is populated any -- at any other

12   percentage across all RTB bid requests to all

13   participants, right?

14              MS. PRITZKER:  Objection as to

15   form.  Asked and answered.

16   A.    That is correct.

17   BY MR. SOMVICHIAN:

18   Q.    I'll show you Exhibit -- I only have

19   one of these.

20          What's the title of that one?

21   A.    This is entitled "Real-Time Bidding

22   Protocol Buffer, Version 2." -- sorry --

23   ".212."

24              MR. SOMVICHIAN:  Okay.  I'll

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
1    selling impression inventory through Google

2    RTB.

3         Q.   What's your understanding of the data

4    that you reviewed?

5         A.   My understanding of this data is that

6    it was produced by The New York Times from

7    tools that Google makes available to

8    publishers that give kind of a summary of the

9    information that is being included in the bid

10   requests that are sent out in the exchange.

11        Q.   I'm trying to understand that.  How

12   does that relate to the actual bid request

13   data that gets sent out to the ultimate RTB

14   participants?

15        A.   Well, I mean, my understanding is that

16   this should have a high correspondence.  So

17   the data provided by The New York Times

18   includes things like user IDs, you know,

19   other -- it has kind of the fields that you

20   would expect and the populated values of the

21   fields that you would expect to see in bid

22   requests.  But I don't have actual knowledge

23   of how Google translates one into the other.

24        Q.   Did you view The New York Times data
```

Page 82

1          that you reviewed to be a reliable source of

2          information from which to draw conclusions

3          about whether or not there's a common set of

4          data that's sent in bid requests?

5               A.   Yes, I view it is a reliable set of

6          data for that purpose.

7               Q.   And, in fact, you relied on it for

8          that purpose, right?

9               A.   Yes.

10              Q.   Do you remember how many records were

11         contained in The New York Times data?

12              A.   Do you happen to recall the paragraphs

13         where I'm talking about The New York Times

14         data?

15              Q.   Page 14.

16              A.   Thank you.

17              Q.   Actually, I see the number here,

18         Paragraph 38.  Maybe you could just -- there's

19         a number at the beginning of the paragraph.

20         Can you confirm that that's what you saw?

21              A.   Yeah.  As I state here, I calculated

22         that there were ██████████ impression events

23         present in these logs.

24              Q.   Do you remember the date range that's

CONFIDENTIAL

1          covered by --

2               A.    Yes.   As I state here in Paragraph 38,

3     this is a log of a 24-hour period covering

4     November 30, 2021.

5               Q.    You said that this comes from a Google

6     tool that's made available to publishers.

7                     Can you describe that more precisely?

8               A.    Well, I've never used the tool.   I'm

9     not a publisher, so I don't have access to it.

10    But my understanding of the tool is that it

11    provides sort of a dump of tabular data, so

12    row-oriented data like you might find in

13    Excel, and in this case, listing individual

14    impressions.

15                    So there was a person who visited The

16    New York Times that generated an impression

17    that was sent to Google RTB.   Google RTB

18    proceeded to auction it.

19              Q.    It's your understanding that

20    information available from the tools intended

21    to reflect what was actually included in the

22    bid request that went out for that ad

23    impression?

24              A.    Yes.   My understanding of the tool is

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1    that it's supposed to be accurate for the

2    publishers who are meant to use it, so the

3    data should reflect what is actually happening

4    in the bid requests.

5        Q.    And the examples that you give here

6    in 39 and 40, what are you trying to convey

7    here in these paragraphs of your report?

8        A.    So again, the purpose of the report is

9    both to present that there is this uniform set

10   of fields and then to, to some extent, also

11   show that those fields are sort of live,

12   right?  They do get populated.

13            So these are meant to be two actual

14   examples where someone actually had an ad

15   impression that was auctioned and an example

16   of what the kind of data would look like.

17       Q.    So for The New York Times data, was

18   your -- strike that.

19            For your review of The New York Times

20   data, did you do the same kind of visual scan

21   that you did for the Trade Desk data, or did

22   you do anything separately or different?

23       A.    My recollection is that I did do the

24   visual scan.  I recall that's how I found

1      generate a fingerprint where you have OS

2      version versus a circumstance where you don't

3      have OS version would lead to different

4      accuracy of being able to use the fingerprint

5      to identify a unique device or user?

6                      MS. PRITZKER:  Objection as to

7      form.

8          A.   That's also difficult to answer

9      without knowing what the amount of entropy in

10     that -- that column of data is.  If it's a

11     low-entropy column, it doesn't matter if it's

12     omitted.  So I don't know the amount of

13     entropy in that column.

14     BY MR. SOMVICHIAN:

15         Q.   Or if it's a high-entropy data field?

16         A.   So then we would have to ask questions

17     about how much entropy is in the other fields.

18     You know, if there are another -- other --

19     number of other columns that are also

20     extremely high entropy, the omission of one

21     column is not going to make a substantive

22     difference.

23         Q.   Does the omission of a data field

24     impact the overall level of entropy in a data

                                    Page 165

CONFIDENTIAL

1      set?

2           A.    Yes.    There is a relationship between

3      data included in the data sets and entropy.

4           Q.    And that relationship depends on the

5      specific amount of entropy in a given data

6      field, which might differ from one field to

7      another or based on the specificity of the

8      values in the field as a general matter,

9      right?

10                     MS. PRITZKER:   Objection as to

11     form.

12          A.    As a general matter, yes, you would

13     need to know the number of fields, the entropy

14     per field, in order to assess something like

15     entropy overall.

16     BY MR. SOMVICHIAN:

17          Q.    On the same page there's a column for

18     "Audience Segment ID"?

19          A.    (Witness nodding.)

20          Q.    Do you know what that field is?

21          A.    I can only speculate.   I don't

22     remember if there's a strong correspondence

23     between that and a field in the protocol

24     buffers themselves.   My general understanding

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1              cookies."

2                     Do you see that?

3         A.   Yes, I see that.

4         Q.   In the context of cookies, is it more

5     accurate to say that a cookie is used to

6     identify a unique browser or instance of a

7     browser as opposed to an individual?

8         A.   I don't believe that's a distinction

9     with meaning.  A device is going to be

10    primarily used by a specific person, so it's

11    tantamount to an individual.

12        Q.   But from a -- from a technical

13    standpoint, a cookie is associated with a

14    browser, right?

15        A.   Yes, that is true.  It is associated

16    with a browser and potentially also with a

17    particular user profile in the browser.

18        Q.   And what you're saying, I think, is

19    that cookie associated with a browser --

20    strike that.

21             I think what you're saying is that a

22    browser identified by a particular cookie

23    value generally corresponds to a person using

24    it, and therefore, the cookie can be used as

Page 193

```
 1        activity.
 2            Q.   And then that information allows the
 3        RTB participant to then use whatever
 4        information that they already have about that
 5        identifier, correct?
 6            A.   Yes.  Sure.
 7            Q.   But you're not saying that in the RTB
 8        bid request there's some field that's related
 9        to the operation of user lists that
10        communicates all the prior browsing history
11        associated with Google's ID, are you?
12                    MS. PRITZKER:  Objection as to
13        form.
14            A.   Yeah, I -- can you restate that.
15        There's a lot to unpack there.
16        BY MR. SOMVICHIAN:
17            Q.   Yes.  In the RTB bid requests protos
18        that you've looked at, there's not some field
19        that conveys prior web browsing history
20        whether it's related to user lists or not,
21        right?
22                    MS. PRITZKER:  Objection.
23            A.   No, I disagree.  I think this is
24        tantamount to communicating that
```

Page 242

CONFIDENTIAL

1        information.

2    BY MR. SOMVICHIAN:

3        Q.    I understand that you think it's

4    tantamount to that.    But in an individual bid

5    request, there is not a field that conveys

6    prior browsing history, is there?

7                    MS. PRITZKER:    Objection as to

8    form.

9        A.    I mean, I think I've answered that.

10   This is communicating prior browsing history.

11   You visited a URL.    That's what it's

12   communicating.    That is a -- something you did

13   in the past in your browser.    It's browsing

14   history.

15   BY MR. SOMVICHIAN:

16       Q.    And when it communicates a cookie

17   match or the inclusion of somebody on a user

18   list, it's in connection with that particular

19   browsing session, is it not?

20       A.    I'm not sure what you mean by

21   "browsing session."    I'm sorry.

22       Q.    When -- walk me through the steps in

23   which you think a single RTB bid request

24   conveys to the RTB participant something about

Page 243

1          A.    Yeah.   They say they're an ad blocker,

2     but their business model as a company is that

3     you can pay to be on an allow list, and Google

4     has paid to be on the list, so DoubleClick

5     still appears.   So it's ineffective at

6     stopping RTB.

7          Q.    Meaning the bid request is still sent,

8     but you might not be shown an ad?

9          A.    In this case, the bid request would be

10    sent, and you would see the ad.

11         Q.    So for -- you said it varies.   You

12    don't like Adblocker, but I assume that there

13    are other ad blockers that do block both the

14    bid request from being sent and the display of

15    ads, right?

16         A.    There are other ad blockers that do

17    their -- do their darndest to try and block

18    all connections to all entities known to be

19    doing advertising.   That would include

20    something like Google RTB.

21         Q.    What are some of those ad blockers

22    that you're aware of?

23         A.    UBlock Origin is the one that comes to

24    mind.   And there's another extension by the

                                        Page  278

CONFIDENTIAL

1   same author named uMatrix that has the same
2   effect.
3        Q.    Any others?
4        A.    I mean, I'm aware that there are
5   dozens of these kinds of things in the Google
6   Chrome extension store.  But I don't remember
7   their names, and I don't know if they work.
8        Q.    Oh, you're aware of some in the Chrome
9   extension store?
10        A.    Yes.
11        Q.    That purport to do this?
12        A.    Yes, I'm aware of them.
13        Q.    You haven't studied them, but if they
14   work like some of the ones that you're aware
15   of, they could potentially block RTB bid
16   requests from being sent?
17              MS. PRITZKER:  Objection as to
18   form.
19        A.    It is possible there are things in the
20   Chrome store that would do this, but I would
21   put a strong caveat on that.  Fake ad blockers
22   are a vector for scams.  So it may be the case
23   that they don't work, and it may actually be
24   the case they are actively harmful to people.

Page 279

1    the web and app activity for the named

2    plaintiffs, determined the websites that they

3    visited, right?

4        A.   Yes, correct.

5        Q.   You took the subset that was, like,

6    non-Google sites?

7        A.   Yes, correct.

8        Q.   You use a web crawler to access those

9    websites and also six pages within each of

10   those websites, right?

11       A.   That's correct.   The home page plus

12   six other or five other internal links.

13       Q.   And then you used this Crawlium thing

14   that you developed to try to determine whether

15   a Google RTB bid request was being generated

16   by that web activity, right?

17       A.   In addition to whether cookie matching

18   is happening, yes, that's correct.

19       Q.   That was a separate part of your

20   analysis to evaluate both whether a cookie

21   match was occurring and also whether an ad was

22   being shown via Google RTB, correct?

23       A.   Yes, that's correct.

24       Q.   Am I correct that you were looking

Page 295

CONFIDENTIAL

```
 1        BY MR. SOMVICHIAN:
 2            Q.    Okay.  But there could be instances
 3        here where the bid request was generated not
 4        from the home page but, like, on some link --
 5        linked page, right?
 6            A.    Yeah, that's true.  But, I mean, the
 7        issue here is that the crawler is picking
 8        these links at random.  The crawler's behavior
 9        is not really reflective of what a human being
10        would do.
11               So the question -- the only real
12        question you can answer with this method is is
13        RTB on the site, not would the person who's
14        going there encounter it because, you know, a
15        person would potentially click on different
16        links, and it's...
17            Q.    But aren't you trying to use these
18        results and draw a conclusion about what
19        actual human beings would do and the
20        prevalence at which actual human beings would
21        encounter Google RTB?
22            A.    I am, and I think these numbers are
23        accurately reflecting that.
24            Q.    Didn't you just say that they
```

Page 302

```
 1        visittable.pynb.
 2             Q.   So you think most likely in, one,
 3        extract.py or, two, analyze.py?
 4             A.   It's either there, or there may be
 5        other Python scripts in these folders that we
 6        provided.  I don't exactly recall.  I'm sorry.
 7             Q.   Are you confident that either those
 8        files or other files that are listed here
 9        would indicate whether you limited your
10        analysis to the subdomain that you believe to
11        be relevant to RTB?
12             A.   Yes.
13             Q.   Look back at Table 5, please.  Under
14        the column for "RTB percentage," you see the
15        high -- I think maybe it's the top row -- or
16        actually it's maybe rkimgee, ███████████
17                  Do you see that?
18             A.   I do see that, yes.
19             Q.   The low is ████████████
20                  Do you see that?
21             A.   The terrydiggs row?
22             Q.   Yes.
23             A.   Yes, I see that.
24             Q.   What explains the variation between
```

Page 311

CONFIDENTIAL

1    those two results and the other results that

2    span that range in terms of percentages?

3         A.   Well, it's based on the websites that

4    they visited.  Did they include RTB or not?

5         Q.   So the individual web activity of

6    these different named plaintiffs led to

7    different results here, right?

8         A.   Yes, that's correct.

9         Q.   Is that also true for the

10   cookie-matching percentages?

11        A.   Yes, that's correct.

12        Q.   What would explain the variation

13   between a low percentage, like ██████████

14   for rethena.green, versus an even lower

15   percentage for terrydiggs at ████████ versus

16   a higher one for jkevran at ██████████

17   What are some of the specific factors that

18   might lead that to variation in results?

19             MS. PRITZKER:  Objection as to

20   form.

21        A.   I believe -- assuming I'm

22   understanding the question, I think I just

23   answered it.  It's based on the websites that

24   these people visited that appeared in the web

Page 312

CONFIDENTIAL

1        "Personalized ads on."

2              And then after you turn it off, in

3        Screenshot 2, it says things like "Some info

4        may still be used to improve your experiences

5        on Google services."

6              But my understanding of the

7        implication here is that outside of these kind

8        of narrow Google services, your data shouldn't

9        be used to personalize your targeted

10       advertising.  So, again, that's what I'm

11       looking for here is am I still receiving those

12       kinds of ads?

13          Q.   Are you aware of other Google

14       disclosures where Google explains that if you

15       opt out of ads personalization, your ads can

16       still be based on things like general

17       location, IP address, browser type, other

18       factors?

19          A.   I'm not sure specifically what you're

20       referring to.  However, again, my

21       understanding of this setting, I think,

22       comports with what you said.

23              My general understanding of this is

24       that it is supposed to be controlling things

Page 328

1    like the user ID and potentially the user

2    list.  But as you said, this is not meant to

3    control other forms of information being

4    distributed, like the user agent, the

5    location.  Those things are still distributed

6    whether you've opted in or out.

7        Q.    And couldn't those other pieces of

8    data that you understand will still be sent

9    have triggered the advertisement that you see

10   here in Paragraph 122, things like the IP

11   address, user agent, if it's being tracked by

12   advertisers?

13       A.    So I think what you're positing is

14   perhaps a scenario where an advertiser uses

15   fingerprinting to try and compute a unique

16   identifier.  That is possible.  I mean,

17   advertisers can compute fingerprints.

18            And unfortunately what that would mean

19   is that the guarantee that Google is making

20   here is false, right?  They're saying --

21   they're allowing you to say, I would not like

22   these ads, and yet they're still providing

23   sufficient information for those ads to be

24   targeted.

Page 329

1      essentially little mini computers in a virtual

2      sense.  And each one of those would have a

3      separate IP address, but they get routed

4      through a single public IP address?

5          A.   Yes, that's correct.

6          Q.   And did -- was -- did that

7      public-facing IP address change over the

8      course of the experiments?

9          A.   I wasn't measuring that.  I can't say

10     for certain.  My general impression of that IP

11     is that it's pretty stable.

12         Q.   How do you know that?

13         A.   Well, it's my home address, and

14     occasionally, I access remotely by IP, and I

15     seem to recall it being stable for a long

16     time.

17         Q.   Your expectation would be -- well, how

18     long did all this crawling take?  Was that all

19     completed in a day?

20         A.   It was not completed in a day.

21              (Witness reviews document.)

22              So what I say in Paragraph 108 is that

23     all the crawlers and data collection took

24     place between January 20 and January 25.  So

Page 333

CONFIDENTIAL

```
1              Q.   And with GAP turned off?

2              A.   That's correct.

3              Q.   I got it.

4                        MR. SOMVICHIAN:  Why don't we go

5         off the record.  I want to see what else I

6         have.

7                        MS. PRITZKER:  I think we're at

8         the seven-hour limit, Counsel.  So I'm not

9         sure --

10                       THE VIDEOGRAPHER:  The time is

11        5:15 p.m.  We're off the record.

12

13        (Recess taken from 5:15 p.m.

14              to 5:18 p.m.)

15

16                       THE VIDEOGRAPHER:  We're back on

17        the record.  The time is 5:18.

18        BY MR. SOMVICHIAN:

19            Q.   Dr. Wilson, we made it to the last

20        paragraph in your report.

21               Paragraph 124, you say in the last

22        sentence, "It is very unlikely that there are

23        any Google U.S. account holders who over the

24        entire seven-year class period did not have
```

Page 347

1    their data shared and sold through Google RTB

2    at least once."

3              You're not prepared to offer any

4    quantification in terms of a percentage or

5    number when you say "very unlikely," are you?

6    A.   I don't present a number, and I was

7    not provided the data to compute such a

8    number.  It was not part of my assignment, so,

9    no.

10   Q.   And could the number depend on whether

11   an account holder tends to access the Internet

12   through a web or mobile device?

13   A.   I don't think that's a strong enough

14   distinction.  RTB is present on both.  You're

15   likely to get swept up in RTB whether you use

16   one or the other or both.

17   Q.   Could the percentage or the likelihood

18   depend on the browser type and whether you're

19   using, for example, a browser that blocks

20   third-party cookies?

21   A.   I mean, again, it's hard to say

22   because a person may use other browsers at

23   other times.  The browsers didn't always block

24   third-party cookies, so we're talking about a

Page 348

```
 1                    CERTIFICATION
 2        I, DARLENE M. COPPOLA, a Notary Public, do hereby
 3   certify that CHRISTOPHER WILSON, PH.D., after having
 4   satisfactorily identifying himself, came before me on
 5   the 31st day of August, 2023, in Boston,
 6   Massachusetts, and was by me duly sworn to testify to
 7   the truth and nothing but the truth as to his
 8   knowledge touching and concerning the matters in
 9   controversy in this cause; that he was thereupon
10   examined upon his oath and said examination reduced to
11   writing by me; and that the statement is a true record
12   of the testimony given by the witness, to the best of
13   my knowledge and ability.
14        I further certify that I am not a relative or
15   employee of counsel/attorney for any of the parties,
16   nor a relative or employee of such parties, nor am I
17   financially interested in the outcome of the action.
18        WITNESS MY HAND THIS 4th day of September, 2023.
19
20
     Darlene M. Coppola
21   DARLENE M. COPPOLA              My commission expires:
22   NOTARY PUBLIC                   November 2, 2029
23   REGISTERED MERIT REPORTER
24   CERTIFIED REALTIME REPORTER

                                          Page 352
```

1          I, CHRISTOPHER WILSON, PH.D., say that I have

2      read the foregoing deposition and hereby declare under

3      penalty of perjury the foregoing is true

4      and correct:  (as prepared)  (as corrected on errata.)

5          Executed this _____ day of _____,

6      2023, at _____,

7      _____.

8

9

10

11

12          _____

13              CHRISTOPHER WILSON, PH.D.

14

15

16

17

18

19

20

21

22

23

24

Page 355