COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
(rhodesmg@cooley.com)
WHITTY SOMVICHIAN (SBN 194463)
(wsomvichian@cooley.com)
AARTI REDDY (SBN 274889)
(areddy@cooley.com)
KYLE C. WONG (SBN 224021)
(kwong@cooley.com)
REECE TREVOR (SBN 316685)
(rtrevor@cooley.com)
ANUPAM DHILLON (SBN 324746)
(adhillon@cooley.com)
ELIZABETH SÁNCHEZ SANTIAGO
(SBN 333789)
(lsanchezsantiago@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone:    +1 415 693 2000
Facsimile:    +1 415 693 2222

COOLEY LLP
ROBBY L.R. SALDAÑA (DC No. 1034981)
(rsaldana@cooley.com)
(*Admitted pro hac vice*)
KHARY J. ANDERSON (DC No. 1671197)
(kjanderson@cooley.com)
(*Admitted pro hac vice*)
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:    +1 202 842 7800
Facsimile:    +1 202 842 7899

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation,<br><br>This Document Relates to: *all actions* | Master File No. 4:21-cv-02155-YGR-VKD<br><br>**GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL** |

**UNREDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................................. 1

II.   BACKGROUND ............................................................................................................ 2

    A.    Cookie matching depends on a variety of factors ..................................................... 4

    B.    Google discloses that RTB Data is used and shared for advertising......................... 4

    C.    Google account holders have many ways to control what information is used for advertising, including in RTB. ...................................................................... 6

    D.    Publishers provide disclosures to users, obtain consent, and can limit the information included in RTB Data........................................................................... 7

    E.    The RTB Data in individual bid requests varies significantly. ............................... 8

III.  APPLICABLE STANDARDS ....................................................................................... 10

IV.   ARGUMENT .................................................................................................................. 11

    A.    Plaintiffs offer no viable way to identify the proposed class. ................................ 11

    B.    RTB data is not "uniform," as Plaintiffs falsely claim, and varies in critical ways that undermine any finding of commonality or predominance.................... 11

    C.    Whether Class Members consented to the alleged sharing of "personal information" through RTB is highly individualized. ........................................... 14

    D.    Plaintiffs' purported common evidence of individuals' "reasonable expectations of privacy" should be rejected....................................................... 19

    E.    Plaintiffs' proposed damages models violate *Comcast* in multiple ways. ............ 20

    F.    Plaintiffs' CIPA claim cannot be certified for additional reasons. ....................... 23

    G.    Plaintiffs' Rule 23(b)(2) injunctive relief class should also be denied. ................ 24

V.    CONCLUSION .............................................................................................................. 25

FIRM NAME
ATTORNEYS AT LAW
OFFICE ADDRESS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrews v. Plains All Am. Pipeline, L.P.*,
  2017 WL 10543402 (C.D. Cal. Feb. 28, 2017).................................................... 21, 23, 25, 26

*Anti Police-Terror Project v. City of Oakland*,
  2021 WL 4846958 (N.D. Cal. Oct. 18, 2021)....................................................................... 12

*In re Apple iPhone Antitrust Litig.*,
  2022 WL 1284104 (N.D. Cal. Mar. 29, 2022).............................................................. 21, 23

*Beaty v. Ford Motor Co.*,
  2021 WL 3109661 (W.D. Wash. July 8, 2021) .................................................................... 24

*Brodsky* v. *Apple Inc.*,
  445 F. Supp. 3d 110 (N.D. Cal 2020) ................................................................................. 15

*Brown v Google, LLC*,
  2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ................................................... 3, 15, 20, 25

*Campbell v. Facebook Inc.*,
  315 F.R.D. 250 (N.D. Cal. 2016) ......................................................................................... 24

*In re Capacitors Antitrust Litig. (No. III)*,
  2018 WL 5980139 (N.D. Cal. Nov. 14, 2018)...................................................................... 25

*Chowning v. Kohl's Dep't Stores, Inc.*,
  2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) ..................................................................... 24

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ......................................................................................................*passim*

*Edquist v. Bidz.com, Inc.*,
  2013 WL 1290130 (D. Mass. Mar. 29, 2013)....................................................................... 15

*In re: Facebook Priv. Litig.*,
  2016 WL 4585817 (N.D. Cal. Sept. 2, 2016) ...................................................................... 13

*In re Google Inc. Gmail Litig.*,
  2014 WL 1102660 (N.D. Cal. Mar. 18, 2014).............................................................. 15, 17

*Handloser v. HCL Techs. Ltd.*,
  2021 WL 879802 (N.D. Cal. Mar. 9, 2021).......................................................................... 25

*Hart v. TWC Prod. & Tech. LLC*,
  2023 WL 3568078 (N.D. Cal. Mar. 30, 2023).............................................................. 15, 20

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*LD v. United Behav. Health*,
    2023 WL 2806323 (N.D. Cal. Mar. 31, 2023) ....................................................................... 20

*In re Lenovo Adware Litig.*,
    2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ....................................................................... 15

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
    2015 WL 4537957 (N.D. Cal. July 27, 2015) ....................................................................... 26

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................................................... 26

*Moore v. Apple Inc.*,
    309 F.R.D. 532 (N.D. Cal. 2015) .......................................................................................... 13

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*,
    31 F.4th 651 (9th Cir. 2022) .......................................................................................... 12, 21

*Senne v. Kan. City Royals Baseball Corp.*,
    2021 WL 3129460 (N.D. Cal. July 23, 2021) ....................................................................... 26

*Stathakos v. Columbia Sportswear Co.*,
    2017 WL 1957063 (N.D. Cal. May 11, 2017) ...................................................................... 24

*Van v. LLR, Inc.*,
    61 F.4th 1053 (9th Cir. 2023) ....................................................................................... 11, 24

*Vizcarra v. Unilever U.S., Inc.*,
    339 F.R.D. 530 (N.D. Cal. 2021) .......................................................................................... 25

*Wal-Mart Stores, Inc. v. Dukes*,
    561 U.S. 338 (2011) ...................................................................................................... 11, 25

*Ward v. Apple Inc.*,
    2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ....................................................................... 23

*In re Zynga Priv. Litig.*,
    750 F.3d 1098 (9th Cir. 2014) .............................................................................................. 15

**Statutes**

Cal. Penal Code §631 .................................................................................................................. 1, 24

**Other Authorities**

Federal Rule of Civil Procedure 23 ......................................................................................... *passim*

Google's Opposition to Motion for
Class Certification
Case No. 4:21-cv-02155-YGR-VKD

### STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiffs have met their burden to show that the elements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) for certifying a damages class are established, where:

    a.    Plaintiffs have not presented a viable method to identify proposed class members;

    b.    Plaintiffs' theories of commonality and predominance are premised primarily on their contention that "personal information" is uniformly shared in Google's Real-Time Bidding system ("RTB") but Plaintiffs' own evidence shows the data at issue varies in significant ways and the specific information they complain of is often not shared due to different user actions and other variables;

    c.    Issues of implied and express consent are central to all of Plaintiffs' claims and cannot be resolved without individualized evidence to determine if proposed class members were aware of numerous disclosures addressing the alleged practices at issue and whether they consented to those practices in different ways;

    d.    Plaintiffs have not shown that individuals' expectations of privacy can be established from common evidence as needed to adjudicate Plaintiffs' privacy-related claims alleged in Counts 5 through 8 of the operative complaint, ECF No. 92 at 106-112;

    e.    Plaintiffs have not presented a viable class-wide method to either demonstrate the fact of injury or quantify alleged damages in a manner that complies with the Supreme Court's requirements in *Comcast Corp. v. Behrend,* 569 U.S. 27, 34 (2013); and

    f.    Plaintiffs have not shown that a California nexus can be established on a class-wide basis as required for their California Invasion of Privacy Act ("CIPA") claim, Cal. Penal Code § 631.

2. Whether Plaintiffs have met their burden of proof to show that the elements of Federal Rules of Civil Procedure 23(a) and 23(b)(2) are established for certifying an injunctive relief class, where the issues above undermine any finding of commonality under Rule 23(a), and Plaintiffs have failed

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  to show it would be appropriate to impose the same injunctive relief on proposed class members

2  who are differently situated.

Cooley LLP
Attorneys at Law
San Francisco

v

Google's Opposition to Motion for
Class Certification
Case No. 4:21-cv-02155-YGR-VKD

1    **I.    INTRODUCTION**

2            Plaintiffs' Motion for Class Certification ("Motion") should be denied because it ignores a

3    host of individualized issues that render classwide litigation impossible. Plaintiffs seek to distract

4    from their Motion's defects by making various sensationalized claims about RTB. But when those

5    distractions are set aside, Plaintiffs' claims involve nothing more than industry standard advertising

6    practices that have been openly disclosed for years and the sharing of basic information—like IP

7    address, user agent, and cookies—that is routinely exchanged as part of normal Internet

8    communications. Regarding the class certification issues at hand, Plaintiffs' claims cannot be

9    shoehorned into Rule 23's requirements because they turn on numerous fact-intensive inquiries that

10   cannot be resolved from any source of common evidence.

11           ***First***, Plaintiffs' Motion is premised on the repeated assertion that data transmitted in RTB

12   is "uniform," but the evidence shows this is patently false. Indeed, one of Plaintiffs' experts claimed

13   in his report that "there is a uniform set of information contained in all Google RTB bid requests

14   shared with and sold to RTB participants," but then disclaimed any such opinion when confronted

15   with findings from the very data he claims he reviewed.[1] This evidence shows immense variation

16   in the data at issue, in which key data fields that Plaintiffs complain of being shared are often

17   omitted due to different user actions and other factors. Without the false foundation of "uniform"

18   data sharing, the Motion falls apart because the "common" issues on which Plaintiffs rely—whether

19   Google breached its contract, whether class members reasonably expected privacy in the data

20   shared, whether Google intercepted contents of communications, and others—have no common

21   answer and will require highly technical and individualized analysis of the particular data allegedly

22   shared for each individual in the proposed class, numbering in the many millions.

23           ***Second***, implied and express consent issues are central to all of Plaintiffs' claims but cannot

24   be adjudicated on a classwide basis given the myriad sources that would have informed individuals

25   of the practices Plaintiffs claim were "undisclosed." Mot. at 6. Plaintiffs blithely claim that consent

26   is no impediment to certification because the Court need only look to "Google's uniform contract"

27

28   _____

[1] *See* Declaration of Whitty Somvichian ("Somvichian Decl.") Ex. 16 (Wilson Depo. Tr. 31:23-35:16).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    and the alleged lack of adequate disclosures in the "ToS or Privacy Policies." *Id*. at 18. But Plaintiffs

2    ignore numerous **non**-contractual Google disclosures and an entire body of **non-Google** materials,

3    including ubiquitous website cookie notices and privacy policies, that address the practices at

4    issue—all of which would need to be considered to resolve whether consent defenses apply to any

5    individual in the proposed class. Indeed, the individualized evidence of consent here goes well

6    beyond that which this Court found sufficient to bar certification in *Brown v. Google LLC*.

7          **Third**, Plaintiffs present no viable method to determine even the fact of injury on a

8    classwide basis, let alone to calculate damages in a manageable way "across the entire class."

9    *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiffs' proposed damages models violate

10   *Comcast* in multiple ways because they are untethered to their theory of liability and would further

11   award damages to entirely uninjured individuals.

12         For all these reasons, the Court should deny the Motion in its entirety.

13   **II.    BACKGROUND**

14         Owners of websites or apps ("publishers") can sell space on their websites and apps to show

15   ads ("ad inventory"), allowing them to generate revenue so they can provide content and services

16   to their users—often for free. Real-time bidding generally refers to a process for selling ad

17   inventory through an automated, real-time auction. Several companies, including Google, operate

18   online advertising platforms that utilize real-time bidding, and there are industry-standard protocols

19   for transmitting information in a real-time bidding process, which Google's systems comply with.

20   Declaration of Glenn Berntson ("Berntson Decl.") ¶¶ 6-7.

21         Google offers two products that allow certain advertising partners and other participants

22   ("RTB participants") to bid on ad inventory through RTB.[2] *Id*. ¶ 7. These RTB participants must

23   pass Google's vetting process and agree to various terms, which restrict how they can use and store

24   information they receive in RTB. Google audits RTB participants for compliance and can terminate

25   access or take other actions if violations are found. *See* Somvichian Decl. Exs. 36, 41.

26         The steps in the RTB process are explained in the Berntson Declaration and Expert Report

27

28   [2] These products are called Authorized Buyers ("AB") and Open Bidding ("OB") and are further
     described in the Berntson Declaration. *See id.* at ¶¶ 7, 9.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

**GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD**

1  of Aaron Striegel (Somvichian Decl. Ex. 1, "Striegel Report") filed herewith, and summarized in

2  the graphic below:



Certain aspects of this data flow are of particular importance.

**First**, the categories of information in the bid requests Google sends to RTB participants conform to industry standard RTB protocols that have been in place for over a decade, known as "OpenRTB."[3] In fact, Google by design sends *less* information than contemplated in OpenRTB. This includes truncating IP addresses, which obscures the full IP address associated with a given device, and providing only generalized location information, which often results in location being reported at the city level. Berntson Decl. ¶¶ 11, 26, 32; Striegel Report ¶¶ 45, 61, 69.

**Second**, much of the data in bid requests that Plaintiffs complain about, including the IP address and user agent of devices that access a publisher's website or app, is already included in the ad request sent to Google and consists of information that publishers receive as part of standard Internet communication protocols, independent of advertising functions. Striegel Report ¶¶ 31-34.

**Third**, bid requests can be generated by the web and app activity of either Google account holders or *non*-account holders. Where a bid request involves a Google account holder, it will not contain any identifier for the Google account nor any information taken from the person's account. For that reason, bid requests associated with a Google account holder contain ***no additional data***

---

[3] *See* https://www.iab.com/wp-content/uploads/2016/03/OpenRTB-API-Specification-Version-2-5-FINAL.pdf  at 2 ("OpenRTB was adopted as an IAB standard in January 2012 ….")

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

*fields* as compared to bid requests for *non*-Google account holders. Berntson Decl. ¶ 10.

*Fourth*, where a bid request involves a device used by a Google account holder, Google maintains multiple internal systems, controls, and policies to prevent the data in such bid requests from being linked to those individuals' Google accounts. *Id.* ¶¶ 15, 65.

*Fifth*, and critically for class certification purposes, whether a given data field is actually populated in a given bid request or whether it is truncated, generalized, or omitted altogether depends on a host of factors, meaning the information included in bid requests ("RTB Data") is not uniform but highly varied across individual bid requests, as discussed further below.

### A.    Cookie matching depends on a variety of factors.

Cookies are small data files stored on a web browser. Google uses a cookie known as the "Biscotti" to pseudonymously identify a given web browser on a device for advertising and other purposes.[4] Berntson Decl. ¶ 15. RTB participants may utilize their own cookies to identify a given web browser. Cookie matching is an optional feature that allows RTB participants to match their cookies with a Biscotti for the same browser. *Id.* ¶ 16. This allows an RTB participant, for example, to limit the bid requests they receive to those involving browsers they interacted with before on other websites, as determined by the presence of their cookies. Where a cookie match is identified, certain information about the match can be included in a bid request, but this does not include browsing history or other information from a Google account holder's account. *Id.* ¶ 23. There are many ways that individuals can prevent cookie matching, including through settings in their Google account and controls in their web browsers for blocking cookies.[5] *Id.* ¶¶ 17, 47, 49, 52, 55, 60; Striegel Report ¶¶ 53-56, 79, 82-83. As a result, whether or not cookie matching occurs during any given web browsing session for any given user will turn on numerous individualized variables.

### B.    Google discloses that RTB Data is used and shared for advertising.

Plaintiffs claim Google's RTB-related practices are "undisclosed" (Mot. at 6), but this bald

---

[4] Biscotti cookies are not associated with a Google account, meaning the user of a web browser tied to a Biscotti may or may not be a Google account holder. Where the user is a Google account holder, Google maintains various internal systems, controls, and policies to prevent the Biscotti from being linked to those individuals' Google accounts. Berntson Decl. ¶ 15.

[5] When a user deletes cookies, the Biscotti cookie for that browser is deleted and any subsequent browsing activity can no longer be associated with the deleted cookie. Berntson Decl. ¶ 56.

Cooley LLP
Attorneys at Law
San Francisco

4

Google's Opposition to Motion for
Class Certification
Case No. 4:21-cv-02155-YGR-VKD

1  assertion ignores a host of Google terms, policies, and other disclosures that explain how Google

2  uses and shares information for advertising purposes, including the practices at issue in this case.

3      *First*, Google's Privacy Policy identifies the information Google collects and uses: (1)

4  "unique identifiers, browser type and settings, device type and settings, operating system . . . the

5  interaction of your apps, browsers, and devices with our services," (2) "information about your

6  location when you use our services," and (3) "your IP address to determine your approximate

7  location." Declaration of Suneeti Vakharia ("Vakharia Decl.") ¶ 14 & Ex. 1. These categories are

8  precisely the information Plaintiffs complain of here. *See* Mot. at 13.

9      *Second*, Google explains this information can be used specifically for advertising purposes,

10  including by informing users that: (1) "we collect information to provide better services to all our

11  users . . . like which ads you'll find most useful," and (2) "[d]epending on your settings, we may

12  also show you personalized ads based on your interests." Vakharia Decl. Ex. 1.

13      *Third*, Google further clarifies this advertising-related use of information is not limited to

14  internal use by Google and that Google may share "non-personally identifiable information" with

15  "advertisers."[6] *Id*.

16      *Fourth* and relatedly, Google explains in multiple widely-viewed sources, including many

17  outside of the ToS and Privacy Policy, that it enables targeted advertising on *non*-Google websites

18  and apps. For example, Google's *Advertising* page explains: "Many websites, such as news sites

19  and blogs, partner with Google to show ads to their visitors." *Id*. ¶ 17 & Ex. 2. Similarly, on a page

20  titled *How Google Uses Information from Sites or Apps that Use Our Service* page ("*Information*

21  *from Sites/Apps*" page), Google explains that it receives data from partner websites and "uses the

22  information shared by sites and apps to . . . personalize content and ads," not just on Google's sites,

23  but also "on our partners' sites and apps." *Id*. ¶ 33 & Ex. 6. As further explained, the data shared

24  by partner websites for this purpose includes the URL of the web page the user is accessing, the

25  user's IP address, information in cookies, and other "unique identifier[s]." *Id*. This sharing of

26  information to enable targeted ads on non-Google websites is precisely what Plaintiffs complain of

27

28  ─────────────────
[6] "[N]on-personally identifiable information" is defined as "information that is recorded about users so that it no longer reflects or references an individually identifiable user." Vakharia Decl. Ex. 1.

Cooley LLP
Attorneys at Law
San Francisco

5

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

in connection with RTB.

*Fifth*, Google provides additional descriptions of specific practices Plaintiffs claim are "undisclosed." For example, the *Advertising* page addresses how Google uses cookies in conjunction with partner websites: "Working with our partners, we may use cookies … to show ads that are likely to be more relevant (such as ads based on websites you have visited)" and "[w]hen you visit a page or see an ad that uses one of [Google's] products, either on Google services or on other sites and apps, various cookies may be sent to your browser" that may be used to serve targeted ads. Vakharia Decl. Ex. 2. This page further explains the advertising-related uses of (1) IP address and related location information ("we may use the IP address to identify your general location" and "[y]our IP address is usually a good indication of your approximate location."), (2) user agent ("We may also select advertising based on information about your computer or device, such as your device model [and] browser type"), and (3) and mobile device identifiers. *Id.*

Collectively, these disclosures provide ample notice that the categories of information in dispute can be shared to enable advertising on non-Google websites and encompass the RTB-related practices Plaintiffs seek to challenge.

**C.    Google account holders have many ways to control what information is used for advertising, including in RTB.**

Broadly speaking, ads in RTB can be selected (1) using only "contextual" information like the content of a website where the ad will be shown, or (2) based on cookies or other pseudonymous identifiers, which allow advertisers to choose ads based on information they may have on prior activity associated with the identifier. Google generally refers to this latter category as a type of "personalized" ad. Berntson Decl. ¶ 39. Whether a given ad shown through RTB involves category (1) or (2) depends on various factors, which in turn impact the specific data included in the corresponding RTB bid requests. To be clear, RTB bid requests never include information from a user's Google account, like prior searches or web activity. *Id.*

*Google account settings*: Google account holders can opt out of personalized advertising through an account setting known as Google Ads Personalization or "GAP." Berntson Decl. ¶¶ 48-49. Opting out of GAP causes all pseudonymous identifiers (e.g., cookies and device IDs) to be

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

removed from RTB Data and also disables cookie matching. Berntson Decl. ¶ 49. Ads shown through RTB are then based only on contextual information, as described above. For users who have GAP enabled, RTB bid requests can include pseudonymous identifiers (if they are not blocked for other reasons as noted below) and advertisers can potentially select ads based on information they have tied to those identifiers. *Id*. ¶ 9. Again, even where a user has GAP turned on, RTB bid requests never contain data from their Google account. *Id*. ¶ 50.

The GAP setting can be accessed in different ways, and Google explains in various disclosures how enabling or disabling GAP affects ad targeting. For example, Google explains that when GAP is disabled, contextual ads can still be shown: "Even if you opt out of Ads Personalization, you may still see ads based on factors such as your general location derived from your IP address, your browser type, and your search terms." Vakharia Decl. ¶ 18, Ex. 2; *see also id.* Ex. 5 (explaining that ads "will be based on general factors like the time of day or the topic of the video, website, or app you're viewing").

***Non-Google controls, settings, and tools***: Beyond GAP, there are numerous ways users can control how information is used in online advertising, which can affect RTB Data in different ways. For instance, all common web browsers allow users to (1) block some or all cookies, (2) delete existing cookies, or (3) use private browsing modes (*e.g.*, "Incognito" in Chrome, "Private Browsing" in Safari). Some popular browsers block cookies by default. Striegel Report ¶ 82. Many mobile devices also include controls and settings that affect RTB. For example, Apple's iOS allows users to stop individual apps from tracking their activity, and Android has settings to block the use of device identifiers, preventing this field from being populated in bid requests. Berntson Decl. ¶¶ 61-63; Striegel Report ¶¶ 87-88. Individuals can also use third-party tools like ad blockers that prevent ads and bid requests entirely, or VPNs that prevent sharing of IP addresses. Berntson Decl. ¶¶ 59-60, 64-65; Striegel Report ¶¶ 85-86. These settings, controls, and tools all affect RTB Data in different ways and cause certain data fields to be altered, truncated, or omitted entirely.

### D. Publishers provide disclosures to users, obtain consent, and can limit the information included in RTB Data.

Publishers must agree to Google terms and policies in order to sell their ad inventory

through Google. These policies require publishers to disclose to their users how data is used and shared for advertising purposes (among other obligations). Somvichian Decl. ¶ 41 & Ex. 30. Many of these disclosures include details on how cookies are used in advertising and how providers like Google are involved. *See* Declaration of Hunter Hanzarik ("Hanzarik Declaration") Exs. 2-39, 40-62 (collecting cookie notices and privacy policies from widely-viewed websites). Publishers obtain users' consent to their terms and policies in many different ways, including through website sign-ups, clickable buttons to indicate acceptance, and other means. *See, e.g.*, Hanzarik Decl. ¶¶ 13-14 & Exs. 14, 17, 42. The Expert Report of Dominique Hanssens (Somvichian Decl. Ex. 3, "Hanssens Report") provides survey results on how users interact with these options, which show that 61% of putative class members have clicked on a cookie banner to accept cookies, among other findings. Hanssens Report ¶¶ 63, Ex. 6.

Google also gives publishers the option to limit the information included in RTB Data generated from activity on their websites and apps. For example, publishers can enable "restricted data processing" mode ("RDP"), which significantly limits the data included in RTB Data and results in (1) omitting cookies, device identifiers, IP address, and other data, (2) generalizing user agent to be less specific, and (3) disabling cookie matching. *See* Berntson Decl. ¶¶ 40-44.

**E.    The RTB Data in individual bid requests varies significantly.**

Plaintiffs' claim that RTB Data is "uniform" is contradicted by all the available evidence, which shows that many data fields—including those Plaintiffs claim to be "personal information"—are often omitted or populated in varying degrees depending on the variables discussed above.

***First***, Plaintiffs claim RTB Data is "personal information" because it includes pseudonymous identifiers like the "google_user_id"[7] or mobile device identifiers. *See, e.g.*, Mot. at 13. But the google_user_id is omitted from bid requests whenever a user blocks cookies through the numerous methods described above, among other reasons as discussed above. Berntson Decl.

---

[7] The google_user_id does *not* identify a Google account. It is derived from the Biscotti cookie described above. Specifically, when a browser with a Biscotti cookie navigates to a website or app and RTB bid requests are generated, a unique, encrypted version of the Biscotti may be sent to each RTB participant; these are each a google_user_id. Berntson Decl. ¶ 19. Where the google_user_id is included in a bid request and the user has a Google account, Google maintains various internal controls and policies to prevent the google_user_id from being linked to the account. *Id.* ¶ 20.

1   ¶¶ 44-49, 52-53, 55-56, 60. As a result, in one dataset that Plaintiffs' expert relied on, the

2   google_user_id was omitted in ▓▓ % of records. Striegel Report ¶ 94. In the same dataset, mobile

3   device identifiers were omitted in ▓▓ % bid requests. *Id.* ¶ 95. Berntson Decl. ¶¶ 49, 52, 61-62.

4       ***Second***, Plaintiffs place great emphasis on cookie matching, but whether cookie matching

5   occurs depends on numerous user and publisher driven factors, and there is often no cookie match

6   data included in RTB Data as a result. Berntson Decl. ¶¶ 41-44, 49, 52, 55, 60. For example, in the

7   named Plaintiffs' data samples, the hosted_match_data field, which contains the output of a

8   successful cookie match, was omitted in ▓▓ % of bid requests. Striegel Report ¶ 115.

9       ***Third***, Plaintiffs claim RTB Data is "personal information" because it includes "highly

10  specific location data" (Mot. at 7), but the accuracy of location data varies immensely. In certain

11  data samples on which Plaintiffs' experts relied, the accuracy of location data spans an area that

12  ranges from approximately ▓▓ square miles (at the 25th percentile) to over ▓▓ square miles (at the

13  75th percentile), which is larger than the city of Chicago and which Plaintiffs cannot conceivably

14  claim is "highly specific" under any standard. Striegel Report ¶ 100.

15      Some of the variation in RTB Data shown in the data sets on which Plaintiffs' experts rely

16  is described below and detailed in Section III.B of the Striegel Report.

| | Named Plaintiffs' data samples | Trade Desk data sample | New York Times data sample |
|---|---|---|---|
| google_user_id (pseudonymous cookie) | Not available in data samples[8] | Omitted ▓▓ **%** | Not included in data; other IDs omitted ▓▓ % |
| mobile device id | Omitted ▓▓ % | Omitted ▓▓ **%** | Not included in data |
| hosted_match_data (cookie matching) | Omitted ▓▓ **%** | Not included in data | Not included in data |
| location accuracy | Area with ▓▓ **km** to ▓▓ **km** radius (10th to 75th percentiles) | Area with ▓▓ **km** to ▓▓ **km** radius (25th to 75th percentiles) | No location coordinates; Only zip code-level information |

27      Given these findings, it is not surprising that Plaintiffs' expert Dr. Wilson recanted his

---

[8] *See* Berntson Decl. ¶ 22.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

opinion that "there is a uniform set of information contained in all Google RTB bid requests shared with and sold to RTB participants." Somvichian Decl. Ex. 16 (Wilson Depo. Tr. 27:1-4). Plaintiffs' other data expert, Dr. Shafiq, also fails to show that RTB data is "uniform" across all bid requests. Notably, Dr. Shafiq limited his analysis to just the data samples for the named Plaintiffs and offers no basis, other than mere conjecture, to extrapolate his findings to a proposed class spanning millions of individual Google account holders.[9] Striegel Report ¶¶ 125-133. Moreover, the findings that Dr. Shafiq reports from the named Plaintiffs' data are highly misleading. Dr. Shafiq tells the Court there is "a common set of at least 60 data fields uniformly shared in all Google RTB auctions," ECF No. 546-3 at 12, but his list includes data fields in which the information supposedly "uniformly shared" includes "NULL" values, brackets, or other meaningless characters. Striegel Report ¶¶ 111-13. In short, Plaintiffs offer no meaningful evidence to support their repeated claim that RTB Data is "uniform," which is the core premise of their Motion.

### III.    APPLICABLE STANDARDS

To certify a class, Plaintiffs "must affirmatively demonstrate . . . compliance" with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 561 U.S. 338, 350 (2011). Under Rule 23(a), "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury" and that "class-wide proceeding [will] generate common *answers* apt to drive the resolution of the litigation." *Id.* at 349-50 (citation omitted). Where, as here, Plaintiffs seek to certify a Rule 23(b)(3) damages class, the Ninth Circuit has recently explained: "[i]f the defendant provides evidence that a valid defense—affirmative or otherwise—will bar recovery on some claims, then the district court must determine, based on the particular facts of the case, whether individualized questions . . . will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3)." *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 (9th Cir. 2023) (citation omitted). Here, Google has provided extensive evidence of "valid defenses . . . [that] will bar recovery" on many individuals' claims,

---

[9] Dr. Wilson's own findings show that even among the Plaintiffs, their level of web activity, and the extent of RTB bid requests generated, differed substantially. For example, Dr. Wilson reports that three Plaintiffs visited fewer than ▮ websites whereas one Plaintiff visited ▮. *See* Expert Report of Christopher Wilson ("Wilson Report") ECF No. 546-4 at Table 5. Further, the percentage of web site visits that triggered RTB bid requests for the Plaintiffs, based on their individual web activity, ranged from ▮% to ▮%. *Id.*

1    and these individualized issues overwhelmingly predominate, precluding certification.

2    **IV.    ARGUMENT**

3        **A.    Plaintiffs offer no viable way to identify the proposed class.**

4            As an initial matter, Plaintiffs offer no viable proposal for identifying members of the

5    proposed class, and their data expert Dr. Shafiq addresses this issue in just two perfunctory

6    paragraphs. Mot. at 4 (citing ECF No. 546-3 ¶¶ 90-91). Instead, Plaintiffs try to avoid this basic

7    requirement by claiming in conclusory terms that "Google RTB affects all or virtually all Google

8    U.S. account holders." Mot. at 7. The evidence Plaintiffs cite, however, actually undermines their

9    blanket assertion. Plaintiffs' expert Dr. Wilson performed testing that shows RTB bid requests were

10   generated by only about 55% of websites the named Plaintiffs visited, Wilson Report ¶ 100, and he

11   conceded in deposition that he cannot quantify what percentage of Google account holders overall

12   have engaged in web activity that generated RTB bid requests. Somvichian Decl. Ex. 16 (Wilson

13   Depo. Tr. 31:23-35:16). Far from supporting the assertion that "virtually all" account holders were

14   impacted by RTB, Dr. Wilson's findings underscore that Plaintiffs have presented no viable method

15   for identifying affected class members, and their failure to do so is alone grounds to deny

16   certification.[10] *See Anti Police-Terror Project v. City of Oakland*, 2021 WL 4846958, at *9 (N.D.

17   Cal. Oct. 18, 2021) (denying class certification where "determining class membership for the

18   proposed class presents serious challenges that are likely to make adjudication on a class basis

19   unmanageable.").

20       **B.    RTB data is not "uniform," as Plaintiffs falsely claim, and varies in critical
             ways that undermine any finding of commonality or predominance.**

21

22           Even if Plaintiffs could present a viable method to identify class members, the significant

23   variation in RTB Data means individualized issues will predominate throughout Plaintiffs' claims.

24   _____

     [10] The proposed class definition is also improper because it seeks to certify a "fail-safe" class. As
25   the Ninth Circuit explained, a class "defined to include only those individuals who were injured by
     the allegedly unlawful conduct" is improper because "a class member either wins or, by virtue of
26   losing, is defined out of the class and is therefore not bound by the judgment." *Olean Wholesale
     Grocery Coop., Inc. v. Bumble Bee Foods, LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (citation
27   omitted). The proposed class here, defined as persons "whose personal information was sold or
     shared by Google" (Mot. at vii), violates the rule against fail-safe classes because it lacks any
28   independent criteria and requires a finding on the core issue in dispute (whether "personal
     information" was shared) in order to determine class membership.

***Breach of Contract***: Certification of breach of contract claims is routinely denied where "the question of whether an individual class member actually experienced a [breach] is not subject to common proof and will require individual inquiries." *Moore v. Apple Inc*., 309 F.R.D. 532, 542-43 (N.D. Cal. 2015); *see also In re: Facebook Priv. Litig*., 2016 WL 4585817, at *9 (N.D. Cal. Sept. 2, 2016) (denying certification where Facebook "produced unrefuted evidence that the questions of breach and misrepresentation cannot be resolved through Facebook's ad click data alone"). Here, highly technical and individualized inquiries are needed to determine what specific data was included in any given RTB bid request and whether that information constitutes "personal information" under Plaintiffs' theories, making it impossible to resolve Plaintiffs' breach of contract claims on a classwide basis.

For example, in arguing that RTB Data is "personal information," Plaintiffs rely heavily on the inclusion of cookies and other identifiers, (Mot. at 6, 15), but these identifiers are often *omitted* from individual bid requests due to different user actions and other factors, as discussed above. Plaintiffs' theory of a breach based on these identifiers therefore does not apply "uniformly," or even broadly, to the proposed class. Plaintiffs also claim Google breaches its contractual promises because RTB Data "can be and are reasonably associated with a particular consumer or household" (Mot. at 15), but this potential risk of association again depends on the specific data included in a given bid request. Even then, whether this information could ever be used to reliably identify a device—much less an individual—is uncertain and variable. It depends, for example, on whether an IP address is shared by multiple devices, whether a device is in a city or other densely-populated area, whether multiple people share a single device or account (as many named Plaintiffs do), and a host of other individualized factors. *See* Expert Report of Konstantinos Psounis (Somvichian Decl. Ex. 2, "Psounis Report") ¶¶ 25-82. Notably, Plaintiffs' own experts conceded the risks of "fingerprinting" or other forms of identification depend on factors like whether pseudonymous identifiers are included, the accuracy of location information, and other variables that differ across individual RTB bid requests. Somvichian Decl. Ex. 12 (Shafiq Depo Tr. 252:15-20).

Relatedly, Plaintiffs' expert Dr. Shafiq opines that data exceeding a particular size threshold (measured in bits) is necessarily personally identifiable under the statistical concept of "entropy."

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

Both of Plaintiffs' data experts, however, acknowledged that the amount of "entropy" in a bid request—and its utility for identifying a device—varies by bid request, so this proposed method also cannot be applied on a classwide basis. Somvichian Decl. Ex. 16 (Wilson Depo Tr. 165:23-166:15), 12 (Shafiq Depo Tr. 223:7-14, 236:6-13); *see also* Psounis Report ¶¶ 91-103 (addressing use of entropy as a measure of identifiability and explaining why any such analysis is necessarily individualized).

***Privacy Claims***:[11] Plaintiffs' privacy claims also cannot be certified because they too are based on the false premise that RTB Data is "uniform" and "standardized." Mot. at 16 (seeking certification of breach of confidence claim "[b]ecause the categories of user data transmitted to RTB participants in Google RTB auctions are standardized …"); *id.* at 20 (similar allegation as to invasion of privacy and intrusion upon seclusion); *id.* at 21 (similar allegation as to publication of privacy facts). Because RTB Data varies widely for individual users, the key elements of Plaintiffs' privacy claims cannot be litigated on a classwide basis. For instance, Plaintiffs claim (Mot. at 21) that the "highly offensive" element of their invasion of privacy and intrusion upon seclusion claims are "subject to common proof" and cite as support portions of Prof. Richards' report that address location data (¶¶ 99, 103), "browsing activities" including "user lists" (¶ 99), and "IP address and device information," among others (¶ 94). None of this supposedly "offensive" data is uniformly included in bid requests, however. Plaintiffs' privacy claims would thus require individualized assessments that cannot feasibly be applied on a classwide basis.

***CIPA***: Plaintiffs claim "[t]here is common proof that Google regularly allows RTB participants to 'read' or 'attempt' to read or 'learn the contents or meaning of' class member communications" in RTB, but do not explain what specific RTB Data allegedly comprises the "contents" of "communications." Instead, Plaintiffs seem to premise their CIPA claim on the same alleged "uniform" data that comprises their other claims. Mot. at 18-19. But again, the data fields that Plaintiffs reference throughout their Motion are *not* consistently shared in all bid requests and are often omitted, so the CIPA claim also cannot be resolved on a classwide basis, even under

---

[11] Counts 5-8 of the Consolidated Class Action Complaint are the active privacy claims for which Plaintiffs seek certification. Mot. at vii & n.2.

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

Plaintiffs' own apparent theory of what constitutes the "contents of communications."[12] *See In re Lenovo Adware Litig.*, 2016 WL 6277245, at \*19 (N.D. Cal. Oct. 27, 2016) (denying certification of CIPA claim where "[p]laintiffs' class-wide evidence . . .  does not identify any particular 'violations' or instances of unauthorized interception" that applied classwide).

### C.    Whether Class Members consented to the alleged sharing of "personal information" through RTB is highly individualized.

As this Court has recognized, a class cannot be certified where the claims involve issues of consent that turn on "individual, and subjective, interactions of what certain class members knew, read, saw, or encountered" about the practices in dispute. *Brown v Google, LLC,* 2022 WL 17961497, at \*19 (N.D. Cal. Dec. 12, 2022) (denying certification of breach of contract, invasion of privacy, and CIPA claims). Numerous courts have similarly denied certification where the record showed that proposed class members could have learned of the challenged practices in different, individualized ways. *See*, *e.g., Hart v. TWC Prod. & Tech. LLC*, No. 20-cv-03842-JST, 2023 WL 3568078, at \*11 (N.D. Cal. Mar. 30, 2023) (denying certification of privacy claims where there were many ways individuals could learn of defendant's data collection practices, and explaining that "individualized factual inquiries" of knowledge therefore predominate); *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at \*16 (N.D. Cal. Mar. 18, 2014) (denying certification of CIPA and other claims because they involved "an intensely factual question" to determine "whether the party whose communication was intercepted was on notice that the communication would be intercepted."); *Edquist v. Bidz.com, Inc*., 2013 WL 1290130, at \*1 (D. Mass. Mar. 29, 2013) (denying certification of breach of contract claims where individualized inquiries were needed on whether class members had read "qualifying terms" outside the contract that could support a finding they assented to the defendant's challenged conduct). Certification should be denied for the same reasons here because consent issues are central to all claims yet cannot be resolved without assessing individuals' awareness of the practices in dispute from innumerable Google and non-

---

[12] On the merits, the types of data at issue are not the "contents of communications." *See, e.g., In re Zynga Priv. Litig.*, 750 F.3d 1098, 1102, 1107–09 (9th Cir. 2014) (IP addresses and referrer URLs without search terms are not "contents of communications"); *Brodsky* v. *Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal 2020) ("geographic location information are not contents").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

1    Google sources that go far beyond "Google's uniform contract." Mot. at 18.

2         ***Google Disclosures & Settings***: To start, a fact-finder would need to assess whether each

3    individual in the proposed class reviewed one or more of the many Google disclosures outside of

4    the ToS and Privacy that refer to the specific information Plaintiffs put at issue—including cookies,

5    IP addresses, user agents, location information and device identifiers—and explain that this

6    information is used for advertising purposes. *See* Section II.C *supra*. For example, in just a seven

7    day period, the "Information from Sites/Apps" page received over ▮▮▮▮▮▮▮ page views. *See*

8    Vakharia Decl. ¶¶ 32-33 & Ex. 6. If the some of the millions of individuals who viewed that page

9    (1) read that "the URL of the page you're visiting and your IP address" can be shared with Google

10   to "personalize . . . ads you see on [Google's] partners' sites and apps," and (2) took no actions

11   reflecting an objection to the practice, Google would be entitled to assert a defense that these

12   individuals impliedly consented to the sharing of URLs and IP addresses in RTB Data. *Id.*

13        As another example, proposed class members may have decided to keep the GAP setting

14   enabled after reviewing Google's explanation (outside of the "uniform contract") that the "Ads

15   Personalization setting lets Google use data from your account, such as the searches you've done

16   and your location, to make the ads we show you more relevant and useful," including "on sites and

17   apps that partner with Google." Vakharia Decl. ¶¶ 35-36, 38-39, Ex. 7. Google would be entitled

18   to argue these individuals consented to the use of their data in RTB by choosing to keep GAP

19   enabled after reviewing these disclosures. In fact, these individuals arguably consented to an even

20   broader scope of data usage than what is actually shared in RTB, because RTB Data never includes

21   information from Google account holders' accounts like "the searches you've done." *See* Berntson

22   Decl. ¶ 50. This disclosure and others with equivalent disclosures, were viewed more than ▮▮▮▮

23   times in a single week, underscoring the magnitude of the individualized issues needed to resolve

24   the consent issues raised by Plaintiffs' claims. *See* Vakharia Decl. Exs. 1-7.

25        Relatedly, each of the named Plaintiffs opted to keep GAP enabled even after they filed this

26   action complaining of the alleged sharing of "personal information" in RTB Data. Indeed, many

27   took no action of any kind to limit the use of their information for advertising purposes, not even

28   something as simple as deleting or blocking cookies. *See, e.g.*, Somvichian Decl. Exs. 7, 9, 17

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

(Diggs Depo. Tr. 133:8-134:11; Kevranian Depo. Tr. 85:10-86:18; Woodruff Depo. Tr. 156:1-157:21). In defending against Plaintiffs' claims, Google is entitled to present this evidence of inaction and argue that Plaintiffs' apparent indifference to the use and sharing of their information, despite filing a complaint reflecting deep knowledge of the issues, constitutes implied consent.

There is no possible way, however, to litigate these types of individualized issues on a classwide basis given the magnitude of the proposed class, the number of distinct Google disclosures and controls, and the many ways that individuals might have encountered these materials and become aware of the practices at issue. *See In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 ("Some Class members likely viewed some of these Google and non-Google disclosures, but others likely did not. A fact-finder, in determining whether Class members impliedly consented, would have to evaluate to which of the various sources each individual user had been exposed and whether each individual 'knew about and consented to the interception' based on the sources to which she was exposed.").

*Publisher Disclosures and Settings*: Any consent analysis must also account for the notices and privacy policies displayed on the thousands of websites that partner with Google to display ads through RTB—many of which specifically disclose the sharing of user information for advertising purposes and some of which specifically identify Google's involvement. *See* Hanzarik Decl. Exs. 2-61 (collecting privacy policies); Striegel Report ¶ 58 (noting that Plaintiffs' expert concluded that many of these sites are RTB participants). For example, AccuWeather.com's privacy policy advises users of the website that "third-party vendors, *including Google*, may use first-party cookies (such as the Google Analytics cookies) and third-party cookies (such as the DoubleClick cookie[13]) together to: (a) inform, optimize and serve ads based on a user's past visits to AccuWeather Sites …." Hanzarik Decl. Ex. 4 (emphasis added). As another example, Twitch.tv's Privacy Policy directly addresses matching of cookies with advertising partners, a core allegation in Plaintiffs' claims (*see* Mot. at 6-7; Shafiq Report ¶ 88): "We may share with these third parties (or they may directly collect) data such as cookie and mobile ad identifiers in order to engage in advertising

---

[13] Plaintiffs' data experts specifically refer to Google's DoubleClick cookie as enabling cookie matching. *See* Wilson Report ¶¶ 53, 119-21.

16

activity" and this sharing can include a "*device identifier for that advertising partner to 'match' to other information that they may have about you.*" Hanzarik Decl. Ex. 51 (emphasis added);. Individuals who saw these sorts of disclosures could also be subject to an implied consent defense, depending on the overall circumstances.

Further complicating the analysis, many individuals may have *expressly* agreed to publisher policies that encompass the sharing of RTB Data, whether by creating an account with the website, clicking a button on a pop-up banner to accept the website's privacy policy, or other means. *See* Hanssens Report ¶¶ 62–64, Exs. 5–7 (explaining various consent methods used by websites and describing survey results showing that individuals respond to these methods in different ways, with many choosing to accept advertising-related cookies or taking other actions that reflect consent to the RTB practices in dispute); Hanzarik Decl. ¶ 14 (showing Etsy's and PayPal's signup flows, which require acceptance to privacy policies); Somvichian Decl. Exs. 54, 55 (quarterly SEC filings from Etsy and PayPal showing that their platforms have over 100 million and 400 million users, respectively). Google is entitled to defend against individual class members' claims by showing that the alleged wrongful sharing of RTB Data was in fact addressed in terms or policies that certain individuals affirmatively accepted when interacting with a publisher, but there is again no feasible means to conduct this fact-intensive inquiry for even a small portion of the thousands of websites that the millions of proposed class members visited over the seven-year class period.

***Third-Party Materials***. Individuals in the proposed class may also have learned of—and impliedly consented to—Google's alleged practices through one or more of the many news articles, web pages, or other readily accessible media that have described the sharing of information at issue. *See, e.g.*, Somvichian Decl. Exs. 45-48 (exemplar articles). For example, the website 9to5Mac.com wrote in its technology blog that Google is "the biggest player in the RTB system" and "allows 4,698 companies to receive RTB data about people in the U.S." Somvichian Decl. Ex. 47. Many of these articles describe in detail specific categories of information shared in the RTB process; in fact, many articles *overstate* the type of data potentially included in RTB Data, which would potentially result in creating implied consent for an even broader use of data than what actually occurs in the RTB process. A 2020 report from the Electronic Frontier Foundation, for instance,

1    described RTB auctions as "shar[ing] sensitive user data—including geolocation, device IDs,

2    identifying cookies, and browsing history—with dozens or hundreds of different adtech

3    companies." Somvichian Decl. Ex. 45. Individuals who read this report and were indifferent to the

4    information sharing as described, would arguably have consented to not only the sharing of RTB

5    Data but to the sharing of "browsing history," which is not included in RTB bid requests.[14]

6         These are just two examples of the dozens of articles, blogs, and other materials that

7    individual class members may have reviewed that describe Google's RTB-related practices and

8    could support an implied consent defense (either alone or in conjunction with other Google and

9    non-Google sources), but it is again impossible to resolve these issues without resorting to separate

10   adjudications for each individual in the proposed class.

11        ***Empirical Evidence Confirms the Pervasiveness of Consent Issues***. Given the myriad

12   disclosures described above, it is no surprise that survey evidence shows a significant portion of

13   Google account holders expect that the data at issue will be shared for advertising purposes when

14   they visit websites that partner with Google. Specifically, 74% of survey respondents indicated they

15   believe it is likely or very likely that browser cookies are shared with advertisers, with similar

16   results for the URL of the website visited (73%), the content category of the website[15] (72%), partial

17   IP address (52%), and others. *See* Hanssens Report ¶ 60, Exs. 3–4. These survey findings confirm

18   that the Google and non-Google evidence discussed above, and undoubtedly many other sources,

19   have together led to broad awareness of the data sharing Plaintiffs challenge.

20        Moreover, a separate survey shows that most Google account holders do not object to these

21   practices and would consent to them if directly asked. Specifically, Dr. Hanssens presented survey

22   respondents with a hypothetical privacy policy that tells users Google will "sell" their "personal

23   information" and defines "personal information" to include the specific categories of information

24   that Plaintiff allege to fall in that category. When presented with those explicit terms, ***nearly three-***

25   ***fourths*** of survey respondents indicated they would still likely or very likely accept those terms.

26

27   [14] RTB bid requests do not include browsing history information, as Plaintiffs' data experts
     conceded. Somvichian Decl. Ex 16 (Wilson Depo. Tr. 242:17 - 243:14).
     [15] This category corresponds to Plaintiffs' allegation that "verticals" are shared in bid requests that
28   categorize websites into different subject matter categories. These verticals have not been included
     in RTB bid requests since February 2020. Berntson Decl. ¶ 34.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

Hanssens Report ¶ 65 & Ex. 8. In combination, these surveys results show that substantial majorities of the proposed class not only expect the data at issue to be shared, but have no issues accepting a privacy policy that defines this information to be "personal information" that will be "sold" and "shared" for advertising. These results go even beyond the findings this Court deemed sufficient in *Brown* to establish "divergent knowledge and expectations regarding [class members'] privacy," and provide even stronger grounds to deny class certification. 2022 WL 17961497, at *18-19.

### D.     Plaintiffs' purported common evidence of individuals' "reasonable expectations of privacy" should be rejected.

The individualized consent issues discussed above apply equally to the question of whether someone has a reasonable expectation of privacy and confirm this element of Plaintiffs' privacy claims also cannot be resolved from common evidence. Indeed, Plaintiffs concede that any "reasonable expectation of privacy rises or falls on consent." Mot. at 20. *See also Hart,* 2023 WL 3568078, at *9 (explaining that in order to have a reasonable expectation of privacy, individual class members must "not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant.") (quotations omitted).

Nonetheless, Plaintiffs ask the Court to find that reasonable expectations of privacy can be determined on a class-wide basis based on the purported expert opinions of Prof. Richards. As explained in Google's motion to strike, Prof. Richards' opinions should be stricken because he purports to address an ultimate question of law that only this Court can resolve. *LD v. United Behav. Health*, 2023 WL 2806323, at *3 (N.D. Cal. Mar. 31, 2023) (Gonzalez Rogers, J.). As Prof. Richards admitted at deposition, his "role in this case . . . is to determine whether there is common evidence from which a jury may conclude that something is the case." Somvichian Depo. Ex. 11 (Richards Depo. Tr. 128:4-7; *see also* 126:19-23; 130:17-131:2). But whether there is "common evidence" to support certification is an ultimate question of law, as even Plaintiffs concede. Mot. at 4. Even if the Court does not strike the Richards Report, his opinions should be given no weight because they are not grounded in any recognized methodology and consist of mere tautologies. For example, when asked to explain a "societal norm" (the key premise of his opinions) Prof. Richards

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

defined it as something "generally accepted," which he then defined in circular terms to mean "commonly understood to be accepted." Somvichian Decl. ¶ 11 (Richards Depo. Tr. 96:12-97:19). In short, nothing in the Richards Report undermines the empirical evidence showing there is no uniform expectation of privacy as it relates to RTB Data and that large swaths of the proposed class are not only aware of the sharing of the data at issue but are indifferent to it.

**E.    Plaintiffs' proposed damages models violate *Comcast* in multiple ways.**

*Comcast Corp. v. Behrend* requires Plaintiffs to show "that damages are susceptible of measurement across the entire class[.]" 569 U.S. 27, 34-37 (2013). To meet this requirement, Plaintiffs must present a damages model that (1) "measure[s] *only* those damages attributable to [their] theory" of liability, *id.* at 28 (emphasis added), and (2) includes "a process for identifying and excluding uninjured class members," *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *16 (N.D. Cal. Mar. 29, 2022) (applying *Comcast*). Plaintiffs' damages methodologies fail on both counts.[16]

*First*, neither damages model measures "damages resulting from the particular [] injury on which [defendant's] liability in this action is premised." *Comcast*, 569 U.S. at 36. To start, Plaintiffs seek disgorgement of 51% of *all* RTB revenues in the U.S., not just revenue from ads shown to the proposed class of "Google account holders subject to a Google United States Terms of Service …" Mot. at vii. This means disgorgement would be applied to revenue Google generated from ads shown to people without Google accounts, who have no connection to this case. Plaintiffs propose no method to exclude revenue related to these *non*-Google account holders, and Google is aware of none. Nor do Plaintiffs tie their disgorgement remedy to revenue associated with account holders who are "subject to a Google United States Terms of Service." *Id.* Plaintiffs propose to use revenues that are deemed U.S. revenue based on the IP address of a user's browser or device. *See* Expert Report of Bruce Deal (Somvichian Decl. Ex. 4, "Deal Report") ¶¶ 10, 39, 43-44. But this has no direct bearing on whether the revenue in fact ties to account holders subject to Google's U.S. ToS,

---

[16] Although Google has not moved to exclude either expert's testimony, the Court can and should find that this evidence is inadequate to support class certification. As the Ninth Circuit has recently observed, "Courts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23." *Olean*, 31 F.4th at 666 n.9.

1    and there is a substantial number of individuals who are not subject to the U.S. ToS but would be

2    included in U.S. revenue based on Plaintiffs' IP-based method. *Id.* ¶¶ 10, 40, 43–47.

3         Moreover, Plaintiffs' proposed 51% disgorgement calculation is also disconnected from

4    their liability theory because it does not measure the incremental revenue Google earns from

5    including alleged "personal information" in RTB bid requests. To determine any such revenue

6    impact, Plaintiffs would need to account for how Google ad auctions actually work, including the

7    fact that RTB Participants compete for the same ad inventory with buyers who use other Google

8    demand-side services and do not receive Google account holder information in bid requests. As

9    explained in the Deal Report, even if Google were barred from including "personal information"

10   in RTB bid requests, which is the premise of Plaintiffs' liability theory, Google could *still* earn the

11   same or potentially higher revenue for the same ad inventory from this latter group of buyers.

12   Plaintiffs' experts fail to address these issues, so their models improperly "identif[y] damages that

13   are not the result of the wrong. *Comcast*, 569 U.S. at 37.

14        Instead, Dr. Zeithammer offers a so-called "meta-analysis" of studies that does not directly

15   address the *overall* revenue impact of removing "personal information" from bid requests, which

16   is the only relevant assessment for purposes of measuring any potential disgorgement remedy in

17   this case.  Specifically, none of the studies he uses measure the incremental revenue Google would

18   lose from sharing "personal information" in bid requests, because they do not account for revenue

19   that would be recouped from other Google demand-side services. Deal Report ¶¶ 12-13, 53–67.

20   The internal Google revenue experiments to support his opinions, these experiments assessed only

21   the potential impact to revenue from ████████ participants and do not address the *overall* impact

22   (if any) that removing alleged "personal information" from RTB bid requests might have on

23   Google's revenues, *id.* ¶¶ 13, 64–66. Setting these deficiencies aside, nearly all of the studies he

24   relies on also overestimate the revenue impact to Google because they precede industry and product

25   changes that already restricted the data Google can collect from users for much of the class

26   period. *Id.* ¶¶ 13, 68–73.

27        Plaintiffs' alternative damages theory—that RTB Data is uniformly worth a "market value"

28   of $3.17/month—is also untethered to Plaintiffs' liability theory because it is not based on accurate

or reliable research or an accepted valuation methodology; nor is it grounded in any analysis of RTB Data or even remotely comparable data. *See* Deal Rept. ¶¶ 15–19, 76–90 (explaining data sources used to calculate Plaintiffs' alleged "market value"). Moreover, the notion that RTB Data is sufficiently uniform across all bid requests such that it could have a single "market value" is not supported by any "properly analyzed, reliable evidence." *Ward v. Apple Inc.*, 2018 WL 934544, at *3-4 (N.D. Cal. Feb. 16, 2018) (rejecting proposed expert methodology on this ground and denying class certification), *aff'd*, 784 F. App'x 539, 540 (9th Cir. 2019). To the contrary, Plaintiffs' own data experts concede RTB Data is *not* uniform across all bid requests and varies in numerous ways that would affect any effort to place a "market price" on the particular data included in a given bid request. *See also* Striegel Report ¶¶ 90-145 (explaining variations in RTB Data); Deal Report ¶¶ 91–93 (explaining how variations in RTB Data preclude determining a single market value).

**Second**, Plaintiffs' damages models also violate *Comcast* because they would award payments to entirely uninjured class members. *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *16 (applying *Comcast* and rejecting damages model that lacked "a process for identifying and excluding uninjured class members"). In Plaintiffs' proposals for both the "disgorgement" and "market value" categories of damages, *all* class members would receive payments, with the specific amounts calculated based on nothing more than the number of months they maintained a Google account. Deal Report ¶¶ 136–143. This rudimentary formula ignores a host of relevant considerations and would award damages to large swaths of class members who suffered no injury, including (1) individuals who consented to the sharing of RTB Data, (2) minors for whom RTB bid requests are automatically blocked, Berntson Decl. ¶ 33, and (3) individuals who used various tools that block the sharing of information in RTB bid requests. Berntson Decl. ¶¶ 45-65 (describing various available tools that block certain data from inclusion in bid requests); Striegel Report ¶¶ 72-88 (same); Deal Report ¶¶ 33, 94–116, 136–143 & Ex. 3.

Uninjured class members would also include users who received more value from the ads they are served through RTB than the alleged "market value" of their RTB Data. Plaintiffs' damages model is unreliable because it does not account for any benefit these users receive. *See Chowning v. Kohl's Dep't Stores, Inc.*, 2016 WL 1072129, at *6 (C.D. Cal. Mar. 15, 2016) ("[E]ven

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

though plaintiffs may pursue alternative forms of restitution,[17] any proposed method must account for the benefits or value that a plaintiff received at the time of purchase"), *aff'd*, 733 F. App'x 404 (9th Cir. 2018) ; *Stathakos v. Columbia Sportswear Co.*, 2017 WL 1957063, at *10-11 (N.D. Cal. May 11, 2017) (Gonzalez Rogers, J.) (rejecting "full refund" model for determining classwide restitution because it failed to account for benefits class members received from the product at issue). For example, Plaintiff Valencia testified he found many targeted ads he viewed online to be helpful, including ads he perceived to be tied to his prior browsing on other websites and his general location.[18] Somvichian Decl. Ex. 14 (Valencia Depo .Tr. 54:13-59:8); *see also* Deal Report ¶¶ 20, 117–35 (explaining need to account for individualized benefits that users receive from targeted advertising to assess damages). Plaintiffs' complete failure to address any of these issues is further grounds to reject their proposed damages models. *See Van*, 61 F.4th at 1068-69 (reversing grant of class certification where defendant presented evidence of "an individualized issue" that "left some class members uninjured," which plaintiffs did not account for in their class certification motion); *Beaty v. Ford Motor Co.*, 2021 WL 3109661, at *13 (W.D. Wash. July 8, 2021) (denying class certification where plaintiffs' damages model applied to individuals who suffered no damages).

### F.    Plaintiffs' CIPA claim cannot be certified for additional reasons.

CIPA applies only when the relevant communication is intercepted "within this state" (*i.e.*, California), which Plaintiffs cannot demonstrate occurred for all class members on a classwide basis. Cal. Penal Code § 631(a). ███████████████████████████████████████████
███████████████████████████████████████████████. Individualized inquiries would therefore be needed to determine whether any given bid request was sent from a California

---

[17] Plaintiffs purport to seek restitution for as part of their breach of contract theory. Mot. at n.28.
[18] Plaintiffs' damages experts also offer no model for measuring CIPA damages. *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 269 (N.D. Cal. 2016) (denying certification of CIPA claim and explaining that plaintiffs cannot simply assume that statutory damages are appropriate in all individual cases because "many class members appear to have suffered little, if any, harm" and "sorting out those disproportionate damages awards would require individualized analyses").
[19] Plaintiffs' Motion does not explain what they contend constitutes the "contents" of "communications" that were allegedly intercepted for purposes of their CIPA claim, but in a recent discovery request they addressed this issue by seeking information on "the locations . . . of all computer servers through which Google RTB bid requests are transmitted." Somvichian Decl. ¶ 10. Google denies these transmissions involved the "contents" of "communications" for CIPA purposes but takes Plaintiffs' theory at face value for purposes of assessing whether a California nexus can be shown on a classwide basis.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

location for purposes of showing the California nexus required under CIPA. Indeed, it is not clear that this analysis is feasible even for an individual bid request. Certification of Plaintiffs' CIPA claims should therefore be denied for this additional reason.[20]

### G.    Plaintiffs' Rule 23(b)(2) injunctive relief class should also be denied.

The Court should likewise deny Plaintiffs' request to certify a class under Rule 23(b)(2).

*First*, the Court need not look further than Rule 23(a)(2) to deny certification of a (b)(2) class. Myriad individualized issues demonstrate that Plaintiffs have not shown the existence of "questions of law or fact common to the class" and have therefore failed to clear the threshold hurdle of commonality needed to certify any class under Rule 23.  Rule 23(a)(2); *Handloser v. HCL Techs. Ltd.*, 2021 WL 879802, at *6, *11 (N.D. Cal. Mar. 9, 2021) (denying certification of (b)(2) class where commonality requirement was not met); *Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 551 (N.D. Cal. 2021) (same) (Gonzalez Rogers, J.). Unlike *Brown*, where the Court observed that "Google does not dispute that the commonality requirement is met," 2022 WL 17961497, at *15, here commonality is very much contested,[21] and Google has shown that the supposed common questions Plaintiffs pose have no common *answers*, given the variation in RTB Data across bid requests, issues of express and implied consent, and other individualized considerations addressed above. *See Dukes*, 564 U.S. at 350 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (citations omitted).

*Second*, a class may not be certified under Rule 23(b)(2) where "the diversity of positions within the class suggests that the class definition is simply too broad and too varying to allow the Court to provide unitary relief. *Andrews v. Plains All Am. Pipeline, L.P.*, 2017 WL 10543402, at *3 (C.D. Cal. Feb. 28, 2017) (denying 23(b)(2) class where some putative class members would either "never want" or "not care" about the proposed injunctive relief); *Cf. McKinnon v. Dollar*

---

[20] Google never waived this argument, contrary to Plaintiffs' assertions. (Mot. at 19 n.27.) When Plaintiffs served an interrogatory on this issue, Google responded ███████████ ████████████. Somvichian Decl. ¶ 10.

[21] *See In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *3 (N.D. Cal. Nov. 14, 2018) ("Courts have . . . found it appropriate to assess Rule 23(a)(2) commonality and Rule 23(b)(3) predominance together.").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD

*Thrifty Auto. Grp., Inc*., 2015 WL 4537957, at *11 (N.D. Cal. July 27, 2015) (certifying injunctive relief class is improper in the context of "diverse, individualized transactions" that vary "depending on the specific facts" giving rise to the claim) (citation omitted). Here, Plaintiffs' proposed injunctive relief effectively seeks to halt the operation of RTB. *See* Mot. at 25. Individuals who are currently unaffected by RTB would have no direct interest in this relief, and others may actively oppose it because they benefit from and prefer to continue receiving personalized ads in RTB. Deal Report ¶¶ 94-132. With respect to Plaintiffs' alternative injunction to mandate additional notices and opt-out procedures, the evidence shows most proposed class members are already well aware of the information shared in RTB and are either indifferent to it or have already availed themselves of various ways to avoid personalized ads. *See* Hanssens Report ¶¶ 60–61, Ex. 3–4; Berntson Decl. ¶¶ 47-53, 60. For these individuals, the alternative injunction serves no purpose and only impose additional friction on their Internet usage, depending on how Plaintiffs propose to implement their proposed measures, which they do not specify. Plaintiffs have thus not established "the Court can fashion one injunction to Plaintiffs' entire class." *Andrews,* 2017 WL 10543402, at *3.

***Third***, Plaintiffs' demand that Google "stop sharing class members' personal information to third parties in Google RTB" is "impermissibly vague and is nothing more than a bare injunction to follow the law, which is disfavored." *Senne v. Kan. City Royals Baseball Corp.*, 2021 WL 3129460, at *9 (N.D. Cal. July 23, 2021); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) ("[B]lanket injunctions to obey the law are disfavored.") (citation omitted).

## V.    CONCLUSION

Given the myriad individualized issues needed to resolve the claims at issue, multiple elements of Rule 23 cannot be met and Plaintiffs' Motion should be denied in its entirety.[22]

---

[22] Plaintiffs mention certification of an issue class under Rule 23(c)(4), Mot. 10 n. 17, but do identify what issues they propose to certify or why piecemeal certification of one or more isolated issues could be appropriate here, and the Court should disregard this stray request made only in passing in a footnote.

1

2     Dated: September 29, 2023                    COOLEY LLP

3

4                                          By:  /s/ Whitty Somvichian

5                                               Whitty Somvichian

6
                                          Attorney for Defendant GOOGLE LLC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**GOOGLE'S OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
CASE NO. 4:21-CV-02155-YGR-VKD**