# EXHIBIT 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

4

5    In re Google RTB Consumer    )
     Privacy                      ) Case No.
6    Litigation,                  ) 4:21-cv-02155-YGR-VKD
                                  )
7                                  )
     This document applies to:    )
8    All actions                  )
     _____ )

9

10

11

12        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13   VIDEO-RECORDED DEPOSITION OF PROFESSOR NEIL RICHARDS

14

15               Thursday, August 24, 2023

16               San Francisco, California

17

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 6056459

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 8

1          The court reporter is Hanna Kim, from the

2     firm Veritext Legal Solutions.

3          I am not related to any party in this

4     action, nor am I financially interested in the

5     outcome.

6          If there are any objections to proceeding,

7     please state them at the time of your appearance.

8          Counsel and all present, including

9     remotely, will now state their appearances and

10    affiliations for the record, beginning with the

11    noticing attorney.

12          MR. WONG:  Kyle Wong of Cooley LLP on

13    behalf of Google.

14          MR. DHILLON:  Anu Dhillon of Cooley LLP

15    also on behalf of Google.

16          MR. DANITZ:  Brian Danitz, Cotchett,

17    Pitre & McCarthy, for the Plaintiffs.

18          MS. PRITZKER:  Elizabeth Pritzker,

19    Pritzker Levine, on behalf of the Plaintiffs.

20          MS. SWOPE:  Karin Swope, Cotchett Pitre,

21    on behalf of the Plaintiffs.

22          THE VIDEOGRAPHER:  Thank you.

23          Will the court reporter please swear in

24    the witness, and then counsel may proceed.

25    ///

NEIL RICHARDS, PH.D.,
having been duly administered an oath
was examined and testified as follows:

EXAMINATION

BY MR. WONG:
Q. Good morning.
Could you state your name for the record.
A. Neil -- Professor Neil Michael Richards, R-I-C-H-A-R-D-S.
Q. Do you understand, Professor Richards, that today you are under oath to tell the truth?
A. I do.
Q. And this is the same oath that you would be under if you were in court.
So even if you're not in a formal court setting, you understand that the same oath applies?
A. Yes.
Q. And the court reporter's transcribing everything that we say. So she can't transcribe if we are talking at the same time. So I'm going to strive to wait until I think you've finished answering my question to ans- -- to ask another one.
And if you could wait to -- to hope that I am done ans- -- ask- -- asking my question before

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 19

1    along a number of lines dealing with -- with -- with

2    several issues.  But -- but, at its essence, whether

3    or not there was a historical societal norm to

4    privacy in the United States and to what extent that

5    norm may have been violated by the allegations and

6    evidence in the case as developed thus far.

7        Q.    Has your rate of $750 per hour been the

8    same throughout your work on this litigation?

9        A.    My rate of $750 an hour was my rate for --

10   up until the preparation and filing of the report.

11   It is -- it is slightly different now.

12       Q.    And what is it now?

13       A.    My rate for deposition preparation,

14   deposition testimony, and trial is a thousand

15   dollars an hour.

16       Q.    Are you a licensed attorney?

17       A.    Yes.

18       Q.    In what state are you licensed in?

19       A.    I passed the bar in Virginia.  I am -- I

20   believe I'm currently inactive in Virginia.  I

21   also -- when I was -- I also am admitted into

22   District of Columbia.

23       Q.    And do you know if you're active or

24   inactive there?

25       A.    I am active to my knowledge.  My assistant

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 35

1      A.    Those are the documents in the footnotes,

2   and there may be some inline citations in the --

3      Q.    Okay.   So outside of the documents that

4   are listed in the footnotes and in Appendix B, are

5   your opinions in this report based on any other

6   materials?

7      A.    I want to be sure to answer that clearly,

8   so I'm taking my time to think about that.

9           My opinions are -- let's see.

10          I believe there's a paragraph of my -- in

11  my report that deals with this.

12          Appendix B are all case materials that I

13  considered when forming my opinions.  In addition, I

14  considered a variety of published sources that I --

15  that I read in forming my opinions and -- and

16  articulating them in the expert report.  In

17  addition, I relied upon 25 years of -- of experience

18  reading and thinking and talking with people and

19  analyzing and teaching and lecturing on questions of

20  privacy, among other topics.

21          So the -- so the report is the product of

22  my -- of my -- depending how you count, a quarter of

23  a century of expertise thinking about these sorts of

24  issues virtually every day.  The -- the case

25  documents that I considered are listed in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 36

1    Appendix B.  That I considered in -- I'm sorry, that

2    I considered in formulating my opinions in this

3    report.

4         Q.   Well, so what I'm trying to get at is that

5    we are entitled to understand the evidentiary basis

6    for the opinions that are in your report.  So I

7    understand that you are -- that your -- or my

8    understanding of your testimony is that, one, you

9    relied upon the materials listed in the footnotes,

10   as well as the case materials listed in Appendix B.

11   At -- at least -- is that correct so far?

12        A.   Yes.

13        Q.   And then are there additional documents

14   that you reviewed that form the basis for the

15   opinions that you espouse in your report that are

16   not listed either in the footnotes or Appendix B?

17        A.   When you say "reviewed," what -- what do

18   you mean?

19        Q.   I guess I'm really just trying to get at

20   whether or not there are additional documents that

21   formed the basis for the opinions that you espouse

22   in your report that are either not in the footnotes

23   or Appendix B.

24        A.   I don't think so.  Though, as I said,

25   the -- the opinions that I -- that I offer are --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

1          Q.   And what is your expertise in how

2     consumers understand privacy?

3               MS. PRITZKER:  Object to form.

4               THE WITNESS:  I have been one of the

5     leading privacy experts in the United States -- I'm

6     sorry.  I have been one of the leading privacy

7     experts in the world.  As -- as someone born in

8     England, it's difficult for me to talk about my

9     accomplishments with the con- -- arrogance often

10    expected of expert witnesses.

11              But I am -- I am one of the leading

12    privacy experts in the world.  I have -- I have

13    studied privacy in -- in, to my knowledge, all of

14    its forms full time at -- at Washington University,

15    as a full-time academic for over -- for over

16    20 years.  I have read a tremendous amount.  I have

17    attended a number -- more conferences than I can --

18    than I can count.  I have given hundreds and

19    hundreds of -- of presentations on -- on questions

20    of -- of privacy.

21              I have had countless conversations, as

22    I -- as I detail in my most recent book, "Why

23    Privacy Matters," with people all walks of life

24    across the Western world about concepts of privacy

25    over the past 20 years in -- in particular.

1          I am regarded by my peers in disciplines

2     outside the law as an expert in -- in privacy.  My

3     work is frequently cited in academic and other

4     treatments of -- of consumer behavior.  I have

5     studied the -- the cultural, social, and legal

6     history of privacy, among others.  And that's --

7     that's a start.

8     BY MR. WONG:

9          Q.    All right.

10          But I asked about your specific expertise

11     in understanding how consumers think about privacy.

12     Not privacy in general, but consumers and their

13     understanding.

14          So what is your expertise in consumers,

15     consumer behavior, which you've just used in your

16     own answer, and privacy?

17          A.    I have written about consumer privacy

18     issues, studied, researched, discussed, presented,

19     and published on these questions for the past

20     20 years.

21          I have been asked to testify about

22     questions of privacy before Congress, before the

23     Federal Trade Commission.  I have read extensively

24     studies and monographs and articles about consumer

25     privacy expectations.  Then there's -- there's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

1    probably more, but I -- that's a start.

2         Q.   Have you ever conducted a study or

3    monograph on consumer privacy expectations?

4              MS. PRITZKER:  Object to form.

5              THE WITNESS:  I have written about

6    consumer privacy extent- -- and their expectations

7    extensively in my work.

8    BY MR. WONG:

9         Q.   My question was whether or not you'd ever

10   conducted a study or monograph on consumer privacy

11   expectations?

12        A.   It depends what you mean by a "study."

13        Q.   You tell me.  What do you think a "study"

14   means?

15        A.   I think a study is a [verbatim] academic

16   treatment of the subjects.  So my most recent book,

17   "Why Privacy Matters," deals a great deal about

18   consumer and other privacy expectations.  My first

19   book, "Intellectual Privacy," reviews some of the

20   empirical evidence about chilling effects on -- on

21   privacy.

22        Q.   When you say empirical -- empirical -- I'm

23   sorry.  What did you -- what's his testimony there,

24   I'm sorry, when he said the word "empirical"?

25             MS. PRITZKER:  I'm not seeing it either.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 56

1    that is a study of consumer expectations of privacy.

2              So to the extent that my historical or --

3    or legal or other public scholarship has dealt with

4    consumer expectations of privacy over time, yes, I

5    have.

6        Q.   How do you measure consumer expectations?

7              MS. PRITZKER:  Object as to form.

8              THE WITNESS:  I'm not sure I understand

9    the question.

10   BY MR. WONG:

11       Q.   Well, you're saying that you have a

12   scholarship about consumer expectations of privacy

13   over time.

14             So I'm asking, how do you quantify or

15   assess what the consumer expectation of privacy is?

16       A.   Well, there are -- there are ways of

17   studying things other than quantification.

18       Q.   Like?

19       A.   Well, there's a -- there's a basic

20   division in -- in the social sciences between

21   quantitative methods of the sort that you're talking

22   about and qualitative methods.

23       Q.   And what are the qualitative methods?

24       A.   They are methods that are not

25   quantitative.  They have to do less with --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

```
 1                THE COURT REPORTER:  Could you slow down,
 2      Professor.
 3                THE WITNESS:  I'm so sorry.
 4                They are -- could you repeat the question?
 5      BY MR. WONG:
 6           Q.   What are the qualitative methods?
 7           A.   Qualitative methods tend to look at
 8      qualities, for -- for lack of a better word, rather
 9      than numbers.  They tend to be more descriptive.
10                And you could include within qualitative
11      methods historical work dealing with consumer
12      expectations of privacy.
13           Q.   And how would you assess in -- well,
14      strike that.
15                MR. WONG:  We've been going for an hour.
16      Do you want to take a little break for like five
17      minutes?
18                MS. PRITZKER:  Brian does.
19                MR. WONG:  Well, then let's take a
20      five-minute break.
21                MS. PRITZKER:  Thanks.
22                THE VIDEOGRAPHER:  This marks end of Media
23      Number 1.  Off the record.  The time is 10:28.
24                (Short recess taken.)
25                THE VIDEOGRAPHER:  This marks the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 58

1    beginning of Media Number 2.  We're back on the

2    record.  The time is 10:45.

3    BY MR. WONG:

4        Q.    So I know in your report you reached a

5    number of conclusions, and I would like to ask you

6    about them in more detail later, but for now, did

7    you reach any conclusions that are not reflected in

8    your report about this case?

9        A.    No, not to my knowledge.

10        Q.    So what methods did you employ to reach

11    your conclusions?

12        A.    What do you mean by "methods"?

13        Q.    Is there a specific methodology you used

14    to reach the conclusions that you did?

15        A.    I used a -- a variety of methods.  I used

16    the -- many of the methods that I have -- I have

17    used in my -- some of my scholarship over the years.

18            I read a great deal.  I reviewed some of

19    the documents provided in discovery.

20            And I reached a series of conclusions

21    based upon my research, my analysis, my expertise in

22    privacy and history that I've developed over the

23    past 25 or so years.

24        Q.    Would it be possible to use empirical data

25    to determine consumers' understanding of the RTB

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

1    work that I have authored, either individually or

2    jointly with -- with co-authors or other

3    collaborators.  In citing that opinion that may be

4    reflected in one of my scholarly works, that opinion

5    itself is a product of -- of documents of work, of

6    research, that is -- some of which is -- that is --

7    that is contained where appropriate in the text and

8    footnotes of that article.

9            So, for example, my -- my second book,

10   "Why Privacy Matters," I cite that a few times in

11   the report.  And by citing that, I'm -- no doubt was

12   thinking of -- of -- of -- of -- of that project,

13   which involved a lot of reading itself.  So -- so

14   all -- all of this is -- is built upon dec- --

15   decades of -- of study and -- and -- and learning

16   and -- and conversations with people from a wide

17   variety of walks of life about privacy.  And I would

18   say that there were -- where a key document should

19   have been cited, I cited it.

20       Q.    In Paragraph 3 -- I believe this is your

21   second opinion; is that correct?  Again, don't --

22   just read it silently, and when you're done, let me

23   know.

24       A.    (Witness reviews.)

25            Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 95

1    have rights that are not guaranteed through law.

2              For example, many people in the United

3    States, including, I believe, most people in the

4    city, believe that there is a fundamental right to

5    reproductive freedom, which is not currently not

6    guaranteed by the U.S. Constitution under the Dobbs

7    decision.

8              So you can have rights that are not

9    legally guaranteed, but a -- but a -- but in -- I

10   would say much of the time there is some linkage

11   between a right and a legal claim.

12             With respect to -- to norms, norms are --

13   I don't want to offer too technical of a -- a

14   definition, but a -- but a casual definition, let's

15   say, for the purpose of our discussion here, would

16   be a norm is something that is a shared expectation

17   of behavior.

18        Q.    Not necessarily shrouded in law?

19        A.    Correct, not necessarily.

20        Q.    And how do you determine what a societal

21   norm is?

22        A.    There are a number of ways to determine

23   what a societal norm is, but -- but I think the --

24   the most effective way is by experience, by -- by

25   reading, by thinking, by living in society, but

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1    BY MR. WONG:

2         Q.    I don't understand what the criteria is if

3    you cannot explain to me what generally accepted

4    means.

5         A.    I have explained it as commonly accepted.

6         Q.    So generally accepted means commonly

7    accepted, but what -- what does that criteria --

8    how -- how is someone supposed to take that

9    methodology and apply it to -- to -- to an

10   everyday -- to everyday conduct?

11        A.    It requires an exercise of judgment

12   grounded in expertise.

13        Q.    So it's discretion?

14        A.    That's not what I said.

15        Q.    Well, I don't understand how -- how

16   does -- why -- why -- what -- what makes your

17   determination that something is generally accepted

18   different from someone who does not have your

19   historical training?

20        A.    Well, without -- again, going some odds to

21   my -- my own cultural conditioning as a -- as a

22   modest Englishman, I am one of the world's leading

23   experts in privacy and in the history of privacy

24   by -- by any measure.  That's the difference.

25             I have devoted 25 years of my life to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 99

1    thinking about these questions every day, to

2    studying them, to subjecting them to analysis, to --

3    to listening to --

4              I'm sorry, I should slow down for you.

5              -- to listening to countervailing

6    arguments and opposing perspectives and di- -- and

7    diverse perspectives, that this is an exercise in --

8    in judgment and expertise, and it is -- it is

9    qualitative rather than quantitative.  I'm not going

10   to put a number on common for you.

11   BY MR. WONG:

12       Q.   So it's your testimony that someone with

13   your expertise applies one criteria, which is

14   whether or not something is, in their determination,

15   generally accepted, and that is how you determine

16   whether or not something is historically a social

17   norm?

18       A.   You asked me what it meant -- as -- as I

19   understand it, you asked me what it meant for

20   something to be generally accepted.

21              With respect to the report that I authored

22   in this case, which was the product of many hours of

23   work and analysis specifically and rested, as I've

24   said, upon close to a quarter of a century of -- of

25   study, erudition, and expertise in these areas, I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 113

1          -- "think about privacy protections far

2     beyond Fourth Amendment doctrine, one that has been

3     influential in American law" -- sorry -- "throughout

4     American society, and around the world."

5          And then I say -- this is the paragraph --

6     the sentence you asked me about -- "That is, in both

7     law and consumer expectations, the test for whether

8     privacy rights exist or have been invaded often

9     rests on threshold questions about whether a

10    reasonable person would have expected something to

11    be private and under her control to determine

12    whether or not it is shared.  This is a historical

13    concept rooted in deep societal norms."

14          So you asked me to what extent the

15    reasonable expectation of privacy concept is related

16    to consumer expectations.  In -- in my experience,

17    in thinking about this for the -- for the past 20,

18    25 years or so, I have noticed that a -- a

19    "reasonable expectation of privacy," which is, of

20    course, a phrase familiar to all lawyers from Katz's

21    concurrence -- sorry, from Harlan's --

22    H-A-R-L-A-N -- concurrence in the Katz, K-A-T-Z,

23    case, is one that is transcended the law and has --

24    has come to shape the way consumers and people and

25    other countries, in fact, think about privacy.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 116

1      A.    So in -- in Fourth Amendment law -- and,

2   of course, the Katz formulation, though it was only

3   in a concurrence, has come to be the -- the -- the

4   dominant doctrinal element.

5          But it's also -- and what I'm try- -- what

6   I'm saying in this -- in this section, it has been

7   so successful that it is -- it has slipped the

8   moorings of law and entered to be a concept that

9   people use outside of the legal concept -- the legal

10  system.

11         It is one -- in my experience it is one of

12  a -- of a handful of phrases from the law that

13  first-year law students come to law school already

14  having heard, not from being lawyers or being, you

15  know, aggressive prelaw overstudiers, but merely

16  from living in our society.

17     Q.    But a first-year law student is not a --

18  the -- the sort of average con- -- consumer; right?

19         MS. PRITZKER:  Object as to form.

20         THE WITNESS:  No, that -- that -- I

21  don't -- I don't think I was suggesting that.

22  BY MR. WONG:

23     Q.    Well, I'm saying, how -- how do you know

24  that -- that -- that this concept has permeated

25  consumers' expectations, like the -- the general

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    consumer?

2        A.    I have observed both in my work and in my

3    living in our society people talking about privacy

4    in these terms regularly.

5        Q.    And you think that's a -- a -- a

6    reasonable representation of the average U.S.

7    consumer?

8              MS. PRITZKER:  Objection.

9              THE WITNESS:  I don't think that's what

10   I'm saying.

11   BY MR. WONG:

12       Q.    So then how can you make the jump between

13   saying that the concept of a -- of a reasonable

14   expectation of privacy is something that the

15   ordinary consumer has -- has permeated down to the

16   level of the ordinary consumer?

17       A.    Because I have observed it.  I -- I

18   believe that it's discussed in the literature.

19       Q.    And you think that the average U.S.

20   consumer has knowledge of this concept?

21       A.    I -- it's -- it's hard to imagine what you

22   mean by an "average U.S. consumer," but I would

23   say -- what I say in the paragraph is that for many

24   people -- I'm paraphrasing here -- but then I do say

25   the -- "The test for whether privacy rights exist or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 131

1  I understand it, that a certain proposition may be

2  true or not.

3      Q.   And how do you know if a fact is common

4  in -- in -- in the analysis that you just told me

5  you are undertaking?

6      A.   I would say whether it is shared by a

7  significant portion.

8      Q.   And how -- and what criteria do you use to

9  determine when something is shared by a significant

10  portion of the class?

11      A.   I'm glad you asked that.  Because in this

12  case, the expectations that are -- the terms of

13  service and privacy policies apply to 100 percent of

14  the class, and so therefore, it would be common.

15      Q.   Do you have to read the terms of service

16  and privacy policies to have an expectation arise

17  from them?

18      A.   I think people have expectations about the

19  privacy practices of the companies with whom they

20  interact, whether or not they have read the privacy

21  policies or not.  But in this case, it is clear that

22  Google's privacy policies make clear that it says

23  repeatedly, more than once, in more than one

24  document, more than one period in time, that it

25  will -- will not, does not, and never shares the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    personal information of its account holders with

2    third parties.

3        Q.    Do you know that -- if every U.S. account

4    holder read the privacy policy that they agree to

5    when they signed up for their account?

6        A.    Do I know whether?

7        Q.    Mm-hmm.

8        A.    I would suspect not.

9        Q.    And do you know whether every U.S. account

10   holder read the terms of service that they agreed to

11   when they signed up for their account?

12       A.    Actually, let me -- let me revise my

13   answer.  I have not seen the -- the interface by

14   which -- I suppose I have seen it because I probably

15   did it myself, but I have forgotten what it looked

16   like because it was many years ago, and it was one

17   of a vast number of -- of such things that I -- that

18   I've engaged with in my career -- in -- in my life.

19   That's a technical question that I think is perhaps

20   best left to a technical expert.

21            I will say, as I have said in -- in my

22   writing, that by and large, consumers do not read

23   privacy policies.  And the reason for that is, it

24   is -- given the volume of privacy policies with

25   which consumers are potentially confronted on an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 135

1             THE WITNESS:  Sorry.

2             "It reflect the deeply-held societal

3     understanding that privacy is a fundamental right

4     and an important societal norm in the United

5     States."  [As read]  That Google's repeated

6     statements that it will -- will not, does not, and

7     never shares or sells account holders' personal

8     information, reflects this broader societal norm.

9             As we discussed before lunch, I review the

10    law, the history, statements of technology

11    companies, consumer surveys and a variety of other

12    forms of evidence in formulating my conclusion that

13    privacy is a fundamental right and a deeply-held

14    societal norm.  That's Part IV of my report.

15            And in Part V of my report, I take that

16    finding, that opinion that we've discussed, and I

17    apply it to Google's public statements.  And I find

18    in Section V that those public statements are

19    consistent with the societal norm.

20    BY MR. WONG:

21        Q.  We were talking, though, about common

22    evidence, and you -- and I'm still trying to

23    understand how these documents can reflect the

24    expectations of all U.S. Google account holders if,

25    as you admit, they may apply to all of them, but

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 137

1    agree with a societal norm?  So I guess my question

2    is, if you argue that a societal norm is that

3    personal information is defined the -- the way that

4    you define it in your report, does that mean every

5    single U.S. account holder also must agree that that

6    is what personal information means, just because

7    you've determined that it's a societal norm?

8        A.   What I say in my report is that, in this

9    case, where Google makes these promises repeatedly

10   in a variety of forms and then breaks these

11   promises, that would be a violation of the societal

12   norm.

13       Q.   But does every single U.S. account holder

14   have that expectation or agree that the societal

15   norm is their conception of what Google can or

16   cannot do with their information?

17       A.   I would say that it is my opinion that if

18   you were to ask people if a company has said, we are

19   not going to -- we will not, do not, and never share

20   or sell your data with third parties, and then that

21   company does that millions and billions of times per

22   day, as the evidence I have seen in this -- from --

23   from in this case suggests, that everyone would find

24   that to be a violation of the -- of the societal

25   norm.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 144

1          THE WITNESS:  Could you repeat the

2    question?

3    BY MR. WONG:

4          Q.    Do you know which websites RTB operates

5    on, or is that beyond your canon?

6          A.    Off the top of my head, no.  But, again,

7    all questions relating to the technical operation of

8    RTB and particularly to the computer science and

9    data science of RTB are outside my expertise and

10   certainly outside the scope of my report.

11         Q.    So in this you just relied on Dr. Shafiq's

12   report and the Complaint, is that correct, for

13   Paragraph 91?

14         MS. PRITZKER:  Object as to form.

15         THE WITNESS:  As a -- as a matter of

16   methodology, Paragraph 91 sets a series of factual

17   assumptions about the nature and operation of RTB

18   upon which I rest my analysis.

19         It is a set of assumptions that I believe

20   to be credible and that I believe to be -- to be

21   grounded not just in the -- the Complaint, but --

22   but also Professor Shafiq's report, which I have

23   read and considered and find to be credible.

24         And also I cite the work of a -- of

25   another historian, Matthew Crain, in Footnotes 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

1    or trier of fact may conclude not only that a

2    reasonable Google account holder has a reasonable

3    expectation of privacy, but that Google is all too

4    well aware of this fact."

5          That is my opinion.

6          Q.    When you say "false expectation," what do

7    you mean?

8          A.    I mean, in the -- in the context here of

9    what a trier of fact could find and there is common

10   evidence to support such a finding, that when Google

11   tells its account holders that they do not, will

12   not, and never will share or sell their personal

13   information with third parties, and that when

14   Google, in fact, does that, that a trier of fact

15   could find those things to be the case, and that it

16   would create a false -- let me use the language I

17   use in my report.

18          In Paragraph 6, could "give rise to a

19   common (false) expectation that Google does not

20   offer for sale or sell information about or

21   associated with U.S. account holders to Google RTB

22   participants."  [As read]

23          Q.    So you did not conduct an [verbatim]

24   quantitative analysis of the actual expectations of

25   Google account holders; is that correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 172

1            MS. PRITZKER:  Just re-ask it.

2    BY MR. WONG:

3        Q.   Did you analyze how many Google account

4    holders saw Google's privacy policies?

5        A.   I did not conduct a quantitative study, so

6    no.

7        Q.   Are you aware that some of the named

8    plaintiffs did not review the specific statements

9    that you discussed?

10            MS. PRITZKER:  Object as to form.

11            THE WITNESS:  I was not aware.

12    BY MR. WONG:

13        Q.   And how would those individuals then have

14    a false expectation of what Google is doing with

15    their information if they did not read the terms of

16    service or privacy policies?

17        A.   My opinion is that Google's privacy

18    policies, Google's statements, are consistent with a

19    deeply rooted societal norm of the fundamental right

20    of privacy.  And it is also my opinion that

21    consumers are entitled to rely upon that --

22    reasonable consumers are entitled to rely upon that

23    fundamental right, particularly where those

24    statements are confirmed by Google's -- sorry, where

25    those norms are confirmed by Google's public

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 173

1    statements.

2        Q.    But not everyone is a reasonable consumer;

3    correct?

4        A.    In this case, Google promised to all of

5    its account holders that it would not, will not, and

6    will never share personal information with third

7    parties, and that promise applies to every Google

8    account holder, as I understand it.

9        Q.    Okay.  But we're talking about

10   expectations, which is different --

11       A.    Of course.

12       Q.    -- from a contractual right.

13       A.    Of course.

14       Q.    So I'm asking about, there are

15   unreasonable consumers who may not have this view of

16   privacy; correct?

17       A.    I think a reasonable consumer, which is my

18   standard here, a reasonable consumer, when faced

19   with a failure to disclosure a vast sharing of

20   personal information that is highly revealing, that

21   might be used to build profiles of them and

22   confronted with statements in Google's -- as a

23   matter of consumer expectations, when confronted

24   with Google's statements, repeated statements in

25   public, on sworn congressional testimony, in a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 174

1    variety of consumer-facing documents, a consistent

2    message that it will not sell or share personal

3    information, is entitled to believe that that

4    violates their reasonable expectation of privacy,

5    regardless of whether they read it.

6        Q.    Right.  But we're talking about a -- a

7    class of potentially millions and millions of U.S.

8    account holders; correct?

9        A.    That's what I understand.

10       Q.    So you're saying that your opinions only

11   apply to that subset of the class who are deemed

12   reasonable consumers?

13       A.    No.

14             MS. PRITZKER:  Object- --

15             THE WITNESS:  I'm sorry.

16             MS. PRITZKER:  Objection as to form.

17   Misstates his testimony.

18   BY MR. WONG:

19       Q.    So then how can we impute this reasonable

20   consumer to all of the class?

21       A.    It -- it is my understanding that the

22   standard that I am addressing is a reasonable

23   consumer standard.

24       Q.    And so, if the standard was not a

25   reasonable consumer standard, your opinions would

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 177

1    Q.    Sorry.  I didn't mean to interrupt.  So it

2    is --

3         A.    I paused.  My -- my fault.

4         Q.    It is immaterial then whether or not any

5    individual account holder knew of the alleged

6    conduct by Google and -- and consented to the

7    conduct?

8         A.    It's irrelevant.

9         Q.    So you said, "It is my opinion that under

10    a reasonable standard or not."  So can you clarify

11    what you mean by a -- "under a reasonable standard

12    or not"?

13        A.    Could you refer me to that paragraph?  I

14    have a pretty good grasp of my report, but that's --

15        Q.    No, no --

16        A.    -- that one's pushing it.

17        Q.    -- no, you testified just now, "It is my

18    opinion that under a reasonable consumer standard or

19    not, where Google promised every one of its account

20    holders that it does not, will not, and will never

21    share their personal information with third

22    parties."  [As read]

23             And then you go on to say that they

24    have -- "everyone in the class has suffered a

25    violation of their reasonable expectations of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178

1    privacy."

2              So I'm trying to get clarification as to

3    whether or not your opinion turns on --

4         A.   I see.

5         Q.   -- a reasonable consumer standard.

6         A.   It is unquestionably my opinion that the

7    reasonable consumer standard is violated here.  And

8    I think -- and I think there is -- there is

9    substantial evidence to provide common objective

10   facts from which the jury or trier of fact may

11   conclude that Google's violations of its promises

12   apply to every Google account holder, regardless of

13   whether they knew about it or not.

14        Q.   So is it your opinion then that consent in

15   this case is immaterial?

16        A.   It is my opinion in this case that where

17   Google says it is going to do one thing -- I'm

18   sorry, let me rephrase that.

19              It is my opinion in this case that where

20   Google makes promises about not sharing personal

21   information with third parties and then shares vast

22   amounts of personal information with third parties

23   in violation of that promise, there's no opportunity

24   for consumers to consent -- for Google account

25   holders, rather, to consent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 179

1        And I offer the opinion in Part IX of my

2    report that "Considering Google's Failure to

3    Disclose the Details of Google RTB to U.S. Google

4    Account Holders, There is Common Proof that Account

5    Holders Lack any Mechanism to Consent to Google

6    Sharing Or Selling their Personal Information

7    Outside of Google via RTB.  [As read]  [As written]

8        So in that respect, yes, consent is

9    irrelevant because Google has not disclosed the

10   conduct at issue and has not -- has -- in fact, has

11   promised the opposite and has provided no mechanism

12   for its account holders to consent to it.

13        Q.   So your opinion is that even if someone

14   learns of Google's behavior, they can never consent

15   to it because Google itself has not disclosed the

16   conduct at issue?

17        A.   Google has provided no opportunity for

18   consumers to consent to RTB, it hasn't disclosed it.

19   In fact, it has promised the opposite, and it has

20   provided no mechanism for consumers to consent to

21   it.

22        Q.   Right.  That's the second part of the

23   question, though.  We're talking about the first

24   part, which is your opinion is that even if someone

25   learns of Google's behavior through a third party,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 184

1    report or news article that their data was being

2    used in a specific way, have essentially consented

3    to that conduct?

4              MS. PRITZKER:  Object as to form.  Calls

5    for a legal conclusion.

6              THE WITNESS:  I'm not here to offer a

7    legal conclusion.  What I am saying is, as a matter

8    of reasonable expectations surrounding consent, that

9    would be -- that it is not possible here because

10   Google is promising the opposite of what it is

11   doing.

12   BY MR. WONG:

13       Q.    So consent in this setting here, when you

14   say "Mechanism to Consent," you're only talking

15   about reasonable expectation of privacy?

16       A.    I'm not offering a legal conclusion, so

17   I'm not off- -- I'm not offering an opinion as to

18   the sufficiency of legal consent to a contract.

19              What I'm saying is in this -- in this

20   section of my report, that because Google does not

21   disclose the details of RTB to its account holders,

22   there is common proof that Goo- -- account holders

23   lack any mechanism to consent to Google sharing or

24   selling their personal information outside of Google

25   via RTB.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 185

1        And that, furthermore, there is

2    substantial evidence both in the public record and

3    from evidence produced by Google in discovery that

4    provides common objective facts from which a jury or

5    trier of fact may conclude that Google's promises to

6    put its users in control with respect to RTB data

7    are false.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 218

1                    CERTIFICATE OF REPORTER

2            I, Hanna Kim, a Certified Shorthand

3     Reporter, do hereby certify:

4            That prior to being examined, the witness

5     in the foregoing proceedings was by me duly sworn to

6     testify to the truth, the whole truth, and nothing

7     but the truth;

8            That said proceedings were taken before me

9     at the time and place therein set forth remotely via

10    videoconference and were taken down by me in

11    shorthand and thereafter transcribed into

12    typewriting under my direction and supervision;

13           I further certify that I am neither

14    counsel for, nor related to, any party to said

15    proceedings, not in anywise interested in the

16    outcome thereof.

17           Further, that if the foregoing pertains to

18    the original transcript of a deposition in a federal

19    case, before completion of the proceedings, review

20    of the transcript [X] was [ ] was not requested.

21           In witness whereof, I have hereunto

      subscribed my name.

22    Dated:  29th day of August 2023

23

24

      Hanna Kim

25    CLR, CSR No. 13083

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 219

```
1              ERRATA SHEET FOR THE TRANSCRIPT OF:

2     Case Name: GOOGLE RTB CONSUMER PRIVACY LITIGATION

3     Dep. Date: 08/24/2023

4     Deponent:  PROFESSOR NEIL RICHARDS

5                      CORRECTIONS:

6     Pg.   Ln.    Now Reads       Should Read        Reason

7     50    6      And so, those − those    And so, those − those    Transcription error
                   habits of mine           habits of mind

8     50    19     the conduction of − of   the conduction of − of   Transcription error
                   large and quantitative   large-n quantitative

9     54    14     I have not conducted     I have not conducted     Transcription error
                   formal large and         formal large-n statistical
10                 statistical

11    80    10     my worse to dispel       my worst to dispel       Transcription error
                   stereotypes about        stereotypes about
12                 academics.  My           academics.  My

13    80    24     too, but I don't         too, but I don't believe  Transcription error
                   believe they has web     they have web browsing
14                 browsing

15    81    9      I used a lot of devices  I use a lot of devices   Transcription error
                   because I'm              because I'm
16    89    10     materials rather than    materials rather than to  Transcription error
                   to academic popular      academic, popular, or
17                 other                    other

18

19                                _____

20                                Signature of Deponent

21    SUBSCRIBED AND SWORN BEFORE ME

22    THIS____DAY OF_____, 2023.

23    _____

24    (Notary Public) MY COMMISSION

25    EXPIRES:_____

      Job No. CS6056459
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 219

1                    ERRATA SHEET FOR THE TRANSCRIPT OF:

2        Case Name: GOOGLE RTB CONSUMER PRIVACY LITIGATION

3        Dep. Date: 08/24/2023

4        Deponent:  PROFESSOR NEIL RICHARDS

5                            CORRECTIONS:

6        Pg.    Ln.     Now Reads        Should Read        Reason

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 95 | 3 | States, including, I believe, most people in the | State, including, I believe, most people in this | Transcription error |
| 95 | 5 | reproductive freedom, which is not currently not | reproductive freedom, which is currently not | Transcription error |
| 98 | 20 | A. Well, without – again, going some odds to | A. Well, without – again, going at some odds to | Transcription error |
| 100 | 8 | historical and other research documenting the - for | historical and other research documenting this - for | Transcription error |
| 103 | 15 | historian to explain rooted in the sources why | historian to explain, rooted in the sources, why | Punctuation error |
| 105 | 1 | Here I – I' m – I' m weary that we're | Here I – I' m – I' m wary that we're | Transcription error |

19

20                            Signature of Deponent

21        SUBSCRIBED AND SWORN BEFORE ME

22        THIS_____DAY OF_____, 2023.

23        _____

24        (Notary Public) MY COMMISSION

25        EXPIRES:_____

Job No. CS6056459

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 219

1              ERRATA SHEET FOR THE TRANSCRIPT OF:

2     Case Name: GOOGLE RTB CONSUMER PRIVACY LITIGATION

3     Dep. Date: 08/24/2023

4     Deponent:  PROFESSOR NEIL RICHARDS

5                      CORRECTIONS:

6      Pg.   Ln.    Now Reads        Should Read       Reason

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 113 | 23 | case, is one that is transcended the law and has - | case, is one that has transcended the law and has - | Transcription error |
| 115 | 4 | some cases, shape societal norms. | some cases, shaped societal norms. | Transcription error |
| 130 | 15 | historical societal privacy norms is an ultimate - | historical societal privacy norms is not ultimate - | Transcription error |
| 139 | 24 | them ad – ad nauseam. | them out, ad nauseam. | Transcription error |
| 180 | 20-21 | consent to its undisclosed, deceptively or falsely ~~promised to the contrary~~ system of vast data sharing | consent to its undisclosed – deceptively or falsely ~~promised to the contrary~~ – system of vast data sharing | Typographical error |

19

20                      Signature of Deponent

21    SUBSCRIBED AND SWORN BEFORE ME

22    THIS_____DAY OF_____, 2023.

23    _____

24    (Notary Public) MY COMMISSION

25    EXPIRES:_____

      Job No. CS6056459

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 219

1            ERRATA SHEET FOR THE TRANSCRIPT OF:

2    Case Name: GOOGLE RTB CONSUMER PRIVACY LITIGATION

3    Dep. Date: 08/24/2023

4    Deponent:  PROFESSOR NEIL RICHARDS

5              CORRECTIONS:

6    Pg.   Ln.    Now Reads       Should Read      Reason

7    184   22     there is common   there is common proof   Transcription error
                  proof that Goo –  that Google's account
8                 account holders   holders

9

10

11   189   12    But it says, the   But it says that    Transcription error
                 "California's tort for   "California's tort for
12

13   208   4     it – my understanding   it's my understanding   Transcription error
                 of it is information   of it as information that
14               that is            is

15   215   18    to that societal norm   to that societal norm   Typographical error
                 and then violates it in   and then violate it in
16

17

18

19                                    Signature of Deponent

20

21   SUBSCRIBED AND SWORN BEFORE ME

22   THIS____DAY OF_____, 2023.

23   _____

24   (Notary Public) MY COMMISSION

25   EXPIRES:_____

     Job No. CS6056459