# EXHIBIT 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                            Page 1

 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3                 OAKLAND DIVISION

 4

 5   In re Google RTB Consumer    )
     Privacy                      ) Case No.
 6   Litigation,                  ) 4:21-cv-02155-YGR-VKD
                                  )
 7                                )
     This document applies to:    )
 8   All actions                  )
     _____ )

 9

10

11

12        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13   VIDEO-RECORDED DEPOSITION OF PROFESSOR NEIL RICHARDS

14

15                Thursday, August 24, 2023

16                San Francisco, California

17

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 6056459
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1   engaged in historical research first as an amateur

2   and then as a professional.

3           And I have published a variety of articles

4   dealing with -- with history.  In -- in particular,

5   the -- the intellectual and legal history of privacy

6   and privacy law.  And I have -- I -- I recently

7   published an -- a review in the leading history

8   journal of a -- of a book dealing with the history

9   of privacy.

10          I -- I serve -- I'm going to be serving on

11  an academic committee to assess the tenure of a --

12  of a his- -- of a historian who's coming up for

13  tenure at a different university.  That's literally

14  the thing I'll be doing next week when I go back to

15  St. Louis.

16      Q.  And outside of being a trained historian

17  and apparently a good cook, do you have any other

18  areas of expertise outside of the law?

19      A.  I'm -- I'm -- I'm sure I do.  I -- I think

20  as relevant to this case, my expertise is as a

21  historian and -- and scholar of privacy and data

22  protection.

23          THE COURT REPORTER:  Professor, can you

24  keep your hands down.

25          THE WITNESS:  I'm sorry.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

1      Q.   And what is your expertise in how

2   consumers understand privacy?

3           MS. PRITZKER:  Object to form.

4           THE WITNESS:  I have been one of the

5   leading privacy experts in the United States -- I'm

6   sorry.  I have been one of the leading privacy

7   experts in the world.  As -- as someone born in

8   England, it's difficult for me to talk about my

9   accomplishments with the con- -- arrogance often

10   expected of expert witnesses.

11           But I am -- I am one of the leading

12   privacy experts in the world.  I have -- I have

13   studied privacy in -- in, to my knowledge, all of

14   its forms full time at -- at Washington University,

15   as a full-time academic for over -- for over

16   20 years.  I have read a tremendous amount.  I have

17   attended a number -- more conferences than I can --

18   than I can count.  I have given hundreds and

19   hundreds of -- of presentations on -- on questions

20   of -- of privacy.

21           I have had countless conversations, as

22   I -- as I detail in my most recent book, "Why

23   Privacy Matters," with people all walks of life

24   across the Western world about concepts of privacy

25   over the past 20 years in -- in particular.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48

1    you mean?

2         A.    Empirical studies, broadly defined, are

3    ones that identify facts about the world to the

4    extent that a legal history describes facts against

5    the world.  That is in -- under the broad

6    definition, it is an empirical study.  Sometimes

7    when people use the term "empirical study," they

8    refer to qualitative research in the social

9    sciences, psychology, economics, sociology or

10   quantitative work in those disciplines as well.

11        So there's a -- there's a range of

12   meanings that -- that scholars and lawyers and the

13   lay public use or mean when they say empirical, and

14   I want to be precise in my answers today.

15        Q.    Have you ever conducted a focus group on

16   consumer expectations of privacy?

17        A.    In a formal methodological setting, no.

18        Q.    Have you ever conducted a survey that

19   looked for statistical significant results in

20   analyzing consumer expectations of privacy?

21        A.    No.

22        Q.    Do you have any formal training in

23   conducting a focus group on consumer expectations of

24   privacy in a formal methodological study?

25        A.    No.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50

1    attending dozens, if not hundreds, of empirical

2    presentations at my home institution and other

3    institutions at conferences over my 20 plus years as

4    a full-time academic every time that I -- that I

5    read or evaluate a study.

6              And so, those -- those habits of mine,

7    those analytical skills are ones that -- that you

8    can't unlearn.  And so, for example, when -- when I

9    read consumer surveys or studies, I'm using that

10   training and that experience in assessing their --

11   their persuasiveness and their validity.

12        Q.   Do you believe you're an expert in

13   conducting surveys that look for statistically

14   significant results in analyzing consumer

15   expectations of privacy?

16        A.   In terms of actually running the survey

17   and conducting it, I would say that I am not trained

18   in quanti- -- I am not trained at an expert level in

19   the conduction of -- of large and quantitative

20   models and consumer surveys.

21              I do think that I would be welcomed on a

22   team, indeed a -- a leading team, as a subject

23   matter expert in privacy and consumers.

24              But with respect to the precise set of

25   skills of -- of actually crunching the numbers, that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

```
 1    work that I have authored, either individually or

 2    jointly with -- with co-authors or other

 3    collaborators.  In citing that opinion that may be

 4    reflected in one of my scholarly works, that opinion

 5    itself is a product of -- of documents of work, of

 6    research, that is -- some of which is -- that is --

 7    that is contained where appropriate in the text and

 8    footnotes of that article.

 9              So, for example, my -- my second book,

10    "Why Privacy Matters," I cite that a few times in

11    the report.  And by citing that, I'm -- no doubt was

12    thinking of -- of -- of -- of -- of that project,

13    which involved a lot of reading itself.  So -- so

14    all -- all of this is -- is built upon dec- --

15    decades of -- of study and -- and -- and learning

16    and -- and conversations with people from a wide

17    variety of walks of life about privacy.  And I would

18    say that there were -- where a key document should

19    have been cited, I cited it.

20         Q.   In Paragraph 3 -- I believe this is your

21    second opinion; is that correct?  Again, don't --

22    just read it silently, and when you're done, let me

23    know.

24         A.   (Witness reviews.)

25              Okay.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 95

1    have rights that are not guaranteed through law.

2              For example, many people in the United

3    States, including, I believe, most people in the

4    city, believe that there is a fundamental right to

5    reproductive freedom, which is not currently not

6    guaranteed by the U.S. Constitution under the Dobbs

7    decision.

8              So you can have rights that are not

9    legally guaranteed, but a -- but a -- but in -- I

10   would say much of the time there is some linkage

11   between a right and a legal claim.

12             With respect to -- to norms, norms are --

13   I don't want to offer too technical of a -- a

14   definition, but a -- but a casual definition, let's

15   say, for the purpose of our discussion here, would

16   be a norm is something that is a shared expectation

17   of behavior.

18        Q.    Not necessarily shrouded in law?

19        A.    Correct, not necessarily.

20        Q.    And how do you determine what a societal

21   norm is?

22        A.    There are a number of ways to determine

23   what a societal norm is, but -- but I think the --

24   the most effective way is by experience, by -- by

25   reading, by thinking, by living in society, but

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 96

1  particularly in a -- in a way that is receptive to

2  looking for social norms.  Many social norms are --

3  are implicit.

4      Q.   So is there a [verbatim] academic -- is

5  there an academic standard by which to measure a

6  societal norm?

7      A.   There -- there is a -- there is a

8  literature on -- on social norms, but I would say

9  the -- the -- the standard for measuring whether a

10 social norm is whether it one is that is -- that is

11 generally accepted.

12     Q.   And how do you know when something is

13 generally accepted?

14     A.   You study it, and you make that

15 determination.  In this case, I have done so based

16 upon my expertise.

17     Q.   That sounds a little circular to me,

18 though.

19         So how do you make an objective

20 determination that something is generally accepted?

21     A.   You study it, and you assess it as a

22 scholar.

23     Q.   How does one do that, though, without some

24 quantitative assessment of something being generally

25 accepted?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 97

1      A.    Because, as I've already said, numbers are
2  not the only way to understand the world.
3      Q.    But if something -- generally accepted --
4  what does generally accepted mean then to you?
5  Because I'm confused by that.  To me, that sounds
6  like something that most people do, like 60 percent
7  of people or 70 percent of people.  Otherwise, it
8  wouldn't be generally accepted.
9      A.    Again, I -- I -- I -- I'm not going to
10 quantify it for you because my understanding in
11 this -- in this context is that it is a qualitative
12 appreciation.
13     Q.    And so what are the criteria for that
14 qualitative appreciation?
15     A.    Whether it is generally accepted.
16     Q.    And what is the criteria for when
17 something is generally accepted?
18     A.    Whether it is commonly understood to be
19 accepted.
20     Q.    So what it sounds like is that your
21 expertise is that you just say something is commonly
22 accepted, it is then generally accepted, and then it
23 is the qualitative social norm?
24          MS. PRITZKER:  Is there a question there?
25          Object as to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1    BY MR. WONG:

2         Q.    I don't understand what the criteria is if

3    you cannot explain to me what generally accepted

4    means.

5         A.    I have explained it as commonly accepted.

6         Q.    So generally accepted means commonly

7    accepted, but what -- what does that criteria --

8    how -- how is someone supposed to take that

9    methodology and apply it to -- to -- to an

10   everyday -- to everyday conduct?

11        A.    It requires an exercise of judgment

12   grounded in expertise.

13        Q.    So it's discretion?

14        A.    That's not what I said.

15        Q.    Well, I don't understand how -- how

16   does -- why -- why -- what -- what makes your

17   determination that something is generally accepted

18   different from someone who does not have your

19   historical training?

20        A.    Well, without -- again, going some odds to

21   my -- my own cultural conditioning as a -- as a

22   modest Englishman, I am one of the world's leading

23   experts in privacy and in the history of privacy

24   by -- by any measure.  That's the difference.

25             I have devoted 25 years of my life to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 99

1    thinking about these questions every day, to

2    studying them, to subjecting them to analysis, to --

3    to listening to --

4                I'm sorry, I should slow down for you.

5                -- to listening to countervailing

6    arguments and opposing perspectives and di- -- and

7    diverse perspectives, that this is an exercise in --

8    in judgment and expertise, and it is -- it is

9    qualitative rather than quantitative.  I'm not going

10   to put a number on common for you.

11   BY MR. WONG:

12       Q.   So it's your testimony that someone with

13   your expertise applies one criteria, which is

14   whether or not something is, in their determination,

15   generally accepted, and that is how you determine

16   whether or not something is historically a social

17   norm?

18       A.   You asked me what it meant -- as -- as I

19   understand it, you asked me what it meant for

20   something to be generally accepted.

21           With respect to the report that I authored

22   in this case, which was the product of many hours of

23   work and analysis specifically and rested, as I've

24   said, upon close to a quarter of a century of -- of

25   study, erudition, and expertise in these areas, I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 100

1    drew upon my training and my work and my expertise

2    and a countless number of things that I have read

3    and conversations that I have had and -- and

4    observations that I have made about privacy in --

5    specifically in the United States and in United

6    States history.

7             And I drew upon a significant amount of

8    historical and other research documenting the -- for

9    example, the instantiation of the fundamental social

10   norm of privacy in legal tests, in statutes, in

11   statements by technology companies, in empirical

12   research upon consumer expectations, and I think

13   other sorts of -- other forms of evidence that were

14   relevant to my determination.

15            But ultimately the determination of

16   whether privacy is a -- I want to refer to the --

17   the phrase that we're talking about to be precise,

18   "that privacy - including freedom from unwanted

19   surveillance - is a fundamental right and important

20   societal norm with deep roots in the social,

21   cultural, and legal history of the United States"

22   was a question of -- based upon all of that learning

23   and -- and observation and -- and research over

24   many, many years, was [verbatim] a conclusion that I

25   reached on the basis of my expert -- expertise.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 116

1      A.    So in -- in Fourth Amendment law -- and,

2   of course, the Katz formulation, though it was only

3   in a concurrence, has come to be the -- the -- the

4   dominant doctrinal element.

5           But it's also -- and what I'm try- -- what

6   I'm saying in this -- in this section, it has been

7   so successful that it is -- it has slipped the

8   moorings of law and entered to be a concept that

9   people use outside of the legal concept -- the legal

10  system.

11          It is one -- in my experience it is one of

12  a -- of a handful of phrases from the law that

13  first-year law students come to law school already

14  having heard, not from being lawyers or being, you

15  know, aggressive prelaw overstudiers, but merely

16  from living in our society.

17      Q.    But a first-year law student is not a --

18  the -- the sort of average con- -- consumer; right?

19          MS. PRITZKER:  Object as to form.

20          THE WITNESS:  No, that -- that -- I

21  don't -- I don't think I was suggesting that.

22  BY MR. WONG:

23      Q.    Well, I'm saying, how -- how do you know

24  that -- that -- that this concept has permeated

25  consumers' expectations, like the -- the general

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

1    consumer?

2         A.   I have observed both in my work and in my

3    living in our society people talking about privacy

4    in these terms regularly.

5         Q.   And you think that's a -- a -- a

6    reasonable representation of the average U.S.

7    consumer?

8              MS. PRITZKER:  Objection.

9              THE WITNESS:  I don't think that's what

10   I'm saying.

11   BY MR. WONG:

12        Q.   So then how can you make the jump between

13   saying that the concept of a -- of a reasonable

14   expectation of privacy is something that the

15   ordinary consumer has -- has permeated down to the

16   level of the ordinary consumer?

17        A.   Because I have observed it.  I -- I

18   believe that it's discussed in the literature.

19        Q.   And you think that the average U.S.

20   consumer has knowledge of this concept?

21        A.   I -- it's -- it's hard to imagine what you

22   mean by an "average U.S. consumer," but I would

23   say -- what I say in the paragraph is that for many

24   people -- I'm paraphrasing here -- but then I do say

25   the -- "The test for whether privacy rights exist or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 123

1      A.   Well, it was -- as you noted earlier, it

2  was offered in a -- in a ballot initiative.  And

3  it -- and it was high -- both highly likely to pass.

4  And then the successor law was passed, I believe,

5  fully by a fairly significant vote by the voters of

6  California when they had a chance to -- to add to,

7  not to the CCPA protections in the California

8  Privacy Rights Act.

9           Second, in my -- in my study of privacy

10  over the last 20 years, I have seen numerous

11  references to, and I have seen -- have had

12  conversations with consumers that they expect their

13  information is protected, even if it is not linked

14  directly to their name, if it is related to them.

15           In addition, in context of this case, I

16  found that there is substantial evidence in the

17  record, as discuss- -- through the discovery

18  process, that that is not just what Google's

19  customers think, but also what Google knows Google's

20  customers think about the scope of privacy

21  protection.

22      Q.   So you're testifying that you understand

23  Google's intent; is that correct?

24           MS. PRITZKER:  Object as to form.

25           THE WITNESS:  I am testifying that I have

Page 126

1    U.S. account holders to Google RTB participants."

2                In that section -- let me turn to that

3    section now.

4                Paragraph 126, I offer eight pieces of

5    evidence that I have seen for the proposition that

6    "evidence produced by Google in discovery provides

7    common, objective facts from which a jury or trier

8    of fact may conclude that Google understands that

9    its privacy notices do not comport with its U.S.

10   account holders' expectations of privacy."  [As

11   read]

12        Q.   So is it your testimony that there's

13   evidence of Google understanding its privacy notices

14   do not comport with U.S. account holders'

15   expectations of privacy, or is it your opinion that

16   Google understands that its privacy notices do not

17   comport with its U.S. account holders' expectations

18   of privacy?

19        A.   I don't understand my role in this matter

20   as an expert, as a privacy expert, to be to go

21   towards the ultimate questions in this case.  My

22   testimony is that there is common evidence from

23   which a jury may conclude that that is the case.

24        Q.   So you don't believe that Google

25   understands that its privacy notices do not comport

1    Google understands that its privacy notices do not

2    comport with its U.S. account holders' expectations

3    of privacy?

4         A.   As I understand my role in this case, it

5    is to determine whether there is common evidence

6    from which a jury may conclude that something is the

7    case.

8         Q.   So it's not your testimony that Google

9    understands that its privacy notices do not comport

10   with its U.S. account holders' expectations of

11   privacy?

12        A.   It's not my testimony, one way or the

13   other on that.  As I -- I see that as going beyond

14   the scope of what I -- the opinion that I was

15   retained to give.

16        Q.   So going to Section V on Page 33.

17        A.   Yes.

18        Q.   Okay.  You claim that quote, "Google's

19   Terms of Service and privacy policies" -- I'm sorry,

20   I'm quoting from -- I might be quoting from

21   Paragraph 3.  Sorry.  Hold on one second.  I just

22   want to make sure that I -- no.

23             Oh, I'm sorry, no.  This is Paragraph 75

24   on Page 33.  I apologize.

25             You write quote, "Google's Terms of

1   Service and Privacy Policies Reflect Historical

2   Societal Privacy Norms and Confirm People's

3   Reasonable Expectations that Google Adheres to Those

4   Norms."

5          Do you see that?

6       A.   Yes.

7       Q.   So you're not saying here that there's

8   evidence that a jury could conclude that these terms

9   of service and privacy policies reflect historical

10  societal privacy norms and confirm people's

11  reasonable expectations that Google adheres to these

12  norms, you're saying merely that there is common

13  evidence that a jury could conclude that?

14      A.   I'll have to look at that section a little

15  more closely.  I was -- in drafting my report, I

16  took very seriously the -- the -- my role and the

17  idea that I should not opine on ultimate questions

18  of law or fact and had to restrict my opinions to

19  whether there was -- for -- for common questions of

20  fact.  For instance, whether there was, in fact,

21  common questions of fact.

22          I do not believe that whether or not

23  Google's terms of service reflect historical

24  societal privacy norms and confirm people's

25  reasonable expectations that Google adheres to those

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

1    norms is an ultimate question.

2              To the extent that it is not an ultimate

3    question, I am happy to -- I -- I -- I stand by the

4    report.  So if it -- if it were to be an ultimate

5    question, then it would be -- there's common

6    evidence to that fact.  But I believe that this --

7    this portion of the report -- because whether

8    Google's privacy policies reflect -- and terms of

9    service reflect historical societal privacy norms --

10             THE COURT REPORTER:  Professor, please

11   slow down, please.

12             THE WITNESS:  Sorry.

13             The -- the question of whether Google's

14   terms of service and privacy policies reflect

15   historical societal privacy norms is an ultimate --

16   because I don't think it is an ultimate question, I

17   offer the opinion that I give in V.  If it were to

18   be an ultimate question, I would, of course,

19   restrict my opinion to the fact that there is common

20   evidence.

21   BY MR. WONG:

22        Q.   And when you say "common evidence," what

23   do you mean?

24        A.   I mean, evidence of factual matters

25   that -- that runs throughout the class that I -- as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 131

1    I understand it, that a certain proposition may be
2    true or not.
3        Q.   And how do you know if a fact is common
4    in -- in -- in the analysis that you just told me
5    you are undertaking?
6        A.   I would say whether it is shared by a
7    significant portion.
8        Q.   And how -- and what criteria do you use to
9    determine when something is shared by a significant
10   portion of the class?
11       A.   I'm glad you asked that.  Because in this
12   case, the expectations that are -- the terms of
13   service and privacy policies apply to 100 percent of
14   the class, and so therefore, it would be common.
15       Q.   Do you have to read the terms of service
16   and privacy policies to have an expectation arise
17   from them?
18       A.   I think people have expectations about the
19   privacy practices of the companies with whom they
20   interact, whether or not they have read the privacy
21   policies or not.  But in this case, it is clear that
22   Google's privacy policies make clear that it says
23   repeatedly, more than once, in more than one
24   document, more than one period in time, that it
25   will -- will not, does not, and never shares the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 143

1    here as a -- as a historian and an expert in

2    privacy.

3          Q.    So in Paragraph 91, your report -- your

4    report de- -- I'm sorry, hold on.  Let me rephrase.

5          In Paragraph 91 of your report, you

6    describe your understanding of the RTB process, and

7    you state, quote, "Google observes, collects, and

8    analyzes real-time data about account holders when

9    they're using the Internet," unquote.

10         A.    Where is this in -- in 90?

11         Q.    It is --

12         A.    It's on page 39?

13         Q.    It starts on 30- -- well, it start -- the

14   sentence starts on 38 and -- and ends on 39.  It's

15   just the -- the sort of last sentence --

16         A.    I see, yes.

17         Q.    -- on the page.

18         So do you know if Google observes user

19   data when they vi- -- when visitors visit any

20   website, or is it just some websites?

21         A.    That's a technical question, and I will

22   defer to the technical experts on that.

23         Q.    And do you know which websites it operates

24   on, if any, or is that also beyond your canon?

25               MS. PRITZKER:  Object as to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 144

1           THE WITNESS:  Could you repeat the

2     question?

3     BY MR. WONG:

4           Q.   Do you know which websites RTB operates

5     on, or is that beyond your canon?

6           A.   Off the top of my head, no.  But, again,

7     all questions relating to the technical operation of

8     RTB and particularly to the computer science and

9     data science of RTB are outside my expertise and

10    certainly outside the scope of my report.

11          Q.   So in this you just relied on Dr. Shafiq's

12    report and the Complaint, is that correct, for

13    Paragraph 91?

14          MS. PRITZKER:  Object as to form.

15          THE WITNESS:  As a -- as a matter of

16    methodology, Paragraph 91 sets a series of factual

17    assumptions about the nature and operation of RTB

18    upon which I rest my analysis.

19          It is a set of assumptions that I believe

20    to be credible and that I believe to be -- to be

21    grounded not just in the -- the Complaint, but --

22    but also Professor Shafiq's report, which I have

23    read and considered and find to be credible.

24          And also I cite the work of a -- of

25    another historian, Matthew Crain, in Footnotes 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 163

1    policy.  That's certainly not my role in this

2    proceeding.

3         Q.   I never suggested it was.  You just said

4    that it would be simple to do.  So if it's so simple

5    to do, I was just -- thought maybe you could do it.

6    But maybe this is the simple thing, which is this

7    very detailed paragraph with eight footnotes.

8         A.   Is that a question?

9         Q.   No.

10             Do you know if the buyers of the --

11   alleged buyers of the information are actually able

12   to view it in the RTB transaction?

13        A.   That is a technical question, and I defer

14   to the technical experts --

15        Q.   Would it --

16        A.   -- in that respect.

17        Q.   -- matter if they were not able to view

18   it?

19        A.   It is my -- as I state in Paragraph 91,

20   "Google matches the cookies to the account holder's

21   personal information stored at Google, and then

22   sends 'a bid request' containing certain of her

23   personal information - including her Google User ID,

24   IP address, device identifiers, personal

25   identifiers, geolocation data, the specific content

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 177

1     Q.    Sorry.  I didn't mean to interrupt.  So it

2     is --

3     A.    I paused.  My -- my fault.

4     Q.    It is immaterial then whether or not any

5     individual account holder knew of the alleged

6     conduct by Google and -- and consented to the

7     conduct?

8     A.    It's irrelevant.

9     Q.    So you said, "It is my opinion that under

10    a reasonable standard or not."  So can you clarify

11    what you mean by a -- "under a reasonable standard

12    or not"?

13    A.    Could you refer me to that paragraph?  I

14    have a pretty good grasp of my report, but that's --

15    Q.    No, no --

16    A.    -- that one's pushing it.

17    Q.    -- no, you testified just now, "It is my

18    opinion that under a reasonable consumer standard or

19    not, where Google promised every one of its account

20    holders that it does not, will not, and will never

21    share their personal information with third

22    parties."  [As read]

23    And then you go on to say that they

24    have -- "everyone in the class has suffered a

25    violation of their reasonable expectations of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 181

1    conclude that this is the case.

2         Q.   So your view is that consent can only be

3    given affirmatively through Google; is that your

4    testimony?

5         A.   That's not what I'm saying.

6         Q.   Well, you did say that.  You said "Google

7    does not offer any opportunity for account holders

8    to consent."  So are you saying that there are other

9    ways that account holders can consent other than if

10   Google offers an opportunity to do so?

11        A.   I'm saying that where a company -- I think

12   I've already answered this question.

13        Q.   I -- I don't think you have.

14             The first question that you have not

15   actually answered because you keep coming back to

16   the opportunity is, can a U.S. account holder have

17   found out about RTB through a third party, not

18   through Google, and consented to the conduct at

19   issue?

20             MS. PRITZKER:  Object as to form.

21             THE WITNESS:  If we are discussing consent

22   in a legal sense, then I am not offering a legal

23   conclusion in my report.  If we are offering a

24   conclusion on consent in terms of expectations of

25   consent and practical ability and norms surrounding

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    consent, the pathologies of consent that I talk

2    about in the article you listed as Exhibit 2, means

3    that consent, in this situation, would be so far

4    from knowing involuntary gold standard consent as to

5    be meaningless.

6    BY MR. WONG:

7        Q.   So are you testifying then that it would

8    be meaningless as a legal matter?

9        A.   No, I'm not offering a legal opinion.

10       Q.   You just said that it would be

11   meaningless.

12       A.   As a matter of expectations.

13       Q.   You said consent in this situation would

14   be so far from knowing -- knowing involuntary gold

15   standard consent would be meaningless.  I don't -- I

16   don't understand how you're not saying that consent

17   would be, as a legal matter, void?

18            MS. PRITZKER:  Objection as to form.

19            THE WITNESS:  I'm not offering a legal

20   opinion.  What I am saying, and I have said this

21   before, that where a promise is made that Google

22   will not, does not, and never shares personal

23   information, and then that promise -- that

24   representation is false and Google, in fact, does,

25   and where Google offers no opportunity either

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 187

1   deper- [verbatim] -- or disable personalized ads?

2       A.   I have not conducted an empirical study of

3   such things, but it is my understanding that the

4   percentage of people -- that -- that -- well, let me

5   retract that.

6           Could you repeat the question?

7       Q.   Do you know what the percentage is for

8   other ad networks that allow people to opt out or

9   disable personalized ads?

10      A.   I do not.

11          MR. WONG:  Do you think we can take a

12  five-minute break?

13          MS. PRITZKER:  Sure.

14          THE VIDEOGRAPHER:  This marks the end of

15  Media Number 4.  Off the record.  The time is 3:05.

16          (Short recess taken.)

17          THE VIDEOGRAPHER:  This marks the

18  beginning of Media Number 5 in the deposition of

19  Professor Neil Richards.

20          We're back on the record.  The time is

21  3:28.

22          (Richards Deposition Exhibit 3 was marked

23          electronically.)

24  BY MR. WONG:

25      Q.   Exhibit 3 is the Plaintiffs' Motion in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 214

1    BY MR. WONG:

2        Q.    And if there were to be any such

3    third-party privacy policies that disclosed the

4    sharing of information between a website and Google

5    and an advertiser, would that change any of the

6    opinions that you are providing here today?

7        A.    No.

8        Q.    And why is that?

9        A.    In this case, it remains my opinion that

10   Google promises that it will -- does not, will not,

11   never share or sell personal information with third

12   parties, and that it violates that promise millions

13   of times a day.  And it is my opinion that a jury

14   could conclude that that promise is broken by

15   Google, notwithstanding language in some privacy

16   policy somewhere on the web.

17       Q.    So are you saying then that Google, as a

18   legal matter, has made a contractual promise that it

19   has violated?

20       A.    I am not offering any legal conclusions in

21   my report.

22       Q.    You literally just said, "In this case, it

23   remains my opinion that Google promises that it

24   will -- does not, will not, never share or sell

25   personal information with third parties, and that it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 218

1                  CERTIFICATE OF REPORTER

2            I, Hanna Kim, a Certified Shorthand

3     Reporter, do hereby certify:

4            That prior to being examined, the witness

5     in the foregoing proceedings was by me duly sworn to

6     testify to the truth, the whole truth, and nothing

7     but the truth;

8            That said proceedings were taken before me

9     at the time and place therein set forth remotely via

10    videoconference and were taken down by me in

11    shorthand and thereafter transcribed into

12    typewriting under my direction and supervision;

13           I further certify that I am neither

14    counsel for, nor related to, any party to said

15    proceedings, not in anywise interested in the

16    outcome thereof.

17           Further, that if the foregoing pertains to

18    the original transcript of a deposition in a federal

19    case, before completion of the proceedings, review

20    of the transcript [X] was [ ] was not requested.

21           In witness whereof, I have hereunto

      subscribed my name.

22    Dated:  29th day of August 2023

23

24

                Hanna Kim

25              CLR, CSR No. 13083