Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

[Additional Counsel Appear on Signature Page]

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*<br><br>This document applies to all actions. | **CASE NO. 4:21-CV-02155-YGR (VKD)**<br><br>**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD<br>Time: TBD<br>Courtroom: 1, Fourth Floor |

**REDACTED VERSION**

Table of Contents

I.  INTRODUCTION ................................................................................................................. 1

II. ARGUMENT ...................................................................................................................... 2

    A. The Class is Objectively Defined and Ascertainable ................................................ 2

    B. There Is One Common Contractual Promise That Applies Across the Class ............ 3

    C. Common Issues Predominate, Thus Satisfying Rule 23(b)(3) ................................... 4

        1. The At-Issue RTB Data is Uniform for Class Certification Purposes ........... 4

        2. Google's Speculative Individualized "Consent" Defense Lacks Merit ......... 6

        3. Common Issues Predominate Regarding the Relief Plaintiffs Seek .............. 9

    D. Class Members' Privacy Expectations Are Subject to Classwide Proof .................. 13

    E. The Evidence Supports Certification of Plaintiffs' CIPA Claim .............................. 14

    F. Classwide Injunctive Relief Under Rule 23(b)(2) is Proper and Warranted ............ 15

III. CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

## CASES

*Bailey v. Rite Aid Corp.*, 338 F.R.D. 390 (N.D. Cal. 2021) .............................................................. 16

*Brown v. Google LLC*, 2023 WL 5029899, at *8 (N.D. Cal. Aug. 7, 2023) ................................... 11

*Campbell v. Facebook, Inc.*, 315 F.R.D. 250 (N.D. Cal. 2016) ....................................................... 10

*Edquist v. Bidz.com, Inc.*, 2013 WL 1290130 (D. Mass Mar. 29, 2013) ........................................ 11

*Garvey v. Kmart Corp.*, 2012 WL 2945473, at *4 (N.D. Cal. July 18, 2012) ................................. 3

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................................................. 3

*Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *11 (N.D. Cal. Mar. 30, 2023) .............. 11

*Hill v. NCAA*, 7 Cal. 4th 1 (1994) ...................................................................................................... 15

*In Re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) ................................... 6

*In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2014 WL 1102660, *15 (N.D. Cal. Mar. 18, 2014) ........................................................................................................... 11

*In re Yahoo Mail Litig.*, 308 F.R.D. 577 (May 26, 2015) ................................................................ 17

*In re. Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535 (N.D. Cal. 2018) *aff'd*, 932 F.3d 1264 (9th Cir. 2019) .......................................................................................................... 8

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ........................................................ 3

*Opperman v. Path, Inc.*, 2016 WL 3844326, at *11 (N.D. Cal. July 15, 2016) ............................. 15

*Pulaski & Middlemen, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015) ................................... 12

*Six (6) Mexican Workers v. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ................................ 15

*True Health Chiro., Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018) .................................... 3

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) .............................................................. 8

*Van v. LLR, Inc.*, 61 F.4th 1053 (9th Cir. 2023) ................................................................................. 8

*Williams v. Apple*, 338 F.R.D. 629 (N.D. Cal. 2021) ......................................................................... 3

*Wolph v. Acer Am. Corp.*, 272 F.R.D. 477 (N.D. Cal. 2011) ............................................................ 5

*WPP Lux. Gamme Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011) .................... 10

## Rules

Fed. R. Civ. P. 23 ............................................................................................................................. 1, 16

## I. INTRODUCTION

"Speculation and surmise" cannot defeat class certification. *Williams v. Apple*, 338 F.R.D. 629, 648 (N.D. Cal. 2021). With access to over ▇▇▇▇▇ bid requests produced in this case, Google has not identified any that illustrate how "individual" issues could predominate. On this record, plaintiffs have met their burden to demonstrate that the requirements of Rule 23 are satisfied.

Plaintiffs' opening brief put forth a body of class-wide evidence supporting every element of plaintiffs' claims such that this case "can be resolved for all members of the class in a single adjudication[.]" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)). Through disclosures made to all class members, Google promises that it will not share or sell users' information to third parties. And the evidence shows that through common action that affects all class members, Google does the opposite.

All of these elements of proof are common: (1) an objectively well-defined and identifiable class: U.S. Google account holders; (2) a common set of disclosures and contractual promises that Google **concedes** apply to all class members; (3) class-wide impact: there is no effective tool class members can use to avoid having their data shared or sold in RTB auctions; (4) a reliable method to calculate the monetary harm to class members – using Google's documents and methodologies – caused by Google's breaches, and a proposal that fairly allocates relief among class members; (5) a uniform absence of actual evidence that any class members consented to Google's RTB auction practices; and (6) a sound basis for injunctive relief to require Google to provide appropriate class wide disclosures and an opportunity to opt out of Google's data sharing practices.

Plaintiffs have met their burden with prima facie showing that Rule 23's elements are met. The burden shifts to Google to come forward with **evidence** to establish the required counter-showing that individualized issues so overwhelmingly predominate that class certification is untenable. *True Health Chiro., Inc. v. McKesson Corp.*, 896 F.3d 923, 932 (9th Cir. 2018) ("[W]e do not consider ... defenses that [the defendant] might advance or for which it has presented no evidence."); *see also Garvey v. Kmart Corp.*, 2012 WL 2945473, at *4 (N.D. Cal. July 18, 2012). Google has not met its burden. It instead spins a counter-factual tale based on **speculation**. Nowhere does Google come close to showing, with evidence, that the common issues that apply to hundreds of millions of Google

account holders are overwhelmed by speculative concerns raised by Google's experts. For the reasons below and in plaintiffs' opening brief, the initial and rebuttal reports of plaintiffs' experts, and the opening and reply declaration of Elizabeth C. Pritzker, the Court should find that common questions predominate, and certify the class.

## II.     ARGUMENT

### A.     The Class is Objectively Defined and Ascertainable

Google does not challenge plaintiffs' showing that the Rule 23 elements of numerosity, typicality, adequacy, and superiority are met. Nor does Google challenge plaintiffs' showing that Google maintains records of when each account holder subject to a U.S. Terms of Service ("ToS") created a Google account, and of all user consents. *See* Mot. (ECF 545-3) at 7, 24 (citing Shafiq Report ("Shafiq Rep.") (ECF 545-5) ¶¶90-91). Google's recent Rule 30b6 testimony confirms this.[1]

Instead, Google suggests that it cannot identify class members whose personal information was sold or shared by Google through RTB during the class period. *See, e.g.,* Expert Report of Bruce Deal ("Deal Rep."), ECF 584-7, at ¶¶41-42.[2] This is false. Google's Rule 30b6 designee, Glenn Berntson, confirms that Google maintains and has preserved data identifying all Google account holders who have been targeted by Google RTB bid requests. Dr. Berntson also confirmed that that data can be ███████████████████████████████████████████████. Pritzker Reply Decl., ¶18, Ex. 51 (Berntson 30b6 Dep. at 151:6-15; 215:6-219:10; 225:13-226:4).[3] And while Mr. Deal, a damages expert, speculates that the "true" country affiliation of a Google account holder "could" be masked by the use of a VPN (Deal Rep. ¶¶45-47), the evidence shows that Google itself

---

[1] Reply Decl. of Elizabeth C. Pritzker ("Pritzker Reply Decl.") Ex. 52 (Rule 30b6 deposition excerpts of Google designee Suneeti Vakharia ("Vakharia 30b6 Dep.") at 129:17-131:12; 274:22-275:8; 275:10-15; 294:6-18.

[2] Mr. Deal, Google's damages expert (*see id* at ¶4), incorrectly claims Google cannot do so, relying, in part, on a hearsay, unrecorded "interview" with Google engineer Stan Belov. *See id*. at ¶¶41-44, fns. 44-49.  Plaintiffs separately move to exclude Mr. Deal's testimony on these and other grounds.

[3] RTB auctions can occur when an account holder is signed-in or signed-out, and Google can identify class members in either state. Google previously told the Court it was "preserving information sufficient to identify signed-in users who were subject to an RTB bid request[,]" ECF 248 at 5. For signed-out account holders, Google can and does identify these accounts with Biscotti IDs, in turn linking (aka mapping) to an individual's Google account via GAIA IDs. *See* Shafiq Rep. ¶96-98; Shafiq Rebuttal Report ("Shafiq Reb.") ¶¶98-107. Dr. Berntson confirmed that Google stores signed-out communications in "█████" ("Biscotti-Keyed" logs), and can associate ████████████ ██████████████." *Id*. at 215:6-216:23; 219:4-10; 225:13-226:4.

relies on ████████████████████████████████████████. Vakharia 30b6 Dep., 66:24-70:21; Berntson 30b6 Tr. at 110:15-111:18; 115:6-117:7; 150:23-151:15.[4] It is nonsensical to suggest plaintiffs must meet a speculative standard ginned up by a hired expert with no technical expertise instead of relying on what Google itself relies on to comply with applicable law.

Plaintiffs' proposed class definition is sufficiently "precise, objective and presently ascertainable": class membership is defined by objective criteria applicable to the class as a whole, and Google can reasonably identify individual class members from its own databases and logs. *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 483 (N.D. Cal. 2011) (internal citation omitted)). This satisfies the minimal definitional standards for certification required by courts in this District.

### B. There Is One Common Contractual Promise That Applies Across the Class

Google does not challenge that there is common proof in Google's ToS, Privacy Policies and related disclosures of its promise that it will not sell or share class members' personal information outside of Google. *See* Mot. at 8. Google admits: (a) that all U.S. account holders ████████ ████████████████████████████ in order to create a Google account[5]; (b) that all U.S. account holders are ████████████████████████[6]; and (c) that there are no ████ ████████████████████████████████████████████████████████████████.[7] Google does not deny that it explicitly promises it will *not* engage in the conduct at issue. Remarkably, Google admits it ████████████████████████████████████████████████ ████████████████████████████████████████████.[8] This admission applies to the entire proposed class.

This is the precise type and form of evidence that courts look to in assessing whether there is common contract to which Google and all class members are bound. *See In Re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 610 (9th Cir. 2020). Claims that arise from common form contracts,

---

[4] Dr. Wilson similarly opines VPN use has no impact on RTB participants' ability to reasonably link or associate bid request data with a class member or his or her household. *See* Ex. 44, Wilson Rebuttal Report ("Wilson Reb.") at ¶¶121-125; Ex. 43, Shafiq Reb. ¶¶ 60-62, 66c-d, 93-95. This is unrebutted by any evidence about VPN use by Google account holders.
[5] Ex. 52, Vakharia 30b6 Dep. at 66:24-67:21, 214:21-215:12, 248:11-25, 249:13-250:15.
[6] *Id.* at 66:24-67:21, 184:20-24.
[7] *Id.* and at 214:21-215:12.
[8] *Id* at 224:15-225:22, 274:22-275:8, 275:10-15, 278:7-17, 294:6-18, 295:6-11.

as here, "are particularly appropriate for class treatment." Newberg on Class Actions, § 3.24 (5th ed.).

**C.     Common Issues Predominate, Thus Satisfying Rule 23(b)(3)**

Google devotes most of its briefing to Rule 23(b)(3)'s requirements, but Google's arguments do not offer credible support that individualized issues, rather than common ones, predominate.

**1.     The At-Issue RTB Data is Uniform for Class Certification Purposes**

Virtually every Google RTB bid request produced so far (99.8%)--the ▮▮▮▮ bid requests produced by Google for the plaintiffs, the ▮▮▮▮ bid requests produced by The Trade Desk, and the ▮▮▮▮ bid requests produced by the New York Times—includes enough information for a sophisticated RTB auction participant (and they are all sophisticated) to identify, describe, be reasonably capable of being associated with, or reasonably linked, either directly or indirectly, with a class member or his or her household. See Shafiq Rep. at ¶¶88-89, Shafiq Reb. at ¶¶65-84; Wilson Rep. ¶¶ 50-79; Wilson Reb. ¶¶ 39-62.

Google claims this is not enough, and that the class cannot be certified because some bid requests may contain more data than others. See Opp. at 11-13. This intentionally misses the point. Uniformity for class certification purposes depends not on whether each bid request is identical in data and fields, but whether each bid request commonly contains enough total information to be deemed personal information under California law. The answer is yes, uniformly, for all ▮▮▮▮ bid requests that have been discussed by the parties in the briefing before the Court.[9] There is thus commonality and predominance with respect to plaintiffs' contract, privacy and CIPA claims.

Google and its technology experts strive mightily to ignore this fact. They speculate about ways bid requests vary based on some controls available to a user or publisher, or an account holder's use of a VPN. But this is speculation unsupported by *any* actual evidence. Google has not put forth even a single example of these controls being implemented in real life. None appear in the ▮▮▮▮ ▮▮▮▮ bid requests produced in the case.[10] Nor can Google explain why any of these would matter,

---

[9] See Shafiq Rep. at Sections V, VI. (analysis of plaintiff data/common set of data fields uniformly shared); Shafiq Reb. at ¶¶ 15-26 (same).

[10] Google refused to produce statistics about the frequency in which any user or publisher controls are actually implemented, other than one control, GAP, which has been used by only 4% of class members at any time during the class period. **Google admits** that GAP does not stop class member data from being shared. See Wilson Rep. (Ex. 3, ECF 545-6) at ¶103.

since *none of these controls ever stop class members from having their data shared or sold in Google RTB auctions*[11] – as Google's own witnesses acknowledge.[12]

Prof. Shafiq opines that the ▮▮▮▮ bid requests produced by Google for the plaintiffs uniformly include around 60 common fields that collectively can identify, describe, be reasonably capable of being associated with, or reasonably linked, either directly or indirectly, with a class member or his or her household.[13] Drs. Striegel and Psounis criticize Prof. Shafiq's data analysis, but both admit that his analysis is correct.[14] Google's experts notably refuse to do what RTB bid participants do in the real world: look at all of the data conveyed in a bid request. Instead, they consider certain fields in isolation.[15] But ignoring how Google RTB operates in the real world to argue that individualized issues might exist or predominate over common ones is to engage in speculation – and is no basis to deny class certification. Nor can such speculative, counter-factual analysis undermine the conclusions reached by Prof. Shafiq – conclusions that are realistic, based on the actual "representative" evidence produced in this case,[16] and supported both by Google's own internal documents and several peer-reviewed studies.[17]

Prof. Wilson opines that the ▮▮▮▮ bid requests produced by The Trade Desk and the NY Times, while containing some differences in terms of data and fields, still uniformly include, in virtually every instance (▮▮▮), enough data collectively to identify, describe, be reasonably capable of being associated with, or reasonably linked, either directly or indirectly, with a class member or his or her household.[18] Google's experts' criticisms do not withstand scrutiny because, as it turns out,

---

[11] Wilson Rep. ¶¶ 80-124; Wilson Reb. ¶¶ 70-134.

[12] Ex. 55, Wolfstein Dep. 46:10-20 (confirming no controls that allow users to opt out of RTB); Berntson 30b6 Dep. 59:19-60:4 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), 165:12-17 (acknowledging that GAP setting has no effect on a signed-out Google account holder).

[13] Shafiq Reb. at ¶¶ 12, 37, 41-89.

[14] Shafiq Reb. at ¶¶19, 71. This is so even though Google's technical experts never looked at all of the data Prof. Shafiq analyzed, and instead considered only what Google's lawyers elected to provide them. *Id.* at 8a, 18, 72; *see also* Ex. 54, Striegel Dep. 19:12-19, 55:25-56:6.

[15] Shafiq Reb. at ¶¶15-26, 65, 72.

[16] Discovery Order re November 21, 2022 Discovery Dispute, December 16, 2022, ECF 382.

[17] *See, e.g.*, Shafiq Rep. at ¶¶28-68, 78 (internal documents), 76-77, 82-88 (peer-reviewed research); Shafiq Reb. at ¶¶30, 45, 50, 52 (internal documents); 40, 42 (peer-reviewed research).

[18] Wilson Reb. ¶¶13, 57-60. These deficiencies render the data entries in the table presented at p. 9 of Google's opposition memorandum meaningless and unreliable. Opp. at 9.

they look at the wrong data sets, focus on the wrong data fields, misrepresent what the data actually shows, and refuse to look at the data collectively, as is done in the real world.[19] This methodologically flawed and incomplete litigation-driven analysis fails to give rise to individualized issues that result in material differences in Google's conduct or its impact as to the claims of individual class members – let alone predominant ones. *See Van v. LLR, Inc.*, 61 F.4th 1053, 1067 (9th Cir. 2023).

        2.      **Google's Speculative Individualized "Consent" Defense Lacks Merit**

Plaintiffs' California Information Privacy Act claim contains the common affirmative defense of consent. Mot. at 18. "Consent 'can be explicit or implied, but any consent must be actual.... In order for consent to be actual, the disclosures must 'explicitly notify' users of the practice at issue." MTD Order at 16; *accord Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012). Google does not dispute that it promises class members that it "will not sell your personal information to anyone" and "do[es] not share personal information … outside of Google." ***Nowhere*** in its ToS or Privacy Policies does Google disclose that, contrary to this promise, it *in fact* shares with and sells to hundreds of companies class members' personal information in RTB auctions. ▓▓▓▓▓.[20] Google also admits ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[21] There is thus common evidence that Google uniformly fails to "explicitly notify" class members of "the practice at issue," i.e., common evidence defeating actual consent. MTD Order at 16; *accord In re. Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 545 (N.D. Cal. 2018), *aff'd*, 932 F.3d 1264 (9th Cir. 2019).

Google speculates that "individual class members could have learned of the challenged practices" - Google's sharing and selling of account holders' personal information in RTB - "in different individual ways." Opp. at 14. None of these arguments have factual or evidentiary merit, let alone demonstrate "actual consent."

***Google Disclosures and Settings.*** Google ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[19] Wilson Reb. ¶¶39-75; Shafiq Reb. ¶¶6-8, 14-63

[20] Ex. 52, Vakharia 30b6 Dep. at 99:8-100:19, 158:8-159:2, 274:22-275:15, 276:10-18, 277:1-10, 278:7-17; *see also* Ex. 5 (ECF 545-9), Expert Report of Prof. Neil Richards ("Richards Rep.") at ¶¶75-83, 119, 126-127, 130-131; Ex. 47, Richards Rebuttal Report ("Richards Reb.") at 74-81.

[21] Ex. 52, Vakharia 30b6 Dep. at 294:6-18; Ex. 55, Wolfstein Dep. at 46:8-20.

1  ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊
2  ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊.[22] Google admits
3  that it "▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊."[23] Nonetheless,
4  Google claims that embedded website links outside of its ToS that say that "Google collects data
5  when users interact with its services," that "Google uses 'your interests' to show personalized ads,
6  including on sites that partner with Google to show ads," or that Google "may share non-personally
7  identifiable information publicly and with our partners – like publishers, advertisers, developers or
8  rights holders," *may* have been read by class members, entitling Google to assert that individual class
9  members *may* have "impliedly consented" to having their personal information sold and shared in
10 RTB auctions billions of times a day, even though Google told them it would not do so. Opp. at 15.
11 This argument fails because these excerpts do not disclose that Google shares and sells personal
12 information outside of Google, let alone explain Google RTB or the vast auction system that shares
13 class member personal information billions of times with hundreds of companies. Given this lack of
14 disclosure, no class member could consent to the conduct as issue. *See* MTD Order at 12, 16-17.[24]

15 Google claims that class members might limit exposure to RTB through various settings,
16 speculating that some class members may always manage to keep them enabled. But Google has not
17 introduced evidence that any user setting, including GAP, prevents any account holder's data from
18 being shared with or sold to companies via Google RTB. To argue that such controls, should they
19 ever be perfectly enabled by an account holder,[25] provide implied consent to Google's RTB practices,
20 all the while knowing that these controls don't stop the sharing or sale of account holder personal
21 information through RTB, renders any legal argument of "actual consent" meaningless. Google offers

---

[22] Ex. 52, Vakharia 30b6 Dep. at 49:15-18; 274:6-18; 274:22-275:8; 275:10-15; 295:6-11.

[23] Ex. 52, Vakharia 30b6 Dep. at 62:18-63:7; *see also* Ex. 47, Richards Reb. ¶74-80.

[24] Google's vague references to "business partners" are insufficient for consent purposes. The average Google account holder would not reasonably consider Facebook/Meta, NBC Universal, or a data broker like Xandr, or hundreds of other companies that participate in Google RTB, to be "partners" in Google's business. ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ in its contracts with such entities. Ex. 47, Richards Reb. ¶81; Ex. 50 (excerpts of Google RTB contracts).

[25] Google provides no evidence that anything more than a de minimis amount of users ever engaged any purported "control," let alone a sufficient number for them to work. Google's failure to present such evidence that is solely within its own possession is even more glaring given that ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ Ex. 51, Berntson 30b6 Dep. Tr. 136:19-137:16.

no authority for this absurd construction, and the Court should reject it.

*Publisher Settings and Websites.* Google points to a collection of screenshots from third-party websites to argue that class members *might* have actually consented to Google RTB because some of them *may* have read third-party statements about ads personalization. *See* Opp. at 16-17. Google's reliance on third-party statements that conflict with its own express contractual promises is contrary to Ninth Circuit law. *WPP Lux. Gamme Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1051 (9th Cir. 2011) ("[e]xtrinsic evidence may not be used to contradict unambiguous express contractual terms"). The proposition that class members must look to third parties to learn that Google is breaching its own promises is inconsistent with the law of actual consent, which requires that the defendant provide notice of its own practices. Even if the third-party website statements were relevant, none disclose Google's RTB auctions at all, Google's role in them, what is shared, the scope of Google's RTB business, or that Google is breaching its express promises. "Google RTB" and "Google real-time-bidding" do not appear *anywhere* in the materials put before the Court.[26] This "critical fact" "undermines Google's argument" that any account holder could have impliedly consented based on what else they "knew, read, saw, or encountered." Opp. at 14:7-10. *See* MTD Order at 12 (quoting *Facebook Tracking*, 956 F.3d at 603) (cleaned up); *see also Campbell v. Facebook, Inc.*, 315 F.R.D. 250, 266–67 (N.D. Cal. 2016).

*Foreign Press and Tech Blogs.* Straying even further afield, Google turns to two foreign press articles (from the BBC and a South African newspaper), a business newsletter (PR Newswire), and three technical blog posts that seek to report on Google RTB and its implications for data privacy – and which, Google maintains, contain *inaccurate* information. *See* Opp at 17-18. Google claims that because these articles exist, Google obtained consent from account holders, but provides no evidence that *any* U.S. account holder read these materials. Nor is it reasonable for U.S. account holders to read British and South African websites and tech-heavy industry blogs to discover that Google's clear and unequivocal promise to not share or sell their personal information to companies is untruthful.[27]

---

[26] *See* Ex. 47, Richards Reb. ¶¶84-86.

[27] Google's cases are distinguishable. None involved unequivocal and affirmative misrepresentations like those here. *See Brown v. Google LLC*, 2023 WL 5029899, at *8 (N.D. Cal. Aug. 7, 2023) (rejecting Google's consent-based arguments and noting the "silence" of its Privacy Policy on the challenged conduct); *Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *11 (N.D. Cal. Mar.

Ex. 47, Richards Reb. ¶¶84-87. This "dearth of evidence regarding implied consent" is fatal to Google's consent-based challenge to certification. *Brown*, 2022 WL 17961497, at *18 ("[A] defendant must present non-speculative evidence that an affirmative defense would require individualized inquiries to defeat the predominance inquiry.").

**The Hanssens Study.** Ignoring Google testimony that consumer surveys ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓,[28] Google argues individualized issues of implied consent *may* be drawn from the consumer surveys set forth in the Hanssens Report, which did not even address the issue in this case.[29] There are several methodological problems with this study, which the Court may consider in evaluating its reliability and conclusions. These include "selection bias," lack of expertise in issues of data collection and data privacy, and quantitative errors.[30] Even setting aside these issues, the Hanssens study is deficient because it, too, does not query or inform survey participants about the nature of Google RTB or its breadth. Indeed, the Hanssens study does not even mention Google RTB. Ex. 47, Richards Reb. ¶¶46-58; Ex. 57, Hanssens Dep. at 282:25-283:11; 287:13-17.

      3.      **Common Issues Predominate Regarding the Relief Plaintiffs Seek**

Plaintiffs presented methods for calculating class-wide damages based on an unjust enrichment model and a market value model. Mot. at 22-23. Google's expert, Bruce Deal, takes issue with some details regarding implementation of these models, suggesting different inputs would change the numbers. His critiques are based on flawed assumptions, unsupported factual assertions, and erroneous claims. To the extent any have merit, plaintiffs' models provide a reasonable basis of computation of damages that can easily accommodate new inputs based on common class-wide evidence. *See Pulaski & Middlemen, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015).

---

30, 2023) (it was "undisputed that TWC's Privacy Policy explicitly disclosed the practices at issue"); *In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2014 WL 1102660, *15 (N.D. Cal. Mar. 18, 2014) (characterizing Google's disclosures as "vague at best, and misleading, at worst"). Google's description of *Edquist v. Bidz.com, Inc.*, 2013 WL 1290130 (D. Mass Mar. 29, 2013), is inaccurate—the court did not find individualized issues regarding "whether class members had read 'qualifying terms' outside the contract" (Opp. at 14:20-23). Rather, the court acknowledged that, in addition to the website's "100% Money Back Guarantee" representation, the auction website's terms were also part of the unilateral contract. *Id.* at *1.

[28] Ex. 52, Vakharia 30b6 Dep. at 205:13-206:10.

[29] Hanssens Dep. at 31:6-25; Hanssens Rep. ¶¶11-12 (Hanssens was retained to report on the survey).

[30] Ex. 45, Zeithammer Rebuttal Report ("Zeit. Reb.") ¶¶122-311; Richards Reb. ¶¶ 22-36; 42-50.

**Unjust Enrichment Model**. Based on a meta-analysis of experiments, including Google's own "hold-back" experiments (which measured the revenue effect of holding back user data from RTB bid requests), plaintiffs' expert Prof. Zeithammer opines that Google derives approximately 51.1% of RTB revenues from the sale of personal information. Mot. at 22 (citing Zeit Rep. ¶¶12-14, 18-63, 81, 98). Plaintiffs' other damages expert, Greg Regan, applied the 51.1% allocation to Google's gross RTB revenues for U.S. account holders to determine gross profits subject to disgorgement under a class-wide unjust enrichment remedy. Mot. at 22 (citing Regan Rep. ¶¶35-53).

Under California law, unjust enrichment focuses on past events with the object of stripping the defendant of a wrongful gain. Ex. 46, Regan Rebuttal Report ("Regan Reb.") ¶¶34-38. For this reason, plaintiffs appropriately considered Google's RTB revenues and removed the portion that Google generated without using personal information. *Id.* Mr. Deal asserts that this methodology should be *expanded* to include potential profits Google *could* make, including in different business segments, in a hypothetical "but-for" world in which Google stopped selling personal information in RTB (Deal Rep. ¶¶56-59), and that maybe these hypothetical revenues *could* even increase Google's overall profitability (*id.* ¶¶12, 67). In addition to being speculative and untested, Mr. Deal's proposition conflates a lost profits analysis with an unjust enrichment calculation. Regan Reb. ¶38. As stated in the Restatement 3d, to calculate unjust enrichment the "court must determine the proportion of [defendant's] overall profits that is derived from [the wrongful conduct] *as distinct from its other activities*." *Id.* ¶39. There is no basis for subtracting such hypothetical profits. *Id.* ¶¶37-42.

Mr. Deal's "but-for" analysis is built on a series of erroneous claims. Zeit. Reb. ¶¶26-40. The Zeithammer Report "focused on apportioning Google's overall RTB revenue." *Id.* ¶14. However, Mr. Deal claims that [internal bidders] ███ and Google Ads are "not at issue" even though "███████████████████████████████████████████████]" because "██████████████████████████████████████████████████████." Deal Rep. ¶48. Mr. Deal is wrong. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████ Zeit. Reb. ¶¶48-58. This is confirmed by Google's response to the Texas AG, which states that ████████████████████████

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Regan Reb. ¶45, discussing GOOG-HEWT-00047091 at 094. As a result, RTB bids by internal bidders (▇▇ and Google Ads) compete with third-party bids driven by shared user data in the same auction, and the internal bidder's strategic response to the third-party bids therefore incorporates the value of shared user data, in turn, placing the internal bids "at issue." For the same reason, it is incorrect to focus only on auctions won by external bidders. Zeit. Reb. ¶¶58, 73 ("Since auction revenues result from a strategic interplay between bidders, it only makes scientific sense to consider the overall auction revenue").[31]

Mr. Deal's related assumption that in his but-for world Google's profits from internal bidders would stay the same or improve runs afoul of "standard auction theory" which "shows that if external bids fell due to less information being transmitted to them, the internal bidder would rationally lower their bids in response to the softer price competition from the outsiders." Zeit. Reb. ¶43. Mr. Deal assumes that "bidders just bid without any regard to the competition they are facing." Zeit. Reb. ¶68, discussing Deal Rep. ¶58. "No company, and certainly no company as sophisticated as Google, would commit such a blunder." Zeit Reb. ¶68. Mr. Deal's speculation that advertisers would simply switch to other Google advertising products is unfounded (*id.* ¶¶97-101) and the prediction that Google as a whole would make more profit is "inconsistent with basic Economics" (*id.* ¶¶102-105). Mr. Deal's critiques taken together "reveals a profound misunderstanding of how auctions actually work" and shows that Mr. Deal's but-for world analysis is not only unsupported by empirical evidence, but also wrong given established theory in economics. *Id.* ¶¶59-75.[32]

Prof. Zeithammer also considers the implications of Mr. Deal's (erroneous) but-for world, and determines that the effect of not sharing user data in RTB requests would actually *increase* Google's losses to ▇▇▇▇▇▇ in Mr. Deal's but-for world, focused only on revenue from external bidders. Zeit. Reb. ¶¶83-84. His revenue reduction of 51.1% is thus conservative. *Id.* ¶¶106-109. Prof. Zeithammer demonstrates that Mr. Deal's other claims are also erroneous: providing empirical evidence that there is no time trend in the magnitude of the effect of user data on Google RTB revenue (Zeit Reb. ¶¶87-91), providing evidence that the holdback experiments in question did indeed

---

[31] Mr. Deal's assertion that plaintiffs agreed these revenues are not at issue is wrong. Zeit. Reb. ¶50.
[32] Internal Google documents confirm that "much of the revenue is lost when personal identifiers are unavailable in RTB bid requests, and recovery of the lost revenue is weak." Zeit. Reb. ¶¶103-105.

measure the entire Google RTB revenue (*Id*. ¶¶92-95), and explaining how Alcobendas et al (2021) focused on total RTB revenue in their simulations (*Id*. ¶96).

Mr. Deal also contests the validity of the spreadsheet ***produced by Google*** to show total RTB revenue from U.S. account holders (Regan Rep. Sched. 1), arguing it includes non-Google account holders and users not subject to a U.S. ToS. Deal Rep. ¶¶40-41. Mr. Deal provides **no evidence** that Google's own spreadsheet's revenue numbers are materially inaccurate. Plaintiffs put forth a reasonable approximation of the amount of the wrongful gain. It is Google's burden to resolve uncertainty in the net profit calculation. *Id*. ¶¶9-11. It has not. In the absence of such evidence, plaintiffs are entitled to rely on Google's production as the best available evidence of these revenues. Regan Reb. ¶¶12-15. If such evidence is produced, it will be basic math to adjust the numbers, but does not render class treatment improper.

Mr. Deal's assertion that Google cannot identify RTB revenues generated from U.S. account holders is specious. First, Mr. Deal's sole basis for this claim is his secret interview with Mr. Belov. Regan Reb. ¶20. His citations to this conversation are unreliable: no record exists and the subjects are technological and outside his expertise. Second, Mr. Deal is wrong. Google admits that it ***does*** have data to determine the proportion of RTB revenue attributable to account holders versus non-account holders (*id*. ¶¶17-22), and that Google can analyze RTB revenue on a country-specific basis for regulatory reasons, including for CCPA and GDPR purposes (*id*. ¶¶24-30; *see also supra* 2-3). Third, Mr. Deal's speculation that some non-U.S. VPN users may fall within the U.S. revenue data produced by Google is wholly unsupported. The findings of Prof. Shafiq and other evidence indicate that VPN usage, if any, is immaterial to the calculation. *Id*. ¶¶24-27; Shafiq Reb. ¶¶92-95.

**Market Value Model**. As an alternative class-wide damages analysis, Prof. Zeithammer proposes a market value model based on analysis of four vendors that pay consumers for their personal information, one of whom is Google itself. Zeit. Rep. ¶¶15-17, 84-97, 100.[33] In response, Mr. Deal argues these are not comparable benchmarks because some data fields collected by some data buyers are not shared in Google's bid requests. Deal Rep. ¶¶76, 85. Mr. Deal is wrong again, because the monthly price paid by the data buyers is not related to the number of data types. Zeit.

---

[33] *See Brown*, 2022 WL 17961497, at *5-7 (accepting *Screenwise*-based damages model).

Reb. ¶113. This is because the actual asset at issue "is privacy, i.e., willingness to be subject to digital surveillance, not a specific set of data fields." *Id.* ¶114. All four data buyers paid to track individuals and the key data fields, the persistent personal identifiers that enable digital surveillance, are collected by each of them. *Id.* ¶115. The valuation literature recognizes that it is almost never possible to identify identical assets to use as a benchmark. Instead, valuation standards recognize that market data is most often similar in nature and may be adjusted to the subject of the valuation analysis." Regan Reb. ¶48. Here, the four vendors – including Google - are paying users to share data that is sufficiently comparable to data shared in RTB bid requests. Zeit Reb. ¶115.[34]

**Allocation Methodology.** Mr. Regan, proposes a method to fairly allocate any aggregate damages awarded to all class members on a *pro rata* basis based on the number of months each class member has maintained an active Google account during the class period. This calculation is knowable: Google has records for all class members identifying when they first signed up for a Google account. Regan Rep. ¶¶54-57, 62-65; Regan Reb. ¶¶71-75; Shafiq Rep. ¶¶90-91. ECF 248, at 5. Google lacks standing to challenge plaintiffs' allocation methods. *Brown*, 2022 WL 17961497 at *7 (citing *Six (6) Mexican Workers v. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990)).

### D.   Class Members' Privacy Expectations Are Subject to Classwide Proof

The question of whether class members have "reasonable expectations" of privacy is subject to common proof of broadly based and widely accepted community norms, not their subjective expectations. *Hill v. NCAA*, 7 Cal. 4th 1, 37 (1994); *Opperman v. Path, Inc.*, 2016 WL 3844326, at *11 (N.D. Cal. July 15, 2016). Plaintiffs put forward a privacy expert and trained historian, Prof. Richards, to provide expert testimony to aid the Court in understanding the community norms of privacy and data privacy that are implicated by Google's RTB practices.[35] Google argues that Prof. Richards opinions should be accorded no weight (Opp. at 19-20), for two flawed reasons.

---

[34] Mr. Deal argues that Google's *Screenwise* program is not analogous because it involves "continuous data collection." Deal Rep. ¶86. He ignores that "Google RTB is so ubiquitous that the surveillance it facilitates is just as continuous as the surveillance *Screenwise* members agree to." Zeit. Reb. ¶117. Mr. Deal's comment that some of the data *buyers* are no longer active does not deny that they were all active throughout much of the relevant time. *Id.* ¶118. And Mr. Deal's analysis of what is shared in *Screenwise* is just wrong, in no small part because he never looked at data flow or relied on any technical expert – not even Google's. *See* Ex. 56, Deal Dep. 64:19-65-9.

[35] Richards Rep. ¶¶1, 11-89; Richards Reb. ¶¶3, 29-41.

First, Google asserts that Prof. Richards' opinions improperly address an ultimate question of law that only the Court can resolve. Opp. at 19. That is incorrect. As is typical in cases involving societal values and individual rights, and as he has done without criticism in other matters, Prof. Richards offers his analysis of history, legal history, and privacy law – all of which are plainly within his area of expertise – to provide background and context to the Court in deciding the crucial question of whether account holders have a reasonable expectation of privacy in light of the disclosures at issue and the context of this case.[36] He has not improperly invaded the province of the Court, and has carefully stayed within his lane of knowledge and expertise.

Second, Google faults Prof. Richards for not conducting a consumer survey. But this Court has held that "[a]n expert who offers testimony on the question of what a reasonable consumer is likely to do and/or think is not required to conduct a consumer survey if his testimony is otherwise reliable." *Brown*, 2022 WL 17961497, at *11, n.8; *accord Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 401 (N.D. Cal. 2021). Google ▆.[37] What Prof. Richards did do is a qualitative, historical study of societal privacy norms, grounded in academic literature, supplemented by research and analysis of informational privacy practices and laws (and societal values expressed in those laws), and a review of materials produced in this case. Richards Rep. ¶¶1, 11-89; Richards Reb. ¶¶4, 11, 19-20, 29-41.

Third, while Google criticizes Prof. Richards for not conducting a survey, the Hanssens survey itself doesn't actually assess, measure or analyze account holders' privacy expectations. And Prof. Hanssens admits he has ***no opinion*** on that subject. Richards Reb. ¶48; Hanssens Dep. at 33:5:12.

### E.  The Evidence Supports Certification of Plaintiffs' CIPA Claim

Plaintiffs' CIPA claim is supported by common proof that Google allows RTB participants to "read" or "attempt to read" or "learn the contents or meaning of "class member communications as part of the Google RTB process. Shafiq Rep. ¶42; Shafiq Reb. ¶¶44-47; Richards Rep. ¶¶90-100. And, proof that Google's action's occurred while the communications were "in transit" is common to all class members. *See, e.g., In re Yahoo Mail Litig.*, 308 F.R.D. 577, 591 (May 26, 2015). Google's new factual assertion that RTB bid requests ultimately "emanate" from points outside of California,

---

[36] Richards Rep. ¶¶1, 11-129; Richards Reb. ¶¶29-41.
[37] Ex. 52, Vakharia 30b6 Dep. at 205:13-206:10.

██████████████████████████████████████

████████[38], is not a substitute for the evidence the Court ordered Google to provide more than a year ago: that "at least one Google RTB recipient or publisher received the communications at issue while they were not located in California." MTD Order (ECF 233) at 17:10-16. Google has not complied. Pritzker Decl. ¶13.

### F.  Classwide Injunctive Relief Under Rule 23(b)(2) is Proper and Warranted

Google complains that plaintiffs' injunctive relief claim "effectively seeks to halt the operation of RTB." Opp. at 25. Not so. Plaintiffs seek an order that Google cease its false representations that it "will not," does not" and will "never" share with or sell to companies the personal information of its U.S. account holders; that Google truthfully disclose precisely what information it in fact shares and sells with RTB participants and for what purposes; and that Google provide an effective mechanism to its U.S. account holders that they can use to decide whether they do or do not consent to Google's sharing and sale of their personal information to companies in Google RTB. Mot. at 25; Pritzker Decl. ¶44.

The requested injunctive relief is logically tied to the claims, legal theories and continuing privacy harms alleged, and provides full class relief here. In a recent CCPA action by the California AG against Sephora, the retailer must disclose to consumers the material facts about the categories of information it shares, sells or makes available to third parties on monetary or beneficial terms-- such as in the form of ads targeting specific customers—and cease telling its customers "that we do not sell personal information."[39] These terms, in the State's view, provide Sephora customers the protections afforded by California law. Google U.S. account holders whose privacy and data privacy rights continue to be impacted by Google RTB would also benefit from such injunctive relief here.

### III.  CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that the Court grant their motion for class certification.

---

[38] Ex. 51, Berntson 30b6 Dep. at 122:13-124:9.
[39] A copy of the Sephora settlement is available for download at https://oag.ca.gov/system/files/attachments/press-docs/Filed%20Judgment.pdf.

| | | |
|---|---|---|
| 1 | DATED: November 29, 2023 | Respectfully submitted, |
| 2 | | |
| 3 | | **PRITZKER LEVINE LLP** |
| 4 | | By: */s/ Elizabeth C. Pritzker* |
| 5 | | Elizabeth C. Pritzker (Cal. Bar No.146267) |
| 6 | | Jonathan K. Levine (Cal. Bar No. 220289)<br>Bethany Caracuzzo (Cal. Bar No. 190687) |
| 7 | | Caroline Corbitt (Cal Bar No. 305492)<br>1900 Powell Street, Ste. 450 |
| 8 | | Emeryville, CA 94608<br>Tel.: (415) 692-0772 |
| 9 | | Fax: (415) 366-6110 |
| 10 | | ecp@pritzkerlevine.com<br>jkl@pritzkerlevine.com |
| 11 | | bc@pritzkerlevine.com<br>ccc@pritzkerlevine.com |
| 12 | | |
| 13 | | *Interim Class Counsel* |
| 14 | | **BLEICHMAR FONTI & AULD LLP**<br>Lesley Weaver (Cal. Bar No.191305) |
| 15 | | Anne K. Davis (Cal. Bar No. 267909)<br>Joshua D. Samra (Cal. Bar No. 313050) |
| 16 | | 1330 Broadway, Suite 630<br>Oakland, CA 94612 |
| 17 | | Tel.: (415) 445-4003 |
| 18 | | Fax: (415) 445-4020<br>lweaver@bfalaw.com |
| 19 | | adavis@bfalaw.com<br>jsamra@bfalaw.com |
| 20 | | |
| 21 | | **SIMMONS HANLY CONROY LLC**<br>Jason 'Jay' Barnes (admitted *pro hac vice*) |
| 22 | | An Truong (admitted *pro hac vice*)<br>Jenny Paulson (admitted *pro hac vice*) |
| 23 | | 112 Madison Avenue, 7th Floor<br>New York, NY 10016 |
| 24 | | Tel.: (212) 784-6400<br>Fax: (212) 213-5949 |
| 25 | | jaybarnes@simmonsfirm.com |
| 26 | | atruong@simmonsfirm.com<br>jpaulson@simmonsfirm.com |
| 27 | | **DICELLO LEVITT LLP** |
| 28 | | David A. Straite (admitted *pro hac vice*)<br>485 Lexington Avenue, Suite 1001 |

Tel.: (212) 784-6400
Fax: (212) 213-5949
New York, NY 10017
Tel: (646) 993-1000
dstraite@dicellolevitt.com

James Ulwick (admitted *pro hac vice*)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
julwick@dicellolevitt.com

**COTCHETT PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
nnishimura@cpmlegal.com
bdanitz@cpmlegal.com
kswope@cpmlegal.com

**BOTTINI & BOTTINI INC.**
Francis A. Bottini, Jr. (Cal. Bar No. 175783)
7817 Ivanhoe Ave., Ste. 102
LA Jolla, CA 92037
Tel.: (848) 914-2001
fbottini@bottinilaw.com

*Counsel for Plaintiffs and the Proposed Class*