# Exhibit 47

# REDACTED VERSION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF
PROFESSOR NEIL RICHARDS

NOVEMBER 29, 2023

REDACTED VERSION

i

# TABLE OF CONTENTS

**Page**

I.      Background…………………………………………………….……..     1

II.     Executive Summary of Rebuttal Opinions………………………………..     3

III.    Opinions…………………………………………………………………...     4

    A.  Professor Hanssens' Critiques of My Work Lack Support
        and Are Unreliable………………………………………………………..     4

        1.     Professor Hanssens Lacks an Understanding
            of My Opinions……………………………………………………..     6

        2.     The Historical Methods on Which I Base My Expert
            Opinions and Testimony Are Generally Accepted,
            Informative, and Reliable……………………………………………..     10

        3.     The Hanssens Surveys are Methodologically Flawed –
            And Admittedly Do Not Even Analyze Privacy Norms
            or Expectations………………………………………….……………..     15

        4.     The Other Critiques in the Hanssens Report Do Not
            Stand Up to Scrutiny……………………………………………………     21

    B.  Mr. Deal Lacks the Qualifications to Assess My Opinions –
        Or to Offer His Own……………………………………………….……..     26

    C.  Google's Corporate Witness, Suneeti Vakharia, Agrees
        With My View That Google Does Not Disclose Google's
        RTB Auctions To Its Account Holders Or Provide Them
        With Any Mechanism To Agree To Having Their
        Personal Information Shared Or Sold In RTB……………………………...     34

    D.  Third-Party Website Information Submitted By Google
        Does Not Disclose RTB Nor Seek Consent For Google To
        Engage In RTB……………………………………………………………     39

## I.      Background

1.      Counsel for plaintiffs in this action ("Counsel") retained me to render opinions concerning the issues of privacy and of Google's conduct at issue in this litigation.

2.      On July 14, 2023, I submitted a report in which I analyzed issues related to Google's Terms of Service, Privacy Policies, disclosures, and data use and sharing practices; my understanding of the nature and volume of information about or associated with U.S. Google account holders that Google offers for sale or sells to third-party organizations in the Google RTB auctions; and the historical and cultural foundations that underlie societal norms in the United States ("Richards Report").

3.      The Richards Report, and the opinions expressed therein, are intended to be helpful to the Court in understanding societal privacy norms and how those norms are implicated by the actions Google takes in its RTB auction. In rendering those opinions, I applied my 25 years of professional research, instruction, and authorship on issues such as the historical importance of privacy and the continued importance of societal privacy norms, privacy rights, and privacy protections in the field of informational privacy.

4.      My detailed CV was included as Attachment A to the Richards Report. My detailed CV was included as Attachment A to the Richards Expert Report. Of particular note:

- I earned a Master's Degree in Legal History at the same time I earned my Juris Doctor Degree from the University of Virginia.

- I clerked for Chief Justice William H. Rehnquist of the United States Supreme Court and Judge Paul Niemeyer of the United States Court of Appeals for the Fourth Circuit.

- I am the Koch Distinguished Professor in Law at Washington University in St. Louis School of Law, and the Director of the University's Cordell Institute, an endowed center devoted to questions of privacy, information and health policy.

- I am an affiliate scholar with the Stanford Center for Internet and Society, the Yale Information Society Project, and the Berkman-Klein Center for Internet and Society.

- I serve as a Fellow with the Center for Democracy and Technology, and as an elected member of the American Law Institute.

- I have authored dozens of academic articles (and many other popular essays) on the history, theory, meaning, and contemporary state of U.S. and transatlantic privacy, security, and consumer data protection, having earned the distinction of being one of the top five most-cited scholars in these fields.[1]

- I am the author of two books on privacy, *Intellectual Privacy* (2015), and *Why Privacy Matters* (2021), both of which were peer reviewed and accepted for publication by Oxford University Press.

- I have testified before the U.S. Congress on the topic of privacy law; twice spoken before the Federal Trade Commission ("FTC") regarding consumer data protection as well as the "notice and choice" regime governing consumer consent to data practices; and served as a testifying witness in the Irish High Court on behalf of the Irish government as an expert on U.S. privacy law in *Data Protection Commission v. Facebook Ireland Limited, Maximilian Schrems* (C-311/18) ("*Schrems II*"), a seminal privacy case.

5.      Counsel has asked me to review the Expert Reports of Professor Dominique Hanssens, Ph.D. and Bruce Deal, which I understand Google submitted to the Court on September 29, 2023, and rebut any points which I believe to be incorrect and/or not relevant to the question of whether the privacy claims in this case are appropriate for class-wide treatment.

6.      I was also asked to review a September 29, 2023 declaration of Google employee Suneeti Vakharia, and a September 29, 2023, declaration of an employee of a third-party vendor

---

[1] *10 Most-Cited Law & Technology Scholars in the US*, 2016-2020, BRIAN LEITER'S LAW SCHOOL REPORTS, https://leiterlawschool.typepad.com/leiter/2021/09/10-most-cited-law-technology-scholars-in-the-us-2016-2020.html. *See also* Fred R. Shapiro, *The Most-Cited Legal Scholars Revisited*, 88 U. CHI. L. REV. 1595 (2021).

hired by Google, Hunter Hanzarik, and also rebut any portions of those materials which I believe are incorrect and/or not relevant to the question of whether the privacy claims in this case are appropriate for class-wide treatment.

7.      I am being compensated for my work on this report at the rate of $750/hour. My compensation does not depend upon the outcome of the case. In the event of any recovery in this case, I understand that I will be excluded from the definition of any proposed or certified class and consent to such exclusion.

8.      In preparing this rebuttal report, I relied upon the materials cited herein and listed in Appendix A, as well as the materials I considered in drafting the opening Richards Report and which are listed in Appendix B of that document. As with the Richards Report (ECF 545-9), I applied my knowledge and expertise as a trained legal historian, researcher, and scholar on U.S. societal privacy norms, privacy rights, and privacy protections in the information privacy field in forming my opinions here.

9.      This rebuttal report has been prepared for purposes of this case only. It may not be used for any other purpose.

## II.      Executive Summary of Rebuttal Opinions

10.     This section offers an executive summary of each of the opinions proffered in this rebuttal report.

11.     As described below in Section III.A, I offer a rebuttal to Prof. Hanssens' expert report. Prof. Hanssens is a marketing expert who admitted at deposition that he has no training or background in historical privacy norms and is not an expert on privacy issues presented by the technology at issue in this case. It is my opinion that in my field, such a critique from Prof. Hanssens would not be accepted as reliable.

12.     As described in Section III.B, I offer a rebuttal to certain opinions in the expert report of Google's expert Bruce Deal. Mr. Deal is an economic expert (not a privacy expert), retained to comment on the expert reports of two of Plaintiffs' experts (Professor Zeithammer and Mr. Regan) "to assess whether Plaintiffs' Experts have offered reliable class-wide methodologies for

calculating" damages. I offer no rebuttal to Mr. Deal's economic opinions, but unfortunately Mr. Deal strayed beyond his assigned role and also critiqued my expert privacy report. I therefore discuss below why privacy experts would consider Mr. Deal unqualified to offer privacy opinions, and also rebut his conclusions on substance.

13.     As described in Section III.D, Plaintiffs recently deposed Google's current Director of Google's Product Management on the Trust, Transparency & Consent team, Suneeti Vakharia, in her capacity as a 30(b)(6) corporate representative. I reviewed the transcript of her deposition and was pleased to see that in several places, she was forthright and confirmed two important conclusions in my initial Richards Expert Report. I discuss below how she confirmed my conclusions. Because her deposition took place after I submitted the initial Richards Expert Report, the transcript was unavailable at that time.

14.     Finally, as described in Section III.E, Google provided more than 60 exhibits (printouts of various privacy policies and terms of service on first-party websites, such as www.nytimes.com), attached to the declaration of Mr. Hanzarik, in support of its opposition to Plaintiffs' motion for class certification. Google advances several arguments regarding the import of these documents whether they bear on the conclusions in the Richards Report. They do not – and indeed, not a single one of the Hanzarik documents (selected by Google counsel, not Mr. Hanzarik, as he admitted at deposition) even mentions Google's RTB auction or discloses that Google might be selling or sharing personal information to third parties in violation of its contracts with consumers. Section III.E. below rebuts Google's position more fully.

## III.    Opinions

### A.    Professor Hanssens' Critiques of My Work Lack Support and Are Unreliable

15.     Prof. Hanssens states that he was retained by Google to design and conduct four online surveys that purport to glean information about Google account holders' knowledge of display advertising, and their experience with and exposure to it.[2] He also states he was asked by Google to

---

[2] Hanssens Rep., ¶ 11, 15.

"[e]valuate Prof. Richards' claims involving expectations of members of the Proposed Class about online privacy and the methodology [Prof. Richards] used to reach his conclusions."[3] I respond to each of these matters, in reverse order, below.

### 1. Professor Hanssens Lacks an Understanding of My Opinions

16.     It is my opinion that Prof. Hanssens is not qualified to assess the validity of the Richards Report, the opinions I relate there, or the methodology I used to reach those opinions, because he is not a historian, researcher, or privacy scholar, and has no expertise or background in privacy or the information privacy field.

17.     It is normal academic practice for scholars, regardless of discipline, to stay within the bounds of their methodological training, scholarship, and experience. In my initial report, as here, I strive to stay within the bounds of my expertise, knowledge and qualifications as a trained historian, legal scholar, and privacy expert to provide historical and societal context, background and understanding on the concepts of privacy and data privacy, and how these concepts may be considered by the trier of fact in reaching the ultimate questions in the litigation.

18.     Because quantitative marketing studies of consumers are not relevant to an objective "reasonable consumer" test used by California, this case does not require a survey to reach my conclusions. I did not attempt to construct such as survey as part of my expert engagement here because one is not necessary.

19.     Instead, I undertook a qualitative, historical study of societal privacy norms, grounded in historical and academic literature, supplemented by research and analysis of informational privacy practices and laws (and the societal values expressed in those laws), and a review of the materials produced by Google and plaintiffs' technical experts in this case. And, in formulating my opinions, I applied the scholarly methods I was trained in, peer reviewed in when being hired, receiving tenure, and then further promotion to a chaired professorship and then a distinguished chair, and that I continue to use in my scholarship, teaching, and training today. This

---

[3] *Id.*, ¶ 11.

method involves the critical use of available documentary evidence, the development of theories supported by the evidence, the citation of sources to show authority and permit reconstruction, and examination and testing of those findings and arguments in the light of real-world events, checking and contextualizing my findings by comparison to related academic research, and the conclusions of others trained in and knowledge of the subject area of inquiry. Historians call this process "the historical method" – it is the academic and scholarly method in which I was trained, and the method I use when producing my scholarship and when teaching, training and mentoring others.[4]

20.     Respectfully, while I stayed in my academic and scholarly lane to offer a historical perspective of recognized U.S. societal privacy and data privacy norms, Prof. Hanssens in his critique of my methods and conclusions does not.

21.     ***Prof. Hanssens is not an historian***. Prof. Hanssens is a retired distinguished research professor of marketing at UCLA Anderson School of Management, and a self-acknowledged expert in econometrics as applied to marketing.[5] He is frequently retained as a paid expert in litigation, testifying in roughly ten to twelve matters a year.[6] He is by his own admission not an historian.[7] His C.V. contains no reference to historical training, expertise in historical analysis, or academic scholarship, intellectual focus or scholarly interest in history or its academic discipline. He has not written any published historical works, nor engaged in any peer-reviewed analysis of history or historical societal norms.

22.     ***Prof. Hanssens is not a privacy expert***. Prof. Hanssens also appropriately acknowledges he also has no expertise in privacy, informational privacy, societal privacy norms, or

---

[4] There are numerous books written on the historical method by scholars from around the world, *see, e.g.,* R.G. COLLINGWOOD, THE IDEA OF HISTORY (1946); E.H. CARR, WHAT IS HISTORY? (1961); MICHAEL J. SALEVOURIS & CONAL NURAY, THE METHODS AND SKILLS OF HISTORY (1st ed. 1979; 4th ed. 2015); MARTHA HOWELL & WALTER PREVENTER, AN INTRODUCTION TO HISTORICAL METHODS (2001).

[5] Hanssens Dep. at 9:15-20.

[6] *See* Hanssens Report, Appx. B.

[7] *Id.* at 9:25-10:2 ("Q. You are not an historian? A. Historian? I use a lot of historical data but I would not call myself a historian.")

the legal and regulatory protections related to privacy, generally, or to informational privacy and data privacy, specifically. His C.V. contains no reference to training, expertise, academic scholarship, intellectual focus or scholarly interest in privacy or any legal or academic discipline related to privacy.

23.     Prof. Hanssens has not written any published works on privacy, nor engaged in any peer-reviewed analysis of privacy, information privacy, data privacy, or the historical societal norms related to privacy. He does not acknowledge ever having read any regulatory agency studies about Google RTB, or its implications on consumers' data security and data privacy.[8]

24.     When asked at deposition whether he is a privacy expert, Prof. Hanssens conceded that he is not.[9] He also acknowledged that he is not an information technology expert.[10] He struggled to answer deposition questions about consumers' "privacy interests," conceding that, as an econometrician with expertise in marketing, he doesn't understand the phrase or what it means, especially as it relates to Google account holder information transmitted by Google to third parties

---

[8] The Richards Report cites to concerns raised by members of the United States Senate on these issues. *See id.*, fn. 131 (citing Senator Ron Wyden (Oregon), et al., Letter to Hon. Joseph J. Simmons, Chairman of the Federal Trade Commission (FTC) urging FTC investigation of RTB, July 31, 2020. https://www.documentcloud.org/documents/7011637-073120-Wyden-Cassidy-Led-FTC-Investigation-Letter).

A report by the Irish Council for Civil Liberties, published just this month, echoes similar concerns – and raises particular concerns for data privacy and data security arising from Google's sharing with companies and state actors in China and Russia, data in the Google RTB auction about U.S. personnel (including location data, time-stamps, device IDs, and other identifiers) that can be easily linked to specific individuals and be used to spy on target individuals' financial resources, mental state, and intimate secrets. See JOHNNIE RYAN & WOLFIE CHRISTL, AMERICA'S HIDDEN SECURITY CRISIS: HOW DATA ABOUT UNITED STATES DEFENSE PERSONNEL AND POLITICAL LEADERS FLOWS TO FOREIGN STATES AND NON-STATE ACTORS, Irish Council for Civil Liberties (Nov. 15, 2023); available at https://www.iccl.ie/wp-content/uploads/2023/11/Americas-hidden-security-crisis.pdf

[9] Hanssens Dep. at 9:21-24 ("Q. You are not a privacy expert? A. Privacy expert? Well, I've done privacy cases in the past. So, it's an area of application, but in terms of unique focus of my work, no.")

[10] *Id.* at 10:7-9 ("Q. And you're not an informational technology expert? A. That is correct.")

in Google RTB.[11] It is therefore unsurprising that, when asked whether he has an opinion on whether or not the information transmitted by Google to third parties through Google RTB "has any aspects that relate to someone's right to privacy," Prof. Hanssens conceded he "do[es] not.[12]

25.     ***Prof. Hanssens spent "no appreciable time" analyzing my work.*** As I show in the Richards Report, as reflected in my C.V., and as I reiterated at my deposition, the historical analysis I bring to my opinions is steeped in my twenty years of training, scholarship, teaching, and expertise in the interdisciplinary fields of privacy, informational privacy, and data privacy, where I have been recognized as a leading expert in these fields. My initial report draws heavily on the academic literature in these areas, including peer-reviewed writings by me (and for which I have received awards for academic excellence and policy relevance) and by other esteemed experts in these areas.

26.     Having made the academic discipline of privacy my professional life's work, it was indeed surprising to learn that Prof. Hanssens admitted, at deposition, that he did not spend any "appreciable time" with my report nor with the various articles and academic works he cites in his report. Prof. Hanssens admitted his total work in this matter, from the time of his retention up to the time of his deposition, amounted to only "approximately 25 hours."[13] Prof. Hanssens conceded that "most" of his time on this engagement was "spent in meetings with Cornerstone[14] and reviewing drafts and sending drafts back and forth."[15] He estimates he spent "something like" six hours writing

---

[11] *Id.* at 32:6-11 ("Q. You're not offering an opinion in this report on whether or not consumers have a privacy interest in the information sent over Google RTB? MR. WONG: Objection. THE WITNESS: I am a – I'm sorry, but I don't understand the word 'privacy interest.'")

[12] *Id*. at 33:5-12 ("Q. You're not offering an opinion as to whether or not the information that is transmitted over Google RTB has any aspect that relate to someone's privacy? A. Ah. MR. WONG: Objection, legal conclusion. THE WITNESS: Okay. I do not. Thank you for clarifying that.")

[13] *Id* at 9:10-14 ("Q. Okay. And what is your total billing to date on this matter. A. It is approximately 25 hours. So, you can multiply through, and that would be through – through September [2023].").

[14] I am informed and believe that Prof. Hanssens' reference to "Cornerstone" refers to Cornerstone Research, a company that provides economic and financial consulting for parties in litigation and regulatory matters.

[15] Hanssens Dep. at 289:12-22.

his fifty-one page report[16], and "[a]nother three hours or so" evaluating the initial Richards Report.[17] However, when asked to estimate the time he spent reading or analyzing the legal authority or privacy literature concerning, in his words, a reasonable person's "expectations of privacy 'relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens,'"[18] Prof. Hanssens concedes his efforts in this regard were exceedingly minimal. He spent "***no meaningful time***" reading a motion to dismiss order he cites at footnote 89 of his report.[19] And Prof. Hanssens similarly expended "***no appreciable time***" researching, analyzing, or even reading the research and source materials listed in his report at footnotes 90, 93-97, 100 (a peer-reviewed article written by me entitled, "Four Privacy Myths," published [in revised form as part of an edited collection] by Cambridge Press in 2015), 108, 109, 124-27, and 130.[20]

27.     Given Prof. Hanssens' lack of expertise in historical research and analysis, and similar lack of expertise in the interdisciplinary fields of privacy, information privacy, and data privacy, it is my opinion that in academic circles, Prof. Hanssens critiques of my opinions about the importance of privacy as a societal norm and a fundamental right in the U.S. would be given no weight. He would also be considered equally unqualified to put forward the entirely conclusory position that the opinions I reach in the Richards Report "are based on unreliable and unsupported assumptions and unscientific analysis."[21]

28.     In sum, lacking any scholarly or professional expertise in privacy, information privacy, or data privacy, and having not read or analyzed the very research and source materials related to these issues cited in his own report (or conducted any peer-reviewed research on his own), it is my opinion that Prof. Hanssens would be considered unqualified by academics in the field to

---

[16] *Id.* at 289:23-25.

[17] *Id.* at 290:24-293:3.

[18] *See* Hanssens Rep., ¶ 70.

[19] Hanssens Dep. at 291:9-292:16.

[20] Hanssens Dep. at 291:25-300:5.

[21] Hanssens Rep. ¶ 67.

9

offer any opinions relating to privacy scholarship, or the methods of historical and qualitative analysis that I employed throughout the Richards Report, that are fundamental to one's understanding of the history of privacy, its importance as a societal norm, and data practices that affect consumers' reasonable expectations of privacy when they use the internet.

###  2. The Historical Methods on Which I Base My Expert Opinions and Testimony Are Generally Accepted, Informative, And Reliable

29. Prof. Hanssens does not challenge my qualifications as a trained legal historian[22] and privacy scholar,[23] or my ability to serve as an expert and evaluate case materials here in light of my extensive expertise, training and scholarship in these fields.[24] Nor does Prof. Hanssens take issue with any of my historical conclusions about the importance of privacy as a societal norm and fundamental right in the U.S.

30. Prof. Hanssens also does not take issue with the methodologies of historical analysis traditionally employed by trained social scientists, scholars in the humanities, and privacy academics, like me, *per se*. As he stated in deposition:

> "It all depends on how it's being done. I'm really – I'm totally fine with historical methods. As I said, I use them all the time. And in social science, it's a perfectly accepted method, but you need to look at the quality of execution. That's – well, I'm repeating myself, but that's my issue with Professor Richards.[25]

---

[22] Hanssens Depo. at 274:13-19 ("Q. You do not challenge Professor Richards' qualifications as a trained legal historian in the field of privacy? A. Probably not. Legal historian, I'm not sure exactly what that means, but he certainly works in the domain of privacy, and he's legally trained. So yes. Q. You don't challenge his qualifications?  A. No, no I don't. I don't.")

[23] *Id*. at 274:7-12 ("Q. You do not challenge Professor Richards' qualifications as an expert in the field of information privacy? A. No, I do not. I mean, he's a lawyer and his focus is on that field. So that's – that's totally fine.")

[24] *Id*. at 279:3-9 ("Q. Do you think a person who has extensive experience in an area of study can review case documents to reach an expert opinion about those documents? MR. WONG: Same objection, vague. THE WITNESS: That would be – that would be the same answer, yes. The way you framed the question, the answer is yes.")

[25] *Id*. at 278:21-279:5.

31.     Rather, Prof. Hanssens' main critique seems to be a blanket one for all forms of academic inquiry and methodological analysis that do not engage in consumer surveys, whether through internet panels of otherwise:

> "Well as long as we're talking about Professor Richards, you know that one of my major comments on Richards is that he doesn't do any empirical work, no surveys."[26]

32.     This critique misses the overarching purpose of my analytical methodology and its use in formulating the opinions reflected in the Richards Report. Government regulators, courts, and juries have long found expert analyses of history and societal norms by academics and scholars trained in the subject matter at issue to be a critical aid to decision-making and rule-making.[27] Indeed, historians employing qualitative research and analysis are often used to guide decision-making when societal norms and individual rights are at play – freedom to marry,[28] voting rights,[29] opioid usage and addiction, and Native American law and policy[30] are just some examples, but there are many

---

[26] *Id.* at 49:5-8.

[27] Prof. Hanssens also ignores the fact that my initial expert report cites and relies upon several quantitative analyses of consumers' desire for and reasonable expectation of privacy in their user data and internet communications, including one such analysis by Google. *See* Richards Rep. at ¶¶ 64-68 and citations in fns. 66-75 of same. He offers no analysis of these surveys on the merits, which is puzzling since these many studies with large consumer sample sizes have findings that are starkly at odds with the findings of his internet panel survey.

[28] *See, e.g.,* Nancy F. Cott, *Which History in Obergefell v. Hodges?*, PERSPECTIVES ON HISTORY (July 1, 2015), https://www.historians.org/research-and-publications/perspectives-on-history/summer-2015/which-history-in-obergefell-v-hodges (noting the importance of history in US Supreme Court same-sex marriage decision, *Obergefell v. Hodges et al*, 576 U.S. 644 (2015), in which Justice Anthony Kennedy, writing for the majority, looks to the history of marriage to the lay the ground for the groundwork for his reasoning: "Before addressing the principles and precedents that govern these cases," the opinion begins, "it is appropriate to note the history of the subject now before the Court.")

[29] *See, e.g.,* Kritika Agarwal, *Historians as Expert Witnesses*, PERSPECTIVES ON HISTORY (Feb. 1, 2017), https://www.historians.org/research-and-publications/perspectives-on-history/february-2017/historians-as-expert-witnesses-can-scholars-help-save-the-voting-rights-act (discussing the importance of historians to guide judicial decision-making in voting rights cases, and explaining that "Nobody but a historian could possibly figure out the intent underlying the adoption of the law in question.").

[30] *See, e.g.,* Greg Ablavsky, *History, Power and Federal Indian Law*, PROCESS: A BLOG FOR AMERICAN HISTORY (Jan. 4, 2018), https://www.processhistory.org/ablavsky-federal-indian-law/ (discussing use of legal historians to examine nineteenth-century treaties, case law and other source materials to guide judicial decision-making on issues involving tribal civil jurisdiction).

others. Indeed, my Master's Thesis in legal history was devoted precisely to this issue – the use of historical evidence (frequently submitted by trained historians) by courts in interpreting the Constitution.[31]

33.  The same is true in matters involving societal privacy norms, data privacy, consumer surveillance and data security practices. As noted in the C.V. attached to the Richards Report, I was invited by the FTC to provide expert testimony on the topics of consumer data protection and the history (and privacy concerns) of the "notice and choice" regime governing consumer consent to data practices at the Commission's Hearings on "Competition and Consumer Protection in the 21st Century" in April 2019.[32] More recently, I was the lead author on a set of FTC comments by the privacy policy institute I direct that focus on the history, nature and prevalence of consumer surveillance and data security practices, the failings of the existing "notice and choice" regulatory regime for privacy, and a proposal that the Commission ground its future data privacy rules under its Section Five powers in historical concepts of trust, loyalty, and relational vulnerability.[33] Also, I was qualified to testify in the Irish High Court as a U.S. privacy law expert in the *Schrems II* case, where my testimony (including a historical treatment of the evolution of U.S. privacy law) was used in part as the predicate for the Court declaring the EU-US Privacy Shield – one of the primary data transfer mechanisms for data flow between EU and US organizations – invalid. The judgment was upheld on appeal both by the Supreme Court of Ireland and again by the European Court of Justice in Luxembourg, forcing organizations to re-think the way they handle cross-border personal data

---

[31] See Neil Richards, *Clio and the Court: A Reassessment of the Supreme Court's Uses of His-tory*, 13 J. L. & POL. 809 (1997). This article was the final version of my thesis, which I published as a law review article while serving as a law clerk on the United States Court of Appeals for the Fourth Circuit.

[32] *See* Richards Rep. at p.77.

[33] *See* Neil Richards et al., *Comments of the Cordell Institute on the Prevalence of Commercial Surveillance and Data Security Practices that Harm Consumers*, Nov. 21, 2022, available at available at https://www.regulations.gov/comment/FTC-2022-0053-1071 (Comment ID: FTC-2022-0053-1071). FTC Chair Lina M. Khan quoted my research and scholarship in these and related areas in an April 2022 speech outlining the FTC's new priorities for privacy and data security enforcement actions to protect consumer privacy expectations and interest. *See Remarks of Chair Lina M. Khan As Prepared for Delivery IAPP Global Privacy Summit 2022*, at fns. 3, 8, 14, 21, available at https://www.ftc.gov/news-events/news/speeches/remarks-chair-lina-m-khan-prepared-delivery-iapp-global-privacy-summit-2022.

transfers and whether they have transfer mechanisms in place that are compliant with E.U. data protection law.[34]

34.    In none of the above instances did my testimony as a legal historian and privacy expert usurp the role of the court, the jury or the regulatory decision-maker on deciding the question (or questions) before the tribunal. The same is true here.

35.    Google account holders in the U.S. do not come to the internet stripped of the historical, societal protections for privacy in their personal communications, their personal information and their personal data that have existed for centuries. A trier of fact will be called upon to decide if those historical societal privacy protections are violated by Google's conduct here. My opinions and expert testimony,[35] which rely on primary and secondary source materials, including Google's own internal records, provide historical context to the Court in making that determination.

36.    Similarly, Google does not write upon a blank slate when it publishes Privacy Policies, Terms of Service and related disclosures that are intended to govern Google's relationship with its account holders. When stating to data protection regulators that "Google believes in user privacy protection, and we strive to protect it whenever we can."[36] and when publicly promising its U.S. account holders that "[w]e never sell your personal information to anyone,"[37] Google clearly conforms these promises to long-standing privacy norms that are deserving of its protection, and governing California data protection laws that historically define "personal information" expansively. A trier of fact will decide whether Google breaks its promises, and whether these transmissions amount to the sharing or selling of account holder "personal information." My opinions and expert testimony,[38] which rely on primary and secondary source materials, including Google's own internal records, are intended to provide historical context to the Court in making these determinations.

---

[34] Case C-311/18, ECLI:EU:C:2020:559 (July 16, 2020).

[35] *See* Richards Rep. at ¶¶ 15-74.

[36] GOOG-HEWT- 00042963 at -696 (Google Ireland Limited Inquiry Reference – Google submissions to the Irish Data Protection Commission), cited in the initial Richards Expert Report, ECF 545-9, at p.30, fn. 84.

[37] Google, *How Our Business Works*, https://about.google/intel/en-US/how-our-business-works, cited in the initial Richards Expert Report, ECF 545-9, at p.103, fn. 107 (and elsewhere).

[38] *See* Richards Rep. at ¶¶ 75-89.

37.     Google's class certification opposition asserts that "Google discloses that RTB Data is used and shared for advertising" and that "a host of Google terms, policies, and other disclosures explain how Google uses and shares information for advertising purposes, ***including the practices at issue in this case.***"[39] Google's Suneeti Vakharia, when deposed recently in her capacity as Google's corporate witness, testified otherwise:



38.     As part of my expert retention, and given my expertise and training in analyzing terms of service and privacy policies for consumer data protection compliance in the "notice and consent" context (a regime of which I am, like most privacy experts, admittedly critical), and having reviewed the Google terms of service, privacy policies and related disclosures that every U.S. Google account holder is subject to, I agree with Ms. Vakharia that neither the fact nor scope of the Google RTB auctions, nor the way or breadth with which Google uses, shares and sells Google

---

[39] Opp Brief, ECF 583-3, at 4:23 and at 5:1-2 (emphasis added).

[40] Vakharia Dep. at 294:6-18 (emphasis added).

*See also id* at 49:25-50:9



 I respond to Ms. Vakaria's declaration submitted in opposition to class certification, ECF 592-5, in Section III.D below.

account holder's personal information in the Google RTB auctions, are disclosed to Google account holders anywhere in these materials.[41]

39.     In my expert opinion, this common **lack of disclosure** of Google's RTB practices has normative privacy implications the trier of fact must consider when determining a reasonable Google account holder's expectations as to her data security or data privacy when using the internet.[42] That is, Google's actions in the auction are not a mere technicality that can be swept into a general description of "personalized advertising." Rather, what Google is sharing and selling to third parties through that process is far beyond the scope of societal norms.

40.     I do not, however, tell the Court or the trier of fact how to decide the issue - a question I view as being within the purview of the Court or trier of fact alone.

41.     Elsewhere in my report, I provide expert opinions and testimony about the privacy, informational privacy and data privacy norms that are implicated by Google's (now admittedly undisclosed) RTB practices – as I understand them. In doing so, I collected and examined primary and secondary source materials, including Google's internal records as well as the expert reports of the experts – sources that I believe will be (and perhaps have been) tested by Google's experts, and which will be provided to the trier of fact in order to decide plaintiffs' class certification motion and, potentially, the merits of plaintiffs' claims at trial. As I explain in the Richards Report, my expert opinions and testimony in this regard are again rooted in history, legal history and my scholarship about and analysis of societal privacy norms.[43] They are offered to provide background and context but do not decide (or purport to decide) any ultimate questions of law or fact for the Court or any potential jury. Because Prof. Hanssens' did not review these materials, he has no basis to critique my analysis of them.

### 3.     The Hanssens' Surveys are Methodologically Flawed – And Admittedly Do Not Even Analyze Privacy Norms or Expectations

42.     It is my expert opinion that Prof. Hanssens' survey is methodologically flawed and fundamentally unreliable because it (a) suffers from significant "selection bias" directly related to the phenomenon being measured; (b) does not inform participants of the fact, nature or breadth of

---

[41] *See* Richards Rep. at ¶¶ 118-131, 137.

[42] *See id*.

[43] *See id*. at ¶¶ 90-118.

Google's RTB practices (the very conduct plaintiffs place at issue, here); (c) was not designed to measure (and, in fact, does not measure) consumers' reasonable expectations of privacy; and (d) its results – and the conclusions Prof. Hanssens' draws from them – have not been analyzed or corroborated by someone with expertise in privacy or societal privacy norms.

43.     Let me begin by offering my experience and qualifications to make these critiques. As I explained at deposition, while I have not personally designed or executed a "large-n" quantitative survey study, I am frequently called upon to read and evaluate such studies for academic rigor, as part of my academic work at Washington University and elsewhere.[44] As one perhaps coincidental example, when Matthew Kugler, a scholar relied upon by the Hanssens Report for its survey methodology,[45] came up for academic tenure at Northwestern University School of Law, his tenure and promotion committee asked me to review his body of empirical work (including the paper in question), and opine on it for purposes of their decision to grant or deny him tenure. And in response to this request, I submitted a confidential evaluation of his work which was used by his law school as part of their tenure decision. This is a task I perform regularly, including when evaluating the scholarship of emerging academics in the areas of history, privacy and other disciplines—including scholars like Prof. Kugler whose work in these fields is qualitative or quantitatively empirical in nature.

44.     ***The Hanssens surveys demonstrate "selection bias".*** As a trained historian and evaluator of empirical research, I am familiar with the problems of "selection bias" – typically, confirmation bias and convenience sampling – and the strategies that scholars may employ to try to mitigate bias when conducting historical study and analysis.[46] This was also something that I

---

[44] *See* Richards Dep. at 49:18-50:11.

[45] *See* Hanssens Rep. at 10, fn. 28-30 (citing Matthew Kugler & R. Charles Henn, *Internet Surveys in Trademark Cases: Benefits, Challenges, and Solutions*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN (Diamond & Swann, eds. 2d ed 2022).

[46] *See, e.g.,* Jørgen Møller and Svend-Erik Skaaning, *The Ulysses Principle: A Criterial Framework for Reducing Bias When Enlisting the Work of Historians*, SOCIOLOGICAL METHODS & RESEARCH, 50(1), 103-134 (2021), available at https://journals.sagepub.com/doi/10.1177/

explained at my deposition.[47] Additionally, I am trained to (and often do) analyze survey results to advise my faculty colleagues at my University and elsewhere whether selection bias distorts the results of a study. Selection bias occurs when there are systemic differences between the participants in a study and non-participants, such that the subset of participants included or analyzed are not representative of the target population, and thus cannot be used to reliably generalize about the population as a whole.[48] Prof. Hanssens appears to understand this concept – he states in his report that "[t]he design of the survey must ensure an accurate representation of the underlying population of interest" and cites to a standard "Reference Guide on Survey Research"[49] – but then fails to check for it. As a preliminary matter, Prof. Hanssens did not verify that participants who self-selected for the survey were Google account holders subject to U.S. Google terms of service[50] – the target population here. But, more critically, as explored at Prof. Hanssens' deposition, any respondent selected to participate in the Hanssens surveys had to (1) choose to be part of a pre-screened panel of Prodege survey-takers to share information about themselves that (2) must first, and repeatedly over time, accept and agree to the terms of Prodege's privacy policy, which states:

> We may share or sell aggregate or individualized information about you that may
>
> include, without limitation: (1) your PII and related information; (2) your use of the
>
> Prodege Sites and Features and our Services; (3) Third Party Services and other

---

0049124118769107; Mick P. Couper, *New developments in survey data collection*, ANNUAL REVIEW OF SOCIOLOGY, 43, 121-145 (2017); ROGER TOURANGEAU, & THOMAS J. PLEWES, EDS., NONRESPONSE IN SOCIAL SCIENCE SURVEYS: A RESEARCH AGENDA (Washington, DC: The National Academies Press 2013); Jelke Bethlehem, *Selection bias in web surveys*, 78(2) INT'L STAT. REV., 161-188 (2010).

[47] *See* Richards Dep. at 49:21-50:5.

[48] *See, e.g.,* Jelke Bethlehem, *Selection bias in web surveys*, 78(2) INT'L STAT. REV., 161-188 (2010).

[49] Hanssens Rep. ¶ 24, fn. 21 (citing Diamond, S.S. (2011), "Reference Guide on Survey Research," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, Washington, D.C.: The National Academies Press, 359-423); *see also* Hanssens Dep. at 58:17-24 ("Q. All right. So, an accurate representation of the underlying population is a key consideration in the design for a reliable survey, is that correct? A. Correct.")

[50] *See* Hanssens Dep. at 101:6-102:6 ("Q. Did you verify that each individual respondent was a Google accountholder? A. Did I independently verify that? No….")

websites you visit; and (4) your geo-location and information derived therefrom."
And upfront, the policy states that "- IF YOU DO NOT WISH TO HAVE US
COLLECT, USE, AND SHARE INFORMATION AS DESCRIBED IN THIS
PRIVACY POLICY, PLEASE DO NOT USE ANY OF THE PRODEGE SITES
AND FEATURES OR OUR SERVICES.[51]

This means that every panelist in the survey pool had to both (1) agree to share information about themselves through a survey as a general matter and (2) specifically agree and accept a privacy policy that expressly disclosed Prodege's selling and sharing of significant amounts of their personal data with third parties – including their browsing activity, their location and information derived therefrom, and other personally identifying information – the types of personal information that plaintiffs have put directly at issue in this litigation. Indeed, as summarized in Appendix H to the Hanssens Report and as detailed in the referenced Privacy Policy, Prodege requires each of its survey panelists to repeatedly agree to significant digital surveillance and to the disclosure of their sensitive personal information to third parties, including advertisers.[52]

45.     In my expert opinion, the self-selection biases in a privacy case of this sort suggest substantial systemic flaws in the design of the Hanssens survey - flaws that cast doubt on the soundness of its methodology and its reliability. The population as a whole does not participate in internet panels in which they share information about themselves, and there is reason to believe that those who would choose to offer information about themselves and their preferences on the internet would not be representative of the population as a whole with respect to their views on privacy. Moreover, there is a second and more significant selection bias in this group, which is the fact that such participants had to expressly agree to a privacy policy that shared their personal information including browsing history and location data, which offers an additional risk of a seriously skewing

---

[51] *See* Hanssens Dep. at 53:10-23; 89:21-95:1. Prof. Hanssens "did not" test whether most Google account holders would have agreed to Prodege's privacy terms. *Id*. at 96:21-24 ("Did you test whether most Google accountholders would have agreed to Prodege's terms in this policy? A. I did not test that.").

[52] Hanssens Dep. at 67:25-69:7; 70:15-95:15.

selection bias. In these two distinct ways, the selection of participants for the Hanssens study was thus biased in ways that are directly related to the phenomenon being purportedly measured. Indeed, Prof. Hanssens testified at his recent deposition that someone who refused Prodege's policy may have answered the survey differently[53]; that if the survey population included only individuals who had refused to accept Prodege's policy, the results could have been different[54]; and finally, that "as an academic he has to admit the possibility" that selection bias limited the survey's reliability.[55]

46.     ***Prof Hanssens did not query survey participants about the nature of Google RTB or its breadth***. In the Richards Report, I discuss the body of evidence, including Google's own internal documents and the technical reports of plaintiffs' experts, that currently exists in the record, and that may be put before a trier-of-fact about the nature, extent and breadth of Google RTB in deciding whether that practice contravenes societal privacy norms.[56] Prof. Hanssens does not contest this body of evidence, or my expert opinion and testimony with respect to this evidence. Prof. Hanssens does not even query panelists on these issues. Indeed, as he conceded at his recent deposition, the Hanssens survey does not even mention Google RTB.[57]

47.     The omission of Google RTB from Prof. Hanssens' survey questions, in my opinion, fatally undermines the reliability of the survey design, as well as the credibility of the opinions that Prof. Hanssens' draws from them. As a result of this omission, the survey does not, among other things: (a) describe the many categories of account holder personal information that are transmitted to hundreds of companies around the world through Google RTB or that these companies, in turn,

---

[53] *See id* at 95:3-15.

[54] *See id* at 95:2-9.

[55] *See id* at 98:25-99.9.

[56] *See* Richards Rep., ECF 545-9, at ¶¶ 90-115.

[57] Hanssens Dep. at 282:25-282:11 ("Q. Did you ask survey takers whether they ever heard of Google RTB from any source? A. RTB is not a formal part of the survey, as you know. It's about sharing data. I never say my survey, that it's analyzed by humans or analyzed by machines. Q. Did you ask survey takers whether they ever heard of Google RTB? A. Same answer – well, no. Q. Did any of your surveys even mention the word "Google RTB"? A. Not that I recall.").

send this information out to hundreds more[58]; (b) explain that these third-party companies use this data to create user profiles[59]; or (c) describe how the aggregate bid stream data sent out in a single bid request can be used to identify individuals, households and devices.[60] These discrepancies between what Prof. Hanssens' survey asks, and the reality that Google account holders face, in my opinion, do not provide a sound or reliable measurement of their reasonable expectations of privacy in their personal information.

48.     ***Prof. Hanssens' surveys were not designed to assess the reasonable privacy expectations of Google account holders based on the disclosures at issue and what Google actually does***. Prof. Hanssens' survey suffers another fundamental flaw: the survey was not designed to (and does not) actually assess, measure or analyze the reasonable privacy expectations of Google account holders. Prof. Hanssens thus has no opinion as to whether the bidstream data that is transmitted by Google to companies outside of Google through Google RTB implicates account holders' rights to privacy – a point Prof. Hanssens conceded at deposition.[61]

49.     ***Prof. Hanssens' surveys lack corroborative assessment or analysis by anyone skilled in privacy.*** Finally, in my expert opinion, the Hanssens Report is unreliable because its conclusions are not grounded in the relevant academic literature.

50.     As previously noted, Prof. Hanssens is not a privacy scholar. As a result, he has not focused on the correct questions and does not interpret his results in a way that a scholar in the field would. For example, the "heterogeneity" he interprets from his self-selected (and selectively biased) internet panels of 300 respondents is not situated in the academic privacy literature, which would put it into greater context. It is not situated in the empirical and theory literature that, for example,

---

[58] *Id.* at 197:5-25.

[59] *Id.* at 198:5-12.

[60] *Id.* at 198:12-199:2.

[61] Hanssens Dep. at 33:5:12 ("Q. You're not offering an opinion as to whether or not the information that is transmitted over Google RTB has any aspects that relate to someone's right to privacy? MR. WONG: Objection, legal conclusion. THE WITNESS: Okay. I do not. Thank you for clarifying that.")

thoroughly discredits the so-called "privacy paradox";[62] shows that consumers are disempowered and feel that they have no control, so they click "I agree" out of despair;[63] shows that consumers are deeply concerned about privacy incursions from large technology companies;[64] and shows that the more consumers learn about privacy issues the more concerned they become and that even consumers who say they aren't concerned about privacy take actual steps to protect their privacy,[65] suggesting that shallow internet surveys devoid of context are unreliable. Thus, while Prof. Hanssens interprets his survey respondents' actions as indicating that they do not care about privacy, scholars in the field would likely reach the opposite conclusion. His lack of expertise has spoiled his conclusions.

**4.      The Other Critiques in the Hanssens Report Do Not Stand Up to Scrutiny**

51.      In addition to the broader critiques that I have already addressed, there are a small number of lesser critiques made by Prof. Hanssens that I believe warrant a brief response, and which I have collected together here to deal with in order. None of them, in my opinion stand up to scrutiny. I deal with five of them here, and leave a final one (the third-party website disclosure claim) to a discussion in Section III.E below, since all of the documents filed in response to my initial report repeat this claim in one form or another.

---

[62] *See, e.g.,* Daniel J. Solove, *The Myth of the Privacy Paradox*, 89 GEO. WASH. L. REV. 1 (2021); Neil Richards & Woodrow Hartzog, *The Pathologies of Digital Consent*, 96 WASH. U. L REV. 1461 (2019).

[63] *See, e.g.,* Joseph Turow et al., *Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand It, Say They're Helpless to Control It, and Believe They're Harmed When Firms Use Their Data – Making What Companies Do Illegitimate*, at 7, Annenberg Sch. Of Comm., Univ. Pa. (February 2023); NEIL RICHARDS, WHY PRIVACY MATTERS 95-100 (2021).

[64] Pew Research Center, *Roughly six-in-ten online daters in the U.S. are concerned about data collection*, May 29, 2020, https://www.pewresearch.org/fact-tank/2020/05/29/roughly-six-in-ten-online-daters-in-the-u-sare-concerned-about-data-collection/;

[65] *See, e.g.,* Müze Fazlioglu, *Privacy and Consumer Trust*, International Association of Privacy Professionals 8, 10 (2023); Alessandro Acquisti et al., *Secrets and Likes: The Drive for Privacy and the Difficulty of Achieving It in the Digital Age*, 30(4) J. CONSUMER PSYCH. 736 (2020), https://myscp.onlinelibrary.wiley.com/doi/10.1002/jcpy.1191.

52.     ***First***, the Hanssens Report suggests that I "ignored evidence from academic research and from Plaintiffs' testimony showing that expectations about privacy can be heterogeneous across consumers and reflect a variety of influences," and that the Richards Report was defective because it did not address the expectations of Google account holders. Once again, this claim misunderstands the purposes and contribution of the Richards Report, which is to examine the extent to which privacy is a foundational social norm and fundamental right, and whether there was evidence from which a jury could conclude that reasonable Google account holders who had been told that Google would never share or sell their personal information might believe that their privacy rights had been violated. (I note, as pointed out in the previous section, that it is in fact the Hanssens Report that is insufficiently grounded in the privacy literature).

53.     ***Second,*** the Hanssens Report suggests that the empirical sources I cited in my initial report are inapplicable because they deal with different issues from the ones at issue here, including dealing with other countries and contexts. These claims once again either misunderstand the purpose of my report or misrepresent the evidence and claims within it. That section of the Richards Report shows that there is substantial empirical evidence that consumers today continue to care deeply about privacy and to wish to preserve the historical societal norm of privacy protection. Moreover, to the extent that empirical scholars have found that consumers express more concern about privacy the more they learn about the privacy practices of large technology companies, as I discuss in the Richards Report, this suggests that reasonable privacy expectations can be hard to infer from Internet surveys of the sort proffered by the Hanssens Report. Finally, the assertion in the Hanssens Report that my evidence does not support my conclusions misunderstands the empirical evidence that I discuss. For example, while the IAPP study I cited was not limited to the United States, it does offer findings for consumers in the US and Canada, which are the ones I relied upon in my initial report. More importantly, such quibbling is ultimately beside the point: Consumers in the U.S. undeniably care a great deal about their privacy, supporting the social norm that privacy continues to matter.

54.     ***Third,*** the Hanssens Report suggests that my use of Google internal documents revealing that it knew its account holders cared about privacy is "not necessarily representative of

the population of Google Account Holders." Once again, this claim misunderstands the Richards Report, which merely offers these materials as additional available record evidence from which the trier of fact may conclude that Google account holders continue to care about privacy—and that Google knows this. The privacy practices of large technology companies are indisputably within my expertise. Indeed, at deposition, Dr. Hanssens himself appeared to concede as much.[66]

55.     **Fourth,** the Hanssens Report suggests that "Prof. Richards' analysis" is flawed because, Prof. Hanssens argues, I ignore evidence that suggests that account holders could learn from "multiple sources" about the information that Google shares with advertisers in the RTB system.[67] While Prof. Hanssens purports to suggest there are "numerous disclosures made by Google informing its account holders of the types of information collected and shared for advertising purposes," of the three he points to – a deeply embedded "Technologies" page (an evolving page published in some form beginning November 14, 2022),[68] accessible through Google's Policies page (by first clicking on https://policies.google.com/, and then clicking on https://policies.google.com/technologies/ads, and then by performing a serious of clicks to https://policies.google.com/technologies/partner-sites); Google's Privacy Policy effective July 1, 2023 (now available only archivally at https://policies.google.com/privacy/archive/20230701; and another deeply-embedded "Ads and Data" link (of uncertain vintage but seemingly recent[69]) that takes three steps to access by clicking on a box at the very bottom, right hand side of the "Security and Safety" page of Google's Safety Center page (that is, by first going to http://safety.google/, then clicking on https://safety.google/security-privacy/, and then by going all the way down the page to a box to click that directs you to https://safety.google/privacy/ads-and-data/ — ***none of them disclose***

---

[66] Prof. Hanssens concedes both that I am a privacy expert (*see* Hanssens Dep. at 274:7-12), and that that "a person who has extensive expertise in an area of study can review case documents to reach an expert opinion about those documents." *See id.* at 279:11-18.

[67] *See id*. at ¶ 79.

[68] *See* Vakharia Dec. (ECF 592-5) at ¶ 32. The version of the embedded attached as Exhibit 6 differs from the one that appears on Google's site today.

[69] Ms. Vakharia does not discuss this page in her September 29, 2023 declaration.

***Google RTB*** or that Google shares and sells account holder personal information to hundreds of outside companies in Google RTB auctions billions of times each day.[70]

56.      Nor do any of these documents provide account holders anywhere near the informational clarity Prof. Hanssens presupposes they do.[71] The first of these embedded pages, "Technologies," begins with the aspirational phrase, "Google advertising services are experimenting with new ways of supporting the delivery and measurement of digital advertising in ways ***that better protect people's privacy online***" (emphasis mine) – reinforcing my initial expert opinion (reiterated in ¶ 54 above) that Google, when drafting these pages, necessarily understands there are long-standing privacy norms that are deserving of protection, and that governing California data protection laws historically define "personal information" expansively. Also reinforcing this point is the referenced archival Privacy Policy, which states: "***We don't share information that personally identifies you with our advertising partners***, such as your name or email, unless you ask us to share it."[72] And, further reinforcing the point, both the "Technologies" and "Security and Safety" links include an introductory box containing Google's front-loaded, and prominently displayed, promise:

---

[70] *See* Vakharia Dep at 224:15-22



[71] Google knows this. In my initial report, I cite numerous internal Google documents produced in discovery underscoring that there is a lack of consumer knowledge or understanding with respect to Google's advertising practices, or with respect to Google RTB in particular. *See* Richards Rep. at ¶¶ 126-127 & notes 73-186.

[72] *See* https://policies.google.com/privacy/archive/20230701 (emphasis added).

> **We never sell** your personal information to anyone.
>
> We never sell your personal information to anyone, including for ads purposes.

57.     Prof. Hanssens' assertions also misunderstand or mischaracterize the opinions offered in the Richards Report. There (at ¶ 84), I offer the opinion that there is evidence from which a reasonable trier or fact could conclude that Google broke its consistent and repeated message to its account holders in both customer-facing documents and public statements "that the company 'does not' 'will not' and 'never' shares or sells account holders' personal information to 'anyone' including, specifically, 'with advertisers[.]'" The Hanssens Report's efforts to scour Google's fine print (or obscure corners of the Internet) to find vaguely-worded statements that ***still do not inform*** Google account holders about Google RTB, much less inform them of the almost unimaginably vast amount and types of account holder bitstream data that Google shares and sells to vast numbers of outside entities, does not disturb my conclusion on this point.

58.     ***Fifth***, as a related matter, Prof. Hanssens makes no argument about the ***amount*** of Google account holder personal information shared and sold by Google to hundreds of outside companies in RTB. Indeed, it appears to be undisputed in this case that Google shares through RTB a vast amount of information about its account holders to a vast number of RTB participants. For example, as I explained in my initial report, the quantity of personal information that Google transmits is historically unprecedented and so vast in scope that it is difficult to comprehend.[73] Nothing in the Hanssens survey measures Google account holder expectations if they were to learn the actual, almost unfathomably large amount of data about them that Google shares and sells to Google RTB participants every day. Prof. Hanssens' report likewise does not address this issue.

---

[73] *See* Richards Rep. at ¶¶ 114-17.

**B.**     **Mr. Deal Lacks the Qualifications to Assess My Opinions – Or to Offer His Own**

59.     Mr. Deal is another expert retained by Google to submit an expert report in support of Google's opposition to the motion for class certification. Mr. Deal states he is a Managing Partner in the Menlo Park, California office of Analysis Group, Inc., an economic consulting firm that provides economic and financial consulting services.[74] He lists his academic qualifications as having a Masters's Degree in Public Policy from Harvard and some additional graduate work at that institution.[75] The C.V. provided with his report says he earned a Bachelor of Arts Degree in Economics and Global Studies from Pacific Lutheran University, in Tacoma, Washington.[76] He taught what he describes as analytical methods and statistics for a couple of years in the 1990s, in addition to two economics summer programs, also in the 1990s.[77] He does not indicate ever having studied history, legal history, or privacy – and lists no peer-reviewed publications,[78] publications, articles, scholarly studies, instruction, or academic work or engagement in these disciplines. He is not a scholar of privacy, or it seems, of anything else.

60.     Mr. Deal describes his assignment in this matter as a limited one: he was retained by Google "to evaluate and respond to the opinions provided by [plaintiffs' experts] Professor Robert Zeithammer and Mr. Greg J. Regan," and "[s]pecifically" "to assess whether Plaintiffs' Experts have offered reliable class-wide methodologies for calculating unjust enrichment and compensatory damages resulting from the alleged conduct at issue."[79] Yet, despite the strict confines of his engagement, Mr. Deal's report strays far afield of the limited purposes of his assignment and the bounds of his field – oftentimes offering, as his own opinion, what appear to

---

[74] *See* Deal Rep., ECF 584-7, at ¶ 1.

[75] *Id.*

[76] *Id.* at Appendix A.

[77] *Id.*

[78] Deal Dep. at 20:16-21:17.

[79] Deal Rep. (ECF 584-7) at ¶ 5.

be the opinions or statements of Google's other retained experts and declarants, or others, without independent analysis or scrutiny. In doing so, Mr. Deal offers no reliable methodology for the conclusions he reaches. He also lacks the requisite qualifications to opine on matters beyond the narrow purposes of his engagement and limited field of experience.

61.     In short, the Deal Report contains serious methodological flaws. In general, these stem from an ignorance and/or misinterpretation of the vast interdisciplinary scholarship on consumer privacy, similar to the Hanssens Report. Indeed, the ignorance of the privacy literature in the Deal Report leads to the plainly wrong conclusion about the benefits of surveillance advertising despite substantial evidence to the contrary. Mr. Deal's analysis is out of step with the academic literature on privacy (as opposed to marketing industry talking points).

62.     Economic analysis is only as good as the assumptions on which it rests, and undergirding the Deal Report is the assumption (common to simplistic and frequently result-oriented economic analysis in the consumer privacy context) that consumers are rational actors gifted with almost limitless resources of intelligence, time, and money to make the kind of rational choices businesses advised by large law firms might make.[80] Of course, when stated in this way, it is obvious that this is a deeply flawed assumption. As one of the founders of behavioral economics, the Nobel Prize-winning economist Richard Thaler puts it well, we should not treat consumers as if they were artificial people (he calls them "econs") but rather as actual human beings (which he calls "humans.").[81]

63.     At the specific level, the simplistic rational actor view of consumers and consumer behavior has also been refuted by the vast interdisciplinary literature on consumer privacy showing

---

[80] *See* Richards, WHY PRIVACY MATTERS, at p. 44. *See also, e.g.,* Ari Ezra Waldman, *Cognitive Biases, Dark Patterns, and the "Privacy Paradox,"* 31 CURR. ISS. IN PSYCH. 2020 ("The rational choice model is ineffective. It also fails to describe privacy decision-making. Individuals have bounded rationality, which limits their ability to acquire all relevant information and translate it into an evidence-based decision. Recent research has identified myriad cognitive and behavioral barriers to rational privacy and disclosure decision-making.") (references omitted)

[81] *See* Richards, WHY PRIVACY MATTERS, at p.45.

how, in practice, consumers in practice are nothing like the "econs" assumed by the simplistic law and economics view of the "notice and choice model" by which consumers are expected to read every privacy policy and make choices as if they were (again) large corporations advised by large law firms. Unfortunately, despite all this evidence to the contrary, the Deal Report repeatedly assumes consumers (and class members) to be gifted by these superhuman characteristics, instead of being what they are — ordinary people trying to live their modern lives that are inescapably and unavoidably mediated by technologies and technology companies including Google and its RTB system. In such circumstances, it is reasonable (as a matter of what people are rationally capable of) for consumers to rely on consistent promises that (for example) companies will never share or sell their personal data rather than engaging in the kinds of superhuman efforts the Deal Report's analysis assumes they have the capability to do.

64.    From this perspective of the Deal Report's unreasonable assumptions about actual (not to mention reasonable) consumer behavior, and its ignorance of evidence to the contrary from the privacy literature, it is easy to see a number of errors and fallacies in the report's analysis.

65.    **First,** the Deal Report suggests that many consumers "do not place a meaningful value on the type of data at issue in this matter."[82] In support of this claim, it cites a handful of economic and marketing studies suggesting that consumers in some contexts are comfortable sharing data for little to no compensation. I note that the Deal Report does not engage in any way with the contrary historical and contemporary conclusions I reached in the Richards Report, nor with the empirical evidence that I cited, nor with the evidence in the record that I cited that supports the contrary proposition that Google account holders care deeply about their privacy and the company knows it. Nor does the Deal Report engage in any meaningful way with the interdisciplinary privacy literature. Instead, it cites a handful of studies, some of them from biased

---

[82] Deal Rep. ¶ 120.

sources such as the "Center for Data Innovation" and McKinsey, which serve business interests.[83] By contrast, the sources that I cited in my initial report are from scholars, the nonprofit Pew Research Center, and the International Association of Privacy Professionals, which find substantial evidence that consumers do in fact care about their privacy.

66.     Yet even some of the sources cited in the Deal Report undermine its claim that people don't care about privacy. For example, one of the sources cited in an exhibit to the Deal Report[84] concludes that, based upon a survey of consumer preferences, "We find that 96% of individuals are willing to pay to avoid sharing their personal data in at least one of [sic] data sharing environments. We also find that individuals are consistent in their rankings of the importance of different types of personal data when these rankings are elicited in different ways. This suggests

---

[83] And Mr. Deal, perhaps due a lack of experience in the privacy field, cherry picks quoted passages from the FTC primer to come to a misleading conclusion. As the FTC repeatedly acknowledges in the very document Mr. Deal cites: "Limiting the collection of personal data and its use for targeted advertising may be beneficial to consumers for privacy reasons"; "consumer harm can 'come directly from disutility that a customer might feel from the perceived intrusiveness of the advertising'"; "[t]hat consumers care about privacy is reflected in numerous studies that attempt to empirically quantify their value of privacy" and that and "[t]here are also consumer privacy concerns that need to be addressed." Yan Lau, *A Brief Primer on the Economics of Targeted Advertising* 9, 10, 16, Bureau of Economics, Federal Trade Commission, Jan. 2020, available at https://www.ftc.gov/system/files/documents/reports/brief-primer-economics-targeted-advertising/economic_issues_paper_-_economics_of_targeted-advertising.pdf.

   More generally though, as any privacy expert would know, the FTC understands that the "privacy paradox" is a simplistic fallacy that fails to take the circumstances of actual consumers (as opposed to simplified microeconomic abstractions of people) into account. As FTC Chair Lina Khan explained in a major policy statement that relied heavily on the interdisciplinary academic privacy literature (including my work, Prof. Solove's, and Prof. Hartzog's): "[w]hen faced with technologies that are increasingly critical for navigating modern life, users often lack a real set of alternatives and cannot reasonably forego using these tools." See *Remarks of Chair Lina M. Khan As Prepared for Delivery IAPP Global Privacy Summit 2022*, at 6, available at https://www.ftc.gov/news-events/news/speeches/remarks-chair-lina-m-khan-prepared-delivery-iapp-global-privacy-summit-2022. More recently, the head of the FTC's Bureau of Consumer Protection was more blunt, explaining that when it comes to privacy, "[i]t's a fantasy that consumers can be put on 'notice' of how their data is being handled by reading thousands of pages of dense privacy policies. And it's a fiction that they can somehow exercise 'choice,' when that would essentially require them to opt out of the digital economy." *See infra* ¶ 70 & n.93.

[84] Deal Rep. at Ex. 9 (citing to Skatova, A, *et al*. (2019)), *infra*.

that the techniques we employ can reveal stable underlying preferences for keeping personal data private."[85] Later on, the paper concludes that it has found "evidence for consistent preferences for privacy."[86]

67. ***Second,*** the Deal Report relies upon the tired and debunked industry trope of the so-called "privacy paradox," the idea that, even though consumers repeatedly and consistently say that they care about their privacy, they behave in ways that do not appear privacy-protective, so the economic notion of "revealed preferences" suggests that they do not care about privacy after all.[87] At the outset, it is worth noting that the very premises of this argument undermine the Deal Report's own claim that consumers do not care about privacy – it assumes (based upon its observation of reality) that consumers ***do frequently and consistently*** express strong preferences for data privacy. Thus, one of the sources quoted by the Deal Report states that "survey results show that the privacy of their personal data is an important issue for online users worldwide."[88]

68. More importantly, however, the so-called "Privacy Paradox" has been debunked by the privacy literature, as I have already noted above.[89] But to put the point crisply, the leading privacy scholar Professor Daniel Solove has explained that there is no privacy paradox because measuring people's behavior in very specific contexts (in which they may well be influenced by

---

[85] Skatova, A., McDonald, R. L., Ma, S., & Maple, C. (2019, May 12). *Unpacking Privacy: Willingness to pay to protect personal data*, at 4, https://doi.org/10.31234/osf.io/ahwe4.

[86] *Id.* at 32.

[87] Deal Rep. at ¶ 122.

[88] Deal Rep., fn. 177 (quoting Gerber, N. et al., *Explaining the privacy paradox: A systematic review of literature investigating privacy attitude and behavior*, 77 COMPUTERS & SECURITY 226, 226 (2018)).

[89] Additionally, Professor Joseph Turow (whom the TRUSTe internet privacy-management organization designated a "privacy pioneer" for his research and writing on marketing and digital-privacy) devotes a whole body of scholarship to this issue. *See, e.g.,* TUROW, THE VOICE CATCHERS: HOW MARKETERS LISTEN IN TO EXPLOIT YOUR FEELINGS, YOUR PRIVACY, AND YOUR WALLET (2021); TUROW, THE AISLES HAVE EYES: HOW RETAILERS TRACK YOUR SHOPPING, STRIP YOUR PRIVACY, AND DEFINE YOUR POWER (2017); TUROW, THE DAILY YOU: HOW THE NEW ADVERTISING INDUSTRY IS DEFINING YOUR IDENTITY AND YOUR WORTH (2013); TUROW, NICHE ENVY: MARKETING DISCRIMINATION IN THE DIGITAL AGE (2006).

the design of interfaces or the exigencies of circumstances) has little to do with the importance of privacy as a general, shared, social value.[90] And as I have shown in my work with Dr. Woodrow Hartzog, building on the work of many other privacy scholars, the contexts in which consumers make actual privacy choices are rarely free, knowing, and voluntary. As we explain:

> We believe that the theory of consent pathologies offered here complicates a seductive but simplistic story that has been offered in tech policy circles for over a decade. This is the notion of the "privacy paradox"—the idea that consumer anxiety about privacy is undermined by the fact that consumers act in privacy-diminishing ways in practice. Understanding this phenomenon in terms of consent pathologies reveals that consumers are not hypocrites who say one thing but do another that reveals their true preferences. On the contrary, the pathologies of consent show how consumers can be nudged and manipulated by powerful companies against their actual interests, and this phenomenon is easier when the legal regime that purports to protect consumers falls far from the gold standard [of knowing and voluntary consent freely given].[91]

69.     As relevant here, Professor Solove explains in an influential paper that this burdensome system of what he calls "privacy self-management" fails because of several problems. First, he explains, that "empirical and social science research demonstrates that there are severe cognitive problems that undermine privacy self-management. These cognitive problems impair individuals' ability to make informed, rational choices about the costs and benefits of consenting to the collection, use, and disclosure of their personal data." Moreover, many privacy harms are the result of an aggregation of pieces of data over a period of time by different entities. It is virtually impossible for people to weigh the costs and benefits of revealing information or permitting its use

---

[90] *See* Daniel J. Solove, *The Myth of the Privacy Paradox*, 89 Geo. Wash. L. Rev. 1 (2021).

[91] *See* Richards & Hartzog, *The Pathologies of Digital Consent*, *supra*, at 1465.

or transfer without an understanding of the potential downstream uses, further limiting the effectiveness of the privacy self-management framework."[92]

70.     The fallacy of the so-called "privacy paradox" and the failure of the "notice and choice" system is not just the consensus of privacy scholars but the position of senior federal regulators. As the Director of the FTC's Bureau of Consumer Protection recently explained in an interview with his alma mater Harvard Law School, "[s]ince the Reagan era, we've had a consumer protection paradigm that I'd describe as 'notice and choice.' In short, this has meant that so long as companies disclose somewhere how they're handling consumers' money or their data, consumers do not need protection. I'm not sure that was ever true, but it's certainly not true in today's digital economy. Consider privacy. It's a fantasy that consumers can be put on 'notice' of how their data is being handled by reading thousands of pages of dense privacy policies. And it's a fiction that they can somehow exercise 'choice,' when that would essentially require them to opt out of the digital economy."[93]

71.     Yet the Deal Report doubles down on the "privacy paradox," and argues that "[o]ne of the most revealing sources about individual valuation of data privacy are user choices to forego protections (such as those offered by CCPA) that give users the opt out of sharing their information with third parties for advertising purposes."[94] It further suggests that because "at most 5 percent of users" ever use their opt-out rights under CCPA, that consumers really do not care about privacy. This is a misleading claim that, once again, relies on simplistic notions of rational choice consumers and ignores both the actual circumstances consumers face and the interdisciplinary privacy literature explaining all of this (as well as a key feature of the CCPA, which requires

---

[92] Daniel J. Solove, *Privacy Self-Management and the Consent Dilemma*, 126 HARV. L. REV. 1880, 1880-81 (2013).

[93] Olivia Klein, *Harvard Law School Alumni Profiles: 'Even My Most Stressful Days are Deeply Fulfilling,'* Nov. 3, 2023, available at https://hls.harvard.edu/clinic-stories/even-my-most-stressful-days-are-deeply-fulfilling/ (Interview with Samuel Levine, FTC Director of the Bureau of Consumer Protection).

[94] Deal Rep. at ¶ 123.

business to tell consumers, in the first instance, about the categories of personal information sold or shared about them[95]). So, to take the example of CCPA opt-outs, for a consumer to choose to tell a web site not to sell their data, they must (a) go to a website, (b) read the privacy policy in order to understand what data is being sold, and (c) find and use the opt-out, (d) for *every website that they use*. Such a burden on consumers, though well-meaning, is overwhelming in practice, part of the phenomenon that Professor Solove has called "Privacy-Self Management,"[96] and contingent on what Professor Hartzog and I have called "the pathologies of consent."[97] Mr. Deal's claims are symptomatic of industry privacy practices under "notice and choice" that place overwhelming and impossible burdens on consumers and then blame them when they fail to be super-human.

72.     While groundbreaking in many respects, the CCPA has been criticized by privacy scholars for requiring that under-informed and over-burdened consumers take a series of affirmative steps to protect their privacy rather than by making consumer protection automatic (as

---

[95] The California Attorney General' recent enforcement efforts against Sephora, an online retailer, make plain that the CCPA requires that if companies make consumer personal information available to third parties and receive a benefit from the arrangement—***such as in the form of ads targeting specific consumers***—they are deemed to be "selling" consumer personal information under the law. This in turn triggers basic obligations, including that the business tell consumers it is selling their information and allow consumers to opt out of those sales. *See* Complaint, *People v. Sephora USA, Inc*., San Francisco Superior Court Case No. 601380, available at https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-settlement-sephora-part-ongoing-enforcement. According to the California AG, Sephora failed to make these required disclosures or give consumers the material facts about the categories of information it sold or shared about consumers, merely noting in its privacy policy that it "share[d] personal information" and provided consumers with a link to see what was shared. Upon clicking the link, Sephora expressly told consumers "that we do not sell personal information." *See id* at ¶¶ 2-4.

[96] Daniel J. Solove, *Privacy Self-Management and the Consent Dilemma*, 126 Harv. L. Rev. 1880 (2013). See also Ari Ezra Waldman, *Cognitive Biases, Dark Patterns, and the "Privacy Paradox,"* 31 Curr. Iss. In Psych. 2020.

[97] *See also* Woodrow Hartzog, Privacy's Blueprint: The Battle to Control the Design of New Technologies (Harvard University Press 2018).

it is, for example, in the protection of food and drink safety).[98] Thus, one obvious explanation for low CCPA exercise rates (or cookie opt-outs, or the use of virtual private networks, or ad blockers, or other tools) is that there are just too many buttons to push and boxes to tick in order to exercise rights that consumers may only poorly understand and which may have little practical effect in practice. *Yet interestingly, when such practices are simplified for consumers, they do exercise them.*

73.     ***Third****,* the Deal Report asserts that people want to share and that advertising confers a benefit upon them, asserting that "[r]esearch has repeatedly shown that a large share of consumers finds [sic] personalized ads to be helpful and/or beneficial."[99] But this entire argument is beside the point and irrelevant. This case, as I understand it, is not about whether "personalization" can be helpful or whether advertising is sometimes beneficial in the abstract. This case is about whether there is a violation of the foundational societal norm of privacy when Google promises that it will not share personal data with third parties and then does precisely the opposite – sharing and selling a vast amount of personal information a vast number of times of day about its account holders. From this perspective, the hypotheses, surveys, and other arguments about "targeted advertising" in the abstract marshalled by the Deal Report[100] are not responsive to the facts and issues of this case and are no more than a distraction.

**C.     Google's Corporate Witness, Suneeti Vakharia, Agrees With My View That Google Does Not Disclose Google's RTB Auctions To Its Account Holders Or Provide Them With Any Mechanism To Agree To Having Their Personal Information Shared Or Sold In RTB**

74.     As noted in the introductory section of this rebuttal report, I was asked by Counsel to review a September 29, 2023 declaration of the current Director of Google's Product Management on the Trust, Transparency & Consent team, Suneeti Vakharia,[101] that was submitted

---

[98] In addition to the other sources cited in this section, *see* Ari Ezra Waldman, *Privacy's Rights Trap*, 117 Nw. U. L. Rev. 88, 91 (2022) (explaining how "people are, for the most part, incapable of exercising their individual rights" to opt out of privacy practices they dislike).

[99] Deal Report ¶ 124.

[100] Deal Report ¶¶ 124-30.

[101] Vakharia Decl. at ¶ 1.

to the Court by Google well after the date of my expert report. That declaration purports to explain "various disclosures that Google makes available to Google Account holders about the data collection and sharing processes that I understand to be at issue in this case."[102]

75.     Some weeks after this submission, I understand that Ms. Vakharia was deposed – both with respect to her declaration and as a Google corporate witness under Rule 30(b)(6) of the Federal Rules of Civil Procedure – on November 15, 2023. Having now read the transcript of Ms. Vakharia's deposition, and gleaning from that record a number of areas in which Ms. Vakharia backs away from the statements in her declaration, I will keep my response to Ms. Vakharia in this rebuttal relatively brief.

76.     Although put forward by Google as its corporate representative, Ms. Vakharia showed little-to-no familiarity with the issues presented by plaintiffs' complaint, or the Google RTB system at her deposition. Ms. Vakharia testified that she: (a) has not seen or read plaintiffs' ███████[103]; (b) is ███████"" with the Google RTB system[104]; and (c) does not ███████████████████████████[105]

The entire source of her understanding of the RTB auction was a declaration submitted by Google's witness, Gleen Berntson. She did not read his subsequent deposition testimony or any other materials relating to the RTB auction.[106]

77.     Ms. Vakharia was, however, forthright in her agreement with two of the expert opinions I express in the Richards Report: (1) that protection of fundamental privacy rights and historical privacy norms require, at a minimum, disclosure about what information is collected

---

[102] *Id.* at 4.

[103] Vakharia Dep. at 87:20-88:7.

[104] *Id.* at 94:17-96:4.

[105] *Id.* at 88:19-89:11; *see also* 49:22-24 (███████████████████████████████████ ██████); 56:14-20 (███████████████████████████████████ ████████████████████); 226:16-23 (████████████████ ████████) 226:25-227:18 (███████████████████████████████████████) 227:20-228:2 (she ███████████████████████████████████████████).

[106] *Id.* at 101:1-23.

about or associated with US Google account holders and offered for sale by Google to RTB participants[107]; and (2) that there is no evidence from which a trier of fact could conclude that Google in fact discloses the Google RTB system, or the sharing of account holder personal information to hundreds of entities outside of Google through the Google RTB system, to its account holders.[108]

78.     As to my first opinion, that protection of fundamental privacy rights and historical societal privacy norms require, at a minimum, disclosure of the data practice at issue in order to establish consumer consent, Ms. Vakharia testified for Google:



79.     With respect to my second opinion, that there is no evidence of disclosure to account holders of the Google RTB system, Ms. Vakharia, on behalf of Google, made repeatedly clear that Google's Terms of Service, Privacy Policies and related disclosures ***do not disclose*** the existence of Google RTB, its extensive reach, or the sharing and sale of Google account holder personal with and to hundreds of outside companies in Google RTB. Here are some notable

---

[107] *See* Richards Rep. at ¶¶ 118-128, 129,

[108] *See id.* at ¶ 135.

[109] Vakharia Dep. at 62:18-63:7 (emphasis mine).

excerpts from Ms. Vakharia's deposition as a corporate representative of Google (excluding counsel's objections) on this point:



---

[110] *Id.* at 49:15-18

[111] *Id.* at 49:25-50:9

[112] *Id.* at 294:6-18 (emphasis mine).

[113] *Id.* at 274:22-275:8



80.     Having conceded, on behalf of her company, that Google's Terms of Service, Privacy Policies and related disclosures do not ***expressly*** disclose Google RTB, or that Google shares and sells account holder personal information to hundreds of outside companies using Google RTB, Ms. Vakharia suggests it is enough for Google to say that "█████████████████████████████," that "█████████████████████████," or that Google "█████████████████████████████."[116] A trier of fact ultimately will decide whether this is right.

81.     It is my expert opinion, however, that Google's representations of what it does itself or with its "business partners" are irrelevant to the issue of consumers' reasonable expectations of privacy when it comes to Google RTB (which, as Google admits, plainly is ***not ever disclosed***). Based on my experience as a privacy and data privacy scholar, it is my opinion that a reasonable consumer would not consider ██████, ████, or █████████, or Chinese companies like █████████████, or Russian companies like ██████████████,

---

[114] *Id.* at 275:10-15 (emphasis mine).

[115] *Id.* at 295:6-11 (emphasis mine).

[116] *See* Vakharia Decl. (ECF 592-5) ¶ 14.

or, indeed the hundreds of other companies that participate in Google RTB[117], to be "partners" in Google's business. ████████████████████████████████████████████████

████████████████████████████████████████████[118]

### D. Third-Party Website Information Submitted By Google Does Not Disclose RTB Nor Seek Consent For Google To Engage In RTB

82.     The final issue that I will address in the report is the claim that it is possible that consumers learned about Google RTB's data-sharing practices from third-party sites that mentioned or allude to RTB. Thus, the Hanssens Report remarks that I "ignore[] disclosures that Google account holders can encounter when they visit publisher websites. These disclosures can include extensive details about the information that publishers share with Google for the purposes of advertising."[119]

83.     *First,* as with Google's Terms of Service, Privacy Policies and related disclosures, none of the third-party websites that Mr. Hanzarik has gathered actually disclose the Google RTB auction, discuss what Google's role in Google RTB is, what specific types of information about Google account holders Google shares or sells to publisher websites (and hundreds of others) in Google RTB, the type and extent of persistent identifiers that are shared in Google RTB, or the sheer scope of Google RTB. *In fact, the words "Google RTB" or "Google real-time-bidding" do not appear anywhere in the materials Mr. Hanzarik puts before the Court.* Prof. Hanssen's speculation is not supported by any of the evidence introduced by Mr. Hanzarik.

84.     *Second,* I note that all of the Hanzarik exhibits are screen shots taken in July to late September of *this year* – and thus do not represent what any Google account holder (or anyone

---

[117] Shafiq Rep. ¶¶ 38-39.

[118] *See, e.g.,* Pritzker Reply Decl., Ex.50 (XANDR-RTB-00000005 (excerpt); GOOG-HEWT-00041850 (excerpt); and NBCU_HEW_00001 (excerpt)).

[119] Hanssens Report ¶ 81.

else, for that matter) may have had access to over the seven years between June 2016 and the end of 2022.[120]

85.     ***Third***, the third-party websites, in my mind, are irrelevant to the core question of what a Google Account Holder's reasonable privacy expectations are with respect to Google's practices. In my experience as a privacy expert, if a reasonable Google Account Holder is told in her contract with Google that "we don't sell your personal information," she would never scour third-party non-Google websites to see if Google might have been lying. As I have explored in my academic work,[121] it is already hard enough for consumers to understand and consent to what companies are doing with their data that a reasonable consumer should be able to rely on an express promise by a company that it does not sell their personal information without engaging in independent fact-checking and cross-referencing. To suggest otherwise is, in my expert opinion, not merely unreasonable but frankly laughable.

86.     Moreover, as a practical matter, suggesting that over-burdened consumers investigate (for example) other websites' privacy policies in order to triangulate those dense legal texts to shed light on the privacy policies of Google is once again to insist that consumers undertake an impossible task.[122] Evidence from the privacy literature confirms this. For example, one famous study found that merely reading the privacy policies the average consumer would encounter in a year would take them 76 working days of non-stop reading.[123] Another study of mobile privacy

---

[120] Mr. Hanzarik likewise made no effort to discern when the third-party website notices he was hired to record were first published or made available to viewers via the web. *See* Hanzarik Dep. at 57:11-23 (testifying that all exhibits were captured in July to late September 2023 and there was no attempt to look at any older versions of webpages or policies).

[121] *E.g.,* Neil Richards & Woodrow Hartzog, *The Pathologies of Digital Consent*, 96 Wash. U. L. Rev. 1461 (2019).

[122] It is equally implausible (and unreasonable) to require average US Google account holders to scour PR Newswire, the BBC, the South African news, or various tech blogs to learn about Google RTB and its impact on their data privacy rights, as Mr. Deal (Deal Rep. at ¶ 107) and Google's counsel (Somvichian Decl. at ¶ 56) suggest.

[123] Aleecia M. McDonald & Lorrie Faith Cranor, *The Cost of Reading Privacy Policies*, 4 I/S: J. L. Pol'y Info. Soc'y 543 (2009).

policies found that average consumers could easily find themselves with 250,000 words of privacy policies to read and that "for most people, this is an impossible task."[124] In this vein, it is worth recalling the statement of the Director of the FTC's Bureau of Consumer Protection that "[i]t's a fantasy that consumers can be put on 'notice' of how their data is being handled by reading thousands of pages of dense privacy policies. And it's a fiction that they can somehow exercise 'choice,' when that would essentially require them to opt out of the digital economy."[125] Yet Google, its employees and its experts seem to be taking the position that it is not enough for consumers to be held accountable for reading thousands of pages of dense and vague privacy policies to make their decisions, but that they must then be required to cross-reference them to see if there are disclosures relevant to other privacy policies that they might have read. Such an obligation would seem to be impossible, both as a practical matter given the reasonable limits of consumer attention and likely also as a mathematical one, given the finite number of hours in the day.

87.     In sum, given the overwhelming burdens already placed upon digital consumers, it is unreasonable to expect Google account holders to rely on any more than the clear representations made to them by Google that it will not sell their personal information, and any speculation about whether Google account holders might have learned about Google RTB from other sources is no more than that, particularly where the Hanssens Report could have—but did not—attempt to test for (to my mind) such a highly implausible hypothesis.

Executed on November 29, 2023 in St. Louis, Missouri.

Neil Richards

---

[124] *250,000 Words of App Terms and Conditions*, Norwegian Consumer Council, May 24, 2016, http://www.forbrukerradet.no/side/250000-words-of-app-terms-and-conditions.

[125] *See* reference at n. 93, *supra*.

## **Appendix A**

### Additional Case Materials Considered

Expert Report of Professor Dominique Hanssens in Support of Google LLC's Opposition to Plaintiff's Motion for Class Certification (Sealed ECF 584-5)

Expert Report of Bruce Deal in Support of Google LLC's Opposition to Plaintiff's Motion for Class Certification (Sealed ECF No. 584-8)

Declaration of Suneeti Vakharia in Support of Google LLC's Opposition to Plaintiff's Motion for Class Certification (Redacted ECF No. 592-4)

Declaration of Hunter Hanzarik Support of Google LLC's Opposition to Plaintiff's Motion for Class Certification (ECF No. 594)

Google LLC's *Daubert* Motion to Exclude Plaintiffs' Expert Neil Richards (ECF No. 582)

Transcript of October 31, 2023 deposition of Professor Dominique Hanssens

Transcript of October 24, 2023 deposition of Bruce Deal

Transcript of November 15, 2023 deposition of Suneeti Vakharia

Transcript of November 2, 2023 deposition of Hunter Hanzarik

XANDR-RTB-00000005

GOOG-HEWT-00041850

NBCU_HEW_00001