# EXHIBIT 1
# to the Declaration of
# Aarti Reddy
## (Excerpt Copy of Transcript of
## B. Deal)

# (REDACTED VERSON OF
# DOCUMENT SOUGHT TO BE FILED
# UNDER SEAL)

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5   In re Google RTB Consumer   ) Case No.

     Privacy Litigation,         ) 4:21-cv-02155-YGR-VKD

 6                               )

                                 )

 7   This document applies to:   )

     All actions                 )

 8   _____ )

 9

10

11

12                   CONFIDENTIAL

13       VIDEO-RECORDED DEPOSITION OF BRUCE DEAL

14

15             Tuesday, October 24, 2023

16             San Francisco, California

17

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 6151469
```

Page 1

CONFIDENTIAL

```
 1                        BRUCE DEAL,

 2           having been duly administered an oath,

 3           was examined and testified as follows:

 4

 5                       EXAMINATION

 6    BY MS. WEAVER:

 7         Q.    Good morning, Mr. Deal.

 8               How are you?

 9         A.    Good morning.  I'm well.

10               Thank you.                        09:10:04

11         Q.    Good.

12               Where are you currently employed?

13         A.    Analysis Group.

14         Q.    And what is Analysis Group?

15         A.    It's an economic financial and strategy   09:10:10

16    consulting firm.

17         Q.    And you've been deposed before; correct?

18         A.    Hundreds of times.

19         Q.    Hundreds of times?

20               More than 200?                    09:10:16

21         A.    I don't know.  Something like that.

22         Q.    More than 300?

23         A.    I doubt it, but I don't know.

24         Q.    And you understand you're under oath

25    today; is that right?                        09:10:26
```

                                                    Page 12

CONFIDENTIAL

```
 1              Thank you.
 2    BY MS. WEAVER:
 3         Q.   Looking at the first page of Appendix A --
 4    well, strike that.
 5              What is Appendix A?                    09:11:20
 6         A.   Appendix A is a copy of my CV.
 7         Q.   And that's up to date and correct?
 8         A.   Yes, as of when the report was filed,
 9    so --
10         Q.   Okay.                                  09:11:24
11         A.   -- there's been a few reports and
12    depositions since then, but it's -- it's -- it was
13    current.
14         Q.   And we'll come back to that.
15              Just looking at the first page, it     09:11:35
16    reflects that you have your double major in
17    economics and global studies; is that right?
18         A.   That's correct, yes.
19         Q.   Okay.  What is currently your primary
20    field of study?                                  09:11:45
21         A.   I'm not sure what you mean by my "field of
22    study."
23         Q.   Do you have an area of expertise?
24         A.   Yes.  I -- I'm an economist.  I -- but
25    I -- that -- that encompasses a range of -- of     09:11:57
```

Page 14

```
 1    different types of issues.

 2            I deal with finance, statistics,

 3    economics, you know, data analytics, a variety of --

 4    of topics.

 5        Q.   So you -- you note here in the first page    09:12:11

 6    that you have over 25 years of experience in

 7    economic litigation and management consulting;

 8    correct?

 9        A.   That's correct.

10        Q.   Is that how you would define your           09:12:21

11    expertise?

12        A.   I'm not sure if I'd say quite that in the

13    sense that -- I mean, that is my -- that is my sort

14    of employment area, but I think the way I would

15    define my expertise is more what I said just a        09:12:36

16    moment before that in terms of economics, finance,

17    statistics, data analytics.

18        Q.   And for the last 25 years, you've been a

19    consultant; correct?

20        A.   Yeah.  I think I understand what you're      09:12:47

21    saying.  I've been an employee of -- of various

22    consulting firms; but, yes.  So with regards to my

23    clients, I've been a consultant.

24        Q.   And the first page here, at the very top

25    it says "BRUCE F. DEAL," which is your name; right?    09:13:01
```

Page 15

CONFIDENTIAL

```
 1        A.    Yes.

 2        Q.    How many times?

 3        A.    Once completely.  I think I may have

 4   reviewed their summary of opinions another time.

 5        Q.    Now, Mr. Striegel is contesting some of      09:41:11

 6   the studies and conclusions drawn by Plaintiffs'

 7   experts; correct?

 8        A.    That's -- again, that's my recollection.

 9   Again, this is outside of my assignment, so I

10   wouldn't -- I wouldn't use me as the source of        09:41:29

11   information as to exactly what he's doing, but I do

12   recall that he was critiquing some of the work by

13   the Plaintiffs' experts.

14        Q.    And you relied on Mr. Striegel's report in

15   your report; correct?                                 09:41:43

16        A.    I'd say in a -- in a -- in a very limited

17   way.  I'd have to go back and -- and review where

18   I -- I -- I cited his report.  It certainly wasn't

19   a -- a foundational opinion that went into my

20   report.  But I may have cited -- here we go.  I just  09:42:04

21   see the Striegel report here.  So, for instance,

22   Footnote 17.  I see that.

23            Oh, sorry, did I say 17?  I meant 37.

24   Where I cite it, you know, re- -- relative to

25   certain of the types of fields that are populated,    09:42:29
```

Page 41

1    which can depend on -- again, I list a number of

2    factors.  So I believe this is the kind of topic

3    that Mr. Striegel was -- was looking at.

4        Q.   And did you just accept his conclusions

5    in -- as true, or did you engage in any kind of          09:42:47

6    inquiry to test whether what he was saying is

7    accurate?

8        A.   I certainly -- again, I wasn't asked to --

9    the -- there -- the topics that Mr. Striegel and the

10   experts he was critiquing were focused on were not       09:43:06

11   topics that were part of my direct assignment.  So I

12   certainly didn't replicate the results or myself do

13   kind of independent critiquing of either

14   Mr. Striegel or the opposing expert.

15          To the extent -- for the purposes of what          09:43:29

16   I needed, which is to understand the types of data

17   that are at issue, kind of the -- the -- the extent

18   to which they are, again, commonly shared, if you

19   will, I -- I relied on his opinions, but also, his

20   opinions are certainly confirmatory, I would say, of     09:43:51

21   what I think is pretty clear from the totality of

22   the record, which is that not every field is shared

23   in -- in -- in every bid request, and there's a

24   number of factors that can affect, which I -- I go

25   into for my own independent analysis, as to the          09:44:06

Page 42

1    kinds of things that can affect the type of

2    information that's being shared.

3              So I'd say his opinions were certainly

4    consistent with mine, but I wasn't -- as part of my

5    assignment, I wasn't asked to go back and, you know,    09:44:19

6    replicate or review or analyze any specific work

7    that was done.

8         Q.   You're not a data engineer; right?

9         A.   I'm not a data engineer, no.  I'm -- I --

10    I work -- I've worked with data and databases for a    09:44:29

11    very, very long time, and many of my cases involve,

12    you know, complex, you know, datasets, but I -- I'm

13    not a data engineer.

14         Q.   Do you understand code?

15         A.   Some.  I don't -- I don't do coding now.    09:44:41

16    I actually started -- I -- I wrote computer software

17    a long time ago.  So I do understand kind of basic

18    principles of code, but I'm not a -- I'm currently

19    not a coder, no.

20         Q.   Currently not a coder.    09:45:01

21              Have you reviewed any of the dataflow in

22    this case?

23              MS. REDDY:  Objection.  Vague and

24    ambiguous.

25              THE WITNESS:  I'm not quite sure what --    09:45:07

Page 43

CONFIDENTIAL

1    and I typically don't do.

2    BY MS. WEAVER:

3        Q.   Were you asked to render opinion about

4    users' expectations?

5        A.   I think the way I would answer that is --    09:47:10

6    is not -- not conclusory opinions.  I think where

7    I -- where I would say there's some overlap with my

8    opinions there is that, as I think I pretty clearly

9    describe in the report, you know, what users

10   understand, what their expectations are, you know,    09:47:35

11   based on the understanding and what the reality is,

12   those are all elements that could contribute to

13   variability and individual questions.

14            So -- but I don't offer any, you know,

15   opinions that X percent of people understood this or    09:47:51

16   expected this or Y percent.  That's not the kind of

17   opinion I'm offering.

18       Q.   You're not a privacy expert; right?

19       A.   I agree with that.  I mean, again, privacy

20   is an issue that comes up more frequently all the    09:48:04

21   time I would say.  But I don't consider myself a --

22   a specific privacy expert, no.

23       Q.   And you're not a data engineer; right?

24       A.   Again, not a -- certainly not a data

25   engineer.  I'm a -- I -- I do lots of data    09:48:18

Page 46

 1    analytics.  And I've worked with -- you know, for

 2    30 years, worked with lots of datasets.  So I am an

 3    expert in working with datasets and understanding

 4    what datasets are and how they're used and how they

 5    interact, but I'm not a data engineer.          09:48:34

 6        Q.   And you didn't conduct any surveys; right?

 7        A.   I did not.  That's correct.

 8        Q.   And looking at -- going back for a moment

 9    to Appendix B, you did not review the reports of the

10    Plaintiffs' experts regarding dataflow; correct?    09:48:55

11            MS. REDDY:  Objection.  Mischaracterizes

12    testimony.  Appendix B lists the documents relied

13    on.

14            THE WITNESS:  Yeah, I'm not -- I'm not

15    sure exactly what you're asking, but it -- but, I    09:49:09

16    mean --

17    BY MS. WEAVER:

18        Q.   You've testified you skimmed possibly one

19    expert report; correct?

20        A.   No.  I think -- no I -- well, in fact, if   09:49:18

21    that's what I said, then that was a

22    mischaracterization.  So --

23            THE COURT REPORTER:  Could you slow down a

24    little bit, please.

25            THE WITNESS:  Sure.                  09:49:26

                                             Page 47

CONFIDENTIAL

```
 1    your --

 2         A.    I did, yes, mm-hmm.

 3         Q.    -- report?

 4               So you wrote, "Contrary to Professor

 5    Zeithammer's assumption that the data fields in a      09:55:03

 6    Bid Request that are 'commonly shared,' I understand

 7    that the types of fields populated and shared vary

 8    substantially across Bid Requests."  [As read]

 9               I'll pause there.

10               Do you see that?                            09:55:16

11         A.    Yes.

12         Q.    And what's the basis for your

13    understanding?

14         A.    Well, I'd say a -- a number of factors.  I

15    cite -- and we -- we already talked a little bit       09:55:28

16    about the Striegel report speaks to these questions,

17    but there's certainly the -- the -- I'd say

18    they're -- they're consistent with my overall

19    understanding.  And I, you know, cite various other

20    documents throughout their -- my report, that speak    09:55:45

21    to the quest- -- this question of, you know, when

22    different fields are shared, for instance, with the,

23    you know, the -- the -- the pop-ups that can come up

24    and -- and, you know, ask questions about do you

25    want to allow cookies, things like that, to the        09:56:04
```

Page 54

```
 1   extent that for a younger, you know, computer users,

 2   other fields are not shared.

 3           There's lots of information that's

 4   consistent with the fact that the -- you know, not

 5   every field is shared in every circumstance.  And      09:56:20

 6   there's browsers that can be used.  There's blockers

 7   that can be used.  There's a lot of different things

 8   that I talk about throughout my report, that, you

 9   know, use of VPN -- so I'm summarizing here, you

10   know, kind of what's con- -- what's throughout my      09:56:37

11   entire report.

12       Q.   So I understand you have a conclusion.  I

13   am trying to ask you what is the basis for that

14   conclusion, both factual and experiential.  You did

15   not perform any testing; right?                        09:56:56

16       A.   I --

17           MS. REDDY:  Objection.  Vague and

18   ambiguous.

19           THE WITNESS:  I think I agree with that to

20   the extent I didn't -- I didn't independently look     09:57:01

21   at bid requests, for instance, so I didn't do any

22   testing of those.

23   BY MS. WEAVER:

24       Q.   And did you look at what data is described

25   to be contained in bid requests?                       09:57:09
```

Page 55

```
 1    understood.  I think -- I think it's clear that --

 2    that there's a set of available fields, and

 3    that's -- that's what this document, as I -- as I

 4    read it, is -- is talking about.  Here are fields

 5    that -- that can be used in bid requests.          10:14:10

 6          But my statement here is much more about,

 7    you know, are they used.  So there are many

 8    circumstances where some of these fields may not be

 9    used.

10          I'm not -- my statement shouldn't be read    10:14:27

11    to say it's a completely different set of variables

12    that are used for Person A and Person B.  That's

13    not -- that's not my point.

14          I think there are -- you know, they may

15    have evolved over time and so forth.  But generally 10:14:42

16    there's a set of potential variables that can be

17    used for -- and that's what I read this to be,

18    "included in Bid Requests."  That -- I don't read

19    that to say every single bid request always has

20    every one of these populated.  I don't think that   10:14:59

21    would be an accurate statement based on my

22    understanding.

23          And that's what I'm referring to here, is

24    when one uses different -- different browsers,

25    different software, different blockers, when it      10:15:11
```

Page 72

1    detects the age and uses, you know, restricted data

2    processing.  There's a lot of circumstances where

3    it's only a subset of the fields that -- that --

4    that may be used at all.

5            So it's more about the -- you know, are        10:15:25

6    all of them?  Is it a subset?  Is it a variation.

7    That's my point.

8        Q.    Mr. Deal, I understand your conclusion.

9            This document does not say what you just

10   said, does it?                                          10:15:37

11           MS. REDDY:  Objection.  Argumentative.

12   Mischaracterizes testimony.

13   BY MS. WEAVER:

14       Q.    Does this document support your statement

15   that it's a completely different set of variables       10:15:45

16   for User A and B?

17       A.    No, no, that's --

18           MS. REDDY:  Objection.  Mischaracterizes

19   the document.  Mischaracterizes his testimony.

20           THE WITNESS:  It's def- -- that's            10:15:59

21   definitely mischaracterizing my testimony.  I said

22   specifically that's not what I'm saying.  I'm not

23   saying there's a complete -- I'm saying there's a --

24   I think of it as there's a master set of -- of

25   variables.  That's what this document is speaking     10:16:07

Page 73

CONFIDENTIAL

1    about.

2            There are many circumstances where not

3    every one of these variables and different

4    combinations of them may not be included in the bid

5    requests.  They may be blank, for instance, for all      10:16:19

6    kinds of reasons, the software you're using, the

7    blockers you're using, device you're using, you

8    know, age of the user, VPNs, all kinds of issues out

9    there.

10           So I'm specifically not saying, "Oh, for      10:16:34

11   you there's a -- there's one set of variables.  For

12   you, there's another."  There's a master set for

13   everybody, But it's only -- you know, they're --

14   whether all of them or a subset or what subset,

15   that's the variability here.                           10:16:47

16   BY MS. WEAVER:

17       Q.   And with regard to the second part of your

18   opinion, that some blockers may prevent some data

19   fields from being transmitted, you did not conduct

20   any testing on that; right?                            10:16:59

21       A.   I agree with that.  If the question is --

22   is a technical question -- that's right.  There's

23   lots of documents that speak to -- to that and, you

24   know, people who talk about their own products and

25   say they block and all that, but I -- I myself        10:17:15

                                             Page 74

1  so that the other side can test the foundation for

2  your conclusions?

3       A.   That -- I mean, there -- there may be

4  other reasons too, but that's certainly frequently

5  what -- what happens.                              10:49:43

6       Q.   And I'll direct your attention here to

7  Footnote 25.

8       A.   Okay.

9       Q.   Actually -- do you see where it says,

10 "Interview with Stanislav Belov, August 16, 2023"?   10:50:07

11      A.   Yes.

12      Q.   What does that refer to?

13      A.   Literally, I had a telephone interview

14 with Mr. Belov on that date.

15      Q.   And who was present?                      10:50:24

16      A.   I was present, Mr. Belov was present, my

17 colleague, Hristina Bartlett, was present.  I think

18 my recollection is counsel was present.  I don't

19 actually remember who -- who in terms of exactly

20 which counsel were present.  I mean, it was -- it    10:50:46

21 was me and my colleague, Ms. Bartlett, asking

22 questions of Mr. Belov.  So I don't recall which

23 other counsel were there.

24      Q.   Has --

25      A.   But there were -- there were some counsel.  10:50:54

Page 90

1    team member present as well to, you know, kind of

2    assist in conducting and then, you know, kind of

3    incorporating the material into -- from the

4    interview into my report.

5         Q.   Is Ms. Bartlett working on any other          10:52:00

6    matters for Google currently?

7         A.   Maybe.  I don't know.

8         Q.   And going back to this interview with

9    Mr. Belov, did you identify that in your Appendix B?

10        A.   I don't recall if I specifically called it   10:52:37

11   out.  It's obviously included in my report.

12        Q.   You don't see it there, do you?

13        A.   I don't see it specifically listed in my

14   Appendix B, which is list of documents relied upon.

15   So it's not a document.  It's an interview.  So it's   10:52:56

16   included in my -- in -- clearly identified in

17   Footnote 25 and other footnotes as I recall.

18        Q.   Yes, we'll discuss them.

19             How long was your conversation with

20   Mr. Belov?                                              10:53:10

21        A.   Best of my recollection -- recollection,

22   it was about an hour.

23        Q.   Was it transcribed?

24        A.   No.

25        Q.   Why not?                                      10:53:17

                                                      Page 92

```
 1            MS. REDDY:  Objection.  Calls for

 2   speculation.

 3            THE WITNESS:  It didn't need to be

 4   transcribed.  I had some specific questions for him.

 5   He answered the questions.  I incorporated the        10:53:27

 6   results into the -- into the report.

 7   BY MS. WEAVER:

 8       Q.   You understand that this is an evidentiary

 9   matter; right?  A fact-based piece of litigation?

10       A.   I think I understand what you're saying.    10:53:38

11       Q.   And so, the answer is?

12            MS. REDDY:  Objection.  Vague and

13   ambiguous.

14            THE WITNESS:  Well, I mean, it -- that

15   sounds right to me.  I mean, and -- I guess, if       10:53:48

16   you're asking for a legal opinion, I don't have a

17   legal opinion, but --

18   BY MS. WEAVER:

19       Q.   I'm asking your opinion as an expert who

20   relied on an interview for which there is no          10:53:57

21   transcript.  Why is there no transcript of your

22   interview with Mr. Belov?

23       A.   I --

24            MS. REDDY:  Objection.  Asked and

25   answered.                                             10:54:04
```

Page 93

1              Just pause for a moment.

2              THE WITNESS:  I didn't need a transcript.

3    BY MS. WEAVER:

4         Q.   And you understand that depositions are

5    transcribed; right?                                10:54:12

6         A.   Typically, yes.

7         Q.   Have you ever heard of a deposition that

8    wasn't?

9         A.   Can't think of one.

10        Q.   In 30 years, you've never heard of a      10:54:25

11   deposition that wasn't transcribed; right?

12        A.   I can't think of one.

13        Q.   In your 30 years of practice, have you

14   ever relied on an interview that was not

15   transcribed?                                        10:54:37

16        A.   Oh, many times, yes.

17        Q.   Uh-huh.  And was -- was your report

18   stricken on that ground?

19        A.   No.

20        Q.   Going back to your interview with          10:54:42

21   Mr. Belov, why did you need the interview with him?

22        A.   I'd say -- well, in a -- you know, I would

23   want to look back and see the various places that I

24   referred to it.  I -- they -- in a couple of

25   cases -- well, let me just -- let me just -- give me  10:54:56

Page 94

```
 1    a moment to look at this one as an example here.

 2              (Witness reviews.)

 3    BY MS. WEAVER:

 4         Q.   And for the record, while you're

 5    reviewing, I'll -- I'll read the testimony for which    10:55:09

 6    you cited him here.

 7              "The percentage earned by Google varies

 8    across products and publishers.  Given that multiple

 9    demand channels compete for the same ad inventory,

10    the ad inventory would almost always be sold, and       10:55:21

11    Google would earn revenue, even if one demand

12    channel is eliminated."

13              Do you see that?

14         A.   I do, yes.

15         Q.   What did you learn from Mr. Belov in your     10:55:29

16    untranscribed interview that provided a basis for

17    that statement?

18         A.   Well, of course, I would note that my

19    Footnote 25 includes -- starts with some citations

20    to the Berntson deposition, which I -- I certainly      10:55:50

21    rely on the Berntson deposition, the pages I cite.

22    And he cited throughout my report, including on my

23    Exhibit 3 and -- and other places.

24              But basically, this was a confirmatory

25    element.  This was my understanding going into the      10:56:03
```

Page 95

1    interview, is that based on the data I had seen, the

2    percentage -- two statements.  The percentage earned

3    could vary across products and publishers.  And that

4    ad inventory would be populated by some method, and

5    Google earns method by the method.                    10:56:25

6             So, for instance, DV3, as an example, even

7    if a demand channel.  So the -- I would say it was

8    confirmatory of my understanding in this case.

9        Q.   When you say "it," do you mean what

10   Mr. Belov told you was confirmatory?                  10:56:37

11       A.   He confirmed my understanding, yes.

12       Q.   Okay.  And go -- going to pages 15 to 16,

13   Footnotes 44 and 47, do you see in Note 44, you cite

14   Mr. Belov following the sentence, "There is no

15   requirement for a user to have a Google account to    10:57:01

16   see ads populated by ██████████."

17            Do you see that?

18       A.   Yes.

19       Q.   What is an ███?

20       A.   ██████████████████.                           10:57:10

21       Q.   What is ████████████████?

22       A.   An ██████████████ is an entity that's

23   allowed to participate in the realtime bidding

24   process via a server-to-server connection that is

25   vetted by Google.  So I don't know exactly how many   10:57:27

Page 96

CONFIDENTIAL

```
1    of them there are, but there are -- they're, you

2    know, dozens or -- or whatnot.  So they're

3    participants -- they're direct participants in the

4    realtime bidding process that have been vetted by

5    Google.                                        10:57:43

6         Q.   And what is an ███?

7         A.   ████████████████████████

8         Q.   And what are they?

9         A.   That would be -- my general

10   understanding -- and, of course, I'm not offering    10:57:50

11   technical opinions on -- on these.  But an open

12   bidding partner is -- for the most part, they are

13   sort of -- I think of them as sub-auctions.  So

14   they're -- they are entities that are themselves

15   conducting an auction among buyers, and then -- or   10:58:05

16   potential buyers and bidders.  And then the winner

17   of that little sub-auction would be a participant in

18   the -- the RTB process.

19        Q.   And looking at Note 47, you again quote

20   Mr. Belov.                                        10:58:24

21             Do you see that?

22        A.   Hang on a second.  Just give me a minute

23   to kind of refresh my memory here of where we are.

24             (Witness reviews.)

25   BY MS. WEAVER:                                    10:58:41
```

Page 97

1       Q.   And I'll read into the record in the

2   footnote what you wrote. ████████████████

3   ███████████████████████████████████████

4   ███████

5       Do you see that?            10:58:52

6       MS. REDDY:  Counsel, he's still reading.

7   Can you give him a moment, please.

8       THE WITNESS:  Yeah, I just --

9   BY MS. WEAVER:

10      Q.   This is a report that you wrote, and I'm   10:58:59

11   reading -- look at Footnote 47.

12      A.   Yeah, I do -- do you mind, I -- I just

13   want to --

14      Q.   Okay.

15      A.   -- refresh -- reread the paragraph, if you   10:59:05

16   don't mind.

17      Q.   Sure.  I was directing your attention to

18   the footnote.

19      A.   Okay.  Let me read the paragraph first,

20   and then I'll --                 10:59:23

21       (Witness reviews.)

22       Okay.

23   ███  █████████████████████████████

24   ████████████████████████████████████

25   ███████████████████          11:00:35

Page 98

```
 1              Do you see that?
 2       A.    Yes.
 3       Q.    What does that mean?
 4       A.    Again, I'm -- I'm not the person that's
 5  going to offer the detailed technical understanding.   11:00:42
 6  But the GAIA cookie would be an ident- -- as
 7  understand it, an identification of the --
 8  essentially, the Google accountholder information.
 9  So when a user's on a third-party -- or a publisher
10  site like CNN, the GAIA cookie would be considered a   11:01:01
11  third-party cookie.  So it's a -- it's a cookie from
12  Google that identifies the Google user.
13       Q.    And your knowledge on that is not based by
14  [verbatim] any testing; right?
15       A.    I agree with that.                          11:01:14
16       Q.    It's based on what Mr. Belov told you in
17  the August 16th undisclosed interview; right?
18       A.    I think it's in the Berntson deposition as
19  well.  I --
20       Q.    Do you cite that there?                     11:01:24
21       A.    Yes.
22       Q.    Following -- I -- I don't believe that's
23  the case, sir.  Look at your footnote.  You wrote
24  the sentence, ███████████████████████████
25  ████████████████████████████████████████  11:01:35
```

Page 99

```
 1            Do you see that?
 2            And then the citation to Mr. Belov follows
 3    that paragraph.
 4       A.   Yeah, but I -- my under- -- I mean, I'd
 5    have to look back in the Berntson deposition, but        11:01:46
 6    in -- my recollection is that the Bernstein
 7    deposition also talked about that.
 8       Q.   And what --
 9            MS. REDDY:  I'm just going to object as
10    mischaracterizes document.                               11:01:54
11    BY MS. WEAVER:
12       Q.   And what did Mr. Belov say to you that
13    provided additional support here?
14       A.   I -- I don't think I would be -- I would
15    characterize it as additional.  I mean, it was          11:02:08
16    confirmatory of -- that was -- this was my
17    understanding going into the interview, was that the
18    GAIA cookie would be a third-party cookie in that
19    situation.  Mr. Berntson confirmed that.
20       Q.   Looking at Note 49, do you see that you         11:02:23
21    wrote the sentence on page 17, "I understand that
22    Google does not ███████████████████████████████
23    ███████████████████████████████████████████
24    ██████████?
25            Do you see that?                                11:02:36
```

Page 100

```
 1        A.    Give me -- give me a second.

 2              (Witness reviews.)

 3              Yes, I see that.

 4    BY MS. WEAVER:

 5        Q.    And you cite -- the only -- the only        11:03:01

 6    citation there is your interview with Mr. Belov.

 7              Do you see that?

 8        A.    Yes.

 9        Q.    And other than your interview with

10    Mr. Belov, do you have any reason to believe that    11:03:11

11    Google does not separately track RTB revenue from

12    ads shown to users with and without Google accounts?

13        A.    I mean, it -- it would make sense given my

14    understanding of -- of, you know, the -- the GAIA

15    cookies and all of that, but that is literally the   11:03:35

16    source for that citation.

17        Q.    Turning to page 19, Footnotes 57 and 58,

18    do you see at Paragraph 47 where you wrote, "I

19    understand that Google does not ███████████████

20    ████████████████████████████████████████████        11:03:58

21    ███████████████████████████████████████

22    ██████████

23              Do you see that?

24        A.    Yes.

25        Q.    And you cite only Mr. Belov for that       11:04:09
```

Page 101

1    statement; right?

2         A.   Correct, that's the footnote.

3         Q.   Do you have any other basis for that

4    statement?

5         A.   I mean, again, no other specific citation.    11:04:27

6    I specifically asked that question to Mr. Belov,

7    and -- and he answered that.  That was my -- my

8    understanding was that the -- going into the

9    interview was that the U.S. identification would be

10   based on, you know, the -- the -- the internet ID,    11:04:40

11   but -- but he -- he was the source for that specific

12   confirmation or that specific element that there's

13   no way -- they don't have a means of -- of

14   identifying who's subject to the U.S. terms of

15   service.                                                11:05:01

16        Q.   And looking at Note 58, Mr. Belov is the

17   only person you cite there for the rest of that

18   paragraph; right?

19             MS. REDDY:  Objection.  The document

20   speaks for itself.                                      11:05:13

21             THE WITNESS:  Yeah, I guess it's a -- I --

22   I mean, I do cite that.  I think some of it is sort

23   of a logical proposition, but the -- the specific

24   reference to Mr. Belov there is really the -- I

25   understand that Google would not be able to            11:05:55

                                                    Page 102

1   determine on a class-wide basis whether certain

2   Google accountholders are subject to U.S. terms of

3   service.

4          That's the -- I mean, that was -- that was

5   my understanding going in, but I specifically asked    11:06:03

6   that question just to confirm that there's no way

7   Google could specifically identify that, and he

8   confirmed that.

9   BY MS. WEAVER:

10     Q.   And do you have an expertise in              11:06:12

11  determining which users are subject to the U.S.

12  terms of service?

13     A.   Certainly not a legal expertise, no.  I --

14  I -- my -- I have an understanding of what -- I

15  have -- I have an understanding that -- in terms      11:06:34

16  of that my overall analysis here is speaking to the

17  fact that the U.S.-identified revenue is not

18  consistent with the U.S. -- it's not synonymous with

19  the U.S. terms of service.  So I have that

20  understanding.                                         11:06:53

21     Q.   What is the basis of your understanding

22  about what U.S.-identified revenue is?

23     A.   Well, again, that was my understanding

24  going in, but -- but, again, confirming that

25  Mr. Belov here, that I understand that that U.S.       11:07:07

Page 103

```
 1    revenue is from U.S. IP addresses.  That's -- that

 2    was part of the confirmation with Mr. Belov that I

 3    reference here.

 4         Q.   What is the basis for your understanding

 5    that ███████████ is U.S. IP addresses?              11:07:20

 6         A.   If I look back here on Paragraph 44,

 7    Footnote 53, I talk about the Regan report, the

 8    Regan deposition, Google's revised supplementary

 9    response.  That was my understanding.

10         Q.   And that -- do you know the evidentiary   11:07:54

11    basis for Mr. Regan's conclusion?

12         A.   I'd have to look back in this footnote.  I

13    can't -- I don't have it memorized.

14         Q.   Do you know if it's what Google produced

15    in this case?                                       11:08:08

16         MS. REDDY:  Objection.  Vague and

17    ambiguous.

18         THE WITNESS:  Do I know if it's what

19    produced?

20    BY MS. WEAVER:                                      11:08:10

21         Q.   Is it -- do you know if it's based on

22    information that Google produced in this case?

23         A.   I'm not -- I'm not sure what you mean by

24    if it.  I mean...

25         Q.   Do you know if the evidentiary basis for  11:08:18
```

                                                    Page 104

CONFIDENTIAL

```
 1              THE WITNESS:  I mean, I just said I don't
 2     know, I haven't reviewed this, so --
 3     BY MS. WEAVER:
 4         Q.   You don't know.
 5         A.   -- I -- I don't know.                      11:46:36
 6         Q.   And you didn't discuss this with
 7     Mr. Belov; right?
 8         A.   If the question is, did I discuss specific
 9     named Plaintiffs' data with him, no, I didn't.  I
10     discussed the -- given the historical data that I --  11:46:47
11     that -- that we have available in this case, you
12     know, what is and isn't included in that data.  How
13     to understand that data that's in the case.  And
14     does -- does that data represent Google users, does
15     it represent U.S. IP addresses, and the answer is    11:47:04
16     no.
17         Q.   When you say "the historical data that we
18     have available in this case," what do you mean?
19         A.   The data that Mr. Regan's relying on.
20         Q.   So you are excluding the named plaintiff   11:47:16
21     data?
22         A.   Well, I'm not sure if I understand your
23     question since it -- Mr. Regan is using the -- the
24     data in my Exhibits 1, 2, 3, 4.  Not the named
25     Plaintiffs' data.  I'm not sure if you're --         11:47:38
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1              And that Google doesn't have a way of

2      replicating this data focusing on just Google

3      accountholders.  It -- it wouldn't be able to

4      identify Google accountholders who weren't signed

5      in, for one.  But also, it's just my understanding    11:49:10

6      that that's not how the data is kept.

7          Q.    And the basis of that is this conversation

8      you had with Mr. Belov?

9              MS. REDDY:  Objection.  Mischaracterizes

10     testimony.                                            11:49:20

11             THE WITNESS:  Yeah.  I'd have to -- well,

12     let me give -- if you give me a minute, I can look

13     back in my report.  This is a -- a slightly

14     different topic than we've been talking about, so...

15             (Witness reviews.)                            11:49:33

16             So I would -- I mean, as part of my

17     answer, I think we've been talking about a topic

18     that I review or that I discuss on pages 15, 16, 17,

19     and the top of 18.  So I have various references in

20     there to deposition testimony from Mr. Bernstein     11:51:41

21     [verbatim] -- or Dr. Bernstein [verbatim],

22     declaration of Dr. Bernstein [verbatim], interview

23     with Mr. Belov, as we've talked about, various other

24     citations.

25             So it's really in this section that I        11:51:58
```

Page 140

1    discuss my understanding of what Google can and

2    can't do in terms of identifying Google users with

3    regards to the relevant data.

4    BY MS. WEAVER:

5        Q.   Do you know if Google maintains a realtime    11:52:09

6    bidding revenue dashboard?

7        A.   I don't know.  I've -- I've seen reference

8    in depositions to various dashboards, but I don't

9    know.

10       Q.   Did you ask to review a realtime bidding    11:52:22

11   revenue dashboard?

12       A.   No.

13       Q.   You say you reviewed but did not rely on

14   Mr. Levitte's deposition; correct?

15       A.   Correct.                                    11:52:38

16       Q.   Do you have any recollection today about

17   whether he said that he says relies on a realtime

18   betting -- bidding revenue dashboard on a daily

19   basis?

20           MS. REDDY:  Objection.  Lacks foundation.    11:52:45

21   Outside the scope of his opinion.

22           THE WITNESS:  I said a minute ago, I -- I

23   recoll- -- I recall testimony about dashboards, and

24   I'm familiar with dashboards as a concept.  But I --

25   as I sit here right now, I don't recall --          11:52:53

Page 141

1           But that it originates from the publisher

2    and then Google is offering up the bid request to

3    either the authorized buyers or open bidding

4    partners that -- either the authorized buyers or the

5    sub-entities underneath the open bidding partners          01:04:51

6    are then looking at that data and putting in a bid

7    saying, "Oh, for this -- for this ad of this size on

8    this site, I'll pay $0.25," or whatever the number

9    is.

10          And it comes back.  That's evaluated              01:05:06

11   and -- against the other alternatives, DV3, other

12   kinds of things who are also participating in

13   realtime bidding.

14          And the winning bid is selected, and then

15   that -- that winning bid comes with an ad that's       01:05:18

16   then populated on the publisher's site.

17       Q.   So in your extensive description there of

18   the realtime bidding auction, you aren't describing

19   information that's collected about the targeted

20   individual, are you?                                   01:05:35

21       A.   I'm not sure what you mean.  I mean,

22   that -- I'm talking about the data that comes from

23   the publisher that it would --

24       Q.   What about the user?  Who's receiving the

25   ad?                                                    01:05:44

Page 162

```
 1          A.    No.   I'm -- and -- no is the short answer.
 2     That's not the purpose of that sentence; but, no.
 3          Q.    Paragraph 45.   This paragraph is about
 4     nonusers who may use VPNs with a U.S. IP address,
 5     which we've discussed extensively.                    02:44:15
 6               You wrote, "However, I understand this
 7     does not make them subject to U.S. terms of service
 8     (i.e., they are not a Proposed Class Member)."
 9               Do you see that?
10          A.    Yes.                                         02:44:25
11          Q.    What is the basis for you concluding that
12     that does not make them subject to a U.S. terms of
13     service?
14          A.    Well, again, I'd be careful about using
15     the word "concluding."   It's my -- it is my           02:44:37
16     understanding and it's a premise of my analysis
17     that -- and basic- -- the -- the answer to the
18     question I think is discussion with counsel.
19               That -- that's my -- I'm not -- I think
20     it's a legal question, as I understand it, but my --  02:44:52
21     in my discussion with counsel, my understanding is
22     the data that's provided is based on -- the U.S.
23     identification is the IP address, but that that's
24     not synonymous with U.S. terms of service.   So that
25     one is coming from my discussion with counsel.        02:45:05
```

                                                     Page 236

```
 1              In that paragraph, are you expressing a

 2    formal opinion about the expectations of class

 3    members based on what you found to be publicly

 4    available?

 5         A.   To the extent you're asking, I -- have I    04:22:25

 6    formed a [verbatim] opinion about what -- you know,

 7    did any individual class member or what percentage

 8    of the class members, exactly what they understood

 9    from those disclosures, no.  I'm not offering that

10    opinion.                                               04:22:42

11         Q.   Okay.  Turning back to the interview that

12    you had with Mr. Belov, why did you have that

13    interview with him?

14              MS. REDDY:  Objection.  Asked and

15    answered.                                              04:23:22

16              THE WITNESS:  Yeah, I -- anyway, I do

17    think that's a topic we've covered.  But I'd say

18    generally to confirm my understanding on a few

19    specific points and to get a -- a -- to develop an

20    understanding on other points.                         04:23:42

21    BY MS. WEAVER:

22         Q.   And what understanding did you develop as

23    a result of the Belov interview?

24         A.   I mean, we've -- we've been through many

25    of these before.  I mean, it -- there's a number of   04:23:54
```

                                                  Page 312

```
 1    places where I cite to the Belov interview.  If you

 2    want to go back through them, I'm happy to -- to do

 3    that.  I think we -- we sort of did that before I

 4    thought on, you know what was confirmatory of my

 5    understanding and what was, you know, specific          04:24:11

 6    information I obtained from Mr. Belov.  But it's a

 7    combination of those two things.

 8         Q.   And -- okay.  Strike that.

 9              We can break for now.

10              THE COURT REPORTER:  You'd like to go off     04:24:39

11    the record?

12              MS. WEAVER:  Yeah.

13              THE VIDEOGRAPHER:  Hang on.  Going off the

14    record.  The time is 4:24 p.m.

15              (Short recess taken.)                         04:24:47

16              THE VIDEOGRAPHER:  Back on the record.

17    The time is 4:38 p.m.

18    BY MS. WEAVER:

19         Q.   May I ask you to look at Exhibit 5 of

20    your -- to your report.                                 04:39:17

21         A.   Okay.

22         Q.   And who prepared this?

23         A.   I did with my team, assisting.

24         Q.   Okay.  And looking at the second page,

25    where it says "Sources," are those all of the          04:39:38
```

Page 313

```
 1              I'm saying that's not the right framework.

 2    There are -- you need to look and understand whether

 3    the benefits that one gets from the sharing of

 4    personalized ads, you know, even if -- even if you

 5    accept the fact that there's a certain cost or value    05:21:23

 6    for the data, which I have obviously lots of

 7    analysis in here to say, it's not -- it's not the $3

 8    and change that is used by Mr. Regan and Professor

 9    Zeithammer.

10              But accepting for the moment that there       05:21:37

11    might be some value, needing -- looking at the

12    benefits that -- that offset that, is certainly the

13    right way to think about, is there harm or not for

14    an individual.

15              (Deal Deposition Exhibit 6 was marked for     05:21:54

16              identification.)

17    BY MS. WEAVER:

18       Q.   Okay.  I've just marked as Exhibit 6, the

19    document that you cited, Note 137 at page 432.

20              And I'll direct your attention to the         05:22:03

21    bottom paragraph, where it says, "Because the

22    but-for scenario differs from what actually happened

23    only with respect to the harmful act, damages

24    measured in this way isolate the loss of value

25    caused by the harmful act and exclude any change in    05:22:19
```

Page 350

1    the plaintiff's value arising from other sources."

2    [As written]

3              Do you see that?

4              MS. REDDY:  Take the time you need to

5    review the document.                           05:22:28

6              THE WITNESS:  Yes, I see that.

7    BY MS. WEAVER:

8         Q.   "And so, a proper construction of the

9    but-for scenario and measurement of the hypothetical

10   but-for plaintiff's value by definition includes in   05:22:46

11   damages only the loss caused by the harmful act."

12   [As read]

13             Do you see that?

14        A.   Yes.

15        Q.   It does not say that you look at other    05:22:52

16   profits earned as a result of what occurred; does

17   it?

18        A.   I -- I'm not sure if I understand the

19   question exactly, but I think that's a

20   misunderstanding of what it's referring to here.   05:23:04

21             What -- what it's referring to is, it's

22   very often a situation where a lot of things are

23   happening at -- at the same time or -- or kind of

24   overlapping.  So it may be that profits go down over

25   time, for instance.  And the -- the issue is, you   05:23:27

                                        Page 351

1    want to -- again, this is sort of a -- it's a --

2    it's a framework.  It's a -- it's a construct for

3    how to do damages, to say the revenues and profits

4    may go down because the economy was bad.

5            So you can't include the economy going bad    05:23:41

6    in your damages analysis.  You have to run the

7    experiment of, if I just do -- change the disputed

8    event, what's the effect of that disputed event.  It

9    shouldn't be read to say, if the disputed event has

10   two -- two effects that you don't look at both    05:23:59

11   effects, that's not the way to read that.  It's

12   to -- the way to read that statement and that

13   analysis is you need to look at just the effects

14   that are associated with the disputed action, not

15   sort of other things that are happening for other    05:24:18

16   reasons.

17       Q.   Looking at that first sentence in

18   Paragraph 94 where you cite this document and

19   looking at page 432, which you cite, can you find

20   the sentence that says "an analysis of economic    05:24:30

21   damages considers the difference between proposed

22   class members' economic position in the actual world

23   and their economic position in the but-for world;

24   thus, isolating the economic effect, if any, of the

25   disputed conduct"?    05:24:45

Page 352

1   A.   I mean, I'm -- I'm not quoting it --

2   Q.   Where does it say --

3   A.   -- verbatim.  It doesn't say that.  It

4   says -- it's -- it's again, the framework --

5   Q.   Can you just --                        05:24:59

6   A.   -- is what I'm citing to.

7   Q.   -- just show me the sentence that you're

8   citing.

9   A.   I -- I'm not sure if I understand your

10  question.                                    05:25:07

11  Q.   There's one page, page 432, which you

12  site.  Where is the sentence that supports the first

13  sentence in your Paragraph 94?

14       MS. REDDY:  Objection.  Asked and

15  answered.                                    05:25:21

16       THE WITNESS:  I mean, I think the sentence

17  we've been talking about is a good example of it.  I

18  can look for other sentences on this page.  But the

19  first sentence of the last paragraph, "Because the

20  but-for scenario differs from what actually    05:25:31

21  happened --

22       THE COURT REPORTER:  Excuse me --

23       THE WITNESS:  Sorry.

24       THE COURT REPORTER:  -- please slow down.

25       THE WITNESS:  My bad.  I'll start over.   05:25:38

Page 353

```
1              "Because the but-for scenario differs from

2     what actually happened only with respect to the

3     harmful act, damages measured in this way isolate

4     the loss of value caused by the harmful act and

5     exclude any change in the plaintiff's value arising    05:25:53

6     from other sources."  [As read]

7              I think that's very consistent with my

8     sentence here.  And that's -- that's the proposition

9     I'm citing it for.

10    BY MS. WEAVER:                                         05:26:06

11        Q.    Sure.

12              Turning to Paragraph 96 of your report, on

13    the top of page 47, you wrote, "For example, if a

14    Proposed Class Member understood Google's Privacy

15    Policy to mean that Google would share the at-issue    05:26:19

16    data with advertisers and still used Google's

17    services, then that implies the person must either:

18    (1) not care about the data sharing at all; or (2)

19    likes the personalization that is the by-product of

20    the sharing."  [As written]                           05:26:36

21              Do you see that?

22        A.    Yes.

23        Q.    What's your basis for asserting that?

24        A.    Oh.  I'd say kind of fundamental economic

25    logic.                                                 05:26:46
```

Page 354

CONFIDENTIAL

CERTIFICATE OF REPORTER

1

2          I, Hanna Kim, a Certified Shorthand

3    Reporter, do hereby certify:

4          That prior to being examined, the witness

5    in the foregoing proceedings was by me duly sworn to

6    testify to the truth, the whole truth, and nothing

7    but the truth;

8          That said proceedings were taken before me

9    at the time and place therein set forth and were

10   taken down by me in shorthand and thereafter

11   transcribed into typewriting under my direction and

12   supervision;

13         I further certify that I am neither

14   counsel for, nor related to, any party to said

15   proceedings, not in anywise interested in the

16   outcome thereof.

17         Further, that if the foregoing pertains to

18   the original transcript of a deposition in a federal

19   case, before completion of the proceedings, review

20   of the transcript [ ] was [X] was not requested.

21         In witness whereof, I have hereunto

22   subscribed my name.

23   Dated:  10/26/23

24

                 Hanna Kim

25               CLR, CSR No. 13083

                                           Page 371