# EXHIBIT C
# to the Declaration of
# G. Berntson

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 45

## SEALED VERSION

## FILED UNDER SEAL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

|  |  |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

## EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF

## PROFESSOR ROBERT ZEITHAMMER

**November 29, 2023**

**UNREDACTED VERSION - SUBMITTED UNDER SEAL**

# Table of Contents

I.    INTRODUCTION ........................................................................................... 1

II.   REPLY TO DEAL REPORT ........................................................................ 3

  1.  Unjust Enrichment Model: introduction ................................................ 3

  2.  Unjust Enrichment Model: definitions .................................................. 6

  3.  Unjust Enrichment Model: erroneous claims in Deal's report ................... 7

  4.  Summary of Response Regarding Unjust Enrichment Model: The Deal Report's
      assumptions do not hold .................................................................. 9

  5.  Assumption 1 is incorrect: internal bidders likely share at least some user data with
      third parties ................................................................................ 10

  6.  Assumption 2 is incorrect: internal bidders would reduce their bids in Deal's but-for
      world ........................................................................................ 13

  7.  If Deal's but-for world is more relevant, experiments that likely already exist should
      have been provided ....................................................................... 20

  8.  Erroneous claim 4: The effect of user data on Google RTB revenue will necessarily
      decrease over time ........................................................................ 25

  9.  Erroneous claim 5: ████████████ I relied upon are unreliable because they
      do not measure overall RTB revenue ................................................. 27

  10. Erroneous claim 6:  the Alcobendas et al. (2021) "studied the auction revenue impact
      on only one browser, Google Chrome" ............................................... 28

  11. Erroneous claim 7:  Speculation that RTB advertisers would switch to other Google
      advertising products is unfounded .................................................... 29

  12. Erroneous Claim 8: Prediction that if user data were held back only from third
      parties, Google as a whole would make more profit than under status quo at the time
      of the case is unrealistic and inconsistent with basic economics .............. 30

  13. My percentage apportionment is conservative relative to the apportionment that
      would apply only to the part of Google RTB revenue from external bidders .......... 32

  14. Market Value Model: comparable assets ............................................. 34

  15. Differences between vendors and digital ads ........................................ 36

  16. Additional Claims Deal makes about the Market Value Model ...................... 36

III.  RESPONSE TO HANSSENS REPORT ........................................................ 38

  17. Summary of Response to Hanssens Report ........................................... 38

  18. First Survey ("Business Disclosures") ................................................ 39

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

A.  Unreliable sampling strategy: a summary ............................................................. 41

B.  Unreliable sampling strategy: detailed analyses ................................................... 44

19.  Second Survey ("Privacy Disclosures") ...................................................................... 67

A.  Unreliable sampling strategy: a summary ............................................................. 69

B.  Unreliable sampling strategy: detailed analyses ................................................... 72

20.  Third and Fourth Surveys ("Hypothetical Disclosures" for "Existing Account" and "New Service") ............................................................................................................. 77

A.  Unreliable sampling strategy: a summary ............................................................. 79

**IV.    MATERIALS RELIED UPON** ............................................................................. **85**

21.  Materials produced in the case .................................................................................... 85

22.  Research papers and reports ........................................................................................ 85

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

# I.    INTRODUCTION

1.    As stated in my Expert Class Certification Report of July 14, 2023 ("Zeithammer Report") (Plaintiffs' Ex. 3, ECF 545-7), I am a Professor of Marketing in the Anderson School of Business at the University of California, Los Angeles ("UCLA"). I was retained by counsel for Plaintiffs as an expert in this matter.

2.    In the Zeithammer Report, I presented my conclusions on two issues.  First, I presented a methodology to apportion the proportion of Google RTB revenues from class members due to Google's sharing of User Data with third parties through Google RTB.  This apportionment is a key input into calculations of damages under the unjust enrichment model.

3.    Second, I presented a methodology to establish a market price of User Data.[1] The market price is a key input into calculations of damages under the market price model.

4.    Google retained Bruce Deal ("Deal") to, among other things, respond to the Zeithammer Report. Mr. Deal issued a report dated September 29, 2023 (the "Deal Report") and was deposed on October 24, 2023 ("Deal Tr.").

5.    My qualifications for responding to the Deal Report are as follows: I have authored or coauthored more than 20 peer-reviewed scientific articles in management science and quantitative marketing journals, including *Management Science*, *Marketing Science*, *Journal of Marketing Research and Quantitative Marketing and Economics*. I am an associate editor of *Management Science* and *Quantitative Marketing and Economics* and a member of the editorial board of *Journal of Marketing Research*. I have participated and/or delivered presentations in numerous academic conferences on quantitative marketing, and I have been invited to present my

---

[1] "User Data" refers to information about the user that Google provides auction participants in a Google RTB bid request.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

research in dozens of university departments. In my research, I have studied auctions generally[2] and real-time bidding (RTB) auctions for internet advertising specifically[3].

6.    Google also retained Professor Dominique Hanssens ("Hanssens") to, among other things, conduct surveys regarding consumer expectations about User Data.  Professor Hanssens issued a report dated September 29, 2023 (the "Hanssens Report") and was deposed on October 31, 2023 ("Hanssens Tr.").

7.    In addition to my general qualifications outlined above, my specific qualifications for responding to the Hanssens Report  include the following: I have a PhD in Marketing from MIT, where I learned how to construct and analyze surveys from numerous world-class behavioral professors. At the UCLA Anderson School of Management, I teach an MBA-level class called "Customer Assessment and Analytics" which focuses mostly on advanced survey methodologies. One particular survey methodology I am an expert at is conjoint analysis – a methodology I published multiple peer-reviewed articles about[4] and which I applied multiple times as a testifying expert.

---

[2] *E.g.* Forward-looking bidding in online auctions, ***Journal of Marketing Research*** 43(3), 462-476, 2006.  Optimal selling in sequential auctions: Commitment vs. Adaptation, ***Marketing Science*** 26 (6), 859-867, 2007. Strategic bid-shading and sequential auctioning with learning from past prices, ***Management Science*** 53 (9), 1510-1519, 2007. Commitment in sequential auctioning: advance listings and threshold prices, ***Economic Theory*** 38(1), 187-216, 2009.

[3] *E.g.* Soft Floors in Auctions. ***Management Science*** 65(9): 3949-4450. 2019.

[4] For example, Shu, S. B., Zeithammer, R., & Payne, J. W. (2018). The Pivotal Role of Fairness: Which Consumers Like Annuities? ***Financial Planning Review***, 1(3-4), e1019; Shu, S. B., Zeithammer, R., & Payne, J. W. (2016). Consumer Preferences for Annuity Attributes: Beyond Net Present Value. ***Journal of Marketing Research***, 53(2), 240–262; Zeithammer, R., & Kellogg, R. P. (2013). The Hesitant Hai Gui: Return-Migration Preferences of U.S.-Educated Chinese Scientists and Engineers. ***Journal of Marketing Research***, 50(5), 644–663; Zeithammer, R., & Lenk, P. (2009). Statistical Benefits of Choices from Subsets. ***Journal of Marketing Research***, 46(6), 816–831; Zeithammer, R., & Lenk, P. (2006). Bayesian Estimation of Multivariate-Normal Models When Dimensions Are Absent. ***Quantitative Marketing and Economics***, 4(3), 241–265.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

8.      In Section III below, I provide a reply to portions of the Deal Report addressing my opinions in the Zeithammer Report. In Section IV below, I then provide a response to the portions of the Hanssens Report addressing the consumer surveys.

## II.    REPLY TO DEAL REPORT

9.      The Deal Report responds to the two analyses I conducted: the apportionment of revenue and the market value analysis. This section of this report addresses Deal's critiques of both models in turn, and also responds to additional claims not directly related to either model of damages.

### 1.  <u>Unjust Enrichment Model: introduction</u>

10.     This part of the response is limited to Deal's critiques of my report's apportionment of Google RTB revenue due to sharing of User Data. Deal acknowledges that (1) experiments such as the ones I rely upon are generally a sound methodology to use in apportioning the revenue due to the conduct at issue (e.g., Deal Report par. 64); (2) acknowledges that a meta-analysis of such experiments and other sources is "appropriate" (Deal Report par. 53); and (3) acknowledges that ██████████████████████████████████████████████ ████████████████████████ (Deal Report par. 57). Deal and I thus agree that my overall methodology is sound, and we differ only in details of its implementation.

11.     Specifically, Deal chips at the edges of the evidence I rely upon in order to exclude some revenue here, change some numerical estimate there, etc. However, he **offers no new empirical evidence** and confines his report to various theoretical critiques of my approach. In this response, I address his critiques and explain why the specific claims his critique relies upon are erroneous.

12.     The overall message of my response is that my proposed apportionment methodology of using experiments to measure the effect of sharing User Data through RTB bid

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

requests on Google RTB revenue is sound. I rely upon multiple such experiments, and find convergent evidence that supports my apportionment. Deal suggests additional experiments, but does not provide any empirical evidence about how such experiments would change the apportionment. Since details of the relevant experiments had not been not produced before the due date of my initial report, I reserved the right to revise the specific numerical results of the methodology given new evidence. Since Deal has produced no new empirical evidence, I continue to reserve this right to update my apportionment numbers if more evidence is produced.

13.　　　Before I address specific claims, I need to acknowledge new information I learned from Deal's report: my original report focused on "Google RTB revenue" in the sense of the total revenue Google makes from its entire RTB business. However, Deal introduces the possibility that only revenue from external bidders ███████████████████████████████████ ██████████████████████████ is at issue in this case, and revenue from internal bidders (███████ ██████████) should be excluded.[5] I disagree with this limited view for several reasons and it seems Deal disagrees with his own assertion later in his report, as well.[6] At the end of my response, I explain why my apportionment methodology is conservative with respect to this alternative definition of relevant revenue.

14.　　　My original report focused on apportioning Google's overall RTB revenue, and I continue to believe along with Deal (par. 61) that it is the most relevant definition revenue to the case at hand, **because auction revenues result from a strategic interplay between diverse bidders**, which in turn makes it difficult to assign parts of revenue as "arising from" a certain type

---

[5] Specifically, par. 57 says: "████████████████████████████████████████████ ████████████████. This means that revenue from these advertisers is not at issue in this matter."

[6] Paragraph 61 of the Deal Report argues that "the relevant approach here is not simply looking in isolation at the effect on Google's AB and OBP RTB revenue from not sharing the at issue data in Bid Requests, but the effect on Google's overall revenue and profit."

4

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

of bidder in various but-for worlds. Deal reaffirms in his deposition that the correct way to measure unjust enrichment is to "**look at the net overall revenue** and profits of Google with sharing and without sharing, **not just** ███████████" revenue (Plaintiffs' Ex. 56, at 271:15-24).

15.     Because of the strategic interplay among bidders in an auction, it is too simplistic and fundamentally incorrect to analyze revenue arising from one type of bidder (█████████ ████) as Deal proposes, i.e. by just adding the winning bids in auctions in which that type of bidder was the winner. This type of mere adding up of winning bids ignores the effect these focal bidders have on the bidding strategies of other bidder types (e.g. internal bidders ███████ ███████). Specifically, basic auction economics shows that the very presence of external bidders forces the internal bidders to increase their own bids. Conversely, a partial absence of external bidders would thus necessarily reduce the bids by internal bidders. So **just counting the situations in which external bidders happen to win the auctions underestimates their impact on overall revenue in Google RTB** because it ignores the impact of a change in external bidders' strategy on the bids of internal bidders.

16.     Another reason why the revenue Google makes **when its own internal bidders happen to win** the auction **is relevant** to the present case is that such revenue *does involve sharing User Data with third parties* during the auction. The fact that those third parties did not win the particular auction does not make them somehow return or forget the data they were sent. So **as long as an RTB auction involves sending User Data to third parties, all the bids in that auction are partly driven through the data sharing with third parties, including bids by internal bidders** ███████████████.

17.     While simply first adding the winning bids from auctions external bidders win and then reducing the resulting sum by some apportionment proportion is not a correct or complete accounting of that bidder type's contribution to Google RTB revenue in a but-for world, simple

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

experiments can measure the complete contribution. Specifically, as I describe later in this report, **simple experiments can measure how much the overall Google RTB revenue would decline if third-party bidders did not receive User Data**. Therefore, the overall methodology I propose in my original report is sound.

18.     Deal makes several claims regarding my apportionment analysis of total Google RTB revenue. In the rest of this section of this report, I first lay out Deal's assumptions and claims, clarify why several assumptions Deal makes are erroneous, and then summarize how correcting these assumptions rebuts Deal's claims, and makes my report's methodology sound and my specific apportionment numbers reliable given the data I was provided to date.

19.     As I also address further below, Deal's critique also reveals that he may have been given access to more data than I have about internal experiments at Google – data which was requested by the plaintiffs but not produced. It is therefore possible that the specific details of my apportionment numbers may change as a result of additional data, and I reserve the right to make those changes if the data is produced.

**2.  Unjust Enrichment Model: definitions**

20.     I will use the following terms in my response:

21.     **External bidders**: these are third-party bidders, such as ███████████████████ ████████████████ . It is my understanding that their receipt of personally identifiable user data in RTB bid requests is at the heart of the present case.

22.     **Internal bidders**: these bidders (i.e., ████████████) are a part of Google. It is my understanding that their receipt of personally identifiable user data as part their participation in RTB may be relevant to the present case if they share some or all of the data with their advertiser, agency, or other clients outside of Google.  Their bids are also relevant to the present

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

case as long as they compete in the same auction with above-defined external bidders who do receive User Data as part of the RTB bid request.

23.    **Deal's but-for world**:  the world in which only external bidders do not receive personal user data in bid requests, but internal bidders do.

24.    **Holdback but-for world**:  the world in which both internal and external bidders do not receive personal user data in bid requests.

25.    **Status-quo world**: the actual world at the heart of the present complaint, in which both internal and external bidders receive user data during the RTB process

26.    The Deal report makes the following assumptions:

27.    **Assumption 1:**  Internal bidders do not share any user data outside of Google,

28.    **Assumption 2**: Bidding by internal bidders would be unaffected in Deal's but-for world compared to the status-quo world,

29.    **Assumption 3**: Bids by bidders without access to user data are lower than in the status quo.

### 3.  Unjust Enrichment Model: erroneous claims in Deal's report

30.    From the above assumptions, Deal deduces the following claims:

31.    **Erroneous Claim 1:** Assumption 1 alone implies that Deal's but-for world is the more relevant counterfactual to consider than the Holdback but-for world.

32.    **Erroneous Claim 2:** Assumptions 1 & 2 together imply that only revenue from external bidders should be considered for apportionment since the sharing of User Data with external bidders has no effect on internal bids. Specifically, Assumption 1 makes Deal's but-for world more relevant, and Assumption 2 implies the only revenue due to the sharing of User Data is the sum of winning bids by external bidders. Therefore, the overall impact on sharing user data

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

in bid requests with external bidders can thus be estimated as the difference in this revenue between the status quo and Deal's but-for world.

33. **Erroneous Claim 3:** Assumptions 1 & 2 & 3 together imply that "████████" experiments in the record that ████████ cookies or other persistent user identifiers in bid requests to <u>all bidders</u> over-estimate the apportionment based on Deal's but-for world.

34. It is immediate if some or all of the Assumptions outlined in the previous subsection do not hold, then some or all of the above resultant claims do not hold either. **I will show below that Assumptions 1 and 2 do not hold in the Google RTB market.**

35. In addition, Deal makes at least the following additional claims that are not related to the Assumptions, but are also erroneous:

36. **Erroneous Claim 4:** The effect of user data on Google RTB revenue will necessarily decrease over time.

37. **Erroneous Claim 5:** ████████ experiments where Google measured the effect of holding back data from Bid Requests on the revenue from the external bidders do not include the effect on overall Google revenue.

38. **Erroneous Claim 6:** The Alcobendas et al. (2021) research studied the auction revenue impact on only one browser, Google Chrome ("Chrome"), if it blocked third-party cookies.

39. **Erroneous Claim 7**: Prediction that RTB advertisers would switch to other Google advertising products.

40. **Erroneous Claim 8**: Prediction that if user data were held back only from third parties, Google as a whole would make more profit than under the status quo.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**4.  Summary of Response Regarding Unjust Enrichment Model: The Deal Report's assumptions do not hold**

41.     The Deal Report is incorrect and unreliable in all the claims it makes about its proposed but-for world because Assumptions 1 and 2 are most likely incorrect.

42.     **Assumption 1** is incorrect because re-targeting (one of the most lucrative forms of RTB advertising) relies on divulging the informational content of the user data at least to some third-parties, i.e. the advertisers on whose behalf they are conducting the re-targeting campaigns. In other words, internal bidders ███████████████████ likely share user data with third parties outside of Google. Therefore, Claim 1 no longer holds, and ████████ experiments such as the ones I relied upon, remain relevant to the apportionment.

43.     **Assumption 2** is incorrect because revenue from internal bidders would actually be affected adversely in Deal's but-for world. Standard auction theory shows that if external bids fell due to less information being transmitted to them, the internal bidder would rationally lower their bids in response to the softer price competition from the outsiders. A simple textbook example illustrates that such a competitive reduction in internal bids can be very large. **Therefore, Claim 2 no longer holds even if only Assumption 2 fails, and the revenue from internal bidders needs to be considered, for apportionment as well.** In other words, the relevant revenue to apportion is the overall RTB revenue.

44.     In other words: since auction revenues result from a strategic interplay between bidders, withholding information from one bidder affects the bidding of the other bidder, and vice versa. **Overall auction revenue that accounts for all these strategic interactions is thus the only economically meaningful revenue to consider for the purposes of my apportionment assignment**. It is possible that that some experiments are measuring the effect at issue more accurately than others, but the effect of removing information from some bidders must still be analyzed in terms of the overall auction revenue.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

45.     Needless to say, Claim 3 does not hold if various subsets of Deal's assumptions do not hold. However, to the extent that the apportionment based on Deal's but-for world is actually different from the revenue measured in the ████ experiments I relied upon, the gold standard of evidence would be to provide a better experiment more tightly connected to Deal's but-for world. As discussed below, I believe Google has conducted the relevant experiments, and I find evidence that some of them are already disclosed in the internal documents I relied upon. Those experiments suggest ████████████████████ than my main estimate. My simple textbook example of how auctions work also predicts that the percentage apportionment should be larger in this case.

46.     Turning to the claims unrelated to the assumptions, I provide empirical evidence that there is no time trend in the magnitude of the effect of user data on Google RTB revenue, provide evidence that the ████ experiments in question did indeed measure the entire Google RTB revenue, explain how Alcobendas et al (2021) focused on total RTB revenue in their simulations and debunk the claims about lack of external competition and the possibility of higher profits without external bidders

47.     Having introduced my responses, I now expand on each in turn.

5.     **Assumption 1 is incorrect: internal bidders likely share at least some user data with third parties**

48.     **Details of opinion:** Specifically, (in par 57) Deal claims "advertisers using ████ ████████████ can compete for ad inventory with ████████████ in the same ad auctions, but the third-party advertisers who use ████████████████ do not receive Bid Requests. This means that revenue from these advertisers is not at issue in this matter, as Plaintiffs' Experts agreed".

49.     In his deposition**,** Deal represents that (referring to User Data): "*equivalent data is still able to be used by DV3 and other Google products that **are not exposing it to third-party***

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

*users*" (278:14-16). This opinion is the basis for arguing his but-for world is more relevant than the holdback but-for world.

50.    **Response:** First, the very footnote (#72) that is supposed to support the assertion that "Plaintiffs' Experts agreed" does not show any evidence of an unequivocal agreement by either plaintiffs' damages expert Greg Regan or myself. Regan does not know for sure, and Deal quotes him as saying that "**if** ▮▮▮▮▮▮▮▮ do not transmit the at-issue data to third parties, then that revenue is not at issue in this matter". The underlined "if" shows that Regan does not know for sure, does not agree with Deal's assertion, and reserves the possibility of counting internal bidders revenue

51.    Personally, I also do not know for sure whether or not third-party advertisers who use ▮▮▮▮▮▮▮▮ receive user data at issue as part of Google's bid request to ▮▮▮▮ ▮▮▮▮▮. But based on my understanding of how at least some types of advertising works, I think third-party advertisers who use ▮▮▮▮▮▮▮▮ **must receive** at least some user data at issue, specifically persistent identifiers. I explain my reasoning next.

52.    Consider re-targeting (also sometimes called "remarketing") – a large chunk of RTB ad spending today (Truelist finds that 68% or marketing agencies have an allocation for remarketing[7]). At first impression, one may argue that the complete unavailability of cookies in bid requests (Holdback but-for world) may make re-targeting unavailable even to internal bidders, but merely omitting the cookies from external RTB bid requests while retaining them for internal bidders (Deal's but-for world) would preserve the re-targeting ability for the internal bidders. But such internal-only re-targeting is not possible under Assumption 1: if internal bidders want to re-target, and for example show an Amazon ad with an item from the user's Amazon shopping basket, the internal bidders must match their cookie information with Amazon's and let Amazon

---

[7] https://truelist.co/blog/retargeting-statistics/

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

know who the user is (to enable the individually customized ad to be created by Amazon), effectively letting Amazon or some other intermediary know the details of the specific user being targeted, and thus effectively transmitting the persistent user identifier information to at least some third parties (e.g. Amazon and its agents, in this case).

53.    I am not a technical expert, so it is possible my understanding of re-targeting is incomplete, and I reserve the right to update this opinion. But based on the information available to me at this time about technologies at the time relevant to the case, I propose that internal Google bidders engaged in re-targeting do indeed need to transmit User Data to third parties in order to bid effectively.

54.    Deal cites GOOG-HEWT-00047130–152 at 150 as saying "████████████ ████████████████████████████". But "████████████" does not mean that no data at issue is actually submitted to third parties via ████████. I contend that at least some identifiers must be transmitted in order for re-targeting to work properly, so Assumption 1 does not hold.

55.    If Assumption 1 does not hold, then Claim 1 does not follow, and the Holdback but-for world is more relevant to the case than Deal's but-for world. In other words, the experiments I relied upon that make cookies unavailable to everyone are actually exactly relevant to what would happen if Google did not transmit any information at issue to third parties, whether the transmission is through bid requests or through ████████ re-targeting campaigns.

56.    Note that re-targeting campaigns are just one prominent example in which internal bidders must share user data at issue with third parties. Other types of targeted campaigns likely also require such sharing, but I defer to technical experts to identify such campaigns.

57.    It is also possible that the advertisers engaged in re-targeting bid via intermediaries, such as digital marketing agencies, that may collect and later re-sell the User Data

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

transmitted by Google internal bidders in order to make re-targeting work. Therefore, the data leakage during re-targeting may not be confined only to the partner advertisers.

58.     As explained in the introduction to this report, revenue from internal bidders is also relevant to the apportionment of the percentage of revenue attributable to user data for other reasons, namely because auction revenues result from a strategic interplay between diverse bidders as I describe next.

### 6.   Assumption 2 is incorrect: internal bidders would reduce their bids in Deal's but-for world

59.     **Details of opinion:** in par. 58, Deal gives a simple hypothetical example of what would happen in an auction if external bidders reduced their bids by 51.1 percent. He uses the example to argue that Google internal bids would remain the same, win more often, and mostly substitute for the foregone revenue from external bidders.

60.     **Reply:** I agree that if only the external bidders reduced their bids as in the example, internal Google bidders would mechanically win more often. But the core prediction that internal bids would remain the same as before (e.g. 96 cents in Deal's example) reveals a profound misunderstanding of how auctions actually work, as I now explain in detail.

61.     The Deal Report suggests that existing bids from internal bidders would remain unaffected in his but-for world. This assertion is simplistic, incorrect, and inconsistent with accepted economic models of bidding in auctions. The experiments I rely upon establish that revenue drops to about ▮ its magnitude when persistent identifiers are held back from bidders.[8] So my estimate suggests that bidders without persistent identifiers bid *as if* their valuations of the impression opportunities dropped by about ▮. But what if <u>only some</u> bidders (e.g. the external

---

[8] To be precise, my report outlines at least eleven diverse sources of evidence, the bulk of which shows revenue reductions of about ▮.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

ones to Google) experience such a reduction in valuations while other (e.g. the internal ones to Google) experience no reduction in valuations? Deal asserts the internal bidders would continue bidding as before. I will now show this simple assertion is incorrect, provide proof that the internal bids would actually drop, and show that they could drop a lot.

62.    The schematic in Figure 1 below shows how auctions with two bidders actually work. Note that the red arrows indicate that each bidder's strategy must be in a Nash equilibrium with the other bidder's strategy. Otherwise, at least one of the bidders would be acting sub-optimally and could unilaterally improve their payoffs. Let me briefly review how such an equilibrium is derived in a textbook example of the first-price sealed-bid auction Google uses to sell impressions through RTB.  Assume for simplicity there are two bidders with valuations distributed uniformly on [0,1], where "1" should be interpreted as the maximum valuation in the observed world with all bidders having access to persistent identifiers through RTB bid requests.[9] It is well known in the auction theory literature that the equilibrium bidding strategy of both bidders in such a "symmetric" world is $b(v) = \frac{v}{2}$, and the auctioneer seller makes an expected revenue of $\frac{1}{3}$. This strategy is an equilibrium strategy because if bidder 1 uses it, bidder 2 cannot do any better (in terms of expected surplus) than by using it as well, and vice versa.

---

[9] The uniform assumption is used here for tractability, but the argument can be generalized numerically to other distributions.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**Figure 1: How auctions actually work**



63.    This benchmark world represents the RTB business as usual during the time of the case, is called "symmetric" because the valuations of the two bidders are drawn from the same distribution, and so the bidders both employ the same bidding strategy.

64.    Now consider the possibility of (following Deal's but-for world) that one of the bidders (without loss of generality the second bidder) loses information about the value of the opportunity, and this loss manifests itself by all of his valuations being halved. In other words, assume the second bidder's valuations are now drawn uniformly from $\left[0, \frac{1}{2}\right]$ while the first bidder's valuations continue to be drawn uniformly from $[0,1]$. Let us review how this change in bidder 2's valuation plays out in the established model of auctions:

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**Figure 2: How a change in one bidder's valuation level would impact auction revenue given how auctions actually work**



65.     It is obvious that bidder 2 will bid differently than in the benchmark situation. But note how the red arrows in Figure 2 also impact the bidding strategy of bidder 1. The equilibrium has to be re-solved to see how the change will impact the market. The resulting equilibrium is derived in detail in Krishna's classic textbook[10] following Griesmer et al (1967)[11], as follows:

$$b_1(v) = \frac{1}{3v}\left(\sqrt{1 + 3v^2} - 1\right) < b_2(v) = \frac{1}{3v}\left(1 - \sqrt{1 - 3v^2}\right)$$

66.     Figure 3 shows the two equilibrium bidding strategies alongside the symmetric $b(v)$ discussed above. It is immediate from the figure (as well as from plugging the respective maximum valuations into the above bidding functions) that the maximum bid falls from half to a third (indicated by the dashed horizontal gray line in Figure 3). Moreover, the figure clearly shows that the internal bidder's strategy (shown in blue and denoted "full info") is strictly below the strategy that bidder would follow in the symmetric world, i.e. $b_1(v) < b(v)$ for every $v$.

---

[10] Auction Theory. Krishna, Vijay. Published by Academic Press (2002). ISBN 10: 012426297X, page 51.

[11] J. Griesmer, R. Levitan, M. Shubik: "Toward a study of bidding processes, Part IV: Games with unknown costs", 14, Naval Research Logistics Quarterly (1967), pp. 415-433.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**Figure 3: Bidding strategies in benchmark world and Deal's but-for world**



67.    Deal's analysis makes a fundamental mistake, demonstrating a complete misunderstanding of how auctions actually work. The mistake can be illustrated as follows:

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**Figure 4: How a change in one bidder's valuation level would impact auction revenue in Deal's simplistic and incorrect model**



68.    In other words, Deal assumes (see par 58) that there are no red arrows as in Figure 2, no equilibrium, and bidders just bid without any regard to the competition they are facing. No company, and certainly no company as sophisticated as Google, would commit such a blunder.

69.    The above analysis implies that in Deal's par. 58 example, if the ▮ bids dropped by 50% as a result of less information, the ▮ bid would necessarily drop as well. This fact makes all the narrative in Deal's subsequent par 58-61 misleading and unreliable, even directionally.

70.    The fact that $b_1(v) < b(v)$ clearly shows the error of Deal's key assertion about the constancy of internal bids. In fact, the internal bids would unequivocally fall in Deal's but-for world because the internal bidder would face much weaker competition. However, also note that the external competitor (shown in red in Figure 1) would actually bid more aggressively than they would in the symmetric world.[12] So what would be the effect on overall auction revenue? The

_____

[12] This is a classic behavior of weak bidders in asymmetric worlds, originally described by Maskin and Riley (2000), the first of whom went on to win the Nobel prize for his work on

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

expected revenue in the asymmetric world in Deal's but-for world cannot be calculated in closed form, but a simple numerical simulation reveals it to be about 0.23 – much less than the $\frac{1}{3} \approx 0.33$ in the symmetric world. In percentage drop terms, this simple model shows that overall Google revenue would drop by about 31% (=1-0.23/0.33) in Deal's but-for world.

71.    The stylized equilibrium model described above illustrates how auction revenues result from a strategic interplay between bidders, and why it is incorrect to hold any single bidder's strategy constant when something in the auction market changes. Specifically, the model shows it is incorrect to assume internal bids would remain unaffected if information sent to external bidders changes. The entire system has to be re-analyzed, and the impact on overall revenue must be estimated.[13]

72.    This analysis thus shows that Deal's assertion in par. 57 that third party advertisers who use "████████████████████████████████… This means that <u>revenue from these advertisers is not at issue in this matter</u>" is incorrect and unreliable.

73.    Since auction revenues result from a strategic interplay between bidders, it only makes scientific sense to consider the overall auction revenue, not revenue coming from particular sources: the alleged fact that a certain magnitude and percentage of revenue came from internal bidders at the time of the case is irrelevant to a prediction of magnitude and percentage of revenue that would come from internal bidders in Deal's but-for world.

---

auction models. In his deposition, Deal agrees that their paper appeared in a "respected journal" in Economics (280:2).

[13] Had I naively assumed that both bidders would continue bidding according to $b(v)$, and the only change would arise from the second bidder having lower valuations, a simple simulation would reveal an expected revenue of 0.27 – far above the correctly predicted counter-factual revenue of 0.23.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

74.    It should be noted that the above stylized model with one bidder of each type is only intended as a mathematically rigorous illustration of the nature of the bidding equilibrium in the but-for world, and the numerical "31%" result is only an illustration that the revenue loss from a single bidder losing access to tracking information can be large even if the remaining bidders maintain their access to information. If I had access to auction-level data from the relevant experiments at Google (data that was not provided despite our requests), I could conduct a more empirically calibrated analysis of the magnitude of the revenue loss involved in Deal's but-for world. Such an analysis would involve complicated but scientifically established procedures for estimating equilibrium bidding functions in asymmetric first-price auctions.[14]

75.    Note also that the model leaves no room for the Deal Report's unrealistic claim that Google could somehow more than make up for the lost revenue: the theory unequivocally predicts that overall revenue declines when even one of the bidders loses access to user tracking information. I will expand on this point later.

### 7.    If Deal's but-for world is more relevant, experiments that likely already exist should have been provided

76.    **Details of opinion:** In proposing his but-for world, Deal effectively argues for a different experiment: "For a study like this to be relevant, it would have to measure the overall revenue decrease if data used to personalize ads is excluded from Bid Requests but is otherwise available to serve ads using DV3 and other products not at issue in this case". (par 64). Note that Deal provides **no empirical evidence to support his speculative claim that the experiments he proposes would produce materially different apportionment estimates**.

---

[14] These methods have been established in the peer-reviewed literature cited and used by, for example, Alcobendas et al (2022) I relied upon in my report.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

77.    **Reply:**  It is useful to provide the following taxonomy of possible experiments and measurements:

| **Taxonomy of experiments** | | What revenue is measured | |
|---|---|---|---|
| | | external only (i.e. sum of winning bids by external bidders) | All Google RTB revenue |
| Which bidders do not get user data | external only | A | B |
| | external & internal | D | C |

78.    The Deal Report essentially argues that I relied upon type C experiments (such as Ravichandran and Korula 2019, or Alcobendas et al. 2021) when, in fact, type B would be more appropriate given the Complaint. While I argue for several reasons why type C experiments are, in fact, relevant, it is possible that Google's revenue in Deal's but-for world is actually different from the revenue measured in the ███ experiments I relied upon. If that is the case, then the gold standard of evidence would be to provide a better experiment more tightly connected to Deal's but-for world. I believe **Google has conducted the relevant experiments, and I find evidence that some of them are already disclosed** in the internal documents I relied upon. Those experiments **suggest** ███ **percentage revenue losses than my main estimate**, as I now explain.

79.    Some of the experiments already disclosed in the internal Google documents available to me seem to be exactly the appropriate ones for measuring Deal's preferred but-for world of, i.e. the effect of holding back data from Bid Requests to third parties only (types A or B in my taxonomy). For example, on Tuesday May 12, 2020 Stan Belov wrote : "… ███

████████████████████████████████████████

████████████████████████████████████████

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

████ ”[15] (underline added here). I interpret the underlined description of the experiments as exactly the kind of situation Deal is referring to in his but-for world: identifiers are removed from bid requests. Revenue from third-party bidders clearly plummets as a result, and it plummets even more than the 51.1% conservative figure I estimated in my report. The big question I have is whether this was a type-A or type-B experiment. I suspect it was a type-B experiment, and the details about the effect on overall Google RTB revenue were simply not produced yet.

80.    Note also that the ██% and ██% numbers Belov mentions are not the same and on average larger as the precise ██████ number I rely upon based on GOOG-HEWT-00456342. So either Belov must be referring to a different experiment in  GOOG-HEWT-00312065 than the experiment detailed in GOOG-HEWT-00456342, or GOOG-HEWT-00456342 indeed reports the effect on overall revenue as I initially understood it.

81.    Another example of a likely experiment that informs Deal's but-for world (type A or B): In an email dated 9/2/2020 and titled "Ad Manager Strategy" , Haskell Garon writes: "████

████████████████████████████████████████████

████████████████ ”[16]. Again, I interpret the underlined description of the experiments as exactly the kind of situation Deal is referring to in his but-for world: identifiers are removed from bid requests.  And again, the big question I have is whether this was a type-A or type-B experiment. I suspect it was a type-B experiment, and the details about the effect on overall Google RTB revenue were simply not produced yet.

---

[15] GOOG-HEWT-00312065
[16] GOOG-HEWT-00278045

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

82.     And again, note that the ▇% and ▇% numbers Garon mentions are not the same and on average smaller than the precise ▇% number I rely upon based on GOOG-HEWT-00456342. So Garon must be referring to yet another experiment.

83.     A third example of a likely type-B experiment is mentioned in a document with custodians Chetna Bindra, Gang Wang, and Stan Belov. The document reports a July 26, 2021 experiment that "████████████████████" and "███████████████."[17] Again, I interpret the underlined description of the experiments as exactly the kind of situation Deal is referring to in his but-for world: identifiers are removed from bid requests. The description does not say "████████████████ **from** ████████ **only**", so this is clearly not a type-A experiment in my taxonomy.

84.     It is my understanding that Plaintiff's Counsel requested the details of the above three (and other experiments), and the details were not provided. Without additional information, I see no reason to believe why these experiments are not precisely the type-B experiments Deal is calling for. I did not rely specifically on these two experiments because I did not receive the requested details, and they were only mentioned in internal emails. But if type-B experiments are judged to be the most relevant, then these experiments should be relied upon, and their details (once provided) are likely to establish revenue reductions that exceed the conservative 51.1% estimate from my report. Without additional information, I would be forced to discount GOOG-HEWT-00312065 and GOOG-HEWT-00278045 because they might actually be type-A experiments, and rely on GOOG-HEWT-00188498, which is clearly a type-B experiment. My estimate of the effect of not sharing user data in RTB requests would change to the ▇% revenue reduction Belov mentions in GOOG-HEWT-00188498.

---

[17] GOOG-HEWT-00188498

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

85.    In his deposition, Deal also argues that some of the experiments I relied upon are, in fact, type-D experiments, and thus do not capture the effect on sharing User Data on overall Google revenue. For example, Deal mis-characterizes Ravichandran and Korula (2019) as type-D experiment when he says "this study, as I am recalling, showed ██████████ ████████" (Plaintiffs' Ex. 56, at 266:18-20) . Instead, it is clearly type-C because it focuses on **publisher** revenue, not just Google revenue from external bidders. The main result I rely on is: "for the top 500 global publishers, average revenue in the treatment group decreased 1 by 52%" (p. 1 of R&K 2019). This mischaracterization invalidates Deal's subsequent claim that "*If someone says, oh, if I can see all of the fields, I might bid $0.25. But if I can see fewer of the fields, I'm only going to bid, whatever, you know, $0.20 or something. You may well lose -- lose the option to someone else that -- by someone else, I mean, another product, DV3, for instance, then their revenue would go up. That's the overall effect on Google. […] the damages expert would need to look at the overall effect on Google*."(267:14 – 268:1). **The Ravichandran and Korula (2019) does clearly capture exactly the overall effect on Google RTB revenue Deal is arguing for**.

86.    The previous paragraph explains why Deal's Exhibit 5 is incorrect when it claims that R&K 2019 did not measure effect on Google revenue overall as Deal himself defines it in his deposition (267:14 – 268:1). Similarly, Exhibit 5 is also incorrect when characterizing all other studies because they all study overall RTB auction revenue or publisher revenue. In other words, there should no tick-marks in the rightmost column of Exhibit 5. In addition, no reasons are given for majority of the tick-marks in the "The study results appear to reflect the effect of other factors that might cause differences in prices for ad impressions beyond the use of user data" column. In summary, Exhibit 5 is an unreliable mis-characterization of the studies I relied upon.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**8.** **Erroneous claim 4: The effect of user data on Google RTB revenue will necessarily decrease over time**

87.    **Specifics**: In par 68, Deal claims "Broadly speaking, various industry and product changes have restricted the data Google could have collected from Proposed Class Members during the Class Period. Thus**, the revenue impact of omitting data from Bid Requests will necessarily decrease over time**, as there is relatively less available data to omit"

88.    In his deposition, Deal admits that he has done **no empirical analysis to support the above opinion**. Specifically, he states "I myself have not tried to say this was an issue in this time period but not an issue in this time period. I've -- **I've not done a specific study on that**." (Plaintiffs' Ex. 56, at 257:5-7).

89.    **Reply**: My reply is both theoretical and empirical. From a theoretical perspective, the Deal Report's Figure 2 lists various Safari and Firefox privacy initiatives over the years, and also adds the CCPA start date. Regarding the possible impact of CCPA on the effect at issue in this case, we know from other research, e.g. the Alcobendas et al (2021) paper that CCPA had very little impact (very few users opted out of tracking), so the effect of CCPA on the effect at issue is likely to be very small. Regarding the Safari and Firefox initiatives, it is my understanding that all the blocking of cookies in those browsers happened in or before 2019 when the key data about the effect begins. So there should be very little trend to the effect after 2019.

90.    **Empirically**, the last prediction is borne out if I plot the estimates in my Table 1 as a function of data year, restricting myself to datapoints in or after 2019. Figure 5 below shows each data point from Google as a blue dot, each data point from outside of Google as a red dot, and the overall trendline as a green dashed line. It is immediate that **there is no trend to the effect**, so the theoretical prediction from the previous paragraph is borne out in the data. Omitting the red dots would make the trend more positive, so **this result is not driven by including non-Google observations**.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**Figure 5a: There is no time trend in the measured effect, 2019-2021**



91.    Given that the class period starts in 2016, it is still possible that the effect was larger between 2016 and 2018, inclusive. Unfortunately, I do not have data from those years. But I do have data from earlier years. So I can repeat the trend exercise from Figure 5 on the entire set of evidence my analysis uncover, i.e. the entire Table 1 of my report. The result of this analysis is in Figure 6. The figure shows that the effect has actually been increasing over the years. I conclude that there is no merit to Deal's claim that the effect at issue in this case is "necessarily increasing" over time.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**Figure 5b: There is no time trend in the measured effect, 2013-2021**



**9.** <u>**Erroneous claim 5:**</u> █████ <u>**experiments I relied upon are unreliable because they do not measure overall RTB revenue**</u>

92.     Specifics: In par. 65, Deal identifies the relevant experiment as the ones in paragraphs 32 and 33 of the Zeithammer Report. He claims that the █████ experiments where Google ████████████████████████████████████████████████████████████ ████████████████████████████████████████████, so they are unreliable.

93.     Reply: In my par. 32, I describe the experiments in GOOG-HEWT-00456342, GOOG-HEWT-00456341, GOOG-HEWT-00456344, and GOOG-HEWT-00456346 as "███████ ████████████████████████████████████████████████████████████ ████████████████████████████.", and I naturally interpret them as experiments that measure the impact on overall Google RTB revenue (type B/C in my taxonomy), not just "█████████████████" as Deal alleges (type A/D in my taxonomy). So **it is**

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**possible that Deal has some additional information about these experiments – information that was not produced.**

94.    It is also inconceivable to me that if Google did indeed conduct an experiment to measure the effect of holding back data from Bid Requests on the revenue, it would restrict the experiment's measurement attention to ███████ revenue. Even if it separated the measured revenue by its source, it would surely measure all of it. In other words, I believe that it is effortless for Google to turn a type-A/D experiment into a type-B/C experiment, so Google would not throw away data and only look at type-A/D experiments.  I continue to believe that GOOG-HEWT-00456342, GOOG-HEWT-00456341, GOOG-HEWT-00456344, and GOOG-HEWT-00456346 refer to overall revenue (type B/C). And if not, I believe Google has the data from those experiments about the overall RTB revenue, and should produce it.

95.    It is my understanding that the **Plaintiff's Counsel requested the details of the above three (and other experiments), and the details were not provided**. Without additional information, I see no reason to believe why these experiments are not precisely the type-B/C experiments Deal is calling for.

### 10. <u>Erroneous claim 6:  the Alcobendas et al. (2021) "studied the auction revenue impact on only one browser, Google Chrome"</u>

96.    **Reply:** this statement misrepresents Alcobendas, as I explained in deposition. In the Conclusions section, the authors explain: "We perform counterfactuals which shed light on the likely impact of the elimination of third-party cookies for Google Chrome users. Auction revenues on our analyzed Yahoo site would decrease by about 45% on average". They do not say "auction revenues from Chrome users only". In Section 4.2, the authors explain how they re-simulate what would happen in the entire RTB exchange among all competitors if Chrome deprecated third-party cookies. Thus **while Chrome cookies are indeed being deprecated, the**

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**revenue in the entire RTB auction market is being simulated and compared to the status quo**.

### 11. Erroneous claim 7: Speculation that RTB advertisers would switch to other Google advertising products is unfounded

97.    **Details of opinion:** in par, 67, the Deal Report states: "Considering these factors, it is clearly incorrect to determine unjust enrichment only by looking at the drop in revenue from ██████████ if the at-issue data was omitted from Bid Requests. Google could earn nearly the same amount of revenue and the same or even higher overall profits in a but-for world where only ██████████ do not receive the at-issue data. Google's unjust enrichment would be zero if the overall profit Google would have earned in the but-for world from all products used to serve ads on publisher sites—not just from ██████████—was higher than or equal to the Google's overall profits in the actual world."

98.    **Reply:** Deal opines without any evidence that the first thing programmatic third-party bidders would do after losing access to personally identifiable user data in the Google RTB auction would be to switch to completely different forms of Google advertising, such as Google Search ads. This is like saying that if Honda no longer provided red cars, consumers interested in buying red cars would switch to buying Honda's motorcycles. But the car market is competitive, so such buyers who are looking for red cars would switch to buying their preferred products from Toyota, Ford or GM.

99.    Just like the car buyers, programmatic third-party bidders unable to target their ad campaigns in the Google Ad Exchange would find other ways to deliver their advertising copy to their target audiences. The advertising market is competitive just like the car market, and Deal is thus incorrect when he assumes that all the advertising spending would necessarily stay with Google.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

100.    It is therefore my opinion that measuring the effect of user data on overall Google RTB revenue is a good approximation of the effect on overall Google revenue that includes search. Deal provides no evidence contrary to this opinion.

101.    In his deposition, Deal does not include the possibility of switching to non-RTB Google products when he defines the "overall effect on Google […] the "damages expert would need to look at" (Plaintiffs' Ex. 56, at 267:14 – 268:1). Instead, he proposes to look at Google's overall RTB revenue – a position I agree with for the reasons outlined above.

**12.  Erroneous Claim 8: Prediction that if user data were held back only from third parties, Google as a whole would make more profit than under status quo at the time of the case is unrealistic and inconsistent with basic economics**

102.    **Specifics**: In par 12, Deal asserts that "if Google's revenue from ████████ ██████████████████ decreased, Google's revenue from other products would have **increased**. Indeed, Google could have even earned **higher** profit in this but-for world…" (bold italics are Deal's). In this critique, Deal argues that the resulting relative shift of the ad revenue from third-party to internal sources would more than make up for both the lost external revenue and the associated profit.

103.    **Reply**: I have already debunked the speculation that <u>revenue</u> from other Google products, such as search ads, would have increased. Thus I concentrate this response to the claim regarding <u>profits</u>. In par. 59, Deal supports his hypothesis with the fact that Google retains more of the ad revenue as profit when it comes from internal bidders than when it comes from external bidders, but this of course does not mean that the internal bidders would be able to recover enough of the lost revenue should the external bidders bid a lot less due to their loss of information. Would they continue bidding as much as before? As I prove above, definitely not. And would they be able to sign up all the advertisers currently working with external bidders? I do not think so, and **Deal provides no empirical evidence that this could happen**.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

104.    But there is an easier way to shed light on the veracity of the profit claim: The following general economic point would be obvious to every undergraduate Economics major: It is a fact that Google – a profit-maximizing publicly traded company - decided to invite external third-party bidders to the advertising auctions it is conducting. Nobody forced Google to extend this invitation, so the presence of external bidders must be more profitable than their absence. But Deal argues that Google would effectively "earn higher profit" without them. Thus  his theory must be that Google is running some sort of a charity for external third party bidders and/or its management is so incompetent that it fails to maximize profits for the shareholders. Either potential theory is preposterous for s a sophisticated company like Google: Google clearly makes more money by inviting outside bidders – both because of the money they bring and because of the competitive pressure they put on Google's internal bidders who then have a fair-market reason to charge their advertisers more. In other words: **if Google could make more profit by excluding outside bidders** (or severely reducing their bids, which is a fact of this case Deal does not dispute), **it would have done so a long time ago**, and the present case would never emerge.

105.    The above economic intuition is sufficient to thoroughly debunk the "higher profit" claim on the basis of theory alone. But empirical support also exists in the numerous internal Google documents that bemoan the "incomplete recovery" of external revenues when user data is held back from third-party bidders. In par. 66, Deal cites Belov as saying that "the loss in revenue ███████████ would be offset, in full or in part, by increased revenue from other channels." This opinion is inconsistent with internal Google presentations of which Belov is a custodian. For example, the 7/9/2020 presentation titled ███████████" documents several work-arounds Google was working on to re-identify Safari users after Apple's ITP went into effect, and the presentation clearly shows that the work-arounds were only able to recover

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

less than ███ the lost revenue.[18] A document titled "███████████████████" tells the same story: much of the revenue is lost when personal identifiers are unavailable in RTB bid requests, and recovery of the lost revenue is weak. These are just two examples of internal Google documents that document a widespread worry that lost revenue would not, in fact, be recovered easily at all.

### 13. <u>My percentage apportionment is conservative relative to the apportionment that would apply only to the part of Google RTB revenue from external bidders</u>

106.    Suppose along with Deal's paragraph 57 that only revenue Google collects when external bidders happen to win the auction needs to be apportioned. If my assignment were to determine how this revenue would change in Deal's but-for world, some of the above analyses would have to be adjusted as I explain in this section. I show that my apportionment is actually conservative to this possibility, both theoretically and empirically.

107.    The first adjustment to this erroneous restriction of relevant RTB revenue would be a switch of focus from type B/C experiments to type A/D experiments in my taxonomy. As discussed above, some of the experiments already disclosed in the internal Google documents available to me seem to possibly be type A/D experiments. For example, on Tuesday May 12, 2020 Stan Belov wrote : "…██████████████████████████████████████████████████████████████████████████████████████████████"[19] (underline added here). I interpret the underlined description of the experiments as measuring only external-bidder revenue. Another example of a likely type-A experiment that informs Deal's but-for world: In an email dated 9/2/2020 and titled "████████████████" , Haskell Garon writes: "████████████████████████████

---

[18] GOOG-HEWT-00480608
[19] GOOG-HEWT-00312065

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

███████████████████████████████████████████████████████"[20]. Again, I interpret the underlined description of the experiments as measuring only external-bidder revenue.

108.    It is my understanding that the **Plaintiff's Counsel requested the details of the above two (and other experiments), and the details were not provided**. Without additional information, I see no reason to believe why these experiments are not type A/D. Without additional information, I would be forced to rely on them, and conclude that the reduction in RTB revenue from external bidders is an average of 40%, 70%, 65%, and 80%, i.e. 64 percent. Since 64% is more than my 51.1% apportionment, **the empirical evidence available to me at this time shows that my estimates are conservative as estimates of apportionment of only the external revenue in Deal's but-for world**

109.    The analytical model I used in the previous section to illustrate the nature of the asymmetric equilibrium that occurs in Deal's but-for world can also be used to illustrate how the focus on external bidders would change the calculation. Recall that the external bidder is "bidder 2" whose valuations are drawn from [0,1/2], and recall also that the expected *total* RTB revenue was 1/3~0.33 in the status quo situation and 0.23 in the asymmetric situation modeled after Deal's but-for world. The 0.23 figure is clearly composed of a combination of bidder 1 winning and bidder 2 winning. And the key question in this section is how much of the 0.23 revenue is contributed by type-2 bidders winning? In other words, what is the expectation of $b_2(v_1)\mathbf{1}[b_1(v_1) < b_2(v_1)]$? A simple simulation reveals that the disadvantaged type-2 bidders win only one third of the auctions, and the expected revenue they contribute is 0.07. Compared to the 0.33/2 revenue they contribute in the status quo situation, this is a 58% reduction ((=1-0.07/(0.33/2)). Since 58% is more than the 50% that went into the modeling assumptions as the reduction in the holdback but-for world, **textbook auction theory shows estimates based on**

─────────────────────────

[20] GOOG-HEWT-00278045

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**holdback but-for worlds are conservative as estimates of apportionment of only the external revenue in Deal's but-for world**.

### 14. <u>Market Value Model: comparable assets</u>

110.    This part of the response is limited to Deal's critiques of the Zeithammer Report's market value analysis. Deal's response to my estimate of the market value of user data centers on a single critique: differences. Differences between data fields, differences between people, and differences between data sources about the market value.

111.    I agree with Deal in Par. 77 that "standard valuation approach is to understand the type of asset being valued and then apply accepted valuation techniques to ensure comparability with the asset being valued." In Figure 3 and elsewhere in his report, **Deal argues that the asset being value is a specific data field, such as geolocation information or name. This is a fundamental misunderstanding of the Complaint. The asset being valued is privacy**, specifically the right to control over what marketers can learn about users online and how the marketers then use that information. In other words, **the asset being valued is the user's willingness to submit to digital surveillance**.

112.    Almost all (about 90 percent) Americans agree that they have a right to control over what marketers can learn about them online and how the marketers then use that information.[21] By including persistent personal identifiers in bid requests, Google enables digital surveillance, and effectively takes control over their data from users. So the key question is whether the user data enables digital surveillance. In my detailed responses below, I explain how **this functional view of what the asset is resolves all the critiques** Deal levels.

---

[21] Turow et al, (2023). Americans Don't Understand What Companies Can Do With Their Personal Data. University of Pennsylvania report.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

113.    In par. 76, the Deal Report alleges that my report "does not use comparable data as a benchmark for the at-issue data". Deal supports this opinion with Figure 3 that lists specific data fields collected by the four data buyers I rely upon. In par. 85, he then highlights the differences in specific technical fields again, pointing out that some of the fields collected by some of the data buyers are not shared in RTB bid requests. For example, the Deal Report emphasizes that "Datacy's Privacy Policy shows that users must provide a name and email address" and "data shared with Killi includes date of birth, email address, and phone number". But these are precisely the kinds of "basic" fields he himself acknowledges "sell for nearly nothing" in his paragraph 83. If there was some sort of a constant per-field market value, Screenwise would far outperform the other data buyers: with 39 checkmarks, it has more than double the checkmarks than the other three companies. But my analysis clearly indicates that Screenwise does not pay double the others. On the contrary: **the monthly payments are not at all related to the number of checkmarks in Deal's Figure 3**. This is **direct evidence against Deal's assertion** based on an unrelated academic article (not peer reviewed) that "different bundles of data will have different value depending on the market value and quantity of each specific data contained in each bundle" which Deal makes in par. 80

114.    The reason why the quantity of checkmarks in Figure 3 is unrelated to the price each of the four vendors in Figure 3 pays users is the fact that the asset traded is privacy, i.e. willingness to be subject to digital surveillance, not a specific set of data fields. Since all four data buyers are buying the user's privacy and the right to watch over them, they are thus buying comparable assets as I indicate in my report.

115.    **If privacy is the assets users sell to the four vendors I rely upon**, then the key data fields are not name, email address or personal characteristics. None of these fields enable continuous digital surveillance. Instead, **the key data fields for the asset being traded here are the persistent personal identifiers that allow companies to follow users in everything they**

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**do in their digital and physical lives.** Thus, my version of Figure 3 would be as shown below. It is evident that the four vendors I rely upon are sufficiently mutually comparable to data shared in RTB bid requests in terms of the functional value the data provides to marketers.

**Alternative Figure to Deal Report's Figure 3**

| Functional usefulness of data users agree to share | *Screenwise* | *Datacy* | *Datacoup* | *Killi* |
|---|---|---|---|---|
| **Persistent individual digital tracking** | X | X | X | X |
| **Continuous geolocation info** | X | | X | X |
| **Continuous digital location info (e.g. URL, shopping, etc.)** | X | X | X | X |

### 15. Differences between vendors and digital ads

116.    In par. 86, Deal asserts that "The Screenwise payment is also for continuous data collection that is not analogous to the occasional Bid Requests for Proposed Class Members".

117.    This difference between Screenwise and RTB bid requests might have some merit if there were a lot of internet properties and mobile apps without RTB advertising. Instead, digital advertising sold by Google RTB is so ubiquitous that the surveillance it facilitates is just as continuous as the surveillance Screenwise members agree to.

118.    In par. 89, Deal points out that some of the vendors I rely upon are no longer active. But he does not deny that they were all active throughout much of the time relevant to this case, which is what makes them relevant.

### 16. Additional Claims Deal makes about the Market Value Model

119.    In par. 100, Deal argues that "A core question in the determination of the fact of harm is whether a Google account holder **understood** that their at-issue data would be shared

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

with third parties in Google RTB." (bold in the Deal Report) And in par. 102, he represents that "the results of Prof. Hanssens's survey analysis conducted in this case suggest that a large share of Google account holders think that it is somewhat or very likely that Google shares with potential advertisers information that Plaintiffs claim is personal information."

120.    I agree that "understood" is the key word here, and I agree that Hanssens attempted to measure whether his respondents (who were not necessarily members of the proposed class, and who were unreliable for a host of reasons I outline in my response to the Hanssens Report below) expect that technical data is shared. However, Hanssens did not measure whether the respondents **understood** what this data meant for their privacy. The disclosures, both actual and hypothetical, used by Hanssens were deliberately vague about the extent to which they explained how such sharing enables thousands of companies to conduct persistent digital surveillance of users as they traverse both the internet and the physical world. For this reason (and others discussed below), the **Hanssens Report cannot be interpreted as "revealed preference" that proposed class members approve the sharing of the data at issue in this case**. Hanssens Report does not measure informed choice because the survey respondents were not provided an opportunity to **understand** the implications of their choices.

121.    In other words: so even if we accept (and we should not, for all the reasons explained in my response to Hanssens) the main alleged result that a majority of US Google Account Holders predict that it is somewhat or very likely that some technical datafields are shared with "advertisers who work with Google," it does not mean that fully-informed consumers would agree to such data sharing, and would not feel like their privacy expectations were being violated.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

## III.    RESPONSE TO HANSSENS REPORT

122.    The Hanssens Report presents four surveys as evidence that:

123.    Most members of the proposed class expect user data at issue in this case to be shared with third parties even when the members are not really informed about the sharing by the present Google disclosures;

124.    And that the members would agree to the sharing of this data if they were better informed by hypothetical more complete disclosures.

125.    And there is substantial heterogeneity among the members of the proposed class regarding the underlying judgments and attitudes outlined in 1) and 2) above.

### 17. Summary of Response to Hanssens Report

126.    This response explains why all four surveys are unreliable for making the above claims:

127.    The respondent sampling suffers from severe selection bias in favor of the defendant.

128.    The analyses rely mostly on unreliable respondents who would be excluded by reasonably careful survey researchers.

129.    The data is accumulated in batches separated by day-long pauses, which raises the possibility of adaptive sampling and invalidates the statistical analyses presented.

130.    The disclosures on which the respondents are supposed to be basing their judgments and attitudes are either completely uninformative about the personally identifiable nature of the data shared with third parties (existing disclosures), or only partially informative in this regard (hypothetical disclosures).

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

131.    The disclosures on which the respondents are supposed to be basing their judgments and attitudes restrict attention to "our advertisers" or "advertisers who work with Google" as the third parties receiving user data, which both creates an illusion of safety arising from a close relationship and omits many categories of authorized recipients of the data under existing Google policies.

132.    The surveys simulate an artificial world which is too far removed from the real world in the way it presents information to respondents.

133.    The surveys are completely silent about RTB bid requests, privacy expectations, and digital surveillance concerns that are at the heart of this case.

134.    The two surveys that measure attitudes towards more complete disclosures suffer from acquiescence bias, which is not measured or controlled for, and which is exacerbated by a non-standard choice of the measurement instrument.

135.    The Hanssens Report confuses heterogeneity between how the same group of people answers different questions with heterogeneity between how different people answer the same question. To the extent the latter heterogeneity (the one relevant to commonality) is observed, it is confounded by both scale-usage heterogeneity and measurement error, neither of which are measured or controlled for.

136.    In the rest of this report, I explain how the above over-arching concerns specifically apply to each survey.

## 18. First Survey ("Business Disclosures")

137.    **Claim:** Based on this survey, the Hanssens Report opines that "after reviewing excerpts from Google documents containing challenged statements, a large share of Google account holders think that it is somewhat or very likely that Google shares with potential

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

advertisers information that Plaintiffs claim is personal information when Google account holders visit websites (or use apps) that display targeted ads" (par. 15).

138.    **Response summary:** The survey is unreliable because the respondent sample suffers from selection bias, is not be representative of the proposed class in terms of basic demographics like age, includes speeders and other inattentive respondents, and includes respondents who answered the survey on a mobile phone who can in turn be shown to respond materially differently to key questions. Together, these unreliable respondents add up to the vast majority of the sample, which renders the results invalid and unreliable.

139.    Even taking aside the unreliable respondent sampling strategy, the survey results are not reliable because the sample was collected in successive batches, which made it possible to perform preliminary analyses, which in turn make the final statistical inference invalid.

140.    Even taking aside the sample selection and batch sampling, the survey results are not reliable because there are both mathematical and conceptual errors in the simplistic "margin of error" calculations Hanssens proposes.

141.    Even taking aside the unreliable sampling strategy, batch accumulation of responses, and incorrect statistical methods, the survey is unreliable because it amounts to a reading comprehension test with a vague and unbalanced prompt, which forces respondents to resort to guesswork and their prior knowledge of how Google and the Internet work in general.

142.    Even taking aside the unreliable sampling strategy, batch accumulation of responses, incorrect statistical methods, and the fact that the survey is just a reading comprehension test, the survey is unreliable because it sets up an artificial world too far removed from reality, both in terms of the information provided to respondents, and in terms of the way the information is presented to them.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

143.    Even putting all of the above problems aside, the survey is not informative about the heterogeneity among respondents relevant in the case because it confuses heterogeneity between how the same group of people answers different questions with heterogeneity between how different people answer the same question.

144.    Finally, the survey is completely silent about privacy and digital surveillance concerns that are at the heart of this case, so it is a largely irrelevant exercise with limited impact on the question of whether the privacy expectations of US Google Account Holders are violated by data sharing in Google RTB bid requests.

145.    In the rest of this report, I provide details of the above reasons why the survey is unreliable and lacks relevance to the case.

### A.  Unreliable sampling strategy: a summary

146.    The **sample of respondents** used in the final analysis is unreliable for several reasons:

147.    **Selection bias towards respondents who value their privacy less than the proposed class**: there are multiple reasons to believe that the survey respondents are not representative of the proposed class (US Google Account Holders) in terms of their attitudes towards privacy: All the respondents are from an online panel called Prodege which requires panelists to surrender their digital privacy and submit to persistent digital surveillance. Prodege members are repeatedly presented with an extremely onerous privacy policy that requires them to give up their online privacy in extraordinary ways, including allowing Prodege to disclose and sell their sensitive personal information.

148.    The survey asked demographic questions like age and gender as part of the screening procedure, and terminated everyone who selected "Prefer not to answer" to even one of

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

these personal questions, thereby introducing selection bias by only allowing participants who were relatively less protective of their privacy.

149. **Selection bias towards older respondents than the proposed class**: there is no evidence offered that the sample is representative of the population of U.S. Google Account Holders, especially in terms of dimensions relevant to privacy concerns. But there is at least some evidence that the sample skews older than the representative US Google Account Holder.

150. **Lack of representativeness due to inclusion of professional survey takers who may not be U.S. Google Account Holders**: the sample includes 34 respondents (11% of the sample) who checked having an account at EVERY online service listed in the filtering question Hanssens solely relies upon to identify Google account users. This filtering question is weak because unqualified respondents who want to get paid can just select all options to get into the survey. Adding to the evidence that these respondents are not responding truthfully, they are subsequently much less likely than other respondents to admit having taken a survey recently. This pattern of behavior is consistent with these respondents understanding that these are filtering questions, and responding to them strategically in order to get paid.

151. **Inclusion of professional survey takers who likely did not engage with the survey** as indicated by "straightlining": the sample includes 20 respondents (7% of the sample) who select the same answer to all nine questions in the key questions about their expectation regarding data sharing. This pattern is inconsistent with even a superficial comprehension of the text upon which they are instructed to base their answers.

152. **Inclusion of speeders, who in turn materially impact the answers**: the sample includes respondents who complete the survey as fast as 95 seconds, including the mandatory 30-second wait to read the text excerpt. 95 seconds is preposterously fast for a survey that includes 14 questions with lots of text to read plus a captcha. The survey requires the reading of at least 1000 words, and normal rate for reading with comprehension is about 300 words per minute, so I

42

would expect respondents who actually comprehend all of the survey questions to take at least three minutes to complete the survey. But the sample includes 95 respondents (32 % of the sample) who complete the survey in less time. The survey did include an "attention check" question, but the question was extremely non-diagnostic in that 99% of respondents passed it. My analysis also shows that speeders answer most of the five key questions regarding their expectation regarding data sharing statistically significantly differently from slower respondents, and thus likely provide biased results.

153.    **Inclusion of distracted respondents**: at the opposite end of the timing spectrum, the survey includes a respondent who took more than two and a half hours to complete the survey. That respondent was doubtlessly distracted by other tasks during the course of answering the survey, and so were the other 22 respondents (7 % of the sample) who took longer than ten minutes (three times the duration required for reading with comprehension).

154.    **Inclusion of respondents who answered the survey on a mobile phone, which in turn materially impacts the answers**: 117 respondents (39 % of the sample) indicated that they were using their mobile phone to answer the survey. My analysis shows that these respondents answer two of the five key questions regarding their expectation regarding data sharing statistically significantly differently from the other respondents who are using bigger screens. Reading paragraphs of text and then answering Likert grid questions on a mobile phone is cumbersome, and likely biases results.

155.    Based on careful practices in survey research, all of the types of problematic respondents identified above should be excluded from analysis to ensure data quality. Many respondents fall into more than one problematic category. When I add all respondents who fall into at least one problematic category, I arrive at **209 respondents (70 percent) who should be excluded from analysis**. In other words, considering only respondents for whom we do not have

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

a reason to suspect low data quality would result in a final sample of only 91 respondents – a statistically insufficient number.

156.     As **evidence of higher data quality among the remaining 91 respondents**, I offer the following observation: they respond more consistently to the obvious question about social security number: 73 percent (up from 63 percent in the whole sample) agree that it is very unlikely to be shared. "Very unlikely" is the obvious correct answer to this question because Americans perceive the social security number to be the single most sensitive piece of personal information according to Pew Research.[22]

### B. Unreliable sampling strategy: detailed analyses

157.     <u>**Selection bias towards respondents who value their privacy less**</u>**:** Hanssens agrees with the established best practice that surveys must be designed to be an accurate representation of the underlying population.[23] Yet, he agreed with the decision of his Cornerstone team to use the Prodege panel.

158.     The Prodege panel only includes respondents who agree to digital surveillance that far surpasses that enabled by the User Data at issue in this case shared via RTB bid requests. Exhibit 1 of this response includes the key passages of the Prodege privacy policy, which states clearly that "We may **share or sell** aggregate **or individualized** information about you that may include, without limitation: (1) **your PII and related information**; (2) your use of the Prodege Sites and Features and our Services; (3) **Third Party Services and other websites you visit**; and (4) **your geo-location and information derived therefrom**." And upfront, the policy states that "**IF YOU DO NOT WISH TO HAVE US COLLECT, USE, AND SHARE INFORMATION**

---

[22]     https://www.pewresearch.org/internet/2014/11/12/americans-consider-certain-kinds-of-data-to-be-more-sensitive-than-others/
[23] Plaintiffs' Ex. 57, Hanssens Tr. at 58:17.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**AS DESCRIBED IN THIS PRIVACY POLICY, PLEASE DO NOT USE ANY OF THE PRODEGE SITES AND FEATURES OR OUR SERVICES**" (bolding and capitalization is Prodege's).

159.    I conclude that members of the proposed class who do not wish to have their personal information shared or sold cannot be respondents in the survey, and so the survey suffers from severe selection bias in favor of the Defendant. And as I explain next, Hanssens does not disagree with my conclusion in this regard.

160.    Hanssens was not aware of the above capitalized requirement for inclusion in the Prodege panel, and hence in his survey (Plaintiffs' Ex. 57, Hanssens Tr. at 74:2-15 and 94:21-95:1), he did not read Prodege's policy (70:15-71:3), and did not know Prodege sells or shares personally identifiable information without limitation (85:20-86:2). After seeing the policy, **Hanssens agreed that Prodege's Privacy Policy discloses that Prodege shares and sell each of the categories of personal information that he asks about in his surveys** – and much more – including IP address, URL, browser cookies, content categories, characteristics of the web browser and device (94:3-12).

161.    Since Hanssens is a scholar and he did not specifically test whether most Google account holders would agree to Prodege's privacy policy (Plaintiffs' Ex. 57, Hanssens Tr. at 96:21-24), he had to concede in deposition that the details of Prodege's privacy policy may have biased his results via selection. Specifically, he **agreed that someone who refused Prodege's policy may have answered the survey differently** (95:2-15), that if the sample population only included individuals who had refused to accept Prodege's privacy-invasive terms and conditions, the results could have been different (95:2-8), and thus "as an academic he has to admit the possibility" that selection bias limited the reliability of his survey (98:25-99:9).

162.    Even among Prodege panelists, there may be respondents with lingering concerns about sharing their personal information in surveys. But these respondents were excluded from

45

the survey, which **automatically terminated anyone who selected "Prefer not to answer"** in response to the age and gender questions. This inexplicable exclusion criterion compounds the **severe selection bias** introduced by only including Prodege panelists in the first place. Together, the two selection biases compound, and result in an unreliable sample of respondents taken to analysis.

163.    <u>**Selection bias towards older respondents than the proposed class**</u>**:** My analysis indicates that the sample is representative of the US population over 13 in terms of age (a chi-squared statistic does not reject the null hypothesis). But Hanssens offers **no evidence that it is representative** of the proposed class, namely US Google Account Holders. Taking Gmail users as a reasonable proxy for Google Account Holders suggests that a sample that is representative of the general US population over 13 in terms of age is, in fact, a biased sample because it over-represents older cohorts. Publicly available data[24] suggests that Gmail is relatively much more popular among younger people while older Americans prefer Yahoo or Outlook.

164.    Since Hanssens has access to Google's detailed demographic data on US Google Account Holders, he could have tested for representativeness (he did not) and then re-weighted the respondents to produce an unbiased estimate of the true expectation judgment in the underlying population (he did not). In fact, he did not even need to ask these questions because Google could have simply provided him with a rich demographic profile of every panelist based on the panelist's Google cookie, which should be available to Hanssens because Prodege panelists agree to digital surveillance and sharing of their personally identifiable data "without limitation."

165.    <u>**Lack of representativeness due to inclusion of professional survey takers who**</u> <u>**may not be Google account holders**</u>**:** In response to the question "In the past seven years, with which of the following online services, if any, have you had a personal account, whether free or

---

[24]https://www.statista.com/statistics/547531/e-mail-provider-ranking-consumer-usa-age/

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

paid?" labeled S8 in the Datamap, 34 respondents check every option except for "None of the above."

166.    When I took the survey in October and November of 2023 at the link provided by the defendant,[25] **I was also able to click the link and try getting into the survey again after not selecting the first "Google" option** on this filtering question, and being terminated. It is possible that this this survey-restart option available to me as a respondent was also available to the actual respondents, enabling them to game the entry criteria. Even if this is not the case, **a filtering question that allows respondents in after checking all the boxes is quite weak and ineffective.**

167.    Adding to the evidence that these respondents are not responding truthfully, 94 percent of them claim "None of the above" on the immediately subsequent question about which types of  surveys they had taken recently, which is much more than the 70 percent of other respondents.

168.    The above pattern of results across multiple questions clearly indicates that **these respondents are gaming the survey filtering questions and not answering them truthfully.** There is thus every expectation that they may not be members of the proposed class, and also will not answer any other questions truthfully either. As a result, I consider the 34 respondents who checked all filtering boxes to be unreliable, and I propose that a careful analysis of the data would have excluded them.

169.    Since Hanssens works for Google and Prodege users agree to be tracked, Hanssens could have literally verified whether each included in the survey is in fact a member of the proposed class using the panelist's Google cookie. He did not.

---

[25] https://researchsurv.com/survey/selfserve/2172/g3e24/231000?list=3

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

170.    **Inclusion of professional survey takers who likely did not engage with the survey, and ineffective ad-hoc attention check:** Straightlining is a well-known problem with Likert grid questions[26], and it is especially problematic in the present survey that includes "decoy" questions expected to yield opposite results. One well-known way to guard against straightlining is to reverse-code some questions on the grid. Hanssens did not reverse-code any of the questions in the key measurement question of this survey.[27] As a result, we do not know which straightliners are simply not engaging with the survey, and which ones are perhaps responding genuinely equally, and all straightliners must be considered as unreliable respondents. I propose that a careful analysis of the data would exclude them.

171.    Both this concern about respondent attentiveness and the next one may seem to be allayed by the "attention check" used in the survey. The attention check was a multiple-choice question that asked the respondent to select "South" from a list of four cardinal directions. This is an unreliable attention check for several reasons:

172.    Hanssens reports that over 99 percent of the candidates passed this test. Thus the question is so easy that even straightliners and speeders get it right.

173.    Hanssens offers no peer-reviewed reference for this attention check. This is not because of a lack of such validated questions. For example, Daniel Oppenheimer (a former colleague of Hanssens) has developed (with two other co-authors) and published a well-known

---

[26] Gummer, T., Roßmann, J., & Silber, H. (2021). Using Instructed Response Items as Attention Checks in Web Surveys: Properties and Implementation. Sociological Methods & Research, 50(1), 238-264.

[27] The key question was "Advertisers work with Google to display targeted ads on many websites and apps across the internet. Based on your understanding of the excerpt you just reviewed, if you visit one of these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?" labeled Q1 in the Datamap.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

attention check question specifically designed to test whether respondents follow instructions in surveys with Likert scales.[28]

174.    The weak attention check comes early in the survey, and it is such an obvious attention check that professional survey takers will surely recognize it as such and relax after passing it in the knowledge that they will not get terminated without payment. Recent research does, in fact show that attention checks early in the survey flow do not guarantee attention later in the survey flow, especially if they are recognized by survey participants as such.[29]

175.    **Inclusion of speeders and empirical proof that speeding is material to the observed answers:** Speeding is a well-known problem with online surveys. In his deposition, Hanssens claims that it is sufficient to make sure there are "no gaps" at the bottom of the timing distribution, and attests that no respondents were excluded based on timing.[30]  As far as I know, this **"no gaps" criterion is not based on any peer-reviewed work, and it is also not standard practice in the scientific survey community**. Instead, I propose that some percentage of the fastest respondents is always excluded from analysis because speeders always pop up. The gold standard is to pre-register the exclusion criteria before running the survey in order to convince the audience that so-called "p-hacking", i.e. fiddling the criteria in order to get desired results, did not occur. Hanssens did not pre-register his exclusion criteria.

---

[28] Daniel M. Oppenheimer; Tom Meyvis; Nicolas Davidenko (July 2009). "Instructional manipulation checks: Detecting satisficing to increase statistical power". Journal of Experimental Social Psychology. 45 (4): 867–872.

[29] Arndt, Ford, Babin and Luong (2023) "A Framework for Screening and Assessing Sample Quality obtained from Online Services" ACR Conference Proceedings 2023.

[30] Plaintiffs' Ex. 57, Hanssens Tr. at 141:23-142:2 ("we did check total time to complete and make sure that it was sort of a continuous number, that there weren't any gaps; that people do it in 25 seconds, and then everybody else takes more than two minutes, in which case we would have thrown out those super fast ones.").

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

176.    To ascertain how fast people can actually read and comprehend the survey instructions, I calculated the survey word count to be about 1000 words.[31] **Established peer-reviewed research suggests that people can read about 300 words per minute if their goal is to comprehend the text**.[32] So it should take just over 3 minutes to just read the survey questions in this survey. Anyone who completes the survey faster, e.g. respondent id 7h3gvr014zj6bzq9 who completed the survey in 95 seconds, is most likely just rushing through to get paid and not really comprehending the text.

177.    To assess the relationship between speed and answers to the key questions, I separated the respondents into speed quartiles, and compared the responses of the fastest quartile to the responses of the slowest quartile on the five key questions of Q1 grid using the Chi-squared test of independence (I ignored the rare "I don't know responses"). The results are shown in the table below. It is evident that there is a strong relationship between speed and the answers for most data-types: For IP and Device, the responses are statistically significantly different at the 5% level, and for URL and Verticals they are different at the 10% level. Given the small numbers of respondents involved, this indicates a **strong sensitivity of the responses to overall timing.**

---

[31] I counted all the words in the Datamap app, and subtracted states and things in brackets.
[32] E.g. Rayner, K., Schotter, E. R., Masson, M. E. J., Potter, M. C., & Treiman, R. (2016). So Much to Read, So Little Time: How Do We Read, and Can Speed Reading Help? Psychological Science in the Public Interest, 17(1), 4-34.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**Table: Counts of responses by Likert option, by quartile of completion speed**

| data type | quartile | very unlikely | somewhat unlikely | neither | somewhat likely | very likely | p-value of the Chi-squared test of independence |
|---|---|---|---|---|---|---|---|
| IP | fastest | 8 | 6 | 18 | 27 | 14 | ** |
| | slowest | 17 | 12 | 10 | 13 | 17 | **0.013** |
| URL | fastest | 4 | 3 | 11 | 27 | 25 | * |
| | slowest | 8 | 2 | 8 | 13 | 36 | *0.066* |
| Cookie | fastest | 4 | 6 | 9 | 29 | 24 | |
| | slowest | 7 | 6 | 5 | 16 | 34 | 0.119 |
| Verticals | fastest | 3 | 4 | 19 | 24 | 24 | * |
| | slowest | 3 | 3 | 6 | 22 | 34 | *0.076* |
| Device | fastest | 2 | 3 | 20 | 25 | 21 | ** |
| | slowest | 10 | 3 | 8 | 23 | 24 | **0.030** |

178.    If the fastest respondents are clearly speeding, does that mean that the slowest respondents are most deliberate and thus most reliable? Not really, as I discuss next.

179.    **Inclusion of distracted respondents who take too long**: If it takes about 3 minutes to read the survey with comprehension, respondents who are truly engaged should not be taking hours to complete the survey. Most likely, such respondents are distracted by other tasks midway through the survey. Since the survey requires them to remember details of lengthy text they reviewed previously during the survey, it is likely that distractions disrupt this memory process, and thus make the responses generated much later quite unreliable. I chose the 10-minute cutoff based on my own experience with the survey, and propose that the 22 respondents who took longer should be excluded.

180.    **Inclusion of respondents who answered the survey on a mobile phone, which in turn materially impacts the answers:** Responding to a survey on a mobile phone is different from responding to it on a laptop or a desktop for at least two reasons: first, the screen is much smaller and second, the respondent is much more likely to be on the go, and thus distracted and not fully paying attention. The table below shows that these differences (and possibly others) have

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

a statistically significant impact on the answers people give: for both URL and Verticals, the responses are statistically significantly different between devices at the 5% level.

**Table: Counts of responses by Likert option, by device type**

| data type | quartile | very unlikely | somewhat unlikely | neither | somewhat likely | very likely | don't know | p-value of the Chi-squared test of indep. |
|---|---|---|---|---|---|---|---|---|
| IP | other | 31 | 19 | 30 | 43 | 44 | 16 | |
| | phone | 17 | 16 | 26 | 26 | 23 | 9 | 0.703 |
| URL | other | 13 | 7 | 16 | 51 | 80 | 16 | * |
| | phone | 2 | 1 | 19 | 36 | 54 | 5 | **0.031** |
| Cookie | other | 16 | 13 | 14 | 56 | 70 | 14 | |
| | phone | 7 | 7 | 21 | 33 | 41 | 8 | 0.172 |
| Verticals | other | 6 | 8 | 18 | 58 | 76 | 17 | * |
| | phone | 4 | 4 | 23 | 35 | 49 | 2 | **0.038** |
| Device | other | 16 | 10 | 28 | 55 | 60 | 14 | |
| | phone | 8 | 3 | 23 | 41 | 33 | 9 | 0.617 |

181.    Given that the phone respondents respond differently than the laptop and desktop ones, they cannot both be reliable. So which data should be considered to be an unbiased representation of the underlying construct? I propose that the phone users should be excluded because they are much more likely to be distracted and inattentive, and their ability to read text is further compromised by the small screen of their phone.

182.    **Batch survey administration evidence and erroneous statistical error analysis:** The sequential administration of the survey renders the subsequent statistical analysis invalid because the sample was accumulated in batches and likely checked for significance along the way. Specifically, I calculated the start time implied by the end time and the survey completion time, and found the following patterns:

183.    Exactly 100 responses were collected on September 11, 2023 between 17:23 and 23:44.

52

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

184.    Zero responses were collected on September 12, 2023.

185.    All the 200 remaining responses were collected on September 13 (with three in the early hours of September 14, 2023).

186.    Why would anyone pause data collection for an entire day, and then resume? I propose that it is likely that Cornerstone analysts looked at the data on September 12 to make sure it was "working out" according to expectations, and then decided to collect 200 more responses in order to get statistical significance. This type of batch analysis can result in so-called "p-hacking" that has recently been exposed to run rampant in survey-based research.[33] It is well known that **if such a sequential approach was used, the simple statistics applied at the end is invalid** because it assumes just a single look at the data, not two looks.[34] This pattern of data collection also suggests that other versions of the survey were run and terminated early, and this practice would also invalidate the subsequent statistics for the same reason.

187.    Regarding the reported margin of error being 5.3% (par 59 of Hanssens report), the report contains both a mathematical and a conceptual error. The **mathematical error** is that applying the formula in footnote 75 to $p$=0.5 and $N$=300 yields 5.7% - a **larger margin of error than reported**. This obvious error makes me question all other statistical results presented in the report. At the minimum, all analyses need to be re-computed and validated.

188.    But even if the margin of error calculation is corrected, the statistical analyses presented would continue to suffer from a conceptual error. The **conceptual error is that the data at hand is multinomial, not "binomial" as Hanssens represents** in his deposition (55:5) and applies in footnote 75. Each person has a choice of six options on the Likert scale, but

---

[33] Simmons, J. P., Nelson, L. D., & Simonsohn, U. (2011). False-positive psychology: Undisclosed flexibility in data collection and analysis allows presenting anything as significant. Psychological Science, 22(11), 1359-1366.
[34] ibid

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

binomial data would involve only two options. The correct statistical test for assessing the observed multinomial choice percentages is thus the Chi-squared Goodness of Fit test, which I use throughout my analyses of the produced data. The **statistical inference thus does not simplify to a single convenient "margin of error" number** as Hanssens proposes, and it is incorrect to simply assess the precision of each percentage in Exhibit 4 as +/- 5.7% (the correct of the formula in footnote 75). Instead, it is only statistically possible to, for example, assess the probability that the 300 responses to the first question about IP address would turn out as observed if, in fact, the underlying population had true probabilities of [18%,18%,18%,18%,18%,10%] corresponding to the six options on the Likert scale (the "null hypothesis" here). As an example, the *p*-value of the relevant Chi-squared statistic is 0.0082, so one would reject the null hypothesis at the 1% level of statistical significance. The point of this example is not to make any claims about the particular null hypothesis, but rather to illustrate that correct statistical testing of the data Hanssens collected is not as simple as thinking of a single scalar "margin of error".

189. **Survey design unreliable: reading comprehension test with "personal information" undefined**: The **design of the survey** is unreliable for the purposes of measuring consumer expectations about sharing of personal information because it does not define what "personal information" is, and instead asks respondents to reason about likelihood of sharing of different data types based on vague and partial disclosures of what Google shares. Here is the text, highlighting the seven mentions of "personal information" and underlining the only definition (by exemplar) of the term offered:

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

We use your **personal information** to make our products more helpful to you. It's how we can autocomplete your searches, get you home faster with Maps, or show you more useful ads based on your interests. But **we never sell your personal information to anyone** and you can use many of our products without signing in or saving any personal information at all.

When we show ads, advertisers pay us either for the placement of an ad – like a banner at the top of a web page – or for how an ad actually performs – like when someone clicks on it. Advertisers do not pay us for **personal information, <u>such as your name or email</u>**, **and we never share that information with advertisers**, unless you ask us to. We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you. We share reports with our advertisers to help them understand the performance of their ads, but we do so **without revealing any of your personal information**. At every point in the process of showing you ads, we **keep your personal information protected** with industry-leading security technologies.

190.    Note that the text offers only two facts about sharing of datafields:

191.    Personal information is NOT shared with advertisers

192.    Personal information is information like "your name or email"

193.    While the assignment calls for measurement of "information <u>that Plaintiffs claim</u> is personal information", Hanssens actually intended for consumers to first make a judgment themselves about what is personal information[35] without asking the question directly. Instead, consumers were given two examples of personal information ("your name or email"), told that such personal information was not shared, and then asked whether technical datafields such as URL, Device type or partial IP address were shared.

---

[35] Plaintiffs' Ex. 57, Hanssens Tr. at 118:10-122:8 ("No, I don't define it. No, I want consumers to define it." at 122:7-8) and ("It's not defined in the -- in the survey; therefore, we allow the respondent to use whatever they think personal information is" at 120:1-14).

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

194.    How could the respondents make this judgment "based on their understanding of the excerpt they just reviewed" (as they were instructed) when **the excerpt did not mention any technical datafields**, and did not say anything about what technical datafields are shared. I propose that the **task effectively asked the respondents to compare each datafield in question Q1 to their "name or email", and select one of the "not shared" options if the datafield seemed like their "name or email"**. The respondents did well on this task in the sense that they showed remarkable agreement that home address and social security number were like name or email (60% and 74% selected "somewhat" or "very" unlikely, respectively).

195.    But how could the respondents make a judgment about technical data such as URL, Device type or partial IP address since the "excerpt they just reviewed" said nothing about these fields? A plausible underlying process (which Hanssens could have tested for, but did not) is that the respondents judged these technical datafields as not similar to their "name or email", and hence could not apply the information in the text, and in turn had to rely on their own understanding of how the Internet works in general and how Google works specifically.

196.    In other words, I propose **that based on the excerpt, respondents cannot actually make a judgment about the expectations of sharing of the technical data**, other than perhaps data that "makes products more helpful". The excerpt does not mention anything like IP or URL. Thus people have to go with their prior beliefs about how the internet works, and their beliefs about Google which is prominently mentioned in the instructions.

197.    Now suppose that people generally understand that some technical information gets shared on the internet. In fact, the respondent population used here is selected to include relatively more informed people as explained above. So the key question[36] is just asking people

---

[36] "Advertisers work with Google to display targeted ads on many websites and apps across the internet. Based on your understanding of the excerpt you just reviewed, if you visit one of

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

to compare the information types to things like name and email, and report that these are not shared. As long as people have a common belief that lots of technical information is likely shared, they generally report the technical information as "somewhat" or "very" likely to be shared, but they correctly pick out social security number and home address as a qualitatively different – much more similar to "your name and email". In fact, the level of agreement that security number is not shared is vastly stronger than any potential agreement about the technical data types: 63 percent of respondents indicate it is "very unlikely" to be shared – which is much more than the highest agreement about something being "very likely" shared (i.e. 48% regarding type of ad that could be displayed).

198.    The pattern of the data thus shows that the key question asks respondents to reason by analogy, and pick out things "like your name and email" from a list. And if they cannot identify a datafield as similar-enough to "name or email", they fall back on their prior beliefs. This is thus a **classic example of a reading comprehension test**: it is consensus among literacy experts that "Studies have shown that readers use their background knowledge—vocabulary, facts, and conceptual understanding—to comprehend the text they read."[37] Hanssens agrees that his survey results could thus be influenced by perceptions of Google (105:8-10, 106:15-21, 107:12-25), which was listed prominently as the author of the text. In other words, it is possible that respondents would have answered the question about technical datafields (such as URL, Device type or partial IP address) similarly even without the text. Hanssens could have tested such baseline beliefs, but he did not. If the baseline beliefs about the sharing of technical datafields (such as URL, Device type or partial IP address) are indeed similar to those after seeing the

---

these websites or use one of these apps, how likely or unlikely do you think it is that Google shares the following types of information with potential advertisers?"

[37] https://www.edweek.org/teaching-learning/what-is-background-knowledge-and-how-does-it-fit-into-the-science-of-reading/2023/01

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

disclosure text, then this would be a proof that the text is simply uninformative about the sharing of technical datafields.

199.    I propose that respondents do not actually realize that the technical datafields (such as URL, Device type or partial IP address) are, in fact, personal information according to Google's own definition.[38] And if they were informed about this fact, they would have responded differently. Even Hanssens accepts that not defining personal information could have affected his results (Hanssens Tr. at 123:17-18).  He also did not test what would happen if he defined Personal Information and it is possible that survey takers would have responded differently (113:10-18). And he agrees that the survey did not explain that URL sharing on RTB allows hundreds of companies to engage in tracking (156:24-157:13). He also agrees the survey does not explain that

█████████████████████████████████████████████████████████████

████████████████████ [GOOG-HEWT-00456109] (147:1-9), and leaves open the possibility that █████████████████████████████████████████ (150:5-17).

200.    The largest omission in this regard is the omission of highly privacy-relevant information on how cookies are actually used. In his deposition, Hanssens agrees that the survey does not explain that a cookie is a unique identifier that can be used to track browsing across the internet  (162:17-163:12; 163:22-165:12), and he agrees that the survey does not explain about cookie matching  (166:3-8). He also insists in several places that cookies track browsers when, in fact, the pseudonymous Google ID shared in RTB bid requests does indeed track individual account holders across multiple browsers and devices.

---

[38] This is information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account. (from https://policies.google.com/privacy/key-terms?hl=en-US).

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

201.    **Survey design unreliable: lack of realism in modeled world**: Ultimately, the survey is unreliable because it describes a situation too far from the real world which it allegedly represents, and on which the present case is based.

**Table: Contrasting narratives between the survey world and the real world**

| Survey world as described by excerpt on which respondents are instructed to rely | Real world and present case |
|---|---|
| <ul><li>"our advertisers" "work with to display targeted ads on many websites and apps across the internet"</li><li>"Google never shares personal information with advertisers"</li><li>"Google never sells personal information to anyone"</li><li>Google only "uses personal information to make products more helpful" to users</li></ul> | Google sends out many fields of detailed personally identifiable information to thousands of third-party firms (many of which are not advertisers and/or are based abroad) 300,000,000,000+ times per hour. The fields, especially when used in combination, enable thousands of third-party firms to conduct pervasive and persistent digital and physical surveillance of US Google account holders. |

202.    The following table details the discrepancies between reality and the carefully circumscribed world represented by the survey in terms of several issues:

203.    Who are the third parties that receive data from RTB bid requests;

204.    What data is shared with the third parties;

205.    What data is not shared with third parties;

206.    Information about whether technical data is shared with third parties;

207.    The key question asked;

208.    The definition of personal information.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

**Table: Discrepancies between the Survey World and the Real World**

| Issue | Survey world as described in the excerpt | Real world and present case |
|---|---|---|
| **third parties** | • our advertisers | • third-party advertisers<br>• data management platforms (including foreign)<br>• research and analytics firms (including major retailers, insurance companies, and airlines)<br>• data providers and brokers,<br>• demand side platforms (including in foreign hostile countries) that may rebroadcast the data further |
| **data shared** | • reports to our advertisers to help them understand the performance of their ads | • persistent individual identifiers, such as encypted Google ID<br>• gender<br>• interests (aka "verticals")<br>• information about publisher's website, app, domain name, URL, IAB content categories, keywords, unique content ID, and other details.<br>• information about user device, operating system, make, hardware version, unique mobile id, mac address IP address unique device ID, browser user-agent string, make, and internet carrier,<br>• information about user's exact physical location down (lat & long), country, region, metro, zip, and time last fixed |
| **data not shared** | "personal information, such as your name or email" | name, email, social security number, home address, content of Gmail and possibly other highly personal data |
| **Info whether technical data is shared** | not provided at all | available from multiple sources about how RTB works |
| **key question** | how likely is it that specific **individual pieces** of technical data are **shared** with **our advertisers who work with Google** | how likely is it that thousands of **third parties (many of whom are not advertisers**) can use the **union of all the shared pieces of data** to violate privacy expectations and **conduct persistent digital surveillance** of users as they traverse **both the internet and the physical world.** |

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

| personal info definition | only **by analogy** "such as your name or email" | Google has one definition, and there is also a legal definition, and neither is just an analogy to "your name or email" |
|---|---|---|

209.    **Survey design unreliable: lack of realism in the way information is presented and collected**: There are numerous other design elements of the survey which make it unrealistic, and hence unreliable as a prediction of what happens in the real world.

210.    Disclosures in Hanssens' surveys were not presented to survey respondents in the same context in which Google Account Holders would have seen them. Specifically, the survey presents an excerpt out of context (it is only an excerpt of a larger "How Our Business Works" page, which is in turn linked from elsewhere in Google's description of its privacy policies)[39]. It is likely that a consumer arriving to this page would have encountered much other information along that way, most of it reassuring about privacy concerns and explaining in much more detail what and how data is shared. It is also likely that respondents arriving at this text in its real-world context would have already learned what "personal information" was along the way, and would thus have answered the key questions differently. Hanssens agrees that the **disclosures are presented out of their real-world context** (Hanssens Tr. at 111:3-4).

211.    Disclosures in Hanssens' surveys were not presented to survey respondents as Google Account Holders would have seen them because the excerpt is not a screenshot, it is **reformatted with altered color, font, it is not what users would experience** on the Internet  In his deposition, Hanssens admits that he has used screenshots in the past, but decided not to use them in this case (111:7-13). He gives no reasoning why other than "because it's just text" (111: 18).

---

[39] https://about.google/how-our-business-works/; *see also* Plaintiffs' Ex. 38 (ECF 546-41)

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

212.    By **forcing respondents to view** the Challenged Statements for at least 20-30 seconds (see Hanssens Report, Appendix E-1, page 5), the survey results reflect an unrealistic scenario in which 100% of customers have scrutinized the disclosures.

213.    People **could tap to view the excerpt again**. This is not a realistic representation of how Google Account Holders browse the internet - they cannot just hover over a word on a webpage and see the disclosure about what that term means and how it is used in RTB advertising.

214.    The 5-point Likert **scale is artificial and not familiar** to respondents from their daily lives. A much more familiar scale would have been "Yes/No/Don't Know", as used for example by Turow, who found a lot of "don't know" responses on analogous questions related to data sharing and privacy.[40] In deposition, Hanssens explained that "they" (presumably Cornerstone and him) selected to use the Likert scale because with Yes/No, the "the information that we convey would have been less valuable because we wouldn't have known anything about the strength of belief." But nowhere in his report does he actually rely on the variance in strength of belief between "very" and "somewhat". Instead, he lumps these two categories together when he reports that "*, a large share of Google account holders think that it is somewhat or very likely that Google shares …"*. In other words, the alleged additional information about strength of belief is not needed for the conclusions Hanssens draws.

215.    I propose that the real reason why Likert scale was used here was to minimize the selection of "I don't know" by providing five other options to choose from, including the vague "neither likely nor unlikely" middle option. Had Hanssens used the more familiar and easy to

---

[40] Turow, Joseph and Lelkes, Yphtach and Draper, Nora and Waldman, Ari Ezra, Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand It, Say They're Helpless to Control It, and Believe They're Harmed When Firms Use Their Data--Making What Companies Do Illegitimate (February 15, 2023). Available at SSRN: https://ssrn.com/abstract=4391134 or http://dx.doi.org/10.2139/ssrn.4391134.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

interpret "Yes/No/Don't Know" scale, he would have get a lot of "don't know" responses like Turow did, and the results would be difficult to interpret. A more natural and simpler question type would thus better expose the intentional vagueness of the excerpt used. A more natural and simpler yes/no question would also make it harder to argue for heterogeneity in the form of disagreement among people.

216. The Likert scale also allowed Hanssens the after-the-fact option of lumping the top two categories together, which he did. But by always combining "very likely" and "somewhat likely" in his reporting, Hanssens inflated the percentage and thus misleads the reader to a conclusion that most respondents expected Google to share their personal information. When we look at only the "very likely" option, we see that only a minority of consumers select it in every instance. But Hanssens does not report that "*a minority of Google account holders think that it is very likely that Google shares with potential advertisers information that Plaintiffs claim is personal information when Google account holders visit websites (or use apps) that display targeted ads*". This is obviously misleading the casual reader into seeing an overwhelming consensus where there is, instead, a great deal of confusion and uncertainty among the respondents.

217. The survey **focuses exclusively on advertisers**, but many other types of "authorized buyers" receive RTB bid requests, and the survey thus cannot say anything about consumer expectations regarding Google's sharing of data with these other types of actors. Hanssens agrees that the surveys do not measure whether people know who is getting their personal data.[41]

---

[41] Plaintiffs' Ex. 57, Hanssens Tr. at 33:17-20 (Q. "Do your surveys measure whether people know who's getting their data?" A. "In as far as it -- as the question relates to advertisers, then they know that it's -- I should say potential advertisers, but beyond that, no".).

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

218.    When giving examples, e.g. examples of URLs or verticals, the survey intentionally picks **"neutral" examples, such as nba.com** for URL. But neutral here means "a URL such that if I visited it, I would not mind anyone else knowing that I did". But that is <u>not neutral, it is as minimally sensitive to privacy concerns as possible</u>, and therefore misleading. A better adjective would be "**neutered examples**".  In his deposition, Hanssens opined that Planned Parenthood.com, Mayo Clinic, pornography, or all of the above would be "leading" even those these are real websites that people use. He also **agrees that if he included such more sensitive examples, it is possible that would change the results** (but unlikely) and he did not test for that. (Hanssens Tr. at 154:1- 156:23).

219.    Unnecessary text was included in questions to distract participants from the key focus of the matter. For example, the key question "Based on your understanding of the excerpt you just reviewed,…" was always preceded by "Advertisers **work with Google** to display targeted ads on many websites and apps across the internet." In his deposition, Hanssens agrees that advertisers do not really "work with Google" in the traditional sense of the phrase (135:24-25), and the relationship is instead automated and impersonal (136:23-137:5). I propose that this unnecessary sentence is a priming device to set up a friendly context in which the third parties receiving the information are really Google's close partners, perhaps a few firms Google works with closely, likely staffed real human beings who care about privacy and other rights of users. This is misleading because we know that there are thousands of advertisers who "work with" Google only in the sense that their impersonal automated algorithms place bids in the RTB auction.

220.    As a result of the numerous discrepancies between the world the survey describes and reality combined with the numerous discrepancies in which the survey represents information to respondents and the way Google Account Holders interact with disclosures in real life, the survey is not a reliable measurement of real-world judgments or behaviors.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

221.    **Survey design unreliable for measuring heterogeneity relevant in the case**: In his par. 15, Hanssens also opines that "*I also find that there is heterogeneity in the expectations of Google account holders depending on whether the information in question is their partial IP address, the URL of the website, the content categories in which Google classifies the website, their browser cookies, or the characteristics of their web browser and device.*" (emphasis added).

222.    In his deposition (252:16-253:18), he explains in response to a question about how many respondents consider sharing to be very likely: "*now looking at the business disclosures. It could be as little as 22 percent, but it could be as high as 45 percent, which precisely illustrates the point that when you talk about sharing information, you need to be specific about what kind of information, okay? That's the heterogeneity.*"

223.    This opinion **mischaracterizes heterogeneity relevant to the case: i.e. heterogeneity in privacy concerns between people.** Instead, it documents heterogeneity between questions / datafields. The fact that people seem to generally think URL is more likely to be shared with advertisers than IP is not evidence of heterogeneity because it says nothing about how people differ from each other on the same question.

224.    The results of the survey say nothing about heterogeneity relevant to the case, i.e. heterogeneity in privacy concerns between people.

225.    But what about heterogeneity in the form of disagreement among people regarding whether URL is shared? **The fact that different people click on different options on a Likert scale is not necessarily evidence of underlying heterogeneity in beliefs**. It can be caused at least by these two other factors:

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

226.    **Scale usage heterogeneity**: Different people use scales differently, and methods exist to account for these differences during analysis of Likert-scale data.[42] Hanssens did not perform any such analyses. Note that this approach relies somewhat strongly on observing each respondent multiple times, but Hanssens only asked about each data field once. Hanssens also mis-characterizes the Rossi et al study[43] as only relevant to cross-cultural studies, such as ones combining responses from Germany and France (259:19-260:15). In fact, the study's main application is a "customer satisfaction survey done in a business-to-business context with an advertising product" conducted in the U.S. by Maritz Research.

227.    **Measurement error**: The task respondents are facing in this survey is a choice between six options (5 likelihoods + 1 don't know). To answer the question, they need to make a probability judgment, and then translate it into English using words like "somewhat" or "very". Both steps can introduce measurement error in the sense that a person with a given fixed underlying belief responds differently. Without repeating similar questions to the same person, it is nearly impossible to measure the magnitude of this error. But Hanssens only asked about each data field once.

**228.**    Because Hanssens did not design the survey to allow econometric controls for scale usage heterogeneity and measurement error, it is possible that many of the differences between people in their answers to the same question arise not from different underlying beliefs, but from these confounding factors. As a result, **the survey is not a reliable instrument for assessing consumer heterogeneity relevant to the case.**

---

[42] Rossi, Peter E., Zvi Gilula, and Greg M. Allenby. "Overcoming scale usage heterogeneity: A Bayesian hierarchical approach." Journal of the American Statistical Association 96.453 (2001): 20-31.
[43] ibid

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

229. **Survey results ultimately not relevant to the case**: Hanssens is not a privacy expert (Hanssens Tr. at 9:21), does not understand the term "privacy interest" (32:6-11) and he agrees that the survey does not ask about expectations of privacy (152:7-11). This was by design: he was not asked to measure how people feel about data sharing, but only about whether they expect sharing of specific technical data fields to happen (31:6-9) – a different question (52:5-10).

230. But the case is about consumer privacy expectations not in the sense of "predictions of what will happen to my privacy anyway" as Hanssens measures it, but in the sense of "**beliefs about what should happen** to my privacy". As an illustration of the difference, consider a consumer buying a ticket on United Airlines to Chicago O'Hare in January. Such a consumer can predict that his arrival to Chicago will be somewhat likely be delayed. But based on the itinerary provided by the airline, the consumer has an expectation of on-time arrival in the sense of belief that airline should get him to Chicago as promised on the ticket.

231. In other words, this **entire survey is about a question irrelevant to the privacy harms from digital surveillance outlined in the Complaint**. So even if we accept (and we should not, for all the reasons explained above) the main alleged result that a majority of US Google Account Holders predict that is somewhat or very likely that some technical datafields are shared with "advertisers who work with Google", it does not mean that fully-informed consumers would agree to such data sharing, and would not feel like their privacy expectations were being violated.

### 19. Second Survey ("Privacy Disclosures")

232. This survey asks the same question as the first survey about consumer expectations, and it is also a basis for the opinion that "*a large share of Google account holders think that it is somewhat or very likely that Google shares with potential advertisers information*

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

*that Plaintiffs claim is personal information when Google account holders visit websites (or use apps) that display targeted ads"* (par. 15).

233.    In addition, the survey also asks respondents whether they have seen popups, and gives a few examples of such popups. The results of these subsequent questions base the additional opinion that "*in the past seven years, the vast majority of Google account holders have seen privacy popups or banners when they visited websites that display advertising*." (par. 16).

234.    **Response summary:** The survey is unreliable because the respondent sample suffers from selection bias, is not representative of the proposed class in terms of basic demographics like age, includes speeders and other inattentive respondents, and includes respondents who answered the survey on a mobile phone and can be shown to respond materially differently to key questions. Together, these unreliable respondents add up to the vast majority of the sample, which renders the results invalid and unreliable.

235.    Even taking aside the unreliable respondent sampling strategy, the survey results are not reliable because the sample was collected in successive batches, which made it possible to perform preliminary analyses, which in turn make the final statistical inference invalid.

236.    Even taking aside the batch sampling, the survey results are not reliable because there are both mathematical and conceptual errors in the simplistic "margin of error" calculations Hanssens proposes.

237.    Even taking aside the unreliable sampling strategy, batch accumulation of responses, and incorrect statistical methods, the survey is unreliable because it amounts to a reading comprehension test with a vague and unbalanced prompt, which forces respondents to resort to guesswork and their prior knowledge of how the Internet works in general.

238.    Even taking aside the unreliable sampling strategy, batch accumulation of responses, incorrect statistical methods, and the fact that the survey is just a reading

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

comprehension test, the survey is unreliable because it sets up an artificial world too far removed from reality, both in terms of the information provided to respondents, and in terms of the way the information is presented to them.

239.    Even taking all of the above problems aside, the survey is not informative about the heterogeneity among respondents relevant in the case.

240.    Finally, the survey is almost completely silent about privacy and digital surveillance concerns that are at the heart of this case, so it is a largely irrelevant exercise with limited impact on the question of whether the privacy expectations of US Google Account Holders are violated by data sharing in Google RTB bid requests.

241.    In the rest of this report, I provide details of the above reasons why the survey is unreliable and lacks relevance to the case. Many of the concerns raised are analogous to those regarding the first survey, in which case I do not repeat them in detail here and simply refer to the relevant section of the first survey.

### A.  Unreliable sampling strategy: a summary

242.    The **sample of respondents** used in the final analysis is unreliable for several reasons:

243.    **Selection bias towards respondents who value their privacy less than the proposed class**: there are multiple reasons to believe that the survey respondents are not representative of the proposed class (US Google Account Holders) in terms of their attitudes towards privacy:

244.    All the respondents are from an online panel called Prodege which requires panelists to surrender their digital privacy and submit to persistent digital surveillance. Prodege members are repeatedly presented with an extremely onerous privacy policy that requires them to

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

give up their online privacy in extraordinary ways, including allowing Prodege to disclose and sell their sensitive personal information.

245.    The survey asked demographic questions like age and gender as part of the screening procedure, and terminated everyone who selected "Prefer not to answer" to even one of these personal questions, thereby introducing selection bias by only allowing participants who were relatively less protective of their privacy.

246.    **Selection bias towards older respondents than the proposed class**: there is no evidence offered that the sample is representative of the population of U.S. Google Account Holders, especially in terms of dimensions relevant to privacy concerns. But there is at least some evidence that the sample skews older than the representative US Google Account Holder.

247.    **Lack of representativeness due to inclusion of professional survey takers who many not be Google account holders**: the sample includes 34 respondents (11% of the sample) who checked having an account at EVERY online service listed in the filtering question Hanssens solely relies upon to identify Google Account Holders. This filtering question is weak because unqualified respondents who want to get paid can just select all options to get into the survey.

248.    **Inclusion of professional survey takers who likely did not engage with the survey** as indicated by "straightlining": the sample includes 20 respondents (7% of the sample) who select the same answer to all nine questions in the key questions about their expectation regarding data sharing.

249.    **Inclusion of speeders**: the survey terminates respondents who do not answer yes to the question about pop-ups, up to which point the survey is almost identical to the first Survey (the only difference is the text to be reviewed). Therefore, there are two groups of respondents to analyze: one who answered a survey of very similar length as the First Survey, and respondents who answered the entire second survey.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

250.     The early-termination group includes respondents who completed the survey as fast as 116 seconds, including the mandatory 20-second wait to read the text excerpts. 116 seconds is preposterously fast for a survey that includes 15 questions with lots of text to read plus a captcha. The survey requires the reading of at least 1000 words, and normal rate for reading is about 300 words per minute, so I would expect the early-termination respondents who actually comprehend all of the survey questions to take about three minutes to complete the survey. But the sample includes 4 respondents (12% of the early terminators) who complete the survey in less time.

251.     The full-length survey is much longer, and requires the reading of at least 1500 words and a review of numerous images. By the same logic, it should take at least 5 minutes to just read the questions with comprehension. Instead, the sample includes respondents who completed the entire survey as fast as 108 seconds, and fully 123 (46%) of the full-length responders take less than 5 minutes.

252.     My analysis shows that speeders answer the question about their expectation of sharing the home address statistically significantly differently from slower respondents, and thus likely provide biased results. In addition, speeding has a strong negative effect on the engagement with the question about actions taken with banners, indicating both that speeders are just rushing through the survey, and that the question about actions taken cannot be analyzed in a prima facie fashion because of this confound.

253.     **Inclusion of distracted respondents**: at the opposite end of the timing spectrum, the survey includes a respondent who took more almost four hours to complete the survey. That respondent was doubtlessly distracted by other tasks during the course of answering the survey, and so were the other 15 full-length respondents who took longer than 15 minutes and 7 early-termination respondents who took more than 10 minutes (together 7% of the entire sample).

254.     Inclusion of respondents who answered the survey on a mobile phone:

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

255.    114 respondents (38 % of the sample) indicated that they were using their mobile phone to answer the survey. My analysis shows that these respondents answer two of the five key questions regarding their expectation regarding data sharing statistically significantly differently from the other respondents who are using bigger screens. Reading paragraphs of text and then answering Likert grid questions on a mobile phone is cumbersome, and likely biases results. In addition, this survey included review of popup screenshots with tiny font, illegible on a phone, so the stimuli effectively differed between phone users and others. In fact, fewer (88%) large-screen respondents indicated that they have "seen similar banners or popups" than phone respondents (91%).

256.    Based on careful practices in survey research, all of the types of problematic respondents identified in points 3) to 7) should be excluded from analysis to ensure data quality. Many respondents fall into more than one problematic category. **When I add all respondents who fall into at least one problematic category, I arrive at 224 respondents (75 PERCENT) who should be excluded from analysis.** In other words, considering only respondents for whom we do not have a reason to suspect low data quality would result in a final sample of only 76 respondents – a statistically insufficient number.

## B. Unreliable sampling strategy: detailed analyses

257.    Many of the concerns raised in the previous section are the same or analogous to those regarding the first survey, in which case I do not repeat them in detail here and simply refer the reader to the relevant section of the First Survey. In particular, all of the surveys in the Hanssens Report are unreliable due to the severe selection bias that is discussed in detail in the prior section. The new concerns and analyses emerging for the second survey are:

258.    **Speeding:** Please refer to the discussion of the First Survey for an explanation of why speeding is a problem. When I do the same fast-quartile vs. slow-quartile analysis detailed

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

in the discussion of the First Survey, the speed has an effect on the question whether the home address is shared, with statistical significance at the 5% level.

259.    In addition, the Table below shows my analysis of engagement with the question "Please select from the following list the actions you have taken in the past seven years when you visited a website that displays advertising and you saw banners or popups…" (Q3 in the Datamap). It is immediate that speeders check a lot fewer boxes on this question, with several of the differences in the average number of boxes checked by speed quintile highly statistically significant.

**Table: Number of popup actions selected, by speed quintile (268 respondents who indicate having seen similar popups)**

| speed quintile | mean | SE | difference | diff SE |
|---|---|---|---|---|
| 0%-20% | 3.09 | 0.26 | | |
| 21%-40% | 3.94 | 0.30 | +0.85 | 0.40 |
| 41%-60% | 5.09 | 0.27 | +1.15 | 0.41 |
| 61%-80% | 5.15 | 0.27 | +0.06 | 0.38 |
| 81%-100% | 4.67 | 0.30 | -0.48 | 0.40 |

260.    **Survey design unreliable: reading comprehension test with "information that personally identifies you" undefined**: The design of the survey is unreliable for the purposes of measuring consumer expectations about sharing of personal information because it does not define what "information that personally identifies you" is, and instead asks respondents to reason about likelihood of sharing of different data types based on vague and partial disclosures of what Google shares. Here is the text:

> We **don't share information that personally identifies you with advertisers, such as your name or email**, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

We **may share non-personally identifiable information** publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

261.    As in the First Survey, the text offers only two pieces of information about sharing of datafields:

262.    Information that personally identifies you is NOT shared with advertisers unless you ask.

263.    Information that personally identifies you are datafields like "your name or email."

264.    So this is **again a reading comprehension test**, and all the discussion from the corresponding section about the First Survey applies here, as well.

265.    Regarding the claim that "We don't share information that personally identifies you with advertisers", the survey does not tell the respondent that the statement is a lie. Instead, the respondent is specifically told to base their response on the text (Hanssens Tr. at 172:13 – 174:16).

266.    Regarding the question about pop-ups administered to respondents who admit having seen "similar" popups, the information conveyed by the pop-ups about data sharing at the heart of the present case is **completely absent**, which Hanssens repeatedly admits in deposition (211:2-4 and 212:17-20, 219:11and 221:3-10). Thus all the results can possibly show is that if you show people uninformative pop-ups that they have learned to click on, people will indeed click on them. But since the pop-ups provide no information about data sharing in RTB bid-requests, clicking on the pop-ups cannot be interpreted as informed consent to such data-sharing.

267.    **Survey design unreliable: lack of realism in the way information is presented and collected**: There is a quantitative difference from the text in the First Survey: this text is even

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

more out of context because it is a much shorter excerpt from a much longer document. Specifically, the survey excerpt quotes the privacy policy which is 29 pages long, and the excerpt is thus taken even more out of context (Plaintiffs' Ex. 57, Hanssens Tr. at 179:3-180:1). As further evidence of Cornerstone and Hanssens carefully doctoring what is shown in the survey, the two paragraphs of the excerpt are presented as if they were together in the policy, but in fact appear seven pages apart in the privacy policy (pages 5 and 12) (180:2-25).

268.    There are numerous other design elements of the survey which make it unrealistic, and hence unreliable as a prediction of what happens in the real world. In his deposition, Hanssens agreed that the survey:

269.    Omits a fair amount of context and how that data could potentially harm them (194:1-195:5);

270.    Does not explain that RTB includes 60 categories of information (195:19-22);

271.    Does not explain that many of the categories of information constitute personal information (186:21-190:3);

272.    Does not explain that these categories are sent out to hundreds of ad tech companies, or that these in turn send it out to hundreds more (197:5-25);

273.    Does not explain that companies use this data to create user profiles (198:5-12);

274.    Does not explain that the user profiles include highly personal details, including sexuality, medical conditions interests, etc.  (198:13-199:2);

275.    Does not explain that the aggregate information sent out in a single bid request can be used to identify individual households and devices  (199:3-9);

276.    Does not explain that personal information is defined as information that can be reasonably linked to a household or device (199:11-16);

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

277.    Does not require the respondent to review the pop-ups for any minimum duration, and could simply click through (207:23-208:3);

278.    Uses pop-ups with information irrelevant to the case, that is pop-ups that say nothing about the kinds of data shared via Google RTB bid requests (210:24—211:4 and 212:17-20, 219:2-13 and 221:2-10);

279.    The survey also uses images of pop-ups with font so small as to be illegible on a mobile phone. Here is an example screenshot from my own phone of one of the pop-ups scaled to about the size of my phone when the page is printed. Can you read the pop-up?



280.    As in the case of the First Survey, as a result of the numerous discrepancies between the world the survey describes and reality combined with the numerous discrepancies in

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

which the survey represents information to respondents and the way Google Account Holders interact with privacy disclosures in real life, the survey is not a reliable measurement of real-world judgments or behaviors.

**20. <u>Third and Fourth Surveys ("Hypothetical Disclosures" for "Existing Account" and "New Service")</u>**

281.    These two surveys are virtually identical,  they suffer from the same defects, and I cover them together.

282.    **Claim (from both surveys):** "More than 70 percent of Google account holders would be somewhat or very likely to click the "I Accept" button after reading a hypothetical Google privacy policy that explicitly states that Google shares with advertisers certain types of information that Plaintiffs allege Google shares with advertisers in the RTB system"

283.    **Response summary:** The survey is unreliable because the respondent sample suffers from selection bias, is not be representative of the proposed class in terms of basic demographics like age, includes speeders and other inattentive respondents, and includes respondents who answered the survey on a mobile phone and can be shown to respond materially differently to key questions. Together, these unreliable respondents add up to the vast majority of the sample, which renders the results invalid and unreliable.

284.    Even taking aside the unreliable respondent sampling strategy, the survey results are not reliable because the sample was collected in successive batches, which made it possible to perform preliminary analyses, which in turn make the final statistical inference invalid. The batch accumulation follows the same pattern as in the first two surveys, so I will not expand on it again in this section.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

285.    Even taking aside the batch sampling, the survey results are not reliable because a majority of respondents could not have actually read the privacy policy with comprehension given the extremely short survey completion times. The completion times are especially short in this survey relative to the first survey which contained a very similar amount of text and number of questions.

286.    Even taking aside the unreliable sampling strategy, batch accumulation of responses, and extremely short completion times, the survey is unreliable because it suffers from acquiescence bias – a tendency for survey respondents to agree, without the action being a true reflection of their own position or the question itself.

287.    Even taking aside the unreliable sampling strategy, batch accumulation of responses, and acquiescence bias, the survey is unreliable because it restricts the third parties to "advertisers", and does not adequately explain the digital surveillance made possible by the data-sharing. Just like the first two surveys, the survey thus sets up an artificial world too far removed from reality, both in terms of the information provided to respondents, and in terms of the way the information is presented to them. This concern is analogous to that plaguing the first two surveys, so I do not explain in detail again.

288.    Even taking all of the above problems aside, the survey is not informative about the heterogeneity among respondents relevant in the case for the same reason as discussed for the First and Second survey.

289.    Finally, the survey is completely silent about privacy and digital surveillance concerns that are at the heart of this case, so it is a largely irrelevant exercise with limited impact on the question of whether the privacy expectations of US Google Account Holders are violated by data sharing in Google RTB bid requests.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

290.    In the rest of this report, I provide details of the above reasons why the survey is unreliable and lacks relevance to the case, restricting attention to new information specific to these two surveys. Please refer to the discussion of the first two surveys for points not mentioned specifically below in detail.

### A. Unreliable sampling strategy: a summary

291.    The **sample of respondents** used in the final analysis is unreliable for several reasons:

292.    **Selection bias towards respondents who value their privacy less than the proposed class**: there are multiple reasons to believe that the survey respondents are not representative of the proposed class (US Google Account Holders) in terms of their attitudes towards privacy:

293.    All the respondents are from an online panel called Prodege which requires panelists to surrender their digital privacy and submit to persistent digital surveillance.

294.    The survey asked demographic questions like age and gender as part of the screening procedure, and terminated everyone who selected "Prefer not to answer" to even one of these personal questions, thereby introducing selection bias by only allowing participants who were less protective of their privacy.

295.    **Selection bias towards older respondents than the proposed class**: there is no evidence offered that the sample is representative of the population of U.S. Google Account Holders, especially in terms of dimensions relevant to privacy concerns. But there is at least some evidence that the sample skews older than the representative US Google Account Holder.

296.    **Lack of representativeness due to inclusion of professional survey takers who many not be Google account holders**: the two samples include 30 and 34 respondents respectively (10% - 11% of the sample) who checked having at account at EVERY online service

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

listed in the filtering question Hanssens solely relies upon to identify Google account users. This filtering question is weak because unqualified respondents who want to get paid can just select all options to get into the survey. Adding to the evidence that these respondents are not responding truthfully, they are subsequently much less likely than other respondents to admit having taken a survey recently (Take the "new service" survey as an example: when asked which types of surveys they took recently, 96% select "None of the above" compared to 72% among other respondents).

297.    **Inclusion of speeders**: The sample includes respondents who complete the survey as fast as 68 seconds, including the mandatory 25-second wait to read the text excerpt. 68 seconds is preposterously fast for a survey that includes 15 questions with lots of text to read plus a captcha. The survey requires the reading of at least 1000 words, and normal rate for reading is about 300 words per minute, so I would expect respondents who actually comprehend all of the survey questions to take about three minutes to complete the survey. But the two samples include 160 rand 178 respondents respectively (a majority of the sample at 53% and 59%!) who complete the survey in less time. The survey did include an "attention check" question, but the question was extremely non-diagnostic in that 99% of respondents passed it. My analysis shows that speeders answer most of the five key questions regarding their expectation regarding data sharing statistically significantly differently from slower respondents, and thus likely provide biased results.

298.    **Inclusion of distracted respondents**: At the opposite end of the timing spectrum, the survey includes a respondent who took more than two and a half hours to complete the survey. That respondent was doubtlessly distracted by other tasks during the course of answering the survey, and so were the other 15 respondents in each sample (5 % of the sample) who took longer than ten minutes.

299.    **Inclusion of respondents who answered the survey on a mobile phone, which in turn materially impacts the answers**: 145 and 136 respondents respectively (48% and 45%

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

of the sample) indicated that they were using their mobile phone to answer the survey. My analysis shows that these respondents are statistically significantly more likely to indicate they would accept the policy, and they complete the survey much faster, than respondents using other devices. This pattern indicates that that phone respondents are inattentive, more susceptible to the acquiescence bias, and therefore unreliable.

300.    Responding to a survey on a mobile phone is different from responding to it on a laptop or a desktop for at least two reasons: first, the screen is much smaller and second, the respondent is much more likely to be on the go, and thus distracted and not fully paying attention. Using the new service survey, the table below shows that these differences (and possibly others) have a statistically significant impact on the answers people give. The difference in answers is statistically significant at the 10 percent level based on the Chi-squared test.

**Table: More acquiescence among respondents on mobile phones**

| device | Very unlikely | Somewhat unlikely | Neither likely nor unlikely | Somewhat likely | Very likely | Don't know |
|---|---|---|---|---|---|---|
| other device | 7.7% | 8.3% | 16.0% | 35.3% | 30.8% | 1.9% |
| phone | 4.1% | 6.2% | 8.3% | 36.6% | 43.5% | 1.4% |

301.    Since the mobile-phone respondents answer differently from the other respondents, they cannot both provide a correct measurement of the underlying ground truth. Since there are several reasons to suspect data quality from mobile respondents more than data quality from respondents on larger screens, I propose that the mobile phone respondents should be excluded from analysis.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

302.    Based on careful practices in survey research, all of the types of problematic respondents identified in points 3) to 6) should be excluded from analysis to ensure data quality. Many respondents fall into more than one problematic category. **When I add all respondents who fall into at least one problematic category, I arrive at 273 respondents (91 percent) who should be excluded from analysis in the new service survey and 283 respondents (94 percent) who should be excluded from analysis in the existing account survey.** In other words, considering only respondents for whom we do not have a reason to suspect low data quality would result in a final sample of only 28 and 19 respondents respectively – a statistically insufficient number.

303.    In the rest of this section, I provide details of the above reasons why the survey is unreliable and lacks relevance to the case. Many of the concerns raised are the same as or analogous to those regarding the First Survey, in which case I do not repeat them in detail here and simply refer to the relevant section of the First Survey.

304.    **Discussion of acquiescence bias**: Acquiescence bias is one of the best-known biases in survey research. An authoritative source explains this well-known bias well: "Acquiescence bias, also known as the agreement bias, is the tendency for survey respondents to agree with research statements, without the action being a true reflection of their own position or the question itself."[44] Since the survey at hand asks respondents whether they accept the policy or not, their responses are clearly subject to this bias.

305.    Another design detail of the present surveys that contributes to acquiescence bias is the fact that all options on the Likert scale are labeled. This practice is not standard: the

---

[44] https://www.qualtrics.com/blog/avoiding-the-yes-bias/

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

Handbook of Marketing Scales[45], which Hanssens testified that he had "some familiarity but not recent" (265-14-266:7-) has been analyzed to contain only a very small minority of scales with all points labeled: fewer than 5 percent of the 603 scales in the Handbook had this feature.[46] The same researchers find that "Net Acquiescence response Style" (aka tendency to agree) increases when all the points of a scale are labeled.[47] Therefore, the design of the present surveys likely exacerbated the acquiescence bias.

306.    There are well-known approaches for correcting for acquiescence bias, for example the idea of "reverse-coding" questions. Hanssens attests that he is familiar with acquiescence bias (263:16). Yet, Hanssens made no effort to follow such standard survey research practice. Therefore, we have no way of knowing the extent of the bias here, and must suspect that much if not all of the observed acceptance is due to the bias and not a reflection of how the respondents would actually behave in real life.

307.    Survey design unreliable because hypothetical disclosure is insufficiently informative of the privacy harms identified in the complaint.

308.    Unlike the actual disclosure in Surveys 1 & 2, the hypothetical more complete disclosure in Surveys 3 & 4 did at least mention the technical data fields, identified them as "personal information" (which is defined to people who hover their mouse in the right place), and explained that they would be shared "with advertisers". I reproduce the hypothetical disclosure here:

---

[45] Bruner, Gordon C., Paul J. Hensel, and Karen E. James. "Marketing scales handbook." Chicago, IL: American Marketing Association, 2005.
[46] Bert Weijters, Elke Cabooter, Niels Schillewaert, The effect of rating scale format on response styles: The number of response categories and response category labels, International Journal of Research in Marketing, Volume 27, Issue 3, 2010, Pages 236-247
[47] ibid

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

309.    Depending on your settings, we may show you personalized ads. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

310.    We don't share your name or email with advertisers unless you ask us to, but we share other personal information. For example, we share the partial IP address of your device; the URL for the webpage where the ad will be placed; your browser cookies including Google-generated cookies that may allow advertisers to associate your browser with your prior visits to their websites; the content categories and subcategories in which Google classifies the website where the ad will be placed; and the characteristics of the web browser and device you use to access the website. We also allow advertisers to associate their cookies with Google's cookies. Matching these cookies allows advertisers to connect the data we share with the data they may already associate with you.

311.    While this disclosure is clearly more complete, it does not come anywhere near explaining to respondents how the technical data fields are actually used by thousands of companies (many of which are not advertisers)  to conduct persistent digital surveillance of users as they traverse both the internet and the physical world. In other words, even the more complete disclosure is not sufficiently informative of the privacy harms identified in the complaint. Respondents' clicking of "I accept" after being exposed to this disclosure (most did not spend enough time to actually read it with comprehension) is thus not evidence of informed consent with the facts in the complaint.

Executed on November 29, 2023 in Los Angeles, California.

Robert Zeithammer, Ph.D.

84

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

# IV.   MATERIALS RELIED UPON

**Materials produced in the case**

GOOG-HEWT-00047130

GOOG-HEWT-00456341

GOOG-HEWT-00456342

GOOG-HEWT-00456344

GOOG-HEWT-00456346

GOOG-HEWT-00312065

GOOG-HEWT-00278045

GOOG-HEWT-00188498

GOOG-HEWT-00456342

GOOG-HEWT-00456109

**Research papers and reports**

"Avoiding The Yes Bias". https://www.qualtrics.com/blog/avoiding-the-yes-bias/. Last accessed November 28, 2023.

Bruner, Gordon C., Paul J. Hensel, and Karen E. James. "Marketing scales handbook." Chicago, IL: American Marketing Association, 2005.

Bert Weijters, Elke Cabooter, Niels Schillewaert, The effect of rating scale format on response styles: The number of response categories and response category labels, International Journal of Research in Marketing, Volume 27, Issue 3, 2010, Pages 236-247

Rossi, Peter E., Zvi Gilula, and Greg M. Allenby. "Overcoming scale usage heterogeneity: A Bayesian hierarchical approach." Journal of the American Statistical Association 96.453 (2001): 20-31.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

Turow, Joseph and Lelkes, Yphtach and Draper, Nora and Waldman, Ari Ezra, Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand It, Say They're Helpless to Control It, and Believe They're Harmed When Firms Use Their Data--Making What Companies Do Illegitimate (February 15, 2023). Available at SSRN: https://ssrn.com/abstract=4391134 or http://dx.doi.org/10.2139/ssrn.4391134.

https://www.edweek.org/teaching-learning/what-is-background-knowledge-and-how-does-it-fit-into-the-science-of-reading/2023/01. Last accessed November 28, 2023.

Simmons, J. P., Nelson, L. D., & Simonsohn, U. (2011). False-positive psychology: Undisclosed flexibility in data collection and analysis allows presenting anything as significant. Psychological Science, 22(11), 1359-1366.

Responses and Objections of Alphabet Inc. to the September 9, 2019 Civil Investigative Demand Issued by the Office of the Attorney General of Texas

Rayner, K., Schotter, E. R., Masson, M. E. J., Potter, M. C., & Treiman, R. (2016). So Much to Read, So Little Time: How Do We Read, and Can Speed Reading Help? Psychological Science in the Public Interest, 17(1), 4-34.

Daniel M. Oppenheimer; Tom Meyvis; Nicolas Davidenko (July 2009). "Instructional manipulation checks: Detecting satisficing to increase statistical power". Journal of Experimental Social Psychology. 45 (4): 867–872.

Arndt, Ford, Babin and Luong (2023) "A Framework for Screening and Assessing Sample Quality obtained from Online Services" ACR Conference Proceedings 2023.

"Americans Consider Certain Kinds of Data to be more Sensitive than Others. Pew Research Report. https://www.pewresearch.org/internet/2014/11/12/americans-consider-certain-kinds-of-data-to-be-more-sensitive-than-others/. Last accessed November 28, 2023.

Auction Theory. Krishna, Vijay. Published by Academic Press (2002). ISBN 10: 012426297X, page 51.

J. Griesmer, R. Levitan, M. Shubik: "Toward a study of bidding processes, Part IV: Games with unknown costs", 14, Naval Research Logistics Quarterly (1967), pp. 415-433.

Gummer, T., Roßmann, J., & Silber, H. (2021). Using Instructed Response Items as Attention Checks in Web Surveys: Properties and Implementation. Sociological Methods & Research, 50(1), 238-264.

Maskin, Eric, and John Riley. "Equilibrium in Sealed High Bid Auctions." The Review of Economic Studies, vol. 67, no. 3, 2000, pp. 439–54.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF ROBERT ZEITHAMMER, PH.D.

# Exhibit 1: Prodege privacy policy

The following are excerpts from Prodege's 19-page Privacy Policy.  The complete policy (Exhibit 2 to the Hanssens deposition) is also attached.

## Section 1 at 1/19 – INTRODUCTION

- We want you to be familiar with how we collect, use, and share your Personally Identifiable Information (defined below).

- IF YOU DO NOT WISH TO HAVE US COLLECT, USE, AND SHARE INFORMATION AS DESCRIBED IN THIS PRIVACY POLICY, PLEASE DO NOT USE ANY OF THE PRODEGE SITES AND FEATURES OR OUR SERVICES.

## Section 2 at 2/19 – INFORMATION WE COLLECT DIRECTLY

- Y our browsing activity on our merchant partners' websites and other websites you visit may be tracked by cookies, Extensions, or other Prodege Sites and Features having such tracking capabilities," that Prodege "may also use GPS or similar geo-location technology to determine the geo-coordinates of where you or your Device are located," that Prodege's "mobile applications may collect, among other things, certain information automatically, including, the type of device, the Device's unique device identifier ("UDID"), the IP address, the operating system, the types of Internet browsers used, and "information about the way you use the mobile application.

## Section 4 at 3/19 - USE AND SHARING OF INFORMATION

- Without limitation, your PII and non-PII may be used by itself, aggregated, or combined with unique identifiers (such as Prodege-assigned identifiers, UDIDs, etc.), and shared with service providers, vendors, advertisers, and merchants, survey partners… for purposes related to our business, including, without limitation, advertising . . .

## Section 10 at 5/19 – USE OF COOKIES AND TRACKING TECHNOLOGIES

- We set and access, and third parties (including Trusted ThirdParties) may set and access, cookies, web beacons, embedded scripts, pixels, tags, software development kits ("SDKs"), session replay tools, and other tracking technologies (collectively, "Tracking Technologies") on your Devices in connection with your use of Prodege Sites and Features or our Services. Such third parties ("Cookie Operators") may collect information across various channels using Tracking Technologies for purposes of delivering more relevant Offers to you or other Business Purposes. We may use a variety of Tracking Technologies in connection with our Data Purposes. Tracking Technologies may automatically capture PII and other information, including, without limitation, your IP

Address, UDID, and browser or operating system type and version, and may detect whether your Device or software has certain capabilities such as a microphone or webcam access. . . . .  In doing so, we and Third Party Services may link the information collected from Tracking Technologies, and from other sources, with other of your PII and non-PII, and we and they may track your web-browsing and other activity in order to provide you with Offers and for our or their other Data Purposes; . . . Third Party Services may link the information we share with them (or that they collect) to cookies stored on your browser or Devices, and they may collect information such as your IP address, UDID, browser or operating system type and version, and demographic or inferred-interest information. Third Party Services may use this information to recognize you across different channels and platforms, including but not limited to, computers, mobile devices, and Smart TVs, over time for advertising, analytics, attribution, and reporting purposes.

**Section 13 at 8/19– DISCLOSURE OF DATA**

- We may <u>share or sell</u> aggregate or individualized information about you that may include, without limitation: (1) your PII and related information; (2) your use of the Prodege Sites and Features and our Services; (3) Third Party Services and other websites you visit; and (4) your geo-location and information derived therefrom.


**Page 11/20 Chart**: "**PI Collection, Disclosure, and Retention – By Category of PI**"

- We collect, disclose, and retain PI as follows

- <u>Row 1</u> lists "Identifiers", including a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, or other similar identifiers

- <u>Row 3</u> lists "Personal Characteristics or Traits", including but not limited to: age, gender, nationality, race, or information related to medical conditions

- <u>Row 5</u> lists "Internet Usage Information", including but not limited to browsing history, search history, and information regarding your interaction with an Internet Web site, application, or advertisement

- <u>Row 6</u> list "Geo-location Data", including but not limited to precise physical location or movements and travel patterns

- <u>Row 8</u> lists "Professional or Employment Information", including but not limited to professional, educational, or employment-related information

- <u>Row 9</u> lists "Inferences from PI Collected", including but not limited to reating a profile about a Consumer reflecting the Consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes

- <u>Row 10</u> lists "Sensitive PI", including Precise Geo-location, Sensitive Personal Characteristics (e.g., racial or ethnic origin, religious or philosophical beliefs, citizenship or immigration status, or union membership), Health Information (PI collected and analyzed concerning a consumer's health, medical history, mental or physical health, diagnosis/condition, and medical treatment), Sex life, Financial Data and Communication Content, including the contents of mail, email, and text messages.

# Privacy Policy
## United States and Canada ∨



### Table of Contents

NEW PRIVACY POLICY

1. Introduction

2. Information We Collect Directly

3. Information We Receive from Third Parties

4. Use and Sharing of Information

5. Friend Referrals

6. Community Features and User Content

7. Third Party Services

8. Advertising Networks

9. Session Replay and Analytics Companies

10. Cookies and Tracking Technologies

11. Card Linked Offers Programs

12. Social Features

13. Disclosure of Data

14. Business Transactions

15. Updating Your Information, Choice and Opt-Out

16. Notification of Privacy Policy Updates

17. Children's Privacy

18. Security

19. Location of Processing and Applicable Law

20. Contact Us

U.S. STATE PRIVACY NOTICE

## NEW PRIVACY POLICY

This Privacy Policy was last updated on: August 1, 2023

### 1. Introduction

This "Privacy Policy" is for residents and persons located within the United States and Canada. For all other visitors, please visit the international version of our Privacy Policy here. We want you to be familiar with how we collect, use, and share your Personally Identifiable Information (defined below). This Privacy Policy outlines the type of information that we collect and receive from and about you via the Prodege Sites and Features and our Services (both as defined below), and our data practices related thereto, with additional disclosures for California, Colorado, Connecticut, Nevada, Utah and Virginia residents in the U.S. State Privacy Notice section below. To the extent that there is a conflict between this Privacy Policy and the U.S. State Privacy Notice section, the U.S. State Privacy Notice section will control as to residents of those states. Please review this Privacy Policy carefully, especially before providing any Personally Identifiable Information through the Prodege Sites and Features or our Services. The Prodege Sites and Features and our Services are generally operated in and controlled from the United States of America unless otherwise stated.

Prodege Sites and Features and our Services may collect and use location-aware and cross-device data for advertising and other purposes.

**IF YOU DO NOT WISH TO HAVE US COLLECT, USE, AND SHARE INFORMATION AS DESCRIBED IN THIS PRIVACY POLICY, PLEASE DO NOT USE ANY OF THE PRODEGE SITES AND FEATURES OR OUR SERVICES.**

**Notice of Terms of Use, Including Arbitration:** Your use of the Prodege Sites and Features and our Services is subject to our **Terms of Use**, which includes binding individual arbitration of any disputes which may arise in connection with such use. Please note that your use of the Prodege Sites and Features or our Services constitutes your express agreement to our Terms of Use, including its arbitration provisions and



EXHIBIT    2
WIT: Hanssens
DATE: 10·31·23
Nadia Newhart, CSR No. 8714

A. Notice of Data Practices

B. Your Consumer Rights and How to
Exercise Them

C. How We Process Your Consumer Privacy
Requests

D. Non-Discrimination/Non-Retaliation

E. Notice of Financial Incentive Programs

F. Our Rights and the Rights of Others

G. Additional Notices for California
Residents

**Looking for Customer
Support?**
Find the Help Centers
Below:

Swagbucks →          InboxDollars →

MyPoints →          Upromise →

Tada →          ySense →

class action waiver. Please read the Terms of Use—including
the arbitration provisions—carefully, and do not use any of the
Prodege Sites and Features or our Services if you do not
agree.

Prodege, LLC and its Affiliates (defined below) (collectively,
**"Prodege," "we," "our"** or **"us"**) own and operate a number of
different services, including, without limitation, Swagbucks,
MyPoints, InboxDollars, Upromise, CouponCause, Swagbucks
Live, Swagit, MyGiftCardsPlus, ySense, Tada, DailyRewards,
Pollfish, BitBurst, AdGate Media, Prodege.com, and others that
may be added from time to time (collectively, the **"Prodege
Sites"**). This Privacy Policy applies to the Prodege Sites and to all
of the features, websites, mobile applications, Internet browser
extensions, emails, online services and other functionalities
(collectively, the **"Features"**) available via or related to the
Prodege Sites, whether accessed via a computer, mobile device,
or other devices you use (each a "**Device**" and collectively,
"**Devices**"), or otherwise (collectively, the **"Prodege Sites and
Features"**), the services available on or through the Prodege Sites
and Features, including our emails and other electronic
communications (collectively, **"our Services"**). Unless specifically
stated, such as in the U.S. State Privacy Notice section, this
Privacy Policy only covers information we collect through Prodege
Sites and Features and our Services and does not cover any
information we receive or collect offline or that is collected by any
unrelated websites or companies to which we may provide
links. Please contact us with any questions regarding this Privacy
Policy and our privacy practices as instructed in Section 20
(Contact Us) of this Privacy Policy below.

## 2. Information We Collect Directly

When you visit any Prodege Sites and Features or use any of our
Services, you may share and/or we may automatically collect
information that identifies you personally. In this Privacy Policy,
**"Personally Identifiable Information"** (or "**PII**") refers to any
information that can reasonably be used to identify, contact or
locate you; provided, however, that the U.S. State Privacy
Notice section applies a definition of personal information under
applicable state law that may be broader than PII. Examples of PII
may include, without limitation, your name, your precise geo-
location, your credit card number, your email address, your mailing
address, and your phone number. We also collect, and may create
from PII, information about you that is not PII ("**Non-PII**"). If we
combine PII collected via Prodege Sites and Features or our
Services with other of your PII or with Non-PII, that combined data
will be treated as PII subject to this Privacy Policy.

PII and Non-PII may be collected on, through, or in connection with
any of the Prodege Sites and Features or our Services.  For
example, we may collect PII and/or Non-PII when you create or
register for an account with us, fill out surveys, join a mailing list,
upload receipts, correspond with us, enter one of our sweepstakes
or contests, choose to submit testimonials, stories, photos or the
like, or otherwise volunteer or provide information about yourself.
 You may also choose to install and use optional Internet browser
extensions, add-ons, or similar plug-in software and technologies
(each an "**Extension**" and collectively, "**Extensions**") which may
collect and use your information in a variety of ways. For example,
the Swagbucks SwagButton, MyPoints Score!, Tada, InboxDollars
Billy Button, Upromise Extension, ySense Addon, and similar
software or technologies we may offer from time to time are
Extensions that allow you to shop directly with our merchant
partners and qualify for rewards. The Extensions also provide other
features and access to Offers (defined below), and allow you to
monitor your earnings, customize your account information or
experience, and other activities. If you install an Extension, we will
automatically track certain websites you visit to allow us to provide
the aforementioned features and to correlate your browser history,
merchant visits, and Prodege Sites and Features engagements to
provide better Services and Offers to you. In addition, Tracking
Technologies (defined below) may be placed on your Devices
when you install and use Extensions or when you click on an
affiliate or Ad Network (defined below) link within a shopping-
rewards feature. Your browsing activity on our merchant partners'
websites and other websites you visit may be tracked by cookies,
Extensions, or other Prodege Sites and Features having such
tracking capabilities. We may also use GPS or similar geo-location
technology to determine the geo-coordinates of where you or your
Device are located. In addition, our mobile applications may
collect, among other things, certain information automatically,
including, but not limited to the type of mobile Device you use, your
mobile Device's unique device identifier ("**UDID**"), the IP address of
your mobile Device, your mobile operating system, the type of
mobile Internet browsers you use, and information about the way
you use the mobile application.

If you don't provide us with or allow us to collect your PII, we
generally will be unable to provide you with our Services and you
may be unable to use the Prodege Sites and Features.

You may be able to limit data collection by changing the settings on your Device (but our services and features may lose functionality as a result), or as otherwise explained in the sections below.

## 3. Information We Receive from Third Parties

We may also receive and supplement the information we directly collect from or about you with information from third parties, including Trusted Third Parties (defined below), and to the extent it is combined with PII collected via Prodege Sites and Features or our Services, it will be governed by this Privacy Policy. If you are on a third party website or service and you opt-in to receive information from us, the third party may forward to us your email address and other information about you so that we may contact you as requested. In addition, we may receive information from Third Party Services to ensure that you properly receive any qualified Offers and for our other Data Purposes (defined below). We may also supplement and combine the PII we collect about you with outside records from third parties in order to enhance our ability to provide you with Offers and for our other Data Purposes, and to the extent it is combined with PII collected via Prodege Sites and Features or our Services, it will be governed by this Privacy Policy.

## 4. Use and Sharing of Information

We use your PII and non-PII we collect about you in order to: (i) provide you with our Services; (ii) operate and improve the Prodege Sites and Features; (iii) provide advertising, content, surveys, location-based deals, special offers, promotions, and other rewards opportunities (collectively, "**Offers**"); and (iv) for other marketing, administrative, operational, business, and commercial purposes subject to applicable law and not inconsistent with this Privacy Policy or other notice by us at collection (collectively, our "**Data Purposes**"). We may use and disclose Non-PII for any purpose subject to applicable law and not inconsistent with this Privacy Policy or other notice by us at collection. Without limitation, your PII and non-PII may be used by itself, aggregated, or combined with unique identifiers (such as Prodege-assigned identifiers, UDIDs, etc.), and shared with (a) our parent companies, subsidiaries, sister companies, trusted agents and affiliated Services that we own and/or operate ("**Affiliates**"); and (b) our service providers, vendors, advertisers, merchants, survey partners, joint business ventures, and other trusted third parties (collectively, "**Trusted Third Parties**") (some of whom may offer Third Party Services (defined below)), for purposes related to our business, including, without limitation, advertising, attribution, measurement of campaigns, analytics and research, and our other Data Purposes as permitted by applicable law. Notwithstanding the foregoing, no phone number you provide to us or one of our mobile service providers (currently Airship, Twilio, Telesign, and Button) for purposes of sending you a link for downloading a mobile app, special offer, a security verification, text (SMS) marketing, or otherwise, will be used or shared with any third party to be used for any other purpose, except as may be permitted or required by law or legal process or with your consent or at your direction.

## 5. Friend Referrals

We may provide you with an opportunity to invite your friends, family, and acquaintances ("**Friends**") to use our Services. If you elect to use our referral service for informing a Friend about any of our Services, you may provide us with your Friend's name and email address. Through our referral service, you may have the ability to direct us to automatically send the Friend one or more emails or other communications, on your behalf, inviting them to visit or register for our Services (which invite may include additional subsequent reminders and communications). You must have your Friend's consent to provide us with his or her information for this purpose and should not knowingly give us referral information for any person not permitted to use the Prodege Sites and Features, including, without limitation, a child under the age of 13, a person whose account has previously been suspended or deactivated, or a person who resides or is located in a territory where use of the Prodege Sites and Features is not authorized.

## 6. Community Features and User Content

The Prodege Sites and Features may provide you the opportunity to participate in, make available, and/or post text (e.g., questions, comments, and suggestions), images, audio, videos, or other content (collectively, "**User Content**") publicly through our blogs, chat rooms, forums, interactive features, public-facing member profile, third-party social networking services or other communication functionality ("**Community Features**"). Please note that certain information, such as your username, Service start date, earning preferences, qualified rewards, profile picture and other profile information we believe will help motivate you and others to participate in our program may be publicly displayed on the Prodege Sites and Features along with User Content. User Content may also contain metadata, which may contain information

about or relating to you, that we may also collect, share and use. Anything posted through Community Features is publicly available. This means that others will have access to that User Content and may use it or share it with third parties; this is beyond our control. If you choose to voluntarily disclose PII in the User Content and/or on the Community Features, that information will be considered publicly available information as well. The protections of this Privacy Policy will not apply to publicly available information. In addition, by posting through our Community Features, you are agreeing that we may use your User Content (and excerpts from your User Content) in connection with our Data Purposes.

## 7. Third Party Services

The Prodege Sites and Features contain links to, or otherwise enable the opportunity to interact with (e.g., Facebook button), other websites, and other services provided by Trusted Third Parties (such as when you link to their site to take a survey or transact with them to qualify for rewards) that we do not own, operate nor control ("**Third Party Services**"). In addition, because aspects of the Prodege Sites and Features include third-party Offers, Third Party Services may collect your information based on your interaction with those Offers, including via Tracking Technologies (defined and discussed below). In addition, by interacting with Offers via Prodege Sites and Features or our Services, you authorize and direct us to share your PII and non-PII with Third Party Services making Offers, and for them to share Offer-related activity data and other information with us. This helps us and them make and fulfill Offers, including making it easier for you to sign up for Offers, facilitating your communications or transactions with them, authenticating and/or validating your identification, crediting you with any qualified rewards, and for our other Data Purposes. Except as legally required for our service providers, the privacy and other practices of Third Party Services are not covered by this Privacy Policy, and we are not responsible for their privacy or other practices. We encourage our users to be aware of and to read the privacy statements, terms of service and similar disclosures and conditions of Third Party Services that collect PII or other data before visiting or otherwise interacting with those services.

For more information on Third Party Services, see sections 8, 9, 11 and 12 of this Privacy Policy (Advertising Networks, Session Replay and Analytics Companies, Card Linked Offers Programs and Social Features).

## 8. Advertising Networks

Companies that host networks connecting advertisers with delivery platforms for digital advertising (collectively, **"Ad Networks"**), which are Third Party Services, may provide advertising based on your interests, as reflected in your use of Prodege Sites and Features and our Services, as well as your use of other websites and services. Some of these Ad Networks may place persistent cookies or other Tracking Technologies (defined below) on your Devices, allowing them to recognize you and/or your Device each time they send you an online advertisement. Ads themselves may also include Tracking Technologies. In this way, Ad Networks may compile information about where you see advertisements online and determine which ads you click on, so, for instance, that we and they may provide you with Offers or advertisements believed to be of most interest to you. We are not the data controller for the cookies or other Tracking Technologies that may be placed by these third parties on your Devices, nor do we have responsibility for these third parties' privacy policies or information collection practices. You may limit or remove such cookies and Tracking Technologies through your Device settings; for more information, visit section 10(ii) (What Are My Cookie Choices?) below.

## 9. Session Replay and Analytics Companies

We use certain third-party analytics and/or other technology providers to help us understand how you use Prodege Sites and Features or our Services, and these companies may set their own cookies and other Tracking Technologies on your Devices. For example, we may use third-party services to record and review your interactions with the Prodege Sites and Features and our Services, including mouse movements, clicks, page visits, keystrokes/key touches, and other details, including any PII that you provide. These "session replay" services help us organize and analyze your interaction data for our Data Purposes, including to improve and prevent fraud related to Prodege Sites and Features and our Services. By using any of the Prodege Sites and Features or our Services, you expressly consent to the recording and sharing of your PII and other data with third-party "session replay" services and other analytics providers.

We may also use Google Analytics and similar third-party analytics providers to track visitors' activity on our website. Google Analytics and similar third-party analytics providers may also use web

browsing data and other data analysis to improve their own products. For more information on how to limit this activity, including to learn about the opt-out mechanism Google offers, visit section 10(ii) (What Are My Cookie Choices?) below. These and other Trusted Third Parties may collect information about you, including but not limited to your online activities over time and across different websites and services, when you use the Prodege Sites and Features or our Services, or other online websites and services.

## 10. Cookies and Tracking Technologies

### i. Use of Cookies and Tracking Technologies

We set and access, and third parties (including Trusted Third Parties) may set and access, cookies, web beacons, embedded scripts, pixels, tags, software development kits ("SDKs"), session replay tools, and other tracking technologies (collectively, "**Tracking Technologies**") on your Devices in connection with your use of Prodege Sites and Features or our Services. Such third parties ("**Cookie Operators**") may collect information across various channels using Tracking Technologies for purposes of delivering more relevant Offers to you or other Business Purposes. We may use a variety of Tracking Technologies in connection with our Data Purposes. Tracking Technologies may automatically capture PII and other information, including, without limitation, your IP Address, UDID, and browser or operating system type and version, and may detect whether your Device or software has certain capabilities such as a microphone or webcam access. We and Third Party Services generally use Tracking Technologies and the information they generate to support the Prodege Sites and Features and our Services or Third Party Services, including, for instance: (i) by offering you surveys, shopping, and other targeted Offers; (ii) for identity verification; (iii) for analytics; (iv) to ensure compliance with our programs; and (v) to identify and honor your choices (such as opt-outs). Tracking Technologies may also be used as follows: (a) to provide you with convenience when you access the Prodege Sites and Features or our Services by remembering that you have visited us before and by remembering your username, password and other user information, and your preferences to help you avoid future re-entry of certain information; (b) to allow us and Third Party Services to understand or predict your interests so we and they can personalize your experience on Prodege Sites and Features or our Services and elsewhere online, across Devices, web browsers, email, mobile and other applications.  In doing so, we and Third Party Services may link the information collected from Tracking Technologies, and from other sources, with other of your PII and non-PII, and we and they may track your web-browsing and other activity in order to provide you with Offers and for our or their other Data Purposes; (c) for analytical and statistical purposes, quality control, validation and verification purposes, and to improve the services we and Third Party Services offer; and (d) Third Party Services may link the information we share with them (or that they collect) to cookies stored on your browser or Devices, and they may collect information such as your IP address, UDID, browser or operating system type and version, and demographic or inferred-interest information. Third Party Services may use this information to recognize you across different channels and platforms, including but not limited to, computers, mobile devices, and Smart TVs, over time for advertising, analytics, attribution, and reporting purposes. For example, Third Party Services may deliver an advertisement to you in your web browser based on a purchase you made in a physical retail store, or they may send a personalized marketing email to you because you visited a particular website. Our mobile applications may include Tracking Technologies that share your Device's precise geo-location and other details about your Device (like hardware characteristics, a variety of sensor data, and a list and history of installed third-party applications) with Third Party Services who may use this information to generate Offers for you, for advertising, attribution, measurement of campaigns, analytics, and research, and their or our other Data Purposes. See instructions to limit or disable such tracking in section 10(ii) below; but be aware that limiting such tracking will affect some Device or mobile application functionality and may limit your ability to use our Services, complete Offers and earn rewards.

### ii. What Are My Cookie Choices?

Cookies may include a small data file which is stored on your systems. We use both session cookies and persistent cookies. For the session cookies, once you close your browser, the cookie terminates. A persistent cookie is a small text file stored on your hard drive for an extended period of time. Persistent cookies can be removed or disabled by following your web browser help-file directions.

You can exercise control over browser-based cookies by adjusting the settings on your browser, and mobile Devices may offer ad and data limitation choices. Please note that when you use cookie control tools, you will have to change your settings for each browser and Device you use, and your limitation on cookies can limit the functionality of online services you use, including Prodege Sites and Features and our Services. Use the help function on your browser or click on the applicable links below to learn more:

- Google Chrome
- Firefox
- Internet Explorer
- Edge
- Safari

If you block cookies in this manner, Prodege Sites and Features and our Services (including the ability to complete Offers and earn rewards), may not operate as intended.

One use of cookies is interest-based advertising, which uses your activity information to help provide you with more relevant Offers. To learn more about internet-based advertising in general, and exercise certain opt-outs that some Ad Networks provide, which may include use of geo-location, cross-device data-directed, and/or "audience matched advertising" ads, please visit the following ad industry self-regulatory resources:

| Digital Advertising Alliance (Web Browser Opt-Out) | US: http://www.aboutads.info/choices  Canada: https://youradchoices.ca/en/tools |
|---|---|
| Digital Advertising Alliance (Mobile App Opt-Out) | US: http://www.aboutads.info/appchoices  Canada: https://youradchoices.ca/en/tools |
| Network Advertising Initiative (Opt-Outs) | http://www.networkadvertising.org/managing/opt_out.asp |

We support these self-regulatory programs and expect the Ad Networks we work with to do so as well. If you'd like to opt-out of being tracked by Google Analytics, simply install this add-on to your browser: https://tools.google.com/dlpage/gaoptout.

We are not responsible for the completeness, accuracy or effectiveness of any third-party cookie-choice programs or tools. If you exercise these choice controls they may need to be compiled on each browser and Device you use, and if they use a cookie to signal your opt-out, your choice may no longer be recognizable if you later clear or block cookies. Not accepting cookies (or opting out of cookies), installing ad blocking technologies, and/or disabling analytics providers may make certain features of the Prodege Sites and Features and our Services unavailable to you and may affect our ability to validate whether or not you qualified for a reward by successfully completing an Offer.

Note that your browser settings may allow you to automatically transmit a "Do Not Track" signal to websites and online services you visit. At present, we do not believe that there is a consensus among industry participants as to what "Do Not Track" means in this context. Like many websites and online services, we currently do not alter our practices when we receive a "Do Not Track" signal from a user's browser. To find out more about "Do Not Track," you may wish to visit http://www.allaboutdnt.com.

## 11. Card Linked Offers Programs

We may offer a service enabling you to enroll a qualifying payment card in order to earn rewards or benefits when you make qualifying transactions with participating merchants (a "**CLO Program**"). Your participation in a CLO Program is further governed by our Card Linked Offer Service Terms. If you participate in a CLO Program and provide your payment information for that purpose, we and Third Party Services (including, without limitation, Braintree Payments (a division of PayPal, Inc.), Visa, Inc., Rewards Network, and Figg, Inc.) will have the right to use and share the transaction information generated in such CLO Program ("**CLO Transaction Data**") for the purposes of operating and improving the CLO Program, including, without limitation: (a) to confirm whether you qualify for an Offer; (b) to confirm whether a specific transaction occurred or rewards were earned (for example, the date and amount of your purchase and the last 4 digits of your card number so the merchant can verify your purchase if there is a missing or

disputed transaction); (c) to allow participating merchants and others to assess the results of their campaign and analyze ways to improve or optimize a CLO Program and its Offers; (d) to create a record of the CLO Transaction Data and thereafter maintain and use such CLO Transaction Data in connection with operating the CLO Program; and (e) to provide information in response to a request from a government authority or a payment organization involved in a transaction with you, a merchant, another relevant Trusted Third Party, or others. **By participating in a CLO Program, you authorize and direct the sharing, exchange, and use of CLO Transaction Data described above and herein by and among us and Third Party Services, applicable payment card networks, and participating merchants.** Please visit the Card Linked Offer Service Terms to learn more about the data collection, use, and sharing practices related to the CLO Program. If you would like to opt out of card linking and CLO Transaction Data collection in connection with a CLO Program, please visit the card linking section of the applicable Service and remove any payment cards that you no longer wish to be associated with the CLO Program.

## 12. Social Features

Certain functionality on Prodege Sites and Features or our Services may permit interactions that you initiate between our Services and third-party social media services ("**Social Media Services**") such as Google, Apple, Facebook, Pinterest, Instagram and Twitter ("**Social Features**"). Examples of Social Features include enabling you to "like" or "share" content from our Services with Social Media Services; to log-in to our Services using your username and password for Social Media Services; to transmit content to or from our Services to or from your account on Social Media Services; and to otherwise connect our Services to Social Media Services. Enabling or interacting with Social Features may also set one or more cookies or other Tracking Technologies on your Devices. Please refer to the terms of use and privacy policies of such Social Media Services offering such Social Features. If you choose to use Social Features, information you post or provide access to may be shared with and publicly displayed on our Services or on such Social Media Services. Similarly, if you post information on a Social Media Service that references any of our Services (e.g., by using a hashtag associated with any of our Services in a tweet or status update), your post may be published on the Prodege Sites and Features in accordance with the terms of the Social Media Services and our Terms of Use. In addition, we may receive information about you if other users of a Social Media Service give us access to their profiles and you are one of their "connections," or information about you is otherwise accessible through your connections' web pages, profile pages, groups you or they belong to, or similar pages on such Social Media Service.

The information we collect in connection with Social Features is subject to this Privacy Policy. The information collected by any Social Media Service via Social Features remains subject to their privacy practices, including whether they continue to share information with us, the types of information shared, and your choices with regard to what is visible to others on such Social Media Service.

## 13. Disclosure of Data

In addition to the types of disclosure and sharing of data described throughout this Privacy Policy, we may disclose your PII and non-PII as described in this section. We may disclose your PII and non-PII when required by law, or where we have a good-faith belief that such action is necessary to comply with a judicial or administrative proceeding, a criminal investigation, a court order, or legal process served on us. We may also share your PII and non-PII at the request of governmental authorities conducting an investigation, or if we in our sole discretion believe there to be a credible situation that requires us to investigate, prevent, or take action regarding illegal activities, suspected fraud or abuse, situations involving potential threats to the physical safety of any person, or violations of our Terms of Use or Privacy Policy for any of the Prodege Sites and Features or our Services. We may also use IP addresses, UDID or other Device, activity or session identifiers to identify users, and we reserve the right (in our sole discretion) to do so in cooperation with Third Party Services, as well as copyright owners, Internet service providers, wireless service providers, or law enforcement agencies, without notice to you. We may also share your PII with Third Party Services in connection with their performance of services to, or on behalf of, the Prodege Sites and Features or our Services (and vice versa) and for our Data Purposes. In addition, if you use our mobile applications, we may share your current geo-location with Third Party Services so that we or they may provide you with Offers based on your location, for our Data Purposes, and for advertising, attribution, measurement of campaigns, analytics and research. Please see section 15 (Updating Your Information, Choice and Opt-Out) below for information about how you can opt out of such sharing.

We may share or sell aggregate or individualized information about you that may include, without limitation: (1) your PII and related information; (2) your use of the Prodege Sites and Features and our Services; (3) Third Party Services and other websites you visit; and (4) your geo-location and information derived therefrom. We share this information with Trusted Third Parties for the purpose of providing you with Offers and for our Data Purposes.

## 14. Business Transactions

In the event Prodege or any of its Affiliates is involved with a business transition, such as a financing, merger, consolidation, restructuring, acquisition by another company, sale or assignment of rights or assets (or a portion thereof), or other company change, we may transfer your and other users' information, including PII and non-PII, and other business data in connection with that business transaction (e.g., to a subsequent owner or operator of Prodege or any of our Services, or any affiliates, agents, service providers, or partners of the foregoing), including during the course of any due diligence process (collectively, **"Business Transactions"**).

## 15. Updating Your Information, Choice and Opt-Out

You are responsible for maintaining the accuracy of any information you submit to us, such as your contact information. If you have any questions about updating your information, privacy choices and/or opting out of certain programs, services, and data activities, please visit section 20 (Contact Us) below for more information and instructions to contact us. You may opt out of receiving marketing emails by: (i) following the opt-out instructions provided to you in those emails; (ii) visiting your account settings or similar features on the relevant Prodege Sites and Features; or (iii) contacting us as provided in section 20 (Contact Us) below. Please note that as long as you remain registered with or a user of any of the Prodege Sites and Features or our Services, even if you opt out of marketing emails, you may still receive administrative and transactional emails, such as notices about service and status updates and changes to our Terms of Use or Privacy Policy. If you sign up to receive text (SMS) messages from the Prodege Sites and Features, you may unsubscribe from any text SMS messages received by replying "STOP". If you do not wish to receive advertisements, content, surveys, promotions, Offers, or rewards from us by virtue of your installation of our Extensions, you should not install or should uninstall such Extensions. You may remove or disable cookies and/or opt out of interest-based advertising as described above in section 10(ii) (What Are My Cookie Choices?) and you may clear your browser history in accordance with the system settings of your web browser. You may also opt out of providing your geo-location information to us by turning off the location services for your Device located in your account settings (if available) or in your Device settings. If you do not want our mobile applications to collect any PII or non-PII about you, you should uninstall the application using the standard uninstall procedures that may be available as part of your mobile Device or via the mobile application marketplace or network where you obtained the mobile application.

## 16. Notification of Privacy Policy Updates

We reserve the right to make changes to this Privacy Policy from time to time via updates. If we decide to make an update with material changes to this Privacy Policy, we will provide notice of the update by sending you an administrative email and/or posting links to the updated Privacy Policy in places on the Prodege Sites and Features deemed appropriate by us so our users are always aware of what PII and other information we collect, how we use it, and under what circumstances it may be shared with others. Your continued use of any of the Prodege Sites and Features and our Services after delivery of the administrative email to you, or after the update links are posted, constitutes your acceptance of the updated Privacy Policy as to any continued use of the Prodege Sites and Features and our Services, including our future use of PII or other information previously or thereafter collected in accordance with the updated Privacy Policy. If you do not accept the changes, please immediately discontinue your use of any Prodege Sites and Features and our Services and close your account with us.

## 17. Children's Privacy

The Prodege Sites and Features and our Services are for general audiences, and we do not knowingly collect any personal information (as defined by the federal Children's Online Privacy Protection Act (**"COPPA"**)) from children younger than the age of 13. If you are under the age of majority (18 in most states and provinces), you should use the Prodege Sites and Features and our Services only with the permission and guidance of your parent or guardian. If you are under 13, you should not use our Service. If

we learn that we have inadvertently collected personal information from a child younger than 13, we will take actions as required by COPPA.

If a California resident is known to us to be under 16 years of age, we will obtain any required expressed opt-in consent to any sale of their personal information collected by the Prodege Sites and Features or our Services, in accordance with the CCPA and applicable regulations thereunder. California minors also have certain rights to remove their own public posts on the Prodege Sites and Features.  More information is included in section G (Additional Notices for California Residents) of the U.S. State Privacy Notice below.

## 18. Security

We maintain security measures in place to help protect against the loss, misuse and alteration of the PII and other information under our control. Please be advised, however, that the Internet and other technologies and communication channels are, by their nature, not entirely secure, and your PII and non-PII may therefore be subject to interception or loss which is beyond our reasonable control. While we strive to protect your PII and non-PII, we cannot ensure or warrant the security of any PII or non-PII you transmit to us or that we otherwise collect, and any transmission is done at your own risk. Accordingly, as permitted by applicable law, we assume no responsibility or liability for disclosure of your PII or non-PII due to errors in transmission, unauthorized third-party access, or other causes beyond our reasonable control.

## 19. Location of Processing and Applicable Law

Although we generally maintain our user data in the United States, it is possible that some of the data processing may occur outside of the United States, carried out by companies or individuals under contract with us. While the data protection laws of these countries may vary, we will make every reasonable effort to protect your PII in accordance with this Privacy Policy. By using the Prodege Sites and Features and our Services, you consent to this transfer of your PII and non-PII to any server used by Prodege or its service providers from time to time.

If you are not a resident of the United States or Canada, please consult the international version of our Privacy Policy here and be aware that data protection laws in the United States and Canada (as well as the legal procedures for courts, governmental authorities, and parties in civil litigation to obtain access to our user data) may differ substantially from the laws and procedures in your country of residence. In addition, if you submit your PII to us, you are consenting to the processing, storage, use and transfer of that PII within the United States as provided in this Privacy Policy.

The interpretation and application of this Privacy Policy shall be governed by the laws of the United States and the State of California without regard to its conflict of law provisions. Except as otherwise expressly provided in our Terms of Use, your use of the Prodege Sites and Features or our Services are not intended to subject us to the laws or jurisdiction of any state, country or territory other than that of the United States and the State of California.

## 20. Contact Us

If you have any questions or concerns regarding this Privacy Policy or your use of any Prodege Sites and Features or our Services, please visit our Help Center or contact options (located or accessed from the applicable Prodege Sites and Features footer or from main menu options).  For questions relating to our privacy practices (other than California residents making CCPA requests), please visit the Privacy section of the appropriate Help Center. If your question is not answered in the Help Center, you can submit a privacy-related request by submitting a ticket to our Customer Support team for the appropriate Service. To contact us by mail, send your correspondence to the following address and specify the Prodege Sites and Features or our Services you are using along with your request, question or concern:

**Prodege, LLC**, 8605 Santa Monica Blvd, PMB 36227, West Hollywood, California 90069-4109, Attention: Privacy

## U.S. STATE PRIVACY NOTICE

This U.S. State Privacy Notice ("**Notice**") applies to "**Consumers**" as defined respectively under the California Consumer Privacy Act, as amended by the California Privacy Rights Act (together, the "**CCPA**"), the Colorado Privacy Act, Connecticut's Act Concerning Personal Data Privacy and Online Monitoring, Chapter 603A of the Nevada Revised Statutes, the Utah Consumer Privacy Act, and the Virginia Consumer Data Protection Act, and all laws implementing,

Privacy Policy | Prodege : Prodege

supplementing, or amending the foregoing, including regulations promulgated thereunder, as well as any additional U.S. state privacy laws now or hereafter applicable to the Company (collectively, "**U.S. State Privacy Laws**"). Capitalized terms used but not defined in this Notice shall have the meanings given to them under the relevant U.S. State Privacy Laws or (if applicable) in other sections of our Privacy Policy.

*Applicability*:

- Section A of this Notice provides notice of our data practices, including our collection, use, disclosure, and sale of Consumers' personal information or personal data under relevant U.S. State Privacy Laws (collectively, "**PI**").

- Sections B-F of this Notice provide information regarding Consumer rights under applicable U.S. State Privacy Laws and how you may exercise them.

- Section G of this Notice provides additional information for California residents only.

For California residents, the term "Consumer" is not limited to data subjects acting as individuals regarding household goods and services and includes data subjects in a business-to-business context (e.g., as a service provider or customer, or an employee of a service provider or customer). This is not the case in the other states.

*Non-Applicability, Human Resources:* This Notice does not apply to our job applicants, current or former employees, or independent contractors ("**Personnel**") in connection with their PI collected in connection with such relationship with the Company; however, our California Personnel may obtain a separate privacy notice that applies to them by contacting our Human Resources department at hr@prodege.com.

## A. Notice of Data Practices

The description of our data practices in this Notice covers the twelve (12) months prior to the Effective Date and will be updated at least annually. Our data practices may differ between updates to this Notice; however, if materially different from this Notice, we will provide supplemental pre-collection notice of the current practices, which may include references to other privacy policies, notices, or statements. Otherwise, this Notice serves as our notice at collection.

We may receive or collect your PI directly from you or from your Devices, from Third Party Services, or from other individuals and businesses, as well as public sources of data.

Generally, we Process your PI to provide you our Services and as otherwise related to the operation of our business, including for one or more of the following Business Purposes: Performing Service; Managing Interactions and Transactions; Security; Debugging; Providing Advertising & Marketing Services; Quality Assurance; Processing Interactions and Transactions; and Research and Development. We may also use PI for other Business Purposes in a context that is not a Sale or Share under applicable U.S. State Privacy Laws, such as disclosing it to our Service Providers, Contractors, or Processors that perform services for us ("**Vendors**"), to you, or to other parties at your direction or through your action (e.g., Third Party Services that you interact with in response to Offers); for the additional purposes explained at the time of collection (such as in the applicable privacy policy or notice); as required or permitted by applicable law; to the government or private parties to comply with law or legal process, and in Business Transactions (collectively, "**Additional Business Purposes**"). Subject to restrictions and obligations under U.S. State Privacy Laws, our Vendors may also use your PI for Business Purposes and Additional Business Purposes and may engage their own vendors to enable them to perform services for us.

We may also use and disclose your PI under this Notice for Commercial Purposes, which may be considered a "Sale" or "Share" under applicable U.S. State Privacy Laws, such as when

Trusted Third Parties collect your PI via third-party cookies, and when we Process PI for certain advertising purposes. In addition, we may make your PI available to third parties for their own use via third-party cookies or otherwise.

As permitted by applicable law, we do not treat deidentified data or aggregate consumer information as PI and we reserve the right to convert, or permit others to convert, your PI into deidentified or aggregate consumer information, and may elect not to treat publicly available information as PI. We have no obligation to re-identify information or keep it longer than we need it to respond to your requests. Data exempt from U.S. State Privacy Laws are not included in this Notice.

Privacy Policy | Prodege : Prodege

We provide more detail on our data practices in the two charts that follow.

**i.    PI Collection, Disclosure, and Retention – By Category of PI**

We collect, disclose, and retain PI as follows:

| Category of PI | Examples of PI Collected and Retained | Categories of Recipients |
|---|---|---|
| 1.  Identifiers | This may include, but is not limited to: a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, or other similar identifiers. | **Business Purpose Disclosure:** <br> • Service Providers (e.g., data processors, IT service providers, storage vendors, marketing service providers, security providers, and professional advisors) |
| 2.  Personal Records | This may include, but is not limited to: physical characteristics or description, signature, telephone number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information. | |
| 3.  Personal Characteristics or Traits | This may include, but is not limited to: age, gender, nationality, race, or information related to medical conditions. | • Affiliates <br> • Government entities (where we are under a duty to disclose or to protect our rights or the rights of others) |
| 4.  Customer Account Details/ Commercial Information | This may include but is not limited to: records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies. | |
| 5.  Internet Usage Information | This may include, but is not limited to: browsing history, search history, and information regarding your interaction with an Internet Web site, application, or advertisement. | • Other parties within the limits of Additional Business Purposes (e.g., when you engage in Offer actions with Third Party Services) |
| 6.  Geo-location Data | This may include, but is not limited to: precise physical location or movements and travel patterns. | |
| 7.  Sensory Data | This may include, but is not limited to: audio recordings of customer care calls, electronic, visual, thermal, olfactory, or similar information. | **Sale/Share:** <br> • Cookie Operators (only to the extent such data is collected by a cookie or other Tracking Technology) |
| 8.  Professional or Employment Information | This may include, but is not limited to: professional, educational, or employment-related information | |
| 9.  Inferences from PI Collected | This may include, but is not limited to: creating a profile about a Consumer reflecting the Consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes. | • Licensees |

10/20/23, 7:50 AM

Privacy Policy | Prodege : Prodege

| Category of PI | Examples of PI Collected and Retained | Categories of Recipients |
|---|---|---|
| 10. Sensitive PI | Precise Geo-location (any data that is derived from a device and that may locate a consumer within a geographic area with a radius of 1,850 feet or less) | |
| | Sensitive Personal Characteristics (e.g., racial or ethnic origin, religious or philosophical beliefs, citizenship or immigration status, or union membership) | |
| | Health Information (PI collected and analyzed concerning a consumer's health, medical history, mental or physical health, diagnosis/condition, and medical treatment) | |
| | Sex Life / Sexual Orientation (PI collected and analyzed concerning a consumer's sex life or sexual orientation) | |
| | Financial Data (e.g., a consumer's account log-in, financial account, debit card, or credit card number in combination with any required security or access code, password, or credentials allowing access to an account) | **Business Purpose Disclosure:**<br>• Service Providers (e.g., data processors, IT service providers, storage vendors, marketing service providers, security providers, and professional advisors) |
| | Government Issued Identification Numbers (e.g., social security, driver's license, state identification card, or passport number) | • Affiliates<br>• Government entities (where we are under a duty to disclose or to protect our rights or the rights of others) |
| | Communication Content (e.g., the contents of a consumer's mail, email, and text messages, unless the business is the intended recipient of the communication) | • Other parties within the limits of Additional Business Purposes (e.g., when you engage in Offer actions with Third Party Services)<br><br>**Sale/Share:**<br>• None |

We retain your PI based on how long we believe we have a legitimate purpose for the retention. In general, we retain all categories of PI listed in the chart above for as long as a customer account is open and for an additional 3 years after the account is closed; however, some data may be retained for a shorter or longer period. When deciding how long to keep your PI, we consider (among other things) whether we have an active relationship with you, whether we need to retain the PI to provide you our Services, whether we are subject to any legal obligations (e.g., any contracts or laws that require us to maintain certain data for a certain period of time), our Data Purposes, and our Business Purposes and Additional Business Purposes. Rather than delete your PI, we might deidentify it by removing identifying details so it is no longer considered PI, in which event we will not attempt to re-identify that data.

There may be additional information we collect that meets the definition of PI under applicable U.S. State Privacy Laws but is not reflected by a category above, in which case we will treat it as PI as required but will not include it when we describe our practices by PI category.

**ii.  PI Use and Disclosure – By Processing Purpose**

We use and disclose PI for the processing purposes described below. For the categories of recipients for each purpose, please refer to the chart above at Section A(i) (PI Collection, Disclosure,

12/19

and Retention – By Category of PI), as indicated by relevant category of PI below:

| Processing Purpose(s) | Example(s) of Processing Purpose | Categories of PI Implicated |
|---|---|---|
| 1. Performing Services | Provide our Services: to provide you with Prodege Sites and Features and our Services, including Offers<br><br>Enable additional features: to provide you with additional Prodege Sites and Features and enhance our Services<br><br>Process orders: to process or fulfil an order or transaction<br><br>Contact You: to contact and communicate with you about your use of our Services, including changes to our Services or our Services' policies<br><br>Account management: to process your registration with our Services, verify your info is active and valid, and otherwise manage your account<br><br>Customer Service: to respond to any questions, comments, or requests you have for us or for other customer service purposes<br><br>Payment and other purchase-related purposes: to facilitate a purchase made using our Services, including payment processing<br><br>Other: marketing, administrative, operational, business, and commercial purposes subject to applicable law and not inconsistent with this Privacy Policy or other notice by us at collection | Identifiers, Customer Account Details/Commercial Information, Internet Usage Information, Geo-location Data, Sensory Data, Inferences |
| 2. Managing Interactions and Transactions | Auditing: related to counting ad impressions to unique visitors, verifying positioning and quality of ad impressions, and auditing compliance with user interaction or transaction specifications and standards | Identifiers, Customer Account Details/Commercial Information, Internet Usage Information |
| 3. Security | Security/fraud prevention: to protect the security of Company, our Services, and its users and to prevent and address fraud and violations of our terms and policies | Identifiers, Internet Usage Information, Customer Account Details/Commercial Information |
| 4. Debugging | Repairs: identify and repair errors that impair existing intended functionality of our Services | Identifiers, Internet Usage Information, Customer Account Details/Commercial Information |
| 5. Providing Advertising & Marketing Services | Content and offers customization: to customize your experience on our Services, or to serve you specific content and Offers that are relevant to/customized for you<br><br>Advertising, marketing, and promotions: to assist us in determining relevant Offers; to develop and evaluate marketing and advertising campaigns; and for promotional activities, such as running sweepstakes, contests, and other promotions. | Identifiers, Internet Usage Information, Customer Account Details/Commercial Information, Geo-location Data, Inferences |
| 6. Quality Assurance | Quality and Safety of Service: undertaking activities to verify or maintain the quality or safety of our Services, and to improve, upgrade, or enhance our Services | Identifiers, Internet Usage Information, Customer Account Details/Commercial Information, Geo-location Data, Inferences |
| 7. Processing Interactions and Transactions | Short-term, transient use: including, but not limited to, non-personalized advertising shown as part of a Consumer's current interactions related to your use of our Services | Identifiers, Internet Usage Information, Customer Account Details/Commercial Information, Geo-location Data, Sensory Data, Inferences |

| Processing Purpose(s) | Example(s) of Processing Purpose | Categories of PI Implicated |
|---|---|---|
| 8. Research and Development | Research and analytics: to better understand how Consumers access and use our Services, both on an aggregated and individualized basis, to improve our Services and respond to user preferences, and for other research and analytical purposes<br><br>Market research and customer satisfaction surveys: to administer surveys and questionnaires, such as for market research or customer satisfaction purposes | Identifiers, Internet Usage Information, Customer Account Details/Commercial Information, Geo-location Data, Inferences |
| 9. Additional Business Purposes | Compliance with legal obligations: to comply with legal obligations, as part of our general business operations, and for other business administration purposes<br><br>Prevention of illegal activities, fraud, injury to others, or violation of our terms and policies: to investigate, prevent or take action if someone may be using info for illegal activities, fraud, or in ways that may threaten someone's safety or violate of our terms or policies<br><br>Purposes disclosed at PI collection: We may provide additional disclosures at the time of PI collection, such as on an Offer page<br><br>Related or compatible purposes: for purposes that are related to and/or compatible with any of the foregoing purposes | Identifiers, Personal Records, Personal Characteristics or Traits, Customer Account Details/Commercial Information, Internet Usage Information, Geo-location Data, Sensory Data, Professional or Employment Information, Inferences |
| 10. Commercial Purposes | We may collect and use your PI for commercial purposes such as for interest-based advertising and sharing PI in a manner that is deemed a sale under the CCPA or other applicable U.S. State Privacy Laws. | Identifiers, Personal Records, Personal Characteristics or Traits, Customer Account Details/Commercial Information, Internet Usage Information, Geo-location Data, Sensory Data, Professional or Employment Information, Inferences |

## B. Your Consumer Rights and How to Exercise Them

We provide Consumers the privacy rights described in this section pursuant to the requirements of their applicable state's law, provided any such request meets the requirements for a Verifiable Consumer Request (defined below). For residents of states without applicable U.S. State Privacy Laws, we may consider requests under this section but will apply our discretion in whether and how we process them. We may also apply state law rights in states with U.S. State Privacy Laws prior to the effective date of such laws in our discretion.

To submit a request to exercise your Consumer privacy rights under U.S. State Privacy Laws, or to submit a request as an authorized agent, please follow the instructions at our Consumer Rights Request page here or mail your request to the following address: Prodege, LLC, 8605 Santa Monica Blvd, PMB 36227, West Hollywood, California 90069-4109, Attention: Privacy, and respond to any follow-up inquiries we make. Please be aware that we do not accept or process requests through other means (via phone, fax, chats, social media, etc.). More details on the request and verification process are provided in Section C (How We Process Your Consumer Privacy Requests) below. The Consumer rights we accommodate are as follows:

### i. Right to Limit Sensitive PI Processing

With regard to PI that qualifies as Sensitive PI under U.S. State Privacy Laws, if you elect to provide us with that Sensitive PI, you will have consented to our collection and processing of such Sensitive PI. You may submit an opt-out request here. However, under applicable U.S. State Privacy Laws, you can limit certain Sensitive PI Processing with the exception of the following processing purposes or any other permitted purposes under such U.S. State Privacy Laws:

- To perform our Services at your request or at your direction;

- To prevent, detect, and investigate security incidents, fraudulent activity, illegal actions, etc.;

- For short term transient use, including, but not limited to, non-personalized advertising as part of your interaction with our Services; and

- To maintain or service accounts, provide customer service, process or fulfill Offers, orders and transactions, verify customer information, process payments, or provide similar services.

### ii.  Right to Know/Access

Residents of California, Colorado, and Virginia are entitled to access PI maintained by the Company up to twice in a 12-month period.  Residents of Connecticut and Utah are entitled to access PI maintained by Company once in a 12-month period, with subsequent requests subject to a service fee.

#### a)  Categories (available for California Residents only)

California residents have a right to submit a request for any of the following for the period that is 12-months prior to the request date:

- The categories of PI we have collected about you.

- The categories of sources from which we collected your PI.

- The Business Purposes or Commercial Purposes for our collecting or Selling your PI.

- The categories of third parties to whom we have shared your PI.

- A list of the categories of your PI disclosed for a Business Purpose and, for each, the categories of recipients, or that no disclosure occurred.

- A list of the categories of your PI sold and, for each, the categories of recipients, or that no sale occurred.

#### b)  Specific Pieces (Transportable Copies)

You may request to confirm if we are Processing your PI and, if we are, to obtain a transportable copy of your PI that we have collected and are maintaining, as required by applicable U.S. State Privacy Laws.  If you wish to receive specific pieces of your PI, we will attempt to honor requests for specific pieces of your PI where reasonably possible.  We have no obligation to re-identity information or to keep PI longer than we normally retain it or longer than we are required to under applicable law to comply with access requests.

### iii.  Do Not Sell / Share / Target for Advertising

Various U.S. State Privacy Laws have broad and differing concepts of "Selling" PI for which an opt-out is required, with some states including PI transfers for non-monetary consideration and other states only including PI transfers for monetary consideration. California also has an opt-out from "Sharing" for Cross-Context Behavioral Advertising purposes (use of PI from different businesses or services to target advertisements across websites or apps). Other states have an opt-out of "Targeted Advertising" (defined differently, but also addressing tracking, profiling, and targeting of advertisements). We may Sell or Share your PI and/or use your PI for Targeted Advertising, as these terms apply under U.S. State Privacy Laws. However, we provide you with an opt-out of Sale/Sharing/Targeting that is intended to combine all of these various state opt-outs into a single opt-out available regardless of which U.S. State Privacy Law is applicable to your PI.

Ad Networks and other Trusted Third Parties may associate cookies and other Tracking Technologies that collect PI about you on Prodege Sites and Features or in connection with our Services, or otherwise Collect and Process PI that we make available about you. We understand that making your PI available on Prodege Sites and Features or in connection with our Services, or otherwise, to Trusted Third Parties could be deemed a Sale and/or Share under some U.S. State Privacy Laws and thus we will treat such PI (e.g., cookie ID, IP address, and other online IDs and internet or other digital activity information) collected by Trusted Third Parties that are not limited to acting as our Service Provider (or Contractor or Processor), as a Sale and/or Share and subject to your right to make a Do Not Sell/Share/Target opt-out request. We will not Sell your PI, Share your PI for Cross-Context Behavioral Advertising, or Process your PI for Targeted Advertising if you make a Do Not Sell/Share/Target opt-out request as follows:

Opt-out for non-cookie PI: If you want to limit our Processing of your non-cookie PI (e.g., your email address or web browsing activity) for Targeted Advertising, or opt-out of the Sale/Sharing of such PI, you may make an opt-out request here.

<u>Opt-out for cookie PI</u>. If you want to limit our Processing of your cookie-related PI for Targeted Advertising, or opt-out of the Sale/Sharing of such PI, you may exercise an opt-out request by following the instructions on our Consumer Rights Request page here, or by clicking the link to update Your Cookie Choices. This cookie management tool enables you to exercise such an opt-out request and enable certain cookie preferences on your Device. Since your browser opt-out is designated by a cookie, if you clear or block cookies on your Device, your preferences may no longer be effective, and you will need to enable them again via our cookie management tool.

Opt-out preference signals ("OOPS", as they are known in California; also known as global privacy control or GPC): Some of the U.S. Privacy Laws require businesses to process OOPS or GPC signals, which are signals sent by a platform, technology, or mechanism, enabled by individuals on their devices or browsers, that communicate the individual's choice to opt-out of the Sale and Sharing of PI. To use an OOPS/GPC, you can download a compatible internet browser or a plugin for on your current internet browser and follow the settings to enable to OOPS/GPC. We have configured the settings of our consent management platform to receive and process OOPS/GPC signals on our website, as explained by our consent management platform here. We process OOPS/GPC signals with respect to any Sales and Sharing of PI with Trusted Third Parties that may occur via cookies or other Tracking Technologies, as discussed above and apply it to the specific browser on which you enable OOPS/GPC. We do not: (1) charge a fee for use of our service if you have enabled OOPS/GPC; (2) change your experience with any product or service if you use OOPS/GPC, although it may affect our ability to accurately track your activities for crediting your account with qualified rewards; or (3) display a notification, pop-up, text, graphic, animation, sound, video, or any interstitial in response to the OOPS/GPC, except for indicating whether we recognize the signal.

We may disclose your PI for the following purposes, which are not a Sale or Share: (i) if you direct us to disclose PI; (ii) to comply with a Consumer rights request you submit to us; (iii) disclosures amongst the entities that constitute Company as defined above, or as part of a Business Transaction; and (iv) as otherwise required or permitted by applicable law.

### iv.  Right to Delete

Except to the extent we have retention rights under applicable law, you may request that we delete your PI. Our retention rights include, without limitation:

- To complete transactions and services that you have requested;
- For security purposes;
- For legitimate internal Business Purposes (e.g. maintaining business records);
- To comply with law and to cooperate with law enforcement; and
- To exercise or defend legal claims.

Please also be aware that making a deletion request does not ensure complete or comprehensive removal or deletion of PI or content you may have posted.

Under certain U.S. State Privacy Laws, your deletion right may apply only to PI that we collected directly from you.

### v.  Correct Your PI

Consumers may bring inaccuracies they find in their PI that we maintain to our attention, and we will act upon such a report as required by applicable law.

You can also make changes to your PI in your online account in the account settings section of the account. That will not, however, necessarily change your PI in other places where we may maintain it.

## C. How We Process Your Consumer Privacy Requests

To submit a request to exercise your Consumer privacy rights, or to submit a request as an authorized agent, please follow the instructions at our Consumer Rights Request page here or mail your request to the following address: Prodege, LLC, 8605 Santa Monica Blvd, PMB 36227, West Hollywood, California 90069-4109, Attention: Privacy, and respond to any follow-up inquiries we make. In addition, you may email privacyrequest@prodege.com and we will respond with the appropriate web submission form for you to use for the submission of your request. To submit a Do Not Sell/Share/Targeting Request for cookie-related PI or the right to

limit Sensitive PI processing, click here. Please be aware that we do not accept or process requests through other means (via phone, fax, chats, social media, etc.).

### i. Your Request Must be a Verifiable Consumer Request

As permitted or required by applicable U.S. State Privacy Laws, any request you submit to us must be a **Verifiable Consumer Request**, meaning that when you make a request, we may ask you to provide verifying information, such as your name, e-mail, phone number and/or account information. We will review the information provided and may request additional information (e.g., transaction history) to ensure we are interacting with the correct individual. We will not fulfill your Right to Know (Categories), Right to Know (Specific Pieces), Right to Delete, or Right to Correction request unless you have provided sufficient information for us to reasonably verify you are the Consumer about whom we collected PI. We do not verify opt-outs of Sell/Share/Target or Limitation of Sensitive PI requests unless we suspect fraud.

You are not required to create a password-protected account with us to make a Verifiable Consumer Request, but you may use your password-protected account to do so. If we suspect fraudulent or malicious activity on or from the password-protected account, we may decline a request or request that you provide further verifying information.

We verify each request as follows:

- _Right to Know (Categories) (available for California residents only)_: If you do not have a password-protected account, we verify your Request to Know Categories of PI to a reasonable degree of certainty, which may include matching at least two data points provided by you with data points maintained by us, which we have determined to be reliable for the purpose of verifying you. If we cannot do so, we will refer you to this Notice for a general description of our data practices.

- _Right to Know (Specific Pieces)_: If you do not have a password-protected account, we verify your Request To Know Specific Pieces of PI to a reasonably high degree of certainty, which may include matching at least three data points provided by you with data points maintained by us, which we have determined to be reliable for the purpose of verifying you together with a signed declaration under penalty of perjury that you are the Consumer whose PI is the subject of the request. If you fail to provide requested information, we will be unable to verify you sufficiently to honor your request, but we will then treat it as a Right to Know Categories Request if you are a California resident.

- _Do Not Sell/Share/Target & Limit Sensitive PI_: No specific verification required unless we suspect fraud.

- _Right to Delete_: If you do not have a password-protected account, we verify your Request to Delete to either (i) a reasonable degree of certainty, which may include matching at least two data points provided by you with data points maintained by us, or (ii) a reasonably high degree of certainty, which may include matching at least three data points provided by you with data points maintained by us, depending on the sensitivity of the PI and the risk of harm to the Consumer posed by unauthorized deletion. If we cannot verify you sufficiently to honor a deletion request, you can still make a Do Not Sell/Share/Target and/or Limit Sensitive PI request.

- _Correction_: If you do not have a password-protected account, we verify your Request to Correct PI to either (i) a reasonable degree of certainty, which may include matching at least two data points provided by you with data points maintained by us, or (ii) a reasonably high degree of certainty, which may include matching at least three data points provided by you with data points maintained by us, depending on the sensitivity of the PI and the risk of harm to the Consumer posed by unauthorized correction.

To protect Consumers, if we are unable to verify you sufficiently, we will be unable to honor your request. We will use PI provided in a Verifiable Consumer Request only to verify your identity or authority to make the request and to track and document request responses, unless you also gave it to us for another purpose.

### ii. Agent Requests

Authorized agents may exercise rights on behalf of California Consumers, but we reserve the right to also verify the Consumer's identity directly as described above. Authorized agents must contact us by submitting a request through our Consumer Rights Request page here and indicating in the open text field that they are submitting the request as an agent. We will require the agent to

demonstrate authority to act on behalf of the Consumer by providing, for example, evidence of the agent's identity, proof of registration with the California Secretary of State (if the agent is a business), and at least one of the following evidencing proof of the agent's legal authority to act on behalf of the individual Consumer: (i) presenting a Power of Attorney granted under the Probate Code that we can reasonably verify; or (ii) signed permission by the Consumer.

We may also require the Consumer to verify their own identity directly with us and to directly confirm with us that they provided the authorized agent permission to submit the request.

In addition, residents of Colorado and Connecticut may use an agent to make an opt-out request subject to reasonable verification of agent authority and consumer identity.

In the absence of any of the general conditions detailed above, we are entitled to reject any request submitted through an agent. In addition, the agent is subject to the verification standards applicable to the type of request(s) made.

### iii.   Appeals (Colorado, Connecticut, and Virginia residents only)

If you are a resident of Colorado, Connecticut, or Virginia, you may appeal Company's decision regarding a request by contacting us at privacyappeals@prodege.com with the following subject line: "CRR Appeals Request".

### iv.   Our Responses

Some PI that we maintain is insufficiently specific for us to be able to associate it with a Consumer (e.g., clickstream data tied only to a pseudonymous browser ID). We do not include that PI in response to those requests. If we deny a request, in whole or in part, we will explain the reasons in our response.

We will make commercially reasonable efforts to identify Consumer PI that we Process to respond to your Consumer request(s). In some cases, particularly with voluminous and/or typically irrelevant data, we may suggest you receive the most recent or a summary of your PI and give you the opportunity to elect whether you want the rest. We reserve the right to direct you to where you may access and copy responsive PI yourself. We may also refuse to act upon a request that is excessive, repetitive, unfounded, or overly burdensome.

Consistent with applicable U.S. State Privacy Laws and our interest in the security of your PI, we will not deliver to you your Social Security number, driver's license number, or other government-issued ID number, financial account number, an account password, or security questions or answers, in response to a Consumer privacy rights request; however, you may be able to access some of this information yourself through your account if you have an active account with us.

## D. Non-Discrimination/Non-Retaliation

We will not discriminate or retaliate against you in a manner prohibited by applicable U.S. State Privacy Laws for your exercise of your Consumer privacy rights. We may charge a different price or rate, or offer a different level or quality of good or service, to the extent that doing so is reasonably related to the value of the applicable data.

## E. Notice of Financial Incentive Programs

We may offer rewards or other benefits ("**Incentives**") from time-to-time to Consumers that provide us with PI, such as name, phone number, e-mail address, IP address, or geo-location. You may opt-in to Incentives by subscribing to our [Incentive programs we may offer from time-to-time. If you subsequently wish to withdraw from such programs, the method for doing so will be explained in the

program Terms of Use, and you may do so at any time. For more information, including valuation notice, see our Notice of Financial Incentives here.

## F. Our Rights and the Rights of Others

Notwithstanding anything to the contrary, we may collect, use and disclose your PI as required or permitted by applicable law and this may limit or affect your rights under U.S. State Privacy Laws. In addition, we are not required to honor your requests to the extent that doing so would infringe upon our or another person's rights or conflict with applicable law.

## G. Additional Notices for California Residents

This Notice provides additional information on our online practices and the rights of California residents related to Prodege Sites and Features and our Services.

### i.   California Minors Erasure

Privacy Policy I Prodege : Prodege

If you are a California resident under eighteen (18) years of age
who has posted content or information on Prodege Sites and
Features or our Services, you can request removal by contacting

Terms of Use | Privacy Policy