# EXHIBIT D
# to the Declaration of
# G. Berntson

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 46

## SEALED VERSION

## FILED UNDER SEAL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation*, | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

### EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF

### GREG J. REGAN, CPA/CFF, CFE

### November 29, 2023

### UNREDACTED VERSION SUBMITTED CONDITIONALLY UNDER SEAL

TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ............................................................................................... 1

    A.    Nature of My Assignment ...................................................................... 1

    B.    Summary of My Responses to the Deal Report ..................................... 1

II.   THE DEAL REPORT IS PREMISED ON A FLAWED METHODOLOGY TO
    CALCULATE UNJUST ENRICHMENT ......................................................... 4

    A.    The Deal Report Does Not Follow a Generally Accepted Process to Calculate
        Google's Unjust Enrichment from RTB ................................................ 4

        1.    Mr. Deal Asserts that the RTB Revenue Produced by Google Includes
                an Unquantified Amount from Non-Google Account Holders .................. 8

        2.    Mr. Deal Asserts that the RTB Revenue for ███████ Produced by
                Google Includes an Unquantified Amount from Other Users Not Subject
                to the U.S. TOS ................................................................................. 12

        3.    Mr. Deal Has No Basis to Assert that RTB Revenue from Users that
                "Voluntarily Shared Data" Should Be Excluded ..................................... 15

    B.    The "But-For" Methodology Presented in the Deal Report is Unsupported ........ 16

        1.    Mr. Deal's Use of a "But-For" World Is Methodologically Flawed ........ 16

        2.    Mr. Deal's "But-For" Analysis is Founded on an Unsupported
                Assumption ........................................................................................ 21

    C.    Mr. Deal Failed to Perform Any Independent Analysis of Google's Marginal
        Costs ..................................................................................................... 24

III.  THE CRITICISMS IN THE DEAL REPORT REGARDING THE REGAN
    REPORT'S COMPENSATORY DAMAGE METHODOLOGY ARE UNFOUNDED .. 24

IV.   MR. DEAL'S CLAIMS INVOLVING THE EXCLUSION OF UNHARMED CLASS
    MEMBERS ARE SPECULATIVE, UNSUPPORTED, AND ULTIMATELY
    UNMEASURED ............................................................................................. 25

    A.    Mr. Deal Has No Basis to Assert that Class Members Received an Economic
        Benefit that Could Be an Offset to Google's Unjust Enrichment ........................ 27

        1.    Mr. Deal's Assertions Regarding a Need to Offset Benefits Is
                Incomplete and Unreliable ................................................................... 28

        2.    Mr. Deal Has No Basis to Assert that Class Members Perceived Their
                Benefit of Advertisements Reflecting Their Personal Information Fully
                Offset Google's Benefits of Providing those Advertisements .................. 29

B.    Mr. Deal Has No Basis to Reduce Unjust Enrichment Related to Class Members that Purportedly Understood How Google's Used of Their Personal Information ........................................................................................... 31

C.    Mr. Deal Has No Basis to Reduce Unjust Enrichment Related to Class Members that Purportedly Took Action to Prevent Sharing of Personal Information ........................................................................................... 32

V.    THE CRITICISMS IN THE DEAL REPORT OF THE ALLOCATION METHODOLOGY ARE UNFOUNDED ........................................................ 32

# I. INTRODUCTION

## A. Nature of My Assignment

1.      My firm, Hemming Morse, LLP ("HM"), was retained by Plaintiffs' counsel in *In re: Google RTB Consumer Privacy Litigation*, Case No. 4:21-cv-02155-YGR-VKD. On July 14, 2023, I issued an expert report on this matter (the "Regan Report").[1] The Regan Report presented a methodology to calculate 1) Google's unjust enrichment from Real Time Bidding ("RTB") auctions after June 28, 2016 and 2) compensatory damages for class members.

2.      Google retained Bruce Deal ("Mr. Deal") to, among other things, respond to the Regan Report. Mr. Deal issued a report dated September 29, 2023 (the "Deal Report") and was deposed on October 24, 2023 ("Deal Deposition Tr.").

3.      The Deal Report relies on inaccurate information, inaccurately characterizes the Regan Report, and provides a flawed analysis of my proposed methodologies to calculate Google's unjust enrichment from RTB and compensatory damages. This Rebuttal Report summarizes my responses to the Deal Report and should be read in conjunction with the Regan Report.

4.      None of Mr. Deal's opinions, whether or not specifically addressed in this Rebuttal Report, change my opinions set forth in the Regan Report. My decision not to respond to a specific assertion made in the Deal Report should not be construed to mean my agreement with such assertions. Nevertheless, the remainder of this Rebuttal Report responds to certain statements and conclusions made by Mr. Deal that are incorrect, unsupported by the facts and conditions in place during the Class Period, and/or are contradicted by available information produced in this matter.

## B. Summary of My Responses to the Deal Report

5.      The methodology I proposed to calculate unjust enrichment in this case is straightforward. First, I relied on Google's recognition of RTB revenues in the U.S. as presented in the document that Google confirms is accurate.[2] I then subtracted the impact of revenues

---

[1] I summarized my qualifications and compensation in the Regan Report. The additional data that I relied upon for purposes of this Rebuttal Report are identified in **Appendix C** hereto.

[2] Regan Report ¶¶ 35-36 citing Google's Response to Interrogatory No. 11, Google LLC's Objections and Responses to Plaintiffs' Third Set of Interrogatories, April 4, 2023. After the

attributable to personalized information used in the auctions (*i.e.*, apportionment), relying on Mr. Zeithammer's analysis.

6.    Mr. Deal's primary methodology for critiquing my report is to assert that Google's RTB revenue must be reduced to account for certain issues he claims to exist. As described throughout this Rebuttal Report, Mr. Deal has not made any effort to quantify the impact of those issues. Mr. Deal's basis to identify the issues is a narrow foundation of record evidence consisting of only nine internal Google documents. Instead, Mr. Deal focused on public articles, which with few exceptions are not specific to Google, let alone Google's RTB. He has not demonstrated that his ability to use, reference, and interpret articles extends beyond insights a lay person might bring to them (and he appears to misunderstand at least certain of the articles he cites). This is an overarching problem. Mr. Deal admits he is only qualified to critique my damages opinion, and yet he reaches beyond that expertise in areas of privacy, consent, and data flow.[3] He could have relied on Google's experts in those fields for these conclusions but does not. Mr. Deal further ventures into matters such as users' expectations, intent, and feelings.

7.    The table below summarizes Mr. Deal's opinions with my accompanying responses:

---

issuance of the Regan Report, Google produced additional data regarding RTB revenue from ▮▮▮▮▮▮▮▮▮▮▮▮ for the period from July 1, 2022 through March 31, 2023, which I incorporate as additional inputs into my methodology for those periods (GOOG-HEWT-00481702.)

[3] Deal Deposition Tr. at 43:8-13 (indicating he is not a data engineer); 46:18-22 (indicating he is not a privacy expert); 116:4-7 and 160:14-23 (indicating he is not a technical expert); 190:19-191:2 (indicating he is not an expert on consent).

| Deal Opinions (Deal Report ¶¶ 9-22) | Regan Response |
|---|---|
| Unjust enrichment calculated in the Regan analysis is overstated because it: | Mr. Deal's analysis is flawed because it is based on factually inaccurate speculation outside the field of Mr. Deal's expertise and: |
| 1. Includes revenue from non-U.S. accountholders. | 1. Google can and does parse revenue from U.S. versus non-U.S. accountholders and it is estimable here. *See* § II.A. |
| 2. Includes revenue from individuals that voluntarily shared data. | 2. There is no basis to exclude individuals that "voluntarily shared" data in the RTB auction, as the fact of the auction was not disclosed to Google account holders. *See* § II.C. |
| 3. Excludes "but-for" revenue from the hypothetical sale of other Google products. | 3. Google has testified that the spreadsheet I used in my analysis includes only RTB revenue from ███████████, which may understate the RTB revenue at issue. The "but-for" framework proposed by Mr. Deal is unsupported. *See* § II.B. |
| 4. Is based on Mr. Zeithammer's flawed apportionment calculation. | 4. Mr. Zeithammer will respond to this claim. |
| Mr. Deal's opinions regarding compensatory damages are principally focused on Mr. Zeithammer's analysis. Mr. Deal also opines that I should have offset the benefits received by class members from the sale of their personal information. | Mr. Zeithammer is responding to those aspects of Mr. Deal's opinions that address calculations of the market value of the class members information. The speculative "benefits" Mr. Deal claims that accrue to Google account holders do not result in an offset to damages. *See* §§ II & IV. |
| There are unharmed class members that should be excluded from the unjust enrichment and compensatory damage calculations. | This is based on factually inaccurate speculation outside the field of Mr. Deal's expertise. There is no evidence that any proposed class member was unharmed. *See* § IV. |
| The proposed award allocation methodology would result in some class members to be overcompensated and others undercompensated. | Mr. Deal concedes that this is not a challenge to my methodology in calculating damages, but rather is a post-award concern. This opinion also rests on a thin factual basis outside Mr. Deal's expertise. *See* § V. |

8.     To the extent that Mr. Deal's opinion rests on numerous assertions regarding technical and privacy considerations, I understand that other experts retained by the Plaintiffs will respond to these analyses.

## II.    THE DEAL REPORT IS PREMISED ON A FLAWED METHODOLOGY TO CALCULATE UNJUST ENRICHMENT

### A.    The Deal Report Does Not Follow a Generally Accepted Process to Calculate Google's Unjust Enrichment from RTB

9.    My unjust enrichment damages model is appropriate to measure damages in the circumstances applicable to this matter. The Deal Report does not claim otherwise. Nor does the Deal Report claim that the three-step methodology to compute unjust enrichment described in the Regan Report is flawed. Instead, the Deal Report critiques the inputs to my methodology for calculating unjust enrichment.

10.    The calculation of unjust enrichment involves an iterative process. First, the property owner establishes and quantifies the defendant's relevant revenue or sales. Typically, an expert for the defendant then reviews and responds to the plaintiff's calculations or provides an independent calculation of those sales. This process to exchange information and improve the precision of the at-issue sales calculation is set forth in a treatise widely used by damages experts:[4]

> *Burden of Proof in Establishing Sales. The owner bears the burden of establishing and quantifying the infringer's sales of the infringing product. In practice, however, an expert for an infringer will almost always make an independent calculation or review the owner's calculation.* ***In cases in which the infringer fails to maintain or produce data adequate to calculate sales with precision, courts have permitted owners to rely on a wide variety of estimation methods.***

---

[4] Litigation Services Handbook, The Role of the Financial Expert, 5th Edition ("LSH"), Ch. 18, Economic Analysis of Nonpatent Intellectual Property Rights, p.29 (emphasis added).

11.     This description of the process to calculate unjust enrichment is consistent with the Restatement of the Law, Restitution, and Unjust Enrichment 3d ("Restatement 3d"). Specifically, the plaintiff's role is to make a reasonable approximation of the amount of the defendant's wrongful gain. At that point, the defendant's role is to resolve residual uncertainty in the net profit calculation.[5]

> *A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain.* **Residual risk of uncertainty in calculating net profit is assigned to the defendant.**

12.     In this case, the plaintiffs requested that Google produce data sufficient to identify Google's RTB revenue from Google account holders subject to the U.S. Terms of Service ("TOS"), which is consistent with the definition of the class members.[6] Specifically, my methodology relies upon evidence Google produced in response to this request from the plaintiffs:[7]

> *Documents sufficient to establish the revenues Google earns through Google Real Time Bidding on a weekly, monthly, quarterly and annual basis…*
>
> *For all Account Holders for whom Google has shared, sold, or disseminated their personal information to other companies through Real Time Bidding, documents sufficient to establish the amount of revenue associated with each Account Holder that Google acquired through the sharing, sale, or dissemination of each Account Holder's personal information to other companies through Real Time Bidding…*

13.     In response to these requests, I understand that Google produced limited information, primarily the spreadsheet that is an input to my methodology. I further understand

---

[5] Restatement 3d at (5)(d). (emphasis added)

[6] Motion for Class Certification, p. 4. Class members are Google account holders subject to a U.S. Google TOS.

[7] Defendant Google LLC's Objections and Responses to Plaintiffs' First and Second Set of Request for Production of Documents, June 22, 2021, No. 34 and 41. The term "Account Holder" referenced the then-current Complaint (Document 1) at ¶ 39 (Plaintiffs' First Request for Production of Documents, Definition No. 1), which stated, "A Google Account gives a user access to Google products.[4] The user, in turn becomes a Google account holder (the 'Account Holder')."

that in follow-up discovery requests, Google stated the RTB revenue data produced in response to this request was attributable to ████████", which it described as follows:[8]

> ████████ *means a user accessing the internet using a device with an IP address that Google associated with a location within the United States at the time the user was shown an ad that generated revenue.*

14.     Additional evidence in this matter confirms that Google uses ██████████ █████████████████████████████████████.[9] Specifically, Google's corporate representative testified that █████████████████████████████████████████ ████████████████████████████████████████████.[10] This representative testified that she was prepared by Google to testify on that topic.[11] Another one of Google's corporate representatives testified that the spreadsheet that it produced in response to Plaintiffs' requests identified U.S. based revenue "from an IP address relating to where an ad served," which is stored in "████████" and "████████████" logs and in "billing reports and invoices."[12]

15.     Accordingly, I have relied on the best available evidence produced by Google in this case of RTB revenue attributable to **U.S. account holders. (**Regan Report, Schedule 1.) This RTB revenue data provides the starting point in my analysis. Consistent with the description of the iterative unjust enrichment process provided above, at my deposition, I testified that I anticipated Google would respond to my analysis and, if applicable, "identify additional information that enables a more precise calculation" of RTB revenue attributable to **U.S. account holders.**[13] If Google provides additional data, it can be input into my methodology.

---

[8] Regan Report ¶ 36, n.61 citing Google LLC's Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories (Nos. 11-12), No. 11.
[9] Deposition of Suneeti Vakharia dated November 15, 2023 ("Vakharia Deposition Tr."), at 68:16-24. The topic relevant to the testimony was "The Google terms of service and privacy policies applicable in the United States and the accounts to which they apply."
[10] *Id.* at 68:25-70:21.
[11] *Id.* at 15:2-14.
[12] Berntson 30(b)(6) Deposition Tr. at 230:9-20; 231:18-232:10; 233:14-234:10; 235:15-236:21.
[13] Deposition of Greg Regan dated September 5, 2023 ("Regan Deposition Tr."), at 100:15-101:24.

16.     Mr. Deal contests the validity of the spreadsheet that Google produced. Mr. Deal claims that somehow the RTB revenue data produced by Google may have included revenue from users whose IP address was located in the U.S. but who were actually not subject to U.S. Terms of Service. In particular, Mr. Deal claims I should have excluded additional RTB revenue from the data Google produced that was attributable to 1) non-Google account holders or 2) users otherwise not subject to Google's TOS. (Deal Report ¶ 37.)

17.     Mr. Deal does not attempt to identify any data or method to quantify the RTB revenue he speculates should be excluded. Indeed, the analysis in the Deal Report relies on just nine Google documents and a private "interview" with a Google employee, while ignoring relevant data that was available to him. For example, I referenced Mr. Levitte's testimony at least seven times in the Regan Report because Mr. Levitte testified about Google's methods to track and record RTB revenue. Relevantly, Mr. Levitte testified that Google's ███████████████████ ██████████████████████████████████████████████. (Regan Report ¶ 52 citing Levitte Tr. 61:2-10, 61:25-62:7.) I described how those ████████ might be accessed to obtain further information about RTB Revenue. (Regan Report ¶ 52.) Yet, Mr. Deal did not review or even ask to see Google's ████████ to consider the availability of this information.[14] In fact, Mr. Deal did not recall Mr. Levitte's role with Google or list Mr. Levitte's deposition within the materials that he relied upon.[15]

18.     Further, Mr. Deal attempts to support this and other assertions based on a single private conversation he had with a Google employee, Mr. Belov.[16] Mr. Deal did not produce a transcript or any notes describing the conversation he had with Mr. Belov.[17] As such, I have no

---

[14] Deal Deposition Tr. at 147:14-20, 148:8-10.

[15] Deal Deposition Tr. at 50:19-25.

[16] *E.g.*, The Belov interview is the only citation for Deal Report n. 49, 57, 58, 82. These citations support a broad array of Mr. Deal's most critical claims including 1) ██████████████████████ ████████████████████████████████████████ (n.49), 2) Google ████████████████████████ ██████████████████████████████████████████████████████████████ (n.57), and 3) ████████████████████████████████████████ (n.82.).

[17] Deal Deposition Tr. at 92:18-93:6 .

ability to review the content of their conversation, test the reliability of Mr. Deal's conclusions, or ask any follow-up questions to clarify what alternative information may exist when Mr. Deal claims, based on his interview of Mr. Below, that certain information is unavailable as described further in the sub-sections below.[18] On their face, many of these assertions for which Mr. Deal cites the Belov interview are contradicted by testimony by Google or its employees in this case.[19] For example, Google's corporate representative testified that it can estimate RTB-revenue derived from Google account holders.[20] In these ways, Mr. Deal has failed to resolve the residual uncertainty he claims to exist in the RTB revenue data attributable to ███████ that Google produced in this matter. If Google wished to produce more finely grained evidence, or Mr. Deal identified a need to refine Google's data, either Google or Mr. Deal could have done so.

       1.   <u>Mr. Deal Asserts that the RTB Revenue Produced by Google Includes an Unquantified Amount from Non-Google Account Holders</u>

19.     Mr. Deal asserts that the RTB revenue data Google produced for **r** ███████ is not suitable for the unjust enrichment calculation because it may include RTB revenue from users who are not Google account holders. (Deal Report ¶ 40.) If Google included revenue from such users in the RTB revenue data that it produced, then Google and Mr. Deal were best positioned to provide data or insights to identify that portion of RTB revenue.

20.     Mr. Deal has not identified any expertise with data flow or otherwise demonstrated that he is qualified to opine on Google's ability to provide such data. But Mr. Deal asserts that Google does not have the ability to distinguish RTB revenue from account holders versus non-account holders. Mr. Deal does not cite any evidence that supports his assertion. Mr. Deal's basis for this assertion is a private interview with one Google employee, with inside and outside counsel

---

[18] Deal Deposition Tr. at 100:20-101:16; 110:6-22.
[19] *See* the examples I present in ¶¶ 19, 21, and 22.
[20] Berntson 30(b)(6) Deposition Tr. at 237:4-242:5 (indicating that the percentage of signed-out traffic associated with Account holders could be determined by "work[ing] with the ███████ ███████ and Gaia teams[s] … [which] would be the most reliable way.").

present.[21] As described below, recent deposition testimony of Google, however, challenges his assertion that Google cannot identify revenues for Google account holders.[22]

21.    Mr. Deal goes further to assert it is not possible to reliably estimate RTB revenue from U.S. account holders. Specifically, Mr. Deal asserts that Google cannot identify the proportion of RTB auctions shown to Google account holders as opposed to users without a Google account. (Deal Report ¶ 41.) To support this assertion, Mr. Deal relies on Google's Dr. Berntson. During his testimony as Google's representative, however, Dr. Berntson testified that Google ***is able to distinguish*** between Google account holders and non-Google account holders.[23] Dr. Berntson explained that Google keeps records of RTB auctions in ████" and "████."[24] The ████" contains a Google Account ID but a "████" does not.[25] Dr. Berntson testified, however, that "it is possible" for Google to associate activities in a ████ with a Google account.[26] Moreover, Dr. Berntson testified that (1) Google's ████, which Mr. Deal chose not to review, provide a breakdown of RTB revenue based upon whether the ad was displayed to a user that was signed-in (*i.e.*, Google account holders) versus not signed-in;[27] and (2) Google could identify the

---

[21] Deal Report ¶ 42, n.49 citing "Interview with Stanislav Belov, August 16, 2023." *See also* Deal Deposition Tr. at 100:20-101:16, (including, *"*Q. Looking at Note 49, do you see that you wrote the sentence on page 17, 'I understand that ████ ████? Do you see that?... And you cite -- the only -- the only citation there is your interview with Mr. Belov. Do you see that? A. Yes. Q. And other than your interview with Mr. Belov, do you have any reason to believe that Google does not separately track RTB revenue from ads shown to users with and without Google accounts? A. I mean, it -- it would make sense given my understanding of -- of, you know, the -- the GAIA cookies and all of that, but that is literally the source for that citation.").

[22] Berntson 30(b)(6) Deposition Tr. at 52:21-54:24; 55:6-56:20. Dr. Berntson confirmed that Google uses the ████████████. GAIA is the name for the Google account identifier that is used when a user is signed-in. (Vakharia Deposition Tr. at 136:1-9; 150:12-15.) **Biscotti is a cookie used for display ads purposes when a user is not signed-in.** (Vakharia Deposition Tr. at 149:10-150:9.)

[23] Berntson 30(b)(6) Deposition Tr. at 237:4-238:15; 241:10-242:5.

[24] *Id.* at 11:18-13:6.

[25] *Id.* at 12:22-13:7.

[26] *Id.* at 225:13-226:4.

[27] *Id.* at 239:3-240:9. *See also* Vakharia Deposition Tr. at 121:22-122:6, "████████████

percentage of signed-out traffic that comes from Google Account holders versus non-Google Account holders.[28] Google's monitoring of revenue from signed-in users is observable in its



22.    Accordingly, it is now clear that Google **does** have the ability to determine the proportion of RTB revenue attributable to account holders versus non-account holders, in signed-in and not signed-in states.[30] This information would provide a basis to refine my estimate of RTB

---

[28] Berntson 30(b)(6) Deposition Tr. at 237:4-242:5 (excerpted above).

[29] Vakharia Deposition Tr. at 124:11-18 regarding Ex. 8 (Vakharia) at GOOG-HEWT-00482717,

(see Ex. 8 at GOOG-HEWT-00482707.) *See also,* Vakharia Deposition Tr. at 132:9-13,

[30] In addition to Dr. Berntson's testimony above, as well as Berntson 30(b)(6) Deposition Tr. at 225:13-226:4 (indicating Google can link signed-out activity to a Google account), and the Shafiq Report dated November 29, 2023, this is consistent with other Google data that I have reviewed.

---

revenue associated with U.S. Google account holders (*i.e.*, the input for Step 1 in my methodology) and resolve Mr. Deal's claim.[31] Yet, Mr. Deal did not obtain any data or perform any other analysis to measure this issue.

23.    Moreover, Mr. Deal anticipated that I might propose a basis to estimate the proportion of U.S. account holders similar to that described above. Mr. Deal further speculated that I would apply an average revenue per user calculation using this estimate. (Deal Report ¶ 42.) But Mr. Deal claims that this method would not be reliable because he has not seen evidence that Google's average revenue per user is the same between account holders and non-account holders. (*Id.*) Mr. Deal does not identify any step that he took, or any other basis he has, to substantiate this opinion. Instead, Mr. Deal speculates that Google would generate less revenue from a hypothetical non-Google account holder using Safari (*i.e.*, because Safari blocks sharing of certain data) as compared to a Google account holder where the blocked data was available.[32] Mr. Deal did not review any internal Google analyses,[33] perform an analysis such as a review of software blocking capabilities (nor is he qualified to do so),[34] and could not cite to any Bid Request data that had bid information blocked.[35] Regardless, even if Mr. Deal's hypothetical was correct (and it is contradicted by the evidence I have reviewed indicating that ███████████████████████████

For example, GOOG-HEWT-00162531 at 541. ███████████████████████ dated July 19, 2021, indicates ████████████████████████████████████████████████████████████████

---

[31] The use of such a ratio to estimate the proportion of Google RTB revenue associated with U.S. account holders may understate class-wide revenue but this data would provide a better basis than the ratio proposed by Mr. Deal, which is zero.

[32] It is noteworthy that Mr. Deal's hypothetical anticipates that Google would earn more revenue from showing an ad to a user where more personal information is known (*i.e.*, a user not using a Safari browser), which is consistent with the expectation that personal information has a measurable value.

[33] I have reviewed Google documents indicating that the Company was ████████████████████ (*e.g.*, GOOGLE-HEWT-00482881 at 921, ██████████████████ October 30, 2017 providing a ████ ██████████.

[34] Deal Deposition Tr. at 74:17-75:2. *See also* Shafiq Rebuttal Report dated November 29, 2023 (indicating that Mr. Deal's assertion regarding software blocking is incorrect).

[35] Deal Deposition Tr. at 77:10-78:12.

███████████████████████████, as seen in the chart excerpted above from Ex. 8 (Vakharia) at GOOG-HEWT-00482717), the use of average account holder revenue would only partially understate Google's RTB revenue from U.S. account holders—a more reasonable outcome than imposing an estimate of zero revenue, which is the implication of Mr. Deal's claim.

       2.    <u>Mr. Deal Asserts that the RTB Revenue for ███████ Produced by Google Includes an Unquantified Amount from Other Users Not Subject to the U.S. TOS</u>

24.    In my experience, large publicly traded companies such as Google maintain sophisticated databases to assemble transaction-level data to monitor business performance, record revenue in financial databases based on transaction-level data, and report revenue in their financial statements, as well as comply with regulatory considerations. (Regan Report ¶¶ 21-22.) Indeed, Google's SEC filings consistently disclosed the revenue the Company generated from customers in the United States during the proposed Class Period. (Regan Report ¶ 30.) Similarly, 1) Mr. Levitte testified that Google is able to ███████████████████████████,[36] 2) Google's corporate representative testified that the user's IP address provides the basis for the Company's methodology to identify the user's location for each transaction,[37] and 3) Google has concluded that the IP address methodology is suitable for privacy and regulatory purposes, including for CCPA and GDPR purposes.[38]

---

[36] Levitte Deposition Tr. at 174:25-175:15. As described in ¶ 16, Mr. Deal could have reviewed Mr. Levitte's testimony to inform his "understanding" of Google's data capabilities, but he failed to do so.

[37] Berntson 30(b)(6) Deposition Tr. at 151:6-15, "My understanding from a regulatory and privacy perspective is that Google takes the IP address that we receive on an ad request and we use that as this is where the user is. If we need to comply with CCPA or GDPR, you name it, we take at face value the IP address that we receive and we make sure we are complying with any regulations that are specific to that location."

[38] *Id. See also* Vakharia Deposition Tr. at 66:24-65:18, "████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

25.     The Deal Report asserts that the data produced by Google identifying RTB revenue for ███████ may, in fact, include RTB revenue from ████████, who may not have agreed to the U.S. TOS. (Deal Report ¶ 43.) Mr. Deal then asserts that he "understand[s] that ████████ ████████████████████████████████████████████████████████████ ██████████████████████████████." (Deal Report ¶ 47.) Again, Mr. Deal does not appear to be a technical expert and he has not identified any expertise in data flow to independently support this opinion. The only identified basis for Mr. Deal's understanding is the same private interview with a Google employee (*i.e.*, Mr. Belov) described in § II.A.1 above. (Deal Report ¶ 47, n.57.)

26.     The one example that Mr. Deal conceived where his hypothetical could have occurred is an international user that used a virtual private network ("VPN") to mask their location to a US-based IP address. (Deal Report ¶ 43.) Mr. Deal could not point to any internal documents relating to this action indicating that this has occurred or quantify how many such instances might have occurred. Mr. Deal also did not consult with Google's experts to assess this issue or evaluate whether any potential revenue impact is offset by ███████ employing non-U.S. based VPN servers.[39] Moreover, Mr. Deal did not know if Google could identify whether a VPN user had originated from a non-U.S. location.[40] As a result, Mr. Deal's understanding of Google's capability to identify relevant data to make an estimation of the extent of the issue Mr. Deal claims to exist, if it exists, is at best incomplete.[41]

27.     The only other basis for Mr. Deal's claim regarding VPN use was several articles that his team pulled from the internet.[42] Those articles do not identify the use of a scientific methodology, are not narrowed to Google account holders in the U.S. or the relevant time period;

███████████████████████████████████████████████████████████████████

[39] Deal Deposition Tr. at 115:21-23.
[40] *Id.* at 122:4-16.
[41] Google's corporate representative, Dr. Berntson, testified that Google may have a method to identify VPN use. (Berntson 30(b)(6) Deposition Tr. at 149:20-150:5.)
[42] Deal Deposition Tr. at 115:16-23; 130:7-131:13.

and a few could even be a form of advertising for entities selling VPNs. (Deal Report ¶ 46.) I understand that Professor Zubair Shafiq, relying on a peer-reviewed article, concluded that all VPN use worldwide is between 0 and 2.6%. These low percentages do not narrow such use to Google account holders in the United States.

28.    Further, it is reasonable to expect that publishers would be concerned about paying a rate for a targeted ad that was displayed to a non-targeted user. For example, I would expect that a publisher of ads for restaurants in Oakland, California would seek to limit the frequency that their ads were displayed to VPN users in China.[43] Consequently, I find it unlikely that, if this issue is meaningful, Google has no means to estimate the impact of the issue. Alternatively, the evidence I have reviewed indicates that Google has determined that the user's IP address provides the most reliable method to identify whether the U.S. TOS applied to the user to whom the ad was displayed and that Google bases its billing and accounting systems on that information.[44] Mr. Deal has not identified a basis to depart from these established Google practices.

29.    Ultimately, even if VPN use by international users were substantial, as Mr. Deal speculates, Mr. Deal failed to analyze or test the extent that international users select VPN servers based in the U.S. and then receive ads displayed from Google RTB. Rather, similar to his approach related to RTB revenue potentially attributable to non-account holders, Mr. Deal asserts that he

---

[43] *E.g.*, Ex. 3 (Deal) at GOOG-HEWT-00047197, Google September 9, 2020 letter to th █████████
████████████████████████████████████████

[44] Berntson 30(b)(6) Deposition Tr. at 231:21-232:10; 235:2-236:8 (indicating that revenue information is derived "from the ██████████ log, which is joined with the █████████ logs" with location "derived from an IP address… that is also stored in billing reports and invoices.").

"wasn't asked to independently quantify" this portion of users, if any.[45] In this way, Mr. Deal fails to follow generally accepted practices in an unjust enrichment calculation.[46]

30.    As described above, I set forth a methodology to calculate Google's unjust enrichment, which included identifying RTB revenue attributable to U.S. account holders. If the data Google produced identifying RTB revenue from ▮▮▮▮▮ included revenue from account holders not subject to Google's U.S. TOS, then my methodology is capable of being readily extended to accommodate a modification to the RTB revenue input.

3.    <u>Mr. Deal Has No Basis to Assert that RTB Revenue from Users that "Voluntarily Shared Data" Should Be Excluded</u>

31.    **Google did not disclose to users that it might sell their personal information. Indeed, Google promises users that they will not do so. Google also failed to inform users that Google is sharing their information in RTB auctions.**[47] Despite these facts, Mr. Deal presupposes that there are class members who understood how Google did use, or would use, their personal information in the RTB auction and then voluntarily consented to Google's use of their personal information. (Deal Report ¶ 48.) This is pure speculation relating to a contested issue in the case: namely whether Google obtained consent from users.

---

[45] Deal Deposition Tr. at 112:7-114:11 (including "And I haven't been asked to independently quantify it, but I -- also as part of my assignment, I try and identify is this something that is likely to be a substantial problem. Again, it's not my job to come up with the specific quantification, but to identify whether this is, you know, a super, super, super tiny issue or a more substantial issue."). In his response, Mr. Deal could not define a "substantial issue" including whether an amount such as 2.6% was substantial. (Deal Deposition Tr. at 114:18-115:8.).

[46] Mr. Deal appears to misunderstand the process to perform an unjust enrichment calculation. Mr. Deal asserts that I used Google's specific data to estimate RTB Revenue from U.S. account holders (*i.e.*, the issue relevant to Step 1 in my unjust enrichment analysis). Mr. Deal then asserts that I failed to go further by testing Google's data to confirm that there are no issues in Google's data. In fact, the individual in position to perform that testing was Mr. Deal but he failed to so. (*e.g.*, Deal Deposition Tr. at 117:15-118:17, "If this really is a nonissue, what I point to is I say, well, Mr. Regan hasn't talked about it. He hasn't tested it. He hasn't confirmed that it's a nonissue. He hasn't done anything. He's literally just using the data that Google gave him, which is clearly U.S. IP addresses.")

[47] Vakharia Deposition Tr., at 274:22-275:15; 278:7-18; 294:22-295:11.

32.    Mr. Deal admits that he is not a privacy expert, is not an expert in determining whether users are subject to the U.S. TOS, did not rely on any documents produced internally related to Google's data flow, and did not consider or address data flow.[48] Indeed, Mr. Deal appears to show his lack of expertise in the field by using this term. I understand consent must be voluntary—involuntary consent is not consent at all. Moreover, Mr. Deal appears to incorrectly assume that users who do not reject sharing their personal information implicitly "opt-in" to sharing their personal information.[49]

33.    Even if Mr. Deal's proposed adjustment was appropriate (and this point is disputed by Plaintiffs),[50] again, Mr. Deal did not perform any independent analysis to estimate the proportion of class members that conform with his definition of "voluntary consent."[51]

## B.    The "But-For" Methodology Presented in the Deal Report is Unsupported

### 1.    Mr. Deal's Use of a "But-For" World Is Methodologically Flawed

34.    In the Regan Report, I set forth my methodology to calculate Google's unjust enrichment from the sale of personal information through RTB. I grounded my methodology in numerous generally accepted treatises including the Restatement 3d. (*E.g.*, Regan Report ¶ 8.) This is a peer-reviewed, widely accepted methodology for calculating unjust enrichment.[52] Mr. Deal

---

[48] Deal Deposition Tr. at 46:18-22; 64:19-65:9; 103:10-20; 211:7-212:5.

[49] For example, Mr. Deal cites articles discussing users that take action to opt-out of the sharing their personal information. Mr. Deal assumes that users that did not opt-out voluntarily opted-in to the sharing of their personal information. (Deal Deposition Tr. at 245:12-20.) I am not aware of a basis to make this assumption.

[50] I understand Plaintiffs contend that users cannot stop their personal information from being shared in RTB Bid Requests.

[51] Deal Deposition Tr. at 174:24-175:15. *See also* Deal Deposition Tr. at 180:25-181:23.

[52] Restatement 3d is "an independent and coherent body of law addressing both the remedy of restitution and the related law of unjust enrichment." Restatement 3d is a publication from The American Law Institute and the Restatement is "primarily addressed to courts and aim at clear formulations of common law and its statutory elements." The Restatement 3d, and every draft of the treatise, was reviewed by a committee of advisers, a consultative group, a council, and the membership of the American Law Institute. *See* "The American Law Institute Publishes New Restatement of the Law of Restitution and Unjust Enrichment," September 8, 2011, available at https://www.ali.org/news/articles/american-law-institute-publishes-new-restatement-law-restitution-and-unjust-enrichment/, "Restatement and Unjust Enrichment," American Law Institute, available at https://www.ali.org/publications/show/restatement-law/, "Frequently Asked

---

does not cite the Restatement 3d. In fact, Mr. Deal appears to provide only a single citation to a damage treatise: The Reference Guide on Estimation of Economic Damages (the "Reference Guide"). (Deal Report ¶ 56, n.69.) I have used the Reference Guide extensively. The Reference Guide does not detail methods to calculate unjust enrichment. Instead, the Reference Guide refers to the Restatement 3d for this purpose.[53]

35.     An unjust enrichment calculation focuses on actual past events where the defendant's profits, if any, have already been fixed and are therefore capable of measurement. For example, the Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit sets forth the calculation of unjust enrichment as follows:[54]

> Profit is determined by deducting all expenses from gross revenue.
>
> Gross revenue is all of defendant's receipts from using the trademark in the sale of a [product]. The plaintiff has the burden of proving a defendant's gross revenue by a preponderance of the evidence.

36.     As seen in the excerpt above, revenue relevant to an unjust enrichment calculation consists of "all of defendant's receipts" involved with the activity at issue (*i.e.*, an analysis of the actual revenue and profit). Next, the unjust enrichment calculation involves an apportionment of the defendant's actual past profits between those profits that were generated from (1) legitimate conduct and (2) wrongful conduct.[55] Here, apportionment removes from the unjust enrichment calculation the proportion of Google's RTB revenue that Google legitimately generated. (Regan

---

Questions," available at https://www.ali.org/about-ali/faq/, all accessed on November 11, 2013. *See also* "Restoring Restitution to the Canon," Douglas Laycock (Michigan Law Review), available at https://www.ali.org/media/filer_public/2d/b6/2db6ef31-af29-4f70-8913-4e68ef882db3/restitution-laycock.pdf.
[53] Reference Guide p.433 at n.6 and p.435 at n.13.
[54] 2017 Ed. updated March 2023, § 15.29, Trademark Damages—Defendant's Profits, which is an instruction I understand to be comparable to those applicable in this matter.
[55] Regan Report ¶ 39 citing to the Restatement 3d, "When the net profit in question has been realized in part as a result of the wrong to the claimant and in part from the defendant's legitimate activities--so that some part, at least, of the defendant's profit would have been realized in the absence of the wrong--what proportion of the net profit is attributable to the wrong to the claimant?"

Report ¶ 39.) In other words, how much would the price that Google received in the RTB transaction have decreased absent the inclusion of personal information in the transaction? This is the "but-for" analysis in an unjust enrichment calculation. For purposes of illustrating my proposed methodology to calculate Google's unjust enrichment, I used an estimate that **51.1% of** RTB revenue, within a 95% confidence interval of **39.5% to 62.8%, was** attributable to the inclusion of personal information. (Regan Report ¶ 42.) Mr. Deal does not challenge my calculation of this confidence interval or render one of his own.

37.    Mr. Deal describes the process of calculating unjust enrichment as identifying the additional profit the defendant earned as a result of the disputed conduct. (Deal Report ¶ 56, n.69.) Mr. Deal's testimony indicates he possesses a similar understanding of the purpose of apportionment to my description in the previous paragraph.[56]

38.    Mr. Deal, however, asserts that this methodology to calculate unjust enrichment should be expanded to include consideration of an additional speculative "but-for" scenario. (Deal Report ¶ 56.) Mr. Deal hypothesizes that if RTB revenue had decreased absent inclusion of personal information, Google might have even been able to increase its overall revenue and profits through its sales of other products. (Deal Report ¶¶ 12, 67.) Even if Mr. Deal had performed any analysis to support this opinion or pointed to any evidence suggesting that this actually would have occurred, which he did not, I am not aware of any methodological basis to incorporate Mr. Deal's expanded "but-for" theory into an unjust enrichment calculation.[57] Mr. Deal is conflating an analysis of lost profits with an unjust enrichment calculation.[58] Instead, as the Restatement 3d

---

[56] Deal Deposition Tr. at 268:25-270:9 (indicating "So what we're -- what we need -- the --the right question is, imagine that you weren't sharing data for certain data fields in realtime ███████ for ███████████████████ would you lose there on those specific ads and interactions, not -- forget what else is happening somewhere else.").

[57] Mr. Deal asserts that the Reference Guide supports this opinion. In his deposition, Mr. Deal was unable to identify support for his opinion by referring to any passage in it or any reputable journal. (Deal Deposition Tr. at 276:25-277:11; 350:18-353:21.)

[58] In effect, Mr. Deal is claiming that if Google did not incur lost profits "but-for" the sale of personal information through RTB because it might have sold another product to the user, then Google could not have been unjustly enriched.

notes, "unjust enrichment is measured by the defendant's profits, where the object of restitution is to strip the defendant of a wrongful gain."[59] Mr. Deal testified and agreed that it was his "economic understanding" that the objective of restitution is to strip the defendant's profits resulting from "bad acts."[60]

39.    The Restatement 3d provides an illustration that demonstrates the flaw in Mr. Deal's expanded "but-for" methodology. The illustration involves a Studio which produced a successful film, "Letty Lynton," but in doing so, violates an Author's copyright. The following steps are presented to calculate unjust enrichment:[61]

> [1] [T]he court must determine the proportion of Studio's overall profits that is derived from the production and distribution of 'Letty Lynton' as distinct from its other activities.

> [2] Calculation of the net profit realized from 'Letty Lynton' requires, moreover, an apportionment of various items of overhead and general expense between 'Letty Lynton' and Studio's other ventures. Despite their complexity, the same apportionments are routinely made in other contexts (for example, in determining Studio's contractual obligations to persons entitled to share in the net profits of particular films). Unless circumstances dictate otherwise, the same apportionment will serve as the starting point for measuring Studio's liability to Author.

> [3] Once the net profits derived from 'Letty Lynton' have been determined, however, the court confronts the further problem of deciding what proportion of those profits is attributable to the unauthorized use of Author's play. Evidence presented at trial would support a range of answers between 25 percent of the total (according to Author's expert) and nil (according to Studio's expert).

> [4] Weighing all the relevant evidence, the court concludes that the proportion of Studio's profits attributable to the infringement is somewhere between zero

---

[59] Restatement 3d, Comment a..

[60] Deal Deposition Tr. at 286:10-287:1 (when asked, "You agree with the statement that the objective of restitution is to strip the defendant of a wrongful gain," Mr. Deal responded, "Again, to the extent there's a legal implication of that, I'm not offering legal opinions, but that is my economic understanding, is that the profit that's – that's resulting from the alleged, you know, what I call disputed acts or alleged bad acts, that profit is what you're trying to isolate and, to you -- to use your words, strip it away from them.").

[61] Restatement 3d, Illustration 14.

> *and 10 percent; moreover, that the correct answer within these limits is*
> *impossible to determine. Because the risk of uncertainty in such an accounting*
> *is assigned to the wrongdoer, Author is entitled to 10 percent of the net profits*
> *of "Letty Lynton."*

40.     As seen in the illustration, the calculation of unjust enrichment did not also involve estimation of the profits the Studio might have made if it had instead produced a hypothetical film, Alternative A, then reducing unjust enrichment attributable to Letty Lynton by offsetting the profits from Alternative A.[62] Put differently, I am not aware of a basis to claim that, if liability is established, the defendant is entitled to keep the profits from the actual wrongful conduct based on an assertion that, if it had the opportunity to recreate history and change its actual wrongful conduct, it might have generated similar profits from legitimate activities. Mr. Deal's proposed methodology, in which the Studio is found liable for infringing the Author's intellectual property but could avoid paying restitution by arguing an alternative sale may have occurred that would have approached or exceeded its net profit from Letty Lynton, runs counter to this principle.

41.     Applying the Studio and Author example to the circumstances here, the unjust enrichment calculation, or the calculation of Google's "wrongful gain," involves the same three-step approach that I have implemented:[63] (Regan Report ¶ 35.)

[1]   Determine the proportion of Google's overall revenue that is derived from RTB.

[2]   Calculate the net profit from the RTB revenue by deducting relevant costs.

[3]   Apportion the net profit to Google's inclusion of personal information in the RTB transactions.

42.     In direct contradiction to the Restatement 3d, Mr. Deal testified that if Google's "but-for" justly earned revenues were greater than unjust enrichment revenues, there would be no

---

[62] Similarly, the illustration does not include consideration of whether customers might have instead chosen to view another film produced by the Studio also providing a potential offset to actual profits to unjust enrichment attributable to Letty Lynton.
[63] The fourth step in the illustration involved the Court's deliberation of the evidence.

unjust enrichment damages at all.[64] I am not aware of peer-reviewed support for this proposition. It is wrong. Consequently, in my opinion, Mr. Deal's proposed methodology to calculate unjust enrichment, which inserts a new step to revise Google's overall "but-for" revenue upwards, is not consistent with generally accepted methodologies and his related criticism is invalid.

        2.   Mr. Deal's "But-For" Analysis is Founded on an Unsupported Assumption

43.    Mr. Deal loosely defined RTB-related Bid Requests to mean "at-issue data from RTB bid requests." (Deal Report ¶ 12.) Mr. Deal did not rely on any Google documents to identify what was included in the Bid Requests.[65] Mr. Deal also could have relied on, but did not, Google's experts to inform his understanding of the information contained in Bid Requests.[66] Oddly, Mr. Deal cites my report as the basis to assert that Google cannot do a complete accounting of data fields that were shared in Bid Requests during the Class Period because Google does not possess the data.[67] This portion of Mr. Deal's report was contradicted by Google's corporate representative.[68] Regardless, Mr. Deal testified that he understood that Bid Requests contained a

---

[64] *E.g.*, Deal Deposition Tr. at 287:2-17 (including "[I]f there is -- you know, you're doing this bad thing and you're earning profits of a hundred. You stop doing that things [verbatim], you still earn profits of a hundred, there's no economic damages.").

[65] Deal Deposition Tr. at 64:19-65:9 (including, "…I didn't independently look at bid requests, for instance, so I didn't do any testing of those…Q. Setting aside financial documents, did you rely on any documents produced internally by Google that reflect the data flow, meaning what is in the bid requests? A. Oh. I -- I think the answer is no…").

[66] Deal Deposition Tr. at 37:4-16; 53:3-16.

[67] Deal Report ¶ 92, n.136 citing Regan Report ¶ 55. This is an odd basis for Mr. Deal's understanding since my report merely conveyed my understanding that Google's counsel has asserted Google did not maintain this data.

[68] Contrary to the prior assertions of Google's counsel that I understand have been made in this case, Google's corporate representative testified that Google maintains logs with RTB auction receipts that "represent a logical super set of the information that would be shared on an RTB bid request," explaining that "a super set would be all of the items, and then there may be additional information." Berntson 30(b)(6) Deposition Tr. at 89:19-91:14 (indicating that there are only "a couple of exceptions" to this).

"master set of variables" for every user.[69] This is consistent with my understanding of the Bid Requests.[70]

44.     The premise of Mr. Deal's "but-for" analysis is that if, because of the absence of personal information in the Bid Requests, the ███████ products would have submitted lower bids or chose not to bid, then other Google products, specifically ████████████████████ ██████████ would have continued to bid for the same ad inventory without sharing data with third parties. (Deal Report ¶¶ 12, 26.) Mr. Deal's premise regarding these other Google products, however, is incorrect. But on this incorrect foundation, Mr. Deal claims that ad inventory sold through these other Google products is not at-issue in this matter and the pricing for ████████ ██████████ would reflect the "impact of omitting the at-issue data from Bid Requests." (Deal Report ¶ 56.)

45.     Mr. Deal's opinion on this issue appears to be beyond his expertise. Additionally, his assertion that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████—relies on a single document.[71] That internal Google document is inconsistent with Google's external representations regarding these products. Specifically, in response to an inquiry from the Office of the Texas Attorney General, Google stated that the █████████████████████████████ ██████████.[72]

---

[69] Deal Deposition Tr. at 73:14-74:15; 225:3-226:5 (including "What I'm offering my opinion related to is that this is all in the context, which we talked about earlier this morning, about there's sort of a master set of variables and fields -- variable and fields are sort of synonymous -- that can be shown in a bid request.").

[70] *E.g.*, GOOG-HEWT-00481219 at 220. ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████ *See also* Shafiq Rebuttal Report dated November 29, 2023.

[71] Deal Report ¶ 12, n.21 and Deal Report ¶ 26, n.71 citing GOOG-HEWT-00047130 stating ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

[72] GOOG-HEWT-00047091 at 094, Responses and Objections of Alphabet Inc. to the September 9, 2019 Civil Investigative Demand Issued by the Office of the Attorney General of Texas.

46.     I understand that Mr. Deal's opinion is also contradictory to the testimony of Google's corporate representative, who testified that RTB bid request data is sent "in parallel" to Google RTB and Google's "Demand-Side" products such as ▮▮▮▮▮ and ▮▮▮.[73]

47.     Consequently, even setting aside that his asserted "but-for" methodology is wrong, Mr. Deal's assumption regarding these other products as benchmarks appears to be incorrect. In fact, the Bid Request data is likely to cause the ▮▮ and ▮▮▮▮▮ products to submit bids that are reflective of the value of personal information. In that event, the ▮▮ and ▮▮▮▮▮ bid amounts do not provide a suitable benchmark to identify "the impact of the at-issue data from Bid Requests." (Deal Report ¶ 56.) Ultimately, Mr. Deal's "imagined"[74] hypothetical auction comparing bid prices from ▮▮▮▮▮ is exactly that. Mr. Deal has not tested or analyzed any RTB transactions involving the ▮▮▮▮▮, as well as ▮▮▮▮▮, to provide a basis for his example or test his assumption.

48.     Moreover, the RTB Revenue I cite in Schedule 1 of the Regan Report is only revenue related to Google's ▮▮▮▮▮ in Google RTB.[75] It is possible that further

---

(highlighting added) ▮▮▮▮▮
▮▮▮▮▮

[73] Berntson 30(b)(6) Deposition Tr. at 162:8-12 (explaining "Unified Auction"); 163:15-164:2 (explaining that RTB data is sent "in parallel" to RTB server and "an internal server that manages Google internal demand"); 106:1-107:25 (comparing RTB data sent "in parallel," and explaining that "all of the other information in the stack [*i.e.*, RTB auction] continues to flow" to both systems.).

[74] Deal Report ¶ 58, "To illustrate, imagine an auction where the highest (and winning) ▮▮ bid for banner ad was $1, the highest ▮▮ bid was 98 cents, and the highest ▮▮ bid was 96 cents."

[75] Regan Report, Schedule 1, citing to GOOG-HEWT-00455648, ▮▮▮▮▮ ▮▮▮▮▮ Gross Revenue (2017 - 2022). *See also* Berntson 30(b)(6) Deposition Tr. at 242:6-243:8 (including "This is gross revenue… which is the total payments coming in from all authorized buyers and open bidding partners... To me it just seems so self-evident…") and

---

discovery may confirm that additional revenue generated from Google through RTB should be included as an input in the RTB Revenue determined in Step 1 of my analysis.

### C. Mr. Deal Failed to Perform Any Independent Analysis of Google's Marginal Costs

49.     The third step in my methodology to calculate Google's unjust enrichment was to evaluate marginal costs. (Regan Report ¶¶ 46-50.) Mr. Deal asserts that I understated Google's marginal costs. (Deal Report ¶ 34, n.39.) The problem with Mr. Deal's criticism is that he was not asked to estimate Google's marginal costs, relies on no evidence relating to it (and Google has not produced any), and has not performed any independent analysis to support his claim.[76]

## III. THE CRITICISMS IN THE DEAL REPORT REGARDING THE REGAN REPORT'S COMPENSATORY DAMAGE METHODOLOGY ARE UNFOUNDED

50.     I also calculated the class members' compensatory damages. (Regan Report ¶¶ 62-65.) My proposed compensatory damages model relies on Professor Zeithammer's calculation of the "fair market value of Google account holders' personal information." (Regan Report ¶ 64.) Mr. Deal criticizes Mr. Zeithammer's calculation. (Deal Report ¶¶ 16, 74.) I understand Professor Zeithammer disagrees with Mr. Deal and is separately addressing Mr. Deal's criticism.

51.     It is worth noting, however, that Mr. Deal criticizes Mr. Zeithammer for not following established valuation standards. (Deal Report ¶ 35.) Specifically, Mr. Deal asserts that Mr. Zeithammer did not follow standards applicable to the *market approach*. (Deal Report ¶ 79.) Based on my review of Mr. Zeithammer's analysis, I disagree. The valuation literature recognizes that it is almost never possible to identify identical assets to use as a benchmark. Instead, valuation

---

Google's Response to Interrogatory No. 11, Google LLC's Objections and Responses to Plaintiffs' Third Set of Interrogatories, April 4, 2023.

[76] Deal Report, Exhibit 1 purports to present "Total Traffic Acquisition Costs." Therein, the source cited for "Total Traffic Acquisition Costs" (*see* note "[D]") is the Regan Report ¶¶ 51-52. This citation is incorrect as those paragraphs do not provide support for the amounts used by Mr. Deal. Moreover, I stated that Google's data production related to Traffic Acquisition Costs ("TAC") did not provide sufficient information to identify marginal costs. (Regan Report ¶ 47, n.81.) Mr. Deal failed to perform any independent analysis of the amount Google reported as TAC to identify the portion of TAC comprised of marginal costs.

standards recognize that market data is most often similar in nature and may be adjusted to the subject of the valuation analysis.[77] This is the approach that Mr. Zeithammer employed. Mr. Deal merely has a different opinion regarding the comparability of the market data. The valuation standards do not impose a bright line definition of market data as Mr. Deal suggests.

## IV.  MR. DEAL'S CLAIMS INVOLVING THE EXCLUSION OF UNHARMED CLASS MEMBERS ARE SPECULATIVE, UNSUPPORTED, AND ULTIMATELY UNMEASURED

52.    Mr. Deal asserts that if "Proposed Class Members are not economically worse off in the but-for world, they are unharmed and should be excluded from damages calculations."[78] (Deal Report ¶ 94.) As an initial matter, Mr. Deal refers to these class members as "unharmed." To clarify, the class members were harmed when Google did not compensate them for the unauthorized sale or sharing of their personal information. Instead, Mr. Deal is challenging whether the extent of the harm experienced by class members should be reduced either because certain class members purportedly did not care about that harm or alternatively received some benefit that could be offset against the harm. (*E.g.*, Deal Report ¶ 121.) In this way, Mr. Deal considers such class members to be potentially unharmed on a net basis.

53.    For purposes of his related analyses, Mr. Deal compares an assumed *benefit* received by a class member when their personal information was sold or shared by Google with the *cost* incurred by the class member in the form of Google's uncompensated for sale or sharing. In this framework, Mr. Deal claims that the benefit offsets the class members' cost.

54.    The implications of Mr. Deal's claim differ for the unjust enrichment calculation as compared to the compensatory damage claim. In regard to unjust enrichment, Mr. Deal's use of

---

[77] *E.g.*, Valuing Intangible Assets, by Robert F. Reilly and Robert P. Schweihs, Ch.9 "Market Approach Methods", p.145, "INTRODUCTION. The market approach to valuing intangible assets is the process by which a market value is derived by ***analyzing similar intangible assets*** that have recently been sold or licensed, and then comparing these transactional intangible assets to the subject intangible asset." (emphasis added) *See also, id.*, p.148, "To apply the market approach, an analyst gathers data on sales, licenses, contracts, offers, refusals, options, and listings of intangible assets considered competitive with, and comparative to, the subject intangible asset."
[78] I addressed Mr. Deal's flawed analysis of the "but-for" world in § II.B.

the terms *benefits* and *costs* are different than their typical usage where the defendant's benefits (revenues) are offset by marginal costs (*i.e.*, culminating in defendant's profits). In his pursuit to identify potentially "unharmed" class members, Mr. Deal attempts to <u>further</u> reduce Google's unjust enrichment (*i.e.*, the "cost" to the class member) by also deducting intangible or non-monetary "benefits" the consumer may have received.

55.    The impact of Mr. Deal's analysis is similar as it relates to the compensatory damages model, but the implementation is different. The compensatory damages model involves identification of the class members' lost profits.[79] An analysis of lost profits first involves identification of the lost revenues that the defendant's actions have caused (*i.e.*, the lost market value of the personal information for which the class members were uncompensated).[80] Next, lost revenues are reduced by the costs that would have been incurred by the class members if the lost revenues had been realized.[81] Mr. Deal's methodology would reduce lost profits because of the "benefits" a plaintiff received from the receipt of personalized ads.

56.    Mr. Deal identifies three reasons why class members may have been "unharmed," in his view, including those who 1) received a greater intangible benefit than the uncompensated for cost of the sale or sharing of their personal information, 2) did not value the personal information sold or shared by Google, and 3) took action to prevent data sharing.[82] (Deal Report ¶¶ 100-135.) Mr. Deal proposes that unharmed class members should be excluded from either method to calculate damages.

57.    Similar to approaches employed elsewhere in his analysis, Mr. Deal 1) does not provide any basis to support his proposed methodology to find unharmed class members, 2) fails to identify any class member with one or more of the conditions he identifies, and 3) fails to

---

[79] LSH, Ch. 4 "Damages Theory, p.8, "Lost profits represent the difference between the profits the plaintiff would have realized but for the defendant's actions and the plaintiff's actual profits."
[80] LSH, Ch. 4, p.27.
[81] LSH, Ch. 4, p.28.
[82] It is my understanding that certain of Plaintiff' Experts will opine on Mr. Deal's assertions that certain Class Members were unharmed based on reasons 1 and 2 above.

perform any calculation to measure the extent of Class Members impacted, if any. For these reasons, as well as those reasons described in the sub-sections below, Mr. Deal has not identified any unharmed class members or any basis to offset Google's unjust enrichment or reduce compensatory damages.

### A. Mr. Deal Has No Basis to Assert that Class Members Received an Economic Benefit that Could Be an Offset to Google's Unjust Enrichment

58.    Mr. Deal asserts that a "substantial portion of class members derive benefits that exceed the costs of Google's at-issue data sharing" but Mr. Deal is not a privacy expert and does not appear to have qualifications to opine as to whether users receive non-monetary benefits let alone quantify those benefits.[83] (Deal Report ¶ 119.) Mr. Deal identifies two categories of class members that may meet his criteria: 1) individuals who received benefits from advertisements that should be offset against any harm and 2) individuals who place low to no value on information protection. (Deal Report ¶¶ 117 and 123, respectively).

59.    As an initial matter, Mr. Deal testified that he is not an expert in perceived value and utility of personalized ads, and he is not aware of any study that assigned economic value to the benefits he claims to be relevant.[84] Additionally, Mr. Deal has not identified any class members that match either of the two categories he has theorized. Moreover, Mr. Deal has not identified any Google documents that purport to consider or evaluate the benefit he assumes was conveyed.

---

[83] With respect to the costs of Google's data sharing, Mr. Deal states that "available data suggests a substantial share of Proposed Class Members having low to no costs of data sharing." (Deal Report ¶120) Mr. Deal appears to suggest that consumers place the value of private information they understand would be kept private, and that they understood would not be sold and shared with others, at zero or close to zero. I understand Plaintiffs' expert, Professor Neil Richards, has reviewed the literature Mr. Deal cites and disagrees with the conclusions that Mr. Deal (who admittedly is not a privacy expert) draws from them. (Richards Reb. ¶¶ 65-66).
[84] Deal Deposition Tr. at 362:9-18, 363:24-364:17.

1. <u>Mr. Deal's Assertions Regarding a Need to Offset Benefits Is Incomplete and Unreliable</u>

60.    Mr. Deal theorizes that unjust enrichment or the plaintiffs' compensatory damages "should be offset by any benefits [class members] received from the sharing of the at-issue data." (Deal Report ¶ 117.) Mr. Deal does not cite any basis to support such a deduction.

61.    The flaw in Mr. Deal's analysis is exposed by a review of Illustration 9 in the Restatement 3d as follows:

> *Without obtaining permission, Orchestra uses a photograph of Artist's sculpture to illustrate one page of a brochure advertising season subscriptions. It is conceded that this use of the image is an infringement of Artist's copyright. Artist is entitled to recover Orchestra's profits attributable to the infringement, but he is unable to produce any evidence of what these might have been (if any). Artist is likewise entitled to recover damages, but he is unable to show that he suffered any. Nevertheless, Orchestra is liable in restitution for the value of what it has obtained in violation of Artist's rights: in this case, the use it made of the photograph in question. The court determines that the reasonable price of a license permitting such use is $ 1000. Orchestra is liable to Artist in restitution (whether characterized as "damages" or "profits" under the Copyright Act) in the amount of $ 1000.*

62.    As seen in Illustration 9 presented above, the Orchestra used the Artist's property without permission. The Artist was unable to demonstrate that either (1) the Orchestra generated profits attributable to the infringement or (2) that he suffered damages. Despite these circumstances, the court awarded the reasonable market price of the photograph to the Artist. In this illustration, the Artist may have benefitted from the Orchestra's use of the photograph (*e.g.*, by increased exposure to a desirable market or enhanced reputation associated with the Orchestra's selection of his work). Yet, the illustration makes no mention of the need to measure and offset these or any other benefits from the reasonable market price.

63.    Even if Mr. Deal was correct, he has not performed any analysis to measure the supposed benefit(s) conferred. And even then, Mr. Deal's methodology is missing an important consideration—whether the plaintiffs requested, or had an opportunity to refuse, the supposed

benefit conferred.[85] For example, Mr. Deal uses an example of a Class Member that clicked on a personalized ad, received a coupon, and purchased a pair of $100 shoes at a $10 discount. (Deal Report ¶ 125.) Mr. Deal's contention that the value of this discount should be an offset to the damage calculation is unsupported. Mr. Deal does not consider whether the Class Member needed or wanted to purchase the shoes. Mr. Deal also does not consider (or test) whether the same shoes might have been available from an alternate reseller at a price of $90 or less—a retailer that did not incur the cost of the advertisement.[86] In the latter case, the Class Member experienced an unmeasured incremental cashflow loss arguably attributable to the advertisement. Mr. Deal also does not consider that a consumer may have been able to purchase these shoes without also having personal information shared with third parties without their consent. In total, Mr. Deal's speculation is contradictory, leads to different conclusions, and has no basis in evidence.

> 2. Mr. Deal Has No Basis to Assert that Class Members Perceived Their Benefit of Advertisements Reflecting Their Personal Information Fully Offset Google's Benefits of Providing those Advertisements

64.     Mr. Deal's second assertion is that "there is substantial evidence that many users do not place a meaningful value on the type of data at issue in this matter, consistent with low or zero cost of such data being shared." (Deal Report ¶ 120.) Once again, Mr. Deal is beyond his expertise. In this instance, Mr. Deal cites reports addressing the "privacy paradox" for a conclusion that is contrary to what studies show. I understand that those studies show not that people do not care, but that they become resigned to the idea that they can do nothing to stop it.[87] Mr. Deal simply speculates that, a Class Member who was not provided with, and did not otherwise know, data about Google's benefit from the use of their personal information, would

---

[85] I have not addressed the nature of Google's alleged conduct, however, the Restatement 3d observes "By contrast, a defendant's claim to credit or deduction will predictably be denied if allowance of the credit would permit a conscious wrongdoer to force the claimant to pay for unrequested services that the claimant had no opportunity to refuse." *See* Restatement 3d (h), *Deductions and credits*.

[86] Mr. Deal also does not identify any real-world occurrence of this issue.

[87] Professor Richards has addressed this issue in his rebuttal report. (Richards Reb. ¶¶ 67-71.)

not have cared what those amounts were. This speculation runs counter to contemporaneous Google analysis.[88]

65.    Even if Mr. Deal established that this is a valid concern that I should address, his claim is simply a re-formulation of his first claim in this category. That is, Mr. Deal's first claim is that a Class Member received a non-monetary benefit that offset Google's unjust enrichment, which he has not quantified. In this case, some subset of Class Members, without any identified data, perceived their benefit to be comparable to Google's perceived benefit, and netting these perceived benefits, results in an unjust enrichment amount of zero (*i.e.*, benefits offset as in Mr. Deal's first category).[89]

66.    Here again though, Mr. Deal has not identified a single Class Member who did not place value on their personal information much less the extent of such members.[90] Moreover, Mr. Deal does not identify his process to identify such members, whether such members were aware of the value of their personal information, or the extent of Google's profit from those users' personal information. Mr. Deal could have worked with privacy experts who might test his proposition, but he did not.

---

[88] GOOG-HEWT-00481219 at 220, "[S]haring user activity across multiple publishes (sites and apps) with hundreds of bidders may not be seen by most users as a fair value exchange for ad-supported free content…" *See also, id.* at GOOG-HEWT-00481221, "[M]ost if not all users won't be comfortable knowing that *all activity across Google publishers* is shared with multiple ad tech companies." (emphasis in original).

[89] Mr. Deal cites an FTC study regarding targeted advertising in general in support of his analysis. (Deal Report ¶ 127.) This study observes that consumers often underestimate the cost of personal data collection ("First, consumers often underestimate the degree and consequence of the personal data collection websites carryout in exchange for providing free digital goods and services (McDonald and Cranor, 2010; Acquisti, Taylor and Wagman, 2016)." *See* Lau, Y., "A Brief Primer on the Economics of Targeted Advertising," Federal Trade Commission, January 2020, pp. 9-10, available at https://www.ftc.gov/system/files/documents/reports/brief-primer-economics-targeted advertising/economic_issues_paper_-economics_of_targeted_advertising.pdf, accessed October 25, 2023.

[90] Deal Deposition Tr. at 362:24-363:12; 363:24-364:17.

**B.    Mr. Deal Has No Basis to Reduce Unjust Enrichment Related to Class Members that Purportedly Understood How Google's Used of Their Personal Information**

67.    Next, Mr. Deal speculates that certain class members may have been aware that Google shared personal information with advertisers that display targeted ads. (Deal Report ¶ 102.) This speculation does not address the challenged conduct here, which is sharing users' personal information in the RTB auction process with hundreds of third parties. Instead, Mr. Deal points to reports his team pulled from websites that purport to reflect that people may be aware of targeted advertising used by third parties, such as Apple.[91] Mr. Deal states his belief that some users are aware of targeted advertising. But Mr. Deal has not identified any basis relevant to his role as a damages expert to critique my methodology or the inputs to my methodology because of this belief.

68.    Mr. Deal concludes that such class members who chose to begin using, or continue to use, Google products instead of other options "is consistent with Google's sharing of the at-issue data not causing the class member to be in an economically inferior position." (Deal Report ¶ 100.)[92] That is, these class members "either (1) do not care about the data that is being shared, or (2) even if they do care, the benefits they obtain from the sharing exceed the costs of sharing." (Deal Report ¶ 101.) As a result, Mr. Deal claims these class members are economically unharmed.

69.    While Mr. Deal presents this unquantified group as a separate category of potentially unharmed class members, it is substantively the same as his first category (*see* § IV.A.1. above) That is, Mr. Deal claims these class members either 1) do not care that Google profited from, or 2) received benefits that exceed the uncompensated-for cost of, the sale or sharing of their personal information. In both instances, Mr. Deal assumes that Google is entitled to an offset of any potential unjust enrichment generated from these class members. I am not aware of a basis to support Mr. Deal's assumption, which assumes the unjust enrichment continues after the

---

[91] Deal Deposition Tr. at 303:23-305:5.

[92] This conclusion is again plagued with the problem that Mr. Deal does not define "at issue data," and could not clearly define what he meant in deposition. Deal Deposition Tr. at 315:8-318:2; 323:17-326:23.

identification of Google's profits to pursue offsets based on assumed intangible benefits perceived by harmed party.

### C.   Mr. Deal Has No Basis to Reduce Unjust Enrichment Related to Class Members that Purportedly Took Action to Prevent Sharing of Personal Information

70.    Mr. Deal also offers speculative opinions about the economic effect of class members' efforts to prevent data sharing. (Deal Report ¶ 111.) Mr. Deal does not rely on the reports of plaintiffs' technical experts and testified that he merely "skimmed" those reports.[93] In fact, those reports conclude that there is nothing class members can do to prevent Google from sharing their personal information in the real time bidding auction.[94]

## V.    THE CRITICISMS IN THE DEAL REPORT OF THE ALLOCATION METHODOLOGY ARE UNFOUNDED

71.    I proposed a methodology that could be used to allocate an award if 1) an award is made and 2) Google does not maintain sufficient data regarding the class members. (Regan Report ¶¶ 54–57.) In this circumstance, an estimate would be required to facilitate an allocation of an award.

72.    Mr. Deal finds flaws in the precision of my proposed allocation method because it involved estimation. (Deal Report ¶ 136.) Of course, an estimate will always be less precise than a calculation made with actual available data (*i.e.*, the circumstance in which an estimate is required). Yet, Mr. Deal fails to offer any alternative allocation methodology to allocate an award in the event his concerns are reliable. Mr. Deal also admits in his deposition that this is a post-award analysis:[95]

> *Q. Would you agree that allocation methodology is a post-award issue?*
>
> *A. That's -- yes. In the sense of I think that there obviously has to be an award to allocate. So it -- by definition, it would be something that would happen after -- literally, the allocation -- whatever methods used would -- would occur after an award is identified.*

---

[93] Deal Deposition Tr. at 37:14-16; 53:3-16.
[94] *See, e.g.*, Expert Report of Prof. Christopher Wilson, dated July 14, 2023.
[95] Deal Deposition Tr. at 366:22-367:4.

73.    Mr. Deal's first concern is that my proposed allocation methodology does not exclude "unharmed" class members. I addressed Mr. Deal's flawed analysis of what he considers to be "unharmed" class members in § IV above.

74.    Mr. Deal's second concern is that Google generated more RTB revenue from some class members than others.[96] (Deal Report ¶¶ 140-141.) As described above, however, an allocation only occurs post-award. If an award is provided, a method must be implemented to allocate that award. The limited circumstance in which my proposed methodology applied is if Google does not maintain data sufficient to enable an allocation reflective of the variability in revenue amongst class members. Again, Mr. Deal fails to acknowledge the conditions in which I proposed an allocation methodology or offer any alternative to the proposed allocation methodology responsive to his criticism.

75.    Mr. Deal's final concern relates to shared Google accounts. (Deal Report ¶ 143.) Here, Mr. Deal conflates the term class member with Google account holder. Class members are Google account holders subject to a U.S. Google TOS.[97] Accordingly, the allocation methodology I proposed was based on individual Google accounts irrespective of whether the Google account was shared with another person. This methodology is intuitive because the RTB revenue was generated based on the personal information associated with the Google account.

* * *

Dated: November 29, 2023

Greg J. Regan, CPA/CFF, CFE

---

[96] Mr. Deal focuses on the variability in the number of Bid Requests for the Named Plaintiffs, and separately, potential variability in RTB revenue for the Named Plaintiffs (Mr. Deal does not quantify the variability in RTB revenue). The variability in these two measures is interrelated and therefore I address Mr. Deal's criticism together.

[97] Motion for Class Certification, p. 4.

<u>APPENDIX C</u>

<u>CASE MATERIALS CONSIDERED</u>

Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Sealed ECF No. 583-4)

Declaration of Whitty Somvichian in Support of Google's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 584)

Expert Report of Bruce Deal in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Sealed ECF No. 584-8)

Expert Class Certification Report of Professor Zubair Shafiq, dated July 14, 2023 (Sealed ECF 545-5)

Expert Class Certification Report of Professor Christopher Wilson, dated July 14, 2023 (Sealed ECF 545-6)

Expert Class Certification Report of Professor Robert Zeithammer, dated July 14, 2023 (Sealed ECF 545-7)

Expert Class Certification Report of Professor Neil Richards, dated July 14, 2023 (Sealed ECF 545-9)

Expert Class Certification Rebuttal Report of Professor Zubair Shafiq, Ph.D., dated November 29, 2023

Expert Class Certification Rebuttal Report of Professor Robert Zeithammer, dated November 29, 2023

Expert Class Certification Rebuttal Report of Professor Neil Richards, Ph.D., dated November 29, 2023

Transcript and Exhibits of October 24, 2023 deposition of Bruce Deal

Transcript and Exhibits of October 30, 2023 deposition of Dr. Glenn Berntson

Transcript and Exhibits of November 15, 2023 deposition of Suneeti Vakharia

| | | |
|---|---|---|
| GOOG-HEWT-00035713 | GOOG-HEWT-00139966 | GOOG-HEWT-00456337 |
| GOOG-HEWT-00047091 | GOOG-HEWT-00162531 | GOOG-HEWT-00472042 |
| GOOG-HEWT-00059000 | GOOG-HEWT-00192670 | GOOG-HEWT-00481219 |
| GOOG-HEWT-00088587 | GOOG-HEWT-00259486 | GOOG-HEWT-00481705 |
| GOOG-HEWT-00130261 | GOOG-HEWT-00366010 | GOOG-HEWT-00481706 |

GOOG-HEWT-00481707

GOOG-HEWT-00481708

GOOG-HEWT-00481710

GOOG-HEWT-00482703

GOOG-HEWT-00482881