# EXHIBIT E
# to the Declaration of
# G. Berntson

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 44

## SEALED VERSION

## FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

**EXPERT CLASS CERTIFICATION REBUTTAL REPORT**
**OF PROFESSOR CHRISTOPHER WILSON**

**NOVEMBER 29, 2023**

**UNREDACTED VERSION FILED UNDER SEAL**

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 3

II.     SUMMARY OF REBUTTAL OPINIONS PROFFERED................................... 4

III.    THE DATA FIELDS SHARED AND SOLD IN GOOGLE RTB AUCTIONS ARE
        INTENDED TO BE UNIFORM AND ARE DESIGNED TO IDENTIFY
        INDIVIDUALS AND HOUSEHOLDS ................................................................... 5

        A.    Unique Identifiers in Google RTB Bid Requests are Designed to Uniquely
              Identify Individuals and Households ...................................................... 7

        B.    Dr. Striegel's Opinions About Cookie Matching and User Lists are Inaccurate
              and Misleading, and Reflect a Lack of Expertise in the Field ............................... 10

IV.     THE DATA SHARED AND SOLD IN GOOGLE RTB AUCTIONS IS
        REASONABLY CAPABLE OF BEING ASSOCIATED WITH INDIVIDUALS
        AND HOUSEHOLDS ALL THE TIME................................................................. 13

        A.    Bid Requests Produced by The New York Times and The Trade Desk are
              Uniformly Identifiable ............................................................................ 14

        B.    Dr. Striegel Misconstrues and Misattributes the Expected Functionality of
              Google RTB ............................................................................................. 19

        C.    Fingerprinting .......................................................................................... 21

V.      THERE IS NO REASONABLE WAY FOR A GOOGLE ACCOUNT HOLDER
        TO AVOID HAVING HIS OR HER DATA SHARED AND SOLD IN GOOGLE
        RTB AUCTIONS..................................................................................................... 22

VI.     USER AND PUBLISHER CONTROLS DO NOT STOP THE SHARING AND
        SELLING OF GOOGLE ACCOUNT HOLDER DATA IN GOOGLE RTB
        AUCTIONS .............................................................................................................. 24

        A.    User Settings, Actions, and Tools........................................................... 24

        B.    Publisher Controls.................................................................................... 37

        C.    Fingerprinting Does Not Explain the Results of my GAP Experiment ................. 41

Expert Class Certification Rebuttal Report of C. Wilson

## I.    **INTRODUCTION**

1.       This case concerns Google RTB, a proprietary Internet-based advertising auction platform through which Google transmits information about Internet users to hundreds of third-party companies around the world, including ad exchanges, advertisers and other entities.

2.       In my role as a subject matter expert retained by the Plaintiffs in this case, on July 14, 2023, I submitted a report ("Wilson Report" or "Report") to the Court in which I offered several opinions relevant to Plaintiffs' Motion for Class Certification.[1] At a high-level, these opinions concern: (a) the uniformity of the structure of bid requests in Google RTB; (b) evidence that bid requests in Google RTB do in fact distribute information that is reasonably capable of being associated with individuals or households; (c) the unavoidability of Google RTB in the real world; and (d) the failure of the Google Account Ad Personalized Opt-Out Setting (a.k.a. "GAP") to halt the flow of Google account holder data to RTB participants.

3.       I was deposed by Google's counsel on August 31, 2023, and provided clarifying information about my Report and the opinions therein.

4.        Subsequent to the submission of my Report and my deposition, Google filed its opposition to Plaintiffs' motion for class certification which included, among other things, the declaration of Glenn Berntson ("Berntson Declaration") and expert reports from Dr. Aaron Striegel ("Striegel Report") and Dr. Konstantinos Psounis ("Psounis Report"). I have reviewed these documents, the associated depositions of Dr. Berntson, Dr. Striegel and Dr. Psounis, and the data and source code provided by Dr. Striegel.

5.       In general, Dr. Berntson's declaration presents information about Google RTB. I agree with some of the information Dr. Berntson presents in his declaration. However, there are inaccuracies and unsupported claims in Dr. Berntson's declaration that I will respond to below.

6.       Dr. Striegel's Report also presents information about Google RTB. Further, Dr. Striegel directly engages with the content of my Report, asserting that many of my opinions are

---

[1] Expert Class Certification Report of Prof. C. Wilson in Support of Plaintiffs' Motion for Class Certification, dated July 14, 2023 ("Wilson Report") (ECF 545-6).

incorrect and unsupported. On these points, Dr. Striegel is wrong. Furthermore, there are inaccuracies, unsupported claims, and misrepresentations in Dr. Striegel's Report, all of which I respond to below.

7.      Dr. Psounis's Report is based substantially on the work done and conclusions reached by Dr. Striegel. To the extent that Dr. Psounis criticizes or disagrees with my opinions based on Dr. Striegel's work, these criticisms are baseless, because Dr. Striegel's analysis and conclusions are wrong.

8.      In this Rebuttal Report, I address the inaccurate, unsupported, and misleading claims in the Berntson Declaration, the Striegel Report, and the Psounis Report.

9.      I organize this Rebuttal Report using the same structure as my original Report, to aid the Court in mapping my clarifications and opinions herein back to the analysis and opinions in my original Report.

10.     In addition to what was set forth in my original Report, I identify any additional materials reviewed and relied upon in the attached Exhibit A.

11.     I reserve the right to amend this Rebuttal Report and my opinions if additional data or documents are produced, or if additional testimony, declarations or expert reports are provided to the Court.

## II.     SUMMARY OF REBUTTAL OPINIONS PROFFERED

12.     Based on the documents and datasets I reviewed when preparing my Report, as well as the Berntson Declaration, my opinion about the structure of Google RTB bid requests remains the same: Google RTB bid requests are intended to be uniform and are designed to identify individuals and households.

13.     Based on the data provided by the New York Times and The Trade Desk, it is my opinion that ▮▮% of Google RTB bid requests are identifiable, i.e., they are explicitly linked to, or reasonably capable of being linked to, an individual or household. This fact directly contradicts insinuations to the contrary made in the Striegel Report. My opinion that the information

commonly shared and sold in Google RTB is reasonably capable of being associated with individuals and households thus remains the same.

14.    Based on the documents and datasets I reviewed when preparing my Report, as well as analysis that I presented in my Report, my opinion about the ubiquity of Google RTB remains the same: it is very unlikely that there are any Google U.S. account holders who, over the entire seven-year Class Period, did not have their data shared and sold through Google RTB at least once, and more likely thousands and thousands of times. Dr. Berntson and Dr. Striegel present no evidence to undermine my opinion. Although Dr. Striegel questions the conclusions of the analysis of Named Plaintiff data that I present in my Report, I explain below why his concerns are unfounded.

15.    Based on the documents and datasets I reviewed when preparing my Report, as well as the Berntson Declaration and Striegel Report, it is my opinion that user and publisher controls do not stop Google RTB from selling and sharing Google account holders' data. In my Report, I present evidence that one such control, Google Account Ad Personalized Opt-Out Setting (a.k.a. "GAP"), does not prevent Google RTB from selling and sharing account holder data. Although Dr. Striegel questions the conclusions of my experiment, I present evidence that his concerns are unfounded. In addition, although Dr. Berntson and Dr. Striegel introduce many more controls, I discuss below how these controls similarly fail to stop Google RTB from selling or sharing account holder data.

## III.    THE DATA FIELDS SHARED AND SOLD IN GOOGLE RTB AUCTIONS ARE INTENDED TO BE UNIFORM AND ARE DESIGNED TO IDENTIFY INDIVIDUALS AND HOUSEHOLDS

16.    Dr. Striegel states that, in his opinion, "Google does not share a 'common' or 'uniform' set of data in all RTB bid requests, as Drs. Shafiq and Wilson contend."[2] Dr. Striegel backs up his assertion by claiming that "[Dr. Shafiq and Dr. Wilson's] opinions are incorrect and

---

[2] Striegel Report ¶ 16 (emphasis in original).

the data samples in this case show significant variation in when data fields are populated[.]"[3] Dr. Striegel's statements fundamentally mischaracterize the opinions that I offer in my Report.[4]

      17.     In my Report, I state the following opinion:

> "[I]t is my opinion that there is a uniform set of information contained in all Google RTB bid requests that is shared with and sold to RTB participants. That is, based on Google's own documentation, the Google RTB bid requests are intended to be uniform in the types of information shared and sold."[5]

In other words, my opinion is that the <u>structure</u> of bid requests in Google RTB is uniform: the <u>fields</u> of information in OpenRTB and RTB Protobuf (also known as Authorized Buyers)[6] have been consistent throughout the proposed class period. In my report, I offer no opinions and perform no analysis about the frequency at which fields are populated in Google RTB bid requests.

      18.     To the extent this was ambiguous in my Report, it was plainly clarified during my deposition:

> "Q.    Then the next sentence goes on to say, 'That is, based on Google's own documentation, the Google RTB bid requests are intended to be uniform in the types of information shared and sold.' So I'm trying to understand what your opinion exactly is. Are you saying that the data in RTB bid requests is intended to be uniform across all bid requests but may actually differ in individual bid requests, or are you saying that the data contained in all bid requests is literally uniform across all bid requests sent to all RTB participants?
>
> …
>
> A.  (Witness reviews document.) Okay. So as I say in Paragraph 13 and Subpoints A and B, what I am looking at here is Google's developer documentation, and these sample bid requests produced by some RTB participants. <u>And what I am saying is uniform is the structure of these bid requests. The fields that are in them are largely uniform. So I am not saying the second thing you said, that every individual value and every individual field is always the same.</u>"[7]

---

[3] Striegel Report ¶ 90.

[4] Dr. Psounis makes the same error. Psounis Report ¶¶ 18, 20.

[5] Wilson Report ¶ 13.

[6] Striegel Report ¶ 45

[7] Wilson Deposition Tr. at 27:12-28:11 (emphasis added). Excerpts from the Wilson Deposition Tr. are attached as Ex. 60 to the Reply Declaration of Elizabeth C. Pritzker in Support of Plaintiffs' Reply ("Pritzker Reply Decl.").

19.     Dr. Berntson's declaration agrees with my opinion that the structure of Google RTB bid requests is uniform. He describes the fields of "generally include[d] information"[8] in Google RTB bid requests and lists many of them in his declaration.[9] Dr. Striegel also represents that Google's documentation for OpenRTB and RTB Protobuf are an accurate description of the protocols that Google RTB uses to distribute bid requests to RTB participants.[10]

20.     Despite the plain language of my Report and my clear statements during my deposition (which Dr. Striegel reviewed to prepare his Report), Dr. Striegel mischaracterizes my opinion as resting on an analysis of the frequency at which fields in RTB bid requests are populated.[11] My opinion does not rest on such an analysis; nor did I perform or present results of such an analysis in my Report.[12]

21.     As a result of this mischaracterization and misapprehension, the bulk of Dr. Striegel's critique with respect to my report is misplaced, and does not impugn the core conclusion, which is that: "[T]here is a uniform set of information contained in all Google RTB bid requests that is shared with and sold to RTB participants. That is, based on Google's own documentation, the Google RTB bid requests are intended to be uniform in the types of information shared and sold."[13]

**A.     UNIQUE IDENTIFIERS IN GOOGLE RTB BID REQUESTS ARE DESIGNED TO UNIQUELY IDENTIFY INDIVIDUALS AND HOUSEHOLDS**

22.     Dr. Striegel asserts that, in my Report, I do not explain how the unique identifiers

---

[8] Berntson Declaration ¶ 9.

[9] Berntson Declaration ¶¶ 9, 18-35.

[10] Striegel Report ¶ 45.

[11] Striegel Report ¶¶ 16, 90.

[12] Google's opposition brief similarly mischaracterizes my opinion. Google claims that I "disclaimed [my opinions] when confronted with findings from the very data [I] claimed [to have] reviewed[.]" Google Opp. (ECF 583-4) at 1:13-15. Not so. I have consistently maintained that my report and opinion pertain to the uniformity of structure, not frequency of fields (an analysis which was conducted by Prof. Zubair Shafiq.

[13] Wilson Report ¶ 13.

that Google RTB sells and shares in bid requests (e.g., the Google User ID and mobile device IDs) can be used to identify individuals.[14] This is true: I do not explain this in my report because there is no need to. There is no disagreement that the purpose of these identifiers is to uniquely identify individuals and households so that RTB participants can target them with ads and build profiles about them.

23.    Google openly discusses how Ad Manager—its service suite that includes Google RTB—enables advertisers to identify specific users and target them with ads. On its Ad Manager website Google posts "success stories" from publishers and advertisers. A cursory search of these testimonials lays bare how Google commodifies user identity:

> "AccuWeather found that integrating Google Ad Manager and Analytics 360 gave its team unique insight into the value of certain audience segments for different advertiser verticals. [...] This revenue increase was driven by users who were actively in-market to travel and were looking at weather in locations like the Turks & Caicos and Barbados. With insights like these, the team has been able to create more relevant advertising packages with high-value audience segments that sales teams can sell to directly or through programmatic marketplaces like Google Ad Manager."[15]

In this example, a publisher (Accuweather) was able to increase advertising revenue by enabling RTB participants to target travel ads to individuals who searched for weather reports in tropical destinations. Google states that this occurred, in part, through their programmatic marketplace, i.e., Google RTB.

> "Many of Priceline's advertisers were looking for very specific inventory. Airlines, for example, want to reach consumers who are in the market for flights. If a consumer researched a flight on Priceline but didn't complete the transaction, Priceline would've lost the opportunity to drive conversions for its airline partner. Today, things are different. Priceline can segment in-market flight seekers more effectively in Google Ad Manager and extend its reach to those audiences. That

---

[14] Striegel Report ¶¶ 147, 152.

[15] AccuWeather delivers value with Google Ad Manager and Google Analytics 360, Google Ad Manager Success Story, available at https://admanager.google.com/home/success-stories/case-study-accuweather-google-ad-manager-analytics-360/, accessed November 4, 2023.

way, the airline partner's messages get to users programmatically, via all user touchpoints, and even outside Priceline's network"[16]

In this example, a publisher (Priceline) enabled advertisers (airlines) to target ads to individuals who searched for flights on Priceline. These ads were served to these individuals across "all user touchpoints" (i.e., websites and apps other than Priceline) "programmatically" (i.e., via Google RTB).

24.    As I describe in my Report,[17] the advertisers in these examples can target ads to specific people or households based on their prior web browsing and app usage history because these individual behaviors are being tracked and associated with unique identifiers (e.g., Google Biscotti cookie on the web and the mobile device ID on smartphones and tablets). Google RTB sells and shares all this data together during cookie matching and in RTB bid requests.

25.    Contrary to his criticism regarding a lack of "explanation,"[18] Dr. Striegel recognizes that the purpose of ad exchanges like Google RTB are to sell and share data linked to individuals and households, and that this is accomplished using technologies like cookies. His understanding is evidenced by his own published work. His ICC 2023 paper—on which he states that his expertise is based—includes a section describing how RTB exchanges function. He writes that "[t]he amount of the bid depends on the user information" and that "user information (i.e., search history) [is collected] through a variety of online tracking techniques such as cookies." He also states that bid requests are "populate[d] with information of the user."[19]

---

[16] Priceline increases ROI for advertising partners in a mobile world, Google Ad Manager Success Story, available at https://admanager.google.com/home/success-stories/case-study-priceline-increases-roi-in-mobile-world/, accessed November 4, 2023.

[17] Wilson Report ¶¶ 23-24, 33-49.

[18] Striegel Report ¶¶ 147, 152.

[19] Alamin Mohammed, Theo Karagioules, Emir Halepovic, Shangyue Zhu, and Aaron Striegel, rePurpose: A Case for Versatile Network Measurement, ICC 2023 (May 28, 2023), available at https://ieeexplore.ieee.org/abstract/document/10279020 (referenced in the Striegel Report at ¶ 12).

26.     Thus, it is my opinion that the purported failure to state the obvious is no failure at all. The very purpose of these identifiers—as used in the advertising industry and as acknowledged by both Google and Dr. Striegel—is to uniquely identify users and devices.

**B.     DR. STRIEGEL'S OPINIONS ABOUT COOKIE MATCHING AND USER LISTS ARE INACCURATE AND MISLEADING, AND REFLECT A LACK OF EXPERTISE IN THE FIELD**

27.     In his report, Dr. Striegel makes statements about the technical foundations of Google RTB—specifically, about cookie matching and user lists—that misconstrue my Report and are inaccurate and misleading. I will address each of these criticisms in turn.

28.     <u>Cookie Matching</u>: Dr. Striegel makes assertions about cookie matching that misconstrue my Report and that are inaccurate. Dr. Striegel writes:

> "Dr. Wilson contends the *hosted_match_data* field can be used to show that successful cookie matching occurred. But Dr. Wilson fails to account for the fact that the *hosted_match_data* is included in only a fraction of bid requests."[20]

It is unclear what point Dr. Striegel is attempting to make because his statements are incongruous. I do not claim that *hosted_match_data* is uniformly populated anywhere in my Report, so it is not clear what I am not "accounting" for. In my Report, I simply describe a field that Google RTB makes available to RTB participants in bid requests—*hosted_match_data* in this instance—and how the data in that field, when it is populated, is interpreted—as a matched cookie with an RTB participant. Dr. Berntson confirms that my description of this field is correct.[21]

29.     Fields in Google RTB are not distributed in isolation or small groups. Rather, each and every Google RTB bid request contains many common fields, which are populated and distributed together. I presented truncated examples of bid requests in my Report (Tables 2 and 3) to illustrate this point: RTB participants receive all the populated fields of data for a given bid request together, and they rely on all the fields that have been populated in each bid request when making bidding decisions (or when storing data to construct user profiles).

---

[20] Striegel Report ¶ 150.

[21] Berntson Declaration ¶ 23.

30.    It is vital that bid requests be analyzed in their totality because they contain multiple fields that can be used to uniquely identify a device, person, or household. I identify these fields in my report in Table 1. The *google_user_id, hosted_match_data, session_id, advertising_id, and encrypted_advertising_id* all contain unique identifiers that are associated with a device, person, or household. Furthermore, the *user_agent, ip, detected_language*, various other device- and location-specific fields, and others identified by Google can be used to calculate accurate and stable probabilistic identifiers (a.k.a. fingerprints).

31.    It is not necessary for *hosted_match_data* to be populated in each bid request for that request to be reasonably capable of being associated with an individual or household, because Google RTB bid requests potentially contain many fields of identifiable data. *hosted_match_data* is just one of these fields.

32.    Dr. Striegel goes on to claim that "Dr. Wilson does not explain how [the cookie matching] process could result in the identification of any individuals[.]"[22] This assertion is incorrect. As I describe in my Report, Google RTB distributes a *google_user_id* in bid requests and Google's own documentation defines the field as "[t]he Google ID for the user. This field may be the same as the Google ID returned by the cookie matching service[.]"[23] I also describe in my Report how RTB participants can match their unique identifiers for devices, people, and households (stored in cookies) with Google RTB's unique identifiers via the cookie matching API offered by Google.[24]

33.    Dr. Berntson confirms my description of the cookie matching process offered by Google RTB and the implications of this functionality. He writes:

> "RTB participants may utilize their own cookies, in the same way Google uses a Biscotti. 'Cookie matching' allows RTB participants to match their cookies with Google's Biscotti for the same browser. This process allows an RTB participant,

---

[22] Striegel Report ¶ 150.

[23] Wilson Report ¶¶ 34-42 and Table 1.

[24] Wilson Report ¶¶ 43-49.

for example, to limit the bid requests they receive to those involving users that they previously interacted with, as determined by the presence of their cookies."[25]

Dr. Berntson's example use case of cookie matching is illustrative, as it confirms that this point of cookie matching is to allow RTB participants to identify individual users (using cookies).

34.    Dr. Striegel makes additional assertions about cookie matching that misconstrue my Report and are inaccurate. He writes:

> "Dr. Wilson also asserts that Google uniformly shares a user's complete IP address through its cookie matching service. This is inaccurate. Google does not share a device's complete IP address in a RTB bid request, only a truncated IP address. In the cookie matching process, the user's device can connect with the RTB participant. This is not directly transmitted from Google but rather the complete IP address is received as part of the expected Internet protocol."[26]

The second sentence in this quote is incongruous and irrelevant: it refers to RTB bid requests, not cookie matching. The third sentence is misleading: as I explained in my report, when Google initiates cookie matching this causes users' browsers to contact the RTB participant,[27] i.e., Google is solely responsible for the Internet protocol transmissions that reveal users' complete (not truncated) IP addresses to RTB participants. Thus, my assertion is correct; Dr. Striegel is wrong.

35.    That Dr. Striegel misunderstands the basic dynamics of Google RTB's cookie matching API and how it interacts with Internet protocols highlights his lack of expertise about online advertising systems, and specifically undermines his claims of being an expert in computer networking.

36.    <u>User Lists</u>: Dr. Striegel states in his report that Google stopped distributing user list identifiers in Google RTB bid requests by at least 2018.[28] This is wrong. As confirmed by Dr. Berntson, Google continued to share user lists identifiers in RTB bid requests through early 2020.[29]

---

[25] Berntson Declaration ¶ 16.

[26] Striegel Report ¶ 151 (citations omitted).

[27] Wilson Report ¶¶ 43-49.

[28] Striegel Report ¶153.

[29] Berntson Declaration ¶ 35.

37.     Dr. Striegel mischaracterizes why user lists are privacy invasive for Google account holders. He writes that his "understanding is that [the user list] did not identify individuals and was only an identifying value for a specific user list created by an RTB participant."[30] This statement is correct: the *user_list.id* field never contained unique identifiers for users. What the *user_list.id* field contained was data about the browsing history of a specific device, person, or household.[31]

38.     Regardless of when the user list field was deprecated, Dr. Berntson reveals that this is a distinction without meaning. Dr. Berntson states that RTB participants can still use "user lists as a filter, to receive bid requests only for a subset of their users they are interested in."[32] Thus, even in this modified form, user lists are still tantamount to announcing the prior browsing behavior of specific Google account holders to RTB participants.

## IV.     THE DATA SHARED AND SOLD IN GOOGLE RTB AUCTIONS IS REASONABLY CAPABLE OF BEING ASSOCIATED WITH INDIVIDUALS AND HOUSEHOLDS ALL THE TIME

39.     Dr. Striegel states that "data samples in this case show significant variation in when data fields are populated, including the key data fields Plaintiffs emphasize in this case."[33] He analyzes samples of data provided by the New York Times and The Trade Desk and highlights cases where specific fields in the datasets are not uniformly populated. Based on this analysis, Dr. Striegel argues that Google's RTB bid requests do not contain a uniform or commonly populated set of fields.

40.     Dr. Striegel's analysis intentionally misses the point of why I discussed the New York Times and The Trade Desk data sets in my report and is incorrect in several fundamental ways, which renders his opinions both incorrect and misleading. As I show below, the datasets produced by The Trade Desk and the New York Times demonstrate the opposite conclusion: the

---

[30] Striegel Report ¶153.

[31] Wilson Report ¶¶ 68-74.

[32] Berntson Declaration ¶ 35.

[33] Striegel Report ¶ 90.

fields in bid requests generated by Google RTB are sufficiently well-populated that they are uniformly identifiable, i.e., each bid request can be reasonably associated with a unique device, person, or household.

41.     Moreover, as his Report demonstrates, Dr. Striegel is not qualified to perform the analysis that he presents in his report. Dr. Striegel states that his "research group has done significant recent work on the interplay of network instrumentation and advertising." This "significant" work comprises a single academic paper.[34] This is the only academic research that Dr. Striegel has performed that is related to online advertising or RTB in any way, and its substance is not relevant to this case in any meaningful respect. In this paper, Dr. Striegel and his co-authors present a hypothetical system that could speed up how online ads are downloaded. In this work, Dr. Striegel does not examine real tracking, advertising, or RTB systems in any way, or demonstrate more than cursory understanding of how these systems operate.

42.     Dr. Striegel confirmed during his deposition that he has no first-hand experience measuring the prevalence or amount of information flows in online advertising systems.[35]

43.     As demonstrated below, Dr. Striegel's lack of experience and qualifications result in an analysis that is fundamentally flawed and reflects his misunderstanding of basic concepts and datasets.

A.     **BID REQUESTS PRODUCED BY THE NEW YORK TIMES AND THE TRADE DESK ARE UNIFORMLY IDENTIFIABLE**

44.     There are three serious problems with Dr. Striegel's analysis of The New York Times and The Trade Desk data, which render his opinions incorrect and unreliable. I address each in turn below.

45.     The first problem with Dr. Striegel's analysis is that he examines whether fields are

---

[34] Striegel Report ¶ 12; *see also* Alamin Mohammed, Theo Karagioules, Emir Halepovic, Shangyue Zhu, and Aaron Striegel, rePurpose: A Case for Versatile Network Measurement, ICC 2023 (May 28, 2023), available at https://ieeexplore.ieee.org/abstract/document/10279020.

[35] Striegel Deposition Tr. at 15:11-17:3. Excerpts from the Striegel Deposition Tr. are attached as Ex. 54 to the Pritzker Reply Decl.

populated in isolation or in small groups.[36] This is improper and misleading, because the omission of one or two fields in any bid request does not reveal whether that bid request is reasonably capable of being associated with an individual or household. To understand whether a given bid request contains enough data to be reasonably capable of being associated with an individual or household requires looking at each bid request in its totality (i.e., all the data in all the fields of the bid request in question), which is, of course, how RTB bid participants view the data in the real world. Dr. Striegel's approach of viewing each field or a few fields in isolation, without regard for all of the fields as a whole, reflects his lack of expertise and experience; his methodology simply does not reflect the reality of how RTB and RTB bid participants operate.

46.     One particular claim by Dr. Striegel exemplifies why it is inappropriate and misleading to analyze fields in Google RTB bid requests in isolation. Dr. Striegel notes that ███% of the user-agents in bid requests in The Trade Desk dataset are generalized (i.e., three of the four version numbers of the web browser are replaced with zeroes).[37] Dr. Berntson describes user-agent generalization as an "additional privacy measure[.]"[38] The implication of Dr. Striegel's statement is that users' privacy is somehow protected in these bid requests where he identifies user-agent generalization. The Trade Desk dataset instead demonstrates the opposite: that user-agent generalization offers no privacy benefit. In the bid requests where the user-agent is generalized, Google RTB still populates ████████████████████████████████████████████ ██████████████████████, which provide ample entropy to compute fingerprints.[39] Furthermore, ██% of the bid requests with a generalized user-agent also included a ██████████████████████ ██████████, meaning that these bid requests are immediately identifiable and user-agent generalization serves no purpose.

---

[36] Striegel Report ¶¶ 92-109.

[37] Striegel Report ¶ 101.

[38] Berntson Declaration ¶ 28.

[39] These fields are populated in at least ██% of bid requests in The Trade Desk dataset and are not generalized by Google RTB, with the exception of ████████████

47.     The second problem with Dr. Striegel's analysis is that he examines the wrong dataset from the New York Times. The New York Times produced several datasets, of which the largest two are the "NetworkRequests" and "NetworkBackfillRequests" datasets. Dr. Striegel analyzes whether fields were populated using the "NetworkRequests" dataset, which is incorrect and inappropriate. For the analysis he was seeking to achieve, he should have used the "NetworkBackfillRequests" data set. Google defines "backfill" as follows:

> "Inventory that has not been pre-sold or reserved. As a verb, 'backfill' means to serve ads to this inventory. Backfill inventory is often monetized with ads sold by ad networks, via non-guaranteed campaigns, or in an auction."[40]

In other words, the "NetworkRequests" dataset includes impressions that the New York Times sold directly to advertisers, without going through the Google RTB auction. In contrast, "NetworkBackfillRequests" is the appropriate dataset to analyze because it contains the impressions that the New York Times sent to the Google RTB auction.

48.     Dr. Striegel states that the "NetworkRequests" dataset "contains ███████ entries[.]"[41] This too is incorrect: the dataset contains ████████ entries. So, in addition to analyzing the wrong dataset, Dr. Striegel's analysis apparently misses 50.8% of the dataset.

49.     Dr. Striegel quotes my deposition, where I stated that I felt the New York Times data was appropriate for the analysis I presented in my report, as justification for his analytical approach.[42] My statement remains true: the New York Times data is appropriate for the analysis I presented in my report—and that analysis was limited to looking at the structure of bid requests and fingerprinting,[43] not an analysis of whether fields were being uniformly populated. Dr. Striegel misconstrues the scope of my opinion, my analysis, and my deposition as justification for

---

[40] Google Ad Manager Help, Glossary, https://support.google.com/admanager/table/7636513?hl=en, accessed November 4, 2023.

[41] Striegel Report ¶ 102.

[42] Striegel Report ¶ 102, fn. 81.

[43] Wilson Report ¶¶ 38-40, 79.

analyzing what is plainly the wrong New York Times dataset for the purposes for which he was using it.

50.    In his deposition, Dr. Striegel confirmed that he did not examine the "NetworkBackfillRequests" dataset. He also stated that he was unaware that it existed, or what the difference is between the two datasets. This highlights Dr. Striegel's lack of familiarity with online advertising systems in general, and the datasets he was tasked with analyzing in particular.[44]

51.    Dr. Striegel states that the ▰▰▰▰ field is empty in ▰▰% of bid requests in the New York Times dataset.[45] This statement exemplifies the problems that stem from Dr. Striegel's use of an inappropriate dataset: the ▰▰▰▰ is populated ▰▰% of the time in the "NetworkBackfillsRequests" dataset. (Dr. Striegel also points out that the most common ▰▰▰▰ is ▰▰▰▰▰▰▰, a fact that is self-evident given that these are bid requests produced by the New York Times and no other publisher.)

52.    A third problem with Dr. Striegel's analysis is that he fails to account for bid requests that originate from international users. In the New York Times data, specifically, many impressions were generated by individuals living outside the U.S. As this case pertains only to U.S.-based Google account holders, examining bid requests from international users is not appropriate.

53.    Failing to filter out bid requests from international users causes Dr. Striegel to present misleading results in his report. For example, Dr. Striegel states that ▰▰% of the ▰▰▰▰ and ▰▰▰▰ fields were empty in the New York Times "NetworkRequests" dataset, while ▰▰% of the ▰▰▰▰ and ▰▰▰▰▰ fields were empty.[46] Dr. Striegel fails to account for the fact that these fields may be left intentionally blank by Google RTB when a user is in a country where these geographic designations do not exist. After filtering out bid requests from non-U.S. users in the "NetworkRequests" dataset (accounting for ▰▰▰▰ out of ▰▰▰▰ rows, or ▰▰% of

---

[44] Striegel Deposition Tr. at 97:16-99:4 (Pritzker Reply Decl. Ex. 54).

[45] Striegel Report ¶ 108.

[46] Striegel Report ¶ 105.

the dataset), I found that the ███ and ████ fields were populated in ██ % of rows, while ████ and ██████ were populated in ██ % of rows.

54.     After addressing Dr. Striegel's various analytical and methodological failures, I analyzed the data produced by The Trade Desk and the correct dataset produced by The New York Times[47] to determine the percentage of bid requests in each dataset that are identifiable, i.e., contain a unique identifier or sufficient data to compute a fingerprint using industry standard methods.[48]

55.     In The Trade Desk dataset, I consider a bid request to contain a unique identifier if the ██████ or ████████ field is populated, and I consider a bid request to be finger-printable if the ██████ field and either ██████ field (██████████) is populated.[49]

56.     In the New York Times "NetworkBackfillRequests" dataset, I consider a bid request to contain a unique identifier if the ████ field is populated, and I consider a bid request to be finger-printable if at least one of the user-agent fields is populated ████████████ ██████ ) and at least one of the location fields is populated (████████████████ ██████ ).[50]

---

[47] TTD-Hewitt-0000002 and the 24 "NetworkBackfillRequests" CSV files produced by the New York Times.

[48] I note that my analysis in this context continues to conform to the parameters of my original report, i.e., my opinion is based on common structure of fields and the ability to uniquely identify individuals or households based on that structure. An analysis with respect to frequency of fields populated via Google RTB with respect to New York Times and Trade Desk data falls within the purview of Prof. Shafiq.

[49] In the Trade Desk Dataset, the fields I rely on are populated at the following rates: ████████████ (██%), ████████ (██%), ████████ (██%), ████████ (██%), and (██%).

[50] The New York Times datasets do not contain IP address fields, so I use the location-related fields instead. In the New York Times "NetworkBackfillRequests" dataset, the fields I rely on are populated at the following rates: ████████ (██%), ██████ (██%), ██████ (██%), ████████ (██%), ██████ (██%), ██████ (██%), ██████ (██%), ██████ (██%), and (██%).

57.     The Trade Desk dataset contains ███████ bid requests, after removing ███ bid requests that were from non-U.S. users or where Google RTB was not the originating ad exchange.

58.     In The Trade Desk dataset, ████% of the bid requests are identifiable, either because they contain a unique identifier or they can be fingerprinted.

59.     The New York Times dataset contains ████████ bid requests, after removing ███████ bid requests that were from non-U.S. users.

60.     In the New York Times dataset, █████% of the bid requests are identifiable, either because they contain a unique identifier or they can be fingerprinted.

61.     This analysis supports my original opinion in my Report, that Google RTB bid requests contain a uniform or "common" set of fields, as well as my opinion that bid requests are uniformly identifiable, based on the fields that are populated. This analysis also demonstrates why Dr. Striegel's opinions are incorrect and misleading.

62.     Dr. Striegel states that "Dr. Wilson does not address the fact that the google_user_id […] is omitted in a substantial portion of bid requests[,]" and asserts that this undermines my opinions.[51] As I have clarified above, I do not offer an opinion on the frequency at which fields in Google RTB bid requests are populated in my Report, so Dr. Striegel is attempting to attack an opinion I did not render. Further, as I demonstrate here, the Google RTB bid requests in the New York Times and The Trade Desk datasets are uniformly identifiable, which directly addresses Dr. Striegel's concern that in some Google RTB bid requests the google_user_id field may not be populated.

### B.     DR. STRIEGEL MISCONSTRUES AND MISATTRIBUTES THE EXPECTED FUNCTIONALITY OF GOOGLE RTB

63.     As I have shown in the above section, Dr. Striegel's opinion that "data samples in this case show significant variation in when data fields are populated"[52] is meaningless because the data samples are uniformly identifiable. Additionally, Dr. Striegel's assessment of variation of

---

[51] Striegel Report ¶ 148.

[52] Striegel Report ¶ 90; *see also* Striegel Report ¶ 17.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF C. WILSON

when data fields are populated is flawed because he does not properly analyze the data fields in context. When we take into account how Google designed Google RTB's systems to function, what Dr. Striegel describes as "variation" is in fact the normal operation of Google RTB—normal operation that RTB participants are aware of and account for when they receive bid requests.

64.     I already discussed one instance where Dr. Striegel's failure to consider the normal operation of Google RTB leads him to present misleading conclusions: in his discussion of empty ███, ████, ██████, and ███████ fields in the New York Times dataset,[53] where Dr. Striegel neglects to account for non-U.S. users.

65.     Dr. Striegel notes that the New York Times dataset does not include latitude, longitude, or accuracy fields.[54] It is unclear why he chooses to highlight this omission, as these fields were simply not produced by the New York Times. There is no dispute that Google RTB routinely distributes these fields in bid requests, ████████████████████████████ ████████████████.[55]

66.     Dr. Striegel notes that the ██████ field is empty in ██% of bid requests in the New York Times dataset.[56] Because Dr. Striegel neglected to examine the data in the related ██ ██, he failed to notice that the ████████████ is sometimes conveyed in this field instead of ██████. Specifically, in the ██% of instances where ███████ is empty, the ██████████ in question is ████████████ and ██████████████████

---

[53] Striegel Report ¶ 105.

[54] Striegel Report ¶ 104.

[55] As noted above, Prof. Shafiq conducted a frequency analysis of the RTB bid request fields based on Google's production of Google RTB bid requests pertaining to each of the Named Plaintiffs. It is my understanding that in his original report, Prof. Shafiq concluded, based on his review of this dataset, that there were approximately ██ common fields shared in RTB. In response to Dr. Striegel's criticisms, Prof. Shafiq has isolated the Named Plaintiff bid requests pertaining to The New York Times and The Trade Desk to determine if his initial frequency analysis was consistent with respect to these RTB participants. It is my understanding that Prof. Shafiq's analysis is reflected in Striegel Deposition Exhibit 4, which confirms that of the ██ common fields originally identified by Prof. Shafiq, those same fields appeared at least ██ percent of the time for bid requests pertaining to The New York Times and The Trade Desk.

[56] Striegel Report ¶ 107.



"). The ▮▮▮▮▮ is also identified in the ▮▮▮▮ field, a fact Dr. Striegel conceded during his deposition.[57]

67.     Dr. Striegel claims that his observations about "variation" in the New York Times dataset are "consistent with the fact that many different user and publisher actions can affect bid request data[.]"[58] This claim is unsubstantiated: the New York Times (and The Trade Desk) dataset do not include any information that describes why a given field was included or omitted from any given bid request. Rather, as I have explained, much of the variation is entirely banal, stemming from the intended design of Google RTB. Additional "variation" stems from Dr. Striegel's use of the wrong New York Times dataset, which I have already detailed above.

## C.     FINGERPRINTING

68.     Dr. Striegel disagrees with the opinions I offer regarding fingerprintability based on analysis of the New York Times dataset.[59] I agree with Dr. Striegel that the New York Times dataset is not the ideal dataset to use for a fingerprintability analysis: it encompasses impressions and bid requests from only a single publisher for only a single day. A far superior dataset for performing fingerprintability analysis would encompass all the impressions and bid requests transacted by Google RTB, the world's largest ad exchange.

69.     Fortunately, Google has performed just such a fingerprintability analysis on that dataset on multiple occasions, as I discuss in my Report. According to Google's own analyses, ▮▮▮ ▮% of bid requests that Google RTB distributes contain uniquely identifiable fingerprints.[60] Neither Dr. Berntson nor Dr. Striegel refer to Google's own fingerprintability analyses or acknowledge their implications.

---

[57] Striegel Deposition Tr. at 141:19-142:25 (Pritzker Reply Decl. Ex. 54).

[58] Striegel Report ¶ 109.

[59] Striegel Report ¶¶ 154-158.

[60] Wilson Report ¶ 77, fn. 35.

**V.     THERE IS NO REASONABLE WAY FOR A GOOGLE ACCOUNT HOLDER TO AVOID HAVING HIS OR HER DATA SHARED AND SOLD IN GOOGLE RTB AUCTIONS**

70.     In my Report, I state that it is "it is very unlikely that there are any Google U.S. account holders who, over the entire seven-year Class Period, did not have their data shared and sold through Google RTB at least once."[61] In his report, Dr. Striegel asserts that "Dr. Wilson's conjecture about the likelihood of bid requests affecting U.S. Google account holders cannot be considered a reliable scientific opinion" because I refused, during my deposition, to precisely quantify the likelihood that Google account holders had their data sold or shared by Google RTB.[62] Dr. Striegel's assertion is disingenuous: nobody can possibly produce the precise estimate that Dr. Striegel demands because nobody has complete historical records of all Internet activity for the last seven years. Further, such a precise estimate is unnecessary, as I do not present such an estimate in my Report or my deposition.

71.     In my Report, I clearly explain what I mean when I state that Google RTB is unavoidable. I present evidence that Google is the most ubiquitous tracker on the Internet[63] and that Google RTB matches cookies for 84% of people using the web.[64] I present evidence that Google RTB is the largest ad exchange on the Internet and that it is used by millions of publishers who collectively monetize multiple millions of websites and apps.[65]

72.     In my deposition, I discussed how many of the most popular websites on the Internet monetize their impression inventory through Google RTB.[66] Neither Dr. Berntson nor Dr. Striegel counter or even bother to discuss any of this evidence. Thus, it strains credulity to imply

---

[61] Wilson Report ¶ 124.

[62] Striegel Report ¶ 160, citing Wilson Deposition Tr. at 347:19-348:9 (Pritzker Reply Decl. Ex. 60).

[63] Wilson Report ¶ 56

[64] Wilson Report ¶ 49.

[65] Wilson Report ¶¶ 81-85 and Table 4.

[66] Wilson Deposition Tr. at 287:6-288:10 (Pritzker Reply Decl. Ex. 60).

that Google account holders, over a seven-year period, never used any of these websites or apps, or never had their data sold or shared by Google RTB.

73.    In my Report I present the results of a data-driven experiment to demonstrate how often the Named Plaintiffs would have had their data sold and shared by Google RTB if they were browsing the web in November 2022.[67] Dr. Striegel asserts that "Dr. Wilson's own findings from the named Plaintiffs' experiences show that the likelihood that any given individual would have been subject to RTB bid requests is not uniform and varies across a wide range based on individualized factors."[68] Dr. Striegel misconstrues the point of my analysis. It is obvious that different people will have their data sold and shared by Google RTB at different frequencies, based on how they use the Internet. Rather, the point of my analysis and what it in fact shows is that every Named Plaintiff would have had their data sold or shared by Google RTB, thus confirming my opinion that Google RTB is unavoidable. Dr. Striegel does not address this.

74.    Dr. Striegel misstates the procedure that I used to conduct my data-driven experiment. He states that I "set up a web crawler to access not just the web pages the Named Plaintiffs visited, but five additional web pages linked to that web page (in the same domain)."[69] This is incorrect: I did not program my crawler to visit the exact web pages that appeared in the Named Plaintiffs' Web and App Activity data; I programmed my crawler to visit the exact websites (plus five additional web pages chosen at random from the same website).[70] For example, if a Named      Plaintiff's      Web      and      App      Activity      data      included      a      visit      to

███████████████████████████████████████████████████████████████████████

██████████████████████████. I did not attempt to crawl the exact web pages that Named Plaintiffs visited because much of the Web and App Activity data is years old, thus the exact web pages may no longer exist or have been modified during the intervening years.

---

[67] Wilson Report ¶¶ 88-100 and Table 5.

[68] Striegel Report ¶ 161.

[69] Striegel Report ¶ 163.

[70] I clearly state the correct procedure in Wilson Report ¶ 92.

75.     Regardless, Dr. Striegel claims that "the percentages Dr. Wilson identified in his report to support his opinion (shown in Table 5) are inflated and unreliable"[71] because I analyze the crawled data at the granularity of websites (combining data from six individual web pages) rather than web pages. In my Report I state that "Google would have shared or sold [Named Plaintiffs'] information (via cookie matching and/or RTB) on 55% of these websites, on average."[72] The equivalent statistic calculated at the level of web pages is 46%, i.e., there is only a modest change in the result and no change to my opinion. All the data underlying my analysis was made available to Dr. Striegel, he could have calculated the web page-level statistic if he chose to, rather than cast baseless and incorrect aspersions on my results and opinions.

## VI.    USER AND PUBLISHER CONTROLS DO NOT STOP THE SHARING AND SELLING OF GOOGLE ACCOUNT HOLDER DATA IN GOOGLE RTB AUCTIONS

### A.    USER SETTINGS, ACTIONS, AND TOOLS

76.     Dr. Berntson and Dr. Striegel both list several settings, actions, and tools that may affect the information that is included in Google RTB bid requests. As I will discuss, Dr. Berntson and Dr. Striegel's discussion of these settings, actions, and tools is misleading: these settings, actions, and tools are either completely impractical to adopt, do not remove all identifying information from Google RTB bid requests (meaning that Google RTB is still selling and sharing Google account holder data even when the setting, action, or tool is adopted), or both.

77.     Before delving into the specifics of each setting, action, and tool mentioned by Dr. Berntson and Dr. Striegel, it is important to revisit the substance of the claim made by Plaintiffs: that Google is violating the promise to, among other things, "[not] sell your personal information to anyone[.]"[73] It should not be Google account holders' responsibility to change settings, take actions, or adopt tools to force Google to uphold its promise.

---

[71] Striegel Report ¶ 163.

[72] Wilson Report ¶ 100.

[73] *See, e.g.,* Consolidated Class Action Complaint, ECF 92, ¶ 80.



*Figure 1: A screenshot of the error message that Google displays if a person attempts to log-in to their Google Account with JavaScript disabled in their web browser.*

78.    <u>Disable JavaScript</u>: Dr. Berntson correctly states that users may disable JavaScript in their web browsers, and if they do so, this will prevent Google RTB from auctioning impressions from their browser.[74]

79.    Dr. Berntson presents no evidence that users actually disable JavaScript in their browsers, and for good reason.

80.    It is extremely unlikely that users disable JavaScript in their web browsers because websites rely on JavaScript to implement essential functionality, such as logging users into their account, facilitating e-commerce, playing videos, etc. For example,

81.    Figure 1 is a screenshot of the error message that Google presents if a user attempts to log-in to their Google Account with JavaScript disabled in their web browser. For these reasons, it is completely impractical to disable JavaScript in web browsers, and thus this is not a viable approach for Google account holders to prevent Google RTB from sharing and selling their information.

82.    On mobile devices, there is no setting for mobile apps that is equivalent to disabling JavaScript in a web browser. Disabling JavaScript does not prevent Google RTB from auctioning impressions from mobile apps, and it has no impact on the information that Google RTB sells and shares in these bid requests.

---

[74] Berntson Declaration ¶ 37.

Case 4:21-cv-02155-YGR    Document 643-10    Filed 12/20/23    Page 29 of 60

83.    <u>GAP Setting for Signed-in Users</u>: Dr. Berntson states the following:

"Google Ad Personalization ('GAP') is a Google account setting, available to signed in Google users, that controls what types of ads a user is shown. Account holders can turn GAP off in various ways, including by visiting the Google Ad Settings page at adssettings.google.com and turning off 'Ad personalization.' […] When Google determines that a signed in user is opted out of GAP, they are shown only non-personalized ads based on "contextual" information, as referenced above, and certain data in RTB bid requests is omitted or generalized, including all pseudonymous identifiers and hosted match data, and cookie matching is also disabled."[75]

84.    In my Report, I tested the GAP setting[76] and found that it does not function as Dr. Berntson and Dr. Striegel describe.[77] In my experiments (which I discuss in more detail below), I observed "personalized" ads (Dr. Berntson's nomenclature) being targeted to a Google Account with GAP opted-out. These ads were sold via Google RTB and targeted my opted-out Google Account based on its prior browsing history, not general context. These observations directly contradict Dr. Berntson's assertions that GAP removes unique identifiers from Google RTB bid requests and disables "personalized" ads overall.

85.    Further, as I note in my Report, Google produced documents that state that only around ▇% of Google account holders have opted-out of GAP at any point during the class period.[78] Neither Dr. Berntson nor Dr. Striegel address why the GAP setting is relevant to this case when so few Google account holders have turned it off.

86.    Even if we take Dr. Berntson and Dr. Striegel's assertions at face value—that GAP does cause Google RTB to remove unique identifiers from bid requests—this is insufficient to prevent Google RTB from selling and sharing Google account holders' data. As I discussed above, Google RTB bid requests contain many fields of identifiable information and thus must be considered in their totality. As described by Dr. Berntson and Dr. Striegel, even when the GAP

---

[75] Berntson Declaration ¶¶ 48-49; Striegel Report ¶ 79.

[76] Wilson Report ¶¶ 101-124.

[77] Berntson Declaration ¶¶ 48-50; Stiegel Report ¶ 79.

[78] Wilson Report ¶ 103, citing GOOG-HEWT-00455800 (Plaintiffs' Ex. 13, ECF 545-11).

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF C. WILSON

setting is enabled, Google RTB bid requests still contain sufficient information to compute fingerprints (i.e., truncated IP, language, user agent, etc.). Thus, Google account holders are still identifiable even when GAP functions as intended.

87.     Signed-out User Settings: Dr. Berntson describes two pathways that are available to users to opt-out of "personalized ads" in their web browser when they are not logged-in to a Google Account. Dr. Berntson correctly states that this opt-out functionality is implemented using a cookie.[79]

88.     Neither Dr. Berntson nor Dr. Striegel present any evidence that users utilize this opt-out functionality.

89.     Because this signed-out opt-out functionality is implemented using a cookie, it suffers from several practical limitations. First, a user must opt-out in every browser they use on every device they own, since each needs its own copy of the opt-out cookie. Second, if a user clears their cookies or enters a private browsing window, the opt-out cookie is deleted (temporarily, in the case of a private browsing window) and thus Google RTB will once again sell and share their information. Third, mobile apps do not use cookies, so this setting has no impact on the information sold and shared by Google RTB in bid requests from mobile apps.

90.     Dr. Berntson asserts that the signed-out opt-out is similar to GAP, in that it causes Google RTB to remove unique identifiers from bid requests.[80] However, as I have already discussed, in this scenario Google RTB bid requests still contain sufficient information to compute fingerprints (i.e., truncated IP, language, user agent, etc.). Thus, Google account holders are still identifiable even when they are using a web browser where the signed-out opt-out is activated.

---

[79] Berntson Declaration ¶¶ 51-53; *see also* Striegel Report ¶ 80.

[80] Berntson Declaration ¶ 52.



*Figure 2: Screenshot from the settings of Google Chrome where users may disable all cookies. Google does not recommend that users disable all cookies because it breaks the essential functionality of websites.*



*Figure 3: A screenshot of the error message that Google displays if a person attempts to log-in to their Google Account with all cookies disabled.*

91.    <u>Blocking All Cookies</u>: Dr. Berntson and Dr. Striegel both correctly state that users can disable all cookies in their web browser, and that if they do so, Google RTB is unable to include a unique identifier (i.e., from Google's Biscotti cookie) in bid requests.[81]

92.    As evidence that this setting may have substantive impact on the information sold and shared by Google RTB, Dr. Striegel cites a report from McKinsey that claims that 41% of a sample of 792 people self-reported that they had "[s]et browser to disable or turn off cookies[.]"[82]

---

[81] Berntson Declaration ¶ 55; Striegel Report ¶ 82.

[82] Venky Anant, et al., The consumer-data opportunity and the privacy imperative, McKinsey & Company (Apr. 27, 2020), available at https://www.mckinsey.com/capabilities/risk-andresilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative, accessed November 3, 2023 (cited in Striegel Report at ¶ 82, fn. 59).

There is no way this statistic is correct: much like disabling JavaScript, disabling all cookies (i.e., first and third-party cookies) breaks essential functionality of many websites, including, for example, the ability to log-in to accounts or conduct e-commerce transactions. Google describes this broken functionality correctly in the settings of Google Chrome (see Figure 2).

93.     Figure 3 is a screenshot of the error message that users receive if they try to log-in to their Google Account with all cookies disabled. It is likely that the respondents in McKinsey's sample misunderstood the question about cookies, perhaps confusing disabling *third-party cookies* (which I discuss below) with disabling *all cookies*. I am unaware of any reliable statistics on users' adoption of total cookie blocking.

94.     Given that blocking all cookies breaks essential functionality of websites, it is completely impractical to disable all cookies in web browsers, and thus this is not a viable approach for Google account holders to prevent Google RTB from sharing and selling their information.

95.     Even if a user were to disable all cookies in their web browser, this would only prevent Google RTB from including unique identifiers (e.g., from the Google Biscotti cookie) in bid requests. As I have already discussed, in this scenario Google RTB bid requests will still contain sufficient information to compute fingerprints (i.e., truncated IP, language, user agent, etc.). Thus, Google account holders are still identifiable even when they disable all cookies in their browser.

96.     Mobile apps do not use cookies, so disabling cookies has no impact on the information sold and shared by Google RTB in bid requests from mobile apps.

97.     <u>Blocking Third-party Cookies</u>: Dr. Berntson and Dr. Striegel correctly state that users may disable third-party cookies in web browsers, and that some web browsers have enabled this functionality by default in recent years[83] (e.g., Firefox in 2019).[84] They correctly state that

---

[83] Berntson Declaration ¶ 55; Striegel Report ¶¶ 82-83.

[84] Firefox rolls out Total Cookie Protection by default to more users worldwide, Mozilla Blog (April 11, 2023), available at https://blog.mozilla.org/en/mozilla/firefox-rolls-out-total-cookie-protection-by-default-to-all-users-worldwide/, accessed November 3, 2023.

Google RTB is unable to include a unique identifier (i.e., from Google's Biscotti cookie) in bid requests when third-party cookies are disabled.

98.     Google Chrome, the most popular web browser in the U.S.,[85] does not block third-party cookies by default. Chrome only began blocking third-party cookies in private browsing windows in May 2020.[86]

99.     Dr. Striegel mischaracterizes when the Safari browser began blocking third-party cookies.[87] Apple implemented an incomplete block of third-party cookies beginning in 2017;[88] they did not implement a complete block until 2020.[89]

100.     Even if a user were to disable third-party cookies in their web browser or adopt a web browser that blocks third-party cookies by default, this would only prevent Google RTB from including unique identifiers (e.g., from the Google Biscotti cookie) in bid requests. As I have already discussed, in this scenario Google RTB bid requests will still contain sufficient information to compute fingerprints (i.e., truncated IP, language, user agent, etc.). Thus, Google account holders are still identifiable even when third-party cookies are disabled in their browser.

101.     Mobile apps do not use cookies, so disabling third-party cookies has no impact on the information sold and shared by Google RTB in bid requests from mobile apps.

102.     <u>Clearing Cookies</u>:  Dr. Berntson correctly describes the implications of clearing browser cookies: after clearing cookies "any subsequent browsing activity can no longer be

---

[85]     Browser Market Share United States of America, Statcounter, available at https://gs.statcounter.com/browser-market-share/all/united-states-of-america, accessed November 3, 2023.

[86]     AbdelKarim Mardini, More intuitive privacy and security controls in Chrome, Chrome Blog (March 19, 2020), available at https://blog.google/products/chrome/more-intuitive-privacy-and-security-controls-chrome/, accessed November 3, 2023.

[87]     Striegel Report ¶ 82.

[88]     John Wilander, Intelligent Tracking Prevention, Apple WebKit Blog (June 5, 2017), available at https://webkit.org/blog/7675/intelligent-tracking-prevention/, accessed November 3, 2023.

[89]     John Wilander, Full Third-Party Cookie Blocking and More, Apple WebKit Blog (March 24, 2020), https://webkit.org/blog/10218/full-third-party-cookie-blocking-and-more/, accessed November 3, 2023.

associated with those deleted identifiers[.]"[90] Dr. Striegel states that deleting cookies will "limit or altogether block certain information from inclusion in bid requests[,]"[91] which is incorrect and incompatible with Dr. Berntson's statement.

103.    Neither Dr. Berntson nor Dr. Striegel present any evidence that users routinely clear their browser cookies or configure their browser to clear their cookies at the conclusion of browsing sessions.

104.    In any event, clearing browser cookies does not limit the information that Google RTB sells and shares in bid requests. If a user clears their cookies, Google RTB will assign them a new unique identifier in the Biscotti cookie and distribute this new identifier in all future bid requests. Prior to cookie deletion, all Google RTB bid requests contained a unique identifier, thus making them Google account holder information. After cookie deletion, all Google RTB bid requests contain a unique identifier, thus making them Google account holder information. The possibility that browsing activity from before and after the cookie deletion may not be linkable by RTB participants does not render any of the data in the bid requests as no longer constituting Google account holder information.

105.    Dr. Striegel asserts that users' ability to remove cookies "impacts any ability to use the google_user_id as a persistent identifier for a browser[.]"[92] As I clarify above, this statement is incorrect and misleading.

106.    Mobile apps do not use cookies, so cookie deletion has no impact on the information sold and shared by Google RTB in bid requests from mobile apps.

107.    <u>Private Browsing Mode</u>: Dr. Berntson correctly describes the functionality and implications of private (or incognito) mode in web browsers: "[b]ecause Chrome creates a new set of cookies for that Incognito session, the Biscotti ID and any google_user_ids derived from that

---

[90] Berntson Declaration ¶ 56.

[91] Striegel Report ¶ 81.

[92] Striegel Report ¶ 149.

Biscotti ID, are unique to that specific Incognito session."[93] Dr. Striegel's description of private browsing mode agrees with Dr. Berntson.[94]

108.    The default behavior of private browsing mode has the same effects as clearing cookies, and therefor fails to prevent Google RTB from selling and sharing Google account holder data for the same reasons: Google RTB will assign a new unique identifier in the Biscotti cookie and distribute this new identifier in all bid requests within this private browsing session. The possibility that browsing activity from inside and outside the private browsing session may not be linkable by RTB participants does not render any of the data in the bid requests as no longer constituting Google account holder information.

109.    Mobile apps do not have an equivalent "private" or "incognito" mode, so private browsing has no impact on the information sold and shared by Google RTB in bid requests from mobile apps.

110.    Browser Extensions: Dr. Berntson correctly describes the functionality of the two most popular ad blocking web browser extensions (that I am aware of): AdBlock and Adblock Plus.[95] Dr. Berntson also correctly explains why these browser extensions do not prevent Google RTB from selling and sharing Google account holders' information:

> "When a user unchecks the 'Allow Acceptable Ads' option in the extension's settings, these ad-blocking extensions may, depending on their configuration, prevent the browser from sending ad requests to Google."[96]

Google has paid to be placed on an allow-list that enables bid requests from Google RTB and ads from Google RTB participants to bypass these ad blocking extensions by default. If a user is savvy enough to install one of these extensions and then modify its default settings, then the extension may, sometimes, prevent Google RTB from auctioning impression.

---

[93] Berntson Declaration ¶¶ 57-58.

[94] Striegel Report ¶ 84.

[95] Berntson Declaration ¶ 59.

[96] *Ibid*.

111.    In my academic research, I have evaluated Adblock Plus in its default configuration and found that it did not reduce flows of data to online trackers or ad exchanges, including Google RTB, as compared to a control web browser with no ad blocking extension at all.[97] AdBlock uses the same allow-list as Adblock Plus, and thus also fails for the same reasons.

112.    Dr. Berntson correctly describes the availability and functionality of the Interest-Based Ads Opt-out browser extension.[98] However, Dr. Berntson also admits that this extension is irrelevant because it is only installed on between 500,000 and 1 million Chrome browsers *worldwide*. Even if all these installations were in the U.S., this covers at most 0.4% of the 226 million adults in the U.S.[99]

113.    Dr. Berntson states that the Interest-Based Ads Opt-out browser extension implements the same functionality as the signed-out opt-out that I discussed above. Thus, this extension fails to prevent Google RTB from selling and sharing Google account holders' information for the same reasons as the signed-out opt-out.

114.    Regardless of the functionality of ad blocking browser extensions, their applicability is limited. Chrome on mobile devices does not support extensions at all. Further, web browser extensions have no impact on the information sold and shared by Google RTB in bid requests from mobile apps.

115.    <u>Device-level Settings</u>: Dr. Berntson and Dr. Striegel state that device-level settings in iOS and Android may impact whether the unique mobile device identifier (IDFA on iOS, ADID on Android) is sold and shared by Google RTB in bid requests.[100] These settings have the same impact as cookie blocking in web browsers, i.e., Google RTB bid requests no longer contain a

---

[97] Muhammad Ahmad Bashir and Christo Wilson, Diffusion of User Tracking Data in the Online Advertising Ecosystem, PoPETS (July 2018) 2018(4), available at https://cbw.sh/static/pdf/bashir-pets18.pdf.

[98] Berntson Declaration ¶ 60.

[99] The Demographic Outlook: 2023 to 2053, The Congressional Budget Office (January 24, 2023), available at https://www.cbo.gov/publication/58612, accessed November 3, 2023.

[100] Berntson Declaration ¶ 61; Striegel Report ¶ 87.

unique identifier. As I have already discussed, in this scenario, Google RTB bid requests will still contain sufficient information to compute fingerprints (i.e., truncated IP, language, user agent, etc.). Thus, Google account holders are still identifiable even when they activate these settings on their mobile devices.

116.     These device-level settings suffer from other practical problems. First, they must be enabled on every smartphone and tablet that a person owns. Second, these device-level settings have no impact on the information sold and shared by Google RTB in bid requests from web browsers.

117.     Google's developer documentation states that the functionality of the "Limit Ad Tracking" ("LAT") setting on Android has changed over time.[101] According to the documentation, in versions of Android released prior to late 2021, the ADID could be read by apps (and subsequently shared with third parties over the Internet) even if the user engaged the LAT opt-out. In subsequent versions of Android, if a user engages the LAT opt-out, apps are blocked from reading the ADID.[102] Thus, for the majority of the proposed class period, the LAT opt-out on Android offered no substantive privacy protection to users.

118.     The LAT opt-out on Android has always been disabled by default. This explains why, according to evidence cited by Dr. Striegel, LAT is only enabled on 2.3% of Android devices.[103] This statistic demonstrates that the LAT opt-out does not have a substantive impact on Google RTB's selling and sharing of Google account holders' data.

119.     Dr. Striegel correctly states that, prior to the release of iOS 14.5 in 2021, iOS also had a LAT opt-out setting that offered analogous functionality to LAT on Android prior to 2021.[104]

---

[101] AdvertisingIdClient.Info, Google Play Services Documentation (March 21, 2022), available at https://developers.google.com/android/reference/com/google/android/gms/ads/identifier/AdvertisingIdClient.Info, accessed November 3, 2023.

[102] Dr. Berntson and Dr. Striegel refer to this as deleting the ADID. Berntson Declaration ¶ 63 and Striegel Report ¶ 88.

[103] Striegel Report ¶ 87.

[104] *Ibid*.

As I have already stated, these LAT opt-out settings offered no substantive privacy protection to users. Dr. Striegel also correctly states that, as of iOS 14.5, apps may not read a device's IDFA until a user opts-in. As I have already stated, however, even if a user refuses to opt-in, Google RTB bid requests will still contain sufficient information to compute fingerprints (i.e., truncated IP, language, user agent, etc.), and thus Google account holders are still identifiable.

120.    Dr. Berntson and Dr. Striegel both discuss how, on Android, users may reset their ADID, which replaces the device's unique identifier with a new unique identifier.[105] This capability fails to prevent Google RTB from selling and sharing Google account holder data for the same reason as clearing cookies (discussed above): in both cases, all Google RTB bid request will contain a unique identifier that is linked to a device, person, or household.

121.    <u>Virtual Private Network (VPN)</u>: Dr. Berntson states that when a device utilizes a VPN that this "masks the sending device's IP address"[106] (Dr. Striegel makes an equivalent claim[107]). These assertions are overbroad and misleading. When a device uses a VPN, the VPN can be configured to reroute all Internet traffic from the device or a subset of Internet traffic. For example, a remote employee at a company could install a VPN on their laptop that directs all network traffic destined for the corporate network through the VPN, while all other Internet traffic bypasses the VPN completely. In this example, Google RTB would observe this employee's true IP address, not the VPN's IP address, and would thus distribute the true (truncated) IP address and geolocation in bid requests. Thus, it is incorrect for Dr. Berntson and Dr. Striegel to assert that VPNs have a uniform impact on Google RTB bid requests; in fact, many VPNs may have no impact on the information distributed by Google RTB at all.

122.    If a user installs a VPN on their device and configures it to tunnel all Internet traffic, then Dr. Berntson and Dr. Striegel's statements about the impact of the VPN are correct: the VPN's truncated IP address and geolocation will appear in Google RTB bid requests, not the user's

---

[105] Berntson Declaration ¶ 62; Striegel Report ¶¶ 88, 152.

[106] Berntson Declaration ¶ 64.

[107] Striegel Report ¶ 85.

truncated IP address and geolocation.[108] However, this is a pointless distinction, because Google RTB continues to sell and share unique identifiers (e.g., from cookies and device identifiers) and information sufficient to compute fingerprints in bid requests even if a user adopts a correctly configured VPN. The information contained in Google RTB bid requests is still reasonably capable of being associated with an individual or household, even if the truncated IP address and geolocation are incorrect.

123.     Dr. Berntson provides no credible evidence that VPN adoption has substantively impacted the correctness of information included in Google RTB bid requests. Dr. Striegel cites two "articles" as evidence of widespread VPN adoption;[109] however, these "articles" in Forbes and Comparitech are actually advertorials full of sponsored links to commercial VPN providers. These two pieces provide no credible information about VPN adoption. Further, Dr. Striegel cites statistics of VPN usage from Statista that were drawn from a sample of only 1,000 people,[110] with no information provided about how these people were recruited or surveyed, and no data presented about the representative nature of this sample. Thus, this particular information from Statista cannot be considered scientifically valid.

124.     Academic research on VPN adoption has consistently found that usage is low overall: between 0.7% and 2.6% of all Internet traffic.[111]

125.     Dr. Berntson also mentions HTTP proxies in his declaration.[112] Dr. Berntson correctly states that a proxy may obfuscate a Google account holder's true IP address. However, he provides no evidence to suggest that proxies are widely adopted. Furthermore, proxies suffer

---

[108] Berntson Declaration ¶¶ 64-65; Striegel Report ¶¶ 85-86.

[109] Striegel Report ¶ 85, fn. 65.

[110] *Ibid.*

[111] Aniss Maghsoudlou, Lukas Vermeulen, Ingmar Poese, and Oliver Gasser, Characterizing the VPN Ecosystem in the Wild, PAM (March 21–23, 2023), available at https://vpnecosystem.github.io/; Luca Schumann, Trinh Viet Doan, Tanya Shreedhar, Ricky Mok, and Vaibhav Bajpai, Impact of Evolving Protocols and COVID-19 on Internet Traffic Shares, arXiv (January 15, 2022), available at https://arxiv.org/abs/2201.00142.

[112] Berntson Declaration ¶¶ 64-65.

from the same shortcomings as VPNs: even if a Google account holder uses a proxy, Google RTB will still include their unique identifiers and data sufficient to calculate a fingerprint in bid requests. Thus, proxies do not render Google RTB bid requests as unidentifiable.

### B.    PUBLISHER CONTROLS

126.    Dr. Berntson states that "publishers can use privacy controls in Google Ad Manager that affect the data included in bid requests."[113] Dr. Striegel relies on the existence of these controls when he claims that "extent to which various fields are included in a bid request, and in what form they appear, depends on many individualized factors and circumstances, including publisher controls[.]"[114] While Dr. Berntson and Dr. Striegel are correct that these control exists and could potentially impact the fields included in some bid requests, the available evidence indicates that these publisher controls are irrelevant and have no bearing in this case; particularly, since neither Dr. Berntson nor Dr. Striegel identify a single instance where a publisher control was actually implemented.

127.    As an overarching matter, I again return to the substance of the claim made by Plaintiffs: that Google is violating its promise to "not sell your personal information to anyone[.]" Google does not fulfill its promise by giving controls to publishers, because it is not publishers' responsibility to fulfill promises that Google has made to its account holders.

128.    Google began offering the controls that Dr. Berntson and Dr. Striegel mention[115] in 2019 (restricted data processing or "RDP"),[116] 2021 (non-personalized ad requests),[117] and 2021

---

[113] Berntson Declaration ¶ 40.

[114] Striegel Report ¶ 72.

[115] Striegel Report ¶¶ 73-77; Berntson Declaration ¶¶ 40-44.

[116] Google Ads Help, https://support.google.com/google-ads/answer/9614122, accessed November 3, 2023.

[117] GOOG-HEWT-00455861.

(blocking remarketing and interest-based cookies),[118] respectively, but the proposed class period begins in 2016. Thus, at a minimum, Google engaged in selling and sharing of Google account holder data for roughly three years before these publisher controls even existed.

129.    There is a strong monetary disincentive for publishers to enable these controls. If these controls function as described by Dr. Berntson, then publishers who enable them will incur a significant drop in their advertising revenue. As described by Dr. Zeithammer,[119] the personal data that Google RTB sells and shares has significant monetary value—RTB participants bid more often and big higher due to this data—some of which is captured by Google RTB itself, and some of which flows down to publishers. A publisher that enables the controls described by Dr. Berntson and Dr. Striegel is simply leaving money on the table. Indeed, publishers face the same monetary disincentive as Google itself, which is why Google RTB continues to sell and share Google account holder data by default.

130.    There are no legal requirements that publishers enable these controls by default. To the best of my knowledge, four U.S. states have online privacy laws currently in effect (the California Consumer Privacy Act ("CCPA"), the California Privacy Rights Act ("CPRA"), the Colorado Privacy Act, the Virginia Consumer Data Protection Act, and the Connecticut Personal Data Privacy and Online Monitoring Act),[120] and all of them are opt-out laws, i.e., companies are free to collect, sell, and share digital data unless a consumer affirmatively opts-out of these practices. The earliest of these laws, the CCPA, went into effect in 2020, and the non-California

[118] Dr. Striegel refers to GOOG-HEWT-00455879 as evidence of this control. This document is undated. The earliest mention I can find of this capability on the web is from 2021, *see* Block cookie and data uses in Ad Manager, https://web.archive.org/web/20210822143642/https://support.google.com/admanager/answer/2913700, accessed November 3, 2023.

[119] Expert Class Certification Report R. Zeithammer in Support of Plaintiffs' Motion for Class Certification, dated July 14, 2023, Sections V-X (ECF 545-7).

[120] Cal. Civ. Code §§ 1798.100 *et seq*., California Proposition 24, Colorado Re. Stat. § 6-1-1301 *et seq*., Connecticut 2022 S.B. 6, and Virginia 2021 H.B. 2307/2021 S.B. 1392. Nine additional states have passed online privacy laws, all of which take effect in the future, including Delaware (1/1/25), Florida (7/1/24), Indiana (1/1/26), Iowa (1/1/25), Montana (10/24/24), Oregon (7/1/24), Tennessee (7/1/25), Texas (7/1/24), and Utah (12/31/23).

laws are going into effect in 2023. Thus, these laws, and the publisher controls that Google has rolled-out to attempt to comply with them, (1) have no bearing on Google account holders who live in most U.S. states, (2) did not exist for most of the proposed class period, and (3) offer no protection by-default to Google account holders.

131.    Laws like the CCPA and CPRA apply to a surprisingly narrow set of publishers. For example, the CPRA only applies to businesses (1) with annual gross revenue greater than or equal to $25 million dollars, (2) that sell the personal information of at least 100,000 unique Californians per year, or (3) derive at least 50% of their annual revenue from the sale of Californian's personal information.[121] I published an academic study in 2022 in which my co-author and I estimated that only around 1,200 websites meet the second prong of the CPRA's applicability criteria.[122] Recall that Google RTB is the largest ad exchange and works with almost 1.3 million publishers,[123] meaning that vast majority of publishers likely have no legal obligation to utilize Google's publisher controls, even in U.S. states that have online privacy laws.

132.    Dr. Berntson and Dr. Striegel state that publishers can enable RDP mode on a per-user basis if the user chooses to opt-out of the sharing and selling of their data.[124] These per-user controls suffer from all the same monetary and legal disincentives publisher controls in general. These per-user controls are problematic for several additional reasons:

> a.    Again, returning to the substance of the claims made by Plaintiffs, Google has promised not to sell or share their personal data. Giving Google account holders per-publisher privacy controls does not release Google from fulfilling its privacy promises.

---

[121] Cal. Civ. Code §§ 1798.140(d)(1).

[122] Maggie Van Nortwick and Christo Wilson, *Setting the Bar Low: Are Websites Complying With the Bare Minimum Requirements of the CCPA?*, PoPETS 2022(1), 2022, available at https://petsymposium.org/popets/2022/popets-2022-0030.php.

[123] Wilson Report Table 4.

[124] Berntson Declaration ¶ 43; Striegel Report ¶ 74.

    b.  These user-controls must be activated on a per-website and per-app basis. The burden of locating and enabling these individual opt-outs on every website and app is placed entirely on Google account holders.

    c.  I have studied websites' compliance with the provisions of the CCPA and CPRA. Using data crawled from the web in 2020 and 2021, my co-author and I estimate that only 18% of websites to which the CCPA was applicable met the minimum requirements of the law, and that only 23% of websites to which the CPRA was applicable met the minimum requirements of the law.[125] Based on these findings, it is unlikely that per-user controls are being offered to Google account holders by most publishers, even in cases where publishers appear to be legally required to do so.

133.    A recent, peer-reviewed scientific study observed that even when publishers do claim to allow users to opt-out of the sharing and selling of their data, these controls do not function as intended. In this study, the authors opted-out of data selling and sharing using publisher controls and then measured sharing and selling of data to third parties, including Google.[126] The authors found that opting-out using publisher controls had no statistically significant impact on selling and sharing of personal information with third-parties, including no impact on the placement of tracking cookies, cookie synching, bid volume on impressions, or bid value on impressions.

134.    Taken together, these points demonstrate the irrelevance of publisher controls. I am not aware of any evidence that Google's publisher controls are adopted or enabled by publishers, and Dr. Berntson and Dr. Striegel present no evidence that they are adopted or enabled. The economic and legal landscape strongly suggests that they are not adopted (at all or on-by-default)

---

[125] Van Nortwick and Wilson, *supra* note 1222.

[126] Zengrui Liu, Umar Iqbal, and Nitesh Saxena, *Opted Out, Yet Tracked: Are Regulations Enough to Protect Your Privacy?*, PoPETS 2024, pre-publication draft available at https://arxiv.org/pdf/2202.00885.pdf.

and available scientific evidence suggests that their adoption is (1) very limited and (2) non-functional even when they are adopted.

### C.     FINGERPRINTING DOES NOT EXPLAIN THE RESULTS OF MY GAP EXPERIMENT

135.     In my report, I describe an experiment that I conducted to test whether the GAP setting that Google makes available to Google account holders allows them to disable "personalized ads" (Google's terminology).[127] My experiment demonstrated that GAP does not function as stated by Google: even after opting-out, my experimental web browser continued to receive ads via Google RTB that were targeted to its prior browsing history.

136.     Dr. Striegel characterizes my experiment as "inherently flawed and his findings are unreliable as a result."[128] Dr. Striegel's interpretation of my experiment is incorrect, because he fails to understand the construction of the experiment, and thus he is incapable of correctly interpreting my findings.

137.     Dr. Striegel lacks the necessary experience and qualifications to evaluate the causal experiments that I present in my report to evaluate the GAP setting.[129] Dr. Striegel confirmed during his deposition that he has never used the Chrome Debug Protocol, a key piece of technology that my experiments rely on.[130] Furthermore, Dr. Striegel does not claim to have any expertise performing or evaluating causal experimental designs, which may explain why he incorrectly interprets the findings of my experiments.

138.     Dr. Striegel summarizes my experimental setup in the following way: "[a]s background, Dr. Wilson programmed a web crawler to [] visit a number of websites."[131] This is incorrect. As I state in my report, my experiments involved three web crawlers running simultaneously: (1) an untreated baseline crawler that visited publishers and collected ads, but did

---

[127] Wilson Report ¶¶ 105-125.

[128] Striegel Report ¶ 164.

[129] Wilson Report ¶¶ 104-125.

[130] Striegel Deposition Tr. at 16:2-16:8 (Pritzker Reply Decl. Ex. 54).

[131] *Ibid.*

not visit advertisers, (2) a treatment crawler that visited advertisers and publishers, and was not opted-out of GAP, and (3) a treatment crawler that visited advertisers and publishers, and was opted-out of GAP.[132] For the purposes of the following discussion, I focus on crawlers (1) and (3), the untreated baseline and the opted-out treatment.

139.    Dr. Striegel postulates that the targeted ad that my opted-out crawler received could have been shown because the DSP purchased the associated impression based on knowledge of my IP address or the combination of my IP address and user-agent[133] (e.g., Criteo, the DSP that purchased the impression and served the ad in question,[134] could have fingerprinted my crawler). He claims that this undermines my conclusion. Dr. Striegel is incorrect, because the design of my experiment rules out IP address-based targeting and fingerprint-based targeting as an explanation for the ad in question.

140.    In my experiment, the untreated baseline crawler and the opted-out treatment crawler both share my home's IP address, and they have identical user-agents.[135] Their fingerprints are identical. However, the ad in question from cuddle+kind was never served to the untreated baseline crawler. If the DSP was targeting this ad based on IP address or fingerprint, it is equally likely that the untreated baseline crawler and the opted-out treatment would have received it. This was not the case.



*Figure 4: An advertisement that was shown to the crawler that was logged-in to a Google account and opted-out of personalized advertising by Google RTB at the URL https://www.whattoexpect.com/first-year/month-by-month/.*

141.    I examined the data produced by my crawlers again and found another targeted ad that was served to my opted-out treatment crawler, but not to the untreated baseline crawler. Like the cuddle+kind advertisement that I highlight in my Report, the advertisement shown in Figure 4

---

[132] Wilson Report ¶ 107.

[133] Striegel Report ¶¶ 166-168.

[134] Wilson Report Exhibit F.

[135] Wilson Report ¶¶ 109-110.

was delivered via Google RTB and advertised a website that the opted-out treatment crawler had previously visited. Exhibit B to this Rebuttal Report includes the inclusion chain that resulted in the download and display of this ad (i.e., the relevant subset of the full inclusion tree for this web page). We can see in the inclusion chain that this impression was auctioned by Doubleclick and then purchased by Google's own DSP (the advertisement was hosted on *2mdn.net*, which is a domain name that Google uses to host ads for their DSP).

142.    Thus, the conclusion from my report stands: the GAP setting had no effect on Google RTB. Even when GAP is set to opt-out, Google RTB continues to distribute Google account holder data in bid requests that is sufficient to facilitate targeted ads.[136] The construction of my experiment rules out IP-based and fingerprinting-based targeting, which leaves Biscotti-based unique identifier or user lists as the likely mechanisms by which Google RTB is sharing and selling Google account holder data to facilitate these ads.

143.    It is striking that Dr. Berntson, who is the Engineering Director and a Lead of the Google Ad Manager team, does not comment on my experiment at all. My findings reveal a serious flaw in Google's systems, and he is uniquely positioned to understand the source of this flaw and elucidate causes, and yet he completely ignores my findings.

144.    It is also striking that Dr. Berntson does not comment on the incompatibility between Google's promise regarding the functionality of GAP (disabling "personalized ads") and the actual functionality offered by the setting. Dr. Berntson states that, according to his understanding of GAP, "pseudonymous identifiers and hosted match data" are removed from bid requests.[137] My experimental results call these assertions into question, but setting that aside, Dr. Berntson admits that even when GAP is enabled bid requests continue to contain Google account

---

[136] Wilson Report ¶ 123.

[137] Berntson Declaration ¶ 49.

holder data that is sufficient to facilitate fingerprinting,[138] which renders Google's no "personalized ads" promise as a lie.[139]

145.    Dr. Striegel misconstrues my deposition to suggest that I believe Google is somehow in compliance with its own promises when it shares and sells finger-printable data about Google account holders,[140] which is not what I said:

Q.    And couldn't those other pieces of data that you understand will still be sent have triggered the advertisement that you see here in Paragraph 122, things like the IP address, user agent, if it's being tracked by advertisers?

A. So I think what you're positing is perhaps a scenario where an advertiser uses fingerprinting to try and compute a unique identifier.  That is possible.  I mean, advertisers can compute fingerprints. And unfortunately what that would mean is that the guarantee that Google is making here is false, right? … they're allowing you to say, I would not like these ads, and yet [Google RTB is] still providing sufficient information for those ads to be targeted.[141]

146.    My testimony clearly demonstrates that any insinuation that I agree or believe that Google is in compliance with its own promises is categorically false.

*       *       *

Dated: November 29, 2023                                    /s/ _____

                                                            Christopher Wilson, Ph.D.

---

[138] *Ibid.*

[139] Recall that Google has actual knowledge that the Google account holder data that Google RTB sells and shares can be used to ███████████████, *see* GOOG-HEWT-00459494 and GOOG-HEWT-00291417.

[140] Striegel Report ¶ 166.

[141] Wilson Deposition Tr. at 329:7-329:24 (Pritzker Reply Decl. Ex. 60).

# Exhibit A
## to Expert Class Certification Rebuttal Report of C. Wilson

### ADDITIONAL MATERIALS REVIEWED AND CONSIDERED

- Google's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated September 29, 2023

- Declaration of Glenn Berntson in Support of Google's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated September 29, 2023, and the exhibits thereto

- Expert Report of Aaron Striegel in *In re Google RTB Consumer Privacy Litig*., dated September 29, 2023, the appendices thereto, and the production of underlying testing and documents relied on

- Expert Report of Konstantinos Psounis in *In re of Google RTB Consumer Privacy Litig*., undated, and the appendices thereto

- October 20, 2023 Deposition Transcript of Aaron Striegel in *In re Google RTB Consumer Privacy Litig.*, and the exhibits thereto

- October 16, 2023 Deposition Transcript of Konstantinos Psounis in *In re Google RTB Consumer Privacy Litig.*, and the exhibits thereto

- October 30, 2023 Deposition Transcript of Gleen Berntson in *IN re Google RTB Consumer Privacy Litig.*, and the exhibits thereto

- https://admanager.google.com/home/success-stories/case-study-accuweather-google-ad-manager-analytics-360/

- https://admanager.google.com/home/success-stories/case-study-priceline-increases-roi-in-mobile-world/

- Alamin Mohammed, Theo Karagioules, Emir Halepovic, Shangyue Zhu, and Aaron Striegel, rePurpose: A Case for Versatile Network Measurement, ICC 2023 (May 28, 2023), available at https://ieeexplore.ieee.org/abstract/document/10279020

- https://support.google.com/admanager/table/7636513?hl=en

- Venky Anant, et al., The consumer-data opportunity and the privacy imperative, McKinsey & Company (Apr. 27, 2020), available at https://www.mckinsey.com/capabilities/risk-andresilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative,

- https://blog.mozilla.org/en/mozilla/firefox-rolls-out-total-cookie-protection-by-default-to-all-users-worldwide/
- Browser Market Share United States of America, Statcounter, available at https://gs.statcounter.com/browser-market-share/all/united-states-of-america

- AbdelKarim Mardini, More intuitive privacy and security controls in Chrome, Chrome Blog (March 19, 2020), available at https://blog.google/products/chrome/more-intuitive-privacy-and-security-controls-chrome/

- John Wilander, Intelligent Tracking Prevention, Apple WebKit Blog (June 5, 2017), available at https://webkit.org/blog/7675/intelligent-tracking-prevention/

- John Wilander, Full Third-Party Cookie Blocking and More, Apple WebKit Blog (March 24, 2020), https://webkit.org/blog/10218/full-third-party-cookie-blocking-and-more/

- Muhammad Ahmad Bashir and Christo Wilson, Diffusion of User Tracking Data in the Online Advertising Ecosystem, PoPETS (July 2018) 2018(4), available at https://cbw.sh/static/pdf/bashir-pets18.pdf

- The Demographic Outlook: 2023 to 2053, The Congressional Budget Office (January 24, 2023), available at https://www.cbo.gov/publication/58612

- AdvertisingIdClient.Info, Google Play Services Documentation (March 21, 2022), available at https://developers.google.com/android/reference/com/google/android/gms/ads/identifier/AdvertisingIdClient.Info

- Aniss Maghsoudlou, Lukas Vermeulen, Ingmar Poese, and Oliver Gasser, Characterizing the VPN Ecosystem in the Wild, PAM (March 21–23, 2023), available at https://vpnecosystem.github.io/

- Luca Schumann, Trinh Viet Doan, Tanya Shreedhar, Ricky Mok, and Vaibhav Bajpai, Impact of Evolving Protocols and COVID-19 on Internet Traffic Shares, arXiv (January 15, 2022), available at https://arxiv.org/abs/2201.00142

- https://support.google.com/google-ads/answer/9614122

- https://web.archive.org/web/20210822143642/https://support.google.com/admanager/answer/2913700

- Maggie Van Nortwick and Christo Wilson, *Setting the Bar Low: Are Websites Complying With the Bare Minimum Requirements of the CCPA?*, PoPETS 2022(1), 2022, available at https://petsymposium.org/popets/2022/popets-2022-0030.php

- Zengrui Liu, Umar Iqbal, and Nitesh Saxena, *Opted Out, Yet Tracked: Are Regulations Enough to Protect Your Privacy?*, PoPETS 2024, pre-publication draft available at https://arxiv.org/pdf/2202.00885.pdf

- TTD-Hewitt-0000002

- New York Time "NetworkBackfillRequests" 24 CSV file

- GOOG-HEWT-00455861

- GOOG-HEWT-00455879

- Underlying data and testing identified by the following file names:
  - 4_reanalyze_by_webpage.ipynb
  - 4_reanalyze_by_webpage.pdf
  - analyze_google_chains.py
  - NYT_identifiability.ipynb
  - NYT_identifiability.pdf
  - publisher_data_per_url.paraquet
  - README.md
  - TDD_identifiability.ipynb
  - TDD_identifiability.pdf

## Exhibit B: Inclusion Chain for the Crate&Kids Ad Image Shown to the Crawler that was Loggin-in to a Google Account and Opted-out of Ad Personalization

```
[
 {
   "timestamp": 1676164795.375991,
   "method": "GET",
   "status": "200",
   "url": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",
   "request": {
     "Upgrade-Insecure-Requests": "1",
     "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"
   },
   "response": {
     "access-control-allow-headers": "Content-Type",
     "access-control-allow-methods": "GET",
     "access-control-allow-origin": "*",
     "cache-control": "public, s-maxage=3600, max-age=600",
     "content-encoding": "gzip",
     "content-length": "55069",
     "content-type": "text\/html; charset=utf-8",
     "date": "Sun, 12 Feb 2023 01:19:55 GMT",
     "edge-cache-tag": "~\/first-year\/month-by-month\/",
     "expires": "Fri, 10 Feb 2023 20:16:25 GMT",
     "last-modified": "Fri, 10 Feb 2023 20:06:25 GMT",
     "vary": "Accept-Encoding",
     "x-device": "desktop",
```

        "x-frame-options": "SAMEORIGIN"

    }

},

{

    "timestamp": 1676164795.607386,

    "method": "GET",

    "status": "200",

    "url":
"https:\/\/content.whattoexpect.com\/assets\/whattoexpect\/dist\/scripts\/min\/js\/views\/sublanding
.bundle.min.js?8439_18189",

    "request": {

        "Referer": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",

        "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like
Gecko) Chrome\/108.0.0.0 Safari\/537.36"

    },

    "response": {

        "x-amz-version-id": "wByV5QQrciXlbgLQyUxIeINZj5vv9gYH",

        "content-encoding": "gzip",

        "date": "Sun, 12 Feb 2023 01:19:55 GMT",

        "x-amz-request-id": "E03SJKZZM53ZF4XD",

        "x-amz-replication-status": "COMPLETED",

        "x-amz-id-2":
"juq9FFVuLdCIHDXfwAEhOfI07\/AQh1nbFs1LfhCoa8PY5jOC4Hoj\/hrod\/mvVdzE85Dm6pY9g0Y=",

        "last-modified": "Wed, 08 Feb 2023 15:30:19 GMT",

        "vary": "Accept-Encoding",

        "access-control-max-age": "86400",

        "content-type": "application\/x-javascript",

        "access-control-allow-origin": "*",

        "access-control-allow-methods": "GET,POST",

        "cache-control": "max-age=604800",

      "access-control-allow-credentials": "false",

      "accept-ranges": "bytes",

      "access-control-allow-headers": "*",

      "expires": "Sun, 19 Feb 2023 01:19:55 GMT"

    }

  },

  {

    "timestamp": 1676164797.715826,

    "method": "GET",

    "status": "200",

    "url": "https:\/\/www.googletagservices.com\/tag\/js\/gpt.js",

    "request": {

      "Referer": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",

      "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"

    },

    "response": {

      "date": "Sun, 12 Feb 2023 01:19:57 GMT",

      "content-encoding": "gzip",

      "x-content-type-options": "nosniff",

      "cross-origin-resource-policy": "cross-origin",

      "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

      "content-length": "27260",

      "x-xss-protection": "0",

      "server": "sffe",

      "etag": "\"1480 \/ 265 of 1000 \/ last-modified: 1676070372\"",

      "vary": "Accept-Encoding",

      "report-to": "{\"group\":\"ads-gpt-scs\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-to\/ads-gpt-scs\"}]}",

        "content-type": "text\/javascript",

        "cache-control": "private, max-age=900, stale-while-revalidate=3600",

        "timing-allow-origin": "*",

        "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-gpt-scs\"",

        "expires": "Sun, 12 Feb 2023 01:19:57 GMT"

      }
    },
    {
      "timestamp": 1676164797.998244,

      "method": "GET",

      "status": "200",

      "url": "https:\/\/securepubads.g.doubleclick.net\/gpt\/pubads_impl_2023020901.js?cb=31072343",

      "request": {

        "Referer": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",

        "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"

      },
      "response": {

        "date": "Thu, 09 Feb 2023 12:02:37 GMT",

        "content-encoding": "gzip",

        "x-content-type-options": "nosniff",

        "age": "220641",

        "cross-origin-resource-policy": "cross-origin",

        "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

        "content-length": "133132",

        "x-xss-protection": "0",

        "last-modified": "Thu, 09 Feb 2023 09:35:45 GMT",

        "server": "sffe",

        "vary": "Accept-Encoding",

"report-to": "{\"group\":\"ads-gpt-
scs\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-
to\/ads-gpt-scs\"}]}",

    "content-type": "text\/javascript",

    "cache-control": "public, immutable, max-age=31536000",

    "accept-ranges": "bytes",

    "timing-allow-origin": "*",

    "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-gpt-scs\"",

    "expires": "Fri, 09 Feb 2024 12:02:37 GMT"

  }
 },
 {

   "timestamp": 1676164823.48643,

   "method": "GET",

   "status": "200",

   "url":
"https:\/\/467865c4009ef66df2eda47770462913.safeframe.googlesyndication.com\/safeframe\/1-0-
40\/html\/container.html",

   "request": {

    "Referer": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",

    "Upgrade-Insecure-Requests": "1",

    "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like
Gecko) Chrome\/108.0.0.0 Safari\/537.36"

   },

   "response": {

    "accept-ranges": "bytes",

    "age": "25",

    "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

    "cache-control": "public, immutable, max-age=31536000",

    "content-encoding": "br",

        "content-length": "2653",

        "content-type": "text\/html",

        "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-gpt-scs\"",

        "cross-origin-resource-policy": "cross-origin",

        "date": "Sun, 12 Feb 2023 01:19:58 GMT",

        "expires": "Mon, 12 Feb 2024 01:19:58 GMT",

        "last-modified": "Thu, 03 Nov 2022 19:10:08 GMT",

        "report-to": "{\"group\":\"ads-gpt-scs\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-to\/ads-gpt-scs\"}]}",

        "server": "sffe",

        "timing-allow-origin": "*",

        "vary": "Accept-Encoding",

        "x-content-type-options": "nosniff",

        "x-xss-protection": "0"

      }

    },

    {

      "timestamp": 1676164823.571097,

      "method": "GET",

      "status": "200",

      "url": "https:\/\/tagan.adlightning.com\/wte\/b-f140f48-a9210dda.js",

      "request": {

        "Referer": "https:\/\/467865c4009ef66df2eda47770462913.safeframe.googlesyndication.com\/",

        "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"

      },

      "response": {

        "date": "Wed, 08 Feb 2023 00:50:39 GMT",

        "content-encoding": "gzip",

      "via": "1.1 cd9c85933a60bbac347299c34015e9ba.cloudfront.net (CloudFront)",

      "x-amz-version-id": "m_Vf7w8qvD.vCgf_BKNBIueIku9WizZd",

      "x-amz-cf-pop": "BOS50-C2",

      "age": "347385",

      "x-cache": "Hit from cloudfront",

      "content-length": "27631",

      "x-amz-meta-git_commit": "f140f48",

      "last-modified": "Mon, 23 Jan 2023 20:16:31 GMT",

      "server": "AmazonS3",

      "etag": "\"7caa80ed58205094d2ab24fecf4c76fd\"",

      "content-type": "application\/javascript",

      "cache-control": "max-age=31536000",

      "accept-ranges": "bytes",

      "x-amz-cf-id": "DjqN3woOUEyh4ZOYEaJe3FVAE3aLOvB8JqOw_n75Vc40nJK3PzL3Uw=="

    }

  },

  {

    "timestamp": 1676164824.259177,

    "method": "GET",

    "status": "200",

    "url": "https:\/\/s0.2mdn.net\/sadbundle\/5233103642561494263\/970x90\/CK04AD_S23_4434433_SpringP
d_Easter_970x90.html",

    "request": {

      "Referer": "https:\/\/467865c4009ef66df2eda47770462913.safeframe.googlesyndication.com\/",

      "Upgrade-Insecure-Requests": "1",

      "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like
Gecko) Chrome\/108.0.0.0 Safari\/537.36"

    },

    "response": {

            "accept-ranges": "bytes",

            "access-control-allow-origin": "*",

            "age": "190094",

            "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

            "cache-control": "public, max-age=31536000",

            "content-encoding": "gzip",

            "content-length": "2150",

            "content-type": "text\/html",

            "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-doubleclick-media\"",

            "cross-origin-resource-policy": "cross-origin",

            "date": "Thu, 09 Feb 2023 20:32:10 GMT",

            "expires": "Fri, 09 Feb 2024 20:32:10 GMT",

            "last-modified": "Tue, 07 Feb 2023 06:18:23 GMT",

            "report-to": "{\"group\":\"ads-doubleclick-media\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-to\/ads-doubleclick-media\"}]}",

            "server": "sffe",

            "timing-allow-origin": "*",

            "vary": "Accept-Encoding",

            "x-content-type-options": "nosniff",

            "x-dns-prefetch-control": "off",

            "x-xss-protection": "0"

        }

    },

    {

        "timestamp": 1676164824.656613,

        "method": "GET",

        "status": "200",

"url":
"https:\/\/s0.2mdn.net\/sadbundle\/5233103642561494263\/970x90\/images\/CK04AD_S23_4434433
_SpringPd_Easter_970x90_atlas_NP_1.jpg",

  "request": {

   "Referer":
"https:\/\/s0.2mdn.net\/sadbundle\/5233103642561494263\/970x90\/CK04AD_S23_4434433_SpringP
d_Easter_970x90.html",

   "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like
Gecko) Chrome\/108.0.0.0 Safari\/537.36"

  },

  "response": {

   "date": "Thu, 09 Feb 2023 20:32:10 GMT",

   "x-content-type-options": "nosniff",

   "age": "190094",

   "x-dns-prefetch-control": "off",

   "cross-origin-resource-policy": "cross-origin",

   "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

   "content-length": "38731",

   "x-xss-protection": "0",

   "last-modified": "Tue, 07 Feb 2023 06:18:23 GMT",

   "server": "sffe",

   "report-to": "{\"group\":\"ads-doubleclick-
media\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-
to\/ads-doubleclick-media\"}]}",

   "content-type": "image\/jpeg",

   "access-control-allow-origin": "*",

   "cache-control": "public, max-age=31536000",

   "accept-ranges": "bytes",

   "timing-allow-origin": "*",

   "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-doubleclick-media\"",

   "expires": "Fri, 09 Feb 2024 20:32:10 GMT"

```
    }
  }
]
```