# EXHIBIT I
# to the Declaration of
# G. Berntson

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 52

## SEALED VERSION

## FILED UNDER SEAL

CONFIDENTIAL

1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4                     ---oOo---

5

6     IN RE GOOGLE RTB

7     CONSUMER PRIVACY

8     LITIGATION

9     _____/      Consolidated Number

10    This document applies to      5:21-cv-02155-LHK-VKD

11    all actions.

12    _____/

13

14                   CONFIDENTIAL

15    VIDEOTAPED DEPOSITION OF GOOGLE AND SUNEETI VAKHARIA

16          30(b)(6) and Personal Capacity

17

18              November 15, 2023

19

20

21

22    REPORTED BY:

23    EARLY K. LANGLEY RMR, RSA, B.A.

24    CSR NO. 3537

25    JOB NO:  SF 6278992

                                        Page 1

CONFIDENTIAL

```
1                    I N D E X
2
                                              PAGE
3
     SUNEETI VAKHARIA                            9
4
     DIRECT EXAMINATION BY MS. WEAVER            9
5
     CROSS-EXAMINATION BY MS. REDDY            300
6
     REDIRECT EXAMINATION BY MS. WEAVER        310
7
8
9
10                   E X H I B I T S
11
12   EXHIBIT NO.                               PAGE
13   Exhibit 1      Amended Notice of Deposition of   12
                    Suneeti Vakharia
14
     Exhibit 2      Third Amended 30(b)(6) Deposition   13
15                  Notice, served 10/18/23
16   Exhibit 3      Suneeti Vakharia's LinkedIn    17
                    Profile
17
     Exhibit 4      Ads Product Strategy Offsite-APSO   71
18                  2018, GOOG-HEWT-00130415
                    through 422
19
     Exhibit 5      Email, GOOG-HEWT-00456480     97
20
     Exhibit 6      Email, GOOG-HEWT-00058905    103
21                  through 08
22   Exhibit 7      Email, GOOG-HEWT-00059000    114
                    through 903
23
     Exhibit 8      GOOG-HEWT-00482703 through 33,   120
24                  "Title:  Display Ads Identity:
                    "Update for N2 Leads/Brad"
25
```

Page 2

1    Exhibit 9      GOOG-HEWT-00486978 through 79    133

2    Exhibit 10     Declaration of Suneeti Vakharia    153
                    with Exhibits 1-7
3
     Exhibit 11     Declaration of Bethany Caracuzzo    189
4                   with Exhibits 34-41

5    Exhibit 12     Reference Notes with witness's    175
                    handwritten notes
6
     Exhibit 13     Caracuzzo Declaration Exhibit 42    191
7
     Exhibit 14     Bates 00486495 through 537    195
8
     Exhibit 15     GOOG-HEWT-00489927 through 931    207
9
     Exhibit 16     Consolidated Class Action    225
10                  Complaint

11   Exhibit 17     Exhibit 26 to the Consolidated    230
                    Class Action Complaint
12
     Exhibit 18     Declaration of Glenn Berntson in    233
13                  Support of Google's Opposition to
                    Class Certification
14
     Exhibit 19     GOOG-HEWT-00482522    323

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1               DEPOSITION OF SUNEETI VAKHARIA

2

3          BE IT REMEMBERED, that pursuant to Notice,

4     and on November 15, 2023, commencing at the hour

5     of 8:02 a.m., in the offices of 840 Malcolm Road,

6     Suite 200, Burlingame, California, before me,

7     EARLY LANGLEY, a Certified Shorthand Reporter,

8     State of California, personally appeared SUNEETI

9     VAKHARIA, produced as a witness in said action,

10    and being by me first duly sworn, was thereupon

11    examined as a witness in said cause.

12                    ---oOo---

13    APPEARANCES:

14    ATTORNEYS FOR THE PLAINTIFFS AND THE

15    PROPOSED CLASS:

16

17          BLEICHMAR FONTI & AULD LLC

18          BY: LESLEY WEAVER, ESQ.

19          BY: MELISSA MATHER, ESQ.

20          1330 Broadway

21          Oakland CA 94607

22          415-445-4003

23          Lweaver@bfalaw.com

24          Mmather@bfalaw.com

25

                                        Page  4

CONFIDENTIAL

```
 1   ATTORNEYS FOR THE PLAINTIFFS AND THE
 2   PROPOSED CLASS (Cont'd):
 3
 4           PRITZKER LEVINE LLP
 5           BY: BETHANY CARACUZZO, ESQ.
 6           1900 Powell Street, Suite 450
 7           Emeryville, California 94608
 8           bc@pritzkerlevine
 9
10           COTCHETT PITRE & MCCARTHY
11           BY: KARIN SCOPE, ESQ.
12           840 Malcolm Road, Suite 200
13           Burlingame, California 94010
14           650-697-6000
15
16   ATTORNEYS FOR DEFENDANT GOOGLE LLC
17   AND THE WITNESS:
18           COOLEY LLP
19           BY: AARTI REDDY, ESQ.
20           BY: REECE TREVOR, ESQ.
21           101 California Street, 5th Floor
22           San Francisco, California 94111-5800
23           415.693.2029
24           areddy@cooley.com
25           rtrevor@cooley.com
```

Page 5

1    ALSO PRESENT:

2            DENISHA BACCHUS, ESQ. (Via Zoom), In-House

3            Counsel for Google

4            ANNE DAVIS (Via Zoom)

5            Cameron Tuttle, Videographer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  6

CONFIDENTIAL

```
 1                      --oOo--

 2              P R O C E E D I N G S

 3                      --oOo--

 4          THE VIDEOGRAPHER:  Good morning.  We are

 5    going on the record.  The time is 8:02 a.m. on      08:02

 6    November 15th, 2023.

 7              Please note that the microphones are

 8    sensitive and may pick up whispering and private

 9    conversations.  Please mute your phones at this

10    time.  Audio and video recording will continue to   08:03

11    take place unless all parties agree to go off the

12    record.

13              This is Media Unit 1 of the video-recorded

14    deposition of Suneeti Vakharia taken by counsel

15    for plaintiff in the matter of In re:  Google RTB    08:03

16    Consumer Privacy Litigation filed in the United

17    States District Court for the Northern District of

18    California, Oakland Division, Case Number

19    21-CV-02155-YGR-VKD.

20              My name is Cameron Tuttle representing      08:03

21    Veritext, and I'm the videographer.  The court

22    reporter is Early Langley, also from Veritext.

23              I'm not authorized to administer an oath.

24    I am not related to any party in this action, nor

25    am I financially interested in the outcome.          08:04
```

Page  7

CONFIDENTIAL

```
 1            If there are any objections to the
 2    proceeding, please state them at the time of your
 3    appearance.
 4            Counsel and all present, including
 5    remotely, will now state their appearances and      08:04
 6    affiliations for the record beginning with the
 7    noticing attorney.
 8            MS. WEAVER:  Good morning.  I'm Lesley
 9    Weaver.  I'm with Bleichmar Fonti.  I'm
10    representing the plaintiffs.                         08:04
11            MS. CARACUZZO:  Good morning.  Bethany
12    Caracuzzo of Pritzker Levine on behalf of
13    plaintiffs.
14            MS. SWOPE:  Good morning.  Karin Swope,
15    Cotchett Pitre & McCarthy, on behalf of             08:04
16    plaintiffs.
17            MS. MATHER:  Melissa Mather from Bleichmar
18    Fonti & Auld on behalf of plaintiffs.
19            MS. REDDY:  Aarti Reddy from the Cooley
20    law firm on behalf of defendant Google, also        08:04
21    representing the witness, Suneeti Vakharia.
22            MR. TREVOR:  Good morning.  Reece Trevor
23    from Cooley LLP for Goggle and Ms. Vakharia.
24            And Ms. Bacchus?
25            MS. BACCHUS:  Good morning.  Denisha         08:04
```

Page 8

CONFIDENTIAL

```
 1    Bacchus, in-house counsel at Google.
 2            THE VIDEOGRAPHER:  Will the court reporter
 3    please swear in the witness.
 4            COURT REPORTER:  Can we go off the record?
 5            MS. WEAVER:  Yes.                        08:05
 6            THE VIDEOGRAPHER:  We're going off the
 7    record.  The time is 8:05 a.m.
 8                (Off the record.)
 9            THE VIDEOGRAPHER:  We're back on the
10    record.  The time is 8:05 a.m.                   08:05
11            Will the court reporter please swear in
12    the witness.
13                    SUNEETI VAKHARIA
14                 sworn as a witness,
15                 testified as follows:               08:06
16    DIRECT EXAMINATION BY MS. WEAVER:
17        Q.  Good morning.  Will you please state your
18    full name for the record.
19        A.  Sure.  My name is Suneeti Vakharia.
20        Q.  And where are you currently employed?    08:06
21        A.  I'm currently employed at Google.
22        Q.  And you are in the San Francisco office of
23    Google; is that correct?
24        A.  I'm in the Sunnyvale office.
25        Q.  Sunnyvale office.  Excellent.            08:06
```

Page 9

CONFIDENTIAL

```
1          A.  Yes, I am.

2          Q.  Okay.  And do you see the second sentence:

3              (As read):

4                  "The terms of service and privacy

5              policies, including incorporated or        08:10

6              hyperlinked documents that are the subject

7              of this topic are limited to the documents

8              specifically discussed and identified in

9              plaintiff's class certification motion,

10             specifically the Caracuzzo declaration"?   08:10

11             Do you see that?

12         A.  I do see that.

13         Q.  Are you prepared to testify on that topic?

14         A.  Yes, I am.

15         Q.  Okay.  And then do you see in the third     08:11

16     sentence, the topic says:

17             (As read):

18                 "We seek testimony from Google about

19             how these documents were created, the

20             authorization and approval process before  08:11

21             any such documents are released publicly,

22             how they are maintained and tracked within

23             Google, who the documents apply to, for

24             what periods of time each applies, and how

25             each is published or made available to      08:11
```

Page 15

1    what it is.

2        Q.  And what is it?

3        A.  It is some version of a marketplace where

4    an ad request is communicated to a set of

5    advertisers, including, I believe, Google as a        08:48

6    participant.  But we have some sort of product

7    that allows for this marketplace to occur such

8    that there is an ad slot made available to a set

9    of advertisers.

10        And then I don't exactly know what a        08:49

11    bidding process looks like, but they're able to do

12    some bid.  And based on whatever just parameters,

13    they're able to be matched to that ad slot, and

14    they get the ad slot.

15        Q.  Are you aware of any projects that were        08:49

16    user facing that describe the real-time bidding

17    auction to users?

18        A.  No.

19        MS. REDDY:  Objection.  Vague and

20    ambiguous.        08:49

21    BY MS. WEAVER:

22        Q.  And are you aware of what user verticals

23    are?

24        A.  I don't know what that is.

25        Q.  Were you aware of any projects that would  08:49

Page 49

1    explain to users what information was being shared

2    about them in the real-time bidding auctions?

3         A.  I'm not familiar --

4              MS. REDDY:  Objection.  Vague as to time.

5              THE WITNESS:  I'm not familiar with any    08:49

6    specific projects related to RTB in general.

7    BY MS. WEAVER:

8         Q.  And at any time?

9         A.  At any time.

10        Q.  Do you know who might be?                   08:50

11        A.  I wouldn't know.  I'm not on the ads team.

12        Q.  You testified earlier that you were also

13   engaged on the issue of consent; is that right?

14        A.  That's correct.

15        Q.  What is consent?                            08:50

16        A.  Consent, from a legal definition, I

17   couldn't tell you.  From a product standpoint,

18   it's the set of screens that my team is

19   responsible for to make sure that we're surfacing

20   the legally required information to users either    08:50

21   in account creation or via those controls, working

22   with that partner team that I mentioned.

23        Q.  And when you say, "that we're surfacing

24   the legally required information," what do you

25   mean?                                               08:50

Page 50

CONFIDENTIAL

1          Q.  How is that different from the consent and
2     privacy -- privacy and consent portfolio?
3          A.  One is an ads team, so I don't know the
4     scope of that team's work.  He is my partner in my
5     work.                                                09:09
6          Q.  So when you say he's an ads team, he is
7     facing advertisers; is that right?
8          A.  He is on the ads team responsible for
9     thinking about privacy in the ads product area.
10         Q.  And are you responsible for thinking about 09:09
11    privacy as to users?
12         A.  I am responsible for thinking about
13    privacy more generally for all users.
14         Q.  And in your work as thinking about privacy
15    for all users more generally, you have not been      09:10
16    tasked or heard of anybody being tasked with
17    focusing on transparency related to the real-time
18    bidding auction; is that right?
19         A.  No, I have not.
20         Q.  Okay.  And your testimony earlier, just to 09:10
21    clarify, is that it is possible that somebody on
22    the ads team was tasked with transparency to users
23    related to the real-time bidding auction; is that
24    fair?
25         A.  I just don't know who, if anyone has.      09:10

                                             Page 56

CONFIDENTIAL

```
1              Your statement a moment ago is that Google
2     aims to try to make things understandable to
3     users; right?
4          A.   Right.  You asked if it was a tenet, if I
5     recall.  From a product perspective, when we work    09:17
6     on consent, we're trying to communicate in a way
7     that's clear and understandable to users.
8     Whatever information we may put in front of them,
9     we try to be clear and understandable.
10         Q.   The question I'm asking is more focused on  09:17
11    what you're communicating and the scope of what is
12    disclosed before a user can agree.
13              Is that fair?
14              MS. REDDY:  Objection.  Vague.
15              THE WITNESS:  Yeah, I think I'm not         09:18
16    understanding your question.
17    BY MS. WEAVER:
18         Q.   So this is the question:  In your work at
19    Google, can somebody consent to a data collection
20    practice that is not disclosed to them?             09:18
21         A.   I don't think we would ask someone to
22    consent to something that is not disclosed to
23    them.  We would disclose what they need to consent
24    to.  We share information, and that's what they're
25    making an agreement to.                             09:18
```

Page 62

1          Q.  So disclosure is critical to consent;

2     correct?

3          A.  Right.  We're sharing information with

4     them.  And I don't know if "disclosure" has a

5     legal definition, but sharing information.  We        09:18

6     would share the appropriate information for them

7     to consent to.

8          Q.  Right.

9          A.  Or to agree or proceed with whatever

10    service they're interacting with.                      09:18

11         Q.  And is it fair to say that if you don't

12    tell users about a certain data collection

13    practice, then they cannot consent to it?

14              MS. REDDY:  Objection.  Calls for a legal

15    conclusion.                                            09:19

16              THE WITNESS:  I don't know if that --

17    like, I don't know, from a legal perspective, if

18    one can consent to something or not under your

19    definition.

20    BY MS. WEAVER:                                         09:19

21         Q.  Okay.  Again, not asking for a legal

22    conclusion.  I'm asking about your practice at

23    Google.

24         A.  Right.

25         Q.  When you are creating consent screens, is  09:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    practices are.  I don't personally work on any of

2    that, but that's the general process in -- in

3    Google.  When you develop a product, there is a

4    back-end feature that matches the product that's

5    user facing.                                        09:21

6        Q.  And what do you mean by "a back-end

7    feature"?

8        A.  There's some sort of enforcement system or

9    logging that's ensuring whatever the requirement

10   is.  If there is a legal requirement to have a      09:21

11   user's account be created and some storage of the

12   fact that that account was created, there would

13   be -- the engineering team would be responsible

14   for making sure that that actually occurs.

15       Q.  And you know that because engineering       09:22

16   folks tell you that; right?

17       A.  Because, yes, that's the general Google

18   process, yes.

19       Q.  And sticking with the idea of when a user

20   account is created, what is in the log?             09:22

21       A.  I am not familiar with what is in the log.

22   That would be something at an engineering level,

23   that they would be familiar with.

24       Q.  When a user account is created, does

25   Google know whether they are subject to a U.S.      09:22

Page 66

```
 1    term of service or GDPR?
 2         A.  Yes.  Google would understand that because
 3    of the location of the account and where -- and,
 4    like, where it's being created from.
 5         Q.  And when you say "because of the location    09:22
 6    of the account," how does Google determine the
 7    location?
 8         A.  I believe that it's based on the location,
 9    the IPGOF, whatever country that they're
10    potentially in.                                       09:22
11         Q.  You say "IPGOF."  What is that?
12         A.  Oh, IPGO, meaning there is some IP address
13    that's assigned as far as the geography of a
14    country.  And so wherever the account was made,
15    based on however that signal is developed, it         09:23
16    would be allocated to a country, and then we know
17    which country you're supposed to show the
18    appropriate disclosure for.
19         Q.  So to be clear, Google relies on the IPGO
20    to determine which privacy rules it complies with     09:23
21    when providing information to users; is that
22    right?
23              MS. REDDY:  Objection.  Misstates the
24    testimony.
25              THE WITNESS:  I understand that's one of    09:23
```

Page 67

1    the signals that's used for defining how a TOS --

2    or you had asked about the terms of service.

3    Like, that is one of the signals.  I don't know

4    all of them.  I don't know if there are others,

5    and I know that there must be other things.  I          09:23

6    just -- that's the one I'm familiar with.

7    BY MS. WEAVER:

8        Q.  Who would know about any other signals

9    that are used to determine what TOS is invoked?

10            MS. REDDY:  Objection.  Vague.                 09:23

11            THE WITNESS:  I don't -- that's -- that's

12    the piece that I -- I don't know who at the

13    company knows other parts of the location kind of

14    signals.  Somebody in engineering.

15    BY MS. WEAVER:                                          09:24

16        Q.  So you recall that Topic 2 for the

17    30(b)(6) is:

18            (As read):

19                "The Google terms of service and

20            privacy policies applicable in the United     09:24

21            States and the accounts to which they

22            apply."

23            Do you recall that sentence?

24        A.  Correct, yes.

25        Q.  So now I'm going to ask you, in the scope      09:24

Page 68

1    of responding on behalf of Google, how does Google

2    know which TOS to show a user when they create a

3    Google account?

4         A.  So --

5              MS. REDDY:  Objection.  Scope.            09:25

6              THE WITNESS:  As I understand it, the TOS

7    is based on -- there's a country-specific version

8    that shows to the relevant location.  I'm not -- I

9    don't work on the account itself, so I don't know

10   what the underlying signal is.                      09:25

11             I understand that IP address is one

12   version that has been used in the course of my

13   work to understand where a user might be located,

14   but there is a signal that would then inform which

15   is the relevant location of the TOS to show.        09:25

16   BY MS. WEAVER:

17        Q.  And what's the basis of your understanding

18   that there is a signal?

19             MS. REDDY:  Objection.  Outside of the

20   scope of the 30(b)(6) notice.                        09:25

21             THE WITNESS:  Because it's a common kind

22   of notion that IP address is the signal that is

23   used for kind of general location or where --

24   like, as the source for this.  Just -- I don't

25   specifically remember where I would have learned    09:26

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1    this.
 2    BY MS. WEAVER:
 3         Q.  So it's based, in general, on your
 4    experience at Google, IP address is the signal for
 5    location in terms of indicating which TOS should    09:26
 6    apply?
 7         A.  That is my --
 8              MS. REDDY:  Same objection.
 9              THE WITNESS:  That is my understanding of
10    one of the signals.  I don't know if there are      09:26
11    other signals.
12    BY MS. WEAVER:
13         Q.  So as you sit here today, you don't know
14    if there are any other signals on behalf of
15    Google?                                             09:26
16              MS. REDDY:  Outside the scope of the
17    30(b)(6) notice.
18              THE WITNESS:  That is my understanding is
19    the IP address is one of the signals that's used.
20    I don't know of the other signals, if there are     09:26
21    any.
22    BY MS. WEAVER:
23         Q.  Okay.  Let's go back to your personal
24    capacity and your resumé.  You were talking about
25    identity ecosystems.                                09:26
```

Page 70

1    under ECF 231.

2            THE WITNESS:  Could you repeat the

3    question?

4    BY MS. WEAVER:

5        Q.  Switching to your testimony on behalf of    09:45

6    Google, with regard to consent, is it your

7    understanding that if Google was using sensitive

8    information, such as health, financial, sexual

9    orientation, race, et cetera, for personalization,

10   should Google tell users that they are doing that    09:45

11   in order to obtain users' consent?

12           MS. REDDY:  Same objection.

13           THE WITNESS:  So in my experience, we

14   don't use that information at all, and so that

15   doesn't apply at all.                                09:45

16   BY MS. WEAVER:

17       Q.  What is the basis of your belief?

18       A.  From our own policies that preclude us

19   from using sensitive information for personalizing

20   as a basis for personalizing ads.                    09:45

21       Q.  Have you read the Complaint in this case?

22       A.  I have read the motion that was submitted.

23       Q.  Not a motion, but Complaint, the original

24   document?

25       A.  I don't think I have access to the           09:45

                                              Page 87

1    original document.

2         Q.  Are you aware that the Complaint

3    identifies specific personal categories called

4    verticals that are attached to users in the bid

5    request that, for example, discloses health          09:46

6    information?

7         A.  I'm not --

8              MS. REDDY:  Objection.  Lacks foundation.

9    BY MS. WEAVER:

10        Q.  Are you aware of whether or not in the        09:46

11   Complaint there is, for example, a vertical that

12   refers to OB/GYN and Solicits ads based on that

13   vertical?

14             MS. REDDY:  Objection.  Outside the scope.

15   Lacks foundation.  Calls for speculation.             09:46

16             THE WITNESS:  I'm not familiar with what a

17   vertical is.

18   BY MS. WEAVER:

19        Q.  And in preparing for your testimony today

20   on the topic of the procedures by which Google        09:46

21   seeks or obtains Google account holders' consent

22   to share with or sell to third parties outside of

23   Google, in Google RTB, any of the information

24   described in Topic 4 --

25        A.  Correct.                                       09:46

Page 88

1          Q.  -- did you consult with an engineer?

2          A.  I consulted with the team that's -- the

3     declarants, and I read the declarants' declaration

4     for RTB, but I did not speak with any engineers.

5          Q.  And so how do you know for sure what        09:47

6     Google is sharing in the Google real-time bidding

7     auction?

8          A.  I --

9              MS. REDDY:  Objection.  Argumentative.

10             THE WITNESS:  It's based on my awareness    09:47

11    of what our policies are in the course of my work.

12    BY MS. WEAVER:

13         Q.  It is not based on an engineering

14    understanding of what actually occurs; is that

15    right?                                                09:47

16             MS. REDDY:  Objection.  Misstates the

17    testimony.

18             THE WITNESS:  I did not speak with an

19    engineer.

20    BY MS. WEAVER:                                        09:47

21         Q.  Do you see on Topic 4(b), where it says

22    "Activity information"?

23         A.  Yes.

24         Q.  Do you see the word "verticals"?

25         A.  I do see the word "verticals."             09:47

                                            Page 89

1        ████████████████████████████

         ████████████████████████

3            Do you see that?

4        A.  I do see that.

5        Q.  What's your understanding of what that       09:51

6    sentence is conveying?

7            MS. REDDY:  Objection.  Calls for

8    speculation.

9            THE WITNESS:  I don't actually know

10   because I don't quite understand the context of      09:51

11   the auto-bidding question or any of this

12   particular proposal when it comes to the overall.

13   I don't have context on the document and haven't

14   quite digested it vis-à-vis what is the big

15   change.                                              09:52

16   BY MS. WEAVER:

17       Q.  Did you refer to reading a declaration a

18   moment ago?

19       A.  I did.  I had been provided Glenn

20   Berntson's declaration to familiarize myself with    09:52

21   the background of kind of roughly how this RTB

22   system works.

23           MS. REDDY:  Counsel, are we back in the

24   30(b)(6) capacity now?

25           MS. WEAVER:  No, we're not yet.              09:52

                                              Page 94

```
 1    BY MS. WEAVER:
 2        Q.  Who is Glenn Berntson?
 3        A.  He's a member of the ads engineering team.
 4        Q.  Had you interacted with him prior to
 5    preparing for your testimony today?              09:52
 6        A.  No, I didn't interact with him.
 7        Q.  In your official capacity testifying on
 8    behalf of Google, did you rely on a declaration of
 9    Glenn Berntson to prepare for your testimony
10    today?                                          09:52
11        A.  Correct, to familiarize myself with the
12    background on what is RTB.
13        Q.  What's your understanding of who Glenn
14    Berntson is?
15        A.  He's an engineering director or leader,  09:53
16    someone involved, a senior engineer that is
17    involved in that particular product.
18        Q.  And how did you come to rely on his
19    declaration?
20        A.  I was provided it by my legal counsel    09:53
21    here.
22        Q.  Did you -- what aspects of his declaration
23    are you relying on for your testimony today?
24        A.  I --
25            MS. REDDY:  Objection.  Vague.           09:53
```

Page 95

```
 1              THE WITNESS:  I was relying on reading the

 2      background to understand exactly how RTB kind of

 3      just generally works because I'm not familiar with

 4      the system or product.

 5      BY MS. WEAVER:                                    09:53

 6          Q.  And what -- I'm sorry.

 7          A.  I'm sorry.

 8          Q.  What do you understand about how RTB works

 9      from reading Mr. Berntson's declaration?

10          A.  It's similar to what I described earlier,  09:53

11      which is that there is some version of a

12      marketplace or an auction that occurs, and we have

13      a particular product that enables this.  And then

14      there are different requests for advertising that

15      then matched to a set of participants who would     09:54

16      then make -- based on various parameters, may

17      make, like, a pricing choice or some kind of bid

18      that then allows them to be matched to that

19      particular ad slot.

20          Q.  Did you review Mr. Berntson's -- I think    09:54

21      it's Dr., isn't it?

22              MS. REDDY:  It's Dr.

23              MS. WEAVER:  I'm sorry.

24              THE WITNESS:  Oh.

25      BY MS. WEAVER:                                      09:54
```

Page 96

CONFIDENTIAL

```
 1          Q.  And do you know who Haskell Garon is?

 2          A.  I do not know who that is.

 3          Q.  Do you know who Stan Belov is?

 4          MS. REDDY:  Objection.  Asked and

 5     answered.                                          09:56

 6          THE WITNESS:  I do not know who that is.

 7     BY MS. WEAVER:

 8          Q.  Okay.  And do you see where Mr. Belov

 9     wrote at the bottom of this document:

10          (As read):                                    09:56

11          ████████████████████████████

     ██        █████████████████████████████

     ██        ███████████████████████████████

     ██        ████████████████████████

15          Do you see that?                              09:57

16          A.  Yes, I do see that.

17          Q.  Do you know whether Google disclosed

18     that -- to users that Google was selling their

19     data?

20          MS. REDDY:  Objection.  Lacks foundation.     09:57

21     Argumentative.  Outside the scope of the 30(b)(6)

22     notice.  It calls for a legal conclusion.

23          THE WITNESS:  I'm not familiar with

24     whether there is an association.  I'm trying to

25     parse what he commented on.  I apologize.          09:57
```

Page 99

CONFIDENTIAL

```
 1    BY MS. WEAVER:

 2          Q.  Take your time.

 3          A.  Could you repeat the question?

 4          Q.  Sure.  Does Google disclose to users that

 5    they are selling their data?                        09:57

 6          A.  Google does not sell data --

 7          MS. REDDY:  Sorry.  Outside the scope.

 8          Go ahead.

 9          THE WITNESS:  Google does not sell data

10    according to the practices and policies that were  09:57

11    disclosed and documented.

12    BY MS. WEAVER:

13          Q.  And I'm asking something slightly

14    different.  You're answering whether Google does

15    it.  I'm asking whether Google discloses to users  09:58

16    that they sell data.

17          MS. REDDY:  Objection.  Scope.

18          THE WITNESS:  We do not disclose that

19    because we do not do it.

20    BY MS. WEAVER:                                      09:58

21          Q.  And the basis for you saying that Google

22    does not do it is what?

23          A.  That we have specific policies that

24    prohibit that and that was disclosed, do not allow

25    us to do that -- we do not do that.                 09:58
```

Page 100

CONFIDENTIAL

```
1          Q.  What is the basis for your testimony that
2     it does not actually happen?
3               MS. REDDY:  Objection.  Scope.
4               THE WITNESS:  The standard processes and
5     faith in the system and enforcement that we have    09:58
6     underlying our policies --
7     BY MS. WEAVER:
8          Q.  Did you -- I'm sorry.
9          A.  -- as opposed to talking to an engineer.
10         Q.  And you didn't talk to Dr. Berntson, did   09:58
11    you?
12         A.  No.  I've never met Dr. Berntson.
13         Q.  Have you talked to any Google engineer
14    about whether or not Google sells users' data?
15         A.  No, I have not.                            09:58
16         Q.  So the basis for your testimony that
17    Google does not sell user data is that Google does
18    not -- has policies in place that would prohibit
19    that; is that correct?
20         A.  Correct.                                   09:59
21         Q.  Is there any other basis for that opinion
22    that you hold on behalf of Google?
23         A.  There is no additional comment, no.
24         Q.  Okay.  We'll go back to your personal
25    capacity.  On page 4, in the middle of the         09:59
```

Page 101

```
1    BY MS. WEAVER:
2         Q.  Okay.  I will show you what I have marked
3    as Exhibit 8.
4         A.  Uh-huh.
5         Q.  And I'll direct your attention -- it's a      10:39
6    little hard to read, but your name appears on the
7    first page.
8         A.  Yes.
9         Q.  Exhibit 8 for the record is
10   GOOG-HEWT-00482703 through 33.                         10:39
11        And if you go to the back of the document,
12   that's hardcopy metadata that was produced by
13   Google in this case.  And you see it says you're a
14   custodian?
15        A.  Yes, that's correct.                          10:40
16        Q.  Just FYI, on some of these documents, that
17   shows up.
18        Do you see it says:
19        ██████████  ████████████████████
          █████████  ████████████████████              10:40
21        A.  Yes, that's correct.
22        Q.  Okay.  What is Exhibit 8?
23        A.  It looks like signed-in identity -- could
24   be coverage from some of our dashboards.
25             MS. REDDY:  Take your time to review the    10:40
```

Page 121

```
 1    document.
 2    BY MS. WEAVER:
 3         Q.  What is signed-in identity coverage?
 4         A.  It is where we have identity of a known
 5    user or a set of platforms where we know that we    10:40
 6    can identify users that are signed in.
 7         Q.  Okay.  Let me back up and say, is
 8    Exhibit 8 a document that you prepared in the
 9    course of your work at Google?
10         A.  Yes.  I contributed to this document.    10:41
11         Q.  And is it a slide deck?
12         A.  It is a slide deck.
13         Q.  Do you recall its purpose?
14         A.  I don't recall the purpose.  This was some
15    years ago.                                          10:41
16         MS. REDDY:  It looks like the witness is
17    still reviewing the document.
18         MS. WEAVER:  She's fine.
19         THE WITNESS:  Give me one moment.  Sorry.
20    Let me --                                           10:41
21         MS. WEAVER:  Sure.
22         THE WITNESS:  -- just read if there's
23    context inside the document itself.
24         Yes, this was some sort of update to Brad,
25    our VP.                                             10:41
```

Page 122

CONFIDENTIAL

 1    be a part of the ads team.

 2         Q.  Okay.  And what was the consent team at

 3    this time?

 4         A.  I don't recall who would be on the consent

 5    team or what it was.                                10:42

 6         Q.  Okay.  Looking -- and can you turn to the

 7    page ending in 2717.

 8         A.  Sure.

 9             Yes.

10         Q.  This says "Signed-" --                    10:43

11             Well, can you describe what this chart is

12    reflecting?

13         A.  Yes.  This is a chart that reflects the

14    different platforms that we have signed-in users

15    interacting on, with revenue data attached to       10:43

16    where we have users signed in and where there's

17    users who are not signed out -- who are not signed

18    in.

19         Q.  And what is the source of the revenue data

20    by sign in and device?                              10:43

21         A.  I don't know what the source would be.  It

22    looks like percentages, but I don't know what

23    those -- the source would have been.  It would

24    have been the ads finance team.

25         Q.  So ads finance team prepared this?         10:43

                                              Page 124

1          MS. REDDY:  Objection.  Misstates

2     testimony.

3          THE WITNESS:  I don't -- I contributed to

4     this, along with my two bosses, but I don't know

5     where the source of the data was.  I don't recall   10:44

6     that.

7     BY MS. WEAVER:

8        Q.  Okay.  I'm asking, actually, probably a

9     really basic question.

10          So does Google track revenue by signed-in   10:44

11     state and device and platform?

12          MS. REDDY:  Objection.  Calls for

13     speculation.

14          THE WITNESS:  I don't know if Google does

15     this regularly.  We reported it in this update,      10:44

16     though.

17     BY MS. WEAVER:

18        Q.  Okay.  And do you know where you got the

19     data to prepare this update?

20        A.  I don't recall.  That's what I was saying   10:44

21     earlier.  I don't recall where this would have

22     come from.

23        Q.  Do you think you did it as opposed to

24     somebody else who worked on this?

25          MS. REDDY:  Objection.  Calls for           10:44

                                         Page 125

CONFIDENTIAL

 1    interacted with yet.
 2        Q.  So, for example, somebody could log into
 3    YouTube and sign in but not have consented for
 4    Gmail; is that right?
 5        A.  For the particular smart features product    10:47
 6    feature for Gmail, yes, correct.
 7        Q.  Got it.
 8            And what is consent-declined?
 9        A.  That would mean users who have said no
10    to -- whatever the thing that was put in front of    10:47
11    them.
12        Q.  But they would still be signed in?
13        A.  Yes.  You do not need to be consented to
14    sign in.
15        Q.  And looking at this chart at 2717, the    10:47
16    chart --
17            Well, let me ask this question:  Is it
18    possible for Google to isolate the pre-consent,
19    consented, and consent-declined users who are also
20    signed in?    10:48
21        A.  Pre-consent...
22            MS. REDDY:  Objection.  Calls for
23    speculation.
24            THE WITNESS:  I don't know if they could.
25    Right here, it says signed-in includes all of    10:48

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1    those.  I don't know how the analysis was done, so
 2    I don't know.
 3    BY MS. WEAVER:
 4         Q.  So consent is important; right?
 5         A.  Correct.                                    10:48
 6         Q.  So Google keeps track of who has consented
 7    and who has not?
 8         A.  Correct.
 9         Q.  And then it honors whether or not they
10    have consented or not; right?                        10:48
11         A.  Correct.
12         Q.  So is it your testimony that
13    notwithstanding that, Google can't identify who is
14    pre-consent, consented, or consent-declined?
15         A.  Oh --                                       10:48
16         MS. REDDY:  Objection.  Misstates
17    testimony.
18         THE WITNESS:  I'm sorry.  I maybe
19    misunderstood your question.
20         Yes, we could understand if a user has          10:48
21    seen a consent or not, has recorded a consent, and
22    whatever that consent decision is.
23    BY MS. WEAVER:
24         Q.  And Google maintains logs that reflect
25    that information; is that right?                     10:49
```

Page 130

1        A.   There is a system that would contain those

2    consent recordings, correct.

3        Q.   And is there a time limitation on those

4    consent recordings?

5        A.   As I understand it, those records are        10:49

6    retained for the length of that account's

7    existence.  So it gets logged sort of until

8    account disappears or is deleted.

9        Q.   And if, for example, somebody consents and

10   then declines consent, is that also retained?        10:49

11       A.   That would also be retained, yes.

12       Q.   Turning to the page ending at 2729.

13            Can you describe what this chart reflects?

14       A.   Yes.  This reflects the ability to serve

15   consented users signed in ads on the display --       10:50

16   Google display network.

17       Q.   And then it associates revenue with them;

18   is that right?

19       A.   By platform, not -- it's -- it's taking in

20   aggregate what a platform opportunity might be --     10:50

21       Q.   And so the --

22       A.   -- correct.

23       Q.   Thank you.  Sorry.

24            The difference between the page and -- the

25   chart on 2717 and 2729 is that 2717 is actual        10:50

1    revenue and 2729 is estimated; is that fair?

2        A.   That's what it -- yes.   The title suggests

3    one is an estimate.

4        Q.   And do you recall what the purpose of the

5    entire slide deck was?                          10:50

6        A.   I don't recall the specific purpose, no.

7    It looks like a general update on revenue and

8    forecasting.

9        Q.   In general, in your role at this time,

10   were you interested in tracking the revenue impact  10:51

11   to having users sign in?

12       A.   That was part of the scope of my

13   engineering team.

14       Q.   And do you have a recollection of your

15   general conclusion around that?                 10:51

16       A.   The general conclusion, I don't remember.

17   I think it was simply that we should have more

18   users signed in if they -- if that's what this

19   chart is indicating, but I don't have any real

20   conclusions.   I was quite junior at the time, so I  10:51

21   didn't have many conclusions.   I was mostly doing

22   work and learning.

23       Q.   ███████████████████████████████████

     ███████████████████████████████████████

                                              10:51

                                        Page 132

CONFIDENTIAL

```
 1         Q.  And as you sit here today -- well, strike
 2    that.
 3              What is GAIA?
 4         A.  GAIA means a Google account.  It's the
 5    name for a Google account identifier.              10:55
 6         Q.  And testifying on behalf of Google, what
 7    is GAIA?
 8         A.  GAIA is the Google account.  It represents
 9    the identifier attached to the Google account.
10              MS. REDDY:  Counsel, I'm just going to    10:56
11    object.  You keep going back and forth between her
12    personal and representative capacity.  It's
13    confusing for the witness.  I thought we were
14    going to proceed sequentially.
15              MS. WEAVER:  She doesn't seem confused.   10:56
16    BY MS. WEAVER:
17         Q.  If you are confused, let me know.
18              On behalf of Google, what is PII data?
19              MS. REDDY:  So are you refusing to proceed
20    sequentially?                                       10:56
21              MS. WEAVER:  I'm proceeding by letting the
22    witness know what I am asking.
23              THE WITNESS:  Sorry.  What was the
24    question?  On behalf...
25    BY MS. WEAVER:                                      10:56
```

Page 136

```
 1    the ███████ consent in terms of the exact legal

 2    scope of it, but it allows -- it allowed users to

 3    make a choice to allow their -- a version of their

 4    Biscotti data, pseudonymous data, to be used with

 5    their Google account data to provide more          11:08

 6    personalized ads, from a Google ad-serving

 7    perspective, using that website and Google account

 8    data jointly.

 9    BY MS. WEAVER:

10        Q.  What is Biscotti data?                      11:08

11            MS. REDDY:  Objection.  Outside the scope

12    of the 30(b)(6) notice.

13    BY MS. WEAVER:

14        Q.  Go ahead.

15        A.  I am not super familiar with what Biscotti 11:08

16    data is in gross detail, but that particular data

17    would be cookie data.

18            Biscotti is a particular cookie that is

19    for display ads purposes, and so it would be a

20    cookie that has information about a website that    11:08

21    has been visited or any other kind of display-

22    related --

23            Where a user is on a site or an app, for

24    instance, it could have information about the site

25    or app interaction, the content that was consumed,  11:08
```

Page 149

CONFIDENTIAL

```
 1    or the site that -- the URL, for instance, that
 2    they visited.  And so that would be collected to
 3    the Biscotti cookie.
 4         Q.  And it's when users are signed out;
 5    correct?                                          11:09
 6              MS. REDDY:  Objection.  Outside the scope
 7    of the 30(b)(6) notice.
 8              THE WITNESS:  I believe it's a
 9    pseudonymous, not signed-in cookie.
10    BY MS. WEAVER:                                    11:09
11         Q.  Thank you.
12              And GAIA is a signed-in cookie; right?
13              MS. REDDY:  Objection.  Outside the scope
14    of the 30(b)(6) notice.
15              THE WITNESS:  It is.                     11:09
16    BY MS. WEAVER:
17         Q.  What is the content policy that you were
18    referring to with regard to personalized
19    advertising?
20         A.  There was a content policy, and I'm not  11:09
21    familiar with it today.  But the product policy
22    would be one of those advertising policies that I
23    mentioned.
24              And that is my understanding of Lauren's
25    old scope.  I don't know, again, what her scope    11:09
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              For instance, the ad settings is one
 2    example of where we would have.
 3              But this represents the breadth of all of
 4    the information that we would provide to users,
 5    and there may be other flavors of it that exist      11:16
 6    since we communicate to them in many different
 7    ways.
 8         Q.  In looking at the exhibits to this
 9    declaration, then, where do they refer to the
10    real-time bidding auction?                           11:16
11         A.  They do not specifically refer to the
12    real-time bidding auction.  They refer to -- we
13    use a different nomenclature.  As I was
14    mentioning, trying to communicate understandably
15    or more clearly to users, that wouldn't be a term    11:16
16    that we would use normally from a user experience
17    perspective.
18              We would talk about it in -- more in the
19    context of Google services with partner sites and
20    apps or with third parties instead of specifically   11:17
21    using terms that are more technical.
22         Q.  So do you believe that the average user
23    would not understand what an auction is?
24              MS. REDDY:  Objection.  Outside the scope
25    of the 30(b)(6) notice.                              11:17
```

Page 158

CONFIDENTIAL

```
 1              THE WITNESS:  That is not something I've
 2    investigated and wouldn't be familiar with.
 3    BY MS. WEAVER:
 4         Q.  Well, you've given testimony --
 5         A.  But --                                      11:17
 6         Q.  -- about why it is --
 7              MS. REEDY:  Excuse me.  Let her finish --
 8    BY MS. WEAVER:
 9         Q.  A moment ago --
10              MS. REEDY:  Let her finish her answer.    11:17
11              Please go ahead.
12              THE WITNESS:  I was going to say that we
13    have not tested that specific concept, but
14    generally, we try to speak in more kind of lay
15    speak.                                              11:17
16              And the notion of an auction is probably
17    not -- again, just from a UX perspective -- this
18    is relying on prior UX knowledge and general --
19    how we communicate.  This would not be something
20    that we would communicate in that word.            11:17
21    BY MS. WEAVER:
22         Q.  Okay.  I want to be really clear for the
23    record that the transcript reflects you were done
24    with your answer and that you interrupted me.  I
25    really want to allow you to finish your sentences.  11:17
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Q.  Why was it called a bump?

2    A.  A bump --

3         MS. REDDY:  I'm just going to object that

4    this is outside the scope of the 30(b)(6) notice.

5         THE WITNESS:  A bump, in general, is kind    11:40

6    of a lay speak for interrupting a user's

7    experience to introduce -- a consent bump might

8    happen in the account creation moment, where there

9    is, like, a moment of pause to introduce something

10   where a choice is being made.                     11:40

11        A consent bump tends to be where the user

12   may already be on Google services and have

13   interacted in some way, and we put a pop-up in

14   front of the user -- for instance, in this case,

15   when they signed in -- to have them actually      11:41

16   proceed through that consent experience and make

17   some sort of choice before they proceed with

18   whatever they're doing on the service.

19   BY MS. WEAVER:

20   Q.  It's your -- it is Google's contention,       11:41

21   correct, that the consent bump applied to every

22   user who received the consent bump in June 2016 to

23   the present; correct?

24   A.  That's correct.

25   Q.  And it is Google's contention that from       11:41

Page 184

CONFIDENTIAL

1    July 2016, existing account holders were taken

2    directly to the consent bump, and from that time

3    period to the present, Google is relying on the

4    consent bump for the argument that it obtained

5    users' consent in this case; correct?                 11:41

6            MS. REDDY:  Objection.  Misstates

7    testimony.  Calls for a legal conclusion.  Outside

8    the scope of the 30(b)(6) notice.

9            THE WITNESS:  This particular consent bump

10   is one of the many communications about how users'  11:42

11   data is used in the context of third parties.  So

12   this is just one of the multitude that I showed.

13   Because there's not a single interaction that is

14   overseeing all of the different ways that data are

15   used or explaining the -- disclosing to users the   11:42

16   interactions between their data and a third-party

17   usage.

18           And so this is one that's explaining in

19   more detail the kinds of data that might be

20   utilized.                                            11:42

21       Q.  Okay.

22       A.  And so -- just to be very specific.

23       Q.  I understand that.

24           Setting aside the other documents that you

25   were referring to, this is the question:  Does      11:42

                                          Page 185

CONFIDENTIAL

1    Google contend that beginning in July 2016, the

2    consent bump you refer to in paragraph 36 was

3    applied to all Google account users to the

4    present?

5         A.  Yes --                                    11:42

6            MS. REDDY:  Objection.  Calls for a legal

7    conclusion.  Outside the scope --

8            THE WITNESS:  -- all users from 2016

9    onward were eligible to get this consent bump.

10   BY MS. WEAVER:                                      11:43

11        Q.  Okay.  And is Google relying on that

12   consent bump to support the argument that it

13   obtained users' consent in this case?

14           MS. REDDY:  Objection.  Outside the scope

15   of the 30(b)(6) notice.  Asked and answered.       11:43

16   Misstates prior testimony.

17           THE WITNESS:  It is one of -- yes, it is

18   one of the pieces of evidence.

19   BY MS. WEAVER:

20        Q.  Okay.  You didn't actually attach the    11:43

21   consent bump itself to your declaration, did you?

22        A.  I think that's what this is.  Is it not?

23           This is the web flow for the consent bump.

24        Q.  What's the difference between a web flow

25   and the consent itself?                            11:43

                                             Page 186

1             THE WITNESS:  This specific one -- every

2     user may not be on a web device, so it would not

3     be this specific one.  There may have been a

4     different screen for a user who entered from a

5     different way to sign in.  If they were not on        11:44

6     their desktop browser, they would have been in a

7     different context, using a different way to sign

8     in.

9             So if they were on their mobile phone and

10    they were signing in, they would have gotten a        11:44

11    different version of the consent, but the consent

12    would have shown to a user -- any number of

13    users -- but in whatever diverse way they interact

14    with our platforms or our services.

15            So they're not all on web, I guess, to be     11:45

16    clear.

17    BY MS. WEAVER:

18        Q.  Understood.

19            However, was the message delivered to each

20    class member the same regardless of what platform    11:45

21    or device they viewed it on?

22        A.  Oh.  Yes, this message would be the same

23    message.

24        Q.  Okay.  And you reviewed in this case

25    Ms. Caracuzzo's declaration; right?                   11:45

                                          Page 188

CONFIDENTIAL

1          A.   Oh.

2          Q.   I didn't realize we didn't have tabs for

3     you when we made copies.

4          A.   The last page of the entire --

5          Q.   Yes.  I think.  Let me look at the copy.   11:46

6          A.   That --

7          Q.   There you go.

8          A.   Like --

9          Q.   There you go.

10         A.   Okay.                                       11:47

11         Q.   You know what?

12         A.   Sorry.  You can -- I'll let you find it.

13         Q.   Oh.

14              MS. WEAVER:  Okay.  We need to go off the

15    record.                                              11:47

16              THE VIDEOGRAPHER:  We are going off the

17    record.  The time is 11:47.

18                   (Off the record.)

19              THE VIDEOGRAPHER:  We're back on the

20    record.  The time is 11:47 a.m.                      11:47

21              MS. WEAVER:  I do have a copy of that.

22    I'll mark as Exhibit 13, Exhibit 42 separately,

23    and we'll address the copying issue of the

24    declaration at a break.

25              MS. REDDY:  I need a copy.                  11:47

                                        Page 190

CONFIDENTIAL

```
 1                    (Whereupon, Deposition Exhibit 13 was

 2              marked for identification.)

 3              MS. WEAVER:  Let's go off the record.

 4              THE VIDEOGRAPHER:  We are going off the

 5     record.  The time is 11:48 a.m.                      11:48

 6                    (Off the record.)

 7              THE VIDEOGRAPHER:  We're back on the

 8     record.  The time is 11:50 a.m.

 9              MS. WEAVER:  I apologize for the delay and

10     the problems we had copying.  We have now handed    11:50

11     to your counsel the one-page document.

12     BY MS. WEAVER:

13         Q.  Do you recognize Exhibit 42?

14         A.  I don't --

15         Q.  Or I marked it as Exhibit 13.                11:50

16         A.  Yes.  I -- I don't recognize it from

17     reviewing the declaration, but I'm reading the

18     content, and I understand it -- what it is now.

19         Q.  What is it?

20         A.  It looks like the same copy, from what I    11:50

21     can tell, of what was the consent bump text.

22         Q.  So this is the consent bump itself; right?

23         A.  I couldn't confirm that for sure, simply

24     just because I can't -- I wanted -- I would have

25     to, like, map it.  But yes, this seems like the     11:51
```

Page 191

CONFIDENTIAL

```
 1    consent bump.
 2         Q.  Okay.  Testifying on behalf of Google --
 3         A.  Yes.
 4         Q.  -- is there any reason that you believe
 5    that this is not the consent bump that you discuss   11:51
 6    in your declaration?
 7         A.  No, I don't have reason to believe this is
 8    distinct.
 9         Q.  Okay.  And is it your testimony on behalf
10    of Google that this is the consent bump that was     11:51
11    provided to every class member from 2016, in June
12    or July, to the present date?
13         A.  Yes.  The consent bump was made available
14    to users who would be eligible to get it in
15    whatever platform they're on.                        11:51
16         Q.  And when you say it "was made available,"
17    what do you mean?
18         A.  Meaning, if you're signed in, you would
19    see some version of this in whatever version of
20    your platform that you're on, if you were not        11:52
21    eligible to see it, you wouldn't see it.  If you
22    weren't trying to sign in, for example, you
23    wouldn't have seen it.
24         Q.  Got it.
25         A.  Yeah.                                       11:52
```

Page 192

```
 1            Q.  But for every class member who signed in
 2    at any point in the class period, from June or
 3    July of 2016 to the present, they had to have seen
 4    the consent bump; is that right?
 5            A.  They should have been presented --        11:52
 6            MS. REDDY:  And I'm just going to object
 7    that this is all outside the scope of 30(b)(6).
 8            THE WITNESS:  I wasn't working on this,
 9    but this should have been proposed to them.  And
10    they can either proceed through it or dismiss it    11:52
11    and move on.
12    BY MS. WEAVER:
13            Q.  Okay.  And you see -- could you read into
14    the record the sentences after "What's still the
15    same"?                                               11:52
16            A.  Yes.
17                "What's still is the same?
18                "Google does not sell your personal
19          information to anyone.
20                "You control the types of information 11:52
21          we collect and use at My Account
22          (myaccount.google.com)."
23            Q.  And every class member, from either June
24    or July 2016 forward, who signed in, until the
25    present, received this message; is that right?      11:52
```

Page 193

CONFIDENTIAL

```
 1              MS. REDDY:  Same -- same objections.
 2              THE WITNESS:  Yes.  Users who experienced
 3     the consent bump would have seen this message,
 4     correct.
 5              MS. WEAVER:  Okay.  Great.  We can go off   11:53
 6     the record:
 7              MR. REECE:  Before we go off the record, I
 8     think there might be some folks on the Zoom.  Can
 9     we get their appearances, please?
10              THE VIDEOGRAPHER:  Sorry?                    11:53
11              MR. REECE:  I believe there are some folks
12     on the Zoom link.  Can we get appearances before
13     we break?
14              THE VIDEOGRAPHER:  Yes.
15              The only person is Ms. Davis, Ms. Anne       11:53
16     Davis.
17              Do you want to --
18              MS. WEAVER:  Let's -- okay.  That's on the
19     record.  We can go off the record.
20              THE VIDEOGRAPHER:  We are going off the      11:53
21     record.  The time is 11:53 a.m.
22                    (Lunch break taken.)
23              THE VIDEOGRAPHER:  We're back on the
24     record.  The time is 12:38 p.m.
25     BY MS. WEAVER:                                        12:38
```

                                        Page 194

CONFIDENTIAL

```
1          Q.  Have you seen that research?
2          A.  I don't recall seeing this research.  I
3     may have seen it, but I don't recall it.
4          Q.  Is it your understanding that if you
5     clicked on that ads consent, which is in a          12:50
6     different color there, that that might be a
7     hyperlink?
8          A.  I don't know if it's a hyperlink.  It
9     usually shows as an underline.  It could just be
10    they're making it color to stand out that that's   12:51
11    the topic.  I'm not sure.  It would normally have
12    a line underneath it to be a hyperlink.
13         Q.  Okay.  At looking at the page ending at
14    6501, do you see where it says "Additional
15    limitation" on the bottom?                          12:51
16         A.  Yes.
17         Q.  Okay.  And it says:
18    ████████████████████████████
      ███████████████████████████
      ██████████████   ████████████████████
      ██████████████████
      ████████████████████████
      ██████████
24         Do you see that?
25         A.  Yes, I do.                                 12:51
```

Page 205

CONFIDENTIAL

```
 1        Q.  Is it consistent with your experience that

 2   doing a survey may not be as accurate as just

 3   observing how people behavior naturally?

 4        A.  That is my understanding, because of

 5   survey bias.                                    12:51

 6        Q.  Yeah.  And what is survey bias?

 7        A.  It is something related to how users

 8   might, not in a real setting, answer differently

 9   than they would in the real setting of whatever

10   that experience is.                             12:52

11        Q.  Okay.  And turning to the page ending at

12   6502, it says, "6 truths of ads consent."

13            Do you see that?

14        A.  Yes, I see that.

15        Q.  And focusing on Number 6, could you read  12:52

16   that into the record?

17        A.  Sure.

18            ███     ████████████████████████████

     █   ██████████████████████████████████████

     █          ████████                          12:52

21        Q.  Do you agree with that?

22        A.  I'm not sure what they mean by

23   "understanding how the ads ecosystem works,"

24   but -- so I can't really agree with the statement.

25   I don't exactly know what they intend.          12:52
```

Page 206

1    to Exhibit 12.  You can set aside the last

2    exhibit.

3         A.  Oh, 12.  Okay.  Sorry.

4             Yes.

5         Q.  And you've testified that Exhibit 12        13:03

6    reflects when the document listed on the left was

7    introduced.

8             And for each of these documents are they

9    effective through today?

10        A.  They're effective through today, and there 13:03

11    may be a more recent version that would be

12    expressed, yes.

13        Q.  Okay.  And you took some notes on this

14    document; is that right?

15        A.  I did.                                      13:03

16        Q.  Was that when you were meeting with

17    counsel?

18        A.  It was right after meeting with them, just

19    to anchor my own thoughts into what I had just

20    reviewed with them.                                 13:04

21        Q.  Okay.  And for each of these policies that

22    you list here, these documents, they apply --

23    well, strike that -- do they apply to all Google

24    account holders who are governed by the U.S. terms

25    of service?                                         13:04

Page 214

1      A.   Yes.  All U.S. account holders would have

2    access to these particular documents.

3           MS. REDDY:  And just to clarify, this is

4    still in her personal capacity; right?

5           MS. WEAVER:  Sure.                         13:04

6    BY MS. WEAVER:

7      Q.   Okay.  In your capacity on behalf of

8    Google, is it your understanding that all U.S.

9    account holders had access to these documents?

10     A.   Yes, these would be made available to all  13:04

11   U.S. account holders, and they should have had

12   access to them.

13     Q.   Thank you.

14          And how did Google determine which

15   policies to make accessible to which account       13:04

16   holders?

17     A.   Generally speaking, all account holders

18   can access any policies that we have that are

19   available globally, and they can consume them at

20   whatever point that they're interacting.  They're  13:05

21   always available, 24/7, to all users.

22     Q.   So how does an account holder know whether

23   the GDPR policy applies to them or not?

24     A.   It cites -- for instance, the GDPR

25   communications about what applies would be cited    13:05

Page  215

1    to show -- if it's about GDPR, that would be an

2    additional disclosure in, perhaps, an additional

3    addendum for a particular region.

4        Q.  How would a U.S. account holder know

5    whether or not GDPR applies to them?                13:05

6        A.  They wouldn't have that information

7    available.  It would be -- they would need to

8    click into an additional disclosure that talks

9    about GDPR and -- in, like, an additional TOS in a

10   different country, perhaps.  I can't remember if   13:05

11   GDPR is listed generally speaking off the top of

12   my head.

13       Q.  Okay.  So for class members in this case,

14   if they clicked on the terms of service, the terms

15   of service that appear are the U.S. terms of       13:05

16   service; correct?

17       A.  That's correct.  That's correct.

18       Q.  Okay.  And you agree that for the class

19   period, there are four applicable terms of

20   service --                                         13:06

21       A.  That's --

22       Q.  -- over the time period; right?

23       A.  That's correct.

24       Q.  Okay.  And so I'm going to ask you to go

25   back to the Caracuzzo declaration and your -- so   13:06

Page 216

CONFIDENTIAL

```
 1    Exhibit 11 --

 2          A.  Yes.  10 and 11.

 3          Q.  -- and Exhibit -- which one are you -- no.

 4    10.

 5              So looking at your declaration, in        13:06

 6    paragraph 6.

 7          A.  Yes, I see that.

 8          Q.  Sorry.  Okay.

 9          A.  Yes, I see that.

10          Q.  You state there that there are four TOS    13:06

11    versions during the proposed class period;

12    correct?

13          A.  That's correct.

14          Q.  And those are the U.S. TOS; correct?

15          A.  That's correct.  These would be the       13:07

16    applicable TOSs.

17          Q.  Okay.  And if you look at Plaintiffs'

18    Exhibit 41.

19          A.  Sorry.  Where would that be?

20          Q.  Geez.  It's --                            13:07

21          A.  Oh, 41.  Is 41 the new one?  No.

22          Q.  Sorry.  I'm sorry.

23              If you go to Plaintiffs' -- if you go to

24    Exhibit 11, which is the Caracuzzo declaration.

25          A.  Yes, I'm in 11.                           13:07
```

Page 217

CONFIDENTIAL

```
1            Q.  And then 41 is an exhibit in the back,
2      and --
3            A.  Okay.  I'm on 36.
4            Q.  -- there should be a slip sheet like this.
5            A.  Yeah, thank you.  I found 36.  I'll just    13:07
6      keep going.
7                MS. REDDY:  It's toward the very end.
8                THE WITNESS:  Yes.  I'm at 41.
9      BY MS. WEAVER:
10           Q.  And is that the TOS effective January 5,    13:07
11     2022?
12           A.  That is what it states, yes.
13           Q.  Is this the most current TOS for U.S.
14     account holders?
15           A.  I believe this is the most current TOS.  I 13:08
16     would have to look on the site to just double-
17     check, but I think this is the most recent one.
18           Q.  Okay.  And are you aware of any updates to
19     the TOS since January 5, 2022?
20           A.  I think it would have been published and    13:08
21     this one would have been an archived version.  So
22     if this is the last one made available, it would
23     be the most recent one.
24           Q.  Okay.  Great.
25                And turning to Exhibit 39.                  13:08
```

Page 218

1        A.  Yes, I'm here.

2        Q.  Did you review Exhibit 39?

3        A.  March 31, 2020, what was I doing then?  I

4    would have -- I would have likely seen this but

5    probably not reviewed it in detail because I        13:08

6    wasn't the lead for the team, no.  So I -- I have

7    seen it.

8        Q.  When you say you weren't the lead for the

9    team, what do you mean?

10       A.  I didn't -- I was not reviewing all         13:09

11   launches for the full team, so I would not review

12   every single document.  But I have seen this one.

13       Q.  Who was the lead for the team?

14       A.  Eric Miraglia, I think, at the time.

15       Q.  Okay.  And do you understand Exhibit 39 to 13:09

16   be the TOS effective March 31, 2020?

17       A.  Yes.

18       Q.  Okay.  And turning to Exhibit 40.

19       A.  Okay.  Yes, I'm here.

20       Q.  Do you understand Exhibit 40 to be the      13:10

21   March 31, 2020, privacy policy?

22       A.  Yes.  It says March 31, 2020, privacy

23   policy, yes, that's correct.

24       Q.  And is that the same as your Exhibit 1 in

25   substance?  If you go to Exhibit 1 of your          13:10

Page 219

CONFIDENTIAL

```
 1    declaration, which is, again, Exhibit 10 --
 2         A.  I'm going there.
 3         Q.  -- Exhibit 1 to Exhibit 10.
 4         A.  I'm double-checking the dates.
 5             Exhibit 1.  Privacy -- yes, effective    13:10
 6    March 31st, that's correct.
 7         Q.  And then going back, Exhibit 35, if you
 8    look at it, that's the privacy policy effective
 9    June 28th to -- 2015; correct?
10         A.  June 28, 2016.                           13:11
11         Q.  2016.
12         A.  Yes.
13         Q.  Sorry.
14         A.  That is --
15         Q.  Yes.                                     13:11
16         A.  That is the date, yes.
17         Q.  And then Exhibit 36, you agree that that
18    is the May 25, 2018, privacy policy?
19         A.  That's correct.
20         Q.  Okay.  Now, your declaration refers to a 13:11
21    site called "How our business works"; is that
22    right?
23         A.  That's correct.
24         Q.  And you attached that as Exhibit 3 to your
25    declaration?                                      13:11
```

Page 220

1      A.   I'm here, yes.

2      Q.   And do you agree that Exhibit 3 is the

3  same policy, even though it appears different, as

4  Exhibit 38 to Ms. Caracuzzo's declaration?

5      A.   36.  Hang on one second.              13:11

6      Q.   38 to Exhibit 3.

7      A.   Yes, let me just get there.

8           Yes, that looks like the same content.

9      Q.   And you agree that "How our business

10  works," this Exhibit 38 or your Exhibit 3, is      13:12

11  hyperlinked in the March 31, 2020, and the

12  January 5, 2020, TOS; correct?

13      A.   That's correct.  It links to this

14  particular safety center document.

15      Q.   Thank you for that fun exercise.        13:12

16           Turning to paragraph 11 of your

17  declaration, which is Exhibit 10.

18      A.   I'm sorry.  What page did you say?

19  Page 11?

20      Q.   Paragraph 11.                           13:12

21      A.   Oh, paragraph 11.

22      Q.   Page 4.

23      A.   Page 4.

24           Yes.

25      Q.   You wrote, "On the contrary" --         13:12

Page 221

CONFIDENTIAL

1    updated.

2         Q.   Okay.  So looking at the exhibits to your

3    declaration and to Ms. Caracuzzo's declaration,

4    can you identify where it is specifically -- and

5    this is a question in your official capacity --    13:15

6    Google discloses to users that personal

7    information may be shared by Google through the

8    real-time bidding auction?

9              MS. REDDY:  Objection.  Overbroad.

10   Exceeds the scope of the 30(b)(6) notice.          13:15

11             THE WITNESS:  Can you repeat the question?

12   You said specific to the TOS documentation?

13   BY MS. WEAVER:

14        Q.   Sure.

15             How about -- let's just say, looking at    13:15

16   all of the exhibits to your declaration and

17   Ms. Caracuzzo's --

18        A.   Yes.

19        Q.   -- can you please identify where Google

20   discloses to users that personal information may    13:15

21   be shared by Google through the real-time bidding

22   auction?

23        A.   Google --

24             MS. REDDY:  Same objections.

25             THE WITNESS:  Google does not disclose     13:16

                                        Page  224

1    that personal information is shared.  It expressly

2    says that it does not share personal

3    information --

4    BY MS. WEAVER:

5        Q.  So no --                                      13:16

6        A.  -- to third-party --

7        Q.  Sorry.

8        A.  -- to third-party entities.

9        Q.  Okay.  So nowhere in any of the documents

10   we've discussed today does Google disclose to any   13:16

11   Google account holder that Google may be sharing

12   their information in the real-time bidding

13   auction; is that correct?

14       A.  They --

15           MS. REDDY:  Objection.  Exceeds the scope   13:16

16   of the 30(b)(6) notice.

17           Go ahead.

18           THE WITNESS:  These documents communicate

19   that there may be some account information -- for

20   instance, like the location of a user -- but not    13:16

21   personal information, and so there's no

22   communication of that.

23           MS. WEAVER:  Okay.  I'm going to mark as

24   Exhibit 16 the Complaint in this action.

25           (Whereupon, Deposition Exhibit 16 was        13:17

Page 225

CONFIDENTIAL

```
 1              marked for identification.)

 2     BY MS. WEAVER:

 3        Q.  I would ask you to turn specifically to

 4     paragraph 137.

 5        A.  I'm on 137.                              13:17

 6        Q.  Have you seen this page before?

 7        A.  I have not seen this page before.

 8        Q.  And do you see where it says:

 9            (As read):

10                "The following chart provides a     13:17

11            subset of the bid request variables that

12            OpenRTB integration shares with

13            developers"?

14            Do you see that?

15        A.  Yes, I do see that.                      13:18

16        Q.  Have you any knowledge as to whether or

17     not Google shares the variables with developers

18     identified in paragraph 137?

19            MS. REDDY:  Objection.  Exceeds the scope

20     of the 30(b)(6) notice.  Lacks foundation.      13:18

21            THE WITNESS:  I do not have familiarity

22     with how specifically these particular identifiers

23     would be communicated in a bid request.

24     BY MS. WEAVER:

25        Q.  And looking at paragraph 138, do you see  13:18
```

Page 226

1    it refers to a "Real-Time Bidding Protocol

2    Buffer"?

3         A.  Yes, I do see that.

4         Q.  And do you see it says:

5             (As read):                              13:18

6                 "It explains of the protocol that it

7             is 'the message that Google uses to

8             request bids' and confirms the same

9             categories of personal information are

10            sent to bidders as those set forth in the  13:18

11            OpenRTB Integration chart"?

12            Do you see that?

13        A.  I see that.

14        Q.  You've never read that before; right?

15            MS. REDDY:  Objection.  Exceeds the scope  13:18

16    of the notice.

17            THE WITNESS:  I have never read the

18    Real-Time Bidding Protocol Buffer.

19    BY MS. WEAVER:

20        Q.  And you haven't spoken with any engineer   13:19

21    about whether or not these kinds of bid request

22    variables are shared; is that right?

23        A.  I have not --

24            MS. REDDY:  Objection.  Asked and

25    answered.                                         13:19

                                              Page 227

1          THE WITNESS:  I have not spoken with an

2     engineer.

3     BY MS. WEAVER:

4          Q.  And looking at paragraph 140, do you see

5     that there is a chart below it?                        13:19

6          A.  Yes, I do.

7          Q.  And do you see that it lists certain kinds

8     of information?

9          A.  I do see different information here.

10          Q.  And do you see that it says that -- in     13:19

11     that buffer "data is shared in the following

12     order"?

13          It's -- sorry -- paragraph 140.

14          A.  I see that on 140 --

15          Q.  Yes.                                         13:19

16          A.  -- yes.

17          Q.  And have you engaged in any discovery or

18     conversations with anyone to determine whether or

19     not it is true that this information is shared in

20     the RTB option process?                               13:19

21          MS. REDDY:  Objection.  Exceeds the scope

22     of the 30(b)(6) notice.

23          THE WITNESS:  I have not communicated on

24     this particular point with anyone from the RTB

25     team.                                                 13:19

                                        Page 228

```
 1          A.  I don't believe there was anybody else
 2     present.
 3          Q.  Did you discuss with anyone else what you
 4     discussed with Nina?
 5          A.  No.  Except for these counsel.        13:59
 6          Q.  Okay.  So you also spoke with engineering
 7     about storage; is that right?
 8          A.  Yes.  Correct.  I was confirming my
 9     understanding of how we record and my
10     understanding of how we record consent.        13:59
11          Q.  And what is your understanding of how you
12     record consent?
13          A.  When a user proceeds through account
14     creation or through a consent, there is a record
15     created of their interaction and their consent   13:59
16     decision, and it's retained.
17          Q.  And do you know what that record is
18     called?
19          A.  No.  It's just the consent record.
20          Q.  Where is it maintained?               13:59
21          A.  In an audit system.  I don't know where
22     exactly.  I wouldn't know the technicalities of
23     which system.
24          Q.  Do you know the name of the audit system?
25          A.  I don't have the name of the audit system. 13:59
```

Page 248

```
 1          Q.  Who specifically did you speak with who
 2     confirmed to you that Google maintains consent
 3     records?
 4          A.  It's the engineer who oversees the
 5     development of that system, Stefan Toman or        13:59
 6     Tolman.
 7          Q.  Is he in the U.S.?
 8          A.  He is not in the U.S.
 9          Q.  Do you know if that information is
10     maintained in the U.S.?                            14:00
11          A.  I don't have familiarity with how our
12     storage systems work.
13          Q.  So is it possible for Google to pull
14     together a list of everybody who consented to the
15     consent bump from 2016 to the present?             14:00
16          A.  It is possible to go through, but you
17     would have to have the individual -- identify the
18     individual name or the account and then find that
19     record in the system.
20          Q.  So for Google account holders, is it      14:00
21     possible for Google to identify who consented to
22     the consent bump?
23          A.  Yes.  You would need to have the Google
24     account holder information, and then they would
25     have to look in the system and find the record for 14:00
```

Page 249

1    that particular account.

2         Q.  When you say "you need to have the Google

3    account holder information," what do you mean?

4         A.  I'm not familiar with exactly how this is

5    logged, but it would need to be something that is    14:01

6    the identifying information for what is an account

7    holder and how -- I don't exactly know what the

8    terminology is that they use, but you would need

9    some version to identify who are the users and

10   then go into the system.  It's not like a -- you    14:01

11   have to find the user and then find the record to

12   the user.

13        Q.  Can you use the GAIA ID?

14        A.  I wouldn't know.  That is one of the key

15   identifiers I wouldn't know.                         14:01

16        Q.  How long did you speak with Stefan Toman?

17        A.  About 20 minutes, maybe a half hour.

18        Q.  And was that by video?

19        A.  By video call.

20        Q.  And who else was on the call?              14:01

21        A.  Aarti was on the call; Reece was on the

22   call; and Denisha was on the call, in-house

23   attorney.  And I don't believe anybody else was.

24        Q.  Did you discuss with anybody else how

25   Google maintains consent records or storage?        14:01

Page 250

CONFIDENTIAL

```
1    bump, which is, again, Exhibit 42, there is a

2    promise that says:

3              (As read):

4                  "Google does not sell your personal

5              information to anyone."                14:28

6         A.  Can you tell me which exhibit that is?

7    Sorry.

8         Q.  It's Exhibit 42.

9         A.  It's 42.

10        Q.  Yeah.                                    14:28

11        A.  And it is some number here, though.

12            MS. REDDY:  Exhibit 13.

13   BY MS. WEAVER:

14        Q.  Exhibit 13.

15        A.  13.  Thank you.                          14:29

16        Q.  I'm sorry.

17        A.  Thanks.  That's okay.

18        Q.  Sorry about that.

19        A.  Thank you.

20            Here's 12.                               14:29

21            Sure.  Thank you.

22        Q.  So the promise that every class member

23   saw:

24            (As read):

25                 "Google does not sell your personal 14:29
```

Page 274

```
 1               information to anyone."
 2          Does Google say anywhere in any of these
 3     disclosures that Google might sell their
 4     information to anyone?
 5          MS. REDDY:  Objection.  Lacks foundation.  14:29
 6     Argumentative:
 7          THE WITNESS:  No, it does not state that
 8     it might sell anyone's information.
 9     BY MS. WEAVER:
10       Q.  Does -- do any of these disclosures say    14:29
11     that Google does sell or has sold class members'
12     information to third parties?
13          MS. REDDY:  Same objection.
14          THE WITNESS:  No, these disclosures do not
15     communicate the sale of any user's information.    14:29
16     BY MS. WEAVER:
17       Q.  Okay.  And turning to the Exhibit 11,
18     which is the declaration of Ms. Caracuzzo.
19       A.  Yes.
20       Q.  And at Exhibit 36 -- I apologize that it    14:29
21     is not numbered.
22       A.  That's okay.  I'm on 36.
23       Q.  It's the 3/24/2021.
24       A.  Yes.
25          Yes, I'm here.                                14:30
```

Page 275

```
 1              Q.  And page 5 of 28, on the bottom, do you
 2      see the promise:
 3                   (As read):
 4                        "We don't show you personalized ads
 5                   based on sensitive categories, such as    14:30
 6                   race, religion, sexual orientation, or
 7                   health"?
 8                   Do you see that?
 9              A.  Yes, I do.
10              Q.  Do any of the disclosures that you have    14:30
11      identified tell users that Google does show
12      personalized ads based on sensitive categories?
13                   MS. REDDY:  Objection.  Exceeds the scope
14      of the 30(b)(6) notice.
15                   THE WITNESS:  No, these disclosures do not 14:30
16      show that.  As a practice, we do not show ads
17      based on a user's sensitive information.
18      BY MS. WEAVER:
19              Q.  Okay.  And looking at the promise below
20      that, do you see:                                      14:31
21                   (As read):
22                        "We don't share information that
23                   personally identifies with you
24                   advertisers"?
25              A.  Yes, I see that.                            14:31
```

Page 276

CONFIDENTIAL

```
 1          Q.   Does Google, in any of the disclosures
 2     you've identified, tell class members, "We do
 3     share information that personally identifies you
 4     with advertisers"?
 5              MS. REDDY:  Objection.  Exceeds the scope   14:31
 6     of the 30(b)(6) notice.
 7              THE WITNESS:  We don't communicate to
 8     users that we share their personal information
 9     with advertisers in our disclosures because we do
10     not do that.                                          14:31
11     BY MS. WEAVER:
12          Q.   And can you turn to Exhibit 40 in the same
13     declaration.
14          A.   Yes.
15          Q.   And that is the 3/24/2021 privacy policy.   14:31
16              And I ask you to turn to page 20 of 29.
17          A.   Yes.
18          Q.   Do you see "Personal information" in this
19     policy?
20          A.   I do.                                        14:32
21          Q.   And can you read that definition into the
22     record.
23          A.   (As read:)
24                  "Personal information.
25                  "This is information that you provide   14:32
```

Page 277

1              to us which personally identifies you,

2              such as your name, email address, or

3              billing information, or other data that

4              can be reasonably linked to such

5              information by Google, such as information    14:32

6              we associate with your Google account."

7        Q.   In any of the policies that you just

8    discussed, does Google tell users that it is

9    sharing with third parties data that can be

10   reasonably linked to such information by Google?    14:32

11            MS. REDDY:  Objection.  Lacks foundation.

12   Exceeds the scope of the 30(b)(6) notice.

13            THE WITNESS:  Our disclosures do not

14   communicate that we would share personal

15   information or information that could be linked to   14:32

16   Google account personal information to -- for the

17   purposes of RTB.

18   BY MS. WEAVER:

19        Q.   And turning to paragraph -- going back to

20   your declaration, which is Exhibit 10.              14:33

21        A.   Yes.

22            Yes, I have it.

23        Q.   So this is fun.

24            Paragraph 14.

25        A.   Yes.                                        14:33

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Exceeds the scope of the 30(b)(6) notice.  Calls

2    for legal conclusion.

3            THE WITNESS:  Correct.  It's an additional

4    page in the technologies disclosure.

5    BY MS. WEAVER                                    14:47

6        Q.  Okay.  Does Google offer users any

7    opportunity to agree to sharing their information

8    in the real-time bidding auction?

9            MS. REDDY:  Objection.  Asked and

10   answered.                                        14:48

11           THE WITNESS:  Users provide their

12   agreement to the creation of their account, which

13   includes the reference to the terms of service and

14   the privacy policies for the collection and use of

15   whatever the specified purposes are, depending on  14:48

16   their settings.

17           There's nothing referencing RTB

18   specifically.

19           And it's in the context of whatever their

20   advertising choices are.                         14:48

21   BY MS. WEAVER:

22       Q.  Does Google describe anywhere the

23   real-time bidding auction process to Google

24   account holders?

25           MS. REDDY:  Objection.  Exceeds the scope  14:48

                                        Page 294

```
 1    of the 30(b)(6) notice.
 2           THE WITNESS:  I would not be familiar with
 3    what help center content or other content may
 4    exist on RTB.
 5    BY MS. WEAVER:                                    14:48
 6        Q.  But in terms of the TOS and all of the
 7    disclosures we've discussed today, you're not
 8    aware of any disclosures to Google account holders
 9    about how the real-time bidding auction functions;
10    right?                                            14:48
11        A.  I am not familiar with any.
12        Q.  Going back to Exhibit 5 and paragraph 29,
13    did that exist from August 18, '22 only?
14        A.  Sorry.  I'm just looking at --
15        Q.  That's okay.                              14:49
16        A.  -- at Exhibit -- I'm on Exhibit 4.  Give
17    me a moment, please.
18           This page has existed since August 2022
19    because the My -- the ad settings page was
20    revamped in fall of 2022 to be called My Ad       14:49
21    Center.  And so all of the content was revamped.
22        Q.  Okay.
23        A.  And that's why this new page was created.
24    It may have existed in some other version.
25           MS. WEAVER:  Okay.  Let's take a quick     14:50
```

Page 295

```
 1    those users visit those websites.  That's -- but I
 2    couldn't comment -- I'd need to reread it.  But it
 3    does not -- it's not specific to the advertiser or
 4    publisher that a user specifically interacts with.
 5    BY MS. WEAVER:                                     15:07
 6         Q.  And isn't it true that if a user visits
 7    the website, they have a relationship with that
 8    website?  Right?
 9         A.  That's correct.
10         MS. REDDY:  Objection.  Exceeds the scope    15:07
11    of the 30(b)(6) notice.
12    BY MS. WEAVER:
13         Q.  Does Google disclose to users that Google
14    is sharing information with third parties with
15    whom the users have no relationship?               15:07
16         MS. REDDY:  Objection.  Exceeds the scope
17    of the 30(b)(6) notice.
18         THE WITNESS:  The privacy policy describes
19    the browsing activity may be communicated, like a
20    web URL, for instance.  And so it does not define  15:07
21    whether that's a browsing activity that they have
22    or have not done.  And it says generally
23    "advertisers and publishers."  It does not comment
24    on that at all.
25    BY MS. WEAVER:                                     15:08
```

Page 298

```
 1    STATE OF CALIFORNIA

 2

 3    REPORTER'S CERTIFICATE

 4

 5          I, EARLY LANGLEY, a Shorthand Reporter,

 6    State of California, do hereby certify:

 7          That SUNEETI VAKHARIA, in the foregoing

 8    deposition named, was present and by me sworn as a

 9    witness in the above-entitled action at the time

10    and place therein specified;

11          That said deposition was taken before me at

12    said time and place, and was taken down in

13    shorthand by me, a Certified Shorthand Reporter of

14    the State of California, and was thereafter

15    transcribed into typewriting, and that the

16    foregoing transcript constitutes a full, true and

17    correct report of said deposition and of the

18    proceedings that took place;

19          That before completion of the proceedings,

20    review of the transcript was not requested.

21          IN WITNESS WHEREOF, I have hereunder

22    subscribed my hand this November 17, 2023.

23

24

          EARLY LANGLEY, CSR NO. 3537

25          State of California
```

Page 333

1    Lesley Weaver

2    Lweaver@bfalaw.com

3                                      November 17, 2023

4    RE: In Re: Google RTB Consumer Privacy Litigation

5    11/15/23, GOOGLE AND SUNEETI VAKHARIA, INDIVIDUALLY, #6278992

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived – Reading & Signature was waived at the

24       time of the deposition.

25

                                                    Page 334

CONFIDENTIAL

```
 1   __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

 2      Transcript - The witness should review the transcript and

 3      make any necessary corrections on the errata pages included

 4      below, notating the page and line number of the corrections.

 5      The witness should then sign and date the errata and penalty

 6      of perjury pages and return the completed pages to all

 7      appearing counsel within the period of time determined at

 8      the deposition or provided by the Federal Rules.

 9   _X_ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127