# EXHIBIT K
# to the Declaration of
# G. Berntson

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 54

## SEALED VERSION

## FILED UNDER SEAL

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4                                    )

5     IN RE GOOGLE RTB CONSUMER      )

6        PRIVACY LITIGATION          ) Case No.

7     -------------------------- ) 4:21-CV-02155-YGR

8    This document applies to      )

9    all actions.                  )

10

                * * * CONFIDENTIAL * * *

11

          The videotaped deposition of AARON

12    STRIEGEL, Ph.D., called for examination pursuant to
      the Rules of Civil Procedure for the United States

13    District Courts pertaining to the taking of
      depositions, taken at 10 North Dearborn Street, 6th

14    Floor, Chicago, Illinois, on the 20th day of
      October, 2023, at the hour of 9:00 a.m.

15

16

17

18

19

20

21

22

23

24    Reported by:  Gina M. Luordo, CSR, RPR, CRR

25    License No.:  084-004143

                                          Page 1

```
 1        APPEARANCES:
 2            PRITZKER LEVINE LLP
             BY:  MR. JONATHAN K. LEVINE
 3                MS. BETHENY L. CARACUZZO
                  (via videoconference)
 4           1900 Powell Street, Suite 450
             Emeryville, California  94608
 5           (415) 682-0772
             jkl@pritzkerlevine.com
 6           bc@pritzkerlevine.com
 7                - and -
 8           SIMMONS HANLY CONROY
             BY:  MS. AN V. TRUONG
 9           112 Madison Avenue
             New York, New York 10016-7416
10           (212) 784-6270
             atruong@simmonsfirm.com
11
                  - and -
12
             BLEICHMAR FONTI & AULD LLP
13           BY:  MS. ANNE K. DAVIS
                  (via videoconference)
14           555 12th Street, Suite 1600
             Oakland, California  94607
15           (415) 455-4003
             adavis@bfalaw.com
16                Representing the Plaintiffs;
17
             COOLEY LLP
18           BY:  MR. WHITTY SOMVICHIAN
                  MS. DANIELLE PIERRE
19                (via videoconference)
             3 Embarcadero Center, 20th Floor
20           San Francisco, California  95111-4004
             (415) 693-2000
21           wsomvichian@cooley.com
             dpierre@cooley.com
22                Representing the Defendants.
23                    * * * * *
24
25    Also Present:  Mr. Nick Page - Videographer
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1                          I N D E X

2        WITNESS                          EXAMINATION

3        AARON STRIEGEL, Ph.D.

4            By Mr. Levine                      5

5

6

7                       E X H I B I T S

8        NUMBER           DESCRIPTION                   PAGE

9        Exhibit 1     Expert Report of Aaron         7

10                     Striegel, Ph.D.

11       Exhibit 2     Final Out CSV File            66

12       Exhibit 3     Field Name & Value Chart      82

13       Exhibit 4     Shafiq Chart                  86

14

15       PREVIOUSLY MARKED              FIRST REFERENCED

16       Psounis 3                        25

17       Psounis 4                        160

18       Psounis 7                        74

19       Shafiq 2                         71

20

21

22

23

24

25

                                         Page  3

```
 1          THE VIDEOGRAPHER:  We're going on the record at
 2     9:00 a.m. on October 20, 2023.  Please note that
 3     the microphones are sensitive and may pick up
 4     whispering and private conversations.  Please mute
 5     your phones at this time.  Audio and video
 6     recording will continue to take place unless all
 7     parties agree to go off the record.
 8              This is media No. 1 of the recorded
 9     deposition of Professor Aaron Striegel, Ph.D. taken
10     in the matter of In Regards to Google RTB Consumer
11     Privacy Litigation.  The location of this
12     deposition is being held in the offices of DiCello
13     & Levitt, LLC located at 10 North Dearborn Street,
14     Chicago, Illinois.
15              My name is Nick Page representing
16     Veritext, and I'm the videographer.  The court
17     reporter is Gina Luordo also from the firm
18     Veritext.  I'm not related to any person in this
19     action, nor am I financially interested in the
20     outcome.  If there are any objections to the
21     proceedings, please state them at the time of your
22     appearance.
23              Counsel and all present will now please
24     state their appearances and affiliations for the
25     record beginning with the noticing attorney.
```

Page 4

1      MR. LEVINE:  Jonathan Levine, Pritzer Levine

2   for the plaintiffs.

3      MS. TRUONG:  An Truon, Simmons Hanly Conroy for

4   plaintiffs.

5      MR. SOMVICHIAN:  Whitty Somvichian with Cooley

6   LLP representing Google and the witness.

7      THE VIDEOGRAPHER:  Will the court reporter

8   please swear in the witness.

9                         (Whereupon, the witness was

10                         sworn.)

11                   AARON STRIEGEL, Ph.D.,

12   having been first duly sworn, was examined and

13   testified as follows:

14                         EXAMINATION

15   BY MR. LEVINE:

16      Q.   Good morning, Dr. Striegel.  My name is

17   Jonathan Levine.  I represent the plaintiffs in

18   this action.  You have been deposed before,

19   correct?

20      A.   Correct.

21      Q.   How many times before today have you been

22   deposed?

23      A.   That's a good question.  I think it's less

24   than 10, but more than five.

25      Q.   There was a matter called Mahon v. YouTube

                                          Page 5

1    IEEE ICC.

2         MR. SOMVICHIAN:  Can you give a page reference

3    so we have it for the record?

4         THE WITNESS:  Sure.  This would be Page 7 of my

5    CV, Appendix A.

6    BY MR. LEVINE:

7         Q.   And is that called Repurpose: A Case For

8    Versatile Network Measurement?

9         A.   That is correct.

10        Q.   Thank you.

11             Have you ever used a product called

12   Selenium, S-e-l-e-n-i-u-m?

13        A.   Yes, I have.

14        Q.   Have you ever used a product called

15   Puppeteer?

16        A.   Not as far as I know, but my students may

17   have.

18        Q.   What experience do you have with web

19   browser automation frameworks?

20        A.   So we have used, and I use kind of the

21   colloquial we talking about myself and my students

22   in terms of using Selenium, particularly with

23   regards to video browsing, short video browsing for

24   some of our more recent -- some of the work that

25   they've done maybe over the last two to three

Page 15

 1    years.

 2         Q.    What experience do you have with Chrome

 3    debug protocol?

 4         A.    I have not personally used Chrome debug

 5    protocol.  I have looked at -- I believe Chrome has

 6    the equivalent of like a developer mode to do that,

 7    but I don't think I specifically use the Chrome

 8    debug protocol.

 9         Q.    What experience do you have measuring the

10    prevalence of information shared by online

11    advertisers and trackers on the web?

12         MR. SOMVICHIAN:  Objection.  Vague and

13    ambiguous.

14         THE WITNESS:  So in terms of that, I think I've

15    read several research papers in that vein as part

16    of our normal ongoing research.  We have not or I

17    have not published any papers, I believe, in that

18    particular space.

19    BY MR. LEVINE:

20         Q.    And what experience do you have measuring

21    the amount of information shared by online

22    advertisers and trackers on the web?

23         MR. SOMVICHIAN:  Same objections.  Vague and

24    ambiguous.

25         THE WITNESS:  So in terms of what I've

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    published on that particular topic, I have not

2    personally published a paper, but I have read

3    various research papers in that area.

4    BY MR. LEVINE:

5        Q.    And with respect to the experiments that

6    Professor Wilson performed for his report, did you

7    look at the source code or data for those

8    experiments?

9        A.    I did.

10        Q.    Prior to this matter, did you know

11    Dr. Psounis?

12        A.    I did not.

13        Q.    Did not?

14        A.    I did not.

15        Q.    Did you have any discussions either in

16    writing or oral with Dr. Psounis about this case

17    before your report was signed?  That's just a yes/

18    no.

19        A.    I did not.

20        Q.    Did you communicate in any way with

21    Dr. Psounis after his deposition earlier this week?

22        A.    No, I did not.

23        Q.    Have you read the transcript of his

24    deposition or a summary of that deposition?

25        A.    I have not read anything on that.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1     Q.  Did you look at any RTB bid data other

2  than the named plaintiff data produced by Google

3  that is identified in your report and the New York

4  Times data and The Trade Desk data?

5     A.  I did have some -- I believe some

6  additional snippets of information provided.  I

7  believe there was some very small examples of

8  Facebook data, and then I don't recall.  There was

9  a very small, I think, example of something from

10  Twitter on that that I had seen them, but they

11  were, I believe, just example snippets.

12     Q.  Did you ask Google to provide you with a

13  complete set of all RTB bid request fields?

14     A.  So if I -- if I understand your question

15  correctly, you're asking if they -- if I asked to

16  view the set of all RTB bid request fields?

17     Q.  Yes.

18     A.  In this case, I was provided the data, and

19  I worked with the data as given to me.

20     Q.  Did you ask to see any of the data logs

21  that Google maintains related to RTB bid requests?

22    MR. SOMVICHIAN:  Objection.  Vague.

23    THE WITNESS:  So in this particular matter, I

24  was provided the data as I understand was also

25  shared with the plaintiffs.

```
 1    Paragraph 35 of Professor Shafiq's report.  So at
 2    the bottom of Table 1, you see that there are four
 3    Bates numbers there?
 4        A.   I think I'm on a different -- sorry.
 5    Paragraph 35?
 6        Q.   Yeah, Page 13 --
 7        A.   Sorry.
 8        Q.   -- in particular.
 9        A.   I went to Page 35.
10        Q.   You see there's a table, right?
11        A.   I do.
12        Q.   Okay.  You see there's a table, and at the
13    bottom of the table, there's a citation to four
14    different Bates numbers, which is where Professor
15    Shafiq got his data from, right?  Do you see that?
16        A.   I do see that.
17        Q.   Okay.  And you read Professor Shafiq's
18    deposition, I believe?
19        A.   Yes, I browsed through it.
20        Q.   So you know that early in his deposition,
21    he specifically identified these same Bates numbers
22    as the productions he relied on for the work he
23    performed, correct?
24        A.   I do believe that's correct.
25        Q.   Okay.  But you only looked at two of the
```

Page 55

1    productions listed in these Bates numbers, not all

2    four, correct?

3        A.    I had -- and again, I don't know to the

4    exact Bates numbers.  I do know the data that

5    counsel had provided to me that they represented

6    was that the totality of the data that's provided.

7        Q.    Well, there are four Bates numbers here

8    listed, 455803, 456450, 481291, and 481294, and I

9    only see two of these on the list of materials that

10   you relied on in your report.  If you look at

11   Appendix C, all I see on this list is the two last

12   Bates numbers, 481291 and 481294 and not the first

13   two; is that correct?

14       A.    Could you just repeat that?  Sorry,

15   Counsel.  There was a lot of numbers to track.

16       Q.    Yeah.  Only two of the -- there are four

17   data sets Professor Shafiq looked at reflected in

18   four Bates numbers, and only two of those data sets

19   reflected in the Bates numbers show up on your

20   list.  You only looked at two of the productions,

21   not all four, correct?

22       A.    I'm not sure that's accurate.  I know I've

23   been provided multiple productions on that, and I

24   had brought them into my code.  The code has each

25   of the particular productions.  I don't know if

Page 56

1    these Bates numbers, if it's just the starting

2    Bates number on that.  I don't recall for sure on

3    this, but I do recall multiple particular

4    productions and different files that I brought into

5    my analysis.  I just don't remember without the

6    code in front of me the exact Bates numbers.

7        Q.   Well, you don't identify the first two

8    Bates -- you'll agree with me that the first two

9    Bates numbers of the two productions that Professor

10   Shafiq looked at don't show up on your list, right?

11       A.   So I see 455800, and then I see it goes up

12   to 808.

13       Q.   But it doesn't include 803, correct?

14       A.   I don't see 803 specifically called out,

15   but again, I had counsel's help in assembling this

16   list of all of the Bates numbers.  So I don't

17   recall for sure if that would have been -- if it

18   would have been the start of a particular

19   production or not.

20       Q.   It's a specific production that's included

21   in only 803.  It's not 800.  It's not 808.  It's

22   803, and that doesn't show up on your list,

23   correct?

24       A.   I don't see 803 specifically mentioned,

25   but I could look at in the appendix where I had

Page 57

1    actually listed all of the code.  I do have all of

2    the files listed.  So if that was, perhaps, a typo,

3    I could look at the code and confirm that for sure.

4         Q.   And you also don't include 456450,

5    correct?

6         A.   I don't see that specifically listed.  As

7    I stated earlier, I could -- I have the Bates

8    numbers actually listed in terms of the files of my

9    code, but I don't recall off the top of my head.

10        Q.   The answer is you don't see it, right?

11        A.   I don't see it listed there, but I don't

12   know without looking at my code for sure as to

13   whether that was brought in.

14        Q.   And the fact that you only looked at half

15   of or two of the four productions that Professor

16   Shafiq looked at is reflected in your data analysis

17   as well, isn't it, Dr. Striegel?

18        MR. SOMVICHIAN:  Object to form.  Vague.

19        THE WITNESS:  No, I'm not sure I would agree

20   with that given that we arrived at the same number

21   of -- roughly the same number of bid query -- so

22   the number of queries.  As I had stated before,

23   when I had looked through the data, I actually

24   found a set of duplicates, which my code had

25   actually removed, and I don't know if Dr. Shafiq

1   page, which is 62 and 63, your numbers are ███.

2   That would round to ██████████, correct?

3       A.   In a general sense if you did an Excel

4   round function, that's what you would get.

5       Q.   So you would agree that, assuming his math

6   is right for Line 2 all the way through Line 61,

7   your numbers are the same or actually even a little

8   higher than Professor Shafiq's for the fields

9   reflected in Lines 1 through 61 just on a numerical

10  basis as set forth in this chart?

11      MR. SOMVICHIAN:  Object to form.

12      THE WITNESS:  So that was -- you did a couple

13  things on that, Counsel.  Could you repeat it so I

14  could --

15  BY MR. LEVINE:

16      Q.   Sure.  I understand you may disagree with

17  some of the conclusions, but as a numerical

18  exercise, you would agree that for the ██████ the

19  first █ fields on this chart, your numbers as a

20  percentage are the same or actually higher than

21  Professor Shafiq's?

22      A.   If we take the blank percent, the null

23  percent on that, that would appear to be the case

24  on that.  And again, with regards to whether it

25  actually contains information, and the definition

Page 77

1    of blank on that is important to remember, but at a

2    high level, adding those columns up would seem to

3    be a reasonable -- would seem to be correct.

4        Q.    And then so for the last two, Professor

5    Shafiq is at ████████, and you're at ████████.

6    Do you have an understanding -- those are the only

7    two that seem to have any significant difference.

8    Do you have any understanding as to why there's a

9    difference for just those two fields?

10       A.    In this case -- so this was device, dot,

11   model and brand.  In this case based on my count on

12   here, that would have been when that particular

13   test would have determined that that field was

14   blank.

15       Q.    But do you have any understanding of why

16   Professor Shafiq concludes it's ██ -- from his

17   data, that it's ████████, and from your data,

18   it's ████████?

19       A.    It could be based on the duplicate data

20   that we had talked about.  If that data was

21   double-counted, it could have been biased upwards

22   with regards to that, but -- that could potentially

23   explain it, but I would have to do an exhaustive

24   comparison to determine why.

25       Q.    And so just I'm clear, you use the word

Page 78

1  duplicate when you're talking about some of his

2  data.  What do you mean by duplicate in that sense?

3      A.   So as I understand the productions as

4  provided, which I believe were provided, several of

5  them subsumed some of the earlier productions in

6  that it was the same data, but with either

7  additional data or a longer or the different time

8  windows.  I don't understand -- I don't remember

9  the exact details, but when I had gone through and

10  conducted my analysis when I had looked at, it

11  looked to be repetitive data in the sense that it

12  was -- it was the same data in multiple files.

13      Q.   And I think you mentioned earlier that

14  your analysis, your backup would show what data you

15  looked at, right?

16      A.   In the sense the code breaks out which

17  particular CSV input files I had brought in, and

18  that's actually listed in the code.

19      Q.   Okay.  But if you didn't look at -- if you

20  didn't look at the earlier productions, how do you

21  know that there's duplication?

22      A.   In the sense that I had -- I had received

23  the productions from counsel, and they had fed into

24  my code, which then, in turn, extracted the

25  analysis.  And as to why it's not listed or on

Page 79

1    that, I'm not sure on that because I had relied on

2    counsel to help categorize which data files I

3    received.

4        Q.    So maybe counsel made a mistake and just

5    didn't give you all the files.  Is that something

6    you -- you can't rule that out, right?

7        MR. SOMVICHIAN:  Object to form.  Assumes

8    facts.

9        THE WITNESS:  I don't believe that's the case

10   as we had analyzed looking at that, and I had sort

11   of double-checked.  That's why I arrived at my

12   conclusion with regards to the duplication of data

13   because of my concern that I had about the

14   discrepancy in numbers.

15   BY MR. LEVINE:

16       Q.    But how will you know that if you didn't

17   look at everything that Professor Shafiq looked at?

18   Unless you look at all four of his data sets, how

19   could you possibly come to that conclusion?

20       A.    Again, I would have to look through all of

21   the specific Bates numbers on that, and I could

22   certainly go through and cross-reference that on

23   that to confirm in terms of those Bates numbers.

24   They're right in the code on that.  I just don't

25   recall off the top of my head.  I know I had looked

Page 80

1    A.    So given that the New York Times is a

2    publisher, so looking at that particular mechanism

3    by which he had conducted his evaluation.

4    Q.    So we looked at your backup data that --

5    for -- let me strike that.  Start over.

6          Part of your backup data includes your

7    analysis of the New York Times data set, correct?

8    A.    I guess we discussed this earlier.  I

9    guess it would be the output of the alter.  I guess

10   we probably -- I shouldn't use the term backup

11   data, but the output of the scripts was provided.

12   Q.    And that would reflect which data sets

13   from the New York Times you looked at, correct?

14   A.    That would have had the input files that I

15   brought in and the resulting output.

16   Q.    And it looks like from your data that what

17   you analyzed and comment on in your report is the

18   data set called network requests.  Does that sound

19   familiar?

20   A.    That does sound roughly familiar.

21   Q.    And it does not appear that you looked at

22   a data set from the New York Times called network

23   backfill requests.  Are you familiar with that

24   name?

25   A.    I am not.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Q.    Do you know what the difference is between

2    the network requests data set and the network

3    backfill requests data set, both of which the New

4    York Times produced?

5    A.    Since I don't recall the backfill, I don't

6    think I could speculate on that.

7    Q.    Okay.  If I told you that the network

8    requests data set is for ad impressions that were

9    not put up for auction and that were, instead, sold

10   directly to advertisers, does that help you?

11   A.    No.

12   Q.    If I told you that the network backfill

13   requests data set is for ad impressions that were

14   actually auctioned in RTB auctions, does that help?

15   A.    Again, since I haven't seen the

16   accompanying information, I couldn't say.

17   Q.    So sitting here today, if the network

18   backfill requests data set is actually for the ad

19   impressions that were auctioned, you didn't look at

20   that data set, correct?

21   A.    I don't recall looking at a backfill --

22   something named backfill.

23   Q.    So since -- since you didn't do that

24   analysis, you don't know whether your data would

25   have been different if you did the analysis for the

Page 98

CONFIDENTIAL

1  network backfill requests data set instead of the

2  network requests data set, right?

3      A.   I would need to run my analysis if,

4  indeed, it's a different set of data.

5      Q.   Let's look at Paragraph 34 of your report

6  if you could, please.

7      A.   Paragraph 34?  Sorry.

8      Q.   Yeah.  Actually, I'm sorry.  Paragraphs 31

9  through 34 of your report.

10     A.   Okay.

11     Q.   So this is an example you provided of, I

12 guess, work you did.  You talk about a GET request

13 right, G-E-T?

14     A.   I do.

15     Q.   And that is, as I understand it, what

16 you're conveying here is your computer

17 communicating directly with the New York Times

18 website.  That's what you're showing here in these

19 pictures and the information you're conveying in

20 Paragraphs 32 and then later in 34 is you to the

21 New York Times, right?

22     A.   So this would be conveying here where my

23 computer is connecting to the New York Times to

24 fetch the website.  So just like I would type into,

25 in this case, it was Safari, captioning all of the

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1    A.    I would have to look at the data to

2    confirm, but I believe it's part of my scripted

3    output that I just don't recall that for sure.

4    ▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮▮▮▮▮

7    A.    I do see that.

8    Q.    Are you aware that Google only fills the

9    OS version field for mobile apps and devices?

10   A.    So the -- that could be the case.  I would

11   have to look at how the ▮▮▮▮▮▮ field got

12   filled, but I don't recall from the Bernston

13   declaration discussions on that.

14   ▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮    ▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮  ▮▮▮▮▮▮  ▮▮▮▮

24   ▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮  ▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 141

1    listed in the New York Times data, but I don't

2    recall doing that specific query on the data.

3    BY MR. LEVINE:

4    ████████    ████████████████████████████████

5    ████████████████████████

6        A.    That I don't recall for sure.  I'm sure if

7    I looked at a little bit of data, I could tease

8    that out fairly quick.

9        Q.    Well, I don't know if this is apples to

10   oranges or not, but let's go back to Paragraph 32

11   of your report, Page 15.

12       A.    Sorry.  I keep going to the page.

13       Q.    Okay.  So you have your example here.  I

14   know this is not a bid request, but you see in your

15   example that's on Paragraph 32, there's something

16   that says user agent.  Do you see that?

17       A.    I do.

18       Q.    And that -- at least this sample of user

19   agent includes the OS version, correct?

20       A.    It does.  It does look like my browser,

21   and this would have been the GET, the request that

22   I sent, so my browser would have sent that.

23   Although, interestingly enough, it's actually not

24   the right version of my operating system that was

25   sent by Safari.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1   Dr. Wilson's experiment is that he had used only a

2   single public IP address for all of his searches

3   from there, which creates a significant issue as to

4   whether the data had come from RTB or the normal

5   sort of shared public IP address that had occurred

6   between them.  There's also various other

7   discussions I offer as well with regards to

8   Dr. Wilson as well.

9       MR. LEVINE:  Let's go off the record.

10      THE VIDEOGRAPHER:  Off the record at 1:34.

11                          (Whereupon, a short break was

12                          taken.)

13      THE VIDEOGRAPHER:  Back on the record at 1:47.

14      MR. LEVINE:  Obviously, subject to any

15  examination by Google's counsel, I have no further

16  questions.

17      MR. SOMVICHIAN:  We have no questions of the

18  witness.  We'll close the depo.  I'd like it to be

19  marked confidential provisionally under the

20  protective order, and I think we're done.

21      MR. LEVINE:  We are.  Thank you, Dr. Striegel.

22      THE VIDEOGRAPHER:  This is the end of the

23  deposition.  Off the record at 1:47.

24                      (FURTHER DEPONENT SAITH NAUGHT.)

25

                                        Page 165

```
 1    STATE OF ILLINOIS  )

 2                       )   SS:

 3    COUNTY OF C O O K  )

 4            I, GINA M. LUORDO, a notary public within

 5    and for the County of Cook County and State of

 6    Illinois, do hereby certify that heretofore,

 7    to-wit, on October 20, 2023, personally appeared

 8    before me, at 10 North Dearborn Street, 6th Floor,

 9    Chicago, Illinois, AARON STRIEGEL, Ph.D., in a

10    cause now pending and undetermined in the United

11    States District Court, Northern District of

12    California, Oakland Division, In Re: Google RTB

13    Consumer Privacy Litigation.

14            I further certify that the said AARON

15    STRIEGEL, Ph.D. was first duly sworn to testify the

16    truth, the whole truth and nothing but the truth in

17    the cause aforesaid; that the testimony then given

18    by said witness was reported stenographically by me

19    in the presence of the said witness, and afterwards

20    reduced to typewriting by Computer-Aided

21    Transcription, and the foregoing is a true and

22    correct transcript of the testimony so given by

23    said witness as aforesaid.

24            I further certify that the signature to

25    the foregoing deposition was not waived by counsel
```

Page 167

1    for the respective parties.

2         I further certify that the taking of this

3    deposition was pursuant to notice and that there

4    were present at the deposition the attorneys

5    hereinbefore mentioned.

6         I further certify that I am not counsel

7    for nor in any way related to the parties to this

8    suit, nor am I in any way interested in the outcome

9    thereof.

10        IN TESTIMONY WHEREOF:  I have hereunto set

11   my hand and affixed my notarial seal this 24th day

12   of October, 2023.

13

14

15

16

17

18        NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19             LIC. NO. 084-004143

20

21

22

23

24

25

                                        Page 168

Re:     Deposition of Aaron Striegel, Ph.D.
         Date: October 20, 2023
         Case: *In re Google RTB Consumer Privacy Litigation*
         Return to: Veritext Legal Solutions

| Page | Line(s) | Correction/Change; Reason |
|------|---------|---------------------------|
| 6 | 16 | Change "Google" to "Cooley"; transcription error |
| 21 | 17, 21 | Change "Bernston" to "Berntson"; typographical error |
| 38 | 3 | Change "Bernston" to "Berntson"; typographical error |
| 40 | 15 | Change "log-in" to "logging"; transcription error |
| 53 | 15 | Change "MPA" to "NPA"; typographical error |
| 69 | 19 | Change "filed" to "field"; typographical error |
| 92 | 23 | Change "buyer" to "buyers"; transcription error |
| 103 | 12 | Change "Bernston" to "Berntson"; typographical error |
| 105 | 1, 4, 9 | Change "Bernston" to "Berntson"; typographical error |
| 105 | 14 | Change "set" to "sent"; typographical error |
| 113 | 4-5 | Change "Bernston" to "Berntson"; typographical error |
| 141 | 12 | Change "Bernston" to "Berntson"; typographical error |
|  |  |  |
|  |  |  |

ACKNOWLEDGMENT OF DEPONENT

I, Aaron Striegel, Ph. D., do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

Date:   November 24, 2023          Signature: