# EXHIBIT L
# to the Declaration of
# G. Berntson

# (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 56

## SEALED VERSION

## FILED UNDER SEAL

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5   In re Google RTB Consumer    ) Case No.
     Privacy Litigation,          ) 4:21-cv-02155-YGR-VKD
 6                                 )
                                   )
 7   This document applies to:    )
     All actions                   )
 8   _____ )

 9

10

11

12                   CONFIDENTIAL

13      VIDEO-RECORDED DEPOSITION OF BRUCE DEAL

14

15              Tuesday, October 24, 2023

16              San Francisco, California

17

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 6151469
```

Page 1

CONFIDENTIAL

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

5  In re Google RTB Consumer    ) Case No.

    Privacy Litigation,        ) 4:21-cv-02155-YGR-VKD

6                          )

                          )

7  This document applies to:    )

    All actions               )

8  _____ )

9

10

11

12          CONFIDENTIAL, VIDEO-RECORDED DEPOSITION OF

13  BRUCE DEAL, taken on behalf of the Plaintiffs, at

14  the law offices of Cooley LLP, located at

15  Three Embarcadero, 20th Floor, San Francisco,

16  California 94111, on Tuesday, October 24, 2023,

17  before Hanna Kim, CLR, Certified Shorthand Reporter,

18  No. 13083.

19

20

21

22

23

24

25

Page 2

```
 1              APPEARANCES OF COUNSEL:

 2

 3   For Plaintiffs:

 4            BLEICHMAR FONTI & AULD LLP

 5            BY:  LESLEY E. WEAVER, ESQ.

 6            BY:  JOSHUA SAMRA, ESQ.

 7            (Via Videoconference)

 8            BY:  ANNE K. DAVIS, ESQ.

 9            (Via Videoconference)

10            1330 Broadway, Suite 630

11            Oakland, California 94612

12            415.445.4004

13            lweaver@bfalaw.com

14            jsamra@bfalaw.com

15

16            -and-

17

18            LAW OFFICES OF H. MELISSA MATHER

19            BY:  H. MELISSA MATHER, ESQ.

20            823 Congress Ave

21            Austin, Texas 78701

22            512.536.1377

23

24

25
```

Page 3

```
 1            APPEARANCES OF COUNSEL:  (CONTINUED)

 2

 3   For Plaintiffs:

 4            PRITZKER LEVINE LLP

 5            BY:  ELIZABETH C. PRITZKER, ESQ.

 6            (Via Videoconference)

 7            1900 Powell Street, Suite 450

 8            Emeryville, California 94608

 9            415.692.0772

10            ecp@pritzkerlevine.com

11

12            -and-

13

14            COTCHETT, PITRE & MCCARTHY LLP

15            BY:  BRIAN DANITZ, ESQ.

16            (Via Videoconference)

17            BY:  KARIN SWOPE, ESQ.

18            (Via Videoconference)

19            San Francisco Airport Office Center

20            840 Malcolm Road, Suite 200

21            Burlingame, California 94010

22            650.697.6000

23            bdanitz@cpmlegal.com

24

25
```

Page  4

```
 1              APPEARANCES OF COUNSEL:   (CONTINUED)

 2

 3   For Defendant:

 4              COOLEY LLP

 5              BY:  AARTI G, REDDY, ESQ.

 6              BY:  WHITTY SOMVICHIAN, ESQ.

 7              (Via Videoconference)

 8              BY:  REECE TREVOR, ESQ.

 9              (Via Videoconference)

10              3 Embarcadero Center, 20th Floor

11              San Francisco, California 94111-4004

12              415.693.2000

13              areddy@cooley.com

14

15

16   Also Present:

17              DANIELLE PIERRE, Google LLC

18              (Via Videoconference)

19              CASSIA LEET, Videographer

20

21

22

23

24

25

                                          Page  5
```

```
1              INDEX OF EXAMINATION

2

3   WITNESS:  BRUCE DEAL

4   EXAMINATION                                    PAGE

5        BY MS. WEAVER:                             12

6

7

8   QUESTIONS INSTRUCTED NOT TO ANSWER:

9   PAGE....LINE

10  52......4

11  53......6

12  57......7

13  60......24

14  87......18

15                     --o0o--

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                    INDEX OF EXHIBITS

 2

 3   DEAL DEPOSITION EXHIBITS                    PAGE

 4   Exhibit 1      "Exhibit 4 to Declaration of W.    13

 5                  Somvichian," Expert Report of

 6                  Bruce Deal, September 29, 2023;

 7                  103 pages

 8   Exhibit 2      "Appendix I, Overview of Google    68

 9                  Authorized Buyers and Real-Time

10                  Bidding, Confidential -

11                  Commercially Sensitive"; 24

12                  pages

13   Exhibit 3      Document; Bates nos.               123

14                  GOOG-HEWT-00047191 through

15                  '47225; 36 pages

16   Exhibit 4      Consolidated Class Action          164

17                  Complaint; 139 pages

18   Exhibit 5      "Exhibit 4 Filed Under Seal,"      293

19                  "Expert Class Certification

20                  Report of Greg J. Regan,

21                  CPA/CFF, CFE, July 14, 2023"; 46

22                  pages

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1                    INDEX OF EXHIBITS (CONTINUED)

2

3    DEAL DEPOSITION EXHIBITS                         PAGE

4    Exhibit 6     Excerpted pages from "Reference    350

5                  Manual on Scientific Evidence,

6                  Third Edition," "III. The

7                  Standard General Approach to

8                  Quantification of Damages"; 14

9                  pages

10                          --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
 1              San Francisco, California

 2       Tuesday, October 24, 2023; 9:06 a.m., PDT

 3                    --o0o--

 4          THE VIDEOGRAPHER:  Good morning.  We are

 5   going on the record at 9:06 a.m., on October 24,        09:06:52

 6   2023.

 7              Please note that the microphones are

 8   sensitive and may pick up whispering and private

 9   conversations.

10              Audio and video recording will continue to   09:07:08

11   take place unless all parties agree to go off the

12   record.

13              This is Media Unit 1 of the video-recorded

14   deposition of Bruce Deal, taken by counsel for

15   Plaintiff, in the matter of In re Google RTB          09:07:21

16   Consumer Privacy Litigation, filed in the United

17   States District Court, Northern District of

18   California, Oakland Division.

19              Case Number 4:21-cv-02155-YGR.

20              The location of this deposition is          09:07:43

21   Three Embarcadero Center, 20th Floor, San Francisco

22   California 94111.

23              My name is Cassia Leet, representing

24   Veritext Legal Solutions, and I am the videographer.

25              The court reporter is Hanna Kim, from the    09:08:00
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    you defend a class action?
 2            And if that's a class action, you would
 3    include that; correct?
 4        A.   I -- definitely.  I thought you had said a
 5    damages model --                                    09:18:37
 6        Q.   Okay.
 7        A.   -- in a class action, which is why I was
 8    just clarifying.  But I -- I think we're on the same
 9    page.
10            THE COURT REPORTER:  I'm going to ask the   09:18:44
11    witness to slow down, please.
12            THE WITNESS:  I will.  Thank you for the
13    reminder.
14            So I think those -- those are the ones.
15    BY MS. WEAVER:                                      09:18:52
16        Q.   And looking at your report -- or, sorry,
17    your -- your Appendix A here, can you identify any
18    peer-reviewed work reflected in Exhibit A that you
19    have engaged in?
20            MS. REDDY:  Objection.  Vague and           09:19:10
21    ambiguous.
22            THE WITNESS:  Are -- are you asking about
23    any peer-reviewed publications that --
24    BY MS. WEAVER:
25        Q.   Yes.                                       09:19:20
```

Page 20

1      A.    -- I've authored?

2            No.

3      Q.    Have you ever authored a peer-reviewed

4  publication on any topic?

5      A.    The -- the reason I'm pausing, there --        09:19:32

6  there -- I was -- I was invited to submit a -- a

7  piece for a --  it was kind of a specific journal

8  that was focused on terrorism insurance.

9            So it was -- it wasn't peer reviewed in

10  the traditional I submit it as a -- you know, for --    09:19:58

11  for consideration and it gets peer reviewed and

12  either accepted or not.  So it wasn't that.

13            But it was a -- it was a journal that had

14  a special issue, and they invited various authors.

15  So that's as close as I can think of.                   09:20:14

16      Q.    In your entire career; is that right?

17      A.    Yes, that's right.

18      Q.    And what is "peer review"?

19      A.    So a peer review is a process where -- in

20  academic journals where, you know, authors will        09:20:27

21  develop a report.  Oftentimes there's some data and

22  analytics with it.  It depends on the kind of --

23  kind of report it is or kind of article.

24            They submit it, and it's -- it's sort of

25  farmed out to a group of, you know, what's             09:20:44

```
 1    expert that was being critiqued by the survey expert

 2    for Google, whose name I don't recall as I sit here

 3    right now.

 4         Q.   Can you identify a single expert who was

 5    working for the Plaintiffs in this matter?          09:36:55

 6         A.   Again -- well, yes.  I mean --

 7         Q.   Who?

 8         A.   -- the -- Mr. Regan and Mr. Zeithammer.

 9         Q.   Can you identify any others?

10         A.   I know that there -- again, not by name, I   09:37:04

11    don't recall as I sit here right at this moment.

12         Q.   And --

13         A.   But it -- I -- there are other experts.

14         Q.   And you didn't read their reports; right?

15         A.   I -- I skimmed their reports.  I didn't --   09:37:13

16    I wouldn't -- I didn't read every work of it, but...

17         Q.   What do you recall about the reports that

18    you skimmed, Mr. Deal?

19         A.   Well, again, I -- what a -- the main thing

20    I recall is that, they were focusing on topics that   09:37:28

21    were not topics I was being asked to critique.  But,

22    you know, again, I -- I'd have to -- I'd have to

23    review them again to -- or -- or to -- to skim them

24    again to remember the specifics.

25              Again, I remember there -- again, the       09:37:52
```

Page 37

1    kinds of things that can affect the type of

2    information that's being shared.

3              So I'd say his opinions were certainly

4    consistent with mine, but I wasn't -- as part of my

5    assignment, I wasn't asked to go back and, you know,    09:44:19

6    replicate or review or analyze any specific work

7    that was done.

8         Q.   You're not a data engineer; right?

9         A.   I'm not a data engineer, no.  I'm -- I --

10   I work -- I've worked with data and databases for a    09:44:29

11   very, very long time, and many of my cases involve,

12   you know, complex, you know, datasets, but I -- I'm

13   not a data engineer.

14        Q.   Do you understand code?

15        A.   Some.  I don't -- I don't do coding now.    09:44:41

16   I actually started -- I -- I wrote computer software

17   a long time ago.  So I do understand kind of basic

18   principles of code, but I'm not a -- I'm currently

19   not a coder, no.

20        Q.   Currently not a coder.                      09:45:01

21              Have you reviewed any of the dataflow in

22   this case?

23              MS. REDDY:  Objection.  Vague and

24   ambiguous.

25              THE WITNESS:  I'm not quite sure what --    09:45:07

Page 43

1    and I typically don't do.

2    BY MS. WEAVER:

3         Q.   Were you asked to render opinion about

4    users' expectations?

5         A.   I think the way I would answer that is --    09:47:10

6    is not -- not conclusory opinions.  I think where

7    I -- where I would say there's some overlap with my

8    opinions there is that, as I think I pretty clearly

9    describe in the report, you know, what users

10   understand, what their expectations are, you know,    09:47:35

11   based on the understanding and what the reality is,

12   those are all elements that could contribute to

13   variability and individual questions.

14            So -- but I don't offer any, you know,

15   opinions that X percent of people understood this or    09:47:51

16   expected this or Y percent.  That's not the kind of

17   opinion I'm offering.

18        Q.   You're not a privacy expert; right?

19        A.   I agree with that.  I mean, again, privacy

20   is an issue that comes up more frequently all the    09:48:04

21   time I would say.  But I don't consider myself a --

22   a specific privacy expert, no.

23        Q.   And you're not a data engineer; right?

24        A.   Again, not a -- certainly not a data

25   engineer.  I'm a -- I -- I do lots of data    09:48:18

Page 46

CONFIDENTIAL

1  don't recall, as I sit here right now.  But, again,

2  as part of the overall background materials, I had

3  those -- those other expert reports.

4  BY MS. WEAVER:

5       Q.   Do you know whether those expert reports    09:51:22

6  were written at the time that Mr. Regan wrote his

7  report?

8       A.   I don't recall.  And, again, I don't

9  recall whether he specifically cited them or not.

10       Q.   Do you know who Zubair Shafiq is?    09:51:31

11       A.   That name does sound a -- a -- a -- a bit

12  familiar, but I'd have to -- maybe you can give me a

13  report or something to refresh my memory.  I don't

14  remember exactly.

15       Q.   Do you know if Mr. Regan cites Mr. Shafiq    09:51:45

16  throughout his report?

17       A.   I'm -- I'm happy to look.  I don't recall

18  as I sit here right now.

19       Q.   And do you know who George Levitte is?

20       A.   Yes.    09:52:01

21       Q.   Who is he?

22       A.   My -- well, I -- I mean, I recognize the

23  name.  But I'd have to go back and refresh my memory

24  as to exactly who he is, but I definitely recognize

25  the name.    09:52:21

Page 50

CONFIDENTIAL

```
 1              THE WITNESS:  Sure.

 2    BY MS. WEAVER:

 3         Q.   Did you rely on other expert reports

 4    submitted by the Plaintiffs in this matter?

 5         A.   No.                                      09:54:15

 6         Q.   Did you review them?

 7              MS. REDDY:  Objection.  I'm instructing

 8    him not to answer.  This expert stipulation is very

 9    clear that you're not entitled to probe what he

10    reviewed.                                          09:54:24

11              (Record marked.)

12    BY MS. WEAVER:

13         Q.   Why didn't you rely on them?

14              MS. REDDY:  Objection.  Argumentative.

15              THE WITNESS:  They weren't relevant for my   09:54:31

16    opinions.

17    BY MS. WEAVER:

18         Q.   Okay.  Let's talk about relevance.  Let's

19    turn to Paragraph 33 of your report.  And that

20    actually is where you were referring to             09:54:45

21    Mr. Striegel's report in Note 37 a moment ago.  Do

22    you recall that?

23         A.   Yes.

24         Q.   And do you see your first sentence there

25    where you wrote -- you wrote this; right?  You wrote   09:54:55
```

Page 53

1          You identified just ten documents produced

2     by Google in this action; correct?

3          A.   (Witness reviews.)

4               That looks right.

5          Q.   And that's the entirety of the documents        10:05:34

6     produced by Google in this case that you relied on;

7     correct?

8          A.   Yes, in the sense of specifically relying

9     on these produced documents.  Many of them are --

10    are data and things like that.                           10:05:51

11         Q.   Many of them are data?

12         A.   Yeah.

13         Q.   These ten documents are data in your view?

14         A.   My recollection is that the Bates

15    numbering on some of the document -- the -- yeah.        10:06:01

16    So, for instance, my Exhibit 4 is Bates -- yeah,

17    that's the profit and loss statement data, and

18    that's referred to in the produced documents.

19         Q.   Setting aside financial documents, did you

20    rely on any documents produced internally by Google      10:06:21

21    that reflect the data flow, meaning what is in the

22    bid requests?

23         A.   Oh.  I -- I think the answer is no.  I

24    mean, some of those -- as I recall, there's many

25    documents of course that were part of the                10:06:39

Page 64

1    depositions that were asked about.

2            So to the extent there's exhibits as part

3    of those depositions, there may have been parts of

4    that.

5            But, again, I wasn't -- you keep using the        10:06:48

6    term "data flow."  That's not a -- a topic that I

7    was asked to address.  Certainly the -- the

8    variability in terms of the data shared, that's a

9    topic that's relevant for my analysis.

10           MS. REDDY:  Counsel --                             10:07:03

11   BY MS. WEAVER:

12       Q.  And what did you do to determine the

13   variability in terms of looking at underlying facts

14   or the data itself?

15       A.  Well, I think I've been clear, and there          10:07:11

16   are -- I believe this is part of Mr. Striegel's

17   report, looking more at specific, you know, data

18   here.  So that's not my assignment.

19           So what I relied on is -- I mean, I've --

20   I've -- I've got, you know, I think hundreds of        10:07:32

21   publicly available documents that I look at.  And --

22   and largely I'm -- I'm focusing on the kinds of --

23   if you will, the -- the -- the underlying software,

24   techniques, circumstances in which different data

25   fields would not be shared.  So, for example, the --    10:08:00

Page 65

1    detects the age and uses, you know, restricted data

2    processing.  There's a lot of circumstances where

3    it's only a subset of the fields that -- that --

4    that may be used at all.

5         So it's more about the -- you know, are        10:15:25

6    all of them?  Is it a subset?  Is it a variation.

7    That's my point.

8         Q.   Mr. Deal, I understand your conclusion.

9         This document does not say what you just

10   said, does it?                                      10:15:37

11        MS. REDDY:  Objection.  Argumentative.

12   Mischaracterizes testimony.

13   BY MS. WEAVER:

14        Q.   Does this document support your statement

15   that it's a completely different set of variables    10:15:45

16   for User A and B?

17        A.   No, no, that's --

18        MS. REDDY:  Objection.  Mischaracterizes

19   the document.  Mischaracterizes his testimony.

20        THE WITNESS:  It's def- -- that's            10:15:59

21   definitely mischaracterizing my testimony.  I said

22   specifically that's not what I'm saying.  I'm not

23   saying there's a complete -- I'm saying there's a --

24   I think of it as there's a master set of -- of

25   variables.  That's what this document is speaking     10:16:07

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1    about.

2         There are many circumstances where not

3    every one of these variables and different

4    combinations of them may not be included in the bid

5    requests.  They may be blank, for instance, for all          10:16:19

6    kinds of reasons, the software you're using, the

7    blockers you're using, device you're using, you

8    know, age of the user, VPNs, all kinds of issues out

9    there.

10        So I'm specifically not saying, "Oh, for           10:16:34

11   you there's a -- there's one set of variables.  For

12   you, there's another."  There's a master set for

13   everybody, But it's only -- you know, they're --

14   whether all of them or a subset or what subset,

15   that's the variability here.                                 10:16:47

16   BY MS. WEAVER:

17       Q.   And with regard to the second part of your

18   opinion, that some blockers may prevent some data

19   fields from being transmitted, you did not conduct

20   any testing on that; right?                                  10:16:59

21       A.   I agree with that.  If the question is --

22   is a technical question -- that's right.  There's

23   lots of documents that speak to -- to that and, you

24   know, people who talk about their own products and

25   say they block and all that, but I -- I myself         10:17:15

CONFIDENTIAL

1    didn't do a [verbatim] independent experiment, for

2    instance.

3        Q.   So you read some publicly available

4    articles about the fact that some people may block

5    data; right?                                          10:17:25

6            MS. REDDY:  Objection.  Mischaracterizes

7    testimony.  Mischaracterizes the document.

8            THE WITNESS:  I mean, I -- sort of in a

9    sense -- I mean, I did read lots of -- and I cite

10   lots and lots and lots of documents in my report,    10:17:39

11   which I speak to -- in my exhibit, I think,

12   summarizes -- Exhibit 3 summarizes many of those

13   different products, things like, you know, blockers,

14   all -- all those sorts of things.

15           So that is based on the totality of my        10:17:56

16   understanding, and I cite the specific sources in

17   that exhibit.  But that is my understanding.

18   BY MS. WEAVER:

19       Q.   What piece of evidence can you point to

20   that you relied on that shows in this case data       10:18:05

21   fields were not transmitted in bid requests because

22   somebody was using a blocker?

23           Let me ask the question again.

24       A.   Yeah.

25       Q.   What piece of evidence produced in this      10:18:28

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    what circumstances, you know, restricted data

2    processing was used as an example.

3            I don't know whether you would consider

4    that to be an answer to your question or not, but

5    I've seen those kinds of things.                    10:19:58

6            But I haven't independently done any

7    statistical analysis of bid requests, or it's not --

8    it's not part of my assignment.

9    BY MS. WEAVER:

10       Q.   And just to be clear, I'm giving you an    10:20:08

11   opportunity now to identify any evidence in this

12   case -- produced in this case that you reviewed that

13   supports that conclusion.

14           Can you do that?

15           MS. REDDY:  Objection.  Asked and           10:20:22

16   answered.  Argumentative.

17           THE WITNESS:  I mean, I've -- this -- this

18   case is -- is, I think, a proposed -- as I

19   understand it, it's a proposed class action for all

20   U.S. term of service users, you know --             10:20:30

21           THE COURT REPORTER:  I'm sorry, "U.S."?

22           THE WITNESS:  -- term of service users

23   for, you know, many years who were -- whose data was

24   part of realtime bidding for either authorized

25   buyers or open bidding partners.  So that's, you     10:20:45

Page 77

```
 1    know, many, many, many people out there.

 2            So, again, it's my understanding that the

 3    type of software, and I cite to, you know, the -- in

 4    terms of the blockers, the changes over time, the

 5    Apple products.  There's a wide variety of -- of        10:21:00

 6    different sources, different studies that people

 7    have looked at.

 8            But I haven't independently done any data

 9    analytics, and I'm not specifically citing to, you

10    know, any set of bid requests data.  There may be      10:21:17

11    other experts that are looking at that question, but

12    that's not what I've been asked to do.

13    BY MS. WEAVER:

14        Q.  So there is no evidentiary support for

15    your conclusion based on the evidence produced in      10:21:28

16    this case that you can identify right here; correct?

17            MS. REDDY:  Objection.  Argumentative.

18    Asked and answered.  Mischaracterizes testimony.

19            MS. WEAVER:  It's a yes-or-no question.

20            THE WITNESS:  I -- I -- with all due           10:21:38

21    respect, I don't think it is a yes-or-no --

22    BY MS. WEAVER:

23        Q.  What --

24        A.  -- question.

25        Q.  Then -- then identify the evidence.            10:21:46
```

Page 78

1    team member present as well to, you know, kind of

2    assist in conducting and then, you know, kind of

3    incorporating the material into -- from the

4    interview into my report.

5        Q.    Is Ms. Bartlett working on any other        10:52:00

6    matters for Google currently?

7        A.    Maybe.  I don't know.

8        Q.    And going back to this interview with

9    Mr. Belov, did you identify that in your Appendix B?

10       A.    I don't recall if I specifically called it   10:52:37

11   out.  It's obviously included in my report.

12       Q.    You don't see it there, do you?

13       A.    I don't see it specifically listed in my

14   Appendix B, which is list of documents relied upon.

15   So it's not a document.  It's an interview.  So it's   10:52:56

16   included in my -- in -- clearly identified in

17   Footnote 25 and other footnotes as I recall.

18       Q.    Yes, we'll discuss them.

19            How long was your conversation with

20   Mr. Belov?                                            10:53:10

21       A.    Best of my recollection -- recollection,

22   it was about an hour.

23       Q.    Was it transcribed?

24       A.    No.

25       Q.    Why not?                                    10:53:17

Page 92

```
 1              MS. REDDY:  Objection.  Calls for

 2     speculation.

 3              THE WITNESS:  It didn't need to be

 4     transcribed.  I had some specific questions for him.

 5     He answered the questions.  I incorporated the          10:53:27

 6     results into the -- into the report.

 7     BY MS. WEAVER:

 8         Q.   You understand that this is an evidentiary

 9     matter; right?  A fact-based piece of litigation?

10         A.   I think I understand what you're saying.      10:53:38

11         Q.   And so, the answer is?

12              MS. REDDY:  Objection.  Vague and

13     ambiguous.

14              THE WITNESS:  Well, I mean, it -- that

15     sounds right to me.  I mean, and -- I guess, if        10:53:48

16     you're asking for a legal opinion, I don't have a

17     legal opinion, but --

18     BY MS. WEAVER:

19         Q.   I'm asking your opinion as an expert who

20     relied on an interview for which there is no           10:53:57

21     transcript.  Why is there no transcript of your

22     interview with Mr. Belov?

23         A.   I --

24              MS. REDDY:  Objection.  Asked and

25     answered.                                              10:54:04
```

                                                    Page 93

CONFIDENTIAL

```
 1                Do you see that?

 2                And then the citation to Mr. Belov follows

 3    that paragraph.

 4        A.    Yeah, but I -- my under- -- I mean, I'd

 5    have to look back in the Berntson deposition, but        11:01:46

 6    in -- my recollection is that the Bernstein

 7    deposition also talked about that.

 8        Q.    And what --

 9              MS. REDDY:  I'm just going to object as

10    mischaracterizes document.                               11:01:54

11    BY MS. WEAVER:

12        Q.    And what did Mr. Belov say to you that

13    provided additional support here?

14        A.    I -- I don't think I would be -- I would

15    characterize it as additional.  I mean, it was          11:02:08

16    confirmatory of -- that was -- this was my

17    understanding going into the interview, was that the

18    GAIA cookie would be a third-party cookie in that

19    situation.  Mr. Berntson confirmed that.

20        Q.    Looking at Note 49, do you see that you       11:02:23

21    wrote the sentence on page 17, ███████████████████

22    ████████████████████████████████████

23    ██████████████████████████████

24    ██████████

25                Do you see that?                            11:02:36
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        A.   Give me -- give me a second.

 2             (Witness reviews.)

 3             Yes, I see that.

 4   BY MS. WEAVER:

 5        Q.   And you cite -- the only -- the only       11:03:01

 6   citation there is your interview with Mr. Belov.

 7             Do you see that?

 8        A.   Yes.

 9        Q.   And other than your interview with

10   Mr. Belov, do you have any reason to believe that    11:03:11

11   Google does not separately track RTB revenue from

12   ads shown to users with and without Google accounts?

13        A.   I mean, it -- it would make sense given my

14   understanding of -- of, you know, the -- the GAIA

15   cookies and all of that, but that is literally the   11:03:35

16   source for that citation.

17        Q.   Turning to page 19, Footnotes 57 and 58,

18   do you see at Paragraph 47 where you wrote, █████

19   ████████████████████████████████████████████████

20   █████████████████████████████████████████████████   11:03:58

21   ████████████████████████████████████████████████

22   █████████████

23             Do you see that?

24        A.   Yes.

25        Q.   And you cite only Mr. Belov for that       11:04:09
```

Page 101

1    determine on a class-wide basis whether certain

2    Google accountholders are subject to U.S. terms of

3    service.

4            That's the -- I mean, that was -- that was

5    my understanding going in, but I specifically asked    11:06:03

6    that question just to confirm that there's no way

7    Google could specifically identify that, and he

8    confirmed that.

9    BY MS. WEAVER:

10       Q.   And do you have an expertise in    11:06:12

11   determining which users are subject to the U.S.

12   terms of service?

13       A.   Certainly not a legal expertise, no.  I --

14   I -- my -- I have an understanding of what -- I

15   have -- I have an understanding that -- in terms    11:06:34

16   of that my overall analysis here is speaking to the

17   fact that the U.S.-identified revenue is not

18   consistent with the U.S. -- it's not synonymous with

19   the U.S. terms of service.  So I have that

20   understanding.    11:06:53

21       Q.   What is the basis of your understanding

22   about what U.S.-identified revenue is?

23       A.   Well, again, that was my understanding

24   going in, but -- but, again, confirming that

25   Mr. Belov here, that I understand that that U.S.    11:07:07

Page 103

1    without Google accounts or Google account holders

2    for whom the GAIA cookie is missing while they

3    browse." [As read]

4            Do you see that?

5        A.   Yes.                                          11:13:43

6        Q.   And you relied for those factual bases on

7    your interview with Mr. Belov; right?

8        A.    Yes, in the sense that I mean that -- like

9    Footnote 58, I'm citing to Mr. Belov, really it's

10   the last sentence in that the -- the prior sentences   11:14:10

11   are really more of a logical analysis, but I agree

12   that Mr. Belov was the source that confirmed that

13   Google wasn't -- would not be able to identify,

14   again, is it truly a U.S. user as opposed to a U.S.

15   IP address.                                            11:14:29

16            And also confirmed that, again, for the

17   class, which would be the Google accountholders, you

18   know, if users without Google accounts or

19   accountholders where the GAIA cooking -- cookie,

20   which is what would identify them as a Google         11:14:44

21   accountholder, would be missing.  So he did con- --

22   he confirmed that information for me.

23       Q.   That's what happened in the interview that

24   we don't have a transcribed record of; right?

25       A.   I agree.                                      11:14:55

                                                  Page 110

```
 1   September of 2023, so...

 2        Q.   Okay.  And you -- you write, looking at

 3   Paragraph 46, "The problem" -- that is of the VPN

 4   use -- "is likely to be substantial."  [As read]

 5        Do you see that?                              11:16:18

 6        A.   I do.

 7        Q.   What's the basis and what methodology did

 8   you use to conclude that a substantial portion of

 9   users outside the U.S. are using VPNs in a way that

10   would impact revenue calculation in this case?      11:16:30

11        MS. REDDY:  Objection.  Compound.  Vague

12   and ambiguous.

13        THE WITNESS:  Well, I -- I think the way

14   that -- the best way I can answer your question --

15        THE COURT REPORTER:  "The best"?  Can         11:16:46

16   you speak up?

17        THE WITNESS:  The best way I can answer

18   your question is, you know, in the context of this

19   section, I'm evaluating the first part of what

20   Mr. Regan has done, which is to take -- say let's   11:16:54

21   look at the amount of revenue that's associated with

22   the U.S.

23        And he basically used the information that

24   Google had provided, which was based on U.S. IP

25   addresses, there.                                   11:17:08
```

Page 112

```
 1              Then I -- again, for the various things

 2      we've been talking about and everything I

 3      incorporated in my report, I note that that isn't --

 4      that there are -- are people outside the U.S. who

 5      are using VPNs who are going to appear to have U.S.   11:17:23

 6      IP addresses.

 7              The -- and what my -- my overall

 8      conclusion here is that this is -- this is a

 9      problem, and it's not something that's been

10      addressed by the expert.  So I'm identi- -- I'm --    11:17:37

11      I'm asked to review and evaluate the work that's

12      been done by the Plaintiffs' expert.  So that's a

13      problem.

14              And I haven't been asked to independently

15      quantify it, but I -- also as part of my assignment,  11:17:49

16      I try and identify is this something that is likely

17      to be a substantial problem.  Again, it's not my job

18      to come up with the specific quantification, but to

19      identify whether this is, you know, a super, super,

20      super tiny issue or a more substantial issue.         11:18:11

21              So that's what I'm referring to in this

22      section (indicating) and, you know, other places

23      where I refer to -- to this is that there are lots

24      of people who use VPNs.  And I specifically cite,

25      you know, a third of the billions of users have used  11:18:29
```

Page 113

```
 1    a VPN based on the -- the studies.

 2          I give an example of a context where it

 3    makes sense that people might be using it trying to

 4    access U.S. content for Netflix, which is a hugely

 5    popular service obviously.                      11:18:45

 6          So my intention here is to provide a

 7    little context for this, but not to provide a

 8    specific quantification.

 9          So substantial is my pointing to reason to

10    think this is something that could have a -- again,  11:18:59

11    a substantial effect on the revenue estimate.

12    BY MS. WEAVER:

13        Q.   In your expert estimation, would zero

14    percent constitute super, super, super tiny?

15        A.   If zero -- if there was zero percent VPN  11:19:13

16    users, I mean, I would have to think about it in a

17    specific context, but it sounds right to me.

18        Q.   What about 2.6 percent?  Would that be

19    super, super, super tiny?

20        A.   Again, this is not -- I'm not intending  11:19:28

21    to -- it -- it would depend on the -- on -- on the

22    data, the issues.  I mean, 2.6 percent of a big

23    number is a big number.

24          So, you know, it -- it would be some --

25    one would need to kind of evaluate it in the      11:19:40
```

Page 114

1    context, but I -- my understanding is it's not a

2    zero percent issue.

3         Q.   And when you say "substantial," is that

4    larger than 2.6 percent?

5         A.   Again, I -- you would -- one would need to    11:19:58

6    sort of understand what data one's referring to and

7    so forth.  I mean, obviously it's -- it's not zero

8    percent, so...

9         Q.   And what percentage in your expert opinion

10   do use VPNs who are Google accountholders outside of    11:20:15

11   the United States?

12            MS. REDDY:  Objection.  Vague and

13   ambiguous.

14            THE WITNESS:  I don't know.

15   BY MS. WEAVER:                                          11:20:25

16        Q.   Did you review any peer-reviewed research

17   about the use of VPNs?

18        A.   I don't -- I'd have to go back through all

19   my docs considered.  I -- possibly.  I just don't

20   recall.                                                 11:20:47

21        Q.   Do you know how to perform an analysis of

22   VPN use?

23        A.   Not technically, no.

24        Q.   If you had to run a study, would you use

25   machine learning or a DMS approach?                     11:20:56

Page 115

CONFIDENTIAL

```
 1          MS. REDDY:  Objection.  Lacks foundation.
 2          THE WITNESS:  I don't know.
 3  BY MS. WEAVER:
 4      Q.  You're not an expert in this field, are
 5  you?                                          11:21:05
 6      A.  I am certainly not a technical expert
 7  in -- in VPN usage.
 8      Q.  Do you know whether VPN uses a very small
 9  fraction of U.S. all internet traffic let alone
10  controlling for Google accountholders?         11:21:19
11          MS. REDDY:  Objection.  Vague and
12  ambiguous.
13          THE WITNESS:  I -- I don't know.  I don't
14  see that that's particularly relevant for -- the --
15  the question here is, you know, Google          11:21:31
16  accountholders who are subject to U.S. terms of
17  service.  That's -- that's the block of revenue that
18  one needs as a starting point.
19          And, again, Plaintiffs' experts haven't
20  made any adjustments for anything on -- on this  11:21:48
21  front.  So -- and I -- I point to pretty clearly
22  this is -- this -- VPN usage -- VPN usage is
23  substantial.
24          So -- and some adjustment, whether it's
25  some -- some type of analysis or estimate needs to  11:22:06
```

Page 116

```
 1   be done, and nothing's been done.
 2   BY MS. WEAVER:
 3       Q.   So can you quantify today the number of
 4   U.S. Google accountholders subject to the U.S. terms
 5   of service that use a VPN that masks an IP address       11:22:22
 6   outside of the United States?
 7       A.   I -- I think the answer is no, if I
 8   understand the question.  I'm not sure that I fully
 9   got the connections there.  But, I mean, the -- I'm
10   not offering any specific estimate of what the          11:22:44
11   correction should be to what Mr. Regan has done.  I
12   note that he hasn't done anything.  And I say this
13   is a substantial issue that would need to be
14   addressed, and nothing's been done.
15       Q.   I understand that you keep repeating it's       11:23:02
16   substantial.  And what I'm trying to do is to figure
17   out the evidentiary basis for that statement.
18            Because if it were super, super, super
19   tiny like zero percent, Mr. Regan would not need to
20   make an adjustment for that input; correct?            11:23:17
21       A.   I -- I have to think about the -- I mean,
22   the -- the -- the problem is that I -- as I
23   understand it, is -- and I -- I certainly don't -- I
24   don't have any reason to believe that hypothetical
25   is -- is an accurate representation if it's zero        11:23:37
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    percent.  If this really is a nonissue, what I point

2    to is I say, well, Mr. Regan hasn't talked about it.

3    He hasn't tested it.  He hasn't confirmed that it's

4    a nonissue.  He hasn't done anything.  He's

5    literally just using the data that Google gave him,        11:23:54

6    which is clearly U.S. IP addresses.

7            I point out that VPN usage is widespread,

8    lots of VPN usage.  If you're hypothesizing that

9    notwithstanding that VPN usage is very widespread,

10   if when one actually does a technical analysis of        11:24:12

11   it, you find its zero, I -- I -- in that -- in that

12   hypothetical, which I don't understand to represent

13   reality, then maybe you wouldn't make an adjustment

14   in that case.

15           But you need to actually do the work to        11:24:26

16   test it, to figure out if this is something that

17   needs to be adjusted, and nothing's been done.

18       Q.  Well, let me just qualify that.  I don't

19   know what you mean by nothing has been done.  Are

20   you -- you're not -- are you aware as you sit here        11:24:39

21   of any peer-reviewed analyses of VPN use by people

22   outside of the United States using U.S. IP

23   addresses?

24       A.  I mean, has it -- I'd -- I'd have to look

25   and see if I've cited anything.  It's not -- it's        11:24:56

Page 118

1    originating -- well, it's my understanding that the

2    way Google tracks its revenue is based on U.S. IP

3    addresses.  That is my understanding.

4        Q.   And is it your understanding that Google

5    can identify where users' IP addresses are?          11:28:46

6            MS. REDDY:  Objection.  Vague and

7    ambiguous.

8            THE WITNESS:  Well, I think maybe you're

9    asking me a technical question about can Google

10   analyze -- if you're using a VPN that has a U.S. IP    11:29:00

11   address, can Google identify whether it's

12   originating from some other place?  Is that the

13   question?

14   BY MS. WEAVER:

15       Q.   Yeah.                                         11:29:13

16       A.   I don't know.

17       Q.   Okay.

18           MS. WEAVER:  I'll mark as Exhibit 3 a

19   document that you relied on in your report.

20           And for the record, this is a letter from     11:29:29

21   Google --

22           THE WITNESS:  Is it --

23           THE COURT REPORTER:  One second, please.

24           THE WITNESS:  I'm sorry, hang on.

25           MS. WEAVER:  You know what, you can hand       11:29:40

                                                    Page 122

```
 1              MS. REDDY:  Objection.  Argumentative.  Is
 2    this a question?
 3              THE WITNESS:  I -- I -- I don't have an
 4    opinion on -- on this.  It's not a topic I've
 5    studied.                                      11:37:35
 6    BY MS. WEAVER:
 7        Q.   Did you come up with the idea that the IP
 8    address could be masked by a VPN so that revenue,
 9    ███████████   by Google could not be recognized?
10              MS. REDDY:  Objection.  Vague and      11:37:50
11    ambiguous.
12              THE WITNESS:  I'm not exactly sure what
13    you mean, "did I come up with the idea."  I mean,
14    it's -- it's something I know about.  So I think the
15    best way I can answer that is to say, I -- I looked  11:38:07
16    at the data that Mr. Regan had.  I worked with my
17    team to understand what that data represented.  And
18    as part of that inquiry, I said, well, is this data
19    really representing U.S. users that would be
20    consistent with the class definition.            11:38:27
21              And knowing that VPNs masked locations --
22    well, I use a VPN all the time.  It always thinks
23    I'm located in Boston or LA or someplace where I'm
24    not located.  So I'm aware of this issue.  So I
25    raise the issue.  And this led to my kind of      11:38:46
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    understanding and confirming with Mr. Belov and so

2    forth.

3              So it's an issue that I flagged as part of

4    the kind of overall inquiry of, okay, what -- what

5    data is he starting with, is that really                11:39:01

6    representing -- is -- first of all is it Goo- --

7    Google users?  No, it's including more than Google

8    users.  Is it -- is it specific to U.S. terms of

9    service?  No, it's U.S. IP addresses, which isn't --

10   isn't the same.                                          11:39:13

11             So it's part of that overall inquiry,

12   which I -- was done [verbatim], you know, with my

13   team, but by me.

14   BY MS. WEAVER:

15        Q.   When Google is reporting ████████ to       11:39:22

16   the IRS, how does it identify ████████

17        A.   I don't know.

18        Q.   Does it rely on the U.S. IP address?

19        A.   I don't know.

20        Q.   You're -- you're rendering an opinion here    11:39:34

21   that the ████████ numbers that Google provided

22   in its interrogatory responses are not consistent

23   with U.S. terms of service users.

24             I'm trying to understand the basis for

25   that, and your answer is, I don't know.  Is that        11:39:48

                                                    Page 131

1      Q.    -- you did not review how Google actually

2    maintains its realtime bidding revenues; correct?

3           MS. REDDY:  Counsel, I'd ask you to stop

4    interrupting the witness mid-response.  You've done

5    it now several times.                           11:58:17

6           THE WITNESS:  I'm not sure what you mean

7    by I didn't review.  I mean, I've reviewed the

8    declaration.  I reviewed the deposition.  I

9    interviewed Mr. Belov.  So that's the source of my

10   understanding of what -- how Google maintains its    11:58:29

11   revenue and what it can and can't do in terms of

12   identifying Google users.

13   BY MS. WEAVER:

14      Q.   You did not review any dashboards that

15   Google maintains that reflect how Google accounts    11:58:38

16   for realtime bidding revenue; correct?

17      A.   I -- I -- I -- I'm not going to

18   characterize what -- what Google does or doesn't do

19   with any dashboards.  It's -- I didn't review any

20   dashboards.                                      11:58:55

21      Q.   Did you have any information other than

22   the conclusion that Google cannot do it?  Did you

23   actually review how Google maintains its books?

24           MS. REDDY:  Objection.  Vague and

25   ambiguous.  Asked and answered.  Argumentative.     11:59:04

                                              Page 147

```
 1              THE WITNESS:  I mean, I'm not sure what
 2    you mean by "actually review."  I obviously read the
 3    depositions.  I interviewed Mr. Belov.  So I
 4    haven't -- and, you know, that's the basis of my
 5    understanding.  I didn't go into their accounting    11:59:18
 6    system.
 7    BY MS. WEAVER:
 8         Q.   And you didn't ask to see any dashboards;
 9    right?
10         A.   I did not ask to see any dashboards.        11:59:23
11         Q.   If the named plaintiff documents show that
12    Google can identify revenue by Google ID, that would
13    contradict your report, wouldn't it?
14         A.   I don't -- I'd have to think about it, but
15    I don't think so.  I think the -- I mean, the -- the  11:59:43
16    fundamental point of my report and this section is
17    to evaluate what Mr. Regan has proposed.
18              Mr. Regan has proposed using the data
19    that's been provided by Google that my understanding
20    is includes much more than just Google users and     12:00:05
21    includes U.S. IP addresses.  Both of those things
22    have problems.
23              So to the extent Mr. Regan had other data
24    available that he could have used to do an
25    adjustment or account for something, he hasn't done  12:00:20
```

Page 148

CONFIDENTIAL

```
 1   enrichment.

 2        Q.   Just to clarify, is it your understanding

 3   that users actually put their own data in the bid

 4   request?

 5        A.   No, no, no.                                01:02:22

 6        Q.   Google does that; right?

 7        A.   Well, I think it's a -- technically --

 8   again, this is a little bit outside the scope of my

 9   understanding, but the data originates from the

10   publisher, and then Google is the one that uses the   01:02:33

11   data in the bid request.  So I agree with that.  But

12   I believe it -- it -- it originates with the

13   publisher.

14        Q.   Your understanding is that for all

15   realtime bidding auctions, the data originates from   01:02:47

16   a publisher?

17        A.   Again, without -- without me being the

18   technical expert in it, that liter- -- literally the

19   bid request is coming from Google.  But the

20   underlying data I understand is coming from the       01:03:00

21   publisher with Google potentially doing some

22   modifications to the data.  But the un- -- the

23   original data is coming from the publisher.

24        Q.   And there's no data coming from the

25   targeted individual in your understanding?            01:03:14
```

Page 160

CONFIDENTIAL

```
 1   things.
 2       Q.   So to be clear, your statement is that if
 3   people did not engage in opt-ins or change their
 4   browser settings, they are voluntarily sharing data?
 5           MS. REDDY:  Objection.  Mischaracterizes    01:16:44
 6   testimony.
 7           THE WITNESS:  Well, I think you're getting
 8   the inverse of this.  I'm saying there are people
 9   who actively are opting in to allow for the sharing
10   of data, and Mr. Regan hasn't done any adjustments    01:17:01
11   for that.
12   BY MS. WEAVER:
13       Q.   And how did you determine that people are
14   opting in?
15       A.   I mean, that's -- I mean, my report speaks    01:17:07
16   for itself, I think, that I talk about the various
17   ways they can opt in with the CCPA.  They can do
18   device -- change device settings on their iPhone to
19   allow for this type of information.  They can set
20   browser settings to -- if the browser defaults to    01:17:23
21   not allow it, they can change it to allow.  So these
22   are all indications of people opting in to
23   affirmatively allow sharing of data.
24       Q.   Did you actually perform any testing that
25   confirmed that people are opting in in this case?    01:17:37
```

Page 174

```
 1        A.   I think -- if I understand your question,

 2    it's similar to a number of questions you asked me

 3    already, which is did I develop any independent

 4    estimates of -- or calculations or technical

 5    testing.  No, is the answer to that.  I cite various    01:17:56

 6    studies, which show a -- a substantial percentage of

 7    people are opting in, or in the case of CPCPA

 8    [verbatim], you know, fairly opting out of that.

 9           But these are all indicative of the fact

10    that it's a substantial share.  But I -- it's not my    01:18:15

11    job, it's not my role to develop an estimate of

12    that.  That would be Mr. Regan's job.  I'm pointing

13    out that -- that he hasn't made any adjustments for

14    the people who have affirmatively opted in to the

15    sharing of information.                                 01:18:31

16        Q.   Well, you actually wrote "Information

17    suggests that a substantial portion of the class

18    likely did."  [As read]

19           Did you see that?

20        A.   Yeah.                                          01:18:39

21        Q.   That's a pretty strong statement; isn't

22    it?

23           MS. REDDY:  Objection.  Argumentative.

24           THE WITNESS:  I mean, whether it's a

25    strong statement or not, it's well supported by the    01:18:46
```

Page 175

CONFIDENTIAL

```
 1        Q.   I assume you did.

 2        A.   I did, but I'm saying --

 3             MS. REDDY:  Counsel, can you stop

 4   interrupting him.  He's -- let him finish his

 5   answer.                                        01:23:20

 6             THE WITNESS:  But if you'd like me to look

 7   at the study now, so my recollection of the CCPA

 8   data from this source and to the extent it's

 9   referenced by others as well, is that, it's an

10   opportunity, it's a popup, it's an opportunity to   01:23:33

11   opt out.  And what I say is 1 to 5 percent of people

12   opt out.  There is an opportunity to also opt in.

13   And I forget the exact percentage, but people opt

14   in.  Many people don't make a selection at all, but

15   they have an opportunity to opt out, and they don't  01:23:50

16   do it.

17             So, again, this is not a tiny percentage.

18   This is 95 percent or more that people don't opt out

19   when they are faced with that choice.  So, again,

20   the quest- -- the threshold question is, is this a   01:24:04

21   substantial issue that needs to be accounted for in

22   an unjust enrichment damages calculation.  The

23   answer is clearly yes.

24   BY MS. WEAVER:

25        Q.   Have you studied yourself why it is users  01:24:15
```

Page 180

1  may or may not spend time going through the various

2  controls to opt in or out of data collection?

3       A.   I haven't done my own independent study,

4  if that's the question, no.

5       Q.   What was you methodology for selecting          01:24:31

6  what you're citing here?  Did you Google "opt-in"?

7       A.   You mean Google, like Google search?

8       Q.   Yes.

9       A.   Well, I -- again, working with my team, I

10  was -- the -- these -- these questions are kind of,     01:24:46

11  if you will, standard of questions that one would

12  ask in terms of doing a class certification

13  analysis.  Obviously, the specific question depends

14  on the case.  But, again, we're talking about the

15  starting point of the revenue.                          01:25:01

16           So when I discuss with my team a -- a -- a

17  core question is, are people opting in to allow data

18  to be shared.  And so, I asked them to find

19  information that is relevant to that question so

20  I'm -- was Google search a part of it?  Google          01:25:22

21  search may well have been a part of it, but it was

22  then a professional evaluation of the sources.  And

23  I cite a couple of different sources here.

24       Q.   How did you select your sources?  Your

25  answer is, I was working with my team?                  01:25:35

Page 181

```
 1              Well, I'd be happy to --

 2              (Simultaneous speaking.)

 3       Q.    In -- I'll -- I'll restate the question.

 4              In -- in the articles that you cite on

 5       page 20, does any one of them identify that users    01:34:50

 6       can be put in vertical categories, such as toxic sub

 7       and poisoning or male impotence which is shared in a

 8       bid request with thousands of third parties by

 9       Google?

10              MS. REDDY:  Objection.  Lacks foundation.    01:35:05

11              THE WITNESS:  Again, as a premise to the

12       question, I understand there's underlying questions

13       about whether that type of data is ever actually

14       shared.

15              But just taking literally the literal       01:35:19

16       question, I'm not aware that any of these sources

17       has words similar to what you just described.

18       BY MS. WEAVER:

19       Q.    And you're not an expert on consent;

20       right?                                              01:35:34

21       A.    I'm certainly not a legal expert on

22       consent.  I have definitely offered opinions about

23       what one can infer from people's actions with regard

24       as to what they understand and what they're

25       consenting to.                                      01:35:51
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          So that's a general topic, but I'm not a

2     legal expert.

3          Q.    All right.

4          You refer in your report to the "privacy

5     paradox."                                          01:35:57

6          Do you recall that?

7          A.    Yes.

8          Q.    What is the privacy paradox in your

9     understanding?

10         A.    Yeah, in my understanding, the privacy    01:36:01

11    paradox is a situation where if you ask people kind

12    of in the abstract, you know, do you -- would you --

13    do you want your data to be private, do you want to

14    share information, people generally -- or many

15    people respond, "Oh, I'd like -- that's private.     01:36:20

16    That's valuable to me.  I don't want it to be

17    shared."

18         But in practice, people are actually very

19    willing to share data, often for no compensation or

20    very, very small amounts of compensation or some     01:36:34

21    offsetting benefit.

22         So there's a bit of a disconnect, if you

23    will, between sort of the words that people say and

24    kind of their actions and their revealed, you know,

25    preferences and value.                               01:36:47

                                                       Page 191

1    that you didn't rely on Google's proffered experts

2    on those topics instead of asserting yourself?

3             MS. REDDY:  Objection.  Argumentative.

4    Asked and answered.

5             THE WITNESS:  No.                          01:58:28

6    BY MS. WEAVER:

7        Q.   And you think it's perfectly fine for you

8    to assert whether or not class members can -- can

9    opt in to sharing their data in numerous ways in

10   this case without even studying the data flow?      01:58:41

11            MS. REDDY:  Objection.  Argumentative.

12   Mischaracterizes testimony.

13            THE WITNESS:  I mean, I -- I think my --

14   my report speaks for itself, and I feel like I've

15   answered the same question many, many, many times   01:58:55

16   today.

17            So I certainly have the expertise to -- I

18   know what the data that was provided is.  I know

19   that it has shortcomings.  I know it needs

20   adjustments, and I don't see Mr. Regan making        01:59:06

21   adjustments.

22            Now, again, if -- I'm not -- I'm not

23   offering myself as the person that's making those

24   adjustments.  That would require analysis and study

25   and could involve experts potentially in certain    01:59:17

                                          Page 211

 1  ways.  But that's not what I'm offering.  I'm not

 2  offering myself as the person that's doing the

 3  adjustment.  I'm offering myself as the damages

 4  expert who can identify issues that need to be

 5  addressed.                                          01:59:32

 6  BY MS. WEAVER:

 7      Q.   Okay.

 8          MS. WEAVER:  We can take a break.

 9          THE VIDEOGRAPHER:  This -- this marks the

10  end of Media Unit 3 of the deposition of Bruce Deal.  01:59:38

11  The time is 1:59 p.m.  We're off the record.

12          (Short recess taken.)

13          THE VIDEOGRAPHER:  We are back on the

14  record at 2:16 p.m.  This marks the beginning of

15  Media Unit 4 of the deposition of Bruce Deal.        02:16:34

16  Please continue.

17  BY MS. WEAVER:

18      Q.   All right.

19          You understand you're still under oath?

20      A.   I do.                                      02:16:41

21      Q.   And I understand that you can now testify

22  as to how much Analysis Group has billed Google for

23  in this matter; is that correct?

24      A.   That's correct.

25      Q.   And what is the total amount?             02:16:54

                                          Page 212

1    of --

2    BY MS. WEAVER:

3        Q.   Are you yourself an expert in publisher

4    choices, as identified in Paragraph 33?

5        A.   I'm not sure if I'm really tracking the --   02:30:57

6    the -- the underlying premise of the questions.  I

7    mean, I'm not -- I'm not offering myself as an

8    expert on -- on exactly what -- what publishers are

9    analyzing.

10           What I'm offering my opinion related to is   02:31:19

11   that this is all in the context, which we talked

12   about earlier this morning, about there's sort of a

13   master set of variables and fields -- variable and

14   fields are sort of synonymous -- that can be shown

15   in a bid request.                                    02:31:35

16           My point is, there are some bid requests

17   where not every field is shown.  These are examples

18   of reasons why they may not be shown in every case.

19   And I am an expert in identifying the types of

20   documents that would speak to, you know, are there   02:31:49

21   situations where it might not be shown here and

22   here, based on the documents.  I haven't done

23   independent testing of that.  I'm relying on the

24   various documents I'm relying on.

25           But for the proposition that there's         02:32:02

Page 225

1    variability in the fields, that are being shared,

2    the sources I'm citing and my own expertise with

3    damages and data analytics is certainly sufficient

4    to develop this opinion that not every bid request

5    has all of the fields.                          02:32:20

6        Q.   Okay.  So I just want to be 100 percent

7    clear so that when the Judge looks at this, she'll

8    understand what you're saying.

9             You are saying, yes, you are an expert on

10   the issue of publisher choices and how it affects   02:32:34

11   the fields populated at issue in this case?

12            MS. REDDY:  Objection.  Asked and

13   answered.

14   BY MS. WEAVER:

15       Q.   It's a yes or no.  Is that true?          02:32:43

16            MS. REDDY:  Objection.  Asked and

17   answered.  Mischaracterizes testimony.

18            THE WITNESS:  I'm an expert on the fact

19   that publisher choices -- well, I'm a damages

20   expert.  The data I reviewed is sufficient for me as  02:32:58

21   a damages expert to opine that publisher choices do

22   affect whether certain fields are populated or not.

23   BY MS. WEAVER:

24       Q.   And the entire set of internal Google

25   documents that you relied upon to make that        02:33:11

Page 226

```
 1    those -- those are generic across websites.  In the

 2    sense of generic, they're -- they're wide spread

 3    across websites.

 4          I do -- I also do speak about the Apple

 5    iPhone, iOS.  I think -- do I talk about Mozilla in    02:54:27

 6    this particular spot or other places out there?  So

 7    I agree that there's numerous other -- and you

 8    [verbatim] -- Safari and Mozilla out there.

 9          THE COURT REPORTER:  Slow down, please.

10          THE WITNESS:  Sorry.                            02:54:39

11    BY MS. WEAVER:

12      Q.   Just -- just to correct you, Note 59,

13    referring to the CCPA study, is about opt-outs, not

14    opt-ins; correct?

15      A.   Well, I'd like to see the whole study         02:54:48

16    'cause I think we talked about this before.  I do

17    refer to the small percentage of people who opt out.

18    And by implication, 95 plus percent of the people

19    are not opting out.  A percentage of them are

20    affirmatively opting in.                             02:55:05

21      Q.   Mm-hmm.

22      A.   -- and a percentage of them are not taking

23    steps at all, as I recall.  But I'm -- the relevance

24    of that is to say when people have a direct choice

25    of taking a step to opt out, there are -- very few   02:55:17
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    need to look at the overall effect on Google.

 2    BY MS. WEAVER:

 3        Q.   So it is your testimony that the proper

 4    methodology here is to look at the effect of the

 5    alleged improper collection, and you can calculate     03:20:03

 6    that, but that you should look to see if another

 7    department of Google is making some money somewhere

 8    else legally?

 9            MS. REDDY:  Objection.  Mischaracterizes

10    testimony.  Argumentative.                             03:20:15

11    BY MS. WEAVER:

12        Q.   Right?  No, I mean, you're saying ███ is

13    not using personalization, so that's not at issue in

14    the case.

15        A.   Right.                                        03:20:25

16        Q.   We're calculating the unjust enrichment

17    they are -- they are main -- they are obtaining by

18    using data without consent, as alleged.  And you're

19    saying this is the unjust enrichment number, but to

20    calculate it, we should look at the total revenues     03:20:35

21    for the company to calculate the unjust enrichment?

22        A.   Not at all.

23            MS. REDDY:  Objection --

24    BY MS. WEAVER:

25        Q.   What are you saying?                          03:20:43
```

Page 268

```
 1            MS. REDDY:  Pause for a second.

 2            THE WITNESS:  Sorry.

 3            MS. REDDY:  Objection.  Mischaracterizes

 4    testimony.

 5            THE WITNESS:  Yeah.  No, I -- I don't -- I    03:20:48

 6    don't agree with that.  The -- the -- the fact that

 7    money is being made already in other parts of the

 8    company is irrelevant for this analysis.  What's

 9    relevant for this analysis is the -- the kind of

10    actual versus but-for scenario as we described it    03:21:05

11    in -- in the damages world.

12            So what we're -- what we need -- the --

13    the right question is, imagine that you weren't

14    sharing data for certain data fields in realtime

15    bidding for ███████████ that's -- and how much      03:21:19

16    would you lose there on those specific ads and

17    interactions, not -- forget what else is happening

18    somewhere else.  On those specific ads.  And

19    that's -- you know, for discussion purposes, let's

20    say that's what that study is measuring, is the      03:21:39

21    effect of the ████████████  But those exact same

22    ads are getting populated by something, by -- by

23    some other means.

24            So what you need to do is, to say the ads

25    that are not where the revenue is dropping, where we 03:21:54
```

Page 269

 1   see an uptick from those same ads, where they're --

 2   you're actually losing the bid, so without this

 3   data, you're losing the bid.  The ███ -- excuse me,

 4   the ██████████ are not winning the bid, it's going

 5   somewhere.                                        03:22:11

 6             If Google is -- if a Google product is

 7   what's then winning that bid, you need to look at

 8   the revenue and the profit margin on that product.

 9   So it's the --

10   BY MS. WEAVER:                                    03:22:22

11        Q.   But --

12        A.   The fact that they had other activity

13   going on for other products is irrelevant.  It's

14   literally the experiment of that exact ad as to kind

15   of what effect is it on Google's revenue from the   03:22:31

16   sharing.  The sharing is the incremental effect, if

17   any, versus the next best alternative.

18        Q.   So in your analysis, there's a revenue

19   impact in A, which is we stop non-personalization.

20   And then that auction goes to a situation where    03:22:47

21   there is no improper data use.  And you are saying

22   as a matter of methodology, you have to subtract the

23   unjust enrichment from the legally obtained revenue.

24   Correct?

25             MS. REDDY:  Objection.  Mischaracterizes  03:23:06

                                                    Page 270

CONFIDENTIAL

1          Q.   And that says the exact opposite of what

2     you just said, doesn't it?

3          A.   Oh, I disagree with that.

4          Q.   And how do you disagree?

5          A.   Well, perhaps you could show me --          03:42:15

6          Q.   Your testimony is that you have to look at

7     the overall profits of Google to determine whether

8     or not there is unjust enrichment?

9               MS. REDDY:  Counsel, again, I'm going to

10    ask you stop interrupting the witness.  He was just   03:42:26

11    about to ask you a question.

12              THE WITNESS:  Yeah, I --

13              MS. WEAVER:  He said perhaps you can show

14    me and held his hand up.

15              THE WITNESS:  Per -- I mean, I'm just        03:42:35

16    saying the quote is -- I was trying to follow the

17    quote as you were reading or whatever you're

18    reading.  But what I understood was not in conflict

19    with my overall approach, but if you want to show me

20    the document or a document, I'm happy to go through    03:42:47

21    it in more specificity, if that would be helpful.

22              THE COURT REPORTER:  Can I get you to get

23    in the middle of those lines.  Thank you.

24    BY MS. WEAVER:

25         Q.   Just to be clear, your testimony is that    03:43:01

                                        Page 276

1    that treatise says that to calculate unjust

2    enrichment, we have to look at Google's total

3    profits?

4            MS. REDDY:  Objection.  Mischaracterizes

5    testimony.                                    03:43:11

6            THE WITNESS:  I would say -- well, again,

7    I'm happy to look at the treatise, if there's

8    something specific, but the economic proposition is,

9    you need to modify the disputed action and look at

10   the profit implications of that modification.  03:43:24

11   That's my testimony --

12   BY MS. WEAVER:

13       Q.   I'm sorry, what do you mean by "modify the

14   disputed action"?

15       A.   Conceptually modify the disputed action.  03:43:32

16   So in this case, the disputed action is the sharing

17   of the, you know, alleged personal information in

18   realtime bidding.  So the right economic framework

19   is estimating a world where you don't do that.

20   What's the but-for world?  The but-for world is that  03:43:54

21   you don't -- you don't share those with ████

22   ████  and you need to look at what the implication

23   of that is of that action on Google profits.

24            You don't care about what the overall

25   profits are of Google.  You look at the implications  03:44:07

                                            Page 277

1    as -- you know, once things adjust so that, okay,

2    gosh, the spend is going more to these other

3    sources, that also has profit implications for

4    Google that could, in fact, not only, you know,

5    be -- be of an offset, but could certainly          03:54:00

6    potentially even be greater.

7           So I agree that there could be longer term

8    adjustments that one thinks about to the extent that

9    was what you were asking in the question.

10       Q.   You agree with the statement that the       03:54:12

11   objection of restitution is to strip the defendant

12   of a wrongful gain; right?

13       A.   I think you meant "objective."

14       Q.   Sorry?

15       A.   You said "objection."                        03:54:22

16       Q.   You agree with the statement that the

17   objective of restitution is to strip the defendant

18   of a wrongful gain; right?

19       A.   Again, to the extent there's a legal

20   implication of that, I'm not offering legal           03:54:38

21   opinions, but that is my economic understanding, is

22   that the profit that's -- that's resulting from the

23   alleged, you know, what I call disputed acts or

24   alleged bad acts, that profit is what you're trying

25   to isolate and, to you -- to use your words, strip    03:54:50

1    it away from them.

2        Q.   And in your scenario, if a company stopped

3    doing something illegal, but, by stopping, obtained

4    legal revenue somewhere else, there is no unjust

5    enrichment if the second number is larger than the      03:55:10

6    first?

7            MS. REDDY:  Incomplete hypothetical.

8            THE WITNESS:  Yeah, I think you're setting

9    aside differences in profit margins, things like

10   that, but -- 'cause that -- that obviously is          03:55:23

11   what -- what ultimately we care about is profits,

12   not revenues.

13           But if I understand your framework, if

14   there is -- you know, you're doing this bad thing

15   and you're earning profits of a hundred.  You stop     03:55:37

16   doing that things [verbatim], you still earn profits

17   of a hundred, there's no economic damages.

18   BY MS. WEAVER:

19       Q.   Okay.  And other than the book that you

20   cite, you have no other citation for that              03:55:47

21   proposition; is that right?

22       A.   I mean, I don't have any citation in

23   this -- I've been doing this for more than 25 years,

24   so I have lots of experience with economic damages

25   analyses.  And there are other articles that speak     03:56:06

```
 1    BY MS. WEAVER:

 2         Q.   This is the question --

 3              (Simultaneous speaking.)

 4              THE COURT REPORTER:  One person at a time.

 5              MS. REDDY:  There's no reason to yell.    04:12:11

 6    BY MS. WEAVER:

 7         Q.   -- what is the methodology that you --

 8              THE COURT REPORTER:  I can't hear both of

 9    you.

10    BY MS. WEAVER:                                       04:12:11

11         Q.   What is the methodology that you used to

12    identify what you call these numerous public

13    sources?

14              MS. REDDY:  Counsel, there is no reason --

15    BY MS. WEAVER:                                       04:12:38

16         Q.   That's the question.

17              MS. REDDY:  -- to yell.  That is

18    unprofessional.  I'd ask that you be civil and

19    courteous to the witness.

20              MS. WEAVER:  I would ask that you do the    04:12:28

21    same.

22    BY MS. WEAVER:

23         Q.   What is the methodology that you used to

24    identify numerous public sources, and what are those

25    sources?                                             04:12:37
```

Page 303

1      A.   Well, that's exactly what the rest of this

2  section is talking about.  So it talks about Source

3  1, website pop-ups and cookies.  It talks about

4  Source 2, "Publicly Available Articles."  It talks

5  about Source 3, "Information From Companies that      04:12:55

6  Provide Tools" [as read].  Source 4, "Google

7  Information and Websites."  So that's exactly what

8  the rest of this section is discussing.

9      Q.   And how did you identify all of these

10 public sources?                                       04:13:07

11     A.   Essentially the same way that you asked me

12 a different, but related question a while ago,

13 working with my team, I asked the question of what

14 sources would -- what are examples of sources,

15 'cause I'm not trying to provide plain estimates.     04:13:28

16 I'm just trying to understand were there sources out

17 there that would be available to inform people.

18          So my team, under my direction, looked in

19 various places, so that's what the various sources

20 are.  And the various references are things that my   04:13:45

21 team was able to identify as examples of -- of

22 sources that -- that could inform individuals.

23          And I -- again, I'm -- the setup for this

24 whole next set of many-paragraph discussion is

25 because there -- there clearly are sources available  04:14:04

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    and they're not hard to find, individual -- my view,

 2    individual inquiry is necessary to determine exactly

 3    what -- what level of information was known and what

 4    actions they're taking as a result of that.  So I

 5    think --                                          04:14:26

 6         Q.   And you're not a privacy expert; right?

 7              MS. REDDY:  Objection.  Asked and

 8    answered.

 9              THE WITNESS:  I agree with that in the

10    same way that you've asked it previously.          04:14:31

11    BY MS. WEAVER:

12         Q.   Okay.  And when you looked at what -- when

13    you were considering here what proposed class

14    members were informed about regarding the sharing of

15    their personal information and the realtime bidding 04:14:47

16    bid requests, did you look at Google's disclosures?

17         A.   In part, but -- but to be clear you said

18    what they would.  That's not my opinion.  My opinion

19    is these sources are available to inform them.  I'm

20    not opining on what any individual --              04:15:07

21         Q.   Okay.

22         A.   -- did or didn't know.

23              (Simultaneous speaking.)

24         Q.   Okay.  Did -- among the sources that were

25    available, did you review the Google's terms of     04:15:13
```

Page 305

```
 1              I'm saying that's not the right framework.
 2     There are -- you need to look and understand whether
 3     the benefits that one gets from the sharing of
 4     personalized ads, you know, even if -- even if you
 5     accept the fact that there's a certain cost or value    05:21:23
 6     for the data, which I have obviously lots of
 7     analysis in here to say, it's not -- it's not the $3
 8     and change that is used by Mr. Regan and Professor
 9     Zeithammer.
10              But accepting for the moment that there         05:21:37
11     might be some value, needing -- looking at the
12     benefits that -- that offset that, is certainly the
13     right way to think about, is there harm or not for
14     an individual.
15              (Deal Deposition Exhibit 6 was marked for       05:21:54
16              identification.)
17     BY MS. WEAVER:
18        Q.   Okay.  I've just marked as Exhibit 6, the
19     document that you cited, Note 137 at page 432.
20              And I'll direct your attention to the           05:22:03
21     bottom paragraph, where it says, "Because the
22     but-for scenario differs from what actually happened
23     only with respect to the harmful act, damages
24     measured in this way isolate the loss of value
25     caused by the harmful act and exclude any change in     05:22:19
```

Page 350

```
 1    the plaintiff's value arising from other sources."

 2     [As written]

 3              Do you see that?

 4              MS. REDDY:  Take the time you need to

 5    review the document.                               05:22:28

 6              THE WITNESS:  Yes, I see that.

 7    BY MS. WEAVER:

 8        Q.   "And so, a proper construction of the

 9    but-for scenario and measurement of the hypothetical

10    but-for plaintiff's value by definition includes in  05:22:46

11    damages only the loss caused by the harmful act."

12     [As read]

13              Do you see that?

14        A.   Yes.

15        Q.   It does not say that you look at other     05:22:52

16    profits earned as a result of what occurred; does

17    it?

18        A.   I -- I'm not sure if I understand the

19    question exactly, but I think that's a

20    misunderstanding of what it's referring to here.    05:23:04

21              What -- what it's referring to is, it's

22    very often a situation where a lot of things are

23    happening at -- at the same time or -- or kind of

24    overlapping.  So it may be that profits go down over

25    time, for instance.  And the -- the issue is, you    05:23:27
```

Page 351

1    want to -- again, this is sort of a -- it's a --

2    it's a framework.  It's a -- it's a construct for

3    how to do damages, to say the revenues and profits

4    may go down because the economy was bad.

5            So you can't include the economy going bad    05:23:41

6    in your damages analysis.  You have to run the

7    experiment of, if I just do -- change the disputed

8    event, what's the effect of that disputed event.  It

9    shouldn't be read to say, if the disputed event has

10   two -- two effects that you don't look at both    05:23:59

11   effects, that's not the way to read that.  It's

12   to -- the way to read that statement and that

13   analysis is you need to look at just the effects

14   that are associated with the disputed action, not

15   sort of other things that are happening for other    05:24:18

16   reasons.

17       Q.   Looking at that first sentence in

18   Paragraph 94 where you cite this document and

19   looking at page 432, which you cite, can you find

20   the sentence that says "an analysis of economic    05:24:30

21   damages considers the difference between proposed

22   class members' economic position in the actual world

23   and their economic position in the but-for world;

24   thus, isolating the economic effect, if any, of the

25   disputed conduct"?    05:24:45

                                                    Page 352

1        A.    I mean, I'm -- I'm not quoting it --

2        Q.    Where does it say --

3        A.    -- verbatim.  It doesn't say that.  It

4   says -- it's -- it's again, the framework --

5        Q.    Can you just --                          05:24:59

6        A.    -- is what I'm citing to.

7        Q.    -- just show me the sentence that you're

8   citing.

9        A.    I -- I'm not sure if I understand your

10  question.                                           05:25:07

11       Q.    There's one page, page 432, which you

12  site.  Where is the sentence that supports the first

13  sentence in your Paragraph 94?

14            MS. REDDY:  Objection.  Asked and

15  answered.                                           05:25:21

16            THE WITNESS:  I mean, I think the sentence

17  we've been talking about is a good example of it.  I

18  can look for other sentences on this page.  But the

19  first sentence of the last paragraph, "Because the

20  but-for scenario differs from what actually          05:25:31

21  happened --

22            THE COURT REPORTER:  Excuse me --

23            THE WITNESS:  Sorry.

24            THE COURT REPORTER:  -- please slow down.

25            THE WITNESS:  My bad.  I'll start over.    05:25:38

                                             Page 353

1    analysis.

2            What I'm opining on is that identifying

3    unharmed class members in order to isolate what

4    damages or what compensatory damage needs to be

5    paid, does depend on a -- a weighing of costs and        05:34:48

6    benefits.  And there are definitely -- and that's

7    something that hasn't been done by Mr. Regan.

8    BY MS. WEAVER:

9        Q.   You have no specialized knowledge

10   regarding the benefits that people allegedly receive    05:35:01

11   from realtime bidding; right?

12       A.   I think I agree with that in a sense that

13   I -- and I -- I certainly cite examples of -- of the

14   benefits.  But I don't put my for- -- I don't put

15   myself forward as an expert in, you know, perceived     05:35:19

16   value and utility of personalized ads that I have

17   any independent estimates or statistical analysis

18   that I've done.  I don't put myself forward as that.

19       Q.   And is it your understanding that people

20   who did not consent can still be unharmed by            05:35:37

21   Google's action alleged in this case?

22       A.   That sounds like a legal question, which I

23   don't have an opinion on.

24       Q.   Can you identify a single unharmed class

25   member?                                                 05:35:54

                                                   Page 362

1      A.   I think the answer is no.  That would

2   require, you know, individualized analysis.  I --

3   I -- I do cite examples of the named Plaintiffs,

4   where they talk about certain benefits that they see

5   from personalized ads, but I don't -- I'm not          05:36:17

6   offering an opinion that named -- or proposed named

7   class member X wasn't harmed.  That's not -- I'm not

8   offering that opinion.

9          I think that is something that would need

10  to be done, and Mr. Regan hasn't done it.  But I'm     05:36:34

11  not offering an opinion about any individual class

12  member.

13     Q.   When you were referring to examples of the

14  named Plaintiffs where they talk about certain

15  benefits, you mean Ms. Diggs saying she sometimes      05:36:44

16  thinks ads are helpful?

17          Paragraph 128.

18     A.   Yeah, that would -- Paragraph 128 is --

19  what I was referring to in that answer is, these are

20  examples from the named Plaintiffs in their            05:37:02

21  deposition testimony, where they talk about, again,

22  some of the potential positive aspects of

23  personalized ads.

24     Q.   Are you aware of any study that has

25  assigned economic value to the benefits that you are   05:37:16

1    identifying here?

2         A.   If I understand your question, I think the

3    answer is no, that I haven't -- I wouldn't expect to

4    see a study that would -- well, I should say, I

5    haven't seen a study that -- that answers the          05:37:41

6    question, one way or the other.  I think it's a --

7    it's a -- it's a relevant question for this

8    analysis.  But I haven't seen a study that

9    specifically, you know, did some survey to say,

10   what's the value of the benefits that you get.         05:37:55

11           I mean, well, I should say, I do cite some

12   examples of, you know, articles and things that talk

13   about, you know, the benefits of advertising and

14   other kinds of things, but I take your question to

15   be a more specific question about the value of         05:38:12

16   personalized ads to individuals.  I haven't seen

17   that study.

18        Q.   In the -- this interview that you had with

19   Mr. Belov on August 16th, 2022, [verbatim] did you

20   or anyone take notes?                                  05:38:31

21        A.   No.

22        Q.   I'm sorry, 2023.

23        A.   Oh.  Thank you.

24        Q.   So to make it clear, in the interview you

25   had with Mr. Belov, did anyone take notes?             05:38:40

                                                        Page 364

1        Q.   It -- was it Ms. -- was it Aarti?  I

2    apologize, I don't know your last name.

3        A.   I don't -- I don't recall.

4        Q.   Was Danielle Pierce present?

5        A.   Maybe.  I don't recall if there -- I think   05:39:43

6    Danielle, if I understand, is a lawyer from Google.

7    There may have been a Google lawyer present as well.

8    I just don't recall.

9        Q.   Was Whitty Somvichian present?

10       A.   Not that I recall.                           05:39:55

11            MS. WEAVER:  Okay.  We'll take a quick

12   break.

13            THE VIDEOGRAPHER:  Going -- going off the

14   record.  The time is 5:39 p.m.

15            (Short recess taken.)                         05:40:06

16            THE VIDEOGRAPHER:  Back on the record.

17   The time is 5:49 p.m.

18   BY MS. WEAVER:

19       Q.   Mr. Deal, you challenge Mr. Regan's

20   allocation methodology; correct?                       05:50:07

21       A.   Yes.

22       Q.   Would you agree that allocation

23   methodology is a post-award issue?

24       A.   That's -- yes.  In the sense of I think

25   that there obviously has to be an award to allocate.   05:50:23

Page 366

```
 1    So it -- by definition, it would be something that

 2    would happen after -- literally, the allocation --

 3    whatever methods used would -- would occur after an

 4    award is identified.

 5        Q.   Did you consider any allocation            05:50:39

 6    methodologies that you have used in the past?

 7        A.   It's a little bit of a hard question to

 8    answer.  I'm not proposing a specific methodology.

 9    I'm identifying that he hasn't done a methodology

10    that accounts for variation.  I mean, I -- I          05:50:57

11    certainly have, in my own experience, done a lot of

12    work in allocation, that -- that's based on

13    different types of metrics.

14            So I'm not -- I'm not proposing a

15    particular methodology.  I'm identifying a           05:51:14

16    shortcoming in what Mr. Regan has done.  But to the

17    extent in the back of my mind, do I al- -- I have my

18    decades of experience doing this, so it -- I'm

19    certainly aware of circumstances where allocation is

20    being done taking into account variation.            05:51:31

21        Q.   And in the absence of data, is it

22    reasonable to make an estimate for allocation

23    purposes?

24            MS. REDDY:  Objection.  Vague and

25    ambiguous.                                           05:51:42
```

Page 367

CONFIDENTIAL

1    Legal Solutions.  The time is 5:52 p.m.  We're off

2    the record.

3              (Proceedings concluded, 5:52 p.m., on

4              October 24, 2023.)

5                                                    05:53:48

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                   Page 369

CONFIDENTIAL

```
 1              CERTIFICATE OF REPORTER
 2          I, Hanna Kim, a Certified Shorthand
 3    Reporter, do hereby certify:
 4          That prior to being examined, the witness
 5    in the foregoing proceedings was by me duly sworn to
 6    testify to the truth, the whole truth, and nothing
 7    but the truth;
 8          That said proceedings were taken before me
 9    at the time and place therein set forth and were
10    taken down by me in shorthand and thereafter
11    transcribed into typewriting under my direction and
12    supervision;
13          I further certify that I am neither
14    counsel for, nor related to, any party to said
15    proceedings, not in anywise interested in the
16    outcome thereof.
17          Further, that if the foregoing pertains to
18    the original transcript of a deposition in a federal
19    case, before completion of the proceedings, review
20    of the transcript [ ] was [X] was not requested.
21          In witness whereof, I have hereunto
22    subscribed my name.
23    Dated:  10/26/23
24
                   Hanna Kim
25                 CLR, CSR No. 13083
```

Page 371

NO. 6151469

Re:    Deposition of **Bruce Deal**
       Date: October 24, 2023
       Case: *In re Google RTB Consumer Privacy Litigation*
       Return to: Veritext Legal Solutions

| Page | Line(s) | Correction/Change and Reason |
|---|---|---|
| 77 | 24-25 | Change <authorized buyer> to <Authorized Buyer>; typographical error |
| 77 | 25 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 96 | 20 | Change <authorized buyer> to <Authorized Buyer>; typographical error |
| 96 | 22 | Change <authorized buyer> to <Authorized Buyer>; typographical error |
| 97 | 7 | Change <open bidding partner> to <Open Bidding Partner>; typographical error |
| 97 | 11-12 | Change <open bidding partner> to <Open Bidding Partner>; typographical error |
| 99 | 8 | Change < accountholder> to <account holder>; typographical error |
| 103 | 2 | Change < accountholders> to <account holders>; typographical error |
| 107 | 5-6 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 107 | 5 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 107 | 6 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 110 | 17 | Change < accountholders> to <account holders>; typographical error |
| 110 | 19 | Change < accountholders> to <account holders>; typographical error |
| 110 | 21 | Change < accountholder> to <account holder>; typographical error |
| 116 | 16 | Change < accountholders> to <account holders>; typographical error |
| 121 | 13 | Change <open bidding> to <Open Bidding>; typographical error |
| 121 | 13 | Change <open bidding partner> to <Open Bidding Partner>; typographical error |
| 121 | 17 | Change < accountholders> to <account holders>; typographical error |
| 139 | 20 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 140 | 3 | Change < accountholders> to <account holders>; typographical error |
| 140 | 4 | Change < accountholders> to <account holders>; typographical error |
| 142 | 23 | Change < accountholders> to <account holders>; typographical error |
| 144 | 14 | Change < accountholders> to <account holders>; typographical error |
| 153 | 8 | Change < accountholders> to <account holders>; typographical error |
| 153 | 17 | Change < accountholders> to <account holders>; typographical error |
| 162 | 3 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 162 | 3-4 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 162 | 4 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 162 | 5 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 165 | 14 | Change <open RTB> to <OpenRTB>; typographical error |

| 167 | 6 | Change <open RTB> to <OpenRTB>; typographical error |
|---|---|---|
| 170 | 5 | Change < accountholders> to <account holders>; typographical error |
| 175 | 7 | Change <CPCPA> to <CCPA>; transcription error |
| 208 | 10 | Change < accountholders> to <account holders>; typographical error |
| 210 | 13 | Change <pole> to <poll>; transcription error |
| 234 | 19 | Change < accountholders> to <account holders>; typographical error |
| 241 | 14 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 241 | 14 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 242 | 13 | Change < accountholders> to <account holders>; typographical error |
| 261 | 2 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 261 | 2 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 262 | 4-5 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 262 | 5 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 262 | 12 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 264 | 3 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |

ACKNOWLEDGMENT OF DEPONENT

I, Bruce Deal, do hereby acknowledge that I have read and
examined the foregoing testimony, and the same is a true, correct and
complete transcription of the testimony given by me and any corrections
appear on the attached Errata sheet signed by me.

Date: 11/19/2023 _____     Signature: _____