# EXHIBIT M
# to the Declaration of
# G. Berntson

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 57

## SEALED VERSION

## FILED UNDER SEAL

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1                IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                     OAKLAND DIVISION

4

    _____

5                                   )

    IN RE GOOGLE RTB CONSUMER       )  Case No. 1-CV-02155-YGR

6                                   )

    PRIVACY LITIGATION              )

7    _____)

8

9

10

11   ** ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL **

12              VIDEOTAPED DEPOSITION OF

13            DOMINIQUE M. HANSSENS, Ph.D.

14             Santa Monica, California

15            Tuesday, October 31, 2023

16                    Volume I

17

18

19

20

21   Reported by:

     NADIA NEWHART

22   CSR No. 8714

23   Job No. 6151485

24   PAGES 1 - 309

25

                                              Page 1

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1              IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                     OAKLAND DIVISION

4

5    _____

                                     )

6    IN RE GOOGLE RTB CONSUMER       )   Case No. 1-CV-02155-YGR

     PRIVACY LITIGATION              )

7    _____)

8

9

10

11

12          Videotaped deposition of DOMINIQUE M.

13   HANSSENS, Ph.D., Volume I, taken on behalf of

14   Plaintiffs, at 1333 Second Street, Suite 400,

15   Santa Monica, California, beginning at 9:23 a.m.

16   and ending at 4:41 p.m. on Tuesday, October 31, 2023,

17   before NADIA NEWHART, Certified Shorthand Reporter

18   No. 8714.

19

20

21

22

23

24

25

                                              Page  2

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    APPEARANCES:

 2

 3    For Plaintiffs and the Proposed Class:

 4         COTCHETT, PITRE & MCCARTHY, LLP

 5         BY:  BRIAN DANITZ, ESQ.

 6         840 Malcolm Road

 7         Burlingame, California 94010

 8         650-697-6000

 9         bdanitz@cprnlegal.com

10              - and -

11         COTCHETT, PITRE & MCCARTHY, LLP

12         BY:  KARIN B. SWOPE, ESQ.

13         999 North Northlake Way

14         Seattle, Washington 98103

15         206-802--1272

16         kswope@cpmlegal.com

17

18    For the Interim Class:

19         PRITZKER LEVINE, LLP

20         BY:  ELIZABETH C. PRITZKER, ESQ.

21         1900 Powell Street, Suite 450

22         Emeryville, California 94608

23         415-805-8532

24         ecp@pritzkerlevine.com

25
```

Page 3

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    APPEARANCES (Continued):

 2

 3    For Plaintiffs and the Proposed Class:

 4         SIMMONS HANLY CONROY, LLC

 5         BY:  AN TRUONG, ESQ.

 6         112 Madison Avenue, 7th Floor

 7         New York, New York

 8         10016-7416

 9         212-257-8482

10         atruong@simmonsfirm.com

11         (Remote appearance.)

12              - and -

13         BLEICHMAR FONTI & AULD, LLP

14         BY:  LESLEY WEAVER, ESQ.

15         BY:  ANNE K. DAVIS, ESQ.

16         555 12th Street, Suite 1600

17         Oakland, California 94607

18         415-445-4003

19         lweaver@bfalaw.com

20         adavis@bfalaw.com

21         (Remote appearance.)

22

23

24

25
```

Page  4

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      APPEARANCES (Continued):

2

3    For Defendant and the Witness:

4         COOLEY, LLP

5         BY:  KYLE WONG, ESQ.

6         BY:  ANU DHILLON, ESQ. (Remote appearance.)

7         3 Embarcadero Center

8         San Francisco, California 94111-4004

9         415-693-2029

10        kwong@cooley.com

11        adhillon@cooley.com

12

13

14   Also Present:

15        DANIELLE C. PIERRE, ESQ., Google (Remote appearance.)

16        ELANNE ZAMBRANO, videographer

17

18

19

20

21

22

23

24

25

                                                    Page 5

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1                        INDEX

 2   WITNESS                            EXAMINATION

 3   DOMINIQUE M. HANSSENS, Ph.D.

 4   Volume I

 5

 6                  BY MR. WONG                  300

 7

 8

 9                     EXHIBITS

10   NUMBER             DESCRIPTION              PAGE

11   Exhibit 1    Expert report of Dominique     21

12                Hanssens, Ph.D. dated

13                9/29/23; 215 pages

14

15   Exhibit 2    Privacy Policy; 19 pages       70

16

17   Exhibit 3    Google document entitled "How  109

18                our business works"; 4 pages

19

20   Exhibit 4    Google Privacy Policy; 29 pages 178

21

22

23

24

25

                                            Page 6
```

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1          Santa Monica, California, Tuesday, October 31, 2023

2                          9:23 a.m.

3

4          THE VIDEOGRAPHER:  Good morning, everyone.

5    We are on the record.  The time is 9:23 a.m.  Today      09:23:00

6    is October 31st of 2023.  My name is Elanne

7    Zombrano.  I'm a video technician with Veritext

8    Legal Solutions located in Los Angeles, California.

9          We are recording these proceedings at

10   1333 Second Street in Santa Monica, California.          09:23:24

11   This is the video deposition of Dominique Hanssens

12   in the action entitled In re Google RTB Consumer

13   Privacy Litigation.  This deposition is being taken

14   on behalf of plaintiff in a class action.  The case

15   number is 421-CV-021755-YGR.                             09:23:50

16         Now, would you all please identify yourselves

17   and who you represent, starting with the noticing

18   attorney.

19         MR. DANITZ:  Good morning.  Brian Danitz of

20   Cotchett Pitre & McCarthy for the plaintiffs.           09:24:11

21         MS. SWOPE:  Karin Swope from Cotchett Pitre &

22   McCarthy for the plaintiffs.

23         MS. PRITZKER:  Elizabeth Pritzker, Pritzker

24   Levine, on behalf of the plaintiffs.

25         THE REPORTER:  Ms. Weaver?                          09:24:29

                                                        Page 7

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1          We have Lesley Weaver on as well for

2      plaintiffs.

3          MR. WONG:  Kyle Wong of Cooley, LLP, on

4      behalf of defendant and the witness.  Also on the

5      line are Anu Dhillon, also of Cooley, LLP, and          09:24:47

6      Danielle Pierre of Google.

7          THE VIDEOGRAPHER:  Okay.  Thank you, all.

8          Now, will the court reporter, Nadia Newhart,

9      please administer the oath.

10          THE REPORTER:  Please raise your right hand.    09:25:11

11

12              DOMINIQUE M. HANSSENS, Ph.D.,

13      having been administered an oath, was examined and

14      testified as follows:

15                                                              09:25:13

16                      EXAMINATION

17      BY MR. DANITZ:

18      Q   Good morning, Professor Hanssens.

19      A   Good morning.

20      Q   My name is Brian Danitz, and I represent the      09:25:16

21      plaintiffs in this action.

22      A   Hi.

23      Q   If at any point you wish to take a break,

24      just let me know.  I probably want to finish up my

25      line of questions, and then we'll take a break.       09:25:28

                                                          Page 8

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      A    Okay.

2      Q    All right.  You are here today because you

3  were retained by Google?

4      A    That is correct.

5      Q    All right.  And you are being compensated for    09:25:36

6  your work, correct?

7      A    That is correct.

8      Q    All right.  How much are you being paid?

9      A    Well, my hourly fee is $1,100.

10     Q    Okay.  And what is your total billing to date    09:25:45

11  on this matter?

12     A    It is approximately 25 hours.  So you can

13  multiply through, and that would be through --

14  through September.

15     Q    You are a distinguished research professor of    09:26:01

16  marketing at UCLA Anderson School of Management?

17     A    Yes.

18     Q    You're an expert in the field of

19  econometrics?

20     A    Econometrics as applied to marketing, yes.    09:26:12

21     Q    You are not a privacy expert?

22     A    Privacy expert?  Well, I've done privacy

23  cases in the past.  So it's an area of application,

24  but in terms of a unique focus of my work, no.

25     Q    You are not a historian?    09:26:31

Page  9

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1        A    Historian?  I use a lot of historical data,

2    but I would not call myself a historian.

3        Q    You are not a software engineer?

4        A    Once again, I use a lot of software, but I

5    don't develop software.  So I am not an engineer, a     09:26:44

6    software engineer.

7        Q    And you're not an information technology

8    expert?

9        A    That is correct.

10       Q    Have you published any peer-review articles    09:26:48

11   about survey methodology?

12       A    Well, I've done a fair amount of surveys in

13   my academic work.  I think your question is about

14   academic work, not expert witness work.

15       Q    If I could clarify.                            09:27:09

16       A    Yeah.

17       Q    Have you published any peer-reviewed articles

18   about survey methodology?

19       A    Yeah.  Okay.  Methodology, no.  Surveys, yes.

20   Methodology, no.                                        09:27:19

21       Q    Have you published any peer-review articles

22   with data from Likert scales?

23       A    Sure, yes.  You said Likert scales, right?

24       Q    Yeah.

25       A    Yes.                                           09:27:29

                                                Page 10

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    hypothetical.

 2          THE WITNESS:  Okay.  It -- the example that

 3    you have -- that you have just given, I would agree

 4    with that statement --

 5    BY MR. DANITZ:                                09:51:31

 6        Q    Right.

 7        A    -- but I am -- I have not been asked to look

 8    at approval, per se.  What I have been asked is, do

 9    they expect Google to do X, Y, Z?

10        Q    Okay.                                09:51:41

11        A    And that's it.  It's an awareness question.

12        Q    I see.  Well, the expected -- the expectation

13    that a person may do something is not the same as

14    knowledge that the person is doing it?

15        A    It's not --                          09:52:00

16          MR. WONG:  Objection; vague.

17          THE WITNESS:  I'm sorry.

18          It's not -- I didn't use the word

19    "knowledge."  I used the word "awareness," okay?  So

20    I'm aware.  Why?  Because I expect Google to do    09:52:09

21    certain things.  I'm aware of that.  I may be wrong,

22    but I am aware of -- of that behavior.

23    BY MR. DANITZ:

24        Q    Right, but it's not knowledge, is it?

25        A    No.                                  09:52:18
```

Page 31

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q   You are not offering an opinion on whether or

2    not consumers have a privacy interest, are you?

3      A   Have a privacy interest?

4          MR. WONG:  Objection; vague.

5          MR. DANITZ:  I'll rephrase.                    09:52:30

6      Q   You're not offering an opinion in this report

7    on whether or not consumers have a privacy interest

8    in the information sent over Google RTB?

9          MR. WONG:  Objection.

10         THE WITNESS:  I am a -- I'm sorry, but I       09:52:42

11   don't understand the word "privacy interest."

12   BY MR. DANITZ:

13     Q   That -- okay.  Well, perhaps you could ask

14   Professor Richards what is meant by privacy

15   interest.  We'll try it again.                       09:52:56

16         Are you offering an opinion on whether or not

17   consumers have a privacy interest --

18         MR. WONG:  Objection --

19   BY MR. DANITZ:

20     Q   -- in the information sent over Google RTB?    09:53:06

21         MR. WONG:  Objection; calls for a legal

22   conclusion.

23         THE WITNESS:  So the words -- so you can't

24   give me an equivalent word for interest?  Because

25   interest could be, I'm interested in a certain sport 09:53:19

                                              Page 32

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    or interest could be something is beneficial for me.

2    I'm struggling a little bit with the fact of, how do

3    I interpret the word "interest"?

4    BY MR. DANITZ:

5        Q   You're not offering an opinion as to whether    09:53:30

6    or not the information that is transmitted over

7    Google RTB has any aspects that relate to someone's

8    right to privacy?

9        A   Ah.

10        MR. WONG:  Objection; legal conclusion.    09:53:44

11        THE WITNESS:  Okay.  I do not.  Thank you for

12    clarifying that.

13    BY MR. DANITZ:

14        Q   Do your surveys measure whether people know

15    who's getting their data?    09:53:58

16        MR. WONG:  Objection; vague.

17        THE WITNESS:  In as far as it -- as the

18    question relates to advertisers, then they know that

19    it's -- I should say potential advertisers, but

20    beyond that, no.    09:54:20

21    BY MR. DANITZ:

22        Q   All right.  And that's because you say that

23    it's potential advertisers, right?

24        A   Well, that's in the wording of some of the

25    questions, yeah.    09:54:30

                                        Page 33

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    cited in that report?

2        A    That is correct.

3        Q    All right.  Also based on the surveys as

4    well, correct?

5        A    Well, as long as we're talking about          10:12:09

6    Professor Richards, you know that one of my major

7    comments on Richards is that he doesn't do any

8    empirical work, no surveys.  In some sense, I've

9    done the work for him and say, look, if you do a

10   survey, you find tremendous heterogeneity.          10:12:23

11           So in that sense, it makes my opinions on

12   Richards a little stronger.  But even without my

13   survey, I could have written those -- those Richards

14   comments.

15       Q    Right.  Is it your view that surveys are a    10:12:37

16   necessary means of determining a reasonable

17   likelihood -- of determining a reasonable

18   expectation of privacy?

19       A    Okay.  I'm taking a note here of your exact

20   terminology.  A reasonable expectation of privacy?    10:12:55

21       Q    That's right.

22       A    Okay.

23           MR. WONG:  Objection; calls for a legal

24   conclusion.

25           THE WITNESS:  Okay.  Well, first of all, my    10:13:03

Page 49

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    correct?

2         MR. WONG:  Objection; vague.

3         THE WITNESS:  What is a different question?

4    BY MR. DANITZ:

5     Q   Well, the question of expectation and the        10:15:02

6    reasonable expectation of privacy are two different

7    questions.

8     A   They're different.

9     Q   All right.

10    A   They're different.                                10:15:09

11        MR. DANITZ:  Let's take a break.

12        THE VIDEOGRAPHER:  Okay.  We're going off the

13   record.  The time is 10:15 a.m.

14        (Recess.)

15        THE VIDEOGRAPHER:  We're going on the record.  10:32:39

16   The time is 10:33 a.m.

17   BY MR. DANITZ:

18    Q   All right.  Professor Hanssens, let's talk

19   about the surveys.

20    A   The survey?                                       10:33:09

21    Q   The surveys.

22    A   Yeah.

23    Q   The surveys were conducted on the Internet

24   through Prodege, correct?

25    A   Well, they are the panel provider, yes.          10:33:16

                                                  Page 52

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q    What do you mean by a panel provider?

2      A    Oh, I see.  Well, they were done through the

3    Internet, as you say, and it is now standard

4    procedure in market research that you start with an

5    Internet panel provider, and we picked Prodege.      10:33:29

6    It's a very, very good one.

7      Q    Okay.

8      A    And they have very, very large numbers of

9    participants and so forth.  So that's the start.

10     Q    So the survey participants were                10:33:42

11   self-selecting; is that correct?

12     A    That is correct -- that is correct.

13     Q    And the survey participants volunteered to

14   complete the surveys, right?

15     A    That is correct.                               10:33:55

16     Q    Survey participants were paid by Prodege for

17   taking the survey?

18     A    Oh, I forgot what the exact remuneration was,

19   but there's always a small token of some sort, not

20   necessarily money.  It could be a gift or points.    10:34:09

21     Q    Maybe $4?

22     A    I'm not sure how much it was but some small

23   amount.

24     Q    And Prodege was paid by Google; is that

25   correct?                                             10:34:18

Page 53

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    say yes, yeah.

2         Q    All right.  So according to this, an accurate

3    representation of the underlying population, right?

4              MR. WONG:  Sorry, where are you?

5              MR. DANITZ:  Oh, I'm sorry.                    10:38:35

6              THE WITNESS:  The second bullet.

7    BY MR. DANITZ:

8         Q    Let's turn to the second bullet.

9         A    The second bullet.  Got it.

10        Q    It says (as read):                            10:38:40

11             "The design of the survey must

12             ensure an accurate representation of

13             the underlying population of

14             interest."

15             Is that correct?                              10:38:46

16        A    That's correct.

17        Q    All right.  So an accurate representation of

18   the underlying population is a key consideration in

19   the design for a reliable survey; is that correct?

20        A    Yes.                                          10:38:58

21        Q    An accurate representation of the underlying

22   population is a standard scientific method to ensure

23   reliability of result?

24        A    Correct.

25        Q    All right.  An inaccurate representation of   10:39:06

                                               Page 58

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1            MR. WONG:  Objection; vague, calls for
 2     speculation.
 3            THE WITNESS:  I don't know that.  I don't
 4     know that for a fact.
 5     BY MR. DANITZ:                                  10:47:29
 6        Q   All right.  Paragraph 57 also refers to, in
 7     footnote 73, to Appendix H.  I think that's the
 8     appendix you were referring to.
 9        A   That's correct.
10        Q   Let's turn to Appendix H.  All right.  And  10:47:37
11     Appendix H of your report is a Prodege brochure
12     titled "ESOMAR 2023 37 Questions to Help Buyers of
13     Online Samples."
14        A   Yes.
15        Q   All right.  Let's turn to page 7 of 31, if  10:47:59
16     you would.  And that's titled with a very nice
17     picture, "Sample Sources and Recruitment," right?
18        A   I got it.
19        Q   Okay.  And within that section, if you would
20     turn to page 9 of 31 to question 5.  All right.     10:48:18
21        A   I see it.
22        Q   And if you go to the -- the black or gray
23     text, right, to the second sentence, it states (as
24     read):
25            "We maintain a database of thousands       10:48:39
```

Page 67

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1            of demographic and behavioral

 2            attributes that are utilized to

 3            access sample for our clients'

 4            projects."

 5            Do you see that?                          10:48:48

 6       A    Okay.

 7       Q    Sample refers to the people who will take the

 8   survey?

 9       A    Just one second.

10            MR. WONG:  Let's give him a second to read   10:48:57

11   this.

12            THE WITNESS:  Yes.

13   BY MR. DANITZ:

14       Q    Okay.  Now let's turn to page 19 of 31.

15       A    I'm with there -- I'm with you there.       10:49:18

16       Q    Okay.  Question 24 in the second paragraph

17   states (as read):

18            "Our proprietary panel and

19            management system maintains

20            individual respondent-level data            10:49:32

21            within our panel database and allows

22            us to automatically update the

23            member records including" -- and it

24            lists a few -- "profiling data."

25       A    Yes.                                        10:49:44
```

Page 68

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1        Q   Is that correct?

2        A   Yes.

3        Q   And that's -- you have no reason to doubt

4    that's true; is that correct?

5        A   I have no reason to doubt that, yes.        10:49:49

6        Q   All right.  And paragraph -- the next page,

7    page 20, right above the icons --

8        A   Oh, the next page, page 20 right above --

9        Q   Right above the icons.

10       A   I'm with you.                               10:50:05

11       Q   It says (as read):

12           "We employ proprietary and 3rd party

13           digital fingerprinting technology."

14           Do you see that?

15       A   I see that.                                 10:50:15

16           MR. WONG:  I'm sorry.  Where is that?  Okay.

17   BY MR. DANITZ:

18       Q   And you have no reason to doubt that that's

19   not accurate, right?

20       A   Agreed.                                     10:50:20

21       Q   All right.  So let's go to page 24 near the

22   end of the Appendix H.  And in the middle of

23   question 29, do you see where it says -- it says (as

24   read):

25           "Our privacy policy is provided to          10:50:44
```

                                                    Page 69

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1          all panelists at sign-up and

 2          repeatedly thereafter."

 3          Do you see that?

 4     A    I do.

 5     Q    All right.  And do you have any reason to      10:50:51

 6   doubt that that's true?

 7     A    No, no reason.

 8     Q    All right.  And then in bold, the brochure

 9   provides a URL of the privacy policy; is that

10   correct?                                              10:51:05

11     A    Correct.

12     Q    And that's www.prodege.com/privacy; is that

13   correct?

14     A    Agreed.

15          MR. DANITZ:  All right.  At this point, I'll   10:51:16

16   mark as Exhibit 2, Prodege's privacy policy.

17          (Exhibit 2 was marked for identification

18          and is attached hereto.)

19   BY MR. DANITZ:

20     Q    All right.  And Exhibit 2 is the -- is called  10:51:42

21   "Privacy Policy United States and Canada" --

22     A    I see it.

23     Q    -- from the www.prodege.com website.

24          And do you recognize this document?

25     A    I recognize it as a privacy policy alluded to  10:51:57
```

Page 70

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    in Appendix H but not -- not beyond that.

 2        Q    Okay.  You've not seen it before?

 3        A    I've seen it before, but I have not read it.

 4        Q    Oh, okay.  Did you have to agree to this

 5    policy to use Prodege's services?                    10:52:15

 6        A    No, at least not that I'm aware of.

 7        Q    Who did?

 8            MR. WONG:  Objection.

 9            THE WITNESS:  I actually don't know that.

10    Presumably -- presumably, the panel members, but I    10:52:28

11    do not know that.

12    BY MR. DANITZ:

13        Q    Well, let's turn to page 1 of 19, and the

14    first sentence says (as read):

15            "This 'Privacy Policy' is for              10:52:39

16            persons located within the United

17            States."

18            Do you see that?

19        A    I see that.

20        Q    It then says (as read):                    10:52:48

21            "We want you to be familiar with how

22            we collect, use and share your

23            Personally Identifiable Information

24            (defined below)."

25            Do you see that?                            10:52:59
```

Page 71

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      A    Actually, I don't.  Is it -- I'm trying to

2    find what you just read.

3            MR. WONG:  Also, if you need to, like,

4    read --

5            MR. DANITZ:  It's the second --              10:53:10

6            MR. WONG:  -- the document --

7            MR. DANITZ:  Excuse me.

8            (Simultaneous speaking - unreportable.)

9    BY MR. DANITZ:

10     Q    It's the second --                            10:53:13

11           MR. WONG:  Brian, I am talking.

12           MR. DANITZ:  Listen, it's -- we just looked

13   at the first sentence.  This is the second sentence.

14           MR. WONG:  Brian, let him look at the

15   document.                                            10:53:22

16   BY MR. DANITZ:

17     Q    Do you see the second sentence?

18           MR. WONG:  You can take as much time as you

19   need to look at the document to familiarize yourself

20   with it.                                             10:53:30

21           And if you don't, we can talk to the judge

22   about that.

23           THE WITNESS:  I want to make sure that I got

24   it right now.  Is it the one that says (as read):

25           "The 'Privacy Policy' outlines the           10:53:40

Page 72

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1          type of information," et cetera, et

 2          cetera?

 3    BY MR. DANITZ:

 4      Q    No.  It's the second sentence at the top.

 5    (As read):                                    10:53:45

 6          "We want you to be familiar with how

 7          we collect, use and share your

 8          Personally Identifiable

 9          Information."

10          Do you see that?                        10:53:51

11      A    Oh, it's the third sentence?  Okay.  (As

12    read):

13          "We want you to be familiar," et

14          cetera.  Okay.  I'm with you.

15      Q    You're right.  It is the third sentence.  10:53:58

16    That is absolutely my fault.  I apologize.

17          Do you see that?

18      A    I do.

19      Q    All right.  And do you see that it says "and

20    share"?                                        10:54:06

21          Do you see that?

22      A    (Reading to self.)  Okay.  Yes.

23      Q    All right.  Now, do you see the bold and

24    capitalized letters two-thirds of the way down the

25    page?                                          10:54:17
```

Page 73

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1        A    Yes.

 2        Q    Can you read that out loud.

 3        A    (As read):

 4             "If you do not wish to have us

 5             collect, use and share information        10:54:22

 6             as described in this privacy policy,

 7             please do not use any of the Prodege

 8             sites and features or our services."

 9        Q    Right.  Were you aware that Prodege requires

10   its users to agree to the sharing of information as   10:54:34

11   described in this policy?

12        A    Of --

13             MR. WONG:  Objection; vague.

14             THE WITNESS:  Officially aware?  No, but

15   let's say that it doesn't surprise me.              10:54:44

16   BY MR. DANITZ:

17        Q    Okay.  Page 2 of 9 -- 2 of 19 -- 2 of 19.

18        A    Page 2, right?

19        Q    Yeah.  All right.  If you go to Section 2,

20   "Information We Collect Directly."                  10:55:13

21             Do you see that?

22        A    I see that.

23        Q    The first paragraph defines personally

24   identifiable information.

25             Do you see that?                          10:55:22
```

Page 74

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1        A    I see that.

2        Q    It's bolded.

3        A    I'm sorry.  I see that, yes.

4        Q    And it's also called PII, right?

5        A    Yes.                                    10:55:29

6        Q    And (as read):

7             "PII refers to any information that

8             can reasonably be used to identify,

9             contact or locate you."

10            Do you see that?                         10:55:36

11       A    I do.

12       Q    All right.  In the second paragraph of

13   section 2, the privacy policy states that Prodege

14   may (as read):

15            "...collect PII and/or Non-PII" --       10:55:58

16       A    Oh, I see it now.

17       Q    (As read):

18            -- "when you create or register for

19            an account with us, fill out

20            surveys," et cetera.                     10:56:11

21            Do you see that?

22       A    You know, I apologize.  I'm not sure.  I'm

23   not sure I saw that.  So earlier, we were talking

24   about the PII --

25       Q    This is the second paragraph of section 2.  10:56:22
```

Page 75

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1      A   So I jumped to the entire second paragraph.

 2   So I skip a bunch of information -- no, no.  The

 3   second --

 4      Q   Okay.  So --

 5      A   What's paragraph?  Is it --                10:56:31

 6      Q   Do you see the second paragraph of section 2?

 7      A   Can you point --

 8      Q   It starts with "PII and Non-PII."

 9      A   "PII and Non-PII."  I'm with you now.  Okay.

10      Q   And then it says "for example," right?      10:56:43

11      A   I see it.

12      Q   You see that?

13      A   Yep.

14      Q   (As read):

15          "...we may collect PII and/or              10:56:49

16          Non-PII when you create or register

17          for an account with us, fill out

18          surveys," et cetera.

19          Do you see that?

20      A   I do.                                       10:56:57

21      Q   Do you have any reason to doubt that that's

22   accurate?

23      A   No.

24      Q   All right.  All right.  So if you go about

25   two-thirds of the way down that same paragraph --  10:57:41
```

Page 76

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1       A    Okay.

2       Q    -- it's the line that starts with "rewards

3   feature."

4            Do you see "rewards feature"?

5       A    Same paragraph, right?                    10:57:49

6       Q    Yeah.

7       A    Let me try and find that.

8       Q    Two-thirds of the way down.  It starts with

9   "rewards feature" on the left column.  The sentence

10  says, "Your browsing activity."                    10:58:04

11           Do you see that?

12      A    Just a second.  I'm still searching here.

13      Q    It's over here, sir.

14      A    Okay.  That's helpful.  Okay.  Oh, "Your

15  browsing activity" --                              10:58:17

16      Q    Yeah.

17      A    -- "on our merchant partners," et cetera?

18      Q    Yeah.

19      A    I'm with you.

20      Q    So it talks about (as read):              10:58:26

21           "Your browsing activity on merchant

22           partners' websites may be tracked by

23           cookies, Extensions and other

24           Prodege Sites and Features having

25           such tracking capabilities."              10:58:37
```

Page 77

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1          Do you see that?

 2     A    I do.

 3     Q    That Prodege, quote (as read):

 4          "...may also use GPS or similar

 5          geo-location technology to determine        10:58:47

 6          the geo-coordinates of where you or

 7          your Device are located."

 8          Do you see that?

 9     A    I do.

10     Q    That Prodege's (as read):                   10:58:54

11          "...mobile applications may collect,

12          among other things, certain

13          information automatically, including

14          the type of device, the device's

15          unique device identifier ('UDID'),          10:59:06

16          the IP address, the operating

17          system, the types of Internet

18          browsers used and information about

19          the way you use the mobile

20          application."                               10:59:19

21          Do you see that?

22     A    I do.

23     Q    That takes us to the bottom of that

24     paragraph.

25     A    Agreed.                                      10:59:23
```

Page 78

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1        Q    Okay.  Those are the same types of
 2    information at issue in your survey, are they not?
 3        A    Some of them are, I presume.  I see an
 4    occasional overlap.  I haven't, obviously, done a
 5    side-by-side comparison.                            10:59:35
 6        Q    The next paragraph begins as follows (as
 7    read):
 8             "If you don't provide us with or
 9             allow us to collect your PII, we
10             generally will be unable to provide        10:59:46
11             you with our Services and you may be
12             unable to use the Prodege Sites and
13             Features."
14             Do you see that?
15        A    I do.                                       10:59:53
16        Q    Did you know that Prodege panelists had to
17    agree to the collection and use of their personally
18    identifiable information to fill out a survey?
19             MR. WONG:  Objection; asked and answered.
20    It's beyond the scope.                               11:00:05
21    BY MR. DANITZ:
22        Q    Did you know that?
23        A    Well, you've just given me the details of
24    that.  I had some awareness of that, but now I know
25    it in more detail.                                   11:00:14
```

Page 79

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1       Q    Okay.  So let's go to section 4 of this

 2    privacy policy.

 3       A    We're still in the privacy policy.

 4       Q    It's page 3 of 19.

 5       A    I see.                                    11:00:26

 6       Q    And it says "Use and Sharing of Information."

 7            Do you see that?

 8       A    I do.  I do.

 9       Q    I'm just trying to -- it's small print, and

10    my eyes are not as good as they used to be.       11:00:56

11            All right.  So it's over here.  Do you see

12    where it says "collection"?  So the sentence goes

13    like this:  "Without limitation."

14            Do you see that?

15       A    Yes.                                      11:01:08

16       Q    (As read):

17            "Without limitation, your PII and

18            non-PII may be used by itself,

19            aggregated or combined with unique

20            identifiers (such as Prodege-            11:01:16

21            assigned identifiers, UDIDs, et

22            cetera), and shared with service

23            providers, vendors, advertisers and

24            merchants, survey partners for

25            purposes related to our business         11:01:33
```

Page 80

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1          including, without limitation,

 2          advertising."

 3          Do you see that?

 4     A    I saw -- I think you skipped a part, but

 5  other than that, yes.                          11:01:42

 6     Q    Yes.  Did you know that all Prodege panel

 7  members had to explicitly agree to this level of

 8  sharing of their information for advertising

 9  purposes?

10          MR. WONG:  Same objections.            11:01:55

11          THE WITNESS:  Well, yeah, same answer.  At

12  that level of specificity, I probably did not know

13  that.  But in general, this does not surprise me.

14  BY MR. DANITZ:

15     Q    All right.  Let's go to section 10 at page 5  11:02:03

16  of 19.  And at the beginning of that paragraph, it

17  states (as read):

18          "We set and access, and third

19          parties (including Trusted Third

20          parties) may set and access,       11:02:29

21          cookies, web beacons, embedded

22          scripts, pixels, tags, software

23          development kits ('SDKs'), session

24          replay tools, and other tracking

25          technologies (collective, 'tracking    11:02:42
```

Page 81

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1            technologies') on your devices in
 2            connection with your use of Prodege
 3            sites and features or our services.
 4            Such third parties ('cookie
 5            operators') may collect information        11:02:54
 6            across various channels using
 7            tracking technologies for purposes
 8            of delivering more relevant offers
 9            to you or other business purposes.
10            Tracking Technologies may                  11:03:07
11            automatically capture PII and other
12            information, including, without
13            limitation, your IP address, UDID,
14            and browser or operating system type
15            and version and may detect whether         11:03:21
16            your device or software has certain
17            capabilities," right?
18      A    I see that, yeah.
19      Q    And then it says (as read):
20            "In doing so, we and Third Party           11:03:29
21            Services may link the information
22            collected from Tracking Technologies
23            and from other sources with other of
24            your PII and non-PII and we and they
25            may track your web-browsing and            11:03:41
```

Page 82

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | | other activity in order to provide | |
| 2 | | you with Offers and for our or their | |
| 3 | | other Data Purposes." | |
| 4 | | Do you see that? | |
| 5 | A | Yes. | 11:03:53 |
| 6 | Q | Then it says (as read): | |
| 7 | | "Third-party Services may link the | |
| 8 | | information we share with them (or | |
| 9 | | they collect) to cookies stored on | |
| 10 | | your browser or Devices, and they | 11:04:02 |
| 11 | | may collect information such as your | |
| 12 | | IP address, UDID, browser or | |
| 13 | | operating system type and version | |
| 14 | | and the demographic or | |
| 15 | | inferred-interest information." | 11:04:15 |
| 16 | | Do you see that? | |
| 17 | A | Yes. | |
| 18 | Q | (As read): | |
| 19 | | "Third Party Services may use this | |
| 20 | | information to recognize you across | 11:04:20 |
| 21 | | different channels and platforms, | |
| 22 | | including, but not limited to, | |
| 23 | | computers, mobile devices and Smart | |
| 24 | | TVs, over time for advertising, | |
| 25 | | analytics attribution and reporting | 11:04:30 |

Page 83

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1          purposes."

2          Do you see that?

3      A    I do.

4      Q    Do you have any reason to doubt that that's

5   accurate?                                          11:04:38

6      A    No.

7      Q    Did you know that all Prodege panel members

8   had to explicitly agree to being tracked by Prodege

9   by third parties for many reasons, including for

10  advertising?                                       11:04:49

11         MR. WONG:  Objection; assumes facts not in

12  evidence, beyond the scope.

13         THE WITNESS:  In general terms, it doesn't

14  surprise me, although specifically I'm learning a

15  bit more here.                                     11:04:58

16  BY MR. DANITZ:

17     Q    Let's go to section 13.  It's called

18  "Disclosure of Data."

19         Do you see that?

20     A    I do.                                      11:05:15

21     Q    And in the first sentence after the comma, it

22  states -- sorry.  I'm going to start somewhere else.

23  I'm sorry.  It's on the next page.

24     A    Okay.

25     Q    The top of the page.  Do you see where it   11:06:10

                                                    Page 84

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    says (as read):

 2          "We may share or sell aggregate or

 3          individualized information about

 4          you," right?

 5          Do you see that?                        11:06:22

 6     A    I do.

 7     Q    So it says (as read):

 8          "We may share or sell aggregate or

 9          individualized information about you

10          that may include, without              11:06:30

11          limitation: (1), your PII and

12          related information; (2), your use

13          of the Prodege sites and features

14          and our services; (3 Third Party

15          Services and other websites you        11:06:42

16          visit; and (4) your geo-location and

17          information derived therefrom."

18          Do you see that?

19     A    I do.

20     Q    Did you know that Prodege engaged in the  11:06:51

21    selling and sharing of, quote, PII and related

22    information?

23          MR. WONG:  Objection; assumes facts not in

24    evidence, beyond the scope.

25          THE WITNESS:  Well, once again, it does not  11:07:01
```

Page 85

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1    surprise me, but specific knowledge I'm learning

2    here from your reading.

3    BY MR. DANITZ:

4        Q   Did you know that Prodege panels had to agree

5    to Prodege selling or sharing their PII?            11:07:12

6        A   Well --

7            MR. WONG:  Objection; assumes facts not in

8    evidence.

9            THE WITNESS:  Well, we know that they have to

10   agree to the privacy policy, and this is part of the   11:07:20

11   privacy policy.

12   BY MR. DANITZ:

13       Q   Did you know that Prodege engaged in the

14   selling and sharing of individualized information

15   about the websites its users visit?                 11:07:32

16           MR. WONG:  Same objections.

17           THE WITNESS:  And same answer.  It's -- yeah,

18   that does not surprise me.

19   BY MR. DANITZ:

20       Q   Did you know that Prodege panelists had to   11:07:40

21   agree to Prodege selling or sharing individualized

22   information about the websites they visit?

23           MR. WONG:  Same objections.

24           THE WITNESS:  Same answer.

25   BY MR. DANITZ:                                      11:07:52
```

Page 86

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1        Q   Did you know that Prodege panelists had to

 2    agree to Prodege selling or sharing their, quote,

 3    geolocation and information derived therefrom?

 4            MR. WONG:  Same objections.

 5            THE WITNESS:  Same answer.                  11:08:05

 6    BY MR. DANITZ:

 7        Q   Did you know that Prodege panelists had to

 8    agree to Prodege selling or sharing individualized

 9    information about their geolocation?

10            MR. WONG:  Same objection.                  11:08:15

11            THE WITNESS:  Same answer.

12    BY MR. DANITZ:

13        Q   Isn't the selling or sharing of that kind of

14    personal information precisely what is at issue in

15    this case?                                          11:08:21

16            MR. WONG:  Same objection.

17            THE WITNESS:  There may be some overlap in

18    this case, but I have not compared those two side by

19    side, so I can't give you a definitive answer.

20    BY MR. DANITZ:                                      11:08:30

21        Q   Aren't expectations about the selling or

22    sharing of that kind of information what you ask

23    about in your surveys?

24        A   Among other things, yes.

25        Q   Let's go to page 10 of 19.  The             11:08:39
```

Page 87

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    next-to-the-last paragraph, it reads (as read):

 2            "We may also use and disclose your

 3            PI under this Notice For Commercial

 4            Purposes, which may be considered a

 5            'Sale' or 'Share' under                    11:09:09

 6            applicable -- applicable -- excuse

 7            me -- U.S. State Privacy Laws such

 8            as when Trusted Third Parties

 9            collect your PI VI-A third-party

10            cookies and when we Process PI for         11:09:21

11            certain advertising purposes.  In

12            addition, we may make your PI

13            available to third parties for their

14            own use VI-A third-party cookies or

15            otherwise."                                 11:09:33

16            Do you see that?

17      A    I do.

18      Q    Did you know that Prodege engaged in the

19    selling and sharing of personal information for

20    advertising purposes?                              11:09:40

21            MR. WONG:  Same objections.

22            THE WITNESS:  Well, this one says that they

23    may do that, right?  So subject to the word "may,"

24    once again, I am not surprised, but the specific

25    knowledge from this paragraph I obtained from your  11:09:51
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    reading.

 2    BY MR. DANITZ:

 3       Q   Did you know that Prodege panelists had to

 4    agree that Prodege could disclose their personal

 5    information?                                    11:10:03

 6          MR. WONG:  Objection; calls for a legal

 7    conclusion.

 8          THE WITNESS:  Same answer.

 9    BY MR. DANITZ:

10       Q   Did you know that Prodege made its users'   11:10:06

11    personal information available to third parties VI-A

12    third-party cookies?

13       A   Same answer.

14          MR. WONG:  Same objection.

15    BY MR. DANITZ:                                  11:10:17

16       Q   Did you know that Prodege panelists had to

17    agree that Prodege could disclose that personal

18    information through the use of third-party cookies?

19          MR. WONG:  Objection.

20          THE WITNESS:  Same answer.                11:10:24

21    BY MR. DANITZ:

22       Q   All right.  Let's go -- we're almost through

23    this.  So let's go to page 11 of 20 here.  You can

24    see there's a chart, and right above the chart

25    there's a title with a heading "PI Collection,      11:10:37
```

Page 89

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    Disclosure and Retention -- By Category of PI."

2         Do you see that?

3    A    Correct.

4    Q    And right above the chart, it says (as read):

5         "We collect, disclose and retain PI         11:10:49

6         as follows:"

7         Do you see that?

8    A    I see that.

9    Q    All right.  And I'll just quickly go through

10   the rows so we can wrap this up, all right?         11:10:58

11        So row 1 is titled "Identifiers."

12        Do you see that?

13   A    Yes.

14   Q    And it includes a real name, alias, postal

15   address, unique personal identifier, online         11:11:10

16   identifier, Internet protocol address, email address

17   and so on.

18        Do you see that?

19   A    I do.

20   Q    Let's go to row 5.  That lists Internet usage   11:11:20

21   information.

22        Do you see that?

23   A    I do.

24   Q    And that includes, but is not limited to,

25   browsing history, search history and information    11:11:29

Page 90

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1     regarding your interaction with an Internet website

2     application or advertisement.

3          Do you see that?

4     A   I do.

5     Q   Row 6 lists geolocation data.                11:11:38

6          Do you see that?

7     A   Yes.

8     Q   That includes, but not limited to, precise

9     physical location or movement and travel --

10    movements and travel patterns.                   11:11:51

11         Do you see that?

12    A   I do.

13    Q   Row 8 lists professional or employment

14    information, including, but not limited to,

15    professional, educational or employment-related    11:12:00

16    information.

17         Do you see that?

18    A   Yes.

19    Q   Row 9 lists inferences from PI collected.

20         Do you see that?                            11:12:10

21    A   Yes.

22    Q   Great.  And that is including, but not

23    limited to, creating a profile about a consumer,

24    reflecting the consumer's preferences,

25    characteristics, psychological trends,           11:12:23
```

Page 91

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    predispositions, behavior, attitudes, intelligence,

2    abilities and aptitudes.

3          Do you see that?

4      A   I do.

5      Q   And row 10 -- row 10 lists -- on the next        11:12:33

6    page, lists sensitive PI, including precise

7    geolocation, sensitive personal characteristics,

8    e.g., racial and ethnic origin, religious or

9    philosophical beliefs, citizenship or immigration

10   status or union membership, health information, et     11:12:52

11   cetera.

12         Do you see that?

13     A   I do.

14     Q   And if you look to the rightmost column, it

15   shows "Categories of Recipients."                      11:13:04

16         Do you see that?

17     A   I do.

18     Q   And the categories of recipients include

19   various third parties, correct, including service

20   providers, right?  And --                              11:13:13

21         MR. WONG:  Objection; the document speaks for

22   itself.

23   BY MR. DANITZ:

24     Q   -- data processors, IT service providers,

25   marketing service providers.                           11:13:23

                                          Page 92

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1              Do you see that?

2         A    I do.

3         Q    All right.  And under "Sale and Share," it

4    includes cookie operators, right?  (As read):

5              "Only to the extent such data is          11:13:33

6              collected by a cookie or other

7              tracking technology."

8              Do you see that near the bottom?

9              Sale/Share?

10        A    It says "Sale/Share none."               11:13:44

11        Q    No, no, on page 11.

12        A    Oh, you're back to 11.

13        Q    Do you see that "Sale/Share"?

14        A    Oh, yeah.  Now I see it.  Yes, of course.

15        Q    All right.  And do you have any reason to   11:13:56

16   doubt that that's -- that's not accurate?

17        A    No reason.

18        Q    And every single member of your online panel

19   had to agree to this policy; is that correct?

20             MR. WONG:  Objection; assumes facts not in   11:14:07

21   evidence, calls for speculation.

22             THE WITNESS:  They agreed to the privacy

23   policy, so in that sense, yes.

24             MR. DANITZ:  Yes.

25             THE WITNESS:  It doesn't mean that they read   11:14:16
```

Page 93

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    it.

 2    BY MR. DANITZ:

 3        Q   Prodege's privacy policy discloses that it

 4    shares and sells each of the categories of personal

 5    information that you ask about in your surveys and      11:14:24

 6    much more, including IP address, URL, browser

 7    cookies, content categories, characteristics of the

 8    web browser and device, correct?

 9            MR. WONG:  Objection; compound, vague.

10    BY MR. DANITZ:                                          11:14:40

11        Q   You can answer it.

12        A   It's a fair statement.

13        Q   100 percent of survey respondents by joining

14    Prodege's panel had agreed to the terms of Prodege's

15    privacy policy, correct?                                11:14:52

16            MR. WONG:  Objection; calls for a legal

17    conclusion, calls for speculation.

18            THE WITNESS:  They had agreed to the privacy

19    policy, yeah.

20    BY MR. DANITZ:                                          11:15:00

21        Q   Is it true that if someone refused to agree

22    to this privacy policy, they would have been

23    excluded from the surveys you performed?

24            MR. WONG:  Objection; assumes facts not in

25    evidence.                                               11:15:07
```

Page 94

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1              THE WITNESS:  That is my impression.
 2       BY MR. DANITZ:
 3          Q   Is it possible that respondents who did or
 4       would have refused to accept Prodege's privacy
 5       invasive terms might have answered your survey        11:15:19
 6       questions differently?
 7              MR. WONG:  Objection; argumentative.
 8              THE WITNESS:  Well, we don't know that.
 9       BY MR. DANITZ:
10          Q   Is it possible?                                11:15:26
11          A   Is it possible?  At the margin, yes.  I can
12       tell you why I doubt it but --
13          Q   But the answer is --
14          A   As an academic -- as an academic, I have to
15       say -- as an emperialist it is a possibility.         11:15:37
16          Q   Only individuals who are willing to agree to
17       Prodege's privacy invasive practices took the
18       survey?
19              MR. WONG:  Objection; argumentative.
20              THE WITNESS:  Only -- well, you used the word   11:15:48
21       privacy invading there.  That's a -- that's a loaded
22       term.  Only people who agree to the privacy policy,
23       okay?  We can't say only people who agreed and read
24       the entire privacy policy agreed to participate.
25       That's the subtle difference.                         11:16:10
```

Page 95

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    BY MR. DANITZ:

 2       Q   But if the inverse were true, if the sample

 3    population only include individuals who refused to

 4    accept Prodege's privacy policy, the results could

 5    have been different?                              11:16:23

 6           MR. WONG:  Objection.

 7           THE WITNESS:  That's -- it's a testable

 8    proposition.  And as an academic, I've said that is

 9    a possibility.  At the same time I think it's

10    unlikely.                                         11:16:35

11    BY MR. DANITZ:

12       Q   Did you test whether most Google

13    accountholders would have agreed to Prodege's

14    privacy invasive terms?

15           MR. WONG:  Objection.                      11:16:43

16           THE WITNESS:  Excuse me.  Whether the Google

17    accountholders --

18    BY MR. DANITZ:

19       Q   Did you -- I'll repeat the question.

20       A   Yeah, yeah, yeah.                          11:16:49

21       Q   Did you test whether most Google

22    accountholders would have agreed to Prodege's terms

23    in this policy?

24       A   I did not test that.

25       Q   Did you account --                         11:16:59
```

Page 96

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    use of Prodege's panel, which has millions of people

2    in it.

3         Sorry it's a little bit of a long-winded

4    answer just to say that I don't necessarily see the

5    word "bias" in there.                              11:18:13

6    BY MR. DANITZ:

7       Q    All right.  Is it appropriate to generalize

8    the results of a survey to the target population if

9    you do not know whether the respondents who complete

10   the survey are representative of that population?  11:18:24

11      A    Through the -- okay.  Could you actually

12   repeat the question, because I'm afraid I'm going to

13   answer a different question.

14      Q    Is it appropriate to generalize the results

15   of a survey --                                      11:18:40

16      A    Yeah.

17      Q    -- to the target population --

18      A    Right.

19      Q    -- if you do not know whether the respondents

20   who completed the survey are representative of the  11:18:46

21   target population?

22      A    I see.  That would be dangerous, okay?  I'm

23   not saying it was always inappropriate, but that

24   would be, let's say, risky.

25      Q    Given the onerous terms of this privacy      11:18:55

                                                         Page 98

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1   policy that everyone who took your survey had to

 2   agree to, isn't it possible that selection bias may

 3   have limited the reliability of your survey results?

 4         MR. WONG:  Objection; argumentative, assumes

 5   facts not in evidence.                            11:19:11

 6         THE WITNESS:  Again, as an academic, I have

 7   to leave open the possibility -- because you said

 8   this is possible, and I also have very strong reason

 9   to believe that it's very unlikely in this case.

10         MR. DANITZ:  All right.  Let's take a        11:19:29

11   ten-minute break.

12         THE WITNESS:  Okay.

13         THE VIDEOGRAPHER:  We're going off the

14   record.  The time is 11:19 a.m.

15         (Recess.)                                    11:20:38

16         THE VIDEOGRAPHER:  We're going on the record.

17   The time is 11:38 a.m.

18   BY MR. DANITZ:

19     Q   All right.  We're back on the record and, as

20   you know, you're still under oath.                 11:38:49

21     A   Yes.

22     Q   Let's go to Appendix E-1 of your report and

23   we'll go to page 4 of 7 of Appendix E-1.

24     A   I'm there.

25         MR. WONG:  Page what?  I'm sorry.            11:39:06
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1          MR. DANITZ:  4 of 7.

2      Q   So looking at S8 --

3      A   I'm with you.

4      Q   -- at the beginning of each of the surveys,

5  you included the filtering question that appears at    11:39:15

6  S8 to identify the population of Google

7  accountholders for the survey --

8      A   That's correct.

9      Q   -- is that correct?

10         And that's -- (as read):                        11:39:31

11         "In the past seven years, with which

12         of the following online services, if

13         any, have you had a personal

14         account, whether free or paid?

15         Select all that apply."                          11:39:39

16         Is that correct?

17     A   Correct.

18     Q   You then provided a list of nine online

19  platforms including Google?

20     A   Yes.                                             11:39:47

21     Q   And allow for multiple selections; is that

22  correct?

23     A   All correct.

24     Q   And the instructions say (as read):

25         "Terminate if respondent does not               11:39:52

                                                    Page 100

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1              select Google."
 2       A    Exactly.
 3       Q    And this is how you identified for Google
 4   accountholders?
 5       A    Absolutely.                              11:40:00
 6       Q    Did you verify that each individual
 7   respondent was a Google accountholder?
 8       A    Did I independently verify that?  No.  That
 9   comes with the -- with the quality control from
10   Prodege, from sample selection, the fact that the  11:40:21
11   person who answers the question is indeed the person
12   who's supposed to answer the question and so forth.
13   But an independent on my own outside of the survey
14   verification, no.
15       Q    So Prodege verified for you that they were,  11:40:33
16   in fact, Google accountholders?
17       A    Well, my point about Prodege is that -- we
18   talked earlier about this fingerprinting
19   technology -- that they have all kinds of technology
20   available to show -- to -- to demonstrate the        11:40:47
21   validity of the sample, okay?  And this is one of
22   them.
23          I do not know if they ask a separate
24   question.  I also, quite frankly, don't see why
25   lying on this question would be of value to any      11:40:59
```

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      response.

2         Q   Well, couldn't somebody have just clicked all

3      of them to make sure they got into the survey?  I

4      mean, they're making money, right?

5         A   It would be interesting to know how many      11:41:11

6      people did that, yes.

7         Q   And if the survey did not select Google

8      products, he or she simply could have taken the

9      survey over and try it again?

10        A   No, I don't think so, because they are        11:41:27

11     immediately terminated, and then the fingerprint

12     technology kicks in to make sure they don't reenter.

13        Q   Do you know that for sure?

14        A   I know that it's one of their quality control

15     elements, yes.  Technically how they do it, I don't   11:41:42

16     know.

17        Q   Did you know that those surveys are still

18     online and I was able to do that?

19        A   The surveys are still online?  Okay.

20        Q   Outside of the Prodege firewall.              11:41:53

21        A   Yeah.

22            MR. WONG:  Objection; assumes facts not in

23     evidence.

24            THE WITNESS:  Well, that could be, but the

25     survey is closed as far as our -- our purposes is     11:42:00

                                              Page 102

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    excerpt, right?

2        A    I do --

3        Q    Yes.

4        A    -- or I am.

5        Q    The first sentence identifies this as an          11:44:06

6    existing statement by Google; is that correct?

7        A    Yes.

8        Q    Could the survey results be influenced by

9    perceptions of Google that are independent of the

10   survey stimuli?                                             11:44:15

11       A    Let me think about your question.   Could the

12   answers be influenced by perceptions of Google that

13   are independent of these statements, right?   That's

14   your question?

15       Q    That's right.                                     11:44:30

16       A    So let's say an either positive or negative

17   halo effect that you have vis-à-vis Google, you like

18   them or don't like them, that sort of thing.   It's

19   very unlikely because in the subsequent questions,

20   we specifically say -- excuse me.   Here.   (As read):     11:44:48

21           "Please base your response on the

22           excerpt you reviewed."

23           So we specifically instruct the respondents

24   to respond in function of what was just disclosed.

25       Q    But by identifying Google as the author of        11:45:07

                                                    Page 105

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    the text, don't you invite the respondents to bring

2    their own perception of Google into the survey?

3         MR. WONG:  Objection; asked and answered.

4         THE WITNESS:  When you're referring to an

5    overall branding effect, positive or negative, from      11:45:19

6    Google, I cannot avoid it.  It's unavoidable unless

7    we're going to talk about some hypothetical, brand X

8    search provider.

9    BY MR. DANITZ:

10        Q   But you did not do that?                         11:45:33

11        A   No, no, no, no.  We -- the case is quite

12   clear that this is about Google and it's about

13   specific statements that Google either makes or does

14   not make.  So we are being very realistic here.

15        Q   Right.  But being realistic, respondents        11:45:47

16   would have been bringing their own feelings and

17   beliefs about Google in taking the survey.

18        MR. WONG:  Objection; vague.

19        THE WITNESS:  I can't -- in other words, I

20   have to agree with the premise because a brand is       11:46:01

21   being mentioned.

22        MR. DANITZ:  Right.

23        THE WITNESS:  Okay.  All right.  But

24   specifically what we're doing, we're creating a

25   disclosure here that is -- let me now call it           11:46:10

                                              Page 106

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1   plaintiff friendly based upon the nature of the

2   complaint, okay?  And so then -- and we're drawing

3   attention to them, and then we ask these questions.

4        If you wanted to know the perception of

5   Google without the excerpt, then you could have just    11:46:28

6   skipped that and just said generally you think

7   Google does this or that.  You could have done that,

8   okay?  But then that wouldn't answer the questions

9   because the question here is about the specific

10  complaint that we have.                                 11:46:43

11  BY MR. DANITZ:

12     Q   But it is the nature of brands and the halo

13  effect that people will bring their perceptions of a

14  brand when they read that -- the name of that brand

15  in a statement.                                         11:46:53

16     A   I cannot disagree with you that the overall

17  perceptions of brands play a role.  Let me end

18  there, okay?  But then we specifically say, based

19  upon what you just read, and that comes from the

20  complaint.  So we are being very deliberate here.      11:47:10

21        See, in the real world, we don't know if any

22  given respondent would ever read these statements,

23  but here we're -- basically forced exposure, and

24  then we're asking questions.  So that's very

25  different.                                              11:47:27

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    by differently, that's correct.

2        Q    In the real world, the Google accountholder

3    will see the entire "How Our Business Works" web

4    page, right?

5        A    Would see it?  Yes.                          11:49:39

6        Q    The text in the survey is an excerpt, as you

7    point out.  It's taken out of context, correct?

8            MR. WONG:  Objection.

9            THE WITNESS:  It's taken out of context, if

10   you wish, because the other information is not       11:49:57

11   given, okay?  But -- but the other information is

12   very defendant friendly.  For example, (as read):

13           "Advertising is what it makes

14           possible to offer our products to

15           everyone."                                   11:50:10

16           So then there's benefits to consumers --

17   BY MR. DANITZ:

18       Q    Right.

19       A    -- okay, but --

20       Q    But you didn't put that in there.           11:50:13

21       A    No, no. Precisely.

22           MR. WONG:  Can you let him finish his answer?

23           THE WITNESS:  Yeah, yeah.  That's precisely

24   the point about the excerpt.  The excerpt from

25   defendants' perspective is a negative; from          11:50:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    plaintiff's perspective is a positive.

2    BY MR. DANITZ:

3        Q   So it -- but it is taken out of context?

4        A   Well, it's an excerpt.

5        Q   Yeah.                                    11:50:31

6        A   An excerpt is not the entire thing.

7        Q   The text in the survey is not a screenshot

8    from Google's web page; is that correct?  In the

9    survey?

10       A   Correct.                                 11:50:42

11       Q   You've shown screenshots in other surveys,

12   have you?

13       A   Sure.

14       Q   But you chose not to do so here.

15       A   In fact, I think we did later in the survey   11:50:51

16   that we show a screenshot.

17       Q   But not of this excerpt?

18       A   Not of this, no, because it's just text.

19       Q   The quoted text is presented with doctored

20   text of yearly uniform size and devoid of any color   11:51:01

21   in the survey.

22           MR. WONG:  Objection.

23           THE WITNESS:  I'm sorry.  Uniform -- no

24   color, and what else did you say?  Uniform?

25   BY MR. DANITZ:                                   11:51:15

Page 111

1      A    What part of the Internet?  The "How Our

2    Business Works" part?

3      Q    That's right.

4      A    Well, it is different.

5      Q    That's right.  If in the wild they came        11:52:01

6    across this page, they may or may not dwell for

7    30 seconds on this page; is that correct?

8      A    Just like they may or may not dwell for

9    30 seconds on the entire disclosure, the entire one

10    meaning "How Our Business Works" one.              11:52:17

11      Q    In the real world, it's not realistic to

12    expect that a hundred percent of visitors would

13    scrutinize the 206 words in this disclosure for

14    30 seconds?

15      A    I agree with that, and that is actually        11:52:29

16    precisely why we ask people to read and read

17    carefully, and we prevent them from proceeding if

18    they read too quickly --

19      Q    Right.

20      A    -- because there's a timer.                  11:52:44

21      Q    For 30 seconds?

22      A    There's a timer -- yeah, okay.

23      Q    On the other hand, do you know how long it

24    takes an average reader to read 200 words?

25      A    Not really, but --                           11:52:53

                                                    Page 113

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1       Q    So you define those terms within than

2   excerpt.

3       A    Google defines those terms.

4       Q    It's Google's definition; you present it.

5       A    Absolutely.  It's not mine.                    11:56:20

6       Q    Are you aware of Google's definition of

7   personal information?

8       A    Well, it's -- I haven't memorized it, but it

9   is whatever it shows when you click on it.

10      Q    And if you clicked on "personal information"   11:56:29

11  in the business disclosure survey, would you get

12  that definition?

13      A    Yeah.

14      Q    Are you sure about that?

15      A    I think so, but -- I -- I think so.            11:56:50

16      Q    Actually, the -- if you want to go to E-1,

17  you'll see that the underlying categories of

18  information are defined but not the word "personal

19  information."

20      A    Okay.                                          11:57:05

21          MR. WONG:  Let's give him a moment to look

22  through.

23          THE WITNESS:  Yeah, E-1?  What am I supposed

24  to look at?

25  BY MR. DANITZ:                                          11:57:16

                                            Page 118

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q    The instructions about hovering or tapping

2  appear above the table on page 6 of 7 and do not

3  address anything in the actual excerpt itself.

4      A    Ah, I see what you mean, because you're

5  referring to the categories of information here,          11:57:32

6  right.  Okay.

7      Q    So there is no additional information

8  provided about what personal information means

9  here --

10     A    Okay.                                             11:57:40

11     Q    -- is that correct?

12     A    Okay.  I think you are right there.  Over the

13  break, I'm going to take another look at this.  I

14  may have a little memory problem here, but I

15  think -- I think we're okay.                             11:57:51

16     Q    There's no underlining in the excerpt.

17     A    That's fine.  So, therefore, it is however

18  the consumer wants to identify it --

19     Q    Right.

20     A    -- or define it.                                 11:58:00

21     Q    And that's just a subjective analysis of what

22  personal information means; is that correct?

23     A    Well, it's letting the consumer, the

24  respondent, interpret it however he or she wants.

25  Subjective is not necessarily bad.                       11:58:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q   So Google's definition includes data that can

2   be reasonably linked to information that personally

3   identifies you such as information Google associates

4   with a Google account, right?  That's what the

5   definition includes.                                    11:58:29

6      A   Yeah, okay.

7      Q   But you do not include that definition in

8   connection with this excerpt at all.

9      A   With that excerpt, that's correct.

10     Q   And even though you mention personal           11:58:36

11  information seven times, it's not defined.

12     A   It's not defined in the -- in the survey;

13  therefore, we allow the respondent to use whatever

14  they think personal information is.

15     Q   So you did not provide additional information   11:58:55

16  about what personal information means, even though

17  personal information is the entire point of this

18  litigation.

19         MR. WONG:  Objection.

20         THE WITNESS:  The entire point of the -- of   11:59:06

21  the -- sorry, I'm not a lawyer, but I think -- I

22  honestly think that the entire point here is that

23  you have these different categories of information.

24  That's why I'm digging into the different

25  categories, and we get different answers for         11:59:19

                                                Page 120

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1     different categories.

2     BY MR. DANITZ:

3        Q   So the disclosure about personal information

4     does not matter?

5        A   Does not matter, meaning?                    11:59:26

6        Q   Is that what you're saying?

7        A   No.  I mean --

8            MR. WONG:  Objection; misstates testimony.

9     BY MR. DANITZ:

10       Q   Isn't personal information the entire point   11:59:31

11    of this excerpt?

12       A   Oh, this excerpt.  Well, it is the opening

13    line, and why do we use it?  Because it's in the

14    complaint a lot --

15       Q   Right.                                        11:59:41

16       A   -- okay?  And then --

17       Q   But it appears seven --

18           MR. WONG:  Let him answer.  Brian, let him

19    answer.

20           THE WITNESS:  Okay.  So that's the opening    11:59:47

21    line, right?  And then we use the term "personal

22    information" in much more specific ways.  I can go

23    over them.

24    BY MR. DANITZ:

25       Q   Right.  It appears seven times in this one -- 11:59:56
```

Page 121

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1        A    That's fine.

 2        Q    -- excerpt, right?

 3        A    Yeah, that's fine.

 4        Q    But you don't define it, correct?

 5        A    Well, we certainly give a lot of examples.    12:00:03

 6        Q    You don't define it?

 7        A    No, I don't define it.  No, I want consumers

 8   to define it.

 9        Q    Oh, do you?  That was on purpose?

10        A    Well, the whole point --                       12:00:15

11        Q    You seemed surprised before that it wasn't

12   defined.

13             MR. WONG:  Let him --

14             MR. DANITZ:  We --

15             MR. WONG:  Let him answer the question or       12:00:21

16   I'll end this deposition.  You keep -- you cannot do

17   that.  You cannot cut him off.  You know this.

18   BY MR. DANITZ:

19        Q    Go ahead.

20             MR. WONG:  I'll call the judge.                 12:00:27

21             MR. DANITZ:  Yeah.

22             THE WITNESS:  I've forgotten what the

23   question on the table is.

24   BY MR. DANITZ:

25        Q    You seemed surprised before --                 12:00:31
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1          Excuse me?
 2          MR. WONG:  I'm saying you can ask the court
 3   reporter to read it again.  He's asking what
 4   question --
 5          THE WITNESS:  It's okay.                    12:00:36
 6   BY MR. DANITZ:
 7      Q   You seemed surprised before when it was not
 8   defined.
 9      A   No, I was not surprised.
10      Q   Oh, okay.  Did you test what would happen if  12:00:41
11   you provided survey takers with a definition of
12   personal information for this excerpt?
13      A   No.
14      Q   Is it possible survey takers would have
15   responded differently if they understood what the  12:00:56
16   term "personal information" meant?
17      A   Again, as an academic, I would have to say
18   possible, yes, but so unlikely.
19      Q   Is it possible that providing the definition
20   of personal information would have changed the      12:01:13
21   results?
22      A   Very unlikely.
23      Q   Is it possible?
24      A   Oh, possible.  As I said, I have to answer as
25   an academic.  Possible, yes.  Highly unlikely.      12:01:24
```

Page 123

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1          THE WITNESS:  Yeah.  I mean, as a very, very

 2     general question about information sharing, sure.

 3     Well, go ahead.  Yeah.

 4     BY MR. DANITZ:

 5         Q   So you agree with that?                  12:12:33

 6         A   In very, very general terms.

 7         Q   All right.  The first sentence is designed to

 8     lead to the conclusion that information is shared

 9     between advertisers and Google because they work

10     with each other; is that correct?                12:12:47

11          MR. WONG:  Same objection.

12          THE WITNESS:  I -- I don't see that.  I don't

13     see that follow at all until, of course, we get to

14     the specific sources of information, which the

15     question gets to.  All we're describing here is a  12:13:01

16     general pattern that you have an advertiser and then

17     you have a data provider, let's say, and one decides

18     whether it would be in his or her brand's best

19     interest to advertise using the other.  That's a

20     broadly -- broadly constructed view of "work with."  12:13:22

21     It's not an employer work -- employee relationship.

22     BY MR. DANITZ:

23         Q   So the advertisers don't really work with

24     Google in the traditional sense.

25         A   Not in an employer/employee relationship.   12:13:36
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q   Or in a partnership-type relationship, not

2   really?

3      A   No, right.  It's -- yeah.

4      Q   It's more impersonal than that?

5      A   I'm it more what?                          12:13:46

6      Q   It's more impersonal than that.

7      A   Most probably.

8      Q   It's automated, actually?

9      A   RTB, yes.

10     Q   And there's literally thousands of          12:13:51

11  participants.  So that's different than a coworker

12  situation?

13          MR. WONG:  Objection.

14          THE WITNESS:  It's many thousands, as you

15  say, as opposed to one-on-one, sure.               12:14:02

16  BY MR. DANITZ:

17     Q   Right.  So isn't the phrase "advertisers work

18  with Google" misleading?

19          MR. WONG:  Objection; asked and answered.

20          THE WITNESS:  I don't think so at all,      12:14:12

21  given -- given the reality of RTB.

22  BY MR. DANITZ:

23     Q   Well, Google is not a small workshop where

24  Google works with a few advertisers to display

25  ads --                                             12:14:25

                                          Page 136

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1       A    Well --

2            MR. WONG:  Objection.

3    BY MR. DANITZ:

4       Q    -- correct?

5       A    Yeah, I agree.                          12:14:29

6       Q    Do you understand -- you do understand how

7    Google works.  I know that.

8       A    I do.

9       Q    Did you read the expert report of Christo

10   Wilson, plaintiff's expert?                     12:14:37

11      A    Is he on my list?

12      Q    He was not on your list.

13      A    Okay.  Then I did not.  Thank you.

14      Q    Did you read the expert report of Zubair

15   Shaikh, another technological expert for plaintiffs?  12:14:51

16   He's also not on your list.

17      A    Thank you.  Then I did not.

18      Q    All right.  Let's look at the terms you ask

19   about in both business disclosures and privacy

20   disclosure surveys.  So we'll look at the terms.    12:15:01

21      A    Okay.

22      Q    All right.  So we're on F-1, page 14 of 15.

23      A    Yeah.

24      Q    All right.  Turning to the table at the

25   bottom of the page, in the left column, you set      12:15:18
```

Page 137

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1            And we know in the pretest that we have some
 2    people who are very Internet savvy and they know all
 3    these things.  And then we have other people who
 4    really don't know what a URL is, okay?  And in order
 5    to put everybody on equal footing, that's why we        12:18:48
 6    allow this opportunity.
 7            The pretest tells us that people are very
 8    clear on that, meaning if they felt they needed
 9    help, they could get it, and if they didn't need
10    help, they could ignore it.  Ignore the hovering        12:19:01
11    over.
12    BY MR. DANITZ:
13       Q   And the pretest, was that found out through a
14    back-and-forth interview situation?
15       A   Yes, because in the pretest, we not only         12:19:09
16    observe, but we also have a conversation about
17    clarity of questions and so forth.
18       Q   And you watched 12 of these pretests?
19       A   I believe I did 12 of them, yeah.
20       Q   And how many total were there?                   12:19:23
21       A   You know, I'd have to look that up.  I'm
22    sorry.  It's more than 12.
23       Q   Okay.  Does the survey require respondents to
24    spend at least a minimum amount of time reading each
25    of these categories that are set out in the table?     12:19:35
```

Page 141

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    A   We have the minimum time on the reading part.

2    We've already discussed that.

3    Q   Well, that was in the introduction, right --

4    A   I understand.  I understand.  On this one, I

5    don't think so, but, of course, we did check total        12:19:50

6    time to complete and make sure that it was sort of a

7    continuous number, that there weren't any gaps; that

8    people do it in 25 seconds, and then everybody else

9    takes more than two minutes, in which case we would

10   have thrown out those super fast ones.  But other         12:20:05

11   than that, no.

12   Q   Did you -- oh, so you threw out some of

13   the -- some of the responses?

14   A   We checked if we should throw out, but we

15   didn't.                                                    12:20:18

16   Q   Just thought I'd ask.

17   A   What's that?  Okay.

18   Q   Did you require respondents to spend at least

19   a minimal amount of time responding to all the

20   categories set out on the page?                           12:20:28

21   A   We expect respondents to spend a reasonable

22   amount of time for the entire survey.

23   Q   I'm not asking what you expected.  Did you

24   require them?

25   A   Oh, require them?  Well, I've already said            12:20:36

                                                     Page 142

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1 ████ ████████████████    ███████

█ ███████████████████████████████

█ ████████████████████████████████████

█ ████████

5        MR. WONG:  Again, objection; assumes a fact    12:24:14

6    not in evidence and incomplete hypothetical.

7        THE WITNESS:  Yeah.  Did I explain that?  No.

8    That's probably my answer, right?  I don't see how

9    that's relevant here.

10   BY MR. DANITZ:                                       12:24:24

11       Q    So you did not explain that (as read):

12            ██████████████████████████████

█    █████████████████████████████████

█    █████████████████████████████

█    ██████████████████████████████          ████████

█    ████████

17            You never explained that.

18       MR. WONG:  First of all, assumes facts not in

19   evidence.

20       MR. DANITZ:  That's also from the Google        12:24:41

21   document.

22       MR. WONG:  That's great.  Do you want to put

23   it in front of him and you can ask him about it?

24       THE WITNESS:  Yeah.  There's also a category

25   of browser cookies, right?                           12:24:50

                                                    Page 147

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL



1      A    That's correct.

2      Q    And you didn't inform the users about that?

3      A    Not beyond the other documents that I saw,

4    not -- not specifically, yeah.

10     A    As an academic --                           12:27:01

11          MR. WONG:  Sorry, again.  Objection; assumes

12    facts not in evidence.

13          THE WITNESS:  Again, as an academic, I have

14    to leave open all possibilities, but it is highly,

15    highly unlikely and especially since you made the    12:27:12

16    distinction between person and device.  Two

17    different answers.

18    BY MR. DANITZ:

                                                          12:27:44

                                              Page 150

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    that I did not reveal anything about the combination

 2    of information.  Digital surveillance, that's like a

 3    Chinese term.

 4    BY MR. DANITZ:

 5      Q   Okay.  You didn't -- you never asked about     12:29:01

 6    digital surveillance?

 7      A   No.

 8      Q   You never asked about expectations of

 9    privacy; is that correct?

10      A   That is true.  I only talk about specific      12:29:11

11    categories of information.

12      Q   All right.  Let's go to the URL of the

13    website.

14      A   Okay.

15      Q   So that's the next category down.  It's also   12:29:20

16    underlined --

17      A   Yeah.

18      Q   -- right?

19          And in the box, it says -- and also in the

20    survey at F-1 at page 14 of 15, in that -- in that    12:29:30

21    column, it states (as read):

22          "The URL of the website or name of

23          the app where the ad will be placed,

24          e.g., www.nba.com/lakers/schedule,"

25          right?                                         12:29:42
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1        A    Yeah, correct.

2        Q    And the definition for URL of the website is

3    the web address of the web page you would be

4    visiting, that's it?

5        A    Correct.                                    12:30:02

6        Q    Who selected nba.com web page as an example?

7        A    We wanted a very, very popular one.  I

8    remember talking with Cornerstone about them.  I

9    think they came up with NBA, and I said, "Fine."

10       Q    Is it possible survey takers would have      12:30:15

11   responded differently to your survey if the URL was

12   plannedparenthood.org/findanabortionprovider?

13           MR. WONG:  Objection; assumes facts not in

14   evidence.

15           THE WITNESS:  That could be possibly leading, 12:30:31

16   because that is a very -- that is not a general

17   purpose or highly popular site.  What we do here is

18   when we explain a concept, if we provide an example,

19   it has to be very, very general one.

20   BY MR. DANITZ:                                        12:30:50

21       Q    But people do go to that website, do they

22   not?

23           MR. WONG:  Objection --

24           THE WITNESS:  You could --

25           MR. WONG:  -- assumes facts not in evidence.  12:30:55
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1          THE WITNESS:  -- study the number who do.  I
 2    suppose that website exists.  I'm not aware of it
 3    but --
 4    BY MR. DANITZ:
 5        Q    It is a website.                       12:30:58
 6        A    -- I suppose it exists.
 7          But that -- that would not be a good example.
 8    If you give an example, you give something common,
 9    not something highly specialized.
10        Q    All right.  How about if the -- if the URL  12:31:11
11    provided in the example was mayoclinic.org/diseases-
12    conditions/pancreaticcancer?
13          MR. WONG:  Same objections.
14    BY MR. DANITZ:
15        Q    Could that have changed the results?     12:31:25
16        A    Same answer.  Okay.  It's more than could
17    that have changed the results?  You shouldn't do
18    that because you're now picking an example that is
19    not characteristic, that is not representative of a
20    much, much more general pattern of URLs.          12:31:39
21        Q    But --
22        A    You need to put -- you need to pick a very
23    general category.  Now, if you pick football instead
24    of basketball, that's fine, but make it very
25    general.                                          12:31:51
```

Page 154

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1       Q    But people use the Internet to search for

2    medical conditions.

3       A    I agree.

4       Q    And the URL -- an actual URL --

5       A    Yeah.                                          12:31:59

6       Q    -- shows up --

7       A    Yeah.

8       Q    -- in the URL?

9       A    Yeah.

10      Q    And people use the Internet to find an        12:32:03

11   abortion provider?

12      A    Perhaps, yeah.

13      Q    And people use the Internet for

14   pornography --

15      A    Perhaps, yes.                                  12:32:11

16      Q    -- right?

17           If you show them a URL related to

18   pornography --

19      A    Yeah.

20      Q    -- would that have changed the results?       12:32:18

21      A    You shouldn't do that.  So, in other words,

22   would that have changed the results?  I'm going to

23   give you my standard answer.  As an academic, I have

24   to leave open the possibility, but I should also

25   say, number one, that it's highly unlikely; and,      12:32:30

                                                    Page 155

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    number two, that it's bad practice to pick an

2    example that suggests a leading question, because

3    that's what you're doing now.

4         You're -- let me now call it unusual

5    examples.  They may be real examples, but they're        12:32:41

6    unusual.  That's -- that's, basically, a standard

7    example of a leading question.

8     Q   How about if the survey presented all those

9    examples?  Could that have changed the results of

10   your survey?                                             12:32:55

11    A   All those --

12        MR. WONG:  Same objections.

13        THE WITNESS:  -- examples.  Again, now you

14   are overloading the consumer.  You want to be

15   concise.  It's a very simple question.  The             12:33:02

16   consumer or the -- I'm sorry, the Google user who

17   says, oh, it's like NBA -- whatever it is, NBA

18   sport.  Fine.  So it could be anything.  It is a

19   URL.  You don't need to go any further.

20   BY MR. DANITZ:                                          12:33:22

21    Q   Okay.  So you didn't test for that, for those

22   other categories?

23    A   No.

24    Q   All right.  You did not explain that Google

25   RTB transmits so many URLs that hundreds of             12:33:27

                                                   Page 156

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    third-party companies are able to compile a detailed

2    history tracking your movements on the web?

3         MR. WONG:  Objection; assumes facts not in

4    evidence.

5         THE WITNESS:  Yeah.  I mean, that -- this is    12:33:40

6    very -- I mean, if there's evidence in support of

7    that, then I'm fine with that because a URL is a

8    URL.  But I have not studied the frequently of

9    use -- the frequency of use of URLs.

10   BY MR. DANITZ:                                        12:33:55

11      Q   But you did not explain that to the

12   recipients -- to the respondents?

13      A   No, I did not.

14      Q   All right.  If you did explain that to the

15   respondents, could that have changed the results?    12:34:01

16      A   Highly unlikely.  Same -- same answer, very

17   highly unlikely.

18      Q   You did not explain that these third-party

19   companies compiled detailed dossiers on individual

20   users, did you?                                       12:34:14

21         MR. WONG:  Objection; assumes facts not in

22   evidence?

23         THE WITNESS:  Same answer.  Same answer,

24   yeah.

25   BY MR. DANITZ:                                        12:34:22

                                            Page 157

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    provided.
 2       Q   All right.  The phrase "small pieces of text"
 3    does not convey that the cookie text is actually a
 4    unique identifier that exists solely to track a
 5    user's activities --                          12:39:55
 6       A   Well, I --
 7           MR. WONG:  Objection; assumes facts not in
 8    evidence.
 9    BY MR. DANITZ:
10       Q   -- is that true?                        12:40:02
11       A   If I go to cnn.com VI-A Google, okay, then a
12    cookie may be placed on my browser.  Yes, that
13    identifies not me but my machine with a visit to CNN
14    or a visit to Google, and then there can be cookie
15    matching, as you mentioned.  That I'm fully aware  12:40:19
16    of, yeah.
17       Q   All right.  But the definition does not
18    explain that the cookie is a unique identifier that
19    exists to track a user's activities on the web, does
20    it?                                            12:40:30
21           MR. WONG:  Objection; assumes facts not in
22    evidence --
23           THE WITNESS:  We use --
24           MR. WONG:  -- argumentative.
25           THE WITNESS:  We used the definition in  12:40:35
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    Google, okay, for obvious reasons.  You used the
 2    word "unique identifier," and then when I hear that,
 3    I have to say, well, unique identifier as in me as a
 4    person, or is it my machine?  Or is it people like
 5    me?  Or is it people with machines like mine?      12:40:54
 6    There's, at least in my mind, some ambiguity around
 7    the term "unique identifier."
 8    BY MR. DANITZ:
 9        Q    Right.  It's a complex technical area, right?
10        A    Yeah.                                       12:41:06
11        Q    But you don't explain that to the user.
12        A    No, I do not.
13        Q    The description of cookies focus on a website
14    you visit, right, and says the cookies help the
15    website remember information about your visit,       12:41:16
16    right?
17        A    (No audible response.)
18        Q    The survey --
19             THE REPORTER:  I didn't get an answer.
20             THE WITNESS:  I'm sorry.  Yes.  I know I     12:41:25
21    shouldn't nod.
22    BY MR. DANITZ:
23        Q    (As read):
24             "The surveys do not explain that
25             Google places unique identifiers           12:41:29
```

Page 163

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1          into the cookies they insert into
 2          each user's web browser and uses
 3          that identifier to mechanically and
 4          automatically track that user as he
 5          or she browses the web."                    12:41:40
 6          It doesn't say that, does it?
 7          MR. WONG:  Hold on.  Objections; assumes
 8     facts not in evidence.
 9          THE WITNESS:  What you just read, where did
10     that come from?                                  12:41:47
11     BY MR. DANITZ:
12       Q   It's a quote, but I actually don't have the
13     reference.
14       A   Okay.
15       Q   It might be from an academic article, I have  12:41:57
16     to say.
17       A   Okay.
18       Q   But either way, you don't -- the question is
19     whether or not you provide that information, whether
20     or not it's true.                                12:42:07
21       A   Okay.  No.
22       Q   Okay.  So you do not -- you do not state that
23     cookies set by Google contain a unique identifier,
24     correct?
25       A   Well, I've already said -- yeah, I've already  12:42:22
```

Page 164

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1      agreed to that.

 2         Q    Right.  And that the unique identifier allows

 3      advertisers to persistently identify you and your

 4      device.

 5         A    Same answers.                              12:42:35

 6              MR. WONG:  Same objection.

 7              THE WITNESS:  Sorry.

 8      BY MR. DANITZ:

 9         Q    Same answer being?

10         A    No.  In other words, I do not --           12:42:40

11         Q    Explain that.

12         A    -- provide that explanation.

13         Q    Right.  Okay.

14              The survey also did not explain that Google

15      offers RTB participants a cookie matching service;  12:42:50

16      is that correct?

17         A    I'm aware of, yes.  In other words --

18         Q    But the survey does not expect --

19              MR. WONG:  Let him finish.

20              MR. DANITZ:  Sorry.                         12:43:03

21              THE WITNESS:  So -- so my understanding is

22      that, along with my partial IP address, let's say,

23      there is a cookie, and then the site can say, oh, we

24      have a cookie on that -- we have a cookie on that

25      machine as well, something -- that's cookie matching  12:43:17
```

Page 165

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

 1    that I'm aware of.

 2    BY MR. DANITZ:

 3       Q   Right.  But your survey does not explain

 4    cookie matching; is that correct?

 5       A   Oh, I'm not sure if it ever comes up.  We      12:43:27

 6    explain --

 7       Q   This survey.  This survey.

 8       A   Yeah.  I don't think so, yeah.

 9       Q   And if you explain how cookies are used in

10    RTB as a unique identifier and with cookie matching   12:43:41

11    and added that as additional context, could that

12    have possibly changed the results?

13          MR. WONG:  Objection; assumes facts not in

14    evidence.

15          THE WITNESS:  Very unlikely.                    12:43:55

16    BY MR. DANITZ:

17       Q   All right.  I have -- this one's a very short

18    one.  So the last category that's underlined is the

19    content categories and subcategories in which Google

20    categorizes the website, e.g., weight loss.          12:44:07

21          Do you see that?

22       A   You say the one that's underlined?

23          MR. WONG:  It's underlined?  It's not

24    underlined.

25          THE WITNESS:  No, no, it's not underlined.      12:44:20

                                              Page 166

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    excerpt.

 2        A    Uh-huh.

 3        Q    The excerpt states in the first paragraph

 4    right at the top (as read):

 5            "We don't share information that          01:36:16

 6            personally identifies you."

 7            Do you see that?

 8        A    I do.  I do.  With advertisers.

 9        Q    With advertisers, (as read):

10            "...such as your name and email."          01:36:27

11            Do you see that?

12        A    Yes.

13        Q    Could these survey results be influenced by

14    perceptions -- sorry, that's the wrong question.

15    I'll take that back.                               01:36:39

16            So it asked that question.  So I'll start

17    that over again.  So the very first sentence of this

18    excerpt states (as read):

19            "We don't share information that

20            personally identifies you with             01:37:00

21            advertisers."

22            Is that correct?

23        A    Yes.

24        Q    Did the survey tell any of the survey takers

25    that the statement is a lie?                       01:37:08
```

Page 172

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1              MR. WONG:  Objection; argumentative.

2              THE WITNESS:  Well, obviously not, and I'm --

3     obviously, you feel that it is a lie and --

4     BY MR. DANITZ:

5         Q   I'm not giving you my feelings.  I'm just      01:37:18

6     asking you whether or not the survey said that.

7         A   Oh, no, no, but I'm -- okay.  I think we're

8     in agreement.  No, it does not say that.

9         Q   So the survey did not tell any of the survey

10    takers that the statement is a lie?                    01:37:30

11        A   Correct.

12             MR. WONG:  Same objections.

13             THE WITNESS:  Correct.

14    BY MR. DANITZ:

15        Q   Then they relied on the accuracy of the        01:37:35

16    statement in answering the survey questions; is that

17    correct?

18        A   Well, they rely on -- as we asked them to do,

19    on the information that was just disclosed.

20        Q   So that's a yes, right?                        01:37:46

21        A   They rely on the information.  They can

22    choose.  They can choose to disagree.

23        Q   Well, what basis do they have to disagree?

24        A   Well, if they have personal information about

25    Google or experience that suggests that this is a      01:38:01
```

Page 173

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    lie, then they can choose to ignore that statement.

2    I mean, that's why we ask Google users.

3       Q   Well, in your questions, you say in Q1 (as

4    read):

5          "Please base your response on the          01:38:15

6          excerpt you reviewed."

7       A   Right, right.

8       Q   And the excerpt they're reviewing says (as

9    read):

10          "We don't share information that          01:38:23

11          personally identifies you with

12          advertisers."

13       A   Right.

14       Q   So they're going to base their answer on

15    that.                                            01:38:29

16       A   Yeah, yeah.

17       Q   Okay.  They're also instructed to review this

18    excerpt carefully; is that correct?

19       A   Correct, yeah.

20       Q   And then they're told after (as read):     01:38:42

21          "You will be asked to answer a few

22          questions," right?

23       A   Yes.

24       Q   And then on the next page in Q1, again, it

25    says (as read):                                  01:38:55

                                              Page 174

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1        A   Well, again, these -- well, first of all,

 2     they both come from the privacy policy from Google.

 3     And we looked for statements in the privacy policy,

 4     which I understand is over 20 pages long, that are

 5     being used or emphasized in the complaint.          01:41:50

 6        Q   Who's "we"?

 7        A   Oh, Cornerstone and I.

 8        Q   Okay.  Did you try other excerpts before

 9     selecting these?

10        A   We did not.                                   01:42:05

11        Q   All right.  And you've already explained it

12     comes from the Google privacy policy.  So let's look

13     at the policy.

14            So we'll mark the next document as Exhibit 3.

15            MS. SWOPE:  I think this is 4.                01:42:25

16            MR. DANITZ:  Oh, as Exhibit 4.  This is, for

17     the record, Google's privacy policy that was

18     attached to the complaint as Exhibit 15, effective

19     date, December 19th, 2019.

20            (Exhibit 4 was marked for identification     01:42:45

21            and is attached hereto.)

22     BY MR. DANITZ:

23        Q   Do you recognize this document?

24        A   Yes, I do.

25        Q   Is this a document you were quoting from in   01:42:55
```

                                                      Page 178

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    the introduction to question 1?

 2        A    I'm sorry.  In my intro- -- yes, yeah.

 3        Q    The policy is 29 pages long, correct?

 4        A    I know, yeah.

 5        Q    Correct?                                    01:43:07

 6        A    Yes, yes.

 7        Q    The quoted text in the survey is presented

 8    differently than what a Google accountholder would

 9    actually see in the world.

10            MR. WONG:  Objection; vague.                 01:43:19

11            THE WITNESS:  Once again, it's an excerpt, so

12    it has to be different.

13    BY MR. DANITZ:

14        Q    Right.  In the real world, the Google

15    accountholder would see the 29-page privacy policy.  01:43:27

16        A    If they so choose, yes.

17        Q    The two paragraphs of text in the survey are

18    excerpts.

19        A    Correct.

20        Q    So they are taken out of context, correct?  01:43:37

21        A    They are, if you wish, taken out of context.

22    If you wish, yeah.  They are asked -- we're asking

23    people to focus something -- on something that is

24    relevant here and that allows people to focus in the

25    sense that we're not diverting their attention with   01:43:55
```

Page 179

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    a whole host of other comments.

2        Q    So paragraph 1 of the quoted text in the

3    survey appears in the second bullet at the bottom of

4    page 5, correct?

5        A    One second, please.                          01:44:12

6             Yes.

7        Q    Paragraph 2 of the quoted text appears at the

8    bottom of page 12 of 29, correct?

9        A    Did you say page 12?

10       Q    Yes.                                          01:44:33

11       A    Okay.  Let me make sure.  Yes, yes.

12       Q    The quoted text in paragraph 1 and

13   paragraph 2 appear seven pages apart in the privacy

14   policy; is that correct?

15       A    Yes.                                          01:44:52

16       Q    They're from different sections of the

17   privacy policy, correct?

18       A    Yes.

19            MR. WONG:  The document speaks for itself.

20   BY MR. DANITZ:                                         01:44:58

21       Q    They are taken out of context, correct?

22       A    Well, again, any time you take an excerpt,

23   you remove the totality -- if you want to call that

24   taking out of content, fine.  It's sort of implied

25   in the definition of what an excerpt is.              01:45:14

                                          Page 180

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1      Q    -- that these two paragraphs did not even

2    mention the idea of personal information, which is a

3    defined term in the policy?

4      A    Agreed.

5      Q    In paragraph 2, the survey links to the        01:51:16

6    definition of non-personally identifiable

7    information.

8           Do you see that?

9      A    I do.

10     Q    And that definition that is linked to is (as    01:51:25

11   read):

12          "This information" -- "this is

13          information" -- sorry.

14          (As read):

15          "This is information that is              01:51:35

16          recorded about users so that it no

17          longer reflects or references an

18          individually identifiable user."

19          Do you see that?

20     A    Yes.                                       01:51:45

21     Q    So you do define non-personally identifiable

22   information, right?

23     A    Yes.

24     Q    But you do not define personal information?

25     A    Well, because personal information is not    01:51:51
```

Page 186

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    listed there.
 2       Q   Okay.  All right.  If you would turn to
 3    page 15 of 29 -- oh, I think that's wrong.  Oh, that
 4    is correct.  I apologize.
 5          15 of 29, that's where the second excerpt        01:52:08
 6    comes from.
 7          Oh, it's not where the second excerpt comes
 8    from.
 9       A   I don't think so, no.
10       Q   Right.  This is another portion of the         01:52:31
11    privacy policy.
12       A   Yes, it is.
13       Q   And it's called "California Requirements,"
14    right?
15       A   Yes.                                            01:52:35
16       Q   The second paragraph states (as read):
17          "Google does not sell your personal
18           information.  We only share your
19           information as described in this
20           policy," right?                                 01:52:44
21       A   Uh-huh, yes.
22       Q   You do not include that in your privacy
23    disclosure survey, do you?
24       A   Not in the privacy disclosure.  We did use it
25    in the business disclosure.                            01:52:57
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1        Q   All right.  Now, if you look at the two

 2    paragraphs which come from completely different

 3    parts of the privacy policy, they create a contrast

 4    between two kinds of information.  Paragraph 1,

 5    taken from page 5 of the privacy policy, introduces      01:53:16

 6    the concept of (as read):

 7            "Information that personally

 8            identifies you as information akin

 9            to your name or email."

10            And that states "Google does not share that      01:53:28

11    kind of information."

12        A   Agreed.

13        Q   In paragraph 2, taken from page 12 of the

14    privacy policy, introduces the concept of

15    non-personally identifiable information, which          01:53:41

16    includes "information from your browser," and

17    technologies like "cookies"; is that correct?

18        A   Correct.

19        Q   So on the one hand, you have a category

20    consisting of names and emails that are not shared,     01:53:56

21    and the other you have a category consisting of

22    technical information related to browsers that is

23    shared?

24        A   Yes.

25        Q   Okay.  Browser and device information are       01:54:10
```

                                                Page 188

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    personal information, but the context within the

2    paragraph indicates strongly to the reader that it

3    is not.

4          Do you agree with that?

5          MR. WONG:  Objection; the document speaks for    01:54:24

6    itself.

7    BY MR. DANITZ:

8      Q   I can repeat the question for you.

9      A   I -- I think I'm fine.  The first part of

10   paragraph 2, which is what we're talking about here,    01:54:34

11   is about, for example, the trends.  You see the word

12   "trends" there.  In other words, sort of -- we call

13   it sort of generalizable information.

14         The second part is about the specific

15   partners, and that is -- now that talks about    01:54:53

16   cookies, et cetera.  That is more individualized, if

17   you wish, than the first part.

18     Q   Right.  Well, either way, the paragraph says

19   that we may share non-personally identifiable

20   information, and it includes cookies or similar    01:55:15

21   technologies.

22     A   Agreed.

23     Q   So that's in contrast to the first paragraph,

24   which is information that is not shared, which is --

25   are things like names and email addresses.    01:55:28

                                           Page 189

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1          MR. WONG:  Objection; the document speaks for

2     itself.

3          THE WITNESS:  That's a fair comparison, yeah.

4     BY MR. DANITZ:

5      Q   Okay.  Well, based on the limited information    01:55:36

6     provided, right, and this contrast in these two

7     excerpts between things that are not shared, like

8     names and emails, versus things that are shared,

9     like cookies and similar technologies, right, when

10    you provide these technical categories for the user    01:56:00

11    to -- to decide whether or not these would be

12    shared, they, obviously, fall under paragraph 2, not

13    paragraph 1; wouldn't you agree?

14          MR. WONG:  Objection; calls for speculation.

15          THE WITNESS:  No.  Look at the subsequent    01:56:20

16    questions.  Your home address is -- is an element

17    there.  Your social security number is an element.

18    BY MR. DANITZ:

19     Q   Right.  Those are decoys, correct?

20     A   But the respondent doesn't know that.    01:56:33

21     Q   Right.  So the underlying defined terms in

22    your categories --

23     A   Yeah.

24     Q   -- include cookies, do they not?

25     A   Yes.    01:56:48

                                                    Page 190

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    Q    All right.  We already discussed these other

2   categories but -- and we discussed how these

3   categories do not include a fair amount of context

4   in the definitions but that those definitions were

5   supplied by Google, correct?                          01:59:49

6    A    I believe that's correct.

7    Q    Okay.  All right.  So both surveys provide

8   identical lists, right, of technical terms; is that

9   correct?

10    A    Yes.                                            02:00:38

11    Q    And they provide a short description of the

12   technical term, right?

13    A    As -- as needed, yeah.  We're not explaining

14   social security number.

15    Q    Right, but those short descriptions do not    02:00:46

16   give the survey takers any context for understanding

17   how advertisers actually use those data and how that

18   data could potentially harm them, does it?

19        MR. WONG:  Objection; the document speaks for

20   itself.                                               02:01:04

21        THE WITNESS:  We -- that -- that is accurate.

22   That is accurate.  We also don't say, for that

23   matter, how it could help them.  You say "harm."  I

24   say "help."

25   BY MR. DANITZ:                                        02:01:17

                                                   Page 194

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q   Right.

2      A   They're both.

3      Q   The presentation of those technical terms do

4    not include the larger context?

5      A   If you wish.                                    02:01:25

6      Q   And you do not explain that Google transmits

7    over 200 categories of information in RTB bid

8    requests?

9      A   I --

10         MR. WONG:  Objection; assumes facts not in      02:01:37

11    evidence.

12         THE WITNESS:  Yeah, I have not seen that

13    number, so I don't know how to answer this.  I have

14    not seen the number 200.

15    BY MR. DANITZ:                                       02:01:45

16      Q   Either way, you don't explain that.  You

17    don't include that information.

18      A   That's correct.

19      Q   And you don't include information that Google

20    transmits 60 categories of information in RTB bid     02:01:53

21    requests.

22      A   That's correct.

23      Q   The surveys did not explain to survey takers

24    that many of the categories of information that are

25    at issue in the complaint -- IP address,              02:02:09

                                            Page 195

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    information.

 2          MR. WONG:  Objection.

 3          THE WITNESS:  Agreed.

 4    BY MR. DANITZ:

 5       Q   And the surveys do not explain to the      02:03:18

 6    respondents that these categories are sent out to

 7    hundreds of ad tech companies for every auction.

 8          MR. WONG:  Objection; states facts not in

 9    evidence.

10          THE WITNESS:  I -- the ad tech companies, are  02:03:32

11    those -- are those authorized users?

12    BY MR. DANITZ:

13       Q   Yes.  Demand-side platforms, for example.

14       A   Okay.  Yes.

15       Q   But it doesn't explain that to the survey   02:03:43

16    takers.

17       A   No.  And I also do not know that it's

18    hundreds or dozens.  I do not know that.

19       Q   The survey also does not explain to the

20    survey takers that the ad tech companies like      02:03:55

21    demand-side platforms, in turn, forward these

22    categories to hundreds of other entities, does it?

23          MR. WONG:  Same objection.

24          THE WITNESS:  We -- we do not get into that,

25    correct.                                           02:04:10
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    BY MR. DANITZ:

2        Q    The survey does not explain that these user

3    profiles -- oh, sorry.  I skipped one.

4            The surveys do not explain that these

5    companies collect this data and create consumer        02:04:25

6    profiles?

7        A    We do not explain that, that's correct.  And

8    I presume that you really meant some companies, not

9    necessarily all of them.

10       Q    Okay.  Participants in the Google RTB          02:04:41

11   auction?

12       A    Some participants, yeah.

13       Q    The survey does not explain that these user

14   profiles include details regarding the user's

15   movements, interests, habits, medical conditions and   02:04:54

16   political interests as well as sexuality.

17           MR. WONG:  Same objections.

18           THE WITNESS:  Did you say that they contain

19   or they may contain?

20           MR. DANITZ:  Include details.                   02:05:10

21           THE WITNESS:  They may include details.  That

22   I'll agree with.  I can't say that they all do.

23   BY MR. DANITZ:

24       Q    Right, but that's not explained in this

25   survey.                                                 02:05:17

                                                 Page 198

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1      A    That's right.  I'm just trying to be accurate

 2    about what your question is.

 3      Q    The surveys do not explain that the aggregate

 4    information sent out in a single bid request can be

 5    used to identify individual households and devices.    02:05:29

 6          MR. WONG:  Same objections.

 7          THE WITNESS:  Well, that's not easy to do,

 8    but maybe it can be technologically.  No, we don't

 9    explain that.

10    BY MR. DANITZ:                                         02:05:43

11      Q    Okay.  And the survey does not explain that

12    personal information is defined as information that

13    can be reasonably linked to a household or a device.

14          MR. WONG:  Same objections.

15          THE WITNESS:  Same answer.  No, we do not       02:05:56

16    explain that at this point.

17    BY MR. DANITZ:

18      Q    All right.  Let's go to Appendix F-2 at 15 of

19    20.

20      A    Okay.                                           02:06:12

21      Q    This is the pop-up questionnaire, right?

22      A    Yeah, correct.

23      Q    So the introduction says (as read):

24          "In this section, we will ask you

25          about your experience visiting               02:06:36
```

                                                    Page 199

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    not a hundred percent sure.

2       Q   Okay.  Were the images presented in the order

3    shown on page 20 of your report from top to bottom?

4       A   I believe so.  Again, not a hundred percent

5    sure.  It could have been randomized.  If it were          02:13:55

6    randomized, we'd probably identify that in the

7    report.

8       Q   No, it doesn't say it was randomized.

9       A   Okay.  Then it was not randomized, yeah.

10      Q   Did the survey program require the survey          02:14:08

11   taker to spend any specific amount of time on each

12   image?

13      A   I don't recall that we had timers set on that

14   one.

15      Q   So no?                                            02:14:21

16      A   Yeah, to the best of my recollection.

17      Q   Should we look at the instructions?  Because

18   it's not in the instructions.

19      A   Then I'm -- I'm with you, yeah.

20      Q   So there was no time limit or minimum time to    02:14:31

21   spend on each image?

22      A   It appears to be the case, yes.

23      Q   So a person could just click, click, click,

24   click and move on?

25      A   In theory, yes.  They hope they don't do that    02:14:41

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    too often, because then they might at the end do the
 2    survey so quickly that they become an outlier and we
 3    start to question their validity.
 4       Q   Well, these are professional survey takers?
 5           MR. WONG:  Objection.                        02:14:58
 6           THE WITNESS:  That's a big word.
 7           MR. WONG:  Mischaracterization.
 8           THE WITNESS:  They're volunteer survey
 9    takers.  They're not professional.
10    BY MR. DANITZ:                                       02:15:05
11       Q   But they've signed up with Prodege?
12       A   Yeah.
13       Q   And they get paid?
14       A   They're volunteers, yeah.
15       Q   All right.  Do the sur- -- did Prodege      02:15:16
16    provide you with any data showing how long a survey
17    taker dwells on each of these images?
18       A   We have access to that data.  I have not
19    scrutinized it, but that data, I believe exists.
20       Q   And that would have been produced to counsel;  02:15:35
21    is that correct?
22           MR. WONG:  To my understanding, yes, we
23    produced all data that we have.
24    BY MR. DANITZ:
25       Q   All right.  So turning back to page 20 of   02:15:50
```

Page 208

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1    cookies on a device as opposed to the sharing and

 2    selling of cookies to third parties?

 3           MR. WONG:  Objection.

 4           THE WITNESS:  You can't share it if you

 5    didn't store it.                              02:16:58

 6    BY MR. DANITZ:

 7      Q   Right.  But just the fact that you stored it

 8    doesn't mean you shared it?

 9      A   That is correct.  And, remember, this is not

10    about Google now.  This about a third-party website.  02:17:04

11      Q   Understood.

12      A   Yeah.

13      Q   But the issue of storing cookies in and of

14    itself is not at issue in this case?

15           MR. WONG:  Asked and answered.            02:17:15

16           THE WITNESS:  Yeah.  I don't totally agree

17    with you because, if you don't store it, you can't

18    share it.  Now, this is with respect to -- this is a

19    whole section, not about Google but about these

20    other websites.                              02:17:27

21           MR. DANITZ:  Okay.

22           THE WITNESS:  And so we're just asking about

23    whether or not they store cookies.

24    BY MR. DANITZ:

25      Q   So this is about storing cookies, not sharing  02:17:32
```

Page 210

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    or selling cookies, correct?

2        A    In this case for the other websites, that's

3    correct, at least not -- at least for this

4    particular example, which is the NBA example.

5        Q    And then it says (as read):                02:17:41

6            "Enhancing site navigation," right?

7            Enhancing site navigation is not an issue in

8    this case?

9        A    The print is so small, but does it say

10   inciting --                                         02:17:55

11       Q    It says (as read):

12           "...storing of cookies on your

13           device to enhance site navigation."

14       A    I'm going to have to take a look at the other

15   page because I -- I just can't read it.  Sorry.     02:18:08

16       Q    All right.  So we will go to E-2 --

17       A    Yeah, page -- here we are.  Yeah, this I can

18   read a lot better.

19       Q    Right.  Let's work off of that page.

20       A    Yeah.                                       02:18:21

21           MR. DANITZ:  For the record, we're on

22   Appendix E-2 at page 8 of 10.

23           THE WITNESS:  Yeah.  And now I agree with

24   you.

25   BY MR. DANITZ:                                       02:18:28

Page 211

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1      Q   All right.  So, it says (as read):

 2          "You agree to the storing of cookies

 3          on your device to enhance site

 4          navigation"?

 5      A   Yeah.                                   02:18:36

 6      Q   Is enhancing site navigation at issue in this

 7   case?

 8      A   Well, again, not in the context of Google

 9   sharing, but this is not about Google sharing, this

10   particular survey.  This is about pop-ups from         02:18:47

11   websites --

12      Q   Okay.

13      A   -- so different objective.

14      Q   And then it also says (as read):

15          "...analyze site usage."                02:18:55

16      A   Same answer.

17      Q   Not an issue in this case -- not an issue in

18   this case because it's about Google; but, generally,

19   pop-ups mention it?

20      A   Yeah.                                   02:19:07

21      Q   Okay.  A website's own marketing efforts is

22   also not at issue in this case, correct?

23          MR. WONG:  Objection.

24          THE WITNESS:  Well, in as far as we're

25   talking about the use of that information for          02:19:16
```

                                                   Page 212

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    more.

2        Q    Thank you.  Image 2, let's go to image 2.

3    I'll try to be quicker.  (As read):

4            "We have updated our privacy policy

5            and cookie policy with a button that          02:24:55

6            says 'I understand,'" right?

7        A    Yes.

8        Q    The representation that an unidentified

9    website has updated its privacy policy is not at

10   issue in this case?                                  02:25:08

11       A    Understood.

12       Q    You agree?

13       A    Yeah, I do.  Understood.

14       Q    The representation that an unidentified

15   website has updated its cookie policy is not at      02:25:19

16   issue in this case.

17       A    Understood.

18       Q    The image says nothing about Google.

19       A    Correct.

20       Q    The image says nothing about Google          02:25:25

21   transmitting personal information to hundreds of

22   third parties.

23       A    Understood.

24       Q    Are you offering an opinion about what it

25   would mean if a reasonable user clicked on the words  02:25:35

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1        A   I see that.

2        Q   Okay.  So, first, the website's own

3    collection of data is not at issue in this case,

4    correct?

5        A   Not that I -- not that I know of, let's say.   02:26:41

6        Q   A website personalizing weather reports is

7    not at issue in this case?

8        A   Correct.

9        Q   The image says nothing about Google, correct?

10       A   That's correct.                              02:26:53

11       Q   All right.  And it says nothing about Google

12   transmitting personal information to hundreds of

13   third parties, correct?

14           MR. WONG:  Objection.

15           THE WITNESS:  Correct.                        02:27:03

16   BY MR. DANITZ:

17       Q   Are you offering an opinion on what it would

18   mean if a user clicked on the words "review privacy

19   in advertising settings"?

20       A   What it would mean to that user?  No.         02:27:13

21       Q   Are you offering an opinion on what it would

22   mean if a user failed to click on the words "review

23   privacy in advertising settings"?

24       A   Same answer.

25       Q   Are you offering an opinion on what it would   02:27:22
```

Page 221

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1       A    Okay.  We have picked the categories, again,

 2    based on the complaint, okay?  We're doing the best

 3    we can to try to represent what it is that plaintiff

 4    is really challenging, okay?  So we're doing that.

 5           We're allowing different categories.  Why?      03:19:00

 6    Because we expect that privacy attitudes may differ

 7    across these categories, and it's exactly what we

 8    find, okay?

 9           So all of these are actions that we took

10    because we're in this particular case.                03:19:14

11       Q    Right.

12       A    If this had been a general survey of Google,

13    I might have done something different, but because

14    of the needs of this particular court case, it was

15    important.                                             03:19:25

16       Q    All your conclusions are based on Likert

17    scales in which only a minority of respondents

18    indicated that data sharing was very likely despite

19    just being told that the data sharing was happening,

20    correct?                                               03:19:38

21       A    I --

22           MR. WONG:  Objection.

23           THE WITNESS:  I'm a little bit careful here.

24           You're now focusing on the very likely,

25    right, which is, obviously, less than the top two      03:19:47
```

Page 252

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    categories.  We could look up exactly what -- what

2    the numbers are, but this isn't -- aren't there some

3    that are like 20 or 16 percent or -- oh, here it is.

4    Here it is.  Yeah, they are smaller.  Well, wait a

5    minute.  Give me one second, please.                03:20:06

6         Yeah, it depends on the variable, which is an

7    interesting finding in and of itself.  So, for

8    example, it very likely could be as little -- I'm

9    now looking at the business disclosures.  It could

10   be as little as 22 percent, but it could be as high   03:20:20

11   as 45 percent, which precisely illustrates the point

12   that when you talk about sharing information, you

13   need to be specific about what kind of information,

14   okay?  That's the heterogeneity.

15        And so -- so then what we did, which is         03:20:37

16   standard in marketing research, is we combined the

17   top two, and then in all but one case, we get a

18   majority.

19   BY MR. DANITZ:

20      Q   Right.  Professor, do you consider consumer   03:20:47

21   expectations to be synonymous with perceived

22   likelihood?

23        MR. WONG:  Objection; vague.

24        THE WITNESS:  Perceived likelihood of what?

25   BY MR. DANITZ:                                       03:21:06

                                              Page 253

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1              "Survey research practitioners have

2              long commented that respondents vary

3              in their usage of the scale...in

4              addition, it has been observed that

5              there are large cultural and cross          03:26:53

6              country differences in scale usage.

7              These different usage patterns,

8              which we term in bold scale usage

9              heterogeneity, impart biases to many

10             of the standard analyses conducted          03:27:11

11             with ratings data" --

12             Are you familiar with that thought?

13       A    Yes.

14       Q    That is, are you familiar with the term

15     "scale usage heterogeneity"?                        03:27:22

16       A    Sure.

17       Q    Okay.

18       A    Sure.

19       Q    You have not adjusted your analyses for scale

20     usage heterogeneity, have you?                      03:27:30

21       A    Well, no, because this is not a trans- --

22     cross-national study.  See what he's referring to --

23     as an example -- I've actually done this myself

24     once -- if you ask people about expectations -- you

25     ask Germans and you ask French, you get different   03:27:47

Page 259

1    scales.  One is sort of systematically a bit more

2    positive than the other.  You need to adjust for

3    that, which is fairly easy to do.

4         Here we have a population of American Google

5    users.  There is absolutely no a priori reason to          03:28:04

6    believe that those from California will have

7    different scale heterogeneity than those from Idaho,

8    okay?  So that is -- so, yes, I am familiar with the

9    concept.  In some cases, yes, you may want to adjust

10   for it.  It's not that hard to do, but I did not do        03:28:20

11   it for the reasons I've just explained.

12       Q   All right.  So you did not conduct a Bayesian

13   hierarchical approach to account for scale usage

14   heterogeneity?

15       A   That is correct.                                   03:28:33

16       Q   All right.

17       A   I noticed when you asked me a question

18   earlier about probability, that the first thing that

19   I said was depends if you're a Bayesian or a

20   frequentist, and that is, in some cases, almost a          03:28:45

21   religious difference, almost.

22       Q   If 300 respondents who understand

23   probabilities all think that they were -- that there

24   is exactly 75 percent chance that their IP address

25   is shared, the scale usage heterogeneity phenomenon        03:29:02

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1           So, no, I'm not familiar with that paper.

2     I'm happy to scrutinize it.  I agree with the

3     premise that there is some heterogeneity there.

4     I've already addressed that.  That is an inherent

5     part of survey research, which, once again, why we     03:31:46

6     use Likert scales.

7           Q    So how do you pronounce Weijters?

8           A    "Waiters," W-e --

9           Q    "Waiters."

10          A    W-e-i-j-t-e-r-s, right?                       03:31:56

11          Q    Yes.

12          A    Weijters.

13          Q    Weijters and colleagues analyze "net

14    acquiescence response style," which is essentially a

15    tendency to agree, right?                                03:32:10

16          A    I am aware with acquiescence bias, yes.

17          Q    They show that the tendency to agree

18    increases when all options are fully labeled as in

19    your survey.  Since you find that many subjects

20    agree with your questions about sharing, you agree       03:32:24

21    that this may at least be in part driven by your

22    choice to label all your options, correct?

23          MR. WONG:  Objection.

24          THE WITNESS:  And by labeling, do you mean,

25    for example, identifying the information category,       03:32:37

                                                   Page 263

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q   It's a tendency to use endpoints of the

2   scale.

3      A   I'm not -- I'm not surprised at that.  That's

4   a good thing it seems to me.

5      Q   Due to the increased salience and          03:33:47

6   attractiveness to the intermediate --

7      A   Yeah.

8      Q   -- options?

9      A   Yeah, I personally think that's a good thing

10  because it avoids that you say yes, I'm sure, or    03:33:56

11  yes, I'm -- or no, I'm sure in the other direction.

12  It allows you to express your degree of belief.  So

13  I'm sorry, but I don't see that as a disadvantage.

14     Q   Are you familiar with Marketing Scales

15  Handbook?                                           03:34:17

16     A   Probably.  It's been a while.

17     Q   It's by Bruner, Hensel and James?

18     A   Hensel and James?

19     Q   Bruner, Hensel and James.

20     A   Yeah.                                        03:34:27

21     Q   Apparently, it's a standard reference.

22     A   Yeah, okay.  Some familiarity but not recent.

23     Q   Okay.  All right.  So you didn't -- you did

24  not consult the Marketing Scales Handbook in

25  designing the scale?                                03:34:38

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      A    No, because we're doing very, very standard

2    things, a very standard Likert -- Likert scale --

3    excuse me -- that -- I don't want to say everybody

4    uses, but there's a lot of acceptance in that, not

5    only in academic literature but also in court cases,    03:34:54

6    et cetera.  So why -- you know, why deviate from

7    a -- from an established norm?

8      Q    Did you know that Weijters and colleagues

9    analyzed 603 scales in the Marketing Scales

10   Handbook, and they find that only less than          03:35:12

11   5 percent of them label all points?

12     A    Okay.

13     Q    Do you agree that you used a very nonstandard

14   design?

15     A    No.                                            03:35:23

16         MR. WONG:  Asked and answered.

17         THE WITNESS:  No, I don't agree with that.

18   It all depends on the context of the survey.  There

19   are other surveys that I have done or could have

20   done that I would use the different scale for.  But    03:35:32

21   in this one, I'm very comfortable -- and I've

22   already explained why.

23         I do agree that if it's 75 percent in

24   somebody's mind, some people will say that's very

25   likely.  Others will say that is somewhat likely.  I    03:35:44

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1        A   I think that is it with respect to at

 2    least -- at least at a high level.  There is an A

 3    and a B, yes.

 4        Q   Okay.  And you have -- that summarizes all of

 5    your opinions about Neil Richards' report, correct?    03:44:12

 6        A   Yes.

 7        Q   You do not challenge Professor Richards'

 8    qualifications as an expert in the field of

 9    information privacy?

10        A   No, I do not.  I mean, he's a lawyer and his    03:44:21

11    focus is on that field.  So that's -- that's totally

12    fine.

13        Q   You do not challenge Professor Richards'

14    qualifications as a trained legal historian in the

15    field of privacy?                                       03:44:34

16        A   Probably not.  Legal historian, I'm not sure

17    exactly what that means, but he certainly works in

18    the domain of privacy, and he's legally trained.  So

19    yes.

20        Q   You don't challenge his qualifications?          03:44:48

21        A   No, no, I don't.  I don't.

22        Q   Okay.  At page 35, you write (as read):

23            "Professor Richards has not done any

24            empirical analysis of the

25            expectations of members of the                   03:45:08
```

Page 274

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1    expect from an analysis such as his.

2       Q   Is it your opinion that using a historical

3    methodology doesn't use extrinsic evidence?

4       A   It does use --

5           MR. WONG:  Objection --                          03:48:33

6           THE WITNESS:  It does use --

7           MR. WONG:  -- vague.

8           THE WITNESS:  I'm sorry.

9           MR. WONG:  Go ahead.

10          THE WITNESS:  It would be -- I mean, again,     03:48:40

11   it depends -- all depends on how it's being done,

12   but -- all right.  So here's a historical study of

13   people's consumption behavior and suddenly the

14   pandemic hits.  The pandemic is extrinsic, right?

15   Did it change people's consumption behavior?         03:48:55

16   Possibly.  You would take that in consideration.

17   That would be extrinsic, yes.

18   BY MR. DANITZ:

19      Q   Isn't this historical method a form of

20   empirical evidence?                                  03:49:11

21      A   It all depends on how it's being done.  I'm

22   really -- I'm totally fine with historical methods.

23   As I said, I use them myself all the time.  And in

24   social science, it's a perfectly accepted method,

25   but you need to look at the quality of execution.    03:49:27
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1   That's -- well, I'm repeating myself, but that's my

 2   issue with Professor Richards' execution.

 3       Q   Do you think a person with extensive

 4   expertise in an area of study can serve as an

 5   expert?                                        03:49:40

 6           MR. WONG:  Objection; vague.  Also, calls for

 7   a legal conclusion.

 8           THE WITNESS:  A person with extensive

 9   expertise in a certain area, yes.

10   BY MR. DANITZ:                                 03:49:55

11       Q   Do you think a person who has extensive

12   expertise in an area of study can review case

13   documents to reach an expert opinion about those

14   documents?

15           MR. WONG:  Same objection; vague.       03:50:04

16           THE WITNESS:  That would be -- that would be

17   the same answer, yes.  The way you framed the

18   question, the answer is yes.

19   BY MR. DANITZ:

20       Q   On page 21, paragraph -- paragraph 9, page  03:50:22

21   21, paragraph 9.  Is it a typo?  That's wrong.

22           MR. WONG:  Page 4?  No.

23           MR. DANITZ:  I think it's page 35.

24           MR. WONG:  Oh.

25           THE WITNESS:  We're going back to 35?      03:50:46
```

Page 279

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    comes from personal experience.

2            Now, my personal experience, by definition,

3    varies from yours and other people's, so I expect

4    this heterogeneity a priori.

5        Q   So it could have been Google that served you      03:53:22

6    the ad, right?

7        A   Oh, it could have been, but the point is

8    somebody had to tell somebody in the area in the

9    business of toasters that I was interested.

10       Q   Right.  They didn't have to share all those       03:53:34

11   fields of information about you.

12       A   Just one.

13       Q   And that is not -- that is not obvious on the

14   face of the toaster ad.

15       A   No.                                                03:53:47

16           MR. WONG:  Objection.

17           THE WITNESS:  All I'm demonstrating here is

18   that there are -- and my report, of course, does

19   this in more detail, that there are these different

20   sources of information about Google sharing and that  03:53:58

21   they can vary or they vary from person to person.

22   I'm just giving you a simple example of that.

23   There's many, many other examples.

24   BY MR. DANITZ:

25       Q   Did you ask survey takers whether they had        03:54:07

                                                   Page 282

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    learned about Google RTB from any source?

2        A    RTB is not a formal part of the survey, as

3    you know.   It's about sharing data.   I never say my

4    survey, that it's analyzed by humans or analyzed by

5    machines.                                          03:54:27

6        Q    Did you ask survey takers whether they ever

7    heard of Google RTB?

8        A    Same answer -- well, no.

9        Q    Did any of your surveys even mention the word

10   "Google RTB"?                                      03:54:36

11       A    Not that I recall.

12       Q    Did your survey respondents review the

13   complete privacy policy of any website?

14       A    Did my survey respondents --

15       Q    Review the complete privacy policy of any    03:54:52

16   website?

17       A    Only -- yeah, only the ones --

18            MR. WONG:   Objection.   What surveys are we

19   talking about?   Sorry.

20            THE WITNESS:   Well --                    03:55:00

21            MR. DANITZ:   The survey respondents from the

22   first surveys.

23            MR. WONG:   Which survey are we talking about?

24            MR. DANITZ:   Kyle.

25       Q    Do you understand my question?            03:55:10

                                                     Page 283

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    BY MR. DANITZ:

2        Q    Paragraph 81 on page 48, you continue (as

3    read):

4            "Moreover, as my privacy disclosure

5            survey results demonstrate, a large            03:59:26

6            share of Google accountholders has

7            accepted (actively or as a result of

8            continuing to navigate the site) the

9            cookie policies and privacy terms

10           and conditions of publisher                    03:59:39

11           websites," right?

12       A    Agreed.

13       Q    But your privacy disclosure survey did not

14   mention Google RTB at all, correct?

15       A    That is also correct.                         03:59:51

16       Q    And none of your surveys did?

17       A    Correct.

18       Q    Your privacy disclosure survey did not show

19   survey participants publisher web- -- publisher

20   websites that -- sorry, I'll rephrase.                 04:00:10

21           Your privacy disclosure survey did not show

22   survey participants publisher websites that

23   supposedly disclose Google RTB?

24       A    That supposedly disclose Google RTB, I agree.

25       Q    Your privacy disclosure survey did not even   04:00:37

                                                Page 287

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q   You could have asked them in your surveys,

2   but you did not.

3      A   There was no reason to.

4          MR. DANITZ:  All right.  Let's take a break

5   and go off the record.                          04:02:09

6          THE VIDEOGRAPHER:  Okay.  We're going off the

7   record.  The time is 4:02 p.m.

8          (Recess.)

9          THE VIDEOGRAPHER:  We're going on the record.

10  The time is 4:32 p.m.                            04:22:52

11  BY MR. DANITZ:

12     Q   Professor Hanssens, earlier today you said

13  that through September 2023, you had worked 25 hours

14  on this case.

15         Do you remember that?                     04:23:11

16     A   Approximately, yes.

17     Q   Okay.  How much time of those 25 hours was

18  spent writing the report?

19     A   Oh, maybe a quarter -- maybe a quarter or so.

20  Most of the time is really spent in meetings with   04:23:25

21  Cornerstone and reviewing drafts and sending drafts

22  back and forth.

23     Q   All right.  So a quarter of that time was

24  spent writing a report.  That's about six hours?

25     A   Maybe something like that, yeah.          04:23:42

                                            Page 289

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      Q   And then most of it was spent in meetings

2    with Cornerstone?

3      A   Yes.  And, of course, you have to also allow

4    for time for me to actually read the documentation.

5      Q   Right.  So how much time was spent designing    04:23:53

6    the survey?

7      A   Well, that's -- that's part of the

8    conversation part.  That -- that's -- up front,

9    that's several hours.  Maybe three or so.

10     Q   Three hours?                                     04:24:10

11     A   Yeah.

12     Q   All right.  And how much time was spent

13   sitting in at the pretest?

14     A   Oh, that was only -- okay.  I can actually be

15   fairly precise on that.  That's a few hours, yeah.    04:24:22

16     Q   So three hours?

17     A   Something like that, yes.

18     Q   All right.  And how much time was spent

19   analyzing the data?

20     A   Well, very little because the statistics are    04:24:36

21   so simple here.  I didn't have to do any econometric

22   modeling.  It's just looking at percentages.  So

23   very little.  Less than an hour, let's say.

24     Q   And how much time was spent evaluating Neil

25   Richards' report?                                     04:24:56

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
1        A    Reading and reviewing and -- excluding

2     writing, right?  Another three hours or so.  Is it

3     adding up?

4        Q    And if you -- if you would turn to page 38 of

5     your report --                                    04:25:15

6        A    Yes.

7        Q    -- which is Exhibit 1.

8        A    Yes.

9        Q    At paragraph 89, you cite the order on the

10    motion to dismiss.                                 04:25:34

11         Do you see that?

12       A    Do you mean on footnote 89?

13       Q    Yes, order on motion to dismiss in Gonzales

14    v. Uber?

15         Do you see that?                              04:25:43

16       A    V. Uber, yes, I do.

17       Q    How long did you spend reading that?

18       A    Let me check the context, okay.  Yeah, that

19    is -- that is, obviously, a reference to the

20    material that I say there.  No -- no particular    04:26:01

21    time.

22       Q    Did you actually read that order?

23       A    Not the entire order, no.  I discussed it

24    with Cornerstone.

25       Q    At paragraph 90, you cite Brooke, et al., for   04:26:11
```

Page 291

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      "Americans' Attitudes and Experiences with Privacy

2      Policies and Laws" from the Pew Research Center.

3            Do you see that?

4      A    Okay.  Give me a minute here.

5            Oh, yes, that's the one about -- that          04:26:36

6      provides some example about the heterogeneity in --

7      in privacy expectations, which is, again, also

8      something I would have asked Google -- not Google,

9      Cornerstone to find me a quote on that.

10     Q    And -- okay.  You didn't actually read          04:26:56

11     "Americans' Attitudes and Experiences with Privacy

12     Policies"?

13     A    Not the entire -- not the entire thing.  I

14     would have just seen the relevant passages.

15     Q    So no meaningful time?                          04:27:04

16     A    No meaningful time.  That's correct.

17     Q    Paragraph 93 --

18     A    Yes.

19     Q    -- cites Bamberger for, "Can You Pay for

20     Privacy?  Consumer Expectations and the Behavior" --  04:27:13

21     A    Right --

22     Q    -- "of Free and Paid Apps" --

23     A    Right.

24     Q    -- from the Berkeley Technology Law Journal.

25           Do you see that?                               04:27:20

                                                    Page 292

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      A   Yes, I do.

2      Q   How much time did you spend reading that law

3   view article?

4      A   Okay.  Give me a minute here again.

5          Oh, yes, yes.  It's the same answer.  I --      04:27:30

6   this is -- this is an instance where, because we're

7   dealing with free apps here, that I felt it's an

8   important point to make in the context of

9   heterogeneity.

10         I asked Cornerstone, is there published        04:27:48

11  research on that?  It turns out, actually, I've done

12  some myself, but we didn't quote that.  So they

13  found the Berkeley reference there, and I took a

14  quick look at it, and that was fine.

15     Q   But no appreciable time spent on that?         04:28:03

16     A   No appreciable time, that's right.

17     Q   And then on footnote 94, Brooke, et al.,

18  2019 --

19     A   Yeah.

20     Q   -- "Users' Expectations About the Use of       04:28:14

21  Smartphone Privacy and Security Settings."

22         Do you see that?

23     A   Right.

24     Q   It's from the proceedings of the 2022 CHI

25  Conference on Human Factors and Computing Systems.   04:28:25

Page 293

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1      A   Yeah, same answer.

2      Q   So no appreciable time spent reading that?

3      A   That's right.  That's right.  These are --

4   I'm sorry.  I just want to kind of say that these

5   are illustrations of a point that I'm making in the     04:28:37

6   report.

7      Q   And then footnote 95 cites Fogel, et al., for

8   "Internet Social Network Communities:  Risk Taking,

9   Trust, and Privacy Concerns."

10         Do you see that?                                  04:28:50

11     A   Yes, I do.

12     Q   It's from "Computers In Human Behavior."

13     A   Yep.

14     Q   And same answer?

15     A   Same answer.                                      04:28:57

16     Q   No appreciable time?

17     A   Yeah.

18     Q   And 96, footnote 96 cites Obar, et al., from

19   2018, "The Biggest Lie on the Internet:  Ignoring

20   the Privacy Policies In Terms of Service Policies of    04:29:07

21   Social Networking Services" --

22     A   Yes, yes.

23     Q   -- right, from the "Information,

24   Communication & Society, TPRC 44?"

25     A   Yeah.                                             04:29:18

                                                     Page 294

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1        Q    Do you see that?

2        A    Yeah.

3        Q    Is it the same answer for that one?

4        A    It's the same answer.  It's all illustrations

5    of heterogeneity.                                      04:29:24

6        Q    But you actually didn't spend any time

7    reading it, correct?

8        A    Not really.  Being an academic myself, it's

9    fairly easy for me to see something and see that

10   this is a credible source and applicable to this      04:29:34

11   case.

12       Q    Okay.  But you asked Cornerstone to find a

13   site --

14       A    Yeah.

15       Q    -- and they found a site?                     04:29:39

16       A    Yeah, that's correct.

17       Q    Footnote 97 you cite Frik, et al., 2022.

18       A    The Frik work, yes.

19       Q    And same answer?

20       A    Yeah.  Hold on a second.  Yes.                04:29:50

21       Q    No appreciable time spent --

22       A    No.

23       Q    -- is that right?

24            All right.  Footnote 100, Richards N., "Four

25   Privacy Myths," "A World Without" -- "A World          04:30:02

                                                   Page 295

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    Without Privacy" --

2        A    Right --

3        Q    -- Cambridge Press.

4        A    Yeah.

5        Q    How much time did you spend reading that?    04:30:08

6        A    Well, this comes from Richards himself.  Of

7    course, I read his material, although this is

8    something from an article of his that Cornerstone

9    found.  They found the quote, and I thought it was

10   useful in this context.                             04:30:22

11       Q    So you read the quote?

12       A    Yeah.

13       Q    Did you read the entire article?

14       A    No.

15       Q    Page 41, footnote 108, "Pinecone" --        04:30:27

16       A    The Pinecone --

17       Q    -- "Loblolly."

18       A    Yeah.

19       Q    How much time did you spend on that?

20       A    That is a Google source.  Give me a second   04:30:44

21   here.

22            Right.  It's -- it's really the same.  The

23   only difference is that this is a Google project.

24       Q    And footnote 109 cites Richards 2015.  How

25   much time did you spend on that?                     04:31:11

                                                Page 296

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1        A    I'm sorry.  I'm looking for 109.  Oh, there

 2    it is.

 3            Right, right, right.  Yeah, same thing.

 4    These are interesting statements that Richards made

 5    himself that I found were applicable here.          04:31:27

 6        Q    But Cornerstone located --

 7        A    Yeah.

 8        Q    -- those --

 9        A    Yes, they did.

10        Q    -- that you cited?                          04:31:35

11        A    Yeah.  That's one of their roles, is to help

12    me with these sources.

13        Q    And Richards N, et al., 2018, "The

14    Pathologies of Digital Consent, Washington

15    University Law REVIEW."                              04:31:47

16            How much time did you spend reading that?

17        A    Same thing.  Same answer.

18        Q    No appreciable time, correct?

19        A    Yeah.

20        Q    All right.  Let's try on page 43, footnote  04:31:57

21    124.

22        A    Oh, Turow, yeah.

23        Q    It's J. Turow, 2023.

24        A    Right.

25        Q    "Americans Can't Consent to Company's Use of  04:32:09
```

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

```
 1     Their Data.  They Admit They Don't Understand It,

 2     Say They're Helpless to Control It and Believe

 3     They're Harmed When Firms Use Their Data -- Making

 4     What Companies Do Illegitimate," Annenberg School of

 5     Communication -- for Communication.                    04:32:24

 6         A    Yes, yes, yes.

 7         Q    And how much time did you spend reading that?

 8         A    Okay.  Give me a minute here.

 9              Ah, okay.  All right.  No appreciable time.

10         Q    Same thing, Cornerstone found it?            04:32:48

11         A    Yes.

12         Q    Footnote 125 "Most Americans Support Right to

13     Have Some Personal Info Removed from Online

14     Searches," Pew Research.

15              Do you see that?                             04:33:01

16         A    Yes, I do.

17         Q    And how much time did you spend reviewing

18     that?

19         A    Same answer.

20         Q    Cornerstone provided that for you --        04:33:05

21         A    Yeah.

22         Q    -- and no appreciable time?

23         A    Yes.

24         Q    Footnote 126, "Roughly Six-in-Ten Online

25     Daters in the U.S. Are Concerned About Data          04:33:13
```

Page 298

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    Collection."

2         You see that?

3    A    Just one second.

4    Q    It's from the Pew Research Center.

5    A    Yeah, I see it.  Just one sec.        04:33:23

6         Privacy concerns, yeah, right.

7    Q    Same answer?

8    A    Yeah, yeah.

9    Q    No appreciable time?

10   A    That's correct, all illustrative material.    04:33:32

11   Q    Footnote 127 on page 44.

12   A    Uh-huh.

13   Q    "Privacy and Consumer Trust" by the

14   International Association of Privacy Professionals.

15        How much time did you spend reading that?    04:33:47

16   A    No appreciable time.  This is a non-U.S.

17   example.

18   Q    Paragraph 130, Acquisti, "Secrets and Likes:

19   The Drive for Privacy and the Difficulty of

20   Achieving it in the Digital Age," Journal of        04:34:10

21   Consumer Psychology.

22        And how much time did you spend reading that

23   one?

24   A    That is a journal I know and an article I

25   have some familiarity with.  I didn't reread it     04:34:20

Page 299

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    recently, but, as I said, I know that journal pretty

2    well and have had some familiarity with it but not

3    necessarily re-reviewed for this purpose.

4         Q    All right.  So no appreciable time spent?

5         A    No appreciable time.  I knew that one.        04:34:40

6              MR. DANITZ:  All right.  So I think that's

7    all I have.

8              THE WITNESS:  Okay.

9              MR. WONG:  Great.  Could you give us two

10   minutes?  I just want to -- I think I'm going to        04:34:50

11   have a very short redirect, but I just wanted to --

12   I just want to go off the record for a minute.

13             THE VIDEOGRAPHER:  Okay.  We're going off the

14   record.  The time is 4:35 p.m.

15             (Recess.)                                      04:37:05

16             THE VIDEOGRAPHER:  All right.  We're going on

17   the record.  The time is 4:37 p.m.

18

19                      EXAMINATION

20   BY MR. WONG:                                            04:37:31

21        Q    Professor Hanssens, earlier you recall

22   Mr. Danitz asking you about approximately how many

23   hours Cornerstone had spent in helping prepare for

24   the report and this deposition.

25             Do you know how many hours, approximately,     04:37:50

                                                  Page 300

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12         Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [ ] was not requested.

16         I further certify that I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21

22   Dated: November 2, 2023

23

24                          *Nadia Newhart*

                            NADIA NEWHART

25                          CSR NO. 8714

                                          Page 306

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    BRIAN DANITZ, ESQ.

2    bdanitz@cprnlegal.com

3                                            November 2, 2023

4    IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

5    October 31, 2023, DOMINIQUE M. HANSSENS, Ph.D., JOB NO. 6151485

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' CONFIDENTIAL - HIGHLY CONFIDENTIAL

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2      Transcript - The witness should review the transcript and

3      make any necessary corrections on the errata pages included

4      below, notating the page and line number of the corrections.

5      The witness should then sign and date the errata and penalty

6      of perjury pages and return the completed pages to all

7      appearing counsel within the period of time determined at

8      the deposition or provided by the Federal Rules.

9    _x_ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 308