# EXHIBIT A
# to the Declaration of
# W. Somvichian

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal. Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

*[Additional Counsel Appear on Signature Page]*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation, | Case No. 4:21-cv-02155-YGR-VKD |
| | **PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE GOOGLE LLC'S EXPERT BRUCE DEAL** |
| This document applies to: *all actions.* | |
| | Judge:      Hon. Yvonne Gonzalez Rogers |
| | Date:        TBD |
| | Time:        TBD |
| | Courtroom:  1, 4th Floor |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

NOTICE OF MOTION AND MOTION ..................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................................2

I.      INTRODUCTION..........................................................................................................2

III.    BACKGROUND FACTS ...............................................................................................4

       A.    Mr. Deal's Expertise Is Limited to Presenting Damages Models .............................4

       B.    Mr. Deal Failed to Consider Critical Information......................................................4

       C.    Mr. Deal's Report Is Replete with Assertions of Fact for Which He Has No
            Credible Source ..........................................................................................................6

            1.    Mr. Deal Relies on Assertions of Counsel for the Concept that Non-
                 U.S. Users Using a VPN with a U.S. IP Address Are Not Subject to
                 the U.S. Terms of Service. ...........................................................................6

            2.    Mr. Deal's Report Asserts as Fact that "Various Factors" Would
                 Cause "Data Variation" in What Is Submitted in RTB Bid Requests............6

            3.    Mr. Deal Asserts That Some Google Account Holders May Have
                 "Voluntarily Shared" Data, But Has No Evidence That Google
                 Account Holders Agreed to Share Their Information in RTB
                 Auctions. ......................................................................................................9

            4.    Mr. Deal's Privacy Opinions About Users' Preferences and
                 Expectations Are Not Grounded in Evidence Adduced in This Case,
                 and He Has No Foundation for Presenting an Opinion About Them. ...........9

       D.    Mr. Deal Relies on an Unrecorded and Undocumented "Interview" with
            Google Employee Stan Belov for "Facts" That Are Incorrect.................................10

IV.    ARGUMENT ...............................................................................................................12

       A.    Legal Standard..........................................................................................................12

       B.    All of Mr. Deal's Opinions Are Improper Under *Daubert* and Should Be
            Stricken....................................................................................................................13

            1.    Opinion 1 (Unjust Enrichment) Should Be Stricken Because It Rests
                 on Incorrect Facts and Purports to Identify "Issues" That Are
                 Outside Mr. Deal's Expertise. .....................................................................13

                 a.    The Court should strike Mr. Deal's opinions regarding
                     Google's ability to track RTB revenue. (Rpt., ¶¶ 36-42.) ...............13

                 b.    The Court should strike Mr. Deal's opinions regarding the
                       applicability of the U.S. Terms of Service. (Rpt., ¶¶ 43-47.)..........14

c.   The Court should strike Mr. Deal's opinions regarding whether "voluntary sharing" of data from class members negates harm. (Rpt, ¶¶ 48-49.) .......................................16

d.   The Court should exclude Mr. Deal's opinions regarding the need to assess Google's "overall profit" in assessing unjust enrichment. (Rpt., ¶¶ 55-67.).............................................17

e.   The Court should strike Mr. Deal's opinion that "it is impossible to reliably determine whether particular ad revenue is attributable to an ad shown to [class members]." ...........18

2.   Opinion 2 (Compensatory Damages) Should Be Stricken...........................20

3.   Opinion 3 (Unharmed Proposed Class Members) Should Be Stricken....................................................................................................21

4.   Opinion 4 (Allocation) Should Be Stricken. ................................................22

IV.    CONCLUSION ..................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Aguilar v. Int'l Longshoremen's Union Local No. 10,
    966 F.2d 443 (9th Cir. 1992) ................................................................................ 23

Aquino v. Cnty. of Monterrey Sherriff's Dept.,
    2018 WL 3548867 (N.D. Cal. July 24, 2018) ......................................................... 18

Berman v. Freedom Financial Network, LLC,
    400 F. Supp. 3d 964 (N.D. Cal. 2019) .............................................................. 12, 14

Brown v. Google,
    2022 WL 17961497  (N.D. Cal. Dec. 12, 2022) ...................................................... 22

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993) .......................................................................................... 2, 12

Fitzhenry-Russell v. Keurig Dr. Pepper Inc.,
    2018 WL 10472794 (N.D. Cal. Sept. 25, 2018) ...................................................... 19

Haynes ex rel. Haynes v. National R.R. Passenger Corp.,
    319 Fed. Appx. 541 (9th Cir. 2009) ................................................................. 16, 22

Highfields Capital I, LP v. SeaWorld Ent., Inc.,
    2022 WL 1037210 (S.D. Cal. Apr. 6, 2022) ....................................................... 2, 20

In re Paoli R.R. Yard PCB Litig.,
    35 F.3d 717 (3d Cir. 1994) ................................................................................... 12

In re Processed Egg Prods. Antitrust Litig.,
    81 F. Supp. 3d 412 (E.D. Pa. 2015) ....................................................................... 19

In re Rail Freight Fuel Surcharge Antitrust Litig.,
    292 F. Supp. 3d 14 (D.D.C. 2017) aff'd sub nom. In re Rail Freight Fuel Surcharge
    Antitrust Litig., 934 F.3d 619 (D.C. Cir. 2019) ..................................................... 19

LD v. United Behavioral Health,
    2023 WL 2806323 (N.D. Cal. Mar. 31, 2023) ................................................... 12, 17

Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,
    523 F.3d 1051 (9th Cir. 2008) ............................................................................... 19

Primiano v. Cook,
    598 F.3d 558 (9th Cir. 2010) ................................................................................. 12

Rai v. Santa Clara Valley Transportation Auth.,
    308 F.R.D. 245 (N.D. Cal. 2015) ........................................................................... 12

Therasense, Inc. v. Becton, Dickinson and Co.,
    2008 WL 2323856 (N.D. Cal. May 22, 2008) ................................................ 3, 13, 14

Villagomes v. Lab'y Corp. of Am.,
    2010 WL 4628085 (D. Nev. Nov. 8, 2010) ........................................................ 18, 21

*Woods v. City of Hayward,*
    2021 WL 4061657 (N.D. Cal. Sep. 7, 2021)................................................................ 18, 20

**RULES AND OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ........................................................................................................... 19

Fed. R. Evid. 702 ....................................................................................................... 2, 12

Fed. R. Evid. 703 ............................................................................................................ 12

Case No. 4:21-cv-02155-YGR-VKD
TABLE OF AUTHORITIES

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on the same date and time that Plaintiffs' pending motion for class certification will come for hearing, or as soon thereafter as this Motion may be heard in the above-entitled Court, before the Honorable Yvonne Gonzalez Rogers of the United States District Court, Northern District of California at the Oakland Courthouse, Courtroom 1 – 4th Floor, 1301 Clay Street, Oakland, CA 94612, Plaintiffs Christopher Valencia, John Kevranian, Terry Diggs, Kimberley Woodruff, Rethena Green, Salvatore Toronto, and Tara Williams will and hereby do move the Court to exclude the opinions of Defendant Google LLC's ("Google") expert Bruce Deal. Plaintiffs' Motion is made pursuant to Federal Rule of Evidence 702, Civil Local Rule 7, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"). Plaintiffs' Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Lesley E. Weaver and accompanying exhibits, all matters of which the Court may take judicial notice, all pleadings and papers on file in this action, and other written or oral argument that Plaintiffs may present to the Court.

## ISSUE TO BE DECIDED

Whether Bruce Deal's opinions, including those regarding whether "common evidence" exists regarding the expectations of consumers in this case, should be excluded under Federal Rule of Evidence 702 and the standards articulated in *Daubert*.

## RELIEF REQUESTED

Plaintiffs request that the Court strike Bruce Deal's opinions, consistent with the accompanying Proposed Order, as offered by Bruce Deal in his September 29, 2023 expert report and in his October 24, 2023 deposition testimony.

1    ### MEMORANDUM OF POINTS AND AUTHORITIES

2    ## I.    INTRODUCTION

3        Plaintiffs move to strike portions of the Expert Report of Bruce Deal submitted by Google in

4    support of its opposition to plaintiffs' motion for class certification, under *Daubert v. Merrell Dow*

5    *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for failure to satisfy the core requirements of Rule 702

6    of the Federal Rules of Evidence. Mr. Deal has been a professional consultant at Analysis Group his

7    entire career. His only professed area of expertise is as a "damages expert" with the limited role of

8    "identify[ing] issues," without "offering myself as the person that's making [particular] adjustments."

9    Tr. 211:7-212:5.[1] Mr. Deal admits that he is not an expert in privacy (Tr. 46:18-22), consent (Tr.

10   190:19-191:2), or any "technical" issues involving "what data is shared in the realtime bidding

11   auction process." Tr. 331:23-332:11.

12       Despite the limited purpose of his retention, Mr. Deal strays far beyond his knowledge and

13   expertise—including into technological and privacy areas in which he has no training, background,

14   or scholarship—to claim as his own a variety of opinions that are unmoored from economics,

15   damages, or allocation theories. His opinions have been struck in the past based on veering into legal

16   conclusions, and the same is appropriate here. *See Highfields Capital I, LP v. SeaWorld Ent., Inc.*,

17   2022 WL 1037210, at *11 (S.D. Cal. Apr. 6, 2022) (excluding sections of a report from Mr. Deal

18   because the report made legal conclusions).

19       Mr. Deal's approach is to use a layperson's view of a smattering of untested, publicly-

20   available information from the internet to identify matters that he claims Plaintiffs' experts Greg

21   Regan and Robert Zeithammer should have addressed. Mr. Deal proffers no methodology to explain

22   what issues caught his eye and even disclaims expertise in them. This "junk science" approach should

23   not form the basis of any fact finder's decisions. The very reason that gatekeepers reject it is to prevent

24   decisions based on counsel's arguments, as opposed to credible evidence. That is what Google

25   attempts to do here.

26

27   [1] "Tr. __:__" refers herein to pages and lines from the transcript of the October 24, 2023 deposition
     of Mr. Deal. "Rpt., ¶¶ ___" refers to paragraphs from the September 29, 2023 Expert Report of
28   Bruce Deal.

1    Equally troubling are the pervasive and substantial errors of fact in Mr. Deal's work in this

2    matter, including mis-describing the subject matter of this case as involving data "coming from the

3    publisher" (Tr. 160:2-23), and incorrectly supposing that plaintiffs and/or Google had submitted a

4    "statistical expert," whose transcript he suggested he may have read (Tr. 35:9-37:16).

5    Rather than rely on the evidence in the case, Mr. Deal expressly admits relying on counsel for

6    key, and contested, assumptions. Tr. 236:3-25 (which users are subject to the U.S. Terms of Service);

7    296:6-10 (whether data exists "to do a complete accounting of data fields that were shared in bid

8    requests during the class period"); 295:10-297:23 (same). And Mr. Deal's report relies heavily on his

9    own description of a secret interview—unrecorded, non-transcribed and for which there are no

10    notes—that Mr. Deal supposedly conducted with Stan Belov, a Google software engineer, on August

11    22, 2023, with Google's lawyers present.[2] But instead of using Mr. Belov's statements as background

12    or underlying factual information, Mr. Deal relies on what Mr. Belov supposedly told him and asserts

13    that information as expert opinion, as in: "[a]ccording to Mr. Stan Belov, a Google software engineer

14    who is technical lead for Google RTB, █████████████████████████████████████

15    ███████████████████████████████████████████████████████████████

16    Rpt., ¶ 66. This type of "spoon-feeding" to a hired expert has been described by Judge Alsup as "[o]ne

17    of the worst abuses in civil litigation." *Therasense, Inc. v. Becton, Dickinson and Co*., 2008 WL

18    2323856, at *1 (N.D. Cal. May 22, 2008). It should be excluded, particularly here, where it is based

19    on a secret and undocumented interview.

20    It is acceptable for a damages expert to rely on another expert's analysis beyond her expertise,

21    and then question whether issues warrant examination. Plaintiffs' own experts do this. But Mr. Deal's

22    report is unconstrained by the evidence or his own admittedly limited expertise. The bulk of Mr.

23    Deal's report should be stricken and his testimony should be limited accordingly.

24

---

25    [2] This is the same day that Magistrate Judge DeMarchi ordered in a discovery hearing that if Google
26    submitted additional declarations containing new facts in opposition to class certification, plaintiffs
      would have the right to depose those declarants. 8/22/23 Hearing Tr. at pp. 19-22. That afternoon,
27    Mr. Deal conducted his "interview" with Mr. Belov, with both in-house and outside counsel present.
      Tr. 89:19-90:23; 364:24-366:10. Plaintiffs first learned of this interview when reviewing the footnotes
28    in Mr. Deal's report.

### III.    BACKGROUND FACTS

#### A.    Mr. Deal's Expertise Is Limited to Presenting Damages Models

Mr. Deal holds a B.A. in Economics and Global Studies from Pacific Lutheran University and an M.A. in Public Policy from Harvard University. Tr. 13:2-10. He does not have a Ph.D. in economics or any field. Tr. 26:13-27:3. He has never authored a peer-reviewed article. Tr. 22:15-23:11. And his only teaching experience was almost 30 years ago, when he served as a teaching fellow and teaching assistant. Rpt., Appendix A. Mr. Deal has spent his entire career working as a consultant and expert at Analysis Group and has been deposed more than 200 times. Tr. 12:17-21.

Mr. Deal is not an expert on privacy or consent (Tr. 46:18-22 (privacy); Tr. 190:19-191:2 (consent)), yet he offers opinions on these issues. Mr. Deal is not a "technical expert" on RTB auctions and has a fundamentally erroneous understanding of what RTB is, believing that Google's RTB auction works by publishers sharing user data with Google, rather than Google sharing user data with auction participants. Tr. 160:2-23. Exhibit 7 to his report, for example, falsely reports what data is shared in Google's RTB auctions and completely ignores what information Google associates with account holders in connection with those auctions.

#### B.    Mr. Deal Failed to Consider Critical Information

Many of the errors of fact and improper conclusions Mr. Deal states in his report can be attributed to his extremely limited and biased review of the record in this matter. For an expert who purports to opine on multiple subjects and criticize multiple other experts, Mr. Deal barely looked at any of the evidence, and he appears to have willfully ignored any evidence that is contrary to the views he expresses in his report. For example, with respect to Google's financial information, Mr. Deal testified that he did not rely on the testimony of Google's group product manager, George Levitte, who testified at length regarding Google's tracking of revenue associated with RTB. Tr. 50:19-51:12; 133:11-134:2. Nor did Mr. Deal review Google's ███████ that demonstrate how the company actually tracks and records revenue. Levitte Tr. 61:2-62:17.

Mr. Deal also never considered other key evidence contrary to his opinions. For example, although Mr. Deal states otherwise, ███████████████████████████████████████ ██████ (Vakharia Tr. 125:8-16 & Ex. 8), that Google maintains **records of Google account holders**

subject to U.S. Terms of Service (Vakharia Tr. 66:24-68:6), and that Google does not disclose to account holders what Google shares with third parties in RTB, let alone provide them with a way to exclude themselves from it (Vakharia T r. 100:4-19). Mr. Deal – Google's expert who presumably could have accessed Google's internal methods of accounting and tracking users subject to RTB auctions – did not obtain this evidence but relies instead on either Google's lawyers or a secret interview engineered by them.

Mr. Deal admits that he did not rely on factual evidence cited by Mr. Regan in his report. At his deposition, Mr. Deal stated:

> Q. Mr. Deal, I appreciate what you're saying and that you hold yourself out as a damages expert. The fundamental problem that we are struggling with here is you are also asserting that you can judge whether certain things are happening with regard to, example, opt-ins or opt-outs, which is way beyond your self-avowed field of expertise. Mr. Regan relied on the Plaintiffs' expert reports. You are not relying on Google's experts here, are you?
>
> MS. REDDY: Objection. Asked and answered. Argumentative.
>
> A. I mean, I'm certainly not -- no, I'm certainly not citing to them. I'm not relying on them. They're -- they're -- I mean, I'm aware of -- of, you know, some of their opinions, which I think are probably consistent with this. But I know what I need to do as a damages expert. I know how to identify whether something is a substantial issue.

Tr. 208:22-209:19.

Mr. Deal also admitted that he did not rely on evidence introduced during testimony for Google's witnesses.

> Q. Did you rely on any exhibits to any of the depositions that you've listed here?
> A. Again, I – I wouldn't say I -- no is the answer. I don't -- I don't specifically rely on any of them. I think they're -- I -- to the best of my recollection, they're con- -- they are consistent with the types of sources that I do cite specifically in terms of what are the different ways in which different types of data is shared or not shared, those types of circumstances, so... But I didn't rely specifically on any of them.

Tr. 67:12-23.

**C.    Mr. Deal's Report Is Replete with Assertions of Fact for Which He Has No Credible Source**

    1.    <u>Mr. Deal Relies on Assertions of Counsel for the Concept that Non-U.S. Users Using a VPN with a U.S. IP Address Are Not Subject to the U.S. Terms of Service.</u>

Mr. Deal asserts, with no citation, that a person physically outside the United States but using a U.S. IP address through a VPN is "not subject to U.S. TOS [terms of service]." Rpt., ¶ 45. When asked in deposition for the source of this assertion, he replied that it was from Google's counsel. Tr. 236:3-25.

> Q. What is the basis for you concluding that [nonusers who may use VPNs with a U.S. IP address may not make them subject to U.S. terms of service] that does not make them subject to a U.S. terms of service?
>
> A. Well, again, I'd be careful about using the word "concluding." It's my -- it is my understanding and it's a premise of my analysis that -- and basic- -- the -- the answer to the question I think is discussion with counsel. That -- that's my -- I'm not -- *I think it's a legal question, as I understand it*, but my -- in my discussion with counsel, my understanding is the data that's provided is based on -- the U.S. identification is the IP address, but that that's not synonymous with U.S. terms of service. So that one is coming from my discussion with counsel.

Tr. 236:3-25 (emphasis added). Because Google's counsel in this case are not fact witnesses, it is improper to allow Mr. Deal to rely on facts they provided him to support his opinions.[3]

    2.    <u>Mr. Deal's Report Asserts as Fact that "Various Factors" Would Cause "Data Variation" in What Is Submitted in RTB Bid Requests.</u>

Mr. Deal opines, frequently and vaguely, about the "[v]arious factors [that] would cause data variation" that would, he postulates, prevent sharing of data in the RTB auction, such as cookie blocking. Rpt., ¶¶ 92; 111-116; 134-135. However, Mr. Deal admitted at his deposition that he had

---

[3] As discussed below, Mr. Deal's reliance on lawyers for facts was misplaced. As set forth in the Rebuttal Report of Zubair Shafiq, VPNs account for 0-2.6% of masked IP addresses, relying on a peer-reviewed study. Shafiq Reb., ECF 616-5 at ¶¶ 60, 61, 66. Mr. Deal admitted that he would not know how to conduct such a study. Finally, Google's corporate testimony now flatly contradicts what the lawyers told Mr. Deal. *See* Berntson Tr. 236:9-21; Vakharia Tr. 66:24-68:6.

Case No. 4:21-cv-02155-YGR-VKD

not "independently done any data analytics, and I'm not specifically citing to, you know, any set of bid requests data." Tr. 78:8-12.[4]

> Q. What piece of evidence produced in this case can you point to that you relied on for your conclusion that data fields were not transmitted in bid requests because somebody was using a blocker?
>
> A. I think -- I think what you're asking is kind of a statistical or a technical question, which is -- ***that's -- I -- I'm not citing anything***. That is my overall understanding based on the usage of the -- the widespread usage of many of these different products, but I'm not offering an opinion that 10 percent of the time, half of them were done, 50 percent of the time, a third of them were shown. I -- that's not the kind of opinion I'm offering. ***So I -- I don't -- I don't have something to cite for that. I'm citing, you know, kind of broader issues here.*** I'm not offering my opinion as to a statistical percentage, for instance.
>
> Q. Can you cite any evidence produced in this case that has to do with whether or not data in bid requests was blocked? It's a yes-or-no question.
>
> MS. REDDY: Objection. Asked and answered.
>
> A. I mean, I -- I'm not sure if I can answer it differently than I've -- I've answered. Certainly that was, you know, a topic of deposition testimony, for instance, as to kind of in what circumstances, you know, restricted data processing was used as an example.
>
> I don't know whether you would consider that to be an answer to your question or not, but I've seen those kinds of things. But I haven't independently done any statistical analysis of bid requests, or it's not – it's not part of my assignment.
>
> Q. And just to be clear, I'm giving you an opportunity now to identify any evidence in this case -- produced in this case that you reviewed that supports that conclusion. Can you do that?
>
> MS. REDDY: Objection. Asked and answered. Argumentative.
>
> A. I mean, I've -- this -- this case is -- is, I think, a proposed -- as I understand it, it's a proposed class action for all U.S. term of service users, you know –
>
> COURT REPORTER: I'm sorry, "U.S."?
>
> A. -- term of service users for, you know, many years who were -- whose data was part of realtime bidding for either authorized buyers or open bidding partners. So

---

[4] Remarkably, Mr. Deal then admitted that there is a "master set" of data shared in Google RTB auctions. Tr. 73:14-74:15. Plaintiffs agree, although it is also true that Mr. Deal has no basis to opine on the topic at all.

1
2
3
4
5

that's, you know, many, many, many people out there. So, again, it's my understanding that the type of software, and I cite to, you know, the – in terms of the blockers, the changes over time, the Apple products. There's a wide variety of -- of different sources, different studies that people have looked at. ***But I haven't independently done any data analytics, and I'm not specifically citing to, you know, any set of bid requests data. There may be other experts that are looking at that question, but that's not what I've been asked to do.***

6

Tr. 75:25-78:12 (emphasis added).

7

8

9

10

11

12

13

14

15

Mr. Deal further opines that "Proposed Class Members can 'opt-in' to allow sharing of their data in numerous ways, and information suggests that a substantial portion of the Proposed Class likely did," but he has no basis for these claims either. Rpt., ¶ 48. That is, when pressed for what that "information" refers to, Mr. Deal did not identify any evidence in this case that supports his supposition. Mr. Deal lists several general scenarios in which he opines that a user might have consented to the sharing of data, such as through browser or device settings. *Id.* He largely relies on articles his team pulled off the internet that address whether people consent to other third parties – such as Apple – using some information for ads personalization. Tr. 181:5-183:17. These articles are not limited to Google account holders and do not address the specific practices at issue here.

16

17

18

19

20

21

22

At its core, the report from Mr. Deal – a damages expert with a limited remit – asserts that because people might consent to some ad personalization, they have consented to Google sharing personal information in RTB auctions, even though Google never discloses its auctions to account holders. And then Mr. Deal speculates, with no privacy or technical background, that "[e]ven Proposed Class Members who know of but choose to forego, options to prevent the sharing of data with advertisers ***can be considered to have voluntarily opted into*** the sharing of their data." Rpt., ¶ 48 (emphasis added). It's an extraordinary claim, with no factual support:

23

24

Q. And -- and as you've discussed, Google doesn't have any control that allows users to either opt in or out; correct?

25

MS. REDDY: Objection. Mischaracterizes testimony.

26

27

28

A. Yeah, that's probably getting into a technical area. What I -- what I specifically said is, ***I'm not aware of any particular setting that -- that -- you know, a – a box that one can check that would say, "Exclude me from realtime bidding." I'm not aware of that.*** But whether or not by taking some of these other actions you are effectively excluding yourself from realtime bidding, you certainly are limiting

fields that are in realtime bidding. So that would be -- that would be beyond the scope of my analysis.

Tr. 254:3-18. And indeed, these opinions are "beyond the scope of [his] analysis." *Id.* There is simply no basis to say that by agreeing to allow Apple to personalize ads, a user "can be considered to have voluntarily opted into the sharing of . . . data [in Google's RTB auction]." Rpt., ¶ 48. No experts, not even Google's technical experts, say this.

3.    Mr. Deal Asserts That Some Google Account Holders May Have "Voluntarily Shared" Data, But Has No Evidence That Google Account Holders Agreed to Share Their Information in RTB Auctions.

Mr. Deal opines that, "[f]rom an economic perspective, if Proposed Class Members voluntarily shared their information, then they would not have suffered harm and should be excluded in Mr. Regan's model . . . ." Rpt., ¶ 48. But Mr. Deal admitted at his deposition that he is not an expert in privacy or consent, and he agreed that there is not—or at least, he was "not aware of"—any particular setting or "a box that one can check that would say, 'Exclude me from realtime bidding.'" Tr. 254:3-18. And Mr. Deal's factual premise is incorrect. Google has testified otherwise: Ms. Vakharia **admitted on behalf of Google that that Google does not disclose to users anywhere what information is shared through RTB, or even mention RTB at all.** Vakharia Tr. 158:8-21. And plaintiffs' expert Prof. Wilson's opening report states that there is nothing account holders can do to prevent Google from sharing their data in the RTB auction. Wilson Rpt., ¶ 123.

4.    Mr. Deal's Privacy Opinions About Users' Preferences and Expectations Are Not Grounded in Evidence Adduced in This Case, and He Has No Foundation for Presenting an Opinion About Them.

Although Mr. Deal admits he is not a privacy expert, his report asserts that, "[a] body of academic studies and industry surveys show that people vary widely in their preferences for privacy, and a substantial share of people do not care about internet data privacy, are unwilling to pay anything to protect their data, and do not utilize readily available and free methods to protect their privacy." Rpt., ¶ 121. It also asserts that, "[i]t is clear that a substantial portion of consumers benefit from personalized ads and that many are aware that personalization is done using data such as the at-issue data." *Id.*, ¶ 132. The ultimate conclusion of this section is that "individualized inquiry [into what

Google Account holders agreed to share in the RTB auction in this case] is necessary." *Id.*, ¶ 135. This is not a damages opinion.

Mr. Deal does not rely on Google's own internal documents discussing what Google account holders prefer. He agreed at his deposition that the factual basis for his assertions on the alleged benefits of personalized advertising is not "specialized knowledge," "independent estimates," or "statistical analysis," and he does not "put [himself] forward as an expert in, you know, perceived value and utility of personalized ads." Tr. 362:9-18.

**D.    Mr. Deal Relies on an Unrecorded and Undocumented "Interview" with Google Employee Stan Belov for "Facts" That Are Incorrect**

Mr. Deal relies heavily in his report on the secret Belov interview. Mr. Deal testified at his deposition that his interview with Mr. Belov was over the telephone, with the presence of in-house counsel for Google, as well as several outside attorneys representing Google in this matter. Tr. 89:19-90:23. The call lasted approximately an hour, was not recorded or transcribed, and there are no notes. Tr. 92:19-24. When asked how Mr. Deal could be sure that his report accurately reflected Mr. Belov's statements without any notes, Mr. Deal testified that what he covered with Mr. Belov was a "discrete set of . . . issues that confirmed my understanding and/or gave me a specific knowledge, [s]o I was able to directly put it into the reports from my conversation with him." Tr. 364:24-365:10.

Specifically, Mr. Deal relies on Mr. Belov's secret interview exclusively or near-exclusively, in the following sections of his report. Even though Mr. Belov was deposed for a full day and has also provided several declarations in this case, Mr. Deal does not rely on any of them for the facts below.

1.   Rpt., ¶ 27 & n.25:  Ad inventory would almost always be sold, and Google would earn revenue, even if one demand channel were eliminated.

2.   Rpt., ¶ 40 & n.44, 47:  ███████████████████████████████████

   ████

3.   Rpt., ¶ 42 & n.49:  Google cannot identify RTB revenues from Google account holders because Google "does not ████████████████████████████████

   ████████████████████."

4. Rpt., ¶ 47 & n.57-58: ███████████████████████████

   ███████████████████████████████████ .[5]

5. Rpt., ¶ 65 & n.81; ¶ 66 & n.82: The ████████ experiment Prof. Zeithammer relies on

   was only ██████████████████████████ . And, the ██████████████

   ███████████████████████████ .

Mr. Deal assumes, incorrectly, that Google cannot identify what portions of RTB revenue can be linked to Google account holders. At his deposition, Mr. Deal made clear that the primary source of this opinion was again from his secret interview with Belov:

> Q. Turning to page 19, Footnotes 57 and 58, do you see at Paragraph 47 where you wrote, "I ████████████████████████████████████████
> ██████████████████████████████████████
> ████████████████████ Do you see that?
>
> A. Yes.
>
> Q. And you cite only Mr. Belov for that statement; right?
>
> A. Correct, that's the footnote.
>
> Q. Do you have any other basis for that statement?
>
> A. I mean, again, no other specific citation. I specifically asked that question to Mr. Belov, and -- and he answered that. That was my – my understanding was that the -- going into the interview was that the U.S. identification would be based on, you know, the -- the -- the internet ID, but -- but he -- he was the source for that specific confirmation or that specific element that there's no way -- they don't have a means of – of identifying who's subject to the U.S. terms of service.[6]

Tr. 101:17-102:15. But Mr. Belov is not an expert in auction pricing. He is an engineer. And it is completely improper for Mr. Deal to report what he believes Belov said to him in a secret, undocumented interview and base an opinion on it.[7]

---

[5] Because all of this is untested, plaintiffs ask that all of Mr. Deal's report relying on these concepts be stricken. *See* Proposed Order.

[6] As discussed below, this is simply wrong. Two 30(b)(6) depositions of Google contradict it. *See* Berntson Tr. 236:9-21; Vakharia Tr. 66:24-68:6. But in any event, an expert may not rely on untested statements attributed to someone else.

[7] Regardless, Mr. Belov's speculation about auction pricing is flawed. Prof. Zeithammer addresses this in his report and rebuttal report. ECF 545-7 at ¶¶ 42-52; ECF 616-7 at ¶¶ 15-17, 102-105.

1    **IV.     ARGUMENT**

2         **A.     Legal Standard**

3         "Under Rule 702, expert opinion evidence must be both reliable and relevant." *Berman v.*

4    *Freedom Financial Network, LLC*, 400 F. Supp. 3d 964, 971 (N.D. Cal. 2019) (Gonzalez Rogers, J.)

5    (citing *Daubert*, 509 U.S. at 589-91 and *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010)).

6         An expert witness may be qualified by "knowledge, skill, experience, training, or education"

7    as to the subject matter of the opinion. Fed. R. Evid. 702. "The proponent of expert testimony has the

8    burden of proving admissibility in accordance with Rule 702." *LD v. United Behavioral Health*, 2023

9    WL 2806323, at *2 (N.D. Cal. Mar. 31, 2023) (Gonzalez Rogers, J.).

10        "Experts assist the factfinder in their own evaluation of the evidence by providing the

11   factfinder with opinions based on verifiable, scientific, or other objective analysis." *Id.* (citing

12   *Daubert*, 509 U.S. at 589-90).

13        To be reliable, the testimony must be (1) "based on sufficient facts or data," (2) "the product

14   of reliable principles and methods," and (3) a sound application and methods of the principles to the

15   facts. Fed. R. Evid. 702. "Facts or data" may include other experts' reliable opinions or hypothetical

16   facts that are supported by the evidence. *Id.*, advisory committee's note to 2000 amendments; *see*

17   Fed. R. Evid. 703. The party offering expert testimony must demonstrate by a preponderance of the

18   evidence that its expert's opinions are reliable. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717,

19   743–44 (3d Cir. 1994). The Supreme Court has confirmed that "the Rules of Evidence—especially

20   Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a

21   reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

22        "At the class certification stage, 'the relevant inquiry is a tailored *Daubert* analysis which

23   scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the

24   current state of the evidence.'" *LD*, 2023 WL 2806323, at *2 (quoting *Rai v. Santa Clara Valley*

25   *Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015)). Deciding questions of law is the

26   exclusive province of the trial judge, and an expert may not opine on questions that are matters of

27   law for the court. *Berman*, 400 F. Supp. 3d at 971 (collecting cases).

28

1

**B.      All of Mr. Deal's Opinions Are Improper Under _Daubert_ and Should Be Stricken**

2

3      1.      Opinion 1 (Unjust Enrichment) Should Be Stricken Because It Rests on Incorrect Facts and Purports to Identify "Issues" That Are Outside Mr. Deal's Expertise.

4

5      Many of the opinions offered in the Unjust Enrichment section of Mr. Deal's report are outside

6   the area of his asserted expertise. Mr. Deal holds himself out only as a damages expert who can

7   "identify issues," (Tr. 211:7-212:5) and does not claim expertise in the fields of privacy, consent, or

8   any technical field such as the operation of a RTB auction, or the use of VPNs.

9      a.      The Court should strike Mr. Deal's opinions regarding Google's ability to track RTB revenue. (Rpt., ¶¶ 36-42.)

10

11      Mr. Deal opines that "Google does not have any means to identify what portion of the ads

12   displayed through Google RTB auctions were shown to Google account holders as opposed to users

13   without a Google account." Rpt., ¶ 41.

14      In support of this assertion, Mr. Deal cites the Berntson deposition, but only for the limited

15   statement that "in the absence of the cookie that contains the [Google account] information, [Google

16   has] no way of knowing that the traffic is associated with a Google user." The key to the inference is

17   Mr. Deal's secret interview with Mr. Belov, in which Mr. Deal purportedly learned that "[w]ith some

18   exceptions, this cookie [the GAIA cookie] would not exist for three types of users who may see ads

19   from ▮▮▮▮▮▮▮: (1) Google account holders signed out of their Google Account; (2) Google

20   Account holders signed in to their Google account but who have blocked third-party cookies; and (3)

21   users with no Google account." Rpt, ¶ 41 & n.47 (citing the Belov interview for the statement that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23

▮▮▮▮▮▮▮).

24      Using Mr. Deal as a hired expert in this way is a good example of what Judge Alsup described

25   as "[o]ne of the worst abuses in civil litigation," which is the "attempted spoon-feeding of client-

26   prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to

27   express an opinion." _Therasense_, 2008 WL 2323856, at *1. Mr. Deal himself purports only to be a

28

damages expert, who can identify issues. He is not a technical expert on RTB auctions and has done no testing or review of any bid requests. Tr. 78:8-12.

As in the example described in *Therasense*, the source of Mr. Deal's opinion is "highly partisan, such as the client," and "[e]verything is kept secret from the other side until the expert report." 2008 WL 2323856, at *1. Judge Alsup's conclusion in that case is correct that "no professional should reasonably rely on such a rigged and biased source of information for any materially important fact to his or her opinion." *Id.* at *2.

Because the testimony Mr. Deal offers regarding Google's ability to track RTB revenue associated with Google account holders is unreliable and outside his area of expertise, it should be excluded.

                b.      The Court should strike Mr. Deal's opinions regarding the applicability of the U.S. Terms of Service. (Rpt., ¶¶ 43-47.)

This Court has been clear that that experts should not invade the province of the Court in offering legal opinions. *See Berman*, 400 F. Supp. 3d at 971 (collecting cases).

Nevertheless, Mr. Deal offers several opinions relating to the applicability of the U.S. Terms of Service:

- Users who are not physically in the United States using a U.S. IP address through a VPN are not "subject to U.S. TOS [terms of service]." Rpt., ¶ 45.

- "[t]he proportion of non-U.S. users who inaccurately appear via IP address to be in the U.S. (and therefore may [not] be subject to a U.S. TOS) is large." Rpt., ¶ 46.

- "Google ███████████████████████████████████████████████████ ████████████████████████████████████████████████." Rpt., ¶ 47.

At his deposition, Mr. Deal stated that whether a person is subject to a U.S. Terms of Service is a "legal question," and admitted that the basis for this opinion is Mr. Deal's "discussion with counsel." Tr. 236:3-25.

Q. Paragraph 45. This paragraph is about nonusers who may use VPNs with a U.S. IP address, which we've discussed extensively. You wrote, "However, I understand this does not make them subject to U.S. terms of service (i.e., they are not a Proposed Class Member)." Do you see that?

1    A. Yes.

2    Q. What is the basis for you concluding that that does not make them subject to a
3    U.S. terms of service?

4    A. Well, again, I'd be careful about using the word "concluding." It's my -- it is my
     understanding and it's a premise of my analysis that -- and basic- -- the -- the answer
5    to the question I think is discussion with counsel. That -- that's my -- I'm not -- I
     think it's a legal question, as I understand it, but my -- in my discussion with counsel,
6    my understanding is the data that's provided is based on -- the U.S. identification is
     the IP address, but that that's not synonymous with U.S. terms of service. So that
7    one is coming from my discussion with counsel.

8    Tr. 236:3-25.

9         With respect to the issue of whether Google has a "███████████████████████████

10   ████████████████████████████████████████████," Mr. Deal made clear

11   that the primary source of this opinion was his secret interview with Mr. Belov:

12        Q. Turning to page 19, Footnotes 57 and 58, do you see at Paragraph 47 where you
13   wrote, ████████████████████████████████████████████████████████████████████

14   ██████████████████? Do you see that?

15   A. Yes.

16   Q. And you cite only Mr. Belov for that statement; right?

17   A. Correct, that's the footnote.

18
19   Q. Do you have any other basis for that statement?

20   A. I mean, again, no other specific citation. I specifically asked that question to Mr.
     Belov, and -- and he answered that. That was my -- my understanding was that the -
21   - going into the interview was that the U.S. identification would be based on, you
     know, the -- the -- the internet ID, but -- but he -- he was the source for that specific
22   confirmation or that specific element that there's no way -- they don't have a means
     of -- of identifying who's subject to the U.S. terms of service.
23

24   Tr. 101:17-102:15.

25        Putting aside the impropriety of relying on a secret interview as the basis for an expert opinion,

26   the information allegedly provided by Mr. Belov here is simply wrong.[8] Mr. Berntson, testifying on

27   _____

28   [8] The other citation for this was, curiously, plaintiffs' own damages expert, Mr. Regan. But as Mr.
     Deal conceded at his deposition, Mr. Regan was not asserting that it was true that Google cannot

15                                                    Case No. 4:21-cv-02155-YGR-VKD

behalf of Google, has admitted that Google uses IP addresses to determine whether account holders are in the U.S. Berntson Tr. 236:9-21. And Ms. Vakharia, another witness testifying for Google, **admitted that Google uses IP addresses to determine which terms of service to show users when they set up accounts.** Vakharia Tr. 66:24-68:14.

Even if the facts Mr. Deal cites were accurate, Mr. Deal admittedly has no expertise in estimating how many "non-U.S. users . . . inaccurately appear via IP address to be in the U.S." Tr. 116:4-7 ("I am certainly not a technical expert in VPN usage."); Tr. 117:3-14 ("Q: So can you quantify today the number of U.S. Google accountholders subject to the U.S. terms of service that use a VPN that masks an IP address outside of the United States? A: I think the answer is no . . ..").

Testimony from a purported expert, even one qualified in a particular area, need not be allowed if it strays beyond the expert's field of expertise. *See Haynes ex rel. Haynes v. National R.R. Passenger Corp.*, 319 Fed. Appx. 541, 542 (9th Cir. 2009) (affirming the exclusion of expert testimony from a person with "extensive qualifications and education in 'Human Factors'" who attempted to testify about medical risks associated with prolonged train travel and their foreseeability).

Here, Mr. Deal's testimony invades the province of the Court and is unreliable. Plaintiffs respectfully request that it be stricken from Mr. Deal's report and any testimony.

c.    The Court should strike Mr. Deal's opinions regarding whether "voluntary sharing" of data from class members negates harm. (Rpt, ¶¶ 48-49.)

Mr. Deal opines that "[f]rom an economic perspective, if Proposed Class Members voluntarily shared their information, then they would not have suffered harm and should be excluded in Mr. Regan's model . . .." Rpt., ¶ 48.

Mr. Deal cites no basis—legal, economic or otherwise—that would rationalize "from an economic perspective" or any perspective why a person could not both "voluntarily share" or consent to the sharing of data and be harmed by its release. In his deposition, Mr. Deal admitted that he is not

_____

identify RTB revenue. Rather, Mr. Regan simply noted that *Google* said it could not. Tr. 105:10-106:9. This is a good example of how Google's lawyers attempt to mask their positions and arguments as evidence.

an expert in privacy or consent, that he has "no specialized knowledge regarding the benefits that people allegedly receive from realtime bidding," and he does not "put [himself] forward" as an expert in "perceived value and utility of personalized ads." Tr. 362:9-18.

Essentially, what Mr. Deal is doing here is making a legal argument regarding consent—equating voluntary sharing with no liability—rather than expressing an economic opinion regarding harm—which would require some additional economic analysis. *See LD*, 2023 WL 2806323, at *2 ("Experts assist the factfinder in their own evaluation of the evidence by providing the factfinder with opinions based on verifiable, scientific, or other objective analysis."). Because this testimony goes beyond Mr. Deal's expertise and veers into expressing a legal opinion, it should be excluded.

                d.      The Court should exclude Mr. Deal's opinions regarding the need to assess Google's "overall profit" in assessing unjust enrichment. (Rpt., ¶¶ 55-67.)

Mr. Deal opines in these paragraphs that "[a]n unjust enrichment methodology . . . must account not just for revenue from ▮▮▮▮▮▮▮ but for the overall impact on Google's revenue in a 'but-for' world without the alleged sharing of the at-issue data with third parties." Rpt., ¶ 56. In support, Mr. Deal cites the Reference Manual on Scientific Evidence, Third Edition. Rpt., ¶ 56 & n. 69. At his deposition, Mr. Deal was unable to identify what in the Reference Manual supported this assertion. Tr. 276:25-277:11.

> Q. Just to be clear, your testimony is that that treatise says that to calculate unjust enrichment, we have to look at Google's total profits?
>
> MS. REDDY: Objection. Mischaracterizes testimony.
>
> A: I would say -- well, again, I'm happy to look at the treatise, if there's something specific, but the economic proposition is, you need to modify the disputed action and look at the profit implications of that modification. That's my testimony –

Tr. 276:25-277:11.

Nevertheless, Mr. Deal continued to assert that "if . . . you're doing this bad thing and you're earning profits of a hundred," but then "[y]ou stop doing that things [verbatim], you still earn profits of a hundred, there's no economic damages." Tr. 287:2-288:3.

Q. And in your scenario, if a company stopped doing something illegal, but, by stopping, obtained legal revenue somewhere else, there is no unjust enrichment if the second number is larger than the first?

MS. REDDY: Incomplete hypothetical

A: Yeah, I think you're setting aside differences in profit margins, things like that, but -- 'cause that -- that obviously is what -- what ultimately we care about is profits, not revenuesBut if I understand your framework, if there is -- you know, you're doing this bad thing and you're earning profits of a hundred. You stop doing that things [verbatim], you still earn profits of a hundred, there's no economic damages.

Q. Okay. And other than the book that you cite, you have no other citation for that proposition; is that right?

A. I mean, I don't have any citation in this -- I've been doing this for more than 25 years, so I have lots of experience with economic damages analyses. And there are other articles that speak to it, but the one that I cite here is the reference manual for scientific evidence for federal judges, so . . .

Tr. 287:2-288:3.

Perhaps most egregiously, Mr. Deal also states as his own opinion certain assertions that are attributed to Mr. Belov, not from a declaration or deposition testimony, but directly from the secret interview. As Mr. Deal writes in his report: "According to [Belov] . . . ███████████████ ████████████████████████████████████████████████████████ ██████████████," because, as "Mr. Belov explained . . . ████████████████████ ████████████████████████████████████████████████████." Rpt., ¶ 66 (emphasis in original). Using an expert report to parrot the opinions or assertions of others, however, is not permitted. *See Woods v. City of Hayward*, 2021 WL 4061657 (N.D. Cal. Sep. 7, 2021) ("Rule 703 . . . is not a license for an expert witness to simply parrot the opinions of non-testifying experts.") (quoting *Villagomes v. Lab'y Corp. of Am.*, 2010 WL 4628085, at *4 (D. Nev. Nov. 8, 2010)) (citing *Aquino v. Cnty. of Monterrey Sherriff's Dept.*, 2018 WL 3548867, at *4 (N.D. Cal. July 24, 2018)).

       e.     The Court should strike Mr. Deal's opinion that "it is impossible to reliably determine whether particular ad revenue is attributable to an ad shown to [class members]."

Mr. Deal's opinion as to unjust enrichment states as follows: "Plaintiffs' Experts have neither proposed a reliable class-wide methodology for calculating unjust enrichment damages nor shown

that unjust enrichment damages can be calculated on a class-wide basis." Rpt., ¶ 9. This is legal argument, not an expert conclusion. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008) (district court commits no error in excluding an expert's legal conclusions). Under Fed. R. Civ. P. 23, courts are required to assess whether "there is a reliable means of proving damages on a classwide basis." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 43 (D.D.C. 2017) (quoting *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 417 (E.D. Pa. 2015)) *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019).

Accordingly, when Mr. Deal opines that plaintiffs' experts do not have "reliable" means of proving damages on a "classwide" basis, this is a legal conclusion that invades the province of the Court.

Even drilling down into the basis for the opinion as stated by Mr. Deal yields a series of legal conclusions:

- "[Mr. Regan's] methodology cannot reliably estimate Google's alleged unjust enrichment on a class-wide basis." Rpt., ¶ 38.

- "it is impossible to reliably determine whether particular ad revenue is attributable to an ad shown to . . . [particular] users." Rpt., ¶ 41.

- "[I]t does not appear possible to reliably estimate, absent some type of individualized inquiry, the proportion of Google RTB revenue generated from Google account holders to exclude the revenue from ads shown to non-Google account holders." Rpt., ¶ 41.

- "Mr. Regan's model *does not* reliably measure Google's unjust revenue . . ." Rpt., ¶ 52 (emphasis in original).

Opining on reliability in the context of classwide damages, and whether "individualized inquiry is necessary," are legal conclusions that are properly excluded. *See Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*, 2018 WL 10472794, at *3 (N.D. Cal. Sept. 25, 2018) (excluding opinions as to whether "individualized inquiry" is necessary because "whether an individualized inquiry is necessary to the extent that the class cannot be certified is a legal conclusion").

1    These conclusions are also similar to those that were stricken by the District Court in the

2   Southern District of California, in assessing testimony by this same witness. *See Highfields Capital*,

3   2022 WL 1037210, at *11 (excluding sections of a report from Mr. Deal because the report made

4   legal conclusions). As Judge Anello found in that case, "[w]hile Mr. Deal should be permitted to

5   testify as to his economic, analysis-driven conclusions," he "may not testify as to the legal import of

6   his analysis." *Id*. at *11.

7    Because Mr. Deal's testimony invades the province of the Court in applying the legal standard

8   for class certification, is offered in areas outside his expertise, and attempts to improperly parrot the

9   statements of others, the testimony is improper and should be stricken.

10    2.    Opinion 2 (Compensatory Damages) Should Be Stricken.

11    Mr. Deal's opinion as to compensatory damages states as follows: "Plaintiffs' Experts

12   likewise fail to present a reliable class-wide damages model for calculating compensatory damages

13   based on the value of the alleged 'personal information' at issue. Here too, the deficiencies in

14   Plaintiffs' Experts' model cannot be cured without individualized inquiry." Rpt., ¶ 15.

15    Mr. Deal's assertion here is that compensatory damages are based on the market value of the

16   data shared, and quantity of data shared cannot be calculated because the data submitted in bid

17   requests varies so widely. Rpt., ¶¶ 75-76, 81-82, 85, 91-92. But how much the data fields shared in

18   Google RTB vary across auctions is not an issue that Mr. Deal has any expertise in or has done any

19   studies to assess. Tr. 55:12-22 ("I didn't independently look at bid requests, for instance, so I didn't

20   do any testing of those.").[9]

21    When asked about the statement: "I understand that the data required to do a complete

22   accounting of data fields that were shared in Bid Requests during the Class Period does not exist,"

23   Mr. Deal testified that "[t]he source of that is my discussion with counsel." Tr. 295:10-297:23.

24    Accordingly, Mr. Deal may use this alleged variance in bid requests as an assumption, but he

25   may not state it as an opinion that he has adopted. *See Woods*, 2021 WL 4061657, at *19 (noting that

26

27   _____

28   [9] Prof. Zeithammer, who by contrast is an expert in auction economics, addresses these arguments in his Rebuttal Report at ECF 616-7, ¶¶ 110-115 and explains why Mr. Deal is wrong.

experts may rely on non-testifying experts "as a foundation" but not "simply parrot the opinions of non-testifying experts" (quoting *Villagomes*, 2010 WL 4628085, at *4)).

In addition, to the extent that these opinions state legal conclusions, because they focus on issues regarding whether plaintiffs' experts have provided a "reliable method of calculating classwide damages," and whether "individualized inquiry" is necessary, these opinions should be stricken.

### 3.    Opinion 3 (Unharmed Proposed Class Members) Should Be Stricken.

In his third primary opinion, Mr. Deal states that "Mr. Regan's assumption of harm to all Proposed Class Members [is] . . . unsupported," because "[t]here are many possible combinations of understanding, knowledge, choices and preferences among Proposed Class Members that would cause a substantial portion of them to be unharmed." Rpt., ¶¶ 96-97. This opinion should be stricken because Mr. Deal admits that he is not an expert in privacy or consent, and that he conducted no testing to assess or determine whether any user was unharmed. Tr. 46:18-22 (privacy); 190:19-191:2 (consent); 55:12-22 (testing). Mr. Deal also admitted in his deposition that he has "no specialized knowledge regarding the benefits that people allegedly receive from realtime bidding," and he does not "put [himself] forward" as an expert in "perceived value and utility of personalized ads." Tr. 362:9-18.

In addition, Mr. Deal opines that Google "publicly disclosed the type of information included in Bid Requests." Rpt., ¶ 110. And that "[d]uring the Class Period, Google account holders were able to take actions to avoid data sharing, and thus avoid harm." Rpt., ¶ 112. Aside from being completely wrong on the facts, these opinions go beyond using information provided by the company as background, and simply repeat Google's assertions as if they are factually true. This is not permissible expert testimony and should be stricken.

With respect to privacy, despite acknowledging that he is not an expert, Mr. Deal opines that "[a] body of academic studies and industry surveys show that people vary widely in their preferences for privacy, and a substantial share of people do not care about internet data privacy, are unwilling to pay anything to protect their data, and do not utilize readily available and free methods to protect their privacy." Rpt., ¶ 121. He further opines that "[i]t is clear that a substantial portion of consumers benefit from personalized ads and that many are aware that personalization is done using data such

1    as the at-issue data." Rpt., ¶ 132. The ultimate conclusion of this section is that "individualized inquiry

2    is necessary." Rpt., ¶ 135.

3        Here again, Mr. Deal asserts no expertise in privacy that would permit him to opine on

4    consumer preferences for privacy or the alleged benefits of personalized ads. These opinions are

5    properly excluded as beyond the scope of Mr. Deal's admitted expertise. *See Haynes*, 319 Fed. Appx.

6    at 542 (9th Cir. 2009) (affirming the exclusion of expert testimony outside a witness's expertise).

7                      4.    <u>Opinion 4 (Allocation) Should Be Stricken.</u>

8        Mr. Deal's final primary opinion asserts that "Mr. Regan has failed to propose a reliable

9    methodology for allocating the alleged damages on a class-wide basis." Rpt., ¶ 22. In support, Mr.

10   Deal argues that "[n]ot all Proposed Class Members suffered economic harm in every month while

11   they were account holders," and the "amount and type of data that Google included in Bid Requests

12   varies substantially even across Proposed Class Members who were Google account holders for the

13   same period of time." *Id*.

14       Mr. Deal admitted at his deposition that he is not an expert in the Google RTB auction or what

15   data fields are shared in the auction. Tr. 55:12-22 ("I didn't independently look at bid requests, for

16   instance, so I didn't do any testing of those."). When asked about the statement: "I understand that

17   the data required to do a complete accounting of data fields that were shared in Bid Requests during

18   the Class Period does not exist," Mr. Deal testified that "[t]he source of that is my discussion with

19   counsel." Tr. 295:10-297:23.

20       With respect to whether data fields "vary substantially," Mr. Deal admits that he has not "done

21   an analysis to say exactly how frequently each field is shared, for instance." Tr. 61:3-62:7.

22   Nevertheless, Mr. Deal insists that this statement is an opinion that he holds, rather than an

23   assumption that he is relying on. Tr. 61:3-62:16.

24       Because this statement is not based on expertise in a relevant field, it should be stricken. *See*

25   *Haynes*, 319 Fed. Appx. at 543 (noting that an expert must be qualified in a relevant field to meet the

26   test under Fed. R. Evid. 702); *Brown v. Google*, 2022 WL 17961497, at *9-11 (N.D. Cal. Dec. 12,

27   2022) (excluding testimony from a "security technologist" who sought to opine about the

28   "expectations and understandings of 'reasonable users'" because he lacked "specialized expertise" in

that field specifically). In addition, to the extent that this opinion asserts legal conclusions, such as whether a particular method can reliably assess classwide damages or whether individualized inquiry is necessary, exclusion is proper. *See Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (expert opinions that reliance was reasonable and foreseeable were inappropriate subjects for expert testimony).

**IV.    CONCLUSION**

For all of the foregoing reasons, plaintiffs respectfully request that the Court exclude Mr. Deal's expert report and strike his testimony consistent with the accompanying Proposed Order.

DATED: November 29, 2023                        Respectfully submitted,

**PRITZKER LEVINE LLP**

By: */s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal. Bar No. 305492)
1900 Powell Street, Ste. 450
Oakland, CA 94602
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**

By: */s/ Lesley E. Weaver*
Lesley E. Weaver (SBN 191305)
H. Melissa Mather (admitted *pro hac vice*)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*mmather@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

23                        Case No. 4:21-cv-02155-YGR-VKD

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Jenny Paulson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*jpaulson@simmonsfirm.com*

**DICELLO LEVITT LLC**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (212) 784-6400
Fax: (212) 213-5949
*dstraite@dicellolevitt.com*

James Ulwick (admitted *pro hac vice*)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*julwick@dicellolevitt.com*

**COTCHETT PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal. Bar No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

**BOTTINI & BOTTINI INC.**
Frances A. Bottini, Jr. (Cal. Bar No. 175783)
Anne Beste (Cal. Bar No. 326881)
7817 Ivanhoe Ave., Ste. 102
LA Jolla, CA 92037
Tel.: (848) 914-2001
*fbottini@bottinilaw.com*
*abeste@bottinilaw.com*

*Counsel for Plaintiffs and the Proposed Class*

Case No. 4:21-cv-02155-YGR-VKD
PLAINTIFFS' *DAUBERT* MOTION
TO EXCLUDE GOOGLE LLC'S EXPERT BRUCE DEAL

1           **ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2         I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained

3 from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

4         Executed this 29th day of November, 2023, at Charleston, South Carolina.

5

6                            */s/ Lesley E. Weaver*
                           Lesley E. Weaver