# EXHIBIT B
# to the Declaration of
# W. Somvichian

## (REDACTED VERSON OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

# Exhibit 1

## FILED UNDER SEAL

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                    OAKLAND DIVISION

 4

 5   In re Google RTB Consumer    ) Case No.
     Privacy Litigation,          ) 4:21-cv-02155-YGR-VKD
 6                                 )
                                   )
 7   This document applies to:    )
     All actions                   )
 8   _____ )

 9

10

11

12                    CONFIDENTIAL

13        VIDEO-RECORDED DEPOSITION OF BRUCE DEAL

14

15              Tuesday, October 24, 2023

16              San Francisco, California

17

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 6151469
```

                                              Page 1

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5   In re Google RTB Consumer    ) Case No.

     Privacy Litigation,          ) 4:21-cv-02155-YGR-VKD

 6                                 )

                                   )

 7   This document applies to:    )

     All actions                   )

 8   _____ )

 9

10

11

12            CONFIDENTIAL, VIDEO-RECORDED DEPOSITION OF

13   BRUCE DEAL, taken on behalf of the Plaintiffs, at

14   the law offices of Cooley LLP, located at

15   Three Embarcadero, 20th Floor, San Francisco,

16   California 94111, on Tuesday, October 24, 2023,

17   before Hanna Kim, CLR, Certified Shorthand Reporter,

18   No. 13083.

19

20

21

22

23

24

25

                                              Page  2
```

CONFIDENTIAL

```
 1                    A P P E A R A N C E S   O F   C O U N S E L:

 2

 3    For Plaintiffs:

 4              BLEICHMAR FONTI & AULD LLP

 5              BY:  LESLEY E. WEAVER, ESQ.

 6              BY:  JOSHUA SAMRA, ESQ.

 7              (Via Videoconference)

 8              BY:  ANNE K. DAVIS, ESQ.

 9              (Via Videoconference)

10              1330 Broadway, Suite 630

11              Oakland, California 94612

12              415.445.4004

13              lweaver@bfalaw.com

14              jsamra@bfalaw.com

15

16              -and-

17

18              LAW OFFICES OF H. MELISSA MATHER

19              BY:  H. MELISSA MATHER, ESQ.

20              823 Congress Ave

21              Austin, Texas 78701

22              512.536.1377

23

24

25
```

Page 3

CONFIDENTIAL

```
 1            APPEARANCES OF COUNSEL:  (CONTINUED)

 2

 3    For Plaintiffs:

 4            PRITZKER LEVINE LLP

 5            BY:  ELIZABETH C. PRITZKER, ESQ.

 6            (Via Videoconference)

 7            1900 Powell Street, Suite 450

 8            Emeryville, California 94608

 9            415.692.0772

10            ecp@pritzkerlevine.com

11

12            -and-

13

14            COTCHETT, PITRE & MCCARTHY LLP

15            BY:  BRIAN DANITZ, ESQ.

16            (Via Videoconference)

17            BY:  KARIN SWOPE, ESQ.

18            (Via Videoconference)

19            San Francisco Airport Office Center

20            840 Malcolm Road, Suite 200

21            Burlingame, California 94010

22            650.697.6000

23            bdanitz@cpmlegal.com

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1            APPEARANCES OF COUNSEL:   (CONTINUED)

 2

 3     For Defendant:

 4            COOLEY LLP

 5            BY:   AARTI G, REDDY, ESQ.

 6            BY:   WHITTY SOMVICHIAN, ESQ.

 7            (Via Videoconference)

 8            BY:   REECE TREVOR, ESQ.

 9            (Via Videoconference)

10            3 Embarcadero Center, 20th Floor

11            San Francisco, California 94111-4004

12            415.693.2000

13            areddy@cooley.com

14

15

16     Also Present:

17            DANIELLE PIERRE, Google LLC

18            (Via Videoconference)

19            CASSIA LEET, Videographer

20

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1                  INDEX OF EXAMINATION

 2

 3   WITNESS:  BRUCE DEAL

 4   EXAMINATION                                    PAGE

 5        BY MS. WEAVER:                             12

 6

 7

 8   QUESTIONS INSTRUCTED NOT TO ANSWER:

 9   PAGE....LINE

10   52......4

11   53......6

12   57......7

13   60......24

14   87......18

15                        --o0o--

16

17

18

19

20

21

22

23

24

25

                                           Page  6
```

```
 1                    INDEX OF EXHIBITS

 2

 3   DEAL DEPOSITION EXHIBITS                         PAGE

 4   Exhibit 1       "Exhibit 4 to Declaration of W.    13

 5                   Somvichian," Expert Report of

 6                   Bruce Deal, September 29, 2023;

 7                   103 pages

 8   Exhibit 2       "Appendix I, Overview of Google    68

 9                   Authorized Buyers and Real-Time

10                   Bidding, Confidential -

11                   Commercially Sensitive"; 24

12                   pages

13   Exhibit 3       Document; Bates nos.              123

14                   GOOG-HEWT-00047191 through

15                   '47225; 36 pages

16   Exhibit 4       Consolidated Class Action         164

17                   Complaint; 139 pages

18   Exhibit 5       "Exhibit 4 Filed Under Seal,"     293

19                   "Expert Class Certification

20                   Report of Greg J. Regan,

21                   CPA/CFF, CFE, July 14, 2023"; 46

22                   pages

23

24

25
                                            Page  7
```

```
 1              INDEX OF EXHIBITS (CONTINUED)

 2

 3    DEAL DEPOSITION EXHIBITS                    PAGE

 4    Exhibit 6     Excerpted pages from "Reference    350

 5                  Manual on Scientific Evidence,

 6                  Third Edition," "III. The

 7                  Standard General Approach to

 8                  Quantification of Damages"; 14

 9                  pages

10                       --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1                        BRUCE DEAL,

 2          having been duly administered an oath,

 3          was examined and testified as follows:

 4

 5                        EXAMINATION

 6   BY MS. WEAVER:

 7        Q.   Good morning, Mr. Deal.

 8             How are you?

 9        A.   Good morning.  I'm well.

10             Thank you.                          09:10:04

11        Q.   Good.

12             Where are you currently employed?

13        A.   Analysis Group.

14        Q.   And what is Analysis Group?

15        A.   It's an economic financial and strategy   09:10:10

16   consulting firm.

17        Q.   And you've been deposed before; correct?

18        A.   Hundreds of times.

19        Q.   Hundreds of times?

20             More than 200?                      09:10:16

21        A.   I don't know.  Something like that.

22        Q.   More than 300?

23        A.   I doubt it, but I don't know.

24        Q.   And you understand you're under oath

25   today; is that right?                          09:10:26
```

Page 12

CONFIDENTIAL

```
 1          A.    Excuse me.  I do, yes.

 2          Q.    You hold a master's in public policy;

 3     correct?

 4          A.    That's correct.

 5          Q.    Which you earned in 1990?                    09:10:32

 6          A.    That's correct.

 7          Q.    And a BA in economics from Pacific

 8     Lutheran University, which you earned in 1987;

 9     right?

10          A.    Also correct.                               09:10:39

11                I had a second degree in global studies as

12     well at Pacific Lutheran, but --

13          Q.    I'm sorry.

14                Let's look at -- we -- for the record, we

15     marked as Exhibit 1 Mr. Deal's expert report         09:10:54

16     submitted in this matter.

17                (Deal Deposition Exhibit 1 was marked for

18                identification.)

19                And I'd ask you to turn to your Tab A and

20                your Tab B, your appendix -- the            09:10:57

21                appendices which lay out your previous

22                testimony and education.

23          A.    Okay.

24                THE COURT REPORTER:  And, Counsel, I'm

25     going to ask you if you could please slow down.       09:11:12
```

Page 13

1    considered peers, so editors that would review it

2    and say, "Oh, I think there's a problem with this.

3    There's a problem with that."

4          And then ultimately if it's accepted, then

5    it's published in the journal.                    09:20:58

6          Q.   Would you agree that peer review is

7    designed to test both issues in underlying facts,

8    assumptions, and methodologies?

9          A.   I mean, I don't -- I don't disagree with

10   that.  It's sort of a -- it's clearly what --        09:21:18

11   exactly what peer review is, what level of analysis

12   is done, what is -- is -- it varies a lot.  But I --

13   the spirit of what -- of those types of things is

14   what it's intended to check.

15         Q.   What is the standard for peer review in    09:21:32

16   economics?

17         A.   I'm not sure what you mean.

18         Q.   Is there a standard for peer-reviewed

19   material in the field of economics?

20         A.   I'm -- I'm not trying to be difficult.     09:21:40

21   I'm just not quite sure what you're asking.  I mean,

22   in the sense of each journal would have its panel of

23   editors, and usually an article would be submitted

24   and reviewed by several individuals.

25         And, you know, if it's -- if it's           09:21:57

                                            Page 22

```
1    ultimately -- there might be revisions, things like

2    that, that go back and forth.

3              And then if it's ultimately, you know,

4    accepted by the various peer reviewers, then it

5    would be published in the journal.            09:22:08

6         Q.   And you -- you've never done that in the

7    field of economics; right?

8              MS. REDDY:  Objection.  Asked and

9    answered.

10             THE WITNESS:  Yeah, that's correct.  It's   09:22:14

11   not an area that I focused on.

12   BY MS. WEAVER:

13        Q.   You understand what a Daubert motion is;

14   right?

15        A.   I do.                                 09:22:21

16        Q.   What is it?

17        A.   A Daubert motion is a legal motion to

18   exclude an expert based on -- you know, kind of

19   the -- the colloquial term would be sort of "junk

20   science," I think, to sort of ensure that the   09:22:35

21   methodologies and approaches are kind of standard in

22   the field.

23        Q.   Do you understand that under the Daubert

24   standard there are four to five factors that

25   includes whether the technique or theory in question   09:22:47
```

Page 23

1          I have additional Ph.D. coursework in

2     econometrics and finance and other topics I passed

3     the Ph.D. exams.

4          I ended up working in consulting, so I

5     didn't -- I didn't go the academic direction and          09:25:09

6     didn't -- didn't complete my dissertation, but my

7     academic training is in, you know, kind of applied

8     economics, if you will, public policy and economics.

9          And then I've been spending the last 25 --

10    well, now 30 years, I guess it's been -- time --          09:25:23

11    time goes on -- you know, working in a variety of

12    settings on economic, finance, statistical issues.

13    Q.   You say that your Ph.D. coursework was

14    completed.

15         What does that mean?                                  09:25:39

16    A.   The way a Ph.D. typically works is there's

17    a portion of -- of, you know, coursework.  Sometimes

18    that could be coterminous with a master's.

19    Sometimes it can be additional coursework.

20         And then it leads to kind of the -- the          09:25:53

21    Ph.D. exams where, again, they test you on the

22    knowledge of the various coursework.

23         Once that's all complete, you basically

24    work on your dissertation.

25         So I finished all of the elements.  And I          09:26:04

Page 26

1    was working on my dissertation when I started

2    working with Analysis Group, and that's when I

3    didn't complete the dissertation.

4        Q.   And part of the dissertation process

5    involves subjecting your work to critique by others;   09:26:14

6    correct?

7        A.   Certainly your committee would -- of --

8    of -- yes, that's right, would -- would -- would

9    certainly review it.

10       Q.   And that didn't happen for you; right?   09:26:23

11       A.   No, I didn't -- I didn't submit -- I

12   didn't even submit the Ph.D.  I just started -- once

13   I started working, I didn't have time to -- to work

14   on it.

15            And once I had realized I wasn't going to   09:26:31

16   go the academic route, it became less salient.

17       Q.   And to be clear, since that time, you have

18   been consulting; is that right?

19       A.   Yes, in the sense that I've been -- I've

20   been working for various consulting firms and   09:26:47

21   working with clients.

22            I mean, much of what I do is serve as an

23   expert witness, for instance, on that, so -- but

24   I -- I -- it's fair to say that I have -- I have

25   been working with consulting firms and working as   09:26:59

Page 27

```
 1          Q.   You know who the Plaintiffs are?

 2          A.   In -- in -- the proposed named

 3     Plaintiffs --

 4          Q.   Yes.

 5          A.   -- is that what you mean?              09:34:57

 6          Q.   And -- and we are proceeding in a

 7     litigation against Google; correct?

 8          A.   Yes.

 9          Q.   And did the Plaintiffs put forward any

10     experts in this case?                            09:35:05

11          A.   Oh, you mean other experts; is that what

12     you're --

13          Q.   Yes.

14          A.   -- talking about?  Oh, yeah, I'm aware of

15     that, yeah.                                      09:35:09

16          Q.   Who are their experts?

17          A.   I don't remember off the top of my head.

18     I think there was a -- a statistical expert, may

19     have been a -- a -- a law professor, talking about

20     some survey or some, you know, kind of framework   09:35:25

21     analysis.  I'd have to go back and look and --

22     and -- and see.

23               But, yeah, I'm aware that there were other

24     experts.  Is that -- I -- now I understand what you

25     were asking.                                     09:35:36
```

Page 35

1        Q.   Your understanding, as you sit here today,

2   is that the Plaintiffs put forward a statistical

3   analysis?

4        A.   No, no.  I think that would be incorrect.

5             So what -- what I'm thinking about as          09:35:45

6   you're asking the question is, I'm aware that there

7   are also other experts for Google who are rebutting

8   certain of those other experts.  So, for instance,

9   there's a survey expert who is rebutting -- and

10  that's what I'm not remembering off the top of my       09:36:02

11  head, the name of the individual that they are

12  serving.

13            I don't recall that the other person had

14  done a survey, so I don't want to -- I don't want to

15  imply that they were.  But some of the critiques had    09:36:13

16  the -- had the characters, I recall, of -- you know,

17  that it wasn't using scientific methods to come up

18  with some of the conclusions, things like that.

19       Q.   I'm sorry, I'm just trying to understand

20  your answer.  Who is the other person in your           09:36:26

21  answer?

22       A.   I'm -- I'm -- so the --

23       Q.   You said, "I don't recall that the other

24  person had done a survey."

25       A.   The -- oh, sorry.  The -- the Plaintiffs'      09:36:38

1    expert that was being critiqued by the survey expert

2    for Google, whose name I don't recall as I sit here

3    right now.

4          Q.   Can you identify a single expert who was

5    working for the Plaintiffs in this matter?          09:36:55

6          A.   Again -- well, yes.  I mean --

7          Q.   Who?

8          A.   -- the -- Mr. Regan and Mr. Zeithammer.

9          Q.   Can you identify any others?

10         A.   I know that there -- again, not by name, I   09:37:04

11   don't recall as I sit here right at this moment.

12         Q.   And --

13         A.   But it -- I -- there are other experts.

14         Q.   And you didn't read their reports; right?

15         A.   I -- I skimmed their reports.  I didn't --  09:37:13

16   I wouldn't -- I didn't read every work of it, but...

17         Q.   What do you recall about the reports that

18   you skimmed, Mr. Deal?

19         A.   Well, again, I -- what a -- the main thing

20   I recall is that, they were focusing on topics that   09:37:28

21   were not topics I was being asked to critique.  But,

22   you know, again, I -- I'd have to -- I'd have to

23   review them again to -- or -- or to -- to skim them

24   again to remember the specifics.

25              Again, I remember there -- again, the     09:37:52

                                              Page 37

1   and I typically don't do.

2   BY MS. WEAVER:

3       Q.   Were you asked to render opinion about

4   users' expectations?

5       A.   I think the way I would answer that is --   09:47:10

6   is not -- not conclusory opinions.  I think where

7   I -- where I would say there's some overlap with my

8   opinions there is that, as I think I pretty clearly

9   describe in the report, you know, what users

10  understand, what their expectations are, you know,   09:47:35

11  based on the understanding and what the reality is,

12  those are all elements that could contribute to

13  variability and individual questions.

14          So -- but I don't offer any, you know,

15  opinions that X percent of people understood this or   09:47:51

16  expected this or Y percent.  That's not the kind of

17  opinion I'm offering.

18      Q.   You're not a privacy expert; right?

19      A.   I agree with that.  I mean, again, privacy

20  is an issue that comes up more frequently all the   09:48:04

21  time I would say.  But I don't consider myself a --

22  a specific privacy expert, no.

23      Q.   And you're not a data engineer; right?

24      A.   Again, not a -- certainly not a data

25  engineer.  I'm a -- I -- I do lots of data   09:48:18

Page 46

```
 1    don't recall, as I sit here right now.  But, again,

 2    as part of the overall background materials, I had

 3    those -- those other expert reports.

 4    BY MS. WEAVER:

 5         Q.   Do you know whether those expert reports    09:51:22

 6    were written at the time that Mr. Regan wrote his

 7    report?

 8         A.   I don't recall.  And, again, I don't

 9    recall whether he specifically cited them or not.

10         Q.   Do you know who Zubair Shafiq is?          09:51:31

11         A.   That name does sound a -- a -- a -- a bit

12    familiar, but I'd have to -- maybe you can give me a

13    report or something to refresh my memory.  I don't

14    remember exactly.

15         Q.   Do you know if Mr. Regan cites Mr. Shafiq   09:51:45

16    throughout his report?

17         A.   I'm -- I'm happy to look.  I don't recall

18    as I sit here right now.

19         Q.   And do you know who George Levitte is?

20         A.   Yes.                                        09:52:01

21         Q.   Who is he?

22         A.   My -- well, I -- I mean, I recognize the

23    name.  But I'd have to go back and refresh my memory

24    as to exactly who he is, but I definitely recognize

25    the name.                                             09:52:21
```

Page 50

```
 1        Q.   Do you know if he was deposed in this

 2   case?

 3        A.   That, I -- I have a recollection that he

 4   may have been deposed.  Yeah, but, again, I'd have

 5   to go back and check.                          09:52:32

 6        Q.   Did you read his deposition?

 7        A.   Best of my recollection, yes.

 8        Q.   And looking at Appendix B, do you see

 9   there that you list Mr. Levitte's deposition as one

10   that you relied on?                            09:52:50

11        A.   No.  My recollection is that while I

12   reviewed it, I didn't rely on it.

13        Q.   And you don't see Mr. Shafiq's expert

14   report listed here in Appendix B, do you?

15        A.   I agree with that.                   09:53:09

16        Q.   So you didn't rely on that; right?

17        A.   I agree with that.

18        Q.   Did you consider it?

19        A.   I --

20             MS. REDDY:  Objection.  I -- we have an  09:53:16

21   expert stipulation in this -- in this matter.  And

22   counsel is not entitled to probe what the witness

23   may have --

24             MS. WEAVER:  I am absolutely --

25             MS. REDDY:  -- considered --         09:53:23
```

Page 51

```
 1    extent that for a younger, you know, computer users,

 2    other fields are not shared.

 3              There's lots of information that's

 4    consistent with the fact that the -- you know, not

 5    every field is shared in every circumstance.  And        09:56:20

 6    there's browsers that can be used.  There's blockers

 7    that can be used.  There's a lot of different things

 8    that I talk about throughout my report, that, you

 9    know, use of VPN -- so I'm summarizing here, you

10    know, kind of what's con- -- what's throughout my       09:56:37

11    entire report.

12         Q.   So I understand you have a conclusion.  I

13    am trying to ask you what is the basis for that

14    conclusion, both factual and experiential.  You did

15    not perform any testing; right?                          09:56:56

16         A.   I --

17              MS. REDDY:  Objection.  Vague and

18    ambiguous.

19              THE WITNESS:  I think I agree with that to

20    the extent I didn't -- I didn't independently look       09:57:01

21    at bid requests, for instance, so I didn't do any

22    testing of those.

23    BY MS. WEAVER:

24         Q.   And did you look at what data is described

25    to be contained in bid requests?                         09:57:09
```

Page 55

```
1              (Record marked.)

2    BY MS. WEAVER:

3        Q.   Can you describe your methodology for

4    assessing -- well, strike that.

5              Isn't it true that you are making an          10:01:52

6    assumption in Paragraph 33, but you have couched it

7    as something that you are asserting to be true?

8              MS. REDDY:  Objection.  Argumentative.

9              THE WITNESS:  I -- I think it's -- I -- I

10   think I understand your question.  It's not an          10:02:11

11   assumption in the sense that it's an assumption that

12   I think has, you know, kind of no basis that I have

13   no knowledge of.  I haven't seen anything related

14   to.

15             So I -- I don't -- it's not that -- it's      10:02:27

16   not an assumption in that sense.  It is an

17   understanding, and it's -- it's obviously consistent

18   throughout my report.

19             I think I -- I spent a lot of time talking

20   about, you know, the -- the type of information       10:02:39

21   that's shared and the variation and the steps that

22   people can take to -- to have information not being

23   shared.

24             So it's -- it is my understanding -- if

25   for some reason it turns out to be, you know,          10:02:52
```

Page 61

1    incorrect and, in fact, every field is always shared

2    with -- in every bid request, that would be contrary

3    to my understanding.

4            But, again, I haven't done an

5    individual -- I haven't done an analysis to say          10:03:05

6    exactly how frequently each field is shared, for

7    instance.

8    BY MS. WEAVER:

9        Q.   Well, to be clear, your opinion here

10   doesn't say every field that is always shared.          10:03:13

11           Your opinion here says, "I understand that

12   the types of field populated and shared vary

13   substantially across individual Bid Requests."  [As

14   read]

15           That's your opinion; right?                     10:03:27

16       A.   It is my opinion.

17       Q.   And it is based on reviewing the Google

18   Plaintiffs' expert reports; right?  That's what you

19   relied on?

20       A.   I -- that is a very minor element of what      10:03:33

21   I rely on.

22       Q.   What else did you rely on?

23       A.   I've repeatedly said throughout my answers

24   to this question that it's all throughout my report.

25   There's lots of information about -- that I -- I        10:03:45

Page 62

1    may or may not be.  I don't know.  I'd just have to

2    look at it, but...

3    BY MS. WEAVER:

4        Q.   Okay.  You've testified repeatedly that

5    you relied on deposition exhibits.                    10:08:46

6             Are any of those identified on Appendix B?

7        A.   They're part of the transcript.

8        Q.   The documents themselves are not part of a

9    transcript, sir.

10            MS. REDDY:  Objection.  Argumentative.        10:08:58

11   BY MS. WEAVER:

12       Q.   Did you rely on any exhibits to any of the

13   depositions that you've listed here?

14       A.   Again, I -- I wouldn't say I -- no is the

15   answer.  I don't -- I don't specifically rely on any  10:09:09

16   of them.  I think they're -- I -- to the best of my

17   recollection, they're con- -- they are consistent

18   with the types of sources that I do cite

19   specifically in terms of what are the different ways

20   in which different types of data is shared or not     10:09:26

21   shared, those types of circumstances, so...

22            But I didn't rely specifically on any of

23   them.

24       Q.   Thank you for clarifying.

25            On page 13, you refer to Exhibit 13 -- or     10:09:37

                                                          Page 67

1    detects the age and uses, you know, restricted data

2    processing.  There's a lot of circumstances where

3    it's only a subset of the fields that -- that --

4    that may be used at all.

5         So it's more about the -- you know, are    10:15:25

6    all of them?  Is it a subset?  Is it a variation.

7    That's my point.

8         Q.   Mr. Deal, I understand your conclusion.

9         This document does not say what you just

10    said, does it?                                  10:15:37

11         MS. REDDY:  Objection.  Argumentative.

12    Mischaracterizes testimony.

13    BY MS. WEAVER:

14         Q.   Does this document support your statement

15    that it's a completely different set of variables   10:15:45

16    for User A and B?

17         A.   No, no, that's --

18         MS. REDDY:  Objection.  Mischaracterizes

19    the document.  Mischaracterizes his testimony.

20         THE WITNESS:  It's def- -- that's       10:15:59

21    definitely mischaracterizing my testimony.  I said

22    specifically that's not what I'm saying.  I'm not

23    saying there's a complete -- I'm saying there's a --

24    I think of it as there's a master set of -- of

25    variables.  That's what this document is speaking   10:16:07

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   about.

 2           There are many circumstances where not

 3   every one of these variables and different

 4   combinations of them may not be included in the bid

 5   requests.  They may be blank, for instance, for all     10:16:19

 6   kinds of reasons, the software you're using, the

 7   blockers you're using, device you're using, you

 8   know, age of the user, VPNs, all kinds of issues out

 9   there.

10           So I'm specifically not saying, "Oh, for       10:16:34

11   you there's a -- there's one set of variables.  For

12   you, there's another."  There's a master set for

13   everybody, But it's only -- you know, they're --

14   whether all of them or a subset or what subset,

15   that's the variability here.                           10:16:47

16   BY MS. WEAVER:

17       Q.   And with regard to the second part of your

18   opinion, that some blockers may prevent some data

19   fields from being transmitted, you did not conduct

20   any testing on that; right?                            10:16:59

21       A.   I agree with that.  If the question is --

22   is a technical question -- that's right.  There's

23   lots of documents that speak to -- to that and, you

24   know, people who talk about their own products and

25   say they block and all that, but I -- I myself        10:17:15
```

Page 74

1    didn't do a [verbatim] independent experiment, for

2    instance.

3         Q.   So you read some publicly available

4    articles about the fact that some people may block

5    data; right?                                        10:17:25

6              MS. REDDY:  Objection.  Mischaracterizes

7    testimony.  Mischaracterizes the document.

8              THE WITNESS:  I mean, I -- sort of in a

9    sense -- I mean, I did read lots of -- and I cite

10   lots and lots and lots of documents in my report,   10:17:39

11   which I speak to -- in my exhibit, I think,

12   summarizes -- Exhibit 3 summarizes many of those

13   different products, things like, you know, blockers,

14   all -- all those sorts of things.

15             So that is based on the totality of my     10:17:56

16   understanding, and I cite the specific sources in

17   that exhibit.  But that is my understanding.

18   BY MS. WEAVER:

19        Q.   What piece of evidence can you point to

20   that you relied on that shows in this case data       10:18:05

21   fields were not transmitted in bid requests because

22   somebody was using a blocker?

23             Let me ask the question again.

24        A.   Yeah.

25        Q.   What piece of evidence produced in this     10:18:28

Page 75

1   case can you point to that you relied on for your

2   conclusion that data fields were not transmitted in

3   bid requests because somebody was using a blocker?

4        A.   I think -- I think what you're asking is

5   kind of a statistical or a technical question, which    10:18:46

6   is -- that's -- I -- I'm not citing anything.  That

7   is my overall understanding based on the usage of --

8   the -- the widespread usage of many of these

9   different products, but I'm not offering an opinion

10  that 10 percent of the time, half of them were done,    10:19:03

11  50 percent of the time, a third of them were shown.

12  I -- that's not the kind of opinion I'm offering.

13             So I -- I don't -- I don't have something

14  to cite for that.  I'm citing, you know, kind of

15  broader issues here.  I'm not offering my opinion as    10:19:18

16  to a statistical percentage, for instance.

17       Q.   Can you cite any evidence produced in this

18  case that has to do with whether or not data in bid

19  requests was blocked?  It's a yes-or-no question.

20             MS. REDDY:  Objection.  Asked and            10:19:34

21  answered.

22             THE WITNESS:  I mean, I -- I'm not sure if

23  I can answer it differently than I've -- I've

24  answered.  Certainly that was, you know, a topic of

25  deposition testimony, for instance, as to kind of in    10:19:45

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    what circumstances, you know, restricted data

2    processing was used as an example.

3              I don't know whether you would consider

4    that to be an answer to your question or not, but

5    I've seen those kinds of things.                    10:19:58

6              But I haven't independently done any

7    statistical analysis of bid requests, or it's not --

8    it's not part of my assignment.

9    BY MS. WEAVER:

10        Q.   And just to be clear, I'm giving you an     10:20:08

11   opportunity now to identify any evidence in this

12   case -- produced in this case that you reviewed that

13   supports that conclusion.

14             Can you do that?

15             MS. REDDY:  Objection.  Asked and          10:20:22

16   answered.  Argumentative.

17             THE WITNESS:  I mean, I've -- this -- this

18   case is -- is, I think, a proposed -- as I

19   understand it, it's a proposed class action for all

20   U.S. term of service users, you know --              10:20:30

21             THE COURT REPORTER:  I'm sorry, "U.S."?

22             THE WITNESS:  -- term of service users

23   for, you know, many years who were -- whose data was

24   part of realtime bidding for either authorized

25   buyers or open bidding partners.  So that's, you     10:20:45

                                                Page 77

1    know, many, many, many people out there.

2            So, again, it's my understanding that the

3    type of software, and I cite to, you know, the -- in

4    terms of the blockers, the changes over time, the

5    Apple products.  There's a wide variety of -- of        10:21:00

6    different sources, different studies that people

7    have looked at.

8            But I haven't independently done any data

9    analytics, and I'm not specifically citing to, you

10   know, any set of bid requests data.  There may be       10:21:17

11   other experts that are looking at that question, but

12   that's not what I've been asked to do.

13   BY MS. WEAVER:

14       Q.   So there is no evidentiary support for

15   your conclusion based on the evidence produced in       10:21:28

16   this case that you can identify right here; correct?

17           MS. REDDY:  Objection.  Argumentative.

18   Asked and answered.  Mischaracterizes testimony.

19           MS. WEAVER:  It's a yes-or-no question.

20           THE WITNESS:  I -- I -- with all due            10:21:38

21   respect, I don't think it is a yes-or-no --

22   BY MS. WEAVER:

23       Q.   What --

24       A.   -- question.

25       Q.   Then -- then identify the evidence.            10:21:46

Page 78

1    housecleaning.  This is your expert report; correct?

2        A.   It certainly appears to be.  We've been

3    talking about it today, and I haven't noticed

4    anything that seems inconsistent with my --

5        Q.   And that's your --                        10:48:49

6        A.   -- expert report.  So --

7        Q.   Apologies.

8        A.   -- it appears to be.

9        Q.   And that's your signature on page 71;

10   right?                                             10:48:55

11       A.   It is.

12       Q.   And does the report ref- -- reflect all

13   the opinions you are rendering at this time in this

14   case?

15       A.   Yes.  In -- in -- in addition to the --   10:49:02

16   you know, the exhibits and things like that to the

17   extent they're referenced, but yes, the totality of

18   my report and opinions are contained in the report.

19       Q.   I'd like to have you turn to pages 10 to

20   11 of your report.                                 10:49:20

21            Now, you understand that you are required

22   to identify all materials that you relied upon in

23   reaching your conclusions; correct?

24       A.   I agree with that, yes.

25       Q.   And would you agree the reason for that is 10:49:30

Page 89

1    so that the other side can test the foundation for

2    your conclusions?

3        A.    That -- I mean, there -- there may be

4    other reasons too, but that's certainly frequently

5    what -- what happens.                              10:49:43

6        Q.    And I'll direct your attention here to

7    Footnote 25.

8        A.    Okay.

9        Q.    Actually -- do you see where it says,

10   "Interview with Stanislav Belov, August 16, 2023"?   10:50:07

11       A.    Yes.

12       Q.    What does that refer to?

13       A.    Literally, I had a telephone interview

14   with Mr. Belov on that date.

15       Q.    And who was present?                       10:50:24

16       A.    I was present, Mr. Belov was present, my

17   colleague, Hristina Bartlett, was present.  I think

18   my recollection is counsel was present.  I don't

19   actually remember who -- who in terms of exactly

20   which counsel were present.  I mean, it was -- it     10:50:46

21   was me and my colleague, Ms. Bartlett, asking

22   questions of Mr. Belov.  So I don't recall which

23   other counsel were there.

24       Q.    Has --

25       A.    But there were -- there were some counsel.  10:50:54

Page 90

1    team member present as well to, you know, kind of

2    assist in conducting and then, you know, kind of

3    incorporating the material into -- from the

4    interview into my report.

5        Q.   Is Ms. Bartlett working on any other        10:52:00

6    matters for Google currently?

7        A.   Maybe.  I don't know.

8        Q.   And going back to this interview with

9    Mr. Belov, did you identify that in your Appendix B?

10       A.   I don't recall if I specifically called it   10:52:37

11   out.  It's obviously included in my report.

12       Q.   You don't see it there, do you?

13       A.   I don't see it specifically listed in my

14   Appendix B, which is list of documents relied upon.

15   So it's not a document.  It's an interview.  So it's   10:52:56

16   included in my -- in -- clearly identified in

17   Footnote 25 and other footnotes as I recall.

18       Q.   Yes, we'll discuss them.

19            How long was your conversation with

20   Mr. Belov?                                             10:53:10

21       A.   Best of my recollection -- recollection,

22   it was about an hour.

23       Q.   Was it transcribed?

24       A.   No.

25       Q.   Why not?                                     10:53:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1        A.    Give me -- give me a second.

 2              (Witness reviews.)

 3              Yes, I see that.

 4    BY MS. WEAVER:

 5        Q.    And you cite -- the only -- the only        11:03:01

 6    citation there is your interview with Mr. Belov.

 7              Do you see that?

 8        A.    Yes.

 9        Q.    And other than your interview with

10    Mr. Belov, do you have any reason to believe that      11:03:11

11    Google does not separately track RTB revenue from

12    ads shown to users with and without Google accounts?

13        A.    I mean, it -- it would make sense given my

14    understanding of -- of, you know, the -- the GAIA

15    cookies and all of that, but that is literally the    11:03:35

16    source for that citation.

17        Q.    Turning to page 19, Footnotes 57 and 58,

18    do you see at Paragraph 47 where you wrote, ██

19    ████████████████████████████████████████

██  ██████████████████████████████████████  ████████

██  ████████████████████████████████████

██  ████████████

23              Do you see that?

24        A.    Yes.

25        Q.    And you cite only Mr. Belov for that        11:04:09
```

Page 101

1    statement; right?

2        A.    Correct, that's the footnote.

3        Q.    Do you have any other basis for that

4    statement?

5        A.    I mean, again, no other specific citation.    11:04:27

6    I specifically asked that question to Mr. Belov,

7    and -- and he answered that.  That was my -- my

8    understanding was that the -- going into the

9    interview was that the U.S. identification would be

10    based on, you know, the -- the -- the internet ID,    11:04:40

11    but -- but he -- he was the source for that specific

12    confirmation or that specific element that there's

13    no way -- they don't have a means of -- of

14    identifying who's subject to the U.S. terms of

15    service.    11:05:01

16        Q.    And looking at Note 58, Mr. Belov is the

17    only person you cite there for the rest of that

18    paragraph; right?

19            MS. REDDY:  Objection.  The document

20    speaks for itself.    11:05:13

21            THE WITNESS:  Yeah, I guess it's a -- I --

22    I mean, I do cite that.  I think some of it is sort

23    of a logical proposition, but the -- the specific

24    reference to Mr. Belov there is really the -- I

25    understand that Google would not be able to    11:05:55

                                        Page 102

1    Mr. Regan's conclusion is based on evidence that

2    Google produced in this case?

3        A.    I guess what's -- what I'm -- what I'm

4    pausing on is I'm not sure -- I'd have to look back

5    in his report as to exactly what Footnote 61 says.    11:08:33

6    So I'm not sure -- when you said his conclusion, I

7    need to remember what his conclusion is --

8        Q.    Okay.

9        A.    -- there.

10       Q.    So I'm just trying to understand the basis    11:08:41

11   and your methodology, Mr. Deal.  You wrote this

12   sentence, "Google classified RTB revenue as being

13   related to ███████████ if the device the user was

14   using when the ad was shown was associated with a

15   U.S. Internet Protocol address."                       11:08:57

16           Do you see that?

17       A.    I do.

18       Q.    And you're telling me that the -- do you

19   believe that to be a true statement?

20       A.    Yes.                                          11:09:05

21       Q.    And you're telling me that the basis for

22   that is Mr. Regan's report; is that right?

23           MS. REDDY:  Objection.  Mischaracterizes

24   testimony.

25           THE WITNESS:  No, no.  I -- I -- I -- I --      11:09:11

                                            Page 105

1    clearly in Footnote 53 I have several elements in

2    there.  I have his report, a specific footnote for

3    his report.  I have a couple of different passages

4    from his deposition, and I have Google's revised

5    responses.                                    11:09:27

6              So what I'm saying is to look at exactly

7    what he said that I cited to, I would need to have

8    his report in front of me, which I don't have right

9    now.

10   BY MS. WEAVER:                                11:09:37

11       Q.   Did you review Google's interrogatory

12   responses?

13       A.   Yes.

14       Q.   And what did they say on this topic?

15       A.   Again, I -- I'll have to -- if you want to   11:09:42

16   put it in front of me, I'm happy to review them.

17   Again, I don't have them memorized.

18       Q.   I -- I don't -- I'm not asking about

19   perfect memorization.  I just mean in concept.

20             What -- what do they say?  As -- you as   11:09:51

21   Google's expert, what do those interrogatory

22   responses say related to the topic to the topic of

23   the sentence that you just read?

24             MS. REDDY:  Objection.  Argumentative.

25             THE WITNESS:  I mean, I need to review the   11:10:00

                                              Page 106

```
 1              MS. REDDY:  Objection.  Lacks foundation.

 2              THE WITNESS:  I don't know.

 3   BY MS. WEAVER:

 4       Q.   You're not an expert in this field, are

 5   you?                                        11:21:05

 6       A.   I am certainly not a technical expert

 7   in -- in VPN usage.

 8       Q.   Do you know whether VPN uses a very small

 9   fraction of U.S. all internet traffic let alone

10   controlling for Google accountholders?       11:21:19

11              MS. REDDY:  Objection.  Vague and

12   ambiguous.

13              THE WITNESS:  I -- I don't know.  I don't

14   see that that's particularly relevant for -- the --

15   the question here is, you know, Google       11:21:31

16   accountholders who are subject to U.S. terms of

17   service.  That's -- that's the block of revenue that

18   one needs as a starting point.

19              And, again, Plaintiffs' experts haven't

20   made any adjustments for anything on -- on this  11:21:48

21   front.  So -- and I -- I point to pretty clearly

22   this is -- this -- VPN usage -- VPN usage is

23   substantial.

24              So -- and some adjustment, whether it's

25   some -- some type of analysis or estimate needs to  11:22:06
```

                                          Page 116

1    be done, and nothing's been done.

2    BY MS. WEAVER:

3        Q.    So can you quantify today the number of

4    U.S. Google accountholders subject to the U.S. terms

5    of service that use a VPN that masks an IP address        11:22:22

6    outside of the United States?

7        A.    I -- I think the answer is no, if I

8    understand the question.  I'm not sure that I fully

9    got the connections there.  But, I mean, the -- I'm

10   not offering any specific estimate of what the          11:22:44

11   correction should be to what Mr. Regan has done.  I

12   note that he hasn't done anything.  And I say this

13   is a substantial issue that would need to be

14   addressed, and nothing's been done.

15       Q.    I understand that you keep repeating it's     11:23:02

16   substantial.  And what I'm trying to do is to figure

17   out the evidentiary basis for that statement.

18            Because if it were super, super, super

19   tiny like zero percent, Mr. Regan would not need to

20   make an adjustment for that input; correct?            11:23:17

21       A.    I -- I have to think about the -- I mean,

22   the -- the -- the problem is that I -- as I

23   understand it, is -- and I -- I certainly don't -- I

24   don't have any reason to believe that hypothetical

25   is -- is an accurate representation if it's zero        11:23:37

```
 1    adjustment to it.

 2    BY MS. WEAVER:

 3         Q.   Is that what Google reports to the

 4    Internal Revenue Service?

 5              MS. REDDY:  Objection.  Calls for      11:41:06

 6    speculation.

 7              THE WITNESS:  I don't know.

 8    BY MS. WEAVER:

 9         Q.   Who would know?

10         A.   I presume somebody at Google.         11:41:08

11         Q.   Did you meet with George Levitte?

12         A.   No.

13         Q.   You said you reviewed his deposition

14    testimony; is that right?

15         A.   That's correct.                       11:41:19

16         Q.   And what do you recall about his

17    testimony?

18         A.   Again, I certainly can't recall any

19    specific quotations here.  There's nothing that I

20    specifically relied on from his deposition.  But  11:41:33

21    my -- to the best of my recollection, it was

22    confirmatory with my understanding about, you know,

23    how the process works, in terms of realtime bidding

24    and, you know, the various other elements of -- of

25    realtime bidding.  But I'd have to go back and      11:41:48
```

Page 133

```
 1   re-review it, but I don't rely on it for anything

 2   specific.

 3        Q.   So by "confirmatory," what you mean is,

 4   you read it to confirm a conclusion you had already

 5   drawn; is that right?                              11:42:00

 6             MS. REDDY:  Objection.  Argumentative.

 7   Mischaracterizes testimony.

 8             THE WITNESS:  No, I don't think that's

 9   quite right.  I -- you know, as I've -- as I started

10   this case and developed it, I had an -- you know, I    11:42:14

11   was developing an understanding of how realtime

12   bidding works.  Of -- and based on that

13   understanding, you know, and the assignment given to

14   Mr. Regan and Professor Zeithammer, you know, kind

15   of, what -- what -- how was what they were doing      11:42:28

16   consistent or not with the allegations in the case

17   and the proper way of understanding the data and

18   realtime bidding.

19             So I would say it was confirmatory for my

20   un- -- my understanding of how it worked.  And I     11:42:42

21   wouldn't say it's a conclusion -- that -- but

22   it's -- you know, realtime bidding is a -- it's a

23   very interesting sort of technology, I think.  So --

24   and -- and frankly can kind of be complex.

25             So developing an understanding of how it    11:43:01
```

Page 134

CONFIDENTIAL

1    enrichment.

2        Q.   Just to clarify, is it your understanding

3    that users actually put their own data in the bid

4    request?

5        A.   No, no, no.                                01:02:22

6        Q.   Google does that; right?

7        A.   Well, I think it's a -- technically --

8    again, this is a little bit outside the scope of my

9    understanding, but the data originates from the

10   publisher, and then Google is the one that uses the    01:02:33

11   data in the bid request.  So I agree with that.  But

12   I believe it -- it -- it originates with the

13   publisher.

14       Q.   Your understanding is that for all

15   realtime bidding auctions, the data originates from    01:02:47

16   a publisher?

17       A.   Again, without -- without me being the

18   technical expert in it, that liter- -- literally the

19   bid request is coming from Google.  But the

20   underlying data I understand is coming from the        01:03:00

21   publisher with Google potentially doing some

22   modifications to the data.  But the un- -- the

23   original data is coming from the publisher.

24       Q.   And there's no data coming from the

25   targeted individual in your understanding?             01:03:14

                                              Page 160

CONFIDENTIAL

```
 1    may or may not spend time going through the various

 2    controls to opt in or out of data collection?

 3         A.   I haven't done my own independent study,

 4    if that's the question, no.

 5         Q.   What was you methodology for selecting     01:24:31

 6    what you're citing here?  Did you Google "opt-in"?

 7         A.   You mean Google, like Google search?

 8         Q.   Yes.

 9         A.   Well, I -- again, working with my team, I

10    was -- the -- these -- these questions are kind of,   01:24:46

11    if you will, standard of questions that one would

12    ask in terms of doing a class certification

13    analysis.  Obviously, the specific question depends

14    on the case.  But, again, we're talking about the

15    starting point of the revenue.                        01:25:01

16             So when I discuss with my team a -- a -- a

17    core question is, are people opting in to allow data

18    to be shared.  And so, I asked them to find

19    information that is relevant to that question so

20    I'm -- was Google search a part of it?  Google        01:25:22

21    search may well have been a part of it, but it was

22    then a professional evaluation of the sources.  And

23    I cite a couple of different sources here.

24         Q.   How did you select your sources?  Your

25    answer is, I was working with my team?                01:25:35
```

Page 181

```
1          A.   Yes.  It -- it --

2               MS. REDDY:  Objection.  Misstates --

3    BY MS. WEAVER:

4          Q.   How is that a scientific methodology?

5               MS. REDDY:  Co- -- Counsel, again, I'm        01:25:44

6    going to ask you nicely, please stop interrupting

7    the witness.  He was in the middle of responding.

8               THE WITNESS:  Yeah.  I -- again, I think

9    you're -- you're sort of -- it feels like in the

10   question, you're conflating some different uses of    01:25:52

11   scientific methodology.  So I'm not offering my own

12   independent estimate.

13              That would require, again, whatever

14   protocols, technology.  I'm -- I'm -- I ask me team,

15   and they were provided data sources which I read and  01:26:08

16   reviewed and analyzed, and the ones I cite are the

17   ones that I rely on, which speak to the question of,

18   is there a -- is the fact that Mr. Regan hasn't made

19   an adjustment, is that a reasonable assumption by

20   him.  Is it reasonable for him not to have made any   01:26:23

21   adjustment.

22              So there's not a scientific protocol in

23   the sense of designing a study for the question of,

24   is there data out there that's consistent with the

25   substantial percentage of people opting in, which     01:26:33
```

Page 182

1    would then require some estimate.

2            So as far as the -- the step of is this

3    type -- is this information the IAB, study the --

4    the -- you know, the CNET analysis, are those

5    sources that --                                    01:26:53

6            THE COURT REPORTER:  The what analysis?

7            THE WITNESS:  CNET, C-N-E-T, analysis.  In

8    my opinion, those are sources that are reliable for

9    giving a sense of this a substantial issue.  So it's

10   reviewing the data source, understanding the        01:27:06

11   information that's in the -- the various documents,

12   and then determining whether or not that's

13   indicative of, again, a substantial issue, which

14   would then require the next step.  And that's the --

15   that's the point I'm raising is, I certainly see      01:27:21

16   substan- -- information that this is an issue that

17   needs to be addressed and was not addressed.

18   BY MS. WEAVER:

19       Q.   Are you competent to render an opinion on

20   whether or not these four instances of what you      01:27:33

21   misdescribe as an opt-in, would constitute a

22   substantial portion of the proposed class?

23            MS. REDDY:  Objection.  Argumentative.

24   Asked and answered.

25            THE WITNESS:  Yes, for sure.  And, again,   01:27:51

                                              Page 183

1          Well, I'd be happy to --

2          (Simultaneous speaking.)

3     Q.   In -- I'll -- I'll restate the question.

4          In -- in the articles that you cite on

5     page 20, does any one of them identify that users      01:34:50

6     can be put in vertical categories, such as toxic sub

7     and poisoning or male impotence which is shared in a

8     bid request with thousands of third parties by

9     Google?

10         MS. REDDY:  Objection.  Lacks foundation.        01:35:05

11         THE WITNESS:  Again, as a premise to the

12    question, I understand there's underlying questions

13    about whether that type of data is ever actually

14    shared.

15         But just taking literally the literal           01:35:19

16    question, I'm not aware that any of these sources

17    has words similar to what you just described.

18    BY MS. WEAVER:

19    Q.   And you're not an expert on consent;

20    right?                                                01:35:34

21    A.   I'm certainly not a legal expert on

22    consent.  I have definitely offered opinions about

23    what one can infer from people's actions with regard

24    as to what they understand and what they're

25    consenting to.                                        01:35:51

Page 190

```
 1              So that's a general topic, but I'm not a
 2     legal expert.
 3          Q.   All right.
 4              You refer in your report to the "privacy
 5     paradox."                                            01:35:57
 6              Do you recall that?
 7          A.   Yes.
 8          Q.   What is the privacy paradox in your
 9     understanding?
10          A.   Yeah, in my understanding, the privacy    01:36:01
11     paradox is a situation where if you ask people kind
12     of in the abstract, you know, do you -- would you --
13     do you want your data to be private, do you want to
14     share information, people generally -- or many
15     people respond, "Oh, I'd like -- that's private.    01:36:20
16     That's valuable to me.  I don't want it to be
17     shared."
18              But in practice, people are actually very
19     willing to share data, often for no compensation or
20     very, very small amounts of compensation or some    01:36:34
21     offsetting benefit.
22              So there's a bit of a disconnect, if you
23     will, between sort of the words that people say and
24     kind of their actions and their revealed, you know,
25     preferences and value.                              01:36:47
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    terms of service, you know, all the things we talked

2    about this morning, plus now, you know, excluding

3    people who have opted in.

4            So that -- that I have the dam- -- I'm a

5    damages expert.  I know that's how you should do it.    01:55:21

6    The specific value by which the -- one puts into

7    these different slots, how much do you reduce this

8    data to account for, you know, U.S.?  How much do

9    you account -- do it to adjust for Google

10   accountholders?  How much do you do it to adjust for    01:55:37

11   people who have opted in?  Those are questions that

12   would require more detailed analysis that I haven't

13   done.  I haven't been asked to do it.

14           It's Mr. Regan's job as the affirmative

15   expert to do that.                                      01:55:50

16           So my expertise is to say, is there -- or

17   my role is to say, is there substan-  -- is there

18   evidence to suggest this is a substantial issue such

19   that zero adjustment isn't the right number?  And I

20   certainly have the expertise for that.                  01:56:04

21   BY MS. WEAVER:

22       Q.   Mr. Deal, I appreciate what you're saying

23   and that you hold yourself out as a damages expert.

24   The fundamental problem that we are struggling with

25   here is you are also asserting that you can judge       01:56:17

Page 208

1    whether certain things are happening with regard to,

2    example, opt-ins or opt-outs, which is way beyond

3    yourself avowed field of expertise.

4         Mr. Regan relied on the Plaintiffs' expert

5    reports.  You are not relying on Google's experts     01:56:32

6    here, are you?

7         MS. REDDY:  Objection.  Asked and

8    answered.  Argumentative.

9         THE WITNESS:  I mean, I'm certainly not --

10   no, I'm certainly not citing to them.  I'm not        01:56:46

11   relying on them.  They're -- they're -- I mean, I'm

12   aware of -- of, you know, some of their opinions,

13   which I think are probably consistent with this.

14   But I know what I need to do as a damages expert.  I

15   know how to identify whether something is a           01:56:57

16   substantial issue.

17        So, I mean, we -- I guess -- it seems like

18   we're sort of going around in circles here a -- a

19   bit, so --

20   BY MS. WEAVER:                                        01:57:06

21        Q.   No, let me try this.  Let me -- let's take

22   it out of the privacy field.

23        A.   Okay.

24        Q.   Let's say you were looking at the

25   likelihood of PG&E causing a fire in the middle of a  01:57:14

1    that you didn't rely on Google's proffered experts

2    on those topics instead of asserting yourself?

3            MS. REDDY:  Objection.  Argumentative.

4    Asked and answered.

5            THE WITNESS:  No.                        01:58:28

6    BY MS. WEAVER:

7        Q.   And you think it's perfectly fine for you

8    to assert whether or not class members can -- can

9    opt in to sharing their data in numerous ways in

10   this case without even studying the data flow?    01:58:41

11           MS. REDDY:  Objection.  Argumentative.

12   Mischaracterizes testimony.

13           THE WITNESS:  I mean, I -- I think my --

14   my report speaks for itself, and I feel like I've

15   answered the same question many, many, many times  01:58:55

16   today.

17           So I certainly have the expertise to -- I

18   know what the data that was provided is.  I know

19   that it has shortcomings.  I know it needs

20   adjustments, and I don't see Mr. Regan making      01:59:06

21   adjustments.

22           Now, again, if -- I'm not -- I'm not

23   offering myself as the person that's making those

24   adjustments.  That would require analysis and study

25   and could involve experts potentially in certain   01:59:17

                                        Page 211

1    ways.  But that's not what I'm offering.  I'm not

2    offering myself as the person that's doing the

3    adjustment.  I'm offering myself as the damages

4    expert who can identify issues that need to be

5    addressed.                                        01:59:32

6    BY MS. WEAVER:

7         Q.   Okay.

8              MS. WEAVER:  We can take a break.

9              THE VIDEOGRAPHER:  This -- this marks the

10   end of Media Unit 3 of the deposition of Bruce Deal.  01:59:38

11   The time is 1:59 p.m.  We're off the record.

12             (Short recess taken.)

13             THE VIDEOGRAPHER:  We are back on the

14   record at 2:16 p.m.  This marks the beginning of

15   Media Unit 4 of the deposition of Bruce Deal.      02:16:34

16   Please continue.

17   BY MS. WEAVER:

18        Q.   All right.

19             You understand you're still under oath?

20        A.   I do.                                    02:16:41

21        Q.   And I understand that you can now testify

22   as to how much Analysis Group has billed Google for

23   in this matter; is that correct?

24        A.   That's correct.

25        Q.   And what is the total amount?           02:16:54

Page 212

```
 1        A.    No.   I'm -- and -- no is the short answer.

 2   That's not the purpose of that sentence; but, no.

 3        Q.    Paragraph 45.   This paragraph is about

 4   nonusers who may use VPNs with a U.S. IP address,

 5   which we've discussed extensively.                      02:44:15

 6              You wrote, "However, I understand this

 7   does not make them subject to U.S. terms of service

 8   (i.e., they are not a Proposed Class Member)."

 9              Do you see that?

10        A.    Yes.                                          02:44:25

11        Q.    What is the basis for you concluding that

12   that does not make them subject to a U.S. terms of

13   service?

14        A.    Well, again, I'd be careful about using

15   the word "concluding."   It's my -- it is my           02:44:37

16   understanding and it's a premise of my analysis

17   that -- and basic- -- the -- the answer to the

18   question I think is discussion with counsel.

19              That -- that's my -- I'm not -- I think

20   it's a legal question, as I understand it, but my --   02:44:52

21   in my discussion with counsel, my understanding is

22   the data that's provided is based on -- the U.S.

23   identification is the IP address, but that that's

24   not synonymous with U.S. terms of service.   So that

25   one is coming from my discussion with counsel.         02:45:05
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

 1    it's beyond the scope of what I'm --

 2    BY MS. WEAVER:

 3        Q.    And -- and as you've discussed, Google

 4    doesn't have any control that allows users to either

 5    opt in or out; correct?                          03:03:35

 6              MS. REDDY:  Objection.  Mischaracterizes

 7    testimony.

 8              THE WITNESS:  Yeah, that's probably

 9    getting into a technical area.  What I -- what I

10    specifically said is, I'm not aware of any          03:03:43

11    particular setting that -- that -- you know, a -- a

12    box that one can check that would say, "Exclude me

13    from realtime bidding."  I'm not aware of that.

14              But whether or not by taking some of these

15    other actions you are effectively excluding yourself  03:04:01

16    from realtime bidding, you certainly are limiting

17    fields that are in realtime bidding.  So that would

18    be -- that would be beyond the scope of my analysis.

19    BY MS. WEAVER:

20        Q.    So your opinion is that it's a substantial  03:04:18

21    issue that Mr. Regan should address because there is

22    a study of users, what you call, opting in by not

23    taking action to sharing data on other third

24    parties; is that right?

25              MS. REDDY:  Objection.  Mischaracterizes   03:04:39

                                          Page 254

1      Q.   And that says the exact opposite of what

2  you just said, doesn't it?

3      A.   Oh, I disagree with that.

4      Q.   And how do you disagree?

5      A.   Well, perhaps you could show me --        03:42:15

6      Q.   Your testimony is that you have to look at

7  the overall profits of Google to determine whether

8  or not there is unjust enrichment?

9          MS. REDDY:  Counsel, again, I'm going to

10  ask you stop interrupting the witness.  He was just     03:42:26

11  about to ask you a question.

12          THE WITNESS:  Yeah, I --

13          MS. WEAVER:  He said perhaps you can show

14  me and held his hand up.

15          THE WITNESS:  Per -- I mean, I'm just      03:42:35

16  saying the quote is -- I was trying to follow the

17  quote as you were reading or whatever you're

18  reading.  But what I understood was not in conflict

19  with my overall approach, but if you want to show me

20  the document or a document, I'm happy to go through   03:42:47

21  it in more specificity, if that would be helpful.

22          THE COURT REPORTER:  Can I get you to get

23  in the middle of those lines.  Thank you.

24  BY MS. WEAVER:

25      Q.   Just to be clear, your testimony is that   03:43:01

Page 276

1   that treatise says that to calculate unjust

2   enrichment, we have to look at Google's total

3   profits?

4          MS. REDDY:  Objection.  Mischaracterizes

5   testimony.                                      03:43:11

6          THE WITNESS:  I would say -- well, again,

7   I'm happy to look at the treatise, if there's

8   something specific, but the economic proposition is,

9   you need to modify the disputed action and look at

10  the profit implications of that modification.    03:43:24

11  That's my testimony --

12  BY MS. WEAVER:

13      Q.   I'm sorry, what do you mean by "modify the

14  disputed action"?

15      A.   Conceptually modify the disputed action.  03:43:32

16  So in this case, the disputed action is the sharing

17  of the, you know, alleged personal information in

18  realtime bidding.  So the right economic framework

19  is estimating a world where you don't do that.

20  What's the but-for world?  The but-for world is that  03:43:54

21  you don't -- you don't share those with ██████

22  ██████ and you need to look at what the implication

23  of that is of that action on Google profits.

24          You don't care about what the overall

25  profits are of Google.  You look at the implications  03:44:07

Page 277

1    it away from them.

2         Q.   And in your scenario, if a company stopped

3    doing something illegal, but, by stopping, obtained

4    legal revenue somewhere else, there is no unjust

5    enrichment if the second number is larger than the     03:55:10

6    first?

7              MS. REDDY:  Incomplete hypothetical.

8              THE WITNESS:  Yeah, I think you're setting

9    aside differences in profit margins, things like

10   that, but -- 'cause that -- that obviously is          03:55:23

11   what -- what ultimately we care about is profits,

12   not revenues.

13             But if I understand your framework, if

14   there is -- you know, you're doing this bad thing

15   and you're earning profits of a hundred.  You stop     03:55:37

16   doing that things [verbatim], you still earn profits

17   of a hundred, there's no economic damages.

18   BY MS. WEAVER:

19        Q.   Okay.  And other than the book that you

20   cite, you have no other citation for that              03:55:47

21   proposition; is that right?

22        A.   I mean, I don't have any citation in

23   this -- I've been doing this for more than 25 years,

24   so I have lots of experience with economic damages

25   analyses.  And there are other articles that speak     03:56:06

Page 287

 1   to it, but the one that I cite here is the reference

 2   manual for scientific evidence for federal judges,

 3   so...

 4       Q.   Okay.  When you say "I've been doing this

 5   for more than 25 years," you mean that companies        03:56:18

 6   have been hiring you to act as their expert on these

 7   issues; right?

 8       A.   I agree with that, yes.  I've been doing

 9   economic damages analysis for 25 years in almost

10   every case, so that unless I'm doing some, you know,   03:56:35

11   other study internally at the firm or something,

12   it's working with clients.

13       Q.   And not doing any peer-reviewed work on

14   the topic; right?

15            MS. REDDY:  Objection.  Asked and             03:56:48

16   answered.

17            THE WITNESS:  Yes, I've -- I've not

18   published any peer-reviewed articles on these

19   topics.

20   BY MS. WEAVER:                                         03:56:58

21       Q.   Turning to Paragraph 91 of your report,

22   you wrote in the second -- third sentence, "For

23   example, I understand that most of the at-issue data

24   elements were removed from Bid Requests processed

25   using restricted data processing, which applied in    03:57:14

1   there?

2           MS. REDDY:  Objection.  The document

3   speaks for itself.

4           THE WITNESS:  No.  I would say it's sort

5   of -- it's a -- kind of a citation in the reverse in    04:04:40

6   the sense of -- or a -- a reference in reverse.

7   It's -- I think it's his understanding.  It's --

8   that's consistent with my understanding as well.

9   BY MS. WEAVER:

10      Q.   No, he did not say it does not exist.        04:04:47

11  Let's compare what he wrote with what you wrote.

12          Mr. Regan said, "I understand that Google

13  has not produced Google realtime bidding transaction

14  data in discovery to date." [As read]

15          He also wrote, "I also understand that       04:05:00

16  Google contends it does not have."

17          You wrote, "Relying on that paragraph, I

18  understand that the data required to do a complete

19  accounting of data fields that were shared in bid

20  requests during the class period does not exist."     04:05:14

21   [As read]

22          He did not say it does not exist, did he?

23          MS. REDDY:  Objection.  Argumentative.

24  Mischaracterizes document.

25          THE WITNESS:  I -- I mean, I -- I'm -- I'm   04:05:24

                                          Page 295

 1  citing the Regan report as being consistent with my

 2  understanding.  My understanding -- I mean, he --

 3  isn't just from the Regan report.  I've also --

 4  you -- you've been asking me questions about where

 5  my understanding is coming from on the thing.        04:05:42

 6          So I understand from my discussions with

 7  counsel that there is no data -- complete set of

 8  data.  And I'm citing the Regan report to be

 9  consistent with that as opposed to him being the --

10  the source of truth on it.                           04:05:56

11          But I don't -- I don't have any reason to

12  disagree with him.  I mean, I understand he's saying

13  that Google hasn't produced it.  I'm not aware that

14  Google can produce it.  I'm not aware that Google

15  keeps it.  So that's --                              04:06:08

16  BY MS. WEAVER:

17      Q.  So he does not say it does not exist.  You

18  say it does not exist.  And the basis for that

19  statement in your report is conversations with

20  counsel; is that correct?                            04:06:15

21          MS. REDDY:  Objection.  Mischaracterizes

22  the document.  Mischaracterizes testimony.

23          THE WITNESS:  I -- let me break that down.

24  I think I understand what you're saying.  So, yes,

25  the statement that "I understand the data required   04:06:29

Page 296

1    to do a complete accounting of data fields that were

2    shared in" --

3              THE COURT REPORTER:  Excuse me, sir.  When

4    you're reading --

5              THE WITNESS:  Sorry, I'm going too fast.

6    Yes, my bad.  I'll go -- I'll start over and to

7    slower.

8              "I understand that the data required to do

9    a complete accounting of data fields that were

10   shared in Bid Requests during the Class Period does

11   not exist."

12             The source of that is my discussion with

13   counsel.  And I haven't seen any other evidence

14   that's in -- that -- that contradicts that.

15             And then I cite the Regan report as         04:06:57

16   that -- as his understanding at least that it wasn't

17   produced.  He's not -- I -- I take the point he's

18   not saying it doesn't exist.  He's just saying it's

19   not available in discovery.  I agree with him on

20   that.                                                 04:07:11

21             My understanding is it couldn't be

22   available in discovery because there is no

23   comprehensive data source of that.

24   BY MS. WEAVER:

25        Q.  And the evidence that you have of that is    04:07:20

                                                    Page 297

1    the -- there's a distinction between anonymous

2    pseudonymous cookies, which is a -- a -- if you

3    will, an additional level of -- of, you know, kind

4    of anonymizing -- that's what it says -- as opposed

5    to the -- the direct pseudonymous cookie, so --          04:59:29

6         Q.   What's the basis of that understanding?

7         A.   I mean, I -- my overall understanding of

8    the -- of the -- the -- the case.

9         Q.   What evidence are you citing in this

10   document for that proposition?                           04:59:44

11        A.   I don't -- I don't think I have a specific

12   citation to that in my report, so it's my -- it's

13   just my overall understanding of -- that these two

14   are -- obviously there's some similarities between

15   them, but that there is a distinction between the       05:00:32

16   anonymized pseudonymous cookie and the straight

17   pseudonymous cookie, which I understand screenwise

18   it has both, whereas the at-issue data is there's

19   times it's not shared at -- nothing's shared.

20   There's other times where what is shared is what's      05:00:45

21   referred to in the -- as an anonymized pseudonymous

22   cookie.

23        Q.   Are you opining in this case on what data

24   is shared in the realtime bidding auction process?

25        A.   I -- I think we've been over this before.     05:01:00

Page 331

```
 1    Not -- certainly not as a technical expert.  I think

 2    this is in my -- in this exhibit here, I'm -- the --

 3    the broad proposition is that there's lots of data

 4    that's shared and -- and activity that's required in

 5    these other examples that Professor Zeithammer's        05:01:17

 6    using for his benchmark.

 7            So I'm -- I'm identifying what my

 8    understanding of -- of certain of the data fields

 9    are.  And more specifically identifying fields that

10    I understand are part of the four sources that he       05:01:33

11    identifies that are not part of the at-issue data.

12       Q.   What is --

13       A.   So I'd say it's more -- it's more the

14    reverse, if you will.

15       Q.   I don't know what you mean by "reverse,"       05:01:43

16    but we'll just move on.

17            What is the basis for your statement that

18    other user IDs are not shared in the realtime

19    bidding auction?

20       A.   Well, for example, the -- the GAIA ID,         05:01:56

21    which is literally the account --

22       Q.   I'm asking what evidence.  What are you

23    citing here?

24            MS. REDDY:  Counsel, please don't

25    interrupt the witness.  He was in the middle of his     05:02:10
```

Page 332

1    analysis.

2         What I'm opining on is that identifying

3    unharmed class members in order to isolate what

4    damages or what compensatory damage needs to be

5    paid, does depend on a -- a weighing of costs and        05:34:48

6    benefits.  And there are definitely -- and that's

7    something that hasn't been done by Mr. Regan.

8    BY MS. WEAVER:

9         Q.   You have no specialized knowledge

10   regarding the benefits that people allegedly receive    05:35:01

11   from realtime bidding; right?

12        A.   I think I agree with that in a sense that

13   I -- and I -- I certainly cite examples of -- of the

14   benefits.  But I don't put my for- -- I don't put

15   myself forward as an expert in, you know, perceived     05:35:19

16   value and utility of personalized ads that I have

17   any independent estimates or statistical analysis

18   that I've done.  I don't put myself forward as that.

19        Q.   And is it your understanding that people

20   who did not consent can still be unharmed by            05:35:37

21   Google's action alleged in this case?

22        A.   That sounds like a legal question, which I

23   don't have an opinion on.

24        Q.   Can you identify a single unharmed class

25   member?                                                 05:35:54

Page 362

1    identifying here?

2        A.   If I understand your question, I think the

3    answer is no, that I haven't -- I wouldn't expect to

4    see a study that would -- well, I should say, I

5    haven't seen a study that -- that answers the          05:37:41

6    question, one way or the other.  I think it's a --

7    it's a -- it's a relevant question for this

8    analysis.  But I haven't seen a study that

9    specifically, you know, did some survey to say,

10   what's the value of the benefits that you get.         05:37:55

11           I mean, well, I should say, I do cite some

12   examples of, you know, articles and things that talk

13   about, you know, the benefits of advertising and

14   other kinds of things, but I take your question to

15   be a more specific question about the value of         05:38:12

16   personalized ads to individuals.  I haven't seen

17   that study.

18       Q.   In the -- this interview that you had with

19   Mr. Belov on August 16th, 2022, [verbatim] did you

20   or anyone take notes?                                  05:38:31

21       A.   No.

22       Q.   I'm sorry, 2023.

23       A.   Oh.  Thank you.

24       Q.   So to make it clear, in the interview you

25   had with Mr. Belov, did anyone take notes?             05:38:40

Page 364

1      A.    No.

2      Q.    How did you take care to ensure that your

3   resuscitation of what he said in your report was

4   accurate?

5      A.    Well, because I -- again, I discussed          05:38:49

6   these questions with Mr. Belov, and it's a discrete

7   set of -- of issues that confirmed my understanding

8   and/or gave me a specific knowledge.  So I was able

9   to directly put it into the reports from my

10  conversation with him.                                  05:39:08

11     Q.    Which counsel was present in that

12  interview?

13          MS. REDDY:  Objection.  Asked and

14  answered.

15          THE WITNESS:  I think I told you, I don't       05:39:12

16  recall specifically.

17  BY MS. WEAVER:

18     Q.    It was lawyers from Cooley; is that

19  correct?

20          MS. REDDY:  Objection.  Asked and               05:39:18

21  answered.

22          THE WITNESS:  Best of my recollection,

23  there was at least one lawyer from Cooley, but I

24  can't recall exactly who it was at this point.

25  BY MS. WEAVER:                                          05:39:27

                                          Page 365

1          Q.    It -- was it Ms. -- was it Aarti?  I

2     apologize, I don't know your last name.

3          A.    I don't -- I don't recall.

4          Q.    Was Danielle Pierce present?

5          A.    Maybe.  I don't recall if there -- I think    05:39:43

6     Danielle, if I understand, is a lawyer from Google.

7     There may have been a Google lawyer present as well.

8     I just don't recall.

9          Q.    Was Whitty Somvichian present?

10         A.    Not that I recall.                              05:39:55

11              MS. WEAVER:  Okay.  We'll take a quick

12     break.

13              THE VIDEOGRAPHER:  Going -- going off the

14     record.  The time is 5:39 p.m.

15              (Short recess taken.)                            05:40:06

16              THE VIDEOGRAPHER:  Back on the record.

17     The time is 5:49 p.m.

18     BY MS. WEAVER:

19         Q.    Mr. Deal, you challenge Mr. Regan's

20     allocation methodology; correct?                         05:50:07

21         A.    Yes.

22         Q.    Would you agree that allocation

23     methodology is a post-award issue?

24         A.    That's -- yes.  In the sense of I think

25     that there obviously has to be an award to allocate.     05:50:23

Page 366

CONFIDENTIAL

1    Legal Solutions.  The time is 5:52 p.m.  We're off

2    the record.

3              (Proceedings concluded, 5:52 p.m., on

4              October 24, 2023.)

5                                                    05:53:48

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 369

CERTIFICATE OF REPORTER

1

2        I, Hanna Kim, a Certified Shorthand

3   Reporter, do hereby certify:

4        That prior to being examined, the witness

5   in the foregoing proceedings was by me duly sworn to

6   testify to the truth, the whole truth, and nothing

7   but the truth;

8        That said proceedings were taken before me

9   at the time and place therein set forth and were

10  taken down by me in shorthand and thereafter

11  transcribed into typewriting under my direction and

12  supervision;

13       I further certify that I am neither

14  counsel for, nor related to, any party to said

15  proceedings, not in anywise interested in the

16  outcome thereof.

17       Further, that if the foregoing pertains to

18  the original transcript of a deposition in a federal

19  case, before completion of the proceedings, review

20  of the transcript [ ] was [X] was not requested.

21       In witness whereof, I have hereunto

22  subscribed my name.

23  Dated:  10/26/23

24

    Hanna Kim

25  CLR, CSR No. 13083

Page 371

NO. 6151469

Re:    Deposition of **Bruce Deal**
       Date: October 24, 2023
       Case: *In re Google RTB Consumer Privacy Litigation*
       Return to: Veritext Legal Solutions

| Page | Line(s) | Correction/Change and Reason |
|------|---------|------------------------------|
| 77 | 24-25 | Change <authorized buyer> to <Authorized Buyer>; typographical error |
| 77 | 25 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 96 | 20 | Change <authorized buyer> to <Authorized Buyer>; typographical error |
| 96 | 22 | Change <authorized buyer> to <Authorized Buyer>; typographical error |
| 97 | 7 | Change <open bidding partner> to <Open Bidding Partner>; typographical error |
| 97 | 11-12 | Change <open bidding partner> to <Open Bidding Partner>; typographical error |
| 99 | 8 | Change < accountholder> to <account holder>; typographical error |
| 103 | 2 | Change < accountholders> to <account holders>; typographical error |
| 107 | 5-6 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 107 | 5 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 107 | 6 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 110 | 17 | Change < accountholders> to <account holders>; typographical error |
| 110 | 19 | Change < accountholders> to <account holders>; typographical error |
| 110 | 21 | Change < accountholder> to <account holder>; typographical error |
| 116 | 16 | Change < accountholders> to <account holders>; typographical error |
| 121 | 13 | Change <open bidding> to <Open Bidding>; typographical error |
| 121 | 13 | Change <open bidding partner> to <Open Bidding Partner>; typographical error |
| 121 | 17 | Change < accountholders> to <account holders>; typographical error |
| 139 | 20 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 140 | 3 | Change < accountholders> to <account holders>; typographical error |
| 140 | 4 | Change < accountholders> to <account holders>; typographical error |
| 142 | 23 | Change < accountholders> to <account holders>; typographical error |
| 144 | 14 | Change < accountholders> to <account holders>; typographical error |
| 153 | 8 | Change < accountholders> to <account holders>; typographical error |
| 153 | 17 | Change < accountholders> to <account holders>; typographical error |
| 162 | 3 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 162 | 3-4 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 162 | 4 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 162 | 5 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 165 | 14 | Change <open RTB> to <OpenRTB>; typographical error |

| 167 | 6 | Change <open RTB> to <OpenRTB>; typographical error |
|---|---|---|
| 170 | 5 | Change < accountholders> to <account holders>; typographical error |
| 175 | 7 | Change <CPCPA> to <CCPA>; transcription error |
| 208 | 10 | Change < accountholders> to <account holders>; typographical error |
| 210 | 13 | Change <pole> to <poll>; transcription error |
| 234 | 19 | Change < accountholders> to <account holders>; typographical error |
| 241 | 14 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 241 | 14 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 242 | 13 | Change < accountholders> to <account holders>; typographical error |
| 261 | 2 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 261 | 2 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 262 | 4-5 | Change <authorized buyers> to <Authorized Buyers>; typographical error |
| 262 | 5 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 262 | 12 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |
| 264 | 3 | Change <open bidding partners> to <Open Bidding Partners>; typographical error |

ACKNOWLEDGMENT OF DEPONENT

I, Bruce Deal, do hereby acknowledge that I have read and
examined the foregoing testimony, and the same is a true, correct and
complete transcription of the testimony given by me and any corrections
appear on the attached Errata sheet signed by me.

Date: 11/19/2023_____    Signature:_____