Pages 1 - 101

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: GOOGLE RTB CONSUMER        )
PRIVACY LITIGATION                )    **Case No. 4:21-cv-02155 YGR**
_____   )


Oakland, California
Wednesday, February 21, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

        PRITZKER LEVINE LLP
        1900 Powell Street, Suite 450
        Emeryville, CA 94608
  BY:  **ELIZABETH C. PRITZKER, ATTORNEY AT LAW**
        **JONATHAN K. LEVINE, ATTORNEY AT LAW**

        BLEICHMAR FONTI & AULD LLP
        1330 Broadway, Suite 630
        Oakland, CA 94612
  BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
        **ANNE K. DAVIS, ATTORNEY AT LAW**
        **JOSHUA D. SAMRA, ATTORNEY AT LAW**

        SIMMONS HANLY CONROY
        112 Madison Avenue, 7th Floor
        New York, NY 10016
  BY:  **AN V. TRUONG, ATTORNEY AT LAW**

        SIMMONS HANLY CONROY
        231 S Bemiston Avenue, Suite 525
        St. Louis, MO 63105
  BY:  **JAY BARNES, ATTORNEY AT LAW**

      **(APPEARANCES CONTINUED ON THE NEXT PAGE.)**


REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                  Official Court Reporter

**APPEARANCES (Continued):**

For Plaintiffs:

        DICELLO LEVITT LLP
        485 Lexington Avenue, Suite 1001
        New York, NY 10017
    BY:  **DAVID A. STRAITE, ATTORNEY AT LAW**

        DICELLO LEVITT LLP
        10 North Dearborn Street, 6th Floor
        Chicago, IL 60602
    BY:  **JAMES A. ULWICK, ATTORNEY AT LAW**

        COTCHETT, PITRE & MCCARTHY LLP
        San Francisco Airport Office Center
        840 Malcolm Road, Suite 200
        Burlingame, California  94010
    BY:  **BRIAN DANITZ, ATTORNEY AT LAW**
        **NANCI E. NISHIMURA, ATTORNEY AT LAW**

        COTCHETT, PITRE & MCCARTHY LLP
        999 N Northlake Way, Suite 215
        Seattle, WA 98103
    BY:  **KARIN B. SWOPE, ATTORNEY AT LAW**

        COTCHETT, PITRE & MCCARTHY LLP
        2716 Ocean Park Boulevard, Suite 3088
        Santa Monica, CA 90405-5267
    BY:  **JEFFREY G. MUDD, ATTORNEY AT LAW**


For Defendant:

        COOLEY LLP
        3 Embarcadero Center, 20th Floor
        San Francisco, CA 94111-4004
    BY:  **WHITTY SOMVICHIAN, ATTORNEY AT LAW**
        **AARTI G. REDDY, ATTORNEY AT LAW**
        **REECE TREVOR, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>**Wednesday - February 21, 2024**</u>                                    <u>**9:26 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Morning, again, everyone.  Just a |
| 5 | reminder, our court reporter is appearing remote.  Please |
| 6 | identify yourselves when speaking.  And if there will be |
| 7 | several attorneys on the lectern, we have to share microphones. |
| 8 | I will start recording now. |
| 9 | **THE CLERK:**  All rise.  The Court is now in session, |
| 10 | the Honorable Yvonne Gonzalez Rogers presiding. |
| 11 | **THE COURT:**  All right.  Good morning, everyone. |
| 12 | **THE CLERK:**  Morning, everyone.  Calling the Civil |
| 13 | Matter 21-cv-02155-YGR, In re: Google RTB Consumer Privacy |
| 14 | Litigation. |
| 15 | Parties, please step forward and state your appearances |
| 16 | for the record, starting with the plaintiffs. |
| 17 | Lecterns, please. |
| 18 | **MS. PRITZKER:**  Morning, Your Honor.  Elizabeth |
| 19 | Pritzker of Pritzker Levine on behalf of the plaintiffs. |
| 20 | **THE COURT:**  Good morning, Ms. Pritzker. |
| 21 | Mr. Levine, good morning. |
| 22 | **MR. LEVINE:**  Good morning, Your Honor. |
| 23 | Jonathan Levine, Pritzker Levine, for the plaintiffs. |
| 24 | **THE COURT:**  Ms. Weaver, good morning. |
| 25 | **MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver, |

```
 1  Bleichmar Fonti, on behalf of the plaintiffs.

 2        MR. DANITZ:  Good morning, Your Honor.  Brian Danitz

 3  of Cotchett Pitre McCarthy for the plaintiffs.

 4        THE COURT:  Okay.

 5        MR. DANITZ:  I'm here today with Nanci Nishimura, who

 6  is on the executive committee, Karin Swope, and Jeffrey Mudd.

 7        THE COURT:  Okay.

 8     Anybody else that's going to come to the mic, come now.  I

 9  mean, I don't know why you're waiting back there.

10        MR. STRAITE:  Morning, Your Honor.  David Straite for

11  the plaintiffs from the DiCello Levitt firm.  Also joining me

12  is my associate James Ulwick.

13        THE COURT:  Okay.  Good morning.

14        MR.BARNES:  Good morning, Your Honor.  Jay Barnes from

15  Simmons Hanly Conroy.  Also with me is An Trong.

16        THE COURT:  Okay.  Morning.

17        MS. WEAVER:  And, forgive me, Your Honor.  I'll

18  identify my partner -- Anne Davis.  Josh Samer, also from my

19  firm, Bleichmar Fonti.

20        THE COURT:  All right.

21     Mr. Somvichian, good morning.

22        MR. SOMVICHIAN:  Good morning, Your Honor.  Whitty

23  Somvichian with Cooley, representing Google today.

24        MS. REDDY:  Good morning, Your Honor.  Aarti Reddy

25  with the Cooley Law Firm, representing Google.
```

```
 1              THE COURT:  Okay.  Mr. Trevor, it lies on both sides.
 2              MR. TREVOR:  Good morning, Your Honor.  Reece Trevor
 3    from Cooley for Google.
 4              THE COURT:  Okay.  Good morning.
 5         All right.  Who's arguing what issues?
 6              MS. PRITZKER:  Good morning, Your Honor.  Obviously,
 7    subject to how you want to arrange the proceedings today,
 8    plaintiffs' counsel are prepared to present argument on all of
 9    the Rule 23 factors.
10              THE COURT:  Who?
11              MS. PRITZKER:  I'm going to tell you.  So focusing on
12    the issues of the challenges to predominance, plaintiffs have
13    divvied up the arguments with the twofold concept of Comcast
14    (check) in mind.
15         Mr. Levine and I will be addressing the first part of the
16    inquiry, which is whether there's common evidence capable of
17    proving issues for the class.
18         Mr. Levine will address the evidence showing that Google's
19    conduct towards the class is capable of proof, comment to the
20    class a whole.  He will also focus on the issues regarding the
21    class definition and ascertain ability and injunctive relief.
22         I will be addressing how plaintiffs can prove their
23    specific claims and overcome Google's specific defenses on a
24    common basis.  I think that goes specifically to the implied
25    consent defenses and the -- whether there's a basis for -- a
```

1  reasonable expectation of privacy on a class-wide basis.  I'm

2  prepared to discuss the Rule 23(a) factors if that's an issue

3  that the Court wants to hear argument on.

4      Brian Danitz, from the Cotchett firm, will be addressing

5  the second part of the inquiry, which is damages.  And then

6  with respect to the pending Daubert motions, Lesley Weaver will

7  address plaintiffs' challenge to Google's damages expert --

8  Bruce Deal.  And Jeffrey Mudd, who is an attorney with under

9  seven years of practice, will address Google's challenge to

10  plaintiffs' privacy expert -- Professor Neil Richards.

11      I hope that's helpful.

12          **THE COURT:**  It is.  Thank you.

13      Danitz is doing what?

14          **MS. PRITZKER:**  This is the opposition -- the challenge

15  to the predominance of -- on the damages inquiry, Your Honor.

16          **THE COURT:**  Okay.

17          **MS. PRITZKER:**  So this is class-wide damages.

18          **THE COURT:**  Great.

19      All right.

20          **MR. SOMVICHIAN:**  Your Honor, my partner -- Aarti

21  Reddy -- will handle the damages issues, including the Daubert

22  motion as it relates to our expert Bruce Deal.  My associate --

23  Reece Trevor -- is prepared to address the evidentiary

24  objections that we lodged to plaintiffs' reply evidence.  And I

25  will do my best to cover everything else.

1          **THE COURT:** All right. Well, stay at the mic. We'll

2    start with you.

3          **MR. SOMVICHIAN:** Okay.

4          **THE COURT:** I want to start with -- as a -- and I'll

5    let Mr. Levine and Ms. Pritzker decide who wants to get up

6    here. This action, in many ways -- not identical -- but, in

7    many ways, seems to me to be similar to Brown. So from a

8    starting point, why wouldn't I just certify an injunctive

9    class? That's where I'm starting.

10         **MR. SOMVICHIAN:** Would you like me to address that

11   first, Your Honor?

12         **THE COURT:** Go ahead. They're still deciding who's

13   getting up here.

14         **MR. SOMVICHIAN:** Okay.

15       The distinction here between -- as it relates to 23(b)(2),

16   Your Honor -- let me back up. First of all, we agree that the

17   23(b)(3) elements cannot be established here, just as they were

18   not established in Brown. And class certification of a damages

19   class should certainly be denied, as it was in Brown.

20       With respect to the injunctive relief class, the

21   difference here is that -- whereas the individualized issues in

22   Brown that defeated 23(b)(3) certification went to defenses of

23   implied consent -- and those were the only grounds the Court

24   found to be individualized that defeated predominance -- in

25   that situation, there are -- that leaves room for a 23(b)(2)

1    class, because you can still have commonality as to the

2    predicate findings of liability.

3        You layer on top individualized issues with respect to

4    implied consent defenses, that defeats 23(b)(3).  But a

5    23(b)(2) class, as your court -- as Your Honor found -- could

6    proceed in that case.  Here, we have additional issues --

7    additional individualized issues -- that go not just to the

8    defenses of consent, but also with respect to the predicate

9    findings of liability, Your Honor.

10       So, in this case, there are -- there is no commonality

11   under 23(a) that could support either an injunctive relief

12   class or a damages class, because there are issues that would

13   need to be adjudicated on an individual basis to determine, for

14   example, whether there's any breach, whether the specific data

15   fields that were shared for any given individual could --

16       **THE COURT:**  Well, do you -- do you -- do you deny

17   that -- do you all agree?  Is there a stipulation as to the

18   contract?

19       **MS. PRITZKER:**  There's not a stipulation, Your Honor.

20   But we do have testimony from Google's 30(b) witness --

21       **THE COURT:**  I -- I'm --

22       **MS. PRITZKER:**  -- deponent -- basically confirming

23   that it's a standard contract that's applicable to the class

24   throughout the class period.

25       **THE COURT:**  Do you agree on what the terms of the

```
 1   contract are?
 2             MR. SOMVICHIAN:  No, Your Honor.
 3             THE COURT:  Isn't that a common issue that can be
 4   decided for the class?
 5             MR. SOMVICHIAN:  What -- what documents comprised the
 6   contract --
 7             THE COURT:  Yes.
 8             MR. SOMVICHIAN:  -- would be a common issue.  Yes.
 9             THE COURT:  So --
10             MR. SOMVICHIAN:  But the issue of breach --
11             THE COURT:  I -- that's not my question.
12             MS. PRITZKER:  Correct.
13             THE COURT:  Right?  We have millions of people, and
14   you all dispute the basics of what a contract is; correct?
15             MR. SOMVICHIAN:  We do as to certain elements of
16   what's incorporated or not, yes.
17             THE COURT:  It's a "yes" or "no."  You either agree
18   that -- I either have a contract that everybody agrees on or
19   not.  I have lots of cases where everybody agrees on the
20   contract.  Do you agree on the contract?
21             MR. SOMVICHIAN:  That is a disputed issue, yes.
22             THE COURT:  Okay.  And that can be resolved on a
23   classified basis; right?
24             MR. SOMVICHIAN:  Yes.
25             THE COURT:  Okay.  So make a note -- or mark the
```

1    record -- we have one, at lease, issue.  And we're going to go

2    through each element of each claim.

3         You disagree on breach; right?

4              **MR. SOMVICHIAN:**  Yes.

5              **THE COURT:**  And why can't that be -- why can't the

6    breach -- once they decide what the contract is -- why can't

7    that be resolved on a class-wide basis?

8              **MR. SOMVICHIAN:**  Because that depends on the actual

9    data that was shared for a given individual, Your Honor, and

10   whether --

11             **THE COURT:**  And if I disagree with you, then that's

12   really your only argument; right?  That is, you have a system

13   in place that may populate different fields differently.  But

14   your algorithm -- your system -- that is something that is

15   common to the class.

16             **MR. SOMVICHIAN:**  There's a single system, but it

17   outputs different data for different people.  And that does

18   matter for breach, Your Honor, because --

19             **THE COURT:**  Well, only if you -- only if -- I mean,

20   how do I know that?  That is, you don't agree on what the terms

21   are.  So I don't know that you can show that it's -- it can't

22   be resolved on a system-wide basis.

23        What is the plaintiffs' view on that?

24             **MS. PRITZKER:**  I think that's you, Mr. Levine.

25             **MR. LEVINE:**  Thank you.  Jonathan Levine for the

 1   plaintiffs.

 2       Plaintiffs' view is that that is capable of resolution on

 3   a class-wide basis, because all of the evidence that's before

 4   the Court is that the information that's conveyed out -- the

 5   information that would be looked at as to whether there's a

 6   breach or not -- is uniform -- not in that it's identical --

 7   but it's uniform in that every single example that's before the

 8   Court -- and there are tens of billions of them -- uniformly

 9   contains enough information to meet the standard for a breach

10   of Google's contract.

11       **THE COURT:**  Is there a -- is there a baseline that

12   is -- is there -- while the data that gets populated into these

13   fields -- while it may differ from one individual to another,

14   are there certain data fields that always must, as a matter of

15   course, be populated?

16       **MR. LEVINE:**  The answer to that is -- is there any one

17   data field that's -- as to whether there's any one, the answer

18   is "no."  As to whether there's a combination of core data

19   fields, that is what our experts focused on.  Professor Shafiq

20   focused on -- out of the 200 -- focused on the core 60.  And,

21   at least for the named plaintiff data Google produced, those

22   core 60 fields are present in every single bid request.

23       With respect to the bid data that we received from The

24   Trade Desk and The New York Times, Professor Wilson looked at

25   that.  That data does have different -- does have -- the data

 1  fields are the same, but whether they're populated or not may

 2  differ.  But he looked at those and concluded, based upon his

 3  expert opinion with doing his analyses, which are set forth in

 4  his first and second report, that 99.7 percent of those bid

 5  requests were identifiable and contained sufficient information

 6  to be identifiable looking at the combination of the fields.

 7      So it's never one field; it's a combination.  But every

 8  bid request includes a sufficient number of fields to make that

 9  combination work.  And that's --

10      THE COURT:  Okay.

11      MR. LEVINE:  -- the evidence that's before the Court

12  on class cert.  There is no other evidence.

13      THE COURT:  Okay.

14      Let's start, first, with his representation about the

15  scope of evidence in front of me; is that correct?

16      MR. SOMVICHIAN:  No, Your Honor.  So with respect to

17  whether there is a common set of data that compromises the

18  alleged personal information, there is not.  We submitted

19  demonstratives to Your Honor yesterday, in the morning.  I have

20  a copy that summarizes some of the distinctions in the data --

21      THE COURT:  And did you -- did share that with the --

22      MR. LEVINE:  We have it.

23      MR. SOMVICHIAN:  We did.

24      THE COURT:  Okay.  I don't have a copy up here.  Do

25  you have them?

1          All right.  Go ahead.

2              MR. SOMVICHIAN:  On the first page there, Your

3    Honor -- what we did was, in our opposition brief, we had

4    summarized this also in a table to show the data fields that

5    the plaintiffs contend are personal information -- the

6    identifiers, location information, other data -- and showed

7    what the actual data reflects.  And there is no uniformity.

8    There's substantial variation in when these data fields are

9    included or omitted, which reflects the fact that there are a

10   multitude of user settings and controls and publisher settings

11   and controls that can impact what the data looks like for any

12   given individual.

13         What we did in the slide before you is to take our

14   version.  The plaintiffs had the last word.  They complained

15   about certain data -- certain of our experts' findings and said

16   they weren't reliable.  And so what we did in this chart was to

17   just populate it with their own expert numbers.  So you see

18   citations to Wilson and Shafiq, those are the plaintiffs'

19   experts.

20         So the numbers here are from the plaintiffs' own experts'

21   rebuttal reports.  So when you see, for example, this Google

22   user ID reference, and you look at The Trade Desk data

23   Dr. Wilson found, it's only populated 40 percent of the time

24   with the mobile device idea, another one of the allegedly

25   identifying aspects of data.  Mr. Wilson -- Dr. Wilson -- found

that's there 15 percent of the time.

This cookie matching data -- this is the centerpiece of their complaint.  They're alleging that this cookie matching process is what makes the combination of data identifying, in many instances.  We found that that was populated only 40 percent of the time.  That's not contested.

The location information -- also a centerpiece of what the plaintiffs claim to be personally identified -- that varies across what was in the named plaintiffs' data versus The Trade Desk date and The New York Times data, Your Honor.

So the -- they had the last word on reply.  And they made a representation that I really want to address, directly.  They said that 99-plus percent of the -- of the data meets their definition of personal information, and, therefore, there is this uniformity, and it's all common, and you can certify a class.  It's really important to see where that comes from, Your Honor.  It's in the Wilson rebuttal report.

And, as an initial matter, we have made an evidentiary objection to those opinions.  This was a data analysis submitted for the first time on reply, based on data that the plaintiffs have had for months, had at the time of their opening motion.  It's not a response to our expert.  It's not a criticism of what our expert did.  It's simply a new opinion that should have been presented in their opening.  And, instead, they held it back, submitted it on reply.  It should

1    not be considered.

2         But even if Your Honor considers it, it actually proves

3    our point.  Because the way that Dr. Wilson gets to this

4    99 percent calculation is a mishmash of different calculations.

5    He has one method that looks at the Google user ID and the

6    mobile device ID.  But, as this chart shows you, that's not

7    populated in a significant portion, a majority of the time.

8         So the way he gets to 99 percent, he says, for some data,

9    I'll look at that.  For other data sources, I'm going to look

10   at different combinations of either user agent or other

11   information for The Trade Desk data.  That didn't work for The

12   New York Times data.  So there's a different methodology there.

13   He looks at a different ID.  That's only 57 percent.  So he

14   says, okay, I'm either going to look at that or look at these

15   other combinations of device information with some location

16   information.

17        The point is, Your Honor, that across the various expert

18   reports, we have multiple methods -- different methods -- that

19   are based on different sources for different data recipients.

20   And there's no common method that's been presented to show that

21   there is a way from common proof to show that the data shared

22   is, in fact, personal information within the definition that

23   the plaintiffs have offered.  And that's because the data

24   differs.  So they've had to do this combination and present it

25   to you as if it was uniform.

1              **THE COURT:**  All right.

2      Your response?

3              **MR. LEVINE:**  Thank you, Your Honor.

4      The data may differ.  The question, though, for the jury

5      is -- it's not about whether every bid request is identical.

6      It's whether every bid request contains enough information,

7      uniformly, to be deemed personal information under Google's

8      privacy policy or California law.  On that question, the data

9      is uniform.

10     So what the defendants -- what Google is doing is focusing

11     on minor differences in some bid requests and ignoring the big

12     picture, which is the liability question that gets presented to

13     the jury.  And, on that, this chart is not relevant, because

14     this chart is, once again, focusing on individual variations in

15     one individual field in isolation, and saying, aha, there,

16     plaintiffs lose.  But that's not the inquiry.

17     The inquiry is whether the bid, as a whole, contains

18     enough data fields and enough information to make it personal

19     information and personally identifiable.  And Google doesn't

20     address that anywhere, and its experts don't address that

21     anywhere.

22             **THE COURT:**  And your evidence of that is the expert

23     report.  Is there other evidence?

24             **MR. LEVINE:**  Well, it's the bid requests themselves.

25     I mean, the Court has -- I don't want to say it -- this is

1    confidential -- but has lots and lots and lots of bid requests

2    that are in the record that have been carefully analyzed by

3    plaintiffs' experts.  So it's plaintiffs' experts, but it is

4    the underlying data itself.  Google produced bid request data

5    for all of the named plaintiffs -- lots of it.  It is

6    completely uniform -- completely.

7        Neither Google nor its experts ever look at all of the

8    data in any bid request to make a judgment as to whether it's

9    uniformly identifiable or not.  They studiously stay away from

10   ever doing that kind of holistic bid-by-bid request.  And the

11   reason they don't do that is because the answer that must flow

12   from that, which is the answer our experts reached, is that

13   they are all uniformly identifiable.

14       Specifics to this chart, the Google user ID column --

15   that's actually not a field that plaintiffs focused on.  The

16   actual column is Google user ID present, which indicates

17   whether simply the Google user ID was or was not sent.

18       The mobile device ID would only be present if a mobile

19   device is being used, which may explain the lower numbers in

20   The Trade Desk.

21       Hosted match data is not even a field that plaintiffs

22   raised as one of their core 62 fields.  So plaintiffs have

23   never alleged that the hosted match data field is a common

24   field on which they are relying for the purposes of class

25   certification.

```
 1        And the location information -- it's different, but all of
 2   them contain location information.  Plaintiffs' experts looked
 3   at that and concluded that was sufficient, along with all of
 4   the other data in every single bid request, to make those bid
 5   requests uniformly identifiable.
 6        THE COURT:  Okay.  We're not going to talk, at the
 7   moment, about damages.
 8        MR. SOMVICHIAN:  Your Honor, can I just give you
 9   citations to the Wilson expert reports that I think are the key
10   paragraphs?
11        THE COURT:  They're not on -- they're not here on the
12   chart?
13        MR. SOMVICHIAN:  No.
14        THE COURT:  Okay.
15        MR. SOMVICHIAN:  When I refer to the different
16   methodologies that Wilson -- Dr. Wilson -- utilizes to get to
17   this 99 percent calculation, that is at paragraphs 154 through
18   156 of his rebuttal report.  I would contrast that to paragraph
19   79 of his opening report.  And if you track those, you can see
20   how the theories have been morphing in response to the
21   differences in the data.
22        THE COURT:  Any comments on that, Mr. Levine?
23        MR. LEVINE:  Yeah.  I think the answer is that
24   Professor Wilson's initial report didn't do the analysis that
25   he was criticized for not doing by Dr. Striegel and
```

1  Dr. Psounis.  So his report -- his original report -- Professor

2  Wilson's report -- was talking about the unavoidability of

3  Google and the structure of Google -- the uniform structure --

4  the process, as I think Your Honor referred to it earlier.

5       So he didn't do the -- the analysis -- the -- sort of

6  the -- of the individual bid requests at that level.  So when

7  he was criticized for that, and when Dr. Striegel criticized

8  him for that, he went back and then looked at that analysis.

9  And these are the results.  So, yes, it is a different analysis

10 between the two reports.  Because, in the first report, he was

11 looking at something different than in his rebuttal report,

12 which is directly in response to the criticisms from Google's

13 experts.

14          **THE COURT:**  All right.

15      Count 2 relates to the breach of the implied covenant.

16 And here --

17          **MR. SOMVICHIAN:**  I believe that's been dismissed, Your

18 Honor.

19          **MS. PRITZKER:**  It's held in abeyance, Your Honor.

20 Elizabeth Pritzker.  That's one of the --

21          **THE COURT REPORTER:**  I'm sorry.  I can't hear you.

22          **THE COURT:**  She can't hear.  You need to be at a mic.

23          **MS. PRITZKER:**  This is Elizabeth Pritzker.

24      That's one of the claims that's being held in abeyance.

25 This is one of the claims that Judge Koh asked us to not

```
 1   proceed on at the moment.  So that's why we can't --
 2          THE COURT:  All right.  So --
 3          MS. PRITZKER:  -- brief it in our class cert briefing.
 4          THE COURT:  All right.  So we have then -- what? --
 5   Count 4, invasion of privacy, and Count 5, intrusion upon
 6   seclusion; is that right?
 7          MS. PRITZKER:  That is correct.
 8          MR. SOMVICHIAN:  Your Honor, I just want to correct
 9   the record.  If you were referring to the breach of implied
10   covenant claim -- Count 2 -- that was addressed in the motion
11   to dismiss.
12          MS. PRITZKER:  Oh.
13          MR. SOMVICHIAN:  And it was --
14          THE COURT:  I granted that.
15          MS. PRITZKER:  Maybe that's the case.
16          MR. SOMVICHIAN:  The motion was granted.
17          MS. PRITZKER:  Yes.
18          MR. SOMVICHIAN:  That is not in abeyance.  It's been
19   dismissed.
20          THE COURT:  I agree.  I agree.  Sorry.
21      All right.  Counts 4 and 5 -- so to state a claim for
22   invasion of privacy under the California constitution,
23   plaintiff must plead, one, that they have a legally protected
24   privacy interest.  Isn't that a common issue that can be
25   addressed on a class-wide basis?  Isn't it?
```

1          **MS. PRITZKER:**  I believe it is here, Your Honor.  I

2    mean, that's certainly how we briefed it.  And that's -- that

3    really stems from the fact that the disclosures that we're

4    relying upon in this case are all the same.  They apply, across

5    the board, to every class member who is a Google account holder

6    in the United States.

7        And those disclosures, we allege -- and I think we've put

8    all of them in front of your Court -- affirmatively represent

9    to all of those consumers that Google will not share or sell

10   their personal information in the Google RTB auction.

11         **THE COURT:**  So I take it you -- do you agree -- do you

12   concede or do you disagree on a privacy -- the existence of a

13   privacy interest?

14         **MR. SOMVICHIAN:**  Well, I think the question is a

15   legally protected interest in privacy in what data, Your Honor.

16         **THE COURT:**  Right.

17         **MR. SOMVICHIAN:**  And that can differ.  So as -- so --

18         **THE COURT:**  So you can't reshape the plaintiffs'

19   claim.  All you can do is defend against their articulation.

20   Do you understand?

21         **MR. SOMVICHIAN:**  I understand, Your Honor.

22         **THE COURT:**  Okay.

23         **MR. SOMVICHIAN:**  And with respect to the question of

24   whether there's a legally protected interest --

25         **THE COURT:**  Isn't it -- it's the -- they've identified

1    a legally protected interest, whether or not -- I'm not sure

2    that they'll win on it, but they've identified it.  And it's

3    the same for everybody.  So why can't that be resolved on a

4    class-wide base?

5            MR. SOMVICHIAN:  They've articulated a legally

6    protected interest in the data in its totality, Your Honor, but

7    not all of that data is shared for every individual.  That's

8    the issue.

9            THE COURT:  That's a separate question.  Whether

10   there's a violation is separate from the existence of the

11   right.

12           MR. SOMVICHIAN:  So if you define it as the totality

13   of the information, and setting aside the question of whether

14   that actually applies to a given individual, the initial issue

15   of a legally protected interest, I agree, is common.

16           THE COURT:  Okay.  So that can be resolved on a

17   class-wide basis.

18           MR. SOMVICHIAN:  That element, yes.

19           THE COURT:  Okay.

20        Second, whether, for that articulation, there's a

21   reasonable expectation of privacy.  A reasonable expectation of

22   privacy is just that:  It's objective.  It is not subjective.

23   So individuals may have opinions, but that doesn't mean that it

24   controls the objective issue.  That seems to me also to be

25   resolvable on a class-wide basis.  It's an objective issue.

1          **MR. SOMVICHIAN:**  I disagree, Your Honor.  The -- an

2     expectation of privacy has to be objectively reasonable, yes,

3     but the --

4          **THE COURT:**  And who decides that?  Who decides?  A

5     jury decides.

6          **MR. SOMVICHIAN:**  Yes.

7          **THE COURT:**  So they're going to put together --

8     they're going to articulate what they believe is the legally

9     protected privacy interest.  You will probably disagree.  The

10    jury will decide whether or not that's legally protected.  And

11    then they'll decide, with respect to that particular

12    articulation, is there a reasonable expectation of privacy?

13    And there's only one answer, and that answer is the jury's.

14         **MR. SOMVICHIAN:**  There's also another element of it,

15    Your Honor.  And that's reflected in the California Supreme

16    Court's decisions that they cite and that have been recognized

17    by the Ninth Circuit -- the Hill v. NCAA case.

18         It says (as read):

19              "The plaintiff, in an invasion of privacy case,

20         must have conducted himself or herself in a manner

21         consistent with an actual expectation of privacy,

22         i.e. he or she must not have manifested, by his or

23         her conduct, a voluntary consent to the invasive

24         actions of a defendant."

25         That's also reflected in the Opperman v. Path case that

1  the plaintiffs also rely on.

2      So, yes, there is a common initial question of whether the

3  alleged expectation of privacy is objectively reasonable.  But

4  for an individual to make out a claim, they have to have an

5  actual expectation of privacy, and their conduct has to be

6  consistent with that expectation of privacy and not --

7          THE COURT:  Well, that's two parts.  So part A, you

8  agree, is resolvable on a class-wide basis.  Your concern is

9  part B.

10          MR. SOMVICHIAN:  Yes.

11          THE COURT:  Okay.

12      A response on part B?

13          MS. PRITZKER:  Well, on part B, Your Honor -- and this

14  is one area in which we think this case differs from the Brown

15  case.

16      On part B, unlike in Brown, the representations that we're

17  relying upon contain an express representation that this

18  personal information belonging to the U.S. account holders will

19  not be sold or shared in RTB.  So when the Google account

20  holder signs up for his or her account, that is the promise

21  that they encounter.

22      It's hard to imagine how they could have manifested an

23  actual -- by their conduct of signing up for a Google

24  account -- consenting to having their information sold and

25  shared in the auction, when Google expressly says that it won't

1    do it.  And it says it repeatedly, again and again and again.

2         And the case -- this is, I think, where the

3    In re: Facebook Internet Tracking case is relevant.  It says

4    that, you know, where you have an expressed representation by

5    the defendant that it will not do something, that creates a

6    reasonable expectation of privacy in that data.  I can get you

7    that cite, and I can probably say it more eloquently, but

8    that's essentially what Facebook Internet Tracking says.

9         And so there is a -- of course, there is -- the item of

10   actual consent -- or the lack of actual consent -- is actually

11   implied by the fact -- of the terms of the agreement

12   themselves.

13        Nowhere in the disclosures -- nowhere in the

14   consumer-facing disclosures -- does Google tell class members

15   that notwithstanding this promise, that it shares and sells

16   their data in the auction.

17        **THE COURT:**  So I'd like you to address, specifically,

18   the Hill case and the issue -- well, yeah -- address Hill,

19   specifically.  Are you saying that, as a matter of law, they

20   could not voluntarily consent?

21        **MS. PRITZKER:**  The way that -- well, they can't under

22   the circumstance.  I mean, there was really an absence of

23   consent.  Because the benefit of the bargain is that you're

24   signing up for a Google account according to its terms.  And

25   the obligation is that the information that you're providing

1  Google associated with your account will not be transmitted or

2  shared elsewhere.  There is --

3      **THE COURT:**  Are you saying that as a matter of law

4  then, if the contract is what you say it is, that an individual

5  could not consent?

6      **MS. PRITZKER:**  There is no way to manifest sort of

7  any -- yeah -- there's sort of a lack of actual consent in that

8  scenario because you're --

9      **THE COURT:**  Do you agree with the proposition that

10 Hill says that one needs -- one may -- in evaluating a

11 reasonable expectation of privacy, that one may voluntarily

12 consent and must act consistent with the objective expectation?

13 Do you agree that that's what it says?

14     **MS. PRITZKER:**  I do agree, Your Honor.  But all of --

15 all the class members are doing are surfing the Internet.  So,

16 I mean, their conduct is that they're surfing -- they're using

17 their -- they're surfing the Internet.  It's not even a factor

18 of using Google services.  They're surfing the Internet.

19 That's their conduct.

20     But undisclosed to them is this -- you know -- is this

21 background auction where, every time they engage in an Internet

22 browsing activity, the data that they share with Google, that

23 Google is scooping up that data, and selling it and transacting

24 it in the auction.  So this is not -- this is not a scenario

25 where there's a way to act --

1    **THE COURT:** Okay. So what is the evidence that they

2    acted -- that they could have knowingly acted in a manner

3    inconsistent with that objective expectation of privacy, and

4    where is it in the record?

5    **MR. SOMVICHIAN:** I think the most direct evidence,

6    Your Honor, is the survey that -- survey evidence -- that we

7    put into the record. That's the report of Dr. Hanssens. We

8    can debate about what the disclosures -- how the disclosures

9    would be interpreted by different people. Ms. Pritzker will

10   say they're confusing and they wouldn't tell anybody about the

11   data practices at issue. I can give you a different

12   interpretation, Your Honor. But the proof really is in how

13   people responded when they were asked these questions,

14   directly, in this survey. We --

15   **THE COURT:** Well, is that proof or is that just

16   evidence on the other side?

17   **MR. SOMVICHIAN:** It is proof, Your Honor. We

18   showed -- we showed these survey respondents the statements

19   that the plaintiffs say are misleading -- the promises about

20   personal information. And --

21   **THE COURT:** And was it 100 percent?

22   **MR. SOMVICHIAN:** It wasn't 100 percent.

23   **THE COURT:** What was it then?

24   **MR. SOMVICHIAN:** There were substantial majority --

25   **THE COURT:** What was it?

1          **MR. SOMVICHIAN:**  I can give the specific numbers for

2    each category, Your Honor.  We asked them about different

3    categories of information.

4          **THE COURT:**  So what was the range?

5          **MR. SOMVICHIAN:**  The range is from 45 to 75 percent,

6    approximate.

7          **THE COURT:**  Okay.  So, on the other side then, it's

8    55 percent -- a majority -- which is proof of a

9    preponderance -- would degree for the issues that are on the

10   lower end of your survey.  It proves the opposite.

11         **MR. SOMVICHIAN:**  I don't think so, Your Honor.  It --

12         **THE COURT:**  Well, that's what a jury gets to decide;

13   right?

14         **MR. SOMVICHIAN:**  Their are substantial -- it doesn't

15   even need to be a majority, Your Honor.  What the survey

16   evidence shows is that there are material numbers of people who

17   understand exactly that things like the URL of the website

18   they're on -- that's going to be shared.

19         **THE COURT:**  Why don't you let the jury decide?  And

20   then all the class members -- millions and millions of

21   people -- whether or not they agree, are bound; right?

22         **MR. SOMVICHIAN:**  That's not the inquiry for implied

23   consent, Your Honor.  What the survey --

24         **THE COURT:**  Implied consent is a defense.  And as I

25   said in Brown, that's not a basis to not certify --

1        **MR. SOMVICHIAN:**  It's not a basis --

2        **THE COURT:**  -- per the Ninth Circuit.

3        **MR. SOMVICHIAN:**  It's not a basis to -- well, it

4   was --

5        **THE COURT:**  Per the Ninth Circuit; right?

6        **MR. SOMVICHIAN:**  Yes.  And it was an adequate basis to

7   deny the 23(b)(3) class.  We agree that that finding should

8   apply here, Your Honor.  Is your question with respect to the

9   injunctive relief class --

10        **THE COURT:**  I'm -- I haven't gotten to -- I haven't

11   gotten to damages; right?  And I said we weren't getting there

12   yet.  I'm talking about the fundamental elements of the

13   claim -- objective expectation, which is not subjective.  So

14   these people's opinions may inform, but they certainly do not

15   bind a jury to decide what's objective.

16        **MR. SOMVICHIAN:**  What it shows, Your Honor, is that

17   there are people who do not have a claim, and that there's no

18   way to identify them --

19        **THE COURT:**  Well, that's ascertainability.  That's not

20   the elements of the claim.  So don't conflate.

21        **MR. SOMVICHIAN:**  I'm --

22        **THE COURT:**  Let's move on.

23        A jury can also decide whether the alleged intrusion is

24   highly offensive.  Perhaps your evidence -- what it shows -- is

25   that it's not offensive.  People don't care.  But a jury gets

1    to decide that.  That's -- that is common evidence to have a

2    jury decide an element of a claim.

3            MR. SOMVICHIAN:  Again, Your Honor, it's based on an

4    assumption that the data is shared in the uniform way when it

5    is not.  They can -- they can --

6            THE COURT:  That's common evidence.

7            MR. SOMVICHIAN:  If -- if the assumption were

8    accurate, and if they had shown that -- in the evidence -- that

9    there's a common --

10           THE COURT:  You're debating evidence.  I'm not here to

11   debate evidence.  I'm here to see is there common evidence that

12   I can have a jury decide that question, and it seems like there

13   is.

14           MR. SOMVICHIAN:  Your Honor --

15           THE COURT:  Like I said -- look, these folks -- these

16   plaintiffs -- they've been in my courtroom before and lost.

17           MS. PRITZKER:  Yes, we have.

18           THE COURT:  They've lost.

19           MS. PRITZKER:  I'll admit it here, right on the

20   record.

21           THE COURT:  So --

22           MR. SOMVICHIAN:  Your Honor --

23           THE COURT:  And so just because there's common

24   evidence doesn't mean that they're going to win.  But it seems

25   like there's common evidence for the jury to decide whether

1    what Google is doing is highly offensive.

2        **MR. SOMVICHIAN:**  But in the context of a particular

3    individual, Your Honor, the highly offensive element can look

4    very different if, for example, there were identifiers --

5        **THE COURT:**  They can evaluate the practice.

6        **MR. SOMVICHIAN:**  -- and the location information

7    was --

8        **THE COURT:**  We aren't talking about damages.  We're

9    talking about the practice of what you are doing.

10       **MR. SOMVICHIAN:**  But claims are resolved for

11   individual people, Your Honor.  And for an individual person,

12   their proof --

13       **THE COURT:**  No, only in a damages case.

14       **MR. SOMVICHIAN:**  I don't think so, Your Honor.  There

15   can be an element of the adjudication that relates to the

16   general practice.  But a practice gets applied to individual

17   people.  And, here, it gets applied in different ways.  And

18   it -- as it relates to the "highly offensiveness" element, the

19   data could look very different from person to person.

20       **THE COURT:**  Well, maybe, then, that's a -- maybe

21   that's just a question of how the class gets defined.

22       **MR. SOMVICHIAN:**  There's not a --

23       **THE COURT:**  I don't know.

24       **MR. SOMVICHIAN:**  Well, the plaintiff --

25       **THE COURT:**  But it seems to me that there's evidence

that a jury could decide whether or not Google is doing

something that is highly offensive to people.

      **MR. SOMVICHIAN:**  There can be a judgment made as to

the practice, but not as to how the practice is applied to an

individual person.

      **THE COURT:**  Well, that's open.

    Let's move on.  Claim for intrusion upon seclusion.

      **MR. SOMVICHIAN:**  I think this implicates the same

issues, Your Honor, with respect to the Hill element of

conduct, an actual expectation.  So, again, I think the survey

evidence shows that there are different expectations, different

understandings, all of which would impact the intrusion upon

seclusion claim, as well as the other privacy claims that we've

talked about.

      **THE COURT:**  Response?

      **MS. PRITZKER:**  I guess I would like to respond in a

couple of ways.  I mean, we took a 30(b)(6) deposition of a

Google employee who was put up on the issue of the consent

flow -- what does it mean to consent to Google's practices.

And I want to say two things about her deposition testimony.

This is -- this is Suneeti Vakharia.  And her deposition

transcript appears in the record at Exhibit 52 to my

declaration, which I think is ECF 617-12.

    In looking at all of the disclosure language about -- in

looking at all of the terms of service and privacy policies and

1    everything that we're alleging contains the affirmative

2    promise, she was asked this question (as read):

3         **"QUESTION:**  In looking at the exhibits to your

4         declaration, filed in opposition to class certification,

5         where do they refer to the real-time bidding auction?"

6         **"ANSWER:**  They do not specifically refer to the real-time

7         bidding auction."

8         At page 274 of her deposition transcript (as read):

9         **"QUESTION:**  So the promise that every class member saw:

10        'Google does not sell your personal information to

11        anyone.'  Does Google say anywhere that Google might sell

12        their information to anyone?"

13        **"ANSWER:**  No.  It does not state that it might sell

14        anyone's information."

15        **"QUESTION:**  Do any of these disclosures say that Google

16        does sell or has sold class members' information to third

17        parties?"

18        **"ANSWER:**  No.  These disclosures do not communicate the

19        sale of any user's information."

20        And there are several other excerpts in her transcript

21   which say the same things.

22        At 295 (as read):

23        **"QUESTION:**  In terms of the terms of service" --

24            **THE COURT:**  So just give me the cite and make your

25   point.  I don't -- I'm not going to be here for five hours.

1          **MS. PRITZKER:**  This is my last one on this issue (as

2    read):

3          **"QUESTION:**  In terms of the terms of service and all of

4          the disclosures that we've discussed today, you're not

5          aware of any disclosures to Google account holders about

6          how the real-time bidding auction functions; right?"

7          **"ANSWER:**  I am not familiar with any."

8          She was also asked about the issue of consent -- a Google

9    account holder consent to these practices.  And this is her

10   deposition transcript at page 62 (as read):

11         **"QUESTION:**  In your work at Google, can someone consent to

12         a data collection practice is that not disclosed to them?"

13         **"ANSWER:**  I don't think we would ask someone to consent to

14         something that is not disclosed to them.  We would

15         disclose what they need to consent to."

16         **"QUESTION:**  So disclosure is critical to consent;

17         correct?"

18         **"ANSWER:**  Right.  We're sharing information with them.

19         And I don't know if 'disclosure' has a legal definition,

20         but sharing information.  We would share the appropriate

21         information for them to consent to."

22         None of that exists here, Your Honor.  None of it.  You

23   know, consent is a class-wide question without a -- it's

24   subject to class-wide proof without a --

25              **THE COURT:**  Well, I found that it couldn't be -- that

implied consent, in any event -- could not be shown through

common evidence in Brown.  Why should I find opposite here?

        MS. PRITZKER:  The disclosures are different.  Here,

we have affirmative representations of what Google will not do

with consumers' personal information.

        THE COURT:  Well, this goes back to your claim that,

effectively, I'd have to be saying, "Well, as a matter of law,

despite an expressed disclosure, they couldn't -- a person --

couldn't agree to this."

        MS. PRITZKER:  I think, to answer the questions that

you've posed to opposing counsel, it's a common question, Your

Honor.  It's not a question of law, but it's a common question.

There's nothing that they can do to get out of, you know, the

Google RTB auction.  There's no conduct that they can engage

into evidence -- consent to a practice -- that is not disclosed

to them.  That's at least what True Health requires -- that

there be some actual disclosure of the practice.

        THE COURT:  Is there -- was there -- is there a way to

extract yourself from --

        MS. PRITZKER:  There is not, Your Honor.

        THE COURT:  So even if someone wanted to -- if someone

wanted to extract themself, could they?

        MR. SOMVICHIAN:  They can opt out of personalized ads.

That changes what information is shared.  That prevents any

cookie matching.  That prevents any IDs from being included.

```
 1   You can undertake other -- or utilize -- other third-party

 2   services, which have the impact of changing what data can be

 3   included in the bid requests.

 4        So there are ways to control and limit the data that is

 5   shared.  Bid requests can still be sent.  I want to be clear

 6   about that.  But users can control what data is included.

 7             THE COURT:  So there's no way to opt out?

 8             MR. SOMVICHIAN:  There's no way to opt out of bid

 9   requests being sent entirely, although there are ways to

10   control the data.

11             THE COURT:  So there's -- then how could one consent

12   if you could never opt out entirely?

13             MR. SOMVICHIAN:  That would be expressed consent, Your

14   Honor.  So I think it's important to keep the distinction

15   between expressed consent and implied consent --

16             THE COURT:  But how can you consent to something when

17   it isn't an option, implied or expressed?  If I say to you --

18   or your client -- who's probably a client sitting back there --

19   "I want to make sure you never do this for my data," it doesn't

20   sound like I could do that.

21             MR. SOMVICHIAN:  You cannot prevent bid requests from

22   being sent entirely.  You can control what data is included.

23   But that's not the inquiry -- that's not the entirety of the

24   inquiry for implied consent, Your Honor.  It's not whether a

25   given practice can be prevented entirely.  Implied content is
```

1  based on understanding of a practice and acceptance of it.  So

2  there is --

3          THE COURT:  But the opposite has to be true.  In order

4  to consent, you either -- you either have to -- it's like --

5  it's like proving a negative.  How can you say I can consent if

6  I can't consent not to have you do it?  You can't have one

7  without the other.

8          MR. SOMVICHIAN:  I don't think so, Your Honor.

9  Because implied -- the Gmail case is one -- is an example.  So,

10 in that case, class certification was denied because of implied

11 consent issues, based on a similar record as here.  There was

12 no way to opt out of the practice at issue --

13         THE COURT:  And that went up to the Ninth?

14         MR. SOMVICHIAN:  It did not.

15         THE COURT:  Okay.

16         MR. SOMVICHIAN:  So that issue involved the automated

17 scanning of Gmail to deliver targeted advertising.

18         THE COURT:  So it's just one judge's opinion.

19         MR. SOMVICHIAN:  It was Judge Koh's opinion.  It's

20 been followed in many cases.  And what it shows is that the

21 implied consent analysis looks at whether there is potential

22 awareness of the practice -- and there was there -- there is

23 here -- and whether people could accept that practice and

24 manifest that through their conduct, including the continued

25 use of the service.  We have --

1          **THE COURT:**  But -- but the opposite's not true.  I

2    don't understand how -- how it can only work in your favor.

3          **MR. SOMVICHIAN:**  I don't -- I don't think we're saying

4    that it can only work in our favor.

5          **THE COURT:**  Of course you are.

6          **MR. SOMVICHIAN:**  We have --

7          **THE COURT:**  You're -- of course you are.  You're

8    saying that you can consent to control only.  You can't consent

9    to not have your data entirely.

10         **MR. SOMVICHIAN:**  As a matter of the element of consent

11   that's based on user actions.  But, again, awareness and

12   inaction, acceptance of the practice, continued use, failure to

13   even opt out of personalized ads -- we're entitled to assert

14   that defense to an individual claim.

15        For example, the named plaintiffs, Your Honor, after

16   filing this case, after learning from their attorneys about the

17   full extent of the practices, what data is shared, and the ways

18   that it can be limited, none of them bothered to turn off

19   personalized ads, none of them bothered to block cookies, all

20   of which would prevent much of the activity --

21         **THE COURT:**  To what effect?

22         **MR. SOMVICHIAN:**  -- that they're complaining about.

23         **THE COURT:**  To what affect?  Only, again, back to the

24   damages.

25         **MR. SOMVICHIAN:**  To --

1          THE COURT:  I mean --

2          MR. SOMVICHIAN:  To the effect that these are

3   individualized issues and individualized defenses that Google

4   is entitled to assert.  And there's no way to --

5          THE COURT:  For what -- for what purpose?

6          MR. SOMVICHIAN:  To defeat liability, Your Honor, to

7   an individual claim.  That's what we're entitled to do.

8          THE COURT:  Response?

9          MR. LEVINE:  With respect to the named plaintiffs,

10  Your Honor, the named plaintiffs, during meet and confers, were

11  told by Google that if they changed any of their settings, that

12  would be viewed as -- after the filing of the lawsuit -- that

13  would be viewed as spoliation.  So that is one reason why they

14  never changed any of their settings.

15      The settings also don't stop anyone from being subject to

16  RTB, a fact that Google now admits.  So the settings -- all the

17  settings do is change one field out of 200.  There is no

18  setting that stops RTB.  So unlike the Gmail case, where one

19  could simply stop using Gmail and go use another email service,

20  what Google is saying is you have to stop using the Internet.

21  That's what they're saying.  You have to stop using the

22  Internet if you don't want to be deemed to consent.

23          THE COURT:  Well, you have to stop using Google.

24          MR. LEVINE:  No, because -- no.  Everyone in America

25  who's using the Internet is being subject to RTB auctions.  Our

1  case is only on behalf of account holders, because that's the

2  only group for which Google makes an express promise that they

3  won't do what they're doing.

4      So everyone is being subject to RTB.  It's pervasive.  It

5  exists all over -- all over the world.  It's on half the

6  websites.  You cannot escape RTB.  And it doesn't matter

7  whether you're an account holder or not.  Our case, though,

8  which is based upon the promise, only applies to Google account

9  holders.  So, in fact, what they're saying is you have to stop

10  using the Internet, otherwise you're deemed to consent to their

11  behavior, which they don't disclose anywhere.

12          **THE COURT:**  All right.

13      Any response?

14          **MR. SOMVICHIAN:**  Your Honor, I'd point to the survey

15  evidence.  I referred earlier to the aspect of the survey that

16  tested people's awareness that certain data -- categories of

17  data -- are, in fact, shared and used in online advertising.

18  Substantial majorities of people said that they were aware.

19      We tested another question also.  We asked people, would

20  they accept terms and gave them a hypothetical set of terms

21  that adopted the plaintiffs' version in this case.  So that

22  version said we will share your personal information.  And your

23  personal information includes all of these categories that the

24  plaintiffs contend, including IP address and user agent and

25  cookies and so forth.  And, again, substantial majorities --

1   over 70 percent -- had no problem accepting those terms.  So,

2   again, awareness and acceptance is implied consent.

3          **THE COURT:**  But you just said -- doesn't that -- I

4   mean, in some ways, doesn't it prove the point that you gave a

5   set of people a question, which that set of people answered,

6   and now you're relying on that?  It's like a class-action.

7   Common evidence presented to a small group, which you'd like to

8   have the Court adopt.  Sounds like a class-action.

9          **MR. SOMVICHIAN:**  Your Honor, this isn't UCL claim, for

10   example, where we're trying to show, in the abstract, that

11   there's some risk that consumers could be misled.  The point of

12   the survey is different here.  The point of the survey here is

13   that there are, in fact, individuals who knew of and --

14          **THE COURT:**  Well, that's the -- that's the point of

15   the survey that you'd like me to -- evidence can have

16   multiple -- can be used for multiple purposes.  I understand

17   that's what you'd like me to use it for.  And that's the reason

18   that you obtained it.  But it does imply some other things.

19     Let me ask you, where do you disclose to users that Google

20   is sharing or selling your information to third parties to

21   provide ads?  Where do you disclose that?

22          **MR. SOMVICHIAN:**  Your Honor, in a multitude of

23   places -- in a collection of places --

24          **THE COURT:**  Where is it in the briefing in front of

25   me?  Do you provide me with an easy list for me to identify

1    your disclosures?

2         **MR. SOMVICHIAN:**  Yes, Your Honor.  Those are all

3    identified in the Vakharia declaration and the exhibits to the

4    Vakharia declaration.  The pertinent portions of those

5    disclosures are quoted in the body of the declaration, and all

6    of the materials are attached.

7         I would also point out that, in addition to Google's

8    disclosures, there's an entire body of additional evidence

9    that's relevant here that actually wasn't at issue in Brown.

10   It's an added layer here to the consent issue.  And that's the

11   cookie notices and privacy policies of publishers -- the

12   websites and apps that integrate Google RTB.

13        So recall that, as Mr. Levine just mentioned, the

14   process -- the Google RTB process -- is triggered when somebody

15   accesses a website or app that displays ads through the Google

16   RTB process.  For that reason, they have specific disclosures

17   and explanations of the data sharing that's triggered by using

18   their website or app.  Those disclosures cover the practices at

19   issue.  And some of them actually specifically refer to Google.

20        And I can get you those examples, Your Honor.  There's one

21   involving an AccuWeather website.  There's another one relating

22   to JetBlue.  But common websites with privacy policies that

23   expressly address the sharing of information and directly

24   address Google.  So I would say --

25        **THE COURT:**  All right.

1        Let's get a response on that.

2            MR. SOMVICHIAN:  Real quick, Your Honor, just so you

3    have the record cites, those are in the Hanzarik declaration.

4            MS. PRITZKER:  I guess I want to point -- let me

5    respond to two pieces of that argument, Your Honor.

6        It is not accurate for Google to say that the disclosures

7    that are attached to the Vakharia declarations filed in this

8    case in any way disclose to class members that Google shares

9    themselves their user data in the auction.  This was a question

10   that she was asked specifically at her deposition, where she

11   was appearing at the 30(b)(6) witness for Google.

12       And at 158 of her deposition transcript, the question was

13   (as read):

14       "QUESTION:  In looking at the exhibits to your declaration

15       filed in opposition to class certification, where do they

16       refer to the real-time bidding auction?"

17       "ANSWER:  They do not specifically refer to the real-time

18       bidding auction."

19       And then there were other references where she says that

20   (as read):

21           "Our disclosures do not communicate that we

22       would share personal information or information that

23       could be linked to Google account personal

24       information for purposes of RTB."

25       So it's not accurate to say that the disclosures that are

```
 1  as part -- attached -- to the declaration of Ms. Vakharia in
 2  any way disclose --
 3         THE COURT:  All right.  I'll take a look at it.
 4      What's the second point you wanted to make?
 5         MS. PRITZKER:  I've forgotten what the second point
 6  was.
 7         THE COURT:  All right.  Well, while you think about
 8  it, let's move to the claim of publication of private
 9  information.
10         MS. PRITZKER:  Oh, the third-party websites.
11      That, too, is a bit of a -- I think if Your Honor wants to
12  look at those excerpts, they're attached to Mr. Hanzarik's
13  declaration.  And none of those disclose the Google RTB auction
14  either.
15      A lot of those websites deal -- all of those websites --
16  deal with cookie policies and advertising policies related to
17  those specific websites.  And sometimes they refer to Google,
18  sometimes they refer to Google analytics, but none of them
19  refer to the fact that information is being shared by Google to
20  any publisher in the real-time bidding auction.  The real-time
21  bidding auction, again, is not disclosed anywhere in those
22  third-party disclosures.
23      So, you know, I don't know how you can imply consent by
24  going to third-party sites, which don't disclose Google's
25  activity as opposed to the activity of that third-party website
```

1    publisher, as evidencing any implied consent here.

2         **THE COURT:** All right. Publication -- a claim for

3    publication of private information. Seems like the arguments

4    are similar.

5         **MS. PRITZKER:** Pretty much the same, mm-hm.

6         **THE COURT:** So first element -- that the RTB process

7    is a public disclosure. That element, itself, seems like it

8    could be commonly answered, whether or not it's a disclosure.

9    It goes from Google to other people. Is that a disclosure?

10      Agreed?

11         **MR. SOMVICHIAN:** I agree, that's a common issue, Your

12    Honor.

13         **THE COURT:** Okay. It's the next one that I assume

14    that you disagree. And that is whether the disclosure -- there

15    is a disclosure of a private fact; right?

16         **MR. SOMVICHIAN:** Correct.

17         **THE COURT:** For the same reasons.

18         **MR. SOMVICHIAN:** Yes.

19         **THE COURT:** Same reasons?

20         **MS. PRITZKER:** That's correct, Your Honor.

21         **THE COURT:** Next, which would be offensive and

22    objectionable to the reasonable person.

23      Same issues?

24         **MS. PRITZKER:** Same issues.

25         **MR. SOMVICHIAN:** I agree.

1      **THE COURT:**  Which is not a legitimate concern.

2  That's -- that's a slightly separate issue.

3      Any comment on that?

4      **MS. PRITZKER:**  I think the issue of not legitimate

5  concern is sort of an add-on to the private nature of the

6  information; right?  I mean, so it's not -- it's not as if --

7      **THE COURT:**  Well, it doesn't have to be, as with the

8  other ones, highly offensive.  The other ones discuss whether

9  something is highly offensive.

10      **MS. PRITZKER:**  Correct.

11      **THE COURT:**  This is whether it's a legitimate concern.

12      **MS. PRITZKER:**  Correct, which, I guess, is one's

13  reasonable expectation of privacy in their personal data that

14  they share with Google.

15      **THE COURT:**  Is that objective or subjective?

16      **MS. PRITZKER:**  It's objective, Your Honor.

17      **THE COURT:**  You agree?  Objective?

18      **MR. SOMVICHIAN:**  I think the public concern element

19  would be objective, Your Honor, but, again, it --

20      **THE COURT:**  "Legitimate concern" is the term.

21      **MR. SOMVICHIAN:**  I agree that legitimate public

22  concern is a common element based on objective -- an objective

23  standard.  But whether it applies to a given individual is

24  where it becomes individualized.  Because the data may --

25  again, it goes back to the variation in the data and applying

1    the general concepts to a given individual.

2            **THE COURT:**  All right.

3        The next one you have breach of confidence, Count 7.  The

4    elements for a breach of confidence claim are that the

5    plaintiff conveyed confidential and novel information to the

6    defendant, one.  Two, the defendant had knowledge that the

7    information was being disclosed in confidence.  Three, there

8    was an understanding between the defendant and the plaintiff

9    that the confidence would be maintained.  And, four, there was

10    disclosure or use in violation of that understanding.

11        How is it that there is evidence that the plaintiff

12    conveyed confidential and novel information to the defendant

13    when your other argument is that they didn't know they were

14    conveying anything?

15            **MS. PRITZKER:**  No.  That's actually not our argument.

16    So to become a Google account holder, you obviously have to

17    agree to the terms of service and the privacy policies.  And

18    those terms of service do -- you do acknowledge that you are

19    sharing information with Google -- a lot of information with

20    Google -- your name, your address, your IP address, a lot of

21    your -- you know -- a lot of information you're sharing with

22    Google.  And you do so with the understanding that Google may

23    use that information for its own purposes and its own services.

24        That's a very different question with respect to whether

25    you are agreeing that Google can then share and tell that

1    information with third parties in the real-time bidding auction

2    when it promises it will not do so.  So the information --

3              THE COURT:  Are you not proceeding on this claim?

4              MS. PRITZKER:  No, we are proceeding on this claim.

5              THE COURT:  Okay.  For class certification?

6              MS. PRITZKER:  Oh, there may be a technical question

7    that Mr. Levine can --

8              MR. LEVINE:  I think Your Honor was -- and this may be

9    wrong -- but I think you were asking the technical question of

10   how is the plaintiff -- if they don't know about RTB, how are

11   they conveying this information to Google.  And I think the

12   answer is --

13             THE COURT:  So --

14             MR. LEVINE:  Yes.

15             THE COURT:  So, Mr. Levine, you don't get to

16   double-dip.  So I'm not going to listen to -- she's -- if she's

17   going to argue the issue -- I want to make sure that I haven't

18   dismissed the breach of confidence claim.  Are you seeking

19   certification on breach of confidence?

20             MS. PRITZKER:  Yes, we are, Your Honor.  That's one of

21   the claims that we're proceeding on.

22             THE COURT:  Okay.

23        You can write her a note.  You just can't double-dip.

24        So all of this you're saying -- your common evidence on

25   all of these issues relates, in part, to the agreement.  How is

```
 1   it -- if that's the case, how is this any different from a
 2   breach of contract claim?
 3          MS. PRITZKER:  They -- they -- you know -- they --
 4   they provide different remedies of --
 5          THE COURT:  What are the remedies?
 6          MS. PRITZKER:  I mean, in this case, I guess, we have
 7   damages and -- under -- under both.  Some of the tort claims
 8   have punitive damages associated with them.
 9          THE COURT:  How is this different -- how is Count 7 --
10          MS. PRITZKER:  It's not different.
11          THE COURT:  -- different --
12          MS. PRITZKER:  It's not different with respect to how
13   we're calculating damages on behalf of class members.
14          THE COURT:  How is Count 7 different from Count 1?
15   And if it's duplicative, why are you moving on both?
16          MS. PRITZKER:  Well, this is class certification, Your
17   Honor.  I think that if we're entitled to have the class --
18   have the claims -- subject to class treatment so that they can
19   proceed to summary judgment and even to trial, I think we --
20   you know -- we're entitled to do that.
21       There may be merits challenges to the particular claims
22   that will come up at summary judgment.  But if they're entitled
23   to class treatment, we'd like to proceed on them.  And then
24   if -- if those claims survive summary judgment, and it comes
25   down to an issue of trial, we can probably trim it -- you
```

1    know -- there may be an opportunity to trim at that time.  But

2    we want to make sure that we have certified claims that we can

3    proceed on, at least through the summary judgment phase and

4    ultimately to trial, and give us the option to pick and choose,

5    depending on how the chips fall later in the case.

6            **THE COURT:**  All right.

7        Is there anything different with respect to this claim

8    that you all want me to consider?

9            **MR. SOMVICHIAN:**  One --

10           **THE COURT:**  Or is it all the same?

11           **MR. SOMVICHIAN:**  One detail, Your Honor.

12       The same issues with respect to awareness and acceptance

13   on the one hand and breach on the other apply here, as well.

14   And for all the reasons we've talked about, we believe those

15   are individualized.

16       I would point out that here -- where the claim requires

17   that the plaintiffs have conveyed information that they believe

18   to be confidential -- now that makes the element of knowledge

19   and awareness part of the prima facie elements of the claim.

20           **THE COURT:**  Well, where does it say that --

21           **MR. SOMVICHIAN:**  It's not just a defense.

22           **THE COURT:**  Where does it say that -- someone can

23   convey information -- well, I guess, that's a question about

24   Element 1.  Did plaintiff have to know that they were conveying

25   confidential and novel information?

1          **MS. PRITZKER:**  I don't know that the elements require

2   a notice -- I mean, a knowledge element -- for the plaintiff to

3   have conveyed the information.

4          **THE COURT:**  Does anybody have any law --

5          **MS. PRITZKER:**  It does --

6          **THE COURT:**  Does anybody have any law on that issue?

7          **MS. PRITZKER:**  I was just going to say there is a

8   knowledge element on behalf of the defendant that the

9   information is confidential and novel.

10         **MR. SOMVICHIAN:**  I don't have a --

11         **MS. PRITZKER:**  Disclosed in confidence.  So...

12         **THE COURT:**  Is there evidence that the defendant had

13  knowledge that the disclosure was in confidence?  Where -- did

14  you go through that issue with the defendant?  Where is the

15  issue -- where is the evidence of confidence?

16         **MS. PRITZKER:**  The evidence of confidence is the fact

17  that, again, in order to become a Google account holder, you

18  have to provide all kinds of information to Google.  And you

19  do.  And you do so --

20         **THE COURT:**  What is the evidence, then, that you were

21  saying was both confidential and known?  What is the proffer of

22  evidence?

23         **MS. PRITZKER:**  It's the same aggregate information

24  that Google ends up transmitting in the Google bid requests.

25  It's -- it's your identifying information --

1           **THE COURT:**  The 60 fields?  200 fields?  What is it?

2           **MS. PRITZKER:**  60 fields.  Well, it's probably the

3    200, but we only have evidence of the 60, because that's all

4    that we were given.  So it's the 60 fields for purposes of

5    trial at this point.

6           It's all of the information that has sort of, you know, an

7    informational aspect to it; right?  It's your IP address.  It's

8    the content of your communications as you're, you know,

9    traveling the web and information is taken in the Google RTB

10   auction.  It's all the information that Google associates with

11   your account -- your device ID -- all of these things from

12   which, again, somebody can obtain private data or private

13   information about you.

14          **THE COURT:**  In the complaint, you argued that that

15   data included health data, race, sexual orientation, religious

16   beliefs.  Is all of that part of the proffer at this juncture?

17   Because that's what you alleged for purposes of this particular

18   claim.

19          **MS. PRITZKER:**  I don't know exactly.  I don't know the

20   technology on that.

21          Is that still in play?

22          **MR. LEVINE:**  That is, Your Honor.

23          **MS. PRITZKER:**  Okay.

24          **MR. LEVINE:**  The -- those would be the sensitive

25   categories.  That is addressed in Professor Shafiq's report.

 1    He did analyze the number of times that the named plaintiffs --

 2    that it -- that comes from their search histories -- from the

 3    URLs that are provided as part of the bids.  And he analyzed

 4    those using Google's own sensitive category categorizations and

 5    determined that, of all of the bid requests for the named

 6    plaintiffs, there were X number -- hundred thousands -- it's a

 7    very large number -- that involved sensitive information, which

 8    is what's -- that's coming -- that's where that complaint was

 9    going on that -- sensitive fields.

10        So if somebody went to the Mayo Clinic website, for

11    example, and looked up a particular disease, that would be

12    deemed sensitive by Google, and that would show up.  And that

13    shows up in Professor Shafiq's report -- his opening report.

14            **THE COURT:**  All right.

15        Anything else on this one?

16            **MR. SOMVICHIAN:**  Your Honor, just on that last point,

17    I think that highlights another element of variation.

18    Dr. Shafiq certainly didn't say that all of the websites

19    visited by the plaintiffs that are reflected in the data are

20    sensitive, nor could he.

21        And the percentages and ranges that he applied for the

22    named plaintiffs differ across the board.  That's another

23    element that's going to cut across all of these privacy claims

24    that have some component that the plaintiffs are trying to tie

25    to the URL information and the ability to track it to

1    categories and so forth.  So, again, it's another element of

2    variation in the data.

3         THE COURT:  So we don't see this in the notice of the

4    motion that you were seeking to have class cert on the breach

5    of confidence claim.  Where did you notice that issue?  If

6    somebody could check while I continue with the argument.

7         All right.  The next one --

8         MS. PRITZKER:  I think it may be in the footnote of

9    our notice, but let me see.

10        In our notice of motion in paragraph 2 --

11        THE COURT:  All right.  Thank you.

12        MS. PRITZKER:  -- where we lay forth all of the claims

13   for which we're seeking certification -- breach of contract,

14   breach of confidence, invasion of privacy, intrusion upon

15   seclusion, publication of private facts, and CIPA -- violations

16   of CIPA.

17        THE COURT:  Let's move to CIPA.

18        MR. SOMVICHIAN:  Your Honor, for what it's worth, we

19   understood their breach of confidence claim was one that they

20   were moving on.

21        THE COURT:  All right.  The last is CIPA; right?

22        MR. SOMVICHIAN:  Your Honor, I think --

23        THE COURT:  This is only for California.

24        MS. PRITZKER:  We haven't pled it that way, Your

25   Honor.

1          THE COURT:  Isn't it a California statute?

2          MS. PRITZKER:  It is a California statute.  But in the

3   recent Doe v. Meta case, there was a nationwide application of

4   CIPA.  The Court found that it was appropriate to apply it, in

5   that case, where there was evidence of a California choice of

6   law clause, the defendant was in California, and that the

7   conduct emanated from California.  That the statutory history

8   allowed -- promoted the idea of folks outside of California

9   asserting that claim.

10         THE COURT:  Doe v. Meta -- is that me?

11         MS. PRITZKER:  I'm sorry?

12         THE COURT:  Doe v. Meta -- we have lots of Meta cases.

13  We have lots of --

14         MS. PRITZKER:  Yeah, I know.  It's Doe v. Meta

15  Platforms.  It's 2023 Westlaw --

16         THE COURT:  Who's the judge?

17         MS. PRITZKER:  This is Judge Orrick.  It's a --

18         THE COURT:  Well, then Judge Orrick can do it

19  nationwide.

20         MS. PRITZKER:  -- September 2023 --

21         THE COURT:  I don't tend to do that.  I don't do it in

22  my antitrust cases.  I barely -- I don't think I've done it in

23  my MDL cases.

24         MS. PRITZKER:  To be fair, Your Honor, it was at the

25  motion to dismiss stage.  It wasn't -- it wasn't class

1    certification or beyond.  So I don't want to misrepresent the

2    context of the decision.  The Court can create a California

3    subclass for CIPA.  I mean...

4         **THE COURT:**  All right.  CIPA requires -- they use --

5    first, that there's a machine, instrument, or contrivance.

6    That's common.  Google's not using different mechanisms to do

7    what it's doing; right?

8         **MR. SOMVICHIAN:**  I will agree that's common, Your

9    Honor.

10        **THE COURT:**  The next one is intentionality -- that it

11    acted with intentionality.  Again, that seems to be common.

12        And then it -- to intercept the content of any

13    communication over any telegraph or telephone wire, line,

14    cable, or instrument.  Or, B, read, attempt to read, or learn

15    the contents or meaning of any message, report, or

16    communication -- while the message, report, or communication is

17    in transit, or passing over any wire, line, or cable, without

18    the consent of all parties to the communication.

19        That's the statute, at least under 631.

20        Are you proceeding under 631 or 632?

21        **MR. SOMVICHIAN:**  631, Your Honor.

22        **MS. PRITZKER:**  Yes, 631, Your Honor.

23        **MR. SOMVICHIAN:**  And the problems with the CIPA

24    claim -- where the individualized issues come in, Your Honor --

25    are twofold.

1      One has to do with the requirement that the alleged

2 interception involved the contents of communications.  CIPA

3 claim, just like the federal analogue, doesn't apply to any and

4 all data.  It applies to data that can meet the requirements of

5 being, quote, "the contents of communications."

6      The plaintiffs haven't clearly articulated what, in a bid

7 request, they believe to be the contents of a communication.

8 But they've referred, generally, to their expert report.  And

9 Dr. Shafiq, in particular.  And he identifies a number of data

10 elements.  We would dispute that many of those could even

11 arguably be contents of communications.

12      But setting aside that merits dispute, what's relevant

13 here is that several of the data fields that Dr. Shafiq

14 identifies are not commonly sent.  Again, this goes back to the

15 slide I handed up to Your Honor.  And one of them that does

16 vary, as reflected by the plaintiffs' own experts, is the

17 Google user ID, for example.  That's one that Dr. Shafiq seems

18 to say, and the plaintiffs seem to say, is the contents of the

19 communication.

20      It's not uniformly sent.  In fact, it's often not sent

21 over 60 percent of the time.  And so the question of whether

22 any given alleged interception involves the contents of

23 communications will differ across different individuals, and

24 that's an individualized issue.

25      The second individualized issue, Your Honor, has to do

1   with the California nexus.  You read the statutory section that

2   refers to that.  The alleged interception has to occur while

3   the communication is either in transit or is being sent from or

4   received in this state -- in California.  And so there has to

5   be some showing that that California nexus can also be shown

6   through common proof.

7       We've submitted evidence, Your Honor, that it cannot.

8   That's in the Glenn Berntson declaration, paragraph 22.  With

9   respect to the sending of a bid request, which we understood

10  the plaintiffs to be focusing on as the alleged moment of

11  interception from their discovery requests, we've shown that

12  that, in fact, often does not occur in California.

13      We acknowledge that there are some circumstances, based on

14  network usage and so forth, where the communication and the

15  initial transmission of a bid request can route through

16  California.  So we acknowledge that.  But the point for class

17  certification is that it differs.  And there's no method to

18  determine which ones, in particular, get routed through

19  California or not, and which ones have the necessary California

20  nexus.

21          **THE COURT:**  All right.

22      Response?

23          **MS. PRITZKER:**  Do you want a response on the Shafiq --

24          **THE COURT:**  Just a response.

25          **MS. PRITZKER:**  Okay.  Two points.

1    So Professor Shafiq does discuss the content of

2    communications element in his expert report at paragraph 42.

3    Again, he lays out the data fields commonly included in all RTB

4    bid requests.  And he provides the relevant content analysis in

5    paragraph 42B, which concludes that the RTB requests transmit

6    the referrer field, which contains the full URLs.

7         Professor Shafiq also discusses in his report, at

8    paragraph 51, in internal Google document in which Google ad

9    tech employees acknowledge the content-rich nature of URLs.  It

10   discusses the ability to establish linking between the user's

11   identity and some notion of the user profile, page verticals,

12   sensitive categories, frequently visits sites, sociodemographic

13   group.  So it does -- it does talk about the contextual nature

14   of the signals in the URL and the categories.

15        In paragraph 60 and paragraph 80, Professor Shafiq also

16   discusses other internal documents in which Google discusses

17   that RTBs -- continued disclosure of URLs for web requests and

18   app name -- app IDs -- for app requests -- means that the

19   recipient can discern the content of the communication and

20   create their own user categorizations based off of that

21   information.

22        At paragraph 80, he discusses other content-rich -- other

23   content factors -- about the URLs that are, in fact, shared in

24   the bid requests.  There are other references in his report to

25   other content-rich nature.  But, you know, the factual evidence

1    of content is there.

2            **THE COURT:**  What about the router issues?

3            **MS. PRITZKER:**  So as to the router -- and this is,

4    frankly, an issue that we've been trying to get to the bottom

5    of for quite some time.  And I think we're there.  But opposing

6    counsel cited to the declaration of Dr. Berntson, who is a

7    Google employee, at paragraph 12, in which he purports to

8    discuss certain -- that there are egress points from Google's

9    internal network that Google uses to transmit many of these

10   Google RTB requests, and that those egress points, you know,

11   often are not in California.

12           But Google has what Dr. Berntson referred to as two

13   trading locations in the entire United States that receive --

14   that Google RTB participants use to organize where they can

15   receive RTB bid requests.  One is in California.  One is

16   identified on Google's website as being in the San Francisco

17   Bay Area.  The other is in Virginia.

18           Now, Dr. Berntson described this as not a server, but some

19   sort of electronic means through which RTB bid requests are

20   received, organized, and transmitted so that each bidder can

21   manage RTB traffic.  Again, it's not a physical location in

22   California, but I think it's -- survives the California nexus

23   under CIPA.

24           **THE COURT:**  All right.

25           Any response?  And then we'll move on.

1      No?

2          **MR. SOMVICHIAN:**  Yeah.  I'm sorry, Your Honor.

3      I want to point out, counsel just said they were trying to

4      get to the bottom of this.  They had a chance to depose

5      Mr. Berntson after he submitted his declaration explaining the

6      issues relating to the California nexus and explain that there

7      is not a consistent California nexus.

8          The testimony about a trading location -- I'd invite you

9      to actually review those citations in the reply brief.  They

10     don't -- they don't refer to California as a physical location

11     for the sending of bid requests.  These trading locations are

12     proxies for RTB participants to determine latency and other

13     technical issues.  The bottom line is, that's not where the bid

14     request actually gets sent from.  And so there is no common

15     evidence that the plaintiffs have put in front of you with

16     respect to a California connection.

17         I also want to very briefly address something that was

18     mentioned earlier.  This has to do with the named plaintiffs in

19     the case and the fact that none of them has ever changed their

20     personalized ad setting or taken any other action to prevent

21     any data sharing.

22         Counsel said that we threatened them with spoliation.

23     That's not true, Your Honor.  We had a discovery fight with

24     Judge DeMarchi for the purpose of getting information about how

25     they might -- or what their settings are and how they've

changed them.  We wanted a record of how they've changed their

settings over time.  But we've never objected to them ever

doing anything with respect to their settings -- turning them

on or off.

        **THE COURT:**  All right.

    Let's move to damages.

        **MS. PRITZKER:**  Thank you, Your Honor.

        **THE COURT:**  So back to where I started.  I did not

certify a damages class in Brown.

    Mr. Danitz?

        **MR. DANITZ:**  Thank you, Your Honor.

    In the Rodriguez case, Chief Judge Seeborg recently

certified a class -- 12(b)(3) class -- looking at substantially

the same damages models that are presented here.  In that

opinion, the Court referenced Your Honor's Brown decision quite

often.

    In looking at Lasinski's models in those cases, the Court

recognized that the market price model based on Screenwise,

which is also at issue here, is based on objective factors and

a standard payment of $3 a month for the right to be

surveilled -- right? -- giving up the right to be surveilled.

That is similar to the issue here.  And it's the basis of the

functional view taken by Professor Zeithammer in the market

price.  It's an objective measure.

    For the unjust enrichment/disgorgement portion, we have

shown that aggregate damages can be measured, and that they're consistent with the theory of liability in this case.  And although it's a -- at the current time -- it's an approximation, that is all plaintiffs have to bring forth at this time.

**THE COURT:**  Okay.

Response?

**MS. REDDY:**  Thank you, Your Honor.  Aarti Reddy for defendant Google.

Plaintiffs in this case have put forward two damages models, an unjust enrichment damages model and a compensatory damages model.  We understand that plaintiffs don't need to prove damages with an exact certainty at the class certification stage; however, their damages models must be consistent with their theory of liability.  That is a requirement under Comcast.  And both of their damages models fail that threshold requirement, Your Honor.

I'd like to talk about unjust enrichment first.  There are two independent reasons on which the Court should reject plaintiffs' unjust enrichment damages model.  First -- now, unjust enrichment -- their damages model is essentially to take the pool of revenue that Google earns from third parties through the RTB auction and deduct 51 percent -- which they say is the percentage attributable to personal and sensitive information -- deduct costs, and that is their damages;

1  however, that damages theory is not consistent with their

2  theory of liability in this case.

3      Your Honor, you should have the demonstrative in front of

4  you that my colleague Mr. Somvichian handed to you.  If I could

5  direct you to page 3 of that demonstrative.  This represents

6  plaintiffs' class definition in this case.  It states, in

7  relevant parts, "All individual Google account holders subject

8  to a Google United States Terms of Service."  That is the class

9  that they are seeking to certify; however, their revenue that

10  they use as a basis for their unjust enrichment damages model

11  includes revenue not just from Google account holders subject

12  to a U.S. TOSs, but all revenue that Google generates from

13  third parties through RTB.

14      And as Mr. Levine [sic] just stated a few minutes ago, you

15  don't have to be a Google account holder to receive ads through

16  RTB.  Google RTB is available to people who are not Google

17  account holders.  The revenue model that they put forward

18  includes revenue from nonpunitive class numbers.  Non-Google

19  account holders are served ads through RTB.  Google does not

20  have revenue limited to their class definition of Google

21  account holders subject to a United States TOSs.

22      We have made this clear in discovery, Your Honor.  And

23  plaintiffs did not seek their revenue data they need to match

24  their class definition until after filing their class

25  certification reply.  Google has now confirmed, in discovery,

 1   it does not have this revenue information.  There is no way for

 2   plaintiffs to remedy this defect, and fact discovery has now

 3   closed.

 4       This is a classic Comcast problem, Your Honor, because

 5   their unjust enrichment damages model does not match their

 6   class definition.  It is overbroad.

 7          **THE COURT:**  Response?

 8          **MR. DANITZ:**  If I may respond, Your Honor.

 9       First --

10          **THE COURT:**  Well, do you agree that the pool that your

11   expert is seeking 51 percent less cost is from all users, not

12   just the class?  Do you concede that?

13          **MR. DANITZ:**  No, Your Honor, not exactly.  Let me

14   explain.

15       In response to plaintiffs' discovery requests seeking

16   documents sufficient to establish Google's RTB revenues, Google

17   produced a spreadsheet -- an attorney-created spreadsheet --

18   with two lines, U.S. users, non-U.S. users.  And that

19   spreadsheet substantially reproduced as Schedule 1 in the

20   (indiscernible) --

21          **THE COURT REPORTER:**  Sorry, "as Schedule 1 in" what?

22          **MR. DANITZ:**  In the Regan Report, R-E-G-A-N.

23          **THE COURT REPORTER:**  Thank you.

24          **MR. DANITZ:**  As discussed in our brief, the record

25   evidence, including internal Google documents and testimony

```
 1    from multiple 30(b)(6) corporate representatives, establishes
 2    that Google can and does parse revenue from U.S. versus
 3    non-U.S. account holders, and it is estimable.
 4         Our expert used the best available evidence in
 5    calculating -- in approximating -- these damages that was
 6    available at the time.  The record evidence shows that Google
 7    has determined the user's IP address provides the most reliable
 8    method to identify whether the U.S. TOSs applied to that user,
 9    and that Google bases its billing and accounting systems on
10    that same information -- IP address -- or also called -- well,
11    I won't use the exact phrase, Your Honor, because we're in open
12    court.
13         Google's response to Interrogatory 11 stated that "U.S.
14    user" in the produced spreadsheet means a U.S. -- a user
15    accessing the Internet using a device with an IP address within
16    the U.S.  The record evidence establishes that Google uses IP
17    address to determine the relevant country for multiple reasons,
18    including Google's calculation of revenues.
19              THE COURT:  So this really isn't an issue between the
20    U.S. and other countries.  This is a question of those who have
21    accounts versus those who do not.
22              MR. DANITZ:  All right, Your Honor.  Yes.
23         So Google also maintains the data that can distinguish
24    between Google account holders and non-Google account holders,
25    Your Honor.  This came through --
```

1    **THE COURT:**  The question is what is it that the expert

2    used?

3    **MR. DANITZ:**  Well, Your Honor, this -- the expert used

4    the only spreadsheet that was produced by Google, which said

5    user -- U.S. user and non-U.S. user.  That is -- that is the

6    spreadsheet that the expert used, Your Honor; however, in the

7    30(b)(6) depositions that were taken, it is clear that, in

8    fact, Google was able to distinguish between Google account

9    holders and non-Google account holders that it logs RTB auction

10   information, including Google account ID, and that Google has a

11   dashboard --

12   **THE COURT:**  So that -- so that it can, but you don't

13   actually have that evidence --

14   **MR. DANITZ:**  That --

15   **THE COURT:**  -- and you didn't get that evidence?

16   **MR. DANITZ:**  Well, Your Honor --

17   **THE COURT:**  Are they accurately representing the state

18   of the record?

19   **MR. DANITZ:**  Your Honor, they're accurately

20   representing that they provided a spreadsheet that we

21   understood --

22   **THE COURT:**  The request that was made --

23   **MR. DANITZ:**  -- that we understood -- that we

24   understood to apply to the Google account holders, but actually

25   we found out in this --

```
 1           THE COURT:  Okay.  I understand you're blaming --
 2           MR. DANITZ:  -- in this motion --
 3           THE COURT REPORTER:  Sorry, I can't understand --
 4           THE COURT:  I understand you're blaming them now.  Do
 5    I have, in the record, what your request was?
 6           MR. DANITZ:  Yes, Your Honor.  That's at paragraph 12
 7    of the Regan reply -- expert report.
 8           THE COURT:  I have -- you copied and pasted the
 9    document request?
10           MR. DANITZ:  Yes, Your Honor.  There are excerpts of
11    two RFPs.
12           THE COURT:  In the response by Google, did you
13    indicate, and do I have it in the record, that this related --
14    that the production -- related to all U.S. users and not the
15    U.S. users who had accounts -- did that make -- did you make
16    that clear?
17           MS. REDDY:  Yes, Your Honor.  We made that clear in
18    our supplemental interrogatory responses where plaintiffs
19    propounded requests for information about the specific revenue
20    spreadsheet.
21        So Mr. Danitz was just referring to Google's references to
22    U.S. versus non-U.S. users.  In -- he's referring to discovery
23    responses in which we made clear that the U.S. versus non-U.S.
24    line item meant an Internet user, not necessarily a Google
25    account holder.
```

1       This was also made clear in subsequent discovery where we

2   have provided, in interrogatory responses, that Google does not

3   parse revenue based on Google account holder versus non-Google

4   account holder.

5       I will -- I do want to emphasize, Your Honor, that

6   plaintiffs only first sought this specific revenue they need --

7   that is, Google RTB revenue limited to Google account holders

8   subject to a United States TOSs -- they only fist sought that

9   information after filing their class certification reply.  At

10  that point, we indicated that we do not have that information,

11  and now fact discovery is closed.

12      **THE COURT:**  Well, does -- so what you're saying is it

13  doesn't matter.  If you don't have the information, are you

14  saying that you -- that had they timely requested, you would

15  have -- you couldn't have produced it?

16      **MS. REDDY:**  We couldn't have produced it, because we

17  don't have it, Your Honor.

18      And I would like to note that their experts had the

19  opportunity and had the last word to propose some methodology

20  or some workaround to fix their model in accounting for this,

21  but they did not.

22      And I would like to respond just on the point about the

23  30(b)(6) witness testimony that Mr. Danitz was referring to.

24  There was no testimony in the record demonstrating that Google

25  actually possesses that information.  I think he's referring to

Mr. -- Dr. Berntson's testimony that is at the 30(b)(6)

deposition transcript 237-4-7.  This is not in the record, Your

Honor, but we're happy to provide this to the Court should the

Court request it (as read):

　　　"**QUESTION:**  Can Google distinguish between Google account

　　　holders and non-Google account holders?"  That's the

　　　question.

　　　"**ANSWER:**  In the finance data set, no."

　　　That is the testimony that they claim supports their view

that this data exists.  It doesn't, Your Honor.  And the

testimony of these other witnesses who aren't responsible for

finance issues is not relevant.  Google has already confirmed

in discovery that it doesn't have this information.

　　　**MR. DANITZ:**  If I may respond, Your Honor.

　　　In the Berntson depo at -- it appears in our briefing and

in the Regan reply report.  In the Berntson's depo, at 225

through 226 and 237 through 242, he testifies and also -- he

testifies -- and also internal documents show, such as the

excerpt at page 10 of the Regan report, that Google, in fact,

has the ability to determine the proportion of RTB revenue

attributable to Google account holders and non-Google account

holders.

　　　This information can be used for finding Mr. Regan's

estimate.  The artful response to that one deposition testimony

about how -- where it is stored in a financial particular

log -- that does not answer the question whether that can be

distinguished.  And the references I just gave Your Honor show

that it can --

     **THE COURT:**  With respect to the --

     **MS. PRITZKER:**  -- including the excerpt at page 10.

     **THE COURT:**  I'm going to stop you.  With respect to

the $3 per individual class member, don't you then, at that

juncture, get into issues of individual implied consent?

     **MR. DANITZ:**  Well, Your Honor, this Court, in Brown,

pointed out that this is an objective standard and that --

     **THE COURT:**  This Court, in Brown, didn't certify a

damages class.

     **MR. DANITZ:**  That's -- that is true.

    Judge Seeborg also recognized that the market price model

is objective and does not --

     **THE COURT:**  The question -- I understand it's

objective.  There was an objective amount in Brown, as well.

That wasn't my question.  My question was implied consent.

     **MR. DANITZ:**  Your Honor, we don't -- we don't believe

the damages issue raises the issue of implied consent,

especially here where there's an express statement that they

will not sell your personal information in these RTB auctions,

and then they secretly do, unbeknownst to --

     **THE COURT:**  So back to what Ms. Pritzker was arguing.

You want me to find, as a matter of law, that people can't do

1  it, even though I've got survey evidence that suggests that

2  they all know that they were doing it, and they were fine with

3  it.

4          **MR. DANITZ:**  Your Honor, Professor Zeithammer --

5          **THE COURT:**  "Yes," right?

6          **MR. DANITZ:**  -- addressed --

7          **THE COURT:**  The answer to my question is "yes" --

8  that's what you want me to find?

9          **MR. DANITZ:**  Your Honor, what -- I believe that could

10  be both a common issue -- I believe it can be a common issue.

11  The Court can also find as a matter of law.  I mean, the

12  evidence presented in the Hanssens' survey -- he admitted that

13  it has nothing to do with privacy.  Nothing.  That's in the

14  record.  That's in our papers.  It's in Dr. Zeithammer's

15  rebuttal response, which is in his -- yeah -- his rebuttal,

16  which is in his reply expert report.

17      There are also multiple methodological issues with that

18  report, including extreme selection bias, which are outlined in

19  the -- in that response by Professor Zeithammer.  It is an

20  unreliable survey that does not ask the correct questions, does

21  not identify anything about RTB, and it's basically a reading

22  comprehension test that's set up for the results they attained.

23  That's all in the Zeithammer rebuttal report.

24          **THE COURT:**  On the other side, if I find that the

25  Rule 23(a) requirements are met, why can't I -- why would an

```
 1   injunctive relief be an appropriate measure here?
 2          MS. REDDY:  Your Honor, I believe my colleague --
 3   Mr. Somvichian -- is prepared to address the injunctive relief
 4   issues.
 5          MR. SOMVICHIAN:  Your Honor, I think it goes back to
 6   the element of commonality, which we don't think is satisfied,
 7   because there are no common answers to the questions that drive
 8   liability in this case.  So it's not an issue of --
 9          THE COURT:  I'm not asking about liability.  Assume
10   you lose on liability.
11          MR. SOMVICHIAN:  Okay.
12          THE COURT:  Then why wouldn't I be able to -- why
13   isn't it appropriate to have injunctive relief as a
14   possibility?
15          MR. SOMVICHIAN:  Injunctive relief would be
16   appropriate relief in -- if you find, Your Honor, which we
17   don't think you should -- that liability is a common issue --
18          THE COURT:  We've spent almost two hours.  I
19   understand that that's your perspective.  I'm asking you to
20   have a response if you lose on that.  Or I could just have you
21   sit down and have no response.
22          MR. SOMVICHIAN:  Understood.
23       So there's the element of commonality that we've talked
24   about.  With respect to a circumstance where you've found that
25   those issues are all common, and now we're having a trial on
```

1    the business practice and injunctive relief, there's a

2    question, Your Honor, as to whether the proposed remedy that

3    they've proffered --

4            **THE COURT:**  Well, I'm not asking about --

5            **MR. SOMVICHIAN:**  -- is appropriate for a class.  The

6    injunctive relief has to provide a remedy to the class as a

7    whole.  What they're asking --

8            **THE COURT:**  But that's -- now you're asking about

9    the -- debating the merits.  That's not my question.

10           **MR. SOMVICHIAN:**  No.  I'm trying to address Your

11   Honor's questions, which I take to be, "Would injunctive relief

12   be appropriate here as a remedy to the class as a whole?"  And

13   what I'm suggesting is that what they had proposed would not

14   offer any meaningful relief to large categories of the class --

15           **THE COURT:**  I'm asking whether it is appropriate for

16   me to consider on a class-wide basis, not whether what they're

17   asking for is what they will get.  The question is, if I find

18   that all of the elements are met, isn't it appropriate for the

19   Court to consider whether injunctive relief is appropriate on a

20   class-wide basis?

21           **MR. SOMVICHIAN:**  That is certainly an issue that would

22   be appropriate to consider, Your Honor.  But with respect to

23   the --

24           **THE COURT:**  And that's all I was questioning -- that's

25   all I was asking, not whether they -- their proposal is any

1    good -- whether any proposal is any good.  That's -- that's not

2    in front of me.

3         MR. SOMVICHIAN:  Understood, Your Honor.  But the

4    question remains, is there a proposal that could be applied?

5    If the Court were to evaluate those options, is there something

6    before the Court that would provide meaningful relief to the

7    class as a whole that would be appropriate injunctive relief?

8    And we don't think --

9         THE COURT:  Well, perhaps -- perhaps people could have

10   the choice, which they obviously don't have now.  There's no

11   transparency and there's no choice.  So maybe that is

12   appropriate.  And it certainly is what you claim they should be

13   able to do at this point.  But it's actually not what you do --

14   and I obviously don't mean you, personally -- your client.  But

15   transparency and choice.  It's kind of my mantra.  Transparency

16   and choice, neither of which exist.

17        MR. SOMVICHIAN:  Those are appropriate considerations,

18   Your Honor, for sure, with respect to how to fashion injunctive

19   relief.  My only point is --

20        THE COURT:  We're not there yet.

21        MR. SOMVICHIAN:  -- they have not proposed something

22   that meets those requirements.

23        THE COURT:  We're not there yet.  But, certainly, it

24   seems to me injunctive relief that focuses on transparency and

25   choice might be an appropriate thing for me to consider.

1          Do you want to add anything?

2              **MR. LEVINE:**  I think you got it, Your Honor.

3              **THE COURT:**  Under Ninth Circuit law, ascertainability

4    isn't something that we are supposed to deny class cert on.

5    You did argue this.  And you did argue issues related to a

6    fail-safe class.  Do you want to address that topic?

7              **MR. SOMVICHIAN:**  Yes, Your Honor.

8          On the fail-safe class issue, that has to do with the fact

9    that their class definition embeds the concept of personal

10   information.  So you're only in the class if data has been

11   shared that meets the definition -- their version of personal

12   information.  So that subsumes the merits issue that's in

13   dispute.  So if they win, then people are class members.  If

14   they lose on their definition of personal information, then

15   people aren't class members.  That's the definition of a

16   fail-safe class.

17             **THE COURT:**  Response?

18             **MR. LEVINE:**  Well, "personal information" is both -- a

19   term that Google uses with all of its account holders.  So we

20   thought it was appropriate.  I mean, that's the language they

21   use in all of the agreements with the account holders.  "We

22   will not sell or share your personal information."

23         Now, it may also be a term of art.  But tracking the

24   language of the disclosures themselves, we think it's an

25   appropriate way to describe -- if you're sending out a class

1  notice, for example -- since this is the very language Google

2  uses with its account holders.  Every single one of them, in a

3  uniform fashion, the words "personal information" show up.

4      So it's the language Google uses to communicate with its

5  account holders, so we do think it's an appropriate term here.

6  We understand that it is also separately a question for the

7  jury, but it doesn't make it a fail-safe class.  It's a

8  well-defined, ascertainable class.  Everyone's identifiable --

9          **THE COURT:**  Yeah.  But isn't your argument, given the

10 evidence that you've presented and the manner in which you were

11 suggesting to present it, that this applies to all account

12 holders?  Because, by definition, your evidence and your common

13 evidence you define as including personal information.  So why

14 do you need it?

15         **MR. LEVINE:**  We had a long internal debate about

16 whether we needed to include that or not.  I mean,

17 ultimately --

18         **THE COURT:**  But I just -- Mr. Levine, I want to make

19 sure I understand the evidence that you are presenting to me.

20 Am I right?  And then you can tell me about your strategy.

21         **MR. LEVINE:**  Okay.

22         **THE COURT:**  But it seems to me that your presentation

23 is just that:  That it does, in fact, apply to all account

24 holders.  That there is no -- you know -- perhaps there's a

25 California subclass related to the CIPA claim.  But, otherwise,

1    you're suggesting that this is a class of all account holders.

2              **MR. LEVINE:**  That is correct, Your Honor.

3         We intend to put before the jury -- the evidence we will

4    put before the jury is Google's internal bid data.  We're

5    probably not going to use The Trade Desk or The New York Times

6    data, because the best evidence of what Google is doing

7    internally and is sending out is the information Google sends

8    out.  So what we're going to put before the jury is all the bid

9    data that we have that Google produced.

10        The evidence, both from Professor Wilson and Professor

11   Shafiq, is that if you are a U.S. Google account holder, and

12   you used the Internet at any point over the last seven years,

13   which you have to do to have a Google account in the first

14   place, you would have been subject to RTB.

15        So it does, in some sense, collapse in on itself, because

16   every U.S. Google account holder over the last seven years,

17   since you can't opt out of it -- and no controls work -- if you

18   used the Internet, they were subject to RTB, and their personal

19   information was also shared, because every bid request that is

20   before the Court uniformly shows that that information is

21   personal information.

22              **THE COURT:**  All right.

23        Do you want to say anything else on this topic?

24              **MR. SOMVICHIAN:**  Your Honor, the reason they didn't

25   define the class as "all Google account holders" is because

1   that would have walked into a different problem.  Then it would

2   have been overbroad.  Now you're including people in the

3   definition who never had bid requests, didn't have combinations

4   of data that they even allege are personal information.  So

5   this is a really important point.

6       They couldn't articulate a workable class definition,

7   because that would depend on objective factors that they don't

8   have here that apply commonly.  So they had to use the proxy of

9   personal information, which is the disputed legal issue in the

10  case.  And so if -- had they went a different tack of proposing

11  what I think you had in mind, Your Honor -- do you even need to

12  refer to personal information?  Isn't it just all Google

13  account holders?  Their own expert found that -- in fact -- and

14  Mr. Levine mentioned, I think, in his argument -- RTB is

15  triggered only on about half of websites and apps that their

16  expert examined.

17      So you can't make a uniform assumption that everybody was

18  affected.  So you can't have a definition of "all Google

19  account holders."  And the way they defined it as "personal

20  information" walks into the fail-safe issue, because now you're

21  incorporating a legal concept right into the definition.

22      What they should have done is identify certain objective

23  metrics around the data that was shared that could form a basis

24  for identifying who's in and out.  But then that walks into

25  another problem, which is the data isn't uniform.  So they

1  couldn't identify a specific set of objective criteria from

2  which they could define the class.  And the class definition

3  actually illustrates many of the problems that we've been

4  talking about today.

5          **MR. LEVINE:**  Your Honor, the data that Google has

6  produced is entirely uniform.  There are millions and millions

7  of bid requests.  And every single one of them contains all 60

8  fields, uniformly, 100 percent.  Google's experts don't dispute

9  that.  That's what Google produced in this case.

10      And if they produce more data -- they produced -- it's

11  not -- it's not before the Court now, but it will be before the

12  Court at trial or before the jury.  Google just produced

13  additional named plaintiff data -- another several million bid

14  requests -- and all of those are uniform, as well.  Every

15  single one of them.

16      So we're into -- we're into multiple, multiple millions of

17  bid requests.  That's the record of what Google sent out.  And

18  every single one of them -- that's the record we're going to

19  put before the jury.  That's the only record here.  Google

20  hasn't come forward with a single bid request that doesn't

21  include all of this data that it produced; not one.

22      The other issue as to whether you can avoid Google --

23  Google is misunderstanding that statistic by Professor Wilson

24  about the 55 percent.  Google RTB is present on at least

25  1.2 million websites.  That's probably a low estimate.  It's --

1    it's everywhere.  The idea that -- so let's just say that's

2    half.  But the idea that somebody can be on the Internet in any

3    meaningful way, and avoid Google RTB -- here -- let me give you

4    just a brief example of what websites you're not going to have

5    to -- if you want to avoid RTB, here are the websites you can't

6    go to:  CNN, ABC, CBS, NBC, FOX, ESPN, CNBC, The New York

7    Times, The Wall Street Journal, The Washington Post, USA Today,

8    U.S. News, The Guardian, Reuters, Newsweek --

9            **THE COURT:**  Slow down.

10           **MR. LEVINE:**  -- Weather.com, AccuWeather, MarketWatch,

11   Zillow, Realtor.com, Orbitz, Mayo Clinic, Women's Health, Men's

12   Health, Sports Illustrated, AOL, Yahoo, MSN, and Ticketmaster.

13       You can't want to -- you can't go through your life and

14   not encounter RTB.  We have a seven-year class period.  The

15   idea that any class member didn't run into RTB at some point,

16   which they can't opt out of, and they can't exercise a control

17   to stop, it is not in the class --

18           **THE COURT:**  Okay.  So -- so back to my question about

19   striking the reference -- the personal information -- given

20   what you've argued and given your theory.

21           **MR. LEVINE:**  The answer is -- I think on the record

22   that's now before the Court with our experts, you could remove

23   the term "whose personal information was sold or shared."

24   Because if you are a U.S. Google account holder, your

25   information -- that -- the evidence will be that your

1    information was, in fact, sold and shared.  So it collapses in

2    on itself.  You simply have to be a U.S. Google account holder

3    with an account.  I mean, we could make it an active account,

4    to be clear.  Google has those records.

5              **THE COURT:**  All right.

6         There were Daubert motions brought.  You didn't title them

7    that way, but they were, in fact, Daubert motions.  And you are

8    subject to my local order with respect to them.  So if you

9    thought you could avoid my standing order by not calling them a

10   "Daubert," you're wrong.  A rose by any other color is still a

11   rose -- or by any other name? -- by any other name.  So they're

12   Dauberts.

13             **MR. SOMVICHIAN:**  We understood they were subject to

14   your limitations, Your Honor.

15             **THE COURT:**  Okay.  Terrific.

16        Let me say -- and I'll give you just a little time --

17   there are -- and I actually don't think we need to deal with

18   the damages expert, because it's not clear to me that -- if I

19   need argument, I can always get it later.

20        Professors of law and cannot opine on my job.  They should

21   apply to be a judge if they want to opine on class

22   certification, or you should hire them to help you write your

23   briefs.  And, in fact, I actually don't even want argument on

24   that.  They cannot opine on what I believe is -- on my job of

25   deciding whether there's common evidence.  I don't know how

1    many times I have to say this.  Every conference I go to, I

2    talk about Dauberts, because they're overused.  But I don't

3    understand why lawyers engage law professors to opine on what

4    it is I'm supposed to decide.

5        So there are elements -- and there are numerous opinions

6    that he has that -- I actually disagree with the defendants.  I

7    think they're totally fine.  He has expertise.  He is making

8    his -- and I'm talking, obviously, about Richards.  He is

9    giving opinions with respect to issues of privacy on which he

10   is qualified to do.  But to do my job, he is not so qualified.

11       Any comments?

12       **MR. SOMVICHIAN:**  Yes, Your Honor.  I -- I agree with

13   your comments.  Obviously that was the basis of some aspects of

14   our motion.

15       **THE COURT:**  Well, only half.

16       **MR. SOMVICHIAN:**  The opinion that I think is really

17   front and center here is in Section VIII of Professor Richards'

18   report.  It's not long.  It's two paragraphs.  But this is the

19   core of his opinion, where he says that Google account holders

20   have a common, parentheses, false expectation of privacy.  And,

21   Your Honor, if you look at any of --

22       **THE COURT:**  You don't -- you have the better of the

23   argument.

24       Response?

25       **MR. MUDD:**  Thank you, Your Honor.

1    I'd like to address your points on common evidence.

2        **THE COURT REPORTER:**  Sorry.  Can I ask who's speaking?

3        **MR. MUDD:**  Jeff Mudd, Cotchett, Pitre & McCarthy.

4        **THE COURT REPORTER:**  Thank you.

5        **MR. MUDD:**  Your Honor, you mentioned it's your job to

6    determine whether there's common evidence.  And the plaintiffs

7    largely agree.

8        I want to first say that Professor Richards plays an

9    important role in this case by explaining overarching

10   fundamental privacy rights, social norms, and historical

11   context --

12       **THE COURT:**  We're talking about number 8, paragraph

13   131.  He tries to opine that there is evidence -- substantial

14   evidence -- produced by Google that provides, quote, (as read):

15           "Common objective facts from which a jury or

16        trier of fact may conclude not only that a reasonable

17        Google account holder has a reasonable expectation of

18        privacy, but that Google is all too well aware of

19        this fact."

20       That is the case.  That is class certification.  That is

21   the ultimate decision of the jury.  And that is not

22   appropriate.

23       **MR. MUDD:**  Thank you, Your Honor.

24       I would state that this should be considered in the

25   context of the rest of his report.  He's not merely opining

1  that there are common objective facts from which a jury could

2  make this conclusion --

3          THE COURT:  You know what?  There are other opinions

4  that I don't think it's appropriate to strike.  That's not what

5  we're talking about.

6          MR. MUDD:  Paragraph 131, specifically?

7          THE COURT:  Well, that's what Mr. Somvichian -- I

8  always get that wrong --

9          MR. SOMVICHIAN:  That was perfect.

10         THE COURT:  -- referenced.

11         MR. MUDD:  Certainly.  The point about common

12 objective facts from which a jury or trier of fact may reach

13 certain conclusions -- the foundation for that is spread

14 throughout Professor Richards report.  So if --

15         THE COURT:  And that's why I require that experts

16 actually identify their opinions so that I know what their

17 opinions are.  And that opinion is referenced earlier.

18     I'm going to let you get out of the hole in which there

19 is -- and I don't blame it on you -- it's also paragraph 6.  It

20 doesn't come in.  And there are others.  But there are numerous

21 opinions here that I think are appropriate.

22     So I'm going to go back.  I did a very quick read on this,

23 but it seems to me the opinion in Sections 5, 6, and 7 are

24 appropriate; 8 and 9 are not.  But I'll go back and look.

25 That's my tentative.

1      Okay.  There is a more junior lawyer before we close up.

2    Let's let the junior lawyer have a chance at the mic.

3          **MR. SOMVICHIAN:**  Yes, Your Honor.

4          **THE COURT:**  I heard there are lots of -- actually, I

5    heard -- I read in the news that there are objections to this

6    notion that we let younger lawyers argue.  I still think it's

7    appropriate.  I'm not entitled, under the federal rules, to

8    have any argument whatsoever.  The fact that I want to use my,

9    quote/unquote, "limited amount of free time" to allow people to

10   argue in my courtroom I think is my choice.

11        And I don't think that federal judges should be criticized

12   for wanting to build the profession and allow people to come to

13   the mic and have some practice getting rid of all their

14   butterflies, because that's the first part of it.

15        Okay.  Mr. Trevor, you're at the mic.

16        **MR. TREVOR:**  Your Honor, thanks very much.  I

17   appreciate that.  And I think many of my more junior colleagues

18   do, as well.  My name is Reece Trevor from Cooley on behalf of

19   Google.

20        I want to address, Your Honor, as Mr. Somvichian

21   previewed, Google's evidentiary objections, which are at

22   ECF 628, with a couple of sealed documents related to them at

23   ECF 627.

24        I know it's been a long morning, so I'll keep it very

25   brief.  But one point of additional color I wanted to add to

1  these objections relates to the testimony of Suneeti

2  Vakharia --

3          **THE COURT:**  You need to slow down.

4          **MR. TREVOR:**  The testimony of Suneeti Vakharia, which

5  is at the core of many of the arguments plaintiffs raised in

6  their reply, and we heard them today from Ms. Pritzker in her

7  argument, as well.

8          Now, Ms. Vakharia offered a declaration in support of

9  Google's opposition.  And after she submitted that declaration,

10  plaintiffs proceeded to depose her on both the declaration's

11  contents and as a 30(b)(6) witness on a set of three very

12  narrow issues.

13          The problem that Google has is that, in their reply papers

14  and their expert reports and argument, plaintiffs have

15  attributed to Ms. Vakharia opinions that she give in her

16  personal capacity -- testimony she gave in her personal

17  capacity -- that exceed the scope of that 30(b)(6) notice,

18  particularly as it relates to consent and to the meaning and

19  contents of a number of documents that Ms. Vakharia submitted

20  in support -- or along with her declaration -- and that weren't

21  the topic of the 30(b)(6) notice.  So that 30(b)(6) notice was

22  very heavily litigated about a year ago, before Judge DeMarchi.

23  It was the result --

24          **THE COURT:**  I take it -- I take it I have the 30(b)(6)

25  notice.

1          **MR. TREVOR:**  You do, Your Honor.  It's in the record

2     at ECF 622.  And the portion that I'm referring to,

3     specifically, is at page 5 of that document.

4          So plaintiffs limited the scope of their examination of

5     Ms. Vakharia in the 30(b)(6) capacity -- I'm sorry -- it's at

6     page 3 of the notice itself and 5 of the ECF header.

7          So plaintiffs limited the scope of Ms. Vakharia's

8     examination on these documents in two ways.  The first is that

9     it wasn't two documents submitted with Ms. Vakharia's

10     declaration.  It was limited to documents that were submitted

11     in plaintiffs' class certification opening brief and the

12     supporting declaration of Ms. Caracuzzo.

13          The second way they limited it was that they clarified

14     that plaintiffs would not ask the Google witness about the

15     meaning or legal significance of any of the provisions of those

16     documents.  Plaintiffs were just going to ask about how those

17     documents were maintained or created.

18          So the problem here, Your Honor, is that many, many places

19     in the record, plaintiffs have attributed to Google some

20     admission about the significance of the documents appended to

21     Ms. Vakharia's declaration, or otherwise.  And both of those --

22     any kind of admission like that goes well beyond what the

23     30(b)(6) notice contemplates.

24          So we have no problem with Your Honor considering

25     Ms. Vakharia's testimony as an individual Google witness,

giving it the same weight you would give it based on the

surrounding testimony.  But to the extent plaintiffs try to

characterize it as an admission by Google, they go too far.

We'd ask Your Honor to disregard that.

        **THE COURT:**  Response?

        **MS. PRITZKER:**  I'm searching for the -- I'm searching

for the notice.  I apologize.

    Two issues.  So we had a deal with Judge DeMarchi that any

declarant who came in at class certification would be able to

be deposed on the topics of his or her declaration between the

timing of the submission and our reply brief.  So she was

deposed on those issues, because that was evidence that was

submitted in opposition to class certification, and we were

allowed, by Judge DeMarchi's ruling, to depose her on those

questions.

    It's not so much that we were asking her for the legal

significance of documents.  She submits in her declaration,

which these documents purport to say.  And many of the

questions, as I've discussed today, were directed at what these

documents do not say.  And so I don't know how that could have

been an improper inquiry, given the nature of her declaration

in this case.

    She was also deposed, as opposing counsel mentions, as a

30(b)(6) witness, I think on the consent flow, but I have to go

find the notice.  So in terms of the ways in which consumers

1    can evidence consent -- what information they're given about

2    what -- the terms of service; the privacy policies; the

3    policies, procedures, and mechanisms through which individuals

4    create a personal Google account -- and she was -- many of

5    these topics were in the 30(b)(6) notice -- you know, how it --

6    you know -- to whom do the terms of service and privacy

7    policies apply, have they been consistent --

8         **THE COURT:**  So -- but the bottom line is that I have

9    an objection.  They believe it's outside the scope.  Your

10   argument is, in short, that Judge DeMarchi authorized it.

11        **MS. PRITZKER:**  Actually, there's two.  Judge DeMarchi

12   did authorize us to depose her on the matters that were in her

13   declaration.

14        The separate argument is we had been seeking this 30(b)(6)

15   notice deposition for some time.  It was not scheduled until --

16   I don't know -- ten days, or so, before our reply was due.  And

17   that was at the convenience of the witness.  So in terms of the

18   timing on the 30(b)(6) topics, they necessarily came in after

19   the opposition briefing because of the schedule of the witness.

20        **THE COURT:**  All right.

21        Any response?

22        **MR. TREVOR:**  Just a couple quick points, Your Honor.

23        First, Ms. Pritzker is exactly right.  Judge DeMarchi did

24   authorize deposition of Ms. Vakharia on the topics in her

25   declaration, but not in a 30(b)(6) capacity, only in a personal

```
 1   capacity.  And that was very clear from Judge DeMarchi's order.
 2   And it was clear at the deposition itself.
 3        Opposing counsel began the deposition by explaining to
 4   Ms. Vakharia that there would be a 30(b)(6) examination and a
 5   personal capacity examination.  We're asking the Court to
 6   consider that evidence, as well.  It's at page 18 of the
 7   transcript, which plaintiffs don't include in their portion of
 8   the record.
 9             THE COURT:  Okay.
10        MR. TREVOR:  On the second point, that Ms. Vakharia
11   was designated to testify about consent issues more broadly, I
12   would just ask the Court to take a close look at the notice.
13   It is not as to any and all things related to consent.  It's to
14   the narrow topics of the TOSs, the privacy policy, the
15   documents in the Caracuzzo declaration, and, as Ms. Pritzker
16   said, the specific flows and screens that Google puts in front
17   of users.
18        So the objection here is really narrowly drawn.  It's just
19   to that point of whether the documents that Ms. Vakharia was
20   characterizing -- whether those are admissions or some other
21   testimony attributable to Google in the 30(b)(6) capacity.
22             THE COURT:  Okay.
23        I think I will take all of this under submission.  I'll
24   give you -- I don't know -- each side two minutes, if there's
25   something that I didn't cover that you really wanted me to
```

1    consider.

2         **MS. PRITZKER:**  I have a non -- a case-management

3    related question I'd like to discuss with Your Honor.

4         **THE COURT:**  Okay.

5         **MS. PRITZKER:**  But if somebody else has a class

6    certification or Daubert motion, I would allow them to go

7    first.

8         I'm trying not to try the patience of the Court, but --

9    oh, okay.

10        **MR. LEVINE:**  I'm going to make a final statement, Your

11    Honor.  Jonathan Levine for the plaintiffs.

12        I think, Your Honor, when you were talking on the

13    injunctive relief, I think you hit the nail on the head:  No

14    transparency plus no choice.  I think that's an equation and

15    solves for equals no consent.  So if there's no transparency

16    plus no choice, that equals no consent.

17        That's it.  Thank you.

18        **MS. PRITZKER:**  The issue I wanted to raise --

19    I'm sorry, did you have something?

20        **MS. REDDY:**  You can go ahead.

21        **MS. PRITZKER:**  Okay.

22        **MS. REDDY:**  I'll go next.

23        **THE COURT:**  No, you had a case management issue.

24    Do you have anything?

25        **MS. REDDY:**  Your Honor, I did want to raise one other

 1  substantive issue regarding damages, with the Court's

 2  permission, really briefly.

 3      So I had mentioned, previously, that there are two

 4  independent bases on which the Court should reject plaintiffs'

 5  unjust enrichment damages model.  The second reason is a bit

 6  more nuanced.  And I'm concerned that our argument won't come

 7  through in the papers.  So I do just want to take the time to

 8  explain it to you in person while we're all here.

 9      So plaintiffs' damages model -- just to take a step back,

10  because I know it's been a long morning, and we've been in the

11  weeds.  Their theory of liability in this case is that Google

12  improperly shares and sells personal information with third

13  parties through bid requests.

14      This case is about one product -- the RTB system --

15  through which Google facilitates the sale of online

16  advertisements.  Your Honor, if I could direct you to the

17  demonstrative that we sent to you earlier today.  On page 2,

18  there's a visual, which is similar to what is included in

19  our -- page 2 of our class certification opposition.  This lays

20  out what the RTB system looks like.

21      Now, there is a fundamental problem with plaintiffs'

22  unjust enrichment damages model, because it is illogical and

23  only focuses on a tiny slice of the RTB system.  There are

24  multiple participants in the RTB system.  There are third

25  parties and then there are also internal Google participants.

1    Now, plaintiffs' claims in this case are that Google

2  improperly shared and sold user data with third parties;

3  however, third parties compete with internal bidders --

4  internal actors within Google -- who also compete bids for the

5  same ad impressions.  It's all part of the same auction.

6    Now, stepping back, their damages theory is to take

7  Google's RTB revenue, deduct 51 percent, which they say is the

8  value of personal or sensitive information, and say -- deduct

9  costs -- and that is their damages award; however, Your Honor,

10  that is fundamentally flawed, because it ignores what the

11  second price -- second highest bidder -- who is not at issue in

12  the case -- the internal Google bidders would have paid.  And,

13  again, those internal Google bidders are not at issue in this

14  case, Your Honor, because this case is about the sharing and

15  sale of user data with third parties.

16    So to take a very --

17         **THE COURT:**  So are they -- are they ignored?  Or does

18  the report not address them at all?

19         **MS. REDDY:**  The report --

20         **THE COURT:**  Or does the report have an explanation?

21         **MS. REDDY:**  Your Honor, I would just ask you to look

22  at the last page of the demonstratives.  They're ignored by

23  their experts, as you can see in the opening reports.

24    In the reply reports -- and plaintiffs had the last word

25  again -- their expert -- Dr. Zeithammer -- and that's -- these

1    are quotes from our expert and their expert -- their expert

2    agrees that they should have looked at this issue, and they

3    didn't.

4           **THE COURT:**  All right.

5        Response?

6           **MR. DANITZ:**  Thank you, Your Honor.

7        Professor Zeithammer always looked at the overall

8    revenues.  This is an apportionment issue, the second step in

9    the unjust enrichment analysis.  In his reply, Professor

10   Zeithammer goes through all of the erroneous claims in

11   connection with this -- in particular, in connection with this

12   but for world, where only the external bidders would not have

13   access to the personal information, but the internal bidders

14   would.

15       Google's overall revenue, including revenue from internal

16   bidders, according to Dr. Zeithammer, is the most relevant

17   definition of revenue to this case.  This auction revenues

18   result from the strategic interplay, as he says, between

19   diverse bidders.

20       It is a competition.  If the person on the right raises a

21   paddle, and the person on the left raises a paddle, it means

22   the price -- the revenue -- is being set by the overall

23   revenue -- the overall auction.  That is driven by the personal

24   information of the personal on the right, the person raising

25   that paddle.

1    The personal information, according to Dr. Zeithammer's

2    application of classic auction theory in economics, which is

3    laid out at paragraphs 59 to 70 and paragraphs 77 to 84,

4    demonstrates that, in fact, the overall price will drop,

5    according to a numerical simulation, by 31 percent in that "but

6    for" world.

7        Professor Zeithammer, at paragraphs 77 to 84, also

8    identifies existing -- I'm not sure I can mention the word --

9    so types of experiments in the record that appear, which shows

10   the effect of holding back that data and the effect on revenue.

11       **THE COURT:**  And that's fine.  I have to go back and

12   read these reports.  So I have the relevant paragraphs.

13       **MR. DANITZ:**  And that actually measures exactly what

14   Mr. Deal is talking about here.  And it actually shows a

15   greater decrease in the overall revenues -- the overall

16   revenues -- due to the holding back only of the external -- of

17   the private information from the external bidders -- which is

18   Mr. Deal's "but for" world.  So, in fact, 51 percent is

19   conservative, Your Honor.

20       There is a -- in addition to the revenue information

21   before Magistrate Judge DeMarchi, there is currently a motion

22   to compel the data for this hold-back experiments, which we

23   previously tried to get, but it was denied.  That is currently

24   teed up with Magistrate Judge DeMarchi.

25       **THE COURT:**  All right.

1              **MS. REDDY:**  Your Honor, just to simplify this, the

2    fact is, their experts have not analyzed what would have

3    happened in a "but for" world if these internal bidders

4    continued to place ads for the same ad impressions that they

5    are competing with the external bidders for.

6         So imagine you have an auction -- a home auction -- and

7    the first -- buyer number one bids $1 million for a home and

8    has additional information about the home.  Buyer number two

9    bids $800,000 for the home but doesn't have the additional

10   information.  It isn't at issue in the litigation.

11             Plaintiffs would have you believe that their damages are

12   51 percent of $1 million, not 51 percent of $200,000, the

13   actual revenue attributed to the additional information.  They

14   haven't done any of that quantitive analysis.  And they

15   concede, as Mr. Danitz just conceded, that the interaction --

16   they should have looked at the overall revenue.  They should

17   have looked at the interaction between the internal bidders and

18   the external bidders.

19             **THE COURT:**  Okay.

20        **MS. REDDY:**  And they did not.

21             **THE COURT:**  I'll look at the issue.

22        All right.  A housekeeping issue?

23        **MR. DANITZ:**  Thank you, Your Honor.

24        **THE COURT:**  Thank you.

25        **MS. REDDY:**  Thank you, Your Honor.

1          **MS. PRITZKER:**  Thank you, Your Honor.  Elizabeth

2     Pritzker.

3          This may be able to be resolved outside of Your Honor, but

4     I wanted to alert you -- I mean, you now know that there are a

5     half a dozen discovery motions pending in front of Judge

6     DeMarchi on key discovery that our experts are hoping to rely

7     upon for their merits reports, if it's ordered to be produced.

8          We run into a problem with the current case schedule, just

9     given the passage of time.  We submitted a revised case

10    schedule to Your Honor about a month ago.  And it currently has

11    opening expert reports due on April 5th, which is only about

12    five weeks from now.

13         **THE COURT:**  My view is you just keep working.  And

14    when I get to this, we'll have a chat.

15         **MS. PRITZKER:**  I think the bigger issue is that I

16    think we would -- we know from, again, appearing in front of

17    Your Honor, that if it's not in the expert report, it doesn't

18    come in.  And obviously we would like the opportunity, if

19    discovery is ordered, to put that information in our expert --

20    in our merits expert reports.

21         And really this is -- I'd like to be able to propose to

22    Your Honor that we move that schedule again, just a little bit,

23    so that we can extend the time for merits expert reports to be

24    due --

25         **THE COURT:**  So it sounds like I have a specific date.

1    What we frequently do is have dates tee off when the order

2    actually issues.  I have a number of big things on the docket

3    right now.  I've got the Dublin Prison that I have to deal

4    with.

5            **MS. PRITZKER:**  I understand.

6            **THE COURT:**  I've got Apple/Epic coming back.  I've got

7    another Apple case scheduled for trial soon.  I've got a

8    three-and-a-half month trial with five codefendant prison gang

9    leaders for June.  So just a few things on the plate.

10           **MS. PRITZKER:**  Yeah.

11           **THE COURT:**  So I'm going to try to get to this,

12   because I don't -- I like to get things out when they're more

13   fresh.  But I cannot tell you when it is going to get out.

14   Having this hearing means it's one step closer to going out.  I

15   would suggest that you all meet and confer, and give me a

16   schedule that does not give a specific date but that gives a

17   template from when you receive my order.

18           **MS. PRITZKER:**  We would appreciate that, Your Honor.

19   And, again, this wasn't an indication that you didn't have

20   other things on your docket.  And I was always willing to meet

21   and confer with opposing counsel on an appropriate schedule.

22           **THE COURT:**  That's the reason that I didn't just

23   automatically issue it, is because I don't know if it's

24   reasonable or not.  I guess, I don't know when I'm going to get

25   you your order.

1      **MS. PRITZKER:**  No, no.  And I understand that.  And I

2   wasn't intending to criticize.

3      **THE COURT:**  And I know that you're not asking -- I

4   know that you're not pushing me.  It's just that -- you know --

5   one of the great things about being a federal judge is that we

6   have to deal with lots of very interesting issues.  But,

7   frankly, I don't know what my day looks like half the time from

8   day to day.  Things explode.  Things go away.

9      And so I'm trying to get to this.  I just don't know

10  exactly when it's going to happen.  So it is better for you --

11  and there is more certainty -- if you can agree on a schedule

12  that tees off when you get my order.  Because you really don't

13  want to have to finish off these --

14     **MS. PRITZKER:**  Exactly.

15     **THE COURT:**  -- kinds of things without knowing whether

16  and if I certify.  So -- and if I do certify, the extent of the

17  certification.  I would just recommend that that's what you all

18  do.

19     **MR. SOMVICHIAN:**  We understand the guidance, Your

20  Honor.  We'll confer based on that.

21     **THE COURT:**  Okay.

22     Anything else?

23     **MS. PRITZKER:**  Nothing from plaintiffs.  Thank you

24  very much.  Appreciate your time.

25     **MR. SOMVICHIAN:**  Not for us.  Thank you for your time,

1    Your Honor.

2              **THE COURT:**  All right.  Thank you.  We're adjourned.

3              **THE CLERK:**  Court is adjourned.

4                   (Proceedings adjourned at 11:52 a.m.)

5                        ---oOo---

6

7                   **CERTIFICATE OF REPORTER**

8         I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:   Wednesday, March 6, 2024

12

13

14   _____

15         Kendra A. Steppler, RPR, CRR

16         Official Reporter, U.S. District Court

17

18

19

20

21

22

23

24

25