# PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER OF SANCTIONS FOR GOOGLE'S DISCOVERY MISCONDUCT

## Redacted Version of Document Sought to be Sealed

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 994607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

*Counsel for Plaintiffs*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
Corban Rhodes (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*
*crhodes@dicellolevitt.com*

Amy Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn St., 6th Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated,

      Plaintiffs,

      v.

GOOGLE LLC,

      Defendant.

Case No. 4:20-cv-05146-YGR-SVK

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER OF SANCTIONS FOR GOOGLE'S DISCOVERY MISCONDUCT**

Date:      TBD[1]
Time:      TBD
Courtroom:  6, 4th Floor

**FRCP 16(f), 37(b), 37(c), 37(e)
Civil L.R. 7-8**

Referral:      Honorable Susan van Keulen

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

---

[1] Via email dated May 23, 2022, the Court instructed Plaintiffs to use "TBD" for the hearing date if the parties were unable to agree to a briefing schedule in advance of this motion.

## NOTICE OF MOTION AND MOTION

TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on a date to be set by the Court, in the Courtroom of the Honorable Susan van Keulen of the United States District Court for the Northern District of California, Courtroom 6 – 4th Floor, 280 South 1st Street, San Jose, California, Plaintiffs shall and hereby do move the Court for an order of evidentiary and monetary sanctions against defendant Google, LLC ("Google") for discovery misconduct, pursuant to the Court's inherent powers and pursuant to Fed. R. Civ. P. 16(f), 37(b), 37(c), and 37(e).

This motion is supported by the attached Memorandum of Points and Authorities, the accompanying Joint Declaration of Jay Barnes, Lesley Weaver, and David Straite dated May 24, 2022 and all exhibits thereto (the "Jt. Decl."), all pleadings and papers hereto had herein, any oral argument, and any other evidence the Court may consider.

### SUMMARY OF DISCOVERY MISCONDUCT AT ISSUE

This motion seeks remedies for the following four specific instances of misconduct:

1. ***False Statements to the Court Regarding Not Synced Signals and Failure to Produce Them***: Throughout the course of this litigation, Google withheld production of signals that indicate, in whole or in part, whether and when users are not synced, while at the same time seeking determinations from the Court premised upon misrepresentations about their very existence. ***First***, Google sought (and obtained) a protective order from the Court relieving it of the obligation to suspend ordinary-course data deletion policies with respect to certain data logs, based in large part on the false representation that Google's sync traffic logs only recorded who *was* synced, as opposed to who *was not* synced. Only later did Google admit to the existence of several not synced signals, but never informed the Court about the earlier false statements. ***Second***, Google opposed discovery of the signals, withheld production of data relating to them, and then opposed class certification on the grounds that Plaintiffs' proposed class included "uninjured" members, specifically arguing that Plaintiffs could not

-i-                                    Case No. 4:20-cv-05146-YGR-SVK

identify who was harmed, when the not synced signals are directly probative of the issue. Plaintiffs are prejudiced both by the arguments advanced by Google and by being foreclosed from the opportunity to obtain discovery about them.

2. ***Violation of Court Orders to Produce Named Plaintiff Data and Abuse of the Special Master Process***: this Court ordered Google to produce all data associated with the Named Plaintiffs, their identifiers and devices. Dkt. 173-1 (April 30, 2021 Order, Dispute 1.3). Google refused, resulting in the appointment of a Special Master. The Court then adopted (in modified form) the first Special Master Order and Recommendations on November 14, 2021, repeating the order to produce the Named Plaintiff data, even requiring an under-oath declaration from Google (not counsel) that the data had been produced. Google's November 18, 2021 declaration to the Court was misleading and did not comply with the Court's order, representing only that Google had made "***or was in the process of making***" the production. Dkt. 383, Declaration of Andre Golueke (emphasis added). In fact, the production is still not complete as of the date of this motion, resulting in substantial prejudice to Plaintiffs.

3. ***Spoliation of Named Plaintiffs Data***: The Complaint identified precise cookie values from Named Plaintiffs' Chrome browsers related to three categories of identifiers: GAIA IDs (Google account IDs), Biscotti IDs (the DoubleClick advertising ID) and Zwieback IDs (the primary ID for tracking signed-out users). Google preserved GAIA-keyed data, but did not even start to search for Biscotti-keyed or Zwieback-keyed data for more than six months after the complaint was filed, by which time critical portions of the pre-complaint historical data had already been auto-deleted.

4. ***Failure to Timely Produce ▮▮▮▮▮▮ Internal Studies on Consent***: Google moved for summary judgment on its affirmative defense of "consent," asking this Court to find ***as a matter of law*** that all six Named Plaintiffs had consented to the data collection forbidden by the Chrome contract, ostensibly

because they did not change the default "Web and App Activity" or "WAA" settings on their accounts. But Google withheld from the Court that the company had conducted a secret study of these very "consent" settings, and senior executives and engineers roundly criticized the WAA settings as confusing, the consent process as hopelessly "broken," and consent as illusory. During discovery and briefing on the motion, Google withheld the fact of this key study until witnesses inadvertently mentioned it in a later deposition. Plaintiffs are prejudiced by the legal position Google took in its premature motion for summary judgment because they were unable to take testimony regarding these documents until after discovery had concluded.

In the interest of brevity, this motion is limited to the discovery misconduct listed above, all of which will cause substantial prejudice and/or irreparable harm if not remedied. Plaintiffs reserve all rights with regard to other misconduct.[2]

## ISSUE PRESENTED

Whether the Court should issue an order of evidentiary and monetary sanctions for the four categories of discovery misconduct identified above.

---

[2] Google's improper interference with third-party discovery from its "independent" auditor E&Y was the subject of a *sua sponte* order to show cause why Google should not be sanctioned (Dkt. 558, Mar. 14, 2022); Google's delay in producing "publisher notice" data caused the Special Master to inform Google that it would incur sanctions of $5,000 per day if not completed by May 20, 2022 (Jt. Decl. ¶ 125, Ex. 1); and Google's improper withholding of key documents under dubious claims of privilege is the subject of multiple rounds of briefing and Court orders (*see, e.g.* Dkts. 565-1 at Dispute 1.11 and 1.34, 589, 592, 594, 599, 603). These and other additional instances of misconduct are not the subject of today's motion.

Respectfully submitted this 24th Day of May 2022.

**BLEICHMAR FONTI & AULD LLP**

By:    */s/ Lesley E. Weaver*
Lesley Weaver (Cal. Bar No. 191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**

By:    */s/ Jay Barnes*
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**DICELLO LEVITT GUTZLER LLC**

By:    */s/ David A. Straite*
David A. Straite (admitted *pro hac vice*)
Corban Rhodes (admitted *pro hac vice*)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 993-1000
*dstraite@dicellolevitt.com*
*crhodes@dicellolevitt.com*

Amy Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn St., 6th Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................. 1

II.  LEGAL STANDARD ............................................................. 4

III. Statement of Relevant Facts ............................................. 6

    A.  Google's Misrepresentations Regarding Not-Synced Signals ................... 6

    B.  Google Failed to Reveal or Produce Plaintiff Data It Had
        Already Searched, Segregated, and Preserved ........................... 10

        1.  Google's Failure to Comply with the Court's
            April 30, 2021 Order .......................................... 10

        2.  Google's Failure to Comply with the Court's
            November 12, 2021 Order....................................... 12

    C.  Google's Failure to Preserve Data Relating to the Named Plaintiffs..................... 14

    D.  Google's Failure to Timely Produce ████████ Documents ....................... 15

IV.  Argument.................................................................... 16

    A.  Google's Discovery Misconduct Demonstrates Willfulness and Bad Faith ........... 16

    B.  Plaintiffs' Have Been Prejudiced by Google's Misconduct.................................. 19

        1.  Prejudice from Google's Misrepresentations Regarding, and
            Destruction of, Not Synced Signals .......................... 19

        2.  Prejudice from Google's Failure to Comply with Court
            Orders Regarding Production of Plaintiff Information .............................. 20

        3.  Prejudice from Google's Failure to Preserve and Comply
            with Court Orders Regarding Production of Device-Keyed Data.............. 21

        4.  Prejudice by Belated Disclosure of ████████ Documents ................. 21

    C.  Evidentiary and Monetary Sanctions Are Warranted ............................................ 22

V.   CONCLUSION ................................................................. 24

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Bowoto v. Chevron Texaco Corp.*,
   2008 WL 552456 (N.D. Cal. Feb. 27, 2008)..................................................................23

5

6

*Callsome Solutions Inc. v. Google, Inc.*, Index No. 652386 /2014;
   2018 NY Slip Op 32716(U), 2018 N.Y. Misc. LEXIS 4852
   (N.Y. Sup. Ct. Oct. 18, 2018)........................................................................................1

7

8

*Clear-View Technologies, Inc., v. Rasnick*,
   2015 WL 2251005 (N.D. Cal. May 13, 2015) ...........................................................18, 22

9

10

*Colonies Partners, L.P. v. Cty. of San Bernardino*,
   2020 WL 1496444 (C.D. Cal. Feb. 27, 2020) *report and recommendation
   adopted* 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020) ...............................................23

11

12

*Dahl v. City of Huntington Beach*,
   84 F.3d 363 (9th Cir. 1996)............................................................................................5

13

14

*Dong Ah Tire & Rubber Co., Ltd. v Glasforms, Inc.*,
   2009 WL 1949124 *adopted in part and modified in part*
   2009 WL 2485556 (N.D. Cal. Jul. 2, 2009) ....................................................................22

15

16

*Evon v. Law Offices of Sidney Mickell*,
   688 F.3d 1015 (9th Cir. 2012)........................................................................................5

17

18

*Excel Innovations, Inc. v. Indivos Corp.*,
   2006 WL 8439364 (N.D. Cal. Nov. 21, 2006) ..............................................................23

19

20

*Facebook, Inc. v. OnlineNIC, Inc.*,
   19-cv-7071-SI-SVK (N.D. Cal. Mar. 25, 2022)............................................................4

21

*Fink v. Gomez*,
   239 F.3d 989 (9th Cir. 2001)..........................................................................................5

22

23

*First Financial Security, Inc. v. Freedom Equity Grp., LLC*,
   2016 WL 5870218 (N.D. Cal. Oct. 7, 2016) ..................................................................23

24

*In re Google Litig.*,
   2011 WL 6951972 (N.D. Cal. Jul. 8, 2011) ...................................................................1

25

26

*Grimes v City and County of San Francisco*,
   951 F.2d 236 (9th Cir. 1991)..........................................................................................5

27

*Hyde & Drath v. Baker*,
   24 F.3d 1162 (9th Cir. 1994)..........................................................................................5

28

*Imagenetix, Inc. v. Robinson Pharma, Inc.*,
  2017 WL 8940118 (N.D. Cal. Jan. 12, 2017) *report and recommendation
  adopted* 2017 WL 570708 (N.D. Cal. Feb. 13, 2017) ............................................................. 18

*Int'l Petroleum Prods. and Additives Company, Inc. v. Black Gold, S.A.R.L.*,
  2021 WL 7448603 (N.D. Cal. Dec. 6, 2021) (Gonzalez-Rogers, J.) ..................................... 18

*Kannan v. Apple Inc.*,
  2020 WL 9048723 (N.D. Cal. Sept. 21, 2020) ....................................................................... 23

*Keithley v Home Store.com, Inc.*,
  2008 WL 3833384 (N.D. Cal. Aug. 12, 2008) .................................................................... 5, 21

*Lugo v Sham*,
  2001 WL 348984 (N.D. Cal. Apr. 5, 2001) ........................................................................... 16

*N. Am. Watch Corp. v. Princess Ermine Jewels*,
  786 F.2d 1447 (9th Cir. 1986) ................................................................................................ 5

*Nat'l Ass'n of Radiation Survivors v. Turnage*,
  115 F.R.D. 543 (.D. Cal. 1987) ............................................................................................ 22

*Network Appliance, Inc. v. Bluearc Corp.*,
  2005 WL 1513099 (N.D. Cal. Jun. 27, 2005) .......................................................................... 4

*Optrics Inc. v. Barracuda Networks Inc*,
  2021 WL 411349 (N.D. Cal. Feb. 4, 2021) ........................................................................... 24

*Payne v. Exxon Corp.*,
  121 F.3d 503 (9th Cir. 1997) .................................................................................................. 5

*Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.*,
  682 F.2d 802 (9th Cir. 1982) ............................................................................................... 22

*Schiavenza v. U.S.*,
  1984 WL 178976 (N.D Cal. Dec. 18, 1984) .......................................................................... 22

*Siebert v. Gene Sec. Network, Inc.*,
  2014 WL 5808755 (N.D. Cal. Nov. 6, 2014) ........................................................................... 5

*Silver v. Stripe*,
  2021 WL 3191752 (N.D. Cal. Jul. 28, 2021) ......................................................................... 20

*In the Matter of the Search of Content Stored at Premises Controlled by Google
  Inc. and as Further Described in Attachment A*,
  16-mc-80263-RS (N.D. Cal. Oct. 19, 2017) ............................................................................ 1

*U.S. v. Sumitomo Marine & Fire Ins. Co.*,
  617 F.2d 1365 (9th Cir. 1980) .............................................................................................. 23

*Valley Eng'rs Inc v. Elec. Eng'g Co.*,
    158 F.3d 1051 (9th Cir. 1998) ............................................................................ 23

**Statutes**

28 U.S.C. § 636 ...................................................................................................... 5

**Other Authorities**

Fed. R. Civ. P. 16 .................................................................................................... 4

Fed. R. Civ. P. 37 ................................................................................................ 4, 5

Fed. R. Civ. P. 72 .................................................................................................... 5

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

Google willfully engaged in four categories of sanctionable misconduct as part of a clear

4

campaign of strategic misdirection and manipulation of the judicial process. The misconduct

5

includes withholding material evidence bearing directly on pivotal and disputed issues while

6

simultaneously seeking adjudication on those very issues; outright false statements to the Court

7

materially bearing on data preservation; spoliation of critical data; and repeated refusals to obey

8

court orders. Google's actions should be subject to sanctions in this case.[3]  Specifically:

9

***1. False Statements to the Court Regarding Sync Logs and Class-Wide Spoliation Thereof***:

10

Google expressly and falsely denied that Google maintains records identifying users who are not

11

synced, premising two key motions on the absence of such evidence: Google's early motion for

12

protective order, and its opposition to Plaintiffs' motion for class certification. ***First***, in February

13

2021, Google sought a protective order on the basis of written and oral assertions that there was no

14

such thing as a not synced signal.[4] Dkt. 102, 109. In support of that motion, Google told the Court

15

that sync traffic logs "do not record identifiers for logged out users" and "will not show data for that

16

user who has not enabled sync." Mar. 5, 2021 Hrg. Tr. at 12:2-10; 14:13-17. ***Second***, Google argued

17

in opposition to Plaintiffs' motion for class certification that Plaintiffs' proposed class would include

18

"uninjured" class members because "not synced" Chrome users could not be identified. Dkt. 429.

19

These statements are undeniably false. Google ***can*** identify who is synced and not synced,

20

and precisely when they were in each sync-state using sync signals only admitted by Google after

21

22

[3]  The facts here are more egregious than those found in other cases. *See, e.g., In the Matter of the Search of Content Stored at Premises Controlled by Google Inc. and as Further Described in Attachment A*, 16-mc-80263-RS (N.D. Cal.), Order dated Oct. 19, 2017, Dkt. No. 96 (holding Google in civil contempt for refusal to obey Court order); *In re Google Litig.*, 2011 WL 6951972, *5-6 (N.D. Cal. Jul. 8, 2011) (holding "the record is clear that Google has not obeyed the January 27 order . . . the undersigned agrees with SRA that sanctions are appropriate"); *Callsome Solutions Inc. v. Google, Inc.*, Index No. 652386 /2014; 2018 NY Slip Op 32716(U), 2018 N.Y. Misc. LEXIS 4852 (N.Y. Sup. Ct. Oct. 18, 2018) (sanctioning Google for abusive confidentiality designations).

23

24

25

26

27

[4]  A "not synced" signal refers to codes or fields which indicate that a user was not synced at the time of data collection. Some signals are binary, such as a sync signal that is on, allowing an inference that when it is not on, the user is not synced. Other signals recently revealed include ██████████ or ██████████

28

1   Plaintiffs' experts discovered them. Google recently offered to preserve data logs containing at least

2   ███ of these ==signals== (but failed to inform the Court that its prior statements were false) (Dkt. 559-3

3   at Dispute 2.1), following Google's belated amendment of its interrogatory responses literally eight

4   minutes before the close of discovery, ***at 11:52pm on March 4, 2022,*** to ==***admit the existence of a***==

5   ==███ ***not-synced signal***==. Jt. Decl. ¶ 34. The 11th hour admission followed the conclusion of all

6   related depositions, a year of failing to preserve class-wide ==sync logs==, and completion of most of the

7   Special Master process. The prejudice to Plaintiffs and the putative class cannot be overstated.

8   **2. Spoliation of ==Biscotti-Keyed== and ==Zwieback-Keyed== Named Plaintiff Data**: Google failed

9   to preserve all data related to the Named Plaintiffs' ==Biscotti== and ==Zwieback== identifiers, despite the

10  inclusion of all related cookie values in the complaint.  We now know that at the outset of litigation,

11  Google preserved some ==account-keyed ("GAIA-keyed")== data related to the Named Plaintiffs,

12  although Google has not revealed to Plaintiffs what it preserved.  But efforts to gather and preserve

13  ==non-accounted-keyed data (related to the all-important Biscotti and Zwieback IDs==) did not begin

14  until the following year.  Google's delay resulted in the permanent spoliation of substantial quantities

15  of data because many of the relevant logs are only preserved ████████████████████████████

16  ██. Google thus waited for this data to be ==auto-deleted== before attempting to preserve it – and recent

17  test searches of these ==short-preserved== logs returned null sets, confirming the spoliation.

18  **3. Google's Unprecedented Refusal to Comply with Repeated Court Orders to Produce All**

19  **Data Associated with the Named Plaintiffs, Their Identifiers and Devices:** for the Named Plaintiff

20  data that Google did preserve, Google violated multiple orders of this Court requiring Google to

21  produce it. The first order, issued on April 30, 2021, directed Google to produce all data associated

22  with the Named Plaintiffs, their identifiers and devices. Dkt. 173-1. The Court even delayed Plaintiff

23  depositions until July 2021 to give Google time to produce the data in advance, noting from the

24  bench that such ordering should incentivize Google to complete the production. Dkt. 173-1 at

25  Dispute 2.2; Apr. 29, 2021 Hrg. Tr. at 68:15-20. And yet Google still refused to comply, resulting

26  in the appointment of a Special Master who recommended in October 2021 a six-part plan to manage

27  discovery of the data logs – ***step one being the production of the Plaintiff data***.

28

The order of operations matters, because the Named Plaintiff data was supposed to act as a road map for discovery into the data logs, thus informing steps 2 through 6 of the Special Master process. On November 12, 2021, the Court adopted the recommendation (in modified form) including ordering Google itself (not counsel) to submit a declaration **under oath** that the Named Plaintiff data had finally been produced. But, again, Google refused to comply, instead only saying that the data had been produced or "*[wa]s in process*." Dkt. 383 at ¶ 4 (emphasis added). But the production was not in process, and Plaintiffs and the Special Master blindly searched the data logs without the benefit of the Named Plaintiff data. Even on the day of this filing, May 24, 2022, Google sent an email admitting that preserved (but not produced) plaintiff data still exists on a litigation platform subject to a litigation hold but Google will not produce it.  Jt. Decl. ¶ 126.

**4. Google's Bad Faith Concealment of the** ▮▮▮▮▮▮ ***Secret Study of Google "Consent" Settings*:** In the fall of 2021, well before the dispositive motion deadline and without notice, Google moved for summary judgment on its consent affirmative defense (i.e., Google's contention that various default account settings constituted valid consent for data collection and override any contractual promises to the contrary). Plaintiffs are confident that even with the discovery in hand at the time, Google's motion will fail, for the reasons set forth in the briefing. Not known to Plaintiffs during briefing, however, was that Google had secretly conducted an internal survey of engineers and executives regarding the very account settings at issue – and these senior employees roundly criticized the consent flow and admitted it was "broken."  Jt. Decl. ¶ 64. Another executive conceded it is a "fantasy that users agreed to this," and another admitted Google's ads system "doesn't really give the user choice", and "[i]f people were the deciders, they wouldn't take the deal, but they are not the deciders." *Id.* The relevant quotes are summarized in a single document, showing how widely held these opinions are within Google. *Id.*

Despite having conducted this survey and knowing how widely Google senior management understood that consent was illusory, Google had the audacity to ask this Court to hold, as a matter of law, the exact opposite – and simultaneously withheld the existence and content of this secret study from Plaintiffs ***until after the fact discovery cut-off in this action.*** It is not unreasonable to conclude that Google hoped to get a quick ruling on summary judgment before ever having to reveal

1  the truth – and so wedded was Google to this gambit that Google waited until after fact discovery to

2  produce the documents, and only after a witness (apparently inadvertently) revealed them. *Id*. at 61.

3  Worse, at no point has Google withdrawn the motion nor corrected its misrepresentations therein.

4  Google even doubled-down in its reply. When Plaintiffs cited many *informal* internal documents

5  suggesting exactly what the formal ███████ survey established, Google told the Court that

6  those informal documents were taken out of context (Dkt. 475 at p. 12-14), failing to note that the

7  "context" was actually far worse for Google.

8      All four categories of misconduct are consistent with an over-arching plan to withhold key

9  evidence while seeking rulings on the very issues to which they relate. Prejudice to Plaintiffs include

10  the significant siphoning of resources – both Plaintiffs' and the Court's – in litigating disputes

11  premised on false evidence. It also includes substantial prejudice related to the timing of disclosures

12  – Google withheld the truth until after the close of discovery, precluding Plaintiffs from taking

13  depositions, seeking additional documents or engaging in any discovery regarding the withheld

14  evidence. Plaintiffs have given Google every opportunity to cure its failures, but Google's recent

15  revelations make clear that the scope of Google's misconduct is so great that the course of discovery

16  in this case has been impossibly thwarted and tainted. Plaintiffs seek sanctions for Google's

17  discovery misconduct in the form of relief in the accompanying proposed order, including the award

18  of monetary sanctions and evidentiary sanctions.

19  **II.    LEGAL STANDARD**

20      "Federal courts have the power to sanction litigants for discovery misconduct under both the

21  Federal Rules of Civil Procedure and the court's inherent power to prevent abusive litigation

22  practices." *Facebook, Inc. v. OnlineNIC, Inc.*, 19-cv-7071-SI-SVK (N.D. Cal.), Dkt. 222, Order

23  granting sanctions dated March 25, 2022 (*citing Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir.

24  2006)); *accord, Network Appliance, Inc. v. Bluearc Corp.*, 2005 WL 1513099, *2 (N.D. Cal. Jun.

25  27, 2005); *see also* Fed. R. Civ. P. 37(b)(2)(A) (sanctions for failure to obey an order to permit or

26  provide discovery); Fed. R. Civ. P. 37(e) (sanctions for failure to preserve electronic evidence); Fed.

27  R. Civ. P. 16(f)(1)(C) (sanctions for failure to obey a scheduling or other pretrial order).

28

1    The authority of magistrates to impose discovery sanctions is established by 28 U.S.C. § 636,

2    and the scope of that authority turns on whether the order is construed as non-dispositive or

3    dispositive. *See* Fed. R. Civ. P. 72 (implementing the Federal Magistrates Act, 28 U.S.C. §§ 604,

4    631–639). If the matter is not dispositive of a claim or defense of a party, a magistrate may enter "a

5    written order setting forth [its] disposition." Fed. R. Civ. P. 72(a). If the matter is dispositive, a

6    magistrate shall confine the order to "a recommendation for the disposition of the matter." Fed. R.

7    Civ. P. 72(b); *accord, Grimes v City and County of San Francisco*, 951 F.2d 236, 240 (9th Cir.

8    1991).

9    Under the Court's inherent authority, sanctions are available for willful violation of a court

10    order, or if "preceded by a finding of bad faith, or conduct tantamount to bad faith," such as

11    recklessness "combined with an additional factor such as frivolousness, harassment, or an improper

12    purpose." *Fink v. Gomez,* 239 F.3d 989, 994 (9th Cir. 2001); *see also Evon v. Law Offices of Sidney*

13    *Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012). Bad faith exists when a party acts "vexatiously,

14    wantonly, or for oppressive reasons." *Siebert v. Gene Sec. Network, Inc.*, 2014 WL 5808755, *2

15    (N.D. Cal. Nov. 6, 2014) *citing Evon*, 688 F.3d at 1035. "Examples of bad faith conduct include a

16    fraud upon the court, delay or disruption of litigation, or interference with the enforcement of a court

17    order." *Id. citing Chambers v. NASCO, Inc.,* 501 U.S. 32, 46 (1991).

18    A finding of bad faith is not necessary for sanctions authorized by the federal rules, and may

19    be imposed for merely negligent conduct. *See* Fed. R. Civ. P. 37(b); *Hyde & Drath v. Baker,* 24 F.3d

20    1162, 1171 (9th Cir. 1994) ("We have not required a finding of bad faith on the part of the attorney

21    before imposing sanctions under Rule 37"); *Keithley v Home Store.com, Inc.,* 2008 WL 3833384,

22    *8 (N.D. Cal. Aug. 12, 2008). The Court may, in deciding whether to grant a motion for sanctions

23    under Rule 37, "properly consider all of a party's discovery misconduct ..., including conduct which

24    has been the subject of earlier sanctions." *Payne v. Exxon Corp.,* 121 F.3d 503, 508 (9th Cir. 1997).

25    A "district court has great latitude in imposing sanctions for discovery abuse[,]" *Dahl v. City*

26    *of Huntington Beach*, 84 F.3d 363, 367 (9th Cir. 1996), and "[b]elated compliance with discovery

27    orders does not preclude the imposition of sanctions," *N. Am. Watch Corp. v. Princess Ermine*

28    *Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986).

1    III.    <u>STATEMENT OF RELEVANT FACTS</u>

2        A.    **Google's Misrepresentations Regarding <mark>Not-Synced</mark> Signals**

3        From the inception of this litigation, mindful of the complexity of the technical issues at the

4    core of this case, Plaintiffs sought transparency from Google regarding the best way to identify

5    Chrome users whose data is collected when they are not synced. Plaintiffs expressly asked for

6    production of schema and fields sufficient to identify not synced users.  Plaintiffs also propounded

7    interrogatories related to identification of class members on August 6, 2021, and later supplemented

8    these interrogatories, on December 21, 2021, with a specific request, ROG 34, for identification of

9    "<mark>all Signals sent from Chrome to Google reflecting when a User is not synced</mark>." As noted below, a

10    Google engineer admitted just this past January that the ███████ signal (<mark>signed in, but not synced</mark>)

11    can be used to <mark>identify not-synced users</mark>, and Google waited until the final eight minutes of fact

12    discovery to come clean about yet another signal, the ███████████ event signal.

13        While Google was concealing these signals, it sought the Court's blessing not to preserve

14    data logs based in part on the supposed absence of the signals. Pursuant to the Stipulated ESI

15    Protocol, January 14, 2021 was the deadline to disclose any relevant ESI that a party contends should

16    not be produced due to undue burden or expense. Dkt. 96, § 4(b). On that date, Google notified

17    Plaintiffs that it would not preserve any "event-level" data beyond ordinary retention periods and

18    asked if Plaintiffs would agree. Because Plaintiffs could not agree without understanding what

19    Google was proposing, Plaintiffs asked Google to "provide a more precise description of these data

20    sources, including with specificity whether these sources including logs reflecting synced and

21    unsynced browser states; collection of PI; websites visited; content of user communications; or other

22    information relevant to … Plaintiffs and the putative class." Jt. Decl. ¶ 4, Ex. 2 (Jan. 21, 2021 letter

23    to Google). Plaintiffs also requested "representative samples of all types of such data currently not

24    being preserved." *Id.* On January 29, 2021, Google falsely asserted, among other things, that

25    "***Google does not have any logs showing when a user is not synced***." *Id.* at ¶ 5, Ex. 3 (Jan. 29, 2021

26    letter) (emphasis added).

27        Google then moved immediately for a protective order "that Google need not suspend its

28    standard retention periods applicable to all data logs that reflect event-level data of any Chrome user

in the United States." Dkt. 109 at p. i; *see also* Dkt. 102. Google told the Court, falsely, that Plaintiffs were demanding that Google preserve everything in all event logs. Dkt. 102 at p. 1. In fact, all Plaintiffs have sought, throughout this litigation, is transparency, and the preservation of relevant information related to not-synced Chrome users. At the hearing on Google's motion, the Court specifically inquired as to whether Google maintained not synced signals, including whether the signals were maintained in sync traffic logs. Google responded that "*if a user has not enabled Sync, then … the Sync traffic logs will not show data for that user who has not enabled sync.*" Mar. 5, 2021 Hrg. Tr. at 14:13-20 (emphasis added). Google further claimed that it could not even identify "just a number of users who are not synced." *Id*. at 24:1-3. The Court noted it was "certainly [the Court's impression] that the Synced traffic log is trafficking the synced users and I think that was also addressed in the papers." *Id*. at 24:12-16; *see also* Dkt. 118-3 (letter from Google asserting that "[d]isabling sync is a client-side action that is not visible server-side (i.e., to Google). Therefore Google does not have any logs showing when a user is not synced.").

Plaintiffs now know that Google's assertion that "Google does not have any logs showing when a user is not synced" is false. Google does, in fact, maintain logs with fields that include signals such as ████████ that do identify when users are not synced. Jt. Decl. ¶¶ 32-34. Likewise, Google made a material misrepresentation to the Court when it stated that sync traffic logs "will not show data for that user who has not enabled sync." It is now clear (including from Google's own recent admissions) that sync traffic logs do identify which users are signed-in but not synced, and also identify who disabled sync. *Id*. ¶ 45.

Further, the evidence now shows that at the time Google informed the Court that it did not maintain not synced signals, Google was aware that not synced signals were sent to the sync server and only stored for a short period of time. On January 25, 2021, just four days before Google told Plaintiffs it did not have a sync signal and four months after stating that "Google does not maintain information showing the number of Chrome users in the U.S. who did not sync their Chrome browser" in response to ROG 34, Google employee Tim Schumann had asked a colleague whether Google could use historical data to "tell all accounts that ever enabled sync" and received a response in the affirmative. Jt. Decl. ¶ 31, Ex. 4 (GOOG-CALH-00854375). In this same correspondence,

1   Schumann references ███████ *Id.* Almost a year later, on January 13, 2022, Schumann would testify

2   that ████████ is a code name for a ████████████████████████████████████████████

3   ████████████████████ Then This not synced signal is stored for ████████ in the sync server logs and

4   ████████ in a system called ████████, after which the signal is "destroyed" and "auto-deleted." Jt.

5   Decl. at Ex. 5 (Schumann Dep.) 132:2-9, 189:6-10. Notably, Schumann is the Google employee who

6   signed Google's verified responses on this topic.

7          For the entire discovery period in this case, Google falsely claimed not synced signals did

8   not exist. For example:

9   •   On April 9, 2021, in a 30(b)(6) deposition, Google testified that it "cannot [identify
10      users who are not synced] because they are not synced" and does not have a user
        ID – a Google Account ID in Chrome for users who are not signed in using Chrome
11      sync. Jt. Decl. ¶ 9, Ex.6 (David Monsees Dep. Tr. at 114:7-117-8).

12  •   On October 5, 2021, Google again denied the existence of a not synced signal in a
        conference with the Special Master.

13  •   On October 12, 2021, Google denied that "Chrome sends a Signal to Google that
14      indicates when a Chrome user is not signed-in and not synced." *Id.* at RFA 12.

15  •   On December 6, 2021, Plaintiffs moved to compel Google's answers to
        interrogatories seeking identification of class members on the basis of not synced
16      signals. Dkt. 397 at 2-3 ("Put simply, Google can identify users who are not
        synced[.]"). In response, Google failed to inform the Court that it had made false
17      statements of fact in its earlier submissions. Instead, Google deflected, calling the
        dispute "a blatant end-run around the Court's previous order" referring items "to
18      Special Master Brush" and asking the Court to refer the issue back to Special
        Master Brush for a "determination concerning the dataflows that affect class
19      member identification." *Id.* at 3.

20  •   On December 22, 2021, Google filed its opposition to Plaintiffs' motion for class
        certification, arguing that the motion should be denied because the proposed class
21      includes "uninjured" class members. Dkt. 429. According to Google, Plaintiffs'
        methodology for identification of class members was flawed because it relied on
22      not synced signals. *See* Dkt. 340-16 (Smith Rpt.) ¶¶ 110-158; Dkt. 340-19 (Shafiq
        Rpt.) at ¶¶ 61-119.

23

24          Nor can Google lay blame on Plaintiffs for not locating not synced signals. Plaintiffs have

25  diligently sought to discover them, including propounding interrogatories asking for verified

26  responses to the fundamental questions here. Plaintiffs in parallel also pushed this issue in the Special

27  Master process.  Thus, for example, on January 5, 2022, the Special Master ordered Google to

28  provide "all field names, field descriptions for all field names, and schemas" for one of the two most

1    important data sources, Zwieback ████ Jt. Decl. ¶ 92. Perhaps because compliance would have

2    revealed truth about the not synced signals, Google ignored the order and claimed it would be too

3    burdensome. *Id.*, ¶ 93. The Special Master again ordered production on or about February 23, 2022,

4    and two days later, Google produced field names but no descriptions or schema for these sources,

5    *id.* ¶ 41, only then revealing the existence of fields with names like (1) ████████ (2)

6    ████████ and (3) ████████. Ex. 7 (GOOG-

7    CALH-01170421). This is just one example of Plaintiffs' efforts to discover not synced signals only

8    to be stymied by Google's failure to comply with the Special Master.

9      It was not until the morning of March 4, 2022 (the last day of fact discovery), that Plaintiffs'

10    expert Prof. Zubair Shafiq and counsel observed a Google employee conduct a live search that

11    revealed a not synced signal passed from Chrome to Google. *See* Jt. Decl. ¶¶ 32-33. Plaintiffs

12    immediately followed up. At 11:52pm, with *eight minutes* left to the end of fact discovery, Google

13    amended its discovery answers to reveal:

14      When a Chrome user stops sync, the Chrome client sends a ████ signal to
     the Chrome Sync server. … The signal is recorded in Chrome Sync's ████ data store,

15    ████ where the record is retained until the user clears the sync data
     associated with that Google Account or deletes the Google Account. The signal is also

16    recorded in the ████.

17    Jt. Decl. ¶ 34, Ex. 8 (Google Suppl. Resp. to ROG. No. 34; verified by T. Schumann). Although the

18    amended response states that the ████ is recorded in the ████,

19    to the best of Plaintiffs' review, Google's November 18, 2021 submission did not include a field

20    with that name – or anything with the word ████ Jt. Decl. ¶ 20.

21      Google's literal 11th-hour admission, mere minutes before the end of fact discovery, is crucial

22    because it identifies when a Chrome user transitions from a synced to a signed-out and not synced

23    state. As explained by Prof. Shafiq, when a Chrome user clicks to "Turn off sync and

24    personalization," they are also automatically signed-out of their account (i.e. "Basic browser" mode)

25    – the portion of the class that is not captured by the ████ or "Signed In But Not Consented for

26    Sync" signal. Jt. Decl. ¶ 33. Thus, this signal easily identifies signed out and not synced users.

27      On March 12, 2022, one week after fact discovery had ended, the parties submitted

28    competing proposals for identification of class members, wherein Google proposed to "preserve (a)

1  ███ **signal … and (b)** ███████████," *mentioning* ██ ***not synced** signals by name a full*

2  *year after telling this Court that none existed. See* Jt. Decl. ¶ 37. At the hearing on March 17, 2022,

3  Google claimed that it had identified relevant signals in previous preservation proposals. *Id.* ¶ 38.

4  This is not true. On August 27, 2021, Google proposed to "preserve" a "random sampling of 1,000

5  log events per day from the display ads logs network" with a "lookup of information stored in sync

6  traffic logs" to "create a record specifically for preservation in this matter that does not exist in the

7  ordinary course of business." Dkt. 294 (Joint Subm. in Resp. to Dkt. 276 re Logs Preservation) at

8  2:9-16. Rather than identify a not synced signal, Google stated that its proposal would do the look-

9  up to "add item (2), showing whether a user had sync enabled." *Id.* Google did not explain that there

10  were specific not synced signals, but instead that it would create this random sample of not synced

11  users that it claimed "does not exist in the ordinary course of business." *Id.* This was misleading. As

12  shown above and now admitted by Google, Chrome sends not synced signals to Google (and Google

13  stores those signals for short periods of time) in the ordinary course of business.

14      **B.**    **Google Failed to Reveal or Produce Plaintiff Data It Had Already Searched, Segregated, and Preserved**

15      Google repeatedly failed to comply with the Court's orders regarding production of Plaintiff

16  Information. This includes the Court's orders of April 30, 2021 and November 12, 2021. The failure

17  has caused Plaintiffs and the Court to engage in repeated guesswork about "sampling" data sources,

18  without the benefit of the roadmap that the Named Plaintiffs' data could have provided. Indeed, it

19  was precisely because the previously collected and preserved Plaintiff data could act as a roadmap

20  that the Special Master (and, on November 12, 2021, the Court) required that the Plaintiff data be

21  produced first. Without that data, countless resources were wasted.

22      **1.**    **Google's Failure to Comply with the Court's April 30, 2021 Order**

23      Almost two years ago, on August 30, 2020, Plaintiffs' served request for production No. 5

24  ("RFP 5"), which sought  all "data and information related to or associated with the Plaintiffs," their

25  identifiers, "and all data collected from their Chrome browsers of any kind," including, but not

26  limited to: Google Account information, email addresses, IP addresses and User-Agents, referrer

27  headers, browsing history, cookie values, x-client data headers, and analytics information. *See* Dkt.

28  166 at 3. On September 30, 2020, Google responded that it would produce "relevant information

associated with Google Account names and email addresses," i.e. Gaia identifiers, but objected to production of device identifiers. *Id.*

On April 30, 2021, the Court ordered: "Google must produce the information it has associated with the named Plaintiffs, including, as detailed at the hearing, data from non-synced sources, and any device data associated with any Plaintiff." Dkt. 173-1. The same Order required Google to make a "comprehensive" production of Plaintiff data prior to taking the depositions of Named Plaintiffs. Dkt. 173-1. On May 3, 2021, Google informed Plaintiffs that it would not comply with the April 30 Order. *See* Jt. Decl. ¶ 100. Instead, Google decided it would produce only a subset of Google Account-keyed data, from sources of Google's choosing, without input from Plaintiffs and without transparency as to the data contained within various sources at Google. *Id.*. On June 2, 2021, Google misled the Court, stating it had "produced what [it] w[as] supposed to produce, or well, what [it] believe [it] w[as] supposed to produce in terms of the data associated with the plaintiffs." Jun. 2, 2021 Hrg. Tr. 48:16-18. On June 23, 2021, Plaintiffs filed a motion to compel compliance with the Court's April 30 Order. Dkt. 226. In response, Google claimed it was not withholding Named Plaintiffs' data:

> Plaintiffs incorrectly claim that Google is withholding relevant GAIA-keyed information … because [it] only searched and produced data relating to ▮ of those logs. … Google produced information from the ▮ specified logs because information is propagated from the identified Google Account-keyed logs to the ▮ logs that Google searched; the rest of the logs would contain duplicative and cumulative information….

Dkt. 233 at 5-6.[5]

Google's representation was not true. Unbeknownst to Plaintiffs, Google had already searched, segregated, and preserved Plaintiff data from ▮ of Gaia-keyed logs (the "Historical Data") that it had neither produced nor disclosed. In fact, Plaintiffs did not learn that Google had already searched, segregated, and preserved this Historical Data until the last week of fact discovery.

---

[5] In the same filing, Google asserted that "the information sought by Plaintiffs … is equally available to Plaintiffs." Dkt. 233 at 5. This was not true. There is no publicly available information that shows Plaintiffs the information that Chrome sent about them to Google next to their identifiers, additional information about the content of their communication, "profiles" that Google had associated with the user, and revenue Google derived from its sale of the users' information.

*See* Jt. Decl. ¶ 103. Upon this revelation, the Special Master again ordered the immediate production of the ==Historical Data==. *See id*. at ¶ 119. Google continued to refuse to comply until the Special Master ordered immediate production of all data for which Google admits third-party "publisher notice" is not needed.  But Google continues to refuse to produce the rest (the "publisher notice" data), contending via email as late as the date of this motion (May 24, 2022) that it will continue to ignore this Court's (and the Special Master's) prior orders.  *Id*. ¶ 126.

### 2.    Google's Failure to Comply with the Court's November 12, 2021 Order

On November 12, 2021, the Court entered an order requiring Google "==to provide the Special Master a full list of *all data sources which have been searched* during the overall discovery process==." Dkt. 377. Google was ordered to provide "==the name of the data source==" and "==the date(s) on which the searches to date were carried out==." The Court further ordered that "==Google shall provide a declaration, under penalty of perjury from Google, not counsel, that (1) To the best of its knowledge, Google has provided a complete list of data sources that contain information relevant to Plaintiffs' claims; and (2) all *responsive* data related to the Named Plaintiffs have been produced from *all searched data* sources in the respective prior searches==." *Id.* (emphasis added).

Google violated the November 12 Order in at least four ways:

1.    Google did not identify the ==Historical Data==;

2.    Google refused to confirm that the data had been produced, saying only that it had been produced or was "in process";

3.    Google falsely certified that all responsive data had been preserved; and,

4.    Google did not directly state that there were not sync signals, such as ▮▮▮▮▮▮▮, that it had never disclosed.

In fact, Google did not identify any additional data sources in response to the Court's November 12 Order. Google once again identified a list of data sources for which it had "==preserved==" but not "==produced==" information. Plaintiffs made repeated requests for production of such information – or, in the alternative, more information about it. Beginning in December 2021, Plaintiffs made at least four requests through the Special Master for Google to produce information Google labelled "==preserved, but not produced==". *See* Jt. Decl. ¶¶ 112-118. Google refused or ignored each request.

Instead of simply producing the ==Historical Data==, which was *==already== searched and ==segregated==*, Google forced Plaintiffs, the Special Master, and the Court, to engage in a convoluted

1   process of "go fish," conducting limited sets of searches from the same or similar logs without

2   revealing what Google had already collected about the Named Plaintiffs or which logs contained

3   not sync signals. On December 29, 2021, Plaintiffs were forced to choose ███ logs *at random*

4   for Google to search. Unbeknownst to Plaintiffs, ██ of the logs chosen were already included in

5   the list of sources that Google had labeled as "preserved" but not "produced." Notwithstanding the

6   existence of the Historical Data, Google conducted *new* searches and on January 11 and 14, 2022,

7   and produced null sets of Plaintiff data for most of the Named Plaintiffs, including the very logs for

8   which Google already possessed the Historical Data. *See id*. at ¶ 83.  Stated differently, Google

9   forced the Court and Plaintiffs to engage in new searches for something that Google had already

10  searched and preserved, so that Google could justify turning over null sets.

11          After receiving null sets, Plaintiffs renewed their efforts to learn about the data that Google

12  had labeled "preserved." On a January 19, 2022 status call with the Special Master, Plaintiffs

13  repeated their request that Google provide more information about the preserved data. *See* Jt. Decl.

14  ¶ 114. Google refused to clarify and further refused to confirm whether it was raising a burdens

15  argument as to production of the preserved information. *See id*. at ¶ 115, Ex. 9 (Google letter of

16  Jan. 25, 2022). From January 25 to February 25, 2022, Plaintiffs renewed their clarification and

17  confirmation of a burdens argument on every call with Google and the Special Master. *See id*. at ¶

18  116. Google continued to refuse. *Id*.

19          On February 25, 2022, with permission and as directed by the Special Master, Plaintiffs

20  identified this dispute as Issue 1.3 to the Court. *See* Dkt. 509-3. On February 27, 2022, Plaintiffs

21  renewed their request that Google "produce the historical plaintiff-related data already gathered and

22  preserved (but not produced) in advance of the expert meetings" that the Special Master scheduled

23  for the week of March 1-5, 2022. Jt. Decl. ¶ 118. Google again refused. *Id*.

24          In the first week of March 2022, the Special Master arranged Zoom calls between Plaintiffs'

25  experts and relevant Google employees. During one of these calls, on March 1, 2022, Plaintiffs

26  learned for the first time from a Google employee that the "preserved data" had been already

27  searched and segregated but was stored in a format that required work before production. Jt. Decl.

28  ¶ 119. At the end of the conference, the Special Master ordered Google to produce all Plaintiff

1    information it had previously searched and had in its possession. *Id.* Google *again* refused to

2    comply. *Id.* at ¶ 120. On March 8, 2022, Google asked the Special Master to be excused from

3    production of all Historically Preserved plaintiff data. *See id.* at ¶ 121. The reason: Google stated

4    that it needed to provide notice to "publishers" and that this would extend the Plaintiff data

5    production process too long. *Id.* On March 9, 2022, Google produced "the preserved data from logs

6    that do not contain" what Google claimed to be "publisher information," *id.,* and did not confirm

7    completion of the production until May 20, 2022.

8           **C.     Google's Failure to Preserve Data Relating to the Named Plaintiffs**

9           In addition to directing production of Named Plaintiffs' Information, the April 30 Order also

10   specified production of "any device data associated with any Plaintiff." Dkt. 173-1 at 1. As set forth

11   above, Google did not comply with the Order, because it failed to preserve much of the device-keyed

12   data – Biscotti- and Zwieback-keyed data.  Through the Special Master process, Plaintiffs learned

13   that Google did not make any attempts to preserve Biscotti-keyed data until February 2021, Jt. Decl.

14   ¶ 78, consistent with Google's testimony in August 2021 that the search for Biscotti-keyed data did

15   not start until "Spring." *Id.* In addition, Plaintiffs are not aware of any Google efforts to preserve

16   Zwieback-keyed data – despite the fact that it was the most frequently mentioned cookie transmitted

17   from Chrome to Google on non-Google websites without authorization in both the original and First

18   Amended Complaints. *See, e.g.* Dkt. 163 at ¶¶ 165, 168-69, 177, 179, 184. While Google has alluded

19   to ill-defined burdens in producing this information (*see, e.g.* Dkt. 231 at 1, alleging Google would

20   need to "reverse engineer unauthenticated identifiers from Google Account-keyed information"),

21   such claims have been proven categorically false. Belated searches by Google demonstrate that there

22   were no significant technical barriers to search or preserve device-keyed information. For example,

23   through the Special Master, the Court ordered production of Zwieback ███ data. Google

24   produced the results of said searches less than a week later. Likewise, Google was able to return

25   results for ████████████ searches relatively quickly after being ordered to do so in the

26   Special Master process. *See id.* at ¶ 81.

27          Google's claim that it did not associate or would not be able to link Gaia-keyed data to device

28   identifiers was also false. Since this misrepresentation, Google produced data for one of Plaintiffs'

1    test accounts by conducting a search for a Biscotti-identifier *in* a Gaia-keyed log. *See* Jt. Decl. ¶ 103.

2    It also produced information from the Gaia ▮▮▮ and Zwieback ▮▮▮ data sources proving that

3    these identifiers are co-mingled. *Id.* at ¶¶ 42-43. There is no excuse for Google's failure to preserve

4    the named Plaintiffs' Zwieback- or Biscotti-keyed data.

5    **D.    Google's Failure to Timely Produce ▮▮▮▮▮▮▮ Documents**

6    Given that consent is one of Google's key defenses, early in this litigation, Plaintiffs served

7    multiple RFPs related to studies, evaluations, documentation and analysis of user expectations of

8    privacy and understanding of user consent interfaces. *See* Jt. Decl. ¶ 46. Rather than engage in good

9    faith productions and meet its discovery obligations, Google withheld key documents responsive to

10   these discovery requests.

11   On November 30, 2021, Google filed a surprise Motion for Summary Judgment on its First

12   Affirmative Defense of Consent. *See* Dkt. 395. In so doing, Google represented to the Court that

13   there was no dispute of material fact on the consent issue, and asked the Court to find as a matter of

14   law that all Named Plaintiffs had so clearly manifested consent to the data collection that the case

15   should be dismissed in its entirety. *Id.* at 2. Google made this representation knowing it to be false,

16   withholding key responsive discovery that would undermine its motion for summary judgment.

17   On December 20, 2021, a Google employee, Sam Heft-Luthy, unwittingly revealed that a

18   secret Google project, called ▮▮▮▮▮▮ included interviews with key Google "stakeholders"

19   – high level executives – recording their views on Google's consumer disclosures – including the

20   very disclosures at issue in the motion for summary judgment. *See* Jt. Decl. ¶¶ 48-50, Ex. 10 (Heft-

21   Luthy Dep.) at 53:12-21. Despite the fact that ▮▮▮▮▮ was clearly relevant and responsive to

22   Plaintiffs many RFPs (*see* Jt. Decl. ¶ 46), at the time of Heft-Luthy's deposition, Google had failed

23   to produce relevant documents related to this project. Critically, Google omitted from production the

24   interview notes with Google executives. Following Heft-Luthy's deposition, Plaintiffs made at least

25   six successive requests for production of ▮▮▮▮▮ documents. *See id.* at ¶¶ 51-60. But Google

26   delayed production, withholding the documents until April 6, 2022, which was after all briefing on

27   Google's Motion for Summary Judgment was concluded, and a full month after the close of fact

28   discovery. *See id.* at ¶ 61.

1       The production of the ▮▮▮▮▮▮ interview notes revealed that high level Google
2   executives were interviewed and the overwhelming consensus was that Google's disclosures were
3   confusing and failed to adequately advise users of the full nature and scope of Google's collection
4   practices. *See* Jt. Decl. ¶ 64, Ex. 11 (GOOG-CABR-05885871) (interviewees acknowledging users
5   had expectations of privacy, but Google's "consent approach" is "out-of-step" with user
6   expectations[] [and] [] makes it difficult for people to understand how we use their data"); *id.*
7   (agreeing people "don't have the time or capacity to absorb all the details, let alone understand the
8   precise impact their choices might have on the particular services they use"); *id.* at ¶ 63, Ex. 12
9   (GOOG-CABR-05885181) (stating "Google's few consent moments alone, very early in the
10  relationship[,] are not enough to help users form accurate expectations about risks involved and
11  benefits gained when engaging in a data-sharing relationship with Google[]"); *id.* at ¶ 64, Ex. 11
12  (GOOG-CABR-05885871) (stating "[i]f people were the deciders, they wouldn't take the deal, but
13  they are not the deciders[]" and "[o]ur ads system as design[ed] doesn't really give the user
14  choice[]"). Google's decision to file its surprise motion of summary judgment on the issue of consent
15  while withholding these key documents is an extraordinary act of bad faith.

16  **IV.    ARGUMENT**

17      Google's discovery misconduct warrants sanctions for misleading the Court and Plaintiffs
18  on material matters. Specifically, Google refused to produce probative and relevant evidence, while
19  simultaneously arguing in its motion for summary judgment and opposing class certification that
20  lack of such evidence either disposed of the case entirely, or defeated class certification. While a
21  showing of bad faith is not necessary for this Court to sanction Google, this conduct meets both
22  culpability thresholds – bad faith and negligence. Google's misconduct frustrated discovery in this
23  case for over a year, has caused Plaintiffs and the Court to expend hundreds of hours and expense to
24  resolve what we now know to be non-issues. There can be no justification for Google's bad faith
25  conduct, which is deeply prejudicial to Plaintiffs.

26      **A.    Google's Discovery Misconduct Demonstrates Willfulness and Bad Faith**

27      "[D]isobedient conduct not shown to be outside the control of the litigant is all that is
28  required to demonstrate willfulness, bad faith, or fault.'" *Lugo v Sham*, 2001 WL 348984, *2 (N.D.

1   Cal. Apr. 5, 2001) *quoting Henry v. Gill Indus., Inc.,* 983 F.2d 943, 946 (9th Cir. 1993). Here, Google

2   has committed disobedient conduct solely within its control. That is more than sufficient to impose

3   sanctions.

4       First, as detailed above, Google falsely represented that "[t]he Chrome sync traffic logs …

5   do not record identifiers for logged out users." Mar. 5, 2021 Hrg. Tr. at 12:2-10. The Court made

6   repeated inquiries during that hearing to confirm that Google does not preserve signals or traffic of

7   not synced Chrome users, and issued a protective order on this basis. But, in fact, there are multiple

8   not-synced signals. Chrome sends a signal to Google via the sync traffic log any time a user is Signed

9   In But Not Consented for Sync. This signal is sent when: (1) a user signs in but does not sync; (2)

10  anytime a user opens the browser in a Signed In But Not Consented for Sync state; and (3)

11  approximately every four hours while the browser is in use in a Signed In But Not Consented for

12  Sync state. Jt. Decl. ¶ 28. Similarly, as Google only admitted at 11:52pm with 8 minutes to spare

13  in fact discovery:

14       When a Chrome user stops sync, the Chrome client sends a ▮▮▮▮▮▮▮▮
         signal to the Chrome Sync server.…The signal is recorded in Chrome Sync's

15       ▮▮▮▮▮▮ data store, ▮▮▮▮▮▮▮▮▮▮ where the record is retained until the
         user clears the sync data associated with that Google Account or deletes that

16       Google Account. The signal is also recorded in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

17  *Id.* ¶ 34. Taking this action sends the user to a Basic browser (or Signed Out) browser mode, and

18  Google records it. Google also revealed on February 25, 2022, ▮▮▮ data parameters from the

19  column titled ▮▮▮▮▮▮▮▮ in the Zwieback ▮▮▮▮ data source clearly showing yet more

20  sources of sync records not admitted during the hearing the year prior: ▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 41, Ex. 7

22  (GOOG-CALH-01170421),

23       Google knew its statements to be false when uttered to the Court. Tim Schumann, the Google

24  employee who verified, under oath, Google's answers to related interrogatories, was communicating

25  with colleagues about the ▮▮▮▮ or "Not Consented for Sync" signal in January 2021, *id.* ¶ 31,

26  right before Google was falsely telling the Court that such signals did not exist.

27       Similarly, there can be no excuse for failing to preserve data keyed to Plaintiffs' Biscotti and

28  Zwieback identifiers – *Plaintiffs included their corresponding cookie values in the complaint. See,*

1   *e.g.*, Complaint ¶¶ 161-186. Google preserved the ==account-keyed (the Gaia-keyed)== data immediately

2   upon receiving the complaint, but did not preserve the other data, even though both types of data are

3   in the same Complaint.  As such, it is permissible to infer that Google's failure to preserve was the

4   result of a strategic decision, not an accident. *See, e.g. Clear-View Technologies, Inc., v. Rasnick*,

5   2015 WL 2251005, *7-8 (N.D. Cal. May 13, 2015) (finding spoliation occurred with culpable

6   mindset where defendants, *inter alia,* failed to conduct reasonable or diligent searches and

7   misrepresented to the court under oath about their preservation and collection efforts); *Imagenetix*,

8   *Inc. v. Robinson Pharma, Inc.*, 2017 WL 8940118, *4 (N.D. Cal. Jan. 12, 2017) *report and*

9   *recommendation adopted* 2017 WL 570708 (N.D. Cal. Feb. 13, 2017) (sanctions warranted based in

10  part on mere "gross negligence" that "prevented the disclosure of relevant evidence to Plaintiffs").

11          In addition, Google's refusal to comply with a year's worth of Court orders to produce the

12  ==preserved== data is per se bad faith. *Int'l Petroleum Prods. and Additives Company, Inc. v. Black Gold,*

13  *S.A.R.L.*, 2021 WL 7448603, *3 (N.D. Cal. Dec. 6, 2021) (Gonzalez-Rogers, J.) (adopting

14  recommendation and granting plaintiff's request for adverse inference sanctions where defendant

15  repeatedly failed to sufficiently respond to discovery requests in accordance with court orders).

16  Withholding the required production of the ==Historical Data==, e.g. ==already searched, segregated, and==

17  ==preserved Gaia-keyed information==, Google encouraged Plaintiffs and the Special Master to engage

18  in a fruitless exercise to try to recreate the data from new identifiers and random new searches. When

19  the new searches were finally completed, Google arbitrarily limited its search to ==*eight days*==, and

20  produced almost entirely null sets. Jt. Decl. ¶ 83. It was not until March 1, 2022 that a Google

21  employee disclosed – through a forced meeting between Plaintiffs' experts and Google engineers –

22  that Google had ==already collected and segregated the Historical Data that Google conceded that the==

23  ==data could easily be produced.== *Id*. ¶ 119.

24          Lastly, Google withheld key documents related to ███████████, ==including interviews with==

25  ==high level executives who criticized Google's disclosure and consent flow==, while simultaneously

26  asserting to the Court that summary judgment was warranted on its consent defense because there

27  were no triable issues of fact. The briefing of this motion, premised on false pretenses,

28

misrepresentations, and concealed evidence, exemplifies the very bad faith conduct that sanctions are intended to prevent.

There is thus sufficient evidence to conclude that Google acted in bad faith, willfully disobeying the Court's orders by withholding discovery, and by intentionally misrepresenting and omitting key information to the Court and the Special Master, in favor of endorsing a process that it knew would be time consuming and costly. There is no justification for this misconduct, which was clearly intended to, and did, serve to frustrate, delay, and impede Plaintiffs' ability to obtain discovery. !

**B.    Plaintiffs' Have Been Prejudiced by Google's Misconduct**

**1.    Prejudice from Google's Misrepresentations Regarding, and Destruction of, Not Synced Signals**

Google's belated proposal to preserve not synced signals confirms that those signals should have been preserved all along. Although Google may argue that the Protective Order entered by the court was broad, there is no fair reading of the briefing and argument transcript to support that contention. It is nonsensical to argue that the Court approved destruction of not synced signals that Google claimed did not exist. Nor is there any fair reading that the order extended to logs that Google claimed were not relevant to its motion. Plaintiffs and the Court were focused on whether not synced signals existed – and Google said they did not, on multiple occasions. Over the course of the litigation, Google (1) failed to timely inform Plaintiffs and the Court of the misrepresentations of material fact; and (2) "destroyed" the relevant not synced signals. Jt. Decl. ¶ 29, Ex. 5 (Schumann Dep.) at 132:2-9.

Google's discovery conduct has hampered the ability of Plaintiffs and absent class members to identify the specific moments when they were using Chrome while not synced and to identify specific communications that Chrome sent to Google while they were not synced. Had Google preserved the not synced signals, Plaintiffs would have a readily identifiable list of people who had used Chrome while either (1) Signed In But Not Consented for Sync, or (2) Signed Out. Had Google preserved these not synced signals in logs with other relevant information (as proposed by Plaintiffs), there would be a ready-made database of information to identify class members and quantify actual unjust enrichment damages on a per user basis.

2.     **Prejudice from Google's Failure to Comply with Court Orders Regarding Production of Plaintiff Information**

Plaintiffs have been prejudiced by Google's violation of the Court's prior orders to identify and produce Plaintiff data in two ways.

*First*, the Historically Data Google is withholding is among the most important in the case because it includes ▆▆▆▆▆▆ data elements the Court identified as highly relevant in its November 2021 order and the logs at issue have the longest retention periods. No other data sources identified by Google fit these criteria. In addition, as the Court made clear in *Silver v. Stripe*, the scope of the data at issue is relevant. 2021 WL 3191752, *6 (N.D. Cal. Jul. 28, 2021) (holding that the "nature and volume of the collection of information is also important" in analyzing invasion of privacy and intrusion upon seclusion claims). Google's arguments against compliance, for example that it would be unduly burdensome to provide email notice to ▆▆ separate "publishers," *see* Jt. Decl. ¶ 123, is, itself, evidence of the "nature and volume" of the data collection at Google, and should be dispositive to the issues of whether Plaintiffs have a reasonable expectation of privacy in the data and whether Google's conduct is highly offensive. Without this data, Plaintiffs are prejudiced by not being able to present a complete picture of Chrome's unauthorized activity with respect to the Named Plaintiffs.

Second, Google's refusal to produce critical discovery and its repeated misrepresentations of key issues of fact prejudiced Plaintiffs' ability to engage in follow-up discovery, and the discovery taken thus far is incomplete. At an early hearing on Plaintiff data, counsel explained that they viewed such production as the key to create a roadmap for discovery for the rest of the case. *Id.* ¶ 18. Similarly, as discussed above, the Court agreed with Plaintiffs that Plaintiff depositions should not start until their data had first been produced, to avoid prejudice to Plaintiffs that naturally arises from one side having relevant data denied to the other. Those depositions occurred almost a year before Google finally produced the data, and the prejudice has already occurred. There is also prejudice because Google unfairly denied Plaintiffs the opportunity to identify or ask substantive questions of Google employees about the late-produced Plaintiff data. The fact that Google has flagrantly disregarded their discovery obligations with respect to production and representations

calls out for sanctions. *See Keithley v. Home Store.com, Inc.*, 2008 WL 3833384, *15 (N.D. Cal. Aug. 12, 2008).

      **3.**      **Prejudice from Google's Failure to Preserve and Comply with Court Orders Regarding Production of ==Device-Keyed== Data**

Google's failure to preserve ==device-keyed== data for the Named Plaintiffs has prejudiced Plaintiffs by preventing them from presenting a full picture of Chrome's unauthorized disclosures to the jury. For most Plaintiffs, there will be no ==device-keyed== data to present at all. *Id*. ¶¶ 83, 94-98. This includes both ==Biscotti- and Zwieback-keyed== data. If Google had diligently preserved ==Biscotti-keyed== data that Chrome sent to Google via non-Google websites, Plaintiffs would likely have had at least nine months of browsing history information, profiles, and revenue information ==keyed to their devices==. If Google had diligently preserved the ==Zwieback-keyed data== that Chrome sent to Google via non-Google websites, Plaintiffs would likely have ==device-keyed== browsing history information, profiles, and revenue information that date back to the very first time they used Chrome on their respective devices. By delaying attempts to preserve ==Biscotti and Zwieback== by nearly ▮▮▮▮, Google ensured that the relevant Plaintiff data was erased. *Id*..  This failure to preserve is made worse by the fact that Plaintiffs included relevant identifiers in their actual Complaint – and provided Google with additional relevant identifiers (***at Google's request***) on December 31, 2020.

      **4.**      **Prejudice by Belated Disclosure of** ▮▮▮▮ **Documents**

Consent is the centerpiece of Google's defense in this case and is the subject of Google's premature motion for summary judgment. Yet Google withheld production of key documents – relating to its secret ▮▮▮▮ project – throughout discovery, only acknowledging their existence after they were unwittingly disclosed by a Google employee in December 2021. Even then, and despite repeated attempts by Plaintiffs to obtain this discovery, Google delayed production of responsive documents until five weeks *after* the close of fact discovery. Google's dilatory tactics have foreclosed the opportunity to cross-examine witnesses – Google "stakeholders" – who made critical admissions, recorded in these documents, that undermine Google's consent defense. Indeed, these late-produced documents demonstrate that ==high-ranking Google executives, who were interviewed as part of a study aimed at assessing the sufficiency of Google's disclosure, *disagreed with the notion (asserted in Google's motion for summary judgment) that users "consented" to==

1   Google's collection of their personal information. For example, these executives concede that it is

2   a "fantasy that users agreed to [the misconduct allged]", that Google's ads systems "doesn't really

3   give the user choice", and that "[i]f people were the deciders, they wouldn't take the deal, but they

4   are not the deciders." Jt. Decl. ¶ 64, Ex. 11 (GOOG-CABR-05885871).

5          Google's decision to withhold and delay production of this damaging information was done

6   in blatant disregard of its discovery obligations, and in furtherance of a motion for summary

7   judgment that was brought on false pretenses. While publicly representing to the Court that there

8   were no triable issues of fact on the question of consent, privately, Google was concealing from the

9   Court a secret study that confirmed the exact opposite. Google's misconduct is an insult to the Court

10  and has prejudiced Plaintiffs' ability to depose relevant stakeholders and caused unnecessary time

11  and expense related to the briefing and defense of a baseless motion for summary judgment.

12         **C.    Evidentiary and Monetary Sanctions Are Warranted**

13         Plaintiffs primarily seek evidentiary sanctions. Courts impose evidentiary sanctions when

14  monetary sanctions remain inadequate. *See Schiavenza v. U.S.,* 1984 WL 178976, *1, 5 (N.D Cal.

15  Dec. 18, 1984); *see also Clear-View Tech., Inc.*, *v. Rasnick*, 2015 WL 2251005 at *7-8 (evidentiary

16  and monetary sanctions warranted given defendants' protracted and needless delays that frustrated

17  discovery process); *Dong Ah Tire & Rubber Co., Ltd. v Glasforms, Inc.*, 2009 WL 1949124, *10

18  *adopted in part and modified in part* 2009 WL 2485556, *4 (N.D. Cal. Jul. 2, 2009) (evidentiary

19  sanctions for failure to preserve evidence). Notably. in the Ninth Circuit, spoliation of evidence

20  raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such

21  evidence was adverse to the party that destroyed it. *See, e.g. Phoceene Sous–Marine, S.A. v. U.S.*

22  *Phosmarine, Inc.,* 682 F.2d 802, 806 (9th Cir. 1982); *Nat'l Ass'n of Radiation Survivors v.*

23  *Turnage,* 115 F.R.D. 543, 557 (N.D. Cal. 1987) ("Where one party wrongfully denies another the

24  evidence necessary to establish a fact in dispute, the court must draw the strongest allowable

25  inferences in favor of the aggrieved party"). While Google's discovery misconduct has made this

26  action more expensive and time-consuming (for both Plaintiffs and the Court), monetary sanctions,

27  alone, are not sufficient. Money will not cure the prejudice to Plaintiffs of being deprived timely

28  discovery to prove their case, nor the untenable position of having been forced to take depositions

1   and conduct discovery while key portions of evidence was being withheld, and will likely not serve

2   to deter such conduct in the future by Google.

3       With fact discovery now closed and the deadline for expert disclosures less than a month

4   away, monetary sanctions alone would actually *reward* Google for its intransigence in refusing to

5   produce information ordered by the Court. Given its size and resources, monetary sanctions would

6   be a small price to pay for Google should it be allowed to thwart Plaintiffs' ability to engage in

7   fulsome discovery, undermine preparation for depositions (past and present), impede expert

8   discovery and summary judgment briefing, and, ultimately, benefit from such misconduct at trial.

9   Google should not be allowed to pay its way out of its discovery abuses to gain litigation advantages.

10      Further, Google was "on notice that [Not Synced signals and Device-Keyed data] were

11  potentially relevant," yet still "fail[ed] to take measures to preserve" them. *Colonies Partners, L.P.*

12  *v. Cty. of San Bernardino*, 2020 WL 1496444, *9 (C.D. Cal. Feb. 27, 2020) *report and*

13  *recommendation adopted* 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020). This failure, combined with

14  the facts above, warrants inferring the destruction was intentional. *Id*. at *11. Courts have frequently

15  found an adverse inference sanction appropriate in cases, like this one, where "bad faith or gross

16  negligence has resulted in either the spoliation of evidence or failure to turn over relevant evidence."

17  *First Financial Security, Inc. v. Freedom Equity Grp., LLC*, 2016 WL 5870218, *3 (N.D. Cal. Oct.

18  7, 2016); *Colonies Partners*, 2020 WL 1496444 at *9 (inferring willful destruction and issuing

19  adverse inference instruction when party failed to preserve evidence it knew was relevant); *Kannan*

20  *v. Apple Inc*., 2020 WL 9048723, *9 (N.D. Cal. Sept. 21, 2020) (same). Any lesser remedy would

21  improperly allow Google to "profit from [its] own failure to comply" with discovery, disclosure, and

22  preservation obligations. *U.S. v. Sumitomo Marine & Fire Ins. Co*., 617 F.2d 1365, 1369 (9th Cir.

23  1980); *see also Valley Eng'rs Inc v. Elec. Eng'g Co.,* 158 F.3d 1051, 1058 (9th Cir. 1998) (sanctions

24  appropriate for perjured testimony); *accord Excel Innovations, Inc. v. Indivos Corp.*, 2006 WL

25  8439364, *1 (N.D. Cal. Nov. 21, 2006) (recommending sanctions for perjured testimony); *Bowoto*

26  *v. Chevron Texaco Corp.,* 2008 WL 552456, *2 (N.D. Cal. Feb. 27, 2008) (failure to preserve

27  evidence meant he was "precluded from raising" arguments regarding the missing evidence).

28

1    In addition to evidentiary sanctions, Plaintiffs seek reimbursement to the Class for costs
2  related to the Special Master discovery process, and fees and costs related to bringing the instant
3  motion. *Optrics Inc. v. Barracuda Networks Inc*, 2021 WL 411349, *10 (N.D. Cal. Feb. 4, 2021)
4  (awarding attorney's fees for successful motion for sanctions).  The Special Master costs are detailed
5  in the accompanying Joint Declaration, see ¶ 127, and the fees and costs associated with bringing
6  this motion will be provided at the request of the Court to ensure all fees and costs are provided.

7  **V.    <u>CONCLUSION</u>**

8    Plaintiffs request that the Court impose evidentiary and monetary sanctions as set forth in
9  the accompanying Proposed Order.

DATED: May 24, 2022

                                        Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**          **DICELLO LEVITT GUTZLER LLC**

By:    /s/ Lesley E. Weaver            By:    /s/ David A. Straite
Lesley Weaver (Cal. Bar No. 191305)    David A. Straite (admitted *pro hac vice*)
Angelica M. Ornelas (Cal. Bar No. 285929)  Corban Rhodes (admitted *pro hac vice*)
Joshua D. Samra (Cal. Bar No. 313050)  One Grand Central Place
555 12th Street, Suite 1600            60 E. 42nd Street, Suite 2400
Oakland, CA 94607                      New York, NY 10165
Tel.: (415) 445-4003                   Tel.: (646) 993-1000
Fax: (415) 445-4020                    *dstraite@dicellolevitt.com*
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*                  Amy Keller (admitted *pro hac vice*)
*jsamra@bfalaw.com*                    Adam Prom (admitted *pro hac vice*)
                                       Sharon Cruz (admitted *pro hac vice*)
**SIMMONS HANLY CONROY LLC**           Ten North Dearborn St., 6th Floor
                                       Chicago, IL 60602
By:    /s/ Jay Barnes                  Tel.: (312) 214-7900
Jason 'Jay' Barnes (admitted *pro hac vice*)  *akeller@dicellolevitt.com*
An Truong (admitted *pro hac vice*)    *aprom@dicellolevitt.com*
Eric Johnson (admitted *pro hac vice*) *scruz@dicellolevitt.com*
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

                         *Counsel for Plaintiffs*

## **ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)**

I, David A. Straite, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th Day of May, 2022, at Marbletown, New York.


By _____*/s/ David A. Straite*_____
David A. Straite

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I, David A. Straite, hereby certify that on May 24, 2022, I caused to be electronically filed

4   the foregoing document with the Clerk of the United States District Court for the Northern District

5   of California using the CM/ECF system, which will send electronic notification to all counsel of

6   record. I also caused a copy of the under seal filings to be delivered to counsel for Defendant Google

7   LLC via electronic mail.

8

                                                        /s/ David A. Straite
9                                                       David A. Straite

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28