# EXHIBIT 5

## Redacted Version of Document Sought to be Sealed

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

PATRICK CALHOUN, et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

GOOGLE LLC,

Defendants.

Case No. 5:20-cv-5146-LHK-SVK

*** CONFIDENTIAL ATTORNEYS' EYES ONLY ***

REMOTE VIDEO DEPOSITION OF
TIM SCHUMANN

DATE TAKEN: Thursday, January 13, 2022
REPORTED BY: RENEE HARRIS, CSR 14168, CCR, RPR
JOB NO. 5031153
PAGES: 1 - 344

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

PATRICK CALHOUN, et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

Case No. 5:20-cv-5146-LHK-SVK

GOOGLE LLC,

Defendants.

*** CONFIDENTIAL ATTORNEYS' EYES ONLY ***

Remote Video Deposition of TIM SCHUMANN, taken remotely via Zoom Conference Video, commencing at 11:07 a.m., CET, Thursday, January 13, 2022, before Renee Harris, CSR No. 14168, Registered Professional Reporter.

Page 2

APPEARANCES OF COUNSEL:

For PLAINTIFFS:

SIMMONS HANLY CONROY
BY: JASON "JAY" BARNES, ESQ.
112 Madison Avenue, Seventh Floor
New York, New York 10016
(618) 693-3104
jaybarnes@simmonsfirm.com

- and -

DICELLO LEVITT & GUTZLER
BY: SHARON CRUZ, ESQ.
444 Madison Avenue, Fourth Floor
New York, New York 10022
(312) 535-9984
scruz@dicellolevitt.com

- and -

BLEICHMAR FONTI & AULD LLP
BY: LESLEY WEAVER, ESQ.
555 12th Street, Suite 1600
Oakland, California 94607
(415) 445-4003
lweaver@bfalaw.com

- and -

Page 3

APPEARANCES OF COUNSEL: (CONTINUED)

For DEFENDANT:

QUINN EMANUEL URQUHART & SULLIVAN LLP
BY: JOSEF ANSORGE, ESQ.
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
josefansorge@quinnemanuel.com

-and-

QUINN EMANUEL URQUHART & SULLIVAN (Schweiz) GmbH
BY: REMO DECURTINS, ASSOC.
Dufourstrasse 29
8008 Zürich
Switzerland
(+41) 44 253 8014
remodecurtins@quinnemanuel.swiss

-and-

BÄR & KARRER
BY: MARTINA ATHANAS, ASSOC.
Brandschenkestrasse 90
CH-8002 Zurich
Switzerland
(+41) 58 261 50 00
Martina.Athanas@BaerKarrer.ch

Page 4

APPEARANCES: (CONTINUED)

ALSO PRESENT:
Heidi Stuart, Videographer
Urlich Malsch, Interpreter
Sven Graefe, Interpreter
Ralf Ulrich

Page 5

INDEX

EXAMINATION BY: PAGE
MR. BARNES 16

EXHIBITS

EXHIBIT NO. DESCRIPTION PAGE
Exhibit 1 - LinkedIn profile, Tim Schumann 18
Exhibit 2 - Exhibit B - Plaintiffs' Fourth Request for Production of Documents 44
Exhibit 3 - Request for Admission No. 14 55
Exhibit 4 - Bates GOOG-CALH-00129119-9120 E-mail, 4/27/2020 71
Exhibit 5 - Bates GOOG-CALH-00651647 MetaData 71
Exhibit 5 - Bates GOOG-CALH-00651647 (Excel) 71
Exhibit 6 - Bates GOOG-CALH-00651647 [REDACTED] Entry – Row 12 72
Exhibit 7 - Bates GOOG-CALH-00028183-187 Logo sync with metadata 103
Exhibit 8 - Bates GOOG-CABR-04742957-958 E-mail, 5/14/2021 132
Exhibit 9 - Bates GOOG-CABR-04866841 E-mail, 1/7/2020 138
Exhibit 10 - Bates GOOG-CABR-03839059--61 E-mail, 3/16/2020 141

EXHIBITS (continued)

EXHIBIT NO DESCRIPTION PAGE
Exhibit 11 - Bates GOOG-CABR-03744846-4867 Design Document - MagicEye 146
Exhibit 12 - Bates GOOG-CALH-00050256-260 E-mail, 3/6/2020 150
Exhibit 13 - Bates GOOG-CALH-00050264-2678 E-mail, 3/6/2020 156
Exhibit 14 - Exhibit A - Plaintiffs' Fourth Request for Production of Documents 175
Exhibit 15 - Bates GOOG-CALH-00552367-368 E-mail, 1/31/2020 206
Exhibit 16 - Request for Admission No 18 213
Exhibit 17 - Bates GOOG-CABR-05469056-096 Chrome Browser Network Traffic Annotations 225
Exhibit 18 - Screenshot (David Monsees) 231
Exhibit 19 - Bates GOOG-CALH-00081141-148 Anchor: Data Pipeline 248
Exhibit 20 - Request for Admission No 37 258
Exhibit 21 - Bates GOOG-CALH-00085975-983 BankServ document 262
Exhibit 22 - Logs 1 - Data Sources with sync State Signals - 2021-11-18 Calhoun Omnibus Sheet 273
Exhibit 23 - Logs 2-3 - Chrome History Raw + WAA Raw 2021-12-21 Calhoun 275
Exhibit 24 - Bates GOOG-CALH-00651647 [REDACTED] Entry – Row 3 281
Exhibit 25 - Bates GOOG-CALH-00171709-711 E-mail, 11/4/2019 283
Exhibit 26 - Bates GOOG-CALH-00137820-833 E-mail, 7/10/20 286

EXHIBITS (continued)

EXHIBIT NO. DESCRIPTION PAGE
Exhibit 27 - Bates GOOG-CABR-04865362-363 E-mail, 1/18/2018 300
Exhibit 28 - Bates GOOG-CALH-00454555-556 E-mail, 8/20/2018 305
Exhibit 29 - Chromium bug report 311
Exhibit 30 - Bates GOOG-CALH-00119712 Bates 8/9/2018 312
31 - Logs 8 - span-global-Chrome-sync-storage 2021-11-18 Calhoun Omnibus Sheet 313
Exhibit 32 - Logs 9 - [REDACTED] [REDACTED] 319
Exhibit 33 - Logs 10 - [REDACTED] [REDACTED] 322
Exhibit 34 - Logs 11 - [REDACTED] 2021-11-18 Calhoun Omnibus Sheet 325
Exhibit 35 - Bates GOOG-CALH-00027477 Logs 12 - Sample from sync Logs 332

THE VIDEOGRAPHER: Good morning, we are going on the record at 11:07 a.m. on January 13, 2022. 11:07:00 11:07:06 11:07:09

Please note that the microphones are sensitive and may pick up whispering, private conversations and cellular interference. 11:07:11 11:07:13 11:07:17

Please turn off all cell phones or place them away from the microphones as they can interfere with the deposition audio. 11:07:21 11:07:24 11:07:25

Audio and video recording will continue to take place unless all parties agree to go off the record. 11:07:29 11:07:31 11:07:34

This is Media Unit 1 of the video recorded deposition of Tim Schumann taken by counsel for Plaintiff in the matter of Patrick Calhoun, et al. vs. Google, LLC, filed in the United States for the Northern District of California, San Jose Division. Case number is 5:20-cv-5146-LHK-SVK. 11:07:36 11:07:39 11:07:45 11:07:46 11:07:51 11:08:01 11:08:19

This deposition is being conducted using Veritext remote technology and all witnesses are attending remotely. The witness is located in Zurich, Switzerland. 11:08:20 11:08:24 11:08:26 11:08:29

My name is Heidi Stuart from the firm Veritext Legal Solutions and I'm the 11:08:31 11:08:31

point in time where one of the connections being made, and that would include whether or not Chrome Sync is enabled. This is like a bit in the protocol that we include in part of the traffic. 11:51:43 11:51:49 11:51:51 11:51:54 11:51:56

BY MR. BARNES: 11:51:58

Q. Okay. Do you keep track -- does Google keep track of users who are in the -- signed-in-but-not-consented-for-sync state? 11:51:59 11:52:13 11:52:21

MR. ANSORGE: Objection. Form. Vague. 11:52:25

THE WITNESS: Yeah, I think it depends what you mean, "keep track." I can -- because, yeah, there's a lot of room for interpretation. 11:52:28 11:52:30 11:52:34 11:52:39

What I can tell you that happens to that specific bit is that it may be stored server side for a limited period of time. 11:52:40 11:52:42 11:52:45

BY MR. BARNES: 11:52:48

Q. Okay. And by that bit, you mean the bit that indicates this user is signed-in-but-not-consented-for-sync? 11:52:48 11:52:52 11:52:55

A. Correct. This is -- and let me make sure that we have the context right here. Again, it's why -- maybe we should also explain why we have this bit in the protocol. 11:52:58 11:53:02 11:53:06 11:53:08

When we made that change, as we said, let's offer this other mode that you don't have to be consented to the server, that the user doesn't have to have opted into the Sync, I like this phrasing better. Then we make big infrastructure changes, like traffic patterns will change, all these kind of things, and in order that we can provide a good user experience as a reliable service, we want to understand what's happening here. 11:53:09 11:53:14 11:53:17 11:53:20 11:53:24 11:53:29 11:53:33 11:53:34 11:53:38 11:53:39

So we introduced that bit that we could primarily identify. If there's some traffic causing problems, is that the new kind of traffic or is it the old one? 11:53:39 11:53:44 11:53:46 11:53:49

So we included that bit and we also have it in -- yeah, primarily to understand the traffic that comes in but not to track users as you put it in the first place. It's not about individuals. 11:53:50 11:53:53 11:53:56 11:54:01

Q. Okay. You testified -- I'm sorry, thank you for that explanation, that's actually very helpful. I was going down one line of questions, and you -- I'm trying to -- part of this is a conversation for you to teach me because I'm trying to understand things, and it's helpful. That's -- that's helpful. 11:54:03 11:54:13 11:54:15 11:54:18 11:54:20 11:54:24 11:54:27

When was that infrastructure change made? 11:54:28

MR. ANSORGE: Objection. Vague. 11:54:33

THE WITNESS: As I mentioned before, [REDACTED] was conceived, I believe it was in '18 and, you know, the changes then being in the process for -- for at least a year, and the question is like, what do you -- do you think, like, when did we launch it, when did we start implementation of that feature? 11:54:35 11:54:37 11:54:40 11:54:48 11:54:50 11:54:52 11:54:53 11:54:58

BY MR. BARNES: 11:54:59

Q. Correct. 11:54:59

A. Which one of the three? 11:54:59

Q. When did you launch it? 11:55:00

A. If I recall it correctly, the first launch was in -- I think it was in May 2019, but it was in the fall of 2019 for Desktop platforms, meaning Windows primarily or macOS. 11:55:02 11:55:07 11:55:11 11:55:18

Q. Is it -- has it been launched for mobile? 11:55:22

A. Yes, I have to be careful. To be specific, we have similar product changes on other platforms and on mobile, we now have a similar functionality. And I believe we recently launched that. 11:55:31 11:55:33 11:55:36 11:55:40 11:55:44

Q. And was this change on Desktop, was the 11:55:45

[REDACTED] 11:55:52

[REDACTED] was that a necessary ground laying before you could implement these infrastructure changes for [REDACTED]? 11:55:56 11:56:02 11:56:05

MR. ANSORGE: Objection. Form. Compound. 11:56:06 11:56:07

THE WITNESS: Yeah, to give you some background, me and my team, we took over Chrome Sync, I think at the end of 2017, and by that time, [REDACTED] was already being planned and implemented and on its way. I believe their main motivation was [REDACTED] 11:56:08 11:56:10 11:56:15 11:56:19 11:56:23 11:56:28

[REDACTED] 11:56:31 11:56:35 11:56:37 11:56:39 11:56:43 11:56:46 11:56:49

And there was -- and anything else about [REDACTED] to me would be speculation because I was not involved in all those conversations. It was before my time in the project. 11:56:51 11:56:53 11:56:55 11:56:58 11:56:59

///

*** CONFIDENTIAL ATTORNEYS' EYES ONLY ***

THE WITNESS: I believe how we put it is, 12:17:05
we call this bit that the Sync feature is not 12:17:06
enabled, but yes, it is the situation that -- 12:17:10
a bit of the connection between the Chrome 12:17:14
browser and the Chrome Sync server for an 12:17:15
account that's being signed in, and the 12:17:17
Chrome client believes that the Sync feature 12:17:19
is not enabled. 12:17:22
BY MR. BARNES: 12:17:23
Q. Okay. When is that bit sent from Chrome 12:17:23
to Google? 12:17:30
MR. ANSORGE: Objection. Vague. 12:17:31
THE WITNESS: I assumed you -- you're 12:17:32
curious about where and when the flows, I 12:17:38
would say this is part of the standard Chrome 12:17:40
Sync protocol. There are some requests where 12:17:42
that precise state -- that precise state is 12:17:46
not known to the client yet because 12:17:50
information hasn't been loaded yet because -- 12:17:53
but in the -- in the regular traffic, you 12:17:55
would see that bit. 12:17:58
BY MR. BARNES: 12:17:59
Q. Okay. And is -- I want to list the 12:17:59
circumstances in which it is sent. 12:18:02
Is it -- is the bit sent when a user 12:18:09

initially does the sign-in? 12:18:11
MR. ANSORGE: Objection. Vague. Form. 12:18:19
THE WITNESS: Let me -- let me specify 12:18:21
this, I would say not necessarily. The 12:18:23
problem I'm having is, what is the moment 12:18:26
when the user is doing the sign-in? 12:18:28
BY MR. BARNES: 12:18:31
Q. Is it -- right. I understand that. 12:18:31
Is it sent around the time when a user 12:18:35
has signed in? 12:18:39
MR. ANSORGE: Objection. Vague. 12:18:43
THE WITNESS: I think probably. So if -- 12:18:45
because you have to think about how -- what's 12:18:48
happening on the Chrome client, is when the 12:18:50
Chrome Sync machinery or Chrome sign-in sees 12:18:55
that the user got signed in and we have valid 12:18:58
credentials and the Chrome browser is aware 12:19:03
of the identity, and there might be cases 12:19:07
that the users opt out of that feature, and 12:19:08
then they cannot have this, right, so this 12:19:08
why I think it's important to -- to 12:19:12
distinguish those. 12:19:13
In those situations, when we start off 12:19:13
the Sync mechanism, and we -- then we would 12:19:17
include that bit, if we already know whether 12:19:21

or not the Sync feature is enabled. There 12:19:23
are some situations where we would establish 12:19:26
the channel and don't even know if -- if the 12:19:30
Sync feature is enabled or not but we have 12:19:33
that -- there are technical features in 12:19:36
there, put it this way. 12:19:40
BY MR. BARNES: 12:19:41
Q. Okay. So I want to -- I want to talk 12:19:42
about the browser is in its default state. 12:19:43
A. Mm-hmm. 12:19:45
Q. The user has clicked to sign in. There's 12:19:46
the communications or the authorization -- auth 12:19:52
tokens we just talked about with the previous 12:19:58
exhibit; correct? 12:20:00
A. Correct. 12:20:01
Q. At that point in time, does the Chrome 12:20:02
browser send the bit to the Sync server indicating 12:20:04
that the user is 12:20:10
signed-in-but-not-consented-for-sync? 12:20:13
A. The scenario you explained is a situation 12:20:14
where the Chrome machinery might be able to -- 12:20:18
like the Chrome Sync machinery might be able to 12:20:22
start up, and as part of that startup, if that 12:20:24
really happens, look at all the settings, if that 12:20:28
happens, then you would include that bit in the 12:20:32

communication with the Chrome Sync server. 12:20:34
Q. Okay. So that's one scenario in which 12:20:37
the bit is sent from the Chrome browser to the 12:20:39
Sync server indicating the user is 12:20:45
signed-in-but-not-consented-for-sync; is that 12:20:48
correct? 12:20:50
A. That is correct. 12:20:50
Q. Okay. I want to describe a second 12:20:50
circumstance, and tell me if I'm right, wrong, or 12:20:52
explain where I'm wrong. 12:20:55
If the user closes the browser without 12:20:57
having signed out, and then they restart the 12:21:01
browser, does the browser, upon restarting, send 12:21:05
the bit to the Sync server indicating that this 12:21:11
user is in this 12:21:15
signed-out-but-not-consented-for-Sync state? 12:21:19
MR. ANSORGE: Objection. Vague. 12:21:21
Incomplete hypothetical. 12:21:23
THE WITNESS: This is very complex. I 12:21:27
would like to -- as I mentioned before, there 12:21:32
are situations where the Chrome machinery 12:21:35
will start up because it can, and in those 12:21:37
situations, if sync traffic is initiated, 12:21:40
then we would include that bit. 12:21:43
Now, what happens on startup -- many 12:21:44

aggregates in -- for dimensions that we are 01:42:19
interested in from a product perspective. 01:42:22
BY MR. BARNES: 01:42:24
Q. Okay. Mr. Schumann, this is just a basic 01:42:24
programming question. 01:42:27
If you have a spreadsheet that has three 01:42:31
columns: One is an account identifier; the second 01:42:33
is a device identifier; and third is the sync 01:42:39
feature state, okay, and you have the spreadsheet 01:42:47
that has lots of entries in -- in there, and there 01:42:49
is full sync enabled and there is [REDACTED]. 01:42:53
It is possible to write a script to 01:42:59
identify all of the account numbers associated 01:43:02
with the [REDACTED] entries in that spreadsheet; 01:43:06
correct? 01:43:09
MR. ANSORGE: Objection. Form and 01:43:10
incomplete hypothetical. 01:43:12
THE WITNESS: So I understand that we are 01:43:15
talking in a hypothetical spreadsheet and I 01:43:19
believe that in a hypothetical spreadsheet, 01:43:21
you could of course do that computation. 01:43:23
BY MR. BARNES: 01:43:29
Q. Okay. And you could do that with logs as 01:43:30
well -- putting to the side policy and legal 01:43:31
reasons, you could do that with a log, as well; 01:43:35

correct? 01:43:37
MR. ANSORGE: Objection. Form. 01:43:39
THE WITNESS: Even -- even looking at 01:43:41
technical aspects, that really depends on a 01:43:44
lot of details. Like, what time frame are we 01:43:47
looking about, what -- what granularity is 01:43:49
that? 01:43:53
BY MR. BARNES: 01:43:53
Q. We're -- well, in this example, we have a 01:43:53
spreadsheet that has three variables: The sync 01:43:55
feature state, the Google account and the device 01:44:00
identifier. 01:44:03
You could -- one could write a script to 01:44:06
say, identify every Google account identifier and 01:44:08
every device identifier associated with a [REDACTED] 01:44:13
state; correct? 01:44:16
MR. ANSORGE: Objection to form and 01:44:18
incomplete hypothetical. 01:44:20
THE WITNESS: What I wanted to clarify 01:44:21
is, like how many rows does the thing have? 01:44:24
Is it ten, hundreds, thousands, million, 01:44:26
billions? This brings a different -- 01:44:30
technical questions in here. 01:44:34
BY MR. BARNES: 01:44:35
Q. Okay. Lots of rows, let's say ten rows. 01:44:35

You could do it -- could you do it for ten rows? 01:44:41
A. I'm pretty sure we can do this for ten 01:44:42
rows. 01:44:45
Q. Okay. Could you do it for a hundred 01:44:45
rows? 01:44:47
A. I would think so, yeah. 01:44:47
Q. You could do it for a thousand rows; 01:44:49
correct? 01:44:51
A. Probably, but, you know, depending on the 01:44:51
spreadsheet implementation. 01:44:54
Q. It -- the more rows, the more time it 01:44:56
might take; correct? 01:44:57
A. It takes more time to compute; it takes 01:44:59
more space to output. Like, staying in your 01:45:07
spreadsheet analogy, do you want to write this in 01:45:10
a single cell, how large would the thing be? 01:45:12
And like, my point is, if you want to go 01:45:14
back to -- to synced traffic logs, like what time 01:45:15
range are you looking at? 01:45:23
We had to do quite some tweaking from a 01:45:24
technical perspective to make that pipeline run 01:45:26
for the -- for the period of time they are looking 01:45:29
at. So it's -- it's not like, okay, it's a 01:45:32
spreadsheet. 01:45:34
Q. And you would agree right now, the 01:45:34

pipeline to identify [REDACTED] users, runs -- I said 01:45:38
"the pipeline." A pipeline to identify [REDACTED] 01:45:43
users runs to [REDACTED] correct? 01:45:46
MR. ANSORGE: Objection. Vague. 01:45:57
THE WITNESS: I would not agree to that. 01:46:00
[REDACTED] is a -- is a different -- we do feed 01:46:02
[REDACTED] into [REDACTED] The purpose is not to 01:46:03
track [REDACTED] users. 01:46:06
BY MR. BARNES: 01:46:07
Q. Okay. But in [REDACTED] users, there is a 01:46:07
field that identifies whether a user was in 01:46:14
[REDACTED] correct? 01:46:17
A. When we produce those records for 01:46:17
[REDACTED] as you saw in the exhibit before, there 01:46:19
is a field where we introduce that, where we have 01:46:22
that, that's correct. 01:46:25
Q. Okay. What is -- down below, it says, 01:46:27
"The devices-per-user metric is a good candidate 01:46:54
to understand the underlying concept. We are 01:46:56
essentially doing a [REDACTED]." 01:46:58
What is a [REDACTED]? 01:47:00
A. [REDACTED] 01:47:03
[REDACTED] 01:47:07
[REDACTED] 01:47:14
Q. Explain what a map produced job; please? 01:47:14

A. Correct. Like, in the -- the process of the pipeline, such a table is being populated, to produce the aggregated -- 01:51:51 01:51:53 01:51:56
Q. Where is that table stored? 01:52:02
MR. ANSORGE: Objection. Vague. 01:52:04
THE WITNESS: As I mentioned, this is -- let me think about, because this is like the multi-step piece. 01:52:05 01:52:09 01:52:14
Again, if you look from the pipeline perspective, we do not persist the intermediate able. In the end, what we do persist is the breakdown of how many clients a user had and then we aggregated across this again, so you get a histogram. You have so many millions of users with a single client, so many users that have two clients connected and so on. 01:52:15 01:52:17 01:52:23 01:52:23 01:52:25 01:52:28 01:52:31 01:52:33 01:52:36
BY MR. BARNES: 01:52:36
Q. Right. 01:52:37
A. That's the aggregation we store. 01:52:37
Q. It's that -- is it in that -- it's that intermediate table that we talked about earlier; right? This is -- this is -- an intermediate table, how -- how long is that table kept? 01:52:38 01:52:40 01:52:44 01:52:49
MR. ANSORGE: Objection. 01:52:52

Mischaracterizes prior testimony. 01:52:53
THE WITNESS: Yes, with the -- I have to look into the details. I -- I'm not sure what the precise retention period is. I want to highlight two things in there. 01:52:55 01:52:59 01:53:03 01:53:07
As I mentioned before, if we have intermediate data that's not sufficiently aggregated, that would simply store within the logs cluster, like within the logs storage system and then I would assume a retention of a few days, that's usually what pipelines are using. 01:53:09 01:53:10 01:53:13 01:53:16 01:53:19 01:53:25 01:53:28
And then again, the thing that we take out into something where we control the retention, that would be the final aggregation. 01:53:29 01:53:30 01:53:31 01:53:33
BY MR. BARNES: 01:53:34
Q. Okay. You say you can backfill the last [REDACTED]. 01:53:34 01:53:51
Is that because data, the underlying gwslog data has the [REDACTED] retention period and you want to build in the cushion there that you described earlier? 01:53:52 01:53:56 01:54:01 01:54:03
A. This is correct. So I mean, I think -- and I know where you were -- like what you meant 01:54:04 01:54:07

although your question was a bit vague. 01:54:10
If you go down where we talk about -- backfilling means, let's assume the pipeline does not manage to succeed in a day or there was some permission problem or something, that we couldn't process the logs for one day, then we have [REDACTED] to fix that until we run it before the underlying data would run out of retention and would be destroyed. 01:54:12 01:54:13 01:54:18 01:54:21 01:54:23 01:54:28 01:54:31 01:54:34
MR. BARNES: Okay. Ms. Cruz, can you publish s4, please? And it should pop up, I think as Exhibit 8. 01:54:37 01:54:38 01:54:54
(Exhibit 8 was received and marked for identification on this date and is attached hereto.) 01:54:55 01:54:55 01:55:03
BY MR. BARNES: 01:55:03
Q. Let me know when you have it, please. 01:55:03
A. I don't see it yet. I see Exhibit 7. 01:55:04
Q. While it's working -- 01:55:08
A. Here it's coming. 01:55:09
Q. What -- what is [REDACTED]? 01:55:10
A. As far as I remember, this was a project code name. 01:55:14 01:55:17
Q. And what was the -- what was the project? 01:55:20
A. This was not a project related to my team 01:55:23

immediately. I believe -- let me recall -- this was a, this was a [REDACTED] [REDACTED]. For the details, I would have to look in the specific ones. 01:55:27 01:55:34 01:55:42 01:55:46
Q. Okay. Let me -- do you have the document? 01:55:48 01:55:50
A. I see the document now, yes. 01:55:50
Q. Do you recognize this? 01:55:52
A. It's an e-mail thread. That was the person reaching out and I responded. So yeah, I would need some time to untangle it but it looks like an e-mail thread from last year that I've been involved with. 01:55:53 01:56:01 01:56:05 01:56:08 01:56:11
Q. Okay. Do you see down at the bottom of the first page, which is GOOG-CABR-04742957 -- 01:56:12 01:56:16
A. Mm-hmm. 01:56:16
Q. -- where you -- you sent an e-mail on May 12th, 2021 -- 01:56:24 01:56:24
A. Mm-hmm. 01:56:24
Q. -- at 6:06 p.m.? 01:56:29
A. Correct. Yeah. 01:56:34
Q. All right. And you state, "We keep server side traffic logs (gwslog) of the last --" 01:56:34 01:56:35
A. Mm-hmm. 01:56:35
Q. "-- [REDACTED]. We could relatively easy 01:56:38

right? 03:18:34
A. Mm-hmm. 03:18:34
Q. And after they sign in and get their credentials, their o-auth credentials, the browser is going to send a transmission to the sync server; correct? 03:18:35
A. That's correct. 03:18:46
Q. Okay. And for this user, is it true or false that the browser will also often send a GetUpdates request? 03:18:47
A. That is true. In these situations, you can expect the Chrome is inclined to send a GetUpdates request. 03:18:53
Q. Okay. Thank you. Can we go to page 859, please. 03:19:00
A. Mm-hmm. 03:19:17
Q. Okay. I have questions I -- this is one thing I really wish we were in the same room. I have questions about this diagram. 03:19:18
Where it says sync http server in the diagram on page 859, does -- is that the [REDACTED] domain? 03:19:24
A. These are the servers behind that domain. So if a client is contacting -- contacting clients for the Google account, then those servers would 03:19:35

in the end fulfill those requests. 03:19:47
Q. Okay. And then it says -- and then from there, it points to http server logs. 03:19:49
What are those http server logs? 03:19:55
MR. ANSORGE: Objection. Form. 03:20:01
THE WITNESS: From my understanding of this diagram and the context we have established, I would assume that these are the gwslogs, the GWS traffic logs. 03:20:02
BY MR. BARNES: 03:20:07
Q. Okay. And then we've got a point to the right, to the active user pipeline, which then goes to reported user activities. 03:20:11
Do you see that? 03:20:20
A. I do see that. 03:20:20
Q. What is -- where are the reported user activities? 03:20:21
MR. ANSORGE: Objection. Vague. 03:20:26
THE WITNESS: From my reading of that pipeline, this is a repository within the [REDACTED] infrastructure. I would assume it's a database but I can also see the document has more contents. 03:20:31
BY MR. BARNES: 03:20:47
Q. Okay. Let's jump ahead to page 860. 03:20:47

It's the very next page. 03:20:50
A. Okay. 03:20:53
Q. You see where it says "storage & location --" 'cause I -- I'm not trying to make this a pop quiz. I'm really trying to figure this out. 03:20:53
It says, "storage & location, log sink." 03:20:59
Do you see that? 03:21:04
A. Yeah. 03:21:04
Q. "The ingested data is stored in the following log source: 03:21:04
[REDACTED] 03:21:11
[REDACTED] 03:21:11
[REDACTED] 03:21:26
Did I read that correctly? 03:21:27
A. That is correct actually. 03:21:27
Q. Okay. Is this log sync where the reported user activities are -- does it refer to the reported -- is there the connection between the reported user activities in the flow diagram on page 859 with the log sync described here? 03:21:32
MR. ANSORGE: Objection to form and foundation. 03:21:49
THE WITNESS: If my interpretation of log sync is correct, because I don't find log 03:21:52

sync mentioned in that diagram, it would be my understanding that this is the location within the [REDACTED] infrastructure where it has been stored. 03:21:58
BY MR. BARNES: 03:22:09
Q. Okay. And the [REDACTED], what does that mean? 03:22:09
A. That means that any data stored at that location is going to be auto deleted after [REDACTED] [REDACTED]. 03:22:15
Q. Okay. If we go back to 859, the ingestion pipeline, [REDACTED], is that the gwslog you referred to earlier? 03:22:22
A. I'm sorry, I cannot completely follow the -- the proxy you are referring -- are we in the diagram? 03:22:39
Q. It's at the -- I'm sorry, I'm outside the diagram. It's at the very bottom of the page. 03:22:44
A. Correct. These are -- these are the Chrome gwslogs, yes. 03:22:50
Q. Okay. And then if we move on to 860, the Chrome Sync HTTP server logs, the [REDACTED] retention time of logs, what does that refer to? 03:22:55
A. As we discussed before, this is the -- 03:23:11

MR. BARNES: Thank you for your time today, Mr. Schumann. We are a little over seven hours, seven hours and like 46 seconds to be precise and we have a seven-hour time limit on this. 07:36:50 07:36:52 07:36:54 07:36:59 07:37:02

I want to note for the record that plaintiffs received a production of documents yesterday evening for which Mr. Schumann was the custodian and we are leaving this deposition open for purposes of asking Mr. Schumann questions about those late produced documents. 07:37:03 07:37:04 07:37:08 07:37:12 07:37:16 07:37:19 07:37:22

Other than that we are finished with questions regarding what has been produced other than the very last-minute production last night. 07:37:24 07:37:26 07:37:30 07:37:33

Mr. Ansorge? 07:37:34

MR. ANSORGE: Yes, Mr. Barnes, we object. Mr. Schumann has come here and he's been brought here at great expense and effort. You had seven hours. He testified fulsomely and I think we can take the dispute off and give the witness his life back. 07:37:35 07:37:40 07:37:42 07:37:45 07:37:49 07:37:52

MR. BARNES: We'll have to agree to disagree. 07:37:57 07:38:00

Page 338

MR. ANSORGE: About giving him his life back? 07:38:00 07:38:03

MR. BARNES: Well, no, he can have his life back. But we'll have to agree to disagree about whether there's a dispute about the late-produced documents or not. 07:38:03 07:38:04 07:38:06 07:38:09

MR. ANSORGE: With that, I'm happy to go off the record. 07:38:12 07:38:13

MR. BARNES: Okay. 07:38:14

THE VIDEOGRAPHER: We are off the record at 7:38 p.m. This concludes today's testimony given by Tim Schumann. The total number of media units used was eight and will be retained by Veritext Legal Solutions. 07:38:14 07:38:17 07:38:20 07:38:25 07:38:29

(Time noted: 7:38 p.m.)

Page 339

DECLARATION UNDER PENALTY OF PERJURY

I, TIM SCHUMANN, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on January 13, 2022; that I have made such corrections as appear noted herein; that my testimony as contained herein, as corrected, is true and correct.

DATED this 23 day of. February 2022, at Munich, Germany

__________________________

TIM SCHUMANN

Page 340

I, RENEE HARRIS, do hereby certify that I am a licensed Certified Shorthand Reporter;

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to tell the truth, the whole truth, and nothing but the truth;

That the said deposition was by me recorded stenographically;

And the foregoing pages constitute a full, true, complete and correct record of the testimony given by the said witness;

That I am a disinterested person, not being in any way interested in the outcome of said action, or connected with, nor related to any of the parties in said action, or to their respective counsel, in any manner whatsoever.

DATED: January 17, 2022

Renee Harris, CSR, CCR, RPR
CA CSR No. 14168,
NJ CRR No. 30XI00241200; RPR

Page 341