1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

8

9

10

11

12

13

14

15

16

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

**Case No.:** 4:21-cv-2155-YGR

**ORDER DENYING WITHOUT PREJUDICE THE MOTION FOR CLASS CERTIFICATION;**

**GRANTING IN PART AND DENYING IN PART GOOGLE'S *DAUBERT* MOTION TO EXCLUDE THE EXPERT OPINIONS OF PROFESSOR NEIL RICHARDS;**

**DENYING WITHOUT PREJUDICE PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE THE EXPERT OPINIONS OF BRUCE DEAL**

Re: Dkt. No. 546, 582, 624

17

18

19

20

21

22

23

24

25

26

27

28

Pending before the Court are plaintiffs' Motion for Class Certification, the parties' corresponding *Daubert*[1] motions, and an Omnibus Sealing Motion that the Court will address by separate order. At issue is Google's Real Time Bidding ("RTB"), the process through which it sells advertisements that make up the vast majority of its business. Plaintiffs assert: Although Google repeatedly promises its account holders that it has not, does not, and will not sell their personal information, they have garnered common evidence that Google sells this this type of data billions of times each day to hundreds of participating advertisers. This common evidence, plaintiffs conclude, justifies class certification. Google objects. It urges that individualized issues will predominate on the critical issue of whether individual account holders have consented to its RTB data collection.

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993).

Having carefully considered the papers submitted, the oral argument heard on February 21, 2024, and for the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Google's *Daubert* motion to exclude the expert opinions of Neil Richards, **DENIES** as moot plaintiffs' *Daubert* motion to exclude the expert opinions of Bruce Deal, and **DENIES WITHOUT PREJUDICE** the motion for class certification,.[2] Though plaintiffs meet many of the requirements of class certification under Rule 23(b)(2), the motion must be denied so that plaintiffs can address two unresolved issues: (1) whether the class, as defined, is fail safe and, if so, whether striking "personal information" from the decision would result in an overbroad class; and (2) whether the RTB data produced thus far is representative of the class as a whole. *See, e.g., In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022). That said, many of Google's arguments are not well-taken. Where the Court has ruled on an argument, the parties shall not reassert it at the next round of briefing.

# I.   BACKGROUND

The Court incorporates the background provided in its Order largely denying Google's motion to dismiss. *In re Google RTB Consumer Privacy Litig.*, 606 F. Supp. 3d 935 (N.D. Cal. 2022). As relevant, plaintiffs allege that Google shares and sells its account holders' information through its RTB auction system to advertisers, or RTB participants. *Id.* at 939. Because Google provides highly detailed information about its account holders, RTB participants can create profiles of individual account holders. *Id.* Plaintiffs allege that this amounts to the sale of account holders' personal information. *Id.* at 940. Google does this, plaintiffs argue, in direct violation of its promise made through its standardized Terms of Service, Privacy Policy, and various other disclosures hyperlinked in both that it does not sell personal information. *Id.* at 940–41.

After the Court ruled on Google's motion to dismiss, the parties engaged in a hotly disputed discovery process. A year later, on July 14, 2023, plaintiffs moved to certify a class under Federal Rules of Civil Procedure 23(b)(2) and (b)(3). Both parties also filed corresponding *Daubert*

---

[2] The Court also denies as moot Google's evidentiary objections to certain evidence presented by plaintiffs in support of their reply brief. (Dkt. No. 628.)

United States District Court
Northern District of California

1    motions. Because of the parties' extended briefing schedule, the Court did not hold a hearing on

2    this motion until February 21, 2024.

3    **II.     LEGAL FRAMEWORK**

4         **A.     DAUBERT MOTION**

5         Federal Rule of Evidence 702[3] provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise <u>if the proponent</u>
> <u>demonstrates to the court that it is more likely than not that</u>:
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the <u>expert's opinion reflects a reliable application of</u> the principles and methods
> to the facts of the case.

Fed. R. Evid. 702 (emphasis supplied). At the class certification stage, "the relevant inquiry is a

tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the

criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley*

*Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*,

957 F.3d 979, 985–86 (9th Cir. 2020). "Ultimately, the test under *Daubert* is not the correctness of

the expert's conclusions but the soundness of [their] methodology." *Elosu v. Middlefork Ranch*

*Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks and citation omitted).

     **B.     CLASS CERTIFICATION**

          A class action is "an exception to the usual rule that litigation is conducted by and on behalf

of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Before

certifying a class, the trial court must conduct a rigorous analysis to determine whether the party

seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666

F.3d 581, 588 (9th Cir. 2012) (quotation marks omitted). The rigorous analysis that a court must

conduct requires "judging the persuasiveness of the evidence presented" for and against

---

[3] The Supreme Court updated the rule effective December 1, 2023. The changes are
underlined. *See* Order of the Court, Rules of Evidence (April 24, 2023),
https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf. The new language does not
change the intent of the rule, rather it provides further clarity.

certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* (citations omitted). The party moving for certification first must show that the four requirements of Rule 23(a) are met. Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact as to the class exist; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

The moving party must then show that the class can be certified based on at least one of the grounds in Rule 23(b). *See* Fed. R. Civ. P. 23(b). Relevant here, certification under Rule 23(b)(3) is appropriate only if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

### III.   *DAUBERT* MOTIONS

In its *Daubert* motion, Google moves to exclude the opinions of plaintiffs' expert Professor Neil Richards in their entirety. (Dkt. No. 582.)[4] It does so for five reasons: (1) Professor Richards impermissibly opines on ultimate questions of law; (2) he lacks the requisite expertise on consumer privacy expectations; (3) he lacks reliable methodology; (4) his opinions do not fit the facts of the case; and (5) he improperly opines on Google's state of mind. (*Id.*) The Court examines each.

Professor Richards is the Koch Distinguished Professor of Law at Washington University School of Law in St. Louis, Missouri. (Dkt. No. 545-9, Expert Class Certification Report on Neil

---

[4] Plaintiffs, in turn, move to exclude the opinions of Google's damages rebuttal expert, Bruce Deal. (Dkt. No. 624.) Because, as set forth below, the Court finds that the proposed class cannot be certified as a Rule 23(b)(3) damages class, it **DENIES** plaintiffs' *Daubert* motion **WITHOUT PREJUDICE**.

United States District Court
Northern District of California

Richards, "Richards Rep." ¶ 11.) He also co-directs the Cordell Institute for Policy in Medicine and Law, where he focuses on problems involving the collection and use of personal information. Professor Richards is an affiliate scholar with the Stanford Center for Internet and Society, the Yale Information Society Project, and the Berkman-Klein Center at Harvard Law School, a Fellow with the Center for Democracy and Technology, and a member of the American Law Institute. (*Id.*) His expertise is in the field of information privacy. (*Id.* ¶ 13.) His body of work has focused on the historical importance of privacy, the continued importance of societal privacy norms, privacy rights, and privacy protections in our digital world. (*Id.*)

Professor Richards sets forth six opinions in his report. First: "[P]rivacy—including freedom from unwanted surveillance—is a fundamental right and important societal norm with deep roots in the social, cultural, and legal history of the United States." (*Id.* ¶ 2.) Second: Google's Terms of Service and Privacy Policies "reflect a societal understanding that privacy is a fundamental right and an important societal norm in the U.S." (*Id.* ¶ 3.) Third: Google's RTB process, and the scope and quantity of information it collects and sells about Google account holders, are at "extreme odds with fundamental privacy rights and societal privacy norms in the U.S." (*Id.* ¶ 4.) Fourth: Societal privacy norms require Google to provide informative disclosures about what information it collects from its account holders. (*Id.* ¶ 5.) Fifth: There is "common evidence" that Google's Terms of Service, Privacy Policies, and disclosures "give rise to a common (false) expectation that Google does not offer for sale or sell information about or associated with U.S. account holders to Google RTB participants." (*Id.* ¶ 6.) Sixth: There is "common evidence" that Google fails to disclose its Google RTB auction to U.S. account holders or to offer any mechanism for them to affirmatively consent to the at-issue data collection. (*Id.* ¶ 7.)

To start, the Court agrees with Google that opinions five and six are impermissible legal conclusions that are based on the cumulation of the prior opinions in the Report. Experts may not opine on "matters of law for the court." *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 971 (N.D. Cal. 2019) (internal citations omitted). (Richards Rep. Sections VIII, IX.) In this regard, the Report is merely a "thinly disguised attempt to submit what is essentially an amicus brief as an expert report." *LD v. United Behavioral Health*, No. 20-cv-2254-YGR, 2023 WL

2806323 at *3 (N.D. Cal. Mar. 31, 2023). Whether RTB data or Google's disclosures are "common evidence" and whether Google violates the privacy rights of its account holders by failing to inform them of the at-issue data collection are two of the central legal questions raised by plaintiffs' class certification motion. Plaintiffs cannot meet their burden by submitting an expert report that invades on the province of the Court. For that reason, the Court **GRANTS** Google's motion as to the Professor Richards's fifth and sixth opinions.

Professor Richards's third opinion—that there is "common evidence" that Google's RTB violates societal privacy norms—impermissibly reaches both an ultimate question of fact and law. (*See* Richards Rep. Section VI.) In addition to opining on a legal issue raised by plaintiffs' motion for class certification, Professor Richards's opinion that RTB in fact violates privacy norms invades the province of a fact finder. (*See, e.g.*, Richards Rep. ¶ 113 "Google's practice of sharing . . . account holders' bidstream data through Google RTB runs contrary to longstanding and important privacy norms.") That said, the rest of the section in which Professor Richards lays out this opinion is admissible. The Court therefore **GRANTS** Google's motion to strike to the extent Professor Richards seeks to opine on factual and legal conclusions (*see id.* ¶¶ 93, 100, 113, 118), but **DENIES** it as to the rest of his third opinion.

Moreover, Professor Richards's opinion that Google "understands" its disclosures do not comport with societal norms and it knowingly gives account holders a "false" expectation of control over their information is an improper attempt to impute Google's intent or state of mind. *See Brown v. Google*, No. 20-cv-3664-YGR, 2022 WL 17961497, at *12 (N.D. Cal. Dec. 12, 2022). (*See, e.g.*, Richards Rep. ¶¶ 126, 136.) Google's motion in that respect is **GRANTED.**

The Court, however, disagrees with Google that Professor Richards's Report should be struck in its entirety. Professor Richards is an expert on consumer privacy expectations and the history of evolving privacy norms in the United States. (Richards Rep. ¶¶ 11–13.) He is certainly qualified by relevant "knowledge, skill, experience, training, or education" to comment on the reasonable privacy expectations of Google's account holders. *See* Fed. R. Evid. 702. That he does not have a "marketing" degree or chose not to run a consumer expectations survey, per Google, is of no consequence. As this Court said in *Brown v. Google*, an Order on which Google relies in its

United States District Court
Northern District of California

1   *Daubert* motion, "[a]n expert who offers testimony on the question o[f] what a reasonable

2   consumer is likely to do and/or think is not required to conduct a consumer survey if his or her

3   testimony is otherwise reliable." 2022 WL 17961497 at *11 n.8.

4          To that point, Professor Richards's methodology is reliable. Google argues that his opinions

5   are not based on a "scientific method," *see Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir.

6   1998), but on his own subjective belief, and thus, should be excluded. In evaluating expert

7   testimony based on historical research, not all of the *Daubert* factors, such as whether the opinions

8   are a product of a scientific, testable process, will be applicable. *See* Fed. R. Evid. 702 advisory

9   committee's note to 2000 amendment (recognizing that "not all of the specific *Daubert* factors can

10  apply to every type of expert testimony"). As here, where Professor Richards bases his opinions on

11  the way privacy norms have evolved over time, the Court instead must determine whether the

12  expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline."

13  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022); *see also, e.g., Walden v. City*

14  *of Chicago*, 755 F. Supp. 2d 942, 950 (N.D. Ill. Dec. 21, 2010) (noting that in academic historian

15  with relevant experience in the field can meet *Daubert* qualifications). In other words, the expert in

16  this type of case must explain "how that experience leads to the conclusion reached, why that

17  experience is a sufficient basis for the opinion, and how the experience is reliably applied to the

18  facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The rest of Professor

19  Richards's opinions are an application of his expertise in the history of privacy norms he has

20  developed over the past twenty years. He has published books and peer-reviewed articles on the

21  topic. *See Daubert*, 509 U.S. at 593 ("Another pertinent consideration is whether the theory or

22  technique has been subjected to peer review and publication."). For that reason, the Court finds that

23  the rest of Professor Richards's opinions have a reliable basis in his knowledge and experience in a

24  discipline relevant to them.

25         Moreover, Professor Richards's opinions are obviously relevant. Google proposes that,

26  because implied consent here is an individualized inquiry, *see infra*, Professor Richards's opinion

27  that there is a universal reasonable expectation of privacy is unfounded. This is specious. It is black

28  letter law that whether someone has a reasonable expectation of privacy is an objective, and

7

therefore common, inquiry. *Shulman v. Group W Prods., Inc.*, 955 P.2d 469, 490 (Cal. 1998). For that objective inquiry, Professor Richards's experience in the history of evolving privacy norms and how those norms apply in this context is apt.

For the reasons stated above, Google's *Daubert* motion as to Professor Richards's third, fifth, and sixth opinions (stated in Sections VI, VIII, and IX of his Report) is **GRANTED IN PART AND DENIED IN PART** but **DENIED** as to the rest.

## IV.    CLASS CERTIFICATION

Plaintiffs seek to certify a class consisting of all individual Google account holders subject to a Google United States Terms of Service whose personal information was sold or shared by Google in its RTB auctions after June 28, 2016. They moved to do so under either Federal Rule of Civil Procedure 23(b)(2) or (b)(3)[5] for the following California law claims: (1) breach of contract; (2) breach of confidence; (3) invasion of privacy; (4) intrusion upon seclusion; (5) publication of private facts; and (6) violations of the California Information Privacy Act ("CIPA"), Cal. Pen. Code § 631.

### A.    RULE 23(A)

#### 1.    Class Definition

Because the class definition is limited to Google account holders whose "personal information" was sold or shared, Google argues in a footnote that it is a fail-safe class. (*See* Dkt. No. 583-4, Google's Opposition at 11 n.10.) Plaintiffs did not reply, perhaps considering this argument was only raised in a footnote. At the hearing, however, the Court gave both parties an opportunity to address the issue. Google argued plaintiffs' class definition "embeds the concept of personal information" and therefore "subsumes the merits issue"—whether Google shared account holders' personal information. (Dkt. No. 616-12, Tr. 76:7–16.) It continued that plaintiffs could not simply resolve the issue by striking "personal information" from the definition. (Tr. 79:1–5.) This would result in an "overbroad" class that contains uninjured members. (Tr. 79: 2.) Plaintiffs disagreed.

---

[5] In a footnote, plaintiffs also request issue certification under Rule 23(c)(4). Because the Court denies with leave to amend plaintiffs' motion for class certification, it does not address whether issue classes would be appropriate.

United States District Court
Northern District of California

United States District Court
Northern District of California

In *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, an *en banc* panel of the Ninth Circuit rejected the argument that "Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." 31 F.4th 651, 669 (9th Cir. 2022). Nevertheless, the Ninth Circuit stated, a district court "must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* at 669 n.14. The problem with a class definition that includes uninjured class members is "the obverse of a different problem with class definition: the problem of the 'fail-safe' class: one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). "Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science." *Id.* Both, however, "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Olean*, 31 F.4th at 669 n.14 (quoting *Messner*, 669 F.3d at 825).

The Court agrees with Google that, as written, the class definition is fail safe. The question on which this suit hinges is whether Google impermissibly shared its account holders' personal information through RTB. That said, the Court at this stage does not have enough information to analyze whether and to what extent omitting "personal information" from the class definition would result in an overbroad class. Even if it would, under *Olean*, the Court should refine rather than "flatly deny[]" a class that includes some number of uninjured members. *See id.* at 669 n.14. Plaintiffs suggested at the hearing that the Court could simply strike "personal information" from their proposed definition because the RTB data released thus far suggests that Google shares all account holders' personal information through its RTB bids. As the Court explains below, *see infra*, plaintiffs have not yet satisfactorily demonstrated that this is the case.

Given that the Court here denies plaintiffs' motion for class certification with leave to amend, and to allow for more thorough exposition of the issue on both sides, the Court will rule on class definition at the next round of briefing. In that briefing, the parties should address the caselaw and concerns identified.

United States District Court
Northern District of California

### 2.    Numerosity

The class proposed must be so numerous that joinder of all members individually would be impracticable. Fed. R. Civ. P. 23(a)(1). As the Supreme Court has explained, the "numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *A.B. v. Hawaii State Dep't of Education*, 30 F.4th 828, 835 (9th Cir. 2022) (quoting *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)). Plaintiffs contend that this requirement is met because there are potentially 1.4 billion U.S. accounts holders at issue. Google does not dispute this estimate. Accordingly, the Court concludes that plaintiffs have satisfied the numerosity requirement.

### 3.    Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. of Civ. P. 23(a)(2). To satisfy this requirement, the common question must be of "such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[F]or purposes of Rule 23(a)(2)[,] even a single [common] question will do." *Id.* at 359 (quotation marks and citation omitted) (third alteration in original). Commonality has been "construed permissively, and all questions of fact and law need not be common to satisfy the rule." *Ellis v. Costco Wholesale Corp*, 657 F.3d 970, 981 (9th Cir. 2011) (cleaned up).

Plaintiffs propose three common questions: whether (1) Google promised not to share or sell account holders' personal or sensitive information to third parties; (2) Google offered for sale and/or sold account holders' personal or sensitive information to RTB participants in Google RTB auctions; and (3) Google's conduct contravenes societal norms and is highly offensive to a reasonable person. These questions are capable of classwide resolution, plaintiffs argue, because they can be answered in one stroke by Google's standardized disclosures and its RTB data. Google disputes this. The Court analyzes whether plaintiffs have demonstrated that both types of evidence—Google's disclosures and its RTB data—are capable of providing common answers. In

1    addition, the Court addresses Google's contention that the Court cannot certify the reasonable

2    expectation of privacy element or CIPA claim because plaintiffs have no common proof for either.

3    <center>a.    Google's Disclosures</center>

4    Plaintiffs argue that Google's Terms of Service, Privacy Policy, and the various documents

5    incorporated will provide common proof to the question of whether Google promised its account

6    holders it would not share or sell their personal information. In one disclosure, for example, Google

7    tells its account holders: "We don't sell users' personal information." (Dkt. No. 546-37, Google's

8    Privacy & Terms.) At the hearing, Google conceded that whether it made a contractual promise not

9    to sell its account holders' personal information is capable of classwide resolution. (Tr. 10:13–24.)

10   It is for that reason that claims that arise from "form contracts" are "particularly appropriate for

11   class action treatment." 1 Newberg on Class Actions § 3.24 (6th ed.) The Court agrees that, at least

12   for commonality purposes, Google's standardized disclosures are common proof capable of

13   resolving that question.

14   <center>b.    RTB Data Collection</center>

15   The parties dispute whether Google's alleged sale of plaintiffs' personal information is

16   capable of classwide resolution. Google argues that because the data shared in each RTB bid varies,

17   the answer to this common question will vary as well. Plaintiffs respond that Google always shares

18   or sells sufficient information for an RTB participant to identify the Google account holder. In

19   support, plaintiffs present reports from two experts, Professors Shafiq and Wilson, opining that

20   virtually every Google RTB bid request produced thus far in discovery includes sufficient

21   information to commonly identify the Google account holder.[6]

22   To determine whether the RTB data will furnish a common answer, the Court analyzes two

23   interrelated issues: whether (i) the RTB data produced thus far is personally identifying, and if so,

24   (ii) it is representative of the class as a whole. First though, the Court lays out how the RTB auction

25   process works, what plaintiffs' experts conclude about that process, and Google's experts' rebuttal.

26

27      [6] Dkt. No. 545-5, Expert Class Certification Report of Professor Zubair Shafiq, "Shafiq
     Rep." Dkt. No. 545-6, Expert Class Certification Report of Professor Christopher Wilson, "Wilson

28   Rep." The Court notes that Google did not bring a *Daubert* motion to challenge these plaintiffs'
     experts' qualifications or methodology.

<center>11</center>

***The RTB Auction Process.*** Google's RTB is so enormous it "may be difficult for the ordinary consumer to comprehend." Every second Google auctions tens of millions of RTB "bids" to participating advertisers. (Shafiq Rep. ¶ 18.) The RTB process starts when a person visiting a website containing Google code, such as Google Analytics. Google's code on the website transmits user information back to Google, including the user's IP address and the URL of the website visited. Google then packages the information into a "bid request" and sends it to RTB auction participants. Participants send "bid responses" back to Google, which then uses these responses to determine the auction winner. Google then instructs its users' browsers or app to display the winning bid's advertisement. (Wilson Rep. ¶ 24.) This auction process is known as "real time bidding" because this all happens "faster than the blink of an eye." (Shafiq Rep. ¶ 19.)

The RTB protocol is identical for every one of its billions of daily bids. (Wilson Rep. ¶ 34; Shafiq Rep. ¶ 18; Tr. 10 at 11–18 (Google so conceding).) An RTB bid request contains hundreds of fields about Google's users. (Shafiq Rep. ¶ 28.)  Google groups these fields into categories, including those that: represent a user's location, such as a postal code; identify a particular account, such as an IP address; and denote browsing history, such as the URL of the webpage visited. (*Id.* ¶¶ 28–29.) That said, the actual user information shared through that protocol can differ from bid to bid.

Relevant here, plaintiffs requested RTB data associated with the seven named plaintiffs during discovery. (*Id.* ¶ 35.) Google produced RTB bids for eight one-week periods which were required to be "representative" of the named plaintiffs' data during the entire class period. (*Id.*; *see also* Dkt. No. 382.)

***Professor Shafiq's expert opinion.*** Based on this sample, Professor Shafiq states that Google commonly populates at least sixty fields in all the bid requests it sends to RTB participants. (Shafiq Rep. ¶ 41.) Among those are: an encrypted version of the Google User ID; the URL of the website or app visited by the user; the IP address; the publisher of the website or application visited; various location fields; device information; and detected language. (*Id.* ¶ 42a–g.)

Professor Shafiq concludes that, through RTB, advertisers could tell exactly where each named plaintiff lives and works, what content they were viewing, and what device and operating

system they used to view that content. (*Id*. ¶ 42.) Even with only a single bid request, an RTB participant could know, for example, that a plaintiff looked up a Bible verse near the Capital Mall in Jefferson City, Missouri or searched the symptoms and causes of insomnia on Mayo Clinic's website near Lynwood, California on their Samsung Galaxy phone. (Shafiq Rep. ¶¶ 46a–46b.) Professor Shafiq notes, however, that RTB participants would not actually limit themselves to analyzing RTB data in isolation. Instead, RTB participants can stitch together detailed user profiles based on the many billions of RTB bids Google shares daily "to identify users with even more certainty." (*Id*. ¶ 78.) In fact, Professor Shafiq notes, Google acknowledges that RTB participants are capable of "build[ing] very rich profiles if they receive a significant volume of bid requests." (*Id*. ¶ 79.)

From this, Professor Shafiq opines that RTB participants can use RTB data to identify a Google account holder in two ways. First, RTB participants who have their own relationship with users can link the RTB data to their internal profiles. For example, many users have both Google and Amazon accounts; when Google shares RTB data about a user with Amazon, Amazon can then use its own internal profile to identify whose information was shared. The same would be true for those who also have Meta, LinkedIn, and Baidu accounts. (*Id*. ¶ 88.) Second, RTB participants "fingerprint" or analyze multiple pieces of information, often using machine learning, to probabilistically determine a user's identity. Google is aware of these practices, Professor Shafiq concludes. (*Id*. ¶¶ 88, 88c.)

***Professor Wilson's expert opinion.*** Next, Professor Wilson analyzed data by two RTB participants, the New York Times and the Trade Desk, who sold ad space through Google's RTB. Professor Wilson concludes that RTB participants can use RTB data to identify individual account holders in three relevant ways.

First, Professor Wilson opines that RTB participants use the RTB data transmitted by Google to "build 'profiles' of individuals by inferring their demographics, interests, hobbies, place of residence, etc." (Wilson Rep. ¶ 31.) This data, like the Google User ID, URL fields, and IP address, is "reasonably capable of being linked to an individual or household." (*Id*. ¶ 36.) Moreover, Professor Wilson opines, Google shares a "common core set" of information in every

13

RTB bid which can be linked to an individual account, such as: Google's unique identifier for a user, or a cookie, truncated IP addresses, a user's current latitude and longitude with accuracy, the model and make of their operating system, and the webpage the person is currently viewing. (*Id.* ¶ 37.)

Second, Google allows an RTB participant to synchronize RTB data with an account holder through cookie matching. (*Id.* ¶¶ 43, 45–48.)  Professor Wilson explains that Google might send its unique identifier, or cookie, to an RTB participant who can then match its own unique identifier for that account holder through the bid process. This allows an RTB participant to synchronize RTB data with an account holder. (*Id.* ¶¶ 45–48.) Professor Wilson references academic studies suggesting the process is widespread. (*Id.* ¶ 49.)

Third, RTB participants can match RTB data to individual account holders through "user lists." For example, an RTB participant might be interested in sending an advertisement to all the people who visit a specific website, such as webmd.com. If Google auctions an impression for an account holder, it will note to RTB participants that the account holder is in the user list. (*Id.* ¶¶ 68, 70, 72.)

Finally, Professor Wilson concludes that account holders cannot avoid Google's RTB process even if they attempt to use its privacy settings. (*Id.* ¶ 101.) For example, Google does tell users of its Account Ad Personalization Opt-Out ("GAP") feature. Google has calculated, however, that only 4% of account holders have ever used the GAP feature. Further, even with GAP enabled, account holders still receive targeted ads based on their browsing history. (*Id.* ¶¶ 102, 103, 123.) In sum, Professor Wilson notes that "[t]he fact that the information shared and sold through Google RTB can be used to identify an individual or household is not surprising. The very purpose of Google RTB is to encourage RTB participants to bid on impressions in Google RTB. And, because RTB participants seek to *target* ads *to individuals* based on context . . . the nature of the information being shared and sold needs to facilitate that *individual targeting*." (Wilson Rep. ¶ 41.)

***Google's rebuttal experts***. Google challenges Professors Shafiq and Wilson's opinion that 99.8% of the bid requests produced so far include sufficient information for an RTB participant to identify a particular Google account holder or household. Dr. Striegel and Dr. Psounis criticize

United States District Court
Northern District of California

1   plaintiffs' conclusions that RTB data was uniformly personally identifying on the ground that each

2   RTB bid includes highly variable information that cannot be used to identify individuals in a

3   statistically-significant way.[7] (*See generally* Striegel Rep.; Psounis Rep.)

4         ***Whether the RTB data produced thus far constitutes common proof.*** With that

5   background, the Court considers whether plaintiffs have put forth evidence that RTB data could

6   constitute personal information. Under California law, personal information is "information that

7   identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably

8   be linked, directly or indirectly, with a particular consumer or household" including "[i]nternet or

9   other electronic network activity information," such as "browsing history, search history, and

10  information regarding a consumer's interaction with an internet website, application, or

11  advertisement." Cal. Civ. Code § 1798.140(v).

12        Based upon named plaintiffs' RTB data, Professor Shafiq was able to identify, for example,

13  a named plaintiff's location, the website they had searched, and their unique device ID. Of course,

14  RTB participants are not so limited; as Professors Shafiq and Wilson opine, advertisers can analyze

15  the millions of bids sent by Google each day about named plaintiffs to create much more detailed

16  profiles of plaintiffs' locations, demographics, and preferences. As an example, with the limited

17  discovery produced thus far, Professor Shafiq was able to pinpoint the exact coordinates of each

18  named plaintiff's home and work locations based on the RTB bids within, at most, a three-

19  kilometer error rate. (Shafiq Rep. ¶ 42e.) In addition to those locations, RTB participants could tell

20  that named plaintiffs were looking up religious verses, medical symptoms, gambling applications,

21  and what a Supreme Court justice thought about a recent abortion decision. (Shafiq Rep. ¶ 46 a–g.)

22        Plaintiffs do not contend that every RTB bid is identical, as Google argues. Instead, they

23  propose that through its uniform RTB process, Google shares so much information about named

24  plaintiffs that its RTB data constitutes "personal information." Based on just eight weeks-worth of

25  data about named plaintiffs, Google produced almost five million records of RTB bid request data

26

27         ───────────────

28         [7] Dkt. No. 584-2, Expert Report of Aaron Striegel, "Striegel Rep." Dkt. No. 584-4, Expert
    Report of Konstantinos Psounis, "Psounis Rep."

15

United States District Court
Northern District of California

shared with hundreds of RTB participants around the world.[8] (Shafiq Reb. ¶ 37.) This amounts to "**10 thousand RTB bid requests per-user per-day**." (*Id.* (emphasis in original).) Plaintiffs have demonstrated sufficiently for class certification that this data, along with user lists and cookie matching, allows RTB participants to create detailed profiles of individual account holders. For that reason, the Court finds that named plaintiffs' RTB data is uniformly personally identifying.

What remains untested is whether the RTB data produced thus far is representative of the class as a whole. On this point, plaintiffs' justifications do not suffice. Plaintiffs primarily argue that they have demonstrated that RTB data will provide common evidence for the rest of the class because the court required "Google's production of sampled plaintiff data be representative of the entire class period ***and*** for the class as a whole." (Dkt. No. 545-3, Class Certification Motion at 7 (emphasis supplied).) In doing so, plaintiffs rely on two orders, one of which quotes the other. (Dkt. Nos. 382 and 483.)[9] A close read of both reveals that plaintiffs overreach. In the first, Magistrate Judge DeMarchi acknowledged Google's point that "production of ***named plaintiff data*** for the ***entire class period*** would impose an undue burden," so "some sampling" was appropriate as long as Google guaranteed that the specific time sample chosen was "representative." (Dkt. No. 382 (emphasis supplied).) Later, because the parties could not agree on what was a sufficiently representative time sample, she ordered the parties to confer on the potential production of additional periods of "***named plaintiffs' data***." (Dkt. No. 484 (emphasis supplied).) In other words, the court ordered Google to produce a sample of RTB data that was representative of the type of information that Google shared about named plaintiffs during the class period, not specifically one that was representative of every other putative member of the class. It did so because by this time plaintiffs only requested RTB data from named plaintiffs.[10] (*See, e.g.*, Dkt. No. 428-3.)

---

[8] Dkt. No. 616-5, Rebuttal Report of Professor Shafiq, "Shafiq Reb."

[9] These orders were written by Magistrate Judge DeMarchi, to whom discovery in this case was referred.

[10] The Court notes that plaintiffs originally requested RTB data about all putative class members. Google refused this discovery request as overbroad. (Dkt. No. 269.) After Google refused to produce RTB data for any account holder other than named plaintiffs, plaintiffs narrowed their request. (Dkt. No. 365.)

United States District Court
Northern District of California

1    After Google's experts challenged him on this point, Professor Shafiq responded that

2    Google has produced millions of RTB bids about named plaintiffs thus far that are uniformly

3    personally identifying and Google experts do not "identify any bid requests that differ in terms of

4    content or form." (Shafiq Reb. ¶¶ 37, 39.)[11] Professor Shafiq also cites to academic literature

5    indicating that Google collects information about the great majority of its users. (*Id.* ¶ 41.)

6    Ultimately, the burden of demonstrating that evidence is common to the class rests with

7    plaintiffs. So far, they have not. A jury cannot be instructed based upon plaintiffs' inaccurate

8    reading of the court's orders. And Professor Shafiq's rebuttal that Google has many millions of

9    RTB bids about named plaintiffs that are uniform and none about putative class members that vary

10   materially is well-taken but insufficiently developed. Plaintiffs need to affirmatively demonstrate,

11   through expert testimony or otherwise, that the RTB data thus far is representative of all putative

12   class members without resorting to orders that do not stand for that point. On the other hand,

13   Google cannot refuse to produce RTB data about other putative class members and then argue that,

14   without this data, plaintiffs cannot meet their commonality burden. Because all six of plaintiffs'

15   claims hinge on whether RTB data is personally identifying, plaintiffs' failure to more definitively

16   demonstrate that the RTB data thus far is representative of the class as a whole is fatal, even for

17   commonality.[12]

18   The Court reminds plaintiffs that simply accusing Google of producing discovery in bad

19   faith, without more, will not do.[13] Plaintiffs must meet this burden on the merits of their arguments.

20   Because the Court expects that plaintiffs can address this deficiency, the Court **DENIES** plaintiffs'

23   [11] Dkt. No. 616-5, Expert Class Certification Rebuttal Report of Professor Zubair Shafiq,
24   "Shafiq Reb."

25   [12] Though the Court acknowledges that the commonality requirement is less rigorous than
     the predominance one, and Google raises this argument with respect to both, it finds for the reasons
26   stated above that even under Rule 23(a)(2)'s less demanding standard, plaintiffs have not met their
     burden.
27

28   [13] This is especially true because Magistrate Judge DeMarchi has already denied plaintiffs'
     motion for sanctions. *See* Dkt. No. 487.

1   motion **WITHOUT PREJUDICE** on this point. *See In re Apple iPhone Antitrust Litig.*, No. 11-cv-

2   6714, 2022 WL 1284104, at *1 (N.D. Cal. Mar. 29, 2022).

3             **c.**      **Reasonable Expectation of Privacy and CIPA**

4          Next, Google argues that the common evidence plaintiffs' proffer for the reasonable

5   expectation of privacy, Professor Richards's Report, should be stricken. This argument is largely a

6   repeat of Google's *Daubert* motion against Professor Richards and is denied on the same grounds.

7   In sum, though the Court does strike certain opinions offered by Professor Richards that are legal

8   conclusions, the rest of Professor Richards's Report will provide common proof on the objective

9   inquiry of whether plaintiffs had a reasonable expectation of privacy.

10          Finally, Google contends that plaintiffs' CIPA claim cannot be certified because there is no

11   evidence that all RTB data is intercepted within California. Cal. Pen. Code § 631(a). Google is

12   headquartered in California and manages RTB from there. It offers no citation for the novel

13   proposition that plaintiffs must demonstrate the precise processor from where Google allegedly

14   intercepted the contents of plaintiffs' communications to meet its class certification burden. More

15   importantly, the Court already told Google two years ago that if it did have evidence that it

16   processes RTB bids from other locations, "Google shall produce it to the plaintiffs immediately." *In*

17   *re Google RTB Consumer Privacy Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022). Google never

18   produced this information and in fact objected to plaintiffs asking for it. (*See* Tr. 123:17–20.) It

19   cannot use the tactic both as a shield and a sword.

20             **4.**      **Typicality**

21          "The purpose of the typicality requirement is to assure that the interest of the named

22   representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617

23   F.3d 1168, 1175 (9th Cir. 2020) (citation omitted). "The typicality requirement looks to whether

24   'the claims of the class representatives [are] typical of those of the class, and [is] "satisfied when

25   each class member's claim arises from the same course of events, and each class member makes

26   similar legal arguments to prove the defendant's liability."'" *Rodriguez v. Hayes*, 591 F.3d 1105,

27   1124 (9th Cir. 2010) (citation omitted) (alterations in original), *abrogated on other grounds by*

28   *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022). The requirement is "permissive," and

the representative's claims need only be "reasonably co-extensive with those of absent class members." *Id.* (quotation marks and citation omitted).

The proposed class representatives here are, like all putative class members, subject to Google's Terms of Service, its Privacy Policy, and other standardized disclosures. Google's RTB uniformly collects their information and shares or sells it to potential advertisers. Because Google does not dispute this, the Court finds that the typicality requirement is met.

### 5. Adequacy

For adequacy, Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether named plaintiffs and their counsel have any conflicts of interest with other class members, and whether plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Named plaintiffs and their counsel have already spent years vigorously litigating discovery. Moreover, plaintiffs' counsel has experience in complex and class action litigation, including privacy class actions. Google does not dispute this. For that reason, the Court finds that the adequacy requirement is met.

### B. RULE 23(B)

Because the Court expects plaintiffs will file a renewed motion for class certification, the Court addresses here whether plaintiffs' class can be certified under Rule 23(b). Consistent with plaintiffs' order of briefing, the Court first addresses whether plaintiffs have met the predominance requirement under Rule 23(b)(3). It then analyzes whether the class here can be certified under Rule 23(b)(2).

### 1. Rule 23(b)(3)

Under Rule 23(b)(3), a court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized,

United States District Court
Northern District of California

1   class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted)

2   (alteration in original). The "predominance inquiry asks whether the common, aggregation-

3   enabling issues in the case are more prevalent or important than the non-common, aggregation-

4   defeating, individual issues." *Id.* (quoting 2 Newberg and Rubenstein on Class Actions § 4:49 (5th

5   ed.)). Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification

6   stage. Merits questions may be considered to the extent—but only to the extent—that they are

7   relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

8   *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013).

9          The parties dispute whether consent defeats predominance. Google argues that its implied

10  consent defense raises individualized issues.[14] Plaintiffs disagree, urging that this defense is

11  speculative because Google does not disclose to account holders that it in fact sells their personal

12  information to hundreds of advertisers all over the world.

13         Someone "who consents to an act is not wronged by it." Cal. Civ. Code § 3515. Consent is

14  generally an element of contract formation or an affirmative defense to tort liability. Under

15  California law, however, "[c]onsent may also be a defense to an action for breach of contract when,

16  for example, the defendant can show that the plaintiff previously accepted and consented to the

17  performance now asserted as a breach." 2 Cal. Affirmative Def. § 32:1 (2d ed.). There are "two

18  different forms of consent." *In re Google Inc. Gmail Litig.*, No. 13-md-2430, 2014 WL 1102660, at

19  *14 (N.D. Cal. Mar. 18, 2014). In privacy litigation, consent can be "express," but it can also be

20  "implied in fact based on whether the surrounding circumstances demonstrate" that the party whose

21  personal information was collected knew it. *See id.* (so holding for alleged privacy violations under

22  the Federal Wiretap Act and CIPA). "Implied consent," in particular, "is an intensely factual

23  question that requires consideration of the circumstances" surrounding the alleged privacy

24  violation. *See id.* at *16. For that reason, Judge Koh in *In re Gmail* concluded "that while consent

25

26         [14] Google also argues that the Court should not certify plaintiffs' Rule 23(b)(3) class
27  because individualized issues will predominate over its CIPA claims, its reasonable expectation of
    privacy contention, and its RTB data. In addition, Google challenges plaintiffs' damages model.
28  Because the Court finds that it cannot certify a Rule 23(b)(3) damages class, it does not address
    these arguments.

United States District Court
Northern District of California

may only be implied in a narrow set of circumstances, a broad set of materials are relevant to determining whether such consent should be implied." *Id.* at *17.

"Defenses that must be litigated on an individual basis can defeat class certification." *Brown*, 2022 WL 17961497, at *17 (citing *Truth Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018)). Because Google here raises consent as an affirmative defense, the Court must start by "analyzing the consent defenses [defendant] has actually advanced and for which it has presented evidence." *Id.* (quoting *Truth Health*, 896 F.3d at 931) (alteration in original). In that regard, Google presents its own disclosures, RTB participants' privacy policies, third-party materials, and consumer surveys. The Court reviews each.

***Google disclosures.*** Google cites to various Google disclosures and settings where it tells account holders that Google shares their information with third parties to serve advertisements. In its "How our business works" page, Google tells account holders that "[a]dvertising is what makes it possible to offer our products to everyone. While we sell things like Pixel phones, apps on the Play Store, YouTube subscriptions, and tools for businesses, we make the vast majority our money from advertising."[15]

Google's Privacy Policy tells its account holders that it "processes information to provide advertising, including online identifiers, browsing and search activity, and information about your location and interactions with advertisements." That information, Google states, may be used to show "personalized ads." Specifically, Google advises that it "may share non-personally identifiable information" with, among others, "advertisers." For example, information about an account holders' location, like their IP address, can be used to serve "ads based on your location." Altogether, Google reveals that there are "over 2 million non-Google websites and apps that partner with Google to show ads."

---

[15] Google, *Terms of Service*, https://policies.google.com/terms?hl=en-US. The Terms of Service has hyperlinked to the "How our business works" page since 2020.

The Privacy Policy also directs users to the "Advertising" page.[16] There, Google tells account holders that "[a]dvertising keeps Google and many of the websites and services you use free of charge." Google explains how it uses "cookies" to "show ads that are likely to be more relevant (such as ads based on websites you have visited)," in partnership with other websites. Google notes that "[s]ometimes the ad you see on a page is served by Google but selected by another company." In addition to using "location information," including IP addresses, Google "infer[s] demographic information, to improve the relevance of the ads you see, to measure ad performance and to report aggregate statistics to advertisers." It notes, however, that Google "prohibit[s] advertisers from selecting an audience based on sensitive information, such as health information or religious beliefs." Google informs users that they may "opt out of Ads Personalization" by turning off certain cookies.

Next, the Privacy Policy directs users to the "How Google uses information from sites or apps that use our services" page.[17] There, Google tells account holders that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google." Google notes it may collect information through cookies. Again, it reiterates that the type of information collected includes the URL of the page visited or an IP address which it uses to "personalize content and ads you see on Google and on our partners' sites and apps." This disclosure also tells account holders they may turn off ad personalization.

***Publisher disclosures.*** Google contends that RTB participants themselves have privacy policies that disclose they may share information with Google for advertisements. As one example, Google points to Accuweather.com's privacy policy. (Dkt. No. 593-4.) In it, Accuweather.com has specific disclosures about Google. It tells its users its websites use Google Analytics and that their

---

[16] Google, *Advertising*, https://policies.google.com/technologies/ads?hl=en-US. At the bottom of the Privacy Policy, Google directs users to "Other useful resources," under which it hyperlinks to "Technologies used for Advertising (hyperlink)."

[17] Google, *How Google uses information from sites or apps that use our services.* https://policies.google.com/technologies/partner-sites?hl=en-US. Also at the bottom of the Privacy Policy, Google hyperlinks to "How Google uses information from sites or apps that use our services."

United States District Court
Northern District of California

22

1   information may be collected through Google's cookies to, among other things, "inform, optimize

2   and serve ads based on a user's past visits to Accuweather sites."

3       ***Third-party materials.*** Next, Google argues that its account holders could learn about its

4   RTB data collection from third-party materials like news articles and nonprofit reports. The

5   Electronic Frontier Foundation ("EFF"), for example, published a report in 2020 about Google's

6   RTB process. (Dkt. No. 591-17.) In it, the EFF reported that, through RTB, Google sells its users'

7   personal information, including their geolocation, gender, age, and interests.

8       ***Consumer surveys.*** Finally, Google points to its expert, Dr. Hanssens, who conducted four

9   surveys to understand Google account holders' expectations of its RTB data collection. (Dkt.

10  No. 584-6.)  As relevant, in the Business Disclosures survey, Dr. Hanssens asked respondents

11  whether they expected Google to share their information when exposed to the "How Our Business

12  Works" disclosure. Based on this disclosure, Dr. Hanssens asked respondents to state how likely

13  they thought it was that Google shared their truncated IP address, the URL of where an ad should

14  be placed, browser cookies, the category of the website, and characteristics of the web browser

15  used. Between 45–74% of respondents stated that Google was very likely or somewhat likely to

16  share that information after being shown Google's disclosure. (Hanssens Rep. ¶ 60.) In the second

17  survey, the Privacy Disclosures survey, Dr. Hanssens showed respondents portions of Google's

18  Privacy Policy. After reading the Privacy Policy, between 52–74% of respondents thought Google

19  shared this information. (*Id.* ¶ 61.)

20      The Court finds that individualized issues will predominate over plaintiffs' damages claims.

21  In litigating plaintiffs' past consent to Google sharing certain types of information, like their IP

22  address or URL viewed, Google has demonstrated that a factfinder will need to assess each account

23  holder's individual, and subjective, understanding of Google's, RTB participants', and third parties'

24  disclosures. Because consent is a central issue to all six of plaintiffs' claims, this individualized

25  inquiry will drive the litigation for plaintiffs' damages remedy.

26      Plaintiffs' arguments otherwise do not persuade. Though Google does not name RTB

27  explicitly in its disclosures, Google tells users that it collects and sells various categories of

28  information from its account holders to serve personalized ads. This is the layperson's explanation

of RTB. That Google chose not to detail the very technical process by which it converts its users' information into advertisements in its generalized disclosures does not vitiate its consent defense.

That said, as the Court explains further below, plaintiffs' injunctive claims for future relief are distinguishable. Google represents that it can provide "personalized ads" by sharing only "non-personally identifiable information" while plaintiffs contend that Google is, in fact, sharing or selling personal information. Whether Google has done so and will continue to do so—in direct violation of its promise to account holders that it "never" has, "does not," and "will not" sell their personal information—is an objective inquiry that can be answered on a common basis, making classwide injunctive relief possible.

Accordingly, and as it did in *Brown v. Google*, the Court finds that all six damages claims implicate the affirmative defense of consent for which individualized inquiries will predominate. No. 20-cv-3664-YGR, 2022 WL 17961497, at *17–*18 (N.D. Cal. Dec. 12, 2022). For that reason, plaintiffs' motion to certify a Rule 23(b)(3) damages class is **DENIED WITH PREJUDICE.** In future briefing, plaintiffs will not relitigate this issue.

### 2. Rule 23(b)(2)

Finally, the parties dispute whether the Court should certify a Rule 23(b)(2) injunctive class.

Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." To obtain certification under Rule 23(b)(2), plaintiffs must describe "the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *B.K. v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014)).

Because Google's RTB is universal and its disclosures are generalized, the Court finds that an injunctive class under Rule 23(b)(2) is appropriate. Moreover, plaintiffs describe the general contours of the relief sought. Plaintiffs seek an order that would stop Google from sharing or selling their personal information without their knowing consent or a meaningful opportunity to opt-out.

1      Google arguments otherwise do not persuade. Google argues that plaintiffs effectively seek

2   to halt RTB. Not so. Instead, plaintiffs request an injunction ultimately seeking transparency: if the

3   evidence reveals that Google is selling personal, and sensitive, information about its account

4   holders to hundreds of RTB participants worldwide, then Google must either tell its account holders

5   or change its practice. There is evidence before the Court which already shows that Google shares

6   enough information that RTB participants can discern what an account holder is reading online,

7   even when it is on a religious or medical topic; exactly where they are reading it, including the

8   coordinates of an account holder's home or work; and their background, which allows for a

9   detailed, demographic profile of the account holder. Google cannot run away from the common

10  question of whether it promises its account holders that it would not sell their personal information

11  and, if so, it violates that promise billions of times a day.

12      To the extent plaintiffs seek transparency and opt-out procedures, Google argues that at

13  least some account holders already know it transmits certain information to advertisers or have

14  availed themselves of its settings to avoid personalized ads. In so arguing, Google misses the point

15  of the injunctive relief sought. Though the Court agrees with Google that individualized inquiries

16  will be required for implied consent, whether Google promised not to share account holders'

17  personal information is a different question. That question will be resolved on the basis of Google's

18  standardized disclosures—and therefore plaintiffs' express consent—alone. *See In re Gmail*, 2014

19  WL 1102660 at *19 (positing that for privacy claims sounding in breach of contract, only

20  contractual disclosures, not extrinsic evidence, are relevant).[18]

21      Finally, plaintiffs are not simply seeking to opt out of certain personalized ads; they are

22  requesting a mechanism to opt out of Google RTB entirely. As Google confirmed at the hearing,

23  there is currently no way for users to stop Google from selling information about their unique IDs,

24  location, and browsing history through the billions of RTB bids exchanged every single day with

25

26      [18] At the hearing, Google cited to *In re Gmail* for the opposite proposition. The Court notes
    that Judge Koh actually differentiated a breach of consent claim from, for example, a claim brought
27  under the Wiretap Act on the question of whether "implied consent should be limited exclusively to
    Google's disclosures." 2014 WL 1102660 at *19. In that situation then, express consent would
28  control. Google cites to no precedent holding otherwise.

United States District Court
Northern District of California

hundreds of RTB participants from all around the world. (Tr. 36:7–22.) The injunctive relief sought would be an important step toward choice, accountability, and transparency.

The Court therefore finds plaintiffs' motion for an injunctive relief class under Rule 23(b)(2) would be appropriate for purposes of plaintiffs' claims under the UCL and CIPA.

## V.      CONCLUSION

For the foregoing reasons, and notwithstanding the Court's rulings in favor of certain portions of plaintiffs' motion, the Court:

- **GRANTS IN PART AND DENIES IN PART** Google's *Daubert* motion against Professor Richards;
- **DENIES** as moot plaintiffs' *Daubert* motion against Google's expert Bruce Deal;
- **DENIES WITH PREJUDICE** plaintiffs' motion for class certification under Rule 23(b)(3); and
- **DENIES WITHOUT PREJUDICE** plaintiffs' motion for class certification under Rule 23(b)(2).

This terminates Docket Nos. 546, 582, and 624.

**IT IS SO ORDERED**.

Date: **April 4, 2024**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**