1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5   IN RE GOOGLE RTB CONSUMER      )  No. C 21-02155-YGR
    PRIVACY LITIGATION,            )
6   _____)

7                                  San Jose, California
                                   Tuesday, June 18, 2024
8

9    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
          RECORDING 10:18 - 11:55 = 1 HOUR 37 MINUTES
10

    APPEARANCES:
11

12  For Plaintiff:
                              Bleichmar Fonti & Auld, LLP
13                            1330 Broadway, Suite 630
                              Oakland, California 94612
                         BY:  ANNE KATHLEEN DAVIS, ESQ.
14

15                            Pritzker Levine, LLP
                              1900 Powell Street, Suite 450
                              Emeryville, California 94608
16                       BY:  JONATHAN KRASNE LEVINE, ESQ.

17  For Defendant:
                              Cooley, LLP
18                            3 Embarcadero Center
                              20th Floor
19                            San Francisco, California
                               94111
20                       BY:  WHITTY SOMVICHIAN, ESQ.

21  Transcribed by:           Echo Reporting, Inc.
                              Contracted Court Reporter/
22                            Transcriber
                              echoreporting@yahoo.com
23

24

25

*Echo Reporting, Inc.*

2

2                   P-R-O-C-E-E-D-I-N-G-S

3                        --oOo--

4         THE CLERK:  Calling Case 21-CV-02155-YGR, In Re

5  Google RTB Consumer Privacy Litigation, on for motion for

6  contempt and spoliations sanctions hearing.

7         THE COURT:  If the parties could state their

8  appearances, please, beginning with Plaintiffs counsel.

9         MR. LEVINE:  Good morning, your Honor.  Jonathan

10 Levine, Pritzker Levine, for the Plaintiffs.

11        THE COURT:  Okay.  Good morning.

12        MS. DAVIS:  Good morning.  Anne Davis, Bleichmar

13 Fonti and Auld, also for Plaintiffs.

14        THE COURT:  Okay.  Good morning.  And you can move

15 that microphone over.  I hope it reaches.  If it doesn't,

16 you may want to shift your seat, but thank you.

17    For the -- for the Defendant?

18        MR. SOMVICHIAN:  Good morning, your Honor.  Whitty

19 Somvichian with Cooley, representing Google today.

20        THE COURT:  Okay.  Good morning.

21        MR. TREVOR:  Good morning, your Honor.  Maurice

22 Trevor, also from Cooley, for Google.

23        THE COURT:  Okay.  Good morning.

24    This matter is set for hearing on the Plaintiffs'

25 motion for contempt and for sanctions.  Several portions of

3

1  the materials have been designated confidential and under

2  seal by Google, and there are administrative motions on that

3  issue.  So, I will provisionally grant Google's

4  administrative motion to seal and order the parties to

5  refrain from saying or referring to the under seal material.

6  It might be a little bit challenging, but this is a public

7  hearing, and I intend to keep it public.  So, please, don't

8  state in open court matters that are sealed.

9      My suggestion is is that for the substantive material

10 that is at issue and underlies the -- the Plaintiffs'

11 motion, I suggest we use the generic term "keys".

12     Is that acceptable to everyone?  That seems to be okay

13 in terms of what I saw in writing.  Does that work for

14 Google?

15         MR. SOMVICHIAN:  Yes, your Honor.

16         THE COURT:  The use of the word "keys" as distinct

17 from something like query ID, which is different.  Okay.

18 And that's acceptable to the Plaintiffs as well?

19         MR. LEVINE:  I was going to refer to it as the at

20 issue date of a keys issue order.  So, that's --

21         THE COURT:  At issue date is fine.  I just don't

22 want us to -- I want us to have a convention that we agree

23 on.  Okay.

24     So, I have read all of the papers, and I've gone back,

25 and it's always a pleasure to read my own orders a year

4

1  later, try to figure out what I meant at the time and

2  understood.  So, I've done that.

3      I do have some questions.  And, of course, I'd like to

4  hear from both parties, but let me start with questions for

5  the Plaintiffs.  It is the Plaintiffs' motion.  And my first

6  question is the procedural one about the timing of the

7  motion, and, you know, I -- I saw the argument and the --

8  and the response to it about Civil Local Rule 37-3, and, you

9  know, I understand the argument that the Plaintiffs are

10  making about discovery of the spoliation issue as you -- I'm

11  just going to use that shorthand, the spoliation issue, that

12  the -- the information was no longer available to be

13  produced in late February, which was after the deadline.

14  But the way I -- I read the -- the timeline here is Google

15  said no to your request to produce the keys on January 11th,

16  and -- and I'm told that there was no discovery dispute

17  submitted on this particular question about producing the

18  keys after that statement, and I know I have at least five

19  discovery disputes from that era dating back to January and

20  February of 2024 I am sorry to say and that this dispute is

21  not among them.

22      And, so, I was -- I was really -- you know, so, now we

23  have a motion for sanctions and a motion for contempt, when

24  I wonder why wasn't this just a motion to produce the

25  material that you think I ordered be produced at the time

5

1  you were told, We are not going to produce it?  Can you just

2  kind of help -- and part of this is -- the reason I'm asking

3  about this is I do have an obligation to consider the

4  availability of less drastic sanctions.  That's my

5  obligation to consider, and, so, this informs my thinking on

6  that point.

7          MR. LEVINE:  Fair enough.  So, there were ongoing

8  discussions -- as we were approaching the discovery cutoff

9  and as your Honor has just alluded to, there were a number

10  of discovery issues the parties were sort of meeting and

11  conferring about over a lengthy period of time which led up

12  to the filing of I think five different discover disputes on

13  the motion deadline, of which this wasn't one of them.

14          THE COURT:  Right.

15          MR. LEVINE:  And this stems from the request for

16  additional weeks of named Plaintiff data, and what Google

17  had -- what Google said in January was, We are producing

18  more named Plaintiff -- the weeks of more named Plaintiff

19  data.  So, that wasn't a dispute on which we needed to move

20  on.  The question was they then said as part of that

21  correspondence, But we're not giving you these two pieces.

22          THE COURT:  And are you referring to the January

23  11th --

24          MR. LEVINE:  Yes.

25          THE COURT:  -- letter?  Okay.  Which is Exhibit --

6

1  Exhibit B to the declaration of Mr. Somvichian?

2          MR. LEVINE:  Correct.  Now, what -- what's not

3  there is what was -- the parties were also engaging in meet

4  and confer discussions.  And at some point during those meet

5  and confer discussions, I do believe it -- there was a

6  question as to whether or not during those discussions

7  Google's counsel had said the data doesn't exist or not.  We

8  were not sure.

9      So, as the record reflects before the Court, we got the

10  letter on January 11th, and the next -- the very next day,

11  we asked for more information.  We said, We're not sure we

12  understand.  Is it that you're not producing -- it exists

13  and you are not producing it, in which case we have a

14  discovery dispute that we need to bring before the Court or

15  it doesn't exist and you're just not telling us.

16          THE COURT:  So --

17          MR. LEVINE:  And -- and on that --

18          THE COURT:  Um-hmm.

19          MR. LEVINE:  -- Google then again sat on its hands

20  for six weeks and didn't respond, and we didn't get that

21  response to that until late February, and --

22          THE COURT:  And is that --

23          MR. LEVINE:  -- that's what triggers the motion.

24          THE COURT:  Is that -- is that response, the late

25  February response, where is that before me?  Can you just

1   point me to that?  I know it's --

2           MR. LEVINE:  Yes.

3           THE COURT:  -- referred to in your papers, but I

4   want to make sure I have it.

5       (Pause.)

6           MR. LEVINE:  Yeah.  It's paragraph 19 of my

7   declaration.  I believe that was in the form of an email.

8           THE COURT:  Oh, okay.  So, I don't actually have

9   the underlying communication.  I have the declaration about

10  it?

11          MR. LEVINE:  That's correct, your Honor.

12          THE COURT:  Okay.  So --

13          MR. LEVINE:  I don't think there's any dispute

14  that that's the day on which we finally learned that the

15  data no longer existed, as opposed to they weren't producing

16  it.

17          THE COURT:  I think there is a dispute about that,

18  but -- but what I'm focusing on is -- is the -- the very

19  last paragraph of the January 11th letter that we've been

20  talking about.  This is, again, Exhibit B where it seems

21  pretty clear, and it's the sentence that begins -- the

22  second sentence, the "To the extent Plaintiffs are

23  referring" sentence, it says "Google will not produce any

24  such keys.  Plaintiffs have not explained why they need this

25  information, particularly in light of the data that's

1  already been produced -- I'm paraphrasing -- and the

2  additional data Google is committing to produce.

3       So, it seemed pretty unequivocal that they just said

4  no, because we don't think it's relevant and you haven't

5  explained why it's relevant.

6       So, I -- that's why, again, I'm back to that seemed

7  like a pretty harsh no.

8            MR. LEVINE:  Because you have to remember the

9  history of the case, which is that Google has throughout

10 this case opposed producing documents, making the exact same

11 argument, only to later say when the Court finally says,

12 Enough, you need to produce it, then they say, Oh, by the

13 way, we don't have it.  We destroyed it.

14           THE COURT:  Okay.  But at this point, they weren't

15 saying, We've investigated whether we have it or we don't

16 have it or we -- it's long gone or any of those things.

17 They were just saying, We're not going to produce it.  At

18 which point could you not have come to me and said -- and

19 maybe this is still a possibility, which is why I'm pressing

20 on it -- could you not have come to me and said, We need

21 this.  Here's why.  They're refusing to produce it, and it

22 could be part of the pile?

23           MR. LEVINE:  Well, we -- we -- before we -- we

24 didn't know what motion to file.  We didn't --

25           THE COURT:  Why not a -- a motion that says, We

1  need this.  You have refused to produce it.  You have to

2  produce it now?

3           MR. LEVINE:  I -- because we -- because you can't

4  look at January 11th without looking at January 12th and

5  what follows, which is we had ambiguity on our side as to

6  whether or not they weren't producing it because it existed

7  and they were refusing, which is a motion to compel versus

8  they were lying to us again about the existence of this

9  data, and it was destroyed, in which case, it's a spoliation

10  sanctions motion, and we've learned that it was destroyed.

11  So, a motion to compel would have been yet another waste of

12  our time and the Court's time, just like it was last time

13  when we had motion after motion after motion, which led to

14  your Honor finally ordering them to produce stuff.  And only

15  then did they say, Oh, well, by the way, none of it's

16  existed.  It hasn't existed at all.  It was all a waste of

17  time.

18           THE COURT:  Well, there -- I mean, there -- there

19  are literally two different things.  If you are entitled to

20  the production, that's one thing.  And if there is

21  information that hasn't been produced that you were entitled

22  to have, then that's a problem.  If you're not entitled to

23  the production, then whether they've not preserved it or

24  destroyed it after the fact or whatever, I'm -- I'm not sure

25  that it doesn't matter because, you know, candor to the

1  Court is always an important thing, and that's one of the

2  themes of your briefing.  But it's certainly less

3  significant if you weren't entitled to it in the first

4  place.  So, that's why I'm -- I am still just puzzled by the

5  timeline, the sequence of events.

6          MR. LEVINE:  Because there was ambiguity -- first

7  of all, they haven't made the production.  So, the

8  underlying production that's referred to in January isn't

9  made until after the discovery cutoff.  So, we didn't have

10 anything.  And we were hesitant to be filing a motion to

11 compel when (a), we had already just sent another letter

12 continuing -- the meet and confer process was still ongoing.

13 We were -- we were -- we were not satisfied with this

14 response.  We didn't know what they were producing.  We

15 specifically reserved rights on this in other motions we

16 filed.  We alerted the Court that as of the discovery cutoff

17 and the motion deadline, that the named Plaintiff data

18 wasn't yet produced and there were issues, and we were still

19 trying.  It is just -- it is not our fault that Google took,

20 you know, till January 11th to respond to a request made two

21 months earlier, and it is not Plaintiffs' fault that Google

22 then in response to a letter simply saying one question,

23 Does the data exist or did you destroy it -- that's the

24 question on January 11th -- 12th.  It took Google 55 days to

25 answer that question.

1        THE COURT:  Okay.  I --

2        MR. LEVINE:  That is not our fault.

3        THE COURT:  I -- nobody's suggesting it's --

4        MR. LEVINE:  Well, I think --

5        THE COURT:  -- anybody's fault.

6        MR. LEVINE:  -- Google is.  I think Google is --

7        THE COURT:  Okay.  Well, I -- but --

8        MR. LEVINE:  -- saying our motion's untimely.

9        THE COURT:  Okay.  No -- well, they're saying the

10   motion's untimely.  They're not I think trying to justify --

11   I mean, they do respond to your critique, but I don't think

12   that untimeliness is -- Google's not trying to sort of

13   defend against that issue by pointing out that it's your

14   fault that they took two months to respond to your inquiry.

15   That's not how I viewed the papers, and I wouldn't credit

16   that as a justification.  So, just to kind of put that to

17   the side, I don't -- I don't think that's the issue.  What

18   I'm -- let me just kind of see if I can close the loop on

19   this concern, which is the premise of the motion for

20   sanctions and for contempt is that there was a clear order

21   requiring production of this information.  I mean, you get a

22   letter that says, We are not producing it.  I wonder what

23   additional meeting and conferring you felt was in order at

24   that point, because if it's clear, it's clear, right?

25        MR. LEVINE:  But, as it turns out, we were right

12

1  to meet and confer because the answer was the meet and
2  confer would have been useless because the data didn't
3  exist.  I mean, that's why we were -- that's why we were
4  still meeting and conferring because the history of this
5  case is we get what I'll call a squirrely letter like this
6  from Google all the time, and you always have to ask more
7  questions, and that's why we -- the next day -- this came in
8  in the afternoon.  The next day, we -- we said, We don't
9  understand what you're saying.  Are you saying -- this is a
10 very carefully written letter, you know, and given the
11 history, particularly of this dispute already and the
12 testimony of the corporate witness that was conducted in
13 late October, we had questions.  And -- along with the
14 ongoing meet and confer.  We had questions that we needed
15 answered, and we were right to do that because we would have
16 filed the wrong motion ultimately.  Had we just gone ahead
17 and filed the motion, we would have, again, gone down the
18 road and had a hearing or maybe this motion would still be
19 pending, only to learn at the end of that process, Oh, by
20 the way, it doesn't exist.  You filed the wrong motion.
21         THE COURT:  But their -- their response to your
22 motion for sanctions and contempt isn't just, Well, it
23 doesn't exist anymore.  Oh, well.  It's that they don't
24 think that I ordered them to produce it in the first place,
25 which we'll get to, but that issue, that dispute is one that

1  I kind of wish had been surfaced earlier.

2       MR. LEVINE:  Well, that's 37(b).  That's the --

3  the contempt of the court order.

4       THE COURT:  Um-hmm.

5       MR. LEVINE:  But we've also moved under 37(e) --

6       THE COURT:  Um-hmm.

7       MR. LEVINE:  -- and Rule 16 and the Court's

8  inherent authority, which simply go to fundamental, that

9  exists in every single litigation, regardless of your

10 Honor's orders, obligations to preserve relevant evidence.

11      THE COURT:  Well, that is -- that is something I

12 wanted to ask you about.  So, let me -- let me to go to that

13 issue because there are these two strands in the -- in the

14 motion, and I wanted to make sure I understood the argument.

15 So, there is the argument that there has been a violation of

16 my discovery orders, particularly the orders at Docket 47

17 and 510.  Those are the two orders at issue.

18      MR. LEVINE:  Correct.

19      THE COURT:  And then there is additional argument

20 about -- under Rule 37(e) about failure to preserve.  And

21 the question there, if I'm understanding the Plaintiffs'

22 position correctly, is whether independent of my orders

23 there was an obligation to preserve this information and, if

24 so, what is its source, right?  So, that's the -- that's the

25 issue.  And then there's the things you have to establish

14

1    for the particular sanctions, a remedy that you're asking,

2    the prejudice or the intent under (e)(1) or (e)(2).

3         Is that -- is that a fair sort of summary of the

4    Plaintiffs' argument there?

5              MR. LEVINE:  Yes.

6              THE COURT:  Okay.  So, if we were to focus --

7    well, I do want to cover all the orders, but let's focus on

8    the things that don't have to do with my order, because that

9    was what you were referring to just now.

10        So, if you were to clarify for me or to crystalize for

11   me what the argument is about what gives rise to the

12   preservation obligation independent of my orders, what would

13   that be?

14             MR. LEVINE:  Well, the -- the clearest example I

15   would give is we make a request in November for four weeks

16   of data for 2023.  One of those weeks, the last week, is

17   that -- that week, that -- the end of September that flows

18   into early October.

19             THE COURT:  Um-hmm.

20             MR. LEVINE:  That data -- at the -- at the moment

21   of that request -- so, we say we want four more weeks of

22   data and we specifically say we want -- we want all the, you

23   know --

24             THE COURT:  The keys.

25             MR. LEVINE:  -- the keys.  Whether Google agrees

15

1  with that or not separately, it's been requested by the

2  party in the litigation, and you have to look at it in

3  context of sort of the disputes that have come before.  And

4  you do have to look at, you know, your Honor's prior orders

5  which address these issues, but --

6           THE COURT:  That's what I was worried about is

7  the --

8           MR. LEVINE:  That's the --

9           THE COURT:  Yeah.  Okay.  Go ahead.

10          MR. LEVINE:  No, not -- not necessarily, because

11 simply -- the simple answer is the -- the Plaintiff

12 requested data that includes the keys and specifically

13 called it out.  As of the date of that request on November

14 17th, it is undisputed that the last week of data that's

15 requested is within the retention window.  It exists.  On

16 November 17th, that data for that week exists.  No one says

17 it doesn't.  It's within the ordinary course of business

18 retention period for that data.

19          THE COURT:  Okay.  And, so, let me just make sure

20 I'm following you.  So, I'm looking at paragraph 12 of your

21 declaration.

22          MR. LEVINE:  Okay.

23          THE COURT:  Which says, On November 17th,

24 Plaintiffs requested that Google produce four additional

25 weeks of new Plaintiff data from 2023 pursuant to the

16

1  Court's April 14th, 2023 order.  The four weeks requested

2  were -- and then you --

3          MR. LEVINE:  Correct.

4          THE COURT:  -- list them.

5          MR. LEVINE:  That's a different order, though.

6  That's not the order --

7          THE COURT:  I know, but you're -- I know which

8  order you're referring to.  I went back and printed them all

9  out.  But -- but you're tying it to an order.

10         MR. LEVINE:  Well, Google agreed to produce the

11 data.  So, that's not a dispute before the Court.

12         THE COURT:  Right.  No, no, no.  I know -- I know

13 that, but you're tying it to an order that doesn't specify

14 the particular things that need to be produced.  It's the

15 order resolving the weeks of data, whether it's 12 or 8 or

16 whatever.  I did a --

17         MR. LEVINE:  Correct.

18         THE COURT:  I did an order resolving that dispute.

19 Okay.  So --

20         MR. LEVINE:  And we're not saying that Google

21 violated that order.

22         THE COURT:  Right.  I understand.  So, then this

23 November 17th request, was that also in an email?  Was that

24 by phone?  I -- I don't think I have the actual request in

25 front of me.

17

1          MR. LEVINE:  We were -- I think we were trying to

2    not overwhelm the Court with information.  It's a letter.

3          THE COURT:  Okay.

4          MR. LEVINE:  It's a -- it's a -- it's a letter.

5          THE COURT:  Okay.  Could I -- could I have a copy

6    of that letter?

7          MR. LEVINE:  Sure.

8          THE COURT:  Just so that I have a complete picture

9    here.  We are well beyond overwhelming the Court with paper

10   in this case.  So, I would say please just file it

11   supplement -- as a supplemental submission.  If it needs to

12   be under seal in whole or in part, you can attend to that.

13         MR. LEVINE:  We'd be happy to do so.

14         THE COURT:  If you could just do that so I have

15   that record.  And I don't think that's in the opposition

16   papers either.  So, okay.

17      So, the -- so, the argument is that there -- for --

18   under Rule 37(e), that there was a request from the

19   Plaintiffs that should have triggered the preservation

20   obligation at the very latest by November 17th, 2023?

21         MR. LEVINE:  That's correct.

22         THE COURT:  Okay.

23         MR. LEVINE:  Whether -- whether Google agrees with

24   what we've asked for, it's -- it's been requested by a party

25   in the litigation.

18

1          THE COURT:  Okay.  All right.  And then -- then

2  you get the -- the next response to that is the January 11th

3  letter authored --

4          MR. LEVINE:  Which is, coincidentally, a few days

5  after the --

6          THE COURT:  Okay.

7          MR. LEVINE:  -- retention period has expired.

8          THE COURT:  Okay.  So, now --

9          MR. LEVINE:  So --

10         THE COURT:  So, I think I understand the -- the

11 timeline, although it was at some -- sometimes confusing to

12 know whether the Rule 37 request for sanctions necessarily

13 depended on one or both of my orders.  That's the part that

14 I was not clear on from the papers.

15         MR. LEVINE:  Not for the 37(e).  I mean, I think

16 37(e) is --

17         THE COURT:  Okay.

18         MR. LEVINE:  Google has an independent obligation

19 to retain relevant evidence, and it doesn't get to decide

20 what it thinks is relevant.  And the -- we have requested

21 it.  If Google -- you know, if Google wanted to destroy that

22 evidence, it should have -- you know, it's -- self-help is

23 not allowed.  That's the --

24         THE COURT:  Right.

25         MR. LEVINE:  -- answer.  Self-help isn't allowed.

19

1  It wasn't for Google to decide, You know what?  We don't

2  think it's relevant.  So, we're just going to go ahead and

3  just destroy it.  They should have either asked -- come back

4  to us and said we're going to do this or, you know, short

5  reconsideration or -- or -- or something.  But the answer is

6  to simply not maintain it.

7           THE COURT:  Well, so, to be clear, we're talking

8  about something that is, as a business process, deliberately

9  not retained for longer than 90 days.  That -- that's a

10 business process that you say should have been suspended.

11          MR. LEVINE:  Absolutely.

12          THE COURT:  Okay.  So, that's the -- that's the

13 thing.  And it -- what I'm trying to figure out is that we

14 all knew it wasn't suspended as of my order.  We all knew

15 that the process was continuing as of my I think May order.

16 And I have to say that that May order was probably the first

17 time that I appreciated the -- what the Plaintiffs were

18 asking, right, because if I look at the -- and let's just do

19 this now because I did print them all out.

20     The order that's dated in April, April 14th, I used the

21 term, which was not under seal, "joining keys".  And the way

22 I read my own order, my concern was making sure that the

23 Plaintiffs -- the Plaintiffs received productions from

24 Google that they could correlate between initial productions

25 and subsequent productions.  So, I was concerned about

20

1 Google producing documents from multiple different data
2 sources in a way that cannot be easily matched out based on
3 this query ID, and I wanted to make sure that that was not a
4 problem for the Plaintiffs, and that's what I think this
5 order was about when I used the term "joining keys". That's
6 how I read it.

7      And then I look back at -- I look forward, rather, at
8 the -- the order on May 16th where, again, the reference is
9 to joining keys. But I think this is the point where I -- I
10 understood that there was a different focus or additional
11 focus or now -- I -- anyway, I have a paragraph where I -- I
12 say from the parties' presentations at the May 16th hearing,
13 the Court now understands the following. And then I
14 summarize what I understand is the Plaintiffs' position
15 about these various things. And the second paragraph is:

16                "With respect to joining keys, the
17           Court understands the Plaintiffs used
18           this term to refer to."

19      And then -- and then I acknowledged that Google has
20 said it maintains no such keys, at least as of that time.
21 But at the end of this order, I asked the parties to file a
22 joint report, to report back to the Court, to go investigate
23 what's available, and then I get your joint report, and it
24 says -- it says what it says. Some of it's under seal. But
25 still working on it, and Plaintiffs reserved their rights.

21

1  And then I don't hear anything else.

2      So, I -- I'm not sure that I actually ordered what you

3  say I ordered.

4              MR. LEVINE:  Well, you have to --

5              THE COURT:  So, help me understand because I'm --

6  I'm honestly trying to reconstruct things, and I --

7              MR. LEVINE:  It is.  So, you have to -- you have

8  to look at the distinction between the past data and the

9  future data.

10             THE COURT:  Yeah.  No, I understand that.

11             MR. LEVINE:  So, at this point in time, the only

12 data that the parties are discussing and -- and what we're

13 working through and what the status report reflects is -- is

14 '21 and '22 data that Google already produced.  It already

15 said this data doesn't exist for -- and what the Court --

16 what we interpreted the Court was trying to do is to say,

17 well, how best can you sort of -- understanding that the

18 specific keys don't exist, how best can you -- can you

19 provide the information Plaintiffs need.  But that's looking

20 backwards --

21             THE COURT:  Right.

22             MR. LEVINE:  -- for the '21 and '22 productions.

23 We weren't discussing at this point, because we hadn't made

24 the request yet, the '23 data which we -- which we hadn't

25 asked for yet.

22

1          THE COURT:  But you're relying on my -- so, this,
2   again, is exclusively about the 37(b) --
3          MR. LEVINE:  Right.
4          THE COURT:  -- part of your motion, not 37(e).
5   So, let's just acknowledge that.  You're -- you're telling
6   me that they violated an order which you've just now
7   characterized as concerning past data.  So, I --
8          MR. LEVINE:  No.
9          THE COURT:  -- I am really -- I'm really
10  struggling to understand how this works.
11         MR. LEVINE:  Because the -- well, the Court's
12  order was both retrospective backwards looking and forwards
13  looking, and it's -- it goes both ways.  But at this point,
14  when we filed the status conference report that your Honor's
15  just referring to -- and I'm addressing that -- where we --
16  where we advise the Court, that is only talking about
17  backwards looking.
18         THE COURT:  Okay.  So --
19         MR. LEVINE:  So, the way -- here's how we read the
20  order.
21         THE COURT:  All right.
22         MR. LEVINE:  We read your Honor's orders
23  collectively as saying, Look, I understand what's the -- I
24  understand what's happened in the past.  See if you can fix
25  it.  However, all future productions need to include this --

23

1  this data is important, and you -- you are to make efforts

2  to include this information in all future productions.

3          THE COURT:  Okay.  Can I ask you to tell me what

4  text in my order says that?

5          MR. LEVINE:  Sure.

6          THE COURT:  And -- and, again, be sensitive to the

7  under seal part because I don't want you to read it out

8  loud.  You can --

9          MR. LEVINE:  That's fine.

10         THE COURT:  You can even refer to page and line

11 number if you prefer, and tell me which order, if it's 510

12 or 487 or both.

13         MR. LEVINE:  So, in -- on page 7 of 487, it's sort

14 of the last paragraph before the conclusion.

15         THE COURT:  Right.  But that reference to joining

16 keys, that one?

17         MR. LEVINE:  Yeah.

18         THE COURT:  Okay.

19         MR. LEVINE:  "The Court expects

20             that it will do so, including remedying

21             its prior productions that omits this --

22             this information."

23     And then it says:

24             "Must take care that all of its

25             productions of named Plaintiff data."

24

1      So, that's not just past productions.  It's all

2  productions.

3           THE COURT:  But if you look at the paragraph that

4  precedes that reference, this is the problem I was talking

5  about earlier is I was understanding joining keys as

6  something different.  I'm pretty sure, again, trying to

7  reconstruct my understanding from a year ago and what I

8  meant when I wrote what I meant -- what I wrote here, I was

9  worried about the matching up problem.

10          MR. LEVINE:  That is in the joining keys.  That --

11  your Honor got it right in these orders in terms of

12  describing what these keys do, in both orders.

13          THE COURT:  Yes, but the -- matching up

14  productions is different than what -- and -- and let me just

15  -- let me just see if I can characterize the issue, and this

16  has to do with the failure to preserve and produce

17  information, and it goes to the question of prejudice and

18  the justification for evidentiary sanctions.

19      The Plaintiffs are concerned about Google's failure to

20  preserve and produce information that allows the

21  coordination of certain data, certain Google account

22  information for signed-out Google account holders, right?

23  That's the -- that's the real -- because there's other

24  things that you have for signed in.  So, it's for the

25  signed-out Google account holders that you need to be able

25

1   to connect stuff that's encrypted with the GAIA ID, which I

2   think I can say out loud, right, GAIA ID, yes?

3                MR. SOMVICHIAN:  Yes.

4                THE COURT:  Okay.  Is -- is that -- that's the nub

5   of the -- the information that you're missing, that you

6   think they should have produced per my orders, right?

7                MR. LEVINE:  Correct.

8                THE COURT:  That's -- that seems to me to be

9   different from make sure that production on day one can be

10  correlated on a user specific basis with production on day

11  10 or day 110, as the case may be, you know, in terms of all

12  of these tranches of data from these different data sources

13  that were specific to each named Plaintiff and you wanted to

14  be able to make sure they all -- you could tell which data

15  went with which named Plaintiff.  That's what I understood

16  the problem was, at least as of the April 14th order.

17               MR. LEVINE:  That's -- no.  The -- you have to go

18  back to our claims.  I mean, you have to look at what --

19  what is it we need to prove to prevail on our case, what --

20               THE COURT:  I know.

21               MR. LEVINE:  Okay.

22               THE COURT:  I -- I know that now, but I'm not sure

23  I ordered that.

24               MR. LEVINE:  But I -- but we -- you did.  I mean,

25  that's -- your -- your orders address the -- the two orders

1   together --

2           THE COURT:  Okay.

3           MR. LEVINE:  -- address the issue and the concerns

4   that the Plaintiffs had.  That's how we read them.

5           THE COURT:  Okay.  Well, I didn't give you a

6   chance to tell me the part of the order at 510 that you

7   are --

8           MR. LEVINE:  I think, again, it's -- you know, I

9   think it's -- well, this is more specific, and it really

10  talks about the whole thing.  So, even though it really is

11  all of the order, but it's certainly that -- the end of the

12  order where, after the Court acknowledges that Google has

13  admitted that doesn't have the keys for '21 and '22, then it

14  goes on and tells, you know, Google, for all sample named

15  Plaintiffs' data what the parties are supposed to do in

16  terms of further productions.  And we understood -- remember

17  the Court's -- you -- you have to look at it also, on top of

18  that, the Court has also said, And you get four more weeks

19  of new data.

20          THE COURT:  Um-hmm.  Right.

21          MR. LEVINE:  So, you -- you put all that together,

22  and at the very least -- and this goes to 37(e) -- at the

23  very least, by May 16th, Google knows the following.

24  Plaintiffs are going to ask for four more weeks of data --

25          THE COURT:  Um-hmm.

27

1          MR. LEVINE:  -- at some point before the discovery

2   cutoff, and it has to include this information that the

3   Court has ordered to be included in -- in any further

4   productions of data.

5       And, you know, the keys are -- are mentioned throughout

6   those orders.  The idea that Google was not aware that keys

7   are at least an issue and relevant in the case at that

8   point, it's just inconceivable, and that's why -- that's why

9   it's our position that Google didn't need to wait for us to

10  then serve a request that said, Hey, we want these weeks.

11  Google had an obligation as of that date to suspend whatever

12  its ordinary practice was.

13          THE COURT:  Okay.

14          MR. LEVINE:  And it violated these courts' orders

15  by not doing that at that point.

16          THE COURT:  Okay.

17          MR. LEVINE:  And you have to -- you have to look

18  at -- it's not simply a matter of whether we can -- the

19  Plaintiffs can -- can correlate data in a way that Google

20  has manufactured for this case.

21          THE COURT:  The query ID?

22          MR. LEVINE:  That's a manufactured term.

23          THE COURT:  But that's what you're referring to

24  right now?

25          MR. LEVINE:  Yes, but it is manufactured by Google

28

1  the -- to get around producing the information the way it's
2  maintained in the ordinary course of business at Google, and
3  you have to look at what is the element of our case we're
4  trying to get to there, and it's the violation of Google's
5  contractual promise to its clients, which underlines every
6  single one of our claims.
7           THE COURT:  So, I understand what you're saying
8  now, and it sounds like very reasonable that you would need
9  this information potentially.  Maybe I'll be told there's,
10 you know, other ways for you to have this information but
11 that it can be a very useful tool.  I'm not sure I
12 understood it back here, and maybe it's my fault, but I'm
13 not sure I understood it before the May 16th order.  And
14 then after the May 16th order, I got a status report that
15 said, We're working on it.
16     And, so, if I understand you correctly, maybe the most
17 powerful argument you have is that by that time, independent
18 of any order to produce, at the very least, Google should
19 have known that this was a relevant and -- you know, a
20 relevant piece of data that should have been preserved and
21 should have required the suspension of its regular data
22 retention policy.
23           MR. LEVINE:  Absolutely.
24           THE COURT:  Okay.
25           MR. LEVINE:  And then if you look at the last week

1    in particular, there's just no excuse for that last week.

2            THE COURT:  The last week?

3            MR. LEVINE:  The September week.  There's just no

4    excuse for -- for the September week --

5            THE COURT:  Oh, for not --

6            MR. LEVINE:  -- because that data existed when the

7    request was made.

8            THE COURT:  In -- in November?

9            MR. LEVINE:  Correct.

10           THE COURT:  Okay.

11           MR. LEVINE:  But -- but we -- I'll push back on

12   the notion that your Honor didn't understand this earlier,

13   because -- no, and here's why.  I think if you go back and

14   look at the May 16th transcript --

15           THE COURT:  The hearing transcript?

16           MR. LEVINE:  -- we have the same discussion at May

17   16th, before this order was issued, and I think your Honor

18   -- we -- said the same thing, which is at that time, I

19   didn't understand it, but now I do.  And -- and I think --

20           THE COURT:  Yeah.

21           MR. LEVINE:  -- we had the same conversation as to

22   why we need this data, and it's not simply a matter of

23   correlating it --

24           THE COURT:  Right.

25           MR. LEVINE:  -- through some ginned up thing that

30

1  Google --

2          THE COURT:  Yes.

3          MR. LEVINE:  -- manufactured for this case.  It's

4  the underlying ability to reasonably associate the data.

5          THE COURT:  I agree with you, and I think that's

6  reflected in the order is that that was the first time I --

7  I understood the argument.  My push back is I'm not sure I

8  ordered them to do it without further investigation, meeting

9  and conferring, reporting back to the Court, and that's the

10 challenge for your 37(b) argument is did I order it as

11 opposed to say, Ah, no, I get there's -- there are two

12 different things that can be joining keys.  I understood it

13 to be one way, correlating productions, and now there's this

14 other thing that is actually, you know, an internal piece of

15 data maintained by Google, all right, which is a thing we're

16 not talking about.

17     So -- so, that's the thing that you are missing and you

18 think I ordered, and I'm just saying, Ah, I'm not sure I

19 did.

20         MR. LEVINE:  Well, that's why we think we still

21 prevail under 37(e).

22         THE COURT:  Okay.  Thank you.

23         MR. LEVINE:  For -- yeah.

24         THE COURT:  That's helpful -- for thinking about

25 the -- the issue.

1          MR. LEVINE:  Or Rule 16 or the Court's --

2          THE COURT:  Yeah.

3          MR. LEVINE:  -- inherent authority obviously.

4          THE COURT:  Right.  Right.  Okay.  So, it's

5  important to, I think, distinguish between those two

6  arguments.

7      Let me ask about the remedy that you're asking for, the

8  sanctions remedy, and let me -- so, I want to focus for the

9  -- for the moment on the evidentiary sanction request

10  because, as I read it -- now, I have this -- this

11  declaration of Miju Han (phonetic), which gives a, to my

12  mind, pretty clear explanation of how the keys are used.

13  And, as I read the Plaintiffs' motion, my interpretation is

14  that the evidentiary sanction that P's are seeking, that

15  Plaintiffs' are seeking, is an order that would prevent

16  Google from presenting -- presenting evidence that would

17  include the evidence in the Han declaration.  So, I think

18  your evidentiary sanction is perhaps broader and more

19  affirmative, as in must assume and must tell the jury X

20  happens and would -- but would necessarily prevent Google

21  from introducing evidence such as what's in the Han

22  declaration, and I want to just make sure that I understand

23  the scope of the evidentiary sanction the Plaintiffs are

24  asking for correctly.

25          MR. LEVINE:  So, I -- what I would say is I --

32

1  without getting into specifics because it's under seal, but

2  the Han declaration is contrary to the testimony of Google's

3  corporate deponent, which we submitted, about --

4          THE COURT:  Okay.  And that's testimony you have?

5          MR. LEVINE:  And it's before the Court.

6          THE COURT:  Mr. -- Mr. --

7          MR. LEVINE:  We -- that's the --

8          THE COURT:  Doctor Bernsten (phonetic)?

9          MR. LEVINE:  Yes, and that's the testimony we

10  submitted about the importance of the -- of the keys in

11  terms of the data flow.

12          THE COURT:  Okay.

13          MR. LEVINE:  This -- this declaration is

14  inconsistent with our understanding and our expert's

15  testimony in class certification as to data flow and data

16  logging at Google, and it's contrary to Doctor Bernsten's

17  corporate testimony --

18          THE COURT:  Okay.

19          MR. LEVINE:  -- which was taken at the very end of

20  October.

21          THE COURT:  So, if you have the corporate

22  testimony --

23          MR. LEVINE:  We do.

24          THE COURT:  -- and you can use that at trial,

25  then, again, I'm still trying to understand the scope of the

33

1  evidentiary sanctions request because you -- you would say,

2  Look, we have this.  Is it that you're not in a position to

3  test and rebut with additional information the evidentiary

4  showing that Google might make if it sort of is along the

5  lines of what's in the Han declaration?  Is that the issue?

6            MR. LEVINE:  It's -- how would I describe it?  The

7  best evidence of Google's practices has been destroyed, of

8  what Google does in the ordinary course of business, which

9  is -- which we believe if it had been produced, directly

10  squares with the violations of the contract, and that's why

11  Google's --

12            THE COURT:  Okay.

13            MR. LEVINE:  -- fought so hard to not produce it.

14  There is a direct -- if -- if that data was produced as we

15  understand it now finally, to be maintained and logged at

16  Google, it would show not only that Google is reasonably

17  capable of linking or associating this data but that it does

18  in the ordinary course of business.

19            THE COURT:  Okay.  So --

20            MR. LEVINE:  In unencrypted, in -- in a form that

21  Google can easily link the data for all users.

22            THE COURT:  Okay.

23            MR. LEVINE:  Signed in or signed out.

24            THE COURT:  And you believe that because of the

25  testimony you obtained from the corporate representative or

34

1  because of --

2          MR. LEVINE:  And from -- and from internal Google

3  documents and from work our experts have done in connection

4  with class cert but ultimately merits also but --

5          THE COURT:  Okay.  So -- so, here's -- here's what

6  I'm getting at.

7          MR. LEVINE:  Yeah.

8          THE COURT:  You have all of that, and then you're

9  asking for an evidentiary sanction that would essentially

10  preclude Google from rebutting that with any explanation or

11  qualification or say, No, actually, what we do is what's in

12  the Han declaration.  It's not in the way that you describe?

13  I mean, what -- what is the goal here?

14          MR. LEVINE:  I mean, the goal here is to pre -- I

15  mean, our -- our view is Google has concocted a defense that

16  doesn't exist in the real world, which is that there's no --

17  that there is no -- and that's what's sort of reflected in

18  the Han declaration, which is there's no actual way to

19  associate or link this data.  You can't get from A -- you

20  can't get from here to there.  And, in fact --

21          THE COURT:  What they say is they take steps to

22  make sure that it doesn't happen.  Even though the

23  potentiality could exist, they take steps so that it doesn't

24  happen --

25          MR. LEVINE:  But --

35

1          THE COURT:  -- right?

2          MR. LEVINE:  -- that's what the data would show is

3    that it does happen --

4          THE COURT:  Okay.

5          MR. LEVINE:  -- and it happens all the time as an

6    ordinary course.

7          THE COURT:  So, and is it -- is it -- kind of

8    going back to my earlier question, is it about signed out

9    Google account holders only or broader than that?

10          MR. LEVINE:  I think the answer is it's actually

11    everyone, but it's primarily the concern is for the signed

12    out users because we're reliant on that piece of data which

13    we don't have.

14          THE COURT:  Okay.

15          MR. LEVINE:  For signed in users, there are

16    multiple ways in -- obviously, they're signed in.  They're

17    associated.  But it's really for signed out users that its

18    the most significant issue in the case, which is the piece

19    -- there's a piece of this linkage that's been severed

20    intentionally as a result of this conduct.

21          THE COURT:  And is the problem at least -- let me

22    just put it this way.  Is the -- the Plaintiffs -- the

23    Plaintiffs need this information to demonstrate that the

24    information in question is personal information under the

25    contract and the statute or -- or and/or is it to establish

36

1  damages, scope of injunction?  What -- I'm -- because it

2  seems to me like you're kind of already there on the

3  personal information argument.  I'm not entirely sure that's

4  been resolved, but I read the class cert order, and that

5  didn't really seem to be a problem.

6          MR. LEVINE:  But, remember, for the named

7  Plaintiffs so far, we only have signed in information.

8          THE COURT:  I see.

9          MR. LEVINE:  We don't have signed out information.

10          THE COURT:  I see.

11          MR. LEVINE:  So -- so, you know, Google is going

12  to be producing class-wide data.

13          THE COURT:  Got it.

14          MR. LEVINE:  And, you know, we may have -- we're

15  going to have the same issue on a class-wide basis.  Google

16  never produced -- and it's not clear our clients were ever

17  signed out -- but never looked for or produced signed out

18  information for the named Plaintiffs.

19          THE COURT:  Okay.

20          MR. LEVINE:  So, that issue was never before -- up

21  till now at least, has not been before the Court.

22          THE COURT:  Got it.  Okay.  That was -- that was

23  kind of -- kind of my suspicion, because it hasn't

24  crystalized as it is right now, at least in my

25  understanding.

1     So -- so, again, getting to what's the right remedy, if
2  there is a violation or even if there's not a violation --
3  and this is where I'm going with this as a practical issue.
4  So, we still have the ongoing whatever.  Can this be fixed,
5  the problem, the need for evidentiary -- the right evidence
6  be fixed given that there is still discovery happening and
7  would be after class cert as well with respect to the class?
8  Could we not fix this by saying, Okay, let's actually
9  suspend for these weeks and -- and just let's, you know, for
10 lack of a better word, do it right this time from the
11 Plaintiffs' perspective.  Would not that be an appropriate
12 remedy instead of a jury instruction which, frankly, that
13 would be up to Judge Gonzalez Rogers, an evidentiary
14 sanction probably also up to Judge Gonzalez Rogers in the
15 end, despite whatever recommendation I might make?  You
16 know, I'm just wondering, since I have to consider less
17 drastic sanctions --
18           MR. LEVINE:  And, your Honor, we did --
19           THE COURT:  -- would that be a solution?
20           MR. LEVINE:  -- in footnote -- let me just find it
21 -- footnote nine, page nine of our opening brief --
22           THE COURT:  Yes.
23           MR. LEVINE:  -- we did -- we did suggest a
24 possible alternative, a less -- a less -- a lesser
25 alternative than a sanction, which would be to order -- as

38

1  you said, to order Google.  But it would have to be, you

2  know, within the last 90 days, frankly.

3          THE COURT:  Right.  No, I understand that.  And,

4  but, you know, you -- this footnote nine was not as a

5  solution but as a critique of Google's behavior.  So, that's

6  how I read it is like you could have done this, but you

7  didn't.

8          MR. LEVINE:  And --

9          THE COURT:  So, and I don't know if you asked for

10 it, but they didn't offer.  So --

11         MR. LEVINE:  Well, we didn't because we're not

12 sure it's a -- it's -- we're actually -- we have concern --

13 or we suggested it that, Look, if -- you know, if it's 90

14 days, give us -- you know, give us something from the last

15 90 days that has this data, you know, still maintained, you

16 know, and produce it.  It must exist.  It's within 90 days.

17         THE COURT:  And -- and --

18         MR. LEVINE:  The problem with that is we don't

19 know -- we're now -- you know, the data we have right now is

20 from '21 and '22.

21         THE COURT:  Right.

22         MR. LEVINE:  We're getting some '23 data.

23         THE COURT:  Okay.

24         MR. LEVINE:  And we're getting some class-wide

25 data.  We've gotten the' 23 data, I'm sorry.  But we're

39

1   getting some class-wide data.  But we don't know whether any

2   practices or -- or policies or procedures -- we haven't had

3   discovery of '24.  So, if we get discovery -- if we get a

4   new set of Plaintiff data or class data from '24, we don't

5   know whether we're going to have to sort of open discovery

6   to find out whether any of the underlying business

7   practices --

8               THE COURT:  Have changed, right.

9               MR. LEVINE:  -- changed or any -- any data logging

10  has changed, because, otherwise, it creates problems for us

11  because now we have a different set of data, and Google's

12  going to then say, Ha, ha, look.  The data's different.  You

13  know, so, that's the concern we have.

14      Now, you could address it through more discovery, which

15  obviously is not the be all and end all, but one solution is

16  to order Google to produce several weeks of data within the

17  last 90 days on both a class-wide basis subject to the

18  parameters the parties have agreed to and for the named

19  Plaintiffs.

20              THE COURT:  So, right now, the current -- the

21  current effort is limited to signed in class members or

22  Plaintiffs only?

23              MR. LEVINE:  Well, the named Plaintiffs we only

24  got signed in information.

25              THE COURT:  Okay.

40

1          MR. LEVINE:  Google never looked for signed out

2  for the named Plaintiffs.

3          THE COURT:  And, so, what are you doing now?

4          MR. LEVINE:  Now we're going to -- now we're

5  waiting for the class-wide discovery --

6          THE COURT:  Okay.

7          MR. LEVINE:  -- which is being -- which is

8  different, because the way Google's looking for that is

9  different, is this class wide?  It's time -- it's time

10 segment snapshots.

11         THE COURT:  Okay.  So, samples still?

12         MR. LEVINE:  It's still sampling.

13         THE COURT:  Okay.

14         MR. LEVINE:  Everything's sampling.

15         THE COURT:  Okay.

16         MR. LEVINE:  Its six 10-minute segments of time.

17         THE COURT:  Okay.

18         MR. LEVINE:  Over a period.

19         THE COURT:  The class wide?

20         MR. LEVINE:  Class wide.

21         THE COURT:  But is it -- so signed in?

22         MR. LEVINE:  And that would include signed out

23 data.

24         THE COURT:  So, it's signed in and signed out?

25         MR. LEVINE:  Yeah.

41

 1          THE COURT:  Okay.  Okay.  And how -- what is the

 2  time parameter?  Like what is the latest in time?

 3          MR. LEVINE:  I think it's '21 through '22 of

 4  signed -- I don't remember.

 5          THE COURT:  Okay.  And that doesn't extend up to

 6  the present day?

 7          MR. LEVINE:  I don't think so.

 8          THE COURT:  Okay.

 9          MR. LEVINE:  I think we are trying to be

10  consistent with what's -- it's for class cert.  So, it's

11  what's consistent with the class cert record, which was, I

12  believe, data for '21 and '22, but there may be some '22 in

13  there.

14          THE COURT:  Okay.  All right.  Thank you for

15  indulging me on that exercise  Anything else -- well, let me

16  just open it up.  Those were my principal questions, kind

17  of, you know, trying to parse out the different arguments

18  for the motion and then the remedy issue.  Is there anything

19  else that you would like to argue that I haven't touched on

20  and that you feel needs elaboration?

21          MR. LEVINE:  I do think -- I do think the Court

22  needs to look at this sort of with a much -- with a holistic

23  eye as to what happened before and how we got here and what

24  -- what the purpose behind the conduct is and what -- what

25  the prejudice is.

42

```
 1          THE COURT:  Um-hmm.
 2          MR. LEVINE:  You know, our view is Google -- this
 3  was willful conduct to deprive us of this specific
 4  information.  Google has fought tooth and nail to not
 5  produce this data throughout the case, and -- and they've
 6  done that for a reason, which is it directly shows a linkage
 7  that they're trying to argue, and all you need to do is look
 8  at the Han declaration to see what's coming, you know,
 9  assuming we get the class certified and, you know, there's
10  -- there's going to be a summary judgment motion, and this
11  is the argument.  Mr. Han, you know, his argument is, No, we
12  don't reasonably associate.  We take steps to -- to sever.
13  We don't do this.  We don't do that.  And the information
14  we've been seeking through these keys directly refutes that.
15  It's ordinary course of business business records that have
16  been destroyed that directly refute this notion that Google
17  not only can reasonably do it but does do it all the time.
18          THE COURT:  And have you taken Mr. Han -- is it --
19  I'm not sure if it's Mr. Han or Ms. Han --
20          MR. SOMVICHIAN:  Ms.
21          MR. LEVINE:  No, we --
22          MR. SOMVICHIAN:  Ms.
23          THE COURT:  Ms. Han, thank you.
24          MR. LEVINE:  We did not.
25          THE COURT:  Okay.
```

43

1          MR. LEVINE:  I mean, these questions will, you

2  know, as -- if your Honor goes back and looks, Doctor

3  Bernsten was asked a lot of these same questions, answered

4  them differently.

5          THE COURT:  Okay.

6          MR. LEVINE:  That's our view at least.

7          THE COURT:  All right.  But that is something -- I

8  mean, that tension is something that you could exploit,

9  right?  But you're saying that you think -- I mean, in any

10  kind of summary judgment proceeding or at trial, if they put

11  up a witness who testifies contrary to their corporate

12  designee on the same subject, I mean, that's totally fair

13  game for you to address.

14     But what you're saying is that if you had this piece of

15  data, you could then more successfully demonstrate that the

16  discussion in the Han declaration is not accurate.  Is that

17  -- is that a fair characterization?

18          MR. LEVINE:  Correct.

19          THE COURT:  Yeah.  Okay.  All right.  I -- I see

20  your point.  Okay.  Anything else before I turn to Google?

21          MR. LEVINE:  I don't think so.  We've been going

22  for a while, your Honor.  So, I certainly --

23          THE COURT:  And I'll give you a chance to -- to

24  respond.

25          MR. LEVINE:  Thank you.

44

1          THE COURT:  Okay.  So, turning to Google's

2  opposition, I did want to start at the point where I was

3  kind of leaving off with -- with the Plaintiffs here, which

4  is I think that there is -- there's two separate things that

5  Google's saying.  There's a retention cycle, which it has

6  not suspended for this particular piece of data that we're

7  fighting about.  But it also has objections to producing it,

8  not just because it doesn't exist for some period of time

9  but that it affirmatively objects to producing it because of

10  relevance and maybe some other arguments.

11     I don't think I've heard those arguments per se, but I

12  understand that, you know, at least part of the argument is

13  there are other things that the Plaintiffs could rely on and

14  you don't need these keys.  And, you know, maybe I need to

15  hear more about that, but I'm also interested in what about

16  doing something that relies -- doesn't require suspension of

17  the data retention policy but relies on the existing window,

18  and we have Google produce a sample just so they can see.

19  And then you all can proceed as you would ordinarily do at

20  trial.  Google will make its arguments.  The Plaintiffs will

21  make their arguments, and we can find out who's right or

22  some decision maker can find out who's right.

23     So -- so, why not do that?  Is that -- is that a

24  possibility as a sort of practical solution?  Again, I

25  realize this is kind of outside the scope of what you all

1 briefed.

2          MR. SOMVICHIAN:  Well, it -- your Honor, I think

3 we're -- we're skipping ahead here in terms of what the --

4 what the ultimate obligation could potentially be if --

5          THE COURT:  Yes, we are.

6          MR. SOMVICHIAN:  -- if the Plaintiffs had filed a

7 timely motion, which they did not, if they had shown

8 prejudice to trigger some entitlement to relief, which we

9 don't believe they have.  But if the question is could --

10         THE COURT:  Indulge me.

11         MR. SOMVICHIAN:  -- do those keys -- and I will.

12 I want to be directly responsive to your question, your

13 Honor.

14         THE COURT:  Okay.

15         MR. SOMVICHIAN:  But I do want to point out, and I

16 do want to go back to those other issues because we haven't

17 had a chance to be heard on -- on those critical points

18 here.  But, yes, the -- the keys that we've been talking

19 about do still exist for this -- for the time period that

20 we've talked about before in terms of the normal retention.

21         THE COURT:  Um-hmm.

22         MR. SOMVICHIAN:  To the extent that the -- the

23 Plaintiffs are engaging in Internet activity that triggers

24 realtime bidding requests and that is being recorded in logs

25 at Google, there is presumably some time period in which we

46

1  could search for those, but --

2         THE COURT:  In other words, the policy hasn't

3  changed.  So, you know, Plaintiffs expressed a concern of,

4  Well, produce something now.  There might be changes in the

5  policy, changes in the logging, changes in something that

6  would -- that would undermine their ability to use whatever

7  data you might produce now if you were to be ordered to do

8  it -- and I'm not ordering you to do it -- but just

9  exploring that.  Has there been a change in policy that

10 would undermine?

11        MR. SOMVICHIAN:  There has not been with respect

12 to the normal retention period.  We -- we haven't changed

13 that.  We haven't shortened it.  The --

14        THE COURT:  What about the information recorded?

15        MR. SOMVICHIAN:  In terms --

16        THE COURT:  The keys.

17        MR. SOMVICHIAN:  I can't speak to the -- to the

18 details of what is recorded in -- in certain logs.  I'm not

19 aware, your Honor, of some material change in the content of

20 what gets recorded.  Our concern, though, is what -- what is

21 the purpose of producing the data in some form in which it

22 does not exist internally.  And that's what we're talking

23 about here.  When we were here last year, 13 months ago, I

24 -- I explained or tried to do the best of my ability, your

25 Honor, how -- how the data is maintained internally, and

47

1  it's -- that understanding is reflected in your May 16 order

2  with respect to data that is associated with a Google user's

3  account ID, the GAIA ID.  Whenever the GAIA ID exists, these

4  other identifiers are encrypted.  We produced the data in

5  that form.  After we were ordered to confer -- investigate

6  and confer, we did that.  I conferred with Mr. Levine.  We

7  told him we are only producing the data with this encrypted

8  identifier.  We have complied with that.  That was --

9            THE COURT:  For signed out users?

10           MR. SOMVICHIAN:  For all the data that we were

11  able to collect for the named Plaintiffs, your Honor, which

12  was -- which was primarily their signed in activity.

13           THE COURT:  Was there any signed out activity?

14           MR. SOMVICHIAN:  We are not able to find that

15  because of the -- because of the separation that we're

16  talking about between encrypted and --

17           THE COURT:  Because you didn't have --

18           MR. SOMVICHIAN:  -- raw identifiers.

19           THE COURT:  -- the keys?  The keys did not exist

20  at the time?

21           MR. SOMVICHIAN:  Correct.

22           THE COURT:  Okay.  Which is exactly the problem

23  the Plaintiffs are highlighting, right?

24           MR. SOMVICHIAN:  So, but the only thing that the

25  keys could be used for, they're not some internal method of

1 joining identifiers.

2          THE COURT:  Yeah.

3          MR. SOMVICHIAN:  We've established that.  They're

4 not data that is sent to RTB participants, which has always

5 been the main focus of discovery.  They're not unique to the

6 named Plaintiffs.  The only thing they could be used for is

7 to change one alphanumeric string of characters in the form

8 that we've produced it to a different string of characters.

9 So, I think the exercise that you have in mind, your Honor,

10 is, okay, for the time period that's -- for which those keys

11 still exist, could you find named Plaintiff data in that

12 slice of time and then use this key to decrypt that value.

13 That would just generate a dataset with a different set of

14 characters for the identifier.  I'm not sure what that

15 achieves, and --

16          THE COURT:  Maybe it proves your point, right?

17 So, here's -- here's my thesis is that you disagree -- I'm

18 being told you disagree about the significance of this key

19 and how it's used and what it means in terms of the contract

20 dispute and the statutory dispute about personal

21 information.  So, you disagree about that at least with

22 respect to these signed out users.

23     The Han declaration sounds -- sounds great.  Maybe

24 that's like really very very compelling, and maybe -- maybe,

25 if you produce what I'm suggesting or hypothesizing might be

1  produced, it just kind of nails the point in Google's favor.

2  Why not, right?  So, that's -- that was my thinking anyway.

3          MR. SOMVICHIAN:  Because it would be a piece of

4  evidence comprised of data in a form in which it does not

5  exist internally.

6          THE COURT:  Okay.

7          MR. SOMVICHIAN:  So, we're creating a record that

8  is inaccurate, potentially --

9          THE COURT:  But could you not make that --

10         MR. SOMVICHIAN:  -- misleading.

11         THE COURT:  Yeah.  But could -- and I'm sorry to

12 interrupt, but could you not make that point and say, you

13 know, we were required by Judge DeMarchi to produce it in

14 this way.  It never exists in this way, and we have a

15 witness who will say that it never exists in this way, and

16 let me just show you what we had to do, the hoops we had to

17 jump through to do what the Plaintiffs are asking for.  And

18 this just doesn't happen in the real world.  So --

19         MR. SOMVICHIAN:  We --

20         THE COURT:  -- doesn't it just like prove your

21 defense?

22         MR. SOMVICHIAN:  We certainly would make all those

23 points, your Honor, if we were required to produce it, but

24 that begs the question of what -- what would be the

25 obligation to --

1          THE COURT:  Okay.

2          MR. SOMVICHIAN:  -- create a dataset in a form in

3    which it does not exist in the ordinary course.  That's not

4    typically part of what a discovery obligation would be.

5    That's why --

6          THE COURT:  I appreciate that, yeah.

7          MR. SOMVICHIAN:  That's why we did not change the

8    retention period for the keys, the only purpose of which

9    would be to manipulate the data into a form in which it does

10   not exist.

11         THE COURT:  But why would you have to change the

12   form.  Why couldn't you just say, Here's the dataset with

13   the key.  Knock yourself out?  And then they would have

14   whatever, whatever they have.  You wouldn't have to actually

15   manipulate any data, change any data, apply any methodology

16   or decryption or anything.  You would just be giving it to

17   them in the form that it literally exists.  And if -- if

18   there's a question about that, we could treat it like source

19   code, right?

20         MR. SOMVICHIAN:  Your Honor, that -- so, to -- to

21   be very clear, the keys are not specific to the named

22   Plaintiffs.  They're not specific to any individual.

23         THE COURT:  Right.  No, no.  I understand.

24         MR. SOMVICHIAN:  They can be used broadly across a

25   massive dataset.

1          THE COURT:  Sure.

2          MR. SOMVICHIAN:  And -- and providing access to

3    the keys that can be used beyond the scope of the case,

4    beyond the named Plaintiffs' data creates a really serious

5    security, privacy, other concerns.  So --

6          THE COURT:  So -- so, what about inspection?

7    Like, if we treated it like source code, right, if we

8    treated it like source code, you can come have a look,

9    Plaintiffs' expert, under strict conditions and that's it,

10   like, would that address your concern?

11         MR. SOMVICHIAN:  That would -- that would

12   partially address the concern -- as compared to actually

13   producing a key that can be used to decrypt data on a

14   massive scale, that would certainly be preferable, your

15   Honor.  But the real question is we're really far afield now

16   from any request that's been made in the case and any

17   discovery obligation as we perceive it consistent with the

18   -- the whole sequence of -- of orders that we've addressed

19   as it relates to named Plaintiff data.  We're months after

20   the close of fact discovery.  We're dealing with a motion

21   that we believe is not even timely, which I would like to

22   address.

23         THE COURT:  I will.  I will let you address it.

24         MR. SOMVICHIAN:  And, so, if -- if you get to the

25   point, your Honor, that you think their motion is timely,

52

they've made an adequate showing of prejudice that there was

a violation of an order from you in your prior April or May

orders that required us to do this and we're at the point

they've established all of those things with clear and

convincing evidence -- that's a Ninth Circuit standard --

and we're talking about what the appropriate remedy is, yes,

we would explore all those.  But I think we're very far away

from that.

THE COURT:  Um-hmm.  Okay.  Well, thank you for

that.  And let me -- let me let you argue about what you

came here to argue about, which is the motion itself.  And I

did want to highlight that I am interested in the

distinction between the Rule 37(b) argument and the rule

37(e) argument in the sense that I understand that

principally the Rule 37(e) argument is you had an obligation

to preserve, even if you disagreed that the -- that the

discovery was relevant and proportional to the needs of the

case, and you were not at liberty, at least let's just say

at the outset -- at the outer bounds, at least as of the

November 17th, 2023 request, which I've asked be submitted

to me so I can see what it actually says, that as of that

point, there was an obligation to preserve this data while

the parties worked out whatever dispute they might have

about its relevance and responsiveness and its

proportionality.

53

1      So, you know, I view that as potentially a stronger

2  argument than the 37(b), as I indicated to Plaintiffs'

3  counsel, but I would like you to treat them discretely, if

4  you -- if you agree that that's appropriate, and I'm happy

5  to hear from you otherwise if you disagree.

6           MR. LEVINE:  Your Honor, I don't mean to

7  interrupt, but --

8           THE COURT:  Yes.

9           MR. LEVINE:  -- if it would help your Honor, I

10  have the November request.  I'd be happy to hand it up right

11  now so you have a copy.

12           THE COURT:  You know, I think it would be better

13  to file it no matter what.  So, you know, I'm sure it's not

14  disputed.  So, if it can be filed either under seal or

15  publically, that's fine.  But let me just make sure I give

16  the Google folks an opportunity to address the argument.

17           MR. SOMVICHIAN:  Yes, your Honor.  So, I -- I will

18  come back to the 37(b) and (e) distinction.

19           THE COURT:  Okay.

20           MR. SOMVICHIAN:  But let me -- let me start off

21  where you started with Mr. Levine with respect to timing.

22           THE COURT:  Okay.  That's fine.

23           MR. SOMVICHIAN:  Is that good?

24           THE COURT:  That's fine.

25           MR. SOMVICHIAN:  The -- the Plaintiffs' ability to

54

1  file a motion on spoliation, contempt, and preservation

2  issues was fully ripe well before the discovery motion

3  cutoff.  It should have been brought timely, consistent with

4  the Local Rules.  It was not.

5      When we sent our January 11 letter, we tried to be as

6  unequivocal as we could to make sure that there was a fully

7  ripe issue.  We told them we are not going to decrypt

8  anything.  We are not giving you the keys that could be used

9  to decrypt things.  And we framed it that way because we

10 didn't want Plaintiffs to morph their data requests to now

11 seek a more recent time period in which the -- the keys

12 could be available and now we've got a dispute.  We wanted

13 to be very clear.  Whether they exist of not for a given

14 time period, we view that as being well outside the bounds

15 of discovery.  So, they were well aware of that by January

16 11th.

17     Counsel's point I think seemed to be that even if there

18 was notice of that, there -- because the keys were no longer

19 available as of the discovery motion cutoff, they didn't

20 need to bring a discovery motion to compel production, and

21 they could, instead, sit on their hands for several weeks

22 and bring a sanctions motion instead for spoliation.  But,

23 your Honor, even that framing -- even viewed from that lens,

24 the motion was fully ripe well before the deadline.

25     And my -- Mr. Levine says there was some ambiguity as

55

1  to what existed and when we told them.  In my declaration,

2  your Honor, paragraph 26, in the footnote there, I quote the

3  letter or email where Mr. Levine makes clear that:

4              "During the meet and confer

5         discussions leading up to the discovery

6         motion deadline, Google's counsel

7         represented that it would not be

8         producing the keys because they did not

9         exist."

10         THE COURT:  Okay.  And I'm sorry.  Can you just

11  give me the paragraph again?

12         MR. SOMVICHIAN:  Paragraph 26.

13         THE COURT:  Twenty-six of your declaration?

14         MR. SOMVICHIAN:  Yes.  So, leading up to the

15  discovery motion deadline, we had made clear they --

16         THE COURT:  Oh, you're referring to the footnote?

17         MR. SOMVICHIAN:  Yes.

18         THE COURT:  And do I have that?  Let me see.

19         MR. SOMVICHIAN:  No, your Honor.  We quoted it.

20         THE COURT:  Do I have that email?

21         MR. SOMVICHIAN:  We -- no.  We quoted it but did

22  not separately --

23         THE COURT:  Okay.

24         MR. SOMVICHIAN:  -- attach it.

25         THE COURT:  Can I have that email as well?

56

1          MR. SOMVICHIAN:  Yes.

2          THE COURT:  So that I have both the letter that

3   Mr. Levine refers to and the email that you refer to in your

4   footnote?

5          MR. SOMVICHIAN:  Yes.

6          THE COURT:  Okay.  So, both of you can file those.

7   All right.

8          MR. SOMVICHIAN:  So, whether -- whether it's

9   viewed as a motion to compel production, which was certainly

10  ripe, or a preservation issue, that was also ripe.  Before

11  the discovery motion cutoff it should have been brought.

12  The Local Rule is clear as to what the deadline is, and

13  there is nothing that counsel learned after our June --

14  January 11 letter or the discussions before the discovery

15  cutoff that would justify a delay in the motion.

16       I would also point out if -- if you zoom out, the --

17  this goes all the way back to 13 months ago when we were

18  before your Honor talking about these issues.  And when we

19  were ordered to confer, we made very clear the only thing

20  that we are producing is these encrypted identifiers.

21       So, if there was a intent at the time by Plaintiffs to

22  make additional data demands that would then implicate some

23  effort to decrypt the data or some need to change the

24  retention period to enable that in the future, we should

25  have had that discussion back in May, your Honor, May of

1   last year.  There was no discussion about that.  The joint

2   report that was submitted to you confirms that the only

3   thing that we indicated Google would do was to produce the

4   encrypted versions of these identifiers, and we took that

5   position because we've never seen it as the -- as an

6   obligation in discovery to produce anything other than data

7   in the form in which it is maintained in the ordinary

8   course.

9           THE COURT:  Okay.  And let me just be clear.  When

10  you say that was the representation Google made about what

11  it would do, you're referring to the May 24th, 2023 status

12  report?

13          MR. SOMVICHIAN:  Correct, your Honor.

14          THE COURT:  And that's filed at -- well, the under

15  seal version is 528-2, right?

16      (Pause.)

17          THE COURT:  It's a single letter?

18          MR. SOMVICHIAN:  Yes.

19          THE COURT:  Okay.

20          MR. SOMVICHIAN:  May 24th, 2023.

21          THE COURT:  Okay.  And -- and that's the place I

22  think where Plaintiffs say we reserve all rights.

23          MR. SOMVICHIAN:  Yes, and we also disputed that

24  Plaintiffs were entitled to any further --

25          THE COURT:  Yes.

58

1          MR. SOMVICHIAN:  -- data production.

2          THE COURT:  Which is the kind of thing where I

3 thought, I think there is more coming, after I got the

4 status report, and then there was nothing more coming.

5 So --

6          MR. SOMVICHIAN:  Yeah.

7          THE COURT:  Well, there was more coming, but --

8          MR. SOMVICHIAN:  And, so -- and, your Honor, so,

9 after this point, after we've made clear what we were going

10 to produce, there was no discussion about a future data

11 request.  There was no discussion about some future need to

12 decrypt data or to preserve the ability to do so.  We

13 completed the entirety of the class certification expert

14 process in which Plaintiffs made all the representations

15 they wanted to make about how data is maintained and how

16 they can prove up their case on a class-wide basis.  We went

17 through the entire expert deposition process, additional

18 witness depositions, and it was only seven months later that

19 we got this additional new request for -- for data.  So,

20 that's the context for the overall timing here.

21          THE COURT:  So, do you disagree, though, that -- I

22 mean, it seems -- it seems clear that -- and the parties

23 don't dispute that there was a request for the keys in

24 November of 2023 and your January 11th, 2024 letter says

25 no?

1          MR. SOMVICHIAN:  That's right, your Honor.

2          THE COURT:  I mean, that's what happened.  So, the

3    request does, at the very latest, date back to November of

4    2023.  So, it's not for the first time in this motion.  It

5    -- it was earlier, and that's where we get to the argument,

6    which I'm not ignoring the timing issue but the argument

7    that really the preservation obligation is what arose in

8    November of 2023 at the very latest.  They say it arose

9    earlier.  Okay.

10         So, I understand the timing point under Rule 37-3.  I'm

11   not ignoring that.  I think that's an important point, but

12   I'm unlikely to resolve this just on that basis.  So, I

13   would like to hear from you about your other arguments.

14         MR. SOMVICHIAN:  Okay.  So, your Honor, with --

15   with respect to the 37(b) and (e) distinction --

16         THE COURT:  Yes.

17         MR. SOMVICHIAN:  -- I -- I don't know that in the

18   context of this case in the way that they've presented their

19   motion that there is a meaningful difference.

20         THE COURT:  Okay.

21         MR. SOMVICHIAN:  One -- one clearly looks to the

22   scope of the orders and whether there was a -- a clear and

23   definite order requiring preservation or the -- the

24   suspension of the normal retention process.  I think your --

25   your struggle in recalling the -- the orders and what was

60

1  specifically required I think proves the point that those

2  orders as we construed them did not have a clear obligation

3  to suspend the normal retention period.  But you can't

4  separately analyze the 37(e) issue divorced from that

5  because if the question is when they made their request,

6  what -- what obligations were triggered, that has to be

7  considered in the context of the prior orders in the case,

8  the -- the parties' prior discussions, the status of the

9  case at the time, and we can't view it in a vacuum, your

10 Honor, as -- if they had made the request in the early

11 stages of the case, We want joining keys, without the

12 entirety of the three-year course of events in the case as

13 it relates to named Plaintiff data and the prior orders of

14 the Court and the limits that were carefully drawn

15 throughout time and in the various orders, the different

16 junctures at which the Plaintiffs could have previously

17 articulated a need for this data, everything that had been

18 produced to date, including millions of lines of -- of

19 records for the named Plaintiffs that had only the encrypted

20 identifiers, without the joining keys, like they used

21 throughout the class certification process, all of that has

22 to be considered because they're saying that when they sent

23 this letter three and a half years into the case, we should

24 just view it in a vacuum and does that trigger a

25 preservation obligation.  It can't be analyzed in that way

61

1  without looking at the entirety of the contents, your Honor.

2  And that includes the scope of the orders that you had

3  issued in April and May of last year.  I'm not going to --

4          THE COURT:  I see.  So --

5          MR. SOMVICHIAN:  -- tell you what you meant by

6  those orders.

7          THE COURT:  Yeah.  Okay.

8          MR. SOMVICHIAN:  But the way we construed them was

9  never -- we never construed them as triggering an obligation

10 to change the form of the data in which it is normally

11 maintained to decrypt identifiers that are in the normal

12 course only maintained in encrypted form or to change the

13 retention period of the keys that could enable that.

14         THE COURT:  This caused me to ask a question which

15 is kind of orthogonal to what you just said.  So, let's say

16 we have a named Plaintiff collection data, one named

17 Plaintiff, their data.  They have some identifiers that are

18 encrypted, and we're talking about a signed out situation,

19 and there is -- there exists still the encryption -- I'm

20 sorry -- the key, the key that we've been talking about.

21 That -- that exists.  It's not going to appear in a log.

22 It's just going to be available.  Is that how -- is that how

23 it's maintained?  So, you made the remark before, We had

24 these keys, and they're used for vast datasets to, you know,

25 decrypt that -- you know, any number of things is how I

62

1  interpreted your argument.  And, so, what I'm -- I'm

2  wondering is how does this production look when it's made to

3  Plaintiff?  So, you have named Plaintiff data, and it will

4  have these identifiers, and then if there's something that

5  would -- that would be relevant to have this key for, how

6  would -- how does the data appear when you produce it?

7          MR. SOMVICHIAN:  Yeah.  So --

8          THE COURT:  How does, yeah, data for which the key

9  is relevant appear when you produce it?

10         MR. SOMVICHIAN:  Your Honor, if -- if we were to

11  replicate the -- the productions that we did before but for

12  a time period last month --

13         THE COURT:  Right.

14         MR. SOMVICHIAN:  -- in the normal course, any

15  record that's associated with their account identifier, the

16  GAIA ID, is only going to include an encrypted ID.

17         THE COURT:  Okay.

18         MR. SOMVICHIAN:  The other ID that we've been

19  talking about.

20         THE COURT:  Okay.  That will appear in encrypted

21  form next to the unencrypted GAIA ID?

22         MR. SOMVICHIAN:  Yes.

23         THE COURT:  And I mean next to -- in the same

24  production, in the same table, same line, whatever?

25         MR. SOMVICHIAN:  With all the other fields that

1  we've produced before that are an attempt to track what is

2  sent in the bid request to an RTB participant.

3          THE COURT:  Okay.

4          MR. SOMVICHIAN:  So, the only -- the only purpose

5  that would be achieved by what they have -- what they have

6  in mind is to then take that dataset, use this decryption

7  key to -- to change that value, something which exists but

8  is not done in the ordinary course, is only done for a very

9  limited purpose, as explained in the Han declaration.  And,

10 so, we'd then be producing the same dataset.  And, instead

11 of the string of characters that appears in the encrypted --

12 you know, the encrypted version of the identifier, now they

13 have a different alphanumeric string that appears after the

14 decryption process has been --

15         THE COURT:  Isn't that de --

16         MR. SOMVICHIAN:  -- applied.

17         THE COURT:  But that's a decrypted ID?

18         MR. SOMVICHIAN:  Yes.

19         THE COURT:  How is it -- in what sense is it

20 decrypted if it's -- oh, it's just -- okay.  So, then that

21 -- but that other decrypted alphanumeric string can then be

22 associated with the GAIA ID by virtue of it being decrypted?

23         MR. SOMVICHIAN:  In -- in that manipulated form --

24         THE COURT:  Right.

25         MR. SOMVICHIAN:  -- in a way that's not maintained

64

1  in an ordinary course.

2       THE COURT:  Okay.  And this is a dumb question I

3  realize, but where does the key exist?  It's not in the

4  same --

5       MR. SOMVICHIAN:  No.

6       THE COURT:  -- data field, table, source.  It's --

7       MR. SOMVICHIAN:  It is --

8       THE COURT:  It's a tool at -- somewhere?

9       MR. SOMVICHIAN:  Yes.

10      THE COURT:  Okay.

11      MR. SOMVICHIAN:  It's a tool.  It is entirely

12  separate from the data logs that we've produced from in the

13  case.  So, it's not as if here's all the data that we've

14  produced and there's some field that we omitted.

15      THE COURT:  That says --

16      MR. SOMVICHIAN:  That's not what we're talking

17  about.

18      THE COURT:  Right.  Okay.

19      MR. SOMVICHIAN:  It is a tool that exists in a

20  separate secure repository that would have to be accessed

21  for this purpose.

22      THE COURT:  Okay.  And let's say then following my

23  experimental hypothetical here further, if we had the -- I

24  don't know how many named Plaintiffs there are right now,

25  but, you know, however many named Plaintiffs, if it's nine

1  or some other number, we have all the named Plaintiffs'

2  data, on a given day, on a given time, time slice, will the

3  same key be the decryption key for all of those people and

4  presumably whatever class members happen to also be that

5  same day, same time?  In other words, there's one key at a

6  given time for this category of information, an encrypted

7  ID.

8            MR. SOMVICHIAN:  Yeah.  I -- I want to tread

9  carefully here, your Honor.

10           THE COURT:  Okay.  If you don't want to answer

11  that questions, that's okay.

12           MR. SOMVICHIAN:  There -- there is detail -- I

13  believe it's in the Han declaration -- about --

14           THE COURT:  Right.  Okay.

15           MR. SOMVICHIAN:  -- how long each given key --

16           THE COURT:  Oh, yeah.  No, I saw that.

17           MR. SOMVICHIAN:  -- can be used for.

18           THE COURT:  But it's -- there's not multiple keys

19  at precisely the same time?

20           MR. SOMVICHIAN:  I think that is accurate.

21           THE COURT:  Okay.  That's what I'm getting at.

22           MR. SOMVICHIAN:  But a given key applies to a

23  given period of time.

24           THE COURT:  A given period of time?

25           MR. SOMVICHIAN:  Yes.

66

1          THE COURT:  Okay.  Thank you.  That's what I'm --

2    what was what I was wondering.  Okay.  Sorry.  Your remark

3    caused me to ask for that additional information, but I -- I

4    fear I have disrupted your argument.  We were talking about

5    the 37(b), 37(e) distinction.

6          MR. SOMVICHIAN:  I don't know if there's much more

7    to say there, your Honor.  I've got -- the -- the point is

8    that you can't divorce the 37(e) analysis from the overall

9    contents of the case.

10          THE COURT:  Okay.

11          MR. SOMVICHIAN:  And --

12          THE COURT:  Go ahead.

13          MR. SOMVICHIAN:  And in some other instances, in

14    some other procedural context, maybe you don't have to

15    account for the orders in the case and the -- and the scope

16    of discovery and the way that it has evolved over very

17    heavily litigated discovery process over multiple years.

18    But that's the circumstance that we have here.  So, when

19    they sent the November 17th letter last year asking, we say

20    for the first time, clearly for production of the keys, that

21    has to be construed in the context of all the orders that in

22    our view have never previously required that to be within

23    the scope of discovery, and the baseline understanding that

24    typically the scope of discovery would not include a

25    manipulation of data outside of the form in which it exists

1  in the ordinary course.

2          THE COURT:  Okay.

3          MR. SOMVICHIAN:  I want to go back to the -- the

4  discussion that we just had about what -- what could

5  potentially be done in -- in a more recent time period

6  and --

7          THE COURT:  Yeah.

8          MR. SOMVICHIAN:  If we had -- if we had changed

9  the retention period, what could be done potentially for

10  other time periods, I -- your Honor, I think -- I think all

11  of that underscores the -- the lack of prejudice that the

12  Plaintiffs have -- have shown here.  So, yes, those things

13  could be done in theory.  I don't know that there's been an

14  articulation of why the -- they've been hindered in some

15  proof, some argument that they were not able to make, some

16  showing that they were prevented from making on class

17  certification or what might be coming down the road on

18  summary judgment or trial that they can't already fully make

19  from the record as it exists, because having this -- this

20  data set that's not in the form in which it exists, Mr.

21  Levine just -- just said today and has said in prior

22  hearings they don't want data that's been changed, that they

23  -- they want things maintained in the ordinary course as it

24  exists.  They've criticized our prior productions because

25  we've had to pull them from different sources and -- and ask

68

1  them to -- to correlate them through the use of different

2  means.  They've criticized us for that because they -- they

3  view that as not being in the ordinary course.

4      So, I don't know how creating something that also is

5  even further beyond the -- the normal scope of how the data

6  is maintained would be useful in the case.  And if the

7  theory is, Well, we want to be able to show that Google in

8  theory could do this, that there -- that in -- that there

9  are these keys in existence that could be used outside of

10  normal policy in violation of normal restrictions to create

11  this dataset that is not maintained in the ordinary course,

12  I don't know what -- what weight that argument could --

13  could carry in -- in any context, but the -- but the broader

14  point is they can already make those arguments.  They've

15  already taken discovery about what these keys are, what they

16  aren't, how they can be used, how they're maintained.

17      Mr. Levine mentioned the 30(b)(6) deposition of Mr.

18  Bernsten that addressed these issues.  So, they -- they have

19  ample evidence from which they can make any argument they

20  want to make about what Google can do internally to link

21  data and to have a dataset that is -- has been manipulated

22  to look like what they think exists but does not.  You know,

23  and I -- I don't think that's within the scope of discovery.

24  I don't think they've made a showing of prejudice or

25  timeliness that could even entitle them to some remedy along

69

those lines, and if you get to the point where you think

that there should be some remedy here, there -- it should

not be to create some dataset in a form that does not exist

internally that could only create confusion in the case

going forward.

THE COURT:  Is there anything in the record that

precedes this dispute that describes in detail -- so, I'm

talking about before this motion, describes in detail the

operation of the keys, how they're maintained, what would be

required?  What would be the best source for me to look at?

Is it the submission that preceded Docket 510?  And I

realize this may be a hard thing.  So --

MR. SOMVICHIAN:  Yes.

THE COURT:  So, I'm looking for what does the

record say about these keys, how they're used, what would be

necessary to -- manipulation would be required, in other

words, which is Google's argument.  If I were to look back

at the record of this case, what is the best source?  And if

you don't know the answer right now off the top of your

head, which would be understandable, I would invite both

parties to let me know in your further submission like where

I would find that, because what I -- I am looking back at

the disputes that preceded each of the orders that the

Plaintiff is relying on and things around that, and I'll go

back and look at the hearing transcript.  I just want to

70

1  make sure I have from the parties your -- you know, the

2  evidence that you think I already have over the three years

3  about this issue.

4          So, I don't know if you have something you can share

5  with me right now.

6                  MR. SOMVICHIAN:  The only thing that comes to

7  mind, your Honor, that's already in the record before you --

8                  THE COURT:  Yes.

9                  MR. SOMVICHIAN:  -- would be the -- the submission

10 leading up to the May 16 --

11                 THE COURT:  May -- okay.  To the Docket 510?

12                 MR. SOMVICHIAN:  -- hearing.  That was a joint

13 letter.  So, it didn't -- it did not attach actual evidence.

14                 THE COURT:  Sure.

15                 MR. SOMVICHIAN:  But there are -- there are some

16 descriptions of -- of the keys.  I don't believe at -- at

17 the level of detail that we're talking about it now.

18                 THE COURT:  Right.  Okay.

19                 MR. SOMVICHIAN:  There was more discussion

20 certainly during the hearing.

21                 THE COURT:  Sure.  Okay.  Thank you.  All right.

22 Anything else that Google would like to say in support of

23 the opposition?

24      (Pause.)

25                 MR. SOMVICHIAN:  Yes, your Honor.  On -- on the --

71

1  on the evidentiary sanction, I think we -- we struggled to

2  understand what the Plaintiffs had in mind, and I think that

3  you had some difficulty understanding what they were

4  specifically requesting also.  I -- I also think it's

5  evolved or more from the opening motion and how it was

6  articulated in the opening motion and how it was most

7  recently described on reply.

8          THE COURT:  Okay.  What do you have in mind?

9          MR. SOMVICHIAN:  It was -- so, what I see in the

10  reply brief -- it's on page 13, line -- line 14.  It says:

11              "Google should be prevented from

12              making any arguments based on the lack

13              of ID's and joining key data in favor of

14              summary judgment or a trial in this

15              matter."

16          THE COURT:  Yeah, that is pretty bad.  Okay.

17          MR. SOMVICHIAN:  I don't -- I don't know what

18  argument they have in mind.  I don't know why not having one

19  alphanumeric string instead of another, which is the only

20  consequence of not having the adjoining keys would prevent

21  them from making any argument that they -- that they might

22  want to make or that they haven't already made strenuously

23  in the class certification process.  And, so, you know, if

24  -- if you get to the point of concluding that they've

25  established some entitlement to relief, I think there's got

72

1  -- that there -- and there is any evidentiary remedy that

2  you think is appropriate, that certainly cannot be it.  I'm

3  not sure how that could even be implemented in terms of the

4  -- the vagueness of it.

5          THE COURT:  Yeah --

6          MR. SOMVICHIAN:  So, I do want to point that out.

7          THE COURT:  I mean, that matches the conclusion of

8  the motion I think, that reference.  But I think that in the

9  motion there is some more particular elaboration of what the

10 Plaintiffs have in mind, which is why I was asking Mr.

11 Levine that question about what would be the scope.  So, but

12 thank you for highlighting that as an important issue for

13 the Court's consideration.

14     Is there anything else from Google?

15         MR. SOMVICHIAN:  No, your Honor.

16         THE COURT:  Okay.  Mr. Levine, I'll give you an

17 opportunity to respond.  If you could be brief, and you

18 don't need to repeat anything that you've already argued or

19 that's in your papers.

20         MR. LEVINE:  I -- I won't do so, your Honor.  So,

21 Ms. Han was never identified before -- just so the record is

22 clear, was never identified as a witness with knowledge

23 before putting in this declaration.  So, we had no

24 opportunity.

25         THE COURT:  Okay.

73

1          MR. LEVINE:  But we didn't depose -- depose her in
2    the ordinary course.  RFP 42, which we mentioned in our
3    brief, which was served on May 17th, 2021, so, many years
4    ago --
5          THE COURT:  I remember it well.
6          MR. LEVINE:  Right.  That asks for information
7    which would include the joining key.  So -- so, we --
8          THE COURT:  Yes.
9          MR. LEVINE:  -- pushed back on the notion -- we
10   don't have to have that fight now, but --
11         THE COURT:  Yeah.
12         MR. LEVINE:  -- the -- that -- that was meant to
13   include information associated with the named Plaintiffs in
14   the account.  So, that's been out there since this case
15   began.  We always understood that this was an issue and that
16   we needed this data.  So, it's not like we asked for it the
17   first time last year.  We asked for it when the case began,
18   and we've been fighting about it ever since.
19         THE COURT:  Could I ask -- pause you on that just
20   to --
21         MR. LEVINE:  Yeah.
22         THE COURT:  -- get a point of clarification?
23   Because you do mention Request for Production 42 in the
24   motion papers.  And, so, I went back and looked at my order
25   at Docket 314, August 26 of 2022.  And you probably remember

74

1 what I said in that order, which is, I don't know what you

2 want or why you want it.  So, okay.  I just -- is there

3 anything that you want me to in retrospect think differently

4 about Request for Production 42 at this moment?

5           MR. LEVINE:  Well, hindsight's 20/20, and --

6           THE COURT:  Yeah.

7           MR. LEVINE:  -- knowing what we do now, we --

8           THE COURT:  Okay.

9           MR. LEVINE:  -- would have all litigated the case

10 in completely different ways.

11           THE COURT:  Yeah, I think --

12           MR. LEVINE:  So, I'm not sure that's a useful

13 exercise, but --

14           THE COURT:  Okay.  All right.  Very good.  I thank

15 you for that.

16           MR. LEVINE:  As to the two places to look for --

17 you asked the question of --

18           THE COURT:  Yes.

19           MR. LEVINE:  -- where to look in the record.

20           THE COURT:  Yes.

21           MR. LEVINE:  What I would recommend is Doctor

22 Bernsten's 30(b)(6) testimony, which we have -- the relevant

23 excerpts have already been submitted as part of this --

24           THE COURT:  Yeah.

25           MR. LEVINE:  -- briefing --

75

1          THE COURT:  Okay.

2          MR. LEVINE:  -- which talks specifically about

3  these keys.  Separately, Doctor Shafik's (phonetic) report,

4  which is ECF 545-5 at paragraph 97 in particular, we quote

5  his -- we cite to and quote his report in our opening brief.

6          THE COURT:  Okay.  And that's --

7          MR. LEVINE:  So --

8          THE COURT:  That's the class cert submission?

9          MR. LEVINE:  That's the class cert expert report.

10          THE COURT:  Okay.

11          MR. LEVINE:  And he looked at the issue of the

12  keys and talks about the importance of that and why they're

13  relevant.

14          THE COURT:  Okay.

15          MR. LEVINE:  So, if you -- for the overview of --

16  of sort of what's in the record -- and we did cite Doctor

17  Shafik's report.  We didn't submit it to your Honor because

18  it's lengthy and we were trying to not --

19          THE COURT:  But if it's in the record, I don't

20  need you to file it.

21          MR. LEVINE:  Yeah, it's in the record.

22          THE COURT:  Okay.

23          MR. LEVINE:  And that's the redacted version at

24  545-5.

25          THE COURT:  Okay.

1        MR. LEVINE:  The -- I guess the -- I guess the --

2   you know, it goes back to sort of what's the purpose of

3   discovery.  The purpose of discovery is for us to be able to

4   test Google's assertions and to see.  So, Google says, Look,

5   we don't use these in the ordinary course, these keys in the

6   ordinary course.  Plaintiffs have got it wrong, and we -- we

7   think that's what we -- we disagree with that, and -- and,

8   you know, Google doesn't get to unilaterally decide, Well,

9   we think they're wrong.  So, we're just not going to produce

10  it and, in fact, we're going to destroy it.  They have to

11  produce it, and then we have a fight about it, and that may

12  be an issue for the jury as to whether -- if the -- if the

13  standard is under the contract reasonably able to associate,

14  right, that sort of suggests a sliding judgment thing, and

15  it may be a jury question at the end of the day or a

16  question for Judge Gonzalez Rogers if we don't have a jury

17  trial of what those reasons -- is it -- is it enough that

18  our expert -- let's just say they produce the keys and we

19  have the logs and our expert says, I was able to link this

20  data in five seconds, all of it, for the entire class or for

21  the names Plaintiffs.  I was able to decrypt and put it all

22  together, and it took me five seconds.

23      Now, maybe a jury would like to hear that.  That means

24  Google is reasonably able, not whether they do or don't,

25  whether they're reasonably able.  That's what the contract

77

1   says, whether they are reasonably able to do that, to

2   associate.  And that's what -- that's the piece that's

3   missing.  I mean, there's -- why do they have keys?  If they

4   don't do anything with them, why do they have them?

5            THE COURT:  Well, I mean, there's an answer in the

6   Han declaration that's provided, but can I -- can I --

7            MR. LEVINE:  But Professor Shafik suggests there's

8   another answer.

9            THE COURT:  Okay.  Yes, but that's -- that's what

10  I wanted to ask you about.  So, you say, We disagree.  And

11  in your earlier remarks, you alluded to information obtained

12  in discovery.

13           MR. LEVINE:  There are internal Google

14  documents --

15           THE COURT:  Yeah.  So --

16           MR. LEVINE:  -- that suggest --

17           THE COURT:  But I don't think I've ever seen those

18  is my point.  They don't sound familiar.

19           MR. LEVINE:  The -- footnote six of page five,

20  footnote six of our opening brief -- and I don't want to

21  read it because it's --

22           THE COURT:  Right.

23           MR. LEVINE:  -- confidential, but quotes from an

24  internal Google document -- it's -- and this is discussed in

25  professor Shafik's report.

78

1           THE COURT:  Right.

2           MR. LEVINE:  -- as to what we think Google is

3   doing with this data.

4           THE COURT:  Right.  But I don't think I saw it

5   before.

6           MR. LEVINE:  Okay.

7           THE COURT:  Right?  Am I -- is that right?  I

8   mean, I don't think this came up in any of our prior

9   discovery dispute --

10           MR. LEVINE:  Probably not --

11           THE COURT:  -- issues.

12           MR. LEVINE:  -- because those disputes predated

13   Professor Shafik's work --

14           THE COURT:  Right.  But not --

15           MR. LEVINE:  -- into the class cert.

16           THE COURT:  -- presumably the underlying Google

17   document he's relying on.  That's something that you got in

18   discovery.

19           MR. LEVINE:  Right.  Also, understood, other than

20   this motion, everything's come to you in the form of -- the

21   Court in the form of a joint letter brief which we can't

22   submit any evidence.

23           THE COURT:  No, but you always cite it --

24           MR. LEVINE:  We try.

25           THE COURT:  -- in the ether.

79

1          MR. LEVINE:  We try.

2          THE COURT:  So -- okay.  All right.  Well, I have

3   been to told to look at the Docket 545-5, which is the

4   Shafik report.  So, I will note your footnote six.

5       Okay.  Yes, anything further?

6          MR. LEVINE:  No.  And -- and as to the relief, I

7   think the question is is relief warranted here.  We'd be

8   happy to sit down with the Court and Google if the -- you

9   know, this is always the hard part on these kinds of motions

10  because you don't know what you don't have.  But if the

11  Court is inclined to, as it -- as we think it should, enter

12  a sanction here, we'd be happy to sit down and tailor that,

13  and we -- we tried.  I mean, our motion is limited.  We

14  didn't ask for money.  We didn't -- we -- you know, we asked

15  for -- for the specific relief going to the issue at hand.

16  And that's all we want.  So, we'd be happy to -- to tailor

17  that.

18          THE COURT:  Okay.  Thank you.  And I just have one

19  question.  This is for both of you, one last question, which

20  is did this issue, meaning the nonproduction of the keys,

21  come up in your class cert hearing, your discussion with

22  Judge Gonzalez Rogers?  Was it an issue that was addressed

23  with her in any way?  I'll ask the Plaintiffs first.

24          MR. LEVINE:  I don't think so because -- I -- I

25  don't think so other than to note that data was still being

1 produced and -- and the like.

2          THE COURT:  Okay.

3          MR. LEVINE:  But I don't think -- I don't think

4 the keys were ever specifically mentioned.

5          THE COURT:  So, in other words --

6          MR. LEVINE:  Other than in Professor Shafik's

7 report.

8          THE COURT:  Okay.  But if I go back and look at

9 the transcript of the hearing, which I'm not inclined to do

10 unless I have to, is there going to be a discussion about

11 that, her -- her class certification hearing?

12          MR. LEVINE:  Not -- not on the key issue.

13          MR. SOMVICHIAN:  Not that we recall, your Honor.

14          THE COURT:  Okay.  Good.  I won't do that.

15      Okay.  All right.  Well, I would like to conclude.  I

16 know everybody --

17          MR. SOMVICHIAN:  Your Honor --

18          THE COURT:  -- would like --

19          MR. SOMVICHIAN:  -- can I have -- can I have 30

20 seconds on --

21          THE COURT:  Okay.  Absolutely the last word, and

22 then we're done.

23          MR. SOMVICHIAN:  Yeah.  On -- on this RFP 42, we

24 attached our response to that in Exhibit A --

25          THE COURT:  I have it.

1          MR. SOMVICHIAN:  -- to my declaration.

2          THE COURT:  You don't need to belabor it.  I went

3    back and read it.  RFP 42, as Mr. Levine kind of conceded,

4    is really not where it's at.

5          MR. SOMVICHIAN:  Yeah.

6          THE COURT:  So, okay.  Thank you all, as -- as

7    always, for your time and attention.  I appreciate it's a

8    long hearing, but thank you very much.  I will get you a

9    written order as soon as I can.

10          MR. LEVINE:  And, your Honor, just --

11          THE COURT:  Oh, no, not another last word.

12          MR. LEVINE:  No, this is not on this, but there

13    are three motions that have been pending --

14          THE COURT:  Oh, yeah.  I'm so sorry.

15          MR. LEVINE:  -- which we just wanted to sort of

16    flag for the Court's attention.  They're at Docket Numbers

17    652, 662 and 664.

18          THE COURT:  I think there are more than three.

19          MR. LEVINE:  Those are the only three substantive

20    ones that I think the parties care about.

21          THE COURT:  You know, they are sitting in a

22    massive binder on my desk because they all came in at the

23    same time.  I apologize for not getting to them sooner, but

24    I -- you know, I do understand that there is still a little

25    bit of time before you have to start briefing other things,

82

1 but please let me know is there -- am I holding up a

2 deposition schedule or something like that, because I am

3 trying to prioritize my various discovery disputes, and I

4 want to be sensitive -- I don't want to mess up your

5 schedule.

6          MR. LEVINE:  Our renewed motion for summary

7 judgment is due September -- our class certification, sorry,

8 is due mid September.  So --

9          THE COURT:  Yeah.

10          MR. LEVINE:  -- I think our goal will be to try

11 and get as much as the sort of --

12          THE COURT:  Yeah.

13          MR. LEVINE:  -- underlying discovery issues

14 hammered out so we --

15          THE COURT:  Yeah.

16          MR. LEVINE:  -- we're moving into the next stage

17 on as clean a record as we can.

18          THE COURT:  Right.  It really is wearing a hole in

19 my desk.  I really apologize for the delay.

20      From the Defendant's perspective, I assume you also

21 want those done sooner rather than later?

22          MR. SOMVICHIAN:  Yes.

23          THE COURT:  Okay.  All right.  I will get on it.

24 I -- I apologize.

25      I also have -- since you're all here and we're talking

1  about really really old things, I have this massive

2  privilege dispute that is now more than a year old, and

3  there is no way -- I'm just going to tell you right now

4  there's no way I can review thousands of documents in

5  camera.  It just can't happen.  And my initial orders, you

6  know, doing -- doing the first tranche of in camera review

7  did not yield any helpful reduction of this problem, and

8  I've been just not getting to the next tranche.  But I'm

9  really really worried that you all need a special master if

10 you're going to persist in this dispute.  So -- because I

11 can't do it.  I just cannot get to thousands of documents

12 for an in camera review, even if I -- and I'd have to

13 determine whether on a document-by-document basis whether in

14 camera review is even appropriate.

15      So, I may be coming to you with some plea for some

16 other solution because when I ask, you know, is there a more

17 expeditious way to deal with this, I think you all said,

18 Hey, why don't you just like deal with the stuff that's in

19 front of you right now, Judge, in a very polite way, but I

20 don't think that's going to solve the overall problem.

21      So, I don't know if any of you have anything you want

22 to share with me, any thoughts you want to share with me

23 right now while we're here.  Otherwise, it's -- it's

24 probably best left for some more directed request on my

25 part.

84

1      Anything Plaintiffs want to share on that point?

2           MR. LEVINE:  Nothing, your Honor.

3           THE COURT:  Defendant?

4           MR. SOMVICHIAN:  It would be easy to just deny the

5    motion, your Honor.

6           THE COURT:  Yes, I realize I could do that, but

7    that doesn't seem very principled.  So -- but neither is

8    like just sitting on it forever.  So, again, my apologies.

9    Thank you all.  This matter is concluded.

10           ALL:  Thank you, your Honor.

11      (Proceedings adjourned at 11:55 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

85

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3      I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17           Echo Reporting, Inc., Transcriber

18               Monday, June 24, 2024

19

20

21

22

23

24

25