# PLAINTIFFS' BRIEF RE: TARGETED USE OF CALHOUN DISCOVERY IN IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION, PURSUANT TO DKT. 683

## Redacted Version of Document Sought to be Sealed

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*

*Counsel for Plaintiffs*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
Corban Rhodes (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

Amy Keller (admitted *pro hac vice*)
Ten North Dearborn St., 6th Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

PATRICK CALHOUN, *et al., on behalf of themselves and all others similarly situated*,

        Plaintiffs,

        v.

GOOGLE LLC,

        Defendant.

Case No. 4:20-cv-05146-YGR-SVK[1]

**PLAINTIFFS' BRIEF RE: TARGETED USE OF *CALHOUN* DISCOVERY IN *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*, PURSUANT TO DKT. 683**

Hon. Yvonne Gonzalez Rogers

**UNREDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

---

[1] In accordance with the Court's instructions, this brief is filed under seal on the *Calhoun* docket only and served separately upon *RTB* counsel for Google.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ...........................................................................................................1

    I.    *Calhoun* Discovery Relating to Data Flow is Relevant to Offensiveness of Collection and *RTB* Contract Claims, *inter alia* ......................................2

        A.    Relevance of *Calhoun* Data Flow Discovery ..................................3

        B.    Relevance of *Calhoun* Logs Discovery: the "Back End" of the Data Flow......................................................................................................4

    II.    Targeted *Calhoun* Discovery for Identification of "Personal Information" is Highly Relevant to the Same Issue in *RTB* ...............................................6

    III.    *Calhoun* Discovery Regarding Consent is Highly Relevant to Google's Consent Defense in *RTB* .............................................................................7

        A.    ██████████ ..............................................................................8

        B.    Privacy Sandbox..................................................................................9

        C.    Additional Relevant Consent Documents ...........................................9

    IV.    *Calhoun* Damages Discovery is Directly Relevant to *RTB* Damages Calculations.........................................................................................................10

CONCLUSION ...........................................................................................................12

# TABLE OF AUTHORITIES

PAGE

**STATUTES**

Cal. Civ. Code § 1798.140 .......................................................................................... 7

**RULES**

Fed. R. Civ. P. 26 ........................................................................................................ 6

## INTRODUCTION

Targeted use of discovery taken in *Calhoun v. Google*, No. 4:20-cv-05146-YGR-SVK ("*Calhoun*") and in the related case *In re Google RTB Consumer Privacy Litig.*, No. 4:21-cv-02155-YGR-VKD ("*RTB*") will dramatically increase the efficiency and pace of litigation in *RTB* while reducing burdens on the Court. In general, four categories of *Calhoun* discovery are relevant to *RTB*: (1) data flow; (2) what constitutes "personal information;" (3) consent; and (4) damages. *Calhoun* discovery on these topics is relevant to *every* affirmative *RTB* claim and, based on Google's Motion to Dismiss, Google's *RTB* defenses. Accordingly, Plaintiffs seek relief from the provisions in paragraph 7.1 of the Protective Order in, *Calhoun* Dkt. 61, to permit use in *RTB* of the targeted *Calhoun* discovery discussed herein. *See RTB* Dkt. 206, Motion to Allow Limited Use of Discovery.

*RTB* seeks redress for what regulators have appropriately called "the world's biggest data breach." *RTB* Dkt. 92, Consolidated Class Action Compl. ("CCAC"), ¶¶ 28-29. Google tracks users across the internet through its products, services, and partnerships, and uses that information to target users with advertising in the RTB auction.[2] The claims in *RTB* focus on the sale and disclosure of users' personal information through the auction process, which violates Google's promises that it will not sell users' information or share their sensitive information, among others. *See* CCAC ¶¶ 1, 11. Google defends these claims by arguing, *inter alia*, that what Google discloses in the auction does not constitute personal information; that the information was public; that Plaintiffs are not harmed; that Plaintiffs consented; and that they are not entitled to unjust enrichment damages. *See RTB* Dkt. 93, Mot. to Dismiss ("MTD"), at 6-8, 10-20.

*Calhoun* discovery is probative of these claims and defenses in at least four ways. **First**, to understand what constitutes personal information and what is disclosed, Plaintiffs need to show the jury what is referred to as the "data flow": what Google has collected about users; how it attaches identifiers to the data; how Google aggregates the information and draws inferences from it; and then how Google uses that information and the identifiers to target users in the auction. *Calhoun* discovery

---

[2] While *Calhoun* focuses largely on one Google product – Chrome – the information at issue in *RTB* draws upon all Google products. *RTB* is thus a significantly larger case than *Calhoun* in scope and damages.

focused heavily on data flow, showing that Google records exactly what personal information is used and shared in the RTB auction. Specifically, Google tracks and records users' personal information, including what an Account Holder is doing, when, precisely where, and how much Google was paid for revealing that information through the auction process. This information is processed through both "front-end" and "back-end" logs. Notably, these logs specifically identify what data is collected and associated with Account Holders through identifiers and how the information is channeled into the auction. **Second**, discovery related to how that information is or is not "anonymized" is relevant to whether Google is disclosing "personal information" under California law. Thus, inquiries into how users are tracked using identifiers, and whether third parties can de-anonymize users using those identifiers, is probative of core issues. **Third**, *Calhoun* discovery relating to Google's disclosures, and Google's flawed process for obtaining consent, are equally relevant in *RTB*. **Fourth**, *Calhoun* Plaintiffs identified methods to calculate individual unjust enrichment damages that are equally applicable to *RTB*.

These are all examples of discovery with overlapping relevance. To be clear, Plaintiffs are not seeking permission for wholesale use of all *Calhoun* discovery. But with the benefit of targeted access to and use, many hard-fought disputes already resolved in *Calhoun* need not be re-litigated here and the parties can get the *RTB* case back on track.

## I.     *CALHOUN* DISCOVERY RELATING TO DATA FLOW IS RELEVANT TO OFFENSIVENESS OF COLLECTION AND *RTB* CONTRACT CLAIMS, *INTER ALIA*

To determine whether collection is highly offensive under privacy claims, or whether it is sensitive, both what is being tracked and how Google does it, are factual inquiries. The CCAC describes how personal information flows from a Google Account Holder's web or device activity through Google, where it is analyzed, compiled, and results in the distribution of both Account Holder data and data inferred about Account Holders for sharing and sale to hundreds of different companies, and how it is made available through the auction process in general. *See, e.g.*, CCAC ¶¶ 1-30, 113-134. This is a process that Plaintiffs will have to explain to the jury. Each step of the RTB data flow was the subject of discovery in *Calhoun* – what the users are doing when Google tracks them and collects information about them, what Google tells users at the point of collection, where the data

goes, and how it is used to create inferences about users and construct bids and the revenue associated,
*see* Declaration of Lesley Weaver ("Weaver Decl.") ¶¶ 4-5 – and should be available to use in *RTB*.

### A.    RELEVANCE OF *CALHOUN* DATA FLOW DISCOVERY

The auctions at issue in *RTB* involve data collected through Google products, including Chrome, that have been the subject of significant *Calhoun* discovery. Google admits as much in its Motion to Dismiss. *See RTB* MTD at 5-6 (describing the *RTB* case as involving many of those products). Data flowing through these points of access determines how Bid Requests are constructed and sent through RTB. An excerpt from GOOG-CABR-00892126 discussing privacy risks in the RTB bidding process outlines the proposed flow of Account Holder data through RTB and how "data leakage" may occur.



*See* Declaration of Prof. Zubair Shafiq ("Shafiq Decl.") ¶ 6; Weaver Decl. ¶ 5.a., Ex. A. This document was produced in *Calhoun* but not in *RTB*. In addition to demonstrating the relevance of data flow, this document also tests a representation made by Google in *RTB*: Google told Judge DeMarchi that the *RTB* Class Period should not begin until 2016. Weaver Decl. ¶ 14.b. Discovery in *RTB* was thus limited to 2016 forward. *See RTB* Dkt. 95 at 6 (Google arguing that "Plaintiffs' insistence on January 1, 2014 is facially excessive and unsubstantiated, particularly when balanced against relevance and proportionality concerns."). This document suggests that at a minimum Google possesses relevant documents that pre-date 2016 and 2016 should not be the discovery limit; the date on the face of this document is November 18, 2014.

"Life of a GPT Ad Request," a *Calhoun* document, illustrates the overlapping relevance of data flow category discovery between the two cases. *See* Weaver Decl. ¶ 5.b., Ex. B (GOOG-CALH-00030221). This *Calhoun* document describes how Google's auctions (including RTB) work from start to finish. In Google's telling, the first half of the process – initial collection of Account Holder information, analysis, and storage – is irrelevant to what is disclosed in *RTB*. But Plaintiffs have alleged that RTB auction discloses, *inter alia*, inferred user interests based on their browsing history. To prove this, Plaintiffs must show the jury that browsing history was collected; that Google drew inferences based on it; and that it was disclosed. Stated differently, Plaintiffs cannot prove the existence of an inferred interest unless they can point to the underlying information and how Google collected and used it. When the users' personal information was collected and how it is used in RTB also bears directly on the users' expectations at the time of the collection and whether consent was obtained for that collection as well as its subsequent use.

*Calhoun* discovery does just this; it shows the "front end" of the data flow: Google's "front end" logs, systems of "collection" and "storage," anonymize data and channel it for different purposes, dictating *how* and *what* information will be disclosed in RTB. This discovery is not tangentially relevant; it squarely supports allegations in *RTB* about the RTB data flow and the resulting contract violations, including whether or not the information is truly anonymous. *See, e.g.*, CACC ¶¶ 13, 120-128.

**B. RELEVANCE OF *CALHOUN* LOGS DISCOVERY: THE "BACK END" OF THE DATA FLOW**

Another key component of data flow is discovery into what is referred to by Google as "back-end" logs. The reason that back-end logs are critical to *RTB* is that they reflect what, specifically, is shared about users. In *RTB*, Google has produced only very narrow discovery into back-end logs. This issue arose at the June 1, 2022 hearing, when Google's counsel asserted that there is only "one central log" relevant to RTB and that is the "call-out proxy log[.]" June 1, 2022 Hr'g Tr. at 24:23-25:2. Not so. Discovery in *Calhoun* revealed numerous back-end logs that identify what is disclosed in RTB and how much Google is paid for the information disclosed, and Google's proposal to produce just one log would exclude key components of it. For example, certain logs and databases reflect

1    "receipts" that identify not only payment for nearly every auction bid, but also what, when, where, to

2    whom, and for how much of nearly every auction and every ad shown to users as a result. Plaintiffs

3    attach a declaration from their expert in *Calhoun* and *RTB* who explains the importance of these logs.

4    *See* Shafiq Decl. ¶¶ 8-17.

5        The relevant logs include ███████████████████████████████████████████

6    ██████████████████████████████. *See* Weaver Decl. ¶ 9; Shafiq Decl. ¶ 17. ███

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████ Shafiq Decl. ¶ 17. This, and other

16   logs, and discovery about them, produced in *Calhoun*, directly adress many of Google's current and

17   anticipated defenses in *RTB* and other disputed issues, such as class member identification and the

18   calculation and apportionment of damages.

19       In addition, *Calhoun* log discovery is highly relevant to the ongoing dispute regarding

20   production of information collected about the *RTB* Named Plaintiffs ("Plaintiff Information"). To

21   date, Google has withheld Plaintiff Information, arguing that Plaintiffs must first provide Google with

22   specific device identifiers for each Named Plaintiff before Google can search its logs. *See* Weaver

23   Decl. ¶ 10. This is not true. This same tactic was used in *Calhoun. See Calhoun* Dkt. 166 at 3 (Dispute

24   No. 1.3). After almost a year of litigation before the *Calhoun* Special Master, *see* Weaver Decl. ¶¶ 7-

25   8, Plaintiffs learned that Google's demand was entirely unwarranted. Google is fully capable of

26   identifying, extracting, and producing Plaintiff Information with just the Account Holder's email

27   address. *See* Shafiq Decl. ¶ 8. Google's demand that *Calhoun* Plaintiffs first search for and provide

28   Account Holder identifiers significantly delayed production of Plaintiff Information in *Calhoun*,

resulting in spoliation of data that was not preserved pending collection. That need not happen here.

The *Calhoun* data flow discovery also shows that Google can identify user-specific settings and browsing history from its own records.[3] *See* Shafiq Decl. ¶ 9. But in discovery disputes before Judge DeMarchi, Google has successfully demanded production of *RTB* Plaintiffs' privacy settings and browsing history, while insisting that it need not produce the same. *Compare RTB* Dkt. 142 at 2 (arguing Plaintiffs must produce "privacy settings, web-browsing habits and all web-browsing history" because it relates to how Google "packages and shares Plaintiffs' information and enables targeted advertisements based on sensitive information," thus admitting that collection is relevant in discovery against Plaintiffs) *with RTB* Dkt. 141 at 6 (arguing Google need not produce information related to how it collects user information). Google did not inform Judge DeMarchi that Google already possesses more information responsive to Google's own discovery requests than the Plaintiffs do. This includes (1) the very setting Google claims to be most relevant (i.e., the "ads personalization" setting);[4] (2) robust browsing histories for individual account holders that Google combines across different devices and device identifiers and uses to populate bid requests; and (3) specific advertisements shown to users as a result of Google's auctions. *See* Shafiq Decl. ¶¶ 9-17. The adverse *RTB* discovery rulings on this issue, which Plaintiffs were prevented from effectively rebutting using *Calhoun* discovery, have resulted in costly device preservation, collection, and production of highly intrusive discovery. *See* Weaver Decl. ¶ 15; *see also* ¶¶ 11-14.

## II. TARGETED *CALHOUN* DISCOVERY FOR IDENTIFICATION OF "PERSONAL INFORMATION" IS HIGHLY RELEVANT TO THE SAME ISSUE IN *RTB*

In *RTB*, Google has mounted a defense that the information shared and sold through Google auctions is not "personal information." *See RTB* MTD at 12-13. Personal information, under California law, is information that is "reasonably capable" of being associated with a user, household, or device. Cal. Civ. Code § 1798.140(o), (x). Thus, one must understand how data is collected and

---

[3] Google has already signaled that it will be relying on user settings as a defense to the asserted claims and class certification. *See, e.g.*, *RTB* Dkts. 142, 172. The ability to identify users and their specific settings will thus be relevant to claims and defenses in *RTB*.

[4] While Plaintiffs disagree that the "ads personalization" setting is relevant, Google has raised this as a defense and the scope of discovery requires that Google produce responsive discovery. *See* Fed. R. Civ. P. 26(b)(1).

what other information is shared with third parties, in the auction or otherwise, to be able to determine if Google knows it constitutes personal information – i.e., is *reasonably capable of* being associated with a user, household or device – and thus allows users to be individually identified. This is a question of fact that should be subject to discovery.

Explaining how Google converts raw data to inferred data and then passes both along to RTB participants is key to telling the jury the story of exactly how Account Holders are targeted and whether they can be identified by what is shared. How Google associates data with users, and whether even pseudonymized data can be traced to users, is critical to this issue in *RTB*. One key claim is that Google passes data to third parties using certain device identifiers that Google knows full well the third parties can decode. A document titled "Field Guide to Display Ads" describes "how Display Ads serving systems work." Weaver Decl. ¶ 5.c., Ex. C (GOOG-CABR-00893711, at -714) (indicating RTB is part of Display Ads). ██████████████████████████

████████████████████████████████████████████████████ ¶¶ 136-147. *See id.* Additional discovery in *Calhoun* lays this out. *See* Weaver Decl. ¶ 6.a., Ex. I (Harting Dep. Tr. at 259:21-261:7); ¶ 6.c., Ex. K (Ravichandran Dep. Tr. at 35:22-43:2, 88:20-95:10, 133:10-140:2, 171:1-172:4); ¶ 6.d., Ex. L (Jun Dep. Tr. at 64:4-68:15, 84:17-86:25, 143:5-157:24, 170:10-171:1); ¶ 6.f., Ex. N (Berntson Dep. Tr. at 11:3-13, 40:25-46:13, 85:23-86:22). These are just examples of discovery relating to how Google associates data with users highly relevant to the claims in *RTB*.

## III. *CALHOUN* DISCOVERY REGARDING CONSENT IS HIGHLY RELEVANT TO GOOGLE'S CONSENT DEFENSE IN *RTB*

At the June 1, 2022 hearing, Google acknowledged that consent is at issue in both *Calhoun* and *RTB*, but argued that any overlap was "minuscule." June 1, 2022 Hr'g. Tr. at 23:4-16. Discovery obtained in *Calhoun* suggests otherwise. Google's *Calhoun* consent defense is based on a theory that it has obtained user consent through the Google Privacy Policy, as well as through varied consent flows and user settings. *See, e.g.*, *Calhoun* Dkt. 395, Mot. for Summ. J. on Consent. All of these disclosures were the subject of extensive discovery in *Calhoun*, and there is no doubt that Google's consent defense in *RTB* will largely be the same. *Compare RTB* MTD at 4-5 (relying on Google

Privacy Policy) *with Calhoun* Dkt. 395, MSJ at 6 (relying on Google Privacy Policy). Google's discovery requests also telegraph that it intends to adopt the same theory of consent. *See, e.g.*, *RTB* Dkts. 142, 172 (discussing discovery requests for user privacy settings and production of privacy policies and disclosures). Consent discovery in *Calhoun* is therefore highly relevant to Google's consent defense in *RTB.*

For example, *Calhoun* discovery identified two prominent Google projects, which, to date, Plaintiffs have been unable to explore in *RTB*: (1) Google's internal project called █████████████; and (2) Google's Privacy Sandbox initiative. These initiatives bear directly on whether Google itself acknowledges that users do not actually consent to Google's collection and sale of their data – as is required by governing law.

**A.** ██████████████████████

*Calhoun* discovery suggests that Google's executives agree that its purported consent model is broken. In a secret internal survey of Google engineers and executives known as ████████ ██████████████████████████████████████████████ ████████████████████████████████████. *See* Weaver Decl. ¶ 5.d., Ex. D (GOOG-CABR-05885871 – GOOG-CABR-058885942). For example, a key executive admitted that it is a "fantasy that users agreed to this" and "if people were the deciders, they wouldn't take the deal, but they are not the deciders." *Id.* at -918, -932. Another executive admitted that "[Google's] ad system as design[ed] doesn't really give the user choice." *Id.* at -872. Yet another cautioned that the "main privacy challenge Google faces today" is that "fear is lack of control and data being shared with third parties." *Id.* at -921.

*Calhoun* Plaintiffs only learned of the ████████ interviews when a Google employee disclosed this information during his deposition in December 2021. *See* Weaver Decl. ¶ 6.b., Ex. J (Heft-Luthy Dep. Tr. at 88:21-93:9). Even then, it took Plaintiffs months and a motion to compel to obtain the discovery. *See* Weaver. Decl. ¶ 6.b., n.1. Google finally produced ████████ documents after the close of discovery. *See Calhoun* Dkt. 670, Mot. for Sanctions, at 15-16. Use of the *Calhoun* consent documents, including ████████, in *RTB* will avoid these delays and avoid the need for Court intervention.

**B.    PRIVACY SANDBOX**

Google's public initiative called "Privacy Sandbox" was intended to explore eliminating the use of third-party cookies because of public outcry against tracking of users to target them with advertising. *See* Weaver Decl. ¶ 5.h. Third-party cookies facilitate targeted advertising, including targeted advertising through RTB. *Id.* Discovery in *Calhoun* shows that prior to any public statement, Google internally vets all aspects of Privacy Sandbox – projects, studies, and analysis – to ensure that Google continues to maintain an advantage in digital advertising. *Id.* This discovery reveals the ways in which Google wanted to claim the benefits of publicly announcing it was engaged in pro-privacy measures, while secretly exploring new ways to track users.

This discovery is relevant to Google's consent defense in *RTB* because the documents are replete with admissions from high level Google executives that Google's disclosures, public statements, and consent models are broken and misleading; that Google's conduct in many cases violates its public statements and user privacy expectations; and that Google was working to undermine any semblance of user choice by creating new avenues to track and collect user information. Not only is this information directly related to the consent defenses in *RTB*, but discovery shows that ***RTB was an impetus for these projects***. *See* Weaver Decl. ¶ 6.e., Ex. M (Kleber Dep. Tr. at 29:13-30:18) (testifying that the "motivating factor" for Privacy Sandbox, and underlying projects, included a 2018 published research which analyzed the diffusion of information *in RTB*); *see* Weaver Decl. ¶ 5.e., Ex. E (GOOG-CALH-00030521 at -522) (with respect to ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

**C.    ADDITIONAL RELEVANT CONSENT DOCUMENTS**

The below are additional examples of *Calhoun* documents discussing privacy issues relevant in *RTB*:

- In one *Calhoun* document, the lead engineer for the Chrome browser admitted that the key promise in *RTB* – that "Google does not sell your personal information to anyone" – is not true. *See* Weaver Decl. ¶ 5.f., Ex. F (GOOG-CABR-00111820 – GOOG-CABR-

00111827). Notably, the lead engineer explains that Google engages in numerous activities "that sounds like selling data to many people" and this is "hard to reconcile" with the core *RTB* promise. *Id.* at -822.

- Another *Calhoun* document shows that a Google 30(b)(6) corporate designee admitted that "[i]f you're browsing the web, then even if you know where you are … you probably don't know all the third parties involved – and it's unreasonable to expect you to." Weaver Decl. ¶ 5.g., Ex. G (GOOG-CALH-00043330 at -379). The corporate designee further noted "it shouldn't matter. People should be able to browse the web without worrying that someone is collecting a dossier on them for doing so[.]" *Id.* at -381.

- *Calhoun* discovery also contains production of many studies conducted and/or reviewed by Google, which analyze user expectations and understanding of Google's data practices, including targeted advertising, as well as analyzing user expectations and understanding regarding Google's privacy disclosures, user interfaces, and consent flows. *See* Weaver Decl. ¶ 5.h., Ex. H (GOOG-CABR-05404180).

These and other *Calhoun* consent discovery have equal weight and relevance in *RTB*. There is no rational basis to preclude Plaintiffs from using it.

## IV.  *CALHOUN* DAMAGES DISCOVERY IS DIRECTLY RELEVANT TO *RTB* DAMAGES CALCULATIONS

*RTB* and *Calhoun* focus on different contractual promises made by Google to users – one, a series of promises not to collect certain kinds of data (*Calhoun*) and the other, a series of promises about not disclosing that data (*RTB*). However, they share similar damage models. Plaintiffs in both cases seek compensation for unjust enrichment as measured by (1) the license value cost to track and use a consumer's personally identifiable browsing history; and (2) the revenue Google actually earned from its unauthorized conduct. Discovery from *Calhoun* is highly relevant to both calculations in *RTB*, including evidence that Google will use to attack Plaintiffs' damages model in this case.

One of the defenses that Google raised in *Calhoun* is that users' personal information has no value to users themselves, which is in a sense a challenge to the license theory. In *Calhoun*, Plaintiffs challenge that argument through proof that Google itself has paid users on occasion to collect data. The same evidence will be used to establish a market value for the data in this case, supporting the license theory of damages. Google runs a program called Screenwise, which provides a measure for the reasonable royalty value of a license to track a consumer's browsing history.[5] Specifically,

---

[5] Screenwise is specifically referenced in the *RTB* Complaint. CCAC ¶ 290. However, at the time of filing, Plaintiffs were not aware it was an active program paying participants for their browsing

through Screenwise, Google "pays users for their online data, and the amount paid (consistent with Google panels' per user price of $20 per month) is uniform across users, and payment is based on an amount Google has determined to be the fair market value." *See Calhoun* Dkt. 484-4 (Mangum Rebuttal Rpt. ¶¶ 30, 76-92). Plaintiffs' experts in *Calhoun* rely, in part, on Screenwise for damages calculations, and *RTB* Plaintiffs seek to do the same. Notwithstanding clear relevance, Google insists on withholding discovery into Screenwise (and the related program Cross Media Panel), arguing that these are "two random consumer market research programs." *RTB* Dkt. 171 at 6. They are not "random;" the data is a critical part of Google's ability to leverage targeting in the RTB auction. Screenwise is the product of extensive surveys and studies – referred to as "Panels" – conducted by Google. These Panels provide Google with a sample of users, representative of a population, that volunteer to allow Google to track certain information in exchange for compensation. The purpose of Screenwise is to conduct market research on behalf of Google to, among other things, determine what it takes "for Google ads [which oversees targeted advertising, including RTB] to be successful." *See Calhoun* Dkt. 484-4 (Mangum Rebuttal Rpt. ¶¶ 76-77, 80).

Significantly, Screenwise pays users for tracking based on the same identifiers and cookies alleged to be at issue in *RTB*, and includes the collection of the same data points that Plaintiffs allege to be illegally sold in RTB – e.g., browsing information. *Id.* at ¶ 81. Permitting use of these documents in *RTB* will resolve at least one dispute pending before Judge DeMarchi. Otherwise, Plaintiffs cannot undermine Google's contentions. Weaver Decl. ¶ 13.

As to the revenue Google earns through the auction, Google is likely to argue in *RTB*, as it did in *Calhoun*, that Plaintiffs cannot apportion damages because collection and sale of users' personal information varies among class members. However, through the *Calhoun* Special Master process, *Calhoun* discovery shows that Google's logs have fields that tie revenue to GAIA IDs, as well as other specific data types. *See* Shafiq Decl. ¶¶ 14-16. Based on this information, *Calhoun* Plaintiffs' experts explained that one can parse through the logs to determine specific unjust enrichment amounts for specific users, thereby refuting Google's claim that there was no way to

---

history. Moreover, Screenwise is specifically cited in the related *Brown* action in support of the Court's holding regarding Plaintiffs' economic damages theories.

1   calculate revenue per user. *See Calhoun* Dkt. 484-4 (Mangum Rebuttal Rpt. ¶ 93); *Calhoun* Dkt. 495

2   (Shafiq Rebuttal Rpt. ¶¶ 157-164, 176-190). The same is true in *RTB*.

3        As demonstrated above, there is significant overlapping discovery in *Calhoun* relevant to

4   *RTB*. Just as Magistrate Judge van Keulen permitted limited cross-use between *Calhoun* and *Brown*,

5   *see Calhoun* Dkt. 263, coordination of discovery between *Calhoun* and *RTB* makes equal sense in

6   these limited contexts. Indeed, the ability to reference *Calhoun* discovery would have streamlined

7   past disputes.[6] But Google's counsel repeatedly threatened Plaintiffs' counsel that discussing *any*

8   substantive aspect of discovery obtained in *Calhoun* would amount to a sanctionable violation of the

9   *Calhoun* protective order. *See, e.g.*, Weaver Decl. ¶¶ 12-15. Plaintiffs submit that at a minimum,

10  permitting Plaintiffs' counsel to share information about *Calhoun* discovery is the most efficient path

11  forward, and that great efficiencies at low impact, and no prejudice to Google, will flow from

12  permitting the use of *Calhoun* discovery in *RTB* as proposed herein.

13  **CONCLUSION**

14       The *Calhoun* documents and discovery discussed in this motion are examples discovery that

15  is plainly relevant to *RTB*. Permitting use in *RTB* of the categories of *Calhoun* discovery described

16  herein[7] will streamline discovery and reduce the number of disputes. Given the current posture of the

17  case Google's pace of production, this may be the only way that the parties can meet the case

18  management schedule.[8] And, at a minimum, permitting use of this discovery in *RTB* will ease burdens

19  on the Court in resolving current discovery disputes.

20  //

21  //

22

23  _____

   [6] Even basic information has been withheld from Plaintiffs in *RTB*. In *Calhoun* and *RTB*, Google has

24  claimed that it does not maintain organizations charts or documents functionally equivalent. That is

   a threshold question for identifying custodians and deponents. But in *Calhoun*, more than one witness

25  testified that Google does. *See* Weaver Decl. ¶ 14.a.

   [7] Running even a limited set of targeted search terms relevant to these categories of documents in the

26  *Calhoun* documents, such as "auction," "verticals," "sell your data," "bid request," and others hit

   upon more than 250,000 documents, five times the number of documents Google has produced in

27  this action to date. Weaver Decl. ¶ 3.

28     [8] *RTB* Dkt. 221 (setting substantial document completion deadline for July 11, 2022).

| | |
|---|---|
| 1 | DATED: June 8, 2022 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

DATED: June 8, 2022                    Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

*/s/ Lesley E. Weaver*
Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

**SIMMONS HANLY CONROY LLC**

*/s/ Jay Barnes*
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
jaybarnes@simmonsfirm.com
atruong@simmonsfirm.com

**DICELLO LEVITT GUTZLER LLC**

*/s/ David A. Straite*
David A. Straite (admitted *pro hac vice*)
Corban Rhodes (admitted *pro hac vice*)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, NY 10165
Tel.: (212) 784-6400
Fax: (212) 213-5949
dstraite@dicellolevitt.com
crhodes@dicellolevitt.com

Amy Keller (admitted *pro hac vice*)
Ten North Dearborn St., 6th Floor
Chicago, IL 60602
Tel.: (312) 214-7900
akeller@dicellolevitt.com

*Counsel for Plaintiffs in RTB and Calhoun*