# EXHIBIT 1

# Redacted In Its Entirety

# EXHIBIT 2

# Redacted In Its Entirety

# EXHIBIT 3

# Redacted Version of Document Sought to be Sealed

Message

| | |
|---|---|
| **From**: | Marc Treib [treib@google.com] |
| **Sent**: | 10/16/2018 6:41:58 AM |
| **To**: | Bettina Dea [bdea@google.com] |
| **CC**: | Mikel Astiz [mastiz@google.com]; Tim Schumann [tschumann@google.com]; Nathan Parker [nparker@google.com]; Chris Pickel [sfiera@google.com] |
| **Subject**: | Re: Metrics about extensions from Sync'd data |

On Mon, Oct 15, 2018 at 8:18 PM Bettina Dea <bdea@google.com> wrote:
Also, is it ok if I set up a meeting this week to go over some more questions that I have? As I keep looking into this, more questions keep coming up (it might be because I'm not understanding the the full picture)

Sure!

On Mon, Oct 15, 2018 at 11:11 AM, Bettina Dea <bdea@google.com> wrote:

On Mon, Oct 15, 2018 at 11:09 AM, Mikel Astiz <mastiz@google.com> wrote:
On Mon, Oct 15, 2018 at 8:03 PM Bettina Dea <bdea@google.com> wrote:
Thanks!!

On Sun, Oct 14, 2018 at 11:46 PM, Marc Treib <treib@google.com> wrote:
On Fri, Oct 12, 2018 at 11:19 PM Bettina Dea <bdea@google.com> wrote:
Ah thanks so much for taking the time to answer my questions!

Some more questions:

• What does "birthday" refer to? Is this the date the storage was created?

Yup, that's pretty close! (Though I'm not sure it's an actual date, just some ID.)
It's changed when the user goes to the Sync dashboard (chrome.google.com/sync) and hits "Reset Sync".
Whenever the user signs in a new device and sync, does that mean that the birthday also changes? Does this also affect the extension creation/modification timestamp?

No, birthdays are updated rarely, when a user resets sync from the server dashboard
in https://chrome.google.com/sync?hl=en-US

Ah sorry about that

• Previously Marc said " And if an extension gets repeatedly installed and uninstalled, all bets are off"
    o        Would there be multiple tombstone objects for this entity or when installed, it will revive the object? (Apologies if this might be a dumb question, I'm not familiar "tombstone objects")

Not a dumb question at all! It'll revive the existing object. There's only ever one actual object OR one tombstone per extension.

• Is it possible to ever figure out the very first time Extension Sync was enabled for a profile?

GOOG-CALH-00850593

I think we can probably figure out when Sync as a whole was first enabled from the ▮▮▮▮ of the corresponding DeviceInfo entity. We don't have it for Extension Sync specifically AFAIK.

- How can I find out which profile a ▮▮▮▮ refers to?

You mean, which (Gaia) account? Profiles are a concept in Chrome, the Sync server doesn't know about them.
One of our server folks will have to comment on how to get the account :)

Do we have an idea of how many people enable auto sync in comparison to not?

Can you clarify what 'auto sync' means?
Where all the options for Sync (i.e. bookmarks, extensions) are selected. I was wondering if there's data on the percentage of people that just sync everything vs. syncing only some of the options.

On desktop, about ▮▮ of all Chrome users have Sync enabled. Of those, the ▮▮▮▮▮▮ are syncing everything, but I don't have concrete numbers.

Thanks,
Mikel

On Fri, Oct 12, 2018 at 5:05 AM, Mikel Astiz <mastiz@google.com> wrote:
On Fri, Oct 12, 2018 at 1:36 PM, Marc Treib <treib@google.com> wrote:

On Fri, Oct 12, 2018 at 7:19 AM Tim Schumann <tschumann@google.com> wrote:

On Thu, Oct 11, 2018 at 10:10 PM Bettina Dea <bdea@google.com> wrote:
Hi,
I just read the documentation on how to analyze the Chrome Sync Storage Data and the flume job way seems like a viable option for us.

A few questions:

- Can we tell whether a user has had sync disabled before from the Zipit data? I see that the sync proto has a ▮▮▮▮▮▮▮▮▮ but it seems that this only happens when a user previously had synced on and then disabled it. The reason is because the user can download extensions prior to having sync enabled and we were thinking of just completely ignoring extensions that were installed while sync is not enabled as the ctime will not be accurate. Are there metrics how often users install extensions while sync is not on?

To my knowledge, we don't persist information about sync being disabled -- but I'll have a closer look at the server code.
We could infer this from other data sets, for example, if there are bookmarks existing with an older date.

GOOG-CALH-00850594

However, as Marc pointed out, if a users temporarily stopped sync in between (possibly over multiple periods of time), our heuristics won't work and we'd get biases.

Also, multi-device users will be problematic (there might be older history from a mobile phone), as we don't distinguish the origin of elements well.

- When an extension is uninstalled, will it disappear from the ▮▮▮▮▮▮▮ list?

We will create a tombstone object for this entity. Marc, Mikel: Can you help me dig out how the ids of extension sync entities are computed (given an extension, can we compute it's ID?). We'll also need to double check how the timestamps of tombstones are maintained (if they exist).

The relevant code is around here [1] - we just use the extension ID as the client tag. I believe the server ID is just a hash of that.

The server ID contains some more information, but it can mostly be inferred given a client tag. I think you'd need to know the birthday too.

It should be easier to do the analysis using the client-tag-hashes, which I believe we keep for server-side tombstones too. For extensions, that'd be a certain hash of the extension ID, as Marc says.

Wrt tombstone timestamps: it'd be best to check empirically, but at least the latest architecture (USS) uses the deletion time as modification-timestamp, and the creation-time seems to be carried over from the original entity.

Cheers,
Mikel


[1]
https://cs.chromium.org/chromium/src/chrome/browser/extensions/extension_sync_data.cc?rcl=742213
0d3da18b70d4cc81951feda2ab615edef9&l=170

Cheers,

--Tim

On Thu, Oct 11, 2018 at 6:48 AM, Marc Treib <treib@google.com> wrote:

On Thu, Oct 11, 2018 at 3:35 PM Mikel Astiz <mastiz@google.com> wrote:

On Thu, Oct 11, 2018 at 3:05 PM, Marc Treib <treib@google.com> wrote:

From looking at the Sync Node Browser in ▮▮▮▮▮▮▮▮▮▮▮ it seems like ▮▮▮▮▮ might be a reasonable approximation of install time. However, when an extension is uninstalled, the sync entity is tombstoned, and I don't know how much metadata we keep around in that case. And if an extension gets repeatedly installed and uninstalled, all bets are off :)

On Thu, Oct 11, 2018 at 2:59 PM Tim Schumann <tschumann@google.com> wrote:
+Mikel Astiz, +Marc Treib to keep me honest.

thanks for reaching out Nathan.

While sync entities have a concept of creation and modification time, these are sync-specific concepts[1] -- so the creation time is about when the sync entity was created (like when sync saw the item the first time) but not when the underlying Chrome element (in your case extension) was created.

GOOG-CALH-00850595

For certain datatypes, we carry over the creation time from the original model.

I haven't myself taken a look, but IIUC treib@ suggests that's the case for extensions.

No, that's not what I was trying to say :)

More precisely: If the user is already syncing at the time of extension installation, then Sync's ▐▐▐▐ should be a pretty good approximation of extension install time.
However, for extensions that were already installed at the time Sync is turned on, the ▐▐▐▐ will just be the Sync-turn-on time.

Cheers,
Mikel

That said, this might be a reasonable approximation for the install-duration, in particular if you want to identify short-lived extensions.

--Tim


-------------------
[1] With possibly the exception of a few sync data types, but not extensions.

On Thu, Oct 11, 2018 at 2:31 AM Nathan Parker <nparker@google.com> wrote:
Hey Tim --

QQ: Can we get "extension install date" from ▐▐▐▐▐▐ data?

Background: We're looking at ways to compute a metric of how long extensions were installed (to help find Uws), and I'm wondering if we can get this from existing ▐▐▐▐ logs. We want to know, per-extension, what the distribution of ▐▐▐▐▐▐ is. Does this exist? Where would we find the schema of these data?

FYI I've included an old thread below on a similar topic where you talk about where the data is stored, so you don't have to repeat yourself. :-) FYI we didn't end up pursuing the Titanium analysis. Thanks.

-- Nathan


On Wed, May 9, 2018 at 9:57 AM Chris Pickel <sfiera@google.com> wrote:
That doc looks correct.
There's also Zipit's own docs, which are convenient in that they use Chrome Sync for many of their examples.

On Wed, May 9, 2018 at 10:46 AM Tim Schumann <tschumann@google.com> wrote:
+Chris Pickel

We have daily dumps from our data store (ZipIt) which contains all the information you need. Chris, can you help Nathan to figure out which MDB group they need to join to get access to the data?

GOOG-CALH-00850596

Also Chris, do you know if this is the best description we have for accessing the exports? (https://docs.google.com/document/d/1SM-gdbJ-prNBd6L6ENqOiZm3wUsejv4WC4p9_lKtmeA/edit#heading=h.krv2gzsw09qh)
It's from 2015 and might be outdated a bit. You might be able to just get what you need from dremel directly.

Let us know if there's something we can do to help. If it's indeed just a dremel query, we might also just write that for you. I just don't know how we can identify Titanium users.

Cheers,

--Tim

On Mon, May 7, 2018 at 9:46 PM Nathan Parker <nparker@google.com> wrote:
Hi Tim --

I'd like to learn how we can do some one-off analysis with the set of extensions that Chrome-Sync users have installed. We just resolved a thread with Kay and Chelsea about the legal/privacy issues, and they agreed this is fine from those POV's.

So next step is to answer "how do we access the data," and this is where I'd like your thoughts. Kay mentioned there is no documented process for this. Should we GVC to discuss the options, or are there design docs we should start with?

The background: We're exploring building some Chrome features to be enabled when a GAIA user opts into the public Titanium program. One part is a whitelist of trusted and needed extensions. To build that we want to know what are the popular extensions for exiting Titanium users, so we'd like to join the set of (few thousand) GAIA ids with Sync data to generate a one-time aggregated report.

-- Nathan

# EXHIBIT 4

# Unredacted Version of Document Sought to be Sealed

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

PATRICK CALHOUN, *et al*., on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    vs.

GOOGLE LLC,

        Defendant.

Case No. 5:20-cv-5146-LHK-SVK

**DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS'**
**FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)**

Pursuant to Federal Rules of Civil Procedure Rule 36, Defendant Google LLC ("Google")
hereby responds and objects to Plaintiffs' First Set of Requests for Admission (Nos. 1-45). These
objections and responses are made solely for the purpose of and in relation to this action. In addition,
the objections and responses set forth in this document are based on Google's knowledge,
investigations, and analysis to date. As discovery proceeds, Google may become aware of additional
facts or evidence and its analysis of the case may change. Google reserves all rights to supplement
and amend its objections and responses accordingly.

**GENERAL OBJECTIONS**

The following objections apply to each and every Request for Admission ("Request")
propounded by Plaintiffs and are incorporated into each of the specific objections by reference as if
set forth fully therein:

1.       Google has not completed its investigation or discovery in this litigation. Google's
Responses and Objections to Plaintiffs' Requests are based upon the information presently known
to Google and are given without prejudice to Google's right to adduce or analyze evidence
subsequent to the date of these responses. Google expressly reserves the right to revise, supplement,
or otherwise amend these Responses and Objections to the extent permitted by the Federal Rules of
Civil Procedure, the Local Rules of Practice and Procedure for the United States District Court for

1  the Northern District of California ("Civil Local Rules"), or any discovery orders governing this

2  case.

3          2.      Google objects to the Requests to the extent that they seek information shielded from

4  disclosure by the attorney-client privilege, the work-product doctrine, the settlement privilege

5  and/or any other applicable privilege or protection from discovery.

6          3.      Google objects to the Requests to the extent they assume facts or legal conclusions

7  in defining the information requested. Google hereby denies any such disputed facts or legal

8  conclusions to the extent assumed by each request for admission. Any information provided by

9  Google with respect to any such request is without prejudice to this objection.

10         4.      Google objects to Plaintiffs' definition of "Google," "Defendant," "You," and

11  "Your" and Instruction No. 1 to the extent that they seek to require Google to respond or provide

12  information that is not within the possession, custody, or control of Google. Google further objects

13  to these definitions and instructions to the extent that they purport to impute knowledge of

14  unspecified or unknown parties or persons to Google. Google further objects to these definitions as

15  overly broad, vague, and ambiguous to the extent they purport to include entities other than Google,

16  which is the only named defendant in the present action. Google further objects to these definitions

17  and instruction to the extent that they include Google's attorneys and, therefore, cause requests using

18  "Google," "Defendant," "You," and "Your" to improperly seek information protected by the

19  attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other

20  applicable privileges or immunities.

21         5.      Google objects to Plaintiffs' definition of "First Run Experience" as vague and

22  ambiguous, especially since the cited document GOOG-CALH-00044222 does not appear to

23  reference what Plaintiffs claim it purportedly references.

24         6.      Google objects to Plaintiffs' definition of "Google Account Holder" as vague and

25  ambiguous. For example, it is unclear what the term "consumer-facing service" entails since Google

26  provides many of its services, including Gmail, YouTube, and Chrome for free, as well as what the

27  term "application" means and what constitutes an "application." Google will interpret the term

28

1    "Google Account Holder" to mean a person who has a registered account with one of Google's

2    services.

3          7.     Google objects to Plaintiffs' definition of "Google Source Code" as overly broad and

4    unduly burdensome, as it seeks "any set of instruction" from "any of [Google's] properties or

5    divisions" and irrelevant Google products, such as Search, Maps, Storage, Fonts, Reaptcha, the

6    Google Custom Search Engine, or "any other Google property." Indeed, in its October 1, 2021

7    Order, the Court stated that "each and every transmission, whether or not authorized, neither can

8    nor should be the subject of discovery in this case" before denying Plaintiffs' request to broaden the

9    scope of the case from to also include www.google.com. *See* Dkt. 329. Google further objects to

10   this definition as overly broad and unduly burdensome, as it encompasses "any set of instruction

11   derived in whole or in part from Google or any of its properties or divisions," which encompasses

12   source code or instructions that are not relevant to Plaintiffs' allegations in this case. Google further

13   objects to this definition as overly broad and unduly burdensome to the extent it seeks information

14   that exceeds the scope of Plaintiffs' allegations in this case related to Google's disclosures regarding

15   data Google receives when users visit third-party websites that use Google services (such as

16   Analytics or Ad Manager) while using a Chrome browser on which sync is not enabled. Google will

17   interpret "Google Source Code" in a manner that is consistent with the relevant scope of this case

18   to the extent it is able to.

19         8.     Google objects to Plaintiffs' definition of "Personal Information" which cherry-picks

20   certain provisions in the CCPA. Plaintiffs' definition of "Personal Information" misleadingly omits

21   the CCPA provision that makes clear that "'Personal information' does not include consumer

22   information that is deidentified," and defines "deidentified" to mean "information that cannot

23   reasonably identify, relate to, describe, be capable of being associated with, or be linked, directly or

24   indirectly, to a particular consumer, provided that a business that uses deidentified information: (1)

25   Has implemented technical safeguards that prohibit reidentification of the consumer to whom the

26   information may pertain. (2) Has implemented business processes that specifically prohibit

27   reidentification of the information. (3) Has implemented business processes to prevent inadvertent

28   release of deidentified information. (4) Makes no attempt to reidentify the information." CCPA

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

1798.140(h). Google further objects to Plaintiffs' definition of "Personal Information" as unduly burdensome, as it would encompass all routine Internet communications including any information that is needed to establish an Internet connection, such as IP addresses. Google further objects to Plaintiffs' definition of "Personal Information" as overly broad and unduly burdensome as it encompasses a broader scope of information than what Plaintiffs specifically identified in their Complaint: "IP addresses linked to user agent," "Session and Persistent cookie identifiers," "X-client-data headers" and "Browsing history and information regarding a consumer's interaction with an Internet website". Dkt. 302-4 (SAC), ¶ 51. Google further objects to Plaintiffs' definition of "Personal Information" as overly broad and unduly burdensome because Google's relevant disclosures, including its Privacy Policy (which Plaintiffs allege is part of the contract at issue), define information as "personal information" if it personally identifies an individual user or is associated with their Google Account. Google will interpret "Personal Information" consistent with its Privacy Policy and other disclosures, which may include information that users provide to Google which personally identifies them, such as name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information Google associates with a Google Account.

9.     Google objects to Plaintiffs' definition of "Person(s)" as overly broad and unduly burdensome in that it purports to include "a non-human entity recognized as having the rights and obligations of a human being."

10.     Google objects to Plaintiffs' definition of "Signal(s)" as overbroad and unduly burdensome, as it would include any type of information or symbol—*e.g.* "code, flag, data, number, entry, or other indicator"—that exists.

11.     Google objects to Plaintiffs' definition of "Un-Synced User" as vague and ambiguous, as it is unclear whether this term refers to a user who has never synced on any Chrome instance, never synced on a specific Chrome instance, turned sync off on that Chrome instance, or for whom sync is not functioning on that Chrome instance at that moment. Google further objects to Plaintiffs' definition of "Un-Synced User" as vague and ambiguous, as it appears to treat a user who only has sync enabled for "Settings" or "Theme" but not browsing history ("History"), the

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

same as a user who has sync enabled for their browsing history ("History" in Chrome)—the information at issue in this case.

12.    Google objects to Plaintiffs' definition of "Relevant Time Period" where "[d]ocuments created outside of the time period but which relate to the subject matter of this Complaint should be included when interpreting the requests set forth herein," as it essentially vitiates the purpose of having a "Relevant Time period." It is improper, unduly burdensome, and entirely disproportionate to the needs of the case for Plaintiffs to propound requests that are not time-limited.

13.    Google objects to Plaintiffs' Definitions, Instructions, and Requests to the extent they seek information and/or records that are not reasonably accessible and whose inclusion is not proportional to the needs of the case.

14.    Google objects to Plaintiffs' Definitions, Instructions, and Requests to the extent they conflict with or encompass information and/or records falling outside the scope of discovery under the Federal Rules of Civil Procedure, the Civil Local Rules, or any discovery orders governing this case.

15.    In making these objections, Google does not waive or intend to waive (a) any objections as to the competency, relevance and admissibility of any information that may be provided in response to these Requests, or the subject matter thereof; (b) any rights to object on any ground to the use of any information that may be provided in response to the Requests, or the subject matter thereof, in any subsequent proceedings, including trial of this or any other action; and (c) any rights to objection on any ground to any request for further responses to this or any discovery request.

**<u>OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION</u>**

Subject to the foregoing objections, Google objects and responds to Plaintiffs' Requests for Admission as follows:

**<u>REQUEST FOR ADMISSION NO. 1:</u>**

Admit that Chrome sent Personal Information about Plaintiffs to Google when they were using the Chrome browser and were not synced.

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

2        In addition to its General Objections, Google specifically objects to this Request on the

3  ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on

4  circumstances that are not specified in the Request. Google admits that when Plaintiffs were using

5  the Chrome browser with or without sync enabled, but while signed into a Google website, to visit

6  a website that uses certain Google services (such as Google Analytics and Google Ad Manager),

7  and while Plaintiffs had selected settings in their Google Account to permit their site activity data

8  to be stored in their Google Account, Google received information that it stored in Plaintiffs'

9  accounts (where they were able to review it). Google treats that information as personal information

10  in accordance with the terms of Google's Privacy Policy. Plaintiffs expressly consented to this

11  practice. *See, e.g.*, GOOG-CALH-00592132 - GOOG-CALH-00592280. Google denies that

12  Chrome ever sent Plaintiffs' Chrome browsing history to Google when Plaintiffs were using the

13  Chrome browser without sync enabled. Google otherwise denies this request.

14  **REQUEST FOR ADMISSION NO. 2:**

15        Admit that when an Un-synced User visits a non-Google website that includes Google

16  Source Code the Google Source Code instructs the Chrome browser to send Personal Information

17  to the Google Property associated with the Google Source Code.

18  **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

19        In addition to its General Objections, Google specifically objects to this Request on the

20  ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on

21  circumstances that are not specified in the Request. The Request fails to specify, for example,

22  whether the user is a Google Account holder, the browser mode and settings being used, the websites

23  and services being used, and the specific categories of information at issue. Google therefore cannot

24  truthfully admit or deny Request.

25  **REQUEST FOR ADMISSION NO. 3:**

26        Admit that when the Chrome browser is in its default state in an un-synced mode the Chrome

27  browser will transmit Personal Information to Google anytime an Un-synced User visits a website

28  on which Google Source Code appears.

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Denied.

**REQUEST FOR ADMISSION NO. 4:**

Admit that when the Chrome browser is in its default state in an un-synced mode the Chrome browser will transmit Personal Information to Google.com when an Un-synced User types into the Chrome omnibar.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

In addition to its General Objections, Google specifically objects to this Request on the ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Request. Google will interpret "omnibar" to mean "omnibox." Google admits that—as explained in the Chrome Privacy Notices that Plaintiffs attached to their Complaint (Dkt. 2, Exs. 17-33)—if Google is the user's default search engine, then the Chrome browser will transmit the characters a user types into the omnibox to Google.com. *Id.*, Ex. 33 at 3 ("When you search using the omnibox or the search box on the new tab page in Chrome, the characters you type (even if you haven't hit 'enter' yet) are sent to your default search engine. If Google is your default search engine, predictions are based on your own search history, topics related to what you're typing in the omnibox or in the search box on the new tab page, and what other people are searching for. Learn more."). Google further admits that if a Google Account holder is using Chrome with or without sync enabled, and (1) is signed into a Google website, (2) Google is her default search engine, and (3) she has enabled the appropriate account settings, then searches she performs using the omnibox are stored in her Google Account (where she can review them). *Id.* ("If you are signed in to a Google site and Google is your default search engine, searches you perform using the omnibox or the search box on the new tab page in Chrome are stored in your Google Account."). Google treats such searches stored in a user's Google Account as Personal Information.  Google otherwise denies this request.

**REQUEST FOR ADMISSION NO. 5:**

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

1    Admit that when the Chrome browser is in its default state in an un-synced mode the Chrome

2    browser will transmit Personal Information and the numbers, letters, and symbols that an Un-synced

3    User types into the Chrome omnibar to Google.com.

4    **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

5    In addition to its General Objections, Google specifically objects to this Request on the

6    ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on

7    circumstances that are not specified in the Request. Google will interpret "omnibar" to mean

8    "omnibox." Google admits that—as explained in the Chrome Privacy Notice that Plaintiffs attached

9    to their Complaint (Dkt. 2, Exs. 17-33)—if Google is the user's default search engine, then the

10   Chrome browser will transmit the numbers, letters, and symbols a user types into the omnibox to

11   Google.com. *Id.*, Ex. 33 at 3 ("When you search using the omnibox or the search box on the new

12   tab page in Chrome, the characters you type (even if you haven't hit 'enter' yet) are sent to your

13   default search engine. If Google is your default search engine, predictions are based on your own

14   search history, topics related to what you're typing in the omnibox or in the search box on the new

15   tab page, and what other people are searching for. Learn more."). Google further admits that if a

16   Google Account holder is using Chrome with or without sync enabled, and (1) is signed in to a

17   Google website, (2) Google is her default search engine, and (3) she has enabled the appropriate

18   account settings, then searches she performs using the omnibox are stored in her Google Account

19   (where she can review them). *Id*. ("If you are signed in to a Google site and Google is your default

20   search engine, searches you perform using the omnibox or the search box on the new tab page in

21   Chrome are stored in your Google Account."). Google treats such searches stored in a user's Google

22   Account as Personal Information. Google otherwise denies this request.

23   **REQUEST FOR ADMISSION NO. 6:**

24   Admit that Chrome has sent Personal Information about Chrome users to Google when users

25   are not synced since at least 2016.

26   **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

27   In addition to its General Objections, Google specifically objects to this Request on the

28   ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on

1 | circumstances that are not specified in the Request. The Request fails to specify, for example,

2 | whether the user is a Google Account holder, the browser mode and settings being used, the websites

3 | and services being used, and the specific categories of information at issue. Google therefore cannot

4 | truthfully admit or deny this Request.

5 | **REQUEST FOR ADMISSION NO. 7:**

6 |      Admit that Google has not suspended the practice of sending Personal Information about

7 | Chrome users to Google when users are not synced.

8 | **RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

9 |      In addition to its General Objections, Google specifically objects to this Request on the

10 | ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on

11 | circumstances that are not specified in the Request. The Request fails to specify, for example,

12 | whether the user is a Google Account holder, the browser mode and settings being used, the websites

13 | and services being used, the specific categories of information at issue, and whether the user enabled

14 | or disabled a feature that would have prevented certain categories of information from being

15 | transmitted to Google and stored in the user's account. Google therefore cannot truthfully admit or

16 | deny this Request.

17 | **REQUEST FOR ADMISSION NO. 8:**

18 |      Admit that Google creates profiles of Chrome users from whom it has received data when

19 | they were not synced.

20 | **RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

21 |      In addition to its General Objections, Google specifically objects to this Request as vague

22 | and ambiguous as to "profiles," as Plaintiffs do not define the term and it is unclear what type of

23 | information they are referring to. For example, Plaintiffs do not specify whether they are referring

24 | to Chrome profiles (*See* GOOG-CALH-00023315,

25 | https://support.google.com/chrome/answer/2364824?hl=en&co=GENIE.Platform%3DDesktop) or

26 | Google Account profiles (*see* https://myaccount.google.com/profile). Google admits that users can

27 | provide information through either of these profile features without enabling Chrome's sync feature.

28 | Google otherwise denies this Request.

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

1  **REQUEST FOR ADMISSION NO. 9:**

2        Admit that when creating user profiles Google does not distinguish between data taken from

3  users when they are synced from data taken from users when they are not synced.

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

5        In addition to its General Objections, Google specifically objects to this Request as vague

6  and ambiguous as to "profiles," as Plaintiffs do not define the term and it is unclear what type of

7  information they are referring to. For example, Plaintiffs do not specify whether they are referring

8  to           Chrome           profiles           (*See*           GOOG-CALH-00023315

9  https://support.google.com/chrome/answer/2364824?hl=en&co=GENIE.Platform%3DDesktop) or

10  Google Account profiles (*see* https://myaccount.google.com/profile). Google admits that users can

11  provide information through either of these profile features without enabling Chrome's sync feature.

12  Google otherwise denies this Request.

13  **REQUEST FOR ADMISSION NO. 10:**

14        Admit that Google can identify the number of Chrome users in the United States from 2016

15  to present whose data was sent from Chrome to Google while not synced.

16  **RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

17        Denied.

18  **REQUEST FOR ADMISSION NO. 11:**

19        Admit that Chrome sends a Signal to Google that indicates when a Chrome user is not

20  synced.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

22        In addition to its General Objections, Google specifically objects to this Request as vague

23  and ambiguous as to "Signal" and "indicates," as it is unclear what type of information is sufficient

24  to be a Signal or an indication. Google admits that if a Chrome user is signed in to a Chrome browser,

25  and signed in to a Google website, and did not have sync enabled on the Chrome browser, then

26  Chrome may send a bit, which depending on the circumstances, may indicate to Google that sync is

27  not enabled on that Chrome browser at that time. This bit is only sent if the user is also signed in to

28  their Google Account at the browser level. Google otherwise denies this request.

10                          Case No. 5:20-cv-5146-LHK-SVK

**REQUEST FOR ADMISSION NO. 12:**

Admit that Chrome sends a Signal to Google that indicates when a Chrome user is not signed-in and not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Denied.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Chrome sends a Signal to Google that a Chrome user is not synced but signed-in to a Google Account.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

In addition to its General Objections, Google specifically objects to this Request as vague and ambiguous as to "Signal," as it is unclear what type of information is sufficient to be a Signal. Google admits that if a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome may send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome browser at that time. This bit is only sent if the user is also signed in to their Google Account at the browser level. Google otherwise denies this request.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Chrome sends a Signal to Google that a Chrome user is not synced but signed-in to a Google Account with Personal Information that identifies the Google Account Holder.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

In addition to its General Objections, Google specifically objects to this Request as vague and ambiguous as to "identifies the Google Account Holder," as it is unclear to what identification Plaintiffs are referring. Google admits that if a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome may send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome browser at that time. Google further admits that the bit is sent with information that identifies the signed-in Google Account. Google denies that Google Account

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

1  information is sufficient in every case to identify the individual using that Google Account. Google

2  otherwise denies this request.

3  **REQUEST FOR ADMISSION NO. 15:**

4    Admit that Chrome sends a Signal to the Google sync service that a specific Chrome user is

5  not synced when the user signs-in to a Google Account but is not synced.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

7    Google admits that if a Chrome user is signed in to a Chrome browser, and signs in to a

8  Google website, and did not have sync enabled on the Chrome browser, then Chrome may send a

9  bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that

10  Chrome browser at that time. Google otherwise denies this request.

11  **REQUEST FOR ADMISSION NO. 16:**

12    Admit that Chrome sends a Signal to the Google sync service that a specific Chrome user is

13  not synced when a Chrome user who has previously signed-in to a Google Account but is not synced

14  re-opens their Chrome browser after closing it without formally signing out of their Google Account.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

16    In addition to its General Objections, Google specifically objects to this Request as vague

17  and ambiguous as to "formally signing out of their Google Account," as it is unclear what the

18  distinction between formally signing out of a Google Account and signing out of a Google Account

19  is. Google admits that if a Chrome user is signed in to a Chrome browser, and signs in to a Google

20  website, and did not have sync enabled on the Chrome browser, then Chrome may send a bit, which

21  depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome

22  browser at that time. Google otherwise denies this request.

23  **REQUEST FOR ADMISSION NO. 17:**

24    Admit that Chrome sends a Signal to the Google sync service when a Chrome user clicks to

25  pause sync.

26  **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

27    In addition to its General Objections, Google specifically objects to this Request as vague

28  and ambiguous as to "a Chrome user clicks to pause sync," as it is unclear what user action is being

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

referred to. Google admits that Chrome attempts to send a request to the Google sync service when a Chrome user clicks to turn sync off on their Chrome browser. Google otherwise denies this request.

**REQUEST FOR ADMISSION NO. 18:**

Admit that Chrome sends a Signal to the Google sync service when a Chrome user clicks to turn off sync.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Google admits that an instance of the Chrome browser will attempt to send a request to the Google sync service when a Chrome user clicks to turn off sync.

**REQUEST FOR ADMISSION NO. 19:**

Admit that when a user clicks to un-pause or re-start Sync, Chrome will send previously un-synced communications stored by the browser to the Chrome sync service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

In addition to its General Objections, Google specifically objects to this Request on the ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Request. Google further objects that the Request does not specify what Plaintiffs mean by "un-synced communications stored by the browser." Accordingly, Google cannot truthfully admit or deny this Request.

**REQUEST FOR ADMISSION NO. 20:**

Admit that Chrome sends a signal to the Google sync service when a Chrome user clicks to Sync.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Google admits that an instance of the Chrome browser will attempt to send a request to the Google sync service when a Chrome user clicks to Sync.

**REQUEST FOR ADMISSION NO. 21:**

Admit that Chrome Sync logs contain data that indicates that Chrome users are not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Google admits that if a Chrome user is signed in to a Chrome browser, and signs in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome logs may

13

1  contain a bit, that may indicate to Google that sync was not enabled for any category of sync data
2  (*i.e.* Apps, Bookmarks, Extensions, History, Settings, Theme, Reading List, Open Tabs, Passwords,
3  Addresses and more, Payment methods and addresses using Google Pay) on that Chrome browser
4  at that time. Google otherwise denies this request.

5  **REQUEST FOR ADMISSION NO. 22:**

6      Admit that Chrome sync logs contain data that indicates when Chrome users chose to sync.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

8      Google admits that Chrome sync logs contain data that indicates that Chrome users had sync
9  enabled for one or more category of sync data (*i.e.* Apps, Bookmarks, Extensions, History, Settings,
10 Theme, Reading List, Open Tabs, Passwords, Addresses and more, Payment methods and addresses
11 using Google Pay). Google otherwise denies this request.

12 **REQUEST FOR ADMISSION NO. 23:**

13     Admit that Google maintains records of when Chrome users choose to sync or un-sync.

14 **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

15     Google admits that it maintains records showing when it received data from users who had
16 sync enabled for one or more category of sync data (*i.e.* Apps, Bookmarks, Extensions, History,
17 Settings, Theme, Reading List, Open Tabs, Passwords, Addresses and more, Payment methods and
18 addresses using Google Pay). Google otherwise denies this request.

19 **REQUEST FOR ADMISSION NO. 24:**

20     Admit that Google maintains records of when Chrome users sign-in to a Google Account.

21 **RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

22     Google admits that it maintains records showing when a Google Account was signed into
23 from any web browser, including Chrome.

24 **REQUEST FOR ADMISSION NO. 25:**

25     Admit that Google maintains records of when Chrome users sign-in to a Google Account
26 without also enabling sync.

27 **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

28

1    Google objects to this Request on the ground that it conflates different Google services and

2    features (*e.g.*, Google Account sign, and Chrome sync), and the records relating to those services

3    and features, which are not one and the same. Google admits that if a Chrome user is signed in to a

4    Chrome browser, and signs in to a Google website, and had sync enabled for one or more category

5    of sync data (*i.e.* Apps, Bookmarks, Extensions, History, Settings, Theme, Reading List, Open Tabs,

6    Passwords, Addresses and more, Payment methods and addresses using Google Pay) on the Chrome

7    browser, then Google's records may contain a bit, which depending on the circumstances, may

8    indicate to Google that the Chrome user had sync enabled. Google otherwise denies this request.

9    **REQUEST FOR ADMISSION NO. 26:**

10    Admit that Google is capable of extracting and joining data and information fields from

11    different logs or data sources to identify users who logged-in to a Google Account but did not enable

12    sync and determine when such actions occurred.

13    **RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

14    In addition to its General Objections, Google specifically objects to this Request on the

15    ground that what Google is "capable of" is wholly irrelevant to the parties' claims and defenses,

16    which turn on actual practices, not hypothetical "capabilities." Google further objects that the

17    request is exceedingly vague. For example, the Request asks Google to admit that it is capable of

18    extracting and joining unspecified "data and information fields" from unspecified "logs or data

19    sources." Accordingly, Google cannot truthfully admit or deny this Request.

20    **REQUEST FOR ADMISSION NO. 27:**

21    Admit that Google does not distinguish between synced and un-synced Chrome traffic

22    anywhere outside the Sync service.

23    **RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

24    Denied.

25    **REQUEST FOR ADMISSION NO. 28:**

26    Admit that Google does not distinguish between synced and un-synced Chrome traffic in

27    Display Ad logs.

28    **RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Case No. 5:20-cv-5146-LHK-SVK

1    Google admits that Chrome's sync feature is a browser personalization feature that is not

2   designed to affect whether Google Display Ads services receive data when a Chrome browser is

3   used to visit a website that uses Google Display Ads services, and thus Display Ads logs do not

4   distinguish between (1) data from a Chrome browser on which sync was enabled for one or more

5   category of sync data (*i.e.* Apps, Bookmarks, Extensions, History, Settings, Theme, Reading List,

6   Open Tabs, Passwords, Addresses and more, Payment methods and addresses using Google Pay)

7   and (2) data from a Chrome browser on which sync was not enabled for any category of sync data.

8   **REQUEST FOR ADMISSION NO. 29:**

9    Admit that Google does not distinguish between synced and un-synced Chrome traffic in

10  Analytics logs.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

12   Google admits that Chrome's sync feature is a browser personalization feature that is

13  not  designed to affect whether Google Analytics receive data when a Chrome browser is used to

14  visit a website that uses Google Analytics, and thus Google Analytics logs do not distinguish

15  between (1) data from a Chrome browser on which sync was enabled for one or more category of

16  sync data (*i.e.* Apps, Bookmarks, Extensions, History, Settings, Theme, Reading List, Open Tabs,

17  Passwords, Addresses and more, Payment methods and addresses using Google Pay) and (2) data

18  from a Chrome browser on which sync was not enabled for any category of sync data.

19  **REQUEST FOR ADMISSION NO. 30:**

20   Admit that Google does not distinguish between synced and un-synced Chrome traffic in

21  Search logs.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

23   Google objects to this Request as seeking information that is outside the scope of the case.

24  *See* Dkt. 329.

25  **REQUEST FOR ADMISSION NO. 31:**

26   Admit that Google does not distinguish between synced and un-synced Chrome traffic in

27  Google API logs.

28  **RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

1    In addition to its General Objections, Google specifically objects to this Request as vague

2  and ambiguous as to "Google API logs," as it is unclear what specific logs are being referred to.

3  Google therefore cannot truthfully admit or deny this Request.

4  **REQUEST FOR ADMISSION NO. 32:**

5    Admit that Google does not distinguish between synced and un-synced Chrome traffic in

6  logs containing Chrome omnibar transmissions.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

8    Google objects to this Request as seeking information that is outside the scope of the case.

9  *See* Dkt. 329.

10  **REQUEST FOR ADMISSION NO. 33:**

11    Admit that Google does not distinguish between synced and un-synced Chrome traffic in

12  logs containing data transmitted to Google.com while a Chrome user is on a non-Google owned-

13  and-operated website.

14  **RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

15    Google objects to this Request as seeking information that is outside the scope of the case.

16  *See* Dkt. 329.

17  **REQUEST FOR ADMISSION NO. 34:**

18    Admit that Google tracks the number of Chrome users who are not synced.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

20    Denied.

21  **REQUEST FOR ADMISSION NO. 35:**

22    Admit that Google seeks to convert Chrome un-synced users to Chrome synced users.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

24    In addition to its General Objections, Google specifically objects to this Request as vague

25  and ambiguous as to "seeks to convert Chrome un-synced users to Chrome synced users," as

26  Chrome sync is a browser personalization feature that Chrome users choose to enable or not enable.

27  Google admits that it informs Chrome users about the availability and function of its features,

28

1    including the Chrome sync feature in at least the Chrome settings menu, the Chrome Privacy Notice,

2    numerous Help Center articles, and the Chrome Whitepaper. Google otherwise denies the Request.

3    **REQUEST FOR ADMISSION NO. 36:**

4         Admit that Google routinely collects records of Chrome transmissions data for Chrome users

5    who are not synced.

6    **RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

7         In addition to its General Objections, Google specifically objects to this Request on the

8    ground that the term "Chrome transmissions data" is unclear and undefined. Accordingly, Google

9    cannot truthfully admit or deny this Request.

10   **REQUEST FOR ADMISSION NO. 37:**

11        Admit that Google records the instances of Google Account Holders who synced during

12   their First Run Experience with a Chrome Instance.

13   **RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

14        Google admits that it has records of Chrome instances on which sync was enabled during

15   the First Run Experience. Google otherwise denies the Request.

16   **REQUEST FOR ADMISSION NO. 38:**

17        Admit that Google is capable of querying, identifying, and joining data fields in logs

18   sufficient to identify Chrome users from whom it collected data when they were not synced.

19   **RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

20        In addition to its General Objections, Google specifically objects to this Request on the

21   ground that what Google is "capable of" is wholly irrelevant to the parties' claims and defenses,

22   which turn on actual practices, not hypothetical "capabilities." Google further objects that the

23   request is exceedingly vague. For example, the Request asks Google to admit that it is capable of

24   extracting and joining unspecified "data fields" from unspecified "logs." Accordingly, Google

25   cannot truthfully admit or deny this Request.

26   **REQUEST FOR ADMISSION NO. 39:**

27        Admit that Google is capable of identifying Google Account Holders who synced a Chrome

28   Instance during their First Run Experience and never paused or stopped syncing.

1   **RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

2        In addition to its General Objections, Google specifically objects to this Request on the

3   ground that what Google is "capable of" is wholly irrelevant to the parties' claims and defenses,

4   which turn on actual practices, not hypothetical "capabilities." Google admits that for some versions

5   of Chrome it is able to identify instances of Chrome on which sync was enabled during the First

6   Run Experience and which continue to be used with sync enabled. After conducting a reasonable

7   inquiry, the information Google knows and can readily obtain is insufficient to enable it to admit or

8   deny that it is capable of identifying Google Account Holders who synced a Chrome Instance during

9   their First Run Experience and never paused or stopped syncing.

10  **REQUEST FOR ADMISSION NO. 40:**

11       Admit that Google maintains a record of all Google Account Holders who have never

12  synced.

13  **RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

14       Denied.

15  **REQUEST FOR ADMISSION NO. 41:**

16       Admit that for any single Chrome Instance, Google is capable of extracting and joining data

17  and information fields from different logs to identify and distinguish between data sent from Chrome

18  to Google when the Chrome Instance was synced versus when it was un-synced.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

20       In addition to its General Objections, Google specifically objects to this Request on the

21  ground that what Google is "capable of" is irrelevant to the parties' claims and defenses, which turn

22  on actual practices, not hypothetical "capabilities." Google further objects that the request is

23  exceedingly vague. For example, the Request asks Google to admit that it is capable of extracting

24  and joining unspecified "data and information fields" from unspecified "different logs."

25  Accordingly, Google cannot truthfully admit or deny this Request.

26  **REQUEST FOR ADMISSION NO. 42:**

27       Admit that for any single Chrome Instance, Google is capable of determining whether the

28  Chrome Instance has never been operated in an un-synced state.

1    **RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

2        Denied.

3    **REQUEST FOR ADMISSION NO. 43:**

4        Admit that Google elected not to retain records of signals that a Chrome user was not synced.

5    **RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

6        Google admits that it followed Magistrate Judge van Keulen's order that "Google need not

7    suspend its standard retention periods applicable to data logs that reflect event-level data of Chrome

8    users in the United States." Dkt. 174. Google otherwise denies the Request.

9    **REQUEST FOR ADMISSION NO. 44:**

10        Admit that Google elected not to retain Chrome sync logs on the advice of counsel.

11    **RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

12        Google objects to this request on the ground that it asks Google to confirm or deny the

13    substance of advice from counsel, which information is privileged.

14    **REQUEST FOR ADMISSION NO. 45:**

15        Admit that Google elected not to retain records of signals that a Chrome user was not synced

16    on the advice of counsel.

17    **RESPONSE TO REQUEST FOR ADMISSION NO. 45:**

18        Google objects to this request on the ground that it asks Google to confirm or deny the

19    substance of advice from counsel, which information is privileged.

20

21    DATED:  October 12, 2021                    QUINN EMANUEL URQUHART &
22                                                SULLIVAN, LLP

23                                            By   */s/ Andrew H. Schapiro*
                                                Andrew H. Schapiro (admitted pro hac vice)
24                                                andrewschapiro@quinnemanuel.com
                                                191 N. Wacker Drive, Suite 2700
25                                                Chicago, IL 60606
                                                Telephone: (312) 705-7400
26                                                Facsimile: (312) 705-7401

27
                                                Stephen A. Broome (CA Bar No. 314605)
28                                                sb@quinnemanuel.com

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Jomaire Crawford (admitted pro hac vice)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Josef Ansorge (admitted pro hac vice)
josefansorge@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

**PROOF OF SERVICE**

**WASHINGTON, D.C.**

    At the time of service, I was over 18 years of age and not a party to this action. I am employed in Washington, D.C. My business address is 1300 I Street, N.W., Suite 900, Washington, D.C. 20005.

    On October 12, 2021, I served true copies of the following document(s) described as **DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)** on the interested parties in this action as follows:

**SEE ATTACHED LIST**

    **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I transmitted PDF format copies of the document(s) described above to the e-mail addresses on the attached Service List pursuant to the agreement between the parties to serve discovery, in lieu of other service methods, by email under Fed. R. Civ. P. 5(b)(2)(E) (*see* Joint Case Management Statement § 8.b, Docket No. 44) and on non-parties pursuant to the Court's August 12, 2021 Cross-use and Discovery Coordination Orders issued in *Brown v. Google*, Case No. 5:20-cv-03664-LHK-SVK (Dkt. 243) and *Calhoun v. Google*, Case No.: 5:20-cv-05146-LHK-SVK (Dkt. 263). The documents were transmitted by electronic transmission and such transmission was reported as complete and without error.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on October 12, 2021 at Washington, D.C.

                  */s/ Tracy Xi Gao*
                   Tracy Xi Gao

1

## SERVICE LIST

2

*Calhoun v. Google LLC*

3

*Case No. 5:20-cv-05146-LHK*

4      **BLEICHMAR FONTI & AULD LLP**
       Lesley Weaver (Cal. Bar No. 191305)
5      Angelica M. Ornelas (Cal. Bar No. 285929)
       Joshua D. Samra (Cal. Bar No. 313050)
6      555 12th Street, Suite 1600
       Oakland, CA 994607
7      Tel.: (415) 445-4003
       Fax: (415) 445-4020
8      *lweaver@bfalaw.com*
9      *aornelas@bfalaw.com*
       *jsamra@bfalaw.com*
10

11     **DICELLO LEVITT GUTZLER LLC**
       David A. Straite (admitted *pro hac vice*)
12     One Grand Central Place
       60 E. 42nd Street, Suite 2400
13     New York, NY 10165
       Tel.: (646) 993-1000
14     *dstraite@dicellolevitt.com*

15
       Amy E. Keller (admitted *pro hac vice*)
16     Ten North Dearborn Street
       Sixth Floor
17     Chicago, IL 60602
       Tel.: (312) 214-7900
18     *akeller@dicellolevitt.com*

19
       **SIMMONS HANLY CONROY LLC**
20     Mitchell M. Breit (admitted *pro hac vice*)
       Jason 'Jay' Barnes (admitted *pro hac vice*)
21     An Truong (admitted *pro hac vice*)
       Eric Johnson (*pro hac vice* to be sought)
22     112 Madison Avenue, 7th Floor
       New York, NY 10016
23     Tel.: (212) 784-6400
       Fax: (212) 213-5949
24     *mbreit@simmonsfirm.com*
25     *jaybarnes@simmonsfirm.com*
       *atruong@simmonsfirm.com*
26     *ejohnson@simmonsfirm.com*

27
       *Counsel for Plaintiffs*
28

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

## SERVICE LIST

*Brown v. Google LLC*
*Case No. 5:20-cv-03664-LHK*

BOIES SCHILLER FLEXNER LLP

Mark C. Mao, CA Bar No. 236165
Sean P. Rodriguez, CA Bar No. 262437
Beko Richardson, CA Bar No. 238027
Antonio Lavalle Ingram, II, CA Bar No. 300528
Alexander Justin Konik, CA Bar No. 299291
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
srodriguez@bsfllp.com
brichardson@bsfllp.com
aingram@bsfllp.com
akonik@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA. 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

William S. Carmody (admitted pro hac vice)
Shawn Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander P. Frawley (admitted pro hac vice)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023

24

Case No. 5:20-cv-5146-LHK-SVK

Tel.: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Ra Olusegun Amen (admitted pro hac vice)
Jean Sutton Martin (admitted pro hac vice)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
ramen@forthepeople.com
jean@jsmlawoffice.com

*Attorneys for Plaintiffs Chasom Brown et al.*

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

# EXHIBIT 5

# Redacted Version of Document Sought to be Sealed

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

PATRICK CALHOUN, *et al*., on behalf of
themselves and all others similarly situated,

        Plaintiffs,

        vs.

GOOGLE LLC,

        Defendant.

Case No. 5:20-cv-5146-LHK-SVK

**DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIFTH SET OF INTERROGATORIES (NO. 21-42)**

      Pursuant to Federal Rule of Civil Procedure 33, Defendant Google LLC ("Google") hereby provides its responses and objections to Plaintiffs' Fifth Set of Interrogatories (Nos. 21-42). These responses and objections are made solely for the purpose of and in relation to this action. In addition, the responses and objections set forth in this document are based on Google's knowledge, investigations, and analysis to date. As discovery proceeds, Google may become aware of additional facts or evidence and its analysis of the case may change. Google reserves all rights to supplement and amend its objections and responses accordingly.

**<u>GENERAL OBJECTIONS</u>**

      The following objections apply to each and every interrogatory propounded by Plaintiffs and are incorporated into each of the specific objections by reference as if set forth fully therein:

      1.      Google objects to Plaintiffs' definition of "Google," "Defendant," "You," and "Your" and Instruction No. 1 to the extent that they seek to require Google to produce or otherwise analyze any document or other information that is not within the possession, custody, or control of Google. Google further objects to this definition and instruction to the extent that they purport to impute knowledge of unspecified or unknown parties or persons to Google. Google further objects to this definition and instruction as overly broad, vague, and ambiguous to the extent they purport

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to include entities other than Google, which is the only named defendant in the present action. Google further objects to this definition and instruction to the extent that they include Google's attorneys and, therefore, cause interrogatories using "Google," "Defendant," "You," and "Your" to seek improperly information protected by the attorney-client privilege, the work product doctrine, the common interest privilege and/or any other applicable privileges or immunities.

2.    Google objects to Plaintiffs' definitions of "Communication," "Correspondence," "Document(s)," "Information," and "File" to the extent that they conflict with the provisions of the ESI Order pertaining to the search and production of documents. Google further objects to each interrogatory to the extent that it requires Google to search for electronically stored information in a manner that is inconsistent with the agreements reached in the parties' ESI negotiations.

3.    Google objects to Plaintiffs' definitions of "[c]oncern," "concerning," "[e]videncing," "[i]ncluding," "[r]egard," "regarding," "refer," "referring," "relate," "relating," "pertain," and "pertaining" to the extent that they propose to alter the plain meaning or scope of any specific interrogatory and to the extent that such alteration renders the interrogatory vague, ambiguous, and overbroad.

4.    Google objects to Plaintiffs' definition of "Data Transmission(s)" as overly broad and unduly burdensome, as it is not limited to computing devices or software programs relevant to this lawsuit and includes any transfer of information from a Chrome browser to "other locations," which is improperly vague.

5.    Google objects to Plaintiffs' definition of "Employee(s)" as including "any person who … purported to act on behalf of any Google entity" as overly broad, vague, and ambiguous to the extent it includes persons other than Google's employees.

6.    Google objects to Plaintiffs' definition of "Google Accountholder(s)" as vague and ambiguous to the extent it refers to an "individual who has" a Google account, as it is unclear what ownership or activity by an individual is sufficient to satisfy this definition.

7.    Google objects to Plaintiffs' definition of "Google Domain or Subdomain" as vague and ambiguous because it purports to include any domain or subdomain "associated with … Google," without providing any definition or context for that phrase.  Google also objects to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Plaintiffs' definition as overly broad and unduly burdensome to the extent it includes domains and

2  subdomains not at issue in this lawsuit.

3        8.    Google objects to Plaintiffs' definition of "Google Property" as overly broad and

4  unduly burdensome to the extent it includes Google products and services not at issue in this lawsuit.

5        9.    Google objects to Plaintiffs' definition of "Google Source Code" as overly broad and

6  unduly burdensome because it is not confined to Google products and services at issue in this

7  lawsuit. To the extent Plaintiffs' definition includes non-public source code, Google further objects

8  because the production of non-public, proprietary source code has already been deemed unwarranted

9  in this case. Dkt. 377 ("[T]he Court finds that the Special Master's factual conclusions regarding

10  the overbreadth of the Plaintiffs' requests for access to nonpublic source code . . . [is] well taken

11  and adopts those findings . . . Plaintiffs have not demonstrated the requisite factual basis of

12  necessity . . .").

13        10.   Google objects to Plaintiffs' definition of "Person(s)" as overly broad and unduly

14  burdensome in that it purports to include "a non-human entity recognized as having the rights and

15  obligations of a human being."

16        11.   Google objects to Plaintiffs' definition of "Policy" or "Policies" as overly broad,

17  vague, and ambiguous in that it purports to include "any rule, procedure, practice, or course of

18  conduct, whether formal or informal, written, or unwritten, recorded, or unrecorded, that was

19  recognized or followed, explicitly or implicitly."

20        12.   Google objects to Plaintiffs' definition of "Personal Information" as overly broad

21  and unduly burdensome because it extends far beyond the "personal information" referenced in

22  Plaintiffs' complaint (*see, e.g.*, Dkt. 162-3 ¶¶ 2, 4) and in Google's privacy policy, which defines

23  "personal information" as "information that you provide to us personally which personally identifies

24  you, such as your name, email address, or billing information, or other data that can be reasonably

25  linked to such information by Google, such as information we associate with your Google Account."

26        13.   Google objects to Plaintiffs' definition of "Relevant Time Period" as overly broad,

27  because it encompasses claims that may be barred by the statute of limitations. Google further

28  objects to Plaintiffs' definition of "Relevant Time Period" to the extent that it encompasses

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   information and/or records that are not reasonably accessible and whose inclusion is not proportional

2   to the needs of the case.

3       14.    Google objects to Plaintiffs' definition of "Signal" as overly broad and unduly

4   burdensome, as it would cover any type of information or symbol—e.g., "code, flag, data, number,

5   entry, or other indicator"—that exists.

6       15.    Google objects to Plaintiffs' definition of "Signed-In" as "refer[ring] to signing in or

7   logging in to a Google Account" as vague and ambiguous because it does not clarify whether the

8   user is (1) signed into a Google Account in the Chrome browser or (2) signed into a Google Account

9   in the content area of the browser while signed out of the Chrome browser. Google objects to

10  Plaintiffs' definition of "Signed-In" and "Sign-In" as vague, ambiguous, and improperly circular

11  because the definition relies on the term it seeks to define and Plaintiffs use the terms in ways that

12  require a technical and precise meaning, but do not provide such a definition.  Plaintiffs confusingly

13  appear to use "Signed-In" as a status state for a Google User (e.g., seeking information on Users

14  who are "not Signed-In"), but their definition in its entirety only refers to the act of "signing in or

15  logging in to a Google Account" and not a User state. This is vague and ambiguous and does not

16  provide the information required to answer the Interrogatories, such as whether a User who has ever

17  logged into a Google Account is considered "Signed-in" under Plaintiffs' definition, and it says

18  nothing of Users who may have logged into a Google Account on some devices but not on others.

19      16.    Google objects to Plaintiffs' definition of "Sync" as "refer[ring] to the Sync feature

20  available on Chrome Browsers" to the extent Plaintiffs purport it adequately defines or includes

21  alleged User states included in Plaintiffs' interrogatories, such as "Synced," "not Synced," or "un-

22  synced," which require a technical and precise definition and are undefined in Plaintiffs' Fifth Set

23  of Interrogatories.

24      17.    Google objects to Plaintiffs' Definitions, Instructions, and interrogatories to the

25  extent they seek information and/or records that are not reasonably accessible and whose inclusion

26  is not proportional to the needs of the case.

27      18.    Google objects to Plaintiffs' Definitions, Instructions, and interrogatories to the

28  extent they conflict with or encompass information and/or records falling outside the scope of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  discovery under the Federal Rules of Civil Procedure, the local rules of the Northern District of

2  California, or any discovery orders governing this case.

3      19.    Google's responses to these interrogatories are hereby made without waiving or

4  intending to waive, but rather, to the contrary, by preserving and intending to preserve:

5          a.    All questions as to the competence, relevance, materiality, and admissibility

6              as evidence for any purpose of the information or documents, or the subject

7              matter thereof, in any aspect of this action or any other court action or judicial

8              or administrative proceeding or investigation;

9          b.    The right to object on any ground to the use of any such information or

10             documents, or the subject matter thereof, in any aspect of this action or any

11             other court action or judicial or administrative proceeding or investigation;

12         c.    The right to object at any time in connection with any further response to this

13             or any other interrogatories; and

14         d.    The right at any time to supplement its responses.

15     20.    In offering to produce various types of documents, information, or things, Google

16  makes no representation that any such documents, information, or things exist or are actually known

17  (or not known) to exist.

18     21.    Google anticipates that future discovery, independent investigation, or analysis will

19  supply additional facts and add meaning to known facts, as well as establish new factual conclusions

20  and legal contentions, all of which may lead to additions to, changes in, and variations from the

21  responses set forth herein. Google reserves the right to modify, supplement, withdraw, or otherwise

22  alter its responses to these interrogatories in accordance with the Federal Rules of Civil Procedure,

23  the local rules of the Northern District of California, or any discovery orders governing this case.

24              **SPECIFIC OBJECTIONS TO INTERROGATORIES**

25     Subject to the foregoing objections, Google objects to Plaintiffs' interrogatories as follows:

26

27

28

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTERROGATORY NO. 21:**

Identify all sources of information from which Google has sufficient data to identify Users who are not Signed-In, whether such identification is possible because the data source (a) consists entirely of Users who were not Signed-In; (b) includes a specific field identifying whether the User was signed-in; or (c) contains Users who were Signed-In and not Signed-In, but also contains fields from which Users who were potentially Signed-In can be identified and excluded.

**RESPONSE TO INTERROGATORY NO. 21:**

Google incorporates its General Objections as if set forth fully herein. Google specifically objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Interrogatory. For example, Google objects to Plaintiffs' use of the phrase "Users who are not Signed-In" which is undefined, vague and ambiguous, and requires a technical and precise definition.  Google objects to Plaintiffs' use of the undefined phrase "potentially Signed-In" as vague, ambiguous, requiring a technical and precise definition, and inconsistent with Plaintiffs' purported definition of "Signed-In". Google further objects to this Interrogatory as overly broad and unduly burdensome, as it seeks information related to "all sources of information," which is undefined, vague, ambiguous, and potentially encompassing information irrelevant to this case.

Subject to the foregoing general and specific objections, and based on its investigation to date, Google responds as follows:

Google is not aware of any sources of information from which Google has sufficient data to establish a (i) person's full name, (ii) present or last known address, (iii) phone number, (iv) email address, and the (v) present or last known place of employment, of Users who are not signed-in.

**INTERROGATORY NO. 22:**

For each such source identified in Interrogatory No. 21 above, identify the retention periods and the specific data fields that can be used to isolate Users who were not Signed-In. As an example, Google has maintained that Biscotti-keyed data consists primarily of data taken from Users who are not Signed-In. However, Biscotti-keyed data also includes Users who were Signed-In but not

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

consented for NAC. Our understanding is that Google's systems are designed to send Signed-In traffic to Biscotti logs only when the User is non-NAC. As a result, the potential Signed-In Users can be excluded by all non-NAC data entries, leaving a remainder of Users who were all not Signed-In at the time their information was taken.

**RESPONSE TO INTERROGATORY NO. 22:**

Google incorporates its General Objections and its Specific Objections to Interrogatory No. 21 as if set forth fully herein. Additionally, Google objects to Plaintiffs' use of the undefined terms "retention periods" and "specific data fields" as vague, ambiguous, and requiring a technical and precise definition. Google also objects to Plaintiffs' use of the undefined phrase "used to isolate Users who were not Signed-In" as vague, ambiguous, and requiring a technical and precise definition, and it is unclear what "data fields" are sufficient to "isolate Users." Google objects to the Interrogatory's use of narrative to attribute views to Google without any citation to the record, such as the Interrogatory's statement that "Google has maintained that Biscotti-keyed data consists primarily of data taken from Users who are not Signed-In." Google objects and does not adopt the Interrogatory's use of other narrative to reflect "Our [*i.e.* Plaintiffs'] understanding," including the following statements:

- "Biscotti-keyed data also includes Users who were Signed-In but not consented for NAC."

- "Our understanding is that Google's systems are designed to send Signed-In traffic to Biscotti logs only when the User is non-NAC."

- "As a result, the potential Signed-In Users can be excluded by all non-NAC data entries, leaving a remainder of Users who were all not Signed-In at the time their information was taken."

Subject to the foregoing general and specific objections, and based on its investigation to date, Google incorporates by reference its response to Interrogatory No. 21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  **INTERROGATORY NO. 23:**

2      State the percentage of Google Accountholders who are "always Synced" when using the

3  Chrome browser. As used in this Interrogatory, "always Synced" means that the Google

4  Accountholder Synced during their First Run Experience on all Instances of Chrome browsers

5  associated with them and has not or did not ever subsequently turn Sync off for the browsers

6  associated with their respective Google Accounts.

7  **RESPONSE TO INTERROGATORY NO. 23:**

8      Google incorporates its General Objections as if set forth fully herein. Google specifically

9  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

10  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory. Google

11  objects to the Interrogatory's attempt to define "always Synced" in the text of the Interrogatory, as

12  it circularly relies on the term it attempts to define, "Synced." Further, the term "Synced" is

13  undefined, vague, and ambiguous, and not logically included in Plaintiffs' definition of "Sync,"

14  which Plaintiffs generically state "refers to the Sync feature available on Chrome Browsers" and

15  does not describe an action or User state relevant to how Plaintiffs use the term "Synced" in this

16  Interrogatory.  It is unclear whether "synced" in the context of this lawsuit only refers to users who

17  (i) enabled the sync function for their Chrome browsing History or (ii) also includes users who

18  enabled the sync function for their Passwords but did not enable the sync function for their Chrome

19  browsing History. Google further objects to the Interrogatory's use of the undefined phrase "Chrome

20  browsers associated" with Google Accountholders, which is vague, ambiguous, and requires a

21  technical or precise definition to alert Google of the connection Plaintiffs deem necessary for a

22  browser to be "associated" with a Google Accountholder.  Google also objects to Plaintiffs'

23  definition of "Google Accountholder(s)" as vague and ambiguous and renders the Interrogatory

24  impossible to answer because Plaintiffs seek percentages related to individuals, rather than Google

25  accounts.

26      Subject to the foregoing general and specific objections, and based on its investigation to

27  date, Google responds as follows:

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google does not maintain information showing the percentage of Google Accountholders

2    who are "always synced" when using the Chrome browser.  Because data showing whether a

3    Chrome browser had sync enabled during its First Run Experience ("FRE") is stored in Chrome

4    User Metrics Analysis ("UMA"), UMA data is not joined with Google Accounts, and information

5    about selections made during FRE are not included in sync traffic, a user can have sync enabled on

6    one device and not have sync enabled on a different device, a user can have sync enabled for a

7    Chrome profile on one device and not have sync enabled for a Chrome profile on the same device,

8    Google can not state the percentage of Google Accountholders who are "always synced" when using

9    the Chrome browser.

10    Subject to and without waiving the foregoing objections, Google further responds that it is

11    willing to meet and confer with Plaintiffs on the information sought through this Interrogatory.

12    **INTERROGATORY NO. 24:**

13    For each month during the class period and for each type of device and manufacturer of

14    device, state the percentage of Chrome traffic and users in the United States who were (1) synced;

15    (2) signed in but not consented for sync; (3) basic browser mode; (4) guest mode; and (5) incognito;

16    (6) WAA-off; (7) sWAA off; and (8) NAC-off.

17    **RESPONSE TO INTERROGATORY NO. 24:**

18
19    Google incorporates its General Objections as if set forth fully herein.  Google objects that

20    the Interrogatory is overly broad and unduly burdensome because it requests Google calculate

      percentages for traffic and users, types of devices, and manufacturers, for eight separate categories
21
      of information for every month during the years-long purported class period.  Further, Google
22
      objects that, despite Plaintiffs seeking statistics related to these categories, Plaintiffs have not
23
      defined any of the categories they seek information about, including "synced", "signed in but not
24
      consented for sync", "basic browser mode", "guest mode", "incognito", "WAA-off", "sWAA off",
25
      and "NAC-off."  Google objects that Plaintiffs' use of these categories is vague, ambiguous, and
26
      each requires a technical or precise definition, particularly given Plaintiffs are seeking technical
27
      "percentage[s] of Chrome traffic and users in the United States" related to each category.  Google
28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  further objects to the Interrogatory's use of the term "Chrome traffic" as undefined, vague,

2  ambiguous, and requiring a technical or precise definition because in its current form it is unclear

3  what Chrome use constitutes "Chrome traffic."  Google objects to the Interrogatory's use of the

4  phrase "each type of device and manufacturer of device" as undefined, vague, ambiguous, and it is

5  unclear what the categories "type of device" or "manufacturer of device" include.

6        Google further objects to this interrogatory as improperly compound because it purports to

7  seek at least eight separate categories of technical statistics that constitute at least eight discrete

8  subparts. Google further objects to this interrogatory because, in light of Plaintiffs' Fifth Set of

9  Interrogatories purporting to serve Plaintiffs' forty-second numbered interrogatory and Plaintiffs'

10 inclusion of improperly compound interrogatories, such as the seventeen subparts in Interrogatory

11 No. 30, Plaintiffs have exceeded the 53 interrogatory limit imposed by the Court. Dkt. No. 349

12 ("Absent a showing of good cause, each party shall be limited to 53 interrogatories. Discrete

13 subparts shall each be counted as a separate interrogatory.").

14       Subject to and without waiving the foregoing objections, Google responds that it is willing

15 to meet and confer with Plaintiffs regarding the scope and discrete subparts contained in this

16 Interrogatory.

17 **INTERROGATORY NO. 25:**

18
19       For all prior versions and throughout the Class Period, identify all changes or distinctions in
20 source code between versions of the Chrome browser, Google Display Ads, Google Ads, Google

21 Analytics, Google reCAPTCHA, Google Maps, Google Storage, Google APIs, and any other

22 Google source code that commands the Chrome browser to send IP address, User-Agent

23 information, X-client data headers, cookie information, or URLs to Google servers as alleged in the

24 First Amended Complaint and described in the Report of Richard M. Smith that Google contends

25 would alter the result that Chrome sends such information to Google servers as alleged in the

26 Complaint and described in the Report of Richard M. Smith.

27 **RESPONSE TO INTERROGATORY NO. 25**

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google incorporates its General Objections as if set forth fully herein. Specifically, Google
2    objects that this Interrogatory is overly broad and unduly burdensome.  For example, it requests
3    Google identify "all changes or distinctions" in source code for "all prior versions" from the years-
4    long purported class period for eight named Google products and "any other Google source code"
5    that "commands" the Chrome browser to send particular information to Google servers. Many of
6    these products have nothing to do with Plaintiffs' allegations and request information that is
7    irrelevant and well beyond the scope of this lawsuit, such as "Google Maps," "Google
8    reCAPTCHA," "Google Storage," and "Google APIs."  Google further objects to the Interrogatory's
9    use of the undefined terms "changes" and "distinctions" relating to source code as they are vague,
10   ambiguous, and require technical and precise definition.

11   Google further objects that the Interrogatory improperly and prematurely requests
12   information that is the subject of ongoing expert discovery, including by requesting responses to
13   allegations in the report of Plaintiffs' expert witness. Under the operative scheduling order, expert
14   discovery does not conclude until June 30, 2022, and opening reports are not due until March 17,
15   2022. *See* Dkt.464; *see also* Fed. R. Civ. P. 33(a)(2) (explaining that a court may order that an
16   "interrogatory need not be answered until designated discovery is complete").  Google further
17   objects because the production of non-public, proprietary source code has already been deemed
18   unwarranted in this case.  Dkt. 377 ("[T]he Court finds that the Special Master's factual conclusions
19   regarding the overbreadth of the Plaintiffs' requests for access to nonpublic source code . . . [is] well
20   taken and adopts those findings . . . Plaintiffs have not demonstrated the requisite factual basis of
21   necessity . . .").  Google further objects that the Interrogatory improperly seeks to shift the burden
22   of proof regarding operation of the Chrome browser during the purported class period to Google
23   when the burden rests squarely with Plaintiffs. Google further objects to this Interrogatory to the
24   extent it seeks information protected from disclosure by the attorney-client privilege, the attorney
25   work product doctrine, or any other applicable privilege or protection.

26   Google further objects to this interrogatory as improperly compound because it purports to
27   seek separate and discrete sets of information regarding at least eight different Google products and
28   services.  Google further objects to this interrogatory because, in light of Plaintiffs' Fifth Set of

11

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Interrogatories purporting to serve Plaintiffs' forty-second numbered Interrogatory and Plaintiffs'

2  inclusion of improperly compound Interrogatories, such as the seventeen subparts in Interrogatory

3  No. 30, Plaintiffs have exceeded the 53 Interrogatory limit imposed by the Court. Dkt. No. 349

4  ("Absent a showing of good cause, each party shall be limited to 53 interrogatories. Discrete

5  subparts shall each be counted as a separate interrogatory."). For these reasons, Google will not

6  provide a response to this Interrogatory.

7  **INTERROGATORY NO. 26:**

8
9      Identify all Google Domains and Subdomains to which Chrome sends any Personal

10  Information about Users who are not Synced and not currently present on a Google Property, and

11  for each Google Domain or Subdomain, identify the Google Property with which the Domain or

12  Subdomain is associated, the specific Data or Information that Chrome sends to the Domain or

13  Subdomain, any and all Data or Information that the Google Property associates with the Domain

14  or Subdomain, how the Data or Information sent and the Data or Information derived from it is used

15  and monetized by Google, where such Data or Information and associated Data or Information is

16  stored and for how long, and where such Data or Information is further processed at Google as a

17  result of Chrome sending it to the Domain or Subdomain in question.

18  **RESPONSE TO INTERROGATORY NO. 26:**

19      Google incorporates its General Objections as if set forth fully herein. Google objects to the

20  phrase "Google Domains … to which Chrome sends any Personal Information about Users" as

21  vague and ambiguous. Google objects to the Interrogatory's request for "all Google Domains and

22  Subdomains," "any and all Data or Information that the Google Property associates with the Domain

23  or Subdomain," "how" the data is "sent" or "derived," and "where" the data is "stored" and

24  "processed" as overly broad, unduly burdensome, and encompassing information irrelevant to this

25  lawsuit. Google objects to Plaintiffs' use of the phrase "Users who are not Synced," which is

26  undefined, vague and ambiguous, and requires a technical and precise definition. For example,

27  Plaintiffs have not explained whether they include signed-in users within their phrase "Users who

28  are not synced," which affects the types of information sent to Google. It is also unclear whether

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Plaintiffs' undefined phrase includes users who are not syncing Chrome browsing History, but are

2   syncing Apps, Bookmarks, Extensions, Settings, Theme, Reading list, Open tabs, Passwords,

3   Addresses and more, or Payment methods and addresses regarding Google Pay.  It is also unclear

4   whether Plaintiffs' undefined phrase includes users who have never synced, or only users who are

5   "not synced" at a specific and unidentified time or with respect to particular devices. The term

6   "Synced," although capitalized, is undefined and not logically included in Plaintiffs' definition of

7   "Sync," which Plaintiffs generically state "refers to the Sync feature available on Chrome Browsers"

8   and does not describe an action or user state relevant to how Plaintiffs use the term "Synced" in this

9   Interrogatory.  Google further objects to Plaintiffs' use of the undefined phrase "not currently

10  present on a Google Property," which is vague, ambiguous, and requires a technical or precise

11  definition that Plaintiffs have not attempted to provide or explain.

12      Google further objects to this interrogatory because Google third-party web services that

13  receive the data at issue in this case are browser-agnostic, and unaffected by whether a Chrome user

14  has Sync enabled.[1] Accordingly, the interrogatory is based on a false premise–*i.e.*, that Chrome

15  sends information to Google web services that other browsers do not.

16      Google further objects that this interrogatory appears to be asking about every Google

17  service that receives any data, which is an improper attempt to expand the scope of the case. *See*

18  Dkt. 329 ("Simply put, each and every transmission, whether or not authorized, neither can nor

19  should be the subject of discovery in this case.").

20      Google further objects to this interrogatory as improperly compound because it purports to

21  seek separate and discrete sets of data and information regarding different Domains, Subdomains,

22  and Google Properties. Google further objects to this interrogatory because, in light of Plaintiffs'

23

24  _____

25  [1] As Google explained in its Motion for Summary Judgment, Dkt. 395 (at 4 n.8), Google's third-party web services generally receive the disputed data regardless of browser brand or whether a

26  Chrome browser user has enabled Sync. There are a number of user-enabled features and settings in Chrome and other browsers that can block certain categories of the disputed data from being transmitted to and/or used by Google's Services (and other similar third-party web-services), such

27  as cookie-blockers, browser plug-ins, opt-out features, and virtual private networks. Websites using Google's Services can also enable or disable settings that affect whether Google receives certain

28  categories of data.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Fifth Set of Interrogatories purporting to serve Plaintiffs' forty-second numbered Interrogatory and

2    Plaintiffs' inclusion of improperly compound interrogatories, such as the seventeen subparts in

3    Interrogatory No. 30, Plaintiffs have exceeded the 53 interrogatory limit imposed by the Court. Dkt.

4    No. 349 ("Absent a showing of good cause, each party shall be limited to 53 interrogatories. Discrete

5    subparts shall each be counted as a separate interrogatory.").

6        Subject to and without waiving the foregoing objections: Google is willing to meet and

7    confer with Plaintiffs regarding the information sought in this interrogatory.

8    **INTERROGATORY NO. 27:**

9
10       Explain how Google uses Profile Information, including categories labeled "for Google
     internal use only."

11
12   **RESPONSE TO INTERROGATORY NO. 27:**

13       Google incorporates its General Objections as if set forth fully herein.  Specifically, Google

14   objects that the Interrogatory is overly broad and unduly burdensome in that it requests "how Google

15   uses Profile Information," without any purported limit to the products, services, or issues relevant

16   to this lawsuit. Google further objects that the phrase "how Google uses Profile Information" is

17   vague and ambiguous because, for example, it does not provide any instruction regarding the type

18   of use Plaintiffs seek to have Google explain, and providing information on all uses would be overly

19   broad and unduly burdensome. Google further objects to Plaintiffs' definition of "Profile

20   Information" as vague, ambiguous, overly broad, and unduly burdensome in that it purports to

21   include "the Data and Information that Google collects about users" without limitation.  Google

22   further objects to Plaintiffs' quotation of the language "for Google internal use only" as a category

23   of information included in the Interrogatory without providing citation or direction to Google

24   regarding the source of the quoted information.  Google further objects to this Interrogatory to the

25   extent it seeks information protected from disclosure by the attorney-client privilege, the attorney

26   work product doctrine, or any other applicable privilege or protection.

27       Subject to and without waiving the foregoing objections, Google directs Plaintiffs to the

28   January 7, 2022 deposition testimony of Deepak Ravichandran in this action. Google also

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

incorporates its publicly available Help Center pages on this topic, including the page titled "About audience targeting," which can be accessed at https://support.google.com/google-ads/answer/2497941.

**INTERROGATORY NO. 28:**

Identify where Chrome sends the "bit" that "indicate[s] to Google that sync is not enabled on that Chrome browser at that time," all locations where the "bit" is stored or transmitted by Google, what other information is contained in the same storage locations associated with the "bit," including information that would identify a Google Account, and how long the "bit" is stored in each location. *See, e.g.* Google's Resp. to RFA No. 14.

**RESPONSE TO INTERROGATORY NO. 28:**

Google incorporates its General Objections as if set forth fully herein. Specifically, Google objects to the extent Plaintiffs mischaracterize Google's responses and objections to Plaintiffs' Request for Admission No. 14, for example by not reciting the limitation on Google's response that the "bit" referenced is sent "if a Chrome user is signed in to a Chrome browser." Google further objects that the Interrogatory's request is overly broad and unduly burdensome in that it requests "all locations" where the "bit" is sent, stored, or transmitted, "other information" contained "in the same storage locations associated with the 'bit,'" and "how long" the "'bit' is stored in each location." Google further objects that the Interrogatory is vague and ambiguous because it does not define or indicate what is sufficient to constitute "other information … associated with the 'bit,'" or the information sufficient to "identify a Google Account." Google also objects that the Interrogatory is vague and ambiguous because it does not define or indicate what is meant by information "contained in the same storage locations," which requires a precise and technical definition.

Subject to and without waiving the foregoing objections, Google responds as follows: The bit referred to in Google's response to Plaintiffs' Request for Admission No. 14 is sent to ███ ██████████. For a list of ███ additional fields of data contained in ████████ ████████, Google refers Plaintiffs to tab 3.3.2 ████████████████ of its November 18, 2021 spreadsheet submitted pursuant to the Special Master process. The retention period for ███

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    ████████████████████. The bit referred to in Google's response to Plaintiffs' Request for

2    Admission No. 14 is transmitted from ██████████████ to █████: Chrome Sync, where

3    it is stored. For a list of additional fields of data in █████: Chrome Sync, Google refers Plaintiffs

4    to GOOG-CALH-00651647. The bit is retained in █████ for █████ with oldest data from

5    June 2020.

6    **INTERROGATORY NO. 29:**

7

8         Identify all persons and documents providing information in response to Plaintiffs' Requests

     for Production of Documents, Requests for Admission, and Interrogatories to Defendant.

9

10    **RESPONSE TO INTERROGATORY NO. 29:**

11         Google incorporates its General Objections as if set forth fully herein. Google specifically

12    objects to this Interrogatory as vague because Plaintiffs do not identify which of Plaintiffs' Requests

13    for Production of Documents, Requests for Admission, and Interrogatories to Defendant this

14    Interrogatory refers to. To the extent the Interrogatory refers to all Requests for Production of

15    Documents, Requests for Admission, and Interrogatories, it is overbroad, unduly burdensome, and

16    compound as Plaintiffs have propounded and Google has responded to a collective total of more

17    than 200 Requests. Google further objects to Plaintiffs' definition of "identify" as overly broad and

18    unduly burdensome, given Plaintiffs have expansively defined it as follows: "[w]hen referring to a

19    person, 'to identify' means to give, to the extent known, the (i) person's full name, (ii) present or

20    last known address, (iii) phone number, (iv) email address, and the (v) present or last known place

21    of employment." Where appropriate in its various responses, Google has cited particular documents

22    where it may have obtained information and has disclosed persons that provided information in

23    response to certain interrogatories, in the form of interrogatory verifications. For these reasons,

24    Google will not provide a response to this Interrogatory.

25    **INTERROGATORY NO. 30:**

26

27         Identify all documents supporting each of your affirmative defenses.

28    **RESPONSE TO INTERROGATORY NO. 30:**

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google incorporates its General Objections as if set forth fully herein. Specifically, Google

2  objects to Plaintiffs' definition of "identify" as overly broad and unduly burdensome, given

3  Plaintiffs have expansively defined it as follows: "When referring to documents, 'to identify' means

4  to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the

5  document creation and, if applicable, transmittal (including dates of any drafts or copies, if

6  applicable); (iv) source or location of where and how the document is stored; (v) custodian(s) of the

7  document; and (vi) the author(s), addressee(s), and recipient(s) of the document." Google further

8  objects to this Interrogatory to the extent it seeks information protected by the attorney-client

9  privilege, the work product doctrine, or the common interest doctrine, or that is otherwise privileged

10  or protected from discovery. *See, e.g.*, *Wahl v. Am. Sec. Ins. Co.*, 2009 WL 3463211, at *2 (N.D.

11  Cal. Oct. 23, 2009) ("the exact documents and witnesses [defendant] intends to use for each

12  affirmative defense reveals defense counsel's mental impressions, is work product and so is

13  privileged") (quoting *Johnson v. Ocean Ships, Inc.*, 2006 WL 2166192, at *3 (W.D. Wash. July 31,

14  2006)).

15    Google further objects to this Interrogatory as improperly compound because it purports to

16  seek the factual bases for at least seventeen affirmative defenses. *See* Dkt. 195 (Google's Answer to

17  Plaintiffs' First Amended Complaint) at 42-47; *Bovarie v. Schwarzenegger*, 2011 WL 719206, at

18  *2 (S.D. Cal. Feb. 22, 2011) ("An interrogatory that seeks a response as to multiple affirmative

19  defenses is counted as a separate interrogatory for each affirmative defense."). Google further

20  objects to this Interrogatory because, in light of Plaintiffs' Fifth Set of Interrogatories purporting to

21  serve Plaintiffs' forty-second numbered Interrogatory and Plaintiffs' inclusion of improperly

22  compound interrogatories, such as the eight subparts in Interrogatory No. 24, Plaintiffs have

23  exceeded the 53 Interrogatory limit imposed by the Court. Dkt. No. 349 ("Absent a showing of good

24  cause, each party shall be limited to 53 interrogatories. Discrete subparts shall each be counted as a

25  separate interrogatory."). Google further objects to the Interrogatory to the extent it improperly asks

26  Google to "identify all documents supporting" each of its affirmative defenses because such request

27  is an overly broad and unduly burdensome contention Interrogatory. *See, e.g.*, *Haggarty v. Wells*

28  *Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    interrogatories are permitted, they are often overly broad and unduly burdensome when they require

2    a party to state 'every fact' or 'all facts' supporting identified allegations or defenses."); *Bovarie*,

3    2011 WL 719206, at *1 ("seeking every fact that underlies every affirmative defense is unduly

4    burdensome.").

5          Subject to and without waiving the foregoing objections, Google responds that it is willing

6    to meet and confer with Plaintiffs regarding the scope and discrete subparts contained in this

7    Interrogatory.

8    **INTERROGATORY NO. 31:**

9

10          Identify all logs and domains which contain data sufficient to identify Users who are not

    synced.

11

12    **RESPONSE TO INTERROGATORY NO. 31:**

13          Google incorporates its General Objections as if set forth fully herein.  Google specifically

14    objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

15    to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  For

16    example, Google objects to Plaintiffs' use of the phrase "Users who are not synced," which is

17    undefined, vague and ambiguous, and requires a technical and precise definition.  Plaintiffs have

18    not explained whether they include signed-in users within their phrase "Users who are not synced,"

19    which affects the types of information sent to Google, and it is also unclear whether Plaintiffs seek

20    logs and domains with information to identity users who have never synced, or only users who are

21    "not synced" at a specific and unidentified time or with respect to particular devices. The term

22    "synced" is undefined and not logically included in Plaintiffs' definition of "Sync," which Plaintiffs

23    generically state "refers to the Sync feature available on Chrome Browsers" and does not describe

24    an action or user state relevant to how Plaintiffs use the term "synced" in this Interrogatory.  Google

25    further objects to this Interrogatory as overly broad and unduly burdensome, as it seeks information

26    related to "all logs and domains," which this Court has previously rejected and is not proportional

27    to the needs of this case.  Google further objects to this Interrogatory as overly broad and unduly

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  burdensome, as it is not time limited.  Google further objects that this Interrogatory improperly seeks

2  discovery that the Court has placed in the purview of the Special Master.

3       Subject to and without waiving the foregoing objections, Google responds that it is unaware

4  of any logs with data sufficient to identify Users—who are not synced—by the (i) person's full

5  name, (ii) present or last known address, (iii) phone number, (iv) email address, and the (v) present

6  or last known place of employment.

7  **INTERROGATORY NO. 32:**

8
9       Identify all efforts Google has taken to identify Users whose data was taken while they were

10 in an un-synced state.

11 **RESPONSE TO INTERROGATORY NO. 32:**

12      Google incorporates its General Objections as if set forth fully herein. Google specifically

13 objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

14 to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  For

15 example, Google objects to Plaintiffs' use of the phrase "un-synced state" which is undefined, vague

16 and ambiguous, and requires a technical and precise definition.  Plaintiffs have not explained

17 whether they include signed-in users within their phrase "un-synced state", which affects the types

18 of information sent to Google, and it is also unclear whether Plaintiffs seek "all efforts" to identity

19 users who have never synced, or only users who are "un-synced" at a specific and unidentified time

20 or with respect to particular devices.  The term "un-synced," is undefined and not logically included

21 in Plaintiffs' definition of "Sync," which Plaintiffs generically state "refers to the Sync feature

22 available on Chrome Browsers" and does not describe an action or user state relevant to how

23 Plaintiffs use the term "un-synced" in this Interrogatory.  Google further objects to Plaintiffs' use

24 of the undefined term "data" as vague and ambiguous and an insufficient identifier of the users

25 Plaintiffs reference.  Google further objects to this Interrogatory as overly broad and unduly

26 burdensome, as it seeks irrelevant information related to third parties, such as spyware, that have no

27 relationship to Google or to any allegations in this case. Google further objects to this Interrogatory

28 as overly broad and unduly burdensome, as it seeks information related to "all efforts," which is

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   vague and ambiguous and not proportional to the needs of this case.  Google also objects to the

2   Interrogatory's use of the undefined term "taken" as vague and ambiguous and disputes that any

3   data was "taken" from users without consent. Google further objects to this Interrogatory to the

4   extent it seeks information protected from disclosure by the attorney-client privilege, the attorney

5   work product doctrine, or any other applicable privilege or protection.

6          Subject to and without waiving the foregoing objections, and to the extent it understands the

7   interrogatory, Google responds that it has not undertaken such efforts.

8   **INTERROGATORY NO. 33:**

9
10         Identify all Signals recorded by Google that reflect whether Users are not synced, and for

11  each such Signal, how long it is kept, where it is stored, how it may be accesses, and how it may be

12  joined with other data about Users in the United States in Google's custody or control.

13  **RESPONSE TO INTERROGATORY NO. 33:**

14         Google incorporates its General Objections as if set forth fully herein. Google specifically

15  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

16  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory. Google

17  further objects to this Interrogatory as vague and ambiguous as to "Signals" because it is unclear

18  what type of information is sufficient to be a Signal, and Plaintiffs' definition includes improperly

19  broad categories such as "number[s]," "data," "entr[ies]," and all "other indicator[s]."  Google

20  further objects to this Interrogatory as vague and ambiguous as to "reflect whether Users are not

21  synced," as it is unclear what type of information is sufficient to show Users are not synced.  For

22  example, Plaintiffs have not explained whether they include signed-in users within their phrase

23  "Users who are not synced," which affects the types of information sent to Google, and it is also

24  unclear whether Plaintiffs seek signals with information to identity users who have never synced, or

25  only users who are "not synced" at a specific and unidentified time or with respect to particular

26  devices.  The term "synced," is undefined and not logically included in Plaintiffs' definition of

27  "Sync," which Plaintiffs generically state "refers to the Sync feature available on Chrome Browsers"

28  and does not describe an action or user state relevant to how Plaintiffs use the term "Synced" in this

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Interrogatory.  Google further objects to Plaintiffs' use of the undefined phrase "joined with other

2  data" as vague and ambiguous, as neither "joined" nor "data" are defined by Plaintiffs or subject to

3  a readily identifiable definition.  Google further objects to this Interrogatory as overly broad and

4  unduly burdensome, as it seeks information related to "all Signals," which encompasses irrelevant

5  information and is therefore not proportional to the needs of this case.

6      Google further objects that this Interrogatory is improperly compound, consisting of multiple

7  Interrogatories, and seeks information that is overly broad and unduly burdensome, in light of its

8  request for Google to explain "for each such Signal, how long it is kept, where it is stored, how it

9  may be accesse[d], and how it may be joined with other data about Users in the United States in

10 Google's custody or control."

11      Subject to and without waiving the foregoing objections, Google responds as follows:

12      If a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and

13 did not have sync enabled on the Chrome browser, then Chrome may send a bit that is stored in the

14 ███████████████████████████████████████████ field   in   ████████████

15 ████████████  Google also incorporates its response to Interrogatory No. 28.

16 **INTERROGATORY NO. 34:**

17      Identify all Signals sent from Chrome to Google reflecting when a User is not synced.

18

19 **RESPONSE TO INTERROGATORY NO. 34:**

20      Google incorporates its General Objections as if set forth fully herein.  Google specifically

21 objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

22 to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  Google

23 further objects to this Interrogatory as vague and ambiguous as to "reflecting when a Users is not

24 synced," as it is unclear what type of information is sufficient to show users are not synced.  For

25 example, Plaintiffs have not explained whether they include signed-in users within their phrase

26 "when a User is not synced," which affects the types of information sent to Google, and it is also

27 unclear whether Plaintiffs seek signals with information to identity users who have never synced, or

28 only users who are "not synced" at a specific and unidentified time or with respect to particular

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   devices. The term "synced," is undefined and not logically included in Plaintiffs' definition of

2   "Sync," which Plaintiffs generically state "refers to the Sync feature available on Chrome Browsers"

3   and does not describe an action or user state relevant to how Plaintiffs use the term "synced" in this

4   Interrogatory.  Google further objects to this Interrogatory as overly broad and unduly burdensome,

5   as it seeks information related to "all Signals," which encompasses irrelevant information and is

6   therefore not proportional to the needs of this case.

7          Subject to and without waiving the foregoing objections, Google responds as follows: The

8   signal sent from the Chrome client to the Chrome sync server identifying when a user is signed in

9   to a Chrome browser, and signed in to a Google website, and did not have the sync feature enabled

10  on the Chrome browser is called "is_sync_feature_enabled."

11  **INTERROGATORY NO. 35:**

12

13         State all reasons that Google promises Users that Chrome will not send Personal Information

    to Google when Users are not synced.

14

15  **RESPONSE TO INTERROGATORY NO. 35:**

16         Google incorporates its General Objections as if set forth fully herein.  Google specifically

17  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

18  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  Google

19  further objects to this Interrogatory as overly broad and unduly burdensome as to "Personal

20  Information" because it goes well beyond the definition of personal information in the terms of

21  Google's Privacy Policy to which Plaintiffs expressly consented (*see, e.g.*, GOOG-CALH-

22  00592132 – GOOG-CALH-00592280). Google further objects to this Interrogatory as overly broad

23  and unduly burdensome, as it seeks information related to "all reasons," which encompasses

24  irrelevant information and is therefore not proportional to the needs of this case. Google further

25  objects to this Interrogatory to the extent it seeks information protected from disclosure by the

26  attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or

27  protection. Google further objects to this Interrogatory to the extent it seeks a legal conclusion.

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google further objects to the Interrogatory to the extent it improperly asks Google to "[s]tate

2    all reasons" Google made particular disclosures prior to the close of fact and expert discovery, and

3    to the extent that such request is an overly broad and unduly burdensome contention Interrogatory.

4    *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012)

5    ("While contention interrogatories are permitted, they are often overly broad and unduly

6    burdensome when they require a party to state 'every fact' or 'all facts' supporting identified

7    allegations or defenses."). Google further objects to this Interrogatory as vague and ambiguous as

8    to the phrase "when Users are not synced," as it is unclear what users Plaintiffs include regarding

9    users who are "not synced."

10    Subject to and without waiving the foregoing objections, Google responds as follows:

11    Google did not state that "Chrome will not send Personal Information [as Plaintiffs define

12    that term] to Google when Users are not synced." Rather, the Chrome Privacy Notice upon which

13    Plaintiffs' purport to base their claims states: "The personal information that Chrome stores won't

14    be sent to Google unless you choose to store that data in your Google Account by turning on sync,

15    or, in the case of passwords, payment cards, and billing information, choosing specific credentials

16    or payment card and billing information to store in your Google Account. Learn More." Thus, this

17    Interrogatory is based on a false premise. Further, the meaning of the sentence in the Chrome

18    Privacy Notice, and how reasonable users would interpret it, has been the subject of extensive

19    briefing and fact and expert depositions. Google declines to respond further.

20    **INTERROGATORY NO. 36:**

21

22    State all facts in support of Your contention that Plaintiffs are not harmed by the acts

23    described in the Complaint.

24    **RESPONSE TO INTERROGATORY NO. 36:**

25    Google incorporates its General Objections as if set forth fully herein. Specifically, Google

26    objects to this Interrogatory as overly broad and unduly burdensome as to "the acts described in the

27    Complaint," as the Complaint included irrelevant information unrelated to the causes of action

28    therein. Google further objects to this Interrogatory as overly broad and unduly burdensome, as it

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   seeks information related to "all facts," which encompasses irrelevant information and is therefore

2   not proportional to the needs of this case.  Google further objects to this Interrogatory to the extent

3   it seeks information protected from disclosure by the attorney-client privilege, the attorney work

4   product doctrine, or any other applicable privilege or protection.  Google further objects to this

5   Interrogatory to the extent it seeks a legal conclusion and to the extent the Interrogatory seeks to

6   improperly imply the burden to prove whether Plaintiffs were harmed by the actions alleged in the

7   complaint rests with Google.  Google further objects to the Interrogatory to the extent it improperly

8   asks Google to "[s]tate all facts in support" of a particular contention prior to the close of fact and

9   expert discovery, and to the extent that such request is an overly broad and unduly burdensome

10   contention Interrogatory. *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2

11   (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted, they are often overly

12   broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting

13   identified allegations or defenses.").

14          Google further objects that the interrogatory improperly and prematurely seeks information

15   that requires expert discovery.  Whether and how Plaintiffs were harmed by the acts described in

16   the complaint and the facts in support will be the subject of expert reports on both sides. *See, e.g.*,

17   *Svenson v. Google, Inc.*, 2016 WL 8943301 (N.D. Cal. 2016) (considering expert analysis to

18   determine the alleged loss of Plaintiffs' benefit of the bargain and diminution of value related to

19   Plaintiffs' personal information).  Indeed, when counsel for Google asked Plaintiff Calhoun about

20   his alleged harm, such as out-of-pocket costs incurred from Google's conduct and his loss of control

21   over property with marketable value, counsel for Plaintiffs objected, in part, on the grounds that the

22   questions called for expert opinion.  Calhoun, July 19, 2021 Dep. Tr. 45:5-46:22; *id*. 50:20-51:6;

23   *see also* Wilson, October 25, 2021 Dep. Tr. 180:24-181:5 (Google asking if Plaintiff Wilson's

24   "personal information [has] been used by Google in a way that harms [her]" and Plaintiffs' counsel

25   objecting that the question "[s]eeks expert testimony"); *see also* Henry, August 9, 2021 Dep. Tr.

26   114:16-23 (Google asking if Plaintiff Henry believes that, as a result of Google's alleged conduct,

27   Plaintiff Henry has "lost information that [he] once had," and Plaintiffs' counsel objecting that the

28   question "calls for expert opinion as to the specifics").  Under the operative scheduling order, expert

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    discovery does not conclude until June 30, 2022, and opening reports are not due until March 17,

2    2022.  *See* Dkt.464; *see also* Fed. R. Civ. P. 33(a)(2) (explaining that a court may order that an

3    "interrogatory need not be answered until designated discovery is complete").  Further, Plaintiffs

4    will receive the factual basis for Google's expert analysis promptly after it is served: Pursuant to the

5    Stipulation and Order Re Expert Discovery, "the documents, data or other information relied upon"

6    by expert witnesses must be provided within three business days of their report being served. Dkt.

7    307 at 4.

8         Subject to and without waiving the foregoing objections, and with the expectation that

9    Google's response will be supplemented at the appropriate time by facts and documents ultimately

10   relied upon by its experts, Google responds as follows:

11        Plaintiffs were not harmed including because they consented to Google's collection of the

12   data at issue.  Further, to date, Plaintiffs' deposition testimony supports Google's contention that

13   they were not harmed by acts described in the complaint.  For example, Plaintiff Kindler explained

14   that she did not know any ways in which Google's conduct has affected her ability to use her

15   personal information in any way, and that she was not aware of having lost any personal information

16   that she once had as a result of Google's conduct.  Kindler, July 5, 2021 Dep. Tr. 64:3-13.  Other

17   Plaintiffs testified similarly.  *See, e.g.*, Calhoun, July 19, 2021 Dep. Tr. 51:18-52:2 (explaining

18   Plaintiff Calhoun has no recollection of ever trying to sell his browsing history, IP address, or

19   information about his computing devices); Crespo, July 21, 2021 Dep. Tr. 138:4-15 (explaining

20   Plaintiff Crespo has never tried and has no plans to ever sell her personal information); Wilson,

21   October 25, 2021 Dep. Tr. 180:24-181:5 (answering "I don't know" to the following question by

22   Google's counsel: "Dr. Wilson, so to your knowledge, has your personal information been used by

23   Google in a way that harms you?"); Henry, August 9, 2021 Dep. Tr. 114:16-23 (answering "I'm not

24   sure" to the question of whether Mr. Henry has "lost information that [he] once had" as a result of

25   Google's alleged conduct).  Further, Plaintiffs have admitted that they did not pay money for the

26   use of Chrome or Gmail.  *See, e.g.*, Plaintiffs' Aug. 2, 2021 Responses and Objections to Request

27   For Admission Nos. 18-21.  Pursuant to Rule 33(d), Google also incorporates herein its Opposition

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  to Plaintiffs' Motion for Class Certification and all supporting declarations, expert reports, and

2  exhibits.

3  **INTERROGATORY NO. 37**:

4

5      State all facts in support of Your contention that Plaintiffs did not suffer common harm by

   the acts described in the Complaint.

6

7  **RESPONSE TO INTERROGATORY NO. 37**:

8      Google incorporates its General Objections as if set forth fully herein.  Specifically, Google

9  objects to this Interrogatory as overly broad and unduly burdensome as to "the acts described in the

10  Complaint," as it included irrelevant information unrelated to the causes of action in the Complaint.

11  Google further objects to this Interrogatory as overly broad and unduly burdensome, as it seeks

12  information related to "all facts," which encompasses irrelevant information and is therefore not

13  proportional to the needs of this case.  Google objects to the Interrogatory's use of the term

14  "common" as vague and ambiguous, and Plaintiffs fail to define it in their Interrogatory.  Google

15  further objects to this Interrogatory to the extent it seeks information protected from disclosure by

16  the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege

17  or protection.  Google further objects to this Interrogatory to the extent it seeks a legal conclusion

18  and to the extent the Interrogatory seeks to improperly imply the burden to prove whether Plaintiffs

19  were harmed by the actions alleged in the complaint (or whether that harm was "common" among

20  Plaintiffs) rests with Google.  Google further objects to the Interrogatory to the extent it improperly

21  asks Google to "[s]tate all facts in support" of a particular contention prior to the close of fact and

22  expert discovery, and to the extent that such request is an overly broad and unduly burdensome

23  contention Interrogatory. *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2

24  (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted, they are often overly

25  broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting

26  identified allegations or defenses.").

27      Google further objects that the interrogatory improperly and prematurely seeks information

28  that requires expert discovery.  Whether and how Plaintiffs were harmed by the acts described in

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  the complaint and the facts in support will be the subject of expert reports on both sides.  *See, e.g.*,

2  *Svenson v. Google, Inc.*, 2016 WL 8943301 (N.D. Cal. 2016) (considering expert analysis to

3  determine the alleged loss of Plaintiffs' benefit of the bargain and diminution of value related to

4  Plaintiffs' personal information).  Indeed, when counsel for Google asked Plaintiff Calhoun about

5  his alleged harm, such as out-of-pocket costs incurred from Google's conduct and his loss of control

6  over property with marketable value, counsel for Plaintiffs objected, in part, on the grounds that the

7  questions called for expert opinion.  Calhoun, July 19, 2021 Dep. Tr. 45:5-46:22; *id.* 50:20-51:6;

8  *see also* Wilson, October 25, 2021 Dep. Tr. 180:24-181:5 (Google asking if Plaintiff Wilson's

9  "personal information [has] been used by Google in a way that harms [her]" and Plaintiffs' counsel

10  objecting that the question "[s]eeks expert testimony"); *see also* Henry, August 9, 2021 Dep. Tr.

11  114:16-23 (Google asking if Plaintiff Henry believes that, as a result of Google's alleged conduct,

12  Plaintiff Henry has "lost information that [he] once had," and Plaintiffs' counsel objecting that the

13  question "calls for expert opinion as to the specifics").  Under the operative scheduling order, expert

14  discovery does not conclude until June 30, 2022, and opening reports are not due until March 17,

15  2022. *See* Dkt.464; *see also* Fed. R. Civ. P. 33(a)(2) (explaining that a court may order that an

16  "interrogatory need not be answered until designated discovery is complete").  Further, Plaintiffs

17  will receive the factual basis for Google's expert analysis promptly after it is served: Pursuant to the

18  Stipulation and Order Re Expert Discovery, "the documents, data or other information relied upon"

19  by expert witnesses must be provided within three business days of their report being served. Dkt.

20  307 at 4.

21      Subject to and without waiving the foregoing objections, pursuant to Rule 33(d), Google

22  incorporates herein its Opposition to Plaintiffs' Motion for Class Certification and all supporting

23  declarations, expert reports, and exhibits.

24  **INTERROGATORY NO. 38:**

25      State all facts in support of Your contention that the Class is not ascertainable.

26

27  **RESPONSE TO INTERROGATORY NO. 38:**

28

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google incorporates its General Objections as if set forth fully herein.  Google further objects

2 to this Interrogatory as overly broad and unduly burdensome, as it seeks information related to "all

3 facts," which encompasses irrelevant information and is therefore not proportional to the needs of

4 this case.  Google further objects to this Interrogatory to the extent it seeks information protected

5 from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other

6 applicable privilege or protection.  Google further objects to this Interrogatory to the extent it seeks

7 expert testimony.   Google further objects to this Interrogatory to the extent it seeks a legal

8 conclusion.  Google further objects to the Interrogatory to the extent it improperly asks Google to

9 "[s]tate all facts in support" of a particular contention prior to the close of fact and expert discovery,

10 to the extent that such request is an overly broad and unduly burdensome contention Interrogatory,

11 and to the extent it seeks an improper preview of Google's opposition to class certification, which

12 is not yet due. *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal.

13 Sept. 18, 2012) ("While contention interrogatories are permitted, they are often overly broad and

14 unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting identified

15 allegations or defenses."); *See Campbell v. Facebook*, 2015 WL 3533221, at *5 (N.D. Cal. 2015)

16 (finding an interrogatory seeking "all facts that support…that this ACTION is appropriate for class

17 treatment" to be "no more than a thinly veiled attempt to sneak preview Plaintiffs' class certification

18 motion").

19    Subject to and without waiving the foregoing objections, pursuant to Rule 33(d), Google

20 incorporates herein its Opposition to Plaintiffs' Motion for Class Certification and all supporting

21 declarations, expert reports, and exhibits.

22 **INTERROGATORY NO. 39:**

23
24    State all facts in support of Your contention that damages are not subject to classwide proof.

25 **RESPONSE TO INTERROGATORY NO. 39:**

26    Google incorporates its General Objections as if set forth fully herein.  Google further objects

27 to this Interrogatory as overly broad and unduly burdensome, as it seeks information related to "all

28 facts," which encompasses irrelevant information and is therefore not proportional to the needs of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    this case.  Google further objects to this Interrogatory as seeking irrelevant information because it

2    is not limited to Chrome users in the United States.  Google further objects to this Interrogatory to

3    the extent it seeks information protected from disclosure by the attorney-client privilege, the

4    attorney work product doctrine, or any other applicable privilege or protection.  Google further

5    objects to this Interrogatory to the extent it seeks expert testimony.  Google further objects to this

6    Interrogatory to the extent it seeks a legal conclusion and to the extent the Interrogatory seeks to

7    improperly imply the burden to prove whether Plaintiffs were harmed by the actions alleged in the

8    complaint (or whether that harm was "common" among Plaintiffs) rests with Google.   Google

9    further objects to the Interrogatory to the extent it improperly asks Google to "[s]tate all facts in

10   support" of a particular contention prior to the close of fact and expert discovery, and to the extent

11   that such request is an overly broad and unduly burdensome contention Interrogatory.  *See, e.g.*,

12   *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While

13   contention interrogatories are permitted, they are often overly broad and unduly burdensome when

14   they require a party to state 'every fact' or 'all facts' supporting identified allegations or defenses.").

15        Google further objects that the interrogatory improperly and prematurely seeks information

16   that requires expert discovery.  Whether and how Plaintiffs were harmed by the acts described in

17   the complaint and the facts in support will be the subject of expert reports on both sides.  *See, e.g.*,

18   *Svenson v. Google, Inc.*, 2016 WL 8943301 (N.D. Cal. 2016) (Considering expert analysis to

19   determine the alleged loss of Plaintiffs' benefit of the bargain and diminution of value related to

20   Plaintiffs' personal information).  Indeed, when counsel for Google asked Plaintiff Calhoun about

21   his harm, such as out-of-pocket costs incurred from Google's conduct and his alleged loss of control

22   over property with marketable value, counsel for Plaintiffs objected, in part, on the grounds that the

23   questions called for expert opinion.  Calhoun, July 19, 2021 Dep. Tr. 45:5-46:22; *id.* 50:20-51:6;

24   *see also* Wilson, October 25, 2021 Dep. Tr. 180:24-181:5 (Google asking if Plaintiff Wilson's

25   "personal information [has] been used by Google in a way that harms [her]" and Plaintiffs' counsel

26   objecting that the question "[s]eeks expert testimony"); *see also* Henry, August 9, 2021 Dep. Tr.

27   114:16-23 (Google asking if Plaintiff Henry believes that, as a result of Google's alleged conduct,

28   Plaintiff Henry has "lost information that [he] once had," and Plaintiffs' counsel objecting that the

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

question "calls for expert opinion as to the specifics"). Under the operative scheduling order, expert discovery does not conclude until June 30, 2022, and opening reports are not due until March 17, 2022. *See* Dkt.464; *see also* Fed. R. Civ. P. 33(a)(2) (explaining that a court may order that an "interrogatory need not be answered until designated discovery is complete"). Further, Plaintiffs will receive the factual basis for Google's expert analysis promptly after it is served: Pursuant to the Stipulation and Order Re Expert Discovery, "the documents, data or other information relied upon" by expert witnesses must be provided within three business days of their report being served. Dkt. 307 at 4.

Subject to and without waiving the foregoing objections, pursuant to Rule 33(d), Google incorporates herein its Opposition to Plaintiffs' Motion for Class Certification and all supporting declarations, expert reports, and exhibits.

**INTERROGATORY NO. 40:**

State all facts in support of Your contention that Google cannot identify Users in the U.S. whose Personal Information was sent by Chrome to Google when Users were not synced during the Class Period.

**RESPONSE TO INTERROGATORY NO. 40:**

Google incorporates its General Objections as if set forth fully herein. Google specifically objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Interrogatory. Google further objects to this Interrogatory as overly broad and unduly burdensome, as it seeks information related to "all facts," which encompasses irrelevant information and is therefore not proportional to the needs of this case. Google further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection. Google further objects to this Interrogatory to the extent it seeks expert testimony or a legal conclusion. Google further objects to the Interrogatory to the extent it improperly asks Google to "[s]tate all facts in support" of a particular contention prior to the close of fact and expert discovery, and to the extent that such request is an overly broad and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    unduly burdensome contention Interrogatory.  *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012

2    WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted,

3    they are often overly broad and unduly burdensome when they require a party to state 'every fact'

4    or 'all facts' supporting identified allegations or defenses.").

5        Subject to and without waiving the foregoing objections, pursuant to Rule 33(d), Google

6    incorporates herein its Opposition to Plaintiffs' Motion for Class Certification and all supporting

7    declarations, expert reports, and exhibits.

8    **INTERROGATORY NO. 41:**

9
10       State all facts in support of Your contention that data contained in Display Logs and

11   Analytics Logs that Google did not retain in this action did not contain data that would help identify

     Class members.
12

13   **RESPONSE TO INTERROGATORY NO. 41:**

14       Google incorporates its General Objections as if set forth fully herein. Google specifically

15   objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

16   to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  Google

17   further objects to this Interrogatory as vague and ambiguous because it does not explain the data in

18   the Display Logs and Analytics Logs it refers to.  Google further objects to this Interrogatory as

19   overly broad and unduly burdensome, as it seeks information related to "all facts," which

20   encompasses irrelevant information and is therefore not proportional to the needs of this case.

21   Google further objects to this Interrogatory to the extent it seeks information protected from

22   disclosure by the attorney-client privilege, the attorney work product doctrine, or any other

23   applicable privilege or protection.  Google further objects to this Interrogatory to the extent it seeks

24   expert testimony or a legal conclusion. Google further objects to the Interrogatory to the extent it

25   improperly asks Google to "[s]tate all facts in support" of a particular contention prior to the close

26   of fact and expert discovery, and to the extent that such request is an overly broad and unduly

27   burdensome contention Interrogatory.  *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL

28   4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted, they are

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

often overly broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting identified allegations or defenses.").

Subject to and without waiving the foregoing objections, Google responds that it is not aware of ever contending that data contained in Display Logs and Analytics Logs that Google did not retain in this action did not contain data that could help identify Class members by the (i) person's full name, (ii) present or last known address, (iii) phone number, (iv) email address, and the (v) present or last known place of employment (although Google has no reason to believe that such data existed). Google is willing to meet and confer with Plaintiffs on the relevance of the information sought and to appropriately narrow the scope of this Interrogatory.

**INTERROGATORY NO. 42**

Identify, in detail, all data types and scenarios that make those data types visible to consumers in My Activity and specifically state whether a consumer can view the following in My Activity: (1) information Google receives when they are not signed in to a Google Account; and (2) information received by Google when a Chrome user has not enabled Sync and visits a non-Google website as a result of a communication that was not the result of the use clicking a link on a Google owned-and-operated property or an advertisement on a non-Google owned-and-operated property.

**RESPONSE TO INTERROGATORY NO. 42**

Google incorporates its General Objections as if set forth fully herein. Google specifically objects that the Interrogatory is overly broad and unduly burdensome because it requests that Google identify "all data types" in My Activity and all "scenarios" making those "data types visible" without limitation to activity connected to Analytics and Ad Manager, the products at issue in this case. Google further objects that Plaintiffs' use of the undefined phrase "scenarios that make those data types visible to consumers in My Activity" is vague and ambiguous, and it is unclear the information Plaintiffs seek to have Google "identify." Google objects to Plaintiffs' use of the phrase "user who has not enabled Sync," which is undefined, vague and ambiguous, and requires a technical and precise definition. For example, Plaintiffs have not explained whether they include signed-in users within their phrase "user who has not enabled Sync," which affects the types of information sent to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Google, and it is also unclear whether Plaintiffs' undefined phrase includes users who have never

2  synced, or only users who are do not have Sync "enabled" at a specific and unidentified time or with

3  respect to particular devices.  Google objects to Plaintiffs' use of the phrase "information Google

4  receives when [users] are not signed in to a Google Account," which is undefined, vague and

5  ambiguous, and requires a technical and precise definition.  Google objects to the Interrogatory as

6  vague and ambiguous because it relies on the following unclear language: "information received by

7  Google when a Chrome user has not enabled Sync and visits a non-Google website as a result of a

8  communication that was not the result of the use clicking a link on a Google owned-and-operated

9  property or an advertisement on a non-Google owned-and-operated property."

10      Subject to and without waiving the foregoing objections, Google responds that it is willing

11  to meet and confer with Plaintiffs on the information sought through this Interrogatory.

12

13  DATED:  January 31, 2022                QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
14

15                                  By  /s/ Andrew H. Schapiro
                                        Andrew H. Schapiro (admitted pro hac vice)
16                                      andrewschapiro@quinnemanuel.com
                                        191 N. Wacker Drive, Suite 2700
17                                      Chicago, IL 60606
                                        Telephone: (312) 705-7400
18                                      Facsimile: (312) 705-7401

19
                                        Stephen A. Broome (CA Bar No. 314605)
20                                      sb@quinnemanuel.com
                                        Viola Trebicka (CA Bar No. 269526)
21                                      violatrebicka@quinnemanuel.com
                                        865 S. Figueroa Street, 10th Floor
22                                      Los Angeles, CA 90017
                                        Telephone: (213) 443-3000
23                                      Facsimile: (213) 443-3100

24
                                        Jomaire Crawford (admitted pro hac vice)
25                                      jomairecrawford@quinnemanuel.com
                                        51 Madison Avenue, 22nd Floor
26                                      New York, NY 10010
                                        Telephone: (212) 849-7000
27                                      Facsimile: (212) 849-7100

28

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Josef Ansorge (admitted pro hac vice)
josefansorge@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## PROOF OF SERVICE

**NEW YORK, NEW YORK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in New York, NY. My business address is 51 Madison Avenue, 22nd Floor, New York, NY.

On January 31, 2021, I served true copies of the following document(s) described as **DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES (NOS. 21-42)** on the interested parties in this action as follows:

### SEE ATTACHED LIST

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I transmitted PDF format copies of the document(s) described above to the e-mail addresses on the attached Service List pursuant to the agreement between the parties to serve discovery, in lieu of other service methods, by email under Fed. R. Civ. P. 5(b)(2)(E) (*see* Joint Case Management Statement § 8.b, Docket No. 44) and on non-parties pursuant to the Court's August 12, 2021 Cross-use and Discovery Coordination Orders issued in *Brown v. Google*, Case No. 5:20-cv-03664-LHK-SVK (Dkt. 243) and *Calhoun v. Google*, Case No.: 5:20-cv-05146-LHK-SVK (Dkt. 263). The documents were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 31, 2022 at Hoboken, NJ.


*/s/ D. Seth Fortenbery*
D. Seth Fortenbery

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## SERVICE LIST

*Calhoun v. Google LLC*

*Case No. 5:20-cv-05146-LHK*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No. 191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 994607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 993-1000
*dstraite@dicellolevitt.com*

Amy E. Keller (admitted *pro hac vice*)
Ten North Dearborn Street
Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*

**SIMMONS HANLY CONROY LLC**
Mitchell M. Breit (admitted *pro hac vice*)
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (*pro hac vice* to be sought)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*mbreit@simmonsfirm.com*
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

*Counsel for Plaintiffs*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

## SERVICE LIST

2

*Brown v. Google LLC*

3

*Case No. 5:20-cv-03664-LHK*

4

BOIES SCHILLER FLEXNER LLP

5

Mark C. Mao, CA Bar No. 236165

6

Sean P. Rodriguez, CA Bar No. 262437
Beko Richardson, CA Bar No. 238027

7

Antonio Lavalle Ingram, II, CA Bar No. 300528
Alexander Justin Konik, CA Bar No. 299291

8

**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor

9

San Francisco, CA 94104

10

Tel.: (415) 293-6800
Fax: (415) 293-6899

11

mmao@bsfllp.com
srodriguez@bsfllp.com

12

brichardson@bsfllp.com
aingram@bsfllp.com

13

akonik@bsfllp.com

14

James Lee (admitted pro hac vice)

15

Rossana Baeza (admitted pro hac vice)
**BOIES SCHILLER FLEXNER LLP**

16

100 SE 2nd St., 28th Floor
Miami, FL 33131

17

Tel.: (305) 539-8400

18

Fax: (303) 539-1307
jlee@bsfllp.com

19

rbaeza@bsfllp.com

20

Amanda K. Bonn, CA Bar No. 270891

21

**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400

22

Los Angeles, CA. 90067
Tel: (310) 789-3100

23

Fax: (310) 789-3150

24

abonn@susmangodfrey.com

25

William S. Carmody (admitted pro hac vice)
Shawn Rabin (admitted pro hac vice)

26

Steven M. Shepard (admitted pro hac vice)
Alexander P. Frawley (admitted pro hac vice)

27

**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor

28

New York, NY 10019-6023

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Tel.: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Ra Olusegun Amen (admitted pro hac vice)
Jean Sutton Martin (admitted pro hac vice)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
ramen@forthepeople.com
jean@jsmlawoffice.com

*Attorneys for Plaintiffs Chasom Brown et al.*

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

# EXHIBIT 6

# Redacted In Its Entirety

# EXHIBIT 7

# Redacted In Its Entirety

# EXHIBIT 8

# Redacted In Its Entirety

# EXHIBIT 9

# Redacted Version of Document Sought to be Sealed

# Notes from interview with Rahul

Role & Responsibility re privacy at google?

- Aligning the company behind a long term strategy and goal around privacy
- Initially the company is very fragmented. Sundar was trying to be the tiebreaker. Sundar was struggling to get people to align. Rahuls role is to get them aligned

When you say alignment what does that mean?

- We should be super crisp about the problem we are trying to solve. When I first started talking to google leads the problem statement was described from existential crisis all the way to this is just a made up crisis (the news industry hates us). We can't be liked by everyone. So there was no clear way to approach and solve this problem.
- Kent for example has a very risk averse and risk mitigation approach
- But Sundar says this is a moment when user expectation is changing. I want to get out ahead of that and not just react
- Google wants everything - no hard trade offs. **This isn't a free lunch. We have to make the hard decisions.**
- Antidote: Data retention - ▓▓▓▓▓ said we are going to lose abilities to do different things. Lorraine pushed back and said this was never your data to use to start with (mindset shift). It was a bug that you were able to do this and now we are fixing that bug.

What is your role in respect to the ▓▓▓▓▓ work

- I don't know - it is up to you all to figure out what you want my role to be. I do feel that we are lacking a long term privacy strategy. I would like to bring the company along on this journey as we tell the story. I am happy to make that my role.

What do you see as the main privacy challenges (consumers) face today?

- Complexity of understanding of all the data that is collected about you. It is challenging for users to understand how data is connected to create insights about user. I see this all the time with location history. It delivers good things, but then it also enables a lot of other things, and it becomes more and more complicated under the hood. There was an implicit bargain made with tech companies. But then the world got more and more complex with more devices. The original contract was a pre mobile space. And now we have not gone back to revisit that contract. Users are just living with discomfort and uneasy.
- There is a game where you have 20 dollars. You have an allocator and a receiver. If they accept they get it, if they don't they get nothing. This study show economic behavior and that people want to have a fair trade. People don't feel that way today. Today people would feel like if they were the decided they wouldn't take the deal, but since they aren't the deciders they just have to take the deal and live with it.

What do you see the main challenges are in privacy for google today?

- Privacy is such an overloaded term. I have my mental model to simplify. Ultimately our job is to become good stewards of user data (that is what privacy means). SO then what does that mean? We have a set of principles. The other part of this is that we don't know what we don't know. We can't tell what the right mental model is for users. And today we can't tell what happens to a piece of data when it comes into our systems. There are gaps, but they aren't high priority problems. But fundamentally then we don't take

GOOG-CABR-04833494

seriously the responsibility of being a good steward of user data. Step 1. We are stewards. It is our responsibility to take care of it

If we are not responsible stewards, why is that a problem?

- We are collecting a ton of data. If we don't treat it with care, and users don't know what they are getting, and if you take a purely business lens to this - what does that mean for google? We are a very successful company- the risks of doing something that are not focused on being good stewards means that the benefit is nebulas but the risk is clear, so it is hard to bring people along. But we have to go back to core principles. We have to get back to basis. We have to have that moment. Our future and our differentiation is wrapped up in this and if we don't take this seriously our future is different. The struggle is that putting a price on that is very difficult.
- Example CVS decided to exit the tobacco business because of their core principles. Where they removed cigarettes they number of smokers in those areas and smokes decreased.
- Libra and FB is another good example. The fact that FB struggled with this is a clear indicator. If we don't have trust and treat data well, think about health care and alphabet - we will be limited to do things there because we lose the trust of users.

You talked about Microsofts back to basic, could you explain from your pov how it happened and what it has done?

- No specific insights, but familiar with it because of work on Chrome. When Chrome mades its moves it was surprising that Microsoft took a long time to understand and what chrome was doing to their core business. They were not nimble. When they went back to basics, they really refocused on a customer first approach. They moved away from a notion of we have products we must sell them. To we have customers, what do they need and how do we solve them.
- Google right now is in a state of FOMO. A good example is Shopping. What are we doing, we want to do something but there isn't a clear rational or plan. Chrome OS used to be like this as well. We would keep things going as a defensive mechanism as well as other things, but there was no story and so we ended up spreading ourselves very thing. What is it that we need to do - and if it means we need to give shopping or chrome etc that is okay.

Looking into the next 5 years - what are the main opportunities for google to be market leader

- We ourselves have to internalize and take seriously data stewardship. It means changing our collections and our infrastructure. In the end, users should never be surprised. They understand clearly what it means. They don't have to read the small print.
- There of course will be regulatory scrutiny and enforcement
- Our goal is to look beyond that and stay true to what users need.
- I was telling Kent that I would like the legal team to tell us longer term what the future challenges that we will face.
- I think we will exit our third party ads business and we will potentially face increasing struggles with our hardware business
- But most importantly is stewardship. If users don't opt into share data, we have to be resilient to that.

What are weakness google will have to overcome for user privacy?

- Making the necessary investment to get privacy as a foundational and long term investments. (I would describe things as incident response)
- PDPO has to step up, we have to be trusted with the other PAs.

- Today our relationship with other PAs is a bit too tactical.  We want to change this. We want them to see us as a partner in their long term success.
  - Long term Strat
  - Resourcing
  - …
- Ads will need to be changed
- Looking forward, 5 years from now, Google's business will not be what it is today. How do we map our privacy strategy to that. We need to merge our stories of privacy and what google will developing for products.
- How can privacy be an enabler for future business and product discussions

Eric talked about embracing contradictions. What are your thoughts on relationship between google account as a construct and google assistance as a construct?

- There are a couple of pieces. There is no question that Gaia is too brittle to handle the assistant.  Gaia is working on this through          . But today we don't have the right extractions. Figuring out the household use case is an unsolved problem. Forget about assistant just think about the home generally - what is sensitive vs not, what is okay to display vs not, and how do you make choices?  Project          - is a guest mode for assistant. We don't have good solutions -everything feels very ad hoc and tacked on. What does this mean in a shared experience? We don't have the right abstractions here. It shows its age when we try. It also is unclear of what the assistant is.
- Is it a product? Or is an access point to google services.  We should talk to the assistant team about how they see it. If we see it as an access point then it speaks to giving unfettered access to Google. But if it is a product then maybe it is worth solving on a series of different usage levels. There is a much deep argument past territorial space here that we haven't gotten to but need to.

Articulation and transformation - What do you think a vision needs here to be considered successful?

- The way I see it is there are many inputs into this process. 1. What we know to be true, user research. 2. Regulatory landscape - what is the future and long term future.
- You you take this and layer principles on top, what you come out with is a strategy. The conclusion inevitably follows form those sets of outputs. For example- 3P display if we look at previous approaches, there has been many conversations. But the question becomes how to we get to a place where they self decide that exiting is the right choice here, for the users, for the business, etc.

How will you personally, define success for this project?

- Clearly articulated long term vision for privacy that everyone understands
- Product strategy and also the culture and leadership shift on how this needs to change.

Personal thoughts:
We need to deliver a story that shows a future that is worth making culture shifts for, that brings us back to our roots and our original goals. We need to put users first forreal and then everything else will follow well - including regulators and gp.

# EXHIBIT 10

# Redacted In Its Entirety

# EXHIBIT 11

# Redacted In Its Entirety

# EXHIBIT 12

# Redacted In Its Entirety

# EXHIBIT 13

# Redacted In Its Entirety

# EXHIBIT 14

# Redacted In Its Entirety

# EXHIBIT 15

# Redacted In Its Entirety

# EXHIBIT 16

# Redacted Version of
# Document Sought to be Sealed

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5    PATRICK CALHOUN, ET AL., ON

6    BEHALF OF THEMSELVES AND ALL

7    OTHERS SIMILARLY SITUATED,

8         PLAINTIFFS,

9      vs.                    NO. 5:20-CV-05146-LHK-SVK

10   GOOGLE LLC,

11        DEFENDANT.

12   _____/

13

14                  *CONFIDENTIAL*

15       VIDEOTAPED DEPOSITION OF SAM HEFT-LUTHY

16        *VIA REMOTE COUNSEL VIDEOCONFERENCE*

17           MONDAY, DECEMBER 20, 2021

18                   VOLUME I

19

20

21

22   STENOGRAPHICALLY REPORTED BY:

23   MEGAN F. ALVAREZ, RPR, CSR No. 12470

24   JOB NO. 4974193

25   PAGES 1 - 331

                                        Page 1

CONFIDENTIAL

**Page 2**

1       UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3        SAN JOSE DIVISION

4

5 PATRICK CALHOUN, ET AL., ON

6 BEHALF OF THEMSELVES AND ALL

7 OTHERS SIMILARLY SITUATED,

8      PLAINTIFFS,

9   vs.      NO. 5:20-CV-05146-LHK-SVK

10 GOOGLE LLC,

11      DEFENDANT.

12 _____/

13

14

15

16     Videotaped Videoconference Deposition of

17 SAM HEFT-LUTHY, Volume I, taken on behalf of Plaintiffs,

18 VIA REMOTE COUNSEL.  Deponent testifying from

19 San Francisco, California, beginning at 9:06 a.m. and

20 ending at 6:35 p.m. on Monday, December 20, 2021, before

21 Megan F. Alvarez, RPR, Certified Shorthand Reporter

22 No. 12470.

23

24

25

**Page 3**

1 APPEARANCES: (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)

2

3 FOR PLAINTIFFS:

4    BY:  JASON "JAY" BARNES, ESQ

5      AN V  TRUONG, ESQ

6    SIMMONS HANLY CONROY

7    ONE COURT STREET

8    ALTON, ILLINOIS 62002

9    618 693 3104

10    JAYBARNES@SIMMONSFIRM COM

11 AND

12    BY:  LESLEY WEAVER, ESQ

13    BLEICHMAR FONTI & AULD LLP

14    555 12TH STREET, SUITE 1600

15    OAKLAND, CALIFORNIA 94607

16    415 445 4003

17    LWEAVER@BFALAW COM

18 AND

19    BY:  DAVID A  STRAITE, ESQ

20    DICELLO LEVITT GUTZLER

21    ONE GRAND CENTRAL PLACE

22    60 EAST 42ND STREET, SUITE 2400

23    NEW YORK, NEW YORK 10165

24    646 933 1000

25    DSTRAITE@DICELLOLEVITT COM

**Page 4**

1 APPEARANCES:  (CONTINUED)

2

3 FOR DEFENDANTS:

4    BY:  CARL SPILLY, ESQ.

5      JOMAIRE CRAWFORD, ESQ.

6    QUINN EMANUEL URQUHART & SULLIVAN LLP

7    51 MADISON AVENUE, 22ND FLOOR

8    NEW YORK, NEW YORK 10010

9    212.849.7000

10    JOMAIRECRAWFORD@QUINNEMANUEL.COM

11    CARLSPILLY@QUINNEMANUEL.COM

12

13 ALSO PRESENT:

14    TONI BAKER, GOOGLE IN-HOUSE COUNSEL

15

16 THE VIDEO OPERATOR:

17    DAVID WEST, VERITEXT

18

19

20

21

22

23

24

25

**Page 5**

1          INDEX

2 WITNESS           EXAMINATION

3 SAM HEFT-LUTHY

4 VOLUME I

5    BY MR. BARNES       21

6

7     --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2 (Pages 2 - 5)

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 1 | LinkedIn profile of Sam Heft-Luthy | 22 |
| Exhibit 2 | Document entitled "Key experience challenges," Bates GOOG-CABR-04754160 through 4754167 | 52 |
| Exhibit 3 | Document entitled ████████ Perspective readout, 9/2/2000," Bates GOOG-CABR-04754257 through 4754291 | 81 |
| Exhibit 4 | Document entitled "All new content moved over to the Perspective draft," Bates GOOG-CABR-04754929 through 4754315 | 99 |

Page 6

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 5 | Document entitled "████████ Perspective, Toward a ████████ experience strategy," Bates GOOG-CABR-04754627 through 4754632 | 109 |
| Exhibit 6 | Document entitled "A new approach to building trust, User & PDPO UX, 10/13/2020," Bates GOOG-CABR-03683283 through 3683355 | 124 |
| Exhibit 7 | Document entitled ████████ Experience Vision, Agency kick-off, 1/20/21," Bates GOOG-CABR-04834261 through 4834299 | 129 |
| Exhibit 8 | Document entitled "1P cross-product sharing control," Bates GOOG-CABR-04344170 through 4344173 | 134 |

Page 7

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 9 | Document entitled "SUNDAR presentation building blocks and owners," Bates GOOG-CABR-04015202 through 4015206 | 139 |
| Exhibit 10 | Document entitled "'Security Products,' messaging opportunities," Bates GOOG-CABR-04343585 through 4343588 | 145 |
| Exhibit 11 | Document entitled "1P cross-product sharing control," Bates GOOG-CABR-04344170 through 4344173 | 145 |
| Exhibit 12 | Privacy controls audit, Bates GOOG-CABR-03682003 | 156 |
| Exhibit 12A | Excel native file, Privacy controls audit, Bates GOOG-CABR-03682003 | 159 |

Page 8

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 13 | Document entitled "Do we have set of devices syncing to GAIA XXX?" | 160 |
| Exhibit 14 | E-mail dated 6/8/21 from Raquel Ruiz to Diogo Marques, My Linh, et al., Subject: 2021-06-08, Reassure xPA sync - Notes, Bates GOOG-CABR-04648710 through 4648712 | 163 |
| Exhibit 15 | E-mail string, topmost dated 10/15/19 from Sam Heft-Luthy to pdpo-pm, Subject Fwd: Aftenposten's story in tomorrow's print edition, Bates GOOG-CABR-03797625 through 3797628 | 180 |
| Exhibit 16 | Sam Heft-Luthy on Substack | 188 |

Page 9

3 (Pages 6 - 9)

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 17 | Article entitled "Markets, | 190 |
| | Subjects, and The State," dated | |
| | 8/1/2020 by Sam Heft-Luthy | |
| | | |
| Exhibit 18 | Message string, topmost dated | 192 |
| | 5/8/19 from Alexander | |
| | Schiffhauer to Dina Lamdany, | |
| | Jason Tiller, Megan Potoski, et | |
| | al., Subject APM 16, Bates | |
| | GOOG-CABR-03681851 through | |
| | 3681856 | |
| | | |
| Exhibit 19 | E-mail string, topmost dated | 205 |
| | 10/22/2020 from Greg Fair to Sam | |
| | Heft-Luthy  Subject Re: Program | |
| | Review: Privacy Surfaces, Bates | |
| | GOOG-CABR-03820864 through | |
| | 3820869 | |
| | | |
| Exhibit 20 | Document entitled "User Privacy | 213 |
| | Moment Outline," Bates | |
| | GOOG-CABR-04343377 through | |
| | 4343390 | |

Page 10

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 25 | Responses to Client Questions | 230 |
| | document, Bates | |
| | GOOG-CABR-04342101 through | |
| | 4342102 | |
| | | |
| Exhibit 26 | Excel spreadsheet, Bates | 236 |
| | GOOG-CALH-00061965 | |
| | | |
| Exhibit 27 | PDF printed version of Exhibit | 236 |
| | 26, Excel spreadsheet, Bates | |
| | GOOG-CALH-00061965 | |
| | | |
| Exhibit 28 | ▮▮▮▮ Video Clip 7, Bates | 247 |
| | GOOG-CALH-00045185 | |
| | | |
| Exhibit 29 | Document entitled "Team Deep | 247 |
| | Dive, Q4 2020, Ads Identity & | |
| | Infrastructure," Bates | |
| | GOOG-CALH-00374314 through | |
| | 374448 | |

Page 12

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 21 | Forums Overview document, Bates | 217 |
| | GOOG-CABR-04344029 through | |
| | 4344038 | |
| | | |
| Exhibit 22 | Message string, topmost dated | 219 |
| | 1/16/2020 from Jason Liu to | |
| | Jason Tiller, Megan Potoski, | |
| | Spriha Baruah, et al., Subject | |
| | APM 16, Bates GOOG-CABR-04034636 | |
| | and 4034637 | |
| | | |
| Exhibit 23 | Document entitled "GBO Comm Doc: | 223 |
| | March 2021 Google privacy | |
| | Update," last updated 3/31/2021, | |
| | Bates GOOG-CABR-04755505 through | |
| | 4755542 | |
| | | |
| Exhibit 24 | Document entitled "Why | 225 |
| | ▮▮▮▮?" Bates | |
| | GOOG-CALH-00027419 | |

Page 11

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 30 | E-mail dated 9/26/18 from David | 251 |
| | Monsees to Reed La Botz, copying | |
| | Carmela Acevedo, Sam Heft-Luthy, | |
| | privacy advisor team, Subject: | |
| | Re: Unauth search history | |
| | questions, Bates | |
| | GOOG-CALH-00452378 through | |
| | 452380 | |
| | | |
| Exhibit 31 | Screenshot of Google "Ad | 256 |
| | personalization settings" page | |
| | | |
| Exhibit 32 | Document entitled "Google Terms | 265 |
| | of Service, effective March 30, | |
| | 2020" | |
| | | |
| Exhibit 33 | Document entitled "Google Chrome | 268 |
| | Privacy Notice, Last modified: | |
| | September 23, 2021" | |
| | | |
| Exhibit 34 | Google Privacy Policy, effective | 273 |
| | July 1, 2021 | |

Page 13

4 (Pages 10 - 13)

1 that we do fits that legal advice in -- you know, in      09:50:05
2 whatever legal regime that we're operating in.      09:50:10
3        Again, I can go into the specifics around      09:50:13
4 the way we try to improve transparency, some of the      09:50:15
5 choices that we make. But with regards to how we      09:50:18
6 think about consent, that's, again, going to depend      09:50:21
7 a lot on the context in which we're operating here.      09:50:25
8 BY MR. BARNES:      09:50:28
9    Q.  What is your understanding of that which      09:50:29
10 is necessary to obtain consent from users in the      09:50:30
11 United States to collect their browsing history?      09:50:34
12        MR. SPILLY:  Objection. Calls for a legal      09:50:42
13 conclusion.      09:50:43
14        THE WITNESS:  So, again, I -- in any      09:50:46
15 moment with regards to a consent that we would have      09:50:49
16 to deliver in order to collect user browsing      09:50:53
17 history, I can walk through the process of      09:50:57
18 development there.      09:50:59
19        So what would happen is if there's new      09:51:00
20 obligations changing our responsibilities, new law      09:51:02
21 that's passed, new interpretation of existing law,      09:51:06
22 we'll receive counsel from counsel and change our      09:51:10
23 products in order to -- in order to match whatever      09:51:14
24 change in legal regime we're operating in. That      09:51:18
25 includes the United States in various ways. I can't      09:51:22
Page 50

1 speak to the overall legal regime of the      09:51:25
2 United States in much detail, but I'll be counseled      09:51:27
3 on the specifics of that if something is relevant to      09:51:31
4 a product that we're working on.      09:51:32
5 BY MR. BARNES:      09:51:34
6    Q.  It's entirely a legal construct, not      09:51:34
7 concern about how a consumer might answer the      09:51:37
8 question, "Did I consent to that?"  Correct?      09:51:40
9        MR. SPILLY:  Objection to the form.      09:51:46
10        THE WITNESS:  As -- as I've said before,      09:51:49
11 the work that we do concretely with regards to any      09:51:51
12 legal obligation that we have is certainly not      09:51:56
13 ignorant of user understanding, user transparency,      09:52:00
14 user engagement. I'm sure we have exhibits that we      09:52:04
15 can go through to talk about the user research that      09:52:08
16 we do.      09:52:11
17        So I wouldn't say that it's fair to      09:52:13
18 summarize the work that we do in consent as entirely      09:52:15
19 unrelated to user understanding. Though, again, I'm      09:52:19
20 not going to be able to speculate on legal questions      09:52:23
21 of validity or -- or consent specifically as a legal      09:52:25
22 construct here.      09:52:31
23 BY MR. BARNES:      09:52:31
24    Q.  Mr. Heft-Luthy, I -- we've placed      09:52:32
25 Exhibit 2 in the share file. Please let me know      09:52:35
Page 51

1 when that's been transmitted?      09:52:38
2        MR. BARNES:  And, Ms. Truong, if you could      09:52:40
3 do a screen share, please.      09:52:42
4        (Whereupon Exhibit 2 was marked for      09:52:44
5        identification.)      09:52:44
6 BY MR. BARNES:      09:52:51
7    Q.  While we're waiting for Ms. Crawford -- do      09:52:51
8 you not see it? Let me ask -- I'll ask some      09:52:53
9 questions while it's getting up.      09:52:55
10        What is ███████ Mr. Heft-Luthy?      09:52:57
11        MS. CRAWFORD:  Hold on. If we could wait,      09:53:00
12 I'm not seeing an exhibit in the exhibit folder.      09:53:02
13 And can you confirm that it's there?      09:53:07
14        Okay. It just arrived just a second ago.      09:53:09
15 Give us all a second to get that loaded for the      09:53:12
16 witness.      09:53:15
17 BY MR. BARNES:      09:53:19
18    Q.  I'm going to ask questions that are      09:53:20
19 unrelated to the document until such time as you get      09:53:21
20 it up.      09:53:23
21        What is ███████ Mr. Heft-Luthy?      09:53:24
22        MR. SPILLY:  Objection. Vague.      09:53:27
23        MS. CRAWFORD:  Yeah, if you can wait a      09:53:28
24 second, because you're asking --      09:53:29
25        MR. BARNES:  No, I'm not going to wait for      09:53:30
Page 52

1 you to do the technology. It is a question that is      09:53:31
2 independent of the exhibit.      09:53:34
3 BY MR. BARNES:      09:53:34
4    Q.  What is ████████, Mr. Heft-Luthy?      09:53:35
5        MR. SPILLY:  Same objection.      09:53:39
6        THE WITNESS:  ████████ is an internal      09:53:43
7 name for a product design and strategy effort that      09:53:46
8 we engaged in through last year.      09:53:51
9 BY MR. BARNES:      09:53:55
10    Q.  Whose idea was ████████?      09:53:57
11        MR. SPILLY:  Objection. Vague.      09:54:03
12        THE WITNESS:  Like most projects at      09:54:08
13 Google, ████████ came out of a variety of      09:54:09
14 different inputs, both work that I had been engaging      09:54:13
15 in previously as a manager of a team we call Privacy      09:54:17
16 Surfaces, which is a collection of privacy,      09:54:21
17 transparency and control surfaces, as well as      09:54:25
18 request from executive stakeholders for strategic      09:54:31
19 orientation. And, again, like most projects, there      09:54:35
20 are a variety of different people that are coming      09:54:38
21 together to start a -- to start a project like this.      09:54:40
22 BY MR. BARNES:      09:54:43
23    Q.  Okay. Were you the project manager for --      09:54:44
24 I'm sorry -- product.      09:54:47
25        Were you the product manager for      09:54:49
Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

| | |
|---|---|
| 1 ██████? 09:54:51 | 1     MR. SPILLY:  Object to the form.    09:57:38 |
| 2   A.  Yes, I was.    09:54:53 | 2 BY MR. BARNES:    09:57:39 |
| 3   Q.  And what is its status today?    09:54:54 | 3   Q.  Was present.  Who else was present?    09:57:39 |
| 4     MR. SPILLY:  Object to the form.    09:55:03 | 4   A.  Cassidy Morgan from the marketing team was    09:57:40 |
| 5     THE WITNESS: ██████ is currently    09:55:04 | 5 present, if I recall correctly.  Greg Fair, who was    09:57:43 |
| 6 not an active project.  It was -- I can't speak to    09:55:06 | 6 my manager at the time, was also present.    09:57:47 |
| 7 exactly when it was discontinued.    09:55:11 | 7   Q.  And was the idea of ██████    09:57:52 |
| 8 BY MR. BARNES:    09:55:13 | 8 presented to outside the P- -- PO team?    09:57:54 |
| 9   Q.  Okay.  I mean, you can speak generally to    09:55:16 | 9   A.  Not to my recollection, no.    09:58:03 |
| 10 when it was discontinued.  Let's not talk about the    09:55:18 | 10     MR. SPILLY:  Object -- sorry, Sam.    09:58:05 |
| 11 specific date it was discontinued.    09:55:21 | 11     Objection.  Vague.    09:58:06 |
| 12     Was it discontinued in the year 2021?    09:55:23 | 12 BY MR. BARNES:    09:58:07 |
| 13   A.  To my recollection, it was discontinued in    09:55:30 | 13   Q.  Is -- well, I should say was Greg Fair    09:58:09 |
| 14 later 2020.  But I -- I could be wrong.  It could    09:55:33 | 14 your supervisor?    09:58:11 |
| 15 have overlapped with 2021 at some point.    09:55:37 | 15   A.  He was, yes.    09:58:14 |
| 16   Q.  Who made the decision to discontinue it?    09:55:40 | 16   Q.  During the time you were the project -- I    09:58:15 |
| 17   A.  We brought the project to what we felt was    09:55:49 | 17 said it again.    09:58:17 |
| 18 a reasonable outcome.  We delivered a few executive    09:55:50 | 18     During the time you were the product    09:58:19 |
| 19 presentations.  It was also an effort of    09:55:55 | 19 manager for ██████, was Greg Fair your    09:58:21 |
| 20 self-clarification for the team and is part of our    09:55:59 | 20 manager, your boss?    09:58:26 |
| 21 overall development process for a variety of    09:56:04 | 21   A.  He was, yes.    09:58:29 |
| 22 different projects that we're engaging in.    09:56:06 | 22   Q.  And who was Mr. Fair's supervisor?    09:58:30 |
| 23     So, again, like any decision to start a    09:56:09 | 23   A.  I can't recall exactly.    09:58:37 |
| 24 project at Google, decision to stop a project or --    09:56:12 | 24     Apologies on that dang lighting.  Let's    09:58:46 |
| 25 or reach a conclusion is -- comes from a variety of    09:56:14 | 25 start again.    09:58:48 |
| Page 54 | Page 56 |
| 1 different inputs that I can -- that are part of that    09:56:17 | 1     I -- I can't recall exactly given there    09:58:49 |
| 2 process.    09:56:21 | 2 was some executive changes over the course of 2020    09:58:52 |
| 3   Q.  You said "executive presentations."    09:56:22 | 3 and 2021.  At certain points during ██████,    09:58:54 |
| 4     To whom were the presentations given?    09:56:24 | 4 Othar Hansson was Greg's manager.  I can't speak to    09:58:59 |
| 5   A.  If I recall, there was a presentation to a    09:56:32 | 5 at which points in the project he was overseeing    09:59:07 |
| 6 few design and product management directors.  That    09:56:37 | 6 Greg or not, however.    09:59:09 |
| 7 was the conclusion of the project.    09:56:42 | 7   Q.  Okay.  What is your understanding of why    09:59:11 |
| 8   Q.  Who were those design and project --    09:56:45 | 8 Google did not go forward with the ██████    09:59:15 |
| 9 product -- you said "PM directors."  Who were the --    09:56:50 | 9 project?    09:59:18 |
| 10   A.  Yeah.    09:56:55 | 10   A.  So, as I said, like any project at Google,    09:59:25 |
| 11   Q.  Who were those designers and PM directors?    09:56:55 | 11 there's a variety of inputs into when projects are    09:59:28 |
| 12     MR. SPILLY:  Object to the form.    09:56:59 | 12 started or stopped.    09:59:31 |
| 13 Misstates.    09:56:59 | 13     As we had had both some internal desire    09:59:37 |
| 14     THE WITNESS:  So to the -- to the question    09:57:04 | 14 for self-clarification and some executive requests    09:59:38 |
| 15 of who that presentation was to, if I recall    09:57:05 | 15 for strategic position work, we incorporated both of    09:59:45 |
| 16 correctly, it included Sarah Hammond, who's a UX    09:57:08 | 16 those inputs to make the decision to stop the    09:59:48 |
| 17 director.    09:57:13 | 17 project in, I believe, late 2021.    09:59:51 |
| 18     I believe, given what -- the organization    09:57:15 | 18   Q.  You mean 2020?  Sorry to correct you.    09:59:56 |
| 19 at the time, it would have included Othar Hansson.    09:57:21 | 19   A.  Late 2020, yes.  Pardon.    09:59:58 |
| 20 But I can't recall for sure if he was physically    09:57:22 | 20   Q.  Okay.  Who were the executives who made    10:00:00 |
| 21 present.    09:57:28 | 21 that request?    10:00:05 |
| 22     But I -- I can recall at least Sarah    09:57:28 | 22   A.  The -- which request specifically?    10:00:09 |
| 23 Hammond was present.    09:57:31 | 23   Q.  You stated that "We had some executive    10:00:11 |
| 24 BY MR. BARNES:    09:57:33 | 24 requests for strategic position work."    10:00:14 |
| 25   Q.  Who else?    09:57:34 | 25     Who were the executives who made requests    10:00:18 |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

CONFIDENTIAL

1 for strategic position work?                10:00:21
2     A.   This was Rahul Roy-Chowdhury.       10:00:25
3     Q.   And where is he on the organization chart?   10:00:29
4         MR. SPILLY: Object to form.          10:00:32
5         THE WITNESS:  At the time he was, I   10:00:43
6 believe, a vice president at Google.  And he's no   10:00:43
7 longer employed by Google.                  10:00:48
8 BY MR. BARNES:                              10:00:49
9     Q.   Do you know where he is now?        10:00:50
10    A.   I do not.                          10:00:54
11    Q.   Is there a company directory where you can   10:00:55
12 look up who works where?                    10:01:01
13        MR. SPILLY: Object to the form.      10:01:03
14        THE WITNESS:  When you say "works where,"   10:01:07
15 in terms of role responsibility?  What -- what --   10:01:09
16 what do you mean by "where"?                 10:01:12
17 BY MR. BARNES:                             10:01:14
18    Q.   Correct.  You just stated, role      10:01:14
19 responsibility.                             10:01:17
20    A.   There is an internal directory that Google   10:01:20
21 employees are able to use that provides, depending   10:01:24
22 on the individual employee, different levels of   10:01:28
23 information, including their responsibility, yes.   10:01:31
24    Q.   Would it include who they report to?   10:01:36
25        MR. SPILLY: Object to the form.      10:01:41
                                              Page 58

1         THE WITNESS:  I can't speak to in all   10:01:47
2 cases given that I don't know the full          10:01:50
3 implementation, but in many cases it does provide   10:01:52
4 notice of -- of who a given person's direct manager   10:01:56
5 is, yes.                                    10:02:00
6 BY MR. BARNES:                             10:02:00
7     Q.   And then vice versa, there are certainly   10:02:01
8 situations where it shows who reports to the person   10:02:04
9 in question, correct?                       10:02:09
10    A.   That's correct, yes.                10:02:14
11    Q.   Okay.  Do you have Exhibit 2,        10:02:15
12 Mr. Heft-Luthy?                             10:02:17
13    A.   Exhibit 2 is the one we're showing here,   10:02:27
14 right?                                      10:02:29
15    Q.   Right.  Correct.                    10:02:29
16    A.   Yes, I have it up.                   10:02:30
17    Q.   Okay.  You see in the first sentence where   10:02:32
18 it says: "This workstream aims to define an   10:02:33
19 overarching vision and strategy for PDPO to inform   10:02:37
20 the Google privacy experience"?              10:02:41
21         Why is Google coming up with an      10:02:45
22 overarching vision and strategy for this     10:02:48
23 ██████████ project?                        10:02:51
24    A.   Why -- why is Google coming up with a   10:02:52
25 strategy in general or why specifically this   10:03:01
                                              Page 59

1 project?                                    10:03:03
2     Q.   Let's start with in general.        10:03:04
3     A.   So as a product manager or as a company   10:03:10
4 that is building tools with regards to privacy, they   10:03:14
5 work much like any other product in that they   10:03:19
6 require a timeline of concrete design and     10:03:23
7 engineering work to meet specific business and legal   10:03:27
8 objectives.  Given that it works like any other   10:03:31
9 product work, there's a requirement for a strategic   10:03:36
10 orientation.  We have choices that we have to make   10:03:38
11 about how and when we deploy certain technologies.   10:03:42
12        Given that, there is always the desire to   10:03:47
13 develop technology in a strategic manner.  There was   10:03:51
14 a request from PDPO leadership to help, you know,   10:03:53
15 improve the strategic orientation, like there often   10:04:00
16 is for a variety of products across Google.   10:04:05
17    Q.   Okay.  You see there where it says:   10:04:08
18 "Related resources, ██████, definition of privacy"?   10:04:09
19        Is that a hyperlink?                 10:04:12
20    A.   I can't say with certainty --       10:04:17
21        MR. SPILLY: Objection.  Calls for    10:04:20
22 speculation.                                10:04:20
23        THE WITNESS:  Yeah, I can't say with   10:04:22
24 certainty here.                             10:04:24
25 ///
                                              Page 60

1 BY MR. BARNES:                             10:04:25
2     Q.   Mr. Heft-Luthy, are you the author -- what   10:04:25
3 is this document?  Let me ask you that.       10:04:27
4     A.   Also, just a note, I'm a Type I diabetic.   10:04:31
5 If I have to do some management, I'm not looking at   10:04:33
6 another device.                             10:04:38
7     Q.   Okay.                              10:04:39
8     A.   So let me -- let me go through just to   10:04:40
9 make sure that I am correct about which exact   10:04:41
10 document that we're referring to here.       10:04:44
11        So I -- I believe that this document would   10:05:17
12 be a -- a short strategic position paper that we   10:05:18
13 would have -- I can't recall if we would have   10:05:24
14 actually delivered this to anybody.  Certainly it   10:05:28
15 would have been circulated within the small team   10:05:31
16 working on it.                              10:05:33
17    Q.   It says "Core Team."  You're the second   10:05:34
18 member of the core team.                    10:05:37
19        Do you see that on page 1?           10:05:38
20    A.   Yes.                               10:05:43
21    Q.   By "page 1," I mean CABR04754160.  Those   10:05:43
22 are called Bates numbers, and we'll refer to them as   10:05:50
23 we go on today.                             10:05:52
24        What is -- ██ stands for ██████████   10:05:56
25 there at the first page of this document, correct?   10:05:58
                                              Page 61

16 (Pages 58 - 61)

CONFIDENTIAL

| | |
|---|---|
| 1 MR. SPILLY: Objection. 10:06:07 | 1 general. As, you know, one player in a broader 10:08:31 |
| 2 BY MR. BARNES: 10:06:09 | 2 market, we're also looking at the solutions that 10:08:35 |
| 3 Q. I am back on the first page. 10:06:09 | 3 other companies are building. 10:08:38 |
| 4 A. Yeah, to -- to the best of my 10:06:11 | 4 When we ask users for their thoughts on 10:08:41 |
| 5 recollection, that's correct. 10:06:12 | 5 Internet technology privacy, we know that they have 10:08:43 |
| 6 Q. Okay. And what is the ███ definition of 10:06:14 | 6 a broad range of understanding of even what products 10:08:46 |
| 7 "privacy"? 10:06:17 | 7 they're using at a given time with regards to am I 10:08:50 |
| 8 A. I don't recall the specific terminology 10:06:24 | 8 on Facebook or Instagram at given time. 10:08:53 |
| 9 that we used. If we have an exhibit to review, I'm 10:06:26 | 9 When we talk about the input to this 10:08:57 |
| 10 happy to talk about choices that we made for that 10:06:30 | 10 development process, we wanted to summarize what are 10:09:01 |
| 11 definition. 10:06:32 | 11 some of the key issues that users face as they go 10:09:03 |
| 12 Q. Okay. And what's the ███ research 10:06:32 | 12 through Google and other Internet technology to try 10:09:08 |
| 13 synthesis? 10:06:35 | 13 to understand what we can do to improve that 10:09:11 |
| 14 MR. SPILLY: Objection. Calls for 10:06:36 | 14 experience across our products. 10:09:14 |
| 15 speculation. 10:06:36 | 15 Q. Mr. Heft-Luthy, the very next sentence is 10:09:16 |
| 16 THE WITNESS: To the best of my 10:06:41 | 16 specific to Google, correct? 10:09:19 |
| 17 recollection, as part of the process for this 10:06:41 | 17 A. That is correct, yes. 10:09:25 |
| 18 project, we asked user research -- user experience 10:06:45 | 18 Q. Was ███ meant to be a project 10:09:28 |
| 19 researcher to collect synthesis of various research 10:06:50 | 19 for Google consents or for other companies' 10:09:33 |
| 20 that we had already conducted that would inform 10:06:55 | 20 consents? 10:09:36 |
| 21 the strategic orientation that we would have as part 10:06:58 | 21 MR. SPILLY: Objection. Compound. 10:09:40 |
| 22 of this program. 10:07:02 | 22 THE WITNESS: So the answer to your 10:09:44 |
| 23 BY MR. BARNES: 10:07:03 | 23 question is that what we wanted to do with 10:09:46 |
| 24 Q. Mr. Heft-Luthy, you were the product 10:07:04 | 24 ███ was articulate changes that Google can 10:09:50 |
| 25 manager for ███? 10:07:06 | 25 make to its product development strategy to improve 10:09:54 |
| Page 62 | Page 64 |

| | |
|---|---|
| 1 A. That's correct, yes. 10:07:08 | 1 both Google's strategic position as well as 10:09:58 |
| 2 MR. BARNES: Okay. Mr. Spilly, asking 10:07:09 | 2 achieving this through impact on a variety of 10:10:02 |
| 3 a -- the product manager for a product, what certain 10:07:11 | 3 different touch points. 10:10:06 |
| 4 terms about the product means does not call for 10:07:15 | 4 So that would apply to Google-specific 10:10:07 |
| 5 speculation. 10:07:17 | 5 permissions which the language that you're 10:10:11 |
| 6 Could you go -- Ms. Truong, can you turn 10:07:18 | 6 referencing is discussing. In other exhibits that 10:10:13 |
| 7 to the second page of this document? 10:07:22 | 7 might be part of my custodial file, you might see 10:10:17 |
| 8 BY MR. BARNES: 10:07:23 | 8 references to technology that would be made 10:10:20 |
| 9 Q. Mr. Heft-Luthy, why is it difficult for 10:07:30 | 9 available broadly across the Web. 10:10:24 |
| 10 people to fully and meaningfully give permission to 10:07:31 | 10 So, to that extent, ███ was 10:10:24 |
| 11 Google? 10:07:35 | 11 intended both to discuss, you know, what can we do 10:10:27 |
| 12 MR. SPILLY: Objection. Vague. 10:07:41 | 12 around specific Google consent that may be offered 10:10:30 |
| 13 THE WITNESS: So just to clarify, you're 10:07:42 | 13 as part of our permission model but also what can we 10:10:34 |
| 14 asking me to provide context into this statement 10:07:46 | 14 do with things like private technology, consent 10:10:38 |
| 15 from the exhibit itself? 10:07:49 | 15 management tools, things that might improve the 10:10:42 |
| 16 BY MR. BARNES: 10:07:51 | 16 experience, not just for users of Google but for 10:10:44 |
| 17 Q. And in general. 10:07:57 | 17 users of broader Internet technologies as well. 10:10:47 |
| 18 A. So what I -- what I can speak to is from 10:07:59 | 18 BY MR. BARNES: 10:10:50 |
| 19 the exhibit itself. As part of the work that we 10:08:01 | 19 Q. Why do people struggle to know what 10:10:51 |
| 20 were doing on ███, it was our objective to 10:08:04 | 20 exactly they're sharing with Google? 10:10:54 |
| 21 collect a summary of user concerns and questions 10:08:09 | 21 MR. SPILLY: Objection. Vague. 10:10:59 |
| 22 from across the product development process that we 10:08:15 | 22 THE WITNESS: So I'm going to -- I'm going 10:11:00 |
| 23 have summarizing key challenges, both for Google 10:08:18 | 23 to go back to the caveat that I said I'm going to 10:11:06 |
| 24 and, you know, specifically with regards to Google 10:08:24 | 24 have to give in a lot of the answers here, which is 10:11:10 |
| 25 technology, but also with regards to technology in 10:08:27 | 25 that we have a variety of different users in most 10:11:12 |
| Page 63 | Page 65 |

17 (Pages 62 - 65)

1 countries in the world that we may at certain points    10:11:17
2 have used language like "users" or "the user" as    10:11:21
3 a -- you know, as a certain rhetorical tool    10:11:26
4 internally to influence the development process.    10:11:28
5         The work that we're doing is also    10:11:33
6 incredibly informed by the fact that, you know,    10:11:34
7 there are different users with different    10:11:36
8 understandings.  So if we were to say why don't    10:11:39
9 users X, why don't users Y, there's certainly always    10:11:42
10 going to be cases where users do X or don't Y.    10:11:47
11 That's always going to be an incredibly contingent    10:11:51
12 answer.    10:11:55
13         And, again, I can speak to challenges that    10:11:55
14 we've seen, things that we try to optimize for in    10:11:57
15 our development.  Though, again, questions about    10:12:01
16 like Y does this or does not this is always going to    10:12:04
17 have a super contingent answer.    10:12:07
18 BY MR. BARNES:    10:12:10
19     Q.  Are you the author of this document,    10:12:10
20 Mr. Heft-Luthy?    10:12:12
21     A.  So I don't recall the drafting process for    10:12:25
22 this specific document.  Given that I was the    10:12:28
23 product manager for the overall process, I think it    10:12:32
24 would be fair that I heavily influenced the    10:12:36
25 direction of this document though I can't speak,    10:12:39

Page 66

1 again, to the specifics of the drafting of it or --    10:12:43
2 or specific language choices here.    10:12:45
3         MR. BARNES:  Ms. Truong, can we turn to    10:13:00
4 page 2, please?    10:13:02
5         I'm sorry.  Page 3.    10:13:12
6 BY MR. BARNES:    10:13:13
7     Q.  And this might -- this is going to be    10:13:13
8 small on the screen, but I want to ask you about    10:13:15
9 Comment 10.    10:13:19
10         Who made Comment 10?    10:13:19
11     A.  Given that it doesn't seem to indicate who    10:13:34
12 made that comment, I wouldn't be able to speculate    10:13:38
13 on that.    10:13:39
14     Q.  Was it you?    10:13:41
15     A.  As said, I -- I don't have recollection of    10:13:45
16 making or not making this specific comment, so I    10:13:48
17 wouldn't be able to speculate on who exactly drafted    10:13:51
18 it.    10:13:55
19         MR. BARNES:  Okay.  Can we go to the next    10:13:56
20 page, Ms. Truong?    10:14:00
21 BY MR. BARNES:    10:14:00
22     Q.  You see -- you see Comment 16 there,    10:14:06
23 Mr. Heft-Luthy?    10:14:07
24     A.  Yes.    10:14:10
25     Q.  Can you read that out loud?    10:14:11

Page 67

1     A.  Commented 16?    10:14:15
2     Q.  Yes.    10:14:16
3     A.  So, again, with the caveat that I don't    10:14:18
4 recall who made this comment, I'll -- I'm happy to    10:14:21
5 read it aloud.    10:14:24
6         "I'd like to see us making the point about    10:14:25
7 ads as a product.  If we can get users to think of    10:14:27
8 ads as I product, it did solve ads, but it reduces    10:14:30
9 complexity in general and gives a clearer path    10:14:34
10 forward for ads to get in line rather than being its    10:14:37
11 own special thing."    10:14:40
12     Q.  What does that mean, that phrase, "It    10:14:41
13 doesn't solve Ads," with "solve" in all caps?    10:14:42
14         MR. SPILLY:  Objection.  Foundation.    10:14:48
15 Calls for speculation.    10:14:48
16         THE WITNESS:  So, again, I can speak to    10:14:50
17 what I would feel reading this comment.    10:14:57
18         Is that what you would like to me to    10:15:00
19 discuss?    10:15:01
20 BY MR. BARNES:    10:15:01
21     Q.  Right.    10:15:02
22         I want to know what the meaning of that    10:15:02
23 term "solve ads" as it related to the ███████    10:15:04
24 project for which you were the product manager,    10:15:09
25 Mr. Heft-Luthy?    10:15:11

Page 68

1         MR. SPILLY:  Same objections.    10:15:15
2         THE WITNESS:  I'm sorry, Carl?    10:15:19
3         MR. SPILLY:  Same objections.    10:15:20
4         THE WITNESS:  So, again, with a caveat    10:15:21
5 that I don't recall the drafting process for this    10:15:23
6 specific comment, I can say, in general, we analyzed    10:15:26
7 a variety of different questions and complications    10:15:32
8 across Google.  As a product manager, your job is    10:15:36
9 often to understand, you know, opportunities for    10:15:40
10 improvement and to develop and deploy technology    10:15:44
11 that matches those opportunities.    10:15:48
12         I can speak again to stuff referenced    10:15:50
13 to -- to comments made in this document with regards    10:15:54
14 to certain user concerns that we've observed with    10:15:58
15 regards to ads.  I would hear a term "solve ads"    10:16:04
16 colloquially as referring to addressing those set of    10:16:07
17 problems.  I would perceive it as shorthand for    10:16:12
18 that, you know, broader, more -- more specific    10:16:18
19 question.    10:16:19
20         But, again, I can't speculate on the    10:16:20
21 actual drafting of the comment or how it was    10:16:23
22 received or drafted at the time because I don't    10:16:25
23 recall.    10:16:26
24 BY MR. BARNES:    10:16:27
25     Q.  What set of problems?    10:16:27

Page 69

18 (Pages 66 - 69)

CONFIDENTIAL

1   A.  What set of problems with regards to user        10:16:36
2   advertising you're saying?                           10:16:39
3   Q.  With respect to ads, what set of problems?        10:16:41
4   A.  So as we can see here in the exhibit             10:16:45
5   that's being projected right now, this document       10:16:47
6   attempts to summarize some of the key questions that  10:16:51
7   we've seen from user ads where that affects and       10:16:56
8   impacts relationships with technology and some of     10:17:00
9   the opportunities that we have to make our            10:17:03
10  relationship to the ads products that we build, you   10:17:06
11  know, always -- always more understandable for our    10:17:09
12  users.                                                10:17:13
13  Q.  Does it relate to consent, Mr. Heft-Luthy?        10:17:14
14      MR. SPILLY:  Objection.  Vague.                   10:17:19
15      THE WITNESS:  I would say that it's               10:17:24
16  certainly fair to say that there are consent moments  10:17:25
17  and questions at Google with Google technologies      10:17:30
18  that relate to ads.  I think it's fair to say that    10:17:33
19  both advertising and consent are related to privacy   10:17:36
20  development.                                          10:17:41
21      Again, with respect to specific concrete          10:17:42
22  questions of specific concrete consent moments or     10:17:46
23  advertising questions, I can get into those as we     10:17:50
24  dive into specifics.                                  10:17:53
25  ///
                                                          Page 70

1   BY MR. BARNES:                                        10:17:54
2   Q.  What are those questions relating to              10:17:54
3   Google ads?                                           10:17:56
4       MR. SPILLY:  Object to the form.                  10:18:00
5       THE WITNESS:  Google provides a variety of        10:18:08
6   advertising services.  A variety of our products are  10:18:10
7   at least partially supported by advertising.  As a    10:18:14
8   result, just like any part of our products have       10:18:19
9   implications on how our products work.  It's almost   10:18:25
10  a tautology that when you add a feature to a           10:18:31
11  product, that affects how users relate to and         10:18:35
12  perceive that product.  And given that many of our    10:18:38
13  products have advertising features built in, that is  10:18:40
14  part of the overall product life cycle that we        10:18:43
15  manage when we are thinking about user advertising    10:18:46
16  questions given that, if our products offer ads, we   10:18:51
17  need to make sure that those products operate under   10:18:55
18  any privacy regime that we're building for either     10:18:58
19  legally or from or a user understanding perspective.  10:19:02
20  BY MR. BARNES:                                        10:19:04
21  Q.  And do you want users to have an accurate         10:19:05
22  understanding of how it works?                        10:19:09
23      MR. SPILLY:  Objection.  Vague.                   10:19:11
24      THE WITNESS:  Personally I can say that I         10:19:16
25  do.  It's something that I am employed by Google in   10:19:17
                                                          Page 71

1   order to ensure happens.  I can say that Google       10:19:21
2   cares about user understanding both from a legal      10:19:26
3   perspective, given that in many cases in the          10:19:30
4   different regimes we operate under there are legal    10:19:34
5   requirements for transparency and notice.  Again, if  10:19:37
6   we want to get into specifics of those regimes, we    10:19:40
7   can discuss them.                                     10:19:43
8       Also, as this document outlines and other         10:19:44
9   work that we've done strategically will show, Google  10:19:47
10  has repeatedly taken positions that stronger user     10:19:51
11  understanding is correlated with trust with -- with   10:19:54
12  perception of Google as a -- as a useful actor in     10:20:00
13  this space and product utility.  And so it's          10:20:04
14  important to Google both from a legal and from a      10:20:07
15  product strategy perspective.                         10:20:11
16  BY MR. BARNES:                                        10:20:13
17  Q.  Why is trust important from a product             10:20:14
18  strategy perspective?                                 10:20:16
19  A.  So for a company like Google that offers a        10:20:24
20  variety of different products, our products for many  10:20:27
21  people are part of their daily lives.                 10:20:31
22      If there's a -- a commonly used term              10:20:36
23  internal to Google, which is "the toothbrush test."   10:20:39
24  You want to have a product that's like a toothbrush.  10:20:42
25  People use it every day, something that's going to    10:20:46
                                                          Page 72

1   be a part of your life.  Given that you're searching  10:20:47
2   for information on the Internet, watching videos on   10:20:49
3   YouTube on a regular basis, regardless of what that   10:20:54
4   is, if it's product that is something that's you      10:20:57
5   know, very useful to you, protecting your privacy,    10:20:59
6   taking issues of -- of privacy seriously is part of   10:21:02
7   that process.                                         10:21:06
8       And so we recognize that trust is an              10:21:07
9   important part of user privacy -- user product        10:21:12
10  perception overall.  If a product doesn't respect     10:21:18
11  your privacy, you know that users are likely to seek  10:21:21
12  alternatives when those alternatives are available    10:21:25
13  to them.  And that's something that we recognize      10:21:28
14  as -- as an important factor in users' product        10:21:30
15  decisions.                                            10:21:34
16  Q.  As trust increases, does user engagement          10:21:35
17  with Google's product increase?                       10:21:39
18      MR. SPILLY:  Objection.  Vague.                   10:21:44
19      THE WITNESS:  I can't speak to                    10:21:45
20  individual -- again, that's going to be an            10:21:46
21  incredibly contingent question.  There's a variety    10:21:47
22  of different surfaces that we might be talking        10:21:51
23  about.  I can't speak to any specific overall --      10:21:54
24  BY MR. BARNES:                                        10:21:58
25  Q.  Mr. Heft-Luthy, it would be helpful if,           10:21:58
                                                          Page 73

19 (Pages 70 - 73)

**Page 74**

1  instead of cabining every answer with a caveat about  10:22:00
2  what you can and can't say, if you would just answer  10:22:03
3  the question.  10:22:05
4      I'm sorry to interrupt.  But every answer,  10:22:07
5  Mr. Heft-Luthy, is -- is -- starts with a 30-second  10:22:09
6  what I can and can't say.  10:22:13
7      So I'm sorry for -- for interrupting.  10:22:18
8      A.  It's -- it's all right.  I mean -- please  10:22:24
9  go ahead.  10:22:27
10      MR. SPILLY:  Hold on.  I object to the --  10:22:27
11  I'm not sure if it's a question but to the  10:22:29
12  argumentative speech.  10:22:34
13  BY MR. BARNES:  10:22:35
14      Q.  Okay.  The question is:  "As trust  10:22:36
15  increases, does user engagement increase?"  10:22:39
16  Mr. Heft-Luthy?  10:22:42
17      MR. SPILLY:  And same objections as before  10:22:45
18  to that.  Vague.  10:22:46
19      THE WITNESS:  Yeah, like I said, I'm --  10:22:47
20  I'm sorry to tell you I'm not going to be able to  10:22:50
21  speculate on that question in general.  We have  10:22:52
22  exhibits on specific product trust questions.  Like  10:22:54
23  I said, Google does a variety of research on product  10:22:59
24  trust.  If we have exhibits to review, I can -- am  10:23:02
25  more than happy to go through the research we've  10:23:04

**Page 75**

1  done in the space and talk aloud about specific  10:23:07
2  research that we've done.  10:23:10
3  BY MR. BARNES:  10:23:11
4      Q.  Mr. --  10:23:12
5      A.  -- trying to pose a bad question.  10:23:12
6      Q.  Mr. Heft-Luthy, why don't you just answer  10:23:13
7  the question without having to have a document put  10:23:14
8  in front of you?  10:23:16
9      Does increased trust increase user  10:23:18
10  engagement in general, Mr. Heft-Luthy?  10:23:21
11      MR. SPILLY:  Objection.  Argumentative.  10:23:24
12  And same as before, vague.  10:23:24
13      THE WITNESS:  I think it's important for  10:23:32
14  me to ensure that the answers to questions that I'm  10:23:34
15  giving are accurate and -- and specific to the way  10:23:37
16  that they're phrased and framed.  And so where I am  10:23:44
17  going to be required to offer contingency to provide  10:23:48
18  what I feel is an accurate and understandable  10:23:53
19  answer, I will do so.  10:23:56
20      Again, to that question that you asked  10:23:58
21  with regards to does user trust correlate with user  10:24:00
22  engagement, we've done research on user trust in a  10:24:06
23  variety of different surfaces and different  10:24:10
24  products.  And, again, I can't speak to that  10:24:15
25  question without going into specifics around  10:24:20

**Page 76**

1  specific products or specific research that we've  10:24:24
2  done.  10:24:27
3  BY MR. BARNES:  10:24:27
4      Q.  What's the answer in general,  10:24:29
5  Mr. Heft-Luthy?  10:24:30
6      MR. SPILLY:  I didn't get this question  10:24:32
7  in -- well, I can pose it to this one.  Objection.  10:24:33
8  Asked and answered at this point, I think multiple  10:24:37
9  times.  10:24:40
10  BY MR. BARNES:  10:24:41
11      Q.  Mr. Heft-Luthy, can you turn to --  10:24:49
12      MR. BARNES:  Let's go -- Ms. Truong, go to  10:24:53
13  the fourth page of the document.  It ends in 4164.  10:24:57
14  BY MR. BARNES:  10:25:01
15      Q.  You see at the top where it says "Sam's  10:25:05
16  Scratch Pad"?  10:25:06
17      A.  That's correct, I do.  10:25:09
18      Q.  Are you Sam?  10:25:09
19      A.  Given that there were no other Sams on the  10:25:15
20  &#9608;&#9608;&#9608;&#9608; project -- again, I'm going to have to  10:25:19
21  be contingent with my answer here given that I don't  10:25:21
22  recall this specific document.  But I was not -- I  10:25:27
23  was the only Sam working the &#9608;&#9608;&#9608;&#9608; project.  10:25:31
24  I can say that.  10:25:34
25      Q.  Is this your scratch pad, Mr. Sam --  10:25:35

**Page 77**

1  Mr. Heft-Luthy?  10:25:38
2      A.  As I've said, I -- I can't speak to that  10:25:39
3  question given that I don't actually recall.  I've  10:25:42
4  been asked to only provide testimony given where  10:25:45
5  it's accurate.  10:25:49
6      Again, as I've stated, I'm the only  10:25:50
7  product manager -- or I'm the only Sam that was part  10:25:53
8  of this project, to my recollection.  10:25:56
9      Q.  So you have no reason to think it's not  10:25:58
10  you, this is -- this is not Sam, as in you, your  10:26:00
11  scratch pad, correct?  10:26:04
12      A.  Again, with the caveat that I also --  10:26:07
13      MR. SPILLY:  Object -- sorry, Sam.  10:26:10
14  Object to the form.  10:26:14
15      THE WITNESS:  Again, with the caveat that  10:26:17
16  I don't specifically recall this, I think it would  10:26:18
17  be -- it would -- my -- my understanding looking at  10:26:22
18  this document would have been that I was drafting  10:26:26
19  it, yes.  10:26:29
20  BY MR. BARNES:  10:26:30
21      Q.  What do you mean by "concerns about being  10:26:36
22  profiled, surveilled" or -- "and even manipulated"?  10:26:38
23      A.  Sorry.  I'm just making sure I can review  10:26:42
24  the language.  10:26:57
25      Q.  It's the third bullet point.  10:27:04

20 (Pages 74 - 77)

CONFIDENTIAL

```
 1    A.  Third bullet point.          10:27:06
 2        Yeah.  So, to -- to this, I can say that,   10:27:08
 3 as I mentioned, advertising products are part of   10:27:11
 4 Google's overall product offering.  They're one in   10:27:17
 5 which we see some user concern alongside questions   10:27:20
 6 of all of our products.  It's something we can     10:27:25
 7 always improve and work better.     10:27:29
 8        As the text states here, I think it speaks  10:27:31
 9 for itself to a certain degree.  We know that there 10:27:35
10 are user concerns about this from some users, and   10:27:37
11 it's something with regards to user concerns about  10:27:41
12 profiling surveillance or manipulation that we want 10:27:45
13 to understand and address with technology that we   10:27:49
14 deploy.                            10:27:53
15        MR. BARNES:  Okay.  And, Ms. Truong, if     10:27:54
16 you could go to the seventh page where it says      10:27:56
17 "Appendix," please.                10:27:59
18 BY MR. BARNES:                     10:28:04
19    Q.  Mr. Heft-Luthy, you see there where it      10:28:05
20 says:  "Google has done a lot of research"?  Is --  10:28:06
21 that appears to be a hyperlink, correct?  10:28:09
22        MR. SPILLY:  Objection.  Speculation.  10:28:18
23        THE WITNESS:  Given that this is a        10:28:21
24 reproduction of a document, and, again, a document  10:28:22
25 that I don't specifically recall drafting, I        10:28:28
                                              Page 78
```

```
 1 approach relationship with user data as a result."  10:29:49
 2        What does that link to, do you believe?  10:29:52
 3        MR. SPILLY:  Objection.           10:29:55
 4        THE WITNESS:  Again, I --          10:29:56
 5        MR. SPILLY:  Speculation.          10:29:57
 6        THE WITNESS:  -- I don't recall.    10:29:57
 7        MR. SPILLY:  Sam, give me a second to 10:29:58
 8 object.                            10:30:00
 9 BY MR. BARNES:                     10:30:00
10    Q.  You see the third bullet point, you say      10:30:04
11 there:  "By turning three controls into 300."  10:30:06
12        What three controls are you speaking of?  10:30:10
13        MR. SPILLY:  Objection.  Foundation.  10:30:14
14        THE WITNESS:  So with this language, "by  10:30:26
15 turning three controls into 300," to my            10:30:28
16 recollection, this was a reference to activity      10:30:33
17 controls at Google.  At the time of drafting, that  10:30:36
18 would have been three controls referred to          10:30:40
19 externally as Web and app activity, location        10:30:46
20 history, and YouTube history.       10:30:48
21 BY MR. BARNES:                     10:30:50
22    Q.  What are they referred to internally as?  10:30:50
23    A.  They are sometimes referred to in those     10:30:56
24 terms.  They are often also referred to with the    10:30:58
25 abbreviations like WAA, LH, or YouTube History or   10:31:03
                                              Page 80
```

```
 1 wouldn't be able to speculate on whether this is    10:28:30
 2 simply an underlining for emphasis or a hyperlink.  10:28:33
 3 BY MR. BARNES:                     10:28:38
 4    Q.  Does Google maintain the research on this   10:28:40
 5 topic in a central location?        10:28:42
 6        MR. SPILLY:  Object to the form.    10:28:47
 7        THE WITNESS:  On the topic of privacy and  10:28:52
 8 consent, you mean?                 10:28:53
 9 BY MR. BARNES:                     10:28:55
10    Q.  Of [REDACTED] as it related to this        10:28:55
11 product for -- project for which you were the       10:28:57
12 product manager, Mr. Heft-Luthy.    10:28:59
13    A.  So as previously stated, to my             10:29:03
14 recollection, there was a request with a user       10:29:07
15 research -- a user experience researcher to collect 10:29:10
16 a summary of privacy research that had been done    10:29:12
17 both internal to Google and external that would     10:29:17
18 assist us with the project.  Again, that might be or 10:29:20
19 might not be in my file.  I can't speak to discovery 10:29:24
20 process.  But there would have been at least a      10:29:28
21 document that was developed as part of the -- as     10:29:31
22 part of the process and foundation for this project, 10:29:35
23 which, as I said, I -- I am under the impression     10:29:39
24 that the link at the top was a link to.  10:29:43
25    Q.  Okay.  And it says:  "Foundational         10:29:46
                                              Page 79
```

```
 1 YTH                                10:31:08
 2        MR BARNES:  Ms Truong, can you place P3   10:31:12
 3 into the folder, please?           10:31:16
 4        (Whereupon Exhibit 3 was marked for        10:31:18
 5        identification )             10:31:18
 6        MR  SPILLY:  Could we take a break?  10:31:19
 7        MR  BARNES:  Sure  How long?      10:31:21
 8        MR  SPILLY:  Ten minutes  Or, actually,   10:31:24
 9 it's up to Sam                     10:31:25
10        THE WITNESS:  Ten minutes sound fine  10:31:27
11        MR  BARNES:  Let's go off the record  I'm  10:31:30
12 sorry                              10:31:31
13        THE VIDEO OPERATOR:  Off the record at     10:31:32
14 10:31 a m                          10:31:33
15        (Off the record at 10:31 a m  and back     10:31:34
16        on the record at 10:46 a m )  10:46:21
17        THE VIDEO OPERATOR:  Okay  We are back on  10:46:24
18 the record  The time is 10:46 a m  Pacific Time  10:46:24
19 BY MR  BARNES:                     10:46:27
20    Q  Ms Truong has shared Exhibit 3  10:46:28
21        MR  BARNES:  Ms  Truong, can you put that  10:46:31
22 up on the screen?                  10:46:33
23 BY MR  BARNES:                     10:46:33
24    Q  And, Mr Heft-Luthy, can you let me know     10:46:33
25 when you have it?                  10:46:36
                                              Page 81
```

21 (Pages 78 - 81)

1    A.  I will.                          10:46:38
2        MS. CRAWFORD: Not yet in the folder.    10:46:45
3  BY MR. BARNES:                         10:46:48
4    Q.  While we're waiting on that,     10:46:57
5  Mr. Heft-Luthy, who is Kallebu?        10:46:58
6        MS. CRAWFORD: Wait. Sorry. Did you --    10:47:03
7  did you hear me, Jay?  It's not yet in the folder.    10:47:04
8        MR. BARNES: Yes.                 10:47:08
9        MS. CRAWFORD: We don't have access to the    10:47:09
10 exhibit yet.                          10:47:10
11       MR. BARNES: Yes, and I'm asking while we    10:47:12
12 are waiting for that to upload --      10:47:13
13       MS. TRUONG: I am, by the way.    10:47:15
14 BY MR. BARNES:                         10:47:16
15   Q.  Mr. Heft-Luthy, who is Kallebu?  10:47:16
16       MR. SPILLY: Objection. Vague.    10:47:22
17       THE WITNESS: Are you referring to -- I    10:47:24
18 can't see here.  Is there text that you're referring    10:47:29
19 to?                                   10:47:33
20 BY MR. BARNES:                         10:47:34
21   Q.  The owner of this document is listed as a    10:47:34
22 Kallebu, K-A-L-L-E-B-U.               10:47:36
23   A.  That would be a internal user name.  We    10:47:44
24 have an internal user name system.  That would be    10:47:47
25 Kalle Bushman.                        10:47:50

Page 82

1    Q.  C-A-L-L-E [sic] is -- is it Mr. or    10:47:54
2  Ms. Bushman?                          10:47:57
3    A.  It would be Mr. Bushman.         10:47:59
4    Q.  And it's just Bushman, B-U-S-H-M-A-N; is    10:48:01
5  that right?                           10:48:04
6    A.  I believe that's the correct     10:48:07
7  pronunciation.                        10:48:09
8    Q.  Does Mr. Bushman report to you,   10:48:10
9  Mr. Heft-Luthy?                       10:48:12
10       Let me back up.                  10:48:15
11       At the time -- in September of 2020, did    10:48:17
12 Mr. Bushman report to you?             10:48:19
13   A.  No.                            10:48:23
14   Q.  Okay.  Was he part of the PDPO team?    10:48:24
15       MR. SPILLY: Objection. Vague.    10:48:30
16       THE WITNESS: Yes.               10:48:32
17 BY MR. BARNES:                         10:48:32
18   Q.  And Mr. Heft-Luthy, who is Mimosal?    10:48:35
19       Do you see there below where it says    10:48:41
20 M-I-M-O-S-A-L?  Who is that?           10:48:42
21   A.  That would be Mimosa Lynch.      10:48:53
22   Q.  That's a -- that's a pretty name.    10:49:09
23       Okay.  And you and Ms. Lynch were the    10:49:09
24 collaborators with Mr. Bushman on this document; is    10:49:12
25 that correct?                         10:49:14

Page 83

1    A.  Let me review this document just to ensure    10:49:28
2  that we're referring to the right one.    10:49:31
3    Q.  Sure.                          10:49:33
4    A.  Both -- both myself and Ms. Lynch    10:49:38
5  contributed to the document.          10:49:40
6    Q.  Okay.  And this was a document prepared by    10:49:41
7  the PDPO team?                        10:49:43
8    A.  Yes.                           10:49:52
9    Q.  What was the purpose of this document?    10:49:53
10       MR. SPILLY: Objection. Vague.    10:49:54
11       THE WITNESS: The purpose of this document    10:50:00
12 was to provide a summary of the progress that we had    10:50:02
13 made on the ███████ project up to -- up to the    10:50:07
14 point at which we delivered the presentation.    10:50:11
15       MR. BARNES: Okay.  If you could go to,    10:50:14
16 Ms. Truong, 5754260.                  10:50:16
17 BY MR. BARNES:                         10:50:20
18   Q.  You see where it says "Arne's words"?    10:50:26
19       Is that a "yes," Mr. Heft-Luthy?  Sorry.    10:50:31
20 You have got to say "yes" or "no."     10:50:33
21   A.  Wait.  Sorry, that was a -- that was a    10:50:34
22 noting nod.                           10:50:36
23       Yes, I do.                      10:50:38
24   Q.  And who is Arne?                 10:50:39
25       MR. SPILLY: Sam, just a reminder that you    10:50:42

Page 84

1  can take the time to familiarize yourself with the    10:50:44
2  document before you speak to it.       10:50:48
3        THE WITNESS: Yep.               10:50:51
4        MR. BARNES: Mr. Spilly --        10:50:51
5  BY MR. BARNES:                         10:50:52
6    Q.  The question, Mr. Heft-Luthy, is: Who is    10:50:52
7  Arne?  Who is Arne, Mr. Heft-Luthy?    10:50:57
8    A.  Arne is a user experience researcher for    10:51:12
9  the Privacy and Data Protection Office.    10:51:15
10   Q.  And what is Arne's full name?     10:51:17
11   A.  Arne's full name is Arne de Booij.    10:51:23
12   Q.  And where is he located?         10:51:28
13   A.  I don't know the answer to that question    10:51:33
14 at the time.                          10:51:35
15       At this moment, I can't -- I can't    10:51:39
16 speculate on that.                    10:51:41
17   Q.  Is he located in Mountain View?   10:51:42
18   A.  At no point in our collaboration was he    10:51:50
19 based in the Mountain View office.     10:51:55
20   Q.  Is he in Europe?                 10:51:57
21       MR. SPILLY: Objection. Asked and    10:52:00
22 answered.                             10:52:00
23 BY MR. BARNES:                         10:52:03
24   Q.  Is he in Europe, Mr. Heft-Luthy?  10:52:07
25   A.  I can't say where he is right now.    10:52:14

Page 85

22 (Pages 82 - 85)

CONFIDENTIAL

1 Through most of our collaboration, he was, yeah.    10:52:16
2    Q.  Thank you, Mr. Heft-Luthy.  These are not    10:52:20
3 difficult questions.    10:52:22
4    Where in Europe during your -- his -- your    10:52:24
5 collaboration was he?    10:52:27
6    MR. SPILLY:  Object to the form.    10:52:32
7    THE WITNESS:  Through most of our    10:52:38
8 collaboration, Arne was working out of the Munich    10:52:38
9 office.  Though through most of the ████████    10:52:46
10 project specifically, he was working from home like    10:52:50
11 many Googlers.    10:52:54
12 BY MR. BARNES:    10:52:55
13    Q.  Understand.  Understand.    10:52:56
14    Do you see below where it says:  "To    10:52:57
15 develop our perspective, we have reviewed and    10:52:59
16 analyzed more than 150 documents representing    10:53:02
17 five-plus years of trust and privacy"?    10:53:06
18    Do you see that?    10:53:12
19    A.  Yes.    10:53:12
20    Q.  Would those documents have been collected    10:53:13
21 in one place?    10:53:15
22    MR. SPILLY:  Objection.  Vague.    10:53:18
23    THE WITNESS:  I -- I can't speculate on    10:53:24
24 what specific place this would be referring to.    10:53:26
25 ///    

Page 86

1 BY MR. BARNES:    10:53:29
2    Q.  Okay.  Who would know what those documents    10:53:29
3 are?    10:53:35
4    A.  With regard to who would be able to say    10:53:45
5 definitively what 150 documents we're discussing?    10:53:48
6    Q.  Correct.    10:53:51
7    A.  I don't -- I don't know of anybody that    10:53:56
8 would be able to, without reviewing previous    10:53:59
9 existing things, be able to answer that question.    10:54:03
10    Q.  If Mr. Pichai asked you to provide them,    10:54:06
11 could you do it?    10:54:11
12    "Pichai."  I'm sorry.    10:54:13
13    If Mr. Pichai asked you to provide him    10:54:14
14 with those documents, could you do so?    10:54:18
15    MR. SPILLY:  Objection.  Speculation and    10:54:25
16 form.    10:54:26
17    THE WITNESS:  I -- I wouldn't be able to    10:54:32
18 say with certainty until I would have time to do    10:54:33
19 further investigation.    10:54:36
20 BY MR. BARNES:    10:54:36
21    Q.  Has this presentation been given to    10:54:37
22 Mr. Pichai?    10:54:39
23    MR. SPILLY:  Objection.  Form.    10:54:47
24    THE WITNESS:  I have not delivered this    10:54:52
25 presentation to Mr. Pichai.    10:54:54

Page 87

1 BY MR. BARNES:    10:54:56
2    Q.  Was the concept of ████████ presented    10:54:56
3 to Mr. Pichai?    10:54:58
4    MR. SPILLY:  Objection.  Vague.    10:55:04
5    THE WITNESS:  I don't know the answer to    10:55:11
6 that question.    10:55:13
7 BY MR. BARNES:    10:55:14
8    Q.  Who would know the answer to that    10:55:14
9 question, Mr. Heft-Luthy?    10:55:16
10    MR. SPILLY:  Objection.  Calls for    10:55:20
11 speculation.    10:55:20
12    THE WITNESS:  I wouldn't be able to    10:55:27
13 speculate with certainty on that.    10:55:29
14 BY MR. BARNES:    10:55:31
15    Q.  Okay.  If we could go to page 26, which    10:55:31
16 the Bates number is -- ends in 282, please.    10:55:34
17    A.  Okay.  I have it.    10:56:10
18    Q.  Do you see it says:  "Our research    10:56:12
19 inputs"?    10:56:13
20    A.  Yes.    10:56:19
21    Q.  Why did you interview people for    10:56:19
22 ████████?    10:56:24
23    MR. SPILLY:  Objection.  Foundation.    10:56:25
24    THE WITNESS:  Can -- can you be more    10:56:33
25 specific about what aspect of why you're looking to    10:56:35

Page 88

1 get into here?    10:56:38
2 BY MR. BARNES:    10:56:39
3    Q.  Did you conduct interviews for    10:56:39
4 ████████?    10:56:42
5    A.  Yes.    10:56:48
6    Q.  Did you personally conduct those    10:56:49
7 interviews?    10:56:51
8    A.  Some of them, yes.    10:56:56
9    Q.  Who else conducted the interviews?    10:56:58
10    A.  I know that Kalle conducted at least some    10:57:07
11 of them.  I can't speculate further.    10:57:12
12    Q.  How many total were conducted?    10:57:15
13    A.  I don't recall.    10:57:21
14    Q.  Approximately how many were conducted?    10:57:24
15    A.  I wouldn't be able to speculate with a    10:57:31
16 level of certainty that I'm comfortable putting on    10:57:33
17 the record here.    10:57:35
18    I can say confidently no more than 30 were    10:57:38
19 conducted.    10:57:42
20    Q.  There are nine listed on the screen,    10:57:44
21 correct?    10:57:46
22    A.  That's correct.    10:57:50
23    Q.  So somewhere between nine and 30    10:57:51
24 interviews were conducted; is that correct?    10:57:53
25    A.  That's correct.    10:58:03

Page 89

23 (Pages 86 - 89)

1   Q.  How many of those do you estimate that you    10:58:04
2  conducted?                                         10:58:07
3   A.  I don't recall.                               10:58:15
4       MR. SPILLY: Objection. Speculation.           10:58:16
5  BY MR. BARNES:                                     10:58:16
6   Q.  Were these interviews recorded?               10:58:17
7   A.  I don't recall.                               10:58:22
8   Q.  You were in the interview, correct?           10:58:28
9       MR. SPILLY: Objection. Foundation.            10:58:31
10      THE WITNESS: Which interview were you         10:58:36
11 referring to?                                      10:58:37
12 BY MR. BARNES:                                     10:58:38
13  Q.  You were in some of these interviews,         10:58:38
14 correct?                                           10:58:40
15  A.  Yes.                                          10:58:47
16  Q.  Did you take notes on the interviews that     10:58:47
17 you conducted?                                     10:58:49
18  A.  I don't recall specifically who took notes    10:58:58
19 on interviews that we conducted.                   10:59:01
20  Q.  Were there other people in the room when      10:59:03
21 you conducted these interviews?                    10:59:05
22      MR. SPILLY: Object to the form.               10:59:10
23      THE WITNESS: With the caveat that these       10:59:16
24 were all remote interviews, there were, if I recall, 10:59:18
25 people -- multiple people from our team on each of 10:59:20

Page 90

1  these interviews, yes.                            10:59:26
2  BY MR. BARNES:                                     10:59:27
3   Q.  Did someone take notes during the            10:59:27
4  interviews for your team?                          10:59:29
5   A.  Yes.                                          10:59:41
6   Q.  Were those notes shared amongst your team?   10:59:41
7   A.  Yes.                                          10:59:45
8   Q.  What was the platform you used to do the     10:59:46
9  interviews?                                        10:59:49
10      MR. SPILLY: Objection. Vague.                 11:00:01
11      THE WITNESS: To -- to conduct them           11:00:02
12 specifically? What do you mean by "to do"?         11:00:03
13 BY MR. BARNES:                                     11:00:05
14  Q.  To conduct them.                              11:00:05
15      MR. SPILLY: Objection. Still vague.           11:00:10
16 BY MR. BARNES:                                     11:00:17
17  Q.  Did you use Google Meet? Mr. Heft-Luthy,      11:00:17
18 did you use Google Meet?                           11:00:19
19  A.  Yes.                                          11:00:24
20  Q.  Did you -- were some of the interviews       11:00:26
21 recorded?                                          11:00:29
22  A.  I don't recall.                               11:00:36
23  Q.  Were there transcripts of the interviews?    11:00:38
24      MR. SPILLY: Object to the form.               11:00:50
25      THE WITNESS: Do you mean in distinction      11:00:57

Page 91

1  from the notes of the interviews?                 11:00:59
2  BY MR. BARNES:                                     11:01:01
3   Q.  Correct, in distinction from the notes.      11:01:01
4   A.  I don't recall any transcript separate       11:01:16
5  from notes taken.                                  11:01:17
6   Q.  Was Mr. Pichai interviewed?                   11:01:19
7       MR. SPILLY: Objection to the form.            11:01:31
8       THE WITNESS: Was Mr. Pichai interviewed       11:01:35
9  as part of this project you're asking?             11:01:38
10 BY MR. BARNES:                                     11:01:40
11  Q.  Correct.                                      11:01:40
12  A.  Not to my recollection.                       11:01:46
13  Q.  Mr. Heft-Luthy, why did it take so long to   11:01:48
14 answer that question?                              11:01:50
15      MR. SPILLY: Objection.                        11:01:53
16      THE WITNESS: I would like to make sure       11:02:00
17 that my answers to questions are accurate given that 11:02:02
18 I've been sworn in under penalty of perjury.       11:02:06
19 BY MR. BARNES:                                     11:02:09
20  Q.  That's fair.                                  11:02:10
21  Q.  Is there -- at the -- at any point in the    11:02:11
22 project was a list compiled of everyone who was    11:02:15
23 interviewed?                                       11:02:19
24  A.  Yes.                                          11:02:27
25  Q.  Who has that list?                            11:02:31

Page 92

1   A.  I can't say with certainty who would have    11:02:39
2  access to it.                                      11:02:42
3   Q.  Okay. Who is -- I'm looking at the           11:02:43
4  stakeholder interview -- interviews -- Micah Laaker? 11:02:48
5  It says "Office of the CEO."                       11:02:57
6       Who is Micah Laaker?                          11:02:59
7   A.  Micah Laaker is a design director. At        11:03:07
8  least he was a design director at the time of      11:03:09
9  this -- at the time of this project.               11:03:12
10  Q.  Does he report to Mr. Pichai?                 11:03:16
11  A.  I can't speculate on that.                    11:03:24
12  Q.  What is Prinascrapa,                          11:03:33
13 P-R-I-N-A-S-C-R-A-P-A?                             11:03:39
14  A.  I don't recall.                               11:03:39
15  Q.  What's ████████?                              11:04:01
16  A.  ██████████████████████████                   11:04:12
17     ████████████████████████████                  11:04:15
18 ████.                                              11:04:17
19  Q.  How many of them are there?                   11:04:21
20      MR. SPILLY: Object to the form.               11:04:23
21      THE WITNESS: I wouldn't be able to           11:04:26
22 speculate on the number.                           11:04:27
23 BY MR. BARNES:                                     11:04:27
24  Q.  Is it more than a hundred?                    11:04:28
25  A.  Like I said, I can't say with certainty.     11:04:36

Page 93

24 (Pages 90 - 93)

CONFIDENTIAL

1  Q. How often -- what's a Brandgeist report?    11:04:39
2      MR. SPILLY: Object to the form.    11:04:47
3      THE WITNESS: What -- what information    11:04:50
4  about Brandgeist are you looking to get here?    11:04:51
5  BY MR. BARNES:    11:04:55
6  Q. What is it? What's a Brandgeist report?    11:04:55
7  A. A Brandgeist report is a marketing report    11:05:05
8  digging into Google's brand reputation alongside    11:05:10
9  competitors and with information that may vary from    11:05:15
10 report to report.    11:05:20
11  Q. How often are they conducted?    11:05:22
12     MR. SPILLY: Object to the form.    11:05:28
13     THE WITNESS: I don't know the answer to    11:05:30
14 that question.    11:05:30
15 BY MR. BARNES:    11:05:31
16  Q. You see below there where it says "XFN    11:05:31
17 POV"?    11:05:34
18     Does POV stand for point of view?    11:05:36
19  A. In common parlance at Google, POV does    11:05:47
20 refer to point of view.    11:05:50
21  Q. And what is XFN?    11:05:51
22  A. In common parlance at Google, XFN is used    11:05:59
23 to refer to cross-functional.    11:06:02
24  Q. So did your team look at user experience,    11:06:08
25 engineering, marketing, and macro trends? Explain    11:06:13
Page 94

1 to me how XFN POV is a research input.    11:06:17
2      MR. SPILLY: Object to the form.    11:06:24
3      THE WITNESS: I think there were two    11:06:28
4  questions in there. Which would you like me to    11:06:32
5  answer?    11:06:34
6  BY MR. BARNES:    11:06:34
7  Q. I want to know how XFN POV is a research    11:06:35
8  input.    11:06:38
9  A. It was included in the material that the    11:06:44
10 team reviewed as we developed our perspective in    11:06:46
11 strategic outputs.    11:06:50
12  Q. Were there documents associated with each    11:06:52
13 of those XFN POV inputs?    11:06:54
14     MR. SPILLY: Objection. Vague.    11:07:00
15     THE WITNESS: As part of the XFN POV,    11:07:09
16 there were documents prepared, yes.    11:07:11
17 BY MR. BARNES:    11:07:13
18  Q. And how did you do the XFN POV? Did you    11:07:14
19 talk to people from user experience?    11:07:16
20     MR. SPILLY: Object to the form.    11:07:20
21     THE WITNESS: For the XFN POV, we had    11:07:28
22 different partners in those functions handle the    11:07:32
23 development of relevant documents.    11:07:36
24 BY MR. BARNES:    11:07:37
25  Q. Was -- is there a list of partners you    11:07:42
Page 95

1 dealt with as the product manager?    11:07:44
2  A. I -- I don't recall for certain.    11:07:52
3  Q. Okay. Who made the contacts with these    11:07:55
4  other -- to -- to gather these other POVs?    11:07:59
5      MR. SPILLY: Object to the form.    11:08:06
6      THE WITNESS: These were handled -- as    11:08:12
7  part of the process of -- of running the program    11:08:13
8  that we handled, we identified people who would    11:08:19
9  handle those POVs.    11:08:23
10 BY MR. BARNES:    11:08:24
11  Q. And there was e-mail traffic, correct?    11:08:25
12     MR. SPILLY: Objection. Vague.    11:08:29
13     THE WITNESS: E-mail traffic in regards    11:08:33
14 to?    11:08:35
15 BY MR. BARNES:    11:08:35
16  Q. When you were making contact with each of    11:08:35
17 these different departments.    11:08:37
18  A. I don't recall the exact process by which    11:08:47
19 we identified contacts here.    11:08:50
20     MR. BARNES: Okay. Let's go to page 32,    11:08:51
21 Ms. Truong, please, which ends in 288.    11:08:54
22 BY MR. BARNES:    11:08:58
23  Q. In your estimation, is Arne a trustworthy    11:09:07
24 colleague?    11:09:13
25     MR. SPILLY: Objection. Form.    11:09:19
Page 96

1      THE WITNESS: I'm not sure what you mean    11:09:21
2  by "trustworthy."    11:09:23
3      What specific are you asking me to trust    11:09:24
4  him with?    11:09:29
5  BY MR. BARNES:    11:09:30
6  Q. I'm asking that if -- when Arne    11:09:30
7  participated in your project, was he someone you    11:09:32
8  could rely upon?    11:09:36
9  A. Again, rely upon him to do what    11:09:48
10 specifically are we referring to here?    11:09:51
11  Q. Is Arne dishonest?    11:09:54
12  A. I'm -- I'm not really going to be able to    11:09:57
13 speculate on that question in generality.    11:10:00
14  Q. Okay. We're on page 32.    11:10:03
15     Who is Elyse?    11:10:06
16  A. Sorry. Could you repeat which exhibit    11:10:16
17 page you're on?    11:10:21
18  Q. Yeah. It's -- it ends in 288. I believe    11:10:22
19 it's page 32. It's on the screen. It's in the top    11:10:25
20 right corner there, E-L-Y-S-E.    11:10:28
21     Who is Elyse?    11:10:34
22  A. Elyse is a user experience designer in the    11:10:43
23 Privacy and Data Protection Office.    11:10:46
24  Q. How long has she been in PDPO?    11:10:49
25  A. I don't recall how long.    11:11:00
Page 97

25 (Pages 94 - 97)

CONFIDENTIAL

1  Q. Okay. How long have you been in PDPO?    11:11:01
2  A. I switched to a role working on privacy    11:11:13
3 work at Google in 2017. I can't recall how long    11:11:17
4 I've been specifically in an organizational    11:11:23
5 structure referred to as the PDPO.    11:11:25
6  Q. Has Elyse -- I'm sorry.    11:11:29
7     What is Elyse's last name? Did I already    11:11:31
8 ask that?    11:11:34
9  A. I don't believe so.    11:11:35
10  Q. Okay. What is Elyse's last name?    11:11:36
11  A. Her last name is Bellamy.    11:11:40
12  Q. B-E-L-L-A-M-Y?    11:11:44
13  A. Yes.    11:11:47
14  Q. Is she in Mountain View?    11:11:48
15  A. I similarly don't know where she is at    11:11:58
16 this time.    11:11:59
17  Q. Generally speaking, is her office location    11:12:00
18 in Northern California at Google's Mountain --    11:12:03
19 associated with Google's Mountain View office,    11:12:06
20 Mr. Heft-Luthy?    11:12:09
21     MR. SPILLY: Objection. Asked and    11:12:10
22 answered.    11:12:10
23     THE WITNESS: The last time we had contact    11:12:18
24 before she went on maternity leave, she was located    11:12:21
25 in Munich.    11:12:25

Page 98

1 BY MR. BARNES:    11:12:26
2  Q. Thank you.    11:12:26
3     MR. BARNES: Ms. Truong, can you share    11:12:38
4 Exhibit 4, please?    11:12:42
5     MS. TRUONG: Just one moment.    11:12:43
6     (Whereupon Exhibit 4 was marked for    11:12:44
7     identification.)    11:12:44
8 BY MR. BARNES:    11:12:45
9  Q. Mr. Heft-Luthy, was ███████ an    11:12:59
10 aspirational project?    11:13:02
11     MR. SPILLY: Objection. Vague.    11:13:05
12     THE WITNESS: Can you define what you mean    11:13:08
13 by "aspirational"?    11:13:09
14 BY MR. BARNES:    11:13:11
15  Q. Yes, I can.    11:13:11
16     Was it a proposal to improve how Google's    11:13:12
17 systems work?    11:13:18
18  A. Yes.    11:13:30
19  Q. And what was it proposing to improve?    11:13:31
20     MR. SPILLY: Objection. Vague.    11:13:33
21     THE WITNESS: Like any product strategy    11:13:40
22 effort at Google, it was intended to address a    11:13:43
23 variety of functional inputs, including underlying    11:13:47
24 technology, user-facing product, and marketing    11:13:54
25 material.    11:13:57

Page 99

1 BY MR. BARNES:    11:13:57
2  Q. Was it primarily focused upon user    11:13:58
3 consent, Mr. Heft-Luthy?    11:14:02
4     MR. SPILLY: Objection. Vague.    11:14:05
5     THE WITNESS: As previously stated, the    11:14:13
6 work that my team does sometimes touches upon    11:14:14
7 consent as part of the landscape in which we    11:14:19
8 operate. It was like other work that we do also    11:14:22
9 addressing user concern, overall product strategy,    11:14:26
10 technical development, and a variety of other inputs    11:14:30
11 in addition to consent.    11:14:33
12 BY MR. BARNES:    11:14:34
13  Q. All funneling to the idea of the consent    11:14:34
14 process, correct?    11:14:37
15     MR. SPILLY: Objection. Vague.    11:14:40
16     THE WITNESS: I'm not sure what you mean    11:14:45
17 by "funneling."    11:14:46
18 BY MR. BARNES:    11:14:47
19  Q. Well, the consent process has a user    11:14:47
20 experience component to it, correct?    11:14:50
21  A. Yes.    11:14:56
22  Q. And the consent process has an engineering    11:14:57
23 component to it, correct?    11:15:00
24     MR. SPILLY: Objection. Vague.    11:15:06
25     THE WITNESS: Insofar as anything that we    11:15:10

Page 100

1 do with code has an engineering component, that    11:15:12
2 would be correct, yes.    11:15:16
3 BY MR. BARNES:    11:15:17
4  Q. And the consent process has a policy    11:15:18
5 aspect to it, correct?    11:15:20
6     MR. SPILLY: Objection. Vague.    11:15:25
7     THE WITNESS: Again, as a product manager,    11:15:25
8 my role is to manage a variety of inputs. Some of    11:15:33
9 those are legal, as we've discussed. Some of them    11:15:35
10 are policy, yes.    11:15:38
11 BY MR. BARNES:    11:15:39
12  Q. Okay. Can you open Exhibit 4?    11:15:40
13     MR. BARNES: And, Ms. Truong, can you put    11:15:41
14 this on the screen?    11:15:42
15 BY MR. BARNES:    11:15:54
16  Q. Mr. Heft-Luthy, does ███ perspective    11:15:54
17 draft" refer to ███████?    11:15:59
18  A. Yes.    11:16:02
19  Q. First paragraph says: "We will craft" --    11:16:07
20 "This document details the foundation upon which we    11:16:09
21 will craft the PDF's five-year user privacy    11:16:13
22 experience vision."    11:16:17
23     Do you see that?    11:16:18
24  A. Yes.    11:16:25
25  Q. And then down below, do you see it says,    11:16:25

Page 101

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

```
 1  highlighted, "broad and contradictory consent"?      11:16:27
 2        MR. SPILLY:  Objection.  Misrepresents the     11:16:37
 3  document.                                            11:16:38
 4  BY MR. BARNES:                                        11:16:39
 5     Q.  Do you see in the second paragraph where      11:16:42
 6  "broad and contradictory consent" is bolded,         11:16:44
 7  Mr. Heft-Luthy?                                       11:16:48
 8     A.  I see the second paragraph with the           11:16:50
 9  sentence that includes that language, yes.           11:16:54
10     Q.  Okay.  Mr. Heft-Luthy, did the                11:16:56
11  [redacted] project relate primarily to user          11:17:01
12  consent at Google?                                    11:17:06
13        MR. SPILLY:  Objection.  Vague.                11:17:09
14        THE WITNESS:  Again, as stated, our legal      11:17:16
15  consent is a driver of some of the activity in which 11:17:19
16  we engage.  The work we're doing includes consent as 11:17:25
17  well as overall user trust, general infrastructure,  11:17:29
18  the future of technology, more broadly.              11:17:33
19        So I'm not sure it would be fair to say        11:17:38
20  something in that processes is more or less primary  11:17:41
21  than others.                                          11:17:47
22  BY MR. BARNES:                                        11:17:47
23     Q.  Okay.  Do you recognize this document?        11:17:48
24  You want to take moment to look at it?               11:17:51
25     A.  Yes, I recognize the document.                11:18:21
```

Page 103

```
 1     Q.  And what is it?                               11:18:24
 2        MR. SPILLY:  Object to the form.               11:18:26
 3        THE WITNESS:  This document is a                11:18:30
 4  in-progress draft of a position paper we drafted as  11:18:33
 5  part of the [redacted] process.                       11:18:38
 6  BY MR. BARNES:                                        11:18:40
 7     Q.  You say, "We drafted."                        11:18:40
 8        Who is "we"?                                    11:18:42
 9     A.  "We" is the variety of stakeholders in the    11:18:43
10  project, some members of a core team, as well as     11:18:52
11  input from various partners and folks that we        11:18:55
12  invited to review.                                    11:19:02
13     Q.  Who did you invite to review and help         11:19:04
14  draft this document?                                  11:19:08
15     A.  I don't recall.                                11:19:15
16     Q.  Okay.  Who has the e-mail address             11:19:16
17  ohelyse@google.com?  Is that Ms. Bellamy?            11:19:18
18     A.  That's correct, yes.                          11:19:27
19     Q.  Okay.  Would you say that [redacted]          11:19:30
20  primary focus was on helping Google to get privacy   11:19:37
21  right?                                                11:19:41
22        MR. SPILLY:  Objection.  Vague.                11:19:46
23        THE WITNESS:  As I said, there's a variety     11:19:52
24  of focuses for the project.  Some of our focuses     11:19:53
25  could be summarized as getting privacy right.        11:19:57
```

Page 104

```
 1  There's also a variety of other focuses.  So, again, 11:20:01
 2  not sure I would be willing to say that it was       11:20:05
 3  primary but a consideration among others.            11:20:07
 4        MR. BARNES:  Can you go to 1 -- 312,           11:20:22
 5  Ms. Truong?                                           11:20:22
 6  BY MR. BARNES:                                        11:20:25
 7     Q.  Mr. Heft-Luthy, do you see at the top         11:20:59
 8  where it says "Ads as a product"?                    11:21:00
 9     A.  Yes.                                           11:21:09
10     Q.  And what's that first sentence say,           11:21:10
11  Mr. Heft-Luthy?                                       11:21:12
12     A.  The segment right under it?                   11:21:18
13     Q.  Correct.                                       11:21:21
14     A.  It says:  "As such, ads and ads supporting    11:21:25
15  system and services (such as realtime bidding and    11:21:28
16  measurement) need to become private by default."     11:21:31
17     Q.  What does "private by default" mean?          11:21:34
18     A.  "Private by default" is a term used within   11:21:38
19  the PDPO, certainly within this project, to refer to 11:21:53
20  a extension of privacy-preserving technologies       11:22:00
21  further into given technological space.              11:22:03
22     Q.  If you were going to explain "private by      11:22:07
23  default" to an ordinary person, what would you say   11:22:09
24  "private by default" means?                          11:22:13
25        MR. SPILLY:  Objection.  Form.                 11:22:19
```

Page 105

```
 1        THE WITNESS:  So with regards to               11:22:21
 2  technology that Google offers, I would say that      11:22:29
 3  Google is building technology to make it really easy 11:22:33
 4  to use Google services and understand and control    11:22:38
 5  the data that's collected, including a variety of    11:22:45
 6  technical means to help preserve privacy across your 11:22:49
 7  experience.                                           11:22:54
 8  BY MR. BARNES:                                        11:22:54
 9     Q.  Mr. Heft-Luthy, that's how you would          11:22:55
10  explain it to a normal person?  What does "private   11:23:02
11  by default" mean, Mr. Heft-Luthy?                    11:23:04
12        MR. SPILLY:  Objection.  Argumentative.        11:23:07
13  Asked and answered.                                   11:23:08
14        THE WITNESS:  I believe I've already           11:23:14
15  answered that question.                               11:23:15
16  BY MR. BARNES:                                        11:23:16
17     Q.  What is the state of a product when it is     11:23:18
18  private by default?                                   11:23:21
19        Scratch that.                                   11:23:24
20        What are the attributes of a product that      11:23:25
21  are private by default?                              11:23:27
22        MR. SPILLY:  Objection.  Vague.                11:23:31
23        THE WITNESS:  With regards to specific         11:23:36
24  definitions, I don't recall if we outlined it in     11:23:38
25  specificity enough to provide a full answer to that  11:23:42
```

27 (Pages 102 - 105)

CONFIDENTIAL

1 question.                                    11:23:44
2 BY MR. BARNES:                               11:23:46
3     Q.  To you, Mr. Heft-Luthy, what does it mean    11:23:46
4 for a product to be private by default?      11:23:48
5         MR. SPILLY:  Objection.  Speculation --    11:23:54
6 calls for speculation and asked and answered.    11:23:55
7         THE WITNESS:  As I said, I've already    11:24:02
8 discussed the broad colloquial definition we're    11:24:04
9 operating under and wouldn't be able to speculate    11:24:09
10 further.                                     11:24:11
11 BY MR. BARNES:                              11:24:11
12     Q.  You stated that "private by default"    11:24:11
13 refers to a number of technologies that Google is    11:24:14
14 developing.                                 11:24:17
15         Do you recall that?                 11:24:18
16     A.  That's correct.                     11:24:23
17     Q.  Is it your testimony that "private by    11:24:24
18 default" refers to those technologies that are in    11:24:26
19 the process of being developed?              11:24:29
20         MR. SPILLY:  Objection.  Misstates    11:24:34
21 witness's testimony.                        11:24:35
22         THE WITNESS:  In addition to technologies    11:24:38
23 which are already deployed that are part of Google's    11:24:41
24 development process including things like    11:24:48
25 differential privacy, it does also refer to    11:24:50
                                          Page 106

1 technology which is in development.           11:24:53
2 BY MR. BARNES:                               11:24:54
3     Q.  Are ads and ad supporting systems private    11:24:55
4 by default at Google today?                  11:25:00
5         MR. SPILLY:  Objection.  Calls for    11:25:02
6 speculation.                                11:25:03
7         THE WITNESS:  I wouldn't be able to    11:25:07
8 speculate on the answer to that question.    11:25:08
9 BY MR. BARNES:                               11:25:11
10     Q.  You -- when you were in charge of Google's    11:25:11
11 privacy policy for approximately three years; is    11:25:13
12 that correct?                               11:25:16
13     A.  Yes.                               11:25:21
14     Q.  Your testimony here today is you're unable    11:25:23
15 to state whether Google ads and ad supporting    11:25:25
16 systems are private by default today, correct?    11:25:30
17         MR. SPILLY:  Objection.  Misstates the    11:25:36
18 witness's testimony.                        11:25:39
19         THE WITNESS:  Again, I'm going to have to    11:25:43
20 provide the caveats given that I'm speaking under    11:25:44
21 oath here and I want to be precise.          11:25:48
22         With regards to this specific term of art,    11:25:51
23 "private by default" used contingently as part of a    11:25:54
24 push to increase investment in privacy preserving    11:26:01
25 technology, I can't speak to the interaction or lack    11:26:04
                                          Page 107

1 of interaction with regards to ads overall following    11:26:08
2 or not following that term of art.           11:26:13
3 BY MR. BARNES:                               11:26:15
4     Q.  Well, the sentence says "need to become    11:26:16
5 private by default."                         11:26:18
6         Do you see that, Mr. Heft-Luthy?     11:26:19
7     A.  Yes, I see it.                       11:26:27
8     Q.  And, Mr. Heft-Luthy, you speak English,    11:26:28
9 right?                                      11:26:29
10         MR. SPILLY:  Objection.  Argumentative.    11:26:30
11 Harassing.                                  11:26:31
12         THE WITNESS:  I do speak English, yes.    11:26:36
13 BY MR. BARNES:                              11:26:38
14     Q.  And if something needs to become    11:26:38
15 something, that means it's not that thing today,    11:26:41
16 correct?                                    11:26:43
17         MR. SPILLY:  Objection.  Vague.     11:26:47
18         THE WITNESS:  I'm -- I'm -- I'm not sure    11:26:53
19 what you're referring to with that question    11:26:54
20 specifically.  Is this a question about ads    11:26:56
21 specifically?  What is -- what is this in reference    11:27:00
22 to?                                         11:27:01
23 BY MR. BARNES:                              11:27:02
24     Q.  This is a basic question about the meaning    11:27:02
25 of words, Mr. Heft-Luthy.                    11:27:05
                                          Page 108

1         If something needs to become something,    11:27:08
2 that refers to a process of transformation, correct?    11:27:10
3         MR. SPILLY:  Objection.  Vague.     11:27:17
4         THE WITNESS:  Again, I'm -- I'm not really    11:27:22
5 going to be able to speculate on the implications    11:27:24
6 of -- of that language in this context or in all    11:27:28
7 contexts.  I can talk specifically about    11:27:30
8 implications about certain parts of versions of use    11:27:33
9 of that language.                           11:27:37
10         MR. SPILLY:  Sorry, Sam.  I didn't get    11:27:40
11 this one in there, but also object that the document    11:27:43
12 speaks for itself.                          11:27:45
13         MR. BARNES:  Oh, thank you.  We'll accept    11:27:46
14 that objection.                             11:27:48
15         Ms. Truong, can you share Exhibit P5,    11:27:57
16 please, which will become Exhibit 5?         11:28:00
17         (Whereupon Exhibit 5 was marked for    11:28:06
18         identification.)                     11:28:06
19 BY MR. BARNES:                              11:28:12
20     Q.  Mr. Heft-Luthy, what is the EMEA 2019    11:28:12
21 deck?                                       11:28:19
22         MR. SPILLY:  Objection.  Vague.     11:28:20
23         THE WITNESS:  Is this in reference to an    11:28:22
24 exhibit?                                    11:28:24
25 ///
                                          Page 109

28 (Pages 106 - 109)

CONFIDENTIAL

1  BY MR BARNES:                              11:28:24
2  Q   It will be                            11:28:25
3      What is EMEA at Google?               11:28:25
4  A   So EMEA is --                         11:28:35
5      THE WITNESS:  I'm sorry, Carl  Go ahead   11:28:37
6      MR SPILLY:  Same objection  Vague     11:28:38
7      MR BARNES:  Can we go -- let's go off the   11:28:39
8  record for a moment                       11:28:40
9      MR  SPILLY:  If you want              11:28:42
10     THE VIDEO OPERATOR:  We're off the record   11:28:45
11 at 11:28 a m                              11:28:46
12     (Off the record at 11:28 a m  and back   11:28:48
13     on the record at 11:30 a m )          11:30:13
14     THE VIDEO OPERATOR:  Back on the record at   11:30:14
15 11:30                                     11:30:15
16     Go ahead                              11:30:16
17 BY MR  BARNES:                            11:30:16
18 Q   Mr Heft-Luthy, what does EMEA refer to at   11:30:17
19 Google?                                   11:30:20
20     MR  SPILLY:  Same objection as before   11:30:20
21     THE WITNESS:  In what context are you   11:30:24
22 referring to?  Is there part of the exhibit we can   11:30:25
23 reference?                                11:30:28
24 BY MR  BARNES:                            11:30:28
25 Q   Do those letters together mean anything to   11:30:28

Page 110

1  you as someone who's been on the PDPO team for four   11:30:31
2  years, EMEA?                              11:30:34
3      MR  SPILLY:  Object to form.          11:30:38
4      THE WITNESS:  Again, I -- is this in   11:30:43
5  reference to a specific document that we're going to   11:30:45
6  be referring to my recollection of?       11:30:48
7  BY MR  BARNES:                            11:30:50
8  Q   Can you pull up Exhibit 5?            11:30:55
9  A   Okay.                                 11:30:57
10 Q   Mr. Heft-Luthy, do you recognize this   11:31:09
11 document?                                 11:31:13
12     MR. BARNES:  Ms. Truong, can you put it on   11:31:16
13 the screen, please?                       11:31:19
14     MS. TRUONG:  The answer to your question   11:31:26
15 is yes.                                   11:31:27
16 BY MR. BARNES:                            11:31:27
17 Q   What is this document?                11:31:28
18 A   This document is another draft of a   11:31:34
19 position paper we developed as part of the   11:31:37
20 ▓▓▓▓▓▓▓▓  project.                        11:31:40
21 Q   By "we," do you mean the Google PDPO team?   11:31:41
22 A   The same caveats of people involved that   11:31:46
23 referred to the previous exhibit that there were   11:31:50
24 attorneys involved.                       11:31:52
25 Q   Right.                                11:31:55

Page 111

1      I mean, you were the product manager of   11:31:55
2  this team, correct?                       11:31:57
3  A   That's correct, yes.                  11:32:01
4  Q   Okay.  And this was a document that was   11:32:04
5  part of that project, correct?            11:32:05
6  A   That is my recollection, yes.         11:32:12
7  Q   Okay.  Elyse says:  "Deprecated, we are   11:32:14
8  back in the actual perspective.  Thanks," with a lot   11:32:17
9  of exclamation points.                    11:32:20
10     Can you explain what that refers to?   11:32:24
11     MR. SPILLY:  Objection.  Foundation.   11:32:31
12     THE WITNESS:  Within Google we'll      11:32:34
13 sometimes have to manage feedback in a variety of   11:32:38
14 different documents.  I recall this being part of   11:32:40
15 that process of bringing people from one link to   11:32:44
16 another link.                             11:32:48
17 BY MR. BARNES:                            11:32:48
18 Q   It says "deprecated," but then it      11:32:49
19 says we're -- "deprecated" and then:  "We are back."   11:32:52
20     So what I'm trying to figure out here was,   11:32:56
21 was the project deprecated and then it was green --   11:32:58
22 green-lit again?                          11:33:02
23     MR. SPILLY:  Object to the form.       11:33:08
24 Compound.                                 11:33:10
25     THE WITNESS:  Sorry.  Could -- yeah, could   11:33:12

Page 112

1  you repeat the question here?             11:33:12
2  BY MR. BARNES:                            11:33:14
3  Q   Was -- was the project deprecated at one   11:33:15
4  point in time and then given new life?    11:33:18
5  A   Not to my --                          11:33:21
6      MR. SPILLY:  Same objections.         11:33:25
7      THE WITNESS:  Not to my recollection.   11:33:26
8  BY MR. BARNES:                            11:33:27
9  Q   Okay.  It was deprecated once, correct?   11:33:31
10 A   As I -- as I previously stated, upon   11:33:37
11 delivery of proposals, the project concluded, yes.   11:33:40
12 Q   Okay.  And was not carried forward,    11:33:46
13 correct?                                  11:33:48
14 A   That is correct, yes.                  11:33:53
15 Q   This was -- this was not a project; it was   11:33:54
16 not like Lazarus, where it died, was revived, and   11:33:57
17 then died again.                          11:34:01
18     Is that accurate to say?              11:34:02
19     MR. SPILLY:  Object to the form.       11:34:06
20     THE WITNESS:  I'm not familiar with the   11:34:07
21 story of Lazarus enough to speculate on whether this   11:34:09
22 is like Lazarus.  But the second part of your   11:34:12
23 statement, that is correct; it was not deprecated   11:34:15
24 and then brought back as a -- as a project.   11:34:18
25 ///

Page 113

29 (Pages 110 - 113)

1 BY MR. BARNES:                            11:34:19
2    Q.  Okay.  It died once.                11:34:20
3        Okay.  Comment 1 there at the very end, it  11:34:22
4 says: "Thanks and good luck.  Hope you're happy  11:34:28
5 with where this lands EOW."                11:34:30
6        Who's EOW?                          11:34:34
7    A.  EOW would be a term of art to refer to end  11:34:39
8 of week.                                   11:34:42
9    Q.  Ah-hah.  Okay.  Thank you.          11:34:44
10       MR. BARNES:  Page -- sorry.  Comment 11 on  11:34:47
11 page 3.  If we could go there, Ms. Truong.  11:34:50
12 BY MR. BARNES:                            11:34:58
13   Q.  Now you see where it says: "Absolutely;  11:34:58
14 making an effort to bolster our citations   11:35:03
15 throughout.  Just FYI, I don't have access to view  11:35:03
16 the ▮▮▮▮▮ dashboard nor the EMEA 2019 deck."  11:35:08
17       Do you see that?                     11:35:13
18   A.  Let me dig in.  Which comment are you  11:35:14
19 saying this is in reference to?  Which number?  11:35:17
20   Q.  Comment 11, the second comment from the  11:35:20
21 top of the page.                           11:35:22
22   A.  Okay.  I don't recall what EMEA 2019 deck  11:35:33
23 is in reference to.                        11:35:35
24   Q.  Thank you.                           11:35:36
25       What is ▮▮▮▮▮, the ▮▮▮▮▮            11:35:36
                                        Page 114

1 dashboard?                                 11:35:40
2        MR. SPILLY:  Objection.  Foundation.  11:35:42
3        THE WITNESS:  ▮▮▮▮▮ dashboard is a   11:35:48
4 product usage overview dashboard available to  11:35:51
5 Googlers with some access restrictions associated  11:35:55
6 with it.                                   11:36:00
7 BY MR. BARNES:                             11:36:01
8    Q.  What can you see in the ▮▮▮▮▮        11:36:02
9 dashboard?                                 11:36:05
10       MR. SPILLY:  Object to the form.      11:36:07
11       THE WITNESS:  A variety of product and  11:36:11
12 demographic metrics relevant to Google's product  11:36:14
13 offerings.                                 11:36:18
14 BY MR. BARNES:                            11:36:19
15   Q.  Do you have access to the ▮▮▮▮▮      11:36:22
16 dashboard?                                 11:36:24
17   A.  I don't know at this specific moment  11:36:32
18 whether I have access to ▮▮▮▮▮             11:36:34
19   Q.  Did you have it -- access to ▮▮▮▮▮ at  11:36:36
20 the time you were the PD- -- the Privacy- -- I'm  11:36:40
21 sorry -- the -- the -- in charge of this project  11:36:45
22 called ▮▮▮▮▮?                             11:36:50
23   A.  There are a lot of P words here.      11:36:51
24       MR. SPILLY:  Object to the form.       11:36:55
25 ///
                                        Page 115

1 BY MR. BARNES:                            11:36:55
2    Q.  Did you have -- have you had access to  11:36:55
3 ▮▮▮▮▮ at some point in time?               11:36:57
4        MR. SPILLY:  Objection.  Vague as to  11:37:02
5 "▮▮▮▮▮."                                  11:37:04
6        THE WITNESS:  Yeah, can you be -- so the  11:37:07
7 ▮▮▮▮▮ dashboard referred to here, at various  11:37:10
8 points I have had access to as a privacy product  11:37:14
9 manager for the Privacy and Data Protection Office.  11:37:18
10 BY MR. BARNES:                            11:37:24
11   Q.  That is a lot of Ps.                  11:37:24
12       Okay.  How did you use the ▮▮▮▮▮     11:37:26
13 dashboard in that role with the string of Ps?  11:37:27
14       MR. SPILLY:  Objection.  Vague.       11:37:33
15       THE WITNESS:  As a product manager, I used  11:37:37
16 various dashboards in various ways to inform product  11:37:40
17 development as a product manager in the Privacy and  11:37:48
18 Data Protection Office working on privacy products.  11:37:49
19 I have used the ▮▮▮▮▮ dashboard to         11:37:55
20 inform general product strategy.           11:37:57
21 BY MR. BARNES:                            11:37:59
22   Q.  Can you give me an example of how you used  11:37:59
23 the ▮▮▮▮▮ dashboard to inform product strategy?  11:38:02
24   A.  So an example of ▮▮▮▮▮ -- the        11:38:14
25 ▮▮▮▮▮ dashboard might be to summarize the   11:38:17
                                        Page 116

1 overall mobile phone penetration in a given country.  11:38:22
2 So you might be able to use that information to say  11:38:27
3 that users in one country would be more likely to  11:38:30
4 view a given product on a mobile device versus a  11:38:35
5 desktop device, for example.               11:38:39
6    Q.  Okay.  So you log in -- is ▮▮▮▮▮     11:38:41
7 something -- the ▮▮▮▮▮ dashboard something you  11:38:44
8 log in to?                                 11:38:46
9        MR. SPILLY:  Object to the form.  Vague.  11:38:48
10       THE WITNESS:  As previously stated, there  11:38:52
11 are access restrictions similar to other dashboards  11:38:54
12 at Google.                                 11:39:00
13 BY MR. BARNES:                            11:39:00
14   Q.  Okay.  Does it have a user-facing      11:39:01
15 interface with which a person, based on their  11:39:03
16 permissions, can engage with?              11:39:06
17       MR. SPILLY:  Objection.  Vague.       11:39:10
18       THE WITNESS:  As a dashboard and, again,  11:39:16
19 caveated with users are Google employees, yes.  11:39:19
20 BY MR. BARNES:                            11:39:24
21   Q.  Okay.  And -- and can you describe what  11:39:24
22 that dashboard looks like it -- looked like when you  11:39:26
23 used the ▮▮▮▮▮ dashboard?                 11:39:31
24   A.  Like most dashboards, it provides a    11:39:39
25 high-level summary of pertinent information, like I  11:39:45
                                        Page 117

CONFIDENTIAL

1  said, including demographic information for specific   11:39:48
2  countries, with the ability to drill down into   11:39:51
3  specifics depending on desired goal with using the   11:39:56
4  dashboard.   11:40:00
5      Q.  Okay.  So there's a high-level summary and   11:40:02
6  then there is sort of a list of different attributes   11:40:04
7  that, based on your permission level, you can drill   11:40:07
8  down into more specifics?   11:40:10
9          Is that accurate?   11:40:12
10         MR. SPILLY:  Objection.  Misstates the   11:40:13
11  witness's testimony.   11:40:15
12         THE WITNESS:  So, as said, it provides a   11:40:16
13  high-level summary with the ability to see certain   11:40:20
14  specifics depending on current implementation of   11:40:25
15  ████████ the user's access restriction.   11:40:29
16  BY MR. BARNES:   11:40:31
17      Q.  Right.   11:40:32
18         And what I mean by "drill down into the   11:40:32
19  specifics," it's not like you, as the user, have to   11:40:34
20  go to ██████ and know exactly what you're   11:40:37
21  searching for.  I mean, in some sense you do, but   11:40:39
22  there's a list of permissions, things to which you   11:40:43
23  would have access to based on your permissions that   11:40:47
24  you could choose from; is that correct?   11:40:50
25         MR. SPILLY:  Object to the form.  Vague.   11:40:52
                                              Page 118

1          THE WITNESS:  So like all dashboards at   11:41:02
2  Google, there's a version available simply through   11:41:06
3  the interaction mechanism of continuing to scroll.   11:41:10
4  Beyond choosing to simply scroll, there are   11:41:12
5  abilities to either filter or change the view of   11:41:20
6  certain pieces of information that are provided.   11:41:26
7  BY MR. BARNES:   11:41:27
8      Q.  How do you filter or change it in the   11:41:28
9  ████████ dashboard?   11:41:32
10     A.  Depending on what's represented, you might   11:41:39
11  use tabs or click certain elements to change how   11:41:41
12  things are represented.   11:41:45
13     Q.  Can you see all of the different things   11:41:46
14  available in ██████?   11:41:49
15         Could you see everything available in   11:41:54
16  ██████ when you -- let -- this is -- let me ask   11:41:56
17  it this way: Can you see all of the different   11:41:58
18  various categories available at ██████ but then   11:42:02
19  only had access to some of those categories?   11:42:06
20         MR. SPILLY:  Objection.  Vague and form.   11:42:09
21         THE WITNESS:  So I'm -- I'm -- apologies.   11:42:13
22  I'm going to have to answer with a little bit of a   11:42:16
23  tautology here.  There's a distinction between   11:42:19
24  ██████ as an overall product and specifically the   11:42:22
25  dashboard that we're referring to.   11:42:27
                                              Page 119

1          Again, sorry to answer with a tautology,   11:42:31
2  but the things you can see in the ██████   11:42:34
3  dashboard are the things that are available as part   11:42:36
4  of the ██████ dashboard.  So there's a set of   11:42:38
5  fields and summaries of information that are   11:42:42
6  available through that specific access layer that   11:42:45
7  you're able to see.   11:42:48
8  BY MR. BARNES:   11:42:49
9      Q.  Okay.  And that -- thank you.  It might   11:42:50
10  have been a tautology, but it was a helpful   11:42:53
11  tautology.   11:42:57
12         So when you go there -- let me give you an   11:42:58
13  example and you tell me if this is how it works.   11:43:00
14  Okay?   11:43:02
15         You're on the PDPO team.  You only have   11:43:03
16  access to certain things in the ██████ dashboard.   11:43:05
17         When you went to the ██████ dashboard,   11:43:09
18  was the situation where they would list 50 different   11:43:11
19  things that are available in the dashboard, but you   11:43:14
20  were only able to actually access a subset of those   11:43:17
21  that relate to PDPO, or -- so that's Option 1.   11:43:22
22         Or Number 2 is, because you're in PDPO,   11:43:28
23  you have access to seven different data fields --   11:43:31
24  I'm making up the numbers -- and you can only see   11:43:34
25  those seven different data fields?   11:43:38
                                              Page 120

1          MR. SPILLY:  Object to the form.  Vague.   11:43:43
2  Calls for speculation.   11:43:47
3          THE WITNESS:  Can you help clarify what   11:43:50
4  the difference between 1 and 2 is?  I'm having   11:43:52
5  trouble understanding.   11:43:56
6  BY MR. BARNES:   11:43:57
7      Q.  Right.   11:43:58
8          In Scenario 1, you would be able to see   11:43:58
9  all of the different fields and attributes available   11:44:01
10  even though you didn't have a permission to actually   11:44:05
11  access the data behind them.   11:44:10
12         And, then, Scenario Number 2 is you,   11:44:14
13  Sam Heft-Luthy, go to ██████ dashboard.  You can   11:44:18
14  only see the data parameters that you can actually   11:44:22
15  access.   11:44:25
16     A.  Okay.  I understand your question.  And   11:44:26
17  I'm -- sorry.   11:44:27
18         MR. SPILLY:  I'm going to object to the   11:44:30
19  form.  Vague.   11:44:31
20         You can answer.   11:44:34
21         THE WITNESS:  I understand the question.   11:44:37
22  And I'm sorry to say I don't recall well enough to   11:44:39
23  be able to -- to be able to answer in detail that   11:44:43
24  question.   11:44:46
25  ///   Page 121

31 (Pages 118 - 121)

CONFIDENTIAL

1 BY MR. BARNES:                                  11:44:46
2    Q.  Okay.  How often did you use the [REDACTED]  11:44:47
3 dashboard?                                      11:44:49
4    A.  I don't think I'd be able to speculate on  11:44:56
5 that.  It would -- yeah.                        11:44:58
6    Q.  Mr. Heft-Luthy, did you use it once?     11:45:02
7    A.  I have used it more than once.           11:45:07
8    Q.  Did you use it a thousand times?         11:45:10
9    A.  I wouldn't be able to speculate on that. 11:45:16
10   Q.  Did you use it every day?                11:45:18
11       MR. SPILLY:  Objection.                  11:45:25
12       You can answer.                          11:45:29
13       THE WITNESS:  There were days in which I 11:45:32
14 did not use the [REDACTED] dashboard.          11:45:33
15 BY MR. BARNES:                                  11:45:35
16   Q.  Did you use it every week?               11:45:36
17       MR. SPILLY:  Objection.  Asked and       11:45:42
18 answered now.                                   11:45:42
19       MR. BARNES:  I'm sorry, Carl --          11:45:47
20 Mr. Spilly.  Show me in this record where I asked if  11:45:47
21 he used the [REDACTED] dashboard every week.  We are  11:45:52
22 verging again into the ridiculous objections.  I am  11:45:54
23 going to ask the question again.  It has not been  11:46:00
24 asked.                                          11:46:00
25 ///
                                      Page 122

1 BY MR. BARNES:                                  11:46:00
2    Q.  Mr. Heft-Luthy, when you had access to the  11:46:00
3 [REDACTED] dashboard, did you use it at least weekly?  11:46:04
4       MR. SPILLY:  Same --                      11:46:13
5       THE WITNESS:  There are weeks in which I  11:46:14
6 did not use it.                                 11:46:16
7 BY MR. BARNES:                                  11:46:17
8    Q.  Did you use it more weeks than not,      11:46:17
9 Mr. Heft-Luthy?                                 11:46:20
10       MR. SPILLY:  Same objection.             11:46:21
11       THE WITNESS:  I don't think I'd be able to  11:46:25
12 speculate on that.                             11:46:28
13 BY MR. BARNES:                                  11:46:28
14   Q.  Okay.  Mr. Heft-Luthy, this document in  11:46:29
15 the PDPO office says that a [REDACTED] Google  11:46:30
16 will put people in a good state by default.     11:46:36
17       What is a good -- I'm sorry -- a good,   11:46:38
18 safe state by default?                          11:46:42
19       What is a good, safe state by default?   11:46:44
20       MR. SPILLY:  Objection.  Vague.          11:46:48
21       I'm sorry, Jay.  I don't know what page  11:46:51
22 you're on or where.                             11:46:53
23 BY MR. BARNES:                                  11:46:58
24   Q.  Mr. Heft-Luthy, what is a good, safe state  11:47:00
25 by default as it relates to the [REDACTED]      11:47:03
                                      Page 123

1 project?                                        11:47:06
2       MR. SPILLY:  Objection.  Calls for        11:47:06
3 speculation.                                     11:47:06
4       THE WITNESS:  I -- I don't think I'd be   11:47:11
5 able to speculate on that question.             11:47:12
6       MR. BARNES:  Okay.  Ms. Truong, can you   11:47:14
7 put up P6?                                       11:47:22
8       (Whereupon Exhibit 6 was marked for       11:47:24
9        identification.)                         11:47:24
10       MS. TRUONG:  Yes, one moment.            11:47:37
11       Document should be up as Exhibit 6.      11:48:36
12       MS. CRAWFORD:  Confirmed.                11:48:42
13 BY MR. BARNES:                                  11:48:43
14   Q.  Mr. Heft-Luthy, let me know when you have  11:48:44
15 it.                                             11:48:46
16   A.  Okay.  I have it up.                      11:49:18
17   Q.  Do you recognize this document,          11:49:20
18 Mr. Heft-Luthy?                                 11:49:20
19   A.  No, I do not.                            11:49:27
20   Q.  You were on the PDPO team, correct?      11:49:28
21   A.  That's correct.                          11:49:32
22   Q.  How many people are on the PDPO team?    11:49:33
23   A.  I don't know the answer to that question. 11:49:40
24   Q.  Okay.  Mr. Heft-Luthy, is it approximately  11:49:42
25 a thousand, or is it approximately 50?          11:49:45
                                      Page 124

1       MR. SPILLY:  Objection.  Compound.        11:49:49
2 BY MR. BARNES:                                  11:49:49
3    Q.  Or somewhere in between?                 11:49:52
4       MR. SPILLY:  Object to the form.          11:49:54
5       THE WITNESS:  Like I said, I wouldn't be  11:49:55
6 able to speculate on that with any specificity. 11:49:57
7 BY MR. BARNES:                                  11:50:02
8    Q.  You have no idea how many people are on  11:50:02
9 the PDPO team at Google.                         11:50:04
10       Is that your testimony?                  11:50:06
11       MR. SPILLY:  Objection.  Asked and       11:50:08
12 answered.                                        11:50:09
13       THE WITNESS:  My testimony is that I don't  11:50:12
14 have an estimation that I feel confident testifying  11:50:15
15 under oath with.                                11:50:20
16 BY MR. BARNES:                                  11:50:21
17   Q.  Okay.  So who is Shammond or S. Hammond?  11:50:22
18 Do you know who S. Hammond is on page 2 of this  11:50:26
19 document.                                        11:50:29
20       Is that a "yes," Mr. Heft-Luthy?         11:50:34
21   A.  Yes.                                     11:50:36
22   Q.  Who is S. Hammond?                       11:50:37
23   A.  S. Hammond refers to Sarah Hammond.      11:50:42
24   Q.  Okay.  And do you work with Ms. Hammond?  11:50:46
25   A.  Yes.                                     11:50:52
                                      Page 125

                                      32 (Pages 122 - 125)

**Page 126**

1  Q  How long have you worked with Ms Hammond?  11:50:53
2  A  I don't recall with specificity  11:50:58
3  Q  Okay  Who is G Gelke?  11:51:00
4  A  G  Gelke is Gretchen Gelke  11:51:11
5  Q  Okay  And do you know Gretchen Gelke?  11:51:14
6  A  Yes  11:51:19
7  Q  And do you work with Gretchen Gelke?  11:51:19
8  A  I have, yes  11:51:24
9  Q  Who is Lauren Palmer?  11:51:26
10  A  Lauren Palmer is a UX researcher  11:51:34
11  Q  Is she on the PDPO team?  11:51:37
12  A  I don't recall formal ownership in terms  11:51:45
13  of if she has responsibilities beyond PDPO  So I  11:51:50
14  can't say with specificity if she's on PDPO in that  11:51:54
15  sense  11:51:59
16  Q  Okay  Who is Tal Herman?  11:51:59
17  A  Tal Herman is a design director  11:52:06
18  Q  At PDPO?  11:52:11
19  A  That is my understanding, yes  11:52:14
20  Q  Okay  And Mr Heft-Luthy, this document  11:52:16
21  has been marked as coming from your files  11:52:19
22  Do you understand that?  11:52:23
23  MR  SPILLY:  Object to the form  11:52:28
24  THE WITNESS:  Yes, I understand that it is  11:52:31
25  through some process associated with me  11:52:37

**Page 127**

1  BY MR. BARNES:  11:52:39
2  Q.  Okay.  Do you have any reason to believe  11:52:40
3  that this is not a document that was produced by  11:52:41
4  PDPO team?  11:52:46
5  A.  I wouldn't be able to speculate on that.  11:52:50
6  Q.  So if the answer is you wouldn't be able  11:52:55
7  to speculate, the answer to that question, then,  11:52:58
8  Mr. Heft-Luthy, is no.  11:53:00
9  I've asked you to identify a reason why  11:53:02
10  this would -- is not something produced by the user  11:53:05
11  in PDPO UX.  11:53:08
12  Can you identify any reason for that,  11:53:11
13  Mr. Heft-Luthy?  11:53:12
14  MR. SPILLY:  Object to the form.  11:53:14
15  Argumentative.  11:53:15
16  THE WITNESS:  Given that I'm not familiar  11:53:20
17  with the process by which this document was  11:53:22
18  produced, I -- I can't say with any certainty that  11:53:26
19  this was or wasn't a PDPO document given that I  11:53:31
20  don't recall it.  11:53:35
21  MR. BARNES:  Okay.  Ms. Truong, can you  11:53:37
22  share Exhibit P7?  11:53:38
23  MS. TRUONG:  Yes, one moment.  11:53:44
24  MR. SPILLY:  You want to take a break?  11:53:45
25  MR. BARNES:  No.  11:53:47

**Page 128**

1  MR. SPILLY:  It's been an hour.  11:53:48
2  MR. BARNES:  No.  We've got a couple more  11:53:50
3  to go and then we'll take a break.  11:53:53
4  MR. SPILLY:  Sam, would you like to take a  11:53:55
5  break?  11:53:56
6  THE WITNESS:  I have no objection to  11:53:57
7  continuing.  If counsel's prepared to continue, I'm  11:53:59
8  okay to continue for another 15, 20.  11:54:03
9  MR. BARNES:  Mr. Spilly, you want to make  11:54:06
10  another try to ask him if he wants to take a break?  11:54:08
11  MR. SPILLY:  I just need to use the  11:54:11
12  restroom.  So --  11:54:14
13  MR. BARNES:  Mr. Spilly, that's all you  11:54:15
14  had to say.  Yes, we can take a break.  11:54:17
15  MR. SPILLY:  Thanks.  11:54:20
16  MR. BARNES:  Off the record.  11:54:20
17  THE WITNESS:  I am happy to take a break.  11:54:20
18  MR. SPILLY:  The first time I asked, the  11:54:22
19  answer was "no" flat, right?  I just need to go to  11:54:23
20  the bathroom.  There's nothing nefarious going on.  11:54:25
21  So, anyway, Sam, you can turn your camera  11:54:28
22  and video off.  11:54:30
23  THE VIDEO OPERATOR:  Off the record,  11:54:32
24  11:54.  11:54:32
25  (Off the record at 11:54 a.m. and back  11:54:33

**Page 129**

1  on the record at 12:03 p m )  12:03:39
2  THE VIDEO OPERATOR:  Okay  We are back on  12:03:46
3  the record  The time is 12:03 p m  Pacific Time  12:03:46
4  BY MR  BARNES:  12:03:49
5  Q  Mr Heft-Luthy, can you open Exhibit 7,  12:03:50
6  please?  12:03:52
7  (Whereupon Exhibit 7 was marked for  12:03:53
8  identification )  12 03:53
9  BY MR  BARNES:  12:04:11
10  Q  Let me know when you have it open, please  12:04:12
11  A  Yeah, I still don't have it yet  12:04:14
12  (Off-the-record discussion )  12:04:16
13  MR  BARNES:  Ms Truong, if you could put  12:05:01
14  it on the screen  Appreciate it  12:05:02
15  MS  TRUONG:  It's there now  12:05:04
16  THE WITNESS:  Again --  12:05:09
17  BY MR  BARNES:  12:05:19
18  Q  Do you have it, Mr Heft-Luthy?  12:05:20
19  A  I do, yes  12:05:21
20  Q  Do you recognize this document?  12:05:23
21  A  Yes  12:05:29
22  Q  What is this document?  12:05:30
23  A  This is a draft of a presentation  12:05:36
24  delivered to a design agency that we partnered with  12:05:40
25  as part of the ████████ project  12:05:47

33 (Pages 126 - 129)

CONFIDENTIAL

| | |
|---|---|
| 1 | Q. Okay. Who was the design agency? 12:05:49 |
| 2 | A. I don't recall the name of the agency. 12:05:55 |
| 3 | Q. Okay. That's easy enough to find out, 12:06:01 |
| 4 | though, correct? 12:06:03 |
| 5 | MR. SPILLY: Objection to the form. 12:06:09 |
| 6 | THE WITNESS: I can't speculate on the 12:06:10 |
| 7 | process that I'd go to get the name. At some point, 12:06:11 |
| 8 | I have engaged with an agency on this project. 12:06:19 |
| 9 | BY MR. BARNES: 12:06:22 |
| 10 | Q. Okay. As the product manager, did you 12:06:22 |
| 11 | actually engage with the agency about ▓▓▓▓▓? 12:06:25 |
| 12 | MR. SPILLY: Objection. Vague. 12:06:32 |
| 13 | THE WITNESS: What form of engagement are 12:06:36 |
| 14 | you asking about here? 12:06:39 |
| 15 | BY MR. BARNES: 12:06:41 |
| 16 | Q. Did you participate in the drafting of 12:06:41 |
| 17 | this document in front of you today? 12:06:42 |
| 18 | A. I -- looking through this document, I can't 12:06:51 |
| 19 | recall if I was part of drafting this specific 12:06:53 |
| 20 | document. So I -- yeah, I can't speak to my 12:06:59 |
| 21 | individual role in a document like this. 12:07:05 |
| 22 | Q. Okay. Is this -- there's something 12:07:09 |
| 23 | referred to on page 6 of the document, which is -- 12:07:10 |
| 24 | ends in 66. 12:07:14 |
| 25 | A. Yes. 12:07:28 |

Page 130

| | |
|---|---|
| 1 | Q. Do you see where it says "This strategy 12:07:29 |
| 2 | playbook"? 12:07:31 |
| 3 | A. Yes. 12:07:37 |
| 4 | Q. And is -- does that help refresh your 12:07:38 |
| 5 | recollection? Is this the strategy playbook? 12:07:40 |
| 6 | MR. SPILLY: Objection to the form. 12:07:49 |
| 7 | THE WITNESS: In the process of managing a 12:07:53 |
| 8 | project like this, as I talked about earlier, 12:07:56 |
| 9 | there's a variety of draft versions that documents 12:08:00 |
| 10 | like this will go through. It's -- it's hard for me 12:08:04 |
| 11 | to speculate and say looking at this thing that I am 12:08:10 |
| 12 | seeing relatively out of context what specific 12:08:15 |
| 13 | document this is or isn't in reference to. 12:08:19 |
| 14 | BY MR. BARNES: 12:08:21 |
| 15 | Q. What is the strategy playbook? 12:08:21 |
| 16 | A. The strategy playbook is a -- another 12:08:31 |
| 17 | position document we produced as part of the 12:08:34 |
| 18 | ▓▓▓▓▓ project. 12:08:38 |
| 19 | Q. Who did you produce it for? 12:08:41 |
| 20 | MR. SPILLY: Objection. Vague. 12:08:48 |
| 21 | THE WITNESS: As previously mentioned, 12:08:52 |
| 22 | there were a variety of executive and management 12:08:52 |
| 23 | stakeholders that we presented on our progress in 12:08:58 |
| 24 | and this was intended for consumption by people that 12:09:03 |
| 25 | were invited to collaborate in part of the program. 12:09:08 |

Page 131

| | |
|---|---|
| 1 | BY MR. BARNES: 12:09:11 |
| 2 | Q. Okay. And so when you're making a 12:09:11 |
| 3 | presentation to management, you are going to do your 12:09:13 |
| 4 | best to make sure everything is correct; is that 12:09:16 |
| 5 | right? 12:09:19 |
| 6 | MR. SPILLY: Objection. Form. 12:09:23 |
| 7 | THE WITNESS: When you say "correct," in 12:09:26 |
| 8 | terms of like -- what are you referring to with 12:09:28 |
| 9 | "correct" specifically? 12:09:31 |
| 10 | BY MR. BARNES: 12:09:33 |
| 11 | Q. As in that these are -- the views that you 12:09:33 |
| 12 | place in this document are the views that you are 12:09:37 |
| 13 | presenting to management, correct? 12:09:39 |
| 14 | MR. SPILLY: Objection. Misrepresents the 12:09:44 |
| 15 | document. 12:09:45 |
| 16 | THE WITNESS: So, again, as I said 12:09:49 |
| 17 | previously, I'm not able to speculate on this 12:09:50 |
| 18 | specific document and its relationship to my 12:09:53 |
| 19 | opinions. We can talk about my opinions if we want 12:09:57 |
| 20 | to. I can't speak on whether this document does or 12:10:05 |
| 21 | doesn't reflect them. 12:10:09 |
| 22 | BY MR. BARNES: 12:10:10 |
| 23 | Q. Okay. But we can agree this is a document 12:10:10 |
| 24 | you recognize was produced by the PDPO team for 12:10:12 |
| 25 | internal use at Google, correct? 12:10:15 |

Page 132

| | |
|---|---|
| 1 | MR. SPILLY: Objection. Form. 12:10:18 |
| 2 | THE WITNESS: Again, as -- as said, given 12:10:24 |
| 3 | that there's a lot of different documents with 12:10:26 |
| 4 | processes behind them, I can't speak to the, you 12:10:28 |
| 5 | know, specific origin of these specific slides and 12:10:31 |
| 6 | their content. 12:10:35 |
| 7 | BY MR. BARNES: 12:10:37 |
| 8 | Q. Is this a PDPO document, Mr. Heft-Luthy? 12:10:39 |
| 9 | A. As said before, I'm -- I'm -- given that I 12:10:46 |
| 10 | don't recognize the document, I'm not going to be 12:10:48 |
| 11 | able to speculate on that, I'm sorry to say. 12:10:51 |
| 12 | Q. Okay. Can we go to 277, please? 12:10:54 |
| 13 | And while we're going there, let me give 12:11:02 |
| 14 | you the preview because it's a simple question. It 12:11:05 |
| 15 | refers to a sizzle reel. 12:11:05 |
| 16 | Do you know what a sizzle reel is? 12:11:09 |
| 17 | A. Yes. 12:11:12 |
| 18 | Q. What's a sizzle reel? 12:11:13 |
| 19 | A. The document itself discusses it. It says 12:11:23 |
| 20 | it's a video to communicate the core ideas of the 12:11:25 |
| 21 | ▓▓▓▓▓ experience and present the concepts. 12:11:28 |
| 22 | Q. ▓▓▓▓▓ Was that created? 12:11:32 |
| 23 | MR. SPILLY: Objection to the form. 12:11:37 |
| 24 | THE WITNESS: To my recollection, it did 12:11:43 |
| 25 | not end up being produced. 12:11:45 |

Page 133

34 (Pages 130 - 133)

CONFIDENTIAL

1 BY MR. BARNES:                                    12:11:47
2    Q.  Okay.  Can you go to page 81, please?     12:11:51
3        What is the document g█████moments?        12:11:59
4        MR. SPILLY:  Objection.  Form.             12:12:05
5 Speculation.                                      12:12:07
6        THE WITNESS:  I don't recall what -- what  12:12:13
7 that specifically refers to.                       12:12:13
8 BY MR. BARNES:                                    12:12:14
9    Q.  ███ refer to ███████?                      12:12:15
10   A.  ███ dash something was a common phrase that 12:12:18
11 we used to refer to ███████ documents.  But as    12:12:23
12 I said, I can't speculate on ███-moments          12:12:27
13 specifically.                                     12:12:31
14   Q.  Okay.                                       12:12:32
15       MR. BARNES:  Ms. Truong, can you share     12:12:37
16 Exhibit P9, please?                               12:12:38
17       MS. TRUONG:  Yes, one moment.              12:12:41
18       (Whereupon Exhibit 8 was marked for        12:12:42
19       identification.)                            12:12:42
20 BY MR. BARNES:                                    12:12:43
21   Q.  And while we're waiting on that,           12:12:44
22 ███████████████████                              12:12:46
23 ███████                                           12:12:50
24       MR. SPILLY:  Objection.  Vague.            12:12:52
25 ███████████████████                              12:13:00

Page 134

1 ███████████████████                              12:13:03
2 ███████████████████                              12:13:07
3 ███████████████████                              12:13:14
4 ████.                                             12:13:18
5 BY MR. BARNES:                                    12:13:31
6    Q.  What is personal content?                  12:13:31
7        MR. SPILLY:  Objection.  Vague.            12:13:34
8        THE WITNESS:  So like most other terms     12:13:35
9 when we're talking about privacy, there's a lot of 12:13:36
10 contingencies and caveats for how they're used    12:13:40
11 colloquially.  And when we do user-facing language 12:13:44
12 with regards to anything here, we, in -- I -- with 12:13:47
13 the context of the ███████,                       12:13:53
14 there was an effort to try to develop and define  12:13:58
15 some user-facing boundaries around it.  But, again, 12:14:02
16 I can't speak in specificity with, like, a firm   12:14:05
17 definition that's going to be applicable in all    12:14:09
18 cases.                                            12:14:12
19 BY MR. BARNES:                                    12:14:12
20   Q.  Do you see Exhibit 8?                       12:14:19
21   A.  Yes.                                        12:14:41
22   Q.  Do you recognize this document?            12:14:41
23   A.  Yes.                                        12:14:42
24   Q.  What is this document?                      12:14:43
25   A.  This document appears to be -- again, with  12:14:52

Page 135

1 the caveat that I don't know the history of some   12:14:54
2 documents prior to my editing them, this appears to 12:14:57
3 be a document produced as part of the ███████1     12:15:00
4 ███████                                            12:15:03
5    Q.  Are you -- were you the author of -- one    12:15:05
6 of the authors of this document, Mr. Heft-Luthy?   12:15:07
7    A.  Again, with the caveat -- and I'm going to  12:15:16
8 caveat here given that I'm under oath, I can't speak 12:15:19
9 to whether every word in this is as I produced it at 12:15:21
10 the time.  I can affirm that I authored a document  12:15:27
11 with this title.                                   12:15:31
12   Q.  You're listed as one of the authors,        12:15:32
13 correct?                                          12:15:34
14   A.  In this document, I'm listed under          12:15:38
15 "Authors."                                         12:15:40
16   Q.  You're -- so you are one of the authors of  12:15:41
17 this document, correct, Mr. Heft-Luthy?            12:15:43
18       MR. SPILLY:  Objection.  Asked and          12:15:51
19 answered.                                          12:15:51
20       THE WITNESS:  As I've said with the         12:15:52
21 caveats that I've provided, I authored a document  12:15:53
22 titled "1P Cross-Product Sharing Controls."        12:15:57
23 BY MR. BARNES:                                    12:16:02
24   Q.  Is a person's Web browsing history          12:16:03
25 personal content?                                 12:16:05

Page 136

1        MR. SPILLY:  Objection.  Vague.            12:16:08
2        THE WITNESS:  I'm not able to speculate on  12:16:12
3 that question.                                     12:16:13
4 BY MR. BARNES:                                    12:16:14
5    Q.  What is browsing history?                   12:16:14
6        MR. SPILLY:  Same objection.  Vague.       12:16:16
7        THE WITNESS:  Similarly, any term like      12:16:20
8 that that we're going to use is going to have a    12:16:24
9 variety of definitions depending on in what context 12:16:26
10 we're using it.  Are we using it internally?       12:16:30
11 Externally?  It's hard for me to give a definition 12:16:31
12 that's going to be applicable in all contexts.     12:16:35
13 BY MR. BARNES:                                    12:16:38
14   Q.  Is Google Photos different than Gmail?      12:16:38
15       MR. SPILLY:  Objection.  Vague.             12:16:42
16       THE WITNESS:  In -- in what sense are you   12:16:44
17 asking if it's different?                          12:16:47
18 BY MR. BARNES:                                    12:16:48
19   Q.  Are those different products?               12:16:49
20       MR. SPILLY:  Same objection.               12:16:54
21       THE WITNESS:  What -- what do you mean by   12:16:59
22 "different products" specifically?                 12:17:00
23 BY MR. BARNES:                                    12:17:02
24   Q.  Are Google -- is Google Photos and Gmail,   12:17:02
25 are those different products?                      12:17:04

Page 137

35 (Pages 134 - 137)

1 you?                                          14:51:08
2          MR. SPILLY:  Object to the form.      14:51:10
3          THE WITNESS:  As said before, it's one of  14:51:20
4 the things that I want out of my life overall.  I  14:51:22
5 think when I think about the work that I'm doing, I  14:51:24
6 need to be able to fit it into my moral framework as  14:51:26
7 a -- as a human being.  And the work that I do is no  14:51:31
8 different.                                     14:51:35
9 BY MR. BARNES:                                 14:51:35
10     Q.  And as part of that work, you want to make  14:51:35
11 things better, correct?                        14:51:38
12         MR. SPILLY:  Object to the form and vague.  14:51:48
13         THE WITNESS:  With the caveat that better  14:51:49
14 is going to rely on my own subjective understanding  14:51:51
15 of "better," yes, I would say that that is fair to  14:51:54
16 say that I want from the work that I do.        14:51:57
17 BY MR. BARNES:                                 14:52:00
18     Q.  Okay.  So, Mr. Heft-Luthy, I think there's  14:52:01
19 been -- is it your belief that you're here on behalf  14:52:02
20 of -- of Google and are testifying as Google today?  14:52:05
21         MR. SPILLY:  Objection.  Yeah, I object to  14:52:12
22 the form and vague.                            14:52:20
23 BY MR. BARNES:                                 14:52:24
24     Q.  Is -- is that your belief, Mr. Heft-Luthy,  14:52:25
25 that you're here to testify on behalf of Google?  14:52:26

Page 210

1          MR. SPILLY:  And objection.           14:52:34
2 Argumentative.                                 14:52:34
3          I will also caution the witness that to  14:52:35
4 the extent responding to that question would require  14:52:41
5 you to reveal communications with counsel, you  14:52:45
6 should not.                                    14:52:51
7          But you can otherwise answer.          14:53:00
8          THE WITNESS:  I -- given that there's --  14:53:04
9 an answer to that question would reveal          14:53:07
10 conversations with counsel, I'm not going to be able  14:53:13
11 to answer that question.                       14:53:14
12 BY MR. BARNES:                                 14:53:15
13     Q.  Mr. Heft-Luthy, you understand you were  14:53:16
14 called here today in your individual capacity?  Do  14:53:17
15 you understand that?                           14:53:20
16         MR. SPILLY:  Objection.  Argumentative.  14:53:21
17         THE WITNESS:  To the extent that I       14:53:31
18 previously stated, I'm currently under the       14:53:31
19 understanding that my right to privilege supersedes  14:53:33
20 the oath that I took to tell the whole truth given  14:53:36
21 that the right to privilege is still protected.  14:53:39
22         MR. BARNES:  Okay.  Ms. Truong, can you  14:53:42
23 share -- share Exhibit C6, please?             14:53:46
24 BY MR. BARNES:                                 14:53:48
25     Q.  Does consent need to be voluntary,     14:54:00

Page 211

1 Mr. Heft-Luthy?                                14:54:01
2          MR. SPILLY:  Objection.  Vague.  Calls for  14:54:03
3 a legal conclusion, I believe.                 14:54:05
4          THE WITNESS:  Seems like in this        14:54:16
5 question -- and just to make sure we're doing this  14:54:17
6 while we're waiting for a specific exhibit, so I'll  14:54:19
7 answer in the general.                         14:54:21
8          It seems like we're going back to the   14:54:23
9 conversation we had previously, which my answer  14:54:25
10 remains the same, which is, you know, being able to  14:54:27
11 speculate on the legal conclusion here is something  14:54:29
12 that I don't think I actually have the capacity to  14:54:32
13 do, and it's not something that I feel like I have  14:54:34
14 the ability to speculate on.                   14:54:38
15 BY MR. BARNES:                                 14:54:40
16     Q.  I'm not asking you the legal definition of  14:54:40
17 "consent."                                     14:54:43
18          I'm asking:  In common parlance, is     14:54:44
19 consent something that has to be voluntary?    14:54:48
20         MR. SPILLY:  Objection.  Asked and       14:54:53
21 answered.                                      14:54:53
22         THE WITNESS:  Once again, given the      14:55:00
23 context of consent as a legal construct, not only  14:55:02
24 would I be asked -- being asked to speculate on a  14:55:06
25 legal matter, I also would need to have more     14:55:09

Page 212

1 information about the market that we're referring  14:55:12
2 to, the context in which this question is being  14:55:14
3 asked.  It's hard for me to answer without       14:55:17
4 specifics.                                     14:55:21
5          MR. BARNES:  Okay.  C6 should be up.  Let  14:55:22
6 me know when it's number -- is it 20?          14:55:24
7          MS. TRUONG:  Yes, it should be up as    14:55:27
8 Exhibit 20.                                    14:55:29
9          (Whereupon Exhibit 20 was marked for    10:50:14
10         identification.)                        10:50:14
11 BY MR. BARNES:                                 14:55:30
12     Q.  What is this document, Mr. Heft-Luthy?  14:55:36
13     A.  To my recollection, this appears to be a  14:56:06
14 reproduction of a document which I authored that was  14:56:07
15 intended to help provide a jumping off point for a  14:56:13
16 product manager on my team who is going to develop  14:56:17
17 some work around user life cycle and being able to  14:56:21
18 have useful interventions in privacy relevant     14:56:26
19 moments for users.                             14:56:35
20          (Reporter request for clarification.)   14:56:37
21 BY MR. BARNES:                                 14:56:37
22     Q.  If you could turn to the second -- I'm   14:56:42
23 sorry -- the third page of this document where it  14:56:43
24 says:  "Day 0:  Account Creation."             14:56:45
25          Let me know when you're there.         14:56:47

Page 213

54 (Pages 210 - 213)

CONFIDENTIAL

| | |
|---|---|
| 1   A. This is a page with exhibit Bates      14:56:49 | 1  BY MR. BARNES:                          14:58:55 |
| 2  Number 379?                               14:56:54 | 2   Q. Well, when we talked about the consent    14:58:56 |
| 3   Q. Correct.                              14:56:56 | 3  audit, you testified when you had a sentence that  14:58:59 |
| 4   A. Yes, I have it up.                     14:56:59 | 4  said, "We don't" -- "We're not talking about turning  14:59:01 |
| 5   Q. And you write: "We know from research   14:57:00 | 5  three controls into 300," the three you referred to  14:59:05 |
| 6  that showing users such impactful settings before  14:57:01 | 6  were these three, correct?                 14:59:07 |
| 7  they have an opportunity to use our products has a  14:57:05 | 7      MR. SPILLY: Object to the form.        14:59:07 |
| 8  negative impact on trust because users cannot   14:57:07 | 8      THE WITNESS: No.                       14:59:12 |
| 9  accurately assess risk and benefits as well because  14:57:10 | 9  BY MR. BARNES:                          14:59:12 |
| 10  the scope of the choices are too large for users to  14:57:14 | 10   Q. Okay. Well, at a break, we'll check the   14:59:13 |
| 11  effectively reason about."                  14:57:17 | 11  record.                                  14:59:16 |
| 12      Do you see that sentence?             14:57:18 | 12      What were the three you referred to      14:59:16 |
| 13      MR. SPILLY: Objection. Mischaracterizes   14:57:21 | 13  previously?                               14:59:19 |
| 14  the document.                             14:57:23 | 14   A. To my recollection -- I don't want to     14:59:26 |
| 15      MR. BARNES: Carl, what did I          14:57:26 | 15  countervail the former recollection. To my    14:59:27 |
| 16  mischaracterize about the document?          14:57:27 | 16  recollection, which is why I said no originally, I   14:59:30 |
| 17  BY MR. BARNES:                          14:57:28 | 17  referred to the three that we were talking about   14:59:33 |
| 18   Q. Do you see that sentence, Mr. Heft-Luthy?  14:57:28 | 18  prior as Web and app activity, YouTube history, and  14:59:35 |
| 19   A. Just to confirm, you're asking me to read  14:57:32 | 19  location history specifically.               14:59:41 |
| 20  the sentence starting "We know from" into the   14:57:34 | 20   Q. Location history instead of ad          14:59:42 |
| 21  record?                                  14:57:36 | 21  personalization. Thank you.                14:59:44 |
| 22   Q. No, I'm not asking you to read it. I'm    14:57:37 | 22      Okay. Ad personalization is the third one  14:59:47 |
| 23  asking if you see that sentence that I read into the  14:57:39 | 23  here.                                    14:59:49 |
| 24  record.                                  14:57:42 | 24      Why does showing Web and app activity,    14:59:54 |
| 25   A. I can confirm that I see that sentence    14:57:43 | 25  YouTube history, and ad personalization have a -- 14:59:56 |
| Page 214 | Page 216 |
| 1  written on this document.                   14:57:45 | 1  account creation have a negative impact on trust?  15:00:02 |
| 2   Q. Okay. What research are you referring to  14:57:46 | 2      MR. SPILLY: Object to the form.        15:00:07 |
| 3  in that paragraph?                         14:57:49 | 3      THE WITNESS: Given that I don't have the   15:00:19 |
| 4   A. I don't recall.                        14:57:55 | 4  research specified in front of me, it's hard for me  15:00:20 |
| 5   Q. Would it be -- there's a footnote         14:57:59 | 5  to speculate on that.                       15:00:21 |
| 6  "go/consent-uxr."                          14:58:00 | 6      MR. BARNES: Okay. Ms. Truong, can you   15:00:23 |
| 7      Would that be where some of the research  14:58:04 | 7  publish C7, please?                        15:00:25 |
| 8  would be?                                 14:58:06 | 8      MS. TRUONG: That should be up as        15:00:49 |
| 9      MR. SPILLY: Objection. Lacks foundation.  14:58:06 | 9  Exhibit 21.                               15:00:49 |
| 10      THE WITNESS: In the common parlance of   14:58:13 | 10      (Whereupon Exhibit 21 was marked for     15:00:51 |
| 11  citation as a reader, I would seek the second   14:58:16 | 11      identification.)                       15:00:51 |
| 12  footnote to find more information. I can't speak   14:58:24 | 12  BY MR. BARNES:                          15:00:51 |
| 13  about the specifics of this document.         14:58:26 | 13   Q. Let me know when you have it.           15:01:00 |
| 14  BY MR. BARNES:                          14:58:29 | 14      Can you explain what this document is,    15:01:12 |
| 15   Q. Why does showing -- this refers to "the   14:58:29 | 15  Mr. Heft-Luthy?                           15:01:14 |
| 16  big three," right? If you look up right above that,  14:58:32 | 16      MR. SPILLY: Objection. Lacks foundation.  15:01:16 |
| 17  there's three bullet points: WAA, YouTube history,  14:58:34 | 17      THE WITNESS: Okay. I have it up. Could   15:01:41 |
| 18  and ad personalization.                     14:58:40 | 18  you repeat the question?                    15:01:42 |
| 19      Do you see that?                       14:58:41 | 19  BY MR. BARNES:                          15:01:43 |
| 20   A. I do.                                14:58:41 | 20   Q. Yeah.                                15:01:44 |
| 21   Q. And those were the big -- those were the   14:58:42 | 21      Could you explain what this document is,  15:01:44 |
| 22  big three you mentioned earlier, correct?      14:58:43 | 22  Mr. Heft-Luthy?                           15:01:45 |
| 23      MR. SPILLY: Objection. Mischaracterizes   14:58:53 | 23      MR. SPILLY: Same objection.            15:01:47 |
| 24  testimony.                                14:58:54 | 24      THE WITNESS: Same caveat I'm going to    15:01:57 |
| 25      THE WITNESS: No, that's not correct.     14:58:54 | 25  provide, which is I -- I don't recall the specific   15:01:59 |
| Page 215 | Page 217 |

55 (Pages 214 - 217)

CONFIDENTIAL

1 history of this document. It looks to be in a        15:02:01
2 format that is typically used for meeting notes of        15:02:05
3 particular sorts of regularly occurring meetings.        15:02:11
4 BY MR. BARNES:        15:02:14
5    Q. Okay. So can we go to GOOG-CABR, the        15:02:15
6 one -- the page that ends in 034.        15:02:21
7        MR. BARNES: Ms. Truong, can you go ahead        15:02:23
8 and put this up on the screen?        15:02:26
9        And there's a -- there's -- in bold it        15:02:29
10 says: "September 24/privacy checkup and the future        15:02:33
11 of proactive privacy."        15:02:35
12        Do you recall giving a presentation on        15:02:38
13 PDPO privacy checkup on September 24?        15:02:41
14        MR. SPILLY: Objection. Vague.        15:02:56
15        THE WITNESS: It's hard for me to give        15:02:57
16 details, including whether it was on September 24th.        15:02:58
17 I can confirm having a memory and speaking at a        15:03:01
18 meeting titled "XFN UX Privacy Forum."        15:03:06
19 BY MR. BARNES:        15:03:11
20    Q. Okay. And you see there it says: "What        15:03:12
21 does it mean for the user to be in a good privacy        15:03:14
22 state?"        15:03:18
23        What does that mean?        15:03:18
24        MR. SPILLY: Object to the form.        15:03:20
25        THE WITNESS: So as -- as said before,        15:03:26

Page 218

1 I -- I don't recall the specific definitions of that        15:03:28
2 term and especially like articulating whether a        15:03:34
3 given user is or is not. It is a overall guideline        15:03:39
4 that we've developed within the PDPO when thinking        15:03:44
5 about approaches we have for things like regular        15:03:49
6 notice, the work that we develop with regards to        15:03:53
7 privacy checkup to try to provide proactive advice        15:03:57
8 to our users. But it's hard for me to speculate on        15:04:01
9 a given user if a user is or is not in a good        15:04:04
10 privacy state.        15:04:05
11        (Reporter request for clarification.)        15:04:18
12        THE WITNESS: Sorry. I do that. That's        15:04:18
13 my biggest voice coach thing.        15:04:18
14        It is hard for me to speculate at an        15:04:19
15 individual level whether a user is or is not in a        15:04:21
16 good privacy state.        15:04:26
17        MR. BARNES: Ms. Truong, can you publish        15:04:29
18 Exhibit C9, please?        15:04:32
19        MS. TRUONG: That should be loading now as        15:04:44
20 Exhibit 22.        15:04:46
21        (Whereupon Exhibit 22 was marked for        15:04:46
22        identification.)        15:04:46
23 BY MR. BARNES:        15:04:56
24    Q. I have Exhibit 22. Do you have it,        15:04:57
25 Mr. Heft-Luthy?        15:04:58

Page 219

1        Who is -- while we're waiting, who is        15:05:03
2 Jason Liu? He's another APM16 person.        15:05:05
3        MR. SPILLY: Objection. Vague.        15:05:10
4 BY MR. BARNES:        15:05:20
5    Q. Mr. Heft-Luthy, do you know?        15:05:26
6    A. Jason Liu is another product manager at        15:05:27
7 Google.        15:05:30
8    Q. What's he a product manager of that you        15:05:31
9 are aware of?        15:05:33
10    A. As previously stated, the associate        15:05:40
11 product manager program -- maybe I didn't state this        15:05:41
12 explicitly. The associate product manager program        15:05:44
13 brings together product managers working on a        15:05:48
14 variety of projects across Google. I don't actually        15:05:51
15 recall with specificity what Jason worked on or        15:05:54
16 didn't work on.        15:05:58
17    Q. Okay. Let me know when you've got it in        15:06:00
18 front of me -- in front of you. "In front of me."        15:06:02
19 In front of you.        15:06:04
20    A. That would be very hard for me to do. I        15:06:04
21 can let you know when I have it in front of me, and        15:06:05
22 I do.        15:06:07
23    Q. That would actually be an objection for        15:06:08
24 speculation.        15:06:12
25    A. Yeah, I have -- I have it. Yeah.        15:06:16

Page 220

1    Q. Okay. If you could turn to the second        15:06:18
2 page here, it says -- can you read the first bullet        15:06:24
3 from you?        15:06:30
4    A. First one on the second page you mean?        15:06:31
5    Q. Correct.        15:06:33
6    A. It says: "Yeah on the privacy side the        15:06:34
7 hope is that Google can spin up something major and        15:06:37
8 weird in the publisher/ads ecosystem, but I'm not        15:06:40
9 sure there's" -- it looks like it's jammed with        15:06:45
10 formatting -- "there's a strong setup between Chrome        15:06:49
11 and ads to have the appetite."        15:06:53
12    Q. What do you mean you're not sure there's a        15:06:55
13 strong setup between Chrome and ads to have the        15:06:57
14 appetite to do something major on the privacy side?        15:07:00
15    A. I don't recall the conditions at the time        15:07:09
16 of drafting this message.        15:07:11
17    Q. Okay. And then the last bullet point, can        15:07:13
18 you read that?        15:07:15
19    A. It says -- just to confirm, we're talking        15:07:18
20 the one sent 14:10:50?        15:07:21
21    Q. Correct.        15:07:24
22    A. It says: "Google looks more and more        15:07:26
23 mealy-mouthed for not doing anything significant,        15:07:28
24 plus regulation is coming."        15:07:31
25    Q. What does "mealy-mouthed" mean?        15:07:34

Page 221

56 (Pages 218 - 221)

**Page 326**

```
 1      MR. BARNES:  Thank you, Mr. Spilly.  Your      18:34:59
 2 objection to keeping the deposition open is noted.   18:35:01
 3      MR. SPILLY:  Thank you.              18:35:07
 4      MR. BARNES:  Let's go off the record.      18:35:11
 5      THE VIDEO OPERATOR:  Okay.  This will end    18:35:14
 6 today's deposition of Sam Heft-Luthy.  The total    18:35:15
 7 number of media units used in the deposition today   18:35:19
 8 was 12 and will be retained by Veritext Legal       18:35:22
 9 Solutions.  We are off the record at 6:35 p.m.      18:35:24
10 Pacific Time.  Thank you.              18:35:27
11      (TIME NOTED: 6:35 p.m.)
12          * * * * *
```

**Page 328**

CERTIFICATE OF REPORTER

 1      I, the undersigned, a Certified Shorthand
 2 Reporter of the State of California, do hereby
 3 certify:
 4      That the foregoing proceedings were taken
 5 before me at the time and place herein set forth;
 6 that any witnesses in the foregoing proceedings,
 7 prior to testifying, were administered an oath; that
 8 a verbatim record of the proceedings was made by me
 9 using machine shorthand, which was thereafter
10 transcribed under my direction; and that the
11 foregoing is an accurate transcription thereof.
12      Further, that if the foregoing pertains to
13 the original transcript of a deposition in a federal
14 case, before completion of the proceedings, review
15 of the transcript [ ] was [X] was not requested.
16      I further certify that I am neither
17 financially interested in the action, nor a relative
18 or employee of any attorney of any party to this
19 action.
20      IN WITNESS WHEREOF, I have this date
21 subscribed my name.
22 DATED: Dec_____ __, 2021

          MEGAN F. ALVAREZ
          CSR No. 12470, RPR

**Page 327**

```
 6      I, SAM HEFT-LUTHY, do hereby declare
 7 under penalty of perjury that I have read the
 8 foregoing transcript; that I have made any
 9 corrections as appear noted, in ink, initialed by
10 me, or attached hereto; that my testimony as
11 contained herein, as corrected, is true and correct.
12      EXECUTED this _____ day of _____
13 2021, at _____, _____.
              (City)          (State)

17      _____
          SAM HEFT-LUTHY
18        VOLUME I
```

**Page 329**

```
 1 JASON "JAY" BARNES, ESQ.
 2 jaybarnes@simmonsfirm.com
 3           December 30, 2021
 4 RE: CALHOUN VS. GOOGLE LLC
 5 DECEMBER 20, 2021, SAM HEFT-LUTHY, JOB NO. 4974193
 6 The above-referenced transcript has been
 7 completed by Veritext Legal Solutions and
 8 review of the transcript is being handled as follows:
 9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, notating the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
```

CONFIDENTIAL

**Deposition Errata Sheet**
**Case: Calhoun, et al. v. Google LLC**
**Deponent: Sam Heft-Luthy**
**Date of Deposition: December 20, 2021**

| Pg. and Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|
| Pg: 28 Ln: 19 | a often product | a product | Transcription error |
| Pg: 30 Ln: 5 | Nina Ilyeva | Nina Ilieva | Transcription error |
| Pg: 53 Ln: 15 | as a manager of | as product manager of | Words used |
| Pg: 66 Ln: 9 | don't | do | Transcription error |
| Pg: 68 Ln: 8 | did | doesn't | Transcription error |
| Pg: 73 Ln: 4 | it's product | it's a product | Transcription error |
| Pg: 76 Ln: 6 | question | objection | Transcription error |
| Pg: 82 Ln: 25 | Bushman | Buschmann | Transcription error |
| Pg: 82 Ln: 2, 3, 4, 8, 12 | Bushman | Buschmann | Transcription error |
| Pg: 103 Ln: 3 | a | an | Transcription error |
| Pg: 104 Ln: 15 | system | systems | Transcription error |
| Pg: 104 Ln: 20 | a | an | Transcription error |
| Pg: 164 Ln: 20 | that was | that I was | Transcription error |
| Pg: 183 Ln: 4 | It's | It | Transcription error |
| Pg: 187 Ln: 16 | MR. SPILLY: | MR. BARNES: | Transcription error |
| Pg: 201 Ln: 15 | reference | referenced | Transcription error |
| Pg: 208 Ln: 17 | be a | be | Transcription error |
| Pg: 218 Ln: 17 | memory | memory of | Transcription error |

CONFIDENTIAL

| Pg: 260 Ln: 5 | distinction | distinct | Transcription error |
|---|---|---|---|
| Pg: 265 Ln: 4 | are on | on | Transcription error |
| Pg: 266 Ln: 11 | graph | draft | Transcription error |
| Pg: 289 Ln: 5 | How | MR. BARNES: How | Transcription error |
| Pg: 290 Ln: 13 | allegations | obligations | Transcription error |
| Pg: 302 Ln: 21 | Sorro | Sauro | Transcription error |
| Pg: 303 Ln: 1 | Sorro | Sauro | Transcription error |
| Pg: 303 Ln: 8 | CDPR | GDPR | Transcription error |
| Pg: 309 Ln: 13 | Common parlance for Google. | In common parlance for Google, | Transcription error |
| Pg: 318 Ln: 20 | "art ownership," | art "ownership," | Transcription error |
| Pg. 319 Ln: 1-2 | "art ownership," | art "ownership," | Transcription error |

# EXHIBIT 17

# Redacted Version of
# Document Sought to be Sealed

**BLEICHMAR FONTI & AULD LLP**
555 12ᵗʰ STREET, SUITE 1600
OAKLAND, CA 94607

**DiCELLO LEVITT GUTZLER LLC**
ONE GRAND CENTRAL PLACE
60 EAST 42ⁿᵈ STREET, SUITE 2400
NEW YORK, NY 10165

**SIMMONS HANLY CONROY LLC**
112 MADISON AVENUE, 7ᵀᴴ FL.
NEW YORK, NY 10016

December 30, 2021

**<u>VIA ELECTRONIC MAIL</u>**
Jomaire Crawford, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Email: jomairecrawford@quinnemanuel.com

   Re: *Calhoun v. Google LLC*, No. 5:20-cv-05146-LHK-SVK (N.D. Cal.)
     **Search Terms for ESI**

Dear Counsel:

   Pursuant to the Court's order, Dkt. No. 422, Plaintiffs propose the following search terms. Should any changes be needed to conform the below to Google's preferred syntax, please include a redline showing any such changes with the hit counts due tomorrow.

1. ((revenue OR revenues OR rev OR profit OR profits) w/10 (increas* OR decreas* OR loss OR losses OR losing OR lose OR lost OR gain* OR growth OR exceed* OR impact* OR "per user" OR UID OR userid* OR identifier* OR gaia OR biscotti OR zwieback OR zwbk OR "device ID")) AND Chrome
2. Revenue w/5 (million OR millions OR billion OR billions)
3. (Chrome OR Ads OR Analytics) w/20 ((Ernst w/2 Young) OR "Ernst&Young" OR EY)
4. "██████████████" or "██████████████"
5. frontline AND fingerprint*
6. reCAPTCHA and security and "ads guarantee"
7. "MyActivity" AND (users OR "user visible" OR "visible to users" OR accessible)
8. "non Google account user" /20 (value OR profit OR revenue)
9. "user data value"
10. "profit per user"
11. "revenue per user"
12. Privacy w/25 (omnibar or reCAPTCHA)
13. Privacy w/25 (vertical* or profile*)
14. (Revenue or profit) w/25 depricat*
15. (Revenue or profit) w/25 chrome
16. (Revenue or profit) w/25 zwieback
17. (Revenue or profit) w/25 biscotti
18. (████████ or FTC or "federal trade commission") w/25 assess*

Counsel for Google                                    SIMMONS HANLY CONROY
December 30, 2021                                     DiCELLO LEVITT GUTZLER LLC
Page 2                                                BLEICHMAR FONTI & AULD LLP

Regards,

Lesley E. Weaver, Esq.
BLEICHMAR FONTI & AULD LLP
Email: lweaver@bfalaw.com

Jay Barnes, Esq.
SIMMONS HANLY CONROY
Email: jaybarnes@simmonsfirm.com

David A. Straite, Esq.
DICELLO LEVITT GUTZLER LLC
Email: dstraite@dicellolevitt.com

cc (via Electronic Mail):

Additional Defendant Google's Counsel

Google Counsel (qecalhoun@quinnemanuel.com)

Plaintiffs' Counsel

Amy E. Keller, Esq. (akeller@dicellolevitt.com)
Adam Prom, Esq. (aprom@dicellolevitt.com)
Sharon Cruz, Esq. (scruz@dicellolevitt.com)
Angelica Ornelas, Esq. (aornelas@bfalaw.com)
An Truong, Esq. (atruong@simmonsfirm.com)
Eric Johnson, Esq. (ejohnson@simmonsfirm.com)

# EXHIBIT 18

# Redacted Version of Document Sought to be Sealed

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7581**

WRITER'S EMAIL ADDRESS
JOMAIRECRAWFORD@QUINNEMANUEL.COM

December 31, 2021

<u>VIA E-MAIL</u>

David A. Straite
Dicello Levitt Gutzler
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, New York 10165

Lesley Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Jay Barnes
Simmons Hanly Conroy LLC
112 Madison Ave., 7th Floor
New York, NY 10016

Re:    *Calhoun, et al. v. Google LLC* – U.S. District Court, Northern District of California, San
        Jose Division: Case No. 5:20-cv-5146-LHK-SVK

Dear Counsel,

I write on behalf of Google LLC ("Google") in furtherance of my December 31, 2021 email
of this afternoon, and pursuant to the Court's December 22, 2021 order concerning search terms,
and specifically, the "remain[ing] 100,000 hit counts before the limits of Dkt. 349 are exhausted."
Dkt. 422.

Google has tested (i) the 18 new terms[1] for the 41 agreed-to ESI custodians (excluding Mr.
Pichai, consistent with the Court's orders, *see* Dkt. Nos. 415, 422), and (ii) "all terms" for Mr. Liu

---

[1] The only syntax correction that Google applied was to remove the "w" from the "w/n" terms.

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | NEW YORK | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | LONDON | TOKYO | MANNHEIM | MOSCOW |
HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

12/31/21 Ltr. from J. Crawford to D. Straite

(as requested in your December 29, 2021 email). As we previously informed Plaintiffs, these counts exceed the 100,000 document hit cap by approximately 20,000 hits. Dkt. 415.

Enclosed at **Appendix A** is a chart with the total document hit counts and unique document hit counts for the 18 new terms run across the 41 agreed-to ESI custodians and at **Appendix B** is a chart with the total document hit counts and unique document hit counts for "all terms" for Mr. Liu. Enclosed at **Appendix C** are the 42 agreed-upon ESI custodians.

Google proposes changing the proximity limiter in Term 13 from /25 to /15 given the exorbitant volume of hits for this term. Although the review would exceed the 100,000 cap by approximately 9,000 hits with this modification, Google is willing to accept this as a compromise, provided Plaintiffs confirm their acceptance of this proposal by **2:00 p.m. PT.**

We look forward to your response.


Very truly yours,

Jomaire Crawford.

Jomaire Crawford


JAC
cc:      (via email) Counsel of Record

2

12/31/21 Ltr. from J. Crawford to D. Straite

# Appendix A

12/31/21 Ltr. from J. Crawford to D. Straite

| # | Plaintiffs' Proposed Final Terms for 41 ESI Custodians | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 1. | ((revenue OR revenues OR rev OR profit OR profits) /10 (increas* OR decreas* OR loss OR losses OR losing OR lose OR lost OR gain* OR growth OR exceed* OR impact* OR "per user" OR UID OR userid* OR identifier* OR gaia OR biscotti OR zwieback OR zwbk OR "device ID")) AND Chrome | 14900 | 16516 | 9169 | 10141 |
| 2. | Revenue /5 (million OR millions OR billion OR billions) | 8222 | 9274 | 7358 | 8137 |
| 3. | (Chrome OR Ads OR Analytics) /20 ((Ernst w/2 Young) OR "Ernst&Young" OR EY) | 1042 | 1124 | 1003 | 1084 |
| 4. | "▮▮▮▮▮▮" OR "▮▮▮▮▮▮▮▮" | 2702 | 2764 | 2660 | 2720 |
| 5. | frontline AND fingerprint* | 197 | 202 | 132 | 137 |
| 6. | reCAPTCHA AND security AND "ads guarantee" | 3 | 3 | 1 | 1 |
| 7. | "MyActivity" AND (users OR "user visible" OR "visible to users" OR accessible) | 11332 | 12424 | 10926 | 12012 |
| 8. | "non Google account user" /20 (value OR profit OR revenue) | 0 | 0 | 0 | 0 |
| 9. | "user data value" | 23 | 23 | 22 | 22 |
| 10. | "profit per user" | 28 | 28 | 24 | 24 |
| 11. | "revenue per user" | 877 | 1113 | 642 | 694 |
| 12. | Privacy /25 (omnibar OR reCAPTCHA) | 329 | 355 | 308 | 332 |
| 13. | Privacy /25 (vertical* OR profile*) | 45221 | 46584 | 43931 | 45281 |
| 14. | (Revenue OR profit) /25 depricat* | 6 | 6 | 0 | 0 |
| 15. | (Revenue OR profit) /25 chrome | 10197 | 11288 | 5110 | 5618 |
| 16. | (Revenue OR profit) /25 zwieback | 219 | 219 | 145 | 145 |
| 17. | (Revenue OR profit) /25 biscotti | 1083 | 1095 | 862 | 873 |
| 18. | (▮▮▮▮ OR FTC OR "federal trade commission") /25 assess* | 1812 | 1859 | 1634 | 1679 |

4

12/31/21 Ltr. from J. Crawford to D. Straite

# **Appendix B**

12/31/21 Ltr. from J. Crawford to D. Straite

| # | Plaintiffs' Proposed Search Terms for Vic Liu | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 1. | OptedInToSync | 0 | 0 | 0 | 0 |
| 2. | "Opted In To Sync With Account" | 0 | 0 | 0 | 0 |
| 3. | NotOptedInToSync | 0 | 0 | 0 | 0 |
| 4. | "Not Opted In To Sync with Account" | 0 | 0 | 0 | 0 |
| 5. | "Not Opted into sync with Account" | 0 | 0 | 0 | 0 |
| 6. | (opt OR opted OR opting OR opts) AND (sync /5 account) | 81 | 172 | 2 | 2 |
| 7. | "background-sync" | 1 | 1 | 0 | 0 |
| 8. | "Sync.Posted" | 0 | 0 | 0 | 0 |
| 9. | "Sync.Startup" | 0 | 0 | 0 | 0 |
| 10. | Sync /15 startup | 13 | 23 | 2 | 2 |
| 11. | Sync /15 "start up" | 3 | 6 | 0 | 0 |
| 12. | "Sync.URL" | 0 | 0 | 0 | 0 |
| 13. | Sync /15 URL | 117 | 191 | 57 | 57 |
| 14. | "SyncEnabled" | 0 | 0 | 0 | 0 |
| 15. | "Sync.InitialState" | 0 | 0 | 0 | 0 |
| 16. | Sync /15 "initial state" | 2 | 2 | 2 | 2 |
| 17. | "Sync.Local.Enabled" | 0 | 0 | 0 | 0 |
| 18. | Sync /3 enabled | 75 | 165 | 3 | 4 |
| 19. | "Sync.ModelTypeStoreCommit" | 0 | 0 | 0 | 0 |
| 20. | "Sync.PostedClientToServer" | 0 | 0 | 0 | 0 |
| 21. | (Sync /15 client) OR (sync /15 post) OR (sync /15 server) | 1437 | 1582 | 1195 | 1243 |
| 22. | Chrome AND ((FRE OR "First Run Experience") /25 sync) | 42 | 102 | 0 | 0 |

12/31/21 Ltr. from J. Crawford to D. Straite

|  | Plaintiffs' Proposed Search Terms for Vic Liu | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 23. | ((Chrome /10 (sync* OR sign-in OR unsync OR nonsync*)) /25 (percent OR percentage OR number OR proportion OR share OR shares OR thousand* OR million*)) AND (FRE OR "First Run Experience" OR histogram*) | 1 | 3 | 0 | 0 |
| 24. | Chrome AND ((never OR always OR fully OR default*) /2 sync*) | 36 | 77 | 1 | 1 |
| 25. | "chrome_uma.chrome_uma_weblog" | 30 | 30 | 28 | 28 |
| 26. | (ad OR ads OR advertisement*) /5 ((Google OR Chrome OR Android OR YouTube) /10 (secure OR security OR private OR privacy OR safe OR safety OR control OR settings OR trust OR personal OR protected OR protection OR "personal information")) | 32 | 32 | 16 | 16 |
| 27. | (NAC OR "new ads control" OR ▇▇▇) /25 (process or flow* OR UI OR UX OR "user interface" OR "user experience" OR consent* OR setting* OR opt OR opts OR opted OR opting) | 755 | 788 | 285 | 297 |
| 28. | (account /10 (create OR creates OR creation OR creating OR "set up" OR "setting up" OR registration)) AND (flow OR flows OR direct OR directs OR directed OR directing) | 1362 | 1533 | 969 | 1027 |
| 29. | "Security and Privacy Policy Creation and Maintenance Process" | 0 | 0 | 0 | 0 |
| 30. | Chrome /25 ("Privacy Advisory Council" OR "Privacy Council") | 0 | 0 | 0 | 0 |
| 31. | (("recovery email" OR "recovery phone") /25 "Google Account") /25 (use OR uses OR used OR using OR link* OR associate* OR associating OR connect* OR identifi* OR map OR maps OR mapped OR mapping OR table OR tables OR tabled OR tabling OR correlat* OR record*) | 2 | 2 | 1 | 1 |
| 32. | ("Google Analytics" /5 ("Opt-Out Browser" w/5 "Add-On")) AND ((user or users) /25 (share OR shares OR percent OR percentage OR number OR thousand* OR million* OR proportion*)) | 1 | 1 | 0 | 0 |
| 33. | ("Google Analytics" /5 ("Opt-Out Browser" /5 "Add-On")) AND (default* OR ((impact* OR gain* OR increas* OR loss* OR decreas* OR drop*) AND (rev OR revenue* OR profit* OR benefit* OR goodwill))) | 2 | 3 | 1 | 2 |

12/31/21 Ltr. from J. Crawford to D. Straite

| | Plaintiffs' Proposed Search Terms for Vic Liu | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 34. | (Privacy /25 ((user* OR UX) /5 (feedback OR survey* OR poll* OR questionnaire* OR review OR reviews OR experienc* OR research OR expectation*)) OR news OR article* OR PIR OR "private information retrieval" OR UXR) AND sync* | 1840 | 2083 | 1115 | 1221 |
| 35. | (Biscotti* /15 fingerprint*) OR (("Biscotti FP" OR "biscotti_fp" OR Biscotti) /5 "native properties") | 11 | 11 | 0 | 0 |
| 36. | Gaia* /15 fingerprint* | 53 | 53 | 12 | 12 |
| 37. | ((Zwieback* OR zwbk* OR Zwiebak) /15 fingerprint*) OR (ZWBK /5 "native properties") | 8 | 8 | 0 | 0 |
| 38. | ((Gaia OR Biscotti) /5 (data OR info OR information)) AND pipeline* | 5438 | 5507 | 4740 | 4775 |
| 39. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND (Biscotti OR unauthenticated OR "b-logs" OR "basic browser" OR DCLK or BISC) AND (conversion OR pipeline*) | 1209 | 1232 | 7 | 7 |
| 40. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND (Zwieback OR ZWBK OR Zwiebak) AND (conversion OR pipeline*) | 9306 | 9414 | 327 | 335 |
| 41. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND (Zwieback OR ZWBK OR Zwiebak) AND (map OR maps OR mapped OR mapping OR connect* OR associat* OR identif* OR table OR tables OR tabled OR tabling OR correlat* OR link* OR mix OR mixes OR mixed OR mixing OR use OR uses OR used OR using) | 12029 | 12184 | 2462 | 2505 |
| 42. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND (Biscotti OR unauthenticated OR "b-logs" OR "basic browser" OR DCLK OR BISC) AND (map OR maps OR mapped OR mapping OR connect* OR associat* OR identif* OR table OR tables OR tabled OR tabling or correlat* OR link* OR mix OR mixes OR mixed OR mixing OR use OR uses OR used OR using) | 2243 | 2275 | 469 | 469 |

12/31/21 Ltr. from J. Crawford to D. Straite

| # | Plaintiffs' Proposed Search Terms for Vic Liu | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 43. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND ▮▮▮▮ AND (map OR maps OR mapped OR mapping OR connect* OR associat* OR identif* OR table OR tables OR tabled OR tabling OR correlat* OR link* OR mix OR mixes OR mixed OR mixing OR use OR uses OR used OR using) | 328 | 331 | 57 | 59 |
| 44. | Analytics AND (("cid" OR "ga" OR "Google Analytics cookie") /10 (encrypt OR "naming convention" OR value OR values OR key OR keyed OR use OR uses OR used OR using)) | 688 | 777 | 352 | 397 |
| 45. | ▮▮▮▮* AND (Biscotti* OR Zwieback* OR zwbk OR Zwiebak OR device OR "id" OR identifi* OR identify*) | 357 | 359 | 237 | 239 |
| 46. | ▮▮▮▮ AND (Biscotti* OR Zwieback* OR zwbk OR Zwiebak OR device OR "id" OR identifi* OR identify*) | 89 | 105 | 21 | 35 |
| 47. | "chrome-omni" | 1 | 2 | 1 | 2 |

12/31/21 Ltr. from J. Crawford to D. Straite

# APPENDIX C

12/31/21 Ltr. from J. Crawford to D. Straite

| Google ESI Custodian List (as of December 31, 2021) | | |
|---|---|---|
| 1.  Jochen Eisinger | 15.  Chris Liao | 29.  Michael Fink |
| 2.  Alexei Svitkine | 16.  Greg Fair | 30.  Will Harris |
| 3.  Deepti Bhatnagar | 17.  Justin Schuh | 31.  Robert Kaplow |
| 4.  Florian Uunk | 18.  David Monsees | 32.  Jon Krafcik |
| 5.  Helen Harris | 19.  Adrienne Porter Felt | 33.  Emil Ochotta |
| 6.  Glenn Berntson | 20.  Chetna Bindra | 34.  Martin Sramek |
| 7.  Hyewon Jun | 21.  Michael Kleber | 35.  Martin Shelton |
| 8.  Keith Wright | 22.  Sam Heft-Luthy | 36.  Martina Laresova |
| 9.  Abdelkarim Mardini | 23.  Deepak Ravichandran | 37.  Rory McClelland |
| 10.  Sabine Borsay | 24.  Sergei Vassilwitskii | 38.  Linda Lu |
| 11.  Alex Ainslie | 25.  George Levitte | 39.  Parisa Tabriz |
| 12.  Tim Schumann | 26.  Arne Mauser | 40.  Sundar Pichai |
| 13.  Dan Stone | 27.  Uwe Bubeck | 41.  Anil Sabharwal |
| 14.  Brad Townsend | 28.  Mikel Astiz | 42.  Vic Liu |

# EXHIBIT 19

# Redacted In Its Entirety

# EXHIBIT 20

# Redacted Version of Document Sought to be Sealed

Message

| | |
|---|---|
| **From**: | Mediha Abdulhay [mediha@google.com] |
| **Sent**: | 7/28/2020 4:13:16 PM |
| **To**: | Sam Heft-Luthy [heftluthy@google.com]; Yingsi Zhang [yingsi@google.com] |
| **Subject**: | Re: ▇▇▇▇▇▇ project intro |

+Yingsi Zhang as well for vis

On Tue, Jul 28, 2020 at 9:10 AM Sam Heft-Luthy <heftluthy@google.com> wrote:
 FYI per ping

 ---------- Forwarded message ---------
 From: **Sam Heft-Luthy** <heftluthy@google.com>
 Date: Mon, Jul 20, 2020 at 4:32 PM
 Subject: ▇▇▇▇▇▇ project intro
 To: Cassidy Morgan <cassidym@google.com>
 Cc: Ilana Rosenberg <irosenberg@google.com>, Kalle Buschmann <kallebu@google.com>, Mimosa Lynch <mimosal@google.com>

 Hi Cassidy,

 Wanted to send a quick message to make sure you had context for a meeting that will get added to your calendar soon.

 PDPO User-Facing Privacy is kicking off a project titled ▇▇▇▇▇▇ — we're still working out the exact proposed governance structure but **we'd like for you to serve in that body to provide project guidance**, hence an invite to the kickoff that we'll follow up with Ilana to set up.

 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

 We'll base this work on the existing narrative and principles workstreams ongoing, with a goal of building a better articulation of what we want "treating users with profound respect when it comes to controlling and understanding their data" to look and feel like.

 As said, our exact governing structure is pending some more feedback from PDPO leadership later this week, but we wanted to make sure we gave context as we work to get a governing-body kickoff scheduled. We'll follow up when we have more details.

 Thanks,
 Sam

 --

CONFIDENTIAL

**Mediha Abdulhay**
Privacy Marketing Lead, Brand Studio
mediha@google.com
6508611660

GOOG-CABR-05753835

# EXHIBIT 21

# Redacted Version of Document Sought to be Sealed

Appointment

---

**From:**       Google Calendar [calendar-notification@google.com]
**Sent:**       7/31/2020 2:31:48 PM
**To:**         Sam Heft-Luthy [heftluthy@google.com]

**Subject:**    Kate <> ███████ Sync
**Attachments:** invite.ics

**Start:**       7/31/2020 5:30:00 PM
**End:**         7/31/2020 6:00:00 PM
**Show Time As:** Busy

**Recurrence:**  (none)

---

**Kate Charlet has accepted this invitation.**
**Kate <> ███████ Sync**

When        Fri Jul 31, 2020 10:30am – 11am Pacific Time - Los Angeles

Joining info    Join with Google Meet
            ████████████████████

            Join by phone
            ████████████████████

            More phone numbers

Calendar    Sam Heft-Luthy

Who         • Sam Heft-Luthy - organizer
            • Kate Charlet
            • Mimosa Lynch
            • Kalle Buschmann

Some time to introduce Kalle and Mimosa and discuss next steps for Kate to provide input into ███████
workstream

---

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for invitation replies on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

# EXHIBIT 22

# Redacted Version
of Document Sought
to be Sealed

Appointment

---

**From:** Google Calendar [calendar-notification@google.com]
**Sent:** 7/28/2020 8:10:19 PM
**To:** kallebu@google.com

**Subject:** ███████ Chat
**Attachments:** invite.ics

**Start:** 8/3/2020 3:00:00 PM
**End:** 8/3/2020 3:25:00 PM
**Show Time As:** Busy

**Recurrence:** (none)

---

Sam Heft-Luthy has accepted this invitation.
███████ **Chat**

When        Mon Aug 3, 2020 17:00 – 17:25 Central European Time - Berlin

Joining info    Join with Google Meet
                ████████████████████

                Join by phone
                ████████████████████████

                More phone numbers

Calendar    kallebu@google.com

Who         • kallebu@google.com – organizer
            • Breonna Rodriguez
            • Sam Heft-Luthy
            • Mimosa Lynch

Hi Breonna, as suggested by Greg we would love to take some of your time to chat about the future privacy
experience vision we are working on.

---

Invitation from **Google Calendar**

You are receiving this email at the account kallebu@google.com because you are subscribed for invitation replies on calendar
kallebu@google.com.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others
regardless of their own invitation status, or to modify your RSVP. **Learn More**.

# EXHIBIT 23

# Redacted Version of Document Sought to be Sealed

Appointment

---

**From:** Google Calendar [calendar-notification@google.com]
**Sent:** 7/28/2020 2:53:03 PM
**To:** Mimosa Lynch [mimosal@google.com]

**Subject:** ▬▬▬▬▬▬ Stakeholder Interview
**Attachments:** edit.url; invite.ics

**Start:** 8/5/2020 5:00:00 PM
**End:** 8/5/2020 5:45:00 PM
**Show Time As:** Busy

**Recurrence:** (none)

---

Sam Heft-Luthy has accepted this invitation.
▬▬▬▬▬ **Stakeholder Interview**

| When | Wed Aug 5, 2020 7pm – 7:45pm Central European Time – Berlin |
|---|---|
| Joining info | Join with Google Meet |
| | ▬▬▬▬▬▬▬▬▬ |
| | Join by phone |
| | ▬▬▬▬▬▬▬▬▬▬ |
| | More phone numbers |
| Calendar | Mimosa Lynch |
| Who | • Mimosa Lynch - organizer |
| | • Micah Laaker |
| | • Sam Heft-Luthy |
| | • kallebu@google.com |
| Attachments | ▬▬▬▬ Charter (go/privacynative) |

Hi Micah,
Please let me know if this time doesn't work for you.

Thank you!
Mimosa

---

Invitation from **Google Calendar**

You are receiving this email at the account mimosal@google.com because you are subscribed for invitation replies on calendar Mimosa Lynch.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**

---

# EXHIBIT 24

# Redacted Version
# of Document Sought
# to be Sealed

Appointment

**From:**      Google Calendar [calendar-notification@google.com]
**Sent:**      8/7/2020 8:16:17 PM
**To:**        kallebu@google.com; Ian Alexander [ianalexander@google.com]

**Subject:**        ▮▮▮▮▮▮▮▮Interview with Ian
**Attachments:**   invite.ics

**Start:**         8/12/2020 3:00:00 PM
**End:**          8/12/2020 3:30:00 PM
**Show Time As:** Tentative


**Recurrence:**    (none)


**You have been invited to the following event.**

▮▮▮▮▮▮▮▮  **Interview with Ian**

When        Wed Aug 12, 2020 17:00 – 17:30 Central European Time – Berlin

Joining info   Join with Google Meet
             ▮▮▮▮▮▮▮▮▮▮▮▮▮▮


             Join by phone
             ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮


             More phone numbers

Calendar     kallebu@google.com

Who         • Sam Heft-Luthy - organizer
            • Ian Alexander
            • kallebu@google.com

**more details »**
Hey Ian,

PDPO are spinning up an effort to build a clearer articulation of Google's future privacy experience. (go▮▮▮▮▮▮▮
for more details)

We're in an information gathering stage and are reaching out to a few Privacy Leads to get some input for our first
round. This will be a half-hour interview asking about some of the basics for how you approach your work.

Thanks!

Going (kallebu@google.com)?   **Yes** - **Maybe** - **No**    more options »

Invitation from **Google Calendar**

You are receiving this email at the account kallebu@google.com because you are subscribed for invitations on calendar
kallebu@google.com.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

CONFIDENTIAL                                                          GOOG-CABR-05753875

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

# EXHIBIT 25

# Redacted Version
# of Document Sought
# to be Sealed

Appointment

**From:**      Google Calendar [calendar-notification@google.com]
**Sent:**      8/7/2020 7:37:34 PM
**To:**        Mimosa Lynch [mimosal@google.com]

**Subject:**      ██████████ Yooki/Kalle/Sam/Mimosa Sync
**Attachments:**  invite.ics

**Start:**          8/12/2020 5:30:00 PM
**End:**            8/12/2020 6:15:00 PM
**Show Time As:** Busy

**Recurrence:**    (none)

---

Sam Heft-Luthy has accepted this invitation.

## Yooki/Kalle/Sam/Mimosa Sync

When          Wed Aug 12, 2020 6:30pm – 7:15pm Western European Time - Lisbon

Joining info  Join with Google Meet
              ████████████████████

              Join by phone
              ████████████████████████

              More phone numbers

Calendar      Mimosa Lynch

Who           • Mimosa Lynch - organizer
              • Sam Heft-Luthy
              • Yooki Park
              • kallebu@google.com

---

Invitation from Google Calendar

You are receiving this email at the account mimosal@google.com because you are subscribed for invitation replies on calendar Mimosa Lynch.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. Learn More

GOOG-CABR-05753874

# EXHIBIT 26

# Redacted Version of
# Document Sought to be Sealed

Appointment

---

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 7/30/2020 4:13:57 PM |
| **To:** | Sam Heft-Luthy [heftluthy@google.com]; Keith Enright [keithenright@google.com]; kallebu@google.com |

| | |
|---|---|
| **Subject:** | ▮▮▮▮▮▮▮▮▮ Keith - Stakeholder Interview |
| **Attachments:** | invite.ics |

| | |
|---|---|
| **Start:** | 8/17/2020 3:00:00 PM |
| **End:** | 8/17/2020 3:45:00 PM |
| **Show Time As:** | Tentative |

| | |
|---|---|
| **Recurrence:** | (none) |

---

**You have been invited to the following event.**

▮▮▮▮▮▮▮▮▮▮ **Keith - Stakeholder Interview**

| When | Mon Aug 17, 2020 8am – 8:45am Pacific Time - Los Angeles |
|---|---|
| Joining info | Join with Google Meet |
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | |
| | Join by phone |
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | |
| | More phone numbers |
| Calendar | Sam Heft-Luthy |
| Who | • Mimosa Lynch - organizer |
| | • Keith Enright |
| | • Sam Heft-Luthy |
| | • kallebu@google.com |

**more details »**

Going (heftluthy@google.com)?    **Yes** - **Maybe** - **No**    more options »

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for invitations on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**

GOOG-CABR-05753847

# EXHIBIT 27

# Redacted Version of
# Document Sought to be Sealed

Appointment

---

**From:** Google Calendar [calendar-notification@google.com]
**Sent:** 8/10/2020 2:47:05 PM
**To:** Sam Heft-Luthy [heftluthy@google.com]

**Subject:** Priscila / Sam
**Attachments:** invite.ics

**Start:** 8/19/2020 7:00:00 PM
**End:** 8/19/2020 7:30:00 PM
**Show Time As:** Busy

**Recurrence:** (none)

---

Priscila Penha has accepted this invitation.

**Priscila / Sam**

When     Wed Aug 19, 2020 12pm – 12:30pm Pacific Time - Los Angeles

Joining info    Join with Google Meet

          ███████████████

          Join by phone

          █████████████████████

          More phone numbers

Calendar     Sam Heft-Luthy

Who        • Sam Heft-Luthy - organizer
             • Priscila Penha

Hi Priscila,

I'm a PM in PDPO on Greg Fair's team.

I'm reaching out to grab some time to discuss ██████████, a program to develop a 5-year vision for privacy across the company (I think Sarah reached out to flag that a calendar invite like this was coming!).

I wanted to grab some time next week to introduce myself and discuss the best way for us to make sure APaS is well represented and how we should keep in contact with you as it continues.

---

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for invitation replies on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

CONFIDENTIAL

GOOG-CABR-05753881

# EXHIBIT 28

# Redacted Version of
# Document Sought to be Sealed

Appointment

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 8/11/2020 2:59:08 PM |
| **To:** | NO_TO_PROPERTY_FOUND |
| **CC:** | burnel@google.com |

**Subject:** ▮▮▮▮▮▮▮ Al Verney - Stakeholder Interview
**Attachments:** invite.ics

**Start:** 8/25/2020 2:30:00 PM
**End:** 8/25/2020 3:15:00 PM
**Show Time As:** Tentative

**Recurrence:** (none)

---

**The following event has been created.**

▮▮▮▮▮▮ **Al Verney - Stakeholder Interview**

When        Tue Aug 25, 2020 3:30pm – 4:15pm United Kingdom Time

Joining info    Join with Google Meet
▮▮▮▮▮▮▮▮▮▮▮▮

Join by phone
▮▮▮▮▮▮▮▮▮▮▮▮▮

More phone numbers

Calendar    Al Verney

Who
- **Sam Heft-Luthy** - organizer
- Al Verney
- Mimosa Lynch
- kallebu@google.com
- burnel@google.com - optional

**more details »**
Per thread with Hannah (added to event as FYI):

As part of the kickoff for the ▮▮▮▮▮▮ program we would like to schedule an interview slot with you to better understand your perspective.

For background, ▮▮▮▮▮▮ is a program that is focused on establishing a 5 year vision for Google's future privacy experience. A key piece of this work is to understand the situation on the ground from our various partner teams in order to make sure we're developing an informed perspective. We would love to have your views and perspective on the space as we go through our first iteration of landscaping.

Prior to the interview if you could please look over the ▮▮▮▮▮▮ charter that would be very helpful.

CONFIDENTIAL

Invitation from **Google Calendar**

You are receiving this email at the account burnel@google.com because you are subscribed for new event updates on calendar Al Verney.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

GOOG-CABR-05753890

# EXHIBIT 29

# Redacted Version of
# Document Sought to be Sealed

Appointment

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 8/21/2020 3:28:38 PM |
| **To:** | David Monsees [davidmonsees@google.com]; Vlad Adzic [adzic@google.com]; Sam Heft-Luthy [heftluthy@google.com]; Mimosa Lynch [mimosal@google.com]; kallebu@google.com |

| | |
|---|---|
| **Subject:** | ▓▓▓▓▓▓▓ Stakeholder interview request |
| **Attachments:** | invite.ics |

| | |
|---|---|
| **Start:** | 8/26/2020 2:00:00 PM |
| **End:** | 8/26/2020 2:30:00 PM |
| **Show Time As:** | Tentative |

**Recurrence:**    (none)

---

**This event has been changed.**

▓▓▓▓▓▓▓ **Stakeholder interview request**

When        **Changed:** Wed Aug 26, 2020 7am – 7:30am Pacific Time – Los Angeles

Joining Info    Join with Google Meet

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Join by phone

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

More phone numbers

Calendar     David Monsees

Who
- Vlad Adzic - organizer
- hanseni@google.com - creator
- David Monsees
- Sam Heft-Luthy
- Mimosa Lynch
- kallebu@google.com

**more details »**

Going (davidmonsees@google.com)?    **Yes** - **Maybe** - **No**    more options »

---

Invitation from **Google Calendar**

You are receiving this email at the account davidmonsees@google.com because you are subscribed for updated invitations on calendar David Monsees.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**

GOOG-CABR-05747697

# EXHIBIT 30

# Redacted Version of
# Document Sought to be Sealed

Appointment

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 8/27/2020 2:12:19 PM |
| **To:** | Mimosa Lynch [mimosal@google.com] |

**Subject:** ████████ David - Stakeholder Interview
**Attachments:** invite.ics

**Start:** 8/31/2020 4:00:00 PM
**End:** 8/31/2020 4:45:00 PM
**Show Time As:** Busy

**Recurrence:** (none)

---

**David Monsees has accepted this invitation.**
████████ **David - Stakeholder Interview**

When        Mon Aug 31, 2020 6pm – 6:45pm Central European Time - Berlin

Joining info    Join with Google Meet
████████████████████

Join by phone
████████████████████

More phone numbers

Calendar    Mimosa Lynch

Who
- Mimosa Lynch - organizer
- David Monsees
- Sam Heft-Luthy
- kallebu@google.com

---

Invitation from **Google Calendar**

You are receiving this email at the account mimosal@google.com because you are subscribed for invitation replies on calendar Mimosa Lynch.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

CONFIDENTIAL                                                                    GOOG-CABR-05747710

# EXHIBIT 31

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**      Google Calendar [calendar-notification@google.com]
**Sent:**      8/24/2020 1:54:57 PM
**To**:         Giles Hogben [gilesh@google.com]; Mimosa Lynch [mimosal@google.com]; kallebu@google.com

**Subject**:        ▮▮▮▮▮▮ Stakeholder Interview with Giles
**Attachments:** invite.ics

**Start**:          9/1/2020 6:00:00 PM
**End**:           9/1/2020 6:30:00 PM
**Show Time As**: Tentative

**Recurrence**:   (none)

---

**You have been invited to the following event.**

▮▮▮▮▮▮ **Stakeholder Interview with Giles**

When      Tue Sep 1, 2020 11am – 11:30am Pacific Time - Los Angeles

Joining info   Join with Google Meet

▮▮▮▮▮▮▮▮▮▮

Join by phone

▮▮▮▮▮▮▮▮▮▮

More phone numbers

Calendar   Giles Hogben

Who       • Sam Heft-Luthy - organizer
           • Giles Hogben
           • Mimosa Lynch
           • kallebu@google.com

**more details »**
Prior to the interview we would love if Giles could read the ▮▮▮▮▮ charter.

Going (gilesh@google.com)?   **Yes** – **Maybe** - **No**   more options »

Invitation from **Google Calendar**

You are receiving this email at the account gilesh@google.com because you are subscribed for invitations on calendar Giles Hogben.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**

GOOG-CABR-05753915

# EXHIBIT 32

# Redacted Version of
# Document Sought to be Sealed

Appointment

**From:** Google Calendar [calendar-notification@google.com]
**Sent:** 9/15/2020 2:17:08 PM
**To:** Jonathan McPhie [jmcphie@google.com]; Mimosa Lynch [mimosal@google.com]; Kalle Buschmann [kallebu@google.com]

**Subject:** Jonathan chat re: ████████
**Attachments:** invite.ics

**Start:** 9/16/2020 5:30:00 PM
**End:** 9/16/2020 6:00:00 PM
**Show Time As:** Tentative

**Recurrence:** (none)

---

### You have been invited to the following event.

## Jonathan chat re: ████████

When    Wed Sep 16, 2020 10:30am – 11am Pacific Time - Los Angeles

Joining info    Join with Google Meet
████████

Join by phone
████████

More phone numbers

Calendar    Jonathan McPhie

Who
- Sam Heft-Luthy - organizer
- Jonathan McPhie
- Mimosa Lynch
- Kalle Buschmann

**more details »**
Hey Jonathan!! Welcome to the team.

I'll grab more time for a 1:1, but first wanted to grab time to discuss a program we're running to develop a privacy experience vision for the PDPO and get your thoughts

(go/████████ is the charter)

Going (jmcphie@google.com)?    **Yes** – **Maybe** – **No**    more options »

Invitation from **Google Calendar**
You are receiving this email at the account jmcphie@google.com because you are subscribed for invitations on calendar Jonathan McPhie.
To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.
Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**

# EXHIBIT 33

# Redacted Version of
# Document Sought to be Sealed

Appointment

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 10/19/2020 9:50:32 AM |
| **To:** | Sam Heft-Luthy [heftluthy@google.com]; Mark Risher [risher@google.com]; Othar Hansson [othar@google.com]; Sarah Hammond [shammond@google.com]; glanza@google.com; talherman@google.com; Jan Hannemann [janhan@google.com]; Elyse Bellamy [ohelyse@google.com]; Kalle Buschmann [kallebu@google.com]; André Fialho [fialho@google.com] |

| | |
|---|---|
| **Subject:** | Privacy Narrative + ▬▬▬▬▬ Follow Up |
| **Attachments:** | invite.ics |

| | |
|---|---|
| **Start:** | 10/20/2020 5:00:00 PM |
| **End:** | 10/20/2020 5:30:00 PM |
| **Show Time As:** | Tentative |

**Recurrence:**    (none)

---

**You have been invited to the following event.**

### Privacy Narrative + ▬▬▬▬▬ Follow Up

When       Tue Oct 20, 2020 10am – 10:30am Pacific Time - Los Angeles

Joining Info    Join with Google Meet
▬▬▬▬▬▬▬▬▬▬▬

Join by phone
▬▬▬▬▬▬▬▬▬▬▬

More phone numbers

Calendar    Sam Heft-Luthy

Who
- Mark Risher - organizer
- devonheston@google.com - creator
- Mimosa Lynch
- Othar Hansson
- Sarah Hammond
- glanza@google.com
- talherman@google.com
- Sam Heft-Luthy
- Jan Hannemann
- Elyse Bellamy
- Kalle Buschmann
- André Fialho

**more details »**
Hi Mel, Alice, Devon, and Kendra!
Would it be possible to get a meeting on the calendar with Sarah, Othar, Tal, and Mark in mid October to check in on the privacy narrative and ▬▬▬▬▬ work.

---

CONFIDENTIAL                                                                              GOOG-CABR-05754210

If we could have 30 minute in an emea friendly time that would be amazing!

Thank you,
Mimosa

Going (heftluthy@google.com)?    **Yes** - **Maybe** - **No**    more options »

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for invitations on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

CONFIDENTIAL

GOOG-CABR-05754211

# EXHIBIT 34

# Redacted Version
# of Document Sought
# to be Sealed

Appointment

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 10/20/2020 2:49:55 PM |
| **To:** | Sam Heft-Luthy [heftluthy@google.com]; Mimosa Lynch [mimosal@google.com]; Mark Risher [risher@google.com]; Othar Hansson [othar@google.com]; Sarah Hammond [shammond@google.com]; glanza@google.com; talherman@google.com; Jan Hannemann [janhan@google.com]; Elyse Bellamy [ohelyse@google.com]; Kalle Buschmann [kallebu@google.com]; André Fialho [fialho@google.com] |

| | |
|---|---|
| **Subject:** | Privacy Narrative + ▮▮▮▮▮▮ Follow Up |
| **Attachments:** | invite.ics |

| | |
|---|---|
| **Start:** | 11/4/2020 6:00:00 PM |
| **End:** | 11/4/2020 6:30:00 PM |
| **Show Time As:** | Tentative |

**Recurrence:** (none)

---

**This event has been changed.**

**Changed: Privacy Narrative + ▮▮▮▮▮▮ Follow Up**

| | |
|---|---|
| When | Changed: Wed Nov 4, 2020 10am – 10:30am Pacific Time - Los Angeles |
| Joining info | Join with Google Meet |
| | ▮▮▮▮▮▮▮▮▮▮ |
| | Join by phone |
| | ▮▮▮▮▮▮▮▮▮▮ |
| | More phone numbers |
| Calendar | Sam Heft-Luthy |
| Who | • Mark Risher - organizer |
| | • devonheston@google.com - creator |
| | • Mimosa Lynch |
| | • Othar Hansson |
| | • Sarah Hammond |
| | • glanza@google.com |
| | • talherman@google.com |
| | • Sam Heft-Luthy |
| | • Jan Hannemann |
| | • Elyse Bellamy |
| | • Kalle Buschmann |
| | • André Fialho |

**more details »**
Hi Mel, Alice, Devon, and Kendra!
Would it be possible to get a meeting on the calendar with Sarah, Othar, Tal, and Mark in mid October to check in on the privacy narrative and ▮▮▮▮▮▮ work.

---

GOOG-CABR-05754222

If we could have 30 minute in an emea friendly time that would be amazing!

Thank you,
Mimosa

Going (heftluthy@google.com)?    **Yes** – **Maybe** - **No**    more options »

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for updated invitations on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

CONFIDENTIAL

# EXHIBIT 35

# Redacted Version of Document Sought to be Sealed

Appointment

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 11/3/2020 3:49:12 PM |
| **To:** | Mark Risher [risher@google.com] |

| | |
|---|---|
| **Subject:** | Privacy Narrative + ▇▇▇▇ Follow Up |
| **Attachments:** | invite.ics |

| | |
|---|---|
| **Start:** | 11/4/2020 6:00:00 PM |
| **End:** | 11/4/2020 6:30:00 PM |
| **Show Time As:** | Busy |

**Recurrence:**  (none)



Sam Heft-Luthy has accepted this invitation.
**Privacy Narrative + ▇▇▇▇ Follow Up**

When    Wed Nov 4, 2020 10am – 10:30am Pacific Time - Los Angeles

Joining info    Join with Google Meet
▇▇▇▇▇▇▇▇

Join by phone
▇▇▇▇▇▇▇▇

More phone numbers

Calendar    Mark Risher

Who
- Mark Risher - organizer
- devonheston@google.com - creator
- Mimosa Lynch
- Othar Hansson
- Sarah Hammond
- glanza@google.com
- talherman@google.com
- Sam Heft-Luthy
- Jan Hannemann
- Elyse Bellamy
- Kalle Buschmann
- André Fialho

Hi Mel, Alice, Devon, and Kendra!
Would it be possible to get a meeting on the calendar with Sarah, Othar, Tal, and Mark in mid October to check in on the privacy narrative and ▇▇▇▇ work.
If we could have 30 minute in an emea friendly time that would be amazing!

Thank you,
Mimosa

CONFIDENTIAL                                                    GOOG-CABR-05754276

Invitation from **Google Calendar**

You are receiving this email at the account risher@google.com because you are subscribed for invitation replies on calendar Mark Risher.

To stop receiving these emails, please log in to https://calendar.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

CONFIDENTIAL

# EXHIBIT 36

# Redacted Version
# of Document Sought
# to be Sealed

Appointment

---

**From:**       Google Calendar [calendar-notification@google.com]
**Sent:**       12/4/2020 5:05:51 PM
**To:**         Jonathan McPhie [jmcphie@google.com]; Yingsi Zhang [yingsi@google.com]; Kalle Buschmann
                [kallebu@google.com]

**Subject:**    ▆▆▆▆▆▆▆▆    Experience Articulation
**Attachments:** invite.ics

**Start:**      12/9/2020 4:30:00 PM
**End:**        12/9/2020 5:00:00 PM
**Show Time As:** Tentative


**Recurrence:**    (none)

---

**You have been invited to the following event.**

▆▆▆▆▆▆▆ **Experience Articulation**

When          Wed Dec 9, 2020 8:30am – 9am Pacific Time – Los Angeles

Joining info  Join with Google Meet
              ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

              Join by phone
              ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

              More phone numbers

Calendar      Jonathan McPhie

Who           • Sam Heft-Luthy - organizer
              • Yingsi Zhang
              • Jonathan McPhie
              • Kalle Buschmann

**more details »**
Grabbing a bit of time with a motley-ish crew to talk a bit about how we can get more ambitious with our 5-year
vignettes for ▆▆▆▆▆▆▆ .

Will propose a bit of pre-work via email.

Going (jmcphie@google.com)?    **Yes** – **Maybe** – **No**    more options »

Invitation from Google Calendar
You are receiving this email at the account jmcphie@google.com because you are subscribed for invitations on calendar Jonathan McPhie.
To stop receiving these emails, please log in to https://calendar.google.com/calendar/ and change your notification settings for this
calendar.
Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others
regardless of their own invitation status, or to modify your RSVP. Learn More.

---

CONFIDENTIAL                                                                          GOOG-CABR-05754367

# EXHIBIT 37

# Redacted Version
# of Document Sought
# to be Sealed

**BLEICHMAR FONTI & AULD LLP**
555 12th STREET, SUITE 1600
OAKLAND, CA 94607

**DiCELLO LEVITT GUTZLER LLC**
ONE GRAND CENTRAL PLACE
60 EAST 42nd STREET, SUITE 2400
NEW YORK, NY 10165

**SIMMONS HANLY CONROY LLC**
112 MADISON AVENUE, 7TH FL.
NEW YORK, NY 10016

January 18, 2022

**THIS LETTER REFERENCES INFORMATION DESIGANTED CONFIDENTIAL**

**VIA ELECTRONIC MAIL**
Jonathan Tse, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
jonathantse@quinnemanuel.com

Re:   *Calhoun v. Google LLC*, No. 5:20-cv-05146-LHK-SVK (N.D. Cal.)
**Re: Curing Google's Deficient Production re** ▮▮▮▮▮▮

Dear Counsel:

Plaintiffs request that Google cure its deficient production of ▮▮▮▮▮▮ documents. Specifically, we request the following documents referenced by Mr. Sam Heft-Luthy at his December 20, 2021 deposition.

With respect to Heft-Luthy Exhibit 3 at page GOOG-CABR04754282 (screenshot copied below), Mr. Heft-Luthy  testified that he and another Google PDPO team member conducted somewhere between 9 to 30 interviews for the ▮▮▮▮▮▮ project for which notes were taken and kept. *See* Heft-Luthy Dep. at 89:3-93:11. Mr. Heft-Luthy further testified to other research and "inputs" to the project. Plaintiffs request all transcripts, notes, and emails regarding interviews taken for ▮▮▮▮▮▮ and all documents, research and "inputs" that pertain to ▮▮▮▮▮▮.



Mr. Heft-Luthy testified that during the course of ▮▮▮▮▮▮ "[w]e delivered a few executive presentations," which included presentations to "a few design and product management

Counsel for Google                           SIMMONS HANLY CONROY
January 18, 2022                             DiCELLO LEVITT GUTZLER LLC
Page 2                                       BLEICHMAR FONTI & AULD LLP

directors." Heft Luthy Dep. at 54:18-19, 55:5-7. Plaintiffs request production of these presentations.

      Mr. Heft-Luthy testified that ██████████ "was discontinued in late 2020." Heft Luthy Dep. at 54:13-15. Plaintiffs request that Google provide documents relating to Google's decision to "discontinue" ██████████

      With respect to Heft-Luthy Exhibit 2, Plaintiffs request production of the following, which appear to be hyperlinked documents:

- ██ definition of privacy"
- ██ research synthesis"
- "a lot of research"

      Plaintiffs request that the information sought be produced by **January 21, 2022.** To the extent already produced, please identify the documents by bates numbers.

        Regards,

Jay Barnes
jaybarnes@simmonsfirm.com

Lesley Weaver
lweaver@bfalaw.com

David Straite
dstraite@dicellolevitt.com

Counsel for Google
January 18, 2022
Page 3

SIMMONS HANLY CONROY
DiCELLO LEVITT GUTZLER LLC
BLEICHMAR FONTI & AULD LLP

cc (via Electronic Mail):

<u>Defendant Google's Counsel</u>

Google Counsel ([qecalhoun@quinnemanuel.com](mailto:qecalhoun@quinnemanuel.com))

<u>Plaintiffs' Counsel</u>

Angelica Ornelas, Esq. ([aornelas@bfalaw.com](mailto:aornelas@bfalaw.com))
An Truong, Esq. ([atruong@simmonsfirm.com](mailto:atruong@simmonsfirm.com))
Adam Prom, Esq. ([aprom@dicellolevitt.com](mailto:aprom@dicellolevitt.com))
Sharon Cruz, Esq. ([scruz@dicellolevitt.com](mailto:scruz@dicellolevitt.com))

# EXHIBIT 38

# Redacted Version of Document Sought to be Sealed

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5
                                     )
6     PATRICK CALHOUN, ET AL., ON     )
      BEHALF OF THEMSELVES AND ALL    )
7     OTHER SIMILARLY SITUATED,       )
                                     )
8               PLAINTIFFS,           )
                                     )
9        VS.                          )  CASE NO.
                                     )  5:20-CV-05146-LHK-SVK
10    GOOGLE LLC,                     )
                                     )
11              DEFENDANT.            )
      _____)

12

13

             ** CONFIDENTIAL  - ATTORNEYS EYES ONLY **
14

15                 REMOTE PROCEEDINGS OF

16            VIDEOTAPED 30(B)(6) DEPOSITION OF

17                    MEDIHA ABDULHAY

18              TUESDAY, APRIL 12, 2022

19

20

21

22    JOB NO. SF 5180827

23    REPORTED BY:  REAGAN EVANS, RPR, RMR, CRR, CCRR,
                     CLR, CRC, CA CSR NO. 8176

24

25

                                              Page 1

| | |
|---|---|
| 1 VIDEOTAPED 30(B)(6) DEPOSITION OF MEDIHA ABDULHAY, | 1            I N D E X |
| 2 TAKEN REMOTELY ON BEHALF OF THE PLAINTIFFS AT | 2 |
| 3 9:03 A M , TUESDAY, APRIL 12, 2022, AT | 3 WITNESS        EXAMINATION            PAGE |
| 4 SAN FRANCISCO, CALIFORNIA, BEFORE REAGAN EVANS, CA | 4 MEDIHA ABDULHAY    BY MR. BARNES            8 |
| 5 CSR NO  8176, RPR, RMR, CRR, CCRR, CLR, CRC | 5 |
| 6 | 6 |
| 7 | 7            E X H I B I T S |
| 8 APPEARANCES OF COUNSEL | 8 |
| 9 | 9 NO.      PAGE    DESCRIPTION |
| 10 FOR THE PLAINTIFFS: | 10 EXHIBIT 1    13    ████████    PERSPECTIVE, |
| 11 SIMMONS HANLY CONROY | 11            TOWARD A PRIVACY-NATIVE GOOGLE |
| 12 BY: JASON 'JAY' BARNES, ESQ | 12            EXPERIENCE, BATES STAMPED |
| 13 BY: ERIC JOHNSON, ESQ | 13            GOOG-CABR-05885987 THROUGH |
| 14   (APPEARING REMOTELY) | 14            GOOG-CABR-05885991 |
| 15 112 MADISON AVENUE | 15 |
| 16 7TH FLOOR | 16 EXHIBIT 2    26    UFP REVIEW:████████ |
| 17 NEW YORK, NEW YORK 10016 | 17            DATED MAY 17, 2021, BATES |
| 18 (212) 784-6400 | 18            STAMPED GOOG-CALH-01198496 |
| 19 JAYBARNES@SIMMONSFIRM COM | 19            THROUGH GOOG-CALH-01198511 |
| 20 EJOHNSON@SIMMONSFIRM COM | 20 |
| 21 | 21 EXHIBIT 3    29    ABDULHAY FACT SHEET, 2 PAGES |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

| | |
|---|---|
| 1 APPEARANCES OF COUNSEL (CONTINUED) | 1            I N D E X |
| 2 FOR THE DEFENDANT: | 2            (CONTINUED) |
| 3 QUINN EMANUEL URQUHART & SULLIVAN, LLP | 3            E X H I B I T S |
| 4 BY: JOMAIRE A. CRAWFORD, ESQ. | 4 |
| 5   (APPEARING REMOTELY) | 5 NO.      PAGE    DESCRIPTION |
| 6 51 MADISON AVENUE | 6 EXHIBIT 4    40    ████████    VISION 2026, |
| 7 22ND FLOOR | 7            DATED MAY 2021, BATES STAMPED |
| 8 NEW YORK, NEW YORK  10010 | 8            GOOG-CABR-05885992 THROUGH |
| 9 (212) 849-7000 | 9            GOOG-CABR-05886013 |
| 10 JOMAIRECRAWFORD@QUINNEMANUEL.COM | 10 |
| 11   - AND - | 11 EXHIBIT 5    46    ████████    CONVERSATIONS, |
| 12 BY: CARL W. SPILLY, ESQ. | 12            BATES STAMPED |
| 13   (APPEARING REMOTELY) | 13            GOOG-CABR-05885871 THROUGH |
| 14 1300 I STREET NW | 14            GOOG-CABR-05885942 |
| 15 SUITE 900 | 15 |
| 16 WASHINGTON, D.C.  20005 | 16 |
| 17 (202) 538-8000 | 17 |
| 18 CARLSPILLY@QUINNEMANUEL.COM | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 ALSO PRESENT: | 21 |
| 22 TONI BAKER, IN-HOUSE COUNSEL FOR GOOGLE LLC | 22 |
| 23 CASSIA LEET, VIDEOGRAPHER | 23 |
| 24   (APPEARING REMOTELY) | 24 |
| 25 | 25 |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

| | |
|---|---|
| 1       SAN FRANCISCO, CALIFORNIA | 1       EXAMINATION |
| 2       TUESDAY, APRIL 12, 2022; 9:03 A.M. | 2   BY MR. BARNES: |
| 3 | 3    Q   Ms. Abdulhay, thank you for braving the |
| 4       THE VIDEOGRAPHER: Good morning. | 4   traffic this morning for the deposition. |
| 5       We are going on the record at 9:03 a.m., on   09:03:01 | 5       Have you ever testified in a deposition    09:05:16 |
| 6   April 12th, 2022. | 6   before? |
| 7       Audio and video recording will continue to | 7    A   I have not. |
| 8   take place unless all parties agree to go off the | 8    Q   Okay. |
| 9   record. | 9       So a few quick basic ground rules. |
| 10       This is Media Unit 1 of the video-recorded    09:03:15 | 10       If you need to take a break, let me know,    09:05:22 |
| 11   deposition of 30(b)(6) witness Mediha Abdulhay taken | 11   but I ask that we not take a break in the middle of |
| 12   by counsel for Plaintiff in the matter of Patrick | 12   a question. Hopefully, with just about an hour, |
| 13   Calhoun, et al., versus Google LLC, filed In the | 13   we're not going to have to take a break. |
| 14   United States District Court for the Northern | 14       Second is when you answer a question, you |
| 15   District of California, San Jose Division. Case    09:03:35 | 15   need to answer verbally and not just with head-nods.   09:05:33 |
| 16   No. 5:20-cv-05146-LHK-SDK. | 16       Do you understand that? |
| 17       This deposition is being conducted using | 17    A   Yes. |
| 18   Veritext virtual technology. And all participants | 18    Q   And that's so the court reporter can take |
| 19   are attending remotely. | 19   down your answer. |
| 20       My name is Cassia Leet from Veritext Legal    09:03:54 | 20       And the third thing is if you don't    09:05:42 |
| 21   Solutions, and I am the videographer. | 21   understand a question for some reason, please ask me |
| 22       The court reporter is Reagan Evans of | 22   to repeat the question, and I will do my best to do |
| 23   Veritext Legal Solutions. | 23   so. |
| 24       I am not related to any party in this | 24       Do you understand that? |
| 25   action; nor am I financially interested in the    09:04:07 | 25    A   Yes.           09:05:52 |
| Page 6 | Page 8 |
| 1   outcome. | 1    Q   Okay. |
| 2       Would counsel, and everyone attending | 2       Ms. Abdulhay, do you understand that you're |
| 3   remotely, please state your appearances and | 3   here today to testify on behalf of Google as Google? |
| 4   affiliations for the record. | 4    A   Yes. |
| 5       MR. BARNES: Yes.          09:04:17 | 5    Q   And that as it relates to the topic of    09:06:04 |
| 6       Jay Barnes and Eric Johnson of Simmons | 6   ███████, your testimony will be binding on |
| 7   Hanly Conroy on behalf of Plaintiff Patrick Calhoun, | 7   Google? |
| 8   et al., and the putative class. | 8    A   Yes. |
| 9       MS. CRAWFORD: Jomaire Crawford, and my | 9    Q   And did you prepare to testify today about |
| 10   colleague Carl Spilly, are on from Quinn Emanuel    09:04:31 | 10   the topic of ███████?          09:06:15 |
| 11   Urquhart & Sullivan on behalf of the defendant in | 11    A   Yes, I did. |
| 12   this case, Google LLC. | 12    Q   Are there any documents that you have with |
| 13       Joined with me is in-house counsel for | 13   you in the room right now? |
| 14   Google, Toni Baker. | 14    A   No, not in the room. I do have a tab in my |
| 15       THE VIDEOGRAPHER: Thank you.    09:04:42 | 15   browser open; however, it is a fact sheet provided    09:06:30 |
| 16       Would the court reporter please swear in | 16   to me by our counsel. |
| 17   the witness. | 17       MR. BARNES: Ms. Crawford, I would like for |
| 18 | 18   that fact sheet to be provided to us before -- I'm |
| 19       MEDIHA ABDULHAY, | 19   going to take a break in about five minutes so that |
| 20   having been first duly sworn by the reporter,    09:05:04 | 20   you can e-mail the fact sheet to us, Ms. Crawford.    09:06:51 |
| 21       was examined and testified as follows: | 21   Understood? |
| 22 | 22       MS. CRAWFORD: That's fine, Jay. We'll |
| 23       THE WITNESS: I do. | 23   take a break in five. |
| 24       THE REPORTER: Thank you. | 24       MR. BARNES: Okay. |
| 25   /// | 25    Q   Ms. Abdulhay, are there any other documents   09:07:00 |
| Page 7 | Page 9 |

3 (Pages 6 - 9)

1  besides the tabbed sheet that you mentioned on your
2  computer?
3    A  No.
4    Q  Okay.
5    Ms. Abdulhay, what is ████████?    09:07:12
6    A  ████████ is the internal name for a
7  project that a team within our group, called privacy
8  data protection office, PDPO, worked on between 2020
9  and 2021.
10    It was primarily a vision and strategy    09:07:36
11  project focused on the privacy user experience.
12    Q  So I asked the question what is
13  ████████.
14    You testified that it was a project in the
15  years 2020 to 2021.    09:07:53
16    Would it be more accurate for me to have
17  asked what was ████████?
18    A  Yes, I think that's accurate.  It was a
19  work stream, the name of a work stream.
20    Q  And what was your role in ████████?    09:08:08
21    MS. CRAWFORD:  Objection.  Foundation.
22    You can answer, Ms. Abdulhay.
23    THE WITNESS:  So as I mentioned,
24  ████████ was a cross-functional project.  At    09:08:28
25  the time I was on Google's marketing team -- one of
                                                Page 10

1  Google's marketing teams -- and I was the marketing
2  partner for the project.
3  BY MR. BARNES:
4    Q  Why did ████████ have a marketing
5  partner?    09:08:38
6    A  The marketing team that I worked on was
7  specifically dedicated to user trust and thinking
8  about external and internal narratives related to
9  user trust.
10    One of the goals and objectives of    09:08:52
11  ████████ was to think about ways to -- creative
12  ways to tell the narrative the team was developing.
13    And one of the approaches that we looked at
14  was potentially creating a video.  We ended up not
15  creating the video.  We stopped at a storyboard, but  09:09:17
16  marketing came in to help with that creative
17  process, as well as identified an external agency to
18  work with.
19    Q  Okay.
20    MR. BARNES:  Let's take a break, please, so  09:09:34
21  that Ms. Crawford can e-mail me the document.
22    MS. CRAWFORD:  Sure.
23    Do you imagine needing more than five
24  minutes if we get that over to you momentarily?
25    MR. BARNES:  No.  No.  I don't imagine    09:09:46
                                                Page 11

1  needing -- let's go off the record, first.
2    THE VIDEOGRAPHER:  Going off the record.
3    The time is 9:10 a.m.
4    (Recess was taken at 9:10 a.m.
5    until 9:19 a.m.)    09:18:56
6    THE VIDEOGRAPHER:  Back on the record.
7    The time is 9:19 a.m.
8    MR. BARNES:  Mr. Johnson, can you publish
9  what's been marked as A1, please.
10    MR. JOHNSON:  It should be up.    09:19:16
11    MR. BARNES:  Let me know when you have it,
12  Ms. Crawford.
13    And then, Ms. Abdulhay, when you eventually
14  receive it, please.
15    MS. CRAWFORD:  Okay.    09:19:44
16    Carl can confirm when it's been published,
17  but I see it in the witness's folder here.  So I
18  think that it should be accessible.
19    THE WITNESS:  Just opened the document.
20  And if it's okay, I'll take a little bit to orient  09:20:02
21  myself.
22  BY MR. BARNES:
23    Q  Sure.
24    A  Okay.
25    Q  Okay.    09:20:54
                                                Page 12

1    Ms. Abdulhay, what is the document which
2  has been marked as Exhibit 1?
3    (Whereupon Abdulhay Exhibit 1 was
4    marked for identification.)
5    THE WITNESS:  This is the ████████    09:21:03
6  Perspective.
7  BY MR. BARNES:
8    Q  And what is the -- and to be -- I want to
9  make the record that the Bates number on the first
10  page is GOOG-CABR-05885987.    09:21:12
11    Does that track with the document you are
12  reviewing right now, Ms. Abdulhay, that says,
13  "████████ Perspective" at the top?
14    A  Yes.
15    Q  Okay.    09:21:28
16    And what was the purpose of the
17  ████████ Perspective?  Would you call this a
18  report?
19    A  I would not call it a report.  I would
20  call it more of a position paper.    09:21:40
21    Q  And was it a position paper -- it says at
22  the top, the "Privacy and Data Protection Office" at
23  Google.
24    Was it a position paper of the Privacy and
25  Data Protection Office at Google?    09:21:56
                                                Page 13

4 (Pages 10 - 13)

1    MS. CRAWFORD: Objection to form. You can
2 answer.
3    THE WITNESS: It's a position paper from a
4 team within that organization.
5 BY MR. BARNES:                    09:22:11
6    Q  And the team, were they employees of
7 Google?
8    A  Yes.
9    Q  Who asked -- who at Google asked for the
10 position paper ████████ Perspective to be    09:22:20
11 created?
12    MS. CRAWFORD: Objection to -- as to
13 foundation and the form of the question.
14    You can answer to the extent possible.
15    THE WITNESS: There was not one specific    09:22:35
16 individual that asked for ████████. I think a
17 number of leads within PDPO decided that this would
18 be a good exercise for both self-clarification and
19 broader strategy setting.
20 BY MR. BARNES:                    09:23:03
21    Q  Okay.
22    And -- sorry.
23    A  Sorry. Those leads would have been both
24 within the product and UX function.
25    Q  And who were those leads?    09:23:09
                                        Page 14

1    A  So Rahul Roy-Chowdhury at the time was the
2 VP of product management for the PDPO.
3    And then within UX, Tal Herman and Sarah
4 Hammond were shepherding this work stream through.
5    Q  What does it mean to be the VP of product    09:23:39
6 management?
7    A  Yes.
8    So PDPO has or, you know, the organization
9 at the time PDPO, had a number of projects and
10 products within its scope.                09:24:00
11    And a VP of project management oversees the
12 strategic direction of those teams and also the --
13 ensures on execution and impact.
14    Q  Where is Mr. Roy-Chowdhury now?
15    I don't mean physically. I mean what is    09:24:17
16 his role at Google now?
17    A  He is no longer employed by Google.
18    Q  And when, to your knowledge, did he become
19 not employed by Google?
20    MS. CRAWFORD: Objection to the form.    09:24:31
21    You can answer.
22    THE WITNESS: Yes. He -- he left Google in
23 the spring of 2021.
24 BY MR. BARNES:
25    Q  And do you know where he works now?    09:24:44
                                        Page 15

1    A  At the time when he departed an internal
2 comms was distributed indicating that he was leaving
3 to become the VP of product at a company called
4 Grammarly.
5    Q  Okay.                        09:25:03
6    Do you see on the first page of the
7 ████████ Perspective document where it says
8 (as read and/or reflected:)
9        This requires an approach that
10    makes respecting user privacy the    09:25:15
11    default - or native - state of our
12    relationship with our users?
13    A  I'm sorry. For some reason, I had to
14 reauthenticate. And so I am just pulling up the
15 document again.                        09:25:27
16    Can you repeat that?
17    Q  Sure.
18    Well, let me have you read it.
19    Do you see where it says "Summary," and
20 then the last sentence of that first paragraph after    09:25:37
21 the word -- after "Summary"?
22    A  Yes, the last sentence of the first
23 paragraph (as read and/or reflected:)
24        This requires an approach that
25    makes respecting user privacy the    09:25:50
                                        Page 16

1    default - or native - state of our
2    relationship with our users.
3    Q  And by the term "████████" does
4 "native" refer to a default state?
5    MS. CRAWFORD: Objection to the form of the    09:26:06
6 question. Vague.
7    You can answer to the extent possible.
8    THE WITNESS: I think native is a broader
9 catchphrase, if you will, from our UX team's
10 perspective.                        09:26:29
11    Striving to embed privacy experiences
12 across user journeys of their -- of the products
13 that they use.
14 BY MR. BARNES:
15    Q  What does Google mean by "embed privacy    09:26:41
16 experiences" within the products they use?
17    A  Yeah.
18    So, for example, we have the Google
19 account. And within the Google account, you can
20 find your key privacy and security settings and    09:26:55
21 controls.
22    And every year, over 3 billion people visit
23 the Google account to change their settings, to
24 change personal information within the Google
25 account, but we also often hear from users that they    09:27:14
                                        Page 17

5 (Pages 14 - 17)

1 want faster, quicker, more convenient access to
2 their privacy settings, or education embedded
3 throughout their journey.
4        And so, we have teams across Google and
5 within this org, the PDPO, focused on creating        09:27:33
6 features that fulfill that broader strategy.
7        And so, for example, in 2020, you know, we
8 brought incognito mode to our apps.
9        And so with one click now, you can access
10 incognito mode from your Google account, things like        09:27:59
11 that where we think it's helpful, as we're
12 constantly striving to make our transparency and
13 control products and features more accessible and
14 easier to use.
15    Q  Can we turn to page 4 of the document,        09:28:19
16 which ends in CABR-05885990, please.
17        And do you see where it says "our path
18 forward"?
19    A  Yes.
20    Q  And the last sentence of that paragraph        09:28:38
21 says, "we" -- does that mean Google in the last
22 sentence of that paragraph?
23        MS. CRAWFORD:  Objection insofar as it asks
24 the witness to speculate.
25        You can answer to the extent possible.        09:28:47

Page 18

1        THE WITNESS:  This is a position paper that
2 was drafted as a self-clarification exercise for
3 PDPO.  So you can assume this is -- this is directly
4 speaking to the work that this team member -- these
5 team members felt PDPO should endeavor to take on.        09:29:09
6 BY MR. BARNES:
7    Q  And is PDPO part of Google?
8    A  Yes.
9    Q  And PDPO stands for Privacy and Data
10 Protection Office?        09:29:21
11    A  Correct.
12    Q  Is there another office within Google that
13 is -- that has charge of privacy and data protection
14 matters at Google?
15        MS. CRAWFORD:  Objection to the form of the        09:29:29
16 question.  You can answer.
17        You can answer.
18        THE WITNESS:  PDPO is -- was a team that
19 was created to solely focus on this, but within
20 every product area, there are designated team        09:29:46
21 members focused on trust and safety and security.
22 BY MR. BARNES:
23    Q  Is PDPO the only team at Google that is
24 solely focused on privacy and data protection?
25    A  We also have trust and safety teams outside        09:30:00

Page 19

1 of Google's PDPO as well.
2        So, no, I'm not familiar with the entire
3 landscape of our organizational structure at Google,
4 but I would say it's fair to say that there are
5 other teams dedicated to trust and safety.        09:30:20
6    Q  Is the Privacy and Data Protection Office
7 the primary team with a focus on privacy and data
8 protection?
9        MS. CRAWFORD:  Objection to the form of the
10 question.  Foundation.        09:30:33
11        You can answer to the extent possible.
12        THE WITNESS:  Yeah.  I would say it is --
13 it is one of the primary teams, yes.
14 BY MR. BARNES:
15    Q  Okay.        09:30:43
16        The sentence says (as read and/or
17 reflected:)
18        We need to address the privacy
19        challenges inherent in our ads
20        business.        09:30:50
21        Do you see that?
22    A  I see that.
23    Q  What are the privacy challenges inherent in
24 Google's ads business?
25        MS. CRAWFORD:  Objection.  Foundation.        09:31:01

Page 20

1        You can answer, Med.
2        THE WITNESS:  So the perspective that you
3 see here was based on kind of a broad literature
4 review and research analysis that uncovered a number
5 of common misperceptions that the team identified as        09:31:23
6 being trust eroding for Google.
7        And broadly, the goal of ▮▮▮▮▮▮, of
8 course, is to identify pathways to continue to build
9 and earn trust.
10        And so one of those misperceptions -- and        09:31:49
11 I'm sure you've seen that across some of the other
12 docs -- is that some users, not all users, but there
13 are some users, and also key opinion formers, who
14 have deep misperceptions about our ads business.
15        And so I think that is what the team here        09:32:16
16 is pointing towards.
17 BY MR. BARNES:
18    Q  Does Google ads business rely on personal
19 information?
20        MS. CRAWFORD:  Objection insofar as that        09:32:29
21 question's outside the scope of the noticed topic
22 for which this.
23        THE WITNESS:  I'm sorry. --
24        MS. CRAWFORD:  Sorry about that.  Let me
25 just get the objection on the record.        09:32:41

Page 21

6 (Pages 18 - 21)

1    That question seems to fall outside the
2 scope of the noticed topic for which Ms. Abdulhay
3 was designated. So I just want to make sure the
4 record reflects that.
5    You can answer, Ms. Abdulhay, to the extent  09:32:50
6 possible.
7    THE WITNESS: Thanks, Jomaire.
8    You know, I'm familiar. I did a review of
9 some of the research that this team was building
10 upon for their perspective.          09:33:02
11    And I think one of the key misperceptions
12 that they are trying to tackle here is the notion
13 that -- that users see ads because Google sells
14 personal information.
15    You know, we do not sell personal      09:33:16
16 information. We never share personal information
17 without the permission of users.
18    And so that's an example of the key
19 misperception we see in the user research, in press,
20 in headlines, that we -- we want to tackle more --  09:33:34
21 beyond the current transparency and control tools
22 that we offer today for the ads products.
23 BY MR. BARNES:
24    Q  I'm sorry, Ms. Abdulhay. I don't believe
25 that answered my question.          09:33:49

Page 22

1    I think my question was, does Google's ads
2 business rely on personal information?
3    It was not, does Google's ads business sell
4 personal information.
5    So I want to go back to the question I      09:34:00
6 asked. And I ask that you answer my question.
7    Does Google's ads business rely on personal
8 information?
9    MS. CRAWFORD: First, let me just make sure
10 the record is clear, that question and the      09:34:10
11 explanatory context, Jay, is extremely
12 argumentative.
13    Setting that aside, I think I have an issue
14 with the form of the question and its use of
15 undefined terms. It also may call for a legal      09:34:24
16 conclusion for which this witness is not being
17 offered to testify regarding.
18    But, Ms. Abdulhay, you can answer the
19 question to the extent possible.
20    MR. BARNES: Ms. Crawford, your      09:34:38
21 objection -- your speaking objection, which became
22 coaching, was highly inappropriate. Not
23 appreciated. And also, a waste of time in a
24 deposition that's only supposed to be an hour.
25    Q  Ms. Abdulhay, the question is, does      09:34:51

Page 23

1 Google's ads business rely on personal information?
2    MS. CRAWFORD: Same set of objections.
3    THE WITNESS: You know, as we -- as you can
4 see in our ad settings tools within the Google
5 account, we provide users with the opportunity to      09:35:06
6 decide if they want to see ad personalization at
7 all. They can turn the setting on or off. And they
8 can also turn off WAA, web and app activity, which
9 would contribute to ad personalization.
10    You also have the option to choose if      09:35:27
11 certain interests are no longer -- if you no longer
12 want to include certain interests in your ad
13 personalization.
14    So I will say that, you know, we work hard
15 to give our users meaningful control and      09:35:46
16 transparency when it comes to ad personalization,
17 but because I am not a product manager, nor do I
18 work on the ads team, I'm not deeply familiar with
19 the data flows that undergird -- undergird our ad
20 systems.          09:36:07
21    And because I'm not sure what definition of
22 "personal information" you're using, I just would
23 not want to misspeak.
24    But I am very familiar with our
25 transparency and control tools as a product manager  09:36:18

Page 24

1 of privacy safety and security.
2 BY MR. BARNES:
3    Q  In the context of ███████, did Google
4 consider the extent to which user information was
5 sent to Google for the purposes of its ads business?  09:36:32
6    MS. CRAWFORD: Objection to the form of the
7 question. Vague and overbroad.
8    Ms. Abdulhay, you can answer.
9    THE WITNESS: This -- I think it's an
10 important clarification that this work stream,      09:36:45
11 ███████, was driven primarily by our UX teams.
12 UX -- one specific UX team.
13    And the position that you see here,
14 strategy documents, storyboards with, you know, a
15 future-looking solution set, are very much divorced  09:37:03
16 from any technical realities.
17    And so if there is a reference to a data
18 flow or a data exchange, the reality is, is that the
19 individuals authoring these documents are very
20 unfamiliar with the ac -- the realities of the text  09:37:27
21 stack.
22    And so the team leaned on broad -- broad
23 understandings of user sentiments and misperceptions
24 to develop this position paper.
25    This position paper is not meant to be a      09:37:47

Page 25

7 (Pages 22 - 25)

1 product roadmap or a mandate for other teams.
2     MR. BARNES:  Mr. Johnson, please publish
3 Exhibit A2, which -- please publish what's been
4 marked as A2 as Exhibit 2.
5     (Whereupon Abdulhay Exhibit 2 was     09:38:10
6     marked for identification.)
7 BY MR. BARNES:
8     Q  While that's pulling up.  It says, "UFP
9 Review: ███████."
10     What does the acronym "UFP" typically stand  09:38:24
11 for?
12     A  User-facing privacy.
13     Q  Okay.
14     And who is Tal Herman?
15     A  Tal Herman is a director on the UX team.    09:38:37
16     Q  Who is Kalle Buschmann?
17     A  Kalle Buschmann is a UX researcher.
18     Q  Do you work with her?
19     MS. CRAWFORD:  Sorry.  I was just noting
20 that the exhibit has now been published and is    09:38:59
21 available for the witness.
22     MR. BARNES:  Thank you, Ms. Crawford.
23     MS. CRAWFORD:  You're welcome.
24 BY MR. BARNES:
25     Q  I will end my time-killing questions.    09:39:05

Page 26

1     Let me know, Ms. Abdulhay, when you have
2 the document up.
3     A  I just opened the document and I will take
4 a few moments to review it.
5     Q  Great.                    09:39:20
6     A  Okay.
7     Thank you.  I have reviewed it.
8     Q  Okay.
9     What is this document -- let me make the
10 record that ends in GOOG-CLAH-01198496.    09:40:50
11     A  So on the first slide you can see the name
12 of this presentation, "User-Facing Privacy Review
13 ███████."
14     In reviewing this document, this is a
15 status update.                09:41:15
16     Q  And to whom was the status update
17 delivered?
18     A  I see the date of May 17, 2021.
19     I had actually transitioned off of the
20 marketing team by this point in time.  So I am not  09:41:32
21 sure exactly who Kalle presented this deck to.
22     Q  Okay.
23     Can we -- let me back up to Exhibit 1 if we
24 could for just a second.
25     To whom was the ███████ Perspective  09:41:46

Page 27

1 presented?
2     A  The ███████ --
3     MS. CRAWFORD:  Sorry.  Let me just lodge a
4 quick objection to this question and the last
5 question, which is insofar as it calls for    09:41:56
6 speculation.
7     But you can answer the question just posed.
8     THE REPORTER:  I'm sorry.  At the end you
9 said you can answer the question just?
10     MS. CRAWFORD:  Posed.            09:42:09
11     THE REPORTER:  Thank you.
12 BY MR. BARNES:
13     Q  So let me clear it up because we had
14 colloquy.  I'm not sure we're sure what the question
15 on the floor is.                09:42:19
16     I went back to Exhibit 1, which is the
17 ███████ Perspective.  To whom was the
18 ███████ Perspective document marked as
19 Exhibit 1 presented?
20     A  Uh-huh.                09:42:29
21     This was shared by the PM of the project
22 Sam Heft-Luthy.  He's no longer with Google.
23     It was shared with the extended project
24 team, the project leads, the consulting team, and,
25 of course, the Steering Committee.        09:42:47

Page 28

1     Q  Okay.
2     And who is the Steering Committee -- let
3 me -- is the Steering Committee on the exhibit --
4 yes.  I see the -- I'll get to -- let's go ahead and
5 mark.                    09:43:07
6     MR. BARNES:  Eric, please -- Mr. Johnson,
7 please upload the Abdulhay Fact Sheet.  So rather
8 than just refer to a document that's marked as an
9 exhibit, let's ...
10     (Whereupon Abdulhay Exhibit 3 was    09:43:19
11     marked for identification.)
12     MS. CRAWFORD:  And when you say "marked as
13 an exhibit," you're referring to a document that has
14 not yet been published, but you're in the process of
15 marking and uploading now?            09:43:35
16     MR. BARNES:  Correct.  It will be marked as
17 Exhibit 3.  It is the Abdulhay Fact Sheet.
18     MS. CRAWFORD:  Perfect.
19     MR. BARNES:  And I would like for you to
20 have the official exhibit in front of you.    09:43:45
21     I know you've got it tabbed on your
22 computer, but I would like for you to have the
23 exhibit in front of you for the question, which is
24 going to be a really simple question.
25     THE WITNESS:  Yeah.            09:43:59

Page 29

8 (Pages 26 - 29)

1 longer with Google.

2 Q When did your leave start?

3 A My leave started in September of 2021 and

4 concluded just recently, March 2022.

5 Q Okay.                                    09:48:30

6 If we can go to the UFP review

7 ███████████ document.

8 If you could go to the -- it's page 4 of

9 the PDF and it ends in the number 499 and the

10 sentence (as read and/or reflected:)          09:49:00

11 Rahul our VP in 2020 had

12 paused all tactical work ...

13 What did -- what's -- what tactical work

14 was paused in 2020?

15 A I believe this is referring to some of the  09:49:18

16 in-flight user-facing privacy projects that Rahul

17 had asked the team to come back and -- and

18 demonstrate how some of these work streams were part

19 of a broader privacy strategy for PDPO.

20 Q What were the other user-facing privacy    09:49:48

21 projects?

22 MS. CRAWFORD: Objection to the form of the

23 question.

24 THE WITNESS: I was not on the product team

25 of PDPO at the time. I'm not intimately familiar  09:50:01

Page 34

---

1 with the work streams that were paused.

2 BY MR. BARNES:

3 Q Okay.

4 If we could go to the next page, of which

5 ends in -- which is GOOG Calhoun 01198500.     09:50:11

6 A Uh-huh.

7 Q It says (as read and/or reflected:)

8 The project was executed in

9 two phases with the second phase

10 still going on with setbacks and           09:50:26

11 changes in priorities.

12 What setbacks occurred with ███████████

13 in the second phase?

14 A Yes.

15 So if you recall, I had said this was a    09:50:37

16 very UX-driven project, but it was still

17 cross-functional.

18 So there are often, on cross-functional

19 working groups, disagreements between the functions

20 on the -- on whether or not the scope of the -- of  09:50:54

21 the work is appropriate, dialed into what the

22 needs -- immediate needs are, et cetera.

23 And also, sometimes disagreements on if a

24 project has reached a sufficient -- a sufficient

25 level of completion.                       09:51:12

Page 35

---

1 I will say that the product team had the

2 perspective that the team had reached a good

3 conclusion, a good concluding point, that they had

4 fulfilled the -- they had fulfilled the initial

5 goals and objectives of the ███████ project.  09:51:32

6 There were members of the UX team -- I

7 believe Kalle was one of them -- who felt like they

8 could take the project a bit further in terms of

9 socialization, but because -- because the work

10 sufficiently influenced OKR setting, team        09:51:51

11 resourcing, the product team didn't feel that

12 additional work needed to be done to socialize.

13 Q Okay.

14 What do you mean by -- what does Google

15 mean by "socializing"?                        09:52:06

16 A Yeah.

17 So, for example, potentially take the

18 storyboard on a road show to more members of PDPO or

19 more members of product teams to make sure that the

20 thesis of ███████ is well-known.           09:52:22

21 You know, in discussing the, you know, in

22 discussing this with team members at the time, I do

23 recall that the product team felt that the

24 perspective on the strategy doc and the storyboard

25 were sufficient -- had reached -- had reached the  09:52:48

Page 36

---

1 right individuals and had successfully influenced

2 resource allocation, as well as the fact that a

3 number of projects, you know, were sufficiently

4 addressing some of the hypotheses that are found

5 within ███████ -- not sufficiently.          09:53:09

6 That's probably not the word to right say

7 it, but were addressing these issues.

8 Q What changes, if any, were specifically

9 made to Chrome as a result of ███████?

10 MS. CRAWFORD: Objection to the         09:53:26

11 foundation -- as to foundation.

12 You can answer to the extent possible.

13 THE WITNESS: So this was -- this is not a,

14 as I mentioned before, a product roadmap or in any

15 way, a mandate. It specifies no product         09:53:43

16 requirements whatsoever for other teams.

17 It was a strategy and positioning paper for

18 the -- primarily the consumption of PDPO for their

19 own resource allocation and milestone setting.

20 BY MR. BARNES:                            09:54:11

21 Q Did Google make any changes to Chrome as a

22 result of ███████?

23 MS. CRAWFORD: Same objection.

24 You can answer to the extent possible.

25 THE WITNESS: I am not aware of -- of any  09:54:22

Page 37

10 (Pages 34 - 37)

1  changes within Chrome because of ███████.
2  BY MR. BARNES:
3     Q  You testified a moment ago about
4  disagreements and you mentioned one disagreement
5  being socialization.                    09:54:38
6        Were there other disagreements?
7     MS. CRAWFORD:  Objection insofar as that
8  misstates the witness's testimony.  Also vague and
9  overbroad.
10       THE WITNESS:  No.  I -- I mean, I think all  09:54:54
11 work streams, you know, the purpose of bringing
12 together different functions is to -- is to voice
13 different opinions and perspectives.  And that is
14 how work gets done often at Google.
15       So it would probably be false to say there  09:55:13
16 were no disagreements, but none that were notable or
17 significant enough that I can even recall them.
18 BY MR. BARNES:
19    Q  Okay.
20       Back to the page 5 that ends in -500.  The  09:55:22
21 sentence says (as read and/or reflected:)
22       Changes in priorities.
23       What changes in priorities impacted the
24 second phase of ███████?
25    A  So I was scanning this document, and I  09:55:39

Page 38

1  think, you know, one of the key slides, you know,
2  references this, that essentially, the ███████
3  vision was successful in serving as a vehicle for
4  internal strategy setting and resource setting and
5  clarification.                          09:56:13
6        And so that is, I think, one of the
7  benefits of a project like this, is that it does
8  help teams identify, you know, what next steps they
9  potentially could take.
10       And I think that that is what this deck  09:56:29
11 reflects actually.
12 BY MR. BARNES:
13    Q  Can you identify -- you said -- I think you
14 said there was a key slide.
15       Can you identify the slide you were  09:56:39
16 referencing in your previous answer.
17    A  Yes.  So, for example, 505, the privacy
18 experience vision 2026.
19       This is the conclusion of ███████, if
20 you will.  It says that they are, you know, (as read  09:56:57
21 and/or reflected:)
22       Focusing on the core of the
23       new experience paradigm.  They're
24       gathering feedback and refining it.
25       And then if you go further in the deck, it  09:57:10

Page 39

1  simply says that (as read and/or reflected:)
2        Our efforts are aligned with
3        the vision.
4        So, in my mind, from the product -- and
5  from the product perspective, this is ultimately how  09:57:23
6  the project concluded.  And some might say
7  successful in being able to influence the resource
8  allocation of PDPO.
9     Q  Okay.
10       MR. BARNES:  Mr. Johnson, can you publish  09:57:35
11 A3, please, as Exhibit 4.
12       (Whereupon Abdulhay Exhibit 4 was
13       marked for identification.)
14 BY MR. BARNES:
15    Q  Okay.                           09:57:51
16       If you could turn -- let's stay on
17 Exhibit 2 right now, I think it is, and go to 501.
18       XFN.  Do you see at the top where it says A
19 XFN project from the start?
20    A  Yes.                            09:58:06
21    Q  Does XFN just refer to cross-function?
22    A  It does.
23    Q  And X -- so X means cross; right?
24    A  It does, yes.
25    Q  Okay.                           09:58:30

Page 40

1        Can you go to 504, please.  And this slide  09:58:34
2  says (as read and/or reflected:)
3        ... the conditions of the
4        project have changed ...
5        What conditions of the project changed?  09:58:34
6     A  So as I mentioned, I think the -- this is,
7  again, the perspective of the UX team potentially.
8  And if you see here, project conditions, it says
9  impact (as read and/or reflected:)
10       Project impact considered  09:58:54
11       sufficient by PM team.
12       I think that is the primary condition which
13 they're referring to, but I did not author this
14 slide.  So I can't tell you concretely that that's
15 the only condition they're referring to.  09:59:09
16    Q  How was ███████ slowed down?
17    A  I think that's a matter of opinion, if you
18 will.  And, again, there was not necessarily
19 consensus that it was slowed down, but that it -- it
20 reached a sufficient level of completion.  09:59:32
21 BY MR. BARNES:
22    Q  Can we go to 507 -- go ahead, Jomaire.
23       MS. CRAWFORD:  Happy to let you continue
24 with the questions.  I just wanted you to know the
25 witness does now have access to what you marked as  09:59:43

Page 41

11 (Pages 38 - 41)

1 Exhibit 4.
2       MR. BARNES: Oh, thank you again.
3   Q  Ms. Abdulhay, can you open up what's been
4 marked as Exhibit 4.
5   A  Yes.                 09:59:59
6   Q  You testified earlier that for Exhibit 2 at
7 -505 there was this referenced Privacy Experience
8 Vision 2026.
9    Do you recall that?
10  A  Uh-huh. Yes.        10:00:10
11  Q  And is Exhibit 4 the slide deck that
12 represents the ████████ Vision 2026?
13  A  I believe it is. I mean, some of the
14 slides might be -- we'd have to do a close
15 comparison of the slides.      10:00:26
16  Q  Why don't you take time to review it. And
17 I will leave the question on the table as you review
18 the document.
19  A  Okay.
20   So yes. I've just done a quick comparison, 10:02:48
21 side-by-side comparison of the Privacy Experience
22 Vision 2026 in Exhibit ...
23  Q  4?
24  A  -- Exhibit 4 with Exhibit 2, the deck
25 reference in Exhibit 2. It looks like, you know,  10:03:06

Page 42

1 the deck in Exhibit 2 was probably an earlier draft
2 or maybe a later draft. Hard to know.
3   And this is -- Exhibit 4 is one version of
4 this presentation.
5  Q  By "this presentation," what do you mean?  10:03:22
6  A  So there is a title at the top of Exhibit 4
7 (as read and/or reflected:)
8      ████████ Vision 2026.
9   And this was one of the last -- this is the
10 last artifact, to my knowledge, of the ████████ 10:03:42
11 work stream authored by our UX team member Kalle
12 Buschmann.
13  Q  Okay.
14   Can you turn to the page in the document
15 that ends in 000. It ends in 6000.     10:03:52
16   And by "the document," I mean Exhibit 4.
17  A  Okay.
18   Okay. Yes.
19  Q  What's it mean for a product to be private
20 by design?              10:04:13
21  A  So, yeah. Private by design is a term we
22 use to describe our approach to ensuring that at
23 every level of a product's development, we are
24 prioritizing user privacy.
25   So it starts at the very beginning, you  10:04:42

Page 43

1 know, when you are drafting a product requirement
2 doc, to then going through all of our privacy launch
3 requirements, to, of course, thinking about the user
4 experience of privacy.
5   And then as users continue to use a   10:05:01
6 product, ensuring that we are enforcing our privacy
7 commitments, we're securing that data appropriately,
8 and that we're always evolving to make sure that our
9 privacy experiences are optimized as user
10 expectations change, as our products evolve, as our 10:05:27
11 features evolve.
12   So private by design is kind of an internal
13 and external way that we reference that entire
14 end-to-end commitment to user privacy.
15  Q  If we could go to 003, please.    10:05:44
16   Let me know when you're there.
17  A  Okay.
18   Yes.
19  Q  What are the ████████ principles?
20  A  ████████ principles. Are you  10:06:22
21 seeing that referenced on the slide somewhere?
22  Q  I am. On 003.
23  A  Oh, 003. I'm on the wrong slide.
24  Q  Okay.
25   Thank you.              10:06:37

Page 44

1  A  Apologies. Let me try that again.
2   003. Okay.
3   Right. Yes. So at Google we have internal
4 privacy and security principles. And they are
5 refreshed periodically as our aspirations grow,  10:07:16
6 evolve and change.
7   And in 2021, at the behest of Rahul
8 Roy-Chowdhury, the principles were actually updated.
9 And he -- the team that was working on this called
10 it the ████████. And --       10:07:44
11  Q  Do you recall -- I'm sorry. Go ahead.
12  A  I'm sorry.
13   MS. CRAWFORD: You can finish. Okay.
14   THE WITNESS: Yeah.
15   No. I wanted to just say it's an internal  10:07:53
16 set of principles. And they are not a mandate.
17 They are not detailed descriptions.
18 BY MR. BARNES:
19  Q  Okay.
20   There are four listed on 003, can we agree  10:08:02
21 with that?
22  A  Yes.
23  Q  Are there any ████████ principles
24 beyond these four?
25  A  I would have to go look at the ████████ 10:08:17

Page 45

12 (Pages 42 - 45)

1 principles to make sure I'm remembering them
2 correctly.
3    Q   Is there a document where the ███████
4 ███ principles are laid out for Google employees?
5    A   Yes.                              10:08:37
6       MS. CRAWFORD: Objection to the form of the
7 question. Also insofar as this is outside the scope
8 of the noticed topic.
9       But you can answer to the extent possible.
10      THE WITNESS: Yes. We do -- we do make our  10:08:48
11 internal principles available.
12 BY MR. BARNES:
13   Q   And is that easily available?
14      MS. CRAWFORD: Objection to the form of the
15 question.                               10:08:57
16      You can answer, Ms. Abdulhay.
17      THE WITNESS: Yes. They are easily
18 available.
19 BY MR. BARNES:
20   Q   Okay.                            10:09:07
21      MR. BARNES: Mr. Johnson, please mark what
22 was -- please publish what has previously marked as
23 A4, which will now become Exhibit 5.
24      (Whereupon Abdulhay Exhibit 5 was
25      marked for identification.)         10:09:26

Page 46

1 BY MR. BARNES:
2    Q   And I believe the Abdulhay Fact Sheet is
3 Exhibit 3; is that correct?
4       MS. CRAWFORD: That squares with the
5 exhibits that I'm looking at.           10:09:35
6       MR. BARNES: Okay.
7    Q   Let me know when you have Exhibit 5,
8 please, Ms. Crawford and Ms. Abdulhay.
9       MS. CRAWFORD: Okay.
10      All right. It should be accessible.   10:10:04
11 BY MR. BARNES:
12   Q   All right.
13      Ms. Abdulhay, we are coming to the end of
14 this deposition. I am not going to ask you -- I
15 will tell you in advance the question I'm going to   10:10:13
16 ask you about this lengthy document.
17      In Exhibit 3 -- on page 2 of Exhibit 3, you
18 have bullet point 2 stakeholder interviewees/sync
19 participants followed by a Bates number that is
20 GOOG-CABR-05885817.                     10:10:33
21      Do you see that on Exhibit 3?
22   A   Yes.
23      MS. CRAWFORD: I'm sorry. Can we just --
24 what page are we on, Jay?
25      MR. BARNES: We're on page 2 of Exhibit 3.   10:10:47

Page 47

1       MS. CRAWFORD: Perfect. Thank you.
2 BY MR. BARNES:
3    Q   My question is, is Exhibit 5 -- what is
4 Exhibit 5?
5       MS. CRAWFORD: And in order -- if you need   10:10:58
6 to take time in order to at least skim Exhibit 5 in
7 order to answer it, please obviously do so.
8 BY MR. BARNES:
9    Q   And then the follow-up question is that's
10 relating, I don't want Jomaire to object to         10:11:11
11 compound, but they're related questions, is
12 Exhibit 5 the document referenced in your Abdulhay
13 Fact Sheet?
14      MS. CRAWFORD: As long as the witness's
15 answer is clear and the record isn't muddled as to   10:11:31
16 the different questions you're posing, I'm fine
17 proceeding.
18      THE WITNESS: Okay.
19      I am just cross-referencing the Bates
20 number, as you call them, and what is in the fact   10:11:47
21 sheet is GOOG-CABR-05885871. That aligns with the
22 Bates number of the Exhibit 5.
23 BY MR. BARNES:
24   Q   Okay.
25   A   Which is identical.                10:12:11

Page 48

1    Q   Okay.
2       And what is Exhibit 5, generally speaking?
3 You know, you don't have to go through each page of
4 Exhibit 5.
5       Generally speaking, what is Exhibit 5?   10:12:22
6    A   Yes.
7       MS. CRAWFORD: Unless you need to in order
8 to answer the question accurately, take the time you
9 need, but if you can answer now, please do.
10      THE WITNESS: Yes.                   10:12:33
11      So I, you know, this document, I was not --
12 I was not -- did not contribute to help authoring
13 this document. My assessment in reviewing it now is
14 that it is -- it is notes from conversations.
15 BY MR. BARNES:                          10:13:02
16   Q   Taken by people relating to -- taken by
17 people relating to the ████████████ project?
18      MS. CRAWFORD: Objection to form.
19      You can answer.
20      THE WITNESS: I would have to review this   10:13:15
21 entire document to give you that answer, but, for
22 example, under the first -- the first program intro
23 2020, 10-19 it says note-taker, KalleBu, that would
24 be Kalle Buschmann.
25      So that first meeting, yes, it looks like   10:13:43

Page 49

13 (Pages 46 - 49)

1 that's the core working group of ████████, but

2 we'd have to go through and see for each of these

3 who the note-takers were, who participated.

4 BY MR. BARNES:

5   Q   As part of ████████, did Kalle and     10:13:54

6 other PDPO team members interview stakeholders at

7 Google?

8   A   Yes, they did.

9   Q   Okay.

10     MR. BARNES:  Let's -- I have no further     10:14:10

11 questions at this time.

12     Let's go off the record -- well, let's go

13 off the record unless Jomaire, do you want to take a

14 break?

15     MS. CRAWFORD:  Well, let's go off the     10:14:19

16 record, and then we can hash it out.  I don't want

17 to eat up your clock.  So let's go off.

18     MR. BARNES:  Thank you.

19     THE VIDEOGRAPHER:  Going off the record.

20 The time is 10:14 a.m.     10:14:27

21     (Recess was taken at 10:14 a.m.

22     until 10:26 a.m.)

23     THE VIDEOGRAPHER:  Back on the record.  The

24 time is 10:26 a.m.

25     MS. CRAWFORD:  No questions from Google at   10:25:55

Page 50

1 this time.

2     MR. BARNES:  So I want to make a request on

3 the record that Google produce the ████████

4 ███ principle documents.

5     And we can -- Jomaire, can -- Ms. Crawford,   10:26:08

6 you can state your piece on that and let's end for

7 the day.

8     MS. CRAWFORD:  It's not entirely sure which

9 documents you're referring to, but obviously, as you

10 know, we're outside the close of fact discovery.     10:26:19

11 And so we -- we can take this up offline, but we

12 obviously object.

13     I don't think there's been a representation

14 made by you that these haven't already been produced

15 by Google.  You should have a look at Google's     10:26:31

16 extensive document production first.  And if there's

17 anything further that you wish to request after

18 having done so, we can take that up at the

19 appropriate time, but we do object to the request,

20 but we are willing to meet and confer with you on it  10:26:45

21 pending the additional investigation I just

22 referenced.

23     MR. BARNES:  Okay.  Great.

24     That ends today.

25     THE REPORTER:  Will the witness be reading   10:26:53

Page 51

1 and signing?

2     MS. CRAWFORD:  Yes, ma'am.

3     THE REPORTER:  And I will follow suit

4 with the confidentially attorneys' eyes only on this

5 transcript.     10:27:04

6     MS. CRAWFORD:  Perfect.

7     I was just about to make sure as a

8 housekeeping matter that we marked it accordingly.

9 Thank you.

10     THE VIDEOGRAPHER:  Okay.     10:27:10

11 This concludes today's deposition of Mediha

12 Abdulhay.

13     The number of media used was one, and will

14 be retained by Veritext Legal Solutions.

15     The time is 10:27 a.m., and we're off the   10:27:25

16 record.

17     (Whereupon, at 10:27 a.m., the

18     remote deposition of MEDIHA

19     ABDULHAY was concluded.)

20         ---oOo---

21

22

23

24

25

Page 52

1 STATE OF _____)

2 COUNTY OF _____)   ss.

3

4

5

6     I, the undersigned, hereby certify under

7 penalty of perjury under the laws of the State of

8 _____ that the foregoing testimony is true

9 and correct.

10     Executed this _____ day of _____,

11 20____, at _____, _____.

12

13

14     _____

15     MEDIHA ABDULHAY

16

17

18

19

20

21

22

23

24

25

Page 53

14 (Pages 50 - 53)

1 STATE OF CALIFORNIA   )
2 COUNTY OF LOS ANGELES )  ss.
3
4     I, Reagan Evans, RPR, RMR, CRR, CCRR, CLR, CRC,
5 CSR No. 8176, in and for the State of California, do
6 hereby certify:
7     That prior to being examined, the witness named
8 in the foregoing deposition was by me duly sworn to
9 testify to the truth, the whole truth, and nothing
10 but the truth;
11     That said remote deposition was taken down by me
12 in shorthand at the time and place therein named and
13 thereafter reduced to typewriting under my
14 direction, and the same is a true, correct, and
15 complete transcript of said proceedings;
16     That if the foregoing pertains to the original
17 transcript of a deposition in a federal case, before
18 completion of the proceedings, review of the
19 transcript {XX} was { } was not required.
20     I further certify that I am not interested in
21 the event of the action.
22     Witness my hand this 14th day of April, 2022.
22
23
24
   Reagan Evans, RPR, RMR, CRR, CCRR,
25        CLR, CRC, CSR No. 8176
                                              Page 54

---

1 JOMAIRE A. CRAWFORD, ESQ.
2 JOMAIRECRAWFORD@QUINNEMANUEL.COM
3           APRIL 14, 2022
4 RE: MEDIHA ABDULHAY
5 APRIL 12, 2022, MEDIHA ABDULHAY, JOB NO. 5180827
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, noting the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25
                                              Page 55

---

1 _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2   Transcript - The witness should review the transcript and
3   make any necessary corrections on the errata pages included
4   below, noting the page and line number of the corrections.
5   The witness should then sign and date the errata and penalty
6   of perjury pages and return the completed pages to all
7   appearing counsel within the period of time determined at
8   the deposition or provided by the Federal Rules.
9 __ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 56

---

1 CALHOUN V. GOOGLE
2 MEDIHA ABDULHAY (#5180827)
3         E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 WITNESS                    Date
25
                                              Page 57

15 (Pages 54 - 57)

DocuSign Envelope ID: AC927EC3-4447-442E-B09D-647FA4EEAEAF

**Deposition Errata**
**Case: *Calhoun, et al. v. Google LLC***
**Deponent: Mediha Abdulhay 30(b)(6)**
**Date of Deposition: April 12, 2022**

I, Mediha Abdulhay, hereby certify that I have read the transcript of my testimony taken under oath in my 30(b)(6) deposition on the 12th day of April, 2022; that the transcript is a true, complete record of my testimony and that the answers on the record as given by me are true and correct, with the following exceptions:

| Pg. and Ln. | Now reads | Should read | Reason |
|---|---|---|---|
| Pg: 11 Ln: 17 | identified | identify | Transcription Error |
| Pg: 15 Ln: 9 | time PDPO, | time, PDPO, | Punctuation |
| Pg: 24 Ln: 17 - 18 | product manager, nor do I work on the ads team, | product manager, nor do I work, on the ads team. | Punctuation |
| Pg: 25 Ln: 1 | privacy safety and security | privacy, safety, and security | Punctuation |
| Pg: 25 Ln: 11 - 12 | UX teams. UX -- one specific UX team. | UX teams – UX team – one specific UX team. | Transcription Error Punctuation |
| Pg: 25 Ln: 20 - 21 | text stack | tech stack | Transcription Error |
| Pg: 33 Ln: 17 | structure, work structure | structure – org structure | Transcription Error Punctuation |
| Pg: 36 Ln: 21 | in discussing the, you know, in | in discussing the, you know – in | Punctuation |
| Pg: 36 Ln:24 | on | and | Transcription Error |
| Pg: 37  Ln: 5 - 6 | █████ -- not sufficiently. That's probably not | █████ – not sufficiently, that's probably not | Punctuation |
| Pg: 41 Ln: 8 - 9 | it says impact | it says: "Impact:" | Punctuation |
| Pg: 42 Ln: 25 | reference | referenced | Transcription Error |

*Mediha Abdulhay*

Mediha Abdulhay

5/23/2022

DATE

CONFIDENTIAL

# ABDULHAY FACT SHEET

**I.**　██████████ **Team Members and Roles (GOOG-CALH-01198512, at -547)**

Core project team
- Elyse Bellamy; ohelyse@google.com (Senior Interaction Designer)
- Kalle Buschmann; kallebu@google.com (UX Design Manager - Munich)
- Mimosa Lynch; mimosal@google.com (Program Manager)
- Sam Heft-Luthy; heftluthy@google.com (Product Manager)
- Mediha Abdulhay; mediha@google.com (Product Manager)

Extended project team
- Arne De Booij; adbooij@google.com (UX Researcher)
- Carmela Acevedo; cacevedo@google.com (Software Engineer)
- D.d Zhang; shudi@google.com (Visual Designer)
- Jennifer Marlow; jamarlow@google.com (UX Researcher)
- Jess Chen; justchen@google.com (Interaction Designer)
- Johanna Woll; jwoll@google.com (UX Writer)
- Micha Segeritz; mseg@google.com (Staff Quant UX Researcher)
- Robert Brauer; robertbrauer@google.com (Senior Interaction Designer)
- Yingsi Zhang; yingsi@google.com (Product Manager)

Project leads
- Lora Felipe; felipel@google.com (Technical Program Manager)
- Greg Fair; gregfair@google.com (Product Manager)
- Gretchen Gelke; ggelke@google.com (UX Manager)
- Jessica Gan Lee; jessicagl@google.com (Senior Privacy Counsel)
- Karen Kalashian; karenkalashian@google.com (Engineering Manager)
- Tal Herman; talherman@google.com (Director of User Experience)

Consulting team
- Kate Charlet; katecharlet@google.com (Director, Data Governance)
- Micha Segeritz; mseg@google.com (Staff Quant UX Researcher)
- Troy Stram; troys@google.com (Director, Privacy Legal)
- Yooki Park; yooki@google.com (Business Operations Principal)
- Jonathan McPhie; jmcphie@google.com (Senior Product Manager)

Exec. Sponsor
- Rahul Roy-Chowdhury; rahulrc@google.com (VP, Product Management)

**CONFIDENTIAL**

Steering Committee
- Annie Klemp; annieklemp@google.com (Director, Strategy & Operations for Privacy, Safety, and Security)
- Cassidy Morgan; cassidym@google.com (VP, Brand & Reputation Marketing)
- Micah Laaker; mlaaker@google.com (Director, UX)
- Othar Hansson; othar@google.com (Principal Engineer)
- Sarah Hammond; shammond@google.com (Director, UX - Privacy, Safety & Security)
- Stephan Micklitz; micklitz@google.com (Engineering Director)

## II.    **Stakeholder Interviewees/Sync Participants (GOOG-CABR-05885871)**

- Emil Ochotta; emilo@google.com (Data Protection Officer)
- Breonna Danielle Rodriguez-Delgrosso; brodgz@google.com (Head of UX Design & Content: Ads Privacy)
- Shona Dutta; shonad@google.com (Visual Designer)
- JK Kearns; jkearns@google.com (Group Product Manager)
- Mark Risher; risher@google.com (Senior Director of Product Management)
- Yooki Park; yooki@google.com (Business Operations Principal)
- Jonathan McPhie; jmcphie@google.com (Senior Product Manager)
- Irene Nyavor; iwn@google.com (Program Manager)
- Giles Hogben; gilesh@google.com (Director, Privacy Engineering)
- David Monsees; davidmonsees@google.com (Product Manager)
- Cassidy Morgan; cassidym@google.com (VP, Brand & Reputation Marketing)
- Al Verney; alv@google.com (Director, Corporate Communications, EMEA)
- Kim Guemmey; guemmy@google.com (Director, Product Management)
- Priscila Penha; ppenha@google.com (Design Director)
- Stephan Micklitz; micklitz@google.com (Engineering Director)
- Bryan Horling; bhorling@google.com (Software Engineer)
- Keith Enright; keithenright@google.com (Chief Privacy Officer)
- Josh Stickler; joshst@google.com (Senior Product Manager)
- Ian Alexander; ianalexander@google.com (Product Manager)
- Othar Hansson; othar@google.com (Principal Engineer)
- Sarah Hammond; shammond@google.com (Director, UX - Privacy, Safety & Security)
- Micah Laaker; mlaaker@google.com (Director, UX)
- Rahul Roy-Chowdhury; rahulrc@google.com (VP, Product Management)
- Kate Charlet; katecharlet@google.com (Director, Data Governance)
- Troy Stram; troys@google.com (Director, Privacy Legal)

# EXHIBIT 39

# Redacted In Its Entirety

# EXHIBIT 40

# Redacted In Its Entirety

# EXHIBIT 41

# Redacted In Its Entirety

# EXHIBIT 42

# Redacted In Its Entirety

# EXHIBIT 43

# Redacted In Its Entirety