# EXHIBIT 2

## REDACTED VERSION

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

**EXPERT CLASS CERTIFICATION REBUTTAL REPORT**
**OF PROFESSOR ZUBAIR SHAFIQ**

**NOVEMBER 29, 2023**

**REDACTED VERSION**

**TABLE OF CONTENTS**

**Page**

I.    QUALIFICATIONS AND ASSIGNMENT ................................................................... 1

II.   SUMMARY OF REBUTTAL OPINIONS PROFFERED ............................................ 2

III.  REBUTTAL TO THE STRIEGEL REPORT ............................................................. 5

    A.    The Striegel Report Incorrectly Asserts That There Are Signficant Variations in the Data Included in RTB Bid Requests ............................................................ 5

    B.    The Striegel Report Provides a Misleading and Inaccurate Opinion Regarding Location Accuracy ...................................................................................................... 9

    C.    The Striegel Report Incorrectly Asserts That There Is No Basis to Extrapolate Findings from the Named Plaintiffs to the Class as a Whole ............................. 11

    D.    The Striegel Report's Assertions About "Misleading" Named Plaintiff Data Examples Are Incorrect ...................................................................................... 14

    E.    The Striegel Report Incorrectly Describes Some Key Basics of Google RTB and Reflects a Lack of Expertise and Experience in the Field ............................. 16

IV.   REBUTTAL TO THE PSOUNIS REPORT .............................................................. 22

    A.    The Psounis Report Provides No Support for the Assertions Regarding Variability of the Data Fields in RTB Bid Requests ............................................... 22

    B.    The Psounis Report Incorrectly Asserts That There Is No Reliable Way to Identify Devices or Users from Individual RTB Bid Request Fields .................. 23

    C.    The Psounis Report Incorrectly Asserts That There Is No Reliable Way to Identify Devices or Users from Multiple RTB Fields in Combination ............... 27

    D.    The Psounis Report Incorrectly Asserts That There is No Reliable Way to Combine Fields Across Multiple Bid Requests ................................................... 28

    E.    The Psounis Report Incorrectly Asserts That Location or Browsing Data Across Multiple RTB BID Requests Cannot Reliably Identify Devices or Users ......................................................................................................................... 28

    F.    The Psounis Report Incorrectly Asserts RTB Participants Cannot Reliably Link RTB Data to a Natural Person or Household ................................................. 29

    G.    The Psounis Report Incorrectly Asserts That Entropy Is Not a Metric for Identifiability ...................................................................................................... 32

V.    REBUTTAL TO THE DEAL REPORT ..................................................................... 33

    A.    The Deal Report Misleads That Google RTB Is Not Specific to Google ............ 33

    B.    The Deal Report's Assertions About VPN Usage and Its Impact Are Misleading ............................................................................................................ 34

C.      The Deal Report Incorrectly Asserts That Using Certain "Blockers" Would Enable Google Account Holders to Avoid Data Sharing ..................................... 35

**VI.     REBUTTAL TO THE BERNTSON DECLARATION ............................................. 36**

A.      The Berntson Declaration Ignores Abundant Evidence That Google Links GAIA and Biscotti ID and Associated Data ......................................................... 37

B.      The Berntson Declaration Ignores Abundant Evidence That Google Links Bid Request Data with Google Accounts ..................................................... 40

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF PROF. ZUBAIR SHAFIQ

## I.    QUALIFICATIONS AND ASSIGNMENT

1.    I previously submitted a declaration in support of Plaintiffs' Motion for Class Certification, dated July 14, 2023, which sets out my expert qualifications and expert conclusions in this matter.[1]

2.    On August 3, 2023, Google submitted its response[2] to Plaintiffs' Motion for Class Certification, which included, among other materials, the reports of Google's experts Dr. Aaron Striegel, Dr. Konstantinos Psounis, and Mr. Bruce Deal; the declaration of Google employee Dr. Glenn Berntson; and the related documents that addressed issues raised in my initial report.[3]

3.    I was asked by Plaintiffs' counsel to review and address certain assertions made in the Striegel Report, Psounis Report, Deal Report, and Berntson Declaration, including identifying and addressing those assertions which are factually wrong, misleading, and unsupported. My analysis and conclusions with respect to that review are set out in this rebuttal report, and further summarized in the following Summary of Rebuttal Opinions Proffered section.

4.    In addition to the items identified in the Shafiq Report, a list of materials received, reviewed, and relied upon for this rebuttal report are identified in the attached **Exhibit A**.

5.    I reserve the right to amend, modify and supplement this declaration should new or additional information be made available to me.

---

[1] Expert Class Certification Report of Professor Zubair Shafiq in Support of Plaintiffs' Motion for Class Certification, *In re Google RTB Consumer Privacy Litigation*, 4:21-cv-02155-YGR-VKD ("*In re. Google RTB*"), July 14, 2023 ("Shafiq Report") (ECF 545-5).

[2] Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification, *("In re. Google RTB")*, September 29, 2023 (ECF 583).

[3] For ease of reference, I will use the following shorthand when referring to the Expert Report of Dr. Aaron Striegel in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification ("Striegel Report"); Expert Report of Dr. Konstantinos Psounis in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification ("Psounis Report"); Expert Report of Bruce Deal in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification ("Deal Report"); and the Declaration of Dr. Glenn Berntson in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification ("Berntson Declaration").

## II.    SUMMARY OF REBUTTAL OPINIONS PROFFERED

6.    <u>Rebuttal Opinion No. 1</u>: With respect to the Striegel Report, based on my review of the Striegel Report and the provided Striegel testing data, as well as my own analysis, I reach the following opinions with respect to the assertions made:

    a.    Based on my review of the Striegel Report and the underlying analysis as well as my own analysis, the Striegel Report's assertions about variability in the data fields shared in RTB bid requests are flawed, misleading, and incorrect. Dr. Stiegel failed to analyze the same datasets as in my report. Dr. Striegel's opinion contradicts his own analysis, which actually supports my original conclusion.

    b.    The Striegel Report's claims about the accuracy of location data shared in RTB bid requests are based on flawed assumptions about how RTB participants would use the shared information. He fails to acknowledge that RTB participants can locate home/work address with an accuracy of 0-1 kilometer even if they take the location coordinates shared in RTB bid requests at their face value. He also fails to acknowledge that a sophisticated RTB participant would do strictly better than my worst-case analysis.

    c.    The Striegel Report's assertions about the representativeness of the named plaintiff data is contradicted by Google's representations to the Court, my analysis, and peer-reviewed research.

    d.    The Striegel Report's critique of my descriptions of RTB bid request examples is misleading. Dr. Striegel fails to analyze how a RTB participant would extrapolate from the data (e.g., page title and verticals from URL) shared in RTB bid requests.

    e.    The Striegel Report's description of Google RTB suffers from several inaccuracies that reflect a lack of relevant expertise and experience.

7.      Thus, my conclusions remain unchanged.

8.      <u>Rebuttal Opinion No. 2</u>: With respect to the Psounis Report, based on my review of the Psounis Report, I reach the following opinions with respect to the assertions made:

    a.  The Psounis Report's assertions about variability of the data fields in RTB bid requests are based on the flawed Striegel analysis. Dr. Psounis does not do any analysis of his own – he did not even look at the named plaintiff data himself.

    b.  The Psounis Report's assertions about identification of devices or users from individual or multiple RTB bid request fields are misleading and incorrect. Dr. Psounis also ignores contradictory evidence from Google's internal documents cited in my original report.

    c.  The Psounis Report's assertions about reliability of combining location or browsing information across multiple bid requests are based on the flawed Striegel analysis, as well as a misleading interpretation of peer-reviewed research.

    d.  The Psounis Report's assertions that RTB participants cannot reliably link RTB data to a natural person or household are based on the flawed Striegel analysis and on unfounded assumptions about reliability.

    e.  The Psounis Report's assertion that entropy is not a suitable metric to assess identifiability risk are unsupported, and in fact contradicted by Google's own documents cited in my original report that he ignores. Dr. Psounis's opinion that Google as well as the broader computer science research community and industry are "wrong" is based on his unsupported say so.

9.      Thus, my conclusions remain unchanged.

10.     <u>Rebuttal Opinion No. 3</u>: With respect to the Deal Report, based on my review of the Deal Report, as well as my own analysis, I reach the following opinions with respect to the assertions made:

a. The Deal Report makes a misleading assertion that Google RTB is just like any other RTB. Mr. Deal fails to recognize several unique data sharing features (e.g., remarketing lists, scale, cross-device tracking) of Google RTB with respect to other RTB providers.

b. The Deal Report's assertions about VPN usage and its impact on RTB are misleading. Mr. Deal fails to recognize that VPN usage is a tiny fraction of overall Internet usage. Even when used, VPN usage is not geared towards websites that have Google RTB. Further, even when VPNs are used to access websites that have Google RTB, they may not materially impact data sharing due to VPN configuration.

c. The Deal Report's assertion about whether using "blockers" would prevent data sharing by Google RTB is misleading and wrong. He fails to admit that Google pays the most popular adblockers such as AdBlock Plus for "whitelisting."

11.     Thus, my conclusions remain unchanged.

12.     <u>Rebuttal Opinion No. 4</u>: With respect to the Berntson Declaration, based on my review of the Berntson Declaration, as well as my own analysis, I reach the following opinions with respect to the assertions made:

a. The Berntson Declaration's assertions that Google does not link GAIA and Biscotti IDs and the associated data ignore abundant evidence that I cited in my report and are contradicted by his deposition testimony.

b. The Berntson Declaration's assertions that Google does not link data shared in RTB bid requests with Google account information are contradicted by abundant evidence that I cited in my report and are contradicted by his deposition testimony.

13.     Thus, my conclusions remain unchanged.

III.     **REBUTTAL TO THE STRIEGEL REPORT**

14.     After considering Dr. Striegel's Report, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Striegel Report in more detail below.

A.     **THE STRIEGEL REPORT INCORRECTLY ASSERTS THAT THERE ARE SIGNFICANT VARIATIONS IN THE DATA INCLUDED IN RTB BID REQUESTS**

15.     Dr. Striegel disagrees with my first conclusion that there is a common set of at least 60 data fields that are uniformly shared in all Google RTB auctions.[4] Overall, Dr. Striegel concludes that "the data samples in this case show significant variation in when data fields are populated, including the key data fields Plaintiffs emphasize in this case." (Striegel Report ¶ 90). Dr. Striegel bases his opinions on his attempt to independently reproduce my analysis of the named plaintiff data produced by Google. But Dr. Striegel's analysis of this data was faulty, incomplete, and misleading, and does not in fact provide support for his opinions. To the contrary, Dr. Striegel's analysis actually supports my original conclusion.

16.     **First**, Dr. Striegel claims in his report to have looked at the same named plaintiff data that I analyzed[5], but during his deposition, he conceded that that he only looked at two of the four data sets that I analyzed.[6] Dr. Striegel did not seem previously aware of the fact that he had not looked at the same data sets that I analyzed at and could not explain why he didn't look at all four of the data sets that I analyzed.[7] He ultimately admitted that he had simply looked at whatever Google's counsel had provided to him.[8] Dr. Striegel's failure to look at the same data sets (identified using precise Bates numbers) that I analyzed in my report undermines his conclusions,

---

[4] Shafiq Report ¶¶ 12, 26–43.

[5] Striegel Report ¶ 14.

[6] Striegel Deposition Tr. at 55:12–56:6. Excerpts from the Striegel Deposition Tr. are attached as Ex. 54 to the Pritzker Reply Decl.

[7] *Id.* at 56:7–58:13.

[8] *Id.* at 79:19–80:3.

calls into question his work and expertise, and does not provide the Court with an apples-to-apples comparison to the work I did that is reflected in my report.

17. **Second**, Dr. Striegel concludes that "my own examination of the data shows Dr. Shafiq considered a field to be 'commonly included in all bid requests' if it had any non-empty value in 98% or higher of records, even where records are populated with null values, brackets, or other non-substantive information." (Striegel Report ¶ 111). This assertion is false, as shown by Dr. Striegel's own analysis.

18. I analyzed Dr. Striegel's analysis as produced by Google. Specifically, Dr. Striegel produced "Final-Out.csv" where he assessed the percentage of times a data field was not populated in the named plaintiff data produced by Google. As I explain below, his own calculations (which he ignores in his report in favor of cherry-picked anecdotes) confirm my conclusion that there are at least 60 data fields that are uniformly shared in all Google RTB auctions as reflected in the named plaintiff data produced by Google.

19. Dr. Striegel analyzed the frequency at which a particular data field is not populated, i.e., it is blank ("IsBlank", "BlankPct")[9] or contains null values ("IsNull", "NullPct")[10]. I summed up the percentage of times Dr. Striegel's calculations show that a data field was blank or null, and subtracted the sum from 100 to compute the percentage of the times a data field was meaningfully populated. The results are set forth in Striegel Deposition Exhibit 4, which is attached as Exhibit B to my report. I compared Dr. Striegel's calculation with my calculations. The comparison shows that Dr. Striegel's calculations match my calculations (i.e., they meet or exceed the 98% threshold) for 60 RTB data fields (rows 2 through 61). In fact, he ▮▮▮▮▮▮▮▮▮▮ in his deposition.[11]

20. Dr. Striegel opines that "Dr. Shafiq's assertion of 'uniformly shared' data is contradicted by the data he reviewed as well as the data samples discussed above" (Striegel Report

---

[9] Columns C and D in "Final-Out.csv".

[10] Columns G and H in "Final-Out.csv".

[11] Striegel Deposition Tr. at 77:16–78:3.

Section C). The "data samples discussed above" that Dr. Striegel is referring to are data sets produced by third parties The Trade Desk and the New York Times. I did not analyze these data sets as part of my original report, but Prof. Wilson did look at them as part of his original report. It is my understanding that Dr. Wilson has concluded that Dr. Striegel analyzed the wrong data set from the New York Times production, and made a number of other material calculation errors in his analysis of The Trade Desk and New York Times data sets.[12] Dr. Striegel's failure to look at the correct data set for the New York Times and his numerous calculation errors (documented in Prof. Wilson's Rebuttal Report) undermine his conclusions, call into question his work and expertise, and fail to provide the Court with any meaningful way to compare Dr. Striegel's work to the work I did, that is reflected in my report.

21.     To respond to Dr. Striegel and provide additional context, I analyzed the named plaintiff data produced by Google to determine whether there were bid requests in that data pertaining to either The Trade Desk (as an RTB participant) or the New York Times (as an RTB publisher). There are ████ bid requests in the named plaintiff data where "The Trade Desk" is listed as the RTB participant/bidder. There are ███ bid requests in the named plaintiff data where "nytimes.com" is the domain in the referer URL (i.e., the New York Times is the publisher).

22.     I used the same methodology as in my original report to assess whether there remains a common set of at least 60 data fields that are uniformly shared. For ease of reference, my results were summarized in a chart and discussed during Dr. Striegel's deposition.[13] The chart again shows that there remain at least 60 data fields that meet or exceed the 98% threshold. Thus, the named plaintiff data produced by Google shows that Dr. Striegel's opinions regarding

---

[12] Expert Class Certification Rebuttal Report of Professor Christopher Wilson in Support of Plaintiffs' Motion for Class Certification, *In re. Google RTB*, Nov. 29, 2023 ("Wilson Reb."), ¶¶ 44–62. The Wilson Reb. is attached as Ex. 44 to the Pritzker Reply Decl.

[13] Striegel Dep. Ex. 4, which is a chart comparing the more than 60 common data fields identified in my original report, with frequency statistics by Dr. Striegel, and then my subsequent analysis of the named plaintiff data pertaining specifically to The Trade Desk and the New York Times. Striegel Dep. Ex. 4 is attached as **Exhibit B**.

variability in bid request fields for The Trade Desk and New York Times are incorrect, at least with respect to the named plaintiff data that Google produced.

23.     **Third**, Dr. Striegel concludes that "Dr. Shafiq identifies fields 'commonly included in all bid requests' even if the field is only a flag in the ███ log that indicates whether or not information was included in a bid request." (Striegel Report ¶ 114). This assertion is misleading because it is presented without the necessary context to refutes his conclusion, and it misrepresents the actual numbers relevant to my inquiry.

24.     For example, Dr. Striegel points out that ████████ field indicates "whether a mobile device advertising ID was sent in a bid request" and its value indicates that "mobile advertising device ID was omitted in ███% of bid requests in the named Plaintiffs' data sample" (Striegel Report ¶ 116). However, he fails to acknowledge that the mobile device ID can only possibly be sent when a user is using a mobile app. In other words, mobile device ID analysis should be limited to bid requests for mobile apps. Dr. Striegel's own analysis of the named plaintiff data produced by Google shows that mobile device ID is sent (i.e., ████████ = 1 or True) 98% of the time when the Google RTB auction happens for a mobile app (i.e., ████████ = 1 or True).[14] In other words, mobile device ID was omitted less than █% of the time, not █% of the time as Dr. Striegel incorrectly asserts.

25.     An example of a flag field that Dr. Striegel omits from his analysis is ████████ that indicates whether Google User ID was present/sent in a RTB bid

---

[14] I did the calculation using Dr. Striegel's "Final-Out.csv" and using the following formula: (B77-L77)/L34x100, where L34 represents the number of times ████████ = 1 or True, B77 represents the number of times ████████ = 0 or False, and L77 represents the total number of times ████████ field was observed in the dataset. Note that ████████ was never blank (C77) or null (H77) as per Dr. Striegel's own analysis. Hence, the formula calculates the percentage of times mobile device ID was sent in bid requests.

request. Dr. Striegel's own analysis of the named plaintiff data produced by Google shows that Google User ID is present/sent (i.e., g██ = 1 or True) ██ of the time.[15]

26. **Fourth**, Dr. Striegel suggests that "Dr. Shafiq's list includes data fields that do not relate to the user and could not be within any definition of 'personal information' that the Plaintiffs allege in this case. For instance, fields such as is_ping, is_test, supply_chain_nodes, billable_event_rate_adjustment, ██ and numerous others relate to the broader RTB process, not user information." (Striegel Report ¶ 118). Dr. Striegel's assertion is unfounded and wrong. He does not present any analysis to support his assertion that these fields are not user information. Dr. Striegel seems to be unaware of the fact these fields can in fact encode user information. For example, the ██ field encodes information about whether the bid request is for a user who is part of a particular user list ("userListTargeting"), is in a particular geographic location ("geoTargeting"), is at a particular publisher ("publisherTargeting"), particular app ("appTargeting"), particular publisher content type ("verticalTargeting") that contains sensitive content ("excludedContentLabelIds") or a particular language ("includedLanguages").[16,17]

**B. THE STRIEGEL REPORT PROVIDES A MISLEADING AND INACCURATE OPINION REGARDING LOCATION ACCURACY**

27. Dr. Striegel asserts that my analysis of the location information shared in bid requests "ignores significant variation in the accuracy of the location data included" (Striegel Report ¶ 120). Based on his analysis of the accuracy field in the named plaintiff data produced by Google, he concludes that the location information was reported at a median accuracy of "██ kilometers" (Striegel Report ¶ 121) and that "99% of the reported accuracy values were ██

---

[15] I did the calculation using the cells K69 and M69 in Dr. Striegel's "Final-Out.csv". K69 shows that the most common value for ██ is 1 or True. M69 shows that the most common value for ██ is (which is 1 or True) is present █ of the time.

[16] https://developers.google.com/authorized-buyers/apis/realtimebidding/reference/rest/v1/bidders.pretargetingConfigs.

[17] https://support.google.com/authorizedbuyers/answer/6048315.

or more" (Striegel Report ¶ 123). He goes on to suggest that this level of accuracy "implies significant coarsening of location information" (Striegel Report ¶ 124). As I explain below, Dr. Striegel's conclusion is misleading and wrong.

28.    Dr. Striegel fails to acknowledge that RTB participants can geolocate plaintiffs' home/work address despite the purported location coarsening. Specifically, the location analysis conducted in my report (Shafiq Report Table 2; ¶ 42e) is essentially a worst-case analysis. In other words, my analysis assumes that the RTB participants take the location coordinates (which are supposedly coarsened) included in RTB bid requests at their face value. Despite this simplistic assumption, the RTB participants can infer the home/work address with an accuracy of ███ kilometers for multiple named plaintiffs based on the named plaintiff data Google produced.

29.    In fact, a more sophisticated RTB participant can further improve the location accuracy by considering Google's purported location accuracy information as well as by correlating information across multiple RTB bid requests.[18,19] Put another way, a sophisticated RTB participant (and most RTB bid participants are sophisticated) should be able to geolocate a Google account holder with much higher accuracy than I was able to do in Table 2 of my report.

30.    As discussed in my report, Google's employees are aware that ████████████ ████████████████████████████ (see GOOG-HEWT-00481219 at -20)[20]. For example, in GOOG-HEWT-00182254, Google RTB tech lead Stan Belov ████████████ ████████████████████████████████████████████ ████████" In GOOG-HEWT00144286, he acknowledges that Google RTB "allow[s] third

---

[18] Zang, Hui and Jean Bolot. "Anonymization of location data does not work: A large-scale measurement study." In Proceedings of the 17th annual international conference on Mobile computing and networking, 2011.

[19] H. Efstathiades, D. Antoniades, G. Pallis, and M. D. Dikaiakos, "Identification of key locations based on online social network activity," in Proceedings of IEEE/ACM ASONAM, 2015.

[20] Plaintiffs' Exhibit 21, submitted in support of Plaintiffs' Motion for Class Certification, at ECF 545-17.

party bidders to build very rich profiles if they receive a significant volume of bid requests". (Shafiq Report ¶¶ 78-80) Dr. Striegel ignores all of this in his report.

### C. THE STRIEGEL REPORT INCORRECTLY ASSERTS THAT THERE IS NO BASIS TO EXTRAPOLATE FINDINGS FROM THE NAMED PLAINTIFFS TO THE CLASS AS A WHOLE

31.    Dr. Striegel opines that "I am not aware of any basis to conclude that the data samples for the seven individual Plaintiffs would be representative of millions of other individuals with respect to all the data fields Dr. Shafiq contends are 'commonly' shared." (Striegel Report ¶ 125). He goes on to state that "I understand Dr. Shafiq testified in his deposition that he believes it is appropriate to extrapolate his findings from the named Plaintiffs' data to Proposed Class Members for three reasons.[21] I disagree that these reasons are a reliable basis to conclude that the named Plaintiffs' data is representative of bid request data for the class as a whole." (Striegel Report ¶ 128). I address Dr. Striegel's concerns, all of which are meritless, below.

32.    **First**, Dr. Striegel suggests that "Dr. Shafiq, however, does not cite any pleading, correspondence, or other document that sets out any such statement by Google in the materials he relied on for his report." (Striegel Report ¶ 129). Since I couldn't remember all of the Court orders and letters among counsel off the top of my head at my deposition, I describe them below. For context, as part of various named plaintiff data discovery disputes where I was assisting plaintiffs' counsel as a technical expert, I am aware that there are Court orders requiring Google to produce data that is "representative" and representations by Google that the data it had produced is indeed "representative." These are quoted from below.

33.    In December 2022, the Court ruled that "if Google wishes to rely on a sample of responsive data to satisfy its obligations, it must take steps to ensure that the sample is representative such that plaintiffs can rely on it in making the arguments they wish to make for class certification."[22]

---

[21] *See* Shafiq Deposition Tr. at 48:1–13.

[22] Discovery Order re November 21, 2022 Discovery Dispute, December 16, 2022, ECF 382.

34.    When plaintiffs demanded a more fulsome data production, Google's counsel stated that production of additional data is "excessive and unnecessary to provide a representative sample."[23]

35.    In a February 2023 joint letter brief on the topic of Google's named plaintiff data production, Google stated that:

      a.  "As Google has explained to Plaintiffs, the records it produced span six week-long samples spaced roughly evenly throughout the time period for which Google possesses this data, making the records 'representative' of the overall data available from these logs". [24]

      b.  "… Google believes its production already fully complies with the Court's directive to produce 'representative' data samples. …"[25]

      c.  "[T]he Court should recognize that Google's production of the ▉▉▉▉ sample is sufficient and representative, and reject Plaintiffs' unfounded attempt to extract additional information of their choosing and from additional sources."[26]

36.    **Second**, Dr. Striegel asserts that "the number of individual records in the named Plaintiffs' data samples, however, does not somehow equate to them being reflective of bid requests of the class as whole" (Striegel Report ¶ 130). I disagree. Dr. Striegel's argument would have some merit had there been only a few records in Google's named plaintiff data production. However, that's not the case.

37.    Just for the eight weeks for which Google produced data, Google produced almost 5 million records of RTB bid request data shared with hundreds of RTB participants around the

---

[23]*In re. Google RTB*: February 8, 2023 Letter from Google to Plaintiffs Re. Response to Plaintiffs' December 28, 2022, January 13, 2023, and January 17, 2023 Letters re Google's Production of Named Plaintiff Data.

[24] *In re. Google RTB* - Joint Letter Brief re Time Sampling, February 28, 2023, ECF 430 (Redacted); 428-3 (Sealed).

[25] *Id*. (ECF 430).

[26] *Id*. (ECF 428-3).

world. This amounts to an average of more than ███████ **RTB bid requests per-user per-day**.

38.     Even if one were to assume that the purported controls mentioned by Dr. Striegel actually work as he says, and were used by some Google account holders at some point in time, it is implausible that there exists a meaningful number of Google account holders who have browsed the Internet across all of their devices (mobile, desktop, TV, etc.) and have somehow managed to not have a single Google RTB bid request over the span of almost 8 years, going as far back as 2016.

39.     It is my opinion that those unicorn users do not exist. Notably, Dr. Striegel does not identify any, **not even one**, in his report, even though he looked at millions of bid requests, and not just for the named plaintiffs. Dr. Striegel is testifying for Google, and presumably had access to all RTB bid data if it would have helped support his opinions, Dr. Striegel does not, in his report, identify any bid requests that differ in terms of content or form from the bid requests produced by Google for the named plaintiffs. In my view, Dr. Striegel is purely speculating because he has no actual evidence to support his position.

40.     **Third**, Dr. Striegel suggests that I do not cite any prior research supporting my "belief that the named Plaintiffs' data samples are similar to RTB bid requests data overall" (Striegel Report ¶ 131). I address his concern below using a recent prior research study that most directly addresses this very issue.[27]

41.     Dambra, et al., studied web tracking from users' perspective based on data from 250,000 users collected over the duration of 8 days.[28]

---

[27] My own peer-reviewed research (including those cited in Striegel Report ¶¶ 132–133) also extensively studies online tracking, including by Google RTB, but I limit my discussion to independent peer-reviewed research to make the same point.

[28] Dambra, Savino, Iskander Sanchez-Rola, Leyla Bilge, and Davide Balzarotti. "When Sally Met Trackers: Web Tracking From the Users' Perspective." In 31st USENIX Security Symposium (USENIX Security 22), pp. 2189-2206. 2022.

a.  The authors reported that Google tracked 99.76% of the 250,000 users in their dataset. The authors go on to explain that the rare users who were not at all tracked "only browsed an average of two different websites in 8 days" suggesting that "in practice *everyone* who browses the web is tracked to some extent" (emphasis in original).

b.  The authors go on to state that "Google, for instance, is encountered on average every 1.11 hours. This means that to fully prevent the largest company in our dataset from being involved in tracking practices, a user should delete the cookies after every single browsing hour, which is obviously not realistic."

42.    In light of the Court's orders and Google's representations about the named plaintiff data it produced, the volume of named plaintiff data Google produced, the lack of any meaningful controls that would actually prevent a Google account holder from being subjected to RTB auctions, the peer reviewed studies by me and others demonstrating the omnipresence of Google RTB across the Internet, and Dr. Striegel's failure to come forward with even a single bid request from Google that differs from the named plaintiff data, it remains my opinion that the named plaintiff data produced by Google to date is representative of the class as a whole for the class period.

**D.    THE STRIEGEL REPORT'S ASSERTIONS ABOUT "MISLEADING" NAMED PLAINTIFF DATA EXAMPLES ARE INCORRECT**

43.    Dr. Striegel asserts that my descriptions of RTB bid request examples in paragraph 46 of my report are inaccurate. I address his concerns, all of which are meritless, below. Whether intentional or not, Dr. Striegel seems to be misreading this portion of my report. The purpose of paragraph 46 of my report is to look at the actual data conveyed in one bid request for each of the named plaintiffs and then extrapolate from that data what could be learned about each named plaintiff from the data in the bid request. It should have been obvious to Dr. Striegel that some of what is conveyed in paragraph 46 is the information extrapolated for the bid request and not simply

information conveyed in the bid request, and it is misleading and wrong for Dr. Striegel to criticize my opinion in paragraph 46 in this regard.

44.    **First**, Dr. Striegel argues that the title of a webpage "is <u>not</u> included in the named Plaintiffs' data based on my review" (Striegel Report ¶ 140; emphasis in original). He ignores a basic fact that the title of a webpage can be trivially extracted once a RTB participant has the URL that Google shares in bid requests. For example, a RTB participant can extract the title of the webpage "47 Bible Verses about Tools" by simply loading the URL in a browser https://bible.knowing-jesus.com/topics/Tools. This is akin to looking up the phone number in a telephone directory. It is a trivial exercise as it is fully automated. Dr. Striegel goes on to concede that sometimes the title of a webpage is literally included in the URL. For example, the three words in the webpage title "Insomnia - Symptoms and causes" are literally included in the URL itself https://www.mayoclinic.org/diseases-conditions/insomnia/symptoms-causes/syc-20355167.

45.    **Second**, Dr. Striegel asserts that "the vertical information is <u>not</u> included in the named Plaintiffs' data." (Striegel Report ¶ 141; emphasis in original). He goes on to state that "verticals data was not shared in bid requests in the time period covered in the named Plaintiffs' data." Dr. Striegel is again ignoring the basic fact that the vertical information can be easily extracted once a RTB participant has the URL that Google RTB shares in bid requests. For example, a RTB participant can extract the vertical ██████████████████████" by using Google provided "content categories" classification API.[29] There are various other third-party services (e.g., WebShrinker[30], RapidAPI[31], Klazify[32]) that would allow a RTB participant to look up the verticals associated with a URL. As I explained in my report (Shafiq Report ¶ 60), Google's employees know that ████████████████████████████

---

[29] Cloud Natural Language API, https://cloud.google.com/natural-language/docs/categories.

[30] Website Categories, https://docs.webshrinker.com/v3/iab-website-categories.html#tier-1-and-tier-2-categories.

[31] https://rapidapi.com/ibmbpmtips/api/iab-taxonomy-text-classification/details.

[32] https://www.klazify.com/.

███████████. Specifically, GOOG-HEWT-00456419 at -420[33] explains that "██████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████ Dr. Striegel ignores this in his report.

46.     Dr. Striegel further states that "verticals data was not shared in bid requests in the time period covered in the named Plaintiffs' data."[34] (Striegel Report ¶ 141). He omits an important fact, that Google RTB still shares verticals with RTB participants via pretargeting.[35] Specifically, in pretargeting, RTB participants can set up ad campaigns such that Google RTB only sends them bid requests that correspond to a particular vertical. When that RTB participant receives a bid request from Google RTB, the participant knows that the bid request corresponds to the vertical.

47.     **Third**, Dr. Striegel suggests that my characterization of location as "████" [some landmark] is misleading. Like the webpage title and vertical issues addressed above, while the bid request does not literally refer to a landmark, a RTB participant would use a map service, such as Google Maps, to identify the nearby landmark or point-of-interest from the geographic coordinates shared in RTB bid requests. While Dr. Striegel and I can disagree on what the nearby landmark should be, the larger point still stands.

### E.    THE STRIEGEL REPORT INCORRECTLY DESCRIBES SOME KEY BASICS OF GOOGLE RTB AND REFLECTS A LACK OF EXPERTISE AND EXPERIENCE IN THE FIELD

48.     Dr. Striegel's "Background" in his report about web communications, real-time bidding, cookie matching, RTB bid request fields, and user/publisher controls suffers from several inaccuracies and omissions that I address below, all of which demonstrate a lack of expertise and experience in the matters at issue here.

---

[33] Plaintiffs' Exhibit 19, submitted in support of Plaintiffs' Motion for Class Certification, at ECF 545-15.

[34] This is true because Google only produced data from 2021 and 2021, but ignores that verticals were shared by Google in RTB bid requests for most of the class period (i.e., 2016 to early 2020).

[35] https://developers.google.com/authorized-buyers/apis/realtimebidding/reference/rest/v1/ bidders.pretargetingConfigs.

49.     While Dr. Striegel's research is broadly in the area of computer networking, he has no prior research experience that is pertinent to the issues in this case. Specifically, to the best of my knowledge, he has never published any research on online tracking, cookie syncing, or real-time bidding. In his report, Dr. Striegel attempts to use his recent ICC 2023 publication to justify his research credentials about advertising and particularly real-time bidding. This publication addresses performance issues in the delivery of advertisements, but it has no relevance whatsoever to privacy issues in RTB. Notably, Dr. Striegel includes an overview of real-time bidding in his 2023 ICC article[36] that is nearly copied from my 2020 research article entitled "Inferring Tracker-Advertiser Relationships in the Online Advertising Ecosystem using Header Bidding".[37] I highlight the text that is copied by Dr. Striegel (and/or his co-authors) from my research article below in Figure 1.



**Figure 1: Real-time bidding (RTB) description in Dr. Striegel's 2023 ICC article. The highlighted text is copied from my 2020 PETS article.**

50.     Dr. Striegel states that "Google User ID is not the Google account ID nor is it related to any information in a user's Google account" (Striegel Report ¶ 50). This is not true for several reasons.

---

[36] Mohammed, A., Karagioules, T., Halepovic, E., Zhu, S., & Striegel, A. (2023, May). rePurpose: A Case for Versatile Network Measurement. In ICC 2023-IEEE International Conference on Communications (pp. 2357-2363). IEEE.

[37] Cook, J., Nithyanand, R., & Shafiq, Z. (2020). Inferring Tracker-Advertiser Relationships in the Online Advertising Ecosystem using Header Bidding. Proceedings on Privacy Enhancing Technologies, 1, 65-82.

51.     First, Google RTB's documentation literally describes google_user_id as "The Google ID for the user."[38] Dr. Striegel ignores this in his report.

52.     Second, Google's internal documentation entitled "████████████████████████" [GOOG-HEWT-00035713[39]] explains that "google_user_id" ████████████████████ ████████████████████████████████" (emphasis added). Dr. Striegel ignores this in his report.

53.     Third, as I explained at length in my original report, Google links a user's Biscotti ID to GAIA ID. I describe at least 7 ways (cookie jar, conversion, ████████████████ ████████████████████████████████████████████████) in which Googles can and does so. Dr. Striegel ignores this in his report.

54.     Dr. Striegel states that "RTB participant's cookies would typically be a first party cookie" (Striegel Report ¶ 51). This is incorrect. RTB participants' cookies are typically third-party cookies. For example, when Google's cookie matching server "cm.g.doubleclick.net" redirects a user's browser to a RTB participant, the request to the RTB participant would be a third-party request that includes the third-party cookie in the Cookie header. Similarly, as shown in Figure 2, when a RTB participant redirects a user's browser to Google's cookie matching server "cm.g.doubleclick.net," the RTB participant's third-party cookie is typically included in the request in the google_hm[40] query parameter.

---

[38] https://developers.google.com/authorized-buyers/rtb/realtime-bidding-guide.

[39] Plaintiffs' Exhibit 26, submitted in support of Plaintiffs' Motion for Class Certification, at ECF 545-22.

[40] "Data the bidder wants to store in a Google-hosted match table," https://developers.google.com/authorized-buyers/rtb/cookie-guide.



**Figure 2: Google RTB's cookie matching service collects RTB participant's (Simpli.fi) third-party cookie "suid"**

55.    Dr. Striegel states that "if a user elects to clear the cookies in their browser related to either the advertiser or Google, the match table linkage is broken" (Striegel Report ¶ 53) and "if the browser does not support third party cookies or if the user employs software that eliminates advertising cookies, Google's cookie and any derived identifiers would no longer be valid." (*Id.* ¶ 54). This is incorrect. Google is able to link its own different third-party cookies, even when one of them is cleared from the browser, to each other and then to a Google account holder. As I explained in my report (Shafiq Report ¶ 97g), Google uses internal systems called ▮▮▮▮▮ and ▮▮▮▮▮ to link different Biscotti cookies to each other and to GAIA ID. In the following diagram (Figure 3) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Dr. Striegel ignores this in his report.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF PROF. ZUBAIR SHAFIQ



**Figure 3:** ████████████████████████████

56.     Dr. Striegel states "Google truncates the IP address value before including it in the bid request sent to RTB participants" (Striegel Report ¶ 60). Dr. Striegel omits a crucial related fact that Google RTB does share the full IP address with RTB participants via cookie matching and also with the winning bidder.

57.     Dr. Striegel states that "the particular public IP address may be shared by one or more devices with most devices undergoing some sort of NAT before transiting out from the initial network connectivity" (Striegel Report ¶ 61). Dr. Striegel omits a crucial related fact that Google RTB additionally shares the IP address and port number with RTB participants via cookie matching and also with the winning bidder, which would allow an RTB participant to distinguish between different users behind a NAT that share the same public IP address.

58.     Dr. Striegel states that "there are no other data fields in bid requests that contain information on the vertical(s) of the websites where the ad inventory is located" (Striegel Report ¶ 79). This is incorrect. As discussed above, the vertical information can be trivially extracted from the "referer" URL field that Google RTB includes in bid requests using the Google content categories classification API[41] or other third-party services (e.g., WebShrinker[42], RapidAPI[43],

---

[41] Cloud Natural Language API, https://cloud.google.com/natural-language/docs/categories.

[42] Website Categories, https://docs.webshrinker.com/v3/iab-website-categories.html#tier-1-and-tier-2-categories.

[43] https://rapidapi.com/ibmbpmtips/api/iab-taxonomy-text-classification/details.

Klazify[44].

59.    Dr. Striegel states that "this ▮▮▮▮▮▮▮▮ field has not been populated in bid requests since approximately February 2020" and that "the user_list field … has not been populated in bid requests since 2018."[45] Dr. Striegel omits an important fact that Google RTB still discloses verticals and user lists with RTB participants via pretargeting.[46] Specifically, in pretargeting, RTB participants can set up ad campaigns such that Google RTB only sends them bid requests that correspond to a particular vertical or user list. For example, an RTB participant can set up a pretargeting ad campaign to target a specific vertical or user list. In this case, when that RTB participant receives a bid request from Google RTB, the participant knows that the bid request corresponds to the vertical or user list. Dr. Striegel is also wrong about when user lists were deprecated. According to Dr. Berntson, that occurred in 2020 not 2018.[47]

60.    Dr. Striegel explains VPNs (Virtual Private Networks) in his report (Striegel Report ¶¶ 29–30, 85–86). He gives the impression in footnote 65 of his report that VPN usage is quite high (e.g., "Statista reports that 79% of U.S. users used VPN at home in 2022"). That's incorrect. Prior research has shown that OpenVPN (the most widely used VPN protocol) comprises just 0.7% of all IPv4 traffic and 0.0% of all IPv6 traffic.[48] While some Internet users may use a VPN at some point in their life, VPN usage remains a tiny fraction of all Internet traffic.

61.    Further, enterprise VPNs typically only tunnel work-related traffic (e.g., access work related websites), not the rest of regular web traffic. This is called VPN split tunneling.[49]

---

[44] https://www.klazify.com/.

[45] Berntson Declaration ¶ 34.

[46] REST Resource: bidders.pretargetingConfigs, https://developers.google.com/authorized-buyers/apis/realtimebidding/reference/rest/v1/bidders.pretargetingConfigs.

[47] Berntson Declaration ¶ 35.

[48] Schumann, Luca, Trinh Viet Doan, Tanya Shreedhar, Ricky Mok, and Vaibhav Bajpai. "Impact of evolving protocols and COVID-19 on internet traffic shares." arXiv:2201.00142 (2022).

[49] Korty, Andrew, Daniel Calarco, and Mark Spencer. "Balancing risk with virtual private networking during a pandemic." Business Horizons 64, no. 6 (2021): 757-761.

Thus, common websites operating Google RTB would not be served via the VPN. Moreover, prior research has shown that people typically use a VPN to access blocked or geo-restricted content such as YouTube, Netflix, and Hulu – where Google RTB does not operate.[50] Hence, the impact of the use of VPNs on Google RTB is negligible in my opinion.

## IV.    REBUTTAL TO THE PSOUNIS REPORT

62.    After considering Dr. Konstantinos Psounis's Report, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Psounis Report in more detail below.

### A.    THE PSOUNIS REPORT PROVIDES NO SUPPORT FOR THE ASSERTIONS REGARDING VARIABILITY OF THE DATA FIELDS IN RTB BID REQUESTS

63.    Dr. Psounis opines that "there is no common set of data fields sent in all RTB bid requests" (Psounis Report ¶ 21). Dr. Psounis has conducted no analysis of his own to arrive at this conclusion. He simply points to the flawed analysis in the Striegel Report that I have criticized above. To the extent that Dr. Psounis is relying on the work done by Dr. Striegel as the basis for the opinions expressed in the Psounis Report, and he relies extensively on Dr. Striegel throughout the Psounis Report, these opinions are flawed for the same reasons Dr. Striegel's opinions are flawed.

64.    Dr. Psounis issues a number of opinions judging the "reliability" of various ways and methods to identify devices, users, individuals, or households (Psounis Report ¶ 14). However, Dr. Psounis never defines in his report what is the exact criterion he uses to say whether something is reliable or not. At one point in his report, he seems to suggest that just because something is not 100%, it is unreliable (Psounis Report ¶ 71). When asked repeatedly at his deposition to explain

---

[50] Dutkowska-Zuk, Agnieszka, Austin Hounsel, Amy Morrill, Andre Xiong, Marshini Chetty, and Nick Feamster. "How and why people use virtual private networks." In 31st USENIX Security Symposium (USENIX Security 22), pp. 3451-3465. 2022.

what standard he applied to determine reliability, he could not do so.[51] Because Dr. Psounis refused to explain what standard he applied to his analysis or how it is different from the standard I used in my report (which tracks California law), it is impossible for anyone else to repeat or confirm his analysis.

> **B.    THE PSOUNIS REPORT INCORRECTLY ASSERTS THAT THERE IS NO RELIABLE WAY TO IDENTIFY DEVICES OR USERS FROM INDIVIDUAL RTB BID REQUEST FIELDS**

65.    Dr. Psounis presents several opinions regarding the identification of devices and users from individual data fields in the RTB bid requests shared with RTB participants (Psounis Report ¶¶ 25–46). As an initial matter, these opinions proffered by Dr. Psounis about individual data fields in isolation do not respond to any opinions I offered in my report because the way Dr. Psounis is looking at the data fields in isolation is totally unrealistic and bears no relation to how RTB bid participants look at bid requests in the real world. Put simply, a RTB participant would always use all of the available data fields in RTB bid requests – why would a RTB participant ever use just one field in isolation. Second, there are several factual inaccuracies and omission of relevant context that I address below.

66.    Dr. Psounis opines that IP addresses cannot reliably identify devices (Psounis Report ¶¶ 25–30).

> a.    Dr. Psounis points out that "One reason that IP addresses in RTB bid requests are not accurate proxies for devices is that the IP address found in a bid request is truncated" (Psounis Report ¶ 27). Like Dr. Striegel, Dr. Psounis omits a crucial relevant fact that Google RTB does share the full IP address with RTB participants via cookie matching. Google RTB also shares the full IP address with the winning RTB participant during ad serving.

---

[51] Psounis Deposition Tr. at 32:23–33:7 ("It's a word I used to distinguish between reliable and unreliable."). Excerpts from the Psounis Deposition Tr. are attached as Ex. 53 to the Pritzker Reply Decl.

b.   Dr. Psounis points out that "Network Address Translation (NAT), which permits multiple devices to have distinct local IP addresses, but share a single public IP address" (Psounis Report ¶ 28a). Like Dr. Striegel, Dr. Psounis omits a crucial relevant fact that Google RTB shares the port number with RTB participants via cookie matching, which would allow an RTB participant to distinguish between different users behind a NAT that share the same public IP address.

c.   Dr. Psounis points out that "for many VPN services, if any of these employees access a website, the external IP address will be the same for each employee and will equal the IP address of the VPN server" (Psounis Report ¶ 28b). Dr. Psounis omits a crucial relevant fact that it is not typically true for all traffic out of the VPN. Enterprise VPNs typically only tunnel work-related traffic (e.g., access work related websites), not the rest of regular web traffic. This is called VPN split tunneling.[52] Hence, for a VPN user visiting a non-work related website with Google RTB, the RTB participant will see the actual IP address – not that of the VPN server. Further, consumer VPN services are typically used to access blocked or geo-restricted content such as YouTube, Netflix, and Hulu – where Google RTB is not applicable.[53]

d.   Dr. Psounis makes it seem like NAT and VPN usage is quite common. It is not. Both NAT and VPN usage represent a tiny fraction of all Internet traffic. A large-scale study[54] of a tier-1 ISP in the United States showed that OpenVPN

---

[52] Korty, Andrew, Daniel Calarco, and Mark Spencer. Balancing risk with virtual private networking during a pandemic. Business Horizons 64, no. 6 (2021): 757-761.

[53] Dutkowska-Zuk, Agnieszka, Austin Hounsel, Amy Morrill, Andre Xiong, Marshini Chetty, and Nick Feamster. How and why people use virtual private networks. In 31st USENIX Security Symposium (USENIX Security 22), pp. 3451-3465. 2022.

[54] Schumann, Luca, Trinh Viet Doan, Tanya Shreedhar, Ricky Mok, and Vaibhav Bajpai. Impact of evolving protocols and COVID-19 on internet traffic shares. arXiv:2201.00142 (2022).

(the most widely used VPN protocol) is just 0.7% of all IPv4 traffic and 0.0% of all IPv6 traffic. NAT is just 0.5% of all IPv4 traffic and 0.0% of all IPv6 traffic.

e.   Dr. Psounis points out that IP addresses (both IPv4 and IPv6) may change and hence cannot be reliably used to identify a device. (Psounis Report ¶¶ 28c, 29). This is pure speculation without any basis. Regarding IPv4, peer-reviewed scientific research shows that IP address can be used to identify users over time: "87% of participants retain at least one IP address for more than a month". For the study participants in the United States, the average IP address retention period was 18.93 days.[55] Regarding IPv6, peer-reviewed scientific research shows that parts of IPv6 addresses (i.e., prefixes) of residential Internet subscribers can remain stable for months, permitting long-term use of 64-bit IPv6 prefixes to identify users at the household level (i.e., the router inside a home). In fact, the researchers found that these household-IPv6 prefixes are even more stable than IPv4 addresses.

67.   Dr. Psounis opines that the user agent field cannot reliably identify devices (Psounis Report ¶¶ 31–33). I never said it could in my report. The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[56]

68.   Dr. Psounis opines that location data cannot reliably identify devices/users (Psounis Report ¶¶ 34–39). In this respect, he is simply parroting the flawed opinion and analysis in the

---

[55] Mishra, V., Laperdrix, P., Vastel, A., Rudametkin, W., Rouvoy, R., & Lopatka, M. (2020, April). Don't count me out: On the relevance of IP address in the tracking ecosystem. In Proceedings of The Web Conference 2020 (pp. 808-815).

[56] Wang, Liang, Kuang-chih Lee, and Quan Lu. Improving advertisement recommendation by enriching user browser cookie attributes. In Proceedings of the 25th ACM International on Conference on Information and Knowledge Management, pp. 2401-2404. 2016; *see also* Shafiq Report ¶ 50 (quoting from GOOG-HEWT-00182243) and ¶ 59 (quoting from GOOG-HEWT-00188275).

Striegel Report. Dr. Psounis does not conduct any analysis of his own to assess the validity of Dr. Striegel's claims.[57]

69.    Dr. Psounis opines that device ID cannot reliably identify devices (Psounis Report ¶¶ 40–42). He suggests that "device IDs can be reset by users so there is no persistent one-to-one mapping" (Psounis Report ¶ 40). He fails to recognize that even if device ID is reset, both the new and the old device IDs identify the same unique device. Put simply, one device can have two device IDs but two devices will never have the same identifier – the probability of a collision is miniscule given that device ID is a 128 bit field. Dr. Psounis conceded this fact in his deposition.[58]

70.    Dr. Psounis opines that Google User ID cannot reliably identify users (Psounis Report ¶¶ 43–46).

a.    First, Dr. Psounis does not dispute the fact that Google User ID uniquely identifies a device.[59] Similar to device ID, if Google User ID is reset (e.g., because a user clears cookies in their browser) then both the old and the new Google User IDs identify the same device. Google also links different Biscotti (that are used to derive Google User ID) to each other. As I explained in my report (Shafiq Report ¶ 97g), Google uses internal systems called ███████ and ███████████ to link different Biscotti cookies to each other and to GAIA ID. Dr. Psounis ignores this in his report.

b.    Second, Dr. Psounis (like Dr. Striegel) ignores Google RTB's public documentation (which literally describes google_user_id as "The Google ID for the user")[60] and internal documentation at GOOG-HEWT-00035713[61] at 714

---

[57] Psounis Deposition Tr. at 144:13–145:18 ("Again, I have not conducted an independent analysis of any data one way or another, right.").

[58] *Id.* at 164:14–165:1.

[59] Psounis Deposition Tr. at 169:4–21.

[60] https://developers.google.com/authorized-buyers/rtb/realtime-bidding-guide.

[61] Plaintiffs' Exhibit 26 (ECF 545-22).



)" (emphasis added).

**C.   THE PSOUNIS REPORT INCORRECTLY ASSERTS THAT THERE IS NO RELIABLE WAY TO IDENTIFY DEVICES OR USERS FROM MULTIPLE RTB FIELDS IN COMBINATION**

71.   Dr. Psounis picked two out of the 200+ data fields that Google shares in RTB bid requests to assess whether these two fields (IP address and user agent), when combined together, can reliably identify devices. Specifically, Dr. Psounis states that "Dr. Shafiq asserts that an IP address, in combination with a User Agent, can be used to "fingerprint" a device." (Psounis Report ¶ 48). Dr. Psounis cites paragraphs 50 and 72 of my report to support this statement. He omits the fact that these two paragraphs in my report point to Google's own documentation, both private[62] and public, which support my opinion and agree with me that these two fields alone can identify a device and or user.[63] Thus, this is not just my opinion – this is Google's opinion too. Dr. Psounis, of course, completely ignores all of the internal Google documents I cited in my report.

72.   Dr. Psounis never looks at any other combination of fields, and never looks at all of the fields together, as a RTB bid participant would do in the real world.

73.   What is perhaps most telling is that Dr. Psounis does not (and cannot) claim that a RTB participant cannot jointly use all of the 200+ data fields in RTB bid requests to identify devices or users. Dr. Psounis conceded as much in his deposition.[64]

74.   Given that there are at least 60 data fields that are uniformly[65] shared in RTB bid requests, many of which are sufficient to reliably identify devices or users on their own, it is obvious that an RTB participant can certainly reliably identify devices or users by combining all of the 200+ data fields.

---

[62] GOOG-HEWT-00182243.

[63] https://github.com/google/ads-privacy.

[64] Psounis Deposition Tr. at 198:19–199:13.

[65] 98% of the time or more.

**D.    THE PSOUNIS REPORT INCORRECTLY ASSERTS THAT THERE IS NO RELIABLE WAY TO COMBINE FIELDS ACROSS MULTIPLE BID REQUESTS**

75.    Dr. Psounis states that "Dr. Shafiq does not explain how one may combine 'the data shared' 'across multiple bid requests', or how one may combine 'the timestamped sequence of locations and browsing history.'" (Psounis Report ¶ 54). He then goes on to state that "Dr. Shafiq may have in mind to combine bid requests with the same pseudonymous identifier like Google User ID or device ID. However, this is not a reliable method to combine bid requests for individuals in the Proposed Class because, as I already explained, these data fields are not consistently populated in bid requests, see Section IV.A" (Psounis Report ¶ 55).

76.    Dr. Psounis is right that the obvious way to link multiple bid requests is to leverage one of the several identifier fields (e.g., Google User ID, which is present in ████ of the RTB bid requests in the named plaintiff data produced by Google) in each RTB bid request. But he is wrong that this is not a reliable method because these data fields are not consistently populated in bid requests. His incorrect opinion can be traced back to his reliance on Dr. Striegel's faulty analysis (Psounis Report § IV.A).

**E.    THE PSOUNIS REPORT INCORRECTLY ASSERTS THAT LOCATION OR BROWSING DATA ACROSS MULTIPLE RTB BID REQUESTS CANNOT RELIABLY IDENTIFY DEVICES OR USERS**

77.    Dr. Psounis opines that combining coarse-grained location (e.g., at the sector-level granularity) is unreliable because it identifies only up to 85% of the users in prior research.[66] Dr. Psounis ignores that these accuracy numbers are just based on top-3 locations. The identification reliability increases as the number of locations increases. The authors showed that the median user visits 30 sectors in just 3 months. The location data shared by Google RTB over the span of several years would far exceed that. Dr. Psounis also fails to address other location privacy research that I cited in my report (Shafiq Report ¶ 83). For example, even at the 10 km location granularity, the

---

[66] Zang, Hui, and Jean Bolot. "Anonymization of location data does not work: A large-scale measurement study." In Proceedings of the 17th annual international conference on Mobile computing and networking, pp. 145-156. 2011.

authors were able to identify a user's workplace with 80% accuracy.[67]

78.    Dr. Psounis opines that "the web browsing history, which is created by combining the visited URLs from multiple bid requests associated with the same user, cannot reliably identify users" (Psounis Report ¶ 63). He cherry picks a result from the paper rather than focusing on the identifiability issue. To provide context, here is the full paragraph excerpt from the paper. It shows that the user identifiability is up to 99.65% and never drops below 92% even when limited to 100 domains. It is noteworthy that Google RTB is present on tens of thousands (if not hundreds of thousands) of unique domains.

> We now estimate how much identifiability is lost by only looking at a portion of a predefined domain list. When all domains were observed, we saw 51,035 different profiles, corresponding to a 99.65% rate of uniqueness among our users. Restricting to visibility only the top 100 most frequently observed domains allowed us to compute 36,652 profiles (based on available histories) of which 95.31% were unique. Substitution of the observed domain popularity with the Trexa list led to the aggregation of 48,919 profiles of which 99.14% were unique. Further constraining visibility to only the top 100 Trexa domains led to 31,810 profiles of which 92.05% were unique. When using the compressed data representation of just 281 categories, we still observed 43,348 profiles, of which 97.24% were unique.

## F.    THE PSOUNIS REPORT INCORRECTLY ASSERTS RTB PARTICIPANTS CANNOT RELIABLY LINK RTB DATA TO A NATURAL PERSON OR HOUSEHOLD

79.    Dr. Psounis states that "RTB bid request fields do not consistently include fields that can be used as reliable identifiers, hence any linking of the information shared in RTB bid requests to a natural person or household will not be reliable." (Psounis Report ¶ 69). As I have explained above, this is not true. Again, Dr. Psounis's mistaken assertion is simply based on Dr. Striegel's faulty analysis.

---

[67]  Efstathiades, Hariton, Demetris Antoniades, George Pallis, and Marios D. Dikaiakos. "Identification of key locations based on online social network activity." In Proceedings of the 2015 IEEE/ACM International Conference on Advances in Social Networks Analysis and Mining, pp. 218-225.

80.     Dr. Psounis does not seem to oppose my opinion that RTB participants who have a first-party relationship (e.g., an account with name, physical address, or email address) with Google account holders can link the information shared in RTB bid requests to a natural person or household. He suggests that RTB participants' ability to link the information to a person or a household "would depend on whether a given individual has an account with or has otherwise provided information to that RTB participant." (Psounis Report ¶ 70). He then dismisses this approach by simply suggesting that this inquiry is fact specific. Dr. Psounis doesn't even attempt to look at the RTB participants such as Meta, Amazon, Verizon, Snap, and LinkedIn, each of which operates online services with millions of accountholders in the United States. For example:

    a.   Meta/Facebook has more than 254 million users in the United States.[68]

    b.   Amazon has more than 167 million users in the United States.[69]

    c.   Verizon has more than 143 million users in the United States.[70]

    d.   Snap has more than 109 million users in the United States.[71]

    e.   LinkedIn has more than 66 million users in the United States.[72]

81.     Given the sheer number of account holders of RTB participants, the chances that there exist a substantial number of Google account holders in the United States who do not have Facebook, Amazon, LinkedIn, Verizon, Snap, or LinkedIn account (or an account with at least one of the 292 RTB participants) is negligible.

82.     To oppose my opinion that RTB participants who do not have a first-party relationship with Google account holders can use identity graphs to link the information shared in RTB bid requests to a natural person or household, Dr. Psounis dismisses identity graphs because they "will never have 100% accuracy" (Psounis Report ¶ 71). His opinion is unfounded and

---

[68] https://www.statista.com/statistics/408971/number-of-us-facebook-users/.

[69] https://www.statista.com/topics/4076/amazon-prime.

[70] https://www.statista.com/statistics/257710/number-of-subscriptions-with-verizon-wireless.

[71] https://www.statista.com/forecasts/1142969/snapchat-users-in-the-united-states.

[72] https://www.statista.com/statistics/194471/number-of-linkedin-users-usa/.

misleading for several reasons. First, Dr. Psounis omits the fact that the identity graphs described in my report (Shafiq Report ¶ 88b) rely on deterministic information, which is 100% reliable due to its very nature. Even for the identity graphs that use probabilistic matching, Dr. Psounis disregards them simply because they are not 100%. He does not provide any basis for his opinion. At his deposition, he concedes that he doesn't have any – he is simply relying on his say-so.[73]

83.      If these identity graphs were unreliable, no one would use them. The accuracy of the identity graphs is vetted. For example, as shown in Figure 4, LiveRamp's identity graph, described in my report (Shafiq Report ¶¶ 88-b-iv, 88-c-iii), has the accuracy between 95.3-98.9% based on an independent audit by comScore against a panel of 12 million verified devices and individuals.[74]



**Figure 4: comScore evaluated the accuracy of LiveRamp's identity graph against a panel of approximately 12 million verified devices and individuals.**

84.      Dr. Psounis states that "Shared devices prevent the reliable identification of users from devices" (Psounis Report ¶ 73) and then goes on to cite research to support this argument (Psounis Report ¶ 73, n. 78). The research cited by Dr. Psounis here simply shows that device sharing happens among members of a household. For example, one paper that Dr. Psounis

---

[73] Psounis Deposition Tr. at 203:13–204:19 ("Me saying so is not some random person saying so." …); 205:8–207:9 ("I answered already I said that the one thing I cite in this section of my report is Dr. Shafiq's report and I also said that the basis for my opinion given that the one thing I cited in this section of my report is Dr. Shafiq's report is my decades long experience with probabilistic models.").

[74] https://www.lotame.com/wp-content/uploads/2017/04/Lotame_Data_Onboarding.pdf.

analyzed in-depth finds "household members borrowing each others' mobile phones."[75] Dr. Psounis tacitly concedes at his deposition that RTB participants would be able to link a device to a household, even if the device is shared between different members of a household.[76]

### G. THE PSOUNIS REPORT INCORRECTLY ASSERTS THAT ENTROPY IS NOT A METRIC FOR IDENTIFIABILITY

85.    Dr. Psounis asserts that "entropy is not a metric for identifiability" and then goes on to disagree with my suggested 32 entropy bit identifiability threshold. He seems to be unaware of the widespread use of entropy in computer science research and practice to assess the identifiability risk, especially with regards to online tracking.[77,78,79,80,81]

86.    Dr. Psounis also seems to be unaware that Google itself uses entropy to assess the identifiability risk and itself uses the 32-bit entropy identifiability threshold, even though he claims to have read my report and I discuss this fact extensively in that report. At his deposition, he

---

[75] Matthews, Tara, Kerwell Liao, Anna Turner, Marianne Berkovich, Robert Reeder, and Sunny Consolvo. "She'll just grab any device that's closer" A Study of Everyday Device & Account Sharing in Households." In Proceedings of the 2016 CHI Conference on Human Factors in Computing Systems, 2016.

[76] Psounis Deposition Tr. at 213:15–217:8.

[77] Torok, Ryan, and Amit Levy. "Only Pay for What You Leak: Leveraging Sandboxes for a Minimally Invasive Browser Fingerprinting Defense." In 2023 IEEE Symposium on Security and Privacy (SP), pp. 1023-1040. IEEE, 2023.

[78] Gómez-Boix, Alejandro, Pierre Laperdrix, and Benoit Baudry. "Hiding in the crowd: an analysis of the effectiveness of browser fingerprinting at large scale." In *Proceedings of the 2018 world wide web conference*, pp. 309-318. 2018.

[79] Eckersley, Peter. "How unique is your web browser?." In Privacy Enhancing Technologies: 10th International Symposium, PETS 2010, Berlin, Germany, July 21-23, 2010. Proceedings 10, pp. 1-18. Springer Berlin Heidelberg, 2010.

[80] Laperdrix, P., Rudametkin, W., & Baudry, B. (2016, May). Beauty and the beast: Diverting modern web browsers to build unique browser fingerprints. In 2016 IEEE Symposium on Security and Privacy (SP) (pp. 878-894). IEEE.

[81] Li, Song, and Yinzhi Cao. "Who touched my browser fingerprint? a large-scale measurement study and classification of fingerprint dynamics." In Proceedings of the ACM Internet Measurement Conference, pp. 370-385. 2020.

admitted to not being aware of whether Google uses entropy[82] and just said Google is "wrong".[83] But, there are numerous internal and public Google documents cited in my report that show that Google uses entropy in RTB as well as its new Privacy Sandbox[84,85] initiative (Shafiq Report ¶¶ 43, 66, 69–74). Finally, outside of Google, EFF[86] and Mozilla[87] have also used entropy as a metric to assess the risk of identifiability. Either Dr. Psounis is wrong or the whole computer science research community and industry (including Google) is wrong.

## V.    REBUTTAL TO THE DEAL REPORT

87.    After considering Mr. Bruce Deal's Report, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Deal Report in more detail below.

### A.    THE DEAL REPORT MISLEADS THAT GOOGLE RTB IS NOT SPECIFIC TO GOOGLE

88.    Mr. Deal suggests that "RTB is not specific to Google." (Deal Report ¶ 25). While it is true that other companies also offer RTB exchanges, Mr. Deal fails to acknowledge several unique aspects and features of Google RTB as compared to other RTB providers. There are several unique data sharing features in Google RTB.

89.    **First**,



(GOOG-HEWT-00139966 at -69). The

---

[82] Psounis Deposition Tr. at 233:4-11.

[83] *Id*. at 229:19-23.

[84] Introducing the Privacy Budget, https://www.youtube.com/watch?v=0STgfjSA6T8.

[85] FAQ: Privacy Budget, https://github.com/bslassey/privacy-budget/blob/4e5f78adde92bd622dafeceae78682fc0823c0eb/faq.md.

[86] A Primer on Information Theory and Privacy, https://www.eff.org/deeplinks/2010/01/primer-information-theory-and-privacy.

[87] Technical Comments on Privacy Budget, https://mozilla.github.io/ppa-docs/privacy-budget.pdf.

90.    **Second**, the scale of Google RTB's ad exchange is significantly larger than other ad exchanges. Specifically, ███████████████████████████████████████ ████████████████████████████████████████ (GOOG-HEWT-00366010 at -015–016). This is because DoubleClick tracks users across more than 80% of the websites,[88] totaling more than 17 million websites.[89] No other ad exchange comes even close to Google's coverage of the web.

91.    **Third**, Google RTB's ad exchange is able to track a user's activity on the same- and across different devices. Specifically, Google ██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████ (GOOG-HEWT-00366010 at -017; GOOG-HEWT-00472042 at -054).

### B.    THE DEAL REPORT'S ASSERTIONS ABOUT VPN USAGE AND ITS IMPACT ARE MISLEADING

92.    Mr. Deal opines that VPN usage impacts the reliability of Mr. Zeithammer's RTB calculations (Deal Report ¶¶ 13, 44–47) because VPN usage would make non-U.S. users appear to be U.S.-based users. Mr. Deal's argument is incorrect for two main reasons.

93.    **First**, Mr. Deal gives the impression that VPN usage is substantial. That's incorrect. Prior research has shown that OpenVPN (the most widely used VPN protocol) comprises of just 0.7% of all IPv4 traffic and 0.0% of all IPv6 traffic.[90] While a large fraction of Internet users may use VPN at some point in their life, VPN usage remains a tiny fraction of all Internet traffic.

94.    **Second**, even when users use VPN, the configuration may mean that Mr. Deal's argument does not apply. For example, non-U.S. users may choose to use a non-U.S. VPN server.

---

[88] https://github.com/duckduckgo/tracker-radar/blob/main/entities/Google%20LLC.json.

[89] https://trends.builtwith.com/websitelist/DoubleClick.Net.

[90] Schumann, Luca, Trinh Viet Doan, Tanya Shreedhar, Ricky Mok, and Vaibhav Bajpai. Impact of evolving protocols and COVID-19 on internet traffic shares. arXiv:2201.00142 (2022).

As another example, one-third of VPN users were found use the VPN provided by their university/employer.[91] Thus, if a non-U.S. user was using the VPN provided by their university (say based in Australia), the VPN server's IP address would not be based in the U.S. As yet another example, enterprise VPNs typically only tunnel work-related traffic (e.g., access work related websites), not the rest of regular web traffic. This is called VPN split tunneling. Thus, common websites operating Google RTB would not be served via the VPN even if the user is using a VPN.

95.    **Third**, prior research has shown that people typically use VPN to access blocked or geo-restricted content such as YouTube, Netflix, and Hulu – where Google RTB does not operate.[92] Mr. Deal acknowledges this issue: "a substantial portion of users outside of the U.S. are using VPN, for example, to watch U.S. content on Netflix" (Deal Report ¶ 46).

## C.    THE DEAL REPORT INCORRECTLY ASSERTS THAT USING CERTAIN "BLOCKERS" WOULD ENABLE GOOGLE ACCOUNT HOLDERS TO AVOID DATA SHARING

96.    "During the Class Period, Google account holders were able to take actions to avoid data sharing, and thus avoid harm. I understand that several companies offer private browsers and software products known as 'blockers' that block data collection and sharing and prevent Google from being able to share at-issue data with ABs and OBPs." (Deal Report ¶ 112). However, Mr. Deal omits an important relevant fact that Google pays the most popular "blockers" such as

---

[91] Dutkowska-Zuk, Agnieszka, Austin Hounsel, Amy Morrill, Andre Xiong, Marshini Chetty, and Nick Feamster. How and why people use virtual private networks. In 31st USENIX Security Symposium (USENIX Security 22), pp. 3451-3465. 2022.

[92] *Id.*

AdBlock Plus[93] to get whitelisted.[94,95] Thus, using the most popular "blockers" would not block data collection and sharing by Google RTB.[96]

## VI.    REBUTTAL TO THE BERNTSON DECLARATION

97.    The Berntson Declaration states that my assertions about Google's ability to associate RTB bid data with Google accounts are "inaccurate." (Berntson Declaration ¶¶ 66–67). Specifically, Dr. Berntson challenges that portion of my report which opined that "'Google maintains common processes and systems by which it can associate or link user data shared in Google RTB auctions with Google account holders, who are identified through their unique Google Account ID, or GAIA ID[,]'" and that there are "'several ways in which Google can <u>and does</u> link the Biscotti ID to the GAIA ID or vice versa' for this purpose." (Berntson Declaration ¶ 66 citing Shafiq Report ¶¶ 96–97; underlined emphasis in Berntson Declaration).

98.    In response to the above, Dr. Berntson makes two assertions. **First**, he states that "[a]s part of standard business practices, Google does <u>not</u> 'link the Biscotti ID to the GAIA ID or vice-versa[.]'" (Berntson Declaration ¶ 67; underlined emphasis in Berntson Declaration).[97] **Second**, Dr. Berntson states that "Google maintains multiple internal systems, controls, and policies to prevent the data in bid requests from being linked to [] individuals Google accounts." (*Id.*). Both statements are contradicted by Google documents and by Dr. Berntson's own

---

[93] https://chromewebstore.google.com/detail/adblock-plus-free-ad-bloc/cfhdojbkjhnklbpkdaibdcc
ddilifddb.

[94] Google, Microsoft, and Amazon are paying to get around Adblock Plus, https://www.theverge
.com/2015/2/2/7963577/google-ads-get-through-adblock.

[95] Walls, R.J., Kilmer, E.D., Lageman, N. and McDaniel, P.D., 2015, October. Measuring the impact and perception of acceptable advertisements. In Proceedings of the 2015 Internet Measurement Conference (pp. 107-120).

[96] Zafar, A., Sabir, A., Ahmed, D. and Das, A., 2021, May. Understanding the Privacy Implications of Adblock Plus's Acceptable Ads. In Proceedings of the 2021 ACM Asia Conference on Computer and Communications Security (pp. 644-657).

[97] In my original report, I also concluded that Google can readily identify Google account holders who are signed into their Google account. Shafiq Report ¶ 98(a). I note that neither Dr. Berntson, nor Drs. Psounis and Striegel, challenge this conclusion.

deposition testimony, including testimony given as Google's corporate representative. Consequently, I have no basis to deviate from my original opinion.

###### A. THE BERNTSON DECLARATION IGNORES ABUNDANT EVIDENCE THAT GOOGLE LINKS GAIA AND BISCOTTI ID AND ASSOCIATED DATA

99. As an initial matter, it bears noting that there is no dispute that Google, in fact, *can* associate and link user data shared in Google RTB auctions with Google account holders, who are identified through their unique Google Account ID (or GAIA ID).

100. Dr. Berntson sole critique is that Google does not in fact engage in this practice. Based on my review of the Berntson Declaration, Dr. Berntson cites no support for this conclusion. Thus, I have no basis to analyze the accuracy of his statement, let alone accept it to be true. Particularly, given the fact that Dr. Berntson's statements are contradicted by abundant Google documents and systems, cited in my report, which show that Google can *and* does link Biscotti to GAIA. For example, I identify and cite to the following Google systems and documents that demonstrate this ability, including: combined identifier storage in cookie jars; linking of information for purposes of conversion, linking of identifiers through the 

); ability to map a GAIA ID to a Biscotti ID via 

). (Shafiq Report ¶¶ 90–98).

101. Further, Dr. Berntson's assertion that Google does <u>not</u> engage in this conduct is belied by his own deposition testimony in this case.

102. It is my understanding that on October 30, 2023 Dr. Berntson was deposed in his capacity as an individual and as a corporate representative for Google. Based on my review of that deposition transcript, I found numerous instances in which Dr. Berntson acknowledged that Google does link Biscotti to GAIA. For example, at his deposition, Dr. Berntson acknowledged the following:

a.  Google uses ████████████████████████████[98] which is described in my report (Shafiq Report ¶ 97-b). Thus, Google can link GAIA and Biscotti just as it does for ████████████.

b.  Google's ████████████████████████
████████████████████████████████
████████████████████████, [99] which is described in my report (Shafiq Report ¶ 97-c). Thus, Google can link GAIA and Biscotti using ██████████████.

c.  When a Google Account holder is signed-in to their Google Account, Google sends the person's identifiers and communications content through its ad-serving system that simultaneously sends the information to Google RTB and the "Google Demand" side of the "Unified Auction." ████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████ [100]

d.  Google stores receipts of RTB auctions in ████████████") and "
██████" ("████") logs that also include other information such that Google described it as "a logical super set of the information that would be shared on an RTB bid request," explaining that "a super set would be all of the items, and there may be additional information."[101]

---

[98] Berntson Deposition Tr. at 56:12–20. Excerpts from the Berntson Deposition Tr. are attached as Ex. 51 to the Pritzker Reply Decl.

[99] Berntson Deposition Tr. at 58:22–24.

[100] Berntson Deposition Tr. at 162:8-170:4.

[101] Berntson Deposition Tr. at 89:19-91:23.

e.  Through the ████ and ████, Google can link GAIA (the Google Account ID) and Biscotti (Google User ID) for ██████████████████████ ████████,[102] which is described in my report (Shafiq Report ¶ 97-f-iii). Thus, Google can ██████████████████████████████████████ ██████████████████.

f.  Dr. Berntson admitted that Google can ████████ "all" of ██████████████ ████████████ and that it can associate activities in the ████ with a Google Account, including through the ██████████████████.[103]

g.  Google used the ██████████████████ to produce Named Plaintiff Data from the ████ log in this case.[104]

h.  Google creates and maintains a "██████████████" that it uses "to be able to connect events across logs. That's it's purpose."[105]

i.  Google maintains the status of purported "controls" cited by Google on a per-query basis.[106]

103.    Given that Dr. Berntson provides no support for the statements in his declaration, and that those very statements are contradicted by documents produced by Google and Dr. Berntson's own subsequent testimony, I have no reason to reconsider and deviate from my prior

---

[102] Berntson Deposition Tr. at 15:3–11.

[103] Berntson Deposition Tr. at 89:19–91:23; 218:24–219:10; 225:13–226:4. I understand that to-date, Google has not produced all of the RTB-relevant information from these logs.

[104] Berntson Deposition Tr. at 212:7-214:18. I understand that to-date, Google has not produced all of the named plaintiff data from the ████ log, and has refused to identify all of the fields in the ████ log.

[105] *Id.* at 94:11-19.

[106] There is a "██████████████ field in P-logs and B-logs that identifies controls status on a per query basis. *Id.* at 136:14-137:16 ("The ██████████████] wraps up a tremendous amount of logic and then tries to create a formal set of rules that control all subsequent behavior in processing the personal data, and so the reason answer is ██████████████ that I mentioned is the record of truth for what is enabled and what is disabled within an ad request, and this is present within internal Google logs[.] … [Prior to 2016, the controls] were individual fields you would have to find and make sense of. Now it is all in one location.").

conclusion that there are "'several ways in which Google can and does link the Biscotti ID to the GAIA ID or vice versa' for this purpose." (Shafiq Report ¶ 97).

**B.    THE BERNTSON DECLARATION IGNORES ABUNDANT EVIDENCE THAT GOOGLE LINKS BID REQUEST DATA WITH GOOGLE ACCOUNTS**

104.    Dr. Berntson states that "Google maintains multiple internal systems, controls, and policies to prevent data in bid requests from being linked to those individuals' Google accounts" (Berntson Declaration ¶ 67).

105.    Dr. Berntson cites no support for this conclusion in his declaration. Thus, I have no basis to analyze the accuracy of his statement, let alone accept it to be true. Particularly, given the fact that Dr. Berntson's statements are contradicted by abundant Google documents and systems, cited in my report, which show that Google _can_ and _does_ link data shared in RTB with Google account holder information. (Shafiq Report ¶¶ 90–98, summarized above).

106.    Further, at his deposition, Dr. Berntson acknowledged that Google does in fact store the fields Google RTB shares in RTB bid requests in ████████████████████████████████ ████████████████████. He described the fields stored in ██████ and ██████ as representing "a logical super set of the information that would be shared on an RTB bid request," explaining that "a super set would be all of the items, and there may be additional information."[107] For example:

   a.    Dr. Berntson acknowledged that Google maintained ████████████████ ████████████████████████████████████████ ████████████████.[108]

   b.    Dr. Berntson acknowledged that Google maintained URLs (a field that was shared during in RTB during the Class Period) ████████████████ ████████████.[109]

---

[107] Berntson Deposition Tr. at 89:19-91:23.

[108] _Id._ at 178:3-8.

[109] _Id._ at 108:1-10.



c.  Dr. Berntson acknowledged that Google maintains ▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [110]

d.  Dr. Berntson acknowledged that Google ▮▮▮▮▮▮ activity information and
    communications content shared by RTB, including details URLs, app IDs,
    verticals, app category IDs, and content labels, in the logs that contain the
    Google account ID. [111]

e.  Dr. Berntson acknowledged that Google maintains ▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [112]

107.  Given that Dr. Berntson provides no support for the statements in his declaration,
and that those very statements are contradicted by documents produced by Google and Dr.
Berntson's own subsequent testimony, I have no reason to reconsider and deviate from my prior
conclusion that there are "Google maintains common processes and systems by which it can
associate or link user data shared in Google RTB auctions with Google account holders, who are
identified through their unique Google Account ID, or GAIA ID[.]" (Shafiq Report ¶ 96).

---

[110] *Id.* at 52:21-53:5 (testifying that Google User ID is a "of the Biscotti ID."); 73:5-13 (identifying
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" as place that Google stores "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮); 75:22-77:1 (testifying regarding IP address logging); 81:24-82:9 (testifying regarding
User-Agent logging); 83:5-18 (testifying regarding device identifiers logging); 88:19-91:11
(testifying regarding device properties logging); 98:21-25 (testifying regarding cookie_age
_seconds logging).

[111] Berntson Deposition Tr. at 109:8-18 (testifying regarding logging App IDs); 197:17-198:12
(testifying regarding logging App Category IDs); 182:2-183:10 (testifying that prior to spring of
2020, he "would suspect" Google logs ▮▮▮▮▮▮▮▮). It is my understanding that Google has not
produced all RTB-relevant fields from ▮▮▮▮▮ and that it has refused to identify the fields in those
logs in this action.

[112] *Id.* at 110:25-111:12 (testifying that Geo_criteria_id is logged); 115:6-17 (testifying regarding
logging Country and Region, including U.S. State); 115:20-116:16 (testifying regarding logging
Metro ID, City, Zip Code); 116:20-22 (testifying regarding logging UTC offset); 110:2-115:5
(testifying regarding geo-object-information, that although not stored in an identical form as that
which is shared in RTB, "it is logically the same information."); 118:8-15 (testifying regarding
logging publisher_country).

\*          \*          \*

Dated: November 29, 2023

/s/ Zubair Shafiq

Zubair Shafiq, Ph.D.

EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF PROF. ZUBAIR SHAFIQ

**EXHIBIT A**

**CASE MATERIALS CONSIDERED**

Discovery Order re November 21, 2022 Discovery Dispute, dated December 16, 2022 (ECF No. 382)

Joint Letter Brief re: Time Sampling, dated February 28, 2023 (Sealed ECF No. 428-3)

Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Sealed ECF No. 583-4)

Expert Report of Dr. Aaron Striegel in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Sealed ECF No. 602-1)

Expert Report of Dr. Konstantinos Psounis in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Sealed ECF No. 584-4)

Expert Report of Bruce Deal in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Sealed ECF No. 584-8)

Declaration of Dr. Glenn Berntson in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Class Certification (Sealed ECF No. 592-1)

Expert Class Certification Report of Professor Christopher Wilson in Support of Plaintiffs' Motion for Class Certification, dated July 14, 2023 (Sealed ECF No. 545-6)

Expert Class Certification Rebuttal Report of Professor Christopher Wilson in Support of Plaintiffs' Motion for Class Certification, dated November 29, 2023

Transcript of October 16, 2023 deposition of Dr. Konstantinos Psounis

Transcript of October 20, 2023 deposition of Dr. Aaron Striegel

Transcript of October 30, 2023 deposition of Dr. Glenn Berntson

February 8, 2023 Letter from Google to Plaintiffs re: Response to Plaintiffs' December 28, 2022, January 13, 2023, and January 17, 2023 Letters re Google's Production of Named Plaintiff Data

GOOG-HEWT-00139966

# EXHIBIT B

**TO THE EXPERT CLASS CERTIFICATION REBUTTAL REPORT OF Z. SHAFIQ**

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Shafiq Field Names | Shafiq Pct | Striegel BlankPct | Striegel NullPct | SharedPct Based on Stiegel Data. SharedPct = 100 - (BlankPCt + NullPct) | TTD Shafiq Pct | NYT Shafiq Pct |
| 2 | query_id | 100 | 0 | 0 | 100 | 100 | 100 |
| 3 | user_agent | 100 | 0 | 0 | 100 | 100 | 100 |
| 4 | user_agent_data | 100 | 0 | 0 | 100 | 100 | 100 |
| 5 | non_personalized_ads_reason | 100 | 0 | 0 | 100 | 100 | 100 |
| 6 | geo_criteria_id | 100 | 0 | 0 | 100 | 100 | 100 |
| 7 | publisher_id | 100 | 0 | 0 | 100 | 100 | 100 |
| 8 | seller_network_id | 100 | 0 | 0 | 100 | 100 | 100 |
| 9 | detected_language | 100 | 0 | 0 | 100 | 100 | 100 |
| 10 | device_type | 100 | 0 | 0 | 100 | 100 | 100 |
| 11 | os_version | 100 | 0 | 0 | 100 | 100 | 100 |
| 12 | carrier_id | 100 | 0 | 0 | 100 | 100 | 100 |
| 13 | screen_width | 100 | 0 | 0 | 100 | 100 | 100 |
| 14 | screen_height | 100 | 0 | 0 | 100 | 100 | 100 |
| 15 | screen_pixel_ratio_millis | 100 | 0 | 0 | 100 | 100 | 100 |
| 16 | screen_orientation | 100 | 0 | 0 | 100 | 100 | 100 |
| 17 | limit_ad_tracking | 100 | 0 | 0 | 100 | 100 | 100 |
| 18 | companion_slot | 100 | 0 | 0 | 100 | 100 | 100 |
| 19 | consented_providers | 100 | 0 | 0 | 100 | 100 | 100 |
| 20 | regs_gdpr | 100 | 0 | 0 | 100 | 100 | 100 |
| 21 | only_deal_bids_accepted | 100 | 0 | 0 | 100 | 100 | 100 |
| 22 | pretargeting_info | 100 | 0 | 0 | 100 | 100 | 100 |
| 23 | matching_deal | 100 | 0 | 0 | 100 | 100 | 100 |
| 24 | is_demand_syndication | 100 | 0 | 0 | 100 | 100 | 100 |
| 25 | viewability | 100 | 0 | 0 | 100 | 100 | 100 |
| 26 | format | 100 | 0 | 0 | 100 | 100 | 100 |
| 27 | chosen_encrypted_signals | 100 | 0 | 0 | 100 | 100 | 100 |
| 28 | billable_event_rate_adjustment | 100 | 0 | 0 | 100 | 100 | 100 |
| 29 | bid_response_feedback | 100 | 0 | 0 | 100 | 100 | 100 |



EXHIBIT
Striegel
4

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | **Shafiq Field Names** | **Shafiq Pct** | **Striegel BlankPct** | **Striegel NullPct** | **SharedPct Based on Stiegel Data. SharedPct = 100 - (BlankPCt + NullPct)** | **TTD Shafiq Pct** | **NYT Shafiq Pct** |
| 30 | bidder_externally_visible_deadline_ms | 100 | 0 | 0 | 100 | 100 | 100 |
| 31 | is_test | 100 | 0 | 0 | 100 | 100 | 100 |
| 32 | is_ping | 100 | 0 | 0 | 100 | 100 | 100 |
| 33 | supply_chain_complete | 100 | 0 | 0 | 100 | 100 | 100 |
| 34 | supply_chain_nodes | 100 | 0 | 0 | 100 | 100 | 100 |
| 35 | supply_chain_version | 100 | 0 | 0 | 100 | 100 | 100 |
| 36 | hosted_match_data_sent | 100 | 0 | 0 | 100 | 99 | 100 |
| 37 | ip | 100 | 0 | 0 | 100 | 100 | 100 |
| 38 | google_user_id_present | 100 | 0 | 0 | 100 | 100 | 100 |
| 39 | cookie_age_seconds | 100 | 0 | 0 | 100 | 100 | 100 |
| 40 | encrypted_hyperlocal_set_length | 100 | 0 | 0 | 100 | 100 | 100 |
| 41 | device.app_tracking_authorization_status | 100 | 0 | 0 | 100 | 100 | 100 |
| 42 | mobile_id_sent | 100 | 0 | 0 | 100 | 99 | 100 |
| 43 | verticals | 100 | 0 | 0 | 100 | 100 | 100 |
| 44 | bid_response_ad_native_ad | 100 | 0 | 0 | 100 | 100 | 100 |
| 45 | adslot | 100 | 0 | 0 | 100 | 100 | 100 |
| 46 | platform | 100 | 0.107231486 | 0 | 99.89276851 | 100 | 100 |
| 47 | bid_response_data | 100 | 0 | 0 | 100 | 98 | 100 |
| 48 | lat | 100 | 0 | 0 | 100 | 100 | 100 |
| 49 | lon | 100 | 0 | 0 | 100 | 100 | 100 |
| 50 | country | 100 | 0 | 0 | 100 | 100 | 100 |
| 51 | accuracy | 100 | 0 | 0 | 100 | 100 | 100 |
| 52 | utcoffset | 100 | 0 | 0 | 100 | 100 | 100 |
| 53 | metro | 100 | 0.090767018 | 0 | 99.90923298 | 100 | 100 |
| 54 | bidder_name | 100 | 0.257137812 | 0 | 99.74286219 | 100 | 100 |
| 55 | city | 100 | 0.305973548 | 0 | 99.69402645 | 100 | 100 |
| 56 | region | 99 | 0.487985586 | 0 | 99.51201441 | 99 | 100 |
| 57 | referer | 99 | 0.250923803 | 0 | 99.7490762 | 100 | 100 |
| 58 | is_mobile_app_request | 98 | | 0 | 100 | 100 | 100 |

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Shafiq Field Names | Shafiq Pct | Striegel BlankPct | Striegel NullPct | SharedPct Based on Stiegel Data. SharedPct = 100 - (BlankPCt + NullPct) | TTD Shafiq Pct | NYT Shafiq Pct |
| 59 | is_interstitial_request | 98 | | 0 | 100 | 100 | 100 |
| 60 | is_mobile_web_optimized | 98 | | 0 | 100 | 100 | 100 |
| 61 | app_rating | 98 | | 0 | 100 | 100 | 100 |
| 62 | device.model | 98 | 10.05936503 | 0 | 89.94063497 | 100 | 100 |
| 63 | brand | 98 | 10.08491151 | 0 | 89.91508849 | 100 | 100 |