# EXHIBIT 4

## REDACTED VERSION

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation* | Case No. 4:21-cv-02155-YGR-VKD |
| This document applies to: *all actions* | |

**EXPERT CLASS CERTIFICATION REPORT OF**
**PROFESSOR CHRISTOPHER WILSON**

**JULY 14, 2023**

**REDACTED VERSION**

## TABLE OF CONTENTS

I.      Qualifications ................................................................................................ 3

II.     Assignments ................................................................................................. 4

III.    Summary of Opinions ................................................................................... 4

IV.     Introduction and Key Terms ......................................................................... 7

V.      The Fields of Information Commonly Shared and Sold Through Google RTB are
        Designed to Identify Individuals and Households and are Intended to be Uniform ........ 10

        A.    Through Bid Requests ........................................................................ 10

        B.    Through Cookie Matching .................................................................. 16

VI.     The Information That is Commonly Shared and Sold Through Google RTB is
        Reasonably Capable of Being Associated with Individuals and Households .................. 18

        A.    Third-party Cookies and Cookie Matching ........................................... 18

        B.    Mobile Device IDs ............................................................................ 21

        C.    User Lists ........................................................................................ 22

        D.    Fingerprinting ................................................................................. 23

VII.    Google RTB is Unavoidable ........................................................................ 25

VIII.   Scientific Analysis Confirms My Opinion that Google RTB is Unavoidable ................. 27

IX.     Privacy Settings Do Not Completely Stop the Sharing and Selling of Google Account
        Holders' Information Through Google RTB ................................................... 30

## I.  **QUALIFICATIONS**

1.      I am currently a tenured associate professor in the Khoury College of Computer Science at Northeastern University. I am a founding member of the Cybersecurity and Privacy Institute at Northeastern, and I serve as director of the Bachelor's of Science in Cybersecurity program. I am also a Faculty Associate at the Berkman Klein Center for Internet & Society at Harvard University.

2.      My research focuses on online tracking and privacy, dark pattern user interfaces, fairness and bias in machine learning, online misinformation, and algorithm auditing.

3.      My work is supported by the U.S. National Science Foundation, a 2019 Sloan Fellowship, the Mozilla Foundation, the Knight Foundation, the Russell Sage Foundation, the Democracy Fund, the Anti-Defamation League, the Data Transparency Lab, the European Commission, Google, Pymetrics, and Verisign Labs.

4.      I received my bachelor's, master's, and doctorate degrees in computer science from the University of California, Santa Barbara, in 2006, 2007, and 2012, respectively.

5.      I am a Sloan Fellow, and have co-authored well over 75 peer reviewed articles, nine of which have received awards. This includes best paper honorable mention awards at ACM SIGCOMM 2012, ACM CHI 2018, ACM CSCW 2018, and ACM CCS 2022, a distinguished paper award at NDSS 2017, the IEEE Cybersecurity Award for Innovation in 2017, the IRTF Applied Networking Research Prize in 2019, a Privacy Papers for Policymakers Award from the Future of Privacy Forum in 2019, and an Outstanding Analysis Award at AAAI ICWSM in 2019.

6.      My curriculum vitae, which includes a list of my research publications, conference papers, patents, and grant support, is attached as **Exhibit A**.

7.      I have been retained by counsel for Plaintiffs as an expert in this matter and submit this report in support of Plaintiffs' Motion for Class Certification. My hourly rate is $500 USD for non-testifying work and $750 USD for deposition and testifying work.

8.      In preparation for this report, I conducted independent testing and analysis, and reviewed the materials identified in **Exhibit B**.

9.     I reserve the right to supplement and amend this report based on additional materials and information that become available to me.

## II.    ASSIGNMENTS

10.     I understand that this case concerns Google's Real Time Bidding auction platform ("Google RTB") and the information that Google shares and sells on that platform.

11.     I have been asked to analyze and provide opinions as to various aspects of Google RTB, including: (1) the nature of the information being shared with and sold to RTB participants and whether it is done on a uniform basis within each bid request; (2) whether the information that is shared and sold through Google RTB may be reasonably associated with an individual or household, either by Google or by an RTB participant; (3) the ubiquity of Google RTB and whether Google account holders can avoid being the subject of a Google RTB bid request; and (4) whether certain privacy settings prevent the sharing and selling of Google account holders' information through Google RTB.

12.     My analysis on the above points is based on Google's public documents, a review of academic research, sample productions of bid requests from certain RTB participants, and independent testing. These are all sources of information that are separate and apart from Google's internal systems and logs of what is shared and sold through Google RTB. It is my understanding that Prof. Zubair Shafiq, also an expert in data science, is analyzing what occurs within Google's systems and Google RTB. My testing and analysis occurred independent of Prof. Shafiq's work and I do not rely on his conclusions for mine.

## III.    SUMMARY OF OPINIONS

13.     Based on my review of Google documents (specifically, its "protocols" related to Google RTB), and analysis of sample bid requests produced by certain RTB participants,[1] it is my opinion that there is a uniform set of information contained in all Google RTB bid requests that is shared with and sold to RTB participants. That is, based on Google's own documentation, the

---

[1] As explained below, "RTB participants" refers to the entities that participate in Google RTB auctions by receiving bid requests from Google and, potentially, bidding in some of the auctions.

Google RTB bid requests are intended to be uniform in the types of information shared and sold. My opinion is supported by:

    a.   <u>Google's own developer documentation</u>. This documentation, often referred to as a protocol, i.e. standard mode of operation, indicates that throughout the Class Period[2] Google RTB bid requests commonly transmitted the following information associated with an individual, the household or device: per-person and per-device unique identifiers (e.g., from third-party cookies and mobile devices); the current and past URL visited; the current mobile app used; the current geolocation and place of residence; and the title and other meta-data associated with video and audio that a person is engaging with.

    b.   <u>Sample bid requests produced by Google RTB Participants</u>. It is my understanding that some of the RTB participants have produced samples of the types of information they receive through Google RTB. Based upon my review and analyses of these samples, it is my opinion that the samples confirm that Google does indeed distribute bid request information consistent with its protocol. That is, the sample bid requests produced by RTB participants in fact contain, among other things, individuals' unique identifiers, geolocation, and browsing history as described in Google RTB protocols.

14.    Based on my experience and expertise in the field of data science, it is my opinion that the common information contained in Google RTB bid requests is reasonably capable of being used to identify individuals and households. In fact, the information shared and sold is explicitly designed to identify individuals and households. The ability to identify individuals and households can be done by Google, as well as by the RTB participants, based in part upon information Google provides. This occurs in the following ways:

---

[2] It is my understanding that the Class Period is June 28, 2016 to present.

a. Third-Party Cookies and Cookie Matching: Google assigns unique identifiers to all web browsers and then makes these identifiers available to RTB participants in bid requests and via an identifier synchronization protocol known as cookie matching.

b. Mobile Device IDs: Android and iOS smartphones all include a unique identifier. Google makes these identifiers available to RTB participants in bid requests.[3]

c. User Lists: Google allows RTB participants to place individuals or households onto "user lists" based on their web browsing history and mobile app usage. Google informs RTB participants if they are bidding on an impression from a user on one of their lists (and which list they appear on), thus enabling RTB participants to re-identify individuals and households based on their prior behaviors.

d. Fingerprinting: Google distributes information in bid requests that is sufficient for RTB participants to compute unique, probabilistic identifiers for individuals and households, commonly known as "fingerprints".

15.    Based on my experience and expertise in the field of data science, and specific analytical work performed for this engagement, it is my opinion that, in the course of using the web and mobile apps, it is impossible for the average Google account holder to avoid having their data shared and sold through Google RTB. This is because Google RTB is the largest ad network, working with 1.3 million publishers, including most of the major media organizations and retailers in the world. This conclusion is found in a large body of academic literature, spanning the last 15 years, and supported by my own testing.

16.    Based on my experience and expertise, review of Google documentation, and my independent testing and analysis, it is my opinion that the various privacy settings that are intended

---

[3] Throughout the Class Period, virtually all smartphones available in the U.S. have been either Android or iOS based.

to stop or limit ad personalization do not completely prevent the sharing and selling of Google account holder information in Google RTB. Regardless of what setting is invoked, enough information is still shared in Google RTB to allow account holders, at the very least, to be fingerprinted.

17.     Based on my experience and expertise in the field of data science, the ubiquity and pervasiveness of Google RTB, and specific analytical work performed for this engagement, it is my opinion that it is very unlikely that there are any Google U.S. account holders who, over the entire seven-year Class Period, did not have their data shared and sold through Google RTB at least once.

## IV.     INTRODUCTION AND KEY TERMS

18.     This case concerns Google RTB, a proprietary Internet-based advertising auction platform through which Google transmits information about Internet users to hundreds of third-party companies around the world, including ad exchanges, advertisers and other entities (these are referred to herein as "RTB participants"). This information transmitted by Google in Google RTB includes device identifiers, cookies, location data, internet protocol (or "IP") addresses, individual demographics, and other information regarding users' interactions with websites and mobile applications ("apps"). As I describe in this report, this information identifies, relates to, describes, or is reasonably capable of being associated with or may be linked with, a particular person or household. By transmitting this information to RTB participants, they can curate and deliver to users targeted, personalized online display and video advertising ("ads").

19.     My understanding is that plaintiffs are Google account holders and that they have alleged that Google shares and sells their information through Google RTB. Throughout this report, I will use the phrases "Google account holder data" and "account holder data" to refer to the data that Google shares and sells via Google RTB about its account holders.

20.     "Publishers" are ad-industry parlance for websites and apps that earn revenue by displaying ads alongside their content. Publishers are on the "sell-side" of Google RTB: they sell

their inventory of impressions to "advertisers"—companies that pay money to purchase impressions and show their ads to internet users.

21.    An "impression" is the basic unit of exchange in Google RTB. It represents an empty space in a website or app that can be filled with an ad that will be shown to a single individual. A publishers' "inventory" is therefore all the impressions they have available for sale, which is intrinsically related to the number of people who use the publishers' website or app.

22.    "Demand Side Platforms" ("DSPs") are tools offered by online advertising companies that enable advertisers to purchase impressions. Along with advertisers, they encapsulate the "buy-side" of Google RTB.  For example, Google owns and operates a DSP currently known as *Google Display and Video 360* (or *DV360*).

23.    "Ad exchanges" are the ad-industry term for RTB auctions that facilitate the selling and buying of impressions. Google owns and operates an ad exchange that is currently part of a product suite known as *Ad Manager*. I will use the phrase "Google RTB" to refer specifically to Google's ad exchange. In the past, Google has sometimes referred to its ad exchange as *AdX*.

24.    In Google RTB, impressions from publishers are made available to RTB participants, who may bid on them. The process works as follows:

    a.  A person visits a website or opens an app that earns money by displaying ads.

    b.  Code (typically provided by Google) that the publisher includes in their website or app sends the impression to Google. The impression includes information about the person and their computer, including unique identifiers associated with the person (e.g., from a Google cookie or device identifier), the device's IP address, the URL of the website or the name of the app that the person is currently using, and the make and model of the person's web browser or mobile device.

    c.  Google receives the impression and packages it into a "bid request". The bid request is a standardized way for Google to communicate impressions with RTB participants. The bid request includes the information from the person and

their device that I describe above, and potentially additional information (such as age and gender) that Google has associated with this person. I describe Google RTB's bid requests more fully below.

d. Google sends the bid request to RTB participants in its auctions. Participants may choose to bid on this impression by submitting "bid responses" to Google. Based on the bid responses, Google determines the winner of auction. **Note that RTB participants gain access to all the information in the bid request even if they choose not to bid on this impression**.

e. Google instructs the person's browser or app to communicate with the winning participant, so that they may fill the impression with an ad.

25.    To the best of my knowledge, the Google RTB process that I describe above has remained consistent for years, dating back to Google's original acquisition of DoubleClick in 2008, well before the start of the Class Period here.

26.    The entire process of soliciting bids for an impression, collecting bids, determining the winner of the auction, and serving the ad typically takes a fraction of a second, which explains the "real time" nomenclature of RTB.

27.    Google RTB is not open to the public. Google only sends bid requests to authorized RTB participants, who must sign contracts and have a formal business relationship with Google.

28.    Google RTB facilitates the selling and buying of impressions generated from a variety of online sources. This includes impressions from websites, apps, and internet-connected devices such as "smart" televisions.

29.    Participants in Google RTB may be DSPs or other ad exchanges. Google refers to the latter as Open Bidding or Exchange Bidding.[4] Open Bidding dramatically increases the distribution of account holder data because the bid requests that Google RTB shares with other ad

---

[4]    See    https://support.google.com/admanager/answer/7128453?hl=en    and    GOOG-HEWT-00004175.

exchanges are then immediately shared with additional participants in these ad exchanges too. As of April 2023, Google's Open Bidding program includes ▮ ad exchange partners.

30.    Money in the online advertising ecosystem flows from advertisers, to DSPs, to ad exchanges, and finally to publishers. DSPs and ad exchanges earn revenue by retaining a percentage of the fees paid by advertisers.

31.    In this report, I use the term "tracking" to refer to the practice of identifying individual people and devices on the internet using unique identifiers for the purpose of observing and recording people's actions on the internet over time. As discussed further below, RTB participants engage in tracking and use the data transmitted by Google in the bid requests to, among other things, build "profiles" of individuals by inferring their demographics, interests, hobbies, place of residence, etc.

## V.    THE FIELDS OF INFORMATION COMMONLY SHARED AND SOLD THROUGH GOOGLE RTB ARE DESIGNED TO IDENTIFY INDIVIDUALS AND HOUSEHOLDS AND ARE INTENDED TO BE UNIFORM

32.    In this section I describe the specific fields of information that are shared and sold through Google RTB. Specifically, I explain how the types of information shared with and sold to RTB participants are uniform and in accordance with two Google protocols: bid requests and cookie matching. I describe each of these in turn, including the specific account holder data that Google distributes in each scenario.

### A.    THROUGH BID REQUESTS

33.    Google distributes bid requests to RTB participants using two protocols:[5] *OpenRTB*, which is a standard defined by the Interactive Advertising Bureau (IAB) Tech Lab,[6] and *RTB Protobuf*, which is a custom protocol defined by Google that is encoded in the Protocol

---

[5] See GOOG-HEWT-00000557 and GOOG-HEWT-00000655.

[6] The IAB (iab.com) is a trade group that purports to have over 700 members representing many stakeholders in the online ad industry, including DSPs, ad exchanges, and publishers. Google is a member. The IAB develops ad industry standards that are often adopted, such as the Trust and Consent (TCF) framework that is used to communicate user consent under GDPR in Europe.

Buffer format.[7] In my experience, protocol documents are, in effect, design specifications that set out the standard operating procedure for Google RTB bid requests.

34.    Both bid request protocols have similar overall functionality: each time an impression arrives in Google RTB, Google creates and disseminates bid requests to RTB participants in a uniform manner. RTB participants that choose to bid on the impression send a bid response to Google that includes the price they are willing to pay and information about the ad they would like to serve to the user.

35.    The below Table 1 contains the names and descriptions of the fields that Google's protocols indicate will be contained in Google RTB bid requests. Both *OpenRTB*- and *RTB Protobuf*-formatted bid requests contain analogous fields.

| Field Name | Description |
|---|---|
| ip | The first 3 bytes of the IP address in network byte order for IPv4, or the first 6 bytes for IPv6. |
| google_user_id | The Google ID for the user. This field may be the same as the Google ID returned from the cookie matching service. |
| hosted_match_data | Match data stored for this google_user_id through the cookie matching service. |
| session_id | Represents a short-lived user session on CTV/OTT devices, with a maximum session duration of 6 hours. The use of session_id is never allowed for ads personalization. The session_id may only be used for frequency capping, competitive exclusions or related purposes. |
| user_agent | A string that identifies the browser and type of device that sent the request. |
| lat, lon, country, region, metro, city, zip | The user's approximate geographic location. All location information is IP geolocation-derived.  The lat/lon fields may be a reference position (for example, centroid) for the IP geolocation-derived location that's also carried by the other fields (for example, a city), and accuracy will be the radius of a circle with the approximate area of that location. Location and its accuracy will be fuzzified as necessary to protect user privacy. |
| user_list.id | The user list id. |
| url | The URL of the page with parameters removed. |
| detected_language | Detected user languages, based on the language of the web page, the browser settings, and other signals. |

---

[7] Protocol Buffers are a tool developed by Google that enable developers to clearly specify the format of data. Clear data specification is important when computers communicate with each other over the Internet, to avoid ambiguity.

| ███████████[8] | Unordered list of ████████. See the publisher-verticals.txt file in the technical documentation for a list of ids.[9] |
|---|---|
| detected_content_label | List of detected content labels. See content-labels.txt file in the technical documentation for a list of ids.[10] |
| platform, brand, model, os_version, carrier_id | The platform of the device. Examples: android, iPhone, palm. The brand of the device, for example, Nokia, Samsung. The model of the device, for example, N70, Galaxy. The OS version; for example, 2 for Android 2.1, or 3.3 for iOS 3.3.1. Unique identifier for the mobile carrier if the device is connected to the internet through a carrier (as opposed to through WiFi). |
| app_id | The identifier of the mobile app when this ad query comes from a mobile app, or from a mobile web page contained inside an app. If the app was downloaded from the Apple iTunes app store, then this is the app-store id, for example, 343200656. For Android devices, this is the fully qualified package name, for example, com.rovio.angrybirds. For Windows devices it's the App ID, for example, f15abcde-f6gh-47i0-j3k8-37l93817mn3o. |
| encrypted_advertising_id | This field is used for advertising identifiers for 1) iOS devices (This is called Identifier for Advertising, or IDFA, as described at https://support.google.com/authorizedbuyers/answer/3221407), 2) Android devices, 3) Roku devices, 4) Microsoft Xbox devices, 5) Amazon devices (for example, Amazon Fire). |
| advertising_id | Unencrypted version of encrypted_advertising_id. |
| app_name | App names for Android apps are from the Google Play store. App names for iOS apps are provided by App Annie (https://www.appannie.com). |
| video. description_url | The URL of the page that the publisher gives Google to describe the video content, with parameters removed. |

*Table 1: Fields in Google RTB bid requests that contain account holder data. Field names and descriptions (lightly edited) taken from Google's RTB Protobuf source code.[11]*

36.     Based on my expertise and experience, the above information that is shared and sold through Google RTB is actually linked or reasonably capable of being linked to an individual or household. This is because the information shared and sold includes:

   a.   Unique identifiers, whether drawn from cookies or mobile devices, that can be used to identify a particular individual or device. For example, the fields

---

[8] It is my understanding that this field was expressly shared by Google and, at some point, Google decided to remove it from RTB bid requests. It is my opinion, however, that the removal of the field has minimal impact on an RTB participant's ability to deduce the content and categorization of the web pages that a particular individual is interacting with. This is because Google continues to share the underlying information, e.g., the URL, from which the verticals are derived.

[9] See https://storage.googleapis.com/adx-rtb-dictionaries/publisher-verticals.txt.

[10] See https://storage.googleapis.com/adx-rtb-dictionaries/content-labels.txt.

[11] See GOOG-HEWT-00000655 and https://developers.google.com/authorized-buyers/rtb/downloads/realtime-bidding-proto.

*google_user_id*, *hosted_match_data*, *session_id*, *user_agent*, *user_list.id*, *encrypted_advertising_id*, and *advertising_id* in Table 1.

b. Information regarding browsing history, including URL visitation, app usage, and video and audio consumption. For example, the fields *url*, ███████████, ████████████, *app_id*, *app_name*, and *video.description_url* in Table 1.

c. Geolocation information. For example, the fields *ip* (from which geolocation can be inferred), *lat*, *lon*, *country*, *region*, *metro*, *city*, and *zip* in Table 1.

37.    It is my understanding that some of the RTB participants have produced sample logs of bid requests that they received from within Google RTB.[12] These logs confirm that Google in fact distributes, among other information, a common core set of Google account holder information that is identified in Google's protocols. This includes:

████████████████████████████

b. mobile device advertising identifiers like Android ADID and Apple IDFA;

c. truncated IP addresses;[13]

d. current latitude and longitude with accuracy;

e. current city, state, and ZIP Code;

f. device make, model, and operating system version; browser vendor and version; and,

---

[12] See, e.g., TTD-Hewitt-0000002. TTD denotes production from The TradeDesk. It is my understanding that additional productions were also made by Google RTB participants LinkedIn, Next Roll, Meta, Walmart, and Twitter, among others. In at least one instance, the Google RTB participant, Meta, redacted certain information shared with the following: "REDACTED FOR PRIVACY REASONS". This redaction appeared on many of the fields that I have identified in this report to be capable of identifying individuals and households. See METARTB_000000004.

[13] Based on GOOG-HEWT-00000655 and https://developers.google.com/authorized-buyers/rtb/downloads/realtime-bidding-proto, Google sends "truncated" IP addresses within bid requests. As explained further below, the "truncated" nature of the IP address does not change the fact that it is account holder data because it can be used calculate "fingerprints," which is a method of identifying individual people.

     g.   the webpage or app the person is currently viewing.

38.    The New York Times is a publisher that sells impressions from its website and mobile app through Google RTB. The New York Times produced logs of bid requests that Google auctioned on its behalf, downloaded from systems that Google makes available to publishers. These logs encompass all impressions that Google auctioned for The New York Times over a 24-hour period starting on November 30, 2021. In total, there are ▮▮▮▮▮▮ impressions in the logs.

39.    The logs produced by The New York Times also confirm that Google in fact distributes, among other information, a common core set of Google account holder information that is identified in Google's protocols. Table 2 (below) contains the (abridged) contents of one bid request from the log, which corresponds to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



*Table 2: Information in a Google RTB bid request produced by The New York Times.*[14]

---

[14] See NYT Production, NetworkRequests_357278_20211130_0.zip, NetworkRequests_357278_20211130_1.zip, NetworkRequests_357278_20211130_2.zip ("Network Request Files").

40.    Table 3 (below) contains the contents of another (abridged) bid request from the log produced by the New York Times, this one corresponding to a ████████████████████ ████████████████████



*Table 3: Information in a Google RTB bid request produced by The New York Times.*[15]

41.    The fact that the information shared and sold through Google RTB can be used to identify an individual or household is not surprising. The very purpose of Google RTB is to encourage RTB participants to bid on impressions in Google RTB. And, because RTB participants seek to *target* ads *to individuals* based on context (i.e., what they are doing on the internet at that moment), location, demographics, historical web browsing or app usage, market "segments" (i.e., conservative men ages 25—40), long-term (inferred) interests, etc., the nature of the information being shared and sold needs to facilitate that *individual targeting*.[16] Thus, providing information

---

[15] See NYT Production, Network Request Files.
[16] Below, I discuss just how "routine" this ad targeting is. In Table 5, I present the number of websites visited by the plaintiffs on which Google RTB was present. In Section IX, I present the

in a bid request that will facilitate identification of individuals is the way in which Google makes money.

42.    Google encourages RTB participants to collect and retain the account holder information that is contained in bid requests for the purpose of building profiles about people. For example, *RTB Protobuf*-formatted bid requests contain a field called *allow_user_data_collection* that Google describes as:

> True if publisher grants the permission to allow the bidder to use user visitation information from the publisher's site to create interest categories that can be used to serve ads based on those categories.[17]

Thus, by default, Google allows RTB participants to use account holder information from bid requests to build interest profiles and use them to target ads unless a publisher specifically disallows it.[18]

## B.    THROUGH COOKIE MATCHING

43.    Google RTB engages in a practice known as "cookie syncing" or "cookie matching." In addition to the sharing and selling of individuals' information through bid requests, Google also facilitates the sharing and selling of individuals' information with RTB participants through cookie matching.

44.    Google's documentation states that Google RTB supports "bidder-initiated" and "Google-initiated" cookie matching.[19] In the former case, an RTB participant initiates the cookie matching process by sending its unique identifier for an individual to Google. In the latter case, Google initiates the cookie matching process by sending Google's unique identifier for an individual to an RTB participant.

---

results of experiments that I conducted where I recorded Google RTB targeting ads to web browsers that I controlled.

[17] See https://developers.google.com/authorized-buyers/rtb/downloads/realtime-bidding-proto.

[18] See https://support.google.com/admanager/answer/11956152.

[19] See https://developers.google.com/authorized-buyers/rtb/cookie-guide.

45.    Google shares and sells individuals' information with RTB participants when it initiates cookie matching. This includes Google's unique identifier for the individual (from their third-party cookie), the current webpage they are visiting (e.g., its URL), their complete IP address, and the vendor and version of their web browser (the user agent). As I have already established, this information can be used to reasonably identify an individual or household.

46.    There is clear evidence that Google and RTB participants engage in cookie matching. Google's documentation states that Google supports cookie matching with participants in Google RTB.[20] Specifically, Google provides RTB participants with an "Application Programming Interface" ("API") where those participants can configure settings to facilitate cookie matching from Google to themselves.[21]

47.    Confirmation of Google RTB cookie matching also comes from third-party productions. Certain RTB participants produced sample logs of bid requests that confirm Google RTB supports and engages in cookie matching.[22] Some log entries contain bid requests that include Google's unique identifier and the RTB participants' unique identifier for the same individual, demonstrating that the two cookies have been matched in those cases.[23]

48.    I have confirmed that Google RTB shares and sells unique identifiers, URLs of visits to websites, and IP addresses to RTB participants using data collected from web crawlers. In these experiments, I had a crawler visit websites that included resources from Google and I recorded all network requests initiated by third parties (including Google). These network requests confirm that the information I state above is transmitted by Google to RTB participants through the cookie matching API.

49.    Academic studies have consistently observed Google matching cookies with tens to hundreds of third parties and estimated that 84% of people using the web are exposed to Google

---

[20] See https://developers.google.com/authorized-buyers/rtb/cookie-guide.

[21] See GOOG-HEWT-00000236.

[22] See TTD-Hewitt-0000002.

[23] See TDD-Hewitt-0000002.

cookie matching.[24] This means that, in addition to sharing and selling account holder information via bid requests, Google is also responsible for sharing significant volumes of account holder information via RTB cookie matching.

## VI.  THE INFORMATION THAT IS COMMONLY SHARED AND SOLD THROUGH GOOGLE RTB IS REASONABLY CAPABLE OF BEING ASSOCIATED WITH INDIVIDUALS AND HOUSEHOLDS

50.     In this section, I describe how the information that is shared and sold through Google RTB is reasonably capable of being used to identify an individual or household (as opposed to actually being capable of identifying an individual or household, which is demonstrated above). This reasonable capability to associate applies both to Google and to RTB participants. Below, I explain the four methods that Google and RTB participants can reasonably use to associate the information shared and sold through Google RTB with individuals and households, including individual Google account holders. In fact, Google's own documentation states plainly that Google wants RTB participants to uniquely identify individuals and households on the Internet and build long-term behavioral "profiles" about them.

### A.     THIRD-PARTY COOKIES AND COOKIE MATCHING

51.     The primary mechanism that Google uses to uniquely identify individuals on the web is "third-party cookies". As I have already shown, Google distributes these unique identifiers to RTB participants via bid requests in the *google_user_id* field, as listed in Table 1.

52.     By way of background, a "cookie" is a piece of data that websites may insert into an individual's web browser.

---

[24] See, e.g., Olejnik et al., *Selling Off Privacy at Auction*, NDSS, February 2014, available at https://www.ndss-symposium.org/wp-content/uploads/2017/09/05_5_0.pdf; Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, CCS, November 2014, available at https://securehomes.esat.kuleuven.be/~gacar/persistent/the_web_never_forgets.pdf; Bashir et al., *Tracing Information Flows Between Ad Exchanges Using Retargeted Ads*, Usenix Security, August 2016, available at https://cbw.sh/static/pdf/bashir-usenix16.pdf (in which my co-authors and I observed that Google was matching cookies with at least 38 third parties).

a. "First-party cookies" are set by the website that a person intends to visit, i.e., the website that appears in the address bar of the web browser.

b. "Third-party cookies" are set by other businesses that embed objects (e.g., images or JavaScript) into a first-party webpage or interact with objects on a first-party webpage.

53. A cookie may contain any type of data. To facilitate long-term observation of an individual's behavior, Google RTB (and other Google products, including Google DV360) places unique identifiers into the cookies they insert into each web browsers. Google stores cookies under the *doubleclick.net* domain name, since DoubleClick was the original developer of the ad exchange that Google acquired.

54. Third-party cookies are not necessary for the web to function. For example, Mozilla Firefox has disabled third-party cookies by default since September 2019.[25] Apple Safari has disabled third-party cookies by default since March 2020.[26] Google Chrome disabled third-party cookies by default in incognito browser windows in May 2020.[27] Disabling third-party cookies does not prevent first-party websites from embedding resources (e.g., images, videos, maps, JavaScript code, etc.) from third parties into their websites.

55. Unless a given cookie is removed from a person's web browser, the web browser will communicate that cookie to the party that set it whenever the web browser contacts that party. For example, once Google has set a cookie in a person's web browser, the web browser will send that cookie back to Google RTB in the future—mechanically and automatically, with no user interaction or notice required—as that person browses the web.

---

[25] See https://blog.mozilla.org/en/products/firefox/firefox-news/todays-firefox-blocks-third-party-tracking-cookies-and-cryptomining-by-default/.

[26] See https://webkit.org/blog/10218/full-third-party-cookie-blocking-and-more/.

[27] See https://venturebeat.com/business/google-chrome-83/.

56.     Academic research has consistently shown that Google is the most prolific tracker on the web.[28] In studies spanning 2006-2016 that collected data from hundreds of thousands of the most popular websites, researchers found that trackers from Google appeared on 75% or more of all studied websites, more than any other company. This means that Google has unprecedented capabilities to set their third-party cookies in peoples' web browsers and track their browsing history over time. Google then sells and shares these unique identifiers to participants in Google RTB.

57.     Google helps RTB participants to identify unique devices, individuals, and households via cookie matching, a protocol that I have already introduced above. Cookie matching is a common process for Google account holders without which RTB participants would have much less comprehensive behavioral profiles of Google account holders.

58.     By way of background, a web browser security mechanism known as the "Same Origin Policy" traditionally prevents third parties from directly reading Google's cookies. For example, Criteo (a DSP) may not directly read Google's cookie.

59.     The Same Origin Policy restriction on the reading of cookies hinders the functionality of Google RTB. For example, when Google sends out a bid request for a person with

---

[28] See, e.g., Balachander Krishnamurthy and Craig E. Wills, *Generating a Privacy Footprint on the Internet*, IMC, October 2006, available at http://conferences.sigcomm.org/imc/2006/papers/p6-bala.pdf; Adam Lerner, et al., *Internet Jones and the Raiders of the Lost Trackers: An Archaeological Study of Web Tracking from 1996 to 2016,* USENIX Security Symposium, August 2016, available at https://www.usenix.org/system/files/conference/usenixsecurity16/sec16_paper_lerner.pdf; Aaron Cahn, et al., *An Empirical Study of Web Cookies*, International World Wide Web Conference, WWW, April 2016, available at https://dl.acm.org/doi/pdf/10.1145/2872427.2882991; Steven Englehardt and Arvind Narayanan, *Online Tracking: A 1-million-site Measurement and Analysis*, CCS, October 2016, available at https://www.cs.princeton.edu/~arvindn/publications/OpenWPM_1_million_site_tracking_measurement.pdf; Muhammad Ahmad Bashir, Sajjad Arshad, William Robertson and Christo Wilson, *Tracing Information Flows Between Ad Exchanges Using Retargeted Ads*, Usenix Security. Austin, TX, August 2016 (Google in fact shares tracking data for advertising purposes across several of its domains, including *doubleclick.net*, *googlesyndication.com*, *googleadservices.com*, and *googletagmanager.com*).

a Google unique identifier, e.g., '12345', participants, like Criteo, may not know who this person is since they assigned different identifiers to them (in their own third-party cookies).

60.    To overcome the Same Origin Policy restriction on the reading of cookies, Google RTB and DSPs engage in cookie matching. In this practice, a third party reads their own unique identifier from their cookie and then sends that information in an HTTP request from the person's web browser to one or more other third parties. The result of this practice is that latter third parties associate their unique identifier for an individual with the unique identifier of the former third party. Continuing the hypothetical example above, Google allows participant Criteo to cookie match by providing Criteo with the information for Criteo to know that unique Google user '12345' is the same as Criteo unique user 'ABCDE'.



62.    Cookie matching enables RTB participants to translate the unique identifiers for individuals provided by Google within bid requests to their own unique identifiers for the same individuals. Thus, when an RTB participant receives a bid request from Google, it can look at data, a behavioral profile, and/or inferences it already has about a given individual (obtained from its own third-party tracking) and associate that information with the data that Google shares and sells in bid requests. This dramatically expands the volume and scope of Google account holder data that RTB participants may draw on to target advertising.

### B.    MOBILE DEVICE IDS

63.    The primary mechanism that Google uses to identify individuals on mobile devices (e.g., smartphones and tablets) is advertising identifiers that are built-in to Google's Android and Apple's iOS operating systems.[29] These identifiers serve the same function as third-party cookies on the web: they identify a unique mobile device.

---

[29] As noted in footnote 4, throughout the Class Period, virtually all smartphones available in the U.S. have been either Android or iOS based.

64.    On Android the advertising identifier is known as the Android Advertising ID (ADID).

65.    On iOS the advertising identifier is known as the Identifier for Advertising (IDFA).

66.    Google distributes ADID and IDFA to participants in Google RTB via the *encrypted_advertising_id*, and *advertising_id* fields in **Error! Reference source not found.**1.

67.    Academic research has consistently shown that Google is the most prolific tracker on mobile devices.[30] In studies spanning 2012-2018 that collected data from hundreds of thousands of the most popular apps, researchers found that trackers from Google appeared on 44-73% of all studied apps, more than any other company. These apps were used by 68-84% of studied users. This means that Google has unprecedented reach and insight into the app usage history and identifiability of app users worldwide.

C.    **USER LISTS**

68.    "User lists", also sometimes known as "remarketing lists", are a tool offered by Google to RTB participants. This tool allows those participants to build lists of individual devices, people, and households that they would like to target advertisements to in the future.[31] User lists are yet another mechanism provided by Google that allows RTB participants to target ads based on account holder data.

69.    RTB participants communicate what devices, people, and households they would like to include in a user list by supplying lists of unique identifiers to Google. Types of unique

---

[30] See, e.g., Vallina-Rodriguez et al., *Breaking for Commercials: Characterizing Mobile Advertising*, IMC, November 2012, available at https://www1.icsi.berkeley.edu/~narseo/papers/AdTraffic_IMC2012.pdf; Theodore Book and Dan S. Wallach, *A Case of Collusion: A Study of the Interface Between Ad Libraries and their Apps*, SPSM, November 2013, available at https://arxiv.org/pdf/1307.6082.pdf; and Razaghpanah et al., *Apps, Trackers, Privacy, and Regulators: A Global Study of the Mobile Tracking Ecosystem*, NDSS, February 2018, available at http://www.icir.org/christian/publications/2018-ndss-trackers.pdf.

[31] See https://developers.google.com/authorized-buyers/rtb/bulk-uploader.

identifiers that Google accepts for user lists include Google Biscotti cookies, Android ADID, and iOS IDFA.[32]

70.    During the cookie matching process, Google permits RTB participants to add individual people to user lists.[33] For example, an RTB participant might decide to add all people who visit a specific website (e.g., webmd.com) to a user list, or even a specific webpage (e.g., webmd.com/women/abortion-procedures).

71.    RTB participants are free to create as many user lists in Google RTB as they choose. Google assigns a unique identifier to each user list (known as the user list ID).

72.    If Google RTB auctions an impression from a person who is on one or more user lists, the corresponding bid requests to the relevant RTB participants will include the user list IDs in the *user_list.id* field, as listed in Table 1.

73.    A bid request may contain user list IDs even if other unique identifiers, such as the Google user ID or the mobile device identifier, are not present.

74.    Considered as a whole, user lists are another mechanism by which Google RTB enables RTB participants to identify people based on their prior browsing history. Again, as I previously established, this is Google account holder data.

**D.    FINGERPRINTING**

75.    In addition to the reasons given above, based on my expertise and experience, the information in Table 1 that is shared and sold through Google RTB also constitutes Google account holder data because it contains probabilistic identifiers. Probabilistic identifiers are also known as "fingerprints." When unique identifiers (e.g., from cookies or device identifiers) are unavailable, advertisers sometimes calculate fingerprints as a way of uniquely identifying Internet users.[34]

---

[32] Ibid.

[33] See https://developers.google.com/authorized-buyers/rtb/cookie-guide.

[34] See e.g., Steven Englehardt and Arvind Narayanan, *Online Tracking: A 1-million-site Measurement and Analysis*, CCS, October 2016, available at https://www.cs.princeton.edu/~arvindn/publications/OpenWPM_1_million_site_tracking_measurement.pdf.

76. Fields in Table 1 from which fingerprints could be calculated include:

    a. The truncated IP address *ip* field.

    b. Information regarding people's devices, including the fields *user_agent*, *platform*, *brand*, *model*, *os_version*, *carrier_id*, and *detected_language*.

77. Google studied the problem of fingerprinting in ▉ and found that, ▉▉▉▉▉



.[35] Google also determined that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

78. Thus, even if some of the information above (e.g., user agent and truncated IP) is not account holder data in isolation, in combination (which is the method in which they are shared and sold through Google RTB) the information constitutes Google account holder data because, taken collectively, it can be used as high-accuracy probabilistic identifiers to uniquely identify a person or device.

79. For example, to determine how susceptible visitors to The New York Times are to fingerprinting via information in Google RTB bid requests, I analyzed data from Google RTB produced by The New York Times. Specifically, I isolated all the impressions in the logs that contained a unique identifier (e.g., ▉▉▉▉▉▉▉ calculated the fingerprint for each request (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉), and finally examined the frequency at which each fingerprint occurred. I found that ▉% of the fingerprints I calculated were uniquely associated with a single individual, device, or household that visited the New York Times. I found that an additional ▉ of the fingerprints were semi-unique, placing these individuals, devices, or households in a group with between ▉ and ▉ others.[36]

---

[35] See GOOG-HEWT-00459494. GOOG-HEWT-00291417 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

[36] See NYT Production, Network Request Files.

## VII.    **GOOGLE RTB IS UNAVOIDABLE**

80.    In this section, I investigate the overall size and scale of Google RTB, including the number of websites and apps that sell ad inventory in Google's RTB marketplace and the number of advertising companies that Google RTB shares and sells data with to facilitate bidding on ad inventory. This investigation addresses people's overall exposure to Google RTB as they use the Internet and the scale at which Google RTB shares and sells their information.

81.    Google RTB is the largest ad exchange on the Internet. It works with more publishers to sell their impressions, and makes these impressions available for purchase to more participants, than any other ad exchange that I am aware of. This means that Google RTB has unprecedented visibility into the websites that people visit and the apps they use, and shares and sells this data at a breathtaking scale.

82.    Google RTB is the largest ad exchange by market share. Publicly available estimates suggest that over 50% of all ad impression inventory in the US is bought and sold on its ad exchange.[37]

83.    There are over a million websites and apps that sell impressions through Google RTB. Ad exchanges, like Google RTB, are required to be compliant with a standard from the Interactive Advertising Bureau (IAB) called *sellers.json*, which mandates that ad exchanges place a file on their website (in a standardized location, using a standardized format) that contains data about all publishers whose impression inventory they are authorized to sell.

---

[37] See In re: Google Digital Advertising Antitrust Litigation, Amended Complaint — Document #81, District Court, S.D. New York, September 2021, available at https://www.courtlistener.com/docket/60149069/81/in-re-google-digital-advertising-antitrust-litigation/; and Patience Haggin and Kara Dapena, *Google's Ad Dominance Explained in Three Charts*, Wall Street Journal, June 2019, available at https://www.wsj.com/articles/why-googles-advertising-dominance-is-drawing-antitrust-scrutiny-11560763800.

| Ad Exchange | Unique Publishers |
|---|---|
| Google | 1,286,648 |
| Taboola | 21,710 |
| OpenX | 8,006 |
| Outbrain | 7,247 |
| PubMatic | 4,578 |
| Index Exchange | 4,072 |
| Rubicon Project | 2,991 |
| AppNexus | 1,988 |

*Table 4: Publishers per Ad Exchange as of November 2022.*

84.     Table 4 presents the number of publishers whose impression inventory is sold by eight large ad exchanges, based on their *sellers.json* files. I collected these files during the week of November 21, 2022. Google's *seller.json* file states that its ad exchange sells impression inventory from over one million publishers, which is two orders of magnitude more than what competing ad exchanges state in their *sellers.json* files.

85.     The count of publishers that Google claims to work with in its ad exchange under-estimates the prevalence of Google RTB around the internet because a given publisher may own multiple websites and apps. For example, in 2019 I observed Vox Media—publisher of New York magazine, Vulture, The Verge, etc.—operated 97 websites that all served ads under the same publisher account.[38]

86.     The number of participants in Google RTB (i.e., ad exchanges and DSPs) is unclear. Google states[39] that there are 1070 participants in its ad exchange in the European market (excluding Google itself, as of November 2022). Google states[40] that there are 306 participants in its ad exchange in U.S. states that have online privacy laws, such as California, (excluding Google itself, as of November 2022) but it is unclear if there are more participants in other U.S. states. To

---

[38] See Muhammad Ahmad Bashir, et al., *A Longitudinal Analysis of the ads.txt Standard*, IMC, October 2019, available at https://cbw.sh/static/pdf/bashir-imc19.pdf.

[39] See https://support.google.com/admanager/answer/9012903.

[40] See https://support.google.com/admanager/answer/10634320.

the best of my knowledge, Google did not publish a list of participants in its ad exchange prior to the advent of state laws like the CCPA.

87.    Based on the foregoing, it is my opinion that, in the course of using the web and mobile apps, it is impossible for the average Google account holder to avoid having their data shared and sold through Google RTB at some point. This would be particularly true here give the seven-year length of the Class Period.

## VIII.    SCIENTIFIC ANALYSIS CONFIRMS MY OPINION THAT GOOGLE RTB IS UNAVOIDABLE

88.    In this section I investigate the following question: to what extent did Google share the named plaintiffs' personal data via cookie matching and RTB? I answer this question by analyzing and experimenting with web-browsing data about the named plaintiffs produced by Google. Based on my analysis, I find that Google RTB is extensively sharing and selling named plaintiffs' information using a consistent set of mechanisms (namely, cookie matching and RTB bid requests).

89.    Google produced data from Google's Web & App Activity (also referred to as "WAA") tool associated with the named plaintiffs' Google accounts.[41] This data reflects web browsing and app usage history for each named plaintiff. Each data point corresponds to an action that a named plaintiff performed on a Google product (e.g., executing a search on Google Search), or an instance where Google observed a named plaintiff using a non-Google website or app.

90.    To be clear, the WAA activity does not reflect the actual information that was shared and sold through Google RTB for each named plaintiff, which I understand Google

---

[41] The WAA data for named plaintiffs that I used is contained in the following documents: GOOG-HEWT-00455537, GOOG-HEWT-00455538, GOOG-HEWT-00455545, GOOG-HEWT-00455547, GOOG-HEWT-00455554, GOOG-HEWT-00455555, GOOG-HEWT-00455562, GOOG-HEWT-00455563, GOOG-HEWT-00455564, GOOG-HEWT-00455565, GOOG-HEWT-00455571, GOOG-HEWT-00455572, GOOG-HEWT-00455579, GOOG-HEWT-00455586, GOOG-HEWT-00455588, GOOG-HEWT-00455595, GOOG-HEWT-00455597, GOOG-HEWT-00455604, GOOG-HEWT-00455605, GOOG-HEWT-00455617, GOOG-HEWT-00455617, GOOG-HEWT-00455625, GOOG-HEWT-00455627, GOOG-HEWT-00455634.

produced from certain internal data logs. My understanding is that analysis of those internal data logs is being undertaken by Prof. Zubair Shafiq.

91.    My review of Plaintiffs' WAA history is to determine, from the outside perspective, the prevalence of Google RTB on the websites visited by named plaintiff.

92.    To answer this question, I performed a simulation study. I extracted all the websites that the named plaintiffs visited, according to the WAA history produced by Google, and used a web crawler to visit six (6) web pages on each of these websites (their homepage plus five (5) additional pages chosen at random from the internal hyperlinks present on the homepage). Using the data from the web crawler, I can observe which of these websites embed Google RTB, and thus resulted in information (see Sec. V) being shared and sold through Google RTB, whether there was cookie matching, or both.

93.    The web crawler that I used is derived from Crawlium.[42] Crawlium controls a copy of Google Chrome to visit websites and record data. I used Chrome version 88, configured Chrome to start the web crawl with a fresh profile (e.g., no prior browsing history or cookies), and left Chrome at its default settings.

94.    Crawlium's primary output is the "inclusion tree" for each webpage that it visits. The inclusion tree is a record of all the individual objects that compose a webpage, the HTTP request and response headers associated with each object (e.g., HTML documents, images, stylesheets), all cookies set by webpages, and the causal relationships between the objects (i.e., which object caused another object to be loaded into the webpage). Inclusion trees allow me to examine, among other things, which RTB participants won the auction in an ad exchange, and which ad exchanges and DSPs were matching cookies (as well as who initiated each match).

95.    In total, the logs produced by Google contained ▮▮▮ unique websites. I crawled these websites on November 3, 2022.

---

[42] See https://gitlab.com/sajjadium/Crawlium.

| Google Account | Data Start | Data End | Total Webpages | Unique Websites | Percentage of Websites Where Google Engages in Particular Actions | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | Cookie Matching % | RTB % |
| ■ | 1/11/2021 | 5/30/2022 | ■ | ■ | ■ | ■ |
| ■ | 1/8/2020 | 6/6/2022 | ■ | ■ | ■ | ■ |
| ■ | 4/5/2020 | 6/6/2022 | ■ | ■ | ■ | ■ |
| ■ | 4/21/2022 | 6/6/2022 | ■ | ■ | ■ | ■ |
| ■ | 1/3/2014 | 6/17/2021 | ■ | ■ | ■ | ■ |
| ■ | 1/22/2021 | 6/5/2022 | ■ | ■ | ■ | ■ |
| ■ | 3/24/2021 | 6/6/2022 | ■ | ■ | ■ | ■ |
| ■ | 2/24/2021 | 6/6/2022 | ■ | ■ | ■ | ■ |
| ■ | 11/27/2013 | 6/3/2022 | ■ | ■ | ■ | ■ |
| ■ | 1/31/2022 | 6/2/2022 | ■ | ■ | ■ | ■ |

*Table 5: Results of analyzing named plaintiffs' Web & App activity logs and corresponding web crawls.*

96.     Table 5 presents the results of my analysis of the named plaintiffs' Web & App Activity logs and corresponding web crawls. Each row corresponds to the Web & App Activity logs associated with a specific named plaintiff. I exclude events in the plaintiffs' logs that correspond to actions taken on Google's own products and services (e.g., Google Search and YouTube) since the focus of my analysis is on Google RTB, which only implicates activity on non-Google services.

97.     The "Data Start" and "Data End" columns denote the date of the earliest and latest events in each Plaintiffs' Web & App activity log that was provided by Google. It is not clear why the date ranges for the Web & App activity vary in Google's production, but this does not change my conclusion that Google RTB is unavoidable.

98.     The "Total Webpages" column denotes the total number of webpages visited by each named plaintiff that were recorded in Google's production.

99.     The "Unique Websites" column denotes the number of unique websites visited by each named plaintiff that were recorded in Google's production.

100.     As shown in the "RTB %" column from Table 5, Google RTB is selling or sharing data with participants via RTB on about half of the websites visited by the named plaintiffs during

this period. Based on the data collected by my crawler, if the named plaintiffs were to have visited these websites circa November 3, 2022 (the date of my data crawl), Google would have shared or sold their information (via cookie matching and/or RTB) on 55% of these websites, on average. These results highlight the ubiquity of Google on the web in general, as well as the ubiquity of Google RTB in particular.

## IX.    PRIVACY SETTINGS DO NOT COMPLETELY STOP THE SHARING AND SELLING OF GOOGLE ACCOUNT HOLDERS' INFORMATION THROUGH GOOGLE RTB

101.    In this section I answer the following question: whether certain privacy settings will completely stop the sharing and selling of Google account holders' information through Google RTB. Based on my experience and expertise, and my independent testing and analysis, I am not aware of any data sharing setting that will completely prevent the sharing and selling of Google account holder information in Google RTB. Regardless of what setting is invoked, enough information is still shared in Google RTB to allow account holders, at the very least, to be fingerprinted by RTB participants.

102.    It is my understanding that Google has, in discovery, only produced class-wide data with respect to the Google Account Ad Personalization Opt-Out Setting (a.k.a. "GAP"), which applies only when a Google account holder is using the web or an app while signed into their Google account. Google claims that if GAP is enabled and the account holder is signed in, it will stop Google from sharing and selling account holder's information in RTB auctions. Based on my independent testing and analysis, I conclude that it does not.

103.    As an initial matter, according to Google, only a small percentage of Google account holders attempt to "disable" personalized ads via the GAP setting. Specifically, Google calculates that only 4% of Google account holders have ever attempted to opt-out of "Google Ads Personalization" in their Google account settings.[43]

---

[43] See GOOG-HEWT-00455800.  I reserve the right to amend my report and opinions on this issue if Google produces additional class-wide data for any other data settings.

104.    For the 4% of Google account holders who do change this setting, my testing reveals that their efforts – the attempt to opt-out of personalized ads – does not stop the sharing and selling of Google account holder information through Google RTB. I set out my analysis below.

105.    The GAP setting is an advertising opt-out setting that Google makes available to Google account holders. People may sign up for an account with Google and, once they have an account, they may access the Google account settings wherein there are several options, including the option to enable (opt-in to) or disable (opt-out of) "personalized ads" (Google's terminology). Figure 1 (below) presents a screenshot of this setting in its default state, which has personalized ads enabled. Figure 2 (below) presents a screenshot of this setting after disabling personalized ads. As of January 2023, Google states that "[y]our info isn't used to personalize ads" when this option is set to disabled.



*Figure 1: Screenshot of the Google Account Ad Personalization Opt-out, taken on January 27, 2023. By default, personalized ads are enabled.*



*Figure 2: Screenshot of the Google Account Ad Personalization Opt-out, taken on January 27, 2023, after disabling ad personalization.*

106.    Although Google offers this opt-out to users with Google accounts, it is not assured that Google will honor a person's wish to opt-out of targeted advertising.

107.    In the remainder of this section, I investigate whether Google respects a Google account holder's decision to disable personalized ads using the GAP setting. At a high-level, I conducted an experiment that is like a medical trial with three conditions: an untreated baseline, a treatment that is given a placebo (GAP enabled), and a treatment that is given medicine (GAP disabled). The point of the experiment is to observe whether the outcomes for the two treatments are different after taking the baseline behavior into account.

 a.  In my experiment, the untreated baseline is a Chrome web browser with no changes to its default settings, no prior browsing history, and no cookies. I programmed this browser to only visit publishers' websites. The point of the untreated baseline is to collect untargeted advertisements that are shown on the publishers' websites, to differentiate them from targeted advertisements shown to the two treatments.

 b.  In my experiment, the treatment with placebo is a Chrome web browser with no changes to its default settings, no prior browsing history, and no cookies. Unlike the untreated baseline, I programmed this browser to visit carefully chosen advertisers' websites and then visit publishers' websites. The point of this treatment is to allow the browser to be tracked while visiting the advertisers, then to collect targeted advertisements related to those advertisers. Here, "related" ads could be from the exact advertisers visited by the treatment browser, or they could be from similar advertisers.

 c.  In my experiment, the treatment with medicine is a Chrome web browser that is logged-in to a Google account that is opted-out of GAP. Other than this one change, this treatment acts identically to the treatment with placebo. The point of this treatment is to compare whether the browser with the opted-out setting receives the same targeted ads shown to the placebo browser. If the two treatments receive the

same targeted ads, it means Google is not respecting the GAP setting, i.e., Google RTB is still distributing personal information to RTB participants in bid requests.

108.    To implement my experiment, I used my Crawlium-based web crawler. I configured each Crawlium instance to save all HTTP requests, HTTP responses, cookies, images on websites, and screenshots of visited websites. I ran the crawlers and collected data between January 20, 2023 and February 25, 2023.

109.    To isolate my crawlers, I ran each in a separate virtual machine. All virtual machines used Ubuntu 22.04 as their operating system. All virtual machines were run on a single computer and shared a single public-facing IP address, located on a residential Internet Service Provider in Massachusetts.

110.    I used Chrome version 108 for my crawls.

111.    In addition to the data logged by Crawlium, I also directed all of Chrome's HTTP traffic through mitmproxy (a widely used web proxy tool that can decrypt and read the contents of encrypted HTTP traffic) and configured it to log all the traffic.

112.    In total, I ran six crawlers, organized into two groups of three. The first group included treatments that visited advertisers related to pregnancy and babies. The second group included treatments that visited advertisers related to online gambling.

113.    The two treatment crawlers in the first group both visited the same advertisers' URLs, which I present in **<u>Exhibit C</u>**. All these websites are related to pregnancy, babies, and products for babies. I configured the two treatment crawlers to visit the exact URLs given in <u>Exhibit C</u>; they did not explore any additional hyperlinks on these websites. I selected these websites by manually using Google Search to query for pregnancy and baby-related phrases. I chose links from the Google Search results (from both search advertisements and organic hyperlinks), visited the resulting webpages in Chrome, and used Chrome's built-in developer tools to filter out websites that did not include trackers from Google. The advertisers' websites in <u>Exhibit C</u> include resources from domains like *g.doubleclick.net*, *googletagmanager.com*, *google-analytics.com,* and/or *googleadservices.com*.

114.     The two treatment crawlers in the second group both visited the same advertisers' URLs, which I present in **Exhibit D**. All these websites are related to online gambling. I configured the two treatment crawlers to visit the exact URLs given in Exhibit D; they did not explore any additional hyperlinks on these websites. I selected these websites by manually using Google Search to query for gambling-related phrases and applied the same filtering criteria as for pregnancy- and baby-related advertisers.

115.     After the treatment crawlers visited the advertisers, all six crawlers (treated and untreated) visited the same publisher websites, which I present in **Exhibit E**. I configured the crawlers to visit each publishers' homepage, select five random internal hyperlinks from the homepage, and visit those hyperlinks as well. I selected these publishers because they are popular websites and they include banner advertisements served via Google RTB.

116.     I made the two Google accounts for these experiments from scratch.

117.     To log the treatment crawlers into their respective Google accounts, I manually logged into each account using Chrome and then copied the 19 cookies set by Google into each crawler. These cookies include unique tokens that Google uses to identify logged-in Google accounts. I added these 19 cookies into each treatment browser using the *Storage.setCookies* API that is available in the Chrome DevTools Protocol.



*Figure 3: Screenshot of a Google search captured by my crawler that was logged in to a Google Account. Note the green "C" in the upper-right hand corner and the pop-up that is contextualized for logged-in users. These elements confirm that this browser was logged in to a Google Account for "Christopher Wilson".*

118.    I confirmed that the treatment crawlers were logged-in to their respective Google accounts by having them visit *google.com*, and then observing that the Google account information displayed in the upper-right corner of the page was correct. Figure 3 (above) presents a screenshot from the crawler of one of these Google searches.

| Group | Experimental Variation | Advertiser Websites | | | Publisher Websites | | |
|---|---|---|---|---|---|---|---|
| | | % w/ Any Google Domain | % w/ doubleclick.net | % w/ Any Google Domain | % w/ doubleclick.net | % w/ image in doubleclick.net chain |
| Pregnancy and Babies | Untreated Baseline | -- | -- | 100.00% | 80.95% | 66.67% |
| | Treated | 93.75% | 46.67% | 100.00% | 76.19% | 61.90% |
| | Treated, Google Account Opt-Out | 87.50% | 46.67% | 100.00% | 61.90% | 52.38% |
| Gambling | Untreated Baseline | -- | -- | 100.00% | 76.19% | 66.67% |
| | Treated | 64.29% | 21.43% | 100.00% | 90.48% | 85.71% |
| | Treated, Google Account Opt-Out | 64.29% | 21.43% | 100.00% | 85.71% | 71.43% |

*Table 6: Summary statistics of Google domains, and Google RTB in particular, encountered by my crawlers.*

119.    I organize my crawlers by group (pregnancy and baby-related, or gambling-related) and by experimental variation. In Table 6 I report the percentage of websites that each crawler visited that included at least one resource from any Google domain and from *doubleclick.net* (i.e., Google RTB) specifically. I break these statistics down, for each crawler, based on whether the visited website was an advertiser or a publisher. For publisher websites, I also report the percentage of websites where a resource from *doubleclick.net* was responsible for downloading an image that was likely to be an advertisement.

120.    All four treatment crawlers were observed by Google visiting advertiser websites. Table 6 reports that 64-94% of the advertiser websites that the treated crawlers visited included at least one resource from a Google domain. 21-47% of these websites included resources specifically from *doubleclick.net* (i.e., Google RTB).

121.    All six crawlers were served images that are advertisements from Google RTB. Table 6 reports that 62-90% of the publisher websites that the untreated baseline and treated

crawlers visited included at least one resource from *doubleclick.net*, and that 52-86% of these websites included substantive image resources that *doubleclick.net* caused to load.

    a.  By "substantive image", I mean an image that was greater than 5x5 pixels in size. Small images called "tracking pixels" are often used by third-party advertisers to track users, but they are not visible advertisements, so I excluded them from this analysis.

    b.  By "caused to load", I mean that the inclusion tree captured by my crawler shows that a resource from *doubleclick.net* caused other resources to load, ultimately resulting in the downloading of a substantive image. In other words, if not for resources from *doubleclick.net*, the crawler would never have downloaded and displayed the image in question.

122.    In one experimental group the treatment crawler received targeted ads that were (1) delivered via Google RTB and (2) advertised websites that it had previously visited from the list in <u>Exhibit C</u>. Figure 4**Error! Reference source not found.** (below) shows an example baby-related ad that was shown to the treatment crawler and was delivered via Google RTB. **<u>Exhibit F</u>** includes the inclusion chain that resulted in the download and display of this ad (i.e., the relevant subsets of the full inclusion tree for the website). The chain starts with the publisher that the crawler was visiting at the time and includes all domains that the browser contacted up-to the point of downloading the example ad. We can see that *doubleclick.net* was involved in loading the ad in Figure 4.



*Figure 4: An advertisement that was shown to the crawler that was logged-in to a Google account and opted-out of personalized advertising by Google RTB at the URL https://www.dictionary.com/.*

123.    Based on these experimental results I draw two conclusions:

    a.   At least a portion of the browsing history of the treatment crawlers that were opted-out of Google Account Ads Personalization were tracked by RTB participants. These RTB participants subsequently used this information to target advertising to the crawlers. This must be true, because the untreated baseline crawlers did not receive the ad in Figure 4**Error! Reference source not found.**, or any like them, while the opted-out treatment crawler did.

    b.   The Google Account Ad Personalization Opt-Out had no effect on Google RTB. One treatment browser with the opt-out enabled and the treatment with the opt-out disabled received targeted ads. This confirms that Google did not honor the opt-out: it auctioned impressions from the opted-out browser and, based on the information contained in these bid requests, a third-party advertiser was able to target ads based on the opted-out treatment's browsing history. If Google did honor the opt-out, I would not have observed targeted ads with the opted-out treatment browser.

124.    Based on my experience and expertise in the field of data science, the ubiquity and pervasiveness of Google RTB, the specific analytical work performed for this engagement, and my conclusions set forth above, it is very unlikely that there are any Google U.S. account holders who, over the entire seven-year Class Period, did not have their data shared and sold through Google RTB at least once.

\*    \*    \*

Dated: July 14, 2023

/s/ Christopher Wilson, Ph.D.

# Exhibit A
## to Expert Class Certification Rebuttal Report of C. Wilson

### ADDITIONAL MATERIALS REVIEWED AND CONSIDERED

- Google's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated September 29, 2023

- Declaration of Glenn Berntson in Support of Google's Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated September 29, 2023, and the exhibits thereto

- Expert Report of Aaron Striegel in *In re Google RTB Consumer Privacy Litig*., dated September 29, 2023, the appendices thereto, and the production of underlying testing and documents relied on

- Expert Report of Konstantinos Psounis in *In re of Google RTB Consumer Privacy Litig*., undated, and the appendices thereto

- October 20, 2023 Deposition Transcript of Aaron Striegel in *In re Google RTB Consumer Privacy Litig.*, and the exhibits thereto

- October 16, 2023 Deposition Transcript of Konstantinos Psounis in *In re Google RTB Consumer Privacy Litig.*, and the exhibits thereto

- October 30, 2023 Deposition Transcript of Gleen Berntson in *IN re Google RTB Consumer Privacy Litig.*, and the exhibits thereto

- https://admanager.google.com/home/success-stories/case-study-accuweather-google-ad-manager-analytics-360/

- https://admanager.google.com/home/success-stories/case-study-priceline-increases-roi-in-mobile-world/

- Alamin Mohammed, Theo Karagioules, Emir Halepovic, Shangyue Zhu, and Aaron Striegel, rePurpose: A Case for Versatile Network Measurement, ICC 2023 (May 28, 2023), available at https://ieeexplore.ieee.org/abstract/document/10279020

- https://support.google.com/admanager/table/7636513?hl=en

- Venky Anant, et al., The consumer-data opportunity and the privacy imperative, McKinsey & Company (Apr. 27, 2020), available at https://www.mckinsey.com/capabilities/risk-andresilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative,

- https://blog.mozilla.org/en/mozilla/firefox-rolls-out-total-cookie-protection-by-default-to-all-users-worldwide/
- Browser Market Share United States of America, Statcounter, available at https://gs.statcounter.com/browser-market-share/all/united-states-of-america

- AbdelKarim Mardini, More intuitive privacy and security controls in Chrome, Chrome Blog (March 19, 2020), available at https://blog.google/products/chrome/more-intuitive-privacy-and-security-controls-chrome/

- John Wilander, Intelligent Tracking Prevention, Apple WebKit Blog (June 5, 2017), available at https://webkit.org/blog/7675/intelligent-tracking-prevention/

- John Wilander, Full Third-Party Cookie Blocking and More, Apple WebKit Blog (March 24, 2020), https://webkit.org/blog/10218/full-third-party-cookie-blocking-and-more/

- Muhammad Ahmad Bashir and Christo Wilson, Diffusion of User Tracking Data in the Online Advertising Ecosystem, PoPETS (July 2018) 2018(4), available at https://cbw.sh/static/pdf/bashir-pets18.pdf

- The Demographic Outlook: 2023 to 2053, The Congressional Budget Office (January 24, 2023), available at https://www.cbo.gov/publication/58612

- AdvertisingIdClient.Info, Google Play Services Documentation (March 21, 2022), available at https://developers.google.com/android/reference/com/google/android/gms/ads/identifier/AdvertisingIdClient.Info

- Aniss Maghsoudlou, Lukas Vermeulen, Ingmar Poese, and Oliver Gasser, Characterizing the VPN Ecosystem in the Wild, PAM (March 21–23, 2023), available at https://vpnecosystem.github.io/

- Luca Schumann, Trinh Viet Doan, Tanya Shreedhar, Ricky Mok, and Vaibhav Bajpai, Impact of Evolving Protocols and COVID-19 on Internet Traffic Shares, arXiv (January 15, 2022), available at https://arxiv.org/abs/2201.00142

- https://support.google.com/google-ads/answer/9614122

- https://web.archive.org/web/20210822143642/https://support.google.com/admanager/answer/2913700

- Maggie Van Nortwick and Christo Wilson, *Setting the Bar Low: Are Websites Complying With the Bare Minimum Requirements of the CCPA?*, PoPETS 2022(1), 2022, available at https://petsymposium.org/popets/2022/popets-2022-0030.php

- Zengrui Liu, Umar Iqbal, and Nitesh Saxena, *Opted Out, Yet Tracked: Are Regulations Enough to Protect Your Privacy?*, PoPETS 2024, pre-publication draft available at https://arxiv.org/pdf/2202.00885.pdf

- TTD-Hewitt-0000002

- New York Time "NetworkBackfillRequests" 24 CSV file

- GOOG-HEWT-00455861

- GOOG-HEWT-00455879

- Underlying data and testing identified by the following file names:
  - 4_reanalyze_by_webpage.ipynb
  - 4_reanalyze_by_webpage.pdf
  - analyze_google_chains.py
  - NYT_identifiability.ipynb
  - NYT_identifiability.pdf
  - publisher_data_per_url.parquet
  - README.md
  - TDD_identifiability.ipynb
  - TDD_identifiability.pdf

## Exhibit B: Inclusion Chain for the Crate&Kids Ad Image Shown to the Crawler that was Loggin-in to a Google Account and Opted-out of Ad Personalization

[
 {
   "timestamp": 1676164795.375991,

   "method": "GET",

   "status": "200",

   "url": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",

   "request": {

     "Upgrade-Insecure-Requests": "1",

     "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"

   },

   "response": {

     "access-control-allow-headers": "Content-Type",

     "access-control-allow-methods": "GET",

     "access-control-allow-origin": "*",

     "cache-control": "public, s-maxage=3600, max-age=600",

     "content-encoding": "gzip",

     "content-length": "55069",

     "content-type": "text\/html; charset=utf-8",

     "date": "Sun, 12 Feb 2023 01:19:55 GMT",

     "edge-cache-tag": "~\/first-year\/month-by-month\/",

     "expires": "Fri, 10 Feb 2023 20:16:25 GMT",

     "last-modified": "Fri, 10 Feb 2023 20:06:25 GMT",

     "vary": "Accept-Encoding",

     "x-device": "desktop",

```
        "x-frame-options": "SAMEORIGIN"
    }
  },
  {
    "timestamp": 1676164795.607386,
    "method": "GET",
    "status": "200",
    "url":
"https:\/\/content.whattoexpect.com\/assets\/whattoexpect\/dist\/scripts\/min\/js\/views\/sublanding
.bundle.min.js?8439_18189",
    "request": {
      "Referer": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",
      "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like
Gecko) Chrome\/108.0.0.0 Safari\/537.36"
    },
    "response": {
      "x-amz-version-id": "wByV5QQrciXlbgLQyUxIeINZj5vv9gYH",
      "content-encoding": "gzip",
      "date": "Sun, 12 Feb 2023 01:19:55 GMT",
      "x-amz-request-id": "E03SJKZZM53ZF4XD",
      "x-amz-replication-status": "COMPLETED",
      "x-amz-id-2":
"juq9FFVuLdCIHDXfwAEhOfI07\/AQh1nbFs1LfhCoa8PY5jOC4Hoj\/hrod\/mvVdzE85Dm6pY9g0Y=",
      "last-modified": "Wed, 08 Feb 2023 15:30:19 GMT",
      "vary": "Accept-Encoding",
      "access-control-max-age": "86400",
      "content-type": "application\/x-javascript",
      "access-control-allow-origin": "*",
      "access-control-allow-methods": "GET,POST",
      "cache-control": "max-age=604800",
```

      "access-control-allow-credentials": "false",

      "accept-ranges": "bytes",

      "access-control-allow-headers": "*",

      "expires": "Sun, 19 Feb 2023 01:19:55 GMT"

    }

  },

  {

    "timestamp": 1676164797.715826,

    "method": "GET",

    "status": "200",

    "url": "https:\/\/www.googletagservices.com\/tag\/js\/gpt.js",

    "request": {

      "Referer": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",

      "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"

    },

    "response": {

      "date": "Sun, 12 Feb 2023 01:19:57 GMT",

      "content-encoding": "gzip",

      "x-content-type-options": "nosniff",

      "cross-origin-resource-policy": "cross-origin",

      "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

      "content-length": "27260",

      "x-xss-protection": "0",

      "server": "sffe",

      "etag": "\"1480 \/ 265 of 1000 \/ last-modified: 1676070372\"",

      "vary": "Accept-Encoding",

      "report-to": "{\"group\":\"ads-gpt-scs\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-to\/ads-gpt-scs\"}]}",

      "content-type": "text\/javascript",

      "cache-control": "private, max-age=900, stale-while-revalidate=3600",

      "timing-allow-origin": "*",

      "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-gpt-scs\"",

      "expires": "Sun, 12 Feb 2023 01:19:57 GMT"

    }

  },

  {

    "timestamp": 1676164797.998244,

    "method": "GET",

    "status": "200",

    "url": "https:\/\/securepubads.g.doubleclick.net\/gpt\/pubads_impl_2023020901.js?cb=31072343",

    "request": {

      "Referer": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",

      "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"

    },

    "response": {

      "date": "Thu, 09 Feb 2023 12:02:37 GMT",

      "content-encoding": "gzip",

      "x-content-type-options": "nosniff",

      "age": "220641",

      "cross-origin-resource-policy": "cross-origin",

      "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

      "content-length": "133132",

      "x-xss-protection": "0",

      "last-modified": "Thu, 09 Feb 2023 09:35:45 GMT",

      "server": "sffe",

      "vary": "Accept-Encoding",

"report-to": "{\"group\":\"ads-gpt-scs\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-to\/ads-gpt-scs\"}]}",

    "content-type": "text\/javascript",

    "cache-control": "public, immutable, max-age=31536000",

    "accept-ranges": "bytes",

    "timing-allow-origin": "*",

    "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-gpt-scs\"",

    "expires": "Fri, 09 Feb 2024 12:02:37 GMT"

  }

 },

 {

   "timestamp": 1676164823.48643,

   "method": "GET",

   "status": "200",

   "url":
"https:\/\/467865c4009ef66df2eda47770462913.safeframe.googlesyndication.com\/safeframe\/1-0-40\/html\/container.html",

   "request": {

     "Referer": "https:\/\/www.whattoexpect.com\/first-year\/month-by-month\/",

     "Upgrade-Insecure-Requests": "1",

     "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"

   },

   "response": {

     "accept-ranges": "bytes",

     "age": "25",

     "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

     "cache-control": "public, immutable, max-age=31536000",

     "content-encoding": "br",

        "content-length": "2653",

        "content-type": "text\/html",

        "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-gpt-scs\"",

        "cross-origin-resource-policy": "cross-origin",

        "date": "Sun, 12 Feb 2023 01:19:58 GMT",

        "expires": "Mon, 12 Feb 2024 01:19:58 GMT",

        "last-modified": "Thu, 03 Nov 2022 19:10:08 GMT",

        "report-to": "{\"group\":\"ads-gpt-scs\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-to\/ads-gpt-scs\"}]}",

        "server": "sffe",

        "timing-allow-origin": "*",

        "vary": "Accept-Encoding",

        "x-content-type-options": "nosniff",

        "x-xss-protection": "0"

      }

    },

    {

      "timestamp": 1676164823.571097,

      "method": "GET",

      "status": "200",

      "url": "https:\/\/tagan.adlightning.com\/wte\/b-f140f48-a9210dda.js",

      "request": {

        "Referer": "https:\/\/467865c4009ef66df2eda47770462913.safeframe.googlesyndication.com\/",

        "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like Gecko) Chrome\/108.0.0.0 Safari\/537.36"

      },

      "response": {

        "date": "Wed, 08 Feb 2023 00:50:39 GMT",

        "content-encoding": "gzip",

      "via": "1.1 cd9c85933a60bbac347299c34015e9ba.cloudfront.net (CloudFront)",

      "x-amz-version-id": "m_Vf7w8qvD.vCgf_BKNBIueIku9WizZd",

      "x-amz-cf-pop": "BOS50-C2",

      "age": "347385",

      "x-cache": "Hit from cloudfront",

      "content-length": "27631",

      "x-amz-meta-git_commit": "f140f48",

      "last-modified": "Mon, 23 Jan 2023 20:16:31 GMT",

      "server": "AmazonS3",

      "etag": "\"7caa80ed58205094d2ab24fecf4c76fd\"",

      "content-type": "application\/javascript",

      "cache-control": "max-age=31536000",

      "accept-ranges": "bytes",

      "x-amz-cf-id": "DjqN3woOUEyh4ZOYEaJe3FVAE3aLOvB8JqOw_n75Vc40nJK3PzL3Uw=="

    }
  },
  {
    "timestamp": 1676164824.259177,

    "method": "GET",

    "status": "200",

    "url":
"https:\/\/s0.2mdn.net\/sadbundle\/5233103642561494263\/970x90\/CK04AD_S23_4434433_SpringP
d_Easter_970x90.html",

    "request": {

      "Referer": "https:\/\/467865c4009ef66df2eda47770462913.safeframe.googlesyndication.com\/",

      "Upgrade-Insecure-Requests": "1",

      "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like
Gecko) Chrome\/108.0.0.0 Safari\/537.36"

    },

    "response": {

        "accept-ranges": "bytes",

        "access-control-allow-origin": "*",

        "age": "190094",

        "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

        "cache-control": "public, max-age=31536000",

        "content-encoding": "gzip",

        "content-length": "2150",

        "content-type": "text\/html",

        "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-doubleclick-media\"",

        "cross-origin-resource-policy": "cross-origin",

        "date": "Thu, 09 Feb 2023 20:32:10 GMT",

        "expires": "Fri, 09 Feb 2024 20:32:10 GMT",

        "last-modified": "Tue, 07 Feb 2023 06:18:23 GMT",

        "report-to": "{\"group\":\"ads-doubleclick-media\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-to\/ads-doubleclick-media\"}]}",

        "server": "sffe",

        "timing-allow-origin": "*",

        "vary": "Accept-Encoding",

        "x-content-type-options": "nosniff",

        "x-dns-prefetch-control": "off",

        "x-xss-protection": "0"

      }

    },

    {

      "timestamp": 1676164824.656613,

      "method": "GET",

      "status": "200",

    "url":
"https:\/\/s0.2mdn.net\/sadbundle\/5233103642561494263\/970x90\/images\/CK04AD_S23_4434433
_SpringPd_Easter_970x90_atlas_NP_1.jpg",

   "request": {

    "Referer":
"https:\/\/s0.2mdn.net\/sadbundle\/5233103642561494263\/970x90\/CK04AD_S23_4434433_SpringP
d_Easter_970x90.html",

    "User-Agent": "Mozilla\/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit\/537.36 (KHTML, like
Gecko) Chrome\/108.0.0.0 Safari\/537.36"

   },

   "response": {

    "date": "Thu, 09 Feb 2023 20:32:10 GMT",

    "x-content-type-options": "nosniff",

    "age": "190094",

    "x-dns-prefetch-control": "off",

    "cross-origin-resource-policy": "cross-origin",

    "alt-svc": "h3=\":443\"; ma=2592000,h3-29=\":443\"; ma=2592000",

    "content-length": "38731",

    "x-xss-protection": "0",

    "last-modified": "Tue, 07 Feb 2023 06:18:23 GMT",

    "server": "sffe",

    "report-to": "{\"group\":\"ads-doubleclick-
media\",\"max_age\":2592000,\"endpoints\":[{\"url\":\"https:\/\/csp.withgoogle.com\/csp\/report-
to\/ads-doubleclick-media\"}]}",

    "content-type": "image\/jpeg",

    "access-control-allow-origin": "*",

    "cache-control": "public, max-age=31536000",

    "accept-ranges": "bytes",

    "timing-allow-origin": "*",

    "cross-origin-opener-policy-report-only": "same-origin; report-to=\"ads-doubleclick-media\"",

    "expires": "Fri, 09 Feb 2024 20:32:10 GMT"

```
  }
 }
]
```