1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Susan van Keulen, Magistrate Judge

4

5  PATRICK CALHOUN, et al.,        )
                                   )
6          Plaintiffs,             )
                                   )
7  vs.                             )   No. C 20-05146-YGR
                                   )
8  GOOGLE LLC,                     )
                                   )
9          Defendant.              )
                                   )   **SEALED PROCEEDINGS**
10
                                   San Jose, California
11                                 Thursday, June 30, 2022

12  TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
        RECORDING 9:34 - 10:41 & 10:50 - 11:10 = 87 MINUTES
13

14 APPEARANCES:

15 For Plaintiffs:
                              Simmons Hanly Conroy
16                            112 Madison Avenue
                              7th Floor
17                            New York, New York 10016
                        BY:   JAY BARNES, ESQ.
18                            AN V. TRUONG, ESQ.

19                            Bleichmar Fonti & Auld LLP
                              555 12th Street
20                            Suite 1600
                              Oakland, California 94607
21                      BY:   LESLEY ELIZABETH WEAVER, ESQ.
                        BY:   ANGELICA MARIA ORNELAS, ESQ.
22

23

24          (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

```
 1  APPEARANCES:  (Cont'd.)

 2  For Plaintiffs:
                            DiCello Levitt Gutzler LLC
 3                          One Grand Central Place
                            60 East 42nd Street
 4                          Suite 2400
                            New York, New York 10165
 5                     BY:  DAVID A. STRAITE, ESQ.

 6                          DiCello Levitt Gutzler
                            10 North Dearborn Street
 7                          6th Floor
                            Chicago, Illinois 60601
 8                     BY:  SHARON D. CRUZ, ESQ.

 9  For Defendant:
                            Quinn Emanuel Urquhart &
10                            Sullivan LLP
                            191 North Upper Wacker Drive
11                          Suite 2700
                            Chicago, Illinois 60606
12                     BY:  ANDREW H. SCHAPIRO, ESQ.

13                          Quinn Emanuel Urquhart &
                              Sullivan LLP
14                          865 South Figueroa Street
                            10th Floor
15                          Los Angeles, California 90017
                       BY:  STEPHEN ANDREW BROOME, ESQ.
16
                            Quinn Emanuel Urquhart &
17                            Sullivan LLP
                            51 Madison Avenue
18                          New York, New York 10010
                       BY:  JOSEF TEBOHO ANSORGE, ESQ.
19
                            Quinn Emanuel Urquhart &
20                            Sullivan LLP
                            1300 I Street NW
21                          Suite 900
                            Washington, D.C. 20005
22                     BY:  TRACY XI GAO, ESQ.

23  Also Present:            Douglas A. Brush, Special
                               Master
24                          Timothy Schmidt

25
```

3

Transcribed by:                Echo Reporting, Inc.
                               Contracted Court Reporter/
                               Transcriber
                               echoreporting@yahoo.com

4

1 <u>Thursday, June 30, 2022</u>                                    <u>9:34 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4      (Call to order of the Court.)

5          THE CLERK:  Calling sealed hearing 20-cv-05146,

6 Calhoun, et al. versus Google LLC.

7      Counsel, please identify yourselves for the record,

8 beginning with plaintiffs.

9          MR. STRAITE (via Zoom):  Good morning, your Honor.

10 This is David Straite from DiCello Levitt Gutzler in New

11 York for plaintiffs.

12     Also joining me from DiCello Levitt is Sharon Cruz.

13 And we also have other firms represented.  I'll let them

14 introduce their teams.

15         THE COURT:  Thank you.  Good morning.

16         MR. BARNES (via Zoom):  Good morning, your Honor.

17 Jay Barnes and An Truong, Simmons Hanly Conroy, on behalf of

18 the plaintiffs.

19         THE COURT:  Good morning.  Thank you.

20         MS. WEAVER (via Zoom):  Good morning, your Honor.

21 Lesley Weaver, also on behalf of the plaintiffs.  And in the

22 room with me actually is Angelica Ornelas of my law firm as

23 well.

24         THE COURT:  Good morning.

25         MS. WEAVER:  Good morning.

5

1          MR. SCHAPIRO (via Zoom):  Your Honor, for Google,

2  I'm Andrew Shapiro from Quinn Emanuel.

3          MR. BROOME (via Zoom):  Good morning, your Honor.

4  Stephen Broome also from Quinn Emanuel for Google.

5          THE COURT:  Mr. Schapiro, Mr. Broome, good

6  morning.

7          MR. ANSORGE (via Zoom):  Good morning, your Honor.

8  I'm Josef Ansorge, also for Google, from Quinn Emanuel.

9          THE COURT:  Mr. Ansorge, good morning.

10          MS. GAO (via Zoom):  Good morning, your Honor.

11  Tracy Gao also from Quinn Emanuel for Google.

12          THE COURT:  Ms. Gao, good morning.

13      I think that's everyone on the screen.  And we have

14  with us and participating in the hearing today the special

15  master, Douglas Brush, as well as Mr. Schmidt who works with

16  Mr. Brush on this matter, both of whom are well known to all

17  of counsel.

18      Thank you, Mr. Brush and Mr. Schmidt, for joining us

19  this morning.  I appreciate it.

20      All right.  We, as I said, are on today to wrap up the

21  issues around the preservation plan.  Let me give you some

22  of my preliminary comments and tentative rulings, and then I

23  will turn to the parties and hear from you.

24      Obviously, we have a history of working through this

25  issue.  And the special master made a report and

6

1  recommendation to the Court in April -- I think that's the
2  April 4th plan -- to which the parties had an opportunity to
3  raise objections, and we had a hearing on that plan on May
4  3rd.

5      Subsequent to the hearing in this case, there were a
6  few issues that were raised that I believed would benefit
7  from focused and limited additional work by the parties with
8  the special master, and that took place in the time period
9  May 4th through about May 17th, and I appreciate everyone
10 turning to that in a very expeditious fashion.

11      After that period of revisiting a few issues,
12 particularly with regards to the scope of preservation of
13 certain data sources, the special master made a second
14 report and recommendation to the Court, and that is the May
15 23rd plan.  That came to me in a very helpful format in that
16 it had, as before, general steps of protocol and then an
17 attachment of the sources.  And in those sources, 14 of
18 those -- for 14, modification had been adjusted.
19 Modification had been adjusted.

20      The special master also provided to the parties and the
21 Court as Exhibit A a summary of how those adjustments were
22 arrived at that set out the parties' positions and
23 considerations.  That was a useful guide to me as I did my
24 de novo review and worked through and paid attention to the
25 issues.  And that's what I used as a guide in assessing the

7

1  report and recommendation.

2     I know that this process has been challenging for the

3  parties, for the special master and for the Court.  And I'm

4  confident that everyone here in court today appreciates that

5  a preservation plan is a compromise, and both sides are

6  going to be unhappy with some aspects of it.  That is the

7  nature of compromise.  But I think we have made good

8  progress, and I believe that we have a plan that will meet

9  the necessary objectives of the plaintiffs and is within the

10 capabilities of the defendant.

11     So let's turn to the issues at hand.

12     First, as I say, there were ██ -- the general concept

13 of preservation, of doing it on a sampling basis of data

14 sources remains intact.  There have been some modifications

15 as to a couple of sources that we're going to address.  To

16 the extent -- and, again, we're focused today on these

17 modifications to these ██ data sources.

18     So with that being said, I'm going to take up first --

19 turn first to Google's objections and then to the

20 plaintiffs.  Let me share with you all my tentative rulings,

21 and then I'll circle back to hear the parties.

22     So Google's objections were three in number.

23     The first was an objection to the ongoing preservation

24 of field values in the GAIA ██████ and Zwieback ██████ data

25 sources.

8

1     And I will say that in those objections, Google

2 included an objection to the category of any ID not

3 mentioned.   Any ID not mentioned.

4     I have reviewed those and I hear Google's complaint

5 that the data sources are too big, there is limited relevant

6 information therein, and they would be expensive to

7 maintain.   I've given that careful consideration and

8 reviewed the process on these issues before the special

9 master.

10     I note that the Quaid declaration in support of

11 Google's objections speaks to the size issues.   There is no

12 evidence before this Court as to expense.   There is a lot of

13 discussion.   There is a great deal of speculation.   There is

14 no evidence as to expense.

15     And so I am -- my tentative ruling is to stick with the

16 special master's recommendation, which is the full and

17 ongoing preservation of certain field values in GAIA ███████

18 and Zwieback ███████.

19     Google also objects -- the second objection is to the

20 full preservation, one full preservation from Zwieback

21 ███████ with similar arguments based on size and expense.

22 And I've tentatively overruled those objections for the

23 reasons I've stated above.

24     Google also argues about very limited relevant data in

25 that database for the plaintiffs.   But that's really not

9

1 Google's call, frankly. I think, given how difficult it's

2 been to identify and extract information, I think that the

3 one full preservation from that database is a reasonable --

4 to be sure challenging but not unreasonable compromise.

5 ██████████████████████████████████████████

6 ██████████████████████████████████████████

7 ████████████████████████████  ████████████

8 ████████████████████████████████  ██████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████

11 ██████████████████████████████████████████

12 ████████████████████████████ And that seems

13 logically to make sense and to meet the needs of the

14 plaintiffs, and I'm inclined to adopt that.

15      Let's turn now to plaintiffs' objections and address

16 those in the following fashion.

17      I took -- plaintiffs on page two of their objections

18 set forth a list of six, which I read as more focused on --

19 as focused, I should say, on the ██ sources, the

20 modifications in the later version of the plan. And there's

21 actually some other objections in there. So I think the

22 total number on my list comes to seven, and those are the

23 ones that we will address here today. So let's move through

24 those.

25      With regards to sync state and the request for

10

1 clarification, that sync state signal be clarified, I

2 believe that that phrase "sync state" will benefit from the

3 following clarification.  And of course many of these

4 clarifications interleave and relate back.  So let me get

5 all the way through these, and then we'll go from there.

6     But sync state will benefit from the following, which

7 is any field that expressly identifies sync state, not

8 already set forth in Exhibit B or in the following

9 adjustments that we discuss here today, is to be identified

10 by Google and included on this list to preserve.  So any

11 field that expressly identifies sync state that hasn't

12 already been captured in Exhibit B is to be identified and

13 included on the list, and that is to be done by July 15.

14     Second, in Exhibit B, where the modified plan is for

15 full ongoing preservation of certain fields -- and, again,

16 this is still relating to defendant's objections to sync

17 state -- for all ▮ data sources at issue, we're to add --

18 to be added to the list of fields are the ▮▮▮ additional

19 fields identified by plaintiffs, that is ▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮  Those fields are to be added to the ▮ data

22 sources that we're talking about today.

23     Third, with regards to the data sources identified by

24 Google in its chart in its objections -- that's docket

25 713-4 -- on the hard copy of the brief, page six there's a

1 table of additional data sources.  Those are to be added to

2 the fields to be preserved if they're not already listed.

3 So those fields are to be preserved to those sources that

4 the chart identifies to the extent they're not already

5 accounted for.

6 　　　And similarly the data sources identified by Google in

7 its chart in its response to the objections at 713-4, at

8 hard copy page nine, those fields identified by Google to

9 those sources, again, if they're not already listed, are to

10 be added.

11 　　　I believe that with those four adjustments, "sync

12 state" is sufficiently comprehensive and clear as to what

13 that term means.

14 　　　In the list of fields to be preserved, currently there

15 is a reference in there to "any ID not mentioned."  "Any ID

16 not mentioned," that field will be removed.  That field is

17 to be removed.

18 　　　With regards to the request that Google identify the

19 fields -- this is plaintiffs' 15th objection -- that Google

20 identify fields.  I've given that careful consideration and

21 will require the following:  That Google is to identify the

22 field names for any data source from which data is to be

23 preserved.  Google is to identify the field names for any

24 data source from which data is to be preserved.  Those names

25 are to be provided by July 15th.

1    The remaining requests in the 15th objection are
2 overruled.

3    Now, on plaintiffs' fourth objection, which is to
4 preserve the log retention periods and not to alter log
5 structures.  Well, it's fourth on their list.  It is the
6 third objection in the brief.  The numbering was a little
7 bit of a challenge.

8    But with regards to preserving log retention periods,
9 we will reflect the language -- the protocol here will
10 reflect the language that has been adopted in <u>Brown</u> as
11 clarified once by the Court as to fields that are to be
12 preserved -- excuse me.  Yes, fields that are currently
13 preserved in perpetuity are to remain so.  So it will be the
14 same preservation as to log retention as required in <u>Brown</u>.

15    I am not going to restrict the alteration of log
16 structures.  I hear the plaintiffs' concern.  I understand
17 it.  I had some discussions around the technology on this
18 issue with the special master and Mr. Schmidt.  But that
19 just does not seem to be feasible and to create more issues
20 than it would help to address.

21    The fifth objection in the brief -- it is the 11th
22 objection.  It is objection titled number 11, which is
23 preservation of the encryption keys.  We addressed that
24 above with Google's proposal.

25    There was another objection, not on plaintiffs' list

13

but interleaved in here, which was preservation of mapping

tables.  Preservation of mapping tables.  There we will

match the language that I adopted in <u>Brown</u>, which is the

mapping and linking tables are to be preserved in their

entirety.

     And last but not least, plaintiffs -- I don't know if

it's really an objection so much as wanting clarification

that Google would not use the fact that certain data had not

been preserved to oppose any motion.  And Google has agreed

to that.

     And I think the challenge was worded in terms of class

certification.  But the absence of data because it is not

caught up in the preservation plan will not be used by

Google to challenge plaintiffs' positions.

     All right.  That works through the issues as I was able

to identify them from the parties' papers.  And I think I

have reached everything.  To the extent there are other open

objections, those are overruled.

     All right.  Let me start with Google, because again,

the objections were fewer and more focused.  And let me hear

from counsel with regards to the preservation issues, and

then we will turn to plaintiffs.

          MR. ANSORGE:  Yes, your Honor.  Josef Ansorge for

Google.

     The problem with the ███████ preservation that we're

14

1  currently facing is that ███████████████████████

2  ████████████████████████████████████████████████

3  ██████████████████████████████████

4  ████████████████████████  ██████████████████████

5  ██████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ██████████████████████████████████████████████

8  ██████████████████████████

9      We speak of ████████████████████████, but it

10  would really be much more accurate to think of it as a

11  █████████████████████████████.  For GAIA █████████,

12  for instance, there's ████████████████████.

13      We think there's a practical solution that we would

14  recommend, is to begin with the column as the unit of

15  analysis.  Instead of saying the entire key space is what we

16  work off of, there are specific columns that plaintiffs have

17  focused on and that we believe are the most relevant.  In

18  particular they relate to sync.

19      And surveying those columns and taking perhaps a

20  snapshot of them would be significantly less burdensome than

21  having to interface with more than a thousand different

22  teams and survey them to establish that none of the data

23  that the special master is requesting exist in some other

24  form within the infrastructure.

25      We would also ask --

15

1        THE COURT:  Mr. Ansorge, let me interrupt you
2   there and ask the question:  What information with regards
3   to identification of columns has Google provided the
4   plaintiffs in this effort -- in the course of developing the
5   preservation plans with the special master?
6        MR. ANSORGE:  We provided all the information that
7   we as counsel also have access to, which are the
8   annotations, the names of the columns.  It ends up being a
9   very long and complex spreadsheet in which the descriptions
10  of the annotations for the separate columns exist.  We could
11  provide you with an example of that as well.  But it was
12  provided --
13       THE COURT:  No, no, no.  Let me understand -- but
14  has Google provided that column information for all of the
15  columns in ██████?
16       MR. ANSORGE:  Yes, your Honor.  And there was a
17  misunderstanding, and I believe we had provided the
18  information to the special master team and it wasn't
19  immediately passed on just due to a misunderstanding between
20  the parties.  But it's something that's been provided and
21  that plaintiffs have received as well.
22       THE COURT:  And what effort, if any, by Google was
23  made to identify from those ████████████████████ as to
24  which ones, from at least Google's perspective, are relevant
25  to these proceedings?

16

1          MR. ANSORGE:  So we've been interfacing with a

2    number of different subject matter experts and they're most

3    commonly also deponents or 30(b)(6) witnesses for different

4    areas that they're focused on.  So of course sync is at

5    issue.  That we've been working with the sync team and quite

6    easily established the columns and the specific data that's

7    relevant within those columns.

8          We could also do the same for different Google subject

9    matter experts who work on what has occasionally been

10   referred to as ███████████████████████████████████████

11   ████████████████████████████████.

12         One of the other ways in which we could proceed, your

13   Honor, that might be efficient and effective is to simply

14   categorically exclude a few products that we believe are out

15   of scope by definition, and then we would no longer have to

16   survey the particular teams.

17         So, for instance, Google Books or Blogger, Google

18   Cultural Institute, Google Phi, and -- I could go on but

19   there's a lot of different categories of product teams that

20   are responsible for separate columns within GAIA ██████ key

21   space that if we could sort of categorically exclude those,

22   it be much easier to focus on both the ones that we've

23   already identified as relevant and then do a survey of the

24   ones that fall in between.

25         So we would propose a sort of bifurcated strategy where

17

1  we divide into:  This is an obvious source that would have

2  to be reviewed and looked at within ██████.  Here are

3  products that we would establish are clearly out of scope

4  and would not require further review.

5      We would look at -- for instance, the argument could be

6  made that if an IP address is stored in Google Blogger, that

7  that is not relevant to this case and we should not have to

8  survey and then store that information.

9      And then the third would be to find the delta of the

10  ones that are remaining.  We could then go out and survey

11  the specific product teams that talk about the allegations

12  in the case so that they understand what type of data is

13  being searched for and then identify that.  The challenge

14  is --

15          THE COURT:  Did Google ever -- excuse, Mr.

16  Ansorge.  Did Google ever make a proposal to the special

17  master in the back-and-forth efforts that identified

18  columns -- specific columns that it believed would be

19  appropriate to preserve?

20          MR. ANSORGE:  Yes, we -- I would have to go back

21  to the correspondence, but I believe that we have.  We have

22  definitely identified columns that we believe are not

23  appropriate to be preserved and then provided that list.

24      We had a lot of debates and discussions about whether

25  it was even appropriate to provide the ████████████

18

1    annotation information to plaintiffs because we felt that

2    was quite outside the scope of the case and basically

3    x-rayed Google's key value storage infrastructure when the

4    allegations are much more focused and focused really on

5    certain web browsing activities.

6        THE COURT:  All right.  I understand.  I hear you

7    with regards to ███.

8        What about the one full preservation?

9        MR. ANSORGE:  The one full preservation as it

10   relates to Zwieback, we -- it's lower on our priority

11   structure, your Honor.  That's why it's number two as well.

12   So if you're inclined to consider one or the other, the

13   first would be much more important for us.

14       But our main reservation on the second one is just it

15   strikes as having really minimal utility where Zwieback

16   ███ fulfills so many different functions.  Taking a

17   snapshot of it strikes us as we're taking pictures of things

18   that we know will not be used and will not be relevant.

19       Here too, we would recommend beginning with the column

20   as the unit of analysis.  And there's a few obvious columns

21   that plaintiffs have shown interest in and had requested

22   information about in different correspondence.

23       The ones which relate to search ads in Zwieback, it

24   would make sense for us to take a snapshot of those.  Others

25   relate to annotation Chrome sync, which the parties have I

1 think a dispute in that -- I would say a misunderstanding

2 about what information is contained in those.  But these

3 would be the obvious sources of information within the

4 Zwieback ▮▮▮▮▮ key space that we would recommend taking a

5 snapshot of instead of taking a snapshot of the entire key

6 space, your Honor.

7          THE COURT:  Okay.  I understand.  Thank you.

8          MR. ANSORGE:  Can I add one more sentence, your

9 Honor?

10          THE COURT:  Yes, you may.  One sentence.

11          MR. ANSORGE:  Yes.  The parties have had a lot of

12 back-and-forth about the potential costs of storage.  And if

13 this is specific information you're interested in, your

14 Honor, we would ask for an opportunity to provide

15 declarations and calculations.  We would say that it's a

16 very complicated process and issue because the scale and

17 size of the data begins to be impacted by the supply chains

18 and how many sort of pieces exist.  It's something that

19 grows exponentially over time.

20     One of the things we struggled with the parties, is

21 take a picture of something, this is how much it would cost

22 to preserve it now.  But every day more data is written and

23 if we continue doing that, we end up with something that's

24 ballooning in a way which I plaintiffs have referred to it

25 as comical or fanciful numbers.

1    But even if there's an order of magnitude below those,

2   we're very quickly in a realm in which we're I think far

3   outside the scope of ordinary preservation and litigation

4   costs.

5           THE COURT:  I understand.  Thank you, Mr. Ansorge.

6           MR. STRAITE:  Your Honor, may plaintiffs be heard

7   on any of those points, or is there a better point for us to

8   address those?

9           THE COURT:  No.  I'd like you just to address the

10  issue with regards to -- excuse me -- having the

11  preservation plan applying to specified columns as opposed

12  to the entire -- just focused on the ██████ discussion,

13  please.

14          MR. STRAITE:  Sure.  So for -- let's start with

15  GAIA ██████, the larger of the two data sources.

16    Plaintiffs did receive a list of the columns on May

17  9th, several months after fact discovery completed --

18          THE COURT:  All right, but as of May 9th.

19          MR. STRAITE:  And we have annotations that

20  describe the columns.  But we don't have any field names.

21  We don't know what the field descriptions would be because

22  we don't even have the names.  We don't know -- we don't

23  have any protos.  We don't have any data dictionaries or

24  schemas.

25    We know nothing about these columns other than some

21

1  annotations that fit into a single spreadsheet.  We would

2  need -- in order to address each of the points raised by Mr.

3  Ansorge, we would need to reopen discovery in ways that I

4  can't even begin to comprehend how complicated it would be

5  in order for it to be fair to absent class members.  We just

6  don't know what we don't know.

7      We did see on May 9th, and our analysis thereafter with

8  our expert, that there are at least -- just from the

9  descriptions that we can comprehend -- some of them are in

10 gibberish -- what we can see in English, at least ▮ of the

11 columns commingled Zwieback and Biscotti, identifiers we

12 were told would never be commingled and is absolutely

13 essential to capture.

14      THE COURT:  I saw that argument, Mr. Straite.  I

15 saw that argument.

16      MR. STRAITE:  So we just don't know what's in any

17 of these columns other than simple annotations.  We don't

18 have a single column where Google has disclosed the fields

19 that are within them.

20      So if Google wanted to propose last year that we have a

21 conversation and discovery into which of the columns could

22 be excluded to reduce burdens, the time for that was last

23 year.  We don't know how the class could properly be

24 protected, how it wouldn't be unfairly prejudicial to the

25 class to start excluding columns based on Google's say-so

22

1  today.

2        THE COURT:  All right.  Thank you, Mr. Straite.

3     Do plaintiffs have any comment or concern with regards

4  to the adoption of the encryption key process that Google

5  has proposed with regards to the three steps?

6        MR. BARNES:  Thank you, your Honor.  A couple of

7  points.

8     Number one, it does make sense that whatever plan

9  details be adopted be consistent with the Brown case.

10  That's important.

11     Number two, we are willing to defer to Google's privacy

12  concerns.  Those are important and we understand that.

13     And, number three, as long as the data sources that are

14  being preserved are readable by humans, we're willing to

15  defer to the mechanics as to how that's accomplished.

16     That's the goal.  As long as the Court orders that it

17  be readable, the precise details I think we can defer to the

18  good faith judgment of Google as to how to balance privacy

19  interests with the preservation of a readable data set.

20  That's the important word, is that they be readable.

21        THE COURT:  All right.

22     Mr. Ansorge, readable data set?

23        MR. ANSORGE:  Yes.  It will be readable.

24     I would like to address two of the points Mr. Straite

25  made.

23

1          THE COURT:  Briefly.

2          MR. ANSORGE:  It will be very brief, your Honor.

3      He said that they received annotations on May 9th, and

4  this was the misunderstanding I mentioned earlier.  We had

5  provided those to the special master team on March 7th and

6  we had thought maybe that they had been passed on.  They had

7  not.  That was something that just got caught in between.

8      The more important issue though I believe is Mr.

9  Straite said we don't understand what's in ███████.  We've

10 produced data for both the expert Shafiq and plaintiffs from

11 the entire GAIA ██████ key space.  We've also produced data

12 from Zwieback ██████.

13     We've provided that information so plaintiffs do not

14 only have the annotations.  They actually have -- I'm

15 lacking coming up with a good example here but sort of like

16 the proof is in the pudding, your Honor.  They have the

17 thing itself as it's been provided.  And that's almost --

18 often much more informative than a map to it, because you

19 know, it's such a large and complex data structure.

20     So with that background, we think we provided more than

21 enough information, and to be frank, much more than we think

22 would be appropriate under the specific confines of what

23 this case is about.  And we think that from that basis, we

24 can work to identify they're specifically interested in the

25 sync columns, they're specifically interested in content

24

1 verticals, they're specifically interested in search ads.

2 And if we would focus on those, that's going to be easier

3 than providing the whole key space.

4          THE COURT:  Okay.  Understood.  Thank you, Mr.

5 Ansorge.

6      Thank you both.

7      Special Master Brush or Mr. Schmidt, do you have any

8 follow-up questions or comments with regards to Google's

9 argument on identification of columns as an alternative

10 approach?

11          MR. BRUSH (via Zoom):  Yes.  I think part of it

12 too, there was a little bit of confusion as we would -- my

13 team will own that.  And apologies to the parties and to the

14 Court if there was anything that made that process more

15 difficult in the exchange of information.  We had something

16 and there was just some confusion as when that was to be

17 turned over.  So first, apologies on that.

18      Second, the columns would work.  I think that's a

19 healthy balance, and we could look to use that as an

20 alternative.

21          THE COURT:  How would the appropriate columns be

22 identified, Mr. Brush?  We're pretty far through this

23 process now.

24          MR. BRUSH:  And that's a challenge.  We'd have to

25 really kind of go back and to look at some of this and see

25

1  how that approach would even look.  And we would certainly

2  need aid and assistance from the Google team and Gaylord

3  Spheres (phonetic) on that.

4      Maybe it could be a subset.  We're looking for the

5  parties -- here again, if we can strike a balance here

6  within proportionality.

7          THE COURT:  Did -- in the re-review with the

8  Calhoun teams, both plaintiff and Google, that followed our

9  last hearing that week or two weeks in May, was there a

10  discussion around columns?  It sounds like that's when it

11  came to light that -- you had the column information and the

12  plaintiffs did not?  Was there a discussion with regards to

13  a column approach to preservation for the ██████ data

14  sources?

15          MR. BRUSH:  Off the top of my head, I don't

16  recall.

17      Mr. Schmidt, do you recall if that was something

18  specific?

19      You know, a lot of it comes again to when we talk about

20  field columns --

21          THE COURT:  Right.

22          MR. BRUSH:  -- and field contents.  So I wouldn't

23  want to guess without having a look at a prior transcript of

24  record.

25          MR. SCHMIDT (via Zoom):  Yeah, I don't believe

26

1  that we seriously approached that.  I think there was a lot

2  of lack of understanding about what was within the columns

3  and the titles of the columns provided in the spreadsheet.

4         THE COURT:  I'm just reviewing my notes on Exhibit

5  A with regards to any discussion around the column approach.

6    Okay.  All right.

7         MS. GAO:  Your Honor, if I may, I just want to

8  clarify one point.

9         THE COURT:  Briefly, Ms. Gao.

10         MS. GAO:  Thank you.

11    So my understanding is like there was not a lot of

12  discussion around columns because in the last round of

13  special master recommendation and report, the special master

14  recommended only some field-based preservation for both GAIA

15  ███████  and Zwieback ███████.  And Google has compromised to

16  agree to do sample-based preservation for those two

17  large-scale key spaces.  And we didn't know that we're going

18  to discuss this field-based preservation until we saw the

19  special master's new and modified report and recommendation.

20         THE COURT:  I appreciate that, Ms. Gao.  But the

21  whole point of returning to the special master after our

22  previous round was that an across-the-board sample-based

23  preservation plan may not be appropriate in this case, as

24  distinguished from Brown where there are fields that speak

25  to identification of class members.

1    So that was the approach.  And whether it would remain
2   entirely sample based or take some other approach was
3   exactly what the return assignment to the parties to return
4   to the special master, that's exactly what the assignment
5   was.
6        Special Master Brush, did you want to be heard?
7            MR. BRUSH:  Yeah, just based on that last point,
8   your Honor.  And I think it's imperative that as we go
9   forward and look at any of this is that we have some greater
10  cooperation on the Google side for some of this.
11       I think one of the challenges we've experienced is, we
12  did put forth requests to both parties to work on a
13  preservation plan.  My team and I worked on that diligently
14  but with limited information, so I think we did the best
15  that we could, given what we had.
16       I would implore that going forward on any of these and
17  based on anything that comes out of modifications or
18  adjusted rulings on this is that there's greater cooperation
19  from parties.  It's just something I want to make sure it's
20  put on record because I felt as if there wasn't enough
21  effort on that and we were left kind of -- I wouldn't say
22  guessing necessarily.  We're making the most educated
23  decisions we could make based on the information we had
24  that's sometimes limited.
25       So I would implore particularly Google, who has more of

28

1  a mapping of this information where the data sources are, to

2  help us understand what, if anything, needs to be modified

3  in the best possible manner so we can achieve the litigation

4  goals --

5          THE COURT:  I appreciate that, Special Master

6  Brush.

7          MR. BRUSH:  -- or preservation goals, I should

8  say.

9          THE COURT:  But the Court is very -- we have been

10  through this now in two full rounds.  And it's very

11  disturbing to the Court, to be candid, to be hearing from

12  the special master as I have heard in my discussions with

13  him in preparation for today.  It's very concerning the

14  concerns that he has raised about Google being forthcoming

15  with helpful information.

16      And the special master -- the record is replete with

17  exhortations to the parties to make proposals and to provide

18  data that supports their proposals.  And of course the data

19  rests with Google to a large extent, almost entirely.

20      And if you say, "Well, now we saw what the special

21  master's done, now he wants something different," your

22  chance to propose something constructive and useful

23  knowing -- knowing what the issue on sampling was, that

24  opportunity -- that's why we took a break and gave

25  additional opportunity in June.

29

1      I am far less inclined to return any issues to the

2 special master at this point.  It is now nigh July.

3      So I will give it consideration.  I recognize the

4 concerns around the ███████ database.  But frankly, the time

5 for a constructive -- constructive and instructive proposal

6 from Google based on columns was in the first round of

7 putting together a proposal, if not the second round instead

8 of:  Let's mete out as little information as we need to and

9 let's see what the special master does with it and then we

10 can argue from there.

11      That is not the way the process works and that has

12 taken up a lot of time and resources of the parties, of the

13 special master and of the Court.

14      So I hear the arguments, and I appreciate the further

15 input of the special master.  I will give it careful

16 consideration and respond accordingly.

17      What I'd like to do now, keeping an eye on our time

18 this morning, is to move to the plaintiffs' objections,

19 starting with the request for clarification of sync state.

20 You have my tentative rulings with the requirements of any

21 field that expressly sync state.

22      I am not going with the language "expressly or infers

23 sync state."  I am rejecting that.  But any field that

24 expressly identifies "sync state" is to be identified.

25      We have the addition of the ██████ specific fields that

1 plaintiffs requested, and we have the addition of the fields

2 that Google has identified in its response to the

3 objections.

4     Again, to the extent those are not already covered and

5 that they exist, those will all be included.

6     So from plaintiffs, anything further with regards to

7 clarification on sync state?  Mindful of time and

8 prioritization of objections.

9     Mr. Straite?

10        MR. STRAITE:  Thank you, your Honor.

11     We just have one request for clarification, and we hear

12 you that you have rejected our request for signals from

13 which one could infer sync state.

14     For expressly stating sync state, we would like

15 clarification that any signal that records when a user is

16 signed out is by definition an express not synced signal,

17 because by definition in Chrome, if one is not signed in,

18 they cannot be synced.

19     So, for example, GAIA user state or any other signal

20 that records that someone is not signed in.  That would be

21 an express not synced signal.

22        THE COURT:  Any response from Google?  Who has --

23 Mr. --

24        MR. ANSORGE:  Yes, your Honor.  I get to look at

25 this one.

1    We believe that the special master explicitly excluded

2  GAIA user state from the sync state question, and there's a

3  good reason for that, and it's because they're orthogonal to

4  each other.  So there's signals that exist within the Chrome

5  logging infrastructure that will relate directly to either

6  how the sync transport layer functions or whether users have

7  taken some type of actions within sync.

8    And then there's an entirely separate logging

9  infrastructure that relates to unauthenticated identifiers

10 and other sorts.  GAIA user state, as it's being cast here,

11 is both not a signal that's tied to sync state and it's also

12 not a reliable signal.  We've had some debates with

13 plaintiffs about this.

14    And so for that reason --

15         THE COURT:  I dropped my pen, pardon me.

16         MR. ANSORGE:  That's all right.

17         THE COURT:  I'm with you.  I'm following you.

18 Okay.

19         MR. ANSORGE:  And I don't mean to much more

20 belabor the issue and we understand how there's time

21 limitations.  But we think that explicitly the GAIA user

22 state, what Mr. Straite is asking for is precisely in an

23 inference.

24    He's talking about signals that one could interpret as

25 meaning something different.  And we believe the Court and

32

1  both the special master have already signaled the response

2  to this, which is that there's specific explicit signals to

3  those.  We've added three others.  We have no objections to

4  your ruling on those issues, your Honor.

5          THE COURT:  Thank you.

6      All right.  Any questions around the plaintiffs'

7  requests from the special master or Mr. Schmidt?

8      Any questions?  No?

9          MR. BRUSH:  No, your Honor.

10          THE COURT:  All right.  Okay.  Then let's move on.

11      As I said, the phrase -- or, excuse me, the inclusion

12  of "any ID not mentioned below" will be removed.

13      And let's move then to Google's identification of

14  fields from which data is to be preserved.

15      Any further comment from the plaintiffs on that?

16          MR. STRAITE:  Thank you, your Honor.

17      And we appreciate that there are identifiers expressly

18  mentioned in the modified preservation plan.  Zwieback is

19  not one of them, and we request clarification.  GAIA IDs are

20  expressly mentioned.  Biscotti is twice mentioned.

21      We request that Zwieback be included as one of the

22  identifiers for clarity.  Zwieback of course is the primary

23  identifier to identify not synced devices.  That's the core

24  of the case.  And there will be plenty of class members who

25  don't sync.  Their devices are tracked.

1    And if their IDs are not used for the sampling, then

2  they'll be left out of the sampling.  So we respectfully

3  request that Zwieback be added as one of the identifiers.

4          THE COURT:  Response from Google?

5          MR. ANSORGE:  I'm not sure if I have this one or

6  Ms. Gao does.  But --

7          MR. SCHAPIRO:  I think Ms. Gao can take it.  I saw

8  her unmute.

9          MR. ANSORGE:  Okay.  Great.

10          MS. GAO:  No objection from Google.  I think the

11  special master has correctly included "any IDs not mentioned

12  below" to precisely capture this kind of situation, for

13  example, Zwieback ID.  We will be preserving Zwieback ID as

14  a field.

15          THE COURT:  All right.  Yes, we had Zwieback ID as

16  a field that would be added, so I assume that that met your

17  concern, Mr. Straite.

18          MR. STRAITE:  Yes, your Honor.  Thank you.

19          THE COURT:  Okay.  Then the preservation of log

20  retention periods will be as in Brown, as clarified in --

21  one time by the Court and no restriction on alteration of

22  log structures.

23    Mr. Straite?

24          MR. STRAITE:  Thank you, your Honor.  We have one

25  clarification, and this is actually -- to be candid, it is a

34

1 request for a slight modification to your words.

2     We recognize and accept that the Court need not approve

3 changing of data fields or other types of details of the

4 logs when they're moved around.  At a minimum, however,

5 could we get an order that Google must at least notify us if

6 relevant fields or any fields are being moved among the

7 preserved data sources, so at least we're aware of what's

8 being moved around?  Just a disclosure and transparency

9 request.

10        MR. SCHAPIRO:  So let me first just make sure --

11 there was one thing I wanted to clarify, but I think we're

12 all on the same page here.  What we're talking about here

13 are the logs -- with your order, your Honor, and parallel to

14 Brown, we're talking about the logs that are incorporated in

15 the special master's preservation plan, right, with regard

16 to retention --

17        THE COURT:  No, that was Google's most recent

18 request for clarification in Brown with regards to the logs

19 that are -- the logs that currently are preserved in

20 perpetuity, they don't have a retention period across the

21 board, whether they're part of this plan or not.

22     If there are logs for which there is currently no -- as

23 I say, the data is always preserved.  I mean that's

24 always -- that's sort of where everybody started.  Well,

25 that's stuff we don't need to talk about preservation

35

1 because it's always preserved.  So those have to remain that

2 way.

3          MR. SCHAPIRO:  Well, just to be clear, because

4 there are lots and lots of logs across Google, can we at

5 least say this is limited to the hundred -- to what we I

6 think have been calling during a lot of this case, the

7 relevant logs, which are the ▮ logs disclosed in September

8 2021?  Perhaps that's what the Court had in mind, because

9 all logs that a company like Google not being able to change

10 retention periods, that would be something that, you know,

11 we would certainly object to and need to --

12          THE COURT:  But we're only talking about logs for

13 which there is no retention period, logs that currently are

14 maintained in perpetuity.

15          MR. SCHAPIRO:  I don't know what logs across a

16 company the size of Google are maintained in perpetuity

17 here.  I mean we're literally talking about -- you know, all

18 logs might include logs that don't even have any user data.

19 But back in September 2021, there was a set of ▮ logs that

20 were identified.

21     I would ask that it at least be limited to that so that

22 we are able to conduct our business in the ordinary course.

23          THE COURT:  And you'll have to give me some

24 context, Mr. Schapiro, with regards to that disclosure.  I'm

25 not recalling it specifically, sitting here today.

36

1          MR. SCHAPIRO:  Go ahead, Ms. Gao.

2          MS. GAO:  Your Honor, I can provide some context.

3          THE COURT:  Briefly, fine.

4          MS. GAO:  So back in September 2021, the special

5 master recommended and your Honor issued an order laying out

6 a three-step process.

7     The first step is for Google to identify all of the

8 relevant data sources at issue in this case.  And Google did

9 that.  So Google produced to special master and plaintiffs

10 on September 17th a list of ███ relevant data sources.  And

11 that is the pool of data sources that has guided the

12 following special master searches and the discussions of the

13 preservation plan.

14     So we would just respectfully that your Honor's order

15 be limited to the pool of ███ data sources.

16          MR. SCHAPIRO:  And I think the special master

17 would agree with us that that's how we got there and what we

18 spent many months speaking about.  But one thing I don't

19 want to do is be in a situation where we're back before the

20 Court, and someone is saying an order was violated

21 because --

22          THE COURT:  I understand, I understand.  Clarity

23 is important.  Sometimes clarity is you have to do it all,

24 which is what the whole exercise on the preservation plan

25 has been, which is to not have a blanket order of Google has

37

1  to preserve everything, which Google has always -- excuse
2  me, has always argued, and the Court has recognized, is not
3  a proportional approach to this problem.  But we've come a
4  long way from there with regards to the plan as we now have
5  it.

6      Special Master Brush, I haven't looked closely at
7  this -- at the ███ logs.  I thought much of the proceedings
8  of identification since then were around whether or not that
9  initial identification of logs was sufficiently broad or if
10 we've been dealing with logs outside of that realm through
11 this process.  But I may be -- I may not have the right
12 perception in this case.  Can you --

13         MR. BRUSH:  I would say, your Honor, it's common
14 like we would see in most discovery.  If we re-frame it
15 saying -- forget that we're talking about logs, that we're
16 talking about unstructured data.  Eventually, through the
17 discovery process, there's going to be additional data
18 sources that are identified.  That's just the natural
19 progress.

20     So for the most part, most of them, I think there was a
21 good due diligence approach and what we knew at the time.
22 The logs were brought forth and -- as identified data
23 sources.  And then there was a handful of additional ones
24 that were relevant to be found later on that was part of the
25 natural discovery process.

38

1          THE COURT:  And could those additional logs

2    outside of the original ██ be identified, Mr. Brush, not by

3    you but by the parties?

4          MR. BRUSH:  Yes.

5          THE COURT:  Okay.

6          MR. STRAITE:  Your Honor, could plaintiffs just be

7    heard on the question of relevant logs and --

8          THE COURT:  In due course, Mr. Straite.  One

9    second.  Let me just be sure my notes are caught up with the

10   inputs.

11       Thank you.  Go ahead.

12          MR. STRAITE:  So you talked about the original ██

13   logs.  Actually, the original number was ██.  That was the

14   number we had.  All three of our 30(b)(6) depositions, on

15   data logs, we were told there was ██ relevant logs.

16       We then found out the following month that Google was

17   admitting there is ██ relevant logs.  Since last September,

18   we've discovered additional logs that are undeniably

19   relevant, and there's more that we have been denied

20   discovery into so we don't know how many additional ones

21   there are.

22       The question on preservation is not about making

23   complex discovery driven determinations as to which

24   additional logs may or may not be relevant.  The question is

25   whether Google simply needs to ask for permission to turn a

39

1  log or a data source from indefinite preservation to a

2  shorter preservation period.

3      The order as written simply asks Google to make its

4  case to the Court if it wants, for burdens reasons or other

5  reasons, to reduce the preservation period on a log to make

6  its case.  It's not in the ordinary course.  It's not doing

7  prohibited from doing so.

8      If Google wants to make the case that a log that we

9  didn't know about is not relevant and it would be beneficial

10 to Google for business reasons to reduce the preservation

11 period, they can make their case.

12     But to have a backwards process now, where we have to

13 reopen the question of what's relevant and what's not with

14 discovery that has been denied to us months after discovery

15 ended, I don't think that serves the purpose of this

16 preservation plan.

17     We're willing to work in good faith with Google.  If

18 they want to identify a log that they contend is not

19 relevant to the case that it currently has indefinite

20 preservation, they want to reduce preservation period on a

21 log-by-log basis, they can make that case.  That's far more

22 efficient than saying let's open up discovery into all the

23 logs we haven't talked about and see, just in case some --

24          THE COURT:  Okay.  Thank you, Mr. Straite.  I get

25 the point.  Let's be clear.  There's going to be no opening

40

1  of discovery.  All right.

2      The question is, is there a reasonably bounded subset

3  for preservation of logs which currently have no retention

4  period and are preserved in perpetuity for which Google

5  should be obligated to maintain that status.

6      And I've given careful consideration to the language I

7  previously used in <u>Brown</u> with regards to changes have to

8  come back to the Court.  And we're not going to have years

9  of week-in week-out proposals from Google and they need to

10  wait for me to get to it and look at it.  And if it's a log

11  that no one has heard of, I would imagine the plaintiffs are

12  going to say:  Well, we don't know.  We need more

13  information about the log before we can agree.

14      We're not going down that path.  I will figure out a

15  parameter, and that will be the parameter.  Those are the

16  logs that will be preserved as is for the duration of the

17  litigation.

18      And the only question here is whether a subset of that

19  should be logs that were initially identified -- that is,

20  using the ■■■ number -- and I appreciate the number has

21  changed.  I'm well aware of that, Mr. Straite -- as well as

22  additional logs that have been identified subsequent to the

23  ■■, which I believe the parties can identify those pretty

24  quickly.

25      That is the only possible subset that the Court would

41

1  consider.

2      MR. SCHAPIRO:  So I'm glad to hear that, your

3  Honor.  I think at least --

4      THE COURT:  I haven't granted it yet.

5      MR. SCHAPIRO:  No, no.  I know you haven't, and so

6  I just wanted to say that I hope in your -- I'm hearing you

7  to say you're going to go back and you're going to consider

8  it and try and come up with something that you think meets

9  the needs of both parties.

10      And I would just ask that in doing that, you bear in

11  mind that -- the point that I was trying to make a moment

12  ago when I was saying we don't want to be in a situation

13  where we are found to have inadvertently violated an order

14  is the fact that we're only litigating one case here.

15      We do not know how many logs in Google -- in various

16  parts of Google now that we've never encountered in relation

17  to anything with this case -- to do with this case are now

18  retained permanently or not retained permanently.  And if we

19  are under an obligation -- so if someone in Singapore alters

20  some log or something that we never bumped into in relation

21  to this case and the plaintiffs have never bumped into in

22  relation to this case, and we have not sought Court

23  permission, we're then on the hook.

24      And so that's why I would just ask that the Court bear

25  in mind the realities here.

42

1           THE COURT:  Mr. Schapiro, what is Google's

2    response to plaintiffs' request with regards the log

3    alteration that there simply be notification to you and to

4    counsel?

5           MR. SCHAPIRO:  My first question is which logs

6    would that apply to because --

7           THE COURT:  Logs in the preservation plan.

8           MR. SCHAPIRO:  Logs in the preservation plan.

9    With regard to that, all changes are recorded.  I don't

10   think we have an obligation to tell the plaintiffs that.  So

11   I think our -- our position is I don't see why we should

12   have to do that, but they are all recorded in case some

13   issue ever came up.

14          THE COURT:  So they're recorded so that a record

15   could be communicated to plaintiffs?

16          MR. SCHAPIRO:  Correct.  And, again, one of the

17   main reasons we don't want to take that on is because there

18   is this issue of -- you know, there's some small change made

19   because of the number of pixels, you know, in -- and certain

20   ads changes or there might be logging clicks of some new ad

21   type or something.  And if we have to be monitoring that,

22   notifying plaintiffs on pain of being found in violation of

23   some sort of court order, we're getting into difficult

24   territory here.

25          So I'm not just trying to say no to something that the

43

1 plaintiffs are seeking.  I'm trying to make sure that the

2 obligations we have are reasonable and proportionate and

3 focus on what actually has to happen in this case.

4          THE COURT:  All right.  Thank you.

5      Let me just make a couple of notes here.

6          MR. STRAITE:  And to Mr. Schapiro's point, your

7 Honor, I don't think plaintiffs are concerned about whether

8 fields are changed to include new pixels.

9      I think the concern is that if a log with a long

10 retention period or even an indefinite retention period, say

11 has some Zwieback key data, that they make the decision to

12 move that field to a log that has very short retention

13 periods, one that's not being preserved, if your Honor is

14 not going to order that that require court approval, which

15 we accept, it should at least be communicated to the

16 plaintiffs so that we know a field we thought was being

17 preserved has now been moved to a log that's either not

18 being preserved or has a shorter retention period.  It's

19 just a disclosure issue.  It's not a court permission issue.

20      So it wouldn't be --

21          THE COURT:  I understand.

22          MR. STRAITE:  Thank you.

23          MS. GAO:  Your Honor, I just have one final point.

24      We understand that you want us not to change the

25 retention period for the logs that are currently maintained

44

1  permanently, but I just have one ask, that Google be

2  permitted to delete data prior to the first day of the class

3  period of this case, because that data is not relevant to

4  the claims or defenses here.

5           THE COURT:  Okay.  Understood.  Thank you, Ms.

6  Gao.

7      All right.  Let's move -- I think preservation of

8  encryption keys, we discussed above.  Preservation of maps,

9  tables, as I said, that will match the language in <u>Brown</u>.

10      Any issue there on which you'd like to be heard, Mr.

11  Straite?

12           MR. STRAITE:  No, your Honor.  Thank you.

13           THE COURT:  Google?

14           MS. GAO:  No issue, your Honor.

15           THE COURT:  Okay.  And no issue with regards to

16  Google's agreement not to use the information that is not

17  preserved against defendants in these proceedings -- or,

18  excuse me, against plaintiffs in these proceedings?

19           MR. STRAITE:  Nothing from plaintiffs, your Honor.

20           THE COURT:  All right.  That addresses the listed

21  issues that I had identified.

22      I will continue to give consideration to the

23  preservation as it relates to the ███████ data sources and

24  the feasibility of going to a column approach.  The Court

25  has expressed its views and concerns there, but I do hear

45

1  and appreciate the argument and will consider that further.

2      With regards to the sync state, I understand

3  plaintiffs' ask that that include a field for when the

4  plaintiff is not signed in, and I hear Google's opposition

5  to that.

6      And then, with regards to log alterations, plaintiffs'

7  request for notification and -- notification of changes, at

8  least as to retention periods.

9      And then the preservation of logs, exactly which logs

10  those should be.  Should be a subset of all logs as it

11  relates to those without retention period.

12      All right.  From plaintiffs, any other issues not

13  addressed by the Court today with regards to the special

14  master's proposed preservation plan?  Any other issues that

15  relate to the 14 proposed modifications?  We're not going

16  back to reargue objections from round one.

17      Mr. Straite?

18          MR. STRAITE:  Nothing from plaintiffs, your Honor.

19  And we appreciate everyone's time and effort in this.  We

20  hear you, this has been a long process, and we thank

21  everyone.

22          THE COURT:  And from Google, other issues that you

23  would like attention to at this time?

24          MR. ANSORGE:  No, your Honor.  Thank you to you

25  and to Mr. Brush and Mr. Schmidt certainly.

46

1          THE COURT:  Okay.  Let's do this.  I'd like to
2  just take a very short five-minute recess and come back.
3      I would like to, based on the request for production
4  five issue that is still open in this matter with regards to
5  the production of the plaintiffs' identifying data and
6  the -- I know I had ordered that Google needed to deal with
7  its third party notifications and get data produced by
8  today.  And there was some further request for clarification
9  as to what the scope of the data was.  This was also an
10  issue that had been before the special master.
11      I did not discuss this further with the special master
12  in advance of today, but I'd like to take advantage of
13  having the parties here, if you have the right folks on your
14  team to address that.
15      So let's take five minutes, and then we will reconvene
16  and see if we can have a productive short -- short
17  productive discussion on that subject.
18      All right?
19          MR. STRAITE:  Thank you, your Honor.
20          THE COURT:  We'll be in recess, five minutes.
21  Thank you.
22      (Proceedings recessed briefly.)
23          THE COURT:  All right.  We are back from our
24  recess.
25      I did just want to clarify one exchange we had at the

1  end there with regards to Ms. Gao's request not to delete --

2  or to be able to delete data from logs that predates the

3  class period.  I think I said "Understood."  I hear the

4  request and I'm taking it under submission.  I wasn't -- I

5  didn't mean to imply that I was granting it.  I don't think

6  anyone would take it that way, but I wanted to be sure my

7  comment was clear.

8      Okay.  Let's turn to the outstanding issue with regards

9  to request for production number five.  And this relates to

10  plaintiffs' identifying data that I know was the subject of

11  back-and-forth before the special master.

12      Excuse me.  And it seems -- it's not clear to me if the

13  parties are talking past each other or if they're really

14  arguing about the scope of what plaintiffs' preserved data

15  is.  So I want to take a moment and see if I can get clarity

16  on that issue while I've you folks here.

17      And I start with plaintiffs' request -- let me just be

18  sure I've got everything in order here -- plaintiffs'

19  initial request to the Court back on May 27th where it was

20  seeking leave to address a number of discovery issues.

21      Specifically with regards to request for production

22  number five, plaintiffs were talking about data that is

23  sitting on a litigation platform that was long ago gathered

24  from multiple data sources using the named plaintiffs'

25  identifiers.  And from that, plaintiffs went on to identify

48

saying there is a tranche of that data -- that's the
universe and now there's a tranche that Google has been
holding on to pending third party notification.

Plaintiffs later refer in the same paper to the
universe of data as that which has been historically
searched and preserved named plaintiff data.

And I took that at plaintiffs' representation that
there was an identifiable set of data on a litigation
platform that had been collected earlier in the case long
ago when we had those discussions about plaintiff
identifiers and that then there were some issues with
regards to third party notification, which I ordered, fine,
notify by this date, produce the data by today.

That was followed by subsequent requests for
clarification from Google as well as further input from
plaintiffs.

At first Google suggested, well, we're talking about
data from a set of ███████ logs to which plaintiffs
responded, pointing specifically to a deposition of a Google
engineer -- which it looks like the deposition was in March
of this year where the Google engineer stated that Google
preserved the data by extracting it from specific data
sources using plaintiffs' Google account identifiers and
then preserved that data on a litigation platform, again
indicating that there is a set of data that everyone knows

49

1  what it is, it's historically collected, and it is in a

2  specific location.

3      Google then responded to that input again by referring

4  to ███████ logs and then further input with regards to --

5  seemed to move away.

6      Google's most recent request for further -- to be able

7  to brief the issue further was that -- they were talking

8  about -- well, Google left the reference to ███████ logs --

9  excuse me -- and began referring to -- said it will produce

10 all of the plaintiff data that Google has preserved pursuant

11 to the litigation hold.  Now, it's litigation hold data.

12     So it's not clear to me if there is a dispute between

13 the parties as to what the universe of data is that we're

14 talking about or not.  And my order was tied to plaintiffs'

15 first request, which indicated to me it was an identifiable

16 set of data collected at a point in time in this case and

17 put on a litigation platform.

18     So where are we?  Is that a fair description?  Does

19 everybody know what that is, and has that been produced or

20 will it be by close of business today?

21     Let me hear first from Google and then from plaintiffs,

22 please.

23         MS. GAO:  Yes, your Honor.  With your Honor's very

24 helpful clarification that your Honor's order is tied to

25 plaintiffs' original request regarding what plaintiffs

50

1 called historically preserved data and what Google calls

2 litigation hold data, that's the same thing.  We don't

3 really have a dispute there.  We already provided

4 notifications to the relevant publishers, and we are on

5 track to produce all of the data to plaintiffs today.

6          THE COURT:  Okay.  And how is Google identifying

7 that data?  What are you -- where are you pulling that data

8 from?  Describe it, please.

9          MS. GAO:  It's in a litigation hold platform, and

10 the data is stored in a non-optimized format.  But Google

11 has processed the data, and the data will be produced in a

12 format that's readable by human beings like plaintiffs.

13          THE COURT:  Well, you mean -- like all of us, Ms.

14 Gao.

15     And is that -- can Google -- is that the data that the

16 engineer was referring to in his deposition in March of this

17 year?

18          MS. GAO:  It should be.  I don't have the

19 deposition transcript before me, but yes, that is the data

20 that -- that is the event level plaintiff data that Google

21 preserved.

22          THE COURT:  And was that preservation at a fixed

23 point in time or has it been throughout the litigation --

24 has the data being identified, plaintiffs identifying and

25 then it -- is it an ongoing process and it's put on this

51

1  platform or was this at a specific point in time, if you

2  know?

3          MS. GAO:  It's an ongoing process.  So the data is

4  transferred to the litigation platform daily, but it's not

5  in a readable format.

6      So the Google engineer -- like back in March when we

7  had this dispute, Google engineers had processed the data to

8  a readable format.  But after we received your Honor's order

9  on June 13th, we also processed the data from March to June,

10 so what we will produce to plaintiffs today would have all

11 of the data preserved through the date of the order, which

12 is June 13th.

13         THE COURT:  Okay.  Thank you, Ms. Gao.

14     From plaintiffs, is that -- that's what we're talking

15 about?  And we're not arguing about the motions that are

16 pending coming up in August.  We're talking about specific

17 plaintiff identifying data that was the object of your

18 initial request.

19     Mr. Straite?

20         MR. STRAITE:  Thank you, your Honor.

21     The object of our request was to produce all data

22 related to the plaintiffs, their identifiers and their

23 devices, as your Honor ordered in April 2021 to the extent

24 it's preserved.  Obviously it can't be produced if it hasn't

25 been preserved.  So that's why we limited that request.

52

1    However, we have some questions that were raised by the

2  brief, and we have less clarity, not more clarity, because

3  of the briefing.  We have two very important questions and

4  then other questions.

5    Number one, we heard Ms. Gao say that event level data

6  is being produced.  What does that mean?  Does that exclude

7  profiles?

8    Number two, we heard in March -- we're very concerned

9  that the only data on this litigation platform was GAIA

10 keyed, meaning account keyed.  So where is the Biscotti

11 keyed and the Zwieback keyed data for our plaintiffs and

12 their devices?  We have no --

13            THE COURT:  Okay.  Well, that's a different

14 question, Mr. Straite.

15            MR. STRAITE:  Correct.

16            THE COURT:  That question may go to issues that

17 are briefing.

18            MR. STRAITE:  So our question then would be --

19            THE COURT:  My issue here today is that we all

20 understand what the universe is.  If it's data that's been

21 preserved pursuant to a litigation hold, plaintiffs may

22 argue that that was not sufficiently expansive and doesn't

23 conform to a court order, but that's an issue for another

24 day.

25    But it sounds like what you have asked for, what

1 plaintiffs have asked for in this very focused, very limited

2 briefing Google has identified and will complete production

3 of today.

4          MR. STRAITE:  We don't know the extent to which

5 there's a difference between capital L litigation, capital H

6 hold data and how that differs from historically preserved

7 plaintiff data and how that differs from all data related to

8 the named plaintiffs and their devices.

9      We do have a request.  We have not completed the

10 briefing of course that Google put in regarding their motion

11 for clarification.  One of the asks we have is to get

12 transparency and clarity.  What is on the litigation hold

13 set?  We don't know the dates.  We don't know what data.  We

14 don't know what keys were used.

15          THE COURT:  Okay.  But you're about to get all the

16 data.  You're about to have it all, so you --

17          MR. STRAITE:  But we don't know what's not there.

18          THE COURT:  Well, I --

19          MR. STRAITE:  We don't know what criteria were

20 used to create the litigation hold set.  We don't know what

21 was excluded.  We don't know if there's other data being

22 preserved that's not in the litigation hold set.  There's

23 absolutely no transparencies, no declaration as required by

24 Rule 34 as regarding what was preserved and what wasn't.

25      So we have no insight into what's in this litigation

54

1  hold set.  We don't know how it was created, when it was

2  created, what was excluded, whether --

3          THE COURT:  Well, that's not correct because it

4  sounds like you deposed an engineer about -- who identified

5  the -- I mean you quote him in your papers.

6          MR. STRAITE:  Right, but he mentioned it in

7  passing.  He was not an expert in precisely what was held,

8  what was withheld and what wasn't.  He simply told us that

9  there was GAIA keyed information that was sitting on a

10  litigation hold.

11      And with your permission, your Honor, the person who is

12  most knowledgeable to answer your questions is Mr. Barnes,

13  if I may pass to him on this one point on this deposition.

14          THE COURT:  Mr. Barnes, briefly.

15          MR. BARNES:  Sure.  So, your Honor, it wasn't a

16  deposition.  It was a meeting arranged by the special master

17  where this --

18          THE COURT:  Yes, that's correct.  That's correct.

19          MR. BARNES:  I wanted to make sure that was clear.

20      But second, what really raised our concerns was the

21  need for Google to file a motion for clarification at all

22  and the statements that were made in the motion for

23  clarification, because your order said that Google should

24  disclose all of the data that has been withheld from

25  plaintiffs.  And we understood that to mean data that Google

55

1 had extracted from the vast sea of data it has about all

2 individuals to be about our plaintiffs.

3     And Google came back by using terminology that we've

4 never used in this case and by creating red herring

5 arguments about data that we've never asked for.

6     And throughout the special master process, we have

7 continually asked Google, what else do you have -- have you

8 preserved and pulled about our named plaintiffs that you

9 haven't told us.  And it seems we can never get a clear

10 answer to that question.

11     And so we don't think we know what data Google has

12 previously searched and segregated for our plaintiffs --

13        THE COURT:  Okay.  Well, you're about to find out,

14 Mr. Barnes.  You're about to find out.

15     So here's the order.  Here is the order.

16        MR. BARNES:  Okay.

17        THE COURT:  Okay.  Because if -- all

18 information -- all information identifying the plaintiffs --

19 plaintiff identifying information that Google has preserved

20 throughout the course of litigation is to be produced.

21 Okay?  And that --

22        MR. BARNES:  And what --

23        THE COURT:  It sounds like from Google's

24 representations today here in court to me that that

25 production will in fact be complete today.

1      But is what I just said something broader than you were

2   speaking to, Ms. Gao?

3           MS. GAO:  I don't believe so.  That is our

4   understanding.  We're going to produce the data that Google

5   has preserved for plaintiffs that has not been produced

6   before.

7           THE COURT:  Okay.  So if Google has plaintiff

8   identifying information that it has been preserving during

9   the course of the litigation, all of that will be turned

10  over and it will be turned over today.

11          MR. BARNES:  Your Honor --

12          THE COURT:  And if that is broader than what

13  you -- than what Google thought it was producing today, it

14  will have to get that production done.

15          MR. BARNES:  I just want to ensure that it's

16  also --

17          THE COURT:  I want to know -- excuse me, Mr.

18  Barnes.  Excuse me.

19          MR. BARNES:  I'm sorry.

20          THE COURT:  Is that understood?  Is there any

21  question from Google on the scope of the order?

22          MR. ANSORGE:  Yes, your Honor.  It might be

23  easiest to just exclude by way of example.  When you say

24  "preserved," we're talking about preserved for the purpose

25  of the litigation.  Google, of course, preserves Gmail.

57

1  Plaintiffs have Google accounts.  There's -- Google has

2  YouTube history.  This information is preserved.  Plaintiffs

3  are Google users and they're storing that information is

4  what we've been describing as the data that's specifically

5  been preserved for this litigation because it fits within

6  the contours of the complaint.

7      And I believe that's what all the clarifications were

8  aiming for previously too.  We just don't want have a

9  situation where, "Well, we expected all our emails to be

10  produced, we expected all the data that is within Google

11  maps to be produced.  We've expected anything that could be

12  tied to YouTube.  We once set up a Google Plus account.  All

13  of that information should be produced," when what has been

14  preserved has been tied to the litigation.

15      And plaintiffs, I would also add, should know when the

16  date began of the preservation because we've already

17  produced data to them that did not require publisher

18  notifications.  We're talking about ██████████ of data.

19          THE COURT:  So I understood -- thank you, Mr.

20  Ansorge.

21      I understood that -- and I recall early in this

22  litigation we had the discussion around plaintiff

23  identifiers, right, and some back-and-forth.  And the

24  plaintiffs provided identifiers to Google and that that

25  information was then used to identify what I've always

58

1  referred to and understood to be the data that identifies

2  the named plaintiffs.

3      And I appreciate perhaps we have not all been

4  sufficiently careful in our language.  And I also appreciate

5  that plaintiffs have concerns that the scope of the Court's

6  previous orders perhaps has not been complied with.

7      What I want to be sure right now is all the data that

8  Google has preserved with regards to the named plaintiffs.

9          MR. ANSORGE:  Yes.

10          THE COURT:  All of this litigation hold data is

11  completely out the door and turned over.

12      And, plaintiffs, you can look at that and you can say

13  this is missing and this is missing and this is missing, and

14  you can raise those issues if they are appropriate and

15  relevant to the ongoing briefing and the hearing that we

16  will have on discovery compliance in August.  Okay?

17      I am not going to take any further briefing on this

18  issue.  Briefing is closed, and it actually closed quite

19  some time ago.  And I don't want any filings from the

20  parties without leave of court.

21      I know everybody is starving for clarification because

22  it helps you, but the Court can only get so many angels on

23  the head of that pin.

24      Mr. Barnes, you've been very patient.  Please.

25          MR. BARNES:  Thank you.  All I wanted was to add

1  that when you say "plaintiff data," you're referring to GAIA

2  keyed, Zwieback keyed, and Biscotti keyed.  Those are the

3  identifiers we provided to Google.  And there's been an

4  ongoing dispute in this case between the parties about

5  whether Biscotti keyed data identifies the plaintiffs and

6  whether Zwieback keyed data identifies the plaintiffs.

7           THE COURT:  I understand, Mr. Barnes, and I'm not

8  wading into that dispute today.

9      You will get the data that has been preserved.  And if

10  you believe it is more narrow than previous court orders, I

11  am confident you are going to bring that to my attention.

12          MR. BARNES:  So it is all data being preserved

13  regardless of the identifier attached to it.

14          THE COURT:  All data that has been preserved

15  regarding the plaintiffs and placed on the litigation hold

16  platform.  That seems to be the universe, a common universe,

17  and plaintiffs think it should be bigger and Google may have

18  arguments in response to that.  We will deal with it in due

19  course but not through the discovery in response to RFP

20  five.  That issue has now been ruled upon.

21      Google's instructions are clear.  That production will

22  be completed forthwith.  And then we will address -- if

23  there's relevant issues that relate to the issues that are

24  coming up in August, we'll take them up then.

25          MR. BARNES:  Thank you, your Honor.

60

1          THE COURT:  Okay.  Thank you.

2      All right.  I appreciate the parties' willingness and

3  ability to pivot to this issue.  It was clear to me -- the

4  only thing that became clear to me from all of the briefing

5  was that we needed to have an actual discussion about this,

6  which we have now done.

7      Thank you.  Thank you for your preparation for today.

8  I wish these proceedings could have been live.  It is my

9  practice now for all substantive issues to do those in

10 person -- it is live, I get it -- in person in my courtroom,

11 but competing schedules didn't allow for that.

12     But I will see everyone in person at the August

13 proceedings.

14     All right.  That wraps us up for today.  Thank you

15 again for your time and attention.  I appreciate it.

16          MS. GAO:  Thank you, your Honor.

17          MR. STRAITE:  Thank you, your Honor.

18          MR. ANSORGE:  Thank you, your Honor.

19          MR. BARNES:  Thank you, your Honor.

20          MR. SCHAPIRO:  Thank you, your Honor.

21          MR. BROOME:  Thank you, your Honor.

22          MR. BRUSH:  Thank you, your Honor.

23          MR. SCHMIDT:  Thank you, your Honor.

24     (Proceedings adjourned at 11:10 a.m.)

25

61

1                    CERTIFICATE OF TRANSCRIBER

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14                   

15

16            Echo Reporting, Inc., Transcriber

17               Friday, July 1, 2022

18

19

20

21

22

23

24

25