# EXHIBIT 2
# to the Declaration of
# Whitty Somvichian

## (REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation, | Master File No. 4:21-cv-02155-YGR-VKD |
| This Document Relates to: *all actions* | |

**SUPPLEMENTAL EXPERT REPORT OF KONSTANTINOS PSOUNIS, PhD.**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    ASSIGNMENT .................................................................................................... 1

III.   SUMMARY OF OPINIONS ................................................................................ 2

     A.     Pseudonymous Identifiers ................................................................... 2

     B.     Cookie Matching.................................................................................. 4

     C.     Privacy Settings .................................................................................. 4

     D.     Location Issues .................................................................................... 5

IV.    THERE ARE VARIATIONS IN BID REQUEST DATA BETWEEN THE
     ABSENT CLASS MEMBERS AND THE PLAINTIFFS THAT
     SIGNIFICANTLY AFFECT RTB PARTICIPANTS' ABILITY TO
     ASSOCIATE BID REQUEST DATA WITH A PERSON OR HOUSEHOLD. ............. 5

     A.     Plaintiffs are not representative of the proposed class because Plaintiffs'
          bid request data includes multiple pseudonymous identifiers, whereas a
          substantial portion of the broader data set omits such identifiers. ........................ 5

     B.     Even where bid requests do include pseudonymous identifiers tied to a
          specific browser or device, RTB participants cannot associate the bid
          requests in the broader dataset with an individual person for many reasons. ........ 8

          a.     Pseudonymous identifiers cannot be reliably associated with
               individual persons by RTB participants.................................................... 8

          b.     Combined fields from multiple RTB bid requests cannot be
               reliably associated with individual persons by RTB participants............. 9

               i.     Location data cannot be used to identify users. .......................... 10

               ii.    The presence of a certain number of entropy bits does not
                    allow RTB participants to identify users. ................................... 11

     C.     Where bid requests do not include pseudonymous identifiers, an RTB
          participant would face even more significant additional obstacles in any
          effort to associate a bid request with an individual person because they
          would have to rely on information in a single bid request.................................. 15

          a.     Individual fields in a single bid request cannot reliably be used to
               identify an individual. ............................................................................. 17

               i.     The User Agent field in a single bid request cannot reliably
                    be used to identify an individual................................................. 17

               ii.    The IP address field in a single bid request cannot reliably
                    be used to identify an individual................................................. 18

               iii.   Geolocation data in a single bid request cannot reliably be
                    used to identify an individual...................................................... 21

**TABLE OF CONTENTS**
(continued)

b.    No combination of fields can reliably be used to identify an individual based on a single bid request. .................................. 21

V.    THE PLAINTIFFS ARE NOT REPRESENTATIVE OF THE PROPOSED CLASS BECAUSE THE FREQUENCY OF COOKIE-MATCHING VIA GOOGLE'S HOSTED MATCH DATA SERVICE IS SIGNIFICANTLY DIFFERENT BETWEEN THE PLAINTIFFS AND THE BROADER DATA SAMPLE. ....................................................................................... 28

VI.   THE PLAINTIFFS ARE NOT REPRESENTATIVE OF THE PROPOSED CLASS BECAUSE, UNLIKE MANY ABSENT CLASS MEMBERS, THEY DID NOT USE VARIOUS PRIVACY-ENHANCING OPTIONS THAT FURTHER LIMIT THE INFORMATION SENT IN RTB BID REQUESTS. ............. 30

A.    Many absent class members opted out of personalized ads. ............................... 31

B.    Many absent class members enabled limited ad tracking on their mobile devices. ........................................................................................... 32

C.    Many absent class members did not authorize app tracking on their iOS devices. ........................................................................................... 33

VII.  THE VARIATIONS IN BID REQUEST DATA BETWEEN THE PROPOSED CLASS MEMBERS AND THE PLAINTIFFS SIGNIFICANTLY AFFECT RTB PARTICIPANTS' ABILITY TO EFFECTIVELY USE IDENTITY GRAPHS, ANOTHER CENTRAL PART OF PLAINTIFFS' CLAIMS. ............. 33

A.    Identity graphs are not reliable tools for identifying any users based on bid request data. ............................................................................. 34

B.    The absence of pseudonymous identifiers in a large fraction of the broader dataset significantly affects RTB participants' ability to effectively use identity graphs, under Plaintiffs' theory. ............................................. 37

C.    The absence of cookie matching and hosted match data in a large fraction of the broader dataset significantly affects RTB participants' ability to effectively use identity graphs under Plaintiffs' theory. ..................................... 37

D.    The absence of personalized ads and app tracking in a large fraction of the broader dataset significantly affects RTB participants' ability to effectively use identity graphs, under Plaintiffs' theory. ..................................... 38

VIII. DR. SHAFIQ'S LOCATION ANALYSIS IS WRONG, MISLEADING, AND CANNOT BE GENERALIZED TO THE PROPOSED CLASS. ................................... 38

A.    Dr. Shafiq's analysis for the Plaintiffs ignores how Google generalizes the geolocation information actually in RTB fields. .................................. 40

B.    Dr. Shafiq's claim to be able to identify the Plaintiffs' home/work locations is misleading. ..................................................................... 45

## TABLE OF CONTENTS
(continued)

Page

C.    Dr. Shafiq cannot apply his misleading location analysis to the absent class members. ......................................................................................... 47

D.    An RTB participant cannot apply Dr. Shafiq's misleading location analysis to either the Plaintiffs or the absent class members. .............................. 48

## I.    Introduction

1.  I previously submitted a report in this litigation responding to the opinions of Plaintiffs' technical experts, Dr. Zubair Shafiq and Dr. Christopher Wilson. In that report (ECF No. 684-24, the "Psounis Opening Report"), I described the persistent errors and mischaracterizations in Dr. Shafiq's and Dr. Wilson's opinions, especially as they relate to the supposed ability of participants in Google LLC's ("Google") realtime bidding ("RTB") platform to reliably identify users or devices based on information contained in RTB bid requests.

2.  I continue to be retained by counsel for Google, who have engaged me to respond to Dr. Shafiq's supplemental report (ECF No. 750-8, the "Shafiq Supplemental Report") in support of Plaintiffs' renewed motion for class certification, in which I understand that Plaintiffs now seek to certify a class consisting of all active Google account holders since June 28, 2016. In so doing, I also address statements in Dr. Shafiq's and Dr. Wilson's rebuttal reports filed in response to the Psounis Opening Report, to the extent those statements are relevant to Dr. Shafiq's arguments in the Shafiq Supplemental Report.[1]

3.  My qualifications and experience are set forth at length in the Psounis Opening Report. An updated copy of my curriculum vitae appears as Exhibit A to this report, and a list of materials I relied on in forming the opinions set forth in this report appears as Exhibit B.

## II.    Assignment

4.  At the request of Google's counsel at Cooley LLP, I was engaged to perform three principal assignments in connection with this report.

    - Evaluate Dr. Shafiq's conclusions regarding the representativeness of bid request

---

[1] *See* ECF Nos. 750-4 ("Shafiq Opening Report"), 750-10 ("Wilson Opening Report"), 750-6 ("Shafiq Rebuttal Report"), 750-12 ("Wilson Rebuttal Report").

data[2] for the Plaintiffs as compared to bid request data that I understand Google produced for absent class members.

- Evaluate Dr. Shafiq's conclusions regarding the effect of variations in the absent class member data as compared to the Plaintiff data, if any, on the ability of RTB participants to associate bid request data with a person or household.

- Evaluate whether variations within the absent class member bid request data affect RTB participants' ability to associate bid request data with a person or household.

### III. Summary of Opinions

5. I conclude that the bid request data for the Plaintiffs is not representative of the broader sample of bid request data because many of the data fields that Plaintiffs and their experts relied on to contend that RTB participants can personally identify users are omitted from substantial portions of the broader dataset. As a result, the methods that Plaintiffs and their experts claim RTB participants can use to personally identify individual users do not apply at all to many members of the proposed class, and many of the issues and concerns that Plaintiffs and their experts have raised about RTB, premised on the bid request data related to Plaintiffs only, do not apply to the broader proposed class.

### A. Pseudonymous Identifiers

6. The first critical distinction between the data pertaining to Plaintiffs and the broader dataset involves pseudonymous identifiers like the Google User ID, which is a unique numerical

---

[2] I understand that the data produced in this case was produced from internal Google logs that are the closest approximation of the information contained in bid requests but are not directly records of bid requests themselves. For ease of reference throughout my report, I use the term "bid request data" to refer to the produced data, rather than referring to the individual internal logs sources from which the data was produced.

value associated with a particular web browser. Plaintiffs and their experts claim that the inclusion of these pseudonymous identifiers in bid requests allows RTB participants to combine data from multiple bid requests for a single user and use that combined information to personally identify the individual. But while pseudonymous identifiers are present in ███ of the data for the Plaintiffs, they are absent in ███████ of the broader data set.

7.  Without these pseudonymous identifiers, Plaintiffs cannot show any reliable way for RTB participants to associate multiple bid requests with a given device or individual because the remaining fields in a single RTB bid request do not–either in isolation or in conjunction with one another–reliably correspond to a single device. For instance, a given IP address or user agent that appears in an RTB bid request generally corresponds to anywhere between a few hundred to many millions or billions of devices (or even more), depending on a host of different factors.

8.  Therefore, where bid requests omit pseudonymous identifiers, RTB participants cannot combine information from multiple bid requests to try to personally identify an individual, which is a key method of alleged personal identification that Plaintiffs and their experts have emphasized based on the data for the Plaintiffs.

9.  Moreover, a single bid request does not contain sufficient information to determine a person's identity, so it is not possible for RTB participants to reliably identify individuals whose bid requests do not contain pseudonymous identifiers.

10. While Plaintiffs and their experts may dispute my conclusions above, the fact remains that these issues (whether bid requests for the same browser/device can be associated without pseudonymous identifiers; whether information in a single bid request is sufficient to

3

identify an individual if it cannot be associated with other bid requests) will not be relevant to the Plaintiffs because their data ***includes*** pseudonymous identifiers in ***all*** records. The Plaintiffs are therefore differently situated from the substantial portion of the proposed class whose bid request data omits any pseudonymous identifiers—which is the case in over a third of records in the broader data set.

**B.    Cookie Matching**

11. The cookie matching process is a major part of Plaintiffs' experts' thesis that bid request data is personally identifying, because (they claim) cookie matching enables a RTB participant to associate a given bid request with their own existing information about a user and therefore increases the potential for personal identification. But whereas cookie matching occurred for all Plaintiffs and in approximately ▆ percent of bid requests for the Plaintiffs, it only occurred for approximately ▆ percent of bid requests in the broader dataset.  The large group of users in the proposed class who did not experience cookie matching are differently situated from the Plaintiffs because the issues and concerns that Plaintiffs and their experts have raised about cookie-matching will not apply to them.

**C.  Privacy Settings**

12. The broader dataset indicates that absent class members enabled various privacy-enhancing features far more frequently than the Plaintiffs did. These features, which include settings available on both websites and specific browsers or devices, affect the data included in bid requests and reduces RTB participants' ability to identify individuals based on that data. Each of these features was enabled for ▆▆▆▆▆ percent of the bid requests in the broader dataset, but none of the Plaintiffs enabled any of them, further differentiating them from substantial groups of users in the broader data set.

### D. Location Issues

13. Dr. Shafiq's claim that it is possible to reliably identify individuals' home or work addresses from RTB bid requests is not only wrong and misleading as to the Plaintiffs but wholly inapplicable to the broader proposed class. Dr. Shafiq does not even attempt to link any bid request in the broader dataset to any user's home or work location as he purported to do with the Plaintiffs, and it is not possible to do so. Dr. Shafiq's analysis for the Plaintiffs depended on knowing their home and work addresses *ex ante*, and because he does not know this information for other class members, the highly generalized geolocation information included in bid requests is not sufficient to replicate his location analysis for absent class members.

**IV. There Are Variations in Bid Request Data Between the Absent Class Members and the Plaintiffs That Significantly Affect RTB Participants' Ability to Associate Bid Request Data with a Person or Household.**

    **A. Plaintiffs are not representative of the proposed class because Plaintiffs' bid request data includes multiple pseudonymous identifiers, whereas a substantial portion of the broader data set omits such identifiers.**

14. In reaching their conclusions regarding RTB participants' ability to associate bid requests with specific users, both Dr. Shafiq and Dr. Wilson rely heavily on the presence of two sets of fields in bid request data: 1) google_user_id ("Google User ID") and 2) IFA, IDFA, and AAID ("Device Advertising ID").[3] These fields, known as "pseudonymous identifiers," correspond or "map" to a single instance of a web browser (in the case of the Google User ID) or mobile device (in the case of the Device Advertising ID). This distinguishes them from most other fields that Dr. Shafiq and Dr. Wilson discuss, which do not necessarily

---

[3] These identifiers refer to the Identifier for Advertising ("IDFA" or "IFA") on iOS devices and the Android Advertising ID ("AAID") on Android devices. ECF No. 592-1 ¶ 29.

map to a single user or device, as I explain in my opening report and as Dr. Shafiq and Dr. Wilson both concede.

15.    Both of Plaintiffs' experts argue that the Google User ID and Device Advertising ID are of great importance for RTB participants' supposed ability to uniformly identify users associated with particular bid requests. Dr. Wilson, for instance, asserts that "Google allows [RTB] participant Criteo to cookie match by providing Criteo with the information for Criteo to know that unique Google user '12345' is the same as Criteo unique user 'ABCDE'"—in effect, that the Google User ID permits consistent identification of a user because that field consistently corresponds to that user for any given RTB participant. Wilson Opening Rep. ¶ 60. Dr. Shafiq likewise acknowledges that "Dr. Psounis is right that the obvious way to link multiple bid requests is to leverage one of the several identifier fields (e.g., Google User ID, which is present in ▮▮▮▮ of the RTB bid requests in the named plaintiff data produced by Google) in each RTB bid request." Shafiq Rebuttal Rep. ¶ 76; *See also* Shafiq Opening Rep. ¶ 88(d) ("[P]eer-reviewed research shows that the device identifiers (e.g., IDFA and ADID) shared by Google with RTB participants can be used to serve hyper-targeted ads to a specific user, surveil a user's commute, detect sensitive visits, etc.").

16.    Critically, Dr. Shafiq opines that both the Google User ID and Device Advertising ID "are present in the Class data, just like they are present in the Plaintiff data." Shafiq Suppl. Rep. ¶ 60.

17.    That is not true. The Google User ID only appears in approximately ▮▮▮▮ percent of bid requests in the broader dataset, as compared with ▮▮▮▮▮ *percent* of bid requests in the named Plaintiff dataset. Striegel Suppl. Rep. ¶¶ 9, 16. The percentage of bid requests

without a Device Advertising ID is similar in the plaintiffs and the broader dataset. Striegel Suppl. Rep. ¶ 24. However, this is immaterial. What matters is the percent of bid requests that have neither of the two pseudonymous identifiers present. And whereas ■ of the bid requests in the named Plaintiff dataset contained at least one of the Google User ID or Device Advertising IDs, ***about*** ■ ***% of bid requests in the broader dataset contain neither field.*** Striegel Suppl. Rep. ¶ 38.

18.    Accordingly, when it comes to Google User ID and Device Advertising ID, the named Plaintiff dataset is not representative of the broader class member dataset.

19.    Notably, individuals whose RTB bid requests contain neither of these two pseudonymous identifiers are differently situated from the Plaintiffs in terms of the alleged privacy risks from RTB. This is true even if one takes Dr. Shafiq and Dr. Wilson's conclusions about these fields as true—which, as I explain below, would be a mistake. Without a pseudonymous identifier that would, according to Plaintiffs' experts, allow a bid participant to reliably associate activity across multiple bid requests with a given user or device, bid participants are not able to determine that a given bid request corresponds with a given user or device and thus would not be able to associate activity across multiple bid requests with a given user or device.

20.    In the sections below, I provide an overview of multiple issues that prevent RTB participants from personally identifying an individual user, even where the user's RTB bid request data includes pseudonymous identifiers. I reserve the right to supplement my opinions on this subject in a further expert report on the merits issues in this case. For present purposes, the key point is that the issues discussed in Section IV.B, and whatever responses Prof. Shafiq might raise on these points largely do not apply in circumstances

where users' bid request data do **not** contain pseudonymous identifiers. In Section IV.C, I explain why the omission of pseudonymous identifiers in RTB bid request data creates many additional and distinct barriers that further prevent RTB participants from attempting to personally identify an individual user. Importantly, these issues do not apply to users, like the Plaintiffs, whose data uniformly includes pseudonymous identifiers.

**B.    Even where bid requests <u>do</u> include pseudonymous identifiers tied to a specific browser or device, RTB participants cannot associate the bid requests in the broader dataset with an individual person for many reasons.**

**a.    Pseudonymous identifiers cannot be reliably associated with individual persons by RTB participants.**

21.    Consider the Google User ID. First, it is important to clarify that this is not an identifier for someone's Google account; it is a bidder-specific, encrypted version of the "Biscotti ID," which is a cookie that Google associates with a given instance of a browser for advertising purposes. Psounis Opening Rep. § IV.B.e. Tellingly, Dr. Shafiq included in his report a lengthy description of how Google might hypothetically associate a Biscotti ID with a Google account but does not claim that **an RTB participant** may do any of the things he is alluding to. An RTB participant cannot identify a specific person by the Google User ID.

22.    Moreover, the Google User ID can be reset by users: for example, by clearing the browser cookies. If a user resets their Google User ID, an RTB participant will not be able to use the Google User ID to combine bid requests predating the reset with bid requests generated after the reset.

23.    Last, even if one inaccurately assumes that the Google account holder associated with a Google User ID could be identified, as discussed in detail in Section IV.D of the Psounis Opening Report, account sharing is widespread and prevents the reliable identification of

the user associated with the bid request that contained the Google User ID under consideration, as this user may not be the owner of the Google account.

24. The Device Advertising ID presents similar issues. As a first matter, neither Google nor an RTB participant can identify a specific person by the Device Advertising ID, since this identifier is tied only to a device.

25. Also, as discussed in detail in Section IV.D of the Psounis Opening Report, device sharing is widespread. Since multiple individuals may use a given device, there is no basis on which to reliably conclude which individual associated with a device corresponds to a particular bid request containing a Device Advertising ID.

26. Moreover, the Device Advertising ID can be reset by users, so there is no persistent one-to-one mapping between a single device and a single Device Advertising ID in all cases. Psounis Opening Rep. § IV.B. Dr. Shafiq, states that I fail "to recognize that even if device ID is reset, both the new and the old device IDs identify the same unique device." Shafiq Rebuttal Rep. ¶ 69. I do not fail to recognize this obvious fact. However, this fact is immaterial to the question whether—as Dr. Shafiq's analysis envisions—this ID can be used to combine multiple bid requests together. Just as for the Google User ID, bid participants cannot use a Device Advertising ID to combine bid requests that predate the reset with bid requests from after the reset.

    **b.    Combined fields from multiple RTB bid requests cannot be reliably associated with individual persons by RTB participants.**

27. Even if pseudonymous identifiers can, in some instances, successfully be used to combine fields from multiple RTB bid requests, RTB participants cannot reliably associate the combined bid requests with an individual person.

9

*i.    Location data cannot be used to identify users.*

28.    Dr. Shafiq has implied that one may use multiple locations associated with a user to identify individual natural persons: he asserts that "if a participant receives multiple bid requests for a user, then the RTB participant can combine the timestamped sequence of location (e.g., longitude and latitude) . . . information" and that "location information (even if its granularity is reduced) is highly identifying." Shafiq Opening Rep. ¶¶ 80, 83.

29.    As I have explained in Section IV.C.d of the Psounis Opening Report, the combination of multiple pieces of location data from multiple RTB bid requests cannot reliably identify devices or users because of the large area of uncertainty associated with such locations thanks to the inherent inaccuracy of IP geolocation and the truncation of the associated coordinates prior to sharing. Specifically, the shared coordinates are truncated to two decimal points and each location is associated with an additional accuracy value reflecting the uncertainty of IP geolocation. This results in uncertainty areas that are, on average, multiple times the areas of San Francisco or Manhattan. Psounis Opening Rep. §§ IV.B.c, IV.B.c, IV.C.d.

30.    Dr. Shafiq provided a table in his first report where he alleges that he can identify the location (home or work address) of plaintiffs with a certain "error" that can be as small as zero. Shafiq Opening Rep. ¶ 42(e).  Because this is a central issue to this case, and because Dr. Shafiq's location analysis is both wrong and misleading, I am including in this report, *see* Section VIII, a detailed analysis of the geolocation data and the most precise maps that RTB participants can deduce from that data for each plaintiff. Based on my analysis and the associated maps, it is evident that not only it is impossible for an RTB participant to identify the location of an individual from the RTB geolocation data, but also, it is

impossible to do so even if one considers multiple pieces of location data as I explain below.[4]

> ii.   *The presence of a certain number of entropy bits does not allow RTB participants to identify users.*

31.  Last, Dr. Shafiq makes general statements related to the entropy associated with the combination of multiple fields from multiple RTB requests to argue that there exists a uniformly high risk of re-identifiability, even if certain identifiers are not present. I anticipate that Dr. Shafiq may contend that, even though he is wrong about the uniform presence of various fields in the broader dataset, the data in those bid requests is nonetheless uniformly and commonly identifying because it contains a sufficiently high number of "entropy bits." *See* Shafiq Opening Rep. ¶ 69.

32.  As I explain in Section V of the Psounis Opening Report, these statements concerning entropy and the risk of re-identifiability are fundamentally flawed. My opinion is supported by a lengthy Appendix which contains formal definitions of entropy and related concepts from the field of Information Theory, formal analysis, and a precise and detailed association of the theory with the issue of re-identification.

33.  In his rebuttal report accompanying Plaintiffs' last class certification motion, Dr. Shafiq fails to rebut any of the specific formal statements that I make. Notably, he does not rebut

---

[4] Another combination of data Dr. Shafiq has implied may be used to associate the bid requests with an individual person is the combination of multiple visited URLs from multiple RTB bid requests. As I explain in Section IV.C.e of the Psounis Opening Report, the combination of multiple visited URLs cannot reliably identify users. Notably, Dr. Shafiq does not conduct any specific re-identification analysis in the case of URL combinations. Instead, he relies on academic publications, which, in fact, do not support his thesis. See Psounis Opening Report § IV.C.e of my first report. Note that while Dr. Shafiq states in his rebuttal report that "[Dr. Psounis] cherry picks a result from the paper," in fact, I present the result that the authors themselves consider the most important one as they choose to highlight it in the abstract of the paper. Shafiq Rebuttal Rep. ¶ 78.

the crucial fact that a large number of entropy bits (above a threshold related to the size of the population to be re-identified) is ***only a necessary but not a sufficient condition*** for an identifier to perform well on average. As I state in my report, a second condition that must be satisfied is the requirement for a reliable one-to-one mapping of identifier values (or combinations thereof) to individuals.

34.    The scientific community with proper training in Information Theory and entropy concepts is well aware of the aforementioned limitation of entropy when applied to privacy questions in general and re-identification questions in particular. This is why that community uses a different Information Theoretic metric—Mutual Information—to study privacy.[5] This is

---

[5] T.M. Cover and J.A. Thomas, "Elements of Information Theory," Wiley (2nd ed. 2006); Weina Wang, Lei Ying, and Junshan Zhang. 2016. On the Relation Between Identifiability, Differential Privacy, and Mutual-Information Privacy. IEEE Trans. Inf. Theor. 62, 9 (September 2016), 5018–5029. https://doi.org/10.1109/TIT.2016.2584610; Paul Cuff and Lanqing Yu. 2016. Differential privacy as a mutual information constraint. In Proceedings of the 2016 ACM SIGSAC Conference on Computer and Communications Security. 43–54. https://doi.org/10.1145/2976749.2978308; J. Cheng and A. Tang, "Maximum Mutual Information under Local Differential Privacy Constraint," 2022 IEEE International Symposium on Information Theory (ISIT), Espoo, Finland, 2022, pp. 2202-2206, doi: 10.1109/ISIT50566.2022.9834741l; M. J. Asl, M. Shateri and F. Labeau, " α - Mutual Information: A Tunable Privacy Measure for Privacy Protection in Data Sharing," 2023 International Conference on Machine Learning and Applications (ICMLA), Jacksonville, FL, USA, 2023, pp. 1206-1211, doi: 10.1109/ICMLA58977.2023.00181; On Local Mutual-Information Privacy, Khac-Hoang Ngo, Johan Östman, Alexandre Graell i Amat, IEEE Information Theory Workshop (ITW) 2024; Toward Evaluating Re-identification Risks in the Local Privacy Model, Takao Murakami, Kenta Takahashi, TRANSACTIONS ON DATA PRIVACY 14 (2021) 79–116; Measuring Re-identification Risk, CJ Carey, Travis Dick, Alessandro Epasto, Adel Javanmard, Josh Karlin, Shankar Kumar, Andres Munoz Medina, Vahab Mirrokni, Gabriel Henrique Nunes, Sergei Vassilvitskii, Peilin Zhong, In Proceedings of the ACM on Management of Data, Volume 1, Issue 2, Article No.: 149, Pages 1 – 26, June 2023; Estimating the success of re-identifications in incomplete datasets using generative models, Luc Rocher, Julien M. Hendrickx & Yves-Alexandre de Montjoye, Nature Communications volume 10, Article number: 3069 (2019); Information-Theoretic Approaches to Differential Privacy, Ayşe Ünsal, Melek Önen, ACM Computing Surveys, Volume 56, Issue 3, Article No.: 76, Pages 1 – 18, October 2023; Privacy-Constrained Policies via Mutual Information Regularized Policy Gradients, Chris Cundy, Rishi Desai, Stefano Ermon, Proceedings of the 27th International Conference on Artificial Intelligence and Statistics (AISTATS) 2024; Privacy utility trades in wireless data via

because mutual information models the aforementioned mapping between an observed identifier value and the chances that this may point to an individual.

35.  Instead of engaging with these formal technical arguments regarding the fundamental flaw of using entropy as a re-identification metric, Dr. Shafiq resorts to technically meaningless statements like that "[e]ither Dr. Psounis is wrong or the whole computer science research community and industry (including Google) is wrong." Shafiq Rebuttal Rep. ¶ 86. This is not surprising because there aren't any technical arguments refuting the fact that the number of entropy bits of one or more identifiers is only a necessary condition for re-identifiability—not a sufficient one.

36.  In an effort to put this undisputed technical issue to rest, I will present a simple example that illustrates to a person without formal training on Information Theory the fundamental flaw of using entropy to assess the risk of identifying a person by observing the value of an identifier.

37.  Consider a family of four drivers with four cars. In this example, the car is an identifier that can assume four different values each representing one of the four cars. The maximum number of entropy bits of this identifier equals 2, since the number of values of the identifier is 4 which equals 2 to the power of 2. According to Dr. Shafiq's reasoning, these two entropy bits should be sufficient to identify any of the four drivers, since the total

---

optimization and learning, L. Clark, M. Clark, K. Psounis, P. Kairouz, in Proceedings of Information Theory and Applications Workshop (ITA), San Diego, California, USA, February 2019; How Much Privacy Does Federated Learning with Secure Aggregation Guarantee? A. Elkordy, J. Zhang, Y. Ezzeldin, K. Psounis, S. Avestimehr, in Proceedings of PETS, 2023; Privacy-utility trades in crowdsourced signal map obfuscation. J. Zhang, L. Clark, M. Clark, K. Psounis and P. Kairouz, Elsevier Computer Networks, Vol. 215, October 2022. DOI: 10.1016/j.comnet.2022.109187.

number of family members equals 2 to the power of 2.

38.    But this is obviously wrong. If each driver is equally likely to drive any of the four cars, an observer would not be able to determine which family member is leaving the house by observing which cars leave the garage, since any car could be driven by any family member.  In contrast, If, say, each driver has a designated car and this designation is known to the observer, that is, if there is a known one-to-one mapping between a car and a driver, then the observer can successfully identify the driver by observing the car leaving the family home.

39.    There are of course many more possibilities than the two I described above. For example, the children may only be allowed to drive the two older cars, whereas the adults may drive any of the four cars. Or it could be the case that the father or the mother has a preference for one car over the rest. What is required to estimate the risk of re-identifiability is a mapping between each observed car and the 4 possible drivers.[6] ***But entropy, by definition, does not have any of this mapping information, as it is solely concerned with the maximum uncertainty of the identifier itself.*** Any argument Dr. Shafiq may make based solely on the presence of entropy bits in the broader bid request dataset therefore must fail. In contrast, mutual information (and other related metrics) encodes in its definition information about this mapping via the concept of conditional entropy.

40.    Even if all of Dr. Shafiq's mistaken assertions about entropy were otherwise correct, and they are not, the Plaintiffs would still not be representative of the broader dataset. At a minimum, Dr. Shafiq must agree that RTB bid requests without pseudonymous identifiers

---

[6] This mapping can be probabilistic; for example, it could be the case that there is a 50% chance for each of the parents to be the drivers of the newest car and 0% chance for each child.

contain considerably less entropy than RTB bid requests with pseudonymous identifiers. While entropy alone can never be used as a metric for the feasibility of re-identifying any individuals, the technical proof required to show that the Plaintiffs' bid requests contain whatever minimum level of entropy Dr. Shafiq contends is required would materially differ from the proof required to make the same showing for the broader proposed class.

C.    **Where bid requests do <u>not</u> include pseudonymous identifiers, an RTB participant would face even more significant additional obstacles in any effort to associate a bid request with an individual person because they would have to rely on information in a single bid request.**

41.    As discussed in Section IV.A, while the Google User ID is present in ▮▮▮ of the bid requests in the dataset for Plaintiffs, it is present in only about ▮▮▮ of the bid requests in the broader dataset. Striegel Suppl. Rep. ¶ 9. More importantly, while at least one of the two pseudonymous IDs is present in ▮▮▮ of bid requests for the Plaintiffs, neither of them is present in about ▮▮▮ of the broader dataset. Striegel Suppl. Rep. ¶ 38.

42.    When no pseudonymous ID is present in a bid request, reliably combining data across multiple bid requests becomes impossible. Without a unique identifier, nothing permits RTB participants to reliably determine which bid requests are associated with the same device, browser, or user. Tellingly, Dr. Shafiq offers no other method by which an RTB participant could do so.

43.    I therefore assess the extent to which an RTB participant can re-identify a user based on a single RTB bid request in isolation—since for the approximately ▮▮▮ of absent class members for whom no pseudonymous identifier is present, this is all an RTB participant would have available.

44.    A single RTB bid request reflects significantly less information than do multiple bid

requests in combination. Indeed, Dr. Shafiq and Dr. Wilson implicitly concede this point by experts which repeatedly rely on this alleged combination of information from multiple bid requests to argue that RTB participants can personally identify individual users. *See, e.g.*,, Wilson Opening Rep. ¶ 78 ("[E]ven if some of the information above (e.g., user agent and truncated IP) is not account holder data in isolation, in combination (which is the method in which they are shared and sold through Google RTB) the information constitutes Google account holder data because, taken collectively, it can be used as high-accuracy probabilistic identifiers to uniquely identify a person or device."); Shafiq Rebuttal Rep. ¶ 29 ("[A] more sophisticated RTB participant can further improve the location accuracy by considering Google's purported location accuracy information as well as by correlating information across multiple RTB bid requests."); Wilson Rebuttal Rep. ¶ 68 ("A far superior dataset for performing fingerprintability analysis would encompass all the impressions and bid requests transacted by Google RTB, the world's largest ad exchange."); Shafiq December 18, 2024 Depo. Tr. at 161:15-17 ("There are 60 fields, so RTB participants look at all of the fields in the totality and across different bid requests.").

45.    In my first report, I explained why the risk of personal identification would be insignificant in this case, based on an analysis of 1) certain specific fields, 2) the combination of fields within the same RTB bid request, and 3) an explanation of the actual meaning and correct usage of entropy in the context of re-identification Psounis Opening Rep. §§V, VI.

46.    I also presented a simple, illustrative example concerning the IP address field to show that observed RTB field values in a given bid request cannot re-identify a user because there is no one-to-one mapping between their values and a device or user. Psounis Opening Rep. § VI.E. Below I present further illustrative examples for RTB fields that plaintiffs' experts

16

identify as identifiers with high risk of re-identifiability, showcasing the lack of one-to-one mapping between the values of one or more fields and a device or user. The examples are based on technical facts and the produced broader dataset.

### a. Individual fields in a single bid request cannot reliably be used to identify an individual.

#### i. *The User Agent field in a single bid request cannot reliably be used to identify an individual.*

47. Consider the user agent (UA) field, which reflects information about the device and browser associated with a given bid request. In my first report I demonstrated that (as common sense would dictate), "many users can share the same UA" and "some UAs are more common than others." I cited recent studies showing that "the top 10 most popular UAs correspond to 26 percent of daily traffic" which implies that "tens of millions of devices from which data have been collected in the study share the same UA." Psounis Opening Rep. ¶ 31. This means that the most popular UA values pose no re-identification risk because an RTB participant knowing the UA field value cannot use it to gain any insight in practice about the Google User ID or Device Advertising ID that corresponds to the bid request, let alone the actual user or device.

48. Let's now consider the UA values in the broader dataset. As shown in Table 1 below, the most popular UA in the produced dataset corresponds to an ███████████████████ ██████ and can be found in more than ██████████ bid requests. The same holds for the second most popular UA, corresponding to an ████████████████████████. It is thus evident that any RTB participant observing the value of the UA in a single bid request cannot make any meaningful prediction about whether this bid request is associated with a certain specific device or user.

17

**Table 1**

| Number of Bid Requests | User Agent |
|---|---|
| ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇ |
| ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇ |
| ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇ |
| ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇ |
| ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇ |
| ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇ |

49.     Broadening this analysis to even the 50 most popular UA values in the produced dataset yields similar results. Even the 50th most popular UA value can be found in ***at least*** ▇▇ ***bid requests.*** What is more, just the 10 most popular UA values correspond to more than ▇▇▇ bid requests out of a total of ▇▇▇ bid requests in the broader data—that is, the top 10 most popular UA values can be found in ▇▇% of the bid requests. It is evident that the UA field offers very little to virtually no information to identify a specific user, and this is true even when combined with other fields such as a truncated IP address. Psounis Opening Rep. § IV.C.b.

        *ii.     The IP address field in a single bid request cannot reliably be used to identify an individual.*

50.     All IP addresses in both the Plaintiffs' data and the broader datasets are truncated.[7]

---

[7] In his rebuttal report, Dr. Shafiq states that "Google RTB does share the full IP address with RTB participants via cookie matching. Google RTB also shares the full IP address with the winning RTB participant during ad serving." Shafiq Rebuttal Rep. ¶ 56. Both of these statements are wrong. Google does not share with RTB participants any IP address information of the user via cookie matching, let alone the full IP address; Dr. Shafiq offers no citation for his contrary assertion. Also,

51.   I will now analyze the implications of sharing a truncated IP address with RTB participants via the corresponding RTB field. Consider a truncated IPv4 IP address, which is found in about ▮▮▮ of the bids in the broader dataset. Striegel Suppl. Rep. ¶ 18. Each of these truncated IPv4 addresses corresponds to at least 256 full IPv4 addresses, and an RTB participant does not know to which of the 256 untruncated IPv4 addresses the observed value corresponds.[8] Psounis Opening Rep. ¶ 49.

52.   What is more, and as I explain in my first report, full IP addresses themselves may correspond to thousands of actual devices because of NAT, DHCP, and VPN protocols. *Id.* ¶ 28. This means that a single truncated IPv4 IP address may correspond to more than 250,000 full IP addresses.

53.   Consider next a truncated IPv6 IP address, which can be found in about ▮▮▮ of the bids in the broader dataset. Striegel Suppl. Rep. ¶ 18. Each of these truncated IPv6 corresponds to more than *1 septillion* full IPv6 addresses. Psounis Opening Rep. ¶ 49. 1 septillion is an enormous number that starts with a 1 followed by 24 zeros. An RTB participant cannot know to which of the 1 septillion full Ipv6 addresses the observed value corresponds to. Like with IPv4 addresses, a full IPv6 address itself may correspond to thousands of actual

---

Google does not share any IP address information of the user with the winning RTB participant during ad serving, let alone the full IP address. Note that the IP address of the user device is used from the IP protocol when the user device is the source or the destination of a packet. As a first matter, this has absolutely nothing to do with the RTB system itself; it has to do with how the Internet works. As a second matter, in neither of these cases is the user device the source or the destination of a packet to or from an RTB participant respectively. In the first case, an RTB participant receives a packet from the RTB system, and, in the second case, the user receives a packet from a publisher (ad space seller), not from an RTB participant (ad space buyer). In summary, Dr. Shafiq's statements regarding the sharing of full IP addresses with RTB participants are both wrong and misleading.

[8] Even excluding typical broadcast addresses, there are at least 254 non-broadcast full IPv4 addresses that correspond to a truncated IPv4 address

devices because of NAT, DHCP, and VPN protocols.

54. In his rebuttal report, Dr. Shafiq states that "[e]enterprise VPNs typically only tunnel work-related traffic (e.g., access work related websites), not the rest of regular web traffic." Shafiq Rebuttal Rep. ¶ 61. Dr. Shafiq does not provide any evidence for his assessment that this practice of "VPN split tunnelling" occurs "typically." He instead cites a reference about the practice of Indiana University during the COVID-19 pandemic, when that institution used VPN split tunneling for scalability purposes. But many enterprises use full tunnel VPNs, which send all web traffic via the VPN, due to high security needs. Dr. Shafiq further argues that VPN usage is not common and cites a paper studying the use of OpenVPN, an open source VPN protocol, within a particular ISP. However, not only is VPN usage large, it is also growing. Even a year ago, there were 1.5 billion VPN users in the world, 93% of organizations used a VPN, and 39% of Americans used VPNs for either work or personal use.[9]

---

[9] *See* Josh Howarth, "Exploding Topics, 30+ VPN Statistics, Trends & Facts," Exploding Topics, https://explodingtopics.com/blog/vpn-stats (Jan. 26, 2024). Dr. Shafiq also claims that "Google RTB shares the port number with RTB participants via cookie matching, which would allow an RTB participant to distinguish between different users behind a NAT that share the same public IP address." Shafiq Rebuttal Rep. ¶ 37. This assertion, for which Dr. Shafiq cites no support, is wrong; Google does not share with RTB participants any port number information of the user via cookie matching. Note that the port number of the user device is used from the IP protocol when the user device is the source or the destination of a packet. As a first matter, this has absolutely nothing to do with the RTB system itself; it has to do with how the Internet works. As a second matter, the user device is neither the source nor the destination of a packet to or from an RTB participant, respectively, during cookie matching. What is more, RTB-related port numbers are often "ephemeral" port numbers which are dynamically allocated to avoid conflicts with other applications or ongoing connections, implemented by algorithms which typically select a different port number for each new connection. So, even if an RTB participant were to receive a port number associated with a user via Google RTB, which is certainly not the case, this port number could not be used to distinguish this user from other users behind a NAT.

       *iii.*    *Geolocation data in a single bid request cannot reliably be used to identify an individual.*

55.    In my opening report I have explained that geolocation data in bid request typically (median value) correspond to an area equal to 200 square kilometers, which makes it impossible to identify the location of an individual. Psounis Opening Rep. ¶ 36. In Section VIII of this report I conduct a detailed analysis of the geolocation data and the most precise maps that RTB participants can deduce from that data for each plaintiff to precisely assess the number of households that are within the corresponding areas. Based on the results presented in Table 2, there are, on average, more than 25,000 households within each area,[10] and, an RTB participant not only does not know which of theses tens of thousands of households belongs to the user associated with the bid request, but also cannot even be certain that the address of the user is within even this very large area (see Section VIII for the complete analysis).

**b.**    **No combination of fields can reliably be used to identify an individual based on a single bid request.**

56.    I have examined above a number of RTB fields in isolation, within a single bid request, summarizing technical arguments from my first report and providing examples from the produced broader dataset. I will now consider combinations of fields within a single bid request.

57.    As an example, consider the class member with encrypted GAIA ID ████████████████████, which is one of the twelve class members for which Dr. Shafiq has presented information that an RTB participant could obtain from one

---

[10] This is computed by adding the number of households per uncertainty area and dividing by the number of plaintiffs.

bid request. Shafiq Suppl. Rep. ¶ 43(c). Below I examine what we can learn from the combination of fields from one bid request for this user.

58. Dr. Shafiq contends [t]hat "The RTB participant ▮▮▮▮▮▮▮▮▮ would be able to ascertain" from a bid request for this class member the following RTB fields: "identifiers (including the Google User ID, hosted match data, and a portion of the IP address); the content information about the website "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, in English language, vertical categories ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; the location of the user (near the Pioneer Square in Portland, OR); and device information (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)." *Id.* Below I will go one by one through the RTB fields mentioned by Dr. Shafiq for this bid.

59. There are a total of 23 bid requests in the produced broader dataset corresponding to this GAIA ID sent to the RTB participant ▮▮▮▮▮▮▮▮▮.[11] They are all accessing the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ page and subpages therein.

60. In all these 23 bid requests, the hosted_match_data_sent field is equal to 0 and there are no hosted match data, contrary to what Dr. Shafiq implies. Striegel Suppl. Rep. ¶ 51.

61. The IP address field in these 23 bid requests contains the truncated IPv4 address ▮▮▮▮▮▮▮. Striegel Suppl. Rep. App. E. I have already discussed in detail why this IP address information is not identifying. But let's look at the actual produced broader dataset.

---

[11] The total number of bid requests on the produced broader dataset corresponding to this GAIA ID sent to any RTB participant equals 1019.

Crucially, there are more than ▮▮▮▮▮▮▮▮ with the exact same IP address information in the broader dataset which correspond to different users than this one.[12] Striegel Suppl. Rep. ¶ 55. Recall that the produced broader dataset represents a total of ▮▮▮▮ of activity over a period of more than ▮▮▮. If the user under study were to be equally active each and every hour during all those months as the user has been during these ▮▮▮▮, something impossible in practice, the number of bid requests to different users with the same IP address information over 24 months can be roughly approximated to at least ▮▮▮▮.[13] The actual number will likely be larger.

62. The referrer field in the particular bid request singled out from Dr. Shafiq out of the 23 aforementioned bid requests contains the URL ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. There are more than ▮▮▮ other bid requests with the exact same referrer URL in the broader dataset which correspond to different users than this one.[14] Striegel Suppl. Rep. ¶ 53 n.46.

63. Dr. Shafiq mentions a list of vertical categories. However, although Google logs verticals categories internally, they have not been shared in RTB bid requests since February 2020. ECF No. 592-1 ¶ 34. Thus, they are irrelevant to the question of whether an RTB participant may or may not personally identify a user based on the information in RTB bid requests.

64. Rather than providing the actual geolocation data in the corresponding bid request, Dr. Shafiq asserts that the RTB data shows "the location of the user (near the Pioneer Square

---

[12] The exact number of bid requests with this IP address information equals ▮▮▮ and one would have to subtract the 1019 bid requests associated with this GAIA ID in the produced dataset to compute the total number of bid requests not related to this user, which equals ▮▮▮.
[13] ▮▮▮ * ▮▮ months * 30 days * 24 hours/day = ▮▮▮▮.
[14] The exact number is ▮▮▮. This URL referrer appears ▮▮▮ times in the dataset, and ▮▮▮ of those instances are associated with the GAIA ID at issue in Dr. Shafiq's example.

in Portland, OR)." Shafiq Suppl. Rep. ¶ 43(c). But let's look at the actual data. The most identifying geolocation data shared in this bid request are the following: latitude = ████, longitude = ████, accuracy = ████. Striegel Suppl. Rep. App. E. Let's see how identifying these geolocation data actually are.

65.   As a first matter, there are more than ████ other bid requests with the exact same coordinate values which correspond to different users. Striegel Suppl. Rep. ¶ 53 n.46. But let's dig deeper and generate the most precise area that the RTB participant can generate based on this data, namely the truncated coordinates and the accuracy value, and look at it. (For a detailed explanation of how this area is generated, see Section VIII.) The actual location of the user can be any address within the yellow circle shown on the map, which corresponds to more than *533 square kilometers*—virtually all of metropolitan Portland and several of its suburbs. It is evident even to the naked eye that this area is huge, and it is definitely not identifying of the address of the user. As a matter of fact, it is not even guaranteed that the address of the user will be inside this circle, see Section VIII. Dr. Shafiq's statement that the location of the user is "near the Pioneer Square in Portland, OR" is grossly misleading.



66.    Next, Dr. Shafiq lists a number of device related fields, which are either included in the user_agent and user_agent_data fields, or they are shared in other fields such as the device_model and brand. By analyzing the produced broader dataset, it is evident that there are more than <span>_____</span> other bid requests with the exact same user_agent value which correspond to different users, more than <span>_____</span> other bid requests with the exact same device_model value which correspond to different users, and billions of other bid requests with the exact same platform, brand and os version which correspond to different users. Striegel Suppl. Rep. ¶ 53 n.46.

67.    Now let's consider the combination of all these fields within this bid request—which is all the information that an RTB participant may have for a user for whom there are no

pseudonymous identifiers included in the bid request.[15] First, let's just use common sense based on these numbers. How can one personally identify a person based on the combination of IP address information that is identical to that in almost 1 million other bids, geolocation data pointing to tens to hundreds of thousands of addresses with no guarantee that the user actually resides in any of them, and device information that is identical to that in multiple millions to billions other bids–all just within a ▮▮▮▮ data snippet? The task of personally identifying an individual from these data is evidently so far-fetched that a specific tangible method must be provided. Plaintiffs' experts offer none.

68.   Dr. Shafiq proposes two methods, but neither is viable. First, Dr. Shafiq argues that the presence of entropy bits alone is sufficient, but that is wrong for the reasons I explain above. Dr. Shafiq also suggests that a bid participant may be able to use an "identity graph" to reliably identify a user based on a single bid request, but that is incorrect too, as I explain below. In our case, identity graphs are to be used to perform fingerprinting using probabilistic matching, which is well known to have very low accuracy even in far less challenging situations than the one at hand.

69.   Dr. Wilson, in his assessment of data obtained from RTB participants, suggests that an RTB participant could "fingerprint" users across multiple bid requests. Wilson Opening Rep. § VI.D. When describing his method, he states: "I isolated all the impressions in the logs that contained a unique identifier (e.g., from the Google cookie), calculated the fingerprint for each request (using the location and user agent information included in the bid request), and finally examined the frequency at which each fingerprint occurred. I

---

[15] Note that while all 12 examples in Dr. Shafiq's report contain at least one pseudonymous identifier, as discussed above, this is not the case for ▮▮% of the bids in the broader dataset.

found that ▮ of the fingerprints I calculated were uniquely associated with a single

individual, device, or household that visited the ▮▮▮▮▮▮▮." Wilson Opening Rep.

¶ 79. This analysis is not viable for a significant portion of the bid requests in the broader

dataset.

70.    First, the aforementioned analysis relies on the presence of at least one "unique identifier,"

that is, a pseudonymous identifier. But there are no unique identifiers in ▮% of the bid

requests in the broader dataset. Note that there are also no unique identifiers shared in bid

requests in ▮▮▮▮▮▮ data that Plaintiffs' expert Dr. Wilson previously

analyzed.[16] Striegel Suppl. Rep. ¶ 37.

71.    Second, Dr. Wilson calculates the fingerprint of each request "using the location and user

agent information included in the bid request." But it is evident that in the produced broader

dataset this combination of identifiers cannot possibly be "uniquely associated with a single

individual," where there are more than ▮▮▮▮ bid requests with the exact same

coordinate values (the most specific location information in bid requests) which correspond

to different users than the user under consideration, and more than ▮▮▮▮ other bid

requests with the exact same user agent information which correspond to different users.

Striegel Suppl. Rep. App. E.

72.    Third, even if some combination of identifiers may be unique in the produced dataset, this

does not mean that they are unique across the whole class. This is because, contrary to what

the Plaintiffs' experts appear to understand, the larger the dataset, the more the users will

share the same identifier values. To see this, consider the map corresponding to the

---

[16] Dr. Wilson cites the "TTID" identifier, but this is an internal Trade Desk field not generated or
sent by Google in bid requests.

geolocation data of a user from the broader dataset above. A smaller dataset may contain only one user with geolocation data associated with the 533 square kilometers shown in the map around Portland, OR. This fingerprint could be "unique" in the smaller dataset but it is very far from being unique in practice as there are tens to hundreds of thousands of people that live within this area. This highlights the fundamental technical flaw of Dr. Wilson's analysis which focuses on the "uniqueness" of a combination of identifiers within the dataset that he considers, and fails to study whether the combination of identifiers would be unique across all the class members. Crucially, the latter requires investigation whether a reliable one to one mapping exists between the combination of identifier values that Dr. Wilson studies and a person or household.

73. To summarize: Since the fields of a single RTB bid request have significantly less information than the fields of a combination of multiple RTB bid requests, the potential risks of re-identification are therefore substantially different for bid requests that omit pseudonymous identifiers as compared to those that contain them (like the Plaintiffs'). Put differently, an individual whose bid request contained no pseudonymous identifiers, as compared to the Plaintiffs, would have to demonstrate several additional facts in order to potentially show that their bid requests created any risk of re-identification or other privacy concerns.

**V. The Plaintiffs are not representative of the proposed class because the frequency of cookie-matching via Google's hosted match data service is significantly different between the Plaintiffs and the broader data sample.**

74. Cookie matching refers to the process of linking cookies from different websites and platforms together, in order to combine information about a user associated with those different cookies. To this end, Dr. Shafiq correctly states that the hosted match data field,

which is the output of Google's cookie matching process, allows an RTB participant "to link together information on particular users that they have gathered with information Google has gathered" for targeted advertising purposes.

75. As I stated in my first report, "the hosted match data field was empty in ██████ of records in the Plaintiffs' data samples," which means that it was present in a bit less than ██████ of the records, thus cookie matching via Google's hosted match data service has occurred for plaintiffs in a bit less than ██████ of the time. Psounis Opening Rep. ¶ 22.

76. In contrast, in the newly produced broader dataset, the hosted match data field is empty in more than ██████ of records, thus cookie matching via Google's hosted match data service has occurred for the broader class in a bit less than ██████ of the time—that is, half as often as for the Plaintiffs. Striegel Suppl. Rep. ¶ 17. Dr. Shafiq conveniently ignores this and barely discusses cookie matching in his supplemental report at all, other than to claim that hosted match data is present for many (though not all) of the twelve bids he claims are examples of personal information shared through RTB.[17] Shafiq Suppl. Rep. ¶¶ 43-44.

77. In their original class certification arguments that they now claim are applicable to the broader dataset, Plaintiffs and their experts relied in significant part on cookie matching as part of their assertions and opinions. For example, Dr. Shafiq states that "[a]n RTB participant can use Google's RTB cookie matching service to populate user lists based on users' browsing history information." Shafiq Opening Rep. ¶ 23. And Dr. Wilson states that "[I]n addition to sharing and selling account holder information via bid requests,

---

[17] For one of these, the example in paragraph 43(a) of his supplemental report, I understand that Dr. Shafiq is mistaken and the hosted_match_data field is not in fact populated as he claims. Striegel Suppl. Rep. ¶ 57.

Google is also responsible for sharing significant volumes of account holder information via RTB cookie matching." Wilson Opening Rep. ¶ 49; *see also id.* ¶¶ 43-49 (asserting that Google "facilitates the sharing and selling of individuals' information with RTB participants through cookie matching"), 61 ("Google distributes the unique identifiers that it has matched with RTB participants in the hosted_match_data field of bid requests.").

78.   For multiple reasons, the concerns raised by Plaintiffs' experts related to cookie matching are not applicable to bid requests where no cookie matching occurs via Google's hosted match data service. First, RTB bidders cannot associate a bid request with their own existing records of a users' web activity in the absence of cookie matching via Google's hosted match data service. Second, RTB bidders will not receive the "significant volumes of account holder information via RTB cookie matching." Wilson Opening Rep. ¶ 49. As a result, they will not be able to use this information to attempt to perform some form of cookie matching themselves, making an already unreliable process even less reliable.

79.   Simply put, the feasibility of cross platform tracking will be diminished significantly in cases where cookie matching does not occur. The Plaintiffs experienced cookie matching at significantly higher rates than we see in the broader set of bid requests, further rendering their data not representative of the proposed absent class from a technical reidentification standpoint.

**VI.   The Plaintiffs are not representative of the proposed class because, unlike many absent class members, they did not use various privacy-enhancing options that further limit the information sent in RTB bid requests.**

80.   Google account holders have access to many settings that can affect the information sent via RTB in meaningful ways. None of the Plaintiffs took advantage of these settings, whereas a substantial portion of the absent class member appear to have done so.

30

Individuals who took advantage of these types of privacy-enhancing tools are thus differently situated from Plaintiffs in terms of the alleged privacy risks from RTB.

**A.    Many absent class members opted out of personalized ads.**

81.    First, users may opt out of personalized ads. Google account holders who are signed in can do so via the My Ad Center. ECF No. 592-1 ¶ 48. Google account holders who are signed out can do so via the AdChoices icon available on publisher websites, and publishers themselves may also opt out of personalized ads being shown on their websites by requesting Restricted Data Processing (RDP). ECF No. 592-1 ¶¶ 41, 51, None of the Plaintiffs opted out of personalized ads. In contrast, based on the non_personalized_ads_reason field, approximately ███ of the bid requests in the broader dataset correspond to situations where the user has opted out of personalized ads through ones of these methods. Striegel Suppl. Rep. ¶ 43.

82.    Once a user or publisher has opted out of personalized advertising, several critical bid request fields will not appear in bid requests triggered by activity associated with that account:

- No pseudonymous identifiers, such as the Google User ID or Device Advertising IDs, will be included in the bid requests. ECF No. 592-1 ¶ 49. I have discussed in detail the significant reduction to the risk of re-identification as a result of this in Section IV.

- No hosted match data will be included in the bid requests and no cookie matching will take place via Google's hosted match data service. I have discussed in detail the significant reduction to the risk of re-identification as a result of this in Section V.

31

- When RDP is active, there is no IP address information shared in bid requests at all. ECF No. 592-1 ¶ 41. Plaintiffs' own experts treat the IP address as a critical identifying field themselves, conceding that its absence would be significant to their analyses. *See, e.g.*, Shafiq Opening Rep. ¶ 42(c), Wilson Opening Rep. ¶ 77.

83. In summary, since a sizable fraction of the bids within the broader dataset correspond to Google account holders who opted out of personalized advertising, and the rest of the bids correspond to class members who have not, the risk of re-identifiability is highly variable across different individuals within the class. And since no Plaintiffs have opted out of personalized advertising, the risk of re-identifiability is highly variable between the Plaintiffs and the rest of the class members—especially those who have opted out—since the omission of pseudonymous identifiers and the lack of any cookie matching reduces the risk of re-identifiability virtually to zero.

**B. Many absent class members enabled limited ad tracking on their mobile devices.**

84. Another privacy-enhancing option available is for a user to set on one's mobile device the "limit ad tracking" option. None of the Plaintiffs used this option. In contrast, approximately ▮ of the bids in the broader dataset have the limit_ad_tracking field set. Striegel Suppl. Rep. ¶ 43.

85. When a user activates limited ad tracking, the Device Advertising IDs, namely IDFA and AAID, are omitted. ECF No. 592-1 ¶ 61. This limits the ability to perform cross-app tracking by third party advertisers like RTB participants. As a result, the RTB participants will collect less information than otherwise. This is true even if RTB participants attempt to fingerprint the device, because device fingerprinting is significantly less reliable than

using a Device Advertising ID to identify a device. This is also true even if the RTB participants indirectly receive some of this information from Google via cookie matching, because cookie matching will not share the same information that RTB participants may collect directly if they know the Device Advertising ID, and because Google itself will not be able to collect an equally granular information about the users actions when using various apps in the absence of a Device Advertising ID.

**C.    Many absent class members did not authorize app tracking on their iOS devices.**

86.    iOS devices offer users the ability to control whether they authorize or not "app tracking," which refers to the ability of apps to track user activity across different apps and results in the IDFA field—a Device Advertising ID—being omitted from bid requests. ECF No. 592-1 ¶ 61. This would yield the same reduction in re-identifiability discussed in the preceding paragraph.  None of the Plaintiffs selected this option, which is identified in the produced data by the app_tracking_authorization_status field. In contrast, the app_tracking_authorization_status is set to denied in ███████ of the bid requests in the broader dataset. Striegel Suppl. Rep. ¶ 40.

**VII.    The Variations in Bid Request Data Between the Proposed Class Members and the Plaintiffs Significantly Affect RTB Participants' Ability to Effectively Use Identity Graphs, Another Central Part of Plaintiffs' Claims.**

87.    In his reports and depositions, Dr. Shafiq has described a two-step "identity graph" method that RTB participants may use to identify a user. First, they collect identifiers for a user via the RTB bid requests, and then they may use identity graphs to link these identifiers to one of the known persons in their identity graph, a step that he refers to as identity resolution. Shafiq Opening Rep. ¶ 88(b). Variations in bid request data between the absent class

members and the Plaintiffs significantly affect RTB participants' ability to effectively use identity graphs as Dr. Shafiq contemplates.

**A.    Identity graphs are not reliable tools for identifying any users based on bid request data.**

88.    To demystify identity graphs, let me explain exactly what they are and how they work as it relates to this case: Identity graphs associate collected data with known individuals. This association is not always correct. Then, bid request data associated with an unknown individual (*e.g.* an IP address, a UA, or a pseudonymous identifier) are compared with those already associated with a known individual in the graph, in an effort to find the best match. As I have explained already in my opening report, any probabilistic matching, no matter how advanced machine learning techniques one may use, will never have 100% accuracy, thus it can only add uncertainty and unreliability to the whole process. Psounis Opening Rep. ¶ 71. The key reason for this is that, as I have explained, RTB fields cannot be reliably associated with an individual, regardless of whether one uses an identity graph or some other method to do so. Psounis Opening Rep. § IV.C.

89.    Dr. Shafiq, resisting this conclusion, cites an audit of the accuracy of LiveRamp's identity graph. Shafiq Rebuttal Rep. ¶ 83. As a first matter, the provided URL "*https://www.lotame.com/wp-content/uploads/2017/04/Lotame_Data_Onboarding.pdf*" that supposedly points to the study does not work. Hence, one cannot establish whether this study applies here. As a matter of fact, it is very likely that it is irrelevant: LiveRamp prides itself on the fact that it primarily relies on ***directly identifiable personal information*** (PII) like email addresses, names, and phone numbers—***which is not found in RTB bid requests***—to link different devices and data to a single individual, prioritizing accuracy.

34

This results in an identity graph that at its core is a "deterministic" identity graph. Dr. Shafiq himself states "the identity graphs described in my report (Shafiq Report ¶ 88b) rely on deterministic information" Shafiq Rebuttal Rep. ¶ 82. Crucially, in the context of the RTB case, there is no directly identifying PII in bid request data with which an identity graph like LiveRamp's can deterministically link data.

90.     Instead, if one were to use an identity graph, including one that has been built using PII, then one would use it to conduct "probabilistic" matching, as Dr. Shafiq himself states in his first report. *Id.* And it is well established that probabilistic matching is significantly less reliable than deterministic matching which is why the former is used when reaching a larger audience, rather than precision, is the goal.[18] In summary, Dr. Shafiq cites the likely accuracy of ***deterministic*** matching to argue that the use of identity graphs in the RTB context would be reliable, but the type of matching that can be used in the RTB context is ***probabilistic*** and it is not reliable.

91.     It is also worth scrutinizing a statement by Dr. Shafiq regarding identity graphs because it is, while intuitively appealing, technically meaningless. He states that "[i]f these identity graphs were unreliable, no one would use them." Shafiq Rebuttal Rep. ¶ 83. The usefulness of a method depends on the goal. If the goal is to reach a large audience, then false positives, *i.e.*, reaching people who are not a good match for an ad campaign, represents a small problem as long as the campaign also reaches people who are a good match. As a result, even unreliable methods with (by way of example) 50% accuracy or less may be useful. If, instead, the goal is to re-identify a person, then unreliable methods like

---

[18] *See, e.g.*, LiveRamp, "Probabilistic vs Deterministic Matching: Our Viewpoint on Identity Graph Methodologies," https://liveramp.com/blog/probabilistic-vs-deterministic/ (Mar. 8, 2019).

probabilistic matching are useless. This is because there would no way to know which matching is correct and which one it isn't. For the example above with an accuracy of 50%, one would merely know that half of the matchings are correct and half are wrong, but would not know which ones are correct.[19]

92.    The above analysis offers an opportunity to clarify one more crucial feature of the RTB system which the plaintiffs' experts fail to understand or to explain. The goal of the system is to match an unknown individual with an ad. As long as the unknown individual's interests are in line with the personalized ad, say, more than 50% of the time, the RTB participant will be placing an ad to the right audience more than 50% of the time. There is no need for this "bet" to be 100% accurate for the system to be useful for the RTB participant. And, as long as the "bet" is correct often enough to offset the cost of placing an ad on a publisher, this is a useful system for RTB participants. Crucially, there is absolutely no need for the RTB participant to know who the individual actually is, in contrast to what Dr. Wilson appears to believe "Thus, providing information in a bid request that will facilitate identification of individuals is the way in which Google makes money." Wilson Opening Rep. ¶ 41. What matters is whether the interests of the unknown individual are often-enough in line with the ad. This is the fundamental reason why the RTB system is useful to an RTB participant, even though, as I have explained in my reports, there is no reliable way to identify an individual from the information in the RTB bid requests.

---

[19] Even if confidence scores were to be provided for the accuracy of each match, the uncertainty regarding the matchings' accuracy remains.

**B.** **The absence of pseudonymous identifiers in a large fraction of the broader dataset significantly affects RTB participants' ability to effectively use identity graphs, under Plaintiffs' theory.**

93.    As I explain in detail in Section IV, in the absence of pseudonymous identifiers an RTB participant cannot combine multiple bid requests with any meaningful accuracy. In this case, an RTB participant may use a collection of identifier values from a single bid request as an input to an identity graph. Obviously, this information would be much less than that in a collection of bid request data from multiple bids with the same pseudonymous identifier, and will result in an even less reliable output from the identity graph than the case where pseudonymous identifiers were present.

94.    Alternatively, an RTB participant may use a collection of identifiers from multiple bid requests, despite the very low confidence that these bids may correspond to the same user as an input of an identity graph. Obviously, this information would have a lot of noise, potentially resulting in even lower reliability than inputting data from a single bid. And, even if this information may lead to better results than in the case of inputting information from a single bid, the results will for sure be much less reliable than in the case where pseudonymous identifiers were available to more reliably combine data from multiple bid requests.

**C.** **The absence of cookie matching and hosted match data in a large fraction of the broader dataset significantly affects RTB participants' ability to effectively use identity graphs under Plaintiffs' theory.**

95.    The absence of cookie matching in general will have a significant impact on the ability of RTB participants to use identity graphs because the available data to conduct identity resolution will be significantly less. Specifically, there will be no data from multiple sources thanks to cross platform tracking via cookie matching, see Section V. As a result,

37

the already unreliable practice of using identity graphs to identify a person in the context of an RTB participant, see Section VII.A, will become even more unreliable.

96.     The absence of hosted match data from Google's hosted match data service in particular will also have a significant impact on the ability of RTB participants to use identity graphs, because the aforementioned data could be used together with other data to conduct probabilistic matching hoping to improve accuracy. Again, the already unreliable practice of using identity graphs to identify a person in the context of an RTB participant, will become even more unreliable.

**D.    The absence of personalized ads and app tracking in a large fraction of the broader dataset significantly affects RTB participants' ability to effectively use identity graphs, under Plaintiffs' theory.**

97.     Turning off personalized ads or disabling app tracking will have a significant effect for similar reasons. Specifically, the absence of Device Advertising IDs, namely IDFA and AAID, from the bid requests limits the ability to perform cross-app tracking by third party advertisers like RTB participants, see Section V. As a result, there will be significantly less data to feed as inputs in the probabilistic matching process and an already unreliable practice will become even more unreliable.

**VIII.    Dr. Shafiq's Location Analysis Is Wrong, Misleading, and Cannot Be Generalized to the Proposed Class.**

98.     Dr. Shafiq purports to have been able to locate with minimal error the precise home or work location for each named Plaintiff. As I explained in the Psounis Opening Report, this analysis is incorrect and deeply flawed. I briefly expand on the flaws in Dr. Shafiq's methods, which ignore basic facts about how geolocation works in general and through RTB. I also explain that, importantly for present purposes, there are major differences

between the Plaintiffs' data and the broader dataset that would prevent even the flawed analysis Dr. Shafiq conducts for the Plaintiffs from being generalized to other Google account holders.

99.    In his rebuttal report, Dr. Shafiq states that "[Dr. Psounis] is simply parroting the flawed opinion and analysis in the Striegel Report. Dr. Psounis does not conduct any analysis of his own to assess the validity of Dr. Striegel's claims" as to Dr. Shafiq's conclusions regarding geolocation through RTB bid requests. Shafiq Rebuttal Rep. ¶ 68. This is incorrect. To show this and provide some background, I will first summarize the main points of my original analysis. After that, I will present location maps for Plaintiffs based on my original analysis, and show that Dr. Shafiq's location analysis is wrong and grossly misleading.

100.    The geolocation data are derived from IP addresses, a truncated version of which may also be contained in a bid request. The main data that an RTB participant may use to estimate the home or work address of an individual are:

- (i) truncated latitude and longitude coordinates, and

- (ii) an accuracy field value which equals the radius of a circle centered at the latitude and longitude coordinates.

The device associated with a bid request may be located anywhere within the circle defined by these two fields. Critically, Dr. Shafiq ignores the imprecise nature of a truncated latitude and longitude pair, and he ignores the accuracy field altogether.

101.    Latitude and longitude coordinates are truncated in RTB bid requests to two decimal points. Thus, each of them corresponds to a length of 1.1 kilometers, and any pair of latitude and longitude values shared in a bid request corresponds to an area of approximately 1.23

39

square kilometers. Accuracy values for the plaintiffs range from 1.9 kilometers up, which corresponds to an area of more than 11 square kilometers, with a median value of approximately 9 kilometers, which corresponds to an area of more than 200 square kilometers. An RTB participant does not know which location within these huge uncertainty areas, containing thousands to tens of thousands of households depending on the corresponding geographic areas and accuracy values, may correspond to a user.

**A.      Dr. Shafiq's analysis for the Plaintiffs ignores how Google generalizes the geolocation information actually in RTB fields.**

102.   First, let me summarize the steps that one should take to correctly use the geolocation data. I will refer to the map corresponding to Christopher Valencia as an example.



103.   First, an RTB participant will generate an area of 1.23 square kilometers corresponding to the truncated  latitude and longitude coordinates shared for a user. In the case of Christopher Valencia, the shared coordinates are ( ████████ ) and the associated

40

uncertainty area is the orange square on the map with a red circle in the middle which corresponds to coordinates (█████████████████).

104. Next, an RTB participant would have to take into consideration the accuracy field. Note that I will address later Dr. Shafiq's assertion that an RTB participant may ignore this field, and establish that this makes no sense because in this case the RTB participant will end up making an even worse estimate of the actual location of the user. To use the accuracy field in practice, an RTB participant would have to draw a circle with a radius equal to the accuracy value from all possible locations within the orange square of step 1, because all coordinates within this area can be the actual un-truncated coordinates. In the case of Christopher Valencia, this area is the area within the large yellow circle as well as the extra area inside the purple curves. For a matter of simplicity, I will omit the extra area inside the purple curves in the rest of the discussion, and work with the smaller area corresponding to the yellow circle.

105. The yellow circle has a radius equal to the accuracy field value, plus half the length of the edge of the orange area corresponding to the 1.1 kilometer uncertainty due to the truncation of the coordinates to two decimal digits. If an RTB participant may combine multiple bids for a user, which is not possible when no pseudonymous identifiers are shared which occurs in ██% of the broader produced data, then the RTB participant would use the minimum accuracy field value which corresponds to the minimum uncertainty and thus the maximum possible accuracy across all bid requests with the same aforementioned coordinates. In the case of Christopher Valencia, this radius equals 1789 (the accuracy value) + 550 (half of the inherent uncertainty encompassed by any two-decimal coordinates) = 2339 meters.

106. Before moving any further, it should be evident to the naked eye upon inspection of the

41

map, that there are so many households in the area that any discussion about re-identifying the home or work address of a user is meaningless. As a matter of fact, any household within this area is equally likely to be the one of the user. To estimate the number of households one may resort to average population densities in cities versus rural areas, as I have already done on my original report. Psounis Opening Rep. § VI.B.c.

107. However, because there is variation across different cities and across different rural areas, I conduct an even more detailed analysis here as follows: I use the Google Earth engine, https://code.earthengine.google.com, to compute an estimate for the population within the yellow circle, based on a dataset which has granular information distinguishing different cities and different rural areas, and even different areas within a city or a rural area. The dataset I use is the CIESIN/GPWv411 dataset, created and maintained by CIESIN (Center for International Earth Science Information Network), a research institute at Columbia University, representing the Gridded Population of the World as of 2010. Because the population has increased since then, my estimates are conservative. Alternative methods to estimate the population are welcome as the exact estimate will be immaterial as it will become evident shortly, because any reasonable method will result in a sheer number of potential addresses within the uncertainty area. Last, I use the average number of persons per household based on Census Bureau data to estimate the number of households from the estimated population.

108. The map shows an additional orange square area. This area corresponds to the truncated coordinates of Christopher Valencia's address, namely (███████) . The blue arrow within this area points to his exact address while the red arrow points to the center of the area, that is, to coordinates (███████).

109. Looking at Table 2 below, which repeats Dr. Shafiq's findings, shows that Dr. Shafiq misrepresents an uncertainty area equal to ███ square kilometers, an area equal to ███ of the whole city of San Francisco, estimated to include ███ households either of which may be the household of Christopher Valencia, with an "error" value of 1 kilometer.[20] This "error" is meaningless in the context of the task at hand which is to assess the ability of an RTB participant to predict the location of the plaintiff from the shared geolocation data. The fact of the matter is, an RTB participant does not know which of the ***more than*** ███ ***households within the uncertainty area*** is the one that corresponds to the plaintiff.

110. I will now explain why Dr. Shafiq's statement that "RTB participants can locate home/work address with an accuracy of 0-1 kilometer even if they take the location coordinates shared in RTB bid requests at their face value" makes no sense; doing so would lead to an even less accurate estimate. Shafiq Rebuttal Rep. ¶ 6(b). To see this, consider the 7 named Plaintiffs, which are the only users for which we have ground truth data, *i.e.*, their actual address. As is evident from the map for Christopher Valencia, not considering the accuracy field (or "tak[ing] the location coordinates shared in RTB bid requests at their face value," as Dr. Shafiq puts it) will result in the RTB participant to look at the wrong area of the map (different orange square), thus it is impossible for the RTB participant to identify the address even if it were to go door by door throughout the identified area.

111. More generally, in 6 of the 7 Plaintiffs' cases, the actual address of the Plaintiff is outside

---

[20] What this error value represents is not spelled out by Dr. Shafiq, my guess is that it is based on the difference between the coordinates shared by RTB, namely (███████), and the truncated version of the coordinates that correspond to Valencia's address, namely (███████), and because the latitude differs by 0.01, which corresponds to a length of 1.1 kilometers, Dr. Shafiq fabricates an "error" of 1 kilometer.

the area which corresponds to the location coordinates shared in RTB bid requests. Hence, an RTB participant has zero chance to estimate the actual address correctly for more than 85% of the Plaintiffs if it takes "the location coordinates shared in RTB bid requests at their face value," *i.e.*, ignores the accuracy field as Dr. Shafiq suggests. In contrast, using the accuracy field, the RTB participant can at least have very high confidence that the user's household is one of the thousands to tens of thousands of households within the uncertainty area.

112.    Notably though, even this is not certain. In the case of one plaintiff, John Kevranian, his actual address is outside even of the uncertainty area.

113.    I will now present the map for John Kevranian and prove the above statement. The shared truncated coordinates, his address and the associated truncated coordinates, as well as the various metrics related to attempting to estimate his address from the shared truncated coordinates and the lowest possible accuracy field value are shown in Table 2 below.[21] It is evident even to the naked eye that there are thousands of households in the uncertainty area on the map. An RTB participant will not know which of the estimated ███ households within the uncertainty area of ███ square kilometers is Kevranian's. ***Notably, and as briefly stated above, Kevranian's actual address is not even within the uncertainty area dedicated by the accuracy field.*** This highlights the inherent inaccuracy of estimating the location of an IP address, as even the very accuracy value calculated by geolocation

---

[21] Note that Dr. Shafiq has likely swapped by oversight the RTB coordinates with the address coordinates thus I am swapping them back in Table 2. Also note that when I used Google maps to find the GPS coordinates for the address of John Kevranian I got (███████████) which rounds to (██████████) and not to (████████████) as Dr. Shafiq has stated, thus I am correcting this as well in Table 2.

services is not enough to guarantee that the actual address will be within the associated uncertainty area.



114. I present the maps for the rest of the Plaintiffs in Appendix C. The corresponding uncertainty areas are reported in Table 2. ***What matters is that an RTB participant does not know which of the thousands (the case for Green and Williams) to tens of thousands (the case for Woodruff, Valencia, Diggs and Toronto) of households within the uncertainty area belong to the Plaintiffs***, and, as a matter of fact, cannot even be certain that the plaintiff's address is within the uncertainty area (as is case for Kevranian).

**B.     Dr. Shafiq's claim to be able to identify the Plaintiffs' home/work locations is misleading.**

115. Dr. Shafiq claims that he "was able to locate … the home/work address for all of the Plaintiffs, with an exact (0.00 percent error) match for two of the seven Plaintiffs." Shafiq Opening Rep. ¶ 42(e). This is a very misleading statement for the following reasons.

116. First, it does not matter what Dr. Shafiq can or cannot do when using the actual home or work address of the plaintiffs *that he already knows*. What matters is what an RTB participant can do with the shared geolocation data, given that an RTB participant does not know the actual home address of the plaintiffs.

117. If Dr. Shafiq had not known the plaintiffs' addresses, then Dr. Shafiq would not have been able to identify a Plaintiff with any better accuracy than what an RTB participant can, as I explain in detail above. Dr. Shafiq cannot otherwise tell which of the thousands (or tens of thousands) of addresses within the uncertainty areas dictated by the yellow circles is each Plaintiff's actual address. As a matter of fact, in view of the fact that John Kevranian's address is not even within the uncertainty area computed based on the truncated coordinates and accuracy field value shared in the bids, neither Dr. Shafiq nor anybody else can tell with certainty that the actual address is even within the tens to hundreds of square kilometers corresponding to the uncertainty areas.

118. Dr. Shafiq's theory that one may ignore the accuracy field values, presumably to reduce the size of the uncertainty area, is untenable. First, even in this case there will be an uncertainty area of 1.21 square kilometers, see the orange squares at the center of the 7 maps. Second, and more importantly, as I explained already, if one were to ignore the accuracy field values, then it would be impossible to find the actual address for 6 out of the 7 plaintiffs because for the 6 named Plaintiff's their address is actually outside the 1.21 square kilometer area encompassed by the truncated set of geolocation coordinates alone.

119. Table 2 below summarizes the results of my analysis and compares the misleading "error" values reported by Dr. Shafiq and the actual uncertainty areas, together with best effort estimates of the corresponding households within these areas. The maps themselves speak

46

on their own, but the numbers in the table quantify precisely what one can see with the naked eye.

**Table 2**

| Plaintiff name | Shared in RTB bid | "Home/work" coordinates | "Home/work" address | Dr. Shafiq's reported "error" | Uncertainty area compared to city of SF | Actual uncertainty and error | Error if accuracy field ignored |
|---|---|---|---|---|---|---|---|
| K. Woodruff | | | | *0.03 = 3 km* | - 709.9 sq km - 5.8 times city area | 1 out of 30773 households (80009 people) | Impossible to identify address |
| C. Valencia | | | | *0.01 = 1 km* | - 17.2 sq km - 14% of city area | 1 out of 52935 households (137631 people) | Impossible to identify address |
| R. Green | | | | *0.00 = 0 km* *0.01 = 1km* | - 16.6 sq km - 14% of city area | 1 out of 4113 households (10695 people ) | Impossible to identify address |
| J. Kevranian | | | | *0.03 = 3 km* | - 23.2 sq km - 19% of city area | 1 out of 21532 households (55982 people ) | Impossible to identify address |
| T. Diggs | | | | *0.01 = 1 km* | - 702.5 sq km - 5.8 times city area | 1 out of  45390 households (117962 people) | Impossible to identify address |
| S. Toronto | | | | *0.00 = 0 km* | - 28.3 sq km - 23% of city area | 1 out of 13490 households (35073 people ) | 1 out of 13490 households |
| T. Williams | | | | *0.01 = 1 km* *0.02 = 2 km* | - 298.3 sq km - 2.5 times city area | 1 out of 8434 households (21923 people) | Impossible to identify address |

### C.     Dr. Shafiq cannot apply his misleading location analysis to the absent class members.

120.   Dr. Shafiq does not know the address of any other class member except the Plaintiffs. Hence, it is evident that he cannot even apply his misleading location analysis to the rest of the class members.

121.   Notably, in the Shafiq Supplemental Report, Dr. Shafiq he does not make any claims about whether he can or cannot predict their location. He merely states that their locations are "near" certain landmarks or locations, e.g. "the location of the user (near the ████████ ████████████████████████████████████████████████ )," Shafiq Suppl. Rep. ¶ 43(a), without

offering any specifics about what he means by "near." He does not offer any estimates of how far from the mentioned landmarks or locations the actual location of the class members may possibly be because he has no idea for the reasons mentioned above. Shafiq 2024 Depo. Tr. at 285:17-288:1.

122. One can produce maps for absent class members in a similar manner that I have produced the aforementioned maps for the Plaintiffs showing the sheer size of the uncertainty areas, I have done above, *see* ¶ 65, for one of the twelve class members that Dr. Shafiq has used as examples. The only difference is that there will be no arrow pointing to the unknown address of the absent class member nor any GPS coordinates that correspond to the unknown address.

**D.    An RTB participant cannot apply Dr. Shafiq's misleading location analysis to either the Plaintiffs or the absent class members.**

123. Unlike Dr. Shafiq, an RTB participant does not know the actual address of the Plaintiffs. Like Dr. Shafiq, an RTB participant does not know the actual address of the rest of the class members. It is thus evident that an RTB participant cannot apply Dr. Shafiq's misleading location analysis to either the plaintiffs or the absent class members. Notably, the material question is what an RTB participant can or cannot do with the location data that it receives via the RTB bid requests.

124. Dr. Shafiq argues that RTB participants can locate absent class members by collecting multiple bid requests over time. However, he does not explain or justify his assertion. As a first matter, an RTB participant cannot apply Dr. Shafiq's misleading location analysis for any geolocation data that it may receive for a certain user, as the RTB participant does not know the actual address for any of these locations. Second, as I explain above in Section

IV.B, an RTB participant cannot combine from multiple bid requests multiple geolocation data for the ▮▮ of absent class members for whom no pseudonymous identifiers are shared in the bid requests.

125. But, let's disregard the fundamental flaws of Dr. Shafiq's location analysis, and let's consider the plaintiffs and the ▮▮ of absent class members for which at least one pseudonymous identifier is shared in the bid requests and thus an RTB participant may attempt to combine multiple geolocation data. What can an RTB participant possibly learn from the combination of these location data that may increase the risk of re-identification? Even if an RTB participant had in its disposal hundreds, or thousands, or hundreds of thousands of uncertainty areas, each one corresponding to different geolocation data, these areas are so large that the RTB participant would gain no material information. For example, consider any of the seven uncertainty area maps for the seven Plaintiffs and envision a user that visits multiple locations. The end result will be a number of uncertainty areas whose union, despite some likely overlap, will correspond to an even larger uncertainty area offering very little to no material insight about the identity of the user.

126. One useful way to take advantage of combined geolocation data when these data correspond to multiple bids with the same truncated coordinates, is to use the smallest accuracy field value across these data to reduce the uncertainty area related to the common truncated coordinates. As I have already discussed, I have already done so in my analysis and the uncertainty areas are still very large.

127. What is more, the median uncertainty area (corresponding to the median accuracy field value representing the common case scenario) equals at least ▮▮ square kilometers in the plaintiffs' dataset and ▮▮ square kilometers in the broader produced dataset, based on

49

dataset-wide statistical analysis.[22]

128. Thus, there are no uncertainty areas that are granular enough to affect the above analysis in a material way, and, most of the uncertainty areas are, as a matter of fact, quite large.

129. Table 3 below summarizes the 10th percentile, median, and 90th percentile values of the accuracy field in the broader dataset and the dataset corresponding to the Plaintiffs for completeness.[23] Striegel Suppl. Rep. ¶¶ 73-75.

**Table 3**

| Percentile | Broader dataset | | Plaintiffs dataset | |
|---|---|---|---|---|
| | Accuracy | Uncertainty area | Accuracy | Uncertainty area |
| 10th | | | | |
| 50th (median) | | | | |
| 90th | | | | |

Konstantinos Psounis, Ph.D.

January 31, 2025

---

[22] For the Plaintiffs, the median accuracy value equals ▮▮ kilometers thus the uncertainty area is at least 3.14*(▮▮+0.550)^2= ▮▮ square kilometers. For the absent class members, the median accuracy value equals ▮▮ kilometers thus the uncertainty area is at least 3.14*(▮▮+0.550)^2= ▮▮ square kilometers.

[23] The median value is defined as the value for which the number of smaller values and the number of larger values than the median are the same, thus sitting right in the middle of the pack. The 10th percentile value is defined as the value for which the number of smaller values than the 10th percentile value represent 10% of the total values, and the 90th percentile value is defined as the value for which the number of smaller values represents 90% of the total values.

**Appendix A: Curriculum Vitae**



**VITERBI**
**SCHOOL OF**
**ENGINEERING**

Konstantinos Psounis
Professor

kpsounis@usc.edu
https://sites.usc.edu/kpsounis/

# Curriculum Vitae

| | | |
|---|---|---|
| **Education** | STANFORD UNIVERSITY | Stanford, CA |
| | *Ph.D. degree in Electrical Engineering* | Jan. 1999 - Dec. 2002 |

Thesis title: "Probabilistic Methods for Web Caching and Performance Prediction of IP Networks and Web Farms", supervised by Prof. Balaji Prabhakar.

| | | |
|---|---|---|
| | STANFORD UNIVERSITY | Stanford, CA |
| | *M.S. degree in Electrical Engineering* | Sep. 1997 - Jan. 1999 |

GPA: 4.0/4.0.

| | | |
|---|---|---|
| | NATIONAL TECHNICAL UNIVERSITY of ATHENS | Athens, Greece |
| | *Diploma in Electrical and Computer Engineering* | Sep. 1992 - June 1997 |

GPA: 9.74/10.0. (Graduated ranking 1st in the class of '97.)

| | | |
|---|---|---|
| **Work** **in Academia** | UNIVERSITY OF SOUTHERN CALIFORNIA | Los Angeles, CA |

Electrical and Computer Engineering (ECE) and (by courtesy) Computer Science dept.

| | |
|---|---|
| *Professor* | Nov. 2017 - now |
| *Associate Chair of ECE department* | July 2021 - June 2024 |
| *Associate Chair of ECE department* | Jan. 2019 - Aug 2019 |
| *Associate Professor* | May. 2009 - Nov. 2017 |
| *Assistant Professor* | Sep. 2003 - Apr. 2009 |

Research interests: Modeling, performance analysis, algorithm design, and system design and implementation for efficient, AI-enabled and privacy-preserving networked, distributed systems, including the Internet and the web, data centers and cloud systems, wireless systems (e.g. WiFi, cellular, IoT, spectrum sharing, delay tolerant, mobile ad hoc), augmented and virtual reality systems, autonomous robotic/vehicle/drone systems, and peer to peer systems.

| | | |
|---|---|---|
| | STANFORD UNIVERSITY | Stanford, CA |
| | *Visiting Associate Professor* | Aug. 2009 - Dec. 2009 |

| | | |
|---|---|---|
| | STANFORD UNIVERSITY | Stanford, CA |
| | *Postdoctoral Research Fellow* | Jan. 2003 - Aug. 2003 |

**Technical Work**
**outside academia**

| | |
|---|---|
| ADANT TECHNOLOGIES | |
| *Technical Consultant* | Jan. 2017 - May 2018 |

WiFi 802.11ax and smart antennas.

| | |
|---|---|
| QUANTENNA COMMUNICATIONS | |
| *Technical Consultant* | Jan. 2015 - 2016 |

Advanced MAC and PHY layer techniques applied to next generation wireless networks.

| | |
|---|---|
| HONEYWELL | |
| *Technical Consultant* | Sep. 2013 - Jun. 2014 |

Sensor-network based fire alarm systems.

SPACEMUX, INC.
*Co-founder and CEO*                                    May 2013 - Dec. 2014
Increasing wireless bandwidth and speed tenfold.

CISCO SYSTEMS                                          San Jose, CA
*Technical Consultant*                            Sep. 2009 - Dec. 2009
Vehicular multi-technology wireless connectivity.

FINEGROUND NETWORKS INC.                              Cambell, CA
*Technology Architect*                          Sep. 2000 - June 2001
Accelerating web downloads using delta encoding.

## Expert Witness
## Ongoing Work

GOOGLE RTB CONSUMER PRIVACY LITIGATION
*Case No. 4:21-cv-02155-YGR-VKD (N.D. Cal.)*              July 2023 - now
Representing defendant Google.
*Reports:*
Initial expert report                                 Sep. 29, 2023
*Court Appearances:*
Deposition re initial expert report                   Oct. 16, 2023

JP MORGAN CHASE V. CHARLIE JAVICE
Representing defendent for issues related to Google Analytics and Data Synthesis and Augmentation
Expert Disclosure                                     July. 15, 2024

## Expert Witness
## Completed Recent Work

BROWN V. GOOGLE LLC
*Case No. 4:20-cv-03664-YGR-SVK (N.D. Cal.)*     Apr. 2022 - Jan. 2024
Representing defendant Google, judge only certified an injunctive class, case settled.
*Reports:*
First rebuttal expert report                          June 7, 2022
Second rebuttal expert report                         Aug. 30, 2023
*Declarations:*
First declaration                                     Nov. 30, 2022
Second declaration                                    Feb. 10, 2023
*Court Appearances:*
Deposition re first rebuttal expert report            Aug. 19, 2022
Deposition re second rebuttal expert report           Oct. 9, 2023

ATLAS GLOBAL TECHNOLOGIES VS ASUSTEK COMPUTER INC.
*Case No. 6:21-cv-00820-ADA (E.D. Texas)*        Sep. 2022 - Dec. 2023
Representing plaintiff Atlas, case settled.
*Reports:*
Rebuttal expert report re validity of multiple patents    July 14, 2023
*Court Appearances:*
Deposition re validity of multiple patents            Aug. 1, 2023

A.3

ATLAS GLOBAL TECHNOLOGIES V. ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD
*Case No. 6:21-CV-01217-ADA (W. D. Texas)*                    Mar. 2023 - Dec. 2023
Representing plaintiff Atlas, case settled.
*Declarations:*
Declaration re claim construction for multiple patents                    Nov. 18, 2022


ZYXEL COMM AND NETWORKS CORPORATION V. ATLAS GLOBAL TECHNOLOGIES
*Case No IPR2023-00877*                    Mar. 2023 - Oct. 2023
Representing patent owner Atlas. PTAB denied institution of IPR. Case settled.
*Declarations:*
Declaration re validity of a patent                    Aug. 11, 2023


ZYXEL COMM AND NETWORKS CORPORATION V. ATLAS GLOBAL TECHNOLOGIES
*Case No IPR2023-00863*                    Mar. 2023 - Oct. 2023
Representing patent owner Atlas. PTAB denied institution of IPR. Case settled.
*Declarations:*
Declaration re validity of a patent                    Aug. 11, 2023


ATLAS GLOBAL TECHNOLOGIES V. SERCOM CORP.
*Case No. 6:21-cv-00818-ADA (E.D. Texas)*                    Oct. 2022 - Oct. 2023
Representing plaintiff Atlas, case settled.
*Reports:*
Rebuttal expert report re validity of multiple patents                    July 14, 2023
*Court Appearances:*
Deposition re validity of multiple patents                    Aug. 1, 2023


SERCOMM CORP. V. ATLAS GLOBAL TECHNOLOGIES
*Case No. IPR2022-01519*                    Sep. 2022 - Apr. 2023
Representing patent owner Atlas, PTAB denied institution of IPR.
*Declarations:*
Declaration re validity of a patent                    Jan. 19, 2023


SERCOMM CORP. V. ATLAS GLOBAL TECHNOLOGIES
*Case No. IPR2022-01520*                    Sep. 2022 - Apr. 2023
Representing patent owner Atlas, PTAB denied institution of IPR.
*Declarations:*
Declaration re validity of a patent                    Jan. 19, 2023


ATLAS GLOBAL TECHNOLOGIES VS TP-LINK TECH., CO, ET AL.
*Case No. 2:21-cv-00430-JRG (E.D. Texas)*                    Sep. 2022 - Sep. 2023
Representing plaintiff Atlas. Atlas was granted the full requested damages amount.
*Reports:*
Rebuttal expert report re validity of multiple patents                    May 23, 2023
*Court Appearances:*
Deposition on opinions rendered re validity of multiple patents                    June 5, 2023


BROADCOM V. NETFLIX
*Case No. 3:20-cv-04677-JD (N.D. Cal.)*                    Jan. 2021 - Apr. 2022

Representing defendant Netflix. Judge ordered the case to stay.

CA AND AVAGO V. NETFLIX
*Case No. 2:21-CV-00080-JRG-RSP (E.D. Texas)*               Jan. 2021 - Apr. 2022
Representing defendant Netflix. Judge ordered the case to stay.
*Reports:*
Opening expert report re invalidity of patents                        Dec. 20, 2021
Supplemental opening expert report re invalidity of patents           Dec. 27, 2021
Rebuttal expert report re infringement of patents                     Jan. 11, 2022
*Declarations:*
Declaration re claim construction for patents                         Aug. 30, 2021
*Court Appearances:*
Deposition re invalidity and non-infringement of patents              Jan. 19, 2022

**PhD Student Supervision**

- Dimitris Andreadis (Aug. 2024 - now)
- Ryan Swift (Aug. 2024 - now)
- Jike Zhong (Aug. 2024 - now)
- Stavros Damianakis (Aug. 2024 - now)
- Rohan Sequeira (Aug. 2023 - now)
- Te Yi Kan (Jan. 2023 - now)
- Tina Esmaeilzadeh (Aug. 2022 - now)
- Namo Asavisanu (Aug. 2021 - now)
- Jiang Zhang (Aug. 2019 - May 2024, currently at *Facebook*)
- Lillian Clark (co-advised with Prof. Bhaskar Krisnamachari, Sep. 2018 - March 2023, currently at *SpaceX*)
- Hang Qiu (primary advisor Prof. Ramesh Govindan, Jan. 2015 - June 2021, currently *Assistant Professor at the University of California, Riverside*)
- Po-Han Huang (Sep. 2015 - Jan. 2020, currently at *Facebook*)
- Kaidong Wang (Sep. 2014 - Dec. 2019, currently at *Qualcomm*)
- Yonglong Zhang (Sep. 2013 - Dec. 2018, currently at *Facebook*)
- Matthew Clark (Sep. 2013 - Dec. 2017, currently at *Aerospace Corporation*)
- Weng Chon Ao (Sep. 2012 - Dec. 2017, currently at *Qualcomm*)
- Antonios Michaloliakos (Aug. 2010 - Sep. 2016, currently at *Enfabrica, California*)
- Ranjan Pal (co-advised with Prof. Leana Golubchik, Jan. 2009 - Aug. 2014, currently *Research Scientist at MIT*)
- Vlad Horia Balan (Sep. 2007 - Aug. 2013, currently at *Google*)
- Wei-Cherng Liao (Sep. 2004 - Dec. 2008, currently at *MediaTek, Taiwan*)
- Apoorva Jindal (Sep. 2003 - Dec. 2008, currently at *Uber*)
- Fragkiskos Papadopoulos (Sep. 2003 - Dec. 2007, currently *Associate Professor at Cyprus University of Technology, Cyprus*)
- Thrasyvoulos Spyropoulos (Sep. 2003 - Jun. 2006, currently *Professor at Technical University of Crete, Greece*)

| | | |
|---|---|---|
| **Proposals Funded** | AMAZON GRANT | Sep. 2023 |

AMAZON GRANT                                                          Sep. 2023
Proposal title: Private labelling and learning for voice assistants with cameras.

AMAZON GRANT                                                          Sep. 2022
Proposal title: Federated learning with secure aggregation: Accessing and improving its privacy.

CA-SANTA MONICA MOUNTAINS CONSERVANCY GRANT                          Dec. 2021
Proposal title: Wildfire Detection and Fighting Using a Network of Collaborative Drones.

NSF SATC GRANT                                                 Oct. 2020 - Sep. 2025
National Science foundation (NSF) award under the Secure and Trustworthy Computing (SaTC) call.
Proposal title: SaTC: Frontiers: Collaborative: Protecting Personal Data Flow on the Internet.

NSF CNS GRANT                                                 Oct. 2020 - Sep. 2023
National Science foundation (NSF) award under the Computer and Networked Systems (CNS) call.
Proposal title: CNS Core: Medium: Network-Enabled Cooperative Perception for Future Autonomous Vehicles.

NSF NETS GRANT                                                Sep. 2019 - Aug. 2022
National Science foundation (NSF) award under the Networking Technology and Systems (NeTS) call.
Proposal Title: CNS Core: Medium: Collaborative Research: Privacy-Preserving Mobile Crowdsourcing.

CISCO SYSTEMS GRANT                                                  April 2019
Proposal Title: Virtual and augmented reality over next generation WiFi.

CISCO SYSTEMS GRANT                                                  Dec 2016
Proposal Title: Data-driven formal optimization of data centers.

NSF NETS GRANT                                                Sep. 2016 - Aug. 2020
National Science foundation (NSF) award under the Networking Technology and Systems (NeTS) call.
Proposal Title: Spectrum Sharing Systems for Wireless Networks: Performance and Privacy Challenges.

ADANT TECHNOLOGIES GRANT                                             June 2016
Proposal Title: Using reconfigurable antenna systems with WiFi communication devices.

HUAWEI GRANT                                                          May 2016
Proposal Title: Addressing wireless bandwidth demand via asynchronously coordinated multi-cell deployments.

ADANT TECHNOLOGIES GRANT                                             Dec. 2015
Proposal Title: Asynchronous coordination of WiFi transmitters equipped with smart antennas for enhanced spectral efficiency.

NSF EARS GRANT                                                Sep. 2014 - Aug. 2019
National Science foundation (NSF) award under the Enhancing Access to the Radio Spectrum (EARS) crosscutting program.
Proposal Title: Future Wireless Broadband Access: Cross-Optimizing Hardware, Physical and Network Layers.

CISCO SYSTEMS GRANT                                    May 2014
Proposal Title: Rateless encoded UDP for error-resilient wireless links.

ARMY RESEARCH LABORATORY (ARL) GRANT          Sep. 2009 - Aug. 2014
CTA: Communications and Networking Academic Research Center.
Proposal Title: QUANTA: Quality of Information-Aware Networks for Tactical Applications.

DOCOMO LABS GRANT                                Sep. 2011 - 2013
Proposal Title: MIMO systems with TDD

CISCO SYSTEMS GRANT                              Sep. 2011 - 2013
Proposal Title: Efficient airtime allocation in wireless networks.

MING HSIEH INSTITUTE (MHI) GRANT                 May 2011 - 2013
Proposal Title: Large-Scale Software-Radio Testbed.

METRANS TRANSPORTATION CENTER GRANT           Aug. 2009 - Aug. 2010
Proposal title: End-to-end performance in vehicular networks with an emphasis on safety
and security applications.

CISCO SYSTEMS GRANT                                    Sep. 2008
Proposal Title: Neighborhood centric transport for home networking environments.

NSF NeTS GRANT                                Aug. 2008 - Aug. 2011
National Science foundation (NSF) award under the Networking Technology and Systems
(NeTS) call.
Proposal title: Contention-Awareness in Mesh Transport: Theory and Practice.

CISCO SYSTEMS GRANT                                    Apr. 2008
Proposal Title: TCP challenges in multi-hop wireless networks. From the networking
workshop "The Future of TCP: Train-wreck or Evolution?".

VSoE INNOVATIVE RESEARCH FUND GRANT          Dec. 2007 - Dec. 2008
Proposal title: Establishing a New USC Invited Workshop on Theory and Practice in
Wireless Networks.

METRANS TRANSPORTATION CENTER GRANT           Oct. 2007 - Dec. 2008
Proposal title: Efficient Routing for Safety Applications in Vehicular Networks.

NSF NeTS GRANT                                Aug. 2005 - Aug. 2008
National Science foundation (NSF) award under the Networking Technology and Systems
(NeTS) call.
Proposal title: Efficient Routing in Delay Tolerant Networking.

ZUMBERGE FACULTY RESEARCH AND INNOVATION GRANT      July 2005 - June 2006
Proposal title: Routing in Intermittently Connected Mobile Networks.

CHARLES LEE POWELL SCHOLARSHIP GRANT          Dec. 2003 - Dec. 2004

**Awards**          ACM DISTINGUISHED MEMBER                           Nov. 2019
The ACM Distinguished Member program recognizes up to 10 percent of ACM worldwide
membership with at least 15 years of professional experience who have achieved significant
accomplishments or have made a significant impact on the computing field.

IEEE FELLOW                                                                  Jan. 2018

The IEEE Grade of Fellow is conferred by the IEEE Board of Directors upon a person with an outstanding record of accomplishments in any of the IEEE fields of interest. The total number selected in any one year cannot exceed one-tenth of one- percent of the total voting membership. IEEE Fellow is the highest grade of membership and is recognized by the technical community as a prestigious honor and an important career achievement.

DISTINGUISHED MEMBER OF 2018 IEEE INFOCOM TPC AWARD                          2018

The IEEE Communications Society awards annually a select number of TPC members of its flagship conference IEEE Infocom with a Distinguished Member award.

DISTINGUISHED MEMBER OF 2016 IEEE INFOCOM TPC AWARD                          2016

The IEEE Communications Society awards annually a select number of TPC members of its flagship conference IEEE Infocom with a Distinguished Member award.

ACM NOTABLE ARTICLE IN COMPUTING - BEST OF 2013                             2014

Selection of paper "Modelling BitTorrent-like systems with many classes of users", W.-C. Liao, F. Papadopoulos, K. Psounis, and C. Psomas, ACM Transactions on Modelling and Computer Simulation, Vol. 23, Issue 2, Article No. 13, May 2013.

MEPC BUSINESS PLAN COMPETITION - 2ND PLACE                                   2013

Presentation of SpaceMUX Inc., a USC spinoff startup specializing in advanced physical layer techniques applied to next generation wireless networks.

ACM SENIOR MEMBER AWARD                                                      Jan. 2009

The Senior Member grade recognizes those ACM members with at least 10 years of prof essional experience and 5 years of continuous professional membership who have demonstrated performance that sets them apart from their peers.

IEEE SENIOR MEMBER AWARD                                                     Nov. 2008

Qualifications for this distinction are at least ten years of professional practice and five years of significant performance as demonstrated by substantial engineering responsibility or achievement, publication of engineering and technical papers, books or inventions, and the development and teaching of engineering courses.

FUTURE OF TCP BEST PRESENTATION AWARD                                        Apr. 2008

"Best and Most Compelling Presentation and Demonstration Award" at the networking workshop "The Future of TCP: Train-wreck or Evolution?" held at Stanford University and sponsored by Cisco Systems.

ZUMBERGE FACULTY RESEARCH AND INNOVATION AWARD                               July 2005

The James H. Zumberge faculty research and innovation award is granted to a selected number of Professors at the University of Southern California.

CHARLES LEE POWELL SCHOLARSHIP AWARD                                         Dec. 2003

The Charles Lee Powell award is granted to a selected number of Assistant Professors at the University of Southern California.

ILLEANA AND ERIC BENHAMOU STANFORD GRADUATE FELLOWSHIP                       1997 - 2002

Fellowship is awarded for four years to a very select number of PhD students based on academic merit.

BEST-STUDENT NATIONAL TECHNICAL UNIVERSITY OF ATHENS AWARD                   1997

Awarded yearly to the student that graduates with the highest GPA across all departments of National Technical University of Athens.

OTHER GRADUATE STUDIES AWARDS                                         1997 - 1998
Regent's Fellowship by University of California Berkeley, Charles Lee Powell Foundation
Graduate Fellowship by Caltech, Gordon Y. S. Wu Fellowship in Engineering by Princeton
University, Sage Fellowship by Cornell University.

**Publications**      ARXIV PREPRINTS

1. M Li, J Zhong, T Chen, Y Lai, K Psounis, "EEE-Bench: A Comprehensive Multi-
   modal Electrical And Electronics Engineering Benchmark", *arXiv preprint arXiv:2411.01492*,
   November 2024.

2. J. Zhang, K. Psounis, S. Avestimehr, "Differentially Private Federated Learning with-
   out Noise Addition: When is it Possible?", *arXiv preprint arXiv:2405.04551*, October
   2024.

CONFERENCE, PEER-REVIEWED, FULL-LENGTH PAPERS

1. J. Zhang, R. Sequeira, K. Psounis, "SpinML: Customized Synthetic Data Generation
   for Private Training of Specialized ML Models", in *Proceedings of PETS*, accepted
   November 2024.

2. T. Khezresmaeilzadeh, E. Zhu, D. J. Dubois, K. Psounis, D. Choffnes, "Echoes of
   Privacy: Uncovering the Profiling Practices of Voice Assistants", in *Proceedings of
   PETS*, accepted November 2024.

3. Jiang Zhang, Qiong Wu, Yiming Xu, Cheng Cao, Zheng Du, and Konstantinos Psou-
   nis, "Efficient Toxic Content Detection by Bootstrapping and Distilling Large Lan-
   guage Models", in *Proceedings of AAAI*, 2024.

4. Y. Hu, X. Ye, Y. Liu, S. Kundu, G. Datta, S. Mutnuri, N. Asavisanu, N.Ayanian, K.
   Psounis, and P. Beerel, "FireFly A Synthetic Dataset for Ember Detection in Wild-
   fire", in *Proceedings of the 5th Workshop on Artificial Intelligence for Humanitarian
   Assistance and Disaster Response, at ICCV*, 2023.

5. J. Zhang, H. Askari, K. Psounis, and Z. Shafiq, "No Video Left Behind: A Utility-
   Preserving Obfuscation Approach for YouTube Recommendations", in *Proceedings of
   PETS*, 2023.

6. A. Elkordy, J. Zhang, Y. Ezzeldin, K. Psounis, and S. Avestimehr, "How Much Privacy
   Does Federated Learning with Secure Aggregation Guarantee?", in *Proceedings of
   PETS*, 2023.

7. H. Qiu, P.-H. Huang, N. Asavisanu, X. Liu, K. Psounis, and R. Govindan, "Auto-
   Cast: Scalable Infrastructure-less Cooperative Perception for Distributed Collabora-
   tive Driving", in *Proceedings of ACM MobiSyS* 2022.

8. J. Zhang, K. Psounis, H. Muhammad, and Z. Shafiq, "HARPO: Learning to Subvert
   Online Behavioral Advertising", in *Proceedings of NDSS*, 2022.

9. L. Clark, C. Andre, J. Galante, B.Krishnamachari, and K. Psounis, "TEAM: Trilat-
   eration for Exploration and Mapping with Robotic Networks", in *Proceedings of the
   18th International Conference on Ubiquitous Robots*, July 2021.

10. L. Clark, J. Galante, B.Krishnamachari, and K. Psounis, "A Queue-Stabilizing Frame-
    work for Networked Multi-Robot Exploration", in *Proceedings of IEEE International
    Conference on Robotics and Automation (ICRA)*, May 2021.

11. P.-H. Huang and K. Psounis, "Efficient User-Cell Association for 360 Video Streaming
    over Wireless Networks", in *Proceedings of IFIP Networking*, June 2020.

12. A. Petropulu, K. Psounis, and A. Al Hilli, "MIMO Radar Privacy Protection Through Gradient Enforcement in Shared Spectrum Scenarios", in *Proceedings of IEEE International Symposium on Dynamic Spectrum Access Networks (DySPAN)*, Newark, NJ, November 2019.

13. E. Alimpertis, A. Markopoulou, C. T. Butts and K. Psounis, "City-Wide Signal Strength Maps: Prediction with Random Forests", in *Proceedings of WWW*, San Fransisco, CA, May 2019. (acceptance rate 15%)

14. A. Dimas, M. Clark, B. Li, K. Psounis and A. Petropulu, "On Radar Privacy in Shared Spectrum Scenarios", in *Proceedings of the International Conference on Acoustics, Speech, and Signal Processing (ICASSP)*, Brighton, UK, May 2019.

15. K. Wang and K. Psounis. "Scheduling and Resource Allocation in 802.11ax", in *Proceedings of IEEE Infocom*, Honolulu, Hi, April 2018. (acceptance rate 19.2%)

16. M. Clark and K. Psounis. "Achievable Privacy-Performance Tradeoffs for Spectrum Sharing with a Sensing Infrastructure", in *Proceedings of the 14th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP WONS)*, 8 pages (no pp. avail.), Isola, France, February 2018.

17. Y. Zhang and K. Psounis. "Efficient MU-MIMO via Switched-beam Antennas", in *Proceedings of ACM MOBIHOC*, 10 pages (no pp. avail.), Madras, India, July 2017. (acceptance rate 17%)

18. M. Clark and K. Psounis. "Designing Sensor Networks to Protect Primary Users in Spectrum Access Systems", in *Proceedings of the 13th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP/IEEE WONS)*, 8 pages (no pp. avail.), Jackson, WY, February 2017. (acceptance rate 30%)

19. P.-H. Huang and K. Psounis. "Efficient mmwave wireless backhauling for dense small-cell deployments", in *Proceedings of the 13th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP/IEEE WONS)*, 8 pages (no pp. avail.), Jackson, WY, February 2017. (acceptance rate 30%)

20. W. Chon Ao and K. Psounis. "An Efficient Approximation Algorithm for Online Multi-Tier Multi-Cell User Association", in *Proceedings of ACM MOBIHOC*, 10 pages (no pp. avail.), Paderborn, Germany, July 2016. (acceptance rate 18.7%)

21. H. Qiu, K. Psounis, G. Caire, K. Chugg and K. Wang. "High-Rate WiFi Broadcasting in Crowded Scenarios via Lightweight Coordination of Multiple Access Points", in *Proceedings of ACM MOBIHOC*, 10 pages (no pp. avail.), Paderborn, Germany, July 2016. (acceptance rate 18.7%)

22. M. Clark and K. Psounis. "Can the Privacy of Primary Networks in Shared Spectrum be Protected?", in *Proceedings of IEEE INFOCOM*, 9 pages (no pp. avail.), San Fransisco, April 2016. (acceptance rate 18.2%)

23. G. Zois, A. Michaloliakos, K. Psounis, V. Vassalos and I. Mourtos. "Non-asymptotic performance bounds for downlink MU-MIMO scheduling", in *Proceedings of the 12th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP WONS)*, 8 pages (no pp. avail.), Italy, January 2016. (acceptance rate 30%)

24. W. Chon Ao and K. Psounis. "Distributed Caching and Small Cell Cooperation for Fast Content Delivery", in *Proceedings of ACM MOBIHOC*, pp. 127–136, Hangzhou, China, June 2015. (acceptance rate 14.8%)

25. M. Clark and K. Psounis. "Efficient Resource Scheduling for a Secondary Network in Shared Spectrum", in *Proceedings of IEEE INFOCOM*, pp. 1257–1265, Hong Kong, April 2015. (acceptance rate 19.0%)

26. R. Pal, L. Golubchik, K. Psounis, and P. Hui. "Will Cyber-Insurance Improve Network Security? A Market Analysis", in *Proceedings of IEEE INFOCOM*, pp. 235–243, Toronto, Canada, April 2014. (acceptance rate 19.4%)

A.10

27. E. N. Ciftcioglu, A. Michaloliakos, K. Psounis, T. La Porta, and A. Yener. "Power Minimization with Quality-of-Information Outages", in *Proceedings of the IEEE Wireless Communications and Networking Conference (WCNC)*, pp. 1655–1660, Istanbul, Turkey, April 2014.

28. R. Pal, L. Golubchik, K. Psounis, and P. Hui. "On A Way to Improve Cyber-Insurer Profits: When A Security Vendor Becomes the Cyber-Insurer", in *Proceedings of IFIP NETWORKING*, 9 pages (no pp. avail.), New York, May 2013. (acceptance rate 26.2%)

29. H. V. Balan, M. Segura, S. Deora, A. Michaloliakos, R. Rogalin, K. Psounis and G. Caire. "USC SDR, an easy-to-program, high data rate, real time software radio platform", in *Proceedings of the ACM SIGCOMM workshop of Software Radio Implementation Forum (SRIF 2013)*, pp. 25–30, Hong Kong, China, August 2013.

30. A. Michaloliakos, R. Rogalin, H. V. Balan, K. Psounis and G. Caire. "Efficient MAC for distributed multiuser MIMO systems", in *Proceedings of the 10th Annual Conference on Wireless On-Demand Network Systems and Services (IFIP/IEEE WONS)*, pp. 52–59, Alberta, March 2013.

31. H. V. Balan, R. Rogalin, A. Michaloliakos, K. Psounis and G. Caire, "Achieving High Data Rates in a Distributed MIMO System", in *Proceedings of ACM MOBICOM*, pp. 41–52, Istanbul, Turkey, August 2012. (acceptance rate 15.1%)

32. M. Mongiovi, A. Singh, X. Yan, B. Zong, and K. Psounis, "Efficient multicasting for delay tolerant networks using graph indexing", in *Proceedings of IEEE INFOCOM*, pp. 1386–1394, Orlando, Florida, March 2012. (acceptance rate 18.0%)

33. R. Pal, L. Golubchik, and K. Psounis. "Aegis: A Novel Cyber-Insurance Model", in *Proceedings of the 2nd Conference on Decision and Game Theory for Security (GameSec 2011)*, pp. 131–150, College Park, Maryland, November 2011.

34. E. N. Ciftcioglu, A. Yener, R. Govindan, and K. Psounis. "Operational Information Content Sum Capacity: Formulation and Examples", in *Proceedings of the 14th International Conference on Information Fusion (FUSION)*, pp. 1–7, Chicago, July 2011.

35. K.-Y. Jang, K. Psounis, and R. Govindan. "Simple Yet Efficient, Transparent Airtime Allocation for TCP in Wireless Mesh Networks", in *Proceedings of ACM CoNEXT*, article no. 28, 12 pages, Philadelphia, December 2010. (acceptance rate 19%)

36. A. Jindal and K. Psounis. "Making the Case for Random Access Scheduling in Wireless Multi-hop Networks", in *Proceedings of IEEE INFOCOM*, (mini-conference), pp. 1–5, San Diego, California, March 2010. (acceptance rate 24%)

37. S. Rangwala, A. Jindal, K.-Y. Jang, K. Psounis, and R. Govindan. "Understanding Congestion Control in Multi-hop Wireless Mesh Networks", in *Proceedings of ACM MOBICOM*, pp. 291–302, San Fransisco, California, September 2008. (acceptance rate 12%)

38. F. Papadopoulos and K. Psounis. "Scaling Properties of IEEE 802.11 Wireless Networks", in *Proceedings of the 6th Intl. Symposium on Modeling and Optimization in Mobile, Ad Hoc and Wireless Networks (WiOpt)*, 8 pages (no pp. avail.), Berlin, Germany, March 2008.

39. W.-C. Liao, F. Papadopoulos and K. Psounis. "Performance Analysis of BitTorrent-like Systems with Heterogeneous Users", in *Proceedings of the 26th International Symposium on Computer Performance, Modeling, Measurements and Evaluation (IFIP Performance)*, pp. 876–891, Cologne, Germany, October 2007. (acceptance rate 23%)

40. W.-J. Hsu, T. Spyropoulos, K. Psounis and A. Helmy. "Modeling Time-variant User Mobility in Wireless Mobile Networks", in *Proceedings of IEEE INFOCOM*, pp. 758–766, Anchorage , Alaska , USA, May 2007. (acceptance rate 18%)

41. A. Jindal, and K. Psounis. "Contention-Aware Analysis of Routing Schemes for Mobile Opportunistic Networks", in *Proceedings of ACM MOBISYS, on the 1st International Workshop on Mobile Opportunistic Networking (MobiOpp)*, pp. 1–8, San Juan, Puerto Rico, June 2007.

42. F. Papadopoulos and K. Psounis. "Predicting the Performance of Mobile Ad hoc Networks Using Scaled-down Replicas", in *Proceedings of IEEE International Conference on Communications (ICC)*, pp. 3928-3935, Glasgow, Scotland, June 2007.

43. T. Spyropoulos, K. Psounis, and C. Raghavendra. "Spray and Focus: Efficient Mobility-Assisted Routing for Heterogeneous and Correlated Mobility", in *Proceedings of IEEE PERCOM, on the International Workshop on Intermittently Connected Mobile Ad hoc Networks (ICMAN)*, pp. 79–85, New York City, USA, March 2007.

44. A. Jindal and K. Psounis. "Fundamental Mobility Properties for Realistic Performance Analysis of Intermittently Connected Mobile Networks", in *Proceedings of IEEE PERCOM, on the International Workshop on Intermittently Connected Mobile Ad hoc Networks (ICMAN)*, pp. 59–64, New York City (USA), March 2007.

45. S. Rangwala, R. Gummadi, R. Govindan, and K. Psounis. "Interference-aware fair rate control in wireless sensor networks", in *Proceedings of ACM SIGCOMM*, pp. 63–74, Pisa, Italy, September 2006. (acceptance rate 12%)

46. T. Spyropoulos, K. Psounis, and C. Raghavendra, "Performance Analysis of Mobility-assisted Routing, in *Proceedings of ACM MOBIHOC*, pp. 49–60, Florence, Italy, May 2006. (acceptance rate 10%)

47. W.-C. Liao, F. Papadopoulos, and K. Psounis. "An Efficient Algorithm for Resource Sharing in Peer-to-peer Networks", in *Proceedings of IFIP Networking*, pp. 592–605, Coimbra, Portugal, May 2006. (acceptance rate 20%)

48. A. Jindal and K. Psounis. "Performance Analysis of Epidemic Routing under Contention", in *Proceedings of IWCMC*, pp. 539–544, Vancouver, Canada, July 2006.

49. K. Psounis, P. Molinero Fernandez, B. Prabhakar, and F. Papadopoulos. "Systems with Multiple Servers under Heavy-tailed Workloads", in *Proceedings of the 24th International Symposium on Computer Performance, Modeling, Measurements and Evaluation (IFIP Performance)*, pp. 456–474, Juan-les-Pins, France, October 2005. (acceptance rate 22%)

50. A. Jindal and K. Psounis. "Modeling Spatially-correlated Data of Sensor Networks with Irregular Topologies", in *Proceedings of IEEE SECON*, pp. 305–316, Santa Clara, California, USA, October 2005. (acceptance rate 27%)

51. T. Spyropoulos, K. Psounis, and C. Raghavendra. "Spary and Wait: An Efficient Routing Scheme for Intermittently Connected Mobile Networks", in *Proceedings of ACM SIGCOMM workshop on Delay Tolerant Networking (WDTN)*, pp. 252–259 Philadelphia, Philadelphia, USA, August 2005. (acceptance rate 22%)

52. J. Faruque, K. Psounis, and A. Helmy. "Analysis of Gradient-based Routing Protocols in Sensor Networks", in *Proceedings of IEEE/ACM DCOSS*, pp. 258–275, Marina Del Rey, California, USA, June 2005. (acceptance rate 28%)

53. K. Psounis, A. Ghosh, B. Prabhakar, and G. Wang. "SIFT: a Simple Algorithm for Trucking Elephant Flows and Taking Advantage of Power Laws", in *Proceedings of the 43rd Allerton Conference on Communication, Control, and Computing*, 10 pages (no pp. avail.), Urbana-Champaign, Illinois, USA, September 2005.

54. F. Papadopoulos, K. Psounis, and R. Govindan. "Performance-Preserving Network Downscaling", in *Proceedings of the 38th Annual Simulation Symposium (ANSS)*, pp. 285–294, San Diego, California, April 2005.

55. A. Jindal and K. Psounis. "Modelling Spatially-correlated Sensor Network Data", in *Proceedings of IEEE SECON*, pp. 162–171, Santa Clara, California, USA, October 2004. (acceptance rate 19%)

56. T. Spyropoulos, K.Psounis, and C. Raghavendra. "Single-copy Routing in Intermittently Connected Mobile Networks", in *Proceedings of IEEE SECON*, pp. 235–244, Santa Clara, California, USA, October 2004. (acceptance rate 19%)

57. R. Pan, B. Prabhakar, K. Psounis, and D. Wischik. "SHRiNK: A Method for Scalable Performance Prediction and Efficient Network Simulation", in *Proceedings of IEEE INFOCOM*, Vol. 3, pp. 1943–1953, San Fransisco, California, USA, April 2003. (acceptance rate 21%)

58. K. Psounis, R. Pan, B. Prabhakar, and D. Wischik. "The Scaling Hypothesis: Simplifying the Prediction of Network Performance Using Scaled-down Simulations", in *Proceedings of ACM HOTNETS*, pp. 35–40, Princeton, New Jersey, USA, October 2002.

59. R. Pan, B. Prabhakar, K. Psounis, and M. Sharma. "A Study of the Applicability of a Scaling Hypothesis", in *Proceedings of ASCC*, 6 pages (no pp. avail.), Singapore, Singapore, September 2002.

60. K. Psounis. "Class-based Delta Encoding: A Scalable Scheme for Caching Dynamic Web Content", in *Proceedings of IEEE ICDCS Workshops*, pp. 799 - 805, Vienna, Austria, July 2002.

61. K. Psounis and B. Prabhakar. "A Randomized Web-cache Replacement Scheme", in *Proceedings of IEEE INFOCOM*, Vol. 3, pp. 1407–1415, Anchorage, Alaska, USA, April 2001. (acceptance rate 23%)

62. R. Pan, B. Prabhakar, and K. Psounis. "CHOKe, A Stateless Active Queue Management Scheme for Approximating Fair Bandwidth Allocation", in *Proceedings of IEEE INFOCOM*, Vol. 2, pp. 942–951, Tel Aviv, Israel, March 2000. (acceptance rate 26%)

63. K. Psounis, R. Pan, and B. Prabhakar. "An Approximate Fair Dropping Scheme for Variable Length Packets", in *Proceedings of Hot Interconnects 8*, pp. 2–10, Stanford, California, USA, August 2000.

64. K. Psounis, B. Prabhakar, and D. Engler. "A Randomized Cache Replacement Scheme Approximating LRU", in *Proceedings of the 34th annual conference on Information Sciences and Systems*, 6 pages (no pp. avail.), Princeton, New Jersey, USA, March 2000.

REFEREED JOURNALS

1. E. Bakopoulou, M. Yang, J. Zhang, K. Psounis and A. Markopoulou. "Location Leakage in Federated Signal Maps", *IEEE Transactions on Mobile Computing*, October 2023.

2. R. Pal, N. Sastry, E. Obiodu, S. Prabhu, K. Psounis. "EdgeMart: A Sustainable Networked OTT Economy on the Wireless Edge for Saving Multimedia IP Bandwidth", *ACM Transactions on Autonomous and Adaptive Systems*, July 2023, DOI: 10.1145/3605552.

3. E. Alimpertis, A. Markopoulou, C. Butts, E. Bakopoulou, K. Psounis. "A Unified Prediction Framework for Signal Maps: Not All Measurements are Created Equal", *IEEE Transactions on Mobile Computing*, October 2022, DOI: 10.1109/TMC.2022.3221773.

4. J. Zhang, L. Clark, M. Clark, K. Psounis and P. Kairouz. "Privacy-utility trades in crowdsourced signal map obfuscation", *Elsevier Computer Networks*, Vol. 215, October 2022. DOI: 10.1016/j.comnet.2022.109187

5. L. Clark, J. Galante, B. Krishnamachari, and K. Psounis. "A Queue-Stabilizing Framework for Networked Multi-Robot Exploration", *IEEE Robotics and Automation Letters*, February 2021, DOI: 10.1109/LRA.2021.3061304.

6. W. Chon Ao, P. Huang and K. Psounis. "Joint Workload Distribution and Capacity Augmentation in Hybrid Datacenter Networks", *IEEE/ACM Transactions on Networking*, Vol. 29, Issue 1, Feb. 2021, DOI: 10.1109/TNET.2020.3027607.

7. R. Pal, K. Psounis, J. Crowcroft, F. Kelly, P. Hui, J. Kelly, A. Chatterjee, L. Golubchil, and S. Tarkoma. "When Are Cyber Blackouts in Modern Service Networks Likely? A Network Oblivious Theory On Cyber (Re)Insurance Feasibility", *ACM Transactions on Management Information Systems*, Article No.: 5, June 2020.

8. M. Clark and K. Psounis. "Optimizing Primary User Privacy in Spectrum Sharing Systems", *IEEE/ACM Transactions on Networking*, Vol. 28, Issue 2, April 2020.

9. W. Chon Ao and K. Psounis. "Resource-constrained Replication Strategies for Hierarchical and Heterogeneous Tasks", *IEEE Transactions on Parallel and Distributed Systems*, Vol. 31, Issue 4, June 2020.

10. K. Wang and K. Psounis. "Efficient scheduling and resource allocation in 802.11ax multi-user transmissions", *Computer Communications, Elsevier*, Vol. 152, pp.171-186, February 2020.

11. R. Pal, L. Golubchik, K. Psounis and T. Bandyopadhyay. "On Robust Estimates of Correlated Risk in Cyber-Insured IT Firms: A First Look at Optimal AI-Based Estimates under Small Data", *ACM Transactions on Management Information Systems*, Article No.: 9, October 2019.

12. Y. Zhang and K. Psounis. "Efficient Indoor Localization via Switched-beam Antennas", *IEEE Transactions on Mobile Computing*, June 2019.

13. P. Huang and K. Psounis, "Optimal Backhauling for Dense Small-Cell Deployments Using mmWave Links", *Computer Communications Journal, Elsevier*, Vol: 139, April 2019.

14. R. Pal, L. Golubchik, K. Psounis, and P. Hui, "Security Pricing as Enabler of Cyber-Insurance: A First Look at Differentiated Pricing Markets", *IEEE Transactions on Dependable and Secure Computing*, Vol. 16, Issue 2, March-April 2019.

15. W. Chon Ao and K. Psounis. "Data-locality-aware User Grouping in Cloud Radio Access Networks", *IEEE Transactions on Wireless Communications*, Vol: 17, Issue: 11, Nov. 2018.

16. Y. Zhang and K. Psounis. "Consistently High MIMO Rates via Switched-beam Antennas", *IEEE/ACM Transactions on Networking*, Vol. 26, Issue: 5, Oct. 2018.

17. W. Chon Ao and K. Psounis. "Fast Content Delivery via Distributed Caching and Small Cell Cooperation", *IEEE Transactions on Mobile Computing*, Vol: 17, Issue: 5, May 2018.

18. R. Pal, L. Golubchik, K. Psounis, "Improving Cyber-Security via Profitable Insurance Markets", *ACM SIGMETRICS Performance Evaluation Review*, Vol: 45, Issue 4, Mar. 2018.

19. M. Clark and K. Psounis. "Trading Utility for Privacy in Shared Spectrum Access Systems", *IEEE/ACM Transactions on Networking*, Vol. 26, Issue 1, February 2018.

20. A. Michaloliakos, W. C. Ao, K. Psounis and Y. Zhang. "Asynchronously Coordinated Multi-timescale beamforming architecture for multi-cell networks", *IEEE/ACM Transactions on Networking*, Vol. 26, Issue 1, February 2018.

21. W. Chon Ao and K. Psounis. "Approximation Algorithms for Online User Association in Multi-Tier Multi-Cell Mobile Networks", *IEEE/ACM Transactions on Networking*, Vol: 25, Issue: 4, August 2017.

22. M. Clark and K. Psounis. "Equal Interference Power Allocation for Efficient Shared Spectrum Resource Scheduling", *IEEE Transactions on Wireless Communications*, Vol: 16, Issue 1, January 2017.

A.14

23. A. Michaloliakos, R. Rogalin, Y. Zhang, K. Psounis and G. Caire. "Performance Modeling of Next-Generation WiFi Networks", *Computer Networks Journal*, Vol. 105, pp.150-165, August 2016.

24. R. Rogalin, O. Y. Bursalioglu, H. Papadopoulos, G. Caire, A. Molisch, A. Michaloliakos, V. Balan, and K. Psounis. "Scalable Synchronization and Reciprocity Calibration for Distributed Multiuser MIMO", *IEEE Transactions on Wireless Communications*, Vol. 13, Issue 4, pp. 1815 - 1831, April 2014.

25. H. V. Balan, R. Rogalin, A. Michaloliakos, K. Psounis and G. Caire. "AirSync: Enabling Distributed Multiuser MIMO with Full Spatial Multiplexing", *IEEE/ACM Transactions on Networking*, Vol. 21, Issue 6, pp. 1681 - 1695, December 2013.

26. A. Jindal and K. Psounis. "On the Efficiency of CSMA-CA Scheduling in Wireless Multihop Networks", *IEEE/ACM Transactions on Networking*, Vol. 21, Issue 5, pp. 1392 - 1406, October 2013.

27. W.-C. Liao, F. Papadopoulos, K. Psounis, and C. Psomas. "Modelling BitTorrent-like systems with many classes of users", *ACM Transactions on Modelling and Computer Simulation*, Vol. 23, Issue 2, Article No. 13, May 2013.

28. A. Jindal, K. Psounis, and M. Liu, "CapEst: A Measurement-based Approach to Estimating Link Capacity in Wireless Networks", *IEEE Transactions on Mobile Computing*, Vol. 11, Iss. 12, pp. 2098–2108, May 2012.

29. S. Rangwala, A. Jindal, K.-Y. Jang, K. Psounis, and R. Govindan. "Neighborhood-centric congestion control for multi-hop wireless mesh networks", *IEEE/ACM Transactions on Networking*, Vol. 19, No. 6, pp. 1797–1810, December 2011.

30. W.-J. Hsu, T. Spyropoulos, K. Psounis and A. Helmy. "Modelling Spatial and Temporal Dependencies of User Mobility in Wireless Mobile Networks", *IEEE/ACM Transactions on Networking*, Vol. 17, Iss. 5, pp. 1564–1577, October 2009.

31. A. Jindal and K. Psounis. "The Achievable Rate Region of 802.11-Scheduled Multihop Networks", *IEEE/ACM Transactions on Networking*, Vol. 17, Iss. 4, pp. 1118–1131, August 2009.

32. A. Jindal, and K. Psounis. "Contention-Aware Performance Analysis of Mobility-Assisted Routing", *IEEE Transactions on Mobile Computing*, Vol. 8, No. 2, 145-161, February 2009.

33. T. Spyropoulos, K. Psounis, and C. Raghavendra. "Efficient Routing in Intermittently Connected Mobile Networks: The Multiple-copy Case", *IEEE/ACM Transactions on Networking*, Vol. 16, Iss. 1, pp. 77–90, February 2008.

34. T. Spyropoulos, K. Psounis, and C. Raghavendra. "Efficient Routing in Intermittently Connected Mobile Networks: The Single-copy Case", *IEEE/ACM Transactions on Networking*, Vol. 16, Iss. 1, pp. 63–76, February 2008.

35. F. Papadopoulos and K. Psounis. "Efficient Identification of Uncongested Internet Links for Topology Downscaling", *ACM SIGCOMM Computer Communication Review (CCR)*, Vol. 37, Issue 5, pp. 39–52, October 2007.

36. W.-C. Liao, F. Papadopoulos and K. Psounis. "Performance Analysis of BitTorrent-like Systems with Heterogeneous Users", *Performance Evaluation Journal*, Vol. 64, Issues 9–12, pp. 876-891, October 2007.

37. F. Papadopoulos, K. Psounis, and R. Govindan. "Performance Preserving Topological Downscaling of Internet-like Networks", *IEEE Journal on Selected Areas in Communications (JSAC)*, special issue on "Sampling the Internet: Techniques and Applications", Vol. 24, No. 12, pp. 2313-2326, December 2006.

38. W.-C. Liao, F. Papadopoulos, and K. Psounis. "A Peer-to-peer Cooperation Enhancement Scheme and its Performance Analysis", *Journal of Communications (JCM)*, Vol. 1, No. 7, pp. 24–35, November/December 2006.

A.15

39. A. Jindal and K. Psounis. "Modelling Spatially Correlated Data in Sensor Networks", *ACM Transactions on Sensor Networks*, Vol. 2, Issue 4, pp. 466 - 499, November 2006.

40. S. Rangwala, R. Gummadi, R. Govindan, and K. Psounis. "Interference-aware Fair Rate Control in Wireless Sensor Networks", *ACM SIGCOMM Computer Communication Review (CCR)*, Vol. 36, Issue 4, pp. 63–74, October 2006.

41. W.-C. Liao, F. Papadopoulos, and K. Psounis. "An Efficient Algorithm for Resource Sharing in Peer-to-peer Networks", *Lecture Notes in Computer Science, Springer*, Vol. 3976/2006, pp. 592–605, April 2006.

42. K. Psounis, P. Molinero Fernandez, B. Prabhakar, and F. Papadopoulos. "Systems with Multiple Servers under Heavy-tailed Workloads", *Performance Evaluation Journal*, Vol. 62, Issue 1–4, pp. 456–474, October 2005.

43. R. Pan, K. Psounis, B. Prabhakar, and D. Wischik. "SHRiNK: A Method for Enabling Scaleable Performance Prediction and Efficient Network Simulation", *IEEE/ACM Transactions on Networking*, Vol. 13, No. 5, pp. 975–988, October 2005.

44. J. Faruque, K. Psounis, and A. Helmy. "Analysis of Gradient-based Routing Protocols in Sensor Networks", *Lecture Notes in Computer Science, Springer-Verlag*, Vol. 3560/2005, pp. 258–275, July 2005.

45. K. Psounis, A. Zhu, B. Prabhakar, and R. Motwani. "Modelling Correlations in Web-Traces and Implications for Designing Replacement Policies", *Computer Networks Journal*, Vol. 45, No. 4, pp. 379–398, July 2004.

46. K. Psounis, R. Pan, B. Prabhakar, and D. Wischik. "The Scaling Hypothesis: Simplifying the Prediction of Network Performance Using Scaled-down Simulations", *ACM SIGCOMM Computer Communication Reviews*, Vol. 33, No. 1, pp. 35–40, January 2003.

47. K. Psounis and B. Prabhakar. "Efficient Randomized Web-Cache Replacement Schemes Using Samples from Past Eviction-Times", *IEEE/ACM Transactions on Networking*, Vol. 10, No. 4, pp. 441-454, August 2002.

48. K. Psounis, R. Pan, and B. Prabhakar. "An Approximate Fair Dropping Scheme for Variable Length Packets", *IEEE Micro*, Vol. 21, No. 1, pp. 48–56, January/February 2001.

49. K. Psounis. "Active Networks, Applications, Security, Safety, and Architectures", *IEEE Communications Surveys Magazine*, Vol. 2, No. 1, pp. 1–16, 1st quarter 1999.

BOOK CHAPTERS

1. K. Psounis and M. Clark. Privacy in Spectrum Sharing Systems with Applications to Communications and Radar, In *Signal Processing for Joint Radar-Communications*, Wiley-IEEE Press, 2021.

INVITED JOURNALS

1. T. Spyropoulos, A. Jindal, and K. Psounis. "An Analytical Study of Fundamental Mobility Properties for Encounter-based Protocols", *International Journal of Autonomous and Adaptive Communications Systems*, Vol. 1, Issue 1, pp. 440, July 2008.

INVITED CONFERENCE PAPERS

A.16

1. L. Clark, M. Clark, K. Psounis and P. Kairouz. "Privacy-utility trades in wireless data via optimization and learning", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 10 pages (no pp. avail.), San Diego, California, USA, February 2019.

2. A. Dimas, B. Li, M. Clark, K. Psounis, A. Petropulu. "Spectrum Sharing Between Radar and Communication systems: Can the Privacy of the Radar be Preserved?", in *Proceedings of the Asilomar Conference on Signals, Systems and Computers*, Pacific Grove, California, USA, October 2017.

3. A. Michaloliakos, W. Chon Ao and K. Psounis. "Joint user-beam selection for hybrid beamforming in asynchronously coordinated multi-cell networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 10 pages (no pp. avail.), San Diego, California, USA, February 2016.

4. Y. Zhang, D. Bethanabhotla, T. Hao and K. Psounis. "Near-optimal user-cell association schemes for real-world networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 10 pages (no pp. avail.), San Diego, California, USA, February 2015.

5. A. Jindal, K. Psounis, and M. Liu. "CapEst: Estimating wireless link capacity in multi-hop networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 6 pages (no pp. avail.), San Diego, California, USA, February 2011.

6. D. Antonellis, A. Mansy, K. Psounis, and M. Ammar. "Real time, distributed network classification for routing protocol selection in mobile ad hoc networks", in *Proceedings of the fourth international wireless Internet conference (WICON)*, 8 pages (no pp. avail.), Maui, Hawaii, November 2008.

7. Y. Wang, A. Ahmed, B. Krishnamachari, and K. Psounis. "IEEE 802.11p performance evaluation and protocol enhancement", in *Proceedings of the IEEE International Conference on Vehicular Electronics and Safety*, pp. 317–322, Columbus, Ohio, USA, September 2008.

8. A. Jindal and K. Psounis. "Achievable Rate Region and Optimality of Multi-hop Wireless 802.11-Scheduled Networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, 7 pages (no pp. avail.), San Diego, California, USA, January 2008.

9. F. Papadopoulos and K. Psounis. "Application of the many sources asymptotic in downscaling Internet-like networks", in *Proceedings of the Information Theory and Applications Workshop (ITA)*, pp. 314–322, San Diego, California, USA, January 2007.

10. A. Jindal and K. Psounis. "Optimizing Multi-Copy Routing Schemes for Resource Constrained Intermittently Connected Mobile Networks", in *Proceedings of the Fortieth Asilomar Conference on Signals, Systems and Computers*, pp. 2142–2146, Pacific Grove, California, USA, October 2006.

| | |
|---|---|
| **Citations** | • Total citations: 14776 |
| | • h-index: 41 |
| | (source: google scholar, accessed: January 2025) |
| **Teaching experience** | • Co-creator and instructor for the USC graduate class EE597: "Wireless Networks". Content: Introduction to current and next generation wireless networking technologies, detailed exploration of fundamental architectural and design principles used at all layers. |
| | • Instructor for the USC graduate class EE503: "Probability for Electrical and Computer Engineering". Content: Probability, discrete and continuous time Markov chains, basic queueing theory. |

- Instructor for the USC undergrad class EE465: "Probabilistic Methods in Computer Systems Modelling". Content: Probability, Markov chains, simulations.
- Creator and instructor for the USC graduate class EE650: "Advance Topics in Computer Networks: Mathematical tools for analyzing wired and wireless networks". Content: Applications to networking problems of probability, queueing, Lyapunov functions, fluid limits, bipartite matchings, stable marriages, random walks on graphs, deterministic and stochastic optimization, statistical analysis, information theory, game theory.

**Issued Patents**

- G. Caire, K. Psounis. Composite beamforming to coordinate concurrent WLAN links. Quantenna Communications, Inc.
  *US Patent No. 9,479,240*, issued Oct. 2016.
- K. Psounis, G. Caire, H. V. Balan. AirSync: enabling distributed multiuser MIMO with full multiplexing gain. USC.
  *US Patent No. 61,651,964*, issued Jan. 2015.
- K. Psounis and J. Jawahar. Method and System for Class-based Management of Dynamic Content in a Networked Environment. Cisco Systems, Inc.
  *US Patent No. 7,802,014*, issued Sep. 2010.
- R. Pan, B. Prabhakar and K. Psounis. A Stateless Active Queue Management Scheme for Approximating Fair Bandwidth Allocation. Stanford.
  *US Patent No. 7,324,442*, issued Jan. 2008.

**Selected Professional Service**

INTERNATIONAL CONFERENCES - ORGANIZING/EXECUTIVE COMMITTEE

- Steering Committee, IFIP/IEEE WONS, 2017 - now.
- General Chair, ACM SIGMETRICS, 2018.
- General Chair, IFIP/IEEE WONS, 2017.
- Program Chair, IFIP/IEEE WONS, 2016.
- Program Chair, IEEE DCOSS workshop on Wireless Sensor Networks (PWSN), 2014.
- Program Chair, ACM MOBICOM workshop on Challenged Networks (CHANTS), 2008.
- Workshop Chair, ACM SIGMETRICS 2008.
- Workshop Chair, USC Workshop on Theory and Practice in Wireless Networks, 2008.
- Publication Chair, ACM SIGMETRICS 2007.
- Panel Chair, ACM MOBIHOC, 2009.
- Panel Chair, IEEE CCW, 2008.

INTERNATIONAL CONFERENCES - TECHNICAL PROGRAM COMMITTEE

- IFIP/IEEE WONS 2013 - 2014, 2018, 2022
- IEEE INFOCOM 2005 - 2020.
- ACM SIGMETRICS 2008, 2014, 2015, 2017, 2020.
- ACM MOBIHOC, 2008 - 2010, 2017-2020.
- WiOpt 2016-2017.
- IEEE SECON 2007 - 2010.
- IFIP NETWORKING 2006 - 2010.
- ACM MOBICOM, 2009.
- IEEE ICNP 2009.

- IEEE WOWMOM workshop on Autonomic and Opportunistic Communications (AOC), 2008 -2009.
- IEEE ICDCS workshop on Delay Tolerant Mobile Networks (DTMN), 2008.
- ACM MOBISYS workshop on Mobile Opportunistic Networks (MOBIOPP), 2007.
- IEEE PERCOM workshop on Intermittently Connected Mobile Ad hoc Networks (IC-MAN), 2007.

JOURNALS

- Editorial Board, IEEE/ACM Transactions on Networking (ToN), 2015 - 2020.
- Editorial Board, IEEE Transactions on Mobile Computing (TMC), 2009 - 2019.
- Editorial Board, Computer Networks Journal, Elsevier, 2009 - 2010.
- Editorial Board, International Journal of Autonomous and Adaptive Communications Systems (IJAACS), 2008.
- Reviewer of IEEE/ACM Transactions on Networking, IEEE Journal on Selected Areas in Communication, IEEE Transactions on Parallel and Distributed Systems, IEEE Transactions on Mobile Computing, ACM Transactions on Sensor networks, Elsevier Computer Networks Journal, Elsevier Performance Evaluation Journal, Elseviers Ad Hoc Networks Journal, Transportation Research Journal Part C, IEEE Transactions on Automatic Control.

GOVERNMENTAL AGENCIES

- NSF ML panel, 2020.
- NSF CAREER panel, 2019.
- NSF EARS meeting, 2016.
- NSF Future Internet Architecture Summit participant, 2009.
- NSF CRI panel member, 2008.
- NSF Wireless mobile workshop participant, 2007.
- NSF NeTS-NOSS panel member, 2005.
- Reviewer of NSF NeTS proposals.

**Professional Associations**

- Institute of Electrical and Electronic Engineers (IEEE):
  IEEE Fellow, 2018 - now.
  Senior Member, 2008 - 2017.
  Member, 1998 - 2008.
- Association for Computing Machinery (ACM):
  ACM Distinguished Member, 2019 - now.
  Senior Member, 2009 - 2018.
  Member, 2001 - 2008.
- Technical Institution of Greece (TEE), 1997 - now.

**Languages**    English, Greek, French.

**Personal**    Married, three children.

A.19

## Appendix B: Litigation Materials Relied Upon

*Pleadings*
- Consolidated Class Action Complaint (ECF No. 92)
- Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 546)
- Plaintiffs' Renewed Motion for Class Certification (ECF No. 750-1)

*Expert Reports & Declarations*
- Expert Class Certification Report of Professor Zubair Shafiq (ECF No. 750-4)
- Expert Class Certification Report of Professor Christopher Wilson (ECF No. 750-6)
- Rebuttal Expert Class Certification Report of Professor Zubair Shafiq (ECF No. 750-10)
- Rebuttal Expert Class Certification Report of Professor Christopher Wilson (ECF No. 750-12)
- Expert Report of Dr. Aaron Striegel (684-22)
- Expert Report of Dr. Konstantinos Psounis (ECF No. 684-23)
- Declaration of Glenn Berntson (ECF No. 592-1)
- Supplemental Expert Class Certification Report of Professor Zubair Shafiq (ECF No. 750-8)
- Supplemental Expert Report of Dr. Aaron Striegel

*Produced Documents*
- GOOG-HEWT-00494721
- GOOG-HEWT-00494724
- GOOG-HEWT-00494727
- GOOG-HEWT-00494730
- GOOG-HEWT-00494733
- GOOG-HEWT-00494736
- GOOG-HEWT-00494738
- GOOG-HEWT-00494739

**Appendix C: Location Analysis for Additional Plaintiffs**

1. In this Appendix, I present maps showing location analyses based on RTB bid request data for the rest of the Plaintiffs.

2. Consider Kimberley Woodruff. The shared truncated coordinates, her address and the associated truncated coordinates, as well as the various metrics related to attempting to estimate her address from the shared truncated coordinates and the lowest possible accuracy field value, which equals ███ meters in her case, as shown in Table 2. It is evident even to the naked eye that there are thousands of households in the uncertainty area of size more than ██ square kilometers. Note that because this is a sparsely populated rural area, the estimated number of households is actually smaller than that for Christopher Valencia, and equals ████—but this is still a very large number. Also note that I zoom in the center of the uncertainty area to better show the two orange areas, the one that corresponds to the truncated coordinates shared by RTB, and the one that corresponds to the truncated coordinates that corresponds to the actual address of the plaintiff. An RTB participant that ignored the accuracy field value would be looking at the wrong area and be unable to locate Woodruff's actual address.

C.1



3.  Next I will present the map for Rethena Green. The lowest accuracy field value in her case equals ▇▇ meters and the rest of the relevant numbers are in Table 2. Notably, an RTB participant can at best compute an uncertainty area of ▇▇ square kilometers with an estimated number of households equal to ▇▇, and cannot know which of these thousands of households is Green's.[24] Last, note that the city of Las Vegas has experienced a large population growth since 2010 that the population dataset has been created, thus this is quite a conservative estimate.

---

[24] Note that when I used Google maps to find the GPS coordinates for the address of Rethena Green I got (▇▇▇▇▇▇▇) which rounds to (▇▇▇▇▇▇) and not to (▇▇▇▇▇▇) as Dr. Shafiq has stated. Thus Dr. Shafiq's "error" using his method is not "0.00 = 0 km." This is of little significance in view of the fundamental flaws in Dr. Shafiq's location analysis established in detail already—what matters is that there are thousands of addresses within the smallest possible uncertainty area—but it further calls into question his conclusions.

C.2



4.  There are three more plaintiffs and I show the three maps below without further commenting, as each of them demonstrates the same point: RTB bid requests' geolocation fields yield only a large areas of uncertainty, spanning numerous households, and do not allow participants to locate individuals with anywhere near the low error rates that Dr. Shafiq claims. The corresponding uncertainty areas are reported in Table 2.

C.3



C.4

