**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**DiCELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
Corban Rhodes (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*
*crhodes@dicellolevitt.com*

**DiCELLO LEVITT GUTZLER LLC**
Amy Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn St., 6th Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*scruz@dicellolevitt.com*
*aprom@dicellolevitt.com*

*Co-Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 4:20-cv-05146-YGR-SVK<br><br>**JOINT REBUTTAL DECLARATION OF JASON "JAY" BARNES, LESLEY WEAVER, AND DAVID STRAITE IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR DISCOVERY MISCONDUCT** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

We, Jay Barnes, Lesley E. Weaver, and David A. Straite, hereby declare under penalty of perjury:

1.      We are co-counsel of record for Plaintiffs in this matter and jointly submit this rebuttal declaration ("Joint Rebuttal Declaration") for the purpose of responding to and correcting facts asserted in Google's July 1, 2022 Opposition to Plaintiffs' Motion for an Order of Sanctions for Google's Discovery Misconduct (Dkt. 748) ("Google's Opposition" or "Opp.").

2.      The statements herein are based on personal knowledge, and if called as witnesses, we could testify competently to the facts set forth herein.

## I.      THE "NOT-SYNCED" SIGNALS

### A.      Evidence Rebutting Google's Argument that the Not-Synced Signals Were Publicly Disclosed

3.      Google's Opposition asserts that Not-Synced signals were "publicly disclosed in chrome://sync-internals/, publicly available source code at https://source.chronmium.org/chromium, and can be observed through inspecting network traffic with chrome://net-export/." Opp. at 4:5-6. We are not aware of any evidence, expert or otherwise, supporting Google Counsel's characterization of this public document.

4.      In contrast, attached hereto as **<u>Exhibit 13</u>** is the rebuttal expert declaration of Richard Smith dated July 21, 2022 ("Smith Rebuttal"), concluding that Google's assertion is misleading.[1]

### B.      Evidence Rebutting Google's Argument that Google's October 2021 Responses to RFAs Cured Earlier False Statements Regarding the Not-Synced Signals

5.      Google's Opposition also asserts that Google "confirmed the existence of [Not Synced] signals on October 12, 2021 in response to Plaintiffs' request for admission[.]" Opp. at 4:9-11. In support, Google cites to its written responses to Plaintiffs' First Set of Request for Admission ("RFA") Nos. 13 and 18; *see also* Declaration of Google counsel Alyssa Olson dated July 1, 2022 ("Olson Decl." Dkt. No. 748-4), attaching Google's responses to the RFAs as Olson Ex. 4.

6.      Omitted from Google's argument, however, are the relevant facts and circumstances surrounding Plaintiffs' attempt to get Google to clarify these very responses.

7.      Plaintiffs served RFA Set No. 1 on September 10, 2021. Google served it responses

---

[1]    Exhibits to this Joint Rebuttal Declaration start with Exhibit 13, continuing the sequential numbering of Exs. 1-12 to the original Joint Declaration dated May 24, 2022 (Dkt. No. 670-1).

and objections on October 12, 2021 (in the record as Olsen Ex. 4, as noted above).

8.      RFA No. 13 asked Google to "[a]dmit that Chrome sends a Signal to Google that a Chrome user is not synced but signed-in to a Google Account[.]" Google refused to admit, instead stating that it "*may* send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled[.]" (emphasis in original). Google otherwise denied the request and did not disclose any signals by name.

9.      RFA No. 18 asked Google to "[a]dmit that Chrome sends a Signal to the Google sync service when a Chrome user clicks to turn off sync[.]"  Google refused to admit, instead stating that "an instance of the Chrome browser *will attempt* to send a request to the Google sync service when a Chrome user clicks to turn off sync[.]"

10.     Google made it impossible to discern whether and to what extent Google was admitting to anything, in the context of all its responses to written discovery and its earlier statements that "Not Synced" signals did not exist. *See* Ex. 3 (Google asserting "Google does not have any logs showing when a user is not synced"); Mar. 5, 2021 Hr'g Tr. at 14:13-20 ("sync traffic logs will not show data for that user who has not enabled sync"). For example, RFA No. 11 asked Google to "[a]dmit that Chrome sends a Signal to Google that indicates when a Chrome user is not synced[.]" Google refused to fully admit, and instead responded:

> "[I]f a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and did not have sync enabled on the Chrome browser, then Google may send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome browser at that time. This bit is only sent if the user is also signed into their Google Account at the browser level. Google otherwise denies this request."

11.     Similarly, in response to RFA No. 12, Google *denied* that "Chrome sends a Signal to Google that indicates when a Chrome user is not signed-in and not synced."

12.     Google's October 2021 RFA responses were also inconsistent with its Interrogatory responses and disclosures in the Special Master process. For example, until the last day of discovery, Google represented, in verified Interrogatory responses, that there was only one not synced signal (which we later learned was called " ▮▮▮▮▮ *See* Joint Decl. ¶ 34.

13.     Also, as discussed below, on November 23, 2021, in response to the Court's sealed

1    order dated November 12, 2021, Google identified ███ data sources that record ████████, but only

2    provided field descriptions for ███ of the ███ and further represented that Google only logs synced

3    users:

4          a.    ████████████████████████████

5          b.    ████████████████████████████████

6                ████████████████████████████████

7                signal is "████████████████████████████." (emphasis

8                added).

9    14.    Plaintiffs were unable to discern any possible reason why Google's supposedly

10    "curative" disclosures were so wildly inconsistent with each other:

11          a.    Google's RFA responses suggested that there "may" be *two* not synced

12                signals, but not identifying them by name.

13          b.    Google's later verified ROG responses, in contrast, said there was *only one*

14                not synced signal, a false statement that Google only corrected 8 minutes

15                before the end of fact discovery the following March.

16          c.    Google's November 23, 2021 responses in the Special Master process,

17                pursuant to the Court's sealed order of November 12, 2021, said there were

18                ***none***, disclosing only a "████████████" signal, and asserting in the

19                field description that it was only logged if the Chrome user had the feature

20                <u>enabled</u>.  There were no other field descriptions provided that describe the

21                logging of sync status.  Plaintiffs would later learn that this disclosure was

22                also false: this signal is actually the ███ signal showing when sync is ***not***

23                enabled.

24    15.    In light of Google's contradictory statements, on November 30, 2021, Plaintiffs sent

25    a letter to Google identifying these deficiencies (among others) and requesting time to meet and

26    confer. A copy of this letter, ignored in Google's Opposition, is attached hereto as **<u>Exhibit 14</u>**.

27    16.    Relevant here, Plaintiffs specifically requested clarification as to Google's responses

28    regarding the assertion that Google "*may send a bit, which depending on the circumstances, may*

1    indicate to Google[.]"

2        17.    Receiving no response, Plaintiffs followed up via email on December 6, 2021, a

3    copy of which is attached hereto as **Exhibit 15**.

4        18.    Still receiving no response, Plaintiffs again followed up via email on December 13,

5    2021. *See id.*

6        19.    Still receiving no response, Plaintiffs again followed up via email on December 16,

7    2021. *See id.* In this email, Plaintiffs stated that if no response was forthcoming, then the issues

8    would be at impasse and Plaintiffs would seek to brief it before the Court.

9        20.    In response to Plaintiffs' fourth attempt above, Google finally responded that it was

10   "working on [its] response" and was "hopeful that we will be able to resolve or at least narrow many

11   of the issues [] raised[.]" *Id.*

12       21.    On December 23, 2021, Google finally provided its response, via letter.  In that letter,

13   attached hereto as **Exhibit 16**, Google changed course and refused to provide any clarification of

14   its RFA responses: "Google has sufficiently responded and objected to these Requests…and will

15   not amend our responses and objections[.]"

16       22.    On December 30, 2021, Plaintiffs again requested to meet and confer and clarify

17   what Google meant when it said "Chrome *may send a bit, which depending on the circumstances,*

18   *may indicate to Google* that sync is not enabled on the Chrome browser…." *See* **Exhibit 17.** Google

19   refused Plaintiffs' request to meet and confer.

20       23.    On January 13, 2022, Plaintiffs took the deposition of Google employee, Tim

21   Schumann, whom Plaintiffs understand is in charge of the sync server logs.  Mr. Schumann's

22   testimony clarified some of the ambiguity in Google's RFA answers as follows:

23               a.    Chrome sends Not Synced signals to the Sync server when a Chrome user is

24                     using the browser in a Not Synced state (*see* **Exhibit 18,** Schumann Dep.

25                     38:7-25; 58:1-8);

26               b.    Google stores Not Synced signals in ███████ with other Google Account-

27                     keyed information (*see id.* at 79:10-25, 125:10-16);

28               c.    Google creates an "████████" called ████████████

that contains ███████ Google Account identifiers, and device identifiers for purposes of tracking Chrome usage (*see id.* at 129:18-130:20);

    d.   Google can "█████████████████" from ███████ to identify Google Account using Chrome in a Not Synced state, but after that "████████ ███████████████████████████████[]" (*id.* at 131:18-132:9);

    e.   ███████ stores the Not Synced data for approximately 60 days (*see id.* at 188:17-189:10);

    f.   The process of compiling a list of Not Synced users would "███████ and involve ███████████████ which Mr. Schumann testified would be related to the approval process necessary to compile such a list (*id.* at 94:25-97:14);

    g.   The sync traffic logs "████████████████████████" for "███████ ████████████████████████████████" (*id.* at 100:3-102:19).

**C.    Evidence Rebutting Google's Assertion that it Complied with the Court's Sealed Order of November 12, 2021**

24.    On November 12, 2021, the Court ordered Google to produce a list of the data sources containing ███████ and a list of "ALL fields with their descriptions" for those data sources. Sealed Order of November 12, 2021, Ex. 1, *Calhoun* Section 3 (Dkt. 377) (emphasis in original).

25.    Google asserts that it produced the required information on November 23, 2021.

26.    Google's assertion is incorrect. Google did not, in fact, produce a list of ALL fields and their descriptions for data sources containing █████ signals and therefore did not comply with the Court's order. Google identified ██ data sources as containing ███████ signals:

███████████████████████████
███████████
████████████
█████████████████
████████████

*See* 2021-11-18 *Calhoun* Omnibus Sheet, Tab 3.3.2 ███ Signals.[2]

27.    However, Google only provided the field names and descriptions for one of these the "████████████" data source, highlighted in blue above.  Google listed ██ fields for this source, including ████████████ which Google  incorrectly described as recording who was synced rather than who was not synced ████████████." *See* 2021-11-18 Calhoun Omnibus Sheet, Tab  3.3.2 ████████ Row ██ (emphasis added) (produced to Plaintiffs on November 23, 2021).  Plaintiffs understood the phrase "████████████" to mean that the "███ of this data parameter may only be logged when the "████" is enabled.

28.    Google's November 23, 2021 production also did not include the ████████ in its list of signals to the sync server log, nor did Google produce the field names and descriptions for the other data sources as ordered by the Court. This omission is notable because Google disclosed ██ other field names. On December 21, 2021, Plaintiffs served their Fifth Set of Interrogatories, seeking further clarification of Google's representations regarding the existence and storage of Not Synced signals.  On January 31, 2022, Google served its responses to Plaintiffs' fifth set of interrogatories. *See* Olson Decl. Ex. 5. But these responses shed no further light on the Not Synced signals. For example, Interrogatory No. 28 requested that Google:

> Identify where Chrome sends the "bit" that "indicate[s] to Google that sync is not enabled on that Chrome browser at that time," all locations where the "bit" is stored or transmitted by Google, what other information is contained in the same storage locations associated with the "bit," including information that would identify a Google Account, and how long the "bit" is stored in

---

[2] Due to the voluminous nature of the referenced Google productions and documents, out of respect for the limited resources of the Court, not every cited document has been attached to this declaration. Plaintiffs will of course provide any or all documents upon request.

each location. *See*, *e.g.* Google's Resp. to RFA No. 14.

In response, Google identified only two data sources, the ███████████ and ███████

data source, not even the full ██ data sources identified pursuant to the November 12, 2021 Sealed

Order. Google has given no explanation for the discrepancy.

**D.    Evidence Rebutting Google's Assertion that Plaintiffs Did Not Accept an Offer of Additional Discovery**

29.    Google's Opposition also asserts that it "offered additional discovery on [Not Synced] signals that Plaintiffs failed to accept," Opp. at 5:8-15, which included a preservation proposal. Leaving aside the fact that a preservation proposal is not an "offer of additional discovery," Google's statements in the Opposition regarding the offer are false.

30.    Google's preservation "offer" on August 27, 2021 was to take a random daily sample of ██████████████████████████████" that "█████████████████████ ████████████████████." Dkt. 293-4. But this preservation offer was not, as Google argues, a disclosure of any Not Synced signals, but instead the exact opposite: it was an offer to preserve information from synced users.

31.    Specifically, Google's Opposition asserts that Google offered to preserve (unnamed) signals showing "whether" a user was synced. But this is untrue. Plaintiffs specifically asked counsel for Google if Google's proposal would account for any existing Not Synced signals. Google refused to answer the question, but confirmed that its proposed sample would only include a "█████████████████████████" and "████████████████████████████ ████████████████████" **Exhibit 19.**

32.    Google's Opposition claims that Google offered to preserve information showing "***whether***" a user was synced, but this is flatly untrue – ***Google altered the quote for the Opposition brief***; instead, Google offered the opposite: to preserve "████████████████████████ ██████." Google then made the offer even clearer by saying in the same email that this phrase means the information ████████████████████████████████████████ ██████████" To ensure an accurate record without the adulteration caused by Google's bad-faith artistic edits, a screenshot of Google's offer is included here, including the red text added by Google counsel in the original:



33.    Google's further assertion that Plaintiffs "refused" to depose Mr. Schumann is also factually incorrect. Plaintiffs did take the deposition, but 3 months later with Google's agreement, to allow for the production of critical evidence in advance.  For example, the Court revised and adopted the First Special Master order on November 12, 2021, requiring Google to produce information  directly relevant to Mr. Schumann; Plaintiffs were also attempting to get Google to clarify its contradictory and vague RFA responses prior to Mr. Schumann's deposition. Far from "refusing" discovery, Plaintiffs were fighting for more discovery in advance of the deposition, a decision that proved wise.

## II.    PRODUCTION OF NAMED PLAINTIFF INFORMATION

### A.    Contrary to its Assertions in the Opposition, Google Failed to Timely Disclose and Produce Already Searched, Segregated and Preserved Named Plaintiff Data

34.    Throughout the entirety of fact discovery, Plaintiffs were denied any insight into the contents of the Gaia ███ data source.  Several months later, on May 9, 2022, Plaintiffs finally received a chart of "column" names in Gaia ████ (along with annotations) showing that at least ███ of the Gaia ██████ contain Zwieback identifiers. *See* **Exhibit 20**, Rebuttal Declaration of Prof. Zubair Shafiq dated July 21, 2022, "Shafiq Rebuttal", at § C. That is, Google in fact associates Zwieback, a purportedly "unauthenticated" identifier, with Gaia, which is an "authenticated" identifier. Evidence of this association goes to a key dispute in this litigation – whether Zwieback is personally identifiable information.

35.    Google also refused to produce critical Plaintiff data from Gaia ████ related to revenues on the pretext of undue burdens.  When the final tranche of information was finally produced on June 30, 2022, it confirmed that Gaia ██████ contains information from ████ ████████ and ████████████ logs, which, in turn contain the following highly relevant information: (1) ████████████; (2) ██████████████████████; (3) █████████████████; (4) ████████████████████████████████████; (5) ████████████████████████; and (6) █████████████████████████████████████████████████. ██████. Shafiq Rebuttal §§ B, C.

### B.    Rebuttal to Google's Assertion That It Searched for Biscotti-keyed Information

36.    Google's Opposition also asserts that Google complied with the April 30, 2021 Order by "searching both the authenticated *and* unauthenticated identifiers that Named Plaintiffs provided, and produc[ed] the associated data." Opp. at 10:3-5. This assertion is false.

37.    The "unauthenticated" identifiers provided by Named Plaintiffs include the Biscotti identifiers. *See* Joint Decl. ¶ 71.

38.    Google did not start to preserve the Biscotti-keyed information for Named Plaintiffs for many months, resulting in much of it being auto-deleted; Google's claim that it "searched" for

data actually means Google searched for data it knew to be already mostly deleted. *See* Joint Decl.
¶¶ 69-83.

### C.    Google Failed to Preserve and Produce Zwieback-keyed Information

39.    Google's Opposition also asserts that "Zwieback ID is not used to key the data at issue[.]" Opp. at 11, n.11. This assertion is false.

40.    The "data at issue" has always encompassed Zwieback-keyed data, as confirmed by multiple orders of this Court and the Special Master.  The following facts rebut Google's assertion in the Opposition that Zwieback IDs are not used to key relevant data:

a.    The unauthorized transmission of Zwieback-keyed information was alleged, extensively, throughout the Complaint and First Amended Complaint. *See* Dkt. 1, Compl., ¶¶ 49, 158, 161, 170, 172, 177, 183, 188, 190 (filed July 2020); Dkt. 163, First Am. Compl. ¶¶ 7b, 74, 148, 152-56, 157-58, 179, 255, and 298 (filed April 2021).

b.    As noted above, Google's Opposition asserts that it complied with the April 30, 2021 Order by "searching both the authenticated *and* unauthenticated identifiers that Named Plaintiffs provided, and produc[ed] the associated data." Opp. at 10:3-5.  The "unauthenticated" identifiers provided by Named Plaintiffs to facilitate Google's search included the Zwieback identifier. *See* Joint Decl. ¶ 71.

c.    On September 30, 2020, in response to Plaintiffs' First Set of Requests for Production of Documents, Google stated that it would be producing discovery about Google Ads, i.e. Zwieback-related information. *See* **Exhibit 21.** For example, in response to Request Nos. 6 and 7, Google stated it would produce responsive documents related to, among other things, "Google Analytics, Google Ad Manager and *Google Ads*."

d.    On April 9, 2021, during the first Rule 30(b)(6) deposition relating to the log preservation, Plaintiffs' counsel asked Google representative, David Monsees, where data shown in a sample transmission to www.google.com

(Zwieback) in ¶ 158 of the original Complaint (now First Am. Compl. ¶ 165) would be sent and stored at Google. Mr. Monsees did not know the precise location but testified that he:



**Exhibit 22**, Google 30(b)(6), Monsees I, at 242:22-243:19. Plaintiffs' attempt to follow up on this issue was interrupted by counsel for Google's request for a break, mid-question. *Id.* at 243:21-25.

e.    On April 29, 2021, the Court heard its first argument on Plaintiffs' Request for Production of Named Plaintiff Data, RFP No. 5. During the hearing, Plaintiffs' counsel raised the specific topic of Google Ads identifiers, mentioning Zwieback specifically and suggesting a compromise requiring Google to:



Apr. 29, 2021 Hr'g Tr. 40:19-41:10. Google counsel did not object or assert that Zwieback was not relevant to the case. Instead, Google counsel acknowledged that Zwieback was like a "▮▮▮▮▮▮▮" uniquely identifying the car being driven by the Plaintiff. *Id.* at 43:5-12.

f.    On May 3, 2021, Plaintiffs provided identifiers for newly-added Plaintiffs, including Google Ads identifiers and a specific list of disclosures associated with Google Ads.

g.    On May 4, 2021, Google responded, not by objecting that Google Ads identifiers were out of scope, but instead by requesting the newly added Plaintiffs "promptly provide requisite [SCA] consent" necessary for

production.

h.  On June 4, 2022, in advance of the second 30(b)(6) deposition of Google representative David Monsees, Plaintiffs' counsel sent Google two letters apprising Google that they would seek specific answers about Zwieback and transmissions to Google.com in the 30(b)(6) deposition.

   i.  In the first letter, Plaintiffs specifically identified Zwieback_ID as an identifier for which they expected Google to provide answers. *See* **Exhibit 23**. Google did not object that Zwieback was "out-of-scope."

   ii.  In the second letter, Plaintiffs provided Google with examples of prospective deposition exhibits relating to the allegations in the Complaint and First Amended Complaint. *See* **Exhibit 24.** The examples contained transmissions from Chrome to Google.com when a Named Plaintiff was on a non-Google website and where Zwieback and Gaia-keyed cookies and the content of the Plaintiffs' communications were sent to Google even though the Named Plaintiff was not synced. *See id.* Google did not object that Zwieback or transmissions to Google.com were out-of-scope. Nor could it. The examples were taken directly from Plaintiffs First Amended Complaint ¶ 177. *See id.*

i.  During the second 30(b)(6) deposition on June 11, 2022, Plaintiffs asked Google representative, David Monsees, specific questions about Chrome transmission to Google.com from non-Google websites. *See* **Exhibit 25**, Google 30(b)(6), Monsees II, at 612:18-613:7; 616:15-617:4 (testifying, "█████ ████████████████" that examples of Zwieback transmissions from FAC ¶ 168 ██████████████████████████████████████████"). Mr. Monsees testified that the Zwieback transmission in FAC ¶ 165 was ██████████████████" (*id.* at 636:5-9) and the Zwieback transmission in FAC ¶ 177 would likely be stored ████████████████

1          ▮▮▮▮▮▮▮▮ *Id.* at 637:1-19.

2          j.    Google did not object to these questions. Nor could it. The questions were

3                taken directly from the allegations of Plaintiffs' Complaint and First

4                Amended Complaint. In addition to not objecting to Zwieback or

5                transmissions to Google.com, Google prepared its witness in advance with a

6                ▮▮▮▮▮▮▮▮" that described the Zwieback_ID as ▮▮▮▮▮▮▮▮

7                ▮▮▮▮▮▮ which was "▮▮▮▮." *See id.* at Monsees Ex. 59 at 3.

8                It provided further information about the NID cookie – which is a Zwieback

9                cookie. *Id.*

10         k.    On December 22, 2021, in its opposition to class certification, Google

11               conceded that Zwieback is part of this case. *See* Joint Decl. ¶ 91.

12    41.   The April 30, 2021 Order specifically included Zwieback-keyed information as part

13  of the Plaintiff production. *See* Joint Decl. ¶ 86, citing Dkt. 173. The Court confirmed its directive

14  in subsequent orders, including:

15         a.    On October 1, 2021, the Court acknowledged that Zwieback-keyed

16               information was alleged by Plaintiffs and part of the case. *See* Dkt. 329.

17         b.    On November 12, 2021, the Court ruled that Zwieback is a relevant identifier

18               in this case. *See* Joint Decl. ¶ 89, citing Dkt. 378.

19         c.    On January 5, 2022, the Special Master ordered that "▮▮▮▮▮▮▮▮

20               ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21               ▮▮▮▮▮▮▮." *See* **Exhibit 26**.

22         d.    On February 27, 2022, the Special Master ordered that Google ▮▮▮

23               ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24               ▮▮▮▮▮▮▮." **Exhibit 27.**

25         e.    On July 5, 2022, the Court ordered the parties to discuss preservation of

26               Zwieback data sources. Dkt. 749.

27         f.    On July 15, 2022, the Court issued a Preservation Order which required ▮▮▮

28               ▮▮▮▮▮▮▮▮▮▮▮. *See* Dkt. 766.

42.    Google's Opposition also falsely asserts that (1) Zwieback is not relevant to Google's tracking of Not Synced users on non-Google properties; (2) direct Search logs are not relevant to this action. Opp. at 11, n.11. Testimony obtained by Plaintiffs, and documents produced by Google on June 30, 2022, conclusively demonstrate that these misrepresentations are false. The following facts rebut Google's assertions in the Opposition:

   a.    On March 30, 2022, Google employee Vic Liu admitted that Chrome sends Not Synced Zwieback-keyed Information from communications on "non-Google websites" to Google.com. *See* **Exhibit 28**, Liu Dep. at 19:22-20:10. Mr. Liu stated that these transmissions are "*completely disjoint* from the information that Display Ads system gathers from that browser regarding … some activities … on a non-Google website." *Id.* at 66:18-68:4. By "completely disjoint," Mr. Liu explained that a team referred to as "A1", which is charged with gathering information for Google Search, Gmail, and Google Shopping from non-Google websites, keys the data by Zwieback, while Display Ads keyed it by Biscotti. *Id*. In addition, Mr. Liu admitted that Zwieback-keyed data is used to build "the set of data or user profile" from "user's browsers" on non-Google websites. *Id*. at 17:22-18:2. The "profile data" Google derives from activity on non-Google websites that is "sent from a browser to Google" is "used to inform Search Ads shown to a person." *Id*. at 47:22-48:19. Despite being "completely disjoint" from Display Ads or Analytics logging, Google never disclosed additional Zwieback logs about activity that occurs on non-Google websites.

   b.    On June 30, 2022, Google produced information it had previously searched, segregated, and preserved from *direct* searches at Google.com, i.e. communications when the user was knowingly sending a communication to Google via Google.com. This production shows that ▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

██████████████████████████. This proves that Google uses the personal information that Chrome sends, without authorization, to Google.com on non-Google websites to derive additional profits through its eponymous search engine.

43. Google delayed in producing Zwieback information.

   a. On February 25, 2022, two weeks before the close of fact discovery, Google produced Zwieback ████████ information that revealed Google had concealed the fact that Zwieback ████ contains (1) ████████ ████████; (2) ████████████████████; (3) ████████████████████; (4) ████████████████████; (5) ████████████; and (6) ████████. *See* Shafiq Rebuttal ¶ 31.

   b. On May 9, 2022, two months *after* the close of fact discovery, Plaintiffs received Gaia ████████ that revealed Google had concealed the fact that Gaia ████ contains (1) ████████; (2) ████████████████; (3) ████████████████; and (4) ████████████████. *See* Shafiq Rebuttal ¶ 32.

   c. On June 15, 2022, three months *after* the close of fact discovery, Google admitted that Google stores ████████████████ in Zwieback ████. *See* Dkt. 713-4 at 8. It attempted to retract its admission regarding ████████ on June 29, 2022. *See* Dkt. 740. Yet, in the same filing, Google disputed that it comingled Zwieback and Gaia.

   *d.* On June 30, 2022, Google produced long concealed Plaintiff data demonstrating how its eponymous search engine uses and profits from the personal information that Chrome sends to Google.com without authorization for not synced users on non-Google websites. *See* Shafiq

Rebuttal ¶ 22.

44.    Google's Opposition also incorrectly states that Zwieback is not relevant.  But the facts confirm that Zwieback goes to the nature and scope of disclosure, revenue and damages, among other issues.  The following facts rebut Google's Opposition:

a.    On December 2, 2021, Google employee Chris Liao admitted that Google Ads "



." **<u>Exhibit 29</u>**, Liao Dep. at 162:17-24.

b.    The majority of Plaintiffs' unjust enrichment damages stem from Google Ads and YouTube. *See, e.g.,* Dkt. 482-9 at 19, Rebuttal Rpt. of Dr. Russell W. Mangum ISO of Class Cert, at 19 (citing Google studies relating to Google Ads, not Display Ads, which conclude that "



").

**D.    Google's Production of Named Plaintiff Data Consisted of Large Volumes of Unreadable Information**

45.    Google has also not fully complied with the Court's orders because most of the ▮▮▮▮ data was produced in unreadable format, a fact that Google does not deny. Plaintiffs now understand that this is the most critical of the Plaintiffs' data.

46.    Prior to March 10, 2022, Plaintiffs understand that Google was producing information from ▮▮▮▮ and ▮▮▮▮ logs (among other sources) in decoded format. That is to say, many of Google's sources store data in nested key-value pairs. The values correspond to field names and subfield names, but, absent a translation by Google, it is impossible to discern the context of the coded information. For example, on January 8, 2022, Google produced searches from Gaia ▮▮▮▮ In this production, Google decoded the key values to its corresponding field name, e.g. the numerical value of "▮" was decoded to ▮▮▮▮.

47.    On March 10, 2022, after months of litigation and only after a Special Master order to do so, Google finally produced searches from Gaia ▮▮▮▮ and Zwieback ▮▮▮▮ But, rather

than decode this production (as it had in the past), the March 10, 2022 production was provided in encoded format, depriving Plaintiffs of the ability to review and assess the information provided.

48.    The March 10, 2022 production contains ▮▮▮▮▮▮▮ of encoded values (e.g., hex, integers, floating point numbers, or strings). This includes coded fields and subfields. Absent translation by Google this information is incomprehensible.

49.    In some instances, the March 10, 2022 production translated the field name but not the subfields. For example, in the below figure, the production provides ▮▮▮▮▮▮▮▮▮▮▮". Google provides the field name ▮▮▮▮▮▮▮" but refuses to decode the subfields "▮▮ "▮ "▮ "▮



Likewise, coded production was provided for ▮▮▮▮▮



and, "▮▮▮

1

2　and, "███████████

3

4　██████████████████████████████████

5

6　and, "████████

7

8

9

10

11

12

13

14

15

16

17　and, coded ████████████████████████_id",

18

19

20

21

22

23

24　　　　50.　　Each of these fields and sub-fields go to core allegations in this case, including the

25　linking and associating of personal information to create detailed dossiers and inferred interests

26　related to Class Members.

27　　　　　a.　　"████████████ for example, refers to the type of content that is on a

28　　　particular webpage. *See, e.g.* GOOG-CABR-00893711 ██████████

b. "████████████" is believed to refer to the specific user and the specific profile categories into which Google has placed that user. A previously produced document bearing the title "████████" suggests that the values at issue in "████████████ correspond to listed profile categories, but Google has refused to produce decryption keys for confirmation. *See* GOOG-CALH-00061695.

51.    Even if the previously produced "████████ document was a partial decoder of the "████████████" values, it still does not answer all of the questions raised by Google's recent encoded productions, including explaining all the subfields.

52.    Plaintiffs have asked Google to provide a translation. Google initially refused.

53.    When Plaintiffs pressed for this production during a May 25, 2022 Special Master hearing, counsel for Google, Tracy Gao, represented that the production had been decoded and re-produced on March 31, 2022. *See* May 25, 2022 Special Master Conference Tr. 9:5-12. Counsel's statement was unequivocal, but this was a lie.

54.    Immediately after May 25, 2022, Plaintiffs conferred with expert, Prof. Shafiq, who compared the March 10 and March 31 productions. Prof. Shafiq confirmed that the March 31 production was not a full decoding of the March 10 production, and further that the March 31 production consisted of concerning discrepancies. *See* Shafiq Rebuttal ¶¶ 14-16.

55.    In June 2022, the parties exchanged proposed inserts for a joint status update to the Special Master on outstanding tasks from a May 17 order (*see infra*). In this exchange, Google finally admitted with respect to the March 10 production of ████ data:

████████████████████████████████████
████████████████████████████████████
██████████████

56.    In response later that day, Plaintiffs added this rebuttal to the Special Master status update chart:

████████████████████████████████████
████████████████████████████████████
████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████
████████
████████████████████████████████████████████████████
██████████████████████
████████████████████████████████████████████████████
████████████████████████████████."

2002.06.03 - Calhoun v. Google - Joint SM Submission re Data Searches – Final (AEO), Tab "Other".

57.    Finally, at a later meet and confer, Google counsel clarified that Google engineers only parsed/decoded *a portion* of the ██████ data that was easy to do; the remainder would have been possible, but just not from memory.

58.    Therefore, Google's production of ██████ data followed this path:

a.    Google failed to produce any Plaintiff data from ██████ until March 10, 2022 (after fact discovery had concluded), and only because ordered to do so.

b.    Google produced the ██████ data in unreadable, encoded format, unlike with any prior production, and never told Plaintiffs about the encoding, waiting for us to discover it.

c.    When Plaintiffs asked Google to decode the production, Google originally refused, but later claimed that the March 31, 2022 production was a decoded re-production of the March 10, 2022 production.

d.    When Plaintiffs did a full analysis of the two productions, Plaintiffs learned that the vast majority of the March 10 production was missing from the March 31 production.

e.    When Plaintiffs asked Google to explain, Ms. Gao then admitted that most was not decoded.

f.    As a later meet and confer, Google then admitted that it was in fact possible to decode the ██████ data, but it would be too hard and Google was refusing to do it.

59.    To date, the vast majority of the March 10, 2022 production of Plaintiff data from ████ has not been produced in readable form, and Google continues to refuse to do so.

**E.    Evidence Rebutting Google's Assertion that it Complied with the Special Master Orders**

**60.**    On May 17, 2022, the Special Master entered an order via email requiring Google to search and produce Plaintiff test account and Named Plaintiff data from an identified subset of the most relevant data sources in this action for ███████████████████████████████████████████████████████████████████████████████████████████████████."

**Exhibit 30.**

61.    The Special Master's order was consistent with Plaintiffs' requests that were made in March 2022, and could have been relatively easily carried out by Google in response (or at any point during this litigation). *See* Shafiq Rebuttal ¶¶ 33-34.

62.    In response, Google effectively asked for reconsideration of the May 17 email order, asking the Special Master to consider its earlier searches to be sufficient.

63.    The parties were then instructed to present their positions in a joint filing to the Special Master. The Special Master has neither retracted nor modified the May 17 order.

64.    Google has still not complied with the May 17 Special Master order. During a Zoom conference on July 5, 2022, Google counsel (Mr. Ansorge and Ms. Gao) confirmed that Google has no intention of complying.

***

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of July 2022, at Jefferson City, Missouri.

**SIMMONS HANLY CONROY LLC**

*/s/ Jay Barnes*
Jason "Jay" Barnes

Executed this 21st day of July 2022, at Oakland, California

**BLEICHMAR FONTI & AULD LLP**

*/s/ Lesley Weaver*
Lesley Weaver

1    Executed this 21st day of July 2022, at New York, New York.

2                                    **DICELLO LEVITT & GUTZLER LLC**

3

4                                    */s/ David Straite*
                                     David Straite

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **ATTESTATION**

I, Jay Barnes, am the ECF User whose identification and password are being used to file this document pursuant to Civil L.R. 5-1(h)(3). I attest under penalty of perjury that the signatories above have concurred in the filing of this document.

/s/ Jay Barnes
Jay Barnes
Simmons Hanly Conroy LLC

*Counsel for Plaintiffs*