# EXHIBIT 3

## [REDACTED VERSION]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR |
| This document applies to: *all actions* | **DECLARATION OF PROFESSOR ROBERT ZEITHAMMER IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION OF SETTLEMENT CLASS AND FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>***REDACTED VERSION***<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD<br>Time: TBD<br>Courtroom: 1, 4th Floor |

I, Robert Zeithammer, hereby declare as follows:

1. I am a Professor of Marketing in the Anderson School of Management at the University of California, Los Angeles (UCLA). Prior to UCLA, I was Assistant Professor of Marketing in the University of Chicago Graduate School of Business. I have been retained by the counsel for plaintiffs as an expert in this matter and I submit this declaration in support of plaintiffs' Motion for Final Approval of Class Action Settlement. I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

## BACKGROUND

2. I previously submitted two expert reports in support of plaintiffs' July 14, 2023 Motion for Class Certification which provided analyses pertaining to the value of the User Data transmitted in Google RTB for damages purposes.[1] In this declaration I rely on the same analyses to estimate the value of the overall benefits provided to class members in this injunctive relief settlement.

3. My expert qualifications generally are set forth in paragraphs 1-4 of the July 14, 2023 Zeithammer Report, and my curriculum vitae was as Appendix 1 thereto. My hourly rate is $900. My fee is neither contingent on the results of this case nor contingent on the content of this declaration.

## ASSIGNMENT

4. In light of my expertise and background and my prior expert work in this matter, counsel for plaintiffs have asked me to opine on the value of the benefits that the proposed settlement will provide if the settlement is approved by the Court and the technical changes contemplated in the settlement are implemented by Google. Specifically, my assignment is to calculate (1) the value to U.S. Google account holders of the proposed "RTB Control" option for limiting the sharing of their user data in RTB bid requests; and (2) the value of the unjust enrichment the proposed settlement will prevent.

[1] Expert Class Certification Report of Professor Robert Zeithammer, July 14, 2023 ("Zeithammer Report") (ECF 545-7); Expert Class Certification Rebuttal Report of Professor Robert Zeithammer, Nov. 29, 2023 ("Zeithammer Rebuttal Report") (ECF 616-7).

## CASE BACKGROUND

5. My understanding of the relevant facts in this matter is as follows: Google sells advertising inventory of publishers through automated real-time bidding auctions ("RTB"). For every potential display advertising impression auctioned by RTB, Google provides all auction participants with a bid request that includes information about the user, hereafter called "User Data," which, plaintiffs' allege, constitutes personal information ("PI"). The User Data includes information about the user, the user's location, the user's browser, the user's device (for example the user's computer or smart phone), the website or app the user is viewing, and unique identifiers that can be used for tracking the user by any recipient of the bid request. In addition, it is my understanding that Google offers RTB participants a "cookie matching" service that enables Google RTB participants to link together their information with Google's information regarding particular users and that this is used to create user lists based on each user's individual browsing history.

## THE PROPOSED SETTLEMENT

6. I understand that under the Settlement Agreement in this case, Google will implement a new RTB Control at both the device and the account level that will for the first time provide U.S. Google account holders with the ability to limit the sharing of their User Data in Google RTB bid requests, so that the information transmitted will no longer constitute PI. Specifically, I understand that if a Google U.S. account holder chooses to limit data sharing by Google through the RTB Control, no personalized ads will be shown and the following categories of information will be modified or deleted from RTB bid requests:

a. All pseudonymous identifiers will be removed from the RTB bid request, including the Google User ID and the device ID.

b. The IP address will be removed from the RTB bid request.

c. No user lists will be shared or used in connection with the RTB bid request.

d. No cookie matching will occur in connection with the RTB bid request.

e. Bid request fields that contain user agent data will be generalized to the highest version level in the RTB bid request.

7. I understand that when a U.S. Google Account Holder chooses to activate the RTB Control, the User Data transmitted in the RTB bid stream will be sufficient to allow contextual ads, but insufficient to allow targeted ads based on identification and tracking of the individual through the bid stream data.

8. I am not a computer science expert and for purposes of this declaration I am assuming that the above facts are correct. I also understand, and for purposes of this Report assume, that Google will also provide all active U.S. Google Account Holders with adequate disclosures advising them about and providing links to the new RTB Control.

## THE SETTLEMENT'S BENEFIT TO THE CLASS

9. As described above, the proposed Settlement will provide all U.S. Google account holders with transparency and choice concerning Google's transmission of their User Data in RTB auctions. It is my opinion that this represents a significant change to the status quo that will benefit each U.S. Google account holder whether or not they ultimately choose to activate the RTB Control.

10. Providing U.S. Google account holders with information about how their User Data is utilized in RTB auctions and with the ability to control whether that data is shared with third parties is valuable to all Class members. Evidence produced in this case demonstrates that Google account holders value the ability to control what is shared and what is not.[2] Publicly available research confirms that both the desire for more information and the need for control are almost universally shared among Americans: A recent large representative poll finds that 91 percent of Americans "want to have control over what marketers can learn about them online", and 87 percent "would like to

---

[2] *See, e.g.*, GOOG-HEWT-00012303 at -324 (2015) (describing privacy as "[redacted]"); GOOG-HEWT-00040123 at -128 (Spring 2016) (expressing concern "[redacted]"); GOOG-HEWT-00480493 at -499 (Oct. 23, 2018) ("[redacted]"); GOOG-HEWT-00098506 at -511 ("[redacted]."); GOOG-HEWT-00057910 at -938 (Dec. 4, 2019) ("[redacted].").

understand how digital marketers use the information they collect about my online activities".[3] Google's Privacy Policy also recognizes the value of control over User Data in the following bolded headline: "**When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control.**"

11. By requiring disclosures regarding the sharing of User Data in RTB auctions and by putting U.S. Google account holders in control of the extent to which their User Data will be shared, this Settlement provides both the information and the control that U.S. Google account holders want and intrinsically value. I do not quantify this intrinsic value of information and control in this report, but focus on the additional extrinsic (market) value to the U.S. Google account holders who actually activate the RTB control. Whatever extrinsic value my analysis calculates to the U.S. Google account holders who actually activate the RTB control is over and above the intrinsic value that accrues to all U.S. Google account holders as outlined in the previous paragraph.

12. To estimate the extrinsic benefit of this Settlement to U.S. Google account holders, I apply the Market Price Model methodology that I previously described in the July 14, 2023 Zeithammer Report (ECF 545-7). The market price model estimates the benefit of this Settlement to US. Google account holders by establishing a market price for the User Data that will no longer be transmitted in the RTB bid stream when the RTB Control is activated. The activation rate is not known at this time, so I provide a range of possible total values.

13. By providing U.S. Google account holders with a truly informed choice over their User Data, the proposed settlement also prevents unjust enrichment by Google, which I documented in the July 14, 2023 Zeithammer Report. The report documented that Google makes more RTB revenue when it shares User Data in bid requests. For the U.S. Google account holders who activate the proposed RTB Control, the accrual of this additional revenue will be prevented directly. For the U.S. Google account holders who do not activate the proposed RTB Control, the revenue will still accrue, but will no longer be earned unjustly. Therefore, whether or not U.S. Google account holders

---

[3] Turow, Lelkes, Draper and Waldman (2023) Americans Can't Consent to Companies' Use of Their Data. Available at: https://www.asc.upenn.edu/sites/default/files/2023-02/Americans_Can%27t_Consent.pdf. (Last accessed June 3, 2025)

choose to activate the RTB Control, the unjust enrichment documented in my July 14, 2023 Zeithammer Report will be prevented as a result of the relief obtained in this settlement.

14. The two methodologies introduced above (prevented unjust enrichment and extrinsic value to the U.S. Google account holders) provide alternative approaches for calculating the value of the benefits that the proposed settlement will provide if the settlement is approved by the Court and the technical changes contemplated in the settlement are implemented by Google. In the rest of this report, I present each methodology in turn, starting with the market price model.

## SETTLEMENT VALUE: MARKET PRICE MODEL

15. The market price model provides an estimate of the benefit of this Settlement to U.S. Google account holders by establishing a market price of the User Data that will no longer be transmitted in the RTB bid stream when the RTB Control is activated. This measures the value of the Settlement as a function of the damages it will prevent.

16. A key input to the settlement value under the market price valuation is the number of U.S. Google account holders which I understand has not been produced. To estimate the number of U.S. Google account holders, I use three different approaches, resulting in a range from 169 million to over 200 million. In the next few paragraphs, I outline each approach in more detail.

17. The first approach starts with public information about the monthly unique U.S. visitors to Google Search, and adjusts this number down to only count logged-in users who, by construction, are U.S. Google account holders. Google Search has around 277 million monthly unique visitors to its official site in the U.S.[4], and 61% of Google searchers are logged into a Google service when using the search engine. This means they are actively using their Google account while searching, and are therefore Google account holders. Therefore, the number of unique U.S. Google account holders is at least 277*0.61=169 million. This estimate is conservative because it does not count infrequent searchers, as well as Google account holders who prefer an alternative search engine. Google provides many other products including Gmail, Google Docs, Google Drive, Google Play

[4] https://magecomp.com/blog/google-search-statistics-and-facts/. (Last accessed June 26, 2025)

Store, ChromeOS, and YouTube, all of which may be associated with a U.S. Google account even when the account holder is not a Google search user.

18. The second approach for estimating the number of U.S. Google account holders starts with the number of Americans in different age cohorts, and adjusts this number down to only count email users who use Gmail, and who, by construction, are therefore U.S. Google account holders. Statista reported that, as of 2024, 75% of U.S. email users (between 18 and 64 years old) currently use Gmail.[5] Since about 93% of Americans between 15 and 64 years of age use email,[6] we can estimate the number of U.S. Google Account holders between 13 and 64 as (*number of Americans in the cohort)* × (*percent of email users*) × (*percent of Gmail users among email users*). Since there are 228 million Americans between 13 and 64 years old, this calculation yields an estimate of 228*0.93*0.75=159 million U.S. Google Account holders between 13 and 64.[7]

19. It is well known that a smaller share of U.S. email users over 65 years of age use Gmail, and one publicly available source conservatively estimates this share to be only 31 percent.[8] Americans over 65 also use email less than younger cohorts, and one source conservatively estimates this usage share to be 84 percent. Since there are 59 million Americans over 65 years old, the same calculation as outlined in the previous paragraph implies that there are about 59*0.84*0.31=15 million U.S. Google Account holders over the age of 65. Adding the two cohorts together finally yields an estimate of 159+15=174 million U.S. Google account holders. This estimate is conservative because it does not count Google account holders who prefer an alternative email provider to Gmail. Google provides many other products including Search, Google Docs, Google Drive, Google Play

---

[5] https://www.statista.com/chart/34197/share-of-us-respondents-use-email-providers/. (Last accessed June 26, 2025)

[6] https://porchgroupmedia.com/blog/100-compelling-email-statistics-to-inform-your-strategy-in-2023/. (Last accessed June 26, 2025)

[7] Lacking information about some of the youngest people, this calculation assumes that the percentage of email usage among 13-14 year olds is similar to the percentage among older Americans, and the percentage of Gmail users among email users 13 to 17 years old is likewise similar to the Gmail share among older email users. Both of these assumptions are plausible and do not impact the final estimate much, but the estimates can easily be adjusted should new information about U.S. Google Account holders under 18 become available.

[8] https://emailanalytics.com/gmail-statistics/. (Last accessed June 26, 2025)

Store, ChromeOS, and YouTube, all of which may be associated with a U.S. Google account even when the account holder is not a Gmail user.

20. The third approach relies on representations from Google regarding the number of active Google accounts in the U.S. today as determined using a confidential and proprietary internal Google metric. This representation cannot be disclosed in this report. It has to be adjusted for the fact that some people may have more than one Google account. In fact, the latest publicly available report found that worldwide, there were 1.9 email accounts per email user.[9] By dividing the number of active Google accounts in the U.S. today by 1.9, we can therefore arrive at an estimate of the number of unique U.S. Google account holders. This calculation results in an estimate over 200 million.

21. Combining the three approaches outlined above, there are between 169 and over 200 million U.S. Google account holders. To the extent the actual number of U.S. Google account holders materially deviates from this range, it is a matter of basic math to substitute the actual number for the estimate of the benefit of this Settlement to U.S. Google account holders to which I now turn.

22. To establish a fair market price for the User Data of a single U.S. Google account holder transmitted in Google RTB, I consider the annual compensation Google itself has offered customers as compensation for sharing personalized tracking data as part of its Screenwise program, which I describe next.

23. Since 2012, Google has worked with Ipsos (a market research company) to recruit consumers into the Ipsos Screenwise Panel (hereafter "Screenwise Panel"). Members of the Screenwise Panel agree to install various "meters" that track their online behavior. The different types of meters include software that collects information from internet browsers or mobile phones and hardware such as a special router that allows personal tracking across devices

24. The "Summary" of the panel's privacy policy states:

- *"Google collects data through its meters, including, for example:*
  - *The content and advertising shown on your devices, and your interactions with that content and advertising, including videos you watched, your emails and SMS, and web pages you've visited.*

[9] https://www.radicati.com/wp/wp-content/uploads/2015/02/Email-Statistics-Report-2015-2019-Executive-Summary.pdf (Last accessed June 26, 2025)

- *Information you input (e.g., text you type) into your devices.*
  - *Cookies and device information.*
- *Your participation in the Panel is voluntary. You may end your participation in the Panel at any time by following the instructions provided to you during the sign-up process. You can also temporarily pause or turn off metering at any time.*
- *Google may combine the data collected with other data collected by Google when you're using Google products and services as a Google user. For example, we may combine your panel data with information in your Google Account(s) (e.g., which ads you viewed), or with anonymous or pseudonymous identifiers (such as cookies or unique device identifiers) used by Google products and services.*
- *Google will use the data above in connection with existing Google products and services, to provide, maintain, and improve them, and to develop new ones. For example, we may use this data to conduct analytics and measurement to understand how our services are used, as well as conduct ads-related market research. As another example, we may use this data to improve Google products such as Search, Android, YouTube and Google Assistant."*[10]

25. Since Screenwise compensates its members for being tracked, and members enter this transaction voluntarily and with full knowledge of the data they are "selling" to Screenwise and how it is to be used, the compensation constitutes a market price for the User Data at the heart of the present matter. The potential usages indicated in the summary prominently include similar types of personalized tracking of usages involved in Google RTB advertising and, to that extent, the Screenwise compensation suggests a market price for the type of data used in RTB.

26. The exact compensation structure of Screenwise Panel participants depends on the number and type of meters the panelist installs. The meters relevant for measuring online behavior are the following three types of software meters: The payment available is $3 per month for installing a piece of tracking software in the Chrome browser. Additional $3 per month is available for installing a tracking app on a mobile phone, and yet additional $3 per month is available for installing a tracking app on a tablet. Based on online reviews of the Screenwise panel, it is also my understanding that the $3 per month per browser can turn into $6 per month if the account holder installs the browser "meter" on browsers on two different devices.[11]

---

[10] https://screenwisepanel.com/google-panel-privacy-policy

[11] https://lushdollar.com/the-screenwise-meter-panel/ includes a reward tier table "taken directly from the app itself", which shows weekly "incentives" of $1.00 for "computer only", and

27. One key benefit of User Data to third party users is cross-device and cross-website tracking. The average person in the US uses about 3 devices connected to IP networks[12], so cross-device tracking is important for tracking the totality of a single user's behavior. It is therefore conservative to assume that members of the class each use just one device to browse the internet, so the compensation they would earn in the Screenwise panel is $3 per month, i.e. $36 per year. My single device assumption is also conservative because both the online reviews and the Screenwise website mention even higher possible rewards available from connecting more than two devices, possibly from multiple household members.[13]

28. Screenwise also tracks types of data that are not included in Google RTB (e.g. content of messages) and unlike Google RTB which is largely focused on third-party participants that gain access to the User data, Screenwise is a program with primary utility to Google owned and operated products. Therefore, both the value account holders place on the data they share with Screenwise and the recipient of the data places on that data may be different than the corresponding values in the context of User Data shared in RTB bid requests. The resulting market price of data sharing on Screenwise is thus only an approximation of the true market price of User Data shared in RTB bid requests, and it is important to corroborate the market price with other sources of evidence, e.g. other markets for sharing personal User Data.

29. Several vendors other than Screenwise pay consumers for sharing data analogous to the User Data at issue in this case, i.e. data which specifically enables tracking of people by third parties. I consider the compensation these other vendors offer as a corroboration of my conclusion that the $3/month compensation Screenwise offers is a plausible estimate of the prevailing market price, i.e. not an obvious over-estimate.

---

$1.50 for "Computer and EITHER Smartphone or Tablet". With four weeks in a month, connecting two devices to Screenwise thus provides a monthly incentive of $6.00

[12] Cisco Annual Internet Report, 2020-2023

[13] The incentive table documented on https://lushdollar.com/the-screenwise-meter-panel/ shows $2.00 per week for connecting "Computer and Smartphone and Tablet", and Screenwise.com says "Earn up to $16/month Each household member age 13+ earns by joining with their own devices." (last accessed May 19 2023).

30. One firm that pays its registered users for their personal data is Reklaim Rewards, formerly known as "Killi" (and covered in more detail in the July 2023 Zeithammer Report), which claimed to have 100 million U.S. accounts in 2020.[14] The compensation available on Reklaim Rewards is in terms of points, which can be converted to gift cards or money. The Reklaim Rewards does not specifically advertise a fixed monetary monthly compensation, so I have to rely on online reviews to estimate the available compensation in dollar terms. One source claims that 1000 points are worth $10, with 200 points available per month for passive sharing of data, so the implied earnings are $24 per year.[15]

31. Another company that pays its registered users for their personal data is Datacy (launched in 2021, and covered in more detail in the July 2023 Zeithammer Report). Their own website represents that "Many of our consumers earn $30+ per month."[16] On an annual basis, this corresponds to over $360. But it is not clear how many "consumers" participate in this program. A recent review represents Datacy as the "most popular" vendor, and provides an estimate of average annual earnings of $120.[17]

32. Yet another company that pays its registered users for their personal data is Caden (launched in 2023, and hence not covered by the July 2023 Zeithammer Report). A recent review describes it as "a widely accepted app for Apple and Android users that allows you to get paid for using your data.", and "overall the most consistent for earning around $160 in passive income over a span of a year."[18]

---

[14] https://www.latimes.com/business/story/2020-12-01/column-privacy-money-for-data-sharing

[15] https://paidfromsurveys.com/reklaim-review (Last accessed June 3, 2025)

[16] https://datacy.com/consumer/knowledge-base/how-much-will-i-earn-using-datacy (Last accessed June 3, 2025)

[17] "Datacy is the most popular extension earning users over $120 a year in passive income." https://freecash.com/academy/en/earn/how-to-get-paid-for-your-data (Last accessed June 3, 2025)

[18] https://freecash.com/academy/en/earn/how-to-get-paid-for-your-data. (Last accessed June 3, 2025)

33. The market for personal data is currently very active, with new vendors appearing regularly, and others going out of business.[19] But the above three examples of vendors show that the $36 annual compensation Screenwise offers is not a high outlier. It is slightly more than the $24 offered by Reklaim Rewards, and quite a bit less than the $120 available on Datacy and $160 available on Caden. I conclude that $36 is a conservative estimate of the fair market price for the User Data of a single U.S. Google account holder transmitted in Google RTB, and hence a reliable estimate of the annual benefit per U.S. Google account holder who decides to enable the new RTB Control (which, for purposes of this declaration, I refer to in short-hand as an "opt in").

34. The overall measure of the Settlement value may be obtained by multiplying the $36 annual benefit per account holder by the number of account holders who will choose to activate the RTB control, as follows: *Total Annual Benefit of Settlement* = (*benefit per account holder*) × (*opt in percentage*) × (*number of account holders*).

35. Since the opt-in percentage is not knowable without details of the implementation, I provide a range of possible value. At the high end, suppose that all U.S. Google account holders opt in. Then, the estimated range from 169 million to over 200 million U.S. Google account holders implies that the total Settlement value will be between $6.1 billion and over $7.2 billion per year or **between $18.3 billion and over $21.6 billion** over the course of the three years that the injunction will remain in force.

36. At the low end of the plausible opt-in percentages, I rely on the very conservative rate of 8.8 percent, which is the percentage of Chrome users opting out of the sale of their personal information under the CCPA as reported by Alcobendas et al (2023). This rate is conservative because businesses implementing the CCPA may "make it difficult for consumers to opt out through various means, including the use of dark patterns."[20] Applying this conservative 8.8 percent opt-in rate, I

---

[19] For example, the July 2023 Zeithammer Report also included one more company that pays users for their personal data called Datacoup. However, it is not clear if that company is continuing to operate today. Accordingly, I omitted Datacoup from this analysis and declaration.

[20] Van Hong Tran, Aarushi Mehrotra, Ranya Sharma, Marshini Chetty, Nick Feamster, Jens Frankenreiter, and Lior Strahilevitz. 2025. Dark Patterns in the Opt-Out Process and Compliance with the California Consumer Privacy Act (CCPA). In Proceedings of the 2025 CHI Conference on

obtain a low-end estimate of **between $1.4 billion and over $1.9 billion** over the course of the three years that the injunction will remain in force. This low-end estimate can be used as a lower bound on the total benefit of the settlement for at least two reasons: the opt-in rate will likely be higher, and this number does not include the intrinsic benefit accruing to the entire class noted in paragraph 10.

## SETTLEMENT VALUE: UNJUST ENRICHMENT MODEL

37. The unjust enrichment model measures the value of the Settlement as a function of the degree of unjust enrichment prevented by the change in RTB. An unjust enrichment occurs because Google currently lacks the transparency and choice that will be provided by this Settlement and it makes more revenue than it would if it did not share User Data that allows personal identification and persistent tracking as part of the RTB bid request. This section of my declaration calculates the percentage of RTB revenue attributable to such sharing of User Data.

38. A key input to the calculation of unjust revenue is the total revenue Google makes in the U.S. from RTB advertising. Earlier in this case, Google produced a document indicating that their annual revenue from RTB was approximately $[redacted] billion in 2021 and $[redacted] billion in 2022.[21] Because this revenue data has not been updated, I use the most recent (2022) number of $[redacted] billion. The calculations in this declaration are based on this estimate. To the extent the actual Google RTB revenue deviates from this estimate, it is a matter of basic math to substitute the actual number for the estimate, and I reserve the right to update this number when a more precise estimate is produced or otherwise comes to light. My unjust enrichment analysis simply multiplies this dollar amount by the percentage that can be attributed to sharing User Data that allows personal identification and persistent tracking as part of the RTB bid request. The rest of this section lays out my computation of this key percentage.[22]

---

Human Factors in Computing Systems (CHI '25). Association for Computing Machinery, New York, NY, USA, Article 223, 1–25. Available at: https://doi.org/10.1145/3706598.3714138 (Last accessed July 29, 2025).

[21] GOOG-HEWT-00455648 gives a January-June total for 2022, and I scaled it up by a factor of [redacted] to arrive at the estimated 2022 annual total.

[22] A more refined calculation of unjust enrichment damages would account for and deduct Google's marginal costs. Google did not, however, produce marginal cost data tied specifically to

39. To estimate the percentage of Google revenue that can be attributed to sharing User Data that allows personal identification and persistent tracking as part of the RTB bid request I draw on various sources: experiments at Google, as well as non-experimental observational data from both academic and industry sources. To combine evidence from diverse sources, I conduct a random-effect meta-analysis of all the estimates following the standard approach outlined in Borenstein et. Al (2010) – a standard reference article.[23] As explained in a recent "how to" guide[24], the method involves eight steps. I now outline how my approach addresses each of the following eight steps:

Step 1 (defining the research question): the question I ask is "What is the percentage of Google RTB auction revenue in U.S. digital advertising markets attributable to sharing User Data in bid requests?"

Step 2 (literature search): I searched three sources of information: 1) the academic literature on RTB revenues due to User Data, starting with the only peer-reviewed article on the topic and searching through all the citing articles. 2) the industry reports on RTB revenues due to User Data, searched through internet keyword searches and citations in academic articles, and 3) the internal Google records produced in the case and provided to me by counsel. As is standard in the meta-analysis methodology, the literature search needs to be as inclusive as possible of potential sources of information about the effect magnitude, so I included both peer-reviewed papers and working papers, and I included both evidence from Google specifically and evidence from similar leading ad exchanges that also share User Data in their RTB requests. As is standard in the methodology, I then removed duplicates, as well as measurements from other markets not relevant to the research question's scope.

Step 3 (choice of effect size measure): The primary measure of the effect of User Data on RTB auction revenues I extract from each source is the proportion of RTB auction revenues

---

the RTB gross revenue numbers; absent such data, a more refined calculation deducting marginal costs is not possible here.

[23] Borenstein M, Hedges LV, Higgins JP, Rothstein HR. A basic introduction to fixed-effect and random-effects models for meta-analysis. Res Synth Methods. 2010 Apr;1(2):97-111.

[24] Hansen, C., Steinmetz, H. & Block, J. How to conduct a meta-analysis in eight steps: a practical guide. Management Review Quarterly 72, 1–19 (2022).

obtained that can be attributed to the availability of the User Data to the auction participants. In scientific terminology, this is the "average treatment effect on the treated", expressed as a proportion in order to compare across different sources. Note that some studies I examine report on the auction revenue directly while other studies report on the publisher revenue – the amount of money left over after the auctioneer and other intermediaries take their cut. Since all the intermediaries, including Google, take their compensation on a percentage basis (i.e. the publisher revenue is an affine transform of the auction revenue), the percentage change in the publisher's revenue due to a regime change such as a deprecation of User Data is the same as the percentage change in the auctioneer's revenue due to the same regime change.

Step 4 (choice of analytical method used): Given the single scalar measure of interest, the analytical method is univariate.

Step 5 (choice of software): The standard random-effect meta-analysis procedure described in the standard reference article can be implemented in Excel.

Step 6 (coding of effect sizes): The random-effect method described in the previous step requires the effect estimate and its standard error.

Step 7 (analysis type): Given the diversity of contexts and sampling strategies the three types of sources are likely to produce, the appropriate analysis to use is the random-effect meta-analysis.

Step 8 (reporting results): Given the analysis type and univariate method selected above, the reporting consists of the full list of evidence discovered by the literature search, the operative list of evidence without duplicates and irrelevant contexts, the meta-analytic mean effect, and its standard error.

40. Having outlined my meta-analysis methodology, I now review the various sources of information the meta-analysis draws on. An ideal empirical framework for measuring the effect of User Data on Google RTB auction revenue experimentally manipulates the availability of the User Data to bidders, and then observes the impact of the manipulation on Google RTB revenue. My understanding from the published literature and the internal communications at Google I reviewed is

that several such experiments "[redacted]" User Data from bidders were performed at Google. The impression-level data from these experiments was requested but was not made available by Google, so I will rely on published and/or internal documents to summarize the results of these experiments. The record contains three distinct relevant experiments, which I now discuss in turn.

41. Google Experiment 1: The only published study about internal experiments at Google I am aware of is "Effect of disabling third-party cookies on publisher revenue" by Deepak Ravichandran (Principal Engineer, Google Display Ads) and Nitish Korula (Senior Staff Research Scientist, Google Ad Manager) ("Ravichandran and Korula 2019").[25] The two authors set out to "empirically quantify the effect that disabling access to third-party cookies would have on the programmatic ad revenue of web publishers". To achieve this goal, they "ran a randomized controlled experiment on publishers who use the programmatic arm of Google Ad Manager 's serving system, in which a Google service places ads on non-Google sites across the web". The experiment "disabled access to cookies for a small fraction of randomly selected users (the treatment group)", and found that "for the top 500 global publishers, average revenue in the treatment group decreased by 52%, with a median per-publisher decline of 64%." In footnote 4, the authors report that the average effect is so precisely estimated that "the 95% confidence interval is under +/- 1%.". Since a 95% confidence interval is about four standard errors wide, I conclude that the standard error on the 52% estimate is less than 0.5%, so I will conservatively take 0.5% to be the standard error of the estimate for the purposes of my meta-analysis. The UK Competition and Markets Authority ("CMA") has re-examined the data from the Ravichandran and Korula experiment, and identified several reasons why the estimate may be conservative.[26]

---

[25] Available at https://services.google.com/fh/files/misc/disabling_third-party_cookies_ publisher_ revenue.pdf (last visited July 23, 2025))

[26] CMA has identified a number of selection issues that might bias the estimates of the effect of blocking cookies on publisher revenue: (1) The treatment blinds Google DSP selectively; (2) the treatment reduces number of impressions per query; (3) the treatment increases queries without impressions and (4) the treatment increases impressions served by non-Google SSPs. To account for these issues, the CMA "implemented econometric solutions to better estimate the effect of blocking cookies access from the perspective of publishers." The CMA report concludes that after re-examining the data, "The results of our analysis show that blocking third-party cookies decreases short-run publisher revenue by 70% of the average revenue per query in the control group, which

42. Google Experiment 2: The record includes undated Excel files showing the results of undated experiments regarding the revenue impacts of various holdback experiments related to the User Data at issue. My best estimate about the dates of these experiments is between 2019 and 2022 since the time-stamped internal communications discuss such experiments in those years, and at least some of these discussions likely refer to the experiments documented in the Excel files. After reviewing the Excel files, it is my understanding that the experiments considered three types of information: "[redacted].[27] Since no information is provided about the precision of the associated [redacted], I assume that the experiment was as precise as the one Google holdback experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

43. Google Experiment 3: A 9/12/2019 document titled "[redacted])"[28] by custodians Chris LaSala and Jason Bigler outlines the impact of privacy regulations. It says "[redacted],

approximates business as usual during the study period." This result shows that the bias in the original estimates is most likely a downward bias, making the 52% estimate conservative. On the other hand, the CMA only investigated data on U.K. users, so their result does not necessarily translate to U.S. users of main interest to this report. UK Competition and Markets Authority (2020): Online platforms and digital advertising market study, Appendix F (available at https://assets.publishing. service.gov.uk/media/5fe495438fa8f56af97b1e6c/Appendix_F_-_role_of_data_in_digital_ advertising_v.4_WEB. Pdf. (Last visited July 23, 2025.

[27] GOOG-HEWT-00456342.

[28] GOOG-HEWT-00018008

[redacted][29]. Since no information is provided about the precision of [redacted], I assume that the experiment was as precise as the one Google holdback experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

44. In addition to the above [redacted][30]. [redacted]. My conservative reading of the record is that [redacted][31], and 3) [redacted].[32] All the other numbers are approximate and often preceded by "~" or "about" to indicate a ballpark magnitude that could plausibly refer to one of these three experiments with exact numbers. To avoid duplication of evidence, I only included the above three experiments in my meta-analysis.

45. Academic study 1: In addition to deliberate experimentation, observational data contains several types of natural experiments that withheld at least some parts of the User Data for an identifiable set of impressions: 1) one such natural experiment occurred after California passed the California Consumer Privacy Act (CCPA) in 2018, allowing people in California to block

[29] "ITP" stands for "Intelligent Tracking Prevention".

[30] GOOG-HEWT-00456342, GOOG-HEWT-00018008, GOOG-HEWT-00188498, GOOG-HEWT-00287442, GOOG-HEWT-00259566, GOOG-HEWT-00312065, GOOG-HEWT-00278045

[31] GOOG-HEWT-00456342

[32] GOOG-HEWT-00018008

personalized ads. 2) Another natural experiment has occurred after 2018-19 when both Safari and Firefox browsers blocked third-party cookies by default while other browsers, most prominently Chrome, did not. Alcobendas, Kobayashi, Shi and Shum (2023)[33] use the resulting variation in the availability of cookies to estimate a sophisticated model that captures the bidder behavior. They analyze over 5.5 million bids in about 740,000 auctions in 2022. In their main counterfactual analysis, they then estimate precisely the percentage of interest to this report, namely how much would the RTB auction revenue decrease if third-party cookies were universally banned. They find that publisher revenue would decline 54.7%. Based on the data in the paper, I calculate the standard error of this estimate to be about 1.2%.[34]

46. Academic study 2: Starting in 2010, the AdChoices program has enabled consumers to opt out of behaviorally targeted advertising among publishers participating in the AdChoices program. Johnson, Shriver and Du (2020) analyze the AdChoices program in the only directly relevant peer-reviewed published to date[35]. They explain that "In 2010, the ad tech industry moved to self-regulate by launching the AdChoices program, which provides both notice and choice to consumers. AdChoices provides notice by superimposing the AdChoices logo over the corner of online display ads. AdChoices enables consumer choice through a website that allows consumers to opt out of behaviorally targeted advertising. Consumers who opt out still see ads, just not ads that are targeted based on their previous browsing behavior." Johnson, Shriver and Du analyze over 62 million ad impression transactions in a single week on a single exchange in 2015.

47. Johnson, Shriver and Du sample impressions from three types of users: cookieless, cookied who opted out, and cookied who did not opt out. They conduct two analyses to account for any potential self-selection of the users into the opt-out category: first, they use fingerprinting

---

[33] Alcobendas, Miguel and Kobayashi, Shunto and Shi, Ke and Shum, Matthew, The Impact of Privacy Protection on Online Advertising Markets (October 6, 2023). Available at https://ssrn.com/abstract=3782889 or http://dx.doi.org/10.2139/ssrn.3782889 (Last accessed June 3, 2025).

[34] Using Table 7, I can compute the standard error of the difference of the two mean revenues, and adjust for the number of observations.

[35] Garrett A. Johnson, Scott K. Shriver, and Shaoyin Du (2020), Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry? Marketing Science 39:1, 33-51.

techniques to re-generate the purchase history for the opted-out users, and they use the imputed history to predict what prices advertisements to those users would have received in the counterfactual world with tracking by cookies. This allows the authors to estimate the percentage difference between the prices fetched by the opted-out impressions and prices of comparable impressions by tracked cookied users. The authors' "preferred marginal effect estimates implies that opt-out impressions fetch 52.0% lower prices than cookied impressions"[36] Based on the data reported in the paper, I calculate the standard error of this estimate to be about 2.7%.[37]

48. Academic study 3: Other academic papers reach very similar conclusions to Alcobendas, Kobayashi, Shi and Shum (2023) and Johnson, Shriver and Du (2020). Beales and Eisenach (2014) analyze a large "impression-level database of advertising placements during a one-week period in August 2013, provided by two anonymous companies that operate advertising exchanges with automated bidding."[38] They perform an econometric analysis that allows them to "measure the premium paid by advertisers for ads served to customers with cookies, and ultimately to assess the added economic value generated by information sharing in the online content market."[39] They find that "the availability of cookies to capture user-specific information is found to increase the observed exchange transaction price by at least 60 percent relative to the average price (for users with "new" cookies)". For the purposes of this report, I consider average-aged cookies for the two companies, and combine the data in Tables 2 and 3 to compute the difference in CPM due to a cookie to be 70.2% (standard error 0.44%) of the average CPM with a cookie for the first anonymous company and 49.4% (standard error 1.42%) for the second anonymous company.[40] I include the

---

[36] *Id.*, p.44.

[37] The model is log-linear, so I assess the error of the percentage difference using the model's formula, and then simulate from the asymptotic distribution of the critical *Opt-out* parameter (Table 3, Column 5 gives the mean and standard deviation of this parameter).

[38] Beales JH, Eisenach JA (2014), An empirical analysis of the value of information sharing in the market for online content, Technical report, Navigant Economics, Chicago.

[39] *Ibid.*

[40] My calculation uses the "Basic model" coefficients in Table 3 to compute the difference in CPM due to an average-aged cookie as 0.35 (SE 0.0022) for the first company and 0.14 (SE 0.0042) for the second company. Then, I infer the average CPM with an average-aged cookie to be 0.509

results for the two anonymous companies as separate datapoints in my meta-analysis.

49. Academic study 4: Laub, Miller and Skiera (2023) analyze a large sample of auctions from a European ad exchange collected in 2016.[41] They use a regression approach similar to Johnson, Shriver and Du (2020) to control for selection, and the model (specification 1.3 in Tables 3 and 4) implies that the estimated relative price difference due to cookies is 41.2%. To control for confounding selection of impressions into the "uncookied" state, the 1.3 model specification controls for a rich set user characteristics (device, OS, browser, time, and location), as well as for ad characteristics (position, format, and publisher). Therefore, one can interpret the 18.8 percentage points reduction from the raw difference to model 1.3 (60-41.3=18.8) as arising from somewhat less valuable kinds of users and ads systematically not having a cookie. This is the right level of controls needed for our counter-factual goal.[42] I do not include their results in my meta-analysis because their data is exclusively from Europe, while my focus is on the U.S. market.

50. Academic study 5: As outlined above, most of the evidence about the magnitude of the key effect within the academic research literature is mutually consistent and converges to a large apportionment of at least half of the revenue to personal tracking information analogous with User Data at issue. Only one academic paper I am aware of reaches a qualitatively different conclusion: Marotta, Abhishek, and Acquisti (2019) gives a small estimate of the effect of User Data on revenue.[43] The magnitude of the effect is difficult to discern from the paper because the critical part of the "Results" section says: "The estimated potential outcome mean for transactions without cookies is $0.93, while the potential outcome mean for transactions with cookies is $1.02, a statistically

---

and 0.296 for the two companies from the overall average CPM and reported percentage of cookied impressions in Table 2. All standard errors are calculated using standard methods.

[41] Laub, Rene and Miller, Klaus and Skiera, Bernd, The Economic Value of User Tracking for Publishers (March 20, 2023). Available at: https://ssrn.com/abstract=4251233 or http://dx.doi.org/10.2139/ssrn.425123.

[42] Laub, Miller and Skiera (2023) go further in specifications 1.4 and 1.5 , which also control for the fact that some advertisers tend to bid less or not at all for uncookied impressions. For the purposes of the present report, such advertiser behavior is material to the measurement of the effect of interest, and so should not be controlled away.

[43] Marotta, V., V. Abhishek, and A. Acquisti (2019): Online tracking and publishers' revenues: An empirical analysis," WEIS 2019 Discussion paper, Working paper.

significant difference. We run the model using a logarithmic transformation of the variable, and the results suggest that when a cookie is available, publisher's revenue increases by about 4%."[44] These two sentences are inconsistent with each other because comparing the two means yields (1.02-0.93)/0.93=9.7% for the increase due to a cookie. My best interpretation of the results is that (1.02-0.93)/1.02=8.8% is the revenue due to personalized tracking. My interpretation of the results is shared by the Laub, Miller and Skiera (2022) report.[45] The standard error of this difference can be computed as the standard error of the difference between the two imputed revenues (with and without cookie) reported in Table 4, and the standard calculation suggests it is 0.46%. The Marotta, Abhishek, and Acquisti (2019) result is broadly discounted in the literature as non-representative and unreliable.[46] Despite all these critiques, I still include Marotta, Abhishek, and Acquisti (2019) in my meta-analysis so as not to bias the study selection in any way.

51. Several published industry reports also include estimates of the key effect of interest. I found three such industry reports, released by Bidswitch, Pubmatic, and the Interactive Advertising Bureau, and I now summarize their estimates in more detail.

---

[44] ibid

[45] Laub, Rene and Miller, Klaus and Skiera, Bernd, The Economic Value of User Tracking for Publishers (March, 2023). Available at: https://ssrn.com/abstract=4251233 or http://dx.doi.org/10.2139/ssrn.4251233.

[46] Some of the critiques include the fact that Marotta *et al* only consider data from a single publisher as opposed to most of the literature that considers samples from multiple publishers on entire exchanges. Different publishers may benefit from personal tracking differently, and it is thus likely that Marotta et al happened to work with an outlier publisher. Google's own Korula and Ravichandran also discount the Marotta et al results when they say: "We believe that the difference in results may be partially attributed to the fact that their analysis was performed on a single publisher (in contrast to the larger scale of previous studies), and in part due to the inherent challenges associated with the nature of observational studies (such as the need to control for many variables, some of which may themselves be influenced by the presence of cookies)." Ravichandran and Korula 2019. The UK Competition and Markets Authority says "the paper is based on a non-randomized observational design and relies on a relatively narrow set of user characteristics to account for selection bias." UK Competition and Markets Authority (2020): Online platforms and digital advertising market study, Appendix F, paragraph 114; available at https://assets.publishing.service.gov.uk/media/5fe495438fa8f56af97b1e6c/Appendix_F_-_role_of_data_in_digital_advertising_v.4_WEB.pdf (last visited July 23, 2025).

52. Industry report 1: A large intermediary firm named Bidswitch reports that in 2019, "matched" (identifiable based on cookies) users have "2x higher eCPMs" than "unmatched" (non-identifiable users).[47] In terms of the portion of the revenue due to personal tracking, this number corresponds to 50%. Bidswitch also reports that Chrome users have "1.8x higher eCPMs" than Safari users, which in turn corresponds to at least 44.4% (=(1.8-1)/1.8) due to personal tracking by cookies since Safari users cannot be tracked by cookies while most Chrome ones can. Since no information is provided about the precision of this revenue reduction, I assume that the comparison was as precise as the median precision among the studies that do contain precision information, and thus assume the standard error to be 0.9%.

53. Industry report 2: Pubmatic, a company that develops and implements online advertising software and strategies, reported in 2021 that [48] "ad prices (eCPMs) are 2.4x higher when an IDFA is present". The IDFA is "Apple's ID for Advertisers", so in terms of the portion of the revenue due to personal tracking, the "2.4x higher" number corresponds to 58.3%. Since no information is provided about the precision of this revenue reduction, I assume that the comparison was as precise as the median precision among the studies that do contain precision information, and thus assume the standard error to be 0.9%.

54. Industry report 3: The Interactive Advertising Bureau, an association of more than 700 leading media companies, brands, agencies, and the technology firms responsible for selling, delivering, and optimizing digital ad marketing campaigns, reports in 2020 that "A proprietary study by the ad exchange OpenX found that, over a week in which cookies were stripped from 3 billion impression opportunities, prices realized by cookie-less impressions were 51% lower"[49] Since no information is provided about the precision of this revenue reduction, I assume that the comparison

[47] https://www.bidswitch.com/wp-content/uploads/2020/03/BidSwitch-Programmatic-Insights-2019.pdf. Last accessed 3/13/2023.

[48] https://pubmatic.com/wp-content/uploads/2021/08/IDFA-Opt-In-Impact-Infographics.pdf?utm_source=website_reports&utm_medium=research_2021&utm_campaign=envision_2021&utm_content=idfa_infographic Last accessed 3/13/2023.

[49] https://www.iab.com/insights/the-socioeconomic-impact-of-internet-tracking/. Last accessed 3/14/2023.

was as precise as the median precision among the studies that do contain precision information, and thus assume the standard error to be 0.9%.

**Table 1: Data sources taken to meta-analysis: Numerical estimates of the reduction in revenue due to removing the bidders' ability to track users individually, sorted in ascending order, Google experiments in bold font.**

| Estimated percentage reduction | Standard error (*imputed*) | Data Year | Source | Comments |
|---|---|---|---|---|
| 8.8% | 0.5% | 2016 | Marotta, Abhishek, and Acquisti (2019) | Econometric model, revenue ~ cookie |
| 44.4% | 0.9% | 2019 | Bidswitch (2020) | Observational data, cookies available vs. not |
| 49.4% | 1.4% | 2013 | Beales and Eisenach (2014) | Econometric model, revenue ~ cookie, Company 2 |
| 51.0% | 0.9% | 2019 | Interactive Advertising Bureau (2020) | Observational data, IDFA vs. not |
| 52.0% | 2.7% | 2015 | Johnson, Shriver and Du (2020) | Econometric model, revenue ~ opt out |
| **52.0%** | **0.5%** | **2019** | **Ravichandran and Korula (2019)** | **Experiment, absence of cookies** |
| 54.7% | 1.2% | 2021 | Alcobendas, Kobayashi and Shum (2021) | Econometric model, revenue ~ cookie |
| 58.3% | 0.9% | 2021 | Pubmatic (2021) | Observational data, cookies available vs. not |
| [redacted] | [redacted] | [redacted] | **GOOG-HEWT-00018008** | [redacted] |
| [redacted] | [redacted] | [redacted] | **GOOG-HEWT-00456342** | [redacted] |
| 70.2% | 0.4% | 2013 | Beales and Eisenach (2014) | Econometric model, revenue ~ cookie, Company 1 |

55. Table 1 collects all the estimates taken to my meta-analysis. Given the diversity of contexts and sampling strategies involved in my inclusive literature search, the appropriate analysis to use is the random-effect meta-analysis. Following Borenstein et al (2010), the random-effect meta-analysis implies a mean effect of 52% with a standard error of 6.9%. Note that this estimate corresponds closely to the average effect in Table 1 because the studies do not vary much in precision. Note also that the exact match to the first decimal point between the meta-analytic estimate and two of the studies (Johnson, Shriver and Du 2020, Ravichandran and Korula 2019) is a co-incidence.

56. As Borenstein et al explain, the meta-analytic standard error is conservative because of the way they compute the underlying variation across studies. Based on totality of the data, the best estimate of the effect of removing User Data from requests is thus 52.0%, with a standard error of at most 6.9% implying a 95% confidence interval of [38.4%,65.6%]. I conclude that User Data has a highly significant effect on auction revenues in RTB, with about 52% of the revenue directly attributable to the User Data.

57. The random-effects meta-analysis based on sources in Table 1 is conservative to narrowing the context solely to auctions run at Google because compared to an analysis that would analyze only the three experiments from Google. The effects in those three experiments have an average of 61.1% with a standard deviation of 8.2%. While directionally higher than the main estimate of 52%, the analysis narrowed to Google sources does not result in statistically significantly higher estimates because 61.1% is within the main estimate's 95% confidence interval.

58. To complete my estimate of the unjust enrichment, I multiply the meta-analytic 52% estimate by the annual U.S. Google revenue from RTB: *Total Annual Unjust Enrichment = (Annual RTB Revenue in the U.S.)* × (*percent of Google RTB revenue attributable to sharing User Data).* This calculation yields a Total Annual Unjust Enrichment of $962 million, or **$2.9 billion over the three years** during which the injunction will remain in force.

## SUMMARY AND CONCLUSIONS

59. The value of the benefits that the proposed settlement will provide to U.S. Google account holders consists of both an intrinsic value of information and control that benefits the whole class, and an extrinsic value to the account holders who adopt the new RTB controls. I do not quantify the intrinsic value account holders place on being informed and having control over their own personal data. The extrinsic value per capita can be quantified using the market price method, and the total extrinsic value to the class depends on the rate of account holder adoption of the new RTB control. Should all U.S. Google account holders adopt the new RTB control, my analysis of the market price of User Data indicates that the settlement will generate a value of **between $18.3 billion and over $21.6 billion** to the account holders over the course of the three years that the proposed

injunction will remain in force. Should only a conservatively estimated 8.8 percent of the U.S. Google account holders adopt the new RTB controls, the settlement will generate a value of **between $1.4 billion and over $1.9 billion o**ver the course of the three years that the proposed injunction will remain in force**.** The range of estimates arises from my uncertainty about the number of U.S. Google account holders being between 169 million and over 200 million. I reserve the right to update the above estimates when a more precise estimate of the number of U.S. Google account holders is produced or otherwise comes to light.

60. My meta-analysis analysis of the percentage of RTB revenue due to sharing of User Data in bid requests indicates that the settlement will prevent an unjust enrichment of **$2.9 billion** over the course of the three years that the proposed injunction will remain in force.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 24th day of July 2025 in Los Angeles, California.

Dated: July 24, 2025



Robert Zeithammer, Ph.D.