**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |
|---|---|
| In re Google RTB Consumer Privacy Litigation,<br><br>This Document Relates to: *all actions* | Case No. 4:21-cv-02155-YGR |

**DECLARATION OF BRUCE DEAL**
**NOVEMBER 26, 2025**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

**TABLE OF CONTENTS**

I.  Prof. Zeithammer's Methodologies are Unreliable ...................................................3

    A.  Prof. Zeithammer's Methodologies Do Not Measure the Value of the RTB Control.........................................................................................................3

    B.  Prof. Zeithammer Makes Incorrect Assumptions About Class Members' Consent ................................................................................................6

    C.  Prof. Zeithammer Incorrectly Assumes that RTB Bid Requests Include Personal Information.........................................................................................7

II.  Prof. Zeithammer's Market Price Model is Unreliable and Overstates the Value of the Settlement.........................................................................................8

    A.  Prof. Zeithammer Grossly Overstates the Market Value of the At-Issue Data ..........................................................................................................8

    B.  Prof. Zeithammer Does Not Sufficiently Support His Estimate of the Fraction of Class Members that Will Enable the RTB Control ....................................11

    C.  Prof. Zeithammer Ignores the Benefits Class Members Receive from Targeted Online Ads .................................................................................12

III.  Prof. Zeithammer's Prevented Unjust Enrichment Methodology is Unreliable and Overstates the Value of the Settlement .........................................................14

1.      I, Bruce Deal, hereby declare as follows:

2.      I am a Managing Principal of Analysis Group, Inc. ("AG"), an economic and financial consulting firm with offices located throughout the United States and internationally. I lead the economic consulting practice in AG's Menlo Park, California office. On September 29, 2023, I submitted an expert report in this matter[1] in which I evaluated and responded to the opinions of Prof. Robert Zeithammer[2] and Mr. Greg Regan[3] related to proposed class-wide damages in this case. My expert qualifications and curriculum vitae are set forth in Appendix A of the Deal Report.

3.      On July 24, 2025, Prof. Robert Zeithammer submitted a declaration[4] in which he opined on the value of the benefits that the proposed settlement will provide to class members if approved.[5] Prof. Zeithammer concluded the value of the settlement is between $1.4 and $21.6 billion using two methodologies:

- A "Market Price Model" that he claims estimates "a market price for the [u]ser [d]ata that will no longer be transmitted in the RTB bid stream when the RTB Control is activated" and the "market value to the U.S. Google account holders who actually activate the RTB control;"[6] and

---

[1] Expert Report of Bruce Deal (ECF 584-7), *In re Google RTB Consumer Privacy Litigation,* Case No. 4:21-cv-02155-YGR(VKD), September 29, 2023 ("Deal Report").

[2] Expert Class Certification Report of Professor Robert Zeithammer (ECF 545-7), *In re Google RTB Consumer Privacy Litigation,* Case No. 4:21-cv-02155-YGR(VKD), July 14, 2023 ("Zeithammer Report").

[3] Expert Class Certification Report of Greg J. Regan (ECF 545-8), CPA/CFF, CFE, *In re Google RTB Consumer Privacy Litigation,* Case No. 4:21-cv-02155-YGR(VKD), July 14, 2023 ("Regan Report").

[4] Declaration of Professor Robert Zeithammer in Support of Plaintiffs' Motion for Certification of Settlement Class and Final Approval of Class Action Settlement (ECF 778-7), *In re Google RTB Consumer Privacy Litigation,* Case No. 4:21-cv-02155-YGR(VKD), July 24, 2025  ("Zeithammer Declaration").

[5] Zeithammer Declaration, ¶ 4. I understand that the proposed settlement includes Google enabling a feature (the "RTB Control") that, when enabled by the user, will: (1) remove all user and pseudonymous identifiers, including encrypted Google User IDs and device advertising IDs, from the RTB bid request; (2) remove IP addresses from the RTB bid request; (3) prevent cookie matching; and (4) generalize bid request fields that contain user agent data. (Plaintiffs' Notice of Motion and Motion to Certify a Settlement Class and Grant Final Approval of Class Action Settlement (ECF 777), *In re Google RTB Consumer Privacy Litigation,* Case No. 4:21-cv-02155-YGR(VKD), September 2, 2025 ("Settlement Motion"), p. 10.) Plaintiffs' allegation in this case is that the at-issue data includes cookies and other pseudonymous identifiers, IP address, user agent, device identifiers, geolocation, and browsing history. (Consolidated Class Action Complaint (ECF 92), in *Benjamin Hewitt, et al., v. Google LLC,* Case No. 5:21-cv-02155-LHK(VKD), September 16, 2021 ("Complaint"), ¶¶ 205–259.)

[6] Zeithammer Declaration, ¶¶ 11-12, 34-36. Prof. Zeithammer estimates the total benefit of the settlement as the product of (1) the benefit per account holder, (2) opt-in percentage, and (3) number of U.S. Google account holders.

- A "Prevented Unjust Enrichment" model that he claims estimates the decline in Google's RTB revenue attributable to "the change in RTB" he understands would be implemented by the settlement.[7]

4.      Counsel for Google has asked me to evaluate, from an economic standpoint, Prof. Zeithammer's estimates of the value that the proposed settlement in this matter will confer if implemented. AG is compensated at the rate of $1,200 per hour for my time. Research and analysis for this declaration was also performed by AG personnel under my direction and guidance. Neither my compensation nor that of AG are contingent upon my findings or the contents of this Declaration.

5.      Based on my review of the information identified herein, and using my experience, expertise, and analysis, it is my opinion that Prof. Zeithammer's estimates are flawed and unreliable, and they vastly overstate the value of the settlement to class members. Specifically:

- Prof. Zeithammer makes unjustified or incorrect assumptions about the quantity and type of data that the RTB Control would prevent from being shared, including assuming that:

    (1) *all* of the at-issue data elements are included in *every* bid request without the RTB Control, even though that is not the case because class members can and some do employ other user settings to limit the data Google shares in bid requests (**Section I.A**);

    (2) *none* of the class members consent to the inclusion of the data Plaintiffs contend is personal information in RTB bid requests (**Section I.B**); and/or

    (3) the information Google includes in RTB bid requests *is* personal information within the context of this litigation (**Section I.C**).

---

The "benefit per account holder" is Prof. Zeithammer's claimed "market price of user data," which he calculates as the product of (1) $36 per year (based on the $3 monthly payment per device from the Screenwise panel) and (2) the three years during which the injunction is expected to remain in force. The "opt-in percentage" ranges between 8.8 and 100 percent and represents the fraction of U.S. Google account holders that Prof. Zeithammer estimates would enable the RTB Control. (Zeithammer Declaration, ¶¶ 22-36.)

[7] Zeithammer Declaration, ¶¶ 37-38, 56, 58. Prof. Zeithammer estimates the total "prevented unjust enrichment" as the product of (1) Google's annual U.S. revenue from RTB in 2022 ▮▮▮▮▮▮▮, (2) his estimate of the share of revenue attributable to the at-issue data (52 percent) based on a "meta analysis" of academic studies, industry reports, and Google documents, and (3) the three years during which the injunction will remain in force. (Zeithammer Declaration, ¶¶ 37-58.)

- Even if the assumptions described above were justified and correct, Prof. Zeithammer's estimates would still be unreliable.

- His **Market Price Model** is unreliable and overstates the settlement value because he:

  (1) *overstates* the value of the at-issue data (**Section II.A**);

  (2) *does not sufficiently support* his calculation of the number of class members who will exercise the RTB Control (**Section II.B**); and

  (3) *ignores the potential offsetting benefits* from targeted ads that class members receive because of the data included in RTB bid requests, which would be foregone if the RTB Control is enabled (**Section II.C**).

- His **Prevented Unjust Enrichment Model** is unreliable and overstated because he:

  (1) *incorrectly assumes* that Google's revenue from class members who would not enable the RTB Control is tied to the alleged conduct;

  (2) *ignores* Google's costs; and

  (3) *incorrectly includes* revenues from non-U.S. users. (**Section III**).

6. My opinions are described in greater detail in the sections that follow.

## I.     PROF. ZEITHAMMER'S METHODOLOGIES ARE UNRELIABLE

### A.     Prof. Zeithammer's Methodologies Do Not Measure the Value of the RTB Control

7. From an economic perspective, the value of the settlement is the difference in value that Google account holders would obtain in a world where the settlement is implemented and the RTB Control is made available, and a world in which users do not have access to the RTB Control (*i.e.*, the current status quo). Prof. Zeithammer's methodologies do not measure the difference in value between these two worlds.

8. The value of the settlement is the value class members will obtain from using the RTB Control to prevent Google's inclusion of certain data fields in RTB bid requests. This calculation must consider that users *already* have controls and tools that allow them to limit the collection and/or sharing of bid request data. If class members can use those existing controls to

3

achieve the same result as they will with the RTB Control, then the RTB Control does not provide any additional economic value. This calculation must also consider that Google also provides a publisher control called restricted data processing ("RDP"), which has the same effect on bid request data as the RTB Control, and which publishers sometimes trigger based on user choices made on their site.[8] The added economic value of the settlement is thus only the value (if any) of the additional data whose inclusion in bid requests will be prevented by the RTB Control (and not by other already existing controls).

9.    For example, users are currently able to:

- Disable the Google Ads Personalization ("GAP") setting, which removes all pseudonymous identifiers from bid requests and disables cookie matching;[9]

- Use browser extensions that (1) prevent the browser from sending ad requests to Google and therefore prevent RTB requests from being sent, resulting in none of the at-issue data being shared, or (2) otherwise affect the data in bid requests;[10]

- Use certain web browsers (e.g., Safari, Firefox, Edge) or private browsing modes (e.g., Incognito on Chrome) that block third party cookies by default;[11,12]

- Enable mobile device settings on iOS and Android that remove pseudonymous device identifiers from the data included in RTB bid requests;[13]

---

[8] Berntson Declaration, ¶¶ 41-43. Prof. Zeithammer's Market Price Model also doesn't account for publishers who are already using RDP. For all bid requests associated with such publishers, the marginal value of the RTB Control is zero because the user's enablement of the RTB Control does not change what data Google collects—it is already limited by RDP.

[9] Berntson Declaration, ¶¶ 48-49. I understand that the only differences between GAP and the RTB Control are that the latter also omits (instead of truncating) IP addresses and generalizes user agents.

[10] Berntson Declaration, ¶¶ 59-60.

[11] Berntson Declaration, ¶ 55; "Browse in Incognito mode," *Google Chrome Help*, available at https://support.google.com/chrome/answer/95464.

[12] Ads can be served through Google RTB to users of Google Chrome and non-Google browsers like Firefox, Safari, and Edge. *See, e.g.,* "Fix an issue with your browser," *Google Ads Help*, available at https://support.google.com/google-ads/answer/1704376?hl=en.

[13] Berntson Declaration, ¶¶ 61-63.

- Use VPNs or proxy servers that mask the user's IP address, showing an IP address assigned by the VPN rather than the IP address of the user's device;[14] or

- Use tools from third parties like NAI[15] and AdChoices[16] that limit RTB bid request data in the same way as GAP but also work while the user is signed out of their Google account.[17]

10. Accordingly, I understand that the only additional data fields that are affected by the RTB Control and that users cannot control with existing settings are: (1) the user agent field (which would be generalized when the RTB Control is enabled);[18] and (2) the IP address field (which can be omitted under the RTB Control, as compared to being truncated under the current default operation of RTB bid requests or masked if a user uses a VPN).[19]

11. Prof. Zeithammer does not calculate the difference in value between the data users can already omit from RTB bid requests using these currently available settings and the data they can omit from RTB bid requests using the planned RTB Control. Instead, his models attempt to measure the difference between: (1) a settlement world where class members who enable the RTB Control do not share any allegedly personal information in bid requests; and (2) a non-settlement world where, in theory, users have no ability to limit the allegedly personal information in RTB bid requests and none of currently available user controls exist.

12. This issue is particularly problematic because many class members are already using some of the existing controls listed above to prevent Google from including in RTB bid

---

[14] Berntson Declaration, ¶ 64.

[15] "How to Opt Out," NAI, available at https://thenai.org/how-to-opt-out/. Although has discontinued its cookie-based and email-based opt-out tools, it still provides a browser extension for Google Chrome that allows users to opt out of tailored advertising. *See,* "Consumer FAQs Opt-out Sunset," *NAI*, available at https://thenai.org/how-to-opt-out/consumer-faqs-opt-out-sunset/.

[16] "YourAdChoices Gives You Control," *YourAdChoices*, available at https://youradchoices.com/control.

[17] Berntson Declaration, ¶¶ 51-53.

[18] I understand that generalizing user agent data means that the field would not include specific sub-versions of the browser or system used, e.g., iOS 14.5 would be generalized to iOS 14.0). I also understand that the user agent field is also generalized if publishers enable the existing RDP control. (Berntson Declaration, ¶ 41.)

[19] Settlement Motion, p. 10.

requests much of the same data affected by the RTB Control.[20,21] This makes the difference between the settlement and non-settlement worlds smaller and causes Prof. Zeithammer to overstate the value of the settlement. The more overlap there is between the group of users who will enable the RTB Control and the group of users who are using previously existing controls, the more the value of the settlement is reduced. For example, if the users who will enable the RTB Control tend to be the more privacy-conscious users who are already using other tools such as GAP, browsers that block third-party cookies, or VPNs, then the effect of the RTB Control on the personally-identifiable nature of the information included in bid requests would be minimal.

**B.      Prof. Zeithammer Makes Incorrect Assumptions About Class Members' Consent**

13.      Prof. Zeithammer's methodologies are also unreliable because he fails to consider that some or all class members may have consented, explicitly or implicitly, to the sharing of data in RTB bid requests.

14.      I understand that the Court has found that Google's disclosures (*e.g.,* Google's Privacy Policy) tell account holders that Google shares information such as their IP address and the URL of the website visited to personalize ads and that they may turn off ad personalization, and that disclosures by publishers and third parties include similar information.[22]

---

[20] For example, Dr. Zeithammer's prevented unjust enrichment model assumes 52 percent of RTB related revenues are tied to the value of the settlement. However, this 52 percent figure is an average calculated including studies that estimate the difference between revenue from an ad targeted with user data and a contextual ad. If the users who enable the RTB Control are, for example, already using GAP or a browser without third-party cookies, the difference between the revenue from ads shown to them with or without the RTB Control will be less than 52 percent. Similarly, Prof. Zeithammer uses the Screenwise payment of $3 per month per device to value all the at-issue data. His methodology does not provide a way to value only the additional elements of data that users will not share through the use of the RTB Control.

[21] For example, around 32 percent of Americans use ad blockers, with around half of users citing privacy concerns as the main reason. *See "Ad Blocker Usage and Demographic Statistics," BlackLinko,* September 2, 2024, available at https://backlinko.com/ad-blockers-users. Similarly, a 2025 CNET survey found that 43% of US adults use VPNs, and nearly half do so to protect their online activity and IP address. *See* Milden, D., "CNET Survey: 47% of Americans Use VPNs for Privacy. That Number Could Rise as State Internet Bans Increase," *CNET,* September 19, 2025, available at https://www.cnet.com/tech/services-and-software/vpn-survey-2025/.

[22] I understand the Court also concluded that putative litigation class members' past consent to Google sharing the at-issue data must be assessed individually to determine damages because someone "who consents to an act is not wronged by it." (Order Denying Without Prejudice the Motion for Class Certification (ECF 690), *In re Google RTB Consumer Privacy Litigation,* 5-02155-YGR(VKD), April 4, 2024, pp. 20-23.)

15.    From an economic perspective, if a user is aware that Google shares certain data with advertisers and chooses not to use already available controls to prevent or limit this data sharing, this reveals that the user is freely sharing those data and finds no value in the controls. Therefore, the value that these user controls, including the RTB Control, have for this user is zero. For this reason, it is wrong for Prof. Zeithammer to assume that Google account holders who would consent to the inclusion of the at-issue data in RTB bid requests—in exchange for no compensation other than receiving targeted ads—would also derive the same value from the RTB Control as Google account holders who would not consent.

**C.    Prof. Zeithammer Incorrectly Assumes that RTB Bid Requests Include Personal Information**

16.    Prof. Zeithammer claims that the effect of the RTB Control is that "the information transmitted will ***no longer*** constitute [Personal Information]."[23] But if RTB bid requests do not currently contain personal information, then class members would not be receiving any additional value in terms of protecting their personal information. Moreover, even if some, but not all, RTB bid requests contained personal information, then the value of the settlement would be lower than if all bid requests contained personal information. Yet, Prof. Zeithammer fails to consider this and simply assumes the at-issue data is personal information.

17.    I understand that the Court has not made any finding as to whether the data included in RTB bid requests constitutes personal information, including on a class-wide basis, and that Plaintiffs and Google continued to dispute that question at the time the settlement was agreed upon.

18.    To the extent that RTB bid request data from class members is not personal information, this would further limit the value of the RTB Control to class members because, under both of Prof. Zeithammer's models, this value is tied to the quantity and nature of the *personal* information shared in absence of the RTB Control.

---

[23] Zeithammer Declaration, ¶ 6 (emphasis added).

## II. PROF. ZEITHAMMER'S MARKET PRICE MODEL IS UNRELIABLE AND OVERSTATES THE VALUE OF THE SETTLEMENT

### A. Prof. Zeithammer Grossly Overstates the Market Value of the At-Issue Data

19. The $36 per class member per year amount that Prof. Zeithammer uses as a measure of the value of each class member's at-issue data is grossly overstated, which means that his estimated value of the settlement is also grossly overstated. To estimate the value of the at-issue data, Prof. Zeithammer looks to payments from market research programs to their participants and picks the $3 per month per device ($36 per year per device) payment in the Ipsos Screenwise program. These programs are not viable comparisons for the value of the at-issue data for at least three reasons.

20. *First*, Prof. Zeithammer's $36 per year comparator, the Screenwise program, as well as other programs he considers, include compensation for user time spent on activities required of participants, not just for the value of their data. For instance, each program requires participants to complete various tasks, such as creating and regularly updating their profile, answering surveys and questionnaires, or linking their social media accounts.[24] The portion of the fee related to compensation for user time should be excluded from the valuation of the settlement, as the RTB Control does not require class members to spend *any* additional time.

21. *Second*, the programs on which Prof. Zeithammer relies for his $36 per user per year estimate collect far broader and more voluminous data than the at-issue data in this case. For example:

- All programs relied on by Prof. Zeithammer collect detailed identifying and demographic information, such as name, contact information, age, gender,

---

[24] *See* Deal Report, Section V.A and Exhibit 7. *See also,* "Google Panel Terms & Conditions," *Ipsos Screenwise Panel*, June 1, 2021, available at https://screenwisepanel.com/google-panel-terms-condition. *See* "Ipsos Screenwise Panel Privacy Policy," *Ipsos Screenwise Panel*, February 1, 2023, available at https://screenwisepanel.com/ipsos-Sow-privacy-policy. *See also,* "Google Panel Privacy Policy," *Ipsos Screenwise Panel,* December 28, 2022, available at https://screenwisepanel.com/google-panel-privacy-policy. *See also,* "Privacy Policy," *Caden*, April 3, 2024, available at https://www.caden.io/privacy. *See also,* "Privacy & Data Policy," *Datacy*, May 14, 2025, available at https://datacy.com/privacy-policy. *See also,* "Privacy Policy," *Killi*, June 23, 2021, available at https://web.archive.org/web/20230202165328/https://killi.io/privacy-policy/.

education, and race or ethnicity,[25] while RTB bid requests only include pseudonymous identifiers and no demographic information.[26]

- The programs that Prof. Zeithammer relies on collect *all* of the user's web browsing activity and app use.[27] Screenwise even collects the information entered on websites or apps, including sensitive information like social security numbers and credit card information. In contrast, RTB bid requests only include the URL of the website or an identifier of the app where the ad will be placed, and even that URL may be very broad like www.cnn.com and not informative of what content the user is accessing on the website.[28]

- Some of the programs, such as Screenwise and Killi, collect *precise* location data with latitude and longitude coordinates (e.g., from a device GPS signal) and Screenwise also collects the user's home and work addresses.[29] In contrast, the RTB bid requests only include general location data based on the user's IP address and coarsened based on Google's privacy-enhancing protections.[30]

- Screenwise even collects detailed device information, such as the content of the user's screen, use of telephone, email, and SMS, or data on clicks and taps on the screen, that is not included in RTB bid requests.[31]

22.     *Third*, research programs restrict users from taking actions to limit the data shared. In particular, Screenwise restricts users from turning off or masking their location, opting

---

[25] *See* Deal Report, Section V.A and Exhibit 7. *See also,* "Ipsos Screenwise Panel Privacy Policy," *Ipsos Screenwise Panel*, February 1, 2023, available at https://screenwisepanel.com/ipsos-Sow-privacy-policy. *See also,* "Google Panel Privacy Policy," *Ipsos Screenwise Panel,* December 28, 2022, available at https://screenwisepanel.com/google-panel-privacy-policy. *See also,* "Privacy Policy," *Caden*, April 3, 2024, available at https://www.caden.io/privacy. *See also,* "Privacy & Data Policy," *Datacy*, May 14, 2025, available at https://datacy.com/privacy-policy. *See also,* "Profile," *Datacy*, available at https://personal.datacy.com/profile/demographics. *See also,* "Privacy Policy," *Killi*, June 23, 2021, available at https://web.archive.org/web/20230202165328/https://killi.io/privacy-policy/.

[26] Berntson Declaration, ¶¶ 9-10.

[27] *See* Deal Report, Section V.A and Exhibit 7. *See also,* "Google Panel Privacy Policy," *Ipsos Screenwise Panel,* December 28, 2022, available at https://screenwisepanel.com/google-panel-privacy-policy. *See also,* "Privacy Policy," *Caden*, April 3, 2024, available at https://www.caden.io/privacy. *See also,* "Privacy & Data Policy," *Datacy*, May 14, 2025, available at https://datacy.com/privacy-policy. *See also,* "Privacy Policy," *Killi*, June 23, 2021, available at https://web.archive.org/web/20230202165328/https://killi.io/privacy-policy/.

[28] Berntson Declaration, ¶ 9.

[29] *See* "Google Panel Privacy Policy," *Ipsos Screenwise Panel,* December 28, 2022, available at https://screenwisepanel.com/google-panel-privacy-policy. *See also,* "Privacy Policy," *Killi*, June 23, 2021, available at https://web.archive.org/web/20230202165328/https://killi.io/privacy-policy/.

[30] Berntson Declaration, ¶¶ 30-32.

[31] *See* "Google Panel Privacy Policy," *Ipsos Screenwise Panel,* December 28, 2022, available at https://screenwisepanel.com/google-panel-privacy-policy.

out of personalized ads, using ad blockers, and using "do not track" features.[32] In contrast, as I discuss in **Section I.A**, all class members already have the ability—and some class members indeed act on this ability—to limit the data included in RTB bid requests.[33]

23.     In fact, the difference between the at-issue data and the data collected by the companies Prof. Zeithammer is using is so great, it defies any reasonable comparison. This is well illustrated by Prof. Zeithammer's calculations themselves. Prof. Zeithammer asserts that Google would retain ███████ in RTB-related revenues over a three year period.[34] As I explain in **Section III** below, Google retains only ██ percent of these revenues, or ████████, and shares the rest with publishers.[35] Even accepting Prof. Zeithammer's unjust enrichment methodology for the sake of argument, 52 percent of this amount—approximately ████ ████[36]—are attributable to the at-issue data.[37] Prof. Zeithammer's calculation of the value of the at-issue data is between $1.4 billion and $21.6 billion.[38] Therefore, even Prof. Zeithammer's lowest possible estimate of the value of the at-issue data represents almost twice the entire net revenues Google was supposedly able to obtain from the data, before covering any other costs. Similarly, his highest estimate of the value of the data is almost 30 times higher than Google's net revenues obtained from those data. From an economic standpoint, the amount calculated by Prof. Zeithammer can only be the "market price" of the at-issue data if a buyer is willing to pay that price for it. It is economically unreasonable to assume that Google, or anyone else, would

---

[32] *See* "Google Panel Terms & Conditions," *Ipsos Screenwise Panel*, June 1, 2021, available at https://screenwisepanel.com/google-panel-terms-condition.

[33] As Mr. Berntson explains, the google_user_id, hosted_match_data, and device identifiers can be omitted due to user settings, the IP address can be replaced with an IP address assigned by a VPN which also affects the geolocation field, and the information in the user agent may be limited in certain circumstances. *See* Berntson Declaration, ¶¶ 18-65.

[34] Zeithammer Declaration, ¶ 38. Prof. Zeithammer calculates ████████ per-year in RTB-related revenues and ████████ times three years totals ████████.

[35] These payments to publishers are the Traffic Acquisition Costs described in **Section III** below.

[36] ████████ = ████████ in RTB revenues over three years) × (██ percent Google's share of revenue net of Traffic Acquisition Costs) × (52 percent of revenue attributable to the at-issue data according to Prof. Zeithammer).

[37] Prof. Zeithammer estimates that 52 percent of Google's ad revenue is attributable to personalization using the at-issue data based on his meta-analysis of academic studies, industry reports, and internal Google documents (Zeithammer Declaration, ¶¶ 39-58.) I discuss this estimate in the Deal Report. (*See* Deal Report, Section IV.D.) As I discuss in **Section III** below, this fraction overstates Google's earnings from the at-issue data.

[38] Zeithammer Declaration, ¶¶ 35-36.

pay $1.4 billion—and surely not $21.6 billion—for these data to only obtain ██████ in net revenues and much less in profit.

24.     Of note, Prof. Zeithammer acknowledges that there is an issue with the comparability of the programs he is using and the at-issue data,[39] but makes no adjustments to the $36 per year Screenwise payment to account for any of the differences listed above. Therefore, his conclusion that this payment is a "conservative estimate of the fair market price" for the at-issue data is flawed and, rather than being "conservative," substantially overstates the value of the settlement.[40]

### B.    Prof. Zeithammer Does Not Sufficiently Support His Estimate of the Fraction of Class Members that Will Enable the RTB Control

25.     From an economic perspective, the settlement offers value to class members only if it reduces the amount of at-issue data that is shared in RTB bid requests. This reduction in data shared can only occur when users enable the RTB Control. Therefore, if Prof. Zeithammer overstates the utilization rate of the RTB Control, he is also overstating the value of the settlement.

26.     Prof. Zeithammer's assumption that between 8.8 and 100 percent of settlement class members will enable the RTB Control is flawed and overstated.[41] Prof. Zeithammer provides no evidence or analysis to support his upper bound. To the extent that he is assuming that every class member will enable the RTB Control, this assumption is entirely unsupported and unrealistic for several reasons, including because: (1) a large share of people *prefer* targeted ads enabled by using their data,[42] and (2) the utilization of already available controls to limit data

---

[39] He states that "Screenwise also tracks types of data that are not included in Google RTB (e.g. content of messages)" and that "the value account holders place on the data they share with Screenwise and the recipient of the data places on that data may be different than the corresponding values in the context of User Data shared in RTB bid requests." (Zeithammer Declaration, ¶ 28.)

[40] Zeithammer Declaration, ¶ 33.

[41] Zeithammer Declaration, ¶¶ 35-36.

[42] For example, the 2024 IAB study found that 90 percent of consumers prefer personalized ads. *See* "Nearly 8 in 10 Consumers Would Rather Receive More Ads Than Pay for Digital Content and Services, According to IAB Research," *IAB*, January 30, 2024, available at https://www.iab.com/news/consumer-privacy-research/.

sharing is much lower than 100 percent.[43] Alternatively, to the extent that Prof. Zeithammer is equating the value of using the RTB Control to the value of the *option* of using it, which all class members would have, this overstates the value of the settlement. This is because, in economic terms, (1) the option value of a good or service is logically less than the payoff from using it, and (2) the option value only exists if an alternative control—one that is not part of the settlement—does not accomplish the same reduction in data shared.

27.    Prof. Zeithammer's lower bound of 8.8 percent is similarly flawed. He bases the estimate on a single study which shows that 8.8 percent of ad impressions on Yahoo websites are from users who opted out of "behavioral targeting" (i.e., personalized advertising).[44] However, evidence from the California Consumer Privacy Act ("CCPA") and other privacy controls shows that adoption rates could be lower than Prof. Zeithammer's 8.8 percent. For example, the CCPA Benchmark Survey reports that most businesses report "opt-out rates of 1-5%" and only a few users requesting deletion of their data.[45] For example, a study by Singular reports that only 2.3 percent of Android users in the U.S. opted out of personalized advertising in 2020 and less than 1 percent did so in 2023.[46] Therefore, Prof. Zeithammer's claim that his 8.8 percent estimate is "very conservative" is misleading and unsupported.[47]

### C.    Prof. Zeithammer Ignores the Benefits Class Members Receive from Targeted Online Ads

28.    Another reason why Prof. Zeithammer overstates the value of the settlement is that he ignores the offsetting benefits that class members receive from targeted ads enabled through the RTB auctions and which will be foregone by users who will enable the RTB Control.

---

[43] For example, as I discuss below, the utilization rate of CCPA opt-out controls is five percent or less.

[44] Zeithammer Declaration, ¶ 36, citing to Alcobendas, M., et al., "The impact of privacy protection on online advertising markets," *SSRN*, October 6, 2023, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3782889, pp. 1-41, at pp. 12-13.

[45] "IAB CCPA Benchmark Survey," *IAB*, November 12, 2020, available at https://www.iab.com/insights/iab-ccpa-benchmark-survey/.

[46] Koetsier, J., "5 billion ad events show that fewer than 1% of Android users opt out of personalized ads," *Singular*, January 26, 2023, available at https://www.singular.net/blog/ad-personalization-android/.

[47] Zeithammer Declaration, ¶ 36.

29.    Research shows that a majority of people are willing to share their information with companies to receive personalized ads and experiences because they derive benefits from them.[48]  For example:

- A 2021 national survey found that more than half of consumers identify benefits of targeted advertising, such as finding promotional sales and incentives, discovering new brands and local businesses, getting personalized product or service recommendations, and offering a more efficient online shopping experience.[49]

- A 2021 Ipsos poll found customers noting that personalized ads help connect them with small local businesses, find information and products of interest, and save money.[50]

- The FTC also noted that ad targeting can also mean advertisers needing to serve fewer targeted ads compared to the number of untargeted ads needed to reach the same population, which means consumers benefit directly from viewing fewer irrelevant ads and also indirectly from cost-savings passed on by firms.[51]

30.    Even users who do not prefer personalized ads can derive benefits from them. For example, a user who otherwise dislikes personalized ads may still see a discount or offer on a product they are interested in via such an ad and may end up purchasing the product at a lower price as a result of seeing the ad. This means that the user would still derive a monetary benefit from the ad, despite their preferences. Similarly, targeted ads also facilitate the provision of free apps and media to consumers, and research shows that most consumers prefer ads to having to

---

[48] *See, e.g.,* Kirkpatrick, D., "Study: 71% of consumers prefer personalized ads," *Marketing Dive*, May 9, 2016, available at https://www.marketingdive.com/news/study-71-of-consumers-prefer-personalized-ads/418831/. *See also*, Clark, T., "74 percent of U.S. consumers are willing to share personal information with brands and retailers," *The Current*, January 3, 2024, available at https://www.thecurrent.com/us-consumers-willing-share-personal-information-brands-retailers. *See also,* Abraham, "What Consumers Want from Personalization," *Boston Consulting Group*, December 12, 2024, available at https://www.bcg.com/publications/2024/what-consumers-want-from-personalization. *See also,* "79 Personalization Statistics & Trends of 2025," *DemandSage*, January 23, 2025, available at https://www.demandsage.com/personalization-statistics.

[49] "Despite Negative Perceptions, 52% of Consumers Can Identify Benefits of Targeted Advertising," *PRNewswire*, March 25, 2021, available at https://www.prnewswire.com/news-releases/despite-negative-perceptions-52-of-consumers-can-identify-benefits-of-targeted-advertising-301255752.html.

[50] "People Globally View Personalized Ads as a Valuable Tool for Finding Relevant Goods and Services," *Ipsos*, June 23, 2021, available at https://www.ipsos.com/en-us/news-polls/ipsos-consumer-online-survey.

[51] Lau, Y., "A Brief Primer on the Economics of Targeted Advertising," *Bureau of Economics, Federal Trade Commission*, January 2020, pp. 1-16, at pp. 6, 12, available at https://www.ftc.gov/system/files/documents/reports/brief-primer-economics-targeted-advertising/economic_issues_paper_-_economics_of_targeted_advertising.pdf, accessed on August 24, 2023.

directly pay for access.[52] Therefore, free access to websites that would otherwise have to offer paid content in the absence of revenue from targeted ads is a benefit to users irrespective of their attitudes towards personalized ads.

31.    I note that the high percentage of users who prefer and benefit from personalized ads is consistent with statistics presented in **Section II.B** showing that most users do not exercise already available options to limit personalized advertising. This is further evidence that Prof. Zeithammer's assumption that 100% of users would utilize the RTB Option is unreasonable.

### III.    PROF. ZEITHAMMER'S PREVENTED UNJUST ENRICHMENT METHODOLOGY IS UNRELIABLE AND OVERSTATES THE VALUE OF THE SETTLEMENT

32.    Prof. Zeithammer's economic framework for calculating unjust enrichment-based settlement value is economically unsound for at least three reasons.

33.    *First*, he includes in his calculation *all* of Google's revenue from *all* U.S. Google account holders—not just those who will enable the RTB Control—even though he acknowledged that revenues from ads shown to users who will not enable the RTB Control "will still accrue, but will no longer be earned unjustly."[53] However, the RTB Control would be of *no value* to class members who knew of and consented to the inclusion of the at-issue data in bid requests—these class members did not take actions to limit or prevent the data sharing before and are likely not to do so even if the RTB Control is implemented. Therefore, from an economic perspective, only Google's revenue and profits from ads served to class members who *will* enable the RTB Control should be included in the value of the settlement.

---

[52] *See* Lau, Y., "A Brief Primer on the Economics of Targeted Advertising," *Bureau of Economics, Federal Trade Commission*, January 2020, pp. 1-16, at p. 11, available at https://www.ftc.gov/system/files/documents/reports/brief-primer-economics-targeted-advertising/economic_issues_paper_-_economics_of_targeted_advertising.pdf, accessed on August 24, 2023.  *See also,* Greenwood, J., et al., "A macroeconomic analysis reveals the benefits for consumers of digital advertising," *University of Pennsylvania Carey Law School*, October 11, 2021, available at https://www.law.upenn.edu/live/blogs/75-a-macroeconomic-analysis-reveals-the-benefits-for. *See also,* Greenwood, J., et al., "'You Will:' A Macroeconomic Analysis of Digital Advertising," *Review of Economic Studies*, 2025, Vol. 92(3), pp. 1837-1881. *See also,* "Nearly 8 in 10 Consumers Would Rather Receive More Ads Than Pay for Digital Content and Services, According to IAB Research," *IAB*, January 30, 2024, available at https://www.iab.com/news/consumer-privacy-research/.

[53] Zeithammer Declaration, ¶ 13.

34.    *Second*, Prof. Zeithammer ignores Google's costs of serving ads via RTB auctions, including basic incremental costs that Google cannot avoid. He calculates the "prevented unjust enrichment" using Google's booked revenue (i.e., the price that advertisers pay for the ad), ignoring that Google only keeps a portion of that revenue because it shares the remainder with the publisher as compensation for the ad space.[54] This publisher share is described as Traffic Acquisition Costs ("TAC") in Google's financial statements.[55] Although Prof. Zeithammer claims there is no available data to estimate Google's marginal costs,[56] the same document he uses to estimate Google's RTB revenues states that Google paid ███████ of its RTB global booked revenue as TAC to publishers.[57] While TAC is only one of the costs Google incurs, Google cannot avoid this cost and it is improper to ignore this cost when calculating any unjust enrichment. Adjusting his calculations to only include revenues net of TAC would decrease his "prevented unjust enrichment" from $███████ to ███████.[58] Google incurs other costs that Prof. Zeithammer fails to consider, such as content acquisition costs, employee compensation, and costs associated with technical infrastructure.[59] Accounting for these costs would further decrease the "prevented unjust enrichment."

35.    *Third*, Prof. Zeithammer's "prevented unjust enrichment" includes revenue associated with non-U.S. users, which I am informed should be excluded from the lawsuit.[60] Google produced RTB revenue from "U.S. User[s]" and explained that "'US User' means a user accessing the internet using a device with an IP address that Google associated with a location within the United States at the time the user was shown an ad that generated revenue."[61] I

---

[54] I discussed this issue in detail in the Deal Report. *See* Deal Report, ¶ 27.

[55] *See, e.g.,* Alphabet Inc., SEC Form 10-K, for the period ended December 31, 2024, p. 33.

[56] *See* Zeithammer Declaration, n. 22.

[57] ███████████████████████████ using values for January – June of 2022. ██████████████████████████████████████████████ ██████████████████████████ *See* GOOG-HEWT-00455648. *See also,* Deal Report, Exhibit 1. Plaintiffs' expert Mr. Regan also subtracted TAC from Google's revenues when he calculated Google's claimed unjust enrichment in this matter. *See* Regan Report, Section III.A.3

[58] ███████████████████████████████████. *See* Zeithammer Report, ¶ 58.

[59] *See, e.g.,* Alphabet Inc., SEC Form 10-K, for the period ended December 31, 2024, p. 33.

[60] Zeithammer Declaration, ¶ 14.

[61] Zeithammer Declaration, ¶¶ 38, 58; Google's Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories, Response No. 11 ("'US User' means a user accessing the internet using a device with an IP address

15

understand that Google would classify revenue associated with users who are not physically in the U.S. and instead use a VPN or other services to appear as if they are in the U.S. (e.g., by changing their actual IP address to a U.S.-based IP address) under "U.S. User" revenue.[62] Data shows the share of non-U.S. users who mask their IP address to appear as if they are in the U.S. is likely significant, given estimates that about one in three Internet users use VPNs and half of the adults worldwide use a VPN to watch location restricted content.[63]

36.     Only accounting for TAC costs (and no other costs) and assuming that the fraction of users who would enable the RTB control is Prof. Zeithammer's lower bound of 8.8 percent results in "prevented unjust enrichment" of only $66.4 million.[64] This valuation is still overstated for at least two reasons: (1) it does not account for other costs to Google, and (2) as I discuss in **Section II.B** above, it likely overstates the fraction of class members who would prefer to enable the RTB Control.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 26th day of November 2025 in Menlo Park, California.



_____

Bruce Deal

---

that Google associated with a location within the United States at the time the user was shown an ad that generated revenue.).

[62] Berntson Declaration, ¶¶ 64-65.

[63] For example, a VPN provider SurfShark estimates that over 1.75 billion people worldwide use VPNs, which is about one-third of all Internet users. *See* Pennell, E., "VPN statistics: usage, markets, and trends," *SurfShark*, June 17, 2025, available at https://surfshark.com/blog/vpn-users. *See also*, Lovely, S., "Streaming Across Borders: 51% of Adults Worldwide Use a VPN to Watch Location Restricted Content on Netflix," CordCutting, December 15, 2021, available at https://cordcutting.com/vpn/streaming-across-borders-study/; "VPNs Used Primarily to Access Geo-Restricted Content," *GeoComply*, July 6, 2018, available at https://www.geocomply.com/blog/vpns-used-primarily-to-access-geo-restricted-content/; Peter, C., "VPN Usage Statistics and Trends for 2025–2026: What the Data Reveals," *Compare Cheap SSL*, July 26, 2025, available at https://comparecheapssl.com/vpn-usage-statistics-and-trends-what-the-data-reveals/.

[64] ███████████████████████████████████████████ *See* Zeithammer Report, ¶ 58.

16