# EXHIBIT N

## REDACTED VERSION

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR |
| This document applies to: *all actions* | **DECLARATION OF PROFESSOR ZUBAIR SHAFIQ IN RESPONSE TO GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**<br><br>***Redacted Version***<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: February 3, 2026<br>Time: 2:00 pm<br>Courtroom: 1, 4th Floor |

I, Zubair Shafiq, hereby declare as follows:

1. I am a Professor of Computer Science at the University of California, Davis, where my research and education efforts broadly focus on online security and privacy, including personal data collection, sharing, and usage in the online advertising ecosystem. I have been retained by counsel for plaintiffs as an expert in this matter and I submit this declaration in response to Google LLC's Opposition to Plaintiffs' Motion for Award of Attorneys' Fees and Expenses ("Google Oppo."). I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

BACKGROUND

2. I previously submitted two expert reports in support of plaintiffs' July 14, 2023 Motion for Class Certification, and one expert report in support of plaintiffs' November 8, 2024 Renewed Motion for Class Certification.[1] I also consulted with counsel for plaintiffs during the settlement discussions leading up to the proposed settlement with Google, and I then submitted a declaration in support of Plaintiffs' Motion for Certification of Settlement Class and Final Approval of Class Action Settlement.[2]

3. My expert qualifications generally are set forth in paragraphs 1-7 of the July 14, 2023 Shafiq Report, and my updated curriculum vitae is attached as Exhibit A to the November 8, 2024 Shafiq Supplemental Report. My hourly rate is $500. My fee is neither contingent on the results of this case nor contingent on the content of this declaration.

ASSIGNMENT

4. I have been asked by plaintiffs' counsel to comment on the unique benefits of the new "RTB Control" that Google has agreed to implement as part of the proposed settlement, which will,

---

[1] Expert Class Certification Report of Professor Zubair Shafiq, July 14, 2023 ("Shafiq Report") (ECF 545-5); Expert Class Certification Rebuttal Report of Professor Zubair Shafiq, Nov. 29, 2023 ("Shafiq Rebuttal Report") (ECF 616-5); Supplemental Expert Class Certification Report of Professor Zubair Shafiq, Nov. 8, 2024 ("Shafiq Supplemental Report") (ECF 750-8).

[2] Declaration of Professor Zubair Shafiq in Support of Plaintiffs' Motion for Certification of Settlement Class and Final Approval of Class Action Settlement, Aug. 28, 2025 ("Shafiq Decl.") (ECF 778-5).

for the first time, allow Google U.S. account holders—whether signed in or signed out—to meaningfully limit the information that Google shares with Real-Time Bidding ("RTB") participants in Google's RTB auctions.

5. I have also been asked to respond to certain statements by Google's expert Bruce Deal concerning what data fields are included in RTB bid requests and whether these data fields collectively convey personally identifying information about Google U.S. account holders.[3]

THE NEW RTB CONTROL

6. As I explained in the August 28, 2025 Shafiq Declaration, by exercising the new RTB Control, Google U.S. account holders will be able to remove or otherwise limit the following categories of information shared by Google with RTB participants in RTB bid requests:[4]

a. All pseudonymous identifiers will be removed from RTB bid requests, including the Google User ID and the device ID.

b. No user lists will be shared or used in connection with RTB bid requests.

c. No cookie matching will occur in connection with RTB bid requests.

d. The IP address will be removed from RTB bid requests.

e. Bid request fields that contain user agent data will be generalized to the coarsest or highest version level in the RTB bid request.

7. As set forth in the Shafiq Declaration, it is my opinion that the removal or generalization of the specific data fields listed above, and the stopping of the use of cookie matching and user lists, will make it much harder, if not impossible, for RTB participants to identify and/or track Google U.S. account holders, and result in those individuals no longer receiving personalized ads from Google's RTB auctions. In essence, when the RTB Control is implemented, the information shared by Google in RTB auctions will no longer identify, be associated with, or be reasonably linkable to a particular person or household.

---

[3] Mr. Deal's statements are set forth in the Declaration of Deal, November 26, 2025 ("Deal Decl.") (ECF 787-14).

[4] Shafiq Decl., ¶ 17.

8. I understand that in opposing plaintiffs' attorneys' fee motion, Google now contends that the already existing Google Ads Personalization ("GAP") Control "affects much of the same data as the new RTB Control"[5] and that it "allows users control over most of the same bid request fields affected by the new RTB Control."[6]

9. As I explain below, Google's contention that the new RTB Control provided for in the proposed settlement is not much different from the existing GAP Control is inaccurate and misleading for at least three significant reasons. The privacy protection offered by the new RTB Control is (a) ***materially broader***, (b) ***more present and future critical***, and (c) ***more effective in protecting users' personal information*** than any existing control offered by Google, including the GAP Control. I address each of these points in detail below.

A. The RTB Control Is Materially Broader and Provides Greater Privacy Protection Than Existing Controls Offered by Google, Including the GAP Control

10. The new RTB Control provided for in the proposed settlement covers the data fields in RTB bid requests that enable user identification, including data fields that no existing Google control—GAP included—addresses. In particular, **only** the new RTB Control suppresses the IP address and User Agent data fields, which are the two primary data fields that allow RTB participants to perform *fingerprinting* (also known as probabilistic matching).

a. **IP Address Removal**: The GAP Control does not remove the IP address in RTB bid requests. The RTB Control uniquely removes it.

b. **User Agent Generalization**: The GAP Control does not modify or generalize User Agent data. The RTB Control uniquely generalizes User Agent data to the highest-level version, eliminating the granular device and browser information that is critical for fingerprinting.

11. Put plainly, the new RTB Control is a strict superset of the GAP Control. This means the new RTB Control covers every data field affected by the GAP Control and, crucially, also suppresses the fingerprinting-critical data fields—IP address and User Agent—that the GAP Control

---

[5] Google Oppo. at 7.

[6] Google Oppo. at 22.

leaves untouched. This distinction is important because to the extent that a Google U.S. account holder enables both the GAP and RTB Controls, or any other privacy controls Google offers, Google will apply the most restrictive privacy treatment,[7] and that will in all cases be the RTB Control provided for in the proposed settlement.

B. <u>The IP Address and User Agent Data Fields in Google RTB Bid Requests Enable Fingerprinting, Which Has Become Increasingly Central to Identification of Consumers by RTB Participants</u>

12. The combination of the IP address and User Agent data fields is widely used today for fingerprinting by RTB participants and is becoming increasingly important as the availability of cookies and other deterministic identifiers decline over time. Unlike deterministic identifiers such as cookies, fingerprinting relies on data fields such as IP address and User Agent to identify a user. As the availability of deterministic identifiers (including third-party cookies) has declined in recent years, fingerprinting has become increasingly important for RTB participants seeking to identify users.

13. In the July 14, 2023 Shafiq Report, I discussed the numerous documents produced by Google in which it internally acknowledged that IP address and User Agent information shared by Google in RTB bid requests with RTB participants is routinely used for fingerprinting. These include the following:

a. GOOG-HEWT-00182243: Google's RTB technical lead Stan Belov explained that the RTB "[redacted]" information can allow an RTB participant to "[redacted]."

---

[7] *See* Declaration of Glenn Berntson in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Sept. 29, 2023, at ¶ 46 (ECF 592).

b. GOOG-HEWT-00134605: Google stated that the "[redacted]," and further acknowledged that "[redacted]" It further stated that "[redacted]."

c. GOOG-HEWT-00257917: Google concluded that "[redacted]"

d. GOOG-HEWT-00248341: Google similarly acknowledged that "[redacted]"

e. GOOG-HEWT-00456109: Google similarly conceded that even truncated IP addresses contain "a [redacted]," and its [redacted]."

f. GOOG-HEWT-00188275: Google acknowledged that [redacted]" (emphasis in original)

g. GOOG-HEWT-00137234, GOOG-HEWT-00472281, GOOG-HEWT-00335599, GOOG-HEWT-00358131, GOOG-HEWT-00143821, and GOOG-HEWT-00247087: Google acknowledged that RTB participants (including those in the bid request data produced by Google for Plaintiffs and Class Members) leverage fingerprinting.

14. Beyond Google's own internal analyses, industry practice also shows that fingerprinting[8] has rapidly expanded as browsers have started to restrict third-party cookies.[9,10] RTB participants (also called Demand Side Platforms ("DSPs")) have developed or adopted identity resolution services that leverage fingerprinting based on the IP address and User Agent data fields. By 2022, industry surveys reported that 81% of DSPs had adopted "cookieless ID solutions" incorporating probabilistic or fingerprint-based methods.[11,12,13]

15. In short, both Google's own internal analyses and industry practice make clear that the IP address and User Agent data fields in RTB bid requests are regularly used by RTB participants to fingerprint users. The privacy protection offered by the new RTB Control is materially more present and future critical than that offered by any existing Google control, including the GAP Control, because the RTB Control directly suppresses the primary data fields used for fingerprinting—whereas the GAP Control leaves these data fields intact.

### C. The GAP Control Does Not Stop User-Identifying Fingerprinting, and Empirical Testing Confirms That GAP Does Not Prevent RTB Participants From Serving Personalized Ads

16. Finally, empirical testing conducted earlier in the litigation by plaintiffs' expert Professor Christopher Wilson—which was reviewed by Google's expert Professor Aaron Striegel—

---

8 Joseph, S. (2022, December 5). AdExplainer: What you need to know about device fingerprinting. AdExchanger. https://www.adexchanger.com/adexplainer/adexplainer-what-you-need-to-know-about-device-fingeprinting/

9 Joseph, S. (2020). Winners, losers and fallout from Google's plan to drop cookies. Digiday. https://digiday.com/marketing/winners-losers-fallout-googles-plan-drop-cookies/

10 IAB Tech Lab. (2024, May). Identity Solutions Guidance. https://iabtechlab.com/wp-content/uploads/2024/05/Identity-Solutions-Guidance-FINAL.pdf

11 The State of Digital Identity 2022. ID5.io https://web.archive.org/web/20221116223533/https://s3.amazonaws.com/media.mediapost.com/uploads/ID5_State_of_Digital_Identity_Report_2022.pdf

12 Kaye, K. (2021). Google's opaque practices to restrict fingerprinting create confusion among its ad tech partners. Digiday. https://digiday.com/media/googles-opaque-practices-to-restrict-fingerprinting-create-confusion-among-its-ad-tech-partners/

13 IAB Australia. (2020). ID Matrix. (Archived March 11, 2022). https://web.archive.org/web/20220311060430/https://m.iabaustralia.com.au/asset/284:id-matrixpdf

demonstrates that the GAP Control does not prevent RTB participants from delivering personalized ads, because, among other reasons, it leaves fingerprinting information (the IP address and User Agent data fields), untouched in RTB bid requests. In contrast, the new RTB Control will suppress this fingerprinting information, in addition to all other information impacted by the GAP Control. As discussed above, the GAP Control does not impact the IP address and User Agent data fields in RTB bid requests. These data fields enable RTB participants to identify users through fingerprinting, even when other identifiers such as cookies are unavailable. Empirical evidence further confirms that the GAP Control does not limit RTB participants that rely on fingerprinting to identify users and serve personalized ads.

17. Empirical testing performed by plaintiffs' expert Professor Wilson confirms that the GAP Control does not prevent RTB participants from serving personalized ads. Professor Wilson's testing showed that even with the GAP Control enabled, personalized ads were still served.[14]

18. Professor Wilson's findings are consistent with how RTB operates in practice. Even when the GAP Control is implemented, Google still shares IP address and User Agent information with RTB participants in bid requests. Thus, the GAP Control leaves user-identifying fingerprinting information shared by Google with RTB participants untouched.

19. Google's expert Professor Striegel concluded that the continued delivery of personalized ads in Prof. Wilson's testing under the GAP Control is consistent with the use of fingerprinting techniques by RTB participants based on IP address and User Agent information provided by Google in RTB bid requests.[15] Professor Wilson's empirical results, together with Dr. Striegel's analysis, demonstrate that the GAP Control does not reliably prevent user identification or ad personalization by RTB participants.

20. In summary, the GAP Control leaves the fingerprinting information, including the IP address and User Agent data fields, unchanged. By contrast, the RTB Control suppresses these data

---

[14] *See* Expert Class Certification Report of Professor Christopher Wilson, July 14, 2023 ("Wilson Report"), at ¶¶ 106-123 (ECF 545-6).

[15] See Expert Report of Aaron Striegel, Sept. 29, 2023, at ¶¶ 167-168 (ECF 584-1).

fields, making it the **only** Google control that meaningfully prevents user identification via fingerprinting and, consequently, the **only** control that reliably limits ad personalization by RTB participants.

21. For these reasons, I stand by my earlier opinion that the RTB Control provided for in the proposed settlement will, for the very first time, address the privacy issues I identified in my expert reports and provide substantial and meaningful new benefits to Google U.S. account holders by removing enough information from RTB bid requests such that the information transmitted by Google will no longer identify, be associated with, or be reasonably linked to a particular person or household.

## RESPONSE TO THE DEAL DECLARATION

22. In support of its opposition to plaintiffs' attorneys' fee motion, Google has submitted a declaration from Bruce Deal, who is an economist, not a computer scientist. In his declaration, Mr. Deal discusses, among other things, various user and publisher controls currently offered by Google, what these controls claim to do, and what the differences between these existing controls and the new RTB Control are.[16] In this section of his declaration, Mr. Deal, relies almost entirely on an unidentified declaration apparently submitted by Google employee Glenn Berntson sometime earlier in the litigation.[17] Mr. Deal's discussion about Google's user and publisher controls is wrong, unsubstantiated by any usage statistics, and contrary to the evidence Google produced in the litigation.

23. The incorrect premise of Mr. Deal's discussion about Google's existing user and publisher controls is that they are actually effective in eliminating all of the personally identifying data fields conveyed by Google in RTB bid requests. Mr. Deal incorrectly assumes that they are, but for the reasons I discuss above, none of these existing Google controls eliminates all of the personally identifying data fields like the new RTB Control will, when it is implemented.

---

[16] *See* Deal Decl., at ¶¶ 5, 9-12.

[17] *See, e.g.*, Deal Decl., fn. 8-11, 13-14, 17-18, citing to an unidentified "Berntson Declaration."

24. Mr. Deal also misunderstands the relevant inquiry, which is not whether any one particular data field is present in all Google RTB bid requests, but rather whether all Google RTB bid requests currently convey enough user data so as to be personally identifying. Based on my extensive analysis of the 50 billion bid requests Google produced earlier in the litigation (which is discussed in the Shafiq Supplemental Report), the answer to that question is yes. Virtually all of the 50 billion bid requests Google produced contain enough user information to be uniquely personally identifying, notwithstanding the existence of all of the user and publisher controls Mr. Deal discusses in his declaration.

25. Putting aside whether Google's existing user and publisher controls actually work as Mr. Deal claims, the other problem with Mr. Deal's analysis of these controls is that it is completely unsubstantiated with any actual usage statistics. Mr. Deal, who presumably had access to usage statistics from Google, does not identify a single statistic associated with how often any of Google's existing user and publisher controls are actually used. This is a telling omission and calls into question his statements and conclusions, because the one usage statistic Google produced in the litigation was for the GAP Control, and that number was only 4 percent.[18]

26. Finally, while Mr. Deal admits in his declaration that the existing Google user controls do not affect the IP address and User Agent data fields, as the new RTB Control will, he fails to address in any way the significance of this difference.[19] As I discuss above, the IP address and User Agent data fields are extremely significant because they allow RTB bid participants to fingerprint and track users and continue to serve personalized ads, something that will not occur when the new RTB Control is implemented. Mr. Deal ignores this material difference in his declaration.

---

[18] *See* Wilson Report, at ¶ 103.

[19] *See* Deal Decl., at ¶ 10.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this _17_ day of December 2025 in Davis, California.

Dated: December 17, 2025

Zubair

Zubair Shafiq, Ph.D.