# EXHIBIT O

# REDACTED VERSION

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

*In re Google RTB Consumer Privacy Litigation,*

This document applies to: *all actions*

Case No. 4:21-cv-02155-YGR

**DECLARATION OF PROFESSOR ROBERT ZEITHAMMER IN RESPONSE TO GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

***Redacted Version***

Judge: Hon. Yvonne Gonzalez Rogers
Date: TBD
Time: TBD
Courtroom: 1, 4th Floor

I, Robert Zeithammer, hereby declare as follows:

1. I am a Professor of Marketing in the Anderson School of Management at the University of California, Los Angeles (UCLA), and I have been retained by the counsel for plaintiffs as an expert in this matter. I previously submitted a declaration in support of plaintiffs' Motion for Final Approval of Class Action Settlement (Dkt. No. 778-8). I submit this Declaration to briefly respond to the Declaration of Bruce Deal dated November 26, 2025 (Dkt. No. 787-15). I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

<u>RESPONSE TO DEAL SECTION I</u>

2. As a preliminary matter, Deal's declaration makes several claims that I will not address as they are outside of my area of expertise. These include technical claims regarding RDP (Restricted Data Processing), the proposed RTB Control, and RTB bid requests, as well as legal claims about customer consent. I understand that others will respond to those technical and legal claims.

3. Deal's main claim in Section I relevant to my Declaration is that U.S. Google Users are currently broadly aware of both Google-provided technologies such as Google Account Ad Personalization opt-out setting ( "GAP") or third-party work-around technologies (*e.g*. VPN or Safari browser) that can achieve something similar to the benefit of the proposed settlement, and that "many class members are already using" some of these technologies "to prevent Google from including in RTB bid requests much of the same data affected by the RTB Control."[1] Deal offers no evidence to support his claims regarding the extent to which U.S. Google Users adopt Google-provided technologies such a GAP or the extent to which publishers engage with the RDP option. The decision not to disclose these adoption rates suggests that the actual number is not significant. Evidence in this case shows that the percentage of users opting out of GAP may be as low as 4 percent, but GAP does not stop the sharing and selling of Google account holder information through Google RTB.[2]

[1] Deal Declaration Par. 12.
[2] Expert Class Certification Report of Prof. Christopher Wilson, July 14, 2023 ¶¶ 30-37.

4. Instead of producing hard data directly relevant to Google's users (such as the opt-out rate under GAP), the only evidence Deal provides for his surprising claim that "many" US Google users use a VPN to get around Google's tracking them is an unscientific and under-documented 2025 survey by a consumer publication CNET, which asked "How long have you used or attempted to use a VPN?" This is a leading question, presuming that the respondent does use a VPN, and a well-known "acquiescence bias" is likely to overestimate the actual usage. It is also a compounded question, mixing up actual use and attempted use. Both of these issues make the question itself unreliable. Most likely, the respondents were invited to a survey "about VPN use", which then disproportionately attracted respondents who know what a "VPN" is, and have well-formed opinions about it. So Deal is basing his opinion on a highly biased compounded question likely asked of a highly selected non-representative sample of US Google users – these are the very definitions of unreliable survey data. But even if we put all of these concerns aside, the survey results indicate that only 19 percent of the respondents have used a VPN for at least the last two years, so this technology was not used by a vast majority of the respondents during much of the timeframe relevant to the case.

5. Deal also contradicts himself, by first claiming (in Section I) that as "many" as 43 percent of users utilize existing privacy-enhancing technologies such as VPN, and then arguing (in section IIB) that fewer than 8.8 percent (the extremely conservative estimate from my Declaration) of users would actually turn on the proposed RTB Control. Both claims cannot be correct. I propose that the 43 percent number is preposterously high as an estimate of the actual adoption of third-party work-around privacy technologies by US Google Users.

6. In summary, Deal provides no reliable support for his exaggerated claims about the status quo usage of existing privacy controls that allegedly replicate the functionality of the proposed RTB Control. He also chooses not to produce actual data about actual usage of existing privacy controls by actual US Google Users despite this data being available to him.

<u>RESPONSE TO DEAL SECTION IIA</u>

7. In this section, Deal critiques my Market Price Model, which is anchored by Google's own Screenwise program. The Screenwise program pays its panelists at least $3 per month in exchange for tracking their behavior online, and often more. Deal alleges that only an unspecified

portion of the Screenwise compensation is for tracking, while the rest is for "user time" spent setting everything up and answering surveys. Regarding the time setting up, this is a misunderstanding of the Screenwise compensation scheme, which compensates users separately for all the initial data input and device setup with a substantial one-time payment of "$20 for qualifying, $100 for signing up."[3] In contrast, the $3 (a conservative minimum) monthly payments I rely on are for the *ongoing tracking of behavior*.

8. Regarding the "regularly updating their profile and answering surveys" claim, Deal only points to the program's privacy policy as his evidence, and this policy refers to "Surveys" as either upfront data collection (presumably covered by the sign-up bonus), or describes surveys as answered "voluntarily" by invitation[4] The privacy policy does not support that the claim that "regular answering of surveys" is required of the panelists. Instead, the privacy policy indicates that the surveys are both infrequent and optional.

9. My Declaration relies on a meta-analysis of all data vendors other than Screenwise (known to me at the time of my Declaration) to show that the $36 annual compensation Screenwise offers is not a high outlier: It is slightly more than the $24 offered by Reklaim Rewards (formerly known as "Killi"), and quite a bit less than the $120 available on Datacy and $160 available on Caden. Deal makes unfounded claims that all these other vendors also require their participants to "regularly answer surveys and questionnaires".[5] As evidence, he again points to the privacy policies of the respective vendors. However, a review of those policies does not support this claim. I found no mention of "survey" or "questionnaire in the Caden policy. The Datacy policy does not appear to mention "questionnaire" either, and "survey" appears only once without at all suggesting that answering of surveys is required. Finally, the Killi policy says that it "may collect" data that "includes opinions on advertising related questions, such as brand awareness or quality (e.g., when you take a survey via the Platform)" which again suggests answering surveys is not a regular requirement for participation. Moreover, the Killi platform clearly pays for surveys separately because it tracks

[3] https://millennialmoneyman.com/get-paid-for-your-data/
[4] https://screenwisepanel.com/ipsos-Sow-privacy-policy. Emphasis added.
[5] Par 20.

accumulated compensation with points, and the policy says "the more information that you provide via our "share and earn" functionality (e.g., by participating in surveys, answering questions, sharing information via social media, downloading browser plugins, Etc.) the more data points collected via the Platform." In summary, Deal's claim that some of the compensation offered by the three alternative vendors is for answering mandatory regular surveys is not supported by the evidence he cites.

10. In contrast to Deal's unsupported claims that the different data vendors compensate panelists for "time" taking surveys and his failed attempt at supporting these claims with general references to privacy policies, my reports submitted in this case offer much more reliable and direct evidence of what the payments offered by the vendors are for: in my prior reports submitted in this case, I note that Yahoo Finance (a reputable source) reports that "Killi pays users to share location, shopping, browsing, and spending data".[6] Tech Crunch (another reputable publication) reports that "Datacy is a tool that allows individuals to collect their browsing data, manage it, have it anonymized and aggregated with others and then sold."[7] Another source calls Caden "a widely accepted app for Apple and Android users that allows you to get paid for using your data."[8]

11. My Declaration relies on a meta-analysis of all data vendors I can find by searching online. The methodology is sound and easily allows the addition of new observations. Since the time of my Declaration, I have discovered another reputable data vendor - the Nielsen Computer & Mobile Panel, which measures how people use the internet across devices (websites visited, app usage patterns, duration, device type, etc.) much like the Screenwise panel. Nielsen Computer & Mobile Panel panelists earn about $60/year, and this is "passive income with minimal effort."[9] And as is the case with a majority of the other vendors I found, the Nielsen annual compensation is above my $36 compensation for Screenwise, adding to the evidence my estimate is conservative

---

[6] https://www.yahoo.com/lifestyle/killi-featured-business-insider-124500261.html (last accessed 3/15/2023)

[7] https://techcrunch.com/2021/05/26/datacy-raises-2-4m-to-help-consumers-monetize-their-own-damn-data/

[8] https://freecash.com/academy/en/earn/how-to-get-paid-for-your-data. (Last accessed June 3, 2025)

[9] https://survey.money/blog/nielsen-computer-mobile-panel-review/

12. Deal also repeats his critique from his original report dated September 29, 2023 (the "Original Deal Report") that there are differences between the vendors in terms of the specific data fields they collect, and some of the vendors seem to collect some additional information beyond that sent out in RTB bid requests. This rehashing of his original critique does not engage with my reply which demonstrated there is no empirical relationship between the compensation amount and the scope of data collected, which in turn invalidates Deal's implicit erroneous assumption that that the asset being value is a specific data field, such as geolocation information or name.[10] This is a fundamental misunderstanding of the Complaint in this case, which clearly explains that the asset being valued is privacy, specifically the right to control over what marketers can learn about users online and how the marketers then use that information. In other words, the asset being valued is the user's willingness to submit to digital surveillance. Almost all (about 90 percent) Americans agree that they have a right to control what marketers can learn about them online and how the marketers then use that information.[11] By including persistent personal identifiers in bid requests, Google RTB enables digital surveillance, and effectively takes control over their data from users. So the key question is whether the user data enables digital surveillance. As I explained before, this functional view of what the asset is resolves all the critiques Deal levels. Yet, Deal does not engage with this view at all, and continues to talk about specific data fields in trying to chip away at the edges of my solid and reliable analysis.

13. While I agree that some of the vendors seem to collect some additional information beyond that sent out in RTB bid requests, Deal does not offer any evidence this is true for all the vendors. And as I have shown in my reply to Deal's Original Report, there is no empirical relationship between the compensation amount and the scope of data collected. In contrast, what they do have in common is the fact that they compensate panelists for online tracking. Deal does agree (in par 21) that RTB bid requests include "pseudonymous identifiers", which are at the heart of the present case.

---

[10] Pars. 110-115 in the Expert Class Certification Rebuttal Report of Prof. Robert Zeithammer (Dkt. No. 617-5).

[11] Turow et al, (2023). Americans Don't Understand What Companies Can Do With Their Personal Data. University of Pennsylvania report.

And these identifiers are what enables any recipient of RTB bid requests to conduct persistent digital surveillance of users.

RESPONSE TO DEAL SECTION IIB

14. In this section, Deal confuses a bound with an estimate. My lower bound of 8.8 percent opt-in for the proposed RTB Control is based on actual user data, and my upper bound is 100 percent in absence of other reliable data. Deal criticizes the 100 percent as unlikely, and I agree. But he provides no empirical evidence as to what the upper bound should be. Instead, he ends Section II with a profound mischaracterization of my report, talking of "Prof. Zeithammer's assumption that 100% users would utilize RTB". I make no such assumption anywhere in my Declaration.

15. Setting aside the upper bound, Deal then suggests that the lower bound may be lower than the 8.8 percent I propose. But Deal's evidence is not reliable: he cites an early survey of a small number of companies (not a survey of actual users, let alone data about their actual behavior) conducted by the Interactive Advertising Bureau (IAB) which was taken very soon after the CCPA was enacted. IAB itself calls the data only "Early data . . . as reported by companies"[12] In contrast, my estimate is based on actual behavior of millions of users much more recently, after consumers had a chance to learn about CCPA. And, as I point out in my Declaration, this rate is still conservative because the CCPA rollout suffered from businesses "making it difficult for consumers to opt out through various means, including the use of dark patterns."[13] Independent research found in 2021 that "CCPA's mandates for privacy disclosures, as currently implemented, have not yet yielded the level of clarity they were designed to deliver, due to both vagueness and ambiguity in CCPA itself as well as potential non-compliance by businesses in their privacy policies."[14] In other words, the low opt-out rates soon after CCPA was implemented do not reasonably imply that users like sharing their

---

[12] https://www.iab.com/insights/iab-ccpa-benchmark-survey

[13] Van Hong Tran, Aarushi Mehrotra, Ranya Sharma, Marshini Chetty, Nick Feamster, Jens Frankenreiter, and Lior Strahilevitz. 2025. Dark Patterns in the Opt-Out Process and Compliance with the California Consumer Privacy Act (CCPA). In Proceedings of the 2025 CHI Conference on Human Factors in Computing Systems (CHI '25). Association for Computing Machinery, New York, NY, USA, Article 223, 1–25. Available at: https://doi.org/10.1145/3706598.3714138 (Last accessed July 29, 2025).

[14] https://arxiv.org/abs/2109.13816

personal data, but rather that users don't know whether or how they can opt out. In contrast, based on the proposed direct notice and other disclosures concerning the proposed RTB Control as well as its simplicity of makes my 8.8 percent estimate conservative.

16. The other piece of evidence Deal offers (an observational study by Singular) is likewise unreliable because the analysis is proprietary, and the author of the study has a conflict of interest: Singular is part of the ad-tech ecosystem, and their business depends on serving ads and measuring ad performance. That may create an incentive to highlight low opt-out rates. Looking deeper into the source of the Singular data, I find that the data come from "ad events" that pass through Singular's ad-tracking/measurement infrastructure. That means users whose devices or apps don't send data to Singular (or aren't instrumented by its partners) are not represented at all. If, for example, privacy- or security-conscious users avoid apps that embed ad-tech tools (or disable tracking), they may be undercounted — biasing the "opt-out rate" downward. This is a highly selected and unreliable sample.

17. Deal provides unreliable third-party survey evidence for his claims despite the fact he works for Google, and could have therefore produced first-party hard data on the actual opt-out rates of actual US Google Users under CCPA and similar programs. My understanding is that Google and Deal has repeatedly refused to produce any such evidence. In the absence of such evidence, my first-party evidence from Yahoo auctions is the best evidence available to date, and my 8.8 percent lower bound estimate is therefore as reliable as possible under the circumstances.

18. One even more conservative estimate of the opt-in rate based on actual behavior of US Google Users is the [redacted] percent estimate of the percentage of US Google Users opting into Google's own GAP program which promised that "Your info isn't used to personalize ads."[15] This opt-in rate is even more conservative than by 8.8 percent estimate for two reasons: 1) the GAP program was not very well publicized to users, and 2) the control did not actually work to stop data sharing in RTB requests.[16] If I were to adopt the [redacted] percent GAP adoption rate, my estimate of the total benefit to the

[15] Expert Class Certification report of Professor Christopher Wilson, July 14, 2023.

[16] Wilson concludes his report by saying that "Google did not honor the opt-out: it auctioned impressions from the opted-out browser and, based on the information contained in these bid

Class over the course of the three years that the injunction will remain in force would be **between $740 million and $864 million**.

<u>RESPONSE TO DEAL SECTION IIC</u>

19. In this section, Deal proposes that my $36 estimate of the annual value of not being tracked needs to be adjusted downward by the consumer value of receiving personally targeted ads because users opting into the proposed RTB Control will not receive such ads. Deal does not provide any dollar value for such an adjustment. Instead, he selectively cites two outdated (2021) and biased surveys that indirectly show that some people like personalized ads.

20. Before explaining why Deal's evidence is not reliable, I note that the fact that some people say they like personalized ads does not imply that US Google Users who will choose to activate the proposed RTB Control feel the same. Importantly, Deal's outdated and biased survey evidence leaves plenty of room for them to be users who actually do not value personalized ads much: at footnotes 48 and 49, Deal cites studies stating that "71% of consumers prefer personalized ads" and "Despite Negative Perceptions, 52% of Consumers Can Identify Benefits of Targeted Advertising." The corollary of these statements is that 29% of consumers *do not* prefer personal ads, and 48% of consumers *cannot* identify benefits of targeted ads. These percentages can easily include the 8.8 percent of users my analysis conservatively uses to compute the lower bound of the benefit to the Class.

21. Deal's proposed evidence for most users valuing personalized ads is biased because it comes from advertising industry advocates (such as Ipsos or PR Newswire), who have a vested interest in arguing in favor of that targeted advertising . But Deal does not engage with the evidence produced in this case that shows consumers themselves do not actually value such targeted advertising positively, for example the large-scale consumer surveys (not conducted by advertising industry advocates) that found a vast majority of Americans do not want ads targeted to their interest based on their browsing history (Turow 2009). If we believe the consumers themselves, then the reduction in ad personalization may thus be a benefit to opted-in users, not a cost.

---

requests, a third-party advertiser was able to target ads based on the opted-out treatment's browsing history" (par. 123).

22. In addition to the consumer value of ad personalization, Deal also argues opted in users would receive more ads – a clear negative effect. However, the outdated theoretical argument Deal cites in his footnote 51 for this potential effect simply did not pan out in reality: academic research shows that advertising volume does not increase when personal identifiers are not available. For example, Alcobendas et al (2023) document that some demand-side platforms only enter ad auctions with third-party cookie identifiers, and users who opt into CCPA thus actually received fewer ads than those who did not opt in. Therefore, another benefit of RDP to users would be a reduction in the amount of digital display advertising. My calculation of the benefit to the class is conservative, and does not include this additional benefit.

23. In paragraph 30, Deal claims that without persistent digital surveillance of users, ad-supported websites would have to charge people money for content. But the alternative to hyper-personalized ads relying on digital surveillance is not necessarily a paywall –contextual advertising has successfully supported many media companies over at least the last 200 years.

RESPONSE TO DEAL SECTION III

24. In par 34, Deal agrees that data sharing in RTB bid requests resulted in $2.9 billion in revenue during the time period relevant to the case. Deal then proposes to deduct Google's "traffic acquisition cost" (TAC) to come up with the net profit Google earned. Such calculations may be of interest if one wanted Google to disgorge its own unjust earnings. But this is not the situation here. My assignment was to measure the *overall amount* of unjust earnings earned by *all participants* in the RTB system that would be prevented by the proposed RTB Control and the related disclosures. And in the RTB system, TAC corresponds to the earnings of publishers. Accordingly, the relevant *overall amount* of unjust earnings is the total of Google *revenues* from RTB, which sum Google's own earnings with the earnings of the publishers who directly benefit from the sharing of data in RTB bid requests. In other words, I propose that handing over unjustly earned revenue to a third party does not make that part of the revenue justly earned by that third party. Accordingly, as discussed in my Declaration, the proposed RTB Control would prevent all of the $2.9 billion in revenue from being earned unjustly by all participants in the RTB system.

25. In par 35, Deal suggests that Google's own production of its revenue from U.S. Users was flawed because Google failed to exclude revenue coming from foreigners pretending to be in the U.S. via a VPN. But Deal does not provide corrected revenue numbers despite the fact the Google surely knows which user is coming from a VPN and which user is a true U.S. user.

26. In par 36, Deal retrospectively launders the revenue earned in the past from users who will choose not to enable the RTB control in the future. This is a misunderstanding of the case. Prior to this proposed settlement, all users lacked informed choice and control over the RTB bid request data that was sent out to RTB participants. Accordingly, all earnings attributable to the data shared in RTB requests are at issue here.

27. Deal also does not engage with my rebuttal report[17] which demonstrated that all RTB auction revenue is at issue in this case, not only the revenue resulting from third-party bidders winning the auctions. The reason is that auctions involve complex interplay among competitors, and the presence of informed third-party bidders increases the bids of Google's own internal bidders.[18] My understanding is that the "Annual Revenue from RTB" produced by Google – the starting point of my analysis - only includes the revenue resulting from third-party bidders winning the auctions. If I were to add the revenue realized when Google's internal bidder wins the auctions in which the RTB bid request shared personal data with third-party bidders (who did not win, but put upward pressure on the Google bidder), the unjust enrichment numbers would rise proportionately. This point shows that the estimates in my Declaration are conservative.

28. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 18th day of December 2025 in Los Angeles, California.

Robert Zeithammer, Ph.D.

[17] Expert Class Certification Rebuttal Report of Prof. Robert Zeithammer (Dkt. No. 617-5)
[18] *See id.* pars. 14-15, 44, 59-73.