# Plaintiffs' Proposed Findings of Fact and Conclusions of Law

# Redacted Version of Document Sought to be Sealed

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC,<br><br>        Defendant. | Case No. 4:20-cv-05146-YGR-SVK<br><br>**PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' MOTION FOR SANCTIONS FOR GOOGLE'S DISCOVERY MISCONDUCT** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

FINDINGS OF FACT ............................................................................................................. 1

I.      Allegations in the Complaint .................................................................................... 1

II.     Google's Misrepresentations Regarding, and Failure to, Identify and Produce Evidence
        Relating to Not Synced Signals ............................................................................... 2

        A.      Google's Misrepresentations in Support of Its Motion for a Protective Order ........ 3

        B.      Google's Misrepresentations and Discovery Deficiencies in Written Discovery
                Responses ........................................................................................................ 6

                1.      Interrogatories ...................................................................................... 6

                2.      Requests for Admission ........................................................................ 8

        C.      Google's Failure to Comply with the November 12, 2021 Order ........................... 10

        D.      Google's Refusal to Cooperate with Plaintiffs' Efforts to Reconcile Google's
                Inconsistent Representations ........................................................................ 12

        E.      Google's Challenge to Plaintiffs' Proposed Methodology to Identify Class
                Members Based on Not Synced Signals .......................................................... 14

        F.      Google's Discovery Misconduct Regarding Not Synced Signals Come to Light .. 16

                1.      The "█████" Signal ............................................................................. 16

                2.      The Zwieback █████ Field Names ...................................................... 18

                3.      The "SyncDisabledEvent" Signal ..................................................... 19

                4.      The "████████████████████" Signal ............................................. 19

                5.      The "Sync_Feature_Enabled" Signal, with Sub-Designations of "True" and
                        "False" ................................................................................................ 20

                6.      Other Signals That Can Be Used to Identify When a User is Not Synced ..... 21

        G.      Google's Factual Defenses Regarding Not Synced Signals Are Unavailing .......... 22

III.    Google's Failure to Preserve Named Plaintiff Information .................................... 24

        A.      The April 30, 2021 Order for Production of Named Plaintiff Information ............. 24

        B.      Google's Misconduct Regarding Production of Gaia-Keyed Information ............. 26

        C.      Google's Misconduct Regarding Production of Zwieback-Keyed Information ..... 36

                1.      Google Failed to Comply with the April 30, 2021 Order ............................ 36

                2.      Google's Misconduct Necessitated Repeated Orders .................................. 37

                3.      Zwieback was Alleged Extensively in Plaintiffs' Original and First Amended
                        Complaints ........................................................................................ 38

                4.      Google Admitted Zwieback (and Google Ads) Were Relevant for the First
                        Year of the Case ................................................................................ 38

PLS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR SANCTIONS FOR DISCOVERY
MISCONDUCT

5.    Google Documents, Testimony, and Pleading Demonstrates Google was and is Misrepresenting the Nature and Importance of Zwieback ......................... 40

6.    Plaintiffs' Class Certification Filings and Google's Response Demonstrate Zwieback's Relevance ................................................................................... 43

7.    Late Discovery Produced by Google Demonstrates that Zwieback is Personally Identifiable Information ............................................................... 44

8.    Google's Misconduct Resulted in the Destruction of Relevant Zwieback Data ..................................................................................................................... 45

9.    Google's Belated Zwieback Productions Were Incomplete and Produced in an Unreadable Format .................................................................................... 46

10.    Google Misrepresented the Technical Difficulties and Burdens Related to Preservation and Production of Zwieback-Keyed Information ..................... 47

D.    Google's Misconduct Regarding Production of Biscotti-Keyed Information ........ 48

1.    Google Failed to Preserve Biscotti-Keyed Information ................................ 48

2.    Google Failed to Comply with the April 30, 2021 Order ............................. 49

E.    Google's Factual Defenses Regarding Its Failure to Preserve and Produced Named Plaintiff Information is Without Merit ...................................................... 50

IV.    Google's Failure to Timely Produce "████████████" Documents ................................... 53

CONCLUSIONS OF LAW ...................................................................................................... 65

I.    Federal Rule of Civil Procedure 16(f) (Failure to Obey Pretrial Order) ............................ 66

A.    A Finding of Civil Contempt Is Warranted .................................................... 70

B.    Evidentiary Sanctions are Warranted .............................................................. 71

C.    Monetary Sanctions are Warranted ................................................................. 73

II.    Federal Rule of Civil Procedure 37(b) (Failure to Obey Discovery Order) ....................... 74

III.    Federal Rule of Civil Procedure 37(e) (Failure to Preserve Electronic Evidence) ............ 79

A.    An Evidentiary Sanction Is Warranted ........................................................... 82

B.    A Jury Instruction Is Warranted ...................................................................... 83

IV.    The Court's Inherent Authority ........................................................................................... 84

PLS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

As directed by the Court on May 25, 2022 (Dkt. 672) and in connection with their motion for sanctions for discovery misconduct (Dkt. 670), Plaintiffs hereby respectfully propose the following findings of fact and conclusion of law.

## FINDINGS OF FACT

### I.    ALLEGATIONS IN THE COMPLAINT

1.    On July 27, 2020, Plaintiffs filed their original Complaint in this matter, alleging privacy, property, statutory, and contract violations on behalf of "Chrome users who chose not to 'sync' their browsers with their Google accounts while browsing the web." Dkt. 1 ¶ 1.

2.    As alleged in the original Complaint, Chrome expressly promises users that they "don't need to provide any personal information to use Chrome" and that "[t]he personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on [s]ync." Dkt. 1 ¶ 2. "Despite these express and binding promises, Google intentionally and unlawfully causes Chrome to record and send users' personal information to Google regardless of whether a user selects to Sync or even has a Google account." Dkt. 1 ¶ 3, (emphasis in original). Plaintiffs' original Complaint set forth multiple examples of the alleged unauthorized disclosures from Chrome to Google of Named Plaintiffs' information, the majority of which were sent from Chrome to Google.com. *See, e.g.*, Dkt. 1 ¶¶ 156-167, 170-172, 176-178, 182-192.

3.    On April 16, 2021, Plaintiffs filed their First Amended Complaint, which provides additional "specific examples of the personal data flow that Chrome sent from Plaintiffs' devices as they used Chrome while Not Synced, demonstrating that Chrome secretly sends personal information to Google even when a Chrome user does not sync." Dkt. 163 ("FAC") ¶ 5.

4.    The examples of alleged unauthorized transmissions provided in Plaintiffs' original and First Amended Complaints shows that information was being disclosed to three Google entities: "Google Ads, Google Doubleclick, and Google Analytics." Dkt. 1 ¶ 145; FAC ¶ 148. For "Google Ads," Plaintiffs identified specific persistent and unique cookies that "Chrome sends to Google Ads" for Not Synced users. These cookies include the "NID" or Zwieback cookie. *See, e.g.*, Dkt. 1 ¶ 149; FAC ¶ 156.

5.    In addition, the sample transmissions included specific cookie identifiers that

Plaintiffs maintain Google associated with individual Named Plaintiffs. For example, ¶ 158 of the original Complaint included specific values for NID and ANID cookies Chrome sent to Google.com when a specific Named Plaintiff was exchanging communications at a state welfare agency and non-Google website. *See also* Dkt. 1 ¶¶ 161, 170, 172, 177, 183, 188, 190; FAC ¶¶ 165, 168, 177, 179, 184. Similarly, other paragraphs of Plaintiffs' original and First Amended Complaints included identifiers that Chrome sent to Doubleclick.net and Google-Analytics.com for Not Synced users on non-Google websites. *See, e.g.*, Dkt. 1 ¶¶ 157, 163, 171-72, 178, 189, 191-92; FAC ¶¶ 164, 170, 178-79, 185.

6.    The original and First Amended Complaints attached exhibits with the full Chrome Privacy Notice and the alleged relevant promises contained therein, including:

    a.    "You don't need to provide any personal information to use Chrome[.]" Dkt. 1 ¶ 37, Exs. 17-33; FAC ¶ 44, Exs. 17-33.

    b.    "The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync[.]" Dkt. 1 ¶ 38(a), Exs. 28-33; FAC ¶ 44, Exs. 17-33.

    c.    "In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you." Dkt. 1, Exs. 17-33; Dkt. 163, Exs. 17-33.

    d.    "Sync is only enabled if you choose." Dkt. 1, Exs. 25-33; Dkt. 163, Exs. 25-33.

    e.    Unless you "enable sync" and "Google Web & App Activity," "Google will only use your Chrome data after its anonymized and aggregated with data from other users." Dkt. 1, Exs. 17-33; Dkt. 163, Ex. 17-33.

7.    The discovery cut-off in this action was March 4, 2022.

## II.    GOOGLE'S MISREPRESENTATIONS REGARDING, AND FAILURE TO, IDENTIFY AND PRODUCE EVIDENCE RELATING TO NOT SYNCED SIGNALS

8.    Plaintiffs' Motion for Sanctions ("Mot.") relates to Google's false and misleading statements regarding the existence of signals that identify when a Chrome user is Not Synced (the "Not Synced Signals"), which are relevant to Plaintiffs' proposed class of individuals' who used the

1    Chrome browser while Not Synced.

2          9.     The Court finds that the Not Synced Signals at issue include:

3              a.     The "████" Signal, i.e. Signed In But Not Consented for Sync;

4              b.     The "SyncDisabledEvent" Signal;

5              c.     The "████████████████████" Signal;

6              d.     The Zwieback ████ Field Names;

7              e.     Sync_Feature_Enabled; and

8              f.     Other signals that can be used to identify when a user is Not Synced.

9         10.    Based on the facts set forth below, the Court finds that Google's misrepresentations

10   and discovery misconduct relating to Not Synced Signals and sync state violated Google's obligations

11   under Rule 16(f), Rule 37(b), Rule 37(e), and duties of candor to the tribunal that are subject to the

12   Court's inherent authority to issue sanctions. Google used its concealment of the Not Synced Signals

13   and sync states to obtain a Protective Order from the Court, and to obtain an improper advantage on

14   its arguments in opposition to Class Certification, i.e. arguing that Plaintiffs could not distinguish

15   between synced versus Not Synced users.

16        11.    Google's misrepresentations resulted in extreme prejudice to Plaintiffs, and caused the

17   Court, the Special Master and Plaintiffs to expend valuable time, resources and costs. Google further

18   perpetuated a costly and time-consuming discovery process by: refusing to correct the record;

19   withholding evidence that would have shed light on its misconduct; and producing information in a

20   manner that confused and deceived.

21        12.    The Court rejects Google's arguments to the contrary, and finds that its purported

22   excuses cannot cure the breadth of misrepresentations and misconduct.

23        **A.**     **Google's Misrepresentations in Support of Its Motion for a Protective Order**

24        13.    In January 2021, Google informed Plaintiffs that "event-level" logs were being

25   preserved only "in the ordinary course of business." Pls' Joint Decl. ¶¶ 3-4. That is, Google wanted

26   permission to maintain its standard retention policies, which would result in the destruction of

27   relevant evidence.

28        14.    On January 21, 2021, Plaintiffs inquired if Google's request to stop preserving data

logs included the destruction of information "reflecting synced and unsynced browser states[.]" Pls'

Joint Decl. Ex. 2, Plaintiffs' Jan. 21, 2021 Letter. Specifically, Plaintiffs asked Google to

> "provide a more precise description of these data sources, including with specificity whether these sources include logs reflecting synced and unsynced browser states; collection of PI; content of user communications; or other information relevant to what Google is collecting about Plaintiffs and the putative class."

*Id.*

15.     On January 29, 2021, Google responded and claimed that there were no signals identifying not sync usage. *See* Pls' Joint Decl. Ex. 3, Google's Jan. 29, 2021 Letter. In this letter, Google identified, for the first time, the ████████ Logs, and represented that these logs contained ████████████████████. *Id.* Google's position was unequivocal. It asserted:

     a.   "Google does not have any logs showing when a user is not synced[]";

     b.   "Disabling sync is a client-side action that is not visible server-side (i.e. to Google)[]"; and,

     c.   ████████████████████████████████████████ ████████

*Id.* at 5.

16.     On February 5, 2021, the parties submitted a Joint Letter Brief Re: Google's Motion for a Protective Order and Plaintiffs' Cross-Motion for Discovery. *See* Dkt. 102. In this briefing, Google sought to "suspend the standard retention periods applicable to the applicable logs[.]" *Id.* at 3:10-11.

17.     On February 17, 2021, Google filed a formal Motion for a Protective Order. *See* Dkt. 109. In this motion, Google clarified that its requested relief pertained to only three logs: ████████, ████████████████ logs. *Id.* at 3:18-19.

18.     On February 24, 2021, Plaintiffs opposed Google's Motion for a Protective Order. *See* Dkt. 118. In their Opposition, Plaintiffs noted that Google had omitted from discussion the ████████ ████ Logs. *Id.* at 2:19-20. "Google's omission is alarming, as it suggests that Google believes that it may unilaterally destroy the ████████ Logs without any Court oversight." *Id.* at 2:20-21.

19.     On March 1, 2021, Google filed its Reply in support of its Motion for a Protective Order. *See* Dkt. 120. In this briefing, Google expressly excluded ████████ Logs from the ambit

1  of its Motion for a Protective Order, stating: "Google never identified as relevant the Chrome ████

2  ████ logs. These logs contain sensitive and personal data specifically excluded from the Complaint;

3  any claim that these are relevant or discoverable is misplaced." *Id.* at 3, n.1. According to Google,

4  "████████████████████████████████████████████████████." *Id.* at 4

5  (emphasis added).

6       20.    On March 5, 2021, the Court held a hearing on Google's Motion for a Protective

7  Order. The purpose of this hearing was to determine whether and to what extent Google's Motion for

8  a Protective Order encompassed relevant information, including information that would identify users

9  who were Not Synced.

10      21.    During the March 5, 2021 hearing, Google made the following representations:

11           a.    ████████ logs are the logs that show ████████████████

12                ████████████ (Mar. 5, 2021 Hr'g Tr. at 11:17-18);

13           b.    ████████ Logs "do not record identifiers for logged out users" (*id.* at 12:9-

14                10);

15           c.    ████████████████████████████████████

16                ████████████████████████████████████

17                ████████████████████████████████ (*id.* at

18                14:13-17); and,

19           d.    ████████ Logs "are not logs that we are able to pull out, or that we have

20                focused on preserving because they are not relevant here.... They record activity

21                ████████████████ (*id.* at 21:7-13). Counsel later

22                amended this statement in the same hearing, telling the Court,

23                     "Can I also clarify – I'm being told, Your Honor, that I
                     misspoke on the record and said that the ████████ logs
24                   record the data of users that … are not synced, and if I
                     misspoke, I apologize. ████████████████████
25                   ████████████."

26                *Id.* at 24:4-9.

27                In response, the Court stated, "You may have misspoken, but that was certainly

28                my impression, that the ████████████████, and I

think that was also addressed in the papers. But thank you for the clarification for today's record." *Id.* at 24:12-16.

22.     The Court asked Google: "For a given period of time, and let's say September of 2020 … is Google able to identify the number of unsynced users who are suing Chrome, who are – like the Plaintiffs allege they were?" Mar. 5, 2021 Hr'g Tr. at 23:7-11. In response, Google answered, "that is not a figure that's readily available to Google. We have figures or numbers related to users who have synced and we've provided those in discovery to Plaintiffs. But to back into the number of users…who are not synced, that is not a number that's readily available." *Id.* at 23:22-24:9.

23.     Following the March 5, 2021 hearing, the Court ordered a series of 30(b)(6) depositions related to the preservation dispute. *See, e.g.*, Dkts. 155, 192-1. During the first deposition, on April 9, 2021, Google's corporate designee, David Monsees, testified on behalf of Google that Google "cannot [identify users who are not synced] because they are not synced" and "Google does not have a…Google Account ID in Chrome for users who are not signed in using Chrome sync." Pls' Joint Decl. Ex. 6, Google 30(b)(6) Dep., Monsees I, at 114:7-117:8.

24.     On April 30, 2021, based in part upon Google's false representations, the Court granted Google's Motion for a Protective Order. *See* Dkt. 174.

**B.     Google's Misrepresentations and Discovery Deficiencies in Written Discovery Responses**

**1.     <u>Interrogatories</u>**

25.     On August 6, 2021, Plaintiffs propounded their Third Set of Interrogatories, which included the following (collectively, the "Class Member Identification Interrogatories"):

a.     "Identify all Google Accountholders, by email, phone number, or other Google Account identifier, from whom Google received Personal Information (as alleged in the Amended Complaint) from their Chrome browser application while it was operating in an un-synced state." Interrogatory No. 13.

b.     "Identify all Google Accountholders who have never synced any device in any of their Google Accounts." Interrogatory No. 14.

c.     "Identify all Google Accountholders who have at least one device Google has

1    associated with them that has never been synced." Interrogatory No. 15.

2        d.   "Identify all Google Accountholders who have clicked to unsync any of their

3           devices or accounts." Interrogatory No. 18.

4  *See* Pls' Joint Decl. ¶ 10 (Plaintiffs' Third Set of Interrogatories).

5       26.    On September 7, 2021, Google served its Responses and Objections to the Class

6  Member Identification Interrogatories. *See* Pls' Joint Decl. ¶ 11. In this response, Google did not

7  identify any Not Sync Signals. Rather, Google refused to provide a substantive response, objecting

8  on the basis that the interrogatories sought "information that exceeds the scope of Google's

9  preservation obligations established by the Court in this action." *See id.* (citing Google's Resp. &

10  Objs. to Plaintiffs' Third Set of Interrogatories at Interrogatory No. 13). Google's objection, which

11  was predicated on the Court's April 30, 2021 Protective Order (Dkt. 174), is misplaced. As noted

12  above, in briefing and arguing its Motion for Protective Order, Google expressly limited the relief

13  requested to three specific logs, none of which implicated the preservation of Not Sync Signals.

14       27.    On September 10, 2021, Plaintiffs noted the deficiency in Google's interrogatory

15  responses and requested that "Google identify, in writing, for each interrogatory …. [w]hether Google

16  maintained records of sync, unsync, not synced, or any other signals indicating a Chrome user's

17  browser-state sufficient to identify absent class members for the entire class period." Pls' Joint Decl.

18  ¶ 12 (quoting Plaintiffs' Sept. 10, 2021 Letter). Google did not provide a substantive answer to this

19  request, nor did it amend its responses to the Class Member Identification Interrogatories.

20       28.    On December 6, 2021, Plaintiffs moved to compel "compliance with interrogatories

21  seeking the identification of Chrome users who are not synced." Dkt. 400 at 2, Joint Discovery Letter

22  Brief. Plaintiffs noted that "Google objects that the requests are unduly burdensome because Google

23  does not maintain this information [i.e. identification of Not Synced Chrome users] in the regular

24  course of business." *Id*. In its response, rather than correct the record as to Not Synced Signals, Google

25  argued that the motion was "a blatant end-run around the Court's previous order" referring the

26  Plaintiff data matters to the Special Master. *Id.* at 4. Google further represented, "[a]s Plaintiffs are

27  well aware, Google continues to work with the Special Master to provide information responsive to

28  discovery requests that seek the identification of users who are not synced," including "recent efforts

Google has undertaken to provide field names for "any potentially relevant source … where information about sync-state signals are stored." *Id.*

29.    On December 7, 2021, relying in part on Google's representation that it was engaging in good faith efforts to resolve the discovery dispute as to identification of Not Synced Chrome users through the Special Master process, the Court referred the issue to the Special Master to "address this issue in due course." Dkt. 404.

30.    The Court finds that Google's representations regarding "efforts" was a misrepresentation and misleading. At the time Google was representing to the Court that its "efforts" remained ongoing, Google, in fact, was already then aware of where and for how long Not Synced Signals were stored at the time.

### 2.    Requests for Admission

31.    On September 10, 2021, Plaintiffs served their First Set of Requests for Admission on Google. *See* Joint Rebuttal Decl. ¶ 7.

32.    Google served it responses and objections on October 12, 2021. *See* Olson Decl. Ex. 4, Google's Resp. & Objs. to Plaintiffs First Set of Requests for Admission.

33.    In these responses, Google refused to admit that Not Synced Signals existed. For example:

   a.    Request for Admission No. 13 asked Google to "[a]dmit that Chrome sends a Signal to Google that a Chrome user is not synced but signed-in to a Google Account[.]" Olson Decl. Ex. 4. Google refused to admit, instead stating that it "*may* send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled[.]" *Id.* (emphasis in original). Google otherwise denied the request and did not disclose any signals by name.

   b.    RFA No. 18 asked Google to "[a]dmit that Chrome sends a Signal to the Google sync service when a Chrome user clicks to turn off sync[.]" Olson Decl. Ex. 4. Google refused to admit, instead stating that "an instance of the Chrome browser *will attempt* to send a request to the Google sync service when a Chrome user clicks to turn off sync[.]" *Id.*

c.    These statements were materially false because Chrome does in fact send multiple signals stored server-side at Google that reflect when users are not synced.

34.    Google's other responses to Plaintiffs' Requests for Admission failed to disclose Not Synced signals or sync states that would enable identification of injured class members.

35.    Request for Admission No. 11 asked Google to "[a]dmit that Chrome sends a Signal to Google that indicates when a Chrome user is not synced[.]" Olson Decl. Ex. 4. Google refused to fully admit, and instead responded:

> "[I]f a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and did not have sync enabled on the Chrome browser, then Google *may* send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome browser at that time. This bit is only sent if the user is also signed into their Google Account at the browser level. Google otherwise denies this request."

*Id.* (emphasis added).

36.    Google's response to Request for Admission No. 11 was misleading. Chrome does in fact send a bit, or a signal, when a user is signed-in but not consented for sync.

37.    Request for Admission No. 12 asked Google to "[a]dmit Chrome sends a Signal to Google that indicates when a Chrome user is not signed-in *and* not synced." Olson Decl. Ex. 4 (emphasis added). Google denied this request.

38.    Google's response to Request for Admission No. 12 is directly contradicted by statements made in Google's Opposition to sanctions. Google admitted in its Opposition that "Google Account holders who are signed out of their Google Accounts" are "therefore not synced" and non-Google Account holders cannot sync because they do not have a Google Account to which they can sign-in. Opp. at 2. This means that any signal or combination of signals indicating that a Chrome user is signed-out is a Not Synced Signal. In light of this admission, Google's initial response to Request for Admission No. 12 is false. Google did not correct this response. *See* Pls' Joint Decl. ¶ 34.

39.    Google's responses to Plaintiffs' Requests for Admission are also inconsistent with its prior misrepresentations to the Court (*see supra* Briefing and Oral Arguments on Google's Motion for Protective Order).

**C.     Google's Failure to Comply with the November 12, 2021 Order**

40.     In February 2021, in tandem with briefing of Google's Motion for a Protective Order (*see supra*), the parties engaged in discussions regarding a preservation plan. In furtherance of these discussions, Plaintiffs requested that Google produce relevant data dictionaries and database architecture documentation in order to craft a reasonable preservation proposal. *See* Dkt. 118-5, Declaration of Charles Cowan in support of Plaintiffs' Opp. to Google's Mot. for Protective Order ("Cowan Decl.") ¶ 7 (expert declaration explaining need for this info).

41.     This request was addressed at the March 5, 2021 hearing. *See* Mar. 5, 2021 Hr'g Tr. at 42:16-22. Specifically, Plaintiffs requested production of documents identified in paragraph 7 of Cowan Decl., relating to data dictionaries, database architecture documentation, and technical documentation to identify and explain the fields are in Google's logs, for example, "do sync logs reflect syncing activity, et cetera, how does the data flow in and out of them[.]" *Id.* The Court granted Plaintiffs' request. *See id.* at 57:10-11; Dkt. 129 ("[T]he parties are ordered to meet and confer regarding a narrow production of documents referenced in [¶ 7 of the Cowan Decl.] in advance of a Rule 30(b)(6) deposition of Defendant on [the issue of preservation]").

42.     Google never produced the internal *Google* data dictionaries for ██████ Logs.

43.     On September 23, 2021, Plaintiffs requested Google identify the data sources for sync signals. Plaintiffs were specific in their request:

> "Plaintiffs specifically request Google identify where ███████████ transmitted from Chrome to Google when a Chrome user signs-in to any Google service without enabling Sync or opens the Chrome browser while still in a SignedIn state is sent and stored, for how long it is stored, and whether Google has been preserving such information. By making this specific request, Plaintiffs do not intend to limit Google's responsibility to inform Plaintiffs of where Sync or Unsync signals are stored."

*See* Pls' Joint Decl. ¶ 16 (citing Plaintiffs' Sept. 23, 2021 Letter).

44.     On September 27, 2021, Google responded that it was "searching through data sources for these fields, but can already confirm that the fields and descriptions disclosed … do not contain these signals." Pls' Joint Decl. ¶ 17 (citing Google's Sept. 27, 2021 Letter to the Special Master).

45.     On November 12, 2021, the Court ordered Google to provide Plaintiffs with information about "sync-state signals" and their storage. *See* Dkt. 377. Specifically, Google was

ordered to provide "full schemas, a list of ALL fields with their descriptions, a list of tools used to search the respective data sources, and instruction sets and manuals for all tools identified" for "any potentially relevant data source....where information about sync-state signals are stored[.]" *Id.* ¶ 3.

46.    Google did not comply with the Order.

47.    The Court rejects Google's contention that it disclosed Not Synced Signals in its November 2021 production of sync-state data sources. *See* Opp. at 4.

48.    On November 23, 2021, Google identified only ▮ data sources that contained sync-state signals:



*See* 2021-11-18 *Calhoun* Omnibus Sheet, Tab. 3.3.2 Sync-State Signal (produced to Plaintiffs on November 23, 2021).

49.    Google did not, as required by the Court's order, identify "ALL fields with their descriptions" for the ▮ identified data sources. Rather, Google only provided field names and descriptions for one of the ten, the "▬▬▬▬▬▬" data source (highlighted in blue above).

50.    For this one data source, Google produced a list of ▮ fields, including the field: ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Google then described the field as recording who was *synced* rather than who was *Not Synced:* "[w]hether the client has full sync (or, sync the feature) enabled or transport-only (aka ▬▬▬. *Logged only when the value is present in the request.*" *See* 2021-11-18 *Calhoun* Omnibus Sheet, Tab 3.3.2 ▬▬▬▬

█████████████████ (emphasis added). Google's description implied that this field only logged the value when sync feature was enabled.

51.     Plaintiffs would later learn that this field was in fact the █████ signal, which records when a user is Signed In But Not Consented to Sync, i.e. when a user is *Not Synced* as opposed to when a user has sync *enabled* (as represented in Google's description).

52.     Google's November 23, 2021 Production did not identify the █████████ Signal. The ████████████ Signal and its storage in ██████████ Logs was not revealed until the last day of discovery, when the Special Master compelled a live log testing conducted by Google engineers.

53.     The Court finds that Google failed to comply with the November 12, 2021 Order in that Google did not adequately identify "potentially relevant data sources….where information about sync-state signals are stored" and it did not provide "full schemas, a list of ALL fields with their descriptions, a list of tools used to search the respective data sources, and instruction sets and manuals for all tools identified" for those potentially relevant data sources, as directed.

54.     The     Court     finds     that     Google's     description     regarding     the     ████████████████████████████████████ field was misleading, as was Google's failure to disclose the █████████████ Signal. These misrepresentations and omissions obscured Plaintiffs' ability to identify injured class members.

**D.     Google's Refusal to Cooperate with Plaintiffs' Efforts to Reconcile Google's Inconsistent Representations**

55.     On November 30, 2021, Plaintiffs sent a letter to Google requesting clarification as to Google's position on the existence of Not Synced Signals. *See* Pls' Joint Rebuttal Decl. Ex. 14, Nov. 30, 2021 Letter. Up to this point, Google had provided a series of inconsistent responses regarding Not Synced Signals. For example:

a.     Google's Requests for Admissions responses suggested that there "may" be Not Synced signals, but in the same set of responses outright denied that Google recorded any Not Synced Signals.

b.     Google's refused to provide substantive responses to the Class Member

1    Identification Interrogatories with indications of whether it possessed Not
2    Synced signals.

3    c.    Google's November 23, 2021 production which disclosed limited logs related to
4    "sync-state but, provided field descriptions for only ██ of those logs, and then
5    stated that the "sync-enabled-field" was "[l]ogged only when the value is present
6    in the request."

7    Plaintiffs' November 30, 2021 Letter sought clarification as to these inconsistent responses. *See id.*
8    Specifically, Plaintiffs asked Google to clarify what it meant when it said that Google "*may send a*
9    *bit, which depending on the circumstances, may indicate to Google[.]*" *Id.* at 4. Google did not timely
10   respond.

11   56.    On December 6, 2021, Plaintiffs followed up on their November 30, 2021 request for
12   clarification. *See* Joint Rebuttal Decl. Ex. 15. That same day, Plaintiffs moved to compel Google's
13   answers to the Class Member Identification Interrogatories. *See* Dkt. 399 at 2-3. In response, Google
14   asked that the Court refer the issue back to Special Master Brush for a "determination concerning the
15   dataflows that affect class member identification." *Id.* at 3. At no point during this briefing, or the
16   lead up to it, did Google correct the misrepresentations it had made to the Court regarding Not Synced
17   Signals or discovery regarding sync states.

18   57.    On December 13, 2021, Plaintiffs again followed up on their November 30, 2021
19   request for clarification. *See* Joint Rebuttal Decl. Ex. 15.

20   58.    On December 16, 2021, Plaintiffs again followed up on their November 30, 2021
21   request for clarification. *See* Joint Rebuttal Decl. Ex. 15. In this email, Plaintiffs stated that if no
22   response was forthcoming, then Plaintiffs would seek to brief the issue before the Court. *See id.*

23   59.    In response to Plaintiffs' fourth attempt above, Google finally replied that it was
24   "working on [its] response" and was "hopeful that we will be able to resolve or at least narrow many
25   of the issues [] raised[.]" Joint Rebuttal Decl. Ex. 15.

26   60.    Pending Google's response, Plaintiffs prepared and served their Fifth Set of
27   Interrogatories on December 21, 2021. *See* Plaintiffs' Fifth Set of Interrogatories.

28   61.    On December 23, 2021, Google responded to Plaintiffs' November 30, 2021 request

for clarification. *See* Joint Rebuttal Decl. Ex. 16, Google's Dec. 23, 2021 Letter. In this letter, Google declined to clarify its discovery responses, maintaining that "Google has sufficiently responded and objected to these Requests…and will not amend [its] responses and objections[.]" *Id.*

62.     On December 30, 2021, Plaintiffs again requested to meet and confer to clarify what Google meant when it said, "Chrome *may send a bit, which depending on the circumstances, may indicate to Google* that sync is not enabled on the Chrome browser…." Joint Rebuttal Decl. Ex. 17. Google refused.

63.     On January 13, 2022, Plaintiffs deposed Tim Schumann, during which Mr. Schumann disclosed, for the first time, the ██████ Signal. *See infra*.

64.     On January 31, 2022, Google served its responses to Plaintiffs' Fifth Set of Interrogatories. *See* Olson Decl. Ex. 5. This set of Interrogatories sought clarification of Google's representations regarding the existence and storage of Not Synced Signals. Like its prior written discovery responses, Google's responses to the Fifth Set of Interrogatories shed no further light on Not Synced Signals. For example, Interrogatory No. 28 requested that Google:

> Identify where Chrome sends ███████████████████████████████ ███████████████████████," all locations where the "bit" is stored or transmitted by Google, what other information is contained in the same storage locations associated with the "bit," including information that would identify a Google Account, and how long the "bit" is stored in each location. *See*, *e.g.* Google's Resp. to RFA No. 14.

In response, Google identified only ███ data sources, the ████████████████ (one of the 10 data sources identified in its November 23, 2021 Production, *see supra*) and ████████data source. Absent from Google's response was any reference to the other ███ data sources (*see* sync-state data sources chart), any clarification or identification of ████████ SyncDisabledEvent, Sync_Feature_Enabled, or any other field or signal related to Not Synced status.

65.     Thus, Google's discovery responses continued to perpetuate confusion and deception regarding the existence and storage of Not Synced Signals and sync states.

**E.     Google's Challenge to Plaintiffs' Proposed Methodology to Identify Class Members Based on Not Synced Signals**

66.     On October 14, 2021, Plaintiffs filed their Motion for Class Certification (Dkt. 339), which included the expert reports of Richard M. Smith (Dkt. 339-16) (the "Smith Report") and Zubair

Shafiq (Dkt. 339-22) (the "Shafiq Report").

67.    Relevant here, based on independent experiments conducted by Plaintiffs' experts regarding data collection at the front end, the Smith Report opined that "a specific signal that Chrome sends to the Google Sync Service to indicate to Google that the user is not [s]ynced and which is accompanied by the specific Google account to which the user has signed-in – for example, an email address." Dkt. 339-16 ¶ 113. It further stated that, "it would be straightforward for Google to keep a record of these Incoming signals attached to specific account holders if Google has not done so already." *Id*. ¶ 114. The Smith Report specifically identified six circumstances in which a Not Synced Signal is sent to Google. *Id*. ¶ 116.

68.    The Smith Report further explained that one of the signals is named "is_sync_feature_enabled" and that it indicates "[w]hether the client has full sync (or, sync the feature) enabled or not." *Id*. ¶¶ 139-40. It then states that the "is_sync_feature_enabled" signal "is set to zero" when a user is "signed in with sync off." *Id*. ¶ 144. The Smith Report then states that "[a]fter sync has been turned on," the "is_sync_feature_enabled" value "is now 1 which appears to indicate that Sync has been enabled." *Id*. ¶ 149. Again, this was based on expert Smith's experiments, not on evidence produced by Google.

69.    Because Plaintiffs do not have their own access to Google's backend storage systems, it was impossible for Plaintiffs to submit evidence of how such a signal was received and saved by Google.

70.    The reason the Smith Report stated that "it would be straightforward" for Google to preserve the Not Synced Signals rather than identifying precisely where they were stored is because Google continued to deny even the existence of any such signals until October 12, 2021 and even then did not correct the record to identify the precise signals and when and how they are sent, received, and stored – and for how long.

71.    The Shafiq Report identified "several accurate methods … using Google's own systems and databases that already exist" through which "Google can identify Chrome users who did not enabled sync or who disabled sync." Dkt. 339-22 ¶ 61. The Shafiq Report states that,

PLS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

"[i]f Google has and had saved [the Signed In But Not Consented for Sync signal], all-signed in but not consented for sync Chrome users could be easily identified for whatever time frame Google decided to retain the data." *Id.* at ¶ 62. The Shafiq Report further explains that "Google could just as easily have designed Chrome to send a separate signal indicating that a user was signed-out and not synced."

*Id.* ¶ 63.

72.     On December 22, 2021, Google filed its opposition to Plaintiffs' Motion for Class Certification. *See* Dkt. 429. In opposing class certification, Google argued that "a class action is not superior here because much of the class cannot be identified." *Id.* at 23. Google also argued that because it could not identify Not Synced users, self-reporting was the only mechanism for class identification, and this was "not reliable." *Id.* All of these arguments are undermined by the existence of a Not Synced signal, which allows class members to be identified.

73.     Notably, Google challenges to class member identification relies on the Declaration of Tim Schumann, wherein Mr. Schumann asserted that "[Prof.] Shafiq's proposed approaches [and reliance on Not Synced Signals] will fail to accurately identify Chrome users who did not enable sync or who disabled sync." Dkt. 430-16 ¶ 2. Mr. Schumann stated that Prof. Shafiq's approach would fail because it "assumes that CHROME_SYNC [in the ████ database] will only be present … if the user has enabled Sync" and "[t]hat is a flawed assumption [because] the CHROME_SYNC value … will also be present for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but did not have sync enabled." *Id.* ¶ 5. Mr. Schumann makes the same statement for Google's Takeout product. *Id.* ¶ 6. He further contends that "the 'Chrome Sync' record can exist for a user" who is signed in "but never enabled sync" but that "the 'access log activity' records are only retained for less than 60 days." *Id.* ¶ 6. The Schumann Declaration omits the existence of signals that exist when a user clicks to turn off sync – and thus be transitioned to a basic browser or signed out mode.

**F.     Google's Discovery Misconduct Regarding Not Synced Signals Come to Light**

**1.     The "████" Signal**

74.     On January 13, 2022, Plaintiffs took the deposition of Google employee Tim Schumann in Switzerland.

75.     During his deposition, Mr. Schumann made various admissions regarding the

existence of Not Synced Signals. Among them, Mr. Schumann testified that Chrome regularly sends a Not Synced Signal to the ████████ Logs for users who are "Signed In But Not Consented for Sync." Schumann Dep. at 38:7-25, 58:1-8; 125:10-16. Internally, Google referred to this signal as "████" *Id.* The ████ Signal is tied to individual Google Accounts and stored for approximately ██ in ████████ Logs before they are "destroyed." Schumann Dep. at 131:18-132:9. Thus, Mr. Schumann disclosed that the "████" signal could be used to identify Not Synced Chrome users, contradicting almost a year of statements to the contrary in this litigation.

76.    Mr. Schumann further testified:

a.    Google stores Not Synced Signals in ████ with other Google Account-keyed information. Schumann Dep. at 79:10-25, 125:10-16.

b.    Google creates an "intermediate table" called ██████████ that contains sync state, Google Account identifiers, and device identifiers for purposes of tracking Chrome usage. Schumann Dep. at 129:18-130:20.

c.    Google can ████████ from ████ to identify Google Account using Chrome in a Not Synced state, but after that "the underlying data would run out of retention and would be destroyed[.]" Schumann Dep. at 131:18-132:9.

d.    ████ stores the Not Synced data for approximately ████. *See* Schumann Dep. at 188:17-189:10.

e.    The process of compiling a list of Not Synced users would "be quick" and involve "[m]aybe a day or two of work," which Mr. Schumann testified would be related to the approval process necessary to compile such a list. Schumann Dep. at 94:25-97:14.

f.    ████ Logs "have that signed-in-not-syncing-bit" for "████ of entries every day for users … who have not enabled sync[.]" Schumann Dep. at 100:3-102:19.

77.    In addition, Mr. Schumann disclosed that Google created two pipelines to send this signal to other Google Account-keyed services, i.e. creating the ability to link them to individual Google accounts.

    a.    The first pipeline goes to a storage system called ████, where the signal is stored for ████ before they are "auto deleted." Schumann Dep. at 189:6-10, Schumann Dep. Exs. 10-15.

    b.    The second pipeline is called the ████ Logs Pipeline, which sends the signal to a database that stores aggregate information. But before the data is aggregated, it is sent to an "intermediate table" called ████ that stores the signal alongside Google Account and device identifiers for an indeterminate period of time. Schumann Dep. at 129:18-130:20; Schumann Dep. Ex. 7. Thus, the "████" signal could be used to identify Not Synced Chrome users, but only for a limited amount of time.

78.    In addition, documents produced by Google show that Mr. Schumann himself was engaged in discussions with other Google employees regarding how Google could identify class members as early as January 2021 – the same time that Google began its campaign for a protective order, and a year before Mr. Schumann was deposed. *See* Pls' Joint Decl. Ex. 4, GOOG-CALH-00854375. Despite this testimony, Google did not clarify its verified interrogatory responses until eight minutes before the close of discovery, otherwise impeded discovery into sync states, and failed to identify additional Not Sync signals. To reiterate, Mr. Schumann was the person who verified the previously incorrect interrogatory responses on Google's behalf.

**2.    The Zwieback ████ Field Names**

79.    On February 25, 2022, with only two weeks to go before the end of fact discovery, Google produced field names for Zwieback ████. Among the Zwieback fields included several not previously revealed that record sync status: (1) ████ (2) ████; and (3) ████. *See* Pls' Joint Decl. Ex. 7, GOOG-CALH- 01170421. By this production, Plaintiffs learned for the first time that Zwieback ████ columns include ████ ████ disposing of the myth that Zwieback logs are "anonymous." Thus, these Zwieback fields – which track Not Synced Chrome Users and are tied personally identifiable information–- can identify class members.

### 3. The "SyncDisabledEvent" Signal

80.     On March 4, 2022 (the last day of fact discovery), the Special Master arranged a live demonstration of Google's internal logs, via video conference, that included Google engineers, counsel for all parties, and Plaintiffs' experts. These attendees observed a Google employee conduct a live search that revealed an additional Not Synced Signal – the SyncDisabledEvent Signal – pass from Chrome to Google. As explained by Plaintiffs' expert, Mr. Smith, this signal identifies class members who chose to "Turn Off" Sync, an action that would then be capable of identifying them as a user in "Basic" or "Signed Out browsing mode. *See* Joint Rebuttal Decl. Ex. 13, Smith Rebuttal, ¶6.

81.     Later that same day, at 11:52 p.m. Pacific, with eight minutes left to the end of fact discovery, Google finally amended its discovery answers to acknowledge the existence of the SyncDisabledEvent Signal. In its supplemental response to Interrogatory No. 34, Google stated:

> When a Chrome user stops sync, the Chrome client sends a 'SyncDisabledEvent' signal to the Chrome Sync server. … The signal is recorded in Chrome Sync's ████████, "████████," where the record is retained until the user clears the sync data associated with that Google Account or deletes the Google Account. The signal is also recorded in the ████████.

Pls' Joint Decl. Ex. 8.

82.     Google asserts that the SyncDisabledEvent Signal is recorded in the "████████ ████████" but it failed to identify this signal as a field in that log when it submitted field names to the Special Master back on November 23, 2021.

### 4. The "████████" Signal

83.     On March 18, 2022, Google produced two documents indicating additional storage of sync-related consent signals that had not previously been disclosed to Plaintiffs, the Special Master, or the Court. For example, in GOOG-CABR-05882544, Google employees discuss a signal for "████████" associated with a system called "the ████ ████████ ████████ to create durable audit records for the user consents" in various Google products, including Chrome. *See also* GOOG-CABR-05882537.

84.     In this case, Google argues consent settings may be a basis to exclude certain users from the proposed class. *See generally* Dkt. 429, Google's Opp. to Class Cert. Thus, in Google's

1    view, identification of putative class members must account for these consent settings.

2        85.    The Court finds that the ███████████████ Signal is therefore relevant

3    to rebut Google's challenges to Plaintiffs' ability to identify class members.

4        **5.    The "Sync_Feature_Enabled" Signal, with Sub-Designations of "True"
              and "False"**

5

6        86.    On April 23, 2022, Google produced ████████ Logs and Gaia ████████ data

7    associated with certain Plaintiffs and test accounts created by Prof. Zubair Shafiq. *See* Pls' Joint Decl.

8    ¶¶ 42-43. This production confirmed that ██████████ Logs store Not Synced Signals in a way that

9    directly identifies a specific user that is not consented for sync. *See id.* This showed that Google's

10   statements to the Court at the outset of the case regarding the ██████████ logs and Not Synced

11   signals were false.

12       87.    For example, the produced information pinpointed the time of the entry, the individual

13   email address nedstark904@gmail.com, the UserID of 936530432958, the UserAgent associated with

14   the entry, the "Birthday" associated with the account, and that "sync_feature_enabled" equals "false."

15   Pls' Joint Decl. ¶ 43. The production further showed that the nedstark904@gmail.com account had

16   sync_featured_enabled equals false eight times in approximately one hour; and that a separate synced

17   test account created by Prof. Shafiq (Bran Stark) had "sync_feature_enabled: true" appear 105 times

18   over roughly the same time period. *Id.* The time stamps correspond to when Prof. Shafiq disabled

19   sync in his test accounts. *Id.*

20   //

21   //

22   //

23

24

25

26

27

28

PLS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR SANCTIONS FOR DISCOVERY
MISCONDUCT

88.     The same production shows █████████████████████████████████████

█████████████████ *See* Pls' Joint Dec. ¶ 44. The screenshot below shows a ████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████



*Id.*

**6.     Other Signals That Can Be Used to Identify When a User is Not Synced**

89.     Four months after the close of discovery, Google's Opposition to sanctions now concedes additional potential Not Synced Signals

90.     Specifically, Google concedes that a person who is "signed out of their Google Account" or not signed-in is "therefore not synced." Opp. at 2. Thus, it is undisputed that signals which identify a user as not being signed in are also Not Synced Signals. These signed-out signals are stored in numerous logs – including logs Google sought permission to destroy based on its assertion that they did not contain any Not Synced Signals. *See supra* (discussing misrepresentations made in furtherance of Google's Mot. for Protective Order).

91.     In addition, throughout the course of discovery, Plaintiffs have discovered additional signals, but Google has failed to provide further information about them. This includes but is not limited to the following:

a.     Is_Sync Feature_Enabled;

b.     ████████████ from ████████████████ column in GAIA ████████

c.     Sync_Disabled;

d.     █████████████ when false;

1    e.    ███████████; and

2    f.    ████████████████████████.

3    92.    The Court finds that, as a result of Google's failure to timely identify and preserve Not

4 Synced Signals, Plaintiffs have been denied discovery relating to them and have been foreclosed from

5 referring to them in briefing class certification or summary judgment. Previously withheld discovery

6 now shows that the Not Synced Signals Google sought to conceal can be used to identify class

7 members, down to the specific dates on which Chrome sent their personal information to Google

8 without authorization.

9    **G.    Google's Factual Defenses Regarding Not Synced Signals Are Unavailing**

10    93.    To the extent not otherwise addressed above, Google's claimed defenses to discovery

11 misconduct related to Not Synced Signals are without merit.

12    94.    Google's reliance on the existence of information purportedly available in public

13 documents does not cure its misrepresentations to the Court, Plaintiffs and the Special Master.

14 Further, the claimed public disclosures are dubious. *See* Joint Rebuttal Decl. Ex. 13, Smith Rebuttal

15 ¶¶ 9-25.

16    95.    Likewise, Google's preservation proposal of August 27, 2021 does not mitigate its

17 misconduct. The proposal did not disclose Not Synced signals, correct the record of

18 misrepresentations made to the Court, nor cure the inconsistencies throughout Google's discovery

19 responses. *See* Pls' Joint Decl. ¶ 18; Pls' Joint Rebuttal Decl. ¶¶ 30-32; Pls' Joint Rebuttal Decl. Ex.

20 19, J. Ansorge Aug. 26, 2021 Email (expressly limiting proposal to sampling of *only "*information

21 showing whether a user had sync *enabled* at the time of the log entry").

22    96.    Google's August 27, 2021 proposal asserted that Google would be able to preserve a

23 subset of information "showing [a] user had sync enabled" which would be taken from "*the sync

24 traffic logs that contain data when a user had sync enabled*." Pls' Joint Rebuttal Decl. Ex. 19, J.

25 Ansorge Aug. 26, 2021 Email (emphasis added). As set forth above, belated discovery has revealed

26 that ████████ Logs in fact also contain information as to when a user is Not Synced, i.e. the Not

27 Synced Signals. Thus, Google's August 27 offer to preserve only the subset of information in ████

28 ████████Logs related to sync *enabled*, establishes that Google has the ability to search, segregate and

preserve the Not Synced Signals. Stated differently, Google was and is capable of distinguishing between synced and Not Synced users.

97.    Google contends that early deposition of Tim Schumann, originally offered in October 2021, would have revealed the existence of Not Synced Signals. This hypothetical is not a fact. First, Google is improperly shifting to Plaintiffs the burden to correct Google's misrepresentations. Second, Google did not amend the interrogatories verified by Mr. Schumann himself until eight minutes before the close of discovery. Third, Google continued to deny and withhold evidence as to the existence of a multitude of additional Not Synced Signals and impede discovery of sync states. even after the deposition of Mr. Schumann.

98.    Google's argument that it "has no logs showing every instance in which a Chrome user browses without sync enabled" is not relevant to the questions on this motion: which is whether Google should be sanctioned for having falsely told the Court that Not Synced Signals did not exist and that it had no logs that could identify Not Synced users. It is not Plaintiffs' burden on this motion to identify any single log at Google that includes "*every* instance in which a Chrome user browses without sync enabled." It is sufficient that Plaintiffs show that Google concealed Not Synced signals and multiple locations where those Not Synced signals are stored that show millions of instances in which "a Chrome user browses without sync enabled."

99.    Lastly, the Court rejects Google's attempt to use Plaintiffs' preservation proposal as a sword against Plaintiffs on this motion. For more than a year, Google failed to identify the fields necessary for Plaintiffs to make meaningful preservation proposals and the logs where such fields are stored. As the Court understands it, Plaintiffs' suggestion that Google include Not Synced signals in other logs was an effort to *reduce* Google's preservation burdens. Google's own preservation proposal of August 2021 demonstrated that including Not Synced signals in a log with other relevant data is something Google is capable of doing. As Google has consistently told the Court, many of its logs have ███████ of different fields. Adding one additional field with an on-off switch to indicate whether a user was Not Synced would not be unduly burdensome.

III.    **GOOGLE'S FAILURE TO PRESERVE NAMED PLAINTIFF INFORMATION**

A.      **The April 30, 2021 Order for Production of Named Plaintiff Information**

100.    As set forth above, Plaintiffs' original and First Amended Complaints expressly referred to specific identifiers associated with Named Plaintiffs' devices.

101.    On August 31, 2020, Plaintiffs served Request for Production ("RFP") No. 5, which called for Google to provide all "data and information related to or associated with the Plaintiffs," their identifiers, "and all data collected from their Chrome browsers of any kind," including but not limited to browsing history information and cookies (hereafter "Named Plaintiff Information"). Dkt. 166 at 3; *see also* Pls' Joint Decl. ¶ 69. In response, Google stated it would produce "relevant information associated with Plaintiffs' Google Account names and email addresses identified in the complaint[.]" *Id*.

102.    In the fall of 2020, Google introduced Plaintiffs to the concepts of Zwieback and Biscotti identifiers. *See* Pls' Joint Decl. ¶ 70.

    a.    The Zwieback identifier (related to the cookie referred to as 'NID') is an identifier that Chrome sends to Google via Google.com when Chrome users are on non-Google websites or type anything into the Chrome omnibar. It is the most common example of an identifier provided in Plaintiffs' original Complaint. *See, e.g.* Pls' Joint Decl. ¶ 70(a). Dkt. 1 ¶¶ 158, 161, 170, 183, 188, 190;

    b.    The Biscotti identifier (related to the cookie referred to as 'IDE') is an identifier that Chrome sends to Google via Doubleclick.net when Chrome users are on non-Google websites that contain Doubleclick source code. It is also referenced in Plaintiffs' original Complaint. *See* Pls' Joint Decl. ¶ 70(b).

103.    Relatedly, the Gaia Identifier is an identifier that is associated with a Google Account.

104.    Named Plaintiff Information can be searched by using one of these three identifiers – Zwieback, Biscotti, and Gaia. Thus, these subsets of information are referred to as Zwieback-Keyed Information, Biscotti-Keyed Information, and Gaia-Keyed Information.

105.    On December 31, 2020, at Google's request, Plaintiffs supplemented RFP No. 5 to provide Google with identifiers for the Named Plaintiffs, including the Zwieback, Biscotti and Gaia

1   identifiers. *See* Pls' Joint Decl. ¶ 71. Upon receipt of the identifiers, Google did not object that any

2   of these identifiers were out-of-scope to the case. *See* Google's Resp. & Objs. to Suppl. RFP No. 5.

3       106.     The Court finds that Google was under a duty to preserve Named Plaintiff Information,

4   including Zwieback-Keyed, Biscotti-Keyed, and Gaia-Keyed Information from the date of filing of

5   the original Complaint.

6       107.     As to those preservation obligations, Google did not begin to preserve Gaia-Keyed

7   Information until February 2021: "Google [][] engineered pipelines to preserve event-level data

8   associated with the Named Plaintiffs' GAIA IDs" that was "completed in March 2021. Ansorge Decl.

9   ¶ 6. These efforts did not occur until eight months after the filing of the original Complaint and five

10  months after Plaintiffs propounded RFP No. 5 (which specifically requested production of Named

11  Plaintiff Information). Further, the fact that Google engineered pipelines to preserve Gaia-Keyed

12  Information did not come to light until March 2022 (*see infra*), and the fact that those pipelines were

13  *created in February 2021* and *completed in March 2021* was not disclosed until the filing of Google's

14  Opposition to sanctions, on July 1, 2022. The pipelines resulted in a set of Named Plaintiffs' Gaia-

15  Keyed Information that was *already searched, segregated and preserved*.

16      108.     The Court finds that Google failed to timely preserve Named Plaintiffs' Gaia-Keyed

17  Information. As to its belated efforts, and as discussed further below, the Court finds that Google

18  withheld key information regarding these efforts that resulted in the Court, Plaintiffs and the Special

19  Master expending needless time and costs.

20      109.     With respect to preservation of Named Plaintiffs' Zwieback-Keyed and Biscotti-

21  Keyed Information, Google presents no evidence that it timely took action to preserve this event-

22  level data. In fact, Google admits that it neither preserved nor produced Zwieback-Keyed Named

23  Plaintiff Information. *See* Ansorge Decl. ¶ 32; *see also* Opp. at 10, n. 11 ("At the time, Google did

24  not preserve Zwieback-keyed data"). The Court finds that Google failed to preserve Zwieback- and

25  Biscotti-Keyed Named Plaintiff Information.

26      110.     On April 16, 2021, Plaintiffs filed their First Amended Complaint, identifying new

27  Named Plaintiffs. *See* Dkt. 163.

28      111.     On May 3, 2021, Plaintiffs' provided Google with additional identifiers for the newly-

added Named Plaintiffs, including Zwieback, Biscotti and Gaia identifiers. *See* Pls' Joint Decl. ¶ 71, n. 3.

112.    Aside from what is set forth above, Google presents no evidence of any additional preservation efforts undertaken as a result of the First Amended Complaint and receipt of additional Named Plaintiff identifiers. The Court finds that no such efforts were taken.

113.    Upon receipt of the additional identifiers, Google did not object that to Zwieback identifiers as out-of-scope to the case. Instead, as reflected in an April 20, 2021 Joint Discovery Chart, Google "objected to [RFP No. 5] to the extent it seeks unauthenticated user data and may capture information related to users other than Plaintiffs." Dkt. 164 at 3.

114.    At a discovery hearing, on April 29, 2021, Plaintiffs specifically requested that the Court compel Google to produce Named Plaintiff Information that can be found through "a search of databases with [identifiers that track users when they are signed-in or signed out] the Zwieback , Biscotti, and Gaia identifiers", i.e. device-keyed (Zwieback and Biscotti) and account-keyed (Gaia) data related to Named Plaintiffs. Apr. 29, 2021 Hr'g Tr. at 39:4-41:10. In response, Google made its "unauthenticated" objection, arguing that "Zwieback and Biscotti – those identifiers are … tied to a device." *Id*. at 43:1-4.

115.    The Court rejected Google's argument. On April 30, 2021, the Court ordered:

> "Google must produce the information it has associated with the named Plaintiffs, including, as detailed at the hearing, profile data, data from non-synced sources, and *any device data* associated with any Plaintiff."

Dkt. 173-1 at 1, regarding Issue 1.3 (emphasis added).

116.    As set forth below, Google did not comply with this Order.

**B.    Google's Misconduct Regarding Production of Gaia-Keyed Information**

117.    The April 30, 2021 Order mandated production of Named Plaintiffs' Gaia-Keyed Information. Google does not dispute this.

118.    But on May 3, 2021, Google informed Plaintiffs that it would not produce the information in full, but rather only a subset of Gaia-keyed Information – of Google's choosing. *See* Dkt. 226-1, Barnes Decl. ISO Pls' Motion to Compel, at ¶ 13 (reciting history of parties' meet and confers).

119.    On May 12, 2021, Google "produced ███████ data associated with Plaintiffs' Google Accounts (data tied to authenticated identifiers)." Ansorge Decl. ¶ 16.

120.    On June 2, 2021, Google represented to the Court that it had complied with the April 30, 2021 Order: "We have produced what we were supposed to produce, or well, what we believe we were supposed to produce in terms of the data associated with the plaintiffs." Jun. 2, 2021 Hr'g Tr. at 48:16-18. Later discovery would show that this representation was false. Google had not produced information from two relevant data resources, Gaia ███████ and Gaia ███████.

121.    On June 23, 2021, Plaintiffs filed a Motion to Compel Production of Named Plaintiff Information, alerting the Court that Google failed to comply with the April 30, 2021 Order in that it produced only a subset of Gaia-Keyed Information, of its choosing, (*see* Dkt. 226 at 5) and omitted entirely device-keyed information (discussed further below).

122.    On July 1, 2021, Google filed its opposition to Plaintiffs' Motion to Compel. *See* Dkt. 232. Regarding production of "Google Account-keyed data," Google made the following misrepresentations:

| Google's Statement | The Truth |
|---|---|
| Plaintiffs' request for "all" Google Account-keyed information "would sweep into discovery data received from Google products and services that have nothing to do with use of a Chrome browser to visit websites running Ad Manager or Analytics." | Google's claim that the case is limited to "Ad Manager" and "Analytics" is knowingly false. Plaintiffs' original and First Amended Complaints alleged more unauthorized Chrome transmissions to Google.com when Not Synced Chrome users were not on a Google website than any other transmissions. Late produced discovery revealed that the revenues Google derives from these transmissions constitutes the bulk of unjust enrichment in the case and that logs associated with those transmissions contain Not Synced signals. |
| "[M]uch (if not all) of this information is already available to Plaintiffs through the Google Takeout tool." Dkt. 232-4 at 3:10-13. Google further explained that it had produced (1) My Activity chrome browsing data for Ads and Analytics; and (2) subscriber settings" and that "[t]hese are the GAIA_keyed information related to the browser communications at issue here, namely communications on the Chrome browser without sync enabled while browsing | Google's factual statement that "My Activity" and "subscriber settings" data "are the Gaia-keyed information related to the browsing communications here" was knowingly false. There are scores of other relevant Gaia-keyed data logs that contain information not present or available to Plaintiffs in My Activity or subscriber settings. |

| Google's Statement | The Truth |
|---|---|
| third-party websites that embed Google services like Google Ad Manager and Google Analytics[.]" *Id.* at 3-4. Emphasis added. | |
| "[E]ven if the information sought by Plaintiffs were relevant, Google should not be compelled to identify and produce it because this information is equally available to Plaintiffs. …Plaintiffs—like all Google account holders—can use Google's publicly-available 'Takeout-tool to export their Google Account-keyed information for 47 categories of information tied to different Google products and services[.]" *Id.* at 7. "Anything more," Google argued, "would be unduly burdensome for Google." *Id.* | Google's factual statement that data in additional logs "is equally available to Plaintiffs" is knowingly false. Logs that Google had not produced at the time (or disclosed the data contained in them) contain highly relevant information that was not "equally available to Plaintiffs." This unavailable information includes (1) synced versus Not Synced status; (2) user profile information; (3) additional identifiers, such as Biscotti-identifiers that are present in GAIA-keyed logs in contravention of Google's public privacy promises; (4) specific geolocation information; (5) browser fingerprint information; (6) revenue information tied to specific users; (7) various purported user "consents" or privacy controls that can also be used to distinguish synced versus Not Synced traffic; and even (8) specific ads shown to specific users at specific times. |
| "Plaintiffs incorrectly claim that Google is withholding relevant GAIA-keyed information because it produced to Plaintiffs a spreadsheet identifying ▮ data logs, but only searched and produced data related to ▮ of those logs. (Mot. at 6). However, only ▮ logs are keyed to a Google Account ("GAK"); the rest are keyed to a pseudonymous non-Google Account keyed identifier ("NGAK"). *See* Plaintiffs' Ex. B (GOOG-CALH-00027455). Google produced information from the ▮ specified logs because information is propagated from the identified Google Account-keyed logs to the ▮ logs that Google searched; the rest of the logs would contain duplicative and cumulative information, production of which the Federal Rules were designed to prohibit." *Id.* at 5-6. | Google's factual statement that the ▮ logs keyed to a Google Account "would contain duplicative and cumulative information" is knowingly false for the same reasons that the data in the additional logs "is equally available to Plaintiffs" is false. The Gaia-keyed data produced by Google to that point in the case lacked the additional information set forth above that is present in the Gaia-keyed logs Google refused to produce.<br><br>Further, Google gave the Court the false impression that it had not searched the other logs. Specifically, Google's statement that it "produced information from … the ▮ logs that Google searched; the rest of the logs would contain duplicative and cumulative information" gives the Court the impression that Google had not already searched any logs other than the ▮ it had already produced. However, as Plaintiffs would not discover until the last week of fact discovery, this claim was false. Google began searching, segregating, and preserving Plaintiff data from the "other" Gaia- |

PLS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

| Google's Statement | The Truth |
|---|---|
| | keyed logs before it filed its opposition to Plaintiffs' motion to compel. |

123.   In its opposition, Google did not inform the Court that it had already searched, segregated and preserved Gaia-Keyed Information. *See* Dkt. 242. Rather, Google's briefing asserted that production was unduly burdensome. Google claimed that complex technical issues "would require a commitment of engineering support, time, and other resources wholly disproportionate to the needs of the case." Dkt. 242 at 5. This representation was false as Google had, by this time, already searched, segregated and preserved Gaia-Keyed Information.

124.   On July 13, 2021, based on Google's technical objections to production of Named Plaintiff Information, the Court appointed a Special Master for the express purpose of "assisting this Court in resolving *disputes of a technical nature* in this litigation." Dkt. 246 ¶ 1 (emphasis added); Dkt. 247 (referring to Special Master *Calhoun* Issue 1.3).

125.   On September 16, 2021, the Court ordered Google to "identify to the Special Master and Plaintiffs all databases and data logs (collectively, 'data sources') that may contain *responsive* information." Dkt. 273 at 1 (emphasis added). For each responsive source, Google was to "provide at a minimum: (1) the name of the database or log; [and] (2) a description of the data source's purpose and function." Dkt. 273 at 2. Further, "[f]or each selected data source, Google will provide, at a minimum: (1) the data schema; (2) definitions and descriptions of each field; (3) tools which Google employees ("Googlers") use to search each data source; and (4) instruction sets and manuals for all tools identified." *Id.*

126.   Google did not comply with this order. Google did not identify "all databases and data logs … that may contain responsive information." Nor did it reveal that it had already searched, segregated and preserved Named Plaintiffs' Gaia-Keyed Information from dozens of relevant logs, and was withholding this information from Plaintiffs and the Special Master.

127.   Instead, on September 27, 2021, Google identified to the Special Master logs for which it had "preserved" but not "produced" Plaintiff data. *See* Pls' Joint Decl. ¶ 107. But Google refused to provide any context. It would not explain what it meant by "preserved" information and why it

1   would not produce that information. *Id.*

2   128.    On October 6, 2021, Plaintiffs requested that Google comply with the Court's order,

3   including that Google "provide Plaintiffs with a list of all logs and other sources for which Google

4   has searched for data about Plaintiffs are devices associated with the Plaintiffs." Pls' Joint Decl. ¶

5   108. Google refused. *Id.*

6   129.    On October 13, 2021, Plaintiffs requested production of the information that Google

7   stated it had already "preserved," or that Google provide details as to any alleged burdens of

8   production. *See* Pls' Joint Decl. ¶ 109. Google refused. *Id.*

9   130.    On November 12, 2021, the Court reiterated its order that Google "provide the Special

10  Master a full list of *all data sources which have been searched* during the overall discovery process."

11  Dkt. 377 at 10 (emphasis added). Google was ordered to provide "the name of the data source" and

12  "the date[s] on which the searches to date were carried out." *Id.* The Court further ordered that

13  "Google shall provide a declaration, under penalty of perjury from Google, not counsel, that (1) to

14  the best of its knowledge, Google has provided a complete list of data sources that contain information

15  relevant to Plaintiffs' claims; and (2) all *responsive* data related to the Named Plaintiffs have been

16  produced from all searched data sources in the respective prior searches." *Id.* (emphasis added).

17  131.    Google did not comply with this order. Google did not identify the data it had already

18  searched, segregated, and preserved, nor the date that was completed.

19  132.    Further, Google did not provide a declaration as instructed. Instead, Google's

20  declarant provided a list of relevant data sources, but did not address the directive for confirmation

21  about production of all *responsive* data. *See* Dkt. 383 ¶ 3.

22  133.    In the midst of the Court's orders, Plaintiffs continued efforts to obtain clarification

23  on what Google meant when it labeled information as "preserved" but not "produced." Plaintiffs

24  requested clarification on December 1, 14, 23, and 29, 2021. *See* Pls' Joint Decl. ¶112. Google refused

25  provide any context on this issue. *See id.*

26  134.    The Court finds that Google failed to comply with the April 30, 2021 Order in that it

27  did not produce the Gaia-Keyed Information that it had already searched, segregated and preserved.

28  The Court finds that Google made misrepresentations to the Court regarding purported technical

-30-    Case No. 4:20-cv-05146-YGR-SVK

burdens which did not exist. But for Google's misrepresentations, the appointment of a Special Master would not have been necessary and the parties would not have had to engage in iterative search rounds in an attempt to reconstruct information that Google already had in its possession.

135.    The November 12, 2021 Order set forth a format for iterative searches (rounds of searches), aimed at resolving the technical burdens that Google had asserted as a barrier to production of Named Plaintiff Information. The success of this process depended on the parties' obligation to disclose information and sources in good faith. Google did not do so. At every step, it sought to conceal information and hinder Plaintiffs' ability to construct fully informed search queries.

136.    In early January 2022, Plaintiffs selected a subset of identified logs to facilitate first-round searches for Plaintiff Information. Discovery would later reveal that Google withheld information critical to first round searches. For example, at the time of the first-round searches, Google was withholding information regarding logs that would contain revenue or user profile information, e.g. the ████████████████ log. Moreover, unbeknownst to Plaintiffs, in implementing the first-round searches Google limited the search to a seven-day period immediately prior to its search – a point in time in which Named Plaintiffs were no longer using Chrome. As a consequence of Google's actions, the first-round searches resulted in almost entirely null results. The rare exceptions being search results related to test account created by Prof. Shafiq.

137.    Critically, at the time of the first-round searches, Google had already set up the "pipelines" (which the Court now knows to have been created in February 2021) from which Google already searched, segregated, and preserved Named Plaintiffs' Gaia-Keyed Information. That is, without disclosing that Google already constructed and used processes to search for and collect Named Plaintiffs' data for this case, and without producing that data, Google forced Plaintiffs to engage in a prolonged process overseen by the Special Master to guess how best to search for the Named Plaintiffs' data. And the process that Google ultimately agreed to engage in yielded null sets for much of those searches. Had Google produced the Named Plaintiff Information it had collected and/or revealed the processes used to do so, the extensive processes described below would not have been necessary.

Pls' [Proposed] Findings of Fact and Conclusions of Law on Motion for Sanctions For Discovery Misconduct

138.    On January 19, 2022, on a call with the Special Master, Plaintiffs again requested that Google provide more information about the "preserved" but not "produced" Named Plaintiff Information. *See* Pls' Joint Decl. ¶ 114. Google refused. *See id.*

139.    On January 25, 2022, Google gave the same response in writing, refusing clarify as it its distinction between "preserved" but not "produced" Named Plaintiff Information. *See* Pls' Joint Decl. Ex. 9.

140.    From January 25 to February 25, 2022, Plaintiffs renewed their request that Google provide more information about the "preserved" data on every call with Google and the Special Master. *See* Pls' Joint Decl. ¶ 116. Google refused. *Id.*

141.    On February 25, 2022, as directed by the Special Master, Plaintiffs raised this issue before the Court. *See* Dkt. 510 at Issue 1.3 (requesting determination as to whether Google may withhold Plaintiff Information it has preserved but not yet produced).

142.    On February 27, 2022, Plaintiffs renewed their request that Google "produce the [] plaintiff-related data already gathered and preserved (but not produced) in advance of the expert meetings" that the Special Master scheduled for the week of March 1-5, 2022. Pls' Joint Decl. ¶ 118. Google refused. *Id.*

143.    On March 1, 2022, the Special Master, counsel, Plaintiffs' experts, and Google employees convened for live demonstrations of Google's systems. On that video call, Plaintiffs learned, for the first time from a Google engineer, that the "preserved data" had already been searched and segregated. At the end of the conference, the Special Master ordered Google to produce all Named Plaintiff Information it had previously searched and had in its possession. *See* Pls' Joint Decl. ¶ 119.

144.    Google did not comply with the Special Master's order.

145.    On March 8, 2022, Google raised a new obstacle to production of Named Plaintiff Information. Google claimed, for the first time, that the previously searched data included "publisher information," that, by contract, required Google to provide notice of its disclosures to affected publishers. Pls' Joint Decl. ¶ 121. Google argued that the process of providing notice to publishers would extend Plaintiff data production process too long. *Id.* In response, the Special Master ordered

1  Google to produce all previously searched data that did not contain alleged "publisher information"

2  and did not make a decision whether Google must produce the "publisher data." *Id*.

3     146.    On March 9, 2022, five days after fact discovery concluded and almost a year after

4  being ordered to do so, Google produced "the preserved [plaintiff] data from logs that do not contain"

5  what Google claimed to be "publisher information." Pls' Joint Decl. ¶ 122. Google continued to refuse

6  to produce Named Plaintiff Information that Google asserted required publisher notice. *Id*.

7     147.    From the limited March 9, 2022 production, Plaintiffs received a chart of "column"

8  names in Gaia ■■■■■ (along with annotations) showing that at least ■ of the Gaia ■■■■■ columns

9  contain Zwieback identifiers. *See* Joint Rebuttal Decl. Ex. 20 (Shafiq Rebuttal), at § C. That is,

10  Google in fact associates Zwieback, a purportedly "unauthenticated" identifier, with Gaia, which is

11  an "authenticated" identifier. Evidence of this association demonstrates that Zwieback is personally

12  identifiable information.

13     148.    With respect to the remaining information that Google continued to withhold on the

14  basis of "publisher notice," after March 9, 2022, Plaintiffs learned, for the first time, that there were

15  approximately 930 publishers from which Google claimed notice must be provided. *See* Pls' Joint

16  Decl. ¶ 123. Plaintiffs also learned, for the first time, that the notice process consisted of merely a

17  form letter or email sent from Google to the publisher. *Id*. No response from the publisher is required,

18  as the publisher does not have any right or ability to prevent Google from producing the information

19  once form notice is provided. *Id*. Plaintiffs requested that Google produce an exemplar of the form

20  letter or email for review. *Id*. Google refused. *Id*.

21     149.    Because of the failure of the first-round searches, the Special Master ordered Google

22  to conduct a second round of searches. For this second round, Plaintiffs chose 40 different five-day

23  periods for which Google was instructed to search a subset of logs.

24     150.    The second-round searches resulted in production of Named Plaintiff Information

25  from outside the seven-day window that Google had placed on the first-round searches. This

26  demonstrates that Google is and always has had the technical ability to search and extract data for

27  each log going back through the log's entire retention period. *See* Shafiq Rebuttal ¶ 35.

28

151.    The Court finds that by this point Google's refusal to produce the already searched, segregated and preserved Gaia-Keyed Information violated Google's discovery obligations. There was, and is, no dispute that the data is relevant. Further, any claimed technical burden, or ones related to Google's belated claim for "publisher notice" are meritless.

152.    On May 14, 2022, the Special Master sent an email to the parties, stating:

> it has come to my attention that Google is currently withholding the production of search results for data sets containing third-party publisher confidential data requiring third-party notification. It has been my understanding that the notification process had begun some time ago and should have been completed and productions made. I now also understand that Google unilaterally decided to make third-party notifications in the *Calhoun* matter, combined with those made in the *Brown* matter. This is unacceptable.
>
> …
>
> Should the aforementioned productions not be made by May 20, 2022, sanctions will be imposed in the amount of $5,000 per calendar day for every day past May 20, 2022, until Google has provided to Plaintiffs, in full, the production of the results of all completed searches requiring third-party publisher notification.

Pls' Joint Decl. Ex. 1.

153.    Google did not comply with the Special Master's deadline. On May 20, 2022, Google produced *a subset* of the "publisher notice" data – only the data gathered as the result of newly conducted searched, i.e. the second-round searches. *See* Pls' Joint Decl. ¶ 126. With respect to the already searched, segregated and preserved Named Plaintiff Information that Google was *continuing to withhold*, Google refused to produce that information.

154.    The Court finds that Google failed to comply with the Special Master's directives of May 14, 2022.

155.    On May 17, 2022, based on the results of the second-round searches, the Special Master ordered Google to conduct a search for Named Plaintiff information from the beginning of the class period or the maximum retention period for a limited set of logs for "GAIA IDs, Zwieback, and Biscotti [ids]." Joint Rebuttal Decl. Ex. 30

156.    The Special Master's order was consistent with Plaintiffs' requests that were made in March 2022 and could have relatively easily been carried out by Google in response or at any point during this litigation. *See* Shafiq Rebuttal Decl. ¶¶ 33-34.

157.    Google did not comply with the Special Master's directives of May 17, 2022.

158.    On May 24, 2022, Google asserted that data gathered in *prior* searches – data related to the Named Plaintiffs that has twice been ordered to be produced – need never be produced because of purported ambiguity in the Special Master's email order of May 14, 2022. *See* Pls' Joint Decl. ¶ 126.

159.    When pressed for production of this information, Google conveniently pivoted and argued that production of the "publisher notice" data was not an issue for the Special Master because there was no "technical" impediment to its production. *See* Dkt. 773.

160.    Yet, when Plaintiffs raised the issue of the publisher notice to the Court (*see* Dkt. 678), Google told the Court that the issue was still before the Special Master (Dkt. 680).

161.    On June 13, 2022, the Court ordered production of the previously searched, segregated, and preserved data and ruled that the Special Master process regarding production of Plaintiff data had reached its end. *See* Dkt. 700 ("All Named Plaintiff data currently being withheld by Google. Regardless of third-party notification status, must be produced no later than June 30, 2022").

162.    On June 30, 2022, Google finally produced some of the searched, segregated and preserved Named Plaintiff Information.

163.    The June 30, 2022 Production confirmed that Gaia ██████ contains information from ████████████████ and ████████████ logs, which, in turn contain the following highly relevant information: (1) Not Synced signals; (2) content of users communications; (3) timestamp of the communication; (4) user controls and settings that Google purports to be relevant (e.g. Google's purported "consent" settings); (5) detailed and sensitive user profile information; and (6) revenue information for every communication at issue that was sent through Google's Display Ads system. *See* Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal, at §§ B, C.

164.    As a result of the shortcoming of the June 30, 2022 Production, and Google's failure to comply with the Special Master's Orders, the Special Master process did not result in production of a complete set of Plaintiff information from any of the most relevant data sources in this case: which would include Gaia ██████, Zwieback ██████, and backend ██████ logs with revenue and

profile information.

165. On July 1, 2022, Google filed its Opposition to Sanctions. Google disclosed, for the first time, that the processes created for the searched, segregated, and preserved Gaia-Keyed Information had been set up in February 2021 and completed in March 2021. *See* Ansorge Decl. ¶ 6.

**C.    Google's Misconduct Regarding Production of Zwieback-Keyed Information**

166. On April 30, 2021, the Court ordered:

> "Google must produce the information it has associated with the named Plaintiffs, including, *as detailed at the hearing*, profile data, data from non-synced sources, and *any device data* associated with any Plaintiff."

Dkt. 173-1 at 1, regarding Issue 1.3 (emphasis added).

167. Google concedes that it did not preserve or produce this information, but argues that its failure to do so is excusable because Zwieback is not relevant to this case and it did not fall within the ambit of the Court's April 30, 2021 Order. The Court rejects Google's arguments.

168. Based on the facts set forth below, the Court finds that Zwieback is relevant to the claims and defenses in this case, that it fell within the scope of the Court's April 30, 2021 Order, and that Google's representations to the contrary – which occurred throughout this litigation and which were reiterated in its Opposition to sanctions – are false and misleading.

**1.    <u>Google Failed to Comply with the April 30, 2021 Order</u>**

169. As set forth above, the April 30, 2021 Order directed production of device data that was "detailed at the [April 29, 2021] hearing."

170. At the April 29, 2021 Hearing, in response to the Court's questions about what Plaintiff Information they were seeking, Plaintiffs' counsel requested that Google be required to search for "data that's associated with three types of identifiers, one is called Gaia; … the other is Zwieback; … and then the third type of identifier is called Biscotti. So data associated that can be found through a search of the database with Gaia, Zwieback, and Biscotti cookies associated with the named Plaintiffs." Apr. 29, 2021 Hr'g Tr. at 40:19-41:10. Google did not object that Zwieback was out-of-scope. *Id*. Rather, Google counsel acknowledged that Zwieback is an identifier that is "tied to the device … like it's a license plate … on a browser." *Id*. at 43:5-12.

171. Accordingly, the Court's April 30, 2021 Order, which encompassed any device data

1  detailed at the hearing, included Zwieback-Keyed Information.

2          172.    The April 30, 2021 Order also mandated that Google "must produce the information

3  it has associated with the named Plaintiffs … from non-synced sources." Dkt. 173-1.

4          173.    In its Opposition to sanctions, Google admits that signed-out users are, by definition,

5  Not Synced. *See* Opp. at 2; *see also* Dkt. 378, Order re Special Master's Report and Orders, at 10

6  (finding that Zwieback is a signal from which sync state "is expressly stated or can be inferred");

7  Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 21 (citing internal Google documents that admit,

8  "Zwieback uniquely identifies signed-out users").

9          174.    Because Zwieback identifies users who are signed-out, which Google now admits is

10  also Not Synced, Zwieback-Keyed Information is a "non-synced source[]" covered by the Court's

11  April 30, 2021 Order.

12          175.    The Court finds that Google failed to comply with the April 30, 2021 Order in that it

13  failed to preserve and produce Zwieback-Keyed Information for Named Plaintiffs.

14                    **2.      Google's Misconduct Necessitated Repeated Orders**

15          176.    After the April 30, 2021 Order, and due to Google's intransigence, the Court had to

16  issue multiple orders confirming the relevance of Zwieback.

17          a.    On October 1, 2021, the Court acknowledged that Zwieback-keyed information

18                was alleged by Plaintiffs and part of the case. *See* Dkt. 329.

19          b.    On November 12, 2021, the Court ruled that Zwieback is a relevant identifier for

20                this case. *See* Dkt. 378.

21          c.    On January 5, 2022, the Special Master ordered that "Zwieback ███ and

22                Zwieback ██ data sources are to be added to the potentially relevant set of data

23                sources for the Calhoun matter." Pls' Joint Rebuttal Decl. Ex. 26.

24          d.    On February 27, 2022, the Special Master ordered that Google "search [] []

25                [Zwieback ███] in [its] entirety without regard to product or service or any

26                other subdivision of those data sources." Pls' Joint Rebuttal Decl. Ex. 27.

27          e.    On July 5, 2022, the Court ordered the parties to discuss preservation of

28                Zwieback data sources. *See* Dkt. 749.

f.    On July 15, 2022, the Court issued a Preservation Order which required that Google preserve Zwieback-related information. *See* Dkt. 766.

### 3.    Zwieback was Alleged Extensively in Plaintiffs' Original and First Amended Complaints

177.    Zwieback-related transmissions from Chrome to Google Ads (i.e. Google.com) were alleged extensively throughout the original and First Amended Complaints, many of which included the actual Zwieback identifiers present on the Named Plaintiffs' computing devices. *See* Dkt. 1 ¶¶ 49, 158, 161, 170, 172, 177, 183, 188, 190; FAC ¶¶ 7b, 74, 148, 152-56, 157-58, 179, 255, 298.

178.    Despite the fact that Plaintiffs clearly alleged Zwieback-related disclosures and included Zwieback identifiers for Named Plaintiffs in both the original and First Amended Complaints, Google took no action to preserve or produce Zwieback-keyed data associated with those allegations.

### 4.    Google Admitted Zwieback (and Google Ads) Were Relevant for the First Year of the Case

179.    On September 30, 2020, in response to Plaintiffs' First Set of Requests for Production of Documents, Google did not object that Google Ads, i.e. Zwieback, was out of scope for the case. *See* Pls' Joint Rebuttal Decl. Ex. 21. To the contrary, Google informed Plaintiffs that it would be producing discovery about Google Ads, i.e. Zwieback-related information. For example, in response to Request Nos. 6 and 7, Google stated it would produce responsive documents related to, among other things, "Google Analytics, Google Ad Manager and Google Ads." *Id.*

180.    Google's listing of Google Ads as an additional category to Google Analytics and Google Ad Manager demonstrates that Google understood from, the beginning of the case, that Zwieback-related transmissions from Chrome to Google.com (as alleged in Plaintiffs' original Complaint) were relevant to the case.

181.    Despite stating that it would produce Google Ads discovery, Google took no action to preserve or produce the Named Plaintiffs' Zwieback-keyed data.

182.    On December 31, 2021, at Google's request, Plaintiffs provided identifiers, including Zwieback identifiers for Google to produced Named Plaintiff data. *See* Pls' Joint Decl. ¶ 71. Google took no action to preserve or produced Named Plaintiffs' Zwieback-keyed data.

-38-

183.     On April 9, 2021, during the first Rule 30(b)(6) deposition relating to log preservation, Plaintiffs' counsel asked Google representative David Monsees where data shown to be transmitted from Chrome to Google.com (Zwieback) in ¶ 158 of the original Complaint would be sent and stored at Google. *See* Google 30(b)(6) Dep., Monsees I, at 242:22-243:19. Mr. Monsees testified that he did not know the precise location but that "if we wanted to be accurate, we would need to search logs or other storage for all services that may serve off of the Google.com domain." *Id.* at 243:21-25.

184.     At the April 29, 2021 Hearing, Google did not object that Zwieback was irrelevant, even though Plaintiffs expressly sought its production. *See* Apr. 29**,** 2021 Hr'g Tr. at 39:4-9.

185.     On May 3, 2021, Plaintiffs provided Google with Google Ads identifiers (including Zwieback) and a specific list of disclosures associated with Google Ads. *See* Pls' Joint Rebuttal Decl. ¶ 40(f).

186.     On May 4, 2021, Google did not object that Google Ads and Zwieback were irrelevant, but instead requested Plaintiffs to "promptly provide requisite [SCA] consent" for Google to produce their information. *See* Pls' Joint Rebuttal Decl. ¶ 40(g).

187.     On June 4, 2021, in advance of the second 30(b)(6) deposition of Google representative David Monsees, Plaintiffs' counsel sent Google two letters apprising Google that they would seek specific answers about Zwieback and transmissions to Google.com in the 30(b)(6) deposition. *See* Pls' Joint Rebuttal Decl. ¶ 40(h).

    a.    In the first letter, Plaintiffs specifically identified the Zwieback_ID as an identifier for which they expected Google to provide answers. *See* Pls' Joint Rebuttal Decl. Ex. 23. Google did not object that Zwieback was "out-of-scope."

    b.    In the second letter, Plaintiffs provided Google with examples of prospective deposition exhibits relating to allegations in the Complaint and FAC. *See* Pls' Joint Rebuttal Decl. Ex. 24. The examples contained transmissions to Google.com when a Named Plaintiff was on a non-Google website and where Zwieback and Gaia-keyed cookies and the content of the Plaintiffs' communications were sent to Google even though the Named Plaintiff was Not Synced. *Id.* Google did not object that Zwieback or transmissions to Google.com

were out-of-scope. Nor could it. The examples were taken directly from Plaintiffs' First Amended Complaint, ¶ 177.

188.    During the second 30(b)(6) deposition on June 11, 2021, Plaintiffs asked Google representative David Monsees specific questions about Chrome transmissions to Google.com when Named Plaintiffs were on non-Google websites. *See* Google 30(b)(6) Dep., Monsees II, at 612:18-613:7; 616:15-617:4). Mr. Monsees testified that "we can confidently say" that examples of Zwieback transmissions from ¶ 168 of the First Amended Complaint "would relate[] to ads on Google's owned and operated properties" even though it was a Chrome transmission to Google.com while the Named Plaintiff was on a non-Google website. *Id.* at 617:2-4. Mr. Monsees also testified that Zwieback transmissions alleged in ¶ 165 of the First Amended Complaint would be "stored in a search log" (*id.* at 636:5-9) and the Zwieback transmission in ¶ 177 would likely be stored in a search log, "probably a remarketing or a conversion tag" (*id.* at 637:1-19).

189.    Google did not object to these Zwieback-related questions.

190.    To the contrary, Google prepared its corporate representative in advance with a "Fact Sheet for Monsees" that described the "Zwieback_ID" as "includes a Zwieback cookie" such as "NID, SNID." Pls' Joint Rebuttal Decl. Ex. 25 (Monsees Ex. 59 at 3). Google also provided further information about the NID cookie – which is a Zwieback cookie. *Id.*

### 5.    <u>Google Documents, Testimony, and Pleading Demonstrates Google was and is Misrepresenting the Nature and Importance of Zwieback</u>

191.    Google's Opposition cites testimony from Glenn Berntson, a Display Ads employee, in the *Brown* action relating to Zwieback. *See* Ansorge Decl. ¶ 32. In *Brown*, Mr. Berntson admitted that Google Analytics "leverage[s] Zwieback" but does not "key data off the Zwieback like searches." *Id.* He further testified that "Google Ad Manager doesn't use Zwieback" and that, in addition to Google.com, Zwieback is used by Google.de and Google.fr. Ansorge Decl. ¶ 32.

192.    The Court finds that Google's citation to Mr. Berntson's testimony in *Brown* is false and misleading for several reasons.

193.    First, the deposition in question occurred in the *Brown* case at a point in time before the cross-use motion (*see* Dkt. 243) had been decided, when *Calhoun* Plaintiffs' counsel were not

present in the deposition and had no chance to ask follow-up questions.

194.    Second, whether Google Analytics "keys data off the Zwieback" or Google Ad Manager "use[s] Zwieback" does not resolve the question of whether Google had an obligation to preserve and produce Zwieback data. Plaintiffs' original and First Amended Complaints specifically distinguished between alleged unauthorized transmissions from Chrome to Google Ads versus Google Doubleclick and Google Analytics. *Compare* FAC ¶¶ 152-158 (alleging unauthorized transmission to "Google Ads, Google Doubleclick, and Google Analytics … regardless of whether the user is synced[]") *with* ¶¶ 164, 165, 170.

195.    Third, Mr. Berntson works on Display Ads, not Google Ads, and thus lacks personal knowledge. *See* Dkt. 430-8 ¶¶ 37, 38.

196.    Fourth, on November 27, 2021 (seven weeks after deadline for substantial completion of discovery and six weeks after Plaintiffs filed their Motion for Class Certification), Google produced GOOG-CABR-0529394, an email indicating that "loss of Zwieback [i.e. signed-out Google Ads] in 3P would amount to ████" in annual revenue loss while "loss of Gaia would easily exceed ████ at the very least[.]" Pls' Joint Decl. ¶ 90. Though raised in Plaintiffs' class certification opening brief and accompanying Joint Declaration, Google did not dispute this point.

197.    Fifth, Google employee Chris Liao admitted on December 2, 2021 that Google Ads would "lose[] more money than [D]isplay [A]ds because of the loss of cookies in third-party context" and that even "YouTube ads would lose money from the loss of cookies in third-party context." Liao Dep. at 162:17-24. In fact, the majority of Plaintiffs' unjust enrichment claims come from reductions in revenue to Google Ads and YouTube. *See* Dkt. 482-9 at 19, Rebuttal Report of Dr. Russell W. Mangum in support of Plaintiffs' Mot. for Class Certification, at 19 (citing GOOG-CABR-0529394, Google internal admission relating to Google Ads not Display Ads for lost revenue as a result of losing access to third-parties cookies in Chrome on non-Google websites.)

198.    Sixth, Google employee Vic Liu (who works with Google Ads) admitted in deposition testimony taken by Plaintiffs on March 30, 2022 that Chrome sends Not Synced Zwieback-keyed Information from communications on "non-Google websites" to Google.com. Liu Dep. at 19:22-20:10. Specifically, Liu testified that the transmissions to Google Ads (i.e. Google.com and

1    Zwieback-related) are "completely disjoint from the information that Display Ads system gathers

2    from that browser regarding … some activities … on a non-Google website." *Id*. at 66:18-68:4. By

3    "completely disjoint," Mr. Liu explained that his team (referred to as 'A1'), which is charged with

4    gathering information for Google Search, Gmail, and Google Shopping from non-Google websites,

5    keys the data by Zwieback – while Display Ads keys data by Biscotti. *Id*. In addition, Mr. Liu

6    admitted that Zwieback-keyed data is used to build "the set of data or user profile" from "user's

7    browsers" on non-Google websites. *Id*. at 17:22-18:2. This "profile data" is derived by Google from

8    user activity on non-Google websites that is "sent from a browser to Google" and is "used to inform

9    Search Ads shown to a person." *Id*. at 47:22-48:19. Despite being "completely disjoint" from Display

10   Ads or Analytics logging, Google never disclosed additional Zwieback logs about activity that occurs

11   on non-Google websites.

12       199.    Seventh, on June 30, 2022, Google produced information it had previously, searched,

13   segregated, and preserved from direct searches at Google.com. *See* Pls' Joint Rebuttal Decl. ¶ 42(b).

14   Google had searched, segregated, and preserved this information through the forward-looking

15   "pipeline" it created in February 2021. *See* Ansorge Decl. ¶ 6. The June 30, 2022 Production of data

16   that Google originally began searching, segregating, and preserving in February 2021 shows that

17   Google derives profile and user list information from tracking users on non-Google websites via

18   allegedly unauthorized Not Synced transmissions to Google to inform the results of a direct search –

19   as Liu admitted in his deposition. *See* Pls' Joint Rebuttal Decl. ¶ 42(b). This demonstrates that Google

20   uses the personal information that Chrome transmits to Google.com when Not Synced users are on

21   non-Google websites to derive additional profits through its eponymous search engine. *See* Pls' Joint

22   Rebuttal Decl. ¶ 42(b).

23       200.    The June 30, 2022 Production from the "███████████████████████████"

24   (GOOG-CALH-01200530) contains information about targeted ads served on Google-owned

25   domains such as Google.com and identifiers such as "gaia_id," "████████████████," and

26   "███████████████" as well as fields such as "████████," "███████████," "segments,"

27   "██████████" "████████████," and "████████████████████" that appear derived from non-

28   Google websites. *See* Pls' Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 22. This shows that Google

was able to use Zwieback-Keyed Information to track individual users, and that this information was highly profitable for Google.

201.    Internal Google documents admit:

    a.    Zwieback uniquely identifies signed-out users. *See* Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 21.

    b.    Zwieback-keyed data is primarily stored on ███. *See id.*

    c.    Zwieback-keyed data is easy to search through ███. *See id.*

    d.    Zwieback-keyed logs may be retained "permanently" or "forever." *See id.*

    e.    Zwieback-keyed data is personally-identifiable. *See id.*

    f.    Zwieback-keyed data is based on cookies that are indefinitely renewable. *See id.*

    g.    Zwieback-keyed data is not subject to user or website deletion controls. *See id.*

    h.    ████████████████████████████████ *Id.* (quoting GOOG-CABR-00125420).

### 6.    Plaintiffs' Class Certification Filings and Google's Response Demonstrate Zwieback's Relevance

202.    On October 14, 2021, Plaintiffs filed their Motion for Class Certification. *See* Dkt. 340.

203.    Consistent with their original and First Amended Complaints, Plaintiffs submitted evidence that Chrome is uniformly designed to send Not Synced users' personal information to Google, without limitation as to the specific Google property to which Chrome sends such information.

204.    For example, Plaintiffs submitted the Expert Report of Richard Smith in Support of Class Certification ("Smith Rpt. ISO Class Cert.") which detailed transmissions of personal information that Chrome sends to Google Ads for Not Synced Chrome users. *See* Dkt. 340-16, Smith Rpt. ISO Class Cert. ¶¶ 80, 94-96, 100-109.

205.    Plaintiffs also submitted the Expert Report of Prof. Zubair Shafiq in Support of Class Certification ("Shafiq Rpt. ISO Class Cert."), where Prof. Shafiq concluded that "Zwieback-keyed

data will be the most efficient and thorough method to identify Chrome users who were not signed-in and thus not-synced[.]" Dkt. 340-19, Shafiq Rpt. ISO Class Cert. ¶¶ 108-112.

206.     On December 22, 2021, Google filed its Opposition to Plaintiffs' Motion for Class Certification. *See* Dkt. 429. The first sentence of Google's fact section described the case as broader than Display Ads and Analytics, it involves "data that Google receives when users visit third-party websites that use Google's web-services (e.g. Analytics, Ads, embedded Maps, Fonts) (the 'Services')." Dkt. 429 at 3.

### 7.     Late Discovery Produced by Google Demonstrates that Zwieback is Personally Identifiable Information

207.     On February 25, 2022, two weeks before the close of fact discovery, Google produced Zwieback ██████ columns that revealed that Zwieback ██████ contains (1) at least ██ columns with Gaia identifiers; (2) at least ████ columns with ██████████████████; (3) at least ████ column with ██████████; (4) at least ██ columns with ██████████████ and another ████ columns with ██████████████ (5) at least ████ columns with ██████████ and (6) at least ████ columns related to ██████████." *See* Pls' Joint Rebuttal Dec. Ex. 20, Shafiq Rebuttal ¶ 31 (citing GOOG-CALH-01170421).

208.     On March 10, 2022, Google produced Zwieback ██████ data associated with test accounts created by Prof. Shafiq. Although much of the data was encrypted, Prof. Shafiq identified that the data included: (1) data associated with Recaptcha visits on non-Google websites; (2) zwieback-state information that identified the account as being signed-out, which, by definition, identifies the user as being Not Synced; and (3) ██████ events that Google's documentation show are tracked with precise geo-location. *See* Pls' Joint Decl. ¶ 97.

209.     Google's belated production of the Zwieback-keyed information associated with Prof. Shafiq's test accounts demonstrate that Google tracks Not Synced Chrome usage as alleged but Google failed to preserve relevant Zwieback-keyed data for the Named Plaintiffs. *See* Pls' Joint Decl. ¶ 98.

210.     Even the limited Zwieback-keyed data that Google produced demonstrates that it contains Plaintiffs' personally identifiable information. For example, the Zwieback-keyed data

1  includes █████████████████████████████████████████████

2  ██████████████████████████████████████████████████████

3  ██████████████████████████████████████████████████████

4  ██████████████████████████████████████████████████████

5  ██████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████

8  ███████████ *See* Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 18.

9      211.    On May 9, 2022, two months after the close of fact discovery, Plaintiffs received Gaia

10 ██████ columns that revealed that Gaia ███████ contains (1) at least ███ columns with ██████████ (2)

11 at least ███ columns relating to ██████████; (3) at least ███ columns with ██████████ and (4) at least

12 columns with ███████████. *See* Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 32.

13     212.    On June 15, 2022, three months after the close of fact discovery, Google admitted that

14 Google stores phone numbers, street addresses, and precise geo-location in Zwieback ██████. *See*

15 Dkt. 713-4 at 8. On June 29, 2022, Google attempted to retract its admission for phone numbers. *See*

16 Dkt. 740. Yet, in the same filing, Google disputed that it comingled Zwieback and Gaia. *See id.*

17      **8.    Google's Misconduct Resulted in the Destruction of Relevant Zwieback Data**

18     213.    Google's internal documentation admits that Zwieback-keyed data is deleted after ███

19 ███ of inactivity. *See* Pls' Joint Decl. ¶ 95 (citing GOOG-CABR-0479622); Pls' Joint Rebuttal Decl.

20 Ex. 20, Shafiq Rebuttal ¶ 19.

21     214.    Google concedes that it did not preserve Zwieback-Keyed Information. *See* Ansorge

22 Decl. ¶ 32; *see also* Opp. at 10, n.11.

23     215.    On March 10, 2022, Google produced Zwieback ██████ data for one Plaintiff that

24 consisted entirely of a Zwieback tombstone. *See* Pls' Joint Decl. ¶ 96; Joint Rebuttal Decl. Ex. 20,

25 Shafiq Rebuttal ¶ 20. The timestamp indicated that the evidence was destroyed on April 30, 2021 -

26 the very day that the Court issued is order directing the production of Named Plaintiff Information.

27 *Id.*

28

**9.    Google's Belated Zwieback Productions Were Incomplete and Produced in an Unreadable Format**

216.    Although Google was ordered by the Special Master to produce Named Plaintiff Information stored *throughout* Zwieback ████, the March 10, 2022 Production consisted of information from only ██ out of the ██ Zwieback ████ columns. *See* Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 14.

217.    Further, Prof. Shafiq has explains that many of Google's searches for Zwieback-keyed data "resulted in null sets because Google did not conduct the searches in a timely manner," including conducting "searches after the retention period of some logs elapsed." Pls' Joint Rebuttal. Decl. Ex. 20, Shafiq Rebuttal ¶ 17. "For example, Plaintiffs submitted second round of searches for ████ ████ on April 6, 2022 but Google did not conduct the search until May 20, 2022 (a delay of 44 days that meant that the log's ████ retention period had already expired by the time Google conducted its search.)" *Id.*

218.    Google's March 10, 2022 Production included search results from Gaia ████ and Zwieback ████. However, rather than decode this production (as it had with others), the March 10, 2022 Production was provided in encoded format, depriving Plaintiffs of the ability to review and assess the information provided. *See* Joint Rebuttal Decl. ¶ 47; Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 14.

219.    The March 10, 2022 Production contains ████████ of encoded values (e.g., hex, integers, floating point numbers, or strings). *See* Pls' Joint Rebuttal Decl. ¶ 48. This includes coded fields and subfields. *Id.* Absent translation by Google this information is incomprehensible. *See id.* As Prof. Shafiq explains, "the data that Google did produce from the ██ Zwieback ████ columns was incomprehensible because Google did not produce the data in the standard decoded form as it had done for previous productions. The field names and their values in this ████ production were unintelligible because they were encoded." Pls' Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 14.

220.    In some instances, the March 10, 2022 Production translated the field name but not the subfields. For example, one part of the production identified fields such as ████████
████████████████████████████████████████████

1    █████████████████████ but did not decode the verticals in the document. *See* Pls' Joint Rebuttal

2    Decl. ¶ 49. Google refuses to decode the values associated with those fields. *Id*.

3        221.    As described by Google's internal documents, these encoded fields and sub-fields go

4    to core allegations in the case, including linking and association of personal information to create

5    detailed dossiers and inferred interest relating to class members. For example, ███████ refers

6    to the type of content on a particular website. *See* Pls' Joint Rebuttal Decl. ¶ 50.

7        222.    On March 31, 2022, after requests from Plaintiffs, Google produced an "updated"

8    Zwieback ████ production. But this "Updated" ████ production was not the decoded version of

9    the "Original" ████ production, made on March 10, 2022. *See* Pls' Joint Rebuttal Decl. Ex. 20,

10   Shafiq Rebuttal ¶ 15.

11       223.    The "Updated" ████ production was 80.3 percent smaller in volume compared to

12   the "Original" ████ production. *See* Pls' Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 16. The

13   "Updated" production was missing data present in the "Original" production – specifically, it was

14   missing data from █ of the █ Zwieback ████ columns that were present in the "Original"

15   production. *Id.* ¶ 16.

16       224.    When Plaintiffs pressed for further translation during a May 25, 2022 Special Master

17   conference, counsel for Google represented that the "Original" production had been decoded and re-

18   produced on March 31, 2022. *See* Pls' Joint Rebuttal Decl. ¶ 53.

19       225.    Google counsel's statement about de-coding and re-production of the March 10, 2021

20   data was unequivocal and false – for the reasons detailed by Prof. Shafiq. *See supra*.

21       226.    In June 2022, Google admitted that its statement to the Special Master on May 25,

22   2022 was false, conceding that "Google engineers were able to parse *a portion* of ████ data … in

23   further decoded form." Pls' Joint Rebuttal Decl. ¶ 55 (emphasis added). On a later meet-and-confer,

24   Google counsel stated that Google's engineers only parsed and decoded a portion of the ████ data,

25   at its choosing. *See* Pls' Joint Rebuttal Decl. ¶ 57.

26       **10.    Google Misrepresented the Technical Difficulties and Burdens Related
             to Preservation and Production of Zwieback-Keyed Information**

27

28       227.    Google's long-standing objection to production of Named Plaintiff Information has

-47-                                                    Case No. 4:20-cv-05146-YGR-SVK

been predicated on technical burdens. It was on this representation that the Court referred the issue

to the Special Master. *See* Dkts. 246, 247.

228.    Now, more than a year later, Google concedes it is capable of "quickly produc[ing]

information associated with Plaintiff-provided unauthenticated identifiers," which would include

Zwieback. Opp. at 11, n.12 (citing Ansorge Decl. ¶¶ 57, 81-82).

229.    The Court finds that Google's representations regarding any technical barriers and

difficulties to preservation or production of Named Plaintiff Information, including Zwieback-Keyed

Information, to be false and misleading.

230.    The limited data that Google has been compelled to produce does not cure any

prejudice. Because it was produced so late and Google denied Plaintiffs the ability to obtain follow

up discovery.

**D.     Google's Misconduct Regarding Production of Biscotti-Keyed Information**

**1.       <u>Google Failed to Preserve Biscotti-Keyed Information</u>**

231.    Plaintiffs' original and First Amended Complaints included specific Biscotti-

identifiers for specific Named Plaintiffs. *See* Dkt. 1 ¶¶ 163, 171-72, 187, 189, 191; FAC ¶¶ 170, 178-

79.

232.    Google's Opposition to Sanctions concedes that it did not begin to preserve Biscotti-

Keyed Information until July 2021. *See* Ansorge Decl. ¶ 32.

233.    Internal documents produced by Google show that the Biscotti identifier present in

Biscotti logs is hashed after 9 months. *See* Pls' Joint Decl. ¶ 79.

234.    Thus, for the original Named Plaintiffs (i.e. those named in the original Complaint

filed July 2020), at the time of filing Google possess Biscotti-Keyed Information for the original

Named Plaintiffs as far back as November 2019. With each successive day that passed, Biscotti-

Keyed Information for each Named Plaintiff was being deleted from Google's systems.

235.    Google's delay in implementing preservation until July 2021 (over a year after

Plaintiffs filed their original Complaint) means that Google destroyed all of the original Named

Plaintiffs' pre-Complaint Biscotti-Keyed Information.

236.    The Court finds that Google was under a duty to preserve original Named Plaintiffs'

Biscotti-Keyed Information from the filing of the original Complaint (and the additional Named Plaintiffs' Biscotti-Keyed Information from the filing of the First Amended Complaint); that Google was aware that Biscotti-Keyed Information had a limited shelf life of 9 months; that Google failed to timely preserve the Biscotti-Keyed Information; and that Google's failure to preserve resulted in the destruction of relevant evidence.

## 2.    Google Failed to Comply with the April 30, 2021 Order

237.    On April 30, 2021, the Court ordered:

"Google must produce the information it has associated with the named Plaintiffs, including, *as detailed at the hearing*, profile data, data from non-synced sources, and *any device data* associated with any Plaintiff."

Dkt. 173-1 at 1, regarding Issue 1.3 (emphasis added). There is no dispute that Biscotti-Keyed Information was encompassed in this Order.

238.    The Court finds that Google did not comply with this Order in that it failed to search and produce Biscotti-Keyed Information for Named Plaintiffs.

239.    In support of its purported compliance, Google claims that on May 12, 2021 it "produced … ▮▮▮▮▮ ads log data associated with Biscottis extracted from the IDE cookie values Plaintiffs provided (data tied to unauthenticated identifiers." Ansorge Decl. ¶ 16 (citing GOOG-CALH-00039102—GOOG-CALH-00039130). A review of Google's cited bates range shows, however, that it produced only one document – merely five pages in length – with "IDE cookie activity for Chrome Privacy Cases" in the first line of the first page. *See* GOOG-CALH-00039120.

240.    The production is suspect when viewed in contrast with Google's past Named Plaintiff productions. While other Plaintiff data was produced in Excel format, with information that included the content of communications, profile information, revenue information, and whether Google deemed the communication sensitive (depending on the log), this purported Biscotti-Keyed document is a PDF that appears to have only been created for the purpose of litigation, and that only included extremely limited excerpts.

241.    Rather than demonstrate that Google complied with its preservation and production duties relating to Biscotti-keyed data, the Court finds that Google's production demonstrates that (1) Google had the ability to preserve, search, and produce Biscotti-Keyed Information, and (2) simply

chose not to do so. Instead, Google produced a hand-selected subset of practically zero value to demonstrate to a jury the true scope and nature of Google's conduct.

242.    Google's long-standing objection to production of Named Plaintiff Information has been predicated on technical burdens. It was on this representation that the Court referred the issue to the Special Master. *See* Dkts. 246. 247.

243.    Discovery now shows and Google concedes that there is no technical burden to production of Named Plaintiffs' Biscotti-Keyed Information. *See* Pls' Joint Decl. ¶ 82 (citing GOOG-CABR-05741806 (titled "IBA Kansas Developer Guide" and setting forth a simple three step process to obtaining data); Opp. at 11, n.12 (citing Ansorge Decl. ¶¶ 57, 81-82).

244.    The Court finds that Google's representations regarding any technical barriers and difficulties to preservation or production of Named Plaintiff Information, including Biscotti-Keyed Information, to be false and misleading.

245.    The Court finds that Google's discovery misconduct with respect to Biscotti-Keyed Information is prejudicial to Plaintiffs as it resulted in the destruction of evidence relevant to the claims and defenses in this action and that Google's misrepresentations on technical burdens initiated an unnecessary, costly, and prolonged discovery process.

**E.    Google's Factual Defenses Regarding Its Failure to Preserve and Produced Named Plaintiff Information is Without Merit**

246.    To the extent not otherwise addressed above, Google's claimed defenses to discovery misconduct related to its failure to preserve and produce Named Plaintiff Information are without merit.

247.    Google's Opposition argues that: (1) it is "categorically wrong" for Plaintiffs to claim that "Google actually links authenticated and unauthenticated information" (Opp. at 9, n.9); (2) "Plaintiffs are also wrong that GAIA and Zwieback identifiers are co-mingled in ▮▮▮▮▮" (*Id*.); and, (3) "[t]he separation of authenticated and unauthenticated data is also enshrined in the consent framework developed at the start of the class period in 2016, which is based on the 'key principle' that Google will not use 'data collected while signed in to target ads when the user is signed out, or vice versa" (Opp. at 9, n.10**,** citing Tr. of video produced at GOOG-CALH-00045185, at 17:22-25).

248. Contrary to Google's assertions about not comingling signed-in and signed-out data, Google's ████████████████ allows Google to map Biscotti IDs to GAIA IDs. *See* Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 23 (citing GOOG-CALH-00030031, GOOG-CALH-00062153, GOOG-CABR-03666182).

249. For example:

  a. GOOG-CABR-03661182 is a document produced by Google that provides on overview of data flow in the ████████████████ that shows systems for Google to ████████████████ and ████████████████ (*Id.*);

  b. GOOG-CABR-03666194 specifies that Google's ████████████████ maps various identifiers to each other, including Gaia ID, Biscotti ID, device ID, PPID, Zwieback ID, YouTube visitor ID, CID, and DSID as part of the ████████████████ service in its ████████████████ (*Id.* ¶ 23(b) (citing GOOG-CABR-03666194)); and,

  c. GOOG-CALH-00062153 explains that the ████████████████ encodes "Biscotti" and "Gaia" identifiers together in the same CID parameter (*id.*).

250. In addition, the very document cited by Google for the "key principle that Google will not use data collected while signed in to target ads when the user is signed out, or vice versa" also contains an admission that Google maps Biscotti to Gaia. Specifically, Google admits in the very document cited by Google that:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████

Dkt. 226-7 (Tr. of video produced at GOOG-CALH-00045185) at 72:25-74:6.

251. Google asserted in its Opposition that Plaintiffs had no support for the assertion that "Google produced data for one of Plaintiffs' test accounts by conducting a search for a biscotti-

-51-

1  identifier in a Gaia-keyed log." Opp. at 9, n.9. However, on Reply, Plaintiffs submitted Prof. Shafiq's

2  Rebuttal Declaration wherein Prof. Shafiq explained that "Google conducted searches and extracted

3  personal information using both the Gaia ID [GOOG-CALH-01134336] as well as corresponding

4  Biscotti IDs [GOOG-CALH-01134348]" for Shafiq test account data "from the same log using both

5  Gaia and Biscotti IDs." Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 24. This exercise "demonstrates

6  that Google can and does join authenticated and unauthenticated information." *Id*.

7       252.     GOOG-CABR-03665962 describes Google's "█████████████" system, which

8  demonstrates Google's express intention to link authenticated and unauthenticated identifiers. Joint

9  Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 25.

10      253.     GOOG-CABR-04726868, at -69, a slide deck entitled █████ ██ ███████

11  ███████" expressly admits, "We have a lot of mappings between identifiers: Biscotti to GAIA,

12  IDFA to Biscotti, IDFA to GAIA, etc." Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 27.

13      254.     GOOG-CABR-04726832, at -36, a document described ███████████████

14  states "examples of identifier mapping and metadata that rarely changes" includes

15  "IDFA/ADID/Biscotti to GAIA" and "IDFA/ADID/PPID to Biscotti." Joint Rebuttal Decl. Ex. 20,

16  Shafiq Rebuttal ¶ 28.

17      255.     GOOG-CABR-05876612, at -14, titled Google's █████████████ Service

18  2.0, admits that █████████████████████████████████████

19  ████████████████████████████████████████████████ Joint

20  Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 29.

21      256.     . In addition to these Biscotti and other device identifier mappings and linkages to

22  Gaia, evidence produced by Google has also demonstrated links between Zwieback and Gaia. *See*

23  Joint Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶¶ 31-32.

24      257.     Based on evidence produced by Google and Google's admissions, the Court finds that

25  Google does link Biscotti to Gaia.

26      258.     The Biscotti identifiers that Google does link to Google Account identifiers would

27  include the IDE cookie.

28      259.     Based on evidence produced by Google and its admissions, the Court also finds that

Google does link Zwieback to Gaia.

260.    The Zwieback identifiers that Google links to Gaia would include the NID cookie.

261.    Google also took no immediate action after the April 30 order to preserve Biscotti-keyed information. Instead, Google waited until July and August of 2021 to "develop[] pipelines to preserve … data associated with … Biscottis extracted from the cookie values Plaintiffs provided."

262.    Google failed to preserve data from all relevant data sources (make clear that Google not only failed to preserve biscotti-keyed and zwieback-keyed, but also failed to preserve GAIA-keyed from some important data sources).

263.    Google failed to preserve relevant unauthenticated data until it was too late.

264.    The Court finds that Google's arguments in opposition are false.

## IV.    GOOGLE'S FAILURE TO TIMELY PRODUCE ███████████ DOCUMENTS

265.    Google withheld from production key documents relating directly to the issue of consent until after the close of discovery and after briefing on Google's motion for summary judgment on the issue of consent was closed. This is despite Plaintiffs' diligence in seeking production of such evidence.

266.    Plaintiffs served multiple Requests for Production of Documents ("RFP") related to studies, evaluations, documentation and analysis of user expectations of privacy and understanding of user consent interfaces. This includes the RFPs set forth below:

a.    "Studies or evaluations of privacy expectations of Chrome users, whether authored by You or by third parties" (RFP No. 12);

b.    "Documents related to Chrome and data privacy" (RFP No. 13);

c.    "All documents relating to any process through which Google claims to have obtained express or implied consent from Users to send personal information to Google (including cookies, X-client data headers, IP addresses, User- Agent information, and other identifiers) associated with Chrome browsing history" (RFP No. 50);

d.    "All Documents relating to the process, user interfaces or flow through which

Google claims to obtain user consent for Web & App Activity ("WAA"), supplemental Web & App Activity ("sWAA"), "NAC," … or any other program or process through which Google claimed it has obtained User consent to collect User Information on non-Google properties" (RFP No. 51);

    e.    "All Documents relating to NAC … or ███████ consent flow" (RFP No. 53);

    f.    "All Documents relating to 'account creation flow' from 2012 to present, … including studies … or other mentions of consumer sentiment surrounding the process or considered alternatives" (RFP No. 55); and,

    g.    "All studies, surveys, focus groups, and reports, research, commissions projects, task forces, tasks assignments or discussion relating to Users' perception of Google's privacy policies and practices, including whether or not Google respects Users' privacy" (RFP No. 76).

*See* Plaintiffs' First Set of Requests for Production (Nos. 1-25); Plaintiffs' Third Set of Requests for Production (Nos. 47-77).

267.    On November 30, 2021, Google filed a Motion for Summary Judgment on its First Affirmative Defense of Consent. *See* Dkt. 395. In doing so, Google represented to the Court that there was no dispute of material fact that would preclude a finding that Plaintiffs had consented to Google's conduct at issue. *Id.* at 2. Google's consent argument was predominantly based on a Google Account Holder Agreement with Google; "agreement" to the Google Privacy Policy; and a "consent bump" process related to WAA. *Id.*

268.    On December 20, 2021, Plaintiffs took the deposition of a Google employee named Sam Heft-Luthy, a member of Google's Privacy and Data Protection Office (PDPO). Mr. Heft-Luthy was considered the "owner" of the Google Privacy Policy for much of the class period.

269.    During this deposition, Mr. Heft-Luthy identified a Google project called ████████ ███████ which was an internal Google project related to ██████████████████ ████████████████████████████████████████████████ Pls' Joint Decl. Ex. 10 (Heft-Luthy Dep. Tr. at 53:12-21). As part of this project, Mr. Heft-Luthy participated in interviews with dozens of Google stakeholders to determine their beliefs about Google's purported consent process.

270.     At the time of Mr. Heft-Luthy's deposition, Google had not produced all responsive documents related to this project. Critically, Google omitted from production the interview notes with the Google stakeholders and the final product of the ███████ project produced by the Google Privacy and Data Protection Office.

271.     Following Mr. Heft-Luthy's deposition, Plaintiffs requested that Google produce all documents associated with ███████, including transcripts or other notes from interviews of key Google stakeholders associated with the project.

272.     On January 10, 2022, Plaintiffs filed their Opposition to Google's Motion for Summary Judgment on Consent (Dkt. 462), but without the benefit of the requested ███████ documents, which Google had refused to produce.

273.     On January 18, 2022, Plaintiffs contacted Google again, and renewed their request for ███████ documents, including interviews. *See* Plaintiffs' Jan. 18, 2022 Letter.

274.     On January 28, 2022, Google filed its Reply in Support of Its Motion for Summary Judgment on Consent. *See* Dkt. 475. In the Reply, Google argued that Plaintiffs were "misquoting and misconstruing internal Google emails and draft documents" and that "[i]nternal discussions by a handful of more than 150,000 people employed by Google" cannot defeat Google's consent argument. Dkt. 475 at 1-2, 12. Google further argued that one of the documents in question merely "reflected the author's scratchpad' notes" and have nothing to do with Google's consent argument. Dkt. 475 at 14, n.20.

275.     On February 4, 2022, during a meet and confer, Google said that it would produce responsive documents to Plaintiffs' ███████ request. Pls' Joint Decl. ¶ 55 Google did not produce this information by the close of fact discovery, which was March 4, 2022. *Id.*

276.     Plaintiffs renewed their request on March 21, 2022, March 23, 2022, March 25, 2022, March 31, 2022, and April 4, 2022. *See* Pls' Joint Decl. ¶¶ 56-60.

277.     On April 6, 2022, Google produced 24 additional documents relating to ███████ ███████. These documents described ███████ as a "cross-function" project of Google's Privacy & Data Protection Office (PDPO) ███████████████████ ███████████████████ that was began by a company vice-president and

1  produced a "final" presentation that had four credited authors, 11 credited contributors, and 11

2  credited reviewers –including senior executives. Pls' Joint Decl. ¶ 61.

3      278.    The "final" paper from the PDPO (Google's primary office for user privacy experience

4  issues), was titled ▮▮▮▮▮▮▮▮ Perspective: Toward a privacy-native Google experience." Pls'

5  Joint Decl. ¶ 62. It included the following admissions:

  a.  Privacy Native would "require[] an approach that makes respecting user privacy

     the default – or native – state of our relationship with users."

  b.  "In this new privacy-native approach, Google will ask for personal data only for

     specific, limited purposes that provide clear benefits to users."

  c.  "At Google, we believe privacy is a universal right[.]"

  d.  "Our research analysis and stakeholder interviews have shown that Google's

     consent approach, enabling the broad collection and use of personal data, is a

     root cause for our systemic privacy challenges."

  e.  "Our approach [to consent] has become out-of-step with user expectations and

     regulations. It makes it difficult for people to understand how we use their data

     in all circumstances, to make the right choices for them, and for us to take clear

     positions and distinguish ourselves among competitors."

  f.  "People often face significantly complex consents when they are creating a

     Google Account, or trying to accomplish a particular task, and don't have the

     time or capacity to absorb all the details, let alone understand the precise impact

     their choices might have on the particular services they use."

*Id.*

     279.    Google also produced an associated document that was a summary of research

analysis, bearing bates number GOOG-CABR-05885181, which among other things, concluded:

  a.  "Google's few consent moments alone, very early in the relationship are not

     enough to help users form accurate expectations about risks involved and

     benefits gained when engaging in a data-sharing relationship with Google." -

     183.

1     b.   █████████████████████████████

2              █████████████████████████████

3              █████████████████████████████

4              █████████████████████████████

5            ████████ (Direct quote from document author).

6     c.   "Engagement is low because consent is not a users' primary goal and they

7              perceive consent as overwhelming." -199.

8     d.   "When people do engage with consent, we see that many don't understand the

9              effect of their choice on risk and benefits," include WAA controls. -200.

10    e.   "[I]t is clear that even when reviewing the text [of WAA], most people will not

11            figure out the exact outcome of their consent choice on data collection and

12            usage." -263.

13    f.   "Among other things, consent needs to be freely given, specific, and informed.

14            This primary means that a person knows: data – what data will be collected;

15            purpose – what it will be used for" and "that they can: decline, not say yes to use

16            a service; change: that consent can always be revoked/changed" and that "for the

17            above, the choice & control need to be specific." -290.

18    g.   "Consent" is "a very bad place for people to form accurate expectations about

19            how their data will be used. … To many participants, it is not clear what the

20            effect of their consent choice is on things like: data collected, purpose of the data

21            collection including its value, amount of ads they will see." -301.

22   Pls' Joint Decl. Ex. 12.

23      280.   Google also produced a document summarizing interviews with key Google

24  stakeholders, in a document bearing bates number GOOG-CABR-05885871. *See* Pls' Joint Decl. Ex.

25  11. Contrary to Google's assertion on its motion for summary judgment, these were not unimportant

26  random Googlers but instead high-ranking executives with authority to bind Google. Pls' Joint Decl.

27  ¶ 64. Moreover, not a single one of the Google executives interviewed agreed with Google's argument

28  on its motion for summary judgment. Among other things, key Googlers (including executives)

PLS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR SANCTIONS FOR DISCOVERY
MISCONDUCT

admitted:

    a.   "If people were the deciders, they wouldn't take the deal, but they are not the deciders."

    b.   "Our ads system as design[ed] doesn't really give the user choice."

    c.   "Sundar proudly likes 2 AC [account consent] settings. Users don't."

    d.   "We have gaps in how our system works and what we promise to people."

    e.   "At Google, we still seem to believe in that fantasy that users agreed to this."

    f.   "Consent is no longer consent if you think of ads as a product."

    g.   "One example are all th[e] controls that we have that have horrible names that don't mean anything to anyone, not even within the company."

    h.   "Most of the systems we built up in an assumption that people don't want to tell us things."

    i.   "There is no coherent strategy" on "privacy at Google."

    j.   "Our data infrastructure is not designed for privacy."

    k.   "[T]he fact that we can't explain what we have on you to users is probably our biggest challenge" on privacy. "I don't have the faintest idea what Google has on me. My Activity is a couple XML logs. If I do Takeout that's a bunch of JSON files."

    l.   "Google is too big."

    m.   "Even with the sum of many controls you don't always end up with what you expect. There is device vs. browser vs. the app vs. the account level controls. Many controls doing many things across many different surfaces. Does it do what it supposed to do, do users understand it? If that is the key part of our strategy, then I don't think it is working."

    n.   "When I look at UDC, what is sWAA v. WAA vs. YT? They don't make sense because of the naming and there are hidden functions that people don't know. Like Chrome sync and others that I don't even understand and can't describe."

    o.   "We need to decouple ads and privacy."

p.   "Everyone is concerned about their data being collected. They don't know about it and they don't know how to control it. Big companies are collecting all these things. I don't know about it, I can't do anything about it. They are doing it for their own benefit or it is a concern because it could be leaked and I can't control it. The challenge we face is how do we exist in this world where everyone is concerned and get to the point where we can function well without irrep[arable] harm to our brand and the company."

q.   "I don't like the idea of Google having data about users that they can't say no to."

r.   The "complexity of the technology ... is beyond the grasp of nearly everyone …We are transferring the onus of all that complexity from companies to users. We are asking users to navigate it. We have ideas how we can make UI and interfaces better. This makes things less transparent and is in conflict with our business model, our ads model, and our economic motives are unclear. There is no clear solution to this."

s.   "User have a right to know … [but] the reasons we provide are so high level and abstract that they don't make sense to people."

t.   "We should find ways to do measurement in a way that we don't need consent I don't think people will consent to measurement because they feel that they are giving something up without anything in return. The value they are getting is so intellectually distant that it is really hard for them to understand. A lot of the value is for the advertiser not for the user."

u.   "Privacy is not the priority for most people in ads."

v.   "There are core stakeholders at the company who think that [privacy] is impossible or too hard to do and therefore not worth it."

w.   "We know privacy is a core user need."

x.   "Users don't know what is happening under the hood."

y.   "We need to decouple ads and privacy."

z.   "Won't it creep people out to know how much we are paying attention."

aa.  "Signup flows are not a good moment to explain or present these kinds of things [purported consents] to users."

bb.  For Privacy Native to succeed, "it needs to confront the s[acred] cow."

cc.  "PDPO is someone you want to hide things from because if they know they will make things worse."

dd.  "Someone named Ben Smith tried to do something like this, the TLDR was that 'teams thought it made sense but then once they were told they had to stop doing stuff, they balked and the thing kinda fell apart. At a high level, teams thought it m[ade] sense for us to point in that direction! …. But they hit some walls …. [and] framed it largely around an all-or-nothing approach …. so that led to a bunch of high-stakes and somewhat defense conversations about 'direct user benefit' because, for example, 'stop collecting data for ads measurement' means basically no more ads measurement at all. So the conversation was 'Measurement delivers $XX billion in revenue??? And nothing is gonna win against $XXB ;)" -881.

ee.  "Do you think it is possible for users to reckon with and make a choice about data collection for the aggregate? No, because we don't frame consent that way." -886.

ff.  "I see a lot of evidence of us doing what Larry and Sergey wanted us to do which is pushing the boundaries and then dealing with the consequence. I don't know if you can change the company because this is the dynamic."

gg.  "A serious signal we could send to the market would be to cut off the limb. The struggle there could be the impact. You could argue that this is a good thing for society, because many of the things that use the services are not positive. In many places we are seen as the people that undermine democracy."

hh.   "We need to get to a degree of simplicity and honest[y] with the public and our users."

ii.    "It is sad that PDPO is seen as an impediment rather than a warmly embraced partner to Google's ethos. If we don't do this and get it right, then we are going to be run over. People are doing short-term thinking and not long-term fixes."

jj.    "We don't understand our users. Every time we run these studies, we learn that users don't get us and we don't know what to do."

kk.    "Privacy needs massive investment. It requires us to re-engineer … complete products for the sake of privacy not anything else."

ll.    "There are few presidents at Google, which is a sign that we want people to be autonomous. But in privacy it is kind of hard to let people do what they want to do. The harm is that people think they can do whatever they want, but this doesn't work well for a regulated problem, it works well for product development. We are pretty grumpy about it and in denial about it (regulation). If you want to work in a bank, you have to get a license to work in a bank, and if you screw up, you lose your license. But we really resist the idea that anyone can tell us what to do."

mm.  "Users don't understand what is going on, and nobody is talking to them about it. They are being talked at. How do you trust someone who talks at you but don't show you what is in their heart? They need to be equal stakeholders. They don't understand what it is going on."

nn.    "Not being able to have agency over what you do with my data" is a big challenge.

oo.    "We are not taking our responsibility as a steward of user data seriously."

pp.    "I am not able to have agency over what you do with my data."

qq.    There is "[n]o coherent and simple access to privacy controls across all apps, in Chrome and Android."

Pls' Joint Decl. Ex. 11

281.    Pursuant to Court order, and over Google's objection, on April 12, 2022, Plaintiffs took a 30(b)(6) deposition relating to ███████. During the deposition, Google testified that the

1    final version of the ███████ white paper was "a position paper" of PDPO, a team that "was

2    created to solely focus on" privacy and data protection matters at Google, and which is "the primary

3    team with a focus on privacy and data protection at Google." Google 30(b)(6) Dep., Abdulhay, at

4    19:1-21; 20:6-13.

5        282.    Google admitted that it did not make "any changes within Chrome because of ███

6    ████." Google 30(b)(6) Dep., Abdulhay, at 37:21-38:1.

7        283.    Google further admitted that there was a disconnect between those in charge of user

8    privacy disclosures, and those in charge with the actual data flows. Ms. Abdulhay further testified

9    that she was "not deeply familiar with the data flows that undergird our ads system" and "the reality

10   is that" PDPO members "are very unfamiliar with … the realities of the [tech] stack." Google 30(b)(6)

11   Dep., Abdulhay, at 24:18-19, 25:13-24.

12       284.    Google confirmed that GOOG-CABR-05885871 contains "notes from conversations"

13   that were "taken by people relating to the ████████ project" and the process where "PDPO

14   team members interview[ed] stakeholders at Google." Google 30(b)(6) Dep., Abdulhay, at 48:9-50:9,

15   49:14.

16       285.    The Court finds that Google's motion for summary judgment was premised on

17   misrepresentations. Google filed the motion on the basis that there were no triable issues of fact

18   regarding user consent, and yet its belated ████████ production provides proof to the contrary.

19       286.    Likewise, the Court finds that Google's reply was premised on misrepresentations.

20   Google's reply argued that Plaintiffs' reliance on Google documents, and the statements therein, were

21   taken "out of context" (Dkt. 475 at 12:13-14), but at the same time Google was challenging Plaintiffs'

22   contextual reading of these documents, it was withholding discovery that would have shed light on

23   these issues.

24       287.    Google's Opposition argues that Plaintiffs "fundamentally misrepresent the nature of

25   ████████" Google Opp. at 14. Regarding the most important of the late documents produced,

26   Google also that ████████ was not aimed at "measuring the adequacy of Google's disclosures

27   or user consent." Google Opp. at 17.

28       288.    The Court finds that Google's argument illustrates the prejudice Google caused by its

1  belated disclosure of the final ███████ report and the interview notes associated with the

2  project. The Court's review of the documents at issue demonstrates that ███████ was, in fact,

3  targeted to discussion with key internal Google stakeholders about privacy, consent, and disclosures.

4  For example, the "Final" report for "███████████: Toward a ███████ Google

5  Experience" opens with its statement of purpose, "Privacy expectations of users … increasingly focus

6  on empowering users and helping them to feel and be safe, respected, and in control of their own

7  data. Going forward, Google's success will depend on meeting and exceeding these expectations.

8  This requires an approach that makes **respecting user privacy the default** – or native – state of our

9  relationship with our users." GOOG-CABR-05885987 (emphasis in original). The word "consent"

10 appears 21 times in this five-page document. The same is true of the ███████ interviews, with

11 the quotes set forth above. However, because Google did not produce the full documents or the

12 interview notes until after the close of fact discovery, Plaintiffs were prevented from taking deposition

13 testimony from those who were interviewed.

14      289.    Google also argues that its production of "a spreadsheet identifying 19 of the 25

15 interviewees who interviews were documented in Plaintiffs' Exhibit 11" on November 16, 2021

16 means that Plaintiffs were not prejudiced by its conduct. Google Opp. at 17. Similarly, Google argues

17 that it was sufficient that "Plaintiffs had the names of 21 of the 25 of the interviewees" by November

18 16, 2021. Google Opp. at 17. The Court finds that these facts do not mitigate Google's failure to

19 produce the final documents and actual interview notes. Identification of the fact that a person was

20 interviewed is far different than production of the actual notes from the interviews. With only limited

21 depositions to take, Plaintiffs could not have guessed at what occurred in the interviews for those 19

22 people without having the actual interview transcripts. Thus, the Court finds that identification of

23 interviewees does not cure the prejudice caused from concealing the content of the actual interviews.

24      290.    The Court does not accept Google's argument that its failure to produce GOOG-

25 CABR-05885987 (the final ███████ white paper) and GOOG-CABR-05885871 (the interview

26 notes) should be excused because they "were inadvertently withheld as privileged." Google Opp. at

27 18, n.18.

28      291.    The Court finds that nothing in the substance of these documents indicates they are

-63-

1   actually privileged. Instead, the Court finds that the documents are highly relevant to one of Google's

2   key defenses – one for which it filed a motion for summary judgment – and that the documents

3   undermine and are directly contrary to that defense. In addition, the Court finds that the documents

4   Google withheld go directly to Google's state-of-mind with respect to its consent defense, evincing

5   that Google not only did not get actual consent from its users, but that Google knows that it does not

6   obtain actual consent.

7        292.   Google also argues that the fact that "Plaintiffs did not request an extension to file

8   their Opposition (due Jan. 10, 2022) to review and incorporate documents that might be produced as

9   a result" of adding ███████████ to search terms is a defense to sanctions. Google Opp. at 15. The

10  Court disagrees. As the Court understands it, Plaintiffs argued that the prejudice suffered with relation

11  to the Motion for Summary Judgment was "unnecessary time and expense related to the briefing and

12  defense of a baseless motion for summary judgment." Dkt. 670, Pl. Mot. for Sanctions at 21.

13  Plaintiffs' position is that they have sufficient evidence to defeat Google's motion for summary

14  judgment even in the absence of ███████ documents. However, Plaintiffs' Opening Motion for

15  Sanctions explained that the prejudice from Google's conduct was that it "foreclosed the opportunity

16  to cross-examine witness – Google stakeholders – who made critical admissions, recorded in these

17  documents[.]" Dkt. 670, Pl. Mot. for Sanctions at 21. The Court finds that this prejudice is lasting

18  and cannot be cured with new discovery or by simply striking Google's affirmative motion for

19  summary judgment.

20       293.   The Court rejects Google's argument that production of similar documents cured any

21  prejudice. Google itself argued on Reply to its Summary Judgment argument that draft documents

22  have no probative value (Dkt. 475 at 12-14) at the same time that it was concealing the final version

23  of the same document.

24       294.   The ███████ documents fall squarely within Plaintiffs' discovery requests, and

25  Google knew this to be the case, having produced a subset of its own choosing. Google then filed an

26  early Motion for Summary Judgment, seeking to take advantage of a record that it knew to be

27  incomplete and which was expressly curated by Google to exclude anything that would undermine

28  its consent defense – in turn hindering Plaintiffs' ability to challenge Google's position. Indeed,

Google chose to withhold the most significant of these documents – ones which contained substantive statements from Google stakeholders expressly rebutting the positions Google asserted in its motion.

295.    The Court finds that Google violated the Court's scheduling order setting a deadline of March 4, 2022 by producing documents after that date.

296.    The Court finds that Google engaged in misconduct by withholding the ███████ documents and misrepresenting to the Court that there were no triable issues of fact (*see* Dkt. 395).

297.    The Court finds that Google's withholding of ███████ documents prejudiced Plaintiffs' in their opposition to Google's motion for summary judgment.

298.    The Court finds that the prejudice caused by Google's improper withholding of key ███████ documents is not limited to Plaintiffs' Opposition to Summary Judgment but extends through further dispositive motions in trial. This prejudice is caused by the fact that Google prevented Plaintiffs from obtaining discovery from key stakeholders who made key admissions about Google's failure to obtain actual consent or make adequate disclosures to consumers in interviewees with Google's only Privacy and Data Protection Office. Google illustrated the prejudice in its Opposition to Sanctions by arguing that the late-produced documents had alternative meanings to what they say on their face. Accordingly, the Court finds that the requested relief will ensure that Google cannot benefit from evidentiary gaps that Google created by concealing key ███████ documents until after the close of fact discovery.

## CONCLUSIONS OF LAW

299.    "When a district court decides to impose sanctions or discipline, it must clearly delineate under which authority it acts to ensure that the attendant requirements are met." *Williams v. Williams*, 2013 WL 3157910, at *4 (N.D. Cal. June 20, 2013) (citing *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1200 (9th Cir. 1999)).

300.    Federal courts have the power to sanction litigants for discovery misconduct under both the Federal Rules of Civil Procedure and the court's inherent power to prevent abusive litigation practices. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).

301.    In their motion, Plaintiffs seek sanctions under Federal Rule of Civil Procedure 16(f), Rule 37(b), Rule 37(e), and the Court's inherent power. at 4, 5. As set forth above, the following

categories of misconduct support an order imposing the sanctions Plaintiffs seek:

        a.    Google made false representations about Not Synced Signals, withheld relevant information, and failed to preserve them. Mot. at 6, Reply at 1.

        b.    Google did not comply with multiple orders requiring production of Named Plaintiff Data, including Gaia-, Zwieback-, and Biscotti-keyed data. Mot. at 2-3, 10-14, Reply at 5-9.

        c.    Google failed to preserve Named Plaintiff Data, including Gaia-, Zwieback-, and Biscotti-keyed data. Mot. at 2, Reply at 8-9.

        d.    Google withheld ▮▮▮▮▮▮ documents. Mot. at 15, Reply at 10.

## I.  FEDERAL RULE OF CIVIL PROCEDURE 16(F) (FAILURE TO OBEY PRETRIAL ORDER)

302.  Plaintiffs invoke Rule 16(f) as a basis for sanctions, Mot. at 3, Reply at 10-12. The rule provides that a "court may issue any just orders ... if a party or its attorney ... fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). Its purpose is "to encourage forceful judicial management." *Sherman v. United States*, 801 F.2d 1133, 1135 (9th Cir. 1986). Case management orders, which are sometimes referred to as scheduling orders under Rule 16, are critical in federal civil litigation. *Kassim v. City of Schenectady*, 221 F.R.D. 363, 365 (N.D.N.Y. 2003) (importance of a case management order "cannot be overstated"). These orders should not be taken lightly. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) ("A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded without peril.") (internal citation and quotation omitted). "Long ago, our system rejected trial by ambush, and instead, instituted the discovery process." *DR Distributors, LLC, v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 939 (N.D. Ill. 2021) (citations omitted).

303.  "The disclosure and discovery rules exist to ensure that cases are not litigated in the dark." *DR Distributors LLC v. 21 Century Smoking Inc.*, 513 F. Supp. 3d at 939 (citations omitted). For that process to work, courts must impose and enforce deadlines. *Id.* (citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (adhering to case management order dates is critical to achieving the goal of Rule 1)). Indeed, Rule 16 requires case management orders to include specific

1    benchmark dates in the order. *Id.* at 939 (citing Fed. R. Civ. P. 16(b)(3)(A)). "Without these orders

2    and the dates contained in those orders, federal civil litigation would be chaotic." *Id.* at 939 (citations

3    omitted). "The purpose of civil discovery is to create an orderly process by which a record may be

4    generated to support trial or dispositive motions. Surprise is not favored." *Lavender v. Florida Gas*

5    *Trans. Co.*, 2003 WL 25682205, at *2 (S.D. Ala. Jun. 30, 2003).

6         304.    Therefore, if a party fails to obey a scheduling or pretrial order, Rule 16 authorizes the

7    Court to impose the sanctions permitted by Rule 37(b)(2)(A)(ii) – (vii). *See In re Bang Energy Drink*

8    *Mktg. Litig.*, 2020 WL 4458916, at *2 (N.D. Cal. Feb. 6, 2020) (citing Fed. R. Civ. P. 37(b)(2)(A);

9    Fed. R. Civ. P. 16(f)(1)). Rule 16 is "broadly remedial and its purpose is to encourage forceful judicial

10   management." *Sherman v. United States*, 801 F.2d 1133, 1135 (9th Cir. 1986). Courts order sanctions

11   under Rule 16 for violation of an order where "[d]isregard of the order would undermine the court's

12   ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent

13   and the cavalier." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992).

14        305.    This case exemplifies why Rule 16 orders are critical in litigation, and the chaos that

15   ensues when parties believe scheduling deadlines are merely recommended and case management is

16   a passive exercise. *See Johnson*, 975 F.2d at 610 ("That is precisely the kind of case management that

17   Rule 16 is designed to eliminate. It is one of the reasons that the district courts have been forced to

18   assume the burdens of case management themselves.").

19        306.    The Court concludes Google violated Rule 16(f) in the following ways:

20             a. Google did not comply with the March 4, 2022 fact discovery cut-off. It did not

21                complete production of ███████ documents until April 6, 2022, nearly one

22                month after the fact discovery cut-off. It did so despite service of the first set of

23                relevant document requests by Plaintiffs more than one year prior on August 31,

24                2020 (and another set on August 6, 2021) and more than five months after filing

25                its motion for summary judgment seeking adjudication of the issues to which the

26                withheld documents squarely pertained. This left Plaintiffs in the position of

27                having to oppose Google's motion without the benefit of this undisputedly relevant

28                information, which only came to light because sworn testimony of its own

employees happened to unearth it. Google's Opposition underscores the prejudice—the meaning of very interview notes and statements Google attempts to explain away are determinations for the jury. Plaintiffs were precluded from taking depositions from the key Google stakeholders that made statements undermining Google's consent defense, ignoring Rule 26's mandate that relevant evidence include not only that which supports a party's claim or defenses but also that which undermines a party's claim or defense. By withholding this evidence, Plaintiffs were deprived of the opportunity to procure additional evidence that might have been presented at trial, such as deposition testimony that would prevent Google from making the arguments it makes in its Opposition. Because Google failed to complete production of █████████ documents by the March 4, 2022 fact discovery cut-off, the Court concludes that Google has violated the Court's scheduling order. *See supra* Part V (Findings of Fact re █████████).

b.  Google disclosed several Not Synced Signals after the close of discovery and well after the Court ordered them to be produced in March 2021, April 2021, and November 2021. *See supra* Part III (Findings of Fact re Not Synced Signals disclosures).

c.  Google did not produce Gaia-Keyed Plaintiff data in its possession until after the close of fact discovery (e.g., March 10, 2022, March 31, 2022, May 9, 2022, and June 30, 2022), even though that data was ordered to be produced in the April 2021 order. *See supra* Part III.B-C (Findings of Fact re Google Account-keyed Plaintiff data).

307.  Having concluded that Google violated Rule 16(f)(1)(C), the Court must now determine the appropriate sanction.

308.  Rule 16 authorizes the Court to impose the sanctions permitted by Rule 37(b)(2)(A)(ii) – (vii). *See In re Bang Energy Drink Mktg. Litig.*, 2020 WL 4458916, at *2 (citing Fed. R. Civ. P. 37(b)(2)(A); Fed. R. Civ. P. 16(f)(1)). The sanctions set forth in Rule 37(b)(2)(ii) – (vii) include:

i.  prohibiting the disobedient party from supporting or opposing designated claims

1        or defenses, or from introducing designated matters in evidence;

2        ii.    striking pleadings in whole or in part;

3        iii.    staying further proceedings until the order is obeyed;

4        iv.    dismissing the action or proceeding in whole or in part;

5        v.    rendering a default judgment against the disobedient party; or

6        vi.    treating as contempt of court the failure to obey any order except an order to submit

7        to a physical or mental examination.

8    309.   Of these, Plaintiffs ask for:

9        a.  A finding of civil contempt for abuse of the discovery process.

10        b.  An order precluding Google from arguing that the absence of signals from which

11        browser state can be determined may not be used as evidence or argument that the

12        proposed Class cannot be ascertained, damages appropriately apportioned, or that

13        the proposed Class definition, which is defined as to include only users who are

14        not synced, contains any "uninjured" class members by reason of an inability to

15        identify users who are not synced.

16        c.  A jury instruction in the form of the following:

17        "Plaintiffs commenced this action by filing a complaint on July 27, 2020, which alleged that the Chrome Web Browser unlawfully disclosed

18        information of Chrome users who did not enable "Sync" to Google. Upon the filing of this complaint, Defendant Google LLC ("Google") was under

19        a duty to preserve evidence, including evidence related to the information that was alleged to be unlawfully disclosed. Google failed to comply with

20        this duty. Specifically, Google failed to prevent the destruction and loss of

21        relevant evidence that would show the full scope, scale and nature of information that was unlawfully disclosed from Chrome to Google related

22        to Named Plaintiffs and Class Members."

23        "I instruct you, members of the jury, as matter of law, that Google's failure

24        to preserve evidence constitutes "spoliation of evidence" and was the direct result of Google's failure to perform its discovery obligations. You may

25        presume the following:

26        First, that Google destroyed relevant evidence. Evidence is relevant if it

27        would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence.

28

PLS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

> Second, that the evidence destroyed by Google was favorable to Plaintiffs and, had the evidence been preserved and produced, it would have shown that Chrome was in fact unlawfully disclosing personal information of Named Plaintiffs and Class Members to Google and that the nature and volume of information being unlawfully disclosed was objectively unreasonable and highly offensive."

    d.  An order striking Google's affirmative defense of consent (First Affirmative Defense) and precluding Google from arguing that it obtained consent for any of the practices challenged in this case, including but not limited to taking data from users who are not synced, creating profiles of them, and how Google benefits from that data.

    e.  All fees and costs related to the Special Master discovery process, to be paid to Plaintiffs' counsel within fourteen (14) days of the date of this Order;

    f.  Leave to apply for reimbursement of all fees and costs related to Google's Motion for Summary Judgment on Google's First Affirmative Defense of Consent (Dkt. 395).

    g.  Leave to apply for reimbursement all fees and costs related to the instant motion for sanctions, related briefing, hearing preparation and travel and lodging for this hearing.

310. The Court concludes that the requested sanctions, with the exception of the requested jury instruction discussed in the context of Rule 37(e), bear "a reasonable relationship to the subject of discovery that was frustrated by sanctionable conduct." *See Navellier v. Sletten*, 262 F.3d 923, 947 (9th Cir. 2001). The Court addresses each in turn.

**A.     A Finding of Civil Contempt Is Warranted**

311. Google argues that a request for contempt was not set forth in Plaintiffs' opening brief. Opp. at 25. In their opening brief, Plaintiffs noted that Google's conduct here exceeds that which supported contempt sanctions in other cases. Mot. at 1 n.1. The Court concludes that Google had sufficient notice that resolution of the instant Motion could result in civil contempt.

312. A court may enforce compliance with its orders through a civil contempt proceeding. *Int'l Union, UMWA v. Bagwell,* 512 U.S. 821, 827-28 (1994). "The

standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir.1999) (quoting *Stone v. City & County of San Francisco,* 968 F.2d 850, 856 n.9 (9th Cir.1992)). The contempt "need not be willful, and there is no good faith exception to the requirement of obedience to a court order." *In re Dual–Deck Video Cassette Recorder Antitrust Litig.,* 10 F.3d 693, 695 (9th Cir. 1993) (citation omitted).

313.    The Court concludes that that pursuant to Fed. R. Civ. P. 16(f), which incorporates Rule 37(b)(2)(A)(vii) by express reference, Google is in civil contempt.

**B.    Evidentiary Sanctions are Warranted**

314.    Rule 16 also authorizes the Court to impose sanctions in the form of an order striking pleadings or prohibiting the disobedient party from supporting or opposing designated claims or defenses. *See In re Bang Energy Drink Mktg. Litig.*, 2020 WL 4458916, at *2 (citing Fed. R. Civ. P. 37(b)(2)(A)(iii); Fed. R. Civ. P. 16(f)(1)).

315.    As discussed above, because Google opposed class certification based in part upon the absence of discovery it improperly withheld, Plaintiffs' remedy is appropriately tailored to deny Google the intended tactical advantage of its misconduct. Google thwarted Plaintiffs' efforts to fully understand, test, and oppose the basis of Google's class certification arguments. It should not now benefit from that gamesmanship. *See 4DD Holdings, LLC v. United States*, 143 Fed. Cl. 118, 133 (2019) ("[T]he government will be precluded from arguing that evidentiary gaps created by its spoliation should be construed in the government's favor.); *see also Craftwood Lumber Co. v. Interline Brands, Inc.*, 2013 WL 4598490, at *13 (N.D. Ill. Aug. 29, 2013) ("Craftwood does not dispute that a preclusion order would leave Interline without a basis for opposing class certification, but notes that this result is of Interline's own making. We agree. The sanction is harsh but warranted.").

316.    The Court therefore adopts Plaintiffs' proposed order as follows:[1]

Google is precluded from arguing that the absence of signals from which browser state can be determined may not be used as evidence or argument that the proposed Class cannot be ascertained, damages appropriately apportioned, or that the proposed Class definition, which is defined as to include only users who are not synced, contains any "uninjured" class members by reason of an inability to identify users who are not synced.

317.    Plaintiffs also ask that Google's affirmative defense of consent (first affirmative defense) be stricken and Google precluded from arguing that it obtained consent for any of the practices challenged in this case, including but not limited to taking data from users who are Not Synced, creating profiles of them,[2] and how Google benefits from that data. This sanction reinforces the Ninth Circuit's guidance that last minute tender of documents does not cure the prejudice to opponents. *Sas v. Sawabeh Info. Services*, 2015 WL 12711646, at *10 (C.D. Cal. Feb. 6, 2015) (internal quotations, citations and modifications omitted).

318.    The Court concludes that this sanction bears "a reasonable relationship to the subject of discovery that was frustrated by sanctionable conduct." *See Navellier v. Sletten*, 262 F.3d 923, 947 (9th Cir. 2001). Google's early motion for summary judgment clearly sought to take advantage of a deliberately incomplete record that it curated to gain partial adjudication of its consent defense in its favor. The imposed sanction is appropriate to deter this type of misconduct in this case and others.

319.    The Court therefore adopts Plaintiffs' proposed order as follows:

Google's affirmative defense of consent (First Affirmative Defense) is stricken and Google is precluded from arguing that it obtained consent for any of the practices challenged in this case, including but not limited to taking data from users who are not synced, creating profiles of them, and how Google benefits from that data.

---

[1] Google argues that its "class certification opposition does not rely on the absence of sync signals for any argument." Opp. at 19. The Court disagrees. Nevertheless, having taken this position, Google cannot seriously object to the preclusion order.

[2] If in the course of proceedings before the trial judge it is determined that Google's discovery misconduct is relevant to an issue before the jury, the Court concludes it would be appropriate to simply preclude Google from opposing the introduction of the late-produced documents into evidence, and presenting contrary evidence or argument regarding the meaning of the late-produced documents.

### C.    Monetary Sanctions are Warranted

320.    For Google's Rule 16(f) violations Plaintiffs seek an award of monetary sanctions in the form of: (a) reimbursement of all fees and costs that Plaintiffs paid to Special Master Brush, (b) leave to apply for reimbursement of all fees and costs related to Google's Motion for Summary Judgment on Google's First Affirmative Defense of Consent (Dkt. 395), and (c) leave to apply for reimbursement all fees and costs related to the instant motion for sanctions, related briefing, hearing preparation and travel and lodging for this hearing. Google counters that any monetary sanctions awarded should be limited to reimbursement for the reasonable expenses incurred in preparing the Motion, as the Court did in the related *Brown* litigation. Opp. at 25.

321.    In fashioning civil contempt sanctions, the court has the discretion to award reasonable fees and costs as a remedial measure, regardless of whether the party that is in contempt acted willfully. *See Perry v. O'Donnell*, 759 F.2d 702, 704-705 (9th Cir.1985).

322.    The Court concludes that such an award is proper here "to compensate [Plaintiffs] for losses resulting from the contemnor's past noncompliance." *In re Count Liberty, LLC*, 370 B.R. 259, 274 (Bankr. C.D. Cal. 2007).

323.    The Court also concludes that the monetary sanctions Plaintiffs seek directly result from Google's noncompliance with repeated court orders. First, but for Google's efforts to obfuscate discovery from the onset of the litigation and the false representations made to Plaintiffs' counsel and the Court in attempt to secure a Protective Order that Google now claims insulates it from sanctions liability, no Special Master would have been appointed. Indeed, Plaintiffs sought production of technical disclosures, including schemas, in February 2021. *See* Dkt. 118 at 7 n.6. Had Google obliged in that good faith request and engaged in what should have been a self-executing process governed by counsel's duty of candor and fairness, among others, *see Synapsis, LLC v. Evergreen Data Sys., Inc.*, 2006 WL 2884413, at *1 (N.D. Cal. Oct. 10, 2006), the costly and time-consuming year-long process that culminated in a return to the beginning would have been unnecessary, as would have been the instant Motion. Instead, Google elected not to comply, even when ordered to do so. This is not acceptable. *See Boyd v. Guilford*, 2014 WL 12966092, at *1 (C.D. Cal. May 5, 2014) ("[A]ll litigants…have an obligation to comply with court orders and failure to comply may result in

sanctions[.]") (internal alterations omitted) (quoting *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009); *see also Chapman v. Pac. Tel. & Tel. Co.*, 613 F.2d 193, 197 (9th Cir. 1979) ("An attorney who believes a court order is erroneous is not relieved of the duty to obey it."). Finally, Google's early summary judgment motion and the costs Plaintiffs incurred in connection with it, were the direct result of Google's Rule 16(f) violations.

324.    In light of the foregoing, Google must pay all fees and costs related to the Special Master discovery process to Plaintiffs' counsel within fourteen (14) days of the date of this Order. If Plaintiffs seek reimbursement for fees and costs incurred in connection with bringing the instant Motion and/or those incurred in connection with Google's summary judgment motion, Plaintiffs shall file a single consolidated application within 35 days of this Order. Google shall have 14 days to respond. The default briefing schedule and page limits under the Local Rules otherwise apply.

## II.    FEDERAL RULE OF CIVIL PROCEDURE 37(B) (FAILURE TO OBEY DISCOVERY ORDER)

325.    Plaintiffs' Motion also seeks sanctions under Rule 37(b). Mot. at 4.

326.    Under Federal Rule of Civil Procedure 37(b)(2)(A), where a party "fails to obey an order to provide or permit discovery," the court "may issue further just orders" which "may include the following:"

    i.    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

    ii.    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

    iii.    striking pleadings in value or in part;

    iv.    staying further proceedings until the order is obeyed;

    v.    dismissing the action or proceeding in whole or in part;

    vi.    rendering a default judgment against the disobedient party; and

    vii.    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A); *see U.S. v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365, 1369 (9th Cir. 1980). "The choice among the various sanctions rests within the discretion of the district court." *Sumitomo*, 617 F.3d at 1369. Sanctions may be warranted under Federal Rule of Civil Procedure 37(b)(2) for failure to obey a discovery order as long as the established issue bears a reasonable relationship to the subject of discovery that was frustrated by sanctionable conduct. *Navellier*, 262 F.3d at 947 (citation omitted).

327.    As a basis for sanctions under Rule 37(b)(2)(A), Plaintiffs argue that Google violated two court orders (1) the Court's April 30, 2021 Order on Dispute 1.3, Dkt. 173-1 requiring production of Plaintiff data and information, and (2) the Court's November 12, 2021 Order, which again required Google to produce all data associated with the Named Plaintiffs and further required Google to provide an under-oath declaration that the data had been produced. Mot. at 10-14.

328.    The Court agrees with Plaintiffs that Google violated both orders.

329.    The Court concludes that Google violated the April 30, 2021 Order. The Order required Google to produce "the information it has associated with the named Plaintiffs, including, as detailed at the hearing, profile data, data from non-synced sources, and any device data associated with any Plaintiff." Dkt. 173-1 (Issue 1.3).

330.    Google violated the Court's April 30, 2021 Order as follows by not producing Named Plaintiff Infromation as directed by the Order, specifically:

a.    Google did not produce Zwieback-keyed data – even though it admitted in Opp. to Sanctions that it could be done quickly. Google Opp. at 11, n.12 (Claiming "Google quickly produced information associated with Plaintiff-provided unauthenticated identifiers."), citing Ansorge Decl. ¶¶ 57, 81, 82. *See supra* Part III.D (Findings of Fact re Zwieback-keyed data).

b.    Google did not produce Biscotti-keyed data – even though it admitted in Opp. to Sanctions that it could be done quickly. Google Opp. at 11, n. 12 (Claiming "Google quickly produced information associated with Plaintiff-provided unauthenticated identifiers."). Instead, the only Biscotti-keyed data Google produced as a result of the April 30 order was a five-page PDF. *See supra* Part

III.E (Findings of Fact re Biscotti-keyed data).

    c.   Google did not produce Gaia-keyed data from Gaia-███ or ███ logs for the Named Plaintiffs for the Class Period even though it was available as of the time of the filing of the Complaint, even though Google had the ability to search, segregate, and produce.

331.    The Court noted Google's noncompliance in its November 12, 2021 Order:

[T]he Court finds that the Special Master's factual conclusion regarding the deficiencies in Google's production of information about . . . data associated with Plaintiffs or their personal information (*Calhoun*) are well founded and adopts those findings. As previously noted by this Court, Google knows what data it has collected regarding Plaintiffs and putative class members and where that data may be found, therefore Google produce the information and data as directed herein.

Dkt. 377 at 3.

332.    Google has no justification for violating the Court's April 30, 2021 Order.

333.    The Court likewise concludes that Google violated the November 12, 2021 Order. The Order required "a declaration, under penalty of perjury, from Google, not counsel that . . . [a]ll responsive data related to the Named Plaintiffs ha[d] been produced from." Dkt. 377, Ex. 1 at 3. The Order further directed Google to provide "full schemes, a list of ALL fields with their descriptions, a list of tools used to search the respective data sources, and instruction sets and manuals for all tools identified as being used by 'Googlers.'" *Id.* at 10

334.    In response to that order, Google submitted the declaration of Mr. Golueke, Dkt. 383, swearing, under oath that:

    a.   To the best of my knowledge and informed understanding, Google has provided a complete list of data sources that contain information about Plaintiffs relevant to Plaintiffs' claims. The data sources are listed in Exhibit A. *Id.* at 1.

    b.   To the best of my knowledge and informed understanding, Google either has or is in the process of producing all responsive and relevant data related to the Named Plaintiffs—or to pseudonymous identifiers Plaintiffs provided—from respective prior searches of those data sources. A summary of the data produced is listed in Exhibit B. *Id.* at 1-2.

335.    The Court concludes that Google violated the Court's November 12, 2021 Order because it:

        a.  Failed to identify all responsive sources;

        b.  Failed to identify all sources searched; and

        c.  Failed to produce all responsive data related to the Named Plaintiffs.

*See supra* Part II.C (Findings of Fact re November 12, 2021 Order).

336.    Google has no justification for its non-compliance with the Court's November 12, 2021 Order.

337.    Having concluded that Google violated two discovery orders, the Court must assess the appropriate sanction. Plaintiffs again seek the following:

        a.  A finding of civil contempt for abuse of the discovery process.

        b.  An order precluding Google from arguing that the absence of signals from which browser state can be determined may not be used as evidence or argument that the proposed Class cannot be ascertained, damages appropriately apportioned, or that the proposed Class definition, which is defined as to include only users who are not synced, contains any "uninjured" class members by reason of an inability to identify users who are not synced.

        c.  A jury instruction in the form of the following:

            "Plaintiffs commenced this action by filing a complaint on July 27, 2020, which alleged that the Chrome Web Browser unlawfully disclosed information of Chrome users who did not enable "Sync" to Google. Upon the filing of this complaint, Defendant Google LLC ("Google") was under a duty to preserve evidence, including evidence related to the information that was alleged to be unlawfully disclosed. Google failed to comply with this duty. Specifically, Google failed to prevent the destruction and loss of relevant evidence that would show the full scope, scale and nature of information that was unlawfully disclosed from Chrome to Google related to Named Plaintiffs and Class Members."

            "I instruct you, members of the jury, as matter of law, that Google's failure to preserve evidence constitutes "spoliation of evidence" and was the direct result of Google's failure to perform its discovery obligations. You may presume the following:

            First, that Google destroyed relevant evidence. Evidence is relevant if it

would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence.

Second, that the evidence destroyed by Google was favorable to Plaintiffs and, had the evidence been preserved and produced, it would have shown that Chrome was in fact unlawfully disclosing personal information of Named Plaintiffs and Class Members to Google and that the nature and volume of information being unlawfully disclosed was objectively unreasonable and highly offensive."

d. An order striking Google's affirmative defense of consent (First Affirmative Defense) and precluding Google from arguing that it obtained consent for any of the practices challenged in this case, including but not limited to taking data from users who are not synced, creating profiles of them, and how Google benefits from that data.

e. All fees and costs related to the Special Master discovery process, to be paid to Plaintiffs' counsel within fourteen (14) days of the date of this Order;

f. Leave to apply for reimbursement of all fees and costs related to Google's Motion for Summary Judgment on Google's First Affirmative Defense of Consent (Dkt. 395).

g. Leave to apply for reimbursement all fees and costs related to the instant motion for sanctions, related briefing, hearing preparation and travel and lodging for this hearing.

338.    The Court concludes that the rationale for finding Google in contempt under Rule 16(f) equally applies here, as does the justification for awarding fees and costs Plaintiffs paid to the Special Master and leave for reimbursement of fees and costs incurred in connection with the instant Motion under that provision. Those monetary sanctions are appropriate for the additional reason that Rule 37(b)(2)(C) requires that the Court "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). The Court concludes that Google's discovery misconduct was not "substantially justified" and that there are no "other circumstances [that] make an award of expenses unjust."

### III.    FEDERAL RULE OF CIVIL PROCEDURE 37(E) (FAILURE TO PRESERVE ELECTRONIC EVIDENCE)

339.    Federal Rule of Civil Procedure 37(e) provides: "If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court . . . upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may" "instruct the jury that it may or must presume the information was unfavorable to the party." "Intent must be established before a court can impose sanctions, such as adverse jury instructions, default, and dismissal under Rule 37(e)(2)." *DR Distributors*, 513 F. Supp. 3d at 980-981 (citing Fed. R. Civ. P. 37(e), advisory committee's notes (2015)). "[I]f a party destroys evidence with the intent to keep the ESI from the opposing party, prejudice is reasonably inferred."[3] *HP Tuners, LLC v. Sykes-Bonnett*, 2019 WL 5069088, at *4 (W.D. Wash. Sept. 16, 2019), *report and recommendation adopted as modified*, 2019 WL 5064762 (W.D. Wash. Oct. 9, 2019).

340.    Plaintiffs request for Rule 37(e) sanctions is based on Google's failure to preserve:

a.    Class wide Not Synced Signals. *See supra* Part II (Findings of Fact re Not Synced Signals disclosures).

b.    Zwieback data – even though Google admitted in Opp. Google Opp. at 11, n. 12 (Claiming "Google quickly produced information associated with Plaintiff-provided unauthenticated identifiers."). *See supra* Part III.D (Findings of Fact re Zwieback-keyed data).

c.    Biscotti data (except for a 5-page PDF). Google Opp. at 11, n. 12 ("Google quickly produced information associated with Plaintiff-provided unauthenticated identifiers."). *See supra* Part III.E (Findings of Fact re Biscotti-keyed data).

341.    Of the relief Plaintiffs seek, the Court analyzes two under the Rule 37(e) framework. First, Plaintiffs request a preclusion sanction in the form of an order "preclud[ing] Google from

---

[3] Google's arguments that Plaintiffs have not established prejudice thus miss the mark. *See* Opp. at 20, 22.

arguing that the absence of signals from which browser state can be determined may not be used as evidence or argument that the proposed Class cannot be ascertained, damages appropriately apportioned, or that the proposed Class definition, which is defined as to include only users who are not synced, contains any "uninjured" class members by reason of an inability to identify users who are not synced." Pls.' Proposed Order at 2. Second, Plaintiffs request a jury instruction, as follows:

> Plaintiffs commenced this action by filing a complaint on July 27, 2020, which alleged that the Chrome Web Browser unlawfully disclosed information of Chrome users who did not enable "Sync" to Google. Upon the filing of this complaint, Defendant Google LLC ("Google") was under a duty to preserve evidence, including evidence related to the information that was alleged to be unlawfully disclosed. Google failed to comply with this duty. Specifically, Google failed to prevent the destruction and loss of relevant evidence that would show the full scope, scale and nature of information that was unlawfully disclosed from Chrome to Google related to Named Plaintiffs and Class Members;

> I instruct you, members of the jury, as matter of law, that Google's failure to preserve evidence constitutes "spoliation of evidence" and was the direct result of Google's failure to perform its discovery obligations. You may presume the following:

> *First,* that Google destroyed relevant evidence. Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence.

> *Second,* that the evidence destroyed by Google was favorable to Plaintiffs and, had the evidence been preserved and produced, it would have shown that Chrome was in fact unlawfully disclosing personal information of Named Plaintiffs and Class Members to Google and that the nature and volume of information being unlawfully disclosed was objectively unreasonable and highly offensive.

Pls.' Proposed Order at 2-3.

342.    The Court turns to the Rule 37(e) factors as to the first act of alleged misconduct, i.e., Google's failure to preserve class wide Not Synced Signals. First, the signal information at issue is ESI. Second, there was a duty to preserve that ESI.[4] Third, the ESI was relevant. Google's Motion for Protective Order underscores that each of these three factors are met. *See* Dkt. 109 at 9 (citing authority for the proposition that perfection in preserving all relevant ESI is often impossible). It

---

[4] The duty to preserve arises when litigation is pending or reasonably foreseeable. *First Fin. Sec., Inc.*, 2016 WL 5870218, at *3. At the latest, Google was on notice of its duty to preserve ESI upon being served with the original Complaint on July 29, 2020, Dkt. 18. *See Facebook, Inc. v. OnlineNIC Inc.*, 2022 WL 2289067, at *7 (N.D. Cal. Mar. 28, 2022).

sought relief from its obligation to preserve this relevant ESI through specific representations that have since been proven false. For that reason, the order does not excuse Google from taking reasonable steps to preserve this relevant ESI. *See City of LA., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (district courts "possess[] the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient."). Indeed, such steps were available. Both of Plaintiffs' experts explain why. *See* Smith Rpt., Dkt. 339-16 ¶¶ 113-114; Shafiq Rpt., Dkt. 339-22 ¶¶ 61-63.

343.    Those steps, however, were not taken, resulting in loss of the ESI.

344.    Fourth, the lost ESI cannot be restored or replaced through other discovery. The ESI at issue is stored for limited periods of time and has already been destroyed.

345.    Finally, Google acted with intent to deprive Plaintiffs of the use of the ESI. Google never approached the Court to correct past misrepresentations whether such Not Synced Signals existed while at the same time opposing Plaintiffs' Motion for Class Certification based on the absence of such signals. *See, e.g.*, Dkt. 429 at 23-24 ("And as for Google Account holders who used Chrome while signed out of their Accounts, Google designed its systems to ensure these users are ***not*** identified…Plaintiffs do not proffer a method to excise uninjured class members[.]" (emphasis in original). In addition, Google made supplemental disclosures in written discovery minutes before the close of fact discovery, and seemingly motivated only by the fact that the deficiencies in those disclosures had been exposed the same day during the Special Master process.

346.    Based on the foregoing, the Court concludes that Google violated Rule 37(e) and that sanctions are appropriate.

347.    The same conclusion holds as to Google's failure to preserve Biscotti-keyed and Zwieback-keyed data. The information is relevant ESI that was subject to a duty to preserve. The ESI was lost because Google failed to take reasonable steps to preserve it. *See, e.g.*, Opp. at 10, n.11 ("At the time, Google did not preserve Zwieback-keyed data[.]"). Google's opposition concedes these steps were available: Google is capable of "quickly produc[ing] information associated with Plaintiff-provided unauthenticated identifiers," which would include Zwieback. Opp. at 11, n.12 (citing Ansorge Decl. ¶¶ 57, 81-82). As to Biscotti-keyed data, Google has not presented evidence that it

1    preserved Biscotti-keyed data before April 27, 2021.

2    348.    The lost ESI cannot be restored or replaced through other discovery. Google's internal

3    documentation admits that Zwieback-keyed data is deleted after ▮▮▮▮▮ of inactivity. See Joint

4    Rebuttal Decl. Ex. 20, Shafiq Rebuttal ¶ 19; Pls' Joint Decl. ¶ 95 (citing GOOG-CABR-0479622).

5    Moreover, Prof. Shafiq has also explained that many of Google's searches for Zwieback-keyed data

6    "resulted in null sets because Google did not conduct the searches in a timely manner," including

7    conducting "searches after the retention period of some logs elapsed." Joint Rebuttal. Decl. Ex. 20,

8    Shafiq Rebuttal ¶ 17. "For example, Plaintiffs submitted second-round searches for tmp-

9    AdQueryState on April 6, 2022 but Google did not conduct the search until May 20, 2022 (a delay of

10    44 days that meant that the log's 35 day retention period had already expired by the time Google

11    conducted its search.)" *Id.* Similarly, with Biscotti-keyed data, because of its shelf-life, all pre-

12    Complaint activity from the Named Plaintiffs, i.e. preceding the filing date of July 27, 2021, had

13    already been deleted from Google's systems by the time Google decided to take action. In addition,

14    Google's belated decision to "develop[] pipelines" (Ansorge Decl. ¶ 32) did not include any action

15    to search and produce Biscotti-keyed data already in Google's systems. Finally, Google acted with

16    intent to deprive Plaintiffs from the use of the ESI. *See supra* Part III.C-E. Rule 37(e)(2) sanctions

17    are therefore appropriate.

18    349.    The Court now turns to the form of sanctions necessary to address Google's failure to

19    preserve Not Synced Signals and Zwieback-keyed and Biscotti-keyed data.

20        **A.    An Evidentiary Sanction Is Warranted**

21    350.    "The Court has discretion when ordering a sanction for spoliation of evidence." *HP*

22    *Tuners, LLC*, 2019 WL 5069088, at *5 (citing Fed. R. Civ. P. 37 advisory committee's note (2015)).

23    "Courts may sanction parties responsible for spoliation of evidence in three ways. First a court can

24    instruct the jury that it may draw an inference adverse to the party or witness responsible for

25    destroying the evidence. Second, a court can exclude witness testimony proffered by the party

26    responsible for destroying the evidence and based on the destroyed evidence. Finally, a court may

27    dismiss the claim of the party responsible for destroying the evidence." *Id.* at *2 (citations omitted).

28    351.    Plaintiffs argue that Google should be precluded from advancing arguments in

opposition to class certification that involve sync signals. Mot. at 19, Pls.' Proposed Order at 2. Plaintiffs' opening and reply briefs cite specific references in Google's class certification opposition papers that show Google invokes the absence of the sync signals as to which it has thwarted discovery as a basis for the District Court to deny class certification. *See supra* Part II.E (Findings of Fact re Google's Challenge to Plaintiffs' Methodology to Identify Class Members).

352.   In light of the above, the Court concludes that the preclusion order Plaintiffs seek is appropriately tailored to remedy Google's failure to preserve Not Synced Signals. Google thwarted Plaintiffs' efforts to fully understand, test, and oppose the basis of Google's class certification arguments. It should not now benefit from that misconduct. *See 4DD Holdings, LLC v. United States*, 143 Fed. Cl. 118, 133 (2019) ("[T]he government will be precluded from arguing that evidentiary gaps created by its spoliation should be construed in the government's favor.); *see also Craftwood*, 2013 WL 4598490, at *13 ("Craftwood does not dispute that a preclusion order would leave Interline without a basis for opposing class certification, but notes that this result is of Interline's own making. We agree. The sanction is harsh but warranted.") (applying Rule 37(b)(2)(C)).

353.   The Court therefore adopts Plaintiffs' proposed order as follows:

> Google is precluded from arguing that the absence of signals from which browser state can be determined may not be used as evidence or argument that the proposed Class cannot be ascertained, damages appropriately apportioned, or that the proposed Class definition, which is defined as to include only users who are not synced, contains any "uninjured" class members by reason of an inability to identify users who are not synced.

**B.   A Jury Instruction Is Warranted**

354.   With respect to Google's failure to preserve Not Sync Signals, Rule 37 authorizes an adverse inference instruction consistent with that proposed by Plaintiffs. *See HP Tuners*, 2019 WL 5069088, at *7 ("The undersigned recommends that the Court grant an adverse inference instruction; the Court should request that plaintiff propose instruction(s) informing the jury of the existence of the flash drive, the information that defendants admit was on the flash drive, that Defendant Sykes-Bonnett destroyed the evidence and allowing the jury to draw an adverse inference against defendants based on these facts."). The jury shall therefore be instructed as follows:

> Plaintiffs commenced this action by filing a complaint on July 27, 2020, which alleged that the Chrome Web Browser unlawfully disclosed information of Chrome users who

did not enable "Sync" to Google. Upon the filing of this complaint, Defendant Google LLC ("Google") was under a duty to preserve evidence, including evidence related to the information that was alleged to be unlawfully disclosed. Google failed to comply with this duty. Specifically, Google failed to prevent the destruction and loss of relevant evidence that would show the full scope, scale and nature of information that was unlawfully disclosed from Chrome to Google related to Named Plaintiffs and Class Members;

I instruct you, members of the jury, as matter of law, that Google's failure to preserve evidence constitutes "spoliation of evidence" and was the direct result of Google's failure to perform its discovery obligations. You may presume the following:

*First,* that Google destroyed relevant evidence. Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence.

*Second,* that the evidence destroyed by Google was favorable to Plaintiffs and, had the evidence been preserved and produced, it would have shown that Chrome was in fact unlawfully disclosing personal information of Named Plaintiffs and Class Members to Google and that the nature and volume of information being unlawfully disclosed was objectively unreasonable and highly offensive.

355.    The Court rejects Google's argument that "Plaintiffs have identified no evidence in the produced data to support their requested instruction," and that they, on that basis "are not entitled to a declaration from the Court that the (materially same) non-preserve data would have proven their case." Opp. at 22. Google misses the point. "[B]ecause the relevance [of the] destroyed documents cannot be clearly ascertained[,] [as] [it] no longer exist[s], a party can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (internal quotations and brackets omitted).

## IV.    THE COURT'S INHERENT AUTHORITY

356.    Courts are vested with inherent powers that are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). The Ninth Circuit has held that sanctions are available under the court's inherent power if "preceded by a finding of bad faith, or conduct tantamount to bad faith." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001); *see Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001).

357.  The bad-faith requirement sets a "high threshold," *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997), which may be met by willful misconduct, or recklessness combined with "frivolousness, harassment, or an improper purpose." *Fink*, 239 F.3d at 993-94.

358.  Plaintiffs do not seek a sanction pursuant to the Court's inherent authority separate and apart from those the Court has already addressed. The Court, however, finds that its inherent authority provides an alternative and independently sufficient basis to impose the sanctions ordered herein. *See, e.g.*, *Hsueh v. New York*, 2017 WL 1194706, at *6 (S.D.N.Y. Mar. 31, 2017) ("Under either Rule 37(e) [or] the Court's inherent authority, an adverse inference is the appropriate remedy in light of the Court's findings. Hsueh was under an obligation to preserve the recording; the recording was undoubtedly highly relevant to Hsueh's claim against the DFS; and Hsueh acted in bad faith, and with an intent to deprive the DFS of the use of the recording, in deleting it."). The record is replete with misconduct conduct so conveniently sequenced that it can only be explained by bad faith. *See United States v. McCabe*, 323 F. App'x 580, 581 (9th Cir. 2009) (finding bad faith where counsel's misrepresentations were material, caused the district court to abort the inquiry into potential intimidation of a government witness and noting that "[m]aking misrepresentations to the fact finder is inherently obstructive because it frustrates the rational search for truth"); *Brown Jordan Int'l, Inc. v. Carmicle*, 2016 WL 815827, at *37 (S.D. Fla., March 2, 2016), *aff'd* 846 F.3d 167 (11th Cir. 2017) (deliberate deletion and destruction of evidence and lack of candor . . . questionably constitutes bad-faith litigation conduct, warranting the imposition of sanctions). Google ran out the clock on Plaintiff data. Google hid the trump cards bearing on its consent defense and filed an early dispositive motion to capitalize on that. Google also skirted its preservation obligations (apparently excused by a protective order it obtained by making misrepresentations to the Court), only to challenge class certification based on the absence of the data it destroyed.

1

## **<u>CERTIFICATE OF SERVICE</u>**

2      I, Lesley E. Weaver, hereby certify that on July 29, 2022, I electronically filed the foregoing

3  document with the Clerk of the United States District Court for the Northern District of California

4  using the CM/ECF system, which will send electronic notification to all counsel of record. I also

5  caused a copy of the under seal filings to be provided to counsel for Defendant.

6

7                                           */s/ Lesley E. Weaver*
                                             Lesley E. Weaver

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28