**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 994607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
Jenny Paulson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*
*jpaulson@simmonsfirm.com*

*Counsel for Plaintiffs*

**DICELLO LEVITT LLC**
David A. Straite (admitted *pro hac vice*)
Corban Rhodes (admitted *pro hac vice*)
485 Lexington Avenue, Tenth Floor
New York, NY 10017
Tel.: (646) 933-1000
Fax: (646) 494-9648
*dstraite@dicellolevitt.com*
*crhodes@dicellolevitt.com*

Amy Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn St., 6th Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

PATRICK CALHOUN, et al., on behalf of themselves and all others similarly situated,

    Plaintiffs,

    v.

GOOGLE LLC,

    Defendant.

Case No. 4:20-cv-05146-YGR-SVK

**PLAINTIFFS' [PROPOSED] SUR-REPLY IN SUPPORT OF THEIR OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

I.    INTRODUCTION ...................................................................................... - 1 -

II.   LEGAL ARGUMENT ................................................................................ - 2 -

      A.  THE AT-ISSUE PROMISES....................................................................- 2 -

      B.  PRODUCTION OF NAMED PLAINTIFF DATA Further refutes GOOGLE'S
          CONSENT ARGUMENTS ...................................................................- 3 -

          1.  Ongoing Production of Named Plaintiff Data Demonstrates a Scope and Nature of
              Misconduct that Far Exceeds any Purported Consent..........................................- 4 -

          2.  Google's October 28, 2022 Production of Named Plaintiff Data Demonstrates that
              █████████████████████████..............................................- 6 -

          3.  Ongoing Production of Named Plaintiff Data Demonstrates that ███████████
              ..................................................................................- 8 -

      C.  LATE-PRODUCED "████████████" DOCUMENTS DEFEAT GOOGLE'S
          MOTION FOR SUMMARY JUDGMENT ...............................................- 11 -

III.  LATE DEPOSITION TESTIMONY OF SABINE BORSAY PRECLUDES SUMMARY
      JUDGMENT ........................................................................................... - 14 -

IV.   CONCLUSION ...................................................................................... - 15 -

1

## TABLE OF AUTHORITIES

2

**Cases**

*Calhoun, et al. v. Google, LLC,*
    526 F. Supp. 3d 605 (N.D. Cal. 2021) ........................................................................ 13

*Campbell v. Facebook, Inc.,*
    77 F. Supp. 3d 836 (N.D. Cal. 2014) ........................................................................... 4

*In re Facebook, Inc., Consumer Privacy User Profile Litig.,*
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ....................................................................... 13

*In re Facebook Internet Tracking Litig.,*
    956 F.3d 589 (9th Cir. 2020) ........................................................................................ 4

*In re Google RTB Consumer Privacy Litig.,*
    2022 WL 2165489 (N.D. Cal. Jun. 13, 2022) ............................................................. 4

*In re Google, Inc.,*
    2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ............................................................ 4

*Silver v. Stripe,*
    2021 WL 3191752 (N.D. Cal. Jul. 28, 2021) ............................................................... 4

*Theofel v. Farey-Jones,*
    359 F.3d 1066 (9th Cir. 2004) ................................................................................. 9, 14

**Statutes**

Cal. Civ. Code § 1790.140 .............................................................................................. 6

**Other Authorities**

Restatement (Second) of Torts § 892B(2)-(3) .................................................................. 9

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  I.    **INTRODUCTION**

2          On November 30, 2021, in the midst of ongoing discovery, Google moved for summary

3  judgment on its first affirmative defense of consent ("Google's Motion"). Dkt. 395. In the 11

4  months since that filing, discovery has revealed additional evidence that directly undermines many

5  of the claims made in Google's Motion. Plaintiffs submit this sur-reply to address this evidence and

6  why it further demonstrates why Google's Motion should not be granted.

7          *First*, Google's October 28, 2022 production of Named Plaintiff Data shows that Chrome's

8  transmission of Chrome users' personal information to Google far exceeds any purported consent

9  that Google claims to have obtained. While this production remains ongoing and does not

10 encompass the *complete* picture of information that Google transmits about the Named Plaintiffs,

11 the information that Google has produced to date, for just the *six* Named Plaintiffs, exceeds

12

13

14 – regardless of their sync status. This new evidence bears

15 directly on whether Plaintiffs consented to the conduct at issue, including consent to the full scope

16 and nature of information that Chrome sent to Google while they were not synced.

17         *Second*, on September 8, 2022, the Court issued its order on Plaintiffs' Motion for Sanctions

18 for Google's Discovery Misconduct, finding, *inter alia,* that Google engaged in discovery

19 misconduct by failing to produce key consent documents related to Google's

20 initiative (                  Documents"). The                  Documents consist of a final paper and

21 detailed interview notes taken from high level Google executives wherein the executives presented

22 views contrary to those espoused in Google's Motion – specifically, multiple Google executives

23 candidly questioned whether consumers in fact consent to Google's practices.

24         *Third*, during the final deposition taken in this case (months after the conclusion of fact

25 discovery), the Product Manager for Chrome, Sabine Borsay, testified that

26

27                  Her understanding is actually incorrect, but that's the point: her misunderstanding

28

That three important Google executives

should forever foreclose that ordinary

Chrome users somehow consented to it as a matter of law.

## II.    LEGAL ARGUMENT

### A.    THE AT-ISSUE PROMISES

This case is about express and implied promises that Chrome makes in the Chrome Privacy Notice, which is a "service-specific additional term" that applies to use of the Chrome browser. Under Google's Terms of Service, "service-specific additional terms" such as the Chrome Privacy Notice "govern for that service."[1] The Terms also specifies that, "[t]he Google services that are subject to these terms are the products and services listed at https://policies.google.com/terms/service-specific." That specific page is referenced and incorporated by hyperlink in 14 different locations of the Terms. The "service-specific" part of the contract is titled "List of Services & Service-Specific Additional Terms" and expressly states:

> Google's Terms of Service applies to the services listed below. Next to each service, we also list additional terms and policies that apply to that particular service. The Terms of Service, additional terms, and policies define our relationship and mutual expectations as you use these services. This list only includes services governed by Google's general Terms of Service. A limited number of popular services, such as YouTube, have their own terms because of unique features. Most of our fee-based enterprise products and our developer API products have their own terms as well.

The Terms then lists more than 100 specific services and accompanying "service-specific additional terms" and policies to which the Google Terms apply. Chrome and the Chrome Privacy Notice are included in the list. However, there are no service-specific additional terms or policies for Google Ads, Google Display Ads, or Google Analytics – what Google argues are the "services" to which Plaintiffs agreed. Nor is there any mention of the Google Privacy Policy or Narnia2. Thus, Google's entire motion is based on a sleight-of-hand that attempts to re-write the Google Terms of Service to include terms for Google Ads, Google Display Ads, and Google Analytics – when there is no

---

[1] Plaintiffs assert that it is important to recognize that the Terms do not state the general rule that "the specific governs the general." Instead, it is that the "service-specific" governs for the service in question.

such thing in the Terms. Instead, as set forth above, the Google Terms expressly states that its "developer API products have their own terms."[2]

Further, although Google relies upon the Google Privacy Policy, that Policy itself incorporates and hyperlinks to the Chrome Privacy Notice in a section titled "Related Privacy Practices – Specific Google services" in which the Privacy Policy says that "[t]he following privacy notice provide additional information about some Google services" and links to the Chrome Privacy Notice in the first bullet-point.

The first sentence of the Chrome Privacy Notice promises users that it is the document to "[l]earn how to control the information that's collected, stored, and shared when you use the Google Chrome browser[.]" It then makes the following express or implied promises at issue here:

1.    "You don't need to provide any personal information to use Chrome[.]"

2.    "The personal information [including "browsing history information" and "cookies"] that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync[.]"

3.    "In general, the fact that you use Chrome … does not cause Google to receive any additional personally identifying information about you."

4.    The section for "Sync" states that "When you sign in to the Chrome browser …. and enable sync with your Google Account, you personal information is saved in your Google Account on Google's servers so you may access it when you sign in and sync to Chrome on other computers and devices. This personal information will be used and protected in accordance with the Google Privacy Policy. This type of information can include: browsing history. Sync is only enabled if you choose."

5.    Unless a user syncs and enabled "Google Web & App Activity," "Google will only use your Chrome data after it's anonymized and aggregated with data from other users."

The late-produced discovery from Google demonstrates that it breaks all these promises.

**B.    PRODUCTION OF NAMED PLAINTIFF DATA FURTHER REFUTES GOOGLE'S CONSENT ARGUMENTS**

The production of Named Plaintiff Data has been a long and arduous process, involving the assistance of a Special Master, the imposing of sanctions against Google for discovery misconduct, and two preservation orders. The results of these efforts – which remain ongoing – shows (1) ▮

---

[2] As set forth below, Google executives have internally recognized this, stating, "Consent is no longer consent if you think of ads as a product."

1    ████████████████████████████████████████████ disclosed

2    in the Chrome Privacy Notice (which expressly states personal information "won't be sent to

3    Google" at all unless one enables sync); (2) that the information Chrome sends to Google for not

4    synced users ████████████████████████; and, (3) that even when looking to the

5    documents on which Google based its consent arguments, i.e. ████████████, Google still

6    violates key promises to users vitiating any purported consent obtained.

> **1.    Ongoing Production of Named Plaintiff Data Demonstrates a Scope and Nature of Misconduct that Far Exceeds any Purported Consent**

9       Google's production of Named Plaintiff Data contradicts Google's claimed consent. It is

10    well settled that, "[i]n order for consent to be actual, the disclosures must 'explicitly notify' users

11    of the practice at issue." *In re Google RTB Consumer Privacy Litig.*, 2022 WL 2165489, at *10

12    (N.D. Cal. Jun. 13, 2022) *quoting In re Google, Inc.*, 2013 WL 5423918, at *13 (N.D. Cal. Sept.

13    26, 2013); *see also Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847–48 (N.D. Cal. 2014). In

14    determining whether the "practice at issue" was adequately disclosed, courts consider "[t]he nature

15    and volume" of the at-issue data as an important fact in determining whether a defendant obtained

16    consent. *See, e.g. In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 603 (9th Cir. 2020); *In re*

17    *Google RTB Consumer Privacy Litig.*, 2022 WL 2165489 at *8; *Silver v. Stripe*, 2021 WL 3191752,

18    at *6 (N.D. Cal. Jul. 28, 2021).

19       In this instant motion for summary judgment, Google contends that it obtained consent from

20    users of the Chrome data transmissions to Google via vague statements in various policies *outside*

21    *of the Chrome Privacy Notice. See, generally* Dkt. 395, Google's Mot. for Summ. J.[3] But nowhere

22    in Google's briefing is there any indication that Google disclosed the true nature and volume of

23    information that Chrome sends to Google when users are not synced. To the contrary, with the

24    benefit of late produced Named Plaintiff Data, it is now clear that the scope and nature of

25    information sent from Chrome to Google for not synced users was *never* disclosed by Google.

26    There is simply no explicit notification of the fact that Chrome shares with Google massive amounts

---

[3] For the reasons set forth above, the Chrome Privacy Notice is the "service-specific additional term" that governs use of the Chrome browser. Google's failure to address the Chrome Privacy Notice is fatal to its motion.

1   of information on individual Chrome users irrespective of whether the user is synced.

2          By way of example, Exhibit A to the accompanying report of Prof. Zubair Shafiq is a snippet

3   of the Named Plaintiff Data that Google produced to Plaintiffs. *See* Barnes Suppl. Decl. Ex. 76,[4]

4   Expert Report of Prof. Zubair Shafiq ("Shafiq Report"), Ex. A. This example represents the

5   transmission of information from Chrome to Google of only *one* browsing event and, even then,

6   only a snippet of the total information associated with that single transmission. *See id.* at ¶ 30. But

7   even this limited excerpt ███████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████████████

10          *See id.* To further put things into perspective, to date Google has produced approximately

11   ███████████ of Named Plaintiff Data from ████████████ (*see id.* at ¶ 27), and still this

12   represents only an unknown *fraction* of what Chrome sent to Google. As held by Magistrate Judge

13   van Keulen, "given the enormous quantity of data collected by Google on a daily basis, the Court

14   would not have required Google to preserve every bit of data regarding Named Plaintiffs. … As

15   such, under no circumstance would there have existed a 'complete picture' of every instance where

16   data was collected regarding Named Plaintiffs." Dkt. 862-1, Order on Pls. Mot. for Sanctions, at p.

17   30, ¶ 120.[5]

18          Moreover, the production of discovery related to Named Plaintiffs Data remains ongoing.

19   On September 8, 2022, Magistrate Judge van Keulen noted that evidence being preserved under

20   the Court's preservation orders "will be available as needed to address issues such as the nature and

21   ────────────────

22   [4] Exhibits are attached the accompanying supplemental declaration of Jason Barnes ("Barnes Suppl.
     Decl."). For ease of reference, exhibit numbering is continued sequentially from Plaintiffs'
23   opposition to Google's Motion for Summary Judgment.

24   [5] Plaintiffs are not aware of any other case in the history of American law where a Court has found
     that a defendant possessed *so much* information about a single person (or, here, a group of six
     persons) that there would be "no circumstance" where a "complete picture" of defendant's alleged
25   misconduct would have to be preserved or produced. And, even absent this finding, Google has
     effectively conceded this issue, arguing repeatedly that it could not produce all Named Plaintiff Data
26   because the volume of information was such that it would be unduly burdensome to produce.
     Plaintiffs submit that this alone is dispositive to the motion for summary judgment. The fact that
27   Chrome sent so much personal information to Google that Google cannot even identify or re-
     produce all of it back to the Named Plaintiffs is troubling, directly relevant (and dispositive) to
28   Google's motion. To what specifically did Plaintiffs purportedly consent? Even Google cannot say.

volume of information collected." Dkt. 862-1, Order on Pls' Mot. for Sanctions, at p. 30, at ¶ 121. Pursuant to said preservation orders, Google made a recent production on October 28, 2022 (discussed further below). Given that preservation continues to be ongoing with production occurring as recently as several weeks ago, discovery as to the nature and volume of the information at issue remains incomplete and summary judgment in Google's favor is not appropriate.

2.    **Google's October 28, 2022 Production of Named Plaintiff Data Demonstrates that** ███████████████████████████

In its Reply brief in further support of summary judgment, Google argued that "none of the data here is personally identifying[.]" Dkt. 475, Reply at 11, n. 18 (responding to Plaintiffs' argument regarding Chrome's express promise that it "does not cause Google to receive any additional personally identifying information about you[]").[6]

Plaintiffs have previously submitted evidence demonstrating to the contrary. However, on October 28, 2022, Google produced ██████████████ which equates to approximately ███ ███ (the "October 28 Production"). Barnes Suppl. Decl. Ex. 76, Shafiq Report, at ¶ 15. The October 28 Production demonstrates that, regardless of a user's browser-state, the information at issue is "Personal Information" regardless of the definition employed; that is, the information is ███████████████████████████████████████ ████████████[7] *See id.* at § IV. In order to interpret and analyze this information, Plaintiffs enlisted the

---

[6] This argument was reiterated at the October 24 evidentiary hearing on Google's Motion, when Google elicited testimony from Google employee Michael Kleber that, to his knowledge, Google does not "connect signed-in Chrome identifiers to signed-out Chrome identifiers." Oct. 24, 2022 Hr'g Tr. at 233:12-235:24. Kleber further testified that, "From the point of view of the browser, we shouldn't expect the consumer to be in charge of keeping track of anything about the details of how browsers work. That's the job of people like me who work on web browsers, not the job of people who use them." *Id.* at 236:15-19. He further agreed that "people should be able to browse the web without worrying that someone is collecting a dossier on them for what they're doing." *Id.* at 236:20-237:3.

[7] Google has argued that something is only personal information if it is directly linked to a user's Google Account. This argument is inconsistent with the definition in Google's public policies, and with California law. *See* Cal. Civ. Code § 1790.140(o), (x) ("'personal information' means information that identifies, relates to, describes, is capable of being associated with, or could be reasonably linked, directly or indirectly, with *a particular consumer or household*" and "includes, but is not limited to: … (A) [i]dentifiers such as a real name, postal address, unique personal identifier, online identifier, [IP] address, email address, account name, … or other similar identifiers'; (F) "Internet or electronic network activity information, including, but not limited to,

1    help of their expert, Prof. Zubair Shafiq, who has submitted a report with his findings. *See id.*

2        The October 28 Production consists of ████████████████████████████████

3        ████ *See* Barnes Suppl. Decl. Ex. 76, Shafiq Report, at ¶ 15. Specifically, Google produced data

4    ██████████████████████████████████████ *See id.* Analysis of this production

5    shows that Google is, in fact, ████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8        ██████ *See id.* at ¶¶ 16-25.

9        For example, the October 28 Production revealed that, ███████, Google:

10      • █████████████████████████████████████████. *See id.* at ¶¶ 17-26; *see also id.* at ¶ 18 (explaining that

11      the ███ ████████████████████████████████████████████████

12      ████████████████████████████████████████

13      ██████████████).

14      • █████████████████████████████████████████████████. *See id.*

15      at ¶ 19 (explaining that there █████████████████████████████

16      ██████████).

17      • ██████████████████████████████████████████████████. *See id.* at

18      ¶ 19 (explaining that there are ███████████████████████

19      ██████████).

20      • ████████████████████████████████████████████████████

21      ██████████████████████. *See id.* at ¶ 21 (explaining that there are ████

22      ██████████████████████████████

23      _____

browsing history, search history, and information regarding a consumer's interaction with an Internet Web Site, application, or advertisement;" (G) Geolocation data; [and] (K) inferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes") (emphasis added). The law further clarifies that "unique identifier" or "unique personal identifier" "means a persistent identifier that can be used to recognize, a consumer, a family, or a device that is linked to a consumer or family, over time and across different services, including, but not limited to, a device identifier; an [IP] address; cookies, beacons, pixel tags, mobile ad identifiers, or similar technology; customer number, unique pseudonym, or use alias; telephone numbers, or other forms of *persistent or probability identifiers that can be used to identify a particular consumer or device*." *Id.* (emphasis added).

[8] While prior productions provided evidence ████████████████████████████████

████. *See* Shafiq Decl. at ¶¶ 16-17.

1    ████████████████████████████████████████████████████
     ████████).

2    • ████████████████████████████████████████████. *See id.* at
3    ¶ 22 (explaining that there are ████████████████████████████
     ████████).

4    This newly produced discovery directly undermines Google's contention that "none of the data

5    here is personally identifying" (Dkt. 475, Reply at 11, n. 18), and that it ████████████████

6    ████████████████████.[9]

7    **3.    Ongoing Production of Named Plaintiff Data Demonstrates that** ████████

8

9    Google's asserted consent is predicated on two documents, one of which is ████████████

10   ████████████.[10] Plaintiffs assert that the Chrome Privacy Notice and Google Terms of Service are

11   the only relevant documents. However, even if the ████████████ documents were also relevant,

12   Google's violation of key promises within the documents negates any claimed consent.

13   Specifically, Google violates the promise ████████████████████ which states that "Google

14   does not sell your personal information to anyone." Fair Decl. at ¶ 19. Google positioned this

15   promise so that it is *directly above* the "I AGREE" button and visible to the user at the time of

16   clicking "I AGREE" regardless of the device in use. *Id.*

17   However, a basic rule of consent is that "[i]f the person [purportedly] consenting to the

18   conduct of another is induced to consent by a substantial mistake concerning the nature of the

19   invasion of his interests or the extent of the harm to be expected from it and the mistake is known

20   to the other or is induced by the other's misrepresentation, the consent is not effective for the

21   unexpected invasion or harm." Restatement (Second) of Torts § 892B(2). Likewise, even "an overt

22   manifestation of assent" is not "effective … if the defendant knew, or probably if he ought to have

23   _____

     [9] To the extent that Google argues that the data it produced on October 28, 2022 does not mean
24   what it literally says, the Court should disregard it. Plaintiffs have sought production of this
     discovery since August 2020, and Magistrate Judge van Keulen initially ordered its production in
25   March 2021. The parties then went through the arduous Special Master process, with Magistrate
     Judge van Keulen eventually re-issuing the original order for Google to disclose the data parameters
26   contained in relevant logs.

     [10] The other document is the New Account Creation Agreement. But both documents specifically
27   incorporate by reference Google's Terms of Service, which, in turn, dictate that the service-specific
     Chrome Privacy Notice should govern over general policies. Thus, they are subservient to the
28   Chrome Privacy Notice.

1    known that the plaintiff was mistaken as to the nature and quality of the invasion intended." *Theofel*

2    *v. Farey-Jones*, 359 F.3d 1066, 1073-74 (9th Cir. 2004) *citing* Prosser & Keeton § 18, at 119. Per

3    *Theofel*, deception alone is "an independent ground for invalidating consent." *Id.* *citing*

4    Restatement (Second) of Torts § 892B(2)-(3) ("Allowing consent procured by known mistake to

5    serve as a defense would seriously impair the [ECPA's] operation."). In short, a defendant cannot

6    induce "consent" by making a false promise of an essential nature associated with it. *See Theofel*

7    *v. Farey-Jones*, 359 F.3d at 1073 (holding that there is "no refuge for a defendant who procures

8    consent by exploiting a known mistake that relates to the essential nature of his access").

9         Here, late-produced Named Plaintiff Data demonstrates that ███████████████████

10   ████████████████████████████████████████████████████████████. *See* Mot.

11   at 7 *citing, inter alia,* Fair. Decl. ¶¶ 18-31. But Prof. Shafiq's analysis of late-produced Named

12   Plaintiff Data shows that ██████████████████████████████████████████████████

13   ████████████████████████████████████. *See* Barnes Suppl. Decl. Ex. 76,

14   Shafiq Report, at ¶¶ 27-29.[11] This evidence was not produced until mid-2022, months after briefing

15   on Google's Motion was completed. *See id.* at ¶ 27. The below chart sets out the types of

16   information that are present in ███████████████████████████[12] *See id.* at ¶ 29.

17   Notably, the information produced from ████████████████████████████████████

18   ████████████████████████████. For example, the production contains, among other things,

19   █████████████████████████████████████████████████████████████

20   ████████████████████████████████████████

─────────────────────────────

[11] Other logs contain additional evidence about ███████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████. Upon request, Plaintiffs can present all or any

portion of the Named Plaintiff Data actually produced by Google to the Court for its review.

[12] This is just one example out of thousands that Google produced too late in the discovery process
for Plaintiffs to take any depositions asking Google employees about the results. Google did not
disclose Named Plaintiff Data from ███████████████████████████ until the spring of 2022
(Barnes Suppl. Decl. Ex. 76, Shafiq Report, at ¶ 27) even though Google created "pipelines" in
February 2021 to search, segregate, and preserve the data from Google's logging systems. *See* Dkt.
862-1, Order on Pls' Mot. for Sanctions, at pp. 21-22, ¶ 87.



*See* Barnes Suppl. Decl. Ex. 76, Shafiq Report, at ¶ 29.

As detailed by Prof. Shafiq, based on Google's internal and public documents describing RTB and this record, after Chrome sent this ██████████████████████████████████████████████████████████████████████████████████████████████████ *See id.* at ¶ 31. The particular content and identifiers ██████████████████████████████████████████████████████████████████████████████████████████████████ *See id.* at ¶ 32. ████████████████████ "Document Verticals" and "*Targeting Verticals*" for clearly sensitive profile categories, ██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

directly in "Document Verticals" and "Targeting_Verticals████████████████████████████████████████

**C.    LATE-PRODUCED "████████████" DOCUMENTS DEFEAT GOOGLE'S MOTION FOR SUMMARY JUDGMENT**

On September 8, 2022, the Court issued an order on Plaintiffs' Motion for Sanctions. *Dkt.* 862. In its findings of fact and conclusions of law, the Court ruled that Google unreasonably delayed in the production of several ███████████ Documents and, as a result, Google was prohibited from "objecting to the admissibility or use of the ██████████ final paper (GOOG-CABR-05885987) and the ██████████ interview notes (GOOG-CABR-05885871)." Dkt. 862-1, Order on Pls' Mot. for Sanctions, at pp. 45-46, at ¶ 14(a). Those two documents – GOOG-CABR-05885987 (Barnes Suppl. Decl. Exhibit 77) and GOOG-CABR-05885871 (Barnes Suppl. Decl. Exhibit 78) (together, the ██████████ Documents) are directly relevant to the arguments raised in Google's Motion. The ██████████ Documents contain recorded statements from Google executives agreeing that consumers had *not* consented to Google's practices. This, alone, should be dispositive of Google's Motion.

Among other things, in the final paper, Google's Privacy & Data Production Office ("PDPO") found that Google's "████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[13] Again, Plaintiffs object to Google making any argument or producing any new evidence that these documents do not mean what they literally say – on this or at any other point in time in this case. Plaintiffs requested this discovery in August 2020. By not producing it until well after the close of fact discovery, Google prevented Plaintiffs from seeking additional discovery on this topic. Google should not be allowed to benefit from its delay.

1  [REDACTED] ' Barnes Suppl. Decl. Ex. 77, GOOG-

2  CABR-05885987 at -988. The PDPO further advised: [REDACTED]

3  [REDACTED]

4  [REDACTED]

5  [REDACTED] ' *Id.* at -989.

6      The interview notes are similar. Among other things, as noted by Judge van Keulen in her

7  Findings of Fact, Google executives candidly stated:

8  - "If people were the deciders, they wouldn't take the deal, but they are not the deciders."

9  - "[O]ur ads system as design[ed] doesn't really give the user choice."

10 - "We have gaps in how our system works and what we promise to people."

   - "At Google, we still seem to believe in that fantasy that users agreed to this."

11 - "Consent is no longer consent if you think of ads as a product."

12 - "One example are all the controls that we have that have horrible names that don't mean anything to anyone, not even within the company."

13 - "When I look at UDC, what is sWAA v. WAA vs. YT? They don't make sense … and there are hidden functions that people don't know. Like Chrome sync and others that I

14   don't even understand and can't describe."

15 - There is "[n]o coherent and simple access to privacy controls across all apps, in Chrome and Android."

16 - "Everyone is concerned about their data being collected. They don't know about it and they don't know how to control it."

17 - The "[c]omplexity of the technology … is beyond the grasp of nearly everyone. … We

18   are transferring the onus of all that complexity from companies to users."

19 - "The fact that we can't explain what we have on you to users is probably our biggest challenge" on privacy. "I don't have the faintest idea what Google has on me."

20 - "Users have a right to know. The reasons we provide are so high level and abstract that they don't make sense to people."

21 - "I don't like the idea of [G]oogle having data about users that they can't say no to."

22 - "We know privacy is a core user need."

   - "Users don't know what is happening under the hood."

23 - "[Users] don't understand what is going on[.]…. They need to be equal stakeholders.

24   They don't understand what is going on."

25 - "Won't it creep people out to know how much we are paying attention?"

   - "Signup flows are not a good moment to explain or present these kinds of things to

26   users."

   - "We need to get to a degree of simplicity and honest[y] with the public and our users."

27

28 Barnes Suppl. Decl. Ex. 78, GOOG-CALH-05885871; *see also* Dkt. 862-1, Order on Pls' Mot. for

1   Sanctions, at pp. 35-38, ¶ 142.

2          Google withheld these interview notes until months after the close of fact discovery (and

3   months after briefing on Google's Motion had concluded. In response to Google's Motion,

4   therefore, Plaintiffs only had access to a few drafts of some of the interview notes quoted above.

5   On Reply, Google argued that Plaintiffs were "misquoting and misconstruing internal Google

6   emails and draft documents" and that "[i]nternal discussions by a handful of more than 150,000

7   people employed by Google" cannot defeat Google's consent argument. Dkt. 862-1, Order on Pls'

8   Mot. for Sanctions, at p. 33, ¶ 136. Google also argued that one of the documents merely "reflected

9   the author's scratch pad notes" and had nothing to do with Google's consent argument. *Id.*

10          However, contrary to Google's arguments on Reply, Plaintiffs now know that the

11   ██████████ project was a "cross-function' project of Google's Privacy and Data Protection

12   Office … that was began by a company vice-president and produced a 'final' presentation that had

13   four credited authors, 11 credited contributors, and 11 credited reviewers—including senior

14   executives." *Id.* at ¶ 140. The Court's sanctions order further noted that Google's PDPO was not a

15   random selection of people employed by Google, but that a 30(b)(6) deponent testified that PDPO

16   was a team that "was created to solely focus on" privacy and data protection matters at Google and

17   "is one of the primary teams with a focus on privacy and data protection at Google." *Id.* at ¶ 143.

18          These internal interview notes – which Plaintiffs contend are admissions – should  dispose

19   of Google's Motion because it is well-settled that "consent must be actual" and disclosures must

20   "explicitly notify users of the practice at issue." *Calhoun, et al. v. Google, LLC,* 526 F. Supp. 3d

21   605, at 620 (N.D. Cal. 2021) (internal citations omitted). Thus, to prevail on consent as a matter of

22   law, Google must demonstrate that its disclosures have only one plausible interpretation. *In re*

23   *Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019).

24   "[I]f a reasonable ... user could have plausibly interpreted the contract language as not disclosing

25   that [the defendant] would engage in particular conduct, then [the defendant] cannot obtain

26   dismissal of a claim about that conduct (at least not based on the issue of consent)." *Id.* at 789–90.

27   The late produced ██████████ documents go directly to this consent inquiry and demonstrate

28

that Google cannot establish as a matter of law that it obtained actual consent. Indeed, Google's own documentation establishes the contrary, that even users do not understand nor consent to Google's practices.

Binding Ninth Circuit law holds that courts should grant "no refuge for a defendant who procures consent by exploiting a known mistake that relates to the essential nature of his access." *Theofel v. Farey-Jones*, 359 F.3d at 1073. Here, there can be no "actual" consent where the defendant itself and its employees have called it a "fantasy," and said (1) it is "no longer consent if you think of ads as a product,"[14] (2) Google's approach was "out-of-step with user expectations," and (3) people "don't have the time or capacity to absorb all the details, let alone understand the precise impact their choices might have[.]" Barnes Suppl. Decl. Ex. 78, GOOG-CALH-05885871; *see also* Dkt. 862-1, Order on Pls' Mot. for Sanctions, at pp. 35-38, ¶ 142.

## III.    LATE DEPOSITION TESTIMONY OF SABINE BORSAY PRECLUDES SUMMARY JUDGMENT

On June 29, 2022, in the final deposition taken in this case, Google's Sabine Borsay, the lead product manager for Chrome, testified that, after users turn off sync,  Barnes Suppl. Decl. Ex. 79, Borsay Dep., at 133:4-10. More specifically, Ms. Borsay testified:

Q:

A:

Q:    …

A:

*Id.* at 134:20-135:11.

Ms. Borsay's understanding of the data flow from Chrome to Google

---

[14] Indeed, Google Ads, Google Display Ads, and Google Analytics are not listed among the more than 100 consumer-facing Google services that have "service-specific policies" that apply to use of that service. Barnes Suppl. Decl. ¶ 11. By contrast, Chrome is a service that has a "service-specific policy", and the Chrome Privacy Notice is expressly listed as one of three documents that govern a consumer's use of the Chrome service.

1

2  ███████████████████████████████████████ Indeed, Google's Motion

3  ████████████████ there is therefore a dispute about ███████████████

4  ███████████████ Employees inside of Ads, Display Ads, and Analytics admit to certain

5  aspects of the data flow. Employees of Chrome and Google's privacy systems deny it. If Chrome

6  employees cannot agree as to whether Chrome sends personal information to Google in the not

7  synced state, how can Google ask this Court to hold as a matter of law that reasonable users have

8  consented to it?

9  **IV.    CONCLUSION**

10      Based on the foregoing, and Plaintiffs' prior briefings and oral arguments, Plaintiffs request

11  that Google's Motion for Summary Judgment (Dkt. 395) be denied.

12  Dated: November 14, 2022          Respectfully submitted,

13

14  **BLEICHMAR FONTI & AULD LLP**          **DICELLO LEVITT LLC**

15  By:  */s/ Lesley Weaver*                By:  */s/ David A. Straite*
     Lesley Weaver (Cal. Bar No. 191305)    David A. Straite (admitted *pro hac vice*)
     Angelica M. Ornelas (Cal. Bar No. 285929)   Corban Rhodes (admitted *pro hac vice*)
16   Joshua D. Samra (Cal. Bar No. 313050)   485 Lexington Avenue, Tenth Floor
     555 12th Street, Suite 1600            New York, NY 10017
17   Oakland, CA 94607                      Tel.: (646) 933-1000
18   Tel.: (415) 445-4003                   Fax: (646) 494-9648
     Fax: (415) 445-4020                    *dstraite@dicellolevitt.com*
19   *lweaver@bfalaw.com*                   *crhodes@dicellolevitt.com*
     *aornelas@bfalaw.com*
20   *jsamra@bfalaw.com*                    Amy Keller (admitted *pro hac vice*)
                                            Adam Prom (admitted *pro hac vice*)
21   **SIMMONS HANLY CONROY LLC**           Sharon Cruz (admitted *pro hac vice*)
                                            Ten North Dearborn St., 6th Floor
22                                          Chicago, IL 60602
     By:  */s/ Jay Barnes*                  Tel.: (312) 214-7900
23   Jason 'Jay' Barnes (admitted *pro hac vice*)   *akeller@dicellolevitt.com*
     An Truong (admitted *pro hac vice*)    *aprom@dicellolevitt.com*
24   Eric Johnson (admitted *pro hac vice*)   *scruz@dicellolevitt.com*
     Jenny Paulson (admitted *pro hac vice*)
25   112 Madison Avenue, 7th Floor
     New York, NY 10016
26   Tel.: (212) 784-6400
     Fax: (212) 213-5949
27   *jaybarnes@simmonsfirm.com*
28

1   *atruong@simmonsfirm.com*
    *ejohnson@simmonsfirm.com*
2   *jpaulson@simmonsfirm.com*

3                                   *Counsel for Plaintiffs*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)

I, David A. Straite, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th Day of November, 2022, at New York, NY.

By _____/s/ David A. Straite_____
David A. Straite

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, David A. Straite, hereby certify that on November 14, 2022, I caused to be electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which will send electronic notification to all counsel of record.

/s/ David A. Straite
David A. Straite